# **<u>EXHIBIT 3</u>**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND CAPITAL
## MANAGEMENT, L.P.'S OBJECTION
## <u>TO MOTION TO WITHDRAW PROOF OF CLAIM</u>

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned chapter 11 case. I submit this Declaration in support of *Highland Capital Management, L.P.'s Objection to Motion to Withdraw Proof of Claim* (the "Objection") being filed contemporaneously with this Declaration. This Declaration is based on my personal knowledge and review of the documents listed below.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the August 4, 2022, deposition transcript of BH Equities, LLC, by and through its designated representative, Dustin Thomas.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of *SE Multifamily Holdings LLC Limited Liability Company Agreement* dated as of August 23, 2018.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the *Bridge Loan Agreement* dated as of September 26, 2018 among Highland Capital Management, LP, HCRE Partners, LLC, The Dugaboy Investment Trust, The SLHC Trust, Nexpoint Advisors, L.P., Nexpoint Real Estate Advisors IV, L.P., SE Multifamily Reit Holdings, LLC, and Certain Property Owners Listed Herein, collectively, as Borrower and The Lenders Party Hereto and KeyBank National Association, as Administrative Agent and KeyBanc Capital Markets, as Sole Lead Arranger and Bookrunner.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the August 11, 2021, deposition transcript of Rob Wills, Esquire.

2

6.     Attached hereto as **Exhibit 5** is a true and correct copy of the *SE Multifamily Holdings LLC First Amended and Restated Limited Liability Company Agreement* dated as of March 15, 2019, to be effective as of August 23, 2018.

7.     Attached hereto as **Exhibit 6** is a true and correct copy of HCRE Partners, LLC's Proof of Claim No. 146, filed on April 8, 2020.

8.     Attached hereto as **Exhibit 7** is a true and correct copy of *Nexpoint Real Estate Partners LLC'S Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1197] filed on October 16, 2020.

9.     Attached hereto as **Exhibit 8** is a true and correct copy of an email string between Bill Gameros and me dated March 31, 2022, April 4, 2022, and April 19, 2022.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of an email between Wade Carvell and me dated July 8, 2022.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of an email from Bill Gameros to me dated July 26, 2022.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of an email from Paul Broaddus to himself, Dusty Thomas, and Ben Roby (with a copy to Matt McGraner) dated March 15, 2019, which was attached to the BH Equities Transcript as Exhibit 5.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of an email string between Dusty Thomas and Paul Broaddus dated October 12, 2018, and March 15, 2019, which was attached to the BH Equities Transcript as Exhibit 6.

3

14.     Attached hereto as **Exhibit 13** is a true and correct copy of an email string from Paul Broaddus to Dusty Thomas dated March 15, 2019, which was attached to the BH Equities Transcript as Exhibit 7.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of an email string between Bill Gameros and me dated August 9, 2022, and August 10, 2022.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of a letter dated June 28, 2022, from Gregory Demo, Esq., to D. Wade Carvell, Esq.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of an email string among Deborah R. Deitch-Perez, Bill Gameros, Wade Carvell, Michael P. Aigen, and me dated July 13, 2022, and July 22, 2022.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated:  September 2, 2022                          */s/ John A. Morris*
                                                                    John A. Morris

# EXHIBIT 1

1      IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE NORTHERN DISTRICT OF TEXAS

3            DALLAS DIVISION

4    _____

5   IN RE:              )
                        ) CHAPTER 11
6   HIGHLAND CAPITAL        )
    MANAGEMENT, L.P.,        ) CASE NO. 19-34054-SGJ11
7                        )
     Reorganized Debtor.    )
8    _____ )

9

10

11

12

13        REMOTE ORAL DEPOSITION OF

14            BH EQUITIES, LLC

15   BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

16            DUSTIN THOMAS

17            Des Moines, Iowa

18          Thursday, August 4, 2022

19

20

21

22

23   REPORTED REMOTELY BY:

24   JANICE K. McMORAN, CSR, RDR, CRR, TCRR

25   JOB NO. 213053

**Page 2**

```
 1
 2
 3
 4
 5
 6          Thursday, August 4, 2022
 7          10:00 a.m. CST
 8
 9
10
11
12
13      REMOTE ORAL DEPOSITION OF BH EQUITIES,
14  LLC, BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
15  DUSTIN "DUSTY" THOMAS, produced as a witness
16  remotely via Zoom videoconference at the instance
17  of the Reorganized Debtor, and duly remotely sworn,
18  was taken in the above-styled and -numbered cause
19  on the 4th of August, 2022, from 10:00 a.m. Central
20  Time until 1:23 p.m. Central time, before Janice K.
21  McMoran, RDR, CRR, TCRR, and Certified Shorthand
22  Reporter in and for the State of Texas, reported
23  stenographically, with the witness appearing
24  remotely from his office in Des Moines, Iowa,
25  pursuant to the Federal Rules of Civil Procedure.
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3  APPEARING FOR THE REORGANIZED DEBTOR/PLAINTIFF:
 4    JOHN MORRIS, ESQ.
      HAYLEY WINOGRAD, ESQ.
 5    Pachulski Stang Ziehl & Jones LLP
      780 Third Avenue
 6    New York, New York 10017
 7
 8  APPEARING FOR NEXPOINT REAL ESTATE PARTNERS, LLC:
 9    CHARLES GAMEROS, JR., ESQ.
      Hoge & Gameros LLP
10    6116 North Central Expressway
      Dallas, Texas 75206
11
12
      APPEARING FOR THE WITNESS:
13
      CASEY DOHERTY, ESQ.
14      Dentons US LLP
        LyondellBasell Tower
15      1221 McKinney Street
        Houston, Texas 77010
16
17
18  APPEARING FOR WILLIAM T. NEARY, U.S. TRUSTEE:
19    LISA LAMBERT, ESQ.
      U.S. Department of Justice
20      Office of the United States Trustee
        1100 Commerce
21      Dallas, Texas 75242
22
23
24
25
```

**Page 4**

```
 1      A P P E A R A N C E S (CONTINUED)
 2
 2
 3  ALSO PRESENT:
 3
 4    La Asia Cantey -
 4        Pachulski Stang Ziehl & Jones LLP
 5    --
      Travis Sheets - General Counsel
 6        BH Companies
 7    Kyle Hougham - Corporate Counsel
          BH Companies
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          I N D E X
 2                      PAGE
 3  Appearances....................................3
 4  Proceedings.................................7
 5  WITNESS: DUSTIN "DUSTY" THOMAS
 6    Examination by Mr. Morris...................9
 7  Reporter's Certificate......................159
 8  Acknowledgment of Deponent...................161
 9  Errata......................................162
10
11
12
13          EXHIBIT INDEX
      BH EXHIBIT
14    NUMBER    DESCRIPTION          IDENTIFIED
15  EXHIBIT 1 - Notice and Subpoena issued to
              BH Equities, LLC.................16-17
16
      EXHIBIT 2 - First Amended and Restated
17        Limited Liability Company
          Agreement dated as of March 15,
18        2019 to be effective as of
          August 23, 2018 (BH0001238 -
19        BH0001266).......................40
20  EXHIBIT 3 - E-mail chain Re Unicorn Portfolio
          (BH0000091 - BH0000093)..........68
21
      EXHIBIT 4 - E-mail chain Re SEMF LLC
22        (BH0000133 - BH0000134)..........71
23  EXHIBIT 5 - E-mail from Paul Broaddus dated
          3/15/19; Re: First A&R LLCA of
24        SE Multifamily Holdings LLC
          (BH0001271 - BH0001273)..........74
25
```

**Page 6**

EXHIBIT INDEX (CONTINUED)

BH EXHIBIT
NUMBER    DESCRIPTION              IDENTIFIED
EXHIBIT 6 - E-mail chain Re: Unicorn
    Combined Underwriting
    (BH0001363 - BH0001367)..........80-81
EXHIBIT 7 - E-mail chain Re: Unicorn
    Combined Underwriting
    (BH0001437 - BH0001437)..........88
EXHIBIT 8 - E-mail from Paul Broaddus dated
    3/15/19; Re: First A&R LLCA of
    SE Multifamily Holdings LLC
    (BH0001140)......................94

EXHIBIT 9 - E-mail from Paul Broaddus dated
    7/25/19; Re: First A&R LLCA of
    SE Multifamily Holdings LLC
    (BH0000277 - BH0000282)..........95
EXHIBIT 10- E-mail from Paul Broaddus to Matt
    Mulcahy dated 9/10/20: Re: SE
    Multifamily Follow-up
    (BH0000716)......................103

EXHIBIT 11- Withdrawn and not identified......--

EXHIBIT 12- E-mail chain attaching 10/30/20
    Unicorn Distribution Calculation
    (BH0000192 - BH0000194)..........107

EXHIBIT 13- E-mail chain dated 6/9/2021
    Re: SE Multifamily Holdings
    (BH0000173 - BH0000174)........121-122

EXHIBIT 14- SE Multifamily 2019 Tax Return
    (BH0000010 - BH0000075)..........128
EXHIBIT 15- SE Multifamily 2020 K-1
    (BH0000076 - BH0000078)..........144

**Page 7**

BH EQUITIES, LLC - D. MILLER

P R O C E E D I N G S

THE REPORTER:  Today's date is August 4th, 2022.  The time is 10:00 a.m.

This is the oral deposition of Dustin Thomas, and it is being conducted remotely.  The witness is located at his office in Des Moines, Iowa.

My name is Janice McMoran, Texas CSR No. 1959.  I am administering the oath and reporting the deposition remotely by stenographic means from my residence in Granbury, Texas, on behalf of TSG Reporting.

Would counsel please state their appearances and locations for the record?

MR. MORRIS:  This is John Morris of Pachulski Stang Ziehl & Jones.  I'm in New Rochelle, New York.  N-E-W, second word, capital R-O-C-H-E-L-L-E.

MR. GAMEROS:  Bill Gameros here for NexPoint Partners, LLC.  I'm in Dallas.

MR. DOHERTY:  This is Casey Doherty for Dentons Law Firm.  I am in Houston, Texas.  I represent BH Equities.  I

**Page 8**

BH EQUITIES, LLC - D. MILLER

don't -- Travis Sheets is observing, but I'll let him introduce -- if he would like, he can introduce himself, but he will not be participating in the deposition.  The same with Kyle Hougham.

MR. SHEETS:  I'm Travis Sheets.  I am general counsel for BH Companies located in Des Moines, Iowa, and as Casey indicated, I'll just be observing today.

THE REPORTER:  I'm sorry.  I didn't hear the last part.

MR. SHEETS:  Oh, Travis Sheets, general counsel for BH Companies.  I'll be observing today.  I'm located in Des Moines, Iowa.

MR. HOUGHAM:  And Kyle Hougham, corporate counsel for BH Companies.  I'm located in Charlotte, North Carolina, also just observing today.

THE REPORTER:  And at this time, do counsel agree to allow me to swear the witness remotely?

MR. MORRIS:  Yes, please.

(Witness sworn.)

**Page 9**

BH EQUITIES, LLC - D. MILLER

MR. MORRIS:  Before we begin, Bill, can you give your verbal assent to having this deposition taken remotely?  I don't think I heard you.

MR. GAMEROS:  I definitely consent to that.  Thank you.

MR. MORRIS:  Okay.  Thank you.

DUSTIN "DUSTY" THOMAS, having been first duly remotely sworn, testified follows:

EXAMINATION

BY MR. MORRIS:

Q.  Good morning, Mr. Thomas.  My name is John Morris.  I'm an attorney at Pachulski Stang Ziehl & Jones, and we represent Highland Capital Management, L.P.  I just want to begin by thanking you for your time today and thanking you and your counsel for their cooperation in complying with the subpoena.  We appreciate the effort that's been undertaken; the expense, no doubt, that's been incurred to comply with the subpoena.  I think that's -- that's a sign of a good corporate citizen.  I just wanted to begin by saying that we

Page 10

BH EQUITIES, LLC - D. MILLER

1
2  appreciate that.
3      A.  Thank you.
4      Q.  Can you just state your name for the
5  record, sir?
6      A.  Yeah.  My name is Dustin Thomas.
7      Q.  Okay.  Mr. Thomas, are you employed
8  today?
9      A.  I am.
10     Q.  By whom?
11     A.  That's not as easy as it might sound.
12 But I work for BH Equities.  We have a parent
13 who I'm actually employed through with a master
14 services agreement.
15     Q.  Okay.
16     A.  And the parent is BH Management
17 Services.
18     Q.  And do you have a title?
19     A.  I do.  I'm managing director of
20 capital markets and investor relations.
21     Q.  Have you ever been deposed before?
22     A.  I have one other time.
23     Q.  Was it in a personal capacity or in a
24 business?
25     A.  It was in a corporate capacity as a

Page 11

BH EQUITIES, LLC - D. MILLER

1
2  just information witness.
3      Q.  And how long ago was that?
4      A.  Approximately three years, three and
5  a half.
6      Q.  So really simple ground rules here.
7  This is a deposition where I am going to ask
8  questions and you'll provide answers.  It's
9  important that you allow me to finish my
10 question before you begin an answer.  Is that
11 fair?
12     A.  That is fair.
13     Q.  And I will attempt to do the same and
14 allow you to finish your answer before I begin
15 a question, but if I fail to do so, will you
16 let me know that?
17     A.  I will do my best.
18     Q.  If there's something that I ask that
19 you don't understand, will you let me know
20 that?
21     A.  I will.
22     Q.  If you need a break at any time, feel
23 free to let me know and I'll do my best to
24 accommodate you.  I only request that you not
25 seek a break while a question is pending.  Is

Page 12

BH EQUITIES, LLC - D. MILLER

1
2  that fair?
3      A.  That is fair.
4      Q.  Okay.  From time to time, a lawyer
5  might object to a question.  Allow the lawyers
6  to do their job and figure out what to do with
7  the objection before you begin your answer.  Is
8  that understood?
9      A.  That is understood.
10     Q.  Okay.  So what are your duties and
11 responsibilities as a managing director of BH
12 Equities?
13     A.  I -- BH Equities invests in various
14 partnerships of real estate, and when we
15 invest, I help with the structure of those,
16 both debt and equity investment.  And if we
17 have outside capital, I'm a liaison for that
18 outside capital.
19     Q.  So that -- is it fair to say that the
20 nature of the business of BH Equities is to
21 invest in real estate partnerships, or at least
22 the primary business?
23     A.  I would say that, yeah, alongside
24 sourcing investment opportunities for partners.
25     Q.  How long have you been with BH

Page 13

BH EQUITIES, LLC - D. MILLER

1
2  Equities?
3      A.  Counting on my fingers, sorry.  A
4  little over six years.
5      Q.  And were you employed before being
6  employed by BH Equities?
7      A.  I was.
8      Q.  Can you describe just briefly your
9  professional background?
10     A.  Yeah.  Prior to BH Equities, I was a
11 partner in a private equity fund acquiring
12 small businesses of, you know, 5 to 10 million
13 of EBITDA.  And prior to that, I was in private
14 investment on the balance sheet of a power
15 company.
16     Q.  Did you graduate from college?
17     A.  I did.
18     Q.  Where did you go to college?
19     A.  Simpson College, a liberal arts
20 school in, Indianola, Iowa.
21     Q.  Do you have any graduate degrees?
22     A.  I do.  I have a master's in business
23 from the University of Iowa.
24     Q.  Do you hold any licenses or
25 certificates?

Page 14

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2        A. I do. I hold the chartered financial
3    analyst designation and the chartered
4    alternative investment analyst designation.
5        Q. Within the BH Equities corporate
6    structure, to whom do you report?
7        A. I report to Travis Sheets, our
8    general counsel.
9        Q. Have you spoken with -- are you
10    familiar with the entity called HCRE or what
11    was known as HCRE?
12        A. Only through our transactions.
13        Q. And have you spoken with anybody that
14    you believed was acting on behalf of HCRE in
15    connection with today's deposition?
16        A. I have not.
17        Q. Do you know whether anybody acting on
18    behalf of BH Equities has communicated with
19    anybody acting on behalf of HCRE concerning
20    today's deposition?
21        A. Not to my knowledge.
22        Q. I'd like to -- so from time to time
23    today, I'm going to ask my assistant, La Asia
24    Canty, to put some documents on the screen.
25    You know, this is not a test. Some of the

Page 15

BH EQUITIES, LLC - D. MILLER

1    documents that we'll put up there, obviously,
2    are very lengthy. I'm going to show you
3    portions of documents. It would be much easier
4    if we were in a room together. So that if you
5    think that there's portions of a document that
6    you need to read in order to -- in order to
7    have context, in order to kind of fully
8    understand the questions that I'm asking, will
9    you let me know that?
10        A. I will.
11        Q. Okay. So the first document that I'd
12    like to put up on the screen, which we've
13    marked as, let's call it BH-1, is the subpoena,
14    the amended subpoena that Highland served in
15    this case.
16        And before we get to that, actually,
17    I just want to deal with a few definitions.
18        As I mentioned at the beginning I
19    represent Highland Capital Management, L.P.
20    I'm going to try to refer to that entity as
21    HCMLP. Is that fair?
22        A. Yep, I understand that.
23        Q. Okay. And then there's another
24    entity that was a party to the amended and

Page 16

BH EQUITIES, LLC - D. MILLER

1    restated LLC agreement that we'll talk about in
2    a few minutes that was called HCRE Partners,
3    LLC. I think you told me that you're familiar
4    with that entity, right?
5        A. Yes.
6        Q. And if I use the -- if I use the term
7    HCRE, that's the entity that I'll be referring
8    to, okay?
9        A. Uh-huh.
10        Q. And you're familiar with an entity
11    called SE Multifamily Holdings, LLC; is that
12    right?
13        A. Yeah.
14        Q. All right. I may refer to that
15    either as SE Multifamily or SEM. Is that fair?
16        A. Yes.
17        Q. Okay. And then I'm going to refer to
18    the entity either that you're employed by or
19    that you have a shared services agreement with
20    as either BH or BH Equities, okay?
21        A. Understood.
22        (Exhibit 1 marked.)
23        Q. Okay. So let's go back to the
24    subpoena. Have you seen this document before?

Page 17

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2        A. I have.
3        Q. Okay. And is it your understanding,
4    are you aware that you're giving testimony
5    today in your capacity as a corporate
6    representative of BH Equities?
7        A. Yes, I am aware.
8        Q. Okay.
9        MR. MORRIS: Can we go to, I guess
10        it's page 2 of the attachment? Yeah,
11        right there.
12    BY MR. MORRIS:
13        Q. Have you seen these topics before
14    today?
15        A. Yes, sir.
16        Q. And are you prepared to testify on
17    behalf of BH Equities as to each of these
18    topics?
19        A. I am.
20        Q. Did you do anything to prepare for
21    today's deposition?
22        A. I did.
23        Q. What did you do?
24        A. I reviewed the bulk of our discovery.
25    And, pardon me, the legal terms are not second

Page 18

BH EQUITIES, LLC - D. MILLER

1  nature to me. And then I talked with Matt
2  Mulcahy, as our BH Equities controller as well,
3  on a couple of clarifications.
4      Q. And when you used the phrase "the
5  bulk of discovery," you're talking about the
6  documents that BH Equities produced to Highland
7  in response to the subpoena. Do I have that
8  right?
9      A. Correct.
10     Q. Okay. And can you tell me for the
11 record who -- it's Matt Mulcahy?
12     A. Mulcahy, yes.
13     Q. Okay. Who is Mr. Mulcahy?
14     A. Mr. Mulcahy is the controller for BH
15 Equities and its, you know, various investment
16 subsidiaries.
17     Q. Did Mr. Mulcahy play any role in
18 connection with the SE Multifamily transaction?
19     A. He would have coordinated certain
20 accounting matters.
21     Q. Other than Mr. Mulcahy and BH
22 Equities' counsel, did you speak with anybody
23 else to prepare for today's deposition?
24     A. No, not directly.

Page 19

BH EQUITIES, LLC - D. MILLER

1      Q. Did you speak with or communicate
2  with anybody indirectly?
3      A. Only review of e-mails that would
4  have been part of the discovery package that we
5  shared.
6      Q. Okay. So looking at the screen,
7  we're just going to take them one at a time.
8  Do you see topic 1 there?
9      A. Yes, sir.
10     Q. Have you reviewed, to the best of
11 your knowledge, all of the written
12 communications between BH Equities and either
13 HCRE or HCMLP relating to the amended
14 agreement?
15     A. To the best of my knowledge, I have.
16     Q. Okay. And there's another phrase
17 that I want to get out there. The subpoena
18 defined amended LLC agreement as the agreement
19 that was entered into on March 15th, 2019. Are
20 you aware of that?
21     A. I am.
22     Q. All right. I may from time to time
23 today use the phrase "amended agreement," and
24 that's the agreement that I'll be referring to.

Page 20

BH EQUITIES, LLC - D. MILLER

1  Do you understand that?
2      A. I do.
3      Q. Okay. So other than -- other than
4  your conversations with counsel and Mr. Mulcahy
5  and your review of the e-mails that BH
6  produced, that's the totality of your
7  preparation for topic number 1? Do I have that
8  right?
9      A. Alongside with reading the agreement
10 several times.
11     Q. Okay. I appreciate that.
12     Topic number 2 is Schedule A,
13 including all communications with either HCMLP
14 or HCRE concerning that Schedule A.
15     Do you have an understanding of what
16 Schedule A is?
17     A. I do.
18     Q. And do you believe that you are
19 adequately prepared to testify as to that
20 topic?
21     A. I do.
22     Q. Is there anybody that you think you
23 should have spoken to about that topic that you
24 kind of forgot to or that you wish you had?

Page 21

BH EQUITIES, LLC - D. MILLER

1      A. No. No. I came prepared.
2      Q. Okay. Topic number 3 concerns your
3  interests in SE Multifamily, including
4  distributions or allocations made to you. And,
5  as you may know, "you" is defined in the
6  subpoena as BH Equities. Are you prepared to
7  testify as to that topic?
8      A. I am.
9      Q. And, again, same answer for all four
10 topics, the scope of document review are the
11 documents that BH produced, correct?
12     A. Correct.
13     Q. Okay. And topic number 4 -- there's
14 a reference to paragraph 5 of the response. Do
15 you see that at the end of topic 4?
16     A. Yes.
17     Q. Okay. Have you seen that response?
18     A. I believe I have.
19     MR. DOHERTY: Just one second. Could
20 we see what the response is defined as in
21 the subpoena, Mr. Morris?
22     MR. MORRIS: Sure, we can scroll up.
23     MR. DOHERTY: Pardon me. I forgot
24 which one it is.

Page 22

BH EQUITIES, LLC - D. MILLER

1
2    MR. MORRIS: No problem. It's just
3    NexPoint's written response to the claim
4    objection.
5    MR. DOHERTY: Okay. Thank you,
6    Mr. Morris.
7    BY MR. MORRIS:
8    Q. All right. So let's go back to the
9    topic. Mr. Thomas, have you personally ever
10   seen the response?
11   A. I believe that was provided to me,
12   and I did review it.
13   Q. Okay. And BH Equities is aware today
14   of HCRE's contention as set forth in paragraph
15   5, right?
16   A. I believe so.
17   Q. Do you know when BH Equities first
18   learned -- actually, I'm going to use a defined
19   term just to make our lives simpler. The
20   quotation that we have in topic 4 says, "All
21   facts and communications concerning HCRE's
22   contention that" -- and then there's a
23   quotation.
24      Do you see that?
25   A. Yes, sir.

Page 23

BH EQUITIES, LLC - D. MILLER

1
2    Q. If I -- if I use the phrase
3    "contention," will you know that I'm meaning
4    that very quotation right there?
5    A. I can understand that, yes.
6    Q. Okay. So when did -- when did BH
7    Equities first learn of HCRE's contention?
8    A. I don't know for sure exactly when we
9    first learned. I couldn't give you an exact
10   date as to when corporately we learned about
11   that contention. But we have been aware of it.
12   Q. Can you tell me what year BH Equities
13   first learned of the contention?
14   A. I don't know exactly when we would
15   have learned of that contention, no.
16   Q. Okay. I'll come back to this with
17   more specificity later on.
18   MR. MORRIS: Let's take this down.
19   BY MR. MORRIS:
20   Q. And let's kind of cut to the chase a
21   little bit. BH Equities entered into the
22   amended agreement with HCMLP and HCRE and
23   Liberty on March 15, 2019, correct?
24   A. Correct.
25   Q. Okay. And you're aware that that

Page 24

BH EQUITIES, LLC - D. MILLER

1
2    agreement was effective as of August 23rd,
3    2018, correct?
4    A. I am.
5    Q. Okay. Did you personally have any
6    role in the negotiation of the amended
7    agreement?
8    A. I was involved in the back and forth
9    and working with parties during the -- that
10   time period to -- as the agreement was -- was
11   going back and forth.
12   Q. Were there any particular issues that
13   you were personally focused on?
14   A. Yes. The allocation -- the biggest
15   issue was getting capital back to the parties
16   prior to any allocations on percentages or
17   those things that I was focused on.
18   Q. Can you identify -- when did you
19   first get involved in this project? Do you
20   recall?
21   A. Prior to the closing of the purchase
22   of the assets, I would have been involved.
23   Q. And when was the closing?
24   A. I believe it was September 26th of
25   2018.

Page 25

BH EQUITIES, LLC - D. MILLER

1
2    Q. Can you identify for me all of the
3    people acting on behalf of BH Equities that
4    were, you know, primarily responsible for
5    negotiating the amended agreement?
6    A. Myself, Ben Roby, and Joanna
7    Zabriskie, our president and CEO, would have
8    been the most actively involved.
9    Q. Did you have legal counsel involved
10   in the review and negotiation or drafting of
11   the amended agreement?
12   A. We did.
13   Q. And who was that?
14   A. Nick Roby, previously Davis Brown,
15   which is now part of Dentons.
16   Q. So in addition to yourself and the
17   president and Ben, you had outside counsel? Do
18   I have that right?
19   A. Yes.
20   Q. Is there anybody else within BH
21   Equities who was involved in the negotiation,
22   drafting, or review of the amended agreement?
23   A. Off the top of my head, I'm sure
24   Travis Sheets would have been copied, at least
25   on correspondence.

Page 26

1        BH EQUITIES, LLC - D. MILLER
2        Q.  Now, there were three other parties
3    to the amended agreement, right?  Liberty,
4    HCRE, and HCMLP.  Do I have that right?
5        A.  Yes, that's my understanding.
6        Q.  Are you able to identify for me the
7    people who were representing the interests of
8    each of those parties and the drafting,
9    negotiation, and execution of the amended
10   agreement?  And if you want me to take them one
11   at a time, I'm happy to.
12       A.  Yeah, that would be...
13       Q.  From BH Equities' perspective as you
14   were negotiating this agreement, did BH
15   Equities form a view that HCMLP and HCRE and
16   Liberty were related parties?
17       A.  Yes.
18       Q.  And did -- was this more of a
19   bilateral negotiation between BH Equities on
20   the one hand and HCMLP and HCRE and Liberty on
21   the other hand?
22       A.  Yes.
23       Q.  Can you identify the people who were
24   working on behalf of -- withdrawn.
25           Based on that, for convenience I'm

Page 27

1        BH EQUITIES, LLC - D. MILLER
2    going to use the phrase "Highland" to refer
3    to -- withdrawn.
4        I'm going to use the phrase
5    "Highland" to refer to HCRE, HCMLP, and
6    Liberty.  Is that okay?
7        A.  That's okay, yes.
8        Q.  Okay.  Can you identify for me the
9    individuals who were representing the interests
10   of Highland in connection with the negotiation
11   of the amended agreement?
12       A.  I can identify my primary
13   correspondence during that time.  Is that
14   acceptable?
15       Q.  Sure.
16       A.  I was primarily corresponding with
17   Paul Broaddus.  Freddy Chang was cc'd on much
18   of the correspondence and occasionally chimed
19   in.  And then only by copy of e-mail, I
20   believe, Wick Phillips was the law firm
21   representing and working with them.
22       Q.  And was Wick Phillips involved in the
23   drafting, negotiation, or review of the amended
24   LLC agreement, to the best of your knowledge?
25       A.  I can't say for certain because I

Page 28

1        BH EQUITIES, LLC - D. MILLER
2    didn't correspond with them directly.
3        Q.  Fair enough.
4            How about Matt McGraner?  Is he
5    somebody who was involved on behalf of Highland
6    in the negotiation, drafting, and review of the
7    amended agreement?
8        A.  I did not have direct correspondence
9    with Mr. McGraner on the topic.
10       Q.  Do you know -- was there anybody
11   involved in the negotiation or drafting of the
12   agreement who BH Equities believed was looking
13   out exclusively for the interests of HCMLP?
14       A.  As -- you know, kind of in the
15   framing of your question, we were viewing them
16   as a bilateral entity.  So -- so I can't say
17   for certain if they were or weren't as to
18   who -- who was looking after what interest.
19       Q.  And that's all I'm asking for is the
20   perspective of BH Equities, was there anybody
21   from BH Equities' perspective that BH Equities
22   believed was looking out only for HCMLP's
23   interests?
24       A.  Again, we viewed them as related
25   parties and coordinating amongst themselves as

Page 29

1        BH EQUITIES, LLC - D. MILLER
2    necessary.  But we viewed it as a bilateral
3    negotiation, as you framed it.
4        Q.  Did you ever -- to the best of your
5    knowledge, did BH Equities ever communicate
6    with anybody who claimed to represent the
7    exclusive interests of Liberty?
8        A.  Not to my knowledge.
9        Q.  And to the best of BH Equities'
10   knowledge, did anybody ever represent to BH
11   Equities that there was an individual who was
12   looking out for the exclusive interests of
13   HCRE?
14       A.  Again, we lumped HCRE and HCM kind of
15   together as the two -- the two large parties
16   kind of, you know, related and things.  So
17   exclusively, no, given that context.
18       Q.  Okay.  Are you familiar with the
19   phrase "Project Unicorn"?
20       A.  I am.
21       Q.  Do you have an understanding of what
22   that phrase means?
23       A.  Yes.
24       Q.  And what's your understanding of the
25   phrase "Project Unicorn"?

1    BH EQUITIES, LLC - D. MILLER
2    A. Project Unicorn was a marketing
3  phrase for a portfolio of -- I believe it was
4  26 properties marketed by -- by CBRE as
5  Starwood was -- as Starwood or Starwood
6  affiliates were selling these properties, and
7  they were purchased by SE Multifamily LLC.
8    Q. All right. Do you know why this
9  project was given the name Project Unicorn?
10    A. No, sir.
11    Q. Sometimes people use the word unicorn
12  to refer to something unique. Did you ever
13  participate in any discussions with anybody
14  where they suggested that they were, you know,
15  unique or rare features of a transaction of
16  this type?
17    A. My understanding is the designation
18  was given by the marketing firm, which would be
19  in line with precedent that the investment bank
20  or brokerage firm would give the project its
21  name. And it's typically under -- included in
22  the NDA and things like that.
23    Q. Okay. Do you know when BH Equities
24  first learned of Project Unicorn?
25    A. Specifically, no. It would have been

1    BH EQUITIES, LLC - D. MILLER
2  the summer of 2018.
3    Q. Do you know how BH Equities learned
4  about Project Unicorn?
5    A. I believe it was introduced to us
6  through the -- I'm going to use your term
7  prior, kind of Highland broadly, the HCRE, HCM,
8  you know, group.
9    Q. Is BH Equities aware that HCRE and
10  HCMLP entered into an LLC agreement with
11  respect to SE Multifamily in August of 2018?
12    A. We were given copies of that at some
13  point along the way, yes.
14    Q. Are you aware that HCRE, HCMLP, and
15  certain other borrowers obtained a loan from
16  KeyBank in September 2018 related to Project
17  Unicorn?
18    A. Yes.
19    Q. Did BH Equities have anything to do
20  with the KeyBank loan?
21    MR. GAMEROS: Objection -- objection,
22  form.
23  BY MR. MORRIS:
24    Q. That's fair. Let me restate the
25  question, Mr. Thomas. BH Equities is not a

1    BH EQUITIES, LLC - D. MILLER
2  signatory to the KeyBank loan, is it?
3    A. That's correct.
4    Q. Okay. Did BH Equities provide any
5  services or any resources, including capital of
6  any kind, in connection with the negotiation or
7  drafting of the KeyBank loan?
8    A. That's a bit nuanced. There was
9  underwriting and things like that done on
10  behalf of all parties involved. Underwriting,
11  diligence, those kinds of things, which I'm
12  certain was used as part of the negotiation
13  work with KeyBank to secure the loan.
14    Q. Were you working with Highland on
15  obtaining the KeyBank loan?
16    A. Again, it's nuanced. Directly
17  working as an agent or things like that, no.
18    Q. Were they keeping you informed?
19    A. In parts, yes. It was an important
20  capitalization to the transaction.
21    Q. Is it BH Equities' understanding that
22  the KeyBank loan was a necessary component to
23  the closing of the transaction on September
24  26th?
25    A. Yes.

1    BH EQUITIES, LLC - D. MILLER
2    Q. SEC Multifamily -- withdrawn.
3    To the best of BH Equities'
4  knowledge, SE Multifamily could not have
5  financed the acquisition of the 26 properties
6  at the end of September without obtaining the
7  KeyBank loan; is that fair?
8    A. That's my understanding.
9    Q. Did there come a time when
10  BH Equities began to negotiate with Highland
11  about a potential participation interest in SE
12  Multifamily?
13    A. Yeah, it was always expected we would
14  participate in the -- in the LLC through
15  capital and, you know, sharing of return of
16  capital and profits and things, yes.
17    Q. Okay. Focusing solely on 2018, did
18  BH Equities loan any money to SE Multifamily in
19  the year 2018?
20    A. Not to my knowledge.
21    Q. Do you know if BH Equities loaned
22  money to anybody in connection with Project
23  Unicorn in 2018?
24    A. Not -- not to my knowledge.
25    Q. And as opposed to loans, do you know

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  whether BH Equities made any investment in SE
3  Multifamily in the year 2018?
4     A.  Yes, we did.
5     Q.  Okay.  Can you describe for me the
6  investment that BH Equities made in SE
7  Multifamily in 2018?
8     A.  The investment in totality was
9  approximately 21.5 million, I believe.
10    Q.  And when you say it was made in 2018,
11  is that because the agreement was ultimately
12  made effective as of August 2018, or was the
13  actual cash -- well, withdrawn.  Let me ask
14  this.
15       You mentioned a $21 million
16  investment.  Is that an actual cash outlay by
17  BH Equities?
18    A.  Yes.
19    Q.  And where did that money go, do you
20  know?
21    A.  It went to purchase the properties.
22    Q.  And do you know when BH Equities made
23  the $21 million investment?
24    A.  It would have been in traunches
25  between the -- and, again, I'm using air quotes

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  here -- the broad Highland group entities,
3  HCRE, HCM, et cetera.  There are expenses
4  leading up such as, you know, earnest money,
5  loan app fees, those kind of things, and we
6  would have likely shared in parts of that.  And
7  then by the time the transaction closed on
8  September 26th, the remaining funds would have
9  been invested, likely funded through title,
10  potentially a little bit directly to a bank
11  account.  But the bulk would have gone through
12  title or to pay for pre- -- preclosing
13  expenses.
14    Q.  And so do I have this right, that BH
15  Equities laid out the $21 million in 2018
16  before there was an actual written agreement?
17    A.  That is correct.
18    MR. DOHERTY:  Objection, form.
19  BY MR. MORRIS:
20    Q.  Was the $21 million investment the
21  subject of negotiation?  Like, how was that
22  number arrived at?
23    A.  It was -- it was a number used to
24  close the transaction, and all parties were
25  aware that BH was investing that money as a

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  member of SE Multifamily at that time.  So it
3  was a known fact amongst all the parties
4  participating.
5     Q.  And when you use the phrase
6  "parties," are you talking about the parties
7  that ultimately became members of SE
8  Multifamily or something else?
9     A.  Yes.  Yeah, the additional members
10  and parties there.
11    Q.  Do you know if KeyBank was aware of
12  the role that BH Equities was playing?
13    A.  I don't know specifically, as we
14  weren't involved.  I would assume so, though.
15    Q.  Prior to 2018, had any agreement been
16  reached on the nature of the interest that
17  BH Equities was going to receive in exchange
18  for its $21 million investment?
19    A.  I don't believe there was anything
20  formal fully agreed to at that time.
21    Q.  BH Equities ultimately obtained a
22  6 percent interest in SE Multifamily, right?
23    A.  It's more nuanced than that.  I'm
24  sorry, I don't mean to avoid the question, but
25  given the -- written how capital flows and

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  things like that, it's more nuanced than just
3  the 6 percent.  So I -- so I wouldn't say that
4  we only had a 6 percent interest, so to speak.
5     Q.  How would you characterize
6  BH Equities' interest in SE Multifamily?  How
7  would you describe it?
8     A.  The expectation was we would give
9  capital back, and then the residual interest
10  thereafter was what was up for negotiation.
11    Q.  What do you mean, it was up for
12  negotiation?
13    MR. DOHERTY:  Objection.  And I don't
14  want to make it -- John, you can tell me
15  not to say anything.  I think I see a
16  disconnect, but if you want me to let you
17  proceed, I will.
18    MR. MORRIS:  Yeah, go ahead, Casey.
19  I appreciate it.  Go ahead.
20    MR. DOHERTY:  Okay.  I think there
21  might be a disconnect on -- with at least
22  for me on the time -- the time frame for
23  the question, about after the amended
24  agreement or before about --
25    MR. MORRIS:  Ah, okay.

Page 38

1 BH EQUITIES, LLC - D. MILLER
2  MR. DOHERTY: That's just my humble
3 suggestion there, but I'll -- okay. All
4 right.
5  MR. MORRIS: I appreciate that.
6 BY MR. MORRIS:
7  Q. In the amended agreement as executed,
8 did BH Equities obtain a 6 percent equity
9 interest in SE Multifamily?
10  A. Again, it's more nuanced than that.
11 We have six -- we have an interest of 6 percent
12 after the return of capital and those things,
13 as the agreement was written.
14  Q. Okay. So after capital is returned,
15 SE Multifamily -- withdrawn.
16  After the original capital investment
17 is returned, BH Equities would have a 6 percent
18 interest in SE Multifamily. Do I have that
19 right?
20  A. Yes, that's a correct
21 characterization.
22  Q. Okay. And at what point in time was
23 an agreement reached that BH Equities would
24 receive 6 percent of SE Multifamily after the
25 return of the initial capital? Was that done

Page 39

1 BH EQUITIES, LLC - D. MILLER
2 in 2018? I'm just trying to get a timeline.
3  A. That was -- that was finalized in
4 March of '19 formally.
5  Q. Okay. So at the time in 2018 that
6 BH Equities laid out the $21 million, there not
7 only had not been a written agreement, but
8 there had not yet been an agreement as to the
9 nature and extent of BH Equities' interest in
10 SE Multifamily. Is that fair?
11  MR. DOHERTY: Objection, form.
12  You may answer, Mr. Thomas.
13  A. I don't think that it's fair. There
14 was multiple discussions and things like that.
15 No written agreement is fair. But there was
16 ongoing discussions trying to formalize things.
17  Q. Okay. Let's turn our attention to
18 HCRE. Do you know whether HCRE ever loaned any
19 money to SE Multifamily?
20  A. I don't believe they did.
21  Q. Do you know if HCMLP ever loaned any
22 money to SE Multifamily?
23  A. Could I ask for clarification around
24 the idea of "loan," just so we're on the same
25 page there? For both HCRE and HCM. I just

Page 40

1 BH EQUITIES, LLC - D. MILLER
2 want to make sure I'm answering the question
3 you're asking here.
4  Q. Sure. Like a loan like an IOU where
5 you give someone money with the expectation
6 that it would be returned with interest that's
7 not -- that's not dependent on the outcome of
8 the enterprise.
9  A. No, I don't believe there were any
10 loans provided by either party.
11  Q. All right. Let's get to the LLC
12 agreement itself.
13  MR. MORRIS: If we can put that on
14 the screen. We'll mark it as BH
15 Exhibit 2.
16  (Exhibit 2 marked.)
17 BY MR. MORRIS:
18  Q. And you've seen this document before,
19 right, sir?
20  A. Yes, sir.
21  Q. And you've reviewed it in preparation
22 for today's deposition, correct?
23  A. I have.
24  Q. All right.
25  MR. MORRIS: If we could go to the

Page 41

1 BH EQUITIES, LLC - D. MILLER
2 signature page.
3 BY MR. MORRIS:
4  Q. Do you see that the document was
5 signed on behalf of HCMLP and HCRE by James
6 Dondero?
7  A. I do.
8  Q. Do you know who Mr. Dondero is?
9  A. Yes.
10  Q. And who do you understand Mr. Dondero
11 to be?
12  A. My understanding is he was a primary
13 owner of both parties and a manager or
14 executive in that capacity as well, you know,
15 CEO type.
16  Q. And what's the basis for that
17 understanding?
18  A. Just understanding of the parties',
19 you know, business as -- you know, and our
20 perspective as a partner.
21  Q. Did anybody from Highland ever
22 explain to you or anybody at BH Equities who
23 Mr. Dondero was?
24  A. Not specifically, no. But -- at
25 least not to my understanding.

1       BH EQUITIES, LLC - D. MILLER
2       MR. MORRIS: Can we scroll down to --
3   BY MR. MORRIS:
4       Q.   Do you see that right there is the
5   signature of Grant Scott, the director of
6   Liberty CLO Holdco, Ltd.?
7       A.   I do.
8       Q.   Do you know who Mr. Scott is?
9       A.   I do not.
10      Q.   Did you ever speak with Mr. Scott?
11      A.   I don't believe so.
12      Q.   Do you know if anybody on behalf of
13  BH Equities ever communicated with Mr. Scott in
14  any way about this amended agreement?
15      A.   Not to my knowledge.
16      Q.   Did you ever see any comments that
17  were made on behalf of Liberty concerning this
18  agreement?
19      A.   No.
20      Q.   Is it fair to say that there were
21  various drafts of this agreement prepared
22  before it was signed?
23      A.   Yes.
24      Q.   Do you recall when the first draft
25  was prepared?

1       BH EQUITIES, LLC - D. MILLER
2       A.   I believe it was on March 14th.
3       Q.   Who was the scribner, if you will?
4   Who was in charge of drafting this amended
5   agreement?
6       MR. DOHERTY: Objection, form.
7       MR. MORRIS: Withdrawn.
8   BY MR. MORRIS:
9       Q.   Do you know who drafted this amended
10  agreement?
11      A.   I do not specifically, no.
12      Q.   Was it Highland or was it
13  BH Equities?
14      A.   It was not BH --
15      MR. DOHERTY: Objection -- hold on.
16      THE WITNESS: I'm sorry.
17      MR. DOHERTY: It's hard virtually,
18  Mr. Thomas.
19      Objection. Objection, form. I'm
20  sorry. You can answer the question.
21      A.   BH Equities was not the drafter.
22  BY MR. MORRIS:
23      Q.   And so is it fair to say from
24  BH Equities' perspective that BH Equities
25  provided comments to drafts that were created

1       BH EQUITIES, LLC - D. MILLER
2   by Highland?
3       A.   Yes.
4       Q.   Do you recall how many drafts of the
5   agreement the parties went through?
6       A.   A specific number, no. A handful, to
7   give it, you know, an order of magnitude, I
8   guess.
9       MR. MORRIS: Can we scroll to the
10  next one, please?
11  BY MR. MORRIS:
12      Q.   There's the signature of Ben Roby.
13  Do you see that?
14      A.   Yes, sir.
15      Q.   That's the person that I think you
16  identified earlier today as someone who was
17  involved in Project Unicorn on behalf of
18  BH Equities. Do I have that right?
19      A.   Correct.
20      Q.   And I apologize if you testified to
21  this earlier, but can you remind me, then, of
22  what role Mr. Roby played within BH Equities?
23      A.   At the time he was an acquisition
24  manager focused on acquiring properties in
25  which we made investments.

1       BH EQUITIES, LLC - D. MILLER
2       Q.   Was there an internal process for
3   reviewing documents like this before execution?
4       MR. DOHERTY: Objection. I want to
5   say, too -- I think this question is fair,
6   but if it goes into what attorneys said or
7   did, Mr. Thomas, you're not to go into
8   details of it.
9       But I just wanted to qualify that,
10  Mr. Morris, for the question. It's a fair
11  question, but I just wanted to make that
12  statement.
13      Go ahead, Mr. Thomas.
14      A.   Yeah, this agreement was somewhat
15  fast moving. So I would say it didn't go
16  through the typical process. But Ben, Joanna,
17  and myself were communicating frequently over
18  the couple of days as it was going back and
19  forth.
20      Q.   Does BH Equities believe today that
21  it had sufficient time to review the document
22  before signing?
23      A.   I believe we knew -- I believe we
24  understood the economics portion of the
25  document as it affected us at the time we

Page 46

```
1         BH EQUITIES, LLC - D. MILLER
2   signed it.
3       Q.  Okay.  Before signing -- before
4   BH Equities signed the amended agreement, did
5   BH Equities take steps to make sure that the
6   document reflected BH Equities' intent?
7       A.  Yes.
8       Q.  At the time BH Equities signed the
9   amended agreement, did BH Equities believe that
10  the amended agreement was consistent with BH
11  Equities' intent?
12      A.  We were prepared to abide by the
13  agreement as written.  There were certain
14  pieces we hoped to maybe further negotiate, but
15  we understood the agreement and the economic
16  relationship at the time.
17      Q.  Is there anything about the amended
18  agreement that BH Equities believed was
19  inconsistent with its intent at the time it
20  signed the document?
21      MR. DOHERTY:  Objection, form.
22  BY MR. MORRIS:
23      Q.  You can answer.
24      A.  Yeah.  I struggle with the word
25  "intent."  There were certain parts we didn't
```

Page 47

```
1         BH EQUITIES, LLC - D. MILLER
2   like or hoped to further discuss, negotiate,
3   but we understood the relationship and -- of
4   capital and return of capital and further
5   economics at that time, and signed
6   understanding those.
7       Q.  Can you identify for me the parts
8   that BH Equities didn't like but it hoped that
9   it would be able to renegotiate?
10      MR. DOHERTY:  Objection, form.
11      And, Mr. Thomas, if this goes into,
12  you know, legal analysis from attorneys,
13  then just be careful.
14      A.  From a business standpoint, we had
15  hoped to increase the 6 percent residual
16  interest after capital was returned.
17  BY MR. MORRIS:
18      Q.  And did you have any discussions
19  with -- withdrawn.  I don't mean to personalize
20  this.
21      Did BH Equities have any
22  communications with Highland prior to the
23  execution of this agreement about BH Equities'
24  desire to increase the 6 percent residual
25  interest?
```

Page 48

```
1         BH EQUITIES, LLC - D. MILLER
2       A.  Can you clarify if we're talking
3   about HCMLP, as we talked about the -- as the
4   bilateral, yes, there would have been e-mail
5   communication that we had hoped to have a
6   larger residual interest than 6 percent.
7       Q.  Okay.  And notwithstanding that hope,
8   BH Equities nevertheless entered into this
9   agreement with their eyes open, right?  They
10  understood that they were getting a 6 percent
11  residual interest that could only be changed if
12  the parties agreed in the future to amend the
13  agreement, right?
14      A.  Yes.
15      Q.  Okay.  Is there any other piece of
16  amended agreement that BH Equities hoped to
17  change in the future?
18      MR. DOHERTY:  Objection, form.
19      And I want to, again, Mr. Thomas, if
20  it involves legal analysis --
21      MR. MORRIS:  Withdrawn.  That's fair.
22  I'll rephrase the question, Casey.
23  BY MR. MORRIS:
24      Q.  Is there any other issue that
25  BH Equities told Highland that it wasn't happy
```

Page 49

```
1         BH EQUITIES, LLC - D. MILLER
2   with at the time it signed the agreement and
3   that it hoped to negotiate an amendment for?
4       A.  Not to my knowledge.
5       Q.  At the time BH Equities signed the
6   amended agreement, did BH Equities have any
7   reason to believe that the agreement did not
8   reflect the intent of all of the members of
9   SEM?
10      MR. DOHERTY:  Objection, form.
11  BY MR. MORRIS:
12      Q.  You can answer.
13      A.  As far as I know, or as far as we
14  knew, no, we did not have any direct knowledge.
15      Q.  So kind of the flip side to that, is
16  it fair to say that at the time BH Equities
17  signed this agreement on March 15th,
18  BH Equities believed that the agreement
19  reflected the intent of the parties?
20      MR. DOHERTY:  Objection, form.
21      MR. MORRIS:  What's the objection?
22      MR. DOHERTY:  This intent about him
23  knowing what the other side thinks.  But I
24  understand your question, but just
25  maybe --
```

Page 50

BH EQUITIES, LLC - D. MILLER

1    MR. MORRIS: I'll rephrase the
2 question.
3    MR. DOHERTY: Okay.
4    BY MR. MORRIS:
5    Q. At any time prior to the -- to March
6 15th, did anybody acting on behalf of Highland
7 inform BH Equities that it believed any aspect
8 of the amended agreement was inconsistent with
9 Highland's intent?
10    A. Not that I'm aware.
11    MR. MORRIS: Hey, Casey, you were
12 spot on. Thank you. That was a better
13 question.
14 BY MR. MORRIS:
15    Q. At the time BH Equities signed the
16 amended agreement, did BH Equities have any
17 reason to believe that the amended agreement
18 contained any errors or mistakes?
19    A. No, I don't believe so.
20    Q. Was BH Equities aware of any error or
21 mistake in the amended agreement at the time it
22 signed it?
23    A. No. Not related to anything that we
24 were focused on.

Page 51

BH EQUITIES, LLC - D. MILLER

1    Q. Did anybody acting on behalf of
2 Highland ever inform BH Equities prior to the
3 execution of the agreement that Highland
4 believed there was an error or mistake in that
5 document?
6    A. No, not to my knowledge.
7    Q. All right.
8    MR. MORRIS: Let's go to Schedule A,
9 please.
10    MR. DOHERTY: And, Mr. Morris, is
11 this -- Mr. Thomas, this has been sent to
12 you in the chat, right, the entire
13 document, so he could pull it open if he
14 wanted to, or he could print it out if he
15 wanted to? I just wanted to let you know.
16 Virtual depositions are hard.
17    THE WITNESS: I was not aware. Thank
18 you, Casey.
19 BY MR. MORRIS:
20    Q. And again, Mr. Thomas, this is not a
21 memory test. I am not trying to trick you. I
22 really appreciate your counsel's suggestion and
23 observation. If there's anything you need to
24 see to make your answers, you know, more

Page 52

BH EQUITIES, LLC - D. MILLER

1 complete or accurate, just let me know, okay?
2    A. Okay.
3    Q. All right. So this is Schedule A to
4 the amended agreement. Do you see that?
5    A. Yes.
6    Q. And you've seen this page before,
7 correct?
8    A. Correct.
9    Q. And this page shows that Highland
10 Capital Management, L.P. made a capital
11 contribution of $49,000. Do I have that right?
12    A. Yes.
13    Q. And it also shows that Highland
14 Capital Management, L.P. had a 46.06 percentage
15 interest in SE Multifamily, correct?
16    A. Yes, that's what it says.
17    Q. Okay. And those facts were known to
18 BH Equities at or before the time it signed
19 this amended agreement, correct?
20    A. Correct.
21    Q. In fact, BH Equities agreed that
22 HCMLP would hold a 46.06 percentage interest in
23 SE Multifamily while making a capital
24 contribution of $49,000, correct?

Page 53

BH EQUITIES, LLC - D. MILLER

1    A. Again, clarifying a little bit on
2 the -- when the percentages came into play
3 being subject to capital being returned, yes.
4    Q. And by that, just to clarify, you
5 mean that the percentage interests only kicks
6 in after the capital contributions are returned
7 in full, correct?
8    A. Yes, that's what I mean.
9    Q. So for purposes of the waterfall, do
10 I have this right -- and there may be some
11 exceptions to this -- but the money had to get
12 paid back to KeyBank first, right?
13    A. Yes.
14    Q. And then any money that was original
15 capital above and beyond the KeyBank loan would
16 then have to be paid back, right?
17    A. Yes.
18    MR. DOHERTY: Object -- sorry.
19 BY MR. MORRIS
20    Q. And it was only after at least those
21 two events occurred that the remaining value
22 would be distributed in accordance with the
23 percentages under the percentage interest
24 column. Is that fair?

Page 54

BH EQUITIES, LLC - D. MILLER

1
2    A.  Yes, that was the deal as we
3    understood it.
4    Q.  Okay.  And is it fair to say that at
5    the time the amended agreement was executed,
6    that BH Equities believed Schedule A accurately
7    reflected the intent of the parties?
8    A.  Yes.
9    Q.  Again, flip side, before signing the
10   agreement, did BH Equities have any reason to
11   believe that Schedule A did not accurately
12   reflect the intent of the parties?
13   A.  No.
14   Q.  Prior to signing this agreement, did
15   BH Equities ever hear from anybody acting on
16   behalf of Highland that Highland believed
17   Schedule A was inaccurate in any way?
18   A.  Using Highland as the counterparty
19   that we were working with, no, we did not.
20   Q.  I'm going to -- I'm going to now ask
21   about each of the component members, because I
22   want to make sure that we're clear here.
23       Prior to the time that BH Equities
24   signed the amended agreement, did anybody
25   acting on behalf of HCRE tell BH Equities that

Page 55

BH EQUITIES, LLC - D. MILLER

1
2    they believed Schedule A was wrong in any way?
3    A.  I don't know that I can say that
4    affirmatively, as it wasn't -- again, with us
5    it was very much a bilateral.  We knew there
6    were two counterparties outside of BH,
7    excluding Liberty, from that discussion.  We
8    didn't exactly know the roles clearly as to who
9    was responsible for what parties' interests
10   other than BH's was very clear and there was a
11   related party of Highland, HCRE, as well.
12   Q.  All right.  Let me ask a different
13   question, then.  Prior to the time that
14   BH Equities signed the amended agreement, did
15   anybody acting on behalf of any of the other
16   members of SE Multifamily inform BH Equities
17   that they believed there was an error in
18   Schedule A?
19   A.  Not to my knowledge.
20   Q.  Thank you.  The percentage interests
21   that are reflected in Schedule A were used
22   elsewhere in the amended agreement; is that
23   correct?
24       MR. DOHERTY:  Objection.  If
25   there's -- objection, form.

Page 56

BH EQUITIES, LLC - D. MILLER

1
2    A.  I'd have to look through the document
3    or search it.
4    BY MR. MORRIS:
5    Q.  Okay.  So let's go to Section 1.7.
6    Do you see 1.7 is entitled "Company Ownership"?
7    A.  Yes, I see that.
8    Q.  And am I reading it correctly that
9    the percentages set forth in Section 1.7 match
10   exactly with the percentage interest set forth
11   on Schedule A?
12   A.  Yes.
13   Q.  And was it, from BH Equities'
14   perspective, the parties' intent that the
15   company ownership percentages set forth in 1.7
16   would match the percentage interests set forth
17   in Schedule A?
18       MR. DOHERTY:  Objection.  Form.
19   Objection, form.  I need to say objection,
20   form.  Sorry.
21   BY MR. MORRIS:
22   Q.  You can answer.
23   A.  It -- I believe it makes sense,
24   without further -- again, I've read the
25   document.  I don't recall specifically what 1.7

Page 57

BH EQUITIES, LLC - D. MILLER

1
2    governs, if it governs anything in particular.
3    But as written, the numbers match up, and we
4    didn't have an issue with this specific clause
5    at the time of signing.
6    Q.  And this is the clause that
7    specifically identifies what ownership interest
8    each member shall have in SE Multifamily.  Am I
9    reading that fairly?
10   A.  Yes, with respect -- and I think it
11   has to give deference to the waterfall
12   provisions and distribution provisions later in
13   the agreement.
14   Q.  Okay.  So subject to the waterfall
15   and distribution provisions, would you agree
16   that Section 1.7 was intended to identify the
17   ownership interest of each of the members of SE
18   Multifamily?
19   A.  I believe so, yes.
20   Q.  Okay.  Can we go to Section 6.1,
21   please?  Do you see there's --
22       MR. DOHERTY:  John, I could use a
23   break in a few minutes, but I can wait.  I
24   just didn't know for a break point if you
25   could take it.  But if you want to keep on

Page 58

BH EQUITIES, LLC - D. MILLER

1    going, that's fine.
2        MR. MORRIS:  Casey, if you could just
3    hold on, I've just got two more provisions
4    and then we'll take a break.
5        MR. DOHERTY:  Sure.  No problem.  I
6    just wanted to flag it.
7    BY MR. MORRIS:
8        Q.   Section 6.1(a), do you see that, sir?
9        A.   Yes, sir.
10       Q.   Okay.  And that provision deals with
11   the distribution of distributable cash as
12   defined, correct?
13       A.   Yes.
14       Q.   And subject to Article VI and
15   Article IX, distributable cash is going to be
16   distributable in the same percentages as the
17   percentage interests set forth in Schedule A,
18   correct?
19       A.   Correct.
20       Q.   And that's -- that's what the parties
21   intended when they wrote this provision and
22   agreed to it, correct?
23       A.   That's what we agreed to, yes.
24       Q.   MR. MORRIS:  Okay.  Can we go to
25

Page 59

BH EQUITIES, LLC - D. MILLER

1    Section 9.3, please?  All right.  So if we
2    could just go to the top of it.
3    BY MR. MORRIS:
4        Q.   All right.  So this Section 9.3 deals
5    with liquidation.  Do you see that?
6        A.   Yes.
7        Q.   And it -- is it fair to say that
8    Section 9.3, if we can scroll down just a
9    little bit, is intended to provide for the
10   waterfall in a liquidation scenario?
11       A.   Yes.
12       Q.   And is it fair to say that after the
13   expenses and payments are made in Sections
14   9.3(a) through (d), that any remaining cash or
15   assets would be distributed to the members of
16   SE Multifamily in the same percentage as the
17   percentage interests set forth on Schedule A?
18       A.   Yes.
19       Q.   And that's what the parties intended
20   when they signed this agreement, to the best of
21   BH Equities' understanding, correct?
22       A.   Correct.
23       Q.   MR. MORRIS:  Okay.  We can take that
24   break now.  It's 12:03.  Can we just come
25

Page 60

BH EQUITIES, LLC - D. MILLER

1    back at 12:10?
2        MR. DOHERTY:  We can go off of the
3    record, too.  I'm fine with that.  I know
4    it's getting around -- I'm good on
5    lunchtime.  I don't know how much time, if
6    you want to talk, John, me and you after,
7    but I'm fine to come back in five minutes
8    from break.
9        MR. MORRIS:  Okay.  12:10.  Seven
10   minutes.  Thank you.
11       MR. DOHERTY:  Okay.
12       (Recess taken 11:03 a.m. Central Time
13       - 11:12 Central Time.)
14   BY MR. MORRIS:
15       Q.   Let's go back to Schedule A, please.
16   Mr. Thomas, can you hear me okay?
17       A.   Yes.
18       Q.   Okay.  Before signing this amended
19   agreement, did BH Equities ever raise any
20   concerns with Highland about HCMLP receiving a
21   46.06 percentage interest while putting in
22   capital of $49,000?
23       A.   I don't recall any specific concerns.
24       Q.   In fact, it was acceptable to
25

Page 61

BH EQUITIES, LLC - D. MILLER

1    BH Equities that Highland Capital Management,
2    L.P. receive a 46.06 percentage interest in SE
3    Multifamily in exchange -- withdrawn.
4        It was acceptable to BH Equities that
5    Highland Capital Management, L.P. make a
6    capital contribution of $49,000 to SE
7    Multifamily while receiving a 46.06 percentage
8    interest, correct?
9        A.   I would say we were somewhat
10   indifferent, as it didn't affect our economics
11   in -- you know, beyond the 6 percent that we
12   understood we were getting into.
13       Q.   You agreed to it, correct?
14       A.   Yes.
15       Q.   And you didn't voice any objections
16   about that, correct?
17       A.   Not to my knowledge.
18       Q.   And you knew that that was part of
19   the overall deal, correct?
20       A.   Yes.
21       Q.   Before signing this agreement, did
22   BH Equities have any understanding as to why
23   Highland Capital Management, L.P. was going to
24   be a member of SE Multifamily?
25

Page 62

BH EQUITIES, LLC - D. MILLER

1    A.  I don't believe we did.
2    Q.  Did BH Equities ever speak with
3  Highland about why HCMLP was participating in
4  this transaction?
5    A.  Not to my knowledge.
6    Q.  Did BH Equities ever ask Highland why
7  HCMLP was obtaining a 46.06 percent interest?
8    A.  I don't recall that we did.
9    Q.  So this was -- Schedule A was
10  something that BH Equities knew about and
11  agreed to at the time it signed this agreement.
12  Fair?
13    A.  Yes.
14    Q.  Okay.  Let's go to Section 6.4(a) on
15  page 12, please.  Okay.  Do you see in Section
16  6.4(a), there's a -- well, 6.4 deals with
17  allocations of profits and losses.
18      Do you see that?
19    A.  Yes.
20    Q.  In Section 6.4(a), the parties agreed
21  that except as provided in that section, 94
22  percent of SE Multifamily's profits and losses
23  would be allocated to HCMLP; is that fair?
24    A.  Yes.

Page 63

BH EQUITIES, LLC - D. MILLER

1    Q.  Was this allocation the subject of
2  any negotiation?
3      MR. DOHERTY:  Objection, form.
4      MR. MORRIS:  Withdrawn.
5  BY MR. MORRIS:
6    Q.  Was the allocation of 94 percent to
7  6 percent for BH Equities on profits and losses
8  the subject of any negotiation?
9    A.  It was on a phone call between myself
10  and Mr. Broaddus, it came up as it, you know,
11  wasn't exactly normal.  But it was an issue
12  that, you know, was kind of internal, so it
13  wasn't broadly negotiated past or those things,
14  as we were, again, somewhat indifferent.
15    Q.  And what does it mean that it was not
16  exactly normal?
17    A.  Normally the allocation of profit and
18  losses would also follow an allocation -- the
19  waterfall allocation or those things more
20  closely.
21    Q.  And did Mr. Broaddus provide any
22  explanation as to why Highland wasn't following
23  that course that you just described?
24    A.  Not in any -- not in detail.

Page 64

BH EQUITIES, LLC - D. MILLER

1    Q.  Did he describe any reason for
2  allocating 94 percent of SE Multifamily's
3  profits and losses to HCMLP?
4    A.  No.
5    Q.  Am I correct that under the terms of
6  the amended agreement, none of SE Multifamily's
7  profits and losses would be allocated to HCRE,
8  correct?
9    A.  That's correct.
10    Q.  Did BH Equities ask Highland why none
11  of the profits and losses were being allocated
12  to HCRE?
13    A.  I don't believe so.
14    Q.  Did anybody acting on behalf of any
15  of the other members ever discuss with
16  BH Equities why HCRE was not being allocated
17  any of SE Multifamily's profits or losses?
18    A.  I don't believe so.
19    Q.  To the best of -- withdrawn.
20      To the best of BH Equities'
21  knowledge, does paragraph 6.4(a) accurately
22  reflect the parties' intent?
23    A.  To the best of our knowledge, yes.
24    Q.  Did anybody acting on behalf of any

Page 65

BH EQUITIES, LLC - D. MILLER

1  member to the SEM amended agreement ever inform
2  BH Equities that Section 6.4(a) was incorrect
3  in any way?
4    A.  I don't believe so.
5    Q.  Do you know if the amended agreement
6  that we're looking at was ever amended for any
7  reason at any time?
8    A.  There was a slip page at some
9  point -- and I believe it was after this --
10  just to update capital.  But it was a
11  nonsubstantial update.
12    Q.  I think we'll get to that in a few
13  minutes.
14      Other than the slip page that you
15  just described, is BH Equities aware of any
16  amendment to the amended agreement as we've
17  defined it here today?
18    A.  No.
19    Q.  BH Equities never signed an amendment
20  to the amended agreement, correct?
21    A.  Correct.
22    Q.  And BH Equities was never informed by
23  anybody acting on behalf of HCRE or any of the
24  other members to the agreement that the amended

BH EQUITIES, LLC - D. MILLER

1
2  agreement had been amended, correct?
3      A.  Correct.
4      Q.  Did BH Equities ever receive in
5  writing any draft agreement to the amended
6  agreement?
7      A.  I don't believe so.
8      Q.  Did -- after the time that this
9  agreement was executed, did BH Equities ever
10  discuss with any member whether this amended
11  agreement would be further amended?
12      A.  Yes.
13      Q.  Can you describe for me when those
14  conversations take place or communications took
15  place?
16      A.  Sure.  There was e-mails expressing
17  our desire to amend our 6 percent amount, right
18  around the time of signing and a couple of
19  times thereafter.  I don't remember specific
20  dates.
21      So, you know, starting in March of --
22  of '19 and then occasionally thereafter, we
23  expressed a desire to expand our 6 percent
24  number.
25      Q.  And what was BH -- what did Highland

BH EQUITIES, LLC - D. MILLER

1
2  say in response?
3      A.  I believe in the e-mail
4  correspondence it said something along the
5  lines of there may be future amendments needed
6  or something along that line.
7      Q.  But it never happened; is that fair?
8      A.  That is fair.
9      Q.  And is it also fair that any
10  discussion of any amendment that BH Equities is
11  aware of would be reflected in the e-mails that
12  BH Equities produced in response to the
13  subpoena?
14      A.  Could you reask the question?  I just
15  want to make sure I answer it correctly.
16      Q.  Sure.  Are the communications
17  concerning a possible amendment to the amended
18  agreement reflected in the e-mails that
19  BH Equities produced in response to the
20  subpoena?
21      A.  Yes.
22      Q.  Are you aware of any communications
23  concerning a possible amendment that are not
24  reflected in the e-mails that BH Equities
25  produced in response to the subpoena?

BH EQUITIES, LLC - D. MILLER

1
2      A.  I am not.
3      Q.  Let's -- let's start to look at some
4  other documents.
5      (Exhibit 3 marked.)
6      MR. MORRIS:  Let's put up on the
7  screen what we've marked as Exhibit 3.
8  And so we're going to go back in time a
9  little bit to prior to the execution of
10      the agreement.
11  BY MR. MORRIS:
12      Q.  And I'm directing your attention to a
13  document that's been marked, if we could look
14  at the bottom, Bates stamp BH 92.  I'm going to
15  skip the zeros.
16      MR. DOHERTY:  Mr. Morris, with
17      e-mails, I always like to, you know, if
18      possible, have it so I can start reading
19      from the bottom of the conversation.  Will
20      these be put in the chat as where we're
21      going?
22      MR. MORRIS:  Oh, yeah, we'll put it
23      in the chat.
24      MR. DOHERTY:  Okay.
25      MR. MORRIS:  I don't think there's

BH EQUITIES, LLC - D. MILLER

1
2  anything below what I'm asking about, but
3  can you scroll --
4      MS. CANTY:  It's in there now.
5      MR. DOHERTY:  These virtual
6      depositions, I know it's -- you go to the
7      top, you don't have context.  So I just
8      wanted to -- I'll let you go.  Thank you.
9  BY MR. MORRIS:
10      Q.  So do you see -- if we could just put
11  this whole e-mail up on the screen right there.
12  Okay.  It's an e-mail from Mr. Roby to Matt
13  McGraner, do you see that, from October 7,
14  2018?
15      A.  Yes.
16      Q.  Okay.  We talked -- I think you
17  mentioned or maybe I mentioned Mr. McGraner
18  earlier.  Do you have an understanding as to
19  whose interest Mr. McGraner was representing in
20  these communications?
21      A.  We would have viewed them as -- or
22  Matt as representing kind of the broader -- you
23  know, again, we viewed it as a bilateral
24  negotiation, so BH -- and then I'm going to use
25  air quotes again -- Highland broadly, the other

Page 70

BH EQUITIES, LLC - D. MILLER

1    two parties.  You know, I don't specifically
2    know which of those two parties, but -- that he
3    was representing, the other party to the
4    agreement.
5        Q.  Okay.  I'm focused on the chart with
6    the sentence above it, but, again, you should
7    read whatever you want of the e-mail for
8    context.  My question for you, the first
9    question is, do you know what that chart is in
10   the middle of the page under the word "Cash"?
11       A.  Yes.
12       Q.  And what's your understanding of what
13   this chart depicts?
14       A.  It is depicting the sources of the
15   capitalization for SE Multifamily Holdings.
16       Q.  And so is this a proposal that's
17   being made by BH Equities, or is this a summary
18   of discussions that have been taking place, if
19   you know?
20       A.  A little of both.
21       Q.  Okay.  And I see that there's a
22   reference to Highland there on the left.  Do
23   you see that?  Is that -- do you know what that
24   refers to?
25

Page 71

BH EQUITIES, LLC - D. MILLER

1        A.  We were kind of lumping -- in this
2    correspondence, we were lumping Highland
3    together as the counterparty to BH in the -- in
4    the agreement and in the transaction.
5        Q.  Okay.  So this is October 7, 2018,
6    and it's after the closing of the acquisition
7    of the real property by SE Multifamily,
8    correct?
9        A.  Correct.
10       Q.  Do you know if the numbers reflected
11   on this chart changed between October and the
12   time the deal was consummated in March?
13       A.  I believe they were modestly updated,
14   but not in any order of magnitude.
15       MR. MORRIS:  Let's go to the next
16   document, we'll mark as Exhibit 4.  It has
17   Bates number BH 133 to 44.
18       (Exhibit 4 marked.)
19   BY MR. MORRIS:
20       Q.  And if you go to the bottom of the
21   first page, you'll see that Mr. Roby asks
22   Mr. Broaddus for a copy of the SE Multifamily
23   LLC agreement.  Do you see that?
24       A.  Yes.
25

Page 72

BH EQUITIES, LLC - D. MILLER

1        MR. MORRIS:  And if we could scroll
2    up just to see Mr. Broaddus's response.
3    BY MR. MORRIS
4        Q.  Mr. Broaddus again was acting on
5    behalf of Highland.  Do I have that right?
6        MR. DOHERTY:  Objection.  I know we
7    have some kind of defined terms for the
8    deposition, but I just want to --
9        objection, form.
10   BY MR. MORRIS:
11       Q.  Based on the prior testimony, you can
12   answer, sir.
13       A.  He was acting on behalf of what we
14   viewed as the Highland, you know, broad entity.
15   So we didn't know specifically HCMLP or HCRE in
16   particular.  But as a counterparty to the
17   broader Highland, you know, ecosystem, yes.
18       Q.  Okay.  Can you just -- can you just
19   read Mr. Broaddus's e-mail to yourself and tell
20   me when you're finished?
21       A.  I've finished.
22       Q.  Okay.  Do you know if anybody ever
23   told KeyBank that the SE Multifamily, LLC
24   agreement that was in existence at that time
25

Page 73

BH EQUITIES, LLC - D. MILLER

1    was just a placeholder?
2        A.  I don't have knowledge one way or the
3    other.
4        Q.  Do you know if anybody told KeyBank
5    that the original LLC agreement was
6    meaningless?
7        A.  The same answer.  I don't have
8    knowledge one way or the other.
9        Q.  Okay.  But as of this time,
10   obviously, BH Equities did know that an
11   original LLC agreement existed, right?
12       A.  Yes.
13       Q.  And that the original agreement was
14   going to be amended to reflect, quote, whatever
15   the deal terms are, closed quote, correct?
16       A.  Correct.
17       Q.  And, in fact, the original LLC
18   agreement was amended, correct?
19       A.  Yes.
20       Q.  And that's the agreement we just
21   looked at; is that fair?
22       A.  Yes.
23       Q.  So is it fair to say that consistent
24   with Mr. Broaddus's November 7th e-mail, the
25

Page 74

BH EQUITIES, LLC - D. MILLER

1 original LLC agreement was amended to, quote,
2 reflect whatever the deal terms were?
3    A. I think that's fair.
4        MR. MORRIS: Let's go to the next
5    document, Exhibit 5, which has Bates
6    number BH 1271 to -73.
7        (Exhibit 5 marked.)
8 BY MR. MORRIS:
9    Q. Before I ask you any questions about
10 this document, the agreement was dated
11 March 15th, 2019. Do you remember that?
12    A. Yes.
13    Q. And was there a sense of urgency to
14 get the agreement signed by the end of that
15 particular day?
16    A. Yes.
17    Q. Do you have an understanding as to
18 what the cause of that urgency was?
19    A. My understanding from the
20 correspondence of March 15th is the deadline to
21 either file or extend taxes for pass-through
22 entities, and that was driving the urgency.
23    Q. And was the goal to make the
24 agreement effective as of August 23rd, 2018,

Page 75

BH EQUITIES, LLC - D. MILLER

1 the date on which the original LLC agreement
2 was entered into?
3    A. Yes.
4    Q. And is it BH Equities' understanding
5 that in order to make the amended and restated
6 agreement retroactive to August 23rd, 2018, it
7 had to be signed by the end of the day on March
8 15, 2019?
9        MR. DOHERTY: Objection -- withdraw
10 my statement.
11    A. I'm not an expert in that matter, but
12 that would certainly be the understanding we
13 were given.
14 BY MR. MORRIS:
15    Q. Okay. I appreciate the distinction.
16 Was BH Equities told by Highland that the
17 agreement had to be executed on or before March
18 15th in order for it to be retroactive to
19 August 2018?
20    A. Yes. That was the -- what we were
21 told.
22    Q. Okay. So let's take a look at the
23 e-mail that's up on the screen. You'll see
24 there's actually two e-mails. The one on the

Page 76

BH EQUITIES, LLC - D. MILLER

1 bottom is from Mr. Broaddus to you and to
2 Mr. Roby with a copy to Mr. McGraner, and it's
3 sent on March 14th. Do you see that?
4    A. Yes, sir.
5    Q. And do you recall -- I think you may
6 have testified to this earlier, but does this
7 refresh your recollection that BH Equities was
8 presented with a draft amended LLC agreement
9 for SE Multifamily on March 14th?
10    A. Yes.
11    Q. And do you see in the
12 next-to-the-last paragraph in Mr. Broaddus'
13 first e-mail there, he says, quote, the
14 contribution schedule in the attached needs to
15 be updated with the actual contribution
16 numbers. I have an updated version I can send
17 in a separate e-mail.
18        Do you see that?
19    A. Yes.
20    Q. So were the actual contribution
21 numbers and the contribution schedule a subject
22 of discussion between BH Equities and Highland
23 prior to the execution of the amended
24 agreement?

Page 77

BH EQUITIES, LLC - D. MILLER

1    A. Yes.
2    Q. And then you can see the e-mail
3 above, and Mr. Broaddus follows up and he says,
4 among other things, quote, "Contribution
5 schedule attached." Do you see that?
6    A. Yes.
7    Q. And if we can scroll to the next
8 page, the next page actually has Schedule A
9 attached. If we could scroll down. I don't
10 know if you can see it in the chat room because
11 I don't want you to just take my word for it.
12 But do you recall receiving a Schedule A from
13 Mr. Broaddus prior to the execution of the
14 agreement?
15    A. Yes.
16    Q. Okay. And is this the schedule that
17 Highland prepared and delivered to BH Equities
18 prior to the execution of the amended
19 agreement?
20    A. I believe so.
21    Q. And is it BH Equities' understanding
22 that somebody acting on behalf of Highland
23 completed Schedule A before delivering it to
24 BH Equities?

Page 78

1    BH EQUITIES, LLC - D. MILLER
2    A. Yes, that was our understanding.
3    Q. Okay. BH Equities didn't prepare the
4    numbers that are set forth on Schedule A, did
5    it?
6    A. No.
7    Q. That was Highland, correct?
8    A. Correct.
9    Q. And Highland delivered this document
10   to BH Equities the day before the agreement
11   was -- withdrawn. Actually, delivered it to BH
12   Equities on March 15, 2019, correct?
13   A. This particular Schedule A, yes, was
14   delivered on March 15th.
15   Q. And it was delivered as a stand-alone
16   document by itself with nothing else; is that
17   right?
18   A. That's my recollection, based on -- I
19   believe so without, you know, seeing some other
20   sourcing.
21   THE REPORTER: I'm sorry,
22   Mr. Doherty, did you say something?
23   MR. DOHERTY: Objection. Well,
24   objection that -- John, may I make a
25   comment?

Page 79

1    BH EQUITIES, LLC - D. MILLER
2    If you need a document to refresh
3    yourself, Dusty, especially if it's on the
4    screen and -- you know, let Mr. Morris
5    know that you want to look at the prior
6    e-mail or, you know, if you're asking
7    to -- I hope that was okay, Mr. Morris.
8    Appreciate it.
9    MR. MORRIS: It's okay. I mean, I'm
10   happy to show him the third page of the
11   document. I just --
12   MR. DOHERTY: I just know Mr. Thomas
13   is a very detailed-oriented man, so I know
14   if he doesn't -- you know, if it's a
15   question like was this the one sent, in
16   case he wants to go back and see that it
17   was attached to the document or he can ask
18   Mr. Morris is this the attachment. But,
19   you know, I just wanted to make that --
20   make that point.
21   MR. MORRIS: All right. First of
22   all, La Asia, can you show Mr. Thomas the
23   third page of the exhibit? It's blank.
24   BY MR. MORRIS:
25   Q. And do you see, Mr. Thomas, that

Page 80

1    BH EQUITIES, LLC - D. MILLER
2    BH Equities has Bates stamped these documents
3    consecutively 1271, 1272, and 1273?
4    A. Yes.
5    Q. And do you see that Mr. Broaddus's
6    e-mail at the very first page shows that
7    there's an attachment?
8    A. Yes.
9    MR. MORRIS: Can we go up to the
10   first page, please?
11   BY MR. MORRIS:
12   Q. And do you see that Mr. Broaddus's
13   first sentence says attached is the
14   contribution schedule, at least in substance?
15   A. Yes.
16   Q. And do you have any reason to believe
17   that the Schedule A that we just looked at is
18   not the contribution schedule that Mr. Broaddus
19   attached to his e-mail on March 15, 2019, at
20   2:02 p.m.?
21   A. No, I do not. I believe that is the
22   schedule.
23   (Exhibit 6 marked.)
24   Q. Okay. So let's go, then, to
25   Exhibit 6, which is a document Bates numbered

Page 81

1    BH EQUITIES, LLC - D. MILLER
2    1363 to -67. Now, this is an e-mail from you,
3    and attached here -- do you see that there is
4    an attachment that's mentioned in the header of
5    your e-mail?
6    A. Yes.
7    Q. And you refer to an attachment in the
8    first sentence of your e-mail. Do you see
9    that?
10   A. Yes.
11   MR. MORRIS: And if we can scroll
12   down.
13   BY MR. MORRIS:
14   Q. Again, you're free to look at
15   whatever you want. I'm looking for the
16   attachment.
17   MR. MORRIS: If we can keep going.
18   Right there.
19   BY MR. MORRIS:
20   Q. Please scroll down and confirm, if
21   you can, that the document that's set forth on
22   page 1366 and 1367 is the attachment to the
23   e-mail that we're looking at that you sent.
24   A. Yeah. And I'm looking to my left
25   because I pulled it up via the chat link. So

Page 82

BH EQUITIES, LLC - D. MILLER

1    I'm just -- it gives me a bigger screen to view
2    it.
3    Q.   Okay.  So that's the attachment that
4  you sent, right?
5    A.   Yes.
6    Q.   And your attachment deals with the
7  very issue that you identified earlier today
8  that you were focused on, and that was the
9  waterfall; is that right?
10    A.   Correct.
11    Q.   Okay.  And in the first sentence when
12  you say that, "Attached is what we proposed in
13  October to try and handle this," this is
14  expressly referring to the waterfall provision,
15  correct?
16    A.   Yes.
17    Q.   Okay.  And you go on to say, "This
18  covers the distribution language in a way that
19  we can get comfortable with, as we need to make
20  sure that if the capital that Highland put in
21  associated with debt is off, that it's not
22  dilutive."
23         Do you see that?
24    A.   I do.

*(line numbers as shown: lines 1–24)*

Page 83

BH EQUITIES, LLC - D. MILLER

1    Q.   What capital that Highland put in
2  associated with debt, what does that refer to?
3    A.   The KeyBank facility.
4    Q.   And what specifically was your
5  concern about how that was treated?
6    A.   Our understanding is it would be a
7  loan to HCRE or, you know, an entity affiliated
8  with, you know, kind of the broad Highland, and
9  would be put in as capital, and that obviously
10  it would have a preference to getting paid off,
11  but that it wouldn't then also keep us from
12  getting our capital back after the KeyBank
13  was -- KeyBank facility was paid off.
14    Q.   Okay.  And then you go on to say
15  later in the paragraph, "We think the
16  attachment does that while still allocating the
17  taxable income loss in a way that meets your
18  needs by percentage."
19         Do you see that?
20    A.   Yes.
21    Q.   What did you mean by that?
22    A.   I had had a brief phone call with
23  Mr. Broaddus, and that was in that -- in
24  relation to the profit and loss allocation

Page 84

BH EQUITIES, LLC - D. MILLER

1    where we were kind of indifferent.
2    Q.   And what needs did Mr. Broaddus
3  describe for you?
4         MR. DOHERTY:  Objection.
5         MR. MORRIS:  Withdrawn.
6  BY MR. MORRIS:
7    Q.   Did Mr. Broaddus describe for you the
8  needs that Highland had with respect to the
9  allocation of taxable income and loss?
10    A.   Not in any level of detail.
11    Q.   So when you said that you believed
12  your provision would meet their needs, how did
13  you believe their provision would meet
14  Highland's needs?
15    A.   The provision that we shared was
16  focused more on the distribution of cash and
17  not the allocation of profits and losses.
18    Q.   And is that because Section 6.1 deals
19  with the allocation of cash and Section 6.4
20  deals with the allocation of profits and
21  losses?
22    A.   Could you show me Section 6.4, just
23  to verify the numbers?  But, yes, 6.1 was
24  focused exclusively on the allocation of cash

Page 85

BH EQUITIES, LLC - D. MILLER

1    or the distribution of cash and that a
2  different section, presumably 6.4, would focus
3  on the allocation of profits and losses,
4  separate and distinct from cash.
5    Q.   Okay.  And I apologize for asking it
6  again, but help me to understand how the
7  attached -- oh, is it because your attached
8  proposal doesn't impact the allocation of
9  taxable income and losses at all?
10    A.   Correct.
11    Q.   Ah, okay.  So I understand.  So -- so
12  you're trying to explain -- is it fair to say
13  that you're trying to explain to Mr. Broaddus
14  that your concern is the distribution waterfall
15  but that he can leave the tax allocation the
16  way they wanted it?
17    A.   Yes, yes.
18    Q.   Okay.  Do you recall -- actually,
19  towards the end it says, "The capital in this
20  agreement would only be the capital that
21  Highland put in that is not also incorporated
22  in the bridge loan agreements.  I think that is
23  plus or minus $40 million based on my
24  understanding."

Page 86

BH EQUITIES, LLC - D. MILLER

1   Is what you're saying there that
2   Highland was going to put in approximately --
3   withdrawn.
4       Is what you're saying there that
5   Highland was going to get credit for having put
6   in $290 million or thereabouts into SE
7   Multifamily, 250 million of which was coming
8   from the KeyBank loan and the other 40 million
9   of which was coming from Highland?
10      A.  Yes, that's the distinction I was
11  trying to make.
12      Q.  Okay.  And under the waterfall is it
13  BH Equities' understanding that it agreed that
14  the $250 million that had been borrowed from
15  KeyBank would be paid back first?
16      A.  Yes.
17      Q.  Before return of capital?
18      A.  Yes.
19      Q.  Does BH Equities know the source of
20  funding for the other $40 million?
21      A.  No, not at this time.
22      Q.  Did BH Equities ever ask Highland
23  where the $40 million was coming from?
24      A.  No, not that I -- not that I'm aware.

Page 87

BH EQUITIES, LLC - D. MILLER

1       Q.  Does BH Equities know when HCRE was
2   formed?
3       A.  I don't believe so.  We may have an
4   organizational doc or something that was
5   provided as part of a deal that was shared with
6   a lender, et cetera, but not in the ordinary
7   course would we know that.
8       Q.  Had BH Equities done business with
9   HCRE prior to Project Unicorn?
10      A.  I don't know for sure.  In our
11  business generally there are a lot of
12  subsidiaries and things like that that are
13  formed for specific deals.  So it's quite
14  possible that HCRE could have been an upper
15  entity that owned a subsidiary, et cetera.  But
16  I just don't know the waterfalls cold -- or the
17  organizational charts cold to know if we did or
18  did not specifically with HCRE.
19      Q.  Okay.  That's fair.
20      Had BH Equities done business with
21  HCMLP or any entity that BH Equities believed
22  was related or affiliated with HCMLP prior to
23  Project Unicorn?
24      A.  We had numerous projects and

Page 88

BH EQUITIES, LLC - D. MILLER

1   partnerships with Highland broadly, you know,
2   whether that be HCRE, HCMLP, the NexPoint RE,
3   et cetera, to the tune of 40-plus property
4   partnerships, et cetera.  So we had significant
5   relations with them and still do on the
6   management company side.  So I don't
7   specifically know what entities were owned or
8   related to what, but we had significant prior
9   experience with the parties involved.
10      Q.  And were -- were Mr. McGraner or
11  Mr. Broaddus or Mr. Chang involved in any of
12  those other deals?
13      A.  Yes.
14      Q.  Were they the primary contacts that
15  BH Equities had for the transactions that
16  BH Equities did with Highland and its
17  affiliated and related entities?
18      A.  I believe so, yes.
19      (Exhibit 7 marked.)
20      Q.  Let's go to Exhibit 7, please, which
21  is a two-page e-mail with Bates number 1437 to
22  -38.  And if we could start at the bottom,
23  you'll see -- this is the e-mail that we just
24  looked at from you, right?

Page 89

BH EQUITIES, LLC - D. MILLER

1       A.  Yep.
2       Q.  It's the exact same e-mail?
3       A.  Yes.
4       Q.  And then if we scroll a little higher
5   on the page, you'll see that it appears that
6   Mr. Broaddus, the person to whom you sent it,
7   forwarded it to Mr. Chang.  Do you see that?
8       A.  Yes.
9       Q.  And then if we can keep scrolling up,
10  Mr. Chang sent an e-mail back to Mr. Broaddus.
11  Do you see that?
12      A.  Yes.
13      Q.  And then Mr. Broaddus forwarded
14  that -- Mr. Chang's e-mail to you.  Is that
15  fair?
16      A.  Yes.
17      Q.  And Mr. Chang's e-mail was a direct
18  response to the proposal that was attached to
19  the e-mail that we just looked at that was
20  marked as Exhibit 6, right?
21      A.  Yes.
22      Q.  And what's in Mr. Chang's e-mail is a
23  different provision for the waterfall.  Fair?
24      A.  Yes.

Page 90

BH EQUITIES, LLC - D. MILLER

1
2     MR. DOHERTY: Objection. Could I see
3  the -- could we zoom out so I can see that
4  whole e-mail? Do y'all mind?
5     MR. MORRIS: Sure. Yep.
6     MR. DOHERTY: Okay. Not really an
7  objection but a request .
8     I think There's an (e). And maybe
9  it's not. Could you scroll down just so I
10  can see the (e)?
11     MR. MORRIS: It's at the bottom of
12  the page there.
13     MR. DOHERTY: I'm sorry to be
14  annoying. I just wanted to see it. While
15  we were talking about it, I didn't know if
16  we could zoom out so we could have the
17  whole --
18     THE WITNESS: Yeah, I can see it. I
19  can see the provision (e), Casey.
20     MR. DOHERTY: Okay. Then I'm okay.
21  I was more talking for you, Dusty. I
22  wanted everybody to be able to see the
23  document. Okay. Sounds good.
24  BY MR. MORRIS:
25     Q. Just let me try to clean this up a

Page 91

BH EQUITIES, LLC - D. MILLER

1
2  bit, Mr. Thomas.
3     Is it your understanding that
4  Mr. Chang's e-mail was effectively a
5  counterproposal to the one that you had made
6  earlier in the day on March 15th with respect
7  to the waterfall?
8     A. Yes. That's how we interpreted it.
9     Q. Okay. And is it your
10  understanding -- withdrawn.
11     Is it BH Equities' understanding that
12  this provision in Mr. Chang's e-mail was a
13  provision that was drafted by Highland?
14     A. Yeah, Highland is kind of the broad
15  counterparty perspective, yes.
16     Q. Okay. And, Mr. Chang's -- withdrawn.
17     Other than the fact that it's labeled
18  1.1 instead of 6.1, are you aware that
19  Mr. Chang's e-mail is -- was adopted verbatim
20  in the executed amended agreement?
21     MR. DOHERTY: Objection.
22     A. I would compare, but, yeah, I believe
23  it is -- it looks to be the language, the final
24  language.
25

Page 92

BH EQUITIES, LLC - D. MILLER

1
2  BY MR. MORRIS:
3     Q. And did Mr. Chang's section -- and
4  what's on Mr. Chang's e-mail, is it your
5  understanding that it ultimately became Section
6  6.1 of the amended agreement? And, again, I'm
7  happy to pull it up if you'd like because I
8  don't mean to test you.
9     A. Yeah, if you wouldn't mind pulling it
10  up, that would be great.
11     Q. Let's do that. Let's pull it up.
12  It's Exhibit 2. If we can pull up 6.1.
13     MR. DOHERTY: Mr. Morris, do you
14  think it would be helpful for Mr. Thomas
15  to print out the amended agreement during
16  this series of questions, or is this kind
17  of a one-off question?
18     MR. MORRIS: I think it's a one-off
19  question.
20     MR. DOHERTY: Okay.
21     MR. MORRIS: But if he wants to do
22  that, I don't mean to stop him.
23     MR. DOHERTY: I understand.
24  BY MR. MORRIS:
25     Q. Here's 6.1. You'll see that it's got

Page 93

BH EQUITIES, LLC - D. MILLER

1
2  five Sections, (a) through (e)?
3     A. Yep.
4     Q. You'll see that -- if we can go back
5  up to (a). You've got the percentages that are
6  set forth in Schedule A, 47.94 percent to HCRE,
7  46.06 percent to HCMLP, and 6 percent to BH.
8  Do you see that?
9     A. Yes.
10     Q. Okay. And then if we scroll down to
11  (e), it basically says, notwithstanding
12  everything that came before it, the first
13  amounts of distributable cash shall be deemed
14  distributed to each member in proportion to
15  amounts borrowed on behalf of SE Multifamily.
16     Is that a fair characterization?
17     A. Borrowed and then invested as equity
18  into the deal, yes.
19     Q. That's right. So that's the pay
20  KeyBank back first provision. Fair?
21     A. Yes.
22     Q. And then little (ii) there says that
23  after that's done, it's pro rata in proportion
24  to the members' respective capital accounts.
25     Do you see that?

Page 94

1      BH EQUITIES, LLC - D. MILLER
2      A. Yes.
3      Q. That's the return of capital
4  provision, correct?
5      A. Correct.
6      Q. And that's what BH Equities was
7  concerned about, correct?
8      A. Correct.
9      Q. And so Mr. Chang's proposal was
10  acceptable to BH Equities, correct?
11     A. Yes.
12     Q. BH Equities accepted Mr. Chang's
13  entire proposal with respect to Section 6.1,
14  correct?
15     A. Correct.
16     Q. Okay.
17        MR. MORRIS: All right. If we can go
18     to the next exhibit, Number 8, Bates
19     number 1140.
20        (Exhibit 8 marked.)
21  BY MR. MORRIS:
22     Q. Okay. So we're still on the 15th.
23  This was a busy day for you. At least it looks
24  that way. It's now 11:20 at night.
25     A. Uh-huh.

Page 95

1      BH EQUITIES, LLC - D. MILLER
2      Q. And Mr. Broaddus sends to you and to
3  Mr. Roby, and he copies his colleagues, and he
4  attaches the agreement with the change, quote,
5  Dusty and I discussed, closed quote, and the
6  document was ready for execution. Do you see
7  that?
8      A. Yes.
9      Q. Is the change that you and
10  Mr. Broaddus discussed the change to 6.1 that
11  we just looked at in the two e-mails?
12     A. Yes.
13     Q. Okay. So that Mr. Broaddus is
14  informing BH Equities that after negotiating
15  Section 6.1 to the satisfaction of all members,
16  they were ready to sign; is that fair?
17     A. Yes.
18     Q. Okay.
19        (Exhibit 9 marked.)
20        MR. MORRIS: All right. Let's go to
21     the next exhibit, please. It's an e-mail
22     string with Bates number 277 to 282.
23  BY MR. MORRIS:
24     Q. And we can start at the bottom so
25  there's no confusion here.

Page 96

1      BH EQUITIES, LLC - D. MILLER
2      A. That would be appreciated.
3      Q. Yep. Okay. So you'll see that at
4  9:24, you know, some version of the agreement,
5  Mr. Roby sent it to himself. Do you see that
6  at 9:24?
7      A. Yes. Yes, sorry.
8      Q. And if we can scroll up just a bit.
9  It looks like -- it's not clear to whom
10  Mr. Roby sent it to, but at 9:28, he had a
11  signed agreement at that time. And he asked
12  about working on a promote structure by the end
13  of April. Do you see that?
14     A. Uh-huh. Yes.
15     Q. So do you recall that there were two
16  different versions of the agreement that were
17  signed, or is that the slip page that you were
18  referring to earlier?
19     A. I don't recall exactly --
20     Q. Okay.
21     A. -- where version control was at that
22  point.
23     Q. Okay. So somebody responds, "Thanks,
24  Ben." It's hard to tell.
25        MR. MORRIS: But keep scrolling up.

Page 97

1      BH EQUITIES, LLC - D. MILLER
2  BY MR. MORRIS:
3      Q. Oh, I guess Mr. Broaddus did. He
4  says, "Thank you, Ben."
5        MR. MORRIS: Keep scrolling up.
6  BY MR. MORRIS:
7      Q. At 9:45, Mr. Chang sends what he says
8  is a fully executed agreement. Do you see
9  that?
10     A. Yes.
11        MR. MORRIS: Keep scrolling up.
12  BY MR. MORRIS:
13     Q. Okay. So a few days later, you sent
14  an e-mail to Mr. Chang and to Mr. Broaddus
15  where you noted a small issue in the agreement.
16  Do I have that correct?
17     A. Correct.
18     Q. Can you describe for me what that
19  small issue was?
20     A. I believe it was just the amount of
21  capital -- exact amount of capital contribution
22  was off slightly.
23     Q. And the piece that was off slightly
24  was the capital contribution amount set forth
25  in Schedule A for BH Equities; is that right?

Page 98

BH EQUITIES, LLC - D. MILLER

1    A.  Yes, that's my understanding.
2    Q.  And so you or somebody acting on
3 behalf of BH Equities was looking at Schedule A
4 and noticed that the capital contribution
5 amount was off by a little bit; is that fair?
6    A.  Yes.
7    Q.  Okay.  And you brought that to
8 Highland's attention, correct?
9    A.  Correct.
10   Q.  But BH Equities didn't identify
11 anything else about Schedule A that appeared to
12 be in error or by mistake at that time,
13 correct?
14   A.  Correct.
15   Q.  And let's -- let's just look to see.
16 So you identify the error, and then you say,
17 "As I understand it, several other items
18 related to the agreement will get discussed and
19 an amendment will be coming.  Can we make that
20 update at the time of the amendment?"
21      Right?  So it was BH Equities'
22 expectation that there would be an amendment;
23 is that right?
24   A.  Yes.
25

Page 99

BH EQUITIES, LLC - D. MILLER

1    Q.  And that amendment that BH Equities
2 was hoping to have made was specifically
3 limited to the question of whether the
4 6 percent residual interest would be increased;
5 is that right?
6    A.  Yes.
7    Q.  Okay.  And is that -- was the promote
8 an attempt to get value through another means,
9 or is that related to the desire to get the
10 6 percent increase?
11   A.  They were one and the same.
12   Q.  Oh, okay.  So -- so the amendment
13 that -- this is what you were referring to
14 earlier, right, that BH Equities agreed to
15 accept the 6 percent residual interest with the
16 hope and expectation that there would be an
17 amendment that would increase that amount,
18 right?
19   A.  Right.
20   Q.  And that's the only issue that BH
21 Equities wanted changed in the amended
22 agreement, correct?
23      MR. DOHERTY:  Objection.
24
25

Page 100

BH EQUITIES, LLC - D. MILLER

1 BY MR. MORRIS:
2    Q.  You can answer.
3    A.  The only issue that I was aware of.
4 Again, I'm focused more on the economics,
5 though.
6    Q.  Okay.  Not -- there is no other
7 provision of the amended agreement that BH
8 Equities ever asked Highland to change except
9 for that number 6.  Fair?
10   A.  That's my understanding.
11   Q.  So let's see what Mr. Broaddus says
12 in response.  Okay.  Right there.  And he
13 suggests the slip page.  Do you see that?
14   A.  Yes.
15   Q.  And he asks a question of Kim and
16 Matt at the bottom about whether the increase
17 in BH Equities' capital contribution would
18 change Highland's contribution or would it be
19 just additional capital to BH only.  Do you see
20 that?
21   A.  Yes.
22   Q.  And the answer to that question was
23 that it was only going to change the capital
24 contribution made by BH Equities, correct?

Page 101

BH EQUITIES, LLC - D. MILLER

1    A.  I believe so, yes.
2    Q.  BH Equities wasn't intending to
3 change the capital contribution of any of the
4 Highland parties, correct?
5    A.  No.
6    Q.  And then -- and then Mr. Chang
7 weighed in in response and said that, you know,
8 quote, we are fine handling this with a slip
9 page if BH Equities, closed quote, is fine with
10 that.  Do you see that?
11   A.  Yes.
12   Q.  And then Mr. Broaddus responds to
13 that and says that Highland would leave it up
14 to BH Equities because, as he understood it,
15 "we do plan to amend anyways; however, if you
16 want it slip paged in the meantime, we can do
17 that."
18      Have I read that correctly?
19   A.  Yes.
20   Q.  But no amendment was ever executed,
21 correct?
22   A.  Correct.
23   Q.  No agreement was ever reached on a
24 modification of any kind to BH Equities'

Page 102

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  residual interest in SE Multifamily, correct?
3    A.  Correct.
4    Q.  Do you know if a slip page was ever
5  inserted into the agreement to make the small
6  change that BH Equities identified to its
7  capital contribution?
8    A.  I believe it was.
9    Q.  So Highland was responsive to
10  BH Equities' request that Schedule A be changed
11  to accurately reflect BH Equities' capital
12  contribution; is that fair?
13    A.  Yes.
14    Q.  Did Highland ever ask BH Equities to
15  make any change to Schedule A at any time after
16  the agreement was executed on March 15, 2019?
17    A.  There was correspondence as KeyBank
18  was paid back in that process and as other
19  assets were sold to get -- get things right as,
20  you know, contributions were paid back along
21  the way.  So there was back-and-forth
22  correspondence.  I don't know if it was
23  specific to update Schedule A, per se, but
24  there were iterative communications ensuring
25  that the capital that was put in was the

Page 103

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  capital that was paid back, et cetera.
3    Q.  Okay.  So -- so is it fair to say,
4  then, that Highland never asked BH Equities to
5  amend Schedule A, but there were discussions
6  about distributions and cash flow?
7    A.  Yes.
8      MR. MORRIS:  Okay.  Let's go to the
9    next document, which is Exhibit 10.  It's
10    Bates number 716.
11      (Exhibit 10 marked.)
12  BY MR. MORRIS:
13    Q.  Have you seen this e-mail before,
14  sir?
15    A.  Yeah, I believe it was part of our
16  discovery process.
17    Q.  Okay.  And do you see -- this is an
18  e-mail from Mr. Mulcahy of BH Management.  Do I
19  have that right?
20    A.  Yes.
21    Q.  Okay.  And do you see he refers to
22  tranche B debt?
23    A.  Yes.
24    Q.  That's a reference to the KeyBank
25  loan, correct?

Page 104

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    A.  It is.
3    Q.  And is this again pointing out that
4  $250 million of tranche B was considered
5  contributable capital by HCRE?
6    A.  Yes.
7    Q.  And by August of 2020, that $250
8  million had been paid back; is that right?
9    A.  Yes, that's my understanding.
10    Q.  So that approximately $39 million of
11  original capital that was credited to HCRE had
12  yet to be returned; is that right?
13    A.  Yes, that's my understanding at that
14  time.
15    Q.  Okay.  And do you recall that in the
16  fall of 2020, there were discussions about the
17  return of capital?
18    A.  Yeah.  In that rough time frame, yes.
19      MR. MORRIS:  Okay.  Let's go to the
20    next exhibit, 482 through 485.
21      MR. DOHERTY:  Mr. Morris, is it -- I
22    just wanted to ask about another break or
23    lunch break.  I don't know, it's your
24    presentation, your deposition.  I know
25    it's around noon.  It's been an hour.

Page 105

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2      MR. MORRIS:  I'm happy to take a
3    short break, but after that break, my goal
4    would be to take it to the finish line
5    because I don't think that I'll have a
6    whole lot more.
7      MR. DOHERTY:  I can defer to -- do
8    you know how much -- the goal there --
9      MR. MORRIS:  It will be another half
10    hour to an hour.  So if you want to take a
11    short break, I'm happy to do that.
12      MR. DOHERTY:  I could use a little --
13    I think -- do you want to do it now, or do
14    you want to go through a couple more?
15      MR. MORRIS:  No, I think now is fine.
16    It's 1:07 here in New York.  Let's just
17    come back at 1:15 and I'll, you know, try
18    to finish up within an hour.
19      MR. DOHERTY:  Okay.  1:15 Central
20    Time, right?
21      MR. MORRIS:  No.  I don't want to
22    take a lunch break.  I want to take --
23      MR. DOHERTY:  Oh, no lunch break.
24    Okay.
25      MR. MORRIS:  No.

Page 106

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    MR. DOHERTY: I just got a call from
3 my -- a personal call. I wanted to be
4 able to call it back. I can jump back on.
5    MR. MORRIS: You go take that --
6 Let's go off the record, please.
7    MR. DOHERTY: Yeah, sorry, off the
8 record.
9    (Recess taken 12:07 p.m. Central Time
10    - 12:17 p.m. Central Time.)
11 BY MR. MORRIS:
12    Q. So we're at Exhibit 11, Bates number
13 482 to 485. You know what, I'm going to
14 withdraw this exhibit. So just leave a blank
15 in the transcript -- yeah, just leave a blank
16 simply because it's redundant.
17    Let's shift topics, because I've only
18 got a little bit left here, to the topic of
19 distributions, Mr. Thomas. Do you recall that
20 that's one of the 30(b)(6) topics that we had
21 written about?
22    A. Yes.
23    Q. Okay. And I think we just confirmed
24 that in the fall of 2020, there were
25 discussions between Highland and BH Equities

Page 107

1 concerning the return of capital. Do you
2 remember that?
3    A. Yes.
4    Q. Okay.
5    (Exhibit 12 marked.)
6    MR. MORRIS: So let's put up what's
7 been marked as Exhibit 12, which is a
8 document with Bates number BH 192 to -94.
9    And if we could start at the bottom.
10 BY MR. MORRIS:
11    Q. Okay. Do you see that Mr. Mulcahy
12 sent an e-mail on Saturday, November 7th to
13 Bonner McDermett and Paul Broaddus with copies
14 to you and Phyllis Jones?
15    A. Yes.
16    Q. I don't think we've seen
17 Mr. McDermett's name before. Do you know who
18 Mr. McDermett is?
19    A. I don't know his exact title, but he
20 has been a correspondent with various
21 properties that we've worked with the Highland
22 entities before, kind of in an acquisition and
23 somewhat asset management type role.
24    Q. And how about Ms. Jones? Who is

Page 108

1    BH EQUITIES, LLC - D. MILLER
2 that?
3    A. She's the CFO of BH Companies.
4    Q. And was there discussions within BH
5 prior to November 7th concerning BH's desire to
6 have its capital returned?
7    A. Yes.
8    Q. And did BH Equities express that to
9 Highland in or before November 2020?
10    A. I don't know the first time it would
11 have been expressed, but, you know, it
12 wasn't -- it was a fairly known fact that we
13 would like to get our capital back.
14    Q. Okay. And the subject of this
15 e-mail, indeed, is called, quote, Unicorn
16 proposed distribution and detail schedules. Do
17 you see that?
18    A. Yes.
19    Q. Okay. And in the second paragraph,
20 Mr. Mulcahy references requested detail as well
21 as a, quote, updated distribution calculation.
22 Do you see that?
23    A. Yes.
24    Q. Do you have an understanding of what
25 a distribution calculation is?

Page 109

1    BH EQUITIES, LLC - D. MILLER
2    A. Yes.
3    Q. What's your understanding of that
4 term?
5    A. Just the -- split of the next
6 dollars going out, who is going to get what
7 from -- from the next amount that would be
8 distributed.
9    Q. And did BH Equities maintain a
10 distribution calculation that it updated from
11 time to time as circumstances changed?
12    A. Yeah, based on our understanding of
13 the agreements, we did.
14    Q. And did Highland ask BH Equities to
15 do that, or is that something that BH Equities
16 just did of its own accord?
17    A. I believe we did it on our own
18 accord.
19    Q. And did BH Equities share their
20 distribution calculations with Highland from
21 time to time?
22    A. Yes.
23    Q. And, in fact, it wasn't attached to
24 this particular document, but Mr. Mulcahy wrote
25 to Highland on November 7th that he was

Page 110

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2   attaching an updated distribution calculation.
3   Have I read that fairly?
4        A.  Yes.
5        Q.  And do you see that the updated
6   distribution calculation was for BH, HCRE, and
7   HCM?
8        A.  I'd need to see the document, but
9   that would be in line with what I understand
10  from that document.
11       Q.  Okay.  And it's your understanding
12  that BH refers to BH Equities, correct?
13       A.  Yes.
14       Q.  And HCRE refers to HCRE Partners,
15  LLC, correct?
16       A.  Yes.
17       Q.  And HCM refers to Highland Capital
18  Management, L.P., correct?
19       A.  Yes.
20       Q.  And was it BH Equities' intention to
21  create a distribution calculation that was
22  consistent with the terms and provisions of the
23  amended agreement?
24       A.  As we understood them, yes.
25       Q.  Okay.  And as BH Equities understood

Page 111

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2   the terms and provisions of the amended
3   agreement on or around November 7th, it
4   prepared a distribution calculation that showed
5   the return of capital to each of the three
6   members of SE Multifamily, correct?
7        A.  I -- I'd prefer to see the document
8   to state in the affirmative on that, but that
9   would be in line with, you know, my
10  understanding.
11       Q.  And it's in line with what
12  Mr. Mulcahy wrote, correct?
13       A.  Yes.
14       Q.  There's no question in BH Equities'
15  mind that Mr. Mulcahy told Highland on
16  November 7, 2020 that it had an updated
17  distribution calculation for BH Equities, HCRE,
18  and HCMLP.  Fair?
19       A.  Yes.
20       Q.  Okay.
21           MR. MORRIS:  Let's -- let's go up to
22       the response to that, if we could scroll
23       up.
24  BY MR. MORRIS:
25       Q.  And you'll see that Mr. McDermett

Page 112

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2   responded the following Tuesday to that e-mail,
3   and he added Matt McGraner and DC Sauter to the
4   thread.  Do you see that?
5        A.  Yes.
6        Q.  Do you know who Mr. Sauter is?
7        A.  Yes.
8        Q.  Who is Mr. Sauter?
9        A.  He is legal counsel within NexPoint,
10  HCRE, those entities.
11       Q.  Had BH Equities dealt with Mr. Sauter
12  on Project Unicorn before November 2020?
13       A.  Yes.  I don't know -- at one point he
14  was with Wick Phillips as well.  And I don't
15  know exactly when he made his transition, but
16  he was involved either as outside counsel or
17  internal, you know, several times throughout
18  the deal.
19       Q.  Okay.  And Mr. McDermett told
20  Mr. Mulcahy and the others copied on the
21  e-mail, including yourself, that he presented
22  BH Equities' proposed distribution and set of
23  facts to Mr. McGraner and Mr. Sauter, correct?
24       A.  Yes.
25       Q.  Okay.  And a couple of days later, BH

Page 113

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2   Equities hadn't received a response, so
3   Mr. Mulcahy followed up, is that fair, on
4   November 12th, in the e-mail above, if we can
5   scroll up?
6        A.  Yes, I see that.
7        Q.  Okay.  Okay.  Let's see what the
8   response to that is.  All right.  I'm just
9   going to read the paragraph out loud, and then
10  I'm going to ask you some questions about it.
11  "On November 19th, 2020, Mr. McDermett told
12  you, Mr. Mulcahy, and Ms. Jones, among others,
13  quote, we have confirmed internally that we are
14  standing by our position that distributions may
15  be returned to BH and HCRE in order to
16  extinguish their debts.  But the HCMLP
17  bankruptcy is temporarily inhibiting our
18  ability to distribute a return of equity at
19  this time.  DC Sauter and our team are working
20  toward a solution there and we will get back to
21  you as soon as we have clearance to move
22  forward with additional distributions (return
23  of equity and profits)."
24       Have I quoted that correctly?
25       A.  Yes.

Page 114

1    BH EQUITIES, LLC - D. MILLER
2    Q.  Okay.  Let's just take this in
3    pieces.  At this moment in time, BH Equities
4    wanted their capital back, right?
5    A.  Correct.
6    Q.  And Highland was refusing to do that,
7    correct?
8    A.  In whole, yes.
9    Q.  Okay.  And their position was that,
10   quote, distributions may be returned to B&H and
11   HCRE in order to extinguish their debts.  Do
12   you see that?
13   A.  Yes.
14   Q.  Do you have an understanding as to
15   what debts are being referred to there?
16   A.  I do.
17   Q.  What debts are being referred to?
18   A.  BH is part of our $21 million --
19   $21.2 or $21.5 million.  Had a $15 million line
20   of credit or debt facility that was drawn to
21   make that investment, and I believe HCRE, it
22   was determined that the entirety of its, you
23   know, 39 or $40 million amount was also
24   borrowed from NexVest Bank and that that's what
25   we were -- what extinguished their debts is

Page 115

1    BH EQUITIES, LLC - D. MILLER
2    referring to.
3    Q.  All right.  Let me make sure that I
4    understand that.  15 of the $21 million that
5    BH Equities put into the deal was borrowed from
6    a third party.  Do I have that right?
7    A.  That is correct.
8    Q.  And BH Equities' understanding is
9    that the difference between HCRE's capital
10   contribution of approximately $290 million and
11   the $250 million that was borrowed from KeyBank
12   was also borrowed from a third party, that $40
13   million.  Do I have that right?
14   A.  That's our understanding during this
15   time frame.
16   Q.  And it was BH Equities' understanding
17   that Highland's position was that it would
18   permit the repayment of amounts sufficient to
19   allow BH and HCRE to repay in full the
20   third-party debt but nothing more; is that
21   right?
22   A.  Yes.
23   Q.  All right.  So you're in November
24   2020, BH wants its entire initial capital
25   contribution returned, and they're told by HCRE

Page 116

1    BH EQUITIES, LLC - D. MILLER
2    that only amounts sufficient to repay
3    third-party debt would be permitted, correct?
4    A.  Correct.
5    Q.  Okay.  And then the next sentence
6    says, "But the HCMLP bankruptcy is temporarily
7    inhibiting our ability to distribute a return
8    of equity at this time."
9    Do you see that?
10   A.  Yes.
11   Q.  Do you know what they meant by that?
12   A.  No.  Not -- we were not in the weeds,
13   so to speak, on that.
14   Q.  Did BH Equities ever ask Highland or
15   anybody acting on behalf of HCRE why the HCMLP
16   bankruptcy would inhibit HCRE's ability to
17   distribute a return of equity in November 2020?
18   A.  I don't know that we asked that
19   directly.  We knew it was a tricky situation
20   and were somewhat deferential to it.
21   Q.  When did BH Equities learn that
22   Highland was in bankruptcy?
23   A.  I don't know a specific date, but it
24   would have been, you know, shortly after the
25   filing, as it started to make the public

Page 117

1    BH EQUITIES, LLC - D. MILLER
2    rounds.
3    Q.  And how did BH Equities learn of
4    that?  Did they learn it from public
5    information, or did they learn it from anybody
6    acting on behalf of HCRE?
7    A.  I don't recall specifically if we
8    were given a heads-up directly from HCRE or our
9    first knowledge was public information.
10   Q.  You don't have a recollection of
11   anybody on behalf of HCRE specifically
12   informing BH Equities that HCMLP would be
13   filing for bankruptcy, do you?
14   MR. DOHERTY:  Objection, form.
15   BY MR. MORRIS:
16   Q.  You can go ahead.
17   A.  I don't.  And in my preparation, I
18   was not made aware of any contact.  That
19   doesn't mean it didn't happen and I just wasn't
20   able to gather that info.
21   Q.  I'll represent to you that HCMLP
22   filed for bankruptcy in October 2019.  So my
23   question is whether BH Equities had any
24   communications with HCRE at any time prior to
25   November 2020 concerning any impact that the

Page 118

BH EQUITIES, LLC - D. MILLER

1 bankruptcy filing would have on HCRE's ability
2 to make distributions in accordance with the
3 amended agreement.
4
5     A. I don't know of anything that
6 specific. We were very focused at the time on
7 continuing the process to get KeyBank paid off
8 and then kind of taking it stride by stride,
9 given the complication of this very complex
10 transaction.
11     Q. Okay. Had anybody acting on behalf
12 of HCRE informed anybody acting on behalf of
13 BH Equities prior to November 19th, 2020 that
14 the HCMLP bankruptcy would have any impact at
15 all on the ability to make distributions?
16         MR. DOHERTY: Objection, form.
17     A. Could you repeat the question?
18 BY MR. MORRIS:
19     Q. Sure. BH Equities is being told in
20 this e-mail that, quote, the HCMLP bankruptcy
21 is temporarily inhibiting our ability to
22 distribute a return of equity at this time.
23         Do you see that?
24     A. Yes.
25     Q. Had anybody acting on behalf of HCRE

Page 119

BH EQUITIES, LLC - D. MILLER

1
2 ever told anybody acting on behalf of
3 BH Equities of that -- of that issue prior to
4 the time you received this e-mail?
5         MR. DOHERTY: Objection, form.
6     A. I don't know that there was anything
7 specifically said in that regard. I'm not
8 aware of anything that specific. We knew of
9 the bankruptcy from both -- from public -- or
10 not both, but from public forums, and we knew
11 that would have an impact, being that it was a
12 direct partner. I don't recall any -- or know
13 of any very specific conversation with HCRE
14 about what impact it was going to have.
15 BY MR. MORRIS:
16     Q. Did anybody from HCRE ever describe
17 for BH Equities the impact that the bankruptcy
18 would have on SE Multifamily or HCRE's ability
19 to make distributions prior to the sending of
20 this e-mail?
21         MR. DOHERTY: Objection, asked and
22 answered.
23         You may answer, Mr. Thomas, the
24 question.
25     A. Okay. Not to my knowledge.

Page 120

BH EQUITIES, LLC - D. MILLER

1
2 BY MR. MORRIS:
3     Q. Okay. And then in the next sentence
4 it says that DC Sauter and our team are working
5 toward a solution.
6         Do you see that?
7     A. Yes.
8     Q. Did they ever explain -- did anybody
9 acting on behalf of HCRE ever explain to
10 BH Equities what the solution was?
11     A. No. Not to my knowledge.
12     Q. Did BH Equities ever ask Highland or
13 HCRE what the solution was that Mr. Sauter was
14 working towards?
15     A. I don't know if we had a specific
16 question or conversation about that within the
17 firm.
18     Q. So if we scroll up, you'll see that
19 Mr. McDermett, I guess, re-sent his e-mail with
20 an attachment. I don't believe that was
21 attached to the document that we received. But
22 in any event, Mr. Mulcahy responded at the top
23 of the e-mail chain. And is it fair to say
24 that in substance --
25         MR. MORRIS: I think if we could keep

Page 121

BH EQUITIES, LLC - D. MILLER

1
2 scrolling up. Yeah.
3 BY MR. MORRIS:
4     Q. Is it fair to say in substance that
5 BH Equities was willing to accept the
6 distributions so that it could repay the
7 third-party debt that it had incurred but still
8 wanted to get the remaining funded capital out
9 of SE Multifamily?
10     A. I might say it slightly differently.
11     Q. Okay.
12     A. HCRE was the manager.
13     Q. Yep.
14     A. And they instructed us to do
15 something as the manager of the entity, and
16 that was done. But, yes, as it's stated
17 clearly here, we hope to find a solution to get
18 our remaining 6.2 million of capital out as
19 well.
20     Q. Okay.
21         MR. MORRIS: Let's go to the next
22 exhibit, please, Exhibit 13.
23         (Exhibit 13 marked.)
24 BY MR. MORRIS:
25     Q. So this is seven months later.

Page 122

BH EQUITIES, LLC - D. MILLER

1    Exhibit 13 is a two-page document Bates
2    numbered BH 173 to 174. The second page is
3    just an icon. And at that e-mail at the bottom
4    of the first page, Mr. Mulcahy is raising the
5    exact same issue that he had raised seven
6    months earlier, and that is BH Equities wanted
7    the return of its capital; is that fair?
8    A.  Yes.
9    Q.  Okay. And, in fact, that
10   $6.258 million that he refers to in his e-mail,
11   that's the same amount that he referred to in
12   his e-mail back in November of 2020, because no
13   capital had been distributed since that time,
14   correct?
15   A.  Correct.
16   Q.  And BH Equities pointed out that SE
17   Multifamily had $8 million in its bank account,
18   and so it wanted every dollar of invested but
19   unreturned capital repatriated to it, correct?
20   A.  Yes.
21   Q.  And if you scroll up, Mr. McDermett
22   again calls others to the table, in this case
23   Mr. McGraner and Rob Harris. Do you see that?
24   A.  Yes.

Page 123

BH EQUITIES, LLC - D. MILLER

1    Q.  And at the top, Mr. McGraner -- no,
2    withdrawn.
3    At the top, Mr. McDermett informs
4    Mr. Mulcahy that Mr. Mulgraner has approved the
5    repatriation of the remaining unpaid capital to
6    BH Equities. Do I have that right?
7    A.  Yes.
8    Q.  And so, in fact, in June of 2021,
9    BH Equities got the last of its capital
10   investment out of SE Multifamily, correct?
11   A.  Yes.
12   Q.  Does SE -- withdrawn.
13   Does BH Equities know whether all of
14   HCRE's original capital contribution has been
15   repatriated?
16   A.  We believe it has at that point.
17   Q.  Does BH Equities know whether the
18   capital contribution made by Highland Capital
19   Management was returned to it?
20   A.  As of the date of this e-mail, we
21   don't believe it has.
22   Q.  Do you know when HCRE's capital
23   contribution was repatriated in full? When was
24   either the month or at least the year when HCRE

Page 124

BH EQUITIES, LLC - D. MILLER

1    had all of its capital returned or at least
2    credited to it?
3    A.  I believe -- my apologies. We're
4    talking about HCRE, correct?
5    Q.  Yes.
6    A.  I believe it was in 2020 when they
7    had received all of their invested capital
8    back.
9    Q.  So -- and is that because all of
10   their invested capital, to the best of
11   BH Equities' understanding, was borrowed from
12   third parties?
13   A.  Yes.
14   Q.  And so the deal was to repatriate all
15   capital contributions that were sourced from
16   third parties, correct?
17   A.  Yes.
18   Q.  So it's BH Equities' understanding
19   that HCRE did not put in any of its own capital
20   in connection with the funding of
21   SE Multifamily, correct?
22   A.  Its own capital being that that
23   wasn't borrowed from a third party, yes, that's
24   correct.

Page 125

BH EQUITIES, LLC - D. MILLER

1    Q.  Okay. And that's why it got paid --
2    well, withdrawn.
3    That's why it was credited with the
4    return of all of its capital before
5    BH Equities; is that fair?
6    A.  Yes.
7    MR. DOHERTY:  Mr. Morris -- and you
8    can tell me -- I believe that the witness
9    misunderstood a question a couple back
10   about Highland Capital. I can --
11   MR. MORRIS:  Sure, go ahead.
12   MR. DOHERTY:  -- identify it now.
13   Okay. You asked about whether he
14   knew Highland Capital had been -- had
15   their capital returned, the 49,000; is
16   that right?
17   MR. MORRIS:  Yep.
18   MR. DOHERTY:  And then I think
19   Mr. Thomas said as of -- he, I think,
20   added a qualifier, as of the date of this
21   e-mail it hadn't.
22   MR. MORRIS:  Right.
23   MR. DOHERTY:  But did you mean
24   what -- so was that the intent of your

Page 126

BH EQUITIES, LLC - D. MILLER

1       question, or was it had it been returned
2    at all?
3       MR. MORRIS: I appreciate that.
4    Well, let me try and clean that up, Casey.
5  BY MR. MORRIS:
6     Q. Mr. Thomas, as of the time that --
7    withdrawn.
8      Do you know whether HCMLP's $49,000
9    was original out-of-pocket capital or whether
10  HCMLP borrowed that money as that third-party
11  debt?
12    A. I don't know for certain, as we
13  haven't traced the source, but we're led to
14  believe that it was not borrowed capital.
15    Q. Okay. So in 2020, all borrowed
16  capital was paid back in full, correct?
17    A. Yes.
18    Q. And to the best of BH Equities'
19  knowledge, all of HCRE's capital was borrowed,
20  correct?
21    A. Yes.
22    Q. And by June 2021, all of BH Equities'
23  capital contribution was paid back or credited
24  in full, correct?


Page 126

BH EQUITIES, LLC - D. MILLER

1    question, or was it had it been returned
2    at all?
3      MR. MORRIS: I appreciate that.
4    Well, let me try and clean that up, Casey.
5  BY MR. MORRIS:
6    Q. Mr. Thomas, as of the time that --
7    withdrawn.
8    Do you know whether HCMLP's $49,000
9    was original out-of-pocket capital or whether
10  HCMLP borrowed that money as that third-party
11  debt?
12    A. I don't know for certain, as we
13  haven't traced the source, but we're led to
14  believe that it was not borrowed capital.
15    Q. Okay. So in 2020, all borrowed
16  capital was paid back in full, correct?
17    A. Yes.
18    Q. And to the best of BH Equities'
19  knowledge, all of HCRE's capital was borrowed,
20  correct?
21    A. Yes.
22    Q. And by June 2021, all of BH Equities'
23  capital contribution was paid back or credited
24  in full, correct?

Page 127

BH EQUITIES, LLC - D. MILLER

1    A. Yes.
2    Q. And that's both the third-party debt
3  as well as the original sourced funding,
4  correct?
5    A. Yes.
6    Q. But HCMLP is the only member who had
7  no capital returned to it, at least as of June
8  2021, correct?
9    A. Correct.
10    Q. Do you know why HCRE and BH Equities
11  was made whole by June 2021 but HCMLP was not?
12    A. That was how we were directed to make
13  payments by the manager.
14    Q. And who on behalf of the manager
15  directed you to make the payments in that
16  manner?
17    A. We coordinated through Mr. McDermett,
18  but it was -- as you can see with his e-mail
19  exchange, I believe the discussion was had with
20  Mr. McGraner, potentially others.
21    Q. Did anybody acting on behalf of the
22  manager explain to BH Equities why it was not
23  instructing BH Equities to make HCMLP whole?
24    A. No.

Page 128

BH EQUITIES, LLC - D. MILLER

1    Q. Did BH Equities ask that question?
2    A. I don't believe so.
3    Q. All right. Let's go to -- just two
4  more documents, sir. Let's start with some tax
5  returns.
6    (Exhibit 14 marked.)
7    MR. MORRIS: Can we go to Exhibit 14,
8  which is BH 10 through 75.
9  BY MR. MORRIS:
10    Q. Are you aware that BH Equities
11  produced in response to the subpoena
12  SE Multifamily's tax returns, including K-1s
13  for 2019?
14    A. Yes.
15    Q. And did you review those in
16  preparation for today's deposition?
17    A. Yes.
18    Q. And the document that's on the screen
19  is a cover letter. Do you see that?
20    A. Yes.
21    Q. Is BH Equities aware that a firm
22  called Barker Viggato prepared the tax returns
23  for SE Multifamily?
24    A. Yes.

Page 129

BH EQUITIES, LLC - D. MILLER

1    Q. And do you see that this is a
2  letter -- the first page of this exhibit is a
3  letter from Barker Viggato dated September 9,
4  2020?
5    A. Yes.
6    Q. Okay. And can you confirm that
7  BH Equities received this letter with the
8  attachments in or around September 2020?
9    A. Yes.
10    Q. All right. Do you know who was
11  responsible for communicating with Barker
12  Viggato on behalf of SE Multifamily? Was that
13  the manager's job?
14    Q. Okay. I'm not asking -- do you know
15  who on behalf of the manager was primarily
16  responsible for communicating with Barker
17  Viggato?
18    A. I do not.
19    Q. Is it BH Equities' understanding that
20  under the terms of the amended agreement that
21  the manager was responsible for causing SE
22  Multifamily's tax returns to be prepared?
23    A. Yes.

Page 130

1      BH EQUITIES, LLC - D. MILLER
2      Q.  Okay.  Is it BH Equities'
3  understanding that the manager was responsible
4  for providing the information that Barker
5  Viggato needed to prepare SE Multifamily's tax
6  returns?
7      A.  Yes.
8      Q.  Has Barker Viggato been the firm that
9  has prepared SE Multifamily's tax returns since
10  SE Multifamily was formed in August of 2018?
11     A.  I don't recall specifically if they
12  did the 2018 return.  I do know they did '19
13  and '20.
14     Q.  I appreciate the specificity.
15        So we can take a look at anything you
16  want in this document.  If we turn to the next
17  page, we'll see that it says 2019 Tax Return
18  Filing Instructions.  Do you see that?
19     A.  Yep.
20     Q.  Do you know if SE Multifamily's tax
21  returns for 2019 were ever amended?
22     A.  Not to my knowledge.
23     Q.  Did BH Equities have any discussions
24  with anybody at any time over whether
25  SE Multifamily's 2019 tax returns should be

Page 131

1      BH EQUITIES, LLC - D. MILLER
2  amended?
3      A.  Could you scroll in here?  There
4  should be the allocation of BH Equities in
5  this.  And in one of the years -- and I don't
6  recall if it was '19 or '20 -- we did have a
7  question about, you know, allocations.  So...
8      Q.  Okay.  And would that be the K-1?
9      A.  Yes.
10     Q.  Okay.  We'll get to that in just a
11  moment, and then we'll come back to the
12  question of amendment at that time.
13        Are you aware that K-1s for each of
14  the members of SE Multifamily were included in
15  the package of documents prepared by Barker
16  Viggato?
17     A.  Yes.
18     Q.  Did BH Equities -- withdrawn.
19        Do you know whether any K-1 that was
20  issued to any member of SE Multifamily was ever
21  amended?
22     A.  Not to my knowledge.
23        MR. MORRIS:  Let's go to Bates number
24  17, please.  And if we could scroll down
25  to line 19a.  Yeah, there you go.

Page 132

1      BH EQUITIES, LLC - D. MILLER
2  BY MR. MORRIS:
3      Q.  Do you see 19a refers to
4  distributions of cash and marketable
5  securities?
6      A.  Yes.
7      Q.  And the number there is $267 million?
8  Do you see that?
9      A.  Yes.
10     Q.  Is that the return of the third-party
11  debt that we've been talking about, if you
12  know?
13     A.  The majority of it would have been,
14  yes.
15     Q.  Okay.  Do you know what portion of
16  that would have related to a distribution other
17  than the repayment of third-party debt?
18     A.  I don't specifically without, you
19  know, referencing the work papers or things
20  like that.
21     Q.  Okay.  Hold on one sec.
22        Do you know, who authorizes the
23  making of distributions on behalf of SE
24  Multifamily?
25     A.  The manager would do that.

Page 133

1      BH EQUITIES, LLC - D. MILLER
2      Q.  And who does BH Equities understand
3  the manager to be?
4      A.  HCRE Partners.
5      Q.  Let's go to Bates number 21, please.
6        MR. DOHERTY:  When you're saying
7  Bates 21, Mr. Morris, is that our Bates
8  numbering?  Okay, thank you.  Okay.
9  BY MR. MORRIS:
10     Q.  So this is Schedule B-1.  Do you see
11  that?
12     A.  Yes.
13     Q.  And Highland Capital Management, L.P.
14  is identified as an entity owning 50 percent or
15  more of the partnership.  Do you see that?
16     A.  Yes.
17     Q.  And Highland Capital Management,
18  L.P.'s interest is fixed at 94 percent.  Do you
19  see that?
20     A.  Yes.
21     Q.  And is it BH Equities' understanding
22  that that 94 percent is a reference to that
23  Section 6.4 where 94 percent of the profits and
24  losses are allocated to HCMLP?
25     A.  Yes.

Page 134

BH EQUITIES, LLC - D. MILLER

1
2    Q.   Okay.  Any reason to believe that
3  this portion of the tax return is incorrect or
4  mistaken?
5    A.   No.
6    Q.   Okay.  Nobody ever suggested to you
7  that this page should be amended, correct?
8    A.   No.
9    Q.   All right.
10      MR. MORRIS:  Let's go to -- let's
11      jump to 55.
12  BY MR. MORRIS:
13    Q.   Do you see that this is the K-1 for
14  HCMLP?
15    A.   Yes.
16    Q.   And do you see that, if we can scroll
17  down just a little bit, that the profits and
18  losses for HCMLP with respect to SE Multifamily
19  were approximately 90.6 percent at the
20  beginning of 2016 and they remained at 90.6
21  percent at the end of that year?
22    A.   Yes.
23    Q.   Do you have any understanding as to
24  why it wasn't 94 percent, as set forth in the
25  agreement?

Page 135

BH EQUITIES, LLC - D. MILLER

1
2    A.   No.
3    Q.   Okay.  Do you see that Highland's
4  capital percentage is fixed at 46.06 at the
5  beginning of 2019 and it remained at 46.06 at
6  the end of the year?
7    A.   Yes.
8    Q.   Is that consistent with your
9  understanding of the residual interest that
10  Highland Capital Management, L.P. has in
11  SE Multifamily?
12    A.   Yes.
13    Q.   And did anybody ever tell you that
14  that capital percentage was incorrect or
15  mistaken in any way?
16    A.   No.
17    Q.   And do you see that in the -- in the
18  Box K, Partner's Share of Liabilities, at the
19  beginning of the year there was qualified
20  nonrecourse financing of over $336 million to
21  HCMLP?
22    A.   Yes.
23    Q.   And that by the end of the year it
24  was reduced to an amount just less than a
25  hundred million dollars.  Do you see that?

Page 136

BH EQUITIES, LLC - D. MILLER

1
2    A.   Yes.
3    Q.   Did BH Equities understand that
4  Highland Capital Management, L.P. was a
5  guarantor and was jointly and severally liable
6  under the KeyBank loan?
7    A.   I don't know if we had that specific
8  knowledge.  I don't believe so.
9    Q.   Okay.  Do you know whether the
10  reduction of approximately $238 million in the
11  qualified nonrecourse financing related to the
12  return of capital to KeyBank under the KeyBank
13  loan?
14    A.   Based on my understanding, that is
15  not what that would be related to.
16    Q.   Do you know what it's related to?
17    A.   Typically, the qualified nonrecourse
18  financing relates to nonrecourse financing on
19  the properties underneath the entity, and if
20  there were properties being sold and those
21  debts being extinguished, that would naturally
22  go down.
23    Q.   Is it BH Equities' understanding that
24  at the beginning of 2019, Highland Capital
25  Management, L.P. was liable on a qualified

Page 137

BH EQUITIES, LLC - D. MILLER

1
2  nonrecourse basis to the tune of $336 million
3  in connection with the property that was
4  acquired by SE Multifamily?
5    A.   Liable throws me off in there because
6  of it being nonrecourse financing.
7    Q.   All right.  I'm going to -- I'm going
8  to pretend -- I'm not going to pretend.
9      Do you see Section K is entitled
10  Partner's Share of Liabilities?
11    A.   Yes.
12    Q.   You know what, I'll ask this of
13  somebody else.
14      Can we -- actually, let's just stay
15  here.  And then there's a Partner Capital
16  Account Analysis in Box L.  Do you see that?
17    A.   Yes.
18    Q.   And did BH Equities have any
19  information relating to the partners' capital
20  accounts?
21    A.   No, I don't believe so.
22    Q.   Okay.  Do you see that Highland is
23  shown as having a capital account worth $15.555
24  million at the end of 2019?
25    A.   Yes.

Page 138

1      BH EQUITIES, LLC - D. MILLER
2      Q.  Okay.  Does BH Equities have any
3  reason to believe that that's a mistake?
4      A.  No.
5      Q.  Okay.  Has anybody ever told
6  BH Equities that they believe Highland had a
7  capital account at the end of 2019 that was
8  something other than the number represented in
9  Box L on Bates-numbered page BH 55?
10     A.  No.
11     MR. MORRIS:  Can we scroll back up
12     further to the top of this page?
13 BY MR. MORRIS:
14     Q.  Do you see that in Box 2, over $30
15  million of rental income is being passed
16  through to Highland from SE Multifamily?
17     A.  Yes.
18     Q.  And is it BH Equities' understanding
19  that that number in Box 2 should represent
20  90.6119893 percent of SE Multifamily's profits
21  in 2019?
22     MR. DOHERTY:  Objection, form.
23     A.  Yeah, it's a little nuanced, and I'm
24  not a CPA nor have access to work papers, so I
25  can't specifically say that that -- that number

Page 139

1      BH EQUITIES, LLC - D. MILLER
2  could include multiple other things, and I'm
3  just not privy to that information.
4  BY MR. MORRIS:
5      Q.  Okay.  Let's go to page 61, which is
6  the K-1 for NexPoint Real Estate Partners.
7      Did there come a time when HCRE
8  Partners, LLC's name was changed to NexPoint
9  Real Estate Partners, LCC?
10     A.  I don't recall specifically, but
11  that's -- that's possible, yes.
12     Q.  Okay.  Do you see that in Part J to
13  this K-1, it shows that the profits and losses
14  were zero percent at the beginning of 2019 and
15  they were zero percent at the end of 2019?
16     A.  Yes.
17     Q.  And that's consistent with the
18  provision that we looked at earlier in the
19  amended agreement that none of SE Multifamily's
20  profits or losses would be allocated to HCRE,
21  correct?
22     A.  Correct.
23     Q.  Okay.  And the capital, though, is
24  set at 47.94 percent at the beginning of the
25  year, and it remains steady until the end of

Page 140

1      BH EQUITIES, LLC - D. MILLER
2  the year, correct?
3      A.  Correct.
4      Q.  And that's consistent with the
5  residual interest that we saw on Schedule A to
6  the amended agreement, correct?
7      A.  Yes.
8      Q.  Okay.  And then if you look to the
9  right in Box 19 -- well, actually, if you look
10  up in Box 2, you'll see there's nothing there,
11  right?
12     A.  Yes.
13     Q.  So that none of SE Multifamily's
14  profits were passed through to HCRE or its
15  successor, correct?
16     A.  Correct.
17     Q.  And Box 19 in the Distributions, that
18  $250 million was the money that was paid back
19  to HCRE in 2019 so that it could pay off the
20  KeyBank loan, tranche B, correct?
21     A.  Potentially with other distributions,
22  but, yes, but it would have been the total
23  distributions received and then applied to
24  KeyBank or other sources.
25     Q.  Are you aware of any distributions

Page 141

1      BH EQUITIES, LLC - D. MILLER
2  that were made to HCRE in 2019 other than
3  amounts sufficient to repay the third-party
4  debt?
5      A.  I don't believe so.
6      Q.  Okay.  And let's go to the next K-1,
7  which I think is BH Equities', page 64.  All
8  right.  This is BH Equities' K-1.  Do you see
9  that?
10     A.  Yes.
11     Q.  Now, do you see the profit and loss
12  there is a shade under 5.8 percent at the
13  beginning of the year and the same at the end
14  of the year?
15     A.  Yes.
16     Q.  Do you know why that's not 6 percent?
17     A.  Not without reviewing work papers or
18  things, no.
19     Q.  Okay.  But the residual percentage
20  interest is -- was 6 percent at the beginning
21  of the year and it was 6 percent at the end of
22  the year, right?
23     A.  Yes.
24     Q.  And that's again consistent with
25  Schedule A to the amended agreement, correct?

Page 142

```
1        BH EQUITIES, LLC - D. MILLER
2     A.  Correct.
3     Q.  And nobody ever suggested that either
4  HCMLP's or HCRE's or BH Equities' 2019 K-1s
5  were incorrect in any way, correct?
6     A.  Correct.
7     Q.  Okay.  Do you see there's a
8  distribution there in Box 19 of $46,000?
9     A.  Yes.
10    Q.  Do you have any idea why BH Equities'
11 K1 for 2019 shows that it received a
12 distribution of $46,926?
13    A.  No, other than seeing there's a
14 footnote A or a notation A next to it, which
15 may have more description.
16       MR. DOHERTY:  Mr. Morris, can you
17 show the witness A?  May I ask that?
18       MR. MORRIS:  Yeah, I'm looking for
19 it.  I actually -- if we could scroll
20 down, the next -- the next page is Code Z.
21 The next page -- I don't see it there.
22 Yeah, I don't see it.  So I'll just move
23 on.  I can only work with what I have.
24 BY MR. MORRIS:
25    Q.  And then let's go to Bates number 70,
```

Page 143

```
1        BH EQUITIES, LLC - D. MILLER
2  please.  And this is the K-1 for Liberty,
3  correct?
4     A.  Yes.
5     Q.  And they have zero percent capital at
6  the beginning of the year and at the end of the
7  year because they didn't make an equity
8  investment in SE Multifamily, correct?
9     A.  It was a preferred equity investment,
10 which would be treated differently.
11    Q.  Correct.  And they got distributions
12 of approximately $17 million, as reflected in
13 paragraph -- in Section 19, because they were
14 preferred holders and they were entitled to get
15 paid first, correct?
16    A.  Yes.
17    Q.  Do you know why they were allocated
18 3.6 percent of the profits and losses in 2019?
19    A.  I don't, no.
20    Q.  Did you know that they were allocated
21 3 percent of the profits and losses in 2019
22 before now?
23    A.  Only from reviewing the documentation
24 and things.
25    Q.  No agreement was ever -- no amendment
```

Page 144

```
1        BH EQUITIES, LLC - D. MILLER
2  to the amended agreement was ever made to
3  change the allocation set forth in Section 6.4,
4  right?
5     A.  Not that I'm aware.
6        MR. MORRIS:  Let's go to the last
7  exhibit, 15, BH 76 to 78.
8        (Exhibit 15 marked.)
9  BY MR. MORRIS:
10    Q.  And do you see this is BH Equities'
11 K-1 for 2020?
12    A.  Yes.
13    Q.  All right.  Let's just scroll down a
14 little bit.  It's just a two-page -- I guess
15 it's a three-page document.
16       In looking at it, does it refresh
17 your recollection -- I had asked you earlier
18 whether there was ever any discussion at any
19 time about filing an amendment to any of SE
20 Multifamily's tax returns or the K-1s at issue.
21 Do you remember that question?
22    A.  Yes, I remember that question.
23    Q.  And I think you testified that there
24 may have been?
25    A.  We had questions.  If you could
```

Page 145

```
1        BH EQUITIES, LLC - D. MILLER
2  scroll up on this.  We were curious as to why
3  there was no allocation in Box 1 or 2 to
4  BH Equities in 2020.
5     Q.  Oh, okay.  So the question was why
6  did BH Equities not receive any allocation of
7  ordinary business income or net rental income
8  from the real estate; is that right?
9     A.  Correct.
10    Q.  Did BH Equities ever get an answer to
11 that question?
12    A.  I don't believe we did.
13    Q.  But BH Equities' allocation of
14 profits and losses doesn't seem to have
15 changed, right?  It's the same 5.78 percent as
16 it was in 2019, at least according to the K-1s,
17 correct?
18    A.  Correct.
19    Q.  Do you know if this K-1 was reported
20 to the IRS?
21       MR. DOHERTY:  Objection, form.  What
22 is reported?  Was it filed, John?
23       MR. MORRIS:  Yeah, that's a fair
24 question.
25
```

Page 146

BH EQUITIES, LLC - D. MILLER

1  BY MR. MORRIS:
2
3      Q.  Yeah.  Do you know if this K-1 was
4  ever filed with the IRS?
5      A.  I don't.  It would have been the
6  manager's responsibility to file the tax return
7  on behalf of the entity, and then BH Equities,
8  given our complex nature, you know, has a very
9  complicated tax return.  So its information
10  would have been used in the broader
11  BH Equities' filing, but we wouldn't have sent
12  this directly attached to our tax return, per
13  se.
14      Q.  Okay.  I appreciate the
15  clarification.
16          Did BH Equities rely on the
17  information in this K-1 to prepare its tax
18  returns for 2020?
19          MR. DOHERTY:  Object.  I don't -- I'm
20  just making this objection in caution.  I
21  think this is a little outside the scope.
22  I mean, I know if you're going places, but
23  if this involves, like, tax advice from
24  attorneys or something, then don't go into
25  detail on that.  I just wanted to -- it's

Page 147

BH EQUITIES, LLC - D. MILLER

1  fair.  If there's a question pending, you
2  can answer the question.
3
4  BY MR. MORRIS:
5      Q.  Look, the question is really simple,
6  Mr. Thomas.  Is this a draft document, or is
7  this something that BH Equities has actually
8  relied upon in the preparation of its tax
9  returns for 2020?
10      A.  Those aren't necessarily the same
11  question.  Or it's not --
12      Q.  I understand.  I'm trying to clean it
13  up and make it as simple as I can to show
14  you --
15      A.  Well, there's not -- sorry to be
16  difficult.  Those aren't the only two
17  possibilities.  And my understanding is
18  we may -- we may have taken a different stance
19  as it is our tax return.  So that's why I'm --
20  I'm saying it was not delivered to us as a
21  draft so that we believed this was the K-1
22  delivered to us, even though we had questions.
23          I can't affirm -- I can't say that we
24  relied on it because I believe we took a
25  different course, as is our right with our

Page 148

BH EQUITIES, LLC - D. MILLER

1
2  taxes.
3      Q.  Why did BH Equities take a different
4  course?  What does that mean?
5          MR. DOHERTY:  Objection, form.
6  BY MR. MORRIS:
7      Q.  You can answer.
8          MR. DOHERTY:  Well, you can answer --
9  again, I think this is outside the scope,
10  but if it involves outside attorney's
11  advice about your taxes, then you need to
12  be careful if you need to -- if you think
13  you're getting attorney advice, then you
14  need to be careful.
15      A.  Yeah, I think it would be just
16  related to internal decision making.
17  BY MR. MORRIS:
18      Q.  Internal decision making is not a
19  reason to not share the answer with me.
20          MR. DOHERTY:  Mr. Thomas, if it's
21  legal counsel, then --
22          MR. MORRIS:  Then you should say so.
23  Then you should say so.
24          MR. DOHERTY:  Right.
25          If you can answer without that, then

Page 149

BH EQUITIES, LLC - D. MILLER

1  you can answer the question.
2
3      A.  We just took a more conservative
4  approach and allocated 6 percent of the net
5  income into our tax liability, given the
6  complexity of our return.
7  BY MR. MORRIS:
8      Q.  I just want to make sure that I
9  understand correctly, that notwithstanding
10  what's stated on this K-1, BH Equities made the
11  decision to allocate to itself 6 percent of
12  SE Multifamily's profits in 2020; is that
13  right?
14      A.  For the purposes of taxes, yes.
15      Q.  Yes.  Okay.  Did BH Equities ever
16  discuss that decision with anybody acting on
17  behalf of HCRE?
18      A.  No.
19      Q.  Did BH Equities ever discuss that
20  decision with anybody acting on behalf of
21  Barker Viggato?
22      A.  No.
23      Q.  Did BH Equities ever discuss this K-1
24  with anybody at Barker Viggato?
25      A.  I don't know for sure.  I know there

Page 150

BH EQUITIES, LLC - D. MILLER

1        BH EQUITIES, LLC - D. MILLER
2  was an e-mail request -- or an e-mail ask on
3  this K-1, and I don't know for sure if Barker
4  Viggato people were included or not on that or
5  if it was just directed to HCRE.
6    Q.  Okay.
7      MR. MORRIS:  If we can scroll down
8  just a little bit.
9  BY MR. MORRIS:
10    Q.  Do you see Box L?
11    A.  Yes.
12    Q.  And there's an ending capital account
13  of approximately $8.5 million.  Do you see
14  that?
15    A.  Yes.
16    Q.  Since all of the original funded
17  capital has been returned with the exception of
18  Highland's $49,000, is it fair to say that that
19  number, $8.5 million, equals approximately
20  6 percent of the capital accounts among the
21  members of SE Multifamily?
22    A.  The tax capital account, yes.  That
23  would be my understanding.
24    Q.  Okay.  So that -- would it be
25  BH Equities' expectation that HCMLP's capital

Page 151

1        BH EQUITIES, LLC - D. MILLER
2  account would be approximately five to six
3  times bigger than that because they have a
4  46.06 percent residual interest?
5    A.  Not necessarily.
6    Q.  Is there a relationship between
7  BH Equities' capital account and the capital
8  accounts of the other members, given that all
9  of the original capital contributions have been
10  paid in full but for HCMLP?
11      MR. DOHERTY:  Objection.  I think
12  that mischaracterizes --
13      MR. MORRIS:  You've got the -- you've
14  got the objection.  I'm going to cut you
15  off this time.
16    A.  Relationship, yes.  But it's not a
17  direct linear relationship given how tax --
18  given how tax remedies work and allocations of
19  profit and loss, capital, those things.  So
20  it's not a simple linear relationship.
21  BY MR. MORRIS:
22    Q.  All right.  Let's shift gears now,
23  last topic, no documents.  Actually, just hold
24  on one second.
25      Okay.  Let's just shift gears and

Page 152

1        BH EQUITIES, LLC - D. MILLER
2  finish this up.  If we could go back to the
3  subpoena, which I think was Exhibit 1.  Again,
4  page 2 of the exhibit, PDF page 9 of 13.  And I
5  know I asked a couple of questions, but I said
6  we'd come back to it.
7      So we're on topic 4, and remember I
8  defined what's in the parenthetical there as
9  HCRE's contention.  Do you remember that?
10    A.  Yes.
11    Q.  Okay.  Really, I don't have a lot
12  here.  Do you recall when BH Equities first
13  learned of HCRE's contention as set forth in
14  topic 4?
15    A.  I believe it would have been, I don't
16  know, a few days after filings or something
17  along those lines, as we tried to pay
18  attention.
19    Q.  When do you think it was?
20    A.  Shortly after the filing of it, once
21  it was on the public record.
22    Q.  And how did -- how did BH Equities
23  learn of the contention?
24    A.  I think we'd been an interested party
25  in the case as it relates to SE Multifamily, so

Page 153

1        BH EQUITIES, LLC - D. MILLER
2  we were paying attention to the court records
3  and things.
4    Q.  Did BH Equities have any source of
5  information other than court records by which
6  it learned of HCRE's contention?
7    A.  I don't believe so.
8    Q.  Okay.  So is it fair to say that to
9  the best of your recollection, BH Equities
10  relied exclusively on what was on the court
11  record in order to learn about HCRE's
12  contention?
13    A.  To the best of my knowledge.
14    Q.  Okay.  Do you know whether BH
15  Equities has ever discussed this contention
16  with anybody at HCRE?
17    A.  Not to my knowledge.
18    Q.  Do you know if anybody acting on
19  behalf of BH Equities has ever communicated
20  with anybody at HCRE concerning the contentions
21  set forth in topic 4?
22    A.  Not to my knowledge.
23    Q.  Do you know whether HCRE, in its
24  capacity as the manager, has ever done anything
25  to address the mistake that's described in its

Page 154

BH EQUITIES, LLC - D. MILLER

1    contention other than file with a proof of
2    claim?
3        A.  Not to my knowledge.  I don't believe
4    so.
5        Q.  And also with -- they also, at least
6    in November 2020, decided to withhold --
7    withdrawn.
8        Other than responding to the
9    subpoena, has BH Equities done anything in
10   response to learning about the contentions set
11   forth in paragraph -- topic 4?
12       MR. DOHERTY:  Objection.  If this --
13       if this involves legal discussions, then
14       you are not to answer, but you can follow
15       the question.
16       A.  I don't believe we've taken any --
17   any business action in regard to this
18   contention.
19   BY MR. MORRIS:
20       Q.  Okay.  Does BH Equities have a view
21   as to whether the contention is fair and
22   accurate?
23       MR. DOHERTY:  Objection.
24
25

Page 155

BH EQUITIES, LLC - D. MILLER

1    BY MR. MORRIS:
2        Q.  Well, let me ask a different
3    question.  Does BH Equities believe that the
4    organizational documents relating to
5    SE Multifamily improperly allocate the
6    ownership percentages of the members thereto
7    due to mutual mistake, lack of consideration,
8    and/or failure of consideration?
9        MR. DOHERTY:  Objection.
10   BY MR. MORRIS:
11       Q.  You can answer.
12       MR. DOHERTY:  Form.
13       You can answer, Mr. Thomas.
14       A.  I don't know that I can answer
15   specifically because, again, we viewed it as a
16   bilateral negotiation at the time, and that
17   would take into account the parties'
18   consideration that we just didn't have -- we
19   weren't privy to nor frankly had an interest in
20   knowing at the time.
21   BY MR. MORRIS:
22       Q.  Is it fair to say that BH Equities
23   does not have a position as to whether or not
24   the organizational documents relating to
25

Page 156

BH EQUITIES, LLC - D. MILLER

1    SE Multifamily improperly allocated the
2    ownership percentages of the members thereto
3    due to mutual mistake, lack of consideration,
4    and/or failure of consideration?
5        A.  Yes.  We do not have a position on
6    that.
7        MR. MORRIS:  I have no further
8    questions.
9        MR. DOHERTY:  Mr. Morris, I'd like to
10       ask one or two questions on redirect to
11       clarify something.  Is that okay to do it
12       now, or would you like a --
13       MR. MORRIS:  No, I think you should
14       do it now.
15       EXAMINATION
16   BY MR. DOHERTY:
17       Q.  Mr. Thomas, I'm going to ask you a
18   couple of questions as if we were in court, you
19   know, as you were with Mr. Morris.
20       During the testimony, I believe --
21   I'm unsure how it came about exactly, but you
22   were asked questions that did Highland Capital
23   Management ever receive their capital
24   contribution back, and you answered at one

Page 157

BH EQUITIES, LLC - D. MILLER

1    point that they had not received it as of June
2    9th, 2021; is that correct?
3        A.  That is correct.
4        Q.  Were you referring to the $49,000 in
5    capital that's reflected on Schedule A?
6        A.  Yes.
7        Q.  Has Highland Capital, to BH's
8    knowledge, now received that $49,000?
9        A.  Yes.
10       MR. DOHERTY:  No further questions.
11       MR. MORRIS:  I have nothing further.
12       MR. GAMEROS:  No questions, either.
13       (Discussion off the record.)
14       MR. DOHERTY:  And for the transcript,
15       now that we're on the phone, is that
16       something where y'all will -- we'll get it
17       e-mailed to us for checking it for errata
18       and everything --
19       MR. MORRIS:  Sure.
20       MR. DOHERTY:  -- Ms. McMoran?
21       THE REPORTER:  Yes, for read and
22       sign, we'll send it to you, Mr. Doherty.
23       Mr. Gameros, did you need a copy of
24   this one, too?
25

Page 158

```
1    BH EQUITIES, LLC - D. MILLER
2    MR. GAMEROS:  Yes.
3    MR. MORRIS:  I'm expediting this.
4    THE REPORTER:  Mr. Gameros, did you
5  need it expedited as well?
6    MR. GAMEROS:  Yes.
7    (Time noted: 1:23 p.m. Central Time)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 159

```
1
2    IN THE UNITED STATES BANKRUPTCY COURT
3      FOR THE NORTHERN DISTRICT OF TEXAS
4         DALLAS DIVISION
5  IN RE:          )
                   ) CHAPTER 11
6  HIGHLAND CAPITAL    )
   MANAGEMENT, L.P.,   ) CASE NO. 19-34054-SGJ11
7                   )
   Reorganized Debtor.  )
8
9     REPORTER'S CERTIFICATION
10       BH EQUITIES, LCC
11  BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
12      DUSTIN "DUSTY" THOMAS
13        AUGUST 4, 2022
14
15    I, Janice K. McMoran, RDR, CRR, TCCR,
16  and Certified Shorthand Reporter in and for the
17  State of Texas, hereby certify to the following:
18      That the witness, BH EQUITIES, LCC BY AND
19  THROUGH ITS DESIGNATED REPRESENTATIVE DUSTIN
20  "DUSTY" THOMAS, was duly remotely sworn by the
21  officer, and that the transcript of the oral
22  deposition is a true record of the testimony given
23  by the witness;
24      I further certify that pursuant to
25  Federal Rules of Civil Procedure, Rule 30(e)(1)(A)
```

Page 160

```
1
2  and (B) as well as Rule 30(e)(2), that review of
3  the transcript and signature of the deponent:
4    __X___ was requested by the deponent or
5  a party before the completion of the deposition and
6  is to be returned within 30 days from date of
7  receipt of the transcript if returned, the
8  attached Errata contains any changes and the
9  reasons therefor;
10    _____ was not requested by the deponent
11  or a party before the completion of the deposition.
12    I further certify that I am neither
13  counsel for, related to, nor employed by any of the
14  parties or attorneys to the action in which this
15  proceeding was taken.  Further, I am not a
16  relative or employee of any attorney of record in
17  this cause, nor am I financially or otherwise
18  interested in the outcome of the action.
19    Subscribed and sworn to on this the 4th
20  day of August, 2022.
21
22    _____
23    JANICE K. McMORAN, RDR, CRR, TCRR
24    Texas CSR #1959
25    Expiration Date:  2/28/23
```

Page 161

```
1      ACKNOWLEDGMENT OF DEPONENT
2
3    I, DUSTIN "DUSTY" THOMAS, do hereby
4  certify that I have read the foregoing pages, and
5  that the same is a correct transcription of the
6  answers given by me to the questions therein
7  propounded, except for the corrections or changes
8  in form or substance, if any, noted in the attached
9  Errata Sheet.
10
11
12    _____
13    DUSTIN "DUSTY" THOMAS          DATE
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 162

1    ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg. No. Now Reads    Should Read  Reason

6   ____ ___ _____  _____  _____

7   ____ ___ _____  _____  _____

8   ____ ___ _____  _____  _____

9   ____ ___ _____  _____  _____

10  ____ ___ _____  _____  _____

11  ____ ___ _____  _____  _____

12  ____ ___ _____  _____  _____

13  ____ ___ _____  _____  _____

14  ____ ___ _____  _____  _____

15  ____ ___ _____  _____  _____

16  ____ ___ _____  _____  _____

17  ____ ___ _____  _____  _____

18  ____ ___ _____  _____  _____

19  ____ ___ _____  _____  _____

20

21      _____

22        Signature of Deponent

    SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2022.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____

Page 163

1     FURTHER CERTIFICATION UNDER RULE 203 TRCP

2    The original deposition was/was not returned to the

3  deposition officer on _____, 2022;

4    If returned, the attached Changes and Signature

5  page contains any changes and the reasons therefor;

6    If returned, the original deposition was delivered

7  to _____, Custodial Attorney;

8    That $_____ is the deposition officer's

9  charges to the Defendant for preparing the original

10  deposition transcript and any copies of exhibits;

11    That the deposition was delivered in accordance

12  with Rule 203.3, and that a copy of this certificate was

13  served on all parties shown herein on and filed with the

14  Clerk.

15    Certified to by me this _____ day of

16  _____, 2022.

17

18

    _____

19     JANICE K. McMORAN, RDR, CRR, TCRR

20     TSG Reporting

21     Firm Registration No. 615

22

23

24

25

**$**

**$15** 114:19

**$15.555** 137:23

**$17** 143:12

**$21** 34:15,23 35:15, 20 36:18 39:6 114:18 115:4

**$21.2** 114:19

**$21.5** 114:19

**$238** 136:10

**$250** 86:15 104:4,7 115:11 140:18

**$267** 132:7

**$290** 86:7 115:10

**$30** 138:14

**$336** 135:20 137:2

**$39** 104:10

**$40** 85:24 86:21,24 114:23 115:12

**$46,000** 142:8

**$46,926** 142:12

**$49,000** 52:12,25 60:23 61:7 126:9 150:18 157:5,9

**$6.258** 122:11

**$8** 122:18

**$8.5** 150:13,19

**(**

**(a)** 93:2,5

**(d)** 59:15

**(e)** 90:8,10,19 93:2,11

**-**

**-38** 88:23

**-67** 81:2

**-73** 74:7

**-94** 107:9

**1**

**1** 16:23 19:9 20:8 145:3 152:3

**1.1** 91:18

**1.7** 56:5,6,9,15,25 57:16

**10** 13:12 103:9,11 128:9

**10:00** 7:4

**11** 106:12

**1140** 94:19

**11:03** 60:13

**11:12** 60:14

**11:20** 94:24

**12** 62:16 107:6,8

**1271** 74:7 80:3

**1272** 80:3

**1273** 80:3

**12:03** 59:25

**12:07** 106:9

**12:10** 60:2,10

**12:17** 106:10

**12th** 113:4

**13** 121:22,23 122:2 152:4

**133** 71:18

**1363** 81:2

**1366** 81:22

**1367** 81:22

**14** 128:7,8

**1437** 88:22

**14th** 43:2 76:4,10

**15** 23:23 75:9 78:12 80:19 102:16 115:4 144:7,8

**15th** 19:20 49:17 50:7 74:12,21 75:19 78:14 91:6 94:22

**17** 131:24

**173** 122:3

**174** 122:3

**19** 39:4 66:22 130:12 131:6 140:9,17 142:8 143:13

**192** 107:9

**1959** 7:10

**19a** 131:25 132:3

**19th** 113:11 118:13

**1:07** 105:16

**1:15** 105:17,19

**1:23** 158:7

**2**

**2** 17:10 20:13 40:15, 16 92:12 138:14,19 140:10 145:3 152:4

**20** 130:13 131:6

**2016** 134:20

**2018** 24:3,25 31:2,11, 16 33:17,19,23 34:3, 7,10,12 35:15 36:15 39:2,5 69:14 71:6 74:25 75:7,20 130:10,12

**2019** 19:20 23:23 74:12 75:9 78:12 80:19 102:16 117:22 128:14 130:17,21,25 135:5 136:24 137:24 138:7,21 139:14,15 140:19 141:2 142:4, 11 143:18,21 145:16

**2020** 104:7,16 106:24 108:9 111:16 112:12 113:11 115:24 116:17 117:25 118:13 122:13 124:7 126:16 129:5,9 144:11 145:4 146:18 147:9 149:12 154:7

**2021** 23:9 126:23 127:9,12 157:3

**2022** 7:4

**21** 133:5,7

**21.5** 34:9

**23rd** 24:2 74:25 75:7

**250** 86:8

**26** 30:4 33:5

**26th** 24:24 32:24 35:8

**277** 95:22

**282** 95:22

**2:02** 80:20

**3**

**3** 21:3 68:5,7 143:21

**3.6** 143:18

**30(b)(6)** 106:20

**39** 114:23

**4**

**4** 21:14,16 22:20 71:17,19 152:7,14 153:21 154:12

**40** 86:9

**40-plus** 88:4

**44** 71:18

**46.06** 52:15,23 60:22 61:3,8 62:8 93:7 135:4,5 151:4

**47.94** 93:6 139:24

**482** 104:20 106:13

**485** 104:20 106:13

**49,000** 125:16

**4th** 7:4

**5**

**5** 13:12 21:15 22:15 74:6,8

**5.78** 145:15

**5.8** 141:12

**50** 133:14

**55** 134:11 138:9

**6**

**6** 36:22 37:3,4 38:8, 11,17,24 47:15,24 48:6,10 61:12 63:8 66:17,23 80:23,25 89:21 93:7 99:5,11, 16 100:10 141:16,20, 21 149:4,11 150:20

**6.1** 57:20 84:19,24 91:18 92:6,12,25 94:13 95:10,15

**6.1(a)** 58:9

**6.2** 121:18

**6.4** 62:17 84:20,23 85:3 133:23 144:3

**6.4(a)** 62:15,17,21 64:22 65:3

**61** 139:5

**64** 141:7

**7**

**7** 69:13 71:6 88:20,21 111:16

**70** 142:25

**716** 103:10

**75** 128:9

**76** 144:7

**78** 144:7

**7th** 73:25 107:13 108:5 109:25 111:3

**8**

**8** 94:18,20

**9**

**9** 95:19 129:4 152:4

**9.3** 59:2,5,9

**9.3(a)** 59:15

**90.6** 134:19,20

**90.61** 19893 138:20

**92** 68:14

**94** 62:22 63:7 64:3 133:18,22,23 134:24

**9:24** 96:4,6

**9:28** 96:10

**9:45** 97:7

**9th** 157:3

---

**A**

**a.m.** 7:4 60:13

**abide** 46:12

**ability** 113:18 116:7, 16 118:2,15,21 119:18

**accept** 99:16 121:5

**acceptable** 27:14 60:25 61:5 94:10

**accepted** 94:12

**access** 138:24

**accommodate** 11:24

**accord** 109:16,18

**accordance** 53:23 118:3

**account** 35:11 122:18 137:16,23 138:7 150:12,22 151:2,7 155:18

**accounting** 18:21

**accounts** 93:24 137:20 150:20 151:8

**accurate** 52:2 154:23

**accurately** 54:6,11 64:22 102:11

**acquired** 137:4

**acquiring** 13:11 44:24

**acquisition** 33:5 44:23 71:7 107:23

**acting** 14:14,17,19 25:3 50:7 51:2 54:15, 25 55:15 64:15,25 65:24 72:5,14 77:23 98:3 116:15 117:6 118:11,12,25 119:2 120:9 127:22 149:16, 20 153:18

**action** 154:18

**actively** 25:8

**actual** 34:13,16 35:16 76:16,21

**added** 112:3 125:21

**addition** 25:16

**additional** 36:9 100:20 113:22

**address** 153:25

**adequately** 20:20

**administering** 7:10

**adopted** 91:19

**advice** 146:23 148:11,13

**affect** 61:11

**affected** 45:25

**affiliated** 83:8 87:23 88:18

**affiliates** 30:6

**affirm** 147:23

**affirmative** 111:8

**affirmatively** 55:4

**agent** 32:17

**agree** 8:22 57:15

**agreed** 36:20 48:12 52:22 58:23,24 61:14 62:12,21 86:14 99:15

**agreement** 10:14 16:2,20 19:15,19,24, 25 20:10 23:22 24:2, 7,10 25:5,11,22 26:3, 10,14 27:11,24 28:7, 12 31:10 34:11 35:16 36:15 37:24 38:7,13, 23 39:7,8,15 40:12 42:14,18,21 43:5,10

**44**:5 45:14 46:4,9,10, 13,15,18 47:23 48:9, 13,16 49:2,6,7,17,18 50:9,17,18,22 51:4 52:5,20 54:5,10,14, 24 55:14,22 57:13 59:21 60:20 61:22 62:12 64:7 65:2,6,17, 21,25 66:2,5,6,9,11 67:18 68:10 70:5 71:5,24 72:25 73:6, 12,14,19,21 74:2,11, 15,25 75:2,7,18 76:9, 25 77:15,20 78:10 85:21 91:20 92:6,15 95:4 96:4,11,16 97:8, 15 98:19 99:23 100:8 101:24 102:5,16 110:23 111:3 118:4 129:22 134:25 139:19 140:6 141:25 143:25 144:2

**agreements** 85:23 109:13

**ahead** 37:18,19 45:13 117:16 125:12

**air** 34:25 69:25

**allocate** 149:11 155:6

**allocated** 62:24 64:8,12,17 133:24 139:20 143:17,20 149:4 156:2

**allocating** 64:3 83:17

**allocation** 24:14 63:2,7,18,19,20 83:25 84:10,18,20, 21,25 85:4,9,16 131:4 144:3 145:3,6, 13

**allocations** 21:5 24:16 62:18 131:7 151:18

**alongside** 12:23 20:10

**alternative** 14:4

**amend** 48:12 66:17 101:16 103:5

**amended** 15:15,25 19:14,19,24 23:22 24:6 25:5,11,22 26:3, 9 27:11,23 28:7 37:23 38:7 42:14 43:4,9 46:4,9,10,17 48:16 49:6 50:9,17, 18,22 52:5,20 54:5, 24 55:14,22 60:19 64:7 65:2,6,7,17,21, 25 66:2,5,10,11 67:17 73:15,19 74:2 75:6 76:9,24 77:19 91:20 92:6,15 99:22 100:8 110:23 111:2 118:4 129:22 130:21 131:2,21 134:7 139:19 140:6 141:25 144:2

**amendment** 49:3 65:17,20 67:10,17,23 98:20,21,23 99:2,13, 18 101:21 131:12 143:25 144:19

**amendments** 67:5

**amount** 66:17 97:20, 21,24 98:6 99:18 109:7 114:23 122:12 135:24

**amounts** 93:13,15 115:18 116:2 141:3

**analysis** 47:12 48:20 137:16

**analyst** 14:3,4

**and/or** 155:9 156:5

**annoying** 90:14

**answering** 40:2

**answers** 11:8 51:25

**apologies** 124:4

**apologize** 44:20 85:6

**app** 35:5

**appearances** 7:16

**appeared** 98:12

**appears** 89:6

**applied** 140:23

**appreciated** 96:2

**approach** 149:4

**approved** 123:5

**approximately** 11:4 34:9 86:3 104:10 115:10 134:19 136:10 143:12 150:13,19 151:2

**April** 96:13

**arrived** 35:22

**Article** 58:15,16

**arts** 13:19

**Asia** 14:23 79:22

**asks** 71:22 100:16

**aspect** 50:8

**assent** 9:3

**asset** 107:24

**assets** 24:22 59:16 102:19

**assistant** 14:23

**assume** 36:14

**attached** 76:15 77:6, 10 79:17 80:13,19 81:3 82:13 85:8 89:19 109:23 120:21 146:12

**attaches** 95:4

**attaching** 110:2

**attachment** 17:10 79:18 80:7 81:4,7,16, 22 82:4,7 83:17 120:20

**attachments** 129:9

**attempt** 11:13 99:9

**attention** 39:17 68:12 98:9 152:18 153:2

**attorney** 9:15 148:13

**attorney's** 148:10

**attorneys** 45:6 47:12 146:24

**August** 7:3 24:2

31:11 34:12 74:25 75:7,20 104:7 130:10

**authorizes** 132:22

**avoid** 36:24

**aware** 17:4,7 19:21 22:13 23:11,25 31:9, 14 35:25 36:11 50:11,21 51:18 65:16 67:11,22 86:25 91:18 100:4 117:18 119:8 128:11,22 131:13 140:25 144:5

---

**B**

**B&h** 114:10

**B-1** 133:10

**back** 16:24 22:8 23:16 24:8,11,15 37:9 45:18 53:13,17 60:2,8,16 68:8 79:16 83:13 86:16 89:11 93:4,20 102:18,20 103:2 104:8 105:17 106:4 108:13 113:20 114:4 122:13 124:9 125:10 126:17,24 131:11 138:11 140:18 152:2,6 156:25

**back-and-forth** 102:21

**background** 13:9

**balance** 13:14

**bank** 30:19 35:10 114:24 122:18

**bankruptcy** 113:17 116:6,16,22 117:13, 22 118:2,14,20 119:9,17

**Barker** 128:23 129:4, 12,18 130:4,8 131:15 149:21,24 150:3

**based** 26:25 72:12 78:18 85:24 109:12 136:14

**basically** 93:11

**basis** 41:16 137:2

**Bates** 68:14 71:18 74:6 80:2,25 88:22 94:18 95:22 103:10 106:12 107:9 122:2 131:23 133:5,7 142:25

**Bates-numbered** 138:9

**began** 33:10

**begin** 9:2,17,25 11:10,14 12:7

**beginning** 15:19 134:20 135:5,19 136:24 139:14,24 141:13,20 143:6

**behalf** 7:13 14:14,18, 19 17:17 25:3 26:24 28:5 32:10 41:5 42:12,17 44:17 50:7 51:2 54:16,25 55:15 64:15,25 65:24 72:6, 14 77:23 93:15 98:4 116:15 117:6,11 118:11,12,25 119:2 120:9 127:15,22 129:13,17 132:23 146:7 149:17,20 153:19

**believed** 14:14 28:12,22 46:18 49:18 50:8 51:5 54:6,16 55:2,17 84:12 87:22 147:21

**Ben** 25:6,17 44:12 45:16 96:24 97:4

**BH** 7:1,25 8:1,8,14,18 9:1 10:1,12,16 11:1 12:1,11,13,20,25 13:1,6,10 14:1,5,18 15:1 16:1,21 17:1,6, 17 18:1,3,7,15,22 19:1,13 20:1,6 21:1, 7,12 22:1,13,17 23:1, 6,12,21 24:1 25:1,3, 20 26:1,13,14,19 27:1 28:1,12,20,21 29:1,5,9,10 30:1,23 31:1,3,9,19,25 32:1, 4,21 33:1,3,10,18,21 34:1,2,6,17,22 35:1,

14,25 36:1,12,17,21 37:1,6 38:1,8,17,23 39:1,6,9 40:1,14 41:1,22 42:1,13 43:1, 13,14,21,24 44:1,18, 22 45:1,20 46:1,4,5, 6,8,9,10,18 47:1,8, 21,23 48:1,8,16,25 49:1,5,6,16,18 50:1, 8,16,17,21 51:1,3 52:1,19,22 53:1 54:1, 6,10,15,23,25 55:1,6, 14,16 56:1,13 57:1 58:1 59:1,22 60:1,20 61:1,2,5,23 62:1,3,7, 11 63:1,8 64:1,11,17, 21 65:1,3,16,20,23 66:1,4,9,25 67:1,10, 12,19,24 68:1,14 69:1,24 70:1,18 71:1, 4,18 72:1 73:1,11 74:1,7 75:1,5,17 76:1,8,23 77:1,18,22, 25 78:1,3,10,11 79:1 80:1,2 81:1 82:1 83:1 84:1 85:1 86:1,14,20, 23 87:1,2,9,21,22 88:1,16,17 89:1 90:1 91:1,11 92:1 93:1,7 94:1,6,10,12 95:1,14 96:1 97:1,25 98:1,4, 11,22 99:1,2,15,21 100:1,8,18,20,25 101:1,3,10,15,25 102:1,6,10,11,14 103:1,4,18 104:1 105:1 106:1,25 107:1,9 108:1,3,4,8 109:1,9,14,15,19 110:1,6,12,20,25 111:1,14,17 112:1, 11,22,25 113:1,15 114:1,3,18 115:1,5,8, 16,19,24 116:1,14,21 117:1,3,12,23 118:1, 13,19 119:1,3,17 120:1,10,12 121:1,5 122:1,3,7,17 123:1,7, 10,14,18 124:1,12,19 125:1,6 126:1,19,23 127:1,11,23,24 128:1,2,9,11,22 129:1,8,21 130:1,2, 23 131:1,4,18 132:1 133:1,2,21 134:1 135:1 136:1,3,23

137:1,18 138:1,2,6,9, 18 139:1 140:1 141:1,7,8 142:1,4,10 143:1 144:1,7,10 145:1,4,6,10,13 146:1,7,11,16 147:1, 7 148:1,3 149:1,10, 15,19,23 150:1,25 151:1,7 152:1,12,22 153:1,4,9,14,19 154:1,10,21 155:1,4, 23 156:1 157:1 158:1

**BH's** 55:10 108:5 157:8

**BH-1** 15:14

**bigger** 82:2 151:3

**biggest** 24:14

**bilateral** 26:19 28:16 29:2 48:4 55:5 69:23 155:17

**Bill** 7:21 9:2

**bit** 23:21 32:8 35:10 53:2 59:10 68:9 91:2 96:8 98:6 106:18 134:17 144:14 150:8

**blank** 79:23 106:14, 15

**Bonner** 107:14

**borrowed** 86:15 93:15,17 114:24 115:5,11,12 124:12, 24 126:11,15,16,20

**borrowers** 31:15

**bottom** 68:14,19 71:21 76:2 88:23 90:11 95:24 100:17 107:10 122:4

**Box** 135:18 137:16 138:9,14,19 140:9, 10,17 142:8 145:3 150:10

**break** 11:22,25 57:23,24 58:5 59:25 60:9 104:22,23 105:3,11,22,23

**bridge** 85:23

**briefly** 13:8

**broad** 35:2 72:15 83:9 91:14

**Broaddus** 27:17 63:11,22 71:23 72:5 76:2 77:4,14 80:18 83:24 84:3,8 85:14 88:12 89:7,11,14 95:2,10,13 97:3,14 100:12 101:13 107:14

**Broaddus'** 76:13

**Broaddus's** 72:3,20 73:25 80:5,12

**broader** 69:22 72:18 146:10

**broadly** 31:7 63:14 69:25 88:2

**brokerage** 30:20

**brought** 98:8

**Brown** 25:14

**bulk** 17:24 18:6 35:11

**business** 10:24 12:20,22 13:22 41:19 47:14 87:9,12,21 145:7 154:18

**businesses** 13:12

**busy** 94:23

---

**C**

**calculation** 108:21, 25 109:10 110:2,6,21 111:4,17

**calculations** 109:20

**call** 15:14 63:10 83:23 106:2,3,4

**called** 14:10 16:3,12 108:15 128:23

**calls** 122:23

**Canty** 14:24 69:4

**capacity** 10:23,25 17:5 41:14 153:24

**capital** 7:20 9:17 10:20 12:17,18 15:20 24:15 32:5 33:15,16

36:25 37:9 38:12,14, 16,25 47:4,16 52:11, 15,24 53:4,7,16 60:23 61:2,6,7,24 65:11 82:21 83:2,10, 13 85:20,21 86:18 93:24 94:3 97:21,24 98:5 100:18,20,24 101:4 102:7,11,25 103:2 104:5,11,17 107:2 108:6,13 110:17 111:5 114:4 115:9,24 121:8,18 122:8,14,20 123:6, 10,15,19,23 124:2,8, 11,16,20,23 125:5, 11,15,16 126:10,15, 17,20,24 127:8 133:13,17 135:4,10, 14 136:4,12,24 137:15,19,23 138:7 139:23 143:5 150:12, 17,20,22,25 151:7,9, 19 156:23,24 157:6,8

**capitalization** 32:20 70:16

**careful** 47:13 148:12, 14

**Carolina** 8:19

**case** 15:16 79:16 122:23 152:25

**Casey** 7:23 8:9 37:18 48:22 50:12 51:19 58:3 90:19 126:5

**cash** 34:13,16 58:12, 16 59:15 70:11 84:17,20,25 85:2,5 93:13 103:6 132:4

**causing** 129:23

**caution** 146:20

**CBRE** 30:4

**cc'd** 27:17

**Central** 60:13,14 105:19 106:9,10 158:7

**CEO** 25:7 41:15

**certificates** 13:25

**cetera** 35:3 87:7,16 88:4,5 103:2

**CFO** 108:3

**chain** 120:23

**Chang** 27:17 88:12 89:8,11 97:7,14 101:7

**Chang's** 89:15,18,23 91:4,12,16,19 92:3,4 94:9,12

**change** 48:17 95:4,9, 10 100:9,19,24 101:4 102:6,15 144:3

**changed** 48:11 71:12 99:22 102:10 109:11 139:8 145:15

**characterization** 38:21 93:16

**characterize** 37:5

**charge** 43:4

**Charlotte** 8:19

**chart** 70:6,10,14 71:12

**chartered** 14:2,3

**charts** 87:18

**chase** 23:20

**chat** 51:13 68:20,23 77:11 81:25

**checking** 157:18

**chimed** 27:18

**circumstances** 109:11

**citizen** 9:24

**claim** 22:3 154:3

**claimed** 29:6

**clarification** 39:23 146:15

**clarifications** 18:4

**clarify** 48:2 53:5 156:12

**clarifying** 53:2

**clause** 57:4,6

**clean** 90:25 126:5 147:12

**clear** 54:22 55:10 96:9

**clearance** 113:21

**CLO** 42:6

**close** 35:24

**closed** 35:7 73:16 95:5 101:10

**closely** 63:21

**closing** 24:21,23 32:23 71:7

**Code** 142:20

**cold** 87:17,18

**colleagues** 95:3

**college** 13:16,18,19

**column** 53:22

**comfortable** 82:20

**comment** 78:25

**comments** 42:16 43:25

**communicate** 19:2 29:5

**communicated** 14:18 42:13 153:19

**communicating** 45:17 129:12,18

**communication** 48:5

**communications** 19:13 20:14 22:21 47:22 66:14 67:16,22 69:20 102:24 117:24

**Companies** 8:8,14, 18 108:3

**company** 13:15 56:6,15 88:7

**compare** 91:22

**complete** 52:2

**completed** 77:24

**complex** 118:9 146:8

**complexity** 149:6

**complicated** 146:9

**complication** 118:9

**comply** 9:23

**complying** 9:20

**component** 32:22 54:21

**concern** 83:6 85:15

**concerned** 94:7

**concerns** 21:3 60:21,24

**conducted** 7:6

**confirm** 81:20 129:7

**confirmed** 106:23 113:13

**confusion** 95:25

**connection** 14:15 18:19 27:10 32:6 33:22 124:21 137:3

**consecutively** 80:3

**consent** 9:6

**conservative** 149:3

**consideration** 155:8,9,19 156:4,5

**considered** 104:4

**consistent** 46:10 73:24 110:22 135:8 139:17 140:4 141:24

**consummated** 71:13

**contact** 117:18

**contacts** 88:15

**contained** 50:19

**contention** 22:14,22 23:3,7,11,13,15 152:9,13,23 153:6, 12,15 154:2,19,22

**contentions** 153:20 154:11

**context** 15:8 29:17 69:7 70:9

**continuing** 118:7

**contributable** 104:5

**contribution** 52:12, 25 61:7 76:15,16,21, 22 77:5 80:14,18 97:21,24 98:5 100:18,19,25 101:4 102:7,12 115:10,25 123:15,19,24 126:24 156:25

**contributions** 53:7 102:20 124:16 151:9

**control** 96:21

**controller** 18:3,15

**convenience** 26:25

**conversation** 68:19 119:13 120:16

**conversations** 20:5 66:14

**cooperation** 9:20

**coordinated** 18:20 127:18

**coordinating** 28:25

**copied** 25:24 112:20

**copies** 31:12 95:3 107:14

**copy** 27:19 71:23 76:3 157:24

**corporate** 8:18 9:24 10:25 14:5 17:5

**corporately** 23:10

**correct** 18:10 21:12, 13 23:23,24 24:3 32:3 35:17 38:20 40:22 44:19 52:8,9, 16,20,21,25 53:8 55:23 58:13,19,20,23 59:22,23 61:9,14,17, 20 64:6,9,10 65:21, 22 66:2,3 71:9,10 73:16,17,19 78:7,8, 12 82:11,16 85:11 94:4,5,7,8,10,14,15 97:16,17 98:9,10,14, 15 99:23 100:25 101:5,22,23 102:2,3 103:25 110:12,15,18 111:6,12 112:23 114:5,7 115:7 116:3, 4 122:15,16,20

123:11 124:5,17,22, 25 126:17,21,25 127:5,9,10 134:7 139:21,22 140:2,3,6, 15,16,20 141:25 142:2,5,6 143:3,8,11, 15 145:9,17,18 157:3,4

**correctly** 56:8 67:15 101:19 113:24 149:9

**correspond** 28:2

**correspondence** 25:25 27:13,18 28:8 67:4 71:3 74:21 102:17,22

**correspondent** 107:21

**counsel** 7:15 8:8,14, 18,22 9:19 14:8 18:23 20:5 25:9,17 112:9,16 148:21

**counsel's** 51:23

**counterparties** 55:6

**counterparty** 54:18 71:4 72:17 91:15

**counterproposal** 91:5

**Counting** 13:3

**couple** 18:4 45:18 66:18 105:14 112:25 125:10 152:5 156:19

**court** 153:2,5,10 156:19

**cover** 128:20

**covers** 82:19

**CPA** 138:24

**create** 110:21

**created** 43:25

**credit** 86:6 114:20

**credited** 104:11 124:3 125:4 126:24

**CSR** 7:10

**curious** 145:2

**cut** 23:20 151:14

**D**

**Dallas** 7:22

**date** 7:3 23:10 75:2 116:23 123:21 125:21

**dated** 74:11 129:4

**dates** 66:20

**Davis** 25:14

**day** 74:16 75:8 78:10 91:6 94:23

**days** 45:18 97:13 112:25 152:16

**DC** 112:3 113:19 120:4

**deadline** 74:21

**deal** 15:18 54:2 61:20 71:13 73:16 74:3 87:6 93:18 112:18 115:5 124:15

**deals** 58:11 59:5 62:17 82:7 84:19,21 87:14 88:13

**dealt** 112:11

**debt** 12:16 82:22 83:3 103:22 114:20 115:20 116:3 121:7 126:12 127:3 132:11, 17 141:4

**debts** 113:16 114:11, 15,17,25 136:21

**decided** 154:7

**decision** 148:16,18 149:11,16,20

**deemed** 93:13

**defer** 105:7

**deference** 57:11

**deferential** 116:20

**defined** 19:19 21:6, 21 22:18 58:13 65:18 72:8 152:8

**definitions** 15:18

**degrees** 13:21

**delivered** 77:18 78:9,11,14,15 147:20,22

**delivering** 77:24

**Dentons** 7:24 25:15

**dependent** 40:7

**depicting** 70:15

**depicts** 70:14

**deposed** 10:21

**deposition** 7:5,11 8:6 9:4 11:7 14:15,20 17:21 18:24 40:22 72:9 104:24 128:17

**depositions** 51:17 69:6

**Des** 7:8 8:9,16

**describe** 13:8 34:5 37:7 64:2 66:13 84:4, 8 97:18 119:16

**description** 142:15

**designation** 14:3,4 30:17

**desire** 47:24 66:7, 23 99:10 108:5

**detail** 63:25 84:11 108:16,20 146:25

**detailed-oriented** 79:13

**details** 45:8

**determined** 114:22

**difference** 115:9

**differently** 121:10 143:10

**difficult** 147:16

**diligence** 32:11

**dilutive** 82:23

**direct** 28:8 49:14 89:18 119:12 151:17

**directed** 127:13,16 150:5

**directing** 68:12

**directly** 18:25 28:2

32:16 35:10 116:19 117:8 146:12

**director** 10:19 12:11 42:5

**disconnect** 37:16,21

**discovery** 17:24 18:6 19:5 103:16

**discuss** 47:2 64:16 66:10 149:16,19,23

**discussed** 95:5,10 98:19 153:15

**discussion** 55:7 67:10 76:23 127:20 144:18 157:14

**discussions** 30:13 39:14,16 47:18 70:19 103:5 104:16 106:25 108:4 130:23 154:14

**distinct** 85:5

**distinction** 75:16 86:11

**distributable** 58:12, 16,17 93:13

**distribute** 113:18 116:7,17 118:22

**distributed** 53:23 59:16 93:14 109:8 122:14

**distribution** 57:12, 15 58:12 82:19 84:17 85:2,15 108:16,21,25 109:10,20 110:2,6,21 111:4,17 112:22 132:16 142:8,12

**distributions** 21:5 103:6 106:19 113:14, 22 114:10 118:3,15 119:19 121:6 132:4, 23 140:17,21,23,25 143:11

**doc** 87:5

**document** 15:6,12 16:25 21:11 40:18 41:4 45:21,25 46:6, 20 51:6,14 56:2,25 68:13 71:17 74:6,11 78:9,16 79:2,11,17 80:25 81:21 90:23

95:6 103:9 107:9 109:24 110:8,10 111:7 120:21 122:2 128:19 130:16 144:15 147:6

**documentation** 143:23

**documents** 14:24 15:2,4 18:7 21:12 45:3 68:4 80:2 128:5 131:15 151:23 155:5, 25

**Doherty** 7:23 21:20, 24 22:5 35:18 37:13, 20 38:2 39:11 43:6, 15,17 45:4 46:21 47:10 48:18 49:10, 20,22 50:4 51:11 53:19 55:24 56:18 57:22 58:6 60:3,12 63:4 68:16,24 69:5 72:7 75:10 78:22,23 79:12 84:5 90:2,6,13, 20 91:21 92:13,20,23 99:24 104:21 105:7, 12,19,23 106:2,7 117:14 118:16 119:5, 21 125:8,13,19,24 133:6 138:22 142:16 145:21 146:19 148:5, 8,20,24 151:11 154:13,24 155:10,13 156:10,17 157:11,15, 21,23

**dollar** 122:19

**dollars** 109:6 135:25

**Dondero** 41:6,8,10, 23

**doubt** 9:22

**draft** 42:24 66:5 76:9 147:6,21

**drafted** 43:9 91:13

**drafter** 43:21

**drafting** 25:10,22 26:8 27:23 28:6,11 32:7 43:4

**drafts** 42:21 43:25 44:4

**drawn** 114:20

**driving** 74:23

**due** 155:8 156:4

**duly** 9:10

**Dustin** 7:5 9:9 10:6

**Dusty** 9:9 79:3 90:21
95:5

**duties** 12:10

**E**

**e-mail** 27:19 48:4
67:3 69:11,12 70:8
72:20 73:25 75:24
76:14,18 77:3 79:6
80:6,19 81:2,5,8,23
88:22,24 89:3,11,15,
18,20,23 90:4 91:4,
12,19 92:4 95:21
97:14 103:13,18
107:13 108:15 112:2,
21 113:4 118:20
119:4,20 120:19,23
122:4,11,13 123:21
125:22 127:19 150:2

**e-mailed** 157:18

**e-mails** 19:4 20:6
66:16 67:11,18,24
68:17 75:25 95:11

**earlier** 44:16,21
69:18 76:7 82:8 91:6
96:18 99:15 122:7
139:18 144:17

**earnest** 35:4

**easier** 15:4

**easy** 10:11

**EBITDA** 13:13

**economic** 46:15

**economics** 45:24
47:5 61:11 100:5

**ecosystem** 72:18

**effective** 24:2 34:12
74:25

**effectively** 91:4

**effort** 9:21

**employed** 10:7,13

13:5,6 16:19

**end** 21:16 33:6 74:15
75:8 85:20 96:12
134:21 135:6,23
137:24 138:7 139:15,
25 141:13,21 143:6

**ending** 150:12

**ensuring** 102:24

**entered** 19:20 23:21
31:10 48:8 75:3

**enterprise** 40:8

**entire** 51:13 94:13
115:24

**entirety** 114:22

**entities** 35:2 74:23
88:8,18 107:23
112:10

**entitled** 56:6 137:9
143:14

**entity** 14:10 15:21,25
16:5,8,11,19 28:16
72:15 83:8 87:16,22
121:15 133:14
136:19 146:7

**equals** 150:19

**Equities** 7:1,25 8:1
9:1 10:1,12 11:1
12:1,12,13,20 13:1,2,
6,10 14:1,5,18 15:1
16:1,21 17:1,6,17
18:1,3,7,16 19:1,13
20:1 21:1,7 22:1,13,
17 23:1,7,12,22 24:1
25:1,3,21 26:1,15,19
27:1 28:1,12,20,21
29:1,5,11 30:1,23
31:1,3,9,19,25 32:1,4
33:1,10,18,21 34:1,2,
6,17,22 35:1,15 36:1,
12,17,21 37:1 38:1,8,
17,23 39:1,6 40:1
41:1,22 42:1,13 43:1,
13,21,24 44:1,18,22
45:1,20 46:1,4,5,8,9,
18 47:1,8,21 48:1,8,
16,25 49:1,5,6,16,18
50:1,8,16,17,21 51:1,
3 52:1,19,22 53:1
54:1,6,10,15,23,25
55:1,14,16 56:1 57:1

58:1 59:1 60:1,20
61:1,2,5,23 62:1,3,7,
11 63:1,8 64:1,11,17
65:1,3,16,20,23 66:1,
4,9 67:1,10,12,19,24
68:1 69:1 70:1,18
71:1 72:1 73:1,11
74:1 75:1,17 76:1,8,
23 77:1,18,25 78:1,3,
10,12 79:1 80:1,2
81:1 82:1 83:1 84:1
85:1 86:1,20,23 87:1,
2,9,21,22 88:1,16,17
89:1 90:1 91:1 92:1
93:1 94:1,6,10,12
95:1,14 96:1 97:1,25
98:1,4,11 99:1,2,15,
22 100:1,9,25 101:1,
3,10,15 102:1,6,14
103:1,4 104:1 105:1
106:1,25 107:1
108:1,8 109:1,9,14,
15,19 110:1,12,25
111:1,17 112:1,11
113:1,2 114:1,3
115:1,5 116:1,14,21
117:1,3,12,23 118:1,
13,19 119:1,3,17
120:1,10,12 121:1,5
122:1,7,17 123:1,7,
10,14,18 124:1
125:1,6 126:1 127:1,
11,23,24 128:1,2,11,
22 129:1,8 130:1,23
131:1,4,18 132:1
133:1,2 134:1 135:1
136:1,3 137:1,18
138:1,2,6 139:1
140:1 141:1 142:1
143:1 144:1 145:1,4,
6,10 146:1,7,16
147:1,7 148:1,3
149:1,10,15,19,23
150:1 151:1 152:1,
12,22 153:1,4,9,15,
19 154:1,10,21
155:1,4,23 156:1
157:1 158:1

**Equities'** 18:23
26:13 28:21 29:9
32:21 33:3 37:6 39:9
43:24 46:6,11 47:23
56:13 59:22 64:21
75:5 77:22 86:14
91:11 98:22 100:18
101:25 102:10,11

110:20 111:14
112:22 115:8,16
124:12,19 126:19,23
129:21 130:2 133:21
136:23 138:18 141:7,
8 142:4,10 144:10
145:13 146:11
150:25 151:7

**equity** 12:16 13:11
38:8 93:17 113:18,23
116:8,17 118:22
143:7,9

**errata** 157:18

**error** 50:21 51:5
55:17 98:13,17

**errors** 50:19

**estate** 12:14,21
139:6,9 145:8

**event** 120:22

**events** 53:22

**exact** 23:9 89:3 97:21
107:20 122:6

**EXAMINATION** 9:12
156:16

**exception** 150:17

**exceptions** 53:12

**exchange** 36:17
61:4 127:20

**excluding** 55:7

**exclusive** 29:7,12

**exclusively** 28:13
29:17 84:25 153:10

**executed** 38:7 54:5
66:9 75:18 91:20
97:8 101:21 102:16

**execution** 26:9 45:3
47:23 51:4 68:9
76:24 77:14,19 95:6

**executive** 41:14

**exhibit** 16:23 40:15,
16 68:5,7 71:17,19
74:6,8 79:23 80:23,
25 88:20,21 89:21
92:12 94:18,20
95:19,21 103:9,11
104:20 106:12,14

107:6,8 121:22,23
122:2 128:7,8 129:3
144:7,8 152:3,4

**existed** 73:12

**existence** 72:25

**expand** 66:23

**expectation** 37:8
40:5 98:23 99:17
150:25

**expected** 33:13

**expedited** 158:5

**expediting** 158:3

**expense** 9:22

**expenses** 35:3,13
59:14

**experience** 88:10

**expert** 75:12

**explain** 41:22 85:13,
14 120:8,9 127:23

**explanation** 63:23

**express** 108:8

**expressed** 66:23
108:11

**expressing** 66:16

**expressly** 82:15

**extend** 74:22

**extent** 39:9

**extinguish** 113:16
114:11

**extinguished**
114:25 136:21

**eyes** 48:9

**F**

**facility** 83:4,14
114:20

**fact** 36:3 52:22 60:25
73:18 91:17 108:12
109:23 122:10 123:9

**facts** 22:21 52:18
112:23

**fail** 11:15

**failure** 155:9 156:5

**fair** 11:11,12 12:2,3, 19 15:22 16:16 28:3 31:24 33:7 39:10,13, 15 42:20 43:23 45:5, 10 48:21 49:16 53:25 54:4 59:8,13 62:13, 24 67:7,8,9 73:22,24 74:4 85:13 87:20 89:16,24 93:16,20 95:16 98:6 100:10 102:12 103:3 111:18 113:3 120:23 121:4 122:8 125:6 145:23 147:2 150:18 153:8 154:22 155:23

**fairly** 57:9 108:12 110:3

**fall** 104:16 106:24

**familiar** 14:10 16:4, 11 29:18

**fast** 45:15

**features** 30:15

**feel** 11:22

**fees** 35:5

**figure** 12:6

**file** 74:22 146:6 154:2

**filed** 117:22 145:22 146:4

**filing** 116:25 117:13 118:2 130:18 144:19 146:11 152:20

**filings** 152:16

**final** 91:23

**finalized** 39:3

**financed** 33:5

**financial** 14:2

**financing** 135:20 136:11,18 137:6

**find** 121:17

**fine** 58:2 60:4,8 101:9,10 105:15

**fingers** 13:3

**finish** 11:9,14 105:4, 18 152:2

**finished** 72:21,22

**firm** 7:24 27:20 30:18,20 120:17 128:22 130:8

**fixed** 133:18 135:4

**flag** 58:7

**flip** 49:15 54:9

**flow** 103:6

**flows** 36:25

**focus** 85:3

**focused** 24:13,17 44:24 50:25 70:6 82:9 84:17,25 100:5 118:6

**Focusing** 33:17

**follow** 63:19 154:15

**footnote** 142:14

**forgot** 20:25 21:24

**form** 26:15 31:22 35:18 39:11 43:6,19 46:21 47:10 48:18 49:10,20 55:25 56:18,19,20 63:4 72:10 117:14 118:16 119:5 138:22 145:21 148:5 155:13

**formal** 36:20

**formalize** 39:16

**formally** 39:4

**formed** 87:3,14 130:10

**forums** 119:10

**forward** 113:22

**forwarded** 89:8,14

**frame** 37:22 104:18 115:15

**framed** 29:3

**framing** 28:15

**frankly** 155:20

**Freddy** 27:17

**free** 11:23 81:14

**frequently** 45:17

**full** 53:8 115:19 123:24 126:17,25 151:10

**fully** 15:8 36:20 97:8

**fund** 13:11

**funded** 35:9 121:8 150:16

**funding** 86:21 124:21 127:4

**funds** 35:8

**future** 48:12,17 67:5

**G**

**Gameros** 7:21 9:6 31:21 157:13,24 158:2,4,6

**gather** 117:20

**gears** 151:22,25

**general** 8:8,14 14:8

**generally** 87:12

**give** 9:3 23:9 30:20 37:8 40:5 44:7 57:11

**giving** 17:4

**goal** 74:24 105:3,8

**good** 9:14,24 60:5 90:23

**governs** 57:2

**graduate** 13:16,21

**Granbury** 7:13

**Grant** 42:5

**great** 92:10

**ground** 11:6

**group** 31:8 35:2

**guarantor** 136:5

**guess** 17:9 44:8 97:3 120:19 144:14

**H**

**half** 11:5 105:9

**hand** 26:20,21

**handful** 44:6

**handle** 82:14

**handling** 101:9

**happen** 117:19

**happened** 67:7

**happy** 26:11 48:25 79:10 92:7 105:2,11

**hard** 43:17 51:17 96:24

**Harris** 122:24

**HCM** 29:14 31:7 35:3 39:25 110:7,17

**HCMLP** 15:22 19:14 20:14 23:22 26:4,15, 20 27:5 28:13 31:10, 14 39:21 41:5 48:3 52:23 60:21 62:4,8, 24 64:4 72:16 87:22, 23 88:3 93:7 111:18 113:16 116:6,15 117:12,21 118:14,20 126:11 127:7,12,24 133:24 134:14,18 135:21 151:10

**HCMLP's** 28:22 126:9 142:4 150:25

**HCRE** 14:10,11,14, 19 16:3,8 19:14 20:15 23:22 26:4,15, 20 27:5 29:13,14 31:7,9,14 35:3 39:18, 25 41:5 54:25 55:11 64:8,13,17 65:24 72:16 83:8 87:2,10, 15,19 88:3 93:6 104:5,11 110:6,14 111:17 112:10 113:15 114:11,21 115:19,25 116:15 117:6,8,11,24 118:12,25 119:13,16 120:9,13 121:12 123:25 124:5,20 127:11 133:4 139:7,

20 140:14,19 141:2 149:17 150:5 153:16, 20,23

**HCRE's** 22:14,21 23:7 115:9 116:16 118:2 119:18 123:15, 23 126:20 142:4 152:9,13 153:6,11

**head** 25:23

**header** 81:4

**heads-up** 117:8

**hear** 8:12 54:15 60:17

**heard** 9:5

**helpful** 92:14

**Hey** 50:12

**higher** 89:5

**Highland** 9:16 15:15, 20 18:7 27:2,5,10 28:5 31:7 32:14 33:10 35:2 41:21 43:12 44:2 47:22 48:25 50:7 51:3,4 52:10,14 54:16,18 55:11 60:21 61:2,6, 24 62:4,7 63:23 64:11 66:25 69:25 70:23 71:3 72:6,15, 18 75:17 76:23 77:18,23 78:7,9 82:21 83:2,9 84:9 85:22 86:3,6,10,23 88:2,17 91:13,14 100:9 101:5,14 102:9,14 103:4 106:25 107:22 108:9 109:14,20,25 110:17 111:15 114:6 116:14, 22 120:12 123:19 125:11,15 133:13,17 135:10 136:4,24 137:22 138:6,16 156:23 157:8

**Highland's** 50:10 84:15 98:9 100:19 115:17 135:3 150:18

**hold** 13:24 14:2 43:15 52:23 58:4 132:21 151:23

**Holdco** 42:6

**holders** 143:14

**Holdings** 16:12 70:16

**hope** 48:7 79:7 99:17 121:17

**hoped** 46:14 47:2,8, 15 48:5,16 49:3

**hoping** 99:3

**Hougham** 8:6,17

**hour** 104:25 105:10, 18

**Houston** 7:24

**humble** 38:2

**hundred** 135:25

**I**

**icon** 122:4

**idea** 39:24 142:10

**identified** 44:16 82:8 102:6 133:14

**identifies** 57:7

**identify** 24:18 25:2 26:6,23 27:8,12 47:7 57:16 98:11,17 125:13

**ii** 93:22

**impact** 85:9 117:25 118:14 119:11,14,17

**important** 11:9 32:19

**improperly** 155:6 156:2

**inaccurate** 54:17

**include** 139:2

**included** 30:21 131:14 150:4

**including** 20:14 21:4 32:5 112:21 128:13

**income** 83:18 84:10 85:10 138:15 145:7 149:5

**inconsistent** 46:19 50:9

**incorporated** 85:22

**incorrect** 65:3 134:3 135:14 142:5

**increase** 47:15,24 99:11,18 100:17

**increased** 99:5

**incurred** 9:22 121:7

**Indianola** 13:20

**indifferent** 61:11 63:15 84:2

**indirectly** 19:3

**individual** 29:11

**individuals** 27:9

**info** 117:20

**inform** 50:8 51:3 55:16 65:2

**information** 11:2 117:5,9 130:4 137:19 139:3 146:9,17 153:5

**informed** 32:18 65:23 118:12

**informing** 95:14 117:12

**informs** 123:4

**inhibit** 116:16

**inhibiting** 113:17 116:7 118:21

**initial** 38:25 115:24

**inserted** 102:5

**instructed** 121:14

**instructing** 127:24

**Instructions** 130:18

**intended** 57:16 58:22 59:10,20

**intending** 101:3

**intent** 46:6,11,19,25 49:8,19,22 50:10 54:7,12 56:14 64:23 125:25

**intention** 110:20

**interest** 28:18 33:11 36:16,22 37:4,6,9 38:9,11,18 39:9 40:6 47:16,25 48:6,11 52:16,23 53:24 56:10 57:7,17 60:22 61:3,9 62:8 69:19 99:5,16 102:2 133:18 135:9 140:5 141:20 151:4 155:20

**interested** 152:24

**interests** 21:4 26:7 27:9 28:13,23 29:7, 12 53:6 55:9,20 56:16 58:18 59:18

**internal** 45:2 63:13 112:17 148:16,18

**internally** 113:13

**interpreted** 91:8

**introduce** 8:3,4

**introduced** 31:5

**invest** 12:15,21

**invested** 35:9 93:17 122:19 124:8,11

**investing** 35:25

**investment** 12:16,24 13:14 14:4 18:16 30:19 34:2,6,8,16,23 35:20 36:18 38:16 114:21 123:11 143:8, 9

**investments** 44:25

**investor** 10:20

**invests** 12:13

**involved** 24:8,19,22 25:8,9,21 27:22 28:5, 11 32:10 36:14 44:17 88:10,12 112:16

**involves** 48:20 146:23 148:10 154:14

**IOU** 40:4

**Iowa** 7:8 8:9,16 13:20,23

**IRS** 145:20 146:4

**issue** 24:15 48:24 57:4 63:12 82:8 97:15,19 99:21 100:4 119:3 122:6 144:20

**issued** 131:20

**issues** 24:12

**items** 98:18

**iterative** 102:24

**IX** 58:16

**J**

**James** 41:5

**Janice** 7:9

**Joanna** 25:6 45:16

**job** 12:6 129:14

**John** 7:17 9:15 37:14 57:22 60:7 78:24 145:22

**jointly** 136:5

**Jones** 7:18 9:16 107:15,25 113:12

**jump** 106:4 134:11

**June** 123:9 126:23 127:8,12 157:2

**K**

**K-1** 131:8,19 134:13 139:6,13 141:6,8 143:2 144:11 145:19 146:3,17 147:21 149:10,23 150:3

**K-1S** 128:13 131:13 142:4 144:20 145:16

**K1** 142:11

**keeping** 32:18

**Keybank** 31:16,20 32:2,7,13,15,22 33:7 36:11 53:13,16 72:24 73:5 83:4,13,14 86:9, 16 93:20 102:17 103:24 115:11 118:7 136:6,12 140:20,24

**kicks** 53:6

**Kim** 100:16

**kind** 15:8 20:25 23:20 28:14 29:14,16 31:7 32:6 35:5 49:15 63:13 69:22 71:2 72:8 83:9 84:2 91:14 92:16 101:25 107:23 118:8

**kinds** 32:11

**knew** 45:23 49:14 55:5 61:19 62:11 116:19 119:8,10 125:15

**knowing** 49:23 155:21

**knowledge** 14:21 19:12,16 27:24 29:5, 8,10 33:4,20,24 42:15 49:4,14 51:7 55:19 61:18 62:6 64:22,24 73:3,9 117:9 119:25 120:11 126:20 130:22 131:22 136:8 153:13, 17,22 154:4 157:9

**Kyle** 8:6,17

**L**

**L.P.** 9:17 15:20 52:11,15 61:3,6,24 110:18 133:13 135:10 136:4,25

**L.p.'s** 133:18

**La** 14:23 79:22

**labeled** 91:17

**lack** 155:8 156:4

**laid** 35:15 39:6

**language** 82:19 91:23,24

**large** 29:15

**larger** 48:6

**law** 7:24 27:20

**lawyer** 12:4

**lawyers** 12:5

**LCC** 139:9

**leading** 35:4

**learn** 23:7 116:21 117:3,4,5 152:23 153:11

**learned** 22:18 23:9, 10,13,15 30:24 31:3 152:13 153:6

**learning** 154:11

**leave** 85:16 101:14 106:14,15

**led** 126:14

**left** 70:23 81:24 106:18

**legal** 17:25 25:9 47:12 48:20 112:9 148:21 154:14

**lender** 87:7

**lengthy** 15:3

**letter** 128:20 129:3,4, 8

**level** 84:11

**Liabilities** 135:18 137:10

**liability** 149:5

**liable** 136:5,25 137:5

**liaison** 12:17

**liberal** 13:19

**Liberty** 23:23 26:3, 16,20 27:6 29:7 42:6, 17 55:7 143:2

**licenses** 13:24

**limited** 99:4

**linear** 151:17,20

**lines** 67:5 152:17

**link** 81:25

**liquidation** 59:6,11

**lives** 22:19

**LLC** 7:1,22 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,2,4,12

17:1 18:1 19:1,19 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1, 24 28:1 29:1 30:1,7 31:1,10 32:1 33:1,14 34:1 35:1 36:1 37:1 38:1 39:1 40:1,11 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1,24 72:1,24 73:1,6,12,18 74:1,2 75:1,2 76:1,9 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,15 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1

**LLC's** 139:8

**loan** 31:15,20 32:2,7, 13,15,22 33:7,18 35:5 39:24 40:4 53:16 83:8 85:23 86:9 103:25 136:6,13 140:20

**loaned** 33:21 39:18, 21

**loans** 33:25 40:10

**located** 7:7 8:8,15,19

**locations** 7:16

**long** 11:3 12:25

**looked** 73:22 80:17 88:25 89:20 95:11 139:18

**loss** 83:18,25 84:10 141:11 151:19

**losses** 62:18,23 63:8,19 64:4,8,12,18 84:18,22 85:4,10 133:24 134:18 139:13,20 143:18,21 145:14

**lot** 87:12 105:6 152:11

**loud** 113:9

**lumped** 29:14

**lumping** 71:2,3

**lunch** 104:23 105:22, 23

**lunchtime** 60:6

---

**M**

**made** 21:5 34:2,6,10, 12,22 42:17 44:25 52:11 59:14 70:18 91:5 99:3 100:25 112:15 117:18 123:19 127:12 141:2 144:2 149:10

**magnitude** 44:7 71:15

**maintain** 109:9

**majority** 132:13

**make** 22:19 37:14 40:2 45:11 46:5 51:25 54:22 61:6 67:15 74:24 75:6 78:24 79:19,20 82:20 86:12 98:20 102:5,15 114:21 115:3 116:25 118:3,15 119:19 127:13,16,24 143:7 147:13 149:8

**magnitude** 44:7

**makes** 56:23

**making** 52:24 132:23 146:20 148:16,18

**man** 79:13

**management** 9:17 10:16 15:20 52:11,15 61:2,6,24 88:7 103:18 107:24 110:18 123:20 133:13,17 135:10 136:4,25 156:24

**manager** 41:13 44:24 121:12,15 127:14,15,23 129:17, 23 130:3 132:25 133:3 153:24

**manager's** 129:14 146:6

**managing** 10:19 12:11

**manner** 127:17

**March** 19:20 23:23 39:4 43:2 49:17 50:6 66:21 71:13 74:12,21 75:8,18 76:4,10 78:12,14 80:19 91:6 102:16

**mark** 40:14 71:17

**marked** 15:14 16:23 40:16 68:5,7,13 71:19 74:8 80:23 88:20 89:21 94:20 95:19 103:11 107:6,8 121:23 128:7 144:8

**marketable** 132:4

**marketed** 30:4

**marketing** 30:2,18

**markets** 10:20

**master** 10:13

**master's** 13:22

**match** 56:9,16 57:3

**Matt** 18:2,12 28:4 69:12,22 100:17 112:3

**matter** 75:12

**matters** 18:21

**Mcdermett** 107:14, 19 111:25 112:19 113:11 120:19 122:22 123:4 127:18

**Mcdermett's** 107:18

**Mcgraner** 28:4,9 69:13,17,19 76:3 88:11 112:3,23 122:24 123:2,5 127:21

**Mcmoran** 7:9 157:21

**meaning** 23:3

**meaningless** 73:7

**means** 7:12 29:22 99:9

**meant** 116:11

**meantime** 101:17

**meet** 84:13,14

**meets** 83:18

**member** 36:2 57:8 61:25 65:2 66:10 93:14 127:7 131:20

**members** 36:7,9 49:8 54:21 55:16 57:17 59:16 64:16 65:25 95:15 111:6 131:14 150:21 151:8 155:7 156:3

**members'** 93:24

**memory** 51:22

**mentioned** 15:19 34:15 69:17 81:4

**middle** 70:11

**MILLER** 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1

58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1

**million** 13:12 34:9,
15,23 35:15,20 36:18
39:6 85:24 86:7,8,9,
15,21,24 104:4,8,10
114:18,19,23 115:4,
10,11,13 121:18
122:11,18 132:7
135:20,25 136:10
137:2,24 138:15
140:18 143:12
150:13,19

**mind** 90:4 92:9
111:15

**minus** 85:24

**minutes** 16:3 57:23
60:8,11 65:14

**mischaracterizes**
151:12

**mistake** 50:22 51:5
98:13 138:3 153:25
155:8 156:4

**mistaken** 134:4
135:15

**mistakes** 50:19

**misunderstood**
125:10

**modestly** 71:14

**modification** 101:25

**Moines** 7:8 8:9,16

**moment** 114:3
131:11

**money** 33:18,22
34:19 35:4,25 39:19,
22 40:5 53:12,15
126:11 140:18

**month** 123:25

**months** 121:25
122:7

**morning** 9:14

**Morris** 7:17 8:24 9:2,
8,13,15 17:9,12
21:22,23 22:2,6,7
23:18,19 31:23 35:19
37:18,25 38:5,6
40:13,17,25 41:3
42:2,3 43:7,8,22
44:9,11 45:10 46:22
47:17 48:21,23
49:11,21 50:2,5,12,
15 51:9,11,20 53:20
56:4,21 58:3,8,25
59:4,24 60:10,15
63:5,6 68:6,11,16,22,
25 69:9 71:16,20
72:2,4,11 74:5,9
75:15 79:4,7,9,18,21,
24 80:9,11 81:11,13,
17,19 84:6,7 90:5,11,
24 92:2,13,18,21,24
94:17,21 95:20,23
96:25 97:2,5,6,11,12
100:2 103:8,12
104:19,21 105:2,9,
15,21,25 106:5,11
107:7,11 111:21,24
117:15 118:18
119:15 120:2,25
121:3,21,24 125:8,
12,18,23 126:4,6
128:8,10 131:23
132:2 133:7,9

134:10,12 138:11,13
139:4 142:16,18,24
144:6,9 145:23 146:2
147:4 148:6,17,22
149:7 150:7,9
151:13,21 154:20
155:2,11,22 156:8,
10,14,20 157:12,20
158:3

**move** 113:21 142:22

**moving** 45:15

**Mulcahy** 18:3,12,13,
14,15,18,22 20:5
103:18 107:12
108:20 109:24
111:12,15 112:20
113:3,12 120:22
122:5 123:5

**Multifamily** 16:12,16
18:19 21:4 30:7
31:11 33:2,4,12,18
34:3,7 36:2,8,22 37:6
38:9,15,18,24 39:10,
19,22 52:16,24 55:16
57:8,18 59:17 61:4,8,
25 70:16 71:8,23
72:24 76:10 86:8
93:15 102:2 111:6
119:18 121:9 122:18
123:11 124:22
128:24 129:13
130:10 131:14,20
132:24 134:18
135:11 137:4 138:16
143:8 150:21 152:25
155:6 156:2

**Multifamily's** 62:23
64:3,7,18 128:13
129:24 130:5,9,20,25
138:20 139:19
140:13 144:20
149:12

**multiple** 39:14 139:2

**mutual** 155:8 156:4

---

**N**

**N-E-W** 7:19

**naturally** 136:21

**nature** 12:20 18:2
36:16 39:9 146:8

**NDA** 30:22

**necessarily** 147:10
151:5

**needed** 67:5 130:5

**negotiate** 33:10
46:14 47:2 49:3

**negotiated** 63:14

**negotiating** 25:5
26:14 95:14

**negotiation** 24:6
25:10,21 26:9,19
27:10,23 28:6,11
29:3 32:6,12 35:21
37:10,12 63:3,9
69:24 155:17

**net** 145:7 149:4

**Nexpoint** 7:22 88:3
112:9 139:6,8

**Nexpoint's** 22:3

**next-to-the-last**
76:13

**Nexvest** 114:24

**Nick** 25:14

**night** 94:24

**nonrecourse** 135:20
136:11,17,18 137:2,6

**nonsubstantial**
65:12

**noon** 104:25

**normal** 63:12,17

**North** 8:19

**notation** 142:14

**noted** 97:15 158:7

**noticed** 98:5

**notwithstanding**
48:7 93:11 149:9

**November** 73:25
107:13 108:5,9
109:25 111:3,16
112:12 113:4,11
115:23 116:17
117:25 118:13
122:13 154:7

**nuanced** 32:8,16
36:23 37:2 38:10
138:23

**number** 20:8,13
21:3,14 35:22,23
44:6 66:24 71:18
74:7 88:22 94:18,19
95:22 100:10 103:10
106:12 107:9 131:23
132:7 133:5 138:8,
19,25 142:25 150:19

**numbered** 80:25
122:3

**numbering** 133:8

**numbers** 57:3 71:11
76:17,22 78:4 84:24

**numerous** 87:25

---

**O**

**oath** 7:10

**object** 12:5 53:19
146:19

**objection** 12:7 22:4
31:21 35:18 37:13
39:11 43:6,15,19
45:4 46:21 47:10
48:18 49:10,20,21
55:24,25 56:18,19
63:4 72:7,10 75:10
78:23,24 84:5 90:2,7
91:21 99:24 117:14
118:16 119:5,21
138:22 145:21
146:20 148:5 151:11,
14 154:13,24 155:10

**objections** 61:16

**observation** 51:24

**observing** 8:2,10,15,
20

**obtain** 38:8

**obtained** 31:15
36:21

**obtaining** 32:15 33:6
62:8

**occasionally** 27:18
66:22

Index: occurred..professional

**occurred** 53:22

**October** 69:13 71:6, 12 82:14 117:22

**office** 7:8

**one-off** 92:17,18

**ongoing** 39:16

**open** 48:9 51:14

**opportunities** 12:24

**opposed** 33:25

**oral** 7:5

**order** 15:7,8 44:7 71:15 75:6,19 113:15 114:11 153:11

**ordinary** 87:7 145:7

**organizational** 87:5, 18 155:5,25

**original** 38:16 53:15 73:6,12,14,18 74:2 75:2 104:11 123:15 126:10 127:4 150:16 151:9

**out-of-pocket** 126:10

**outcome** 40:7

**outlay** 34:16

**owned** 87:16 88:8

**owner** 41:13

**ownership** 56:6,15 57:7,17 155:7 156:3

**owning** 133:14

———

**P**

**p.m.** 80:20 106:9,10 158:7

**Pachulski** 7:18 9:15

**package** 19:5 131:15

**paged** 101:17

**paid** 53:13,17 83:11, 14 86:16 102:18,20 103:2 104:8 118:7 125:2 126:17,24 140:18 143:15

151:10

**papers** 132:19 138:24 141:17

**paragraph** 21:15 22:14 64:22 76:13 83:16 108:19 113:9 143:13 154:12

**pardon** 17:25 21:24

**parent** 10:12,16

**parenthetical** 152:8

**part** 8:12 19:5 25:15 32:12 61:19 87:6 103:15 114:18 139:12

**participate** 30:13 33:14

**participating** 8:5 36:4 62:4

**participation** 33:11

**parties** 24:9,15 26:2, 8,16 28:25 29:15 32:10 35:24 36:3,6, 10 41:13 44:5 48:12 49:19 54:7,12 58:21 59:20 62:21 70:2,3 88:10 101:5 124:13, 17

**parties'** 41:18 55:9 56:14 64:23 155:18

**partner** 13:11 41:20 119:12 137:15

**Partner's** 135:18 137:10

**partners** 7:22 12:24 16:3 110:14 133:4 139:6,8,9

**partners'** 137:19

**partnership** 133:15

**partnerships** 12:14, 21 88:2,5

**parts** 32:19 35:6 46:25 47:7

**party** 15:25 40:10 55:11 70:4 115:6,12 124:24 152:24

**pass-through** 74:22

**passed** 138:15 140:14

**past** 63:14

**Paul** 27:17 107:14

**pay** 35:12 93:19 140:19 152:17

**paying** 153:2

**payments** 59:14 127:14,16

**PDF** 152:4

**pending** 11:25 147:2

**people** 25:3 26:7,23 30:11 150:4

**percent** 36:22 37:3,4 38:8,11,17,24 47:15, 24 48:6,10 61:12 62:8,23 63:7,8 64:3 66:17,23 93:6,7 99:5, 11,16 133:14,18,22, 23 134:19,21,24 138:20 139:14,15,24 141:12,16,20,21 143:5,18,21 145:15 149:4,11 150:20 151:4

**percentage** 52:15, 23 53:6,24 55:20 56:10,16 58:18 59:17,18 60:22 61:3, 8 83:19 135:4,14 141:19

**percentages** 24:16 53:3,24 56:9,15 58:17 93:5 155:7 156:3

**period** 24:10

**permit** 115:18

**permitted** 116:3

**person** 44:15 89:7

**personal** 10:23 106:3

**personalize** 47:19

**personally** 22:9 24:5,13

**perspective** 26:13 28:20,21 41:20 43:24 56:14 91:15

**Phillips** 27:20,22 112:14

**phone** 63:10 83:23 157:16

**phrase** 18:5 19:17,24 23:2 27:2,4 29:19,22, 25 30:3 36:5

**Phyllis** 107:15

**piece** 48:15 97:23

**pieces** 46:14 114:3

**place** 66:14,15 70:19

**placeholder** 73:2

**places** 146:22

**plan** 101:16

**play** 18:18 53:3

**played** 44:22

**playing** 36:12

**point** 31:13 38:22 57:24 65:10 79:20 96:22 112:13 123:17 157:2

**pointed** 122:17

**pointing** 104:3

**portfolio** 30:3

**portion** 45:24 132:15 134:3

**portions** 15:4,6

**position** 113:14 114:9 115:17 155:24 156:6

**possibilities** 147:17

**potential** 33:11

**potentially** 35:10 127:21 140:21

**power** 13:14

**pre-** 35:12

**precedent** 30:19

**preclosing** 35:12

**prefer** 111:7

**preference** 83:11

**preferred** 143:9,14

**preparation** 20:8 40:21 117:17 128:17 147:8

**prepare** 17:20 18:24 78:3 130:5 146:17

**prepared** 17:16 20:20 21:2,7 42:21, 25 46:12 77:18 111:4 128:23 129:24 130:9 131:15

**presentation** 104:24

**presented** 76:9 112:21

**president** 25:7,17

**pretend** 137:8

**previously** 25:14

**primarily** 25:4 27:16 129:17

**primary** 12:22 27:12 41:12 88:15

**print** 51:15 92:15

**prior** 13:10,13 24:16, 21 31:7 36:15 47:22 50:6 51:3 54:14,23 55:13 68:9 72:12 76:24 77:14,19 79:5 87:10,23 88:9 108:5 117:24 118:13 119:3, 19

**private** 13:11,13

**privy** 139:3 155:20

**pro** 93:23

**problem** 22:2 58:6

**proceed** 37:17

**process** 45:2,16 102:18 103:16 118:7

**produced** 18:7 20:7 21:12 67:12,19,25 128:12

**professional** 13:9

**profit** 63:18 83:25 141:11 151:19

**profits** 33:16 62:18, 23 63:8 64:4,8,12,18 84:18,21 85:4 113:23 133:23 134:17 138:20 139:13,20 140:14 143:18,21 145:14 149:12

**project** 24:19 29:19, 25 30:2,9,20,24 31:4, 16 33:22 44:17 87:10,24 112:12

**projects** 87:25

**promote** 96:12 99:8

**proof** 154:2

**properties** 30:4,6 33:5 34:21 44:24 107:22 136:19,20

**property** 71:8 88:4 137:3

**proportion** 93:14,23

**proposal** 70:17 85:9 89:19 94:9,13

**proposed** 82:13 108:16 112:22

**provide** 11:8 32:4 59:10 63:22

**provided** 22:11 40:10 43:25 62:22 87:6

**providing** 130:4

**provision** 58:11,22 82:15 84:13,14,16 89:24 90:19 91:12,13 93:20 94:4 100:8 139:18

**provisions** 57:12,15 58:4 110:22 111:2

**public** 116:25 117:4, 9 119:9,10 152:21

**pull** 51:14 92:7,11,12

**pulled** 81:25

**pulling** 92:9

**purchase** 24:21 34:21

**purchased** 30:7

**purposes** 53:10 149:14

**put** 14:24 15:2,13 40:13 68:6,20,22 69:10 82:21 83:2,10 85:22 86:3,6 102:25 107:7 115:5 124:20

**putting** 60:22

**Q**

**qualified** 135:19 136:11,17,25

**qualifier** 125:21

**qualify** 45:9

**question** 11:10,15, 25 12:5 28:15 31:25 36:24 37:23 40:2 43:20 45:5,10,11 48:22 49:24 50:3,14 55:13 67:14 70:9,10 79:15 92:17,19 99:4 100:16,23 111:14 117:23 118:17 119:24 120:16 125:10 126:2 128:2 131:7,12 144:21,22 145:5,11,24 147:2,3, 5,11 149:2 154:16 155:4

**questions** 11:8 15:9 74:10 92:16 113:10 144:25 147:22 152:5 156:9,11,19,23 157:11,13

**quotation** 22:20,23 23:4

**quote** 73:15,16 74:2 76:14 77:5 95:4,5 101:9,10 108:15,21 113:13 114:10 118:20

**quoted** 113:24

**quotes** 34:25 69:25

**R**

**R-O-C-H-E-L-L-E**

**7:20**

**raise** 60:20

**raised** 122:6

**raising** 122:5

**rare** 30:15

**rata** 93:23

**re-sent** 120:19

**reached** 36:16 38:23 101:24

**read** 15:7 56:24 70:8 72:20 101:19 110:3 113:9 157:22

**reading** 20:10 56:8 57:9 68:18

**ready** 95:6,16

**real** 12:14,21 71:8 139:6,9 145:8

**reask** 67:14

**reason** 49:7 50:18 54:10 64:2 65:8 80:16 134:2 138:3 148:19

**recall** 24:20 42:24 44:4 56:25 60:24 62:9 76:6 77:13 85:19 96:15,19 104:15 106:19 117:7 119:12 130:11 131:6 139:10 152:12

**receive** 36:17 38:24 61:3 66:4 145:6 156:24

**received** 113:2 119:4 120:21 124:8 129:8 140:23 142:11 157:2, 9

**receiving** 60:21 61:8 77:13

**recess** 60:13 106:9

**recollection** 76:8 78:18 117:10 144:17 153:9

**record** 7:16 10:5 18:12 60:4 106:6,8 152:21 153:11 157:14

**records** 153:2,5

**redirect** 156:11

**reduced** 135:24

**reduction** 136:10

**redundant** 106:16

**refer** 15:21 16:15,18 27:2,5 30:12 81:7 83:3

**reference** 21:15 70:23 103:24 133:22

**references** 108:20

**referencing** 132:19

**referred** 114:15,17 122:12

**referring** 16:8 19:25 82:15 96:18 99:14 115:2 157:5

**refers** 70:25 103:21 110:12,14,17 122:11 132:3

**reflect** 49:8 54:12 64:23 73:15 74:3 102:11

**reflected** 46:6 49:19 54:7 55:21 67:11,18, 24 71:11 143:12 157:6

**refresh** 76:8 79:2 144:16

**refusing** 114:6

**regard** 119:7 154:18

**related** 26:16 28:24 29:16 31:16 50:24 55:11 87:23 88:9,18 98:19 99:10 132:16 136:11,15,16 148:16

**relates** 136:18 152:25

**relating** 19:14 137:19 155:5,25

**relation** 83:25

**relations** 10:20 88:6

**relationship** 46:16 47:3 151:6,16,17,20

**relied** 147:8,24 153:10

**rely** 146:16

**remained** 134:20 135:5

**remaining** 35:8 53:22 59:15 121:8,18 123:6

**remains** 139:25

**remedies** 151:18

**remember** 66:19 74:12 107:3 144:21, 22 152:7,9

**remind** 44:21

**remotely** 7:7,11 8:23 9:4,10

**renegotiate** 47:9

**rental** 138:15 145:7

**repatriate** 124:15

**repatriated** 122:20 123:16,24

**repatriation** 123:6

**repay** 115:19 116:2 121:6 141:3

**repayment** 115:18 132:17

**repeat** 118:17

**rephrase** 48:22 50:2

**report** 14:6,7

**reported** 145:19,22

**REPORTER** 7:3 8:11,21 78:21 157:22 158:4

**reporting** 7:11,14

**represent** 7:25 9:16 15:20 29:6,10 117:21 138:19

**representative** 17:6

**represented** 138:8

**representing** 26:7 27:9,21 69:19,22 70:4

**request** 11:24 90:7
102:10 150:2

**requested** 108:20

**residence** 7:12

**residual** 37:9 47:15,
24 48:6,11 99:5,16
102:2 135:9 140:5
141:19 151:4

**resources** 32:5

**respect** 31:11 57:10
84:9 91:6 94:13
134:18

**respective** 93:24

**responded** 112:2
120:22

**responding** 154:9

**responds** 96:23
101:13

**response** 18:8
21:15,18,21 22:3,10
67:2,12,19,25 72:3
89:19 100:13 101:8
111:22 113:2,8
128:12 154:11

**responsibilities**
12:11

**responsibility** 146:6

**responsible** 25:4
55:9 129:12,18,23
130:3

**responsive** 102:9

**restate** 31:24

**restated** 16:2 75:6

**retroactive** 75:7,19

**return** 33:15 38:12,
25 47:4 86:18 94:3
104:17 107:2 111:5
113:18,22 116:7,17
118:22 122:8 125:5
130:12,17 132:10
134:3 136:12 146:6,
9,12 147:19 149:6

**returned** 38:14,17
40:6 47:16 53:4,7
104:12 108:6 113:15
114:10 115:25

123:20 124:2 125:16
126:2 127:8 150:17

**returns** 128:6,13,23
129:24 130:6,9,21,25
144:20 146:18 147:9

**review** 19:4 20:6
21:11 22:12 25:10,22
27:23 28:6 45:21
128:16

**reviewed** 17:24
19:11 40:21

**reviewing** 45:3
141:17 143:23

**Rob** 122:24

**Roby** 25:6,14 44:12,
22 69:12 71:22 76:3
95:3 96:5,10

**Rochelle** 7:19

**role** 18:18 24:6 36:12
44:22 107:24

**roles** 55:8

**room** 15:5 77:11

**rough** 104:18

**rounds** 117:2

**rules** 11:6

**S**

**satisfaction** 95:15

**Saturday** 107:13

**Sauter** 112:3,6,8,11,
23 113:19 120:4,13

**scenario** 59:11

**schedule** 20:13,15,
17 51:9 52:4 54:6,11,
17 55:2,18,21 56:11,
17 58:18 59:18 60:16
62:10 76:15,22 77:6,
9,13,17,24 78:4,13
80:14,17,18,22 93:6
97:25 98:4,12
102:10,15,23 103:5
133:10 140:5 141:25
157:6

**schedules** 108:16

**school** 13:20

**scope** 21:11 146:21
148:9

**Scott** 42:5,8,10,13

**screen** 14:24 15:13
19:7 40:14 68:7
69:11 75:24 79:4
82:2 128:19

**scribner** 43:3

**scroll** 21:23 42:2
44:9 59:9 69:3 72:2
77:8,10 81:11,20
89:5 90:9 93:10 96:8
111:22 113:5 120:18
122:22 131:3,24
134:16 138:11
142:19 144:13 145:2
150:7

**scrolling** 89:10
96:25 97:5,11 121:2

**search** 56:3

**sec** 33:2 132:21

**section** 56:5,9 57:16,
20 58:9 59:2,5,9
62:15,16,21,22 65:3
84:19,20,23 85:3
92:3,5 94:13 95:15
133:23 137:9 143:13
144:3

**Sections** 59:14 93:2

**secure** 32:13

**securities** 132:5

**seek** 11:25

**selling** 30:6

**SEM** 16:16 49:9 65:2

**send** 76:17 157:23

**sending** 119:19

**sends** 95:2 97:7

**sense** 56:23 74:14

**sentence** 70:7 80:13
81:8 82:12 116:5
120:3

**separate** 76:18 85:5

**September** 24:24

31:16 32:23 33:6
35:8 129:4,9

**series** 92:16

**served** 15:15

**services** 10:14,17
16:20 32:5

**set** 22:14 56:9,10,15,
16 58:18 59:18 78:4
81:21 93:6 97:24
112:22 134:24
139:24 143:3 152:13
153:21 154:11

**severally** 136:5

**shade** 141:12

**share** 109:19 135:18
137:10 148:19

**shared** 16:20 19:6
35:6 84:16 87:6

**sharing** 33:15

**sheet** 13:14

**Sheets** 8:2,7,13 14:7
25:24

**shift** 106:17 151:22,
25

**short** 105:3,11

**shortly** 116:24
152:20

**show** 15:3 79:10,22
84:23 142:17 147:13

**showed** 111:4

**shown** 137:23

**shows** 52:10,14 80:6
139:13 142:11

**side** 49:15,23 54:9
88:7

**sign** 9:24 95:16
157:23

**signatory** 32:2

**signature** 41:2 42:5
44:12

**signed** 41:5 42:22
46:2,4,8,20 47:5
49:2,5,17 50:16,23
52:19 54:24 55:14

59:21 62:12 65:20
74:15 75:8 96:11,17

**significant** 88:5,9

**signing** 45:22 46:3
54:9,14 57:5 60:19
61:22 66:18

**simple** 11:6 147:5,13
151:20

**simpler** 22:19

**simply** 106:16

**Simpson** 13:19

**sir** 10:5 17:15 19:10
22:25 30:10 40:19,20
44:14 58:9,10 72:13
76:5 103:14 128:5

**situation** 116:19

**skip** 68:15

**slightly** 97:22,23
121:10

**slip** 65:9,15 96:17
100:14 101:9,17
102:4

**small** 13:12 97:15,19
102:5

**sold** 102:19 136:20

**solely** 33:17

**solution** 113:20
120:5,10,13 121:17

**sound** 10:11

**Sounds** 90:23

**source** 86:20 126:14
153:4

**sourced** 124:16
127:4

**sources** 70:15
140:24

**sourcing** 12:24
78:20

**speak** 18:23 19:2
37:4 42:10 62:3
116:13

**specific** 44:6 57:4
60:24 66:19 87:14
102:23 116:23 118:6

119:8,13 120:15
136:7

**specifically** 30:25
36:13 41:24 43:11
56:25 57:7 70:2
72:16 83:5 87:19
88:8 99:3 117:7,11
119:7 130:11 132:18
138:25 139:10
155:16

**specificity** 23:17
130:14

**split** 109:5

**spoken** 14:9,13
20:24

**spot** 50:13

**stamp** 68:14

**stamped** 80:2

**stance** 147:18

**stand-alone** 78:15

**standing** 113:14

**standpoint** 47:14

**Stang** 7:18 9:16

**start** 68:3,18 88:23
95:24 107:10 128:5

**started** 116:25

**starting** 66:21

**Starwood** 30:5

**state** 7:15 10:4 111:8

**stated** 121:16 149:10

**statement** 45:12
75:11

**stay** 137:14

**steady** 139:25

**stenographic** 7:12

**steps** 46:5

**stop** 92:22

**stride** 118:8

**string** 95:22

**structure** 12:15 14:6
96:12

**struggle** 46:24

**subject** 35:21 53:4
57:14 58:15 63:2,9
76:22 108:14

**subpoena** 9:20,23
15:14,15 16:25 18:8
19:18 21:7,22 67:13,
20,25 128:12 152:3
154:10

**subsidiaries** 18:17
87:13

**subsidiary** 87:16

**substance** 80:14
120:24 121:4

**successor** 140:15

**sufficient** 45:21
115:18 116:2 141:3

**suggested** 30:14
134:6 142:3

**suggestion** 38:3
51:23

**suggests** 100:14

**summary** 70:18

**summer** 31:2

**swear** 8:22

**sworn** 8:25 9:10

─────────

**T**

**table** 122:23

**taking** 70:19 118:8

**talk** 16:2 60:7

**talked** 18:2 48:3
69:16

**talking** 18:6 36:6
48:2 90:15,21 124:5
132:11

**tax** 85:16 128:5,13,23
129:24 130:5,9,17,
20,25 134:3 144:20
146:6,9,12,17,23
147:8,19 149:5
150:22 151:17,18

**taxable** 83:18 84:10
85:10

**taxes** 74:22 148:2,11
149:14

**team** 113:19 120:4

**temporarily** 113:17
116:6 118:21

**term** 16:7 22:19 31:6
109:4

**terms** 17:25 64:6
72:8 73:16 74:3
110:22 111:2 129:22

**test** 14:25 51:22 92:8

**testified** 9:10 44:20
76:7 144:23

**testify** 17:16 20:20
21:8

**testimony** 17:4
72:12 156:21

**Texas** 7:9,13,25

**thanking** 9:18,19

**thereabouts** 86:7

**thereto** 155:7 156:3

**things** 24:17 29:16
30:22 32:9,11,17
33:16 35:5 37:2
38:12 39:14,16
63:14,20 77:5 87:13
102:19 132:19 139:2
141:18 143:24
151:19 153:3

**thinks** 49:23

**third-party** 115:20
116:3 121:7 126:11
127:3 132:10,17
141:3

**Thomas** 7:6 9:9,14
10:6,7 22:9 31:25
39:12 43:18 45:7,13
47:11 48:19 51:12,21
60:17 79:12,22,25
91:2 92:14 106:19
119:23 125:20 126:7
147:6 148:20 155:14
156:18

**thread** 112:4

**three-page** 144:15

**throws** 137:5

**time** 7:4 8:21 9:18
10:22 11:22 12:4
14:22 19:8,23 24:10
26:11 27:13 33:9
35:7 36:2,20 37:22
38:22 39:5 44:23
45:21,25 46:8,16,19
47:5 49:2,5,16 50:6,
16,22 52:19 54:5,23
55:13 57:5 60:6,13,
14 62:12 65:8 66:8,
18 68:8 71:13 72:25
73:10 86:22 96:11
98:13,21 102:15
104:14,18 105:20
106:9,10 108:10
109:11,21 113:19
114:3 115:15 116:8
117:24 118:6,22
119:4 122:14 126:7
130:24 131:12 139:7
144:19 151:15
155:17,21 158:7

**timeline** 39:2

**times** 20:11 66:19
112:17 151:3

**title** 10:18 35:9,12
107:20

**today** 8:10,15,20
9:18 10:8 14:23 17:5,
14 19:24 22:13 44:16
45:20 65:18 82:8

**today's** 7:3 14:15,20
17:21 18:24 40:22
128:17

**told** 16:4 48:25 72:24
73:5 75:17,22 111:15
112:19 113:11
115:25 118:19 119:2
138:5

**top** 25:23 59:3 69:7
120:22 123:2,4
138:12

**topic** 19:9 20:8,13,
21,24 21:3,8,14,16
22:9,20 28:9 106:18
151:23 152:7,14
153:21 154:12

**topics** 17:13,18
21:11 106:17,20

**total** 140:22

**totality** 20:7 34:8

**traced** 126:14

**tranche** 103:22
104:4 140:20

**transaction** 18:19
30:15 32:20,23 35:7,
24 62:5 71:5 118:10

**transactions** 14:12
88:16

**transcript** 106:15
157:15

**transition** 112:15

**traunches** 34:24

**Travis** 8:2,7,13 14:7
25:24

**treated** 83:6 143:10

**trick** 51:22

**tricky** 116:19

**TSG** 7:13

**Tuesday** 112:2

**tune** 88:4 137:2

**turn** 39:17 130:16

**two-page** 88:22
122:2 144:14

**type** 30:16 41:15
107:24

**typical** 45:16

**typically** 30:21
136:17

─────────

**U**

**Uh-huh** 16:10 94:25
96:14

**ultimately** 34:11
36:7,21 92:5

**underneath** 136:19

**understand** 11:19
15:9,23 20:2 23:5
41:10 49:24 85:7,12
92:23 98:18 110:9
115:4 133:2 136:3

147:12 149:9

**understanding** 17:3
20:16 26:5 29:21,24
30:17 32:21 33:8
41:12,17,18,25 47:6
59:22 61:23 69:18
70:13 74:18,20 75:5,
13 77:22 78:2 83:7
85:25 86:14 91:3,10,
11 92:5 98:2 100:11
104:9,13 108:24
109:3,12 110:11
111:10 114:14 115:8,
14,16 124:12,19
129:21 130:3 133:21
134:23 135:9 136:14,
23 138:18 147:17
150:23

**understood** 12:8,9
16:22 45:24 46:15
47:3 48:10 54:3
61:13 101:15 110:24,
25

**undertaken** 9:21

**underwriting** 32:9,
10

**unicorn** 29:19,25
30:2,9,11,24 31:4,17
33:23 44:17 87:10,24
108:15 112:12

**unique** 30:12,15

**University** 13:23

**unpaid** 123:6

**unreturned** 122:20

**unsure** 156:22

**update** 65:11,12
98:21 102:23

**updated** 71:14
76:16,17 108:21
109:10 110:2,5
111:16

**upper** 87:15

**urgency** 74:14,19,23

---

**V**

**verbal** 9:3

**verbatim** 91:19

**verify** 84:24

**version** 76:17 96:4,
21

**versions** 96:16

**VI** 58:15

**view** 26:15 82:2
154:21

**viewed** 28:24 29:2
69:21,23 72:15
155:16

**viewing** 28:15

**Viggato** 128:23
129:4,13,19 130:5,8
131:16 149:21,24
150:4

**virtual** 51:17 69:5

**virtually** 43:17

**voice** 61:16

---

**W**

**wait** 57:23

**wanted** 9:25 45:9,11
51:15,16 58:7 69:8
79:19 85:17 90:14,22
99:22 104:22 106:3
114:4 121:8 122:7,19
146:25

**waterfall** 53:10
57:11,14 59:11 63:20
82:10,15 85:15 86:13
89:24 91:7

**waterfalls** 87:17

**weeds** 116:12

**weighed** 101:8

**Wick** 27:20,22
112:14

**withdraw** 75:10
106:14

**withdrawn** 26:24
27:3 33:2 34:13
38:15 43:7 47:19
48:21 61:4 63:5
64:20 78:11 84:6

86:4 91:10,16 123:3,
13 125:3 126:8
131:18 154:8

**withhold** 154:7

**word** 7:19 30:11
46:24 70:11 77:12

**work** 10:12 32:13
132:19 138:24
141:17 142:23
151:18

**worked** 107:22

**working** 24:9 26:24
27:21 32:14,17 54:19
96:12 113:19 120:4,
14

**worth** 137:23

**writing** 66:5

**written** 19:12 22:3
35:16 36:25 38:13
39:7,15 46:13 57:3
106:21

**wrong** 55:2

**wrote** 58:22 109:24
111:12

---

**Y**

**y'all** 90:4 157:17

**year** 23:12 33:19 34:3
123:25 134:21 135:6,
19,23 139:25 140:2
141:13,14,21,22
143:6,7

**years** 11:4 13:4
131:5

**York** 7:19 105:16

---

**Z**

**Zabriskie** 25:7

**zeros** 68:15

**Ziehl** 7:18 9:16

**zoom** 90:3,16

**GZJ KDV'4**

**SE Multifamily Holdings LLC**
(A Delaware Limited Liability Company)

LIMITED LIABILITY COMPANY AGREEMENT

———————————

Dated as of August 23, 2018

———————————

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.

# SE MULTIFAMILY HOLDINGS LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of SE Multifamily Holdings LLC, a Delaware limited liability company (the "Company"), is entered into as of August 23, 2018 (the "Effective Date"), by Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP") and HCRE Partners, LLC, a Delaware limited liability company ("HCRE"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with HCMLP and HCRE, the "Members").

## RECITALS

WHEREAS, the Members deem it desirable to enter into this Agreement in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
Organization

1.1     Formation; Continuance.  The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act").  The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on August 23, 2018, and shall continue for the period of duration set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with Article IX.

1.2     Name.  The name of the Company is SE Multifamily Holdings LLC. The Manager may change the name of the Company from time to time.  In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

1.3     Purpose.  The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate-related investment property; (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable; and (iii) conduct any business or activity related to the foregoing activities that may lawfully be conducted by a limited liability company organized under the Act. Any or all of the

foregoing activities may be conducted directly by the Company or indirectly through another limited liability company, partnership, joint venture or other arrangement.

1.4     Registered Office and Agent; Principal Place of Business.  The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Company's registered agent at such address is The Corporation Trust Company.  The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201.  The Manager may change such registered agent, registered office or principal place of business from time to time.  In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change.  The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

1.5     No State-Law Partnership.  The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

1.6     Management, Control and Voting Rights Vested Solely in HCRE and the Manager.  HCRE shall have the exclusive right to appoint the Manager and the Manager shall have unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement.

1.7     Company Ownership: 51% to HCRE and 49% to HCMLP.  Except with respect to particular items specified in this Agreement, HCRE shall have a 51% ownership interest and HCMLP shall have a 49% ownership interest, respectively, in all assets and activities of the Company, including, without limitation, rights to receive distributions of cash and assets in-kind in the process of winding down and liquidating the Company pursuant to Article 9 of this Agreement.

1.8     Anti-Consolidation For HCMLP.  In the event that this Agreement at any time is interpreted to require consolidation of the Company with HCMLP under Generally Accepted Accounting Principles ("GAAP"), the Members agree to retroactively or prospectively, as the case may be,  amend this Agreement and to reallocate any economic or other items between HCMLP and HCRE to the extent necessary to cause the Company not to be consolidated with HCMLP for GAAP purposes and to the extent the reallocation involves items shared by percentage interests, the reallocation shall be made in an amount that is 1% more than the minimum reallocation necessary to cause the Company not to be consolidated for GAAP purposes with HCMLP. Any  amendment or reallocation made pursuant to this Section 1.8  shall be made in accordance with the Treasury Regulations under Code Section 704(b).

## ARTICLE 2
### Capital Contributions

2.1    <u>Initial Capital Contributions</u>.  Each Member shall make capital contributions on the Effective Date in the amounts that are set forth next to such Member's name on <u>Schedule A</u> hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2    <u>Additional Capital Contributions</u>.

    (a)    The Manager may call capital contributions at any time from HCRE in order to carry out the business of the Company as set forth in <u>Section 1.3</u>; <u>provided, however</u>, that the Company shall issue "Preferred Membership Interests" in exchange for any additional capital contributions made under this Section 2.2(a). On each occasion the Manager desires that HCRE make additional capital contributions to the Company, the Manager shall give HCRE a written notice (a "<u>Funding Notice</u>") that shall include (i) the aggregate amount of additional capital contributions required, (ii) the date by which such additional capital contributions are required to be funded, and (iii) the address where additional capital contributions shall be sent. No other Member shall be required to make capital contributions at any time for any reason.

    (b)    The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

2.3    <u>No Return of Capital Contributions</u>.  No Member shall be entitled to a withdrawal or return of its capital contributions.  Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4    <u>No Interest</u>.  No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5    <u>Member Loans</u>.  If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members.  Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6    <u>Capital Accounts</u>.

    (a)    The Company shall maintain a separate capital account (a "<u>Capital Account</u>") for each Member in accordance with the following provisions:

(i)     to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii)     to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)     if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv)     in determining the amount of any liability for purposes of Sections 2.6(a)(i) and 2.6(a)(ii), Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b)     This Section 2.6 as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; provided, however, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this Article II. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; provided, however, that such modification is not likely to have a material effect on the amounts distributed to any person pursuant to Article IX upon the dissolution, liquidation and termination of the Company. In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

## ARTICLE 3
### Rights and Obligations of the Manager

3.1　<u>Initial Manager; Term; Vacancies; Resignation; Removal</u>.  The initial manager of the Company (the "<u>Manager</u>") shall be James Dondero, in his capacity as an officer of HCRE. The Manager shall hold office for so long as HCRE is a member of the Company.  Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of HCRE so long as HCRE is a member of the Company.

3.2　<u>Management</u>.  The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3　<u>Powers</u>.  Subject to <u>Section 3.4</u>, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

　　　(a)　to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

　　　(b)　to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

　　　(c)　to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

　　　(d)　to establish reserves for contingencies and for any other proper purpose;

　　　(e)　to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

　　　(f)　to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

6

(g)   to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

(h)   to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

(i)   to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

(j)   to negotiate and effect a merger or consolidation of the Company with any other entity;

(k)   approve any transaction entered into by the Company and any Member, or affiliate of any Member;

(l)   to develop an annual budget and to approve any deviations from such budget; and

(m)   to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4   <u>Limitations on Manager's Authority</u>.  Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of all the Members:

(a)   enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

(b)   issue additional membership interests in the Company;

(c)   sell the Company or sell all or substantially all assets of the Company;

(d)   admit new Members to the Company;

(e)   permit a transferee of an interest in the Company to become a substitute Member of the Company under <u>Section 7.3</u>;

(f)   borrow funds or otherwise commit the credit of the Company; or

(g)   take any action in contravention of the provisions of this Agreement or take any other action that requires the approval of all the Members under the terms of this Agreement or the Act.

3.5     Liability of Manager.  No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6     Other Activities.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7     Officers.  The Manager may appoint and remove officers of the Company in his sole discretion.

3.8     Reimbursement.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.

3.9     Replacement of Manager.  Subject to Section 3.1, in the event that the Manager resigns for any reason, a replacement Manager may be appointed by HCRE.

ARTICLE 4
Rights and Obligations of Members

4.1     No Authority.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to an officer pursuant to Section 3.7); provided, however, that nothing contained in this Section 4.1 shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2     Liability of Members.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3     Consents and Limited Voting Rights.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager.  In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of HCRE.

ARTICLE 5
Exculpation and Indemnification

5.1     Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or otherwise to the Company or any Member by reason of, arising from or relating to the

operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2 <u>Limitation of Liability</u>. Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3 <u>Indemnification</u>.

(a) <u>Indemnifiable Claims</u>. The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b) <u>Satisfaction; Capital Contributions</u>. The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company. No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c) <u>Advancement of Expenses</u>. Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; <u>provided</u>, <u>however</u>, that the affected Covered Person shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this <u>Section 5.3</u>.

(d) <u>Successors; Remedies</u>. The indemnification provided by this <u>Section 5.3</u> shall be in addition to any other rights to which any Covered Person may be entitled, in

any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person.  This <u>Section 5.3</u> shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)     <u>Amendment</u>.  Any repeal or amendment of this <u>Section 5.3</u> shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this <u>Section 5.3</u>.

5.4     <u>Other Agreements</u>.  Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this <u>Article V</u> shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5     <u>Guaranties</u>.  As used in this Agreement, a "<u>Guaranty</u>" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries.  No Member or Affiliate shall be required to execute any Guaranty.

ARTICLE 6
Distributions and Allocations

6.1     <u>Distributions of Cash</u>.

(a)     <u>Distributable Cash.</u>  Except as otherwise specifically provided in this Article VI and Article IX, all Distributable Cash shall be distributed 51% to HCRE and 49% to HCMLP at such time and in such amounts as determined by the Manager.

(b)     <u>Net Cash from Rental/Leasing Activities</u>. Net Cash from Rental/Leasing Activities shall be distributed 99% to HCMLP and 1% to HCRE at such time and in such amounts as determined by the Manager.

(c)     <u>Net Cash from Specified Company Assets</u>. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(d)     Notwithstanding <u>Sections 6.1(a), (b) and (c)</u>, if any "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution as determined in the sole discretion of the Manager shall be distributed to

10

HCRE with respect to HCRE's Preferred Membership Interest until HCRE has received cumulative distributions under this Sections 6.1(d) equal to HCRE's additional capital contributions plus an 8 percent simple preferred return on such additional capital contributions made to acquire such Preferred Membership Interest.

(e)     Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(c) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(f)     Tax Distributions.  Notwithstanding anything in Section 6.1(a), (b), (c) and (d), the Company shall first make minimum distributions of cash available from all sources as determined in the sole discretion of the Manager to the Members in an amount necessary for each Member to pay taxes on taxable income allocable to such Member, assuming each Member is subject to tax at the highest combined marginal federal, state and local tax for an individual living in Dallas, Texas.  Distributions to any Member under this Section 6.1(f) shall be treated as advances against any future distributions payable to such Member under Section  6.1(a), (b), (c) and (d).

6.2     Restrictions on Distributions.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

6.3     Withholding Taxes.  Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that he determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person.  Without limiting the provisions of this Section 6.3, if any such withholding requirement in respect of any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.  The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid.  Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law.  Notwithstanding the foregoing provisions of this Section 6.3, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4    Allocations of Profits and Losses.  Profits and Losses shall be allocated as follows:

(a)    Except as provided in Section 6.4(b) and (c) and after the special allocations set forth in Sections A.III.2 and A.III.3 of Schedule B,  Profits and Losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated 51% to HCRE and 49% to HCMLP.

(b)    All Profits and Losses from the Company's Rental/Leasing Activities shall be allocated 99% to HCMLP and 1% to HCRE.

(c)    All Profits and Losses with respect to each Specified Company Asset will be allocated in accordance with each Member's Capital Percentage Interest in such Specified Company Asset.

ARTICLE 7
Admissions, Transfers and Withdrawals

7.1    Admissions.  New Members may be admitted to the Company only with the unanimous written consent of, and upon such terms and conditions as are approved by, the Members in accordance with Section 3.3.  Substituted Members shall not be deemed new Members for purposes of this Section 7.1.

7.2    Transfer of Membership Interests.

(a)    No Transfers Without Consent.  No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with Section 3.3; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee. For purposes hereof, "Permitted Transferee" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

(b)    Death, Bankruptcy, etc. of Member.  In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)    the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in Section 9.1;

(ii)    such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in Section 7.3, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)    the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)    the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)    any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3    <u>Substitution</u>.  A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with <u>Section 3.4</u>, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member. Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4    <u>Withdrawal</u>.  Except as permitted by this <u>Section 7.4</u>, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with <u>Section 7.3</u> or <u>7.5</u>.

## ARTICLE 8
## Accounting and Tax Matters

8.1    <u>Fiscal Year</u>.  The fiscal year of the Company ("<u>fiscal year</u>") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required.  The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2    <u>Books of Account; Tax Returns</u>.  The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations, business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act.  Except as otherwise expressly provided in this Agreement, such books and records shall

be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the Manager be prepared on either a cash basis or accrual basis.

8.3    Place Kept; Inspection.   The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during the ordinary business hours of the Company.

ARTICLE 9
Dissolution, Liquidation and Termination

9.1    Dissolution.   The Company shall be dissolved upon the first to occur of the following events ("Dissolution Events"):   (i) the election of the Manager to dissolve the Company at any time in accordance with Section 3.3; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

9.2    Accounting.   After the dissolution of the Company pursuant to Section 9.1, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date.   The Manager shall serve as liquidator of the Company.   If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members.   The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity.   The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

9.3    Liquidation.   As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business), after the dissolution of the Company pursuant to Section 9.1, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company.   The proceeds of such liquidation shall be applied in the following order of priority:

(a)    first, in payment of the expenses of the liquidation;

(b)    second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

(c)    third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans);

(d)    fourth, to the Members in accordance with Sections 6.1(b), (c) and (d); and

(e)    thereafter, 51% to HCRE and 49% to HCMLP.

9.4    Termination.   At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the

14

Comptroller of the State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "Tax Certificate"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

9.5     No Deficit Capital Account Restoration Obligation.  Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

9.6     No Other Cause of Dissolution.  The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this Article IX.

ARTICLE 10
Miscellaneous Provisions

10.1     Amendments and Waivers.  This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and all the Members (a copy of which shall be promptly sent by the Manager to all the Members).  For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in Section 1.3, (d) change any provision of this Agreement requiring the approval of all the Members or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2     Binding Effect.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3     Counterparts.  This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4     Entire Agreement.  This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6   Venue.  To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7   Notices.  All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on Schedule A, and if to the Company, at the address of its principal place of business referred to in Section 1.4, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this Section 10.7.  Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this Section 10.7 shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent.  Notwithstanding the foregoing provisions of this Section 10.7 (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8   Remedies Cumulative No Waiver.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  No delay or omission on the part of any party hereto, whether in one or more instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9   Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law.  Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.10  Waiver of Partition.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., General Partner

By: _____
Name: James D. Dondero
Title:  President

HCRE PARTNERS, LLC

By: _____
Name: James D. Dondero
Title:  Manager

## Schedule A

### Capital Contributions and Percentage Interests

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $51 | 51% |
| Highland Capital Management, L.P. | $49 | 49% |

### Capital Percentage Interests in Specified Company Assets

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
|  |  |
|  |  |

## Schedule B

### Allocations

A.I.    *Definitions*.  Capitalized terms used and not defined in this Schedule B have the meanings ascribed to them in the Agreement, of which this Schedule B forms a part.  As used in this Schedule B, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)    Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; *provided, however,* if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and *provided, further,* if the Company is utilizing the remedial allocation method under Regulations Section 1304-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule B.

"Capital Percentage Interest" means, with respect to each Member, and with respect to each Specified Company Asset, the designated percentage listed next to such Member's name, in respect of such Specified Company Asset, on Exhibit A, attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and the rulings issued thereunder.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Distributable Cash" means all cash, revenues and funds received by the Company (including, without limitation, from sales, refinancings and other dispositions of Company property), less the sum of the following: (i) Net Cash from Rental/Leasing Activities (ii) all cash expenditures incurred in the operation of the Company's business; (iii) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; and (iv) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Distributable Cash shall include all principal and interest payments received by the Company with respect to any note or other obligation in connection with sales or other dispositions of Company property.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)     the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)     the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.7041(b)(2)(ii);

(c)     the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)     the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)     if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Net Cash from Rental/Leasing Activities" means the gross cash proceeds from Company rental and leasing activities less the portion thereof used to pay or establish reserves for Company expenses, property repairs, debt payments, capital improvements, replacements and contingencies, in each case determined by the Manager. Net Cash from Rental/Leasing Activities shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances. Net Cash from Rental/Leasing Activities shall not include net cash from sales or refinancings of Company property.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; provided that items of Profit and Loss specially allocated to a Member pursuant to Section 6.4 of the Agreement and Sections A.III.2 and A.III.3 of this Schedule B shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d) In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e)     Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's membership interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Specified Company Asset" means any capital asset owned by the Company with respect to which the Members have agreed to share proceeds from a sale, refinancing or other disposition thereof in a sharing ratio set forth with respect to each such Specified Company Asset from time to time on Schedule B.

A.II.    *Members' Capital Accounts.*

1.      There shall be established for each Member on the books and records of the Company a Capital Account. Each Member's initial Capital Account shall be zero and, without limiting the generality of the foregoing, shall be adjusted as follows:

(a)     To each Member's Capital Account there shall be credited such Member's Capital Contributions (net of any liabilities assumed by the Company or which are secured by any property contributed by such Member), such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections A.III.2 and A.III.3.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement (net of any liabilities assumed by the Member or which are secured by any property distributed to such Member by the Company), such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections A.III.2 and A.III.3.

2.      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with such statutory and regulatory provisions.

3.      In the event all or a portion of an Interest in the Company is transferred in accordance with the terms of Section 7.2, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, adjusted as required by the aforementioned Treasury Regulations.

A.III.  *Allocations*.

1.   *Allocations of Net Profit and Net Loss.* After giving effect to the special allocations set forth in Sections A.III.2 and A.III.3, below, Profits and Losses for any fiscal year or other period shall be allocated among the Members such that each Member's Capital Account balance (computed after taking into account all distributions with respect to such taxable period and increased by such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain) would, as nearly as possible, be equal to the amount that each Member would receive if all of the remaining assets of the Company were sold for cash equal to their Gross Asset Values, all liabilities of the Company were satisfied (limited, with respect to Nonrecourse Liabilities, to the Gross Asset Values of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 9.3(d) to the Members immediately after making such allocation, in each case on a Company Asset-by-Company Asset basis; *provided, however,* that the Losses allocated to a Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year or other period.

2.   *Special Allocations.*  The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)   *Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.7042(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations.  This Section A.III.2(a) is intended to comply with the minimum gain Chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)   *Member Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)   *Qualified Income Offset.*  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each such Member in an

amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule B have been tentatively made as if this Section A.III.2(c) were not in the Agreement. This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)     *Nonrecourse Deductions.* Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)     *Member Nonrecourse Deductions.* Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3.     *Curative Allocations.* The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3. Therefore, notwithstanding any other provision of this Schedule B (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.III.1. In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A in that, although not yet made, are likely to offset other Regulatory Allocations previously made.

A.IV.   *Other Allocation Rules*.

1.     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits. Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2.     The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to, the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3.     Tax Allocations: Code Section 704(c).

(a)   For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule B except as otherwise provided in this Section A.IV.3.

(b)   Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company. Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)   In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)   Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.   *Company Representative*.

The partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager. (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative"). The Company Representative shall inform each Member of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity. The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law. Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company. The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager. The Company Representative shall not bind any Member to a settlement agreement without obtaining the consent of such Member. If any Member intends to flea notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.     *Tax Elections*.

       1 .     The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.

# EXHIBIT 3

,"

Execution Version

BRIDGE LOAN AGREEMENT

dated as of

September 26, 2018

among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY
INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL
ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND CERTAIN
PROPERTY OWNERS LISTED HEREIN,
collectively, as Borrower

and

The Lenders Party Hereto

and

KEYBANK NATIONAL ASSOCIATION,
as Administrative Agent

and

KEYBANC CAPITAL MARKETS,
As Sole Lead Arranger and Bookrunner

# TABLE OF CONTENTS

ARTICLE I Definitions ...................................................................................................... 1

    Section 1.01 Defined Terms ......................................................................................... 1
    Section 1.02 Classification of Loans and Borrowings.................................................. 25
    Section 1.03 Terms Generally ..................................................................................... 25
    Section 1.04 Accounting Terms; GAAP...................................................................... 25
    Section 1.05 Appointment of Lead Borrower.............................................................. 25

ARTICLE II The Loans ..................................................................................................... 26

    Section 2.01 [Intentionally Omitted] ........................................................................... 26
    Section 2.02 Commitments .......................................................................................... 26
    Section 2.03 Loans and Borrowings............................................................................ 27
    Section 2.04 [Intentionally Omitted] ........................................................................... 27
    Section 2.05 [Intentionally Omitted] ........................................................................... 27
    Section 2.06 [Intentionally Omitted] ........................................................................... 27
    Section 2.07 [Intentionally Omitted]........................................................................... 27
    Section 2.08 Interest Elections.................................................................................... 27
    Section 2.09 Reserved.................................................................................................. 28
    Section 2.10 Repayment of Loans; Evidence of Debt. ................................................ 29
    Section 2.11 Prepayment of Loans.............................................................................. 29
    Section 2.12 Fees.......................................................................................................... 31
    Section 2.13 Interest. ................................................................................................... 31
    Section 2.14 Alternate Rate of Interest....................................................................... 32
    Section 2.15 Increased Costs. ...................................................................................... 33
    Section 2.16 Break Funding Payments ....................................................................... 34
    Section 2.17 Taxes. ...................................................................................................... 35
    Section 2.18 Payments Generally; Pro Rata Treatment; Sharing of Set-offs. ........... 39
    Section 2.19 Mitigation Obligations; Replacement of Lenders................................. 40
    Section 2.20 Defaulting Lenders. ................................................................................ 41
    Section 2.21 Extension of Tranche A Maturity Date................................................... 42
    Section 2.22 Extension of Tranche B Maturity Date................................................... 43

ARTICLE III Representations and Warranties................................................................. 43

    Section 3.01 Organization; Powers.............................................................................. 43
    Section 3.02 Authorization; Enforceability ................................................................ 43
    Section 3.03 Governmental Approvals; No Conflicts ................................................. 44
    Section 3.04 Financial Condition; No Material Adverse Change. ............................... 44
    Section 3.05 Properties. ............................................................................................... 44
    Section 3.06 Intellectual Property................................................................................ 45
    Section 3.07 Litigation and Environmental Matters.................................................... 46
    Section 3.08 Compliance with Laws and Agreements ................................................ 48
    Section 3.09 Investment and Holding Company Status .............................................. 48
    Section 3.10 Taxes....................................................................................................... 48

Section 3.11 ERISA ........................................................................................................ 48
Section 3.12 Disclosure .................................................................................................. 48
Section 3.13 Solvency ..................................................................................................... 48
Section 3.14 Margin Regulations .................................................................................. 49
Section 3.15 Subsidiaries ............................................................................................... 49
Section 3.16 OFAC; Anti-Money Laundering .............................................................. 49
Section 3.17 EEA Financial Institution ........................................................................ 49
Section 3.18 Single Asset Entity; Compliance With Laws ........................................... 49

ARTICLE IV Conditions .................................................................................................... 51
Section 4.01 Effective Date ............................................................................................ 51
Section 4.02 Each Borrowing ........................................................................................ 53

ARTICLE V Affirmative Covenants ................................................................................. 53
Section 5.01 Financial Statements; Ratings Change and Other Information ............... 53
Section 5.02 Financial Tests. ......................................................................................... 54
Section 5.03 Notices of Material Events ........................................................................ 54
Section 5.04 Existence; Conduct of Business ................................................................ 55
Section 5.05 Payment of Obligations ............................................................................ 55
Section 5.06 Maintenance of Properties; Insurance ..................................................... 55
Section 5.07 Books and Records; Inspection Rights. ..................................................... 58
Section 5.08 Compliance with Laws .............................................................................. 58
Section 5.09 Use of Proceeds ........................................................................................ 58
Section 5.10 Fiscal Year ................................................................................................ 58
Section 5.11 Environmental Matters .............................................................................. 58
Section 5.12 Collateral Requirement. ........................................................................... 60
Section 5.13 Further Assurances ................................................................................... 62
Section 5.14 [Intentionally Omitted] ............................................................................ 62
Section 5.15 [Intentionally Omitted] ............................................................................ 62
Section 5.16 Approved Leases ....................................................................................... 62
Section 5.17 Permanent Financing ................................................................................ 63
Section 5.18 Keepwell. .................................................................................................. 63
Section 5.19 DST Offerings. .......................................................................................... 63

ARTICLE VI Negative Covenants ..................................................................................... 65
Section 6.01 Liens .......................................................................................................... 65
Section 6.02 Fundamental Changes ............................................................................... 66
Section 6.03 Investments, Loans, Advances and Acquisitions ....................................... 66
Section 6.04 Hedging Agreements ................................................................................. 66
Section 6.05 Restricted Payments .................................................................................. 66
Section 6.06 Transactions with Affiliates ...................................................................... 66
Section 6.07 [Intentionally Omitted] ............................................................................ 66
Section 6.08 Restrictive Agreements ............................................................................. 67
Section 6.09 Indebtedness .............................................................................................. 67
Section 6.10 Subordination of Claims ........................................................................... 68
Section 6.11 Amendment to Organizational Documents ............................................... 68

Section 6.12 Sanctions .................................................................................................. 68
Section 6.13 Specified DSTs. ....................................................................................... 69

ARTICLE VII Events of Default .................................................................................... 70

ARTICLE VIII The Administrative Agent ..................................................................... 73

ARTICLE IX Miscellaneous .......................................................................................... 76

Section 9.01 Notices ..................................................................................................... 76
Section 9.02 Waivers; Amendments. ............................................................................ 77
Section 9.03 Expenses; Indemnity; Damage Waiver. ................................................... 78
Section 9.04 Successors and Assigns. .......................................................................... 79
Section 9.05 Survival .................................................................................................... 82
Section 9.06 Counterparts; Integration; Effectiveness. ................................................ 83
Section 9.07 Severability .............................................................................................. 83
Section 9.08 Right of Setoff .......................................................................................... 83
Section 9.09 Governing Law; Jurisdiction; Consent to Service of Process. ................ 84
Section 9.10 WAIVER OF JURY TRIAL ..................................................................... 85
Section 9.11 Headings ................................................................................................... 85
Section 9.12 Confidentiality ......................................................................................... 85
Section 9.13 Interest Rate Limitation ........................................................................... 86
Section 9.14 USA PATRIOT Act .................................................................................. 86
Section 9.15 Fiduciary Duty/No Conflicts. .................................................................. 87
Section 9.16 Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 87
Section 9.17 Multiple Borrowers; Joint and Several Liability. .................................... 88

<u>SCHEDULES</u>:

Schedule 1.01       –       Property Owner Borrowers
Schedule 2.01       –       Commitments
Schedule 3.05       –       Portfolio Properties
Schedule 3.07       –       Litigation Disclosure
Schedule 3.15       –       Subsidiaries
Schedule 6.09       –       Existing Indebtedness
Schedule 6.10       –       Junior Claims

<u>EXHIBITS</u>:

Exhibit A          --       Form of Assignment and Acceptance
Exhibit B          –       Form of Compliance Certificate
Exhibit C          –       Form of Guaranty
Exhibit D          –       Form of Note
Exhibit E          –       Form of Borrowing Request/Interest Rate Election
Exhibit F          –       Form of Tax Compliance Certificate

BRIDGE LOAN AGREEMENT ("Agreement") dated as of

September 26, 2018, among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND THE PROPERTY OWNERS LISTED ON SCHEDULE 1.01 HERETO, individually and collectively, jointly and severally, as Borrower,

the LENDERS party hereto,

KEYBANK NATIONAL ASSOCIATION, as Administrative Agent,

And

KEYBANC CAPITAL MARKETS, as Sole Lead Arranger and Boookrunner

ARTICLE I

Definitions

Section 1.01 Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adjusted EBITDA" means (a) EBITDA for the most recently ended calendar quarter, annualized, *less* (b) the Capital Expenditure Reserve.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means KeyBank, National Association, in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advisor" means, collectively, NexPoint Advisors, L.P. and NexPoint Real Estate Advisors IV, L.P.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, and (c) the applicable LIBO Rate for a one month Interest Period plus one percent (1%) per annum.  Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Anti-Corruption Laws" means all Legal Requirements of any jurisdiction concerning or relating to bribery or corruption, including without limitation, the Foreign Corrupt Practices Act of 1977.

"Anti-Money Laundering Laws" means all Legal Requirements related to the financing of terrorism or money laundering, including without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Commitments of the Lenders represented by such Lender's Commitment.  If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"Applicable Rate" means, a rate per annum equal to: (a) with respect to Tranche A Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 140 basis points, and for any ABR Borrowing, 40 basis points and (b) with respect to Tranche B Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 375 basis points, and for any ABR Borrowing, 275 basis points.

"Appraisal" (whether one or more) means a written appraisal of the Mortgaged Properties by an MAI appraiser satisfactory to the Administrative Agent.  Each Appraisal must comply with all Legal Requirements and, unless specifically provided to the contrary in this Agreement, must be in form and substance reasonably satisfactory to the Administrative Agent.

"Appraised Value" means the "as is" value of Real Property, as set forth in the most recent Appraisal for such Real Property.

"Approved Fund" has the meaning set forth in Section 9.04(b).

"Approved Lease" has the meaning set forth in Section 5.16.

 "Arranger" means KeyBanc Capital Markets or any successors thereto.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignment of Leases and Rents" means an assignment of leases and rents from the applicable Borrower to the Administrative Agent delivered to secure the Obligations, as may be modified or amended.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time, which is described in the EU Bail-In Legislation Schedule.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association, or such other form as may be reasonably requested by any Lender.

"BH Pledgor" means BHSL Holdings, LLC, an Iowa limited liability company.

"BH Loan" means that certain $10,000,000 loan from SE Multifamily Holdings, LLC, a Delaware limited liability company, to the BH Pledgor pursuant to the BH Loan Agreement.

"BH Loan Agreement" means that certain Promissory dated as of the Effective Date by SE Multifamily Holdings, LLC, a Delaware limited liability company, and BH Pledgor.

"BH Loan Documents" means, collectively, the BH Loan Agreement, the BH Pledges, and each other documents or certificate entered into in connection therewith.

"BH Pledges" means those certain Pledge and Security Agreements by the BH Pledgor and/or its Subsidiaries in favor of the Lender to secure the BH Loan, which have been assigned to the Administrative Agent as Collateral for the loan.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means, individually and collectively, jointly and severally, Highland Capital, HCRE PARTNERS, LLC, a Delaware limited liability company, The Dugaboy Investment Trust, The SLHC Trust, NEXPOINT ADVISORS, L.P., a Delaware limited partnership, NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership, the REIT Borrower, and each Property Owner Borrower.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts or New York, New York are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan or Daily LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditure Reserve" means, on an annual basis, an amount equal to $250 per unit with respect to each Real Property owned by the Borrower or any Subsidiary.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means, collectively, all shares of capital stock (whether denominated as common or preferred stock), equity interests, partnership, limited liability company, or membership interests, joint venture interests or other ownership interests in or equivalents of or in a Person (other than an individual), whether voting or non-voting, and to the extent not included in the foregoing, any of a member's or partner's control rights in such Person, including the rights to manage or participate in management, voting rights, inspection rights and other rights.

"Change in Control" means (a) a transfer or series of transfers of any legal or equitable interest since the Effective Date that results in a change of more than 50% of the ownership interests in any Borrower (other than the Property Owner Borrowers); (b) James Dondero ceases to be the manager of HCRE Partners, LLC, a Delaware limited liability company, the sole member of NexPoint Advisors GP, LLC, or the sole member of NexPoint Real Estate Advisors GP, LLC, in each case, unless replaced with an Affiliate thereof; (c) the acquisition of more than 50% of the ownership interests in HCRE Partners, LLC by any Person other than The Dugaboy Investment Trust, unless replaced with an Affiliate of James Dondero; (d) the failure of Highland Capital, HCRE Partners, LLC, and the REIT Borrower, in the aggregate, to own, directly or indirectly, free and clear of any Liens except those granted in favor of the Agent, 90% of the ownership interests in, and Control, each Property Owner Borrower, (e) the replacement, removal or resignation of NexPoint Real Estate Advisors GP, LLC as general partner of NexPoint Real Estate Advisors IV, L.P., unless replaced with an Affiliate thereof, (f) the replacement, removal or resignation of NexPoint Advisors GP, LLC as general partner of NexPoint Advisors, L.P., unless replaced with an Affiliate thereof, or (g) the replacement, removal or resignation of the trustee of the SLHC Trust as of the Effective Date, unless replaced with an Affiliate thereof.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement by any Governmental Authority, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline

or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement. Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property, tangible or intangible, real, personal or mixed, now or hereafter subject to the liens and security interests of the Loan Documents, or intended so to be, which Collateral shall secure the Obligations and Hedging Obligations.

"Collateral Assignment of Management Contract" means each Collateral Assignment of Management Contract by and among a Borrower, the applicable manager and the Administrative Agent previously, now or hereafter delivered to secure the Obligations, as the same may be amended, modified, supplemented or replaced from time to time.

"Collateral Subsidiary" means each Subsidiary of the Borrower which owns a direct or indirect interest in a Portfolio Property.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01. As of the Effective Date, the aggregate amount of the Lenders' Commitments is $556,275,000.00.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communication" has the meaning set forth in ARTICLE VIII.

"Compliance Certificate" has the meaning set forth in Section 5.01(d) hereof and a form of which is attached hereto as Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, which includes the customary powers of a managing member of any limited liability company, any general partner of any limited partnership, or any board of directors of a corporation. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost To Repair" has the meaning set forth in Section 5.06(d).

"Current Survey" means a boundary survey of each Mortgaged Property.

"Daily LIBOR" means, for any Business Day, the LIBO Rate as determined by the Administrative Agent for a Loan with an Interest Period of one month in the amount of the subject Daily LIBOR Loan.

"Debtor Relief Laws" means any applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, fraudulent conveyance, reorganization, or similar laws affecting the rights, remedies, or recourse of creditors generally, including without limitation the Bankruptcy Code and all amendments thereto, as are in effect from time to time during the term of this Agreement.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that: (a) has failed to perform any of its funding obligations hereunder, including in respect of its Commitment, within two (2) Business Days of the date required to be funded by it hereunder; (b) has notified the Borrower or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder (unless such notification or public statement relates to such Lender's obligation to fund a Loan and indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular Default, if any) to funding a Loan is not or cannot be satisfied) or under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after written request by the Administrative Agent or a Borrower (and the Administrative Agent has received a copy of such request), to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations hereunder; or (d) has, or has a direct or indirect parent company that has: (i) become the subject of a proceeding under any Debtor Relief Law; (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it; or (iii) in the good faith determination of the Administrative Agent, taken any material action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; or (iv) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority; provided, further, that such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Lender.

"Designated Jurisdiction" means any country, region, or territory to the extent that such country, region, or territory itself, or its government, is the subject or target of any Sanction.

"Dollars" or "$" refers to lawful money of the United States of America.

"DST" means, a Delaware statutory trust.

"DST Depositor" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other Person approved by the Agent that becomes a depositor with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"DST Sale" has the meaning set forth in Section 6.13(a).

"DST Permitted Sale" has the meaning set forth in Section 6.13(a).

"EBITDA" means an amount derived from (a) net income, plus (b) to the extent included in the determination of net income, depreciation, amortization, interest expense and income taxes, plus or minus (c) to the extent included in the determination of net income, any extraordinary losses or gains, such as those resulting from sales of payment of Indebtedness, plus (d) to the extent not capitalized, the amount of non-recurring expenses, fees, costs and charges incurred in connection with the Loan, plus (e) to the extent not capitalized, the amount of all non-recurring expenses, fees, costs and charges incurred with any acquisition, issuance of debt or equity, asset disposition or investment permitted hereunder, or any proposed or actual amendment, modification or refinancing of any Indebtedness, plus or minus (f) to the extent included in the determination of net income, any realized or unrealized losses or gains on investments; in each case, as determined for Borrower and its Wholly-Owned Subsidiaries on a consolidated basis, and including (without duplication) the Equity Percentage of EBITDA for the Borrower's Unconsolidated Affiliates.

"Economic Interests Pledge" means that certain Pledge and Security Agreement (Economic Interests), dated as of the date hereof, by and among certain of the Borrowers and the Administrative Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Electronic System" has the meaning set forth in ARTICLE VIII.

"Environmental Assessment" shall mean a written assessment and report approved by the Administrative Agent as to the status of each Mortgaged Property regarding compliance with any Legal Requirements related to environmental matters and accompanied by a reliance letter satisfactory to the Administrative Agent.  Each Environmental Assessment must comply with all Legal Requirements.

"Environmental Claim" means any notice of violation, action, claim, Environmental Lien, demand, abatement or other order or direction (conditional or otherwise) by any Governmental Authority or any other Person for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restriction, resulting from or based upon (i) the existence, or the continuation of the existence, of a Release (including, without limitation, sudden or non-sudden accidental or non-accidental Releases) of, or exposure to, any Hazardous Material, or other Release in, into or onto the environment (including, without limitation, the air, soil, surface water or groundwater) at, in, by, from or related to any property owned, operated or leased by the Borrower or any of its Subsidiaries or any activities or operations thereof; (ii) the environmental aspects of the transportation, storage, treatment or disposal of Hazardous Materials in connection with any property owned, operated or leased by the Borrower or any of its Subsidiaries or their operations or facilities; or (iii) the violation, or alleged violation, of any Environmental Laws or Environmental Permits of or from any Governmental Authority relating to environmental matters connected with any property owned, leased or operated by the Borrower or any of its Subsidiaries.

"Environmental Indemnity" means that certain Environmental Compliance and Indemnity Agreement of even date herewith by the Borrower and delivered to the Administrative Agent, together with any other environmental risk or indemnity agreement hereafter executed with respect to any Mortgaged Property.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters and includes (without limitation) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., (to the extent the same relates to any Hazardous Materials), and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., as such laws have been amended or supplemented, and the regulations promulgated pursuant thereto, and all analogous state and local statutes.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of

any Environmental Law, (b) exposure to any Hazardous Materials in violation of any Environmental Law, (c) the Release or threatened Release of any Hazardous Materials into the environment in violation of any Environmental Law or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" means any lien in favor of any Governmental Authority arising under any Environmental Law.

"Environmental Permit" means any permit required under any applicable Environmental Law or under any and all supporting documents associated therewith.

"Equity Interests" means, with respect to any Person, all of the shares, partnership or membership interests, economic and other rights, participations or other equivalents (however designated) of Capital Stock of such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of such Person, all of the securities convertible into or exchangeable for shares of Capital Stock of such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, membership or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Offering" means, any issuance and/or sale after the effective Date by any Person of any Equity Interests or equity securities of such Person, including, without limitation, (a) any new preferred securities, and (b) any conversion of equity interests or securities into equity interests in such Person.

"Equity Percentage" means the aggregate ownership percentage of Borrower in each Unconsolidated Affiliate, which shall be calculated as the greater of (a) Borrower's nominal capital ownership interest in the Unconsolidated Affiliate as set forth in the Unconsolidated Affiliate's organizational documents, and (b) Borrower's economic ownership interest in the Unconsolidated Affiliate, reflecting Borrower's share of income and expenses of the Unconsolidated Affiliate.

"Equity Proceeds Pledge" shall mean the pledge and security agreement dated as of even date herewith related to any equity issuance proceeds of the Borrower granted by the Borrower to the Administrative Agent, together with all other instruments, agreements and written obligations executed and/or delivered by any of the Borrowers in connection therewith.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to the liability of any Borrower with respect to a Swap Obligation, including the grant of a security interest to secure such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the liability or grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under an agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or its Commitment pursuant to Legal Requirements in effect on the date on which (i)

such Lender acquires such interest in the Loan or its Commitment (other than pursuant to an assignment request by the Borrowers under <u>Section 2.17</u> as a result of costs sought to be reimbursed pursuant to <u>Section 2.17</u> or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.17</u> amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.17</u> and (d) any U.S. federal withholding Taxes imposed under FATCA.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it. Notwithstanding the foregoing, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed zero for the purposes of this Agreement.

"<u>Fee Letter</u>" means that certain Fee Letter dated as of the date hereof by and between the Borrower and the Agent, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"<u>Financing Statements</u>" means all such Uniform Commercial Code financing statements as the Administrative Agent shall require, duly authorized by the Borrower, to give notice of and to perfect or continue perfection of the Lenders' security interest in all Collateral.

"<u>Fixed Charge Coverage Ratio</u>" means the ratio of (a) Adjusted EBITDA for the immediately preceding calendar quarter of Borrower and its Subsidiaries to (b) the sum of (i) all regularly scheduled principal due and payable and actually paid on Indebtedness (other than amounts paid in connection with balloon maturities and payments in respect of the Loans), including the Equity Percentage for such amounts for the Borrower's Unconsolidated Affiliates, plus (ii) all Interest Expense, plus (iii) the aggregate amount of all cash dividends payable on any preferred stock for the immediately preceding calendar quarter, in each case, for the Borrower and its Subsidiaries.

"<u>Foreign Lender</u>" means, if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"GAAP" means generally accepted accounting principles in the United States of America, subject to the provisions of Section 1.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law; provided, that Hazardous Materials shall not include any such substances or wastes utilized or maintained at the Real Property in the ordinary course of business and in accordance with all applicable Environmental Laws.

"HCRE Property" "individually, or collectively "HCRE Properties," means, as of the Effective Date, each of the Real Properties set forth in Schedule 1.01(A) hereto.

"Hedging Agreement" means any interest rate protection agreement (including an interest rate cap), foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Hedging Obligations" means, with respect to the any Borrower or any Subsidiary of the Borrower, any obligations arising under any Hedging Agreement entered into with the Administrative Agent or any Lender with respect to the Loans. Under no circumstances shall any of the Hedging Obligations secured or guaranteed by any Loan Document as to a surety or guarantor thereof include any obligation that constitutes an Excluded Swap Obligation of such Person.

"Highland Capital" means HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware limited partnership.

- 12 -

"Impacted Interest Period" has the meaning set forth in the definition of LIBO Rate.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, including mandatorily redeemable preferred stock, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, but excluding customary non-recourse, carveout guarantees and environmental indemnitees until such time as such guarantees or indemnitees become a recourse obligation, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations, contingent or otherwise, of such Person with respect to any Hedging Agreements (calculated on a mark-to-market basis as of the reporting date), and (l) payments received in consideration of sale of an ownership interest in Borrower when the interest so sold is determined, and the date of delivery is, more than one (1) month after receipt of such payment and only to the extent that the obligation to deliver such interest is not payable solely in such interest of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  For purposes of calculating the financial covenants set forth herein, Indebtedness shall not include any Indebtedness that has been expressly subordinated in right of payment to the Obligations on terms and conditions acceptable to the Administrative Agent, including, without limitation, intercompany Indebtedness that is subject to Section 6.10(b).  Indebtedness shall be calculated on a consolidated basis for the Borrower and its Wholly-Owned Subsidiaries, and including (without duplication) the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Information Materials" has the meaning set forth in ARTICLE VIII.

"Interest Election Request" means a request by the Borrower to convert or continue the then outstanding amount of the Loan in accordance with Section 2.07.

"Interest Expense" means, with respect to any Person, all paid, accrued or capitalized interest expense on such Person's Indebtedness (whether direct, indirect or contingent, and

including, without limitation, interest on all convertible debt), and including (without duplication) the Equity Percentage of Interest Expense for the Borrower's Unconsolidated Affiliates.

"Interest Payment Date" means the first Business Day of each calendar month.

"Interest Period" means with respect to any Eurodollar Loan, the period commencing on the date that the then outstanding portion of the Loan is converted to or continued as a Eurodollar Loan, and ending on the numerically corresponding day in the calendar month that is one or three months thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Loan that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Borrowing, thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the LIBO Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Rate for the longest period for which the LIBO Rate is available that is shorter than the Impacted Interest Period; and (b) the LIBO Rate for the shortest period for which that LIBO Rate is available that exceeds the Impacted Interest Period, in each case, at such time.

"KeyBank" means KeyBank, National Association, in its individual capacity.

"Lead Borrower" means HCRE Partners, LLC.

"Legal Requirement" means any law, statute, ordinance, decree, requirement, order, judgment, rule, regulation (or interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" means, subject to Section 2.14(b),with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate

from time to time as selected by the Administrative Agent in its reasonable discretion; in each case the "LIBOR Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that (i) if the LIBOR Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement; provided further that if the LIBOR Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate; provided that if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement, and (ii) if no such rate administered by ICE Benchmark Administration (or by such other Person that has taken over the administration of such rate for U.S. Dollars) is available to the Administrative Agent, the applicable LIBO Rate for the relevant Interest Period shall instead be the rate determined by the Administrative Agent to be the rate at which KeyBank or one of its Affiliate banks offers to place deposits in U.S. dollars with first class banks in the London interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in the approximate amount of the relevant Eurodollar Loan and having a maturity equal to such Interest Period.

"LIBOR Screen Rate" is defined in the definition of LIBO Rate.

"Lien" means, with respect to an asset, (a) any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, negative pledge, collateral assignment, encumbrance, deposit arrangement, charge or security interest in, on or of such asset; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; (c) the filing under the Uniform Commercial Code or comparable law of any jurisdiction of any financing statement naming the owner of the asset to which such Lien relates as debtor; (d) any other preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation; and (e) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, including any dividend reinvestment or redemption plans.

"Liquidity" means the sum of (i) unencumbered and unrestricted cash and cash equivalents of the Borrower, excluding any debt service, capital improvement or other similar reserve funds held under or required by any loan documents entered in to by the Borrower or any Subsidiary, plus (ii) the market value of all common shares of NexPoint Residential Trust, Inc. or operating partnership units in NexPoint Residential Operating Partnership, LP, in each case, owned by The Dugaboy Investment Trust and which have been pledged as Collateral for the Obligations, plus (iii) the market value of all unencumbered and unrestricted marketable securities held by Borrower, plus (iv) the market value of all unencumbered and unrestricted marketable securities held by Borrower less all related outstanding Indebtedness.

"Loan" means the loans made by the Lenders to the Borrower pursuant to Section 2.02 of this Agreement, including, without limitation, the Tranche A Loan and Tranche B Loan.

"Loan Documents" means this Agreement, the Notes, the Mortgages, the Environmental Indemnity, the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interests Pledge, the Financing Statements, and all other instruments, agreements and written obligations executed and delivered by any of the Borrowers in connection with the transactions contemplated hereby.

"Management Company" means, each of BH Management Services, LLC, an Iowa limited liability company, and Milestone Management, LLC, a Delaware limited liability company.

"Mandatory Prepayment" has the meaning set forth in Section 2.11(d).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or financial condition of (i) the Borrower and its Subsidiaries taken as a whole, (b) the ability of any of the Borrowers to perform their obligations under the Loan Documents or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect: (A) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Borrower, and its Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (B) any change in applicable Law, rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) the failure, in and of itself, of the Borrower to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; or (D) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, the Administrative Agent.

"Material Contract" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which any Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the Tranche A Maturity Date or the Tranche B Maturity Date, as applicable.

"Maximum Rate" shall have the meaning set forth in Section 9.13.

"Mortgage" (whether one or more) means a deed of trust and security agreement, a mortgage and security agreement, or a security deed (or deed to secure debt) and security agreement granted by each Property Owner Borrower in favor of the Administrative Agent, for the benefit of the Lenders, covering each Mortgaged Property in the aggregate amount of the Tranche A Loan.

"Mortgaged Property" individually, or collectively "Mortgaged Properties," means, as of the Effective Date, each of the nine (9) Real Properties identified as "Mortgaged Properties" in Schedule 3.05 hereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Note" means a promissory note in the form attached hereto as Exhibit D payable to a Lender evidencing certain of the obligations of the Borrower under the Loans to such Lender and executed by Borrower, as the same may be amended, supplemented, modified or restated from time to time; "Notes" means, collectively, all of such Notes outstanding at any given time.

"Obligations" means all liabilities, obligations, covenants and duties of any Borrower to the Administrative Agent and/or any Lender arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Borrower or any Affiliate thereof of any proceeding under any bankruptcy or other insolvency proceeding naming such person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings. For the avoidance of doubt, "Obligations" shall not include any indebtedness, liabilities, obligations, covenants or duties in respect of Hedging Obligations.

"OFAC" has the meaning set forth in Section 3.16.

"Offering Documents" means, each Private Placement Memorandum and any supplements thereto relating to the sale of beneficial interests in any Specified DST, all as approved by Agent.

"Other Taxes" means, all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17 as a result of costs sought to be reimbursed pursuant to Section 2.17).

"Patriot Act" has the meaning set forth in Section 9.14.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

(b)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(c)     deposits to secure the performance of bids, trade contracts, purchase, construction or sales contracts, leases, statutory obligations, surety and appeal bonds,

performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

> (d) the Title Instruments, Liens and other matters described in the Title Insurance Policy for each Portfolio Property or HCRE Property;

> (e) uniform commercial code protective filings with respect to personal property leased to the Borrower or any Subsidiary;

> (f) landlords' liens for rent not yet due and payable;

> (g) Liens on the Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc. securing the Stonebridge Term Loan; and

> (g) liens on a Portfolio Property (other than a Mortgaged Property) arising under the Senior Loan or on an HCRE Property arising under property-level Indebtedness secured by such Real Property;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than the Senior Loan and the Stonebridge Term Loan.

"Permitted Investments" means:

> (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

> (b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having an investment grade credit rating on the date of acquisition;

> (c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

> (d) fully collateralized repurchase agreements with a term of not more than 90 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

> (e) investments of a Borrower in Subsidiaries and Unconsolidated Affiliates made in accordance with this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" means those certain Pledge and Security Agreements executed by the Borrower in favor of Administrative Agent pledging Borrower's interest in the Pledged Interests.

"Pledged DST Account" has the meaning set forth in Section 6.13(d).

"Pledged Interests" means, collectively, the ownership (or in the reasonable discretion of the Administrative Agent, the economic) interests now or hereafter pledged by Borrower and each Collateral Subsidiary and the economic interest, including rights to receive cash and other distributions from each other Subsidiary of the Borrower hereunder and subject to the liens and security interests of the Loan Documents, or intended so to be.

"Portfolio One DST" means NREA Southeast Portfolio One, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Andros Isles, Arborwalk, Walker Ranch, and Towne Crossing properties.

"Portfolio One DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio One DST.

"Portfolio Property" individually, or "Portfolio Properties" collectively, means each of the twenty three (23) Real Properties listed on Schedule 3.05 hereto, including, without limitation, the Mortgaged Properties.

"Portfolio Three DST" means NREA Southeast Portfolio Three, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Arboleda, Fairways, and Grand Oasis properties.

"Portfolio Three DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Three DST.

"Portfolio Two DST" means NREA Southeast Portfolio Two, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the West Place, Vista Ridge, and Hidden Lake properties.

"Portfolio Two DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Two DST

"Prime Rate" means the rate of interest per annum publicly announced from time to time by KeyBank, National Association, as its prime rate in effect at its principal office in Cleveland, Ohio; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"<u>Property Owner Borrower</u>" means each of the Persons listed on <u>Schedule 1.01</u> hereto, which own the Mortgaged Properties.

"<u>Qualified ECP Party</u>" means, in respect of any interest rate cap, swap or other hedging obligation, each Person which is a Borrower that has total assets exceeding $10,000,000 at the time such Borrower's guarantee, mortgage and/or other credit or collateral support, of such interest rate cap, swap or other hedging obligation secured pursuant to the Deed to Secure Debt becomes effective, or otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder.

"<u>Real Property</u>" means, collectively, all interest in any land and improvements located thereon (including direct financing leases of land and improvements owned by a Borrower or any of Borrower's Subsidiaries), together with all equipment, furniture, materials, supplies and personal property now or hereafter located at or used in connection with the land and all appurtenances, additions, improvements, renewals, substitutions and replacements thereof now or hereafter acquired by a Borrower or any of Borrower's Subsidiaries.

"<u>Recipient</u>" means, each of the Administrative Agent and any Lender.

"<u>Register</u>" has the meaning set forth in <u>Section 9.04</u>.

"<u>REIT Borrower</u>" means SE MULTIFAMILY REIT HOLDINGS, LLC, a Delaware limited liability company.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching or migration on or into the indoor or outdoor environment or into or out of any property in violation of applicable Environmental Laws.

"<u>Remedial Action</u>" means all actions, including without limitation any capital expenditures, required or necessary to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material so it does not migrate or endanger public health or the environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) bring facilities on any property owned or leased by the Borrower or any of its Subsidiaries into compliance with all Environmental Laws.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders having more than 66 2/3% of the Commitments or, if the Commitments of each Lender to make Loans have been terminated pursuant to Article VII, Lenders holding in the aggregate at least 66 2/3% of the aggregate Obligations; <u>provided</u> that the Commitment of, and the portion of the Obligations held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any ownership interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such ownership interests in the Borrower or any option, warrant or other right to acquire any such shares of capital stock of the Borrower.

"Senior Credit Agreement" means, collectively, each of those certain Loan Agreements, as amended, with the Federal Home Loan Mortgage Corporation, as lender, set forth on Schedule 3.05 hereof with respect to the Portfolio Properties (other than the Mortgaged Properties).

"Senior Loan" means each loan made pursuant to a Senior Credit Agreement.

"Senior Loan Documents" means each Senior Credit Agreement and all other instruments, agreements and written obligations executed and delivered in connection with the transactions contemplated by a Senior Credit Agreement.

"Specified DST" means the Portfolio One DST, the Portfolio Two DST, the Portfolio Three DST, the Stonebridge DST, and any other DST approved by the Agent that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, o Portfolio Three DST, as of the Effective Date.

"Specified DST Depositor" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other depositor approved by the Agent with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Governmental Authority to which the Administrative Agent is subject, with respect to the Adjusted LIBO Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stonebridge DST" means NREA Retreat, DST, a Delaware statutory trust, which will own the Retreat at Stonebridge Ranch property located in McKinney, TX.

"Stonebridge DST Depositor" means NREA Retreat Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for Stonebridge DST.

"Stonebridge Term Loan" means the term loan made by KeyBank pursuant to that certain Second Amended and Restated Credit Agreement dated as of September 17, 2018 by and among NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust, as borrowers, and KeyBank National Association, as lender.

"Subsidiary" means, with respect to Borrower, as applicable (the "parent"), at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by parent, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.

"Summers Landing Property" means that certain Real Property known as Summers Landing and located at 3900 Centreport Drive, Fort Worth, Texas 76155, which is indirectly owned by the BH Pledgor.

"Swap Obligation" means, any Hedging Obligation that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Tangible Net Worth" shall mean, with respect to the Borrowers and their Subsidiaries, (a) total assets (without deduction for accumulated depreciation and accumulated amortization of lease intangibles) less (b) all intangible assets and (c) all liabilities (including contingent and indirect liabilities), all determined in accordance with sound accounting principles, consistently applied. The term "intangible assets" shall include, without limitation, (i) deferred charges such as straight-line rents and other non-cash items, and (ii) the aggregate of all amounts appearing on the assets side of any such balance sheet for franchises, licenses, permits, patents, patent applications, copyrights, trademarks, trade names, goodwill, treasury stock, experimental or organizational expenses and other like intangibles (other than amounts related to the purchase price of real property which are allocated to lease intangibles). The term "liabilities" shall include, without limitation, (i) Indebtedness secured by Liens on property of the Person with respect to which Tangible Net Worth is being computed whether or not such Person is liable for the payment thereof, (ii) deferred liabilities, and (iii) Capital Lease Obligations. Tangible Net Worth shall be calculated on a consolidated basis Borrower and their Wholly-Owned Subsidiaries and including the Borrower's Equity Percentage of Tangible Net Worth of the Borrower's Unconsolidated Affiliates.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"The Dugaboy Investment Trust" means THE DUGABOY INVESTMENT TRUST, under trust agreement dated November 15, 2010.

"The SLHC Trust" means THE SLHC TRUST, under trust agreement dated December 27, 2016.

"Title Instruments" means true and correct copies of all instruments of record in the Office of the County Clerk, the Real Property Records or of any other Governmental Authority affecting title to all or any part of the Portfolio Properties, including but not limited to those (if any) which impose restrictive covenants, easements, rights-of-way or other encumbrances on all or any part of such Real Properties.

"Title Insurance Policy" means, collectively, (i) with respect to the Mortgaged Properties, the policies of title insurance in the aggregate face amounts equal to the Tranche A Loan, issued in favor of the Administrative Agent by a title insurance company satisfactory to the Administrative Agent and insuring that title to each Mortgaged Property is vested in the applicable Property Owner Borrower, free and clear of any Lien, objection, exception or requirement, and that each Mortgage creates a valid first and prior lien on all the applicable Mortgaged Property, subject only to the Permitted Encumbrances and such other exceptions as may be approved in writing by the Administrative Agent, and (ii) with respect to other Real Property, the policies of title issued in favor of the respective Collateral Subsidiary by a title insurance company satisfactory to the lender under a Senior Credit Agreement or other Indebtedness secured by such Real Property and insuring that title to such Real Property is vested in such Collateral Subsidiary, free and clear of any Lien, objection, exception or requirement, subject only to the Permitted Encumbrances.

"Titled Agents" means, collectively, the Arranger and any syndication agents or documentation agent named as such on the cover page of this Agreement.

"Total Asset Value" means the sum of (without duplication) (a) the aggregate Appraised Value of all of the Portfolio Properties, plus (b) total assets (without deduction for accumulated depreciation and amortization) of the Borrowers (other than the Property Owner Borrowers) determined in accordance with sound accounting principles, consistently applied.  For any non-wholly owned Real Properties, Total Asset Value shall be adjusted for Borrower's and Subsidiaries' Equity Percentage thereof.

"Total Leverage Ratio" means the ratio (expressed as a percentage) of (a) the Indebtedness of Borrower to (b) Total Asset Value.

"Tranche A Initial Maturity Date" means March 26, 2019.

"Tranche A Maturity Date" means the earlier of (i) the Tranche A Initial Maturity Date, as such date may be extended as provided in Section 2.21, and (ii) the date on which the Tranche A Loans shall become due and payable pursuant to the terms hereof.

"Tranche B Initial Maturity Date" means September 26, 2019.

"Tranche B Maturity Date" means the earlier of (i) the Tranche B Initial Maturity Date, as such date may be extended as provided in Section 2.22, and (ii) the date on which the Tranche B Loans shall become due and payable pursuant to the terms hereof.

"Transactions" means the execution, delivery and performance by the Borrowers of the Loan Documents, the borrowing of the Loans, and the use of the proceeds thereof.

"Trust Agreement" means the Trust Agreement for the Portfolio One DST dated as of the Effective Date, the Trust Agreement for the Portfolio Two DST dated as of the Effective Date, the Trust Agreement for the Portfolio Three DST dated as of the Effective Date, the Amended and Restated Trust Agreement for Stonebridge DST dated as of the Effective Date, and the trust agreement for any other Specified DST.

"Trust Interests" means the beneficial interests in each Specified DST which will be (x) sold pursuant to the applicable Offering Document or (y) issued to an Affiliate of Borrower that owns any unsold beneficial interests.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowings, is determined by reference to the Adjusted LIBO Rate, the Daily LIBOR Rate, or the Alternate Base Rate.

"Unconsolidated Affiliate" means, without duplication, in respect of any Person, any other Person (other than a Person whose stock is traded on a national trading exchange) in whom such Person holds, directly or indirectly, an investment consisting of a voting equity or ownership interest, which investment is accounted for in the financial statements of such Person on an equity basis of accounting.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.  In determining whether a Subsidiary of a Person is a Wholly-Owned Subsidiary, all preferred shareholders of a Subsidiary that is organized as a real estate investment trust shall be disregarded.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02 <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03 <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04 <u>Accounting Terms; GAAP</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with sound accounting principles, consistently applied; provided that, if GAAP accounting is expressly required and the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until  such notice shall have been withdrawn or such provision  amended in accordance herewith.

Section 1.05 <u>Appointment of Lead Borrower</u>.

(a)      For the purpose of implementing the joint borrower provisions of this Agreement and the other Loan Documents, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for the purpose of requesting and obtaining Borrowings hereunder, including delivery of any Borrowing Request or Interest Election Request, and such Borrower shall be obligated to the Administrative Agent and the Lenders on account of Borrowings so made as if made directly by the Lenders to such Person.  Further, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for all other purposes under the Loan Documents, including the giving and receiving of notices and other communications, the giving of consents or approvals pursuant to the terms hereof, and

submitting Compliance Certificates and other similar certificates required hereunder. Any request by the Lead Borrower for a Borrowing or an Interest Election Request shall in all events be deemed and construed as a request for such Borrowing by all Borrowers hereunder.

(b)     The proceeds of each loan and advance provided under the Loans which is requested by the Lead Borrower shall be advanced as and when otherwise provided herein or as otherwise indicated by the Lead Borrower. The Lead Borrower shall cause the transfer of the proceeds thereof to the Borrower(s) on whose behalf such loan and advance was obtained. Neither the Administrative Agent nor any Lender shall have any obligation to see to the application of such proceeds.

(c)     It is understood and agreed that the handling of this credit facility on a joint borrowing basis as set forth in this Agreement is solely as an accommodation to the Borrower and at their request. Accordingly, the Administrative Agent and the Lenders are entitled to rely, and shall be exonerated from any liability for relying upon, any Borrowing Request, Interest Election Request, or any other request or communication made by a purported officer of any Borrower without the need for any consent or other authorization of any other Borrower and upon any information or certificate provided on behalf of any Borrower by a purported officer of such Borrower, and any such request or other action shall be fully binding on each Borrower as if made by it.

<div align="center">

ARTICLE II

The Loans

</div>

Section 2.01 [Intentionally Omitted].

Section 2.02 Commitments. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Loans to the Borrower on the Effective Date as follows:

(a)     a term loan (the "Tranche A Loan") to finance the acquisition of the Mortgaged Properties on the Effective Date in an aggregate principal amount not to exceed the lesser of (i) $231,400,000 and (ii) 65% of the lesser of (x) the allocated acquisition cost of the Mortgaged Properties as approved by the Administrative Agent and (y) the aggregate "as is" Appraised Value of the Mortgaged Properties; and

(b)     a term loan (the "Tranche B Loan") in an aggregate principal amount of $324,875,000 to finance a portion of the acquisition cost of the Portfolio Properties that is not financed by the Tranche A Loan or the Senior Loan;

Each Loan shall be made in immediately available funds in accordance with instructions provided by the Borrower. The aggregate amount of the Loan shall not exceed the aggregate amount of the Commitments. Once repaid, no portion of the Loans may be reborrowed. Notwithstanding anything herein to the contrary, the Commitments shall terminate upon the making of the Loans described in this Section 2.02 on the Effective Date.

Section 2.03 <u>Loans and Borrowings</u>.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Subject to <u>Section 2.13</u>, each Borrowing shall be comprised of ABR Loans, Daily LIBOR Loans, and/or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)     Each Eurodollar Loan shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of six (6) Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.04 <u>[Intentionally Omitted]</u>.

Section 2.05 <u>[Intentionally Omitted]</u>.

Section 2.06 <u>[Intentionally Omitted]</u>.

Section 2.07 <u>[Intentionally Omitted]</u>.

Section 2.08 <u>Interest Elections</u>.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrower were requesting a Borrowing of the Type

resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in the form of a Borrowing Request (with proper election made for an interest rate election only) and signed by the Lead Borrower.

(c)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing;

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing, a Daily LIBOR Borrowing, or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Loan but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Eurodollar Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.09 Reserved.

Section 2.10  <u>Repayment of Loans; Evidence of Debt.</u>

(a)      The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of (i) the Tranche A Loans on the Tranche A Maturity Date and (i) the Tranche B Loans on the Tranche B Maturity Date.

(b)      At the request of each Lender, the Loans made by such Lender shall be evidenced by a Note payable to such Lender in the amount of such Lender's Commitment.

(c)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)      The entries made in the accounts maintained pursuant to <u>paragraph (b)</u> or <u>(c)</u> of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

Section 2.11  <u>Prepayment of Loans.</u>

(a)      The Borrower shall have the right at any time and from time to time to prepay, without penalty, any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section, and subject to <u>Section 2.15</u>, if applicable.

(b)      The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing or a Daily LIBOR Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that is an integral multiple of $100,000 and not less than $200,000.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.12</u>.

(c)     In connection with the prepayment of any portion of the Loan prior to the expiration of the Interest Period applicable thereto, the Borrower shall also pay any applicable expenses pursuant to <u>Section 2.15</u>.

(d)     The Borrower shall prepay the Loans (a "<u>Mandatory Prepayment</u>") in an amount equal to with respect to any sale, finance, refinance or other recapitalization of (i) the Mortgaged Properties, the greater of (x) $381,000,000 and (y) one hundred percent (100%) of the net proceeds payable to Borrowers or any Subsidiary (after payment of usual and customary closing costs and expenses) from the sale, finance, refinance or other recapitalization of the Mortgaged Properties; it being understood that prepayments required under this clause (d)(i) are in addition to any prepayments under clause (f) below and prepayments required under clause (f) below shall not diminish the required prepayment amounts under this clause (d)(i), and (ii) any other Real Property, one hundred percent (100%) of the net proceeds payable to Borrower or any Subsidiary (after payment of usual and customary closing costs and expenses and repayment of any Indebtedness secured by such Real Property and including, with respect to any partial recapitalization of a Portfolio Property through a joint venture or similar structure whereby the Borrower will, directly or indirectly, retain an Equity Interest in such Portfolio Property (other than any DST structure whereby Borrower will retain an approximately 1% Equity Interest in such Portfolio Property), an amount equal to the value of the Equity Interest in such Portfolio Property that the Borrower will retain) generated by the sale, finance, refinance or other recapitalization of any such Real Property owned directly or indirectly by Borrower, including, without limitation, any net proceeds thereof to be redeployed into the acquisition of one or more real properties to complete a 1031 exchange transaction, and all payments under the BH Loan. All Mandatory Prepayments shall be applied, first, to the prepayment of the Tranche A Loans until the Tranche A Loans have been repaid in full.  Thereafter all Mandatory Prepayments shall be applied to the Tranche B Loans.

(e)     Without limiting the foregoing, the Borrower shall make prepayments of the Loans from time to time in the amounts necessary such that after giving effect to any such prepayments, the aggregate outstanding amount of the Loans on each of the dates listed below shall not be more than the "Maximum Principal Amount" set forth across from such date on the table below:

| Date | Maximum Principal Amount |
| --- | --- |
| March 26, 2019 | $150,000,000 |
| June 26, 2019 | $100,000,000 |
| September 26, 2019 | $50,000,000 |
| December 26, 2019 | $15,000,000 |

<u>provided</u> that, if the Tranche A Initial Maturity Date is extended pursuant to <u>Section 2.21</u>, the "Maximum Principal Amount" set forth in the table above for each applicable date during the term of such extension of the Tranche A Initial Maturity Date, shall be

increased by an amount equal to the aggregate outstanding principal amount of Loans that were funded to purchase the Mortgaged Properties.

(f)     In addition to any other payment or prepayment required by any of the foregoing, on or prior to October 26, 2018, the Borrowers shall make payments to the Administrative Agent for application to the outstanding principal balance of the Loans from proceeds of additional equity contributions received by the Borrowers (other than the Property Owner Borrowers) after the Effective Date in an aggregate amount not less than $150,000,000.

(g)     Amounts to be applied to the prepayment of the Loans pursuant to any of the preceding subsections of this Section shall be applied, first, to reduce outstanding ABR Loans, next, to the extent of any remaining balance, to reduce outstanding Daily LIBOR Loans, and next, to the extent of any remaining balance, to reduce outstanding Eurodollar Loans.  Any amounts repaid under this Section 2.11 may not be reborrowed.

Section 2.12 Fees.

(a)     In addition to all fees specified herein, the Borrower agrees to pay to KeyBank and the Arranger, for their own account, certain fees for services rendered or to be rendered in connection with the Loans as provided pursuant to the Fee Letter.

(b)     All fees payable hereunder shall be paid on the dates due in immediately available funds.  Fees paid shall not be refundable under any circumstances.

Section 2.13 Interest.

(a)     The ABR Loans shall bear interest at the lesser of (x) the Alternate Base Rate plus the Applicable Rate, or (y) the Maximum Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the lesser of (x) the Adjusted LIBO Rate for the Interest Period in effect for such Eurodollar Loan plus the Applicable Rate, or (y) the Maximum Rate.

(c)     The Loans comprising each Daily LIBOR Borrowing shall bear interest at the lesser of (x) the Daily LIBOR plus the Applicable Rate, or (y) the Maximum Rate

(d)     Notwithstanding the foregoing, (A) if any principal of or interest on the Loans or any portion thereof or any other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of the Loans, the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate, or (ii) in the case of any other amount, the lesser of (x) 4% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section, or (y) the Maximum Rate; and (B) after the occurrence of any Event of Default, at the option of the Administrative Agent, or if the Administrative Agent is directed in writing by the Required Lenders to do so, the Loans shall bear interest at a rate per

annum equal to the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate.

(e)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Eurodollar Loan shall be payable on the effective date of such conversion.

(f)     All computations of interest on the Loans and of other fees to the extent applicable shall be based on a 360-day year and paid for the actual number of days elapsed.  The applicable Alternate Base Rate, Adjusted LIBO Rate, LIBO Rate, or Daily LIBOR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14 Alternate Rate of Interest.

(a)     If prior to the commencement of any Interest Period for a Eurodollar Borrowing or Daily LIBOR Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii)     the Administrative Agent is advised by any Lender that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Eurodollar Loan for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in clause (a) of this Section 2.14 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a) of this Section 2.14 have not arisen but the supervisor for the administrator of LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBO Rate shall no longer be used for determining interest rates for loans (in the case of either such

clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Administrative Agent and the Borrowers shall endeavor to establish an alternate rate of interest to LIBO Rate, which rate may include adjustment (to be determined from time to time by Administrative Agent in its sole discretion) to effect an aggregate interest rate comparable to the LIBO Rate on a historical basis prior to such determination, and that gives due consideration to the then prevailing market convention for determining a rate of interest for similar dollar-denominated credit facilities in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Such amendment shall become effective without any further action or consent of any other party to this Agreement. To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention; provided that, to the extent such prevailing market convention is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and the Borrowers. From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, any Interest Election Request that requests the conversion of any Loan to, or continuation of any Loan as, an Eurodollar Loan shall be ineffective; provided that (subject to clause (a) of this Section 2.14) LIBO Rate for such Interest Period is not available or published at such time on a current basis; provided, further, that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Section 2.15 Increased Costs.

(a)     If any Change in Law shall:

(i)     subject any Recipient to any Taxes or withholding of any nature with respect to this Agreement, the other Loan Documents, such Lender's Commitment or the Loans (other than for Indemnified Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and Connection Income Taxes), or

(ii)     materially change the basis of taxation (except for changes in taxes on gross receipts, income or profits or its franchise tax) of payments to any Recipient of the principal of or the interest on any Loans or any other amounts payable to any Lender under this Agreement or the other Loan Documents, or

(iii)     impose or increase or render applicable any special deposit, reserve, assessment, liquidity, capital adequacy or other similar requirements (whether or not having the force of law and which are not already reflected in any amounts payable by Borrowers hereunder) against assets held by, or deposits in or for the account of, or loans by, or commitments of an office of any Lender, or

(iv)     impose on any Recipient any other conditions or requirements with respect to this Agreement, the other Loan Documents, the Loans, such Lender's Commitment, or any class of loans or commitments of which any of the Loans or such Lender's Commitment forms a part;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or liquidity or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company would have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16 Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.10(b)), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.18, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the

period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

Section 2.17 <u>Taxes</u>.

(a)     All payments by the Borrower hereunder and under any of the other Loan Documents shall be made without setoff or counterclaim, and free and clear of and without deduction or withholding for any Taxes, except as required by Legal Requirements. If any Legal Requirement (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Legal Requirements and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 2.17</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     The Borrower shall timely pay to the relevant Governmental Authority in accordance with Legal Requirements, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error; provided that the determinations in such statement are made on a reasonable basis and in good faith.

(d)     Each Lender shall severally indemnify the Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Borrower has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.04(c)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that

are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this subsection.

(e)     As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Legal Requirements or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the immediately following clauses (ii)(2)(A), (ii)(2)(B) and (ii)(2)(D)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from

time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(A)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)      an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8ECI;

(C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(D)      to the extent a Foreign Lender is not the beneficial owner, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which

such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by a Borrower or the Agent) of any other form prescribed by Legal Requirements as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Legal Requirements to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by Legal Requirements and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by Legal Requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all reasonable third party out-of-pocket expenses (including Taxes) of such indemnified party actually incurred and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund has not been deducted, withheld or otherwise

imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it reasonably deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this <u>Section 2.17</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18 <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under <u>Section 2.15</u>, <u>Section 2.16</u> or <u>2.17</u>, or otherwise) prior to 1:00 p.m., Boston, Massachusetts time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its main offices in Cleveland, Ohio, except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> shall be made directly to the Persons entitled thereto.  If the Administrative Agent receives a payment for the account of a Lender prior to 1:00 p.m., Boston, Massachusetts time, such payment must be delivered to the Lender on the same day and if it is not so delivered due to the fault of the Administrative Agent, the Administrative Agent shall pay to the Lender entitled to the payment interest thereon for each day after payment should have been received by the Lender pursuant hereto until the Lender receives payment, at the Federal Funds Effective Rate.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are

purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)       Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)       If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.18(d), then the Administrative Agent may, in its reasonable discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19 Mitigation Obligations; Replacement of Lenders.

(a)       Each Lender will notify the Borrower of any event occurring after the date of this Agreement which will entitle such Person to compensation pursuant to Sections 2.13 and 2.15 as promptly as practicable after it obtains knowledge thereof and determines to request such compensation, provided that such Person shall not be liable for any costs, fees, expenses, or additional interest due to the failure to provide such notice.  If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any such Person or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to avoid or minimize the amounts payable, including, without limitation, the designation of a different lending office for funding or booking its Loans hereunder or the assignment of its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort (excluding any costs or expense incurred by such Defaulting Lender), upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20 Defaulting Lenders.

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Credit Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Credit Agreement shall be restricted as set forth in Section 9.02.

(ii)     Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of a Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to ARTICLE VII or otherwise, and including any amounts made available to Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to Administrative Agent hereunder; second, if so determined by Administrative Agent, to be held as cash collateral for future funding obligations of such Defaulting Lender; third, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Credit Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the applicable Borrower as a result of any judgment of a court

of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement; and fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.20(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     Defaulting Lender Cure.  If the Borrower and Administrative Agent agree in writing in their reasonable discretion that a Defaulting Lender has taken such action that it should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Defaulting Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Defaulting Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no cessation in status as Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising during the period that such Lender was a Defaulting Lender.

Section 2.21 Extension of Tranche A Maturity Date.  The Borrower shall have the right and option to extend the Tranche A Maturity Date on no more than two occasions and for a term of 90 days on each occasion, first to June 26, 2019 and then to September 26, 2019, in each case, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of any extension of the Tranche A Initial Maturity Date:

(a)     Extension Request.  The Borrower shall deliver written notice of such request (the "Extension Request") to the Agent not later than the date which is thirty (30) days prior to the Tranche A Initial Maturity Date.

(b)     Payment of Extension Fee.  The Borrower shall pay to the Agent for the pro rata accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.10% of the outstanding principal amount of the Tranche A Loans on the date of each extension of the Tranche A Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)     No Default.  On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)     Purchase and Sale.  Borrower shall have, prior to the effective date of each such extension, entered in a legally binding purchase and sale agreement (or similar) with respect to the Mortgaged Properties, with the sale of the Mortgaged Properties pursuant to such agreement

being scheduled to occur prior to the latest date to which the Tranche A Initial Maturity Date could be extended in accordance with the provisions of this Section 2.21.

Section 2.22 <u>Extension of Tranche B Maturity Date</u>. The Borrower shall have the right and option to extend the Tranche B Maturity Date on a single occasion to March 26, 2020, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of such extension of the Tranche B Initial Maturity Date:

(a)     <u>Extension Request</u>. The Borrower shall deliver an Extension Request to the Agent not later than the date which is thirty (30) days prior to the Tranche B Initial Maturity Date.

(b)     <u>Payment of Extension Fee</u>. The Borrower shall pay to the Agent for the <u>pro rata</u> accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.40% of the outstanding principal amount of the Tranche B Loans on the Tranche B Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)     <u>No Default</u>. On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)     <u>Principal Reduction</u>. On the date of such extension, the Tranche A Loans shall have been paid in full and the aggregate principal amount of the Tranche B Loans shall not exceed $50,000,000.

<div align="center">ARTICLE III</div>

<div align="center">Representations and Warranties</div>

The Borrower represents and warrants to the Lenders and the Administrative Agent that:

Section 3.01 <u>Organization; Powers</u>. Each Borrower and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02 <u>Authorization; Enforceability</u>. The Transactions are within the corporate, partnership or limited liability company powers (as applicable) of the respective Borrowers and their Subsidiaries and have been duly authorized by all necessary corporate, partnership or limited liability company action. This Agreement and the Loan Documents have been duly executed and delivered by each Borrower which is a party thereto and constitute the legal, valid and binding obligation of each such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03 <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or which shall be completed at the appropriate time for such filings under applicable securities laws, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Borrower or any Collateral Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Borrower or any Collateral Subsidiary or its assets, or give rise to a right thereunder to require any payment to be made by any Borrower or any of the Borrower's Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Borrower or any Collateral Subsidiary, except pursuant to the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interest Pledge, and the Senior Loan.

Section 3.04 <u>Financial Condition; No Material Adverse Change</u>.

(a)     The Borrower has heretofore furnished to the Lenders audited financial statements for Highland Capital and management-prepared financial statements for all other Borrowers (other than the Property Owner Borrowers) as of and for the annual fiscal period ended December 31, 2017 and management-prepared financial statements as of and for the quarterly fiscal period ended June 30, 2018.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with sound accounting principles, consistently applied, subject to year-end audit adjustments.

(b)     To Borrower's actual knowledge, since December 31, 2017, no event has occurred which would reasonably be expected to have a Material Adverse Effect.

Section 3.05 <u>Properties</u>.

(a)     Each of the Borrower and its Subsidiaries has title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, or Liens permitted under <u>Section 6.01</u>.

(b)     To each Borrower's actual knowledge, all franchises, licenses, authorizations, rights of use, governmental approvals and permits (including all certificates of occupancy and building permits) required to have been issued by Governmental Authority to enable all Real Property owned or leased by Borrower or any of its Subsidiaries to be operated as then being operated have been lawfully issued and are in full force and effect, other than those which the failure to obtain in the aggregate would not be reasonably expected to have a Material Adverse Effect.  To each Borrower's actual knowledge, no Borrower or any Subsidiary thereof is in violation of the terms or conditions of any such franchises, licenses, authorizations, rights of use, governmental approvals and permits, which violation would reasonably be expected to have a Material Adverse Effect.

(c)     None of the Borrowers has received any notice or has any actual knowledge of any pending, threatened or contemplated condemnation proceeding affecting any of the Real

Properties or any part thereof, or any proposed termination or impairment of any parking (except as contemplated in any approved expansion approved by Administrative Agent) at the Real Properties or of any sale or other disposition of the Real Properties or any part thereof in lieu of condemnation, which in the aggregate, are reasonably likely to have a Material Adverse Effect.

(d)     Subject to the property conditions reports obtained by the Borrower at the time of acquisition with respect to the Mortgaged Property, to Borrower's actual knowledge, all components of all improvements included within the Mortgaged Property owned or leased, as lessee, by any Borrower, including, without limitation, the roofs and structural elements thereof and the heating, ventilation, air conditioning, plumbing, electrical, mechanical, sewer, waste water, storm water, paving and parking equipment, systems and facilities included therein, are in good working order and repair, subject to such exceptions which are not reasonably likely to have, in the aggregate, a Material Adverse Effect.  To Borrower's actual knowledge, all water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems serving the Mortgaged Property owned or leased by Borrower are installed and operating and are sufficient to enable the Mortgaged Property to continue to be used and operated in the manner currently being used and operated, and no Borrower has any knowledge of any factor or condition that reasonably would be expected to result in the termination or material impairment of the furnishing thereof, subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect.  To Borrower's actual knowledge, no improvement or portion thereof, or any other part of any Mortgaged Property, is dependent for its access, operation or utility on any land, building or other improvement not included in such Mortgaged Property, other than for access provided pursuant to a recorded easement or other right of way establishing the right of such access subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect.

(e)     Except for events or conditions not reasonably likely to, in the aggregate, materially impair the value or operation of the Mortgaged Property, to Borrower's actual knowledge (i) no portion of the Mortgaged Property has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition prior to such casualty, and (ii) no portion of the Mortgage Property is located in a special flood hazard area as designated by any federal Government Authorities unless the Administrative Agent shall have received evidence that such Mortgaged Property is insured by special flood insurance under the National Flood Insurance Program in an amount equal to the full replacement cost (subject to sublimits and exclusions approved by the Administrative Agent) or the maximum amount then available under the National Flood Insurance Program.

(f)     There are no Persons operating or managing the Mortgaged Property other than the Borrower and the Management Company pursuant to (i) the management agreements delivered to Administrative Agent as of the Effective Date, and (ii) such other management agreements in form and substance reasonably satisfactory to the Administrative Agent.

Section 3.06 Intellectual Property.  To the actual knowledge of each Borrower, such Borrower and its Subsidiaries owns, or is licensed to use, all patents and other intellectual property material to its business, and the use thereof by such Borrower or such Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that,

individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. To the actual knowledge of each Borrower, there are no material slogans or other advertising devices, projects, processes, methods, substances, parts or components, or other material now employed, or now contemplated to be employed, by any Borrower or any Subsidiary of any Borrower, with respect to the operation of any Real Property, and no claim or litigation regarding any slogan or advertising device, project, process, method, substance, part or component or other material employed, or now contemplated to be employed by any Borrower or any Subsidiary of any Borrower, is pending or threatened, the outcome of which could reasonably be expected to have a Material Adverse Effect.

Section 3.07 <u>Litigation and Environmental Matters</u>.

(a)     To the actual knowledge of the Borrower, except as set forth in <u>Schedule 3.07</u> attached hereto, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, threatened against or affecting any Borrower or any of the Borrower's Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)     Except as disclosed in the environmental reports obtained by the Borrower at the time of acquisition with respect to the Portfolio Property and with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)     to the actual knowledge of the Borrowers, all Real Property leased or owned by Borrower or any of its Subsidiaries is free from contamination by any Hazardous Material, except to the extent such contamination would not reasonably be expected to cause a Material Adverse Effect;

(ii)     to the actual knowledge of the Borrower, the operations of Borrower and its Subsidiaries, and the operations at the Real Property leased or owned by Borrower or any of its Subsidiaries are in compliance with all applicable Environmental Laws, except to the extent such noncompliance would not reasonably be expected to cause a Material Adverse Effect;

(iii)     neither the Borrower nor any of its Subsidiaries have known liabilities with respect to Hazardous Materials and, to the knowledge of each Borrower, no facts or circumstances exist which would reasonably be expected to give rise to liabilities with respect to Hazardous Materials, in either case, except to the extent such liabilities would not reasonably be expected to have a Material Adverse Effect;

(iv)     to Borrower's actual knowledge, (A) the Borrower and its Subsidiaries and all Real Property owned or leased by Borrower or its Subsidiaries have all Environmental Permits necessary for the operations at such Real Property and are in compliance with such Environmental Permits; (B) there

are no legal proceedings pending nor, to the knowledge of any Borrower, threatened to revoke, or alleging the violation of, such Environmental Permits; and (C) none of the Borrowers have received any notice from any source to the effect that there is lacking any Environmental Permit required in connection with the current use or operation of any such properties, in each case, except to the extent the nonobtainment or loss of an Environmental Permit would not reasonably be expected to have a Material Adverse Effect;

(v)     neither the Real Property currently leased or owned by Borrower nor, to the actual knowledge of any Borrower, are subject to any outstanding written order or contract, including Environmental Liens, with any Governmental Authority or other Person, or to any federal, state, local, foreign or territorial investigation of which a Credit Party has been given notice respecting (A) Environmental Laws, (B) Remedial Action, (C) any Environmental Claim; or (D) the Release or threatened Release of any Hazardous Material, in each case, except to the extent such written order, contract or investigation would not reasonably be expected to have a Material Adverse Effect;

(vi)     to the actual knowledge of each Borrower, none of the Borrowers are subject to any pending legal proceeding alleging the violation of any Environmental Law nor are any such proceedings threatened, in either case, except to the extent any such proceedings would not reasonably be expected to have a Material Adverse Effect;

(vii)     Borrower has not filed any notice under federal, state or local, territorial or foreign law indicating past or present treatment, storage, or disposal of or reporting a Release of Hazardous Material into the environment with respect to the Mortgaged Property, in each case, except to the extent such Release of Hazardous Material would not reasonably be expected to have a Material Adverse Effect;

(viii)     to the actual knowledge of each Borrower, none of the operations of the Borrower or any of its Subsidiaries or, of any owner of premises currently leased by Borrower or any of its Subsidiaries or of any tenant of premises currently leased from Borrower or any of its Subsidiaries, involve the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Part 261.3 (in effect as of the date of this Agreement) or any state, local, territorial or foreign equivalent, in violation of Environmental Laws; and

(ix)     to the knowledge of the Borrower, there is not now (except, in all cases, to the extent the existence thereof would not reasonably be expected to have a Material Adverse Effect), on, in or under any Real Property leased or owned by Borrower or any of its Subsidiaries (A) any underground storage tanks or surface tanks, dikes or impoundments (other than for surface water); (B) any friable asbestos-containing materials; (C) any polychlorinated biphenyls; or (D) any radioactive substances other than naturally occurring radioactive material.

Section 3.08 <u>Compliance with Laws and Agreements</u>.  Each of the Borrower and its Subsidiaries is in material compliance with all Legal Requirements (including all Environmental Laws) applicable to it or its property and all indentures, agreements and other instruments binding upon it or to its knowledge, its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.09 <u>Investment and Holding Company Status</u>.  Neither any of the Borrowers nor any of the Borrower's Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

Section 3.10 <u>Taxes</u>.  To Borrower's actual knowledge, each Borrower and each of the Borrower's Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Person has set aside on its books adequate reserves or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.11 <u>ERISA</u>.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.  Neither the Borrower nor any of its Subsidiaries have any Plans as of the date hereof.  As to any future Plan the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of all such underfunded Plans.

Section 3.12 <u>Disclosure</u>.  To the actual knowledge of the Borrower, the Borrower has disclosed or made available to the Lenders all agreements, instruments and corporate or other restrictions to which it, any other Borrower, or any of its Subsidiaries is subject, and all other matters known to it, that, in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 3.13 <u>Solvency</u>.  As of the Effective Date and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents (including any contribution rights under the Guaranty), including all Loans made or to be made hereunder, the Borrower is not insolvent on a balance sheet basis such that the sum of such Person's assets

exceeds the sum of such Person's liabilities, the Borrower is able to pay its debts as they become due, and the Borrower has sufficient capital to carry on its business.

Section 3.14 <u>Margin Regulations</u>. Neither the Borrower nor any Subsidiary of Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no proceeds of the Loans will be used to purchase or carry any margin stock.

Section 3.15 <u>Subsidiaries</u>. As of the Effective Date, no Person owns any Equity Interests in the Portfolio Properties, Summers Landing Property, or HCRE Properties except as set forth on <u>Schedule 3.15</u> attached hereto.

Section 3.16 <u>OFAC; Anti-Money Laundering.</u> None of the Borrower, any of the other Subsidiaries, or any other Affiliate thereof is (or will be) (i) a Sanctioned Person, (ii) located, organized or resident in a Designated Jurisdiction, (iii) to the best of Borrower's knowledge, without any independent inquiry, is or has been (within the previous five (5) years) engaged in any transaction with any Sanctioned Person or any Person who is located, organized or resident in any Designated Jurisdiction to the extent that such transactions would violate Sanctions, or (iv) has violated any Anti-Money Laundering Law in any material respect. Each Borrower and its Subsidiaries, and to the knowledge of the Borrower, each director, officer, employee, agent and Affiliate of the Borrower and each such Subsidiary, is in compliance with the Anti-Corruption Laws in all material respects. The Borrowers have implemented and maintain in effect policies and procedures designed to promote and achieve compliance with the Anti-Corruption Laws and applicable Sanctions.

Section 3.17 <u>EEA Financial Institution</u>. No Borrower is an EEA Financial Institution.

Section 3.18 <u>Single Asset Entity; Compliance With Laws</u>. Each Property Owner Borrower hereby represents and warrants to, and covenants with, Agent that as of the date hereof and until such time as the Loan shall be paid in full, that such Property Owner Borrower has not at any time, does not presently, and shall not:

(a)    own any asset or property other than (i) the Mortgaged Property owned by it as of the date hereof, and (ii) incidental personal property necessary for the ownership or operation of such Mortgaged Property;

(b)    engage in any business other than the ownership, management and operation of such Mortgaged Property;

(c)    enter into any contract or agreement with any Affiliate of Property Owner, any constituent party of such Property Owner Borrower or any Affiliate of any constituent party, except upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with third parties other than any such party;

(d)    incur any Indebtedness other than (i) the Loan, (ii) unsecured trade payables in the ordinary course of business not evidenced by a note, (iii) indebtedness incurred in the financing of equipment and other personal property used on the Property, and (iv) obligations to

tenants under Approved Leases; provided that any indebtedness incurred pursuant to subclauses (ii) and (iii) shall (x) be paid within ninety (90) days of the date incurred (or, in the case of equipment leases, such longer period as may be permitted by such leases), and (y) be incurred in the ordinary course of business.

(e)     make any loans or advances to any third party (including any Affiliate or constituent party), or acquire obligations or securities of its Affiliates;

(f)     fail to remain solvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; for the avoidance of doubt, nothing herein shall require any member of Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(g)     fail to do all things necessary to observe organizational formalities and preserve its existence, and such Property Owner Borrower shall not, nor shall such Property Owner Borrower permit any constituent party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such Property Owner Borrower or such constituent party without the prior consent of Lender in any manner that (i) violates the covenants set forth in this Section 3.17, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Administrative Agent's consent;

(h)     fail to maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party.  Such Property Owner Borrower's assets will not be listed as assets on the financial statement of any other Person, provided, however, that such Property Owner Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Property Owner Borrower and such Affiliates and to indicate that such Property Owner Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on such Property Owner Borrower's own separate balance sheet.  Such Property Owner Borrower shall maintain its books, records, resolutions and agreements as official records;

(i)     fail to be, or fail to hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Property Owner Borrower or any constituent party of such Property Owner Borrower), fail to correct any known misunderstanding regarding its status as a separate entity, fail to conduct business in its own name, or fail to maintain and utilize separate stationery, invoices and checks bearing its own name, and such Property Owner Borrower shall not identify itself or any of its Affiliates as a division or part of the other;

(j)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; for the avoidance of doubt, nothing herein shall require any member of such Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(k)     seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of such Property Owner Borrower nor permit any constituent party of such Property Owner Borrower to do any of the foregoing; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower;

(l)     commingle the funds and other assets of such Property Owner Borrower with those of any Affiliate or constituent party or any other Person, and shall hold all of its assets in its own name;

(m)     fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person;

(n)     except with respect to the Obligations, guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person;

(o)     permit any Affiliate independent access to its bank accounts; or

(p)     fail to compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower.

ARTICLE IV

Conditions

Section 4.01 Effective Date.  The obligations of the Lenders to make the Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent (or its counsel) shall have received from each Borrower either (i) a counterpart of this Agreement and all other Loan Documents to which it is party signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of each such Loan Document other than the Notes) that such party has signed a counterpart of the Loan Documents, together with copies of all Loan Documents.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Wick Phillips Gould & Martin, LLP, counsel for the Borrower, and such other counsel as the Administrative Agent may approve, covering such matters relating to the Borrower, the Loan Documents or the Transactions as the Administrative Agent shall reasonably request.  The Borrower hereby requests such counsel to deliver such opinion.

(c)     The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions and any other legal matters relating to the Borrower, this Agreement (including each Borrower's compliance with Section 9.14 and other customary "know your customer" requirements) or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d)     The Administrative Agent shall have received a Compliance Certificate, dated the date of this Agreement and signed by Borrowers or Lead Borrower, in form and substance satisfactory to the Administrative Agent.

(e)     The Administrative Agent shall have received searches of Uniform Commercial Code ("UCC") filings (or their equivalent) together with such other customary lien, litigation and bankruptcy searches as the Administrative Agent may require.

(f)     The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(g)     The Administrative Agent shall have received an Appraisal of each Mortgaged Property being included as Collateral in form and substance satisfactory to the Administrative Agent and the Lenders;

(h)     The Administrative Agent shall have received executed copies of all other Loan Documents, the Environmental Assessment, the Title Insurance Policy and the Current Survey (in each instance as delivered in connection with the original closing of the Loan, with the Administrative Agent receiving an acceptable endorsement to each Title Insurance Policy), property condition assessments, insurance certificates, and such other due diligence information as the Administrative Agent may require for each Mortgaged Property.

(f)     The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the Effective Date.

(g)     At the time of and immediately after giving effect to the making of the Loans, no Default shall have occurred and be continuing.

(h)     The Administrative Agent shall have received and approved executed copies of the Senior Loan Documents and sufficient evidence that the Senior Loan has closed and funded and that the proceeds thereof, together with the proceeds of the Loans hereunder, shall be sufficient to consummate the acquisition of the Portfolio Properties and the Summers Landing Property.

(i)     Upon the reasonable request of any Lender made at least ten (10) days prior to the Effective Date, each Borrower shall have provided to such Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money-

laundering rules and regulations, including the Patriot Act, in each case at least five (5) days prior to the Effective Date.

(j)     At least five (5) days prior to the Effective Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower to each requesting Lender.

Section 4.02 <u>Each Borrowing</u>.  The obligation of each Lender (as applicable) to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)     The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the date of such Borrowing.

(b)     At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)     With respect to any requested Borrowings, the Borrower shall have complied with <u>Section 2.03</u>.

(d)     Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section.

<div align="center">

ARTICLE V

Affirmative Covenants

</div>

Until the principal of and interest on the Loans and all fees payable hereunder shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 5.01 <u>Financial Statements; Ratings Change and Other Information</u>.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)     within 120 days after the end of each fiscal year of the Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, together with all notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, which shall be (i) with respect to Highland Capital, reported on by Deloitte or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit), and (ii) with respect to each other Borrower other than the Property Owner Borrowers, certified by each such Borrower, in each case, to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the applicable Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with sound accounting principles, consistently applied;

(b)     within 60 days after the end of each fiscal quarter of each fiscal year of the Borrower, each Borrower's (other than the Property Owner Borrowers) consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of

and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and including supporting notes and schedules, all certified by each such Borrower as presenting fairly in all material respects the financial condition and results of operations of the applicable Borrower on a consolidated basis in accordance with sound accounting principles, consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with any delivery of financial statements under clause (a) or (b) above, a compliance certificate of the Borrowers (the "Compliance Certificate") in the form of Exhibit B attached hereto;

(d)     concurrently with any delivery of quarterly financial statements under clause (b) above, operating statements, rent roll and accounts receivable aging for each Mortgaged Property; and

(e)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Borrower or any Subsidiary of the Borrower, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request.

Section 5.02 Financial Tests.  The Borrower shall have and maintain at all times, on a consolidated basis in accordance with sound accounting principles, consistently applied, tested as of the close of each calendar quarter:

(a)     A Total Leverage Ratio not to exceed sixty-five percent (65%);

(b)     A minimum Fixed Charge Coverage Ratio of not less than 1.30:1.00;

(c)     Tangible Net Worth at all times of not less than $750,000,000; and

(d)     A minimum Liquidity at all times in an amount not less than $75,000,000; provided that, at any time when the aggregate outstanding principal amount of the Loans is $150,000,000 or less, Borrower shall maintain minimum Liquidity in an amount not less than the lesser of (i) $75,000,000 and (ii) 25% of the aggregate outstanding principal amount of the Loans.

Section 5.03 Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after it becomes aware of same (unless specific time is set forth below):

(a)     the occurrence of any Default under this Agreement or any default or event of default under a Senior Loan Document;

(b)     within fifteen (15) Business Days after the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any

Borrower or any Affiliate thereof that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)     within fifteen (15) Business Days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000.00; and

(d)     any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of such Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

At the Administrative Agent's option, after the happening of any of the events listed in clauses (a), (b) or (d) above which would reasonably be expected to result in a Material Adverse Effect on any of the Mortgaged Properties, the Administrative Agent may obtain, or cause the Borrower to obtain, an updated Appraisal for the Mortgaged Properties giving rise to such events, all at the Borrower's expense.

Section 5.04 Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under this Agreement.  The Borrower may not be organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.  As an express inducement to Lenders to make and maintain the Loan, each Property Owner Borrower agrees at all times prior to payment and satisfaction of all Obligations to be and remain a single purpose entity in accordance with Section 3.18 above.

Section 5.05 Payment of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including Tax liabilities, that, if not paid, would result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with sound accounting principles, consistently applied, and (c) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect.  The Borrower will, and will cause each of its Subsidiaries to, comply with all of its obligations and liabilities (as applicable) under the Senior Loan Documents.

Section 5.06 Maintenance of Properties; Insurance.

(a)     The Borrower will, and will cause each of its Subsidiaries to, (i) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (ii) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are reasonable and

customary for similarly situated Properties.  Without limitation to the foregoing, the Borrower will, with respect to each Mortgaged Property, maintain, with financially sound and reputable insurance companies, insurance against such risks as are set forth below and in such amounts as are reasonably required by Administrative Agent from time to time, with Administrative Agent named as loss payee and a beneficiary of such insurance on substantially similar policies and programs as are acceptable to Administrative Agent.

(b)      The Borrower shall maintain the following insurance coverages for the Mortgaged Property:

(i)      An all-risk policy of permanent property insurance insuring the Mortgaged Property against all risks that are commonly covered under real property insurance except those permitted by the Administrative Agent in writing to be excluded from coverage thereunder.

(ii)      A boiler and machinery insurance policy covering loss or damage to all portions of the Mortgaged Property comprised of air-conditioning and heating systems, other pressure vessels, machinery, boilers or high pressure piping.

(iii)      An all-risk policy of insurance covering loss of earnings and/or rents from the Mortgaged Property in the event that the Mortgaged Property is not available for use or occupancy due to casualty, damage or destruction required to be covered by the policies of insurance described in (i) and (ii) above.

(iv)      Commercial general liability, auto liability, umbrella or excess liability and worker's compensation insurance against claims for bodily injury, death or property damage occurring on, in or about the Mortgaged Property in an amount and containing terms reasonably acceptable to the Administrative Agent.

(v)      Such other insurance against other insurable hazards, risks or casualties which at the time are commonly insured against in the case of owners and premises similarly situated, due regard being given to the financial condition of the Borrower, the height and type of the Mortgaged Property, its construction, location, use and occupancy.

(vi)      All required insurance with respect to the Mortgaged Property will be written on forms acceptable to the Administrative Agent and by companies having a Best's Insurance Guide Rating of not less than A or A+ and which are otherwise acceptable to the Administrative Agent, and such insurance (other than third party liability insurance) shall be written or endorsed so that all losses are payable to the Administrative Agent, as Administrative Agent for the Lenders. The original policies evidencing such insurance shall be delivered by the Borrower to the Administrative Agent and held by the Administrative Agent, unless Administrative Agent expressly consents to accept insurance certificates instead.  Each such policy shall expressly prohibit cancellation of insurance without thirty (30) days' written notice to the Administrative Agent.  The

Borrower agrees to furnish due proof of payment of the premiums for all such insurance to Administrative Agent promptly after each such payment is made and in any case at least fifteen (15) days before payment becomes delinquent.

(c)     The Borrower will pay and discharge, or cause to be paid and discharged, all taxes, assessments, maintenance charges, permit fees, impact fees, development fees, capital repair charges, utility reservations and standby fees and all other similar impositions of every kind and character charged, levied, assessed or imposed against any interest in any of the Mortgaged Property owned by it or any of its Subsidiaries, as they become payable and before they become delinquent.  The Borrower shall furnish receipts evidencing proof of such payment to the Administrative Agent promptly after payment and before delinquency.

(d)     All proceeds of insurance with respect to any Mortgaged Property shall be paid to Administrative Agent and, at Administrative Agent's option, be applied to Borrower's Obligations or released, in whole or in part, to pay for the actual cost of repair, restoration, rebuilding or replacement (collectively, "Cost To Repair").  If the Cost To Repair does not exceed thirty-five percent (35%) of the Appraised Value of the subject Mortgaged Property, provided no Event of Default is then in existence, Administrative Agent shall release so much of the insurance proceeds as may be required to pay for the actual Cost to Repair in accordance with and subject to the provisions of Section 5.06(e) below.

(e)     If Administrative Agent elects or is required to release insurance proceeds, Administrative Agent may impose, reasonable conditions on such release which shall include, but not be limited to, the following:

(i)     prior written approval by Administrative Agent, which approval shall not be unreasonably withheld or delayed of plans, specifications, cost estimates, contracts and bonds for the restoration or repair of the loss or damage;

(ii)    waivers of lien, architect's certificates, contractor's sworn statements and other evidence of costs, payments and completion as Agent may reasonably require;

(iii)   if the Cost To Repair does not exceed $500,000.00, the funds to pay therefor shall be released to Borrower. Otherwise, funds shall be released upon final completion of the repair work, unless Borrower requests earlier funding, in which event partial monthly disbursements equal to 90% of the value of the work completed shall be made prior to final completion of the repair, restoration or replacement and the balance of the disbursements shall be made upon full completion and the receipt by Administrative Agent of satisfactory evidence of payment and release of all liens;

(iv)    determination by Administrative Agent that the undisbursed balance of such proceeds on deposit with Administrative Agent, together with additional funds deposited for the purpose, shall be at least sufficient to pay for the remaining Cost To Repair, free and clear of all liens and claims for lien;

(v)     all work to comply with the standards, quality of construction and Legal Requirements applicable to the original construction of the Mortgaged Property; and

(vi)     in Administrative Agent's good faith judgment the repair work is likely to be completed at least three (3) months prior to the Maturity Date.

(f)     If there is any condemnation for public use of a Mortgaged Property, the awards on account thereof shall be paid to Administrative Agent and shall be applied to Borrower's obligations, or at Administrative Agent's discretion released to Borrower.  If, in the case of a partial taking or a temporary taking, in the sole judgment of Administrative Agent the effect of such taking is such that there has not been a material and adverse impairment of the viability of the Mortgaged Property or the value of such Collateral, so long as no Default exists Administrative Agent shall release awards on account of such taking to Borrower if such awards are sufficient (or amounts sufficient are otherwise made available) to repair or restore the Mortgaged Property to a condition reasonably satisfactory to Administrative Agent subject to the requirements of Section 5.06(e).

Section 5.07 Books and Records; Inspection Rights.

(a)     The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.

(b)     The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice and subject to rights of tenants, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.08 Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 5.09 Use of Proceeds.  The proceeds of the Loans will be used solely to fund a portion of the cost to consummate the acquisition of the Portfolio Properties, including to make a loan to the BH Pledgor to fund such Person's acquisition of the Summers Landing Property.  No part of the proceeds of the Loans will be used, whether directly or indirectly, for financing, funding or completing the hostile acquisition of publicly traded Persons or for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

Section 5.10 Fiscal Year.  Borrower shall maintain as its fiscal year the twelve (12) month period ending on December 31 of each year.

Section 5.11 Environmental Matters.

(a)      Borrower shall comply and shall cause each of its Subsidiaries and each Real Property owned or leased by such parties to comply in all material respects with all applicable Environmental Laws currently or hereafter in effect, except to the extent noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)      If the Administrative Agent or the Required Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law related to the Mortgaged Property, or Real Property adjacent to such Mortgaged Property, which would reasonably be expected to have a Material Adverse Effect, then Borrower agrees, upon request from the Administrative Agent (which request may be delivered at the option of Administrative Agent or at the direction of Required Lenders), to provide the Administrative Agent, at the Borrower's expense, with such reports, certificates, engineering studies or other written material or data as the Administrative Agent or the Required Lenders may reasonably require so as to reasonably satisfy the Administrative Agent and the Required Lenders that any Credit Party or Real Property owned or leased by them is in material compliance with all applicable Environmental Laws.

(c)      Borrower shall take such Remedial Action or other action as required by Environmental Law or any Governmental Authority except to the extent the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)      If the Borrower fails to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any action described in this Section, the Administrative Agent may, after notice to the Borrower, with the consent of the Required Lenders, make advances or payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so.  All sums so advanced or paid by the Administrative Agent (including reasonable counsel and consultant and investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will become due and payable from the Borrower ten (10) Business Days after demand, and shall bear interest at the Default Rate from the date any such sums are so advanced or paid by the Administrative Agent until the date any such sums are repaid by the Borrower.  Promptly upon request, the Borrower will execute and deliver such instruments as the Administrative Agent may deem reasonably necessary to permit the Administrative Agent to take any such action, and as the Administrative Agent may require to secure all sums so advanced or paid by the Administrative Agent.  If a Lien is filed against the Mortgaged Property by any Governmental Authority resulting from the need to expend or the actual expending of monies arising from an action or omission, whether intentional or unintentional, of the Borrower or for which the Borrower is responsible, resulting in the Releasing of any Hazardous Material into the waters or onto land located within or without the state where the Mortgaged Property is located, then the Borrower will, within thirty (30) days from the date that the Borrower is first given notice that such Lien has been placed against the Mortgaged Property (or within such shorter period of time as may be specified by the Administrative Agent if such Governmental Authority has commenced steps to cause the Mortgaged Property to be sold pursuant to such Lien), either (i) pay the claim and remove the Lien, or (ii) furnish a cash deposit, bond or such other security with respect thereto as is

satisfactory in all respects to the Administrative Agent and is sufficient to effect a complete discharge of such Lien on the Mortgaged Property.

Section 5.12 <u>Collateral Requirement.</u>

(a)    <u>General Requirement</u>.  The Obligations and the Hedging Obligations, if any, shall be secured by a perfected first priority lien and security interest to be held by the Administrative Agent for the benefit of the Lenders, pursuant to the terms of the Security Documents, in

(i)    each Mortgaged Property;

(ii)    the Equity Interests of each Property Owner Borrower, fifty percent (50%) of the Equity Interests in each Collateral Subsidiary other than the Property Owner Borrowers, and the Equity Interests held by HCRE Partners and its Subsidiaries in the HCRE Properties; <u>provided</u> that the Borrower shall not, pursuant to this subclause (i), be required to pledge any portion of the Equity Interests of any Collateral Subsidiary that is not a Property Owner Borrower or in any owner of an HCRE Property to the extent (and only to the extent) that such a grant of a security interest is prohibited by, or under the terms thereof, may give rise to a default, breach, right of recoupment, buyout, repurchase, purchase option, right of first refusal or similar rights (whether effective with the pledge or any related exercise of rights thereunder), claim, defense or remedy, or directly or indirectly results in the termination of or requires any consent not obtained under, the Senior Loans or Indebtedness secured by the HCRE Properties; <u>provided</u> further that, to the extent such pledge of any portion of such Equity Interests is restricted as set forth in the previous proviso, the Borrower shall, to the extent permitted under any such debt instruments, pledge to the Administrative Agent, pursuant to documentation reasonably acceptable to the Administrative Agent, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of such Collateral Subsidiary or owner of an HCRE Property;

(iii)    to the extent not included in clause (ii) above, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of each Collateral Subsidiary and each owner of a HCRE Property to the extent owned by HCRE;

(iv)    all of the Borrower's rights with respect to the pledge by the BH Pledgor and its Subsidiaries of their interests in the Summers Landing Property;

(v)    the proceeds of all Equity Offerings with respect to the Stonebridge DST on a pari passu basis with the Stonebridge Term Loan subject to the terms of this Agreement;

(vi)    the common shares in NexPoint Residential Trust Inc. or partnership units in NexPoint Residential Operating Partnership, LP that are

identified on Schedule 5.12 hereto, 1,000,000 of which shall be pledged on a pari passu basis with the Stonebridge Term Loan;

(vii)   the economic interests in NexPoint Advisors, L.P. subject to the terms of the Economic Interests Pledge; and

(viii)   all of the common shares in NexBank Capital, Inc. owned by The SLHC Trust.

Upon the occurrence and during the continuance of an Event of Default, if the Administrative Agent determines to exercise rights and remedies with respect to the Collateral in accordance with the terms of the Loan Documents, the Administrative Agent shall first exercise rights and remedies with respect to any Equity Interests in NexPoint Residential Trust Inc. before exercising rights and remedies against any other Collateral.

(b)    <u>Release of Certain Collateral</u>.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this <u>Section 5.12(b)</u>, including any paydown of the Loans in connection with the transactions contemplated by this <u>Section 5.12(b)</u>), the Administrative Agent shall release the Collateral related to a Portfolio Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a sale, refinancing, or recapitalization of such Portfolio Property, subject to and upon the following terms and conditions:

(i)    The Borrower shall have provided the Administrative Agent with written notice of its intention to remove any specified Collateral at least five (5) Business Days (or such shorter period as the Administrative Agent may agree) prior to the requested release (which notice may be revoked by Borrower at any time);

(ii)    Borrower shall submit to the Administrative Agent with such request an executed Compliance Certificate adjusted in the best good faith estimate of Borrower solely to give effect to the proposed release and demonstrating that no Default or Event of Default with respect to the covenants referred to therein shall exist after giving effect to such release and if the Borrower would not be in compliance, then any reduction in the outstanding amount of the Loans in connection with such release;

(iii)    The Administrative Agent shall have determined in its reasonable discretion, and received such evidence acceptable to it as it shall reasonably request, that the proceeds from expected sale, refinancing, or recapitalization transactions with respect to the Portfolio Properties (or the Equity Interests therein) remaining as Collateral for the Obligations after giving effect to the requested release, shall be sufficient to repay the Obligations in full;

(iv)    Borrower shall make all Mandatory Prepayments required under <u>Section 2.11(d)</u> in connection with such sale, refinancing, or recapitalization;

(v)     Borrower shall pay all reasonable costs and expenses of the Administrative Agent in connection with such release, including without limitation, reasonable attorney's fees; and

(vi)     without limiting or affecting any other provision hereof, any release of a Collateral will not cause the Borrower to be in violation of the covenants set forth in Section 5.02.

(c)     <u>Release of Collateral</u>.  Upon the refinancing or repayment of the Obligations and Hedging Obligations in full, then the Administrative Agent shall release the Collateral from the lien and security interest of the Security Documents.

(d)     <u>Release of Certain HCRE Properties</u>.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this <u>Section 5.12(b)</u>, including any paydown of the Loans in connection with the transactions contemplated by this <u>Section 5.12(b)</u>), the Administrative Agent shall release the Collateral related to a HCRE Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a Transfer of 100% of the indirect interest in any Borrower in conjunction with the formation of a publically traded real estate investment trust (the "**Transferee REIT**"), which Transferee REIT shall be under common Control with NexPoint Advisors, L.P. pursuant to a written management or advisory agreement; <u>provided</u>, such applicable Borrower shall pledge its Equity Interests in such Transferee REIT as Collateral for the Obligations pursuant to documentation reasonably acceptable to the Agent.

Section 5.13 <u>Further Assurances</u>.  At any time upon the request of the Administrative Agent, Borrower will, promptly and at its expense, execute, acknowledge and deliver such further documents and perform such other acts and things as the Administrative Agent may reasonably request to evidence the Loans made hereunder and interest thereon in accordance with the terms of this Agreement.

Section 5.14 [Intentionally Omitted].

Section 5.15 [Intentionally Omitted].

Section 5.16 <u>Approved Leases</u>.  Borrower shall not enter into any tenant lease of space in the Portfolio Properties unless approved by Administrative Agent or deemed approved pursuant to the provisions of this <u>Section 5.16</u> (each such lease, an "<u>Approved Lease</u>"); <u>provided</u>, however, for the avoidance of doubt, certain master leases and residential leases entered into by Portfolio One DST, Portfolio Two DST, Portfolio Three DST, and Stonebridge DST or their subsidiaries for the purposes of a Specified DSTs' Equity Offering shall not require approval for the purposes of this <u>Section 5.16</u>.  Borrower's standard form of residential tenant lease, and any material revisions thereto, must have the prior written approval of Administrative Agent; it being understood that Borrower's standard form of residential tenant lease as of the Effective Date is approved.  Administrative Agent shall be "deemed" to have approved any tenant lease that (a) is on the standard form lease approved by Administrative Agent, with no material deviations except as approved by Administrative Agent; (b) is entered into in the ordinary course of

business with a bona fide unrelated third party tenant, and Borrower, acting in good faith and exercising due diligence, has determined that the tenant is financially capable of performing its obligations under the lease or is leased to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property; (c) is received by Administrative Agent (together with each guarantee thereof (if any) and financial information regarding the tenant and each guarantor (if any) received by Borrower) within fifteen (15) days after Administrative Agent's request; (d) reflects an arms-length transaction at then current market rate for comparable space (except for a lease to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property); and (e) contains no right to purchase the Real Property, or any present or future interest therein. Borrower shall provide to Administrative Agent a correct and complete copy of each tenant lease, including any exhibits, and each guarantee thereof (if any), prior to execution unless the lease in question meets the foregoing requirements for "deemed" approval by Administrative Agent. If requested by Administrative Agent, Borrower shall provide to Administrative Agent a fully executed copy of each tenant lease within fifteen (15) days of such request. Borrower shall, throughout the term of this Agreement, pay all reasonable costs incurred by Administrative Agent in connection with Administrative Agent's review and approval of tenant leases and each guarantee thereof (if any), including reasonable attorneys' fees and costs.

Section 5.17 <u>Permanent Financing</u>. Borrower agrees, on behalf of itself and its Affiliates, that it shall utilize KeyBank to place permanent debt (e.g. CMBS, Fannie/Freddie, life company placements) with respect to the Portfolio Properties and all other Real Property acquired with proceeds from the Loans.

Section 5.18 <u>Keepwell</u>. Each Borrower that is a Qualified ECP Party at the time that the Agreement becomes effective with respect to any Hedging Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower that is not then an "eligible contract participant" under the Commodity Exchange Act (a "<u>Specified Party</u>") to honor all of its obligations under the Agreement in respect of Hedging Obligations (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Party's obligations and undertakings under this <u>Section 5.16</u> voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Party under this <u>Section 5.16</u> shall remain in full force and effect until the Loans have been repaid in full. Each Qualified ECP Party intends this <u>Section 5.16</u> to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Party for all purposes of the Commodity Exchange Act.

Section 5.19 <u>DST Offerings.</u>

(a) <u>Marketing</u>. Borrower will cause each DST Depositor to use commercially reasonable efforts to market and sell its respective Trust Interests so as to achieve a DST Permitted Sale that will maximize the proceeds which can reasonably be expected to be obtained from a sale of such Trust Interests.

(b)      Periodic Investor Reports.  Borrower shall provide to the Agent a report, to be submitted for each two-calendar week period on or before each Friday of the succeeding calendar week after such two week period, identifying the amount paid by any investor in a Specified DST (but not the identity of such investor) and each such investor's and each other Borrower's percentage interest in each Specified DST, in form and substance reasonably satisfactory to Lender.

(c)      Monthly Distributions. During the existence of any Event of Default, Borrower shall, to the extent permitted by each applicable Trust Agreement, cause the applicable Specified DST to distribute all available cash under its Trust Agreement on a monthly basis to the holders of its Trust Interests in accordance with their percentage of ownership, and thereafter any Affiliate of Borrower directly or indirectly holding such Trust Interests shall cause such cash to be distributed to Borrower and, in the case of a DST Depositor, to its other members in accordance with the terms of such DST Depositor's organizational documents. All such distributions payable to Borrower during the existence of an Event of Default shall be paid directly to the Agent for application to the Obligations. The Borrower shall not permit any Indebtedness of any Specified DST (or its Subsidiaries) to prohibit such monthly distributions in the absence of a default or event of default thereunder; provided that the foregoing shall not apply to any Senior Loan in respect of the Portfolio Property owned directly or indirect by any Specified as of the Effective Date.

Section 5.20 BH Loan.

(a)      The Borrower shall require the BH Pledgor to comply with all material terms of the BH Loan Documents and shall enforce its rights as a lender thereunder in its reasonable discretion, unless otherwise agreed by the Administrative Agent.

(b)      The Borrower shall not permit any amendment or waiver of any material term of the BH Loan Documents without the prior consent of the Administrative Agent.

Section 5.21 Post-Closing Covenant.

(a)      The Borrowers shall use commercially reasonable efforts to, no later than fifteen (15) Business Days after the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver an estoppel certificate with respect to that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 340 and that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 324, in each case, in accordance with the provisions of such Declaration of Reciprocal Easements.

(b)      No later than ten (10) Business Days after the Effective Date, the Borrowers shall deliver to the Administrative Agent (i) a control agreement, duly executed by the applicable Borrower and the applicable custodian, securities intermediary, or other person holding any of the Equity Interests in NexPoint Residential Trust Inc., NexPoint Residential Operating Partnership, LP, or NexBank Capital Inc. that are required to be pledged to the Administrative Agent under the Loan Documents, in form and substance reasonably satisfactory to the

Administrative Agent, and (ii) such notices, stock powers, transfer documents and other documentation and take such action as may be reasonably required by the Administrative Agent in order to maintain a perfected, first priority Lien and security interest in such Equity Interests.

(c)      No later than two (2) Business Days after the Effective Date, the Borrowers shall execute such documents and take such further action as the Administrative Agent may request in order to pledge to the Administrative Agent, for the benefit of the Lenders, common shares owned by the Borrowers or their Affiliates in NexPoint Residential Trust, Inc. and NexPoint Strategic Opportunities Fund with an aggregate market value of no less than $10,000,000.

(d)      Notwithstanding anything herein to the contrary, the Borrowers acknowledge and agree that any breach of this Section 5.21 shall constitute an immediate Event of Default (subject only to notice from the Administrative Agent).

Section 5.22 Sufficiency of Funds.  Each Borrower hereby represents, warrants, and covenants that:

(a)      In connection with the required prepayment under Section 2.11(f) hereof, the Borrowers and their Affiliates will recommend to the appropriate investment committees of funds managed by any Borrower or such Affiliates to make investments in the Portfolio Properties in an aggregate amount as may be required for the Borrowers to make such prepayments in full when required hereunder;

(b)      such funds are permitted under their respective organizational documents to make investments, in the form of debt or equity, in assets similar to the Portfolio Properties; and

(c)      the Borrowers and their affiliates will promptly undertake such action to obtain the necessary funding from such related funds and Affiliates in order to make the prepayment under Section 2.11(f) when required hereunder.

## ARTICLE VI

## Negative Covenants

Until the principal of and interest on the Loans and all other amounts due and  payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 6.01 Liens.  No Borrower will create, incur, assume or permit to exist any Lien on the Collateral or the Portfolio Properties, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except solely with respect to the Portfolio Properties and the pledged Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc., Permitted Encumbrances.  The Dugaboy Investment Trust shall not, prior to the date when the Obligations shall have been reduced to no more than $150,000,000, create, incur, assume or permit to exist any Lien on any marketable securities owned by it, whether now owned or hereafter acquired, except the Lien in favor of the Administrative Agent to secure the Obligations.

Section 6.02 <u>Fundamental Changes</u>.  The Borrower will not, and will not permit any Collateral Subsidiary to:

(a)       merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Borrower or all or substantially all of the stock of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve;

(b)       sell, transfer, lease or otherwise dispose of any of its assets to the extent such transaction would result in a breach of <u>Section 5.02</u>; or

(c)       engage to any material extent in any business other than the ownership of interest in entities that own, develop, operate and manage the Properties and businesses reasonably related thereto, except as allowed by <u>Section 6.03</u>.

Section 6.03 <u>Investments, Loans, Advances and Acquisitions</u>.  The Borrower will not purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness (subject to <u>Section 6.09</u> below) or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments.

Section 6.04 <u>Hedging Agreements</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Hedging Agreement, other than Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks to which any Subsidiary of the Borrower is exposed in the conduct of its business or the management of its liabilities.

Section 6.05 <u>Restricted Payments</u>.  The Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment while any Default or Event of Default shall be in existence.

Section 6.06 <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than would be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its wholly owned Subsidiaries not involving any other Affiliate, (c) transactions related to the closing of and ongoing  activities necessary to implement the loan obligations and requirements of this Agreement,  and (d) any Restricted Payment permitted by <u>Section 6.05</u>.

Section 6.07 <u>[Intentionally Omitted]</u>.

Section 6.08 <u>Restrictive Agreements</u>. No Borrower will, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that the restrictions contained in this <u>Section 6.08</u> shall not apply to (i) restrictions and conditions imposed by law or by this Agreement or as otherwise approved by the Administrative Agent, (ii) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness or Liens permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, or ownership interests in the obligors with respect to such Indebtedness, and (iv) solely with respect to clause (a), provisions in leases restricting the assignment thereof.

Section 6.09 <u>Indebtedness</u>. Neither any Borrower nor any Collateral Subsidiary shall, without the prior written consent of the Required Lenders, create, incur, assume, guarantee or be or remain liable, contingently or otherwise with respect to any Indebtedness on a recourse basis, except:

(a)     Indebtedness under this Agreement;

(b)     Indebtedness of a Collateral Subsidiary (other than any Property Owner Borrower) under the Senior Loan Documents;

(c)     Indebtedness under any Hedging Obligations;

(d)     Indebtedness of NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust under the Stonebridge Term Loan;

(e)     Recourse Indebtedness of the The Dugaboy Investment Trust and Highland Capital in an amount not to exceed the aggregate principal amount of such Borrower's Indebtedness outstanding on the date hereof and set forth in <u>Schedule 6.09</u>; provided that, from an after the date that the aggregate outstanding principal amount of the Obligations shall be reduced to $150,000,000 or less, The Dugaboy Investment Trust and Highland Capital may incur additional recourse Indebtedness on a recourse basis, subject to compliance with the covenants in <u>Section 5.02</u>;

(f)     Customary non-recourse, carveout guarantees and environmental indemnitees entered into in connection with property-level secured Indebtedness of such Borrower's Subsidiaries; and

(g)     Indebtedness for trade payables and operating expenses incurred in the ordinary course of business.

Section 6.10 <u>Subordination of Claims</u>.

(a)     Prior to repayment in full of the Obligations, no Borrower or any Subsidiary may pay any advisory, asset management, property, acquisition, financing, and other fees and amounts due and payable to the Advisor in connection with the Portfolio Properties; <u>provided</u> that, so long as no Event of Default exists or would result therefrom, (i) the Advisor may receive asset management fees with respect to the Portfolio Properties (but not any acquisition, financing or similar fees with respect to the Specified DSTs) and (ii) from and after the date that the market value of the common shares of NexPoint Residential Trust Inc. are equal to an amount no less than 110% of the then aggregate outstanding balance of the Loans and the Stonebridge Term Loan has been repaid in full, the Borrower may pay acquisition, financing or similar fees with respect to a sellout of any DST offering occurring after such date.[1]

(b)     Each Borrower hereby expressly covenants and agrees for the benefit of the Administrative Agent and the Lenders that all obligations and liabilities of any Borrower or its Subsidiaries or Affiliates to such Borrower or its Subsidiaries or Affiliates of whatever description, including without limitation, all intercompany receivables of such Borrower from another Borrower or its Subsidiaries or Affiliates (collectively, the "<u>Junior Claims</u>") shall be subordinate and junior in right of payment to all Obligations; provided, however, that payment thereof may be made so long as no Event of Default shall have occurred and be continuing. If an Event of Default shall have occurred and be continuing, then no Borrower or its Subsidiaries or Affiliates shall accept any direct or indirect payment (in cash, property, securities by setoff or otherwise) from another Borrower or its Subsidiaries or Affiliates on account of or in any manner in respect of any Junior Claim until all of the Obligations have been indefeasibly paid in full.  <u>Schedule 6.10</u> is, as of the Effective Date, a complete and correct listing of all Junior Claims, and if such Indebtedness is secured by any Lien, a description of the property subject to such Lien. Except as set forth in <u>Schedule 6.10</u> no default exists under any Junior Claims as of the Effective Date.

(c)     All such parties shall execute subordination agreements in form and substance acceptable to the Administrative Agent with respect to such fees and Junior Claims.

Section 6.11 <u>Amendment to Organizational Documents</u>.  Without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed, no Borrower will, nor will it permit any Collateral Subsidiary to, amend, modify or waive any rights under its certificate of incorporation, bylaws or other organizational documents in any manner, except: (a) modifications necessary to clarify existing provisions of such organizational documents; (b) modifications which would not have a Material Adverse Effect, and (c) modifications in connection with mergers, consolidations, investments and other transactions not otherwise prohibited by the other provisions of this Agreement.

Section 6.12 <u>Sanctions</u>.  No Borrower shall permit the proceeds of any Loan:  (a) to be lent, contributed or otherwise made available to fund any activity or business in any Designated Jurisdiction; (b) to fund any activity or business of any Sanctioned Person or any Person located,

---

[1] NTD: Key's understanding is that the fees would accrue but would not be paid until the 110% condition above is satisfied.

organized, formed, incorporated or residing in any Designated Jurisdiction or who is the subject of any Sanctions; (c) in any other manner that will result in any material violation by any Person (including any Lender or Administrative Agent) of any Sanctions; or (d) to be used in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws.

Section 6.13 <u>Specified DSTs.</u>

(a)     <u>Sale of Trust Interests.</u>  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Documents, no DST Depositor may sell (or redeem the Trust Interests owned by such DST Depositor) or otherwise dispose of its Trust Interests or any portion thereof or interest (beneficial or otherwise) in any Trust Interests or Specified DST, or enter into a contract to sell or dispose of such Trust Interests or Specified DST, or any portion thereof or interest therein (collectively referred to as a "<u>DST Sale</u>"), unless:

        (i)     the DST Sale is being made pursuant to the applicable Offering Documents;

        (ii)     the DST Sale is not to an Affiliate (other than the redemption of Trust Interests held by the applicable DST Depositor in connection with a DST Permitted Sale to third party investors) unless the terms of the sale are no more favorable to the buyer than the terms upon which third party investors are acquiring the Trust Interests; and

        (iii)     the DST Sale is for all cash and all proceeds are deposited into the applicable Pledged DST Account.

A DST Sale satisfying these conditions shall be defined as a "<u>DST Permitted Sale</u>".

(b)     <u>Terms of DST Sales.</u>  The Offering Documents shall set forth the terms of the possible sale of Trust Interests owned by the applicable DST Depositor or sold for purposes of redeeming a separate class of Trust Interests held by such DST Depositor. No other beneficial interests in any property owned by a Specified DST shall be sold by the applicable Specified DST or its Affiliates other than Trust Interests pursuant to the terms of this Agreement or other than resales of Trust Interests owned by Investors other than a DST Depositor or its Affiliates. Prior to commencing the marketing of Trust Interests of any Specified DST, Borrower shall deliver to Lender a proposed budget in a form reasonably approved by Lender for each Specified DST showing anticipated proceeds from any issuance of Trust Interests, anticipated equity contributions by Borrower and its Affiliates (other than to DST Depositor as the initial holder of unsold Class 2 Trust Interests in such Specified DST), the amount of any "presold" Trust Interests, and the amount of any property level Indebtedness of such Specified DST or its Subsidiaries.   There shall be no change in the purchase price or any other material terms of a DST Sale (other than the reduction of commissions and/or expenses) without the prior written consent of the Agent. Notwithstanding anything set forth in this Agreement to the contrary, the original issuance of Trust Interests to its respective DST Depositor shall not be prohibited by this Agreement.

(c)     No Changes to DST.  No Specified DST shall change its corporate form from a Delaware statutory trust, or transfer or permit its subsidiaries to transfer any of its interests in any Portfolio Property; provided however, that any Specified DST may consummate any Transfer Distribution (as the term is defined in the Trust Agreement) so long as the Agent shall have received notice of such Specified DST no more than ten (10) days following the occurrence thereof, the Borrower or an Affiliate thereof remains as the manager of any limited liability company resulting from such Transfer Distribution, and such resulting limited liability company shall have executed such additional documents as the Administrative Agent may reasonably require to preserve its rights under the Loan Documents.

(d)     Pledged DST Accounts.  No later than the date that is thirty days after the Effective Date (or, with respect to a Specified DST formed hereafter, the date such Specified DST is form, or, in each case, such later date that the Agent may agree), the Borrowers shall cause each DST Depositor to establish with KeyBank a deposit account into which all proceeds of the sale of Trust Interests owned by such DST Depositor shall be deposited (with respect to each DST Depositor, it's "Pledged DST Account"), which shall be pledged to the Agent and subject to the sole control of the Agent pursuant to documentation reasonably acceptable to the Agent.

(e)     Partial Release.  Notwithstanding any other term or provision of this Agreement, the parties agree that upon the sale of 100% of the Trust Interests in a Specified DST pursuant to a DST Permitted Sale, so long as no Event of Default has occurred and is continuing (such conditions, the "Release Provisions"), the Specified DST Depositor with respect to such Specified DST shall be automatically released from the Loan Documents, and such Person shall no longer be obligated to comply with any of the representations, warranties or covenants applicable to such Person under the Loan Documents, provided, however, that the release contained in this Section 6.13(e) shall not apply to the extent any such representations, warranties or covenants apply to Subsidiaries of the Borrower for as long as any such Person constitutes a Subsidiary thereof. Further, from and after satisfaction of the Release Provisions for any Specified DST Depositor and its respective properties, any proceeds received with respect to the properties of such Specified DST shall no longer constitute Collateral under the Loan Documents or remain subject to the rights of the Agent under the Loan Documents.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure (other than the payment due on the Maturity Date, for which there shall be no grace period) shall continue unremedied for a period of over three (3) Business Days;

(b)     the Borrower shall fail to pay any interest on the Loans or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under any Loan

Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of over three (3) Business Days (such three Business Day period commencing after written notice from the Administrative Agent as to any such failure);

(c)     any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Article V or VI other than Sections 5.04, 5.05, 5.06, 5.07(a), 5.08, and 5.11;

(e)     any Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of over 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) and if such default is not curable within thirty (30) days and the Borrower is diligently pursuing cure of same, the cure period may be extended for thirty (30) days (for a total of 60 days after the original notice from the Administrative Agent) upon written request from the Borrower to the Administrative Agent;

(f)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Borrower or any Collateral Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Borrower or any Collateral Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)     any Borrower or any Collateral Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h)     any Borrower or any Collateral Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(i)        one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall be rendered against any Borrower, any Subsidiary of the Borrower or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of such Person to enforce any such judgment;

(j)        an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000;

(k)        [Intentionally Omitted];

(l)        any Borrower shall default under any agreement and such default would reasonably be expected to result in a Material Adverse Effect;

(m)        any Borrower shall (or shall attempt to) disavow, revoke or terminate any Loan Document to which it is a party or shall otherwise challenge or contest in any action, suit or proceeding in any court or before any Governmental Authority the validity or enforceability of any Loan Document;

(k)        any provision of any Loan Document with respect to the Collateral shall for any reason cease to be valid and binding on, enforceable against, any Borrower resulting in a Material Adverse Effect, or any lien created under any Loan Document ceases to be a valid and perfected first priority lien in any of the Collateral purported to be covered thereby;

(n)        a Change in Control shall occur;

(o)        (i) Any Borrower defaults under any recourse Indebtedness, or (ii) any Subsidiaries of a Borrower defaults under any non-recourse Indebtedness in an aggregate amount equal to or greater than $75,000,000 at any time (such $75,000,000 calculated based on the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates); or

(p)        An "event of default" occurs under any of the Senior Loan Documents or any other debt secured by the Portfolio Properties (excluding the Summers Landing Property);

then, and in every such event (other than an event described in clause (f) or (g) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take some or all of the following actions, at the same or different times:  (i) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, and (ii) exercise any other rights or remedies

provided under this Agreement or any other Loan Document, or any other right or remedy available by law or equity; and in case of any event described in clause (f) or (g) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

<div align="center">ARTICLE VIII</div>

<div align="center">The Administrative Agent</div>

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.  In the event of conflicting instructions or notices given to the Borrower by the Administrative Agent and any Lender, the Borrower is hereby directed and shall rely conclusively on the instruction or notice given by the Administrative Agent.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein,

(iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent agrees that, in fulfilling its duties hereunder, it will use the same standard of care it utilizes in servicing loans for its own account.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower, and may be removed by the Required Lenders in the event of the Administrative Agent's gross negligence or willful misconduct. Upon any such resignation or removal, the Required Lenders shall have the right, with the approval of Borrower (provided no Default has occurred and is continuing), which approval shall not be unreasonably withheld, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or is removed, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a Lender, or a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent for its own behalf shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was

acting as Administrative Agent. The Administrative Agent shall cooperate with any successor Administrative Agent in fulfilling its duties hereunder.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder. Administrative Agent agrees to provide the Lenders with copies of all material documents and certificates received by the Administrative Agent from Borrower in connection with the Loans.

The Titled Agents shall not have any additional rights or obligations under the Loan Documents, except for those rights, if any, as a Lender.

Any material to be delivered pursuant to <u>Section 5.01</u> and <u>Section 5.03</u> (collectively, "<u>Information Materials</u>") may be delivered electronically directly to the Administrative Agent or made available to Administrative Agent pursuant to an accessible website and the Lenders provided that such material is in a format reasonably acceptable to Administrative Agent, and such material shall be deemed to have been delivered to Administrative Agent and the Lenders upon Administrative Agent's receipt thereof or access to the website containing such material. The Administrative Agent shall distribute any such information to the other Lenders after receipt thereof, and may do so by electronic form in the same manner as provided in this <u>Article VIII</u>. Upon the request of Administrative Agent, Borrower shall deliver paper copies thereof to Administrative Agent and the Lenders. Borrower authorizes Administrative Agent and Arranger to disseminate any such materials through the use of Intralinks, SyndTrak or any other electronic information dissemination system provided that system is secure and access thereto is protected by a password that is only disclosed to the Lenders (an "<u>Electronic System</u>"). Any such Electronic System is provided "as is" and "as available." The Administrative Agent and the Arranger do not warrant the adequacy of any Electronic System and expressly disclaim liability for errors or omissions in any notice, demand, communication, information or other material provided by or on behalf of Borrower that is distributed over or by any such Electronic System ("<u>Communications</u>"). No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Administrative Agent or the Arranger in connection with the Communications or the Electronic System. In no event shall the Administrative Agent, Arranger or any of their directors, officers, employees, agents or attorneys have any liability to the Borrower, any Lender or any other Person for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, the Administrative Agent's or Arranger's transmission of Communications through the Electronic System, and the Borrowers release Administrative Agent, the Arrangers and the Lenders from any liability in connection therewith. Certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public

information with respect to the Borrowers, their Subsidiaries or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market related activities with respect to such Persons' securities. The Borrower hereby agrees that it will identify that portion of the Information Materials that may be distributed to the Public Lenders and that (i) all such Information Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Information Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lenders and the Arranger to treat such Information Materials as not containing any material non-public information with respect to the Borrowers, their Subsidiaries, their Affiliates or their respective securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Information Materials constitute confidential information, they shall be treated as provided in Section 9.12); (iii) all Information Materials marked "PUBLIC" are permitted to be made available through a portion of any electronic dissemination system designated "Public Investor" or a similar designation; and (iv) the Administrative Agent and the Arranger shall be entitled to treat any Information Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of any electronic dissemination system not designated "Public Investor" or a similar designation.

<div align="center">ARTICLE IX</div>

<div align="center">Miscellaneous</div>

Section 9.01 <u>Notices</u>. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)     if to the Borrower, in care of Highland Capital Management, L.P., at 300 Crescent Court, Suite 700, Dallas, Texas 75201, Attention: Matt McGraner (Telephone No. (972) 419-6229 and Email: mmcgraner@highlandcapital.com); copies to: Wick Phillips Gould & Martin, LLP, 3131 McKinney, Suite 100, Dallas, Texas 75204, Attention: Chris Fuller (Telephone No. (214) 740-4023 and Email: cfuller@wickphillips.com);

(b)     if to the Administrative Agent, to KeyBank, National Association, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110, Attention: Christopher T. Neil, (Telephone No. (617) 385-6202 and Email: christopher_t_neil@keybank.com; and

(c)     if to any other Lender, to it at its address (or telecopy number) set forth on the signature pages of this Agreement, or as provided to Borrower in writing by the Administrative Agent or the Lender.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given (i) if given by telecopy, when such telecopy is transmitted to the telecopy number specified in this Section and the appropriate confirmation is received (or if

such day is not a Business Day, on the next Business Day); (ii) if given by mail (return receipt requested), on the earlier of receipt or three (3) Business Days after such communication is deposited in the mail with first class postage prepaid, addressed as aforesaid; or (iii) if given by any other means, when delivered at the address specified in this Section; provided that notices to the Administrative Agent under Article II shall not be effective until received.

Section 9.02 Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any provision of any Loan Document may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.17(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, (vi) release any Borrower from its obligations under the Loan Documents or release any Collateral, except as specifically provided for herein, without the written consent of each Lender, (vii) subordinate the Loans or any Collateral without the written consent of each Lender, (viii) waive or modify any conditions of extending the Loan set forth in Section 2.21 or Section 2.22 without the written consent of each Lender affected thereby, or (ix) consent to the Collateral securing any other Indebtedness without the written consent of each Lender; provided further that no such agreement shall

amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

(c)     There shall be no amendment, modification or waiver of ARTICLE VIII or any other provision in the Loan Documents that affects the rights or duties of the Administrative Agent under this Agreement or any of the other Loan Documents without the written consent of the Administrative Agent.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender; and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Section 9.03 <u>Expenses; Indemnity; Damage Waiver</u>.

(a)     The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Arranger, and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the closing of the credit facilities provided for herein, the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all mortgage taxes and other charges incurred or required to be paid by the Administrative Agent in connection with the Loan Documents, and (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred (including any Appraisal costs) during any waivers, workout, restructuring or negotiations in respect of the Loans.

(b)     The Borrower shall indemnify the Administrative Agent, the Arranger, and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) the Loans or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim,

litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee as determined by a court of law in a final non-appealable judgment, or the failure of the Indemnitee to make Loans pursuant to its Commitment in breach of its obligations hereunder.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than ten days after written demand therefor.

Section 9.04 Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Default has occurred and is continuing, any other assignee; and (ii) such consent shall be deemed granted unless the

Lead Borrower objects within five (5) Business Days of a receipt of written notice of the proposed assignment;

(B)     the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

Provided, no consent of the Borrower or Administrative Agent shall be required in connection with any assignment to an entity acquiring, or merging with, a Lender.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000.00 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if a Default has occurred and is continuing and such consent shall not be unreasonably withheld;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500.00; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)  Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and

Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) Borrower's obligations hereunder shall not be increased.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to

paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that, except in the case of a Participant asserting any right of set-off pursuant to Section 9.08, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17(e) as though it were a Lender.

(e)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05 Survival. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loans or any fee or any other amount payable under this Agreement is

outstanding and unpaid. The provisions of <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> and <u>Article VIII</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06 <u>Counterparts; Integration; Effectiveness</u>.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

(c)     Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07 <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08 <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits of a Borrower (general or special, time or demand, provisional or final, but excluding any funds held by the Borrower on behalf of tenants or other third parties) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of a Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. Each Lender agrees promptly to notify the Borrower after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. In the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent

and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

Section 9.09 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)	This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)	The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the state and federal courts in Boston, Massachusetts and in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

Notwithstanding the foregoing choice of law:

(i)	matters relating to the creation, perfection, priority and enforcement of the liens on and security interests in a Mortgaged Property or other assets situated in another jurisdiction(s), including by way of illustration, but not in limitation, actions for foreclosure, for injunctive relief, or for the appointment of a receiver, shall be governed by the laws of such state;

(ii)	Administrative Agent shall comply with applicable law in such state to the extent required by the law of such jurisdiction(s) in connection with the foreclosure of the security interests and liens created under the Mortgages or exercising any rights with respect to the Mortgaged Property directly, and the other Loan Documents with respect to the Mortgaged Property or other assets situated in another jurisdiction; and

(iii)	provisions of Federal law and the law of such other jurisdiction(s) shall apply in defining the terms Hazardous Materials, Environmental Laws and Legal Requirements applicable to the Mortgaged Property as such terms are used in this Agreement, the Environmental Indemnity and the other Loan Documents

(c)	The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the

parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10 <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11 <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12 <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent  required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Borrower or (h) to any Person in connection with any Hedging Agreement to the (i) extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Borrower, and (j) to the National Association of Insurance Commissioners or any other similar organization or any nationally recognized rating agency that requires access to information about a Lender's or its Affiliates' investment portfolio in connection with ratings issued with respect to such Lender or its Affiliates  For the purposes of this Section, "Information" means all information received from any Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative

Agent or any Lender on a nonconfidential basis prior to disclosure by any Borrower; provided that, in the case of information received from any Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.13 <u>Interest Rate Limitation</u>. If at any time there exists a maximum rate of interest which may be contracted for, charged, taken, received or reserved by the Lenders in accordance with applicable law (the "<u>Maximum Rate</u>"), then notwithstanding anything herein to the contrary, at any time the interest applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on the Loans under applicable law (collectively, the "<u>Charges</u>"), shall exceed such Maximum Rate, the rate of interest payable in respect of the Loans hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been paid in respect of the Loans but were not payable as result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders. If, for any reason whatsoever, the Charges paid or received on the Loans produces a rate which exceeds the Maximum Rate, the Lenders shall credit against the principal of the Loans (or, if such indebtedness shall have been paid in full, shall refund to the payor of such Charges) such portion of said Charges as shall be necessary to cause the interest paid on the Loans to produce a rate equal to the Maximum Rate. All sums paid or agreed to be paid to the holders of the Loans for the use, forbearance or detention of the Loans shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this Agreement, so that the interest rate is uniform throughout the full term of this Agreement. The provisions of this Section shall control all agreements, whether now or hereafter existing and whether written or oral, between the parties hereto. Without notice to the Borrower or any other person or entity, the Maximum Rate, if any, shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

Section 9.14 <u>USA PATRIOT Act</u>. . Each Lender that is subject to the Patriot Act (as hereinafter defined) and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Borrower in accordance with the Patriot Act. Borrower shall, promptly following a request by Administrative Agent or any Lender, provide all documentation and other information that Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and Anti-Money Laundering Laws, rules and regulations, including the Patriot Act.

Section 9.15 <u>Fiduciary Duty/No Conflicts.</u>

The Administrative Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Borrower, their stockholders and/or their affiliates. Each Borrower agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Borrower, its stockholders or its affiliates, on the other. The Borrower acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrowers, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Borrower, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Borrower, its stockholders or its Affiliates on other matters) or any other obligation to any Borrower except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting hereunder solely as principal and not as the agent or fiduciary of any Borrower, its management, stockholders, creditors or any other Person. Each Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Borrower agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower, in connection with such transaction or the process leading thereto in its capacity as a Lender.

Section 9.16 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 9.17 <u>Multiple Borrowers; Joint and Several Liability.</u>

(a)    With respect to the definition of the "Borrower" hereunder or in any other Loan Document, except where the context otherwise provides, (a) any representations contained herein or in any other Loan Documents of Borrower shall be applicable to each Borrower, (b) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower and shall require performance by all Borrowers, (c) any negative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower, and shall be breached if any Borrower fails to comply therewith, (d) the occurrence of any Event of Default with respect to any Borrower shall be deemed to be an Event of Default hereunder or thereunder, and (e) any Obligations of Borrowers, including, without limitation, under the Note (i) shall be deemed to be Obligations of all of the Borrowers, and (ii) shall be joint and several.  Each Borrower recognizes that credit available to it under the Loan is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower, jointly and severally, hereby assumes and agrees fully, faithfully and punctually to discharge all Obligations of all of the Borrowers.

(b)    To the fullest extent permitted by Law, the obligations of each Borrower shall not be affected by (i) the failure of Administrative Agent to assert any claim or demand or to enforce or exercise any right or remedy against any other Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the collateral or other security held by or on behalf of Administrative Agent, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Borrower or that would otherwise operate as a discharge of any Borrower as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted).  The obligations of each Borrower shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.

(c)    To the fullest extent permitted by Law, each Borrower waives any defense based on or arising out of any defense of any other Borrower or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other

Borrower, other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Administrative Agent may, at its election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Borrower, or exercise any other right or remedy available to them against any other Borrower, without affecting or impairing in any way the liability of any Borrower hereunder except to the extent that all of the Obligations have been indefeasibly paid in full in cash, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Each Borrower waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Borrower against any other Borrower.

(d)    Notwithstanding the foregoing, it is the intent of each Borrower and the Lenders that in any proceeding under any Debtor Relief Laws, such Borrower's maximum obligation hereunder shall equal, but not exceed, the maximum amount which would not otherwise cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lenders under the Loan Documents) to be avoidable or unenforceable against such Borrower in such proceeding as a result of any Legal Requirements, including, without limitation, (i) Section 548 of the Bankruptcy Code of the United States and (ii) any state fraudulent transfer or fraudulent conveyance act or statute applied in such proceeding, whether by virtue of Section 544 of the Bankruptcy Code of the United States or otherwise. The Legal Requirements under which the possible avoidance or unenforceability of the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents) shall be determined in any such proceeding are referred to herein as "Avoidance Provisions". Accordingly, to the extent that the obligations of a Borrower hereunder would otherwise be subject to avoidance under the Avoidance Provisions, the maximum Obligations for which such Borrower shall be liable hereunder shall be reduced to the greater of (A) the amount which, as of the time any of the obligations of such Borrower are deemed to have been incurred by such Borrower under the Avoidance Provisions, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions or (B) the amount which, as of the time demand is made hereunder upon such Borrower for payment on account of the Obligations, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions. The provisions under this Section are intended solely to preserve the rights of the Lenders hereunder to the maximum extent that would not cause the obligations of any Borrower hereunder to be subject to avoidance under the Avoidance Provisions, and no Borrower or any other Person shall have any right or claim under this Section as against the Administrative Agent or any Lender that would not otherwise be available to such Person under the Avoidance Provisions.

(e)    Upon payment by any Borrower of any Obligations, all rights of such Borrower against any other Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and

junior in right of payment to the prior indefeasible payment in full in cash of all of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. In addition, any indebtedness of any Borrower now or hereafter held by any other Borrower is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted and no Borrower will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Borrower on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Borrower, such amount shall be held in trust for the benefit of Administrative Agent and shall forthwith be paid to Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers.  As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(f)      Each Borrower agrees that it shall never be entitled to be subrogated to any of the Administrative Agent's or any Lender's rights against any Borrower or other Person or any collateral or offset rights held by the Administrative Agent or the Lenders for payment of the Loans until the full and final payment of the Loans and all other obligations incurred under the Loan Documents and final termination of the Lenders' obligations, if any, to make further advances under this Agreement or to provide any other financial accommodations to any Borrower.  The value of the consideration received and to be received by each Borrower is reasonably worth at least as much as the liability and obligation of each Borrower incurred or arising under the Loan Documents.  Each Borrower has determined that such liability and obligation may reasonably be expected to substantially benefit each Borrower directly or indirectly.  Each Borrower has had full and complete access to the underlying papers relating to the Loans and all of the Loan Documents, has reviewed them and is fully aware of the meaning and effect of their contents.  Each Borrower is fully informed of all circumstances which bear upon the risks of executing the Loan Documents and which a diligent inquiry would reveal. Each Borrower has adequate means to obtain from each other Borrower on a continuing basis

information concerning such other Borrower's financial condition, and is not depending on the Administrative Agent or the Lenders to provide such information, now or in the future.  Each Borrower agrees that neither the Administrative Agent nor any of the Lenders shall have any obligation to advise or notify any Borrower or to provide any Borrower with any data or information regarding any other Borrower.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

<div align="center">

**BORROWERS**:

</div>

HCRE PARTNERS, LLC,
a Delaware limited liability company

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

SE MULTIFAMILY REIT HOLDINGS, LLC, a
Delaware limited liability company

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

NEXPOINT ADVISORS, L.P., a Delaware limited partnership

By:     NexPoint Advisors GP, LLC, a Delaware limited
        liability company its general partner

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

NEXPOINT REAL ESTATE ADVISORS IV, L.P., a
Delaware limited partnership

By:     NexPoint Real Estate Advisors GP, LLC, a
        Delaware limited liability company, its general
        partner

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

*[Signature Page to Bridge Loan Agreement]*

HIGHLAND CAPITAL MANAGEMENT, L.P., a
Delaware limited partnership

By:     Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero
Title: President

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010

By: _____
Name: Nancy Dondero
Title: Family Trustee

THE SLHC TRUST,
under trust agreement dated December 27, 2016

By:_____

Name: Grant James Scott
Title: Trustee

RIVERVIEW PARTNERS SC, LLC
HAMPTON RIDGE PARTNERS, LLC
LAT BATTLEGROUND PARK, LLC
LANDMARK AT BATTLEGROUND PARK II, LLC
MAR QUAIL LANDING, LLC
G&E APARTMENT REIT THE MYRTLES AT OLDE
TOWNE, LLC
G&E APARTMENT REIT THE HEIGHTS AT OLDE
TOWNE, LLC
SE OAK MILL I OWNER, LLC
SE OAK MILL II OWNER, LLC
SE STONEY RIDGE, LLC
SE GOVERNORS GREEN, LLC
each a Delaware limited liability company

By:_____
Name: Matt McGraner
Title: Authorized Signatory

[Signatures Continue on the Following Page]

*[Signature Page to Bridge Loan Agreement]*

## SCHEDULE 1.01
## PROPERTY OWNER BORROWERS

1. RIVERVIEW PARTNERS SC, LLC, a Delaware limited liability company
2. HAMPTON RIDGE PARTNERS, LLC, a Delaware limited liability company
3. LAT BATTLEGROUND PARK, LLC, a Delaware limited liability company
4. LANDMARK AT BATTLEGROUND PARK II, LLC, a Delaware limited liability company
5. MAR QUAIL LANDING, LLC, a Delaware limited liability company
6. G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC, a Delaware limited liability company
7. G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC, a Delaware limited liability company
8. SE OAK MILL I OWNER, LLC , a Delaware limited liability company
9. SE OAK MILL II OWNER, LLC, a Delaware limited liability company
10. SE STONEY RIDGE, LLC, a Delaware limited liability company
11. SE GOVERNORS GREEN, LLC, a Delaware limited liability company

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 1.01(A)**
**HCRE PROPERTIES**

|   | <u>Property Owner</u> | <u>HCRE Property</u> |
|---|---|---|
| 1. | HCRE Plano, LLC | Homewood Suites – Plano [2601 E President George Bush Hwy, Plano, TX 75074][ 4705 Old Shepard Pl, Plano, TX 75093] |
| 2. | HCRE Addison, LLC | Homewood Suites – Addison 4451 Belt Line Rd, Addison, TX 75001 |
| 3. | HCRE Las Colinas, LLC | Homewood Suites – Las Colinas 4300 Wingren Dr, Irving, TX 75039 |
| 4. | HCBH Buffalo Pointe, LLC, HCBH Buffalo Pointe II, LLC, HCBH Buffalo Pointe III, LLC | Connection at Buffalo Pointe, 10201 Buffalo Speedway, Houston, TX 77054 |
| 5. | Camelback Residential Partners, LLC | The Angela, 2727 E Camelback Road, Phoenix, AZ 85016 |
| 6. |  | [McKinney Land] [Dallas Land] [Florida Land] |
| 7. |  |  |

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 2.01**

| LENDER | COMMITMENT (Percentage) |
|---|---|
| KeyBank, National Association | $556,275,000 (100%) |
| TOTAL: | $556,275,000 (100%) |

**SCHEDULE 3.05**
**PORTFOLIO PROPERTIES AND MORTGAGED PROPERTIES**

|  | **Property Owner** | **Portfolio Property** | **Mortgaged Properties (Y/N)** | **Senior Credit Agreement** |
|---|---|---|---|---|
| 1. | Riverview Partners SC, LLC | Reserve at River Walk - 4501 Bentley Drive Columbia, South Carolina 29210 | Yes | N/A |
| 2. | Hampton Ridge Partners, LLC | Victoria Park - 4616 Stoney Trace Drive Charlotte, North Carolina 28227 | Yes | N/A |
| 3. | LAT Battleground Park and Landmark AT Battleground Park II, LLC | Landmark at Battleground Park - 3520 Drawbridge Parkway Greensboro, North Carolina 27410 | Yes | N/A |
| 4. | MAR Quail Landing, LLC | Quail Landing - 14200 North May Avenue Oklahoma City, Oklahoma 73134 | Yes | N/A |
| 5. | G&E Apartment REIT The Myrtles at Olde Towne, LLC | The Myrtles at Olde Towne - 850 Crawford Parkway Portsmouth, Virginia 23704 | Yes | N/A |
| 6. | G&E Apartment REIT The Heights at Olde Towne, LLC | The Heights at Olde Towne - 303 Effingham Street and 301 Green Street Portsmouth, Virginia 23704 | Yes | N/A |
| 7. | SE Oak Mill I, LLC and SE Oak Mill II, LLC | Oak Mill - 20010 Frederick Road Germantown, Maryland 20876 | Yes | N/A |
| 8. | SE Stoney Ridge LLC | Stoney Ridge - 14397 Westminster Lane Woodbridge, Virginia 22193 | Yes | N/A |
| 9. | SE Governors Green, LLC | Governor's Green - 16501 Governor Bridge Road Bowie, Maryland 20716 | Yes | N/A |

| 10. | SOF-X GSOwner, L.P. | Gulfstream Isles - 1601 Red Cedar Drive<br>Fort Meyers, Florida 33901 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
|---|---|---|---|---|
| 11. | Lakes at Renaissance Park Apartments Investors, L.P. | Lakes at Renaissance Park - 1400 Renaissance Court<br>Austin, Texas 78728 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 12. | LATBriley Parkway, LLC | Glenview Reserve - 100 Arbor Creek Boulevard<br>Nashville, Tennessee 37217 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 13. | NREA SE1Andros Isles, DST<br>May be converted from DK Gateway Andros, LLC | Andros Isles - 100 Acklins Circle<br>Daytona Beach, Florida 32119 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 14. | NREA SE1Arborwalk, DST<br>May be converted from MAR Arborwalk, LLC | Arborwalk - 1318 SW Manor Lake Drive<br>Lee's Summit, Missouri 64082 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 15. | NREA SE1Walker Ranch, DST<br>May be converted from SOFWalker Ranch Owner, L.P. | Walker Ranch - 14500 Blanco Road<br>San Antonio, Texas 78216 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 16. | NREA SE1Towne Crossing, DST<br>May be converted from Apartment REIT Towne Crossing, L.P. | Towne Crossing - 1601 Town Crossing Boulevard<br>Mansfield, Texas 76063 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 17. | NREA SE2West Place, DST<br>May be converted from Landmark at West Place, LLC | West Place - 753 Sherwood Terrace Drive<br>Orlando, Florida 32818 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 18. | NREA SE2Vista Ridge, DST<br>May be converted from | Vista Ridge - 160 Vista Ridge Mall Drive<br>Lewisville, Texas 75067 | No | Loan Agreement dated as of the Effective Date between the Property Owner set |

| | MAR Vista Ridge, L.P. | | | forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
|---|---|---|---|---|
| 19. | NREA SE2Hidden Lake, DST May be converted from SOFHidden Lake SA Owner, L.P. | Hidden Lake - 8910 North Loop 1604 West San Antonio, Texas 78249 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 20. | NREA SE3Arboleda, DST May be converted from G&EApartment REIT Arboleda, LLC | Arboleda - 900 Discovery Boulevard Cedar Park, Texas 78613 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 21. | NREA SE3Fairways, DST May be converted from MAR Fairways, LLC | Fairways - 16501 Stonemason Drive Huntersville, North Carolina 28078 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 22. | NREA SE3Grand Oasis, DST May be converted from Landmark at Grand Oasis, L.P. | Grand Oasis - 400 McGinnis Ferry Road Suwanee, Georgia 30024 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |

**SCHEDULE 3.07**
**LITIGATION**

See attached.



| | | |
|---|---|---|
| Date: | 08/15/2018 | |
| Reference: | 5470.06/JTB | |
| Copies Requested: | Docket Sheet and Judgment | |
| Copy Cost Limit: | $50.00 | |

**Searched Through:** 08/08/2018
**Subject:** RIVERVIEW PARTNERS SC, LLC
**Jurisdiction:** Richland County, Circuit Court, SC
**Index Searched:** Open & Closed Litigation by Defendant

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 03/09/2016 | 2016CP4001549 | Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*9-10984022S\***
9-10984022S



# Richland County
# Fifth Judicial Circuit
# Public Index



## Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al

| | | | | | |
|---|---|---|---|---|---|
| Case Number: | 2016CP4001549 | Court Agency: | Richland County Common Pleas | Filed Date: | 03/09/2016 |
| Case Type: | Common Pleas | Case Sub Type: | Personal Injury 350 | File Type: | Jury |
| Status: | Dismissed | Assigned Judge: | Clerk Of Court C P, G S, And Family Court | | |
| Disposition: | Dismissed per Rule 43(k) | Disposition Date: | 10/25/2017 | Disposition Judge: | Manning, L. Casey |
| Original Source Doc: | | Original Case #: | | | |
| Judgment Number: | | Court Roster: | | | |

## Case Parties

Click the ☑ icon to show associated parties.

| Name | Address | Race | Sex | Year Of Birth | Party Type | Party Status | Last Updated |
|---|---|---|---|---|---|---|---|
| ☑Bradshaw, James Andrew | One Liberty Square 55 Beattie Place, Suite 1200 Greenville SC 29601 | | | | Defendant Attorney | | 02/15/2017 |
| ☑Hendrix, Jonathan R. | Hendrix & Steigner PO Box 6398 Cayce SC 29171 | | | | Plaintiff Attorney | | 02/15/2017 |
| ☑Hendrix, Roy Paul Sr | | | | | Plaintiff | | 10/25/2017 |
| ☑Jones, Roger | | | | | Defendant | | 03/10/2016 |
| ☑Landmark Apartment Trust Inc | | | | | Defendant | | 03/10/2016 |
| ☑Landmark Apartment Trust of America Inc | | | | | Defendant | | 03/10/2016 |
| Melton, Lawrence Caldwell(Inactive) | 747 Albion Rd. Columbia SC 292021913 | | | | Mediator | | 12/28/2016 |
| ☑Milestone Apartments Reit | | | | | Defendant | | 03/10/2016 |
| ☑Riverview Partners SC LLC | | | | | Defendant | | 03/10/2016 |
| ☑Stallings, Daryl | | | | | Defendant | | 03/10/2016 |
| ☑Starwood Capital Corp | | | | | Defendant | | 03/10/2016 |
| ☑Starwood Capital Group Global I LLC | | | | | Defendant | | 03/10/2016 |
| Williams, Daryl L. (Inactive) | PO Box 456 Columbia SC 29202 | | | | Alternate Mediator | | 12/28/2016 |

## Actions

| Name | Description | Type | Motion Roster | Begin Date | Completion Date | Documents |
|---|---|---|---|---|---|---|
| Hendrix, Roy Paul Sr | Form 4 Order this Case has been Fully Settled at Mediation ( | Order | | 10/25/2017-08:42 | | 📄 |
| | | Filing | | | | 📄 |

| Hendrix, Roy Paul Sr | ADR/Mediation Results Report/Filing - case fully settled | | | 10/23/2017-08:32 | 10/25/2017-08:32 | |
|---|---|---|---|---|---|---|
| Hendrix, Jonathan R. | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Bradshaw, James Andrew | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Hendrix, Roy Paul Sr | Consent Scheduling Order trial not before October 1, 2017 | Order | | 02/27/2017-10:51 | 10/25/2017-10:51 | 📄 |
| Hendrix, Roy Paul Sr | Order/Order Filing Fee | Filing | | 02/23/2017-11:38 | 10/25/2017-11:38 | |
| Hendrix, Jonathan R. | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Bradshaw, James Andrew | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Hendrix, Roy Paul Sr | ADR/Notice of ADR | Filing | | 12/28/2016-00:00 | 10/23/2017-00:00 | |
| Hendrix, Roy Paul Sr | ADR/Alternative Dispute Resolution (Workflow) | Action | | 10/05/2016-14:33 | 12/28/2016-14:33 | |
| Riverview Partners SC LLC | Answer of Riverviwe Partners SC LLC, Landmark Apartment Trus | Filing | | 05/19/2016-16:38 | 10/25/2017-16:38 | 📄 |
| Starwood Capital Corp | Answer of Starwood Capital Group and Milestone Apartments Re | Filing | | 05/19/2016-16:22 | 10/25/2017-16:22 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/31/2016-15:38 | 10/25/2017-15:38 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APT TRUST INC | Filing | | 03/25/2016-10:05 | 10/25/2017-10:05 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/25/2016-10:04 | 10/25/2017-10:04 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail STARWOOD CAPITAL GROUP | Filing | | 03/25/2016-10:03 | 10/25/2017-10:03 | 📄 |
| Hendrix, Roy Paul Sr | Affidavit Of Service DARYL STALLINGS | Filing | | 03/25/2016-10:01 | 10/25/2017-10:01 | 📄 |
| Hendrix, Roy Paul Sr | Affidavit Of Service ROGER RAY JONES | Filing | | 03/25/2016-10:00 | 10/25/2017-10:00 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail MILESTONE MANAGEMENT L | Filing | | 03/16/2016-11:21 | 10/25/2017-11:21 | 📄 |
| Hendrix, Roy Paul Sr | Verification/Verified | Filing | | 03/11/2016-08:37 | 10/25/2017-08:37 | |
| Hendrix, Roy Paul Sr | Amended Summons And Complaint | Filing | | 03/10/2016-14:24 | 10/25/2017-14:24 | 📄 |
| Hendrix, Roy Paul Sr | Summons & Complaint | Filing | | 03/09/2016-14:27 | 10/25/2017-14:27 | 📄 |

# Financials

| Summary | | | | | |
|---|---|---|---|---|---|
| Fine/Costs: | $175.00 | Total Paid for fine/costs: | $175.00 | Balance Due: | $0.00 |

| Costs | | | | |
|---|---|---|---|---|
| Description | Cost Code | Amount | Charge Action | Disbursed Amount |
| Motion/Order Filing Fee $25 | MOTION | $25.00 | | $25.00 |
| SCJD Filing Fee Proviso $50 / $25 | SCJDPV | $50.00 | | $50.00 |

| Civil Filing Fee State 56% | CVFFST | $56.00 | | $56.00 |
|---|---|---|---|---|
| Civil Filing Fee County 44%/100% | CVFFCN | $44.00 | | $44.00 |

| Payments | | | | |
|---|---|---|---|---|
| Payment Date | Receipt Number | Entered By | Transaction Type Code | Payment Amount |
| 02/23/2017 | 219457 | C4OBMETTS | PY | $25.00 |
| 03/09/2016 | 205131 | C4OJMCMILL | PY | $150.00 |

# CAPITOL
# SERVICES

| | |
|---|---|
| **Date:** | 08/15/2018 |
| **Reference:** | 5470.06/JTB |
| **Copies Requested:** | Docket Sheet and Judgment |
| **Copy Cost Limit:** | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| **Jurisdiction:** | Portsmouth City, Circuit Court, VA |
| **Index Searched:** | Open & Closed Litigation by Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 02/28/2011 | CL11000769-00 | G&E APARTMENT REIT v. CITY OF PORTSMOUTH |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*84-109838988\***
84-109838988

Portsmouth Circuit - Civil Division
**Case Details**

| Case Number:<br>CL11000769-00 | Filed:<br>02/28/11 |
|---|---|
| Filing Type:<br>Complaint - Catch-All | Filing Fee Paid |
| Number of Plaintiffs:<br>0003 | Number of Defendants:<br>0001 |
| Commenced By:<br>Initial Filing | |
| Bond: | Complex Case: |

**Plaintiffs**

Plaintiff 1:   **G&E APARTMENT REIT**
Trading as:
Attorney:   SMITH, SHANE L

Plaintiff 2:   **THE MYRTLES OLE TOWNE LLC**
Trading as:
Attorney:   SMITH, SHANE L

Plaintiff 3:   **THE HEIGHTS AT OLDE TOWNE LLC**
Trading as:
Attorney:   SMITH, SHANE L

**Defendants**

Defendant:   **CITY OF PORTSMOUTH**
Trading as:
Attorney:

**Hearings**

| # | Date | Time | Type | Room | Duration | Jury | Result |
|---|------|------|------|------|----------|------|--------|
| 1 | 01/27/12 | 9:59AM | Motion - Other-Pretrial | 3 | | | Granted |

**Date Ordered To Mediation:**

**Final Disposition**

- **Judgment:**        Other
- **Final Order Date:**   01/27/12
- **Appealed Date:**
- **Concluded By:**      Other

Portsmouth Circuit - Civil Division
**Pleadings/Orders Detail**

**Case Number: CL11000769-00**

| Filed | Type | Party | Judge | Book | Page | Remarks |
|-------|------|-------|-------|------|------|---------|
| 08/24/11 | Motion | | | GDH | SCAN | FOR LEAVE TO FILE AMNDD CO |
| 09/08/11 | Order | | KRM | GDH | SCAN | AGREED ODR FOR LEAVE TO FI |
| 10/20/11 | Scheduling Order | | JAC | GDH | SCAN | SCH ORDER |
| 10/24/11 | Demurrer | DEF | | NCT | SCAN | DEMURRER |
| 10/28/11 | Motion | | | JMW | SCAN | FILE SECOND COMPLAINT |
| 11/16/11 | Order | | KRM | GDH | SCAN | AGREED ORDER FOR LEAVE |
| 11/23/11 | Answer | DEF | | GDH | SCAN | CITY OF PORTSMOUTH |
| 11/29/11 | Other | | | GDH | SCAN | CC LTR |
| 12/27/11 | Other | | | GDH | SCAN | ATTORNY LTR |
| 01/04/12 | Notice Of Depositions | | | NCT | SCAN | NOTICE TAKE DEPOSITIONS |
| 01/25/12 | Notice Of Hearing | | | DLM | SCAN | HEARING 1/27/12 @10AM |
| 01/27/12 | Order | | DWS | DLM | SCAN | CONSENT ORDER |



| | | |
|---|---|---|
| Date: | 08/15/2018 |
| Reference: | 5470.06/JTB |
| Copies Requested: | Docket Sheet and Judgment |
| Copy Cost Limit: | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| **Jurisdiction:** | Portsmouth City, General District Court, VA |
| **Index Searched:** | Open & Closed Litigation by Defendant & Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|

See Attached Listing.

Includes results for both G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC and G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC. The cases are only indexed under G&E APARTMENT REIT. This specific index classifies THE HEIGHTS AT OLDE TOWNE and THE MYRTLES AT OLDE TOWNE as DBAs and does not include them on the index.

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*9-109838996\***
9-109838996

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH, DAVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH,D AVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11011695-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11011696-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013085-00 | G&E APARTMENT REIT | HUGHES, ERIKA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013086-00 | G&E APARTMENT REIT | ROBINSON, YOLANDA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11014139-00 | G&E APARTMENT REIT | BURTON, KIMBERLY | 12/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11014140-00 | G&E APARTMENT REIT | CONNOR, MICHAEL | 12/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002245-00 | G&E APARTMENT REIT | BASKIN, THOMAS | 03/08/2012 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV12002246-00 | G&E APARTMENT REIT | BROWN, JUSTIN | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002247-00 | G&E APARTMENT REIT | MARSHALL, TERRENCE | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12003326-00 | G&E APARTMENT REIT | ROUSE, WINSTON | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004722-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004723-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004724-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 05/10/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006011-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006012-00 | G&E APARTMENT REIT | MORTON, MICHAEL | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12007582-00 | G&E APARTMENT REIT | BROWN, WILLIAM | 07/12/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12007583-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 07/12/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008660-00 | G&E APARTMENT REIT | BENNETT, SHANEIKIA | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008661-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12011434-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12011435-00 | G&E APARTMENT REIT | JENKINS, REINA | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011436-00 | G&E APARTMENT REIT | PORTER, RYAN | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011437-00 | G&E APARTMENT REIT | WEBB, JAMES | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12012479-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012479-01 | G&E APARTMENT REIT | FULGHAM, CURTIS | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012479-02 | G&E APARTMENT REIT | FULGHAM, CURTIS | 03/12/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012811-01 | G&E APARTMENT REIT | MCCONNELL, BRENT | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-02 | G&E APARTMENT REIT | MCCONNELL, BRENT | 07/09/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12013780-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013781-00 | G&E APARTMENT REIT | BOONE, ALESHA | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013782-00 | G&E APARTMENT REIT | PORTER, RYAN | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013783-00 | G&E APARTMENT REIT | WEST, CASEY | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013784-00 | G&E APARTMENT REIT | HORTON, AMELIA | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013785-00 | G&E APARTMENT REIT | WEBB, JAMES | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014732-00 | G&E APARTMENT REIT | BOONE, ALESHA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014733-00 | G&E APARTMENT REIT | HAND, MARCUS | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014734-00 | G&E APARTMENT REIT | HARDY, CHARLETTE | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014735-00 | G&E APARTMENT REIT | HORTON, AMELIA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13000775-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13000776-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000777-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000778-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002968-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 03/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002969-00 | G&E APARTMENT REIT | NATION, DEBORAH | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13002970-00 | G&E APARTMENT REIT | ROMINIYI, MICHAEL | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003803-00 | G&E APARTMENT REIT | DONOHOE, ERYN | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003804-00 | G&E APARTMENT REIT | EDWARD, TONYA | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003805-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003806-00 | G&E APARTMENT REIT | HARRIS, GERALD | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003807-00 | G&E APARTMENT REIT | PORTER, RYAN | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003808-00 | G&E APARTMENT REIT | ROBINSON, KENNETH | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003809-00 | G&E APARTMENT REIT | DANIELS, HEATHER | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003810-00 | G&E APARTMENT REIT | RODGERS, PHILLIP | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005200-00 | G&E APARTMENT REIT | BROWN, KEVIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005201-00 | G&E APARTMENT REIT | HALEY, BENJAMIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005202-00 | G&E APARTMENT REIT | WEBB, JAMES | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006359-00 | G&E APARTMENT REIT | ALVAREZ, BRYANT | 06/06/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13006360-00 | G&E APARTMENT REIT | HAND, MARCUS | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006361-00 | G&E APARTMENT REIT | PORTER, RYAN | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13007830-00 | G&E APARTMENT REIT | BOONE, ALESHA | 07/11/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009056-00 | G&E APARTMENT REIT | BOONE, ALESHA | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009057-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009058-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009059-00 | G&E APARTMENT REIT | NATION, DEBORAH | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009060-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009061-00 | G&E APARTMENT REIT | REED, CASSIE | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009062-00 | G&E APARTMENT REIT | WANG, LEI | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010008-00 | G&E APARTMENT REIT | BOONE, ALESHA | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010009-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010010-00 | G&E APARTMENT REIT | NATION, DEBORAH | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010011-00 | G&E APARTMENT REIT | REED, CASSIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010012-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13011382-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13011383-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013265-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013266-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013267-00 | G&E APARTMENT REIT | HUNTER, LONNIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013972-00 | G&E APARTMENT REIT | FUTRELL, JARRON | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13013973-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13014023-00 | G&E APARTMENT REIT | BENNET, SHANEIKIA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014024-00 | G&E APARTMENT REIT | JENKINS, REINA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014025-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 12/05/2013 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV13014026-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014027-00 | G&E APARTMENT REIT | MCGHEE, TRAVONDA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014028-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13014029-00 | G&E APARTMENT REIT | SOTO, EDGAR | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015168-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015169-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015170-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015171-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015172-00 | G&E APARTMENT REIT | NELSON, INGRID | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015173-00 | G&E APARTMENT REIT | SMITH, MARVIN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000605-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000606-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000626-00 | G&E APARTMENT REIT | BRYANT, AXL | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000627-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001590-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001591-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001592-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14001593-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001594-00 | G&E APARTMENT REIT | BRYANT, AXL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001595-00 | G&E APARTMENT REIT | COUNTRYMAN, YAHCKEL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001596-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001597-00 | G&E APARTMENT REIT | SMITH, MARVIN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002092-00 | G&E APARTMENT REIT | LANE, JASON | 03/27/2014 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV14002092-01 | G&E APARTMENT REIT | LANE, JASON | 03/10/2016 | 02:00 PM | Closed | Garnishment |
| ☐ | GV14002728-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002729-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002730-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002742-00 | G&E APARTMENT REIT | GILES, KARL | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002743-00 | G&E APARTMENT REIT | HARDEE, BAILY | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002744-00 | G&E APARTMENT REIT | SMITH, MARVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003665-00 | G&E APARTMENT REIT | KOCH, LINDSAY | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14003666-00 | G&E APARTMENT REIT | FERNANDEZ, JOSE | 05/08/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003667-00 | G&E APARTMENT REIT | GREENE, JOSHUA | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14006009-00 | G&E APARTMENT REIT | FAULK, MELVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006010-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006011-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS; JR | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006904-00 | G&E APARTMENT REIT | CRUMBY, DON | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14006905-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010173-00 | G&E APARTMENT REIT | BARBER, VICTORIA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010174-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010175-00 | G&E APARTMENT REIT | HEDGES, BRUCE | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010176-00 | G&E APARTMENT REIT | SHEETLEWORTH, ALEXANDRA | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010177-00 | G&E APARTMENT REIT | WALKER, KYNDRA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013741-00 | G&E APARTMENT REIT | COOPER, SOROYA | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013742-00 | G&E APARTMENT REIT | BERRY, ZACH | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14013743-00 | G&E APARTMENT REIT | ADERHOLT, MICHAEL | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013744-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013745-00 | G&E APARTMENT REIT | HITE, DANIEL | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15000919-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 02/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002885-00 | G&E APARTMENT REIT | LOPEZ, PETER | 04/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002886-00 | G&E APARTMENT REIT | PETERSON, MARTHA | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15002921-00 | G&E APARTMENT REIT | DORFE, HARRY | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15003962-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 05/07/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004875-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004876-00 | G&E APARTMENT REIT | HADSELL, RICHARD | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004877-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004878-00 | G&E APARTMENT REIT | OWENS, BRIANNA | 06/04/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15004879-00 | G&E APARTMENT REIT | REED, WILLIAM | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004880-00 | G&E APARTMENT REIT | SCULLY, ANDREW | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006215-00 | G&E APARTMENT REIT | BRISCO, SHABREYA | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006216-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006217-00 | G&E APARTMENT REIT | JONES, DAVID | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15006218-00 | G&E APARTMENT REIT | FIGUROA, RAFAEL NIEVES | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006219-00 | G&E APARTMENT REIT | RAMUSSEN, CHARLES | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15007898-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 08/20/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009578-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009579-00 | G&E APARTMENT REIT | WILEY, STEFAN | 10/08/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009586-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009587-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009588-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009589-00 | G&E APARTMENT REIT | SHEPPHERD, TIFFANY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009590-00 | G&E APARTMENT REIT | WILLIAMS, GARY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012360-00 | G&E APARTMENT REIT | DORFE, HARRY | 11/05/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012361-00 | G&E APARTMENT REIT | WILEY, STEFAN | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15012362-00 | G&E APARTMENT REIT | LOPEZ, PETER | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014985-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014986-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15014987-00 | G&E APARTMENT REIT | WELLS, KARISHA | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014988-00 | G&E APARTMENT REIT | WHITEHEAD, LEVI | 02/11/2016 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000710-00 | G&E APARTMENT REIT | HOYAT, BLACK | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000711-00 | G&E APARTMENT REIT | LOPEZ, PETER | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000712-00 | G&E APARTMENT REIT | SMITH, VALERIE | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000713-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003560-00 | G&E APARTMENT REIT | MONDESIR, BECHIR | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003561-00 | G&E APARTMENT REIT | OTEY, KESHARA | 03/31/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16003562-00 | G&E APARTMENT REIT | SMITH, VALERIE | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004830-00 | G&E APARTMENT REIT | BETHEL, ANDREW | 05/05/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004831-00 | G&E APARTMENT REIT | COOPER, TIARIK | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004832-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004833-00 | G&E APARTMENT REIT | HEATH, JAMES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004834-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004835-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004836-00 | G&E APARTMENT REIT | POULOS, JARON | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004837-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006568-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006569-00 | G&E APARTMENT REIT | PACE, DERRICK | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006570-00 | G&E APARTMENT REIT | SIMMONS, STEVEN | 06/30/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16007396-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007397-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007398-00 | G&E APARTMENT REIT | PACE, DERRICK | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007399-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007400-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 07/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16007401-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008059-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008060-00 | G&E APARTMENT REIT | HEATH, JAMES | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008061-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008062-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010077-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010078-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010079-00 | G&E APARTMENT REIT | GREEN, JADA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010080-00 | G&E APARTMENT REIT | HEATH, JAMES | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010081-00 | G&E APARTMENT REIT | JONES, JASON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010082-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010083-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010084-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010085-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010086-00 | G&E APARTMENT REIT | TOSTENSON, HANNAH | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16012387-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012388-00 | G&E APARTMENT REIT | BUSACCO, SARAH | 12/15/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012389-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012390-00 | G&E APARTMENT REIT | GARRETT, JEFFERY | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012391-00 | G&E APARTMENT REIT | GREEN, JADA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012392-00 | G&E APARTMENT REIT | HEATH, JAMES | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012393-00 | G&E APARTMENT REIT | JONES, JASON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012394-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012395-00 | G&E APARTMENT REIT | PENN, PAMELA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012396-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012397-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012398-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012399-00 | G&E APARTMENT REIT | TREADWAY, GREG | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013427-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013428-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013429-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013430-00 | G&E APARTMENT REIT | ELGAMAL, ROSE | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013431-00 | G&E APARTMENT REIT | GREEN, JADA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013432-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013433-00 | G&E APARTMENT REIT | HINES, AARON | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16013434-00 | G&E APARTMENT REIT | JONES, JASON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013435-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013436-00 | G&E APARTMENT REIT | PAULA, JAVIER | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013437-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013438-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013439-00 | G&E APARTMENT REIT | TAYLOR, LISA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013440-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000636-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000637-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000638-00 | G&E APARTMENT REIT | GREEN, JADA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000639-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000640-00 | G&E APARTMENT REIT | JOHNSON, MANCY | 02/23/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000641-00 | G&E APARTMENT REIT | JONES, JASON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000642-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000643-00 | G&E APARTMENT REIT | PARKS, FRANCISCO | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000644-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000645-00 | G&E APARTMENT REIT | SCHLOSSER, KEITH | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000646-00 | G&E APARTMENT REIT | SUTTON, WANDA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000647-00 | G&E APARTMENT REIT | TREADWAY, GREG | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17002755-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17002756-00 | G&E APARTMENT REIT | GREEN, JADA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002757-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002758-00 | G&E APARTMENT REIT | JONES, JASON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002759-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002760-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002761-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002762-00 | G&E APARTMENT REIT | REID, RONNA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002763-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002764-00 | G&E APARTMENT REIT | SUTTON, WANDA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003602-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003603-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003604-00 | G&E APARTMENT REIT | GREEN, JADA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003605-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003606-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003607-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003608-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003609-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003610-00 | G&E APARTMENT REIT | SUTTON, WANDA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004895-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004896-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17008915-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008916-00 | G&E APARTMENT REIT | DESINCE, VANITY | 09/07/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17008917-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008918-00 | G&E APARTMENT REIT | SUTTON, WANDA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011350-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011351-00 | G&E APARTMENT REIT | DESINCE, VANITY | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011352-00 | G&E APARTMENT REIT | FIELDS, CHERI | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011353-00 | G&E APARTMENT REIT | FRITZINGER, KELLY | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011354-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011355-00 | G&E APARTMENT REIT | HESS, CHRISTOPHER | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011356-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011357-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011358-00 | G&E APARTMENT REIT | REID, RONNA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011359-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011360-00 | G&E APARTMENT REIT | SUTTON, WANDA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011361-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012212-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012213-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012214-00 | G&E APARTMENT REIT | CULLUMBER, SARAH | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012215-00 | G&E APARTMENT REIT | DESINCE, VANITY | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17012216-00 | G&E APARTMENT REIT | EDWARDS, TAMEKA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012217-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012218-00 | G&E APARTMENT REIT | HUBBLE, GARY | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012219-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012220-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012221-00 | G&E APARTMENT REIT | MCKINLAY, AIDAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012222-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012223-00 | G&E APARTMENT REIT | REED, SEAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012224-00 | G&E APARTMENT REIT | SMITH, JIA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013612-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013613-00 | G&E APARTMENT REIT | ALSTON, TRAVIS | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013614-00 | G&E APARTMENT REIT | DESINCE, VANITY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013615-00 | G&E APARTMENT REIT | DODSON, BRYAN | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013616-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013617-00 | G&E APARTMENT REIT | JONES, JASON | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013618-00 | G&E APARTMENT REIT | JORDAN, MALIK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013619-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013620-00 | G&E APARTMENT REIT | PHELAN, ERIN | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013621-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013622-00 | G&E APARTMENT REIT | RIDDICK, DEREK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17013623-00 | G&E APARTMENT REIT | SMITH, JIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013624-00 | G&E APARTMENT REIT | SUTTON, WANDA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013625-00 | G&E APARTMENT REIT | WILLIAMS, CARLA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013626-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014481-00 | G&E APARTMENT REIT | HEARN, KAMREE ALLEN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014482-00 | G&E APARTMENT REIT | ANDERSON, VIRGINIA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014483-00 | G&E APARTMENT REIT | DESINCE, VANITA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014484-00 | G&E APARTMENT REIT | DIAZ, LUIS | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014485-00 | G&E APARTMENT REIT | DODSON, BRYAN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014486-00 | G&E APARTMENT REIT | ERNEST, LACEY | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014487-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014488-00 | G&E APARTMENT REIT | JOHNSON, CHERYLE | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014489-00 | G&E APARTMENT REIT | JONES, JASON | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014490-00 | G&E APARTMENT REIT | MALONE-FREEMAN, SHANITA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014491-00 | G&E APARTMENT REIT | SMITH, JIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014492-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014493-00 | G&E APARTMENT REIT | WILLIAMS, CASEY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014494-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000813-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000814-00 | G&E APARTMENT REIT | DESINCE, VANITY | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18000815-00 | G&E APARTMENT REIT | DODSON, BRYAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000816-00 | G&E APARTMENT REIT | EBBA, LEONARD | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000817-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000818-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000819-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000820-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002735-00 | G&E APARTMENT REIT | CLARK, LAURA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002736-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002737-00 | G&E APARTMENT REIT | HOLLOMAN, SHAMONA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002738-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002739-00 | G&E APARTMENT REIT | JONES, JASON | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002740-00 | G&E APARTMENT REIT | JORDAN, MALIK | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002741-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002742-00 | G&E APARTMENT REIT | MOODY, JULIANA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004062-00 | G&E APARTMENT REIT | CLARK, LAURA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004063-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004064-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004065-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004066-00 | G&E APARTMENT REIT | JONES, DIAMOND | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004067-00 | G&E APARTMENT REIT | MACKLIBN, KAREN | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18004068-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004069-00 | G&E APARTMENT REIT | MANLEY-LEE, ISAIAH | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004070-00 | G&E APARTMENT REIT | MOODY, JULIANA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005037-00 | G&E APARTMENT REIT | BLACK, HOYAT | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005038-00 | G&E APARTMENT REIT | CLARK, LAURA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005039-00 | G&E APARTMENT REIT | HUGHES, CHARLOTTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005040-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005041-00 | G&E APARTMENT REIT | JONES, JASON | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005042-00 | G&E APARTMENT REIT | RUSSELL, KEYANTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005043-00 | G&E APARTMENT REIT | SELLERS-BROWN, SHAMIR | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005044-00 | G&E APARTMENT REIT | WELLS, NICHOLAS | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005074-00 | G&E APARTMENT REIT | GAMBOA, ELIZABETH | 06/07/2018 | 10:13 AM | Other | Unlawful Detainer |
| ☐ | GV08018432-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003334-00 | G&E APARTMENT REIT 1 | DURIO, ADRIAN | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003335-00 | G&E APARTMENT REIT 1 | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003336-00 | G&E APARTMENT REIT 1 | HALLEY, HOLLY | 04/09/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09003337-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003338-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003339-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018436-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08018437-00 | G&E APARTMENT REIT 2 | LOCK, TERRELL | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003340-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014903-00 | G&E APARTMENT REIT 2 | DEMARIO, EMILY | 01/13/2011 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014904-00 | G&E APARTMENT REIT 2 | MOSLEY, ALYSSIA | 12/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014905-00 | G&E APARTMENT REIT 2 | PAGE, JASON | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004682-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008951-00 | G&E APARTMENT REIT 1 | BARNETTE, ERIN | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008952-00 | G&E APARTMENT REIT 1 | KORLISON, OMENTUS | 08/06/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09008953-00 | G&E APARTMENT REIT 1 | SMITH, DAVID | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008954-00 | G&E APARTMENT REIT 1 | TERRY, MONIQUE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010897-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012910-00 | G&E APARTMENT REIT 1 | JAZWINSKI, BRUCE | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015719-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015720-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015721-00 | G&E APARTMENT REIT 1 | MURRAY, BARBARA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015722-00 | G&E APARTMENT REIT 1 | WILLIAMSON, ROY | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017160-00 | G&E APARTMENT REIT 1 | BEAULIEU, KENNETH | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017161-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017162-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017163-00 | G&E APARTMENT REIT 1 | VASQUEZ, MARIA | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10000692-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000693-00 | G&E APARTMENT REIT 1 | POLK, WILLIE | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002058-00 | G&E APARTMENT REIT 1 | CHAMPION, BOBBY | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10014902-00 | G&E APARTMENT REIT 1 | BULLOCK, TEAIRA | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000756-00 | G&E APARTMENT REIT 1 | ACOSTA, ENRIQUE | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000757-00 | G&E APARTMENT REIT 1 | JACKSON, KATHERINE | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000758-00 | G&E APARTMENT REIT 1 | KING-SMITH, RIQUITA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000759-00 | G&E APARTMENT REIT 1 | MCCONNELL, BRENT | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000760-00 | G&E APARTMENT REIT 1 | PAGE, JASON | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000761-00 | G&E APARTMENT REIT 1 | ROSKOWSKI, TARA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010013-00 | G&E APARTMENT REIT 1 | HUNTER, LONNIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010014-00 | G&E APARTMENT REIT 1 | ROLLINS, TYRONEE | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008455-00 | G&E APARTMENT REIT 1 | NEATHERY, DIANE | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004680-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004681-00 | G&E APARTMENT REIT 2 | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004683-00 | G&E APARTMENT REIT 2 | MURRAY, BARBARA | 05/07/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008955-00 | G&E APARTMENT REIT 2 | EDWARDS, DOUGLAS | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008956-00 | G&E APARTMENT REIT 2 | KARIKA, SARAH | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008957-00 | G&E APARTMENT REIT 2 | ROGERS, ALVALON | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008959-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010934-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010935-00 | G&E APARTMENT REIT 2 | RIUSECH, EDUARDO | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015723-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015724-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015725-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017164-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017165-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017166-00 | G&E APARTMENT REIT 2 | PRUITT, DUSTIN | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017167-00 | G&E APARTMENT REIT 2 | SAUCIER, JEREMY | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000694-00 | G&E APARTMENT REIT 2 | GRIFFINM, MICHAEL | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000695-00 | G&E APARTMENT REIT 2 | HENDERSON, JAMESHA | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000696-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002051-00 | G&E APARTMENT REIT 2 | BULLOCK, DARREN | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002052-00 | G&E APARTMENT REIT 2 | FOX, CHRISTIE | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002053-00 | G&E APARTMENT REIT 2 | GRAYSMITH CONSTRUCTION | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10002054-00 | G&E APARTMENT REIT 2 | HOLAS-SHORTER, ABIGAIL | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002055-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002056-00 | G&E APARTMENT REIT 2 | NUNES, SCOTT | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002057-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000807-00 | G&E APARTMENT REIT 2 | BULLOCK, TEAIRA | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11000808-00 | G&E APARTMENT REIT 2 | JAMES, SABRINA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000809-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000810-00 | G&E APARTMENT REIT 2 | MCCONNELL, JOHN | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003668-00 | G&E APARTMENT REIT 2 | SMITH, MARVIN | 09/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008456-00 | G&E APARTMENT REIT 2 | BRYANT, AXI | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008457-00 | G&E APARTMENT REIT 2 | DUNN, KEEGAN | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008458-00 | G&E APARTMENT REIT 2 | GOUGH, JOSEPH | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008459-00 | G&E APARTMENT REIT 2 | PIERCE, JOSHUA | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002059-00 | G&E APARTMENT REIT H | POLK, WILLIE | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006847-00 | G&E APARTMENT REIT H | HUTTMAN, STEVEN | 06/10/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10006848-00 | G&E APARTMENT REIT H | JEFFERSON, LLLITHIA | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006849-00 | G&E APARTMENT REIT H | JONATHAN, MCCOY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006850-00 | G&E APARTMENT REIT M | HOLAS-SHORTER, ABIGAIL | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006851-00 | G&E APARTMENT REIT M | PHELPS, LIN HERMAN | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006852-00 | G&E APARTMENT REIT M | SAUCIER, JEREMY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08008522-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 06/17/2008 | 11:00 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08008523-00 | G&E APARTMENT REIT THE | MAGEE, KENNETH | 06/05/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08014899-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 12/18/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016783-00 | G&E APARTMENT REIT THE | BARNETTE, ERIN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016784-00 | G&E APARTMENT REIT THE | DEGERAFF, GEORGE | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08016785-00 | G&E APARTMENT REIT THE | FLORES, MATTHEW | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016786-00 | G&E APARTMENT REIT THE | HECKER, ALISON | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016787-00 | G&E APARTMENT REIT THE | HUBBARD, DERIKISHA | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016788-00 | G&E APARTMENT REIT THE | JORDAN, SHAWN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016789-00 | G&E APARTMENT REIT THE | PARKER, JUSTIN | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016791-00 | G&E APARTMENT REIT THE | SMITH, DAVID | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016792-00 | G&E APARTMENT REIT THE | TAYLOR, LEROY | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016793-00 | G&E APARTMENT REIT THE | TAYLOR, SATASHA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016794-00 | G&E APARTMENT REIT THE | VINES, YOLANDA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010613-00 | G&E APARTMENT REIT THE | HEFFLEFINGER, LARRY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010614-00 | G&E APARTMENT REIT THE | HELMS, ERIC | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010615-00 | G&E APARTMENT REIT THE | PORTER, SHANICA | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010617-00 | G&E APARTMENT REIT THE | HOLAS-SHORTER, ABIGAIL | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010618-00 | G&E APARTMENT REIT THE | MORTON, MICHAEL | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010619-00 | G&E APARTMENT REIT THE | PARKS, KELLY | 09/09/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10010620-00 | G&E APARTMENT REIT THE | SAUCIER, JEREMY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011724-00 | G&E APARTMENT REIT THE | BALLIAT, TYLER | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011725-00 | G&E APARTMENT REIT THE | FRANKLIN, MAURICE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011726-00 | G&E APARTMENT REIT THE | JACKSON, KATHERINE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011727-00 | G&E APARTMENT REIT THE | SIMMONS, LARRY | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15001850-00 | G&E APARTMENT REITENTS LP | MATHIS, ANTONIO | 03/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12001049-00 | G&E APARTMENTS M | BASKIN, THOMAS | 03/08/2012 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001050-00 | G&E APARTMENTS M | CONNOR, MICHAEL | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001051-00 | G&E APARTMENTS M | ROBINSON, YOLANDA | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14011316-00 | G&E APARTMENTS REIT | HEDGES, BRUCE | 11/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008752-00 | G&E APARTMENTS REIT | GAGE, ALEXIS | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008774-00 | G&E APARTMENTS REIT | PLUMMER, ASHLEY | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008775-00 | G&E APARTMENTS REIT | SCULLY, ANDREW | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013384-00 | G&E APARTMENTS REIT | WILEY, STEFAN | 12/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013385-00 | G&E APARTMENTS REIT | BLACK, HOYAT | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013386-00 | G&E APARTMENTS REIT | CLOSE, RACHEL | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013387-00 | G&E APARTMENTS REIT | NOLAND, BENJAMIN | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004586-00 | G&E APARTMENTS REIT | MONDESIR, BECHIR | 04/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004587-00 | G&E APARTMENTS REIT | PAGEL, JAMES | 04/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001984-00 | G&E APARTMENTS REIT | CULLUMBER, SARAH | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001985-00 | G&E APARTMENTS REIT | DESINCE, VANITY | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001986-00 | G&E APARTMENTS REIT | JENNINGS, TANIA | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001987-00 | G&E APARTMENTS REIT | JONES, ERICA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001988-00 | G&E APARTMENTS REIT | JONES, JASON | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001989-00 | G&E APARTMENTS REIT | JORDAN, MALIK | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18001990-00 | G&E APARTMENTS REIT | LIEDKE, CHRISTINE | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001991-00 | G&E APARTMENTS REIT | MACKLIN, KAREN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001992-00 | G&E APARTMENTS REIT | WEBB, CHRISTIAN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001993-00 | G&E APARTMENTS REIT | WELLS, KARISHA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001994-00 | G&E APARTMENTS REIT | WHITE, HELEN | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

**SCHEDULE 3.15**
**LIST OF SUBSIDIARIES**

See attached.

Project Unicorn
Quail Landing



**Quail Landing**
14200 North May Avenue
Oklahoma City, Oklahoma 73134

Project Unicorn
Gulfstream Isles



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Victoria Park



**Victoria Park**
4616 Stoney Trace Drive
Charlotte, North Carolina 28227

Project Unicorn
Reserve at River Walk



**Reserve at River Walk**
4501 Bentley Drive
Columbia, South Carolina 29210

Project Unicorn
Heights at Olde Towne



**Heights at Olde Towne**
303 Effingham Street and 301 Green Street
Portsmouth, Virginia 23704

Project Unicorn
Myrtles at Olde Towne



**Myrtles at Olde Towne**
850 Crawford Parkway
Portsmouth, Virginia 23704



Project Unicorn
Governors Green

Governors Green
16501 Governor Bridge Road
Bowie, Maryland 20716



Stoney Ridge

Liberty CLO Holdco Ltd.

Hunt Companies Finance Trust, LP (DE)

HCRE Partners, LLC (DE)

49%

51%

SE Multifamily Holdings, LLC (DE)

51%

49%

100%

SE Multifamily REIT Holdings, LLC (DE)

100%

SE Stoney Ridge I, LLC (DE)

SE Stoney Ridge II, LLC (DE)

100%

SE Stoney Ridge REIT, L.L.C. (DE)

57%

43%

SE Stoney Ridge Holdings, L.L.C. (DE)

100%

SE Stoney Ridge, LLC (DE)

**Stoney Ridge**
14397 Westminster Lane
Woodbridge, Virginia 22193

Project Unicorn –
Oak Mill



Project Unicorn
Battleground Park





Project Unicorn
Lakes at Renaissance Park

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Lakes at Renaissance Park**
1400 Renaissance Court
Austin, Texas 78728

Project Unicorn
Brandywine



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)    person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)   person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Glenview Reserve



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Andros Isles



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Andros Isles**
100 Acklins Circle
Daytona Beach, Florida 32119

Project Unicorn
Arborwalk



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/1718

Project Unicorn
Walker Ranch



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Towne Crossing



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)      person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
West Place



James Dondero
(Settlor) (US)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%   25%   5%

Highland Capital Management, L.P. (DE)

HCRE Partners, LLC (DE)

49%   51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

100%

NREA SE2 West Place Leaseco, LLC (DE) Master Tenant

NREA SE2 West Place Manager, LLC (DE) Manager

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%   100%

NREA Southeast Portfolio Two, DST (DE)

100%

NREA SE2 West Place, DST (DE) May be converted from Landmark at West Place, LLC (DE)

West Place
753 Sherwood Terrace Drive
Orlando, Florida 32818

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Vista Ridge



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Hidden Lake



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Hidden Lake**
8910 North Loop 1604
West San Antonio, Texas 78249

Project Unicorn
Arboleda



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 9/17/18

Project Unicorn
Fairways



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Fairways
16501 Stonemason Drive
Huntersville, North Carolina 28078

Project Unicorn
Grand Oasis



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)      person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Project Unicorn
Summers Landing Apartments
(AT CLOSING)**



Harry Bookey

85%
Managing
Member

BH EQUITIES, L.L.C.
(IA)

Other individuals owning 15% in the
aggregate and not more than 5% individually

100%

BHSL Holdings, LLC
(IA)

100%                    100%

BH Summers Landing GP, LLC
(DE)

BH Summers Landing, LLC
(IA)

Sole LP

Summers Landing Apartments
Investors, L.P.
(DE)

Sole GP

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

**Summers Landing Apartments**

Updated 9/21/18

**SCHEDULE 5.12**
**PLEDGED NXRT SHARES**

1,300,000 common shares of NexPoint Residential Trust, Inc. (NXRT)

**SCHEDULE 6.09**
**EXISTING INDEBTEDNESS**

**[BORROWER TO UPDATE]**

**SCHEDULE 6.10**
**JUNIOR CLAIMS**

**[BORROWER TO UPDATE]**

**BRIDGE LOAN AGREEMENT**

**EXHIBIT A**

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Bridge Loan Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all its Commitment and outstanding Loans and a corresponding interest in and to all other rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

Assignee, subject to the terms and conditions hereof, hereby assumes all obligations of Assignor with respect to the Assigned Interests from and after the Effective Date as if Assignee were an original Lender under and signatory to the Credit Agreement, which obligations shall include, but shall not be limited to, the obligation to make Loans to the Borrowers with respect to the Assigned Interest and to indemnify the Administrative Agent as provided therein (such obligations, together with all other obligations set forth in the Credit Agreement and the other Loan Documents are hereinafter collectively referred to as the "Assigned Obligations"). Assignor shall have no further duties or obligations with respect to, and shall have no further interest in, the Assigned Obligations or the Assigned Interests.

1.  Assignor:                       _____

2.  Assignee:                       _____
                                    [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.  Borrower:                       [___]

4.  Administrative Agent:           KeyBank, National Association, as the administrative agent under
                                    the Credit Agreement

5.  Credit Agreement:               The Bridge Loan Agreement dated as of September 25, 2018, among
                                    the Borrower, the Lenders parties thereto, and KeyBank, National
                                    Association, as Administrative Agent

6.  Assigned Interest:

| Aggregate Amount of Tranche A Loan for all Lenders | Amount of Tranche A Loan Assigned | Percentage Assigned of Tranche A Loans[2] |
|---|---|---|
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |

| Aggregate Amount of Tranche B Loan for all Lenders | Amount of Tranche B Loan Assigned | Percentage Assigned of Tranche B Loans[3] |
|---|---|---|
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |

In consideration of the assignment made pursuant to this Assignment and Assumption, Assignee agrees to pay to Assignor on the Effective Date, an amount equal to the "Amount of Outstanding Loans Assigned" set forth in the table above.

Effective Date:                    _____, 20____ [TO BE INSERTED BY
                                   ADMINISTRATIVE AGENT AND WHICH SHALL BE THE
                                   EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE
                                   REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

_____

[1] Select as applicable.
[2] Set forth, to at least 9 decimals, as a percentage of the Tranche A Loans of all Lenders thereunder.
[3] Set forth, to at least 9 decimals, as a percentage of the Tranche B Loans of all Lenders thereunder.

ASSIGNOR

[NAME OF ASSIGNOR]


By:_____

Title:_____

ASSIGNEE

[NAME OF ASSIGNEE]


By:_____

Title:_____

[Consented to and][4] Accepted:

[KeyBank, National Association], as
  Administrative Agent


By:_____

Title:_____


[Consented to:][5]

[NAME OF LEAD BORROWER]


By:_____

Title:_____

---

[4] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[5] To be added only if the consent of the Borrower and/or other parties is required by the terms of the Credit Agreement.

A-3

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. <u>Representations and Warranties</u>.

1.1 <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers as are reasonably incidental thereto pursuant to the terms of the Loan Documents; and (c) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. All payments to Assignee under the Credit Agreement shall be made as provided in the Credit Agreement in accordance with the separate instructions delivered to Administrative Agent.

     3.  <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**BRIDGE LOAN AGREEMENT**

EXHIBIT B

FORM OF COMPLIANCE CERTIFICATE

Key Bank, National
Association
as Administrative Agent
225 Franklin Street
Boston, MA 02110

Attn: Mr. Christopher Neil

        RE HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE
DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P.,
NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER
BORROWERS Compliance Certificate
     for _____ through _____

Dear Ladies and Gentlemen:

        This Compliance Certificate is made with reference to that certain Bridge Loan
Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise
modified from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL
MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT
TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE
ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the
"Borrower"), the financial institutions party thereto, as lenders, and KeyBank, National
Association, as Administrative Agent. All capitalized terms used in this Compliance
Certificate (including any attachments hereto) and not otherwise defined in this Compliance
Certificate shall have the meanings set forth for such terms in the Credit Agreement. All
Section references herein shall refer to the Credit Agreement.

        I hereby certify that I am the [_____] of [LEAD BORROWER], and that I
make this Certificate on behalf of the Borrower. I further represent and certify on behalf of
the Borrower as follows as of the date of this Compliance Certificate:

        I have reviewed the terms of the Loan Documents and have made, or have caused to be
made under my supervision, a review in reasonable detail of the transactions and
consolidated and consolidating financial condition of the Borrower and its Subsidiaries,
during the accounting period (the "Reporting Period") covered by the financial reports
delivered simultaneous herewith pursuant to Section 5.01[(a)][(b)], and that such review
has not disclosed the existence during or at the end of such Reporting Period (and that I do
not have knowledge of the existence as at the date hereof) of any condition or event which
constitutes a Default or Event of Default.

(a) Total Leverage Ratio
     1.    Indebtedness of Borrower and its Subsidiaries    $_____
     2.    Total Asset Value:
          (A)    Value of all real property
          (B)    other assets
                    TOTAL            $_____
     3.    Ratio:  1 divided by 2   _____
     4.    Required Ratio:  not greater than 65%

(b) Fixed Charge Coverage Ratio
     1.    Adjusted EBITDA  $_____
     2.    Fixed Charges:
          (A)    Current Principal
          (B)    Interest Expense
          (C)    Cash Dividends on Preferred Stock
                    TOTAL            $_____
     3.    Ratio:  1 divided by 2   _____
     4.    Required Ratio:  not less than 1.6 to 1.0

(c) Tangible Net Worth $_____
     1.    Actual  _____
     2.    Required $750,000,000

(d) Minimum Liquidity $_____
     1.    Cash and Cash Equivalents (excluding reserve amounts)  $_____
     2.    market value of shares in NXRT and units in the OP    $_____
     3.    market value of all other unencumbered securities    $_____
     4.    market value of all other encumbered securities (net of any outstanding
            debt related thereto)                  $_____
     5.    Required Amount: $75,000,000 (or if  Loans are less than $150,000,000,
lesser of (i) $75,000,000 and (ii) 25% of outstanding Loan balance):    $_____

(e) Recourse Debt                      $_____
<u>Currently Defaulted Other Debt</u>:
(i) Aggregate Defaulted Recourse Debt of the Borrower $_____
(ii) Aggregate Defaulted Recourse Debt of Borrower $_____
(iii) Aggregate Defaulted Non-recourse Debt of the Subsidiaries of Borrower or Borrower
(of $75,000,000 or greater in the aggregate)  $_____

       This Compliance Certificate has been executed and delivered as of the date set forth above.

              [Signature Page Follows]

LEAD BORROWER:

[___]


By:_____
Name:
Title:

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT C</u>

<u>[INTENTIONALLY OMITTED]</u>

**BRIDGE LOAN AGREEMENT**

**EXHIBIT D**

FORM OF NOTE

$_____                                                          _____, 2016

      **FOR VALUE RECEIVED, [___]** (the "Maker") jointly and severally promise to pay without offset or counterclaim to the order of [insert name of Lender], ("Payee"), the principal amount equal to the lesser of (x) _____ ($_____) or (y) the outstanding amount advanced by Payee as a Loan under the Credit Agreement (as hereinafter defined), payable in accordance with the terms of the Credit Agreement.

      Maker also promises to pay interest on the unpaid principal amount of this Note (this "Note") at the rates and at the times which shall be determined in accordance with the provisions of that certain Bridge Loan Agreement dated of September 25, 2018, among Maker, the Lenders named therein, and KeyBank, National Association, as Administrative Agent for itself and the Lenders (as hereafter amended, supplemented or otherwise modified from time to time, the "Credit Agreement").  Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

      The Loans are not revolving loans.  Amounts paid and prepaid may not be reborrowed.

      Payments hereunder shall be made to the Administrative Agent for the Payee at 127 Public Square, Cleveland, Ohio 44114-1306, or at such other address as Administrative Agent may designate from time to time, or made by wire transfer in accordance with wiring instructions provided by the Administrative Agent.

      This Note is subject to (a) mandatory prepayment and (b) prepayment at the option of the Maker, as provided in the Credit Agreement.

      This Note is issued pursuant to the Credit Agreement and is entitled to the benefits of the Credit Agreement, reference to which is hereby made for a more complete statement of the terms and conditions under which the Loan evidenced hereby is made and is to be repaid.

      THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  MAKER AGREES THAT JURISDICTION AND VENUE FOR ANY ACTION REGARDING THIS NOTE SHALL BE AS SET FORTH IN THE CREDIT AGREEMENT.

      Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

Maker promises to pay all reasonable fees, costs and expenses incurred in the collection and enforcement of this Note in accordance with the terms of the Credit Agreement.  Maker and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind (except such notices as may be expressly required under the Credit Agreement or the other Loan Documents) and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered by its duly authorized officer, as of the day and year first written above.

**BORROWERS**:

HCRE PARTNERS, LLC,
a Delaware limited liability company


By:     _____
Name:
Title:

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010


By:_____
Nancy Dondero, Family Trustee


HIGHLAND CAPITAL MANAGEMENT, LP, a
Delaware limited partnership


By:     [___], its general partner

     By:     _____
     Name:
      Title:

THE SLHC TRUST,
under trust agreement dated [___]

By:_____
Name:
Title:


NEXPOINT ADVISORS, L.P., a Delaware limited partnership


By:      [___], its general partner

     By:  _____
     Name:
      Title:


NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership


By:      [___], its general partner

     By:  _____
     Name:
      Title:

[**PROPERTY OWNER BORROWERS**]

**BRIDGE LOAN AGREEMENT**

EXHIBIT E

[FORM OF] BORROWING REQUEST

[Date]

KeyBank, National Association
as Administrative Agent
225 Franklin Street, 16th floor
Boston, Massachusetts 02110

Attn: Mr. Christopher Neil

Re:    HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS

Dear Ladies and Gentlemen:

This Interest Election Request is made with reference to that certain Bridge Loan Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank, National Association, as Administrative Agent. All capitalized terms used in this Interest Election Request (including any attachments hereto) and not otherwise defined in this Interest Election Request shall have the meanings set forth for such terms in the Credit Agreement. All Section references herein shall refer to the Credit Agreement.

The undersigned Lead Borrower hereby requests [check as applicable]

□ a conversion of an existing Loan as provided below and/or

□ a Borrowing under the Credit Agreement in the amount of $_____ [minimum of $1,000,000.00 and in multiples of $100,000.00].

The advance or conversion is to be made as follows:

A.    ABR Loan.

    1.    Amount of ABR Loan:                                          $_____

    2.    Amount of conversion of existing

|  | Loan to ABR Loan | $_____ |

3. Date of ABR Loan conversion: _____

B. Eurodollar Loan:

1. Amount of Eurodollar Loan: $_____

2. Amount of conversion of existing
Loan to Eurodollar Loan: $_____

3. Number of Eurodollar
Loans(s) now in effect:
[cannot exceed six (6)] _____

4. Date of Eurodollar Loan conversion: _____

5. Interest Period: _____

6. Expiration date of current Interest
Period as to this conversion: _____

C. Daily LIBOR Loan.

1. Amount of Daily LIBOR Loan: $_____

2. Amount of conversion of existing
Loan to Daily LIBOR Loan $_____

3. Date of Daily LIBOR Loan conversion: $_____

The Borrower hereby represents and warrants that the amounts set forth above are true and correct, that the representations and warranties contained in the Credit Agreement are true and correct as if made as of this date (except to the extent relating to a specific date), and that the Borrower has kept, observed, performed and fulfilled each and every one of its obligations under the Credit Agreement as of the date hereof [except as follows: _____]

Very truly yours,

[LEAD BORROWER]

By:_____
Name:
Title:

**EXHIBIT F-1**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

   Name:

   Title:

Date: _____ __, 20[ ]

**EXHIBIT F-2**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[ ]

<u>**EXHIBIT F-3**</u>

<u>[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE</u>

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of <u>Section 2.17</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[  ]

**EXHIBIT F-4**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

    Name:

    Title:

    Date: _____ __, 20[  ]

2371788.5

# EXHIBIT 4

Page 1

1

2          IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3                 DALLAS DIVISION

4
   IN RE:
5                          CHAPTER 11
   HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,          CASE NO. 19-34054-SGI11
        Debtor.
7
   ----------------------------x
8
   HIGHLAND CAPITAL
9   MANAGEMENT, L.P.,
        Plaintiff,        ADVERSARY PROCEEDING
10
     vs.              NO: 21-03000-SGI
11
   HIGHLAND CAPITAL
12   MANAGEMENT FUND ADVISORS,
   L.P.; NEXPOINT ADVISORS,
13   L.P.; HIGHLAND INCOME
   FUND; NEXPOINT STRATEGIC
14   OPPORTUNITIES FUND;
   NEXPOINT CAPITAL, INC.;
15   AND CLO HOLDCO, LTD.,
        Defendants.
16   ----------------------------/

17

18        DEPOSITION OF ROB WILLS, ESQ.

19        VIA REMOTE VIDEOCONFERENCE

20              August 11, 2021

21              9:30 a.m., Central

22

23   Reported by:

24   Anne E. Vosburgh, CSR-6804, RPR, CRR

25   Job No. 197673

| Page 2 | |
|---|---|
| 1 | |
| 2 | REMOTE APPEARANCES: |
| 3 | |
| 4 | On behalf of the Debtor: |
| 5 | PACHULSKI STANG ZIEHL & JONES |
| 6 | 150 California Street |
| 7 | San Francisco, California 94111 |
| 8 | BY: KENNETH BROWN, ESQ. |
| 9 | - and - |
| 10 | PACHULSKI STANG ZIEHL & JONES |
| 11 | 780 Third Avenue |
| 12 | New York, New York 10017 |
| 13 | BY: HAYLEY WINOGRAD, ESQ. |
| 14 | |
| 15 | |
| 16 | On behalf of Unsecured Creditors Committee: |
| 17 | SIDLEY AUSTIN |
| 18 | 2021 McKinney Avenue |
| 19 | Dallas, Texas 75201 |
| 20 | BY: CHANDLER ROGNES, ESQ. |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 3 | |
|---|---|
| 1 | |
| 2 | REMOTE APPEARANCES (Continued): |
| 3 | |
| 4 | On behalf of HCRE Partners, LLC (n/k/a NexPoint Real |
| 5 | Estate Partners, LLC): |
| 6 | WICK PHILLIPS |
| 7 | 100 Throckmorton Street |
| 8 | Fort Worth, Texas 76102 |
| 9 | BY: BRANT MARTIN, ESQ. |
| 10 | LAUREN DRAWHORN, ESQ. |
| 11 | |
| 12 | On behalf of the Senior Employees and CPCM, LLC: |
| 13 | BAKER MCKENZIE |
| 14 | 1900 North Pearl Street |
| 15 | Dallas, Texas 75201 |
| 16 | BY: DEBRA DANDENEAU, ESQ. |
| 17 | |
| 18 | ALSO PRESENT: |
| 19 | LA ASIA CANTY, Paralegal from Pachulski Stang |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 4 | |
|---|---|
| 1 | |
| 2 | I N D E X |
| 3 | |
| 4 | ---------- EXAMINATIONS ---------- |
| 5 | WITNESS: ROB WILLS, ESQ. |
| 6 | Examination by Mr. Brown          6 |
| 7 | Examination by Mr. Martin         113 |
| 8 | Re-Examination by Mr. Brown       124 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | ---------- MARKED EXHIBITS ---------- |
| 14 | NUMBER     DESCRIPTION        PAGE |
| 15 | Exhibit A     Amended Notice of 30(b)(6)    11 |
| 16 | Deposition |
| 17 | Exhibit B     SE Multifamily Holdings LLC,   14 |
| 18 | Limited Liability Company |
| 19 | Agreement, August 23, 2018 |
| 20 | Exhibit C     Bridge Loan Agreement,     20 |
| 21 | September 26, 2018 |
| 22 | Exhibit D     Email chain, "RE:  Project    72 |
| 23 | Unicorn - Final Org Charts," |
| 24 | with attachments |
| 25 | |

| Page 5 | |
|---|---|
| 1 | |
| 2 | EXHIBITS (Continued): |
| 3 | Exhibit E     Email chain, "RE: Unicorn -    90 |
| 4 | DSTs" |
| 5 | Exhibit F     SE Multifamily Holdings LLC    98 |
| 6 | First Amended and Restated |
| 7 | Limited Liability Company |
| 8 | Agreement |
| 9 | Exhibit H     Email chain, "FW: Draft LLC    101 |
| 10 | Agreement" |
| 11 | Exhibit I     Email chain  "RE: SE         122 |
| 12 | Multi-Family  Holdings LLC: |
| 13 | Amended and Restated," |
| 14 | beginning Bates |
| 15 | Highland136853 |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 6

1     Wick Phillips 30(b)(6) - R. Wills
2     Remote Videoconference Deposition
3     August 11, 2021, 9:30 a.m., Central
4          --------------
5          PROCEEDINGS
6          --------------
7          ROB WILLS, ESQ.,
8     (Having been called to appear via
9     remote videoconference, declared his
10    testimony to be truthful under penalty
11    of perjury.)
12          —
13          EXAMINATION
14    BY MR. BROWN:
15     Q.  Would you state your full name for
16    the record.
17     A.  Sure.  James Robert Wills, IV.
18     Q.  Mr. Wills, I'm counsel for Highland
19    Capital Management L.P.  I think I'll be
20    referring to that entity, the Debtor,
21    throughout the deposition as Highland.
22          Will you understand what I mean
23    when I refer to Highland as the Debtor?
24     A.  Yes, sir.
25     Q.  And your last name is pronounced

Page 7

1     Wick Phillips 30(b)(6) - R. Wills
2     Willis?
3     A.  Wills.
4     Q.  Mr. Wills, you're an attorney; is
5    that correct?
6     A.  Yes, sir.
7     Q.  Okay.  Can you tell me what your
8    current role is and position with
9    Wick Phillips?
10    A.  Sure.  I'm an equity partner here.
11   I'm one of two partners that run the real
12   estate group.
13    Q.  Okay.  Have you ever had your
14   deposition taken before?
15    A.  No, sir.
16    Q.  Have you ever taken a deposition
17   before?
18    A.  I have.
19    Q.  Okay.  So can we all assume that
20   you understand the rules, and I can
21   reasonably dispense with explaining to you
22   the protocol and procedures for a deposition?
23    A.  Yes.  That's fine with me.
24    Q.  Just very basically, you understand
25   you're under oath?

Page 8

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  Yes, sir.
3     Q.  And that what you say here is like
4    what you say in a court of law?
5     A.  Yes, sir.
6     Q.  It's important for you to
7    understand my question.  Wait until I'm
8    finished before you answer.
9          We don't want to be talking at the
10   same time because that makes for an unclear
11   record for the court reporter.
12    A.  Not a problem.
13    Q.  You understand all that?
14    A.  Yes, sir.
15    Q.  You also understand that you'll
16   have an opportunity to review the transcript
17   of this deposition and make corrections?
18    A.  Yes, sir.
19    Q.  Okay.  And that I'll be able to
20   comment on those corrections at the time of
21   the hearing on this?
22    A.  Yes, sir.
23    Q.  Okay.  Do you understand that
24   you've been designated as the witness for
25   Wick Phillips pursuant to Federal Rule of

Page 9

1     Wick Phillips 30(b)(6) - R. Wills
2    Civil Procedure 30(b)(6), made applicable in
3    this proceeding by Bankruptcy Rule 9011?
4     A.  Yes, sir.
5     Q.  And you're aware that you're
6    required to provide complete and
7    knowledgeable answers on behalf of
8    Wick Phillips with respect to the topics that
9    have been designated in the Wick Phillips
10   Rule 30(b)(6) deposition notice?
11    A.  Yes, sir.
12    Q.  And you understand that your
13   responses will be binding on Wick Phillips in
14   this matter?
15    A.  Yes, sir.
16    Q.  And when I refer to "this matter,"
17   again, at the risk of stating the obvious,
18   this deposition is being taken today in
19   connection with the Debtor's motion to
20   disqualify Wick Phillips from representing an
21   adverse party in connection with their proof
22   of claim against the Debtor in the Debtor's
23   bankruptcy case.
24          Is that your understanding?
25    A.  Yes, sir.

Page 10

```
1        Wick Phillips 30(b)(6) - R. Wills
2        Q.   And you understand that what you
3    say today in your testimony represents the
4    testimony of the law firm of Wick Phillips
5    rather than your personal testimony?
6        A.   Yes, sir, I do.
7        Q.   Okay.  Do you know how you were
8    selected as Wick Phillips' designated witness
9    in connection with the disqualification
10   motion?
11       MR. MARTIN:  I'm going to object
12       and instruct the witness not to answer
13       based on the question of privilege.
14       That's the law firm's privilege and
15       we're not going to waive it.
16   BY MR. BROWN:
17       Q.   Well, do you -- can you answer that
18   question without disclosing the privilege?
19       A.   I'm one of two partners in the real
20   estate section of the firm.  This is a real
21   estate matter that we handled.
22       Q.   Okay.  What have you done to become
23   prepared to provide complete, knowledgeable,
24   and binding answers to the questions relating
25   to the topics in the deposition notice?
```

Page 11

```
1        Wick Phillips 30(b)(6) - R. Wills
2        A.   I reviewed the Motion to Disqualify
3    and the Brief in Support, my firm's
4    Opposition in that brief; as well as talking
5    with D.C. Sauter, a former partner of mine;
6    Rachel Sam, a current partner of mine; and
7    reviewing the exhibits and declarations
8    attached to all the briefs, as well as our
9    internal files and -- in relation.
10       Q.   Okay.  How much time did you spend
11   preparing for this deposition?
12       A.   It was over a couple of days.  I
13   would say several hours.
14       Q.   About five?
15       A.   I would say right about there.
16       MR. BROWN:  Could the court
17       reporter mark Exhibit A?
18       THE REPORTER:  As Exhibit A?
19       MR. BROWN:  Sure.  Mark Exhibit A
20       as Exhibit A.
21       (Amended Notice of 30(b)(6)
22       Deposition, marked as Exhibit A.)
23   BY MR. BROWN:
24       Q.   And housekeeping matter.  I don't
25   know --
```

Page 12

```
1        Wick Phillips 30(b)(6) - R. Wills
2        (Brief interruption.)
3    BY MR. BROWN:
4        Q.   So Mr. Wills, do you have this in
5    front of you or are you just looking at it on
6    the screen?
7        A.   No.  I've got the exhibits in front
8    of me.  It's also on the screen.
9        Q.   Okay.  So have you seen this?  It's
10   called Debtor's Amended Notice of 30(b)(6)
11   Deposition to Wick Phillips Gould & Martin
12   LLP.
13       Have you seen this before?
14       A.   Yes, sir.
15       Q.   And have you reviewed it?
16       A.   Yes, sir.
17       Q.   And if you scroll down to page 4,
18   that sets forth the topics that you have been
19   designated as the witness for Wick Phillips
20   on.
21       Have you reviewed those topics?
22       A.   Yes, sir.
23       Q.   And are you prepared to testify as
24   Wick Phillips' designated witness on those
25   topics today?
```

Page 13

```
1        Wick Phillips 30(b)(6) - R. Wills
2        A.   Yes, sir.
3        Q.   Okay.  Very good.
4        During the deposition today, you
5    are required to answer the questions
6    truthfully.  If you don't know the answer to
7    a question, that is a legitimate response if
8    it's a truthful response, and I'm sure you
9    know that.
10       But I want to make sure you
11   understand that if you say "I don't know" as
12   an answer to one of the questions about the
13   topics that have been designated, that I can
14   consider that and advance the argument at the
15   hearing that that is an admission by
16   Wick Phillips that Wick Phillips doesn't have
17   any knowledge or position with respect to the
18   question that you answer "I don't know" on,
19   and that I can argue that Wick Phillips can
20   be precluded -- should be precluded from
21   offering documents, evidence, or testimony at
22   the hearing on that matter.
23       Do you understand that?
24       A.   I do.
25       Q.   In this deposition, I may get a
```

Wick Phillips 30(b)(6) - R. Wills

1 little sloppy and use the term "you" rather
2 than "Wick Phillips." But because of the
3 nature of this deposition, when I do use the
4 term "you," I'm going to be referring to
5 Wick Phillips unless I specifically say I
6 want your knowledge rather than
7 Wick Phillips'.
8     Do you understand that?
9 A. Yes, sir.
10     MR. BROWN: Ms. Vosburgh, can you
11 please mark Exhibit B as Exhibit B.
12     (SE Multifamily Holdings LLC,
13     Limited Liability Company
14     Agreement, August 23, 2018, marked
15     as Exhibit B.)
16 BY MR. BROWN:
17 Q. Mr. Wills, what has been marked as
18 Exhibit B is a copy of the SE Multifamily
19 Holdings LLC, Limited Liability Company
20 Agreement, dated August 23, 2018.
21     Have you seen this document before?
22 A. Yes, sir.
23 Q. And in what context did you see it?
24 A. In connection with this motion.

Wick Phillips 30(b)(6) - R. Wills

1 Q. So is it accurate to say that
2 before you started preparing to be the Rule
3 30(b)(6) witness of Wick Phillips, you had
4 not seen this document before?
5 A. That's correct.
6 Q. So you personally, as opposed to
7 Wick Phillips, have had no role in connection
8 with this document, the preparation or
9 negotiation of this document, correct?
10 A. Yes, sir.
11 Q. Okay. Do you understand what
12 Wick Phillips' role, if any, was in
13 connection with this document?
14 A. Yes, sir.
15 Q. Okay. Could you tell me what
16 Wick Phillips' role was in connection with
17 the SE Multifamily Holdings Limited Liability
18 Company Agreement, which is Exhibit B.
19 A. Yes. Our -- Wick Phillips' role
20 was using this LLC Agreement in connection
21 with the financing of the Project Unicorn
22 transaction.
23 Q. Okay. Do you know what the purpose
24 of the SE Family Holdings -- let me make this

Wick Phillips 30(b)(6) - R. Wills

1 simpler.
2     For this deposition, I would like
3 to refer to the SE Multifamily Holdings LLC
4 Limited Liability Company Agreement as the
5 LLC Agreement.
6     Is that acceptable to you, and will
7 we be talking about the same thing when we
8 talk about the LLC Agreement?
9 A. Sure. That works great.
10 Q. What was the purpose of the
11 LLC Agreement?
12 A. The purpose of the LLC Agreement
13 was, again, to use in connection with the
14 Project Unicorn structuring for the financing
15 of those acquisitions.
16 Q. Do you know who the parties were to
17 the LLC Agreement?
18 A. I know who the parties are from
19 reading the agreement, but I can't list them.
20 Q. Okay. So I think that Highland was
21 one of the parties. And the other party was
22 an entity known as HCRE Partners LLC.
23     Is that your understanding?
24 A. Yes, sir.

Wick Phillips 30(b)(6) - R. Wills

1 Q. Okay. So -- and I'm going to refer
2 to HCRE Partners, LLC throughout this
3 deposition as "HCRE."
4     Will you understand what I'm
5 talking about and will we be talking about
6 the same thing when I refer to HCRE?
7 A. Yes.
8 Q. It's just the counterparty to
9 Highland in the LLC Agreement, or the other
10 party to the LLC Agreement.
11     Did Wick Phillips have any role in
12 connection with the negotiation and drafting
13 of the LLC Agreement?
14 A. No, sir.
15 Q. Okay. It didn't represent any
16 party?
17 A. Not at -- no, sir.
18 Q. Okay. So it didn't represent
19 either Highland or HCRE, correct?
20 A. Correct.
21 Q. Do you know if Wick Phillips had
22 any communications with either of the parties
23 to the LLC Agreement while the agreement was
24 being negotiated and drafted?

1     Wick Phillips 30(b)(6) - R. Wills
2     A.   I'm not sure.  I don't know.
3     Q.   Okay.  Did Wick Phillips have
4  occasion to at any time need to become aware
5  of the ownership percentages as between the
6  Debtor, Highland, and HCRE, that were
7  allocated in the LLC Agreement?
8     A.   My suspicion would be in connection
9  with the financing, the Loan Agreement with
10  KeyBank and with Freddie, Freddie Mac,
11  obviously, the organizational structure is
12  important to those lenders and, to a certain
13  extent, attached to those loan agreements.
14       And so as it relates to that, yes,
15  sir.
16     Q.   And do you know what the
17  ownership -- does Wick Phillips know what the
18  ownership percentages were in connection with
19  the LLC Agreement?
20     A.   I know what the LLC Agreement says,
21  yes, sir.
22     Q.   And what does the LLC Agreement
23  say?
24     A.   It says --
25     Q.   I think if we flip to page 18,

1     Wick Phillips 30(b)(6) - R. Wills
2  scroll to page 18 of the LLC Agreement...
3     A.   Yes, sir.  Yes, sir.
4       Do you want me to read that?
5     Q.   Yeah, sure.
6     A.   It says that HCRE Partners, LLC has
7  a percentage interest of 51 percent, and
8  Highland Capital Management L.P. has a
9  percentage interest of 49 percent.
10     Q.   Okay.  And do you have any
11  understanding if those percentages were
12  correct or incorrect at the time the Limited
13  Partnership Agreement was executed?
14     A.   I assume they were correct at the
15  time, yes, sir.
16     Q.   Did Wick Phillips have any
17  communications with HCRE concerning the
18  capital contributions required by the
19  LLC Agreement?
20     A.   No, sir.
21     Q.   Did Wick Phillips have any
22  communications with HCRE concerning the
23  ownership interests set forth in the
24  LLC Agreement?
25     A.   Only in connection with -- as a

1     Wick Phillips 30(b)(6) - R. Wills
2  conduit to KeyBank or Freddie Mac in terms of
3  who owns what.
4     Q.   Okay.  We'll talk about that later,
5  then, when we talk about the KeyBank
6  Loan Agreement.
7     A.   Okay.
8     Q.   But no communications --
9  Wick Phillips had no communications with the
10  parties with respect to the ownership
11  interests limited -- if we limit that to the
12  context of just the LLC Agreement, its
13  drafting, negotiation, formation; is that
14  correct?
15     A.   That's correct.
16     Q.   And the same answer if, instead of
17  asking about ownership percentages, I asked
18  about contributions?
19     A.   Yes, sir.  Same answer.
20       MR. BROWN:  Okay.  Ms. Vosburgh,
21  can we mark Exhibit C as Exhibit C.
22       (Bridge Loan Agreement, September
23       26, 2018, marked as Exhibit C.)
24  BY MR. BROWN:
25     Q.   Okay.  So Mr. Wills, up on the

1     Wick Phillips 30(b)(6) - R. Wills
2  screen -- and I think you have a binder of
3  exhibits, I assume?
4     A.   Yes, sir.
5     Q.   So up on the screen marked as
6  Exhibit C, and hopefully in your binder also
7  as Exhibit C, is a document called the Bridge
8  Loan Agreement dated as of September 26,
9  2018, among a group of entities set forth on
10  the agreement that I won't repeat, who are
11  the borrowers, and also the lender, KeyBank
12  National Association, as agent, and KeyBanc
13  Capital Markets as the sole lead arranger and
14  bookrunner.
15       Is that the document you have as
16  Exhibit C?
17     A.   Yes, sir.
18     Q.   Okay.  Have you ever seen this
19  document before?
20     A.   Yes, sir.
21     Q.   Okay.  Are you familiar with it?
22     A.   Yes, sir.
23     Q.   Is it a true copy of -- let's --
24  this Exhibit C, for the rest of the
25  deposition, I'm going to refer to it as the

Page 22

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement.
3       And will you understand and be
4  comfortable referring to Exhibit C as the
5  Loan Agreement?
6    A.  Yes, sir.
7    Q.  Is this a true copy of the
8  Loan Agreement?
9    A.  Yes, sir.  I believe so.
10   Q.  Okay.  Did Wick Phillips have any
11 role in connection with the Loan Agreement?
12   A.  Yes, sir.
13   Q.  Can you describe the role that
14 Wick Phillips played in connection with the
15 Loan Agreement?
16   A.  Sure.  We helped the property-level
17 borrowers here in connection with the
18 Project Unicorn acquisition.
19      This -- the Loan Agreement that
20 we're looking at was for a bucket of
21 properties that could not get agency
22 financing through Freddie Mac.  So we needed
23 KeyBank to come in and provide sort of some
24 additional financing in connection with the
25 Project Unicorn closing.

Page 23

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Okay.  Did Wick Phillips represent
3  Highland in connection with the KeyBank -- in
4  connection with the Loan Agreement?
5    A.  Highland is a co-borrower, but not
6  separately, no, sir.
7    Q.  Okay.  So is the answer to the
8  question did Wick Phillips represent Highland
9  in connection with the Loan Agreement yes or
10 no?
11   A.  No.  No, sir.
12   Q.  It had no representation of
13 Highland?
14   A.  That's correct.
15   Q.  Can you turn to -- let's flip to
16 page 3 of the Loan Agreement.
17      Okay.  So I want to focus you on
18 the term "Borrower" under the Loan Agreement.
19   A.  Okay.
20   Q.  Do you see where the term
21 "Borrower" is defined to include
22 Highland Capital?
23   A.  Yes, sir.
24   Q.  And Highland Capital has been
25 defined earlier in the Loan Agreement, has it

Page 24

1    Wick Phillips 30(b)(6) - R. Wills
2  not, as Highland Capital Management, L.P.?
3    A.  Correct.
4    Q.  So Highland, the Debtor, was a
5  borrower under the Loan Agreement, correct?
6    A.  Yes, sir.
7    Q.  Did Wick Phillips represent the
8  borrowers under the Loan Agreement?
9    A.  Wick Phillips represented some of
10 the borrowers.
11   Q.  Okay.  And which borrowers did it
12 not represent?
13   A.  We did not represent what we've
14 been calling Highland.
15   Q.  Where does it say in the
16 Loan Agreement that you didn't represent
17 Highland?
18   A.  I don't know that the
19 Loan Agreement would say that.
20   Q.  Okay.
21      MR. MARTIN:  I don't think he
22 finished his answer, Counsel.
23      MR. BROWN:  I'm sorry.
24      MR. MARTIN:  The question on the
25 table was which borrowers did

Page 25

1    Wick Phillips 30(b)(6) - R. Wills
2  Wick Phillips not represent, and he was
3  in the middle of providing his answer.
4      MR. BROWN:  I apologize.  I didn't
5  mean to interrupt.
6      MR. MARTIN:  That's okay.
7  BY MR. BROWN:
8    Q.  Can you please provide a complete
9  answer to the question?
10   A.  Sure.
11      Initially we represented the
12 NexPoint entities and the property-level
13 entities all as co-borrowers.  And KeyBank
14 needed more credit from the borrower side
15 since this was such a large transaction, and
16 that's when Highland Capital was added as an
17 additional borrower to the loan.
18   Q.  Okay.  Can we scroll to page 51.
19      Can you please focus on
20 Section 4.01(b).
21   A.  Okay.
22   Q.  This is -- this discusses certain
23 conditions to the Loan Agreement.  And (b)
24 says:
25      "The Administrative Agent shall

Page 26

1    Wick Phillips 30(b)(6) - R. Wills
2    have received" -- as a condition -- "a
3    favorable written opinion (addressed
4    to the Administrative Agent and the
5    Lenders and dated the Effective Date)
6    of Wick Phillips Gould & Martin, LLP,
7    counsel for the Borrower."
8        Is that statement referring to
9    Wick Phillips as "counsel for the borrower"
10   and referencing back to the borrower as
11   several entities, including Highland, is that
12   statement in the Loan Agreement incorrect?
13   A.   I mean, that's what it says, yes,
14   sir.
15   Q.   Is it incorrect?
16   A.   It is incorrect as to who
17   Wick Phillips represented.  It is correct in
18   terms of providing a legal opinion.  You
19   wouldn't have multiple legal opinions from
20   different firms for the same borrower,
21   typically, or collection of borrowers.
22   Q.   So the Loan Agreement -- your
23   testimony today on behalf of Wick Phillips is
24   that this Loan Agreement, to the extent it
25   refers to Wick Phillips' representation of

Page 27

1    Wick Phillips 30(b)(6) - R. Wills
2    the borrower, is inaccurate to the extent the
3    borrower includes Highland; is that correct?
4        MR. MARTIN:  Objection, form.
5    A.   Yes, sir.  That's what we're
6    saying.
7    BY MR. BROWN:
8    Q.   Did Wick Phillips say anything,
9    ever raise the issue of the lack of accuracy
10   of these representations in the
11   Loan Agreement to anybody at any time?
12       MR. MARTIN:  Objection to form.
13   A.   Not to my knowledge.
14   BY MR. BROWN:
15   Q.   Okay.  Can we also scroll forward
16   to page 76.  This is Article IX of the
17   Loan Agreement.  Section 9.01 discusses
18   Notices.
19       And do you see at Section 9.01(a)
20   where it says, in the case of notices, "if to
21   the Borrower, in care of Highland Capital
22   Management," with copies to Wick Phillips?
23   A.   Yes, sir.  I see that.
24   Q.   Okay.  So I'm just trying to
25   ascertain Wick Phillips' position here.  Is

Page 28

1    Wick Phillips 30(b)(6) - R. Wills
2    it that Section 9.01(a) is inaccurate to the
3    extent it reflects that Wick Phillips
4    represented Highland Capital Management in
5    connection with the Loan Agreement?
6    A.   My suspicion is this was the same
7    notice provision as had been there in
8    previous loans that we had worked on -- we,
9    Wick Phillips, had worked on with KeyBank.
10       And once Highland was added as a
11   co-borrower, which had not been the case
12   previously, it was not changed.
13   Q.   Okay.  So was Wick Phillips
14   receiving notices on behalf of
15   Highland Capital Management relating to the
16   Loan Agreement or not?
17   A.   Not that I'm aware of.
18   Q.   Okay.  So did Wick Phillips ever
19   raise the issue with any of the parties to
20   the Loan Agreement that this Section 9.01(a)
21   of the Loan Agreement did not accurately
22   reflect the position of Wick Phillips with
23   respect to its representation of
24   Highland Capital Management?
25       MR. MARTIN:  Objection, form.

Page 29

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   Well, I think we would want the
3    notices, with the borrower being a collection
4    of borrowers, of which we did represent some.
5    BY MR. BROWN:
6    Q.   And why wouldn't the notices be in
7    care of the entities that you represented as
8    opposed to an entity that you didn't
9    represent?
10   A.   I don't know.
11   Q.   Give me a moment, please.
12       Do you have a copy of
13   Wick Phillips' Brief in Opposition to the
14   Debtor's Motion to Disqualify in front of
15   you?
16   A.   Not in front of me, no, sir.
17   Q.   I'm looking at it right now, and I
18   know that you have read it before.
19       And at page 4 of that Opposition,
20   Wick Phillips says:
21       "As a borrower under the bridge
22       loan, Wick Phillips was counsel to
23       HCM L.P."
24       So Wick Phillips' statement in a
25   document filed with the Court on May 6th,

Page 30

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills
2    2021, is inconsistent with your testimony
3    today, is it not?
4        MR. MARTIN: Objection, form.
5    A. I'm sorry. Did you say HC L.P.
6    or --
7    BY MR. BROWN:
8    Q. HCM L.P., which is Highland Capital
9    Management, L.P., the Debtor, Highland.
10   A. Right.
11   Q. We're calling it Highland.
12    So in Wick Phillips' brief filed on
13  May 6th, 2021, in opposition to the Motion to
14  Disqualify, Wick Phillips said:
15    "As a borrower under the bridge
16  loan" -- which is what we're referring
17  to as the Loan Agreement --
18    "Wick Phillips was counsel to HCM
19  L.P."
20    So that is, by my lights,
21  inconsistent with your testimony today.
22    Can you explain why you are
23  testifying in a manner that is not consistent
24  with an admission Wick Phillips has already
25  made in pleadings filed with the bankruptcy

Page 31

1    Wick Phillips 30(b)(6) - R. Wills
2    court?
3        MR. MARTIN: Objection, form.
4    A. Yes. I believe what I said was
5    that -- I guess what we're calling here
6    Highland is a co-borrower under this
7    Loan Agreement that was added later on.
8        And, yes, we did represent the
9    co-borrowers in connection with this
10  Loan Agreement.
11  BY MR. BROWN:
12  Q. Okay. So you agree, then, with the
13  statement made in Wick Phillips' May 6th
14  filing in opposition to the disqualification
15  motion that Wick Phillips did represent the
16  borrower, Highland, under the bridge loan; is
17  that correct?
18  A. We represented all of the borrowers
19  as co-borrowers in this -- with this loan.
20  Q. Okay. Other than the borrowers --
21  other than the co-borrowers, did
22  Wick Phillips represent any other entities in
23  connection with the Loan Agreement?
24  A. No, sir.
25  Q. Okay. Does Wick Phillips have a

Page 32

1    Wick Phillips 30(b)(6) - R. Wills
2    retention agreement in connection with the
3    work it did for the borrowers under the --
4    relating to the Loan Agreement?
5    A. No, sir.
6    Q. Why not?
7    A. I don't know the answer to that
8    question.
9    Q. Does Wick Phillips normally require
10  retention agreements when it undertakes a
11  client representation?
12  A. In an ideal world, we do, yes, sir,
13  but it's not a requirement.
14  Q. Can you tell me what Wick Phillips'
15  custom and practice is with respect to
16  obtaining retention agreements when it
17  undertakes the representation of a client?
18  A. A similar answer. We ideally would
19  have an engagement letter or retention
20  letter, as you mentioned. But it is not
21  required for us to open a matter, or a new
22  client matter.
23  Q. Okay. Do you personally get
24  retention agreements from your clients when
25  you undertake a representation?

Page 33

1    Wick Phillips 30(b)(6) - R. Wills
2    A. I certainly try to.
3    Q. Do you always do it?
4    A. I do not.
5    Q. Did Wick Phillips obtain a conflict
6    waiver from the borrowers, or any of them,
7    concerning its joint representation of them
8    in connection with the Loan Agreement?
9    A. I don't believe so.
10  Q. Have you ever seen a conflict
11  waiver?
12  A. Yes, sir.
13  Q. I'm sorry. I didn't mean it that
14  way. That's the problem with lawyers.
15  They're too literal.
16    Have you ever seen a conflict
17  waiver in connection with the Loan Agreement?
18  A. No, sir.
19  Q. Okay. Did you have -- in your
20  preparation for this deposition and to be the
21  designated witness of Wick Phillips, was
22  there any discussion or reference to a
23  conflict waiver among Wick Phillips' joint
24  clients relating to the Loan Agreement?
25  A. Not that I'm aware of.

Page 34

1    Wick Phillips 30(b)(6) - R. Wills
2       Q.  Do you know whether Wick Phillips
3    considered whether a conflict waiver was
4    necessary because of the joint representation
5    of clients under the Loan Agreement?
6       A.  I do not.
7       Q.  Do you know if Wick Phillips
8    undertook any analysis to determine if the
9    joint representation of the borrowers
10   presented a conflict or a potential conflict
11   for which a conflict waiver was required?
12      A.  I do not.
13      Q.  You don't know if it was done?
14      A.  I don't know.
15      Q.  Okay.  Were there any discussions
16   of the issue of the advisability or necessity
17   of a conflict waiver in connection with the
18   Loan Agreement that Wick Phillips had?
19      A.  I don't believe so.
20      Q.  Do you -- is Wick Phillips familiar
21   with the Texas Rules of Professional Conduct,
22   Section 1.07?
23      A.  Yes, sir.
24      Q.  And do you know if it's familiar
25   with Section 1.07(a) that requires written

Page 35

1    Wick Phillips 30(b)(6) - R. Wills
2    consent for common representations?
3       MR. MARTIN:  Objection, form.
4       A.  Yes, sir.
5    BY MR. BROWN:
6       Q.  And do you know why Wick Phillips
7    did not obtain a written conflict waiver in
8    conformity and compliance with
9    Section 1.07 --
10      MR. MARTIN:  Objection, form.
11   BY MR. BROWN:
12      Q.  -- in connection with the joint
13   representation of clients under the
14   Loan Agreement?
15      MR. MARTIN:  Same objection.
16      A.  I do not know.
17   BY MR. BROWN:
18      Q.  Do you know if Wick Phillips had
19   any discussions with any of the borrowers --
20   as that term is defined under the
21   Loan Agreement -- about actual or potential
22   conflicts that could arise from
23   Wick Phillips' joint representation of them
24   under the Loan Agreement?
25      A.  I don't.

Page 36

1    Wick Phillips 30(b)(6) - R. Wills
2       Q.  Did Wick Phillips undertake any
3    analysis of its responsibilities in
4    connection with the joint representation and
5    whether the representation could be
6    undertaken without an improper impact on its
7    responsibilities?
8       MR. MARTIN:  Objection, form.
9       A.  I'm not aware of that.
10   BY MR. BROWN:
11      Q.  Did Wick Phillips consult with any
12   of the borrowers concerning the implications
13   of the joint representation, for example, on
14   the attorney-client privilege?
15      A.  I don't know.
16      Q.  Do you know if Wick Phillips
17   consulted with any of the borrowers
18   concerning the advantages and risks to them
19   individually of having Wick Phillips jointly
20   represent them in connection with the Loan
21   Agreement?
22      MR. MARTIN:  Objection, form.
23      A.  I don't know.
24   BY MR. BROWN:
25      Q.  Do you have any understanding of

Page 37

1    Wick Phillips 30(b)(6) - R. Wills
2    whether the representation -- well, as you
3    sit here today on behalf of Wick Phillips, do
4    you have an opinion on whether or not the
5    joint representation of the multiple
6    borrowers under the Loan Agreement gave rise
7    to any actual or potential conflicts?
8       MR. MARTIN:  Objection, form.
9       A.  I don't have an opinion.
10   BY MR. BROWN:
11      Q.  Do you understand that HCRE was
12   designated as the lead borrower under the
13   Loan Agreement?
14      A.  Yes, sir.
15      Q.  It was, to your understanding,
16   designated as the lead borrower?
17      A.  Yes, sir.
18      Q.  Can we -- let's see.
19      MS. CANTY:  Ken, if you tell me the
20   section, I can probably jump to it
21   quickly.
22      MR. BROWN:  Yeah.  It's
23   Section 1.05, page 14.
24      MS. CANTY:  Sorry.  I have it as
25   page 25.

Page 38

1      Wick Phillips 30(b)(6) - R. Wills
2      MR. BROWN:  No, I'm sorry.  That --
3  let's first --
4      Okay.  That's fine.  That's fine.
5  BY MR. BROWN:
6      Q.  So if you -- could you review this
7  Section 1.05, Mr. Wills.
8      A.  Sure.  (Reviewing document.)
9      Okay.
10     Q.  Okay.  Did you have a chance to
11 look at both (a) and (b) of Section 1.05?
12     A.  Yes, sir.
13     Q.  Okay.  So the lead borrower under
14 the Loan Agreement is HCRE, correct?
15     A.  Correct.
16     Q.  And this Section 1.05 talks about
17 the appointment of the lead borrower and some
18 of the rights and obligations of the lead
19 borrower, correct?
20     A.  Yes, sir.
21     Q.  And Section (b) says:
22     "The proceeds of each loan and
23  advance provided under the Loans which
24  is requested by the Lead Borrower
25  shall be advanced as and when

Page 39

1      Wick Phillips 30(b)(6) - R. Wills
2  otherwise provided herein or as
3  otherwise indicated by the Lead
4  Borrower."
5      Correct?
6      A.  Correct.
7      Q.  And that "The Lead Borrower shall
8  cause the transfer of the proceeds to the
9  other borrowers on whose behalf such loan and
10 advance was obtained."
11     So is it your understanding that
12 under this Loan Agreement, the lead borrower
13 had the ability to both determine when the
14 advances were made and to direct where the
15 transfers went?
16     A.  Yes, sir, according to this
17 provision.
18     Q.  Okay.  And do you also have an
19 understanding that the other borrowers,
20 including Highland, were on the hook jointly
21 and severally for all amounts that were
22 borrowed under the Loan Agreement?
23     A.  Yes, sir.
24     Q.  So, in your mind, does the fact
25 that HCRE could determine when advances were

Page 40

1      Wick Phillips 30(b)(6) - R. Wills
2  made and direct how those advances were
3  applied, while Highland was jointly and
4  severally liable for those advances, does
5  that give rise to a conflict or potential
6  conflict between Highland and HCRE?
7      MR. MARTIN:  Objection, form.
8      A.  No, sir, not in my opinion.
9  BY MR. BROWN:
10     Q.  Okay.  Why not?
11     A.  Well, my understanding is the
12 Highland entity is more -- was added as a
13 borrower more in a guarantee/guarantor
14 context.  And so the HCRE, or the lead
15 borrower, would just be directing the funds
16 to the property-level borrowers in connection
17 with each of the various acquisitions.
18     Q.  Do you know that's what occurred?
19     A.  That's the setup of the
20 Loan Agreement.
21     Q.  Do you have any knowledge on
22 whether HCRE used moneys that it obtained
23 under the Loan Agreement to make a capital
24 contribution to the Limited Partnership?
25     A.  I don't have that knowledge, no,

Page 41

1      Wick Phillips 30(b)(6) - R. Wills
2  sir.
3      Q.  You don't know one way or the
4  other?
5      A.  No, sir.
6      Q.  Do you know if Wick Phillips ever
7  explained to any of the borrowers the
8  operation of the Loan Agreement to the extent
9  that it permitted HCRE to direct the
10 advances, but that all of the other borrowers
11 were liable under the Loan Agreement,
12 irrespective of how the advances were
13 directed?
14     MR. MARTIN:  Objection, form.
15     A.  I don't know.
16 BY MR. BROWN:
17     Q.  Did Wick Phillips ever advise
18 Highland that it was liable for all amounts
19 due under the Loan Agreement whether or not
20 it received the proceeds or received the
21 benefit of the proceeds?
22     A.  I don't know.
23     Q.  Do you know whether or not Highland
24 received the benefit of the proceeds advanced
25 under the Loan Agreement?

Wick Phillips 30(b)(6) - R. Wills

1    A.  I don't.
2    Q.  Who was Wick Phillips' client
3  contact at HCRE in connection with the
4  Loan Agreement?
5    A.  I believe there were several that
6  we typically deal with, Matt Goetz,
7  Matt McGraner.  Freddy Chang was at one point
8  some form of in-house counsel there.
9    Q.  So Matt Goetz.  Do you know if
10  Matt Goetz was an employee of Highland?
11    A.  I don't know.
12    Q.  Do you know who he was employed by?
13    A.  I don't.
14    Q.  What about Mr. McGraner; do you
15  know if he was an employee of Highland?
16    A.  I don't.
17    Q.  Do you know if he was an employee
18  of HCRE?
19    A.  I do not.
20    Q.  What about Freddy Chang; do you
21  know if he was an employee of Highland?
22    A.  I don't.
23    Q.  Do you know if he was an employee
24  of HCRE?

Wick Phillips 30(b)(6) - R. Wills

1    A.  I do not.
2    Q.  You understand you're testifying on
3  behalf of Wick Phillips right now, correct?
4    A.  Yes, sir.
5    Q.  Who was Wick Phillips' client
6  contact at Highland in connection with the
7  Loan Agreement?
8    A.  I don't believe we have a client
9  contact for Highland.
10    Q.  And why was that?
11    A.  We -- I mean, our silo is the real
12  estate silo for NexPoint that handles loan
13  agreements like we're looking at right now.
14  Highland is a separate part of that company.
15    Q.  But Wick Phillips has already
16  acknowledged in its Opposition that it
17  represented Highland in connection with the
18  Loan Agreement.  And I'm just trying to
19  establish whether, in connection with that
20  acknowledged representation, Wick Phillips
21  had a client contact at Highland.
22    And so the question is did
23  Wick Phillips have a client contact and, if
24  so, who?

Wick Phillips 30(b)(6) - R. Wills

1    A.  Not to my knowledge.
2    Q.  No client contact.  Okay.
3    Did Wick Phillips have contact with
4  James Dondero in connection with the
5  Loan Agreement?
6    A.  Not to my knowledge.
7    Q.  Okay.  With respect to Mr. Geotz,
8  who you did indicate was a client contact for
9  HCRE --
10    MR. MARTIN:  Objection, form.
11  BY MR. BROWN:
12    Q.  -- how did Wick Phillips determine
13  what hat, if you will, Mr. Geotz was wearing
14  and what entity he was speaking on behalf of,
15  communicating on behalf of?
16    MR. MARTIN:  Objection, form.
17    A.  My assumption is wearing a NexPoint
18  hat, as typically is the case.
19  BY MR. BROWN:
20    Q.  And what is that assumption based
21  on?
22    A.  Our prior representations and
23  dealings.
24    Q.  But is it true that in connection

Wick Phillips 30(b)(6) - R. Wills

1  with this representation, Wick Phillips'
2  representation of the borrowers under the
3  Loan Agreement, you don't know how
4  Wick Phillips made a determination of what
5  hat the individuals it spoke to were wearing,
6  do you?
7    MR. MARTIN:  Objection, form.
8    A.  I don't know if a determination was
9  made at all, no, sir.
10  BY MR. BROWN:
11    Q.  And do you know whether
12  Wick Phillips made any distinction in terms
13  of people that -- the client contacts it
14  communicated with in connection with the
15  Loan Agreement, whether it made any
16  distinction whether those individuals were
17  communicating with it on behalf of Highland
18  or HCRE?
19    MR. MARTIN:  Objection, form.
20    A.  I don't know.
21    MR. MARTIN:  Is now a good time to
22  take a break?
23    (Recess taken.)

Page 46

1     Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3     Q.  Mr. Wills, do you know what the
4  purpose of the Loan Agreement was?
5     A.  To provide financing in connection
6  with the Project Unicorn property
7  acquisitions.
8     Q.  Which was going to be done by the
9  LLC?  The acquisitions were going to be by
10 the LLC?
11    A.  By some subsidiaries, but yes, sir.
12    Q.  And do you know what HCRE's role
13 was in connection with the Loan Agreement?
14    A.  They were the lead borrower.
15    Q.  Okay.  And we've already talked
16 about to some extent what that involved.
17       Do you know what Highland's role
18 was in connection with the Loan Agreement?
19    A.  It's a little bit like I've already
20 mentioned, but primarily to provide more
21 credit to the borrowing base, to the
22 collective definition of "borrower."
23    Q.  Do you know whether the ownership
24 structure of the Limited Partnership was an
25 issue that was addressed in the

Page 47

1     Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3     A.  The Highland Limited Partnership?
4     Q.  I'm sorry.  Do you know -- let me
5  rephrase the question.  I misstated it.
6        Do you know whether or not the
7  ownership interests between -- as and between
8  Highland and HCRE in the LLC was an issue
9  that was part of the Loan Agreement?
10    A.  I'm not sure I understand your
11 question.  I apologize.
12    Q.  Okay.  Did the ownership interest
13 in the LLC between Highland and HCRE -- was
14 that a component of the Loan Agreement?
15    A.  Yes, sir.
16    Q.  Okay.  And in what way?
17    A.  Just as far as which party was
18 51 percent and which was 49 percent.
19    Q.  I'd like to scroll to Schedule 3.15
20 of the Loan Agreement.
21       MS. CANTY:  Do you know which page
22 that's on, Ken?
23       Never mind.  I see it.
24       MR. BROWN:  Yeah.
25

Page 48

1     Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3     Q.  Okay.  Let's go back to the prior
4  page, the caption page, Schedule 3.15.
5        Okay.  Mr. Wills, are you familiar
6  with Schedule 3.15?
7     A.  Yes, sir.
8     Q.  What role did Wick Phillips have in
9  connection with Schedule 3.15 of the
10 Loan Agreement?
11    A.  We provided these -- the
12 attachments to KeyBank to attach here as the
13 schedule.
14    Q.  Okay.  Let's look at the
15 attachments.
16       MR. BROWN:  Flip -- if we could
17 flip to the very next page.
18       Okay.  Is there any way we could
19 change the view on that so it's upright?
20 Okay.
21 BY MR. BROWN:
22    Q.  Is this one of the attachments?
23    A.  Yes, sir.
24    Q.  And Wick Phillips prepared this
25 attachment in connection with the

Page 49

1     Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3        MR. MARTIN:  Objection, form.
4     A.  No, sir.  We provided these
5  schedules to KeyBank.
6  BY MR. BROWN:
7     Q.  Okay.  You provided the schedules
8  to KeyBank.  Did Wick Phillips prepare the
9  schedules?
10    A.  No, sir.
11    Q.  Did it have any -- did it have any
12 role in connection with the preparation of
13 the schedules?
14    A.  Just as sort of the conduit between
15 the business folks and the lender.
16    Q.  The business folks at the borrower?
17    A.  Correct.
18    Q.  So did Wick Phillips make any
19 changes to these schedule -- to the schedules
20 attached as schedule -- to Schedule 3.15, did
21 it make any changes to them after it received
22 them from the borrowers?
23    A.  No, sir.
24    Q.  Did it review -- did it review
25 these attachments?

Page 50

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2      A.  Yes, sir.
 3      Q.  And did it make any determination
 4   as to their accuracy?
 5      A.  I would assume so, yes, sir.
 6      Q.  And, for example, this first
 7   schedule reflects the ownership interests of
 8   Highland and HCRE in the LLC; is that
 9   correct?
10      A.  Yes, sir.
11      Q.  And it reflects the ownership
12   interest as 49 percent for Highland and
13   51 percent for HCRE; is that correct?
14      A.  Yes, sir.
15      Q.  And you don't have -- is it your
16   understanding that that ownership allocation
17   was correct at the time these schedules were
18   prepared?
19      A.  Yes, sir.
20      Q.  And let's scroll down to the next
21   attachment in the schedule.
22          This is the second attachment.  At
23   the bottom it says it's for Gulfstream Isles.
24          Do you see that?
25      A.  Yes, sir.
```

Page 51

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2      Q.  And that would be a reference to
 3   the underlying property that was being
 4   acquired; is that correct?
 5      A.  Yes, sir.
 6      Q.  Okay.  And, again, the ownership
 7   percentages for HCRE and Highland in the LLC
 8   are reflected as the same, 51 for HCRE and
 9   49 percent for Highland.  Correct?
10      A.  Yes, sir.
11      Q.  And based on your prior review of
12   these attachments as Schedule 3.15, your
13   recollection is that they all -- I think
14   there's 22 of them, and they all reflect the
15   same ownership percentage in the LLC; is that
16   correct?
17      A.  I think so, yes, sir.  We can flip
18   through them, but I assume so.
19      Q.  Yeah.  Why don't we just briefly
20   flip through them.  If we go to the next one.
21          Again, this is for Victoria Park.
22          Same ownership percentage reflected
23   there, correct?
24      A.  Yes, sir.
25      Q.  And the next one, this is for the
```

Page 52

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   Reserve at River Walk.
 3          Same ownership percentage reflected
 4   there, correct?
 5      A.  Yes, sir.
 6      Q.  The next one, Heights at
 7   Olde Towne.
 8          Same ownership percentage reflected
 9   there, correct?
10      A.  Yes, sir.
11      Q.  Okay.  I don't think we have to
12   flip further after these.  They say what they
13   say.
14      A.  Okay.
15          MR. MARTIN:  Mr. Brown, I don't
16   pretend to know as much about these
17   transactions as you certainly do, but I
18   do believe that starting with some of
19   the properties towards the back, there
20   are -- while some of the ownership
21   percentages may be the same, you may
22   want to go over them.  Governors Green,
23   Stoney Ridge, Oak Mill --
24          MR. BROWN:  Okay.
25          MR. MARTIN:  The structures do
```

Page 53

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   change a little bit.
 3   BY MR. BROWN:
 4      Q.  Okay.  We can do that.  Let's look
 5   through each one of them.  Let's just do a
 6   page flip.
 7          Again, this is Governors Green.
 8          With respect to the interests that
 9   are reflected in the LLC, they're the same,
10   correct, for Highland and HCRE, as the
11   others, 49 percent and 51 percent
12   respectively?
13      A.  Yes, sir.
14      Q.  Okay.  Let's go down to the next
15   one, Stoney Ridge.
16          Again, focusing just on the
17   ownership interest in the LLC, it's reflected
18   as 49 percent Highland and 51 percent HCRE,
19   correct?
20      A.  Yes, sir.
21      Q.  And the next one, Oak Mill.
22          Again, focusing just on the LLC,
23   the ownership interest is reflected at
24   49 percent for Highland and 51 percent for
25   HCRE.  Correct?
```

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  Yes, sir.
3    Q.  And the next one, which is
4  Battleground Park, and focusing again on the
5  LLC, the ownership interests are reflected as
6  49 percent Highland, 51 percent HCRE.
7  Correct?
8    A.  Yes, sir.
9    Q.  And for Lakes at Renaissance Park,
10  again focusing on the LLC, the ownership
11  percentage is reflected as 49 percent
12  Highland and 51 percent HCRE, correct?
13    A.  Yes, sir.
14    Q.  And for Brandywine -- huh.  Unless
15  I'm missing something, this doesn't even
16  address the LLC interests.
17    MR. MARTIN:  That's one of the
18  reasons I was asking.
19    MR. BROWN:  Pardon me?
20    MR. MARTIN:  That's one of the
21  reasons I was asking.
22    MR. BROWN:  Yeah.  Yeah.
23    MR. MARTIN:  I know you're trying
24  to make your record and I'm not trying
25  to interrupt you.

1    Wick Phillips 30(b)(6) - R. Wills
2    MR. BROWN:  Thank you.  I
3  appreciate it.
4  BY MR. BROWN:
5    Q.  So Brandywine just doesn't -- in
6  this chart, the LLC is not even shown,
7  correct?
8    A.  Correct.
9    Q.  Scroll to the next one, please.
10    This one, which is
11  Glenview Reserve, with respect to the LLC, it
12  reflects the same ownership percentage,
13  49 percent in Highland and 51 percent in
14  HCRE, correct?
15    A.  Yes, sir.
16    Q.  Scroll down, please.
17    And, again, this is for Andros
18  Isles.
19    And with respect to the LLC, it is
20  again reflecting and repeating the same
21  ownership percentage of 49 percent in
22  Highland and 51 percent in HCRE.  Correct?
23    A.  Yes, sir.
24    Q.  Again, this is Arborwalk.
25    And with respect to the LLC, the

1    Wick Phillips 30(b)(6) - R. Wills
2  same ownership percentages are reflected for
3  Highland and HCRE as on the prior charts,
4  correct?
5    A.  Yes, sir.
6    Q.  For Walker Ranch, which is the next
7  page, the same ownership percentages are
8  reflected for the LLC as on the prior charts,
9  correct?
10    A.  Yes, sir.
11    Q.  And with respect to Towne Crossing,
12  the next page, the same ownership percentages
13  are reflected in the LLC, correct?
14    A.  Yes, sir.
15    Q.  And with respect to the next page,
16  West Place, the same LLC percentages are
17  reflected for Highland and HCRE, correct?
18    A.  Yes, sir.
19    Q.  And the next page, Vista Ridge, the
20  same LLC percentages -- the same ownership
21  percentages are reflected for Highland as
22  HCRE as on the prior charts, correct?
23    A.  Yes, sir.
24    Q.  Next page, which is Hidden Lake.
25    With respect to the LLC, the same

1    Wick Phillips 30(b)(6) - R. Wills
2  ownership percentages are reflected for HCRE
3  and Highland as on the prior charts, correct?
4    A.  Yes, sir.
5    Q.  The next page, Arbolita.
6    With respect to the LLC, the same
7  ownership percentages are reflected, correct?
8    A.  Yes, sir.
9    Q.  Next page, Fairways.
10    With respect to the LLC, the same
11  ownership percentages are reflected, correct?
12    A.  Yes, sir.
13    Q.  The next page, with respect to
14  Grand Oasis, it's the same ownership
15  percentages as on the prior charts, correct?
16    A.  Yes, sir.
17    Q.  And with respect to
18  Summers Landing, there is no indication
19  here -- no reflection of the LLC in the
20  chart; is that correct?
21    A.  Yes, sir.  That's correct.
22    Q.  Okay.  I think that takes us
23  through it.  And I apologize for dragging
24  everybody through that, but your counsel is
25  correct that they're not all -- they did not

Wick Phillips 30(b)(6) - R. Wills

1   Wick Phillips 30(b)(6) - R. Wills
2   all reflect the ownership interests in the
3   LLC.
4        But is it correct to say that, with
5   respect to Schedule 3.15 of the
6   Loan Agreement, and the charts reflecting the
7   ownership interests of the subsidiaries that
8   do address the ownership interest in the LLC,
9   they all identically reflect that the
10  ownership interest is 41 percent --
11  49 percent in Highland and 51 percent in
12  HCRE?
13      A.   Yes, sir.
14      Q.   And that's consistent with the
15  ownership interest that is set forth in the
16  LLC Agreement, correct?
17      A.   Correct.
18      Q.   Did you become familiar with the --
19  with Schedule 3.15 of the Loan Agreement
20  before or after your designation as the -- as
21  Wick Phillips' Rule 30(b)(6) witness?
22      A.   After.
23      Q.   Did Wick Phillips have any
24  communications with HCRE concerning the
25  charts we just went through that comprise

1   Wick Phillips 30(b)(6) - R. Wills
2   Schedule 3.15 of the Loan Agreement?
3        MR. MARTIN:  Objection, form.
4        A.   Yes, sir.
5   BY MR. BROWN:
6        Q.   And with whom did Wick Phillips
7   have those communications?
8        A.   I don't recall specific names, but
9   different people within both NexPoint and
10  from the in-house team at Highland.
11      Q.   And how do you -- what is the
12  distinction between NexPoint and Highland in
13  Wick Phillips' mind?
14      A.   The NexPoint distinction would be
15  we've always been hired in the real estate
16  silo, only operating on sort of what I would
17  call the property level.
18      And then, sort of like when we're
19  looking at the structure charts in 3.15, once
20  you get up to really the 49/51 percent
21  distinction, Mr. Brown, that you were talking
22  about, that structuring is beyond the scope
23  of our representation and typically goes to
24  in-house or a different law firm handling
25  that side of things for that portion of the

1   Wick Phillips 30(b)(6) - R. Wills
2   company.
3        Q.   Did Highland have separate counsel
4   in connection with the Loan Agreement?
5        A.   I don't know.
6        Q.   So you, testifying here on behalf
7   of Wick Phillips, you don't know any of the
8   names of the individuals with whom
9   Wick Phillips communicated relating to the
10  HCRE representation; is that correct?
11      MR. MARTIN:  Objection, form.
12      A.   No.  That's -- I don't think that's
13  exactly what I said.  We've already gone over
14  a few of the Wick Phillips contacts at
15  NexPoint, Matt McGraner and Matt Goetz.
16  BY MR. BROWN:
17      Q.   Yes.
18      A.   In reviewing some of the
19  correspondence in preparation for this
20  deposition, yes, sir, there are some other
21  names that I'm not familiar with.  My partner
22  at the time would have been having those
23  communications within the context of this
24  transaction.
25      So there's a Paul Broaddus and a

1   Wick Phillips 30(b)(6) - R. Wills
2   handful of other names that I believe had a
3   role in creating some of these charts and
4   passing them along to us, but I don't recall
5   their specific names.
6        Q.   Okay.  So, again, we'll get to
7   those emails and we can follow up on that.
8        But other than Mr. Goetz,
9   Mr. McGraner, Mr. Chang, and Mr. Broaddus,
10  did Wick Phillips have communications with
11  any other individuals that were
12  representatives of HCRE in connection with
13  the Loan Agreement?
14      MR. MARTIN:  Objection, form.
15      A.   Not that I'm aware of.
16  BY MR. BROWN:
17      Q.   Okay.  Did Wick Phillips have
18  communications with any individuals that were
19  representatives of Highland in connection
20  with the Loan Agreement other than Mr. Goetz,
21  Mr. -- well, strike that.
22      Did Wick Phillips have any
23  communications with representatives of
24  Highland in connection with the
25  Loan Agreement?

Page 62

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2         MR. MARTIN:  Objection, form.
 3     A.   I think with Mr. Broaddus and
 4  probably a handful of other folks in
 5  connection with some of these charts and
 6  structuring.
 7  BY MR. BROWN:
 8     Q.   When it spoke to, for example,
 9  Mr. Broaddus, who was communicating on behalf
10  of Highland, was there another counsel
11  involved for Highland in the communications
12  that Wick Phillips had for Mr. Broaddus?
13     A.   I believe in connection with some
14  of the structuring, yes, sir.
15     Q.   And who would that have been?
16     A.   I believe it was Hunton & Williams.
17     Q.   So you believe that
18  Hunton & Williams was involved in the
19  representation of Highland in connection with
20  the Loan Agreement?
21         MR. MARTIN:  Objection, form.
22     A.   In connection with the
23  organizational structure, yes, sir.
24  BY MR. BROWN:
25     Q.   Are you sure you're not conflating
```

Page 63

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2  that with the representation of Highland in
 3  connection with the LLC?
 4     A.   No, sir.  I mean -- no, I guess, is
 5  the short answer.
 6     Q.   And are you aware of any writings
 7  that reflect that the Hunton firm represented
 8  Highland in connection with the
 9  Loan Agreement?
10     A.   I'm not aware of those.
11     Q.   And what do you base your
12  conclusion on that the Hunton firm
13  represented Highland in connection with the
14  Loan Agreement?
15     A.   Because Hunton is typically the
16  Highland tax counsel that provides the
17  organizational charts that are attached to
18  the Loan Agreement.
19     Q.   And do you have independent -- do
20  you have knowledge -- did the organizational
21  charts that comprise Schedule 3.15 of the
22  Loan Agreement, did they come from Hunton?
23         MR. MARTIN:  Objection, form.
24     A.   They came from Highland.  So beyond
25  that, I'm not sure.
```

Page 64

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2  BY MR. BROWN:
 3     Q.   Okay.  So are you aware of any
 4  communications that Wick Phillips had with
 5  Hunton directly in connection with the
 6  Loan Agreement?
 7     A.   No, sir.
 8     Q.   So you have no independent
 9  knowledge -- you have no knowledge, do you,
10  that Hunton represented Highland in
11  connection with the Loan Agreement, do you?
12         MR. MARTIN:  Objection, form.
13     A.   I don't know.  Section 3.15 is part
14  of the Loan Agreement.  So that's where I'm
15  getting a little hung up, I suppose.
16  BY MR. BROWN:
17     Q.   Okay.  And what part of Section --
18  of Schedule 3.15 leads you to believe that
19  Hunton represented Highland in connection
20  with the Loan Agreement?
21         MR. MARTIN:  Objection, form.
22     A.   I guess it's just a little bit of
23  deduction because Wick Phillips did not.  So
24  it's either Highland in-house or their
25  typical tax counsel, which is Hunton, or DST
```

Page 65

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2  counsel or REIT counsel.
 3         So I can't say for certain that
 4  it's Hunton, but I can say for certain that
 5  it's not Wick Phillips.
 6  BY MR. BROWN:
 7     Q.   So you can say -- I'm sorry.  You
 8  can say for certain that what is not
 9  Wick Phillips?
10     A.   That we did not -- we had no role
11  in these org charts, which you're saying isn't
12  Hunton represent Highland in connection with
13  the Loan Agreement.
14         And I'm saying, it looks like it
15  because these org charts were not prepared by
16  Wick Phillips, so somebody represented
17  Highland in connection with the
18  Loan Agreement, to answer that question.
19     Q.   But you're speculating that it was
20  Hunton, correct?
21     A.   That -- I just said I don't know
22  for certain that it was Hunton.
23     Q.   You actually -- as you sit here
24  today, you have no idea whether it was Hunton
25  or whether any firm was involved in preparing
```

Page 66

Wick Phillips 30(b)(6) - R. Wills

1     Wick Phillips 30(b)(6) - R. Wills
2 those charts, do you?
3     A.  That's correct.
4     Q.  Okay.  Can you describe the
5 conversations that Wick Phillips had with
6 HCRE concerning the organization charts that
7 are attached to -- as Schedule 3.15 to the
8 Loan Agreement?
9     A.  Generally, yes.  To get an
10 understanding of what the structure was for
11 each of the properties so that we could
12 accurately communicate that to the lender.
13     Q.  Okay.  Can you give me any more
14 detail as to what those communications were
15 beyond what you just testified to?
16     A.  You know, it would -- sort of like
17 we had just talked about, it would be whether
18 it was going to be part of the restructure, a
19 DST structure, you know, for purposes of
20 communicating which buckets those would fall
21 in, whether it's KeyBank or Freddie.
22     Q.  Are you aware that the
23 Loan Agreement contained representations and
24 warranties?
25     A.  Yes, sir.

Page 67

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  And are you aware that those
3 representations and warranties on multiple
4 occasions included reps and warranties by the
5 borrowers relating to the subsidiaries?
6     A.  Yes, sir.
7     Q.  Did Wick Phillips perform any
8 diligence on behalf of any of its clients in
9 connection with the Loan Agreement to
10 determine if the representations and
11 warranties in the Loan Agreement that related
12 to the subsidiaries were true and accurate?
13     A.  Diligence as far as asking the
14 client if their org chart is accurate?  Yes.
15     Q.  And what did it do to diligence the
16 reps and warranties and, in particular, the
17 reps and warranties relating to the
18 subsidiaries as they're reflected on
19 Schedule 3.15?
20     A.  Confirm with the people that
21 prepared the org charts.
22     Q.  So what were those communications?
23 What was the substance of those
24 communications?
25     A.  I don't know.

Page 68

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Okay.  Do you know who
3 Wick Phillips had these discussions relating
4 to diligencing the reps and warranties
5 relating to the subsidiaries?
6     A.  Yes.  At the time it would have
7 been primarily D.C. Sauter.  And then --
8     Q.  Could you spell that?
9     A.  Sure.  It's just the initials D,
10 like dog, C, like Charles.
11     Q.  Yep.
12     A.  Sauter, S-a-u-t-e-r.
13     Q.  And who was D.C. Sauter a
14 representative of, what entity?
15     A.  He was a partner at Wick Phillips.
16     Q.  Oh, okay.  So he was the
17 Wick Phillips lawyer that would have
18 diligenced -- done the underlying work to
19 diligence the reps and warranties relating to
20 the subsidiaries, correct?
21     A.  Yes, sir.
22     Q.  Did you speak to him in connection
23 with your preparation for your testimony as
24 the designated witness of Wick Phillips?
25     A.  Yes, sir.  We spoke yesterday.

Page 69

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Okay.  And so on behalf of
3 Wick Phillips, who did Wick Phillips speak to
4 in connection with diligencing the reps and
5 warranties in the Loan Agreement relating to
6 the subsidiaries?
7     MR. MARTIN:  Objection, form.
8     It would have been the laundry list
9 of folks we've been over, whether it was
10 Paul Broaddus, Freddy Chang, Matt McGraner,
11 someone within the NexPoint or Highland team
12 that had created those charts and could tell
13 us that they were accurate.
14 BY MR. BROWN:
15     Q.  Okay.  It's your understanding that
16 Wick Phillips made a determination that the
17 charts that comprise Schedule 3.15 and the
18 reps and warranties in the Loan Agreement
19 relating to those charts were true and
20 accurate, correct?
21     A.  Yes, sir.
22     Q.  And do you know if Wick Phillips
23 had an understanding when it did this due
24 diligence and spoke to that group of people
25 you had identified earlier, Goetz, McGraner,

Page 70

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   Chang, and Broaddus, I believe were the
 3   universe; is that correct?
 4        MR. MARTIN:  Objection, form.
 5        A.  Yes, sir.
 6   BY MR. BROWN:
 7        Q.  Okay.  So of those four people,
 8   did -- how did Wick Phillips determine what
 9   hat those individuals were wearing when it
10   spoke to them, i.e., were they speaking on
11   behalf of HCRE or were they speaking on
12   behalf of Highland or were they speaking on
13   behalf of some other borrower?
14        MR. MARTIN:  Objection, form.
15   BY MR. BROWN:
16        Q.  Do you understand the question,
17   Mr. Wills?
18        A.  Yes.  I can answer the question.
19        The Matt McGraner, Matt Goetz part
20   of things is NexPoint.  So they should
21   communicate to us from the borrower level --
22   I'm sorry, the SE Multifamily Holdings LLC
23   level down, as we got down to the property
24   level.
25        And then Paul Broaddus, on that
```

Page 71

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   side of things on the Highland level, is what
 3   handles the chain up, or the chart up.  And
 4   so we would rely on their understanding of
 5   the chart and the accuracy of that chart.
 6        Q.  Okay.  You said McGraner was
 7   speaking on behalf of NexPoint; is that
 8   correct?
 9        A.  Yes, sir.
10        Q.  And who else did you say was
11   speaking on behalf of NexPoint?
12        A.  Matt Goetz.
13        Q.  Okay.  Do you know whether McGraner
14   was also a representative of Highland or had
15   any affiliation with Highland?
16        A.  I don't.
17        Q.  What about Geotz?  Do you know if
18   he had any affiliation with Highland?
19        A.  I don't know.
20        Q.  And Wick Phillips understood, did
21   it not, that the lender under the
22   Loan Agreement would be relying on the reps
23   and warranties made by the borrower, correct?
24        A.  Yes, sir.
25        Q.  And Wick Phillips understood that
```

Page 72

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   an incorrect or false representation or
 3   warranty was an event of default under the
 4   Loan Agreement, correct?
 5        A.  Yes, sir.
 6        Q.  And the event of default could lead
 7   to acceleration of the amounts due, correct?
 8        A.  Yes, sir.
 9        MR. BROWN:  Can we attach -- or can
10   we mark Exhibit D.
11        (Email chain, "RE:  Project Unicorn
12          - Final Org Charts," with
13          attachments, marked as Exhibit D.)
14        MR. BROWN:  Okay.  So can we scroll
15   down to the first email in the chain?
16   Okay.  That's the one I want to focus on
17   for right now.
18   BY MR. BROWN:
19        Q.  Okay.  So Mr. Wills, focusing on
20   the email that's on the screen, it's the
21   Monday, September 17, 2018, email that is
22   sent by Rachel Sam at 4:21 p.m.
23        A.  Uh-huh.
24        MR. MARTIN:  You need to say "yes"
25   or "no."
```

Page 73

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2        THE WITNESS:  Yes.
 3   BY MR. BROWN:
 4        Q.  Okay.  Have you seen that email
 5   before?
 6        A.  Yes.
 7        Q.  Who is Rachel Sam?
 8        A.  She is an attorney at
 9   Wick Phillips.
10        Q.  Okay.  This email was sent by
11   Rachel Sam?
12        A.  Yes, sir.
13        Q.  And you have seen it before?
14        A.  Yes, sir.
15        Q.  Before or after your designation?
16        A.  After.
17        Q.  Okay.  And did you review this
18   email as part of your preparation to testify
19   today?
20        A.  Yes, sir.
21        Q.  So this email, the caption is
22   "Final Org Charts."
23        And if we scroll down further to
24   the attachments, they are either -- and I
25   can't tell, but they are either -- this is
```

1    Wick Phillips 30(b)(6) - R. Wills
2  this first email, says -- I'm sorry, the
3  first attachment refers to Governors Green.
4      And this is either one of the
5  charts attached to Schedule 3.15 in the
6  Loan Agreement or some prior and very similar
7  version to it.
8      Would you say that's accurate?
9      MR. MARTIN:  Objection, form.
10     A.  Yes, sir.
11 BY MR. BROWN:
12     Q.  And, again, on the org chart, as
13 with all of the org charts attached as
14 Schedule 3.15 that contain a reference to the
15 LLC, this org chart provides that the
16 ownership interests are 51 percent HCRE and
17 49 percent Highland, correct?
18     A.  Yes, sir.
19     Q.  And if we could scroll down to the
20 next org chart.
21     Again, this one is Stoney Ridge.
22     And would you agree that this is
23 either the same chart that's attached to --
24 as Schedule 3.15 or a virtually identical
25 version and certainly identical with respect

1    Wick Phillips 30(b)(6) - R. Wills
2  to the ownership interests in the LLC?
3      A.  Yes, sir.
4      Q.  Scroll down one more chart, please.
5      With respect to the attachment to
6  Rachel Sam's email regarding Oak Mill
7  Apartments, again, would you agree that this
8  is either identical to the schedule attached
9  as -- to the chart attached for -- to
10 Schedule 3.15 or a virtually identical
11 version, and certainly identical with respect
12 to the reflection of the ownership interests
13 in the LLC?
14     A.  Yes, sir.
15     MR. BROWN:  Okay.  Scroll down
16 again.  I think that's the end.  Yeah.
17 Okay.
18     Let's go back to the email, the
19 September 17 email.
20 BY MR. BROWN:
21     Q.  Okay.  So in her email, Ms. Sam is
22 writing or emailing to, if you look up to the
23 "To" line, Matt McGraner, who you've
24 referenced before.  There are two -- there's
25 an entry for him showing a Highland Capital

1    Wick Phillips 30(b)(6) - R. Wills
2  email address, correct?
3      A.  Yes, sir.
4      Q.  And you had previously testified
5  that you believed he was a representative of
6  NexPoint, correct?
7      A.  Yes, sir.
8      Q.  Does this refresh your recollection
9  or change your conclusions as to whether or
10 not he was also a representative of Highland?
11     MR. MARTIN:  Objection, form.
12     A.  No, sir.
13 BY MR. BROWN:
14     Q.  Okay.  Do you have any idea why
15 Mr. McGraner has a Highland Capital email
16 address?
17     A.  No, sir.
18     Q.  And, again, it's also to Mr. Geotz,
19 who you also, I believe, testified that
20 Wick Phillips was communicating with on
21 behalf of NexPoint.
22     He also has a Highland Capital
23 email address, correct?
24     A.  Yes, sir.
25     Q.  And does this change your

1    Wick Phillips 30(b)(6) - R. Wills
2  conclusion or refresh your recollection as to
3  whether or not Mr. Goetz was also a
4  representative of Highland Capital or
5  Highland?
6      A.  No, sir.  No, sir.
7      Q.  I want to make sure the record is
8  correct.  I meant to just say Highland
9  because we've defined the Debtor as Highland.
10     Does this refresh your recollection
11 or change your conclusion as to whether
12 Mr. Goetz was a representative of Highland?
13     A.  No, sir.
14     Q.  Okay.  And do you know who
15 Bonner McDermett is?
16     A.  Yes, sir.  I believe he is an
17 analyst with Mr. Goetz and Mr. McGraner.
18     Q.  And do you know whether or not he
19 is a representative of Highland or some other
20 entity?
21     A.  I do not know.
22     Q.  You also had referred to
23 Mr. Broaddus, who is another recipient of
24 this email, also with a Highland Capital
25 email address?

Wick Phillips 30(b)(6) - R. Wills

1
2    A.   Yes, sir.
3    Q.   Do you know whether Mr. Broaddus is
4  a representative of Highland?
5    A.   I believe that's correct.
6    Q.   Okay.  And also Freddy Chang, who I
7  believe you also referenced, with a
8  Highland Capital email address.
9        Do you know who Freddy Chang is a
10  representative of?
11    A.   I believe he's NexPoint, some sort
12  of in-house counsel role.
13    Q.   Okay.  And do you know why he has a
14  Highland Capital email address?
15    A.   No, sir.
16    Q.   Okay.  And the cc is to D.C. Sauter
17  of Wick Phillips, correct?
18    A.   Yes, sir.
19    Q.   And other than D.C. Sauter, there
20  are no other outside lawyers that are on --
21  that are recipients of this email, correct?
22    A.   That's correct.
23    Q.   So this email by Rachel Sam, the
24  Wick Phillips lawyer says:
25        "I made a couple of clean up

Wick Phillips 30(b)(6) - R. Wills

1
2  changes to the DST org charts and am
3  waiting for signoff from
4  Baker McKenzie.  Once I hear back from
5  Baker, I will circulate those updated
6  org charts."
7        So you, I believe, testified
8  earlier that Wick Phillips didn't make any
9  changes to the org charts.  Does this refresh
10  your recollection as to whether or not
11  Wick Phillips made changes to the org charts?
12    A.   Yeah.  It looks like Rachel may
13  have cleaned up some typos that she got from
14  DST counsel.
15    Q.   Does this refer to typos?
16    A.   "Clean up" is what I would
17  interpret as typo.
18    Q.   You're assuming that clean up means
19  typo?
20    A.   Yes, sir.
21    Q.   But you don't know, do you?
22    A.   I do not.
23    Q.   So, for example, you don't know
24  whether the changes related to substance, do
25  you?

Wick Phillips 30(b)(6) - R. Wills

1
2        MR. MARTIN:  Objection, form.
3    A.   Well, I do because we are not DST
4  counsel.  So we would not be making material
5  changes to the DST org chart.
6  BY MR. BROWN:
7    Q.   Whether DST -- Delaware Statutory
8  Trust is what DST means, correct?
9    A.   Yes, sir.
10    Q.   And the reason you say you know
11  that the changes were, quote, "typos" is
12  because -- tell me again?
13    A.   Well, they're attached and we just
14  went through and said they're substantially
15  similar to what's in the Loan Agreement.
16        And quite frankly, we don't have
17  DST counsel here.  We don't have that
18  capability.  So we wouldn't -- we wouldn't be
19  making those changes.
20    Q.   Okay.  But again, you're
21  speculating, correct?  You don't know.
22        MR. MARTIN:  Objection, form.
23  BY MR. BROWN:
24    Q.   You don't know what changes Rachel
25  made, do you?

Wick Phillips 30(b)(6) - R. Wills

1
2    A.   No, sir.
3        MR. BROWN:  Okay.  Can we scroll up
4  to the next email.
5  BY MR. BROWN:
6    Q.   Again, this is a -- appears to be
7  the next email on the chain.  It's just under
8  an hour later, at 5:16 p.m., to the same
9  group with a copy to D.C. Sauter, and it's
10  Rachel again here saying:
11        "Just wanted to follow up on the
12        org charts.  Let us know if you have
13        any comments or if these are okay to
14        submit to Freddie."
15        Does that -- have you seen that
16  email before?
17    A.   Yes, sir.
18    Q.   And is that an email that
19  Rachel Sam of Wick Phillips sent to all the
20  people reflected on the "To" and "cc" line?
21    A.   Yes, sir.
22    Q.   Okay.  Let's scroll up to the next
23  email.  And this is -- have you seen this
24  email before?
25        It's the September 18, 2018, email

1    Wick Phillips 30(b)(6) - R. Wills
2  from Freddy Chang with a Highland Capital
3  email address, to Rachel Sam, again,
4  regarding the final org charts.  And it's
5  Freddy Chang asking, "Are the DST org charts
6  ready to go?"  Asking Rachel.
7      Have you seen this before?
8    A.  Yes, sir.
9    Q.  And is this an email that was
10 received by Wick Phillips?
11   A.  Yes, sir.
12   Q.  Okay.  Next email.
13     This appears to be Rachel Sam's
14 response to Freddy Chang's prior email at
15 7:45.  It's like seven minutes later, at
16 7:52, from Rachel Sam to Freddy Chang,
17 copying D.C. Sauter.
18     Have you seen this email before?
19   A.  Yes, sir.
20   Q.  And was this email sent by
21 Wick Phillips?
22   A.  Yes, sir.
23   Q.  And in response to Mr. Chang's
24 inquiry to Rachel Sam if the DST org charts
25 were ready to go, Rachel says:

1    Wick Phillips 30(b)(6) - R. Wills
2    "The only remaining question is
3  whether we will be converting or
4  merging the borrower-level DST owner
5  entities.  The org charts currently
6  reflect that the owner entities 'may
7  be converted.'"
8    Is that a -- is that a substantive
9  question regarding the structure of the
10 subsidiaries, in your opinion?
11   A.  A substantive question from --
12   Q.  Yeah.  I mean, you said all that
13 was done was typos and passing on, you know,
14 information that other people provided.  You
15 said that that was all Wick Phillips did.
16     But here, this email seems to ask a
17 substantive question regarding converting or
18 merging borrower-level DST owner entities.
19     MR. MARTIN:  Objection, form.
20   A.  Yes, sir.  Again, we're at this
21 point a conduit between Baker McKenzie, DST
22 counsel, REIT counsel, and -- Rachel is
23 simply reiterating the outstanding item for
24 Baker McKenzie to complete on the org chart
25 so we can accurately deliver that to Freddie

1    Wick Phillips 30(b)(6) - R. Wills
2  Mac.
3  BY MR. BROWN:
4    Q.  Is Baker McKenzie on any of these
5  emails?
6    A.  Yes, sir.  The first one we looked
7  at.
8    Q.  The initiating email by Rachel Sam
9  of September 17, 2018?
10   A.  Yes, sir.
11     MR. BROWN:  Okay.  Let's scroll --
12   I must be missing something.  Let's
13   scroll to the bottom.  There.  That
14   email.
15 BY MR. BROWN:
16   Q.  Can you point to the Baker McKenzie
17 recipient for me?
18   A.  No.  I'm sorry.  I may have been
19 speaking past you.  I'm referencing the
20 substance of the email.
21   Q.  Oh, I see.  Okay.  "I'm waiting for
22 signoff from Baker McKenzie."
23     Okay.  I got it.
24     And who did Baker McKenzie
25 represent?

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I'm not certain.  I just know
3  they're DST counsel on the Highland side.
4    Q.  Delaware Statutory Trust counsel;
5  it's your understanding that that's who they
6  represented?
7    A.  Yes, sir.
8    (Telephonic interruption.)
9    Q.  Okay.  Let's go back to where we
10 were, the September 18 email, "The only
11 remaining question."
12     Okay.  Scroll up one email.  Okay.
13 And this is a September 18 email, again, one
14 minute after Rachel's email at 7:52, from
15 Freddie Chang to Rachel Sam copied to
16 D.C. Sauter.  And it's Rachel Sam saying:
17     "Thanks.  Are you working on the
18   REIT share acquisition org charts?"
19     And the only question I have for
20 you on that, Mr. Wills, is did Wick Phillips
21 receive that email?
22   A.  Yes, sir.
23   Q.  Okay.  And scroll up to
24 Rachel Sam's response.
25     Rachel Sam responds four minutes

Wick Phillips 30(b)(6) - R. Wills

1      Wick Phillips 30(b)(6) - R. Wills
2  later, at 7:57, to the inquiry by
3  Freddie Chang:
4      "Yes, the current versions of
5      those" -- being the REIT share
6      acquisition charts -- "are attached.
7      Paul has previously reviewed and
8      approved these, but let us know if you
9      have any comments."
10     So did Wick Phillips receive this
11 email?
12     A.  Yes.
13     Q.  Do you know who Paul is?
14     A.  I believe Paul Broaddus.
15     MR. BROWN:  Okay.  So it's now
16  about an hour from the last time we took
17  a break, and I would like to take a
18  five-minute break, if that's okay with
19  everybody.
20     MR. MARTIN:  It's your deposition.
21  Sure.
22     MR. BROWN:  All right.  Let's
23  reconvene in about five minutes.
24     MR. MARTIN:  Okay.  Thank you.
25     (Recess taken.)

Wick Phillips 30(b)(6) - R. Wills

1      MR. BROWN:  So let's get Exhibit D
2  back on the screen.  And let's go to the
3  bottom of the initiating email.
4  BY MR. BROWN:
5      Q.  So, again, Mr. Wills, I just want
6  to focus on these emails in particular, as
7  opposed to more generally, which I have
8  discussed in more general terms.
9      But Rachel Sam is communicating
10  here with the people on the "To" line:
11  Matt McGraner with the Highland Capital email
12  address, Matt Goetz with the Highland Capital
13  email address, Bonner McDermett with the
14  Highland Capital email address, Paul Broaddus
15  with the Highland Capital email address, and
16  Freddy Chang with the Highland Capital email
17  address.
18     Does Wick Phillips have knowledge
19  of the capacity that it was communicating
20  with these individuals in?
21     In other words, who were these
22  individuals representing -- who were these
23  individuals representing in these
24  communications, which entities?

Wick Phillips 30(b)(6) - R. Wills

1      Wick Phillips 30(b)(6) - R. Wills
2      And I'm interested in Wick
3  Phillips' knowledge and not your speculation.
4      A.  Sure.  So from our knowledge,
5  Matt McGraner, Geotz, Bonner McDermett, and
6  Freddy Chang are NexPoint.  Paul Broaddus is
7  Highland.  And there's a shared services
8  agreement between the two companies, and so
9  they're operating somewhat together.
10     Q.  In other words, Highland and
11  NexPoint are operating together; is that what
12  you mean?
13     A.  Yes, sir.
14     Q.  And are any of these individuals
15  that Rachel Sam was communicating with in
16  these emails, are they representatives of
17  HCRE, the lead borrower?
18     A.  I don't know.
19     Q.  Would Wick Phillips have been
20  communicating with the lead borrower in
21  connection with its communications relating
22  to the Loan Agreement?
23     A.  I would assume so.
24     Q.  Do you know who Mark Patrick was or
25  is?

Wick Phillips 30(b)(6) - R. Wills

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  I believe he's an attorney with
3  Highland.
4      Q.  Do you know why he wasn't included
5  on these emails?
6      A.  No, sir.
7      Q.  And this email string, which is
8  Exhibit D, this relates to Wick Phillips'
9  work on the Loan Agreement, correct?
10     A.  Yes, sir.
11     Q.  And did these emails reflect some
12  of the work that Wick Phillips did in
13  connection with the Loan Agreement?
14     A.  Yes, sir.
15     Q.  Other than what's reflected in
16  these emails, do you know what other work
17  Wick Phillips did relating to the org charts
18  that constitute Schedule 3.15 of the
19  Loan Agreement?
20     MR. MARTIN:  Objection, form.
21     A.  Yes.  I mean, just as part of the
22  legal diligence in connection with, you know,
23  a loan checklist, making sure that the org
24  charts that we receive and are delivering
25  back to the lender are approved by the

Wick Phillips 30(b)(6) - R. Wills

1 business parties, and then, therefore, we can
2 get them to Freddie or KeyBank or whomever
3 needs to have those and then have them
4 checked off of the diligence portion of the
5 checklist.
6 BY MR. BROWN:
7 Q. In connection with the org charts
8 that show up as Schedule 3.15 of the
9 Loan Agreement, who was Wick Phillips taking
10 instructions from on behalf of the borrowers?
11 A. I think primarily the parties you
12 see here, both from The NexPoint side and
13 Mr. Broaddus.
14 Q. On the Highland side?
15 A. Yes, sir.
16 Q. Other than this email, are you
17 aware of other -- I'm sorry. Other than this
18 email string, are you aware of other
19 communications between Wick Phillips and any
20 of the borrowers concerning the org charts?
21 A. No, sir.
22 MR. BROWN: Can we put Exhibit E up
23 on the screen, please.
24 (Email chain, "RE: Unicorn - DSTs",

Wick Phillips 30(b)(6) - R. Wills

1 marked as Exhibit E.)
2 BY MR. BROWN:
3 Q. Okay. Exhibit E appears to be an
4 August 18, 2018 [sic] email from
5 Paul Broaddus; is that correct?
6 A. Yes, sir.
7 Q. And have you seen this email
8 before?
9 A. Yes, sir.
10 Q. Before or after your designation?
11 A. After.
12 Q. Did you review it in connection
13 with your preparation for your testimony
14 today?
15 A. Yes, sir.
16 Q. And it appears that there are a
17 number of recipients to this. One of them is
18 D.C. Sauter; is that right?
19 A. Yes, sir.
20 Q. So Wick Phillips did receive this
21 email from Paul Broaddus, correct?
22 A. Yes, sir.
23 Q. And Paul Broaddus is -- as you have
24 previously testified, was a representative of

Wick Phillips 30(b)(6) - R. Wills

1 Highland in connection with Wick Phillips'
2 role representing the borrowers in the
3 Loan Agreement, correct?
4 A. Yes, sir.
5 Q. And the initiating email of
6 July 27, the first email in the string, which
7 is the second email on Exhibit E,
8 indicates -- it says:
9 "Hi. Please see attached as
10 discussed for the basic DST charts.
11 Please note the open items.
12 "Should we have a call next week?
13 "Want to specifically discuss the
14 items that will need to be closed
15 out sooner rather than later.
16 "Thanks. Paul."
17 So, again, did Wick Phillips
18 receive this email?
19 A. Yes, sir. It looks that way.
20 Q. As well as the attachments,
21 correct?
22 And maybe we should look at the
23 attachments too. So if we could scroll
24 further.

Wick Phillips 30(b)(6) - R. Wills

1 Okay. So let's -- the first page
2 of the attachment says "Open items:
3 Economics/ownership of JV LLC."
4 Do you know what that refers to?
5 A. Not specifically, no.
6 Q. Okay. Could we scroll to the next
7 page of the attachment to Paul Broaddus'
8 email. No. We can --
9 Have you seen the attachments
10 before, Mr. Wills?
11 A. Yes, sir.
12 Q. Okay. Let's scroll to the next
13 page.
14 Okay. This attachment reverts to
15 the ownership interests of a JV -- of the JV
16 LLC, which was referred to in the first
17 document as being -- to be determined, but
18 approximately 51 percent for Partner 1 and
19 49 percent for Partner 2.
20 Do you know whether this is
21 referring to the LLC, which is the subject of
22 the, I think, Exhibit D in our case here?
23 It's the SE Multifamily LLC Agreement.
24 Is that what this refers to?

Wick Phillips 30(b)(6) - R. Wills

1
2    A.   That's what it looks like.  Yes,
3  sir.
4    Q.   Yeah.  And just to go back and
5  trace the history, the SE Multifamily
6  Holdings LLC Agreement was dated August 23.
7  The email that this was attached to is dated
8  August 1.  So this would have been -- this
9  email would have been sent prior to the
10  original LLC Agreement.
11       And this would have been the
12  discussions about the formation of it,
13  correct?
14    A.   Yes, sir.
15    Q.   Okay.  Can we scroll to the next
16  page.
17       And, again, this chart called DST
18  Properties LLC reflects ownership interest of
19  Partner 1 at 51 percent and Partner 2 at
20  49 percent for the LLC to be formed, correct,
21  which subsequently we learned was the SE
22  Multifamily Holdings LLC Agreement, correct?
23    A.   Yes, sir.
24    Q.   Okay.  Can we scroll forward again?
25       Again, this is another chart that

Wick Phillips 30(b)(6) - R. Wills

1
2  refers to the ownership interests of the
3  to-be-formed LLC Agreement, ultimately which
4  became SE Multifamily Holdings LLC, correct?
5    A.   Yes, sir.
6    Q.   And it reflects the same ownership
7  interests as we saw in Schedule 3.15 to the
8  Loan Agreement and in the LLC Agreement,
9  correct?
10    A.   Yes, sir.
11    Q.   Okay.  Next chart.
12       That's not sufficiently legible to
13  me.  Let's see.  Yeah.  I think we can pass
14  on this.
15       Do you have any idea what these
16  represent?
17       MR. MARTIN:  Objection, form.
18    A.   It's tough to make it out, but -- I
19  don't know if this is the structure that
20  Starwood had, who was the owner of the
21  portfolio, and they're just reflecting that,
22  or if this is a proposed structure for the
23  acquisition itself.
24  BY MR. BROWN:
25    Q.   And this is Highland263748,

Wick Phillips 30(b)(6) - R. Wills

1
2  correct?
3    A.   Yes, sir.
4    Q.   Of Exhibit E.
5    A.   Correct.
6    Q.   Okay.  Next chart, please.
7       And, again, this would be
8  Highland263749.
9       Do you know what this is?
10    A.   Similarly, it's tough to tell, but
11  more of the same if that was the existing
12  structure of the asset at the time of the
13  acquisition.
14    Q.   Next chart, please.  This is
15  263750.
16       Again, do you know what this is?
17    A.   Same thing, existing structure.
18    Q.   Next chart.  Same answer for
19  263751?
20    A.   Yes, sir.  It just looks like the
21  underlying property or asset changes.  But,
22  yes, sir.
23    Q.   Okay.  Next chart.
24       Go to the next chart after this.
25  And the next chart.  Next chart.  Keep going.

Wick Phillips 30(b)(6) - R. Wills

1
2  Keep going.  Keep going.
3       Okay.  One more -- okay.  One more.
4       This is a different format.  Do you
5  know how this is different from the
6  other charts?
7    A.   I don't know why.  It just looks
8  like a different structure.
9    Q.   Okay.  Let's go back to the
10  original email.
11       Hold on a second.  It says
12  K&E Draft on all of these charts.
13       What does that mean?
14    A.   I believe Kirkland & Ellis.
15    Q.   Okay.  And were these generated by,
16  do you know, the seller -- the potential
17  seller of the assets to the limited -- to the
18  LLC?
19    A.   Yes, sir.  I believe this was the
20  existing structure in place.
21    Q.   I see.
22    A.   At the time.
23    Q.   Okay.  Let's go back to the
24  original email.
25       Okay.  On both these emails from

1       Wick Phillips 30(b)(6) - R. Wills
2    Paul Broaddus, the July 27 email and the
3    August 1 email that constitute Exhibit E,
4    they were sent and received by D.C. Sauter of
5    Wick Phillips, correct?  They were sent to
6    and received by D.C. Sauter?
7       A.   Yes, sir.
8       Q.   And do you know if Wick Phillips
9    ever responded to these emails in any way?
10      A.   I don't believe so.
11      Q.   Okay.  Did Wick Phillips have any
12   communications with Paul Broaddus relating to
13   the charts attached on these emails?
14      A.   Not other than what we previously
15   discussed.
16      Q.   Okay.  Let's move on to Exhibit F.
17          (SE Multifamily Holdings LLC First
18          Amended and Restated Limited
19          Liability Company Agreement, marked
20          as Exhibit F.)
21   BY MR. BROWN:
22      Q.   So Exhibit F is the SE Multifamily
23   Holdings LLC First Amended and Restated
24   Limited Liability Company Agreement, dated as
25   of March 15, 2019, to be effective August 23,

1       Wick Phillips 30(b)(6) - R. Wills
2    2018, correct?
3       A.   Yes, sir.
4       Q.   And is this a true copy of that,
5    this Agreement?
6       A.   It looks to be so, yes, sir.
7          MR. BROWN:  Let me just digress for
8    a moment.
9          Lauren, we had agreed by emails
10   that the documents attached to both
11   declarations, the Morris declaration and
12   the McGraner declaration, that we could
13   stipulate to their authenticity.
14          MS. DRAWHORN:  Yes.
15          MR. BROWN:  So with respect to
16   Exhibit B to this deposition, the
17   original LLC Agreement, the
18   Loan Agreement, I believe, which is
19   Exhibit C, and this Loan Agreement,
20   Exhibit F, the Amended and Restated
21   Limited Liability Agreement, we're
22   agreeing that they're authentic.
23          We're reserving whatever other
24   objections, but nobody -- we're agreeing
25   as to authenticity.  So I'm not going to

1       Wick Phillips 30(b)(6) - R. Wills
2    worry about dealing with that in this
3    deposition.
4          Is that agreed, they're authentic?
5          MS. DRAWHORN:  Yes.  That's agreed.
6    BY MR. BROWN:
7       Q.   Okay.  So tell me what this
8    document is, Mr. Wills.
9       A.   Sure.  It's the Amended and
10   Restated LLC Agreement for SE Multifamily
11   Holdings.  My understanding in talking to
12   D.C. Sauter was that KeyBank retraded us at
13   the last minute and pulled back some of the
14   previously committed funds, and so we were
15   short about 20 million, which is why we
16   needed to bring in additional equity.
17          There was a previous relationship
18   with BH on some prior multifamily deals, and
19   so BH came in as the bridge equity, for lack
20   of a better term.  So the contributions
21   changed and it's memorialized here.
22      Q.   Do you know where they're
23   memorialized in the Agreement?  And I can
24   tell you if we flip to Schedule A.
25      A.   Yes, sir.  That's where I was going

1       Wick Phillips 30(b)(6) - R. Wills
2    as well.
3          (Email chain, "FW: Draft LLC
4          Agreement," marked as Exhibit H.)
5    BY MR. BROWN:
6       Q.   Okay.  So you had referred to BH in
7    your testimony you just gave.
8          And if you look at Schedule A to
9    the Amended LLC Agreement, it provides the
10   capital contributions and percentage
11   interest, correct?
12      A.   Correct.
13      Q.   And is this Schedule A, the chart
14   on Schedule A reflecting current -- the
15   percentage interest, is that what you were
16   referring to in terms of changing the
17   ownership interest?
18      A.   Yes, sir.
19      Q.   And is that an accurate statement
20   regarding the ownership interest of the
21   parties?
22      A.   I believe it accurately shows the
23   BH portion, and on the remainder, I'm not
24   positive.
25      Q.   Okay.  Let me -- let's back up a

Wick Phillips 30(b)(6) - R. Wills
1  little bit.
2
3       Did -- what was Wick Phillips' role
4  in connection with the Amended and Restated
5  Limited Liability Company Agreement that's
6  Exhibit E?
7       Let's just -- I'm going to try to
8  make it simple.
9       Like we referred to the original
10  Agreement in this deposition as the
11  LLC Agreement, can we refer to this as -- if
12  I refer to this as the Amended LLC Agreement,
13  you'll understand I'm referring to Exhibit F,
14  correct?
15   A.  Yes, sir.
16   Q.  Okay.  So what was Wick Phillips'
17  role in connection with the Amended
18  LLC Agreement?
19   A.  We did not have one, other than
20  delivering, you know, and communicating with
21  KeyBank on the modified structure.
22   Q.  Okay.  So I don't believe I have
23  seen any -- well, let me back up.
24       How were the communications with
25  KeyBank on the modified structure?  What form

Wick Phillips 30(b)(6) - R. Wills
1
2  did those communications take?
3   A.  I would assume telephonic or email.
4       MR. BROWN:  Hayley, are you on the
5       call?
6       MS. WINOGRAD:  Yes.  I'm here.
7       MR. BROWN:  I have not seen and I
8       don't know if -- I don't think we've
9       received any communications between
10      Wick Phillips and KeyBank relating to
11      the Amended LLC Agreement, have we?
12      MS. WINOGRAD:  I haven't seen any,
13      no.
14  BY MR. BROWN:
15   Q.  So I guess, Mr. Wills, it raises
16  the question, we've asked for documents --
17  and maybe, Lauren, this is better addressed
18  to you --
19      MR. MARTIN:  Yeah.  Mr. Brown, I'll
20      represent to you, we haven't found any
21      of those communications.  I think
22      Mr. Wills is mistaken on that.
23      MR. BROWN:  Okay.
24      MR. MARTIN:  We're not withholding
25      anything, and if we were withholding

Wick Phillips 30(b)(6) - R. Wills
1
2  something, we would have produced a
3  privilege log or some other grounds for
4  withholding.  I'm never in the business
5  of withholding anything that you're
6  otherwise entitled to.
7       MR. BROWN:  And I'm not accusing.
8  I was just confused because --
9       MR. MARTIN:  I appreciate that.
10      MR. BROWN:  -- I'm familiar with
11      the documents that were produced and
12      I've looked at them fairly closely in
13      this deposition and I never saw any
14      communications between Wick Phillips and
15      KeyBank.
16      MR. MARTIN:  Yeah.  I think if you
17      ran the tape back, you would probably
18      see both Ms. Drawhorn and I raise our
19      eyebrows when Mr. Wills said that.  I
20      think he was simply mistaken.
21  BY MR. BROWN:
22   Q.  Mr. Wills, in light of that
23  discussion, let's talk about, again, what
24  your understanding is of Wick Phillips' role
25  in connection with the Amended LLC Agreement.

Wick Phillips 30(b)(6) - R. Wills
1
2   A.  We did not have one.
3   Q.  You don't -- let me ask you this:
4  You indicated in your prior testimony that
5  you believed there were communications with
6  KeyBank regarding the Amended LLC Agreement.
7       Why did you think that?
8   A.  Well, that has been the siloed role
9  that we've maintained throughout the
10  Project Unicorn transaction as sort of the
11  conduit in between the lender and the various
12  borrowers.
13   Q.  Okay.  So I think your counsel has
14  represented that there were no emails between
15  Wick Phillips and KeyBank concerning the
16  Amended LLC Agreement.
17       Are you aware of whether there were
18  emails that took place in form -- I'm sorry,
19  whether there were communications that took
20  place in a form other than an email
21  communication?
22   A.  I'm not aware.
23   Q.  So is it true that Wick Phillips
24  did not represent any party to the Amended
25  LLC Agreement?

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills

2    A.  Correct.  We did not prepare it or

3  have anything to do with that agreement.

4    Q.  And is there any retention

5  agreement with respect to the LLC Agreement?

6    A.  No, sir.

7    Q.  Do you know if Wick Phillips had

8  any communications with James Dondero in

9  connection with the Amended LLC Agreement?

10    A.  I do not.

11    Q.  So let's focus again -- I think

12  that before we established that

13  Wick Phillips -- your testimony that

14  Wick-Phillips had no role in connection with

15  the Amended LLC Agreement.  We didn't

16  complete the questions with respect to your

17  knowledge of the percentage interest set

18  forth in the Amended LLC Agreement.

19    So what is your understanding

20  concerning the accuracy of the percentage

21  interest set forth in Schedule A to the

22  Amended LLC Agreement?

23    A.  In speaking with D.C., I believe

24  they modified this with the intent of

25  updating it prior to any distribution.  But

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills

2  other than that, I'm not aware of the

3  accuracy one way or the other.

4    Q.  I'm not sure I understand what that

5  means.  Can you help me understand?  When you

6  say, "they modified this with the intent of

7  updating it prior to the distribution."

8    Can you unpack that for me?

9  Because I don't understand what that means.

10  Modified what?

11    A.  Well, they added in the BH portion

12  and then, obviously, the HCRE contributions

13  and percentages and the Highland

14  contributions and percentages are different

15  from the original LLC Agreement.

16    Q.  Okay.  And they're -- I mean, the

17  math, I'm sure if you did it on a calculator,

18  it would reflect that these percentages are

19  modified from the original percentages, 49

20  and 51, based on a proportional pro rata

21  reduction for the 6 percent given to

22  BH Management, correct?

23    A.  Yes.

24    Q.  Does Wick Phillips have any

25  knowledge concerning whether or not the

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills

2  percentages reflected in this Schedule A do

3  not accurately reflect what the parties

4  intended?

5    MR. MARTIN:  Objection, form.

6    A.  I don't know.

7    MR. BROWN:  Okay.  I'd like to take

8  a brief recess.

9    And, Hayley, I'd like to talk on

10  the phone with you, so can we have a

11  separate phone call?

12    MS. WINOGRAD:  Sure.

13    MR. BROWN:  I'm going to put myself

14  on mute and stop the video.

15    And, Hayley, can you call me on my

16  cell?

17    MS. WINOGRAD:  Yeah.  I'll do that

18  right now.

19    (Recess taken.)

20  BY MR. BROWN:

21    Q.  Do you know who represented HCRE

22  and Highland in connection with the Amended

23  LLC Agreement?

24    A.  I believe it was Hunton & Williams.

25    Q.  And what do you base that

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills

2  understanding on?

3    A.  Review of some material in

4  connection with the deposition.

5    Q.  What material?

6    A.  Some of these exhibits.

7    (Technical interruption, 1:29 p.m.

8  to 1:34 p.m.)

9  BY MR. BROWN:

10    Q.  So Mr. Wills, we've covered

11  Wick Phillips' involvement in the

12  representation of the parties in connection

13  with the Loan Agreement, correct?

14    A.  Yes, sir.

15    Q.  And Wick Phillips represented the

16  borrowers in connection with the

17  Loan Agreement, correct?

18    A.  Yes, sir.

19    Q.  And Wick Phillips communicated with

20  both -- with Highland, I think you've

21  acknowledged through Paul Broaddus, with

22  respect to the ownership interests in the LLC

23  in connection with the Loan Agreement,

24  correct?

25    MR. MARTIN:  Objection, form.

Page 110

```
 1    Wick Phillips 30(b)(6) - R. Wills
 2      A.   I don't think that's accurate.  We
 3   had -- we communicated with Mr. Broaddus as
 4   it related to finalizing and forwarding the
 5   org charts that are part of Schedule 3.15 to
 6   the Loan Agreement.
 7   BY MR. BROWN:
 8      Q.   And those org charts contain a
 9   reflection of the ownership interest as they
10   appear on the LLC Agreement, correct?
11      A.   Yes, sir.  That's what they said.
12      Q.   And those org charts that were
13   transmitted by Wick Phillips to
14   Paul Broaddus, among others, reflect an
15   ownership interest of 51 percent in HCRE and
16   49 percent in Highland, correct?
17      A.   Yes, sir.
18      Q.   And the percentage interests that
19   appear in Schedule A of the Amended
20   LLC Agreement reflect those same ownership
21   interests adjusted for the addition of
22   BH Management as a 6 percent owner, correct?
23      MR. MARTIN:  Objection, form.
24      I'm going to instruct the witness
25      to not answer the question as being
```

Page 111

```
 1   outside the scope of the 30(b)(6)
 2   notice.
 3      And the record should probably
 4   reflect, Mr. Brown, I think you would
 5   agree with me, the court reporter lost
 6   about five minutes' worth of testimony.
 7      So I appreciate the fact that
 8   you're trying to go back through it
 9   methodically.  I certainly don't want to
10   get in the way with that.  But we got
11   into a scrap while she was offline about
12   this and about what the scope of the
13   30(b)(6) deposition notice is.
14      So we perhaps have to have that
15      discussion over again.
16
17      MR. BROWN:  Okay.  Well, if you're
18   instructing him not to answer --
19   BY MR. BROWN:
20      Q.   Are you going to follow your
21   counsel's instruction, Mr. Wills?
22      A.   Yes, sir.
23      MR. BROWN:  Okay.
24      All right.  I don't have any
25      further questions.
```

Page 112

```
 1    Wick Phillips 30(b)(6) - R. Wills
 2      MR. MARTIN:  Okay.  I've got a few
 3   questions.
 4      Are you passing the witness,
 5   Mr. Brown?
 6      MR. BROWN:  I'll pass the witness
 7   and reserve my right to reexamine.
 8      MR. MARTIN:  Okay.  Well, I guess I
 9   should make it clear that we're going to
10   ask you to petition the Court for a
11   reexamination because we presented
12   Mr. Wills here and are giving you ample
13   opportunity to ask questions.
14      MR. BROWN:  Well, I may need to
15   clarify questions that you ask.
16      MR. MARTIN:  After the read and
17   sign, that would be standard procedure,
18   and I would not disagree with that.
19      MR. BROWN:  Well, you're going to
20   ask him some questions.
21      MR. MARTIN:  Oh, I'm sorry.  Yeah,
22   yeah.  I'm sorry.
23      After me?  Sure.
24      MR. BROWN:  That's what I mean.
25      MR. MARTIN:  I apologize.  I didn't
```

Page 113

```
 1    Wick Phillips 30(b)(6) - R. Wills
 2   understand what you were saying.  I
 3   thought you were saying we'd get back
 4   together at some point in the future.
 5      MR. BROWN:  No.  I want the
 6   opportunity to, essentially, redirect
 7   after you --
 8      MR. MARTIN:  Recross after my
 9   direct?  Sure.
10      Does anybody else have any
11   questions before I go?  Ms. Dandeneau?
12      MS. DANDENEAU:  No, I do not.
13      MR. MARTIN:  Okay.  And I apologize
14   if I tortured your name.
15      MS. DANDENEAU:  You actually said
16   it perfectly -- well, pretty perfectly.
17          --
18          EXAMINATION
19   BY MR. MARTIN:
20      Q.   Okay.  Mr. Wills, most of my
21   questions are going to be just follow-up to
22   what Mr. Brown asked you.
23      Who is it your understanding that
24   Wick Phillips represented in connection with
25   the Loan Agreement?
```

Page 114

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2     A.   The borrowers.
 3     Q.   And of those, was there any
 4  representation -- Mr. Brown asked you a lot
 5  of questions about Highland being the lead
 6  borrower.
 7         Do you remember that?
 8         MR. BROWN:  That's an incorrect --
 9     by the way, you're mischaracterizing.
10     It was HCRE, not Highland.
11         MR. MARTIN:  Okay.  HCRE.
12  BY MR. MARTIN:
13     Q.   Did HCRE have its own counsel
14  in-house or outside counsel?
15     A.   No.
16     Q.   Now, at Wick Phillips, at the time
17  of these transactions, who would have
18  consulted with the client about possible
19  conflicts or waiver of conflicts that
20  Mr. Brown was asking you about?
21     A.   D.C. Sauter.
22     Q.   Okay.  And at the time, Mr. Sauter
23  was a partner at Wick Phillips, correct?
24     A.   Yes, sir.
25     Q.   Is Mr. Sauter still a partner at
```

Page 115

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2  Wick Phillips?
 3     A.   No, sir.
 4     Q.   And who would have consulted with
 5  the client regarding Mr. Brown's questions
 6  about the mechanics of the loan, who directed
 7  what, where the money was going, what the
 8  role of the lead borrower was compared to the
 9  other borrowers, etc.?
10     A.   D.C. Sauter.
11     Q.   Now, to your knowledge -- and I'm
12  just going to try to make all of this crystal
13  clear.  Because I think this is where the
14  fight with Mr. Brown is going to come in.
15         To your knowledge, did
16  Wick Phillips have anything to do with the
17  formation of the LLC Agreement or the
18  negotiation of the LLC Agreement?
19     A.   No, sir.
20     Q.   Can you explain in
21  non-real-estate-lawyer terms what the scope
22  of the representation was of Wick Phillips in
23  the matter at issue?
24     A.   Yes.  Our -- the scope of our
25  representation was at specifically the real
```

Page 116

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2  estate/property level, working with
 3  essentially going through the
 4  lender required --
 5         MR. BROWN:  Can I just interpose
 6     an -- ask for clarification?
 7         You asked for Wick Phillips' role
 8     in the matter at issue.
 9         Could you clarify, please, what the
10     matter at issue is that you're referring
11     to?
12  BY MR. MARTIN:
13     Q.   Mr. Wills, who has Wick Phillips
14  represented while you're here today?
15     A.   NexPoint.
16         MR. BROWN:  Again, I'm going to
17     object.  It's vague and ambiguous.
18         Do you mean with respect to the
19     claim --
20         MR. MARTIN:  Make an objection.
21         MR. BROWN:  Do you mean with
22     respect to the Loan Agreement?  Do you
23     mean with respect to the LLC Agreement?
24         There's several -- Wick Phillips
25     has more than one representation.  I'm
```

Page 117

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2  just trying to get the record clear on
 3  what you're asking him.
 4         MR. MARTIN:  Are you finished?
 5         MR. BROWN:  Yes.
 6         MR. MARTIN:  I would ask you to
 7     keep your objections to the "objection,
 8     form" called for by the Federal Rules of
 9     Civil Procedure.  If I ask you for the
10     basis, then you can make a speaking
11     objection.
12         You are still trying to conflate
13     all of these issues.  I'm trying to
14     separate them out to make them clear.  I
15     get to ask my questions, and if you want
16     to come back and ask other questions,
17     you can.
18         MR. BROWN:  Thank you for the
19     lecture and for the instructions on how
20     to practice law.
21         MR. MARTIN:  Well, you started it.
22  BY MR. MARTIN:
23     Q.   Are you aware that NexPoint had a
24  shared services agreement with one of the
25  Highland entities, which is why their email
```

Page 118

```
1        Wick Phillips 30(b)(6) - R. Wills
2   addresses have Highland Capital in them?
3        A.  Yes.
4        Q.  Did Wick Phillips form the LLC that
5   Mr. Brown asked you about today?
6        A.  No.
7        Q.  Did Wick Phillips draft or
8   negotiate the Amended LLC Agreement that
9   Mr. Brown asked you about today?
10       A.  No.
11       Q.  If, in fact, another law firm
12  drafted the LLC Agreement, would that be
13  consistent with your understanding of how the
14  LLC was formed?
15       A.  Yes.
16       Q.  Regardless of who formed the LLC,
17  as a real estate lawyer, since Wick Phillips
18  was representing NexPoint and the borrowers,
19  would Wick Phillips had to have known the
20  ownership structure of the LLC in order to
21  work on Project Unicorn?
22       A.  Yes.
23       Q.  Why?
24       A.  So that we could accurately
25  communicate that to KeyBank, and because
```

Page 119

```
1        Wick Phillips 30(b)(6) - R. Wills
2   those same -- the structure charts are
3   attached as an exhibit to the Loan Agreement.
4        Q.  I'm going to direct your attention
5   to the exhibits that Mr. Brown provided prior
6   to this deposition and ask you to look at
7   Exhibit H.
8        And you were in the room when we
9   became aware that the court reporter was
10  offline for a little bit, correct?
11       A.  Yes, sir.
12       Q.  And if my memory of this is
13  correct, I think she was offline when
14  Mr. Brown asked you a couple of questions
15  about Exhibit H.
16       Do you remember that?
17       A.  Yes, sir.
18       Q.  Can you please look at Exhibit H
19  and tell me, on the -- that's an email string
20  starting on July 27, 2018, correct?
21       A.  Yes, sir.
22       Q.  And who is the author of the first
23  email in that chain?
24       A.  Alexander McGeoch.
25       Q.  And Mr. McGeoch's email signature
```

Page 120

```
1        Wick Phillips 30(b)(6) - R. Wills
2   indicates he's a partner at Hunton Andrews
3   Kurth, correct?
4        A.  Yes, sir.
5        Q.  In Dallas, Texas, right?
6        A.  Correct.
7        Q.  Who is the email addressed to?
8        A.  Mark Patrick.
9        Q.  And Mark Patrick you previously
10  identified as being one of the in-house
11  people at Highland, correct?
12       A.  Yes, sir.
13       Q.  And is there a Wick Phillips
14  attorney on the email from Mr. McGeoch to
15  Mr. Patrick?
16       A.  No, sir.
17       Q.  And then the top email on Exhibit H
18  is from Mr. Patrick to Tim Cournoyer,
19  correct?
20       A.  Yes, sir.
21       Q.  And it's my understanding
22  Tim Cournoyer is a Highland person as well,
23  correct?
24       A.  Yes, sir.
25       Q.  And he doesn't work at
```

Page 121

```
1        Wick Phillips 30(b)(6) - R. Wills
2   Wick Phillips, does he?
3        A.  He does not.
4        Q.  And there's no Wick Phillips
5   attorney on either of these emails, correct?
6        A.  Correct.
7        Q.  Could you read Mr. McGeoch's email
8   beginning with the word "Mark"?
9        A.  (Reading.)
10       "Mark, a draft of the Unicorn LLC
11       agreement is attached.  We need to
12       select another name because Unicorn
13       is taken in Delaware.  It would be
14       helpful to schedule a call with you
15       to walk through our thoughts on the
16       allocation and distribution drafting
17       approach we took.  Please let me
18       know if you have time for a call
19       with Mark and me this morning.
20       "Thanks, Alex."
21       Q.  So does that indicate to you that
22  Hunton Andrews Kurth actually was involved in
23  the allocation and distribution drafting of
24  the LLC Agreement?
25       A.  Yes.
```

1    Wick Phillips 30(b)(6) - R. Wills

2    Q.   When Mr. Brown asked you questions

3    about Mr. Wick Phillips' role in drafting the

4    LLC Agreement, he didn't ask you about Hunton

5    Andrews Kurth, did he?

6    A.   No, sir.

7         (Email chain "RE: SE Multi-Family

8         Holdings LLC: Amended and

9         Restated," beginning Bates

10        Highland136853, marked as Exhibit

11        I.)

12   BY MR. MARTIN:

13   Q.   If you would, please, look at

14   Exhibit I.

15   A.   Okay.

16   Q.   This is an email chain, several

17   pages long.  And if we're going by the Bates

18   numbers, from -- starting on Highland136853

19   through Highland136856.

20        Do you see that?

21   A.   Yes.

22   Q.   Will you page through any of those

23   emails and identify any email addresses from

24   Wick Phillips that are included in that

25   chain?

1    Wick Phillips 30(b)(6) - R. Wills

2    A.   There are no Wick Phillips' emails.

3         MR. MARTIN:  Okay.  I'll pass the

4    witness.

5         MR. BROWN:  Ms. Vosburgh, could you

6    go back to the first question that

7    Counsel asked on his set of questions of

8    Mr. Wills, to the first question, and

9    read it back to me.

10        THE REPORTER:  (Reading back.)

11        "Question:  Okay.  Mr. Wills, most

12   of my questions are going to be

13   follow-up questions to what

14   Mr. Brown asked you.

15        "Who is it your understanding that

16   Wick Phillips represented in

17   connection with the Loan Agreement?"

18        "Answer:  The borrowers."

19        MR. BROWN:  Okay.  There's a

20   question regarding the matter at hand.

21   That's the one I want read back.

22        THE REPORTER:  (Reading back.)

23        "Question:  Can you explain in

24   non-real-estate-lawyer terms what

25   the scope of the representation was

1    Wick Phillips 30(b)(6) - R. Wills

2    of Wick Phillips in the matter at

3    issue?"

4         THE REPORTER:  Is that the one?

5         MR. BROWN:  Yes.

6         THE REPORTER:  (Reading back.)

7         "Answer:  Yes.  Our -- the scope

8    of our representation was at

9    specifically the real

10        estate/property level working with

11        especially going through the lender

12        required --"

13        And then there was an interjection.

14             --

15             RE-EXAMINATION

16   BY MR. BROWN:

17   Q.   Okay.  Mr. Wills, I want to

18   understand what your understanding was when

19   you were asked about the scope of the

20   representation of the matter at issue.

21        What matter at issue did you

22   understand was being referred to?

23   A.   Wick Phillips' role with

24   Project Unicorn.

25   Q.   Okay.  So you were not answering

1    Wick Phillips 30(b)(6) - R. Wills

2    the question in connection with

3    Wick Phillips' role in connection with the

4    Loan Agreement then, were you?

5    A.   Well, to me, Project Unicorn

6    incorporates really all of the topics on the

7    depo notice, the Loan Agreement,

8    LLC Agreements.  It's all sort of the same

9    global project.

10   Q.   But you've already testified, have

11   you not, and Wick Phillips has already

12   acknowledged in its papers that it filed in

13   the bankruptcy court that it represented the

14   borrowers in connection with the

15   Loan Agreement, correct?

16   A.   Correct.

17        MR. BROWN:  I don't have any other

18   questions.

19        MR. MARTIN:  We'll reserve.  Thank

20   you.

21        (The deposition was concluded at

22        1:51 p.m.)

23

24

25

Page 126

| | |
|---|---|
| 1 | Wick Phillips 30(b)(6) - R. Wills |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | I, ANNE E. VOSBURGH, Certified Shorthand |
| 5 | Reporter, Registered Professional Reporter, |
| 6 | Certified Realtime Reporter, and Closed |
| 7 | Captioner, hereby certify: |
| 8 | That ROB WILLS, via remote |
| 9 | videoconference, solemnly affirmed and agreed to |
| 10 | testify to the truth, the whole truth and |
| 11 | nothing but the truth; that all counsel |
| 12 | stipulated to this process, notwithstanding the |
| 13 | location of reporter or witness at time of |
| 14 | deposition; and that this transcript is a true |
| 15 | and correct record of testimony given. |
| 16 | I further certify that I am not related |
| 17 | to any of the parties to this action and that I |
| 18 | am in no way interested in the outcome of this |
| 19 | matter. Dated: August 11th, 2021. |
| 20 | |
| 21 | _____ |
| 22 | ANNE E. VOSBURGH |
| 23 | Certified Shorthand Reporter No. 6804 |
| 24 | Registered Professional Reporter |
| 25 | Certified Realtime Reporter |

Page 127

| | |
|---|---|
| 1 | ERRATA SHEET |
| 2 | Case Name: |
| 3 | Deposition Date: |
| 4 | Deponent: |
| 5 | Pg. No. Now Reads    Should Read   Reason |
| 6 | ___ ___ _____ _____ _____ |
| 7 | ___ ___ _____ _____ _____ |
| 8 | ___ ___ _____ _____ _____ |
| 9 | ___ ___ _____ _____ _____ |
| 10 | ___ ___ _____ _____ _____ |
| 11 | ___ ___ _____ _____ _____ |
| 12 | ___ ___ _____ _____ _____ |
| 13 | ___ ___ _____ _____ _____ |
| 14 | ___ ___ _____ _____ _____ |
| 15 | ___ ___ _____ _____ _____ |
| 16 | ___ ___ _____ _____ _____ |
| 17 | ___ ___ _____ _____ _____ |
| 18 | ___ ___ _____ _____ _____ |
| 19 | ___ ___ _____ _____ _____ |
| 20 | |
| 21 | _____ |
| | Signature of Deponent |
| 22 | SUBSCRIBED AND SWORN BEFORE ME |
| 23 | THIS ____ DAY OF _____, 2021. |
| 24 | _____ |
| 25 | (Notary Public)  MY COMMISSION EXPIRES:_____ |

**(**

**(a)** 38:11

**(b)** 25:23 38:11,21

---

**1**

**1** 93:19 94:8,19 98:3

**1.05** 37:23 38:7,11,16

**1.07** 34:22 35:9

**1.07(a)** 34:25

**11** 6:3

**14** 37:23

**15** 98:25

**17** 72:21 75:19 84:9

**18** 18:25 19:2 81:25 85:10,13 91:5

**1:29** 109:7

**1:34** 109:8

---

**2**

**2** 93:20 94:19

**20** 100:15

**2018** 14:15,21 20:23 21:9 72:21 81:25 84:9 91:5 99:2 119:20

**2019** 98:25

**2021** 6:3 30:2,13

**22** 51:14

**23** 14:15,21 94:6 98:25

**25** 37:25

**26** 20:23 21:8

**263750** 96:15

**263751** 96:19

**27** 92:7 98:2 119:20

---

**3**

**3** 23:16

**3.15** 47:19 48:4,6,9 49:20 51:12 58:5,19 59:2,19 63:21 64:13, 18 66:7 67:19 69:17 74:5,14,24 75:10 89:18 90:9 95:7 110:5

**30(b)(6)** 6:1 7:1 8:1 9:1,2,10 10:1 11:1,21 12:1,10 13:1 14:1 15:1,4 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 21 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1,2,14 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1

---

**4**

**4** 12:17 29:19

**4.01(b)** 25:20

**41** 58:10

**49** 19:9 47:18 50:12

---

51:9 53:11,18,24 54:6,11 55:13,21 58:11 74:17 93:20 94:20 107:19 110:16

**49/51** 59:20

**4:21** 72:22

---

**5**

**51** 19:7 25:18 47:18 50:13 51:8 53:11,18, 24 54:6,12 55:13,22 58:11 74:16 93:19 94:19 107:20 110:15

**5:16** 81:8

---

**6**

**6** 107:21 110:22

**6th** 29:25 30:13 31:13

---

**7**

**76** 27:16

**7:45** 82:15

**7:52** 82:16 85:14

**7:57** 86:2

---

**9**

**9.01** 27:17

**9.01(a)** 27:19 28:2,20

**9011** 9:3

**9:30** 6:3

---

**A**

**a.m.** 6:3

**ability** 39:13

**acceleration** 72:7

**acceptable** 16:7

**accuracy** 27:9 50:4 71:5 106:20 107:3

**accurate** 15:2 67:12,

---

14 69:13,20 74:8 101:19 110:2

**accurately** 28:21 66:12 83:25 101:22 108:3 118:24

**accusing** 104:7

**acknowledged** 43:17,21 109:21

**acquired** 51:4

**acquisition** 22:18 85:18 86:6 95:23 96:13

**acquisitions** 16:16 40:17 46:7,9

**actual** 35:21 37:7

**added** 25:16 28:10 31:7 40:12 107:11

**addition** 110:21

**additional** 22:24 25:17 100:16

**address** 54:16 58:8 76:2,16,23 77:25 78:8,14 82:3 87:13, 14,15,16,18

**addressed** 26:3 46:25 103:17 120:7

**addresses** 118:2 122:23

**adjusted** 110:21

**Administrative** 25:25 26:4

**admission** 13:15 30:24

**advance** 13:14 38:23 39:10

**advanced** 38:25 41:24

**advances** 39:14,25 40:2,4 41:10,12

**advantages** 36:18

**adverse** 9:21

**advisability** 34:16

**advise** 41:17

---

**affiliation** 71:15,18

**agency** 22:21

**agent** 21:12 25:25 26:4

**agree** 31:12 74:22 75:7 111:6

**agreed** 99:9 100:4,5

**agreeing** 99:22,24

**agreement** 14:15,21 15:19,21 16:5,6,9,12, 13,18,20 17:10,11, 14,24 18:7,9,19,20, 22 19:2,13,19,24 20:6,12,22 21:8,10 22:2,5,8,11,15,19 23:4,9,16,18,25 24:5, 8,16,19 25:23 26:12, 22,24 27:11,17 28:5, 16,20,21 30:17 31:7, 10,23 32:2,4 33:8,17, 24 34:5,18 35:14,21, 24 36:21 37:6,13 38:14 39:12,22 40:20,23 41:8,11,19, 25 42:5 43:8,19 44:6 45:4,16 46:4,13,18 47:2,9,14,20 48:10 49:2 58:6,16,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6,11,14,20 65:13, 18 66:8,23 67:9,11 69:5,18 71:22 72:4 74:6 80:15 88:8,22 89:9,13,19 90:10 92:4 93:24 94:6,10, 22 95:3,8 98:19,24 99:5,17,18,19,21 100:10,23 101:4,9 102:5,10,11,12,18 103:11 104:25 105:6, 16,25 106:3,5,9,15, 18,22 107:15 108:23 109:13,17,23 110:6, 10,20 113:25 115:17, 18 116:22,23 117:24 118:8,12 119:3 121:11,24 122:4 123:17

**agreements** 18:13 32:10,16,24 43:14

**Alex** 121:20

**Alexander** 119:24

**allocated** 18:7

**allocation** 50:16 121:16,23

**ambiguous** 116:17

**amended** 11:21 12:10 98:18,23 99:20 100:9 101:9 102:4, 12,17 103:11 104:25 105:6,16,24 106:9, 15,18,22 108:22 110:19 118:8 122:8

**amounts** 39:21 41:18 72:7

**ample** 112:12

**analysis** 34:8 36:3

**analyst** 77:17

**Andrews** 120:2 121:22 122:5

**Andros** 55:17

**answering** 124:25

**answers** 9:7 10:24

**Apartments** 75:7

**apologize** 25:4 47:11 57:23 112:25 113:13

**appears** 81:6 82:13 91:4,17

**applicable** 9:2

**applied** 40:3

**appointment** 38:17

**approach** 121:17

**approved** 86:8 89:25

**approximately** 93:19

**Arbolita** 57:5

**Arborwalk** 55:24

**argue** 13:19

**argument** 13:14

**arise** 35:22

**arranger** 21:13

**Article** 27:16

**ascertain** 27:25

**asset** 96:12,21

**assets** 97:17

**Association** 21:12

**assume** 7:19 19:14 21:3 50:5 51:18 88:23 103:3

**assuming** 79:18

**assumption** 44:18, 21

**attach** 48:12 72:9

**attached** 11:8 18:13 49:20 63:17 66:7 74:5,13,23 75:8,9 80:13 86:6 92:10 94:7 98:13 99:10 119:3 121:11

**attachment** 48:25 50:21,22 74:3 75:5 93:3,8,15

**attachments** 48:12, 15,22 49:25 51:12 72:13 73:24 92:21,24 93:10

**attention** 119:4

**attorney** 7:4 73:8 89:2 120:14 121:5

**attorney-client** 36:14

**August** 6:3 14:15,21 91:5 94:6,8 98:3,25

**authentic** 99:22 100:4

**authenticity** 99:13, 25

**author** 119:22

**aware** 9:5 18:4 28:17 33:25 36:9 61:15 63:6,10 64:3 66:22 67:2 90:18,19 105:17,22 107:2 117:23 119:9

**B**

**back** 26:10 48:3 52:19 75:18 79:4 85:9 87:3 89:25 94:4 97:9,23 100:13 101:25 102:23 104:17 111:9 113:3 117:16 123:6,9,10, 21,22 124:6

**Baker** 79:4,5 83:21, 24 84:4,16,22,24

**bankruptcy** 9:3,23 30:25

**base** 46:21 63:11 108:25

**based** 10:13 44:21 51:11 107:20

**basic** 92:11

**basically** 7:24

**basis** 117:10

**Bates** 122:9,17

**Battleground** 54:4

**beginning** 121:8 122:9

**behalf** 9:7 26:23 28:14 37:3 39:9 43:4 44:15,16 45:18 60:6 62:9 67:8 69:2 70:11, 12,13 71:7,11 76:21 90:11

**believed** 76:5 105:5

**benefit** 41:21,24

**BH** 100:18,19 101:6, 23 107:11,22 110:22

**binder** 21:2,6

**binding** 9:13 10:24

**bit** 46:19 53:2 64:22 102:2 119:10

**Bonner** 77:15 87:14 88:5

**bookrunner** 21:14

**borrowed** 39:22

**borrower** 23:18,21 24:5 25:14,17 26:7,9, 10,20 27:2,3,21 29:3, 21 30:15 31:16 37:12,16 38:13,17, 19,24 39:4,7,12 40:13,15 46:14,22 49:16 70:13,21 71:23 88:17,20 114:6 115:8

**borrower-level** 83:4,18

**borrowers** 21:11 22:17 24:8,10,11,25 26:21 29:4 31:18,20 32:3 33:6 34:9 35:19 36:12,17 37:6 39:9, 19 40:16 41:7,10 45:3 49:22 67:5 90:11,21 92:3 105:12 109:16 114:2 115:9 118:18 123:18

**borrowing** 46:21

**bottom** 50:23 84:13 87:4

**Brandywine** 54:14 55:5

**break** 45:23 86:17,18

**bridge** 20:22 21:7 29:21 30:15 31:16 100:19

**briefly** 51:19

**briefs** 11:8

**bring** 100:16

**Broaddus** 60:25 61:9 62:3,9,12 69:10 70:2,25 77:23 78:3 86:14 87:15 88:6 90:14 91:6,22,24 98:2,12 109:21 110:3,14

**Broaddus'** 93:8

**Brown** 6:14 10:16 11:16,19,23 12:3 14:11,17 20:20,24 24:23 25:4,7 27:7,14 29:5 30:7 31:11 35:5, 11,17 36:10,24 37:10,22 38:2,5 40:9 41:16 44:12,20 45:11

46:2 47:24 48:2,16, 21 49:6 52:15,24 53:3 54:19,22 55:2,4 59:5,21 60:16 61:16 62:7,24 64:2,16 65:6 69:14 70:6,15 72:9, 14,18 73:3 74:11 75:15,20 76:13 80:6, 23 81:3,5 84:3,11,15 86:15,22 87:2,5 90:7, 23 91:3 95:24 98:21 99:7,15 100:6 101:5 103:4,7,14,19,23 104:7,10,21 108:7, 13,20 109:9 110:7 111:5,17,19,23 112:5,6,14,19,24 113:5,22 114:4,8,20 115:14 116:5,16,21 117:5,18 118:5,9 119:5,14 122:2 123:5,14,19 124:5,16

**Brown's** 115:5

**bucket** 22:20

**buckets** 66:20

**business** 49:15,16 90:2 104:4

**C**

**calculator** 107:17

**call** 59:17 92:13 103:5 108:11,15 121:14,18

**called** 6:8 12:10 21:7 94:17 117:8

**calling** 24:14 30:11 31:5

**CANTY** 37:19,24 47:21

**capability** 80:18

**capacity** 87:20

**capital** 6:19 19:8,18 21:13 23:22,24 24:2 25:16 27:21 28:4,15, 24 30:8 40:23 75:25 76:15,22 77:4,24 78:8,14 82:2 87:12, 13,15,16,17 101:10

118:2

**caption** 48:4 73:21

**care** 27:21 29:7

**case** 9:23 27:20 28:11 44:19 93:23

**cell** 108:16

**Central** 6:3

**chain** 71:3 72:11,15 81:7 90:25 101:3 119:23 122:7,16,25

**chance** 38:10

**Chang** 42:8,21 61:9 69:10 70:2 78:6,9 82:2,5,16 85:15 86:3 87:17 88:6

**Chang's** 82:14,23

**change** 48:19 53:2 76:9,25 77:11

**changed** 28:12 100:21

**changing** 101:16

**Charles** 68:10

**chart** 55:6 57:20 67:14 71:3,5 74:12, 15,20,23 75:4,9 80:5 83:24 94:17,25 95:11 96:6,14,18,23,24,25 101:13

**charts** 56:3,8,22 57:3,15 58:6,25 59:19 61:3 62:5 63:17,21 65:11,15 66:2,6 67:21 69:12, 17,19 72:12 73:22 74:5,13 79:2,6,9,11 81:12 82:4,5,24 83:5 85:18 86:6 89:17,24 90:8,21 92:11 97:6, 12 98:13 110:5,8,12 119:2

**checked** 90:5

**checklist** 89:23 90:6

**circulate** 79:5

**Civil** 9:2 117:9

**claim** 9:22 116:19

**clarification** 116:6

**clarify** 112:15 116:9

**clean** 78:25 79:16,18

**cleaned** 79:13

**clear** 112:9 115:13 117:2,14

**client** 32:11,17,22 42:3 43:6,9,22,24 44:3,9 45:14 67:14 114:18 115:5

**clients** 32:24 33:24 34:5 35:13 67:8

**closed** 92:15

**closely** 104:12

**closing** 22:25

**co-borrower** 23:5 28:11 31:6

**co-borrowers** 25:13 31:9,19,21

**collection** 26:21 29:3

**collective** 46:22

**comfortable** 22:4

**comment** 8:20

**comments** 81:13 86:9

**committed** 100:14

**common** 35:2

**communicate** 66:12 70:21 118:25

**communicated** 45:15 60:9 109:19 110:3

**communicating** 44:16 45:18 62:9 66:20 76:20 87:10,20 88:15,20 102:20

**communication** 105:21

**communications** 17:23 19:17,22 20:8, 9 58:24 59:7 60:23 61:10,18,23 62:11 64:4 66:14 67:22,24

87:25 88:21 90:20 98:12 102:24 103:2, 9,21 104:14 105:5,19 106:8

**companies** 88:8

**company** 14:14,20 15:19 16:5 43:15 60:2 98:19,24 102:5

**compared** 115:8

**complete** 9:6 10:23 25:8 83:24 106:16

**compliance** 35:8

**component** 47:14

**comprise** 58:25 63:21 69:17

**conclusion** 63:12 77:2,11

**conclusions** 76:9

**condition** 26:2

**conditions** 25:23

**Conduct** 34:21

**conduit** 20:2 49:14 83:21 105:11

**Confirm** 67:20

**conflate** 117:12

**conflating** 69:2

**conflict** 33:5,10,16, 23 34:3,10,11,17 35:7 40:5,6

**conflicts** 35:22 37:7 114:19

**conformity** 35:8

**confused** 104:8

**connection** 9:19,21 10:9 14:25 15:8,14, 17,21 16:14 17:13 18:8,18 19:25 22:11, 14,17,24 23:3,4,9 28:5 31:9,23 32:2 33:8,17 34:17 35:12 36:4,20 40:16 42:4 43:7,18,20 44:5,25 45:15 46:5,13,18 48:9,25 49:12 60:4 61:12,19,24 62:5,13,

19,22 63:3,8,13 64:5, 11,19 65:12,17 67:9 68:22 69:4 88:21 89:13,22 90:8 91:13 92:2 102:4,17 104:25 106:9,14 108:22 109:4,12,16,23 113:24 123:17

**consent** 35:2

**considered** 34:3

**consistent** 30:23 58:14 118:13

**constitute** 89:18 98:3

**consult** 36:11

**consulted** 36:17 114:18 115:4

**contact** 42:4 43:7,10, 22,24 44:3,4,9

**contacts** 45:14 60:14

**contained** 66:23

**context** 14:24 20:12 40:14 60:23

**contribution** 40:24

**contributions** 19:18 20:18 100:20 101:10 107:12,14

**conversations** 66:5

**converted.'** 83:7

**converting** 83:3,17

**copied** 85:15

**copies** 27:22

**copy** 14:19 21:23 22:7 29:12 81:9 99:4

**copying** 82:17

**correct** 7:5 15:6,10 17:20,21 19:12,14 20:14,15 23:14 24:3, 5 26:17 27:3 31:17 38:14,15,19 39:5,6 43:4 49:17 50:9,13, 17 51:4,9,16,23 52:4, 9 53:10,19,25 54:7, 12 55:7,8,14,22 56:4, 9,13,17,22 57:3,7,11,

15,20,21,25 58:4,16, 17 60:10 65:20 66:3 68:20 69:20 70:3 71:8,23 72:4,7 74:17 76:2,6,23 77:8 78:5, 17,21,22 80:8,21 89:9 91:6,22 92:4,22 94:13,20,22 95:4,9 96:2,5 98:5 99:2 101:11,12 102:14 106:2 107:22 109:13, 17,24 110:10,16,22 114:23 119:10,13,20 120:3,6,11,19,23 121:5,6

**corrections** 8:17,20

**correspondence** 60:19

**counsel** 6:18 24:22 26:7,9 29:22 30:18 49:9 57:24 60:3 62:10 63:16 64:25 65:2 78:12 79:14 80:4,17 83:22 85:3,4 105:13 114:13,14 123:7

**counsel's** 111:21

**counterparty** 17:9

**couple** 11:12 78:25 119:14

**Cournoyer** 120:18, 22

**court** 8:4,11 11:16 29:25 31:2 111:6 112:10 119:9

**covered** 109:10

**created** 69:12

**creating** 61:3

**credit** 25:14 46:21

**Crossing** 56:11

**crystal** 115:12

**current** 7:8 11:6 86:4 101:14

**custom** 32:15

## D

**D.C.** 11:5 68:7,13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 106:23 114:21 115:10

**Dallas** 120:5

**Dandeneau** 113:11, 12,15

**Date** 26:5

**dated** 14:21 21:8 26:5 94:6,7 98:24

**days** 11:12

**deal** 42:7

**dealing** 100:2

**dealings** 44:24

**deals** 100:18

**Debtor** 6:20,23 9:22 18:6 24:4 30:9 77:9

**Debtor's** 9:19,22 12:10 29:14

**declaration** 99:11, 12

**declarations** 11:7 99:11

**declared** 6:9

**deduction** 64:23

**default** 72:3,6

**defined** 23:21,25 35:20 77:9

**definition** 46:22

**Delaware** 80:7 85:4 121:13

**deliver** 83:25

**delivering** 89:24 102:20

**deposition** 6:2,21 7:14,16,22 8:17 9:10, 18 10:25 11:11,22 12:11 13:4,25 14:4 16:3 17:4 21:25 33:20 60:20 86:20

99:16 100:3 102:10 104:13 109:4 111:14 119:6

**describe** 22:13 66:4

**designated** 8:24 9:9 10:8 12:19,24 13:13 33:21 37:12,16 68:24

**designation** 58:20 73:15 91:11

**detail** 66:14

**determination** 45:5, 9 50:3 69:16

**determine** 34:8 39:13,25 44:13 67:10 70:8

**determined** 93:18

**digress** 99:7

**diligence** 67:8,13,15 68:19 69:24 89:22 90:5

**diligenced** 68:18

**diligencing** 68:4 69:4

**direct** 39:14 40:2 41:9 113:9 119:4

**directed** 41:13 115:6

**directing** 40:15

**directly** 64:5

**disagree** 112:18

**disclosing** 10:18

**discuss** 92:14

**discussed** 87:9 92:11 98:15

**discusses** 25:22 27:17

**discussion** 33:22 104:23 111:16

**discussions** 34:15 35:19 68:3 94:12

**dispense** 7:21

**disqualification** 10:9 31:14

**disqualify** 9:20 11:2 29:14 30:14

**distinction** 45:13,17 59:12,14,21

**distribution** 106:25 107:7 121:16,23

**document** 14:22 15:5,9,10,14 21:7,15, 19 29:25 38:8 93:18 100:8

**documents** 13:21 99:10 103:16 104:11

**dog** 68:10

**Dondero** 44:5 106:8

**draft** 97:12 101:3 118:7 121:10

**drafted** 17:25 118:12

**drafting** 17:13 20:13 121:16,23 122:3

**dragging** 57:23

**Drawhorn** 99:14 100:5 104:18

**DST** 64:25 66:19 79:2,14 80:3,5,7,8,17 82:5,24 83:4,18,21 85:3 92:11 94:17

**DSTS** 90:25

**due** 41:19 69:23 72:7

## E

**earlier** 23:25 69:25 79:8

**Economics/ ownership** 93:4

**effective** 26:5 98:25

**Ellis** 97:14

**email** 72:11,15,20,21 73:4,10,18,21 74:2 75:6,18,19,21 76:2, 15,23 77:24,25 78:8, 14,21,23 81:4,7,16, 18,23,24,25 82:3,9, 12,14,18,20 83:16 84:8,14,20 85:10,12, 13,14,21 86:11 87:4,

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

**emailing** 75:22

**emails** 61:7 84:5 87:7 88:16 89:5,11, 16 97:25 98:9,13 99:9 105:14,18 121:5 122:23 123:2

**employed** 42:13

**employee** 42:11,16, 18,22,24

**end** 75:16

**engagement** 32:19

**entities** 21:9 25:12, 13 26:11 29:7 31:22 83:5,6,18 87:25 117:25

**entitled** 104:6

**entity** 6:20 16:23 29:8 40:12 44:15 68:14 77:20

**entry** 75:25

**equity** 7:10 100:16, 19

**ESQ** 6:7

**essentially** 113:6 116:3

**establish** 43:20

**established** 106:12

**estate** 7:12 10:20,21 43:13 59:15 118:17

**estate/property** 116:2 124:10

**event** 72:3,6

**evidence** 13:21

**EXAMINATION** 6:13 113:18

**executed** 19:13

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

**exhibit** 11:17,18,19, 20,22 14:12,16,19 15:19 20:21,23 21:6, 7,16,24 22:4 72:10, 13 87:2 89:8 90:23 91:2,4 92:8 93:23 96:4 98:3,16,20,22 99:16,19,20 101:4 102:6,13 119:3,7,15, 18 120:17 122:10,14

**exhibits** 11:7 12:7 21:3 109:6 119:5

**existing** 96:11,17 97:20

**explain** 30:22 115:20 123:23

**explained** 41:7

**explaining** 7:21

**extent** 18:13 26:24 27:2 28:3 41:8 46:16

**eyebrows** 104:19

## F

**fact** 39:24 111:8 118:11

**fairly** 104:12

**Fairways** 57:9

**fall** 66:20

**false** 72:2

**familiar** 21:21 34:20, 24 48:5 58:18 60:21 104:10

**Family** 15:25

**favorable** 26:3

**Federal** 8:25 117:8

**fight** 115:14

**filed** 29:25 30:12,25

**files** 11:9

**filing** 31:14

**final** 72:12 73:22 82:4

**finalizing** 110:4

**financing** 15:22 16:15 18:9 22:22,24

46:5

**fine** 7:23 38:4

**finished** 8:8 24:22 117:4

**firm** 10:4,20 59:24 63:7,12 65:25 118:11

**firm's** 10:14 11:3

**firms** 26:20

**five-minute** 86:18

**flip** 18:25 23:15 48:16,17 51:17,20 52:12 53:6 100:24

**focus** 23:17 25:19 72:16 87:7 106:11

**focusing** 53:16,22 54:4,10 72:19

**folks** 49:15,16 62:4 69:9

**follow** 61:7 81:11 111:20

**follow-up** 113:21 123:13

**form** 27:4,12 28:25 30:4 31:3 35:3,10 36:8,22 37:8 40:7 41:14 42:9 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 102:25 105:18, 20 108:5 109:25 110:23 117:8 118:4

**format** 97:4

**formation** 20:13 94:12 115:17

**formed** 94:20 118:14,16

**forward** 27:15 94:24

**forwarding** 110:4

**found** 103:20

**frankly** 80:16

**Freddie** 18:10 20:2 22:22 66:21 81:14

83:25 85:15 86:3 90:3

**Freddy** 42:8,21 69:10 78:6,9 82:2,5, 14,16 87:17 88:6

**front** 12:5,7 29:14,16

**full** 6:15

**funds** 40:15 100:14

**future** 113:4

**FW** 101:3

**G**

**gave** 37:6 101:7

**general** 87:9

**generally** 66:9 87:8

**generated** 97:15

**Geotz** 44:8,14 61:8 71:17 76:18 88:5

**give** 29:11 40:5 66:13

**giving** 112:12

**Glenview** 55:11

**Goetz** 42:7,10,11 60:15 61:20 69:25 70:19 71:12 77:3,12, 17 87:13

**good** 13:3 45:22

**Gould** 12:11 26:6

**Governors** 52:22 53:7 74:3

**Grand** 57:14

**great** 16:10

**Green** 52:22 53:7 74:3

**grounds** 104:3

**group** 7:12 21:9 69:24 81:9

**guarantee/ guarantor** 40:13

**guess** 31:5 63:4 64:22 103:15 112:8

**Gulfstream** 50:23

**H**

**hand** 123:20

**handful** 61:2 62:4

**handled** 10:21

**handles** 43:13 71:3

**handling** 59:24

**hat** 44:14,19 45:6 70:9

**Hayley** 103:4 108:9, 15

**HC** 30:5

**HCM** 29:23 30:8,18

**HCRE** 16:23 17:3,4, 7,20 18:6 19:6,17,22 37:11 38:14 39:25 40:6,14,22 41:9 42:4, 19,25 44:10 45:19 47:8,13 50:8,13 51:7, 8 53:10,18,25 54:6, 12 55:14,22 56:3,17, 22 57:2 58:12,24 60:10 61:12 66:6 70:11 74:16 88:17 107:12 108:21 110:15 114:10,11,13

**HCRE's** 46:12

**hear** 79:4

**hearing** 8:21 13:15, 22

**Heights** 52:6

**helped** 22:16

**helpful** 121:14

**Hidden** 56:24

**Highland** 6:18,21,23 16:21 17:10,20 18:6 19:8 23:3,5,8,13,22, 24 24:2,4,14,17 25:16 26:11 27:3,21 28:4,10,15,24 30:8,9, 11 31:6,16 39:20 40:3,6,12 41:18,23 42:11,16,22 43:7,10, 15,18,22 45:18 47:3, 8,13 50:8,12 51:7,9 53:10,18,24 54:6,12

55:13,22 56:3,17,21 57:3 58:11 59:10,12 60:3 61:19,24 62:10, 11,19 63:2,8,13,16, 24 64:10,19,24 65:12,17 69:11 70:12 71:2,14,15,18 74:17 75:25 76:10,15,22 77:4,5,8,9,12,19,24 78:4,8,14 82:2 85:3 87:12,13,15,16,17 88:7,10 89:3 90:15 92:2 107:13 108:22 109:20 110:16 114:5, 10 117:25 118:2 120:11,22

**Highland's** 46:17

**Highland136853** 122:10,18

**Highland136856** 122:19

**Highland263748** 95:25

**Highland263749** 96:8

**hired** 59:15

**history** 94:5

**Hold** 97:11

**Holdings** 14:13,20 15:18,25 16:4 70:22 94:6,22 95:4 98:17, 23 100:11 122:8

**hook** 39:20

**hour** 81:8 86:16

**hours** 11:13

**housekeeping** 11:24

**hung** 64:15

**Hunton** 62:16,18 63:7,12,15,22 64:5, 10,19,25 65:4,12,20, 22,24 108:24 120:2 121:22 122:4

**I**

**i.e.** 70:10

**idea** 65:24 76:14 95:15

**ideal** 32:12

**ideally** 32:18

**identical** 74:24,25 75:8,10,11

**identically** 58:9

**identified** 69:25 120:10

**identify** 122:23

**impact** 36:6

**implications** 36:12

**important** 8:6 18:12

**improper** 36:6

**in-house** 42:9 59:10, 24 64:24 78:12 114:14 120:10

**inaccurate** 27:2 28:2

**include** 23:21

**included** 67:4 89:4 122:24

**includes** 27:3

**including** 26:11 39:20

**inconsistent** 30:2, 21

**incorrect** 19:12 26:12,15,16 72:2 114:8

**independent** 63:19 64:8

**indication** 57:18

**individually** 36:19

**individuals** 45:6,17 60:8 61:11,18 70:9 87:21,23,24 88:14

**information** 83:14

**Initially** 25:11

**initials** 68:9

**initiating** 84:8 87:4 92:6

**inquiry** 82:24 86:2

**instruct** 10:12 110:24

**instructing** 111:18

**instruction** 111:21

**instructions** 90:11 117:19

**intended** 108:4

**intent** 106:24 107:6

**interest** 19:7,9 47:12 50:12 53:17,23 58:8, 10,15 94:18 101:11, 15,17,20 106:17,21 110:9,15

**interested** 88:2

**interests** 19:23 20:11 47:7 50:7 53:8 54:5,16 58:2,7 74:16 75:2,12 93:16 95:2,7 109:22 110:18,21

**interjection** 124:13

**internal** 11:9

**interpose** 116:5

**interpret** 79:17

**interrupt** 25:5 54:25

**interruption** 12:2 85:8 109:7

**involved** 46:16 62:11,18 65:25 121:22

**involvement** 109:11

**irrespective** 41:12

**Isles** 50:23 55:18

**issue** 27:9 28:19 34:16 46:25 47:8 115:23 116:8,10 124:3,20,21

**issues** 117:13

**item** 83:23

**items** 92:12,15 93:3

**IV** 6:17

**IX** 27:16

**J**

**James** 6:17 44:5 106:8

**joint** 33:7,23 34:4,9 35:12,23 36:4,13 37:5

**jointly** 36:19 39:20 40:3

**July** 92:7 98:2 119:20

**jump** 37:20

**JV** 93:4,16

**K**

**K&e** 97:12

**Ken** 37:19 47:22

**Keybanc** 21:12

**Keybank** 18:10 20:2, 5 21:11 22:23 23:3 25:13 28:9 48:12 49:5,8 66:21 90:3 100:12 102:21,25 103:10 104:15 105:6, 15 118:25

**Kirkland** 97:14

**knowledge** 13:17 14:7 27:13 40:21,25 44:2,7 63:20 64:9 87:19 88:3,4 106:17 107:25 115:11,15

**knowledgeable** 9:7 10:23

**Kurth** 120:3 121:22 122:5

**L**

**L.P.** 6:19 19:8 24:2 29:23 30:5,8,9,19

**lack** 27:9 100:19

**Lake** 56:24

**Lakes** 54:9

**Landing** 57:18

**large** 25:15

**laundry** 69:8

**Lauren** 99:9 103:17

**law** 8:4 10:4,14 59:24 117:20 118:11

**lawyer** 68:17 78:24 118:17

**lawyers** 33:14 78:20

**lead** 21:13 37:12,16 38:13,17,18,24 39:3, 7,12 40:14 46:14 72:6 88:17,20 114:5 115:8

**leads** 64:18

**learned** 94:21

**lecture** 117:19

**legal** 26:18,19 89:22

**legible** 95:12

**legitimate** 13:7

**lender** 21:11 49:15 66:12 71:21 89:25 105:11 116:4 124:11

**lenders** 18:12 26:5

**letter** 32:19,20

**level** 59:17 70:21,23, 24 71:2 116:2 124:10

**Liability** 14:14,20 15:18 16:5 98:19,24 99:21 102:5

**liable** 40:4 41:11,18

**light** 104:22

**lights** 30:20

**limit** 20:11

**limited** 14:14,20 15:18 16:5 19:12 20:11 40:24 46:24 47:3 97:17 98:18,24 99:21 102:5

**list** 16:20 69:8

**literal** 33:15

**LLC** 14:13,20 15:21 16:4,6,9,12,13,18,23 17:3,10,11,14,24

18:7,19,20,22 19:2,6, 19,24 20:12 46:9,10 47:8,13 50:8 51:7,15 53:9,17,22 54:5,10, 16 55:6,11,19,25 56:8,13,16,20,25 57:6,10,19 58:3,8,16 63:3 70:22 74:15 75:2,13 93:4,17,22, 24 94:6,10,18,20,22 95:3,4,8 97:18 98:17, 23 99:17 100:10 101:3,9 102:11,12,18 103:11 104:25 105:6, 16,25 106:5,9,15,18, 22 107:15 108:23 109:22 110:10,20 115:17,18 116:23 118:4,8,12,14,16,20 121:10,24 122:4,8

**LLP** 12:12 26:6

**loan** 18:9,13 20:6,22 21:8 22:2,5,8,11,15, 19 23:4,9,16,18,25 24:5,8,16,19 25:17, 23 26:12,22,24 27:11,17 28:5,16,20, 21 29:22 30:16,17 31:7,10,16,19,23 32:4 33:8,17,24 34:5, 18 35:14,21,24 36:20 37:6,13 38:14,22 39:9,12,22 40:20,23 41:8,11,19,25 42:5 43:8,13,19 44:6 45:4, 16 46:4,13,18 47:2,9, 14,20 48:10 49:2 58:6,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6, 11,14,20 65:13,18 66:8,23 67:9,11 69:5, 18 71:22 72:4 74:6 80:15 88:22 89:9,13, 19,23 90:10 92:4 95:8 99:18,19 109:13,17,23 110:6 113:25 115:6 116:22 119:3 123:17

**loans** 28:8 38:23

**log** 104:3

**long** 122:17

**looked** 84:6 104:12

**lost** 111:6

**lot** 114:4

**M**

**Mac** 18:10 20:2 22:22 84:2

**made** 9:2 30:25 31:13 39:14 40:2 45:5,10,13,16 69:16 71:23 78:25 79:11 80:25

**maintained** 105:9

**make** 8:17 13:10 15:25 40:23 49:18,21 50:3 54:24 77:7 79:8 95:18 102:8 112:9 115:12 116:20 117:10,14

**makes** 8:10

**making** 80:4,19 89:23

**Management** 6:19 19:8 24:2 27:22 28:4, 15,24 30:9 107:22 110:22

**manner** 30:23

**March** 98:25

**mark** 11:17,19 14:12 20:21 72:10 88:24 120:8,9 121:8,10,19

**marked** 11:22 14:15, 18 20:23 21:5 72:13 91:2 98:19 101:4 122:10

**Markets** 21:13

**Martin** 10:11 12:11 24:21,24 25:6 26:6 27:4,12 28:25 30:4 31:3 35:3,10,15 36:8, 22 37:8 40:7 41:14 44:11,17 45:8,20,22 49:3 52:15,25 54:17, 20,23 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4, 14 72:24 74:9 76:11

80:2,22 83:19 86:20, 24 89:20 95:17 103:19,24 104:9,16 108:5 109:25 110:23 112:2,8,16,21,25 113:8,13,19 114:11, 12 116:12,20 117:4, 6,21,22 122:12 123:3

**material** 80:4 109:3, 5

**math** 107:17

**Matt** 42:7,8,10,11 60:15 69:10 70:19 71:12 75:23 87:12,13 88:5

**matter** 9:14,16 10:21 11:24 13:22 32:21,22 115:23 116:8,10 123:20 124:2,20,21

**Mcdermett** 77:15 87:14 88:5

**Mcgeoch** 119:24 120:14

**Mcgeoch's** 119:25 121:7

**Mcgraner** 42:8,15 60:15 61:9 69:10,25 70:19 71:6,13 75:23 76:15 77:17 87:12 88:5 99:12

**Mckenzie** 79:4 83:21,24 84:4,16,22, 24

**means** 79:18 80:8 107:5,9

**meant** 77:8

**mechanics** 115:6

**memorialized** 100:21,23

**memory** 119:12

**mentioned** 32:20 46:20

**merging** 83:4,18

**methodically** 111:10

**middle** 25:3

**Mill** 52:23 53:21 75:6

**million** 100:15

**mind** 39:24 47:23 59:13

**mine** 11:5,6

**minute** 85:14 100:13

**minutes** 82:15 85:25 86:23

**minutes'** 111:7

**mischaracterizing** 114:9

**missing** 54:15 84:12

**misstated** 47:5

**mistaken** 103:22 104:20

**modified** 102:21,25 106:24 107:6,10,19

**moment** 29:11 99:8

**Monday** 72:21

**money** 115:7

**moneys** 40:22

**morning** 121:19

**Morris** 99:11

**motion** 9:19 10:10 11:2 14:25 29:14 30:13 31:15

**move** 98:16

**Multi-family** 122:7

**multifamily** 14:13,19 15:18 16:4 70:22 93:24 94:5,22 95:4 98:17,22 100:10,18

**multiple** 26:19 37:5 67:3

**mute** 108:14

**N**

**names** 59:8 60:8,21 61:2,5

**National** 21:12

**nature** 14:4

**necessity** 34:16

**needed** 22:22 25:14 100:16

**negotiate** 118:8

**negotiated** 17:25

**negotiation** 15:10 17:13 20:13 115:18

**Nexpoint** 25:12 43:13 44:18 59:9,12, 14 60:15 69:11 70:20 71:7,11 76:6,21 78:11 88:6,11 90:13 116:15 117:23 118:18

**non-real-estate-lawyer** 115:21 123:24

**note** 92:12

**notice** 9:10 10:25 11:21 12:10 28:7 111:3,14

**notices** 27:18,20 28:14 29:3,6

**number** 91:18

**numbers** 122:18

**O**

**Oak** 52:23 53:21 75:6

**Oasis** 57:14

**oath** 7:25

**object** 10:11 116:17

**objection** 27:4,12 28:25 30:4 31:3 35:3, 10,15 36:8,22 37:8 40:7 41:14 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 108:5 109:25 110:23 116:20 117:7, 11

**objections** 99:24 117:7

**obligations** 38:18

**obtain** 33:5 35:7

**obtained** 39:10 40:22

**obtaining** 32:16

**obvious** 9:17

**occasion** 18:4

**occasions** 67:4

**occurred** 40:18

**offering** 13:21

**offline** 111:12 119:10,13

**Olde** 52:7

**open** 32:21 92:12 93:3

**operating** 59:16 88:9,11

**operation** 41:8

**opinion** 26:3,18 37:4,9 40:8 83:10

**opinions** 26:19

**opportunity** 8:16 112:13 113:6

**opposed** 15:7 29:8 87:8

**opposition** 11:4 29:13,19 30:13 31:14 43:17

**order** 118:20

**org** 65:11,15 67:14, 21 72:12 73:22 74:12,13,15,20 79:2, 6,9,11 80:5 81:12 82:4,5,24 83:5,24 85:18 89:17,23 90:8, 21 110:5,8,12

**organization** 66:6

**organizational** 18:11 62:23 63:17,20

**original** 94:10 97:10, 24 99:17 102:9 107:15,19

**outstanding** 83:23

**owner** 83:4,6,18 95:20 110:22

**ownership** 18:5,17, 18 19:23 20:10,17 46:23 47:7,12 50:7, 11,16 51:6,15,22 52:3,8,20 53:17,23 54:5,10 55:12,21 56:2,7,12,20 57:2,7, 11,14 58:2,7,8,10,15 74:16 75:2,12 93:16 94:18 95:2,6 101:17, 20 109:22 110:9,15, 20 118:20

**owns** 20:3

**P**

**p.m.** 72:22 81:8 109:7,8

**pages** 122:17

**Pardon** 54:19

**Park** 51:21 54:4,9

**part** 43:15 47:9 64:13,17 66:18 70:19 73:18 89:21 110:5

**parties** 16:17,19,22 17:23 20:10 28:19 90:2,12 101:21 108:3 109:12

**partner** 7:10 11:5,6 60:21 68:15 93:19,20 94:19 114:23,25 120:2

**partners** 7:11 10:19 16:23 17:3 19:6

**Partnership** 19:13 40:24 46:24 47:3

**party** 9:21 16:22 17:11,17 47:17 105:24

**pass** 95:13 112:6 123:3

**passing** 61:4 83:13 112:4

**past** 84:19

**Patrick** 88:24 120:8,

9,15,18

**Paul** 60:25 69:10
70:25 86:7,13,14
87:15 88:6 91:6,22,
24 92:17 93:8 98:2,
12 109:21 110:14

**penalty** 6:10

**people** 45:14 59:9
67:20 69:24 70:7
81:20 83:14 87:11
120:11

**percent** 19:7,9 47:18
50:12,13 51:9 53:11,
18,24 54:6,11,12
55:13,21,22 58:10,11
59:20 74:16,17
93:19,20 94:19,20
107:21 110:15,16,22

**percentage** 19:7,9
51:15,22 52:3,8
54:11 55:12,21
101:10,15 106:17,20
110:18

**percentages** 18:5,
18 19:11 20:17 51:7
52:21 56:2,7,12,16,
20,21 57:2,7,11,15
107:13,14,18,19
108:2

**perfectly** 113:16

**perform** 67:7

**perjury** 6:11

**permitted** 41:9

**person** 120:22

**personal** 10:5

**personally** 15:7
32:23

**petition** 112:10

**Phillips** 6:1 7:1,9 8:1,
25 9:1,8,9,13,20
10:1,4 11:1 12:1,11,
19 13:1,16,19 14:1,3,
6 15:1,4,8 16:1 17:1,
12,22 18:1,3,17 19:1,
16,21 20:1,9 21:1
22:1,10,14 23:1,2,8
24:1,7,9 25:1,2 26:1,
6,9,17,23 27:1,8,22

28:1,3,9,13,18,22
29:1,20,22 30:1,14,
18,24 31:1,15,22,25
32:1,9 33:1,5,21
34:1,2,7,18,20 35:1,
6,18 36:1,2,11,16,19
37:1,3 38:1 39:1 40:1
41:1,6,17 42:1 43:1,
4,16,21,24 44:1,4,13
45:1,5,13 46:1 47:1
48:1,8,24 49:1,8,18
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1,23 59:1,6 60:1,
7,9,14 61:1,10,17,22
62:1,12 63:1 64:1,4,
23 65:1,5,9,16 66:1,5
67:1,7 68:1,3,15,17,
24 69:1,3,16,22 70:1,
8 71:1,20,25 72:1
73:1,9 74:1 75:1
76:1,20 77:1 78:1,17,
24 79:1,8,11 80:1
81:1,19 82:1,10,21
83:1,15 84:1 85:1,20
86:1,10 87:1,19 88:1,
19 89:1,12,17 90:1,
10,20 91:1,21 92:1,
18 93:1 94:1 95:1
96:1 97:1 98:1,5,8,11
99:1 100:1 101:1
102:1 103:1,10
104:1,14 105:1,15,23
106:1,7,13 107:1,24
108:1 109:1,15,19
110:1,13 111:1 112:1
113:1,24 114:1,16,23
115:1,2,16,22 116:1,
13,24 117:1 118:1,4,
7,17,19 119:1 120:1,
13 121:1,2,4 122:1,
24 123:1,16 124:1,2

**Phillips'** 10:8 12:24
14:8 15:13,17,20
26:25 27:25 29:13,24
30:12 31:13 32:14
33:23 35:23 42:3
43:6 45:2 58:21
59:13 88:3 89:8 92:2
102:3,16 104:24
109:11 116:7 122:3
123:2 124:23

**phone** 108:10,11

**place** 56:16 97:20

105:18,20

**played** 22:14

**pleadings** 30:25

**point** 42:8 83:21
84:16 113:4

**portfolio** 95:21

**portion** 59:25 90:5
101:23 107:11

**position** 7:8 13:17
27:25 28:22

**positive** 101:24

**potential** 34:10
35:21 37:7 40:5
97:16

**practice** 32:15
117:20

**precluded** 13:20

**preparation** 15:9
33:20 49:12 60:19
68:23 73:18 91:14

**prepare** 49:8 106:2

**prepared** 10:23
12:23 48:24 50:18
65:15 67:21

**preparing** 11:11
15:3 65:25

**presented** 34:10
112:11

**pretend** 52:16

**pretty** 113:16

**previous** 28:8
100:17

**previously** 28:12
76:4 86:7 91:25
98:14 100:14 120:9

**primarily** 46:20 68:7
90:12

**prior** 44:23 48:3
51:11 56:3,8,22 57:3,
15 74:6 82:14 94:9
100:18 105:4 106:25
107:7 119:5

**privilege** 10:13,14,
18 36:14 104:3

**pro** 107:20

**problem** 8:12 33:14

**procedure** 9:2
112:17 117:9

**procedures** 7:22

**proceeding** 9:3

**PROCEEDINGS** 6:5

**proceeds** 38:22 39:8
41:20,21,24

**produced** 104:2,11

**Professional** 34:21

**Project** 15:22 16:15
22:18,25 46:6 72:11
105:10 118:21
124:24

**pronounced** 6:25

**proof** 9:21

**properties** 22:21
52:19 66:11 94:18

**property** 46:6 51:3
59:17 70:23 96:21

**property-level**
22:16 25:12 40:16

**proportional** 107:20

**proposed** 95:22

**protocol** 7:22

**provide** 9:6 10:23
22:23 25:8 46:5,20

**provided** 38:23 39:2
48:11 49:4,7 83:14
119:5

**providing** 25:3 26:18

**provision** 28:7 39:17

**pulled** 100:13

**purpose** 15:24
16:11,13 46:4

**purposes** 66:19

**pursuant** 8:25

**put** 90:23 108:13

**Q**

**question** 8:7 10:13,
18 13:7,18 23:8
24:24 25:9 32:8
43:23 47:5,11 65:18
70:16,18 83:2,9,11,
17 85:11,19 103:16
110:25 123:6,8,11,
20,23

**questions** 10:24
13:5,12 106:16
111:25 112:3,13,15,
20 113:11,21 114:5
115:5 117:15,16
119:14 122:2 123:7,
12,13

**quickly** 37:21

**quote** 80:11

**R**

**Rachel** 11:6 72:22
73:7,11 75:6 78:23
79:12 80:24 81:10,19
82:3,6,13,16,24,25
83:22 84:8 85:15,16,
24,25 87:10 88:15

**Rachel's** 85:14

**raise** 27:9 28:19
104:18

**raises** 103:15

**ran** 104:17

**Ranch** 56:6

**rata** 107:20

**RE-EXAMINATION**
124:15

**read** 19:4 29:18
112:16 121:7 123:9,
21

**reading** 16:20 121:9
123:10,22 124:6

**ready** 82:6,25

**real** 7:11 10:19,20
43:12 59:15 115:25
118:17 124:9

**reason** 80:10

**reasons** 54:18,21

**recall** 59:8 61:4

**receive** 85:21 86:10 89:24 91:21 92:19

**received** 26:2 41:20, 24 49:21 82:10 98:4, 6 103:9

**receiving** 28:14

**recess** 45:24 86:25 108:8,19

**recipient** 77:23 84:17

**recipients** 78:21 91:18

**recollection** 51:13 76:8 77:2,10 79:10

**reconvene** 86:23

**record** 6:16 8:11 54:24 77:7 111:4 117:2

**Recross** 113:8

**redirect** 113:6

**reduction** 107:21

**reexamination** 112:11

**reexamine** 112:7

**refer** 6:23 9:16 16:4 17:2,7 21:25 79:15 102:11,12

**reference** 33:22 51:2 74:14

**referenced** 75:24 78:7

**referencing** 26:10 84:19

**referred** 77:22 93:17 101:6 102:9 124:22

**referring** 6:20 14:5 22:4 26:8 30:16 93:22 101:16 102:13 116:10

**refers** 26:25 74:3 93:5,25 95:2

**reflect** 28:22 51:14 58:2,9 63:7 83:6 89:11 107:18 108:3 110:14,20 111:5

**reflected** 51:8,22 52:3,8 53:9,17,23 54:5,11 56:2,8,13,17, 21 57:2,7,11 67:18 81:20 89:15 108:2

**reflecting** 55:20 58:6 95:21 101:14

**reflection** 57:19 75:12 110:9

**reflects** 28:3 50:7,11 55:12 94:18 95:6

**refresh** 76:8 77:2,10 79:9

**REIT** 65:2 83:22 85:18 86:5

**reiterating** 83:23

**related** 67:11 79:24 110:4

**relates** 18:14 89:8

**relating** 10:24 28:15 32:4 33:24 60:9 67:5, 17 68:3,5,19 69:5,19 88:21 89:17 98:12 103:10

**relation** 11:9

**relationship** 100:17

**rely** 71:4

**relying** 71:22

**remainder** 101:23

**remaining** 83:2 85:11

**remember** 114:7 119:16

**remote** 6:2,9

**Renaissance** 54:9

**repeat** 21:10

**repeating** 55:20

**rephrase** 47:5

**reporter** 8:11 11:17, 18 111:6 119:9

123:10,22 124:4,6

**represent** 17:16,19 23:2,8 24:7,12,13,16 25:2 29:4,9 31:8,15, 22 36:20 65:12 84:25 95:16 103:20 105:24

**representation** 23:12 26:25 28:23 32:11,17,25 33:7 34:4,9 35:13,23 36:4, 5,13 37:2,5 43:21 45:2,3 59:23 60:10 62:19 63:2 72:2 109:12 114:4 115:22, 25 116:25 123:25 124:8,20

**representations** 27:10 35:2 44:23 66:23 67:3,10

**representative** 68:14 71:14 76:5,10 77:4,12,19 78:4,10 91:25

**representatives** 61:12,19,23 88:16

**represented** 24:9 25:11 26:17 28:4 29:7 31:18 43:18 63:7,13 64:10,19 65:16 85:6 105:14 108:21 109:15 113:24 116:14 123:16

**representing** 9:20 87:23,24 92:3 118:18

**represents** 10:3

**reps** 67:4,16,17 68:4, 19 69:4,18 71:22

**requested** 38:24

**require** 32:9

**required** 9:6 13:5 19:18 32:21 34:11 116:4 124:12

**requirement** 32:13

**requires** 34:25

**reserve** 52:2 55:11 112:7

**reserving** 99:23

**respect** 9:8 13:17 20:10 28:23 32:15 44:8 53:8 55:11,19, 25 56:11,15,25 57:6, 10,13,17 58:5 74:25 75:5,11 99:15 106:5, 16 109:22 116:18,22, 23

**responded** 98:9

**responds** 85:25

**response** 13:7,8 82:14,23 85:24

**responses** 9:13

**responsibilities** 36:3,7

**rest** 21:24

**Restated** 98:18,23 99:20 100:10 102:4 122:9

**restructure** 66:18

**retention** 32:2,10,16, 19,24 106:4

**retraded** 100:12

**reverts** 93:15

**review** 8:16 38:6 49:24 51:11 73:17 91:13 109:3

**reviewed** 11:2 12:15, 21 86:7

**reviewing** 11:7 38:8 60:18

**Ridge** 52:23 53:15 56:19 74:21

**rights** 38:18

**rise** 37:6 40:5

**risk** 9:17

**risks** 36:18

**River** 52:2

**ROB** 6:7

**Robert** 6:17

**role** 7:8 15:8,13,17, 20 17:12 22:11,13

46:12,17 48:8 49:12 61:3 65:10 78:12 92:3 102:3,17 104:24 105:8 106:14 115:8 116:7 122:3 124:23

**room** 119:8

**Rule** 8:25 9:3,10 15:3 58:21

**rules** 7:20 34:21 117:8

**run** 7:11

**S**

**S-A-U-T-E-R** 68:12

**Sam** 11:6 72:22 73:7, 11 75:21 78:23 81:19 82:3,16,24 84:8 85:15,16,25 87:10 88:15

**Sam's** 75:6 82:13 85:24

**Sauter** 11:5 68:7,12, 13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 114:21,22,25 115:10

**schedule** 47:19 48:4,6,9,13 49:19,20 50:7,21 51:12 58:5, 19 59:2 63:23 64:18 66:7 67:19 69:17 74:5,14,24 75:8,10 89:18 90:9 95:7 100:24 101:8,13,14 106:21 108:2 110:5, 19 121:14

**schedules** 49:5,7,9, 13,19 50:17

**scope** 59:22 111:2, 13 115:21,24 123:25 124:7,19

**scrap** 111:12

**screen** 12:6,8 21:2,5 72:20 87:3 90:24

**scroll** 12:17 19:2 25:18 27:15 47:19 50:20 55:9,16 72:14

73:23 74:19 75:4,15
81:3,22 84:11,13
85:12,23 92:24 93:7,
13 94:15,24

**section** 10:20 25:20
27:17,19 28:2,20
34:22,25 35:9 37:20,
23 38:7,11,16,21
64:13,17

**select** 121:12

**selected** 10:8

**seller** 97:16,17

**separate** 43:15 60:3
108:11 117:14

**separately** 23:6

**September** 20:22
21:8 72:21 75:19
81:25 84:9 85:10,13

**services** 88:7 117:24

**set** 19:23 21:9 58:15
106:17,21 123:7

**sets** 12:18

**setup** 40:19

**severally** 39:21 40:4

**share** 85:18 86:5

**shared** 88:7 117:24

**short** 63:5 100:15

**show** 90:9

**showing** 75:25

**shown** 55:6

**shows** 101:22

**sic** 91:5

**side** 25:14 59:25 71:2
85:3 90:13,15

**sign** 112:17

**signature** 119:25

**signoff** 79:3 84:22

**silo** 43:12,13 59:16

**siloed** 105:8

**similar** 32:18 74:6
80:15

**Similarly** 96:10

**simple** 102:8

**simpler** 16:2

**simply** 83:23 104:20

**sir** 6:24 7:6,15 8:2,5,
14,18,22 9:4,11,15,
25 10:6 12:14,16,22
13:2 14:10,23 15:11,
15 16:25 17:15,18
18:15,21 19:3,15,20
20:19 21:4,17,20,22
22:6,9,12 23:6,11,23
24:6 26:14 27:5,23
29:16 31:24 32:5,12
33:12,18 34:23 35:4
37:14,17 38:12,20
39:16,23 40:8 41:2,5
43:5 45:10 46:11
47:15 48:7,23 49:4,
10,23 50:2,5,10,14,
19,25 51:5,10,17,24
52:5,10 53:13,20
54:2,8,13 55:15,23
56:5,10,14,18,23
57:4,8,12,16,21
58:13 59:4 60:20
62:14,23 63:4 64:7
66:25 67:6 68:21,25
69:21 70:5 71:9,24
72:5,8 73:12,14,20
74:10,18 75:3,14
76:3,7,12,17,24 77:6,
13,16 78:2,15,18
79:20 80:9 81:2,17,
21 82:8,11,19,22
83:20 84:6,10 85:7,
22 88:13 89:6,10,14
90:16,22 91:7,10,16,
20,23 92:5,20 93:12
94:3,14,23 95:5,10
96:3,20,22 97:19
98:7 99:3,6 100:25
101:18 102:15 106:6
109:14,18 110:11,17
111:22 114:24 115:3,
19 119:11,17,21
120:4,12,16,20,24
122:6

**sit** 37:3 65:23

**sloppy** 14:2

**sole** 21:13

**sooner** 92:16

**sort** 22:23 49:14
59:16,18 66:16 78:11
105:10

**speak** 68:22 69:3

**speaking** 44:15
70:10,11,12 71:7,11
84:19 106:23 117:10

**specific** 59:8 61:5

**specifically** 14:6
92:14 93:6 115:25
124:9

**speculating** 65:19
80:21

**speculation** 88:3

**spell** 68:8

**spend** 11:10

**spoke** 45:6 62:8
68:25 69:24 70:10

**standard** 112:17

**started** 15:3 117:21

**starting** 52:18
119:20 122:18

**Starwood** 95:20

**state** 6:15

**statement** 26:8,12
29:24 31:13 101:19

**stating** 9:17

**Statutory** 80:7 85:4

**stipulate** 99:13

**Stoney** 52:23 53:15
74:21

**stop** 108:14

**strike** 61:21

**string** 89:7 90:19
92:7 119:19

**structure** 18:11
46:24 59:19 62:23
66:10,19 83:9 95:19,
22 96:12,17 97:8,20
102:21,25 118:20
119:2

**structures** 52:25

**structuring** 16:15
59:22 62:6,14

**subject** 93:22

**submit** 81:14

**subsequently** 94:21

**subsidiaries** 46:11
58:7 67:5,12,18 68:5,
20 69:6 83:10

**substance** 67:23
79:24 84:20

**substantially** 80:14

**substantive** 83:8,11,
17

**sufficiently** 95:12

**Summers** 57:18

**Support** 11:3

**suppose** 64:15

**suspicion** 18:8 28:6

———

**T**

**table** 24:25

**takes** 57:22

**taking** 90:10

**talk** 16:9 20:4,5
104:23 108:9

**talked** 46:15 66:17

**talking** 8:9 11:4 16:8
17:6 59:21 100:11

**talks** 38:16

**tape** 104:17

**tax** 63:16 64:25

**team** 59:10 69:11

**technical** 109:7

**telephonic** 85:8
103:3

**term** 14:2,5 23:18,20
35:20 100:20

**terms** 20:2 26:18
45:13 87:9 101:16
115:21 123:24

**testified** 66:15 76:4,
19 79:7 91:25

**testify** 12:23 73:18

**testifying** 30:23 43:3
60:6

**testimony** 6:10 10:3,
4,5 13:21 26:23 30:2,
21 68:23 91:14 101:7
105:4 106:13 111:7

**Texas** 34:21 120:5

**thing** 16:8 17:7 96:17

**things** 59:25 70:20
71:2

**thought** 113:3

**thoughts** 121:15

**Tim** 120:18,22

**time** 8:10,20 11:10
18:4 19:12,15 27:11
45:22 50:17 60:22
68:6 86:16 96:12
97:22 114:16,22
121:18

**to-be-formed** 95:3

**today** 9:18 10:3
12:25 13:4 26:23
30:3,21 37:3 65:24
73:19 91:15 116:14
118:5,9

**top** 120:17

**topics** 9:8 10:25
12:18,21,25 13:13

**tortured** 113:14

**tough** 95:18 96:10

**Towne** 52:7 56:11

**trace** 94:5

**transaction** 15:23
25:15 60:24 105:10

**transactions** 52:17
114:17

**transcript** 8:16

**transfer** 39:8

**transfers** 39:15

**transmitted** 110:13

**true** 21:23 22:7 44:25 67:12 69:19 99:4 105:23

**Trust** 80:8 85:4

**truthful** 6:10 13:8

**truthfully** 13:6

**turn** 23:15

**typical** 64:25

**typically** 26:21 42:7 44:19 59:23 63:15

**typo** 79:17,19

**typos** 79:13,15 80:11 83:13

**U**

**Uh-huh** 72:23

**ultimately** 95:3

**unclear** 8:10

**underlying** 51:3 68:18 96:21

**understand** 6:22 7:20,24 8:7,13,15,23 9:12 10:2 13:11,23 14:9 15:12 17:5 22:3 37:11 43:3 47:10 70:16 102:13 107:4, 5,9 113:2 124:18,22

**understanding** 9:24 16:24 19:11 36:25 37:15 39:11,19 40:11 50:16 66:10 69:15,23 71:4 85:5 100:11 104:24 106:19 109:2 113:23 118:13 120:21 123:15 124:18

**understood** 71:20, 25

**undertake** 32:25 36:2

**undertaken** 36:6

**undertakes** 32:10, 17

**undertook** 34:8

**Unicorn** 15:22 16:15 22:18,25 46:6 72:11 90:25 105:10 118:21 121:10,12 124:24

**universe** 70:3

**unpack** 107:8

**updated** 79:5

**updating** 106:25 107:7

**upright** 48:19

**V**

**vague** 116:17

**version** 74:7,25 75:11

**versions** 86:4

**Victoria** 51:21

**video** 108:14

**videoconference** 6:2,9

**view** 48:19

**virtually** 74:24 75:10

**Vista** 56:19

**Vosburgh** 14:11 20:20 123:5

**W**

**Wait** 8:7

**waiting** 79:3 84:21

**waive** 10:15

**waiver** 33:6,11,17,23 34:3,11,17 35:7 114:19

**walk** 52:2 121:15

**Walker** 56:6

**wanted** 81:11

**warranties** 66:24 67:3,4,11,16,17 68:4, 19 69:5,18 71:23

**warranty** 72:3

**wearing** 44:14,18 45:6 70:9

**week** 92:13

**West** 56:16

**whomever** 90:3

**Wick** 6:1 7:1,9 8:1,25 9:1,8,9,13,20 10:1,4, 8 11:1 12:1,11,19,24 13:1,16,19 14:1,3,6,8 15:1,4,8,13,17,20 16:1 17:1,12,22 18:1, 3,17 19:1,16,21 20:1, 9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1,6,9,17, 23,25 27:1,8,22,25 28:1,3,9,13,18,22 29:1,13,20,22,24 30:1,12,14,18,24 31:1,13,15,22,25 32:1,9,14 33:1,5,21, 23 34:1,2,7,18,20 35:1,6,18,23 36:1,2, 11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1,3 43:1,4,6,16, 21,24 44:1,4,13 45:1, 2,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,21,23 59:1,6,13 60:1,7,9,14 61:1,10, 17,22 62:1,12 63:1 64:1,4,23 65:1,5,9,16 66:1,5 67:1,7 68:1,3, 15,17,24 69:1,3,16, 22 70:1,8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 2,19 89:1,8,12,17 90:1,10,20 91:1,21 92:1,2,18 93:1 94:1 95:1 96:1 97:1 98:1, 5,8,11,19 99:1 100:1 101:1 102:1,3,16 105:1,15,23 106:1,7, 13 107:1,24 108:1 109:1,11,15,19

110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 7,13,24 117:1 118:1, 4,7,17,19 119:1 120:1,13 121:1,2,4 122:1,3,24 123:1,2, 16 124:1,2,23

**Wick-phillips** 106:14

**Williams** 62:16,18 108:24

**Willis** 7:2

**Wills** 6:1,7,17,18 7:1, 3,4 8:1 9:1 10:1 11:1 12:1,4 13:1 14:1,18 15:1 16:1 17:1 18:1 19:1 20:1,25 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1,7 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,3 47:1 48:1,5 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,17 71:1 72:1,19 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1,20 86:1 87:1,6 88:1 89:1 90:1 91:1 92:1 93:1, 11 94:1 95:1 96:1 97:1 98:1 99:1 100:1, 8 101:1 102:1 103:1, 15,22 104:1,19,22 105:1 106:1 107:1 108:1 109:1,10 110:1 111:1,21 112:1,12 113:1,20 114:1 115:1 116:1,13 117:1 118:1 119:1 120:1 121:1 122:1 123:1,8,11 124:1,17

**WINOGRAD** 103:6, 12 108:12,17

**withholding** 103:24, 25 104:4,5

**word** 121:8

**words** 87:22 88:10

**work** 32:3 68:18 89:9,12,16 118:21 120:25

**worked** 28:8,9

**working** 85:17 116:2 124:10

**works** 16:10

**world** 32:12

**worry** 100:2

**worth** 111:7

**writing** 75:22

**writings** 63:6

**written** 26:3 34:25 35:7

**Y**

**yesterday** 68:25

# EXHIBIT 5

**SE Multifamily Holdings LLC**
(A Delaware Limited Liability Company)

FIRST AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

Dated as of March 15, 2019

to be effective as of

August 23, 2018

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.

# SE MULTIFAMILY HOLDINGS LLC

# FIRST AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

THIS FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of SE Multifamily Holdings LLC, a Delaware limited liability company (the "Company"), is entered into as of March 15, 2019, to be effective as of August 23, 2018 (the "Effective Date"), by Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP"), HCRE Partners, LLC, a Delaware limited liability company ("HCRE"), BH Equities, LLC ("BH"), and Liberty CLO HoldCo, Ltd., a Cayman Islands company ("Liberty"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with HCMLP, HCRE, BH and Liberty, the "Members").

## RECITALS

WHEREAS, the Company was formed by virtue of its Certificate of Formation, filed with the Secretary of State of the State of Delaware on August 23, 2018, and the Company's original limited liability company agreement dated August 23, 2018, pursuant to the terms of the Act.

WHEREAS, BH has acquired membership interests in the Company and each Member holds the membership interests set forth opposite its name on Schedule A.

WHEREAS, Liberty has acquired a preferred membership interest in the Company on the terms set forth herein and as set forth on Schedule A.

WHEREAS, the Members deem it desirable to, and do hereby, amend and restate in its entirety the Company's original limited liability company agreement as hereinafter provided in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
Organization

1.1     Formation; Continuance.  The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act").  The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on August 23, 2018, and shall continue for the period of duration

set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with Article 9.

1.2   Name.  The name of the Company is SE Multifamily Holdings LLC. The Manager may change the name of the Company from time to time.  In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

1.3   Purpose.  The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate-related investment property; (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable; and (iii) conduct any business or activity related to the foregoing activities that may lawfully be conducted by a limited liability company organized under the Act. Any or all of the foregoing activities may be conducted directly by the Company or indirectly through another limited liability company, partnership, joint venture or other arrangement.

1.4   Registered Office and Agent; Principal Place of Business.  The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Company's registered agent at such address is The Corporation Trust Company.  The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201.  The Manager may change such registered agent, registered office or principal place of business from time to time.  In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change.  The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

1.5   No State-Law Partnership.  The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

1.6   Management, Control and Voting Rights Vested Solely in HCRE and the Manager.  HCRE shall have the exclusive right to appoint the Manager and the Manager shall have unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement.

1.7   Company Ownership: 47.94% to HCRE, 46.06% to HCMLP, and 6% to BH.  Except with respect to particular items specified in this Agreement, HCRE shall have 47.94% ownership interest, HCMLP shall have a 46.06% ownership interest, and BH shall have a 6% ownership interest, respectively, in all assets and activities of the Company, including, without limitation, rights to receive distributions of cash and assets in-kind in the process of winding down and liquidating the Company pursuant to Article 9 of this Agreement.

1.8    Anti-Consolidation For HCMLP.  In the event that this Agreement at any time is interpreted to require consolidation of the Company with HCMLP under Generally Accepted Accounting Principles ("GAAP"), the Members agree to retroactively or prospectively, as the case may be,  amend this Agreement and to reallocate any economic or other items between HCMLP and HCRE to the extent necessary to cause the Company not to be consolidated with HCMLP for GAAP purposes and to the extent the reallocation involves items shared by percentage interests, the reallocation shall be made in an amount that is 1% more than the minimum reallocation necessary to cause the Company not to be consolidated for GAAP purposes with HCMLP. Any amendment or reallocation made pursuant to this Section 1.8  shall be made in accordance with the Treasury Regulations under Code Section 704(b).

ARTICLE 2
Capital Contributions

2.1    Initial Capital Contributions.  Each Member has made capital contributions as of the Effective Date in the amounts that are set forth next to such Member's name on Schedule A hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2    Additional Capital Contributions.

(a)    The Manager may call capital contributions at any time from Liberty, up to a maximum cumulative amount of $16,000,000, in order to carry out the business of the Company as set forth in Section 1.3; provided, however, that the Company shall issue "Class B Preferred Membership Interests" in exchange for any additional capital contributions made under this Section 2.2(a). On each occasion the Manager desires that Liberty make additional capital contributions to the Company, the Manager shall give Liberty a written notice (a "Funding Notice") that shall include (i) the aggregate amount of additional capital contributions required, (ii) the date by which such additional capital contributions are required to be funded, and (iii) the address where additional capital contributions shall be sent. No other Member shall be required to make capital contributions at any time for any reason.  Schedule A hereto includes the current capital contributions made in consideration for Preferred Membership Interests and shall be amended from time to time to reflect additional capital contributions made in consideration for the issuance of additional Preferred Membership Interests.

(b)    The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

2.3    No Return of Capital Contributions.  No Member shall be entitled to a withdrawal or return of its capital contributions.  Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4     No Interest.  No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5     Member Loans.  If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members.  Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6     Capital Accounts.

(a)     The Company shall maintain a separate capital account (a "Capital Account") for each Member in accordance with the following provisions:

(i)     to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii)     to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)     if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv)     in determining the amount of any liability for purposes of Sections 2.6(a)(i) and 2.6(a)(ii), Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b)     This Section 2.6 as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; provided, however, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this Article 2.  If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; provided, however, that such modification is

not likely to have a material effect on the amounts distributed to any person pursuant to Article 9 upon the dissolution, liquidation and termination of the Company. In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

ARTICLE 3
Rights and Obligations of the Manager

3.1     Initial Manager; Term; Vacancies; Resignation; Removal.  The initial manager of the Company (the "Manager") shall be James Dondero, in his capacity as an officer of HCRE.  The Manager shall hold office for so long as HCRE is a member of the Company.  Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of HCRE so long as HCRE is a member of the Company.

3.2     Management.  The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3     Powers.  Subject to Section 3.4, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

        (a)     to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

        (b)     to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

        (c)     to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

        (d)     to establish reserves for contingencies and for any other proper purpose;

        (e)     to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

(f)     to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

(g)     to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

(h)     to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

(i)     to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

(j)     to negotiate and effect a merger or consolidation of the Company with any other entity;

(k)     approve any transaction entered into by the Company and any Member, or affiliate of any Member;

(l)     to develop an annual budget and to approve any deviations from such budget;

(m)     to appoint a "partnership representative" for purposes of interacting with, and representing the Company before, the Internal Revenue Service; and

(n)     to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4     <u>Limitations on Manager's Authority</u>.  Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of HCRE:

(a)     enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

(b)     issue additional membership interests in the Company;

(c)     sell the Company or sell all or substantially all assets of the Company;

(d)     admit new Members to the Company;

(e)     permit a transferee of an interest in the Company to become a substitute Member of the Company under Section 7.3;

(f)     borrow funds or otherwise commit the credit of the Company; or

(g)     take any action that requires the approval of HCRE under the terms of this Agreement or the Act.

3.5     Liability of Manager.  No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6     Other Activities.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7     Officers.  The Manager may appoint and remove officers of the Company in his sole discretion.

3.8     Reimbursement.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.

3.9     Replacement of Manager.  Subject to Section 3.1, in the event that the Manager resigns for any reason, a replacement Manager may be appointed by HCRE.

ARTICLE 4
Rights and Obligations of Members

4.1     No Authority.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to an officer pursuant to Section 3.7); provided, however, that nothing contained in this Section 4.1 shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2     Liability of Members.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3     Consents and Limited Voting Rights.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager.  In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of HCRE.

## ARTICLE 5
## Exculpation and Indemnification

5.1     Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or otherwise to the Company or any Member by reason of, arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2     Limitation of Liability.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3     Indemnification.

(a)     Indemnifiable Claims.  The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b)     Satisfaction; Capital Contributions.  The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company.  No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c)     Advancement of Expenses.  Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; provided, however, that the affected Covered Person

9

shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this <u>Section 5.3</u>.

(d)     <u>Successors; Remedies</u>.  The indemnification provided by this <u>Section 5.3</u> shall be in addition to any other rights to which any Covered Person may be entitled, in any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person.  This <u>Section 5.3</u> shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)     <u>Amendment</u>.  Any repeal or amendment of this <u>Section 5.3</u> shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this <u>Section 5.3</u>.

5.4     <u>Other Agreements</u>.  Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this <u>Article 5</u> shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5     <u>Guaranties</u>.  As used in this Agreement, a "<u>Guaranty</u>" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries.  No Member or Affiliate shall be required to execute any Guaranty.

ARTICLE 6
Distributions and Allocations

6.1     <u>Distributions of Cash</u>.

(a)     <u>Distributable Cash.</u>  Except as otherwise specifically provided in this Article 6 and Article 9, all Distributable Cash shall be distributed (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH, at such time and in such amounts as determined by the Manager.

(b)     <u>Net Cash from Specified Company Assets</u>. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the

Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(c)     Notwithstanding Sections 6.1(a) and (b), if any class of "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution may, as determined in the sole discretion of the Manager, be distributed to Liberty with respect to one or more classes of Liberty's Preferred Membership Interest until Liberty has received cumulative distributions under this Sections 6.1(c) equal to the sum of (i) Liberty's capital contributions with respect to such Preferred Membership Interest, and (ii) with respect to Liberty's Class A Preferred Membership Interest, a 12 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest or, with respect to Liberty's Class B Preferred Membership Interest, a 6.25 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest.

(d)     Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(b) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(e)     Notwithstanding Sections 6.1(a), 6.1(b), 6.1(c) and 6.1(d), the first amounts of any Distributable Cash shall be deemed distributed to each Member (i) in proportion to the amounts paid by the Company directly to any lender on behalf of such Member to pay principal and interest on any loan incurred by such Member to fund such Member's capital contributions to the Company until such loans are fully extinguished, then (ii) pro rata in proportion to the Members' respective Capital Accounts until the Members' respective Capital Accounts are reduced to zero.

6.2     Restrictions on Distributions.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

6.3     Withholding Taxes.  Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that he determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person.  Without limiting the provisions of this Section 6.3, if any such withholding requirement in respect of any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.  The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite,

combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid. Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law. Notwithstanding the foregoing provisions of this <u>Section 6.3</u>, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4     <u>Allocations of Profits and Losses</u>. Profits and Losses shall be allocated as follows:

(a)     Except as provided in <u>Sections 6.4(b), (c) and (d)</u> and after the special allocations set forth in Sections A.III.2 and A.III.3 of <u>Schedule B</u>, Profits and Losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated 94% to HCMLP and 6% to BH.

(b)     Notwithstanding Section 6.4(a), Profits (and any items related thereto) shall be allocated to Liberty until the aggregate amount of Profits allocated to Liberty pursuant to this Section 6.4(b) equals the amount that has been distributed to Liberty pursuant to Section 6.1(c)(ii).

(c)     Notwithstanding Section 6.4(a), Losses (and any items related thereto) shall be allocated to Liberty, until the aggregate amount of Losses allocated to Liberty pursuant to this Section 6.4(c) equals the aggregate amount of Profits previously allocated to Liberty pursuant to Section 6.4(b).

(d)     All Profits and Losses with respect to each Specified Company Asset will be allocated in accordance with each Member's Capital Percentage Interest in such Specified Company Asset.

ARTICLE 7
Admissions, Transfers and Withdrawals

7.1     <u>Admissions</u>. New Members may be admitted to the Company only with the written consent of, and upon such terms and conditions as are approved by, HCRE in accordance with <u>Section 3.3</u>. Substituted Members shall not be deemed new Members for purposes of this <u>Section 7.1</u>.

7.2     <u>Transfer of Membership Interests</u>.

(a)     <u>No Transfers Without Consent</u>. No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with <u>Section 3.3</u>; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee. For purposes hereof, "<u>Permitted Transferee</u>" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

(b)  <u>Death, Bankruptcy, etc. of Member</u>.  In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)  the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in <u>Section 9.1</u>;

(ii)  such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in <u>Section 7.3</u>, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)  the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)  the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)  any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3  <u>Substitution</u>.  A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with <u>Section 3.4</u>, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member.  Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4  <u>Withdrawal</u>.  Except as permitted by this <u>Section 7.4</u>, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with <u>Section 7.3</u>, and (b) after executing an indemnification agreement that indemnifies the Company for such Member's allocable share

of any tax arising during any tax period when such Member held a membership interest in the Company as a result of an adjustment issued by the IRS to the Company subsequent to such Member's withdrawal.

ARTICLE 8
Accounting and Tax Matters

8.1 <u>Fiscal Year</u>. The fiscal year of the Company ("<u>fiscal year</u>") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required. The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2 <u>Books of Account; Tax Returns</u>. The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations, business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act. Except as otherwise expressly provided in this Agreement, such books and records shall be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the: Manager be prepared on either a cash basis or accrual basis.

8.3 <u>Place Kept; Inspection</u>. The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during the ordinary business hours of the Company.

ARTICLE 9
Dissolution, Liquidation and Termination

9.1 <u>Dissolution</u>. The Company shall be dissolved upon the first to occur of the following events ("<u>Dissolution Events</u>"): (i) the election of the Manager to dissolve the Company at any time in accordance with <u>Section 3.3</u>; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

9.2 <u>Accounting</u>. After the dissolution of the Company pursuant to <u>Section 9.1</u>, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date. The Manager shall serve as liquidator of the Company. If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members. The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity. The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

9.3 <u>Liquidation</u>. As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business),

14

after the dissolution of the Company pursuant to <u>Section 9.1</u>, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company. Subject to Section A.III.4 of Schedule B, the proceeds of such liquidation shall be applied in the following order of priority:

        (a)     first, in payment of the expenses of the liquidation;

        (b)     second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

        (c)     third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans);

        (d)     fourth, to the Members in accordance with <u>Sections 6.1(b) and (c)</u>; and

        (e)     thereafter, (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH.

    9.4    <u>Termination</u>. At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the Comptroller of the State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "<u>Tax Certificate</u>"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

    9.5    <u>No Deficit Capital Account Restoration Obligation</u>. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

    9.6    <u>No Other Cause of Dissolution</u>. The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this <u>Article 9</u>.

<div align="center">ARTICLE 10<br>Miscellaneous Provisions</div>

    10.1    <u>Amendments and Waivers</u>. This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and HCRE (a copy of which shall be promptly sent by the Manager to all the Members). For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in <u>Section 1.3</u>, (d) change any provision of this Agreement requiring the approval of HCRE or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the

Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2  Binding Effect.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3  Counterparts.  This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4  Entire Agreement.  This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5  Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6  Venue.  To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7  Notices.  All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on Schedule A, and if to the Company, at the address of its principal place of business referred to in Section 1.4, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this Section 10.7.  Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this Section 10.7 shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent.  Notwithstanding the foregoing provisions of this Section 10.7 (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8  Remedies Cumulative No Waiver.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  No delay or omission on the part of any party hereto, whether in one or more

instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof. The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9    <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law.  Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.10    <u>Waiver of Partition</u>.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., General Partner

By: _____
Name: James D. Dondero
Title: President

HCRE PARTNERS, LLC

By: _____
Name: James D. Dondero
Title: Manager

LIBERTY CLO HOLDCO, LTD.

By: _____
Name:
Title

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., General Partner

By: _____
Name: James D. Dondero
Title:  President

HCRE PARTNERS, LLC

By: _____
Name: James D. Dondero
Title:  Manager

LIBERTY CLO HOLDCO, LTD.

By: _____
Name:  GRANT SCOTT
Title  DIRECTOR

BH EQUITIES, LLC

By: _____
      *Ben Roby*

Name: Ben Roby
Title: Authorized Officer

## **Schedule A**

### **Capital Contributions and Percentage Interests**

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $  291,146,036 | 47.94% |
| Highland Capital Management, L.P. | $       49,000 | 46.06% |
| BH Management | $    21,213,721 | 6.00% |

### **Class A Preferred Interests**

| Member Name | Capital Contribution | Class A Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $    5,808,603 | 100% |

### **Class B Preferred Interests**

| Member Name | Capital Contribution | Class B Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $___ | 100% |

### **Capital Percentage Interests in Specified Company Assets**

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
|  |  |
|  |  |

## Schedule B

## Allocations

A.I.  *Definitions*.  Capitalized terms used and not defined in this Schedule B have the meanings ascribed to them in the Agreement, of which this Schedule B forms a part.  As used in this Schedule B, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)     Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; *provided, however,* if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and *provided, further,* if the Company is utilizing the remedial allocation method under Regulations Section 1.704-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule B.

"Capital Percentage Interest" means, with respect to each Member, and with respect to each Specified Company Asset, the designated percentage listed next to such Member's name, in respect of such Specified Company Asset, on Schedule A, attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and the rulings issued thereunder.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Distributable Cash" means all cash, revenues and funds received by the Company (including, without limitation, from sales, refinancings and other dispositions of Company property), less the sum of the following: (i) all cash expenditures incurred in the operation of the Company's business; (ii) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; and (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Distributable Cash shall include all principal and interest payments received by the Company with respect to any note or other obligation in connection with sales or other dispositions of Company property.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)     the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)     the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.704-1(b)(2)(ii);

(c)     the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)     the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)     if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; provided that items of Profit and Loss specially allocated to a Member pursuant to Section 6.4 of the Agreement and Sections A.III.2 and A.III.3 of this Schedule B shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d)     In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e)     Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

3

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's membership interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Specified Company Asset" means any capital asset owned by the Company with respect to which the Members have agreed to share proceeds from a sale, refinancing or other disposition thereof in a sharing ratio set forth with respect to each such Specified Company Asset from time to time on Schedule B.

A.II.    *Members' Capital Accounts*.

1.     There shall be established for each Member on the books and records of the Company a Capital Account.  Each Member's initial Capital Account shall be zero and, without limiting the generality of the foregoing, shall be adjusted as follows:

(a)     To each Member's Capital Account there shall be credited such Member's Capital Contributions (net of any liabilities assumed by the Company or which are secured by any property contributed by such Member), such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections A.III.2 and A.III.3.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement (net of any liabilities assumed by the Member or which are secured by any property distributed to such Member by the Company), such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections A.III.2 and A.III.3.

2.     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with such statutory and regulatory provisions.

3.     In the event all or a portion of an Interest in the Company is transferred in accordance with the terms of Section 7.2, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, adjusted as required by the aforementioned Treasury Regulations.

A.III.   Allocations.

1.     *Reserved.*

2.    *Special Allocations.*    The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)    *Minimum Gain Chargeback.*    Except as otherwise provided in Section 1.7042(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations.  This Section A.III.2(a) is intended to comply with the minimum gain Chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    *Member Minimum Gain Chargeback.*    Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset.*    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule B have been tentatively made as if this Section A.III.2(c) were not in the Agreement.  This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)    *Nonrecourse Deductions.*    Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)    *Member Nonrecourse Deductions.*    Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt to which such Member

Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3. *Curative Allocations.* The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3. Therefore, notwithstanding any other provision of this Schedule B (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 6.4. In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A in that, although not yet made, are likely to offset other Regulatory Allocations previously made.

4. *Liquidating Allocations*. It is intended that immediately prior to a distribution of proceeds from liquidation of the Company pursuant to Article 9 of this Agreement, the positive Capital Account balance of each Member shall be equal to the total amount that such Member would receive upon a liquidation pursuant to Section 6.1. Accordingly, to the extent permissible under Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, Profits and Losses and, if necessary, items of gross income, gain, deduction, and loss, of the Company for the year of liquidation (or, if the liquidation or event spans more than a year, each such year) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive upon a liquidation pursuant to Section 6.1. Notwithstanding the foregoing, to the extent a Member has been allocated Profits pursuant to Section 6.4(a) in excess of the amount of distributions received by such Member under Section 6.1(a), then such Member shall receive the first amount of distributions under Section 9.3(e), in proportion to the amount of the excess, until such excess has been eliminated, provided, that the aggregate amount of distributions pursuant to Section 9.3(e) upon a liquidation shall as close as possible be in proportion to the percentage shares set forth in Section 9.3(e).

A.IV. *Other Allocation Rules*.

1. For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits. Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2. The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to, the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3. Tax Allocations: Code Section 704(c).

(a)     For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule B except as otherwise provided in this Section A.IV.3.

(b)     Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company.  Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)     In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)     Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.     _Company Representative_.

The partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager.  (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative").  The Company Representative shall inform HCRE of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity.  The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law.  Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager.  If any Member intends to flea notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.     _Tax Elections_.

1. The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.

# EXHIBIT 6

| Fill in this information to identify the case: |
| --- |

| Debtor | Highland Capital Management, L.P. |
| --- | --- |

United States Bankruptcy Court for the: __Northern__ ___ District of __Texas__
(State)

Case number ___19-34054___

## Official Form 410
# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

1. **Who is the current creditor?**

HCRE Partner, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

2. **Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| HCRE Partner, LLC<br>300 Crescent Court, Ste. 700<br>Dallas, TX 75201 | |
| Contact phone _____ | Contact phone _____ |
| Contact email  bryan.assink@bondsellis.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

4. **Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
MM  /  DD  /  YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Official Form 410                          **Proof of Claim**

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**    $ _See attached Exhibit "A"_____ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See attached Exhibit "A"_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                     $_____

**Amount of the claim that is secured:**          $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000058

| | | | Amount entitled to priority |
|---|---|---|---|
| **12.** | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| | | ☐ Yes. *Check all that apply:* | |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| **13.** | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | | $_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/James D. Dondero
Signature

**Print the name of the person who is completing and signing this claim:**

Name        James D. Dondero
            First name        Middle name        Last name

Title        _____

Company      HCRE Partner, LLC
             Identify the corporate servicer as the company if the authorized agent is a servicer.

Address      _____

Contact phone  _____        Email  _____

---

Official Form 410                    Proof of Claim

1934054200408000000000058

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** 19-34054 - Highland Capital Management, L.P. **District:** Northern District of Texas, Dallas Division | |
| **Creditor:** HCRE Partner, LLC 300 Crescent Court, Ste. 700 Dallas, TX, 75201 **Phone:** **Phone 2:** **Fax:** **Email:** bryan.assink@bondsellis.com | **Has Supporting Documentation:** Yes, supporting documentation successfully uploaded **Related Document Statement:** |
| | **Has Related Claim:** No **Related Claim Filed By:** |
| | **Filing Party:** Authorized agent |
| **Other Names Used with Debtor:** | **Amends Claim:** No **Acquired Claim:** No |
| **Basis of Claim:** See attached Exhibit "A" | **Last 4 Digits:** No     **Uniform Claim Identifier:** |
| **Total Amount of Claim:** See attached Exhibit "A" | **Includes Interest or Charges:** No |
| **Has Priority Claim:** No | **Priority Under:** |
| **Has Secured Claim:** No **Amount of 503(b)(9):** No **Based on Lease:** No **Subject to Right of Setoff:** No | **Nature of Secured Amount:** **Value of Property:** **Annual Interest Rate:** **Arrearage Amount:** **Basis for Perfection:** **Amount Unsecured:** |
| **Submitted By:** James D. Dondero on 08-Apr-2020 4:47:11 p.m. Eastern Time **Title:** **Company:** HCRE Partner, LLC | |

VN: E06680EE00F9144D26F793E57FB2634B

## **Exhibit A**

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an entity called SE Multifamily Holdings, LLC ("SE Multifamily"). Claimant may be entitled to distributions out of SE Multifamily, but such distributions have not been made because of the actions or inactions of the Debtor. Additionally, Claimant contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does belong to the Debtor or may be the property of Claimant. Accordingly, Claimant may have a claim against the Debtor. Claimant has requested information from the Debtor to ascertain the exact amount of its claim. This process is on-going. Additionally, this process has been delayed due to the outbreak of the Coronavirus. Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

# EXHIBIT 7

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

---

### NEXPOINT REAL ESTATE PARTNERS LLC'S RESPONSE TO DEBTOR'S
### FIRST OMNIBUS OBJECTION TO CERTAIN (A) DUPLICATE CLAIMS;
### (B) OVERSTATED CLAIMS; (C) LATE FILED CLAIMS; (D) SATISFIED CLAIMS;
### (E) NO-LIABILITY CLAIMS; AND (F) INSUFFICIENT-DOCUMENTATION CLAIMS

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("HCREP") files this

Response to the Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated

Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-

Documentation Claims (the "Objection") and respectfully states as follows:

### I. PROCEDURAL BACKGROUND

1.       On or about April 8, 2020, HCREP filed its Proof of Claim with Highland Capital

Management, LP's (the "Debtor") claims agent, a copy of which is attached hereto as Exhibit 1.

[Claim No. 146] (the "Proof of Claim"). In the Proof of Claim, HCREP asserts a claim against the

Debtor based on the parties' interests and agreements in connection with an entity called SE

---

1934054201016000000000022

Multifamily Holdings, LLC ("SE Multifamily"). In the Proof of Claim, HCREP notes that it has requested information from the Debtor to ascertain the exact amount of its claim, such process is on-going, and has been delayed due to the outbreak of the Coronavirus. *See* Proof of Claim, Ex. A.

2.      On July 30, 2020, Debtor filed its Objection, objecting to various categories of claims that it seeks to disallow, expunge, or reduce. HCREP's Proof of Claim was included in Schedule 5 to the Objection, which the Debtor characterized as alleged "No-Liability Claims." Specifically, the Debtor claims that the Proof of Claim has no basis in the Debtor's Books and Records and is not an obligation of the Debtor. *See* Objection, ¶ 22. The Debtor seeks to disallow and expunge the Proof of Claim.

3.      After initial discussions between HCREP and the Debtor, the Debtor agreed to multiple extensions of HCREP's deadline to respond to the Objection, such that the agreed deadline for HCREP to respond to the Objection is now October 16, 2020. The parties have attempted to resolve the Objection; however, have not yet been able to do so.

4.      For the reasons set forth in detail below, HCREP respectfully requests the Court enter a scheduling order to allow for discovery in connection with HCREP's Proof of Claim, set an evidentiary hearing on HCREP's Proof of Claim, and overrule the Debtor's Objection and allow the claim in the amount determined at such evidentiary hearing.

## II. RESPONSE

5.      After reviewing what documentation is available to HCREP with the Debtor, HCREP believes the organizational documents relating to SE Multifamily Holdings, LLC (the "SE Multifamily Agreement") improperly allocates the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration. As such, HCREP has a claim to reform, rescind and/or modify the agreement.

6. However, HCREP requires additional discovery, including, but not limited to, email communications and testimony, to determine what happened in connection with the memorialization of the parties' agreement and improper distribution provisions, evaluate the amount of its claim against the Debtor, and protect its interests under the agreement. Accordingly, HCREP requests the Court enter a scheduling order allowing for formal discovery and set an evidentiary hearing after such discovery has occurred.

## III. CONCLUSION

For these reasons, the HCREP respectfully requests that the Court (i) hold a status conference at which it sets a scheduling order in connection with this contested matter; (ii) set a date for an evidentiary hearing on the Proof of Claim; (iii) overrule the Objection and allow HCREP's Proof of Claim in the amount established at such evidentiary hearing; and (iii) grant HCREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: jason.rudd@wickphillips.com
    lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2020, a true and correct copy of the foregoing Joinder was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the following parties:

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com

Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

*/s/ Lauren K. Drawhorn*
    Lauren K. Drawhorn

425

# EXHIBIT 1

**Fill in this information to identify the case:**

Debtor  _Highland Capital Management, L.P._

United States Bankruptcy Court for the: _Northern_  District of _Texas_
(State)

Case number  _19-34054_

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | **Who is the current creditor?** | HCRE Partner, LLC |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
|---|---|---|
| | | ☐ Yes.  From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | | HCRE Partner, LLC
300 Crescent Court, Ste. 700
Dallas, TX 75201 | |
| | | Contact phone _____ | Contact phone _____ |
| | | Contact email _bryan.assink@bondsellis.com_ | Contact email _____ |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): |
| | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ |

| 4. | **Does this claim amend one already filed?** | ☑ No |
|---|---|---|
| | | ☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ____/____/____
MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

Official Form 410                    Proof of Claim

1934054200408000000000058

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _See attached Exhibit "A"_   . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See attached Exhibit "A"_

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                    **Proof of Claim**

1934054200408000000000058

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | |

---

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   04/08/2020<br>                            MM / DD / YYYY |

/s/James D. Dondero
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | James D. Dondero |
|---|---|
| | First name                    Middle name                    Last name |
| Title | |
| Company | HCRE Partner, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____     Email _____ |

19340542004080000000000058

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** 19-34054 - Highland Capital Management, L.P. | |
| **District:** Northern District of Texas, Dallas Division | |
| **Creditor:** HCRE Partner, LLC 300 Crescent Court, Ste. 700 Dallas, TX, 75201 **Phone: Phone 2: Fax: Email:** bryan.assink@bondsellis.com | **Has Supporting Documentation:** Yes, supporting documentation successfully uploaded **Related Document Statement:** |
| | **Has Related Claim:** No **Related Claim Filed By:** |
| | **Filing Party:** Authorized agent |
| **Other Names Used with Debtor:** | **Amends Claim:** No **Acquired Claim:** No |
| **Basis of Claim:** See attached Exhibit "A" | **Last 4 Digits:** No     **Uniform Claim Identifier:** |
| **Total Amount of Claim:** See attached Exhibit "A" | **Includes Interest or Charges:** No |
| **Has Priority Claim:** No | **Priority Under:** |
| **Has Secured Claim:** No | **Nature of Secured Amount:** **Value of Property:** |
| **Amount of 503(b)(9):** No | **Annual Interest Rate:** |
| **Based on Lease:** No | **Arrearage Amount:** |
| **Subject to Right of Setoff:** No | **Basis for Perfection:** **Amount Unsecured:** |
| **Submitted By:** James D. Dondero on 08-Apr-2020 4:47:11 p.m. Eastern Time **Title:** **Company:** HCRE Partner, LLC | |

VN: E06680EE00F9144D26F793E57FB2634B

### Exhibit A

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an entity called SE Multifamily Holdings, LLC ("SE Multifamily"). Claimant may be entitled to distributions out of SE Multifamily, but such distributions have not been made because of the actions or inactions of the Debtor. Additionally, Claimant contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does belong to the Debtor or may be the property of Claimant. Accordingly, Claimant may have a claim against the Debtor. Claimant has requested information from the Debtor to ascertain the exact amount of its claim. This process is on-going. Additionally, this process has been delayed due to the outbreak of the Coronavirus. Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

# EXHIBIT 8

**From:** John A. Morris
**Sent:** Tuesday, April 19, 2022 3:26 PM
**To:** 'Bill Gameros' <bgameros@legaltexas.com>
**Cc:** Hayley R. Winograd <hwinograd@pszjlaw.com>; Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: Highland: HCRE Litigation

Bill,

When we last spoke, you were going to prepare a draft Scheduling Order by the end of last week.

Please get the draft to me as soon as you're able and let me know if you will be unable to get it to me by the end of the week.

Thanks,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Monday, April 4, 2022 11:41 AM
**To:** John A. Morris
**Cc:** Hayley R. Winograd ; Wade Carvell ; Bill Gameros ; LuCretia Milam
**Subject:** RE: Highland: HCRE Litigation

1

John,

Do you have any time tomorrow afternoon between 1:30 central and 3:30 central?

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone: (214) 765-6002
Facsimile: (214) 559-4905

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, April 4, 2022 6:52 AM
**To:** Bill Gameros <bgameros@legaltexas.com>
**Cc:** Hayley R. Winograd <hwinograd@pszjlaw.com>; Wade Carvell <wcarvell@legaltexas.com>
**Subject:** RE: Highland: HCRE Litigation

Following up on this, please propose a time this week to discuss the status of this matter.

Regards,


**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** John A. Morris
**Sent:** Thursday, March 31, 2022 9:02 AM
**To:** 'bgameros@LegalTexas.com' <bgameros@LegalTexas.com>
**Cc:** Hayley R. Winograd <hwinograd@pszjlaw.com>; 'wcarvell@LegalTexas.com' <wcarvell@LegalTexas.com>
**Subject:** Highland: HCRE Litigation

Dear Mr. Gameros:

We represent Highland Capital Management. L.P. ("HCMLP").

On January 14, 2022, your firm filed a Notice of Appearance on behalf of NexPoint Real Estate Partners, f/k/a HCRE ("HCRE"), apparently substituting for Wick Phillips. Docket No. 3181.

As I am sure you know, HCMLP has objected to HCRE's Proof of Claim No. 146 and we would like to get that resolved.

Please let me know if you have some time this afternoon or tomorrow morning to introduce ourselves and begin working on a Scheduling Order for this matter.

I look forward to speaking with you shortly.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

# EXHIBIT 9

**From:** Wade Carvell [mailto:wcarvell@legaltexas.com]
**Sent:** Friday, July 8, 2022 5:17 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Bill Gameros <bgameros@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** NREP/HCMLP - Subpoenas

Mr. Morris,

We will accept service of the subpoenas for Messrs. McGraner and Donderro. Thank you.

DWC
_____
Douglas Wade Carvell, P.C.
HOGE & GAMEROS, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:       214-765-6000
Direct:            214-765-6006
Facsimile:       214-594-4400
Email:             WCarvell@LegalTexas.com

# EXHIBIT 10

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Tuesday, July 26, 2022 3:10 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Bill Gameros <bgameros@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>; Wade Carvell
<wcarvell@legaltexas.com>
**Subject:** HCMLP - NREP Depositions

John,

We have Mr. Dondero on August 16 starting at 9:30 CT and, consistent with our discussions, Mr. McGranger, individually
and as 30(b)(6), on August 17 starting at 9:30 CT.

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:    (214) 559-4905

# EXHIBIT 11

Exhibit 5

Message

| | |
|---|---|
| **From:** | Paul Broaddus [PBroaddus@HighlandCapital.com] |
| **Sent:** | 3/15/2019 2:02:50 PM |
| **To:** | Paul Broaddus [PBroaddus@HighlandCapital.com]; Dusty Thomas [dthomas@bhmanagement.com]; Ben Roby [broby@bhmanagement.com] |
| **CC:** | Matt McGraner [MMcGraner@HighlandCapital.com] |
| **Subject:** | RE: First A&R LLCA of SE Multifamily Holdings LLC.docx |
| **Attachments:** | Document1.docx |

Hi Ben and Dusty -

Contribution schedule attached. Again, happy to discuss any questions live.

When do you feel you will be able to return the executed page of the LLCA?

As a reminder, we do need all signed pages today to meet the deadline for tax purposes.

Thanks guys!
Paul

-----Original Message-----
From: Paul Broaddus <PBroaddus@HighlandCapital.com>
Sent: Thursday, March 14, 2019 5:14 PM
To: DThomas@bhmanagement.com; broby@bhmanagement.com
Cc: Matt McGraner <MMcGraner@HighlandCapital.com>
Subject: First A&R LLCA of SE Multifamily Holdings LLC.docx

Dusty/Ben-

Please find the amended SE Multifamily Holdings LLC agreement.  Let me know if you want to discuss- 915-
241-6809.
Otherwise, can you please execute and return the signed page to me on or before tomorrow?

The contribution schedule in the attached needs to be updated with the actual contribution numbers.  I
have an updated version I can send in a separate email.

Once executed, I will circulate the fully executed copy for your records.

Thanks!
Paul

_____

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced
without explicit permission. The material provided herein is for informational purposes only and does not
constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter
into or conclude any transaction. It may contain confidential, proprietary or legally privileged
information. If you receive this message in error, please immediately delete it.

## Schedule A

### Capital Contributions and Percentage Interests

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $ 291,146,036 | 47.94% |
| Highland Capital Management, L.P. | $ 49,000 | 46.06% |
| BH Management | $ 21,213,721 | 6.00% |

### Class A Preferred Interests

| Member Name | Capital Contribution | Class A Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $ 5,808,603 | 100% |

### Class B Preferred Interests

| Member Name | Capital Contribution | Class B Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $ ___ | 100% |

### Capital Percentage Interests in Specified Company Assets

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
| | |
| | |

Confidential - Subject to Protective Order

Confidential - Subject to Protective Order

BH0001273

# EXHIBIT  12

**Exhibit 6**

Message

| | |
|---|---|
| **From**: | Dusty Thomas [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=276F934B237540EEA820BABEF5CDFC7D-DUSTY THOMA] |
| **Sent**: | 3/15/2019 8:59:21 PM |
| **To**: | Paul Broaddus [PBroaddus@HighlandCapital.com] |
| **CC**: | Ben Roby (broby@bhmanagement.com) [broby@bhmanagement.com] |
| **Subject**: | FW: [Ext] Unicorn Combined Underwriting |
| **Attachments**: | Uniform Portfolio - SE Multifamily LLC Agreement - Changes to Distribution & BH Fee Provisions .docx; SE_Multifamily_Holdings_LLC_-_AR_LLC_Agreement (REVISED).docx; Unicorn Combined Underwriting - Portfolio.pdf |

Paul,

Attached is what we proposed in October to try and handle this. This covers the distribution language in a way that we can get comfortable with as we need to make sure that if the capital that Highland put in associated with debt is paid off, that it is also not dilutive to BH a second time in the pro-rata allocation or we could be in a position where we are unable to repay our borrowings even with a successful deal. We think the attached does that while still allocating the taxable income/loss in a way that meets your needs (by %). We would be most comfortable signing something that explicitly states that everyone gets their capital back first (inclusive of a return). The capital in this agreement would only be the capital that Highland put in that is not also incorporated in the bridge loan agreements. I think that is +/- $40 million based on my understanding from our discussion but that might.

If you need to redline any of the tax provisions etc we can get comfortable there, but we really need language related to the payback of capital first in order to be able to sign an agreement and meet your deadline. We understand you are on a tight timeline, but this is the best we can do at the moment.

I am with my son this afternoon, but if we need to talk call my cell. 515.783.6179.

Dusty

**From:** Ben Roby
**Sent:** Friday, March 15, 2019 3:09 PM
**To:** Dusty Thomas <DThomas@bhmanagement.com>; Joanna Zabriskie <JZabriskie@bhmanagement.com>
**Subject:** Fwd: [Ext] Unicorn Combined Underwriting

Ben Roby | Director of Acquisitions

Extension: 1286
Phone: (515) 201-3774
Fax: (515) 244-2742

Begin Forwarded Message:

Confidential - Subject to Protective Order

**From:** "Ben Roby" <broby@bhmanagement.com>

**Subject:** [Ext] Unicorn Combined Underwriting

**Date:** 12 October 2018 17:47

**To:** "Matt McGraner" <MMcGraner@HighlandCapital.com>

**Cc:** "Ian O'Connor" <ioconnor@bhmanagement.com>, "Joanna Zabriskie" <JZabriskie@bhmanagement.com>

Matt –

Just wanted to revisit this so we could button up the SE Multifamily Investment LLC before the lenders coming asking for it.

Here is how we are coming up with the cash flows:

High level – the Sale and DST bucket really just breakeven for SE Multifamily LLC based on this underwriting as we marked up the DST and the Sale bucket (given the quick turn) but marked down the Other bucket.

In the Other bucket – we have BOVs in had that represent a gross profit of $25M.  Our underwriting is projecting holding on to all 4 deals until the end of Year 1 and then selling them on a forward looking NOI.  Little aggressive approach but I think these will outperform our underwriting in Year 1.

If we do that we end up with ~$47M of profit upon sale – this equates to a $239.7M PP and then 2.00% of fees applied.

In effort of fully transparency – here is what we would be making:

BHE acquisition fees for deal structuring, underwriting, due dili, closing and dispo work on flipping the sale bucket:

- NXRT Acquisition fee - $200,000
- Mortgage expenses reimbursement - $400,000
- DST Acquisition fee to be paid when the DST's close - $1,000,000
- Total Acquisition Fee - $1.8M (16 bps when applied to the entire portfolio).

Return of/on Invested Capital:

- $21.2M investment
- $46M of total profit – BHE's portion is:
  - 15% of $25M = $3.75M
  - 20% of $21M = $4.4M
  - Total = $8.17M

Confidential - Subject to Protective Order

BH0001364

Attached is the underwriting and the SEMF JV agreement previously sent to DC with Harry's signature.


Thanks,

Ben




*Ben Roby*

Acquisitions Manager

BH Management Services, LLC

Phone: (515) 201-3774

Fax: (515) 244-2742

400 Locust St., Ste. 790 Des Moines, IA 50309

bhmanagement.com


The Davis Brown Law Firm is committed to providing Exceptional Client Service. For a review of the supporting principles, go to www.davisbrownlaw.com/exceptional.


This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply E-mail and destroy all copies of the original message.

HEALTHCARE PRIVACY STATEMENT: This message may contain protected health information that is strictly confidential. If you have received this email, you are required to maintain the security and confidentiality of the information and may not disclose it without written consent from the patient or as otherwise permitted by law. Unauthorized disclosure may be subject to federal and state penalties.

Confidential - Subject to Protective Order

6.1    Distributions of Cash.   The Company shall not make any distributions to the Members until the Tranche B Loan (as defined in that certain Bridge Loan Agreement, dated as of the date hereof, by and among HCMLP, HCRE, the Dugaboy Investment Trust, the SLHC Trust, Nexpoint Advisors, L.P., Nexpoint Real Estate Advisors IV, L.P., SE Multifamily REIT Holdings, LLC, and certain other borrowers listed therein, as borrowers, the lenders party thereto, Keybank National Association, as administrative agent, and Keybanc Capital Markets, as sole lead arranger and bookrunner) has been repaid in full.

(a)    Distributable Cash.   Except as otherwise specifically provided in this Article VI and Article IX, all Distributable Cash shall be distributed to the Members at such time and in such amounts as determined by the Manager as follows:

(i)    First, pro rata in proportion to the Member's respective Percentage Interests until the Members have received cumulative distributions equal to their respective Capital Contributions plus a 7 percent cumulative, but noncompounded annual return on unreturned Capital Contributions; then

(ii)    Second, 85% to the Members (including BH), pro rata in proportion to the Member's respective Percentage Interests; and 15% to BH until cumulative distributions made under this Section 6.1(b) total $25,000,000; and

(iii)    Third, the balance, 80% to the Members (including BH), pro rata in proportion to the Member's respective Percentage Interests; and 20% to BH.

(b)    Net Cash from Specified Company Assets. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset; provided, however, that once the Members have received cumulative distributions equal to their respective Capital Contributions plus a 7 percent cumulative, but noncompounded annual return on unreturned Capital Contributions, then subsequent distributions shall be made in accordance with Section 6.1(a)(ii) and (iii).

(c)    Notwithstanding Sections 6.1(a) and (b), if any "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution as determined in the sole discretion of the Manager shall be distributed to HCRE with respect to HCRE's Preferred Membership Interest until HCRE has received cumulative distributions under this Sections 6.1(c) equal to HCRE's additional capital contributions plus an 8 percent simple preferred return on such additional capital contributions made to acquire such Preferred Membership Interest.

(d)    Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(b) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

Confidential - Subject to Protective Order

(e)     Tax Distributions.  Notwithstanding anything in Section 6.1(a), (b) and (c), the Company shall first make minimum distributions of cash available from all sources as determined in the sole discretion of the Manager to the Members in an amount necessary for each Member to pay taxes on taxable income allocable to such Member, assuming each Member is subject to tax at the highest combined marginal federal, state and local tax for an individual living in Dallas, Texas.  Distributions to any Member under this Section 6.1(e) shall be treated as advances against any future distributions payable to such Member under Section 6.1(a), (b) and (c).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**NEW SECTION 6.5**

6.5     BH Stucturing Fees.  Upon the sale or other disposition of any real estate asset owned directly or indirectly by the Company to a Delaware statutory trust or similar entity, a fee shall be paid by the Company to BH in the amount of 0.20% of the sales price or other consideration paid for such asset.

Confidential - Subject to Protective Order

# EXHIBIT 13

Exhibit 7

| | |
|---|---|
| **Message** | |
| **From:** | Paul Broaddus [PBroaddus@HighlandCapital.com] |
| **Sent:** | 3/15/2019 11:00:21 PM |
| **To:** | Dusty Thomas [dthomas@bhmanagement.com] |
| **Subject:** | FW: [Ext] Unicorn Combined Underwriting |

---

**From:** Freddy Chang <FChang@HighlandCapital.com>
**Sent:** Friday, March 15, 2019 4:48 PM
**To:** Paul Broaddus <PBroaddus@HighlandCapital.com>
**Subject:** RE: [Ext] Unicorn Combined Underwriting

1.1    Distributions of Cash.

(a)    Distributable Cash.  Except as otherwise specifically provided in this Article 6 and Article 9, all Distributable Cash shall be distributed (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH, at such time and in such amounts as determined by the Manager.

(b)    Net Cash from Specified Company Assets. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(c)    Notwithstanding Sections 6.1(a) and (b), if any class of "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution may, as determined in the sole discretion of the Manager, be distributed to Liberty with respect to one or more classes of Liberty's Preferred Membership Interest until Liberty has received cumulative distributions under this Sections 6.1(c) equal to the sum of (i) Liberty's capital contributions with respect to such Preferred Membership Interest, and (ii) with respect to Liberty's Class A Preferred Membership Interest, a 12 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest or, with respect to Liberty's Class B Preferred Membership Interest, a 6.25 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest.

(d)    Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(b) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(e)    Notwithstanding Sections 6.1(a), 6.1(b), 6.1(c) and 6.1(d), the first amounts of any Distributable Cash shall be deemed distributed to each Member (i) in proportion to the amounts paid by the Company directly to any lender on behalf of such Member to pay principal and interest on any loan incurred by such Member to fund such Member's capital contributions to the Company until such loans are fully extinguished, then (ii) pro rata in proportion to the Members' respective Capital Accounts until the Members' respective  Capital Accounts are reduced to zero.

Frederic Chang
Highland Capital Management, L.P.
(972) 628-4163

Confidential - Subject to Protective Order

BH0001437

**From:** Paul Broaddus <PBroaddus@HighlandCapital.com>
**Sent:** Friday, March 15, 2019 4:31 PM
**To:** Freddy Chang <FChang@HighlandCapital.com>
**Subject:** Fwd: [Ext] Unicorn Combined Underwriting

Sent from my iPhone

Begin forwarded message:

**From:** Dusty Thomas <DThomas@bhmanagement.com>
**Date:** March 15, 2019 at 3:59:21 PM CDT
**To:** Paul Broaddus <PBroaddus@HighlandCapital.com>
**Cc:** Ben Roby <broby@bhmanagement.com>
**Subject: FW: [Ext] Unicorn Combined Underwriting**

Paul,
Attached is what we proposed in October to try and handle this. This covers the distribution language in a way that we can get comfortable with as we need to make sure that if the capital that Highland put in associated with debt is paid off, that it is also not dilutive to BH a second time in the pro-rata allocation or we could be in a position where we are unable to repay our borrowings even with a successful deal. We think the attached does that while still allocating the taxable income/loss in a way that meets your needs (by %). We would be most comfortable signing something that explicitly states that everyone gets their capital back first (inclusive of a return). The capital in this agreement would only be the capital that Highland put in that is not also incorporated in the bridge loan agreements. I think that is +/- $40 million based on my understanding from our discussion but that might.

If you need to redline any of the tax provisions etc we can get comfortable there, but we really need language related to the payback of capital first in order to be able to sign an agreement and meet your deadline. We understand you are on a tight timeline, but this is the best we can do at the moment.

I am with my son this afternoon, but if we need to talk call my cell. 515.783.6179.

Dusty

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

BH0001438

# EXHIBIT 14

**From:** John A. Morris
**Sent:** Wednesday, August 10, 2022 10:28 AM
**To:** 'Bill Gameros' <bgameros@legaltexas.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

Thanks, Bill.

I am going to dial in shortly and we can deal with this after.

OK?

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Wednesday, August 10, 2022 10:27 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>; Bill Gameros <bgameros@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

We can agree as follows:

1. Except for NREP 005905-006148, HCRE agrees that it shall not use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter.
2. Highland, on the other hand, can use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter *provided*, however, that if Highland does so and "opens the door," HCRE can then use any Documents related to the same subject matter on re-cross or re-direct (notwithstanding paragraph 1).
3. In exchange for the foregoing, Highland will waive all objections to the late production of Documents.

Please advise.

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:    (214) 559-4905

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:    (214) 559-4905

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, August 10, 2022 9:18 AM
**To:** Bill Gameros <bgameros@legaltexas.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

No, Bill.

We did our searches and produced our documents.  We're not going to trial with any documents other than those that have been produced and we're not conducting new searches.

If one of these documents happens to be on our server but wasn't captured in prior searches, it doesn't become fair game now.

And I don't know how anyone would ever know anyway.  What I am supposed to do, cross-check everything on our system to see if we "have it"?

Sorry.

John

---

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Wednesday, August 10, 2022 10:10 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>; Bill Gameros <bgameros@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

We can agree as follows:

1. To the extent that Highland does not otherwise already have the documents at issue, HCRE agrees that it shall not use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter.
2. Highland, on the other hand, can use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter *provided*, however, that if Highland does so and "opens the door," HCRE can then use any Documents related to the same subject matter on re-cross or re-direct (notwithstanding paragraph 1).
3. In exchange for the foregoing, Highland will waive all objections to the late production of Documents.

Please advise.

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:   (214) 559-4905

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, August 10, 2022 9:00 AM
**To:** Bill Gameros <bgameros@legaltexas.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

Thanks, Bill.

John

---

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Wednesday, August 10, 2022 9:58 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>; Bill Gameros <bgameros@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

I have forward this proposal to my client.

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:   (214) 559-4905

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, August 10, 2022 8:37 AM
**To:** Bill Gameros <bgameros@legaltexas.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

Bill,

If time permits, please call me to discuss this issue before today's deposition and after considering the following proposal.

Background

3

As you know, HCRE produced over 4,000 documents (the "Documents") late yesterday afternoon, with no prior notice (other than that HCRE might have a "supplemental" production), about six weeks after the deadline.

Prejudice

HCMLP has been prejudiced by the late production of Documents because we have already taken the depositions of three third-party witnesses (Mark Patrick, BH Equities, and Barker Viggato, together, the "Third Parties"), and had prepared Mr. Seery (together with the Third Parties, the "Witnesses") for his deposition today.

It be unfair to expect Highland to serve new subpoenas and re-question the Third Parties, or delay Mr. Seery's deposition at the last moment or call him back for further questioning due to HCRE's late production of the Documents, and we doubt very much a Court would order Highland to do any of those things.

Proposal

In order to address the prejudice, and avoid motion practice, Highland proposes the following:

1. HCRE agrees that it shall not use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter.
2. Highland, on the other hand, can use any of the Documents to examine any of the Witnesses if any of them testify at any hearing or trial in this matter *provided*, however, that if Highland does so and "opens the door," HCRE can then use any Documents related to the same subject matter on re-cross or re-direct (notwithstanding paragraph 1).
3. In exchange for the foregoing, Highland will waive all objections to the late production of Documents.

If I don't hear from you, I will make this offer as part of a "meet and confer" at the beginning of this morning's deposition.

I can be reached at 1.646.341.3686.

Regards,

John

---

**From:** Bill Gameros [mailto:bgameros@legaltexas.com]
**Sent:** Tuesday, August 9, 2022 4:25 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Wade Carvell <wcarvell@legaltexas.com>; Bill Gameros <bgameros@legaltexas.com>; LuCretia Milam <lmilam@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

John,

Our IT person was out with COVID after I was.

It's about 700 emails.   NREP 005905-006148 were available this week. The rest were not and have not been provided to Mr. Pully.

Thank you,

Bill

Charles W. Gameros, Jr., P.C.
Hoge & Gameros, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  (214) 765-6002
Facsimile:    (214) 559-4905

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, August 9, 2022 3:21 PM
**To:** Wade Carvell <wcarvell@legaltexas.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Bill Gameros <bgameros@legaltexas.com>
**Subject:** RE: HCMLP?NREP Documents

I am stunned.

Almost six weeks after the deadline, after two third-party depositions, and hours before my client is scheduled to testify, you produce over 4,000 pages of information without notice of any kind in an action that has been pending for a year?

What do you expect us to do with this?  How are we not substantially prejudiced?

Have you given any of these materials to Mr. Pully?

If so, when did you deliver them to him?

You can respond now, or we can do this on the record tomorrow at the beginning of the deposition.

HCMLP reserves all rights.

Regards,

John

---

**From:** Wade Carvell [mailto:wcarvell@legaltexas.com]
**Sent:** Tuesday, August 9, 2022 4:09 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Cc:** Bill Gameros <bgameros@legaltexas.com>
**Subject:** HCMLP?NREP Documents

Greetings.

Below is the link to the following the following files: NREP_001184-5904.zip, and NREP_005905-006148.pdf

**Link:** https://spaces.hightail.com/space/Spo8ZLrwG1
**Password:** HCMLP-NREP82022
**Link Expires:** December 31, 2022

DWC
_____
Douglas Wade Carvell, P.C.

Hᴏɢᴇ & Gᴀᴍᴇʀᴏs, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:      214-765-6000
Direct:             214-765-6006
Facsimile:       214-594-4400
Email:              WCarvell@LegalTexas.com

# EXHIBIT 15



**PACHULSKI
STANG
ZIEHL
JONES**

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

N E W   Y O R K ,   N Y
L O S   A N G E L E S ,   C A
S A N   F R A N C I S C O ,   C A
W I L M I N G T O N , D E

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

Gregory Demo
Attorney

June 28, 2022

212-561-7730
gdemo@pszjlaw.com

**Via E-mail**

D. Wade Carvell
Hoge & Gameros LLP
6116 North Central Expressway
Suite 1400
Dallas, TX 75206

**Re:    Potential Violation of Agreement and Request for
Books and Records**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. ("Highland"), in its bankruptcy proceeding currently pending in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj11 (the "Bankruptcy Case").

As you also know, your client, HCRE Partner, LLC ("HCRE"), filed a claim in the Bankruptcy Case (Claim No. 146) alleging, *inter alia*, that all or a portion of Highland's "equity, ownership, economic rights, equitable or beneficial interests" in SE Multifamily Holdings LLC ("SEMF") does not belong to Highland.

That assertion is false. Highland has a 46.06% membership interest in SEMF and is entitled to all rights available to SEMF's members under that certain *First Amended and Restated Limited Liability Company Agreement*, dated as of March 15, 2019 (the "Agreement"), and applicable law.

**Potential Violation of Agreement**

Messrs. Bonner McDermett and DC Sauter emailed HCMLP on June 24, 2021, and again on June 27, 2022, stating that they intended to return Highland's "principal capital contribution … made to capitalize" SEMF.

LOS ANGELES
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

DOCS_NY:46028.1 36027/003



PACHULSKI

STANG

ZIEHL

JONES

L A W   O F F I C E S

D. Wade Carvell
June 28, 2022
Page 2

These communications were improper for a number of reasons, including the following.

First, SEMF is managed by James Dondero.  Agreement, §§ 3.1; 3.2.  Neither Mr. McDermett nor Mr. Sauter have any management or control rights with respect to SEMF.

Second, even assuming Messrs. McDermett and Sauter have authority, there is no provision in the Agreement or applicable law authorizing SEMF to unilaterally return the capital HCMLP contributed to SEMF or to otherwise remove Highland as a member of SEMF.

Messrs. McDermett and Sauter's actions are therefore either an attempt to tortiously interfere with Highland's rights or, if they are acting at the direction of Mr. Dondero, to breach the Agreement.

Either way, their request to "return" Highland's capital contributions in SEMF is rejected, but Messrs. McDermett and Sauter's admission as to Highland's membership interest is accepted.

Finally, and as you know, HCMLP and HCRE are currently litigating HCMLP's respective rights with respect to SEMF.  As an attorney, Mr. Sauter should know better than to communicate with HCMLP under these circumstances.  Please direct your client to cease all direct communications with HCMLP concerning SEMF unless it is for the purpose of making distributions pursuant to the terms of the Agreement or otherwise in the ordinary course of business.

<u>**Request for Books and Records**</u>

Pursuant to Section 8.3 of the Agreement, SEMF is required to maintain its books and records at its principal place of business and "all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during [SEMF's] ordinary business hours."

***Highland, as a member of SEMF, hereby requests access to SEMF's books and records at the earliest available opportunity but in no event later than July 6, 2022.***



D. Wade Carvell
June 28, 2022
Page 3

Highland reserves all rights it may have whether arising in law, equity, or contract, and all such rights are expressly reserved.

Sincerely,

Gregory Demo

cc:     John A. Morris, Esq.
        Hayley R. Winograd, Esq.
        Charles W. Gameros, Jr., Esq.

# EXHIBIT 16

---

**From:** John A. Morris
**Sent:** Friday, July 22, 2022 8:53 AM
**To:** 'Deitsch-Perez, Deborah R.' <deborah.deitschperez@stinson.com>; 'Bill Gameros' <bgameros@legaltexas.com>; 'Wade Carvell' <wcarvell@legaltexas.com>; 'Aigen, Michael P.' <michael.aigen@stinson.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland - HCMLP Demand for SE Multifamily's Books and Records

Counsel:

No one has provided a substantive response to HCMLP's request for access to inspect and copy SE Multifamily's books and records, first made on June 28 to Bill and Wade, with a follow-up from me to each of you on July 7 (I have removed Clay Taylor from this e-mail chain since Mr. Dondero and Dugaboy have sued him and his firm for malpractice, presumably severing their relationships).

Given that HCRE/SE Multifamily attempted to unilaterally return HCMLP's capital, there can be no dispute that HCMLP has an interest in SE Multifamily and, therefore, has the contractual right to inspect and copy SE Multifamily's books and records.

Please let me know by the close of business, Tuesday, July 26, when –on or before August 9--HCMLP will be provided access to inspect and copy SE Multifamily's books and records.

HCMLP reserves all of its rights at law and in equity.

Regards,

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



**From:** John A. Morris
**Sent:** Wednesday, July 13, 2022 2:26 PM
**To:** 'Deitsch-Perez, Deborah R.' <deborah.deitschperez@stinson.com>; 'Bill Gameros' <bgameros@legaltexas.com>;
Wade Carvell <wcarvell@legaltexas.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor
(clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland - HCMLP Demand for SE Multifamily's Books and Records

Thanks, Deborah.

As it turns out, by Amendment, HCRE (and not Mr. Dondero) is the Manager of SE Multifamily so I think Bill and Wade
are the appropriate attorneys to respond since they represent HCRE, but please let us know when we can expect to
receive a response so we can hold off doing anything else.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



**From:** Deitsch-Perez, Deborah R. [mailto:deborah.deitschperez@stinson.com]
**Sent:** Wednesday, July 13, 2022 2:21 PM
**To:** John A. Morris <jmorris@pszjlaw.com>; 'Bill Gameros' <bgameros@legaltexas.com>; Wade Carvell
<wcarvell@legaltexas.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com)
<clay.taylor@bondsellis.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland - HCMLP Demand for SE Multifamily's Books and Records

I understand others are addressing this.

**Deborah R. Deitsch-Perez**
Partner

STINSON LLP

3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2218  \  Mobile: 214.232.7582  \  Bio

Assistant: DAL.LSSTeam2@stinson.com  \  469.587.8860

**STINSON.COM**
This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, July 7, 2022 9:14 AM
**To:** 'Bill Gameros' <bgameros@legaltexas.com>; Wade Carvell <wcarvell@legaltexas.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Clay Taylor (clay.taylor@bondsellis.com) <clay.taylor@bondsellis.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** Highland - HCMLP Demand for SE Multifamily's Books and Records

**External Email – Use Caution**

Counsel:

As you know, we represent Highland Capital Management, L.P. ("HCMLP").

I write to you as counsel to HCRE and/or James Dondero, in his capacities as an officer of HCRE and the Manager of SE Multifamily Holdings LLC.

HCRE recently acknowledged that HCMLP holds an interest in SE Multifamily, although we understand that HCRE disputes the extent of that interest (strangely, two NexPoint employees—DC Sauter and Bonner McDermott—recently attempted to unilaterally "return" HCMLP's capital contribution; please let us know who directed them to take such action.).

On June 28, in an exercise of its express contractual rights, HCMLP wrote to HCRE's counsel and, among other things, demanded access to SE Multifamily's books and records.  A copy of that letter is attached.

On July 1, HCRE's counsel informed us that they believed the demand was more properly addressed to SE Multifamily, an entity HCRE's counsel asserted they did not represent, even though the Amended LLC Agreement expressly provides that (a) HCRE has the right to appoint and replace the Manager of SE Multifamily, (b) Mr. Dondero is the Manager of SE Multifamily (in his capacity as an officer of HCRE), and (c) the Manager is responsible for, among other things, keeping "complete and appropriate records and books of account" for SE Multifamily.

On July 6, a third-party attempted to hand-deliver to SE Multifamily at its principal place of business a further written demand by HCMLP for access to SE Multifamily's books and records but was told that "only Mr. Dondero [was] authorized to accept" the delivery.  A copy of HCMLP's latest demand is attached.

HCRE controls the Manager; the Manager controls SE Multifamily; and Mr. Dondero is the Manager.

As counsel to HCRE and/or Mr. Dondero, please either (a) acknowledge receipt of this e-mail and promptly propose a date for HCMLP's inspection of SE Multifamily's books and records, or (b) confirm that none of you are authorized to accept HCMLP's demands and/or arrange for the inspection.

This is HCMLP's third and final attempt to consensually exercise its contractual rights so your prompt, substantive responses are expected.

HCMLP reserves, and does not waive, all of its rights at law and in equity, including the right to seek judicial relief without further notice.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston