# **EXHIBIT A**

## **FIFTH CIRCUIT INITIAL OPINION**

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2022

Lyle W. Cayce
Clerk

No. 21-10449

IN THE MATTER OF: HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Debtor*,

NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT STRATEGIC OPPORTUNITIES FUND; HIGHLAND GLOBAL ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED; JAMES DONDERO; THE DUGABOY INVESTMENT TRUST; GET GOOD TRUST,

*Appellants*,

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Appellee*.

Appeal from the United States Bankruptcy Court
for the Northern District of Texas
USDC No. 19-34054
USDC No. 3:21-CV-538

Before WIENER, GRAVES, and DUNCAN, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

No. 21-10449

Highland Capital Management, L.P., a Dallas-based investment firm, managed billion-dollar, publicly traded investment portfolios for nearly three decades. By 2019, however, myriad unpaid judgments and liabilities forced Highland Capital to file for Chapter 11 bankruptcy. This provoked a nasty breakup between Highland Capital and its co-founder James Dondero. Under those trying circumstances, the bankruptcy court successfully mediated with the largest creditors and ultimately confirmed a reorganization plan amenable to most of the remaining creditors.

Dondero and other creditors unsuccessfully objected to the confirmation order and then sought review in this court. In turn, Highland Capital moved to dismiss their appeal as equitably moot. First, we hold that equitable mootness does not bar our review of any claim. Second, we affirm the confirmation order in large part. We reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds.

## I. Background

### A. Parties

In 1993, Mark Okada and appellant James Dondero co-founded Highland Capital Management, L.P. ("Highland Capital") in Dallas. Highland Capital managed portfolios and assets for other investment advisers and funds through a complex of entities under the Highland umbrella. Highland Capital's ownership-interest holders included Hunter Mountain Investment Trust (99.5%); appellant The Dugaboy Investment Trust, Dondero's family trust (0.1866%);[1] Okada, personally and through

---

[1] The Dugaboy Investment Trust appeals alongside Dondero's other family trust Get Good Trust (collectively, the "Trusts").

trusts (0.0627%); and Strand Advisors, Inc. (0.25%), the only general partner, which Dondero wholly owned.

Dondero also manages two of Highland Capital's clients—appellants Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Advisors"). Both the Advisors and Highland Capital serviced and advised billion-dollar, publicly traded investment funds for appellants Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. (collectively, the "Funds"), among others. For example, on behalf of the Funds, Highland Capital managed certain investment vehicles known as collateral loan obligations ("CLOs") under individualized servicing agreements.

## B. Bankruptcy Proceedings

Strapped with a series of unpaid judgments, Highland Capital filed for Chapter 11 bankruptcy in the District of Delaware in October 2019. The creditors included Highland Capital's interest holders, business affiliates, contractors, former partners, employees, defrauded investors, and unpaid law firms. Among those creditors, the Office of the United States Trustee appointed a four-member Unsecured Creditors' Committee (the "Committee").[2] *See* 11 U.S.C. § 1102(a)(1), (b)(1). Throughout the bankruptcy proceedings, the Committee investigated Highland Capital's past and current operations, oversaw its continuing operations, and

---

[2] First, Redeemer Committee of the Highland Crusader Fund had obtained a $191 million arbitration award after a decade of litigation against Highland Capital. Second, Acis Capital Management, L.P. and Acis Capital Management GP, LLC had sued Highland Capital after facing an adverse $8 million arbitration award, arising in part from its now-extinguished affiliation. Third, UBS Securities LLC and UBS AG London Branch had received a $1 billion judgment against Highland Capital following a 2019 bench trial in New York. Fourth, discovery vendor Meta-E Discovery had $779,000 in unpaid invoices. The Committee members are not parties on appeal.

negotiated the reorganization plan. *See id.* § 1103(c). Upon the Committee's request, the court transferred the case to the Northern District of Texas in December 2019.

Highland Capital's reorganization did not proceed under the governance of a traditional Chapter 11 trustee. Instead, the Committee reached a corporate governance settlement agreement to displace Dondero, which the bankruptcy court approved in January 2020. Under the agreed order, Dondero stepped down as director and officer of Highland Capital and Strand to be an unpaid portfolio manager and "agreed not to cause any Related Entity . . . to terminate any agreements" with Highland Capital. The Committee selected a board of three independent directors to act as a quasi-trustee and to govern Strand and Highland Capital: James Seery Jr., John Dubel, and retired Bankruptcy Judge Russell Nelms (collectively, the "Independent Directors"). The order also barred any claim against the Independent Directors in their official roles without the bankruptcy court's authorizing the claim as a "colorable claim[] of willful misconduct or gross negligence." Six months later, at the behest of the creditors, the bankruptcy court appointed Seery as Highland Capital's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. The order contained an identical bar on claims against Seery acting in these roles. Neither order was appealed.

Throughout summer 2020, Dondero proposed several reorganization plans, each opposed by the Committee and the Independent Directors. Unpersuaded by Dondero, the Committee and Independent Directors negotiated their own plan. When Dondero's plans failed, he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients. *See Highland Cap. Mgmt., L.P. v. Dondero (In*

*re Highland Cap. Mgmt., L.P.*), Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex. June 7, 2021) (holding Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a "nasty divorce"). In Seery's words, Dondero wanted to "burn the place down" because he did not get his way. The Independent Directors insisted Dondero resign from Highland Capital, which he did in October 2020.

Highland Capital, meanwhile, proceeded toward confirmation of its reorganization plan—the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan"). In August 2020, the Independent Directors filed the Plan and an accompanying disclosure statement with the support of the Committee. *See* 11 U.S.C. §§ 1121, 1125. The bankruptcy court approved the statement as well as proposed notice and voting procedures for creditors, teeing up confirmation. Leading up to the confirmation hearing, the Advisors and the Funds asked the court to bar Highland Capital from trading or disposing of CLO assets pending confirmation. The bankruptcy court denied the request, and Highland Capital declined to voluntarily abstain and continued to manage the CLO assets.

