UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE CHARITABLE DAF FUND LP; CLO HOLDCO LTD; MARK PATRICK; SBAITI & COMPANY PLLC; MAZIN A. SBAITI; JONATHAN BRIDGES; and JAMES DONDERO, | § § § § § § § | |
| *Appellants*, | § § | Civil Action No. 3:21-cv-01974-X |
| | § | |
| v. | § § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT LP, | § § | |
| | § | |
| *Appellee*. | § | |

**MEMORANDUM OPINION AND ORDER**

The Charitable DAF Fund LP, CLO Holdco LTD, Sbaiti & Company PLLC, Mazin Sbaiti, Jonathan Bridges, Mark Patrick, and James Dondero (collectively "Contemnors") appeal the bankruptcy court's *Order Holding Certain Parties and Their Attorneys in Civil Contempt of Court for Violation of Bankruptcy Court Orders*.[1] For the reasons explained below, the Court **AFFIRMS** in part and **VACATES** in part the bankruptcy court's order.

## I. Factual Background

Highland Capital Management, LP ("Highland")—previously headed by James Dondero—filed for Chapter 11 bankruptcy in October 2019. "[A] nasty breakup between Highland Capital and . . . James Dondero" ensued, and "[Dondero] and other

---

[1] *See* Doc. No. 8-1 at 33.

creditors began to frustrate the [bankruptcy] proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients."[2]

Ultimately, Dondero agreed to relinquish some of his positions, and three individuals—John Dubel, Russell Nelms, and James P. Seery, Jr.—became independent directors of Highland.[3]  The bankruptcy court approved that settlement in January 2020 (the "Governance Order").[4]  Later, one of those directors, Seery, became Highland's CEO, and the bankruptcy court approved that appointment in July 2020 (the "Seery Order").[5]  Given "Dondero's continued litigiousness,"[6] both orders (collectively the "gatekeeping orders") provided that "[n]o entity may commence or pursue a claim . . . against Mr. Seery relating in any way to his role as the chief executive officer . . . of the Debtor without the Bankruptcy Court . . . specifically authorizing such entity to bring such claim."[7]  Those orders were not appealed.[8]

But those gatekeeping orders failed to deter: Less than a year later, two entities attempted to sue Seery.  Their claims centered on a settlement between

---

[2] *In re Highland Capital Mgmt., L.P.*, No. 21-10449, 2022 WL 4093167, at *2–3 (5th Cir. Sept. 7, 2022).

[3] *See* Doc. No. 8-2 at 127, 39; Doc. No. 8-4 at 33.

[4] Doc. No. 8-4 at 33.

[5] Doc. No. 8-2 at 164–65.

[6] *Highland Capital*, 2022 WL 4093167, at *3.

[7] Doc. No. 8-2 at 165, 127–28.

[8] *Highland Capital*, 2022 WL 4093167, at *2.

Highland and one of its creditors, HarbourVest.  When Seery requested the
bankruptcy court's approval of that settlement, Dondero, two trusts of which he is a
beneficiary, and CLO Holdco, Ltd. ("CLO Holdco") objected—but to no avail.  The
bankruptcy court approved the settlement.  Believing that "filing [a] motion with the
bankruptcy court would have been . . . futile," Dondero took a different tack.[9]

Dondero had founded the Charitable DAF Fund LP ("DAF") and historically
acted as its informal investment advisor.  Mark Patrick had become DAF's managing
member on March 24, 2021.  Although Patrick initially had "no reason to believe that
Mr. Seery had done anything wrong with respect to the HarbourVest transaction,"
Dondero quickly "told [him] that an investment opportunity was essentially
usurped."[10]   Patrick thus "engaged [Sbaiti & Company PLLC] to launch an
investigation" and asked "Dondero to work with the Sbaiti firm with respect to their
investigation of the underlying facts."[11]

Following that investigation, DAF and CLO Holdco—which DAF owns and
controls—sued Highland in this Court, alleging that Highland fraudulently withheld
information when it settled with HarbourVest.  That lawsuit centered on "Mr. Seery's
allegedly deceitful conduct" and "mention[ed] Mr. Seery 50 times."[12]   The complaint
named Seery as a "[p]otential party," and it provided his citizenship and domicile.[13]

---

[9] Doc. No. 38 at 13.

[10] Doc. No. 8-45 at 179.

[11] *Id.* at 178.

[12] Doc. No. 8-1 at 58–59.  DAF and CLO Holdco agree that "the action [was] based on Seery's
misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO."  Doc.
No. 8-7 at 117.

[13] Doc. No. 8-7 at 48.

Unsurprisingly, then, DAF and CLO Holdco quickly moved for leave to amend their complaint to add Seery as a defendant (the "Seery Motion").[14]    The movants highlighted the bankruptcy court's gatekeeping orders but requested leave to add Seery as a defendant anyhow.  This Court denied that motion the following day on the ground that the defendants had not yet been served.

Back in the bankruptcy court, Highland moved for an order requiring DAF, CLO Holdco, and those that authorized the Seery Motion to show cause why they should not be held in contempt for violating the gatekeeping orders.  The bankruptcy court granted that motion, adding Dondero to the list of individuals and entities that had to show cause.  After holding a hearing on Highland's motion, the bankruptcy court found Contemnors in contempt for violating its gatekeeping orders.  The court imposed $239,655 in sanctions to compensate Highland for its attorneys' fees and $100,000 in sanctions for each unsuccessful appeal of its contempt order.

Contemnors now appeal.

## II. Legal Standards

District courts have jurisdiction to hear appeals from final judgments of bankruptcy courts.[15]  This Court reviews a bankruptcy court's sanctions for abuse of discretion, reviewing the court's findings of fact for clear error and its conclusions of

---

[14] Doc. No. 8-7 at 115.

[15] 28 U.S.C. § 158(a)(1).

law *de novo*.[16]  A finding of fact is clearly erroneous when "the reviewing court is left with the definite and firm conviction that a mistake has been committed."[17]

### III. Analysis

Contemnors assert that the bankruptcy court (A) erroneously found them in contempt, (B) unlawfully issued the gatekeeping orders, (C) punitively sanctioned them, (D) erroneously sanctioned Dondero, and (E) violated the Constitution in myriad ways.  Each argument is meritless.

