## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

**APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

James Dondero, Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC (collectively, "Movants") file this Appendix to Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C § 455:

| Exhibit | Description | Appendix Page No. |
|:---:|:---:|---|
| A | December 3, 2019, Hearing Transcript | APP. 0001 – APP. 0010 |
| B | January 9, 2020, Hearing Transcript | APP. 0011 – APP. 0021 |
| C | February 19, 2020, Hearing Transcript | APP. 0022 – APP. 0034 |
| D | June 30, 2020, Hearing Transcript | APP. 0035 – APP. 0053 |

| E | July 8, 2020, Hearing Transcript | APP. 0054 – APP. 0062 |
|---|---|---|
| F | July 14, 2020, Hearing Transcript | APP. 0063 – APP. 0074 |
| G | September 23, 2020, Hearing Transcript | APP. 0075 – APP. 0080 |
| H | October 21, 2020, Hearing Transcript | APP. 0081 – APP. 0091 |
| I | December 10, 2020, Hearing Transcript | APP. 0092 – APP. 0097 |
| J | December 16, 2020, Hearing Transcript | APP. 0098 – APP. 0103 |
| K | January 8, 2021, Hearing Transcript | APP. 0104 – APP. 0112 |
| L | January 26, 2021, Hearing Transcript | APP. 0113 – APP. 0121 |
| M | February 8, 2021, Hearing Transcript | APP. 0122 – APP. 0147 |
| N | February 23, 2021, Hearing Transcript | APP. 0148 – APP. 0155 |
| O | May 10, 2021, Hearing Transcript | APP. 0156 – APP. 0161 |
| P | May 20, 2021, Hearing Transcript | APP. 0162 – APP. 0171 |
| Q | June 8, 2021, Hearing Transcript | APP. 0172 – APP. 0177 |
| R | June 10, 2021, Hearing Transcript | APP. 0178 – APP. 0183 |
| S | June 25, 2021, Hearing Transcript | APP. 0184 – APP. 0189 |
| T | March 1, 2022, Hearing Transcript | APP. 0190 – APP. 0195 |
| U | August 31, 2022, Hearing Transcript | APP. 0196 – APP. 0212 |
| V | September 12, 2022, Hearing Transcript | APP. 0213 – APP. 0239 |

| **W** | August 4, 2021, Hearing Transcript | APP. 0240 – APP. 0246 |
|---|---|---|

Dated: October 17, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

*/s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Attorneys for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 17, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

# EXHIBIT A

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7          Debtor.                    19-12239(CSS)

8  - - - - - - - - - - - - - - - - - - - -x

9

10

11              United States Bankruptcy Court

12              824 North Market Street

13              Wilmington, Delaware

14

15              December 2, 2019

16              10:07 AM

17

18

19  B E F O R E:

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

HIGHLAND CAPITAL MANAGEMENT, L.P.                    77

1    Acis, learned all about Acis' relationship to Highland.  But

2    the real issue before Your Honor is what does that have to do

3    with this debtor, this debtor's assets and liabilities, and

4    this debtor's operations.  And as my comments will show, we

5    think that's a significantly overblown argument.

6           Your Honor, during their presentation, Counsel really

7    strayed a little bit from what the motion and the joinders sort

8    of said.  There they went through a painstaking analysis of the

9    various factors supporting venue.  I know Your Honor said that

10   over three factors, you don't find that helpful, but the courts

11   have relied on a series of factors.

12          And I think the reason why they have strayed away from

13   that and focused on the committee being the one to support the

14   transfer-of-venue motion and the facts of the Acis case is

15   because when you pare it down, the actual factors demonstrate

16   that there is no way the committee can carry its burden to

17   demonstrate that venue should be transferred.

18          However -- Your Honor pointed to this at the

19   beginning, in mentioning comments about forum-shopping -- the

20   committee and Acis are really being disingenuous, and they have

21   not told you the real reason that they want the case before

22   Judge Jernigan.

23          At the first-day hearing, Your Honor, Acis said they

24   intended to file a motion for an appointed trustee.  The

25   committee has told the debtor it intends to file a motion to

HIGHLAND CAPITAL MANAGEMENT, L.P.                    78

1   appoint a trustee after this hearing.  The motion has not yet

2   been filed, Your Honor, because they want Judge Jernigan to

3   rule on that motion.  And it's not because she's familiar with

4   this debtor's business, this debtor's assets, or this debtor's

5   liabilities, because she generally is not.  It is because she

6   formed negative views regarding certain members of the debtor's

7   management that the committee and Acis hope will carry over to

8   this case.

9          The convenience of the parties and the interests of

10   justice and how this case is so unique are just a pretext.

11   They want a trustee to run the debtor, and they want Judge

12   Jernigan and not Your Honor to rule on that motion.  That, Your

13   Honor, is not a proper reason to transfer venue, but rather a

14   transparent litigation ploy.

15          Similarly, Acis also wants the case to proceed in its

16   home court where it has enjoyed success in litigating against

17   the debtor.  Your Honor mentioned the conflicts-of-interest

18   theories.  They're not just conflicts of interest between two

19   jointly administered debtors.  These go to the crux of what the

20   Acis case is about and significant claims against the debtor.

21          The Court may ask, appropriately -- and the Court

22   did -- why would the debtor file the case in Delaware?  Chapter

23   11 is all about a fresh start.  The debtor recognized concerns

24   that the creditors had with certain aspects of its pre-petition

25   conduct, and proactively appointed Brad Sharp as chief

HIGHLAND CAPITAL MANAGEMENT, L.P.                    79

1    restructuring officer with expanded powers, to oversee the

2    debtor's operations.

3            Mr. Sharp worked with the debtor and Counsel to craft

4    a protocol for transactions that would be subject to increased

5    transparency.  The debtor didn't have to do that.  As Your

6    Honor mentioned at the first-day hearing, the debtor operates

7    its business in the ordinary course.  But given the

8    circumstances surrounding this case, given the history, we

9    felt, and the CRO, importantly, felt it was important to get on

10   the table what the debtor, through the CRO, believed was

11   ordinary and what was not, so we could have a transparent

12   discussion, discussion that, while we've made headway with the

13   committee, we have not yet been able to come to an agreement.

14           The debtor filed the case in this district because it

15   wanted a judge to preside over this case that would look at

16   what's going on with this debtor, with this debtor's

17   management, this debtor's post-petition conduct, without the

18   baggage of what happened in a previous case, which contrary to

19   what Acis and the committee says, has very little to do with

20   this debtor.

21           These form insufficient grounds, Your Honor, to

22   overturn the debtor's choice of venue, and the motion should be

23   denied.

24           I would like to now walk through the statutory

25   analysis, something that Counsel avoided, because again, I

HIGHLAND CAPITAL MANAGEMENT, L.P.                    80

1    think it highlights the weakness of their argument.

2            It is clear that the Delaware venue is proper, and

3    1408 says the places where a Chapter 11 debtor can file the

4    case.  As the vast majority of debtors who file cases in this

5    district, the debtor filed here because it was domiciled in

6    Delaware.  It is a Delaware LP.  But it goes further than that.

7    99.94 percent of its LP interests are owned by Delaware

8    entities.  And the general partner, Strand Advisors, is a

9    Delaware general partner.

10            While many cases, Your Honor, before this court, rely

11   on the domicile of one affiliate to bring other non-Delaware

12   related affiliates before the court, that's not the case here.

13   All you have, virtually, are Delaware entities, through the

14   ownership structure.

15            As I will also discuss in a few moments, Your Honor,

16   domicile is not the only connection that this debtor has to

17   this district, as significant litigation matters involving the

18   debtor, including those commenced by committee members, that

19   was the catalyst to the filing, are pending in Delaware.

20   Accordingly, the committee acknowledges, as they must, that

21   Delaware is, of course, a proper venue.

22            However, they rely on 1412 which sets forth the

23   standard -- test that the movant has to meet in order to

24   transfer venue, either for the convenience of the parties or

25   the interest of the justice.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

1    willingness to hire Delaware Counsel.

2              The last argument --

3              THE COURT:  Even when you do have mom and -- again, to

4    comment on reality, even when you do have mom-and-pop creditors

5    in businesses that are very locally focused, general practice

6    today is to make their claims irrelevant, in that to the extent

7    they have avoidance claims, they're paid on the first day.

8    Their real concern is whether the business will continue or

9    not.

10             Now, it's certainly true that pension claims are

11   important, and proofs of claim are important.  But we have

12   many -- all courts have many procedures in place to ensure that

13   those types of creditors can participate without having to go

14   to the courthouse.

15             MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16   mentioned that in the Restaurants Acquisition case, which was a

17   Texas-based --

18             THE COURT:  He's a smart guy.

19             MR. POMERANTZ:  We'll be sorry to see him go, Your

20   Honor.

21             THE COURT:  Yeah, absolutely.

22             MR. POMERANTZ:  Which was a Texas-based restaurant

23   chain that had more of a local flair.  But he made the comments

24   Your Honor made.

25             The last argument the committee makes is that Texas is

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

1   more convenient.  And this is really the crux, which I'll spend
2   some time over the next few minutes.

3         Texas is more convenient -- convenient -- because the
4   Texas bankruptcy court, where Acis is pending has, in their
5   words, already expended great time and effort familiarizing
6   itself with the debtor and its operations.  You've heard
7   statements like "learning curve".  You heard statements about
8   everything that the debtor -- that Judge Jernigan has found out
9   about this debtor, and how important and how helpful it is, and
10  how Your Honor will be behind the learning curve.  We just
11  don't buy that, Your Honor.

12        And aside from that argument, the arguments that the
13  committee makes for transfer are arguments that could be made
14  in any case before Your Honor.

15        THE COURT:  Yeah, I was going to say that's kind of an
16  interesting argument, because actually it assumes Judge
17  Jernigan's going to ignore the rules of evidence in making
18  factual findings, because you're limited to the record before
19  you on a specific motion.  And what fact you may have learned
20  with regard to something a person has done, maybe that goes
21  into questions of credibility on cross-examination or direct
22  testimony, but to actually base your decision on a fact that's
23  not in the record for the specific proceeding would be
24  improper.

25        MR. POMERANTZ:  Look, I agree, Your Honor.  And the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

1  familiarity with the type of business -- if I wasn't speaking

2  to Your Honor or your brethren or many other judges around the

3  country, I'd say well, maybe there are certain judges who

4  haven't dealt with large financial services company, may not

5  know what a CLO, may not know what a hedge fund is or private

6  equity fund is.  I'm very confident that Your Honor has had

7  many cases with sophisticated financial instruments, likely CLO

8  obligations, so that Your Honor not only has a good base of

9  knowledge that would give you the same base of knowledge that

10  Judge Jernigan has, but as we've also found, you are a fairly

11  quick study and that I have no doubt that you could come up-to-

12  speed without very little effort.

13         So their argument is a grossly overstated

14  interpretation of what the Acis case was about and that what

15  was learned in that case has any relevance.  As a part -- as a

16  result of the Acis plan confirmation, Acis is no longer part of

17  the debtor's organizational structure.  The debtor owns no

18  equity in Acis.  And the debtor no longer provides any advisory

19  services to Acis.

20         We admit that Judge Jernigan conducted many hearings,

21  and she issued several lengthy opinions, and she heard from a

22  variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23  has not -- Your Honor might read the opinions that she wrote

24  that are attached to the exhibits, the plan confirmation

25  opinion, the arbitration opinion, the involuntary opinion; and

APP. 0009

116

1

2                        C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10                                       December 3, 2019

11   _____        _____

12   CLARA RUBIN                         DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

                    eScribers, LLC  |  (973) 406-2250
              operations@escribers.net  |  www.escribers.net

# EXHIBIT B

```
1                IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION

3                              )   Case No. 19-34054-sgj-11
    In Re:                     )   Chapter 11
4                              )
    HIGHLAND CAPITAL           )   Dallas, Texas
5   MANAGEMENT, L.P.,          )   January 9, 2020
                               )   9:30 a.m. Docket
6           Debtor.            )
                               )   DEBTOR'S MOTION TO COMPROMISE
7                              )   CONTROVERSY WITH OFFICIAL
                               )   COMMITTEE OF UNSECURED
8   _____ )   CREDITORS [281]

9                      TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10              UNITED STATES BANKRUPTCY JUDGE.

11  APPEARANCES:

12  For the Debtor:            Jeffrey N. Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
13                             10100 Santa Monica Blvd.,
                                13th Floor
14                             Los Angeles, CA  90067-4003
                               (310) 277-6910
15
    For the Debtors:           Ira D. Kharasch
16                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
17                              13th Floor
                               Los Angeles, CA  90067-4003
18                             (310) 277-6910

19  For the Debtor:            John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
20                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
21                             (212) 561-7700

22  For the Debtors:           Melissa S. Hayward
                               Zachery Z. Annable
23                             HAYWARD & ASSOCIATES, PLLC
                               10501 N. Central Expressway,
24                              Suite 106
                               Dallas, TX  75231
25                             (972) 755-7104
```

51

1          MS. LAMBERT:  Well, I mean, either that or we need to
2     clear the room.
3          THE COURT:  I've read the arbitration award.
4          MS. LAMBERT:  Right.
5          THE COURT:  It's in my brain.
6          MS. LAMBERT:  Right.  Okay.
7          THE COURT:  Uh-huh.
8          MS. LAMBERT:  And so one of the arguments here today
9     is that the U.S. Trustee is representing the SEC and
10    representing other Government agencies and things.  No.
11    Obviously, that is not the U.S. Trustee --
12         THE COURT:  I didn't hear that.
13         MS. LAMBERT:  Okay.  The -- one of the positions has
14    been, in the papers, is, well, that we don't have standing to
15    raise their issues.  And that's true.
16         THE COURT:  Okay.
17         MS. LAMBERT:  But the problem is that the U.S.
18    Trustee has been constrained from discussing those issues with
19    the SEC.  The arbitration award is very relevant to the SEC's
20    oversight.  I anticipate the evidence today will be that the
21    SEC, after the financial crisis of 2008, imposed restrictions
22    on this Debtor on breach of fiduciary duty issues.  I
23    anticipate that the arbitration findings would be very
24    relevant to whether those issues are ongoing or not.
25         THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1  standard that this Court has to weigh today as being:  Is the

2  Debtor proposing something that is reflective of sound

3  business judgment, reasonable business judgment?  And to the

4  extent this is a compromise of controversies with the

5  Committee, is this fair and equitable and in the best interest

6  of the estate?

7      And as Mr. Pomerantz has said, you know, a lot of this

8  maybe doesn't even need Court approval.  But to the extent

9  there are aspects of this that are appropriate to seek Court

10 approval on, you know, this is my task.  I have to look at

11 what's presented, and is this reflective of sound business

12 judgment?  Is this fair and equitable?  Is it in the best

13 interest?

14     So, assuming there are tons of bad facts here reflected in

15 the arbitration award, reflected in other evidence, bad facts

16 that might justify a trustee, a Chapter 11 trustee, is this

17 nevertheless, what's proposed today, a reasonable compromise

18 of, you know, the trustee arguments the Committee could make

19 or, you know, is this a reasonable framework for going

20 forward?  Okay?

21     So I guess what I'm saying is I'm confused about, you

22 know, do I need to look at the arbitration award?  Do we need

23 to have evidence of all of that?  I can assume that there are

24 terrible facts out there that might justify a trustee, but I'm

25 looking at what's proposed.  Is this a fair and equitable way

53

1    to resolve the disputes?  Is it sound business judgment?

2    Frankly, is it a pragmatic solution here to preserve value?

3    So that's the legal standard I have in my mind here.

4              MS. LAMBERT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. LAMBERT:  The standard is whether it is fair and

7    equitable to resolve the issues in the Chapter 11 trustee

8    motion, and it is the U.S. Trustee's position that they are

9    not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15             THE COURT:  But how --

16             MS. LAMBERT:  Other employees are implicated.

17             THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21             MS. LAMBERT:  Those people --

22             THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

77

1   very compelling appeal.  Among them, certainly, the Committee

2   that's negotiated this term sheet retains the right at any

3   time to move for a Chapter 11 trustee if it believes there are

4   grounds.  The Committee is granted standing to pursue estate

5   claims, certain estate claims right off the bat, without

6   having to come back and ask the Court, without having to rely

7   on the Debtor to pursue that.  There are document production

8   provisions, document preservation provisions, a shared

9   privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

78

1  business justification for proposing the independent slate of

2  directors at the GP level for the Debtor, the protocols, the

3  negotiation with the Committee, the document sharing, the

4  standing given to them?  Does all of this reflect reasonable

5  business judgment?  And I find, quite clearly, it does.  I

6  find it to be a pragmatic solution to the Committee's concerns

7  about existing management and control.

8      And I think I used the words "fair and equitable," not

9  just Ms. Lambert, because it is also presented to the Court as

10 a 9019 compromise of disputes with the Committee, and we

11 traditionally use a fair and equitable and best interest of

12 the estate analysis in this context.  So, to the extent that

13 applies, I do find this a fair and equitable way of resolving

14 the disputes with the Committee, and I find this to be in the

15 best interest of the estate.  So I do approve this.

16     And by approving this motion, I'm approving the term sheet

17 as it's been presented, the various terms therein, the

18 exhibits thereto.  I'm specifically approving the new

19 independent directors, the document management and

20 preservation process, the standing to the Committee over

21 certain of the estate claims, the reporting requirements, the

22 operating protocols, the whole bundle of provisions.

23     Now, there is one specific thing I want to say about the

24 role of Mr. Dondero.  When Ms. Patel got up and talked about

25 the newest language that has been added to the term sheet, she

79

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10  they were surreptitiously liquidating funds, they were

11  changing agreements, assigning agreements to others.  They

12  were doing things behind the scenes that were impacting the

13  value of the Debtor in a bad way.

14      So not only do I think that language is very important,

15  but I am going to require that language to be put in the

16  order.  Okay?  So we're not just going to have an order

17  approving the term sheet that has that language.  I want

18  language specifically in the order.  You know, you can figure

19  out where the appropriate place to stick it in the order is,

20  but I want specific language in here regarding Mr. Dondero's

21  role.  I also -- the language in there that his role as an

22  employee of the Debtor will be subject at all times to the

23  supervision, direction, and authority of the Debtors, I want

24  that language in there as well.  Let's go ahead and put the

25  language in there that at any time, in any event, the

80

1   independent directors can determine he's no longer going to be

2   retained.  I want that in the order.

3       And I'm sure most of you can read my mind why, but I want

4   it crystal clear that if he violates these terms, he's

5   violated a federal court order, and contempt will be one of

6   the tools available to the Court.  He needs to understand

7   that.  Mr. Ellington needs to understand that.  You know, if

8   there are any games behind the scene, not only do I expect the

9   Committee  is going to come in and highlight that to the Court

10  and file a motion for a trustee or whatever, but we're going

11  to have a contempt of court issue.

12      So, anybody want to respond to that?

13          MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14  Stang Ziehl & Jones.

15      We hear Your Honor.  What I thought I'd do now is I have a

16  clean redline of the order, of course not including the

17  provision you just requested, --

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  -- which we will go back and upload

20  and hope to get an order signed by Your Honor today, if you're

21  around.  But to go over the other changes, the changes to

22  Jefferies, the other language changes I discussed before.  I

23  gave a copy to Ms. Lambert and to the Committee.  May I

24  approach with a --

25          THE COURT:  You may.

81

1           MR. POMERANTZ:  Thank you.

2           THE COURT:  Okay.  All right.  (Pause.)  All right.

3    The form of order looks fine to me.  Obviously, you'll add the

4    Dondero-related language, and we may have further wording

5    tweaks negotiated with the CLO Issuers.  But, again, I approve

6    all of this.  I didn't say on the record the compensation, but

7    certainly I am approving that as reasonable.  I expect these

8    three directors are going to be working very, very hard.  And

9    so, as you said, not 50,000-foot level monitoring, actually

10   rolling up sleeves on-site, so I think the compensation is

11   reasonable.

12          MR. POMERANTZ:  Thank you, Your Honor.  We will

13   submit an order shortly that includes Your Honor's language

14   requested.

15          THE COURT:  Okay.

16          MR. POMERANTZ:  Are you around this afternoon?

17          THE COURT:  I am around, --

18          MR. POMERANTZ:  Okay.

19          THE COURT:  -- so just pick up the phone or send an

20   email to Traci, my courtroom deputy, --

21          MR. POMERANTZ:  Yes.

22          THE COURT:  -- so she can tell me, "It's in your

23   queue to sign."

24          MR. POMERANTZ:  She has been extremely helpful and

25   responsive.

90

1          THE COURT:  All right.  Very good.  I'll sign your

2  order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5  else, I'll be on the lookout for your orders.  And, again, if

6  you could coordinate with Traci to make sure she's clear on

7  everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10          MR. CLEMENTE:  Thank you, Your Honor.

11          MR. DEMO:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13      (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                      CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **12/10/2020**

24  _____     _____
   Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

# EXHIBIT C

APP. 0022

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    February 19, 2020
 5                                  )    9:30 a.m.
               Debtor.             )
 6                                  )    MOTIONS
     _____)
 7
                         TRANSCRIPT OF PROCEEDINGS
 8            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
 9
     APPEARANCES:
10
     For the Debtor:              Greg Demo
11                                John A. Morris
                                  PACHULSKI STANG ZIEHL & JONES, LLP
12                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
13                                (212) 561-7700

14   For the Debtor:              Jeffrey N. Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
15                                10100 Santa Monica Blvd., 13th
                                    Floor
16                                Los Angeles, CA  90067
                                  (310) 277-6910
17
     For the Debtor:              Melissa S. Hayward
18                                Zachery Z. Annable
                                  HAYWARD & ASSOCIATES, PLLC
19                                10501 N. Central Expressway,
                                    Suite 106
20                                Dallas, TX  75231
                                  (972) 755-7104
21
     For the Official Committee   Matthew A. Clemente
22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
23                                Chicago, IL  60603
                                  (312) 853-7539
24

25
```

Nelms - Direct                              61

1  the original motion but which the Debtor no longer seeks to
2  pursue?
3  A   One of the matters that was pending when we took office
4  was an appeal, and I believe it was still in the District
5  Court, and that related to an alleged conflict of interest by
6  the Winstead firm.  And so there was an objection to their
7  fees and an appeal concerning payment of Winstead fees.  And
8  the Board has decided not to go forward with that appeal.
9  Q   Okay.  So the Board -- did you hear the opening from
10 Acis's counsel that charged that the Debtor was just doing
11 more scorched-earth litigation tactics?  Did you hear that
12 charge?
13 A   I heard that, yes.
14 Q   Okay.  But yet the Board has instructed Foley not to
15 pursue the Winstead matter; is that right?
16 A   That's correct.
17 Q   And just again, for the record, why did the Board make
18 that decision?
19 A   The Board made that decision because we just thought it
20 was in the best interest of the Debtor and this estate not to
21 do that.
22 Q   And did the Debtor see any benefit to pursuing that
23 particular litigation?
24 A   You know, there -- a benefit could be articulated, but we
25 decided not to pursue it.

Nelms - Direct                                    62

1  Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2  mean, I apologize, withdrawn.  That, plus the DAF matter, are

3  two examples where the Board exercised its judgment not to

4  pursue pending litigation; is that fair?

5  A    That's correct.

6  Q    Okay.  Is the Board supportive of the Debtor's application

7  to retain Foley for the three matters you have described?

8  A    It is.

9  Q    And without revealing privileged communications, can you

10 describe generally the diligence that the Board conducted to

11 reach that decision?

12 A    Well, we met with some of the people that work at

13 Highland.  We met with the Debtor's attorneys, the Pachulski

14 firm.  We did have a couple of meetings with Ms. Patel and Mr.

15 Terry.  Some of us have reviewed the pleadings, some more than

16 others.  And, well, we may have done other things, but those

17 are the ones that come to mind right now.

18 Q    I don't know if you mentioned it, but did you confer with

19 Ms. O'Neil?

20 A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21 Q    Okay.  And what was the purpose of the diligence that you

22 just described for the Court?

23 A    Well, ultimately, what we as a board were trying to do was

24 to conduct kind of a cost-benefit analysis to the estate:   How

25 much will this potentially cost us?  What's the potential

Nelms - Direct                                        63

1  upside of pursuing it?  And based upon that cost-benefit

2  analysis, we thought that this was the best thing to do.

3  Q    Okay.  Let's just focus on a couple of very narrow 327(e)

4  issues.  Is the Debtor seeking to retain Foley to act as

5  general bankruptcy counsel?

6  A    No.

7  Q    And which firm serves as general bankruptcy counsel?

8  A    That would be the Pachulski firm.

9  Q    Okay.  And do you know whether Foley Gardere represented

10 the Debtor's interest in each of the three matters that you've

11 described?

12 A    It has been representing the Debtor previously.

13 Q    Okay.  So let's talk about those three matters.  The first

14 one I believe you said was with respect to the representation

15 of the Debtor in connection with an $8 million claim that it

16 has against Acis; is that right?

17 A    That's correct.

18 Q    And is that the claim -- is that the subject of a formal

19 proof of claim?

20 A    Yes.

21 Q    Okay.

22 A    It is a claim filed in the Acis case.

23 Q    I've placed before you an exhibit binder, and I would ask

24 you to turn first to Exhibit 4.

25 A    Okay.

173

1   that benefits everybody.

2       So I guess, Your Honor, I mean, I don't know what else to

3   say about the benefits of the Neutra appeal except that the

4   testimony, I think, speaks for itself.  But, you know, I --

5   and in terms of --

6           THE COURT:  Again, fight the claim of a creditor.

7   Foley can represent Highland in the adversary proceeding,

8   wherever that goes forward.

9           MR. DEMO:  Yeah.

10          THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14          MR. DEMO:  And conversely, Your Honor, if -- if --

15          THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17          MR. DEMO:  Right.

18          THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20          MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24      And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

174

1   receiving a benefit from this, the Committee has standing to

2   pursue that.

3       So it's not a null set, Your Honor, whereas cutting off

4   the appeal now does take away that possibility.

5           THE COURT:  How would I be cutting off the appeal?

6   I'm not cutting off the appeal.  King & Spalding can go in

7   there and fight hard.  Foley can go in there and fight hard

8   for Neutra.  So, --

9           MR. DEMO:  One second, Your Honor.

10      (Counsel confer.)

11          MR. DEMO:  And I guess, you know, Your Honor, and I

12   do want to reiterate that there is no other party with an

13   economic incentive to fight the Neutra appeal the way that the

14   Debtor has an economic incentive.

15          THE COURT:  That makes no sense to me.  HCLOF is the

16   one who hated this injunction.

17          MR. DEMO:  That's not the Neutra appeal, Your Honor.

18   That's the confirmation order.

19          THE COURT:  Well, okay.  Neutra gets its company back

20   if they win.

21          MR. DEMO:  And we would get our contracts back.

22          THE COURT:  And arguably, it can control Acis, maybe,

23   okay, and it can assign management contracts to whoever it

24   wants.  That just -- and it says it'll assign them to

25   Highland.  If you can trust Jim Dondero, then Highland's going

175

1  to benefit if Neutra wins that appeal.  Right?

2          MR. DEMO:  Yes.  Yes, Your Honor.

3          THE COURT:  Okay.  So that --

4          MR. DEMO:  Highland would benefit greatly --

5          THE COURT:  Okay.

6          MR. DEMO:  -- if Neutra were to win that appeal.

7          THE COURT:  Okay.  Okay.  Well, but first Neutra

8  benefits, right?  And then --

9          MR. DEMO:  No.

10          THE COURT:  -- Highland only secondarily benefits --

11          MR. DEMO:  I -- I --

12          THE COURT:  -- if Jim Dondero keeps his word and

13  gives the management contracts back to Highland.

14          MR. DEMO:  Jim Dondero would also have to repay the

15  $8 million in claim, even if he didn't reinstate those

16  contracts.  And that $8 million would be hundred-cent dollars.

17          THE COURT:  Okay.

18          MR. DEMO:  So, worst case, --

19          THE COURT:  It would have been nice to have him

20  testify as to all of this.

21          MR. DEMO:  Worst --

22          THE COURT:  It would be more compelling if I had him.

23          MR. DEMO:  Well, --

24          THE COURT:  Okay?  But I don't think --

25          MR. DEMO:  -- I can only do so much, Your Honor.

176

1              THE COURT:  -- that's going to happen anytime soon.

2              MR. DEMO:  But I guess worst-case scenario is that

3    it's $8 million in hundred-cent dollars.

4              THE COURT:  Okay.

5              MR. DEMO:  And that's not nothing for $500,000.  And

6    only a portion of that $500,000.

7              THE COURT:  Okay.

8              MR. DEMO:  Thank you, Your Honor.

9              THE COURT:  Okay.  Mr. Lamberson?

10             MR. LAMBERSON:  Your Honor, do you want a closing

11   from me?  Or no?

12             THE COURT:  I don't really need it.  Thank you.

13             MR. LAMBERSON:  Okay.

14             THE COURT:  Okay.

15             MR. LAMBERSON:  Because I know your hearing starts in

16   about two minutes.

17             THE COURT:  All right.  So, I just hate it that we

18   spent so much time on this.  I hate it that we spent so much

19   time, but, I mean, I understand.  I understand.  You know, I

20   think the employment application was filed pretty early in the

21   case, right, and -- October 29th.  And it was continued,

22   continued, continued, because we were getting objections from

23   the Committee, or they wanted time to look at it, I guess.

24   And now you're kind of up against the wire, right, because

25   oral arguments are set at the Fifth Circuit next month.  So I,

177

1   you know, I hate it that we were here, but I understand it.

2      But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10   look for -- they have exercised their powers of persuasion or

11   whatever to make the Board and the professionals think that

12   there is some valid prospect of benefit to Highland with these

13   appeals, when it's really all about Neutra, HCLOF, and Mr.

14   Dondero.  That's what I believe.

15      I mean, this is awkward, right, because you want to defer

16   to the debtor-in-possession, but I have this long history, and

17   I can think through the scenarios.  If this is reversed, here

18   is how it will play out.  If this is reversed, here is how it

19   might play out.  And I know, you know, there are multiple ways

20   it might play out, but I cannot believe there is a chance in

21   the world there is economic benefit to Highland if these

22   things get reversed.  Economic benefit to Neutra:  Yeah,

23   maybe.  Economic benefit to HCLOF:  Well, they'll get what

24   they want.  You know, whether it's an economic benefit, I

25   don't know.  But benefit to Highland?  I just don't think the

178

1   evidence has been there to convince me it's reasonable

2   business judgment for Highland to pay the legal fees

3   associated with the appeal.

4       And even more concerning to me is a valid point was made

5   that Highland is in bankruptcy because of litigation,

6   litigation, litigation.  The past officers and directors and

7   controls' propensity to fight about everything.  This isn't a

8   balance sheet restructuring, okay?  It's not a Chapter 11

9   caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13      Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18      So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

179

1   that's my ruling.

2       I will additionally rule, for the avoidance of doubt, that

3   if Foley wants to represent Neutra in the appeals and get paid

4   by Neutra, I don't have any problem with that.  In other

5   words, I'm not going to find something like there's a conflict

6   with the estate, you know, because of its simultaneous

7   representation of Neutra.  That's fine.  But I'm not going to

8   approve Highland paying anything in connection with either of

9   those appeals.  So that is the ruling of the Court.

10      Have I left any gaps here?

11          MR. DEMO:  Your Honor, just one clarification.

12          THE COURT:  Uh-huh.

13          MR. DEMO:  Foley is representing Highland Capital

14  Management in the appeal of the confirmation order to the

15  Fifth Circuit.  I just want to clarify that your ruling that

16  Highland can represent -- I'm sorry -- Foley can represent

17  Highland in all Acis matters extends to their representation

18  of Highland Capital Management in the appeal of the

19  confirmation order that's set for March 30th.

20          THE COURT:  Okay.  Let me think through that.

21          MR. DEMO:  And again, Your Honor, there's been no

22  objection to that.

23          THE COURT:  King & Spalding is in there representing

24  HCLOF.  Foley would be representing both Neutra and Highland

25  in connection with the confirmation order?

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                    **02/20/2020**

24 _____    _____

Kathy Rehling, CETD-444                       Date
25 Certified Electronic Court Transcriber

APP. 0034

# EXHIBIT D

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj11
         In Re:                      )
                                     )
 4       HIGHLAND CAPITAL            )    Dallas, Texas
         MANAGEMENT, L.P.,           )    June 30, 2020
 5                                   )    9:30 a.m. Docket
                                     )
 6              Debtor.              )    MOTION FOR REMITTANCE OF FUNDS
                                     )    HELD IN REGISTRY OF COURT
 7                                   )    FILED BY CLO HOLDCO, LTD.
                                     )    (590)
 8       _____)

 9                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11       WEBEX/TELEPHONIC APPEARANCES:

12       For the Debtor:             Jeffrey N. Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
13                                   10100 Santa Monica Blvd.,
                                       13th Floor
14                                   Los Angeles, CA  90067
                                     (310) 277-6910
15
         For the Debtor:             John A. Morris
16                                   Greg Demo
                                     PACHULSKI STANG ZIEHL & JONES, LLP
17                                   780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
18                                   (212) 561-7700

19       For CLO Holdco, Ltd.,       John J. Kane
         Movant:                     Brian W. Clark
20                                   KANE RUSSELL COLEMAN LOGAN, P.C.
                                     901 Main Street, Suite 5200
21                                   Dallas, TX  75202
                                     (214) 777-4261
22
         For the Official Committee  Matthew A. Clemente
23       of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                     One South Dearborn Street
24                                   Chicago, IL  60603
                                     (312) 853-7539
25
```

1  the argument that you can't look at the Bankruptcy Code to

2  determine whether the money should come out of the registry or

3  not, and then be back in front of you, you know, three or four

4  weeks later to relitigate any of those issues.

