# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) CHAPTER 11 |
| HIGHLAND CAPITAL | ) |
| MANAGEMENT, L.P., | ) CASE NO. 19-34054-SGJ11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

REMOTE ORAL DEPOSITION OF

BH EQUITIES, LLC

BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

DUSTIN THOMAS

Des Moines, Iowa

Thursday, August 4, 2022

REPORTED REMOTELY BY:

JANICE K. McMORAN, CSR, RDR, CRR, TCRR

JOB NO. 213053

Page 10

BH EQUITIES, LLC - D. MILLER

appreciate that.
A. Thank you.
Q. Can you just state your name for the record, sir?
A. Yeah. My name is Dustin Thomas.
Q. Okay. Mr. Thomas, are you employed today?
A. I am.
Q. By whom?
A. That's not as easy as it might sound. But I work for BH Equities. We have a parent who I'm actually employed through with a master services agreement.
Q. Okay.
A. And the parent is BH Management Services.
Q. And do you have a title?
A. I do. I'm managing director of capital markets and investor relations.
Q. Have you ever been deposed before?
A. I have one other time.
Q. Was it in a personal capacity or in a business?
A. It was in a corporate capacity as a

Page 11

BH EQUITIES, LLC - D. MILLER

just information witness.
Q. And how long ago was that?
A. Approximately three years, three and a half.
Q. So really simple ground rules here. This is a deposition where I am going to ask questions and you'll provide answers. It's important that you allow me to finish my question before you begin an answer. Is that fair?
A. That is fair.
Q. And I will attempt to do the same and allow you to finish your answer before I begin a question, but if I fail to do so, will you let me know that?
A. I will do my best.
Q. If there's something that I ask that you don't understand, will you let me know that?
A. I will.
Q. If you need a break at any time, feel free to let me know and I'll do my best to accommodate you. I only request that you not seek a break while a question is pending. Is

Page 12

BH EQUITIES, LLC - D. MILLER

that fair?
A. That is fair.
Q. Okay. From time to time, a lawyer might object to a question. Allow the lawyers to do their job and figure out what to do with the objection before you begin your answer. Is that understood?
A. That is understood.
Q. Okay. So what are your duties and responsibilities as a managing director of BH Equities?
A. I -- BH Equities invests in various partnerships of real estate, and when we invest, I help with the structure of those, both debt and equity investment. And if we have outside capital, I'm a liaison for that outside capital.
Q. So that -- is it fair to say that the nature of the business of BH Equities is to invest in real estate partnerships, or at least the primary business?
A. I would say that, yeah, alongside sourcing investment opportunities for partners.
Q. How long have you been with BH

Page 13

BH EQUITIES, LLC - D. MILLER

Equities?
A. Counting on my fingers, sorry. A little over six years.
Q. And were you employed before being employed by BH Equities?
A. I was.
Q. Can you describe just briefly your professional background?
A. Yeah. Prior to BH Equities, I was a partner in a private equity fund acquiring small businesses of, you know, 5 to 10 million of EBITDA. And prior to that, I was in private investment on the balance sheet of a power company.
Q. Did you graduate from college?
A. I did.
Q. Where did you go to college?
A. Simpson College, a liberal arts school in, Indianola, Iowa.
Q. Do you have any graduate degrees?
A. I do. I have a master's in business from the University of Iowa.
Q. Do you hold any licenses or certificates?

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 4 of 37

Page 14
BH EQUITIES, LLC - D. MILLER
A. I do. I hold the chartered financial analyst designation and the chartered alternative investment analyst designation.
Q. Within the BH Equities corporate structure, to whom do you report?
A. I report to Travis Sheets, our general counsel.
Q. Have you spoken with -- are you familiar with the entity called HCRE or what was known as HCRE?
A. Only through our transactions.
Q. And have you spoken with anybody that you believed was acting on behalf of HCRE in connection with today's deposition?
A. I have not.
Q. Do you know whether anybody acting on behalf of BH Equities has communicated with anybody acting on behalf of HCRE concerning today's deposition?
A. Not to my knowledge.
Q. I'd like to -- so from time to time today, I'm going to ask my assistant, La Asia Canty, to put some documents on the screen. You know, this is not a test. Some of the

Page 15
BH EQUITIES, LLC - D. MILLER
documents that we'll put up there, obviously, are very lengthy. I'm going to show you portions of documents. It would be much easier if we were in a room together. So that if you think that there's portions of a document that you need to read in order to -- in order to have context, in order to kind of fully understand the questions that I'm asking, will you let me know that?
A. I will.
Q. Okay. So the first document that I'd like to put up on the screen, which we've marked as, let's call it BH-1, is the subpoena, the amended subpoena that Highland served in this case.
And before we get to that, actually, I just want to deal with a few definitions.
As I mentioned at the beginning I represent Highland Capital Management, L.P. I'm going to try to refer to that entity as HCMLP. Is that fair?
A. Yep, I understand that.
Q. Okay. And then there's another entity that was a party to the amended and

Page 16
BH EQUITIES, LLC - D. MILLER
restated LLC agreement that we'll talk about in a few minutes that was called HCRE Partners, LLC. I think you told me that you're familiar with that entity, right?
A. Yes.
Q. And if I use the -- if I use the term HCRE, that's the entity that I'll be referring to, okay?
A. Uh-huh.
Q. And you're familiar with an entity called SE Multifamily Holdings, LLC; is that right?
A. Yeah.
Q. All right. I may refer to that either as SE Multifamily or SEM. Is that fair?
A. Yes.
Q. Okay. And then I'm going to refer to the entity either that you're employed by or that you have a shared services agreement with as either BH or BH Equities, okay?
A. Understood.
(Exhibit 1 marked.)
Q. Okay. So let's go back to the subpoena. Have you seen this document before?

Page 17
BH EQUITIES, LLC - D. MILLER
A. I have.
Q. Okay. And is it your understanding, are you aware that you're giving testimony today in your capacity as a corporate representative of BH Equities?
A. Yes, I am aware.
Q. Okay.
MR. MORRIS: Can we go to, I guess it's page 2 of the attachment? Yeah, right there.
BY MR. MORRIS:
Q. Have you seen these topics before today?
A. Yes, sir.
Q. And are you prepared to testify on behalf of BH Equities as to each of these topics?
A. I am.
Q. Did you do anything to prepare for today's deposition?
A. I did.
Q. What did you do?
A. I reviewed the bulk of our discovery. And, pardon me, the legal terms are not second

TSG Reporting - Worldwide 877-702-9580

Page 18

BH EQUITIES, LLC - D. MILLER

nature to me. And then I talked with Matt Mulcahy, as our BH Equities controller as well, on a couple of clarifications.

Q. And when you used the phrase "the bulk of discovery," you're talking about the documents that BH Equities produced to Highland in response to the subpoena. Do I have that right?

A. Correct.

Q. Okay. And can you tell me for the record who -- it's Matt Mulcahy?

A. Mulcahy, yes.

Q. Okay. Who is Mr. Mulcahy?

A. Mr. Mulcahy is the controller for BH Equities and its, you know, various investment subsidiaries.

Q. Did Mr. Mulcahy play any role in connection with the SE Multifamily transaction?

A. He would have coordinated certain accounting matters.

Q. Other than Mr. Mulcahy and BH Equities' counsel, did you speak with anybody else to prepare for today's deposition?

A. No, not directly.

Page 19

BH EQUITIES, LLC - D. MILLER

Q. Did you speak with or communicate with anybody indirectly?

A. Only review of e-mails that would have been part of the discovery package that we shared.

Q. Okay. So looking at the screen, we're just going to take them one at a time. Do you see topic 1 there?

A. Yes, sir.

Q. Have you reviewed, to the best of your knowledge, all of the written communications between BH Equities and either HCRE or HCMLP relating to the amended agreement?

A. To the best of my knowledge, I have.

Q. Okay. And there's another phrase that I want to get out there. The subpoena defined amended LLC agreement as the agreement that was entered into on March 15th, 2019. Are you aware of that?

A. I am.

Q. All right. I may from time to time today use the phrase "amended agreement," and that's the agreement that I'll be referring to.

Page 20

BH EQUITIES, LLC - D. MILLER

Do you understand that?

A. I do.

Q. Okay. So other than -- other than your conversations with counsel and Mr. Mulcahy and your review of the e-mails that BH produced, that's the totality of your preparation for topic number 1? Do I have that right?

A. Alongside with reading the agreement several times.

Q. Okay. I appreciate that.

Topic number 2 is Schedule A, including all communications with either HCMLP or HCRE concerning that Schedule A.

Do you have an understanding of what Schedule A is?

A. I do.

Q. And do you believe that you are adequately prepared to testify as to that topic?

A. I do.

Q. Is there anybody that you think you should have spoken to about that topic that you kind of forgot to or that you wish you had?

Page 21

BH EQUITIES, LLC - D. MILLER

A. No. No. I came prepared.

Q. Okay. Topic number 3 concerns your interests in SE Multifamily, including distributions or allocations made to you. And, as you may know, "you" is defined in the subpoena as BH Equities. Are you prepared to testify as to that topic?

A. I am.

Q. And, again, same answer for all four topics, the scope of document review are the documents that BH produced, correct?

A. Correct.

Q. Okay. And topic number 4 -- there's a reference to paragraph 5 of the response. Do you see that at the end of topic 4?

A. Yes.

Q. Okay. Have you seen that response?

A. I believe I have.

MR. DOHERTY: Just one second. Could we see what the response is defined as in the subpoena, Mr. Morris?

MR. MORRIS: Sure, we can scroll up.

MR. DOHERTY: Pardon me. I forgot which one it is.

TSG Reporting - Worldwide 877-702-9580

Page 22

BH EQUITIES, LLC - D. MILLER

MR. MORRIS: No problem. It's just NexPoint's written response to the claim objection.

MR. DOHERTY: Okay. Thank you, Mr. Morris.

BY MR. MORRIS:

Q. All right. So let's go back to the topic. Mr. Thomas, have you personally ever seen the response?

A. I believe that was provided to me, and I did review it.

Q. Okay. And BH Equities is aware today of HCRE's contention as set forth in paragraph 5, right?

A. I believe so.

Q. Do you know when BH Equities first learned -- actually, I'm going to use a defined term just to make our lives simpler. The quotation that we have in topic 4 says, "All facts and communications concerning HCRE's contention that" -- and then there's a quotation.

Do you see that?

A. Yes, sir.

Page 23

BH EQUITIES, LLC - D. MILLER

Q. If I -- if I use the phrase "contention," will you know that I'm meaning that very quotation right there?

A. I can understand that, yes.

Q. Okay. So when did -- when did BH Equities first learn of HCRE's contention?

A. I don't know for sure exactly when we first learned. I couldn't give you an exact date as to when corporately we learned about that contention. But we have been aware of it.

Q. Can you tell me what year BH Equities first learned of the contention?

A. I don't know exactly when we would have learned of that contention, no.

Q. Okay. I'll come back to this with more specificity later on.

MR. MORRIS: Let's take this down.

BY MR. MORRIS:

Q. And let's kind of cut to the chase a little bit. BH Equities entered into the amended agreement with HCMLP and HCRE and Liberty on March 15, 2019, correct?

A. Correct.

Q. Okay. And you're aware that that

Page 24

BH EQUITIES, LLC - D. MILLER

agreement was effective as of August 23rd, 2018, correct?

A. I am.

Q. Okay. Did you personally have any role in the negotiation of the amended agreement?

A. I was involved in the back and forth and working with parties during the -- that time period to -- as the agreement was -- was going back and forth.

Q. Were there any particular issues that you were personally focused on?

A. Yes. The allocation -- the biggest issue was getting capital back to the parties prior to any allocations on percentages or those things that I was focused on.

Q. Can you identify -- when did you first get involved in this project? Do you recall?

A. Prior to the closing of the purchase of the assets, I would have been involved.

Q. And when was the closing?

A. I believe it was September 26th of 2018.

Page 25

BH EQUITIES, LLC - D. MILLER

Q. Can you identify for me all of the people acting on behalf of BH Equities that were, you know, primarily responsible for negotiating the amended agreement?

A. Myself, Ben Roby, and Joanna Zabriskie, our president and CEO, would have been the most actively involved.

Q. Did you have legal counsel involved in the review and negotiation or drafting of the amended agreement?

A. We did.

Q. And who was that?

A. Nick Roby, previously Davis Brown, which is now part of Dentons.

Q. So in addition to yourself and the president and Ben, you had outside counsel? Do I have that right?

A. Yes.

Q. Is there anybody else within BH Equities who was involved in the negotiation, drafting, or review of the amended agreement?

A. Off the top of my head, I'm sure Travis Sheets would have been copied, at least on correspondence.

TSG Reporting - Worldwide 877-702-9580

Page 26

BH EQUITIES, LLC - D. MILLER

Q. Now, there were three other parties to the amended agreement, right? Liberty, HCRE, and HCMLP. Do I have that right?

A. Yes, that's my understanding.

Q. Are you able to identify for me the people who were representing the interests of each of those parties and the drafting, negotiation, and execution of the amended agreement? And if you want me to take them one at a time, I'm happy to.

A. Yeah, that would be...

Q. From BH Equities' perspective as you were negotiating this agreement, did BH Equities form a view that HCMLP and HCRE and Liberty were related parties?

A. Yes.

Q. And did -- was this more of a bilateral negotiation between BH Equities on the one hand and HCMLP and HCRE and Liberty on the other hand?

A. Yes.

Q. Can you identify the people who were working on behalf of -- withdrawn.

Based on that, for convenience I'm

Page 27

BH EQUITIES, LLC - D. MILLER

going to use the phrase "Highland" to refer to -- withdrawn.

I'm going to use the phrase "Highland" to refer to HCRE, HCMLP, and Liberty. Is that okay?

A. That's okay, yes.

Q. Okay. Can you identify for me the individuals who were representing the interests of Highland in connection with the negotiation of the amended agreement?

