# EXHIBIT 4

1       IN THE UNITED STATES BANKRUPTCY COURT

2     FOR THE NORTHERN DISTRICT OF TEXAS

3           DALLAS DIVISION

4   _____

5  IN RE:              )
                      ) CHAPTER 11

6  HIGHLAND CAPITAL      )
   MANAGEMENT, L.P.,     ) CASE NO. 19-34054-SGJ11

7                 )
     Reorganized Debtor.  )

8  _____ )

9

10

11

12

13        REMOTE ORAL DEPOSITION OF

14          BARKER VIGATTO LLP

15 BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

16           MARK BARKER

17         Dallas, Texas

18      Friday, August 5, 2022

19

20

21

22

23  REPORTED REMOTELY BY:

24  JANICE K. McMORAN, CSR, RDR, CRR, TCRR

25  JOB NO. 215016

Page 10

BARKER VIGGATO LLP - M. BARKER

1
2  that, will you let me know?
3      A.  Yes.
4      Q.  There's a court reporter here,
5  Janice, who is transcribing everything we say.
6  Every word that we say is going to be
7  accurately transcribed on a page.  So it's very
8  important that all of your answers be verbal
9  answers and not nods of the head or anything
10  like that.  Is that okay?
11      A.  Yes.
12      Q.  Okay.  From time to time, I'm going
13  to share documents with you.  We're going to
14  put them on the screen, we're going to put them
15  in the chat room.  This is not a test.  This is
16  not a memory test.  I'm not playing got you.
17  If I show you a document and you think that
18  there's another piece of it that you may want
19  to see in order to either refresh your
20  recollection or to put in context the question
21  that I'm asking you, please, I encourage you to
22  do that.  Is that okay?
23      A.  Yes.
24      Q.  Okay.  If you need a break at any
25  time, let me know and I'll be happy to

Page 11

BARKER VIGGATO LLP - M. BARKER

1
2  accommodate you.  I just ask that you not
3  request a break while a question is pending,
4  okay?
5      A.  Okay.
6      Q.  From time to time, a lawyer may
7  object to a question.  And that's just kind of
8  lawyer stuff that's going back and forth, and
9  then I'm going to have to make a decision about
10  what to do.  Let us do our job, and, you know,
11  unless your lawyer instructs you not to answer,
12  you know, I'll just ask you to answer the
13  question, okay?
14      A.  Okay.
15      (Exhibit 1 marked.)
16      Q.  I'm going to put up on the screen --
17  so I've got my legal assistant, La Asia Canty,
18  with me, and I'm going ask La Asia to put up
19  the screen the first exhibit, which is the
20  subpoena that was served on Barker Viggato.
21      So this give you a sense of how the
22  process will work.  We can only put up a
23  portion of a page at a time, but this is --
24  have you seen this document before, sir?
25      A.  Yes.  Yes, I have.

Page 12

BARKER VIGGATO LLP - M. BARKER

1
2      Q.  And do you understand that this is
3  the subpoena that Highland Capital Management,
4  L.P. served on Barker Viggato?
5      A.  Yes.
6      Q.  Okay.  And if we can scroll down to
7  the topics.  Do you understand, sir, that
8  you're here today to testify as the
9  representative of Barker Viggato?
10      A.  Yes.
11      Q.  Okay.  And have you seen the topics
12  that are set forth on this page that are on the
13  screen?
14      A.  Yes, I have.
15      Q.  And are you prepared to testify on
16  behalf of Barker Viggato with respect to the
17  topics that are listed on the screen?
18      A.  Yes.
19      Q.  Did you do anything to prepare for
20  today's deposition?
21      A.  Well, I gathered the requested
22  documents that y'all had requested in your
23  request, and so went through and assembled
24  those documents, provided them to my attorney,
25  Matthew Roberts, which then he, in turn,

Page 13

BARKER VIGGATO LLP - M. BARKER

1
2  provided to you and your team, and then I
3  reviewed the LLC agreement and passed through,
4  you know, some of the other information just to
5  refresh my memory on the, you know, various
6  documents.
7      Q.  Okay.  I want to thank you, sir, for
8  your efforts and for your lawyer's efforts.
9  You are a third-party witness here.  While you
10  have an obligation to comply with the subpoena,
11  I do appreciate the meticulous way that it
12  appears you and your counsel went about it.  So
13  I just -- I just wanted to thank you.
14      Other than the LLC agreement, do you
15  remember with any specificity any of the
16  documents that you reviewed to prepare yourself
17  for today's deposition?
18      A.  I also went back through some of the
19  old e-mails that were provided as part of the
20  documentation.  And I also -- I'll say I passed
21  through the tax returns from 2018, 2019 and
22  2020.  And, you know, other than
23  refamiliarizing myself with those sets of
24  documents, that's really what I did to prepare
25  for today's meeting.

Page 14

```
              BARKER VIGGATO LLP - M. BARKER
 1
 2       Q.   Okay.  Did you review any documents
 3   that weren't produced in response to the
 4   subpoena?
 5       A.   No.
 6       Q.   Okay.  Did you speak with any
 7   individuals other than Mr. Roberts in
 8   connection with your preparation for today's
 9   testimony?
10       A.   Yes.  I also spoke to one of my staff
11   people, Ross Kirshner, who assisted me in the
12   preparation of the tax return.  And then he, in
13   turn -- we also spoke to Kristin Martin, who is
14   also one of my staff people as well.
15       Q.   Can I refer to Barker Viggato as BV?
16       A.   You may.
17       Q.   Okay.  And you're familiar with the
18   entity SE Multifamily Holdings, LLC?  Do I have
19   that right?
20       A.   Yes, you have that right.
21       Q.   Can I refer to that entity as either
22   SEM or SE Multifamily?
23       A.   You may.
24       Q.   Has BV prepared the tax returns for
25   SEM?
```

Page 15

```
 1            BARKER VIGGATO LLP - M. BARKER
 2       A.   We have prepared the 2018, 2019, and
 3   2020 tax returns.
 4       Q.   Will BV be preparing the tax returns
 5   for 2021 for SEM?
 6       A.   To be determined.
 7       Q.   Have there been any discussions yet
 8   about whether BV would provide services in
 9   connection with SE Multifamily's 2021 tax
10   returns?
11       A.   They have sent us the financials, but
12   at this point no further discussions have been
13   had regarding the preparation of the 2021 tax
14   return.
15       Q.   Do you know whether SE Multifamily
16   got an extension until September 15th, 2022 to
17   file its 2021 tax returns?
18       A.   Yes.  We did file an extension for
19   them.
20       Q.   Do you know who the manager of SE
21   Multifamily is?
22       A.   When you say "the manager," are you
23   talking about from the LLC's perspective or
24   from internal, who provides our information?
25       Q.   Let's start with from the LLC
```

Page 16

```
 1            BARKER VIGGATO LLP - M. BARKER
 2   perspective.
 3       A.   Okay.  That has been historically
 4   HCRE, now known as NexPoint.
 5       Q.   And when you use the phrase HCRE, are
 6   you referring to the entity that was previously
 7   known as HCRE Partners, LCC?
 8       A.   Yes.
 9       Q.   And is it your understanding that
10   that firm was renamed as NexPoint Real Estate,
11   LLC or Real Estate Advisors, LCC?
12       A.   Yes.
13       Q.   Okay.  I'm just going to refer to
14   that entity as HCRE for purposes of this
15   deposition.  Is that okay?
16       A.   Yes.
17       Q.   Okay.  Have you or anybody at BV
18   spoken with anybody at HCRE in connection with
19   today's deposition?
20       A.   I have.  I spoke to Paul Broaddus
21   just to inform him that I had been served this
22   deposition.
23       Q.   And when did you have that
24   conversation with Mr. Broaddus?
25       A.   It was shortly after the deposition
```

Page 17

```
 1            BARKER VIGGATO LLP - M. BARKER
 2   was served.  So I want to say, gosh -- I want
 3   to say that was early July.
 4       Q.   Do you recall anything about your
 5   discussion with Mr. Broaddus other than
 6   informing him that BV had been served with the
 7   subpoena?
 8       A.   No.
 9       Q.   Did he say anything to you in
10   response?
11       A.   No, not really, other than he at one
12   point, I guess, had been served as well.
13       Q.   What is BV?
14       A.   It's an accounting firm.
15       Q.   And how long has it been in business?
16       A.   Since fall of 2004.
17       Q.   And is BV aware that HCRE is
18   controlled by a gentleman named James Dondero?
19       A.   I was not -- I don't know what the
20   exact ownership is and who controls who.
21       Q.   Is BV aware that -- withdrawn.
22            BV is aware that HCRE and Highland
23   Capital Management, L.P. are two members in SE
24   Multifamily, correct?
25       A.   Correct.
```

Page 18

BARKER VIGGATO LLP - M. BARKER

2    Q.    And I'm going to refer to Highland
3  Capital Management, L.P. going forward as HCMLP
4  if I can.  Will you understand that I'm
5  referring to that entity?
6    A.    Yes.
7    Q.    Okay.  Is BV aware of any affiliation
8  or relationship between HCRE and HCMLP at the
9  time the SE Multifamily amended and restated
10 agreement was entered into in March of 2019?
11    A.    From my knowledge, they were related
12 parties.  I don't know exactly what the
13 ownership structure was upstream and what the
14 exact nature of the relationship was.  But my
15 understanding is they were, I guess, related
16 business partners.
17    Q.    Are you familiar with the entity
18 that's referred to sometime as Liberty?
19    A.    Only in the context of the fact that
20 they were a member of SE Multifamily.
21    Q.    Does BV have any reason to believe
22 that Liberty was also related to HCMLP and
23 HCRE?
24    A.    No.
25    Q.    Do you -- what's the basis for BV's

Page 19

BARKER VIGGATO LLP - M. BARKER

2  understanding that HCRE and HCMLP were related?
3    A.    It is my understanding they basically
4  share an office space, and I guess just from
5  observing over the course of time, that
6  people's e-mail tag lines seemed to change
7  between HCMLP and HCRE or NexPoint.
8    Q.    Do you know whether HCRE has ever had
9  any employees?
10    A.    Pardon me?  I didn't hear you.
11    Q.    Do you know whether HCRE has ever had
12 any employees?
13    A.    No.
14    Q.    Has BV ever provided any services to
15 any entity that it believed was related to HCRE
16 or HCMLP other than SE Multifamily?
17    A.    Yes, we have.
18    Q.    Can you identify the entities to
19 which BV provided services?
20    A.    There are a number of I'll call them
21 Delaware Statutory Trust vehicles in which we
22 prepare the investor reporting and the grantor
23 tax returns for those DST entities.
24    Q.    And how long has BV been providing
25 services to those DST vehicles?

