# EXHIBIT 62

Page 1

1

2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION

4
   IN RE:
5                        CHAPTER 11
   HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,          CASE NO. 19-34054-SGI11
         Debtor.
7
      ----------------------------x
8
   HIGHLAND CAPITAL
9   MANAGEMENT, L.P.,
         Plaintiff,          ADVERSARY PROCEEDING
10
      vs.                NO: 21-03000-SGI
11
   HIGHLAND CAPITAL
12   MANAGEMENT FUND ADVISORS,
   L.P.; NEXPOINT ADVISORS,
13   L.P.; HIGHLAND INCOME
   FUND; NEXPOINT STRATEGIC
14   OPPORTUNITIES FUND;
   NEXPOINT CAPITAL, INC.;
15   AND CLO HOLDCO, LTD.,
         Defendants.
16   ----------------------------/

17

18        DEPOSITION OF ROB WILLS, ESQ.

19        VIA REMOTE VIDEOCONFERENCE

20              August 11, 2021

21              9:30 a.m., Central

22

23   Reported by:

24   Anne E. Vosburgh, CSR-6804, RPR, CRR

25   Job No. 197673

## Page 2

1
2 REMOTE APPEARANCES:
3
4 On behalf of the Debtor:
5     PACHULSKI STANG ZIEHL & JONES
6     150 California Street
7     San Francisco, California 94111
8     BY: KENNETH BROWN, ESQ.
9  - and -
10     PACHULSKI STANG ZIEHL & JONES
11     780 Third Avenue
12     New York, New York 10017
13     BY: HAYLEY WINOGRAD, ESQ.
14
15
16 On behalf of Unsecured Creditors Committee:
17     SIDLEY AUSTIN
18     2021 McKinney Avenue
19     Dallas, Texas 75201
20     BY: CHANDLER ROGNES, ESQ.
21
22
23
24
25

## Page 3

1
2 REMOTE APPEARANCES (Continued):
3
4 On behalf of HCRE Partners, LLC (n/k/a NexPoint Real
5 Estate Partners, LLC):
6     WICK PHILLIPS
7     100 Throckmorton Street
8     Fort Worth, Texas 76102
9     BY: BRANT MARTIN, ESQ.
10       LAUREN DRAWHORN, ESQ.
11
12 On behalf of the Senior Employees and CPCM, LLC:
13     BAKER MCKENZIE
14     1900 North Pearl Street
15     Dallas, Texas 75201
16     BY: DEBRA DANDENEAU, ESQ.
17
18 ALSO PRESENT:
19     LA ASIA CANTY, Paralegal from Pachulski Stang
20
21
22
23
24
25

## Page 4

1
2         I N D E X
3
4     ---------- EXAMINATIONS ----------
5 WITNESS:  ROB WILLS, ESQ.
6 Examination by Mr. Brown           6
7 Examination by Mr. Martin          113
8 Re-Examination by Mr. Brown        124
9
10
11
12
13     ---------- MARKED EXHIBITS ----------
14 NUMBER       DESCRIPTION        PAGE
15 Exhibit A    Amended Notice of 30(b)(6)    11
16              Deposition
17 Exhibit B    SE Multifamily Holdings LLC,    14
18              Limited Liability Company
19              Agreement, August 23, 2018
20 Exhibit C    Bridge Loan Agreement,        20
21              September 26, 2018
22 Exhibit D    Email chain, "RE: Project    72
23              Unicorn - Final Org Charts,"
24              with attachments
25

## Page 5

1
2 EXHIBITS (Continued):
3 Exhibit E    Email chain, "RE: Unicorn -    90
4              DSTs"
5 Exhibit F    SE Multifamily Holdings LLC    98
6              First Amended and Restated
7              Limited Liability Company
8              Agreement
9 Exhibit H    Email chain, "FW: Draft LLC    101
10             Agreement"
11 Exhibit I    Email chain  "RE: SE          122
12             Multi-Family Holdings LLC:
13             Amended and Restated,"
14             beginning Bates
15             Highland136853
16
17
18
19
20
21
22
23
24
25

Page 6

1      Wick Phillips 30(b)(6) - R. Wills
2      Remote Videoconference Deposition
3      August 11, 2021, 9:30 a.m., Central
4      ---------------
5           PROCEEDINGS
6      ---------------
7           ROB WILLS, ESQ.,
8      (Having been called to appear via
9      remote videoconference, declared his
10     testimony to be truthful under penalty
11     of perjury.)
12           ---
13           EXAMINATION
14     BY MR. BROWN:
15     Q.   Would you state your full name for
16     the record.
17     A.   Sure.  James Robert Wills, IV.
18     Q.   Mr. Wills, I'm counsel for Highland
19     Capital Management L.P.  I think I'll be
20     referring to that entity, the Debtor,
21     throughout the deposition as Highland.
22           Will you understand what I mean
23     when I refer to Highland as the Debtor?
24     A.   Yes, sir.
25     Q.   And your last name is pronounced

Page 7

1      Wick Phillips 30(b)(6) - R. Wills
2      Willis?
3      A.   Wills.
4      Q.   Mr. Wills, you're an attorney; is
5      that correct?
6      A.   Yes, sir.
7      Q.   Okay.  Can you tell me what your
8      current role is and position with
9      Wick Phillips?
10     A.   Sure.  I'm an equity partner here.
11     I'm one of two partners that run the real
12     estate group.
13     Q.   Okay.  Have you ever had your
14     deposition taken before?
15     A.   No, sir.
16     Q.   Have you ever taken a deposition
17     before?
18     A.   I have.
19     Q.   Okay.  So can we all assume that
20     you understand the rules, and I can
21     reasonably dispense with explaining to you
22     the protocol and procedures for a deposition?
23     A.   Yes.  That's fine with me.
24     Q.   Just very basically, you understand
25     you're under oath?

Page 8

1      Wick Phillips 30(b)(6) - R. Wills
2      A.   Yes, sir.
3      Q.   And that what you say here is like
4      what you say in a court of law?
5      A.   Yes, sir.
6      Q.   It's important for you to
7      understand my question.  Wait until I'm
8      finished before you answer.
9           We don't want to be talking at the
10     same time because that makes for an unclear
11     record for the court reporter.
12     A.   Not a problem.
13     Q.   You understand all that?
14     A.   Yes, sir.
15     Q.   You also understand that you'll
16     have an opportunity to review the transcript
17     of this deposition and make corrections?
18     A.   Yes, sir.
19     Q.   Okay.  And that I'll be able to
20     comment on those corrections at the time of
21     the hearing on this?
22     A.   Yes, sir.
23     Q.   Okay.  Do you understand that
24     you've been designated as the witness for
25     Wick Phillips pursuant to Federal Rule of

Page 9

1      Wick Phillips 30(b)(6) - R. Wills
2      Civil Procedure 30(b)(6), made applicable in
3      this proceeding by Bankruptcy Rule 9011?
4      A.   Yes, sir.
5      Q.   And you're aware that you're
6      required to provide complete and
7      knowledgeable answers on behalf of
8      Wick Phillips with respect to the topics that
9      have been designated in the Wick Phillips
10     Rule 30(b)(6) deposition notice?
11     A.   Yes, sir.
12     Q.   And you understand that your
13     responses will be binding on Wick Phillips in
14     this matter?
15     A.   Yes, sir.
16     Q.   And when I refer to "this matter,"
17     again, at the risk of stating the obvious,
18     this deposition is being taken today in
19     connection with the Debtor's motion to
20     disqualify Wick Phillips from representing an
21     adverse party in connection with their proof
22     of claim against the Debtor in the Debtor's
23     bankruptcy case.
24           Is that your understanding?
25     A.   Yes, sir.

Page 10

1       Wick Phillips 30(b)(6) - R. Wills
2       Q.  And you understand that what you
3   say today in your testimony represents the
4   testimony of the law firm of Wick Phillips
5   rather than your personal testimony?
6       A.  Yes, sir, I do.
7       Q.  Okay.  Do you know how you were
8   selected as Wick Phillips' designated witness
9   in connection with the disqualification
10  motion?
11      MR. MARTIN:  I'm going to object
12      and instruct the witness not to answer
13      based on the question of privilege.
14      That's the law firm's privilege and
15      we're not going to waive it.
16  BY MR. BROWN:
17      Q.  Well, do you -- can you answer that
18  question without disclosing the privilege?
19      A.  I'm one of two partners in the real
20  estate section of the firm.  This is a real
21  estate matter that we handled.
22      Q.  Okay.  What have you done to become
23  prepared to provide complete, knowledgeable,
24  and binding answers to the questions relating
25  to the topics in the deposition notice?

Page 11

1       Wick Phillips 30(b)(6) - R. Wills
2       A.  I reviewed the Motion to Disqualify
3   and the Brief in Support, my firm's
4   Opposition in that brief; as well as talking
5   with D.C. Sauter, a former partner of mine;
6   Rachel Sam, a current partner of mine; and
7   reviewing the exhibits and declarations
8   attached to all the briefs, as well as our
9   internal files and -- in relation.
10      Q.  Okay.  How much time did you spend
11  preparing for this deposition?
12      A.  It was over a couple of days.  I
13  would say several hours.
14      Q.  About five?
15      A.  I would say right about there.
16      MR. BROWN:  Could the court
17      reporter mark Exhibit A?
18      THE REPORTER:  As Exhibit A?
19      MR. BROWN:  Sure.  Mark Exhibit A
20      as Exhibit A.
21      (Amended Notice of 30(b)(6)
22      Deposition, marked as Exhibit A.)
23  BY MR. BROWN:
24      Q.  And housekeeping matter.  I don't
25  know --

Page 12

1       Wick Phillips 30(b)(6) - R. Wills
2       (Brief interruption.)
3   BY MR. BROWN:
4       Q.  So Mr. Wills, do you have this in
5   front of you or are you just looking at it on
6   the screen?
7       A.  No.  I've got the exhibits in front
8   of me.  It's also on the screen.
9       Q.  Okay.  So have you seen this?  It's
10  called Debtor's Amended Notice of 30(b)(6)
11  Deposition to Wick Phillips Gould & Martin
12  LLP.
13      Have you seen this before?
14      A.  Yes, sir.
15      Q.  And have you reviewed it?
16      A.  Yes, sir.
17      Q.  And if you scroll down to page 4,
18  that sets forth the topics that you have been
19  designated as the witness for Wick Phillips
20  on.
21      Have you reviewed those topics?
22      A.  Yes, sir.
23      Q.  And are you prepared to testify as
24  Wick Phillips' designated witness on those
25  topics today?

Page 13

1       Wick Phillips 30(b)(6) - R. Wills
2       A.  Yes, sir.
3       Q.  Okay.  Very good.
4       During the deposition today, you
5   are required to answer the questions
6   truthfully.  If you don't know the answer to
7   a question, that is a legitimate response if
8   it's a truthful response, and I'm sure you
9   know that.
10      But I want to make sure you
11  understand that if you say "I don't know" as
12  an answer to one of the questions about the
13  topics that have been designated, that I can
14  consider that and advance the argument at the
15  hearing that that is an admission by
16  Wick Phillips that Wick Phillips doesn't have
17  any knowledge or position with respect to the
18  question that you answer "I don't know" on,
19  and that I can argue that Wick Phillips can
20  be precluded -- should be precluded from
21  offering documents, evidence, or testimony at
22  the hearing on that matter.
23      Do you understand that?
24      A.  I do.
25      Q.  In this deposition, I may get a

Page 14

Wick Phillips 30(b)(6) - R. Wills

1    little sloppy and use the term "you" rather
2    than "Wick Phillips."  But because of the
3    nature of this deposition, when I do use the
4    term "you," I'm going to be referring to
5    Wick Phillips unless I specifically say I
6    want your knowledge rather than
7    Wick Phillips'.
8         Do you understand that?
9    A.  Yes, sir.
10        MR. BROWN:  Ms. Vosburgh, can you
11   please mark Exhibit B as Exhibit B.
12        (SE Multifamily Holdings LLC,
13        Limited Liability Company
14        Agreement, August 23, 2018, marked
15        as Exhibit B.)
16   BY MR. BROWN:
17   Q.  Mr. Wills, what has been marked as
18   Exhibit B is a copy of the SE Multifamily
19   Holdings LLC, Limited Liability Company
20   Agreement, dated August 23, 2018.
21        Have you seen this document before?
22   A.  Yes, sir.
23   Q.  And in what context did you see it?
24   A.  In connection with this motion.

Page 15

Wick Phillips 30(b)(6) - R. Wills

1    Q.  So is it accurate to say that
2    before you started preparing to be the Rule
3    30(b)(6) witness of Wick Phillips, you had
4    not seen this document before?
5    A.  That's correct.
6    Q.  So you personally, as opposed to
7    Wick Phillips, have had no role in connection
8    with this document, the preparation or
9    negotiation of this document, correct?
10   A.  Yes, sir.
11   Q.  Okay.  Do you understand what
12   Wick Phillips' role, if any, was in
13   connection with this document?
14   A.  Yes, sir.
15   Q.  Okay.  Could you tell me what
16   Wick Phillips' role was in connection with
17   the SE Multifamily Holdings Limited Liability
18   Company Agreement, which is Exhibit B.
19   A.  Yes.  Our -- Wick Phillips' role
20   was using this LLC Agreement in connection
21   with the financing of the Project Unicorn
22   transaction.
23   Q.  Okay.  Do you know what the purpose
24   of the SE Family Holdings -- let me make this

Page 16

Wick Phillips 30(b)(6) - R. Wills

1    simpler.
2         For this deposition, I would like
3    to refer to the SE Multifamily Holdings LLC
4    Limited Liability Company Agreement as the
5    LLC Agreement.
6         Is that acceptable to you, and will
7    we be talking about the same thing when we
8    talk about the LLC Agreement?
9    A.  Sure.  That works great.
10   Q.  What was the purpose of the
11   LLC Agreement?
12   A.  The purpose of the LLC Agreement
13   was, again, to use in connection with the
14   Project Unicorn structuring for the financing
15   of those acquisitions.
16   Q.  Do you know who the parties were to
17   the LLC Agreement?
18   A.  I know who the parties are from
19   reading the agreement, but I can't list them.
20   Q.  Okay.  So I think that Highland was
21   one of the parties.  And the other party was
22   an entity known as HCRE Partners LLC.
23        Is that your understanding?
24   A.  Yes, sir.

Page 17

Wick Phillips 30(b)(6) - R. Wills

1    Q.  Okay.  So -- and I'm going to refer
2    to HCRE Partners, LLC throughout this
3    deposition as "HCRE."
4         Will you understand what I'm
5    talking about and will we be talking about
6    the same thing when I refer to HCRE?
7    A.  Yes.
8    Q.  It's just the counterparty to
9    Highland in the LLC Agreement, or the other
10   party to the LLC Agreement.
11        Did Wick Phillips have any role in
12   connection with the negotiation and drafting
13   of the LLC Agreement?
14   A.  No, sir.
15   Q.  Okay.  It didn't represent any
16   party?
17   A.  Not at -- no, sir.
18   Q.  Okay.  So it didn't represent
19   either Highland or HCRE, correct?
20   A.  Correct.
21   Q.  Do you know if Wick Phillips had
22   any communications with either of the parties
23   to the LLC Agreement while the agreement was
24   being negotiated and drafted?

Page 18

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I'm not sure.  I don't know.
3    Q.  Okay.  Did Wick Phillips have
4  occasion to at any time need to become aware
5  of the ownership percentages as between the
6  Debtor, Highland, and HCRE, that were
7  allocated in the LLC Agreement?
8    A.  My suspicion would be in connection
9  with the financing, the Loan Agreement with
10  KeyBank and with Freddie, Freddie Mac,
11  obviously, the organizational structure is
12  important to those lenders and, to a certain
13  extent, attached to those loan agreements.
14    And so as it relates to that, yes,
15  sir.
16    Q.  And do you know what the
17  ownership -- does Wick Phillips know what the
18  ownership percentages were in connection with
19  the LLC Agreement?
20    A.  I know what the LLC Agreement says,
21  yes, sir.
22    Q.  And what does the LLC Agreement
23  say?
24    A.  It says --
25    Q.  I think if we flip to page 18,

Page 19

1    Wick Phillips 30(b)(6) - R. Wills
2  scroll to page 18 of the LLC Agreement...
3    A.  Yes, sir.  Yes, sir.
4    Do you want me to read that?
5    Q.  Yeah, sure.
6    A.  It says that HCRE Partners, LLC has
7  a percentage interest of 51 percent, and
8  Highland Capital Management L.P. has a
9  percentage interest of 49 percent.
10    Q.  Okay.  And do you have any
11  understanding if those percentages were
12  correct or incorrect at the time the Limited
13  Partnership Agreement was executed?
14    A.  I assume they were correct at the
15  time, yes, sir.
16    Q.  Did Wick Phillips have any
17  communications with HCRE concerning the
18  capital contributions required by the
19  LLC Agreement?
20    A.  No, sir.
21    Q.  Did Wick Phillips have any
22  communications with HCRE concerning the
23  ownership interests set forth in the
24  LLC Agreement?
25    A.  Only in connection with -- as a

Page 20

1    Wick Phillips 30(b)(6) - R. Wills
2  conduit to KeyBank or Freddie Mac in terms of
3  who owns what.
4    Q.  Okay.  We'll talk about that later,
5  then, when we talk about the KeyBank
6  Loan Agreement.
7    A.  Okay.
8    Q.  But no communications --
9  Wick Phillips had no communications with the
10  parties with respect to the ownership
11  interests limited -- if we limit that to the
12  context of just the LLC Agreement, its
13  drafting, negotiation, formation; is that
14  correct?
15    A.  That's correct.
16    Q.  And the same answer if, instead of
17  asking about ownership percentages, I asked
18  about contributions?
19    A.  Yes, sir.  Same answer.
20    MR. BROWN:  Okay.  Ms. Vosburgh,
21  can we mark Exhibit C as Exhibit C.
22    (Bridge Loan Agreement, September
23    26, 2018, marked as Exhibit C.)
24  BY MR. BROWN:
25    Q.  Okay.  So Mr. Wills, up on the

Page 21

1    Wick Phillips 30(b)(6) - R. Wills
2  screen -- and I think you have a binder of
3  exhibits, I assume?
4    A.  Yes, sir.
5    Q.  So up on the screen marked as
6  Exhibit C, and hopefully in your binder also
7  as Exhibit C, is a document called the Bridge
8  Loan Agreement dated as of September 26,
9  2018, among a group of entities set forth on
10  the agreement that I won't repeat, who are
11  the borrowers, and also the lender, KeyBank
12  National Association, as agent, and KeyBanc
13  Capital Markets as the sole lead arranger and
14  bookrunner.
15    Is that the document you have as
16  Exhibit C?
17    A.  Yes, sir.
18    Q.  Okay.  Have you ever seen this
19  document before?
20    A.  Yes, sir.
21    Q.  Okay.  Are you familiar with it?
22    A.  Yes, sir.
23    Q.  Is it a true copy of -- let's --
24  this Exhibit C, for the rest of the
25  deposition, I'm going to refer to it as the

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement.
3       And will you understand and be
4  comfortable referring to Exhibit C as the
5  Loan Agreement?
6    A.  Yes, sir.
7    Q.  Is this a true copy of the
8  Loan Agreement?
9    A.  Yes, sir.  I believe so.
10   Q.  Okay.  Did Wick Phillips have any
11 role in connection with the Loan Agreement?
12   A.  Yes, sir.
13   Q.  Can you describe the role that
14 Wick Phillips played in connection with the
15 Loan Agreement?
16   A.  Sure.  We helped the property-level
17 borrowers here in connection with the
18 Project Unicorn acquisition.
19       This -- the Loan Agreement that
20 we're looking at was for a bucket of
21 properties that could not get agency
22 financing through Freddie Mac.  So we needed
23 KeyBank to come in and provide sort of some
24 additional financing in connection with the
25 Project Unicorn closing.

