# EXHIBIT 63

1      IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE NORTHERN DISTRICT OF TEXAS

3         DALLAS DIVISION

4

5

6  In re          §

7             §

8  HIGHLAND CAPITAL     § Chapter 11

9  MANAGEMENT, L.P.,     § Case No. 19-34054-SGJ11

10

11

12

13

14

15

16

17      Remote Oral Deposition of

18        MARK PATRICK

19         Dallas, Texas

20        Friday, August 13, 2021

21          11:06 a.m.

22

23

24   Job No.: 197674
Pages: 1 - 79

25   Reported by: Micheal A. Johnson, RDR, CRR

Page 2

1    Remote Oral Deposition of MARK
2  PATRICK, held via Zoom videoconference at the
3  location of the witness:
4
5    Dallas, Texas 75201
6
7    Pursuant to Notice, before Micheal A.
8  Johnson, Registered Diplomate Reporter and
9  Certified Realtime Reporter.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    REMOTE APPEARANCES
2  ON BEHALF OF THE DEBTOR
   HIGHLAND CAPITAL MANAGEMENT, L.P.:
3
     Kenneth Brown, Esq.
4     Hayley Winograd, Esq.
     PACHULSKI STANG ZIEHL & JONES
5     150 California Street
     San Francisco, California 94111
6
7
8
   ON BEHALF OF
9  UBS SECURITIES LLC AND
   UBS AG LONDON BRANCH:
10
     Shannon McLaughlin, Esq.
11    LATHAM & WATKINS
     1271 Avenue of the Americas
12    New York, New York 10020
13
14
   ON BEHALF OF THE
15  UNSECURED CREDITORS COMMITTEE:
16    Elliot Bromagen, Esq.
     SIDLEY AUSTIN
17    One South Dearborn Street
     Chicago, Illinois 60603
18
19
20  ON BEHALF OF CRE PARTNERS, LLC
     (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC):
21
     Lauren Drawhorn, Esq.
22    WICK PHILLIPS
     100 Throckmorton Street
23    Fort Worth, Texas 76102
24
25

Page 4

1    APPEARANCES CONTINUED
2  ON BEHALF OF THE WITNESS:
3    Debra Dandeneau, Esq.
     Michelle Hartmann, Esq.
4    BAKER & McKENZIE
     452 Fifth Avenue
5    New York, New York 10018
6
7
8  ALSO PRESENT:
9    La Asia Canty
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         M. PATRICK - 8/13/2021
2           PROCEEDINGS
3           MARK PATRICK
4  called as a witness, having been duly sworn, was
5  examined and testified as follows:
6           EXAMINATION
7  BY MR. BROWN:
8    Q.  Mr. Patrick, my name is Kenneth Brown.
9  I am with the law firm of Pachulski Stang Ziehl &
10  Jones and I represent Highland Capital Management,
11  LP, the debtor, in a Chapter 11 case.  If I refer
12  to Highland during this deposition, you'll
13  understand that I'm referring to Highland Capital
14  Management, LP, will you?
15    A.  Yes.
16    Q.  Okay.  Have you ever had your
17  deposition taken before?
18    A.  Once before.
19    Q.  Okay.  I'm going to just briefly go
20  over some ground rules for the deposition before
21  we start.  You understand that you are under oath
22  and the court -- and the testimony you give today
23  in this deposition is the same as if you gave
24  it -- gave your sworn testimony in a court of law?
25    A.  Yes.

Page 6

M. PATRICK - 8/13/2021

1
2    Q.  And that you are obligated to tell the
3  truth?
4    A.  Yes.
5    Q.  Okay.  I'm going to be asking you a
6  series of questions and you're going to answer
7  those questions to the best of your knowledge and
8  as truthfully as you can.  It's important that you
9  understand the questions I ask you.  And so if you
10  don't understand, feel free to ask me or tell me
11  that you don't understand the question.  You
12  understand that --
13    A.  Yes.
14    Q.  -- you're free to ask me to restate
15  the question or tell me --
16    A.  Yes.
17    Q.  -- you don't understand?
18    A.  Yes.
19    Q.  It's also important, and especially
20  important in this format that we're using, using
21  the Zoom platform, that we get an accurate record
22  of what my questions are and what your testimony
23  is.  And in order to do that, it's important that
24  we don't -- we try not to speak at the same time.
25  So please allow me to finish my question before

Page 7

M. PATRICK - 8/13/2021

1
2  you begin to answer it, because the court reporter
3  can't take down two people speaking at the same
4  time.  You understand?
5    A.  Yes.
6    Q.  Okay.  Is there any reason that you
7  can't give truthful and accurate testimony today
8  to the best of your recollection?
9    A.  No.
10    Q.  All right.  Have you done anything to
11  prepare for this deposition?
12    A.  Yes.
13    Q.  Can you tell me what you did?
14    A.  I spoke to the Baker firm yesterday
15  afternoon.
16    Q.  Okay.  And is the Baker firm your
17  counsel?
18    A.  Yes.
19    Q.  And does the Baker firm represent
20  other entities that are affiliated with
21  Jim Dondero?
22    MS. DANDENEAU:  Objection to form.
23    A.  I don't know.
24  BY MR. BROWN:
25    Q.  You can answer the question.

Page 8

M. PATRICK - 8/13/2021

1
2    A.  I don't know.
3    Q.  You have -- you don't know whether or
4  not -- well, who do you work for, Mr. Patrick?
5    A.  I work for Skyview.
6    Q.  Okay.  Do you work for any -- well,
7  let's do it this way.  Can you tell me what your
8  employment history is?
9    A.  It's --
10    Q.  Let's go back even further.  What's
11  your educational background?
12    A.  I went to the University of Miami for
13  college, I went to Boston University for law
14  school and then I went to NYU for a master of laws
15  and taxation.
16    Q.  Okay.  And tell me your employment
17  history.
18    A.  Well, I'll go back as far as when I
19  started with Highland, and that was in January of
20  2008.
21    Q.  When you say Highland, what -- are you
22  referring to Highland Capital Management, LP, the
23  debtor in the bankruptcy case?
24    A.  Yes.  As you indicated, we can use the
25  word Highland.

Page 9

M. PATRICK - 8/13/2021

1
2    Q.  Thank you.
3    MS. DANDENEAU:  Mr. Brown, I would
4  just ask that you please let the witness finish
5  his answer before interrupting -- before
6  interjecting.
7    A.  So my employment at Highland ended at
8  the end of February and then my employment began
9  with a company called Skyview.  I'm not sure if it
10  was legally formed as Highgate Consultants and
11  doing business as Skyview, but that is the company
12  I work for.
13  BY MR. BROWN:
14    Q.  Okay.  So in January 2008, you began
15  working for Highland and you ceased your
16  employment there in February of 2021?
17    A.  Yes.
18    Q.  Okay.  And while you were employed by
19  Highland, in what capacity were you employed?
20    A.  I was an employee in the tax
21  department.
22    Q.  Okay.  And did you -- is -- your
23  current employer is called, again -- can you tell
24  me what it is again?
25    A.  Skyview.

Page 10

M. PATRICK - 8/13/2021

1
2    Q. Skyview.
3    A. Skyview Group I believe is the full
4  name. I could be incorrect.
5    Q. Okay. And what is Skyview Group?
6      MS. DANDENEAU: Objection to form.
7    A. It's a business.
8  BY MR. BROWN:
9    Q. And what does it do?
10   A. It provides back office services.
11   Q. For whom?
12   A. For a variety of entities.
13   Q. And are -- do you know if Jim Dondero
14 is involved with any of those entities in any way?
15     MS. DANDENEAU: Objection to form.
16   A. I'm sorry, what entities are you
17 referring to?
18 BY MR. BROWN:
19   Q. Well, is he -- is Jim Dondero involved
20 in Skyview Group?
21     MS. DANDENEAU: Objection to form.
22   A. What do you mean by involved?
23 BY MR. BROWN:
24   Q. Does he have any affiliation with it?
25     MS. DANDENEAU: Objection to form.

Page 11

M. PATRICK - 8/13/2021

1
2    A. What do you mean by affiliation?
3  BY MR. BROWN:
4    Q. What do you understand -- you're a
5  lawyer, a tax lawyer. What do you understand the
6  term affiliation to mean?
7      MS. DANDENEAU: Objection to form.
8    A. I would define it as ownership. And
9  if that is the case, he has no affiliation with
10 Skyview, is my understanding.
11 BY MR. BROWN:
12   Q. Does he have any other relationship to
13 Skyview separate and apart from ownership?
14   A. What do you mean by relationships?
15   Q. How would you define relationship,
16 Mr. Patrick?
17   A. I'll define it as if -- whether he or
18 his entities have -- are clients of Skyview Group.
19   Q. No, I'm talking about broader than
20 that. Does he have any role at Skyview?
21     MS. DANDENEAU: Objection to form.
22   A. No.
23 BY MR. BROWN:
24   Q. Do you communicate with Jim Dondero?
25   A. Yes.

Page 12

M. PATRICK - 8/13/2021

1
2    Q. Let me state it another way. Since
3  February of 2021, have you had any communications
4  with Jim Dondero?
5    A. Yes, I have.
6    Q. In what capacity have you had those
7  communications?
8    A. Well, as an employee of Skyview Group.
9    Q. And why have you communicated with
10 Jim Dondero as an employee of the Skyview Group?
11   A. We have back office service agreements
12 with respect to some of his entities.
13   Q. Which entities?
14   A. I don't know all of them.
15   Q. State the ones you do know, please.
16   A. Yeah. I think NexAnnuity is one of
17 his entities that we have a back office
18 arrangement with.
19   Q. Any others that you can recall?
20   A. I have not seen the agreement, so I
21 would have to be making a lot of assumptions.
22   Q. Well, you're required to testify to
23 the best of your recollection and that's what I
24 want.
25     MS. DANDENEAU: Well, Mr. Brown, this

Page 13

M. PATRICK - 8/13/2021

1
2  deposition is ostensibly about the motion to
3  disqualify Wick Phillips. And you are -- you are
4  quizzing Mr. Patrick about something that is
5  completely outside the scope of the motion to
6  disqualify Wick Phillips. So you can go on this
7  path if you want, but I'm not really sure where
8  it's leading in connection with that motion.
9  BY MR. BROWN:
10   Q. Mr. Patrick, can you please answer my
11 question?
12   A. Can you please restate the question?
13     MR. BROWN: Can you read back the
14 question, please, Mr. Johnson.
15     (Requested portion read back.)
16 BY MR. BROWN:
17   Q. The question was what other entities
18 does Skyview Group provide services to that
19 Mr. Dondero is involved with?
20     MS. DANDENEAU: Objection to form.
21   A. I don't know because I've not seen the
22 service agreement, so I would have to be
23 speculating. That's my answer.
24 BY MR. BROWN:
25   Q. Okay. Separate and apart from having

Page 14

1      M. PATRICK - 8/13/2021
2  reviewed the service agreement, do you have any
3  independent recollection of the entities that
4  Skyview Group provides services to that are in any
5  way related to Mr. Dondero?
6      A.  No, without speculating.
7      Q.  Well, go ahead.  You can speculate.
8  If you have an idea, you can tell me what that --
9  what those entities are.  I want to know to the
10 best of your recollection.
11     A.  Yeah, I -- I would -- I mean, I'm
12 just -- I would just speculate.  I don't really
13 know because I haven't seen the agreements.
14     Q.  Go ahead and tell me what you think.
15     A.  I think I don't really know.
16     Q.  What's your role at Skyview Group?
17     A.  Well, we're in -- we're a new start-up
18 company, so we're in transition.  So I don't think
19 my role has been clearly defined as of yet.
20     Q.  What do you do day to day?
21     A.  I do a lot of work on behalf of the
22 charitable investment vehicle that I'm director
23 of.
24     Q.  Okay.  What kind of work?
25     A.  Decisions and management.

Page 15

1      M. PATRICK - 8/13/2021
2      Q.  Do you do tax work?
3      A.  No, I have not -- to my best
4  recollection, I have not done a lot of tax work
5  since my transition.
6      Q.  Okay.  Have you ever done any work for
7  HCRE Partners, LLC?
8      A.  HCRE Partners, LLC, work for.  What do
9  you mean by work for?
10     Q.  How do you understand the term work?
11     A.  Well, I would say -- have I received a
12 W-2 statement from HCRE and the answer is no.
13     Q.  No.  Have you ever been involved in
14 providing any kinds of advice or service to HCRE
15 Partners, LLC?
16         MS. DANDENEAU:  Objection to form.
17         MS. DRAWHORN:  Ken, is there -- are
18 you talking about when he's Skyview or are you
19 talking completely --
20         MR. BROWN:  Let's start --
21         MS. DRAWHORN:  I don't know that's
22 clear.
23 BY MR. BROWN:
24     Q.  When you were at Highland?
25     A.  Advice or service to HCRE, if I

Page 16

1      M. PATRICK - 8/13/2021
2  understand the question.
3      Q.  Yeah.  And we can refer -- again,
4  we'll refer to HCRE Partners, LLC, as HCRE.  Will
5  you understand -- will we be on the same page if I
6  do that?
7      A.  Yes.  I cannot recall specifically.
8      Q.  While you were at Highland, did you
9  ever have any communications with representatives
10 of HCRE?
11         MS. DANDENEAU:  Objection to form.
12     A.  Representatives?  What do you mean by
13 representatives?
14 BY MR. BROWN:
15     Q.  Anybody that was affiliated with HCRE,
16 either employed by or represented HCRE; employees,
17 officers, directors, managing agents, attorneys,
18 accountants, consultants.
19         MS. DANDENEAU:  Objection to form.
20         MR. BROWN:  I'm sorry?  Ms. Dandeneau,
21 did you say something?
22         MS. DANDENEAU:  No, I'm sorry, I kind
23 of lost the thread of that question, but just
24 objection to form.
25

Page 17

1      M. PATRICK - 8/13/2021
2  BY MR. BROWN:
3      Q.  Do you understand the question,
4  Mr. Patrick?  You were asking me to describe the
5  individuals I was interested to know whether you
6  communicated with in their capacity as the
7  representatives of HCRE and I was giving you a
8  noninclusive set of examples.
9      A.  Yes, no.  Thank you.  Mr. Dondero in
10 his capacity as the manager and president of HCRE
11 is my recollection, as far as myself having a
12 conversation with him.
13     Q.  Okay.  And when you would speak to
14 Mr. Dondero as a representative of HCRE, how did
15 you know whether he was wearing an HCRE hat or a
16 Highland hat?
17         MS. DANDENEAU:  Objection to form.
18 BY MR. BROWN:
19     Q.  You understand by what I mean?
20     A.  Yeah.  Yeah.  No, I follow.  Because
21 at the time -- the time that I was talking to him,
22 he was -- he had both capacity as the general --
23 sort of as the president or the general partner of
24 Highland, if you will, and then knowing also that
25 he was also the manager, if you will, of HCRE.

