# EXHIBIT 64

1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION
   In re:                    )
3                            )
   HIGHLAND CAPITAL MANAGEMENT,  )  Chapter 11
4  L.P.                      )
                             )
5     Debtor.                )  Case No.:19-34054-sgj11
                             )
6  ********************************************************
7              ORAL ZOOM DEPOSITION OF
8                  ROBERT L. KEHR
9                SEPTEMBER 16, 2021
10                  Volume 1 of 1
   ********************************************************
11
12         ORAL ZOOM DEPOSITION OF ROBERT L. KEHR,
13  produced as a witness at the instance of the Debtor and
14  duly sworn, was taken in the above-styled and numbered
15  cause on the 16th day of September, 2021, from 10:30
16  a.m. to 2:01 p.m. , before ASHLEY ELIZONDO, CSR No. 9465
17  in and for the State of Texas, reported by machine
18  shorthand, in Los Angeles County, California, pursuant
19  to the Texas Rules of Civil Procedure and the provisions
20  stated on the record or attached hereto.
21
22  Job No. 4800824
23
24
25

                                              Page 1

APPEARANCES:

FOR NEXPOINT REAL ESTATE PARTNERS:
Brant C. Martin, Esq.
Lauren K. Drawhorn, Esq.
WICK PHILLIPS
100 Throckmorton Street
Suite 1500
Fort Worth, Texas 76102
Telephone: 817-332-7788
E-mail: brant.martin@wickphillips.com
lauren.drawhorn@wickphillips.com

FOR HIGHLAND CAPITAL MANAGEMENT:
Kenneth Brown, Esq.
La Asia Canty, Esq.
PACHULSKI STANG ZIEHL AND JONES
10100 Santa Monica Boulevard
Floor 13
Los Angeles, California 90067
Telephone: 310-201-0760
E-mail: kbrown@pszjlaw.com
lsc@pszjlaw.com

FOR UBS SECURITIES AND UBS AG LONDON BRANCH:
Shannon McLaughlin, Esq
LATHAM AND WATKINS
885 3rd Avenue
Suite 1000
New York, New York 10022
Telephone: 212-906-4612
E-mail: shannon.mclaughlin@lw.com

Page 2

I N D E X

Appearances                                    2
ROBERT L. KEHR
     Examination by Mr. Brant C. Martin        6
Changes and Signature                        142
Reporter's Certificate                       144
Further Certificate                          146

EXHIBITS
NO.           DESCRIPTION               PAGE
Exhibit 1    Highland Expert Disclosure       51
Exhibit 2    Kehr Engagement Letter           96
Exhibit 3    HCMLP Expert Production          75
Exhibit 4    Release from Loan Agreement      98
Exhibit 5    Bridge Loan Agreement           100
Exhibit 6    Unicorn PSA's                   110
Exhibit 7    Email Re LLC's to be Formed     122
Exhibit 8    Email Re DST Structures         124
Exhibit 10   Mark Patrick Deposition         125
Exhibit 11   Original LLC Agreement          130
Exhibit 12   First Amended LLC Agreement     133
Exhibit 14   McGrander Declaration           116

Page 3

REQUESTED DOCUMENTS/INFORMATION
NO.        DESCRIPTION              PAGE
           NONE


           CERTIFIED QUESTIONS
           NONE

Page 4

REPORTERS NOTE: Please note this deposition was taken
via Zoom; therefore, due to the poor quality of the Zoom
videoconference, audio distortions, internet connections
freezing, extraneous room noise, et cetera,
unintelligent, indiscernible, or inaudibles may have
created inaccuracies in the transcription.

     THE REPORTER: Would the witness please raise
their right hand? Do you solemnly swear to tell the
truth, the whole truth, and nothing but the truth?

     THE WITNESS: I do.
          ROBERT L. KEHR,
having been first duly sworn was examined and testified
as follows:
          EXAMINATION
     THE REPORTER: Will counsel present please
state their appearances for the record.

     MR. MARTIN: Good morning. This is Brant
Martin from Wick, Phillips, Gould, and Martin, and with
me is also one of my partners, Ms. Lauren Drawhorn. We
represent NexPoint Real Estate Partners, LLC.

     MR. BROWN: Good morning. Kenneth Brown from
the Law Firm of Pachulski, Stang, Ziehl, and Jones
representing Highland Capital Management, the debtor.

     MR. MARTIN: Ms. McLaughlin, do you want to
make your appearance just for the record?

Page 5

2 (Pages 2 - 5)

1      MS. MCLAUGHLIN:  Certainly.  My name is Shannon
2  McLaughlin of Latham and Watkins, LLP, and we represent
3  UBS Securities, LLC, and UBS AG London Branch, as
4  creditors in the bankruptcy.
5  BY MR. MARTIN:
6      Q   All right.  Mr. Kehr, are you ready to proceed?
7      A   I am.
8      Q   Excellent.  Can you identify yourself for the
9  record please?
10     A   Yes.  I am Robert Kehr, and the last name is
11  spelled, K-E-H-R.
12     Q   And, Mr. Kehr, how are you employed?
13     A   I'm a partner in the law firm called Kehr,
14  Schiff, Crane, and Cohen.
15     Q   How long have you been a partner with that
16  particular firm, sir?
17     A   With slight name changes, this firm has existed
18  for 21 years.
19     Q   And are you a founder of the firm?
20     A   Yes.
21     Q   And where is the firm located?
22     A   In Los Angeles.
23     Q   Mr. Kehr, again, we haven't met prior to today;
24  is that correct?
25     A   Correct.

Page 6

1      Q   And other than me asking you how to pronounce
2  your name prior to us going on the record, that's the
3  only conversations you and I have ever had; is that
4  correct?
5      A   Yes.
6      Q   And you understand my name is Brant Martin, and
7  that I represent NexPoint Real Estate Partners in this
8  matter?
9      A   I understand.
10     Q   And I believe you've been retained as an expert
11  by Mr. Brown and his firm in support of their motion to
12  disqualify my firm from representing NexPoint Real
13  Estate Partners.  Do I have that correct?
14     A   You do.
15     Q   And we're here today on that matter, on the
16  motion to disqualify, and you are here to provide expert
17  opinions, correct?
18     A   Correct.
19     Q   And it's your understanding that you're not a
20  fact witness, right?
21     A   That is correct.
22     Q   I'm going to -- so -- and just for the clarity
23  of the record and since this is not being videotaped,
24  I'm going to clarify that this record is being taken --
25  taken by Zoom by videoconference.  You agree with that?

Page 7

1      A   Yes.
2      Q   So I'll represent for the record I am here at
3  my office is Fort Worth, Texas.  You, I believe, are in
4  your home in California; is that right?
5      A   I am actually in my office in --
6      Q   Oh --
7      A   -- In California.
8      Q   Excellent.  What city are you in in California?
9      A   Century City which is Los Angeles.
10     Q   I know it well.  And, Mr. Brown, I believe you
11  are in your home office in California; is that correct?
12         MR. BROWN:  Correct.  In Oakland.
13     Q   Mr. Kehr, if at any point in time during this
14  new day and age when we're doing many things remotely,
15  if at any time you can't understand me or there is a
16  technical difficulty, I want you to let me know; is that
17  all right?
18     A   Of course.
19     Q   And I'm going to assume from your curriculum
20  vitae that you have participated in depositions before
21  either as an attorney or as a witness; is that right?
22     A   It is.
23     Q   So -- and I'm going to also assume that there
24  have been many depositions that you have participated
25  in; is that accurate as well?

Page 8

1      A   Yes.
2      Q   Can you even estimate for the court how many?
3      A   I -- I couldn't begin.  It would be a blind
4  guess.  I've been practicing law for 50 years.
5      Q   What's your primary area of practice?
6      A   For the last many years, my practice has been
7  entirely transactional practice.  I started off thinking
8  I wanted to be a litigator.  Pretty quickly realized
9  that that was an unwise choice and transitioned into --
10  into transactional work.  Transition took, oh,
11  perhaps four or five years but was finished by -- was
12  finished at least 40 years ago.  So of the past 40
13  years, I've been a transactional lawyer and part of my
14  transactional practice, my non-litigation practice is
15  advising lawyers, law firms, and companies that provide
16  services to or through lawyers and law firms about
17  professional responsibility of lawyers.
18     Q   Excellent.  Since you are a transactional
19  lawyer, I am going to run through a couple of ground
20  rules that will make this hopefully go faster.  I'm
21  certainly aware that you're probably familiar with most
22  of them, but, again, in this day and age of Zoom and
23  pandemics, some of the ways we do things have changed.
24  So I'll ask for your patience as I go through some of
25  these.  Is that okay with you?

Page 9

3 (Pages 6 - 9)

1    A    Of course.  It's your deposition.
2    Q    Thank you.  I appreciate that.  First of all,
3 let me ask you this.  Is anybody else in the room with
4 you?
5    A    No.
6    Q    Are you in contact with anyone else in any way,
7 shape, or form whether electronically or otherwise --
8    A    No.
9    Q    -- While you're in the deposition?
10    A    No.  I'm not.  Well, my email is on the other
11 computer screen so I could receive an email I suppose.
12    Q    I understand.  That's fine.  That's kind of my
13 point, Mr. Kehr.  I would advise you that under the
14 rules, you're not allowed to contact anyone once you're
15 sworn in as a witness, that includes Mr. Brown, so
16 that -- and I would take the position that if you do
17 communicate with anyone while you're being deposed, that
18 I'm entitled to see those communications.  Whether you
19 agree with that or not, do you understand what my
20 position would be?
21    A    Yes.
22    Q    Again, if you have any technology issues, if I
23 happen to freeze up or Mr. Brown freezes up, I'll
24 represent to you that I'm more than willing to be
25 patient and to wait to make sure we get those taken care

Page 10

1 of so that we get your full and complete testimony; is
2 that fair?
3    A    Yes.
4    Q    You're doing a great job of it now, but I would
5 ask that you give me verbal answers to my questions
6 rather than uh-huh or huh-uh, because those are
7 difficult for Ms. Elizondo to take down.  Do you
8 understand?
9    A    I do.
10    Q    Sometimes, as you can probably already tell, I
11 tend to talk a little fast.  So if I don't -- if I do
12 talk fast or you don't understand one of my questions, I
13 welcome you to ask me to repeat it or rephrase it,
14 because if you answer one of my questions, I'm going to
15 assume that you understood it; is that fair?
16    A    It is.
17    Q    Excellent.  Is there any reason whether mental,
18 physical, or medical, that you cannot testify truthfully
19 today?
20    A    No.
21    Q    Have you ever gone by any other names other
22 than Robert Kehr?
23    A    No.
24    Q    Do you have any felony convictions or
25 convictions of moral turpitude in the last ten years?

Page 11

1    A    No.
2    Q    Have you ever been a party to a lawsuit in your
3 personal capacity outside of your law firm?
4    A    No.
5    Q    How many times have you testified either at
6 trial or a deposition or an arbitration?
7    A    I don't keep a running total of that.  I can
8 only say that I have testified at trial and at
9 deposition multiple times.
10    Q    Do you know what subject matters you've
11 testified on since you came here to the cases?
12    A    Well, I've testified on the professional
13 responsibility of lawyers.  I testified on fiduciary
14 duties both in and outside of the lawyer context.  I've
15 testified several times on the reasonableness of legal
16 fees.  I've testified about some corporate law issues.
17 That's all I can think of at the moment.
18    Q    Fair enough.  When you've testified in those
19 previous matters, has it always been as an expert
20 witness?
21    A    I testified once that I can think of.  No.
22 Twice that I can think of as percipient witness.
23    Q    Just twice?
24    A    The only ones I can think of.  Yes.
25    Q    Okay.  Can you tell me when you testified as a

Page 12

1 percipient witness, what the matter that you were
2 testifying about was?  Rather than being as an expert
3 witness.
4    A    Yes.  These both involved transactions in which
5 I had been involved, and my client in each of these
6 situations was pursuing rights related to the
7 transaction that I had been involved in.
8    Q    All right.  So as a fact witness, which is what
9 we call it down here, you were testifying about what the
10 documents said, who was involved, what was going on,
11 rather than as an expert witness; is that right?
12    A    Correct.
13    Q    And if at any time, Mr. Kehr, you know the
14 drill.  If I summarize one of your answers, if I'm
15 putting words into your mouth, that's not my intention,
16 and I invite you to correct me.  Can you do that for me?
17    A    I can.
18    Q    Excellent.  The other times you testified other
19 than those two matters, to your knowledge as we sit here
20 today, the other times you testified were as an expert
21 witness; is that correct?
22    A    Yes.
23    Q    And you indicated that you had testified -- I'm
24 include -- I'm assuming that includes depositions or
25 trials; is that right?

Page 13

4 (Pages 10 - 13)

1   A   Yes.
2   Q   How many times have you testified at trial?
3   A   I don't keep a total.  I couldn't tell you.
4 Certainly it's been at least a dozen times over the past
5 30 years --
6   Q   All right.
7   A   -- A bit more than that, but I don't have any
8 number that you could rely on.
9   Q   I appreciate that.  When you testified in these
10 other matters as an expert witness, was it always either
11 about a lawyer's responsibilities and duties or as to
12 attorney's fees?  Is there any other areas that you've
13 testified as an expert witness other than those two?
14   A   Yes.  I've testified about fiduciary duty
15 several times outside of the lawyer context.
16   Q   Fair enough.  Anything else?
17   A   That's all I can think of at the moment.
18   Q   When you've testified in those others, have you
19 testified -- well, I lost my train of thought.  I
20 apologize.  Have all of those -- oh, I know what it
21 was -- I was going to ask.  Have you ever testified in a
22 tribunal other than open court?  For example, in front
23 of a disciplinary proceeding involving a state bar?
24   A   Yes.  I -- I did -- I think twice.  Yes.  I
25 have.

Page 14

1   Q   And was that in California?
2   A   Both times in California.  Yes.  Once as a
3 percipient witness and once as an expert witness.
4   Q   How many times of the other episodes in which
5 you have testified as an expert witness regarding
6 lawyer's duties, how many times has that been in
7 California?
8   A   I don't think I've ever left California to
9 testify when I've been in court or in an arbitration.
10 It's always been in California.
11   Q   How many times have you testified regarding
12 anything related to the Texas Disciplinary Rules of
13 Professional Conduct?
14   A   I've advised on the Texas rules.  I have a
15 Texas client who I've advised several times.  I don't
16 offhand remember ever testifying about the Texas rules.
17      MR. MARTIN:  Objection.  Nonresponsive.
18   Q   So to the extent that we're sitting here today,
19 to the extent that you remember, you've never testified
20 at deposition or in open court regarding matters
21 involving the Texas Disciplinary Rules of Professional
22 Conduct; is that correct?
23   A   I think that's right.
24   Q   And I have a copy of your CV which we're going
25 to go over here in a second, but the articles and

Page 15

1 presentations you've made primarily, if not solely,
2 involve the California rules and not the Texas rules; is
3 that correct?
4   A   Well, I would say they primarily involve the
5 California rules, but several of them have been
6 nationwide in scope where national -- where the rules of
7 other jurisdictions which I would say primarily would be
8 focused on the ABA model rules as the format that's the
9 basis for which all 50 states and the District of
10 Columbia on which they've based their -- their rules --
11      (Simultaneous speakers)
12   Q   And none of your articles or presentations
13 involve the Texas rules, correct?
14   A   You know, I can't say yes or no to that.  It's
15 certainly possible that -- that I've testified -- that
16 I've done programs in which the Texas rules have come
17 up, because I have done some programs that are not --
18 not California programs, but I just wouldn't remember
19 that after so many years.
20   Q   And, primarily, if you were testifying about
21 something other than the California rules, I took from
22 your previous answer that that testimony or analysis
23 would be based primarily on the ABA model rules,
24 correct?
25   A   I would say most commonly it would be, but I

Page 16

1 can't tell you that I haven't done comparisons in
2 testimony to the rules of other jurisdictions.  Whether
3 that includes Texas or not, I have no way of
4 identifying.
5   Q   I understand.  Thank you, Mr. Kehr.  And that
6 actually leads me to my next question.  You would agree
7 with me that the ABA model rules, while forming a basis
8 for the adoption of somewhat uniform rules across the
9 country, that in most, if not all, jurisdictions the ABA
10 model rules are modified somewhat from jurisdiction to
11 jurisdiction, correct?
12   A   They have been modified in every jurisdiction.
13   Q   Thank you.
14   A   In some jurisdictions, only a little, and other
15 jurisdictions, more, but they're all based on the same
16 premiss which are the underlying fiduciary duties that
17 lawyers have more or less in common with other
18 fiduciaries.
19   Q   All right.  I understand that, sir, and I agree
20 with you.  Have you ever had a grievance filed against
21 you?
22   A   Not that I know of.
23   Q   Have you ever been disciplined by any of the
24 professional or business organizations of which you are
25 or have been a member?

Page 17

5 (Pages 14 - 17)

**Page 18**

1    A  No.
2    Q  What's the procedure for grievances in
3 California? Do you know whether or not somebody files a
4 grievance? Do they dismiss it without telling you?
5 What's the -- what's the procedure?
6    A  Well, it depends on the nature of the
7 grievance. There is an online system for anyone in the
8 world to file a complaint about a lawyer, and only --
9 only if it rises to a level of interest do -- is the
10 complaint assigned to an investigator. We have a
11 professional investigation group that are employed by
12 the -- what's called The Office of Chief Trial Counsel
13 and act under the supervision of a lawyer employed full
14 time by OCTC.
15    Q  Have you served as part of the California Bar's
16 disciplinary structure related to attorneys?
17    A  No. It's not a voluntary arrangement. Used to
18 be years ago. But for many years, the disciplinary
19 system has been entirely professionalized. There are
20 full-time lawyers, staff, full-time investigators,
21 separate bar courts with judges who wear robes and
22 patches like normal judges.
23    Q  That's interesting because here in Texas there
24 are -- there are tribunals. There is actually lawyers
25 that serve as voluntary -- voluntary arbiters, if you

**Page 19**

1 will, of determining whether or not grievances have
2 merit. You don't have that same system in California?
3    A  We have it only in the rare situation in which
4 The Office of Chief Trial Counsel declares a conflict
5 and then there are some lawyers around the state,
6 litigators, with some degree of experience in
7 professional responsibility matters who undertake to act
8 as the prosecutor, the investigator and prosecutor, in
9 those matters. I've never done that. I'm not a
10 litigator.
11    Q  Well, I -- that was actually my next question,
12 and I almost interrupted you. I apologize for that.
13 You're not a litigator, right?
14    A  Correct.
15    Q  So in terms of analyzing a conflict, you've
16 never actually had to analyze a conflict for a -- have
17 you ever had to analyze a conflict for a matter you were
18 taking on personally in terms of litigation?
19    A  Well, my firm, yes.
20    Q  Right. But I mean in your practice. Have you
21 sat down and analyzed, if I take on this transaction,
22 this is a, for instance, same or substantially related
23 matter?
24    A  Of course.
25    Q  All right. Can you give me some examples of

**Page 20**

1 that?
2    A  I can't offhand. No.
3    Q  How much of your practice is providing expert
4 testimony?
5    A  Well, that varies enormously from month to
6 month and year to year, but I would say it's a -- it's a
7 small minority of all of my time.
8    Q  Can you give a -- even a ballpark percentage of
9 the amount of time you spend regarding expert testimony
10 in your practice?
11    A  I'm uncomfortable giving any number because
12 people will think I actually calculated it and I never
13 have, but I'm comfortable saying that it's a small
14 minority. I'm largely a transactional lawyer and part
15 of that is advising lawyers, law firms, and others about
16 professional responsibility matters.
17    Q  I -- I do understand that, Mr. Kehr, and you've
18 made that very clear. I'll give you a disclaimer. I'm
19 not going to hold you to the number, but when you're
20 provided as an expert testimony trying to disqualify my
21 firm, I'm very interested in what your qualifications
22 are to provide that opinion. You understand that,
23 right?
24    A  Of course.
25    Q  And if somebody was trying to disqualify your

**Page 21**

1 firm, you would take that very seriously, correct?
2    A  Of course.
3    Q  And so if someone was proffered as an expert
4 witness to disqualify your firm, you would want to know
5 what experience they have analyzing the situation under
6 which they were offering that opinion, correct?
7    A  Fair enough.
8    Q  All right. So if you could even give me an
9 estimate of the amount of time that you spend analyzing
10 litigation conflicts as an expert witness, I would
11 appreciate it.
12    A  Couldn't possibly do that because you've just
13 redefined your question from analyzing conflicts -- I'm
14 sorry. From testifying as to expert witness to
15 analyzing conflicts in litigation for expert witness
16 purposes. I couldn't begin to do that, but I can tell
17 you that the analysis of conflicts in the litigation and
18 non-litigation contexts, are -- are precisely the same.
19 The underlying fiduciary duties are the same. The
20 expectations of the legal system with regard to the
21 conduct of lawyers is the same, and the importance of it
22 to the legal system and to the system of law and the
23 court system is the same whether it's litigation or a
24 non-litigation matter.
25    Q  Well, Mr. Kehr, I'll tell you I agree with that

6 (Pages 18 - 21)

1 statement as well, but let me ask you a question, and I
2 think it's important that you and I define some terms
3 right now. You keep coming back to the concept of
4 fiduciary duty, and I know what a fiduciary duty is, and
5 I think I know what you mean by it. Are you equating a
6 conflict under the Texas Rules of Disciplinary Procedure
7 as being the same as a breach of fiduciary duty?
8    A   Well, the -- the Texas rules are disciplinary
9 rules, and it -- it is generally the rule that a lawyer
10 cannot be professionally disciplined except for
11 violating an explicit standard that is contained in the
12 disciplinary rules. That's true everywhere that I've
13 ever looked. Disciplinary authorities don't have the
14 ability to fill in gaps or in effect invent new rules,
15 but in a courtroom setting, which would include the
16 disqualification setting, the trial court is free to do
17 whatever it wants. The rules of professional conduct
18 are important evidence of what lawyers are required to
19 do and are prohibited from doing, but they don't cover
20 the water front.
21       Those -- those rules are written in a fairly
22 narrow way for purposes of discipline. The idea of
23 being that a lawyer shouldn't be disciplined unless
24 there is a reasonable explicit rule that gives fair
25 notice to the lawyer what the lawyer is required to or

Page 22

1 prohibited from doing. But in a disqualification
2 setting, the court can ignore the rule. It can decline
3 to disqualify even if there is a -- an apparent
4 violation of the rule, or it can disqualify even if
5 there is no clear authority that the rule itself has
6 been violated.
7       These rules are based on the underlying
8 fiduciary duties of lawyers, and they exist for the
9 functioning of the legal system. That's a long
10 discussion I hope we don't need to have, but I think
11 it's important that the fiduciary duties are never
12 ignored.
13       MR. MARTIN: I object as nonresponsive.
14    Q   Mr. Kehr, I believe my question was, do you
15 equate a conflict under the disciplinary rules with a
16 breach of fiduciary duty?
17    A   I think that if there is ever a conflict under
18 the disciplinary rules, there is a breach of fiduciary
19 duty.
20    Q   Per say?
21    A   I think that's probably true. It would take a
22 long time to think about all of the possible
23 hypothetical's, but because the rules are based on
24 fiduciary duties, loyalty, confidentiality, full
25 disclosure, then I think it's -- it's probably going to

Page 23

1 be a correct statement that -- that there is going to be
2 a fiduciary breach if there is a violation -- a conflict
3 violation of one of the conflict rules.
4    Q   Okay. So I think you answered my question, but
5 I want to make it very clear, and let's get this on the
6 record. So you think that in this situation, my firm
7 breached a fiduciary duty by taking on the
8 representation that you think we should be disqualified
9 from pursuing, right?
10    A   Correct. That's correct.
11    Q   That's not in the summary of your findings.
12       MR. BROWN: Well, objection. All the findings
13 were -- they weren't findings. They were just a
14 disclosure of what he was going to express an opinion on
15 at trial, and he's not going to -- you've asked him
16 that, but he is not -- that's not something he is
17 expressing an opinion on at trial. That's why they're
18 not in what you call, "The findings." They're not
19 findings. They're just the disclosure of what he is
20 going to opine on at the hearing on this matter.
21       MR. MARTIN: Mr. Brown, respectfully, I would
22 ask you to keep your objection to that which is allowed
23 under the federal rules --
24       MR. BROWN: No. I was -- I think I'm entitled
25 to correct misstatements you make on the record, and --

Page 24

1       (Simultaneous speakers)
2       MR. BROWN: I'm going to continue to do that,
3 Mr. Martin. So every time you make a misstatement, I am
4 going to correct it on the record, and you made a
5 misstatement.
6       MR. MARTIN: I don't believe I made a
7 misstatement, but to the extent that you're objecting to
8 my use of the word findings, I'll withdraw it and I'll
9 rephrase it.
10    Q   Mr. Kehr, in the summary that was provided to
11 me of what you were going to testify about, I don't
12 believe it appeared that you were going to testify that
13 there was an actual breach of fiduciary duty by my firm.
14 Now, the reason this is important, and you and I may
15 disagree on this, but I draw a distinction between a
16 conflict under the disciplinary rules and a breach of
17 the fiduciary duty, and your answer to my previous
18 question takes this to an entirely new level for me. So
19 I need to make this very clear what I'm asking you.
20       Do you believe that the conflict that you're
21 testifying about today equates to a breach of fiduciary
22 duty by my firm?
23       MR. BROWN: Objection. Goes beyond the
24 designation that we've submitted. He is not going to
25 opine on that, and we have made it clear he is not.

Page 25

7 (Pages 22 - 25)

1    A    The answer to the question is, yes.
2    Q    Thank you.
3        MR. MARTIN: Mr. Brown, are you willing to
4 stipulate that he's not going stipulate in this matter
5 that there was a breach of fiduciary duty by my firm?
6        MR. BROWN: We're willing to live by the
7 designation. That's what I'll -- what his opinions are
8 as set forth in the designation.
9        MR. MARTIN: You can't have it both ways.
10        MR. BROWN: I'm not willing to stipulate to
11 anything with you right now, Mr. Martin.
12        MR. MARTIN: Okay. Well, I need to put this on
13 the record. So -- and Mr. Kehr, nobody is picking on
14 you just because Mr. Brown and I have having a fight.
15 My point in making this record is this: When I was
16 preparing for this deposition to depose this witness, I
17 was operating off of the description that was given to
18 me by opposing counsel which was that this witness was
19 going to opine that there was a conflict. Within the
20 first 20 minutes of this deposition, it appears that
21 this witness equates a violation of the disciplinary
22 rules with a breach of fiduciary duty.
23    A    You've -- you've overstated what I said before.
24    Q    Please clarify.
25    A    I talked only about the conflict rules.

Page 26

1    Q    Okay. But I asked you --
2    A    There is lots of other rules, and -- and I'm
3 not able as I sit here to think about the -- I'm not
4 certain how many there are in Texas, roughly 65 rules of
5 professional conduct, and it would take me a good deal
6 of time to think through your question with regard to
7 each of the rules.
8    Q    Sure.
9    A    But with regard to conflict rules, they are
10 based on underlying fiduciary principles which are
11 confidentiality and loyalty principles, they're both
12 fiduciary duties, and if a lawyer were to violate
13 confidentiality or loyalty standards, creating -- as a
14 result of a conflict of interest, I believe that there
15 is both a disciplinary violation under the rules --
16 disciplinary rules of -- in Texas and of the fiduciary
17 duty on which those rules are based.
18        MR. MARTIN: I -- I understand that, Mr. Kehr,
19 and I -- that's not the distinction I'm trying to make.
20 So I'll try to be even clearer about that. My point
21 was, is that you've been disclosed as an expert witness
22 regarding conflict rules, right? And then now you're
23 saying that there was a breach of fiduciary duty. To
24 me, that takes it to another level in terms of the
25 accusations against my firm.

Page 27

1 So, therefore, I want to take it up with the
2 court which is why I'm making this record. Mr. Brown
3 and I are not going to agree on this today, but I want
4 to take it up with the court that to the extent that
5 there is going to be any evidence offered that my firm
6 might have breached a fiduciary duty, which I believe is
7 separate from the conflict rules, then I'm going to
8 object to that, because to me, that's a far more serious
9 allegation. That's all I was trying to put on to the
10 record.
11        MR. BROWN: Yeah. And -- and Brant -- Brant,
12 let me just -- I think that we may be able to clarify
13 this. I need to talk to Mr. Kehr off the record,
14 because I don't believe we've designated him as an
15 expert on breach of fiduciary duty. I don't believe
16 that we're going to offer any testimony by him with
17 respect to the firms breach of fiduciary duty other
18 than -- well, what he is going to testify to is that, in
19 a sense, that there was a violation of rule 109 of the
20 Texas Disciplinary Rules. I don't think there is any
21 need for him to get into the breach of fiduciary duty.
22 The reason he answered that question is you specifically
23 asked him. If you had asked him, "What are you going to
24 express an opinion on at the hearing?" That wouldn't
25 have been included.

Page 28

1 So if you want a stipulation, I'm happy to
2 consider it, but I need to talk to Mr. Kehr off the
3 record. So perhaps we can save this for a break and
4 come back to it, because I think we're -- I think
5 we're -- we're mashing gears here without the need to do
6 so, because I don't think that this is something that's
7 going to come up at the hearing.
8        MR. MARTIN: Okay. Well, I think we've made
9 our record regardless. I appreciate that attempt at
10 clarification, Ken. I think that, you know, we've made
11 our record, and we can move on so I appreciate the --
12 the dialogue.
13        MR. BROWN: And I agree. It's not in -- it's
14 not in the designation. It's simply not.
15    Q    I understand. I understand. Mr. Kehr, thank
16 you for your patience.
17    A    No problem.
18    Q    Are you -- are you aware of -- in all your
19 other expert testimony regardless of the subject, are
20 you aware of any time that your opinion has been struck
21 by a court?
22    A    I can think of one time when I was not allowed
23 to testify.
24    Q    Tell me about that.
25    A    There was a criminal prosecution of a lawyer

Page 29

1 for -- I'm trying to think of what the term is in the
2 criminal law. Let's just call it blackmail.
3    Q   Oh.
4    A   That's probably not the statutory term. And
5 the defense lawyer wanted to offer testimony about
6 certain aspects of lawyer conduct, and the court ruled
7 that no expert testimony would be permitted. That's the
8 only instance I can think of.
9    Q   Thank you. I'm going to ask a little bit of a
10 separate question now so listen for the distinction, and
11 if you don't get it, I want you to ask me to clarify,
12 but there is a difference between being struck as an
13 expert and having an expert opinion of your's limited in
14 some way. Are you aware of any instance in which your
15 expert opinion has been limited in any way by a court or
16 a tribunal?
17    A   Oh, my. Well, it seems to me that it's -- it's
18 certainly possible that there have been limitations.
19 Quite possibly limitations I'm not even aware of as a
20 result of in limine motions and discussions among trial
21 counsel and the court. I can't think of an instance. I
22 can only say that I can't think of any as I sit here.
23    Q   Thank you. And you've never taught any classes
24 on the Texas Disciplinary Rules of Professional Conduct,
25 correct?

Page 30

1    A   That's correct.
2    Q   When were you retained in this case?
3    A   You know, I'd have to look at my computer to
4 try to figure out when I was first contacted. I'm just
5 not sure of that.
6    Q   Could you estimate it? Like, what season was
7 it? Was it cold? Was it football season? I mean,
8 it's -- it's kind of important to know.
9    A   You know, we don't have seasons in Los Angeles.
10    Q   Fair enough.
11    A   It [inaudible] stays the same.
12        (Simultaneous speakers)
13    MR. BROWN: You have his retention letter. I
14 know we produced it to you.
15    Q   Oh, you know what? That's a great idea,
16 because we do have that. I wasn't there yet, but let me
17 go ahead and go there. So, Mr. Kehr, I've got your
18 retention letter here as June 18th, 2021. As we sit
19 here today, it's September 16th, 2021. So that's --
20 let's see. July, August, September. That was three
21 months ago. Does that sound about right?
22    A   Fair enough. I can live with that.
23    Q   All right. In your memory as we sit here
24 today, can you remember how much time elapsed between
25 when you were first contacted about this and your

Page 31

1 retention letter?
2    A   I received a call from one of Ken's partners.
3 I'm going to -- I'm going to estimate two weeks before I
4 was retained.
5    Q   Okay.
6    A   And he -- he asked me questions that turned out
7 to be about this situation. Although, in those -- I
8 think we had two or three conversations. Give me a
9 moment to think about this because I'm trying to draw a
10 picture in my mind. I was somewhere out of doors on an
11 iPhone. I can't remember exactly what the context was.
12 I'm sorry.
13    Q   It's okay. That's usually how I ask people to
14 remember. That's why I always say was it football
15 season or was it basketball season because sometimes
16 that triggers people's memories on exactly the situation
17 that you're talking about. So please -- please take
18 your time.
19    A   My best estimate is I had perhaps three
20 phonecalls with one of Ken's partners asking me
21 questions about what turned out to be this situation
22 although he didn't tell me who was involved. And then
23 subsequently I got a call from -- I think one of the
24 other firm partners involved in the Highland Capital
25 Management situation, and I drew the connection between

Page 32

1 those roughly three calls I had with another partner.
2 So I'm going to say for -- as an estimate, two weeks
3 before I was retained.
4    Q   All right. So two weeks prior to your
5 retention -- your retention was on June 18th, 2021, and,
6 again, I'm not going to hold you to the exact date. Can
7 we agree that some time in early June 2021 is when you
8 think you were first contacted about this case?
9    A   I think that's a -- that's a fair estimate.
10    Q   Thank you. And what was the name of the
11 partner that first contacted you that you had the two or
12 three conversations with?
13    A   Stan Goldich, G-O-L-D-I-C-H.
14    Q   And is Mr. Goldich a professional colleague or
15 a friend?
16    A   He and I served on a LA County Bar Committee
17 together a number of years ago, and that's how we first
18 met.
19    Q   Are you friends? I mean, how -- how often do
20 you speak to Mr. Goldich?
21    A   Rarely.
22    Q   Okay. And what was the name of the second
23 colleague of Mr. Brown's that you spoke to when you put
24 it together that it was the same case that Mr. Goldich
25 had called you about?