Before confirmation, Dondero and other creditors (including several non-appellants) filed over a dozen objections to the Plan. Like Dondero, the United States Trustee primarily objected to the Plan's exculpation of certain non-debtors as unlawful. Highland Capital voluntarily modified the Plan to resolve six such objections. The Plan proposed to create eleven classes of creditors and equity holders and three classes of administrative claimants. *See* 11 U.S.C. § 1122. Of the voting-eligible classes, classes 2, 7, and 9 voted to accept the Plan while classes 8, 10, and 11 voted to reject it.

### C. Reorganization Plan

The Plan works like this: It dissolves the Committee, and creates four entities—the Claimant Trust, the Reorganized Debtor, HCMLP GP LLC,[3] and the Litigation Sub-Trust. Administered by its trustee Seery, the Claimant Trust "wind[s]-down" Highland Capital's estate over approximately three years by liquidating its assets and issuing distributions to class-8 and -9 claimants as trust beneficiaries. Highland Capital vests its ongoing servicing agreements with the Reorganized Debtor, which "among other things" continues to manage the CLOs and other investment portfolios. The Reorganized Debtor's only general partner is HCMLP GP LLC. And the Litigation Sub-Trust resolves pending claims against Highland Capital under the direction of its trustee Marc Kirschner.

The whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor. The Claimant Trust wholly owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust. The Claimant Trust (and its interests) will dissolve either at the soonest of three years after the effective date (August 2024) or (1) when it is unlikely to obtain additional proceeds to justify further action, (2) all claims and objections are resolved, (3) all distributions are made, and (4) the Reorganized Debtor is dissolved.

Anticipating Dondero's continued litigiousness, the Plan shields Highland Capital and bankruptcy participants from lawsuits through an exculpation provision, which is enforced by an injunction and a gatekeeper

---

[3] The Plan calls this entity "New GP LLC," but according to the motion to dismiss as equitably moot, the new general partner was later named HCMLP GP LLC. For the sake of clarity, we use HCMLP GP LLC.

provision (collectively, "protection provisions"). The protection provisions extend to nearly all bankruptcy participants: Highland Capital and its employees and CEO; Strand; the Independent Directors; the Committee; the successor entities and Oversight Board; professionals retained in this case; and all "Related Persons"[4] (collectively, "protected parties").[5]

The Plan exculpates the protected parties from claims based on any conduct "in connection with or arising out of" (1) the filing and administration of the case, (2) the negotiation and solicitation of votes preceding the Plan, (3) the consummation, implementation, and funding of the Plan, (4) the offer, issuance, and distribution of securities under the Plan before or after the filing of the bankruptcy, and (5) any related negotiations, transactions, and documentation. But it excludes "acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct" *and* actions by Strand and its employees predating the appointment of the Independent Directors.

Under the Plan, bankruptcy participants are enjoined "from taking any actions to interfere with the implementation or consummation of the Plan" or filing any claim related to the Plan or proceeding. Should a party seek to bring a claim against any of the protected parties, it must go to the bankruptcy court to "first determin[e], after notice and a hearing, that such

---

[4] The Plan generously defines "Related Persons" to include all former, present, and future officers, directors, employees, managers, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, heirs, agents, other representatives, subsidiaries, divisions, and managing companies.

[5] The Plan expressly excludes from the protections Dondero and Okada; NexPoint Advisors, L.P.; Highland Capital Management Fund Advisors, L.P; their subsidiaries, managed entities, managed entities, and members; and the Dugaboy Investment Trust and its trustees, among others.

claim or cause of action represents a colorable claim of any kind." Only then may the bankruptcy court "specifically authoriz[e]" the party to bring the claim. The Plan reserves for the bankruptcy court the "sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable" and then to adjudicate the claim if the court has jurisdiction over the merits.

### D. Confirmation Order

At a February 2021 hearing, the bankruptcy court confirmed the Plan from the bench over several remaining objections. *See* FED. R. BANKR. P. 3017–18; 11 U.S.C. §§ 1126, 1128, 1129. In its later-written decision, the bankruptcy court observed that Highland Capital's bankruptcy was "not a garden variety chapter 11 case." The type of debtor, the reason for the bankruptcy filing, the kinds of creditor claims, the corporate governance structure, the unusual success of the mediation efforts, and the small economic interests of the current objectors all make this case unique.

The confirmation order criticized Dondero's behavior before and during the bankruptcy proceedings. The court could not "help but wonder" if Highland Capital's deficit "was necessitated because of enormous litigation fees and expenses incurred" due to Highland Capital's "culture of litigation." Recounting Highland Capital's litigation history, it deduced that Dondero is a "serial litigator." It reasoned that, while "Dondero wants his company back," this "is not a good faith basis to lob objections to the Plan." It attributed Dondero's bad faith to the Advisors, the Trusts, and the Funds, given the "remoteness of their economic interests." For example, the bankruptcy court "was not convinced of the[] [Funds'] independence" from Dondero because the Funds' board members did not testify and had "engaged with the Highland complex for many years." And so the bankruptcy court "consider[ed] them all to be marching pursuant to the orders of Mr. Dondero." The court, meanwhile, applauded the members of

the Committee for their "wills of steel" for fighting "hard before and during this Chapter 11 Case" and "represent[ing] their constituency . . . extremely well."

On the merits of the Plan, the bankruptcy court again approved the Plan's voting and confirmation procedures as well as the fairness of the Plan's classes. *See* 11 U.S.C. §§ 1122, 1125(a)–(c). The court held the Plan complied with the statutory requirements for confirmation. *See id.* §§ 1123(a)(1)–(7), 1129(a)(1)–(7), (9)–(13). Because classes 8, 10, and 11 had voted to reject the Plan, it was confirmable only by cramdown.[6] *See id.* § 1129(b). The bankruptcy court found that the Plan treated the dissenting classes fairly and equitably and satisfied the absolute-priority rule, so the Plan was confirmable. *See id.* § 1129(b)(2)(B)–(C). The court also concluded that the protection provisions were fair, equitable, and reasonable, as well as "integral elements" of the Plan under the circumstances, and were within both the court's jurisdiction and authority. The court confirmed the Plan as proposed and discharged Highland Capital's debts. *Id.* § 1141(d)(1). After confirmation and satisfaction of several conditions precedent, the Plan took effect August 11, 2021.