### A. Contempt Finding

Contemnors claim that the bankruptcy court erred in finding them in contempt for violating its gatekeeping orders.  "[T]he movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order."[18]

The bankruptcy court found each element by clear and convincing evidence.  In particular, the bankruptcy court had previously ordered that "[n]o entity may commence or pursue a claim . . . against Mr. Seery."[19]  Contemnors failed to comply with this order and "pursu[ed] litigation" against Seery because they filed a motion

---

[16] *In re Pratt*, 524 F.3d 580, 584 (5th Cir. 2008) (cleaned up).

[17] *In re Am. Dev. Intern. Corp.*, 188 B.R. 925, 933 (N.D. Tex. 1995) (cleaned up).

[18] *Tex. v. Dep't of Labor*, 929 F.3d 205, 213 n.11 (5th Cir. 2019) (cleaned up).

[19] Doc. No. 8-2 at 165.

requesting leave to add Seery as a defendant to a lawsuit that already centered on "Mr. Seery's allegedly deceitful conduct."[20]  Contemnors raise five objections.

First, they contend that the term *pursue* in the gatekeeping orders refers only to legal activities that occur *after* a claim has already been filed.  They cite dictionaries defining *pursue* as to "prosecute or sue" or to "carry it out or follow it."[21] But Contemnors' definitions appear absent in most dictionaries.[22]  Instead, most dictionaries define *pursue* as "seeking"[23] or "trying"[24] to obtain a desired end.

Contemnors counter that expanding *pursue* beyond "prosecute" begets a slippery slope such that even "legal research . . . [or] conferring with a client" could count.[25]  Not so.  To pursue a claim, a party must "try" or "seek" to bring that claim. Requesting leave to amend differs from legal research or client communications

---

[20] Doc. No. 8-1 at 58–59.

[21] Doc. No. 19 at 28 (cleaned up).  Contemnors also cite the Court's distinction in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 408 (1821), between *commence* and *prosecute*: "[T]o commence a suit, is to demand something by the institution of process in a Court of justice, and to prosecute the suit, is, according to the common acceptation of language, to continue that demand."

[22] *See Hepp v. Facebook*, 14 F.4th 204, 212 (3d Cir. 2021) (recognizing that "[a] comparative weighing of dictionaries is often necessary," by which a court checks multiple dictionaries (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 417 (2012))).

[23] *Pursue*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[T]o ***seek***." (emphasis added)); *Pursue*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/pursue (last visited Sept. 26, 2022) ("[T]o find or employ measures to obtain or accomplish : ***seek***." (emphasis added)).

[24] *Pursue*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To ***try*** persistently to gain or attain . . . ." (emphasis added)); *Pursue*, MACMILLAN DICTIONARY, https://www.macmillandictionary.com/us/dictionary/american/pursue (last visited Sept. 26, 2022) ("[T]o ***try*** to achieve something." (emphasis added)); *Pursue*, OXFORD LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/us/definition/english/pursue?q=pursue (last visited Sept. 26, 2022) ("[T]o do something or ***try*** to achieve something . . . ." (emphasis added)); *Pursue*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/pursue (last visited Sept. 26, 2022) ("***[T]ry*** to do." (emphasis added)).

[25] Doc. No. 19 at 29.

because "a party who moves to amend usually does intend to amend."[26]  In fact, in this Court, Contemnors would have had no choice:  They attached the proposed amended complaint, and, as the local rules make clear, "[i]f leave [to amend] is granted . . . the clerk will file a copy of the amended pleading."[27]  In short, by requesting leave to amend, Contemnors tried to—and, in fact, took every action necessary on their part to—bring a claim against Seery.

Contemnors next aver that the gatekeeping orders' requirement that litigants seek the bankruptcy court's authorization to bring claims "confirms that a motion for leave to amend cannot itself be deemed to 'commence or pursue a claim.'"[28]  But Contemnors shoot themselves in the foot: "The expression of one thing implies the exclusion of others," so the gatekeeping orders' reference to an allowed method of pursuing a claim implies that other methods—like petitioning a district court—are prohibited.[29]

Second, Contemnors contend that they, in fact, complied with the gatekeeping orders by asking this Court for authorization because bankruptcy courts "constitute a unit of the district court."[30]  But the Fifth Circuit has already "reject[ed] the . . .

---

[26] *Blanks v. Lockheed Martin Corp.*, No. 4:05CV137LN, 2006 WL 1139941, at *2 (S.D. Miss. Apr. 25, 2006).

[27] N.D. TEX. CIV. R. 15.1(b); *see, e.g.*, Electronic Order Granting Motion for Leave to File, *Christman v. Walmart Inc*, No. 3:21-cv-03055-X (N.D. Tex. Sept. 20, 2022), ECF No. 20 (Starr, J.) ("Unless the [Amended Complaint] has already been filed, clerk to enter the document as of the date of this order.").

[28] Doc. No. 19 at 30.

[29] *In re Benjamin*, 932 F.3d 293, 298 (5th Cir. 2019) (quoting Scalia & Garner, *supra* note 22, at 107).

[30] Doc. No. 19 at 31 (quoting 28 U.S.C. § 151).

argument" that a party may bypass bankruptcy gatekeeping orders "by filing suit in the district court with supervisory authority over the bankruptcy court."[31]

Third, Contemnors claim they lacked "clear notice" that their request to the district court violated the gatekeeping orders because that is not a "plain or exclusive reading of those orders."[32]  It's true that only a "definite and specific order" that proscribes the performance of "a particular act" can form the foundation of a contempt finding.[33]  But the underlying order need not "anticipate every action to be taken in response to it[],"[34] because bankruptcy courts are "entitled to a degree of flexibility in vindicating [their] authority against actions that . . . violate the reasonably understood terms of the order."[35]

The gatekeeping orders were definite and specific: They proscribed the pursuit of claims against Seery sans bankruptcy-court approval.  Accordingly, the bankruptcy court did not need to delineate every activity that could constitute pursuit of a claim against Seery.  And it certainly did not need to explain that filing a proposed complaint—which this Court could automatically docket—constituted pursuit of a claim.  Although Contemnors cite cases where the sanctioned conduct was unrelated

---

[31] *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015).  Although Contemnors claim that *Villegas* "was careful to limit its holding," they only cite limiting language from a section that did not deal with the argument that bankruptcy courts are merely units of the district court.  Doc. No. 19 at 31 n.5.  When it actually addressed Contemnors' argument, the Fifth Circuit was clear that it "maintained the distinction between the bankruptcy court and the district court."  *Villegas*, 788 F.3d at 159.

[32] Doc. No. 19 at 32.

[33] *In re Skyport Glob. Commc'ns, Inc.*, 661 F. App'x 835, 840 (5th Cir. 2016) (cleaned up).