5      So that was absolutely my recollection and understanding,

6  Your Honor, and I think from your comments I intuit that it

7  was your understanding as well, that this was not something

8  that we were going to deal with again very quickly, but was

9  something to preserve the status quo, a reasonable solution,

10  an equitable solution under Section 105.  And I believe that's

11  what Your Honor ordered.

12          THE COURT:  All right.  Well, I'll let you go ahead

13  and make your opening statement.  I think Mr. Kane was

14  finished before I started asking my questions.

15          MR. CLEMENTE:  Okay.

16          THE COURT:  Mr. Clemente, you may proceed.

17          MR. CLEMENTE:  Thank you, Your Honor.  I appreciate

18  that.  So, and I'll try and be brief on the opening.

19     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                     UNSECURED CREDITORS

21          MR. CLEMENTE:  Your Honor, like it or not, CLO Holdco

22  is not an independent, unrelated, third-party investor merely

23  seeking distributions on account of its own arm's-length

24  independent investments.  Instead, CLO is a related party in

25  literally every sense of the word.  That's not in dispute.

22

1   That is part of the Jim Dondero or Mr. Dondero web of

2   entities.

3       CLO Holdco is effectively controlled by Mr. Dondero.  It

4   was seeded and received assets transferred from the Debtor,

5   including the assets giving rise to the distribution that's in

6   the registry.  None of that is in dispute.  All of this at a

7   time when Mr. Dondero controlled the Debtor as well as the

8   parties through the various intermediate transactions that

9   ultimately resulted in the assets arriving in CLO Holdco.

10  That is not in dispute.

11      Mr. Dondero's past fraudulent conduct, including

12  fraudulent transfers, is also not in dispute.  He was on all

13  sides of this transaction.  And therefore this transaction,

14  along with many of the others, must be viewed with skepticism

15  and scrutinized very closely by the Committee and by this

16  Court.

17      The Committee has only just begun such work, Your Honor.

18  And given the Byzantine empire created by Mr. Dondero, it will

19  take time and significant resources to fully and properly

20  conduct an investigation.

21      And Mr. Kane referred to, did we do discovery?  We did

22  not.  Our reaction to this motion was the same as Your Honor.

23  And as you can see by the stipulations that we have agreed to

24  for purposes of this hearing, we didn't want this to be a

25  situation where the estate would spend a tremendous amount of

23

1   resources to deal with something that we thought that was

2   dealt with on March 4th.

3       But aside from that, given the web that's been created

4   here, we can't just isolate one piece of it.  We can't just be

5   like, I'm going to look at the CLO Holdco documents and be

6   able to develop a full theory.  This is a tapestry of

7   interrelated entities that is opaque and vague and purposely

8   so.  So you can't just focus on one piece and then try and

9   say, well, I know what this piece is, because that piece has

10  many interrelated complex ramifications and relationships

11  where, frankly, you can't just say, okay, let's focus on this

12  one issue, because you're going to miss the entire tapestry.

13      We still need to examine, as I mentioned, the whole thing,

14  and this takes time and it takes an investment.  So while I

15  understand CLO Holdco wants to receive its distribution, I

16  also understand that my constituency wants to be paid, some of

17  whom have been waiting for over a decade.

18      To be clear, Your Honor, my constituency didn't choose to

19  be here in the bankruptcy.  But CLO Holdco chose to associate

20  itself with Mr. Dondero and to take assets from Highland in

21  convoluted related-party transactions and reap the benefits of

22  those transactions.  CLO Holdco can't now step away from that

23  and try and suggest to Your Honor that this is about taking

24  time under 28 U.S.C. 2042.  That was never what it was about

25  on March 4th, and it's not what it's about today.

1   Holdco has or doesn't have, we have no idea.  And it's

2   controlled, ultimately, let us not lose sight of the fact, by

3   Mr. Dondero.

4       So, allowing CLO Holdco to take distributions will place

5   them with an offshore entity, potentially outside the

6   jurisdiction of this Court, or at the very least, placed in

7   five or six entities removed or who knows where, including

8   potentially other foreign entities.

9       Therefore, exercising authority under Section 105 is

10  consistent with preserving, protecting, and maximizing the

11  value of the Debtor's estate, which estate includes claims,

12  causes of action, and avoidance actions.

13      As you know, 105 is the means and -- circumstances (audio

14  gap) preserve and protect the estate.

15      And to be sure, this is not inconsistent with any other

16  provision of the Bankruptcy Code, and it's, in fact, from our

17  perspective, in furtherance of the goals of the Code.

18      Your Honor, regarding the payments that Mr. Kane (audio

19  gap), the fact that a few payments were made on the note

20  doesn't change the fact that Section 105 applies and the Court

21  should deny the motion.

22      As with all that is Highland, nothing is simple or easy.

23  First, CLO Holdco received millions more in assets and

24  transfers, aside from the interests giving rise to the

25  distributions at issue.  So the fact that there were payments

68

1   on the notes really speak nothing to the fact of whether the

2   overall transaction was for reasonably equivalent value or

3   otherwise problematic, especially when there is nothing in the

4   record regarding the Dugaboy Trust, its wherewithal to pay, or

5   the fairness of the terms of the note, or any of that.  Or why

6   the note was structured this way or, you know, what the Get

7   Good Trust and the Dugaboy Trust do, how they interact, who

8   makes decision on what gets paid and doesn't get paid.

9       The few payments, while interesting, Your Honor, again, do

10  not establish reasonably equivalent value or the propriety, in

11  our view, of the transfers.

12      Finally, as this Court knows, reasonably equivalent value

13  is not determinative of whether the transfer was intentionally

14  fraudulent or otherwise potentially avoidable or problematic.

15  So, while deeds are interesting, Your Honor, I would submit

16  that they don't move the needle in changing the fact that the

17  motion should be denied.

18      Now, Your Honor, to the point that you raised with me

19  before I started my remarks here.  Much has been made about

20  inappropriate prejudgment remedy or attachment or similar

21  arguments.  I submit this case is moot, Your Honor.  Again, at

22  the risk of repeating myself, I will emphasize that CLO Holdco

23  is not an independent third party.  Like it or not, it is tied

24  up in a ruinous web with Mr. Dondero, and that in and of

25  itself makes this case unique and distinguishes it from the

69

1   other cases cited by CLO Holdco.

2       Additionally, Your Honor, the current circumstances are

3   distinguishable because the Debtor had control over these

4   funds.  That's why we were in front of you on March 4th.  I

5   agree, and I'm not arguing, that the Debtor did not own these

6   funds.  But it clearly had control over them at the time that

7   it sought to make the distributions on March 4th.  So, in my

8   humble opinion, Your Honor, that means the Court had control

9   over that.

10      Having them held in a registry while an investigation

11  occurs is not akin to slapping a lien on someone's house or

12  taking possession of an automobile, like the cases cited by

13  Mr. Kane where they require there's some -- an adversary

14  proceeding or some type of complaint.

15      The situation here, again, Your Honor, matters.  The

16  Debtor was before you seeking your authority to make this

17  distribution.  That is entirely different than if I were to

18  walk in here and say my colleague, Mr. Twomey, I think that,

19  you know what, I don't like him and so I have a claim against

20  him, and I want Your Honor to enjoin him from being able to

21  sell his automobile.  That is entirely different, and in my

22  view completely distinguishes it from any of the cases that

23  Mr. Kane cited, including, of course, I have much respect for

24  Judge Houser, but including the case authored by Judge Houser.

25      So, Your Honor, again, having them held in the registry is

79

1   attachment.  Bankruptcy Rules aren't structured like that.

2       But importantly, Mr. Clemente presented no facts to

3   support his balancing of harms argument and presented no facts

4   to establish that he has any viable claims against CLO Holdco.

5   Arguments that James Dondero participated in frauds does not

6   mean that there's a claim or cause of action that the

7   Committee can assert against CLO Holdco, which is what would

8   be required to obtain an injunction.

9       This is a big if.  If the Committee is seeking to obtain

10  an injunction, it must satisfy its burden of proving under

11  7065 and the four-factor test established by *Janvey v. Alguire*

12  in the Fifth Circuit in 2011 and the many cases before that.

13  And it just can't do it.

14      So I want to leave the Court with one case citation,

15  because if the Court is considering some means of entering a

16  preliminary injunction outside of an adversary proceeding, I

17  was able to find a grand total of one case that address that

18  in the Fifth Circuit.  And that is the 1995 decision of *In re*

19  *Zale* in which the Fifth Circuit noted that the only way a

20  105(a) preliminary injunction could be issued, after a finding

21  of these unusual circumstances and the like, was if all of the

22  protections of an adversary proceeding had been afforded to

23  the non-movant and if the party that was requesting the

24  injunction satisfied the four-factor test that's found in

25  7065.

80

1      There are no extraordinary circumstances or unusual

2  circumstances here.  And if this Court believes that the

3  context of this case warrants that, then the Committee would

4  still have to satisfy that four-factor test for a preliminary

5  injunction.  And it has the burden of proof on those four

6  factors.  It hasn't presented any evidence whatsoever to

7  support that it can meet the first, let alone the second,

8  third, and fourth factors of that test.

9      So, Your Honor, with that, I'll close our case, unless you

10  have additional questions, and request that the Court grant

11  CLO Holdco's motion.

12         THE COURT:  A couple of follow-up questions.  I have

13  certain facts in my brain, and I can't remember if they're in

14  evidence or stipulated to or I read them in a pleading.  So, I

15  just want to ask:  Somewhere I remember seeing that CLO

16  Holdco, or, you know, maybe it's its parent, I think -- Mr.

17  Clemente said we have a Byzantine structure here and we have a

18  sub-web within a bigger web with regard to CLO Holdco.  But,

19  anyway, CLO Holdco or its parent has assets of approximately

20  $225 million?  Is that evidence or undisputed?

21         MR. KANE:  Your Honor, that was contained in one of

22  the pleadings asserted, I believe, by the Committee, and that

23  was the Charitable DAF entities, not necessarily CLO Holdco.

24  There hasn't been any evidence presented by the Committee of

25  the assets held by CLO Holdco other than what we have before

1  the Court.

2         THE COURT:   Okay.  So it's not something you would

3  stipulate or offer one way or another?

4         MR. KANE:  No, Your Honor, I think that's factually

5  incorrect and I don't stipulate to that.

6         THE COURT:  Okay.  I think my notes show that that

7  was the alleged amount of assets as of September 30, 2019.

8  But, again, that may have just been a pleading, not anything

9  in evidence.

10    All right.  And are Mr. Scott or Mr. Dondero on the phone

11  today or on the video?  I'm just curious.

12         MR. KANE:  Your Honor, I lost you on the video a

13  little bit, but assuming you can hear me, though, Mr. Scott is

14  not.  We had conversations with the Committee about various

15  exhibits and whether or not Mr. Scott would be here to testify

16  to prove up exhibits.  Once the exhibits were all stipulated

17  as admissible, then there was no need for Mr. Scott to

18  participate.

19         THE COURT:  Okay.  I was not going to ask him

20  anything.  I just was curious if he was listening in.  Or Mr.

21  Dondero, for that matter.  I guess Mr. Dondero is not on the

22  line, correct?  (Pause.)  All right.  I'll --

23         MR. KANE:  Your Honor, I -- I think -- I'm sorry.

24  I've had no conversations with Mr. Dondero.  I have no idea

25  whether he's on the line.

82

1          THE COURT:  Okay.  I'll take silence to mean he's

2     probably not, but --

3          All right.  I asked that question for, I guess, a couple

4     of reasons.  But the main reason I asked is -- and I'm going

5     to say this as kindly as I can.  They're not here to hear it

6     anyway.  But I feel like perhaps they are a little tone deaf,

7     for lack of a better term, on how this all looks to the Court

8     today.  And what I mean by that is, obviously, I assume it was

9     their decision to bring this motion, at least Mr. Scott's, and

10    likely Mr. Dondero as well had some involvement in that

11    decision.  And the reason I say that it feels like they're a

12    little tone deaf about how this looks is that we just had an

13    extensive hearing and some very thorough pleadings, a lot of

14    evidence uploaded, on a $2.5 million issue.  And I don't --

15    you know, I appreciate that that is a significant sum of

16    money, but we've used the word context a lot this morning:  In

17    the context of this reorganization, it seems like a very big

18    deal was raised here, at the choice of Mr. Scott and Mr.

19    Dondero, over a $2.5 million issue, in the context of a

20    reorganization that involves at least hundreds of millions of

21    dollars of debt, if not over a billion.  UBS says they're owed

22    a billion.

23         And I just asked my question a minute ago about the value

24    of assets that the DAF or CLO Holdco or that sub-structure has

25    managed, because while no one will commit, is it $225 million

83

1  or not, you know, I take it that the Committee had a good

2  faith basis for saying that, and if it's not that, it's

3  probably a quite sizable number.

4      Again, so I'm kind of thinking out loud about the

5  proportionality of this issue.  $2.5 million, not anything to

6  sneeze at, but we're talking about a Charitable DAF that

7  probably has many, many, many more times that of assets.  And

8  so there was certainly no equitable argument of hardship or,

9  you know, significant detriment that's befalling CLO Holdco by

10  the tying up of this money in the registry of the Court for

11  this relatively short time period.  So, again, it feels a

12  little tone deaf to be bringing this argument, occupying so

13  much time from the parties, the lawyers, the Court, over this

14  issue.

15      And just to further elaborate on that, it matters to me,

16  and I say this about the tone-deafness, partly because I

17  thought -- I said this at the beginning of the hearing, and I

18  still say it -- we already put this issue to rest, albeit

19  temporarily, in March.  And in April, we get this new motion.

20  Again, I recognize the language of the March order reserved

21  everyone's rights to come back and argue about this, but,

22  again, the buzzwords for this hearing are going to be context

23  matters, I guess.  Mr. Clemente, you get credit for that buzz

24  phrase, those buzzwords.

25      Again, I issued the order with regard to putting these

1   monies in the registry of the Court at the suggestion of Mr.

2   Dondero's very wonderful lawyer, retired Judge Lynn.  And,

3   again, the context was we had a protocol order early in this

4   case that the Committee negotiated heavily with regard to

5   monies being disbursed out under the control of the Debtor,

6   and heavily negotiated.  I remember the CLO Issuers, I think,

7   had some pause and concerns and got their language into that

8   order.

9       So we had this protocol order.  Debtor was worried about

10  violating the protocol order, so Debtor files the motion

11  February 24th, wanting the blessing of a court order before it

12  transferred these monies to CLO Holdco and some other

13  Highland-affiliated entities.  There were vehement objections,

14  and the Court issued the order saying, Let's put these monies

15  into the registry of the Court, at the suggestion of very able

16  counsel as to how we could resolve that contested matter we

17  were there on on March 4th.

18      So, you know, a month later, April, we have this new

19  motion of CLO Holdco reviving the dispute, the $2.5 million

20  dispute that we had just put to rest temporarily in March at

21  the suggestion of lawyers.  I didn't issue a 105 injunction

22  outside the context of an adversary proceeding just on my own,

23  *sua sponte*.  It was suggested to me that this was a good

24  solution.  People embraced it.  That's what we did.  And I

25  sure didn't have in my brain that a month later we'd have a

```
 1   brand new motion regarding whether these monies should be

 2   disbursed to CLO Holdco all over again, when that was the

 3   issue that was already before the Court in March.

 4        I, again, fully recognize that everybody reserved their

 5   rights, but I focus on this context because, again, I wish Mr.

 6   Dondero and Mr. Scott were on the call to hear this:  This

 7   almost feels like a good faith issue to me.  You know, maybe I

 8   would feel slightly different if there had been a broad

 9   emphasis, heavy emphasis, CLO Holdco standing up through a

10   lawyer that day saying, We're just letting you know, we're

11   going to get together a motion in very short order and tee

12   this up again.  Because I would have probably said no.  You

13   know, if -- let's just hear it right now today, if this is

14   only a three-week mandate or whatever.  So, good faith is

15   something that I can't help but scratch my head and be

16   troubled by.

17        So, I want to emphasize that CLO Holdco's lawyer has made

18   perfect arguments regarding the potential legal issues here.

19   There are some valid arguments here about is this tantamount,

20   holding the money in the registry of the Court that a non-

21   debtor asserts is its property, is that tantamount to a

22   prejudgment remedy?  You know, did it require an adversary

23   proceeding?  Did it require the traditional four-prong prove-

24   up for a preliminary injunction?  And did the Court just give

25   short shrift to those legal technicalities?
```

1    Again, these are compelling arguments, but I'm overruling

2    the arguments because, again, I believe it ignores the context

3    that CLO Holdco essentially consented, acquiesced, in this

4    placeholder keep-the-status-quo solution.  And I question its

5    good faith in, so quickly after consenting, bringing this

6    motion.

7    But moreover, I do find that in the unique context of the

8    disputes before the Court on March 4th, I did have authority

9    to issue a 105 injunction.  105, as we all know, at Subsection

10   (a) gives a bankruptcy court authority to issue orders

11   necessary or appropriate to carry out provisions of Title 11,

12   and the last sentence even provides a mechanism for the Court

13   to *sua sponte* take action to, among other things, prevent an

14   abuse of process or just do what's necessary or appropriate to

15   implement court orders or rules.

16   So I think, again, in the context before the Court, it was

17   not only a consensual thing, but the Court had authority.  And

18   the backdrop of this, again, cannot be overstated.  Again, to

19   use Mr. Clemente's word, we have this Byzantine structure

20   here.  It's a lot for the Committee to get its arms around.

21   And even the CLO Holdco structure -- again, I'm looking at my

22   notes, my fancy chart -- we have CLO Holdco, a Cayman Island

23   entity.  Its parent is Charitable DAF Fund, LP, another Cayman

24   Island entity.  It, in turn, is owned by Charitable DAF

25   Holdco, Ltd., yet another Cayman Island entity.  Its general

1   partner happens to be a Delaware entity, Charitable DAF GP,

2   LLC, but the beneficial owners of it are the three Highland

3   Foundations, of which Dondero is president and director, and

4   Mr. Scott the treasurer and director.

5        So, I'm not saying the Byzantine structure is in and of

6   itself problematic, although one might wonder why a charitable

7   organization needs to have three offshore entities as part of

8   its structure.  I digress.  But we all know a Byzantine

9   structure and ties to Dondero do not mean something is

10  attackable in and of itself, but we have had issues raised

11  about the Dynamic Fund and the various transfers with regard

12  to Dugaboy, the Dondero Family Trust, and Get Good Trust and

13  the note.  All of that is worthy of examination, and the

14  Committee has not had all that long in this case to

15  investigate it.

16       So, I'm going to say a couple of more things.  First, the

17  motion is denied, but I'm going to put more strings on it than

18  that.  I'm denying the motion, but as part of this ruling I'm

19  going to order that the Committee has 90 days, unless the

20  Court happens to extend that on motion or agreement of the

21  parties, to file an adversary proceeding against CLO Holdco or

22  the money shall be released.  Okay?

23       So, again, I intended it, as I think everybody did, to be

24  a placeholder, to keep the status quo little bit.  Again, Mr.

25  Kane has raised good arguments that maybe an adversary

1   conceivably was necessary or might become necessary.  So here

2   we have a requirement of an adversary within 90 days or the

3   money shall be released to Holdco -- again, unless someone

4   moves to extend that or I get an agreement to extend that and

5   I happen to decide to issue an order extending that.

6       I presume that if an adversary is filed, then if the

7   Committee wants that money to continue to be held in the

8   registry of the Court, then they would have to file an

9   application for injunctive relief, essentially, to keep the

10  money in the registry of the Court pending the resolution of

11  the adversary proceeding.

12      So that is the ruling of the Court.  Mr. Clemente, I'll

13  ask you to draft up the order.  And I reserve the right to

14  supplement this oral ruling in that form of order.  And please

15  run it by Mr. Kane before electronically submitting it to the

16  Court.

17      Now, I'm going to say a couple of other things, and then

18  I'll, before closing, I'll ask if there are questions or other

19  announcements.  I have told the parties and the lawyers to

20  focus on a plan and problem-solving how we're going to pay

21  creditors.  And I think I expressed my strong hope that people

22  would stop litigating everything.  I think I'm remembering

23  saying this most recently at the UBS hearing a few weeks ago

24  on a motion to lift stay.  Once again, we had a very lengthy

25  hearing that day.  I denied the motion.  And here we are

99

1  as I can to distance CLO Holdco from that taint, because

2  understanding that it's in what has been alleged as a

3  Byzantine web, we think it's important to separate CLO Holdco

4  and its operations to ensure that things are done in an

5  appropriate fashion with square corners.

6      That's all I have, Your Honor.  We have no objection to

7  the additional funds being pled into the registry of the

8  Court.  We can agree those funds would be adjudicated as part

9  of this dispute.  We understand that we did not prevail, and

10 we appreciate your Court hearing our argument.

11     (Proceedings concluded at 12:06 p.m.)

12                          --oOo--

13

14

15

16

17

18

19                     CERTIFICATE

20     I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
21 the proceedings in the above-entitled matter.

22   **/s/ Kathy Rehling**                        **07/02/2020**

23 _____        _____

24 Kathy Rehling, CETD-444                        Date
   Certified Electronic Court Transcriber

25

# EXHIBIT E

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                              )     Case No. 19-34054-sgj11
      In Re:                    )
                                )
 4    HIGHLAND CAPITAL          )     Dallas, Texas
      MANAGEMENT, L.P.,         )     July 8, 2020
 5                              )     1:30 p.m. Docket
                                )
           Debtor.             )
 6                              )     - MOTION TO EXTEND EXCLUSIVITY
                                )       PERIOD (737)
 7                              )     - MOTION TO EXTEND TIME TO
                                )       REMOVE ACTIONS (747)
 8    _____)