A. I can identify my primary correspondence during that time. Is that acceptable?

Q. Sure.

A. I was primarily corresponding with Paul Broaddus. Freddy Chang was cc'd on much of the correspondence and occasionally chimed in. And then only by copy of e-mail, I believe, Wick Phillips was the law firm representing and working with them.

Q. And was Wick Phillips involved in the drafting, negotiation, or review of the amended LLC agreement, to the best of your knowledge?

A. I can't say for certain because I

Page 28

BH EQUITIES, LLC - D. MILLER

didn't correspond with them directly.

Q. Fair enough.

How about Matt McGraner? Is he somebody who was involved on behalf of Highland in the negotiation, drafting, and review of the amended agreement?

A. I did not have direct correspondence with Mr. McGraner on the topic.

Q. Do you know -- was there anybody involved in the negotiation or drafting of the agreement who BH Equities believed was looking out exclusively for the interests of HCMLP?

A. As -- you know, kind of in the framing of your question, we were viewing them as a bilateral entity. So -- so I can't say for certain if they were or weren't as to who -- who was looking after what interest.

Q. And that's all I'm asking for is the perspective of BH Equities, was there anybody from BH Equities' perspective that BH Equities believed was looking out only for HCMLP's interests?

A. Again, we viewed them as related parties and coordinating amongst themselves as

Page 29

BH EQUITIES, LLC - D. MILLER

necessary. But we viewed it as a bilateral negotiation, as you framed it.

Q. Did you ever -- to the best of your knowledge, did BH Equities ever communicate with anybody who claimed to represent the exclusive interests of Liberty?

A. Not to my knowledge.

Q. And to the best of BH Equities' knowledge, did anybody ever represent to BH Equities that there was an individual who was looking out for the exclusive interests of HCRE?

A. Again, we lumped HCRE and HCM kind of together as the two -- the two large parties kind of, you know, related and things. So exclusively, no, given that context.

Q. Okay. Are you familiar with the phrase "Project Unicorn"?

A. I am.

Q. Do you have an understanding of what that phrase means?

A. Yes.

Q. And what's your understanding of the phrase "Project Unicorn"?

TSG Reporting - Worldwide 877-702-9580

BH EQUITIES, LLC - D. MILLER

A. Project Unicorn was a marketing phrase for a portfolio of -- I believe it was 26 properties marketed by -- by CBRE as Starwood was -- as Starwood or Starwood affiliates were selling these properties, and they were purchased by SE Multifamily LLC.
Q. All right. Do you know why this project was given the name Project Unicorn?
A. No, sir.
Q. Sometimes people use the word unicorn to refer to something unique. Did you ever participate in any discussions with anybody where they suggested that they were, you know, unique or rare features of a transaction of this type?
A. My understanding is the designation was given by the marketing firm, which would be in line with precedent that the investment bank or brokerage firm would give the project its name. And it's typically under -- included in the NDA and things like that.
Q. Okay. Do you know when BH Equities first learned of Project Unicorn?
A. Specifically, no. It would have been

BH EQUITIES, LLC - D. MILLER

the summer of 2018.
Q. Do you know how BH Equities learned about Project Unicorn?
A. I believe it was introduced to us through the -- I'm going to use your term prior, kind of Highland broadly, the HCRE, HCM, you know, group.
Q. Is BH Equities aware that HCRE and HCMLP entered into an LLC agreement with respect to SE Multifamily in August of 2018?
A. We were given copies of that at some point along the way, yes.
Q. Are you aware that HCRE, HCMLP, and certain other borrowers obtained a loan from KeyBank in September 2018 related to Project Unicorn?
A. Yes.
Q. Did BH Equities have anything to do with the KeyBank loan?
MR. GAMEROS: Objection -- objection, form.
BY MR. MORRIS:
Q. That's fair. Let me restate the question, Mr. Thomas. BH Equities is not a

BH EQUITIES, LLC - D. MILLER

signatory to the KeyBank loan, is it?
A. That's correct.
Q. Okay. Did BH Equities provide any services or any resources, including capital of any kind, in connection with the negotiation or drafting of the KeyBank loan?
A. That's a bit nuanced. There was underwriting and things like that done on behalf of all parties involved. Underwriting, diligence, those kinds of things, which I'm certain was used as part of the negotiation work with KeyBank to secure the loan.
Q. Were you working with Highland on obtaining the KeyBank loan?
A. Again, it's nuanced. Directly working as an agent or things like that, no.
Q. Were they keeping you informed?
A. In parts, yes. It was an important capitalization to the transaction.
Q. Is it BH Equities' understanding that the KeyBank loan was a necessary component to the closing of the transaction on September 26th?
A. Yes.

BH EQUITIES, LLC - D. MILLER

Q. SEC Multifamily -- withdrawn.
To the best of BH Equities' knowledge, SE Multifamily could not have financed the acquisition of the 26 properties at the end of September without obtaining the KeyBank loan; is that fair?
A. That's my understanding.
Q. Did there come a time when BH Equities began to negotiate with Highland about a potential participation interest in SE Multifamily?
A. Yeah, it was always expected we would participate in the -- in the LLC through capital and, you know, sharing of return of capital and profits and things, yes.
Q. Okay. Focusing solely on 2018, did BH Equities loan any money to SE Multifamily in the year 2018?
A. Not to my knowledge.
Q. Do you know if BH Equities loaned money to anybody in connection with Project Unicorn in 2018?
A. Not -- not to my knowledge.
Q. And as opposed to loans, do you know

BH EQUITIES, LLC - D. MILLER

whether BH Equities made any investment in SE Multifamily in the year 2018?
A. Yes, we did.
Q. Okay. Can you describe for me the investment that BH Equities made in SE Multifamily in 2018?
A. The investment in totality was approximately 21.5 million, I believe.
Q. And when you say it was made in 2018, is that because the agreement was ultimately made effective as of August 2018, or was the actual cash -- well, withdrawn. Let me ask this.
You mentioned a $21 million investment. Is that an actual cash outlay by BH Equities?
A. Yes.
Q. And where did that money go, do you know?
A. If went to purchase the properties.
Q. And do you know when BH Equities made the $21 million investment?
A. It would have been in traunches between the -- and, again, I'm using air quotes

BH EQUITIES, LLC - D. MILLER

here -- the broad Highland group entities, HCRE, HCM, et cetera. There are expenses leading up such as, you know, earnest money, loan app fees, those kind of things, and we would have likely shared in parts of that. And then by the time the transaction closed on September 26th, the remaining funds would have been invested, likely funded through title, potentially a little bit directly to a bank account. But the bulk would have gone through title or to pay for pre- -- preclosing expenses.
Q. And so do I have this right, that BH Equities laid out the $21 million in 2018 before there was an actual written agreement?
A. That is correct.
MR. DOHERTY: Objection, form.
BY MR. MORRIS:
Q. Was the $21 million investment the subject of negotiation? Like, how was that number arrived at?
A. It was -- it was a number used to close the transaction, and all parties were aware that BH was investing that money as a

BH EQUITIES, LLC - D. MILLER

member of SE Multifamily at that time. So it was a known fact amongst all the parties participating.
Q. And when you use the phrase "parties," are you talking about the parties that ultimately became members of SE Multifamily or something else?
A. Yes. Yeah, the additional members and parties there.
Q. Do you know if KeyBank was aware of the role that BH Equities was playing?
A. I don't know specifically, as we weren't involved. I would assume so, though.
Q. Prior to 2018, had any agreement been reached on the nature of the interest that BH Equities was going to receive in exchange for its $21 million investment?
A. I don't believe there was anything formal fully agreed to at that time.
Q. BH Equities ultimately obtained a 6 percent interest in SE Multifamily, right?
A. It's more nuanced than that. I'm sorry, I don't mean to avoid the question, but given the -- the written how capital flows and

BH EQUITIES, LLC - D. MILLER

things like that, it's more nuanced than just the 6 percent. So I -- so I wouldn't say that we only had a 6 percent interest, so to speak.
Q. How would you characterize BH Equities' interest in SE Multifamily? How would you describe it?
A. The expectation was we would give capital back, and then the residual interest thereafter was what was up for negotiation.
Q. What do you mean, it was up for negotiation?
MR. DOHERTY: Objection. And I don't want to make it -- John, you can tell me not to say anything. I think I see a disconnect, but if you want me to let you proceed, I will.
MR. MORRIS: Yeah, go ahead, Casey. I appreciate it. Go ahead.
MR. DOHERTY: Okay. I think there might be a disconnect on -- with at least for me on the time -- the time frame for the question, about after the amended agreement or before about --
MR. MORRIS: Ah, okay.

MR. DOHERTY: That's just my humble suggestion there, but I'll -- okay. All right.

MR. MORRIS: I appreciate that.

BY MR. MORRIS:

Q. In the amended agreement as executed, did BH Equities obtain a 6 percent equity interest in SE Multifamily?

A. Again, it's more nuanced than that. We have six -- we have an interest of 6 percent after the return of capital and those things, as the agreement was written.

Q. Okay. So after capital is returned, SE Multifamily -- withdrawn.

After the original capital investment is returned, BH Equities would have a 6 percent interest in SE Multifamily. Do I have that right?

A. Yes, that's a correct characterization.

Q. Okay. And at what point in time was an agreement reached that BH Equities would receive 6 percent of SE Multifamily after the return of the initial capital? Was that done

in 2018? I'm just trying to get a timeline.

A. That was -- that was finalized in March of '19 formally.

Q. Okay. So at the time in 2018 that BH Equities laid out the $21 million, there not only had not been a written agreement, but there had not yet been an agreement as to the nature and extent of BH Equities' interest in SE Multifamily. Is that fair?

MR. DOHERTY: Objection, form.

You may answer, Mr. Thomas.

A. I don't think that it's fair. There was multiple discussions and things like that. No written agreement is fair. But there was ongoing discussions trying to formalize things.

Q. Okay. Let's turn our attention to HCRE. Do you know whether HCRE ever loaned any money to SE Multifamily?

A. I don't believe they did.

Q. Do you know if HCMLP ever loaned any money to SE Multifamily?

A. Could I ask for clarification around the idea of "loan," just so we're on the same page there? For both HCRE and HCM. I just

want to make sure I'm answering the question you're asking here.

Q. Sure. Like a loan like an IOU where you give someone money with the expectation that it would be returned with interest that's not -- that's not dependent on the outcome of the enterprise.

A. No, I don't believe there were any loans provided by either party.

Q. All right. Let's get to the LLC agreement itself.

MR. MORRIS: If we can put that on the screen. We'll mark it as BH Exhibit 2.

(Exhibit 2 marked.)

BY MR. MORRIS:

Q. And you've seen this document before, right, sir?

A. Yes, sir.

Q. And you've reviewed it in preparation for today's deposition, correct?

A. I have.

Q. All right.

MR. MORRIS: If we could go to the

signature page.

BY MR. MORRIS:

Q. Do you see that the document was signed on behalf of HCMLP and HCRE by James Dondero?

A. I do.

Q. Do you know who Mr. Dondero is?

A. Yes.

Q. And who do you understand Mr. Dondero to be?

A. My understanding is he was a primary owner of both parties and a manager or executive in that capacity as well, you know, CEO type.

Q. And what's the basis for that understanding?

A. Just understanding of the parties', you know, business as -- you know, and our perspective as a partner.

Q. Did anybody from Highland ever explain to you or anybody at BH Equities who Mr. Dondero was?

A. Not specifically, no. But -- at least not to my understanding.

Exhibit 3 Page 11 of 37

Page 42

BH EQUITIES, LLC - D. MILLER

MR. MORRIS: Can we scroll down to --
BY MR. MORRIS:
Q. Do you see that right there is the signature of Grant Scott, the director of Liberty CLO Holdco, Ltd.?
A. I do.
Q. Do you know who Mr. Scott is?
A. I do not.
Q. Did you ever speak with Mr. Scott?
A. I don't believe so.
Q. Do you know if anybody on behalf of BH Equities ever communicated with Mr. Scott in any way about this amended agreement?
A. Not to my knowledge.
Q. Did you ever see any comments that were made on behalf of Liberty concerning this agreement?
A. No.
Q. Is it fair to say that there were various drafts of this agreement prepared before it was signed?
A. Yes.
Q. Do you recall when the first draft was prepared?

Page 43

BH EQUITIES, LLC - D. MILLER

A. I believe it was on March 14th.
Q. Who was the scribner, if you will? Who was in charge of drafting this amended agreement?
MR. DOHERTY: Objection, form.
MR. MORRIS: Withdrawn.
BY MR. MORRIS:
Q. Do you know who drafted this amended agreement?
A. I do not specifically, no.
Q. Was it Highland or was it BH Equities?
A. It was not BH --
MR. DOHERTY: Objection -- hold on.
THE WITNESS: I'm sorry.
MR. DOHERTY: It's hard virtually, Mr. Thomas.
Objection. Objection, form. I'm sorry. You can answer the question.
A. BH Equities was not the drafter.
BY MR. MORRIS:
Q. And so is it fair to say from BH Equities' perspective that BH Equities provided comments to drafts that were created

Page 44

BH EQUITIES, LLC - D. MILLER

by Highland?
A. Yes.
Q. Do you recall how many drafts of the agreement the parties went through?
A. A specific number, no. A handful, to give it, you know, an order of magnitude, I guess.
MR. MORRIS: Can we scroll to the next one, please?
BY MR. MORRIS:
Q. There's the signature of Ben Roby. Do you see that?
A. Yes, sir.
Q. That's the person that I think you identified earlier today as someone who was involved in Project Unicorn on behalf of BH Equities. Do I have that right?
A. Correct.
Q. And I apologize if you testified to this earlier, but can you remind me, then, of what role Mr. Roby played within BH Equities?
A. At the time he was an acquisition manager focused on acquiring properties in which we made investments.