Page 20

1    BARKER VIGGATO LLP - M. BARKER
2    A.    John, I don't know the exact time
3  frame.  It could be four or five years.
4    Q.    So was it -- was it before BV began
5  providing tax services to SE Multifamily?
6    A.    Yes.
7    Q.    Okay.  And is BV continuing to
8  provide services to the DST vehicles as of
9  today?
10    A.    Yes.
11    Q.    Does BV have a primary contact for
12 purposes of the preparation of SE Multifamily's
13 tax returns?
14    A.    Yes.
15    Q.    And who is the primary contact at the
16 client?
17    A.    Oh, the contact with the client?
18    Q.    Yes.
19    A.    Is Paul Broaddus.
20    Q.    And has Mr. Broaddus been the primary
21 contact for BV since the time SE Multifamily
22 was created?
23    A.    Yes.
24    Q.    Is there anybody else with whom BV
25 regularly communicates in connection with the

Page 21

BARKER VIGGATO LLP - M. BARKER

2  preparation of SE Multifamily's tax returns?
3    A.    We have also communicated with the --
4  I'll call it the BH Equities entity.
5    Q.    And is BH Equities a member of SE
6  Multifamily, to the best of your knowledge?
7    A.    Yes, to the best of my knowledge.
8    Q.    Is there a process that BV follows
9  with respect to the preparation of
10 SE Multifamily's tax returns?
11    A.    Yes.  We will usually get the
12 financials from the client, and we then take
13 those financials that are prepared, more or
14 less, on a book or GAAP basis and we will take
15 those financials and adjust them so that we are
16 reporting the information for federal tax
17 purposes consistent with the Code and
18 regulations of the Internal Revenue Code.
19        And once we've, I guess, made the
20 financials such that they are conforming to the
21 provisions of the Internal Revenue Code, we
22 then enter them into a software program.  The
23 software program is what generates the tax
24 return and the related K-1s.
25        And then once the federal tax return

**Page 22**

BARKER VIGGATO LLP - M. BARKER

1
2  is completed, we will complete the state tax
3  returns in which it operates.
4      Q.   Has the process you just described
5  ever changed since the time BV began providing
6  tax services to SE Multifamily?
7      A.   No, not in any material respect.
8      Q.   Does that process differ in any
9  material respect from the process BV uses to
10  prepare tax returns for others -- other clients
11  of theirs?
12      A.   No.  That's very consistent.
13      Q.   Does BV rely on the manager to
14  provide the information that's necessary for
15  the preparation of SE Multifamily's tax
16  returns?
17      A.   The initial financial statements are
18  usually provided by BH Equities, as they are
19  the -- as I understand it, the third party that
20  was engaged to prepare the property operating
21  statements and consolidate them.  And --
22      Q.   Does -- I'm sorry.
23      A.   And then someone from the HCRE/HCMLP
24  shop would then get involved and look at the
25  financials from sort of a consolidating

**Page 23**

BARKER VIGGATO LLP - M. BARKER

1
2  standpoint and just high-level review to make
3  sure that they were consistent with their
4  understanding.
5      Q.   So is it BV's understanding that
6  BH Equities is the party responsible for the
7  maintenance of SE Multifamily's financial
8  statements?
9      A.   Well, I would say they're responsible
10  for the day-to-day maintenance of reporting the
11  debits and credits from the operating
12  activities of the properties, but I view it as
13  HCMLP and HCRE are the ultimate responsible
14  parties for the consolidated financial
15  statements.
16      Q.   Does BV receive any information from
17  HCRE or HCMLP that it relies upon to prepare
18  its tax -- SE Multifamily's tax returns?
19      A.   Yes.
20      Q.   Can you describe for me what
21  information BV receives and relies upon that it
22  gets from either HCRE or HCMLP?
23      A.   We would make sure that they were in
24  agreement with the partner contributions and
25  the partner distributions, as well as the

**Page 24**

BARKER VIGGATO LLP - M. BARKER

1
2  allocations of income reflected in the tax
3  returns.
4      Q.   Okay.  So I just want to make sure I
5  have this right, that BV relies upon HCRE to
6  make sure that the contributions of the
7  members, the distributions to the members, and
8  the allocation of SE Multifamily's profits and
9  losses are accurate.  Do I have that right?
10      A.   Yes.
11      MR. MORRIS:  If we could scroll up,
12      La Asia, to the page before this, the
13      document requests.  Do you see -- stop
14      there.
15  BY MR. MORRIS:
16      Q.   You see that request number 6 asks
17  for documents concerning any statement,
18  suggestion, assertion, or allegation made at
19  any time by HCRE that there was any error in
20  the amended LLC agreement?  Do you see that
21  request?
22      A.   Yes, I do.
23      Q.   BV has no documents or communications
24  responsive to that request.  Do I have that
25  right?

**Page 25**

BARKER VIGGATO LLP - M. BARKER

1
2      A.   You have that right.  Along those
3  lines is that in the preparation of the 2020
4  tax return, we were, I guess, verbally informed
5  and then provided a footnote that was to be
6  attached to the 2020 tax return.  That footnote
7  is known as -- I guess really it's Statement 1
8  that was attached to the 2020 tax return
9  that -- again, it was drafted by -- I'm not
10  sure who drafted it, but it was legal counsel
11  for either HCRE or HCMLP.
12      And I guess you're probably familiar
13  with that footnote, but I do want to point that
14  out.  That could be a -- I guess an indication
15  that perhaps there was, I guess, alternative
16  thoughts regarding, you know, what the economic
17  ownership was.
18      Q.   Okay.  And -- I'm sorry, I may have
19  violated one of my early rules.  Are you
20  finished with your answer?
21      A.   Yes.
22      Q.   Okay.  The footnote that you just
23  referenced, that would be a footnote to the
24  2020 tax returns, right?
25      A.   Right.

Page 26

BARKER VIGGATO LLP - M. BARKER

1
2     Q.   And the 2020 tax returns for
3   SE Multifamily were prepared in September 2021,
4   correct?
5     A.   Correct.
6     Q.   And it was in September of 2021 that
7   BV was informed for the first time of the issue
8   that's described in what ultimately became the
9   footnote; is that fair?
10     A.   That's fair.
11     Q.   Okay.  We'll talk about that in more
12   detail in a moment.
13         MR. MORRIS:  La Asia, just so you
14     know, I am going to skip over what has
15     been marked as Exhibit 2.  So that's just
16     blank.
17         (Exhibit 3 marked.)
18   BY MR. MORRIS:
19     Q.   But let's spend a few minutes, if we
20   can, just looking at the amended agreement,
21   which we've premarked as Exhibit 3.
22         And so I believe the amended and
23   restated LLC agreement is a document,
24   Mr. Barker, that you mentioned you had reviewed
25   to prepare for today's deposition.  Do I have

Page 27

BARKER VIGGATO LLP - M. BARKER

1
2   that right?
3     A.   You have that right.
4     Q.   Okay.  Did BV provide any advice to
5   anybody in connection with the drafting or
6   preparation of this document?
7     A.   No.
8     Q.   I'm going to refer to the First
9   Amended and Restated Limited Liability Company
10   Agreement for SE Multifamily Holdings LLC as
11   the amended agreement.  Is that okay?
12     A.   That's fine.
13     Q.   Did BV have -- withdrawn.
14         Do you recall when BV first learned
15   of the existence of the amended agreement?
16     A.   It was, if I recall correctly, in
17   March of 2019.
18     Q.   And do you remember the circumstances
19   around how BV learned of the amended agreement?
20     A.   We were contacted by a representative
21   of, at the time, HCMLP, Paul Broaddus, and he
22   had requested that we assist with the
23   preparation of the tax return for
24   SE Multifamily, and at that point in time
25   provided a copy of the amended agreement.

Page 28

BARKER VIGGATO LLP - M. BARKER

1
2     Q.   And at the time that you received the
3   agreement, do you recall if it was already
4   executed?
5     A.   It was not.  Well, I'll say this.
6   The agreement that we -- the amended agreement
7   that we first received back in that time frame
8   had not been -- well, the copy we received was
9   not executed.
10     Q.   Do you see that this agreement is
11   dated as of March 15, 2019?
12     A.   Right.
13     Q.   Do you recall how far before
14   March 15th BV received the unsigned agreement
15   that you described?
16     A.   No, I don't.
17     Q.   And other than receiving the unsigned
18   agreement from Mr. Broaddus in March of 2019,
19   did -- did you have any substantive comments
20   with Mr. Broaddus about the terms or conditions
21   in the amended agreement?
22     A.   No.
23     Q.   Did you give any advice that the
24   agreement had to be signed by March 15th in
25   order for it to be retroactive to August 23rd,

Page 29

BARKER VIGGATO LLP - M. BARKER

1
2   2018?
3     A.   No, I did not provide that advice.
4     Q.   You mentioned that you believed that
5   Mr. Broaddus was acting on behalf of HCMLP.  Do
6   I have that right?
7     A.   Right.
8     Q.   How do you know if he was acting on
9   behalf of HCMLP or HCRE?
10     A.   Well, from reviewing the e-mails at
11   that point in time, if you looked at the tag
12   line in his e-mail, it indicates that he is,
13   you know, with HCMLP.
14     Q.   Right.  Other than his e-mail
15   address, do you have any basis for believing
16   that he was representing either HCRE or HCMLP
17   or representing both entities?
18     A.   To me, he was representing both
19   entities.
20     Q.   To you.
21     A.   Yes.
22     Q.   And why did you believe that he was
23   representing both entities?
24     A.   Well, because I knew there was some
25   relation between the two parties, they shared

Page 30

```
1            BARKER VIGGATO LLP - M. BARKER
2    office space, and he had indicated in a verbal
3    conversation that the agreement was drafted in
4    a way such that the allocations would provide
5    flexibility between HCRE and HCMLP.
6        Q.   Is that a common -- have you seen
7    that feature before where you have the
8    flexibility that you just referred to?
9        A.   I would say it's -- you know, it
10   happens, you know.
11       Q.   Well, when you -- I'm sorry.  Are you
12   finished with your answer?
13       A.   Yes.
14       Q.   What flexibility are you referring
15   to?
16       A.   The flexibility regarding
17   allocations.
18       Q.   Allocations of what?
19       A.   Income.  Income or loss.
20       Q.   So it's your understanding that this
21   agreement provided flexibility to adjust the
22   allocation of SE Multifamily's profits and
23   losses between the members?
24       A.   Yes.
25       Q.   And was it just between HCRE and
```

Page 31

```
1            BARKER VIGGATO LLP - M. BARKER
2    HCMLP, or was it between and among all of the
3    members?
4        A.   Effectively, I think it was between
5    HCMLP, HCRE, and BH Equities.
6        Q.   Do you know what factors are
7    considered in deciding how to allocate
8    SE Multifamily's profits and losses among the
9    members?
10       A.   I'm not sure I understand your
11   question.  When you say "factors," can you be a
12   little more specific?
13       Q.   Sure.  You said that there's
14   flexibility in that the profits and losses
15   could be allocated between and among the
16   members.  Is it in any fashion that the members
17   decide?
18       A.   Well, I don't know that it's in any
19   fashion, but under the Internal Revenue Code,
20   partners do have leeway to share allocations as
21   they determine.
22            Now, there are certain, I guess,
23   regulatory allocations that can impact losses
24   and how income or loss would be allocated under
25   those regulatory allocations.  But generally,
```

Page 32

```
1            BARKER VIGGATO LLP - M. BARKER
2    that's kind of the concept of Subchapter K in
3    the Internal Revenue Code is that partnerships
4    and their related partners have some
5    flexibility to, I guess, determine their
6    allocations amongst themselves.
7        Q.   Okay.  Is this document a document
8    that was relevant to BV's work in connection
9    with the preparation of SE Multifamily's tax
10   returns?
11       A.   When you say "document," are you
12   referring to the amended agreement?
13       Q.   Yes, I am.
14       A.   Okay.  Well, yeah, no, it was
15   relevant to our preparation of the tax return.
16       Q.   And did BV rely upon the amended
17   agreement to prepare SE Multifamily's tax
18   returns?
19       A.   Well, we relied both on the agreement
20   as well as e-mail and verbal conversations that
21   we had with our client.
22       Q.   Is BV aware of any written amendment
23   or modification to this amended agreement?
24       A.   No.
25       Q.   So BV has never been presented with a
```