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Okay.  Did Wick Phillips represent
3  Highland in connection with the KeyBank -- in
4  connection with the Loan Agreement?
5    A.  Highland is a co-borrower, but not
6  separately, no, sir.
7    Q.  Okay.  So is the answer to the
8  question did Wick Phillips represent Highland
9  in connection with the Loan Agreement yes or
10 no?
11   A.  No.  No, sir.
12   Q.  It had no representation of
13 Highland?
14   A.  That's correct.
15   Q.  Can you turn to -- let's flip to
16 page 3 of the Loan Agreement.
17       Okay.  So I want to focus you on
18 the term "Borrower" under the Loan Agreement.
19   A.  Okay.
20   Q.  Do you see where the term
21 "Borrower" is defined to include
22 Highland Capital?
23   A.  Yes, sir.
24   Q.  And Highland Capital has been
25 defined earlier in the Loan Agreement, has it

1    Wick Phillips 30(b)(6) - R. Wills
2  not, as Highland Capital Management, L.P.?
3    A.  Correct.
4    Q.  So Highland, the Debtor, was a
5  borrower under the Loan Agreement, correct?
6    A.  Yes, sir.
7    Q.  Did Wick Phillips represent the
8  borrowers under the Loan Agreement?
9    A.  Wick Phillips represented some of
10 the borrowers.
11   Q.  Okay.  And which borrowers did it
12 not represent?
13   A.  We did not represent what we've
14 been calling Highland.
15   Q.  Where does it say in the
16 Loan Agreement that you didn't represent
17 Highland?
18   A.  I don't know that the
19 Loan Agreement would say that.
20   Q.  Okay.
21       MR. MARTIN:  I don't think he
22 finished his answer, Counsel.
23       MR. BROWN:  I'm sorry.
24       MR. MARTIN:  The question on the
25 table was which borrowers did

1    Wick Phillips 30(b)(6) - R. Wills
2  Wick Phillips not represent, and he was
3  in the middle of providing his answer.
4       MR. BROWN:  I apologize.  I didn't
5  mean to interrupt.
6       MR. MARTIN:  That's okay.
7  BY MR. BROWN:
8    Q.  Can you please provide a complete
9  answer to the question?
10   A.  Sure.
11       Initially we represented the
12 NexPoint entities and the property-level
13 entities all as co-borrowers.  And KeyBank
14 needed more credit from the borrower side
15 since this was such a large transaction, and
16 that's when Highland Capital was added as an
17 additional borrower to the loan.
18   Q.  Okay.  Can we scroll to page 51.
19       Can you please focus on
20 Section 4.01(b).
21   A.  Okay.
22   Q.  This is -- this discusses certain
23 conditions to the Loan Agreement.  And (b)
24 says:
25       "The Administrative Agent shall

Page 26

1       Wick Phillips 30(b)(6) - R. Wills
2    have received" -- as a condition -- "a
3    favorable written opinion (addressed
4    to the Administrative Agent and the
5    Lenders and dated the Effective Date)
6    of Wick Phillips Gould & Martin, LLP,
7    counsel for the Borrower."
8        Is that statement referring to
9    Wick Phillips as "counsel for the borrower"
10   and referencing back to the borrower as
11   several entities, including Highland, is that
12   statement in the Loan Agreement incorrect?
13       A.  I mean, that's what it says, yes,
14   sir.
15       Q.  Is it incorrect?
16       A.  It is incorrect as to who
17   Wick Phillips represented.  It is correct in
18   terms of providing a legal opinion.  You
19   wouldn't have multiple legal opinions from
20   different firms for the same borrower,
21   typically, or collection of borrowers.
22       Q.  So the Loan Agreement -- your
23   testimony today on behalf of Wick Phillips is
24   that this Loan Agreement, to the extent it
25   refers to Wick Phillips' representation of

Page 27

1       Wick Phillips 30(b)(6) - R. Wills
2    the borrower, is inaccurate to the extent the
3    borrower includes Highland; is that correct?
4        MR. MARTIN:  Objection, form.
5        A.  Yes, sir.  That's what we're
6    saying.
7    BY MR. BROWN:
8        Q.  Did Wick Phillips say anything,
9    ever raise the issue of the lack of accuracy
10   of these representations in the
11   Loan Agreement to anybody at any time?
12       MR. MARTIN:  Objection to form.
13       A.  Not to my knowledge.
14   BY MR. BROWN:
15       Q.  Okay.  Can we also scroll forward
16   to page 76.  This is Article IX of the
17   Loan Agreement.  Section 9.01 discusses
18   Notices.
19       And do you see at Section 9.01(a)
20   where it says, in the case of notices, "if to
21   the Borrower, in care of Highland Capital
22   Management," with copies to Wick Phillips?
23       A.  Yes, sir.  I see that.
24       Q.  Okay.  So I'm just trying to
25   ascertain Wick Phillips' position here.  Is

Page 28

1       Wick Phillips 30(b)(6) - R. Wills
2    it that Section 9.01(a) is inaccurate to the
3    extent it reflects that Wick Phillips
4    represented Highland Capital Management in
5    connection with the Loan Agreement?
6        A.  My suspicion is this was the same
7    notice provision as had been there in
8    previous loans that we had worked on -- we,
9    Wick Phillips, had worked on with KeyBank.
10       And once Highland was added as a
11   co-borrower, which had not been the case
12   previously, it was not changed.
13       Q.  Okay.  So was Wick Phillips
14   receiving notices on behalf of
15   Highland Capital Management relating to the
16   Loan Agreement or not?
17       A.  Not that I'm aware of.
18       Q.  Okay.  So did Wick Phillips ever
19   raise the issue with any of the parties to
20   the Loan Agreement that this Section 9.01(a)
21   of the Loan Agreement did not accurately
22   reflect the position of Wick Phillips with
23   respect to its representation of
24   Highland Capital Management?
25       MR. MARTIN:  Objection, form.

Page 29

1       Wick Phillips 30(b)(6) - R. Wills
2        A.  Well, I think we would want the
3    notices, with the borrower being a collection
4    of borrowers, of which we did represent some.
5    BY MR. BROWN:
6        Q.  And why wouldn't the notices be in
7    care of the entities that you represented as
8    opposed to an entity that you didn't
9    represent?
10       A.  I don't know.
11       Q.  Okay.  Give me a moment, please.
12       Do you have a copy of
13   Wick Phillips' Brief in Opposition to the
14   Debtor's Motion to Disqualify in front of
15   you?
16       A.  Not in front of me, no, sir.
17       Q.  I'm looking at it right now, and I
18   know that you have read it before.
19       And at page 4 of that Opposition,
20   Wick Phillips says:
21       "As a borrower under the bridge
22       loan, Wick Phillips was counsel to
23       HCM L.P."
24       So Wick Phillips' statement in a
25   document filed with the Court on May 6th,

1    Wick Phillips 30(b)(6) - R. Wills
2  2021, is inconsistent with your testimony
3  today, is it not?
4        MR. MARTIN: Objection, form.
5    A.  I'm sorry.  Did you say HC L.P.
6  or --
7  BY MR. BROWN:
8    Q.  HCM L.P., which is Highland Capital
9  Management, L.P., the Debtor, Highland.
10   A.  Right.
11   Q.  We're calling it Highland.
12       So in Wick Phillips' brief filed on
13 May 6th, 2021, in opposition to the Motion to
14 Disqualify, Wick Phillips said:
15       "As a borrower under the bridge
16       loan" -- which is what we're referring
17     to as the Loan Agreement --
18       "Wick Phillips was counsel to HCM
19       L.P."
20       So that is, by my lights,
21 inconsistent with your testimony today.
22       Can you explain why you are
23 testifying in a manner that is not consistent
24 with an admission Wick Phillips has already
25 made in pleadings filed with the bankruptcy

1    Wick Phillips 30(b)(6) - R. Wills
2  court?
3        MR. MARTIN:  Objection, form.
4    A.  Yes.  I believe what I said was
5  that -- I guess what we're calling here
6  Highland is a co-borrower under this
7  Loan Agreement that was added later on.
8        And, yes, we did represent the
9  co-borrowers in connection with this
10 Loan Agreement.
11 BY MR. BROWN:
12   Q.  Okay.  So you agree, then, with the
13 statement made in Wick Phillips' May 6th
14 filing in opposition to the disqualification
15 motion that Wick Phillips did represent the
16 borrower, Highland, under the bridge loan; is
17 that correct?
18   A.  We represented all of the borrowers
19 as co-borrowers in this -- with this loan.
20   Q.  Okay.  Other than the borrowers --
21 other than the co-borrowers, did
22 Wick Phillips represent any other entities in
23 connection with the Loan Agreement?
24   A.  No, sir.
25   Q.  Okay.  Does Wick Phillips have a

1    Wick Phillips 30(b)(6) - R. Wills
2  retention agreement in connection with the
3  work it did for the borrowers under the --
4  relating to the Loan Agreement?
5    A.  No, sir.
6    Q.  Why not?
7    A.  I don't know the answer to that
8  question.
9    Q.  Does Wick Phillips normally require
10 retention agreements when it undertakes a
11 client representation?
12   A.  In an ideal world, we do, yes, sir,
13 but it's not a requirement.
14   Q.  Can you tell me what Wick Phillips'
15 custom and practice is with respect to
16 obtaining retention agreements when it
17 undertakes the representation of a client?
18   A.  A similar answer.  We ideally would
19 have an engagement letter or retention
20 letter, as you mentioned.  But it is not
21 required for us to open a matter, or a new
22 client matter.
23   Q.  Okay.  Do you personally get
24 retention agreements from your clients when
25 you undertake a representation?

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I certainly try to.
3    Q.  Do you always do it?
4    A.  I do not.
5    Q.  Did Wick Phillips obtain a conflict
6  waiver from the borrowers, or any of them,
7  concerning its joint representation of them
8  in connection with the Loan Agreement?
9    A.  I don't believe so.
10   Q.  Have you ever seen a conflict
11 waiver?
12   A.  Yes, sir.
13   Q.  I'm sorry.  I didn't mean it that
14 way.  That's the problem with lawyers.
15 They're too literal.
16       Have you ever seen a conflict
17 waiver in connection with the Loan Agreement?
18   A.  No, sir.
19   Q.  Okay.  Did you have -- in your
20 preparation for this deposition and to be the
21 designated witness of Wick Phillips, was
22 there any discussion or reference to a
23 conflict waiver among Wick Phillips' joint
24 clients relating to the Loan Agreement?
25   A.  Not that I'm aware of.

Wick Phillips 30(b)(6) - R. Wills
1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Do you know whether Wick Phillips
3  considered whether a conflict waiver was
4  necessary because of the joint representation
5  of clients under the Loan Agreement?
6     A.  I do not.
7     Q.  Do you know if Wick Phillips
8  undertook any analysis to determine if the
9  joint representation of the borrowers
10  presented a conflict or a potential conflict
11  for which a conflict waiver was required?
12     A.  I do not.
13     Q.  You don't know if it was done?
14     A.  I don't know.
15     Q.  Okay.  Were there any discussions
16  of the issue of the advisability or necessity
17  of a conflict waiver in connection with the
18  Loan Agreement that Wick Phillips had?
19     A.  I don't believe so.
20     Q.  Do you -- is Wick Phillips familiar
21  with the Texas Rules of Professional Conduct,
22  Section 1.07?
23     A.  Yes, sir.
24     Q.  And do you know if it's familiar
25  with Section 1.07(a) that requires written

1  consent for common representations?
2     MR. MARTIN:  Objection, form.
3     A.  Yes, sir.
4  BY MR. BROWN:
5     Q.  And do you know why Wick Phillips
6  did not obtain a written conflict waiver in
7  conformity and compliance with
8  Section 1.07 --
9     MR. MARTIN:  Objection, form.
10  BY MR. BROWN:
11     Q.  -- in connection with the joint
12  representation of clients under the
13  Loan Agreement?
14     MR. MARTIN:  Same objection.
15     A.  I do not know.
16  BY MR. BROWN:
17     Q.  Do you know if Wick Phillips had
18  any discussions with any of the borrowers --
19  as that term is defined under the
20  Loan Agreement -- about actual or potential
21  conflicts that could arise from
22  Wick Phillips' joint representation of them
23  under the Loan Agreement?
24     A.  I don't.

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Did Wick Phillips undertake any
3  analysis of its responsibilities in
4  connection with the joint representation and
5  whether the representation could be
6  undertaken without an improper impact on its
7  responsibilities?
8     MR. MARTIN:  Objection, form.
9     A.  I'm not aware of that.
10  BY MR. BROWN:
11     Q.  Did Wick Phillips consult with any
12  of the borrowers concerning the implications
13  of the joint representation, for example, on
14  the attorney-client privilege?
15     A.  I don't know.
16     Q.  Do you know if Wick Phillips
17  consulted with any of the borrowers
18  concerning the advantages and risks to them
19  individually of having Wick Phillips jointly
20  represent them in connection with the Loan
21  Agreement?
22     MR. MARTIN:  Objection, form.
23     A.  I don't know.
24  BY MR. BROWN:
25     Q.  Do you have any understanding of

1     Wick Phillips 30(b)(6) - R. Wills
2  whether the representation -- well, as you
3  sit here today on behalf of Wick Phillips, do
4  you have an opinion on whether or not the
5  joint representation of the multiple
6  borrowers under the Loan Agreement gave rise
7  to any actual or potential conflicts?
8     MR. MARTIN:  Objection, form.
9     A.  I don't have an opinion.
10  BY MR. BROWN:
11     Q.  Do you understand that HCRE was
12  designated as the lead borrower under the
13  Loan Agreement?
14     A.  Yes, sir.
15     Q.  It was, to your understanding,
16  designated as the lead borrower?
17     A.  Yes, sir.
18     Q.  Can we -- let's see.
19     MS. CANTY:  Ken, if you tell me the
20  section, I can probably jump to it
21  quickly.
22     MR. BROWN:  Yeah.  It's
23  Section 1.05, page 14.
24     MS. CANTY:  Sorry.  I have it as
25  page 25.

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills
2    MR. BROWN:  No, I'm sorry.  That --
3    let's first --
4    Okay.  That's fine.  That's fine.
5    BY MR. BROWN:
6    Q.  So if you -- could you review this
7    Section 1.05, Mr. Wills.
8    A.  Sure.  (Reviewing document.)
9    Okay.
10    Q.  Okay.  Did you have a chance to
11    look at both (a) and (b) of Section 1.05?
12    A.  Yes, sir.
13    Q.  Okay.  So the lead borrower under
14    the Loan Agreement is HCRE, correct?
15    A.  Correct.
16    Q.  And this Section 1.05 talks about
17    the appointment of the lead borrower and some
18    of the rights and obligations of the lead
19    borrower, correct?
20    A.  Yes, sir.
21    Q.  And Section (b) says:
22    "The proceeds of each loan and
23    advance provided under the Loans which
24    is requested by the Lead Borrower
25    shall be advanced as and when

1    Wick Phillips 30(b)(6) - R. Wills
2    otherwise provided herein or as
3    otherwise indicated by the Lead
4    Borrower."
5    Correct?
6    A.  Correct.
7    Q.  And that "The Lead Borrower shall
8    cause the transfer of the proceeds to the
9    other borrowers on whose behalf such loan and
10    advance was obtained."
11    So is it your understanding that
12    under this Loan Agreement, the lead borrower
13    had the ability to both determine when the
14    advances were made and to direct where the
15    transfers went?
16    A.  Yes, sir, according to this
17    provision.
18    Q.  Okay.  And do you also have an
19    understanding that the other borrowers,
20    including Highland, were on the hook jointly
21    and severally for all amounts that were
22    borrowed under the Loan Agreement?
23    A.  Yes, sir.
24    Q.  So, in your mind, does the fact
25    that HCRE could determine when advances were

1    Wick Phillips 30(b)(6) - R. Wills
2    made and direct how those advances were
3    applied, while Highland was jointly and
4    severally liable for those advances, does
5    that give rise to a conflict or potential
6    conflict between Highland and HCRE?
7    MR. MARTIN:  Objection, form.
8    A.  No, sir, not in my opinion.
9    BY MR. BROWN:
10    Q.  Okay.  Why not?
11    A.  Well, my understanding is the
12    Highland entity is more -- was added as a
13    borrower more in a guarantee/guarantor
14    context.  And so the HCRE, or the lead
15    borrower, would just be directing the funds
16    to the property-level borrowers in connection
17    with each of the various acquisitions.
18    Q.  Do you know that's what occurred?
19    A.  That's the setup of the
20    Loan Agreement.
21    Q.  Do you have any knowledge on
22    whether HCRE used moneys that it obtained
23    under the Loan Agreement to make a capital
24    contribution to the Limited Partnership?
25    A.  I don't have that knowledge, no,

1    Wick Phillips 30(b)(6) - R. Wills
2    sir.
3    Q.  You don't know one way or the
4    other?
5    A.  No, sir.
6    Q.  Do you know if Wick Phillips ever
7    explained to any of the borrowers the
8    operation of the Loan Agreement to the extent
9    that it permitted HCRE to direct the
10    advances, but that all of the other borrowers
11    were liable under the Loan Agreement,
12    irrespective of how the advances were
13    directed?
14    MR. MARTIN:  Objection, form.
15    A.  I don't know.
16    BY MR. BROWN:
17    Q.  Did Wick Phillips ever advise
18    Highland that it was liable for all amounts
19    due under the Loan Agreement whether or not
20    it received the proceeds or received the
21    benefit of the proceeds?
22    A.  I don't know.
23    Q.  Do you know whether or not Highland
24    received the benefit of the proceeds advanced
25    under the Loan Agreement?

Page 42

Wick Phillips 30(b)(6) - R. Wills
1
2    A.  I don't.
3    Q.  Who was Wick Phillips' client
4  contact at HCRE in connection with the
5  Loan Agreement?
6    A.  I believe there were several that
7  we typically deal with, Matt Goetz,
8  Matt McGraner.  Freddy Chang was at one point
9  some form of in-house counsel there.
10   Q.  So Matt Goetz.  Do you know if
11  Matt Goetz was an employee of Highland?
12   A.  I don't know.
13   Q.  Do you know who he was employed by?
14   A.  I don't.
15   Q.  What about Mr. McGraner; do you
16  know if he was an employee of Highland?
17   A.  I don't.
18   Q.  Do you know if he was an employee
19  of HCRE?
20   A.  I do not.
21   Q.  What about Freddy Chang; do you
22  know if he was an employee of Highland?
23   A.  I don't.
24   Q.  Do you know if he was an employee
25  of HCRE?

Page 43

Wick Phillips 30(b)(6) - R. Wills
1
2    A.  I do not.
3    Q.  You understand you're testifying on
4  behalf of Wick Phillips right now, correct?
5    A.  Yes, sir.
6    Q.  Who was Wick Phillips' client
7  contact at Highland in connection with the
8  Loan Agreement?
9    A.  I don't believe we have a client
10  contact for Highland.
11   Q.  And why was that?
12   A.  We -- I mean, our silo is the real
13  estate silo for NexPoint that handles loan
14  agreements like we're looking at right now.
15  Highland is a separate part of that company.
16   Q.  But Wick Phillips has already
17  acknowledged in its Opposition that it
18  represented Highland in connection with the
19  Loan Agreement.  And I'm just trying to
20  establish whether, in connection with that
21  acknowledged representation, Wick Phillips
22  had a client contact at Highland.
23       And so the question is did
24  Wick Phillips have a client contact and, if
25  so, who?

Page 44

Wick Phillips 30(b)(6) - R. Wills
1
2    A.  Not to my knowledge.
3    Q.  No client contact.  Okay.
4       Did Wick Phillips have contact with
5  James Dondero in connection with the
6  Loan Agreement?
7    A.  Not to my knowledge.
8    Q.  Okay.  With respect to Mr. Geotz,
9  who you did indicate was a client contact for
10  HCRE --
11       MR. MARTIN:  Objection, form.
12  BY MR. BROWN:
13   Q.  -- how did Wick Phillips determine
14  what hat, if you will, Mr. Geotz was wearing
15  and what entity he was speaking on behalf of,
16  communicating on behalf of?
17       MR. MARTIN:  Objection, form.
18   A.  My assumption is wearing a NexPoint
19  hat, as typically is the case.
20  BY MR. BROWN:
21   Q.  And what is that assumption based
22  on?
23   A.  Our prior representations and
24  dealings.
25   Q.  But is it true that in connection

Page 45

Wick Phillips 30(b)(6) - R. Wills
1
2  with this representation, Wick Phillips'
3  representation of the borrowers under the
4  Loan Agreement, you don't know how
5  Wick Phillips made a determination of what
6  hat the individuals it spoke to were wearing,
7  do you?
8       MR. MARTIN:  Objection, form.
9    A.  I don't know if a determination was
10  made at all, no, sir.
11  BY MR. BROWN:
12   Q.  And do you know whether
13  Wick Phillips made any distinction in terms
14  of people that -- the client contacts it
15  communicated with in connection with the
16  Loan Agreement, whether it made any
17  distinction whether those individuals were
18  communicating with it on behalf of Highland
19  or HCRE?
20       MR. MARTIN:  Objection, form.
21   A.  I don't know.
22       MR. MARTIN:  Is now a good time to
23  take a break?
24       (Recess taken.)
25

Page 46

1    Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3    Q.  Mr. Wills, do you know what the
4  purpose of the Loan Agreement was?
5    A.  To provide financing in connection
6  with the Project Unicorn property
7  acquisitions.
8    Q.  Which was going to be done by the
9  LLC?  The acquisitions were going to be by
10  the LLC?
11   A.  By some subsidiaries, but yes, sir.
12   Q.  And do you know what HCRE's role
13  was in connection with the Loan Agreement?
14   A.  They were the lead borrower.
15   Q.  Okay.  And we've already talked
16  about to some extent what that involved.
17       Do you know what Highland's role
18  was in connection with the Loan Agreement?
19   A.  It's a little bit like I've already
20  mentioned, but primarily to provide more
21  credit to the borrowing base, to the
22  collective definition of "borrower."
23   Q.  Do you know whether the ownership
24  structure of the Limited Partnership was an
25  issue that was addressed in the

Page 47

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3    A.  The Highland Limited Partnership?
4    Q.  I'm sorry.  Do you know -- let me
5  rephrase the question.  I misstated it.
6       Do you know whether or not the
7  ownership interests between -- as and between
8  Highland and HCRE in the LLC was an issue
9  that was part of the Loan Agreement?
10   A.  I'm not sure I understand your
11  question. I apologize.
12   Q.  Okay.  Did the ownership interest
13  in the LLC between Highland and HCRE -- was
14  that a component of the Loan Agreement?
15   A.  Yes, sir.
16   Q.  Okay.  And in what way?
17   A.  Just as far as which party was
18  51 percent and which was 49 percent.
19   Q.  I'd like to scroll to Schedule 3.15
20  of the Loan Agreement.
21       MS. CANTY:  Do you know which page
22  that's on, Ken?
23       Never mind.  I see it.
24       MR. BROWN:  Yeah.
25

Page 48

1    Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3    Q.  Okay.  Let's go back to the prior
4  page, the caption page, Schedule 3.15.
5       Okay.  Mr. Wills, are you familiar
6  with Schedule 3.15?
7    A.  Yes, sir.
8    Q.  What role did Wick Phillips have in
9  connection with Schedule 3.15 of the
10  Loan Agreement?
11   A.  We provided these -- the
12  attachments to KeyBank to attach here as the
13  schedule.
14   Q.  Okay.  Let's look at the
15  attachments.
16       MR. BROWN:  Flip -- if we could
17  flip to the very next page.
18       Okay.  Is there any way we could
19  change the view on that so it's upright?
20  Okay.
21  BY MR. BROWN:
22   Q.  Is this one of the attachments?
23   A.  Yes, sir.
24   Q.  And Wick Phillips prepared this
25  attachment in connection with the

Page 49

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3       MR. MARTIN:  Objection, form.
4    A.  No, sir.  We provided these
5  schedules to KeyBank.
6  BY MR. BROWN:
7    Q.  Okay.  You provided the schedules
8  to KeyBank.  Did Wick Phillips prepare the
9  schedules?
10   A.  No, sir.
11   Q.  Did it have any -- did it have any
12  role in connection with the preparation of
13  the schedules?
14   A.  Just as sort of the conduit between
15  the business folks and the lender.
16   Q.  The business folks at the borrower?
17   A.  Correct.
18   Q.  So did Wick Phillips make any
19  changes to these schedule -- to the schedules
20  attached as schedule -- to Schedule 3.15, did
21  it make any changes to them after it received
22  them from the borrowers?
23   A.  No, sir.
24   Q.  Did it review -- did it review
25  these attachments?