Page 18

M. PATRICK - 8/13/2021

1
2 So, you know, I was talking to Jim -- to Jim, is
3 the best way I can kind of describe it.
4     Q.  So when you talked to Jim, meaning
5 Jim Dondero, when you were employed by Highland,
6 there was no way for you to distinguish whether
7 Jim Dondero was acting as a representative of
8 Highland or HCRE; is that correct?
9     A.  I don't agree with that
10 characterization.
11     Q.  Well, that --
12     A.  I would -- when I think about the
13 conversations where -- if you -- you originally
14 asked me, have I had a conversation with a
15 representative of HCRE, the answer was yes, I
16 recall was my testimony, because I do know he held
17 that position. So when -- when I -- I think -- I
18 think you have to be a little more specific as to
19 the context of asking me. There's no way to
20 distinguish because, you know, I think certain
21 situations I could easily distinguish, but we're
22 really talking hypotheticals at this point. You
23 have to give me some specific situations and then
24 I'll be happy to answer.
25     Q.  Okay.  Mr. Patrick, I understand.  And

Page 19

M. PATRICK - 8/13/2021

1
2 we'll get there. Let's move on for right now,
3 though. Okay.
4     So what did you do to prepare for this
5 deposition?
6     A.  Yesterday afternoon, I spoke to the
7 Baker McKenzie lawyers.
8     Q.  Who did you speak to at Baker &
9 McKenzie?
10     A.  Deb and Michelle.
11     Q.  And how long did you speak to them
12 for?
13     A.  About three hours.
14     Q.  Did you review any documents?
15     A.  Yes.
16     Q.  What documents did you review?
17     A.  I believe they're the exhibits to this
18 deposition.
19     Q.  Any other documents?
20     A.  No.
21     Q.  Did you have any conversations with
22 anyone from Wick Phillips?
23     A.  No.
24     MR. BROWN:  Court Reporter, could you
25 please mark Exhibit B and could we put that up on

Page 20

M. PATRICK - 8/13/2021

1
2 the screen.
3     (Deposition Exhibit B marked for
4 identification.)
5 BY MR. BROWN:
6     Q.  Mr. Patrick, do you have a hard copy
7 of Exhibit B?
8     A.  I believe I do. Let me get that.
9     Q.  It might be easiest -- I'll leave it
10 up to you and your counsel, but feel free to look
11 at your hard copy if that's more comfortable for
12 you.
13     A.  Okay.  I have Exhibit B.
14     Q.  Okay.  So do you know what this
15 document is?
16     A.  Yes.
17     Q.  Can you tell us?
18     A.  It is the Limited Liability Agreement
19 for SE Multifamily Holdings LLC, dated as of
20 August 23rd, 2018.
21     Q.  Okay.  And you've seen it before?
22     A.  Yes.
23     Q.  You saw it before yesterday in
24 preparing for your deposition?
25     A.  Yes.

Page 21

M. PATRICK - 8/13/2021

1
2     Q.  Okay.  And what was the purpose of
3 this LL -- oh, let's also -- just for purposes of
4 making sure we're on the same page. This
5 Exhibit B, the SE Multifamily Holdings LLC,
6 Limited Liability Company Agreement, I would like
7 to refer to it as the LLC agreement for purposes
8 of this deposition. Are you comfortable with that
9 and will you understand what I'm talking about?
10     MS. DANDENEAU:  Mr. Brown, can we call
11 it perhaps the original LLC agreement, given that
12 it was amended and restated subsequently and just
13 so there's no confusion?
14     MR. BROWN:  I'm fine with that. We
15 can call this the original LLC agreement.
16     A.  Thank you. Yes.
17 BY MR. BROWN:
18     Q.  I forgot what my question was. I
19 think I was just getting the terms straight. What
20 was the purpose of the original LLC agreement?
21     MS. DANDENEAU:  Objection to form.
22     A.  The purpose of the original LLC
23 agreement was to reflect the agreement between
24 Highland Capital Management and HCRE Partners LLC.
25

Page 22

M. PATRICK - 8/13/2021

1
2  BY MR. BROWN:
3      Q.  And reflect the agreement concerning
4  what?
5      A.  Concerning the business of the LLC.
6      Q.  And what was the business of the LLC?
7      A.  Real estate.
8      Q.  And can you be more explicit?
9      A.  I recall holding real estate --
10 certain real estate assets.
11     Q.  Do you recall anything else about the
12 nature and purpose of the original LLC agreement?
13     A.  Not offhand.  You'll have to refresh
14 my recollection.
15     Q.  Do you recall who the parties were to
16 the original LLC agreement?
17     A.  Yes.  I was just looking at the
18 signature page and -- I just lost it.
19     Q.  It's page -- if we can -- it's
20 page 17.
21     A.  Yeah, page 17.  So Highland Capital
22 Management and HCRE Partners, LLC.
23     Q.  Okay.  And who signed on behalf of
24 Highland?
25     A.  James Dondero.

Page 23

M. PATRICK - 8/13/2021

1
2      Q.  And do you recognize that to be his
3  signature?
4      A.  I don't know.
5      Q.  Are you familiar with his signature?
6      A.  No.
7      Q.  Do you have any reason to believe it's
8  not his signature?
9      A.  No.
10     Q.  And who signed on behalf of HCRE?
11     A.  James Dondero.
12     Q.  And do you have any knowledge of
13 whether he was authorized to sign on behalf of
14 both entities?
15     A.  It's been my understanding generally
16 through the years, that Jim has always been
17 authorized to sign on behalf of Highland.  I just
18 don't have as much familiarity with HCRE.
19     Q.  Okay.  Do you understand what
20 Mr. Dondero's affiliation with HCRE was?
21     A.  Yes.  I understood him to be the
22 manager.
23     Q.  And what was the relationship between
24 Highland and HCRE?
25     A.  It's reflected in this LLC agreement.

Page 24

M. PATRICK - 8/13/2021

1
2      Q.  Did they have any other connection
3  besides this LLC agreement?
4          MS. DANDENEAU:  Objection to form.
5      A.  Not that I can recall offhand.
6  BY MR. BROWN:
7      Q.  Well, other than the fact that they
8  both appear to have been entities for which --
9  that were controlled by Jim Dondero, correct?
10     A.  What do you mean by controlled?
11     Q.  Well, Jim Dondero was the president of
12 Highland, correct?
13     A.  Correct.
14     Q.  What role -- while you were at
15 Highland, what role did Jim Dondero play when you
16 were there?
17     A.  He was the owner and president of the
18 general partner, Strand Advisors.
19     Q.  Okay.  And he was the manager of HCRE
20 Partners -- of HCRE, correct?
21     A.  That is my understanding.
22     Q.  Okay.  So other than the fact that
23 Jim Dondero had a -- the role as president of
24 Highland and as manager of HCRE, did Highland and
25 HCRE have any other common employees?

Page 25

M. PATRICK - 8/13/2021

1
2      A.  I do not know if they did have any
3  other common employees.
4      Q.  Do you know if they had a shared
5  services agreement?
6      A.  I do not know.
7      Q.  Do you know if they had any other
8  agreements other than the original LLC agreement
9  and the amended LLC agreement, which we'll talk
10 about later?
11     A.  Offhand, I do not know.
12     Q.  Did you have any role in connection
13 with the LLC agreement?
14         MS. DANDENEAU:  Objection to form.
15     A.  Yes.
16 BY MR. BROWN:
17     Q.  Please describe it.
18     A.  I coordinated the document.
19     Q.  What does that mean?
20     A.  It means I helped facilitate this --
21 the creation of this document by coordinating with
22 respective parties.
23     Q.  So you coordinated with Highland and
24 HCRE?
25     A.  Coordinated with Highland and HCRE.  I

Page 26

M. PATRICK - 8/13/2021

2  would describe it as I was -- I was coordinating
3  the deal between the two parties and having that
4  coordination reflect what was desired in this LLC
5  agreement.
6      Q.  Okay.  And what did your coordination
7  actually involve in practical terms?
8      A.  Yes.  That's a good question.  I
9  recall calling up the law firm of Hunton &
10  Williams to draft and prepare this LLC agreement.
11     Q.  And why did you call the law firm of
12 Hunton & Williams?
13     A.  It's generally the firm that I worked
14 with in the past.
15     Q.  And you worked with Hunton & Williams
16 in your capacity as an employee of Highland?
17     A.  Yes.
18     Q.  Who did Hunton & Williams represent?
19 Let me -- let me strike that.
20         Did you act as counsel for any party
21 in connection with this LLC agreement, the
22 original LLC agreement?
23     A.  No.
24     Q.  Were any of the -- well, were either
25 party, either HCRE or Highland, represented by any

Page 27

M. PATRICK - 8/13/2021

2  counsel in connection with the original LLC
3  agreement?
4      MS. DRAWHORN:  Objection, form.
5      A.  I understand your question.  I can
6  just answer with the facts.  It feels like a legal
7  conclusion.  The facts are I called up Hunton and
8  I told them that we needed an LLC agreement
9  drafted and they started working on it.
10 BY MR. BROWN:
11     Q.  Did they get a retention agreement?
12     A.  Not specifically for this -- for this
13 LLC agreement.
14     Q.  But you -- Highland had a retention
15 agreement with them for general matters?
16     A.  Yes, with Hunton.
17     Q.  And did that agreement -- okay.  So do
18 you have an understanding of whether Hunton was
19 representing HCRE in connection with the original
20 LLC agreement?
21     A.  Again, that's a legal conclusion.  I
22 called up Hunton and I told them that -- about
23 this transaction and a need for this LLC agreement
24 to be drafted.
25     Q.  So you are unable -- you have no --

Page 28

M. PATRICK - 8/13/2021

2  you have no ability to testify who you understood
3  Highland -- I'm sorry, Hunton firm was
4  representing in connection with the LLC agreement?
5      A.  I'm telling you the facts.  These are
6  the facts.  You can draw your own legal
7  conclusion, but the facts are I called up Hunton &
8  Williams and asked them to draft this LLC
9  agreement.
10     Q.  Okay.  Thank you for the facts,
11 Mr. Patrick.  I'm trying -- now I want your
12 understanding, if you had one, at the time you --
13     A.  I did not -- I'm sorry, I apologize.
14 I wasn't listening close enough to your question,
15 Mr. Brown.  I did not have an understanding of
16 what they were representing because I did not
17 think about that.  I just simply called them up
18 and asked them to prepare this LLC agreement.
19     Q.  Okay.  Was there any other lawyer
20 involved -- who was the lawyer for the Hunton firm
21 that you were dealing with?
22     A.  Alex McGeoch and I believe his
23 associate at the time, a gentleman named Mark
24 Melton.
25     Q.  Okay.  Were there any other lawyers

Page 29

M. PATRICK - 8/13/2021

2  involved for either Highland or HCRE in connection
3  with the draft -- the drafting and negotiation of
4  the LLC agreement?
5      A.  There were lawyers involved.  It's
6  hard to remember what lawyers were involved in the
7  original LLC agreement versus the amended.  Let me
8  think -- let my think.
9          I believe internal Highland counsel,
10 Tim Cournoyer, I always mispronounce his name, but
11 that was -- my recollection was refreshed
12 yesterday from seeing one of the exhibits.  So I
13 believe he was involved in the original LLC
14 agreement.
15         I also -- my memory was refreshed
16 yesterday from looking at the exhibits.  It
17 appears Freddy Chang, another lawyer, he was
18 involved.
19         Tim, he worked in the legal
20 department.  I worked in the tax department.  And
21 so Tim was properly functioning as a lawyer and
22 Freddy Chang was a lawyer as well.  I don't recall
23 exactly what department or what entity he had
24 worked for.  So he was involved.
25     Q.  So the two lawyers you've identified,

Page 30

M. PATRICK - 8/13/2021

1    I believe are Freddy Chang and Tim -- can you
2    pronounce that again for me?
3        A.    I always mispronounce it. It's a
4    fault. I've said it a million times and I
5    mispronounce it differently each time. I want to
6    say Cournoyer. Cournoyer.
7        MS. DANDENEAU: Mr. Brown, if it's
8    helpful, it's Cournoyer.
9        A.    Cournoyer. That's it.
10   BY MR. BROWN:
11       Q.    Thank you. Save us a lot of grief.
12   Okay. Freddy Chang and Tim Cournoyer are the two
13   lawyers I think you identified as being involved
14   in the original LLC agreement. Anybody else?
15       A.    Besides Hunton & Williams?
16       Q.    I'm sorry, you're correct. Aside from
17   the two lawyers from Hunton.
18       A.    Yeah. No.
19       Q.    Okay.
20       A.    Oh, I'm sorry, I apologize. I knew I
21   was missing somebody. My colleague, he was an
22   independent contractor, an attorney, Shawn Raver.
23       Q.    Shawn, last name?
24       A.    Raver, R-a-v-e-r. I knew it. I knew

Page 31

M. PATRICK - 8/13/2021

1    I was forgetting somebody.
2        Q.    So who did Shawn Raver represent in
3    connection with the original LLC agreement?
4        A.    I can tell you the facts. And I don't
5    specifically remember with respect to what he had
6    done on the original or whatnot, but as -- just
7    sort of as a matter of practice, you know, I may
8    have told him the business deal, you know, as me
9    representing the client and then he -- and he may
10   have done some drafting, reflecting the business
11   deal in the original of it. But I keep falling
12   back to, you know, those are the facts. I don't
13   think neither he nor I -- you know, I won't speak
14   for him, but I certainly wasn't thinking about
15   anything in a, you know, who's representing who
16   capacity. I think we were just doing the
17   transaction.
18       Q.    Okay. What about Tim Cournoyer?
19       A.    Well, he was -- he worked in
20   Highland's legal department.
21       Q.    Okay. And what about Freddy Chang?
22       A.    I don't know what department or what
23   entity he actually had worked for, so I can't
24   really -- you'll have to ask Tim.