Page 33

9 (Pages 30 - 33)

1   A  That I don't know.  There have been -- it seems
2 like about a half a dozen firm lawyers who I've had
3 contact with at one time or another, and I just don't
4 remember the order of them, and these are all people who
5 I've never physically seen so I have no mental picture
6 to call on.
7   Q  Fair enough.  Do you know whether or not it was
8 a man or a woman?
9   A  Man.
10   Q  And you said partner.  Do you know it was a
11 partner, or could it have been an associate?
12   A  I can't be certain.
13   Q  Fair enough.  Tell me about that conversation
14 when you put it together that this was the same case
15 Mr. Goldich had called you about.
16   MR. BROWN:  I'm going to caution you, Mr. Kehr.
17 Unless you considered the -- whatever information you
18 got in these calls and in forming the opinions that
19 you've been designated to testify on in this case, the
20 conversations that you had about this case with lawyers
21 from the Pachulski firm are work product and or are
22 privileged, and so I want you to be careful to not
23 disclose information that you did not consider in
24 forming your opinions.
25   A  Okay.  I'm fine with that.  But my answer was

Page 34

1 going to be even less helpful than that.  There is no
2 way I can distinguish individual conversations.  During
3 the past three months, I've probably had, you know, 20
4 or 30 conversations with different people at the firm
5 with regard to the underlying circumstances, facts,
6 their discovery of new facts, scheduling questions, and
7 so on and so forth, and it's a complete jumble.  I can't
8 distinguish conversations.
9   Q  Have you had any conversations with anybody at
10 Mr. Brown's firms about any matter related to Highland
11 Capital other than this disqualification motion?
12   A  I'm just trying to distinguish -- give me a
13 moment.  I think the answer is yes.
14   Q  Okay.  Can you tell me what other matters
15 you've had conversations about other than this
16 disqualification motion?
17   MR. BROWN:  Again, I'm going to caution you,
18 Mr. Kehr.  The conversations -- this is even more
19 limited because to the extent you've had conversations
20 with Counsel at Pachulski on other matters, obviously
21 you had to consider them in forming your opinion.  So
22 those would either be work product or privileged.  And
23 so to the extent those communications relate to work
24 product or privilege, I'm instructing you not to answer.
25   MR. MARTIN:  Mr. Brown, I just want to get a

Page 35

1 clarification in here.  So you're taking the position
2 that any conversations that your firm had with an expert
3 are not discoverable based on work product or privilege
4 if they didn't form the basis of his opinion.
5   MR. BROWN:  He didn't consider it in forming
6 the opinions he's going to give in this case.  If my
7 firm consulted with Mr. Kehr on legal issues unrelated
8 to this matter, yes, those are privilege.
9   MR. MARTIN:  All right.  Well, fair enough.
10 I'm not conceding that but I understand your position
11 and that's why I wanted the clarification.  Let me take
12 it one step further and ask you this.  If he has a
13 conversation with somebody from your firm about this
14 disqualification motion, are you instructing him not to
15 answer or to limit his testimony in any way if it
16 involved this disqualification motion?
17   MR. BROWN:  I'm -- he needs -- it's under Rule
18 26, it's not work product protected if he considered it
19 in forming his opinions.  So to the extent he considered
20 it, he can disclose it.  To the extent he had
21 conversations and communications with my firm that he
22 didn't consider in forming his opinions, it's work
23 product.
24   Q  Thank you.  Mr. Kehr, I think the question that
25 I originally asked you -- let me rephrase it --

Page 36

1   A  Sure.
2   Q  -- To perhaps assuage Mr. Browns concerns.  If
3 you had any conversation -- without revealing the
4 contents of any conversations, have you had
5 conversations with anybody about -- from his firm about
6 any matter other than this disqualification motion?
7 Just give me the subject matter if you have.
8   A  Well, I don't -- I don't think I can do that.
9 I have known Stan Goldich for -- and I'm just going to
10 roughly estimate 20 years, and he has called me from
11 time to time with questions about the -- I think
12 probably always about the professional responsibilities
13 of lawyers.  Most of time I probably made no notes of
14 those things, and these are things that have been gone
15 from my memory for ages.  I have no practical way of
16 answering your question except I have been in touch from
17 time to time on a variety of matters --
18   Q  Are -- sorry.  I didn't want to interrupt you.
19 I apologize.  Go ahead.
20   A  No.  That's okay.  Please go ahead.
21   Q  Okay.  We established that you were first
22 contacted about this disqualification some time in early
23 June 2021, correct?
24   A  Yes.  I think that's a fair estimate.
25   Q  All right.  So that was three months ago,

Page 37

10 (Pages 34 - 37)

1 right?
2    A    Right.
3    Q    Have you had any discussion with anybody at
4 Mr. Brown's firm in the last three months about anything
5 related to Highland that was not about this
6 disqualification motion?
7    A    Yeah. I think you asked me that before, and I
8 think the answer is, yes. I think there have been
9 conversations about the Highland situation that didn't
10 directly relate to the disqualification motion.
11    Q    Can you identify those matters by subject
12 matter without revealing the contents of the
13 conversation?
14    A    I really can't. I have -- I have no clear
15 recollection of what discussions there might have been,
16 but I'm pretty sure that's -- that's happened. Give me
17 one moment to turn off my phone which just tried to tell
18 me there was a call coming in. Okay. Go ahead.
19    Q    Sure. All right. Do you know whether or not
20 you've been designated as an expert by Mr. Brown's firm
21 in any other matters?
22    A    Not that I know of. I don't think so.
23    Q    Do you know whether or not -- or let me ask it
24 a different way. Have you prepared or reviewed
25 materials related to any matter from Mr. Brown's firm

Page 38

1 involving Highland other than this disqualification
2 motion?
3        MR. BROWN: I'm sorry. You broke up, Brant.
4 Could you just repeat it? I didn't get -- I didn't hear
5 the question.
6    Q    Sure. Mr. Kehr, have you reviewed any
7 materials or provided even a preliminary opinion on any
8 other matters involving Highland other than this
9 disqualification motion?
10    A    Prepared materials, I think the answer is, no.
11 Reviewed materials, possibly. That would require a
12 computer search to see whether I -- whether my
13 interactions with the firm have all been verbal or
14 whether I actually received something in writing. I'm
15 just not sure of the answer to that.
16    Q    Can you identify by subject matter what the
17 other matters might have been that you have worked with
18 Mr. Brown's firm on in involving Highland other than
19 this disqualification?
20        MR. BROWN: I think asked -- objection. Asked
21 and answered.
22    Q    You can answer it, Mr. Kehr.
23    A    The answer is, no. I can't.
24    Q    You can't identify the subject matter, right?
25    A    No.

Page 39

1    Q    Other than Highland and other than this
2 disqualification, how many other times have you been
3 retained by Mr. Brown's firm as an expert witness?
4    A    To the best of my memory, I never have been.
5    Q    When you were analyzing this matter and this
6 disqualification matter, did you analyze whether or not
7 it would have been more appropriate to have an expert on
8 the Texas rules be the expert in this case? Did you
9 consider that?
10    A    Well, I think I am an expert on the Texas
11 rules. My -- my involvement with the rules to
12 professional conduct is nationwide. I advise two
13 international law firms, other multi-branch law firms,
14 and one continuing Texas client. I -- I dealt -- I
15 regularly deal with the rules of professional conduct
16 all across the country. That's probably a slight
17 exaggeration. I don't offhand remember ever having
18 advised any -- anybody on the North Dakota rules, but I
19 have advised on the rules in Texas, Washington, DC,
20 Virginia, South Carolina, Massachusetts, New York,
21 Nevada.
22    Q    I -- I understand that, Mr. Kehr, but your
23 previous answer was that you do consider yourself an
24 expert on the Texas rules, correct?
25    A    Correct.

Page 40

1    Q    Okay. How many times have you consulted on the
2 Texas rules such that you believe it qualifies you as an
3 expert on the Texas rules?
4    A    Well, I don't think my expertise is based on
5 how many times I've consulted on the Texas rules. The
6 answer to that is, oh, maybe ten times as a very rough
7 estimate, but I have studied the rules around the
8 country when I was part of the commission that wrote the
9 California Rules of Professional Conduct and that
10 exercise, which went on for years, involved our
11 comparing the rules in all other 49 states and
12 Washington, DC, to look for ideas to see what the logic
13 was and so on. We did a -- a 50 jurisdiction comparison
14 and the Texas rules were certainly part of that. So
15 I -- I have studied these rules. I did it over a period
16 of years as well as consulting specifically on the Texas
17 rules on multiple occasions.
18    Q    Mr. Kehr, have you ever testified in a case as
19 an expert regarding the Texas rules specifically?
20    A    [inaudible]
21        (Simultaneous speakers)
22        MR. BROWN: Objection. Asked and answered.
23    A    Yeah.
24    Q    You have or you have not?
25    A    No. I don't believe I have.

Page 41

11 (Pages 38 - 41)

1    Q    Okay. Mr. Kehr, prior to this case, have you
2  ever worked with Mr. Brown before?
3    A    I don't think so.
4    Q    Have you ever worked with John Morris before?
5    A    I don't believe so.
6    Q    Have you ever worked with Jeffery Pomerantz
7  before?
8    A    I don't think so.
9    Q    How are you being compensated in this case?
10    A    Isn't -- isn't that in the court filing?
11    Q    It might be. I'm asking if you know.
12    A    I -- I send bills to Mr. Brown's firm which
13  then passes them on to Highland, and I'm paid by
14  Highland.
15    Q    And do you know what your rate is?
16    A    Not offhand. I don't remember.
17    Q    Do you know whether or not the bills have been
18  paid when they were submitted?
19    A    That's a good question. I don't offhand know
20  that. No.
21    Q    I own a firm too, Mr. Kehr, and I can -- you
22  know, that's one of the things I always look at is that
23  the client are paying or not. You don't know whether
24  or not this client has been paid?
25    A    I'd have to check.

Page 42

1    Q    Do you know whether or not you charge a
2  different rate for analyzing the case versus providing
3  testimony?
4    A    I charge a single rate.
5    Q    But you don't know what that rate is, right?
6    A    I'd have to check to be certain.
7    Q    How many hours have you worked on this case?
8    A    Oh, I have no idea. That's by -- the computer
9  keeps track. I couldn't keep track without a --
10    Q    Well, that actually goes to my next question.
11  How frequently do you record your time on this case?
12    A    We have a billing system that allows us to
13  record time as we are performing services. It's -- it's
14  a written --
15        (Simultaneous speakers)
16    Q    That's [inaudible] but it doesn't always
17  happen. My question is how often do you record your
18  time on this case?
19    A    Whenever I'm spending time on the case.
20    Q    Okay. So that's on a daily basis? If you're
21  working on this case, you automatically -- you
22  immediately record the time?
23    A    It's a minute by minute basis. It's a clock in
24  the system. You punch the clock when you start working
25  on a new matter, and it keeps track of the time.

Page 43

1    Q    Is anyone else assisting you on this matter?
2    A    It's conceivable that my partner Rachelle Cohen
3  has spent a little bit of time on this. We often work
4  together, but I can't be certain without checking the
5  billing records.
6    Q    Do you know what parts of this case Ms. Cohen
7  may have worked on versus what parts you worked on
8  personally?
9    A    Either all or virtually all of the work has
10  been my personal work. If I've asked her to -- to
11  double check something for me, I -- I wouldn't be able
12  to identify that without looking at time records.
13    Q    And in connection with your work on this case,
14  when is the last time you read the Texas Rules of
15  Disciplinary Procedure?
16    A    You mean procedure?
17    Q    When is the last time you read the Texas rules
18  in connection with this case?
19    A    Okay. You asked the rules of procedure and
20  that's the reason I paused.
21    Q    Okay.
22    A    Yeah.
23        MR. BROWN: Objection. The question is vague
24  and ambiguous as to what rules you're referring to.
25    Q    I apologize. Let me get the name right. Your

Page 44

1  opinion in based on at least Rule 109 of the Texas
2  Disciplinary Rules of Professional Conduct, correct?
3    A    Correct.
4    Q    When is the last time you read them in
5  connection with this case?
6    A    Yesterday.
7    Q    Okay. And which rules did you read?
8    A    I think on that instance, I only looked at
9  1.09.
10    Q    How many other of the rules did you consider in
11  analyzing this case?
12    A    I'm pretty sure I looked at 1.05. Probably --
13  no. No. I'm not sure. 1.05, yes. It's the only one I
14  can think of offhand.
15    Q    So 1.05 and 1.09 and at -- I'm going to be
16  generous. I'm going to -- assuming -- your testimony
17  would be there might have been others, but you can't
18  remember them right now; is that right?
19    A    Yes. In order to be certain, I'd probably need
20  to put the rules in front of me and think through what
21  my analytical process was.
22    Q    Prior to working on this case, when was the
23  last time you had read the Texas rules?
24    A    I would estimate that the last time I got a
25  call specific to Texas was about a month before that.

Page 45

12 (Pages 42 - 45)

1 Q   Was that from Mr. Brown's firm, or was it
2 related to another matter?

3 A   Another matter.

4 Q   And you didn't testify or get designated as an
5 expert witness in that other matter, correct?

6 A   No.  It was advising a law firm about a Texas
7 situation.  It was not an expert witness engagement.

8 Q   I'm still a little troubled by somebody
9 retaining a California expert in a case involving the
10 Texas rules.  So I'm going to ask you, part of your
11 basis for claiming to be an expert in the Texas rules is
12 your work for a Texas law firm; is that correct?

13 A   That's part of it.  Yeah.

14 Q   All right.  What's the name of that firm?

15 A   I think the names of my clients are
16 confidential.

17 Q   Okay.  And I thought that might be your answer.
18 Are you -- you would rather not or you're refusing -- in
19 a nice way, you're refusing to answer that question
20 based on confidentiality; is that correct?

21 A   Correct.

22 Q   Is your compensation dependent on the outcome
23 of this case?

24 A   No.

25 Q   Have you ever been retained to testify for

Page 46

1 James Seery before now?

2 A   No.

3 Q   Do you know who James Seery is?

4 A   I think he's the CEO now, isn't he?  Of
5 Highland.

6 Q   When you were first contacted about this case
7 and you started considering this case and analyzing it,
8 what were you told about the disqualification motion?

9 A   [inaudible]

10 (Simultaneous speakers)

11 MR. BROWN:  Well, again, I'm going to object to
12 the extent you considered matters that were told to you
13 by lawyers of Pachulski in forming your opinions.  You
14 can testify to the extent they were considered.  Beyond
15 that, it's work product, it's privilege, and I'm
16 instructing you not to answer.

17 Q   Let me try to fix his objection, Mr. Kehr,
18 before you answer.  When you're contacted about a case,
19 do you ask what the facts of the case are?

20 A   Well, I think that somewhere early in my
21 discussions with -- with a law firm about a potential
22 expert witness engagement, I'm going to be given
23 initially the names of the players so we can check for
24 possible conflicts.

25 Q   Sure.

Page 47

1 A   That's always the first step.  And the second
2 step typically is a, kind of, high level 35,000-foot
3 overview of what the circumstances are.

4 Q   And you take that into account in analyzing the
5 case, correct?

6 A   It's -- it's -- to some degree, yes.  But --
7 but the initial discussion of that kind, my
8 understanding generally is indefinite and often
9 incorrect because the lawyer who tries to give me the
10 overview of something that the lawyer has already spent
11 hundreds of hours on.  It is not digestible.  It's got
12 to be slowed down.  It's only when I start receiving
13 copies of materials that I can appreciate the -- the
14 full context and the details of a potential expert
15 witness engagement.

16 Q   So is it your testimony that you did not take
17 into account anything in those first two or three
18 conversations in analyzing this case?

19 A   No.  I can't say that.  I can only say that I
20 can't distinguish that conversation from the dozens of
21 others I've had from the other sources of
22 information.  The copies of the contracts that are
23 involved in this situation.  It becomes a -- a -- a
24 combined source of information.

25 Q   So because that is a combined source of

Page 48

1 information, you -- according to your lawyer's
2 instructions, don't want to testify as to what those
3 first conversations were.  Do I have that correct?

4 A   No.  I'm telling you that I can't distinguish
5 those first conversations from other sources of
6 information and --

7 Q   What do you remember -- sorry.  Go ahead.

8 A   That's okay.  You go ahead.

9 Q   What do you remember from those first
10 conversations that you took that you did take into
11 account in analyzing this case?

12 A   I -- I -- again, I can't distinguish first
13 conversations from other sources of information.  There
14 are particular topics such as, you know, how the Bridge
15 Loan worked.  I might have heard about multiple times.
16 There is no way I can distinguish what I might have
17 heard in a first or second conversation from the other
18 sources of information.

19 THE REPORTER:  Did you say, "How the Bridge
20 Loan worked"?

21 A   It's bridge, B-R-I-D-G-E.  The Bridge Loan.

22 Q   Mr. Kehr, I need to state this simply because
23 we might have to take up with the court.  Are you
24 willing to tell me about those initial two or three
25 conversations when you were first contacted about this

Page 49

1 case, or do you feel that you can't do it because of
2 your lawyer's instruction?
3    A   I -- I'm delighted to tell you about them if I
4 could. What I'm telling is I can't distinguish them
5 from other sources of information.
6    Q   Right.
7    A   I have an understanding today of what the
8 transactions involved and who the players were. I
9 obtained that information over a period of time from
10 multiple sources. I can't tell you which particular
11 source led to any particular element of my
12 understanding.
13    Q   I understand. All right. Let's go to -- and,
14 Mr. Kehr, this is the part where we might experience
15 some technical difficulties because I'm technologically
16 sometimes not very adept. I'll just put it that way.
17 That's a nice way to say it. And we've been going about
18 an hour so I think now might be a good time for a
19 personal convenience break for about five minutes if
20 that's okay with everybody and then we'll come back and
21 we'll talk about some of the documents. Fair enough?
22    A   Whatever you want.
23    Q   Great. Come back in five.
24       (Recess from 11:31 a.m. to 11:41 a.m.)
25    Q   Mr. Kehr, are you ready to proceed?

Page 50

1    A   I am.
2    Q   And you understand you're still under oath?
3    A   Correct.
4    Q   All right. I'm going to ask you about some
5 documents now. So let me explain to you to speed us up
6 how this is going to work. Ms. Drawhorn is attending
7 this deposition with me in a different Zoom room, if you
8 will. She is going to put the exhibit up there, and I'm
9 going to ask you questions about each exhibit. To the
10 extent that I might be a little slow on the highlighting
11 or the emphasis on certain documents, I want you to ask
12 me to restate something. Because if you don't get it,
13 then, you know, that's trouble for both of us. Fair
14 enough?
15    A   Yes.
16    Q   All right. And before we go there, you're not
17 licensed in the State of Texas, correct?
18    A   No.
19    Q   And how many other jurisdictions other than
20 California are you licensed in?
21    A   None.
22       (Exhibit No. 1 was marked for identification.)
23    Q   Okay. All right. I want to go to Exhibit 1,
24 and I believe these were provided to you ahead of time.
25 If you need time to catch up, I want you to let me know.

Page 51

1 Mr. Kehr, do you see a document appearing on your
2 screen?
3    A   I do.
4    Q   Excellent. And if you'll see this documents
5 title -- and you're familiar with the style of cases in
6 litigation and where the title is on a document that's
7 filed in litigation, correct?
8    A   Yes.
9    Q   All right. This document's titled -- read
10 along with me. Is Highland Capital Management LP's
11 disclosure of intent to use as an expert witness at the
12 hearing on it's motion to disqualify Wick, Phillips,
13 Gould, and Martin, LLP. Did I read that correctly?
14    A   Yes.
15    Q   And I assume that you've seen this documents
16 before?
17    A   Yes.
18    Q   And when did -- when did you see this document?
19    A   I think at about the time it was filed.
20    Q   All right. And I'm going to direct your
21 attention on this document to page three. As we move
22 down, you'll see the heading there says, Summary of
23 Opinions. Did I read that correctly?
24    A   Yes.
25    Q   All right. And you understand that this is the

Page 52

1 summary of opinions we were provided that Mr. Brown used
2 to disclose what you were going to testify about,
3 correct?
4    A   Yes.
5    Q   How much input, if any, did you have into the
6 drafting or the editing of this summary?
7    A   Well, I don't think I was involved in -- in
8 drafting or editing. I was involved in explaining to
9 Mr. Brown what my opinions are, how I analyze the
10 situation, and that became his summary of my opinion.
11    Q   All right. So I'm taking it from that answer
12 that as far as you are concerned, Mr. Brown drafted this
13 summary of opinions, correct?
14    A   Yes. I probably commented on it at some point,
15 but I think it's based on communications that he and I
16 had had before he did his summary.
17    Q   Do you remember at any point editing this
18 document or a version of this summary prior to it being
19 filed?
20    A   I don't.
21    Q   Do you remember whether or not you provided any
22 red line comments or anything else to Mr. Brown
23 correcting a description of the summary?
24    A   I don't.
25    Q   You don't remember or you didn't do it?

Page 53

14 (Pages 50 - 53)

1   A   I don't remember whether I did.
2   Q   All right.  So let's go to -- well, let me ask
3   this question first.  Since this document has been
4   filed, had you reviewed this summary of your opinions?
5   A   I'm -- I'm not certain.  I might have seen it
6   before it was filed.  I might have seen it afterwards.
7   I'm just not certain.
8   Q   Do you know whether or not this section of this
9   document accurately reflects what you think about this
10   case?
11   A   I think it does in the summary fashion.  Yes.
12   Q   All right.  I want to go to subsection B, and
13   I'm going to read the first bullet point under
14   subsection B, and I want you to follow along.
15   A   If you could give me one -- if you could give
16   me one moment.  I have a copy of it on my computer.
17   Q   That would be great.
18   A   And I'm going open it up because on the
19   screen it's partly blocked by the -- by the images of
20   the participants.  Okay.  Go ahead.  I'm ready.
21   Q   All right.  The first bullet point states, "A
22   lawyer owes two duties to a former client.  These are
23   continuing duties of loyalty and of confidentiality.
24   Those are separate and independent duties.  A lawyer can
25   violate the continuing duty of loyalty even if the

Page 54

1   lawyer possesses no confidential information of a former
2   client.  An attorney who has acted as such for a former
3   client cannot render professional services adversely to
4   the former client in the same or substantially related
5   matter nor, in any event, whether it be in the same
6   matter or not, can the lawyer assume a position hostile
7   to the former client and one inimical to the interest
8   the lawyer previously was engaged to protect."  Did I
9   read that correctly?
10   A   You did.
11   Q   All right.  I want to ask you some general
12   questions about the statements of law that you put in
13   there.
14   A   Sure.
15   Q   And, again, Mr. Kehr, I don't want to put words
16   in your mouth, and I'm going to ask you these questions
17   knowing this is your shot to tell us what we did wrong.
18   Okay?  So I want you to correct me if I say anything
19   wrong.  But the way that I read that is that you
20   essentially identify two different situations there.  I
21   read that one situation that you have a problem with is
22   an attorney who renders professional services adversely
23   to a former client in the same or substantially related
24   matter and then the second situation that you identify
25   is, whether it be in the same matter or not, the lawyer

Page 55

1   cannot assume a position hostile to the former client
2   and one inimical to the interests the lawyer previously
3   was engaged to protect.  Am I correct in assuming that
4   in your opinion those are two separate situations?
5   A   No.  I don't think that's right.  The -- there
6   are -- let me try to do it this way.
7   Q   Sure.
8   A   There are two continuing duties.  A narrow
9   continuing duty of loyalty and a continuing duty of
10   confidentiality.  Typically, the confidentiality issue
11   trumps everything else because, typically, in
12   disqualification motions, it's all that the court needs
13   to look at in order to determine whether the law firm
14   will be disqualified, but as the -- which sentence is
15   this?  It's the final -- the long final sentence which
16   is roughly one, two, three -- the fifth sentence of that
17   paragraph I think.  The long one.  What that does is to
18   summarize that even if there is no confidential
19   information, the duty of loyalty does exist.  It's --
20   it's not common for there to be a loyalty duty without
21   confidentiality but it does exist, and the two duties
22   have historically been recognized as being distinct.
23   Q   And in this case, you didn't find any evidence
24   that Wick Phillips was misusing confidential
25   information, correct?

Page 56

1   A   My view is that there is no confidential
2   information that I'm aware of, because there would have
3   been joint lawyer-client relationship, and in a joint
4   relationship, each client -- I'm sorry.  The lawyer has
5   the same duty of full disclosure and loyalty to each
6   jointly represented client, and that means that the
7   lawyer cannot favor the interest of one joint client
8   over the other.  So if the common lawyer obtains
9   material information about the engagement from one
10   client, the lawyer probably is obligated to share that
11   information with the other joint client.
12   Q   And you didn't find that in this case, correct?
13   A   I -- I don't understand your question.
14   Q   You didn't find any violation of the duty of
15   confidentiality in this case related to Wick Phillips,
16   correct?
17   A   No.  I'm not aware of any evidence that there
18   is any confidential information as between the jointly
19   represented clients.
20   Q   Right.
21   A   A law firm in a joint representation owes an
22   equal duty to each client to maintain the
23   confidentiality.  So that would go only to the outside
24   world.  It wouldn't go to the sharing of information
25   between the jointly represented clients.

Page 57

15 (Pages 54 - 57)

1    Q    Right.  And my question was, you didn't find
2  any evidence that Wick Phillips violated any duty
3  related to that sharing of confidential information,
4  correct?
5    A    Correct.
6    Q    All right.  So that's -- and can you and I
7  agree that that's Texas Rule 105?
8    A    Well, not exactly.  The duty of confidentiality
9  is in 1.05, but you don't need to look -- I'm sorry.
10  You can't look only at 1.05 to understand the interplay.
11  Part of the concept here is that the duty of loyalty to
12  each jointly represented client which is not in 1.05,
13  but is an underlying fiduciary duty of lawyers prohibits
14  the lawyer from favoring the interests of any one joint
15  client.  So that's what creates the sharing of
16  information as a general principle, and that would be
17  true in every jurisdiction.
18    Q    You didn't find a violation of Texas Rule 1.05
19  in this case, correct?
20    A    Correct.
21    Q    All right.  And, in fact, if I understand
22  your -- the summary of your opinions correctly, your
23  primary criticism is a violation, in your opinion, of
24  Texas Rule 1.09, correct?
25    A    Correct.

Page 58

1    A    Okay.
2    Q    Because the way I read that sentence was that
3  you were identifying two possible scenarios, and you
4  disagreed with that.  So I want to investigate that a
5  little bit because that's -- I read it differently than
6  apparently how you mean it.  I read that as two
7  scenarios.  One is that a lawyer cannot render
8  professional services adversely to the former client in
9  the same or substantially related matter.  That's one
10  scenario.  And then the second scenario would be whether
11  it's in the same matter or not, a lawyer cannot assume a
12  position hostile to the former client and one inimical
13  to the interest the lawyer previously was engaged to
14  protect.  Is that not two scenarios?
15    A    Well, I think it is, but it's a highly unusual
16  situation for there to be a violation of the duty of
17  loyalty without the lawyer undertaking a representation
18  in the same or substantially related matter.  There are
19  instances in which -- that would be outside that.  And
20  this summary, which is actually a quotation from a case
21  or pretty close to a quotation from the case, covers the
22  water front.  A -- what I thought was a rather
23  well-written summary of how these two duties -- two
24  former clients operate.
25    Q    I -- I understand and that -- and that's why

Page 60

1    Q    And you are stating and you stated earlier
2  today, that the obligation under Texas Rule 1.09 has, as
3  it's basis, the fiduciary duty that lawyers owe to
4  clients, correct?
5    A    I'm sorry.  Would you say that again?  It
6  didn't quite track for me.
7    Q    Absolutely.  You stated earlier today, and I
8  think even in your answer just now that the limitations
9  of 1.09 on what a lawyer can or cannot do, are informed
10  and, in fact, based in a lawyer's fiduciary duty to it's
11  client's, correct?
12    A    Duties.  Plural.  Yes.
13    Q    I said plural.  I'm not -- I'm not trying to
14  trick you, sir.
15    A    It came through as a singular.  I think there
16  must have been -- the S was chopped off by the
17  electronics but yes.  The answer is yes.
18    Q    Okay.  Fair enough.  So your primary criticism
19  in this case of my firms conduct is a violation of rule
20  .109 [sic], correct?
21    A    1.09.  Yes.
22    Q    All right.  Thank you.  Now, I'm going to back
23  up because I asked you a question earlier about that
24  long sentence at the end of the first bullet point.  So
25  take a look at it again.

Page 59

1  I'm asking you the question, Mr. Kehr, is because I want
2  to make sure that I have the entire universe of what
3  you're criticizing Wick Phillips about.  So I -- and I
4  will give you the opportunity by asking you an open
5  ended question.  Based on that second sentence, what of
6  the duties of loyalty do you think Wick Phillips
7  violated?  Is it -- did they render professional
8  services adversely to the former client in the same or
9  substantially related matter?  Or did they assume a
10  position hostile to the former client and one inimical
11  to the interest the lawyer previously was engaged to
12  protect?  Or was it both?
13    A    Well, I -- I don't draw any distinction among
14  those three elements in my analysis.  It doesn't make
15  any difference whether one were to consider that the
16  position that your firm is in now in the -- in it's
17  creditors claim is the same matter as the prior
18  engagement whether it would be considered substantially
19  related or it's simply taking the position that is
20  hostile to the interests it was formerly engaged to
21  protect.  It -- it's irrelevant to the analysis to
22  determine which of those it is.
23      It's my view that it's the same matter, but my
24  opinion doesn't depend on the court determining that
25  it's the same matter.  I mean, if I were a judge, I -- I

Page 61

16 (Pages 58 - 61)

1 wouldn't pause over the question of whether it's the
2 same matter, substantially related, or simply hostile.
3 The question is -- or the answer, in my view, is the
4 same anyway that you want to look at it. But, again, I
5 view it as being the same matter.
6   Q   And you're getting to the heart of this -- this
7 line of questioning, Mr. Kehr, so I appreciate that
8 because your position is that my firm's representation
9 in this adversary proceeding is the same or
10 substantially related matter to the previous
11 representation, correct?
12   A   Yes.
13   Q   My hypothetical is, let's say the court says,
14 no. It was not the same or substantially related
15 matter. Is it going to be your testimony that we still
16 violated rule 109?
17   A   Yes.
18   Q   Why?
19   A   Because the creditor's claim and the effort to
20 reallocate ownership interest is hostile to the
21 interests that the firm previously was engaged to
22 protect in advance.
23   Q   Do you thank that a law firm cannot take a
24 position hostile to a former client even if the matter
25 is not the same or substantially related?

Page 62

1   A   Well, as this -- as this quote says, hostile to
2 the interest the lawyer previously was engaged to
3 protect. That I view as just being the, kind of,
4 umbrella statement that probably includes every matter
5 in which the lawyer is engaged in the same or
6 substantially related matter, but I think one difference
7 might be if the lawyer doesn't even have a lawyer-client
8 relationship is not acting as a lawyer but is acting in
9 some other way that is hostile to the interest that the
10 lawyer previously was engaged to protect or advance.
11   Q   All right. Let's -- let's --
12   A   You're trying to -- you're looking at an
13 analytical distinction that I don't think has any
14 application here. I think it's sufficient to say same
15 or substantially related, and -- but -- but the summary
16 that this court used in that final phrasing tells us
17 that you don't have to -- I'm sorry. That the law firm
18 doesn't have to have a client in the same or
19 substantially related matter. It's broader than that.
20   Q   And I understand that's what you're saying, and
21 that's what I'm trying to flush out, Mr. Kehr. I'm
22 under no illusion that I'm going to convince you to be
23 on my side on this. All right? But my question is --
24 I'm trying to define, for the sake of the record, the
25 interests that you were saying were violated, right?

Page 63

1       And so we have this situation where a lawyer is
2 rendering services adversely to the client in the same
3 or substantially related matter, and what I'm taking
4 from your testimony is, yes, that's a no-no. You can't
5 do that. All right. But you're saying it's broader
6 than that. That even if it wasn't the same or
7 substantially related matter, there is a second
8 component to this according to this case you quoted.
9 That second component being, even if it's not the same
10 or substantially related matter, that the lawyer could
11 still be violating Texas Rule 1.09 if it takes a
12 position hostile to the former client and one inimical
13 to the interest the lawyer previously was engaged to
14 protect. So it's broader than just the same or
15 substantially related matter, rule, correct?
16   A   Right. And the distinction that I was trying
17 to explain a moment ago is the lawyer doesn't even need
18 to have a client. If the lawyer has a client, the
19 lawyer has been engaged by someone in a matter that is
20 the same or substantially related to the prior
21 engagement. That would be virtually every situation.
22 But one could imagine a situation in which the lawyer
23 doesn't even have a client but is acting in a way that
24 is hostile to the interest it previously was engaged to
25 protect or advance.