## E. The Appeal

Dondero, the Advisors, the Funds, and the Trusts (collectively, "Appellants") timely appealed, objecting to the Plan's legality and some of

---

[6] The bankruptcy court must proceed by nonconsensual confirmation, or "cramdown," 11 U.S.C. § 1129(b), when a class of unsecured creditors rejects a Chapter 11 reorganization plan, *id.* § 1129(a)(8), but at least one impaired class accepts it, *id.* § 1129(a)(10). A cramdown requires that the plan be "fair and equitable" to dissenting classes and satisfy the absolute priority rule—that is, dissenting classes are paid in full before any junior class can retain any property. *Id.* § 1129(b)(2)(B); *see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).

the bankruptcy court's factual findings.[7] Together with Highland Capital, Appellants moved to directly appeal the confirmation order to this court, which the bankruptcy court granted. *See* 28 U.S.C. § 158(d). A motions panel certified and consolidated the direct appeals. *See ibid.* Both the bankruptcy court and the motions panel declined to stay the Plan's confirmation pending appeal. Given the Plan's substantial consummation since its confirmation, Highland Capital moved to dismiss the appeal as equitably moot, a motion the panel ordered carried with the case.

\* \* \*

We first consider equitable mootness and decline to invoke it here. We then turn to the merits, conclude the Plan exculpates certain non-debtors beyond the bankruptcy court's authority, and affirm in all other respects.

## II. Standard of Review

A confirmation order is an appealable final order, over which we have jurisdiction. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015); *see* 28 U.S.C. §§ 158(d), 1291. This court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo. Evolve Fed. Credit Union v. Barragan-Flores (In re Barragan-Flores)*, 984 F.3d 471, 473 (5th Cir. 2021) (citation omitted).

## III. Equitable Mootness

Highland Capital moved to dismiss this appeal as equitably moot. It argues we should abstain from appellate review because clawing back the implemented Plan "would generate untold chaos." We disagree and deny the motion.

---

[7] The Trusts adopt the Funds' and the Advisors' briefs in full, and Dondero adopts the Funds' brief in full and the Advisors' brief in part. Fed. R. App. P. 28(i).

No. 21-10449

The judge-made doctrine of equitable mootness allows appellate courts to abstain from reviewing bankruptcy orders confirming "complex plans whose implementation has substantial secondary effects." *New Indus., Inc. v. Byman (In re Sneed Shipbuilding, Inc.)*, 916 F.3d 405, 409 (5th Cir. 2019) (citing *In re Trib. Media Co.*, 799 F.3d 272, 274, 281 (3d Cir. 2015)). It seeks to balance "the equitable considerations of finality and good faith reliance on a judgment" and "the right of a party to seek review of a bankruptcy order adversely affecting him." *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.3d 1065, 1069 (11th Cir. 1992)); *see In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008); *see also* 7 Collier on Bankruptcy ¶ 1129.09 (16th ed.), LexisNexis (database updated June 2022) (observing "the equitable mootness doctrine is embraced in every circuit").[8]

This court uses equitable mootness as a "scalpel rather than an axe," applying it claim-by-claim, instead of appeal-by-appeal. *In re Pac. Lumber Co. (Pacific Lumber)*, 584 F.3d 229, 240–41 (5th Cir. 2009). For each claim, we analyze three factors: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re Manges*, 29 F.3d at 1039 (citing *In re Block Shim*

---

[8] The doctrine's atextual balancing act has been criticized. *See In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Despite its apparent virtues, equitable mootness is a judicial anomaly."); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 438–54 (3rd Cir. 2015) (Krause, J., concurring); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (banishing the term "equitable mootness" as a misnomer); *In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting); *see also* Bruce A. Markell, *The Needs of the Many: Equitable Mootness' Pernicious Effects*, 93 Am. Bankr. L.J. 377, 393–96 (2019) (addressing the varying applications between circuits). *But see In re Trib. Media*, 799 F.3d at 287–88 (Ambro, J., concurring) (highlighting some benefits of the equitable mootness doctrine).

No. 21-10449

*Dev. Co.*, 939 F.2d 289, 291 (5th Cir. 1991); and *Cleveland, Barrios, Kingsdorf & Casteix v. Thibaut*, 166 B.R. 281, 286 (E.D. La. 1994)); *see also, e.g., In re Blast Energy Servs.*, 593 F.3d 418, 424–25 (5th Cir. 2010); *In re Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022). No one factor is dispositive. *See In re Manges*, 29 F.3d at 1039.

Here, the bankruptcy court and this court declined to stay the Plan pending appeal, and it took effect August 11, 2021. Given the months of progress, no party meaningfully argues the Plan has not been substantially consummated.[9] *See Pacific Lumber*, 584 F.3d at 242 (observing "consummation includes transferring all or substantially all of the property covered by the plan, the assumption of business by the debtors' successors, and the commencement of plan distributions" (citing 11 U.S.C. § 1141; and *In re Manges*, 29 F.3d at 1041 n.10)). But that alone does not trigger equitable mootness. *See In re SCOPAC*, 624 F.3d 274, 281–82 (5th Cir. 2010). Instead, for each claim, the inquiry turns on whether the court can craft relief for that