[34] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000).

[35] *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).

to the underlying order, they fail to find any precedent where an underlying order was fatally indefinite merely on account of a contemnor's definitional quibble.[36]

Fourth, Contemnors Sbaiti and Bridges assert deficient notice because they "entered the case after" the gatekeeping orders were already in existence.[37] But the record belies Contemnors' cry of ignorance. Acknowledging that Contemnors Sbaiti and Bridges were "new to the case," Highland's counsel—prior to the Seery Motion—made them "aware of the . . . Bankruptcy Court orders that prohibit Mr. Seery . . . from being sued without first obtaining authority from the Bankruptcy Court."[38] Lest doubt remain, Highland's counsel clarified that Contemnors would "violate such Orders by filing [their] motion in the District Court."[39] Sbaiti and Bridges had notice.

Fifth, Contemnors contend that their "good faith" and "forthright[ness]" counsel against a contempt finding.[40] And Contemnors Sbaiti and Bridges claim they lacked notice that the Seery Order would prohibit the conduct of those "who acted with complete candor towards this Court."[41] But candor is inapposite. The

---

[36] *See In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (reversing sanctions for attorney's taking deposition, when the bankruptcy court previously ordered that the deposition notice was vacated but "did not explicitly direct that the deposition not take place"); *In re Gravel*, 6 F.4th 503, 513 (2d Cir. 2021) (concluding that a bankruptcy court's order did not provide notice where it prohibited challenges to a debtor's status "in any other proceeding," and the sanctioned conduct occurred outside of court), *cert. denied sub nom. Sensenich v. PHH Mortgage Corp.*, 142 S. Ct. 2829 (2022).

[37] Doc. No. 19 at 34.

[38] Doc. No. 8-7 at 93.

[39] *Id.* at 92.

[40] Doc. No. 19 at 35.

[41] *Id.* at 34.

gatekeeping orders didn't proscribe deceitful conduct—they prohibited pursuit of claims against Seery.  Forthright disregard of a court order is no defense.[42]

Similarly, Contemners assert that the Seery Motion was "harmless[]" because this Court denied it "before Highland expended any time responding."[43]  But the time entries of Highland's counsel tell another story.  Highland spent thousands of dollars preparing to fight the Seery Motion before this Court denied it.[44]  With no indication Contemnors would abandon their ambitions to sue Seery, Highland did not need to wait to suffer more harm.

The bankruptcy court did not err in finding Contemnors in contempt for violating its gatekeeping orders.

## B. Gatekeeping Orders

Contemnors challenge the gatekeeping orders themselves, claiming that bankruptcy courts may not shield the actions of a company's CEO.  They also assert

---

[42] *Cf. Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) ("[A] party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable.").

[43] Doc. No. 19 at 35.

[44] Doc. No. 8-45 at 21–23 (recognizing that Highland's lawyers billed myriad hours discussing "DAF lawyers['] correspondence to add CEO to DAF lawsuit, and how to respond," reviewing "e-mails . . . re[garding] DAF intention to name Seery as a defendant," "telephone conferenc[ing] . . . re: DAF intention to name Seery as a defendant," "[r]eview[ing] . . . DAF motion for leave to amend and add CEO," reviewing "correspondence with Board" regarding the motion, and "conferenc[ing] . . . regarding DAF motion to amend and response," to name a few).

that gatekeeping orders cannot shield "debtors in possession . . . with respect to any of their acts or transactions in carrying on business connected with such property."[45]

Highland asserts that this Court cannot consider Contemnors' collateral challenge of the gatekeeping orders. A "collateral attack on an [order] during contempt proceedings is prohibited if earlier review of the [order] was available."[46] In fact, when asked to review the Governance and Seery Orders, the Fifth Circuit recently concluded that it lacked "jurisdiction to consider collateral attacks on final bankruptcy orders."[47] This Court agrees that it lacks jurisdiction to consider Contemnors' collateral attack. Like the Fifth Circuit, this Court declines to "roll back the protections" of the gatekeeping orders.[48] Contemnors provide three responses.

First, Contemnors claim that the bar against collateral attacks applies only when the contemnor "previous[ly]" challenged the order and then, during contempt proceedings, asked the court to "reopen" the issue.[49] That's wrong. Both the Fifth

---

[45] Doc. No. 19 at 40 (quoting 28 U.S.C. § 959(a)).

[46] *W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 108 (5th Cir. 1994); *accord Reich v. Crockett*, No. 95-50159, 1995 WL 581875, at *2 (5th Cir. 1995) (per curiam) ("The collateral attack of an injunction in a contempt proceeding is prohibited where the injunction was subject to earlier review."); *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 34 (1st Cir. 1980) ("Ordinarily the validity and terms of an injunction are not reviewable in contempt proceedings."); *cf. Maggio v. Zeitz*, 333 U.S. 56, 68 (1948) ("[T]he turnover proceeding is a separate one and, when completed and terminated in a final order, it becomes res judicata and not subject to collateral attack in the contempt proceedings.").

[47] *Highland Capital*, 2022 WL 4093167, at *12 n.15.

[48] *Id.*

[49] Doc. No. 38 at 11 (cleaned up); *see also Brown*, 40 F.3d at 108 (declining to allow litigants to "reopen consideration of [an] issue" after their "previous attack" on an injunction).

11

Circuit[50] and other courts[51] have declined to hear collateral challenges to orders even when the litigants had not previously challenged those orders. And, in considering the gatekeeping orders, the Fifth Circuit did not require a previous challenge to solidify "the orders' ongoing *res judicata* effects and our lack of jurisdiction to review those orders."[52]

Second, Contemnors assert that "the Seery Order was not even a 'final' appealable order because the bankruptcy court retained jurisdiction."[53] The Fifth Circuit disagreed, describing the gatekeeping orders as "final."[54]

Third, Contemnors aver that they lacked "notice of the Seery Order when it was issued" and thus could not "have filed a timely appeal even if they wanted to."[55] It's true that collateral attacks are barred only where the party—or "those in privity with them"—had "a fair chance to challenge" the orders.[56] But that doesn't help Contemnors. Dondero affirmatively agreed to the Governance Order,[57] and both Dondero and CLO Holdco were served with the Seery Order.[58] Further, DAF is in

---

[50] *Crockett*, 1995 WL 581875, at *1–2 (declining to allow a collateral attack when a party previously "consent[ed]" to an injunction, but it was "subject to direct review by this court").