 9                        TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX/TELEPHONIC APPEARANCES:

12    For the Debtor:           Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
13                              10100 Santa Monica Blvd.,
                                  13th Floor
14                              Los Angeles, CA  90067
                                (310) 277-6910
15
      For the Official Committee Matthew A. Clemente
16    of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                                One South Dearborn Street
17                              Chicago, IL  60603
                                (312) 853-7539
18
      For the Debtor:           Zachery Z. Annable
19                              Melissa S. Hayward
                                HAYWARD & ASSOCIATES, PLLC
20                              10501 N. Central Expressway,
                                  Suite 106
21                              Dallas, TX  75231
                                (972) 755-7104
22
      For Acis Capital          Rakhee V. Patel
23    Management GP, LLC:       Annmarie Antoinette Chiarello
                                WINSTEAD, P.C.
24                              2728 N. Harwood Street, Suite 500
                                Dallas, TX  75201
25                              (214) 745-5250
```

41

1  been working very cooperatively with our creditors over the

2  last few months and we're just seeking to do it the best way.

3      So nothing I've said today, nothing, you know, should come

4  as and will come as a surprise to the Committee, but we're

5  working better, recognizing that ultimately the creditors want

6  to be paid, and doing that in an appropriate manner and a

7  thoughtful manner is what the Debtor is committed to do with

8  its partner, the Committee, in this process.

9          THE COURT:  Okay.  Sort of jumping back, I forgot to

10  ask earlier when we were talking about Acis:  Has the Fifth

11  Circuit rescheduled oral argument on the appeal of the Acis

12  confirmation order and order for relief?

13          MR. POMERANTZ:  I believe -- Your Honor, maybe Ms.

14  Patel would know off the top of her head.

15          THE COURT:  Ms. Patel?

16          MS. PATEL:  Your Honor, it was -- it was briefly -- I

17  -- and I say briefly, it was briefly we had -- we got a notice

18  at some point, I believe in early June, that the Fifth Circuit

19  had reset oral argument.  And then approximately, I can't

20  remember exactly, but it was like, I don't know, a week or

21  maybe ten days later, we got a notice that it was cancelled

22  again.  We have not received notice that it is rescheduled, so

23  it is still pending.  But it has not been taken off oral -- it

24  has not been taken off oral argument at some juncture.

25          THE COURT:  Okay.  Well, I acknowledge that that is a

42

1   pandemic disruption for sure.  It would have been nice to have

2   that resolved one way or another by now.

3          MS. PATEL:  Agreed, Your Honor.  We were trying to

4   figure out, frankly, in the week to ten days that it took from

5   the scheduling to how it was cancelled, exactly how our team

6   was going to get down to New Orleans.  And the -- I think the

7   leading contender was to rent an RV and drive down so we could

8   safely get there.  So it certainly has been a casualty of the

9   pandemic.

10          THE COURT:  Okay.  All right.  Two more questions.

11  And this one has been a bit of a tough one for me to decide

12  whether I should broach this topic or not.  You know, I read

13  the newspapers, the financial papers, just like everyone else,

14  and I saw a headline that I wished almost I wouldn't have

15  seen, and it was a headline about Dondero or Highland

16  affiliates getting three PPP loans.  And, you know, I'm only

17  supposed to consider evidence I hear in the courtroom, right,

18  or things I hear in the courtroom, but I've got this

19  extrajudicial knowledge right now thanks to just keeping up on

20  current events.  I decided I needed to ask about this.

21      What can you tell me about this, Mr. Pomerantz?  I mean, I

22  assumed, from less-than-clear reporting, that it wasn't

23  Highland Capital Management, LP, but I'd like to hear anything

24  you can report about this.

25          MR. POMERANTZ:  So, look, Your Honor, the first I

43

1   could say is that, to my knowledge, Highland Capital, the

2   Debtor, has not obtained a PPP loan.  I know there have been

3   discussions with certain funds that basically have certain

4   assets, private operating companies, about obtaining PPP

5   loans.  I don't have the specifics for Your Honor.  I'm happy

6   to provide that.

7        Of course, to the extent Mr. Dondero, on any of his

8   affiliated funds that are under the control of the Debtor, I

9   would have no way of answering that, but I'm happy to follow

10  up with that with the Board and report back to Your Honor in

11  whatever appropriate manner you felt to obtain that

12  information.

13            THE COURT:  Okay.  Well, let's have a report on that

14  on the 14th when we come in.  You know, maybe Mr. Seery or Mr.

15  Sharp or some other person.  But you can probably imagine the

16  different things going through my brain.  You know, well,

17  first, let's see if it was -- you know, I don't -- again, I'm

18  not expecting it to be Highland Capital Management, LP.  I

19  would be beyond shocked if, you know, that somehow happened

20  when they're in bankruptcy.  And, you know, I think it would

21  require a 364 motion, just like any other borrowing, although

22  I know it's kind of a forgivable loan.  Strange bird.

23       But then if it's some affiliate of Highland, I still feel

24  like we need some transparency and disclosure on that.  I

25  mean, I -- and who were the human beings behind it.  It just

45

1   busiest judges in the country right now.  I'm wondering when

2   were they contacted.  Was it really recently, or a week or two

3   ago?  Because they've probably gotten ten new mega-cases in

4   the past two weeks.

5            MR. POMERANTZ:  So, Your Honor, the last -- the last

6   two weeks, again, probably since June 15th, we had been

7   discussing the structure of a mediation.  We, the Debtor,

8   proposed perhaps a combination of Judge Isgur and Jones.  We

9   initially had that conversation with Mr. Clemente, and then we

10  socialized it with the rest of the Committee members.  As of

11  last Thursday, I believe it was, we had consensus that Judge

12  Jones, and if available, also Judge Isgur, would make sense.

13       I sent an email to Judge Jones' clerk, indicating that we

14  had a hearing today, that it would be helpful if we got a

15  response, and this morning, two hours before the hearing,

16  Judge Jones' clerk responded and told Mr. Clemente and I that

17  he is available and ready and suggested that we have a

18  conference with -- again, I'm not sure if it'll be him or his

19  clerk, to talk about availability.  Of course, we didn't want

20  to go ahead and have that discussion until, you know, we got

21  Your Honor's input on it.

22            THE COURT:  Okay.  I mean, a couple of things come to

23  mind.  One is I am just flabbergasted that they would have any

24  availability.  I know they're -- I'm aware of Judge Jones

25  doing hearings on weekends.

46

1    But second, I'm also concerned what is their idea of

2 availability.  Because in order for a mediator to meaningfully

3 help you on this, I mean, it's going to take not just hours

4 but days of time, unless you want the mediator to just have a

5 30,000-foot view.  And I mean, I just cannot imagine, --

6         MR. POMERANTZ:  So, --

7         THE COURT:  -- once again, that they would have days

8 and days to come up to speed with, you know, 11 years of

9 litigation or however long it was, not that long, with UBS,

10 you know the years with Acis, you know, the various alleged

11 claims and causes of action, and, you know, the Byzantine

12 structure here.  I mean, you know, not that they have to be,

13 you know, as educated as a judge presiding over litigated

14 matters, but I just cannot imagine they could meaningfully

15 spend time on this.

16    So what are you all envisioning?  Because I know what I'm

17 envisioning, and maybe we're not seeing it the same way.  I

18 mean, what are you thinking?  That you'll go in and spend a

19 day with, you know, maybe just each of you doing a 25-page

20 white paper, and you'll either settle it by the end of the day

21 or not, or what?

22         MR. POMERANTZ:  So, let me start by saying that when

23 everyone raised the issue of Judge Jones and Isgur, everyone

24 had the same potential concern that Your Honor has mentioned.

25 You know, my firm and me personally, I'm involved in a couple

47

1  of cases before Judge Jones now, significant cases.  So there

2  was a concern.

3      I think people also generally thought that if they

4  accepted and they knew what they were getting into, they would

5  want to do a good job and they'd have the time.

6      We have not had the ability to have an extensive

7  discussion.  That discussion could either occur with Mr.

8  Clemente and myself speaking to the clerk or the judge, or if

9  Your Honor -- nothing stops Your Honor from picking up the

10 phone, speaking to Judge Jones and asking him as well.

11     But I expect it to be a very intensive mediation process.

12 I do understand that Judge Jones only does mediations in

13 person, so this would require people getting to Houston,

14 which, in my experience, while I have participated in

15 mediations virtually on the phone, it's a lot more effective

16 to be in person.  We would anticipate detailed mediation

17 briefs.  We would envision each of the parties speaking to

18 Judge Jones to give him their perspective.  But it would be --

19 it would be a significant assignment.

20     Again, whether we would conclude at the end of August, I

21 don't know, but I would contemplate a good two, three days of

22 in-person mediation at the end of August, and then probably,

23 if necessary, to set up for something else, which, again,

24 there are several different things.  And I mentioned in my

25 opening remarks why I think people like Judge Jones -- and

57

1  nothing else, we'll go ahead and adjourn for today.  And I'll

2  keep -- if there's anything worthwhile to report on the

3  mediation front before we have our hearing on the 14th, I'll

4  have my courtroom deputy reach out to all counsel by email and

5  let you know.  Okay?  All right.

6          MR. POMERANTZ:  Thank you very much, Your Honor.

7          MS. PATEL:  Thank you, Your Honor.

8          THE COURT:  Thank you.  We stand adjourned.

9          THE CLERK:  All rise.

10     (Proceedings concluded at 3:00 p.m.)

11                         --oOo--

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript to
21  the best of my ability from the electronic sound recording of
    the proceedings in the above-entitled matter.
22
    **/s/ Kathy Rehling**                          **07/09/2020**
23
    _____     _____
24  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber
25

# EXHIBIT F

1

2

            IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

                              )   **Case No. 19-34054-sgj11**
In Re:                        )
                              )
HIGHLAND CAPITAL              )   Dallas, Texas
MANAGEMENT, L.P.,            )   July 14, 2020
                              )   1:30 p.m. Docket
          Debtor.            )
                              )   APPLICATIONS TO EMPLOY JAMES
                              )   P. SEERY AND DEVELOPMENT
                              )   SPECIALISTS, INC. (774, 775)
_____)

3

4

5

6

7

8

                    TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
              UNITED STATES BANKRUPTCY JUDGE.

9

10

WEBEX/TELEPHONIC APPEARANCES:

11

For the Debtors:          Jeffrey N. Pomerantz
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067
                          (310) 277-6910

For the Debtors:          John A. Morris
                          Greg Demo
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          780 Third Avenue, 34th Floor
                          New York, NY  10017-2024
                          (212) 561-7700

For the Debtors:          Ira D. Kharasch
                          PACHULSKI STANG ZIEHL & JONES, LLP
                          10100 Santa Monica Blvd.,
                           13th Floor
                          Los Angeles, CA  90067-4003
                          (310) 277-6910

For the Debtors:          Zachery Z. Annable
                          Melissa S. Hayward
                          HAYWARD & ASSOCIATES, PLLC
                          10501 N. Central Expressway,
                           Suite 106
                          Dallas, TX  75231
                          (972) 755-7104

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Seery - Direct                           52

1   file Multi-Strat as a bankruptcy, it was hard to get folks to
2   really come to the table and think about how to settle that
3   issue.

4       These issues in regard to the total case are much more
5   complicated.  We're going to file a plan.  We believe that
6   will set a bit of a crucible to folks to think about how to
7   move forward with their claims.  We are, as Jeff Pomerantz
8   mentioned last time, agreed in principle, but we have some
9   issues to work through with Redeemer that we hope to be able
10  to resolve by this week.  And so that's my internal goal, but
11  I expect to be able to do it.

12      The reason that's complex is not that it's simply a -- the
13  arbitration award is not simply a money award; it actually
14  requires certain offsets, it requires certain assets be sold
15  and paid for.  And we're trying to carve our way around some
16  of those, because they (inaudible) agreement, because they're
17  -- they're more difficult than simply exchanging cash for
18  assets, because we don't have the ability to do that right
19  now.  We don't have the cash, and we're in bankruptcy.

20      So I do believe that we can get these done.  And then if
21  mediation is something that would work, great.  We're going to
22  try to do it without mediation as well.  Going to try to do it
23  before we get to mediation and resolve claims.  And if we're
24  unable to do that, hopefully mediation will push it forward or
25  we have to have a fallback, which will be dispositive motions

                            Seery - Direct                        53

1  with respect to certain of the claims.

2       But we expect to have and I think we have a number of

3  claims objections that have (inaudible).  We've resolved

4  those.  We're really down to three claims.  And one of them is

5  almost done.

6  Q    All right.  At the last hearing, --

7            MR. MORRIS:  Your Honor, that really does finish the

8  substance of the testimony with respect to this motion, but at

9  the last hearing Your Honor raised some questions about PPP

10 loans.

11           THE COURT:  Yes.

12           MR. MORRIS:  Would you like me to just take a moment

13 with Mr. Seery to address that?

14           THE COURT:  Yes, please.

15           MR. MORRIS:  Okay.

16 BY MR. MORRIS:

17 Q    Mr. Seery, you're aware that the Judge raised some

18 questions about whether and to what extent the Debtor may have

19 been involved in any of the PPP loans?

20 A    Yes.

21 Q    And have you done any work to try to figure out the

22 answers to the questions the Judge posed?

23 A    Well, work in response to the question, but also work

24 previously.  So, just a -- quickly, as I think we all know,

25 the PPP program was put forth to try to give companies cash

Seery - Direct                              54

1  that they had to use for employee payments, to continue to

2  keep payroll supported and to continue to have folks hold

3  their jobs.

4       We have -- and I think the *Business Insider* article, which

5  I'm not familiar, I know the publication is not something I

6  seen much, but I'm not familiar with the specifics of that

7  article, and -- but any PPP, away from the assets that HCMLP

8  actually owns or controls.  And we've got -- we've got three

9  -- and I think there's some substance to the article.  But

10 we've got three businesses.  And these are -- this is public,

11 but I'll go into the -- sort of the obvious reasons without

12 going into the specifics of the business around the ones that

13 I know of well.

14      Carey Limousine is a business that transports folks in

15 high-quality cars from airports or from events or between

16 businesses.  It was hit severely by the COVID-19 pandemic.,

17 particularly with respect to the air transportation, which was

18 really one of its biggest areas.  The business,

19 notwithstanding Uber and the other type of shared ride

20 services, had actually done quite well, and Highland was an

21 owner of a significant portion of that business related to

22 some loans that it held in various funds.

23      That business's management, with its own outside counsel,

24 sought a PPP loan.  Then our director came to us and discussed

25 with the Board the propriety of that loan.  We engaged outside

Seery - Direct                               55

1    counsel, not bankruptcy counsel but counsel that had

2    particularized expertise in PPP, and spent a ton of time

3    really understanding both the law as well as the specific

4    regs.  Carey did get a PPP loan.  It is potentially

5    forgivable, depending on how it's used.

6        The second entity that was similar but didn't come to the

7    Board, we have a business called SSP, which is an excellent

8    highway business that provides equip -- materials for a lot of

9    different road construction, but primarily highway road

10   construction.  Very well run business.  That entity got a PPP

11   loan as well, primarily worried about whether the construction

12   on the highways would shut down.

13       So it's been -- I don't believe that's really happened in

14   Texas, which is where most of their business is, but they

15   qualified for that loan.  They did not come to the Board.  A

16   very specific carve-out, because one of the interest holders

17   that we share that position with is a Small Business

18   Administration fund and, so it was very clear that it was

19   entitled to that loan.

20       Then there's a third entity called Roma that got a very

21   small PPP loan.  We don't control the entity and we were not

22   involved in its acquisition of that loan.  Again, it would

23   have to be used as required.

24       One of the things I want to make sure that is in the

25   record and for Your Honor with respect to Carey, we spent a

Seery - Direct                          56

1  lot of time as a Board focused on, one, whether it was legal

2  to get that loan, first.  We're doing everything right, by the

3  book.  We're not going to play in the gray.  There is no gray.

4  There's black and white in these areas.

5      Number two, was it ethical, was it appropriate that we

6  went and got this loan or that Carey went and got this loan?

7  Management, with the outside counsel, was sure that we could

8  do it, but we didn't want to take their word for it, so we

9  went out and got our own counsel, third-party counsel for the

10  Board to make sure that this was appropriate.

11      Three, the requirements around these loans are significant

12  and the penalties for violating them are severe.  So if you

13  get a loan by mistake, are you really required to pay it back?

14  And if you're mistaken, that will be expensive, but it won't

15  be a real penalty.  But if you get a loan that's really

16  inappropriate, that you shouldn't have gotten, that was a

17  material misstatement of any of the facts around it, the

18  penalties are significant.  And not only in terms of the

19  opprobrium that you'd suffer in the press, because that's

20  coming, but in terms of how you use the funds.

21      So they can only be used in very specific ways, and we

22  were exceptionally careful around this program.

23      The basis of the program is to keep people employed.  And

24  with a business like Carey Limousine in particular, where

25  there's a significant amount of debt, where the business is

Seery - Examination by the Court                  57

1 | shut down by COVID, where we didn't have the funds to put into

2 | Carey, nor even if we wanted to, we might not have been able

3 | to do it without the Committee's approval because of the

4 | protocol, a PPP loan was not only legal but it was

5 | appropriate.  And it's being used in that fashion, meaning to

6 | keep employees employed.

7 | Q   Thank you very much, Mr. Seery.

8 |       MR. MORRIS:  Your Honor, I have no further questions

9 | of Mr. Seery.  Does the Court have any questions?

10 |       THE COURT:  I actually have a follow-up question

11 | regarding the PPP, just to kind of put a bow on this.

12 |                    EXAMINATION BY THE COURT

13 |       THE COURT:  I'm looking at the demonstrative aide.  I

14 | don't know if you, Mr. Seery, have it there handy.

15 |       THE WITNESS:  I do, Your Honor.

16 |       THE COURT:  Okay.  So I'm turning to Page 6, the

17 | chart, the subchart, Investments and Subsidiaries.  The third

18 | column, Privately-Held Equity, Various Companies.  I mean,

19 | that would be the type of investment entity we're talking

20 | about here that got the PPP loan:  Carey Limousine, SSP, Roma?

21 | Nothing that was -- well, I'm going to say Highland affiliate.

22 | Affiliate, that's a dicey term, but that's the type of entity

23 | in the organizational structure we're talking about, correct?

24 |       THE WITNESS:  Those are the ones -- I want to be very

25 | careful, because I know what I know and I know I won't

Seery - Examination by the Court                    58

1  represent anything that I don't know.

2      So, with respect to the entities that HCMLP, the Debtor,

3  controls, that's absolutely the case.  I don't know, and I can

4  try to find out, but they are not HCMLP-controlled entities.

5  Whether other entities in the related-party complex received

6  loans -- so, obviously, HCMLP did not receive a loan.  And the

7  only entities that we were involved with is the ones I

8  mentioned to you.

9      And I should mention, there are other entities in the

10 privately-held equity that got other government money, in the

11 medical space, that they didn't even ask for.  HHS pushed

12 forward payments to folks in the business, medical healthcare-

13 providing businesses, to assure that they had liquidity to

14 provide.  And so -- and this has been described to me exactly

15 this way, that they woke up in the morning and found money in

16 their account.  And with one of the companies, they actually

17 returned a bunch of the money because it was from a dormant

18 provider number and they didn't believe it was appropriate to

19 keep that money.  So that was one of the entities that we

20 control with other investors.

21     But with respect to our HCMLP entities, these are the only

22 ones I know.  With respect to other related entities that

23 might be in the family of businesses, for lack of a better

24 term, that were alluded to in the *Business Insider* article, I

25 don't know that answer.  So, I -- if I -- I can try to find

Seery - Examination by the Court                59

1    out.  I just don't know the answer, Your Honor.

2            THE COURT:  All right.  Thank you.  Well, this has

3    been extremely helpful.

4        I should ask does anyone have any questions of Mr. Seery?

5    The Committee counsel, perhaps?  Anyone else?

6            MR. CLUBOK:  Your Honor, this is Andrew Clubok.  In

7    light of the testimony, I do have some questions on behalf of

8    UBS.

9            THE COURT:  All right.  Briefly.  Go ahead.

10           MR. CLUBOK:  Okay.

11           MR. MORRIS:  Your Honor?  Your Honor, I'm sorry to

12   interrupt, but there's no objection lodged here.  If Your

13   Honor wants to permit it, that's obviously the Court's

14   prerogative.  But as just a point of order, having not lodged

15   an objection, I don't know what right anybody has to cross-

16   examine the witness.

17           THE COURT:  All right.  Well, that's why I said

18   briefly.  I think that Mr. Morris makes a good point, Mr.

19   Clubok.  You could have filed a written objection, response,

20   comment, or something.  So, you're a party in interest.  I'll

21   give you a little bit of leeway here.  But please keep it

22   brief.

23           MR. CLUBOK:  Yeah.  Thank you, Your Honor.  It's just

24   some of the things that Mr. Seery said which we didn't expect

25   to hear that has raised a few questions that I just very

Seery - Cross                              60

1  briefly will try to address.

2                         CROSS-EXAMINATION

3  BY MR. CLUBOK:

4  Q   Mr. Seery, good afternoon.  I'm Andrew Clubok, Latham &

5  Watkins, on behalf of UBS.

6      Mr. Seery, you talked about the fiduciary duties you've

7  understood yourself to have with respect to certain parties,

8  and my question to you is:  Have you understood, since the

9  beginning of your service as an Independent Director of

10 Strand, that you had fiduciary duties to the unsecured

11 creditors of the Debtor?

12 A   It's a -- it's a -- the answer is I understand the

13 fiduciary duties very well.  I think we have fiduciary duties

14 to the estate.  So Highland -- what I tried to explain is that

15 Highland, as an asset manager, has very specific fiduciary

16 duties that are set forth in (inaudible) in the cases and the

17 rules that have interpreted it.  We, as directors of Strand,

18 have a duty to the estate.

19     I don't think it's -- I don't think it's fair, and I'd

20 have to subject myself to some education from counsel, I don't

21 think it's fair to say we had a specific fiduciary duty to a

22 particular creditor.

23     So, for example, if I had a fiduciary duty to UBS, it

24 would be very difficult for me to object to UBS's claim.  It

25 would be -- I don't know how I could do that as a fiduciary.

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6              THE COURT:  Oh, absolutely.  Mr. Dondero is --

7              MS. PATEL:  -- a two-party --

8              THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10             MS. PATEL:  Thank you, Your Honor.

11             THE COURT:  All right.  Well, if there's nothing

12   further, we'll see you on the 21st.  And, again, my courtroom

13   deputy may be reaching out before then if we've got things

14   nailed down on mediation.

15        (Proceedings concluded at 4:54 p.m.)

16                           --oOo--

17

18

19

20                         CERTIFICATE

21

22        I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
     the proceedings in the above-entitled matter.
23

      /s/ Kathy Rehling                         07/16/2020
24

     _____    _____
25   Kathy Rehling, CETD-444                         Date
     Certified Electronic Court Transcriber

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 18-30264-SGJ-11 |
| | ) Case No. 18-30265-SGJ-11 |
| | ) (Jointly administered under |
| ACIS CAPITAL MANAGEMENT, L.P. | )  Case No. 18-30264-SGJ-11) |
| and ACIS CAPITAL MANAGEMENT GP, | ) |
| LLC, | ) <u>DEBTORS' MOTION to FILE</u> |
| | ) <u>REDACTED QUARTERLY REPORTS</u> |
| Debtors. | ) |
| | ) September 23, 2020 |
| | ) Dallas, Texas |

<u>Appearances via video and/or telephone</u>:

| | |
|---|---|
| For the Reorganized<br>Debtors: | Annemarie Chiarello<br>Rahkee V. Patel<br>Winstead PC<br>500 Winstead Building<br>2728 North Harwood Street<br>Dallas, Texas   75201 |
| For James Dondero: | D. Michael Lynn, of Counsel<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Forth Worth, Texas   76102 |
| For William T. Neary,<br>United States Trustee: | Lisa L. Lambert, Assistant U.S. Trustee<br>Office of the U.S. Trustee, Region 6<br>1100 Commerce Street, Room 976<br>Dallas, Texas   75242-1496 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Michael F. Edmond, Judicial<br> Support Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas   75242<br>(214) 753-2062, direct; 753-2072, fax |
| Certified Electronic<br>Transcriber: | Palmer Reporting Services<br>1948 Diamond Oak Way<br>Manteca, California   95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*The Ruling of the Court*                                             50

1    thing that it might be is commercial information, but I really

2    don't think there's been a showing that it is of the nature that

3    107(b) is intended to address.

4         Now don't get me wrong, I am very troubled by some of

5    what I've heard today.  I doubt Mr. Dondero is listening in

6    personally, but I'm going to say, and maybe it will get back to

7    him, maybe it won't, but that I'm very troubled by hearing that

8    Dondero-controlled entities, and I believe the DAF, based on

9    what I've heard in the past, is Dondero controlled, I'm very

10   troubled that Dondero-controlled entities are suing Acis and

11   parties that have dealt with Acis, U.S. Bank, Brigade, and the

12   Moody's one is really mind-boggling, but I'm very troubled that

13   this could be hampering Acis' ability to do a reset and it's

14   driving up expenses.

15        And if these lawsuits were brought before me through a

16   removal or any other mechanism, you know, first, I would have to

17   look at subject matter jurisdiction of the Bankruptcy Court.

18   Yes, we're way past the effective date of Acis' plan, but the

19   Fifth Circuit case authority provides that if there is a dispute

20   postconfirmation that bears on the interpretation,

21   implementation, or execution of a confirmed plan, then the

22   Bankruptcy Court has subject matter jurisdiction in that

23   context.  And it sure sounds like, hearing Mr. Terry's version

24   of things today, which sounded very credible, that this is

25   potentially impinging on the reorganization and plan of Acis.

*The Ruling of the Court*                                                    51

1          So it's very troubling to me that — well, I've said it

2    before in Highland hearings, that these battles just continue

3    on, but if it's impairing with a plan I confirmed, it's

4    impairing a plan I confirmed, it's impairing the ability to

5    perform under that plan, then that is a problem for the

6    plaintiffs.

7          Now I've heard there is no pending litigation in that

8    regard, but I'm troubled by the April 2020 letter I saw that is

9    essentially a suggestion we may start this up again, the

10   litigation that we dismissed.  It's just ridiculous, for lack of

11   a better term, that Dondero and his entities would be doing some

12   of the things it sounds like they're doing:  Suing Moody's, for

13   crying out loud, for not downgrading the Acis CLOs.  If Mr.

14   Dondero doesn't think that is so transparently vexatious

15   litigation, yeah, I'm going out there and saying that.  I

16   haven't seen it, but, come on.

17         So, bottom line, I don't find the 107 standard here is

18   met today, so I am denying entirely the motion.  I haven't been

19   convinced that this is commercial information that 107(b)

20   justifies redacting or sealing.  But, again, I am most troubled

21   by what I've heard today.

22         I have found Mr. Terry to be a very credible witness

23   today on these points.  He's testified in this Court many times

24   and I continue to find him a very credible witness.

25         And so to the extent Mr. Dondero is listening or gets

*The Ruling of the Court*                                                    52

1    a transcript, I hope it's loud and clear to him that to the

2    extent you are engaging in efforts surreptitious or overt to

3    derail Acis in its reorganization, there is going to be a price

4    to pay for that.  So I hope that message gets to him.

5          Very troubled, very troubled by what I've heard today.

6          All right.  Well, I think that concludes our business

7    here today.  Is there anything else anyone wants to raise?

8          MS. LAMBERT:  Judge Jernigan, Ms. Lambert for the U.S.

9    Trustee.  Would you like me to prepare an order just as for the

10   reasons stated?

11         THE COURT:  I would like you to do that.  Thank you

12   very much.  All right.

13         MS. LAMBERT:  And I think I will order the — I think I

14   will order the transcript and have it sent to Mr. Lynn.

15         THE COURT:  All right.  Thank you.

16       (The hearing was adjourned at 5:21 o'clock p.m.)

17                              —o0o—

18

19

20

21

22

23

24

25

State of California           )
                              )      SS.
County of San Joaquin         )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated September 26, 2020

# EXHIBIT H

1
2

                    IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

3
                                  )    **Case No. 19-34054-sgj-11**
In Re:                            )    Chapter 11
                                  )
4
HIGHLAND CAPITAL                  )    Dallas, Texas
MANAGEMENT, L.P.,                 )    Wednesday, October 21, 2020
5                                 )    10:00 a.m. Docket
         Debtor.                  )
6                                 )    MOTION TO COMPROMISE
                                  )    CONTROVERSY WITH ACIS CAPITAL
7                                 )    MANAGEMENT [1087]
                                  )    *Continued from 10/20/2020*
8  _____)

9                         TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                    UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX/TELEPHONIC APPEARANCES:

12  For the Debtor:               Ira D. Kharasch
                                  Jeffrey N. Pomerantz
13                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
14                                  13th Floor
                                  Los Angeles, CA  90067
15                                (310) 277-6910

16  For the Debtor:               John A. Morris
                                  Gregory V. Demo
17                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
18                                New York, NY  10017-2024
                                  (212) 561-7700

19
For Acis Capital                  Annmarie Antoinette Chiarello
20  Management GP, LLC:           WINSTEAD, P.C.
                                  2728 N. Harwood Street, Suite 500
21                                Dallas, TX  75201
                                  (214) 745-5250

22
For Acis Capital                  Brian Patrick Shaw
23  Management GP, LLC:           ROGGE DUNN GROUP, P.C.
                                  500 N. Akard Street, Suite 1900
24                                Dallas, TX  75201
                                  (214) 239-2707

25

9

1  motion that ever comes before it.

2      I daresay that Mr. Terry and Ms. Patel and Mr. Shaw firmly

3  believe that their client has been wronged and that they're

4  entitled to $75 million or more.  Thankfully, they were able

5  to check their egos at the door and come to an agreement, I

6  guess, that they believe represents a fair and reasonable

7  compromise.

8      So I understand that while -- that Mr. Dondero embraced

9  and appreciated the arguments that the Debtor made in its

10 pleading, but the fact of the matter is the Debtor came to a

11 position when it had the choice of either going forward with

12 that litigation, with all of the costs and risks and

13 uncertainty that were described, or taking this settlement.

14 And it came to the -- I believe the record shows -- the very

15 considered and reasonable decision to end all of the

16 litigation with Acis on the terms set forth in the agreement.

17      And I just wanted to kind of -- that doesn't go to any of

18 the particular -- necessarily go to any of the particular

19 elements of the legal standard, but so much time was spent

20 trying to tie Mr. Seery and the Debtor to the objection, and I

21 think -- I think it's important for the Court to look at this

22 in context.

23      And frankly, there are other very substantial claims out

24 there.  And Mr. Seery was very clear that each case is going

25 to be judged on its own merits.  And just because we've

10

1  settled a case where we put forth a strong legal position

2  here, it's only because we got to terms that the Debtor felt

3  were fair and reasonable.  We've taken -- and parties do this

4  all the time.  They take their litigation position and we're

5  going to take our litigation position.  But when it comes to

6  settlement, you have to view:  What are the alternatives?  And

7  that's all Mr. Seery did.  That's what the board did, servant

8  of their fiduciary duties.

9      And I'm going to talk in a few minutes about the benefits

10 to the estate that this settlement entails, but I just -- I

11 was a little surprised that anybody would try to say that

12 because we took a position in litigation we're not allowed to

13 compromise that position.  Because if that were the standard,

14 Your Honor, no 9019 would ever be approved, because, by

15 definition, 9019s are compromises.

16     So let me turn for a moment now to the actual elements of

17 the standard under 9019.  The first one is the probability of

18 success on the merits.  As I said, Mr. Seery felt strongly

19 about the position, but he also articulated some very, very

20 specific concerns, from *Mirant* to the Court's views on

21 equities that may not be -- the Court may not share our views

22 on equities.  The Court may not share.  The Court has a lot of

23 experience with these particular litigants.  The Court has

24 already assessed the credibility of certain witnesses in

25 relation to the claims at issue in this matter.  The Court has

11

1  already rendered decisions with respect to certain aspects of

2  this matter.  And so the Debtor took all of those things into

3  account in assessing the probability of success on the merits,

4  and that's all very much in the record.

5      But I did want to point to one other piece of evidence

6  that hasn't been discussed yet, and that is Professor

7  Rapoport's expert report that has now been admitted into

8  evidence.  You know, I question the weight that the Court

9  should give, but never -- only because I'm not sure how -- the

10 depth of the opinion.  But nevertheless, Professor Rapoport

11 specifically says at the top of Page 5, on Page 13, at the

12 very end of her opinion as to Question 1, she says, in

13 substance, if the Court follows *Mirant* and otherwise finds

14 that damages would benefit the Acis estate, then the Acis

15 claim, valued by Acis at least $75 million, could have

16 significant value.  Still, that value would depend on how the

17 Court found -- how the facts fall after the Court hears

18 testimony and is able to weigh the evidence.

19     That's kind of what Mr. Seery did.  So I'm not even sure

20 that there's a dispute, frankly, over the probability of

21 success.  Nobody has quantified it.  Nobody asked Mr. Seery to

22 quantify it.  We haven't gone down that path.

23     But Professor Rapoport, in her very first opinion, said:

24 Could be zero, could be $75 million or more.  It depends on

25 where the Court comes out.

33

1  consistent with the Bankruptcy Rules.  The notice was given on

2  September 23rd, so we're certainly good from notice and

3  opportunity to be heard, from that standpoint.

4       As we all know and as I went through yesterday in ruling

5  on the Redeemer Committee settlement, I am consulting

6  Bankruptcy Rule 9019 as well as the abundance of jurisprudence

7  that tells bankruptcy courts how they are to evaluate

8  compromises and settlements:  Cases such as *AWECO*, *Jackson*

9  *Brewing*, *TMT Trailer*, *Cajun Electric*, and *Foster Mortgage*,

10  significantly, among the cases.

11      I am to look at, obviously, whether the proposed

12  compromise is fair and equitable and in the best interest of

13  creditors when considering probability of success in future

14  litigation, with due consideration for the uncertainty of law

15  and fact; when considering the complexity and likely duration

16  of future litigation and any attendant inconvenience and

17  delay; and all other factors bearing on the wisdom of the

18  compromise.

19      Case law also talks about the Court probing into whether a

20  settlement is within the range of reasonableness, and

21  obviously the Court should consider the paramount interests of

22  creditors.

23      So, here, giving all due consideration of the record

24  before me and the very eloquent arguments, I am going to

25  approve the compromise today.

34

1    I'm going to turn for a moment to Mr. Seery's testimony.

2  Just as I found his testimony to be very credible with regard

3  to the Redeemer Committee settlement, I once again found it to

4  be very credible and compelling in connection with the Acis

5  and Terry settlements.

6       Among other things, I believe his testimony reflected a

7  deep understanding of the risks and rewards of further

8  litigation and the uncertainty that there was in both the law

9  and the fact.  He mentioned his understanding of the *Mirant*

10  holding and how that absolutely posed some risks for the

11  estate in challenging the claims of the reorganized Acis.  He

12  mentioned what I consider significant due diligence that he

13  performed.  He mentioned not only reading many of the rulings

14  of this Court throughout the tortured history of the Acis

15  bankruptcy, but he mentioned meeting with the board members.

16  In fact, meeting with Mr. Terry and Acis's professionals.  He

17  picked out certain of the issues, the fact issues, the $10

18  million note transfer that was argued to be a fraudulent

19  transfer.  He described the disputes regarding the changing of

20  the fee structure imposed by Highland or Highland entities on

21  Acis, and he expressed concerns regarding the cost of

22  litigating all of that.

23       He spoke in depth about Mr. Terry's claims regarding his

24  retirement funds, and said he thought it was a pretty

25  straightforward win for the Terrys that he thought should have

35

1   been settled years ago for full value.

2       He mentioned his knowledge about the Guernsey litigation,

3   that being a jurisdiction where loser pays.  So that was sort

4   of an open-shut one as far as he was concerned.  And he talked

5   about the Acis GP proof of claim in some depth, regarding the

6   lawsuits in New York.

7       So, again, I find that he was very compelling and his

8   testimony reflected significant due diligence.

9       Now, the next thing I want to highlight that is very

10  compelling to me in deciding I should approve this settlement

11  is -- and I probably should have mentioned this first and

12  foremost -- this was a mediated settlement.  This is certainly

13  some indication of its good faith and arm's-length nature, and

14  certainly is a point in favor of the wisdom of the settlement,

15  given that we had two very respected co-mediators, retired

16  Judge Gropper from the Bankruptcy Court of the Seventh

17  District of New York.  Ms. Mayer was a partner at Weil Gotshal

18  with a very impressive career background.  And so it, again,

19  it is a point very much in favor of the *bona fides* of this

20  settlement.  So I cannot overstate that one.

21      A few other points I will make.  In looking at the risks

22  and rewards and likely expense and inconvenience of further

23  litigation, while Professor Rapoport estimated maybe $350,000

24  to $1.1 million of fees might be incurred for future

25  litigation of the issues between Highland and Acis, and while

36

1    I respect her views tremendously -- I know she's been a fee

2    examiner in many, many cases and really has some *bona fides* in

3    speaking about fees in bankruptcy cases -- I tend to think

4    that is an extremely low estimate.  And I can't separate from

5    this analysis my own experience and knowledge with how

6    litigious and expensive things have historically been between

7    Acis and Highland.

8        I cannot remember the final fee application amounts of the

9    Chapter 11 Trustee and his professionals, but I know that in a

10   year-plus of the Acis case, the fees were much, much larger

11   than this amount, and I seem to remember that at least Foley

12   Lardner had a very, very large unsecured claim in this case

13   related to its fees representing *Highland v. Acis*, millions of

14   dollars.

15       So, with complete respect to Professor Rapoport, I believe

16   with all my heart that that number is way, way low as far as

17   future fees and expenses.

18       And as Ms. Chiarello pointed out and I think Mr. Morris

19   pointed out, we don't actually have evidence of Mr. Dondero's

20   willingness to pay legal fees for fights of *Highland v. Acis*.

21   While certainly I believe one hundred percent that Mr. Lynn

22   was told that Dondero would pay those fees and he has every

23   reason to believe him, I just don't have the equivalent of

24   evidence there that I can point to, evidence being Mr. Dondero

25   testifying that he would do that and maybe putting something

37

1  else in front of me to show a commitment.

2      So I again will turn to Ms. Rapoport's report.  While she

3  used words to the effect of, you know, she thought challenging

4  this would be a reasonable endeavor, I think that, all in all,

5  Mr. Seery was just very credible in his evaluation of things

6  and his strong feeling from the beginning that we're going to

7  fight this, it should be zero, and then as he did his due

8  diligence, as he looked at some of the issues -- and I will

9  point out that Professor Rapoport identified 16 issues of law

10  this Court would have to determine, in her estimation, and

11  then there could be potentially 12 fact issues the Court might

12  have to rule on, depending on how I ruled on the 16 issues of

13  law.  I don't think I could do that as swiftly as maybe this

14  case needs and deserves to get on its way to reorganization,

15  and I do think the settlement enhances the likelihood of

16  confirmation of a plan in the near future.  While we may have

17  miles to go before we get there, I think this settlement is a

18  step in the right direction, just like the settlement with the

19  Redeemer Committee is a step in the right direction.  And

20  that's a big factor in my mind.  I'm supposed to look at all

21  factors bearing on the wisdom of the compromise, and I think

22  the compromise enhances the prospect of a reorganization

23  sooner rather than later.

24      All right.  I reserve the right to supplement in more

25  detailed findings and conclusions, but Mr. Morris, I'm going

47

1            THE COURT:  All right.

2            MR. KHARASCH:  If we need more time, obviously, we

3    will be letting you know.

4            THE COURT:  All right.  So, rescheduled for 10:30

5    tomorrow morning.  And if there's nothing further, we're

6    adjourned.  Thank you.

7            MR. KHARASCH:  Thank you, Your Honor.  Appreciate it.

8            THE CLERK:  All rise.

9        (Proceedings concluded at 11:26 a.m.)

10                            --oOo--

11

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript to
      the best of my ability from the electronic sound recording of
22    the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                    **10/24/2020**

24    _____        _____

      Kathy Rehling, CETD-444                        Date
25    Certified Electronic Court Transcriber

# EXHIBIT I

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3                              )    Case No. 19-34054-sgj-11
    In Re:                      )    Chapter 11
                                )
 4  HIGHLAND CAPITAL            )    Dallas, Texas
    MANAGEMENT, L.P.,           )    December 10, 2020
 5                              )    9:30 a.m. Docket
                                )
 6          Debtor.             )
    _____)
 7                              )
    HIGHLAND CAPITAL            )    Adversary Proceeding 20-3190-sgj
    MANAGEMENT, L.P.,           )
 8                              )
                                )
 9          Plaintiff,          )    - MOTION FOR PRELIMINARY
                                )      INJUNCTION
10  v.                          )    - MOTION FOR TEMPORARY
                                )      RESTRAINING ORDER
11  JAMES D. DONDERO,           )
                                )
12          Defendant.          )
    _____)

13                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14               UNITED STATES BANKRUPTCY JUDGE.

15  WEBEX/TELEPHONIC APPEARANCES:

16  For the Plaintiff:          Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              10100 Santa Monica Blvd.,
                                 13th Floor
18                              Los Angeles, CA  90067-4003
                                (310) 277-6910
19
    For the Plaintiff:          John A. Morris
20                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
21                              New York, NY  10017-2024
                                (212) 561-7700
22
    For the Official Committee  Matthew A. Clemente
23  of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                One South Dearborn
24                              Chicago, IL  60603
                                (312) 853-7539
25
```