Page 45

BH EQUITIES, LLC - D. MILLER

Q. Was there an internal process for reviewing documents like this before execution?
MR. DOHERTY: Objection. I want to say, too -- I think this question is fair, but if it goes into what attorneys said or did, Mr. Thomas, you're not to go into details of it.
But I just wanted to qualify that, Mr. Morris, for the question. It's a fair question, but I just wanted to make that statement.
Go ahead, Mr. Thomas.
A. Yeah, this agreement was somewhat fast moving. So I would say it didn't go through the typical process. But Ben, Joanna, and myself were communicating frequently over the couple of days as it was going back and forth.
Q. Does BH Equities believe today that it had sufficient time to review the document before signing?
A. I believe we knew -- I believe we understood the economics portion of the document as it affected us at the time we

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 12 of 37

Page 46

BH EQUITIES, LLC - D. MILLER

signed it.
Q. Okay. Before signing -- before BH Equities signed the amended agreement, did BH Equities take steps to make sure that the document reflected BH Equities' intent?
A. Yes.
Q. At the time BH Equities signed the amended agreement, did BH Equities believe that the amended agreement was consistent with BH Equities' intent?
A. We were prepared to abide by the agreement as written. There were certain pieces we hoped to maybe further negotiate, but we understood the agreement and the economic relationship at the time.
Q. Is there anything about the amended agreement that BH Equities believed was inconsistent with its intent at the time it signed the document?
MR. DOHERTY: Objection, form.
BY MR. MORRIS:
Q. You can answer.
A. Yeah. I struggle with the word "intent." There were certain parts we didn't

Page 47

BH EQUITIES, LLC - D. MILLER

like or hoped to further discuss, negotiate, but we understood the relationship and -- of capital and return of capital and further economics at that time, and signed understanding those.
Q. Can you identify for me the parts that BH Equities didn't like but it hoped that it would be able to renegotiate?
MR. DOHERTY: Objection, form.
And, Mr. Thomas, if this goes into, you know, legal analysis from attorneys, then just be careful.
A. From a business standpoint, we had hoped to increase the 6 percent residual interest after capital was returned.
BY MR. MORRIS:
Q. And did you have any discussions with -- withdrawn. I don't mean to personalize this.
Did BH Equities have any communications with Highland prior to the execution of this agreement about BH Equities' desire to increase the 6 percent residual interest?

Page 48

BH EQUITIES, LLC - D. MILLER

A. Can you clarify if we're talking about HCMLP, as we talked about the -- as the bilateral, yes, there would have been e-mail communication that we had hoped to have a larger residual interest than 6 percent.
Q. Okay. And notwithstanding that hope, BH Equities nevertheless entered into this agreement with their eyes open, right? They understood that they were getting a 6 percent residual interest that could only be changed if the parties agreed in the future to amend the agreement, right?
A. Yes.
Q. Okay. Is there any other piece of amended agreement that BH Equities hoped to change in the future?
MR. DOHERTY: Objection, form.
And I want to, again, Mr. Thomas, if it involves legal analysis --
MR. MORRIS: Withdrawn. That's fair. I'll rephrase the question, Casey.
BY MR. MORRIS:
Q. Is there any other issue that BH Equities told Highland that it wasn't happy

Page 49

BH EQUITIES, LLC - D. MILLER

with at the time it signed the agreement and that it hoped to negotiate an amendment for?
A. Not to my knowledge.
Q. At the time BH Equities signed the amended agreement, did BH Equities have any reason to believe that the agreement did not reflect the intent of all of the members of SEM?
MR. DOHERTY: Objection, form.
BY MR. MORRIS:
Q. You can answer.
A. As far as I know, or as far as we knew, no, we did not have any direct knowledge.
Q. So kind of the flip side to that, is it fair to say that at the time BH Equities signed this agreement on March 15th, BH Equities believed that the agreement reflected the intent of the parties?
MR. DOHERTY: Objection, form.
MR. MORRIS: What's the objection?
MR. DOHERTY: This intent about him knowing what the other side thinks. But I understand your question, but just maybe --

TSG Reporting - Worldwide 877-702-9580

Page 50

BH EQUITIES, LLC - D. MILLER

MR. MORRIS: I'll rephrase the question.

MR. DOHERTY: Okay.

BY MR. MORRIS:

Q. At any time prior to the -- to March 15th, did anybody acting on behalf of Highland inform BH Equities that it believed any aspect of the amended agreement was inconsistent with Highland's intent?

A. Not that I'm aware.

MR. MORRIS: Hey, Casey, you were spot on. Thank you. That was a better question.

BY MR. MORRIS:

Q. At the time BH Equities signed the amended agreement, did BH Equities have any reason to believe that the amended agreement contained any errors or mistakes?

A. No, I don't believe so.

Q. Was BH Equities aware of any error or mistake in the amended agreement at the time it signed it?

A. No. Not related to anything that we were focused on.

Page 51

BH EQUITIES, LLC - D. MILLER

Q. Did anybody acting on behalf of Highland ever inform BH Equities prior to the execution of the agreement that Highland believed there was an error or mistake in that document?

A. No, not to my knowledge.

Q. All right.

MR. MORRIS: Let's go to Schedule A, please.

MR. DOHERTY: And, Mr. Morris, is this -- Mr. Thomas, this has been sent to you in the chat, right, the entire document, so he could pull it open if he wanted to, or he could print it out if he wanted to? I just wanted to let you know. Virtual depositions are hard.

THE WITNESS: I was not aware. Thank you, Casey.

BY MR. MORRIS:

Q. And again, Mr. Thomas, this is not a memory test. I am not trying to trick you. I really appreciate your counsel's suggestion and observation. If there's anything you need to see to make your answers, you know, more

Page 52

BH EQUITIES, LLC - D. MILLER

complete or accurate, just let me know, okay?

A. Okay.

Q. All right. So this is Schedule A to the amended agreement. Do you see that?

A. Yes.

Q. And you've seen this page before, correct?

A. Correct.

Q. And this page shows that Highland Capital Management, L.P. made a capital contribution of $49,000. Do I have that right?

A. Yes.

Q. And it also shows that Highland Capital Management, L.P. had a 46.06 percentage interest in SE Multifamily, correct?

A. Yes, that's what it says.

Q. Okay. And those facts were known to BH Equities at or before the time it signed this amended agreement, correct?

A. Correct.

Q. In fact, BH Equities agreed that HCMLP would hold a 46.06 percentage interest in SE Multifamily while making a capital contribution of $49,000, correct?

Page 53

BH EQUITIES, LLC - D. MILLER

A. Again, clarifying a little bit on the -- when the percentages came into play being subject to capital being returned, yes.

Q. And by that, just to clarify, you mean that the percentage interests only kicks in after the capital contributions are returned in full, correct?

A. Yes, that's what I mean.

Q. So for purposes of the waterfall, do I have this right -- and there may be some exceptions to this -- but the money had to get paid back to KeyBank first, right?

A. Yes.

Q. And then any money that was original capital above and beyond the KeyBank loan would then have to be paid back, right?

A. Yes.

MR. DOHERTY: Object -- sorry.

BY MR. MORRIS

Q. And it was only after at least those two events occurred that the remaining value would be distributed in accordance with the percentages under the percentage interest column. Is that fair?

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 14 of 37

Page 54

BH EQUITIES, LLC - D. MILLER

A. Yes, that was the deal as we understood it.

Q. Okay. And is it fair to say that at the time the amended agreement was executed, that BH Equities believed Schedule A accurately reflected the intent of the parties?

A. Yes.

Q. Again, flip side, before signing the agreement, did BH Equities have any reason to believe that Schedule A did not accurately reflect the intent of the parties?

A. No.

Q. Prior to signing this agreement, did BH Equities ever hear from anybody acting on behalf of Highland that Highland believed Schedule A was inaccurate in any way?

A. Using Highland as the counterparty that we were working with, no, we did not.

Q. I'm going to -- I'm going to now ask about each of the component members, because I want to make sure that we're clear here.

Prior to the time that BH Equities signed the amended agreement, did anybody acting on behalf of HCRE tell BH Equities that

Page 55

BH EQUITIES, LLC - D. MILLER

they believed Schedule A was wrong in any way?

A. I don't know that I can say that affirmatively, as it wasn't -- again, with us it was very much a bilateral. We knew there were two counterparties outside of BH, excluding Liberty, from that discussion. We didn't exactly know the roles clearly as to who was responsible for what parties' interests other than BH's was very clear and there was a related party of Highland, HCRE, as well.

Q. All right. Let me ask a different question, then. Prior to the time that BH Equities signed the amended agreement, did anybody acting on behalf of any of the other members of SE Multifamily inform BH Equities that they believed there was an error in Schedule A?

A. Not to my knowledge.

Q. Thank you. The percentage interests that are reflected in Schedule A were used elsewhere in the amended agreement; is that correct?

MR. DOHERTY: Objection. If there's -- objection, form.

Page 56

BH EQUITIES, LLC - D. MILLER

A. I'd have to look through the document or search it.

BY MR. MORRIS:

Q. Okay. So let's go to Section 1.7. Do you see 1.7 is entitled "Company Ownership"?

A. Yes, I see that.

Q. And am I reading it correctly that the percentages set forth in Section 1.7 match exactly with the percentage interest set forth on Schedule A?

A. Yes.

Q. And was it, from BH Equities' perspective, the parties' intent that the company ownership percentages set forth in 1.7 would match the percentage interests set forth in Schedule A?

MR. DOHERTY: Objection. Form. Objection, form. I need to say objection, form. Sorry.

BY MR. MORRIS:

Q. You can answer.

A. It -- I believe it makes sense, without further -- again, I've read the document. I don't recall specifically what 1.7

Page 57

BH EQUITIES, LLC - D. MILLER

governs, if it governs anything in particular. But as written, the numbers match up, and we didn't have an issue with this specific clause at the time of signing.

Q. And this is the clause that specifically identifies what ownership interest each member shall have in SE Multifamily. Am I reading that fairly?

A. Yes, with respect -- and I think it has to give deference to the waterfall provisions and distribution provisions later in the agreement.

Q. Okay. So subject to the waterfall and distribution provisions, would you agree that Section 1.7 was intended to identify the ownership interest of each of the members of SE Multifamily?

A. I believe so, yes.

Q. Okay. Can we go to Section 6.1, please? Do you see there's --

MR. DOHERTY: John, I could use a break in a few minutes, but I can wait. I just didn't know for a break point if you could take it. But if you want to keep on

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 15 of 37

Page 58
BH EQUITIES, LLC - D. MILLER
going, that's fine.
MR. MORRIS: Casey, if you could just hold on, I've just got two more provisions and then we'll take a break.
MR. DOHERTY: Sure. No problem. I just wanted to flag it.
BY MR. MORRIS:
Q. Section 6.1(a), do you see that, sir?
A. Yes, sir.
Q. Okay. And that provision deals with the distribution of distributable cash as defined, correct?
A. Yes.
Q. And subject to Article VI and Article IX, distributable cash is going to be distributable in the same percentages as the percentage interests set forth in Schedule A, correct?
A. Correct.
Q. And that's -- that's what the parties intended when they wrote this provision and agreed to it, correct?
A. That's what we agreed to, yes.
MR. MORRIS: Okay. Can we go to

Page 59
BH EQUITIES, LLC - D. MILLER
Section 9.3, please? All right. So if we could just go to the top of it.
BY MR. MORRIS:
Q. All right. So this Section 9.3 deals with liquidation. Do you see that?
A. Yes.
Q. And it -- is it fair to say that Section 9.3, if we can scroll down just a little bit, is intended to provide for the waterfall in a liquidation scenario?
A. Yes.
Q. And is it fair to say that after the expenses and payments are made in Sections 9.3(a) through (d), that any remaining cash or assets would be distributed to the members of SE Multifamily in the same percentage as the percentage interests set forth on Schedule A?
A. Yes.
Q. And that's what the parties intended when they signed this agreement, to the best of BH Equities' understanding, correct?
A. Correct.
MR. MORRIS: Okay. We can take that break now. It's 12:03. Can we just come

Page 60
BH EQUITIES, LLC - D. MILLER
back at 12:10?
MR. DOHERTY: We can go off of the record, too. I'm fine with that. I know it's getting around -- I'm good on lunchtime. I don't know how much time, if you want to talk, John, me and you after, but I'm fine to come back in five minutes from break.
MR. MORRIS: Okay. 12:10. Seven minutes. Thank you.
MR. DOHERTY: Okay.
(Recess taken 11:03 a.m. Central Time - 11:12 Central Time.)
BY MR. MORRIS:
Q. Let's go back to Schedule A, please. Mr. Thomas, can you hear me okay?
A. Yes.
Q. Okay. Before signing this amended agreement, did BH Equities ever raise any concerns with Highland about HCMLP receiving a 46.06 percentage interest while putting in capital of $49,000?
A. I don't recall any specific concerns.
Q. In fact, it was acceptable to

Page 61
BH EQUITIES, LLC - D. MILLER
BH Equities that Highland Capital Management, L.P. receive a 46.06 percentage interest in SE Multifamily in exchange -- withdrawn.
It was acceptable to BH Equities that Highland Capital Management, L.P. make a capital contribution of $49,000 to SE Multifamily while receiving a 46.06 percentage interest, correct?
A. I would say we were somewhat indifferent, as it didn't affect our economics in -- you know, beyond the 6 percent that we understood we were getting into.
Q. You agreed to it, correct?
A. Yes.
Q. And you didn't voice any objections about that, correct?
A. Not to my knowledge.
Q. And you knew that that was part of the overall deal, correct?
A. Yes.
Q. Before signing this agreement, did BH Equities have any understanding as to why Highland Capital Management, L.P. was going to be a member of SE Multifamily?

TSG Reporting - Worldwide 877-702-9580

Page 62

BH EQUITIES, LLC - D. MILLER

A. I don't believe we did.

Q. Did BH Equities ever speak with Highland about why HCMLP was participating in this transaction?

A. Not to my knowledge.

Q. Did BH Equities ever ask Highland why HCMLP was obtaining a 46.06 percent interest?

A. I don't recall that we did.

Q. So this was -- Schedule A was something that BH Equities knew about and agreed to at the time it signed this agreement. Fair?