Page 33

```
1            BARKER VIGGATO LLP - M. BARKER
2    written amendment or modification to the
3    amended agreement, correct?
4        A.   Correct.
5            MR. MORRIS:  Okay.  Can we scroll
6        down to Section 1.7?
7    BY MR. MORRIS:
8        Q.   Do you see here, sir, that Section
9    1.7 addresses company ownership?
10       A.   Yes.
11       Q.   And do you see that each of the
12   members of SE Multifamily is identified and
13   their respective ownership interests are stated
14   in Section 1.7?
15       A.   Yes.
16       Q.   Is this section relevant to any of
17   the work that BV did in preparing
18   SE Multifamily's tax returns?
19       A.   Well, the -- this paragraph here,
20   1.7, addresses company ownership.  There's
21   another paragraph -- I don't remember the
22   paragraph number off the top of my head -- that
23   addresses how allocations of income would be
24   shared.  And so that was a little -- to me
25   that's more relevant as to how the allocations
```

Page 34

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   will be shared.
 3        Q.   And do you know if the allocations
 4   are shared consistent with the percentage
 5   interests of company ownership?
 6        A.   They are not.
 7        Q.   Okay.  Let's take a look -- when you
 8   talk about allocation, are you talking about
 9   allocation of profits and losses or are you
10   talking about distributable cash?
11        A.   No, I'm talking about allocations of
12   profits or losses.
13        Q.   Okay.  But on the K-1, the K-1 does
14   identify the ownership, the capital interests
15   of each member in the enterprise, correct?
16        A.   It does.
17        Q.   And would Section 1.7 be the portion
18   of the -- or one portion of the amended
19   agreement that BV relies upon to prepare that
20   portion of the K-1s?
21        A.   Yes.
22        Q.   Okay.
23             MR. MORRIS:  Can we go to -- let's
24        just go to Schedule -- actually, we'll do
25        it in order.  Let's go to Section 6.1,
```

Page 35

```
 1         BARKER VIGGATO LLP - M. BARKER
 2        please.
 3   BY MR. MORRIS:
 4        Q.   And are you familiar with Section 6.1
 5   of the agreement?  And we can scroll down, if
 6   you'd like, to look at more.
 7        A.   Yes, I'm familiar with this
 8   provision, yes.
 9        Q.   Do you understand this is the
10   waterfall for distributions?
11        A.   Yes.
12        Q.   And it sets forth the order in which,
13   you know, claims and debts and obligations must
14   be satisfied before cash is distributed to the
15   equity holders; is that fair?
16        A.   Well, I think that's fair, but it is
17   the client that ultimately has determined what
18   was distributed, when it was distributed, and
19   to whom it was distributed.
20        Q.   And whether or not -- that's right,
21   but -- but is it your understanding that
22   Section 6.1 is the parties' agreement on how
23   that's supposed to happen?
24        A.   Yes.
25        Q.   Whether or not the manager followed
```

Page 36

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   that is a different question.  The manager
 3   decides what to do in the manager's own
 4   discretion, right?
 5        A.   Right.
 6        Q.   Okay.  So is it BV's job to determine
 7   whether or not the manager is following the
 8   waterfall set forth in Section 6.1?
 9        A.   No, it's not -- I mean, I guess it's
10   not BV's responsibility to say, well, the
11   agreement says X, you distributed cash under
12   some different provision.  I'm going to rely on
13   a -- what I would consider a very sophisticated
14   client to determine its own allocations since
15   they have specifically said that this
16   agreement, as a whole, was drafted in order to
17   provide flexibility between the partners as to
18   how they determine allocations of income or
19   loss and I guess also how they distributed
20   cash.
21        Q.   Okay.  Do you believe that HCRE is a
22   sophisticated client?
23        A.   I didn't hear that.  What?
24        Q.   Do you believe -- from BV's
25   perspective, is HCRE a sophisticated client?
```

Page 37

```
 1         BARKER VIGGATO LLP - M. BARKER
 2        A.   Yes.
 3        Q.   Do you think that they pay attention
 4   to details?
 5        A.   Yes.
 6        Q.   Do you think that they understand the
 7   agreements that they sign?
 8        A.   I think that's a question for HCRE.
 9        Q.   Do you have any reason to believe
10   that HCRE didn't understand this agreement at
11   the time it signed it?
12        A.   No.  I don't have a reason to believe
13   they didn't.
14        Q.   Okay.  Nobody acting on behalf of
15   HCRE has ever informed BV that it didn't
16   understand the amended agreement at the time it
17   signed it, correct?
18        A.   Correct.
19        Q.   And if you look at Section 6.1(a),
20   that sets forth how distributable cash will be
21   distributed among the members of
22   SE Multifamily, correct?
23        A.   Well, I think that's one part of it.
24   I think you have to look at Section 6.1 as a
25   whole and not just look at 6.1(a).
```

Page 42

BARKER VIGGATO LLP - M. BARKER

1    lender on behalf of such member to pay
2    principal and interest on loan -- any loan
3    incurred by such member to fund such member's
4    capital contributions.
5        Q.   So what do you understand that to
6    mean?
7        A.   Well, I'm just saying that that's
8    a -- it's part of the whole overall view of
9    distributions.
10       Q.   Okay.
11       A.   So I think -- again, I don't know how
12   else to say it.  I think you have to look at
13   6.1(a) in totality, and whether (e) was germane
14   or not, I cannot say.  I'm just saying that
15   provision is there, and to me the way it's
16   there, you don't necessarily fall squarely
17   under 6.1(a).
18       Q.   You know what, I don't mean to
19   quarrel with you at all, sir.  Let me try it
20   this way.  You understand that Section 6.1 is
21   the agreement relating to the waterfall?
22       A.   We'll agree with that, yeah.
23       Q.   And would you agree that when we use
24   the phrase "waterfall," we're talking about the
25

Page 43

BARKER VIGGATO LLP - M. BARKER

1    order in which cash is distributed from
2    SE Multifamily to its members?
3        A.   Right.  But, again, you have to
4    consider the totality of Section 6.1.
5        Q.   I'm trying to do exactly that.  6.1
6    contains a waterfall, right?
7        A.   Yes.
8        Q.   And it tells the members the order of
9    priority in which cash is going to be
10   distributed before it gets to the next level of
11   the waterfall.  Fair?
12       A.   Right.
13       Q.   And we don't have to debate about
14   what the levels are.  At some point cash might
15   be distributed pursuant to Section 6.1(a),
16   correct?
17       A.   Right.  Or it could be distributed or
18   deemed distributed under 6.1(e).
19       Q.   Correct.  But -- but 6.1(e) has to be
20   completed before you get to 6.1(a), right?
21   That's why it says notwithstanding?
22       A.   Right.
23       Q.   Okay.  So at some point in time, if
24   you get to 6.1(a), would you agree that the
25

Page 44

BARKER VIGGATO LLP - M. BARKER

1    distributable cash has to be allocated and
2    distributed to its members in accordance with
3    the percentages set forth in 6.1(a)?
4        A.   Well, that is what is drafted in this
5    agreement.
6        Q.   Okay.
7        A.   Now, I will say that, again, it's my
8    understanding that there was a -- I'll call it
9    a related party relationship between HCMLP and
10   HCRE/NexPoint that allowed them to make
11   determinations of how cash was to be
12   distributed.
13       Q.   Can you point to something in the
14   document that would allow a deviation from
15   Section 6.1(a) when the manager was going to
16   make distributions in accordance with that
17   section?  Where is the flexibility for that?
18       A.   It's not -- perhaps it's not drafted
19   in this agreement, but, again, I go back to
20   initial conversations that I had with -- with
21   Paul that said, look, we've drafted this
22   agreement, but it was drafted in such a manner
23   to allow flexibility regarding the economics of
24   the partners.

Page 45

BARKER VIGGATO LLP - M. BARKER

1
2        Q.   In your professional opinion, are the
3    parties to this agreement allowed to rely on
4    the terms set forth therein?
5        A.   Yes.  I mean, it's --
6        Q.   Did Mr. Broaddus ever point to you
7    any provision in the agreement that would allow
8    him to distribute cash in a manner inconsistent
9    with Section 6.1(a)?
10       A.   Well, I was never consulted in any
11   form or fashion regarding how the cash was
12   distributed.  I was provided a financial
13   statement, and that financial statement said,
14   all right, capital contributions were X,
15   capital distributions were Y, and the
16   distributions were distributed to each partner
17   in a specified amount.  I was never consulted
18   in any way regarding how those distributions
19   were made.
20       Q.   Do you have -- does Barker Viggato
21   have a view as to whether or not the manager
22   complied with the agreement when making
23   distributions of cash?
24       A.   No.
25       Q.   Has Barker Viggato done any work to

BARKER VIGGATO LLP - M. BARKER

2  determine whether or not the manager complied
3  with the agreement when it distributed cash?
4      A.   I'm going to -- I keep going back to
5  the same statements that were made early on at
6  the initiation of this vehicle, that it was
7  drafted in a format such that the partners had
8  leeway to determine allocations amongst
9  themselves.
10     Q.   I understand that that's what you
11 were told.  I'm asking you whether Barker
12 Viggato has formed any opinion as to whether
13 the manager distributed cash consistently with
14 this signed document.
15     A.   Again, I don't know that I -- Barker
16 Viggato has, quote/unquote, formed an opinion
17 regarding whether or not the parties were, I
18 guess, distributing cash based on the exact
19 provisions in this agreement.
20     Q.   Okay.  And you can't point me to any
21 provision in the agreement that gives the
22 manager the flexibility to distribute the cash
23 in any manner that it sees fit, correct?
24     A.   Correct.
25     Q.   And while Mr. Broaddus may have told

BARKER VIGGATO LLP - M. BARKER

2  you that he believed the agreement gave him
3  flexibility, he didn't show you or cite to you
4  or identify any provision in this agreement
5  that would give him that flexibility, correct?
6      A.   Correct.
7          MR. MORRIS:  Let's go Section 6.4.
8  BY MR. MORRIS:
9      Q.   Do you see Section 6.4 addresses
10 allocations of profits and losses?
11     A.   Yes.
12     Q.   And do you see that it specifically
13 says that except as provided in Section 6.4 and
14 after special allocations described in Section
15 6.4(a), that profits and losses would be
16 allocated 94 percent to HCMLP and 6 percent to
17 BH Equities?
18     A.   Yes.
19     Q.   Okay.  Is that a provision that BV
20 relied upon in preparing SE Multifamily's tax
21 returns?
22     A.   Well, in the 2018 tax year, we were
23 told that the allocations between HCMLP and BH
24 would be done on a pro-rata basis so that, in
25 essence, you would come up with a ratio to