Page 50

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  Yes, sir.
3      Q.  And did it make any determination
4   as to their accuracy?
5      A.  I would assume so, yes, sir.
6      Q.  And, for example, this first
7   schedule reflects the ownership interests of
8   Highland and HCRE in the LLC; is that
9   correct?
10      A.  Yes, sir.
11      Q.  And it reflects the ownership
12   interest as 49 percent for Highland and
13   51 percent for HCRE; is that correct?
14      A.  Yes, sir.
15      Q.  And you don't have -- is it your
16   understanding that that ownership allocation
17   was correct at the time these schedules were
18   prepared?
19      A.  Yes, sir.
20      Q.  And let's scroll down to the next
21   attachment in the schedule.
22         This is the second attachment.  At
23   the bottom it says it's for Gulfstream Isles.
24         Do you see that?
25      A.  Yes, sir.

Page 51

1      Wick Phillips 30(b)(6) - R. Wills
2      Q.  And that would be a reference to
3   the underlying property that was being
4   acquired; is that correct?
5      A.  Yes, sir.
6      Q.  Okay.  And, again, the ownership
7   percentages for HCRE and Highland in the LLC
8   are reflected as the same, 51 for HCRE and
9   49 percent for Highland.  Correct?
10      A.  Yes, sir.
11      Q.  And based on your prior review of
12   these attachments as Schedule 3.15, your
13   recollection is that they all -- I think
14   there's 22 of them, and they all reflect the
15   same ownership percentage in the LLC; is that
16   correct?
17      A.  I think so, yes, sir.  We can flip
18   through them, but I assume so.
19      Q.  Yeah.  Why don't we just briefly
20   flip through them.  If we go to the next one.
21         Again, this is for Victoria Park.
22         Same ownership percentage reflected
23   there, correct?
24      A.  Yes, sir.
25      Q.  And the next one, this is for the

Page 52

1      Wick Phillips 30(b)(6) - R. Wills
2   Reserve at River Walk.
3         Same ownership percentage reflected
4   there, correct?
5      A.  Yes, sir.
6      Q.  The next one, Heights at
7   Olde Towne.
8         Same ownership percentage reflected
9   there, correct?
10      A.  Yes, sir.
11      Q.  Okay.  I don't think we have to
12   flip further after these.  They say what they
13   say.
14      A.  Okay.
15         MR. MARTIN:  Mr. Brown, I don't
16   pretend to know as much about these
17   transactions as you certainly do, but I
18   do believe that starting with some of
19   the properties towards the back, there
20   are -- while some of the ownership
21   percentages may be the same, you may
22   want to go over them.  Governors Green,
23   Stoney Ridge, Oak Mill --
24         MR. BROWN:  Okay.
25         MR. MARTIN:  The structures do

Page 53

1      Wick Phillips 30(b)(6) - R. Wills
2   change a little bit.
3         BY MR. BROWN:
4      Q.  Okay.  We can do that.  Let's look
5   through each one of them.  Let's just do a
6   page flip.
7         Again, this is Governors Green.
8         With respect to the interests that
9   are reflected in the LLC, they're the same,
10   correct, for Highland and HCRE, as the
11   others, 49 percent and 51 percent
12   respectively?
13      A.  Yes, sir.
14      Q.  Okay.  Let's go down to the next
15   one, Stoney Ridge.
16         Again, focusing just on the
17   ownership interest in the LLC, it's reflected
18   as 49 percent Highland and 51 percent HCRE,
19   correct?
20      A.  Yes, sir.
21      Q.  And the next one, Oak Mill.
22         Again, focusing just on the LLC,
23   the ownership interest is reflected as
24   49 percent for Highland and 51 percent for
25   HCRE.  Correct?

Page 54

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  Yes, sir.
3     Q.  And the next one, which is
4  Battleground Park, and focusing again on the
5  LLC, the ownership interests are reflected as
6  49 percent Highland, 51 percent HCRE.
7  Correct?
8     A.  Yes, sir.
9     Q.  And for Lakes at Renaissance Park,
10 again focusing on the LLC, the ownership
11 percentage is reflected as 49 percent
12 Highland and 51 percent HCRE, correct?
13    A.  Yes, sir.
14    Q.  And for Brandywine -- huh.  Unless
15 I'm missing something, this doesn't even
16 address the LLC interests.
17       MR. MARTIN:  That's one of the
18 reasons I was asking.
19       MR. BROWN:  Pardon me?
20       MR. MARTIN:  That's one of the
21 reasons I was asking.
22       MR. BROWN:  Yeah.  Yeah.
23       MR. MARTIN:  I know you're trying
24 to make your record and I'm not trying
25 to interrupt you.

Page 55

1     Wick Phillips 30(b)(6) - R. Wills
2       MR. BROWN:  Thank you.  I
3  appreciate it.
4  BY MR. BROWN:
5     Q.  So Brandywine just doesn't -- in
6  this chart, the LLC is not even shown,
7  correct?
8     A.  Correct.
9     Q.  Scroll to the next one, please.
10       This one, which is
11 Glenview Reserve, with respect to the LLC, it
12 reflects the same ownership percentage,
13 49 percent in Highland and 51 percent in
14 HCRE, correct?
15    A.  Yes, sir.
16    Q.  Scroll down, please.
17       And, again, this is for Andros
18 Isles.
19       And with respect to the LLC, it is
20 again reflecting and repeating the same
21 ownership percentage of 49 percent in
22 Highland and 51 percent in HCRE.  Correct?
23    A.  Yes, sir.
24    Q.  Again, this is Arborwalk.
25       And with respect to the LLC, the

Page 56

1     Wick Phillips 30(b)(6) - R. Wills
2  same ownership percentages are reflected for
3  Highland and HCRE as on the prior charts,
4  correct?
5     A.  Yes, sir.
6     Q.  For Walker Ranch, which is the next
7  page, the same ownership percentages are
8  reflected for the LLC as on the prior charts,
9  correct?
10    A.  Yes, sir.
11    Q.  And with respect to Towne Crossing,
12 the next page, the same ownership percentages
13 are reflected in the LLC, correct?
14    A.  Yes, sir.
15    Q.  And with respect to the next page,
16 West Place, the same LLC percentages are
17 reflected for Highland and HCRE, correct?
18    A.  Yes, sir.
19    Q.  And the next page, Vista Ridge, the
20 same LLC percentages -- the same ownership
21 percentages are reflected for Highland as
22 HCRE as on the prior charts, correct?
23    A.  Yes, sir.
24    Q.  Next page, which is Hidden Lake.
25       With respect to the LLC, the same

Page 57

1     Wick Phillips 30(b)(6) - R. Wills
2  ownership percentages are reflected for HCRE
3  and Highland as on the prior charts, correct?
4     A.  Yes, sir.
5     Q.  The next page, Arbolita.
6       With respect to the LLC, the same
7  ownership percentages are reflected, correct?
8     A.  Yes, sir.
9     Q.  Next page, Fairways.
10       With respect to the LLC, the same
11 ownership percentages are reflected, correct?
12    A.  Yes, sir.
13    Q.  The next page, with respect to
14 Grand Oasis, it's the same ownership
15 percentages as on the prior charts, correct?
16    A.  Yes, sir.
17    Q.  And with respect to
18 Summers Landing, there is no indication
19 here -- no reflection of the LLC in the
20 chart; is that correct?
21    A.  Yes, sir.  That's correct.
22    Q.  Okay.  I think that takes us
23 through it.  And I apologize for dragging
24 everybody through that, but your counsel is
25 correct that they're not all -- they did not

Wick Phillips 30(b)(6) - R. Wills
1  all reflect the ownership interests in the
2
3  LLC.
4       But is it correct to say that, with
5  respect to Schedule 3.15 of the
6  Loan Agreement, and the charts reflecting the
7  ownership interests of the subsidiaries that
8  do address the ownership interest in the LLC,
9  they all identically reflect that the
10  ownership interest is 41 percent --
11  49 percent in Highland and 51 percent in
12  HCRE?
13     A.  Yes, sir.
14     Q.  And that's consistent with the
15  ownership interest that is set forth in the
16  LLC Agreement, correct?
17     A.  Correct.
18     Q.  Did you become familiar with the --
19  with Schedule 3.15 of the Loan Agreement
20  before or after your designation as the -- as
21  Wick Phillips' Rule 30(b)(6) witness?
22     A.  After.
23     Q.  Did Wick Phillips have any
24  communications with HCRE concerning the
25  charts we just went through that comprise

Wick Phillips 30(b)(6) - R. Wills
1
2  Schedule 3.15 of the Loan Agreement?
3       MR. MARTIN:  Objection, form.
4     A.  Yes, sir.
5  BY MR. BROWN:
6     Q.  And with whom did Wick Phillips
7  have those communications?
8     A.  I don't recall specific names, but
9  different people within both NexPoint and
10  from the in-house team at Highland.
11     Q.  And how do you -- what is the
12  distinction between NexPoint and Highland in
13  Wick Phillips' mind?
14     A.  The NexPoint distinction would be
15  we've always been hired in the real estate
16  silo, only operating on sort of what I would
17  call the property level.
18       And then, sort of like when we're
19  looking at the structure charts in 3.15, once
20  you get up to really the 49/51 percent
21  distinction, Mr. Brown, that you were talking
22  about, that structuring is beyond the scope
23  of our representation and typically goes to
24  in-house or a different law firm handling
25  that side of things for that portion of the

Wick Phillips 30(b)(6) - R. Wills
1
2  company.
3     Q.  Did Highland have separate counsel
4  in connection with the Loan Agreement?
5     A.  I don't know.
6     Q.  So you, testifying here on behalf
7  of Wick Phillips, you don't know any of the
8  names of the individuals with whom
9  Wick Phillips communicated relating to the
10  HCRE representation; is that correct?
11       MR. MARTIN:  Objection, form.
12     A.  No.  That's -- I don't think that's
13  exactly what I said.  We've already gone over
14  a few of the Wick Phillips contacts at
15  NexPoint, Matt McGraner and Matt Goetz.
16  BY MR. BROWN:
17     Q.  Yes.
18     A.  In reviewing some of the
19  correspondence in preparation for this
20  deposition, yes, sir, there are some other
21  names that I'm not familiar with.  My partner
22  at the time would have been having those
23  communications within the context of this
24  transaction.
25       So there's a Paul Broaddus and a

Wick Phillips 30(b)(6) - R. Wills
1
2  handful of other names that I believe had a
3  role in creating some of these charts and
4  passing them along to us, but I don't recall
5  their specific names.
6     Q.  Okay.  So, again, we'll get to
7  those emails and so we can follow up on that.
8       But other than Mr. Geotz,
9  Mr. McGraner, Mr. Chang, and Mr. Broaddus,
10  did Wick Phillips have communications with
11  any other individuals that were
12  representatives of HCRE in connection with
13  the Loan Agreement?
14       MR. MARTIN:  Objection, form.
15     A.  Not that I'm aware of.
16  BY MR. BROWN:
17     Q.  Okay.  Did Wick Phillips have
18  communications with any individuals that were
19  representatives of Highland in connection
20  with the Loan Agreement other than Mr. Goetz,
21  Mr. -- well, strike that.
22       Did Wick Phillips have any
23  communications with representatives of
24  Highland in connection with the
25  Loan Agreement?

Page 62

1      Wick Phillips 30(b)(6) - R. Wills
2          MR. MARTIN: Objection, form.
3      A.  I think with Mr. Broaddus and
4  probably a handful of other folks in
5  connection with some of these charts and
6  structuring.
7  BY MR. BROWN:
8      Q.  When it spoke to, for example,
9  Mr. Broaddus, who was communicating on behalf
10  of Highland, was there another counsel
11  involved for Highland in the communications
12  that Wick Phillips had for Mr. Broaddus?
13      A.  I believe in connection with some
14  of the structuring, yes, sir.
15      Q.  And who would that have been?
16      A.  I believe it was Hunton & Williams.
17      Q.  So you believe that
18  Hunton & Williams was involved in the
19  representation of Highland in connection with
20  the Loan Agreement?
21          MR. MARTIN: Objection, form.
22      A.  In connection with the
23  organizational structure, yes, sir.
24  BY MR. BROWN:
25      Q.  Are you sure you're not conflating

Page 63

1      Wick Phillips 30(b)(6) - R. Wills
2  that with the representation of Highland in
3  connection with the LLC?
4      A.  No, sir.  I mean -- no, I guess, is
5  the short answer.
6      Q.  And are you aware of any writings
7  that reflect that the Hunton firm represented
8  Highland in connection with the
9  Loan Agreement?
10      A.  I'm not aware of those.
11      Q.  And what do you base your
12  conclusion on that the Hunton firm
13  represented Highland in connection with the
14  Loan Agreement?
15      A.  Because Hunton is typically the
16  Highland tax counsel that provides the
17  organizational charts that are attached to
18  the Loan Agreement.
19      Q.  And do you have independent -- do
20  you have knowledge -- did the organizational
21  charts that comprise Schedule 3.15 of the
22  Loan Agreement, did they come from Hunton?
23          MR. MARTIN: Objection, form.
24      A.  They came from Highland.  So beyond
25  that, I'm not sure.

Page 64

1      Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3      Q.  Okay.  So are you aware of any
4  communications that Wick Phillips had with
5  Hunton directly in connection with the
6  Loan Agreement?
7      A.  No, sir.
8      Q.  So you have no independent
9  knowledge -- you have no knowledge, do you,
10  that Hunton represented Highland in
11  connection with the Loan Agreement, do you?
12          MR. MARTIN: Objection, form.
13      A.  I don't know.  Section 3.15 is part
14  of the Loan Agreement.  So that's where I'm
15  getting a little hung up, I suppose.
16  BY MR. BROWN:
17      Q.  Okay.  And what part of Section --
18  of Schedule 3.15 leads you to believe that
19  Hunton represented Highland in connection
20  with the Loan Agreement?
21          MR. MARTIN: Objection, form.
22      A.  I guess it's just a little bit of
23  deduction because Wick Phillips did not.  So
24  it's either Highland in-house or their
25  typical tax counsel, which is Hunton, or DST

Page 65

1      Wick Phillips 30(b)(6) - R. Wills
2  counsel or REIT counsel.
3      So I can't say for certain that
4  it's Hunton, but I can say for certain that
5  it's not Wick Phillips.
6  BY MR. BROWN:
7      Q.  So you can say -- I'm sorry.  You
8  can say for certain that what is not
9  Wick Phillips?
10      A.  That we did not -- we had no role
11  in these org charts, which you're saying did
12  Hunton represent Highland in connection with
13  the Loan Agreement.
14      And I'm saying, it looks like it
15  because these org charts were not prepared by
16  Wick Phillips, so somebody represented
17  Highland in connection with the
18  Loan Agreement, to answer that question.
19      Q.  But you're speculating that it was
20  Hunton, correct?
21      A.  That -- I just said I don't know
22  for certain that it was Hunton.
23      Q.  You actually -- as you sit here
24  today, you have no idea whether it was Hunton
25  or whether any firm was involved in preparing

Page 66

Wick Phillips 30(b)(6) - R. Wills

1  those charts, do you?
2     A.  That's correct.
3     Q.  Okay.  Can you describe the
4  conversations that Wick Phillips had with
5  HCRE concerning the organization charts that
6  are attached to -- as Schedule 3.15 to the
7  Loan Agreement?
8     A.  Generally, yes.  To get an
9  understanding of what the structure was for
10  each of the properties so that we could
11  accurately communicate that to the lender.
12     Q.  Okay.  Can you give me any more
13  detail as to what those communications were
14  beyond what you just testified to?
15     A.  You know, it would -- sort of like
16  we had just talked about, it would be whether
17  it was going to be part of the restructure, a
18  DST structure, you know, for purposes of
19  communicating which buckets those would fall
20  in, whether it's KeyBank or Freddie.
21     Q.  Are you aware that the
22  Loan Agreement contained representations and
23  warranties?
24     A.  Yes, sir.
25

Page 67

Wick Phillips 30(b)(6) - R. Wills

1     Q.  And are you aware that those
2  representations and warranties on multiple
3  occasions included reps and warranties by the
4  borrowers relating to the subsidiaries?
5     A.  Yes, sir.
6     Q.  Did Wick Phillips perform any
7  diligence on behalf of any of its clients in
8  connection with the Loan Agreement to
9  determine if the representations and
10  warranties in the Loan Agreement that related
11  to the subsidiaries were true and accurate?
12     A.  Diligence as far as asking the
13  client if their org chart is accurate?  Yes.
14     Q.  And what did it do to diligence the
15  reps and warranties and, in particular, the
16  reps and warranties relating to the
17  subsidiaries as they're reflected on
18  Schedule 3.15?
19     A.  Confirm with the people that
20  prepared the org charts.
21     Q.  So what were those communications?
22  What was the substance of those
23  communications?
24     A.  I don't know.
25

Page 68

Wick Phillips 30(b)(6) - R. Wills

1     Q.  Okay.  Do you know who
2  Wick Phillips had these discussions relating
3  to diligencing the reps and warranties
4  relating to the subsidiaries?
5     A.  Yes.  At the time it would have
6  been primarily D.C. Sauter.  And then --
7     Q.  Could you spell that?
8     A.  Sure.  It's just the initials D,
9  like dog, C, like Charles.
10     Q.  Yep.
11     A.  Sauter, S-a-u-t-e-r.
12     Q.  And who was D.C. Sauter a
13  representative of, what entity?
14     A.  He was a partner at Wick Phillips.
15     Q.  Oh, okay.  So he was the
16  Wick Phillips lawyer that would have
17  diligenced -- done the underlying work to
18  diligence the reps and warranties relating to
19  the subsidiaries, correct?
20     A.  Yes, sir.
21     Q.  Did you speak to him in connection
22  with your preparation for your testimony as
23  the designated witness of Wick Phillips?
24     A.  Yes, sir.  We spoke yesterday.
25

Page 69

Wick Phillips 30(b)(6) - R. Wills

1     Q.  Okay.  And so on behalf of
2  Wick Phillips, who did Wick Phillips speak to
3  in connection with diligencing the reps and
4  warranties in the Loan Agreement relating to
5  the subsidiaries?
6     MR. MARTIN:  Objection, form.
7     A.  It would have been the laundry list
8  of folks we've been over, whether it was
9  Paul Broaddus, Freddy Chang, Matt McGraner,
10  someone within the NexPoint or Highland team
11  that had created those charts and could tell
12  us that they were accurate.
13  BY MR. BROWN:
14     Q.  Okay.  It's your understanding that
15  Wick Phillips made a determination that the
16  charts that comprise Schedule 3.15 and the
17  reps and warranties in the Loan Agreement
18  relating to those charts were true and
19  accurate, correct?
20     A.  Yes, sir.
21     Q.  And do you know if Wick Phillips
22  had an understanding when it did this due
23  diligence and spoke to that group of people
24  you had identified earlier, Goetz, McGraner,
25

Page 70

Wick Phillips 30(b)(6) - R. Wills
1
2 Chang, and Broaddus, I believe were the
3 universe; is that correct?
4        MR. MARTIN: Objection, form.
5    A. Yes, sir.
6 BY MR. BROWN:
7    Q. Okay. So of those four people,
8 did -- how did Wick Phillips determine what
9 hat those individuals were wearing when it
10 spoke to them, i.e., were they speaking on
11 behalf of HCRE or were they speaking on
12 behalf of Highland or were they speaking on
13 behalf of some other borrower?
14        MR. MARTIN: Objection, form.
15 BY MR. BROWN:
16    Q. Do you understand the question,
17 Mr. Wills?
18    A. Yes. I can answer the question.
19        The Matt McGraner, Matt Goetz part
20 of things is NexPoint. So they should
21 communicate to us from the borrower level --
22 I'm sorry, the SE Multifamily Holdings LLC
23 level down, as we got down to the property
24 level.
25        And then Paul Broaddus, on that

Page 71

Wick Phillips 30(b)(6) - R. Wills
1
2 side of things on the Highland level, is what
3 handles the chain up, or the chart up. And
4 so we would rely on their understanding of
5 the chart and the accuracy of that chart.
6    Q. Okay. You said McGraner was
7 speaking on behalf of NexPoint; is that
8 correct?
9    A. Yes, sir.
10    Q. And who else did you say was
11 speaking on behalf of NexPoint?
12    A. Matt Goetz.
13    Q. Okay. Do you know whether McGraner
14 was also a representative of Highland or had
15 any affiliation with Highland?
16    A. I don't.
17    Q. What about Geotz? Do you know if
18 he had any affiliation with Highland?
19    A. I don't know.
20    Q. And Wick Phillips understood, did
21 it not, that the lender under the
22 Loan Agreement would be relying on the reps
23 and warranties made by the borrower, correct?
24    A. Yes, sir.
25    Q. And Wick Phillips understood that

Page 72

Wick Phillips 30(b)(6) - R. Wills
1
2 an incorrect or false representation or
3 warranty was an event of default under the
4 Loan Agreement, correct?
5    A. Yes, sir.
6    Q. And the event of default could lead
7 to acceleration of the amounts due, correct?
8    A. Yes, sir.
9        MR. BROWN: Can we attach -- or can
10    we mark Exhibit D.
11        (Email chain, "RE: Project Unicorn
12        - Final Org Charts," with
13        attachments, marked as Exhibit D.)
14        MR. BROWN: Okay. So can we scroll
15    down to the first email in the chain?
16    Okay. That's the one I want to focus on
17    for right now.
18 BY MR. BROWN:
19    Q. Okay. So Mr. Wills, focusing on
20 the email that's on the screen, it's the
21 Monday, September 17, 2018, email that is
22 sent by Rachel Sam at 4:21 p.m.
23    A. Uh-huh.
24        MR. MARTIN: You need to say "yes"
25    or "no."