Page 32

M. PATRICK - 8/13/2021

1        Q.    Do you know if he had any -- any
2    affiliation with HCRE?
3        A.    I do not know.
4        Q.    And Shawn Raver, is he with a private
5    law firm?
6        A.    He's a sole practitioner.
7        Q.    Did Wick Phillips have any involvement
8    in the representation of any party -- let me
9    restate that.
10       Did Wick Phillips represent Highland
11   in connection with the original LLC agreement?
12       A.    No.
13       Q.    Did Wick Phillips represent HCRE in
14   connection with the original LLC agreement?
15       A.    No.
16       Q.    Okay. Do you know if anyone reviewed
17   the amended LLC agreement on behalf of Highland?
18       MS. DANDENEAU: Objection to form.
19   And I would note you referred to the amended LLC
20   agreement.
21       MR. BROWN: I'm sorry.
22   BY MR. BROWN:
23       Q.    Did anyone review the original LLC
24   agreement on behalf of just Highland; in other

Page 33

M. PATRICK - 8/13/2021

1    words, in connection with just protecting and
2    advancing the interests of Highland versus the
3    interests of HCRE?
4        MS. DANDENEAU: I'm going to object to
5    form again.
6        A.    Look, I would say Tim, as his role
7    within the Highland's legal department when he
8    reviewed it.
9    BY MR. BROWN:
10       Q.    Okay. So you -- you think that Tim
11   reviewed it on behalf of Highland, correct?
12       A.    Correct.
13       Q.    And your statement is based on -- your
14   statement is based on the fact that he was an
15   employee of Highland, correct?
16       A.    He was a lawyer working in the legal
17   department of Highland and employed by Highland.
18       Q.    Okay. Did anyone review the original
19   LLC agreement on behalf of HCRE with regard to
20   protecting and/or advancing HCRE's interests,
21   separate and apart from Highland's?
22       MS. DANDENEAU: Objection to form.
23       A.    And we're still talking about the
24   original LLC agreement, correct?

Page 34

1        M. PATRICK - 8/13/2021
2    BY MR. BROWN:
3        Q.  Yes.  We're just talking about the
4    original LLC agreement.
5        A.  I do not know if -- I do not know if
6    anyone did or did not.
7        Q.  Did anybody negotiate the terms of the
8    LLC agreement on behalf of Highland?
9        A.  I think the premise of the question is
10   false in the case of the original LLC agreement
11   because as we both noted, on page 17 you have
12   Mr. Dondero's signature on both sides.  And so to
13   characterize this as a sort of negotiation, he
14   would have to be negotiating mentally with
15   himself.  So I did not view this as an adversarial
16   document.
17       Q.  I understand.
18       A.  The original.  The original.
19       Q.  Okay.  So the original document.
20   There was no negotiation back and forth between
21   representatives of Highland and representatives of
22   HCRE concerning the terms of the original LLC
23   agreement, correct?
24       A.  I would agree with that, correct.
25       Q.  Did you ever have any communications

Page 35

1        M. PATRICK - 8/13/2021
2    with any lawyer from Wick Phillips with -- that
3    concerned the original LLC agreement?
4        A.  No.
5        Q.  Can you turn to page 18, which is
6    Schedule A of the original LLC agreement.
7        A.  Okay.
8        Q.  Have you ever seen Schedule A before?
9        A.  Yes, I have.
10       Q.  Okay.  And --
11           MS. DRAWHORN:  Mr. Brown, I know that
12   you haven't lodged your question yet, but I just
13   want to state, to the extent that you're getting
14   into the underlying dispute, I don't think that's
15   proper here, since this is noticed specific to the
16   motion to DQ and if you are going to get into the
17   underlying dispute, I think that waives any motion
18   to disqualify Wick Phillips.  Again, I probably
19   should have waited for your question, but I do
20   want to raise that.
21           MR. BROWN:  How do you figure it --
22   how does it waive any motion to disqualify?
23           MS. DRAWHORN:  If you're continuing to
24   pursue your response to our proof of claim -- or
25   your objection to our proof of claim, then you're

Page 36

1        M. PATRICK - 8/13/2021
2    waiving the disqualification of us.  Because if
3    you're seeking to disqualify Wick Phillips from
4    representing HCRE Partners or -- now known as
5    NexPoint Real Estate Partners, then you're saying
6    that we can't represent them in the underlying
7    dispute.
8           But if you're pursuing your objection
9    to our claim on that underlying dispute, then you
10   can't -- you can't do both at the same time.  It's
11   a waiver.
12           MR. BROWN:  Yeah.  Well, I would
13   disagree.  It's not -- there's no intentional
14   waiver and -- and this all goes to the underlying
15   issue of the disqualification motion which has to
16   do with Wick Phillips representing -- now
17   representing HCRE, challenging the percentage
18   interest allocations in the amended LLC agreement.
19   So I don't know how -- they're all related.  I
20   mean, the whole idea of how we ended up with what
21   we ended up in in the amended LLC agreement is
22   related to the interests in the original LLC
23   agreement and that's the ultimate issue in terms
24   of the substantial relationship.  So I disagree
25   with you that this --

Page 37

1        M. PATRICK - 8/13/2021
2           MS. DRAWHORN:  No, the substantial
3    relationship --
4           MR. BROWN:  I'm not asking these
5    questions with respect to the underlying objection
6    to the proof of claim.  I'm asking these questions
7    to understand the substantial relationship issue.
8           MS. DRAWHORN:  The substantial
9    relationship that you're arguing is the LLC
10   agreement to the extent that these -- the LLC
11   agreement is related to the loan agreement.
12   That's the relationship.  Wick Phillips
13   represented the borrowers and HCRE in the loan
14   agreement.  And you're saying this LLC agreement
15   is substantially related.  You don't have to go
16   through the substance of our dispute, which is
17   these capital -- these -- the capital
18   contributions and percentage interests.  It's
19   outside the scope of the deposition notice and if
20   you're pursuing the content, that's waiving your
21   motion to --
22           MR. BROWN:  The deposition notice
23   wasn't limited in scope in any way.
24           MS. DRAWHORN:  It says that you're
25   taking the deposition in connection with the

Page 38

M. PATRICK - 8/13/2021

1
2  debtor's motion to disqualify Wick Phillips.
3       MR. BROWN:  Right.  And that really is
4  about -- the scope of the motion is whether or not
5  the representation by Wick Phillips of Highland in
6  connection with the loan agreement is
7  substantially related to Wick Phillips' current
8  adverse representation of HCRE challenging the
9  percentage interest in the amended LLC agreement.
10  And those percentage interests in the LLC
11  agreement, which are the very core of the
12  substantial relationship test, flow through the
13  original LLC agreement, the loan agreement and the
14  amended LLC agreement.  They're at issue --
15  they're all part of a continuum.  And they're all
16  part of the -- they all are -- relate to the issue
17  of Wick Phillips' current adverse representation
18  of HCRE, which is the basis of the
19  disqualification motion.  I don't know how you can
20  separate them.
21       MS. DRAWHORN:  I mean, Mr. Patrick
22  testified that Wick Phillips was not involved in
23  the drafting of this agreement.  If you're asking
24  questions about Wick Phillips' representation in
25  connection with this document or involvement in

Page 39

M. PATRICK - 8/13/2021

1
2  connection with this document, I think that
3  absolutely relates to the disqualification issue.
4       MR. BROWN:  I don't know how --
5       MS. DRAWHORN:  Let me finish,
6  Mr. Brown, please.  Please let me finish my
7  statement before you interrupt me.
8       If you are asking about the underlying
9  substance of the LLC agreement, that is outside
10  the scope of the disqualification.  That goes to
11  the merits of our proof of claim and the debtor's
12  objection to our proof of claim and you cannot
13  pursue that while pursuing a disqualification.
14       MR. BROWN:  Well, I disagree and you
15  can argue that we -- that this shouldn't come in
16  as -- if you're disqualified, and I would agree,
17  this would not be evidence that could come in if
18  you're disqualified in connection with the
19  underlying proof of claim because the argument
20  would be that HCRE wasn't represented at the
21  deposition on the issue of the underlying claim
22  objection.  That's very different from waiver of
23  the disqualification motion.
24       So if HCRE ultimately wants to say,
25  no, we don't think that deposition testimony can

Page 40

M. PATRICK - 8/13/2021

1
2  be used against us, I can understand that, but
3  that's not at issue today.
4       MS. DRAWHORN:  Okay.  Mr. Brown, if
5  you want to pursue the underlying substance of the
6  objection, that's fine.  I'm informing you that we
7  will use that as a waiver.  We consider that a
8  waiver and we'll present that with --
9       MR. BROWN:  I'm not pursuing --
10       MS. DRAWHORN:  Again, Mr. Brown,
11  please stop interrupting me.  If you pursue the
12  underlying merits of the claim objection, we
13  will -- we will perceive that as a waiver and we
14  will present that argument to the Court.
15       MR. BROWN:  Okay.  Let me be -- are
16  you finished?
17       MS. DRAWHORN:  Yes.
18       MR. BROWN:  Let me be very clear.  I
19  am not pursuing the underlying merits of the claim
20  objection.  I am asking questions that relate to
21  the substantial relationship between Wick
22  Phillips' current adverse representation of HCRE
23  challenging the percentage interest allocation in
24  the amended LLC agreement, which relates solely to
25  the disqualification motion.  And we are -- you

Page 41

M. PATRICK - 8/13/2021

1
2  know, we're not -- if you're disqualified, yes, we
3  acknowledge that HCRE may have -- may have a
4  legitimate objection to the use of this deposition
5  testimony in the underlying merits.
6       MS. DRAWHORN:  And I disagree with
7  that position.  But I have stated that and I will
8  have -- we'll -- I'll object to the testimony as
9  needed --
10       MR. BROWN:  Okay.
11       MS. DRAWHORN:  -- and the questions as
12  needed.
13       MR. BROWN:  Well, we've been going for
14  an hour.  So let's take a short recess and return
15  in ten minutes.
16       MS. DRAWHORN:  Okay.
17       THE REPORTER:  We're off the record.
18       (Recess taken from 11:55 a.m. CDT to
19  12:08 p.m. CDT)
20       MR. BROWN:  Can you mark Exhibit G as
21  Exhibit G.
22       (Deposition Exhibit G marked for
23  identification.)
24  BY MR. BROWN:
25       Q.  Mr. Patrick, back on the record.  Can

Page 42

M. PATRICK - 8/13/2021

1  you -- have you ever seen what has been marked as
2  Exhibit G before?
3
4  A.  Well, it has my name on it, so
5  presumably at some point I did see it.  I just
6  don't recall it offhand.
7  Q.  Okay.  You're a recipient of this
8  August 23, 2018, e-mail from Paul Broaddus,
9  correct?
10  A.  Yes.  My name is on the e-mail.
11  Q.  Okay.  And you received the e-mail,
12  correct?
13  A.  I assume I did.
14  Q.  Do you have any reason to believe you
15  didn't receive it?
16  A.  That's correct, I have no reason that
17  I didn't receive it.
18  Q.  And the e-mail is to Helen Kim with
19  copies to Matt McGraner, you, Michael [sic]
20  Patrick, Rick Swadley and Jae Lee, correct?
21  A.  Correct.
22  Q.  Who is Helen Kim?
23  A.  She is a paralegal in the Highland
24  legal department.
25  Q.  Okay.  Does she work for anybody else

Page 43

M. PATRICK - 8/13/2021

1  other than Highland, or did she as of August 23,
2  2018?
3
4  MS. DANDENEAU:  Objection.
5  A.  I do not know.
6  BY MR. BROWN:
7  Q.  Okay.  And who is Matt McGraner?
8  A.  Matt McGraner leads the real estate
9  team.
10  Q.  At -- for what entity?
11  A.  I don't know.
12  Q.  Okay.  So you don't know -- was he --
13  was he employed by Highland?
14  A.  I don't know.
15  Q.  Okay.  And what about Rick -- who is
16  Rick Swadley?
17  A.  He's -- I believe he's compliance
18  officer -- a chief tax compliance officer, excuse
19  me, at Highland.  He works in the tax department.
20  Q.  Is he a lawyer?
21  A.  No.
22  Q.  And Matt McGraner is not a lawyer
23  either?
24  A.  Matt McGraner is a lawyer.
25  Q.  Okay.

Page 44

M. PATRICK - 8/13/2021

1
2  A.  I mean, he has a legal degree is my
3  understanding.
4  Q.  I understand.  What about Jae or Jae
5  Lee?
6  A.  Yeah.
7  Q.  Who is --
8  A.  Yeah.  He is a tax manager in the tax
9  department.  Excuse me for interrupting you before
10  you asked the question.
11  Q.  Thank you.  Who is -- who is he
12  employed by -- who was he employed by on
13  August 23, 2018?
14  A.  It is my understanding he was employed
15  by Highland Capital Management.
16  Q.  Okay.  So what did you understand the
17  purpose of this e-mail was?
18  MS. DANDENEAU:  Objection to form.
19  A.  I think the e-mail speaks for itself.
20  BY MR. BROWN:
21  Q.  You're right, I think it does.  What
22  did Paul Broaddus do?
23  A.  He is a tax manager within the tax
24  department of Highland Capital Management.
25  Q.  Did he have any affiliation with HCRE?