Page 64

1   Q   Okay.
2   A   So I -- I just -- I don't think that last
3 sentence really adds anything in this situation because
4 Wick Phillips does have a client. It is engaged by that
5 client. And the question is whether the engagement is
6 adverse to the former client with regard to the subject
7 of the former representation.
8   Q   What -- and you know what? I don't know that I
9 disagree with you, Mr. Kehr, because I think you're
10 going to agree with me that our position is going to be
11 our previous representation is not the same or a
12 substantially related matter. And the reason I'm asking
13 you these questions is not to pick on you, but to say if
14 the court says, you know what, Wick Phillips' previous
15 representation was not the same or substantially related
16 matter. Is it going to be your opinion that we still
17 violated rule 109?
18   A   The answer is yes.
19   Q   And I'm asking you why?
20   A   Well, this gets into a whole other element of
21 my analysis. What Wick Phillips has been attempting to
22 do is to -- to use a word that popped up in one of the
23 depositions. It's attempting to silo it's
24 representation. The silo concept was that it was
25 involved in the drafting and in providing legal advice

Page 65

17 (Pages 62 - 65)

1 with regard to the Bridge Loan. It was not involved in
2 the drafting or providing advice with regard to the --
3 the LLC agreement in which the ownership interests were
4 stated. And -- and, therefore, they are separate
5 matters, and my view is that they are not separate
6 matters.
7      They're part of a single transaction. The
8 single transaction included probably many dozens of
9 individual instruments, and they all existed for the
10 single purpose of acquiring 20 or 30, whatever the
11 number was, pieces of real property. The Bridge Loan
12 existed because, at least initially, Highland Capital's
13 credit was needed for the banks to make the loan, and
14 without that loan, the acquisition couldn't have taken
15 place. The -- the LLC agreement -- the multi --
16 multifamily -- SE Multifamily, whatever the name of it
17 is, LLC, agreement wouldn't have existed but for the
18 need for Highland's credit. The Bridge Loan wouldn't
19 have existed except for the other agreements. All of
20 them are part of a single transaction, and I don't think
21 that any of the law firms involved in the circumstances
22 are in a position to be adverse to any of the work that
23 they did previously.
24      So if there is a law firm, I don't know who it
25 was, that provided advice on income tax consequences, it

1 remember is the same or substantially related.
2    Q    Okay. But if it's not the same transaction,
3 then your back up position would be, well, it's at least
4 substantially related, and therefore Wick Phillips is
5 disqualified under that ground, correct?
6    A    That's correct. I view this -- if I may just
7 extend this a bit. I don't view the difference between
8 the same or substantially related as being meaningful.
9 The standard is the same. One doesn't have to conclude
10 it's the same as opposed to substantially related to
11 result -- I'm sorry. To reach the same result. My own
12 analysis is it's the same transaction.
13    Q    I understand. And I think you've been very
14 clear, Mr. Kehr, and I'm -- again, I'm not here to
15 convince you otherwise, but I am here to test what
16 your -- what your opinions are. You understand that,
17 right?
18    A    Of course.
19    Q    Okay. So I think coming from our same line, if
20 the court finds that this was not the same or
21 substantially related, then your opinion fails and it's
22 not a violation of 109, correct?
23    A    Well, no. You still have the concept of
24 hostile to the interests.
25    Q    Okay. And that's where -- I'm trying to make

1 is not in the position, assuming that it's a former
2 client situation rather than a current client situation,
3 I should make that assumption with all of my explanation
4 here. So if there is a law firm that provided advice to
5 this overall transaction to any of the clients, to any
6 client whether it was Highland or any of the other
7 participants, or provided advice with regard to
8 hazardous material issues with regard to any of the
9 properties, or provided advice on any other topic that
10 was part of the overall package, that law firm cannot
11 now be adverse to the former client with regard to this
12 transaction.
13    Q    Right. Doesn't that conclusion require the
14 fundamental premiss that this was a single integrated
15 transaction?
16    A    Yes.
17    Q    Okay. So, again, hypothetical, if the court
18 finds this was not a single integrated transaction then
19 your theory fails, correct?
20    A    I agree with that. I view it --
21    Q    Okay.
22    A    -- It -- it's the same transactions. Then the
23 back up question is whether it's substantially related.
24 I view it as being a single transaction but the -- the
25 rule in Texas and everywhere else so far as I can

1 that distinction. I'm trying to see how far you're
2 going to go, right? And so if it's not the same or
3 substantially related, then you've got this back up,
4 kind of, catch all of hostile to the former client
5 inimical to the interest standard, right?
6    A    Right. Part of that whether you look at it as
7 the same transaction or substantially related or just
8 other hostility is the concept that a lawyer cannot seek
9 to undercut the -- the validity of the work that the
10 lawyer previously did for the client. That's part of
11 the duty of loyalty. It's not the entire duty of
12 loyalty, but it's one prong of the duty of loyalty so --
13    Q    I understand what you're saying, Mr. Kehr, but
14 that's kind of -- that's my question. I've got a couple
15 questions about this. The first thing -- well, let me
16 back it up. You said you were quoting a case here.
17 What case are you quoting as to this standard?
18    A    I think that -- that language -- the -- that
19 long sentence comes from a 19th Century case called, In
20 Re Boone.
21    Q    Can you spell that please?
22    A    B-O-O-N-E.
23    Q    All right. And what jurisdiction is that Boone
24 case from?
25    A    It's a -- it's a federal case that preexisted

1 the current Courts of Appeal. The current -- what is
2 it? 11 circuits of Courts of Appeal. It's before the
3 federal courts were aligned that way.
4      (Simultaneous speakers)
5    Q   I understand. That wasn't my question. You
6 said it was a 19th Century case meaning that it was an
7 1800's case?
8    A   Correct.
9    Q   Okay. And do you know what court issued the
10 opinion that you're quoting here for this standard?
11   A   It is what was then called the Circuit Court
12 for Northern District of California and the site is 83
13 Fed 944.
14   Q   So 83 Fed meaning the first version of the
15 federal reporter and we're now on --
16   A   Correct.
17   Q   -- I think the fourth version, right?
18   A   That's right.
19   Q   All right. So it was a long time ago. You
20 agree with me on that, right?
21   A   I do.
22   Q   Okay. And it was from California and not from
23 Texas, correct?
24   A   It was from a federal court in California.
25 Yes. And it cites other older cases.

Page 70

1    Q   I understand. Can you tell me the year that
2 was issued?
3    A   1897.
4    Q   All right. So Texas was admitted as a state of
5 the Union, and, in fact, by then had succeeded and come
6 back after the Civil War, correct?
7    A   Yes.
8    Q   All right. Is there a reason you're using a
9 standard for disqualification from an 1897 case out of
10 California Federal Court rather than using, for
11 instance, a Texas Supreme Court case from somewhere
12 closer to the 22nd Century? 21st -- 21st Century.
13 Yeah. We're in the 21st.
14   A   I won't tell anyone you don't know what century
15 it is.
16   Q   You know, I went to law school because I can't
17 count.
18   A   It will be our secret. There are lots of Texas
19 authorities. I happen to like the rather poetic
20 phrasing of In Re Boone, but I can -- one well-known
21 Texas authority was cited by the Pachulski firm in its
22 original brief. It's the American Airlines case.
23 You'll find language in that.
24   Q   Well -- but this language that you've quoted --
25 or I'm sorry. That Mr. Brown quoted in the summary of

Page 71

1 your opinions to me, and you would agree, it's a broader
2 duty than just the same or substantially similar
3 transaction, correct?
4    A   Well, I just don't see any -- the difference
5 you're trying to draw I can't live with. There -- these
6 are all the same concept --
7    Q   Well, let me ask you --
8    A   -- And the concept is whether you look at it as
9 the same or substantially related, the loyalty concept
10 is that the lawyer cannot attack the matter on which he
11 previously was engaged by former client, and sometimes
12 that's phrased as attacking the lawyers own work.
13 Sometimes under the specific facts of a -- of an
14 opinion, that comes into play, but it's a more
15 generalized concept.
16   Q   I understand that, Mr. Kehr. Five minutes ago
17 you told me that the second dependent clause in that
18 quote was broader than the same or substantially related
19 matter concept. Do you remember that?
20   A   I do. But you're -- you're missing the reason
21 for the distinction. The reason for the distinction is
22 that one can imagine situations in which the lawyer or
23 law firm doesn't even have a client. So it's -- it's
24 not -- in a representation, the question is -- is it the
25 same or substantially related, but one could imagine

Page 72

1 non-representative situations in which a lawyer is
2 attacking work previously done for a former client, and
3 as I said before, it's going to be extremely rare, but I
4 think that the generalized statement and the In Re Boone
5 decision captures that broader concept.
6      In our situation, you don't have to go beyond
7 that because your law firm does have a client, and it's
8 possible to analyze whether the current representation
9 on the creditor's claim is in the same or substantially
10 related matter to the prior representation.
11   Q   I understand that, Mr. Kehr, but it goes back
12 to a question I asked you previously. If the court
13 finds it was not the same or substantially related
14 matter, you're still going to say that we're
15 disqualified. So it would have to be under this second
16 text, correct?
17   A   I'm not going to say you're disqualified.
18 That's a judicial decision. What I'm going to say is
19 that the same duty of loyalty issue arises without
20 regard to how one categorizes it. What -- what exists
21 in my view is that your law firm is acting in a way that
22 is adverse to its former client with regard to the
23 subject of the former representation.
24   Q   And if it's not the subject of the former
25 representation, it's going to be your position there is

Page 73

1 still a violation of rule 109 because we were taking a
2 position hostile to the former client and one inimical
3 to the interests that we were previously engaged to
4 protect, correct?
5 A Well, I'm not certain I can go quite that far
6 because it -- it -- it -- there is a representation.
7 You know, again, I've said this I guess twice before.
8 But I view the broader statement as being a fair summary
9 of the narrower statement, but it does include that, you
10 know, unusual situation, highly unusual situation, in
11 which there is no current representation.
12 Q Does the broader statement, the second part of
13 this, the -- the lawyer cannot assume a position hostile
14 to the former client and one inimical to the interests
15 that the lawyer was previously engaged to protect, that
16 doesn't appear in rule 109, correct?
17 A That's correct.
18 Q It appears in In Re Boone from 1897, correct?
19 A Well, I think it -- it exists in other places
20 too.
21 MR. MARTIN: Objection. Nonresponsive.
22 A It exists in the American Airlines case.
23 Q Those words exist in the American Airlines
24 case?
25 A Not those words. That concept. And there are

Page 74

1 a number of other cases. There is a Texas advisory
2 ethics opinion that has the broader concept.
3 Q Okay. Mr. Kehr, I was going to ask you about
4 this in a little while, but I noticed in the
5 documents -- well, first of all, Madam Court Reporter,
6 do we have Exhibit 1 marked?
7 THE REPORTER: Yes.
8 (Exhibit No. 3 was marked for identification.)
9 Q Okay. I'm going to come back to that. Let's
10 go to Exhibit 3 real quick. Mr. Kehr, Exhibit 3 is a
11 list that was provided to us by Mr. Brown of the
12 documents that were considered by you in connection with
13 this Motion to Disqualify. Do you see that?
14 A I do. I have it on my -- my screen on my
15 computer here.
16 Q Perfect. Have you seen this document before?
17 A I think I saw it for the first time yesterday.
18 MR. BROWN: Grant, excuse me for just a minute.
19 I just wanted to add that we also sent Lauren a
20 letter -- I'm sorry. An email after we sent this that
21 added to this list with greater declaration and the
22 attached exhibits which was framed as an appendix and
23 was filed under seal as one additional document with the
24 attachments which Mr. Kehr considered, and it -- I mean,
25 it could be part of this list, because it was part of

Page 75

1 the opposition --
2 MR. MARTIN: I understand.
3 MR. BROWN: -- Of Wick Phillips. But just for
4 clarity.
5 MR. MARTIN: And, Mr. Brown, I'll stipulate I
6 saw that email. I'm not disputing that those were also
7 part of the documents he reviewed. That's not what I'm
8 going to ask him about, but thank you for the
9 clarification. Mr. Kehr, do you have Exhibit 3 up in
10 front of you?
11 A I do.
12 Q Can you identify where Exhibit 3 lists In Re
13 Boone from 1897?
14 A I didn't understand that that was the purpose
15 of this list. This list documents. It doesn't list
16 cases or advisory ethics opinions.
17 Q I was going to ask you that next. It doesn't
18 list American Airlines case. It doesn't list the ethics
19 opinions, correct?
20 A I think that's correct.
21 Q All right. So if I was going to test your
22 interpretation of these cases and test your
23 interpretation of the opinions, I don't have the
24 opportunity to do that because I don't know what you've
25 looked at, right?

Page 76

1 A I -- I think that's a rhetorical question.
2 MR. BROWN: I'm going to object to this line of
3 questioning to the extent -- to the extent it applies
4 that there was an agreement to produce authorities.
5 That's not the case. We agreed to produce documents
6 that Mr. Kehr relied on. We did not agree in our
7 stipulation to produce authorities or to list
8 authorities.
9 MR. MARTIN: Mr. Brown -- Mr. Brown, is it your
10 position that under rule 26 you don't have to produce
11 everything he looked at in evaluating this and rendering
12 his opinions?
13 MR. BROWN: We agreed to produce documents not
14 authorities.
15 MR. MARTIN: And so you don't think you have
16 the obligation to produce the authorities; is that
17 correct?
18 MR. BROWN: That's correct. Neither party
19 produced any authorities.
20 MR. MARTIN: Objection. Okay. That's fine.
21 You're on the record. Anything else, Mr. Brown, before
22 I actually ask your witness a question?
23 Q Mr. Kehr, you would agree with me that courts
24 sometimes disagree about what cases say, correct?
25 A Yes.

Page 77

20 (Pages 74 - 77)

1  Q   And, in fact, even Supreme Court has majority
2  opinions and sense that can disagree about specific
3  provisions that a case might turn on, correct?
4  A   Correct.
5  Q   So if you and I were looking at the same
6  advisory opinions, you and I might have a different
7  interpretation of those advisory opinions, correct?
8  A   Agreed.
9  Q   And you and I might have a different opinion
10 about what the American Airlines case says, correct?
11 A   Of course.
12 Q   You and I might have a different opinion as to
13 the affect of In Re Boone from 1897 has on rule 109 of
14 the Texas rules, correct?
15 A   Yes.
16 Q   So it's difficult for me to question you about
17 your assumptions without knowing what you looked at.
18 You agree with that, right?
19 A   I think, again, this is a rhetorical question.
20 I don't want to get involved in your debate with
21 Mr. Brown about whether either of the parties violated
22 some agreement between them.  It's --
23      (Simultaneous speakers)
24 Q   I'm not asking you for that.  Mr. Kehr, I
25 appreciate that, but I'm not asking you for that.  I'm

Page 78

1  asking you whether or not I can test your opinions about
2  what a Texas case does or does not say if I don't know
3  what you looked at.  I can't, right?
4  A   I don't agree with that.  You can test my
5  opinion.  I will tell you the reason I think what I
6  think, and you can find out everything you need to know
7  about what my analytical process is.  Whether a
8  particular opinion supports or contradicts my opinion is
9  something for you and Mr. Brown to work out in your
10 filings that I understand are due in a couple of weeks.
11 But I'm not going to have a debate with you here about
12 what particular cases say.  I would -- would be totally
13 incapable of doing that except by written materials.  I
14 can't do that spontaneously.  What I can do is explain
15 what my thought process is.
16 Q   I understand that and you testified earlier
17 that you consider yourself an expert on the Texas rules.
18 You remember that?
19 A   I do.
20      [Zoom audio interference]
21 Q   [inaudible] -- On disciplinary rules is
22 interpreting cases and interpreting advisory opinions,
23 correct?
24 A   Yes.
25 Q   Can you identify as we sit here today what

Page 79

1  cases or advisory opinions you looked at in reaching
2  your conclusions here today?
3  A   I -- I couldn't possibly.  I could read cases
4  and advisory ethics opinions and participated in writing
5  advisory ethics opinions for 40 years.  Probably
6  slightly more than 40 years.  So, I mean, the -- the
7  whole body of the -- roughly the 40 or so years that
8  I've been involved in the field of professional
9  responsibility, all of the work that I did on the two
10 commissions that wrote the California rules, all of that
11 comes into play.
12      When Mr. Brown ultimately files his brief,
13 there will be some sampling of particular opinions that
14 he's going to view important for the courts
15 understanding, but my opinion is based on 40 years of
16 experience in the field.
17      MR. MARTIN:  Okay.  I'm going to object as
18 nonresponsive.
19 Q   Mr. Kehr, can you identify which authorities
20 you consulted in reaching your opinions in this case in
21 the last three months?
22 A   I couldn't give you a complete answer.
23 Q   Could you give me a partial answer other than
24 In Re Boone and the American Airlines case?
25 A   Yes.  I recall looking at the restatement third

Page 80

1  of the law governing lawyers.  I remember that offhand.
2  I recall the Texas advisory ethics opinion that I
3  mentioned a moment ago.
4  Q   Do you remember which one that was?
5  A   No.  I don't remember the number.
6  Q   Do you remember what it was about?
7  A   I only remember that it is one of the sources
8  that talks about the lawyer and I'm going to -- these
9  are not the words of the opinion, but -- but a
10 paraphrase of the concept seeking to undo the lawyers
11 own work or attacking the lawyers own prior work.
12 Q   What else?
13 A   A fairly -- fairly common concern that pops up
14 around the country, and it's come up in any number of
15 cases and advisory ethics opinions.
16 Q   What else did you look at?
17 A   I can't tell you.
18 Q   Okay.  So as we sit here today, you've
19 identified everything that you can remember that you
20 looked at in interpreting the Texas rules to reach the
21 opinions you have in this case, correct?
22 A   Yes.
23 Q   All right.  So I'm going to move on to
24 something else.  Part of your opinions revolve around
25 this concept of -- that this was a single integrated

Page 81

21 (Pages 78 - 81)

1 transaction, correct?
2    A    Yes.
3    Q    All right.  Now, I don't need to get into
4 another semantic discussion with you unless you find it
5 necessary after hearing my questions.  But in my opinion
6 or in my mind, there is a difference between a single
7 integrated transaction and different representations of
8 a lawyer.  Do you agree or disagree with that statement?
9    A    I agree.
10    Q    So you could have a single integrated
11 transaction and have different lawyers representing a
12 client in different parts of a single integrated
13 transaction, correct?
14    A    I agree with that.  Different lawyers in a
15 single law firm or different lawyers in different law
16 firms?
17    Q    So, for example, if you had a law firm that the
18 client loves for whatever reason to do their finance
19 work.
20    A    Excuse me.  But I missed one word in your
21 question.  Could you start it over again please?
22    Q    Absolutely.  I'm just giving you an example.
23 And one example I might have is that a client loves to
24 use certain -- certain law firm for their finance work
25 but doesn't use that lawyer for their intellectual

Page 82

1 property work, correct?
2    A    Yes.
3    Q    And so those lawyers perhaps in a single
4 transaction might have different representations.  Their
5 scope of representation would be different, correct?
6    A    Correct.
7    Q    And so, for example, if the lawyer -- if the
8 law firm doing the finance work doesn't have the
9 capability to do intellectual property work, then that
10 representation by definition would not involve
11 intellectual property, correct?
12    A    Correct.
13    Q    Now, I don't think I'm previewing anything that
14 anybody doesn't already know.  You understand that my
15 firm is taking a position that we represented,
16 regardless of -- we'll get into it, who was represented,
17 but the representation of my firm was limited to the
18 loan agreement, right?
19    A    Yes.
20    Q    And you understand that that's our position,
21 correct?
22    A    I do.
23    Q    So if that is the case and the court finds that
24 we represented whoever you're talking about just for the
25 purposes of the loan transaction, it is your opinion

Page 83

1 that rule 109 was still violated because the entirety of
2 it was a single integrated transaction or no?
3    A    Well, because it's a single integrated
4 transaction and what your firm is doing is attacking the
5 effectiveness or validity of work it did before.  What
6 you're -- what you're doing in my opinion is mixing the
7 concept of scope of representation, which is extremely
8 important, with the loyalty issue which is not limited
9 to the particular legal issues on which the lawyer
10 previously advised the client.  The scope of
11 representation is essential for -- primarily for
12 malpractice purposes.  Let's -- let's --
13        (Simultaneous speakers)
14    Q    Go ahead.  I'm sorry.
15    A    Yeah.  Let's just say to simplify the
16 discussion that there were ten law firms involved in
17 the -- what was it called?  The unicorn transaction?
18    Q    Project Unicorn.
19    A    Yeah.  And that one of them provided advice
20 about title insurance on properties that were being
21 acquired.  And let's assume that the other nine law
22 firms provided no advice on that subject and that a --
23 that whomever or whichever their client was, didn't rely
24 on any of those other nine law firms to provide advice
25 on title insurance questions.

Page 84

1        If there was malpractice on the title
2 insurance, then it's only that one law firm that
3 provided that advice that would be in jeopardy.  That's
4 the scope of representation, and it's essential for
5 lawyers to carefully define the scope of representation
6 so that the client can not reasonably rely on the lawyer
7 to provide advice or representation with regard to any
8 other topic.
9        And as you said in your question, a lawyer
10 might not be competent to provide advice on some other
11 issue.  The finance lawyer might not know anything about
12 IP issues or might know nothing about title insurance or
13 might know nothing about Delaware trusts or any number
14 of other issues that were involved in Project Unicorn.
15 And the prudent lawyer will also always carefully limit
16 the scope so there is no reasonable reliance, and there
17 is no potential risk and so that the client is protected
18 and will know who to look to, who to communicate with,
19 and so on.
20        I view the loyalty issue as being a completely
21 unrelated analysis.  The question is whether the lawyer
22 is acting in a way that's hostile to the former
23 representation.
24    Q    Okay.
25    A    Either the lawyers work in it or in some other

Page 85

22 (Pages 82 - 85)

1 fashion --
2        (Simultaneous speakers)
3    Q    But, Mr. Kehr, I think you're getting to the
4 heart of the matter --
5        MR. BROWN: Excuse me. Can you let the witness
6 finish answering before you interrupt?
7        MR. MARTIN: I didn't mean to interrupt him. I
8 apologize. I --
9        MR. BROWN: He wasn't finished.
10        (Simultaneous speakers)
11        MR. BROWN: Go ahead and finish, Mr. Kehr.
12    A    I -- actually, I thought I was, but please --
13 please go ahead, Mr. Martin.
14    Q    Thank you, Mr. Kehr, and, again, my apologies
15 if you believe that I interrupted you. I didn't think I
16 did either. So in your -- let's use your hypothetical
17 for a second so we're talking apples to apples. In your
18 hypothetical involving this title company that -- that
19 committed alleged malpractice, right? You're saying the
20 title -- that the law firm that did the title work was
21 in jeopardy, right?
22    A    Yes.
23    Q    In your hypothetical, would any of those other
24 nine firms be able to take some action to try to undo
25 that title -- the work that that law firm did regarding

Page 86

1    Q    All right. Mr. Kehr, we took a short break.
2 You understand you're still under oath?
3    A    I do.
4    Q    Did you communicate with anyone during the
5 break including Mr. Brown?
6    A    No.
7    Q    Excellent. All right. I want to go back to
8 what we've marked as Exhibit 1 which is the summary of
9 your opinions.
10    A    Give me one moment to get it back up on my
11 screen.
12    Q    Take your time.
13    A    Got it. Go ahead.
14    Q    All right. I want to go to the second bullet
15 point. I'm sorry. I apologize. The third bullet point
16 right at the bottom of page three where it states, "Wick
17 Phillips attempt to distinguish it's work for HCRE and
18 Highland in the negotiation and drafting of the loan
19 agreement from the work allegedly done by other lawyers
20 and law firms in connection with drafting the LLC
21 agreement is not supported by well-settled ethical
22 standards or the Texas Disciplinary Rules of
23 Professional Conduct." Did I read that correctly?
24    A    You did.
25    Q    What did you rely on in reaching that opinion

Page 89

1    Q    All right. Mr. Kehr, we took a short break.
2 each of the other jurisdictions. What your -- while
3 you're thinking about that, can we take our second
4 break? I need to run down the hall.
5    Q    Sure. Let me ask one quick follow-up question
6 --
7    A    Of course.
8    Q    -- Because I have to object to that last
9 response as nonresponsive. Because what I asked you was
10 it is your testimony that those nine firms taking an
11 action to undo whatever the title law firm did wrong
12 that that is a violation of Texas Rule 1.09?
13    A    Well, that's only if the Texas rules are
14 applicable. You might have a law firm that's in
15 Illinois or Massachusetts or somebody else -- somewhere
16 else --
17    Q    I'm asking --
18    A    -- That's involved in a transaction in some
19 other jurisdiction.
20    Q    Yes, sir. I'm asking under Texas rules. It's
21 your opinion that scenario you painted is violative
22 of Texas Rule 1.09 if Texas rule 1.09 applies, correct?
23    A    Correct.
24    Q    All right. Let's take a break.
25        (Recess from 12:34 p.m. to 12:43 p.m.)

Page 88

1 title?
2    A    No.
3    Q    And why is that? Because it's the same
4 transaction?
5    A    Correct.
6    Q    Okay. So your view is because those ten firms
7 worked on that transaction, all ten of those firms are
8 barred by the -- by the duty of loyalty from attacking
9 any parts of that transaction, correct?
10    A    Correct. Without client consent.
11    Q    I understand. And so -- and it's your view
12 that if one of those other nine firms took any other
13 action to try to undo that part of the transaction that
14 that would be a breach of their duty of loyalty,
15 correct?
16    A    Correct.
17    Q    And you believe that that standard that you're
18 testifying to is the standards that are required under
19 Texas Rule 1.09, correct?
20    A    I think the answer would be the same whether we
21 were looking at the Illinois rules or the New York rules
22 or the California rules because all the phrasings are
23 slightly different. Texas does have a unique twist on
24 the phrasing of it's 109. The underlying concepts are
25 the same and will be found in the equivalent rule in

Page 87

23 (Pages 86 - 89)

1 other than what we've already discussed?
2    A   I don't think there is anything else.  I think
3 we've covered it.
4    Q   Okay.  Can you explain to me -- well, and you
5 didn't draft this summary.  So what -- what I found
6 interesting there was the use of the phrase,
7 well-settled.  Did you -- is that your phrase or
8 Mr. Brown's phrase?
9    A   I don't know.  But I do consider these concepts
10 all to be well-settled.
11    Q   And you considered these concepts well-settled
12 based on the authorities that you've discussed, correct?
13    A   Yes.  I think that these are national standards
14 that prohibits a lawyer from being adverse to the former
15 client as we've discussed.
16    Q   Right.  And that includes the quote up above in
17 the first bullet point that you identified came from the
18 In Re Brown [sic] case, correct?
19    A   Yes.
20    Q   All right.  Let me ask you another
21 hypothetical.  If the court finds that that second
22 dependent clause from In Re Brown [sic] doesn't apply to
23 Texas Rule 109 then your opinion failed, correct?
24    A   No.  I don't think so unless I misunderstand
25 what you're pointing at, because you still have the same

Page 90

1 or substantially related matter.
2    Q   That's a fair point.  So let me give you a
3 different hypothetical.  Let's say that the court finds
4 that the representation of Wick Phillips was not in the
5 same or substantially related matter and finds that the
6 second part of that last sentence is not settled while
7 under Texas Rule 109, then your opinion fails, correct?
8    A   Well, you still have the question of whether
9 what your firm is doing is attacking the work that it
10 previously did.  Now, I -- I -- you're -- you're
11 attempting to create narrow distinctions here that I
12 don't see.  I view all of these concepts of being
13 essentially the same loyalty duty to the former client,
14 but there still is authority, including Texas authority,
15 for the concept that a lawyer cannot attack the prior
16 work.  The prior work included on the allocation --
17 representing the allocation to the lender and all of
18 that, and so there is still be that basis on which a
19 court might determine that disqualification would be
20 appropriate.
21    Q   And the Texas authority you're relying on there
22 is the American Airlines case and the advisory opinion
23 for the attorney general that you identified earlier,
24 correct?
25    A   I think the advisory opinion is not from the

Page 91

1 attorney general.  I think it's from an ethics
2 committee, but there is also other Texas authority.
3    Q   And which are those?
4    A   I -- I can't tell you offhand.
5    Q   Okay.  And those aren't listed in the -- what
6 you reviewed, correct?
7    A   In -- in that disclosure we talked about
8 before?
9    Q   Yes.
10    A   No.  That's a document disclosure not an
11 authority disclose.
12    Q   I understand that.  At no point have you
13 provided us the list of authorities you relied on in
14 reaching your opinions, correct?
15    A   That's correct.
16    Q   All right.  Thank you.  Let's now go to the
17 next bullet point on the next page.  You state, "The
18 drafting of the LLC agreement, the 2018 joint
19 investment, the various steps needed to effect their
20 terms, and the drafting and the negotiation of the loan
21 agreement, and the various steps required to effect it's
22 terms including with respect to the preparation of
23 multiple separate documents, schedules, and exhibits
24 attached to the loan agreement comprise a single
25 integrated transaction.  The subject of which was the

Page 92

1 acquisition of the mortgaged properties and the
2 portfolio properties as defined in the loan agreement."
3 Did I read that correctly?
4    A   Yes.
5    Q   So if I was to summarize your previous
6 testimony, that bullet point addresses your concept that
7 because all of this was a single transaction, that
8 anybody that was involved in any step of this would be
9 disqualified from attacking any part of the transaction;
10 is that correct?
11    A   Well, any -- any lawyer or law firm.
12    Q   Yeah.
13    A   Yeah.
14    Q   That's what I meant.
15    A   Yes.
16    Q   All right.
17    A   I agree with that.
18    Q   And you believe that that is called for and
19 required under Texas Rule 109, correct?
20    A   I do.
21    Q   All right.  And you have reached that opinion
22 regardless of whether or not the scope of representation
23 of any individual law firm was limited, correct?
24    A   Well, I would say I'd assume that the
25 representation of individual law firms was limited.  I

Page 93

24 (Pages 90 - 93)

1  would say that's -- that's a fundamental assumption that
2  I'm making, and I'm prepared to assume that Highland did
3  not actually or reasonably rely on your firm for legal
4  advice or representation with regard to the drafting or
5  the negotiation of the LLC agreement.
6      Q   Right. And actually that's a great point. I
7  wanted to get back to that. You mentioned it earlier,
8  and we didn't flush it out. You agree with me that
9  there is evidence in this case that Wick Phillips was
10  not involved in the negotiation drafting of the LLC
11  agreement, correct?
12     A   Yes.
13     Q   Do you have any evidence or anything to suggest
14  that Wick Phillips did, in fact, negotiate or draft the
15  LLC agreement?
16     A   No.
17     Q   And, in fact, there is evidence in this case
18  that another law firm and in-house lawyers from the
19  clients were the ones that actually negotiated and
20  drafted the LLC agreement, correct?
21     A   Yes.
22     Q   And your opinion that we are disqualified is
23  based on the fact that if we touched -- in laymen's
24  terms, if we touched any part of this transaction then
25  we can't attack any other part of the transaction,

Page 94

1  right?
2      A   Well, in part that's correct although you have
3  to keep in mind that the part that your firm did handle,
4  I think unquestionably handled, does involve the
5  allocation of ownership interests. You prepared
6  documents that made those representations and
7  representations and warranties to the lenders. So you
8  did touch the allocation even if you didn't advise about
9  the allocation, it was among the things that you did.
10  So there were written representations and warranties by
11  the borrowers, plural, regarding that allocation.
12     Q   Have you seen a notice that Wick Phillips
13  touched the allocations after the amended LLC agreement
14  was done?
15     A   I mean, only that it was in the Bridge Loan.
16  So there would be a distinction between what your firm
17  did and our hypothetical firm that advised on title
18  insurance -- I'm sorry. Title issues. Not title
19  insurance but title issues with regard to one of the 20
20  or 30 properties.
21     Q   I -- I --
22     A   -- That -- that law firm that looked at a title
23  report wouldn't have seen -- wouldn't have known about
24  and wouldn't have drafted a piece of paper that talked
25  about the allocation of ownership interests. Your firms

Page 95

1  connection was closer because it did.
2      Q   In connection with the original loan documents,
3  right?
4      A   Yes.
5      Q   And that's when the first LLC agreement was in
6  effect, correct?
7      A   At least then, yes. I'm not certain what your
8  firm did when the new investor came in.
9      Q   Do you have any evidence that my firm was
10  involved in the allocations aspect of it after the
11  amended LLC agreement was entered into?
12     A   I don't recall whether I've seen anything on
13  that, but I'm certainly prepared to assume that it did
14  not.
15     Q   All right. So it's your testimony that even
16  assuming my firm did not touch the allocation issue
17  after the amended LLC agreement was entered into, that
18  our firm would still be disqualified because of it's
19  work on the original loan agreement, correct?
20     A   Correct.
21     (Exhibit No. 2 was marked for identification.)
22     Q   All right. Let's do Exhibit 2. Mr. Kehr, just
23  a couple of questions. This is your engagement
24  agreement with --
25     A   Give me just one second to open it on my screen

Page 96

1  so I can see all of it.
2      Q   Take your time.
3      A   Yes. That is my engagement agreement.
4      Q   Right. And that's -- the addressee of that is
5  Mr. Seery, the CEO of Highland Capital Management,
6  correct?
7      A   Correct.
8      Q   And looking at this letter in the second
9  paragraph it states that your time is billed at $775 per
10  hour; is that correct?
11     A   Yes.
12     Q   And Ms. Cohen, who I think you identified
13  earlier. Her time would be billed at $575 per pour; is
14  that correct?
15     A   Yes. Correct.
16     Q   Has anyone else worked on this besides you and
17  Ms. Cohen?
18     A   Well, I'm not certain that she has, but nobody
19  else would have.
20     Q   Fair enough. That answered my question. Thank
21  you. Is $775 an hour your normal billing rate?
22     A   I don't really have a normal billing rate, but
23  it's in the range of what I am charging for expert
24  witness consultation and testimony.
25     Q   And that's my question. Do you -- you charge a

Page 97

25 (Pages 94 - 97)

Page 98

1 higher rate for expert witness work than in your normal
2 representation of clients providing legal services,
3 correct?
4    A   Yes.
5    Q   And what's your normal rate for providing legal
6 services to clients?
7    A   It would be $100 or more lower except with some
8 longterm clients who are billed at -- I think the lowest
9 rate for -- I've got some clients.  One client in
10 particular I've had since about 1986, and I charge that
11 company I believe at 550.
12    Q   So your rates are higher for expert work,
13 right?
14    A   They are.
15    Q   Let's go to -- Madam Court Reporter, I just
16 want to make sure as we go through this that I don't
17 miss anything.  Can you please confirm that Exhibit 2
18 and 3 are marked as part of the record?
19       THE REPORTER:  They are.
20    (Exhibit No. 4 was marked for identification.)
21    Q   Thank you very much.  Mr. Kehr, now I want to
22 go to Exhibit 4 which is a document that has now been
23 Bates labeled Highland underscore WPEP000014, and it
24 runs through Highland underscore WPEP000018.
25    A   I have it open on my screen.

Page 99

1    Q   Thank you.  I'm going to represent to you that
2 there was no Bates label in this -- on this document in
3 the production in the underlying adversary matter.  So
4 how did you obtain this document?
5    A   Either from Mr. Brown or from one of his
6 colleagues.
7    Q   And you used this document as part of reaching
8 your opinions in this case?
9    A   I think that's -- that's fair to say.  I had to
10 think through the implications of this.  So, yes, I
11 agree with you.
12    Q   Which of your opinions, if any, does this
13 document support?  Why is this document important to
14 your opinions?
15    A   Well, I don't think it is.  It's something I
16 had to think through.  That doesn't support any of my
17 opinions.  It doesn't undercut any of my opinions.  It's
18 part of the -- it's part of the underlying factual
19 situation.
20    Q   So does this -- I understand that you looked at
21 this document in reaching your opinions, but is it fair
22 to say that this document doesn't -- or it just has no
23 relevance whatsoever to your opinions?
24    A   Yes.
25    Q   Do you remember what you were told about that

Page 100

1 document when you received it?
2    A   I remember being told in a phonecall that there
3 had been a release of Highland Capital Management, LP,
4 from the Bridge Loan obligation, and I recall that
5 Pachulski Stang didn't at first have the document
6 although they understood it existed, and there was some
7 delay in getting it to me.  I don't recall them saying
8 anything else about it.
9    Q   All right.  Now -- all right.  That document
10 doesn't relate to your opinions now in any way; is that
11 correct?
12    A   Yes.  That's correct.
13    (Exhibit No. 5 was marked for identification.)
14    Q   All right.  I want to go now to Exhibit 5, and
15 Madam Court Reporter, please mark Exhibit 4.  Mr. Kehr,
16 I'm going to represent to you I'm not going to go
17 through the Bridge Loan agreement page by page.  You're
18 welcome.
19    A   Everyone thanks you for that.
20    Q   But it is part of your opinion --
21    A   I --
22       MR. BROWN:  Brant, I think there may be some
23 self-interest involved there.
24    Q   A little bit.  A little bit.  I've got a
25 volleyball and football game to get to later today, and

Page 101

1 I don't want to be here all night.
2       We've established that one of your opinions is
3 that the LLC agreement and the loan agreement and the --
4 and by -- let me -- hold on.  Let me back up.  You agree
5 with me that there is two LLC agreements involved in
6 this case, correct?
7    A   You mean the original and the amendment?
8    Q   Yes.
9    A   Yeah.  Okay.
10    Q   All right.  And as we go through these
11 questions, Mr. Kehr, I'm going to attempt to make a
12 distinction between the original LLC agreement and the
13 amended LLC agreement, and if I slip up and I don't make
14 that distinction or you think I'm missing something, I
15 want you to point it out to me.  Okay?
16    A   Yeah.
17    Q   All right.  But I think it's your opinion in
18 this case that between the original LLC agreement and
19 the loan agreement, in your opinion, those were
20 certainly, in your opinion, part of a single integrated
21 transaction, correct?
22    A   Yes.
23    Q   Is it your opinion that the subsequent amended
24 LLC agreement was also part of a single integrated
25 transaction?