---

[9] Since the Plan's effectuation, Highland Capital paid $2.2 million in claims to a committee member and $525,000 in "cure payments" to other counterparties. The independent directors resigned. The Reorganized Debtor, the Claimant Trust, HCMLP GP LLC, and the Litigation Sub-Trust were created and organized in accordance with the Plan. The bankruptcy court appointed the Oversight Board members, the Litigation Sub-Trust trustee, and the Claimant Trust trustee. Highland Capital assumed certain service contracts, including management of twenty CLOs with approximately $700 million in assets, and transferred its assets and estate claims to the successor entities. Highland Capital's pre-petition partnership interests were cancelled and cease to exist. A third party, Blue Torch Capital, infused $45 million in exit financing, fully guaranteed by the Reorganized Debtor, its operating subsidiaries, the Claimant Trust, and most of their assets. From the exit financing, an Indemnity Trust was created to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Ligation Sub-Trust, Claimant Trustee, Litigation Trustee, or Oversight Board members. The lone class-1 creditor withdrew its claim against Highland Capital. The lone class-2 creditor has been fully paid approximately $500,000 and issued a note of $5.2 million secured by $23 million of the Reorganized Debtor's assets. Classes 3 and 4 have been paid $165,412. Class 7 has received $5.1 million in distributions from the Claimant Trust, totaling 77% of class-7 claims filed.

claim that would not have significant adverse consequences to the reorganization. Highland Capital highlights four possible disruptions: (1) the unraveling of the Claimant Trust and its entities, (2) the expense of disgorging disbursements, (3) the threat of defaulting on exit-financing loans, and (4) the exposure to vexatious litigation.

Each party first suggests its own all-or-nothing equitable mootness applications. To Highland Capital, Appellants' broad requested remedy with only a minor economic stake demands mooting the entire appeal. To Appellants, the type of reorganization plan categorically bars equitable mootness, or, alternatively, Highland Capital's joining the motion to certify the appeal estops it from asserting equitable mootness. These arguments are unpersuasive and foreclosed by *Pacific Lumber*.

First, Highland Capital contends the entire appeal is equitably moot because Appellants, with only a minor economic stake and questionable good faith, "seek[] nothing less than a complete unravelling of the confirmed Plan." It claims the court cannot "surgically excise[]" certain provisions, as the Funds request, because the Bankruptcy Code prohibits "modifications to confirmed plans after substantial consummation." *See* 11 U.S.C. § 1127(b). Not so.

"Although the Bankruptcy Code . . . restricts post-confirmation plan modifications, it does not expressly limit appellate review of plan confirmation orders." *Pacific Lumber*, 584 F.3d at 240 (footnote omitted) (citing 11 U.S.C. § 1127). This court may fashion "fractional relief" to minimize an appellate disturbance's effect on the rights of third parties. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (denying dismissal on equitable mootness grounds because the court "could grant partial relief . . . without disturbing the reorganization"); *cf. In re Cont'l Airlines*, 91 F.3d 553, 571–72 (3d Cir. 1996) (en banc) (Alito, J., dissenting)

(observing "a remedy could be fashioned in the present case to ensure that the [debtor's] reorganization is not undermined"). In short, Highland Capital's speculations are farfetched, as the court may fashion the remedy it sees fit without upsetting the reorganization.

Second, Appellants contend that equitable mootness cannot apply—full-stop—because this appeal concerns a liquidation plan, not a reorganization plan. We reject that premise. *See infra* Part IV.A. Even if it were correct, however, this court has conducted the equitable-mootness inquiry for a Chapter 11 liquidation plan in the past. *See In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 353–54 (5th Cir. 2009). And other circuits have squarely rejected the categorical bar proposed by Appellants. *See In re Abengoa Bioenergy Biomass of Kan., LLC*, 958 F.3d 949, 956–57 (10th Cir. 2020); *In re BGI, Inc.*, 772 F.3d 102, 107–09 (2d Cir. 2014). We do the same.

Finally, Appellants assert that because Highland Capital and NexPoint Advisors, L.P. jointly moved to certify the appeal, it should be estopped from arguing the appeal is equitably moot. They cite no legal support for that approach. We decline to adopt it.

Instead, we proceed with a claim-by-claim analysis, as our precedent requires. Highland Capital suggests only two claims are equitably moot: (1) the protection-provisions challenge and (2) the absolute-priority-rule challenge. Neither provides a basis for equitable mootness.

For the protection provisions, Highland Capital anticipates that, without the provisions, its officers, employees, trustees, and Oversight Board members would all resign rather than be exposed to Dondero-initiated litigation. Those resignations would disrupt the Reorganized Debtor's operation, "significant[ly] deteriorat[ing] asset values due to uncertainty." Appellants disagree, offering several instances when this court has reviewed release, exculpation, and injunction provisions over calls for equitable

mootness. *See, e.g.*, *In re Hilal*, 534 F.3d at 501; *Pacific Lumber*, 584 F.3d at 252; *In re Thru Inc.*, 782 F. App'x 339, 341 (5th Cir. 2019) (per curiam). In response, Highland Capital distinguishes this case because the provisions are "integral to the consummated plans." *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 486 (2d Cir. 2012). We again reject that premise. *See infra* Part IV.E.1. In any event, Appellants have the better argument.

We have before explained that "equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). That is so because "the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process." *Pacific Lumber*, 584 F.3d at 252. As in *Pacific Lumber*, the legality of a reorganization plan's non-consensual non-debtor release is consequential to the Chapter 11 process and so should not escape appellate review in the name of equity. *Ibid.* The same is true here. Equitable mootness does not bar our review of the protection provisions.

For the absolute-priority-rule challenge,[10] Highland Capital contends our review requires us to "rejigger class recoveries." *Pacific Lumber* is again instructive. There, the court declined to apply equitable mootness to a secured creditor's absolute-priority-rule challenge, as no other panel had extended the doctrine so far. *Id.* at 243. Similarly, Highland Capital fails to identify a single case in which this court has declined review of the treatment of a class of creditor's claims resulting from a cramdown. *See id.* at 252. Regardless, Appellants challenge the distributions to classes 8, 10, and 11. According to Highland Capital's own declaration, "Class 8 General

---

[10] While the issue is nearly forfeited for inadequate briefing, it fails on the merits regardless. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020).