[51] *John Zink Co. v. Zink*, 241 F.3d 1256, 1260 (10th Cir. 2001) ("This issue **should have been raised** in an appeal from the 1987 proceeding and defendants are barred from raising the issue now." (emphasis added)); *G. & C. Merriam*, 639 F.2d at 34 (finding that an injunction was "not reviewable in contempt proceedings" even when the contemnor "failed effectively to exercise its right of appeal").

[52] *Highland Capital*, 2022 WL 4093167, at *12 n.15.

[53] Doc. No. 38 at 15 (cleaned up).

[54] *Highland Capital*, 2022 WL 4093167, at *12 n.15.

[55] Doc. No. 38 at 15.

[56] *In re Linn Energy, L.L.C.*, 927 F.3d 862, 867 (5th Cir. 2019) (cleaned up).

[57] Doc. No. 8-4 at 32.

[58] Doc. No. 8-28 at 88.

12

privity with CLO Holdco because it controls and owns 100% of CLO Holdco.[59]  Patrick is in privity with DAF and CLO Holdco because he is DAF's managing member, and his predecessor was "the only human being authorized to act on behalf of CLO Holdco and [] DAF."[60]  Likewise, the Sbaiti firm and its lawyers are in privity with DAF because they represent DAF.  Thus, Contemnors had a fair chance to challenge the gatekeeping orders or are in privity with an entity that did.[61]

### C. Punitive Sanctions

Contemnors first assert that the bankruptcy court's $100,000-per-appeal sanction was excessive and punitive.[62]  Highland agrees that this Court should vacate that award.  Because the parties are in accord, the Court vacates the bankruptcy court's $100,000-per-appeal sanction without prejudice.[63]

Contemnors also assert that the bankruptcy court's $239,655 sanction was "criminal, rather than civil."[64]  "[B]ankruptcy courts do not have inherent *criminal* contempt powers"—they can only issue civil contempt sanctions.[65]

---

[59] Doc. No. 8-41 at 84–85.

[60] Doc. No. 8-41 at 84–85; *see also* Doc. No. 19 at 34–35.

[61] Contemnors also analogize to as-applied challenges, claiming that parties may "challenge regulations as applied to them, despite the limitations period for facial challenges having expired." Doc. No. 19 at 33.  Whatever the merits of that analogy, it does not allow this Court to ignore Fifth Circuit precedent barring collateral attacks during contempt proceedings.

[62] Doc. No. 8-1 at 41 ("[T]he court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for [*certiorari*] that the Alleged Contemnors may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for certiorari are not successful.").

[63] Because the Court vacates that award based on the parties' agreement, it need not reach Contemnors' arguments that that award is punitive, unconstitutional, or outside the bankruptcy court's authority.

[64] Doc. No. 19 at 44.

[65] *In re Hipp, Inc.*, 895 F.2d 1503, 1511 (5th Cir. 1990).

To determine whether a sanction is criminal or civil, courts examine the "primary purpose" of the sanction.[66]  If the primary purpose is "to punish the contemnor and vindicate the authority of the court," then the sanction is criminal; but if the primary purpose is "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation," then the order is civil.[67]

The bankruptcy court recognized that it could only order sanctions necessary to "coerce obedience" or "compensate the Debtor," deciding that "compensatory damages are more appropriate."[68]  Thus, the court reviewed "invoices of the fees incurred by [Highland's] counsel relating to this matter," finding that fees totaling $187,795 were "reasonable and necessary fees incurred in having to respond . . . to the contemptuous conduct."[69]  In addition, the court recognized that three attorneys participated in the contempt hearing, multiplied their hourly rates times the length of the hearing, and thus imposed $11,860 in additional costs.  After that, the court made some assumptions.  For instance, the court recognized an additional $22,271.14 that Highland's counsel "incurred during this time period" and reduced that number to $10,000, "assum[ing]" that that lower amount related to the contempt hearing.[70] The court also "assume[d] the [Unsecured Creditors Committee] incurred $20,000 in fees monitoring this matter," evidenced by the fact that the Committee's lawyer

---

[66] *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990).

[67] *Id.*

[68] Doc. No. 8-1 at 60.

[69] *Id.*

[70] *Id.* at 61.

attended the contempt hearing.[71]  Lastly, the court assumed that Highland's local
counsel "incurred $10,000 in fees."[72]  Contemnors lodge five objections to that award.

First, Contemnors aver that the bankruptcy court "repeatedly emphasized"
that it imposed sanctions to punish Contemnors—not to compensate Highland.[73]
Oddly enough—considering the alleged "repeated emphasis"—Contemnors can't
come up with a solitary quote supporting that assertion.  That's because the
bankruptcy court expressly designed its award to "compensate the Debtor"[74]—not to
mete out punishment—and based its sanctions entirely on its calculation of
Highland's attorneys' fees.[75]

Second, Contemnors contend that the sanction is excessive and that the
bankruptcy court "largely pulled numbers out of thin air" in making assumptions
about which fees might relate to the contempt motion.[76]  But "[t]he essential goal in
shifting fees . . . is to do rough justice."[77]  This Court need not demand "auditing
perfection" of the bankruptcy court, and it must give "substantial deference" to the
"court's overall sense of a suit."[78]  Although the bankruptcy court did make multiple

---

[71] *Id.*

[72] *Id.*

[73] Doc. No. 19 at 45.

[74] Doc. No. 8-1 at 60.

[75] *See Ravago Americas L.L.C. v. Vinmar Int'l Ltd.*, 832 F. App'x 249, 255 (5th Cir. 2020) (per curiam) ("[F]or a sanction to be compensatory, it must be measured in some degree by the pecuniary injury caused by the act of disobedience." (cleaned up)).

[76] Doc. No. 19 at 49.

[77] *Roussell v. Brinker Intern., Inc.*, 441 F. App'x 222, 233 (5th Cir. 2011) (per curiam) (cleaned up).

[78] *Id.* (cleaned up).

assumptions, Contemnors do not quibble with any particular assumption. Absent any argument that the bankruptcy court botched a particular calculation, this Court cannot conclude that the bankruptcy court erred.[79]

Third, Contemnors assert that the bankruptcy court erred in awarding Highland fees associated with the contempt motion because "litigants are expected to pay the fees for the litigation tactics they employ."[80] Not so. The Fifth Circuit has affirmed sanctions that "reimburse [the opposing litigant] for its reasonable attorney fees related to the hearing on the motion for contempt."[81] In awarding compensatory civil sanctions, bankruptcy courts do not err in awarding a sanction that "restores the

---

[79] *See Skyport Glob.*, 661 F. App'x at 841–42 (finding no error where "the bankruptcy court carefully calculated the fees and awarded far less than was requested").