23

1          THE COURT:  Yes.

2          MR. BONDS:  Can I have a second?  Mr. Dondero did

3    apologize to counsel and to Mr. Seery as well, and so the idea

4    that Mr. Dondero has not apologized is not entirely correct.

5          THE COURT:  Okay.  Well, if I misunderstood, I

6    apologize.  But I guess what I was really trying to convey is,

7    in a situation like this, I think coming into court and taking

8    his lumps and saying things under oath might have been a

9    better way to proceed.

10        I guess the second thing I want to say is I wish Mr.

11   Dondero was here, because maybe I'm reading this wrong, but I

12   think he needs to hear and know he is not in charge anymore of

13   Highland.  It may have been his baby.  He may have created its

14   wealth.  But when he and the board made the decision to file

15   Chapter 11, number one, that changed everything.  And then

16   number two, when the Committee was formed and was threatening

17   "We think we need a Chapter 11 trustee because of conflicts of

18   interest of Mr. Dondero and others," and when the Committee

19   negotiated something short of that with the Debtor in January

20   2020, you know, a settlement that involved Mr. Dondero no

21   longer being in charge, no longer being CEO, no longer having

22   any role except portfolio manager with the Debtor, and when

23   various protocols were negotiated, heavily negotiated, for

24   weeks, detailed, complex protocols, life changed even further.

25   It changed when he filed Chapter 11, when he put his baby,

24

1   Highland, in Chapter 11, and then it changed further in

2   January 2020 when this global corporate governance settlement

3   was reached.  As we know, it involved independent new board

4   members coming in and eventually a new CEO.  He's not in

5   charge.

6       Now, that doesn't mean he's not a party in interest, and

7   he can certainly weigh in with pleadings in the bankruptcy

8   court.  But these communications that I've admitted into

9   evidence, and the declaration, the sworn declaration of Mr.

10  Seery, suggest to me that he's not fully appreciating that,

11  sorry, you're not in charge.  And when you chose to put the

12  company in bankruptcy because of the overwhelming debt, it

13  started a cascade of events, so that now I'm depending on a

14  debtor-in-possession with a new board and a new CEO and a

15  Committee of very sophisticated members and professionals who

16  are working in tandem with the Debtor to be in charge,

17  basically.  All right?  So that's another thing I just feel

18  compelled to say for Mr. Dondero's benefit.

19      I guess another thing is there was a little bit of a

20  theme, Mr. Bonds, in your comments that Mr. Dondero is just

21  concerned, more than anything else, about the way employees

22  are being treated, or at least that's a major concern.  And I

23  don't find that to be especially compelling.  I mean, maybe if

24  he was sworn under oath and testified, I would believe that,

25  but it doesn't feel like what's really going on here.  Again,

25

1   he took the step of deciding that the company should file

2   Chapter 11.  We had the change in corporate governance in

3   January.  And he has the ability -- everyone, I think, would

4   very much be interested in a plan that he supports.  You know,

5   he wants to get the company back.  That has been made clear in

6   hearings from time to time, and I believe, from Seery's

7   declaration and Highland's lawyers, that they've been and will

8   remain receptive to Mr. Dondero's ideas for a different type

9   of plan that might allow him to get back into control of

10   Highland, if he puts in adequate consideration that makes the

11   Committee and others happy.

12      But we're in a proverbial the-train-is-leaving-the-station

13   posture right now.  Okay?  We've got confirmation coming up

14   the second week of January or something like that.  Okay.  So

15   the train is leaving the station, so we're running out of time

16   to hear what Dondero might want to do as far as an alternative

17   plan.

18      So, as far as the requested TRO, I appreciate that Mr.

19   Dondero and his counsel are worried about some ambiguity, but

20   I'm looking through the literal wording that has been

21   proposed, and the wording proposed is that Dondero is

22   temporarily enjoined and restrained for communicating, whether

23   orally, in writing, or otherwise, directly or indirectly, with

24   any board member, unless Mr. Dondero's counsel and counsel for

25   the Debtor are included in such communications.  Not ambiguous

57

1  Court next Wednesday, he needs to testify.  And if NexPoint,

2  through whoever their decision-maker is, is wanting to urge a

3  position to the Court, they need a human being to testify.

4  And I'll hear Seery and I'll hear Dondero and I'll hear

5  whoever that person is, and that's what's going to matter, you

6  know, most to me.  Yeah, we have some legal issues, certainly,

7  but I like to hear business people explain things, no offense

8  to the lawyers.  But it's always very helpful to hear the

9  business people in addition to the lawyers.  All right.  So,

10 Mr. Morris, you're going to upload that TRO for me.

11         MR. MORRIS:  Yes, Your Honor.

12         THE COURT:  Mr. Wright, you can upload your order

13 setting your motion for hearing next Wednesday at 1:30.  And I

14 think we have our game plan for now.  Anything else?  All

15 right.  We're adjourned.

16         THE CLERK:  All rise.

17     (Proceedings concluded at 11:33 a.m.)

18                         --oOo--

19

20                       CERTIFICATE

21     I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
22 the proceedings in the above-entitled matter.

23  **/s/ Kathy Rehling**                         **12/11/2020**

24 _____      _____

   Kathy Rehling, CETD-444                     Date
25 Certified Electronic Court Transcriber

# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:                          )  **Case No. 19-34054-sgj-11**
                                )  Chapter 11
                                )
HIGHLAND CAPITAL                )  Dallas, Texas
MANAGEMENT, L.P.,               )  Wednesday, December 16, 2020
                                )  1:30 p.m. Docket
        Debtor.                 )
                                )  - MOTION FOR ORDER IMPOSING
                                )  TEMPORARY RESTRICTIONS [1528]
                                )  - DEBTOR'S EMERGENCY MOTION TO
                                )  QUASH SUBPOENA AND FOR ENTRY
                                )  OF PROTECTIVE ORDER [1564,
                                )  1565]
                                )  - JAMES DONDERO'S MOTION FOR
                                )  ENTRY OF ORDER REQUIRING
                                )  NOTICE AND HEARING [1439]
                                )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                            13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            John A. Morris
                           Gregory V. Demo
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn Street
                            Chicago, IL  60603
                            (312) 853-7539

62

1          The Movants are not parties to those agreements.  The

2     testimony is undisputed that there are many holders of

3     preferred shares and notes that have had no notice of this

4     proceeding that will undoubtedly be impacted by the tying of

5     the hands of the portfolio manager.  The chart that was

6     attached as Exhibit B expressly shows just what a large

7     portion of interested parties and people who would be affected

8     by this motion are not -- they didn't get notice.  There was

9     no attempt to get notice.  There was no attempt to get their

10    consent.  All of that testimony is now in the record, and I

11    think due process alone would prevent the entry or even the

12    consideration of an order of this type.

13         There is nothing improper that's been alleged.  There is

14    no -- there is no allegation of fraud.  There is no allegation

15    of breach of contract of any kind.  There's not even a

16    question of business judgment.  The Movants didn't even do

17    their diligence to ask the Debtor why they made these

18    transactions.  There is nothing in the record that shows that

19    the Debtor, as the portfolio manager of the CLOs, did anything

20    improper.

21         The only thing that the Movants care about is that they

22    don't like the results in two particular trades.  I don't

23    think that that meets their burden of persuasion that the

24    Court should enter an order of this type, and I would like to

25    relieve Mr. Seery of the burden, frankly, and the Court, of

63

1   having to put on testimony to justify transactions that really

2   aren't even being questioned, Your Honor.

3       So the Debtor would respectfully move for the denial of

4   the motion and the relief sought therein.

5           THE COURT:  All right.  Your request for a directed

6   verdict, something equivalent to a directed verdict here, is

7   granted.  I agree that the Movant has wholly failed to meet

8   its burden of proof here today to show the Court, persuade the

9   Court that, as Mr. Morris said, I should essentially tie the

10  hands of the Debtor as a portfolio manager here, as stated.

11  Nothing improper has been alleged.  There has been no showing

12  of a statutory right here, or a contractual right here, on the

13  part of the Movants.

14      I am -- I'm utterly dumbfounded, really.  I agree with the

15  -- I was going to say innuendo; not really innuendo -- I agree

16  with part of the theme, I think, asserted by the Debtor here

17  today that this is Mr. Dondero, through different entities,

18  through a different motion.  I feel like he sidestepped the

19  requirement that I stated last week that if we had a contested

20  hearing on his motion, Dondero's motion, that I was going to

21  require Mr. Dondero to testify.  He apparently worked out an

22  eleventh hour agreement with the Debtor on his motion to avoid

23  that.  But, again, these so-called CLO Motions very clearly,

24  very clearly, in this Court's view, were pursued at his sole

25  direction here.

64

1     This is almost Rule 11 frivolous to me.  You know, we're

2  -- we didn't have a Rule 11 motion filed, and, you know, I

3  guess, frankly, I'm glad that a week before the holidays begin

4  we don't have that, but that's how bad I think it was, Mr.

5  Wright and Mr. Norris.  This is a very, very frivolous motion.

6  Again, no statutory basis for it.  No contractual basis.  You

7  know, you didn't even walk me through the provisions of the

8  contracts.  I guess that would have been fruitless.  But you

9  haven't even shown something equitable, some lack of

10  reasonable business judgment.

11     Bluntly, don't waste my time with this kind of thing

12  again.  You wasted my time.  We have 70 people on the video.

13  Utter waste of time.

14     All right.  So, motion is denied.  Mr. Morris, please

15  upload an order.

16          MR. MORRIS:  Thank you, Your Honor.

17          THE COURT:  All right.  Do we have any other business

18  to accomplish today?

19          MR. POMERANTZ:  I don't think so, Your Honor.  I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22          THE COURT:  Well, yeah, we do have that.  Okay.  We

23  will see you tomorrow.  We stand adjourned.

24          MR. CLEMENTE:  Thank you, Your Honor.

25          MR. MORRIS:  Thank you, Your Honor.

65

1             THE CLERK:  All rise.

2             (Proceedings concluded at 3:05 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                       **12/17/2020**

23  _____     _____
    Kathy Rehling, CETD-444                       Date
24  Certified Electronic Court Transcriber

25

# EXHIBIT K

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                 FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
2
                                 )     Case No. 19-34054-sgj-11
3    In Re:                      )     Chapter 11
                                 )
4    HIGHLAND CAPITAL            )     Dallas, Texas
     MANAGEMENT, L.P.,           )     Friday, January 8, 2021
5                                )     9:30 a.m. Docket
          Debtor.               )
6    _____ )
                                 )
7    HIGHLAND CAPITAL            )     Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,           )
8                                )
          Plaintiff,            )     PRELIMINARY INJUNCTION
9                                )     HEARING [#2]
     v.                          )
10                               )
     JAMES D. DONDERO,           )
11                               )
          Defendant.            )
12   _____ )

13                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX/TELEPHONIC APPEARANCES:

16   For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               10100 Santa Monica Blvd.,
                                  13th Floor
18                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
19
     For the Debtor/Plaintiff:   John A. Morris
20                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
21                               New York, NY  10017-2024
                                 (212) 561-7700
22

23

24

25
```

Dondero - Cross                      118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3   S has a copy of?  Yes.  Yeah, I have to -- I have to access

4   him.  I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6       I believe settlement in this case is only going to happen

7   with somebody fostering communication.  And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q   (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Dondero - Cross                          119

 1            MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

 2    hearing that question.

 3            THE COURT:  Please repeat.

 4            MR. BONDS:  Sure.

 5    BY MR. BONDS:

 6    Q    Do you recall the questions Debtor's counsel had regarding

 7    the letters sent by K&L Gates to the clients of the Debtor --

 8    to the Debtor?

 9    A    Yes.

10    Q    You testified on direct that the letters were sent to do

11    the right thing; is that correct?

12    A    Yes.

13    Q    What did you mean by that?

14    A    I don't want to repeat too much of what I just said, but

15    the Debtor has a contract to manage the CLOs, which in no way

16    is it not in default of.  It doesn't have the staff.  It

17    doesn't have the expertise.  Seery has no historic knowledge

18    on the investments.  The investment staff of Highland has been

19    gutted, with me being gone, with Mark Okada being gone, with

20    Trey Parker being gone, with John Poglitsch being gone.

21        And there's -- there's a couple analysts that are a year

22    or two out of school.  The overall portfolio is in no way

23    being understood, managed, or monitored.  And for it to be

24    amateur hour, incurring losses for no business purpose, when

25    the investors have requested numerous times for their account

Dondero - Cross                    120

1   not to be traded, is crazy to me.  Where the investors say, We

2   just want our account left alone.  We just want to keep the

3   exposure.  And Jim Seery decides no, there's -- I'm going to

4   turn it into cash for no reason.  I'm just going to sell your

5   assets and turn them to cash and incur losses by doing it the

6   week of Thanksgiving and the week of Christmas.  I think it's

7   -- it's shameful.  I'm glad the compliance people and the

8   general counsel at HFAM and NexPoint saw it the same way.  I

9   didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

Dondero - Cross                          121

1          MR. BONDS:  Your Honor, my response would be that

2     there are several exhibits the Debtor introduced today that

3     stand for the proposition that the compliance officers were

4     concerned.  So I think there is ample evidence of that in the

5     record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9     the record.  Say again.

10         MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11    -- there are references that are replete in the record that

12    have to do with the compliance officers' understanding of the

13    transactions.

14         THE COURT:  I don't know what you're referring to.

15         THE WITNESS:  Your Honor?

16         THE COURT:  I've got a lot of exhibits.  You're going

17    to have to point out what you think --

18         THE WITNESS:  Can I -- can I -- can I -- can I answer

19    for -- that for a second?  The letters that were signed by the

20    compliance people or by the businesspeople at NexPoint and

21    HFAM objecting to the transactions, those letters were their

22    beliefs, their researched beliefs.  They weren't --

23         THE COURT:  Okay.

24         THE WITNESS:  -- micromanaged by me.  You know, they

25    weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                          122

1  that they've stated.  Those were their own beliefs and their

2  own research, --

3              THE COURT:  All right.

4              THE WITNESS:  -- and the record should reflect --

5              THE COURT:  This is clearly hearsay.  I mean, it's

6  one thing to have a letter, but to go behind the letter and

7  say, you know, what the beliefs inherent in the words were is

8  inadmissible.  All right?  So I strike that.

9              THE WITNESS:  Maybe ask your question again.

10 BY MR. BONDS:

11 Q   Yeah.  What is your understanding of the rights that these

12 parties had and what do you believe that was intended to be

13 conveyed by the compliance officers?

14             MR. MORRIS:  Objection.  Calls -- calls for Mr.

15 Dondero to divine the intent of third parties.  Hearsay.

16             THE COURT:  I sustain.

17             MR. BONDS:  Your Honor, --

18             MR. MORRIS:  No foundation.

19             MR. BONDS:  -- I don't agree.  I think that this is

20 asking Mr. Dondero what he thinks.

21             MR. MORRIS:  The letters speak for themselves, Your

22 Honor.

23             THE COURT:  Okay.  I sustain --

24             MR. MORRIS:  And Mr. --

25             THE COURT:  I sustain the objection.

Dondero - Cross                               123

1          MR. MORRIS:  All right.  Thank you.

2          THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

204

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 4:09 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20   above-entitled matter.

21   **/s/ Kathy Rehling**                    **01/11/2021**

22   _____    _____
     Kathy Rehling, CETD-444                      Date
23   Certified Electronic Court Transcriber

24

25

# EXHIBIT L

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                     )    Case No. 19-34054-sgj-11
 3   In Re:                          )    Chapter 11
                                     )
 4   HIGHLAND CAPITAL                )    Dallas, Texas
     MANAGEMENT, L.P.,               )    Tuesday, January 26, 2021
 5                                   )    9:30 a.m. Docket
              Debtor.                )
 6                                   )    MOTION FOR ENTRY OF ORDER
                                     )    AUTHORIZING DEBTOR TO
 7                                   )    IMPLEMENT KEY EMPLOYEE
                                     )    PLAN [1777]
 8   _____)
                                     )
 9   HIGHLAND CAPITAL                )    Adversary Proceeding 21-3000-sjg
     MANAGEMENT, L.P.,               )
10                                   )
                                     )
11            Plaintiff,             )
                                     )
12   v.                              )    PLAINTIFF'S MOTION FOR A
                                     )    PRELIMINARY INJUNCTION AGAINST
13   HIGHLAND CAPITAL                )    CERTAIN ENTITIES OWNED AND/OR
     MANAGEMENT FUND ADVISORS,       )    CONTROLLED BY MR. JAMES
14   L.P., et al.                    )    DONDERO [5]
                                     )
15            Defendants.            )
     _____)
16
                        TRANSCRIPT OF PROCEEDINGS
17            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
18
     WEBEX APPEARANCES:
19
     For the Debtor:            Jeffrey Nathan Pomerantz
20                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
21                               13th Floor
                                Los Angeles, CA  90067-4003
22                              (310) 277-6910

23   For the Debtor:            John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
24                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
25                              (212) 561-7700
```

250

1  can't talk them about specifically, but they're at least 20

2  percent better than what the Debtor has put forward as far as

3  a plan.  And what we put forward is elegant, it's simpler, it

4  treats the employees fairly, it gives the business continuity,

5  it gives investors continuity, and it's not just a harsh,

6  punitive liquidation that's going to end up in a myriad of

7  litigation.

8      We're paying a premium, it's a capitulation price, to try

9  and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17      You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23          THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

251

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10  it's not going to be unsealed absent an order of the Court.

11  Okay?  So we'll just leave it at that for now.  And while I

12  still encourage good-faith negotiations here, I've said it

13  umpteen times, where you're tired of the cliché, probably:

14  The train is leaving the station.  And if you want the Court

15  to have patience in the process and if you want the parties to

16  cooperate in good faith, it might help if we didn't have

17  things like Dugaboy and Get Good Trust filing a motion for an

18  examiner 15 months into the case.

19       I mean, it feels to me, Mr. Dondero, whether I'm right or

20  wrong, that it's like you've got a twofold approach here:  I

21  either get the company back or I burn the house down.  And I'm

22  telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25  come back on the 5th for a continuation of this hearing and a

252

1    motion to hold you in contempt, you know, I'm leaning right

2    now, based on what I've heard so far, and I know I haven't

3    heard everything, but I'm leaning right now towards finding

4    contempt and shifting a whole bundle of attorneys' fees.

5    That, to me, seems like the likely place we're heading.

6         I mean, I commented at the December hearing on the

7    preliminary injunction against you personally that it had been

8    like a $250,000 hearing, I figured, okay, just guesstimating

9    everybody's billable rate times the hours we spent.  Well,

10   here we were again, and I know we've got all this time outside

11   the courtroom preparing, taking depositions.  I mean, what

12   else is a judge to think except, by God, let's drive up

13   administrative expenses as much as we can; if we can't win,

14   we're going to go down fighting?  That's what this looks like.

15   Okay?  So if it's not really what's going on, then you've got

16   to work hard to change my perceptions at this point.

17        MR. RUKAVINA:  Your Honor, I hear everything what

18   you're saying, and I'm going to discuss it very bluntly with

19   my clients.  But we're being asked not to exercise contract

20   rights in the future.  This is not a contempt hearing.  And

21   Your Honor, we did ask and offered the estate a million

22   dollars, found money, plus to waive almost all our plan

23   objections, if they would just put this case on pause for 30

24   days.

25        So we are trying.  We are trying creative solutions here.

253

1  We know that the train is leaving.  We've put our money where

2  our mouth is.  We will continue trying.  But Your Honor, this

3  is not a contempt proceeding, and my clients are not Mr.

4  Dondero.  You've heard they're independent boards.

5        MR. POMERANTZ:  I can't leave that last comment

6  without a response.  Yes, there was an offer of a million

7  dollars, by an entity that owes the estate multiples of that.

8  So they are offering to pay us something that they already owe

9  us.  So Mr. Rukavina continues try to do this.  We will not

10  stand for it.

11        MR. RUKAVINA:  That is not a fair statement, sir.  I

12  misrepresented nothing.  We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability.  So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17        THE COURT:  All right.

18        MR. POMERANTZ:  Should tell the Court --

19        THE COURT:  You know what?

20        MR. POMERANTZ:  -- that that entity owed the Debtor.

21        THE COURT:  You know what?  You know what?  I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

254

1  to terminate any agreements with the Debtor." Okay? That was

2  -- go back and look at the transcript. That was so meaningful

3  to me.

4      We were facing a possible trustee. And that's what I did

5  in the *Acis* case. Okay? I had a Chapter 11 trustee. And it

6  was not a perfect fit, to be sure. But it is where we were

7  heading in this case, had the lawyers and parties not

8  negotiated what they did. That was a very important

9  provision, convincing me that, you know what, I think the

10 structure they've got will be better than a trustee. And it

11 has, for the most part. But the fees have gone out the roof,

12 and I lay that at the feet of Mr. Dondero, for the most part.

13 Okay? We have a bomb thrown every five minutes by either him

14 personally or the Dugaboy or the Get Good Trust or the Funds

15 or the Advisors or I don't know who else. Okay?

16     So the train is leaving the station, unless you all come

17 to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18 -- grand solution here. Okay? If you get there in the next

19 few days, wonderful. Okay? But I don't know what else to say

20 except I'm tired of the carpet-bombing, and if I had to rule

21 this minute, there would be a huge amount of fee-shifting for

22 what we went through today, for what we went through in

23 December, for the restriction motion that, after I called it

24 frivolous, the lawyers were sending letters pretty much

25 regurgitating the same arguments. All right. So, not a happy

255

1 camper.

2     But upload your order on the motion to seal the plan.

3 And, again, it's not going to be unsealed absent a further

4 order of the Court.  And if you all come to me next week and

5 say, hey, we've got something in the works here, okay, I'll

6 consider unsealing it and letting you go down a different

7 path.  But I'm not naïve.  I feel like this is just more

8 burning the house down, maybe.  I don't know.  I hope I'm

9 wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10 see you next week.

11         MR. POMERANTZ:  Thank you, Your Honor.

12         MR. MORRIS:  Thank you, Your Honor.

13         THE COURT:  All right.  We're adjourned.

14         MR. RUKAVINA:  Thank you, Your Honor.

15         THE CLERK:  All rise.

16     (Proceedings concluded at 6:08 p.m.)

17                     --oOo--

18

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                 **01/28/2021**

24 _____     _____

Kathy Rehling, CETD-444             Date
25 Certified Electronic Court Transcriber

255

1   camper.

2      But upload your order on the motion to seal the plan.

3   And, again, it's not going to be unsealed absent a further

4   order of the Court.  And if you all come to me next week and

5   say, hey, we've got something in the works here, okay, I'll

6   consider unsealing it and letting you go down a different

7   path.  But I'm not naïve.  I feel like this is just more

8   burning the house down, maybe.  I don't know.  I hope I'm

9   wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11            MR. POMERANTZ:  Thank you, Your Honor.

12            MR. MORRIS:  Thank you, Your Honor.

13            THE COURT:  All right.  We're adjourned.

14            MR. RUKAVINA:  Thank you, Your Honor.

15            THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      **01/28/2021**

24  _____     _____

    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

# EXHIBIT M

<pre>
                  IN THE UNITED STATES BANKRUPTCY COURT
 1               FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION
 2
                                )   Case No. 19-34054-sgj-11
 3   In Re:                      )   Chapter 11
                                )
 4   HIGHLAND CAPITAL            )   Dallas, Texas
     MANAGEMENT, L.P.,           )   Monday, February 8, 2021
 5                               )   9:00 a.m. Docket
                                )
        Debtor.                  )
 6                               )   BENCH RULING ON CONFIRMATION
                                )   HEARING [1808] AND AGREED
 7                               )   MOTION TO ASSUME [1624]
                                )
 8   _____)

                       TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX APPEARANCES:
11
     For the Debtor:             Jeffrey Nathan Pomerantz
12                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
13                                 13th Floor
                                 Los Angeles, CA  90067-4003
14                               (310) 277-6910

15   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
16                               One South Dearborn Street
                                 Chicago, IL  60603
17                               (312) 853-7539

18   For James Dondero:          D. Michael Lynn
                                 John Y. Bonds, III
19                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
20                                 JONES, LLP
                                 420 Throckmorton Street,
21                                 Suite 1000
                                 Fort Worth, TX  76102
22                               (817) 405-6900

23   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
24                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
25                               (504) 299-3300
</pre>

APP. 0123

6

1    of evidence, considering testimony from five witnesses and

2    thousands of pages of documentary evidence, in considering

3    whether to confirm the Plan pursuant to Sections 1129(a) and

4    (b) of the Bankruptcy Code.

5        The Court finds and concludes that the Plan meets all of

6    the relevant requirements of Sections 1123, 1124, and 1129 of

7    the Code, and other applicable provisions of the Bankruptcy

8    Code, but is issuing this detailed ruling to address certain

9    pending objections to the Plan, including but not limited to

10   objections regarding certain Exculpations, Releases, Plan

11   Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13   oral ruling in more detailed findings of fact, conclusions of

14   law, and an Order.