A. Yes.

Q. Okay. Let's go to Section 6.4(a) on page 12, please. Okay. Do you see in Section 6.4(a), there's a -- well, 6.4 deals with allocations of profits and losses.

Do you see that?

A. Yes.

Q. In Section 6.4(a), the parties agreed that except as provided in that section, 94 percent of SE Multifamily's profits and losses would be allocated to HCMLP; is that fair?

A. Yes.

Page 63

BH EQUITIES, LLC - D. MILLER

Q. Was this allocation the subject of any negotiation?

MR. DOHERTY: Objection, form.

MR. MORRIS: Withdrawn.

BY MR. MORRIS:

Q. Was the allocation of 94 percent to 6 percent for BH Equities on profits and losses the subject of any negotiation?

A. It was on a phone call between myself and Mr. Broaddus, it came up as it, you know, wasn't exactly normal. But it was an issue that, you know, was kind of internal, so it wasn't broadly negotiated past or those things, as we were, again, somewhat indifferent.

Q. And what does it mean that it was not exactly normal?

A. Normally the allocation of profit and losses would also follow an allocation -- the waterfall allocation or those things more closely.

Q. And did Mr. Broaddus provide any explanation as to why Highland wasn't following that course that you just described?

A. Not in any -- not in detail.

Page 64

BH EQUITIES, LLC - D. MILLER

Q. Did he describe any reason for allocating 94 percent of SE Multifamily's profits and losses to HCMLP?

A. No.

Q. Am I correct that under the terms of the amended agreement, none of SE Multifamily's profits and losses would be allocated to HCRE, correct?

A. That's correct.

Q. Did BH Equities ask Highland why none of the profits and losses were being allocated to HCRE?

A. I don't believe so.

Q. Did anybody acting on behalf of any of the other members ever discuss with BH Equities why HCRE was not being allocated any of SE Multifamily's profits or losses?

A. I don't believe so.

Q. To the best of -- withdrawn.

To the best of BH Equities' knowledge, does paragraph 6.4(a) accurately reflect the parties' intent?

A. To the best of our knowledge, yes.

Q. Did anybody acting on behalf of any

Page 65

BH EQUITIES, LLC - D. MILLER

member to the SEM amended agreement ever inform BH Equities that Section 6.4(a) was incorrect in any way?

A. I don't believe so.

Q. Do you know if the amended agreement that we're looking at was ever amended for any reason at any time?

A. There was a slip page at some point -- and I believe it was after this -- just to update capital. But it was a nonsubstantial update.

Q. I think we'll get to that in a few minutes.

Other than the slip page that you just described, is BH Equities aware of any amendment to the amended agreement as we've defined it here today?

A. No.

Q. BH Equities never signed an amendment to the amended agreement, correct?

A. Correct.

Q. And BH Equities was never informed by anybody acting on behalf of HCRE or any of the other members to the agreement that the amended

TSG Reporting - Worldwide 877-702-9580

Page 66

BH EQUITIES, LLC - D. MILLER

agreement had been amended, correct?

A. Correct.

Q. Did BH Equities ever receive in writing any draft agreement to the amended agreement?

A. I don't believe so.

Q. Did -- after the time that this agreement was executed, did BH Equities ever discuss with any member whether this amended agreement would be further amended?

A. Yes.

Q. Can you describe for me when those conversations take place or communications took place?

A. Sure. There was e-mails expressing our desire to amend our 6 percent amount, right around the time of signing and a couple of times thereafter. I don't remember specific dates.

So, you know, starting in March of -- of '19 and then occasionally thereafter, we expressed a desire to expand our 6 percent number.

Q. And what was BH -- what did Highland

Page 67

BH EQUITIES, LLC - D. MILLER

say in response?

A. I believe in the e-mail correspondence it said something along the lines of there may be future amendments needed or something along that line.

Q. But it never happened; is that fair?

A. That is fair.

Q. And is it also fair that any discussion of any amendment that BH Equities is aware of would be reflected in the e-mails that BH Equities produced in response to the subpoena?

A. Could you reask the question? I just want to make sure I answer it correctly.

Q. Sure. Are the communications concerning a possible amendment to the amended agreement reflected in the e-mails that BH Equities produced in response to the subpoena?

A. Yes.

Q. Are you aware of any communications concerning a possible amendment that are not reflected in the e-mails that BH Equities produced in response to the subpoena?

Page 68

BH EQUITIES, LLC - D. MILLER

A. I am not.

Q. Let's -- let's start to look at some other documents.

(Exhibit 3 marked.)

MR. MORRIS: Let's put up on the screen what we've marked as Exhibit 3. And so we're going to go back in time a little bit to prior to the execution of the agreement.

BY MR. MORRIS:

Q. And I'm directing your attention to a document that's been marked, if we could look at the bottom, Bates stamp BH 92. I'm going to skip the zeros.

MR. DOHERTY: Mr. Morris, with e-mails, I always like to, you know, if possible, have it so I can start reading from the bottom of the conversation. Will these be put in the chat as where we're going?

MR. MORRIS: Oh, yeah, we'll put it in the chat.

MR. DOHERTY: Okay.

MR. MORRIS: I don't think there's

Page 69

BH EQUITIES, LLC - D. MILLER

anything below what I'm asking about, but can you scroll --

MS. CANTY: It's in there now.

MR. DOHERTY: These virtual depositions, I know it's -- you go to the top, you don't have context. So I just wanted to -- I'll let you go. Thank you.

BY MR. MORRIS:

Q. So do you see -- if we could just put this whole e-mail up on the screen right there. Okay. It's an e-mail from Mr. Roby to Matt McGraner, do you see that, from October 7, 2018?

A. Yes.

Q. Okay. We talked -- I think you mentioned or maybe I mentioned Mr. McGraner earlier. Do you have an understanding as to whose interest Mr. McGraner was representing in these communications?

A. We would have viewed them as -- or Matt as representing kind of the broader -- you know, again, we viewed it as a bilateral negotiation, so BH -- and then I'm going to use air quotes again -- Highland broadly, the other

TSG Reporting - Worldwide 877-702-9580

BH EQUITIES, LLC - D. MILLER

two parties. You know, I don't specifically know which of those two parties, but -- that he was representing, the other party to the agreement.

Q. Okay. I'm focused on the chart with the sentence above it, but, again, you should read whatever you want of the e-mail for context. My question for you, the first question is, do you know what that chart is in the middle of the page under the word "Cash"?

A. Yes.

Q. And what's your understanding of what this chart depicts?

A. It is depicting the sources of the capitalization for SE Multifamily Holdings.

Q. And so is this a proposal that's being made by BH Equities, or is this a summary of discussions that have been taking place, if you know?

A. A little of both.

Q. Okay. And I see that there's a reference to Highland there on the left. Do you see that? Is that -- do you know what that refers to?

BH EQUITIES, LLC - D. MILLER

A. We were kind of lumping -- in this correspondence, we were lumping Highland together as the counterparty to BH in the -- in the agreement and in the transaction.

Q. Okay. So this is October 7, 2018, and it's after the closing of the acquisition of the real property by SE Multifamily, correct?

A. Correct.

Q. Do you know if the numbers reflected on this chart changed between October and the time the deal was consummated in March?

A. I believe they were modestly updated, but not in any order of magnitude.

MR. MORRIS: Let's go to the next document, we'll mark as Exhibit 4. It has Bates number BH 133 to 44.

(Exhibit 4 marked.)

BY MR. MORRIS:

Q. And if you go to the bottom of the first page, you'll see that Mr. Roby asks Mr. Broaddus for a copy of the SE Multifamily LLC agreement. Do you see that?

A. Yes.

BH EQUITIES, LLC - D. MILLER

MR. MORRIS: And if we could scroll up just to see Mr. Broaddus's response.

BY MR. MORRIS

Q. Mr. Broaddus again was acting on behalf of Highland. Do I have that right?

MR. DOHERTY: Objection. I know we have some kind of defined terms for the deposition, but I just want to -- objection, form.

BY MR. MORRIS:

Q. Based on the prior testimony, you can answer, sir.

A. He was acting on behalf of what we viewed as the Highland, you know, broad entity. So we didn't know specifically HCMLP or HCRE in particular. But as a counterparty to the broader Highland, you know, ecosystem, yes.

Q. Okay. Can you just -- can you just read Mr. Broaddus's e-mail to yourself and tell me when you're finished?

A. I've finished.

Q. Okay. Do you know if anybody ever told KeyBank that the SE Multifamily, LLC agreement that was in existence at that time

BH EQUITIES, LLC - D. MILLER

was just a placeholder?

A. I don't have knowledge one way or the other.

Q. Do you know if anybody told KeyBank that the original LLC agreement was meaningless?

A. The same answer. I don't have knowledge one way or the other.

Q. Okay. But as of this time, obviously, BH Equities did know that an original LLC agreement existed, right?

A. Yes.

Q. And that the original agreement was going to be amended to reflect, quote, whatever the deal terms are, closed quote, correct?

A. Correct.

Q. And, in fact, the original LLC agreement was amended, correct?

A. Yes.

Q. And that's the agreement we just looked at; is that fair?

A. Yes.

Q. So is it fair to say that consistent with Mr. Broaddus's November 7th e-mail, the

Exhibit 3 Page 19 of 37

Page 74

BH EQUITIES, LLC - D. MILLER

original LLC agreement was amended to, quote, reflect whatever the deal terms were?
A. I think that's fair.
MR. MORRIS: Let's go to the next document, Exhibit 5, which has Bates number BH 1271 to -73.
(Exhibit 5 marked.)
BY MR. MORRIS:
Q. Before I ask you any questions about this document, the agreement was dated March 15th, 2019. Do you remember that?
A. Yes.
Q. And was there a sense of urgency to get the agreement signed by the end of that particular day?
A. Yes.
Q. Do you have an understanding as to what the cause of that urgency was?
A. My understanding from the correspondence of March 15th is the deadline to either file or extend taxes for pass-through entities, and that was driving the urgency.
Q. And was the goal to make the agreement effective as of August 23rd, 2018,

Page 75

BH EQUITIES, LLC - D. MILLER

the date on which the original LLC agreement was entered into?
A. Yes.
Q. And is it BH Equities' understanding that in order to make the amended and restated agreement retroactive to August 23rd, 2018, it had to be signed by the end of the day on March 15, 2019?
MR. DOHERTY: Objection -- withdraw my statement.
A. I'm not an expert in that matter, but that would certainly be the understanding we were given.
BY MR. MORRIS:
Q. Okay. I appreciate the distinction. Was BH Equities told by Highland that the agreement had to be executed on or before March 15th in order for it to be retroactive to August 2018?
A. Yes. That was the -- what we were told.
Q. Okay. So let's take a look at the e-mail that's up on the screen. You'll see there's actually two e-mails. The one on the

Page 76

BH EQUITIES, LLC - D. MILLER

bottom is from Mr. Broaddus to you and to Mr. Roby with a copy to Mr. McGraner, and it's sent on March 14th. Do you see that?
A. Yes, sir.
Q. And do you recall -- I think you may have testified to this earlier, but does this refresh your recollection that BH Equities was presented with a draft amended LLC agreement for SE Multifamily on March 14th?
A. Yes.
Q. And do you see in the next-to-the-last paragraph in Mr. Broaddus' first e-mail there, he says, quote, the contribution schedule in the attached needs to be updated with the actual contribution numbers. I have an updated version I can send in a separate e-mail.
Do you see that?
A. Yes.
Q. So were the actual contribution numbers and the contribution schedule a subject of discussion between BH Equities and Highland prior to the execution of the amended agreement?

Page 77

BH EQUITIES, LLC - D. MILLER

A. Yes.
Q. And then you can see the e-mail above, and Mr. Broaddus follows up and he says, among other things, quote, "Contribution schedule attached." Do you see that?
A. Yes.
Q. And if we can scroll to the next page, the next page actually has Schedule A attached. If we could scroll down. I don't know if you can see it in the chat room because I don't want you to just take my word for it. But do you recall receiving a Schedule A from Mr. Broaddus prior to the execution of the agreement?
A. Yes.
Q. Okay. And is this the schedule that Highland prepared and delivered to BH Equities prior to the execution of the amended agreement?
A. I believe so.
Q. And is it BH Equities' understanding that somebody acting on behalf of Highland completed Schedule A before delivering it to BH Equities?

TSG Reporting - Worldwide 877-702-9580

Page 78

BH EQUITIES, LLC - D. MILLER

A. Yes, that was our understanding.
Q. Okay. BH Equities didn't prepare the numbers that are set forth on Schedule A, did it?
A. No.
Q. That was Highland, correct?
A. Correct.
Q. And Highland delivered this document to BH Equities the day before the agreement was -- withdrawn. Actually, delivered it to BH Equities on March 15, 2019, correct?
A. This particular Schedule A, yes, was delivered on March 15th.
Q. And it was delivered as a stand-alone document by itself with nothing else; is that right?
A. That's my recollection, based on -- I believe so without, you know, seeing some other sourcing.
THE REPORTER: I'm sorry, Mr. Doherty, did you say something?
MR. DOHERTY: Objection. Well, objection that -- John, may I make a comment?