BARKER VIGGATO LLP - M. BARKER

2  allocate the income between BH Equities and
3  HCMLP based on that concept.  And that would be
4  a direction again from Paul.
5          And then in 2019, the allocations
6  were done on the 94/6 relationship.  And then
7  in 2020 we were specifically directed to
8  allocate all of the income to HCRE with the
9  exception of -- well, let me back up just a
10 tad.
11         Liberty CLO had a preferred interest.
12 And so to the extent cash was distributed to
13 them on their preferred interest, they would
14 get a corresponding allocation of income.
15         So outside of that, though, the
16 allocations were as I specified.
17     Q.   What's the purpose -- do you have a
18 view as to whether or not -- withdrawn.
19     The members' agreement with respect
20 to allocation of profits and losses is set
21 forth in Section 6.4.  Would you agree with
22 that?
23     A.   Yes.
24     Q.   And Section 6.4(a) specifically says
25 that unless set forth in other sections,

BARKER VIGGATO LLP - M. BARKER

2  profits and losses should be allocated 94
3  percent to HCMLP and 6 percent to BH Equities,
4  correct?
5      A.   Correct.
6      Q.   But in 2018 and 2020, profits and
7  losses were allocated in a different manner,
8  correct?
9      A.   Yes.
10     Q.   And you've described for me generally
11 how that allocation differed in those years,
12 right?
13     A.   Right.
14     Q.   Did you have any discussion with HCRE
15 or anybody as to what the basis was for
16 deviating from the allocations set forth in
17 Section 6.4(a) in 2018?
18     A.   Well, I mean, again, we were directed
19 by Paul, who to me was a representative of both
20 HCMLP and HCRE, that that's how they wanted the
21 allocations completed in 2018.  And in the
22 grand scheme of things, it did not deviate in a
23 material manner from the 94/6 split.
24         '19 was strictly, again, except for
25 the preferred return allocation, very common in

Page 50

BARKER VIGGATO LLP - M. BARKER

1        BARKER VIGGATO LLP - M. BARKER
2    these types of arrangements.  The rest of it
3    was split 94/6.
4        In 2020, we were specifically
5    directed again that the income should be
6    allocated to, slash, HCRE or NexPoint.
7        Q.   Okay.  And 6.4(a) doesn't show any
8    allocation to HCRE; is that fair?
9        A.   That's fair.
10       Q.   And so is it BV's understanding that
11   the allocation of profits and losses to HCRE in
12   2020 -- withdrawn.
13       So in 2018, BV allocated profits and
14   losses as directed by Mr. Broaddus; is that
15   fair?
16       A.   Yes.
17       Q.   And it wasn't -- did BV -- withdrawn.
18       Did BV make any inquiry to determine
19   whether or not the allocation of profits and
20   losses that it was being directed to effectuate
21   was consistent with the amended agreement?
22       A.   Well, again, we were told at the
23   onset that there was to be flexibility amongst
24   the partners as to how allocations occurred,
25   and as part of the whole 2020 process, again,

Page 51

BARKER VIGGATO LLP - M. BARKER

1        BARKER VIGGATO LLP - M. BARKER
2    we were directed to do the allocations by the
3    client, and they also provided that statement
4    that apparently their legal counsel had
5    drafted -- and, again, I don't know if that's
6    HCRE, I don't know if it's HCMLP.  I mean, I
7    don't have visibility into what was happening
8    sort of behind the curtain between those two
9    parties.  All I know is that I was provided the
10   statement, and as a result of that and clear
11   direction from the client that this should be
12   attached to the return and made part of the
13   records, and that the losses -- or, I'm sorry,
14   not losses -- the income were to be allocated
15   in a manner in which they prescribed.
16       Q.   Okay.  I'm going to just try and
17   simplify this if I can.
18       With respect to the allocation of
19   profits and losses, is it fair to say that BV
20   relied upon Mr. Broaddus to make -- withdrawn.
21       Is it fair to say that BV relied upon
22   Mr. Broaddus to report the allocation of
23   SE Multifamily's profits and losses?
24       A.   Yes.
25       Q.   Is it fair to say that BV did not

Page 52

BARKER VIGGATO LLP - M. BARKER

1        BARKER VIGGATO LLP - M. BARKER
2    make a determination as to whether or not
3    Mr. Broaddus' directions were consistent with
4    the terms and provisions of the amended
5    agreement?
6        A.   Now, again, I'm looking to apply it
7    here.  That, to me, is a sophisticated client
8    with respect to all financial and tax matters,
9    and, again, HCMLP/HCRE as related parties, and
10   then they were making the determination of how
11   they wanted allocations completed.
12       Q.   Okay.  And I just want to put a fine
13   point on it.  Was it -- did BV make any effort
14   to ascertain whether the instructions that it
15   was receiving were consistent with the terms of
16   the amended agreement?
17       A.   Well, to me it seemed reasonable to
18   perform the allocations the way they did since
19   the distributions of cash to which we, again,
20   had no input in whatsoever, that the income in
21   2020 would be consistent with how they had
22   distributed the cash.
23       Q.   So it's BV's position that the
24   allocation of profits and losses as directed by
25   Mr. Broaddus is consistent with the agreement?

Page 53

BARKER VIGGATO LLP - M. BARKER

1        BARKER VIGGATO LLP - M. BARKER
2    Is that BV's position?
3        A.   Again, I'm not saying that it is
4    consistent with the agreement.  I'm saying it
5    is consistent with the direction that they
6    provided to us to make these allocations.
7        Q.   And I appreciate that.  That's the
8    point that I'm trying to make.  BV did as
9    instructed by Mr. Broaddus with respect to the
10   allocation of profits and losses; is that fair?
11       A.   That's fair.
12       Q.   And BV did not undertake any effort,
13   nor was it its responsibility to determine,
14   whether or not those instructions complied with
15   the terms and conditions in the amended
16   agreement.  That wasn't your job, right?
17       A.   Right.  It wasn't.
18       Q.   And you didn't do that, correct?
19       A.   Right.  Well, especially when you're
20   provided a statement from I guess what I
21   thought to be outside legal counsel
22   representing SE Multifamily from a tax
23   perspective that said, please attach Statement
24   1 to the return, and, therefore --
25       Q.   You're talking specifically about the

BARKER VIGGATO LLP - M. BARKER

1   
2   footnote to the --
3       A.   2020.
4       Q.   -- 2020 tax return?
5       A.   Yes.
6       Q.   Okay.  What legal counsel are you
7   referring to?
8       A.   I don't know who it was.  Paul had
9   just indicated that they had this drafted by
10  outside tax counsel.  Who that was, I don't
11  know.  I didn't inquire as to who outside tax
12  counsel was.  I just -- I mean, I accepted it
13  at face value.
14      Q.   And is it fair to say that BV never
15  spoke with any outside counsel about the issue
16  that Mr. Broaddus brought to your attention in
17  September of 2021?
18      A.   Correct.
19      Q.   Okay.  Do you know how HCRE made the
20  decision to allocate profits and losses among
21  the partners?
22      A.   No.
23      Q.   Do you know what motivations there
24  were in Mr. Broaddus's decision to allocate
25  profits and losses as instructed to BV?

BARKER VIGGATO LLP - M. BARKER

1   
2       A.   No.
3       Q.   Did BV ever ask Mr. Broaddus or
4   anybody acting on behalf of any of the members
5   why profits and losses were being allocated in
6   the manner that BV was being directed?
7       A.   No.
8       Q.   So is it fair to say that BV has no
9   knowledge as to why profits and losses were --
10  withdrawn.
11           Is it fair to say that BV has no
12  knowledge as to the basis for the allocation of
13  profits and losses that BV was directed to
14  implement?
15      A.   Yes, I think that's fair.
16      Q.   Okay.  Are you aware that BV -- I
17  assume you are since you did the production,
18  but I've got to lay a foundation.  Are you
19  aware that BV produced certain documents called
20  equity rolls in response to the subpoena?
21      A.   Yes.
22      Q.   Do you have an understanding of what
23  an equity roll is?
24      A.   Yes.
25      Q.   What's your understanding of an

BARKER VIGGATO LLP - M. BARKER

1   
2   equity roll?
3       A.   Well, we have, in essence, rolled
4   forward the -- what I'll call the capital
5   accounts of the partners in SE Multifamily
6   Holdings.  So it's a spreadsheet that, in
7   essence, summarizes partner contributions,
8   partner distributions, partner allocations of
9   income by year, by partner.  And it, in
10  essence, rolls it forward each year.
11      Q.   And who -- do you know who creates
12  the equity rolls that you're referring to?
13      A.   BV had.
14      Q.   Okay.  So the equity roll is a
15  document that's prepared by BV.  Do I have that
16  right?
17      A.   Right.  But important point is that
18  this equity roll was prepared by financial
19  information provided by a combination of
20  BH Equities, HCRE, and HCMLP.  So we just
21  summarized the information that we were
22  provided.
23      Q.   And does BV use the equity rolls to
24  prepare SE Multifamily's tax returns?
25      A.   I would say it's a part of the

BARKER VIGGATO LLP - M. BARKER

1   
2   overall work papers, and it allows us to track
3   in this case the tax capital accounts for
4   federal income tax reporting, because it
5   represents a summation of, again, partner
6   contributions, partner distributions, and
7   allocations of income.
8       Q.   Has BV ever shared the equity rolls
9   with BH Equities?
10      A.   I'm not certain.  I don't -- I mean,
11  whether this particular work paper was shared
12  with BH Equities over the course of either, you
13  know, '19, '20, or '21, the years in question,
14  I mean, I'm just not certain whether we had or
15  had not.
16      Q.   Okay.  Do you know whether BV ever
17  shared any version of the equity roll with
18  anybody acting on behalf of HCRE or HCMLP?
19      A.   Yes.
20      Q.   And to whom did it share the equity
21  rolls.  Do you remember?
22      A.   It was provided, I think, to Paul and
23  maybe to others there at HCRE/Highland.
24      Q.   And would it be provided to Paul each
25  year in the connection with BV's preparation of

BARKER VIGGATO LLP - M. BARKER

1
2  each year's tax returns?
3       A.   You know, again, I can't say for
4  certain, but certainly, you know, Paul was very
5  involved in the process of, again, determining
6  how the allocations worked, and certainly in
7  helping fine-tune what the distributions were
8  and the capital contributions as provided and
9  presented in this document.
10      Q.   In the ordinary course, would it be
11 BV's practice to share the equity roll with the
12 manager of an LLC as part of the process of
13 preparing tax returns?
14      A.   Certainly if it's requested, we
15 provide it.  I mean, not all clients will come
16 back and ask for, you know, a detailed equity
17 roll.  Some do, some don't.
18      Q.   And you mentioned earlier that one of
19 the jobs that HCRE had was to make sure that
20 contributions, distributions, and allocations
21 of income were properly reflected on the tax
22 returns.  Do I have that right?
23      A.   Yes.
24      Q.   Okay.  How would -- how would that be
25 accomplished?  How would you satisfy yourself

BARKER VIGGATO LLP - M. BARKER

1
2  that BV -- withdrawn.
3       How would BV satisfy itself that HCRE
4  as the manager has approved of the
5  contribution, distribution, and allocation
6  information in the tax returns?
7       A.   Because certainly in the initial
8  years, we had provided to Paul a summary of the
9  contributions as we had been -- which we had
10 been provided, and there were probably a year
11 or two when they came back and said, no, we
12 need to adjust X or Y.  And so then by
13 adjusting X or Y, to me, the client has, you
14 know, acquiesced to what is presented in the
15 tax return, not to mention the client has
16 provided a tax return to review and sign,
17 because they -- clients have the ultimate
18 responsibility on the accuracy of their tax
19 returns.
20      So the -- and their signature of the
21 fact that they, you know, signed the tax return
22 after they completed their review would be, to
23 me, an indication that they had reviewed and
24 accepted the allocations.
25      Q.   Okay.