Page 73

Wick Phillips 30(b)(6) - R. Wills
1
2        THE WITNESS: Yes.
3 BY MR. BROWN:
4    Q. Okay. Have you seen that email
5 before?
6    A. Yes.
7    Q. Who is Rachel Sam?
8    A. She is an attorney at
9 Wick Phillips.
10    Q. Okay. This email was sent by
11 Rachel Sam?
12    A. Yes, sir.
13    Q. And you have seen it before?
14    A. Yes, sir.
15    Q. Before or after your designation?
16    A. After.
17    Q. Okay. And did you review this
18 email as part of your preparation to testify
19 today?
20    A. Yes, sir.
21    Q. So this email, the caption is
22 "Final Org Charts."
23        And if we scroll down further to
24 the attachments, they are either -- and I
25 can't tell, but they are either -- this is

Page 74

1       Wick Phillips 30(b)(6) - R. Wills
2  this first email, says -- I'm sorry, the
3  first attachment refers to Governors Green.
4       And this is either one of the
5  charts attached to Schedule 3.15 in the
6  Loan Agreement or some prior and very similar
7  version to it.
8       Would you say that's accurate?
9       MR. MARTIN: Objection, form.
10  A.  Yes, sir.
11 BY MR. BROWN:
12  Q.  And, again, on the org chart, as
13 with all of the org charts attached as
14 Schedule 3.15 that contain a reference to the
15 LLC, this org chart provides that the
16 ownership interests are 51 percent HCRE and
17 49 percent Highland, correct?
18  A.  Yes, sir.
19  Q.  And if we could scroll down to the
20 next org chart.
21      Again, this one is Stoney Ridge.
22      And would you agree that this is
23 either the same chart that's attached to --
24 as Schedule 3.15 or a virtually identical
25 version and certainly identical with respect

Page 75

1       Wick Phillips 30(b)(6) - R. Wills
2  to the ownership interests in the LLC?
3   A.  Yes, sir.
4   Q.  Scroll down one more chart, please.
5       With respect to the attachment to
6  Rachel Sam's email regarding Oak Mill
7  Apartments, again, would you agree that this
8  is either identical to the schedule attached
9  as -- to the chart attached for -- to
10 Schedule 3.15 or a virtually identical
11 version, and certainly identical with respect
12 to the reflection of the ownership interests
13 in the LLC?
14  A.  Yes, sir.
15      MR. BROWN: Okay.  Scroll down
16 again.  I think that's the end.  Yeah.
17 Okay.
18      Let's go back to the email, the
19 September 17 email.
20 BY MR. BROWN:
21  Q.  Okay.  So in her email, Ms. Sam is
22 writing or emailing to, if you look up to the
23 "To" line, Matt McGraner, who you've
24 referenced before.  There are two -- there's
25 an entry for him showing a Highland Capital

Page 76

1       Wick Phillips 30(b)(6) - R. Wills
2  email address, correct?
3   A.  Yes, sir.
4   Q.  And you had previously testified
5  that you believed he was a representative of
6  NexPoint, correct?
7   A.  Yes, sir.
8   Q.  Does this refresh your recollection
9  or change your conclusions as to whether or
10 not he was also a representative of Highland?
11      MR. MARTIN: Objection, form.
12  A.  No, sir.
13 BY MR. BROWN:
14  Q.  Okay.  Do you have any idea why
15 Mr. McGraner has a Highland Capital email
16 address?
17  A.  No, sir.
18  Q.  And, again, it's also to Mr. Geotz,
19 who you also, I believe, testified that
20 Wick Phillips was communicating with on
21 behalf of NexPoint.
22      He also has a Highland Capital
23 email address, correct?
24  A.  Yes, sir.
25  Q.  And does that change your

Page 77

1       Wick Phillips 30(b)(6) - R. Wills
2  conclusion or refresh your recollection as to
3  whether or not Mr. Goetz was also a
4  representative of Highland Capital or
5  Highland?
6   A.  No, sir.  No, sir.
7   Q.  I want to make sure the record is
8  correct.  I meant to just say Highland
9  because we've defined the Debtor as Highland.
10      Does this refresh your recollection
11 or change your conclusion as to whether
12 Mr. Goetz was a representative of Highland?
13  A.  No, sir.
14  Q.  Okay.  And do you know who
15 Bonner McDermett is?
16  A.  Yes, sir.  I believe he is an
17 analyst with Mr. Goetz and Mr. McGraner.
18  Q.  And do you know whether or not he
19 is a representative of Highland or some other
20 entity?
21  A.  I do not know.
22  Q.  You also had referred to
23 Mr. Broaddus, who is another recipient of
24 this email, also with a Highland Capital
25 email address?

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  Yes, sir.
3      Q.  Do you know whether Mr. Broaddus is
4  a representative of Highland?
5      A.  I believe that's correct.
6      Q.  Okay.  And also Freddy Chang, who I
7  believe you also referenced, with a
8  Highland Capital email address.
9          Do you know who Freddy Chang is a
10 representative of?
11     A.  I believe he's NexPoint, some sort
12 of in-house counsel role.
13     Q.  Okay.  And do you know why he has a
14 Highland Capital email address?
15     A.  No, sir.
16     Q.  Okay.  And the cc is to D.C. Sauter
17 of Wick Phillips, correct?
18     A.  Yes, sir.
19     Q.  And other than D.C. Sauter, there
20 are no other outside lawyers that are on --
21 that are recipients of this email, correct?
22     A.  That's correct.
23     Q.  So this email by Rachel Sam, the
24 Wick Phillips lawyer says:
25         "I made a couple of clean up

1  changes to the DST org charts and am
2  waiting for signoff from
3  Baker McKenzie.  Once I hear back from
4  Baker, I will circulate those updated
5  org charts."
6          So you, I believe, testified
7  earlier that Wick Phillips didn't make any
8  changes to the org charts.  Does this refresh
9  your recollection as to whether or not
10 Wick Phillips made changes to the org charts?
11     A.  Yeah.  It looks like Rachel may
12 have cleaned up some typos that she got from
13 DST counsel.
14     Q.  Does this refer to typos?
15     A.  "Clean up" is what I would
16 interpret as typo.
17     Q.  You're assuming that clean up means
18 typo?
19     A.  Yes, sir.
20     Q.  But you don't know, do you?
21     A.  I do not.
22     Q.  So, for example, you don't know
23 whether the changes related to substance, do
24 you?

1      Wick Phillips 30(b)(6) - R. Wills
2          MR. MARTIN:  Objection, form.
3      A.  Well, I do because we are not DST
4  counsel.  So we would not be making material
5  changes to the DST org chart.
6  BY MR. BROWN:
7      Q.  Whether DST -- Delaware Statutory
8  Trust is what DST means, correct?
9      A.  Yes, sir.
10     Q.  And the reason you say you know
11 that the changes were, quote, "typos" is
12 because -- tell me again?
13     A.  Well, they're attached and we just
14 went through and said they're substantially
15 similar to what's in the Loan Agreement.
16         And quite frankly, we don't have
17 DST counsel here.  We don't have that
18 capability.  So we wouldn't -- we wouldn't be
19 making those changes.
20     Q.  Okay.  But again, you're
21 speculating, correct?  You don't know.
22         MR. MARTIN:  Objection, form.
23 BY MR. BROWN:
24     Q.  You don't know what changes Rachel
25 made, do you?

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  No, sir.
3          MR. BROWN:  Okay.  Can we scroll up
4  to the next email.
5  BY MR. BROWN:
6      Q.  Again, this is a -- appears to be
7  the next email on the chain.  It's just under
8  an hour later, at 5:16 p.m., to the same
9  group with a copy to D.C. Sauter, and it's
10 Rachel again here saying:
11         "Just wanted to follow up on the
12 org charts.  Let us know if you have
13 any comments or if these are okay to
14 submit to Freddie."
15         Does that -- have you seen that
16 email before?
17     A.  Yes, sir.
18     Q.  And is that an email that
19 Rachel Sam of Wick Phillips sent to all the
20 people reflected on the "To" and "cc" line?
21     A.  Yes, sir.
22     Q.  Okay.  Let's scroll up to the next
23 email.  And this is -- have you seen this
24 email before?
25         It's the September 18, 2018, email

Page 82

1      Wick Phillips 30(b)(6) - R. Wills
2 from Freddy Chang with a Highland Capital
3 email address, to Rachel Sam, again,
4 regarding the final org charts.  And it's
5 Freddy Chang asking, "Are the DST org charts
6 ready to go?"  Asking Rachel.
7      Have you seen this before?
8   A.  Yes, sir.
9   Q.  And is this an email that was
10 received by Wick Phillips?
11   A.  Yes, sir.
12   Q.  Okay.  Next email.
13      This appears to be Rachel Sam's
14 response to Freddy Chang's prior email at
15 7:45.  It's like seven minutes later, at
16 7:52, from Rachel Sam to Freddy Chang,
17 copying D.C. Sauter.
18      Have you seen this email before?
19   A.  Yes, sir.
20   Q.  And was this email sent by
21 Wick Phillips?
22   A.  Yes, sir.
23   Q.  And in response to Mr. Chang's
24 inquiry to Rachel Sam if the DST org charts
25 were ready to go, Rachel says:

Page 83

1      Wick Phillips 30(b)(6) - R. Wills
2      "The only remaining question is
3      whether we will be converting or
4      merging the borrower-level DST owner
5      entities.  The org charts currently
6      reflect that the owner entities 'may
7      be converted.'"
8      Is that a -- is that a substantive
9 question regarding the structure of the
10 subsidiaries, in your opinion?
11   A.  A substantive question from --
12   Q.  Yeah.  I mean, you said all that
13 was done was typos and passing on, you know,
14 information that other people provided.  You
15 said that that was all Wick Phillips did.
16      But here, this email seems to ask a
17 substantive question regarding converting or
18 merging borrower-level DST owner entities.
19      MR. MARTIN:  Objection, form.
20   A.  Yes, sir.  Again, we're at this
21 point a conduit between Baker McKenzie, DST
22 counsel, REIT counsel, and -- Rachel is
23 simply reiterating the outstanding item for
24 Baker McKenzie to complete on the org chart
25 so we can accurately deliver that to Freddie

Page 84

1      Wick Phillips 30(b)(6) - R. Wills
2 Mac.
3 BY MR. BROWN:
4   Q.  Is Baker McKenzie on any of these
5 emails?
6   A.  Yes, sir.  The first one we looked
7 at.
8   Q.  The initiating email by Rachel Sam
9 of September 17, 2018?
10   A.  Yes, sir.
11      MR. BROWN:  Okay.  Let's scroll --
12   I must be missing something.  Let's
13   scroll to the bottom.  There.  That
14   email.
15 BY MR. BROWN:
16   Q.  Can you point to the Baker McKenzie
17 recipient for me?
18   A.  No.  I'm sorry.  I may have been
19 speaking past you.  I'm referencing the
20 substance of the email.
21   Q.  Oh, I see.  Okay.  "I'm waiting for
22 signoff from Baker McKenzie."
23      Okay.  I got it.
24      And who did Baker McKenzie
25 represent?

Page 85

1      Wick Phillips 30(b)(6) - R. Wills
2   A.  I'm not certain.  I just know
3 they're DST counsel on the Highland side.
4   Q.  Delaware Statutory Trust counsel;
5 it's your understanding that that's who they
6 represented?
7   A.  Yes, sir.
8      (Telephonic interruption.)
9   Q.  Okay.  Let's go back to where we
10 were, the September 18 email, "The only
11 remaining question."
12      Okay.  Scroll up one email.  Okay.
13 And this is a September 18 email, again, one
14 minute after Rachel's email at 7:52, from
15 Freddie Chang to Rachel Sam copied to
16 D.C. Sauter.  And it's Rachel Sam saying:
17      "Thanks.  Are you working on the
18      REIT share acquisition org charts?"
19      And the only question I have for
20 you on that, Mr. Wills, is did Wick Phillips
21 receive that email?
22   A.  Yes, sir.
23   Q.  Okay.  And scroll up to
24 Rachel Sam's response.
25      Rachel Sam responds four minutes

Page 86

1       Wick Phillips 30(b)(6) - R. Wills
2   later, at 7:57, to the inquiry by
3   Freddie Chang:
4       "Yes, the current versions of
5   those" -- being the REIT share
6   acquisition charts -- "are attached.
7   Paul has previously reviewed and
8   approved these, but let us know if you
9   have any comments."
10      So did Wick Phillips receive this
11  email?
12  A.  Yes.
13  Q.  Do you know who Paul is?
14  A.  I believe Paul Broaddus.
15      MR. BROWN:  Okay.  So it's now
16  about an hour from the last time we took
17  a break, and I would like to take a
18  five-minute break, if that's okay with
19  everybody.
20      MR. MARTIN:  It's your deposition.
21  Sure.
22      MR. BROWN:  All right.  Let's
23  reconvene in about five minutes.
24      MR. MARTIN:  Okay.  Thank you.
25      (Recess taken.)

Page 87

1       Wick Phillips 30(b)(6) - R. Wills
2       MR. BROWN:  So let's get Exhibit D
3   back on the screen.  And let's go to the
4   bottom of the initiating email.
5   BY MR. BROWN:
6   Q.  So, again, Mr. Wills, I just want
7   to focus on these emails in particular, as
8   opposed to more generally, which I have
9   discussed in more general terms.
10      But Rachel Sam is communicating
11  here with the people on the "To" line:
12  Matt McGraner with the Highland Capital email
13  address, Matt Goetz with the Highland Capital
14  email address, Bonner McDermett with the
15  Highland Capital email address, Paul Broaddus
16  with the Highland Capital email address, and
17  Freddy Chang with the Highland Capital email
18  address.
19      Does Wick Phillips have knowledge
20  of the capacity that it was communicating
21  with these individuals in?
22      In other words, who were these
23  individuals representing -- who were these
24  individuals representing in these
25  communications, which entities?

Page 88

1       Wick Phillips 30(b)(6) - R. Wills
2       And I'm interested in Wick
3   Phillips' knowledge and not your speculation.
4   A.  Sure.  So from our knowledge,
5   Matt McGraner, Geotz, Bonner McDermett, and
6   Freddy Chang are NexPoint.  Paul Broaddus is
7   Highland.  And there's a shared services
8   agreement between the two companies, and so
9   they're operating somewhat together.
10  Q.  In other words, Highland and
11  NexPoint are operating together; is that what
12  you mean?
13  A.  Yes, sir.
14  Q.  And are any of these individuals
15  that Rachel Sam was communicating with in
16  these emails, are they representatives of
17  HCRE, the lead borrower?
18  A.  I don't know.
19  Q.  Would Wick Phillips have been
20  communicating with the lead borrower in
21  connection with its communications relating
22  to the Loan Agreement?
23  A.  I would assume so.
24  Q.  Do you know who Mark Patrick was or
25  is?

Page 89

1       Wick Phillips 30(b)(6) - R. Wills
2   A.  I believe he's an attorney with
3   Highland.
4   Q.  Do you know why he wasn't included
5   on these emails?
6   A.  No, sir.
7   Q.  And this email string, which is
8   Exhibit D, this relates to Wick Phillips'
9   work on the Loan Agreement, correct?
10  A.  Yes, sir.
11  Q.  And did these emails reflect some
12  of the work that Wick Phillips did in
13  connection with the Loan Agreement?
14  A.  Yes, sir.
15  Q.  Other than what's reflected in
16  these emails, do you know what other work
17  Wick Phillips did relating to the org charts
18  that constitute Schedule 3.15 of the
19  Loan Agreement?
20      MR. MARTIN:  Objection, form.
21  A.  Yes.  I mean, just as part of the
22  legal diligence in connection with, you know,
23  a loan checklist, making sure that the org
24  charts that we receive and are delivering
25  back to the lender are approved by the

Page 90

Wick Phillips 30(b)(6) - R. Wills

1      business parties, and then, therefore, we can
2      get them to Freddie or KeyBank or whomever
3      needs to have those and then have them
4      checked off of the diligence portion of the
5      checklist.
6  BY MR. BROWN:
7      Q.   In connection with the org charts
8  that show up as Schedule 3.15 of the
9  Loan Agreement, who was Wick Phillips taking
10 instructions from on behalf of the borrowers?
11     A.   I think primarily the parties you
12 see here, both from The NexPoint side and
13 Mr. Broaddus.
14     Q.   On the Highland side?
15     A.   Yes, sir.
16     Q.   Other than this email, are you
17 aware of other -- I'm sorry.  Other than this
18 email string, are you aware of other
19 communications between Wick Phillips and any
20 of the borrowers concerning the org charts?
21     A.   No, sir.
22        MR. BROWN:  Can we put Exhibit E up
23 on the screen, please.
24        (Email chain, "RE: Unicorn - DSTs",

Page 91

Wick Phillips 30(b)(6) - R. Wills

1          marked as Exhibit E.)
2  BY MR. BROWN:
3      Q.   Okay.  Exhibit E appears to be an
4  August 18, 2018 [sic] email from
5  Paul Broaddus; is that correct?
6      A.   Yes, sir.
7      Q.   And have you seen this email
8  before?
9      A.   Yes, sir.
10     Q.   Before or after your designation?
11     A.   After.
12     Q.   Did you review it in connection
13 with your preparation for your testimony
14 today?
15     A.   Yes, sir.
16     Q.   And it appears that there are a
17 number of recipients to this.  One of them is
18 D.C. Sauter; is that right?
19     A.   Yes, sir.
20     Q.   So Wick Phillips did receive this
21 email from Paul Broaddus, correct?
22     A.   Yes, sir.
23     Q.   And Paul Broaddus is -- as you have
24 previously testified, was a representative of

Page 92

Wick Phillips 30(b)(6) - R. Wills

1  Highland in connection with Wick Phillips'
2  role representing the borrowers in the
3  Loan Agreement, correct?
4      A.   Yes, sir.
5      Q.   And the initiating email of
6  July 27, the first email in the string, which
7  is the second email on Exhibit E,
8  indicates -- it says:
9          "Hi.  Please see attached as
10 discussed for the basic DST charts.
11 Please note the open items.
12         "Should we have a call next week?
13         "Want to specifically discuss the
14 items that will need to be closed
15 out sooner rather than later.
16         "Thanks.  Paul."
17         So, again, did Wick Phillips
18 receive this email?
19     A.   Yes, sir.  It looks that way.
20     Q.   As well as the attachments,
21 correct?
22         And maybe we should look at the
23 attachments too.  So if we could scroll
24 further.

Page 93

Wick Phillips 30(b)(6) - R. Wills

1          Okay.  So let's -- the first page
2  of the attachment says "Open items:
3  Economics/ownership of JV LLC."
4          Do you know what that refers to?
5      A.   Not specifically, no.
6      Q.   Okay.  Could we scroll to the next
7  page of the attachment to Paul Broaddus'
8  email.  No.  We can --
9          Have you seen the attachments
10 before, Mr. Wills?
11     A.   Yes, sir.
12     Q.   Okay.  Let's scroll to the next
13 page.
14         Okay.  This attachment reverts to
15 the ownership interests of a JV -- of the JV
16 LLC, which was referred to in the first
17 document as being -- to be determined, but
18 approximately 51 percent for Partner 1 and
19 49 percent for Partner 2.
20         Do you know whether this is
21 referring to the LLC, which is the subject of
22 the, I think, Exhibit D in our case here?
23 It's the SE Multifamily LLC Agreement.
24         Is that what this refers to?

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  That's what it looks like.  Yes,
3  sir.
4      Q.  Yeah.  And just to go back and
5  trace the history, the SE Multifamily
6  Holdings LLC Agreement was dated August 23.
7  The email that this was attached to is dated
8  August 1.  So this would have been -- this
9  email would have been sent prior to the
10  original LLC Agreement.
11      And this would have been the
12  discussions about the formation of it,
13  correct?
14      A.  Yes, sir.
15      Q.  Okay.  Can we scroll to the next
16  page.
17      And, again, this chart called DST
18  Properties LLC reflects ownership interest of
19  Partner 1 at 51 percent and Partner 2 at
20  49 percent for the LLC to be formed, correct,
21  which subsequently we learned was the SE
22  Multifamily Holdings LLC Agreement, correct?
23      A.  Yes, sir.
24      Q.  Okay.  Can we scroll forward again?
25      Again, this is another chart that

1      Wick Phillips 30(b)(6) - R. Wills
2  refers to the ownership interests of the
3  to-be-formed LLC Agreement, ultimately which
4  became SE Multifamily Holdings LLC, correct?
5      A.  Yes, sir.
6      Q.  And it reflects the same ownership
7  interests as we saw in Schedule 3.15 to the
8  Loan Agreement and in the LLC Agreement,
9  correct?
10      A.  Yes, sir.
11      Q.  Okay.  Next chart.
12      That's not sufficiently legible to
13  me.  Let's see.  Yeah.  I think we can pass
14  on this.
15      Do you have any idea what these
16  represent?
17      MR. MARTIN:  Objection, form.
18      A.  It's tough to make it out, but -- I
19  don't know if this is the structure that
20  Starwood had, who was the owner of the
21  portfolio, and they're just reflecting that,
22  or if this is a proposed structure for the
23  acquisition itself.
24  BY MR. BROWN:
25      Q.  And this is Highland263748,

1      Wick Phillips 30(b)(6) - R. Wills
2  correct?
3      A.  Yes, sir.
4      Q.  Of Exhibit E.
5      A.  Correct.
6      Q.  Okay.  Next chart, please.
7      And, again, this would be
8  Highland263749.
9      Do you know what this is?
10      A.  Similarly, it's tough to tell, but
11  more of the same if that was the existing
12  structure of the asset at the time of the
13  acquisition.
14      Q.  Next chart, please.  This is
15  263750.
16      Again, do you know what this is?
17      A.  Same thing, existing structure.
18      Q.  Next chart.  Same answer for
19  263751?
20      A.  Yes, sir.  It just looks like the
21  underlying property or asset changes.  But,
22  yes, sir.
23      Q.  Okay.  Next chart.
24      Go to the next chart after this.
25  And the next chart.  Next chart.  Keep going.