Page 45

M. PATRICK - 8/13/2021

1
2  MS. DANDENEAU:  Objection to form.
3  A.  I do not -- I do not know if he does
4  or does not.
5  BY MR. BROWN:
6  Q.  Okay.
7  A.  I don't know if it matters, but,
8  Mr. Brown, I cannot see you on my screen.
9  Q.  Well, I think it does -- I mean, I'd
10  like you to be able to see me and I'm wondering if
11  you changed the view.  Are you looking at --
12  what's -- are you -- are you using a gallery or
13  speaker or full screen?
14  A.  Yeah, I'm using a -- I'm using a full
15  screen.  I see the document and I see myself.  I
16  apologize for this technical problem.
17  Q.  No, no, I --
18  MS. DANDENEAU:  Perhaps we should go
19  just briefly offline and maybe we can help
20  Mr. Patrick work through the view.
21  MR. BROWN:  Yeah.
22  MS. DANDENEAU:  I don't know if we
23  need to --
24  MR. BROWN:  To the extent it's
25  helpful, I had the same problem on Wednesday and

Page 46

M. PATRICK - 8/13/2021

1 it was fixed by changing the view.

2    A.   I got it fixed. I'm going to the step

3 boxes instead of something else. Okay. We're all

4 good. I'm fine. I apologize.

5 BY MR. BROWN:

6    Q.   I totally get it. I had the same

7 issues.

8 MR. BROWN:  Can we -- what exhibit are

9 we -- we were on exhibit --

10    MS. DANDENEAU:  We were on Exhibit G.

11    MR. BROWN:  G. Let's go to Exhibit H.

12    (Deposition Exhibit H marked for

13 identification.)

14    MR. BROWN:  Mr. Johnson, I want to

15 make sure I'm accommodating your needs here too in

16 terms of marking. When I say let's go to

17 Exhibit H, can we mark it as Exhibit H? I meant

18 to do that for each exhibit that we've discussed

19 so far. Is that -- has that been clear?

20    THE REPORTER:  Yes.

21    MR. BROWN:  So let's mark Exhibit H,

22 which is the July 30, 2018, e-mail from Mark

23 Patrick.

24

25

Page 47

M. PATRICK - 8/13/2021

1 BY MR. BROWN:

2    Q.   Mr. Patrick, can you tell me if you've

3 ever seen this e-mail that has been marked as

4 Exhibit H before?

5    A.   Yes. I saw it yesterday.

6    Q.   Okay. Did you receive it? I'm sorry,

7 did you send it?

8    A.   To the best of my knowledge, I did.

9    Q.   Okay. And it's to Tim --

10    A.   Cournoyer.

11    Q.   Tim Cournoyer. It's to Tim Cournoyer?

12    A.   Yeah.

13    Q.   And it says regarding draft LLC

14 agreement, correct?

15    A.   Correct.

16    Q.   And is that a draft of the original

17 LLC agreement that we have been talking about for

18 most of this deposition?

19    A.   I believe it is.

20    Q.   And the next e-mail in the string,

21 which is Exhibit H, is an e-mail from Alex McGeoch

22 to you?

23    A.   McGeoch. Yeah, it's another funny

24 one.

25

Page 48

M. PATRICK - 8/13/2021

1    Q.   McGeoch. McGeoch to you dated

2 July 27, 2018, correct?

3    A.   Correct.

4    Q.   Did you receive that e-mail?

5    A.   To the best of my knowledge, I did.

6    Q.   Okay. The subject line is draft LLC

7 agreement. And am I correct that this is

8 Mr. McGeoch of Hunton Andrews & Kurth, his

9 transmission of a draft LLC agreement to you?

10    A.   The original LLC agreement, correct, a

11 draft of it.

12    Q.   Okay. And the second sentence of the

13 e-mail says: It would be helpful to schedule a

14 call with you to walk through our thoughts on the

15 allocation and distribution drafting approach we

16 took. Please let me -- and then the next sentence

17 says: Please let me know if you have another --

18 if you have time for a call with Mark and me this

19 morning.

20    Do you recall if you ever had that

21 call with McGeoch?

22    A.   I don't recall specifically, but I am

23 confident we did have that call.

24    Q.   Okay. Do you recall anything about

Page 49

M. PATRICK - 8/13/2021

1 what was discussed in the call?

2    A.   No.

3    MR. BROWN:  Can we put up Exhibit C

4 and mark it.

5    (Deposition Exhibit C marked for

6 identification.)

7 BY MR. BROWN:

8    Q.   Mr. Patrick, have you ever seen

9 this -- what's been marked as Exhibit C?

10    A.   Yesterday I did.

11    Q.   Before yesterday, had you ever seen

12 it?

13    A.   Not that I can recall seeing it.

14    Q.   Okay. So did you have -- did you have

15 any role in connection with the -- any role of any

16 type in connection with the bridge loan

17 agreement -- well, hold on. Let me start over

18 again.

19    So this Exhibit C is the bridge loan

20 agreement dated as of September 26th, 2018, among

21 various entities, borrower entities and Keybank

22 National Association and KeyBanc Capital Markets,

23 correct?

24    A.   Well, what exhibit is this? I

25

Page 50

M. PATRICK - 8/13/2021

1    apologize because I don't see those dates. I

2    can't scroll.

3       Q.   Okay.  If you look -- can you see it

4    on the screen?

5       A.   Yes.  But I couldn't see the date.

6       Q.   Okay.  It says the Bridge Loan

7    Agreement dated as of September 26, 2018.

8       A.   Okay.  Fair enough.  I see it.  I just

9    didn't notice it.  Thank you.

10      Q.   Just like we've done with some of the

11   other terms that are a mouthful, I'd like to refer

12   to this as the loan agreement.  If I refer to

13   Exhibit C as the loan agreement in this

14   deposition, you'll understand what I am referring

15   to, correct?

16      A.   Correct.

17      Q.   So did you have any role in connection

18   with the loan agreement?

19      A.   No.

20      Q.   And to your recollection, you never

21   saw it before yesterday?

22      A.   That is correct.

23      Q.   Okay.  Prior to yesterday, did you

24   ever talk to anybody about the loan agreement?

Page 51

M. PATRICK - 8/13/2021

1       A.   No.

2       Q.   Did you ever e-mail with anybody about

3    the loan agreement?

4       A.   Not that I can recall.

5       Q.   Okay.  Did you ever have any

6    communications of any nature with anybody about

7    the loan agreement?

8       A.   Not that I can recall.

9       Q.   Do you have -- do you know who drafted

10   the loan agreement?

11      A.   I do not.

12      Q.   Do you know anything about the loan

13   agreement?

14           MS. DANDENEAU:  Objection to form.

15      A.   No, I do not.

16   BY MR. BROWN:

17      Q.   Do you have any understanding of what

18   role Wick Phillips played in connection with the

19   representation of any of the borrowers to the loan

20   agreement?

21      A.   I do not.

22           MR. BROWN:  Let's put up on the

23   screen, please, and mark Exhibit D.

24

25

Page 52

M. PATRICK - 8/13/2021

1           (Deposition Exhibit D marked for

2    identification.)

3           MR. BROWN:  And if we could scroll to

4    the bottom and the first e-mail on the string,

5    please.

6    BY MR. BROWN:

7       Q.   Mr. Patrick, have you ever seen these

8    e-mails before?  Have you ever seen this e-mail,

9    which is the first e-mail on Exhibit D?

10      A.   I believe we might have gone through

11   that yesterday.

12      Q.   But other than yesterday, you haven't

13   seen it?

14      A.   Correct.

15      Q.   Okay.  And I'll note, you're not a

16   recipient or a sender on any of the e-mails in

17   Exhibit D and so I'm not going to ask you about

18   their substance.  What I am going to ask you about

19   is whether or not you have an understanding of who

20   the entity -- the sender and recipients of the

21   e-mail are.  So Matt McGraner, I believe we've

22   already discussed him, but just to refresh -- to

23   make sure, do you know who Matt McGraner is?

24      A.   Yes.

Page 53

M. PATRICK - 8/13/2021

1       Q.   And who is he?

2       A.   The head of real estate.

3       Q.   And he has a Highland Capital e-mail

4    address.  Do you know if he works for Highland

5    Capital?

6       A.   I do not know.

7       Q.   Okay.  What about M. Goetz, do you

8    know who he is?

9       A.   Yes.

10      Q.   Who is he?

11      A.   I believe he works in the real estate

12   team.

13      Q.   For what entity?

14      A.   I do not know.

15      Q.   And Bonner McDermett, who is he?

16      A.   He works in the real estate team as

17   well.

18      Q.   For what entity?

19      A.   I do not know.

20      Q.   Paul Broaddus we have discussed.

21   Freddy Chang we have discussed.  Do you know D.C.

22   Sauter?

23      A.   Yes.

24      Q.   Who is he?

Page 54

1        M. PATRICK - 8/13/2021
2      A.  He is the current general counsel of
3  NexPoint Advisors.
4      Q.  Do you know how long he's been there?
5      A.  I do not know.
6      Q.  Okay.  Do you know, what is NexPoint
7  Real Estate Advisors, LLC?
8      A.  I don't know what it is.
9      Q.  Have you ever heard of it?
10     A.  I'm not sure.
11     Q.  Do you know if you've ever
12 communicated with any representatives of NexPoint
13 Real Estate Advisors, LLC?
14     A.  I cannot recall.
15        MR. BROWN:  Can we put up and mark
16 Exhibit E.
17        (Deposition Exhibit E marked for
18 identification.)
19 BY MR. BROWN:
20     Q.  Have you ever seen the e-mail chain
21 marked as Exhibit E?
22     A.  I see my name on it.  Hold on a
23 second.  Let me see if I...
24        (Witness reviews document.)
25     A.  I can't recall if I saw it yesterday

Page 55

1        M. PATRICK - 8/13/2021
2  or not.
3  BY MR. BROWN:
4      Q.  Okay.
5      A.  I don't think I did.
6      Q.  The first e-mail is from Paul Broaddus
7  dated January -- I'm sorry, July 27, 2018.  One of
8  the recipients is Daniel Cullen at Baker &
9  McKenzie.  Do you know who Daniel Cullen is?
10     A.  Yes.
11     Q.  And who did he represent in the
12 context of this e-mail; do you know?
13     A.  I do not know.
14     Q.  The subject line or his e-mail is
15 Unicorn - DSTs.  Do you know what that means?
16     A.  Not specifically.
17     Q.  Unspecifically can you describe what
18 your understanding is?
19     A.  Yeah.  Like a DST is generally an
20 acronym for Delaware Statutory Trusts.  And
21 Unicorn is generally an overall description of
22 this purchase involving these real estate assets.
23     Q.  Okay.  And the -- there's an
24 attachment to the e-mail.  If we flip to the --
25 scroll to the next page.

Page 56

1        M. PATRICK - 8/13/2021
2        MR. BROWN:  And can we change the
3  view?
4  BY MR. BROWN:
5      Q.  Do you know what the attachment is?
6  It says Project Unicorn DST Detail.
7      A.  No.
8      Q.  Do you know who prepared it?
9      A.  No.
10        MR. BROWN:  Can we go to -- put up and
11 mark Exhibit I.
12        (Deposition Exhibit I marked for
13 identification.)
14        MR. BROWN:  And could we scroll to the
15 first e-mail on this string.
16 BY MR. BROWN:
17     Q.  So, Mr. Patrick, Exhibit I is an
18 e-mail string which you appear to have initiated
19 on February 28, 2019.  The re line is SE
20 Multi-Family Holdings LLC:  Amended and Restated.
21        Have you ever seen this e-mail before?
22     A.  Yesterday.
23     Q.  And you saw it -- did you ever see it
24 before yesterday?
25     A.  I assume I did because it appears I

Page 57

1        M. PATRICK - 8/13/2021
2  wrote it.
3      Q.  Yeah.  And did you write it?
4      A.  I would have -- I would believe so.
5      Q.  No reason to think you didn't,
6  correct?
7      A.  Correct.
8      Q.  And why did you write it?
9      A.  As I read it, it appears that I am
10 highlighting certain issues that need to be
11 addressed before a tax deadline.
12     Q.  And this relates to an amended and
13 restated LLC agreement?
14     A.  Correct.
15     Q.  And the amended -- this is an
16 amendment that -- to the LLC agreement -- the
17 original LLC agreement that we've been talking
18 about, correct?
19     A.  Correct.
20     Q.  And why was an amendment required?
21     A.  Because as specified here, there were
22 certain issues that needed to be addressed.
23     Q.  And what were those issues?
24     A.  As the e-mail reflects.
25     Q.  And so can you explain those issues?

Page 58

1           M. PATRICK - 8/13/2021
2   What does BH ownership mean?
3       A.   My understanding, BH came in as a
4   partner into this LLC.
5       Q.   Why were they brought in as a partner?
6       A.   I do not know.
7           MS. DRAWHORN:  Objection, form.
8   Again, Mr. Brown, this is reiterating my objection
9   and position earlier.  To the extent you start
10  getting into the substance of the amendment and
11  why it was amended, I think that exceeds the scope
12  of the disqualification and starts getting into
13  the substance of the underlying proof of claim and
14  objection, and I think that results in a waiver of
15  the disqualification.
16  BY MR. BROWN:
17      Q.   What did you mean when you referred to
18  Liberty CLO ownership?
19          MS. DRAWHORN:  Same objection.
20      A.   That was an additional partner.
21  BY MR. BROWN:
22      Q.   And were they ever brought in?
23      A.   Yes.
24      Q.   As part of this amendment?
25      A.   I seem to recall, yes.