1   A   Yes.
2   Q   And that forms part of the basis of your
3 opinions in this case, correct?
4   A   Well, I don't think it's -- it's significant
5 for my view of your firms duties, but if -- if we were
6 to imagine for a moment that a brand new law firm came
7 in to represent one of the parties to the amendment,
8 then that other law firm having had no involvement with
9 the original LLC agreement or with the Bridge Loan
10 agreement or with the many, many other underlying
11 elements to the -- to Project Unicorn, would have the
12 same loyalty obligation with regard to the entire
13 package.
14   Q   Well, let's talk about that for a second.
15   A   Sure.
16   Q   If a new law firm came in to negotiate and
17 draft the amended LLC agreement that Wick Phillips was
18 involved in the original loan agreement, which was
19 executed at the same time as the original LLC agreement,
20 your positions -- I think I understand your position is
21 that because Wick Phillips was involved in the original
22 loan agreement which necessarily involved the original
23 LLC agreement that at that point, at that snapshot in
24 time, Wick Phillips is barred from representing
25 interests against Highland later on no matter what,

Page 102

1 correct?
2   A   With regard to Project Unicorn.
3   Q   With regard to Project Unicorn.
4   A   It would be adverse to Highland with regard to
5 other matters.
6   Q   I understand.  But if another law firm came in
7 and negotiated or drafted the amended LLC agreement and
8 a subsequent arose about the amended LLC agreement, it
9 is your opinion Wick Phillips would still be
10 disqualified because they were involved prior to the
11 amended LLC agreement in Project Unicorn, correct?
12   A   Correct.
13   Q   I guess I need to make it clear for the record.
14 I don't concede that I think you're right, but I think
15 you --
16       MR. BROWN:  Brant -- Brant, we can stipulate
17 that you're not conceding any of the positions that
18 Mr. Kehr is stating here unless you so state.
19       MR. MARTIN:  Fair enough.
20       MR. BROWN:  So you don't need to waste your
21 time or breath.
22   Q   Thank you, Ken.  All right.  Talking about this
23 Bridge Loan agreement, Mr. Kehr.  I'm assuming that part
24 of your opinion on the conflict here is based on the
25 fact that Highland Capital Management, LP, is one of at

Page 103

1 least seven borrowers, correct?
2   A   Correct.
3   Q   And you agree with me that this loan agreement
4 is dated September 26th, 2018, correct?
5   A   Dated as of September 26th, 2018, yes.
6   Q   All right.  And Mr. Brown and I covered this
7 earlier, but also part of the documents you reviewed
8 even if they're not on Exhibit 3 is what we've been
9 calling the appendix which included the unicorn purchase
10 and sale agreements of the underlying assets, correct?
11   A   Yes.
12   Q   All right.  So you saw the unicorn PSA's,
13 correct?
14   A   I -- I didn't -- I don't think I really looked
15 at them, but they were available to me, and I think the
16 content of the individual purchase agreements was not
17 relevant to my analysis.
18   Q   Tell me why that is.
19   A   What's relevant to my analysis is that Wick
20 Phillips represented Highland with regard to the loan
21 agreement that was a portion of Project Unicorn.
22       (Simultaneous speakers)
23   Q   What's the -- sorry.  Go ahead.
24   A   The other underlying elements of this such as
25 the way in which the Delaware Statutory Trusts were

Page 104

1 drafted and what the purchase agreements for individual
2 properties said not relevant.
3   Q   All right.  Let me give you -- let me ask you
4 another question then.  Let's assume that the DST's, the
5 Delaware Statutory Trusts, were set up as part of
6 Project Unicorn and the original PSA's.  Are you with me
7 so far?
8   A   I am.
9   Q   And that Wick Phillips worked on the loan
10 agreement to set up that structure in September of 2018.
11 Okay?
12   A   Very good.
13   Q   Later, an entirely different property that was
14 not involved in the original Project Unicorn PSA's was
15 purchased and shoved by Highland underneath one of those
16 DST's.  You with me so far?
17   A   I'm not certain.  I need you to repeat that.
18   Q   Sure.  I'm asking you to assume for the
19 purposes of this hypothetical that after September 26th,
20 2018, that there was another asset that was purchased by
21 a Highland entity and put under the ownership structure
22 of one of the DST's, and that that asset that was later
23 purchased had nothing to do with the original Project
24 Unicorn assets.  Are you with me?
25   A   I am.

Page 105

27 (Pages 102 - 105)

Page 106

```
 1   Q   Under your opinion, I assume you are going to
 2  say that because Wick Phillips represented parties in
 3  connection with the loan agreement originally setting up
 4  Project Unicorn, that an after acquired asset that was
 5  later put into one of those entities, that Wick Phillips
 6  would be disqualified from being adverse in that matter
 7  as well, correct?
 8   A   I think that's probably correct.  I -- I want
 9  to try to chart this out.  And I think I have some
10  related questions in order to be able to at least
11  mentally chart it out.  Was the later acquisition
12  related to the Bridge Loan in any way?
13   Q   I'm saying no.  Under my hypothetical, the
14  answer to that question would be no.
15   A   And your hypothetical is that -- that Highland
16  Capital Management, LP, acquired another property
17  unrelated to the 20 or 30 involved in Project Unicorn in
18  September of 2018 but put it into the SE Multifamily?
19   Q   Yes.  That is my hypothetical.
20   A   I have to think about that one.
21   Q   All right.  And -- and let's put a -- kind of a
22  fine point on it.  I'm -- I'm actually enjoying this
23  conversation.  Let's say it was something completely
24  unrelated to Multifamily.  All right.  Let's call it --
25  you don't have these in California that much, but let's
```

Page 107

```
 1  call it oil and gas lease.  Right?  They got a producing
 2  oil and gas lease, and they don't know where to put it
 3  so they put it under SE Multifamily.  It wasn't part of
 4  Project Unicorn in September of 2018.  It wasn't part of
 5  the loan agreement.  It wasn't anticipated by any of the
 6  schedulers.  My question to you is, would Wick Phillips
 7  be disqualified from representing a party about that
 8  transaction of the oil and gas lease?
 9   A   I think the answer to that one is probably not.
10  I'm finding -- I'm finding it difficult to see how
11  anyone would feel that -- that your firms being adverse
12  to Highland with regard to a later transaction not
13  involved in the -- the 2018 acquisitions or the Bridge
14  Loan could be considered as being part of the prior
15  representations.
16   Q   So how is it that the later changing of the
17  ownership allocations in the amended LLC agreement is
18  connected or related to my firms prior representation if
19  my firm had nothing to do with the amended LLC?  What's
20  the difference between those two scenarios?
21   A   Because this is the same Project Unicorn.  If
22  the day after September 26 the parties agreed to make
23  some change, either a change with the lender or a change
24  among the borrowers, that's part of Project Unicorn.
25  It's still Project Unicorn.  But your hypothetical had
```

Page 108

```
 1  to do with an oil and gas lease of which by way there
 2  are many in California.
 3   Q   Fair enough.
 4   A   And -- and that's not related in any way that I
 5  can see to the work that was done by your firm in and
 6  around 2018.  It's not the same LLC agreement.  It's not
 7  the same Bridge Loan.
 8       Well, let's start with the Bridge Loan
 9  agreement.  That's the entry point.  It's not the same
10  Bridge Loan agreement.  It doesn't affect that -- it
11  doesn't affect anything about the work that you did.
12  It's not part of the -- the integrated project that I
13  see.  You know, you -- if you look in the Bridge Loan
14  agreement, you'll see that there is a description of
15  purpose somewhere, and the purpose of the loan is to
16  acquire those 20 to 30 properties.  It has nothing to do
17  with the later acquisition of an oil and gas lease and
18  in California or Alaska, or wherever it might be.
19   Q   All right.  But the acquisition of those
20  properties occurred on or about September of 2018,
21  correct?
22   A   What's the antecedent for those properties?
23  The 20 or 30 you're talking about?
24   Q   Yes.
25   A   Yes.  That's correct.
```

Page 109

```
 1   Q   All right.  So I think my question is why does
 2  a change of the ownership allocations seven months after
 3  the acquisitions of the properties were included, why is
 4  that any more related to the original acquisition than
 5  the acquisition of an oil and gas lease?
 6   A   Well, because the Bridge Loan agreement still
 7  exists.  And -- and your firms work had to do with the
 8  Bridge Loan agreement and the acquisition of the
 9  properties and the agreements that went with the
10  acquisition of the properties all were part of a single
11  integrated transaction as I view it.
12       (Simultaneous speakers)
13   Q   Sorry.
14   A   If there is a later transaction involving a
15  different property financed in a different way, I'm
16  finding the connection considerably thinner, and I think
17  it's unlikely that that would be viewed as a violation
18  of the duty of undivided loyalty.
19   Q   How is it in your opinion that the change of
20  the allocations in this amended LLC changed the
21  underlying terms of the Bridge Loan?
22   A   Well, I don't think it changed the underlying
23  terms of the Bridge Loan.
24   Q   All right.
25   A   A new investor came in and that resulted in a
```

28 (Pages 106 - 109)

1 change in the allocations, but the loan still existed.
2 The promissory note still existed. It's still that same
3 integrated transaction. It's just been tinkered with a
4 bit.
5    Q   All right. And the ownership allocations were
6 what were tinkered with, correct?
7    A   Yes. But I would view the same answer if it
8 turned out that while this agreement says that the
9 purpose of the loan is to finance the acquisition of the
10 20 or 30 properties, if one of the properties dropped
11 out or a new property was dropped in at its place, and
12 do some tinkering with the Bridge Loan as a result of
13 that, you still have the same essential transaction.
14    Q   I understand. I understand your opinion, and I
15 appreciate the clarification, sir. I want to move to
16 Exhibit 6.
17    (Exhibit No. 6 was marked for identification.)
18    A   You skipped 205 pages, you know.
19    Q   I know you're disappointed.
20    A   Okay. And this one is even longer. I have it
21 up on my screen.
22    Q   All right. I'm going to represent to you that
23 this one is three separate PSA's. This is part of the
24 appendix which was provided to you that Mr. Brown
25 pointed out had been provided to you, and it wasn't on

Page 110

1 the list, but we can agree that you saw it ahead of
2 time, right?
3    A   I had it available to me, but I did not really
4 look at it. I certainly didn't study it at all.
5    Q   All right. Would you -- so if I ask you a
6 question about one of these and you don't want to opine
7 on it or you don't want to confirm it, I want you to
8 point that out to me. Can you do that?
9    A   Of course.
10    Q   All right. Because it's my understanding that
11 these PSA's, there is three of them in this one exhibit.
12 One starts on appendix page 7. The second starts on
13 appendix page 81, and the third one starts on appendix
14 page 150, but these PSA's were for the purchase of the
15 mortgaged properties and the portfolio properties. Do
16 you have that understanding or do you not?
17    A   That is my understanding.
18    Q   All right. And you would agree with me that
19 Highland Capital Management, LP, was not a party to the
20 PSA's, correct?
21    A   That's my understanding, although, again, I
22 haven't actually looked at all three of them to confirm
23 that but that's my understanding.
24    Q   All right. And so did you -- so since you
25 haven't really looked at them, I'm assuming that you

Page 111

1 didn't consider the content of these PSA's in making
2 your opinion that the loan agreement and the LLC
3 agreement were a single integrated transaction, correct?
4    A   That is correct.
5    Q   Don't you think that's important?
6    A   No.
7    Q   Why not?
8    A   Well, because as the Bridge Loan says, it's
9 purpose was to acquire a -- a portfolio of -- of
10 properties. The terms under which they were acquired
11 doesn't change the fact that the purpose of the Bridge
12 Loan was the acquisition, and that the acquisition
13 ultimately was for the LLC whose ownership interests
14 your creditor -- your client's creditor claim seeks to
15 adjust.
16    Q   But the ownership allocation does affect the
17 Bridge Loan?
18    A   Well, it does.
19    Q   How?
20    A   But that's not -- that's not the reason for my
21 analysis.
22    Q   Well --
23    A   The reason for my analysis is that the Bridge
24 Loan and the LLC agreement were part of an integrated
25 transaction.

Page 112

1    Q   I understand that but I'm asking you a
2 different question. So it's my understanding that the
3 client we're bringing that Mr. Brown is trying to
4 disqualify us from is to say that the ownership
5 allocation changed in the amended LLC agreement. That
6 change was wrong in some way, shape, or form, and we're
7 getting disqualified or we're attempting to be
8 disqualified from that, because somehow that change in
9 the ownership allocation was related to the work that we
10 did on the Bridge Loan. Can we agree on that?
11    A   Yes.
12    Q   All right. So my question to you is how does
13 the change in the ownership allocation affect the work
14 that was done on the Bridge Loan other than your view
15 that this was a single integrated transaction?
16    A   Well, I think the starting point is it was a
17 single integrated transaction, and what makes it a
18 single integrated transaction is that the Bridge Loan
19 existed for the purpose of the acquisitions.
20    Q   Which occurred prior to the amending of the
21 LLC, correct?
22    A   I'm sorry. Which occurred?
23    Q   The acquisition of the properties. The
24 acquisition of the underlying assets occurred prior to
25 the amendment of the LLC, correct?

Page 113

29 (Pages 110 - 113)

1   A   I believe that's correct.

2   Q   All right.  And so the work on the loan

3 agreement from your prior testimony was, well, it's a

4 single transaction because the loan agreement was used

5 to purchase the underlying assets, right?

6   A   Yes.  That's fair enough.

7   Q   Okay.  And that work was done and then later --

8 in fact, seven months later, the LLC agreement was

9 amended, correct?

10   A   Correct.

11   Q   And it's your position that seven months later

12 when that LLC agreement was amended that that relates

13 back to the original Project Unicorn transaction such

14 that it was a single integrated transaction, correct?

15   A   Well, my -- my recollection of the amendment is

16 that it says it relates back, but even if it didn't, my

17 answer would be the same.

18   Q   And your answer would be yes, right?

19   A   Yes.  The LLC agreement still exists.  It's

20 been amended but it's the same LLC agreement.  It's the

21 same basic agreement, and the Bridge Loan still exists

22 and -- and it was -- the Bridge Loan was for the purpose

23 of carrying out the purpose of the LLC agreement.

24 That's all one thing.

25   Q   Did you take into account the lapse of time

Page 114

1 duty of loyalty attached from there until eternity as it

2 related to Project Unicorn, correct?

3   A   That is correct.

4   Q   And therefore since the amendment of the LLC

5 was related to Project Unicorn even though it was seven

6 months later, in your opinion, that duty of loyalty

7 still attached and therefore Wick Phillips can't

8 represent anybody in trying to unwind the amendment of

9 the LLC, correct?

10   A   Correct.

11   Q   All right.

12     THE REPORTER:  Can you slow down, counsel?

13   Q   Yeah.  Go ahead.

14     THE REPORTER:  I just said, can you slow down?

15   Q   Yes, ma'am.  Not the first or the last time

16 that's been said.  I apologize.  Mr. Kehr, are you aware

17 that the loan agreement was not the sole source of

18 funding to acquire the properties?

19   A   Yes.

20   Q   And, in fact, Freddie Mac also provided

21 financing, correct?

22   A   I -- I don't recall knowing that it was Freddie

23 Mac.

24     (Exhibit No. 14 was marked for identification.)

25   Q   All right.  All right.  Let's go to -- do we

Page 116

1 between the original closing and the amendment of the

2 LLC in reaching the conclusion that this was a single

3 transaction?

4   A   No.  In my view, it's irrelevant.

5   Q   So are you aware that there are courts that

6 consider the timing of two different transactions as a

7 contributing factor of whether or not a transaction is

8 considered a single integrated transaction?

9   A   I think there -- no.  No.  I don't think I've

10 ever seen that.  Let me think about that for a moment.

11 Yes.  I think that that's true as to whether there is an

12 integration.  Yes.

13   Q   Right.  But you didn't take that into account

14 that the amendment of the LLC occurred seven months

15 after the original transaction, correct?

16   A   I -- I didn't because I think that for my

17 purposes it's not relevant.  It may be relevant for

18 other purposes in -- in contract interpretation, but

19 it's not relevant for purposes of my area analysis of

20 the loyalty duty that the law firms involved in the --

21 in the consummation of Project Unicorn have to their

22 clients or former clients in that project.

23   Q   I understand.  Because I think it's your

24 position that once Wick Phillips did work on that

25 original loan agreement, the Project Unicorn, that that

Page 115

1 have Mr. McGraner's declaration?  Fourteen.  All right.

2 We're going to go out of order here for a second,

3 Mr. Kehr, and I'm going to show you -- hold on.  Let's

4 go back to the title.  Do you see a document on the

5 screen in front of you?

6   A   Yes.  And that's Exhibit 14?

7   Q   Yes.

8   A   Okay.  I've opened it on my computer.

9   Q   Okay.  This is a declaration from Matthew

10 McGraner.  Do you know who that is?

11   A   I'm afraid -- well, yes.  Because it -- my

12 memory was -- was joggled by paragraph two.  I probably

13 would have gotten the answer wrong if it hadn't said it

14 right in front of me.  Senior vice president of

15 NexPoint.

16   Q   Right.  And that's -- NexPoint is the client

17 we're currently representing that Mr. Brown is trying to

18 disqualify us from representing.  You understand that,

19 correct?

20   A   Yes.

21     MR. BROWN:  Hold on.  Objection.  Hold on,

22 Brant.  I think that is a different entity.  NexPoint

23 Real Estate Advisers is a different entity than we're

24 trying to disqualify you from representing as --

25     (Simultaneous speakers)

Page 117

30 (Pages 114 - 117)

1    Q   All right.  Mr. Kehr, let me ask it a different
2  way.  Mr. McGraner's statement says that he's the
3  executive vice president for NexPoint Real Estate
4  Advisers, LLC, correct?
5    A   It does.
6    Q   It states that he's been an employee of NREA
7  since June of 2016, correct?
8    A   Yes.
9    Q   All right.  And let me ask one question.  Since
10  you had never heard of this transaction prior to June of
11  2021, you would agree with me that the persons involved
12  in the transaction and the representation of Wick
13  Phillips have personal knowledge of what happened and
14  you don't, correct?
15    A   Of course.  As an expert witness, I never have
16  personal knowledge.
17    Q   Excellent.  All right.  I want to go to
18  paragraph six of Exhibit 14.  Paragraph six states, "In
19  connection with and to help fund the Unicorn
20  Acquisition, Key Bank National Association and Freddie
21  Mac provided various financing the loans.  Plural.  One
22  such financing was a Bridge Loan with Key Bank for
23  approximately half of the purchase price.  However, Key
24  Bank required additional borrowers on the Bridge Loan
25  and as a result, HCMLP, NexPoint Real Estate Partners,

Page 118

1  LLC, formally known as HRCE Partners, LLC, and five
2  other entities were included as co-borrowers under the
3  Bridge Loan with NREP.  NREP was the lead borrower under
4  the Bridge Loan agreement and the main point of contact
5  for the borrowing institutes."  Did I read that
6  correctly?
7    A   Yes.
8    Q   But that does, in fact, indicate that Freddie
9  Mac was apart of the financing for Project Unicorn,
10  correct?
11    A   It does.
12    Q   Did you consider that in making your opinion
13  that the loan agreement and the LLC agreement were a
14  single integrated transaction?
15    A   It's not relevant to my analysis that there
16  were other sources of financing.
17    Q   Why is that?  Once we touch the loan agreement
18  we were off limits?
19    A   Because the loan agreement is, in my view, part
20  of the same transaction as the LLC agreement.
21    Q   Right.  And so under your analysis then, a law
22  firm that was representing Freddie Mac in one of those
23  other loans related to Project Unicorn would also be
24  prevented under Texas rule 109 from representing anybody
25  in connection with the amended LLC agreement, correct?

Page 119

1    A   It would be prevented from being adverse to
2  Freddie Mac with respect to Project Unicorn.
3    Q   All right.  That's a fair point.  Let's say
4  that there was a borrower -- let me just pick one.  Go
5  back to the appendix to the purchase and sale agreements
6  which I believe is Exhibit 6.  So looking here on
7  Exhibit 6, we've got a purchase and sale contract, and
8  I'm going to pick one.  Let's say Sof-X Monument
9  Holdings, LP, which is a party to this.  Do you see
10  that?
11    A   Yes.
12    Q   Would their lawyers be prevented from attacking
13  the amended LLC agreement?
14    A   If doing so would be adverse to the interests
15  of their former client.
16    Q   All right.
17    A   Assuming that it's a former lawyer-client
18  relationship.
19    Q   And, in your opinion -- going back to the
20  PSA's.  Is it important to you that the loan agreement,
21  the Bridge Loan agreement, didn't have the -- the
22  Highland entity as a party?
23    MR. BROWN:  Objection.  Mischaracterizes the
24  loan agreement.
25    Q   Do you know whether or not the conflicting

Page 120

1  entity, the Highland entity, was a party to the Bridge
2  Loan agreement?
3    MR. BROWN:  Which -- which Highland entity?
4  Are you referring to the debtor, Grant --
5    MR. MARTIN:  Yes.
6    MR. BROWN:  -- Or another Highland entity?
7    MR. MARTIN:  I apologize, Mr. Brown.  Yes.  I'm
8  referring to the debtor.
9    A   Well, give me one moment.
10    Q   Yeah.  Take your time.
11    A   Highland Capital Management, LP, is the first
12  listed borrower.  Am I misunderstanding your question?
13  Not certain what you're driving at.
14    Q   You may be.  There is a bunch of documents and
15  sometimes, Mr. Kehr, honestly I get confused as well.
16  But I'm looking here at the Bridge Loan agreement which
17  is Exhibit 5.
18    A   I am also.
19    Q   All right.  So we got Highland Capital
20  Management, LP.  You see that?
21    A   Yes.  I do.
22    Q   We got HCRE Partners, LLC, the Dugaboy
23  Investment Trust, the SLHC Trust.  All -- all of these
24  parties were parties to the Bridge Loan agreement,
25  right?

Page 121

31 (Pages 118 - 121)

1    A   Right.
2    (Exhibit No. 7 was marked for identification.)
3    Q   All right.  I want to go to Exhibit 7.
4        THE REPORTER:  Are you marking all of these,
5    counsel?
6        MR. MARTIN:  Yes.  I'm sorry.  Yes, ma'am.
7        MR. BROWN:  Brant, it's been another hour, and
8    at a convenient time, I would like to take another
9    convenience break.
10       MR. MARTIN:  Absolutely.  Why don't we just do
11   that now.
12       MR. BROWN:  Okay.  Five minutes?
13       MR. MARTIN:  Sure.
14       (Recess from 1:27 p.m. to 1:36 p.m.)
15   Q   Mr. Kehr, you understand you're still under
16   oath, correct?
17   A   Yes.
18   Q   All right.  I want to move to Exhibit 7, and,
19   Mr. Kehr, if you're bringing it up on your computer, let
20   me know when you're there.
21   A   I have it.
22   Q   All right.  You see Exhibit 7 is an email from
23   Paul Broaddus dated Thursday, August 23rd, 2018, to
24   Helen Kim.  Copied on that is Matt McGraner, Mark
25   Patrick, Rick Swadley, and Jae Lee.  Do you see that?

Page 122

1    Q   And you don't have any evidence that Wick
2    Phillips drafted the amended LLC agreement seven months
3    later, correct?
4    A   Correct.
5    (Exhibit No. 8 was marked for identification.)
6    Q   Madam Court Reporter, please mark Exhibit 7.
7    Let's go to Exhibit 8.  Mr. Kehr, are you on Exhibit 8?
8    A   I have it.
9    Q   Have you seen this document before?
10   A   Yes.
11   Q   Did you use this document -- did you review
12   this documents in forming your opinions in this case?
13   A   I looked at it, but it's not essential to my
14   opinions.
15   Q   I understand.  I'm going to ask you some
16   questions about it anyway.  It's dated Thursday,
17   August 9th, 2018, at 12:58 p.m., correct?
18   A   Yes.
19   Q   And the author is Paul Broaddus, correct?
20   A   Correct.
21   Q   And the addressees are Daniel Cullen at Baker
22   McKenzie, David Gong at Baker McKenzie, Peter Matejcak
23   at Baker McKenzie, and Brian Mitts and Bonner McDermett.
24   Did I read that correctly?
25   A   Yes.

Page 124

1    A   I do.
2    Q   I'm going to represent to you that none of
3    those people work for Wick, Phillips, Gould, and Martin.
4    Do you have any reason to dispute that representation?
5    A   No.
6    Q   All right.  And Mr. Broaddus, and, in fact, I'm
7    going to represent to you that those were all internal
8    people.  Mr. Broaddus says to Helen, "As discussed, can
9    you please form the following LLC's?  SC Multifamily
10   Holdings, LLC."  And he lists an ownership percentage
11   down there.  HCMLP at 49 percent and HCREP at
12   51 percent, correct?
13   A   Yes.
14   Q   And then the second LLC he wants Ms. Kim to
15   form is SE Multifamily REIT Holdings, LLC.  Do you see
16   that?
17   A   I do.
18   Q   And the second bullet point under number 2A
19   states, "We are drafting the LLC agreement so we have
20   that covered."  Did I read that correctly?
21   A   Yes.
22   Q   And I asked you this before.  But you don't
23   have any evidence that Wick Phillips drafted the LLC
24   agreement, right?
25   A   That is correct.

Page 123

1    Q   I'm going to represent to you that none of
2    those people work for Wick Phillips either.  Do have any
3    tuning to dispute that statement?
4    A   No.
5    Q   And you and I can agree that Baker McKenzie is
6    not Wick Phillips, correct?
7    A   Yes.  We can agree on that.
8    Q   Okay.  Considering I used to work at Baker
9    McKenzie, I'm quite aware that they are very, very
10   different firms.  And so as far as you know, Wick
11   Phillips had no involvement in the Delaware Statutory
12   Trust structures involved in Project Unicorn, correct?
13   A   Correct.
14   Q   And when this email refers to a DST, it's
15   referring to the formation of Delaware Statutory Trusts,
16   correct?
17   A   Yes.
18   (Exhibit No. 10 was marked for identification.)
19   Q   All right.  Let's go to Exhibit 10.  Mr. Kehr,
20   Exhibit 10 is excerpts -- actually, it might be the
21   whole thing of a deposition of Mr. Mark Patrick.  Do you
22   see that?
23   A   Yes.  I do.
24   Q   Did you review this in reaching your opinions
25   in this case?

Page 125

32 (Pages 122 - 125)

1    A    Give me one moment to look at it for a moment.
2  The answer is, yes.  I believe that I did.
3    Q    All right.  I want to direct your attention to
4  certain testimony in this deposition, and I'm going to
5  give you the disclaimer, Mr. Kehr, that I know that you
6  are not Mr. Patrick, and I know that you don't know
7  everything that's inside Mr. Patrick's head.  So I'm not
8  asking you to guess as to what Mr. Patrick may or may
9  not know outside of what he said in this deposition, but
10  I do want to get your opinion on some of the things he
11  said.  Do you understand the disclaimer that I gave you?
12    A    Yes.
13    Q    And if you don't feel comfortable giving me
14  your opinions on that, I want you to let me know.  Okay?
15    A    Very good.
16    Q    All right.  I want you to turn to page 25, and
17  I have these highlighted.  Are they highlighted on the
18  copies on your computer?
19    A    Yes.
20    Q    So starting on line 12, question, "Did you have
21  any role in connection with the LLC agreement?"  Line
22  15, answer, "Yes."  Question on line 17, "Please
23  describe it."  Answer, "I coordinated the document."
24  Question, "What does that mean?"  Answer, "It means I
25  helped facilitate this -- the creation of this document

Page 126

1  one of the shared employees in the Highland
2  organization, might have been involved but --
3    Q    Fair enough.
4    A    -- Hunton and Williams definitely was involved.
5    Q    And you had no evidence that Wick Phillips was
6  involved, correct?
7    A    Correct.
8    Q    All right.  Let's go -- I'm going to try to
9  shorten this up for all of us, Mr. Kehr.  Let's go to
10  page 32.
11    A    I'm there.
12    Q    All right.  Looking -- starting on line 8.  The
13  highlighted portions of Mr. Patrick's deposition.
14  Question, "Did Wick Phillips have any involvement in the
15  representation of any party -- let me restate that.  Did
16  Wick Phillips represent Highland in connection with the
17  original LLC agreement?"  Answer, "No."  Question, "Did
18  Wick Phillips represent HCRE in connection with the
19  original LLC agreement?"  Answer, "No."  Did I read that
20  correctly?
21    A    You did.
22    Q    And as we sit here today, you have no
23  information to dispute what Mr. Patrick said under oath,
24  correct?
25    A    Well, I would -- I would say that the -- the

Page 128

1  by coordinating with respective parties."  Question, "So
2  you coordinated with Highland and HCRE?"  Answer,
3  "Coordinated with Highland and HCRE.  I would describe
4  it as I was -- I was coordinating the deal between the
5  two parties and having that coordination reflect what
6  was desired in this LLC agreement."  Question, "Okay.
7  And what does your coordination actually involve in
8  practical terms?"  Answer, "Yes.  That's a good
9  question.  I recall calling up the law firm of Hunton
10  and Williams to draft and prepare this LLC agreement."
11  Question, "And why did you call the law firm of Hunton
12  and Williams?"  Answer, "It's generally the firm that I
13  worked with in the past."  Question, "And you worked
14  with Hunton and Williams in your capacity as an employee
15  of Highland?"  Answer, "Yes."  Did I read that
16  correctly?
17    A    You did.
18    Q    You and I agree that Hunton and Williams is not
19  Wick, Phillips, Gould, and Martin, correct?
20    A    Yes.
21    Q    So this would indicate, as I think you
22  indicated earlier, that Hunton and Williams drafted the
23  original LLC agreement, correct?
24    A    Well, it was at least involved in it.  There is
25  that earlier email that suggests that somebody in-house,

Page 127

1  questions and answers were a bit loose.  I think the
2  accurate statement would be that Wick Phillips was not
3  involved in the drafting of the LLC agreement or
4  providing legal advice to Highland with regard to the
5  LLC agreement.  And as I also previously said, I'm not
6  aware of any evidence to suggest that Highland relied on
7  Wick Phillips for advice or representation concerning
8  the negotiation or drafting of the LLC agreement.  In
9  connection with is a much looser statement, and my view
10  is that the Bridge Loan is in connection with the LLC
11  agreement.
12    Q    I understand that, Mr. Kehr, and I think you've
13  made that very clear, but I appreciate the clarification
14  and I would encourage you to continue to clarify your
15  answers when you feel the need.  But you and I can agree
16  that this witness, who was there at the time, confirmed
17  that Wick Phillips did not represent Highland or anybody
18  else in connection with the drafting of the original LLC
19  agreement, correct?
20    A    Yes.
21    Q    All right.  Let's go quickly to page 63 of the
22  same exhibit.
23    A    I'm there.
24    Q    Line three.  Question, "Do you know if Wick
25  Phillips had any role in connection with the amended LLC

Page 129

33 (Pages 126 - 129)

1 agreement?"  Answer, "My understanding they had no
2 role."  Question, "Did you ever have any communications
3 with Wick Phillips in connection with the amended LLC
4 agreement?"  Answer, "I do not recall ever having
5 communications with Wick Phillips on this amended LLC
6 agreement."  Did I read that correctly?
7   A   Yes.
8   Q   You have no evidence to dispute what
9 Mr. Patrick said under oath there, correct?
10   A   That is correct.
11   (Exhibit No. 11 was marked for identification.)
12   Q   All right.  Let's go to Exhibit 11.  This is
13 the actual original limited liability company agreement
14 dated as of August 23rd, 2018, correct?
15   A   Yes.
16   Q   And you reviewed this, I presume, in connection
17 with your opinions in this case?
18   A   I did.
19   Q   All right.  I want you to turn to page 18 which
20 is Schedule A.
21   A   I have it.
22   Q   And this provides for the member name, the
23 capital contribution, and the percentage interest,
24 correct?
25   A   Yes.

Page 130

1   Q   And according to Schedule A on the original LLC
2 agreement, HCRE has a capital contribution of $51 or
3 51 percent percentage interest, correct?
4   A   Yes.
5   Q   And Highland has a $49 capital contribution for
6 a 49 percent percentage interest, correct?
7   A   Correct.
8   Q   Would you -- you would agree with me that these
9 are the ownership percentages that made it into the
10 Delaware Statutory Trust charts that were attached to
11 the loan agreement, correct?
12   A   Yes.
13   Q   And this is, at least in part, a basis of your
14 opinion that the loan agreement and the LLC agreement
15 were a single integrated transaction, correct?
16   A   Yes.
17   Q   All right.  What else supports your opinion, in
18 your view, that these were a single integrated
19 transaction such that Wick Phillips loan -- work on the
20 loan agreement implicates this document?
21   A   Well, I first want to make it clear that I'm
22 not here as an advocate, and I haven't attempted to
23 compile all of the information or arguments that might
24 support my opinion, but I -- I can give you a -- a
25 couple.

Page 131

1   One is that somewhere in this agreement there
2 is a statement of purpose, and the statement of purpose
3 is the acquisition of the properties that will go into
4 the LLC, and I think that that's the key point.  The
5 reason for the existence of this loan agreement with
6 Highland as a borrower and the reason for the -- the
7 Bridge Loan are a single project.  What you've called
8 Project Unicorn.  They're inextricably connected.  One
9 wouldn't exist without the other.
10   Q   I think you and I appreciate that, Mr. Kehr,
11 and I think we've -- we've spent a lot of time today
12 talking about your view of that, correct?
13   A   We have.
14   Q   All right.  And I know that earlier, in fact,
15 you mentioned that provision about the fact that the
16 purpose of the loan was for the acquisition of the
17 unicorn properties and that that formed the basis of
18 your opinion, correct?
19   A   It forms a basis for my opinion.  Yes.
20   Q   Right.  Okay.  And -- and -- so fair enough.
21 I'm asking for what else forms the basis for your
22 opinion that this was a single integrated transaction
23 other than what you've already testified to today?
24   A   I don't think there is anything that I haven't
25 testified to already.