No. 21-10449

Unsecured Claims have received their Claimant Trust Interests." But there is no evidence that classes 10 or 11 have received any distributions. *Contra Pacific Lumber*, 584 F.3d at 251 (holding certain claims equitably moot where "the smaller unsecured creditors" had already "received payment for their claims"). As a result, the relief requested would not affect third parties or the success of the Plan. *See In re Manges*, 29 F.3d at 1039. The doctrine of equitable mootness does not bar our review of the cramdown and treatment of class-8 creditors.

We DENY Highland Capital's motion to dismiss the appeal as equitably moot.

## IV. Discussion

As to the merits, Appellants fire a bankruptcy-law blunderbuss. They contest the Plan's classification as a reorganization plan, the Plan's satisfaction of the absolute priority rule, the Plan's confirmation despite Highland Capital's noncompliance with Bankruptcy Rule 2015.3, and the sufficiency of the evidence supporting the court's factual finding that the Funds are "owned/controlled" by Dondero. For each, we disagree and affirm. We do, however, agree with Appellants that the bankruptcy court exceeded its statutory authority under § 524(e) by exculpating certain non-debtors, and so we reverse and vacate the Plan only to that extent.

## A. Discharge of Debt

We begin with the Plan's classification as a reorganization plan, allowing for automatic discharge of the debts. The confirmation of a Chapter 11 restructuring plan "discharges the debtor from any [pre-confirmation] debt" unless, under the plan, the debtor liquidates its assets, stops "engag[ing] in [its] business after consummation of the plan," and would be denied discharge in a Chapter 7 case. 11 U.S.C. § 1141(d)(1), (3); *see In re Sullivan*, No. 99-11107, 2000 WL 1597984, at *2 (5th Cir. Sept. 26, 2000)

No. 21-10449

(per curiam). The bankruptcy court concluded Highland Capital continued to engage in business after plan consummation, so its debts are automatically discharged. The Trusts call foul because, in their view, Highland Capital's "wind down" of its portfolio management is not a continuation of its business. We disagree.

Whether a corporate debtor "engages in business" is "relatively straightforward." *Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (contrasting the more complex question for individual debtors); *see Grausz v. Sampson (In re Grausz)*, 63 F. App'x 647, 650 (4th Cir. 2003) (per curiam) (same). That is, "a business entity will not engage in business post-bankruptcy when its assets are liquidated and the entity is dissolved." *Um*, 904 F.3d at 819 (collecting cases).[11] But even a temporary continuation of business after a plan's confirmation is sufficient to discharge a Chapter 11 debtor's debt. *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 804 n.15 (5th Cir. 1997) (recognizing a debtor's "conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)" (citation omitted)). That is the case here.

By the plain terms of the Plan, Highland Capital has and will continue its business as the Reorganized Debtor for several years. Indeed, much of this appeal concerns objections to Highland Capital's "continu[ing] to manage the assets of others." Because the Plan contemplates Highland Capital "engag[ing] in business after consummation," 11 U.S.C. § 1141(d)(1), the

---

[11] *See, e.g.*, *In re W. Asbestos Co.*, 313 B.R. 832, 853 (Bankr. N.D. Cal. 2003) (holding corporate debtor was not engaging in business by merely having directors and officers, rights under an insurance policy, and claims against it); *In re Wood Fam. Ints., Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding corporate debtor was not engaging in business when the plan called for liquidation and discontinuation of its business upon confirmation).

bankruptcy court correctly held Highland Capital was eligible for automatic discharge of its debts.[12]

### B. Absolute Priority Rule

Next, we consider the Plan's compliance with the absolute-priority rule. When assessing whether a plan is "fair and equitable" in a cramdown scenario, courts must invoke the absolute-priority rule. 11 U.S.C. § 1129(b)(1); *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.04. Under that rule, if a class of unsecured claimants rejects a plan, the plan must provide that those claimants be paid in full on the effective date *or* any junior interest "will not receive or retain under the plan ... any property." 11 U.S.C. § 1129(b)(2)(B).[13]

Because class-8 claimants voted against the Plan, the bankruptcy court proceeded by nonconsensual confirmation. The court concluded the Plan was fair and equitable to class 8 and its distributions were in line with the absolute-priority rule. 11 U.S.C. § 1129(b)(2)(B). The Advisors claim the Plan violates the absolute priority rule by giving class-10 and -11 claimants a "Contingent Claimant Trust Interest" without fully satisfying class-8 claimants. We agree the absolute-priority rule applies, and the Plan plainly satisfies it.

The Plan proposed to pay 71% of class-8 creditors' claims with *pro rata* distributions of interest generated by the Claimant Trust and then *pro rata*

---

[12] For the same reasons, we reject the Trusts' follow-on argument extending the same logic to the protection provisions.

[13] *See Pacific Lumber*, 584 F.3d at 244 (noting the rule "enforces a strict hierarchy of [creditor classes'] rights defined by state and federal law" to protect dissenting creditor classes); *see also In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) ("[U]nsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." (citations omitted)).

No. 21-10449

distributions from liquidated Claimant Trust assets. Classes 10 and 11 received a *pro rata* share of "Contingent Claimant Trust Interests," defined as a Claimant Trust Interest vesting only when the Claimant Trustee certifies that all class-8 claimants have been paid indefeasibly in full and all disputed claims in class 8 have been resolved. Voilà: no interest junior to class 8 will receive any property until class-8 claimants are paid.

But the Advisors point to Highland Capital's testimony and briefs to suggest the Contingent Claimant Trust Interests (received by classes 10 and 11) are property in some sense because they have value. That argument is specious. Of course, the Contingent Claimant Trust Interests have some small probability of vesting in the future and, thus, has some *de minimis* present value. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (holding a junior creditor's receipt of a presently valueless equity interest is receipt of property). But the absolute-priority rule has never required us to bar junior creditors from ever receiving property. By the Plan's terms, no trust property vests with class-10 or -11 claimants "unless and until" class-8 claims "have been paid indefeasibly in full." *See* 11 U.S.C. § 1129(b)(2)(B)(ii). That plainly comports with the absolute-priority rule.