[80] Doc. No. 19 at 47.

[81] *Ravago*, 832 F. App'x at 253, 261; *accord Skyport Glob.*, 661 F. App'x at 841 ("Almost without exception it is within the discretion of the trial court to include, as an element of damages assessed against the defendant found guilty of civil contempt, the attorneys' fees incurred in the investigation and prosecution of the contempt proceedings." (cleaned up)). Although Contemnors make an argument "borrowing . . . from tort law," they fail to explain how this Court could abandon binding Fifth Circuit authority in favor of a tort-law theory. Doc. No. 19 at 48.

. . . parties to where they were before they incurred attorneys' fees in an attempt to ensure compliance with the injunction."[82]

Fourth, Contemnors aver that civil sanctions must be "conditional" in that they "may be lifted if the contemnor changes course."[83]  And they cite the Supreme Court's statement that "a flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to . . . avoid the fine through compliance."[84]   Because the $239,655 sanction was not conditional, they contend it constituted a criminal sanction.

But Contemnors strip the Supreme Court's statement from its salient context. The Supreme Court really said that civil sanctions can either (1) "coerce[] the defendant into compliance" or (2) "compensate[] the complainant."[85]  "Where a fine is **not compensatory**, it is civil only if the contemnor is afforded an opportunity to purge" and "avoid the fine through compliance."[86]   In other words, the conditional nature of a sanction matters only if the sanction is meant to "**coerce**[] the defendant

---

[82] *Skyport Glob.*, 661 F. App'x at 841.  Contemnors also assert that Highland might have paid more attorneys' fees if Contemnors had properly requested the bankruptcy court's permission to sue Seery, and they cite *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017) (cleaned up), for the proposition that a "complainant in a contempt action may recover only the portion of his fees that he would not have paid but for the misconduct."  Doc. No. 19 at 47 (cleaned up).  But Contemnors misconstrue *Goodyear*.  In reality, *Goodyear* made clear that courts must "determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct."  *Goodyear*, 137 S. Ct. at 1187.  The bankruptcy court properly constrained its compensatory award to fees incurred during the contempt hearing, which would not have occurred in the absence of the sanctioned conduct.

[83] Doc. No. 19 at 45.

[84] Doc. No. 38 at 18 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994)).

[85] *Bagwell*, 512 U.S. at 829 (cleaned up).

[86] *Id.* (emphasis added).

17

into compliance"—not where it ***compensates*** the injured party.[87]  Thus, when the bankruptcy court expressly designed its award to "compensate the Debtor," it did not need to craft a conditional sanction.[88]

The bankruptcy court did not err in imposing the $239,655 sanction.

## D. Dondero

Arguing separately, Dondero asserts that the bankruptcy court erred in holding him in contempt.  At the outset, the parties dispute the appropriate standard of review.[89]  This Court reviews the bankruptcy court's sanction of Dondero for abuse of discretion.[90]  Thus, to the extent Dondero challenges the bankruptcy court's factual findings about him, this Court reviews those findings for clear error.[91]  To the extent he challenges the court's legal conclusions concerning the scope of its gatekeeping orders, this Court reviews that issue *de novo*.[92]

The bankruptcy court made three factual findings concerning Dondero.  It concluded that "Dondero sparked this fire," meaning that he had "the idea of bringing the District Court Action to essentially re-visit the HarbourVest Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct."[93]  Next, the court

---

[87] *Bagwell*, 512 U.S. at 829 (emphasis added).

[88] Doc. No. 8-1 at 60.

[89] *Compare* Doc. No. 33 at 40 (arguing that this issue involves "factual matter" that this Court reviews for "clear error"), *with* Doc. No. 37 at 6 n.2 (arguing that this issue involves a "question of law that is reviewed *de novo*").

[90] *Pratt*, 524 F.3d at 584 (cleaned up).

[91] *Id.*

[92] *Id.*

[93] Doc. No. 8-1 at 53.

concluded that "Dondero encouraged Mr. Patrick to do something wrong."[94]  Finally, it concluded that Patrick "basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing the litigation strategy."[95]  Dondero lodges four objections.

First, Dondero asserts that "[t]hese findings are not supported by the record"[96] and that he "had no involvement with the Seery Motion."[97]  Instead, he claims that he provided the Sbaiti Firm and Patrick *factual information only*."[98]  This Court reviews the bankruptcy court's factual conclusions for clear error, which occurs only if, "on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed."[99]

Ample evidence supports the bankruptcy court's factual findings.  Dondero has had a significant role in DAF for over a decade.  DAF's assets come in part from Dondero and his "family trusts."[100]  Dondero "was DAF's managing member until 2012," and he remains "DAF's informal investment advisor."[101]  After Dondero stepped down as managing member, that role went to Grant Scott, "Dondero's long-

---

[94] *Id.*

[95] *Id.*

[96] Doc. No. 17 at 37.

[97] *Id.* at 29.

[98] Doc. No. 37 at 12.

[99] *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (cleaned up).

[100] Doc. No. 8-1 at 34.

[101] *Id.*

time friend, college housemate, and best man at his wedding."[102]  Scott ultimately resigned due to "disagreements with . . . Dondero."[103]

Patrick replaced Scott as "DAF's general manager on March 24, 2021"—19 days before the Seery Motion.[104]  Patrick initially had "no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction."[105] Only once "Dondero told [him] that an investment opportunity was essentially usurped"[106] did Patrick "engage[] the Sbaiti firm to launch an investigation" and ask "Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts."[107]  After that, Dondero "communicated directly with the Sbaiti firm"—Patrick did not.[108]  Dondero "saw versions of the complaint before it was filed" and had "conversations with attorneys" about the complaint pre-filing.[109]  That complaint focused on "Seery's allegedly deceitful conduct" and "mention[ed] Mr. Seery 50 times."[110]  Further, when listing the parties, the complaint listed each party named

---

[102] *Id.* at 34–35.

[103] *Id.*

[104] *Id.* at 35.

[105] Doc. No. 8-45 at 179.

[106] *Id.*

[107] *Id.* at 178.

[108] *Id.* at 180.

[109] Doc. No. 8-30 at 145–46.