15       First, by way of introduction, this case is not your

16   garden-variety Chapter 11 case.  Highland Capital Management,

17   LP is a multibillion dollar global investment advisor,

18   registered with the SEC pursuant to the Investment Advisers

19   Act of 1940.  It was founded in 1993 by James Dondero and Mark

20   Okada.  Mr. Okada resigned from his role with Highland prior

21   to the bankruptcy case being filed.  Mr. Dondero was in

22   control of the Debtor as of the day it filed bankruptcy, but

23   agreed to relinquish control of it on or about January 9,

24   2020, pursuant to an agreement reached with the Official

25   Unsecured Creditors' Committee, which will be described later.

7

1        Although Mr. Dondero remained on as an unpaid employee and

2   portfolio manager with the Debtor after January 9, 2020, his

3   employment with the Debtor terminated on October 9, 2020.  Mr.

4   Dondero continues to work for and essentially control numerous

5   nondebtor companies in the Highland complex of companies.

6        The Debtor is headquartered in Dallas, Texas.  As of the

7   October 2019 petition date, the Debtor employed approximately

8   76 employees.

9        Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17       None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25       Many of the companies are offshore entities, organized in

8

1   such faraway jurisdictions as the Cayman Islands and Guernsey.

2       The Debtor is privately owned 99.5 percent by an entity

3   called Hunter Mountain Investment Trust; 0.1866 percent by the

4   Dugaboy Investment Trust, a trust created to manage the assets

5   of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6   personally and through family trusts; and 0.25 percent by

7   Strand Advisors, Inc., the general partner.

8       The Debtor's primary means of generating revenue has

9   historically been from fees collected for the management and

10  advisory services provided to funds that it manages, plus fees

11  generated for services provided to its affiliates.

12      For additional liquidity, the Debtor, prior to the

13  petition date, would sell liquid securities in the ordinary

14  course, primarily through a brokerage account at Jefferies,

15  LLC.  The Debtor would also, from time to time, sell assets at

16  nondebtor subsidiaries and distribute those proceeds to the

17  Debtor in the ordinary course of business.

18      The Debtor's current CEO, James Seery, credibly testified

19  that the Debtor was "run at a deficient for a long time and

20  then would sell assets or defer employee compensation to cover

21  its deficits."  This Court cannot help but wonder if that was

22  necessitated because of enormous litigation fees and expenses

23  that Highland was constantly incurring due to its culture of

24  litigation, as further addressed hereafter.

25      Highland and this case are not garden-variety for so many

14

1  11 case is its postpetition corporate governance structure.

2  Highland filed bankruptcy October 16, 2019.  Contentiousness

3  with the Creditors' Committee began immediately, with first

4  the Committee's request for a change of venue from Delaware to

5  Dallas, and then a desire by the Committee and the U.S.

6  Trustee for a Chapter 11 or 7 trustee to be appointed due to

7  concerns over and distrust of Mr. Dondero and his numerous

8  conflicts of interest and alleged mismanagement or worse.

9       After many weeks of the threat of a trustee lingering, the

10 Debtor and the Creditors' Committee negotiated and the Court

11 approved a corporate governance settlement on January 9, 2020

12 that resulted in Mr. Dondero no longer being an officer or

13 director of the Debtor or of its general partner, Strand.

14      As part of the court-approved settlement, three eminently-

15 qualified Independent Directors were chosen by the Creditors'

16 Committee and engaged to lead Highland through its Chapter 11

17 case.  They were James Seery, John Dubel, and Retired

18 Bankruptcy Judge Russell Nelms.  They were technically the

19 Independent Directors of Strand, the general partner of the

20 Debtor.  Mr. Dondero had previously been the sole director of

21 Strand, and thus the sole person in ultimate control of the

22 Debtor.

23      The three independent board members' resumes are in

24 evidence.  James Seery eventually was named CEO of the Debtor.

25 Suffice it to say that this changed the entire trajectory of

15

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15      By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1  could not get Highland and its affiliates to agree to any

2  actions taken in the case, and he finally obtained

3  confirmation of a plan over Highland and its affiliates'

4  objections in his fourth attempted plan, which confirmation

5  then was promptly appealed by Highland and its affiliates.

6      Suffice it to say it was not easy to get such highly-

7  qualified persons to serve as independent board members and

8  CEO of this Debtor.  They were stepping into a morass of

9  problems.  Naturally, they were worried about getting sued, no

10  matter how defensible their efforts might be, given the

11  litigation culture that enveloped Highland historically.  It

12  seemed as though everything always ended in litigation at

13  Highland.

14      The Court heard credible testimony that none of them would

15  have taken on the role of Independent Director without a good

16  D&O insurance policy protecting them, without indemnification

17  from Strand, guaranteed by the Debtor; without exculpation for

18  mere negligence claims; and without a gatekeeper provision,

19  such that the Independent Directors could not be sued without

20  the bankruptcy court, as a gatekeeper, giving a potential

21  plaintiff permission to sue.

22      With regard to the gatekeeper provision, this was

23  precisely analogous to what bankruptcy trustees have pursuant

24  to the so-called "Barton Doctrine," which was first

25  articulated in an old U.S. Supreme Court case.

17

1    The Bankruptcy Court approved all of these protections in

2  a January 9, 2020 order.  No one appealed that order.  And Mr.

3  Dondero signed the settlement agreement that was approved by

4  that order.

5    An interesting fact about the D&O policy came out in

6  credible testimony at the confirmation hearing.  Mr. Dubel and

7  an insurance broker from Aon, named Marc Tauber, both credibly

8  testified that the gatekeeper provision was needed because of

9  the so-called, and I quote, "Dondero Exclusion" in the

10  insurance marketplace.

11    Specifically, the D&O insurers in the marketplace did not

12  want to cover litigation claims that might be brought against

13  the Independent Directors by Mr. Dondero because the

14  marketplace of D&O insurers are aware of Mr. Dondero's

15  litigiousness.  The insurers would not have issued a D&O

16  policy to the Independent Directors without either the

17  gatekeeping provision or a "Dondero Exclusion" being in the

18  policy.

19    Thus, the gatekeeper provision was part of the January 9,

20  2020 settlement.  There was a sound business justification for

21  it.  It was reasonable and necessary.  It was consistent with

22  the Barton Doctrine in an extremely analogous situation --

23  *i.e.*, the independent board members were analogous to a three-

24  headed trustee in this case, if you will.  Mr. Dondero signed

25  off on it.  And, again, no one ever appealed the order

18

1   approving it.

2       The Court finds that, like the Creditors' Committee, the

3   independent board members here have been resilient and

4   unwavering in their efforts to get the enormous problems in

5   this case solved.  They seem to have at all times negotiated

6   hard and with good faith.  As noted previously, they changed

7   the entire trajectory of this case.

8       Still another reason why this was not your garden-variety

9   case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22      As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

19

1    settlement was laid, or at least helped, through the

2    mediation.  And as earlier noted, other enormous claims have

3    been settled during this case, including that of the Redeemer

4    Committee, who, again, had asserted approximately or close to

5    a $200 million claim; HarbourVest, who asserted a $300 million

6    claim; and Patrick Daugherty, who asserted close to a $40

7    million claim.

8        This Court cannot stress strongly enough that the

9    resolution of these enormous claims and the acceptance of all

10   of these creditors of the Plan that is now before the Court

11   seems nothing short of a miracle.  It was more than a year in

12   the making.

13       Finally, a word about the current remaining Objectors to

14   the Plan before the Court.  Once again, the Court will use the

15   phrase "not garden-variety."  Originally, there were over one

16   dozen objections filed to this Plan.  The Debtor has made

17   various amendments or modifications to the Plan to address

18   some of these objections.  The Court finds that none of these

19   modifications require further solicitation, pursuant to

20   Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21   3019, because, among other things, they do not materially

22   adversely change the treatment of the claims of any creditor

23   or interest holder who has not accepted in writing the

24   modifications.

25       Among other things, there were changes to the projections

20

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5        These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13       The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21       Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

21

1    they have, and the Court believes that they have.

2        Now, to be specific about the remoteness of the objectors'

3    interests, the Court will address them each separately.

4    First, Mr. Dondero has a pending objection.  Mr. Dondero's

5    only economic interest with regard to the Debtor at this point

6    is an unliquidated indemnification claim.  And based on

7    everything this Court has heard, his indemnification claim

8    will be highly questionable at this juncture.

9        Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor.  The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18       Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds.  The Court understands they

21   assert disputed administrative expense claims against the

22   estate.  While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

22

1   entities have ever testified before the Court.  Moreover, they

2   have all been engaged with the Highland complex for many

3   years.

4        The witness who testified on these Objectors' behalves at

5   confirmation, Mr. Jason Post, their chief compliance officer,

6   resigned from Highland after more than twelve years in October

7   2020, at the same time that Mr. Dondero resigned or was

8   terminated by Highland.  And a prior witness recently for

9   these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12       Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims.  Mr.

14  Dondero appears to be in control of these entities as well.

15       To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith.  Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22       In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence.  Around the

23

1   time that this all came to light and the Court began setting

2   hearings on the alleged interference, Mr. Dondero's company

3   phone supplied to him by Highland, which he had been asked to

4   turn in, mysteriously went missing.  The Court merely mentions

5   this in this context as one of many reasons that the Court has

6   to question the good faith of Mr. Dondero and his affiliated

7   objectors.

8        The only other pending objection besides these objections

9   of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12       In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17       With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

1       Now, after all of that, this Court believes the following

2   can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3   hinted that consensual exculpations and/or consensual

4   nondebtor third-party releases are permissible.  The Court

5   was, of course, dealing with nonconsensual exculpations in

6   *Pacific Lumber*.  In this regard, I note Page 252, where the

7   Court cited various prior Fifth Circuit authority and then

8   stated, "These cases seem broadly to foreclose nonconsensual

9   nondebtor releases and permanent injunctions."

10       The second thing that can be gleaned from *Pacific Lumber*:

11   The Fifth Circuit hinted that nondebtor releases may be

12   permissible in cases involving global settlements of mass

13   claims against the debtors and co-liable parties.  The Court,

14   of course, referred to 524(g), but various other cases which

15   approved nondebtor releases where mass claims were channeled

16   to a specific pool of assets.

17       Third, the Fifth Circuit outright held that exculpations

18   from negligence for a Creditors' Committee and its members are

19   permissible because the concept is both consistent with

20   1103(c), "which implies Committee members have qualified

21   immunity for actions within the scope of their duties," and a

22   good policy result, since "if members of the Committee can be

23   sued by persons unhappy with the outcome of the case, it will

24   be extremely difficult to find members to serve on an official

25   committee."

37

1        Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2   that *res judicata* may bar complaints regarding an

3   impermissible plan release, citing to its earlier *Republic*

4   *Supply v. Shoaf* opinion.

5        Now, being ever-mindful of the Fifth Circuit's words in

6   *Pacific Lumber*, this Court cannot help but wonder about at

7   least three things.

8        First, did the Fifth Circuit leave open the door that

9   facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21       Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

38

1  Chapter 11 case, did this rationale leave open the door to

2  sometimes permitting exculpations to other parties in a

3  particular Chapter 11 case besides Creditors' Committees and

4  their members?  For example, in a situation such as the

5  Highland case, in which Independent Directors, brought in to

6  avoid a trustee, are more like a Creditors' Committee than an

7  incumbent board of directors.

8      Third, the Fifth Circuit's sole statutory basis was

9  Section 524(e).  This Court would humbly submit that this is a

10  statute dealing with prepetition liability in which some

11  nondebtor is liable with the Debtor.  Exculpation is a concept

12  dealing with postpetition liability.

13      The Ninth Circuit recently, in a case called *Blixseth v.*

14  *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15  validity of an exculpation clause incorporated into a

16  confirmed Chapter 11 plan that purported to absolve certain

17  nondebtor parties that were "closely involved" in drafting the

18  plan.  They were the largest secured creditor, a purchaser,

19  and an individual who was an indirect owner of certain of the

20  debtor companies.  The exculpation was from any negligence,

21  liability, for "any act or omission in connection with,

22  related to, or arising out of the Chapter 11 cases."

23      By the time the appeal was before the Ninth Circuit, the

24  only issue was the propriety of the exculpation clause as to

25  the large secured creditor, which was also a plan proponent,

39

1  since all the other exculpated parties had settled with the

2  appellant.

3      The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10  affect the liability of any other entity on such debt."  In

11  other words, the discharge in no way affects the liability of

12  any other entity for the discharged debt.  By its terms,

13  524(e) prevents a bankruptcy court from extinguishing claims

14  of creditors against nondebtors over the very discharged debt

15  through the bankruptcy proceedings.

16      The Court went on to explicitly disagree with *Pacific*

17  *Lumber* in its analysis of 524(e), reiterating that an

18  exculpation clause covers only liabilities arising from the

19  bankruptcy proceedings and not of any of the debtor's

20  discharged debt.  Footnote 7, Page 1085.

21      Ultimately, the Court held that under Section 105(a),

22  which empowers a bankruptcy court to issue any order, process,

23  or judgment that is necessary or appropriate to carry out the

24  provisions of Chapter 11 and Section 1123, which establishes

25  the appropriate content of the bankruptcy plan, under these

40

1  sections, the bankruptcy court had authority to approve an

2  exculpation clause intended to trim subsequent litigation over

3  acts taken during the bankruptcy proceedings and so render the

4  plan viable.

5      This Court concludes that, just as the Fifth Circuit left

6  open the door for consensual exculpations and releases in

7  *Pacific Lumber*, just as it left open the door for consensual

8  exculpations and releases in *Pacific Lumber*, its dicta

9  suggests that an exculpation might be permissible if there is

10 a showing that "costs that the released parties might incur

11 defending against suits alleging such negligence are likely to

12 swamp either the Exculpated Parties or the reorganization."

13 Again, that was a quote from the Fifth Circuit.

14     If ever there were a risk of that happening in a Chapter

15 11 reorganization, it is this one.  The Debtor's current CEO

16 credibly testified that Mr. Dondero has said outside the

17 courtroom that if Mr. Dondero's own pot plan does not get

18 approved, that he will "burn the place down."  Here, this

19 Court can easily expect the proposed exculpated parties might

20 expect to incur costs that could swamp them and the

21 reorganization process based on the past litigious conduct of

22 Mr. Dondero and his controlled entities.

23     Additionally, this Court concludes that the Fifth

24 Circuit's rationale in *Pacific Lumber* for permitted

25 exculpations to Creditors' Committees and their members, which

41

1  was clearly policy-based based on their implied qualified

2  immunity flowing from Section 1103 and their importance in a

3  Chapter 11 case, leaves the door open to sometimes permitting

4  exculpations to other parties in a particular Chapter 11 case

5  besides a UCC and its members.

6      Again, if there was ever such a case, the Court believes

7  it is this one, in which Independent Directors were brought in

8  to avoid a trustee and are much more like a Creditors'

9  Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

44

1   appropriate.  They are entirely consistent with and

2   permissible under Bankruptcy Code Sections 1123(a)(5),

3   1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4   Rule 3016(c), which articulates the form that a plan

5   injunction must be set forth in a plan.

6       The Court finds the objections to the Plan Injunctions to

7   be unfounded, and they are thus overruled without much

8   discussion here.

9       Now, lastly, the Gatekeeper Provision.  It appears at

10  Paragraph 4 of Article IX.F of the Plan and provides, in

11  pertinent part, "Subject in all respects to Article XII.D, no

12  Enjoined Party may commence or pursue a claim or cause of

13  action of any kind against any Protected Party that arose or

14  arises from or is related to the Chapter 11 case, the

15  negotiation of the Plan, the administration of the Plan, or

16  property to be distributed under the Plan, the wind-down of

17  the business of the Debtor or Reorganized Debtor, the

18  administration of the Claimant Trust or the Litigation Sub-

19  Trust, or the transactions in furtherance of the foregoing,

20  without the Bankruptcy Court (1) first determining, after

21  notice and a hearing, that such claim or cause of action

22  represents a colorable claim of any kind, including but not

23  limited to negligence, bad faith, criminal misconduct and

24  willful misconduct, fraud, or gross negligence against a

25  Protected Party; and (2) specifically authorizing such

45

1   Enjoined Party to bring such claim or cause of action against

2   such Protected Party, provided, however, that the foregoing

3   will not apply to a claim or cause of action against Strand or

4   against any employee other than with respect to actions taken,

5   respectively, by Strand or any such employee from the date of

6   appointment of the Independent Directors through the effective

7   date.  The Bankruptcy Court will have sole and exclusive

8   jurisdiction to determine whether a claim or cause of action

9   is colorable and, only to the extent legally permissible and

10  as provided for in Article XI, shall have jurisdiction to

11  adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13  in light of the litigiousness of Mr. Dondero and his

14  controlled entities that has been described at length herein.

15  Provisions similar to this have been approved in this district

16  in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17  provision is within the spirit of the Supreme Court's Barton

18  Doctrine.  And it appears consistent with the notion of a pre-

19  filing injunction to deter vexatious litigants that has been

20  approved by the Fifth Circuit in such cases as *Baum v. Blue*

21  *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22  850 F.3d 811, which arose out of a bankruptcy pre-filing

23  injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25  federal courts have authority to enjoin vexatious litigants

46

1   under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2   under the Bankruptcy Code, a bankruptcy court can issue any

3   order, including a civil contempt order, necessary or

4   appropriate to carry out the provisions of the Code, citing,

5   of course, 105 of the Bankruptcy Code.

6        The Fifth Circuit stated that, when considering whether to

7   enjoin future filings against a vexatious litigant, a

8   bankruptcy court must consider the circumstances of the case,

9   including four factors:  (1)  the party's history of

10  litigation; in particular, whether he has filed vexatious,

11  harassing, or duplicative lawsuits; (2) whether the party had

12  a good faith basis for pursuing the litigation, or perhaps

13  intended to harass; (3) the extent of the burden on the courts

14  and other parties resulting from the party's filings; and (4)

15  the adequacy of alternatives.

16       In the *Baum* case, the Fifth Circuit stated that the

17  traditional standards for injunctive relief -- *i.e.*,

18  irreparable harm and inadequate remedy at law -- do not apply

19  to the issuance of an injunction against a vexatious litigant.

20       Here, although I have not been asked to declare Mr.

21  Dondero and his affiliated entities as vexatious litigants *per*

22  *se*, it is certainly not beyond the pale to find that his long

23  history with regard to the major creditors in this case has

24  strayed into that possible realm, and thus this Court is

25  justified in approving this provision.

47

1       One of the Objectors' lawyers stated very eloquently in

2    closing argument, in opposing the plan injunction and

3    gatekeeping provisions, that "Even a serial killer has

4    constitutional rights," suggesting that these provisions would

5    deprive Mr. Dondero and his controlled entities of fundamental

6    rights or due process somehow.  But to paraphrase the district

7    court in the *Carroll* case, no one, rich or poor, is entitled

8    to abuse the judicial process.  There exists no constitutional

9    right of access to the courts to prosecute actions that are

10   frivolous or malicious.  The Plan injunction and gatekeeper

11   provisions in Highland's plan simply set forth a way for this

12   Court to use its tools, its inherent powers, to avoid abuse of

13   the court system, protect the implementation of the Plan, and

14   preempt the use of judicial time that properly could be used

15   to consider the meritorious claims of other litigants.

16       Accordingly, the Objectors' objections to this provision

17   are overruled.

18       As earlier stated, this Court reserves the right to alter

19   or supplement this ruling in a written order.  In this regard,

20   the Court directs Debtor's counsel -- I hope you are still

21   awake; it's been a long time -- the Court directs Debtor's

22   counsel to submit a form of order.  And specifically, I assume

23   that you've already prepared or have been in the process of

24   preparing a set of findings of fact, conclusions of law, and

25   confirmation order that tracks the confirmation evidence and

50

1   to win, I turned it off.

2      I'm sorry.  That's terrible.  You know, my law clerk, my

3   law clerk that you can't see, Nate, he is from Ann Arbor,

4   Michigan, University of Michigan, and he almost cried when I

5   said I didn't like Tom Brady the other day.  So, I apologize.

6          MR. POMERANTZ:  Your Honor, one other comment.  We

7   had our motion to assume our nonresidential real property

8   lease that was also on.  It got missed in all the fanfare, but

9   it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12         THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14         MR. POMERANTZ:  Thank you, Your Honor.

15         THE CLERK:  All rise.

16     (Proceedings concluded at 10:35 a.m.)

17                         --oOo--

18

19

20                       CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/09/2021**

24  _____     _____
    Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

# EXHIBIT N

```
                IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION

                                )   Case No. 19-34054-sgj-11
In Re:                          )   Chapter 11
                                )
HIGHLAND CAPITAL                )   Dallas, Texas
MANAGEMENT, L.P.,               )   Tuesday, February 23, 2021
                                )   9:00 a.m. Docket
          Debtor.               )
_____ )
                                )
HIGHLAND CAPITAL                )   Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,               )
                                )
          Plaintiff,            )   PLAINTIFF'S MOTION FOR ORDER
                                )   REQUIRING JAMES DONDERO TO
v.                              )   SHOW CAUSE WHY HE SHOULD NOT
                                )   BE HELD IN CIVIL CONTEMPT FOR
JAMES D. DONDERO,               )   VIOLATING THE TRO [48]
                                )
          Defendant.            )
_____ )
                                )
HIGHLAND CAPITAL                )   Adversary Proceeding 21-3010-sgj
MANAGEMENT, L.P.,               )
                                )
          Plaintiff,            )   DEBTOR'S EMERGENCY MOTION FOR
                                )   MANDATORY INJUNCTION REQUIRING
v.                              )   THE ADVISORS TO ADOPT AND
                                )   IMPLEMENT A PLAN FOR THE
HIGHLAND CAPITAL MANAGEMENT )       TRANSITION OF SERVICES BY
FUND ADVISORS, L.P.,            )   FEBRUARY 28, 2021 [2]
et al.,                         )
                                )
          Defendants.           )
_____ )
```

                TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
              UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

231

1  really was just a termination of the agreement, in accordance

2  with the terms.  And I had put the provisions up before the

3  Court during my opening and walked Mr. Seery through.  That's

4  the basis for the --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- termination of the agreement.  It's

7  not rejection at all.

8          THE COURT:  Fair point.

9          MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12          THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19          MR. MORRIS:  No.  We'll prepare a form of order.

20          THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22          MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

232

1   to really say anything lest I get myself in trouble.  But I

2   thank you for your time today.

3          THE COURT:  All right.  Well, they are what they are,

4   and I hope we're not in an argument about that down the road.

5   But it seems like my hopes are always dashed when I want

6   things to be worked out.

7      I don't want you to think my calm demeanor means I am a

8   happy camper.  I am not.  I am beyond annoyed.  I mean, I

9   can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13     I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24     I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

233

1  creditors to get anything, is the way this looks.  If he wants

2  me to have a different impression, then he needs to start

3  behaving differently.  I mean, I can't even imagine how many

4  hundreds of thousands of dollars of legal fees were probably

5  spent the past two weeks on Option A, Option B, and all the

6  different sub-agreements and whatnot.  And as recently as

7  Friday afternoon, the K&L Gates lawyer saying we have a deal,

8  and then, oh, wait, maybe not, maybe we do, maybe we don't.

9  And then Mr. Dondero acting like he had no clue what the K&L

10 Gates lawyers were saying as far as we have a deal.  And Mr.

11 Norris distancing himself from having seen any of that, and I

12 didn't have power.  You know, I'm sure he had a cell phone,

13 like the rest of us, that gets emails.  I'm making a

14 supposition.  I shouldn't make that.  But it just feels like

15 sickening games.

16     And again, if this keeps on, if this keeps on, one day,

17 one day, there may be an enormous attorney fee-shifting order.

18 And, of course, I would have to find bad faith, and I wouldn't

19 be surprised at all if I get there.

20     So I don't know if Mr. Dondero is listening.  I suspect,

21 if he is, he doesn't care much.  But I am --

22          MR. DONDERO:  I'm on the line, Judge.

23          THE COURT:  Okay.

24          MR. DONDERO:  I'm on the line.

25          THE COURT:  I'm glad you're on the line.  I cannot

234

1  overstate how very annoyed I am by hearing all these hours of

2  testimony and to feel like none of it was necessary.  None of

3  it was necessary.  Okay?  There could have been a consensual

4  deal --

5          MR. DONDERO:  Judge, you have to pay attention --

6  Judge, you have to pay attention to what's going on, okay?

7          THE COURT:  I am --

8          MR. DONDERO:  When I was president of Highland, --

9          THE COURT:  -- razor-sharp focused on what is going

10 on.  Okay?  I read every piece of paper.  I listen to every

11 sentence of testimony.  And what is going on --

12         MR. DONDERO:  Okay.  How about this, Your Honor?

13         THE COURT:  -- is an enormous waste of parties and

14 lawyer time and resources.  People need to get their eye on

15 the ball.  Well, certain people do have their eye on the ball,

16 but certain people do not.  Okay?  So we're done.  You've got

17 your divorce now.  Okay?  And if the operating plan is all

18 shored up, as Mr. Norris testified, it sounds like you're in

19 good shape.  All right?

20     Mr. Morris, I'll look for the order from you.

21         MR. MORRIS:  Thank you, Your Honor.

22         THE CLERK:  All rise.

23     (Pause.)

24         THE COURT:  Oh, Michael?

25     (Court confers with Clerk.)

235

1                THE CLERK:  Hello?  Hang on.  Mr. Morris?

2                THE COURT:  Is anyone still there?

3                THE CLERK:  Mr. Rukavina is still there.  Mr.

4    Rukavina, Mr. Morris, are you all still there?

5                MR. RUKAVINA:  Judge, this is Davor.

6                THE COURT:  All right.

7                MR. RUKAVINA:  I think we're all wondering whether

8    we're going to have the contempt hearing.

9                THE COURT:  Well, yes, that's why I came back in.

10               MR. RUKAVINA:  I can't hear you, Judge.  We can't

11   hear you.

12               THE COURT:  I realized I -- it's 4:19 Central time.

13   We are not starting the contempt hearing.

14        Mr. Morris, are you there now?

15               MR. MORRIS:  I am.  I did have one suggestion.

16               THE COURT:  All right.  I neglected to mention our

17   other setting, but we are not going to start at 4:19 Central

18   time.  Do we want to talk about scheduling on that?

19               MR. MORRIS:  I did, Your Honor.  And it's just an

20   idea, and I understand we've had a long day.  But I was going

21   to suggest if there was any way to just get their motion *in*

22   *limine* out of the way today, so that when we come back for the

23   evidentiary hearing parties are fully prepared.  If you don't

24   want to do it, that's fine.  Otherwise, I'm available at Your

25   Honor's convenience.

238

1        THE CLERK:  All rise.

2     (Proceedings concluded at 4:23 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21    I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                    **02/24/2021**

24 _____     _____

Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

# EXHIBIT O

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

      Debtor.

)
)
)
)
)
)
)
)

**Case No. 19-34054-sgj-11**
Chapter 11

Dallas, Texas
Monday, May 10, 2021
1:30 p.m. Docket

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

      Plaintiff,

v.

JAMES D. DONDERO,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)

**Adversary Proceeding 20-3190-sgj**

- TRIAL DOCKET CALL
- DEFENDANT'S EMERGENCY MOTION
  TO STAY PROCEEDINGS PENDING
  RESOLUTION OF DEFENDANT'S
  PETITION FOR WRIT OF
  MANDAMUS [154]

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Plaintiff:         John A. Morris
                        PACHULSKI STANG ZIEHL & JONES, LLP
                        780 Third Avenue, 34th Floor
                        New York, NY  10017-2024
                        (212) 561-7700

For the Plaintiff:         Jeffrey Nathan Pomerantz
                        PACHULSKI STANG ZIEHL & JONES, LLP
                        10100 Santa Monica Blvd.,
                          13th Floor
                        Los Angeles, CA  90067-4003
                        (310) 277-6910

42

1   permanent.  I mean, I understand the -- well, right, I mean,

2   with respect to the relief being sought, but with respect to

3   preliminary (garbled) in attendance at the preliminary

4   injunction hearing.

5            THE COURT:  Okay.  Unfortunately, you have

6   connectivity issues suddenly.

7            MR. WILSON:  You know, I've got -- I've got a

8   different view on those things.  I mean, the contempt hearing

9   has some things --

10           THE COURT:  Mr. Wilson, I don't know if --

11           MR. WILSON:  And I think we lost Mr. Morris on the

12   screen.  Can you hear --

13           THE COURT:  -- you can hear me, but we suddenly have

14   very bad connectivity.

15           MR. WILSON:  Can you hear me?

16           THE COURT:  Your screen is frozen, your video is

17   frozen, and I really didn't get any of the last two minutes.

18           MR. WILSON:  Is it better now, Your Honor?

19           THE COURT:  Well, I heard you say, "Is it better

20   now?"

21           MR. WILSON:  I'm going to log off and log back on.

22           THE COURT:  Okay.  We're going to have to -- we're

23   going to have to cut this --

24           MR. WILSON:  I'm going to try to log off and log on.

25           THE COURT:  No.  I'm ready to be finished with this

43

1   hearing.  You need to go back and look at this, because I am

2   leaning towards what Mr. Morris is arguing, and that is that

3   this is really bad faith.  Okay?  There is no change of

4   issues.  It's been the same issue at the TRO hearing, at the

5   preliminary injunction hearing.  Okay.  The motion for

6   contempt, we were looking backwards a little at behavior.  But

7   the issues are not expanded.  Okay?  It's just duration of the

8   injunction.  And now a slightly skinnied-down injunction.

9       So, of course, I am willing to consider evidence I've

10   heard at the TRO hearing and the preliminary injunction

11   hearing.  And I would note that on many, many, many of these

12   exhibits, you didn't object.  Or if you did, you argued it and

13   I overruled it.

14       So you need to go back and look at this and think hard

15   whether you're really going to press these issues at the

16   trial.  Okay?  This is -- again, *Dondi*, we require counsel to

17   work in good faith to streamline trials and work with people.

18   If you can agree, if you can stipulate to evidence, that's

19   what you need to do.  And this looks like -- I don't know what

20   it looks like.  But if this is any guidance to you, it should

21   be, if I admitted it at the TRO hearing, if I admitted it at

22   the preliminary injunction hearing, it's fair game to consider

23   it now.

24       Here's the last thing I want to say, and this is very big-

25   picture, not unique to this adversary proceeding.

44

1      Can everyone hear me okay?  I don't know if we're having

2   connectivity issues.  Can everyone hear me?