Page 79

BH EQUITIES, LLC - D. MILLER

If you need a document to refresh yourself, Dusty, especially if it's on the screen and -- you know, let Mr. Morris know that you want to look at the prior e-mail or, you know, if you're asking to -- I hope that was okay, Mr. Morris. Appreciate it.
MR. MORRIS: It's okay. I mean, I'm happy to show him the third page of the document. I just --
MR. DOHERTY: I just know Mr. Thomas is a very detailed-oriented man, so I know if he doesn't -- you know, if it's a question like was this the one sent, in case he wants to go back and see that it was attached to the document or he can ask Mr. Morris is this the attachment. But, you know, I just wanted to make that -- make that point.
MR. MORRIS: All right. First of all, La Asia, can you show Mr. Thomas the third page of the exhibit? It's blank.
BY MR. MORRIS
Q. And do you see, Mr. Thomas, that

Page 80

BH EQUITIES, LLC - D. MILLER

BH Equities has Bates stamped these documents consecutively 1271, 1272, and 1273?
A. Yes.
Q. And do you see that Mr. Broaddus's e-mail at the very first page shows that there's an attachment?
A. Yes.
MR. MORRIS: Can we go up to the first page, please?
BY MR. MORRIS:
Q. And do you see that Mr. Broaddus's first sentence says attached is the contribution schedule, at least in substance?
A. Yes.
Q. And do you have any reason to believe that the Schedule A that we just looked at is not the contribution schedule that Mr. Broaddus attached to his e-mail on March 15, 2019, at 2:02 p.m.?
A. No, I do not. I believe that is the schedule.
(Exhibit 6 marked.)
Q. Okay. So let's go, then, to Exhibit 6, which is a document Bates numbered

Page 81

BH EQUITIES, LLC - D. MILLER

1363 to -67. Now, this is an e-mail from you, and attached here -- do you see that there is an attachment that's mentioned in the header of your e-mail?
A. Yes.
Q. And you refer to an attachment in the first sentence of your e-mail. Do you see that?
A. Yes.
MR. MORRIS: And if we can scroll down.
BY MR. MORRIS:
Q. Again, you're free to look at whatever you want. I'm looking for the attachment.
MR. MORRIS: If we can keep going. Right there.
BY MR. MORRIS:
Q. Please scroll down and confirm, if you can, that the document that's set forth on page 1366 and 1367 is the attachment to the e-mail that we're looking at that you sent.
A. Yeah. And I'm looking to my left because I pulled it up via the chat link. So

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 21 of 37

Page 82

BH EQUITIES, LLC - D. MILLER

I'm just -- it gives me a bigger screen to view it.
Q. Okay. So that's the attachment that you sent, right?
A. Yes.
Q. And your attachment deals with the very issue that you identified earlier today that you were focused on, and that was the waterfall; is that right?
A. Correct.
Q. Okay. And in the first sentence when you say that, "Attached is what we proposed in October to try and handle this," this is expressly referring to the waterfall provision, correct?
A. Yes.
Q. Okay. And you go on to say, "This covers the distribution language in a way that we can get comfortable with, as we need to make sure that if the capital that Highland put in associated with debt is off, that it's not dilutive."
Do you see that?
A. I do.

Page 83

BH EQUITIES, LLC - D. MILLER

Q. What capital that Highland put in associated with debt, what does that refer to?
A. The KeyBank facility.
Q. And what specifically was your concern about how that was treated?
A. Our understanding is it would be a loan to HCRE or, you know, an entity affiliated with, you know, kind of the broad Highland, and would be put in as capital, and that obviously it would have a preference to getting paid off, but that it wouldn't then also keep us from getting our capital back after the KeyBank was -- KeyBank facility was paid off.
Q. Okay. And then you go on to say later in the paragraph, "We think the attachment does that while still allocating the taxable income loss in a way that meets your needs by percentage."
Do you see that?
A. Yes.
Q. What did you mean by that?
A. I had had a brief phone call with Mr. Broaddus, and that was in that -- in relation to the profit and loss allocation

Page 84

BH EQUITIES, LLC - D. MILLER

where we were kind of indifferent.
Q. And what needs did Mr. Broaddus describe for you?
MR. DOHERTY: Objection.
MR. MORRIS: Withdrawn.
BY MR. MORRIS:
Q. Did Mr. Broaddus describe for you the needs that Highland had with respect to the allocation of taxable income and loss?
A. Not in any level of detail.
Q. So when you said that you believed your provision would meet their needs, how did you believe their provision would meet Highland's needs?
A. The provision that we shared was focused more on the distribution of cash and not the allocation of profits and losses.
Q. And is that because Section 6.1 deals with the allocation of cash and Section 6.4 deals with the allocation of profits and losses?
A. Could you show me Section 6.4, just to verify the numbers? But, yes, 6.1 was focused exclusively on the allocation of cash

Page 85

BH EQUITIES, LLC - D. MILLER

or the distribution of cash and that a different section, presumably 6.4, would focus on the allocation of profits and losses, separate and distinct from cash.
Q. Okay. And I apologize for asking it again, but help me to understand how the attached -- oh, is it because your attached proposal doesn't impact the allocation of taxable income and losses at all?
A. Correct.
Q. Ah, okay. So I understand. So -- so you're trying to explain -- is it fair to say that you're trying to explain to Mr. Broaddus that your concern is the distribution waterfall but that he can leave the tax allocation the way they wanted it?
A. Yes, yes.
Q. Okay. Do you recall -- actually, towards the end it says, "The capital in this agreement would only be the capital that Highland put in that is not also incorporated in the bridge loan agreements. I think that is plus or minus $40 million based on my understanding."

TSG Reporting - Worldwide 877-702-9580

BH EQUITIES, LLC - D. MILLER

Is what you're saying there that Highland was going to put in approximately -- withdrawn.

Is what you're saying there that Highland was going to get credit for having put in $290 million or thereabouts into SE Multifamily, 250 million of which was coming from the KeyBank loan and the other 40 million of which was coming from Highland?

A. Yes, that's the distinction I was trying to make.

Q. Okay. And under the waterfall is it BH Equities' understanding that it agreed that the $250 million that had been borrowed from KeyBank would be paid back first?

A. Yes.

Q. Before return of capital?

A. Yes.

Q. Does BH Equities know the source of funding for the other $40 million?

A. No, not at this time.

Q. Did BH Equities ever ask Highland where the $40 million was coming from?

A. No, not that I -- not that I'm aware.

BH EQUITIES, LLC - D. MILLER

Q. Does BH Equities know when HCRE was formed?

A. I don't believe so. We may have an organizational doc or something that was provided as part of a deal that was shared with a lender, et cetera, but not in the ordinary course would we know that.

Q. Had BH Equities done business with HCRE prior to Project Unicorn?

A. I don't know for sure. In our business generally there are a lot of subsidiaries and things like that that are formed for specific deals. So it's quite possible that HCRE could have been an upper entity that owned a subsidiary, et cetera. But I just don't know the waterfalls cold -- or the organizational charts cold to know if we did or did not specifically with HCRE.

Q. Okay. That's fair.

Had BH Equities done business with HCMLP or any entity that BH Equities believed was related or affiliated with HCMLP prior to Project Unicorn?

A. We had numerous projects and

BH EQUITIES, LLC - D. MILLER

partnerships with Highland broadly, you know, whether that be HCRE, HCMLP, the NexPoint RE, et cetera, to the tune of 40-plus property partnerships, et cetera. So we had significant relations with them and still do on the management company side. So I don't specifically know what entities were owned or related to what, but we had significant prior experience with the parties involved.

Q. And were -- were Mr. McGraner or Mr. Broaddus or Mr. Chang involved in any of those other deals?

A. Yes.

Q. Were they the primary contacts that BH Equities had for the transactions that BH Equities did with Highland and its affiliated and related entities?

A. I believe so, yes.

(Exhibit 7 marked.)

Q. Let's go to Exhibit 7, please, which is a two-page e-mail with Bates number 1437 to -38. And if we could start at the bottom, you'll see -- this is the e-mail that we just looked at from you, right?

BH EQUITIES, LLC - D. MILLER

A. Yep.

Q. It's the exact same e-mail?

A. Yes.

Q. And then if we scroll a little higher on the page, you'll see that it appears that Mr. Broaddus, the person to whom you sent it, forwarded it to Mr. Chang. Do you see that?

A. Yes.

Q. And then if we can keep scrolling up, Mr. Chang sent an e-mail back to Mr. Broaddus. Do you see that?

A. Yes.

Q. And then Mr. Broaddus forwarded that -- Mr. Chang's e-mail to you. Is that fair?

A. Yes.

Q. And Mr. Chang's e-mail was a direct response to the proposal that was attached to the e-mail that we just looked at that was marked as Exhibit 6, right?

A. Yes.

Q. And what's in Mr. Chang's e-mail is a different provision for the waterfall. Fair?

A. Yes.

Exhibit 3 Page 23 of 37

Page 90

BH EQUITIES, LLC - D. MILLER

MR. DOHERTY: Objection. Could I see the -- could we zoom out so I can see that whole e-mail? Do y'all mind?

MR. MORRIS: Sure. Yep.

MR. DOHERTY: Okay. Not really an objection but a request .

I think There's an (e). And maybe it's not. Could you scroll down just so I can see the (e)?

MR. MORRIS: It's at the bottom of the page there.

MR. DOHERTY: I'm sorry to be annoying. I just wanted to see it. While we were talking about it, I didn't know if we could zoom out so we could have the whole --

THE WITNESS: Yeah, I can see it. I can see the provision (e), Casey.

MR. DOHERTY: Okay. Then I'm okay. I was more talking for you, Dusty. I wanted everybody to be able to see the document. Okay. Sounds good.

BY MR. MORRIS:

Q. Just let me try to clean this up a

Page 91

BH EQUITIES, LLC - D. MILLER

bit, Mr. Thomas.

Is it your understanding that Mr. Chang's e-mail was effectively a counterproposal to the one that you had made earlier in the day on March 15th with respect to the waterfall?

A. Yes. That's how we interpreted it.

Q. Okay. And is it your understanding -- withdrawn.

Is it BH Equities' understanding that this provision in Mr. Chang's e-mail was a provision that was drafted by Highland?

A. Yeah, Highland is kind of the broad counterparty perspective, yes.

Q. Okay. And, Mr. Chang's -- withdrawn.

Other than the fact that it's labeled 1.1 instead of 6.1, are you aware that Mr. Chang's e-mail is -- was adopted verbatim in the executed amended agreement?

MR. DOHERTY: Objection.

A. I would compare, but, yeah, I believe it is -- it looks to be the language, the final language.

Page 92

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:

Q. And did Mr. Chang's section -- and what's on Mr. Chang's e-mail, is it your understanding that it ultimately became Section 6.1 of the amended agreement? And, again, I'm happy to pull it up if you'd like because I don't mean to test you.

A. Yeah, if you wouldn't mind pulling it up, that would be great.

Q. Let's do that. Let's pull it up. It's Exhibit 2. If we can pull up 6.1.

MR. DOHERTY: Mr. Morris, do you think it would be helpful for Mr. Thomas to print out the amended agreement during this series of questions, or is this kind of a one-off question?

MR. MORRIS: I think it's a one-off question.

MR. DOHERTY: Okay.

MR. MORRIS: But if he wants to do that, I don't mean to stop him.

MR. DOHERTY: I understand.

BY MR. MORRIS:

Q. Here's 6.1. You'll see that it's got

Page 93

BH EQUITIES, LLC - D. MILLER

five Sections, (a) through (e)?

A. Yep.

Q. You'll see that -- if we can go back up to (a). You've got the percentages that are set forth in Schedule A, 47.94 percent to HCRE, 46.06 percent to HCMLP, and 6 percent to BH. Do you see that?

A. Yes.

Q. Okay. And then if we scroll down to (e), it basically says, notwithstanding everything that came before it, the first amounts of distributable cash shall be deemed distributed to each member in proportion to amounts borrowed on behalf of SE Multifamily.

Is that a fair characterization?

A. Borrowed and then invested as equity into the deal, yes.

Q. That's right. So that's the pay KeyBank back first provision. Fair?

A. Yes.

Q. And then little (ii) there says that after that's done, it's pro rata in proportion to the members' respective capital accounts.

Do you see that?

TSG Reporting - Worldwide 877-702-9580

Page 94

BH EQUITIES, LLC - D. MILLER

A. Yes.
Q. That's the return of capital provision, correct?
A. Correct.
Q. And that's what BH Equities was concerned about, correct?
A. Correct.
Q. And so Mr. Chang's proposal was acceptable to BH Equities, correct?
A. Yes.
Q. BH Equities accepted Mr. Chang's entire proposal with respect to Section 6.1, correct?
A. Correct.
Q. Okay.
MR. MORRIS: All right. If we can go to the next exhibit, Number 8, Bates number 1140.
(Exhibit 8 marked.)
BY MR. MORRIS:
Q. Okay. So we're still on the 15th. This was a busy day for you. At least it looks that way. It's now 11:20 at night.
A. Uh-huh.

Page 95

BH EQUITIES, LLC - D. MILLER

Q. And Mr. Broaddus sends to you and to Mr. Roby, and he copies his colleagues, and he attaches the agreement with the change, quote, Dusty and I discussed, closed quote, and the document was ready for execution. Do you see that?
A. Yes.
Q. Is the change that you and Mr. Broaddus discussed the change to 6.1 that we just looked at in the two e-mails?
A. Yes.
Q. Okay. So that Mr. Broaddus is informing BH Equities that after negotiating Section 6.1 to the satisfaction of all members, they were ready to sign; is that fair?
A. Yes.
Q. Okay.
(Exhibit 9 marked.)
MR. MORRIS: All right. Let's go to the next exhibit, please. It's an e-mail string with Bates number 277 to 282.
BY MR. MORRIS:
Q. And we can start at the bottom so there's no confusion here.

Page 96

BH EQUITIES, LLC - D. MILLER

A. That would be appreciated.
Q. Yep. Okay. So you'll see that at 9:24, you know, some version of the agreement, Mr. Roby sent it to himself. Do you see that at 9:24?
A. Yes. Yes, sorry.
Q. And if we can scroll up just a bit. It looks like -- it's not clear to whom Mr. Roby sent it to, but at 9:28, he had a signed agreement at that time. And he asked about working on a promote structure by the end of April. Do you see that?
A. Uh-huh. Yes.
Q. So do you recall that there were two different versions of the agreement that were signed, or is that the slip page that you were referring to earlier?
A. I don't recall exactly --
Q. Okay.
A. -- where version control was at that point.
Q. Okay. So somebody responds, "Thanks, Ben." It's hard to tell.
MR. MORRIS: But keep scrolling up.