BARKER VIGGATO LLP - M. BARKER

1
2       A.   They provided the allocations to us.
3       MR. MORRIS:  All right.  Let's --
4  let's take a short break here.  We've been
5  going for about an hour and a quarter.
6  It's 11:45 New York time.  Let's just take
7  a 10-minute break.  Is that okay, sir?
8       THE WITNESS:  Good with me.
9       MR. MORRIS:  Okay.  Let's take a
10 10-minute break.  We'll come back in five
11 minutes to the hour.
12      THE WITNESS:  Okay.
13      MR. MORRIS:  Thanks.
14      THE WITNESS:  Thanks.
15      (Recess taken 10:44 a.m. CST - 10:58
16      a.m. CST.)
17 BY MR. MORRIS:
18      Q.   Let's -- let's pick up where we left
19 off on the topic of equity rolls.  Barker
20 Viggato produced, I think, three forms of that
21 document.  Is that consistent with your
22 recollection, sir?
23      A.   Three forms?
24      Q.   Well, one for each year.
25      A.   Oh, one for each year, yes, yes.

BARKER VIGGATO LLP - M. BARKER

1
2       Q.   That's all I'm asking.
3       (Exhibit 4 marked.)
4       MR. MORRIS:  Let's put up the first
5  one.  We'll mark it as Exhibit 4, which I
6  think is the 2018 equity roll.
7  BY MR. MORRIS:
8       Q.   And while we're waiting for Ms. Canty
9  to do that, is it a fact that SE Multifamily
10 received an extension for the filing of their
11 tax returns in each year since its formation?
12      A.   Yes.
13      Q.   So that the tax returns for
14 SE Multifamily were completed and filed in
15 September of the year following the taxable
16 year; is that right?
17      A.   That's right.
18      Q.   So the 2018 returns were completed
19 and filed in 2019, correct?
20      A.   Correct.
21      Q.   And the 2019 returns were completed
22 and filed in September 2020, correct?
23      A.   Correct.
24      Q.   And the 2020 returns were completed
25 and filed in September 2021, correct?

Page 62

```
1              BARKER VIGGATO LLP - M. BARKER
2        A.    Correct.
3        Q.    But you have not yet prepared the
4   returns for 2021, and it's not yet clear
5   whether your firm will perform that service for
6   SE Multifamily, correct?
7        A.    Correct.
8        Q.    Okay.  So what we've put up on the
9   screen, the 2018 equity roll.  Do you see that?
10       A.    I see it.
11       Q.    And how long in advance of September
12  2019 did BV prepare this document?
13       A.    You know what, I don't remember the
14  exact dates.  It was, you know, probably some
15  number of weeks, maybe a month before the
16  return was due on extension.
17       Q.    Okay.  So is it fair to say somewhere
18  between two and five weeks before the September
19  15th deadline, this document was prepared?
20       A.    Yes.
21       Q.    Okay.  And where did BV obtain the
22  information that it used to create the 2018
23  equity roll?
24       A.    It was from the financials provided
25  by the client.
```

Page 63

```
1              BARKER VIGGATO LLP - M. BARKER
2        Q.    And to the best of your knowledge,
3   does this document accurately set forth the
4   information that was presented?
5        A.    Yes.
6        Q.    Are you aware of any errors in this
7   document as you sit here today?
8        A.    No.
9        Q.    Has anybody ever told BV that any of
10  the information that's reflected in this
11  document is inaccurate or incorrect?
12       A.    We have not been told that anything
13  is incorrect.
14       Q.    Okay.  Do you see that it shows that
15  HCRE made a capital contribution of
16  approximately $288 million?  And I'm looking
17  specifically in Box B-11?
18       A.    Yes.
19       Q.    Do you know the source of that
20  capital contribution?  Do you know where HCRE
21  got that money?
22       A.    I do not.
23       Q.    Is that relevant to BV's work in
24  preparing SE Multifamily's tax returns?
25       A.    No.
```

Page 64

```
1              BARKER VIGGATO LLP - M. BARKER
2        Q.    There's one piece of the equity roll
3   that's set forth under GAAP capital accounts,
4   and then there's another piece that's set forth
5   under tax capital accounts.  Do you see that?
6        A.    Well, again, I mean, there's two sets
7   of columns, one obviously for the GAAP capital
8   accounts and another set of columns for the tax
9   capital accounts.
10       Q.    Okay.  And can you explain to me what
11  the difference is?
12       A.    Yes.  The GAAP capital accounts
13  reflect the client-provided financials and the
14  information they gave us as recorded on the
15  books that they were using internally to track
16  this entity, and then the tax capital
17  accounts -- the primary difference, as you can
18  see, is on what I'll call Row 13, the income or
19  loss.  And so those amounts were different
20  under GAAP rules versus tax rules.
21       Q.    And can you explain to me in layman's
22  terms, if you're able, what the difference is
23  between the tax treatment and the GAAP
24  treatment of income and losses?
25       A.    Well, for example, I think in this
```

Page 65

```
1              BARKER VIGGATO LLP - M. BARKER
2   year they had taken a -- I'll call it a
3   substantial amount of depreciation in their
4   GAAP financials, and the tax depreciation was
5   considerably less.  I think that is the most
6   significant item in that particular year
7   between the GAAP capital accounts -- well,
8   between the GAAP income -- or I should say GAAP
9   loss and the tax income.  But there were also
10  the other differences as well.  I mean, we will
11  account for prepaid items differently and a
12  host of other items.
13             But, I mean, by and large what it is
14  is under the Internal Revenue Code, we have
15  very precise rules of how certain items are
16  treated and depreciated, et cetera.  And so
17  that's really, in layman's terms, the
18  difference.
19       Q.    And I think you mentioned earlier
20  that Mr. Broaddus gave direction to BV as to
21  how to allocate the profits and losses in each
22  year.  Do I have that right?
23       A.    Yes.
24       Q.    Is Mr. Broaddus's directions
25  reflected in the GAAP capital accounts or in
```

BARKER VIGGATO LLP - M. BARKER

1  the tax capital accounts?

2     A.  It's really in the tax capital
3  accounts.

4     Q.  Okay.  So is it fair to say that the
5  GAAP capital accounts shows the allocation of
6  SE Multifamily's profits and losses in 2018 but
7  that the tax capital accounts shows the
8  allocation of profits and losses for
9  SE Multifamily in 2018, as directed by
10  Mr. Broaddus?

11     A.  Yes.

12     Q.  And, again, Mr. Broaddus didn't
13  provide an explanation as to why he was
14  directing BV to allocate SE Multifamily's
15  profits and losses for 2018 in a way that
16  differed from the GAAP accounting.  Fair?

17     A.  Well, I think your statement is, I
18  guess, somewhat off in that we were strictly
19  focused on the allocation of income for tax
20  purposes.  And so how they did things for GAAP
21  was not all that critical.  What we were really
22  focused on was the allocation of income for tax
23  purposes and then reflecting that in the tax
24  capital accounts.

BARKER VIGGATO LLP - M. BARKER

2     Q.  Okay.  So line 13, the allocation of
3  income, that was determined by Mr. Broaddus,
4  correct?

5     A.  Right.

6     Q.  And BV doesn't have review and didn't
7  have responsibility for determining whether
8  that allocation was consistent with the terms
9  of the amended agreement.  Fair?

10     A.  Fair.

11     Q.  And do you recall if this -- I don't
12  mean to put words in your mouth.  That's not my
13  job.  My job is to try to just get evidence
14  here.

15     Did you testify earlier that you
16  recall providing equity rolls to Mr. Broaddus?

17     A.  At some point this information in
18  some form or fashion, I believe, was exchanged,
19  because I think they had us make an adjustment
20  to the amount of the distribution.

21     Q.  And do you recall what year that was?

22     A.  I don't know.  It was either '18 or
23  '19.

24     Q.  Okay.  Is it fair to say that if the
25  equity roll was provided to Mr. Broaddus, that

BARKER VIGGATO LLP - M. BARKER

2  the substance of the information reflected on
3  the equity roll was provided to him?

4     A.  Yes.  I think that's fair.

5     Q.  Okay.  Do you recall whether
6  Mr. Broaddus or anybody acting on behalf of any
7  of the members ever informed BV that any of the
8  information reflected on this equity roll was
9  inaccurate in any way?

10     A.  No.  We were never informed that any
11  of this information was inaccurate.

12     MR. MORRIS:  Okay.  Let's go to the
13     next exhibit, Exhibit 5, which is the 2019
14     equity roll.

15     (Exhibit 5 marked.)

16  BY MR. MORRIS:

17     Q.  Is it fair to say that this version
18  of the equity roll simply adds the information
19  for the tax year 2019?

20     A.  Yes.

21     Q.  So it's -- is it fair to describe
22  this as a build-up?

23     A.  Yes.

24     Q.  So you start with the information at
25  the top, then you've got the 2018 activity,

BARKER VIGGATO LLP - M. BARKER

2  you've got the equity determinations at the end
3  of 2018, and then you show the 2019 activity;
4  is that fair?

5     A.  That's fair.

6     Q.  And, again, would the allocation of
7  SE Multifamily's profits and losses for 2019,
8  as reflected in line 20 -- actually, withdrawn.

9     There is no -- there are no entries
10  in the GAAP -- withdrawn.  It's just my
11  eyesight.  Let me try to ask the question
12  again.

13     Is it fair to say that the allocation
14  of income and losses set forth in line 20 were
15  directed by HCRE?

16     A.  Well, let's separate GAAP versus tax.
17  I wasn't concerned about how they had allocated
18  GAAP income or loss --

19     Q.  Okay.

20     A.  -- what was really occurring from a
21  GAAP basis.  I was more focused on the tax
22  allocations, the tax capital accounts there in
23  columns I through M, although it's kind of cut
24  off on my screen.