1      Wick Phillips 30(b)(6) - R. Wills
2  Keep going.  Keep going.
3      Okay.  One more -- okay.  One more.
4      This is a different format.  Do you
5  know how this is different from the
6  other charts?
7      A.  I don't know why.  It just looks
8  like a different structure.
9      Q.  Okay.  Let's go back to the
10  original email.
11      Hold on a second.  It says
12  K&E Draft on all of these charts.
13      What does that mean?
14      A.  I believe Kirkland & Ellis.
15      Q.  Okay.  And were these generated by,
16  do you know, the seller -- the potential
17  seller of the assets to the limited -- to the
18  LLC?
19      A.  Yes, sir.  I believe this was the
20  existing structure in place.
21      Q.  I see.
22      A.  At the time.
23      Q.  Okay.  Let's go back to the
24  original email.
25      Okay.  On both these emails from

1    Wick Phillips 30(b)(6) - R. Wills
2 Paul Broaddus, the July 27 email and the
3 August 1 email that constitute Exhibit E,
4 they were sent and received by D.C. Sauter of
5 Wick Phillips, correct?  They were sent to
6 and received by D.C. Sauter?
7    A.  Yes, sir.
8    Q.  And do you know if Wick Phillips
9 ever responded to these emails in any way?
10    A.  I don't believe so.
11    Q.  Okay.  Did Wick Phillips have any
12 communications with Paul Broaddus relating to
13 the charts attached on these emails?
14    A.  Not other than what we previously
15 discussed.
16    Q.  Okay.  Let's move on to Exhibit F.
17       (SE Multifamily Holdings LLC First
18       Amended and Restated Limited
19       Liability Company Agreement, marked
20       as Exhibit F.)
21 BY MR. BROWN:
22    Q.  So Exhibit F is the SE Multifamily
23 Holdings LLC First Amended and Restated
24 Limited Liability Company Agreement, dated as
25 of March 15, 2019, to be effective August 23,

1    Wick Phillips 30(b)(6) - R. Wills
2 2018, correct?
3    A.  Yes, sir.
4    Q.  And is this a true copy of that,
5 this Agreement?
6    A.  It looks to be so, yes, sir.
7       MR. BROWN:  Let me just digress for
8 a moment.
9       Lauren, we had agreed by emails
10    that the documents attached to both
11    declarations, the Morris declaration and
12    the McGraner declaration, that we could
13    stipulate to their authenticity.
14       MS. DRAWHORN:  Yes.
15       MR. BROWN:  So with respect to
16    Exhibit B to this deposition, the
17    original LLC Agreement, the
18    Loan Agreement, I believe, which is
19    Exhibit C, and this Loan Agreement,
20    Exhibit F, the Amended and Restated
21    Limited Liability Agreement, we're
22    agreeing that they're authentic.
23       We're reserving whatever other
24    objections, but nobody -- we're agreeing
25    as to authenticity.  So I'm not going to

1    Wick Phillips 30(b)(6) - R. Wills
2 worry about dealing with that in this
3 deposition.
4    Is that agreed, they're authentic?
5       MS. DRAWHORN:  Yes.  That's agreed.
6 BY MR. BROWN:
7    Q.  So tell me what this
8 document is, Mr. Wills.
9    A.  Sure.  It's the Amended and
10 Restated LLC Agreement for SE Multifamily
11 Holdings.  My understanding in talking to
12 D.C. Sauter was that KeyBank retraded us at
13 the last minute and pulled back some of the
14 previously committed funds, and so we were
15 short about 20 million, which is why we
16 needed to bring in additional equity.
17       There was a previous relationship
18 with BH on some prior multifamily deals, and
19 so BH came in as the bridge equity, for lack
20 of a better term.  So the contributions
21 changed and it's memorialized here.
22    Q.  Do you know where they're
23 memorialized in the Agreement?  And I can
24 tell you if we flip to Schedule A.
25    A.  Yes, sir.  That's where I was going

1    Wick Phillips 30(b)(6) - R. Wills
2 as well.
3       (Email chain, "FW: Draft LLC
4       Agreement," marked as Exhibit H.)
5 BY MR. BROWN:
6    Q.  Okay.  So you had referred to BH in
7 your testimony you just gave.
8       And if you look at Schedule A to
9 the Amended LLC Agreement, it provides the
10 capital contributions and percentage
11 interest, correct?
12    A.  Correct.
13    Q.  And is this Schedule A, the chart
14 on Schedule A reflecting current -- the
15 percentage interest, is that what you were
16 referring to in terms of changing the
17 ownership interest?
18    A.  Yes, sir.
19    Q.  And is that an accurate statement
20 regarding the ownership interest of the
21 parties?
22    A.  I believe it accurately shows the
23 BH portion, and on the remainder, I'm not
24 positive.
25    Q.  Okay.  Let me -- let's back up a

Page 102

1    Wick Phillips 30(b)(6) - R. Wills
2 little bit.
3       Did -- what was Wick Phillips' role
4 in connection with the Amended and Restated
5 Limited Liability Company Agreement that's
6 Exhibit E?
7       Let's just -- I'm going to try to
8 make it simple.
9       Like we referred to the original
10 Agreement in this deposition as the
11 LLC Agreement, can we refer to this as -- if
12 I refer to this as the Amended LLC Agreement,
13 you'll understand I'm referring to Exhibit F,
14 correct?
15    A.  Yes, sir.
16    Q.  Okay.  So what was Wick Phillips'
17 role in connection with the Amended
18 LLC Agreement?
19    A.  We did not have one, other than
20 delivering, you know, and communicating with
21 KeyBank on the modified structure.
22    Q.  Okay.  So I don't believe I have
23 seen any -- well, let me back up.
24       How were the communications with
25 KeyBank on the modified structure?  What form

Page 103

1    Wick Phillips 30(b)(6) - R. Wills
2 did those communications take?
3    A.  I would assume telephonic or email.
4       MR. BROWN:  Hayley, are you on the
5 call?
6       MS. WINOGRAD:  Yes.  I'm here.
7       MR. BROWN:  I have not seen and I
8 don't know if -- I don't think we've
9 received any communications between
10 Wick Phillips and KeyBank relating to
11 the Amended LLC Agreement, have we?
12       MS. WINOGRAD:  I haven't seen any,
13 no.
14 BY MR. BROWN:
15    Q.  So I guess, Mr. Wills, it raises
16 the question, we've asked for documents --
17 and maybe, Lauren, this is better addressed
18 to you --
19       MR. MARTIN:  Yeah.  Mr. Brown, I'll
20 represent to you, we haven't found any
21 of those communications.  I think
22 Mr. Wills is mistaken on that.
23       MR. BROWN:  Okay.
24       MR. MARTIN:  We're not withholding
25 anything, and if we were withholding

Page 104

1    Wick Phillips 30(b)(6) - R. Wills
2 something, we would have produced a
3 privilege log or some other grounds for
4 withholding.  I'm never in the business
5 of withholding anything that you're
6 otherwise entitled to.
7       MR. BROWN:  And I'm not accusing.
8 I was just confused because --
9       MR. MARTIN:  I appreciate that.
10       MR. BROWN:  -- I'm familiar with
11 the documents that were produced and
12 I've looked at them fairly closely in
13 this deposition and I never saw any
14 communications between Wick Phillips and
15 KeyBank.
16       MR. MARTIN:  Yeah.  I think if you
17 ran the tape back, you would probably
18 see both Ms. Drawhorn and I raise our
19 eyebrows when Mr. Wills said that.  I
20 think he was simply mistaken.
21 BY MR. BROWN:
22    Q.  Mr. Wills, in light of that
23 discussion, let's talk about, again, what
24 your understanding is of Wick Phillips' role
25 in connection with the Amended LLC Agreement.

Page 105

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  We did not have one.
3    Q.  You don't -- let me ask you this:
4 You indicated in your prior testimony that
5 you believed there were communications with
6 KeyBank regarding the Amended LLC Agreement.
7 Why did you think that?
8    A.  Well, that has been the siloed role
9 that we've maintained throughout the
10 Project Unicorn transaction as sort of the
11 conduit in between the lender and the various
12 borrowers.
13    Q.  Okay.  So I think your counsel has
14 represented that there were no emails between
15 Wick Phillips and KeyBank concerning the
16 Amended LLC Agreement.
17       Are you aware of whether there were
18 emails that took place in form -- I'm sorry,
19 whether there were communications that took
20 place in a form other than an email
21 communication?
22    A.  I'm not aware.
23    Q.  So is it true that Wick Phillips
24 did not represent any party to the Amended
25 LLC Agreement?

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  Correct.  We did not prepare it or
3  have anything to do with that agreement.
4    Q.  And is there any retention
5  agreement with respect to the LLC Agreement?
6    A.  No, sir.
7    Q.  Do you know if Wick Phillips had
8  any communications with James Dondero in
9  connection with the Amended LLC Agreement?
10   A.  I do not.
11   Q.  So let's focus again -- I think
12 that before we established that
13 Wick Phillips -- your testimony that
14 Wick-Phillips had no role in connection with
15 the Amended LLC Agreement.  We didn't
16 complete the questions with respect to your
17 knowledge of the percentage interest set
18 forth in the Amended LLC Agreement.
19       So what is your understanding
20 concerning the accuracy of the percentage
21 interest set forth in Schedule A to the
22 Amended LLC Agreement?
23   A.  In speaking with D.C., I believe
24 they modified this with the intent of
25 updating it prior to any distribution.  But

1    Wick Phillips 30(b)(6) - R. Wills
2  other than that, I'm not aware of the
3  accuracy one way or the other.
4    Q.  I'm not sure I understand what that
5  means.  Can you help me understand?  When you
6  say, "they modified this with the intent of
7  updating it prior to the distribution."
8        Can you unpack that for me?
9  Because I don't understand what that means.
10 Modified what?
11   A.  Well, they added in the BH portion
12 and then, obviously, the HCRE contributions
13 and percentages and the Highland
14 contributions and percentages are different
15 from the original LLC Agreement.
16   Q.  Okay.  And they're -- I mean, the
17 math, I'm sure if you did it on a calculator,
18 it would reflect that these percentages are
19 modified from the original percentages, 49
20 and 51, based on a proportional pro rata
21 reduction for the 6 percent given to
22 BH Management, correct?
23   A.  Yes.
24   Q.  Does Wick Phillips have any
25 knowledge concerning whether or not the

1    Wick Phillips 30(b)(6) - R. Wills
2  percentages reflected in this Schedule A do
3  not accurately reflect what the parties
4  intended?
5        MR. MARTIN:  Objection, form.
6    A.  I don't know.
7        MR. BROWN:  Okay.  I'd like to take
8  a brief recess.
9        And, Hayley, I'd like to talk on
10 the phone with you, so can we have a
11 separate phone call?
12       MS. WINOGRAD:  Sure.
13       MR. BROWN:  I'm going to put myself
14 on mute and stop the video.
15       And, Hayley, can you call me on my
16 cell?
17       MS. WINOGRAD:  Yeah.  I'll do that
18 right now.
19       (Recess taken.)
20 BY MR. BROWN:
21   Q.  Do you know who represented HCRE
22 and Highland in connection with the Amended
23 LLC Agreement?
24   A.  I believe it was Hunton & Williams.
25   Q.  And what do you base that

1    Wick Phillips 30(b)(6) - R. Wills
2  understanding on?
3    A.  Review of some material in
4  connection with the deposition.
5    Q.  What material?
6    A.  Some of these exhibits.
7        (Technical interruption, 1:29 p.m.
8        to 1:34 p.m.)
9  BY MR. BROWN:
10   Q.  So Mr. Wills, we've covered
11 Wick Phillips' involvement in the
12 representation of the parties in connection
13 with the Loan Agreement, correct?
14   A.  Yes, sir.
15   Q.  And Wick Phillips represented the
16 borrowers in connection with the
17 Loan Agreement, correct?
18   A.  Yes, sir.
19   Q.  And Wick Phillips communicated with
20 both -- with Highland, I think you've
21 acknowledged through Paul Broaddus, with
22 respect to the ownership interests in the LLC
23 in connection with the Loan Agreement,
24 correct?
25       MR. MARTIN:  Objection, form.

Page 110

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  I don't think that's accurate.  We
3    had -- we communicated with Mr. Broaddus as
4    it related to finalizing and forwarding the
5    org charts that are part of Schedule 3.15 to
6    the Loan Agreement.
7    BY MR. BROWN:
8      Q.  And those org charts contain a
9    reflection of the ownership interest as they
10   appear on the LLC Agreement, correct?
11     A.  Yes, sir.  That's what they said.
12     Q.  And those org charts that were
13   transmitted by Wick Phillips to
14   Paul Broaddus, among others, reflect an
15   ownership interest of 51 percent in HCRE and
16   49 percent in Highland, correct?
17     A.  Yes, sir.
18     Q.  And the percentage interests that
19   appear in Schedule A of the Amended
20   LLC Agreement reflect those same ownership
21   interests adjusted for the addition of
22   BH Management as a 6 percent owner, correct?
23         MR. MARTIN:  Objection, form.
24         I'm going to instruct the witness
25      to not answer the question as being

Page 111

1    outside the scope of the 30(b)(6)
2    notice.
3         And the record should probably
4    reflect, Mr. Brown, I think you would
5    agree with me, the court reporter lost
6    about five minutes' worth of testimony.
7         So I appreciate the fact that
8    you're trying to go back through it
9    methodically.  I certainly don't want to
10   get in the way with that.  But we got
11   into a scrap while she was offline about
12   this and about what the scope of the
13   30(b)(6) deposition notice is.
14         So we perhaps have to have that
15   discussion over again.
16         MR. BROWN:  Okay.  Well, if you're
17   instructing him not to answer --
18 BY MR. BROWN:
19     Q.  Are you going to follow your
20   counsel's instruction, Mr. Wills?
21     A.  Yes, sir.
22         MR. BROWN:  Okay.
23         All right.  I don't have any
24   further questions.

Page 112

1    Wick Phillips 30(b)(6) - R. Wills
2         MR. MARTIN:  Okay.  I've got a few
3    questions.
4         Are you passing the witness,
5    Mr. Brown?
6         MR. BROWN:  I'll pass the witness
7    and reserve my right to reexamine.
8         MR. MARTIN:  Okay.  Well, I guess I
9    should make it clear that we're going to
10   ask you to petition the Court for a
11   reexamination because we presented
12   Mr. Wills here and are giving you ample
13   opportunity to ask questions.
14         MR. BROWN:  Well, I may need to
15   clarify questions that you ask.
16         MR. MARTIN:  After the read and
17   sign, that would be standard procedure,
18   and I would not disagree with that.
19         MR. BROWN:  Well, you're going to
20   ask him some questions.
21         MR. MARTIN:  Oh, I'm sorry.  Yeah,
22   yeah.  I'm sorry.
23         After me?  Sure.
24         MR. BROWN:  That's what I mean.
25         MR. MARTIN:  I apologize.  I didn't

Page 113

1    Wick Phillips 30(b)(6) - R. Wills
2    understand what you were saying.  I
3    thought you were saying we'd get back
4    together at some point in the future.
5         MR. BROWN:  No.  I want the
6    opportunity to, essentially, redirect
7    after you --
8         MR. MARTIN:  Recross after my
9    direct?  Sure.
10         Does anybody else have any
11   questions before I go?  Ms. Dandeneau?
12         MS. DANDENEAU:  No, I do not.
13         MR. MARTIN:  Okay.  And I apologize
14   if I tortured your name.
15         MS. DANDENEAU:  You actually said
16   it perfectly -- well, pretty perfectly.
17         ---
18         EXAMINATION
19 BY MR. MARTIN:
20     Q.  Okay.  Mr. Wills, most of my
21   questions are going to be just follow-up to
22   what Mr. Brown asked you.
23         Who is it your understanding that
24   Wick Phillips represented in connection with
25   the Loan Agreement?

Page 114

Wick Phillips 30(b)(6) - R. Wills
1     Wick Phillips 30(b)(6) - R. Wills
2     A.  The borrowers.
3     Q.  And of those, was there any
4  representation -- Mr. Brown asked you a lot
5  of questions about Highland being the lead
6  borrower.
7         Do you remember that?
8         MR. BROWN:  That's an incorrect --
9  by the way, you're mischaracterizing.
10    It was HCRE, not Highland.
11        MR. MARTIN:  Okay.  HCRE.
12 BY MR. MARTIN:
13    Q.  Did HCRE have its own counsel
14 in-house or outside counsel?
15    A.  No.
16    Q.  Now, at Wick Phillips, at the time
17 of these transactions, who would have
18 consulted with the client about possible
19 conflicts or waiver of conflicts that
20 Mr. Brown was asking you about?
21    A.  D.C. Sauter.
22    Q.  Okay.  And at the time, Mr. Sauter
23 was a partner at Wick Phillips, correct?
24    A.  Yes, sir.
25    Q.  Is Mr. Sauter still a partner at

Page 115

1  Wick Phillips?
2     A.  No, sir.
3     Q.  And who would have consulted with
4  the client regarding Mr. Brown's questions
5  about the mechanics of the loan, who directed
6  what, where the money was going, what the
7  role of the lead borrower was compared to the
8  other borrowers, etc.?
9     A.  D.C. Sauter.
10    Q.  Now, to your knowledge -- and I'm
11 just going to try to make all of this crystal
12 clear.  Because I think this is where the
13 fight with Mr. Brown is going to come in.
14        To your knowledge, did
15 Wick Phillips have anything to do with the
16 formation of the LLC Agreement or the
17 negotiation of the LLC Agreement?
18    A.  No, sir.
19    Q.  Can you explain in
20 non-real-estate-lawyer terms what the scope
21 of the representation was of Wick Phillips in
22 the matter at issue?
23    A.  Yes.  Our -- the scope of our
24 representation was at specifically the real

Page 116

1     Wick Phillips 30(b)(6) - R. Wills
2  estate/property level, working with
3  essentially going through the
4  lender required --
5         MR. BROWN:  Can I just interpose
6  an -- ask for clarification?
7         You asked for Wick Phillips' role
8  in the matter at issue.
9         Could you clarify, please, what the
10    matter at issue is that you're referring
11    to?
12 BY MR. MARTIN:
13    Q.  Mr. Wills, who has Wick Phillips
14 represented while you're here today?
15    A.  NexPoint.
16        MR. BROWN:  Again, I'm going to
17 object.  It's vague and ambiguous.
18        Do you mean with respect to the
19 claim --
20        MR. MARTIN:  Make an objection.
21        MR. BROWN:  Do you mean with
22 respect to the Loan Agreement?  Do you
23 mean with respect to the LLC Agreement?
24        There's several -- Wick Phillips
25 has more than one representation.  I'm

Page 117

1     Wick Phillips 30(b)(6) - R. Wills
2  just trying to get the record clear on
3  what you're asking him.
4         MR. MARTIN:  Are you finished?
5         MR. BROWN:  Yes.
6         MR. MARTIN:  I would ask you to
7  keep your objections to the "objection,
8  form" called for by the Federal Rules of
9  Civil Procedure.  If I ask you for the
10    basis, then you can make a speaking
11    objection.
12        You are still trying to conflate
13    all of these issues.  I'm trying to
14    separate them out to make them clear.  I
15    get to ask my questions, and if you want
16    to come back and ask other questions,
17    you can.
18        MR. BROWN:  Thank you for the
19    lecture and for the instructions on how
20    to practice law.
21        MR. MARTIN:  Well, you started it.
22 BY MR. MARTIN:
23    Q.  Are you aware that NexPoint had a
24 shared services agreement with one of the
25 Highland entities, which is why their email

Page 118

```
1        Wick Phillips 30(b)(6) - R. Wills
2    addresses have Highland Capital in them?
3        A.  Yes.
4        Q.  Did Wick Phillips form the LLC that
5    Mr. Brown asked you about today?
6        A.  No.
7        Q.  Did Wick Phillips draft or
8    negotiate the Amended LLC Agreement that
9    Mr. Brown asked you about today?
10       A.  No.
11       Q.  If, in fact, another law firm
12   drafted the LLC Agreement, would that be
13   consistent with your understanding of how the
14   LLC was formed?
15       A.  Yes.
16       Q.  Regardless of who formed the LLC,
17   as a real estate lawyer, since Wick Phillips
18   was representing NexPoint and the borrowers,
19   would Wick Phillips had to have known the
20   ownership structure of the LLC in order to
21   work on Project Unicorn?
22       A.  Yes.
23       Q.  Why?
24       A.  So that we could accurately
25   communicate that to KeyBank, and because
```

Page 119

```
1        Wick Phillips 30(b)(6) - R. Wills
2    those same -- the structure charts are
3    attached as an exhibit to the Loan Agreement.
4        Q.  I'm going to direct your attention
5    to the exhibits that Mr. Brown provided prior
6    to this deposition and ask you to look at
7    Exhibit H.
8        And you were in the room when we
9    became aware that the court reporter was
10   offline for a little bit, correct?
11       A.  Yes, sir.
12       Q.  And if my memory of this is
13   correct, I think she was offline when
14   Mr. Brown asked you a couple of questions
15   about Exhibit H.
16       Do you remember that?
17       A.  Yes, sir.
18       Q.  Can you please look at Exhibit H
19   and tell me, on the -- that's an email string
20   starting on July 27, 2018, correct?
21       A.  Yes, sir.
22       Q.  And who is the author of the first
23   email in that chain?
24       A.  Alexander McGeoch.
25       Q.  And Mr. McGeoch's email signature
```

Page 120

```
1        Wick Phillips 30(b)(6) - R. Wills
2    indicates he's a partner at Hunton Andrews
3    Kurth, correct?
4        A.  Yes, sir.
5        Q.  In Dallas, Texas, right?
6        A.  Correct.
7        Q.  Who is the email addressed to?
8        A.  Mark Patrick.
9        Q.  And Mark Patrick you previously
10   identified as being one of the in-house
11   people at Highland, correct?
12       A.  Yes, sir.
13       Q.  And is there a Wick Phillips
14   attorney on the email from Mr. McGeoch to
15   Mr. Patrick?
16       A.  No, sir.
17       Q.  And then the top email on Exhibit H
18   is from Mr. Patrick to Tim Cournoyer,
19   correct?
20       A.  Yes, sir.
21       Q.  And it's my understanding
22   Tim Cournoyer is a Highland person as well,
23   correct?
24       A.  Yes, sir.
25       Q.  And he doesn't work at
```

Page 121

```
1        Wick Phillips 30(b)(6) - R. Wills
2    Wick Phillips, does he?
3        A.  He does not.
4        Q.  And there's no Wick Phillips
5    attorney on either of these emails, correct?
6        A.  Correct.
7        Q.  Could you read Mr. McGeoch's email
8    beginning with the word "Mark"?
9        A.  (Reading.)
10       "Mark, a draft of the Unicorn LLC
11   agreement is attached.  We need to
12   select another name because Unicorn
13   is taken in Delaware.  It would be
14   helpful to schedule a call with you
15   to walk through our thoughts on the
16   allocation and distribution drafting
17   approach we took.  Please let me
18   know if you have time for a call
19   with Mark and me this morning.
20       "Thanks, Alex."
21       Q.  So does that indicate to you that
22   Hunton Andrews Kurth actually was involved in
23   the allocation and distribution drafting of
24   the LLC Agreement?
25       A.  Yes.
```

Page 122

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  When Mr. Brown asked you questions
3  about Mr. Wick Phillips' role in drafting the
4  LLC Agreement, he didn't ask you about Hunton
5  Andrews Kurth, did he?
6    A.  No, sir.
7    (Email chain "RE: SE Multi-Family
8       Holdings LLC: Amended and
9       Restated," beginning Bates
10      Highland136853, marked as Exhibit
11      I.)
12 BY MR. MARTIN:
13   Q.  If you would, please, look at
14 Exhibit I.
15   A.  Okay.
16   Q.  This is an email chain, several
17 pages long.  And if we're going by the Bates
18 numbers, from -- starting on Highland136853
19 through Highland136856.
20     Do you see that?
21   A.  Yes.
22   Q.  Will you page through any of those
23 emails and identify any email addresses from
24 Wick Phillips that are included in that
25 chain?