Page 59

1           M. PATRICK - 8/13/2021
2       Q.   And the amendments to the cash
3   distribution and tax allocation sections?
4           MS. DRAWHORN:  Objection, form.  Same
5   objection.
6       A.   What's the question?
7   BY MR. BROWN:
8       Q.   What does that mean?
9           MS. DRAWHORN:  Same objection.
10      A.   It means those sections can be amended
11  if it's desired to be, but it has to be amended
12  before March 15th.
13  BY MR. BROWN:
14      Q.   Okay.  And in terms of the recipients
15  of this e-mail, let's see if there's -- who's
16  D. Klos?
17      A.   I don't know if this is a correct
18  title, but I think he's the -- what I would call
19  the corporate controller of Highland Capital
20  Management.  He reported to the CFO, Frank
21  Waterhouse.
22      Q.   Okay.  And Shawn Raver -- does this
23  refresh your recollection of when Shawn Raver
24  became involved?
25      A.   If the question implies was this

Page 60

1           M. PATRICK - 8/13/2021
2   the -- I think he became involved with respect to
3   the original LLC agreement from that point
4   forward.
5       Q.   Okay.  And Frank Waterhouse?
6       A.   CFO of Highland.
7       Q.   Did he have any role at any other
8   entity that you know of that was related to
9   Jim Dondero?
10          MS. DANDENEAU:  Objection to form.
11      A.   Not specifically.
12          MR. BROWN:  If we can scroll up to
13  Mr. Patrick's e-mail of March 4, 2019, at
14  7:39 a.m.
15  BY MR. BROWN:
16      Q.   Mr. Patrick, have you seen this
17  March 4, 2019, e-mail that is from you?
18      A.   Yes.
19      Q.   When did you see it?
20      A.   I saw it yesterday and presumably I
21  saw it when I sent it.
22      Q.   Yeah.  Did you send it?
23      A.   Yes.
24      Q.   And the e-mail says:  Today?  I'd like
25  to get this to the return preparer ASAP to sign

Page 61

1           M. PATRICK - 8/13/2021
2   off on the tax allocations.  Shawn and I are both
3   out next week and if we don't get to sign off on
4   this, outside counsel will need to be brought in
5   and keep fall in Paul's lap next to meet the
6   March 15 deadline.
7           Can you explain what you -- what that
8   means, why you were saying that outside counsel
9   might need to be brought in?
10      A.   I don't -- I don't recall.  I'd have
11  to speculate.
12      Q.   Well, I want your understanding --
13  your best understanding.
14      A.   Yeah, I -- I don't recall my
15  understanding.
16      Q.   Okay.  Was outside counsel ever
17  brought in in connection with any amendments to
18  the original LLC agreement?
19      A.   I don't recall whether Hunton was
20  involved at this point or not and if that was the
21  reference.  I'm having trouble remembering what
22  that reference was.
23      Q.   Okay.
24          MR. BROWN:  Can we please put up and
25  mark Exhibit F.

Page 62

M. PATRICK - 8/13/2021

1
2          (Deposition Exhibit F marked for
3 identification.)
4 BY MR. BROWN:
5      Q.  Mr. Patrick, have you ever seen what's
6 been marked as Exhibit F?
7      A.  Yes.
8      Q.  Can you tell me what it is?
9      A.  It's the First Amended and Restated
10 LLC Agreement of SE Multifamily Holdings LLC.
11      Q.  And will you understand that -- will
12 you understand that I am -- if I refer to this as
13 the amended LLC agreement, that that's what I'm
14 referring to, is this -- the Exhibit F?
15      A.  Sounds good.
16      Q.  What role did you have in connection
17 with the amended LLC agreement?
18      A.  Part of it, I was involved in
19 coordinating certain provisions and terms, I
20 recall.
21      Q.  What terms were you involved in
22 coordinating?
23      A.  Certain provisions in the tax
24 allocations.
25      Q.  Anything else?

Page 63

M. PATRICK - 8/13/2021

1
2      A.  I cannot recall precisely.
3      Q.  Do you know if Wick Phillips had any
4 role in connection with the amended LLC agreement?
5      A.  My understanding, they had no role.
6      Q.  Did you ever have any communications
7 with Wick Phillips in connection with the amended
8 LLC agreement?
9      A.  I did not recall ever having
10 communications with Wick Phillips on this amended
11 LLC agreement.
12      Q.  And why was -- why was the LLC
13 agreement amended?
14          MS. DRAWHORN:  Objection, form.  Same
15 objection as previously stated.
16          MS. DANDENEAU:  Objection, that's
17 already answered.
18      A.  I believe it was amended to reflect
19 the understanding with respect to those issues
20 that I had previously sent an e-mail out to
21 address some of those issues.
22 BY MR. BROWN:
23      Q.  Did you represent any party as legal
24 counsel in connection with the -- let me finish
25 the question.

Page 64

M. PATRICK - 8/13/2021

1
2      A.  I'm sorry.
3      Q.  Did you represent -- well, state it
4 this way.  Is it correct that you did not
5 represent any party to the amended LLC agreement
6 as a lawyer?
7      A.  That is correct.
8      Q.  Was Highland represented by counsel in
9 connection with the amended LLC agreement?
10      A.  I do not know.
11      Q.  Was HCRE represented by counsel to the
12 amended LLC agreement?
13      A.  I do not know.
14          MR. BROWN:  Can we scroll down to the
15 signature pages, which begins at 18.
16 BY MR. BROWN:
17      Q.  So in addition to the signature of
18 James Dondero on behalf of Highland Capital
19 Management, LP, and on behalf of HCRE, there's a
20 signature line --
21          MR. BROWN:  Can we scroll one more
22 page down.
23 BY MR. BROWN:
24      Q.  There's a signature line for Liberty
25 CLO Holdco, Ltd.  Do you see that?

Page 65

M. PATRICK - 8/13/2021

1
2      A.  Yes.
3      Q.  Do you know if Liberty was represented
4 by counsel?
5      A.  I do not -- I do not know if they were
6 or were not.
7      Q.  Okay.
8          MR. BROWN:  And scroll down one more
9 page, please.
10 BY MR. BROWN:
11      Q.  And the last signature page is for
12 BH Equities, LLC.  Do you know if they were
13 represented by counsel?
14      A.  I do not know if they were or were
15 not.
16      Q.  Do you know if any negotiations --
17 well, do you know if negotiations took place
18 between HCRE and Highland concerning the terms of
19 this amended LLC agreement?
20      A.  I think my -- my answer is the same as
21 with respect to the original.  I did not view that
22 there were negotiations between Highland and HCRE.
23      Q.  So the answer is no?
24      A.  No.
25      Q.  Did you have communications with

Page 66

1      M. PATRICK - 8/13/2021
2   James Dondero in connection with the amended LLC
3   agreement?
4      A.  Yes.
5      Q.  Can you describe the nature of those
6   communications, please.
7      MS. DRAWHORN:  Objection to form.
8   Same objection as previously with regards to
9   waiver.
10     A.  To discuss the tax allocations.
11  BY MR. BROWN:
12     Q.  And did you -- were you able to make
13  any distinction with respect to what
14  Mr. Dondero was wearing when you communicated to
15  him; in other words, were you communicating with
16  him as a representative of HCRE or as a
17  representative of Highland or was it
18  indistinguishable in your mind?
19     MS. DANDENEAU:  Objection to form.
20     A.  My thought at the time was that I was
21  talking to Mr. Dondero, that I was aware that he
22  was the manager of HCRE as well as I was aware
23  that he was the general partner, president and
24  general partner of Highland.  That's how I thought
25  about it.

Page 67

1      M. PATRICK - 8/13/2021
2   BY MR. BROWN:
3      Q.  So you were unable to make a
4   distinction?
5      MS. DANDENEAU:  Objection to form.
6      A.  I don't know what that means.
7      MR. BROWN:  Ms. Dandeneau, did you
8   want to say something?
9      MS. DANDENEAU:  No, I just wanted to
10  make sure that was the end of the question.  You
11  said so you were unable to make a distinction.  Is
12  that the entire question?
13     MR. BROWN:  I think the testimony and
14  the voices may have got confused or they were
15  confusing to me, so let me ask again.
16  BY MR. BROWN:
17     Q.  Is it correct to say that when you
18  spoke to Mr. Dondero, you were unable to make --
19  in connection with the amended LLC agreement, you
20  were unable to determine whether or not he was
21  speaking as a representative of Highland or as a
22  representative of HCRE?
23     MS. DANDENEAU:  Objection to form.
24     A.  No, I disagree with that
25  characterization.

Page 68

1      M. PATRICK - 8/13/2021
2   BY MR. BROWN:
3      Q.  Okay.  How were you able to
4   distinguish whether he was speaking on behalf of
5   HCRE or Highland?
6      MS. DANDENEAU:  Objection to form.
7      A.  He was making -- he was making
8   decisions, and so I guess I would distinguish
9   between whether those decisions were -- just based
10  upon his decisions.
11  BY MR. BROWN:
12     Q.  Okay.  Elaborate more on how his
13  decisions enabled you to make a distinction
14  between -- as to whether he was communicating to
15  you on behalf of Highland or HCRE.
16     A.  Yeah, I cannot recall specifically
17  offhand how.
18     Q.  So your testimony is that you are
19  unable to testify on how you made a determination
20  on whom -- on whose behalf Mr. Dondero was
21  communicating with you in connection with the
22  amended LLC agreement, correct?
23     A.  No.
24     MS. DANDENEAU:  Objection to form and
25  misstates his testimony.

Page 69

1      M. PATRICK - 8/13/2021
2      A.  Yeah, it is kind of too vague.  If you
3   gave me something very specific, I could answer.
4   BY MR. BROWN:
5      Q.  Well, okay.  That's fine.  You're
6   saying -- the question was you're unable -- you're
7   unable to determine on whose behalf Mr. Dondero
8   was speaking when you talked to him concerning --
9   or when you communicated with him concerning the
10  amended LLC agreement, and you said that's not
11  true.  So tell me how it was you were able to make
12  a distinction.
13     A.  Based upon what he -- based upon what
14  he said.
15     Q.  Okay.  Can you give me an example of
16  what he said that enabled you to distinguish on
17  whose behalf he was communicating to you?
18     A.  I just cannot recall factually
19  specifically.  It's just more or less the
20  impression that I had in my mind.
21     Q.  Did you ever have any discussions with
22  Mr. Dondero in connection with the amended LLC
23  agreement, where you did not have an understanding
24  on whose behalf he was communicating; in other
25  words, there was -- you were unable to make a

Page 70

1        M. PATRICK - 8/13/2021
2    distinction?
3        A.  I cannot recall specifically.
4        MS. DANDENEAU:  Patrick, please let me
5    make my objection for the record.
6        Objection to form.
7        You can go ahead and answer.
8        A.  I just cannot recall specifically.
9    BY MR. BROWN:
10       Q.  Is it accurate to say that there was
11   no arm's-length negotiation that took place
12   between Highland and HCRE with respect to the
13   terms of the amended LLC agreement?
14       MS. DRAWHORN:  Objection, form.
15       MS. DANDENEAU:  And objection to form,
16   and I do think that this is going well astray of
17   the motion to disqualify Wick Phillips, which is
18   what you assured me would be the topic of this
19   deposition.
20   BY MR. BROWN:
21       Q.  Do you understand the question,
22   Mr. Patrick?
23       A.  Yes.  I'm just waiting to see if I can
24   answer.
25       MS. DANDENEAU:  You can go ahead and

Page 71

1        M. PATRICK - 8/13/2021
2    answer.
3        THE WITNESS:  Okay.
4        A.  Please restate the question again
5    because I want to answer it precisely because I
6    think I was formulating an answer.
7    BY MR. BROWN:
8        Q.  Were you aware of any arm's-length
9    negotiations that took place between Highland and
10   HCRE with respect to the amended LLC agreement?
11       MS. DRAWHORN:  Objection to form.
12       A.  With respect to those two entities,
13   no.
14       MR. BROWN:  Can we put up and mark
15   Exhibit J, please.
16       (Deposition Exhibit J marked for
17   identification.)
18   BY MR. BROWN:
19       Q.  Mr. Patrick, this is an e-mail from
20   you dated March 4, 2019, to Paul Broaddus, copied
21   to Shawn Raver and Rick Swadley.  Did you send
22   this -- well, have you seen this e-mail before?
23       A.  Yes, I did, yesterday.
24       Q.  Did you ever see it before?
25       A.  Presumably, yes, because I believe I

Page 72

1        M. PATRICK - 8/13/2021
2    wrote it.
3        Q.  Okay.  Did you send this e-mail with
4    the attachment?
5        A.  To the best of my knowledge, I did.
6        Q.  Okay.
7        MR. BROWN:  Let's take a short break.
8    You know, give me about ten minutes, and I think
9    I'm done or almost done with my questions.
10       MS. DANDENEAU:  Thank you.
11       (Recess taken from 12:56 p.m. CDT to
12   1:04 p.m. CDT)
13       MR. BROWN:  At present I have no
14   further questions.
15       MS. DRAWHORN:  I have a few questions
16   for you, Mr. Patrick.
17       THE WITNESS:  Sorry, who is speaking?
18       MS. DRAWHORN:  This is Lauren
19   Drawhorn.  I'm with Wick Phillips.  Can you see
20   me?
21       THE WITNESS:  Okay.
22       EXAMINATION
23   BY MS. DRAWHORN:
24       Q.  Do you need outside counsel to form an
25   entity when you were at Highland?