Page 132

1   Q   Okay.
2   A   Nothing else I can think of as I sit here.
3   (Exhibit No. 12 was marked for identification.)
4   Q   Fair enough.  Thank you very much.  All right.
5 I'm going to go now to Exhibit 12.  You've seen this
6 document before, correct?
7   A   I see it.
8   Q   And this is the amended and restated limited
9 liability company agreement dated as of March 15th,
10 2019, to be effective as of August 23rd, 2018, correct?
11   A   Well, not precise [indiscernible].  Entered
12 into as of March 15 to be effective as of the prior
13 August.
14   Q   Okay.  I was just reading off the page itself.
15 It says dated as of, but I don't think that's -- it's
16 probably a distinction without a difference.  Can you
17 and I agree that this amended LLC agreement was executed
18 seven months after the original?
19   A   Yes.
20   Q   Thank you.  And if you would, I want you turn
21 to -- and of course page numbers on this are going to be
22 difficult.  If you look at the top of each page, there
23 is a page number because these were filed in court, and
24 I want you to look at page 22 of 30 on Exhibit 12.
25   A   Schedule A?

Page 133

34 (Pages 130 - 133)

1  Q   Yes.  Schedule A?
2  A   Very good.
3  Q   All right.  And we've talked about the fact
4  that you didn't -- you don't think that the fact that
5  this was executed six or seven months after the
6  transaction, in your mind, that doesn't change your
7  opinion that this was a single integrated transaction,
8  correct?
9  A   Correct.
10  Q   All right.  And this Schedule A includes
11  capital contributions and percentage interests that were
12  different from the original LLC agreement, correct?
13  A   That is correct.
14  Q   Now, you would also agree with me that these
15  are not the ownership percentages that were in the
16  original loan agreement and the DST charts in the
17  original loan agreement, correct?
18  A   Correct.
19  Q   And you would agree with me that Wick Phillips
20  had no involvement with this amended LLC agreement,
21  correct?
22  A   None that I know of.
23  Q   Now, are you aware that the claims that are
24  made in -- in the -- the lawsuit that -- that Mr. Brown
25  is trying to disqualify my firm from that those claims

Page 134

1  integrity of the bar, and if I may give you a slightly
2  long-winded answer.  It's not --
3      (Simultaneous speakers)
4  A   You're not going to complain.
5  Q   No.  It's fine.  I want to know what you're
6  going to say so please go ahead.
7  A   Sure.  The -- it's not intuitively obvious that
8  lawyers should be permitted to serve in the courts, and
9  there have been times in history when lawyers were
10  prohibited from appearing in courts.  Sure would
11  simplify things if there weren't any pesky lawyers
12  involved.  But one of the reasons that lawyers are
13  involved in the litigation process is that they are
14  important to the functioning of the legal system, and
15  part of that functioning is that they need to get from
16  clients all of the information that the lawyer needs to
17  provide an informed and reasonably well-rounded opinion
18  and advice to the client, and the lawyer will get that
19  information, and the lawyers opinion then will only be
20  trusted if the lawyer is viewed as being entirely loyal
21  to the client.  And that's, in my view, the essential
22  reason for the duty of undivided loyalty.
23      With a current client, the duty of undivided
24  loyalty prohibits the lawyer from being adverse to the
25  current client on any matter even if entirely unrelated

Page 136

1  relate to these allocations that are in the amended LLC
2  agreement?
3  A   That's my understanding.
4  Q   All right.  And -- but in your opinion, the
5  fact that Wick Phillips was not involved in the amended
6  LLC agreement does not change your opinion as to the
7  fact that this was a single integrated transaction,
8  correct?
9  A   Correct.
10  Q   Other than what I have asked you about today,
11  and we've covered a lot of ground, do you have any other
12  opinions that you plan on testifying about if this
13  matter comes to a hearing?
14  A   Well, I can think of one thing that is part of
15  my analysis that might come up when I testify that
16  hasn't come up so far this morning.
17  Q   Please.
18  A   And that is with regard to the duty of loyalty.
19  It is common, and I think this is also true in the
20  American Airlines opinion, that the continuing duty of
21  loyalty is explained in terms of the interests of the
22  former client.  But it's my opinion that the duty of
23  loyalty has a much broader significance.
24      Enforcement of the continuing duty of loyalty
25  is important for the maintenance of public confidence in

Page 135

1  to the subject matter of the current representation.
2  It's viewed as destructive of the lawyer-client
3  relationship, and, therefore, of the lawyer's role in
4  the legal system and the functioning of the legal
5  system.
6  Q   Can I -- can I ask you a question as you go
7  through this, or do you want me to wait until the end?
8  A   Well, I'm almost done and then by all means.
9  Q   All right.
10  A   It's -- it's -- it's considered to be
11  destructive if the client ever sees a current lawyer on
12  the other side of the table.  Figuratively speaking.
13  Q   No matter the type of matter?
14  A   Correct.  Without regard to whether it's
15  litigation, non-litigation, or some ambiguous in between
16  sort of thing such as foreclosure of a deed of trust
17  under a power of sale, which is a non-courtroom
18  proceeding.  I'm not certain whether that's
19  transactional or litigation.  It's somewhere in between.
20      With a former client, a lawyer is permitted to
21  be adverse to a former client, but not if it implicates
22  the lawyers work for the former client, and that's the
23  same or substantially related matter analysis in almost
24  every situation.  So I think it's important to keep in
25  mind, and courts do from time to time accurately capture

Page 137

35 (Pages 134 - 137)

1 the idea that the functioning of the legal system
2 depends on loyalty. There are some people in the ethics
3 committee -- I'm sorry. Community who actually say
4 there is only one duty. It's the duty of undivided
5 loyalty, and the other obligations, confidentiality and
6 full disclosure in particular, are viewed by some people
7 as simply being elements of the duty of undivided
8 loyalty.
9      But I would think broadly in terms of the
10 functioning of lawyers in the legal system, and the role
11 that they play and the expectations that the legal
12 system wants to have clients hold in order for the
13 clients to fully disclose themselves to their lawyers
14 and then to trust and rely on the advice that the lawyer
15 provides.
16   Q   All right. I'm going to ask you a couple
17 follow-up questions on that.
18   A   Sure. Go ahead.
19   Q   When you're talking about the legal systems
20 encouragement and incentives for clients to give their
21 lawyers full information, that necessarily implicates
22 the rational behind rules such as 105 and the
23 confidentiality, correct?
24   A   It does.
25   Q   And you're not alleging that there was a breach

Page 138

1   A   No. No. I'm not saying -- I wasn't going to
2 tell you what an informed consent is --
3   Q   Okay.
4   A   I was going to give you an example of when
5 consent sometimes is given. It's irrelevant to this
6 situation, but it does happen in joint representations.
7 Outside -- if -- if clients -- if the lawyer were to
8 represent one of the former joint clients against the
9 other former joint client on an unrelated matter, there
10 would be no prohibition.
11   Q   I think you answered my follow-up question.
12 Mr. Kehr, I know that you and I have had disagreements
13 on the substance of your testimony, but have you been
14 treated with respect today?
15   A   Always.
16   Q   Thanks a lot. Okay. I pass the witness.
17      MR. BROWN: I don't have any questions of
18 Mr. Kehr.
19      MR. MARTIN: Okay. I gave you back some time,
20 Mr. Kehr.
21      MR. BROWN: Yeah. One thing I just wanted to
22 raise is, you know, you asked for other opinions, and I
23 think you said he didn't have any others. He has been
24 designated also as a rebuttal witness, and so after we
25 know what Mr. Sellman's testimony is, it is possible

Page 140

1 of confidentiality in this case, correct?
2   A   Correct.
3   Q   All right. Secondly, let me give you a
4 hypothetical, and I'm not sure I'm even arguing with you
5 on this. I just want to make sure I understand the full
6 scope of your soliloquy here which was, let's say that I
7 represent Client A, and Client A is in a transaction
8 with Client B, who I do not represent. Are you with me
9 so far?
10   A   Yes.
11   Q   Client A continues to be my client. Later on
12 there is a dispute between Client A and Client B related
13 to another matter. Do you think that because I
14 represented Client A in a joint -- in a common matter
15 with Client B originally, that I can't represent Client
16 A against client B?
17   A   In the same manner or an unrelated matter?
18   Q   Let's do both. I think I know what you're
19 going to say, but go -- let's do both. Let's say it's
20 in the same matter.
21   A   Then the answer is, no, unless there has been a
22 contractual, informed consent. Sometimes -- there
23 sometimes is and I can give you an example.
24   Q   No. I -- I know what informed consent is.
25 What if it's --

Page 139

1 that Mr. Kehr will have opinions to rebut Mr. Sellman's
2 testimony.
3      MR. MARTIN: Duly noted, Mr. Brown. And I am
4 not going to dispute that he is allowed to present
5 rebuttal testimony to Mr. Sellman's and Mr. Sellman will
6 be allowed to present -- well, hopefully will be allowed
7 to present testimony to Mr. Kehr. But duly noted and
8 I'm not going to dispute that he can have additional
9 opinions that wouldn't violate the question I just asked
10 him if those opinions are in rebuttal to Mr. Sellman.
11      THE REPORTER: Off the record?
12      MR. MARTIN: I'm fine going off the record.
13      MR. BROWN: I'm fine.
14      (Deposition concluded at 3:02 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 141

36 (Pages 138 - 141)

## Page 142

```
 1          CHANGES AND SIGNATURE
 2 WITNESS NAME:  ROBERT L. KEHR
 3 DATE OF DEPOSITION:  SEPTEMBER 16, 2021
 4
 5 PAGE   LINE   CHANGE          REASON
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

## Page 143

```
 1     I, ROBERT L. KEHR, have read the foregoing
   deposition and hereby affix my signature that same is
 2 true and correct, except as noted above.
 3
 4
                     _____
 5             ROBERT L. KEHR
 6
 7 THE STATE OF _____   )
 8 COUNTY OF _____   )
 9     Before me, _____, on this day
   personally appeared ROBERT L. KEHR, known to me (or
10 proved to me under oath or through _____)
   (description of identity card or other document) to be
11 the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that he executed the
12 same for the purposes and consideration therein
   expressed.
13     Given under my hand and seal of office this
14 _____ day of _____, _____.
15
16
           _____
17     NOTARY PUBLIC IN AND FOR
           THE STATE OF _____
18
19
20
21
22
23
24
25   Job No. TX4800824
```

## Page 144

```
 1     IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 2                 DALLAS DIVISION
   In re:             )
 3                    )
   HIGHLAND CAPITAL MANAGEMENT,  )  Chapter 11
 4 L.P.               )
                      )
 5   Debtor.          )  Case No.:19-34054-sgj11
 6   ****************************************
 7           REPORTER'S CERTIFICATE
 8         DEPOSITION OF ROBERT L. KEHR
 9             SEPTEMBER 16, 2021
10
11     I, Ashley Elizondo, Certified Court Reporter,
12 in and for the State of Texas, hereby certify to the
13 following:
14     That the witness, ROBERT L. KEHR, was duly
15 sworn by the officer and that the transcript of the oral
16 deposition is a true record of the testimony given by
17 the witness;
18     That the deposition transcript was submitted
19 on _____, to the witness or to the attorney
20 for the witness for examination, signature, and returned
21 to me by _____;
22     That the amount of time used by each party at
23 the deposition is as follows:
24     MR. GRANT C. MARTIN-3 HOURS AND 2 MINUTES
25     That pursuant to information given to the
```

## Page 145