## C. Bankruptcy Rule 2015.3

We turn to whether the failure to comply with Bankruptcy Rule of Procedure 2015.3 bars the Plan's confirmation. The Independent Directors failed to file periodic financial reports per Federal Rule of Bankruptcy Procedure 2015.3(a) about entities "in which the [Highland Capital] estate holds a substantial or controlling interest." The Advisors claim the failure dooms the Plan's confirmation because the Plan proponent failed to comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). We disagree.

Rule 2015.3 cannot be an applicable provision of Title 11 because the Federal Rules of Bankruptcy Procedure are not provisions of the Bankruptcy Code. *See Bonner v. Adams (In re Adams)*, 734 F.2d 1094, 1101 (5th Cir. 1984) ("The Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075, provides that the Supreme Court may prescribe 'by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure' in bankruptcy courts."); *cf. In re Mandel*, No. 20-40026, 2021 WL 3642331, at *6 n.7 (5th Cir. Aug. 17, 2021) (per curiam) (noting "Rule 2015.3 implements section 419 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005," which amended 28 U.S.C. § 2073). The Advisors' attempt to tether the rule to the bankruptcy trustee's general duties lacks any legal basis. *See* 11 U.S.C. §§ 704(a)(8), 1106(a)(1), 1107(a). The bankruptcy court, therefore, correctly overruled the Advisors' objection.

## D. Factual Findings

One factual finding is in dispute, but we see no clear error. The bankruptcy court found that, despite their purported independence, the Funds are entities "owned and/or controlled by [Dondero]." The Funds ask the court to vacate the factual finding because it threatens the Funds' compliance with federal law and damages their reputations and values. According to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him. Highland Capital maintains Dondero has sole discretion over the Funds as their portfolio manager and through his control of the Advisors, so the finding is supported by the record.

"Clear error is a formidable standard: this court disturbs factual findings only if left with a firm and definite conviction that the bankruptcy court made a mistake." *In re Krueger*, 812 F.3d 365, 374 (5th Cir. 2016) (cleaned up). We defer to the bankruptcy court's credibility determinations.

*See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587–88 (5th Cir. 1999).

Here, the bankruptcy court drew its factual finding from the testimony of Jason Post, the Advisors' chief compliance officer, and Dustin Norris, an executive vice president for the Funds and the Advisors. Post testified that the Funds have independent board members that run them. But the bankruptcy court found Post not credible because "he abruptly resigned" from Highland Capital at the same time as Dondero and is currently employed by Dondero. Norris testified that Dondero "owned and/or controlled" the Funds and Advisors. The bankruptcy court found Norris credible and relied on his testimony. The bankruptcy court also observed that none of the Funds' board members testified in the bankruptcy case and all "engaged with the Highland complex for many years." Because nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are "owned and/or controlled by [Dondero]," we leave the bankruptcy court's factual finding undisturbed.

## E. The Protection Provisions

Finally, we address the legality of the Plan's protection provisions. As discussed, the Plan exculpates certain non-debtor third parties supporting the Plan from post-petition lawsuits not arising from gross negligence, bad faith, or willful or criminal misconduct. It also enjoins certain parties "from taking any actions to interfere with the implementation or consummation of the Plan." The injunction requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as "colorable"—*i.e.*, the bankruptcy court acts as a gatekeeper. Together, the provisions screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness.

No. 21-10449

The bankruptcy court deemed the provisions legal, necessary under the circumstances, and in the best interest of all parties. We agree, but only in part. Though the injunction and gatekeeping provisions are sound, the exculpation of certain non-debtors exceeds the bankruptcy court's authority. We reverse and vacate that limited portion of the Plan.

### 1. *Non-Debtor Exculpation*

We start with the scope of the non-debtor exculpation. In a Chapter 11 bankruptcy proceeding, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Contrary to the bankruptcy court's holding, the exculpation here partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors. *See Pacific Lumber*, 584 F.3d 251–53. We must reverse and strike the few unlawful parts of the Plan's exculpation provision.

The parties agree that *Pacific Lumber* controls and also that the bankruptcy court had the power to exculpate both Highland Capital and the Committee members. Appellants, however, submit the bankruptcy court improperly stretched *Pacific Lumber* to shield other non-debtors from breach-of-contract and negligence claims, in violation of § 524(e). Highland Capital counters that the exculpation provision is a commonplace Chapter 11 term, is appropriate given Dondero's litigious nature, does not implicate § 524(e), and merely provides a heightened standard of care.

To support that argument, Highland Capital highlights the distinction between a concededly unlawful release of all non-debtor liability and the Plain's limited exculpation of non-debtor post-petition liability. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (describing releases as "eliminating" a covered party's liability "altogether" while exculpation provisions "set[] forth the applicable standard of liability" in

No. 21-10449

future litigation). According to Highland Capital, the Third and Ninth Circuits have adopted that distinction when applying § 524(e). *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021); *In re PWS Holding*, 228 F.3d at 246–47. Under those cases, narrow exculpations of post-petition liability for certain critical third-party non-debtors are lawful "appropriate" or "necessary" actions for the bankruptcy court to carry out the proceeding through its statutory authority under § 1123(b)(6) and § 105(a). *See* 11 U.S.C. § 1123(b)(6) ("[A] plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title."); *id* § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

Highland Capital reads *Pacific Lumber* as "in step with the law in [those] other circuits" by allowing a limited exculpation of post-petition liability. *Cf. Blixseth*, 961 F.3d at 1084. We disagree. As the Ninth Circuit acknowledged, our court in *Pacific Lumber* arrived at "a conclusion opposite [the Ninth Circuit's]." 961 F.3d at 1085 n.7. Moreover, the Ninth Circuit expressly disavowed *Pacific Lumber*'s rationale—that an exculpation provision provides a "fresh start" to a non-debtor in violation of § 524(e)—because, in the Ninth Circuit's view, the post-petition exculpation "affects only claims arising from the bankruptcy proceedings themselves." *Ibid.* We are not persuaded, as Highland Capital contends, that the Ninth Circuit was "sloppy" and simply "misread *Pacific Lumber*." *See* O.A. Rec. 19:45–21:38.