[110] Doc. No. 8-1 at 58–59.

in the caption along with "[p]otential party James P. Seery, Jr.," providing his citizenship and domicile.[111]

Further, although Dondero averred that he did not direct the Sbaiti firm to add Seery to the complaint, Dondero also contradicted himself, first claiming that he did not know that "the Sbaiti firm intended to file a motion for leave to amend their complaint to add Mr. Seery,"[112] but then agreeing during the hearing that he "[p]robably" was "aware that that motion was going to be filed prior to the time that it actually was filed."[113]  He also testified to conversations about the Seery Motion, noting that it involved a "very complicated legal preservation" issue.[114]

Based on all that evidence, the Court is not left with a definite and firm conviction that the bankruptcy court erred.  After being stymied in the bankruptcy court, Dondero manufactured the exigency for the lawsuit that challenged Seery's conduct.  Dondero's claim that he "did not suggest that Mr. Seery should be added as a defendant"[115] is not credible.  Dondero gave Patrick the idea of challenging Seery's conduct, and he worked with the Sbaiti firm to bring that idea to fruition in the complaint—a complaint that clearly contemplated adding Seery to the lawsuit. Likewise, his plea that he "had no involvement with the Seery Motion"[116] is not

---

[111] Doc. No. 8-7 at 48.

[112] Doc. No. 8-30 at 153.

[113] Doc. No. 8-46 at 83.  Although Dondero asserts that "no evidence demonstrates that he knew about . . . the . . . Seery Motion before it was filed," his testimony that he "probably" knew about the Seery Motion provides at least some evidence of his knowledge.  Doc. No. 37 at 14.

[114] Doc. No. 8-46 at 83.

[115] Doc. No. 17 at 38.

[116] *Id.* at 22.

credible.    Dondero himself testified to the contents of attorney communications concerning the Seery Motion, eventually admitting that he "probably" had knowledge of the Motion before it was filed.    In short, the bankruptcy court did not err, after considering the "totality of the evidence," in finding that Dondero had "the idea of" suing to "challenge Mr. Seery's . . . conduct," that he "encouraged Mr. Patrick to do something wrong," and that Patrick "abdicated responsibility to Mr. Dondero with regard to . . . executing the litigation strategy."[117]

Second, Dondero repeatedly asserts that the "only way" the bankruptcy court could have found him in contempt is if the court found him to be "an 'authorizing person' for [] DAF or CLO Holdco."[118]  Because Patrick was DAF's managing member, Dondero asserts that only Patrick could have been an "authorizing person" who could be held in contempt.  Tellingly, Dondero provides no citation for his claim that only "authorizing persons" can be liable for contempt.  Although he cites a Texas Supreme Court case holding that corporate agents are "not necessarily" liable for a corporation's contemptuous conduct, that case held that an agent could be liable if there was "evidence in the record that the corporate agent . . . was somehow *personally* connected with defying the authority of the court."[119]  And here, evidence

---

[117] Doc. No. 8-1 at 53.

[118] Doc. No. 17 at 29; *see also id.* at 37 (arguing "that was the **only way** Mr. Dondero could have been held in contempt" (emphasis added)).

[119] *Ex parte Chambers*, 898 S.W.2d 257, 261 (Tex. 1995).

abounds that Dondero was personally connected with violating the gatekeeping orders.[120]

Third, Dondero asserts that the bankruptcy court erred in holding him in contempt "sua sponte."[121]  Highland's initial contempt motion did not name Dondero, and Dondero contends that "a civil contempt sanction may [not] be imposed without a request of a party."[122]  That's wrong.  "[B]ankruptcy courts may *sua sponte*, take any action necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process," including issuing "civil contempt orders."[123]  For instance, courts may "*sua sponte* order[]" individuals to "show cause why they should not . . . be sanctioned and held in contempt."[124]

Fourth, Dondero complains that he did not have "prior notice" that he could be held in contempt because the bankruptcy court's show cause order did "*not* include[]

---

[120] Contemnors also cite agency law and argue that the bankruptcy court found that Dondero was not an agent of DAF or CLO Holdco for purposes of attorney-client privilege.  But that misses the point.  As Highland rightly argues, "[i]t does not matter whether Dondero was acting as an agent of DAF or CLO Holdco; what matters is whether he acted to violate two Bankruptcy Court Orders *that explicitly restrained his own personal conduct*."  Doc. No. 33 at 42.

[121] Doc. No. 17 at 42.

[122] *Id.* at 43 (quoting *United States v. Russotti*, 746 F.2d 945, 949 (2d Cir. 1984)).  At the outset, Dondero's cases are inapposite.  One of his cases questioned a court's civil-contempt authority to issue a sanction when the purportedly aggrieved party declined to "submit[] any papers in this Court" opposing the contemnors actions.  *Russotti*, 746 F.2d at 949.  Another case determined which *parties* may institute civil contempt proceedings.  *MacNeil v. United States*, 236 F.2d 149, 153 (1st Cir. 1956) ("[C]ivil contempt proceedings may be instituted only by the parties primarily in interest.").  Neither of those issues is relevant here because Highland, the proper party, requested sanctions.

[123] *In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 294 & n.14 (5th Cir. 2022) (cleaned up); *see also Lamar*, 918 F.2d at 566 ("Acting *sua sponte* . . . the district court ordered the Adamses to appear before it . . . and to show cause why they should not be held in contempt.").

[124] *Hill v. Hunt*, No. 3:07-CV-2020-O, 2010 WL 11537888, at *1 (N.D. Tex. Feb. 6, 2010) (Solis, J.); *see also Netsphere, Inc. v. Baron*, No. 3:09-CV-0988-F, 2011 WL 13130079, at *3 (N.D. Tex. Dec. 13, 2011) (Furgeson, J.) ("If ICANN fails to comply with the Court's orders, then the Court will proceed *sua sponte* to hold a hearing to determine if ICANN is in contempt and should be subjected to fines and sanctions.").

[him] in the definition of Violators."[125]  Although the show cause order didn't define "violators," it required DAF, CLO Holdco, and "Dondero [to] appear in-person before this Court and show cause why an order should not be granted . . . finding and holding each of the Violators in contempt of court."[126]  The only reasonable interpretation is that "violators" denoted the aforementioned individuals and entities summoned to court to defend their conduct.

Dondero disagrees, averring there is nothing "in the record suggesting that the Order should be read" to include him as a violator.[127]  *Au contraire.*  Dondero himself admitted to the bankruptcy court his understanding that he had been "named by the Court as an alleged or implied violator."[128]  Thus, as Highland rightly argues, "Dondero's feigned surprise . . . is an unpersuasive attempt to rewrite history."[129]

The Court cannot find that the bankruptcy court erred in sanctioning Dondero.