3           MR. MORRIS:  Yes, Your Honor.

4           THE COURT:  Can you hear me, Mr. Wilson?

5           MR. MORRIS:  Yes, Your Honor.

6           MR. WILSON:  Yes, Your Honor.

7           THE COURT:  Okay.  I have been pondering something

8   the past few days.  And I haven't figured out how I want to

9   address it, but maybe Mr. Dondero's counsel and counsel from

10  some of the Dondero-controlled entities, maybe they can listen

11  to what I'm about to say and figure out a solution.

12      As you all know, there are so many law firms, so many

13  lawyers involved now that are basically singing the same tune

14  at a lot of these hearings as far as objections, me too, me

15  too, me too.  And so just quickly eyeballing what we have, we

16  obviously have Mr. Dondero represented by Bonds Ellis.  There

17  is another firm that represents Mr. Dondero that filed a

18  motion asking that I recuse myself.  I can't remember the name

19  of that firm, but I think they appealed my denial of that

20  motion.  So, I can't remember who that was.  Then we have the

21  various affiliates.  We have -- well, I'll just start

22  chronologically.  Highland CLO Funding, Ltd. has historically

23  been represented by King & Spalding.  I don't know if that's

24  -- I know there were some changes there with the ownership of

25  that entity, so maybe they're gone.  But then we have NexPoint

54

1  Can we just have an hoc committee each time?

2      I don't even think I listed all the law firms.  I know a

3  new law firm filed a lawsuit in front of Judge Jane Boyle

4  recently.  We've got a hearing on that coming up in June.  I

5  mean, and now you're -- I'm hearing there are going to be

6  more.  Well, if you don't figure out a way to rein it in, then

7  I'm just going to have to get that list of who are the

8  stakeholders in these entities, under oath, because I don't

9  understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11      So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13          MR. MORRIS:  Thank you, Your Honor.  Yes.

14          THE COURT:  Okay.  Thank you.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 3:07 p.m.)

17                      --oOo--

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23  **/s/ Kathy Rehling**                    05/11/2021

24  _____    _____

Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

# EXHIBIT P

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) |
| | ) PLAINTIFF'S MOTION for |
| Plaintiff, | ) CONTINUANCE |
| | ) |
| v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT DONDERO'S MOTION |
| v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
| Defendant. | ) May 20, 2021 |
| _____ | ) Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

| | |
|---|---|
| For Plaintiff Highland Capital Management, | John A. Morris<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, California  90067 |
| For Defendant-Movant James Dondero: | Michael P. Aigen<br>Stinson, L.L.P.<br>3102 Oak Lawn Avenue, Suite 777<br>Dallas, Texas  75219 |
| | Bryan C. Assink<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Forth Worth, Texas  76102 |

Appearances continued on next page.

*Adversary 21-3003, Motion to Compel Discovery*                    19

1   We — it was more just a coordination thing.  We intend that he

2   will be at all hearings before, Your Honor, you know, Friday's

3   hearing and substantive hearings.  I just — I think this is more

4   of a coordination issue, Your Honor, and I apologize.

5            THE COURT:  Okay.

6            MR. ASSINK:  There has been a lot going on.

7            THE COURT:  Oh, don't I know.  There's two of us, me

8   and my Law Clerk working on this, and there are a bunch of

9   y'all.  So, yes, I feel — I feel absolutely what you feel and

10  more as far as a lot going on.

11           So let me clarify.  My language that ordered Mr.

12  Dondero to be at every hearing was in the preliminary injunction

13  that's now superseded by the agreed order y'all announced

14  Tuesday.  So are you telling me you thought now that mandate

15  didn't apply?  Is that one of the things —

16           MR. ASSINK:  Not — not specifically, Your Honor, —

17           THE COURT:  — I'm hearing?

18           MR. ASSINK:  Not specifically, Your Honor.  We thought

19  perhaps the formal mandate in the order was no longer applying,

20  but our understanding was you would want Mr. Dondero at

21  substantive hearings going forward, and that has been our

22  understanding.  And we would expect him to be before Your Honor

23  at all such hearings.  Part of the basis, the reasoning he's not

24  here today was perhaps as an oversight on my part due to the

25  scheduling, and I had a lot of deadlines yesterday and I think

*Adversary 21-3003, Motion to Compel Discovery*                    20

1   it just maybe fell through the cracks, and I apologize, Your

2   Honor.

3             THE COURT:  All right.

4             MR. ASSINK:  You know, we — Your Honor, —

5             THE COURT:  Well, I'm going to say a couple of things.

6   You know this could have been raised Tuesday, when we were here

7   on the adversary proceeding, in which the preliminary injunction

8   was issued, okay, it would have been — it would have been wise,

9   it would have been very wise to raise the issue.

10            Second, it screams irony, if nothing else, that at a

11  time when I have under advisement a motion to hold Mr. Dondero

12  in contempt of Court that there would be a trip-up, the

13  second-recent trip-up, by the way, where he didn't appear at a

14  hearing.  There was a time a few weeks ago, two or three weeks

15  ago, can't remember what hearing it was then, but he wasn't

16  here.

17            Okay.  The —

18            MR. ASSINK:  Well, Your Honor, I just want to say —

19            THE COURT:  — the third thing I'm going to say — the

20  third thing I'm going to say is I guess I'll issue an order in

21  the main case now, you know, a one- or two-sentence order in the

22  main case saying repeating the sentence that was in the

23  preliminary injunction, that he's going to show up at every

24  hearing.  I never said only at substantive hearings.  The only

25  thing I hesitated on at all, because I've done this in other

*Adversary 21-3003, Motion to Compel Discovery*                    21

1    cases, is sometimes I'll say any hearing at which, you know, the

2    person is taking a position, okay, an opposition, an objection,

3    you know, even if you file a pleading taking a neutral stand, if

4    he's going to file a pleading that requires the Court and all

5    the lawyers' attention to some extent, he's going to need to be

6    in court.  So that's something I thought about doing, but then I

7    was reminded, that I said, no, he's just going to be at all

8    hearings in the future.

9            And procedural, substantive, I never made that

10   distinction and I never would because — because it's taking up

11   time, it's taking up time of the Court, lawyers, parties.  And

12   if he is going to use the offices of this Court or, you know,

13   take up the time of any lawyers, then he needs to be a part of

14   it, okay?

15           MR. ASSINK:  Your Honor, yes, I —

16           THE COURT:  So I thought I made that very clear the

17   last time he didn't show up, but I think —

18           MR. ASSINK:  Your Honor, I apologize.  You know that's

19   certainly not our intention here.  We've been rushing around.  I

20   think this is more — this is more on — on me and just the fast

21   pace with everything.  We would intend that he would be here at

22   all hearings.  We're not trying to make any exception.  We're

23   not trying to say that the preliminary injunction got rid of his

24   obligation to be before, Your Honor.  You know, we weren't clear

25   exactly what the directive was for these kinds of hearings, or

*Adversary 21-3003, Motion to Compel Discovery*                    22

1   at least perhaps I wasn't fully, and — but, nevertheless, Your

2   Honor, we would — we would have had him be here.  I think the

3   fast pace with the hearing settings and just everything going

4   on, it might have slipped through the cracks.  It's not — there

5   was no ill will with him not being here, Your Honor.  I

6   apologize.  It's just an oversight on our part.  We would

7   anticipate that he will be here for all future hearings.  You

8   know it's no disrespect to the Court.  It was not an intentional

9   thing.  We apologize, Your Honor.  So I understand the Court's

10  comments.  It's — but I just want to make clear it's we're not

11  trying to be cute, we're not trying to say that, oh, the

12  preliminary injunction is gone, he doesn't have to be here.

13  That's not our intention, Your Honor.  It was I think just an

14  oversight and a scheduling issue this time, but Mr. Dondero will

15  of course appear before Your Honor in all matters going forward,

16  so I apologize.

17          THE COURT:  All right.  Well, again, you're

18  scheduling.  You sought the scheduling, you sought the emergency

19  hearing, and this is the second time we've had this discussion

20  in less than a month.

21          All right.  So, Mr. Morris, back to you.  I think —

22          MR. MORRIS:  Yeah.

23          THE COURT:  — you were about to answer the question of

24  if Mr. Seery is going to be produced and talk about 13 different

25  topics, why is it a big deal to talk about these other seven

1    that condition subsequent was, it was the liquidation of certain

2    assets.  Since the liquidation of those assets has not been

3    completed, by definition, no other maker could have had a note

4    or an oral agreement or an agreement of any kind of the type

5    that Mr. Dondero has.  So yet another reason why it fails to

6    meet the burden, they fail to meet the burden under Rule 26.

7    Nobody could have ever had the same note forgiven or agreement,

8    because the condition subsequent hasn't been met yet.

9                    THE COURT'S RULING ON THE MOTION TO COMPEL

10                  THE COURT:  All right.  Well, I'm going to deny the

11   motion to compel.  I don't think that the burden has been met to

12   establish the relevance of these, I guess it's — one, two,

13   three, four, five — six topics that are now at issue, topics 9,

14   14 through 17, or 20, and, you know, I don't think the

15   proportionality standard is met here.

16                  I do think it would be not proportionate to the needs

17   of the case for the CEO, who came in place in 2020,

18   postpetition, two years after these notes were executed, to have

19   to go do research about any loans made by Highland to any

20   officers and employees over the years and, you know, I don't

21   know who he's going to question, what policy he is going to look

22   into that might be some substance or evidence as to oral

23   agreements or forgiveness.  I don't think he should have any

24   obligation to search files and interview people to figure out

25   what the affirmative defenses and Mr. Dondero are all about or

*The Court's Ruling on the Motion to Compel*                                    34

1   based in.  And, again, no one would have better information

2   about his own compensation than Mr. Dondero himself.

3          I mean I want to stress that this comes against a

4   backdrop of — well, it seems like some antagonism, to say the

5   least, on the part of Mr. Dondero where Mr. Seery's concerned.

6   It seems like it's always a fight with Mr. Seery.  And you say,

7   well, we didn't handpick him as the 30(b)(6) witness, but, you

8   know, the motion to compel names him by name.  It just — it

9   feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11  so different topics.  I think it is appropriate to draw the line

12  on these six or so topics that again just don't seem relevant or

13  proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15  just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18  to do it.  I'm sorry.  I need to be thinking about attorney's

19  fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21  an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25  particular adversary, let me just double check.  Any

1   housekeeping matters before I move onto the other adversary?

2           MR. AIGEN:  Not from the debtor, Your Honor.

3           MR. CLUBOK:  Your Honor, —

4           THE COURT:  All right.

5           MR. CLUBOK:  I don't know if you're about to move on.

6   Your Honor, can you hear me?

7           THE COURT:  I'm sorry, Mr. Clubok?

8           MR. CLUBOK:  Your Honor, —

9           THE COURT:  Were you weighing in on —

10          MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11  that proceeding, but are you about to move on beyond — beyond

12  the Highland matters?

13          THE COURT:  No, no, no.

14          MR. CLUBOK:  There was another Highland matter —

15          THE COURT:  I was next — I was next going to go to the

16  other adversary, the dispute between the committee and seven or

17  so defendants.  And, yes, I know we have UBS I guess all day

18  tomorrow unless anything has changed.  So we'll — we'll hear

19  before we're done any previews about tomorrow.

20          All right, so moving on —

21          MR. CLUBOK:  Thank you.

22          THE COURT:  — the Committee versus CLO Holdco,

23  20-3195.  We have a committee motion to basically stay the

24  adversary proceeding for 90 days.  So I will get lawyer

25  appearances on that.

```
State of California          )
                             )    SS.
County of San Joaquin        )
```

        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated May 22, 2021

# EXHIBIT Q

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
 2
                                   )    Case No. 19-34054-sgj-11
 3   In Re:                        )    Chapter 11
                                   )
 4   HIGHLAND CAPITAL              )    Dallas, Texas
     MANAGEMENT, L.P.,             )    Tuesday, June 8, 2021
 5                                 )    9:30 a.m. Docket
                                   )
 6        Debtor.                  )
                                   )    - SHOW CAUSE HEARING (2255)
 7                                 )    - MOTION TO MODIFY ORDER
                                   )      AUTHORIZING RETENTION OF
                                   )      JAMES SEERY (2248)
 8                                 )    - MOTION FOR ORDER FURTHER
                                   )      EXTENDING THE PERIOD WITHIN
 9                                 )      WHICH DEBTOR MAY REMOVE
                                   )      ACTIONS (2304)
10   _____)

11                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                   UNITED STATES BANKRUPTCY JUDGE.

13   APPEARANCES:

14   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
15                                10100 Santa Monica Blvd.,
                                    13th Floor
16                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
17
     For the Debtor:              John A. Morris
18                                Gregory V. Demo
                                  PACHULSKI STANG ZIEHL & JONES, LLP
19                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
20                                (212) 561-7700

21   For the Debtor:              Zachery Z. Annable
                                  HAYWARD & ASSOCIATES, PLLC
22                                10501 N. Central Expressway,
                                    Suite 106
23                                Dallas, TX  75231
                                  (972) 755-7104
24

25
```

293

1   the Committee maintaining a two-person membership at this

2   point.

3       In terms of whether the MGM transaction is a game-changer,

4   we've not yet seen, to Your Honor's point, how all of that

5   rolls up through the various interests that the Debtor may or

6   -- you know, may have --

7           THE COURT:  Okay.

8           MR. CLEMENTE:  -- that would be implicated by the MGM

9   transaction.  If ultimately the MGM transaction has to

10  actually occur, right?  I mean, so, you know, just based on

11  what I read in the public documents, we're not sure when that

12  transaction may actually happen.  But obviously it's a good

13  thing for the Debtor's estate because it's going to recognize

14  value for the estate.

15      In terms of whether it ultimately changes how Mr. Dondero,

16  you know, wishes to proceed, that's entirely up to him, Your

17  Honor.  But we don't see it as something at this point that

18  would suggest that there's an overall back to let's talk about

19  a pot plan because of where the MGM transaction might

20  ultimately come out.

21      So I don't know if that's helpful to Your Honor, but those

22  are -- that's my perspective.

23          THE COURT:  Well, and I'm not trying to, you know,

24  push a pot plan on anyone.

25          MR. CLEMENTE:  No, I understand.

294

1          THE COURT:  I'm just saying it looked like an

2    economic windfall.  I just -- I don't know how much is

3    Highland versus other entities in the so-called byzantine

4    complex, but, gosh, I just hoped that there might be something

5    there to change the dynamic of, you know, lawsuit, lawsuit,

6    lawsuit, lawsuit, motion for contempt, motion for contempt.

7          MR. CLEMENTE:  Agreed, Your Honor.

8          THE COURT:  Uh-huh.

9          MR. CLEMENTE:  And like I said, it was a very

10   positive development obviously for the creditors for the

11   Debtor.  But whether it's the game-changer that Your Honor

12   would envision, I'm not sure that I can suggest at this point

13   that it is.

14       I think that, you know, obviously, we don't like to see

15   these lawsuits continue to be filed.  That's the whole point

16   of the gatekeeper order, Your Honor.

17         THE COURT:  Uh-huh.

18         MR. CLEMENTE:  I didn't say anything during the

19   hearing, but obviously the January 9th order, as Your Honor

20   has said many times, was in the context of a trustee being

21   appointed.

22         THE COURT:  Right.  Right.

23         MR. CLEMENTE:  Right?  So, and the July 16th order,

24   very similar vein, it's an outshoot of that.  In fact, it was

25   contemplated in the January 9th settlement that a CEO could be

295

1   appointed.

2       So I think, again, it's just -- it's important, the

3   context in which that January 9th order came into play, for

4   this very reason, so we could avoid this type of litigation,

5   Your Honor.

6               THE COURT:  Uh-huh.

7               MR. CLEMENTE:  And so again, I didn't -- I obviously

8   didn't rise to mention that during the hearing, but Your Honor

9   is already aware of that.  I didn't need to remind Your Honor

10  of that.

11              THE COURT:  Uh-huh.  Okay.

12              MR. CLEMENTE:  Anything else for me, Your Honor?

13              THE COURT:  No.  Thank you.

14              MR. CLEMENTE:  Okay, then, Your Honor.

15              THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24      Mr. Morris, anything else?

25              MR. MORRIS:  Nothing.  No, thank you.

296

1           THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3           THE CLERK:  All rise.

4       (Proceedings concluded at 6:00 p.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **06/09/2021**

24   _____        _____

     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

# EXHIBIT R

```
1                IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3                              )    Case No. 19-34054-sgj-11
     In Re:                    )    Chapter 11
                               )
4    HIGHLAND CAPITAL          )    Dallas, Texas
     MANAGEMENT, L.P.,         )    Thursday, June 10, 2021
5                              )    9:30 a.m. Docket
            Debtor.            )
6                              )    MOTION TO COMPEL COMPLIANCE
                               )    WITH BANKRUPTCY RULE 2015.3
7                              )    FILED BY GET GOOD TRUST AND
                               )    THE DUGABOY INVESTMENT TRUST
8                              )    (2256)
     _____)
9                              )
     HIGHLAND CAPITAL          )    Adversary Proceeding 21-3006-sgj
10   MANAGEMENT, L.P.,         )
                               )
11         Plaintiff,          )    DEFENDANT'S MOTION FOR LEAVE
                               )    TO FILE AMENDED ANSWER AND
12   v.                        )    BRIEF IN SUPPORT [15]
                               )
13   HIGHLAND CAPITAL          )
     MANAGEMENT SERVICES, INC.,)
14                             )
            Defendant.         )
15   _____)
                               )
16   HIGHLAND CAPITAL          )    Adversary Proceeding 21-3007-sgj
     MANAGEMENT, L.P.,         )
17                             )
           Plaintiff,          )    DEFENDANT'S MOTION FOR LEAVE
18   TO                        )    TO AMEND ANSWER TO PLAINTIFF'S
     v.                        )    COMPLAINT [16]
19                             )
     HCRE PARTNERS, LLC        )
20   N/K/A NEXPOINT REAL       )
     ESTATE PARTNERS, LLC,     )
21                             )
            Defendant.         )
22   _____)

23                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
24                UNITED STATES BANKRUPTCY JUDGE.

25
```

86

1          MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,

2   Your Honor.  And the issue, I think, with you -- we need to

3   have this motion resolved, because it -- unless the Court is

4   going to continue discovery or stay.  You know, one of the

5   reasons why we had initially requested the expedited hearing

6   was because of the discovery is continued -- continuing to --

7   discovery deadlines are continuing to move.  And obviously

8   whatever the Court decides on this motion for leave to amend

9   will determine what the scope of that discovery is.

10       Similarly, if the Debtor decides to amend, that could

11   change the scope of discovery as well.

12       So we are open to continuing deadlines, and I think, you

13   know, might end up filing a motion to continue.  I haven't

14   conferred with Mr. Morris yet.  I suspect he's opposed, based

15   on our prior conversations.  But that's something that might

16   be helpful, especially if the Court is concerned on how it

17   will affect the motion to withdraw the reference, to -- maybe

18   we continue some of these upcoming deadlines, and that might

19   appease, you know, solve some of your concerns.

20          THE COURT:  All right.  Well, Rule 15(a), of course,

21   is the governing rule here, and the case law is abundant that

22   courts "should freely give leave when justice so requires."

23   And the law is also abundantly clear that the rule "evinces a

24   bias in favor of granting leave to amend."  And again and

25   again, cases say that leave should be granted unless there's

87

1  substantial reason to deny leave, and courts may consider

2  factors such as delay or prejudice to the non-movant, bad

3  faith or dilatory motives on the part of the movant, repeated

4  failure to cure deficiencies, or futility of the amendment.

5      While the Debtor has presented arguments that there might

6  be bad faith here on the part of the Movants and there might

7  be futility in allowing the amendments because of various

8  strong arguments and defenses the Debtor believes it has to

9  this issue of agreements with regard to the notes that

10  allegedly provide affirmative defenses, the Court believes the

11  rule requires me to allow leave to amend the answer.

12      Now, a couple of things.  I am going to require, though,

13  that the amended answer be more specific than has been

14  suggested.  I am going to agree that if new affirmative

15  defenses are made that there was this agreement to forgive

16  when certain conditions happened, then there does need to be

17  identification of who the human beings were that were involved

18  in making the agreement, the date of any agreement or

19  agreements, and disclose what documents substantiate the

20  agreement or reflect the agreement.  All right?  So if that

21  could --

22          MR. MORRIS:  Your Honor?

23          THE COURT:  Yes?

24          MR. MORRIS:  John Morris.  I apologize for

25  interrupting, but just a fourth thing is what is the

88

1   agreement?  I mean, what is the agreement?

2          THE COURT:  Well, okay.  That's fair enough.  What is

3   the agreement?  I guess --

4          MR. MORRIS:  And -- and --

5          THE COURT:  -- that needs to be spelled out.  I mean,

6   I guess I was assuming that that would be spelled out in --

7   but maybe it's not.  So we'll go ahead and add that.

8       As far as extension of the discovery, Ms. Drawhorn has

9   offered that.  I think it would be reasonable if the Debtor or

10  Plaintiff wants that.  Do you want an extension of discovery?

11         MR. MORRIS:  What I really want, Your Honor, is a

12  direction for them to serve this amended answer within 24 or

13  48 hours and grant leave to the Debtor to promptly file

14  written discovery.  We've got Nancy Dondero -- if it turns out

15  -- and maybe Ms. Drawhorn can just answer the question right

16  now.  Who entered the agreement on behalf of the Debtor?

17  Because I'm already taking Nancy Dondero's deposition on the

18  28th.  And it seems to me, if they would just answer the

19  question of whether Ms. Dondero is the person who did that, I

20  could just add a notice of deposition and take the deposition

21  on that date, too, and it would be, really, more efficient for

22  everybody.

23         THE COURT:  Ms. Drawhorn, who was the human being?

24         MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25  entered into the -- the subsequent agreement.

90

1          THE COURT:  Please upload an order, Ms. Drawhorn,

2   granting your motion with these specific requirements that

3   I've orally worked in.

4       I think clients need to be careful what they ask for.  I'm

5   very concerned.  And I know it was just argument and I'll hear

6   evidence, but of all of the things that I guess -- well, I'm

7   concerned about a lot of things, but do we have audited

8   financial statements that didn't disclose these agreements

9   with regard to --

10          MR. MORRIS:  Yes, Your Honor.

11          THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 11:58 a.m.)

17                          --oOo--

18

19                        CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21   above-entitled matter.

22   **/s/ Kathy Rehling**                    **06/12/2021**

23   _____        _____

    Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

# EXHIBIT S

1
        IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2
               DALLAS DIVISION

3
                   )  **Case No. 19-34054-sgj-11**
In Re:            )  Chapter 11
4
                   )
HIGHLAND CAPITAL     )  Dallas, Texas
MANAGEMENT, L.P.,    )  Friday, June 25, 2021
5
                   )  9:30 a.m. Docket
      Debtor.       )
6
                   )  EXCERPT:  MOTION FOR
                   )  MODIFICATION OF ORDER
7
                   )  AUTHORIZING RETENTION OF JAMES
                   )  P. SEERY, JR. DUE TO LACK OF
8
                   )  SUBJECT MATTER JURISDICTION
                   )  (2248)
9
                   )

10
             TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11
       UNITED STATES BANKRUPTCY JUDGE.

12
WEBEX APPEARANCES:

13
For the Debtor:         Jeffrey Nathan Pomerantz
                   PACHULSKI STANG ZIEHL & JONES, LLP
14
                   10100 Santa Monica Blvd.,
                    13th Floor
15
                   Los Angeles, CA  90067-4003
                   (310) 277-6910
16
For the Debtor:         John A. Morris
17
                   PACHULSKI STANG ZIEHL & JONES, LLP
                   780 Third Avenue, 34th Floor
18
                   New York, NY  10017-2024
                   (212) 561-7700
19
For CLO Holdco, Ltd. and  Jonathan E. Bridges
20
The Charitable DAF Fund,  Mazin Ahmad Sbaiti
LP:                  SBAITI & COMPANY, PLLC
21
                   JP Morgan Chase Tower
                   2200 Ross Avenue, Suite 4900 W
22
                   Dallas, TX  75201
                   (214) 432-2899
23
For Get Good Trust and   Douglas S. Draper
24
Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                   650 Poydras Street, Suite 2500
25
                   New Orleans, LA  70130
                   (504) 299-3300

108

1  any exceptional circumstances to declare the order or any of

2  its provisions void.  The Movants have put on no evidence that

3  constitutes surprise or constitutes newly-disputed evidence.

4  So why are there no exceptional circumstances here such that

5  the Court might find, you know, a void order or void

6  provisions of an order?

7      First, this Court concludes that there's no credible

8  argument that the Court overreached its jurisdiction with the

9  gatekeeping provisions in the order.  Gatekeeping provisions

10 are not only very common in the bankruptcy world -- in

11 retention orders and in plan confirmation orders, for example

12 -- but they are wholly consistent with the *Barton* case, the

13 U.S. Supreme Court's *Barton's* case, and its progeny that has

14 become known collectively as the *Barton* doctrine.  Gatekeeping

15 provisions are wholly consistent with 28 U.S.C. Section

16 959(a)'s complete language.

17     The Fifth Circuit has blessed gatekeeping provisions in

18 all sorts of contexts.  It has blessed them in the situation

19 of when *Stern* claims are involved in the *Villegas* case.  It

20 even blessed Bankruptcy Courts' gatekeeping functions a long

21 time ago, in 1988, in a case that I don't think anyone

22 mentioned in the briefing, but as I've said, my brain

23 sometimes goes down trails, and I'm thinking of the *Louisiana*

24 *World Exposition* case in 1988, when the Fifth Circuit blessed

25 there a procedure where an unsecured creditors' committee can

109

1    bring causes of action against persons, such as officers and

2    directors or other third parties, if they first come to the

3    Bankruptcy Court and show a colorable claim.  They have to

4    come to the Bankruptcy Court, show they have a colorable claim

5    and they're the ones that should be able to pursue them.  Not

6    exactly on point, but it's just one of many cases that one

7    could cite that certainly approve gatekeeper functions of

8    various sorts of Bankruptcy Courts.

9         It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11        And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17        Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23        Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

110

1   other claims that don't rise to the level of gross negligence

2   or willful misconduct, again, I reiterate there's nothing

3   exceptional in the bankruptcy world about exculpation

4   provisions like this.  They absolutely are a term of

5   employment very often.  Just like compensation, they're

6   frequently requested, negotiated, and approved.  They are

7   normal in the corporate governance world, generally.  They are

8   normal in corporate contracts between sophisticated parties.

9   And most importantly of all, even if this Court overreached

10  with the exculpation provisions in the Seery retention order,

11  even if it did, res judicata bars the attack of these

12  provisions at this late stage, under cases such as *Shoaf,*

13  *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14  case from the U.S. Supreme Court, and even *Applewood*, since

15  the Court finds the language in this order was clear,

16  specific, and unambiguous with regard to the gatekeeping

17  provisions and the exculpation provisions.

18       Last, and this is the part where I said I'm going to get

19  to this agreement that has been submitted, the Second Amended

20  and Restated Investment Advisor Agreement or whatever the

21  title is.  I am more than a little disturbed that so much of

22  the theme of the Movants' pleadings and arguments, and I think

23  even representations to the District Court, have been they

24  have these sacred jury trial rights, these inviolate jury

25  trial rights, and an Article I Court like this Court should

121

1   annoyance or anything like that.  I guess what I'm trying to

2   do is I don't want anyone to mistake the delay in ruling on

3   the contempt motion to mean I'm just not that -- you know, I'm

4   not prioritizing it, other things are more serious to me or

5   important to me, or I'm going to take two months to get to it.

6   It's literally been I've been in trial almost all day long

7   every day since you were here.  But trust me, I'm about as

8   upset as upset can be about what I heard on June 8th, and I'm

9   going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14      So I hope -- I don't know if that matters very much, but

15  it should.

16      All right.  We stand adjourned.

17      (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/29/2021**

24  _____     _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

# EXHIBIT T

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                                )   Case No. 19-34054-sgj-11
 3   In Re:                      )   Chapter 11
                                )
 4   HIGHLAND CAPITAL            )   Dallas, Texas
     MANAGEMENT, L.P.,           )   March 1, 2022
 5                              )   1:30 p.m. Docket
          Reorganized Debtor.   )
 6                              )   - REORGANIZED DEBTOR'S MOTION
                                )     FOR ENTRY OF AN ORDER
 7                              )     APPROVING SETTLEMENT WITH
                                )     PATRICK DAUGHERTY [3088]
 8                              )   - REORGANIZED DEBTOR'S MOTION
                                )     FOR ENTRY OF AN ORDER
 9                              )     FURTHER EXTENDING THE PERIOD
                                )     WITHIN WHICH IT MAY REMOVE
10                              )     ACTIONS [3199]
     _____)
11                              )
     ELLINGTON,                  )   Adversary Proceeding 22-3003-sgj
12                              )
            Plaintiff,           )
13                              )   STATUS CONFERENCE
     v.                          )   (NOTICE OF REMOVAL)
14                              )
     DAUGHERTY,                  )
15                              )
            Defendant.           )
16   _____)

17               TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18              UNITED STATES BANKRUPTCY JUDGE.

19   APPEARANCES:

20   For the Debtor:            John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
21                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
22                              (212) 561-7700

23   For Scott Ellington:       Debra A. Dandeneau
                                Laura R. Zimmerman
24                              BAKER & MCKENZIE, LLP
                                452 Fifth Avenue
25                              New York, NY  10018
                                (212) 626-4875
```

82

1  consent to Bankruptcy Court adjudication or are we going to

2  have a motion for remand.

3     So I don't know what we're going to attempt to accomplish

4  here because later in this month we have set a hearing on Mr.

5  Ellington's motion for remand and abstention.  So I'll ask

6  counsel, did you all view this setting as something that, you

7  know, we needed to address issues on, or is it premature

8  before we have the hearing on the motion for remand and

9  abstention?

10         MR. YORK:  Your Honor, this is Drew York from Gray

11 Reed.  I represent Mr. Daugherty in the adversary action.  And

12 I agree with the Court that it is, based upon the motion to

13 abstain and remand that was filed, it's premature.  We set the

14 status conference at the Court's request immediately after we

15 filed the removal notice.  I think we can address all of the

16 issues at the hearing at the end of the month.

17         THE COURT:  All right.  Ms. --

18         MS. DANDENEAU:  Your Honor?

19         THE COURT:  Go ahead.

20         MS. DANDENEAU:  We agree with Mr. York and the Court,

21 Your Honor.

22         THE COURT:  Okay.  Well, so I guess we will see you

23 at the end of the month.  I think, what is it, maybe March

24 28th, something like that?  March 29th?