Page 97

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:
Q. Oh, I guess Mr. Broaddus did. He says, "Thank you, Ben."
MR. MORRIS: Keep scrolling up.
BY MR. MORRIS:
Q. At 9:45, Mr. Chang sends what he says is a fully executed agreement. Do you see that?
A. Yes.
MR. MORRIS: Keep scrolling up.
BY MR. MORRIS:
Q. Okay. So a few days later, you sent an e-mail to Mr. Chang and to Mr. Broaddus where you noted a small issue in the agreement. Do I have that correct?
A. Correct.
Q. Can you describe for me what that small issue was?
A. I believe it was just the amount of capital -- exact amount of capital contribution was off slightly.
Q. And the piece that was off slightly was the capital contribution amount set forth in Schedule A for BH Equities; is that right?

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 25 of 37

Page 98

BH EQUITIES, LLC - D. MILLER

A. Yes, that's my understanding.
Q. And so you or somebody acting on behalf of BH Equities was looking at Schedule A and noticed that the capital contribution amount was off by a little bit; is that fair?
A. Yes.
Q. Okay. And you brought that to Highland's attention, correct?
A. Correct.
Q. But BH Equities didn't identify anything else about Schedule A that appeared to be in error or by mistake at that time, correct?
A. Correct.
Q. And let's -- let's just look to see. So you identify the error, and then you say, "As I understand it, several other items related to the agreement will get discussed and an amendment will be coming. Can we make that update at the time of the amendment?"
Right? So it was BH Equities' expectation that there would be an amendment; is that right?
A. Yes.

Page 99

BH EQUITIES, LLC - D. MILLER

Q. And that amendment that BH Equities was hoping to have made was specifically limited to the question of whether the 6 percent residual interest would be increased; is that right?
A. Yes.
Q. Okay. And is that -- was the promote an attempt to get value through another means, or is that related to the desire to get the 6 percent increase?
A. They were one and the same.
Q. Oh, okay. So -- so the amendment that -- this is what you were referring to earlier, right, that BH Equities agreed to accept the 6 percent residual interest with the hope and expectation that there would be an amendment that would increase that amount, right?
A. Right.
Q. And that's the only issue that BH Equities wanted changed in the amended agreement, correct?
MR. DOHERTY: Objection.

Page 100

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:
Q. You can answer.
A. The only issue that I was aware of. Again, I'm focused more on the economics, though.
Q. Okay. Not -- there is no other provision of the amended agreement that BH Equities ever asked Highland to change except for that number 6. Fair?
A. That's my understanding.
Q. So let's see what Mr. Broaddus says in response. Okay. Right there. And he suggests the slip page. Do you see that?
A. Yes.
Q. And he asks a question of Kim and Matt at the bottom about whether the increase in BH Equities' capital contribution would change Highland's contribution or would it be just additional capital to BH only. Do you see that?
A. Yes.
Q. And the answer to that question was that it was only going to change the capital contribution made by BH Equities, correct?

Page 101

BH EQUITIES, LLC - D. MILLER

A. I believe so, yes.
Q. BH Equities wasn't intending to change the capital contribution of any of the Highland parties, correct?
A. No.
Q. And then -- and then Mr. Chang weighed in in response and said that, you know, quote, we are fine handling this with a slip page if BH Equities, closed quote, is fine with that. Do you see that?
A. Yes.
Q. And then Mr. Broaddus responds to that and says that Highland would leave it up to BH Equities because, as he understood it, "we do plan to amend anyways; however, if you want it slip paged in the meantime, we can do that."
Have I read that correctly?
A. Yes.
Q. But no amendment was ever executed, correct?
A. Correct.
Q. No agreement was ever reached on a modification of any kind to BH Equities'

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 26 of 37

Page 102
BH EQUITIES, LLC - D. MILLER
residual interest in SE Multifamily, correct?
A. Correct.
Q. Do you know if a slip page was ever inserted into the agreement to make the small change that BH Equities identified to its capital contribution?
A. I believe it was.
Q. So Highland was responsive to BH Equities' request that Schedule A be changed to accurately reflect BH Equities' capital contribution; is that fair?
A. Yes.
Q. Did Highland ever ask BH Equities to make any change to Schedule A at any time after the agreement was executed on March 15, 2019?
A. There was correspondence as KeyBank was paid back in that process and as other assets were sold to get -- get things right as, you know, contributions were paid back along the way. So there was back-and-forth correspondence. I don't know if it was specific to update Schedule A, per se, but there were iterative communications ensuring that the capital that was put in was the

Page 103
BH EQUITIES, LLC - D. MILLER
capital that was paid back, et cetera.
Q. Okay. So -- so is it fair to say, then, that Highland never asked BH Equities to amend Schedule A, but there were discussions about distributions and cash flow?
A. Yes.
MR. MORRIS: Okay. Let's go to the next document, which is Exhibit 10. It's Bates number 716.
(Exhibit 10 marked.)
BY MR. MORRIS:
Q. Have you seen this e-mail before, sir?
A. Yeah, I believe it was part of our discovery process.
Q. Okay. And do you see -- this is an e-mail from Mr. Mulcahy of BH Management. Do I have that right?
A. Yes.
Q. Okay. And do you see he refers to tranche B debt?
A. Yes.
Q. That's a reference to the KeyBank loan, correct?

Page 104
BH EQUITIES, LLC - D. MILLER
A. It is.
Q. And is this again pointing out that $250 million of tranche B was considered contributable capital by HCRE?
A. Yes.
Q. And by August of 2020, that $250 million had been paid back; is that right?
A. Yes, that's my understanding.
Q. So that approximately $39 million of original capital that was credited to HCRE had yet to be returned; is that right?
A. Yes, that's my understanding at that time.
Q. Okay. And do you recall that in the fall of 2020, there were discussions about the return of capital?
A. Yeah. In that rough time frame, yes.
MR. MORRIS: Okay. Let's go to the next exhibit, 482 through 485.
MR. DOHERTY: Mr. Morris, is it -- I just wanted to ask about another break or lunch break. I don't know, it's your presentation, your deposition. I know it's around noon. It's been an hour.

Page 105
BH EQUITIES, LLC - D. MILLER
MR. MORRIS: I'm happy to take a short break, but after that break, my goal would be to take it to the finish line because I don't think that I'll have a whole lot more.
MR. DOHERTY: I can defer to -- do you know how much -- the goal there --
MR. MORRIS: It will be another half hour to an hour. So if you want to take a short break, I'm happy to do that.
MR. DOHERTY: I could use a little -- I think -- do you want to do it now, or do you want to go through a couple more?
MR. MORRIS: No, I think now is fine. It's 1:07 here in New York. Let's just come back at 1:15 and I'll, you know, try to finish up within an hour.
MR. DOHERTY: Okay. 1:15 Central Time, right?
MR. MORRIS: No. I don't want to take a lunch break. I want to take --
MR. DOHERTY: Oh, no lunch break. Okay.
MR. MORRIS: No.

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 27 of 37

Page 106
BH EQUITIES, LLC - D. MILLER

MR. DOHERTY: I just got a call from my -- a personal call. I wanted to be able to call it back. I can jump back on.

MR. MORRIS: You go take that -- Let's go off the record, please.

MR. DOHERTY: Yeah, sorry, off the record.

(Recess taken 12:07 p.m. Central Time - 12:17 p.m. Central Time.)

BY MR. MORRIS:

Q. So we're at Exhibit 11, Bates number 482 to 485. You know what, I'm going to withdraw this exhibit. So just leave a blank in the transcript -- yeah, just leave a blank simply because it's redundant.

Let's shift topics, because I've only got a little bit left here, to the topic of distributions, Mr. Thomas. Do you recall that that's one of the 30(b)(6) topics that we had written about?

A. Yes.

Q. Okay. And I think we just confirmed that in the fall of 2020, there were discussions between Highland and BH Equities

Page 107
BH EQUITIES, LLC - D. MILLER

concerning the return of capital. Do you remember that?

A. Yes.

Q. Okay.

(Exhibit 12 marked.)

MR. MORRIS: So let's put up what's been marked as Exhibit 12, which is a document with Bates number BH 192 to -94. And if we could start at the bottom.

BY MR. MORRIS:

Q. Okay. Do you see that Mr. Mulcahy sent an e-mail on Saturday, November 7th to Bonner McDermett and Paul Broaddus with copies to you and Phyllis Jones?

A. Yes.

Q. I don't think we've seen Mr. McDermett's name before. Do you know who Mr. McDermett is?

A. I don't know his exact title, but he has been a correspondent with various properties that we've worked with the Highland entities before, kind of in an acquisition and somewhat asset management type role.

Q. And how about Ms. Jones? Who is

Page 108
BH EQUITIES, LLC - D. MILLER

that?

A. She's the CFO of BH Companies.

Q. And was there discussions within BH prior to November 7th concerning BH's desire to have its capital returned?

A. Yes.

Q. And did BH Equities express that to Highland in or before November 2020?

A. I don't know the first time it would have been expressed, but, you know, it wasn't -- it was a fairly known fact that we would like to get our capital back.

Q. Okay. And the subject of this e-mail, indeed, is called, quote, Unicorn proposed distribution and detail schedules. Do you see that?

A. Yes.

Q. Okay. And in the second paragraph, Mr. Mulcahy references requested detail as well as a, quote, updated distribution calculation. Do you see that?

A. Yes.

Q. Do you have an understanding of what a distribution calculation is?

Page 109
BH EQUITIES, LLC - D. MILLER

A. Yes.

Q. What's your understanding of that term?

A. Just the -- the split of the next dollars going out, who is going to get what from -- from the next amount that would be distributed.

Q. And did BH Equities maintain a distribution calculation that it updated from time to time as circumstances changed?

A. Yeah, based on our understanding of the agreements, we did.

Q. And did Highland ask BH Equities to do that, or is that something that BH Equities just did of its own accord?

A. I believe we did it on our own accord.

Q. And did BH Equities share their distribution calculations with Highland from time to time?

A. Yes.

Q. And, in fact, it wasn't attached to this particular document, but Mr. Mulcahy wrote to Highland on November 7th that he was

TSG Reporting - Worldwide 877-702-9580

Page 110

BH EQUITIES, LLC - D. MILLER

attaching an updated distribution calculation. Have I read that fairly?

A. Yes.

Q. And do you see that the updated distribution calculation was for BH, HCRE, and HCM?

A. I'd need to see the document, but that would be in line with what I understand from that document.

Q. Okay. And it's your understanding that BH refers to BH Equities, correct?

A. Yes.

Q. And HCRE refers to HCRE Partners, LLC, correct?

A. Yes.

Q. And HCM refers to Highland Capital Management, L.P., correct?

A. Yes.

Q. And was it BH Equities' intention to create a distribution calculation that was consistent with the terms and provisions of the amended agreement?

A. As we understood them, yes.

Q. Okay. And as BH Equities understood

Page 111

BH EQUITIES, LLC - D. MILLER

the terms and provisions of the amended agreement on or around November 7th, it prepared a distribution calculation that showed the return of capital to each of the three members of SE Multifamily, correct?

A. I -- I'd prefer to see the document to state in the affirmative on that, but that would be in line with, you know, my understanding.

Q. And it's in line with what Mr. Mulcahy wrote, correct?

A. Yes.

Q. There's no question in BH Equities' mind that Mr. Mulcahy told Highland on November 7, 2020 that it had an updated distribution calculation for BH Equities, HCRE, and HCMLP. Fair?

A. Yes.

Q. Okay.

MR. MORRIS: Let's -- let's go up to the response to that, if we could scroll up.

BY MR. MORRIS:

Q. And you'll see that Mr. McDermett

Page 112

BH EQUITIES, LLC - D. MILLER

responded the following Tuesday to that e-mail, and he added Matt McGraner and DC Sauter to the thread. Do you see that?

A. Yes.

Q. Do you know who Mr. Sauter is?

A. Yes.

Q. Who is Mr. Sauter?

A. He is legal counsel within NexPoint, HCRE, those entities.

Q. Had BH Equities dealt with Mr. Sauter on Project Unicorn before November 2020?

A. Yes. I don't know -- at one point he was with Wick Phillips as well. And I don't know exactly when he made his transition, but he was involved either as outside counsel or internal, you know, several times throughout the deal.

Q. Okay. And Mr. McDermett told Mr. Mulcahy and the others copied on the e-mail, including yourself, that he presented BH Equities' proposed distribution and set of facts to Mr. McGraner and Mr. Sauter, correct?

A. Yes.

Q. Okay. And a couple of days later, BH

Page 113

BH EQUITIES, LLC - D. MILLER

Equities hadn't received a response, so Mr. Mulcahy followed up, is that fair, on November 12th, in the e-mail above, if we can scroll up?

A. Yes, I see that.

Q. Okay. Okay. Let's see what the response to that is. All right. I'm just going to read the paragraph out loud, and then I'm going to ask you some questions about it. "On November 19th, 2020, Mr. McDermett told you, Mr. Mulcahy, and Ms. Jones, among others, quote, we have confirmed internally that we are standing by our position that distributions may be returned to BH and HCRE in order to extinguish their debts. But the HCMLP bankruptcy is temporarily inhibiting our ability to distribute a return of equity at this time. DC Sauter and our team are working toward a solution there and we will get back to you as soon as we have clearance to move forward with additional distributions (return of equity and profits)."

Have I quoted that correctly?