25     And so -- yeah, I mean, those

Page 70

```
 1        BARKER VIGGATO LLP - M. BARKER
 2   allocations to me are consistent with the
 3   guidance we had and also from the client, and
 4   it's also, in this year, consistent with the
 5   agreement.
 6        Q.   And that's because it was allocated
 7   94 percent to HCMLP and 6 percent to
 8   BH Equities?
 9        A.   Right.  But, again, you have to layer
10   in the fact that Liberty CLO is a preferred
11   partner.  And so they received an allocation of
12   income in that year based on the cash they were
13   distributed associated with their preferred
14   interest.
15        So it's like you have to --
16   mechanically the way you have to look at it is,
17   all right, Liberty CLO received X for an income
18   allocation.  So you take the total plus the
19   amount given to Liberty, and the residual,
20   what's left, is 94/6.
21        Q.   Okay.  And did anybody on -- acting
22   on behalf of any of the members of SE --
23   withdrawn.
24        Do you recall if this particular
25   equity roll was ever provided to any of the
```

Page 71

```
 1        BARKER VIGGATO LLP - M. BARKER
 2   members of SE Multifamily?
 3        A.   You know, I just can't say for
 4   certainty.
 5        Q.   Okay.  Do you know if BV provided the
 6   substance of the information reflected on this
 7   document to HCRE prior to the time that the
 8   2019 tax returns were completed?
 9        A.   Yes, I would say that's probably
10   accurate.
11        Q.   Okay.  Did anybody acting on behalf
12   of any member ever tell BV that they believed
13   that the substance of the information reflected
14   on this document was inaccurate in any way?
15        A.   Did not.
16        Q.   Does BV have any reason to believe
17   today that there's anything on this document
18   that is inaccurate in any way?
19        A.   Not as of now, no.
20        MR. MORRIS:  Let's go to the next
21   version of this document.  We'll mark as
22   Exhibit 6 the 2020 equity roll.
23        (Exhibit 6 marked.)
24        MR. MORRIS:  And if we could slide to
25   the left so Mr. Barker can see the GAAP,
```

Page 72

```
 1        BARKER VIGGATO LLP - M. BARKER
 2   too.  There we go.
 3   BY MR. MORRIS:
 4        Q.   Mr. Barker, is this the 2000 -- is
 5   this the version of the equity roll that was
 6   prepared in connection with the preparation of
 7   the 2020 tax returns for SE Multifamily?
 8        A.   Yes.
 9        Q.   And does this, again, simply carry
10   forward -- withdrawn.
11        I see that there's nothing in 2020
12   activity for GAAP capital accounts.  Am I
13   reading that correctly?
14        A.   You are.
15        Q.   Do you know why there's no
16   information provided for 2020?
17        A.   Well, yeah, I mean, we just stopped
18   tracking the GAAP capital because it became
19   irrelevant.  Starting as of 1/1/20, the IRS
20   regulations required us to report capital
21   accounts on the Schedule K-1 on a tax basis,
22   and so these GAAP capital accounts were no
23   longer being presented anywhere on the tax
24   return.  Well, they were not being presented on
25   the partners' K-1s.  It was just -- it was a
```

Page 73

```
 1        BARKER VIGGATO LLP - M. BARKER
 2   change in the IRS regs requiring disclosure of
 3   tax capital accounts.
 4        Q.   Okay.  Do you see that there is a
 5   determination made as to the equity at December
 6   31st, 2020?  I think that's line 31.
 7        A.   Yes.
 8        Q.   Where did those numbers come from?
 9        A.   Well, it's just -- it's the
10   rolling -- I mean, it starts with the balance
11   from 2019 and reflects contributions, reflects
12   income, reflects distributions, and any
13   nondeductible expenses.
14        Q.   The income and loss reflected in line
15   28, that allocation of income and losses was
16   determined by HCRE, correct?
17        A.   Yes.
18        Q.   That was the direction that BV was
19   given, correct?
20        A.   Correct.
21        Q.   And BV didn't undertake any analysis
22   or seek to make any determination as to whether
23   those allocations were consistent with the
24   terms of the amended agreement, correct?
25        A.   Correct.
```

Page 74

```
 1           BARKER VIGGATO LLP - M. BARKER
 2       Q.    Then line 29, there's a reference to
 3   distributions.  Do you see that?
 4       A.    Yes.
 5       Q.    And those distributions were made at
 6   the direction of the manager, HCRE.  Is that
 7   BV's understanding?
 8       A.    Well, again, I'm going to go back to
 9   the fact that the client here, HCRE, HCMLP,
10   BH Equities, they were providing us financials
11   that showed how much was distributed to each
12   party, okay?  All we're doing is we're taking
13   the amount that they said was distributed to
14   each party, and we're putting it on this
15   spreadsheet.
16       Q.    Can you identify anybody that BV has
17   communicated who BV believed was acting on
18   behalf of HCMLP?
19       A.    Wait.  Say that again.
20       Q.    Can you identify any individual that
21   BV believes was acting on behalf of HCMLP?
22       A.    Well, again --
23             MR. GAMEROS:  Objection.  Vague as to
24       time.  When are you asking about, John?
25             MR. MORRIS:  Anytime.
```

Page 75

```
 1           BARKER VIGGATO LLP - M. BARKER
 2       A.    I mean, to me these parties were
 3   related, and I didn't know if Paul was really
 4   representing just HCRE or if he was
 5   representing HCMLP or both.
 6   BY MR. MORRIS:
 7       Q.    Okay.  That's fair.  Are you aware
 8   that HCMLP filed for bankruptcy?
 9       A.    Yes.
10       Q.    When did BV learn that HCMLP filed
11   for bankruptcy?
12       A.    Gosh.  Probably about four weeks ago,
13   give or take a few days.
14       Q.    So until sometime in July 2022, BV
15   was unaware that HCMLP filed for bankruptcy.
16   Do I have that right?
17       A.    You have that right.
18       Q.    Are you aware, sir, of the nature of
19   the dispute at issue here?
20       A.    All I know is, you know, that the
21   parties are at odds with each other between
22   HCRE/NexPoint and Highland Capital, and what
23   all is happening behind the scenes and what's
24   happening to whom and who's suing whom or
25   whatever, it's -- no, I don't know.
```

Page 76

```
 1           BARKER VIGGATO LLP - M. BARKER
 2       Q.    I appreciate that.  I do on many
 3   levels.
 4             Okay.  So did anybody ever explain to
 5   BV whether and to what extent HCMLP's
 6   bankruptcy filing had on SE Multifamily, if
 7   any?
 8       A.    No.
 9       Q.    Did anybody ever inform BV that the
10   bankruptcy filing had any impact on
11   SE Multifamily?
12       A.    No.
13       Q.    Did anybody ever inform BV that
14   HCMLP's bankruptcy filing impacted HCRE's
15   ability to make distributions?
16       A.    No.
17             (Exhibit 7 marked.)
18             MR. MORRIS:  All right.  Let's take
19       this down and put up the next exhibit,
20       Exhibit 7, which is just a short e-mail
21       exchange.
22             Oh, before we leave that -- don't
23       take that yet, please.
24   BY MR. MORRIS:
25       Q.    Mr. Barker, the document we're
```

Page 77

```
 1           BARKER VIGGATO LLP - M. BARKER
 2   looking at here, the 2020 equity roll -- I
 3   apologize if I asked these questions.  I just
 4   don't recall.  Do you recall whether BV
 5   provided this version of the equity roll to any
 6   of the members of SE Multifamily?
 7       A.    I don't recall.
 8       Q.    Do you recall whether BV provided the
 9   substance of the information reflected on this
10   document to HCRE prior to the time the 2020 tax
11   returns were completed?
12       A.    Well, we certainly provided them a
13   copy of the tax return and reflected in the tax
14   return would be this information.  It was
15   present on everybody's Schedule K-1 for HCRE,
16   Highland, BH, Liberty.  It all presents this
17   information, you know, on their Schedule K-1.
18       Q.    And this is -- this is the
19   conversation that took place in -- this would
20   have taken place in September 2021, right?
21       A.    Right.  I mean, they would have been
22   provided the tax return in order for them to
23   review, and then they have to sign it before we
24   could file it.
25             MR. MORRIS:  Okay.  All right.  Let's
```

```
 1          BARKER VIGGATO LLP - M. BARKER
 2      go to the next document, please,
 3      Exhibit 7.
 4   BY MR. MORRIS:
 5      Q.    And this is just a short e-mail
 6   exchange, and I'm focused first on your e-mail
 7   there to Paul Broaddus.  Do you see that?
 8      A.    Yes.
 9      Q.    Can you help me to understand the
10   substance of your second paragraph there where
11   you're referring to the GAAP and tax issues for
12   Liberty?
13      A.    Well, I believe it must have been,
14   because they were showing a total distribution
15   of 17 million to Liberty, and what this is
16   really getting at is how much of the
17   distribution was returning their capital versus
18   a return at the specified preferred return rate
19   on their capital.
20      Q.    And is it the latter issue that
21   caused BV -- no, withdrawn.
22            Is the latter issue -- withdrawn.
23            Is it BV's understanding that the
24   latter issue is what caused Mr. Broaddus to
25   allocate approximately 3 percent of
```

```
 1          BARKER VIGGATO LLP - M. BARKER
 2   SE Multifamily's profits to Liberty in 2019?
 3      A.    Yeah, I don't recall the percentage
 4   that ends up getting allocated to them, but,
 5   yes, we were trying to allocate Liberty CLO
 6   income equal to the amount of their preferred
 7   return.
 8      Q.    All right.  And what do you mean in
 9   the next sentence beginning with the word
10   "Remainder"?  "Remainder of income is allocated
11   to HCMLP and BH based on their common equity
12   ownership percentages on a pro-rata basis."
13   What does that mean?
14      A.    Well, just the fact that the
15   remainder of the income is going to be
16   allocated based on the ratios of 94/6.
17      Q.    So after allocating the portion of
18   the income attributable to Liberty, is the
19   question you're asking whether the balance of
20   the income should be allocated 94/6 --
21      A.    Yes.
22      Q.    -- consistent with the agreement?
23      A.    Yeah.
24      Q.    Okay.  And is that, in fact, what --
25   is that, in fact, the direction that BV
```

```
 1          BARKER VIGGATO LLP - M. BARKER
 2   received from Mr. Broaddus?
 3      A.    Yes.
 4      Q.    Okay.  And you asked the question in
 5   the next paragraph, should HCRE be receiving an
 6   income allocation this year.  Do you see that?
 7      A.    Yes.
 8      Q.    Why did you ask that question, if you
 9   remember?
10      A.    I don't remember.
11      Q.    Did you ever have any discussion with
12   anybody at HCRE as to whether or not any of
13   SE Multifamily's profits or losses should be
14   allocated to HCRE?
15      A.    Now, again, they provided the
16   direction of, you know, how they wanted the
17   allocations done in '18 and '19 and '20.
18      Q.    Okay.
19      A.    In fact, I was just being thorough in
20   asking the question.
21      Q.    Okay.
22            MR. MORRIS:  We can take this down.
23   BY MR. MORRIS:
24      Q.    You're familiar with the IRS form
25   K-1; is that right?
```

```
 1          BARKER VIGGATO LLP - M. BARKER
 2      A.    Yes.
 3      Q.    Can you just describe for me your
 4   understanding of what a Form K-1 is?
 5      A.    Yeah.  In essence, it is reporting to
 6   each partner each partner's allocable share of
 7   either income, loss, deductions, credits,
 8   et cetera, and that's presented on -- on the
 9   K-1.  So each partner knows how much income or
10   loss they have been allocated in a given year
11   and that they need to reflect on their tax
12   returns.
13      Q.    And did the K-1s also identify the
14   interest that each member has in the
15   enterprise?
16      A.    Yes.
17      Q.    And does the client --
18      A.    That is, I guess, a judgment call as
19   to what's presented there as far as the
20   ownership percentage.  It can either be on
21   stated percentages or it can be on actual
22   allocations of income in that year.
23      Q.    Or can it be both in certain
24   circumstances?
25      A.    Well, I mean, you only present one
```

Page 82

```
 1          BARKER VIGGATO LLP - M. BARKER
 2  profit or loss ratio at the end of the year,
 3  and so it's likely either one or the other.
 4      Q.   Did BV prepare the K-1s for each of
 5  the members of SE Multifamily for the tax years
 6  2018, '19, and '20?
 7      A.   Yes.
 8      Q.   Do you know whether any of those K-1s
 9  have ever been amended?
10      A.   Not to my knowledge.
11      Q.   Has BV ever had any discussion with
12  anybody at any time as to whether the K-1s
13  should be amended in any respect?
14      A.   No.
15      Q.   And the information for the K-1s, is
16  that obtained from the client?
17      A.   Yes.
18      Q.   Is there any information that's in a
19  K-1 that BV obtains independent from the
20  client?
21      A.   No.
22      Q.   Is it fair to say that BV relies on
23  the accuracy and the completeness of the
24  information that it receives from the client in
25  order to prepare the K-1?
```