Page 123

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  There are no Wick Phillips' emails.
3     MR. MARTIN:  Okay.  I'll pass the
4    witness.
5     MR. BROWN:  Ms. Vosburgh, could you
6    go back to the first question that
7    Counsel asked on his set of questions of
8    Mr. Wills, to the first question, and
9    read it back to me.
10     THE REPORTER:  (Reading back.)
11     "Question:  Okay.  Mr. Wills, most
12    of my questions are going to be
13    follow-up questions to what
14    Mr. Brown asked you.
15     "Who is it your understanding that
16    Wick Phillips represented in
17    connection with the Loan Agreement?"
18    "Answer:  The borrowers."
19     MR. BROWN:  Okay.  There's a
20    question regarding the matter at hand.
21    That's the one I want read back.
22     THE REPORTER:  (Reading back.)
23    "Question:  Can you explain in
24    non-real-estate-lawyer terms what
25    the scope of the representation was

Page 124

1    Wick Phillips 30(b)(6) - R. Wills
2    of Wick Phillips in the matter at
3    issue?"
4    THE REPORTER:  Is that the one?
5    MR. BROWN:  Yes.
6    THE REPORTER:  (Reading back.)
7    "Answer:  Yes.  Our -- the scope
8    of our representation was at
9    specifically the real
10    estate/property level working with
11    especially going through the lender
12    required --"
13    And then there was an interjection.
14    ---
15    RE-EXAMINATION
16 BY MR. BROWN:
17   Q.  Okay.  Mr. Wills, I want to
18 understand what your understanding was when
19 you were asked about the scope of the
20 representation of the matter at issue.
21    What matter at issue did you
22 understand was being referred to?
23   A.  Wick Phillips' role with
24 Project Unicorn.
25   Q.  Okay.  So you were not answering

Page 125

1    Wick Phillips 30(b)(6) - R. Wills
2  the question in connection with
3  Wick Phillips' role in connection with the
4  Loan Agreement then, were you?
5    A.  Well, to me, Project Unicorn
6  incorporates really all of the topics on the
7  depo notice, the Loan Agreement,
8  LLC Agreements.  It's all sort of the same
9  global project.
10   Q.  But you've already testified, have
11 you not, and Wick Phillips has already
12 acknowledged in its papers that it filed in
13 the bankruptcy court that it represented the
14 borrowers in connection with the
15 Loan Agreement, correct?
16   A.  Correct.
17    MR. BROWN:  I don't have any other
18 questions.
19    MR. MARTIN:  We'll reserve.  Thank
20 you.
21    (The deposition was concluded at
22    1:51 p.m.)
23
24
25

Page 126

1    Wick Phillips 30(b)(6) - R. Wills

2          C E R T I F I C A T E

3

4       I, ANNE E. VOSBURGH, Certified Shorthand

5    Reporter, Registered Professional Reporter,

6    Certified Realtime Reporter, and Closed

7    Captioner, hereby certify:

8       That ROB WILLS, via remote

9    videoconference, solemnly affirmed and agreed to

10   testify to the truth, the whole truth and

11   nothing but the truth; that all counsel

12   stipulated to this process, notwithstanding the

13   location of reporter or witness at time of

14   deposition; and that this transcript is a true

15   and correct record of testimony given.

16      I further certify that I am not related

17   to any of the parties to this action and that I

18   am in no way interested in the outcome of this

19   matter. Dated: August 11th, 2021.

20

21   _____

22        ANNE E. VOSBURGH

23   Certified Shorthand Reporter No. 6804

24   Registered Professional Reporter

25   Certified Realtime Reporter

Page 127

1          ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads    Should Read  Reason

6    ___  ___ _____    _____    _____

7    ___  ___ _____    _____    _____

8    ___  ___ _____    _____    _____

9    ___  ___ _____    _____    _____

10   ___  ___ _____    _____    _____

11   ___  ___ _____    _____    _____

12   ___  ___ _____    _____    _____

13   ___  ___ _____    _____    _____

14   ___  ___ _____    _____    _____

15   ___  ___ _____    _____    _____

16   ___  ___ _____    _____    _____

17   ___  ___ _____    _____    _____

18   ___  ___ _____    _____    _____

19   ___  ___ _____    _____    _____

20

21                _____
                  Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2021.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____

**(**

**(a)** 38:11

**(b)** 25:23 38:11,21

---

**1**

**1** 93:19 94:8,19 98:3

**1.05** 37:23 38:7,11,16

**1.07** 34:22 35:9

**1.07(a)** 34:25

**11** 6:3

**14** 37:23

**15** 98:25

**17** 72:21 75:19 84:9

**18** 18:25 19:2 81:25 85:10,13 91:5

**1:29** 109:7

**1:34** 109:8

---

**2**

**2** 93:20 94:19

**20** 100:15

**2018** 14:15,21 20:23 21:9 72:21 81:25 84:9 91:5 99:2 119:20

**2019** 98:25

**2021** 6:3 30:2,13

**22** 51:14

**23** 14:15,21 94:6 98:25

**25** 37:25

**26** 20:23 21:8

**263750** 96:15

**263751** 96:19

**27** 92:7 98:2 119:20

---

**3**

**3** 23:16

**3.15** 47:19 48:4,6,9 49:20 51:12 58:5,19 59:2,19 63:21 64:13, 18 66:7 67:19 69:17 74:5,14,24 75:10 89:18 90:9 95:7 110:5

**30(b)(6)** 6:1 7:1 8:1 9:1,2,10 10:1 11:1,21 12:1,10 13:1 14:1 15:1,4 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 21 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1,2,14 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1

---

**4**

**4** 12:17 29:19

**4.01(b)** 25:20

**41** 58:10

**49** 19:9 47:18 50:12

51:9 53:11,18,24 54:6,11 55:13,21 58:11 74:17 93:20 94:20 107:19 110:16

**49/51** 59:20

**4:21** 72:22

---

**5**

**51** 19:7 25:18 47:18 50:13 51:8 53:11,18, 24 54:6,12 55:13,22 58:11 74:16 93:19 94:19 107:20 110:15

**5:16** 81:8

---

**6**

**6** 107:21 110:22

**6th** 29:25 30:13 31:13

---

**7**

**76** 27:16

**7:45** 82:15

**7:52** 82:16 85:14

**7:57** 86:2

---

**9**

**9.01** 27:17

**9.01(a)** 27:19 28:2,20

**9011** 9:3

**9:30** 6:3

---

**A**

**a.m.** 6:3

**ability** 39:13

**acceleration** 72:7

**acceptable** 16:7

**accuracy** 27:9 50:4 71:5 106:20 107:3

**accurate** 15:2 67:12,

14 69:13,20 74:8 101:19 110:2

**accurately** 28:21 66:12 83:25 101:22 108:3 118:24

**accusing** 104:7

**acknowledged** 43:17,21 109:21

**acquired** 51:4

**acquisition** 22:18 85:18 86:6 95:23 96:13

**acquisitions** 16:16 40:17 46:7,9

**actual** 35:21 37:7

**added** 25:16 28:10 31:7 40:12 107:11

**addition** 110:21

**additional** 22:24 25:17 100:16

**address** 54:16 58:8 76:2,16,23 77:25 78:8,14 82:3 87:13, 14,15,16,18

**addressed** 26:3 46:25 103:17 120:7

**addresses** 118:2 122:23

**adjusted** 110:21

**Administrative** 25:25 26:4

**admission** 13:15 30:24

**advance** 13:14 38:23 39:10

**advanced** 38:25 41:24

**advances** 39:14,25 40:2,4 41:10,12

**advantages** 36:18

**adverse** 9:21

**advisability** 34:16

**advise** 41:17

**affiliation** 71:15,18

**agency** 22:21

**agent** 21:12 25:25 26:4

**agree** 31:12 74:22 75:7 111:6

**agreed** 99:9 100:4,5

**agreeing** 99:22,24

**agreement** 14:15,21 15:19,21 16:5,6,9,12, 13,18,20 17:10,11, 14,24 18:7,9,19,20, 22 19:2,13,19,24 20:6,12,22 21:8,10 22:2,5,8,11,15,19 23:4,9,16,18,25 24:5, 8,16,19 25:23 26:12, 22,24 27:11,17 28:5, 16,20,21 30:17 31:7, 10,23 32:2,4 33:8,17, 24 34:5,18 35:14,21, 24 36:21 37:6,13 38:14 39:12,22 40:20,23 41:8,11,19, 25 42:5 43:8,19 44:6 45:4,16 46:4,13,18 47:2,9,14,20 48:10 49:2 58:6,16,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6,11,14,20 65:13, 18 66:8,23 67:9,11 69:5,18 71:22 72:4 74:6 80:15 88:8,22 89:9,13,19 90:10 92:4 93:24 94:6,10, 22 95:3,8 98:19,24 99:5,17,18,19,21 100:10,23 101:4,9 102:5,10,11,12,18 103:11 104:25 105:6, 16,25 106:3,5,9,15, 18,22 107:15 108:23 109:13,17,23 110:6, 10,20 113:25 115:17, 18 116:22,23 117:24 118:8,12 119:3 121:11,24 122:4 123:17

**agreements** 18:13 32:10,16,24 43:14

**Alex** 121:20

**Alexander** 119:24

**allocated** 18:7

**allocation** 50:16
121:16,23

**ambiguous** 116:17

**amended** 11:21
12:10 98:18,23 99:20
100:9 101:9 102:4,
12,17 103:11 104:25
105:6,16,24 106:9,
15,18,22 108:22
110:19 118:8 122:8

**amounts** 39:21
41:18 72:7

**ample** 112:12

**analysis** 34:8 36:3

**analyst** 77:17

**Andrews** 120:2
121:22 122:5

**Andros** 55:17

**answering** 124:25

**answers** 9:7 10:24

**Apartments** 75:7

**apologize** 25:4
47:11 57:23 112:25
113:13

**appears** 81:6 82:13
91:4,17

**applicable** 9:2

**applied** 40:3

**appointment** 38:17

**approach** 121:17

**approved** 86:8 89:25

**approximately**
93:19

**Arbolita** 57:5

**Arborwalk** 55:24

**argue** 13:19

**argument** 13:14

**arise** 35:22

**arranger** 21:13

**Article** 27:16

**ascertain** 27:25

**asset** 96:12,21

**assets** 97:17

**Association** 21:12

**assume** 7:19 19:14
21:3 50:5 51:18
88:23 103:3

**assuming** 79:18

**assumption** 44:18,
21

**attach** 48:12 72:9

**attached** 11:8 18:13
49:20 63:17 66:7
74:5,13,23 75:8,9
80:13 86:6 92:10
94:7 98:13 99:10
119:3 121:11

**attachment** 48:25
50:21,22 74:3 75:5
93:3,8,15

**attachments** 48:12,
15,22 49:25 51:12
72:13 73:24 92:21,24
93:10

**attention** 119:4

**attorney** 7:4 73:8
89:2 120:14 121:5

**attorney-client**
36:14

**August** 6:3 14:15,21
91:5 94:6,8 98:3,25

**authentic** 99:22
100:4

**authenticity** 99:13,
25

**author** 119:22

**aware** 9:5 18:4 28:17
33:25 36:9 61:15
63:6,10 64:3 66:22
67:2 90:18,19
105:17,22 107:2
117:23 119:9

**B**

**back** 26:10 48:3
52:19 75:18 79:4
85:9 87:3 89:25 94:4
97:9,23 100:13
101:25 102:23
104:17 111:9 113:3
117:16 123:6,9,10,
21,22 124:6

**Baker** 79:4,5 83:21,
24 84:4,16,22,24

**bankruptcy** 9:3,23
30:25

**base** 46:21 63:11
108:25

**based** 10:13 44:21
51:11 107:20

**basic** 92:11

**basically** 7:24

**basis** 117:10

**Bates** 122:9,17

**Battleground** 54:4

**beginning** 121:8
122:9

**behalf** 9:7 26:23
28:14 37:3 39:9 43:4
44:15,16 45:18 60:6
62:9 67:8 69:2 70:11,
12,13 71:7,11 76:21
90:11

**believed** 76:5 105:5

**benefit** 41:21,24

**BH** 100:18,19 101:6,
23 107:11,22 110:22

**binder** 21:2,6

**binding** 9:13 10:24

**bit** 46:19 53:2 64:22
102:2 119:10

**Bonner** 77:15 87:14
88:5

**bookrunner** 21:14

**borrowed** 39:22

**borrower** 23:18,21
24:5 25:14,17 26:7,9,
10,20 27:2,3,21 29:3,
21 30:15 31:16
37:12,16 38:13,17,
19,24 39:4,7,12
40:13,15 46:14,22
49:16 70:13,21 71:23
88:17,20 114:6 115:8

**borrower-level**
83:4,18

**borrowers** 21:11
22:17 24:8,10,11,25
26:21 29:4 31:18,20
32:3 33:6 34:9 35:19
36:12,17 37:6 39:9,
19 40:16 41:7,10
45:3 49:22 67:5
90:11,21 92:3 105:12
109:16 114:2 115:9
118:18 123:18

**borrowing** 46:21

**bottom** 50:23 84:13
87:4

**Brandywine** 54:14
55:5

**break** 45:23 86:17,18

**bridge** 20:22 21:7
29:21 30:15 31:16
100:19

**briefly** 51:19

**briefs** 11:8

**bring** 100:16

**Broaddus** 60:25
61:9 62:3,9,12 69:10
70:2,25 77:23 78:3
86:14 87:15 88:6
90:14 91:6,22,24
98:2,12 109:21
110:3,14

**Broaddus'** 93:8

**Brown** 6:14 10:16
11:16,19,23 12:3
14:11,17 20:20,24
24:23 25:4,7 27:7,14
29:5 30:7 31:11 35:5,
11,17 36:10,24
37:10,22 38:2,5 40:9
41:16 44:12,20 45:11

46:2 47:24 48:2,16,
21 49:6 52:15,24
53:3 54:19,22 55:2,4
59:5,21 60:16 61:16
62:7,24 64:2,16 65:6
69:14 70:6,15 72:9,
14,18 73:3 74:11
75:15,20 76:13 80:6,
23 81:3,5 84:3,11,15
86:15,22 87:2,5 90:7,
23 91:3 95:24 98:21
99:7,15 100:6 101:5
103:4,7,14,19,23
104:7,10,21 108:7,
13,20 109:9 110:7
111:5,17,19,23
112:5,6,14,19,24
113:5,22 114:4,8,20
115:14 116:5,16,21
117:5,18 118:5,9
119:5,14 122:2
123:5,14,19 124:5,16

**Brown's** 115:5

**bucket** 22:20

**buckets** 66:20

**business** 49:15,16
90:2 104:4

**C**

**calculator** 107:17

**call** 59:17 92:13
103:5 108:11,15
121:14,18

**called** 6:8 12:10 21:7
94:17 117:8

**calling** 24:14 30:11
31:5

**CANTY** 37:19,24
47:21

**capability** 80:18

**capacity** 87:20

**capital** 6:19 19:8,18
21:13 23:22,24 24:2
25:16 27:21 28:4,15,
24 30:8 40:23 75:25
76:15,22 77:4,24
78:8,14 82:2 87:12,
13,15,16,17 101:10

118:2

**caption** 48:4 73:21

**care** 27:21 29:7

**case** 9:23 27:20 28:11 44:19 93:23

**cell** 108:16

**Central** 6:3

**chain** 71:3 72:11,15 81:7 90:25 101:3 119:23 122:7,16,25

**chance** 38:10

**Chang** 42:8,21 61:9 69:10 70:2 78:6,9 82:2,5,16 85:15 86:3 87:17 88:6

**Chang's** 82:14,23

**change** 48:19 53:2 76:9,25 77:11

**changed** 28:12 100:21

**changing** 101:16

**Charles** 68:10

**chart** 55:6 57:20 67:14 71:3,5 74:12, 15,20,23 75:4,9 80:5 83:24 94:17,25 95:11 96:6,14,18,23,24,25 101:13

**charts** 56:3,8,22 57:3,15 58:6,25 59:19 61:3 62:5 63:17,21 65:11,15 66:2,6 67:21 69:12, 17,19 72:12 73:22 74:5,13 79:2,6,9,11 81:12 82:4,5,24 83:5 85:18 86:6 89:17,24 90:8,21 92:11 97:6, 12 98:13 110:5,8,12 119:2

**checked** 90:5

**checklist** 89:23 90:6

**circulate** 79:5

**Civil** 9:2 117:9

**claim** 9:22 116:19

**clarification** 116:6

**clarify** 112:15 116:9

**clean** 78:25 79:16,18

**cleaned** 79:13

**clear** 112:9 115:13 117:2,14

**client** 32:11,17,22 42:3 43:6,9,22,24 44:3,9 45:14 67:14 114:18 115:5

**clients** 32:24 33:24 34:5 35:13 67:8

**closed** 92:15

**closely** 104:12

**closing** 22:25

**co-borrower** 23:5 28:11 31:6

**co-borrowers** 25:13 31:9,19,21

**collection** 26:21 29:3

**collective** 46:22

**comfortable** 22:4

**comment** 8:20

**comments** 81:13 86:9

**committed** 100:14

**common** 35:2

**communicate** 66:12 70:21 118:25

**communicated** 45:15 60:9 109:19 110:3

**communicating** 44:16 45:18 62:9 66:20 76:20 87:10,20 88:15,20 102:20

**communication** 105:21

**communications** 17:23 19:17,22 20:8, 9 58:24 59:7 60:23 61:10,18,23 62:11 64:4 66:14 67:22,24

87:25 88:21 90:20 98:12 102:24 103:2, 9,21 104:14 105:5,19 106:8

**companies** 88:8

**company** 14:14,20 15:19 16:5 43:15 60:2 98:19,24 102:5

**compared** 115:8

**complete** 9:6 10:23 25:8 83:24 106:16

**compliance** 35:8

**component** 47:14

**comprise** 58:25 63:21 69:17

**conclusion** 63:12 77:2,11

**conclusions** 76:9

**condition** 26:2

**conditions** 25:23

**Conduct** 34:21

**conduit** 20:2 49:14 83:21 105:11

**Confirm** 67:20

**conflate** 117:12

**conflating** 62:25

**conflict** 33:5,10,16, 23 34:3,10,11,17 35:7 40:5,6

**conflicts** 35:22 37:7 114:19

**conformity** 35:8

**confused** 104:8

**connection** 9:19,21 10:9 14:25 15:8,14, 17,21 16:14 17:13 18:8,18 19:25 22:11, 14,17,24 23:3,4,9 28:5 31:9,23 32:2 33:8,17 34:17 35:12 36:4,20 40:16 42:4 43:7,18,20 44:5,25 45:15 46:5,13,18 48:9,25 49:12 60:4 61:12,19,24 62:5,13,

19,22 63:3,8,13 64:5, 11,19 65:12,17 67:9 68:22 69:4 88:21 89:13,22 90:8 91:13 92:2 102:4,17 104:25 106:9,14 108:22 109:4,12,16,23 113:24 123:17

**consent** 35:2

**considered** 34:3

**consistent** 30:23 58:14 118:13

**constitute** 89:18 98:3

**consult** 36:11

**consulted** 36:17 114:18 115:4

**contact** 42:4 43:7,10, 22,24 44:3,4,9

**contacts** 45:14 60:14

**contained** 66:23

**context** 14:24 20:12 40:14 60:23

**contribution** 40:24

**contributions** 19:18 20:18 100:20 101:10 107:12,14

**conversations** 66:5

**converted.'** 83:7

**converting** 83:3,17

**copied** 85:15

**copies** 27:22

**copy** 14:19 21:23 22:7 29:12 81:9 99:4

**copying** 82:17

**correct** 7:5 15:6,10 17:20,21 19:12,14 20:14,15 23:14 24:3, 5 26:17 27:3 31:17 38:14,15,19 39:5,6 43:4 49:17 50:9,13, 17 51:4,9,16,23 52:4, 9 53:10,19,25 54:7, 12 55:7,8,14,22 56:4, 9,13,17,22 57:3,7,11,

15,20,21,25 58:4,16, 17 60:10 65:20 66:3 68:20 69:20 70:3 71:8,23 72:4,7 74:17 76:2,6,23 77:8 78:5, 17,21,22 80:8,21 89:9 91:6,22 92:4,22 94:13,20,22 95:4,9 96:2,5 98:5 99:2 101:11,12 102:14 106:2 107:22 109:13, 17,24 110:10,16,22 114:23 119:10,13,20 120:3,6,11,19,23 121:5,6

**corrections** 8:17,20

**correspondence** 60:19

**counsel** 6:18 24:22 26:7,9 29:22 30:18 42:9 57:24 60:3 62:10 63:16 64:25 65:2 78:12 79:14 80:4,17 83:22 85:3,4 105:13 114:13,14 123:7