Page 73

1        M. PATRICK - 8/13/2021
2        A.  Do I need outside counsel to form an
3    entity when I was at Highland?  No.
4        Q.  Did you need -- while you were at
5    Highland, did you need outside counsel to amend a
6    limited liability company agreement?
7        A.  We're talking hypothetically, nothing
8    specifically, correct?
9        Q.  That's correct.
10       A.  Yeah.  The answer is no, we did not
11   need that.  We had sufficient internal legal help
12   in the legal department.
13       Q.  Okay.  And I'd like to -- I just had
14   one follow-up question on Exhibit I that Mr. Brown
15   looked at, and I will try and share my screen with
16   it really quick.  Can you see it up on screen?
17       A.  Yes, I can.
18       Q.  So I'm scrolling to the May -- the
19   March 4th, 2019, that you spoke about previously
20   on Exhibit I.  It's Highland136853 on the bottom
21   right.  Can you see that?
22       A.  Yes.
23       Q.  Okay.  So the e-mail from you to
24   Freddy Chang copying Shawn Raver and Paul
25   Broaddus, Mr. Brown had pointed out a sentence

Page 74

```
1          M. PATRICK - 8/13/2021
2  where you said:  Shawn and I are both out next
3  week and if we don't get sign off on this, outside
4  counsel will need to be brought in.
5          Who -- what -- who would outside
6  counsel have been?  Would that have been Hunton?
7          MS. DANDENEAU:  Objection to form.
8      A.  Again, I'm not sure.  I just don't
9  remember what I was thinking when I wrote that.
10 BY MS. DRAWHORN:
11     Q.  Okay.  But it would not have been
12 Wick Phillips, correct?
13     A.  I didn't even know -- that is correct.
14         MS. DRAWHORN:  I have no further
15 questions, and I will try to see if I can figure
16 out how to stop sharing.  Hold on.  How do I stop
17 sharing the screen?
18         MS. CANTY:  At the top, there should
19 be a red little bar that says stop share.  Just
20 rub your mouse over the -- hover it over the top
21 of your screen and see if you see it.
22         MS. DRAWHORN:  There we go.  Thank
23 you.
24         MS. CANTY:  You're welcome.
25         MR. BROWN:  No further questions from
```

Page 75

```
1          M. PATRICK - 8/13/2021
2  me.
3          MS. DANDENEAU:  Thank you.
4          MR. BROWN:  Thank you-all.
5          MS. DANDENEAU:  No questions.  No
6  questions from Baker McKenzie either.
7          MS. DRAWHORN:  And no further
8  questions from Wick Phillips.
9          (Deposition concluded at
10 1:08 p.m. CDT)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 76

```
1          C E R T I F I C A T E
2
3  STATE OF _____)
                        )
4                       ) ss.:
                        )
5  COUNTY OF _____)
6
7          I, MICHEAL A. JOHNSON, a Notary
8  Public within and for the State of Texas, do
9  hereby certify:
10         That MARK PATRICK, the witness whose
11 deposition is hereinbefore set forth, was duly
12 sworn by me and that such deposition is a true
13 record of the testimony given by such witness.
14         I further certify that I am not
15 related to any of the parties to this action by
16 blood or marriage; and that I am in no way
17 interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto
19 set my hand this 13th day of August, 2021.
20
21
22         _____
23         MICHEAL A. JOHNSON, RDR, CRR
24
25
```

Page 77

```
1  -------------------- I N D E X --------------------
2  EXAMINATION OF MARK PATRICK:
3  BY MR. BROWN                          5
4  BY MS. DRAWHORN                      72
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  ---------------- E X H I B I T S -----------------
2  NUMBER          DESCRIPTION        MARKED
3  Exhibit B    Limited Liability Company    20
            Agreement, August 23,
4           2018
5  Exhibit C    Bridge Loan Agreement      49
            dated as of September 26,
6           2018
7  Exhibit D    09/17/2018 through     52
            09/18/2018 E-mail Chain,
8           with Attachment
9  Exhibit E    07/27/2018 through     54
            08/01/2018 E-mail Chain,
10          with Attachments
            Highland263740 -
11          Highland263768
12  Exhibit F    First Amended and       62
            Restated Limited
13          Liability Company
            Agreement, Dated as of
14          March 15, 2019
15  Exhibit G    08/23/2018 E-mail, Paul    41
            Broaddus to Helen Kim
16          Highland209134
17  Exhibit H    07/27/2018 through     46
            07/30/2018 E-mail Chain,
18          with Attachments
            Highland246786 -
19          Highland246818
20  Exhibit I    02/28/2019 through     56
            03/04/2019 E-mail Chain,
21          with Attachments
            Highland136853 -
22          Highland136883
23  Exhibit J    03/04/2019 E-mail, Mark    71
            Patrick to Paul Broaddus,
24          with Attachment
            Highland136795 -
25          Highland136822

1         ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads   Should Read  Reason
6  ___  ___ _____   _____   _____
7  ___  ___ _____   _____   _____
8  ___  ___ _____   _____   _____
9  ___  ___ _____   _____   _____
10  ___  ___ _____   _____   _____
11  ___  ___ _____   _____   _____
12  ___  ___ _____   _____   _____
13  ___  ___ _____   _____   _____
14  ___  ___ _____   _____   _____
15  ___  ___ _____   _____   _____
16  ___  ___ _____   _____   _____
17  ___  ___ _____   _____   _____
18  ___  ___ _____   _____   _____
19  ___  ___ _____   _____   _____
20
          _____
21           Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

## 1

**11** 5:11

**11:55** 41:18

**12:08** 41:19

**12:56** 72:11

**15** 61:6

**15th** 59:12

**17** 22:20,21 34:11

**18** 35:5 64:15

**1:04** 72:12

**1:08** 75:10

## 2

**2008** 8:20 9:14

**2018** 20:20 42:8 43:3
44:13 46:23 48:3
49:21 50:8 55:7

**2019** 56:19 60:13,17
71:20 73:19

**2021** 9:16 12:3

**23** 42:8 43:2 44:13

**23rd** 20:20

**26** 50:8

**26th** 49:21

**27** 48:3 55:7

**28** 56:19

## 3

**30** 46:23

## 4

**4** 60:13,17 71:20

**4th** 73:19

## 7

**7:39** 60:14

## 8

**8/13/2021** 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1

## A

**a.m.** 41:18 60:14

**ability** 28:2

**absolutely** 39:3

**accommodating**
46:16

**accountants** 16:18

**accurate** 6:21 7:7
70:10

**acknowledge** 41:3

**acronym** 55:20

**act** 26:20

**acting** 18:7

**addition** 64:17

**additional** 58:20

**address** 53:5 63:21

**addressed** 57:11,22

**advancing** 33:3,21

**adversarial** 34:15

**adverse** 38:8,17
40:22

**advice** 15:14,25

**Advisors** 24:18 54:3,
7,13

**affiliated** 7:20 16:15

**affiliation** 10:24
11:2,6,9 23:20 32:3
44:25

**afternoon** 7:15 19:6

**agents** 16:17

**agree** 18:9 34:24
39:16

**agreement** 12:20
13:22 14:2 20:18
21:6,7,11,15,20,23
22:3,12,16 23:25
24:3 25:5,8,9,13
26:5,10,21,22 27:3,8,
11,13,15,17,20,23
28:4,9,18 29:4,7,14
30:15 31:4 32:12,15,
18,21,25 33:20,25
34:4,8,10,23 35:3,6
36:18,21,23 37:10,
11,14 38:6,9,11,13,
14,23 39:9 40:24
47:15,18 48:8,10,11
49:18,21 50:8,13,14,
19,25 51:4,8,11,14,
21 57:13,16,17 60:3
61:18 62:10,13,17
63:4,8,11,13 64:5,9,
12 65:19 66:3 67:19
68:22 69:10,23 70:13
71:10 73:6

**agreements** 12:11
14:13 25:8

**ahead** 14:7,14 70:7,
25

**Alex** 28:22 47:22

**allocation** 40:23
48:16 59:3

**allocations** 36:18
61:2 62:24 66:10

**amend** 73:5

**amended** 21:12 25:9
29:7 32:18,20 36:18,
21 38:9,14 40:24
56:20 57:12,15 58:11
59:10,11 62:9,13,17
63:4,7,10,13,18 64:5,

9,12 65:19 66:2
67:19 68:22 69:10,22
70:13 71:10

**amendment** 57:16,
20 58:10,24

**amendments** 59:2
61:17

**and/or** 33:21

**Andrews** 48:9

**apologize** 28:13
30:21 45:16 46:5
50:2

**appears** 29:17 56:25
57:9

**approach** 48:16

**argue** 39:15

**arguing** 37:9

**argument** 39:19
40:14

**arm's-length** 70:11
71:8

**arrangement** 12:18

**ASAP** 60:25

**assets** 22:10 55:22

**associate** 28:23

**Association** 49:23

**assume** 42:13 56:25

**assumptions** 12:21

**assured** 70:18

**astray** 70:16

**attachment** 55:24
56:5 72:4

**attorney** 30:23

**attorneys** 16:17

**August** 20:20 42:8
43:2 44:13

**authorized** 23:13,17

**aware** 66:21,22 71:8

## B

**back** 8:10,18 10:10

9,12 65:19 66:2
67:19 68:22 69:10,22
70:13 71:10

**background** 8:11

**Baker** 7:14,16,19
19:7,8 55:8 75:6

**bankruptcy** 8:23

**bar** 74:19

**based** 33:14,15 68:9
69:13

**basis** 38:18

**began** 9:8,14

**begin** 7:2

**begins** 64:15

**behalf** 14:21 22:23
23:10,13,17 32:18,25
33:12,20 34:8 64:18,
19 68:4,15,20 69:7,
17,24

**BH** 58:2,3 65:12

**Bonner** 53:16

**borrower** 49:22

**borrowers** 37:13
51:20

**Boston** 8:13

**bottom** 52:5 73:20

**boxes** 46:4

**break** 72:7

**bridge** 49:17,20 50:7

**briefly** 5:19 45:19

**Broaddus** 42:8
44:22 53:21 55:6
71:20 73:25

**broader** 11:19

**brought** 58:5,22
61:4,9,17 74:4

**Brown** 5:7,8 7:24
9:3,13 10:8,18,23
11:3,11,23 12:25
13:9,13,16,24 15:20,
23 16:14,20 17:2,18
19:24 20:5 21:10,14,
17 22:2 24:6 25:16
27:10 28:15 30:8,11

32:22,23 33:10 34:2
35:11,21 36:12 37:4,
22 38:3 39:4,6,14
40:4,9,10,15,18
41:10,13,20,24 43:6
44:20 45:5,8,21,24
46:6,9,12,15,22 47:2
49:4,8 51:17,23 52:4,
7 54:15,19 55:3 56:2,
4,10,14,16 58:8,16,
21 59:7,13 60:12,15
61:24 62:4 63:22
64:14,16,21,23 65:8,
10 66:11 67:2,7,13,
16 68:2,11 69:4 70:9,
20 71:7,14,18 72:7,
13 73:14,25 74:25
75:4

**business** 9:11 10:7
22:5,6 31:9,11

---

**C**

**call** 21:10,15 26:11
48:15,19,22,24 49:2
59:18

**called** 5:4 9:9,23
27:7,22 28:7,17

**calling** 26:9

**CANTY** 74:18,24

**capacity** 9:19 12:6
17:6,10,22 26:16
31:17

**capital** 5:10,13 8:22
21:24 22:21 37:17
44:15,24 49:23 53:4,
6 59:19 64:18

**case** 5:11 8:23 11:9
34:10

**cash** 59:2

**CDT** 41:18,19 72:11,
12 75:10

**ceased** 9:15

**CFO** 59:20 60:6

**chain** 54:20

**challenging** 36:17
38:8 40:23

**Chang** 29:17,22
30:2,13 31:22 53:22
73:24

**change** 56:2

**changed** 45:11

**changing** 46:2

**Chapter** 5:11

**characterization**
18:10 67:25

**characterize** 34:13

**charitable** 14:22

**chief** 43:18

**claim** 35:24,25 36:9
37:6 39:11,12,19,21
40:12,19 58:13

**clear** 15:22 40:18
46:20

**client** 31:10

**clients** 11:18

**CLO** 58:18 64:25

**close** 28:14

**colleague** 30:22

**college** 8:13

**comfortable** 20:11
21:8

**common** 24:25 25:3

**communicate** 11:24

**communicated** 12:9
17:6 54:12 66:14
69:9

**communicating**
66:15 68:14,21
69:17,24

**communications**
12:3,7 16:9 34:25
51:7 63:6,10 65:25
66:6

**company** 9:9,11
14:18 21:6 73:6

**completely** 13:5
15:19

**compliance** 43:17,
18

**concerned** 35:3

**concluded** 75:9

**conclusion** 27:7,21
28:7

**confident** 48:24

**confused** 67:14

**confusing** 67:15

**confusion** 21:13

**connection** 13:8
24:2 25:12 26:21
27:2,19 28:4 29:2
31:4 32:12,15 33:2
37:25 38:6,25 39:2,
18 49:16,17 50:18
51:19 61:17 62:16
63:4,7,24 64:9 66:2
67:19 68:21 69:22

**consultants** 9:10
16:18

**content** 37:20

**context** 18:19 55:12

**continuing** 35:23

**continuum** 38:15

**contractor** 30:23

**contributions** 37:18

**controlled** 24:9,10

**controller** 59:19

**conversation** 17:12
18:14

**conversations**
18:13 19:21

**coordinated** 25:18,
23,25

**coordinating** 25:21
26:2 62:19,22

**coordination** 26:4,6

**copied** 71:20

**copies** 42:19

**copy** 20:6,11

**copying** 73:24

**core** 38:11

**corporate** 59:19

**correct** 18:8 24:9,12,
13,20 30:17 33:12,
13,16,25 34:23,24
42:9,12,16,20,21
47:15,16 48:3,4,8,11
49:24 50:16,17,23
52:15 57:6,7,14,18,
19 59:17 64:4,7
67:17 68:22 73:8,9
74:12,13

**counsel** 7:17 20:10
26:20 27:2 29:9 54:2
61:4,8,16 63:24 64:8,
11 65:4,13 72:24
73:2,5 74:4,6

**Cournoyer** 29:10
30:7,9,10,13 31:19
47:11,12

**court** 5:22,24 7:2
19:24 40:14

**creation** 25:21

**Cullen** 55:8,9

**current** 9:23 38:7,17
40:22 54:2

---

**D**

**D.C.** 53:22

**Dandeneau** 7:22 9:3
10:6,15,21,25 11:7,
21 12:25 13:20 15:16
16:11,19,20,22 17:17
21:10,21 24:4 25:14
30:8 32:19 33:5,23
43:4 44:18 45:2,18,
22 46:11 51:15 60:10
63:16 66:19 67:5,7,9,
23 68:6,24 70:4,15,
25 72:10 74:7 75:3,5