```
 1 deposition officer at the time said testimony was taken,
 2 the following includes counsel for all parties of
 3 record:
 4 FOR NEXPOINT REAL ESTATE PARTNERS:
 5     Brant C. Martin, Esq.
      Lauren K. Drawhorn, Esq.
 6   WICK PHILLIPS
      100 Throckmorton Street
 7     Suite 1500
      Fort Worth, Texas 76102
 8 Telephone: 817-332-7788
      E-mail: brant.martin@wickphillips.com
 9   lauren.drawhorn@wickphillips.com
10 FOR HIGHLAND CAPITAL MANAGEMENT:
11     Kenneth Brown, Esq.
      La Asia Canty, Esq.
12   PACHULSKI STANG ZIEHL AND JONES
      10100 Santa Monica Boulevard
13     Floor 13
      Los Angeles, California 90067
14 Telephone: 310-201-0760
      E-mail: kbrown@pszjlaw.com
15   lsc@pszjlaw.com
16 FOR UBS SECURITIES AND UBS AG LONDON BRANCH:
17     Shannon McLaughlin, Esq
      LATHAM AND WATKINS
18     885 3rd Avenue
      Suite 1000
19     New York, New York 10022
      Telephone: 212-906-4612
20 E-mail: shannon.mclaughlin@lw.com
21
22
23     I further certify that I am neither counsel
24 for, related to, nor employed by any of the parties or
25 attorneys in the action in which this proceeding was
```

Veritext Legal Solutions
800-336-4000

1 taken, and further that I am not financially or
2 otherwise interested in the outcome of the action.
3     Certified to by me this 23rd day of
4 September, 2021.
5
6
7
8

9     Ashley Elizondo, Texas CSR No. 9465
      Expiration Date:  02/28/2022
10    VERITEXT LEGAL SOLUTIONS
      Veritext Registration No. 571
11    300 Throckmorton Street
      Suite 1600
12    Fort Worth, Texas 76102
      (817) 336-3042  (800) 336-4000
13
14
15
16
17        FURTHER CERTIFICATION
18 -------------------------------------------------------
19        The original deposition was/was not returned
20 to the deposition officer on
21 _____;
22        If returned, the attached Changes and
23 Signature page contains any changes and the reasons
24 therefor;
25        If returned, the original deposition was

Page 146

1 kbrown@pszjlaw.com
2             September 23, 2021
3 RE: IN RE Highland Capital Management, L.P.
4 DEPOSITION OF: Robert L. Kehr (# 4800824)
5     The above-referenced witness transcript is
6 available for read and sign.
7     Within the applicable timeframe, the witness
8 should read the testimony to verify its accuracy. If
9 there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25

Page 148

1 delivered to _____, ROBERT L. KEHR;
2        That $_____ is the deposition
3 officer's charges to the DEBTOR for preparing the
4 original deposition transcript and any copies of
5 exhibits;
6        That a copy of this certificate was served on
7 all parties shown herein and filed with the Clerk.
8        Certified to by me this _____ day of
9 _____, 2021.
10
11
12
13

14    Ashley Elizondo, Texas CSR No. 9465
      Expiration Date:  02/28/2022
15    VERITEXT LEGAL SOLUTIONS
      Veritext Registration No. 571
16    300 Throckmorton Street
      Suite 1600
17    Fort Worth, Texas 76102
      (817) 336-3042  (800) 336-4000
18
19
20
21
22
23
24
25

Page 147

38 (Pages 146 - 148)

**[02/28/2022 - 76102]**

**0**

**02/28/2022**   146:9
147:14

**1**

**1**   1:10,10 3:11
51:22,23 75:6
89:8
**1.05**   45:13,15 58:9
58:10,12,18
**1.05.**   45:12
**1.09**   45:15 58:24
59:2,9 64:11
87:19 88:11,21,21
**1.09.**   45:9 59:21
**10**   3:19 125:18,19
125:20
**100**   2:5 3:15 98:7
145:6
**1000**   2:17 145:18
**10022**   2:18 145:19
**10100**   2:11 145:12
**105**   58:7 138:22
**109**   28:19 45:1
59:20 62:16 65:17
68:22 74:1,16
78:13 84:1 87:24
90:23 91:7 93:19
119:24
**11**   1:3 3:20 70:2
130:11,12 144:3
**110**   3:16
**116**   3:22
**11:31**   50:24
**11:41**   50:24
**12**   3:21 126:20
133:3,5,24
**122**   3:17
**124**   3:18
**125**   3:19

**12:34**   88:25
**12:43**   88:25
**12:58**   124:17
**13**   2:12 145:13
**130**   3:20
**133**   3:21
**14**   3:22 116:24
117:6 118:18
**142**   3:6
**144**   3:7
**146**   3:8
**15**   126:22 133:12
**150**   111:14
**1500**   2:6 145:7
**15th**   133:9
**16**   1:9 142:3 144:9
**1600**   146:11
147:16
**16773**   146:8
147:13
**16th**   1:15 31:19
**17**   126:22
**18**   130:19
**1800's**   70:7
**1897**   71:3,9 74:18
76:13 78:13
**18th**   31:18 33:5
**19-34054**   1:5
144:5
**1986**   98:10
**19th**   69:19 70:6
**1:27**   122:14
**1:36**   122:14

**2**

**2**   3:3,12 96:21,22
98:17 144:24
**20**   26:20 35:3
37:10 66:10 95:19
106:17 108:16,23
110:10

**2016**   118:7
**2018**   92:18 104:4,5
105:10,20 106:18
107:4,13 108:6,20
122:23 124:17
130:14 133:10
**2019**   133:10
**2021**   1:9,15 31:18
31:19 33:5,7
37:23 118:11
142:3 144:9 146:4
147:9 148:2
**205**   110:18
**21**   6:18
**212-906-4612**   2:18
145:19
**21st**   71:12,12,13
**22**   133:24
**22nd**   71:12
**23**   148:2
**23rd**   122:23
130:14 133:10
146:3
**25**   126:16
**26**   36:18 77:10
107:22
**26th**   104:4,5
105:19
**2:01**   1:16
**2a**   123:18

**3**

**3**   3:13 75:8,10,10
76:9,12 98:18
104:8 144:24
**30**   14:5 35:4 66:10
95:20 106:17
108:16,23 110:10
133:24
**300**   146:11 147:16
**310-201-0760**   2:13
145:14

**32**   128:10
**336-3042**   146:12
147:17
**336-4000**   146:12
147:17
**35,000**   48:2
**3:02**   141:14
**3rd**   2:17 145:18

**4**

**4**   3:14 98:20,22
100:15
**40**   9:12,12 80:5,6,7
80:15
**4800824**   1:22
148:4
**49**   41:11 123:11
131:5,6

**5**

**5**   3:15 100:13,14
121:17
**50**   9:4 16:9 41:13
**51**   3:11 123:12
131:2,3
**550**   98:11
**571**   146:10 147:15
**575**   97:13

**6**

**6**   3:5,16 110:16,17
120:6,7
**63**   129:21
**65**   27:4

**7**

**7**   3:17 111:12
122:2,3,18,22
124:6
**75**   3:13
**76102**   2:6 145:7
146:12 147:17

**[775 - agreement]**

**775** 97:9,21

**8**

**8** 3:18 124:5,7,7
128:12
**800** 146:12 147:17
**81** 111:13
**817** 146:12 147:17
**817-332-7788** 2:7
145:8
**83** 70:12,14
**885** 2:17 145:18

**9**

**90067** 2:12 145:13
**944** 70:13
**9465** 1:16 146:9
147:14
**96** 3:12
**98** 3:14
**9th** 124:17

**a**

**a.m.** 1:16 50:24,24
**aba** 16:8,23 17:7,9
**ability** 22:14
**able** 27:3 28:12
44:11 86:24
106:10
**absolutely** 59:7
82:22 122:10
**account** 48:4,17
49:11 114:25
115:13
**accuracy** 148:8
**accurate** 8:25
129:2
**accurately** 54:9
137:25
**accusations** 27:25
**acknowledged**
143:11

**acquire** 108:16
112:9 116:18
**acquired** 84:21
106:4,16 112:10
**acquiring** 66:10
**acquisition** 66:14
93:1 106:11
108:17,19 109:4,5
109:8,10 110:9
112:12,12 113:23
113:24 118:20
132:3,16
**acquisitions**
107:13 109:3
113:19
**act** 18:13 19:7
**acted** 55:2
**acting** 63:8,8
64:23 73:21 85:22
**action** 86:24 87:13
88:10 145:25
146:2
**actual** 25:13
130:13
**add** 75:19
**added** 75:21
**additional** 75:23
118:24 141:8
**addressee** 97:4
**addressees** 124:21
**addresses** 93:6
**adds** 65:3
**adept** 50:16
**adjust** 112:15
**admitted** 71:4
**adoption** 17:8
**advance** 62:22
63:10 64:25
**adversary** 62:9
99:3

**adverse** 65:6
66:22 67:11 73:22
90:14 103:4 106:6
107:11 120:1,14
136:24 137:21
**adversely** 55:3,22
60:8 61:8 64:2
**advice** 65:25 66:2
66:25 67:4,7,9
84:19,22,24 85:3,7
85:10 94:4 129:4
129:7 136:18
138:14
**advise** 10:13 40:12
95:8
**advised** 15:14,15
40:18,19 84:10
95:17
**advisers** 117:23
118:4
**advising** 9:15
20:15 46:6
**advisory** 75:1
76:16 78:6,7
79:22 80:1,4,5
81:2,15 91:22,25
**advocate** 131:22
**affect** 78:13
108:10,11 112:16
113:13
**affix** 143:1
**afraid** 117:11
**ag** 2:15 6:3 145:16
**age** 8:14 9:22
**ages** 37:15
**ago** 9:12 18:18
31:21 33:17 37:25
64:17 70:19 72:16
81:3
**agree** 7:25 10:19
17:6,19 21:25

28:3 29:13 33:7
58:7 65:10 67:20
70:20 72:1 77:6
77:23 78:18 79:4
82:8,9,14 93:17
94:8 99:11 101:4
104:3 111:1,18
113:10 118:11
125:5,7 127:18
129:15 131:8
133:17 134:14,19
**agreed** 77:5,13
78:8 107:22
**agreement** 3:14,15
3:20,21 66:3,15,17
77:4 78:22 83:18
89:19,21 92:18,21
92:24 93:2 94:5
94:11,15,20 95:13
96:5,11,17,19,24
97:3 100:17 101:3
101:3,12,13,18,19
101:24 102:9,10
102:17,18,19,22
102:23 103:7,8,11
103:23 104:3,21
105:10 106:3
107:5,17 108:6,9
108:10,14 109:6,8
110:8 112:2,3,24
113:5 114:3,4,8,12
114:19,20,21,23
115:25 116:17
119:4,13,13,17,19
119:20,25 120:13
120:20,21,24
121:2,16,24
123:19,24 124:2
126:21 127:6,10
127:23 128:17,19
129:3,5,8,11,19

Veritext Legal Solutions
800-336-4000

[agreement - arrangement]

130:1,4,6,13 131:2
131:11,14,14,20
132:1,5 133:9,17
134:12,16,17,20
135:2,6
**agreements** 66:19
101:5 104:10,16
105:1 109:9 120:5
148:14
**ahead** 31:17 37:19
37:20 38:18 49:7
49:8 51:24 54:20
84:14 86:11,13
89:13 104:23
111:1 116:13
136:6 138:18
**airlines** 71:22
74:22,23 76:18
78:10 80:24 91:22
135:20
**alaska** 108:18
**aligned** 70:3
**allegation** 28:9
**alleged** 86:19
**allegedly** 89:19
**alleging** 138:25
**allocation** 91:16
91:17 95:5,8,9,11
95:25 96:16
112:16 113:5,9,13
**allocations** 95:13
96:10 107:17
109:2,20 110:1,5
135:1
**allotted** 148:15
**allowed** 10:14
24:22 29:22 141:4
141:6,6
**allows** 43:12
**ambiguous** 44:24
137:15

**amended** 3:21
95:13 96:11,17
101:13,23 102:17
103:7,8,11 107:17
107:19 109:20
113:5 114:9,12,20
119:25 120:13
124:2 129:25
130:3,5 133:8,17
134:20 135:1,5
**amending** 113:20
**amendment** 101:7
102:7 113:25
114:15 115:1,14
116:4,8
**american** 71:22
74:22,23 76:18
78:10 80:24 91:22
135:20
**amount** 20:9 21:9
144:22
**analysis** 16:22
21:17 61:14,21
65:21 68:12 85:21
104:17,19 112:21
112:23 115:19
119:15,21 135:15
137:23
**analytical** 45:21
63:13 79:7
**analyze** 19:16,17
40:6 53:9 73:8
**analyzed** 19:21
**analyzing** 19:15
21:5,9,13,15 40:5
43:2 45:11 47:7
48:4,18 49:11
**angeles** 1:18 2:12
6:22 8:9 31:9
145:13

**answer** 11:14
16:22 25:17 26:1
34:25 35:13,24
36:15 38:8 39:10
39:15,22,23 40:23
41:6 46:17,19
47:16,18 53:11
59:8,17 62:3
65:18 80:22,23
87:20 106:14
107:9 110:7
114:17,18 117:13
126:2,22,23,24
127:2,8,12,15
128:17,19 130:1,4
136:2 139:21
**answered** 24:4
28:22 39:21 41:22
97:20 140:11
**answering** 37:16
86:6
**answers** 11:5
13:14 129:1,15
**antecedent** 108:22
**anticipated** 107:5
**anybody** 10:3 35:9
37:5 38:3 40:18
83:14 93:8 116:8
119:24 129:17
**anyway** 62:4
124:16
**apart** 119:9
**apologies** 86:14
**apologize** 14:20
19:12 37:19 44:25
86:8 89:15 116:16
121:7
**apparent** 23:3
**apparently** 60:6
**appeal** 70:1,2

**appear** 74:16
**appearance** 5:25
**appearances** 2:1
3:3 5:16
**appeared** 25:12
143:9
**appearing** 52:1
136:10
**appears** 26:20
74:18
**appendix** 75:22
104:9 110:24
111:12,13,13
120:5
**apples** 86:17,17
**applicable** 88:13
148:7,14
**application** 63:14
**applies** 77:3 88:21
**apply** 90:22
**appreciate** 10:2
14:9 21:11 29:9
29:11 48:13 62:7
78:25 110:15
129:13 132:10
**appropriate** 40:7
91:20
**approximately**
118:23
**arbiters** 18:25
**arbitration** 12:6
15:9
**area** 9:5 115:19
**areas** 14:12
**arguing** 139:4
**arguments** 131:23
**arises** 73:19
**arose** 103:8
**arrangement**
18:17

Veritext Legal Solutions
800-336-4000

[articles - borrowers]

**articles** 15:25
16:12
**ashley** 1:16 144:11
146:9 147:14
**asia** 2:10 145:11
**asked** 24:15 27:1
28:23,23 32:6
36:25 38:7 39:20
39:20 41:22 44:10
44:19 59:23 73:12
88:8 123:22
135:10 140:22
141:9
**asking** 7:1 25:19
32:20 42:11 61:1
61:4 65:12,19
78:24,25 79:1
88:16,19 105:18
113:1 126:8
132:21
**aspect** 96:10
**aspects** 30:6
**asset** 105:20,22
106:4
**assets** 104:10
105:24 113:24
114:5
**assigned** 18:10
**assisting** 44:1
**associate** 34:11
**association** 118:20
**assuage** 37:2
**assume** 8:19,23
11:15 52:15 55:6
56:1 60:11 61:9
74:13 84:21 93:24
94:2 96:13 105:4
105:18 106:1
**assuming** 13:24
45:16 56:3 67:1
96:16 103:23

111:25 120:17
**assumption** 67:3
94:1
**assumptions** 78:17
**attached** 1:20
75:22 92:24 116:1
116:7 131:10
146:22 148:10,12
**attachments** 75:24
**attack** 72:10 91:15
94:25
**attacking** 72:12
73:2 81:11 84:4
87:8 91:9 93:9
120:12
**attempt** 29:9
89:17 101:11
**attempted** 131:22
**attempting** 65:21
65:23 91:11 113:7
**attending** 51:6
**attention** 52:21
126:3
**attorney** 8:21 55:2
55:22 91:23 92:1
144:19
**attorney's** 14:12
**attorneys** 18:16
145:25
**audio** 5:3 79:20
**august** 31:20
122:23 124:17
130:14 133:10,13
**author** 124:19
**authorities** 22:13
71:19 77:4,7,8,14
77:16,19 80:19
90:12 92:13
**authority** 23:5
71:21 91:14,14,21
92:2,11

**automatically**
43:21
**available** 104:15
111:3 148:6
**avenue** 2:17
145:18
**aware** 9:21 29:18
29:20 30:14,19
57:2,17 115:5
116:16 125:9
129:6 134:23

**b**

**b** 49:21 54:12,14
69:22 139:8,12,15
139:16
**back** 22:3 29:4
50:20,23 59:22
67:23 68:3 69:3
69:16 71:6 73:11
75:9 89:7,10 94:7
101:4 114:13,16
117:4 120:5,19
140:19
**baker** 124:21,22
124:23 125:5,8
**ballpark** 20:8
**bank** 118:20,22,24
**bankruptcy** 1:1
6:4 144:1
**banks** 66:13
**bar** 14:23 18:21
33:16 136:1
**bar's** 18:15
**barred** 87:8
102:24
**based** 16:10,23
17:15 23:7,23
27:10,17 36:3
41:4 45:1 46:20
53:15 59:10 61:5
80:15 90:12 94:23

103:24
**basic** 114:21
**basis** 16:9 17:7
36:4 43:20,23
46:11 59:3 91:18
102:2 131:13
132:17,19,21
**basketball** 32:15
**bates** 98:23 99:2
**believe** 7:10 8:3,10
23:14 25:6,12,20
27:14 28:6,14,15
41:2,25 42:5
51:24 86:15 87:17
93:18 98:11 114:1
120:6 126:2
**best** 32:19 40:4
**beyond** 25:23
47:14 73:6
**billed** 97:9,13 98:8
**billing** 43:12 44:5
97:21,22
**bills** 42:12,17
**bit** 14:7 30:9 44:3
60:5 68:7 100:24
100:24 110:4
129:1
**blackmail** 30:2
**blind** 9:3
**blocked** 54:19
**body** 80:7
**bonner** 124:23
**boone** 69:20,23
71:20 73:4 74:18
76:13 78:13 80:24
**borrower** 119:3
120:4 121:12
132:6
**borrowers** 95:11
104:1 107:24
118:24 119:2

Veritext Legal Solutions
800-336-4000

[borrowing - cause]

**borrowing** 119:5
**bottom** 89:16
**boulevard** 2:11
145:12
**branch** 2:15 6:3
40:13 145:16
**brand** 102:6
**brant** 2:4 3:5 5:17
7:6 28:11,11 39:3
100:22 103:16,16
117:22 122:7
145:5
**brant.martin** 2:7
145:8
**breach** 22:7 23:16
23:18 24:2 25:13
25:16,21 26:5,22
27:23 28:15,17,21
87:14 138:25
**breached** 24:7
28:6
**break** 29:3 50:19
88:3,23 89:1,5
122:9
**breath** 103:21
**brian** 124:23
**bridge** 3:15 49:14
49:19,21,21 66:1
66:11,18 95:15
100:4,17 102:9
103:23 106:12
107:13 108:7,8,10
108:13 109:6,8,21
109:23 110:12
112:8,11,17,23
113:10,14,18
114:21,22 118:22
118:24 119:3,4
120:21 121:1,16
121:24 129:10
132:7

**brief** 71:22 80:12
**bringing** 113:3
122:19
**broaddus** 122:23
123:6,8 124:19
**broader** 63:19
64:5,14 72:1,18
73:5 74:8,12 75:2
135:23
**broadly** 138:9
**broke** 39:3
**brown** 2:10 5:21
5:21 7:11 8:10,12
10:15,23 24:12,21
24:24 25:2,23
26:3,6,10,14 28:2
28:11 29:13 31:13
34:16 35:17,25
36:5,17 39:3,20
41:22 42:2 44:23
47:11 53:1,9,12,22
71:25 75:11,18
76:3,5 77:2,9,9,13
77:18,21 78:21
79:9 80:12 86:5,9
86:11 89:5 90:18
90:22 99:5 100:22
103:16,20 104:6
110:24 113:3
117:17,21 120:23
121:3,6,7 122:7,12
134:24 140:17,21
141:3,13 145:11
**brown's** 33:23
35:10 38:4,20,25
39:18 40:3 42:12
46:1 90:8
**browns** 37:2
**bullet** 54:13,21
59:24 89:14,15
90:17 92:17 93:6

123:18
**bunch** 121:14
**business** 17:24

**c**

**c** 2:4 3:5 33:13
144:24 145:5
**calculated** 20:12
**california** 1:18
2:12 8:4,7,8,11
15:1,2,7,8,10 16:2
16:5,18,21 18:3,15
19:2 41:9 46:9
51:20 70:12,22,24
71:10 80:10 87:22
106:25 108:2,18
145:13
**call** 13:9 24:18
30:2 32:2,23 34:6
38:18 45:25
106:24 107:1
127:11
**called** 6:13 18:12
33:25 34:15 37:10
69:19 70:11 84:17
93:18 132:7
**calling** 104:9
127:9
**calls** 33:1 34:18
**canty** 2:10 145:11
**capability** 83:9
**capacity** 12:3
127:14
**capital** 1:3 2:9
5:23 32:24 35:11
52:10 97:5 100:3
103:25 106:16
111:19 121:11,19
130:23 131:2,5
134:11 144:3
145:10 148:3

**capital's** 66:12
**capture** 137:25
**captures** 73:5
**card** 143:10
**care** 10:25
**careful** 34:22
**carefully** 85:5,15
**carolina** 40:20
**carrying** 114:23
**case** 1:5 31:2 33:8
33:24 34:14,19,20
36:6 40:8 41:18
42:1,9 43:2,7,11
43:18,19,21 44:6
44:13,18 45:5,11
45:22 46:9,23
47:6,7,18,19 48:5
48:18 49:11 50:1
54:10 56:23 57:12
57:15 58:19 59:19
60:20,21 64:8
69:16,17,19,24,25
70:6,7 71:9,11,22
74:22,24 76:18
77:5 78:3,10 79:2
80:20,24 81:21
83:23 90:18 91:22
94:9,17 99:8
101:6,18 102:3
124:12 125:25
130:17 139:1
144:5
**cases** 12:11 52:5
70:25 75:1 76:16
76:22 77:24 79:12
79:22 80:1,3
81:15
**catch** 51:25 69:4
**categorizes** 73:20
**cause** 1:15

[caution - compile]

**caution** 34:16
35:17
**century** 8:9 69:19
70:6 71:12,12,14
**ceo** 47:4 97:5
**certain** 27:4 30:6
34:12 43:6 44:4
45:19 51:11 54:5
54:7 74:5 82:24
82:24 96:7 97:18
105:17 121:13
126:4 137:18
**certainly** 6:1 9:21
14:4 16:15 30:18
41:14 96:13
101:20 111:4
**certificate** 3:7,8
144:7 147:6
**certification**
146:17
**certified** 4:5
144:11 146:3
147:8 148:16
**certify** 144:12
145:23
**cetera** 5:4
**change** 107:23,23
107:23 109:2,19
110:1 112:11
113:6,8,13 134:6
135:6 142:5
**changed** 9:23
109:20,22 113:5
**changes** 3:6 6:17
142:1 146:22,23
148:9
**changing** 107:16
**chapter** 1:3 144:3
**charge** 43:1,4
97:25 98:10

**charges** 147:3
**charging** 97:23
**chart** 106:9,11
**charts** 131:10
134:16
**check** 42:25 43:6
44:11 47:23
**checking** 44:4
**chief** 18:12 19:4
**choice** 9:9
**chopped** 59:16
**circuit** 70:11
**circuits** 70:2
**circumstances**
35:5 48:3 66:21
**cited** 71:21
**cites** 70:25
**city** 8:8,9
**civil** 1:19 71:6
**claim** 61:17 62:19
73:9 112:14
**claiming** 46:11
**claims** 134:23,25
**clarification** 29:10
36:1,11 76:9
110:15 129:13
**clarify** 7:24 26:24
28:12 30:11
129:14
**clarity** 7:22 76:4
**classes** 30:23
**clause** 72:17 90:22
**clear** 20:18 23:5
24:5 25:19,25
38:14 68:14
103:13 129:13
131:21
**clearer** 27:20
**clerk** 147:7
**client** 13:5 15:15
40:14 42:24 54:22

55:2,3,4,7,23 56:1
57:3,4,6,7,10,11
57:22 58:12,15
60:8,12 61:8,10
62:24 63:7,18
64:2,12,18,18,23
65:4,5,6 67:2,2,6
67:11 69:4,10
72:11,23 73:2,7,22
74:2,14 82:12,18
82:23 84:10,23
85:6,17 87:10
90:15 91:13 98:9
113:3 117:16
120:15,17 135:22
136:18,21,23,25
137:2,11,20,21,22
139:7,7,8,11,11,12
139:12,14,15,15
139:16 140:9
**client's** 42:23
59:11 112:14
**clients** 46:15 57:19
57:25 59:4 60:24
67:5 94:19 98:2,6
98:8,9 115:22,22
136:16 138:12,13
138:20 140:7,8
**clock** 43:23,24
**close** 60:21
**closer** 71:12 96:1
**closing** 115:1
**cohen** 6:14 44:2,6
97:12,17
**cold** 31:7
**colleague** 33:14,23
**colleagues** 99:6
**columbia** 16:10
**combined** 48:24
48:25

**come** 16:16 29:4,7
50:20,23 71:5
75:9 81:14 135:15
135:16
**comes** 69:19 72:14
80:11 135:13
**comfortable** 20:13
126:13
**coming** 22:3 38:18
68:19
**commented** 53:14
**comments** 53:22
**commission** 41:8
**commissions**
80:10
**committed** 86:19
**committee** 33:16
92:2 138:3
**common** 17:17
56:20 57:8 81:13
135:19 139:14
**commonly** 16:25
**communicate**
10:17 85:18 89:4
**communications**
10:18 35:23 36:21
53:15 130:2,5
**community** 138:3
**companies** 9:15
**company** 86:18
98:11 130:13
133:9
**comparing** 41:11
**comparison** 41:13
**comparisons** 17:1
**compensated** 42:9
**compensation**
46:22
**competent** 85:10
**compile** 131:23

[complain - correct]

complain  136:4
complaint  18:8,10
complete  11:1
  35:7 80:22
completely  85:20
  106:23
component  64:8,9
comprise  92:24
computer  10:11
  31:3 39:12 43:8
  54:16 75:15 117:8
  122:19 126:18
concede  103:14
conceding  36:10
  103:17
conceivable  44:2
concept  22:3
  58:11 65:24 68:23
  69:8 72:6,8,9,15
  72:19 73:5 74:25
  75:2 81:10,25
  84:7 91:15 93:6
concepts  87:24
  90:9,11 91:12
concern  81:13
concerned  53:12
concerning  129:7
concerns  37:2
conclude  68:9
concluded  141:14
conclusion  67:13
  115:2
conclusions  80:2
conduct  15:13,22
  21:21 22:17 27:5
  30:6,24 40:12,15
  41:9 45:2 59:19
  89:23
confidence  135:25
confidential  46:16
  55:1 56:18,24

57:1,18 58:3
confidentiality
  23:24 27:11,13
  46:20 54:23 56:10
  56:10,21 57:15,23
  58:8 138:5,23
  139:1
confirm  98:17
  111:7,22
confirmed  129:16
conflict  19:4,15,16
  19:17 22:6 23:15
  23:17 24:2,3
  25:16,20 26:19,25
  27:9,14,22 28:7
  103:24
conflicting  120:25
conflicts  21:10,13
  21:15,17 47:24
confused  121:15
connected  107:18
  132:8
connection  32:25
  44:13,18 45:5
  75:12 89:20 96:1
  96:2 106:3 109:16
  118:19 119:25
  126:21 128:16,18
  129:9,10,18,25
  130:3,16
connections  5:3
consent  87:10
  139:22,24 140:2,5
consequences
  66:25
consider  29:2
  34:23 35:21 36:5
  36:22 40:9,23
  45:10 61:15 79:17
  90:9 112:1 115:6
  119:12

considerably
  109:16
consideration
  143:12
considered  34:17
  36:18,19 47:12,14
  61:18 75:12,24
  90:11 107:14
  115:8 137:10
considering  47:7
  125:8
consultation  97:24
consulted  36:7
  41:1,5 80:20
consulting  41:16
consummation
  115:21
contact  10:6,14
  34:3 119:4
contacted  31:4,25
  33:8,11 37:22
  47:6,18 49:25
contained  22:11
contains  146:23
content  104:16
  112:1
contents  37:4
  38:12
context  12:14
  14:15 32:11 48:14
contexts  21:18
continue  25:2
  129:14
continues  139:11
continuing  40:14
  54:23,25 56:8,9,9
  135:20,24
contract  115:18
  120:7
contracts  48:22

contractual
  139:22
contradicts  79:8
contributing
  115:7
contribution
  130:23 131:2,5
contributions
  134:11
convenience  50:19
  122:9
convenient  122:8
conversation
  34:13 36:13 37:3
  38:13 48:20 49:17
  106:23
conversations  7:3
  32:8 33:12 34:20
  35:2,4,8,9,15,18
  35:19 36:2,21
  37:4,5 38:9 48:18
  49:3,5,10,13,25
convictions  11:24
  11:25
convince  63:22
  68:15
coordinated
  126:23 127:2,3
coordinating
  127:1,4
coordination
  127:5,7
copied  122:24
copies  48:13,22
  126:18 147:4
copy  15:24 54:16
  147:6 148:16
corporate  12:16
correct  6:24,25
  7:4,13,17,18,21
  8:11,12 13:12,16

[correct - definitely]

| | | | |
|---|---|---|---|
| 13:21 15:22 16:3 | 124:17,19,20 | 62:13 63:16 65:14 | 136:23,25 137:1 |
| 16:13,24 17:11 | 125:6,12,13,16 | 67:17 68:20 70:9 | 137:11 |
| 19:14 21:1,6 24:1 | 127:19,23 128:6,7 | 70:11,24 71:10,11 | **currently** 117:17 |
| 24:10,10,25 25:4 | 128:24 129:19 | 73:12 75:5 78:1 | **curriculum** 8:19 |
| 30:25 31:1 37:23 | 130:9,10,14,24 | 83:23 90:21 91:3 | **cv** 15:24 |
| 40:24,25 45:2,3 | 131:3,6,7,11,15 | 91:19 98:15 | |
| 46:5,12,20,21 48:5 | 132:12,18 133:6 | 100:15 124:6 | **d** |
| 49:3 51:3,17 52:7 | 133:10 134:8,9,12 | 133:23 144:1,11 | **d** 3:1 33:13 49:21 |
| 53:3,13 55:18 | 134:13,17,18,21 | **courtroom** 22:15 | **daily** 43:20 |
| 56:3,25 57:12,16 | 135:8,9 137:14 | 137:17 | **dakota** 40:18 |
| 58:4,5,19,20,24,25 | 138:23 139:1,2 | **courts** 18:21 70:1 | **dallas** 1:2 144:2 |
| 59:4,11,20 62:11 | 143:2 | 70:2,3 77:23 | **daniel** 124:21 |
| 64:15 67:19 68:5 | **correcting** 53:23 | 80:14 115:5 136:8 | **date** 33:6 142:3 |
| 68:6,22 70:8,16,23 | **correctly** 52:13,23 | 136:10 137:25 | 146:9 147:14 |
| 71:6 72:3 73:16 | 55:9 58:22 89:23 | **cover** 22:19 | **dated** 104:4,5 |
| 74:4,16,17,18 | 93:3 119:6 123:20 | **covered** 90:3 | 122:23 124:16 |
| 76:19,20 77:17,18 | 124:24 127:16 | 104:6 123:20 | 130:14 133:9,15 |
| 77:24 78:3,4,7,10 | 128:20 130:6 | 135:11 | **david** 124:22 |
| 78:14 79:23 81:21 | **counsel** 5:15 18:12 | **covers** 60:21 | **day** 1:15 8:14 9:22 |
| 82:1,13 83:1,5,6 | 19:4 26:18 30:21 | **crane** 6:14 | 107:22 143:9,14 |
| 83:11,12,21 87:5,9 | 35:20 116:12 | **create** 91:11 | 146:3 147:8 |
| 87:10,15,16,19 | 122:5 145:2,23 | **created** 5:6 | **dc** 40:19 41:12 |
| 88:21,22 90:12,18 | **count** 71:17 | **creates** 58:15 | **deal** 27:5 40:15 |
| 90:23 91:7,24 | **country** 17:9 | **creating** 27:13 | 127:4 |
| 92:6,14,15 93:10 | 40:16 41:8 81:14 | **creation** 126:25 | **dealt** 40:14 |
| 93:19,23 94:11,20 | **county** 1:18 33:16 | **credit** 66:13,18 | **debate** 78:20 |
| 95:2 96:6,19,20 | 143:8 | **creditor** 112:14,14 | 79:11 |
| 97:6,7,10,14,15 | **couple** 9:19 69:14 | **creditor's** 62:19 | **debtor** 1:5,13 5:23 |
| 98:3 100:11,12 | 79:10 96:23 | 73:9 | 121:4,8 144:5 |
| 101:6,21 102:3 | 131:25 138:16 | **creditors** 6:4 | 147:3 |
| 103:1,11,12 104:1 | **course** 8:18 10:1 | 61:17 | **decision** 73:5,18 |
| 104:2,4,10,13 | 19:24 20:24 21:2 | **criminal** 29:25 | **declaration** 3:22 |
| 106:7,8 108:21,25 | 68:18 78:11 88:6 | 30:2 | 75:21 117:1,9 |
| 110:6 111:20 | 111:9 118:15 | **criticism** 58:23 | **declares** 19:4 |
| 112:3,4 113:21,25 | 133:21 | 59:18 | **decline** 23:2 |
| 114:1,9,10,14 | **court** 1:1 9:2 | **criticizing** 61:3 | **deed** 137:16 |
| 115:15 116:2,3,9 | 14:22 15:9,20 | **csr** 1:16 146:9 | **defense** 30:5 |
| 116:10,21 117:19 | 21:23 22:16 23:2 | 147:14 | **define** 22:2 63:24 |
| 118:4,7,14 119:10 | 28:2,4 29:21 30:6 | **cullen** 124:21 | 85:5 |
| 119:25 122:16 | 30:15,21 42:10 | **current** 67:2 70:1 | **defined** 93:2 |
| 123:12,25 124:3,4 | 49:23 56:12 61:24 | 70:1 73:8 74:11 | **definitely** 128:4 |

Veritext Legal Solutions
800-336-4000

[definition - documents]

definition  83:10
degree  19:6 48:6
delaware  85:13
  104:25 105:5
  125:11,15 131:10
delay  100:7
delighted  50:3
delivered  147:1
depend  61:24
dependent  46:22
  72:17 90:22
depends  18:6
  138:2
depose  26:16
deposed  10:17
deposition  1:7,12
  3:19 5:1 10:1,9
  12:6,9 15:20
  26:16,20 51:7
  125:21 126:4,9
  128:13 141:14
  142:3 143:1 144:8
  144:16,18,23
  145:1 146:19,20
  146:25 147:2,4
  148:4
depositions  8:20
  8:24 13:24 65:23
describe  126:23
  127:3
description  3:10
  4:2 26:17 53:22
  108:14 143:10
designated  28:14
  34:19 38:20 46:4
  140:24
designation  25:24
  26:7,8 29:14
desired  127:6
destructive  137:2
  137:11

details  48:14
determine  56:13
  61:22 91:19
determining  19:1
  61:24
dialogue  29:12
difference  30:12
  61:15 63:6 68:7
  72:4 82:6 107:20
  133:16
different  35:4
  38:24 43:2 51:7
  55:20 78:6,9,12
  82:7,11,12,14,15
  82:15 83:4,5
  87:23 91:3 105:13
  109:15,15 113:2
  115:6 117:22,23
  118:1 125:10
  134:12
differently  60:5
difficult  11:7
  78:16 107:10
  133:22
difficulties  50:15
difficulty  8:16
digestible  48:11
direct  52:20 126:3
directly  38:10
disagree  25:15
  65:9 77:24 78:2
  82:8
disagreed  60:4
disagreements
  140:12
disappointed
  110:19
disciplinary  14:23
  15:12,21 18:16,18
  22:6,8,12,13 23:15
  23:18 25:16 26:21

27:15,16 28:20
  30:24 44:15 45:2
  79:21 89:22
discipline  22:22
disciplined  17:23
  22:10,23
disclaimer  20:18
  126:5,11
disclose  34:23
  36:20 53:2 92:11
  138:13
disclosed  27:21
disclosure  3:11
  23:25 24:14,19
  52:11 57:5 92:7
  92:10 138:6
discoverable  36:3
discovery  35:6
discussed  90:1,12
  90:15 123:8
discussion  23:10
  38:3 48:7 82:4
  84:16
discussions  30:20
  38:15 47:21
dismiss  18:4
dispute  123:4
  125:3 128:23
  130:8 139:12
  141:4,8
disputing  76:6
disqualification
  22:16 23:1 35:11
  35:16 36:14,16
  37:6,22 38:6,10
  39:1,9,19 40:2,6
  47:8 56:12 71:9
  91:19
disqualified  24:8
  56:14 68:5 73:15
  73:17 93:9 94:22

96:18 103:10
  106:6 107:7 113:7
  113:8
disqualify  7:12,16
  20:20,25 21:4
  23:3,4 52:12
  75:13 113:4
  117:18,24 134:25
distinct  56:22
distinction  25:15
  27:19 30:10 61:13
  63:13 64:16 69:1
  72:21,21 95:16
  101:12,14 133:16
distinctions  91:11
distinguish  35:2,8
  35:12 48:20 49:4
  49:12,16 50:4
  89:17
distortions  5:3
district  1:1 16:9
  70:12 144:1
division  1:2 144:2
document  52:1,6
  52:18,21 53:18
  54:3,9 75:16,23
  92:10 98:22 99:2
  99:4,7,13,13,21,22
  100:1,5,9 117:4
  124:9,11 126:23
  126:25 131:20
  133:6 143:10
document's  52:9
documents  4:1
  13:10 50:21 51:5
  51:11 52:4,15
  75:5,12 76:7,15
  77:5,13 92:23
  95:6 96:2 104:7
  121:14 124:12

[doing - ethics]

**doing** 8:14 11:4
22:19 23:1 79:13
83:8 84:4,6 91:9
120:14
**doors** 32:10
**double** 44:11
**dozen** 14:4 34:2
**dozens** 48:20 66:8
**draft** 90:5 94:14
102:17 127:10
**drafted** 53:12
94:20 95:24 103:7
105:1 123:23
124:2 127:22
**drafting** 53:6,8
65:25 66:2 89:18
89:20 92:18,20
94:4,10 123:19
129:3,8,18
**draw** 25:15 32:9
61:13 72:5
**drawhorn** 2:4
5:19 51:6 145:5
**drew** 32:25
**drill** 13:14
**driving** 121:13
**dropped** 110:10
110:11
**dst** 3:18 125:14
134:16
**dst's** 105:4,16,22
**due** 5:2 79:10
**dugaboy** 121:22
**duly** 1:14 5:12
141:3,7 144:14
**duties** 12:14 14:11
15:6 17:16 21:19
23:8,11,24 27:12
54:22,23,24 56:8
56:21 59:12 60:23
61:6 102:5

**duty** 14:14 22:4,4
22:7 23:16,19
24:7 25:13,17,22
26:5,22 27:17,23
28:6,15,17,21
54:25 56:9,9,19,20
57:5,14,22 58:2,8
58:11,13 59:3,10
60:16 69:11,11,12
72:2 73:19 87:8
87:14 91:13
109:18 115:20
116:1,6 135:18,20
135:22,24 136:22
136:23 138:4,4,7

**e**

**e** 2:7,13,19 3:1
6:11 49:21 69:22
145:8,14,20
**earlier** 59:1,7,23
79:16 91:23 94:7
97:13 104:7
127:22,25 132:14
**early** 33:7 37:22
47:20
**editing** 53:6,8,17
**effect** 22:14 92:19
92:21 96:6
**effective** 133:10
133:12
**effectiveness** 84:5
**effort** 62:19
**either** 8:21 12:5
14:10 35:22 44:9
78:21 85:25 86:16
99:5 107:23 125:2
**elapsed** 31:24
**electronically** 10:7
**electronics** 59:17
**element** 50:11
65:20

**elements** 61:14
102:11 104:24
138:7
**elizondo** 1:16 11:7
144:11 146:9
147:14
**email** 3:17,18
10:10,11 75:20
76:6 122:22
125:14 127:25
**emphasis** 51:11
**employed** 6:12
18:11,13 145:24
**employee** 118:6
127:14