The simple fact of the matter is that there is a circuit split concerning the effect and reach of § 524(e).[14] Our court along with the Tenth Circuit

---

[14] Amicus's contention that failing to adopt the Ninth Circuit's holding "would generate a clear circuit split" is wrong. There already is one. *See* Petition for Writ of

No. 21-10449

hold § 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code. *Pacific Lumber*, 584 F.3d at 252–53; *Landsing Diversified Props. v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600 (10th Cir. 1990) (per curiam). By contrast, the Ninth Circuit joins the Second, Third, Fourth, Sixth, Seventh, and Eleventh Circuits in reading § 524(e) to allow varying degrees of limited third-party exculpations. *Blixseth*, 961 F.3d at 1084; *accord In re PWS Holding*, 228 F.3d at 246–47 (allowing third-party releases for "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2015).

Our *Pacific Lumber* decision was not blind to the countervailing view, as it twice cites the Third Circuit's contrary holding in other contexts. *See* 584 F.3d at 241, 253 (citing *In re PWS Holding*, 228 F.3d at 236–37, 246). But we rejected the parsing between limited exculpations and full releases that Highland Capital now requests. We are obviously bound to apply our own precedent. *See Hidalgo Cnty. Emergency Serv. Found. v. Carranza (In re Hidalgo Cnty. Emergency Serv. Found.)*, 962 F.3d 838, 841 (5th Cir. 2020) ("Under our well-recognized rule of orderliness, . . . a panel of this court is bound by circuit precedent." (citation omitted)).

Under *Pacific Lumber*, § 524(e) does not permit "absolv[ing] the [non-debtor] from any negligent conduct that occurred during the course of the

---

Certiorari, *Blixseth v. Credit Suisse*, 141 S. Ct. 1394 (No. 20-1028) (highlighting the circuits' divergent approaches to the non-debtor discharge bar under § 524(e)).

No. 21-10449

bankruptcy" absent another source of authority. 584 F.3d at 252–53; *see also In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995). At oral argument, Highland Capital pointed only to § 1123(b)(6) and § 105(a) as footholds. *See* O.A. Rec. 16:45–17:28. But in this circuit, § 105(a) provides no statutory basis for a non-debtor exculpation. *In re Zale*, 62 F.3d at 760 (noting "[a] § 105 injunction cannot alter another provision of the code" (citing *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993))). And the same logic extends to § 1123(b)(6), which allows a plan to "include any other appropriate provision *not inconsistent with the applicable provisions of this title*." 11 U.S.C. § 1123(b)(6) (emphasis added).

*Pacific Lumber* identified two sources of authority to exculpate non-debtors. *See* 584 F.3d at 252–53. The first is to channel asbestos claims (not present here). *Id.* at 252 (citing 11 U.S.C. § 524(g)). The second is to provide a limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties. *Pacific Lumber*, 584 F.3d at 253 (citing 11 U.S.C. § 1103(c)); *see In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012). And, though not before the court in *Pacific Lumber*, we have also recognized a limited qualified immunity to bankruptcy trustees unless they act with gross negligence. *In re Hilal*, 534 F.3d at 501 (citing *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000)); *accord Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) (per curiam). If other sources exist, Highland Capital failed to identify them. So we see no statutory authority for the full extent of the exculpation here.

The bankruptcy court read *Pacific Lumber* differently. In its view, *Pacific Lumber* created an additional ground to exculpate non-debtors: when the record demonstrates that "costs [a party] might incur defending against suits alleging such negligence are likely to swamp either [it] or the consummated reorganization." 584 F.3d at 252. We do not read the decision that way. The bankruptcy court's underlying factual findings do not alter

No. 21-10449

whether it has statutory authority to exculpate a non-debtor. That is the holding of *Pacific Lumber*.

That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*. We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital. Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee. *See* 11 U.S.C. § 1107(a); 7 Collier on Bankruptcy ¶ 1101.01. It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501. Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

In sum, our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties, *see Baron*, 914 F.3d at 993. And so, excepting the Independent Directors and the Committee members, the exculpation of non-debtors here was unlawful. Accordingly, the other non-debtor exculpations must be struck from the Plan. *See Pacific Lumber*, 584 F.3d at 253.[15]

---

[15] Highland Capital, like the bankruptcy court, claims the *res judicata* effect of the January and July 2020 orders appointing the independent directors and appointing Seery as CEO binds the court to include the protection provisions here. We lack jurisdiction to consider collateral attacks on final bankruptcy orders even when it concerns whether the court properly exercised jurisdiction or authority at the time. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019) (quoting *Bailey*, 557 U.S. at 152). To the extent Appellants seek to roll back the protections

No. 21-10449

As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and CEO; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors.

### 2. *Injunction & Gatekeeper Provisions*

The injunction and gatekeeper provisions are, on the other hand, perfectly lawful. Appellants object to the bankruptcy court's injunction as vague and the gatekeeper provision as overbroad. We are unpersuaded.

First, Appellants' primary contention—that the Plan's injunction "is broad" by releasing non-debtors in violation of § 524(e)—is resolved by our striking the impermissibly exculpated parties. *See supra* Part IV.E.1.

Second, Appellants dispute the permanency of the injunction for the legally exculpated parties by enjoining conduct "on and after the Effective

---

in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded.

As a result, the bankruptcy court was correct insofar as *those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities, but it was incorrect that *res judicata* mandates their inclusion in the Plan's new exculpation provision. Despite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 orders, given the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders. But that says nothing of the effect of the Plan's exculpation provision.