---

[125] Doc. No. 17 at 46–47.  He also claims that this dearth of notice constituted a due process violation.  *Id.* at 49.  This Court rejects that argument because Dondero did have notice and an opportunity to be heard.

[126] Doc. No. 8-8 at 138 (emphasis omitted).

[127] Doc. No. 37 at 17.

[128] Doc. No. 8-8 at 171.  To borrow Contemnors' turn of phrase, Dondero's counsel "repeatedly emphasized" that the court had named Dondero as a violator.  *See* Doc. No. 8-45 at 159–60 (acknowledging that Dondero was "an alleged violator"); Doc. No. 8-46 at 150 (acknowledging that Dondero and his counsel appeared because Dondero "was named . . . within the order as an alleged violator").  Dondero contends that he didn't acknowledge that he was named as a violator because he was only making the argument that he was not "a control or authorizing person."  Doc. No. 8-8 at 171; *see also* Doc. No. 37 at 19.  But his argument that he was not *properly* before the court does not undermine his acknowledgment that he had been *named* by the court as a violator.

[129] Doc. No. 33 at 44.  Dondero's citation to *Skinner v. White*, 505 F.2d 685, 690 (5th Cir. 1974), hurts his case.  The court there recognized that an order "to show cause . . . called upon [the named person] to answer simply for the act and conduct specified."  *Id.* at 690–91 (cleaned up).  Thus, *Skinner* suggests that an order to show cause provides the named individual notice that it could be held in contempt for the specified conduct.

### E. Constitutional Objections

Contemnors lodge a bevy of constitutional objections, which this Court reviews *de novo*.[130]  They ask the Court to recognize these "troubling constitutional issues," practice constitutional avoidance, and bypass these "constitutionally turbulent waters."[131]  Finding no constitutional turbulence, this Court declines.

### a. Due Process

Contemnors raise five due process issues.

First, Contemnors contend that the bankruptcy court violated due process by failing to provide notice of "the scope of potential sanctions for . . . a minor supposed infraction."[132]  Sanction decisions "must comport with due process."[133]  "[D]ue process demands . . . that the sanctioned party be afforded notice . . . ."[134]  The bankruptcy court's show cause order provided each of the named parties notice of their alleged violations and notice that the court might impose an award equal to Highland's "actual expenses incurred in bringing this Motion."[135]  Contemnors cite no authority

---

[130] *Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022).

[131] Doc. No. 19 at 64–65.

[132] *Id.* at 53.

[133] *Spiller v. Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 346 (5th Cir. 1990) (cleaned up).

[134] *Meyers v. Textron Fin. Corp.*, 609 F. App'x 775, 778 (5th Cir. 2015) (cleaned up).

[135] Doc. No. 8-8 at 138–39.

holding that notice must include a dollar range of any possible sanctions.  Their notice argument is meritless.[136]

Second, Contemnors ask this Court to apply the rule of lenity.  The rule of lenity "says that . . . ***criminal*** statutes will be construed favorably to ***criminal*** defendants."[137]  As this Court has already found, the bankruptcy court did not impose criminal sanctions.  The rule of lenity is inapplicable.

Third, Contemnors claim that the bankruptcy court prejudged their case when it referred to Contemnors as "violators" in its show cause order.  It's true that "a fair tribunal is a basic requirement of due process."[138]  But Contemnors fail to show that the court prejudged the case.  The show cause order adopted the term "violators" from Highland's contempt motion.[139]   In total, the order referred to Contemnors as "violators" three times.  Contemnors cite no precedent where any similar isolated references deprived a contemnor of due process.  Absent such an argument, this Court cannot conclude that the bankruptcy court's isolated use of "violators" deprived Contemnors of due process.

Fourth, Contemnors claim the bankruptcy court prejudged the case by "shift[ing] the burden" to Contemnors to show cause why they should not be held in

---

[136] Contemnors contend that the presence of "notice and due process *during the contempt proceedings* . . . . does not cure the bankruptcy court's failure to provide clear notice before the motion for leave was filed regarding the breadth of the Seery Order."  Doc. No. 38 at 28.  This Court already concluded Contemnors had notice of the scope of the Seery Order.  *See* Part III.A.  To the extent they regurgitate that argument as a due-process argument, it is likewise meritless.

[137] Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 332 (2000) (emphases added).

[138] *In re Murchison*, 349 U.S. 133, 136 (1955).

[139] Doc. No. 8-4 at 183.

contempt.[140]  But show cause orders do not improperly shift the burden to the alleged contemnor.[141]  This Court rejected a similar argument where the bankruptcy court made clear that it was applying a "clear and convincing evidence" burden of proof.[142]  Because the bankruptcy court made clear that it was applying a "clear and convincing evidence" burden of proof, this Court cannot conclude that the bankruptcy court improperly shifted the burden to Contemnors.[143]

Fifth, Contemnors assert that the bankruptcy court prejudged the case by allowing evidence of Dondero's actions, even though he was not a litigant in the HarbourVest suit.  But one of the primary purposes of the gatekeeping orders was to shield Seery from "Dondero's continued litigiousness."[144]  Further, Contemnors filed the Seery Motion shortly after Dondero and CLO Holdco objected concerning the same transaction in the bankruptcy court.  The court did not need to ignore the context of this litigation, and it was entitled to question whether Dondero might be

---

[140] Doc. No. 19 at 54.

[141] *Am. Airlines*, 228 F.3d at 581–84 (recognizing "the district court's Show Cause Order" and still recognizing that the "movant in a civil contempt proceeding bears the burden" (cleaned up)).

[142] *In re LATCL&F, Inc.*, No. 398-35100-HCA, 2001 WL 984912, at *3 (N.D. Tex. Aug. 14, 2001) (Buchmeyer, C.J.).

[143] Doc. No. 8-1 at 58.

[144] *Highland Capital*, 2022 WL 4093167, at *3.

involved with the Seery Motion.  The bankruptcy court did not prejudge the suit by allowing evidence concerning Dondero.

The Court cannot conclude that the bankruptcy court violated due process.

### b. Appointments Clause

Contemnors next argue that "construing Judge Jernigan's authority as expansive and subject to deference runs headlong into caselaw concerning the Appointments Clause."[145]  Specifically, Contemnors apply four factors enumerated in *Morrison v. Olson*, 487 U.S. 654 (1988), contending that bankruptcy judges are principal offers.