25         MS. DANDENEAU:  I believe it's March 29th.

83

1          THE COURT:  Okay.  And you know that I tend to

2    sometimes share my views just to see if it will spur a fit of

3    reasonableness or encourage people to settle or walk away.

4    I'm pretty exasperated with that attempt in this case.  But

5    this litigation is -- I'm going to call it the stalking

6    lawsuit.  Okay?  Every time -- I don't know how much longer it

7    will be in my court, but as long as it's in my court I'm going

8    to call it what it is, a stalking lawsuit.  It is one grown

9    man accusing another grown man of stalking.  You know, it's

10   just embarrassing to me, and it should be embarrassing to

11   those involved.

12       Now, I have read the lawsuit and I have read that Mr.

13   Ellington accuses Mr. Daugherty of driving by his house,

14   driving by his father's house, driving by his sister's house,

15   driving by his office, 143 sightings, he's taking pictures.

16   And you know, if that's true, again, that's embarrassing.  If

17   -- I don't even know what to say except this is embarrassing.

18   One grown man accusing another grown man of stalking.  Okay?

19   A statute, by the way, that was designed to protect, you know,

20   ex-wives, girlfriends, battered women, from abusive men.  You

21   know, gender doesn't matter, but wow.  It's just -- I don't

22   know what to say except people should be embarrassed, and so

23   that's what I'm going to say.

24       I don't know if it's going to make a whit of difference in

25   anyone's litigation posture.  But we'll come back on March

84

1  29th and we'll do what we need to do on the motions before the

2  Court.

3      (Proceedings concluded at 3:41 p.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                    **03/07/2022**

23  _____    _____
   Kathy Rehling, CETD-444                    Date
24  Certified Electronic Court Transcriber

25

84

1    29th and we'll do what we need to do on the motions before the

2    Court.

3         (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                           CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **03/07/2022**

23   _____      _____
     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

# EXHIBIT U

1
2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

3

In Re:

)   **Case No. 19-34054-sgj-11**
)   Chapter 11
)

4

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

)   Dallas, Texas
)   August 31, 2022
)   9:30 a.m. Docket

5

6

Reorganized Debtor.

)
)
)   STATUS CONFERENCE RE: MOTION
)   FOR FINAL APPEALABLE ORDER
)   FILED BY JAMES DONDERO
)   [3406]
)

7

8

9

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

10

11

APPEARANCES:

12

For the Reorganized
Debtor:

Jeffrey Nathan Pomerantz
PACHULSKI STANG ZIEHL & JONES, LLP
10100 Santa Monica Blvd.,
   11th Floor
Los Angeles, CA  90067
(310) 277-6910

13

14

15

For the Reorganized
Debtor:

Melissa S. Hayward
HAYWARD, PLLC
10501 N. Central Expressway,
   Suite 106
Dallas, TX  75231
(972) 755-7104

16

17

18

19

For James Dondero,
Movant:

Michael Justin Lang
CRAWFORD WISHNEW & LANG, PLLC
1700 Pacific Avenue, Suite 2390
Dallas, TX  75201
(214) 817-4500

20

21

22

Recorded by:

Michael F. Edmond, Sr.
UNITED STATES BANKRUPTCY COURT
1100 Commerce Street, 12th Floor
Dallas, TX  75242
(214) 753-2062

23

24

25

12

1    And when he, being Judge Kinkeade, after the briefs were

2    filed, he obviously was looking at it, he questioned his

3    jurisdiction, he requested briefing on the jurisdiction,

4    because in that order that he sent out requesting the

5    briefing, he pointed out -- you know, one of the issues he

6    pointed out was the Court's language, the reservation language

7    in the order.  And, again, Highland argued that because of

8    that language, among other things, that language made the

9    order not final.

10       So all we're saying, all we're asking is just remove that

11   language so when we file the writ of mandamus that argument

12   isn't there.  The Court is done dealing with the issue.

13   Nobody can disagree with it.

14       You know, nobody -- Highland is not agreeing that we, you

15   know, can seek mandamus, so I'm not saying that.  And I'm not

16   asking the Court to agree to that.  Mandamus is a -- we

17   believe is an option.  It's still on the table.  And we're

18   just dealing with one issue that came up before and just

19   trying to head it off before -- so that we don't have to come

20   back down and ask the Court to remove it later.

21           THE COURT:  All right.  Mr. Pomerantz, what do you

22   want to say about this?

23           MR. POMERANTZ:  So, Your Honor, this is extremely

24   frustrating.  I know Your Honor had said you didn't want to

25   waste Court time.  There has already been a tremendous amount

13

1  of Court time that's wasted.

2      When we got this motion, it was a head-scratcher.  We read

3  it as seeking way more things than what Mr. Lang is saying

4  now.  If he had called up and asked us if we had any issue,

5  subject to Your Honor's agreement, to remove that last

6  sentence, we would have said we don't, because the briefing

7  before the District Court and the District Court's decision

8  have really nothing to do with that last sentence.  Maybe the

9  -- Judge Kinkeade mentioned it in his December order, but it's

10  clear, as Your Honor mentions, from the reading of the

11  District Court opinion that it is irrelevant.

12      And the argument that the Court, the District Court which

13  denied interlocutory appeal is somehow, once that sentence is

14  eliminated, going to entertain and grant a writ of mandamus is

15  farcical.  It's just not going to happen.  And unfortunately,

16  what's going to happen is we're going to have to spend more

17  time, more money, and more effort.

18      And Your Honor, I know the motion to strike has been

19  resolved, but I'd just like to mention it, because this is --

20  continues to be frustrating from the Highland side.  They

21  filed an appendix that sought to slip in three letters written

22  by attorneys for various Dondero entities that were

23  essentially a smear campaign, a smear campaign on Mr. Seery, a

24  smear campaign on the Independent Directors, incidentally,

25  which may be actionable in its own right.

14

1    That had nothing to do with bias.  They wanted to slip

2   that in, somehow it would get into the appellate record, if

3   and when they ever got to an appeals court.

4    So what do we do, Your Honor?  We called them up, called

5   Mr. Lang up and said, will you withdraw the letters?  There's

6   no basis for those to be included in the appendix.  He said

7   no.  Said, okay, will you make the deponents -- the people who

8   wrote the letters available for deposition?  Wouldn't agree to

9   that, either.

10    And then we go to the time and the money, we file our

11  motion to strike, and lo and behold, which has become a

12  considerable pattern in this case, Your Honor, what does Mr.

13  Lang do?  He calls up and says, I will withdraw the letters.

14  Okay?  That's aside.  We got what we wanted.  There's nothing

15  we can do.  But it is kind of frustrating, how that -- how

16  that played out.

17    Your Honor, this motion, to the extent it asks for that

18  sentence to be removed, that's fine.  Again, we think it's a

19  legal nullity.  What Mr. Lang asked for in his motion is for

20  Your Honor to issue a final order.  Your Honor can't determine

21  whether your order is final.  We've made that point in our

22  opposition.  It seems maybe now Mr. Lang is walking back on

23  that.  There's nothing you can do.  Your Honor can issue an

24  order; it'll be up to the District Court.

25    With respect to the supplement, Your Honor, as we put in

15

1  the record, we think all the quote/unquote evidence that was

2  submitted just is a severe mischaracterization of the record.

3  And it's important, Your Honor, that not only does the -- we

4  agree that the evidence can come in, but we think Your Honor

5  has to make a determination whether those additional

6  allegations of bias and evidence do in fact demonstrate bias.

7  What we think Mr. Lang wanted to do, or the Appellants wanted

8  to do, or the Movants, they wanted to have that information

9  come in and argue at first blush to the Appellate Court that

10  that is bias, without having had Your Honor make the initial

11  determination, as you would have if there was a motion to

12  reconsider, as you would have if there was a new motion.

13      And so we think it's very important that Your Honor

14  consider those additional allegations.  We think categorically

15  they do not demonstrate any bias, and our Exhibit A goes

16  through each item and points out the severe

17  mischaracterizations.

18      So, Your Honor, we've wasted a lot of time.  We've wasted

19  a lot of money.  But if all they want is to remove that

20  sentence, supplement the record, have Your Honor deny the

21  motion yet again after considering the additional evidence, we

22  do not have an opposition to that.  But it was -- kind of took

23  a long time and a lot of money to get to this place.

24      Thank you, Your Honor.

25          THE COURT:  All right.  And Mr. Lang, on the subject

16

1  of it took a lot of time and a lot of money, estate resources,

2  to get to this place, I just want to note a couple of things.

3  And I guess I'm happy to hear any response to these things

4  that I feel very frustrated about.

5       Again, my focus at this point is judicial resources as

6  well as estate resources.  And no judge, no judge looks

7  lightly on a motion to recuse.  Okay?  Any judge, I would

8  think, is going to have some self-introspection.  Like, oh my

9  goodness, what would motivate someone to think this needs to

10  be urged?

11      But, so on the topic of -- again, I want you to respond to

12  this, Mr. Lang -- my concern about judicial resources and

13  estate resources.

14      The timeline here -- and I always talk about timelines, I

15  know -- but this Court signed the confirmation order in this

16  case February 22, 2021, and your motion to recuse was filed

17  about a month later, March 18, 2021.  Now, here's the first

18  thing I'll mention about judicial resources and estate

19  resources.  Your motion and brief to recuse included an

20  appendix that was 200 -- no, excuse me, 2,722 pages long.

21  Okay?

22      So any judge, again, has to take it seriously when a

23  motion to recuse is filed.  And the standard is I have to

24  stand back and look at would a reasonable person have concerns

25  here.  So I can't just say, I know I'm not biased, I don't

17

1  think I'm biased; I have to look at what a reasonable person

2  might think.

3      So you presented to me a 2,722-page appendix for me to do

4  my job and look at what would a reasonable person think.  So,

5  then would it raise a doubt in the mind of a reasonable

6  observer as to the judge's impartiality?

7      So I think here's another point that goes to judicial

8  resources.  I had my law clerk, just out of curiosity, count

9  up for me how many orders that I had signed as of the day that

10 the motion to recuse was filed, March 18, 2021, and I had

11 presided over the bankruptcy case for 15 months at that point,

12 but it had been in Delaware for two months before Dallas.  On

13 the day you had filed your motion to recuse, March 18, 2021, I

14 had signed 263 orders in the Highland bankruptcy case and the

15 adversary proceedings.  It's a lot more now, of course.  But

16 so I suppose, if I was really to do my job thoroughly, I might

17 look not merely at your 2,722 pages of appendix attached to

18 your motion to recuse, but all 263 orders I had entered to

19 see, hmm, would a reasonable observer question my

20 impartiality?

21     So, anyway, this is all about judicial resources and

22 estate resources.  So, going down the timeline, March 23,

23 2021, five days after you filed the motion to recuse -- after,

24 I will tell you, I won't say I dropped everything to pore

25 through this, but spent a lot of time -- I issued an order

18

1  denying the motion to recuse.

2       Now, here's inside baseball, okay, if there ever was:  The

3  last sentence, reserving the right to supplement or amend,

4  here's why I did it.  I didn't know it would cause a brouhaha.

5  Maybe I didn't give it enough thought.  But in reading the

6  case law during those many days and hours I spent focusing on

7  your motion to recuse, I realized that most of the case law

8  says you don't have to have a hearing, okay, the statute

9  doesn't require a hearing, the case law says you don't have to

10  have a hearing.  And I cited some of that my order.  But I

11  thought, these Movants, after seeing this order, they may come

12  back and say, you didn't give us our day in court.  We wanted

13  a hearing.  We weren't just going to rely on our 2,722-page

14  appendix.  We wanted to put on witnesses.

15       So I didn't have to stick that sentence in there, but I

16  was just sort of anticipating what the Movants might do.

17       Okay.  So, live and learn.  I guess I won't, if I'm ever

18  confronted with the situation again, do that.  But that's what

19  that was about.

20       So, my law clerk went and looked at the appellate record

21  in the past few days, because, I mean, again, head-scratcher.

22  We were trying to get a feel for how big a deal was this

23  sentence, okay, to the District Court, if at all.  But anyway,

24  we happened to note that in July, July 20, 2021, the District

25  Court record on appeal was supplemented with 1,001 more pages

19

1   of record.  So I guess, goodness gracious, poor Judge Kinkeade

2   and his staff, they had 3,723 pages of appendix.  I don't even

3   know if that's all.  You know, I don't know.

4        But so Judge Kinkeade dismissed the appeal because he said

5   my order was interlocutory on February 9, 2022, and then we

6   didn't see a motion for rehearing or an appeal to the Fifth

7   Circuit or a petition for writ of mandamus to the Fifth

8   Circuit.  Five and half months later, this new motion for

9   final appealable order and supplement to the motion to recuse

10  is filed, containing 365 more pages.  And then I see that, Mr.

11  Lang, you filed an amended motion to take out certain of the

12  items, with the agreement, the stipulation that was reached

13  with Debtor's counsel, so it's now a 154-page appendix.

14       But I should add that, in Highland's objection to your

15  latest motion, they attached 86 exhibits, and I couldn't count

16  all those exhibits, but it was more than 5,500 pages.  And it

17  was, as I understood it, sort of almost like a rule of

18  optional completeness.  If you're going to submit these 154

19  pages to supplement the record, we think you need to attach

20  more than snippets of a transcript here and there.  You need

21  to have the whole context.

22       So, anyway, I -- you know, look at what you're doing.  I'm

23  just -- and I guess I could totally appreciate and understand

24  if there had been a brief order from Judge Kinkeade saying,

25  because of that one sentence, this is an interlocutory order,

20

1  no leave to appeal an interlocutory order is warranted, end of

2  order.  And, frankly, when you filed your motion, this latest

3  motion, having not seen Judge Kinkeade's order, I thought

4  that's what it was going to say.

5      So, from the tone of your motion, it sounded like that's

6  all his order was about, just:  I have a problem with this

7  last sentence, it makes the whole order interlocutory.  And

8  then I go back and read it and he gives four or five different

9  reasons why an order denying a motion to recuse is

10  interlocutory until the end of the case.  I know that's a

11  bizarre concept in the world of bankruptcy, but he considered

12  this is even the rule in the world of bankruptcy.

13      So, anyway, help me to understand why this isn't

14  unnecessary carpet-bombing the Court, me and whoever might

15  hear your petition for writ of mandamus, and the Debtor

16  estate, carpet-bombing us with paper and causing us to expend

17  resources.  And, again, we've got this backdrop of the

18  original motion to recuse being filed 15 months after I

19  started presiding over the case and after I had signed 263

20  orders.

21      Please, Mr. Lang, please help me to understand if this is

22  warranted.  Why, I mean, help me to understand why this is not

23  wasting resources in your view and why this isn't just some

24  strategy.  Again, I'm trying to not play psychologist, I'm

25  really trying to understand why you think this is fine.

21

1            MR. LANG:  Well, Your Honor, we've moved to recuse,

2    and we've stated the grounds, and we have put in documents

3    from the record that we think support those grounds.  We have

4    not unnecessarily carpet-bombed.  We've cited to the various

5    transcripts.  The length of the record is directly related to

6    the length of the transcripts mostly, the various transcripts

7    throughout the proceeding.  And so, you know, with respect to

8    the 2,722 pages of appendix, most of those are just complete

9    copies of transcripts.

10        But again, we're just creating our record to support our

11    position on our motion.  And the current motion is eight

12    pages.  It's got reference to the additional grounds that

13    we've set forth that we think support our motion.  And we

14    attached the various documents and transcripts that, again,

15    support -- we think support our position.  And we're making

16    our record for appeal.

17        And as far as Mr. Pomerantz and the withdrawing of the

18    letters, you know, I was getting ready for trial when Mr.

19    Morris called.  And he said, they're hearsay.  We had a brief

20    conversation.  I disagreed.  They filed their motion.  When I

21    got the time to look at it, I read through it, and Mr. Morris

22    and I had a conversation, and we decided, you know what, we

23    don't need them, we'll pull them out.  Let's just do away with

24    this issue.  It's not worth the time to deal with it.

25        I'm sorry they had to file their motion.  But, you know, I

22

1  couldn't drop everything at that moment to look through.  And

2  again, the reason that he gave was hearsay.  So, you know,

3  it's not gamesmanship.  It was just, look, you know, when we

4  got down to looking at it, when I looked at it, I decided it

5  wasn't worth the effort and the hassle, and we agreed to pull

6  them down and withdraw them.  And that's why I filed the

7  amended motion.

8       As far as the current appendix, Your Honor, we're just

9  making a record.  You know, we're trying to get this thing

10 reviewed.  We're making sure the Court is aware of all the

11 grounds and having considered all the grounds and all the

12 actions that we think support our motion.  We're giving the

13 Court the opportunity to look at it, and then just enter the

14 order without that language and we'll deal with the mandamus.

15      Again, the issue is ultimately going to be reviewed.

16 We're trying to get it reviewed.  And you're right, you know,

17 we don't have to, you know, you didn't have to have a hearing

18 on the first deal, you don't have to have a hearing on this

19 one.

20           THE COURT:  Okay.

21           MR. POMERANTZ:  Your Honor, this is -- this is just

22 one more match in furtherance of Mr. Dondero's stated desire,

23 as you've heard many times, to burn the place down.  We would

24 have hoped, and I guess it would have been naïve to hope, as I

25 know Your Honor has hoped throughout the case, that at some

23

1  point in time the Dondero side would stop blaming Your Honor,

2  blaming Mr. Seery, blaming the estate, and actually look at

3  what he can do to put an end to this.  Pay his notes, stop

4  raising frivolous claims, so everyone can go on with his life.

5  That's what the estate wanted to do and wants to do.  That's

6  what Mr. Seery wants to do.  Unfortunately, Mr. Dondero

7  doesn't seem capable of it, and this is just one more match on

8  the flames.  And Mr. Lang, doing his job, following his

9  client's wishes, is just one more player in that.  But it is

10 extremely frustrating.

11         THE COURT:  Okay.  All right.  Here's what I'm going

12 to do.  First, I'm simply going to deny the pending amended

13 motion for final appealable order and supplement to motion to

14 recuse, as it is procedurally improper as framed.  Okay?  It

15 was kind of like a Rule 54 motion.  It was kind of like a new

16 motion to recuse.  It was kind of like a Rule 59 motion for,

17 you know, new -- to put in new evidence, have a new trial, but

18 way untimely for that.

19     So I'm just denying the motion that's before me.  Okay?

20 And by doing that, I mean, I guess, I guess the stipulation

21 and order that's before me on the motion to strike and the

22 motion to compel, I guess I'll -- it's in my queue, I'll sign

23 it, unless someone tells me there is a reason it doesn't make

24 sense to sign it.

25     But I'm denying the motion before me.  But just so it's

24

1   clear, Mr. Lang, it's without prejudice to you either filing a

2   simple Rule 54 motion, without attachments, that simply asks

3   me to strike the last sentence of my original order denying

4   your motion to recuse from March 2021.

5        If you give me a simple Rule 54-based motion simply asking

6   me to strike that sentence, I'll sign it.  Without a waiting

7   period.  Without a hearing.  And I assume Mr. Pomerantz

8   doesn't have a problem with that.

9            MR. POMERANTZ:  That is correct, Your Honor.  If all

10  that motion asks for, we would not oppose that.

11           THE COURT:  Okay.  It's also, my ruling today denying

12  your motion, is without prejudice to you filing a new motion

13  to recuse, if that's what you want to do, to start this over

14  and supplement the record.

15       But, you know, proceed as you will.  This Court is going

16  to do its duty.  And, well, if you want to do that, you do

17  that, but I'll have a more elaborate order if I have to rule

18  on a new motion to recuse.  Among other things, I'm going to

19  point out to the Court above, whoever hears this, that because

20  I think timeliness was always an issue I raised in your

21  original order, you know, filing a motion to recuse after

22  confirmation, 15 months after this judge was assigned to the

23  case, and after the judge had signed 263 orders.

24       You know, we have case authority, as I'm sure you

25  researched and know, that talk about timeliness.  Even though

25

1  it's not baked into the statute, 28 U.S.C. Section 455, it is

2  a factor.  And so this is not *A v. B* litigation.  This is a

3  case affecting many, many people.  And at some point, don't we

4  have to wonder why a motion would be filed after 263 orders?

5  If your clients legitimately think there was bias, I don't

6  know why they didn't raise the issue way, way earlier in the

7  case.

8      And that's why these appendices are so huge, right?  It

9  dovetails with the timeliness.  Okay?  Fifteen months.

10  There's a huge, huge, huge, huge record.

11      So, anyway, do you have any questions, Mr. Lang?

12      Again, I  will say it for at least the third time this

13  morning:  I'm worried about judicial resources and estate

14  resources.  Okay?  And, you know, I have to worry about I'll

15  loosely call my bosses, okay, you know, the courts that grade

16  my papers.  The District Court who hears appeals and hears

17  petitions for writ of mandamus.  The Fifth Circuit.  They're

18  going to get frustrated with me if -- well, you know, if, for

19  example, I had ruled on this motion before me today, a clearly

20  procedurally defective motion.  And if I just willy-nilly let

21  people put things in the record without a procedurally proper

22  basis, it just makes more work for the Court of Appeals,

23  right?

24      So it's not just about the lawyers here.  It's not just

25  about me and my staff.  It's about the people who grade my

26

1  papers.  If I granted your motion as it's pending here before

2  me today, I have every reason to think, whether it's Judge

3  Kinkeade or the Fifth Circuit, they would think, what is this

4  judge doing?  Okay?  So it's just procedurally defective, what

5  you filed.  Okay?  But, again, you've got the ruling.  Do you

6  have any questions?

7            MR. LANG:  I don't.

8            THE COURT:  We're adjourned.

9            THE CLERK:  All rise.

10       (Proceedings concluded at 10:25 a.m.)

11                         --oOo--

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   /s/ Kathy Rehling                        08/31/2022

24  _____        _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

# EXHIBIT V

```
                  UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                      .   Case No. 19-34054-11(SGJ)
                            .
HIGHLAND CAPITAL            .   Earle Cabell Federal Building
MANAGEMENT, L.P.,          .   1100 Commerce Street
                            .   Dallas, TX  75242-1496
                            .
          Debtor.           .   Monday, September 12, 2022
. . . . . . . . . . . . . .     9:40 a.m.
```

TRANSCRIPT OF HEARING ON MOTION TO WITHDRAW PROOF OF CLAIM #146
               BY HCRE PARTNERS, LLC (3443) AND
 REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
             PROTECTION [DOCKET NO. 3464] AND
 (B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
            TO COMPEL A DEPOSITION (3484)

             BEFORE HONORABLE STACEY G. JERNIGAN
           UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

For Highland Capital        Pachulski Stang Ziehl & Jones LLP
Management, L.P.:           BY:  JOHN MORRIS, ESQ.
                            780 3rd Avenue, 34th Floor
                            New York, New York 10017


For NexPoint Real           Hoge & Gameros, L.L.P.
Estate Partners LLC         BY:  CHARLES W. GAMEROS, JR., ESQ.
f/k/a HCRE Partners         6116 North Central Expressway
LLC:                        Suite 1400
                            Dallas, Texas 75206


Audio Operator:             Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
              produced by a transcript service.

                     LIBERTY TRANSCRIPTS
                     7306 Danwood Drive
                     Austin, Texas 78759
               E-mail:  DBPATEL1180@GMAIL.COM
                       (847) 848-4907

31

1  we've already said the Court should allow us to withdraw the

2  proof of claim and condition it with prejudice.

3         There is no other lawsuit out there.  There is no

4  other position being taken anywhere.  Frankly, Your Honor, the

5  reason why I said admit the exhibits and I question their

6  relevance is because none of them go to actual legal prejudice.

7  Can't show it, hasn't shown it, hasn't demonstrated it.  It

8  says they did a lot of work, gave you the greatest hits of some

9  email, but quite frankly, Your Honor, that goes to merit, not

10 legal prejudice.  That goes to, I believe, part of their story

11 as to what happened.

12        The story that matters to me is we think things were

13 going to happen during the estate, he's right.  We didn't move

14 for them.  We looked back at it and said we don't need the

15 proof of claim anymore, we should withdraw it.  That's the only

16 thing that's happened, and that's why we're here.  We don't

17 think he's entitled to discovery as to why we withdrew the

18 proof of claim.

19        It's his burden to show legal prejudice.  He can show

20 it or he can't.  He hasn't.

21        THE COURT:  Okay.

22        MR. GAMEROS:  The estate hasn't.

23        THE COURT:  Mr. Gameros?

24        MR. GAMEROS:  (Indiscernible) Mr. Dondero.

25        THE COURT:  I have a question.  I mean I'm looking at

32

1  your pleading, your motion to withdraw the proof of claim, and

2  I'm looking at this wonderful chart you have on Page 7 saying

3  here are the standards under Bankruptcy Rule 3006, you, Court,

4  should consider.  They were articulated in the <u>Manchester</u> case.

5        And it's not merely about is there any prejudice to

6  the estate.  I mean you set forth five factors.  One is "reason

7  for dismissal."  One is diligence in bringing the motion to

8  withdraw.  One is undue vexatiousness.  One is the matter's

9  progression including trial preparation.  One is duplication of

10 expense of relitigation.

11       This is your own authority, which I believe actually

12 is correctly articulating the standards.  It's not just about

13 prejudice.  Yes, I agree that some of the case law has zeroed

14 in on that one in particular.  But I mean you say yourself

15 reason for dismissal is a factor the Court must consider.

16       MR. GAMEROS:  That's correct, Your Honor.  Those are

17 the factors, and I think our analysis on them is correct.

18       If we go all the way to trial and the result is that

19 our proof of claim is denied, we're in the same position we are

20 right now.  So why should the parties, the estate, and the

21 Court go through that exercise?

22       THE COURT:  Okay.  Well, that's another issue, I

23 think, other than the reason for dismissal.  But a follow-up

24 question to what you just said is this.

25       Would you agree to a condition on the withdrawal of

**WWW.LIBERTYTRANSCRIPTS.COM**

33

1 your proof of claim that your client agrees that Highland has a

2 46-point whatever it was percent interest in SE Multifamily

3 Holdings and your client waives any right in the future to

4 challenge that interest?

5       MR. GAMEROS:  Your Honor, if that's what the Court

6 wants to put in an order and I have a chance to confer with my

7 client on it, I'm pretty sure that would be agreeable.

8       THE COURT:  Today's the day.  I'm not going to

9 continue.  I've got, you know, the whole day booked if I needed

10 it because I wasn't sure what you all were going to want to put

11 on.

12       MR. GAMEROS:  Your Honor, we'd agree with that.

13       MR. MORRIS:  Your Honor, I'm sorry to interrupt, but

14 a waiver of any appeal, too.  I just hard that if that's what

15 you want to put in the order, that's okay.  But this case has

16 to end, and that's what we're looking for.

17       We're a post-confirmation estate that will not go

18 forward with the possibility hanging over its head that it may

19 be divested of this asset.  That is what this proof of claim

20 and this dispute is about.

21       And what the debtor needs in order to avoid legal

22 prejudice is the complete elimination of any uncertainty that

23 it owns 46.06 percent of SE Multifamily.  And if HCRE is not

24 willing to give that comfort today, we again renew our request

25 for a direction that the three HCRE witnesses appear for

34

1  substantive depositions and we get this on the trial calendar.

2          MR. GAMEROS:  Your Honor, we'll agree to it.

3          THE COURT:  Well, you know what, this is such a big

4  deal I really need a client representative to say that.  It

5  would be that --

6          MR. GAMEROS:  I don't have one here today, but I can

7  get you one.

8          THE COURT:  How soon --

9          MR. GAMEROS:  Do you want me to file a stipulation or

10 an affidavit?

11         THE COURT:  Pardon?

12         MR. GAMEROS:  Do you want me to file an affidavit?

13         THE COURT:  Well, let's be a hundred percent clear.

14 Your client would state that with the granting of the motion to

15 withdraw proof of claim number 146, HCRE is irrevocably waiving

16 the right to ever challenge Highland Capital Management's 46

17 percent interest -- and I know it's 46-point something -- 46

18 percent interest in SE Multifamily Holdings, LLC and is,

19 likewise, waiving the right to appeal or challenge the order to

20 this effect.

21         MR. MORRIS:  Your Honor, if I may, perhaps we can

22 take a ten-minute recess and allow him to consult with his

23 client and perhaps get a client representative on the phone who

24 can make that representation?

25         THE COURT:  All right.  Mr. Gameros, you think you

35

1  can get a client rep on the WebEx?

2          MR. GAMEROS:  I'm pretty sure I can, Your Honor.

3          THE COURT:  All right.  Well, how about we take a 15-

4  minute recess.  Does that sound a reasonable amount of time?

5  We've got, you know, two dozen people --

6          MR. GAMEROS:  It does, Your Honor.

7          THE COURT:  Two dozen people on the WebEx.  I don't

8  know if maybe one is a client representative, but we'll take a

9  15-minute break and I'll come back.  Okay.

10         THE CLERK:  All rise.

11     (Recess at 10:33 a.m./Reconvened at 10:50 a.m.)

12         THE CLERK:  All rise.

13         THE COURT:  Please be seated.

14         We're back on the record in Highland.

15         Mr. Gameros, how did you want to proceed now?

16         MR. GAMEROS:  Your Honor wanted me to get a

17 representative of NexPoint Real Estate Partners to state that

18 they agree that the estate has its 46 percent interest in the

19 company agreement subject to the company agreement.  And I've

20 got Mr. Sauter here who has authority to speak on behalf of

21 NexPoint Real Estate Partners.

22         THE COURT:  All right.  Well, so what is his position

23 with HCRE?

24         MR. SAUTER:  Your Honor, I don't have -- this is DC

25 Sauter.  I don't have an official position with HCRE, but I

36

1 have spoken with Mr. Dondero and he has authorized me to appear

2 here today and agree to the conditions that Mr. Gameros just

3 outlined.

4        THE COURT:  All right.  Well, it sounds like hearsay

5 to me.  I don't know -- Counsel, let me have you both respond.

6 You know, I worry about this will fall apart the minute Mr.

7 Dondero is instructing a lawyer, I never agreed to that.  I

8 mean I just don't know.  This is highly unusual.

9        First --

10        MR. GAMEROS:  Your Honor, if I might?

11        THE COURT:  Please.

12        MR. GAMEROS:  Mr. Sauter is an officer of the Court.

13 He works, you know, with Mr. Dondero at his business at

14 NexPoint; certainly an authorized agent on behalf of NexPoint

15 Real Estate Partners to make this agreement on behalf of

16 NexPoint Real Estate Partners.

17        To the extent that the condition that you originally

18 described as a conclusory matter, in other words, how to end

19 the withdrawal, we already agreed to that, that we also can

20 agree on the record to waive any appeal.  Mr. Sauter is

21 authorized to agree to that, as well.