A. Yes.

TSG Reporting - Worldwide 877-702-9580

BH EQUITIES, LLC - D. MILLER

Q. Okay. Let's just take this in pieces. At this moment in time, BH Equities wanted their capital back, right?
A. Correct.
Q. And Highland was refusing to do that, correct?
A. In whole, yes.
Q. Okay. And their position was that, quote, distributions may be returned to B&H and HCRE in order to extinguish their debts. Do you see that?
A. Yes.
Q. Do you have an understanding as to what debts are being referred to there?
A. I do.
Q. What debts are being referred to?
A. BH is part of our $21 million -- $21.2 or $21.5 million. Had a $15 million line of credit or debt facility that was drawn to make that investment, and I believe HCRE, it was determined that the entirety of its, you know, 39 or $40 million amount was also borrowed from NexVest Bank and that that's what we were -- what extinguished their debts is

BH EQUITIES, LLC - D. MILLER

referring to.
Q. All right. Let me make sure that I understand that. 15 of the $21 million that BH Equities put into the deal was borrowed from a third party. Do I have that right?
A. That is correct.
Q. And BH Equities' understanding is that the difference between HCRE's capital contribution of approximately $290 million and the $250 million that was borrowed from KeyBank was also borrowed from a third party, that $40 million. Do I have that right?
A. That's our understanding during this time frame.
Q. And it was BH Equities' understanding that Highland's position was that it would permit the repayment of amounts sufficient to allow BH and HCRE to repay in full the third-party debt but nothing more; is that right?
A. Yes.
Q. All right. So you're in November 2020, BH wants its entire initial capital contribution returned, and they're told by HCRE

BH EQUITIES, LLC - D. MILLER

that only amounts sufficient to repay third-party debt would be permitted, correct?
A. Correct.
Q. Okay. And then the next sentence says, "But the HCMLP bankruptcy is temporarily inhibiting our ability to distribute a return of equity at this time."
Do you see that?
A. Yes.
Q. Do you know what they meant by that?
A. No. Not -- we were not in the weeds, so to speak, on that.
Q. Did BH Equities ever ask Highland or anybody acting on behalf of HCRE why the HCMLP bankruptcy would inhibit HCRE's ability to distribute a return of equity in November 2020?
A. I don't know that we asked that directly. We knew it was a tricky situation and were somewhat deferential to it.
Q. When did BH Equities learn that Highland was in bankruptcy?
A. I don't know a specific date, but it would have been, you know, shortly after the filing, as it started to make the public

BH EQUITIES, LLC - D. MILLER

rounds.
Q. And how did BH Equities learn of that? Did they learn it from public information, or did they learn it from anybody acting on behalf of HCRE?
A. I don't recall specifically if we were given a heads-up directly from HCRE or our first knowledge was public information.
Q. You don't have a recollection of anybody on behalf of HCRE specifically informing BH Equities that HCMLP would be filing for bankruptcy, do you?
MR. DOHERTY: Objection, form.
BY MR. MORRIS:
Q. You can go ahead.
A. I don't. And in my preparation, I was not made aware of any contact. That doesn't mean it didn't happen and I just wasn't able to gather that info.
Q. I'll represent to you that HCMLP filed for bankruptcy in October 2019. So my question is whether BH Equities had any communications with HCRE at any time prior to November 2020 concerning any impact that the

Exhibit 3 Page 30 of 37

Page 118
BH EQUITIES, LLC - D. MILLER
bankruptcy filing would have on HCRE's ability to make distributions in accordance with the amended agreement.
A. I don't know of anything that specific. We were very focused at the time on continuing the process to get KeyBank paid off and then kind of taking it stride by stride, given the complication of this very complex transaction.
Q. Okay. Had anybody acting on behalf of HCRE informed anybody acting on behalf of BH Equities prior to November 19th, 2020 that the HCMLP bankruptcy would have any impact at all on the ability to make distributions?
MR. DOHERTY: Objection, form.
A. Could you repeat the question?
BY MR. MORRIS:
Q. Sure. BH Equities is being told in this e-mail that, quote, the HCMLP bankruptcy is temporarily inhibiting our ability to distribute a return of equity at this time.
Do you see that?
A. Yes.
Q. Had anybody acting on behalf of HCRE

Page 119
BH EQUITIES, LLC - D. MILLER
ever told anybody acting on behalf of BH Equities of that -- of that issue prior to the time you received this e-mail?
MR. DOHERTY: Objection, form.
A. I don't know that there was anything specifically said in that regard. I'm not aware of anything that specific. We knew of the bankruptcy from both -- from public -- or not both, but from public forums, and we knew that would have an impact, being that it was a direct partner. I don't recall any -- or know of any very specific conversation with HCRE about what impact it was going to have.
BY MR. MORRIS:
Q. Did anybody from HCRE ever describe for BH Equities the impact that the bankruptcy would have on SE Multifamily or HCRE's ability to make distributions prior to the sending of this e-mail?
MR. DOHERTY: Objection, asked and answered.
You may answer, Mr. Thomas, the question.
A. Okay. Not to my knowledge.

Page 120
BH EQUITIES, LLC - D. MILLER
BY MR. MORRIS:
Q. Okay. And then in the next sentence it says that DC Sauter and our team are working toward a solution.
Do you see that?
A. Yes.
Q. Did they ever explain -- did anybody acting on behalf of HCRE ever explain to BH Equities what the solution was?
A. No. Not to my knowledge.
Q. Did BH Equities ever ask Highland or HCRE what the solution was that Mr. Sauter was working towards?
A. I don't know if we had a specific question or conversation about that within the firm.
Q. So if we scroll up, you'll see that Mr. McDermett, I guess, re-sent his e-mail with an attachment. I don't believe that was attached to the document that we received. But in any event, Mr. Mulcahy responded at the top of the e-mail chain. And is it fair to say that in substance --
MR. MORRIS: I think if we could keep

Page 121
BH EQUITIES, LLC - D. MILLER
scrolling up. Yeah.
BY MR. MORRIS:
Q. Is it fair to say in substance that BH Equities was willing to accept the distributions so that it could repay the third-party debt that it had incurred but still wanted to get the remaining funded capital out of SE Multifamily?
A. I might say it slightly differently.
Q. Okay.
A. HCRE was the manager.
Q. Yep.
A. And they instructed us to do something as the manager of the entity, and that was done. But, yes, as it's stated clearly here, we hope to find a solution to get our remaining 6.2 million of capital out as well.
Q. Okay.
MR. MORRIS: Let's go to the next exhibit, please, Exhibit 13.
(Exhibit 13 marked.)
BY MR. MORRIS:
Q. So this is seven months later.

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 31 of 37

Page 122

BH EQUITIES, LLC - D. MILLER

Exhibit 13 is a two-page document Bates numbered BH 173 to 174. The second page is just an icon. And at that e-mail at the bottom of the first page, Mr. Mulcahy is raising the exact same issue that he had raised seven months earlier, and that is BH Equities wanted the return of its capital; is that fair?

A. Yes.

Q. Okay. And, in fact, that $6.258 million that he refers to in his e-mail, that's the same amount that he referred to in his e-mail back in November of 2020, because no capital had been distributed since that time, correct?

A. Correct.

Q. And BH Equities pointed out that SE Multifamily had $8 million in its bank account, and so it wanted every dollar of invested but unreturned capital repatriated to it, correct?

A. Yes.

Q. And if you scroll up, Mr. McDermett again calls others to the table, in this case Mr. McGraner and Rob Harris. Do you see that?

A. Yes.

Page 123

BH EQUITIES, LLC - D. MILLER

Q. And at the top, Mr. McGraner -- no, withdrawn.

At the top, Mr. McDermett informs Mr. Mulcahy that Mr. McGraner has approved the repatriation of the remaining unpaid capital to BH Equities. Do I have that right?

A. Yes.

Q. And so, in fact, in June of 2021, BH Equities got the last of its capital investment out of SE Multifamily, correct?

A. Yes.

Q. Does SE -- withdrawn.

Does BH Equities know whether all of HCRE's original capital contribution has been repatriated?

A. We believe it has at that point.

Q. Does BH Equities know whether the capital contribution made by Highland Capital Management was returned to it?

A. As of the date of this e-mail, we don't believe it has.

Q. Do you know when HCRE's capital contribution was repatriated in full? When was either the month or at least the year when HCRE

Page 124

BH EQUITIES, LLC - D. MILLER

had all of its capital returned or at least credited to it?

A. I believe -- my apologies. We're talking about HCRE, correct?

Q. Yes.

A. I believe it was in 2020 when they had received all of their invested capital back.

Q. So -- and is that because all of their invested capital, to the best of BH Equities' understanding, was borrowed from third parties?

A. Yes.

Q. And so the deal was to repatriate all capital contributions that were sourced from third parties, correct?

A. Yes.

Q. So it's BH Equities' understanding that HCRE did not put in any of its own capital in connection with the funding of SE Multifamily, correct?

A. Its own capital being that that wasn't borrowed from a third party, yes, that's correct.

Page 125

BH EQUITIES, LLC - D. MILLER

Q. Okay. And that's why it got paid -- well, withdrawn.

That's why it was credited with the return of all of its capital before BH Equities; is that fair?

A. Yes.

MR. DOHERTY: Mr. Morris -- and you can tell me -- I believe that the witness misunderstood a question a couple back about Highland Capital. I can --

MR. MORRIS: Sure, go ahead.

MR. DOHERTY: -- identify it now. Okay. You asked about whether he knew Highland Capital had been -- had their capital returned, the 49,000; is that right?

MR. MORRIS: Yep.

MR. DOHERTY: And then I think Mr. Thomas said as of -- he, I think, added a qualifier, as of the date of this e-mail it hadn't.

MR. MORRIS: Right.

MR. DOHERTY: But did you mean what -- so was that the intent of your

TSG Reporting - Worldwide 877-702-9580

Exhibit 3 Page 32 of 37

Page 126
BH EQUITIES, LLC - D. MILLER
question, or was it had it been returned at all?
MR. MORRIS: I appreciate that. Well, let me try and clean that up, Casey.
BY MR. MORRIS:
Q. Mr. Thomas, as of the time that -- withdrawn.
Do you know whether HCMLP's $49,000 was original out-of-pocket capital or whether HCMLP borrowed that money as that third-party debt?
A. I don't know for certain, as we haven't traced the source, but we're led to believe that it was not borrowed capital.
Q. Okay. So in 2020, all borrowed capital was paid back in full, correct?
A. Yes.
Q. And to the best of BH Equities' knowledge, all of HCRE's capital was borrowed, correct?
A. Yes.
Q. And by June 2021, all of BH Equities' capital contribution was paid back or credited in full, correct?

Page 127
BH EQUITIES, LLC - D. MILLER
A. Yes.
Q. And that's both the third-party debt as well as the original sourced funding, correct?
A. Yes.
Q. But HCMLP is the only member who had no capital returned to it, at least as of June 2021, correct?
A. Correct.
Q. Do you know why HCRE and BH Equities was made whole by June 2021 but HCMLP was not?
A. That was how we were directed to make payments by the manager.
Q. And who on behalf of the manager directed you to make the payments in that manner?
A. We coordinated through Mr. McDermett, but it was -- as you can see with his e-mail exchange, I believe the discussion was had with Mr. McGraner, potentially others.
Q. Did anybody acting on behalf of the manager explain to BH Equities why it was not instructing BH Equities to make HCMLP whole?
A. No.

Page 128
BH EQUITIES, LLC - D. MILLER
Q. Did BH Equities ask that question?
A. I don't believe so.
Q. All right. Let's go to -- just two more documents, sir. Let's start with some tax returns.
(Exhibit 14 marked.)
MR. MORRIS: Can we go to Exhibit 14, which is BH 10 through 75.
BY MR. MORRIS:
Q. Are you aware that BH Equities produced in response to the subpoena SE Multifamily's tax returns, including K-1s for 2019?
A. Yes.
Q. And did you review those in preparation for today's deposition?
A. Yes.
Q. And the document that's on the screen is a cover letter. Do you see that?
A. Yes.
Q. Is BH Equities aware that a firm called Barker Viggato prepared the tax returns for SE Multifamily?
A. Yes.

Page 129
BH EQUITIES, LLC - D. MILLER
Q. And do you see that this is a letter -- the first page of this exhibit is a letter from Barker Viggato dated September 9, 2020?
A. Yes.
Q. Okay. And can you confirm that BH Equities received this letter with the attachments in or around September 2020?
A. Yes.
Q. All right. Do you know who was responsible for communicating with Barker Viggato on behalf of SE Multifamily? Was that the manager's job?
A. Yes.
Q. Okay. I'm not asking -- do you know who on behalf of the manager was primarily responsible for communicating with Barker Viggato?
A. I do not.
Q. Is it BH Equities' understanding that under the terms of the amended agreement that the manager was responsible for causing SE Multifamily's tax returns to be prepared?
A. Yes.

TSG Reporting - Worldwide 877-702-9580

BH EQUITIES, LLC - D. MILLER

Q. Okay. Is it BH Equities' understanding that the manager was responsible for providing the information that Barker Viggato needed to prepare SE Multifamily's tax returns?

A. Yes.

Q. Has Barker Viggato been the firm that has prepared SE Multifamily's tax returns since SE Multifamily was formed in August of 2018?

A. I don't recall specifically if they did the 2018 return. I do know they did '19 and '20.

Q. I appreciate the specificity.

So we can take a look at anything you want in this document. If we turn to the next page, we'll see that it says 2019 Tax Return Filing Instructions. Do you see that?

A. Yep.

Q. Do you know if SE Multifamily's tax returns for 2019 were ever amended?

A. Not to my knowledge.

Q. Did BH Equities have any discussions with anybody at any time over whether SE Multifamily's 2019 tax returns should be

BH EQUITIES, LLC - D. MILLER

amended?

A. Could you scroll in here? There should be the allocation of BH Equities in this. And in one of the years -- and I don't recall if it was '19 or '20 -- we did have a question about, you know, allocations. So...

Q. Okay. And would that be the K-1?

A. Yes.

Q. Okay. We'll get to that in just a moment, and then we'll come back to the question of amendment at that time.

Are you aware that K-1s for each of the members of SE Multifamily were included in the package of documents prepared by Barker Viggato?