Page 83

```
 1          BARKER VIGGATO LLP - M. BARKER
 2      A.   Yes.
 3      Q.   And in the case of SE Multifamily,
 4  who exactly is BV's client?
 5      A.   Well, I guess a combination to me,
 6  really, of HCRE and HCMLP.
 7      Q.   And is SE Multifamily the client,
 8  too?
 9      A.   Yes.
10      Q.   And is BH Equities the client?
11      A.   Well, they're obviously a partner in
12  the partnership, but I don't know that I view
13  them, quote/unquote, as a -- necessarily as a
14  client.
15      Q.   Are you -- are you familiar with the
16  phrase "manager" in the context of limited
17  liability companies?
18      A.   Yes.
19      Q.   Do you know who the manager of
20  SE Multifamily is?
21      A.   I believe it was HCRE.
22      Q.   Do you know whether under the amended
23  agreement HCRE, as the manager, had the
24  exclusive responsibility for causing SE
25  Multifamily's tax returns to be prepared?
```

Page 84

```
 1          BARKER VIGGATO LLP - M. BARKER
 2      A.   Yes.
 3      Q.   That is BV's understanding, correct?
 4      A.   Correct.
 5      Q.   Would it be fair to characterize BV's
 6  client as SE Multifamily, as directed by its
 7  manager, HCRE?
 8      A.   Yes.
 9      Q.   That would be accurate, correct?
10      A.   Yeah, I think so, yes.
11      Q.   You don't have any reason to believe
12  that HCMLP was ever the manager of
13  SE Multifamily, correct?
14      A.   Correct.
15      Q.   And you don't have any reason to
16  believe that HCMLP was ever authorized to cause
17  SE Multifamily to file tax returns, right?
18      A.   Right.
19          (Exhibit 8 marked.)
20          MR. MORRIS:  Let's go through the
21      K-1s.  So if we could put up Exhibit 8,
22      please.
23  BY MR. MORRIS:
24      Q.   Just so you -- I am trying to get
25  through this quickly and then I'm probably
```

Page 85

```
 1          BARKER VIGGATO LLP - M. BARKER
 2  close to done.
 3          I'm going to go through each K-1,
 4  through each of the four members of
 5  SE Multifamily, first in 2018, then in 2019,
 6  and then in 2020.
 7      A.   Okay.
 8      Q.   And, Mr. Barker, I really -- I'll
 9  just pause for a second and say I greatly
10  appreciate your patience, and I'll repeat again
11  that if there's anything that you need to see
12  that's not on the screen, let me know, okay?
13      A.   Okay.
14      Q.   This is -- do you recall in BV's
15  production there was a set of K-1s that was
16  produced as the original K-1s and there was
17  another set that was produced as drafts?
18      A.   Yes.
19      Q.   Okay.  I'm going to represent to you
20  that what I've attempted to do, anyway, is to
21  extract from the original pile the K-1s for
22  each of the members in 2018 and '19, okay?  So
23  that's my representation to you is that this --
24  this is the 2018 K-1 for HCMLP.  Do you see
25  that?
```

Page 86

```
 1             BARKER VIGGATO LLP - M. BARKER
 2        A.   I see it.
 3        Q.   Okay.  And it shows -- it shows that
 4   HCMLP, at the beginning of the -- withdrawn.
 5        2018 is kind of a stub year, right?
 6   It's only for a portion of the year because
 7   SE Multifamily was created in August of 2018.
 8   Do I have that right?
 9        A.   Right.
10        Q.   Okay.  And, in fact, this is just for
11   the period October 1st through the end of the
12   year, right?
13        A.   Right.
14        Q.   And if we could scroll down just a
15   little bit, you'll see that on HCMLP's 2018
16   K-1, it was reported as having approximately 46
17   percent of the profits and losses at the
18   beginning and the end of the reporting period.
19   Have I read that correctly?
20        A.   You've read that correctly.
21        Q.   And 46 percent of the capital of
22   SE Multifamily at the beginning and at the end
23   of the reporting period, correct?
24        A.   Correct.
25        Q.   Okay.  The information on this
```

Page 87

```
 1             BARKER VIGGATO LLP - M. BARKER
 2   document -- you know what, I'm going to speed
 3   this up.
 4        Are you familiar with the K-1s that
 5   BV prepared for each of SE Multifamily's
 6   members in 2018, '19, and '20?
 7        A.   Yes.  I mean, I don't know how
 8   detailed you're going to get.  Do I remember
 9   exact numbers and amounts?  No, probably not.
10        Q.   Okay.  And has any member ever
11   suggested to you that any of the K-1s were
12   wrong or inaccurate in any way?
13        A.   No.
14        Q.   Do you know why the K-1 for 2018 for
15   HCMLP showed profits and losses at 46 percent
16   rather than the 94 percent we saw in the
17   amended agreement?
18        A.   Well, as we've discussed earlier,
19   these percentages are the common ownership
20   percentages in the agreement.  I mean, there's
21   some latitude there in what percentages are
22   presented in what I call Box J.  And so -- but
23   they don't necessarily -- they don't have a
24   bearing, you know, on the overall allocation of
25   profits.
```

Page 88

```
 1             BARKER VIGGATO LLP - M. BARKER
 2        Q.   Well, who determined the numbers that
 3   are in Box J?
 4        A.   I would say BV did.
 5        Q.   And where did BV get the information
 6   that's in Box J?
 7        A.   From the LLC agreement.
 8        Q.   If I put the LLC agreement up on the
 9   screen, would you be able to show me where in
10   the LLC agreement?
11        A.   Yep.
12        Q.   Do you know BV relied upon or what
13   provision BV relied upon to set the profit and
14   losses at 46 percent?
15        A.   Yes.
16        Q.   Okay.  Can you tell me, please?
17        A.   Yeah, it's Article 6.1.
18        Q.   And what provision of Article 6.1 did
19   BV rely upon for purposes of --
20        A.   I believe it was 6.1(a).
21        Q.   Okay.  So does 6.1(a) --
22        A.   Well, you know what?  The other
23   thing, too, is -- hold on.  If you go to
24   Schedule A, which is attached to the LLC
25   agreement --
```

Page 89

```
 1             BARKER VIGGATO LLP - M. BARKER
 2        Q.   Yes, sir.
 3        A.   -- that's really -- I mean, the
 4   stated percentages, ownership percentages are
 5   really coming from that schedule.
 6        Q.   Okay.  So that's where -- Schedule A
 7   is where BV got the information from --
 8        A.   Yes.
 9        Q.   -- for J?
10        A.   Yes.
11        Q.   I think you have a printed-out copy
12   of the amended agreement?
13        A.   I do, yes.
14        Q.   And if you can flip to Section
15   6.4(a), do you see that profits and losses --
16        A.   Uh-huh.
17        Q.   -- allocated 94 percent to HCMLP and
18   6 percent to BH?
19        A.   Right.
20        Q.   Do you know why the profits and
21   losses on this K-1 were not allocated 94
22   percent to HCMLP?
23        A.   Again, it goes back to the direction
24   we were provided.  And the amounts are the
25   percentages presented in Box J.  I mean,
```

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   are 46.06 percent?
 3        A.   Right.
 4        Q.   To the best of your recollection, are
 5   the capital percentages -- did the capital
 6   percentages remain the same for all members
 7   throughout the three tax years?
 8        A.   I think so, but I don't know unless I
 9   looked at the 2020 K-1 to, you know,
10   definitively say that.
11             MR. MORRIS:  Okay.  So -- so let's --
12        let's pull up Exhibit 17.
13        (Exhibit 17 marked.)
14   BY MR. MORRIS:
15        Q.   And this is the 2020 K-1 for HCMLP.
16   Do you see that?
17        A.   Uh-huh.
18        Q.   And it also shows --
19        A.   Yes, it does.
20        Q.   -- 46.06 percent for capital?  Do you
21   see that?
22        A.   Yep.
23        Q.   So looking at the three K-1s, is it a
24   fact that BV prepared K-1s for HCMLP that
25   consistently showed it had a 46.06 percent
```

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   capital interest in SE Multifamily?
 3        A.   Yes.
 4        Q.   And did anybody ever tell BV that
 5   that was incorrect or mistaken or in error?
 6        A.   No.
 7             MR. MORRIS:  And if we can go back to
 8        the 2019 K-1.  I'm sorry, Exhibit 12.
 9   BY MR. MORRIS:
10        Q.   In Box 2, there's approximately
11   $32 million of SE Multifamily profits that were
12   allocated to HCMLP.  Am I reading that
13   correctly?
14        A.   Yes.
15        Q.   And that was a decision that was made
16   by HCRE, correct?
17        A.   Correct.
18        Q.   Do you know if HCMLP is also a
19   pass-through entity?
20        A.   Not definitively, no.
21        Q.   Did -- does BV have any knowledge as
22   to who the ultimate beneficial owners of HCMLP
23   are?
24        A.   No.
25        Q.   Are there any guidelines that the IRS
```

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   has that informs taxpayers as to what's
 3   permitted and what's not permitted with respect
 4   to the allocation of profits for an LCC?
 5        A.   Well, the guidelines would be there
 6   are certain regulatory allocations that are
 7   intended to make sure that the allocations have
 8   what I will call economic effect.
 9        Q.   And what does it mean to have
10   economic effect?
11        A.   Probably in layman's terms the best
12   summary would be that upon ultimate dissolution
13   or termination of a partnership, if there were
14   a final liquidation, is that the capital
15   accounts that reflected the allocations reflect
16   how the partners will share in the
17   distributable proceeds.
18        Q.   And from BV's perspective, did the
19   allocations that HCRE directed for
20   SE Multifamily, did they have economic effect?
21        A.   Yes.  I have no reason to believe
22   they didn't.
23        Q.   Did BV do any work to confirm that
24   the allocations had economic effect?
25        A.   Well, embedded in the LLC agreement
```