**counsel's** 111:21

**counterparty** 17:9

**couple** 11:12 78:25 119:14

**Cournoyer** 120:18, 22

**court** 8:4,11 11:16 29:25 31:2 111:6 112:10 119:9

**covered** 109:10

**created** 69:12

**creating** 61:3

**credit** 25:14 46:21

**Crossing** 56:11

**crystal** 115:12

**current** 7:8 11:6 86:4 101:14

**custom** 32:15

## D

**D.C.** 11:5 68:7,13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 106:23 114:21 115:10

**Dallas** 120:5

**Dandeneau** 113:11, 12,15

**Date** 26:5

**dated** 14:21 21:8 26:5 94:6,7 98:24

**days** 11:12

**deal** 42:7

**dealing** 100:2

**dealings** 44:24

**deals** 100:18

**Debtor** 6:20,23 9:22 18:6 24:4 30:9 77:9

**Debtor's** 9:19,22 12:10 29:14

**declaration** 99:11, 12

**declarations** 11:7 99:11

**declared** 6:9

**deduction** 64:23

**default** 72:3,6

**defined** 23:21,25 35:20 77:9

**definition** 46:22

**Delaware** 80:7 85:4 121:13

**deliver** 83:25

**delivering** 89:24 102:20

**deposition** 6:2,21 7:14,16,22 8:17 9:10, 18 10:25 11:11,22 12:11 13:4,25 14:4 16:3 17:4 21:25 33:20 60:20 86:20

99:16 100:3 102:10 104:13 109:4 111:14 119:6

**describe** 22:13 66:4

**designated** 8:24 9:9 10:8 12:19,24 13:13 33:21 37:12,16 68:24

**designation** 58:20 73:15 91:11

**detail** 66:14

**determination** 45:5, 9 50:3 69:16

**determine** 34:8 39:13,25 44:13 67:10 70:8

**determined** 93:18

**digress** 99:7

**diligence** 67:8,13,15 68:19 69:24 89:22 90:5

**diligenced** 68:18

**diligencing** 68:4 69:4

**direct** 39:14 40:2 41:9 113:9 119:4

**directed** 41:13 115:6

**directing** 40:15

**directly** 64:5

**disagree** 112:18

**disclosing** 10:18

**discuss** 92:14

**discussed** 87:9 92:11 98:15

**discusses** 25:22 27:17

**discussion** 33:22 104:23 111:16

**discussions** 34:15 35:19 68:3 94:12

**dispense** 7:21

**disqualification** 10:9 31:14

**disqualify** 9:20 11:2 29:14 30:14

**distinction** 45:13,17 59:12,14,21

**distribution** 106:25 107:7 121:16,23

**document** 14:22 15:5,9,10,14 21:7,15, 19 29:25 38:8 93:18 100:8

**documents** 13:21 99:10 103:16 104:11

**dog** 68:10

**Dondero** 44:5 106:8

**draft** 97:12 101:3 118:7 121:10

**drafted** 17:25 118:12

**drafting** 17:13 20:13 121:16,23 122:3

**dragging** 57:23

**Drawhorn** 99:14 100:5 104:18

**DST** 64:25 66:19 79:2,14 80:3,5,7,8,17 82:5,24 83:4,18,21 85:3 92:11 94:17

**DSTS** 90:25

**due** 41:19 69:23 72:7

## E

**earlier** 23:25 69:25 79:8

**Economics/ ownership** 93:4

**effective** 26:5 98:25

**Ellis** 97:14

**email** 72:11,15,20,21 73:4,10,18,21 74:2 75:6,18,19,21 76:2, 15,23 77:24,25 78:8, 14,21,23 81:4,7,16, 18,23,24,25 83:2,9, 12,14,18,20 83:16 84:8,14,20 85:10,12, 13,14,21 86:11 87:4,

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

**emailing** 75:22

**emails** 61:7 84:5 87:7 88:16 89:5,11, 16 97:25 98:9,13 99:9 105:14,18 121:5 122:23 123:2

**employed** 42:13

**employee** 42:11,16, 18,22,24

**end** 75:16

**engagement** 32:19

**entities** 21:9 25:12, 13 26:11 29:7 31:22 83:5,6,18 87:25 117:25

**entitled** 104:6

**entity** 6:20 16:23 29:8 40:12 44:15 68:14 77:20

**entry** 75:25

**equity** 7:10 100:16, 19

**ESQ** 6:7

**essentially** 113:6 116:3

**establish** 43:20

**established** 106:12

**estate** 7:12 10:20,21 43:13 59:15 118:17

**estate/property** 116:2 124:10

**event** 72:3,6

**evidence** 13:21

**EXAMINATION** 6:13 113:18

**executed** 19:13

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

## exhibit
**exhibit** 11:17,18,19, 20,22 14:12,16,19 15:19 20:21,23 21:6, 7,16,24 22:4 72:10, 13 87:2 89:8 90:23 91:2,4 92:8 93:23 96:4 98:3,16,20,22 99:16,19,20 101:4 102:6,13 119:3,7,15, 18 120:17 122:10,14

**exhibits** 11:7 12:7 21:3 109:6 119:5

**existing** 96:11,17 97:20

**explain** 30:22 115:20 123:23

**explained** 41:7

**explaining** 7:21

**extent** 18:13 26:24 27:2 28:3 41:8 46:16

**eyebrows** 104:19

## F

**fact** 39:24 111:8 118:11

**fairly** 104:12

**Fairways** 57:9

**fall** 66:20

**false** 72:2

**familiar** 21:21 34:20, 24 48:5 58:18 60:21 104:10

**Family** 15:25

**favorable** 26:3

**Federal** 8:25 117:8

**fight** 115:14

**filed** 29:25 30:12,25

**files** 11:9

**filing** 31:14

**final** 72:12 73:22 82:4

**finalizing** 110:4

**financing** 15:22 16:15 18:9 22:22,24

46:5

**fine** 7:23 38:4

**finished** 8:8 24:22 117:4

**firm** 10:4,20 59:24 63:7,12 65:25 118:11

**firm's** 10:14 11:3

**firms** 26:20

**five-minute** 86:18

**flip** 18:25 23:15 48:16,17 51:17,20 52:12 53:6 100:24

**focus** 23:17 25:19 72:16 87:7 106:11

**focusing** 53:16,22 54:4,10 72:19

**folks** 49:15,16 62:4 69:9

**follow** 61:7 81:11 111:20

**follow-up** 113:21 123:13

**form** 27:4,12 28:25 30:4 31:3 35:3,10 36:8,22 37:8 40:7 41:14 42:9 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 102:25 105:18, 20 108:5 109:25 110:23 117:8 118:4

**format** 97:4

**formation** 20:13 94:12 115:17

**formed** 94:20 118:14,16

**forward** 27:15 94:24

**forwarding** 110:4

**found** 103:20

**frankly** 80:16

**Freddie** 18:10 20:2 22:22 66:21 81:14

83:25 85:15 86:3 90:3

**Freddy** 42:8,21 69:10 78:6,9 82:2,5, 14,16 87:17 88:6

**front** 12:5,7 29:14,16

**full** 6:15

**funds** 40:15 100:14

**future** 113:4

**FW** 101:3

_____

**G**

**gave** 37:6 101:7

**general** 87:9

**generally** 66:9 87:8

**generated** 97:15

**Geotz** 44:8,14 61:8 71:17 76:18 88:5

**give** 29:11 40:5 66:13

**giving** 112:12

**Glenview** 55:11

**Goetz** 42:7,10,11 60:15 61:20 69:25 70:19 71:12 77:3,12, 17 87:13

**good** 13:3 45:22

**Gould** 12:11 26:6

**Governors** 52:22 53:7 74:3

**Grand** 57:14

**great** 16:10

**Green** 52:22 53:7 74:3

**grounds** 104:3

**group** 7:12 21:9 69:24 81:9

**guarantee/ guarantor** 40:13

**guess** 31:5 63:4 64:22 103:15 112:8

**Gulfstream** 50:23

_____

**H**

**hand** 123:20

**handful** 61:2 62:4

**handled** 10:21

**handles** 43:13 71:3

**handling** 59:24

**hat** 44:14,19 45:6 70:9

**Hayley** 103:4 108:9, 15

**HC** 30:5

**HCM** 29:23 30:8,18

**HCRE** 16:23 17:3,4, 7,20 18:6 19:6,17,22 37:11 38:14 39:25 40:6,14,22 41:9 42:4, 19,25 44:10 45:19 47:8,13 50:8,13 51:7, 8 53:10,18,25 54:6, 12 55:14,22 56:3,17, 22 57:2 58:12,24 60:10 61:12 66:6 70:11 74:16 88:17 107:12 108:21 110:15 114:10,11,13

**HCRE's** 46:12

**hear** 79:4

**hearing** 8:21 13:15, 22

**Heights** 52:6

**helped** 22:16

**helpful** 121:14

**Hidden** 56:24

**Highland** 6:18,21,23 16:21 17:10,20 18:6 19:8 23:3,5,8,13,22, 24 24:2,4,14,17 25:16 26:11 27:3,21 28:4,10,15,24 30:8,9, 11 31:6,16 39:20 40:3,6,12 41:18,23 42:11,16,22 43:7,10, 15,18,22 45:18 47:3, 8,13 50:8,12 51:7,9 53:10,18,24 54:6,12

55:13,22 56:3,17,21 57:3 58:11 59:10,12 60:3 61:19,24 62:10, 11,19 63:2,8,13,16, 24 64:10,19,24 65:12,17 69:11 70:12 71:2,14,15,18 74:17 75:25 76:10,15,22 77:4,5,8,9,12,19,24 78:4,8,14 82:2 85:3 87:12,13,15,16,17 88:7,10 89:3 90:15 92:2 107:13 108:22 109:20 110:16 114:5, 10 117:25 118:2 120:11,22

**Highland's** 46:17

**Highland136853** 122:10,18

**Highland136856** 122:19

**Highland263748** 95:25

**Highland263749** 96:8

**hired** 59:15

**history** 94:5

**Hold** 97:11

**Holdings** 14:13,20 15:18,25 16:4 70:22 94:6,22 95:4 98:17, 23 100:11 122:8

**hook** 39:20

**hour** 81:8 86:16

**hours** 11:13

**housekeeping** 11:24

**hung** 64:15

**Hunton** 62:16,18 63:7,12,15,22 64:5, 10,19,25 65:4,12,20, 22,24 108:24 120:2 121:22 122:4

_____

**I**

**i.e.** 70:10

**idea** 65:24 76:14 95:15

**ideal** 32:12

**ideally** 32:18

**identical** 74:24,25 75:8,10,11

**identically** 58:9

**identified** 69:25 120:10

**identify** 122:23

**impact** 36:6

**implications** 36:12

**important** 8:6 18:12

**improper** 36:6

**in-house** 42:9 59:10, 24 64:24 78:12 114:14 120:10

**inaccurate** 27:2 28:2

**include** 23:21

**included** 67:4 89:4 122:24

**includes** 27:3

**including** 26:11 39:20

**inconsistent** 30:2, 21

**incorrect** 19:12 26:12,15,16 72:2 114:8

**independent** 63:19 64:8

**indication** 57:18

**individually** 36:19

**individuals** 45:6,17 60:8 61:11,18 70:9 87:21,23,24 88:14

**information** 83:14

**Initially** 25:11

**initials** 68:9

**initiating** 84:8 87:4 92:6

**inquiry** 82:24 86:2

**instruct** 10:12 110:24

**instructing** 111:18

**instruction** 111:21

**instructions** 90:11 117:19

**intended** 108:4

**intent** 106:24 107:6

**interest** 19:7,9 47:12 50:12 53:17,23 58:8, 10,15 94:18 101:11, 15,17,20 106:17,21 110:9,15

**interested** 88:2

**interests** 19:23 20:11 47:7 50:7 53:8 54:5,16 58:2,7 74:16 75:2,12 93:16 95:2,7 109:22 110:18,21

**interjection** 124:13

**internal** 11:9

**interpose** 116:5

**interpret** 79:17

**interrupt** 25:5 54:25

**interruption** 12:2 85:8 109:7

**involved** 46:16 62:11,18 65:25 121:22

**involvement** 109:11

**irrespective** 41:12

**Isles** 50:23 55:18

**issue** 27:9 28:19 34:16 46:25 47:8 115:23 116:8,10 124:3,20,21

**issues** 117:13

**item** 83:23

**items** 92:12,15 93:3

**IV** 6:17

**IX** 27:16

**J**

**James** 6:17 44:5 106:8

**joint** 33:7,23 34:4,9 35:12,23 36:4,13 37:5

**jointly** 36:19 39:20 40:3

**July** 92:7 98:2 119:20

**jump** 37:20

**JV** 93:4,16

**K**

**K&e** 97:12

**Ken** 37:19 47:22

**Keybanc** 21:12

**Keybank** 18:10 20:2, 5 21:11 22:23 23:3 25:13 28:9 48:12 49:5,8 66:21 90:3 100:12 102:21,25 103:10 104:15 105:6, 15 118:25

**Kirkland** 97:14

**knowledge** 13:17 14:7 27:13 40:21,25 44:2,7 63:20 64:9 87:19 88:3,4 106:17 107:25 115:11,15

**knowledgeable** 9:7 10:23

**Kurth** 120:3 121:22 122:5

**L**

**L.P.** 6:19 19:8 24:2 29:23 30:5,8,9,19

**lack** 27:9 100:19

**Lake** 56:24

**Lakes** 54:9

**Landing** 57:18

**large** 25:15

**laundry** 69:8

**Lauren** 99:9 103:17

**law** 8:4 10:4,14 59:24 117:20 118:11

**lawyer** 68:17 78:24 118:17

**lawyers** 33:14 78:20

**lead** 21:13 37:12,16 38:13,17,18,24 39:3, 7,12 40:14 46:14 72:6 88:17,20 114:5 115:8

**leads** 64:18

**learned** 94:21

**lecture** 117:19

**legal** 26:18,19 89:22

**legible** 95:12

**legitimate** 13:7

**lender** 21:11 49:15 66:12 71:21 89:25 105:11 116:4 124:11

**lenders** 18:12 26:5

**letter** 32:19,20

**level** 59:17 70:21,23, 24 71:2 116:2 124:10

**Liability** 14:14,20 15:18 16:5 98:19,24 99:21 102:5

**liable** 40:4 41:11,18

**light** 104:22

**lights** 30:20

**limit** 20:11

**limited** 14:14,20 15:18 16:5 19:12 20:11 40:24 46:24 47:3 97:17 98:18,24 99:21 102:5

**list** 16:20 69:8

**literal** 33:15

**LLC** 14:13,20 15:21 16:4,6,9,12,13,18,23 17:3,10,11,14,24

18:7,19,20,22 19:2,6, 19,24 20:12 46:9,10 47:8,13 50:8 51:7,15 53:9,17,22 54:5,10, 16 55:6,11,19,25 56:8,13,16,20,25 57:6,10,19 58:3,8,16 63:3 70:22 74:15 75:2,13 93:4,17,22, 24 94:6,10,18,20,22 95:3,4,8 97:18 98:17, 23 99:17 100:10 101:3,9 102:11,12,18 103:11 104:25 105:6, 16,25 106:5,9,15,18, 22 107:15 108:23 109:22 110:10,20 115:17,18 116:23 118:4,8,12,14,16,20 121:10,24 122:4,8

**LLP** 12:12 26:6

**loan** 18:9,13 20:6,22 21:8 22:2,5,8,11,15, 19 23:4,9,16,18,25 24:5,8,16,19 25:17, 23 26:12,22,24 27:11,17 28:5,16,20, 21 29:22 30:16,17 31:7,10,16,19,23 32:4 33:8,17,24 34:5, 18 35:14,21,24 36:20 37:6,13 38:14,22 39:9,12,22 40:20,23 41:8,11,19,25 42:5 43:8,13,19 44:6 45:4, 16 46:4,13,18 47:2,9, 14,20 48:10 49:2 58:6,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6, 11,14,20 65:13,18 66:8,23 67:9,11 69:5, 18 71:22 72:4 74:6 80:15 88:22 89:9,13, 19,23 90:10 92:4 95:8 99:18,19 109:13,17,23 110:6 113:25 115:6 116:22 119:3 123:17

**loans** 28:8 38:23

**log** 104:3

**long** 122:17

**looked** 84:6 104:12

**lost** 111:6

**lot** 114:4

**M**

**Mac** 18:10 20:2 22:22 84:2

**made** 9:2 30:25 31:13 39:14 40:2 45:5,10,13,16 69:16 71:23 78:25 79:11 80:25

**maintained** 105:9

**make** 8:17 13:10 15:25 40:23 49:18,21 50:3 54:24 77:7 79:8 95:18 102:8 112:9 115:12 116:20 117:10,14

**makes** 8:10

**making** 80:4,19 89:23

**Management** 6:19 19:8 24:2 27:22 28:4, 15,24 30:9 107:22 110:22

**manner** 30:23

**March** 98:25

**mark** 11:17,19 14:12 20:21 72:10 88:24 120:8,9 121:8,10,19

**marked** 11:22 14:15, 18 20:23 21:5 72:13 91:2 98:19 101:4 122:10

**Markets** 21:13

**Martin** 10:11 12:11 24:21,24 25:6 26:6 27:4,12 28:25 30:4 31:3 35:3,10,15 36:8, 22 37:8 40:7 41:14 44:11,17 45:8,20,22 49:3 52:15,25 54:17, 20,23 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4, 14 72:24 74:9 76:11

80:2,22 83:19 86:20, 24 89:20 95:17 103:19,24 104:9,16 108:5 109:25 110:23 112:2,8,16,21,25 113:8,13,19 114:11, 12 116:12,20 117:4, 6,21,22 122:12 123:3

**material** 80:4 109:3, 5

**math** 107:17

**Matt** 42:7,8,10,11 60:15 69:10 70:19 71:12 75:23 87:12,13 88:5

**matter** 9:14,16 10:21 11:24 13:22 32:21,22 115:23 116:8,10 123:20 124:2,20,21

**Mcdermett** 77:15 87:14 88:5

**Mcgeoch** 119:24 120:14

**Mcgeoch's** 119:25 121:7

**Mcgraner** 42:8,15 60:15 61:9 69:10,25 70:19 71:6,13 75:23 76:15 77:17 87:12 88:5 99:12

**Mckenzie** 79:4 83:21,24 84:4,16,22, 24

**means** 79:18 80:8 107:5,9

**meant** 77:8

**mechanics** 115:6

**memorialized** 100:21,23

**memory** 119:12

**mentioned** 32:20 46:20

**merging** 83:4,18

**methodically** 111:10

**middle** 25:3

**Mill** 52:23 53:21 75:6

**million** 100:15

**mind** 39:24 47:23 59:13

**mine** 11:5,6

**minute** 85:14 100:13

**minutes** 82:15 85:25 86:23

**minutes'** 111:7

**mischaracterizing** 114:9

**missing** 54:15 84:12

**misstated** 47:5

**mistaken** 103:22 104:20

**modified** 102:21,25 106:24 107:6,10,19

**moment** 29:11 99:8

**Monday** 72:21

**money** 115:7

**moneys** 40:22

**morning** 121:19

**Morris** 99:11

**motion** 9:19 10:10 11:2 14:25 29:14 30:13 31:15

**move** 98:16

**Multi-family** 122:7

**multifamily** 14:13,19 15:18 16:4 70:22 93:24 94:5,22 95:4 98:17,22 100:10,18

**multiple** 26:19 37:5 67:3

**mute** 108:14

**N**

**names** 59:8 60:8,21 61:2,5

**National** 21:12

**nature** 14:4

**necessity** 34:16

**needed** 22:22 25:14 100:16

**negotiate** 118:8

**negotiated** 17:25

**negotiation** 15:10 17:13 20:13 115:18

**Nexpoint** 25:12 43:13 44:18 59:9,12, 14 60:15 69:11 70:20 71:7,11 76:6,21 78:11 88:6,11 90:13 116:15 117:23 118:18

**non-real-estate-lawyer** 115:21 123:24

**note** 92:12

**notice** 9:10 10:25 11:21 12:10 28:7 111:3,14

**notices** 27:18,20 28:14 29:3,6

**number** 91:18

**numbers** 122:18

**O**

**Oak** 52:23 53:21 75:6

**Oasis** 57:14

**oath** 7:25

**object** 10:11 116:17

**objection** 27:4,12 28:25 30:4 31:3 35:3, 10,15 36:8,22 37:8 40:7 41:14 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 108:5 109:25 110:23 116:20 117:7, 11

**objections** 99:24 117:7

**obligations** 38:18

**obtain** 33:5 35:7

**obtained** 39:10 40:22

**obtaining** 32:16

**obvious** 9:17

**occasion** 18:4

**occasions** 67:4

**occurred** 40:18

**offering** 13:21

**offline** 111:12 119:10,13

**Olde** 52:7

**open** 32:21 92:12 93:3

**operating** 59:16 88:9,11

**operation** 41:8

**opinion** 26:3,18 37:4,9 40:8 83:10

**opinions** 26:19

**opportunity** 8:16 112:13 113:6

**opposed** 15:7 29:8 87:8

**opposition** 11:4 29:13,19 30:13 31:14 43:17

**order** 118:20

**org** 65:11,15 67:14, 21 72:12 73:22 74:12,13,15,20 79:2, 6,9,11 80:5 81:12 82:4,5,24 83:5,24 85:18 89:17,23 90:8, 21 110:5,8,12

**organization** 66:6

**organizational** 18:11 62:23 63:17,20

**original** 94:10 97:10, 24 99:17 102:9 107:15,19

**outstanding** 83:23

**owner** 83:4,6,18 95:20 110:22

**ownership** 18:5,17, 18 19:23 20:10,17 46:23 47:7,12 50:7, 11,16 51:6,15,22 52:3,8,20 53:17,23 54:5,10 55:12,21 56:2,7,12,20 57:2,7, 11,14 58:2,7,8,10,15 74:16 75:2,12 93:16 94:18 95:2,6 101:17, 20 109:22 110:9,15, 20 118:20

**owns** 20:3

**P**

**p.m.** 72:22 81:8 109:7,8

**pages** 122:17

**Pardon** 54:19

**Park** 51:21 54:4,9

**part** 43:15 47:9 64:13,17 66:18 70:19 73:18 89:21 110:5

**parties** 16:17,19,22 17:23 20:10 28:19 90:2,12 101:21 108:3 109:12

**partner** 7:10 11:5,6 60:21 68:15 93:19,20 94:19 114:23,25 120:2

**partners** 7:11 10:19 16:23 17:3 19:6

**Partnership** 19:13 40:24 46:24 47:3

**party** 9:21 16:22 17:11,17 47:17 105:24

**pass** 95:13 112:6 123:3

**passing** 61:4 83:13 112:4

**past** 84:19

**Patrick** 88:24 120:8,

9,15,18

**Paul** 60:25 69:10 70:25 86:7,13,14 87:15 88:6 91:6,22, 24 92:17 93:8 98:2, 12 109:21 110:14

**penalty** 6:10

**people** 45:14 59:9 67:20 69:24 70:7 81:20 83:14 87:11 120:11

**percent** 19:7,9 47:18 50:12,13 51:9 53:11, 18,24 54:6,11,12 55:13,21,22 58:10,11 59:20 74:16,17 93:19,20 94:19,20 107:21 110:15,16,22