**Daniel** 55:8,9

**date** 50:6

**dated** 20:19 48:2
49:21 50:8 55:7
71:20

**dates** 50:2

**day** 14:20

**deadline** 57:11 61:6

**deal** 26:3 31:9,12

**dealing** 28:21

**Deb** 19:10

**debtor** 5:11 8:23

**debtor's** 38:2 39:11

**decisions** 14:25
68:8,9,10,13

**define** 11:8,15,17

**defined** 14:19

**degree** 44:2

**Delaware** 55:20

**department** 9:21
29:20,23 31:21,23
33:8,18 42:24 43:19
44:9,24 73:12

**deposition** 5:12,17,
20,23 7:11 13:2 19:5,
18 20:3,24 21:8
37:19,22,25 39:21,25
41:4,22 46:13 47:19
49:6 50:15 52:2
54:17 56:12 62:2
70:19 71:16 75:9

**describe** 17:4 18:3
25:17 26:2 55:17
66:5

**description** 55:21

**desired** 26:4 59:11

**Detail** 56:6

**determination**
68:19

**determine** 67:20
69:7

**differently** 30:6

**director** 14:22

**directors** 16:17

**disagree** 36:13,24
39:14 41:6 67:24

**discuss** 66:10

**discussed** 46:19
49:2 52:23 53:21,22

**discussions** 69:21

**dispute** 35:14,17 36:7,9 37:16

**disqualification** 36:2,15 38:19 39:3, 10,13,23 40:25 58:12,15

**disqualified** 39:16, 18 41:2

**disqualify** 13:3,6 35:18,22 36:3 38:2 70:17

**distinction** 66:13 67:4,11 68:13 69:12 70:2

**distinguish** 18:6,20, 21 68:4,8 69:16

**distribution** 48:16 59:3

**document** 20:15 25:18,21 34:16,19 38:25 39:2 45:15 54:24

**documents** 19:14, 16,19

**Dondero** 7:21 10:13, 19 11:24 12:4,10 13:19 14:5 17:9,14 18:5,7 22:25 23:11 24:9,11,15,23 60:9 64:18 66:2,14,21 67:18 68:20 69:7,22

**Dondero's** 23:20 34:12

**DQ** 35:16

**draft** 26:10 28:8 29:3 47:14,17 48:7,10,12

**drafted** 27:9,24 51:10

**drafting** 29:3 31:11 38:23 48:16

**draw** 28:6

**Drawhorn** 15:17,21 27:4 35:11,23 37:2,8, 24 38:21 39:5 40:4, 10,17 41:6,11,16 58:7,19 59:4,9 63:14

66:7 70:14 71:11 72:15,18,19,23 74:10,14,22 75:7

**DST** 55:19 56:6

**DSTS** 55:15

**duly** 5:4

**E**

**e-mail** 42:8,10,11,18 44:17,19 46:23 47:4, 21,22 48:5,14 51:3 52:5,9,10,22 53:4 54:20 55:6,12,14,24 56:15,18,21 57:24 59:15 60:13,17,24 63:20 71:19,22 72:3 73:23

**e-mails** 52:9,17

**earlier** 58:9

**easiest** 20:9

**easily** 18:21

**educational** 8:11

**Elaborate** 68:12

**employed** 9:18,19 16:16 18:5 33:18 43:13 44:12,14

**employee** 9:20 12:8, 10 26:16 33:16

**employees** 16:16 24:25 25:3

**employer** 9:23

**employment** 8:8,16 9:7,8,16

**enabled** 68:13 69:16

**end** 9:8 67:10

**ended** 9:7 36:20,21

**entire** 67:12

**entities** 7:20 10:12, 14,16 11:18 12:12, 13,17 13:17 14:3,9 23:14 24:8 49:22 71:12

**entity** 29:23 31:24 43:10 52:21 53:14,19

60:8 72:25 73:3

**Equities** 65:12

**estate** 22:7,9,10 36:5 43:8 53:3,12,17 54:7, 13 55:22

**evidence** 39:17

**EXAMINATION** 5:6 72:22

**examined** 5:5

**examples** 17:8

**exceeds** 58:11

**excuse** 43:18 44:9

**exhibit** 19:25 20:3,7, 13 21:5 41:20,21,22 42:3 46:9,10,11,12, 13,18,19,22 47:5,22 49:4,6,10,20,25 50:14 51:24 52:2,10, 18 54:16,17,21 56:11,12,17 61:25 62:2,6,14 71:15,16 73:14,20

**exhibits** 19:17 29:12, 16

**explain** 57:25 61:7

**explicit** 22:8

**extent** 35:13 37:10 45:24 58:9

**F**

**facilitate** 25:20

**fact** 24:7,22 33:15

**facts** 27:6,7 28:5,6,7, 10 31:5,13

**factually** 69:18

**Fair** 50:9

**fall** 61:5

**falling** 31:12

**false** 34:10

**familiar** 23:5

**familiarity** 23:18

**fault** 30:5

**February** 9:8,16 12:3 56:19

**feel** 6:10 20:10

**feels** 27:6

**figure** 35:21 74:15

**fine** 21:14 40:6 46:5 69:5

**finish** 6:25 9:4 39:5,6 63:24

**finished** 40:16

**firm** 5:9 7:14,16,19 26:9,11,13 28:3,20 32:6

**fixed** 46:2,3

**flip** 55:24

**flow** 38:12

**follow** 17:20

**follow-up** 73:14

**forgetting** 31:2

**forgot** 21:18

**form** 7:22 10:6,15,21, 25 11:7,21 13:20 15:16 16:11,19,24 17:17 21:21 24:4 25:14 27:4 32:19 33:6,23 44:18 45:2 51:15 58:7 59:4 60:10 63:14 66:7,19 67:5,23 68:6,24 70:6, 14,15 71:11 72:24 73:2 74:7

**format** 6:20

**formed** 9:10

**formulating** 71:6

**forward** 60:4

**Frank** 59:20 60:5

**Freddy** 29:17,22 30:2,13 31:22 53:22 73:24

**free** 6:10,14 20:10

**full** 10:3 45:13,14

**functioning** 29:21

**funny** 47:24

**G**

**gallery** 45:12

**gave** 5:23,24 69:3

**general** 17:22,23 24:18 27:15 54:2 66:23,24

**generally** 23:15 26:13 55:19,21

**gentleman** 28:23

**give** 5:22 7:7 18:23 69:15 72:8

**giving** 17:7

**Goetz** 53:8

**good** 26:8 46:5 62:15

**grief** 30:12

**ground** 5:20

**Group** 10:3,5,20 11:18 12:8,10 13:18 14:4,16

**guess** 68:8

**H**

**happy** 18:24

**hard** 20:6,11 29:6

**hat** 17:15,16 66:13

**HCRE** 15:7,8,12,14, 25 16:4,10,15,16 17:7,10,14,15,25 18:8,15 21:24 22:22 23:10,18,20,24 24:19,20,24,25 25:24,25 26:25 27:19 29:2 32:3,14 33:4,20 34:22 36:4,17 37:13 38:8,18 39:20,24 40:22 41:3 44:25 64:11,19 65:18,22 66:16,22 67:22 68:5, 15 70:12 71:10

**HCRE's** 33:21

**head** 53:3

heard 54:9

held 18:16

Helen 42:18,22

helped 25:20

helpful 30:9 45:25 48:14

Highgate 9:10

Highland 5:10,12,13 8:19,21,22,25 9:7,15, 19 15:24 16:8 17:16, 24 18:5,8 21:24 22:21,24 23:17,24 24:12,15,24 25:23,25 26:16,25 27:14 28:3 29:2,9 32:11,18,25 33:3,12,16,18 34:8, 21 38:5 42:23 43:2, 13,19 44:15,24 53:4, 5 59:19 60:6 64:8,18 65:18,22 66:17,24 67:21 68:5,15 70:12 71:9 72:25 73:3,5

Highland's 31:21 33:8,22

Highland136853 73:20

highlighting 57:10

history 8:8,17

hold 49:18 54:22 74:16

Holdco 64:25

holding 22:9

Holdings 20:19 21:5 56:20 62:10

hour 41:14

hours 19:13

hover 74:20

Hunton 26:9,12,15, 18 27:7,16,18,22 28:3,7,20 30:16,18 48:9 61:19 74:6

hypothetically 73:7

hypotheticals 18:22

I

idea 14:8 36:20

identification 20:4 41:23 46:14 49:7 52:3 54:18 56:13 62:3 71:17

identified 29:25 30:14

implies 59:25

important 6:8,19,20, 23

impression 69:20

incorrect 10:4

independent 14:3 30:23

indistinguishable 66:18

individuals 17:5

informing 40:6

initiated 56:18

intentional 36:13

interest 36:18 38:9 40:23

interested 17:5

interests 33:3,4,21 36:22 37:18 38:10

interjecting 9:6

internal 29:9 73:11

interrupt 39:7

interrupting 9:5 40:11 44:9

investment 14:22

involve 26:7

involved 10:14,19,22 13:19 15:13 28:20 29:2,5,6,13,18,24 30:14 38:22 59:24 60:2 61:20 62:18,21

involvement 32:8 38:25

involving 55:22

issue 36:15,23 37:7 38:14,16 39:3,21 40:3

issues 46:8 57:10, 22,23,25 63:19,21

J

Jae 42:20 44:4

James 22:25 23:11 64:18 66:2

January 8:19 9:14 55:7

Jim 7:21 10:13,19 11:24 12:4,10 18:2,4, 5,7 23:16 24:9,11,15, 23 60:9

Johnson 13:14 46:15

Jones 5:10

July 46:23 48:3 55:7

K

Ken 15:17

Kenneth 5:8

Keybanc 49:23

Keybank 49:22

Kim 42:18,22

kind 14:24 16:22 18:3 69:2

kinds 15:14

Klos 59:16

knew 30:21,25

knowing 17:24

knowledge 6:7 23:12 47:9 48:6 72:5

Kurth 48:9

L

lap 61:5

Lauren 72:18

law 5:9,24 8:13 26:9, 11 32:6

laws 8:14

lawyer 11:5 28:19,20 29:17,21,22 33:17 35:2 43:20,22,24 64:6

lawyers 19:7 28:25 29:5,6,25 30:14,18

leading 13:8

leads 43:8

leave 20:9

Lee 42:20 44:5

legal 27:6,21 28:6 29:19 31:21 33:8,17 42:24 44:2 63:23 73:11,12

legally 9:10

legitimate 41:4

liability 20:18 21:6 73:6

Liberty 58:18 64:24 65:3

limited 20:18 21:6 37:23 73:6

listening 28:14

LL 21:3

LLC 15:7,8,15 16:4 20:19 21:5,7,11,15, 20,22,24 22:5,6,12, 16,22 23:25 24:3 25:8,9,13 26:4,10,21, 22 27:2,8,13,20,23 28:4,8,18 29:4,7,13 30:15 31:4 32:12,15, 18,20,24 33:20,25 34:4,8,10,22 35:3,6 36:18,21,22 37:9,10, 14 38:9,10,13,14 39:9 40:24 47:14,18 48:7,10,11 54:7,13 56:20 57:13,16,17 58:4 60:3 61:18 62:10,13,17 63:4,8, 11,12 64:5,9,12 65:12,19 66:2 67:19 68:22 69:10,22 70:13 71:10

loan 37:11,13 38:6,13 49:17,20 50:7,13,14, 19,25 51:4,8,11,13, 20

lodged 35:12

long 19:11 54:4

looked 73:15

lost 16:23 22:18

lot 12:21 14:21 15:4 30:12

LP 5:11,14 8:22 64:19

M

made 68:19

make 16:16 52:24 66:12 67:3,10,11,18 68:13 69:11,25 70:5

making 12:21 21:4 68:7

management 5:10, 14 8:22 14:25 21:24 22:22 44:15,24 59:20 64:19

manager 17:10,25 23:22 24:19,24 44:8, 23 66:22

managing 16:17

March 59:12 60:13, 17 61:6 71:20 73:19

mark 5:3 19:25 28:23 41:20 46:18,22,23 48:19 49:5 51:24 54:15 56:11 61:25 71:14

marked 20:3 41:22 42:2 46:13 47:4 49:6, 10 52:2 54:17,21 56:12 62:2,6,7 71:16

Markets 49:23

marking 46:17

master 8:14

Matt 42:19 43:7,8,22, 24 52:22,24

matter 31:8

**matters** 27:15 45:7

**Mcdermett** 53:16

**Mcgeoch** 28:22 47:22,24 48:2,9,22

**Mcgraner** 42:19 43:7,8,22,24 52:22, 24

**Mckenzie** 19:7,9 55:9 75:6

**meaning** 18:4

**means** 25:20 55:15 59:10 61:8 67:6

**meant** 46:18

**meet** 61:5

**Melton** 28:24

**memory** 29:15

**mentally** 34:14

**merits** 39:11 40:12, 19 41:5

**Miami** 8:12

**Michael** 42:19

**Michelle** 19:10

**million** 30:5

**mind** 66:18 69:20

**minutes** 41:15 72:8

**mispronounce** 29:10 30:4,6

**missing** 30:22

**misstates** 68:25

**morning** 48:20

**motion** 13:2,5,8 35:16,17,22 36:15 37:21 38:2,4,19 39:23 40:25 70:17

**mouse** 74:20

**mouthful** 50:12

**move** 19:2

**Multi-family** 56:20

**Multifamily** 20:19 21:5 62:10

**N**

**named** 28:23

**National** 49:23

**nature** 22:12 51:7 66:5

**needed** 27:8 41:9,12 57:22

**negotiate** 34:7

**negotiating** 34:14

**negotiation** 29:3 34:13,20 70:11

**negotiations** 65:16, 17,22 71:9

**Nexannuity** 12:16

**Nexpoint** 36:5 54:3, 6,12

**noninclusive** 17:8

**note** 32:20 52:16

**noted** 34:11

**notice** 37:19,22 50:10

**noticed** 35:15

**NYU** 8:14

**O**

**oath** 5:21

**object** 33:5 41:8

**objection** 7:22 10:6, 15,21,25 11:7,21 13:20 15:16 16:11, 19,24 17:17 21:21 24:4 25:14 27:4 32:19 33:23 35:25 36:8 37:5 39:12,22 40:6,12,20 41:4 43:4 44:18 45:2 51:15 58:7,8,14,19 59:4,5,9 60:10 63:14,15,16 66:7,8,19 67:5,23 68:6,24 70:5,6,14,15 71:11 74:7