**employees** 128:1
**encourage** 129:14
**encouragement**
138:20
**ended** 61:5
**enforcement**
135:24
**engaged** 55:8 56:3
60:13 61:11,20
62:21 63:2,5,10
64:13,19,24 65:4
72:11 74:3,15
**engagement** 3:12
46:7 47:22 48:15
57:9 61:18 64:21
65:5 96:23 97:3
**enjoying** 106:22
**enormously** 20:5
**entered** 96:11,17
133:11
**entire** 61:2 69:11
102:12
**entirely** 9:7 18:19
25:18 105:13
136:20,25

**entirety** 84:1
**entities** 106:5
119:2
**entitled** 10:18
24:24
**entity** 105:21
117:22,23 120:22
121:1,1,3,6
**entry** 108:9
**episodes** 15:4
**equal** 57:22
**equate** 23:15
**equates** 25:21
26:21
**equating** 22:5
**equivalent** 87:25
**errata** 148:10,12
148:13
**esq** 2:4,4,10,10,16
145:5,5,11,11,17
**essential** 84:11
85:4 110:13
124:13 136:21
**essentially** 55:20
91:13
**established** 37:21
101:2
**estate** 2:3 5:20 7:7
7:13 117:23 118:3
118:25 145:4
**estimate** 9:2 21:9
31:6 32:3,19 33:2
33:9 37:10,24
41:7 45:24
**et** 5:4
**eternity** 116:1
**ethical** 89:21
**ethics** 75:2 76:16
76:18 80:4,5 81:2
81:15 92:1 138:2

Veritext Legal Solutions
800-336-4000

[evaluating - file]

**evaluating** 77:11
**event** 55:5
**everybody** 50:20
**evidence** 22:18
28:5 56:23 57:17
58:2 94:9,13,17
96:9 123:23 124:1
128:5 129:6 130:8
**exact** 33:6
**exactly** 32:11,16
58:8
**exaggeration**
40:17
**examination** 3:5
5:14 144:20
**examined** 5:12
**example** 14:22
82:17,22,23 83:7
139:23 140:4
**examples** 19:25
**excellent** 6:8 8:8
9:18 11:17 13:18
52:4 89:7 118:17
**excerpts** 125:20
**excuse** 75:18
82:20 86:5
**executed** 102:19
133:17 134:5
143:11
**executive** 118:3
**exercise** 41:10
**exhibit** 3:11,12,13
3:14,15,16,17,18
3:19,20,21,22 51:8
51:9,22,23 75:6,8
75:10,10 76:9,12
89:8 96:21,22
98:17,20,22
100:13,14,15
104:8 110:16,17
111:11 116:24

117:6 118:18
120:6,7 121:17
122:2,3,18,22
124:5,6,7,7 125:18
125:19,20 129:22
130:11,12 133:3,5
133:24
**exhibits** 3:9 75:22
92:23 147:5
**exist** 23:8 56:19,21
74:23 132:9
**existed** 6:17 66:9
66:12,17,19 100:6
110:1,2 113:19
**existence** 132:5
**exists** 73:20 74:19
74:22 109:7
114:19,21
**expectations**
21:20 138:11
**experience** 19:6
21:5 50:14 80:16
**expert** 3:11,13
7:10,16 12:19
13:2,11,20 14:10
14:13 15:3,5 20:3
20:9,20 21:3,10,14
21:15 27:21 28:15
29:19 30:7,13,13
30:15 36:2 38:20
40:3,7,8,10,24
41:3,19 46:5,7,9
46:11 47:22 48:14
52:11 79:17 97:23
98:1,12 118:15
**expertise** 41:4
**expiration** 146:9
147:14
**explain** 51:5 64:17
79:14 90:4

**explained** 135:21
**explaining** 53:8
**explanation** 67:3
**explicit** 22:11,24
**express** 24:14
28:24
**expressed** 143:12
**expressing** 24:17
**extend** 68:7
**extent** 15:18,19
25:7 28:4 35:19
35:23 36:19,20
47:12,14 51:10
77:3,3
**extraneous** 5:4
**extremely** 73:3
84:7

**f**

**facilitate** 126:25
**fact** 7:20 13:8
58:21 59:10 71:5
78:1 94:14,17,23
103:25 112:11
114:8 116:20
119:8 123:6
132:14,15 134:3,4
135:5,7
**factor** 115:7
**facts** 35:5,6 47:19
72:13
**factual** 99:18
**failed** 90:23
**fails** 67:19 68:21
91:7 148:15
**fair** 11:2,15 12:18
14:16 21:7 22:24
31:10,22 33:9
34:7,13 36:9
37:24 50:21 51:13
59:18 74:8 91:2
97:20 99:9,21

103:19 108:3
114:6 120:3 128:3
132:20 133:4
**fairly** 22:21 81:13
81:13
**familiar** 9:21 52:5
**far** 28:8 53:12
67:25 69:1 74:5
105:7,16 125:10
135:16 139:9
**fashion** 54:11 86:1
**fast** 11:11,12
**faster** 9:20
**favor** 57:7
**favoring** 58:14
**fed** 70:13,14
**federal** 24:23
69:25 70:3,15,24
71:10
**feel** 50:1 107:11
126:13 129:15
**fees** 12:16 14:12
**felony** 11:24
**fiduciaries** 17:18
**fiduciary** 12:13
14:14 17:16 21:19
22:4,4,7 23:8,11
23:16,18,24 24:2,7
25:13,17,21 26:5
26:22 27:10,12,16
27:23 28:6,15,17
28:21 58:13 59:3
59:10
**field** 80:8,16
**fifth** 56:16
**fight** 26:14
**figuratively**
137:12
**figure** 31:4
**file** 18:8

[filed - further]

**filed** 17:20 52:7,19
53:19 54:4,6
75:23 133:23
147:7
**files** 18:3 80:12
**filing** 42:10
**filings** 79:10
**fill** 22:14
**final** 56:15,15
63:16
**finance** 82:18,24
83:8 85:11 110:9
**financed** 109:15
**financially** 146:1
**financing** 116:21
118:21,22 119:9
119:16
**find** 56:23 57:12
57:14 58:1,18
71:23 79:6 82:4
**finding** 107:10,10
109:16
**findings** 24:11,12
24:13,18,19 25:8
**finds** 67:18 68:20
73:13 83:23 90:21
91:3,5
**fine** 10:12 34:25
77:20 106:22
136:5 141:12,13
**finish** 86:6,11
**finished** 9:11,12
86:9
**firm** 5:22 6:13,16
6:17,19,21 7:11,12
12:3 19:19 20:21
21:1,4 24:6 25:13
25:22 26:5 27:25
28:5 32:24 34:2
34:21 35:4 36:2,7
36:13,21 37:5

38:4,20,25 39:13
39:18 40:3 42:12
42:21 46:1,6,12,14
47:21 56:13 57:21
61:16 62:21,23
63:17 66:24 67:4
67:10 71:21 72:23
73:7,21 82:15,17
82:24 83:8,15,17
84:4 85:2 86:20
86:25 88:10,13
91:9 93:11,23
94:3,18 95:3,16,17
95:22 96:8,9,16,18
102:6,8,16 103:6
107:19 108:5
119:22 127:9,11
127:12 134:25
**firm's** 62:8
**firms** 9:15,16
20:15 28:17 35:10
40:13,13 59:19
66:21 82:16 84:16
84:22,24 86:24
87:6,7,12 88:9
89:20 93:25 95:25
102:5 107:11,18
109:7 115:20
125:10
**first** 3:21 5:12
10:2 26:20 31:4
31:25 33:8,11,17
37:21 47:6 48:1
48:17 49:3,5,9,12
49:17,25 54:3,13
54:21 59:24 69:15
70:14 75:5,17
90:17 96:5 100:5
116:15 121:11
131:21

**five** 9:11 50:19,23
72:16 119:1
122:12
**fix** 47:17
**floor** 2:12 145:13
**flush** 63:21 94:8
**focused** 16:8
**follow** 54:14 88:4
138:17 140:11
**following** 123:9
144:13 145:2
**follows** 5:13
144:23
**foot** 48:2
**football** 31:7
32:14 100:25
**foreclosure** 137:16
**foregoing** 143:1
143:11
**form** 10:7 36:4
113:6 123:9,15
**formally** 119:1
**format** 16:8
**formation** 125:15
**formed** 3:17
132:17
**former** 54:22 55:1
55:2,4,7,23 56:1
60:8,12,24 61:8,10
62:24 64:12 65:6
65:7 67:1,11 69:4
72:11 73:2,22,23
73:24 74:2,14
85:22 90:14 91:13
115:22 120:15,17
135:22 137:20,21
137:22 140:8,9
**formerly** 61:20
**forming** 17:7
34:18,24 35:21
36:5,19,22 47:13

124:12
**forms** 102:2
132:19,21
**fort** 2:6 8:3 145:7
146:12 147:17
**forth** 26:8 35:7
**found** 87:25 90:5
**founder** 6:19
**four** 9:11
**fourteen** 117:1
**fourth** 70:17
**framed** 75:22
**freddie** 116:20,22
118:20 119:8,22
120:2
**free** 22:16
**freeze** 10:23
**freezes** 10:23
**freezing** 5:4
**frequently** 43:11
**friend** 33:15
**friends** 33:19
**front** 14:22 22:20
45:20 60:22 76:10
117:5,14
**full** 11:1 18:13,20
18:20 23:24 48:14
57:5 138:6,21
139:5
**fully** 138:13
**functioning** 23:9
136:14,15 137:4
138:1,10
**fund** 118:19
**fundamental**
67:14 94:1
**funding** 116:18
**further** 3:8 36:12
145:23 146:1,17

Veritext Legal Solutions
800-336-4000

[g - highland]

| g | | | |
|---|---|---|---|
| **g** 33:13 49:21 | 98:16,22 100:14 | 140:1,4 141:4,8,12 | **hcmlp** 3:13 118:25 |
| **game** 100:25 | 100:16 101:10 | **goldich** 33:13,14 | 123:11 |
| **gaps** 22:14 | 104:23 116:13,25 | 33:20,24 34:15 | **hcre** 89:17 121:22 |
| **gas** 107:1,2,8 | 117:2,4 118:17 | 37:9 | 127:2,3 128:18 |
| 108:1,17 109:5 | 120:4 122:3 124:7 | **gong** 124:22 | 131:2 |
| **gears** 29:5 | 125:19 128:8,9 | **good** 5:17,21 27:5 | **hcrep** 123:11 |
| **general** 55:11 | 129:21 130:12 | 42:19 50:18 | **head** 126:7 |
| 58:16 91:23 92:1 | 132:3 133:5 136:6 | 105:12 126:15 | **heading** 52:22 |
| **generalized** 72:15 | 137:6 138:18 | 127:8 134:2 | **hear** 39:4 |
| 73:4 | 139:19 | **gotten** 117:13 | **heard** 49:15,17 |
| **generally** 22:9 | **goes** 25:23 43:10 | **gould** 5:18 52:13 | 118:10 |
| 48:8 127:12 | 73:11 | 123:3 127:19 | **hearing** 24:20 |
| **generous** 45:16 | **going** 7:2,22,24 | **governing** 81:1 | 28:24 29:7 52:12 |
| **getting** 62:6 86:3 | 8:19,23 9:19 | **grant** 75:18 121:4 | 82:5 135:13 |
| 100:7 113:7 | 11:14 13:10 14:21 | 144:24 | **heart** 62:6 86:4 |
| **give** 11:5 19:25 | 15:24 20:19 23:25 | **great** 11:4 31:15 | **helen** 122:24 |
| 20:8,18 21:8 32:8 | 24:1,14,15,20 25:2 | 50:23 54:17 94:6 | 123:8 |
| 35:12 36:6 37:7 | 25:4,11,12,24 26:4 | **greater** 75:21 | **help** 118:19 |
| 38:16 48:9 54:15 | 26:19 28:3,5,7,16 | **grievance** 17:20 | **helped** 126:25 |
| 54:15 61:4 80:22 | 28:18,23 29:7 | 18:4,7 | **helpful** 35:1 |
| 80:23 89:10 91:2 | 30:9 32:3,3 33:2,6 | **grievances** 18:2 | **hereto** 1:20 |
| 96:25 105:3 121:9 | 34:16 35:1,17 | 19:1 | **high** 48:2 |
| 126:1,5 131:24 | 36:6 37:9 45:15 | **ground** 9:19 68:5 | **higher** 98:1,12 |
| 136:1 138:20 | 45:16 46:10 47:11 | 135:11 | **highland** 1:3 2:9 |
| 139:3,23 140:4 | 47:22 50:17 51:4 | **group** 18:11 | 3:11 5:23 32:24 |
| **given** 26:17 47:22 | 51:6,8,9 52:20 | **guess** 9:4 74:7 | 35:10 38:5,9 39:1 |
| 140:5 143:13 | 53:2 54:13,18 | 103:13 126:8 | 39:8,18 40:1 |
| 144:16,25 | 55:16 59:22 62:15 | | 42:13,14 47:5 |
| **gives** 22:24 | 63:22 65:10,10,16 | h | 52:10 66:12 67:6 |
| **giving** 20:11 82:22 | 69:2 73:3,14,17,18 | **h** 6:11 33:13 | 89:18 94:2 97:5 |
| 126:13 | 73:25 75:3,9 76:8 | **half** 34:2 118:23 | 98:23,24 100:3 |
| **go** 9:20,24 15:25 | 76:17,21 77:2 | **hall** 88:3 | 102:25 103:4,25 |
| 31:17,17 37:19,20 | 79:11 80:14,17 | **hand** 5:8 143:13 | 104:20 105:15,21 |
| 38:18 49:7,8 | 81:8,23 99:1 | **handle** 95:3 | 106:15 107:12 |
| 50:13 51:16,23 | 100:16,16 101:11 | **handled** 95:4 | 111:19 120:22 |
| 54:2,12,20 57:23 | 106:1 110:22 | **happen** 10:23 | 121:1,3,6,11,19 |
| 57:24 69:2 73:6 | 117:2,3 120:8,19 | 43:17 71:19 140:6 | 127:2,3,15 128:1 |
| 74:5 75:10 84:14 | 123:2,7 124:15 | **happened** 38:16 | 128:16 129:4,6,17 |
| 86:11,13 89:7,13 | 125:1 126:4 128:8 | 118:13 | 131:5 132:6 144:3 |
| 89:14 92:16 98:15 | 133:5,21 136:4,6 | **happy** 29:1 | 145:10 148:3 |
| | 138:16 139:19 | **hazardous** 67:8 | |

Veritext Legal Solutions
800-336-4000

[highland's - intellectual]

**highland's** 66:18
**highlighted**
  126:17,17 128:13
**highlighting** 51:10
**highly** 60:15 74:10
**historically** 56:22
**history** 136:9
**hold** 20:19 33:6
  101:4 117:3,21,21
  138:12
**holdings** 120:9
  123:10,15
**home** 8:4,11
**honestly** 121:15
**hope** 23:10
**hopefully** 9:20
  141:6
**hostile** 55:6 56:1
  60:12 61:10,20
  62:2,20,24 63:1,9
  64:12,24 68:24
  69:4 74:2,13
  85:22
**hostility** 69:8
**hour** 50:18 97:10
  97:21 122:7
**hours** 43:7 48:11
  144:24
**house** 94:18
  127:25
**hrce** 119:1
**huh** 11:6,6
**hundreds** 48:11
**hunton** 127:9,11
  127:14,18,22
  128:4
**hypothetical**
  62:13 67:17 86:16
  86:18,23 90:21
  91:3 95:17 105:19
  106:13,15,19

107:25 139:4
**hypothetical's**
  23:23

**i**

**idea** 22:22 31:15
  43:8 138:1
**ideas** 41:12
**identification**
  51:22 75:8 96:21
  98:20 100:13
  110:17 116:24
  122:2 124:5
  125:18 130:11
  133:3
**identified** 81:19
  90:17 91:23 97:12
**identify** 6:8 38:11
  39:16,24 44:12
  55:20,24 76:12
  79:25 80:19
**identifying** 17:4
  60:3
**identity** 143:10
**ignore** 23:2
**ignored** 23:12
**illinois** 87:21
  88:14
**illusion** 63:22
**images** 54:19
**imagine** 64:22
  72:22,25 102:6
**immediately** 43:22
**implicates** 131:20
  137:21 138:21
**implications** 99:10
**importance** 21:21
**important** 22:2,18
  23:11 25:14 31:8
  80:14 84:8 99:13
  112:5 120:20
  135:25 136:14

137:24
**inaccuracies** 5:6
**inaudible** 31:11
  41:20 43:16 47:9
  79:21
**inaudibles** 5:5
**incapable** 79:13
**incentives** 138:20
**include** 13:24
  22:15 74:9
**included** 28:25
  66:8 91:16 104:9
  109:3 119:2
**includes** 10:15
  13:24 17:3 63:4
  90:16 134:10
  145:2
**including** 89:5
  91:14 92:22
**income** 66:25
**incorrect** 48:9
**indefinite** 48:8
**independent** 54:24
**indicate** 119:8
  127:21
**indicated** 13:23
  127:22
**indiscernible** 5:5
  133:11
**individual** 35:2
  66:9 93:23,25
  104:16 105:1
**inextricably** 132:8
**information** 4:1
  34:17,23 48:22,24
  49:1,6,13,18 50:5
  50:9 55:1 56:19
  56:25 57:2,9,11,18
  57:24 58:3,16
  128:23 131:23
  136:16,19 138:21

144:25
**informed** 59:9
  136:17 139:22,24
  140:2
**inimical** 55:7 56:2
  60:12 61:10 64:12
  69:5 74:2,14
**initial** 48:7 49:24
**initially** 47:23
  66:12
**input** 53:5
**inside** 126:7
**instance** 1:13
  19:22 30:8,14,21
  45:8 71:11
**instances** 60:19
**institutes** 119:5
**instructing** 35:24
  36:14 47:16
**instruction** 50:2
**instructions** 49:2
**instrument** 143:11
**instruments** 66:9
**insurance** 84:20
  84:25 85:2,12
  95:18,19
**integrated** 67:14
  67:18 81:25 82:7
  82:10,12 84:2,3
  92:25 101:20,24
  108:12 109:11
  110:3 112:3,24
  113:15,17,18
  114:14 115:8
  119:14 131:15,18
  132:22 134:7
  135:7
**integration** 115:12
**integrity** 136:1
**intellectual** 82:25
  83:9,11

Veritext Legal Solutions
800-336-4000

[intent - kind]

**intent** 52:11
**intention** 13:15
**interactions** 39:13
**interest** 18:9 27:14
  55:7 57:7 60:13
  61:11 62:20 63:2
  63:9 64:13,24
  69:5 100:23
  130:23 131:3,6
**interested** 20:21
  146:2
**interesting** 18:23
  90:6
**interests** 56:2
  58:14 61:20 62:21
  63:25 66:3 68:24
  74:3,14 95:5,25
  102:25 112:13
  120:14 134:11
  135:21
**interference** 79:20
**internal** 123:7
**international**
  40:13
**internet** 5:3
**interplay** 58:10
**interpretation**
  76:22,23 78:7
  115:18
**interpreting** 79:22
  79:22 81:20
**interrupt** 37:18
  86:6,7
**interrupted** 19:12
  86:15
**intuitively** 136:7
**invent** 22:14
**investigate** 60:4
**investigation**
  18:11

**investigator** 18:10
  19:8
**investigators**
  18:20
**investment** 92:19
  121:23
**investor** 96:8
  109:25
**invite** 13:16
**involve** 16:2,4,13
  83:10 95:4 127:7
**involved** 13:4,5,7
  13:10 32:22,24
  36:16 41:10 48:23
  50:8 53:7,8 65:25
  66:1,21 78:20
  80:8 84:16 85:14
  88:17 93:8 94:10
  96:10 100:23
  101:5 102:18,21
  102:22 103:10
  105:14 106:17
  107:13 115:20
  118:11 125:12
  127:24 128:2,4,6
  129:3 135:5
  136:12,13
**involvement** 40:11
  102:8 125:11
  128:14 134:20
**involving** 14:23
  15:21 39:1,8,18
  46:9 86:18 109:14
**ip** 85:12
**iphone** 32:11
**irrelevant** 61:21
  115:4 140:5
**issue** 56:10 73:19
  84:8 85:11,20
  96:16

**issued** 70:9 71:2
**issues** 10:22 12:16
  36:7 67:8 84:9
  85:12,14 95:18,19

**j**

**jae** 122:25
**james** 47:1,3
**jeffery** 42:6
**jeopardy** 85:3
  86:21
**job** 1:22 11:4
  143:25
**joggled** 117:12
**john** 42:4
**joint** 57:3,3,7,11
  57:21 58:14 92:18
  139:14 140:6,8,9
**jointly** 57:6,18,25
  58:12
**jones** 2:11 5:22
  145:12
**judge** 61:25
**judges** 18:21,22
**judicial** 73:18
**july** 31:20
**jumble** 35:7
**june** 31:18 33:5,7
  37:23 118:7,10
**jurisdiction** 17:10
  17:11,12 41:13
  58:17 69:23 88:18
**jurisdictions** 16:7
  17:2,9,14,15 51:19
  88:1

**k**

**k** 2:4 6:11 145:5
**kbrown** 2:13
  145:14 148:1
**keep** 12:7 14:3
  22:3 24:22 43:9

95:3 137:24
**keeps** 43:9,25
**kehr** 1:8,12 3:4,12
  5:11 6:6,10,12,13
  6:23 8:13 10:13
  11:22 13:13 17:5
  20:17 21:25 23:14
  25:10 26:13 27:18
  28:13 29:2,15
  31:17 34:16 35:18
  36:7,24 39:6,22
  40:22 41:18 42:1
  42:21 47:17 49:22
  50:14,25 52:1
  55:15 61:1 62:7
  63:21 65:9 68:14
  69:13 72:16 73:11
  75:3,10,24 76:9
  77:6,23 78:24
  80:19 86:3,11,14
  89:1 96:22 98:21
  100:15 101:11
  103:18,23 116:16
  117:3 118:1
  121:15 122:15,19
  124:7 125:19
  126:5 128:9
  129:12 132:10
  140:12,18,20
  141:1,7 142:2
  143:1,5,9 144:8,14
  147:1 148:4
**ken** 29:10 103:22
**ken's** 32:2,20
**kenneth** 2:10 5:21
  145:11
**key** 118:20,22,23
  132:4
**kim** 122:24 123:14
**kind** 10:12 31:8
  48:2,7 63:3 69:4

[kind - litigator]

69:14 106:21
**know** 8:10,16
12:10 13:13 14:20
16:14 17:22 18:3
21:4 22:4,5 29:10
31:3,8,9,14,15
34:1,7,10 35:3
38:19,22,23 42:11
42:15,17,19,22,23
43:1,5 44:6 47:3
49:14 51:13,25
54:8 65:8,8,14
66:24 70:9 71:14
71:16 74:7,10
76:24 79:2,6
83:14 85:11,12,13
85:18 90:9 107:2
108:13 110:18,19
117:10 120:25
122:20 125:10
126:5,6,6,9,14
129:24 132:14
134:22 136:5
139:18,24 140:12
140:22,25
**knowing** 55:17
78:17 116:22
**knowledge** 13:19
118:13,16
**known** 37:9 71:20
95:23 119:1 143:9

**l**

**l** 1:8,12 3:4 5:11
33:13 142:2 143:1
143:5,9 144:8,14
147:1 148:4
**l.p.** 1:4 144:4
148:3
**la** 2:10 33:16
145:11

**label** 99:2
**labeled** 98:23
**language** 69:18
71:23,24
**lapse** 114:25
**largely** 20:14
**latham** 2:16 6:2
145:17
**lauren** 2:4 5:19
75:19 145:5
**lauren.drawhorn**
2:8 145:9
**law** 5:22 6:13 9:4
9:15,16 12:3,16
20:15 21:22 30:2
40:13,13 46:6,12
47:21 55:12 56:13
57:21 62:23 63:17
66:21,24 67:4,10
71:16 72:23 73:7
73:21 81:1 82:15
82:15,17,24 83:8
84:16,21,24 85:2
86:20,25 88:10,15
89:20 93:11,23,25
94:18 95:22 102:6
102:8,16 103:6
115:20 119:21
127:9,11
**lawsuit** 12:2
134:24
**lawyer** 9:13,19
12:14 14:15 18:8
18:13 20:14 22:9
22:23,25,25 27:12
29:25 30:5,6 48:9
48:10 54:22,24
55:1,6,8,25 56:2
57:3,4,7,8,10
58:14 59:9 60:7
60:11,13,17 61:11

63:2,5,7,7,8,10
64:1,10,13,17,18
64:19,22 69:8,10
72:10,22 73:1
74:13,15 81:8
82:8,25 83:7 84:9
85:6,9,11,15,21
90:14 91:15 93:11
120:17 136:16,18
136:20,24 137:2
137:11,20 138:14
140:7
**lawyer's** 14:11
15:6 49:1 50:2
59:10 137:3
**lawyers** 9:15,16
9:17 12:13 17:17
18:20,24 19:5
20:15 21:21 22:18
23:8 34:2,20
37:13 47:13 58:13
59:3 72:12 81:1
81:10,11 82:11,14
82:15 83:3 85:5
85:25 89:19 94:18
120:12 136:8,9,11
136:12,19 137:22
138:10,13,21
**laymen's** 94:23
**lead** 119:3
**leads** 17:6
**lease** 107:1,2,8
108:1,17 109:5
**led** 50:11
**lee** 122:25
**left** 15:8
**legal** 12:15 21:20
21:22 23:9 36:7
65:25 84:9 94:3
98:2,5 129:4
136:14 137:4,4

138:1,10,11,19
146:10 147:15
148:19
**lender** 91:17
107:23
**lenders** 95:7
**letter** 3:12 31:13
31:18 32:1 75:20
97:8
**level** 18:9 25:18
27:24 48:2
**liability** 130:13
133:9
**licensed** 51:17,20
**limine** 30:20
**limit** 36:15 85:15
**limitations** 30:18
30:19 59:8
**limited** 30:13,15
35:19 83:17 84:8
93:23,25 130:13
133:8
**limits** 119:18
**line** 53:22 62:7
68:19 77:2 126:20
126:21,22 128:12
129:24 142:5
**list** 75:11,21,25
76:15,15,15,18,18
77:7 92:13 111:1
**listed** 92:5 121:12
**listen** 30:10
**lists** 76:12 123:10
**litigation** 9:14
19:18 21:10,15,17
21:18,23,24 52:6,7
136:13 137:15,15
137:19
**litigator** 9:8 19:10
19:13

Veritext Legal Solutions
800-336-4000

[litigators - martin]

**litigators** 19:6
**little** 11:11 17:14
  30:9 44:3 46:8
  51:10 60:5 75:4
  100:24,24
**live** 26:6 31:22
  72:5
**llc** 3:20,21 5:20
  6:3 66:3,15,17
  89:20 92:18 94:5
  94:10,15,20 95:13
  96:5,11,17 101:3,5
  101:12,13,18,24
  102:9,17,19,23
  103:7,8,11 107:17
  107:19 108:6
  109:20 112:2,13
  112:24 113:5,21
  113:25 114:8,12
  114:19,20,23
  115:2,14 116:4,9
  118:4 119:1,1,13
  119:20,25 120:13
  121:22 123:10,14
  123:15,19,23
  124:2 126:21
  127:6,10,23
  128:17,19 129:3,5
  129:8,10,18,25
  130:3,5 131:1,14
  132:4 133:17
  134:12,20 135:1,6
**llc's** 3:17 123:9
**llp** 6:2 52:13
**loan** 3:14,15 49:15
  49:20,21 66:1,11
  66:13,14,18 83:18
  83:25 89:18 92:20
  92:24 93:2 95:15
  96:2,19 100:4,17
  101:3,19 102:9,18

102:22 103:23
104:3,20 105:9
106:3,12 107:5,14
108:7,8,10,13,15
109:6,8,21,23
110:1,9,12 112:2,8
112:12,17,24
113:10,14,18
114:2,4,21,22
115:25 116:17
118:22,24 119:3,4
119:13,17,19
120:20,21,24
121:2,16,24
129:10 131:11,14
131:19,20 132:5,7
132:16 134:16,17
**loans** 118:21
  119:23
**located** 6:21
**logic** 41:12
**london** 2:15 6:3
  145:16
**long** 6:15 23:9,22
  56:15,17 59:24
  69:19 70:19 136:2
**longer** 110:20
**longterm** 98:8
**look** 31:3 41:12
  42:22 56:13 58:9
  58:10 59:25 62:4
  69:6 72:8 81:16
  85:18 108:13
  111:4 126:1
  133:22,24
**looked** 22:13 45:8
  45:12 76:25 77:11
  78:17 79:3 80:1
  81:20 95:22 99:20
  104:14 111:22,25
  124:13

**looking** 44:12
  63:12 78:5 80:25
  87:21 97:8 120:6
  121:16 128:12
**loose** 129:1
**looser** 129:9
**los** 1:18 2:12 6:22
  8:9 31:9 145:13
**lost** 14:19
**lot** 132:11 135:11
  140:16
**lots** 27:2 71:18
**loves** 82:18,23
**lower** 98:7
**lowest** 98:8
**loyal** 136:20
**loyally** 138:8
**loyalty** 23:24
  27:11,13 54:23,25
  56:9,19,20 57:5
  58:11 60:17 61:6
  69:11,12,12 72:9
  73:19 84:8 85:20
  87:8,14 91:13
  102:12 109:18
  115:20 116:1,6
  135:18,21,23,24
  136:22,24 138:2,5
**lp** 100:3 103:25
  106:16 111:19
  120:9 121:11,20
**lp's** 52:10
**lsc** 2:14 145:15
**lw.com** 2:19
  145:20

**m**

**ma'am** 116:15
  122:6
**mac** 116:20,23
  118:21 119:9,22
  120:2

**machine** 1:17
**madam** 75:5 98:15
  100:15 124:6
**mail** 2:7,13,19
  145:8,14,20
**main** 119:4
**maintain** 57:22
**maintenance**
  135:25
**majority** 78:1
**making** 26:15 28:2
  94:2 112:1 119:12
**malpractice** 84:12
  85:1 86:19
**man** 34:8,9
**management** 1:3
  2:9 5:23 32:25
  52:10 97:5 100:3
  103:25 106:16
  111:19 121:11,20
  144:3 145:10
  148:3
**manner** 139:17
**march** 133:9,12
**mark** 3:19 100:15
  122:24 124:6
  125:21
**marked** 51:22
  75:6,8 89:8 96:21
  98:18,20 100:13
  110:17 116:24
  122:2 124:5
  125:18 130:11
  133:3
**marking** 122:4
**martin** 2:4 3:5
  5:17,18,18,24 6:5
  7:6 15:17 23:13
  24:21 25:3,6 26:3
  26:9,11,12 27:18
  29:8 35:25 36:9

Veritext Legal Solutions
800-336-4000

[martin - nationwide]

52:13 74:21 76:2
76:5 77:9,15,20
80:17 86:7,13
103:19 121:5,7
122:6,10,13 123:3
127:19 140:19
141:3,12 144:24
145:5
**mashing** 29:5
**massachusetts**
40:20 88:14
**matejcak** 124:22
**material** 57:9 67:8
**materials** 38:25
39:7,10,11 48:13
79:13
**matt** 122:24
**matter** 7:8,15 13:1
19:17,23 21:24
24:20 26:4 35:10
36:8 37:6,7 38:12
38:25 39:16,24
40:5,6 43:25 44:1
46:2,3,5 55:5,6,24
55:25 60:9,11,18
61:9,17,23,25 62:2
62:5,10,15,24 63:4
63:6,19 64:3,7,10
64:15,19 65:12,16
72:10,19 73:10,14
86:4 91:1,5 99:3
102:25 106:6
135:13 136:25
137:1,13,13,23
139:13,14,17,20
140:9
**matters** 12:10,19
13:19 14:10 15:20
19:7,9 20:16
35:14,20 37:17
38:11,21 39:8,17

47:12 66:5,6
103:5
**matthew** 117:9
**mcdermett** 124:23
**mcgrander** 3:22
**mcgraner** 117:10
122:24
**mcgraner's** 117:1
118:2
**mckenzie** 124:22
124:22,23 125:5,9
**mclaughlin** 2:16
5:24 6:1,2 145:17
**mean** 19:20 22:5
31:7 33:19 44:16
60:6 61:25 75:24
80:6 86:7 95:15
101:7 126:24
**meaning** 70:6,14
**meaningful** 68:8
**means** 57:6 126:24
137:8
**meant** 93:14
**medical** 11:18
**member** 17:25
130:22
**memories** 32:16
**memory** 31:23
37:15 40:4 117:12
**mental** 11:17 34:5
**mentally** 106:11
**mentioned** 81:3
94:7 132:15
**merit** 19:2
**met** 6:23 33:18
**mind** 32:10 82:6
95:3 134:6 137:25
**minority** 20:7,14
**minute** 43:23,23
75:18

**minutes** 26:20
50:19 72:16
122:12 144:24
**mischaracterizes**
120:23
**missed** 82:20
**missing** 72:20
101:14
**misstatement** 25:3
25:5,7
**misstatements**
24:25
**misunderstand**
90:24
**misunderstanding**
121:12
**misusing** 56:24
**mitts** 124:23
**mixing** 84:6
**model** 16:8,23
17:7,10
**modified** 17:10,12
**moment** 12:17
14:17 32:9 35:13
38:17 54:16 64:17
81:3 89:10 102:6
115:10 121:9
126:1,1
**monica** 2:11
145:12
**month** 20:5,6
45:25
**months** 31:21 35:3
37:25 38:4 80:21
109:2 114:8,11
115:14 116:6
124:2 133:18
134:5
**monument** 120:8
**moral** 11:25

**morning** 5:17,21
135:16
**morris** 42:4
**mortgaged** 93:1
111:15
**motion** 7:11,16
35:11,16 36:14,16
37:6 38:6,10 39:2
39:9 47:8 52:12
75:13
**motions** 30:20
56:12
**mouth** 13:15
55:16
**move** 29:11 52:21
81:23 110:15
122:18
**multi** 40:13 66:15
**multifamily** 66:16
66:16 106:18,24
107:3 123:9,15
**multiple** 12:9
41:17 49:15 50:10
92:23

| n |
| --- |

**n** 3:1 69:22
**name** 6:1,10,17
7:2,6 33:10,22
44:25 46:14 66:16
130:22 142:2
143:11
**names** 11:21 46:15
47:23
**narrow** 22:22 56:8
91:11
**narrower** 74:9
**national** 16:6
90:13 118:20
**nationwide** 16:6
40:12

Veritext Legal Solutions
800-336-4000

[nature - opinion]

**nature** 18:6
**necessarily** 102:22
138:21
**necessary** 82:5
**need** 23:10 25:19
26:12 28:13,21
29:2,5 45:19
49:22 51:25 58:9
64:17 66:18 79:6
82:3 88:3 103:13
103:20 105:17
129:15 136:15
**needed** 66:13
92:19
**needs** 36:17 56:12
136:16
**negotiate** 94:14
102:16
**negotiated** 94:19
103:7
**negotiation** 89:18
92:20 94:5,10
129:8
**neither** 77:18
145:23
**nevada** 40:21
**never** 15:19 19:9
19:16 20:12 23:11
30:23 34:5 40:4
118:10,15
**new** 2:18,18 8:14
22:14 25:18 35:6
40:20 43:25 87:21
96:8 102:6,16
109:25 110:11
145:19,19
**nexpoint** 2:3 5:20
7:7,12 117:15,16
117:22 118:3,25
145:4

**nice** 46:19 50:17
**night** 101:1
**nine** 84:21,24
86:24 87:12 88:9
**noise** 5:4
**non** 9:14 21:18,24
73:1 137:15,17
**nonresponsive**
15:17 23:13 74:21
80:18 88:8
**normal** 18:22
97:21,22 98:1,5
**north** 40:18
**northern** 1:1
70:12 144:1
**notarize** 148:11
**notary** 143:17
**note** 5:1,1 110:2
148:9
**noted** 141:3,7
143:2
**notes** 37:13
**notice** 22:25 95:12
**noticed** 75:4
**nrea** 118:6
**nrep** 119:3,3
**number** 14:8
20:11,19 33:17
66:11 75:1 81:5
81:14 85:13
123:18 133:23
**numbered** 1:14
**numbers** 133:21

---

**o**

**o** 33:13 69:22,22
**oakland** 8:12
**oath** 51:2 89:2
122:16 128:23
130:9 143:10
**object** 23:13 28:8
47:11 77:2 80:17

88:7
**objecting** 25:7
**objection** 15:17
24:12,22 25:23
39:20 41:22 44:23
47:17 74:21 77:20
117:21 120:23
**obligated** 57:10
**obligation** 59:2
77:16 100:4
102:12
**obligations** 138:5
**obtain** 99:4
**obtained** 50:9
**obtains** 57:8
**obvious** 136:7
**obviously** 35:20
**occasions** 41:17
**occurred** 108:20
113:20,22,24
115:14
**octc** 18:14
**offer** 28:16 30:5
**offered** 28:5
**offering** 21:6
**offhand** 15:16
20:2 40:17 42:16
42:19 45:14 81:1
92:4
**office** 8:3,5,11
18:12 19:4 143:13
**officer** 144:15
145:1 146:20
**officer's** 147:3
**oh** 8:6 9:10 14:20
30:3,17 31:15
41:6 43:8
**oil** 107:1,2,8 108:1
108:17 109:5
**okay** 9:25 12:25
24:4 26:12 27:1

29:8 32:5,13
33:22 34:25 35:14
37:20,21 38:18
41:1 42:1 43:20
44:19,21 45:7
46:17 49:8 50:20
51:23 54:20 55:18
59:18 60:1 65:1
67:17,21 68:2,19
68:25 70:9,22
75:3,9 77:20
80:17 81:18 85:24
87:6 90:4 92:5
101:9,15 105:11
110:20 114:7
117:8,9 122:12
125:8 126:14
127:6 132:20
133:1,14 140:3,16
140:19
**older** 70:25
**once** 10:14 12:21
15:2,3 115:24
119:17
**ones** 12:24 94:19
**online** 18:7
**open** 14:22 15:20
54:18 61:4 96:25
98:25
**opened** 117:8
**operate** 60:24
**operating** 26:17
**opine** 24:20 25:25
26:19 111:6
**opinion** 20:22 21:6
24:14,17 28:24
29:20 30:13,15
35:21 36:4 39:7
45:1 53:10 56:4
58:23 61:24 65:16
68:21 70:10 72:14

Veritext Legal Solutions
800-336-4000

[opinion - patrick]

75:2 78:9,12 79:5
79:8,8 80:15 81:2
81:9 82:5 83:25
84:6 88:20 89:25
90:23 91:7,22,25
93:21 94:22
100:20 101:17,19
101:20,23 103:9
103:24 106:1
109:19 110:14
112:2 116:6
119:12 120:19
126:10 131:14,17
131:24 132:18,19
132:22 134:7
135:4,6,20,22
136:17,19
**opinions** 7:17 26:7
34:18,24 36:6,19
36:22 47:13 52:23
53:1,9,13 54:4
58:22 68:16 72:1
76:16,19,23 77:12
78:2,6,7 79:1,22
80:1,4,5,13,20
81:15,21,24 89:9
92:14 99:8,12,14
99:17,17,21,23
100:10 101:2
102:3 124:12,14
125:24 126:14
130:17 135:12
140:22 141:1,9,10
**opportunity** 61:4
76:24
**opposed** 68:10
**opposing** 26:18
**opposition** 76:1
**oral** 1:7,12 144:15
**order** 34:4 45:19
56:13 106:10

117:2 138:12
**organization**
128:2
**organizations**
17:24
**original** 3:20
71:22 96:2,19
101:7,12,18 102:9
102:18,19,21,22
105:6,14,23 109:4
114:13 115:1,15
115:25 127:23
128:17,19 129:18
130:13 131:1
133:18 134:12,16
134:17 146:19,25
147:4
**originally** 36:25
106:3 139:15
**outcome** 46:22
146:2
**outside** 12:3,14
14:15 57:23 60:19
126:9 140:7
**overall** 67:5,10
**overstated** 26:23
**overview** 48:3,10
**owe** 59:3
**owes** 54:22 57:21
**ownership** 62:20
66:3 95:5,25
105:21 107:17
109:2 110:5
112:13,16 113:4,9
113:13 123:10
131:9 134:15

**p**

**p.m.** 1:16 88:25,25
122:14,14 124:17
141:14

**pachulski** 2:11
5:22 34:21 35:20
47:13 71:21 100:5
145:12
**package** 67:10
102:13
**page** 3:10 4:2
52:21 89:16 92:17
100:17,17 111:12
111:13,14 126:16
128:10 129:21
130:19 133:14,21
133:22,23,24
142:5 146:23
**pages** 110:18
148:12
**paid** 42:13,18,24
**painted** 88:20
**pandemics** 9:23
**paper** 95:24
**paragraph** 56:17
97:9 117:12
118:18,18
**paraphrase** 81:10
**part** 9:13 18:15
20:14 41:8,14
46:10,13 50:14
58:11 66:7,20
67:10 69:6,10
74:12 75:25,25
76:7 81:24 87:13
91:6 93:9 94:24
94:25 95:2,3
98:18 99:7,18,18
100:20 101:20,24
102:2 103:23
104:7 105:5 107:3
107:4,14,24
108:12 109:10
110:23 112:24
119:19 131:13

135:14 136:15
**partial** 80:23
**participants** 54:20
67:7
**participated** 8:20
8:24 80:4
**particular** 6:16
49:14 50:10,11
79:8,12 80:13
84:9 98:10 138:6
**parties** 78:21
102:7 106:2
107:22 121:24,24
127:1,5 145:2,24
147:7
**partly** 54:19
**partner** 6:13,15
33:1,11 34:10,11
44:2
**partners** 2:3 5:19
5:20 7:7,13 32:2
32:20,24 118:25
119:1 121:22
145:4
**parts** 44:6,7 82:12
87:9
**party** 12:2 77:18
107:7 111:19
120:9,22 121:1
128:15 144:22
**pass** 140:16
**passes** 42:13
**patches** 18:22
**patience** 9:24
29:16
**patient** 10:25
**patrick** 3:19
122:25 125:21
126:6,8 128:23
130:9

Veritext Legal Solutions
800-336-4000

[patrick's - previously]

**patrick's** 126:7
128:13
**paul** 122:23
124:19
**pause** 62:1
**paused** 44:20
**paying** 42:23
**people** 20:12
32:13 34:4 35:4
123:3,8 125:2
138:2,6
**people's** 32:16
**percent** 123:11,12
131:3,6
**percentage** 20:8
123:10 130:23
131:3,6 134:11
**percentages** 131:9
134:15
**percipient** 12:22
13:1 15:3
**perfect** 75:16
**performing** 43:13
**period** 41:15 50:9
**permitted** 30:7
136:8 137:20