No. 21-10449

Date." Even assuming the issue was preserved,[16] permanency alone is no reason to alter a bankruptcy court's otherwise-lawful injunction on appeal. *See In re Zale*, 62 F.3d at 759–60 (recognizing the bankruptcy court's jurisdiction to issue an injunction in the first place allowed it to issue a permanent injunction).

Third, the Advisors argue that the injunction is "overbroad and vague" because it does not define what it means to "interfere" with the "implementation or consummation of the Plan." That is unsupported by the record. As the bankruptcy court recognized, the Plan defined what constitutes interference: (i) filing a lawsuit, (ii) enforcing judgments, (iii) enforcing security interests, (iv) asserting setoff rights, or (v) acting "in any manner" not conforming with the Plan. The injunction is not unlawfully overbroad or vague.

Finally, Appellants maintain that the gatekeeper provision impermissibly extends to unrelated claims over which the bankruptcy court lacks subject-matter jurisdiction. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (noting a bankruptcy court retains jurisdiction post-confirmation only over "matters pertaining to the implementation or execution of the plan" (citations omitted)). While that may be the case, our precedent requires we leave that determination to the bankruptcy court in the first instance.

Courts have long recognized bankruptcy courts can perform a gatekeeping function. Under the "*Barton* doctrine," the bankruptcy court may require a party to "obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other

---

[16] *See Roy*, 950 F.3d at 251 ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citation omitted)).

bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added) (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)); *accord Barton v. Barbour*, 104 U.S. 126 (1881).[17] In *Villegas*, we held "that a party must continue to file with the relevant bankruptcy court for permission to proceed with a claim against the trustee." 788 F.3d at 158. Relevant here, we left to the bankruptcy court, faced with pre-approval of a claim, to determine whether it had subject matter jurisdiction over that claim in the first instance. *Id.* at 158–59; *see, e.g.*, *Carroll v. Abide*, 788 F.3d 502, 506–07 (5th Cir. 2015) (noting *Villegas* "rejected an argument that the *Barton* doctrine does not apply when the bankruptcy court lacked jurisdiction"). In other words, we need not evaluate whether the bankruptcy court would have jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision. We leave that to the bankruptcy court in the first instance.[18]

\*     \*     \*

In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. The exculpatory order is therefore vacated as to all parties *except* Highland Capital, the Committee and its members, and the

---

[17] The Advisors also maintain that Highland Capital is neither a receiver nor a trustee, so *Barton* has no application here. We disagree. Highland Capital, for all practical purposes, was a debtor in possession entitled to the rights of a trustee. *See* 7 COLLIER ON BANKRUPTCY ¶ 1101.01 ("The debtor in possession is generally vested with all of the rights and powers of a trustee as set forth in section 1106 . . . ."); *see also Carter*, 220 F.3d at 1252 n.4. (finding no distinction between bankruptcy court "approved" and bankruptcy court "appointed" officers).

[18] For the same reasons, we also leave the applicability of *Barton*'s limited statutory exception to the bankruptcy and district courts in the first instance. *See* 28 U.S.C. § 959(a) (allowing suit, without leave of the appointing court, if the challenged acts relate to the trustee or debtor in possession "carrying on business connected with [their] property").

Independent Directors for conduct within the scope of their duties. We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.[19]

## V. Conclusion

Highland Capital's motion to dismiss the appeal as equitably moot is DENIED. The bankruptcy court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

[19] Nothing in this opinion should be construed to hinder the bankruptcy court's power to enjoin and impose sanctions on Dondero and other entities by following the procedures to designate them vexatious litigants. *See In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (per curiam). But non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

August 19, 2022

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

      No. 21-10449    NexPoint v. Highland Capital Management
                USDC No. 19-34054
                USDC No. 3:21-CV-538

Enclosed is a copy of the court's decision.  The court has entered judgment under **FED. R. APP. P.** 36.  (However, the opinion may yet contain typographical or printing errors which are subject to correction.)

**FED. R. APP. P.** 39 through 41, and **5TH CIR. R.** 35, 39, and 41 govern costs, rehearings, and mandates.  **5TH CIR. R. 35 and 40 require you to attach to your petition for panel rehearing or rehearing en banc an unmarked copy of the court's opinion or order.**  Please read carefully the Internal Operating Procedures (IOP's) following **FED. R. APP. P.** 40 and **5TH CIR. R.** 35 for a discussion of when a rehearing may be appropriate, the legal standards applied and sanctions which may be imposed if you make a nonmeritorious petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  **5TH CIR. R.** 41 provides that a motion for a stay of mandate under **FED. R. APP. P.** 41 will not be granted simply upon request.  The petition must set forth good cause for a stay or clearly demonstrate that a substantial question will be presented to the Supreme Court.  Otherwise, this court may deny the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court and/or on appeal, and are considering filing a petition for <u>certiorari</u> in the United States Supreme Court, you do not need to file a motion for stay of mandate under **FED. R. APP. P.** 41.  The issuance of the mandate does not affect the time, or your right, to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible for filing petition(s) for rehearing(s) (panel and/or en banc) and writ(s) of certiorari to the U.S. Supreme Court, unless relieved of your obligation by court order.  If it is your intention to file a motion to withdraw as counsel, you should notify your client promptly, **and advise them of the time limits for filing for rehearing and certiorari.**  Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

The judgment entered provides that each party bear its own costs on appeal.


                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Nancy F. Dolly, Deputy Clerk

Enclosure(s)

Mr. Zachery Z. Annable
Mr. Bryan Christopher Assink
Mr. Douglas Scott Draper
Mr. Roy Theodore Englert Jr.
Mr. David R. Fine
Ms. Melissa Sue Hayward
Mr. George W. Hicks Jr.
Mr. A. Lee Hogewood
Ms. Emily K. Mather
Mr. Jeffrey N. Pomerantz
Mr. Davor Rukavina
Mr. Clay Marshall Taylor
Mr. Julian Preston Vasek