The Appointments Clause says that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States"—known as principal officers.[146]  The so-called Excepting Clause says that "Congress may by Law vest the Appointment of [] inferior Officers . . . in the Courts of Law."[147]  Bankruptcy judges are "appointed by the court of appeals of the United States."[148]  Consequently, if bankruptcy judges are principal officers, then an Appointments Clause issue arises, given the dearth of presidential appointment or

---

[145] Doc. No. 19 at 59.

[146] U.S. Const. art. II, § 2, cl. 2.

[147] *Id.*

[148] 28 U.S.C. § 152(a)(1).

senatorial advice and consent.  Thus, this issue hinges on whether bankruptcy judges are principal or inferior officers.

*Edmond v. United States*, 520 U.S. 651, 658–66 (1997)—a case conspicuously absent from Contemnors' copious briefing—considered whether judges of the Coast Guard Court of Criminal Appeals were principal or inferior officers.  *Edmond* held that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."[149]  The Coast Guard judges qualified as inferior because both the Judge Advocate General and the Court of Appeals for the Armed Forces (the "CAAF") had power to review their judgments.[150]  Even though the CAAF's review was limited to determining whether there was "some competent evidence in the record to establish each element," the Court concluded that this "limitation upon review does not . . . render the [Coast Guard] judges . . . principal officers" because they could only render a final decision if "permitted to do so by other Executive officers."[151]

*Edmond*'s reasoning suggests that bankruptcy judges are inferior officers.  For instance, bankruptcy judges' work is "subject to appellate review, first by the district courts and then by the courts of appeals."[152]  Although Contemnors are correct that this Court, on certain issues, provides deference to the bankruptcy court, that

---

[149] *Edmond*, 520 U.S. at 663.

[150] *Id.* at 664.

[151] *Id.* at 664–65.

[152] Tuan Samahon, *Are Bankruptcy Judges Unconstitutional? An Appointments Clause Challenge*, 60 Hastings L.J. 233, 288 (2008).

deference in no way rivals the CAAF's deference approved in *Edmond*.   As Contemnors' leading source on the issue candidly concedes, "bankruptcy judges ultimately 'have no power to render a final decision . . . unless permitted to do so' by superior judicial officers."[153]  Thus, it's not shocking that the only courts to consider the issue have rejected similar Appointments Clause challenges.[154]

Contemnors' contrary argument rests entirely on *Morrison v. Olson*.   But "*Edmond* . . . essentially displaced the faulty Appointments Clause analysis of *Morrison*."[155]  And *Edmond* itself acknowledged that the Coast Guard judges would have satisfied multiple *Morrison* factors—yet it failed to follow those factors.[156] Further, the Fifth Circuit cites *Edmond* as the defining test for Appointments Clause issues—not *Morrison*.[157]

Contemnors provide no justification for their reliance on *Morrison* over *Edmond*.   Absent such an argument, this Court cannot conclude that bankruptcy judges are unconstitutionally appointed.

---

[153] *Id.* (quoting *Edmond*, 520 U.S. at 665).

[154] *In re Khan*, No. 10-46901-ESS, 2014 WL 10474969, at *54 (E.D.N.Y. Dec. 24, 2014) ("Defendant has not shown that Article II and the Appointments Clause prevent this Court from hearing and determining this adversary proceeding."); *see also In re Khan*, 706 F. App'x 22, 22–23 (2d Cir. 2017) (rejecting the argument that "bankruptcy judges are not appointed in accordance with the Appointments Clause of the United States Constitution").  Contemnors assert that "much water has passed under the Appointments Clause bridge since" those cases.  Doc. No. 38 at 30.  But they fail to identify said "water."

[155] Steven G. Calabresi, *The Structural Constitution and the Countermajoritarian Difficulty*, 22 Harv. J.L. & Pub. Pol'y 3, 5 (1998) (emphases added).

[156] *Edmond*, 520 U.S. at 661 (concluding that the Coast Guard judges are "not 'limited in tenure,' as that phrase was used in *Morrison* . . . . Nor are military judges 'limited in jurisdiction'").

[157] *See Burgess v. FDIC*, 871 F.3d 297, 303 (5th Cir. 2017) ("As the Supreme Court stated in *Edmond*, inferior Officers' work is often directed and supervised . . . by a superior." (cleaned up)).

### c.  Other Constitutional Issues

Contemnors claim that the sanctions violate the Eighth Amendment's prohibition on excessive fines.  But "a fine assessed for civil contempt does not implicate the Excessive Fines Clause."[158]  And this Court has already determined that the bankruptcy court's sanctions were civil—not criminal.

Next, Contemnors assert that the gatekeeping orders constitute a judicial taking.  Their paltry argument on this point spans three sentences, culminating in their admission that their on-point case held that "Takings Clause claims for compensation are unavailable against a bankruptcy judge."[159]  Without more, Contemnors have failed to make out a judicial-takings argument.

Lastly, Contemnors assert that "the power exercised by bankruptcy courts . . . raise[s] serious separation of powers concerns" because "the gatekeeping orders purport to oust the authority of this Court to hear cases between private parties in the first instance, imposing an initial non-judicial bite at the apple."[160]  Once again,

---

[158] *In re Grand Jury Proc.*, 280 F.3d 1103, 1110 (7th Cir. 2002); *accord United States v. City of Yonkers*, 856 F.2d 444, 459 (2d Cir. 1988) ("Even if the Excessive Fines Clause should be determined to apply to punitive damages, it does not apply to civil contempt sanctions imposed to obtain compliance with court orders."), *rev'd sub nom. on other grounds Spallone v. United States*, 493 U.S. 265 (1990); *Spallone v. United States*, 487 U.S. 1251, 1257 (1988) (Marshall, J., concurring in the denial of stay) ("[T]he Cruel and Unusual Punishments Clause does not apply to civil contempt sanctions. This is not surprising since the Cruel and Unusual Punishments Clause, like the Excessive Fines Clause, applies to punishments for past conduct, while civil contempt sanctions are designed to secure future compliance with judicial decrees." (cleaned up)).

[159] Doc. No. 19 at 64 (cleaned up).

[160] Doc. No. 19 at 58.

this Court "lack[s] jurisdiction to consider [Contemnors'] collateral attacks" on the gatekeeping orders.[161]

## IV. Conclusion

For the foregoing reasons, the judgment of the bankruptcy court is **AFFIRMED** in part and **VACATED** in part. The Court **AFFIRMS** the bankruptcy court's judgment as to the $239,655 sanction and **VACATES** the judgment as to the $100,000-per-appeal sanction without prejudice.

**IT IS SO ORDERED** this 28th day of September, 2022.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[161] *Highland Capital*, 2022 WL 4093167, at *12 n.15.