22        So I think as an agent and a lawyer on behalf of

23 NexPoint Real Estate Partners, he's fully able to do that.

24        THE COURT:  How do I know he's able to do that?

25        And, by the way, if Mr. Dondero is in I guess the

**WWW.LIBERTYTRANSCRIPTS.COM**

37

1  last 15 minutes given him authority to testify before the

2  Court, why couldn't Dondero just get on the WebEx himself?

3          MR. SAUTER:  Your Honor, I think he felt more

4  comfortable with me being a lawyer agreeing to those terms so

5  that he wouldn't misstate something.  He has been listening.  I

6  believe he's still on, although I'm not certain.

7          THE COURT:  Mr. Morris, do you want to respond?  I

8  mean I'm not sure, frankly, I care what you say, no offense.  I

9  don't think I have a person with clear authority here.

10          MR. MORRIS:  I'll just be quick and say I agree.

11          THE COURT:  Okay.  Mr. Gameros --

12          MR. GAMEROS:  As an attorney for NexPoint Real Estate

13  Partners, I have the authority to make that agreement on the

14  record and it be binding.  Mr. Sauter is confirming that

15  authority having spoken with Mr. Dondero about it.

16          I think that the Court is fully --

17          THE COURT:  Mr. Gameros --

18          MR. GAMEROS:  -- capable of doing that --

19          THE COURT:  Mr. Gameros, come on.  You know this is

20  the client's decision to make.  Okay.  I don't have a client

21  representative.  I don't have an officer or controlling

22  equityholder as evidence here of --

23          MR. MORRIS:  Mr. Dondero --

24          THE COURT:  -- the willingness to make the agreement.

25          Pardon?

**WWW.LIBERTYTRANSCRIPTS.COM**

38

1              MR. MORRIS:  Can Mr. Dondero make the representation

2    on the record to the Court that he is authorizing Mr. Sauter to

3    waive any claim that HCRE has to Highland's 46.06 percent

4    interest in SE Multifamily along with any appeal?  This is just

5    step one.  But if Mr. Dondero was on the phone, let him speak

6    up and make it crystal clear that he is delegating the full

7    authority to Mr. Sauter to negotiate and enter into this

8    consensual order on behalf of HCRE.

9              THE COURT:  All right.  Mr. Gameros, do you want to

10   give your client authority to speak up?  Your client

11   representative, someone who's actually an officer or a

12   controller or equity owner?

13             MR. GAMEROS:  Your Honor, if Mr. Dondero can do that,

14   that would be great.  I don't know if he's in a place where he

15   can do that.

16             THE COURT:  All right.  Mr. Dondero, if you can hear

17   us, are you willing to give some quick testimony in that

18   regard?

19       (No audible response)

20             MR. DONDERO:  I can't see the box --

21             UNIDENTIFIED SPEAKER:  Surprising that -- surprising

22   he was on the phone before, but now he's not after delegating.

23   Just I'm not --

24             MR. SAUTER:  Your Honor, he's on the phone.  I'm just

25   -- if you will give me a minute, I got to run around the corner

**WWW.LIBERTYTRANSCRIPTS.COM**

39

1   and try to make sure he knows how to unmute himself.

2          THE COURT:  Star 6.  If he's on a phone, star 6 is

3   the way to unmute himself.  But I want to see video, too.

4          THE OPERATOR:  There we go.  Try again.

5          MR. DONDERO:  Hello?

6          THE COURT:  All right.

7          MR. DONDERO:  Hello?

8          THE COURT:  Mr. Dondero, is that you?

9          MR. DONDERO:  It's me.  I've been on the entire time.

10         THE COURT:  All right.  Can you turn your video on,

11  please?

12         MR. DONDERO:  I am on my cell phone.

13         THE COURT:  Okay.  Well, so I guess you just called

14  in on your cell phone, you don't have a WebEx connection on

15  your cell phone?

16         MR. DONDERO:  I don't have a WebEx.

17         THE COURT:  Okay.  Well -- yeah, it sounded like you

18  were in the same office as Mr. Sauter.  Is that -- did I

19  misunderstand?

20         MR. DONDERO:  We work in the same office.  I'm in my

21  car.  I just stepped out of my car.

22         THE COURT:  All right.  Well, this is not ideal, you

23  know, without us seeing you.  But I'll go ahead and swear you

24  in.  All right.  Can you hear me okay?  I need to swear you in.

25         MR. DONDERO:  Yes.

**WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                              40

1              THE COURT:  All right.

2                   JAMES DONDERO, HCRE'S WITNESS, SWORN

3              THE COURT:  All right.

4              Mr. Gameros, do you want to ask him the questions we

5    need to hear answers on, please?

6              MR. GAMEROS:  Thank you, Your Honor.

7                         DIRECT EXAMINATION

8    BY MR. GAMEROS:

9    Q    Mr. Dondero, on behalf of HCRE, do you agree as a

10   condition for withdrawing the proof of claim that HCRE will not

11   challenge the estate's ownership or equity interest in SE

12   Multifamily subject to the company agreement?

13   A    Yes.

14   Q    Do you agree that you will not appeal and that, therefore,

15   HCRE is waiving any appeal right to that determination as a

16   condition of withdrawing the proof of claim?

17   A    Yes.

18             MR. GAMEROS:  Those are the questions for Mr.

19   Dondero.

20             MR. MORRIS:  Your Honor, if I may?

21             THE COURT:  Mr. Morris, you may.

22             MR. MORRIS:  I'm very uncomfortable.  I'm very

23   uncomfortable with the inclusion of the language subject to the

24   company agreement.  It sounds like a very conditional waiver.

25   We need an irrevocable unconditional admission by HCRE that

41

1 Highland owns 46.06 percent of SE Multifamily, period, full

2 stop.  If they want to keep conditions in there and make it

3 conditional and make it subject to other things, let's please

4 deny the motion and proceed to trial.

5          THE COURT:  All right.  Well, Mr. --

6          MR. GAMEROS:  The equity that they own is part of the

7 company agreement.  It's not modifying the company agreement by

8 saying.

9          THE COURT:  Well --

10          MR. MORRIS:  Our ownership is not subject to the

11 agreement.  We either have an ownership interest or we don't.

12 Our rights and obligations as a member of SE Multifamily are

13 subject to the agreement, but our ownership interest is not.

14 And that's the ambiguity that we need to remove.

15          THE COURT:  Okay.  Well, Mr. Gameros, do you want to

16 rephrase the question or are you not willing to make the

17 agreement as specific as Mr. Morris says he needs it?

18          MR. GAMEROS:  That's what I'm -- I guess I don't

19 understand what his complaint is.  If the estate owns 46

20 percent of the equity of SE Multifamily, it owns that subject

21 to the company agreement.  It's not a separate ownership

22 interest.  So I don't know what the problem is.

23          THE COURT:  Okay.  Let me try to phrase it as I

24 understand it.

25          What I understand has been asserted in the proof of

**WWW.LIBERTYTRANSCRIPTS.COM**

42

1  claim is that what was set forth in the agreement was a

2  mistake, okay.  A mistake.  And it sounds like you're using

3  language that says we'll agree the agreement, you know, they

4  have a 46 percent interest pursuant to the agreement.  But that

5  doesn't change -- that does not really zero in on the argument

6  made in the proof of claim that there was a mistake in the

7  agreement, right?

8          So you'd have to go broader to completely resolve the

9  issues raised in your proof of claim and say we agree, Highland

10 has a 46.06 interest in SE Multifamily and we agree that is

11 correct and we waive any right to challenge it in the future

12 and we waive any right to appeal this order.

13         MR. GAMEROS:  And, Your Honor, if that's the

14 condition, I guess my concern is that the 46 percent is still

15 part of the company agreement.  We agree not to challenge it on

16 the basis of anything asserted in the proof of claim, that

17 being mistake, lack of consideration, or failure of

18 consideration.  Their 46 percent is their ownership interest in

19 SE Multifamily and HCRE won't challenge that.

20         Is that sufficient?

21         THE COURT:  Well, I need to hear from your client.  I

22 mean he needs to be asked every which way from Sunday whether

23 he is waiving the right to challenge Highland's 46.06 interest

24 from now until eternity, okay.  That's basically, you know, we

25 either have that agreement or we'll just have a trial.

**WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                              43

1                    CONTINUED DIRECT EXAMINATION

2   BY MR. GAMEROS:

3   Q    Mr. Dondero, do you agree that NexPoint Real Estate

4   Partners will not challenge in any way the estate's interest in

5   SE Multifamily, its 46-point whatever percent interest that is?

6   A    I think the nuance is that agreement is okay in current as

7   of today.  But it's part of an operating agreement, and that

8   percentage ownership can change due to capital calls and other

9   things.  And it could change over time.  It's never in a

10  partnership agreement fixed into perpetuity.  And so no

11  businessman can agree to that.

12       If the Court wants it fixed into perpetuity, that would be

13  very odd.

14            MR. MORRIS:  Can we go to trial, Your Honor?  Can we

15  just deny the motion and go to trial?  Let me have my

16  depositions and go to trial.  This is -- if Mr. Dondero wants

17  to take that position, he's welcome to do that.  But I'm

18  entitled to finality, and I'd like to get there.

19            THE COURT:  All right.  Well, Mr. Gameros, anything

20  else you want to ask your client that you think might be

21  helpful?

22  BY MR. GAMEROS:

23  Q    Mr. Dondero, you desire to withdraw the proof of claim.

24  Correct?

25  A    Yes.

**WWW.LIBERTYTRANSCRIPTS.COM**

44

1  Q    And you agree to an order denying the proof of claim with

2  prejudice.  Correct?

3  A    Yes.

4  Q    And can you agree that HCRE will not challenge the equity

5  ownership of its member in SE Multifamily of the estate?

6  A    Yes.

7            MR. GAMEROS:  Your Honor, I think there it is.

8            THE COURT:  Mr. Morris, do you have any --

9            MR. GAMEROS:  He agrees.

10            THE COURT:  -- do you have any follow-up questions --

11            MR. MORRIS:  The waiver of the right to --

12            THE COURT:  -- Mr. Dondero?

13            MR. MORRIS:  The waiver of the right to any appeal

14  whatsoever.  And I do have -- you know, there are the other

15  conditions that we mentioned earlier, right?  Either they have

16  to also agree that Mr. Seery's deposition transcript shall

17  never be used for any purpose at any time or they need to level

18  the playing field and submit their witnesses to examination.

19            The playing field needs to be level here.  Either if

20  they want to use that deposition transcript for some purpose, I

21  have no problem with that.  Just let me take my depositions.

22  If they don't want to submit their witnesses to depositions,

23  then they also have to agree that that transcript will never be

24  used for any other purpose.  It's as if this proof of claim has

25  never been filed, right, for that purpose, right.  Because

**WWW.LIBERTYTRANSCRIPTS.COM**

45

1  that's just not fair.  That's the legal prejudice.

2          How do you take my client's deposition on Wednesday

3  and file this motion on Friday knowing your client's supposed

4  to be deposed on Tuesday?  Level the playing field.  That's

5  conditional number two.

6          And condition number three, frankly, Your Honor, this

7  proof of claim was fraudulent.  I mean my client has been

8  damaged.  My client has spent an enormous amount of money on

9  this, and I'd like them to agree to if not make us whole, you

10 know, do something because it's wrong.  It's just wrong that

11 Mr. Dondero files proofs of claim under penalty of perjury that

12 have absolutely no basis in fact.

13         It's distressing.  I'd like those two last issues

14 addressed, as well.

15         MR. GAMEROS:  Your Honor, in terms of the Court's

16 questions in terms of finality with respect to the membership

17 interest in SE Multifamily, Mr. Dondero agrees with the Court.

18 He's already said that he won't waive -- that he waives, rather

19 -- I'm sorry, let me start again.

20         He has said very clearly that he has waived appeal of

21 this order allowing the withdrawal of the proof of claim with

22 the conditions that you asked for.  I think you should grant

23 the motion to withdraw and we can put an end to all of this.

24         THE COURT:  Okay.

25         MR. MORRIS:  Here's the thing, Your Honor.  We know

**WWW.LIBERTYTRANSCRIPTS.COM**

51

1 but it's also a big deal because we want to make sure only

2 parties with legitimate claims are given a seat at the table,

3 so to speak, in bankruptcy as far as, you know, their right to

4 a distribution, their right to be heard in a case.

5          So, you know, that's the reason for the rule.  We

6 don't see it come into play very often, but it's there because

7 we want to make sure that we protect the integrity of the

8 bankruptcy process.  And if someone files a proof of claim and

9 it's pending and, you know, activity happens in the bankruptcy

10 case as a result of it, that we don't just let a party say

11 never mind.

12          So the Manchester case, which you both cited in your

13 pleadings, has set forth fact-intensive factors -- fact-

14 intensive inquiry.  And, again, I'm just looking at HCRE's

15 motion, Page 7.  There was a chart and it sets forth the

16 Manchester factors.  Factor number one, diligence in bringing

17 the motion to withdraw the proof of claim.

18          In Mr. Gameros' chart, his response to that factor is

19 that HCRE brought its motion to withdraw immediately after

20 conferring with debtor's counsel.  I don't even know what that

21 means, okay.  But what I do know is in looking at diligence of

22 bringing the motion, the proof of claim was filed April 8th,

23 2020.  It was objected to, the proof of claim, July 30th, 2020.

24 And then on August 12th, 2022, this motion to withdraw the

25 proof of claim was filed.

**WWW.LIBERTYTRANSCRIPTS.COM**

52

1    So two years and one month after the objection was

2  filed to the proof of claim HCRE withdraws it.  So that doesn't

3  seem very diligent.  It's not diligent at all, to be honest.

4    Your second factor, you cited, Mr. Gameros, undue

5  vexatiousness, and you say HCRE has not been vexatious in

6  pursuing its proof of claim.  And outside the motion to

7  disqualify previous counsel, which is not substantive,

8  everything in the matter has proceeded by agreement and there

9  have been no hearings set or held.

10    Okay.  Well, debtor has represented in its pleadings

11 and today through counsel on the record that it has spent

12 hundreds of thousands of dollars litigating this.  It has

13 mentioned that four depositions have been taken.  It was Mr.

14 Mark Patrick.  It was the tax accounting firm.  We had the B --

15 the entity -- BH Equities, LLC, their representative.  And then

16 Mr. Seery.  So four depositions, and I'm told a lot of written

17 discovery.

18    And on the day before the -- well, the day after, day

19 or two after the Seery deposition, the motion to withdraw the

20 proof of claim was filed after 5:00 in the evening on a Friday,

21 August 12th, and I guess a couple of business days before the

22 depositions were to occur of Mr. Dondero and the fellow, Mr.

23 McGraner, and I feel like there was one other deposition.  I'm

24 losing track of those.

25    But --

53

1         THE CLERK:  The 30(b)(6).

2         THE COURT:  Oh, the 30(b)(6).  The 30(b)(6)

3 representative.

4         So on top of all of that, you know, Highland argues

5 there was just simply no good-faith basis for the proof of

6 claim.  Proof of claim asserted the membership interest,

7 Highland's 46.06 interest, set forth in the Multifamily LLC

8 agreement were the result of mistake.

9         Mr. Dondero signed the agreement for both parties,

10 HCRE and Highland.  And then now the motion to withdraw says

11 something to the effect of the anticipated issues have not

12 materialized.  So anyway, the undue vexatiousness factor I

13 think weighs -- because of these factors I've mentioned, weighs

14 in favor of there has been undue vexatiousness.

15         Factor number three, according to HCRE's motion to

16 withdraw the proof of claim, is matter's progression including

17 trial preparation.  Again, four depositions, thousands of pages

18 of written discovery.  We were days away from the last

19 depositions occurring, those of HCRE's potential witnesses and

20 we have trials set.  We have a trial set in November.  So that

21 factor, again, seems to weigh heavily in favor of Highland's

22 objection here.

23         Duplication of expense of relitigation, here's why we

24 got Mr. Dondero on the phone or wanted to have a witness with

25 authority.  Highland is saying we are concerned about

54

1    relitigation of this ownership interest issue.  And as part of

2    its argument, Highland has said we've got claims, we've got our

3    own claims for breach of agreement and different things that

4    are going to cause us to have to drill down on terms of the LLC

5    agreement.

6           And we can't -- we don't want to face exposure on

7    this issue of, well, you don't have the ownership interest or

8    the rights you say you do, Highland.  So, you know, if we could

9    get ironclad language here of, you know, we waive the right, we

10   agree that Highland has the 46.06 interest and we waive the

11   right to challenge that, then I don't think we'd have to worry

12   about relitigation of the issues in the proof of claim.  But it

13   feels like we had a little bit of reluctance to say it as

14   forcefully as we would need to have it said to avoid

15   relitigation.

16          Reason for dismissal, I don't know.  I don't know

17   what the reason for dismissal.  Again, to quote HCRE's pleading

18   on Page 7, the reason for dismissal is, "The operation of the

19   company" -- I think that means SE Multifamily -- "during the

20   case and the anticipated issues therewith have not materialized

21   and NREP no longer desires to proceed in the matters raised in

22   the proof of claim."

23          I mean that's just not in sync with the theory

24   espoused in the proof of claim that we think there was a

25   mistake made in the LLC agreement.  So, again, looking at these

55

1  legal factors, I do not think that the correct result is to

2  grant the motion to withdraw the proof of claim under Rule 3006

3  under the Manchester factors.  I will throw in that I think

4  there is potential for prejudice here of the debtor.

5          I mean not even considering that hundreds of

6  thousands of dollars have been spent over two-plus years on

7  this issue, you know, I remember very well the disqualifying

8  motion.  And I said Wick Phillips should be disqualified.  I

9  didn't shift fees because I just wasn't sure at the time that,

10 frankly, HCRE should be imposed with the fees attributable to

11 its lawyers, not recognizing the conflict of interest when they

12 saw one.  It was just a little fuzzy in my mind.

13         But I'm just letting you know that now that we are

14 here many years later, many months later and we have all the

15 sudden, okay, never mind, this is just a situation where I have

16 some regrets I didn't shift fees, to be honest.  But -- so the

17 motion is denied.  The depositions shall go forward.  I'm not

18 sure, you know, if the dates that have been proposed are still

19 workable, but if someone wants to speak up now about those

20 deposition dates to avoid an emergency hearing, I'm willing to

21 hear that.

22         I think what I heard was, well, I don't know what --

23 have you talked about dates at all?  Probably not, Mr. Morris,

24 in light of this hearing today.

25         MR. MORRIS:  We have not, Your Honor.  But I do think

**WWW.LIBERTYTRANSCRIPTS.COM**

56

1   that Counsel and I can work that out.  I'm not available until

2   the week of the 26th.  So it won't be early that week but

3   sometime between let's say the 28th of September and the 7th of

4   October, I'll be prepared to take these depositions.  And I

5   would respectfully request, and we can work with Ms. Ellison to

6   try to find a trial date sometime the last week of October,

7   first week of November so we can get this finished.

8        THE COURT:  Okay.  Did I dream up that there was a

9   trial set already in November?

10       MR. MORRIS:  You know what?

11       You know what, let's just keep that date, Your Honor.

12  Let's just keep that date.

13       THE COURT:  All right.  Traci, are you still on the

14  line?  Can you confirm my memory?  I thought we had a two-day

15  trial set aside for this in November.

16       MS. ELLISON:  Is this on the merits of HCRE's claims,

17  Judge Jernigan?  I have a note holding November 1 and 2.

18       THE COURT:  Okay.

19       MR. MORRIS:  Yeah.

20       THE COURT:  So we'll go ahead and mark that down.

21       Now the last -- so you'll work on an a mutually

22  agreeable date for these three remaining depositions sometime,

23  you know, late September, early October.  And I trust you will

24  --

25       MR. MORRIS:  Yeah.  I would respectfully request that

57

1 Counsel just propose dates for the depositions.  I'll wait to

2 hear from him.  But I think -- I'm representing to the Court

3 that any time between September 28th and let's just give it two

4 full weeks, October 12th.  That's plenty of time in advance of

5 the trial.

6 　　　　　THE COURT:  All right.  Mr. Gameros, anything you

7 want to add on that?

8 　　　　　MR. GAMEROS:  No, Your Honor.  I'm sure we can work

9 with Mr. Morris to get those scheduled.

10 　　　　　THE COURT:  All right.  And here's actually the last

11 thing I wanted to say.

12 　　　　　You know, I had thought about, you know, waiting 24

13 hours to give you a ruling on this motion to withdraw the proof

14 of claim and directing you all to kind of talk and see if maybe

15 you could work out language, you know, without the pressure of

16 the Court hovering over you that could make both of your

17 clients satisfied.

18 　　　　　I still encourage you to do that, but I'm going to

19 pick on our U.S. Trustee.  I see she's observing today, and I'm

20 not going to ask you to say anything, Ms. Lambert.  But if you

21 all do agree, if you all in the next, you know, 24 hours come

22 to some sort of agreement, I don't mean to be alarming, but I

23 want it run by the U.S. Trustee because, you know, I've heard

24 some things that have troubled me about the, you know, lack of

25 good faith with regard to the proof of claim and, you know,

**WWW.LIBERTYTRANSCRIPTS.COM**

58

1 alleged gamesmanship.

2        And, you know, I talked earlier about this goes to
3 the integrity of the system, you know, filing a proof of claim
4 under penalty of perjury.  Anyway, I'm feeling a little bit
5 uncomfortable about signing off on an agreed order where there
6 may be quid pro quos that went back and forth in connection
7 with withdrawing a proof of claim.  I mean at some point --
8 well, that's why we have scrutiny of these things under Rule
9 3006, right?

10        Again, there are integrity issues.  And so I just --
11 you know, if you were to work out language, I want you to run
12 it by Ms. Lambert and I want to hear that either she was okay
13 with it or she wasn't okay with it or maybe she declines to
14 comment.  You know, I'm not going to tell her how to do her
15 job, but I feel like that needs to happen, okay?

16        It's just something uncomfortable going on in my
17 brain about, you know, again a proof of claim being on file
18 two, almost two and a half years and then, you know, okay,
19 never mind, okay, I agree to never mind as long as you agree to
20 XYZ.

21        And I have no idea what's in the Seery transcript.  I
22 don't have it before me.  But, you know, I don't even know what
23 that's all about.  I don't even know if I care what that's all
24 about.  I just know if there are quid pro quos I feel like, you
25 know, maybe I need to have the U.S. Trustee, you know, not per

59

1  se signing off on any agreed order but at least kind of looking

2  at it and telling me either U.S. Trustee's fine with it, U.S.

3  Trustee is not fine with it, or U.S. Trustee declines to

4  comment.  Just I know that I've gone through the drill, okay?

5          So just letting you know I am still, you know, all

6  open to an agreed resolution of this, okay.  But we're going

7  forward as if you can't get there, okay?

8          All right.  I'll look for -- what am I going to look

9  for?  I'm going to look for an order denying the motion to

10  withdraw proof of claim.  I'm going to look for an order

11  granting the -- well, an order resolving the objection to

12  motion to quash and cross-motion for subpoenas saying that

13  these three witnesses are going to appear at a mutually

14  agreeable time either late September or early October.

15          All right.  We're adjourned.

16          THE CLERK:  All rise.

17          MR. MORRIS:  Thank you, Your Honor.

18      (Proceedings concluded at 11:35 a.m.)

19                      *  *  *  *  *

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0238

60

1          **C E R T I F I C A T I O N**

2          I, DIPTI PATEL, court-approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7    /s/ Dipti Patel

8    DIPTI PATEL, CET-997

9

10   LIBERTY TRANSCRIPTS          DATE: September 13, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

APP. 0239

# EXHIBIT W

```
                   IN THE UNITED STATES BANKRUPTCY COURT
 1                FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION
 2
                                )   Case No. 19-34054-sgj-11
 3   In Re:                      )   Chapter 11
                                 )
 4   HIGHLAND CAPITAL            )   Dallas, Texas
     MANAGEMENT, L.P.,           )   Wednesday, August 4, 2021
 5                               )   9:30 a.m. Docket
             Debtor.            )
 6                               )   - STATUS CONFERENCE RE:
                                 )     APPLICATION FOR
 7                               )     ADMINISTRATIVE EXPENSES
                                 )     (1888)
 8                               )   - MOTION FOR ORDER AUTHORIZING
                                 )     SALE OF CERTAIN PROPERTY
 9                               )     (2535)
                                 )   - MOTION FOR ORDER AUTHORIZING
10                               )     SALE OF CERTAIN LIMITED
                                 )     PARTNERSHIP INTERESTS (2537)
11   _____)

12                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
13               UNITED STATES BANKRUPTCY JUDGE.

14   WEBEX APPEARANCES:

15   For the Debtor:          Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
16                            10100 Santa Monica Blvd.,
                               13th Floor
17                            Los Angeles, CA  90067-4003
                              (310) 277-6910
18
     For the Debtor:          John A. Morris
19                            Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
20                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
21                            (212) 561-7700

22   For the NexBank          Lauren K. Drawhorn
     Entities:                WICK PHILLIPS
23                            3131 McKinney Avenue, Suite 100
                              Dallas, TX  75204
24                            (214) 692-6200

25
```

76

1  motions.

2        THE COURT:  All right.  Anything else before I give a

3  ruling?

4        All right.  Well, the Court, of course, has jurisdiction

5  over these two motions.  I'll call them the Maple Avenue

6  Motion and the PetroCap III Motion.  The Court will

7  specifically note for the record that notice has been proper

8  under the Rules and sufficient.  I'd note that July 8th these

9  motions were filed.

10       The Court will also note for the record that the only

11  objections that were lodged to these motions were withdrawn

12  during the hearing before the evidence, as were separate bids

13  that had been submitted.  Thus, there are no pending

14  objections, no pending bids at this juncture.

15       363(b) of the Bankruptcy Code applies to these proposed

16  transactions.

17       With regard to Maple Holdings, this is, of course,

18  technically a motion under 363(b) for approval for the Debtor

19  to exercise its management rights in Maple Avenue Holdings,

20  LLC to cause Maple Avenue Holdings, LLC to sell the real

21  property at 2817 Maple Avenue, Dallas, Texas.  So it's a

22  usage, I guess you could say, of property outside the ordinary

23  course of business.

24       And then with regard to the PetroCap III transaction, once

25  again, 363(b) is the governing authority.  The transaction is

77

1   either in the nature of a sale or usage in the form of a

2   forfeiture of certain of the limited partnership interests and

3   other rights in the agreements described in the motion.

4        The Court finds that the evidence very well demonstrated a

5   sound business justification for both of these transactions

6   and a reasonable business judgment has been exercised and

7   these transactions are in the best interests of the estate.

8        First, with regard to the Maple Avenue transaction, the

9   evidence showed that the purchase price, $9.75 million, is

10  certainly within the range of market values that expert

11  brokers and the Debtor's informal marketing process revealed.

12  The Court believes that the Debtor and its professionals

13  marketed the property appropriately, and this appears to be a

14  sale process that has been undertaken in good faith without

15  conclusion -- without collusion, I should say.  The purchaser,

16  Stonelake Capital Holdings, LP, is not an insider, and again

17  appears to be a participant in an arm's length, good faith,

18  and fair transaction.

19       The Court is not in the least troubled that we didn't have

20  an auction.  While auctions in the universe of Chapter 11 are

21  a very common protocol, there's nothing in the Bankruptcy Code

22  or Bankruptcy Rules that requires a public auction.  And when

23  we're talking about real estate, it's very common not to have

24  an auction.

25       But in any event, the Court reiterates that the marketing

78

1  of this property and the sale process appear to be in all ways

2  adequate and in good faith and have yielded fair value for the

3  property.  In any event, this is the highest and best offer

4  the Debtor received.

5      So the Court approves the Maple Avenue Holdings, LLC

6  transaction.  The Court reserves the right to supplement this

7  ruling in a written form of order.

8      Turning now specifically to PetroCap III, the Court

9  likewise believes that there has been a reasonable effort on

10  the part of the Debtor to maximize the value of these

11  interests and rights.  The Court believes that this

12  transaction is the highest and best transaction that can be

13  achieved by the estate.  The Court believes this was arm's

14  length and that all parties, including PetroCap, have acted in

15  good faith.  And so I should add both of these transactions

16  are going to be free and clear of any interests, with those

17  interests to attach to the proceeds.

18      The Court once again reserves the right to supplement in a

19  more fulsome written ruling, but the Court hereby approves the

20  PetroCap transaction.

21      To the extent these parties have asked for waiver of the

22  14 days under 6004, I can't remember if that request was made

23  on both transactions or just the real estate transaction.  Is

24  that a request for both transactions, Mr. --

25          MR. POMERANTZ:  Your Honor, I'm not sure it's even a

79

1   request for the Maple, because I think the closing is not

2   expected to occur until after that 14-day period.

3            THE COURT:  Okay.

4            MR. POMERANTZ:  With respect to PetroCap, I'll ask

5   Mr. Demo.  Since he was going to present the specific facts,

6   he may know the answer to whether we asked for the 14-day stay

7   waiver there.

8            MR. DEMO:  We did ask, Your Honor.  Again, this is

9   Greg Demo from Pachulski Stand Ziehl & Jones.  So if we could

10  have the 14-day waiver, that would be wonderful.

11           THE COURT:  All right.  Well, given that we have no

12  objection and so no concern for an appeal, and otherwise given

13  the circumstances of this transaction, I think that it is a

14  reasonable request -- I see it right now -- to waive 6004(h).

15  And so that request is granted.  All right.

16           MR. DEMO:  Thank you.

17           THE COURT:  Well, is there any more business before

18  we adjourn?

19           MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

20           THE COURT:  All right.  Well, I thank you all.  You

21  know, I'm --

22           MR. POMERANTZ:  Your Honor, I just may point out that

23  we do expect to be going effective either the end of this week

24  or sometime beginning to middle of next week.  So there'll

25  obviously be a watershed event in the case that has been --

81

1   pretty much gone with these contempt motions.

2       And, again, read my last paragraph.  I can understand

3   getting bored reading that thing, but please read the last

4   paragraph to know that it's going to get worse if we have

5   another one of these hearings and I do find contempt.

6       So, all right.  Well, we will see you all I guess on the

7   19th is my next -- I think that's where we have our next

8   hearing.

9       (Proceedings concluded at 11:31 a.m.)

10                          --oOo--

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **08/05/2021**

23   _____     _____
     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25