A. Yes.

Q. Did BH Equities -- withdrawn.

Do you know whether any K-1 that was issued to any member of SE Multifamily was ever amended?

A. Not to my knowledge.

MR. MORRIS: Let's go to Bates number 17, please. And if we could scroll down to line 19a. Yeah, there you go.

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:

Q. Do you see 19a refers to distributions of cash and marketable securities?

A. Yes.

Q. And the number there is $267 million? Do you see that?

A. Yes.

Q. Is that the return of the third-party debt that we've been talking about, if you know?

A. The majority of it would have been, yes.

Q. Okay. Do you know what portion of that would have related to a distribution other than the repayment of third-party debt?

A. I don't specifically without, you know, referencing the work papers or things like that.

Q. Okay. Hold on one sec.

Do you know, who authorizes the making of distributions on behalf of SE Multifamily?

A. The manager would do that.

BH EQUITIES, LLC - D. MILLER

Q. And who does BH Equities understand the manager to be?

A. HCRE Partners.

Q. Let's go to Bates number 21, please.

MR. DOHERTY: When you're saying Bates 21, Mr. Morris, is that our Bates numbering? Okay, thank you. Okay.

BY MR. MORRIS:

Q. So this is Schedule B-1. Do you see that?

A. Yes.

Q. And Highland Capital Management, L.P. is identified as an entity owning 50 percent or more of the partnership. Do you see that?

A. Yes.

Q. And Highland Capital Management, L.P.'s interest is fixed at 94 percent. Do you see that?

A. Yes.

Q. And is it BH Equities' understanding that that 94 percent is a reference to that Section 6.4 where 94 percent of the profits and losses are allocated to HCMLP?

A. Yes.

BH EQUITIES, LLC - D. MILLER

A. Correct.

Q. And nobody ever suggested that either HCMLP's or HCRE's or BH Equities' 2019 K-1s were incorrect in any way, correct?

A. Correct.

Q. Okay. Do you see there's a distribution there in Box 19 of $46,000?

A. Yes.

Q. Do you have any idea why BH Equities' K1 for 2019 shows that it received a distribution of $46,926?

A. No, other than seeing there's a footnote A or a notation A next to it, which may have more description.

MR. DOHERTY: Mr. Morris, can you show the witness A? May I ask that?

MR. MORRIS: Yeah, I'm looking for it. I actually -- if we could scroll down, the next -- the next page is Code Z. The next page -- I don't see it there. Yeah, I don't see it. So I'll just move on. I can only work with what I have.

BY MR. MORRIS:

Q. And then let's go to Bates number 70,

BH EQUITIES, LLC - D. MILLER

please. And this is the K-1 for Liberty, correct?

A. Yes.

Q. And they have zero percent capital at the beginning of the year and at the end of the year because they didn't make an equity investment in SE Multifamily, correct?

A. It was a preferred equity investment, which would be treated differently.

Q. Correct. And they got distributions of approximately $17 million, as reflected in paragraph -- in Section 19, because they were preferred holders and they were entitled to get paid first, correct?

A. Yes.

Q. Do you know why they were allocated 3.6 percent of the profits and losses in 2019?

A. I don't, no.

Q. Did you know that they were allocated 3 percent of the profits and losses in 2019 before now?

A. Only from reviewing the documentation and things.

Q. No agreement was ever -- no amendment

BH EQUITIES, LLC - D. MILLER

to the amended agreement was ever made to change the allocation set forth in Section 6.4, right?

A. Not that I'm aware.

MR. MORRIS: Let's go to the last exhibit, 15, BH 76 to 78.

(Exhibit 15 marked.)

BY MR. MORRIS:

Q. And do you see this is BH Equities' K-1 for 2020?

A. Yes.

Q. All right. Let's just scroll down a little bit. It's just a two-page -- I guess it's a three-page document.

In looking at it, does it refresh your recollection -- I had asked you earlier whether there was ever any discussion at any time about filing an amendment to any of SE Multifamily's tax returns or the K-1s at issue. Do you remember that question?

A. Yes, I remember that question.

Q. And I think you testified that there may have been?

A. We had questions. If you could

BH EQUITIES, LLC - D. MILLER

scroll up on this. We were curious as to why there was no allocation in Box 1 or 2 to BH Equities in 2020.

Q. Oh, okay. So the question was why did BH Equities not receive any allocation of ordinary business income or net rental income from the real estate; is that right?

A. Correct.

Q. Did BH Equities ever get an answer to that question?

A. I don't believe we did.

Q. But BH Equities' allocation of profits and losses doesn't seem to have changed, right? It's the same 5.78 percent as it was in 2019, at least according to the K-1s, correct?

A. Correct.

Q. Do you know if this K-1 was reported to the IRS?

MR. DOHERTY: Objection, form. What is reported? Was it filed, John?

MR. MORRIS: Yeah, that's a fair question.

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:

Q. Yeah. Do you know if this K-1 was ever filed with the IRS?

A. I don't. It would have been the manager's responsibility to file the tax return on behalf of the entity, and then BH Equities, given our complex nature, you know, has a very complicated tax return. So its information would have been used in the broader BH Equities' filing, but we wouldn't have sent this directly attached to our tax return, per se.

Q. Okay. I appreciate the clarification.

Did BH Equities rely on the information in this K-1 to prepare its tax returns for 2020?

MR. DOHERTY: Object. I don't -- I'm just making this objection in caution. I think this is a little outside the scope. I mean, I know if you're going places, but if this involves, like, tax advice from attorneys or something, then don't go into detail on that. I just wanted to -- it's

BH EQUITIES, LLC - D. MILLER

fair. If there's a question pending, you can answer the question.

BY MR. MORRIS:

Q. Look, the question is really simple, Mr. Thomas. Is this a draft document, or is this something that BH Equities has actually relied upon in the preparation of its tax returns for 2020?

A. Those aren't necessarily the same question. Or it's not --

Q. I understand. I'm trying to clean it up and make it as simple as I can to show you --

A. Well, there's not -- sorry to be difficult. Those aren't the only two possibilities. And my understanding is we may -- we may have taken a different stance as it is our tax return. So that's why I'm -- I'm saying it was not delivered to us as a draft so that we believed this was the K-1 delivered to us, even though we had questions.

I can't affirm -- I can't say that we relied on it because I believe we took a different course, as is our right with our

BH EQUITIES, LLC - D. MILLER

taxes.

Q. Why did BH Equities take a different course? What does that mean?

MR. DOHERTY: Objection, form.

BY MR. MORRIS:

Q. You can answer.

MR. DOHERTY: Well, you can answer -- again, I think this is outside the scope, but if it involves outside attorney's advice about your taxes, then you need to be careful if you need to -- if you think you're getting attorney advice, then you need to be careful.

A. Yeah, I think it would be just related to internal decision making.

BY MR. MORRIS:

Q. Internal decision making is not a reason to not share the answer with me.

MR. DOHERTY: Mr. Thomas, if it's legal counsel, then --

MR. MORRIS: Then you should say so. Then you should say so.

MR. DOHERTY: Right.

If you can answer without that, then

BH EQUITIES, LLC - D. MILLER

you can answer the question.

A. We just took a more conservative approach and allocated 6 percent of the net income into our tax liability, given the complexity of our return.

BY MR. MORRIS:

Q. I just want to make sure that I understand correctly, that notwithstanding what's stated on this K-1, BH Equities made the decision to allocate to itself 6 percent of SE Multifamily's profits in 2020; is that right?

A. For the purposes of taxes, yes.

Q. Yes. Okay. Did BH Equities ever discuss that decision with anybody acting on behalf of HCRE?

A. No.

Q. Did BH Equities ever discuss that decision with anybody acting on behalf of Barker Viggato?

A. No.

Q. Did BH Equities ever discuss this K-1 with anybody at Barker Viggato?

A. I don't know for sure. I know there

Page 150

BH EQUITIES, LLC - D. MILLER

was an e-mail request -- or an e-mail ask on this K-1, and I don't know for sure if Barker Viggato people were included or not on that or if it was just directed to HCRE.

Q. Okay.

MR. MORRIS: If we can scroll down just a little bit.

BY MR. MORRIS

Q. Do you see Box L?

A. Yes.

Q. And there's an ending capital account of approximately $8.5 million. Do you see that?

A. Yes.

Q. Since all of the original funded capital has been returned with the exception of Highland's $49,000, is it fair to say that that number, $8.5 million, equals approximately 6 percent of the capital accounts among the members of SE Multifamily?

A. The tax capital account, yes. That would be my understanding.

Q. Okay. So that -- would it be BH Equities' expectation that HCMLP's capital

Page 151

BH EQUITIES, LLC - D. MILLER

account would be approximately five to six times bigger than that because they have a 46.06 percent residual interest?

A. Not necessarily.

Q. Is there a relationship between BH Equities' capital account and the capital accounts of the other members, given that all of the original capital contributions have been paid in full but for HCMLP?

MR. DOHERTY: Objection. I think that mischaracterizes --

MR. MORRIS: You've got the -- you've got the objection. I'm going to cut you off this time.

A. Relationship, yes. But it's not a direct linear relationship given how tax -- given how tax remedies work and allocations of profit and loss, capital, those things. So it's not a simple linear relationship.

BY MR. MORRIS:

Q. All right. Let's shift gears now, last topic, no documents. Actually, just hold on one second.

Okay. Let's just shift gears and

Page 152

BH EQUITIES, LLC - D. MILLER

finish this up. If we could go back to the subpoena, which I think was Exhibit 1. Again, page 2 of the exhibit, PDF page 9 of 13. And I know I asked a couple of questions, but I said we'd come back to it.

So we're on topic 4, and remember I defined what's in the parenthetical there as HCRE's contention. Do you remember that?

A. Yes.

Q. Okay. Really, I don't have a lot here. Do you recall when BH Equities first learned of HCRE's contention as set forth in topic 4?

A. I believe it would have been, I don't know, a few days after filings or something along those lines, as we tried to pay attention.

Q. When do you think it was?

A. Shortly after the filing of it, once it was on the public record.

Q. And how did -- how did BH Equities learn of the contention?

A. I think we'd been an interested party in the case as it relates to SE Multifamily, so

Page 153

BH EQUITIES, LLC - D. MILLER

we were paying attention to the court records and things.

Q. Did BH Equities have any source of information other than court records by which it learned of HCRE's contention?

A. I don't believe so.

Q. Okay. So is it fair to say that to the best of your recollection, BH Equities relied exclusively on what was on the court record in order to learn about HCRE's contention?

A. To the best of my knowledge.

Q. Okay. Do you know whether BH Equities has ever discussed this contention with anybody at HCRE?

A. Not to my knowledge.

Q. Do you know if anybody acting on behalf of BH Equities has ever communicated with anybody at HCRE concerning the contentions set forth in topic 4?

A. Not to my knowledge.

Q. Do you know whether HCRE, in its capacity as the manager, has ever done anything to address the mistake that's described in its

TSG Reporting - Worldwide 877-702-9580

Page 154

BH EQUITIES, LLC - D. MILLER

contention other than file with a proof of claim?

A. Not to my knowledge. I don't believe so.

Q. And also with -- they also, at least in November 2020, decided to withhold -- withdrawn.

Other than responding to the subpoena, has BH Equities done anything in response to learning about the contentions set forth in paragraph -- topic 4?

MR. DOHERTY: Objection. If this -- if this involves legal discussions, then you are not to answer, but you can follow the question.

A. I don't believe we've taken any -- any business action in regard to this contention.

BY MR. MORRIS:

Q. Okay. Does BH Equities have a view as to whether the contention is fair and accurate?

MR. DOHERTY: Objection.

Page 155

BH EQUITIES, LLC - D. MILLER

BY MR. MORRIS:

Q. Well, let me ask a different question. Does BH Equities believe that the organizational documents relating to SE Multifamily improperly allocate the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration?

MR. DOHERTY: Objection.

BY MR. MORRIS:

Q. You can answer.

MR. DOHERTY: Form.

You can answer, Mr. Thomas.

A. I don't know that I can answer specifically because, again, we viewed it as a bilateral negotiation at the time, and that would take into account the parties' consideration that we just didn't have -- we weren't privy to nor frankly had an interest in knowing at the time.

BY MR. MORRIS:

Q. Is it fair to say that BH Equities does not have a position as to whether or not the organizational documents relating to

Page 156

BH EQUITIES, LLC - D. MILLER

SE Multifamily improperly allocated the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration?

A. Yes. We do not have a position on that.

MR. MORRIS: I have no further questions.

MR. DOHERTY: Mr. Morris, I'd like to ask one or two questions on redirect to clarify something. Is that okay to do it now, or would you like a --

MR. MORRIS: No, I think you should do it now.

EXAMINATION

BY MR. DOHERTY:

Q. Mr. Thomas, I'm going to ask you a couple of questions as if we were in court, you know, as you were with Mr. Morris.

During the testimony, I believe -- I'm unsure how it came about exactly, but you were asked questions that did Highland Capital Management ever receive their capital contribution back, and you answered at one

Page 157

BH EQUITIES, LLC - D. MILLER

point that they had not received it as of June 9th, 2021; is that correct?

A. That is correct.

Q. Were you referring to the $49,000 in capital that's reflected on Schedule A?

A. Yes.

Q. Has Highland Capital, to BH's knowledge, now received that $49,000?

A. Yes.

MR. DOHERTY: No further questions.

MR. MORRIS: I have nothing further.

MR. GAMEROS: No questions, either.

(Discussion off the record.)

MR. DOHERTY: And for the transcript, now that we're on the phone, is that something where y'all will -- we'll get it e-mailed to us for checking it for errata and everything --

MR. MORRIS: Sure.

MR. DOHERTY: -- Ms. McMoran?

THE REPORTER: Yes, for read and sign, we'll send it to you, Mr. Doherty.

Mr. Gameros, did you need a copy of this one, too?

TSG Reporting - Worldwide 877-702-9580