```
 1         BARKER VIGGATO LLP - M. BARKER
 2   there's something called qualified income
 3   offset, which is intended to support
 4   allocations that could be disproportional such
 5   that a partner would have to, for example,
 6   recognize income in order to restore the
 7   capital account back to zero.
 8        Q.   And has anybody tried to do that with
 9   respect to SE Multifamily?
10        A.   Well, I mean, that would really come
11   into play either in the tax year 2021 or at
12   some point when there was a dissolution,
13   windup, termination of the entity.
14        (Exhibit 16 marked.)
15             MR. MORRIS:  Let's -- let's take a
16        look at -- I think it's Exhibit 16, which
17        is an e-mail.
18   BY MR. MORRIS:
19        Q.   And if we can start at the bottom.
20   Do you see this is an e-mail from a gentleman
21   named Mr. Rios --
22             MR. MORRIS:  Oh, I guess you have to
23        scroll up just a little bit to see
24        actually who it was sent from.  It's on
25        the prior page.
```

BARKER VIGGATO LLP - M. BARKER

1
2   BY MR. MORRIS:
3       Q.   Do you see it's from Mr. Broaddus --
4       A.   Yes.
5       -- to you and some others, including
6   Mr. Kirshner?
7       A.   Yes.
8       Q.   And he's asking the question on
9   September 13th, 2021, whether the
10  SE Multifamily's tax returns had been filed at
11  that point.  Do you see that?
12      A.   Yes.
13      Q.   And was September 15th the filing
14  deadline, to the best of your knowledge?
15      A.   Yes.
16      Q.   And was BV in the process of
17  preparing SE Multifamily's tax returns on
18  September 13th, 2021?
19      A.   Yes.
20      Q.   And do you see that Mr. Broaddus
21  informs you and the other recipients of the
22  e-mail that, "We want to add a statement to the
23  return and then file a superseded return on or
24  before Wednesday"?  Do you see that?
25      A.   Yes.

BARKER VIGGATO LLP - M. BARKER

1
2       Q.   Is this the moment that you learned
3   that HCRE wanted to create that footnote that
4   you mentioned earlier today?
5       A.   Yes, it is.
6       Q.   Was there any communication with BV
7   about that footnote at any time prior to
8   September 13th?
9       A.   I don't think so.
10      Q.   You don't have a recollection of
11  that?
12      A.   I don't have a recollection of it.
13      Q.   Did you have an understanding when
14  you received this e-mail about why they would
15  want to file a superseded return?
16      A.   No.
17      Q.   Did you ever have any -- withdrawn.
18      Did you ever speak to Mr. Broaddus
19  about this -- the issue that he's raising in
20  this e-mail, or is all of your communication
21  reflected in the e-mail exchanges that you've
22  produced?
23      A.   No, I don't recall.
24      Q.   You don't recall having any
25  conversations with Mr. Broaddus about this

BARKER VIGGATO LLP - M. BARKER

1
2   topic; is that fair?
3       A.   That's fair.
4       Q.   Do you know whether anybody in your
5   firm would have spoken or -- withdrawn.
6       Do you know whether anybody in your
7   firm did speak with Mr. Broaddus about the
8   topic referenced in this e-mail?
9       A.   Yeah, no, I'm not aware of anybody in
10  my firm having spoken to Paul about this
11  particular e-mail and statement.
12      Q.   All right.  Let's -- let's see where
13  this leads.
14      MR. MORRIS:  If we can scroll up,
15  please.
16  BY MR. MORRIS:
17      Q.   You'll see that Mr. Rios responds.
18  Do you know who Mr. Rios is?
19      A.   Yeah, he's one of the -- you know,
20  Skyview Group is somehow or another, I guess,
21  maybe a group that's either outsourced or
22  affiliated with HCMLP and/or HCRE, and he was
23  one of the employees there.
24      Q.   Did you understand that he was
25  working on behalf of the manager in this

BARKER VIGGATO LLP - M. BARKER

1
2   regard?
3       A.   Well, I mean, he was certainly
4   working on behalf of, you know, some
5   combination of NexPoint and HCMLP and
6   everything, trying to get the return filed.
7       Q.   Okay.  So he raises a question -- he
8   informs everybody that he hasn't signed the
9   e-file authorization and he notes some changes
10  of address.  Do you see that?
11      A.   Well, it says -- he says, "I haven't
12  signed the e-file authorizations yet."
13      Q.   Oh, if I misstated that, I apologize.
14      A.   Yes.
15      Q.   He informed everybody that he hadn't
16  yet filed --
17      A.   Right.
18      Q.   He informed everybody that he hadn't
19  yet signed the authorization, and he gives some
20  instruction about certain changes of address;
21  is that fair?
22      A.   That's fair.
23      Q.   Okay.  And then if we go to the
24  bottom of the next page, Mr. Kirshner responds,
25  you'll see, and he informs everybody that he

BARKER VIGGATO LLP - M. BARKER

1
2  hasn't yet filed the return, and he's asking
3  for the statement that Mr. Broaddus referred to
4  earlier.  Is that a fair characterization of
5  that?
6      A.   Yes.
7      Q.   Okay.  At this point are you aware
8  yet of what the substance of the statement is
9  going to be?
10     A.   No.
11     Q.   And then if we can scroll up to the
12 next e-mail, there is an e-mail from Mr. Rios
13 that informs you and Mr. Kirshner that
14 Mr. Broaddus will send the statement over once
15 it's ready.  Do you see that?
16     A.   Yes.
17     Q.   Okay.
18          MR. MORRIS:  And then if you'll
19     scroll up.
20 BY MR. MORRIS:
21     Q.   Later in the day there's an e-mail
22 from Mr. Kirshner that doesn't address the
23 substance of the statement that's ultimately
24 tendered to BV; is that fair?  It's
25 administrative in nature?

BARKER VIGGATO LLP - M. BARKER

1
2      A.   Yes, that's fair.
3          MR. MORRIS:  Okay.  Scroll up.
4  BY MR. MORRIS:
5      Q.   And then Mr. Rios responds with
6  another response that's administrative in
7  nature; is that fair?
8      A.   Yes.
9      Q.   And then the next day you respond and
10 you ask to see if the statement is ready; is
11 that fair?
12     A.   Yes.
13     Q.   And then the next page is the
14 statement.
15     A.   Correct.
16     Q.   Okay.  And he says in his e-mail on
17 September 14th, "Statement as discussed."  Do
18 you see that?
19     A.   Uh-huh.
20     Q.   Do you have -- is that a yes?
21     A.   Yes.
22     Q.   Do you have any recollection of
23 having discussed this statement with
24 Mr. Broaddus before receiving this e-mail?
25     A.   You know what, I believe that we did.

BARKER VIGGATO LLP - M. BARKER

1
2  What exactly transpired in that conversation, I
3  don't recall.
4      Q.   Okay.  Is this the first time you
5  learned of a dispute between HCMLP and HCRE?
6      A.   Yes.
7      Q.   Did you ask any questions --
8  withdrawn.
9          Did BV request any information
10 relating to the nature of the dispute?
11     A.   We did not.
12     Q.   Did Mr. Broaddus provide any
13 information relating to the nature of the
14 dispute other than what's set forth on this
15 page?
16     A.   I don't recall.
17     Q.   Do you know if anybody acting on
18 behalf of HCRE ever provided any information to
19 BV relating to the nature of the dispute, other
20 than what's set forth in this e-mail?
21     A.   No.
22     Q.   You don't recall that; is that fair?
23     A.   That's fine.
24     Q.   And as you sit here today, you don't
25 have the ability to -- withdrawn.  I don't -- I

BARKER VIGGATO LLP - M. BARKER

1
2  didn't mean for that to come off pejoratively.
3          As you sit here today, you don't have
4  knowledge about the nature of the dispute
5  between HCMLP and HCRE; is that fair?
6      A.   No, I don't know what the underlying
7  cause, nature, you know, of this dispute is.
8      Q.   Okay.  And what, if anything, did BV
9  do with the statement that Mr. Broaddus gave to
10 BV?
11     A.   Well, we obviously replicated that
12 statement basically word for word, and we made
13 it a disclosure as part of the 2020 tax return
14 filing.
15     Q.   And you did so at the direction of
16 HCRE; is that fair?
17     A.   Yes.
18     Q.   And BV didn't do any diligence into
19 the disclosure that's being made, correct?
20     A.   Correct.
21     Q.   And BV doesn't take a position as to
22 the accuracy of the information that's in the
23 disclosure; is that fair?
24     A.   That's fair.
25     Q.   Did BV ever attempt to speak with

1        BARKER VIGGATO LLP - M. BARKER
2    anybody who was acting on behalf of HCMLP
3    concerning this statement?
4        A.    No.
5        MR. MORRIS:  All right.  Let's take a
6    short break.  It's 12:56.  Why don't we
7    come back at 1:05, so nine minutes.  I may
8    be done, sir.  I just want to check my
9    notes.
10        THE WITNESS:  Okay.  All right.
11        MR. MORRIS:  Thank you.
12        (Recess taken 11:56 a.m. CST - 12:06
13    p.m. CST.)
14        MR. MORRIS:  I have no further
15    questions, sir.  Thank you so much for
16    your time.  Greatly appreciated.
17        THE WITNESS:  You're welcome.  So I
18    guess we're done, right?
19        MR. GAMEROS:  No questions for you,
20    Mr. Barker.  Thank you.
21        THE WITNESS:  You're welcome.
22        MR. MORRIS:  All right.  Thanks
23    again, sir.  I really do appreciate it.
24    Have a great weekend.
25        THE WITNESS:  Thanks.  You too.

1    BARKER VIGGATO LLP - M. BARKER
2        THE REPORTER:  Mr. Roberts, would you
3    like your client to read and sign?
4        MR. ROBERTS:  Yeah.  Are you going to
5    send that to us by e-mail?
6        THE REPORTER:  Yes, if you could just
7    give me your e-mail address.
8        MR. ROBERTS:  mroberts@
9    freemanlaw.com.
10        THE REPORTER:  Okay.  And,
11    Mr. Gameros, did you need a copy of this
12    one as well?
13        MR. GAMEROS:  We'll get it expedited,
14    please.  Yeah, I don't need the exhibits
15    on this one.
16        THE REPORTER:  Okay.  I'm sorry, you
17    did want expedited.
18        MR. GAMEROS:  I want it expedited,
19    yes.
20        (Time noted:  12:06 p.m. CST.)
21
22
23
24
25

1
2        IN THE UNITED STATES BANKRUPTCY COURT
3        FOR THE NORTHERN DISTRICT OF TEXAS
4                DALLAS DIVISION
5    IN RE:                )
                          ) CHAPTER 11
6    HIGHLAND CAPITAL      )
     MANAGEMENT, L.P.,     ) CASE NO. 19-34054-SGJ11
7                          )
     Reorganized Debtor.   )
8
9
10        REPORTER'S CERTIFICATION
11            BARKER VIGGATO LLP
12    BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
13            MARK BARKER
14            AUGUST 5, 2022
15
16        I, Janice K. McMoran, RDR, CRR, TCCR,
17    and Certified Shorthand Reporter in and for the
18    State of Texas, hereby certify to the following:
19        That the witness, BARKER VIGATTO LLP, BY
20    AND THROUGH ITS DESIGNATED REPRESENTATIVE MARK
21    BARKER, was duly remotely sworn by the officer, and
22    that the transcript of the oral deposition is a
23    true record of the testimony given by the witness;
24        I further certify that pursuant to
25    Federal Rules of Civil Procedure, Rule 30(e)(1)(A)

1
2    and (B) as well as Rule 30(e)(2), that review of
3    the transcript and signature of the deponent:
4        __X___ was requested by the deponent or
5    a party before the completion of the deposition and
6    is to be returned within 30 days from date of
7    receipt of the transcript if returned, the
8    attached Errata contains any changes and the
9    reasons therefor;
10        _____ was not requested by the deponent
11    or a party before the completion of the deposition.
12        I further certify that I am neither
13    counsel for, related to, nor employed by any of the
14    parties or attorneys to the action in which this
15    proceeding was taken.  Further, I am not a
16    relative or employee of any attorney of record in
17    this cause, nor am I financially or otherwise
18    interested in the outcome of the action.
19        Subscribed and sworn to on this the 5th
20    day of August, 2022.
21
22        _Janice K. McMoran_
23        JANICE K. McMORAN, RDR, CRR, TCRR
24        Texas CSR #1959
25        Expiration Date:  2/28/23