**percentage** 19:7,9 51:15,22 52:3,8 54:11 55:12,21 101:10,15 106:17,20 110:18

**percentages** 18:5, 18 19:11 20:17 51:7 52:21 56:2,7,12,16, 20,21 57:2,7,11,15 107:13,14,18,19 108:2

**perfectly** 113:16

**perform** 67:7

**perjury** 6:11

**permitted** 41:9

**person** 120:22

**personal** 10:5

**personally** 15:7 32:23

**petition** 112:10

**Phillips** 6:1 7:1,9 8:1, 25 9:1,8,9,13,20 10:1,4 11:1 12:1,11, 19 13:1,16,19 14:1,3, 6 15:1,4,8 16:1 17:1, 12,22 18:1,3,17 19:1, 16,21 20:1,9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1, 6,9,17,23 27:1,8,22

28:1,3,9,13,18,22 29:1,20,22 30:1,14, 18,24 31:1,15,22,25 32:1,9 33:1,5,21 34:1,2,7,18,20 35:1, 6,18 36:1,2,11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1 43:1, 4,16,21,24 44:1,4,13 45:1,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,23 59:1,6 60:1, 7,9,14 61:1,10,17,22 62:1,12 63:1 64:1,4, 23 65:1,5,9,16 66:1,5 67:1,7 68:1,3,15,17, 24 69:1,3,16,22 70:1, 8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 19 89:1,12,17 90:1, 10,20 91:1,21 92:1, 18 93:1 94:1 95:1 96:1 97:1 98:1,5,8,11 99:1 100:1 101:1 102:1 103:1,10 104:1,14 105:1,15,23 106:1,7,13 107:1,24 108:1 109:1,15,19 110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 13,24 117:1 118:1,4, 7,17,19 119:1 120:1, 13 121:1,2,4 122:1, 24 123:1,16 124:1,2

**Phillips'** 10:8 12:24 14:8 15:13,17,20 26:25 27:25 29:13,24 30:12 31:13 32:14 33:23 35:23 42:3 43:6 45:2 58:21 59:13 88:3 89:8 92:2 102:3,16 104:24 109:11 116:7 122:3 123:2 124:23

**phone** 108:10,11

**place** 56:16 97:20

105:18,20

**played** 22:14

**pleadings** 30:25

**point** 42:8 83:21 84:16 113:4

**portfolio** 95:21

**portion** 59:25 90:5 101:23 107:11

**position** 7:8 13:17 27:25 28:22

**positive** 101:24

**potential** 34:10 35:21 37:7 40:5 97:16

**practice** 32:15 117:20

**precluded** 13:20

**preparation** 15:9 33:20 49:12 60:19 68:23 73:18 91:14

**prepare** 49:8 106:2

**prepared** 10:23 12:23 48:24 50:18 65:15 67:21

**preparing** 11:11 15:3 65:25

**presented** 34:10 112:11

**pretend** 52:16

**pretty** 113:16

**previous** 28:8 100:17

**previously** 28:12 76:4 86:7 91:25 98:14 100:14 120:9

**primarily** 46:20 68:7 90:12

**prior** 44:23 48:3 51:11 56:3,8,22 57:3, 15 74:6 82:14 94:9 100:18 105:4 106:25 107:7 119:5

**privilege** 10:13,14, 18 36:14 104:3

**pro** 107:20

**problem** 8:12 33:14

**procedure** 9:2 112:17 117:9

**procedures** 7:22

**proceeding** 9:3

**PROCEEDINGS** 6:5

**proceeds** 38:22 39:8 41:20,21,24

**produced** 104:2,11

**Professional** 34:21

**Project** 15:22 16:15 22:18,25 46:6 72:11 105:10 118:21 124:24

**pronounced** 6:25

**proof** 9:21

**properties** 22:21 52:19 66:11 94:18

**property** 46:6 51:3 59:17 70:23 96:21

**property-level** 22:16 25:12 40:16

**proportional** 107:20

**proposed** 95:22

**protocol** 7:22

**provide** 9:6 10:23 22:23 25:8 46:5,20

**provided** 38:23 39:2 48:11 49:4,7 83:14 119:5

**providing** 25:3 26:18

**provision** 28:7 39:17

**pulled** 100:13

**purpose** 15:24 16:11,13 46:4

**purposes** 66:19

**pursuant** 8:25

**put** 90:23 108:13

**Q**

**question** 8:7 10:13, 18 13:7,18 23:8 24:24 25:9 32:8 43:23 47:5,11 65:18 70:16,18 83:2,9,11, 17 85:11,19 103:16 110:25 123:6,8,11, 20,23

**questions** 10:24 13:5,12 106:16 111:25 112:3,13,15, 20 113:11,21 114:5 115:5 117:15,16 119:14 122:2 123:7, 12,13

**quickly** 37:21

**quote** 80:11

**R**

**Rachel** 11:6 72:22 73:7,11 75:6 78:23 79:12 80:24 81:10,19 82:3,6,13,16,24,25 83:22 84:8 85:15,16, 24,25 87:10 88:15

**Rachel's** 85:14

**raise** 27:9 28:19 104:18

**raises** 103:15

**ran** 104:17

**Ranch** 56:6

**rata** 107:20

**RE-EXAMINATION** 124:15

**read** 19:4 29:18 112:16 121:7 123:9, 21

**reading** 16:20 121:9 123:10,22 124:6

**ready** 82:6,25

**real** 7:11 10:19,20 43:12 59:15 115:25 118:17 124:9

**reason** 80:10

**reasons** 54:18,21

**recall** 59:8 61:4

**receive** 85:21 86:10 89:24 91:21 92:19

**received** 26:2 41:20, 24 49:21 82:10 98:4, 6 103:9

**receiving** 28:14

**recess** 45:24 86:25 108:8,19

**recipient** 77:23 84:17

**recipients** 78:21 91:18

**recollection** 51:13 76:8 77:2,10 79:10

**reconvene** 86:23

**record** 6:16 8:11 54:24 77:7 111:4 117:2

**Recross** 113:8

**redirect** 113:6

**reduction** 107:21

**reexamination** 112:11

**reexamine** 112:7

**refer** 6:23 9:16 16:4 17:2,7 21:25 79:15 102:11,12

**reference** 33:22 51:2 74:14

**referenced** 75:24 78:7

**referencing** 26:10 84:19

**referred** 77:22 93:17 101:6 102:9 124:22

**referring** 6:20 14:5 22:4 26:8 30:16 93:22 101:16 102:13 116:10

**refers** 26:25 74:3 93:5,25 95:2

**reflect** 28:22 51:14 58:2,9 63:7 83:6 89:11 107:18 108:3 110:14,20 111:5

**reflected** 51:8,22 52:3,8 53:9,17,23 54:5,11 56:2,8,13,17, 21 57:2,7,11 67:18 81:20 89:15 108:2

**reflecting** 55:20 58:6 95:21 101:14

**reflection** 57:19 75:12 110:9

**reflects** 28:3 50:7,11 55:12 94:18 95:6

**refresh** 76:8 77:2,10 79:9

**REIT** 65:2 83:22 85:18 86:5

**reiterating** 83:23

**related** 67:11 79:24 110:4

**relates** 18:14 89:8

**relating** 10:24 28:15 32:4 33:24 60:9 67:5, 17 68:3,5,19 69:5,19 88:21 89:17 98:12 103:10

**relation** 11:9

**relationship** 100:17

**rely** 71:4

**relying** 71:22

**remainder** 101:23

**remaining** 83:2 85:11

**remember** 114:7 119:16

**remote** 6:2,9

**Renaissance** 54:9

**repeat** 21:10

**repeating** 55:20

**rephrase** 47:5

**reporter** 8:11 11:17, 18 111:6 119:9

123:10,22 124:4,6

**represent** 17:16,19 23:2,8 24:7,12,13,16 25:2 29:4,9 31:8,15, 22 36:20 65:12 84:25 95:16 103:20 105:24

**representation** 23:12 26:25 28:23 32:11,17,25 33:7 34:4,9 35:13,23 36:4, 5,13 37:2,5 43:21 45:2,3 59:23 60:10 62:19 63:2 72:2 109:12 114:4 115:22, 25 116:25 123:25 124:8,20

**representations** 27:10 35:2 44:23 66:23 67:3,10

**representative** 68:14 71:14 76:5,10 77:4,12,19 78:4,10 91:25

**representatives** 61:12,19,23 88:16

**represented** 24:9 25:11 26:17 28:4 29:7 31:18 43:18 63:7,13 64:10,19 65:16 85:6 105:14 108:21 109:15 113:24 116:14 123:16

**representing** 9:20 87:23,24 92:3 118:18

**represents** 10:3

**reps** 67:4,16,17 68:4, 19 69:4,18 71:22

**requested** 38:24

**require** 32:9

**required** 9:6 13:5 19:18 32:21 34:11 116:4 124:12

**requirement** 32:13

**requires** 34:25

**reserve** 52:2 55:11 112:7

**reserving** 99:23

**respect** 9:8 13:17 20:10 28:23 32:15 44:8 53:8 55:11,19, 25 56:11,15,25 57:6, 10,13,17 58:5 74:25 75:5,11 99:15 106:5, 16 109:22 116:18,22, 23

**responded** 98:9

**responds** 85:25

**response** 13:7,8 82:14,23 85:24

**responses** 9:13

**responsibilities** 36:3,7

**rest** 21:24

**Restated** 98:18,23 99:20 100:10 102:4 122:9

**restructure** 66:18

**retention** 32:2,10,16, 19,24 106:4

**retraded** 100:12

**reverts** 93:15

**review** 8:16 38:6 49:24 51:11 73:17 91:13 109:3

**reviewed** 11:2 12:15, 21 86:7

**reviewing** 11:7 38:8 60:18

**Ridge** 52:23 53:15 56:19 74:21

**rights** 38:18

**rise** 37:6 40:5

**risk** 9:17

**risks** 36:18

**River** 52:2

**ROB** 6:7

**Robert** 6:17

**role** 7:8 15:8,13,17, 20 17:12 22:11,13

46:12,17 48:8 49:12 61:3 65:10 78:12 92:3 102:3,17 104:24 105:8 106:14 115:8 116:7 122:3 124:23

**room** 119:8

**Rule** 8:25 9:3,10 15:3 58:21

**rules** 7:20 34:21 117:8

**run** 7:11

---

**S**

**S-A-U-T-E-R** 68:12

**Sam** 11:6 72:22 73:7, 11 75:21 78:23 81:19 82:3,16,24 84:8 85:15,16,25 87:10 88:15

**Sam's** 75:6 82:13 85:24

**Sauter** 11:5 68:7,12, 13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 114:21,22,25 115:10

**schedule** 47:19 48:4,6,9,13 49:19,20 50:7,21 51:12 58:5, 19 59:2 63:21 64:18 66:7 67:19 69:17 74:5,14,24 75:8,10 89:18 90:9 95:7 100:24 101:8,13,14 106:21 108:2 110:5, 19 121:14

**schedules** 49:5,7,9, 13,19 50:17

**scope** 59:22 111:2, 13 115:21,24 123:25 124:7,19

**scrap** 111:12

**screen** 12:6,8 21:2,5 72:20 87:3 90:24

**scroll** 12:17 19:2 25:18 27:15 47:19 50:20 55:9,16 72:14

73:23 74:19 75:4,15
81:3,22 84:11,13
85:12,23 92:24 93:7,
13 94:15,24

**section** 10:20 25:20
27:17,19 28:2,20
34:22,25 35:9 37:20,
23 38:7,11,16,21
64:13,17

**select** 121:12

**selected** 10:8

**seller** 97:16,17

**separate** 43:15 60:3
108:11 117:14

**separately** 23:6

**September** 20:22
21:8 72:21 75:19
81:25 84:9 85:10,13

**services** 88:7 117:24

**set** 19:23 21:9 58:15
106:17,21 123:7

**sets** 12:18

**setup** 40:19

**severally** 39:21 40:4

**share** 85:18 86:5

**shared** 88:7 117:24

**short** 63:5 100:15

**show** 90:9

**showing** 75:25

**shown** 55:6

**shows** 101:22

**sic** 91:5

**side** 25:14 59:25 71:2
85:3 90:13,15

**sign** 112:17

**signature** 119:25

**signoff** 79:3 84:22

**silo** 43:12,13 59:16

**siloed** 105:8

**similar** 32:18 74:6
80:15

**Similarly** 96:10

**simple** 102:8

**simpler** 16:2

**simply** 83:23 104:20

**sir** 6:24 7:6,15 8:2,5,
14,18,22 9:4,11,15,
25 10:6 12:14,16,22
13:2 14:10,23 15:11,
15 16:25 17:15,18
18:15,21 19:3,15,20
20:19 21:4,17,20,22
22:6,9,12 23:6,11,23
24:6 26:14 27:5,23
29:16 31:24 32:5,12
33:12,18 34:23 35:4
37:14,17 38:12,20
39:16,23 40:8 41:2,5
43:5 45:10 46:11
47:15 48:7,23 49:4,
10,23 50:2,5,10,14,
19,25 51:5,10,17,24
52:5,10 53:13,20
54:2,8,13 55:15,23
56:5,10,14,18,23
57:4,8,12,16,21
58:13 59:4 60:20
62:14,23 63:4 64:7
66:25 67:6 68:21,25
69:21 70:5 71:9,24
72:5,8 73:12,14,20
74:10,18 75:3,14
76:3,7,12,17,24 77:6,
13,16 78:2,15,18
79:20 80:9 81:2,17,
21 82:8,11,19,22
83:20 84:6,10 85:7,
22 88:13 89:6,10,14
90:16,22 91:7,10,16,
20,23 92:5,20 93:12
94:3,14,23 95:5,10
96:3,20,22 97:19
98:7 99:3,6 100:25
101:18 102:15 106:6
109:14,18 110:11,17
111:22 114:24 115:3,
19 119:11,17,21
120:4,12,16,20,24
122:6

**sit** 37:3 65:23

**sloppy** 14:2

**sole** 21:13

**sooner** 92:16

**sort** 22:23 49:14
59:16,18 66:16 78:11
105:10

**speak** 68:22 69:3

**speaking** 44:15
70:10,11,12 71:7,11
84:19 106:23 117:10

**specific** 59:8 61:5

**specifically** 14:6
92:14 93:6 115:25
124:9

**speculating** 65:19
80:21

**speculation** 88:3

**spell** 68:8

**spend** 11:10

**spoke** 45:6 62:8
68:25 69:24 70:10

**standard** 112:17

**started** 15:3 117:21

**starting** 52:18
119:20 122:18

**Starwood** 95:20

**state** 6:15

**statement** 26:8,12
29:24 31:13 101:19

**stating** 9:17

**Statutory** 80:7 85:4

**stipulate** 99:13

**Stoney** 52:23 53:15
74:21

**stop** 108:14

**strike** 61:21

**string** 89:7 90:19
92:7 119:19

**structure** 18:11
46:24 59:19 62:23
66:10,19 83:9 95:19,
22 96:12,17 97:8,20
102:21,25 118:20
119:2

**structures** 52:25

**structuring** 16:15
59:22 62:6,14

**subject** 93:22

**submit** 81:14

**subsequently** 94:21

**subsidiaries** 46:11
58:7 67:5,12,18 68:5,
20 69:6 83:10

**substance** 67:23
79:24 84:20

**substantially** 80:14

**substantive** 83:8,11,
17

**sufficiently** 95:12

**Summers** 57:18

**Support** 11:3

**suppose** 64:15

**suspicion** 18:8 28:6

---

**T**

**table** 24:25

**takes** 57:22

**taking** 90:10

**talk** 16:9 20:4,5
104:23 108:9

**talked** 46:15 66:17

**talking** 8:9 11:4 16:8
17:6 59:21 100:11

**talks** 38:16

**tape** 104:17

**tax** 63:16 64:25

**team** 59:10 69:11

**technical** 109:7

**telephonic** 85:8
103:3

**term** 14:2,5 23:18,20
35:20 100:20

**terms** 20:2 26:18
45:13 87:9 101:16
115:21 123:24

**testified** 66:15 76:4,
19 79:7 91:25

**testify** 12:23 73:18

**testifying** 30:23 43:3
60:6

**testimony** 6:10 10:3,
4,5 13:21 26:23 30:2,
21 68:23 91:14 101:7
105:4 106:13 111:7

**Texas** 34:21 120:5

**thing** 16:8 17:7 96:17

**things** 59:25 70:20
71:2

**thought** 113:3

**thoughts** 121:15

**Tim** 120:18,22

**time** 8:10,20 11:10
18:4 19:12,15 27:11
45:22 50:17 60:22
68:6 86:16 96:12
97:22 114:16,22
121:18

**to-be-formed** 95:3

**today** 9:18 10:3
12:25 13:4 26:23
30:3,21 37:3 65:24
73:19 91:15 116:14
118:5,9

**top** 120:17

**topics** 9:8 10:25
12:18,21,25 13:13

**tortured** 113:14

**tough** 95:18 96:10

**Towne** 52:7 56:11

**trace** 94:5

**transaction** 15:23
25:15 60:24 105:10

**transactions** 52:17
114:17

**transcript** 8:16

**transfer** 39:8

**transfers** 39:15

**transmitted** 110:13

**true** 21:23 22:7 44:25 67:12 69:19 99:4 105:23

**Trust** 80:8 85:4

**truthful** 6:10 13:8

**truthfully** 13:6

**turn** 23:15

**typical** 64:25

**typically** 26:21 42:7 44:19 59:23 63:15

**typo** 79:17,19

**typos** 79:13,15 80:11 83:13

**U**

**Uh-huh** 72:23

**ultimately** 95:3

**unclear** 8:10

**underlying** 51:3 68:18 96:21

**understand** 6:22 7:20,24 8:7,13,15,23 9:12 10:2 13:11,23 14:9 15:12 17:5 22:3 37:11 43:3 47:10 70:16 102:13 107:4, 5,9 113:2 124:18,22

**understanding** 9:24 16:24 19:11 36:25 37:15 39:11,19 40:11 50:16 66:10 69:15,23 71:4 85:5 100:11 104:24 106:19 109:2 113:23 118:13 120:21 123:15 124:18

**understood** 71:20, 25

**undertake** 32:25 36:2

**undertaken** 36:6

**undertakes** 32:10, 17

**undertook** 34:8

**Unicorn** 15:22 16:15 22:18,25 46:6 72:11 90:25 105:10 118:21 121:10,12 124:24

**universe** 70:3

**unpack** 107:8

**updated** 79:5

**updating** 106:25 107:7

**upright** 48:19

**V**

**vague** 116:17

**version** 74:7,25 75:11

**versions** 86:4

**Victoria** 51:21

**video** 108:14

**videoconference** 6:2,9

**view** 48:19

**virtually** 74:24 75:10

**Vista** 56:19

**Vosburgh** 14:11 20:20 123:5

**W**

**Wait** 8:7

**waiting** 79:3 84:21

**waive** 10:15

**waiver** 33:6,11,17,23 34:3,11,17 35:7 114:19

**walk** 52:2 121:15

**Walker** 56:6

**wanted** 81:11

**warranties** 66:24 67:3,4,11,16,17 68:4, 19 69:5,18 71:23

**warranty** 72:3

**wearing** 44:14,18 45:6 70:9

**week** 92:13

**West** 56:16

**whomever** 90:3

**Wick** 6:1 7:1,9 8:1,25 9:1,8,9,13,20 10:1,4, 8 11:1 12:1,11,19,24 13:1,16,19 14:1,3,6,8 15:1,4,8,13,17,20 16:1 17:1,12,22 18:1, 3,17 19:1,16,21 20:1, 9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1,6,9,17, 23,25 27:1,8,22,25 28:1,3,9,13,18,22 29:1,13,20,22,24 30:1,12,14,18,24 31:1,13,15,22,25 32:1,9,14 33:1,5,21, 23 34:1,2,7,18,20 35:1,6,18,23 36:1,2, 11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1,3 43:1,4,6,16, 21,24 44:1,4,13 45:1, 2,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,21,23 59:1,6,13 60:1,7,9,14 61:1,10, 17,22 62:1,12 63:1 64:1,4,23 65:1,5,9,16 66:1,5 67:1,7 68:1,3, 15,17,24 69:1,3,16, 22 70:1,8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 2,19 89:1,8,12,17 90:1,10,20 91:1,21 92:1,2,18 93:1 94:1 95:1 96:1 97:1 98:1, 5,8,11 99:1 100:1 101:1 102:1,3,16 103:1,10 104:1,14,24 105:1,15,23 106:1,7, 13 107:1,24 108:1 109:1,11,15,19

110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 7,13,24 117:1 118:1, 4,7,17,19 119:1 120:1,13 121:1,2,4 122:1,3,24 123:1,2, 16 124:1,2,23

**Wick-phillips** 106:14

**Williams** 62:16,18 108:24

**Willis** 7:2

**Wills** 6:1,7,17,18 7:1, 3,4 8:1 9:1 10:1 11:1 12:1,4 13:1 14:1,18 15:1 16:1 17:1 18:1 19:1 20:1,25 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1,7 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,3 47:1 48:1,5 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,17 71:1 72:1,19 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1,20 86:1 87:1,6 88:1 89:1 90:1 91:1 92:1 93:1, 11 94:1 95:1 96:1 97:1 98:1 99:1 100:1, 8 101:1 102:1 103:1, 15,22 104:1,19,22 105:1 106:1 107:1 108:1 109:1,10 110:1 111:1,21 112:1,12 113:1,20 114:1 115:1 116:1,13 117:1 118:1 119:1 120:1 121:1 122:1 123:1,8,11 124:1,17

**WINOGRAD** 103:6, 12 108:12,17

**withholding** 103:24, 25 104:4,5

**word** 121:8

**words** 87:22 88:10

**work** 32:3 68:18 89:9,12,16 118:21 120:25

**worked** 28:8,9

**working** 85:17 116:2 124:10

**works** 16:10

**world** 32:12

**worry** 100:2

**worth** 111:7

**writing** 75:22

**writings** 63:6

**written** 26:3 34:25 35:7

**Y**

**yesterday** 68:25