**obligated** 6:2

**offhand** 22:13 24:5 25:11 42:6 68:17

**office** 10:10 12:11,17

**officer** 43:18

**officers** 16:17

**offline** 45:19

**order** 6:23

**original** 21:11,15,20, 22 22:12,16 25:8 26:22 27:2,19 29:7, 13 30:15 31:4,7,12 32:12,15,24 33:19,25 34:4,10,18,19,22 35:3,6 36:22 38:13 47:17 48:11 57:17 60:3 61:18 65:21

**originally** 18:13

**ostensibly** 13:2

**owner** 24:17

**ownership** 11:8,13 58:2,18

**P**

**p.m.** 41:19 72:11,12 75:10

**Pachulski** 5:9

**pages** 64:15

**paralegal** 42:23

**part** 38:15,16 58:24 62:18

**parties** 22:15 25:22 26:3

**partner** 17:23 24:18 58:4,5,20 66:23,24

**Partners** 15:7,8,15 16:4 21:24 22:22 24:20 36:4,5

**party** 26:20,25 32:9 63:23 64:5

**past** 26:14

**path** 13:7

**Patrick** 5:1,3,8 6:1 7:1 8:1,4 9:1 10:1

11:1,16 12:1 13:1,4, 10 14:1 15:1 16:1 17:1,4 18:1,25 19:1 20:1,6 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1,11 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1, 21 39:1 40:1 41:1,25 42:1,20 43:1 44:1 45:1,20 46:1,24 47:1, 3 48:1 49:1,9 50:1 51:1 52:1,8 53:1 54:1 55:1 56:1,17 57:1 58:1 59:1 60:1,16 61:1 62:1,5 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,4,22 71:1, 19 72:1,16 73:1 74:1 75:1

**Patrick's** 60:13

**Paul** 42:8 44:22 53:21 55:6 71:20 73:24

**Paul's** 61:5

**people** 7:3

**perceive** 40:13

**percentage** 36:17 37:18 38:9,10 40:23

**Phillips** 13:3,6 19:22 32:8,11,14 35:2,18 36:3,16 37:12 38:2,5, 22 51:19 63:3,7,10 70:17 72:19 74:12 75:8

**Phillips'** 38:7,17,24 40:22

**place** 65:17 70:11 71:9

**platform** 6:21

**play** 24:15

**played** 51:19

**point** 18:22 42:5 60:3 61:20

**pointed** 73:25

**portion** 13:15

**position** 18:17 41:7 58:9

**practical** 26:7

**practice** 31:8

**practitioner** 32:7

**precisely** 63:2 71:5

**premise** 34:9

**prepare** 7:11 19:4 26:10 28:18

**prepared** 56:8

**preparer** 60:25

**preparing** 20:24

**present** 40:8,14 72:13

**president** 17:10,23 24:11,17,23 66:23

**previously** 63:15,20 66:8 73:19

**Prior** 50:24

**private** 32:5

**problem** 45:16,25

**PROCEEDINGS** 5:2

**Project** 56:6

**pronounce** 30:3

**proof** 35:24,25 37:6 39:11,12,19 58:13

**proper** 35:15

**properly** 29:21

**protecting** 33:2,21

**provide** 13:18

**providing** 15:14

**provisions** 62:19,23

**purchase** 55:22

**purpose** 21:2,20,22 22:12 44:17

**purposes** 21:3,7

**pursue** 35:24 39:13 40:5,11

**pursuing** 36:8 37:20 39:13 40:9,19

**put** 19:25 49:4 51:23 54:15 56:10 61:24

71:14

**Q**

**question** 6:11,15,25
7:25 13:11,12,14,17
16:2,23 17:3 21:18
26:8 27:5 28:14 34:9
35:12,19 44:10 59:6,
25 63:25 67:10,12
69:6 70:21 71:4
73:14

**questions** 6:6,7,9,22
37:5,6 38:24 40:20
41:11 72:9,14,15
74:15,25 75:5,6,8

**quick** 73:16

**quizzing** 13:4

**R**

**R-A-V-E-R** 30:25

**raise** 35:20

**Raver** 30:23,25 31:3
32:5 59:22,23 71:21
73:24

**read** 13:13,15 57:9

**real** 22:7,9,10 36:5
43:8 53:3,12,17 54:7,
13 55:22

**reason** 7:6 23:7
42:14,16 57:5

**recall** 12:19 16:7
18:16 22:9,11,15
24:5 26:9 29:22 42:6
48:21,23,25 49:14
51:5,9 54:14,25
58:25 61:10,14,19
62:20 63:2,9 68:16
69:18 70:3,8

**receive** 42:15,17
47:7 48:5

**received** 15:11 42:11

**recess** 41:14,18
72:11

**recipient** 42:7 52:17

**recipients** 52:21

55:8 59:14

**recognize** 23:2

**recollection** 7:8
12:23 14:3,10 15:4
17:11 22:14 29:11
50:21 59:23

**record** 6:21 41:17,25
70:5

**red** 74:19

**refer** 5:11 16:3,4 21:7
50:12,13 62:12

**reference** 61:21,22

**referred** 32:20 58:17

**referring** 5:13 8:22
10:17 50:15 62:14

**reflect** 21:23 22:3
26:4 63:18

**reflected** 23:25

**reflecting** 31:11

**reflects** 57:24

**refresh** 22:13 52:23
59:23

**refreshed** 29:11,15

**regard** 33:20

**reiterating** 58:8

**relate** 38:16 40:20

**related** 14:5 36:19,22
37:11,15 38:7 60:8

**relates** 39:3 40:24
57:12

**relationship** 11:12,
15 23:23 36:24 37:3,
7,9,12 38:12 40:21

**relationships** 11:14

**remember** 29:6 31:6
74:9

**remembering** 61:21

**reported** 59:20

**reporter** 7:2 19:24
41:17 46:21

**represent** 5:10 7:19
26:18 31:3 32:11,14

36:6 55:11 63:23
64:3,5

**representation** 32:9
38:5,8,17,24 40:22
51:20

**representative**
17:14 18:7,15 66:16,
17 67:21,22

**representatives**
16:9,12,13 17:7
34:21 54:12

**represented** 16:16
26:25 37:13 39:20
64:8,11 65:3,13

**representing** 27:19
28:4,16 31:10,16
36:4,16,17

**requested** 13:15

**required** 12:22 57:20

**respect** 12:12 31:6
37:5 60:2 63:19
65:21 66:13 70:12
71:10,12

**respective** 25:22

**response** 35:24

**restate** 6:14 13:12
32:10 71:4

**restated** 21:12 56:20
57:13 62:9

**results** 58:14

**retention** 27:11,14

**return** 41:14 60:25

**review** 19:14,16
32:24 33:19

**reviewed** 14:2 32:17
33:9,12

**reviews** 54:24

**Rick** 42:20 43:15,16
71:21

**role** 11:20 14:16,19
24:14,15,23 25:12
33:7 49:16 50:18
51:19 60:7 62:16
63:4,5

**rub** 74:20

**rules** 5:20

**S**

**Sauter** 53:23

**Save** 30:12

**schedule** 35:6,8
48:14

**school** 8:14

**scope** 13:5 37:19,23
38:4 39:10 58:11

**screen** 20:2 45:8,13,
15 50:5 51:24 73:15,
16 74:17,21

**scroll** 50:3 52:4
55:25 56:14 60:12
64:14,21 65:8

**scrolling** 73:18

**sections** 59:3,10

**seeking** 36:3

**send** 47:8 60:22
71:21 72:3

**sender** 52:17,21

**sentence** 48:13,17
73:25

**separate** 11:13
13:25 33:22 38:20

**September** 49:21
50:8

**series** 6:6

**service** 12:11 13:22
14:2 15:14,25

**services** 10:10 13:18
14:4 25:5

**set** 17:8

**share** 73:15 74:19

**shared** 25:4

**sharing** 74:16,17

**Shawn** 30:23,24 31:3
32:5 59:22,23 61:2
71:21 73:24 74:2

**short** 41:14 72:7

**sic** 42:19

**sides** 34:12

**sign** 23:13,17 60:25
61:3 74:3

**signature** 22:18
23:3,5,8 34:12 64:15,
17,20,24 65:11

**signed** 22:23 23:10

**simply** 28:17

**situations** 18:21,23

**Skyview** 8:5 9:9,11,
25 10:2,3,5,20 11:10,
13,18,20 12:8,10
13:18 14:4,16 15:18

**sole** 32:7

**solely** 40:24

**sort** 17:23 31:8 34:13

**Sounds** 62:15

**speak** 6:24 17:13
19:8,11 31:14

**speaker** 45:13

**speaking** 7:3 67:21
68:4 69:8 72:17

**speaks** 44:19

**specific** 18:18,23
35:15 69:3

**specifically** 16:7
27:12 31:6 48:23
55:16 60:11 68:16
69:19 70:3,8 73:8

**speculate** 14:7,12
61:11

**speculating** 13:23
14:6

**spoke** 7:14 19:6
67:18 73:19

**Stang** 5:9

**start** 5:21 15:20
49:18 58:9

**start-up** 14:17

**started** 8:19 27:9

**starts** 58:12

**state** 12:2,15 35:13 64:3

**stated** 41:7 63:15

**statement** 15:12 33:14,15 39:7

**Statutory** 55:20

**step** 46:3

**stop** 40:11 74:16,19

**straight** 21:19

**Strand** 24:18

**strike** 26:19

**string** 47:21 52:5 56:15,18

**subject** 48:7 55:14

**subsequently** 21:12

**substance** 37:16 39:9 40:5 52:19 58:10,13

**substantial** 36:24 37:2,7,8 38:12 40:21

**substantially** 37:15 38:7

**sufficient** 73:11

**Swadley** 42:20 43:16 71:21

**sworn** 5:4,24

— T —

**taking** 37:25

**talk** 25:9 50:25

**talked** 18:4 69:8

**talking** 11:19 15:18, 19 17:21 18:2,22 21:9 33:24 34:3 47:18 57:17 66:21 73:7

**tax** 9:20 11:5 15:2,4 29:20 43:18,19 44:8, 23 57:11 59:3 61:2 62:23 66:10

**taxation** 8:15

**team** 43:9 53:13,17

**technical** 45:16

**telling** 28:5

**ten** 41:15 72:8

**term** 11:6 15:10

**terms** 21:19 26:7 34:7,22 36:23 46:17 50:12 59:14 62:19,21 65:18 70:13

**test** 38:12

**testified** 5:5 38:22

**testify** 12:22 28:2 68:19

**testimony** 5:22,24 6:22 7:7 18:16 39:25 41:5,8 67:13 68:18, 25

**thinking** 31:15 74:9

**thought** 66:20,24

**thoughts** 48:15

**thread** 16:23

**Tim** 29:10,19,21 30:2, 13 31:19,25 33:7,11 47:10,12

**time** 6:24 7:4 17:21 28:12,23 30:6 36:10 48:19 66:20

**times** 30:5

**title** 59:18

**today** 5:22 7:7 40:3 60:24

**told** 27:8,22 31:9

**top** 74:18,20

**topic** 70:18

**totally** 46:7

**transaction** 27:23 31:18

**transition** 14:18 15:5

**transmission** 48:10

**trouble** 61:21

**true** 69:11

**Trusts** 55:20

**truth** 6:3

**truthful** 7:7

**truthfully** 6:8

**turn** 35:5

**type** 49:17

— U —

**ultimate** 36:23

**ultimately** 39:24

**unable** 27:25 67:3, 11,18,20 68:19 69:6, 7,25

**underlying** 35:14,17 36:6,9,14 37:5 39:8, 19,21 40:5,12,19 41:5 58:13

**understand** 5:13,21 6:9,10,11,12,17 7:4 11:4,5 15:10 16:2,5 17:3,19 18:25 21:9 23:19 27:5 34:17 37:7 40:2 44:4,16 50:15 62:11,12 70:21

**understanding** 11:10 23:15 24:21 27:18 28:12,15 44:3, 14 51:18 52:20 55:18 58:3 61:12,13,15 63:5,19 69:23

**understood** 23:21 28:2

**Unicorn** 55:15,21 56:6

**University** 8:12,13

**Unspecifically** 55:17

— V —

**vague** 69:2

**variety** 10:12

**vehicle** 14:22

**versus** 29:7 33:3

**view** 34:15 45:11,20 46:2 56:3 65:21

**voices** 67:14

— W —

**W-2** 15:12

**waited** 35:19

**waiting** 70:23

**waive** 35:22

**waiver** 36:11,14 39:22 40:7,8,13 58:14 66:9

**waives** 35:17

**waiving** 36:2 37:20

**walk** 48:15

**wanted** 67:9

**Waterhouse** 59:21 60:5

**wearing** 17:15 66:14

**Wednesday** 45:25

**week** 61:3 74:3

**whatnot** 31:7

**Wick** 13:3,6 19:22 32:8,11,14 35:2,18 36:3,16 37:12 38:2,5, 7,17,22,24 40:21 51:19 63:3,7,10 70:17 72:19 74:12 75:8

**Williams** 26:10,12, 15,18 28:8 30:16

**wondering** 45:10

**word** 8:25

**words** 33:2 66:15 69:25

**work** 8:4,5,6 9:12 14:21,24 15:2,4,6,8, 9,10 42:25 45:20

**worked** 26:13,15 29:19,20,24 31:20,24

**working** 9:15 27:9 33:17

**works** 43:19 53:5,12, 17

**write** 57:3,8

**wrote** 57:2 72:2 74:9

— Y —

**years** 23:16

**yesterday** 7:14 19:6 20:23 29:12,16 47:6 49:11,12 50:22,24 52:12,13 54:25 56:22,24 60:20 71:23

**you-all** 75:4

— Z —

**Ziehl** 5:9

**Zoom** 6:21