**person** 143:11
**personal** 12:3
44:10 50:19
118:13,16
**personally** 19:18
44:8 143:9
**persons** 118:11
**pesky** 136:11
**peter** 124:22
**phillips** 2:5 5:18
52:12 56:24 57:15
58:2 61:3,6 65:4
65:14,21 68:4
76:3 89:17 91:4
94:9,14 95:12

102:17,21,24
103:9 104:20
105:9 106:2,5
107:6 115:24
116:7 118:13
123:3,23 124:2
125:2,6,11 127:19
128:5,14,16,18
129:2,7,17,25
130:3,5 131:19
134:19 135:5
145:6
**phone** 38:17
**phonecall** 100:2
**phonecalls** 32:20
**phrase** 90:6,7,8
**phrased** 72:12
**phrasing** 63:16
71:20 87:24
**phrasings** 87:22
**physical** 11:18
**physically** 34:5
**pick** 65:13 120:4,8
**picking** 26:13
**picture** 32:10 34:5
**piece** 95:24
**pieces** 66:11
**place** 66:15 110:11
**places** 74:19
**plan** 135:12
**play** 72:14 80:11
138:11
**players** 47:23 50:8
**please** 5:1,7,15 6:9
26:24 32:17,17
37:20 69:21 82:21
86:12,13 98:17
100:15 123:9
124:6 126:22
135:17 136:6

**plural** 59:12,13
95:11 118:21
**poetic** 71:19
**point** 8:13 10:13
26:15 27:20 53:14
53:17 54:13,21
59:24 89:15,15
90:17 91:2 92:12
92:17 93:6 94:6
101:15 102:23
106:22 108:9
111:8 113:16
119:4 120:3
123:18 132:4
**pointed** 110:25
**pointing** 90:25
**pomerantz** 42:6
**poor** 5:2
**popped** 65:22
**pops** 81:13
**portfolio** 93:2
111:15 112:9
**portion** 104:21
**portions** 128:13
**position** 10:16,20
36:1,10 55:6 56:1
60:12 61:10,16,19
62:8,24 64:12
65:10 66:22 67:1
68:3 73:25 74:2
74:13 77:10 83:15
83:20 102:20
114:11 115:24
**positions** 102:20
103:17
**possesses** 55:1
**possible** 16:15
23:22 30:18 47:24
60:3 73:8 140:25
**possibly** 21:12
30:19 39:11 80:3

**potential** 47:21
48:14 85:17
**pour** 97:13
**power** 137:17
**practical** 37:15
127:8
**practice** 9:5,6,7,14
9:14 19:20 20:3
20:10
**practicing** 9:4
**precise** 133:11
**precisely** 21:18
**preexisted** 69:25
**preliminary** 39:7
**premiss** 17:16
67:14
**preparation** 92:22
**prepare** 127:10
**prepared** 38:24
39:10 94:2 95:5
96:13
**preparing** 26:16
147:3
**present** 5:15 141:4
141:6,7
**presentations** 16:1
16:12
**president** 117:14
118:3
**presume** 130:16
**pretty** 9:8 38:16
45:12 60:21
**prevented** 119:24
120:1,12
**previewing** 83:13
**previous** 12:19
16:22 25:17 40:23
62:10 65:11,14
93:5
**previously** 55:8
56:2 60:13 61:11

Veritext Legal Solutions
800-336-4000

[previously - putting]

62:21 63:2,10
64:13,24 66:23
69:10 72:11 73:2
73:12 74:3,15
84:10 91:10 129:5
**price** 118:23
**primarily** 16:1,4,7
16:20,23 84:11
**primary** 9:5 58:23
59:18
**principle** 58:16
**principles** 27:10
27:11
**prior** 6:23 7:2 33:4
42:1 45:22 53:18
61:17 64:20 73:10
81:11 91:15,16
103:10 107:14,18
113:20,24 114:3
118:10 133:12
**privilege** 35:24
36:3,8 47:15
**privileged** 34:22
35:22
**probably** 9:21
11:10 23:21,25
30:4 35:3 37:12
37:13 40:16 45:12
45:19 53:14 57:10
63:4 66:8 80:5
106:8 107:9
117:12 133:16
**problem** 29:17
55:21
**procedure** 1:19
18:2,5 22:6 44:15
44:16,19
**proceed** 6:6 50:25
**proceeding** 14:23
62:9 137:18
145:25

**process** 45:21 79:7
79:15 136:13
**produce** 77:4,5,7
77:10,13,16
**produced** 1:13
31:14 77:19
**producing** 107:1
**product** 34:21
35:22,24 36:3,18
36:23 47:15
**production** 3:13
99:3
**professional** 9:17
12:12 15:13,21
17:24 18:11 19:7
20:16 22:17 27:5
30:24 33:14 37:12
40:12,15 41:9
45:2 55:3,22 60:8
61:7 80:8 89:23
**professionalized**
18:19
**professionally**
22:10
**proffered** 21:3
**programs** 16:16
16:17,18
**prohibited** 22:19
23:1 136:10
**prohibition**
140:10
**prohibits** 58:13
90:14 136:24
**project** 84:18
85:14 102:11
103:2,3,11 104:21
105:6,14,23 106:4
106:17 107:4,21
107:24,25 108:12
114:13 115:21,22
115:25 116:2,5

119:9,23 120:2
125:12 132:7,8
**promissory** 110:2
**prong** 69:12
**pronounce** 7:1
**properties** 67:9
84:20 93:1,2
95:20 105:2
108:16,20,22
109:3,9,10 110:10
110:10 111:15,15
112:10 113:23
116:18 132:3,17
**property** 66:11
83:1,9,11 105:13
106:16 109:15
110:11
**prosecution** 29:25
**prosecutor** 19:8,8
**protect** 55:8 56:3
60:14 61:12,21
62:22 63:3,10
64:14,25 74:4,15
**protected** 36:18
85:17
**proved** 143:10
**provide** 7:16 9:15
20:22 84:24 85:7
85:10 136:17
**provided** 20:20
25:10 39:7 51:24
53:1,21 66:25
67:4,7,9 75:11
84:19,22 85:3
92:13 110:24,25
116:20 118:21
**provides** 130:22
138:15
**providing** 20:3
43:2 65:25 66:2
98:2,5 129:4

**provision** 132:15
**provisions** 1:19
78:3
**prudent** 85:15
**psa's** 3:16 104:12
105:6,14 110:23
111:11,14,20
112:1 120:20
**pszjlaw.com** 2:13
2:14 145:14,15
148:1
**public** 135:25
143:17
**punch** 43:24
**purchase** 104:9,16
105:1 111:14
114:5 118:23
120:5,7
**purchased** 105:15
105:20,23
**purpose** 66:10
76:14 108:15,15
110:9 112:9,11
113:19 114:22,23
132:2,2,16
**purposes** 21:16
22:22 83:25 84:12
105:19 115:17,18
115:19 143:12
**pursuant** 1:18
144:25
**pursuing** 13:6
24:9
**put** 26:12 28:9
33:23 34:14 45:20
50:16 51:8 55:12
55:15 105:21
106:5,18,21 107:2
107:3
**putting** 13:15

Veritext Legal Solutions
800-336-4000

[qualifications - related]

| q | quick 75:10 88:4 | real 2:3 5:20 7:7 | record 1:20 5:16 |
|---|---|---|---|
| **qualifications** 20:21 | **quickly** 9:8 129:21 | 7:12 66:11 75:10 | 5:25 6:9 7:2,23,24 |
| **qualifies** 41:2 | **quite** 30:19 59:6 | 117:23 118:3,25 | 8:2 24:6,25 25:4 |
| **quality** 5:2 | 74:5 125:9 | 145:4 | 26:13,15 28:2,10 |
| **question** 17:6 | **quotation** 60:20 | **realized** 9:8 | 28:13 29:3,9,11 |
| 19:11 21:13 22:1 | 60:21 | **reallocate** 62:20 | 43:11,13,17,22 |
| 23:14 24:4 25:18 | **quote** 63:1 72:18 | **really** 38:14 65:3 | 63:24 77:21 98:18 |
| 26:1 27:6 28:22 | 90:16 | 97:22 104:14 | 103:13 141:11,12 |
| 30:10 36:24 37:16 | **quoted** 64:8 71:24 | 111:3,25 | 144:16 145:3 |
| 39:5 42:19 43:10 | 71:25 | **reason** 11:17 | **records** 44:5,12 |
| 43:17 44:23 46:19 | **quoting** 69:16,17 | 25:14 28:22 44:20 | **red** 53:22 |
| 54:3 57:13 58:1 | 70:10 | 65:12 71:8 72:20 | **redefined** 21:13 |
| 59:23 61:1,5 62:1 | | 72:21 79:5 82:18 | **referenced** 148:5 |
| 62:3 63:23 65:5 | **r** | 112:20,23 123:4 | **referring** 44:24 |
| 67:23 69:14 70:5 | **r** 6:11 49:21 | 132:5,6 136:22 | 121:4,8 125:15 |
| 72:24 73:12 77:1 | **rachelle** 44:2 | 142:5 | **refers** 125:14 |
| 77:22 78:16,19 | **raise** 5:7 140:22 | **reasonable** 22:24 | **reflect** 127:5 |
| 82:21 85:9,21 | **range** 97:23 | 85:16 | **reflects** 54:9 |
| 88:4 91:8 97:20 | **rare** 19:3 73:3 | **reasonableness** | **refusing** 46:18,19 |
| 97:25 105:4 | **rarely** 33:21 | 12:15 | **regard** 21:20 27:6 |
| 106:14 107:6 | **rate** 42:15 43:2,4,5 | **reasonably** 85:6 | 27:9 35:5 65:6 |
| 109:1 111:6 113:2 | 97:21,22 98:1,5,9 | 94:3 136:17 | 66:1,2 67:7,8,11 |
| 113:12 118:9 | **rates** 98:12 | **reasons** 136:12 | 73:20,22 85:7 |
| 121:12 126:20,22 | **rational** 138:22 | 146:23 | 94:4 95:19 102:12 |
| 126:24 127:1,6,9 | **reach** 68:11 81:20 | **rebut** 141:1 | 103:2,3,4 104:20 |
| 127:11,13 128:14 | **reached** 93:21 | **rebuttal** 140:24 | 107:12 129:4 |
| 128:17 129:24 | **reaching** 80:1,20 | 141:5,10 | 135:18 137:14 |
| 130:2 137:6 | 89:25 92:14 99:7 | **recall** 80:25 81:2 | **regarding** 15:5,11 |
| 140:11 141:9 | 99:21 115:2 | 96:12 100:4,7 | 15:20 20:9 27:22 |
| **questioning** 62:7 | 125:24 | 116:22 127:9 | 41:19 86:25 95:11 |
| 77:3 | **read** 44:14,17 45:4 | 130:4 | **regardless** 29:9,19 |
| **questions** 4:5 11:5 | 45:7,23 52:9,13,23 | **receive** 10:11 | 83:16 93:22 |
| 11:12,14 32:6,21 | 54:13 55:9,19,21 | **received** 32:2 | **registration** |
| 35:6 37:11 51:9 | 60:2,5,6 80:3 | 39:14 100:1 | 146:10 147:15 |
| 55:12,16 65:13 | 89:23 93:3 119:5 | **receiving** 48:12 | **regularly** 40:15 |
| 69:15 82:5 84:25 | 123:20 124:24 | **recess** 50:24 88:25 | **reit** 123:15 |
| 96:23 101:11 | 127:15 128:19 | 122:14 | **relate** 35:23 38:10 |
| 106:10 124:16 | 130:6 143:1 148:6 | **recognized** 56:22 | 100:10 135:1 |
| 129:1 138:17 | 148:8 | **recollection** 38:15 | **related** 13:6 15:12 |
| 140:17 | **reading** 133:14 | 114:15 | 18:16 19:22 35:10 |
| | **ready** 6:6 50:25 | | 38:5,25 46:2 55:4 |
| | 54:20 | | |

Veritext Legal Solutions
800-336-4000

**[related - right]**

55:23 57:15 58:3
60:9,18 61:9,19
62:2,10,14,25 63:6
63:15,19 64:3,7,10
64:15,20 65:12,15
67:23 68:1,4,8,10
68:21 69:3,7 72:9
72:18,25 73:10,13
91:1,5 106:10,12
107:18 108:4
109:4 113:9 116:2
116:5 119:23
137:23 139:12
145:24
**relates**  114:12,16
**relationship**  57:3
57:4 63:8 120:18
137:3
**release**  3:14 100:3
**relevance**  99:23
**relevant**  104:17,19
105:2 115:17,17
115:19 119:15
**reliance**  85:16
**relied**  77:6 92:13
129:6
**rely**  14:8 84:23
85:6 89:25 94:3
138:14
**relying**  91:21
**remember**  15:16
15:19 16:18 31:24
32:11,14 34:4
40:17 42:16 45:18
49:7,9 53:17,21,25
54:1 68:1 72:19
79:18 81:1,4,5,6,7
81:19 99:25 100:2
**remotely**  8:14
**render**  55:3 60:7
61:7

**rendering**  64:2
77:11
**renders**  55:22
**repeat**  11:13 39:4
105:17
**rephrase**  11:13
25:9 36:25
**report**  95:23
**reported**  1:17
**reporter**  5:7,15
49:19 70:15 75:5
75:7 98:15,19
100:15 116:12,14
122:4 124:6
141:11 144:11
**reporter's**  3:7
144:7
**reporters**  5:1
**represent**  5:20 6:2
7:7 8:2 10:24 99:1
100:16 102:7
110:22 116:8
123:2,7 125:1
128:16,18 129:17
139:7,8,15 140:8
**representation**
24:8 57:21 60:17
62:8,11 65:7,11,15
65:24 72:24 73:8
73:10,23,25 74:6
74:11 83:5,10,17
84:7,11 85:4,5,7
85:23 91:4 93:22
93:25 94:4 98:2
107:18 118:12
123:4 128:15
129:7 137:1
**representations**
82:7 83:4 95:6,7
95:10 107:15
140:6

**representative**
73:1
**represented**  57:6
57:19,25 58:12
83:15,16,24
104:20 106:2
139:14
**representing**  5:23
7:12 82:11 91:17
102:24 107:7
117:17,18,24
119:22,24
**requested**  4:1
**require**  39:11
67:13
**required**  22:18,25
87:18 92:21 93:19
118:24
**respect**  28:17
92:22 120:2
140:14
**respectfully**  24:21
**respective**  127:1
**response**  88:8
**responsibilities**
14:11 37:12
**responsibility**
9:17 12:13 19:7
20:16 80:9
**restate**  51:12
128:15
**restated**  133:8
**restatement**  80:25
**result**  27:14 30:20
68:11,11 110:12
118:25
**resulted**  109:25
**retained**  7:10 31:2
32:4 33:3 40:3
46:25

**retaining**  46:9
**retention**  31:13,18
32:1 33:5,5
**return**  148:12
**returned**  144:20
146:19,22,25
**revealing**  37:3
38:12
**review**  124:11
125:24
**reviewed**  38:24
39:6,11 54:4 76:7
92:6 104:7 130:16
**revolve**  81:24
**rhetorical**  77:1
78:19
**rick**  122:25
**right**  5:8 6:6 7:20
8:4,17,21 13:8,11
13:25 14:6 15:23
17:19 19:13,20,25
20:23 21:8 22:3
24:9 26:11 27:22
31:21,23 33:4
36:9 37:25 38:1,2
38:19 39:24 43:5
44:25 45:18,18
46:14 50:6,13
51:4,16,23 52:9,20
52:25 53:11 54:2
54:12,21 55:11
56:5 57:20 58:1,6
58:21 59:22 63:11
63:23,25 64:5,16
67:13 68:17 69:2
69:5,6,23 70:17,18
70:19,20 71:4,8
76:21,25 78:18
79:3 81:23 82:3
83:18 86:19,21
88:23 89:1,7,14,16

Veritext Legal Solutions
800-336-4000

[right - sees]

90:16,20 92:16
93:16,21 94:6
95:1 96:3,15,22
97:4 98:13 100:9
100:9,14 101:10
101:17 103:14,22
104:6,12 105:3
106:21,24 107:1
108:19 109:1,24
110:5,22 111:2,5
111:10,18,24
113:12 114:2,5,18
115:13 116:11,25
116:25 117:1,14
117:16 118:1,9,17
119:21 120:3,16
121:19,25 122:1,3
122:18,22 123:6
123:24 125:19
126:3,16 128:8,12
129:21 130:12,19
131:17 132:14,20
133:4 134:3,10
135:4 137:9
138:16 139:3
**rights** 13:6
**rises** 18:9
**risk** 85:17
**robert** 1:8,12 3:4
5:11 6:10 11:22
142:2 143:1,5,9
144:8,14 147:1
148:4
**robes** 18:21
**role** 126:21 129:25
130:2 137:3
138:10
**room** 5:4 10:3
51:7
**rough** 41:6

**roughly** 27:4 33:1
37:10 56:16 80:7
**rounded** 136:17
**rule** 22:9,24 23:2,4
23:5 28:19 36:17
45:1 58:7,18,24
59:2,19 62:16
64:11,15 65:17
67:25 74:1,16
77:10 78:13 84:1
87:19,25 88:11,21
88:21 90:23 91:7
93:19 119:24
**ruled** 30:6
**rules** 1:19 9:20
10:14 15:12,14,16
15:21 16:2,2,5,6,8
16:10,13,16,21,23
17:2,7,8,10 22:6,8
22:9,12,14,17,21
23:7,15,18,23 24:3
24:23 25:16 26:22
26:25 27:2,4,7,9
27:15,16,17,22
28:7,20 30:24
40:8,11,11,15,18
40:19,24 41:2,3,5
41:7,9,11,14,15,17
41:19 44:14,17,19
44:24 45:2,7,10,20
45:23 46:10,11
78:14 79:17,21
80:10 81:20 87:21
87:21,22 88:12,19
89:22 138:22
148:14
**run** 9:19 88:3
**running** 12:7
**runs** 98:24

**s**

**s** 59:16
**sake** 63:24
**sale** 104:10 120:5
120:7 137:17
**sampling** 80:13
**santa** 2:11 145:12
**sat** 19:21
**save** 29:3
**saw** 75:17 76:6
104:12 111:1
**saying** 20:13 27:23
63:20,25 64:5
69:13 86:19 100:7
106:13 140:1
**says** 52:22 62:13
63:1 65:14 78:10
110:8 112:8
114:16 118:2
123:8 133:15
**sc** 123:9
**scenario** 60:10,10
88:20
**scenarios** 60:3,7
60:14 107:20
**schedule** 130:20
131:1 133:25
134:1,10
**schedulers** 107:6
**schedules** 92:23
**scheduling** 35:6
**schiff** 6:14
**school** 71:16
**scope** 16:6 83:5
84:7,10 85:4,5,16
93:22 139:6
**screen** 10:11 52:2
54:19 75:14 89:11
96:25 98:25
110:21 117:5

**se** 66:16 106:18
107:3 123:15
**seal** 75:23 143:13
**search** 39:12
**season** 31:6,7
32:15,15
**seasons** 31:9
**second** 15:25
33:22 48:1 49:17
55:24 60:10 61:5
64:7,9 72:17
73:15 74:12 86:17
88:2 89:14 90:21
91:6 96:25 97:8
102:14 111:12
117:2 123:14,18
**secondly** 139:3
**secret** 71:18
**section** 54:8
**securities** 2:15 6:3
145:16
**see** 10:18 31:20
39:12 41:12 52:1
52:4,18,22 69:1
72:4 75:13 91:12
97:1 107:10 108:5
108:13,14 117:4
120:9 121:20
122:22,25 123:15
125:22 133:7
**seek** 69:8
**seeking** 81:10
**seeks** 112:14
**seen** 34:5 52:15
54:5,6 75:16
95:12,23 96:12
115:10 124:9
133:5
**seery** 47:1,3 97:5
**sees** 137:11

Veritext Legal Solutions
800-336-4000

[self - speakers]

self 100:23
sellman 141:5,10
sellman's 140:25
  141:1,5
semantic 82:4
send 42:12
senior 117:14
sense 28:19 78:2
sent 75:19,20
sentence 56:14,15
  56:16 59:24 60:2
  61:5 65:3 69:19
  91:6
separate 18:21
  28:7 30:10 54:24
  56:4 66:4,5 92:23
  110:23
september 1:9,15
  31:19,20 104:4,5
  105:10,19 106:18
  107:4,22 108:20
  142:3 144:9 146:4
  148:2
serious 28:8
seriously 21:1
serve 18:25 136:8
served 18:15
  33:16 147:6
services 9:16
  43:13 55:3,22
  60:8 61:8 64:2
  98:2,6
set 26:8 105:5,10
setting 22:15,16
  23:2 106:3
settled 89:21 90:7
  90:10,11 91:6
seven 104:1 109:2
  114:8,11 115:14
  116:5 124:2
  133:18 134:5

sgj11 1:5 144:5
shannon 2:16 6:1
  145:17
shannon.mclaug...
  2:19 145:20
shape 10:7 113:6
share 57:10
shared 128:1
sharing 57:24 58:3
  58:15
sheet 148:10
short 89:1
shorten 128:9
shorthand 1:18
shot 55:17
shoved 105:15
show 117:3
shown 147:7
sic 59:20 90:18,22
side 63:23 137:12
sign 148:6,11
signature 3:6
  142:1 143:1
  144:20 146:8,23
  147:13
signed 148:17
significance
  135:23
significant 102:4
silo 65:23,24
similar 72:2
simplify 84:15
  136:11
simply 29:14
  49:22 61:19 62:2
  138:7
simultaneous
  16:11 25:1 31:12
  41:21 43:15 47:10
  70:4 78:23 84:13
  86:2,10 104:22

109:12 117:25
  136:3
single 43:4 66:7,8
  66:10,20 67:14,18
  67:24 81:25 82:6
  82:10,12,15 83:3
  84:2,3 92:24 93:7
  101:20,24 109:10
  112:3 113:15,17
  113:18 114:4,14
  115:2,8 119:14
  131:15,18 132:7
  132:22 134:7
  135:7
singular 59:15
sir 6:16 17:19
  59:14 88:19
  110:15
sit 13:19 27:3
  30:22 31:18,23
  79:25 81:18
  128:22 133:2
site 70:12
sitting 15:18
situation 19:3 21:5
  24:6 32:7,16,21,25
  38:9 46:7 48:23
  53:10 55:21,24
  60:16 64:1,21,22
  65:3 67:2,2 73:6
  74:10,10 99:19
  137:24 140:6
situations 13:6
  55:20 56:4 72:22
  73:1
six 118:18,18
  134:5
skipped 110:18
slhc 121:23
slight 6:17 40:16

slightly 80:6 87:23
  136:1
slip 101:13
slow 51:10 116:12
  116:14
slowed 48:12
small 20:7,13
snapshot 102:23
sof 120:8
sole 116:17
solely 16:1
solemnly 5:8
soliloquy 139:6
solutions 146:10
  147:15 148:19
somebody 18:3
  20:25 36:13 46:8
  88:14 127:25
somewhat 17:8,10
sorry 21:14 32:12
  37:18 39:3 49:7
  57:4 58:9 59:5
  63:17 68:11 71:25
  75:20 84:14 89:15
  95:18 104:23
  109:13 113:22
  122:6 138:3
sort 137:16
sound 31:21
source 48:24,25
  50:11 116:17
sources 48:21 49:5
  49:13,18 50:5,10
  81:7 119:16
south 40:20
speak 33:20
speakers 16:11
  25:1 31:12 41:21
  43:15 47:10 70:4
  78:23 84:13 86:2
  86:10 104:22

[speakers - talk]

109:12 117:25
136:3
**speaking** 137:12
**specific** 45:25
72:13 78:2
**specifically** 28:22
41:16,19
**speed** 51:5
**spell** 69:21
**spelled** 6:11
**spend** 20:9 21:9
**spending** 43:19
**spent** 44:3 48:10
132:11
**spoke** 33:23
**spontaneously**
79:14
**staff** 18:20
**stan** 33:13 37:9
**standard** 22:11
68:9 69:5,17
70:10 71:9 87:17
**standards** 27:13
87:18 89:22 90:13
**stang** 2:11 5:22
100:5 145:12
**start** 43:24 48:12
82:21 108:8
**started** 9:7 47:7
**starting** 113:16
126:20 128:12
**starts** 111:12,12
111:13
**state** 1:17 5:16
14:23 19:5 49:22
51:17 71:4 92:17
103:18 143:7,17
144:12
**stated** 1:20 59:1,7
66:4

**statement** 22:1
24:1 63:4 73:4
74:8,9,12 82:8
118:2 125:3 129:2
129:9 132:2,2
**statements** 55:12
**states** 1:1 16:9
41:11 54:21 89:16
97:9 118:6,18
123:19 144:1
**stating** 59:1
103:18
**statutory** 30:4
104:25 105:5
125:11,15 131:10
**stays** 31:11
**step** 36:12 48:1,2
93:8
**steps** 92:19,21
**stipulate** 26:4,4,10
76:5 103:16
**stipulation** 29:1
77:7
**street** 2:5 145:6
146:11 147:16
**struck** 29:20 30:12
**structure** 18:16
105:10,21
**structures** 3:18
125:12
**studied** 41:7,15
**study** 111:4
**style** 52:5
**styled** 1:14
**subject** 12:10
29:19 37:7 38:11
39:16,24 65:6
73:23,24 84:22
92:25 137:1
**submitted** 25:24
42:18 144:18

**subscribed** 143:11
**subsection** 54:12
54:14
**subsequent** 101:23
103:8
**subsequently**
32:23
**substance** 140:13
**substantially**
19:22 55:4,23
60:9,18 61:9,18
62:2,10,14,25 63:6
63:15,19 64:3,7,10
64:15,20 65:12,15
67:23 68:1,4,8,10
68:21 69:3,7 72:2
72:9,18,25 73:9,13
91:1,5 137:23
**succeeded** 71:5
**sufficient** 63:14
**suggest** 94:13
129:6
**suggests** 127:25
**suite** 2:6,17 145:7
145:18 146:11
147:16
**summarize** 13:14
56:18 93:5
**summary** 24:11
25:10 52:22 53:1
53:6,10,13,16,18
53:23 54:4,11
58:22 60:20,23
63:15 71:25 74:8
89:8 90:5
**supervision** 18:13
**support** 7:11
99:13,16 131:24
**supported** 89:21
**supports** 79:8
131:17

**suppose** 10:11
**supreme** 71:11
78:1
**sure** 10:25 27:8
31:5 37:1 38:16
38:19 39:6,15
45:12,13 47:25
55:14 56:7 61:2
88:4 98:16 102:15
105:18 122:13
136:7,10 138:18
139:4,5
**swadley** 122:25
**swear** 5:8
**sworn** 1:14 5:12
10:15 144:15
**system** 18:7,19
19:2 21:20,22,22
21:23 23:9 43:12
43:24 136:14
137:4,5 138:1,10
138:12
**systems** 138:19

**t**

**table** 137:12
**take** 10:16 11:7
19:21 21:1 23:21
27:5 28:1,4 32:17
36:11 48:4,16
49:10,23 59:25
62:23 86:24 88:2
88:23 89:12 97:2
114:25 115:13
121:10 122:8
**taken** 1:14 5:1
7:24,25 10:25
66:14 145:1 146:1
**takes** 25:18 27:24
64:11
**talk** 11:11,12
28:13 29:2 50:21

Veritext Legal Solutions
800-336-4000

[talk - three]

102:14

**talked** 26:25 92:7
95:24 134:3

**talking** 32:17
83:24 86:17
103:22 108:23
132:12 138:19

**talks** 81:8

**taught** 30:23

**tax** 66:25

**technical** 8:16
50:15

**technologically**
50:15

**technology** 10:22

**telephone** 2:7,13
2:18 145:8,14,19

**tell** 5:8 11:10
12:25 14:3 17:1
21:16,25 29:24
32:22 34:13 35:14
38:17 49:24 50:3
50:10 55:17 71:1
71:14 79:5 81:17
92:4 104:18 140:2

**telling** 18:4 49:4
50:4

**tells** 63:16

**ten** 11:25 41:6
84:16 87:6,7

**tend** 11:11

**term** 30:1,4

**terms** 19:15,18
22:2 27:24 92:20
92:22 94:24
109:21,23 112:10
127:8 135:21
138:9

**test** 68:15 76:21,22
79:1,4

**testified** 5:12 12:5
12:8,11,12,13,15
12:16,18,21,25
13:18,20,23 14:2,9
14:13,14,18,19,21
15:5,11,19 16:15
41:18 79:16
132:23,25

**testify** 11:18 15:9
25:11,12 28:18
29:23 34:19 46:4
46:25 47:14 49:2
53:2 135:15

**testifying** 13:2,9
15:16 16:20 21:14
25:21 87:18
135:12

**testimony** 11:1
16:22 17:2 20:4,9
20:20 28:16 29:19
30:5,7 36:15 43:3
45:16 48:16 62:15
64:4 88:9 93:6
96:15 97:24 114:3
126:4 140:13,25
141:2,5,7 144:16
145:1 148:8

**texas** 1:1,17,19 2:6
8:3 15:12,14,15,16
15:21 16:2,13,16
17:3 18:23 22:6,8
27:4,16 28:20
30:24 40:8,10,14
40:19,24 41:2,3,5
41:14,16,19 44:14
44:17 45:1,23,25
46:6,10,11,12
51:17 58:7,18,24
59:2 64:11 67:25
70:23 71:4,11,18
71:21 75:1 78:14

79:2,17 81:2,20
87:19,23 88:11,12
88:19,21,21 89:22
90:23 91:7,14,21
92:2 93:19 119:24
144:1,12 145:7
146:9,12 147:14
147:17

**text** 73:16

**thank** 10:2 17:5,13
26:2 29:15 30:9
30:23 33:10 36:24
59:22 62:23 76:8
86:14 88:24 92:16
97:20 98:21 99:1
103:22 133:4,20

**thanks** 100:19
140:16

**theory** 67:19

**therefor** 146:24

**thing** 69:15 114:24
125:21 135:14
137:16 140:21

**things** 8:14 9:23
37:14,14 42:22
95:9 126:10
136:11

**think** 12:17,21,22
12:24 14:17,24
15:8,23 20:12
22:2,5 23:10,17,21
23:22,25 24:4,6,8
24:24 27:3,6
28:12,20 29:4,4,6
29:8,10,22 30:1,8
30:21,22 32:8,9,23
33:8,9 35:13
36:24 37:8,11,24
38:7,8,8,22 39:10
39:20 40:10 41:4
42:3,8 45:8,14,20

46:15 47:4,20
50:18 52:19 53:7
53:15 54:9,11
56:5,17 59:8,15
60:15 61:6 63:6
63:13,14 65:2,9
66:20 68:13,19
69:18 70:17 73:4
74:19 75:17 76:20
77:1,15 78:19
79:5,6 83:13 86:3
86:15 87:20 90:2
90:2,13,24 91:25
92:1 95:4 97:12
98:8 99:9,10,15,16
100:22 101:14,17
102:4,20 103:14
103:14 104:14,15
106:8,9,20 107:9
109:1,16,22 112:5
113:16 115:9,9,10
115:11,16,23
117:22 127:21
129:1,12 132:4,10
132:11,24 133:2
133:15 134:4
135:14,19 137:24
138:9 139:13,18
140:11,23

**thinking** 9:7 88:2

**thinner** 109:16

**third** 80:25 89:15
111:13

**thought** 14:19
46:17 60:22 79:15
86:12

**three** 31:20 32:8
32:19 33:1,12
35:3 37:25 38:4
48:17 49:24 52:21
56:16 61:14 80:21

Veritext Legal Solutions
800-336-4000

[three - ultimately]

89:16 110:23
111:11,22 129:24
**throckmorton** 2:5
145:6 146:11
147:16
**thursday** 122:23
124:16
**time** 8:13,15 13:13
18:14,20,20 20:7,9
21:9 23:22 25:3
27:6 29:20,22
31:24 32:18 33:7
34:3 37:11,11,13
37:17,17,22 43:11
43:13,18,19,22,25
44:3,12,14,17 45:4
45:23,24 50:9,18
51:24,25 52:19
70:19 75:17 89:12
97:2,9,13 102:19
102:24 103:21
111:2 114:25
116:15 121:10
122:8 129:16
132:11 137:25,25
140:19 144:22
145:1 148:15
**timeframe** 148:7
**times** 12:5,9,15
13:18,20 14:2,4,15
15:2,4,6,11,15
40:2 41:1,5,6
49:15 136:9
**timing** 115:6
**tinkered** 110:3,6
**tinkering** 110:12
**title** 52:5,6 84:20
84:25 85:1,12
86:18,20,20,25
87:1 88:10 95:17
95:18,18,19,22

117:4
**titled** 52:9
**today** 6:23 7:15
11:19 13:20 15:18
25:21 28:3 31:19
31:24 50:7 59:2,7
79:25 80:2 81:18
100:25 128:22
132:11,23 135:10
140:14
**told** 47:8,12 49:10
72:17 99:25 100:2
**top** 133:22
**topic** 67:9 85:8
**topics** 49:14
**total** 12:7 14:3
**totally** 79:12
**touch** 37:16 95:8
96:16 119:17
**touched** 94:23,24
95:13
**track** 43:9,9,25
59:6
**train** 14:19
**transaction** 13:7
19:21 66:7,8,20
67:5,12,15,18,24
68:2,12 69:7 72:3
82:1,7,11,13 83:4
83:25 84:2,4,17
87:4,7,9,13 88:17
92:25 93:7,9
94:24,25 101:21
101:25 107:8,12
109:11,14 110:3
110:13 112:3,25
113:15,17,18
114:4,13,14 115:3
115:7,8,15 118:10
118:12 119:14,20
131:15,19 132:22

134:6,7 135:7
139:7
**transactional** 9:7
9:10,13,14,18
20:14 137:19
**transactions** 13:4
50:8 67:22 115:6
**transcript** 144:15
144:18 147:4
148:5,16
**transcription** 5:6
**transition** 9:10
**transitioned** 9:9
**treated** 140:14
**trial** 12:6,8 14:2
18:12 19:4 22:16
24:15,17 30:20
**trials** 13:25
**tribunal** 14:22
30:16
**tribunals** 18:24
**trick** 59:14
**tried** 38:17
**tries** 48:9
**triggers** 32:16
**trouble** 51:13
**troubled** 46:8
**true** 22:12 23:21
58:17 115:11
135:19 143:2
144:16
**trumps** 56:11
**trust** 121:23,23
125:12 131:10
137:16 138:14
**trusted** 136:20
**trusts** 85:13
104:25 105:5
125:15
**truth** 5:9,9,9

**truthfully** 11:18
**try** 27:20 31:4
47:17 56:6 86:24
87:13 106:9 128:8
**trying** 20:20,25
27:19 28:9 30:1
32:9 35:12 59:13
63:12,21,24 64:16
68:25 69:1 72:5
113:3 116:8
117:17,24 134:25
**tuning** 125:3
**turn** 38:17 78:3
126:16 130:19
133:20
**turned** 32:6,21
110:8
**turpitude** 11:25
**twice** 12:22,23
14:24 74:7
**twist** 87:23
**two** 13:19 14:13
32:3,8 33:2,4,11
40:12 48:17 49:24
54:22 55:20 56:4
56:8,16,21 60:3,6
60:14,23,23 80:9
101:5 107:20
115:6 117:12
127:5
**tx** 148:13
**tx4800824** 143:25
**type** 137:13
**typically** 48:2
56:10,11

| u |
| --- |

**ubs** 2:15,15 6:3,3
145:16,16
**uh** 11:6,6
**ultimately** 80:12
112:13

Veritext Legal Solutions
800-336-4000

[umbrella - wants]

**umbrella** 63:4
**uncomfortable**
  20:11
**undercut** 69:9
  99:17
**underlying** 17:16
  21:19 23:7 27:10
  35:5 58:13 87:24
  99:3,18 102:10
  104:10,24 109:21
  109:22 113:24
  114:5
**underneath**
  105:15
**underscore** 98:23
  98:24
**understand** 7:6,9
  8:15 10:12,19
  11:8,12 17:5,19
  20:17,22 27:18
  29:15,15 36:10
  40:22 50:13 51:2
  52:25 57:13 58:10
  58:21 60:25 63:20
  68:13,16 69:13
  70:5 71:1 72:16
  73:11 76:2,14
  79:10,16 83:14,20
  87:11 89:2 92:12
  99:20 102:20
  103:6 110:14,14
  113:1 115:23
  117:18 122:15
  124:15 126:11
  129:12 139:5
**understanding**
  7:19 48:8 50:7,12
  80:15 111:10,16
  111:17,21,23
  113:2 130:1 135:3

**understood** 11:15
  100:6
**undertake** 19:7
**undertaking** 60:17
**undivided** 109:18
  136:22,23 138:4,7
**undo** 81:10 86:24
  87:13 88:10
**unicorn** 3:16
  84:17,18 85:14
  102:11 103:2,3,11
  104:9,12,21 105:6
  105:14,24 106:4
  106:17 107:4,21
  107:24,25 114:13
  115:21,25 116:2,5
  118:19 119:9,23
  120:2 125:12
  132:8,17
**uniform** 17:8
**unintelligent** 5:5
**union** 71:5
**unique** 87:23
**united** 1:1 144:1
**universe** 61:2
**unquestionably**
  95:4
**unrelated** 36:7
  85:21 106:17,24
  136:25 139:17
  140:9
**unusual** 60:15
  74:10,10
**unwind** 116:8
**unwise** 9:9
**use** 25:8 52:11
  65:22 82:24,25
  86:16 90:6 124:11
**usually** 32:13

**v**

**vague** 44:23
**validity** 69:9 84:5
**varies** 20:5
**variety** 37:17
**various** 92:19,21
  118:21
**verbal** 11:5 39:13
**verify** 148:8
**veritext** 146:10,10
  147:15,15 148:12
  148:19
**veritext.com.**
  148:13
**version** 53:18
  70:14,17
**versus** 43:2 44:7
**vice** 117:14 118:3
**videoconference**
  5:3 7:25
**videotaped** 7:23
**view** 57:1 61:23
  62:3,5 63:3 66:5
  67:20,24 68:6,7
  73:21 74:8 80:14
  85:20 87:6,11
  91:12 102:5
  109:11 110:7
  113:14 115:4
  119:19 129:9
  131:18 132:12
  136:21
**viewed** 109:17
  136:20 137:2
  138:6
**violate** 27:12
  54:25 141:9
**violated** 23:6 58:2
  61:7 62:16 63:25
  65:17 78:21 84:1

**violating** 22:11
  64:11
**violation** 23:4 24:2
  24:3 26:21 27:15
  28:19 57:14 58:18
  58:23 59:19 60:16
  68:22 74:1 88:11
  109:17
**violative** 88:20
**virginia** 40:20
**virtually** 44:9
  64:21
**vitae** 8:20
**volleyball** 100:25
**volume** 1:10
**voluntary** 18:17
  18:25,25

**w**

**wait** 10:25 137:7
**want** 5:24 8:16
  21:4 24:5 28:1,3
  29:1 30:11 34:22
  35:25 37:18 49:2
  50:22 51:11,23,25
  54:12,14 55:11,15
  55:18 60:4 61:1
  62:4 78:20 89:7
  89:14 98:16,21
  100:14 101:1,15
  106:8 110:15
  111:6,7,7 118:17
  122:3,18 126:3,10
  126:14,16 130:19
  131:21 133:20,24
  136:5 137:7 139:5
**wanted** 9:8 30:5
  36:11 75:19 94:7
  140:21
**wants** 22:17
  123:14 138:12

Veritext Legal Solutions
800-336-4000

[war - zoom]

war 71:6
warranties 95:7
95:10
washington 40:19
41:12
waste 103:20
water 22:20 60:22
watkins 2:16 6:2
145:17
way 10:6 17:3
22:22 30:14,15
35:2 36:15 37:15
38:24 46:19 49:16
50:16,17 55:19
56:6 60:2 63:9
64:23 70:3 73:21
85:22 100:10
104:25 106:12
108:1,4 109:15
113:6 118:2
ways 9:23 26:9
we've 25:24 28:14
29:8,10 50:17
89:8 90:1,3,15
101:2 104:8 120:7
132:11,11 134:3
135:11
wear 18:21
weeks 32:3 33:2,4
79:10
welcome 11:13
100:18
went 41:10 71:16
109:9
whatsoever 99:23
whichever 84:23
wick 2:5 5:18
52:12 56:24 57:15
58:2 61:3,6 65:4
65:14,21 68:4
76:3 89:16 91:4

94:9,14 95:12
102:17,21,24
103:9 104:19
105:9 106:2,5
107:6 115:24
116:7 118:12
123:3,23 124:1
125:2,6,10 127:19
128:5,14,16,18
129:2,7,17,24
130:3,5 131:19
134:19 135:5
145:6
wickphillips.com
2:7,8 145:8,9
williams 127:10
127:12,14,18,22
128:4
willing 10:24 26:3
26:6,10 49:24
winded 136:2
withdraw 25:8
witness 1:13 5:7
5:10 7:20 8:21
10:15 12:20,22
13:1,3,8,11,21
14:10,13 15:3,3,5
21:4,10,14,15
26:16,18,21 27:21
40:3 46:5,7 47:22
48:15 52:11 77:22
86:5 97:24 98:1
118:15 129:16
140:16,24 142:2
144:14,17,19,20
148:5,7,9,11,15
woman 34:8
word 25:8 65:22
82:20
words 13:15 55:15
74:23,25 81:9

work 9:10 34:21
35:22,23 36:3,18
36:22 44:3,9,10,13
46:12 47:15 51:6
66:22 69:9 72:12
73:2 79:9 80:9
81:11,11 82:19,24
83:1,8,9 84:5
85:25 86:20,25
89:17,19 91:9,16
91:16 96:19 98:1
98:12 108:5,11
109:7 113:9,13
114:2,7 115:24
123:3 125:2,8
131:19 137:22
worked 39:17 42:2
42:4,6 43:7 44:7,7
49:15,20 87:7
97:16 105:9
127:13,13
working 43:21,24
45:22
world 18:8 57:24
worth 2:6 8:3
145:7 146:12
147:17
wpep000014
98:23
wpep000018
98:24
writing 39:14 80:4
written 22:21
43:14 60:23 79:13
95:10
wrong 55:17,19
88:10 113:6
117:13
wrote 41:8 80:10

**x**

x 3:1 120:8

**y**

yeah 28:11 38:7
41:23 44:22 46:13
71:13 84:15,19
93:12,13 101:9,16
116:13 121:10
140:21
year 20:6,6 71:1
years 6:18 9:4,6
9:11,12,13 11:25
14:5 16:19 18:18
18:18 33:17 37:10
41:10,16 80:5,6,7
80:15
yesterday 45:6
75:17
york 2:18,18
40:20 87:21
145:19,19

**z**

ziehl 2:11 5:22
145:12
zoom 1:7,12 5:2,2
7:25 9:22 51:7
79:20

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.