# EXHIBIT 66

1     IN THE UNITED STATES BANKRUPTCY COURT

2       FOR THE NORTHERN DISTRICT OF TEXAS

3            DALLAS DIVISION

4  IN RE:              )
                       ) CHAPTER 11
5  HIGHLAND CAPITAL        )
   MANAGEMENT, L.P.,       ) CASE NO. 19-34054-SGJ11
6                       )
     Reorganized Debtor.   )
7  _____ )
                       )
8  HIGHLAND CAPITAL       )
   MANAGEMENT, L.P.,       )
9                       )
     Plaintiff,         ) ADVERSARY PROCEEDING
10                      )
   VS.                ) NO. 21-03000-SGJ
11                      )
   HIGHLAND CAPITAL        )
12  MANAGEMENT FUND ADVISORS, )
   L.P., NEXPOINT ADVISORS,  )
13  L.P., HIGHLAND INCOME    )
   FUND, NEXPOINT STRATEGIC  )
14  OPPORTUNITIES FUND,     )
   NEXPOINT CAPITAL, INC.,   )
15  AND CLO HOLDCO, LTD.,    )
                       )
16    Defendants.         )

17

18          REMOTE ORAL DEPOSITION OF

19            MARK PATRICK

20            Dallas, Texas

21          Tuesday, August 2, 2022

22

23  REPORTED BY:

24  JANICE K. McMORAN, CSR, RDR, CRR, TCRR

25  JOB NO. 214839

Page 2

```
1
2
3
4
5
6        Tuesday, August 2, 2022
7        8:02 a.m. CST
8
9
10
11
12
13
14      REMOTE ORAL DEPOSITION OF MARK PATRICK,
15   produced as a witness remotely via Zoom
16   videoconference at the instance of the Reorganized
17   Debtor/Plaintiff, and duly remotely sworn, was
18   taken in the above-styled and -numbered cause on
19   the 2nd of August, 2022, from 8:02 a.m. until 10:24
20   a.m., before Janice K. McMoran, RDR, CRR, TCRR, and
21   Certified Shorthand Reporter in and for the State
22   of Texas, reported stenographically, with the
23   witness appearing remotely from Dallas, Texas,
24   pursuant to the Federal Rules of Civil Procedure.
25
```

Page 3

```
1            A P P E A R A N C E S
2
3    APPEARING FOR THE REORGANIZED DEBTOR/PLAINTIFF:
4      HAYLEY WINOGRAD, ESQ.
        JOHN MORRIS, ESQ.
5      Pachulski Stang Ziehl & Jones LLP
        780 Third Avenue
6      New York, New York 10017
7
8
9    APPEARING FOR NEXPOINT REAL ESTATE PARTNERS, LLC:
10     CHARLES GAMEROS, JR., ESQ.
        Hoge & Gameros LLP
11     6116 North Central Expressway
        Dallas, Texas 75206
12
13
14
15   APPEARING FOR THE WITNESS:
16     DEBRA DANDENEAU, ESQ.
        Baker & McKenzie LLP
17     452 Fifth Avenue
        New York, New York 10018
18
19
20
21
22   ALSO PRESENT:
23     La Asia Cantey -
           Pachulski Stang Ziehl & Jones LLP
24
25     Louis M. Phillips
```

Page 4

```
1           I N D E X
2
3
4                   PAGE
5    Appearances....................................3
6    Proceedings....................................6
7    WITNESS: MARK PATRICK
8      Examination by Ms. Winograd................8
9    Reporter's Certificate.....................110
10   Acknowledgment of Deponent.................113
11   Errata.....................................114
12
13
14          EXHIBIT INDEX
     EXHIBIT
15   NUMBER    DESCRIPTION         IDENTIFIED
16   EXHIBIT 2 - Limited Liability Company
           Agreement of SE Multifamily
17         Holdings LLC dated as of
           August 23, 2018..................16
18
     EXHIBIT 4 - First Amended and Restated
19         Limited Liability Company
           Agreement dated as of March 15,
20         2019 to be effective as of
           August 23, 2018..................44
21
     EXHIBIT 5 - Proof of Claim for HCRE Partner,
22         LLC dated 4/8/2020.............102-103
23   EXHIBIT 12- E-mail from Mark Patrick dated
           28 Feb 2019 with attachments
24         (D-HCRE-143903 - D-HCRE-143984)...73
25
```

Page 5

```
1         EXHIBIT INDEX (CONTINUED)
2
     EXHIBIT
3    NUMBER    DESCRIPTION         IDENTIFIED
4    EXHIBIT 15- E-mail chain dated February 28,
           2019 - March 4, 2019; Subject:
5          RE: Multifamily Holdings LLC
           Amended and Restated Agreement
6          (D-HCRE-107089 - D-HCRE-107091)...60
7    EXHIBIT 18- E-mail from Mark Patrick to
           Paul Broaddus dated March 8,
8          2020; Subject:  Unicorn - LLC
           Agreement (D-HCRE-183922 -
9          D-HCRE-183949).................54-55
10   EXHIBIT 28- E-mail dated 3/16/19 with
           attached First Amended and
11         Restated Limited Liability
           Agreement of SE Multifamily
12         Holdings LLC (BH0001236 -
           BH0001266)......................99
13
14
15
16
17
18
19
20
21
22
23
24
25
```

M. PATRICK

1
2      P R O C E E D I N G S
3      THE REPORTER:  We are on the record.
4  Today's date is August 2nd, 2022, and the
5  time is 8:02 a.m. Central.
6      This is the oral deposition of Mark
7  Patrick, and it is being conducted
8  remotely.
9      The witness is located in Dallas,
10  Texas.
11      My name is Janice McMoran, Texas
12  CSR No. 1959.  I am administering the oath
13  and reporting the deposition remotely by
14  stenographic means from my residence in
15  Granbury, Texas, on behalf of TSG
16  Reporting.
17      Would counsel please state their
18  appearances and locations for the record?
19      MS. WINOGRAD:  My name is Hayley
20  Winograd.  I'm at the firm of Pachulski
21  Stang Ziehl & Jones, LLP.  I represent
22  Highland Capital Management, L.P., and I'm
23  located in New York City.
24      MS. DANDENEAU:  My name is Debra
25  Dandeneau.  I'm representing Mark Patrick.

M. PATRICK

1
2  I'm from the firm of Baker McKenzie, and
3  I'm currently located in New York City.
4      MR. GAMEROS:  Bill Gameros for
5  NexPoint Real Estate Partners.  I am
6  currently located in Dallas, Texas.
7      MR. MORRIS:  This is John Morris from
8  Pachulski Stang Ziehl & Jones.  I'm
9  second-chairing Ms. Winograd today.
10      THE REPORTER:  Okay.  At this time,
11  would counsel agree to allow me to swear
12  in the witness remotely?
13      MS. WINOGRAD:  Yes.
14      MS. DANDENEAU:  Yes.
15      (Witness sworn.)
16      MS. DANDENEAU:  Ms. Winograd, as I
17  mentioned to Mr. Morris, I'd like to make
18  a brief statement before this deposition
19  starts.  As I believe your firm knows from
20  prior depositions, even though Mr. Patrick
21  is qualified as a lawyer, Mr. Patrick did
22  not practice as a lawyer or give legal
23  advice during his tenure at Highland
24  Capital.
25      So that said, Ms. Winograd, you're

M. PATRICK

1
2  here as the representative of his former
3  employee, and during the deposition, if
4  any questions arise that might be
5  considered privileged, attorney-client
6  privileged, we would rely upon you to
7  assert whatever privilege that Highland
8  believes is applicable.
9      So thank you.  I just wanted to make
10  that clear from the outset.
11      MS. WINOGRAD:  Thank you.
12      MARK PATRICK,
13  having been first duly remotely sworn,
14  testified as follows:
15      EXAMINATION
16  BY MS. WINOGRAD:
17      Q.  Good morning, Mr. Patrick.  Can you
18  hear me?
19      A.  Yes, I can.
20      Q.  Okay.  My name is Hayley Winograd.
21  I'm an attorney at Pachulski Stang Ziehl &
22  Jones.  We are counsel to the reorganized
23  debtor known as Highland Capital Management,
24  L.P., and I'll be taking your deposition today.
25      Do you understand that?

M. PATRICK

1
2      A.  Yes, I do.
3      Q.  Can we refer to Highland Capital
4  Management, L.P. as Highland going forward?
5      A.  Yes.
6      Q.  I will be putting up documents from
7  time to time on the screen, and if you need to
8  see any other portion of the document in order
9  to give a complete answer, will you please let
10  me know?
11      A.  Yes, I will.
12      Q.  And if you need me to repeat a
13  question, will you please let me know?
14      A.  Yes, I will.
15      Q.  And if you don't understand a
16  question, will you please let me know?
17      A.  Yes, I will.
18      Q.  Okay.  Please allow me to finish my
19  questions before you start to answer.  Is that
20  fair?
21      A.  Yes.
22      Q.  Okay.  And I will wait for you to
23  finish your answer before I ask another
24  question.  And if I start asking you a question
25  before you're done answering, will you please

M. PATRICK

1
2  let me know?
3      A.  I will.
4      Q.  Okay.  And do you understand that
5  everything you say during today's deposition is
6  under oath?
7      A.  Yes, I do.
8      Q.  Okay.  And if you need to take a
9  break to use the restroom, let me know.  But if
10 we do it, it just can't be in the middle of a
11 question.  Is that fair?
12     A.  Yes.
13     Q.  Okay.  Did you do anything to prepare
14 for this deposition?
15     A.  Yes.
16     Q.  What did you do to prepare?
17     A.  I met with the law firm of Baker
18 McKenzie and spoke to Debra Dandeneau.
19     Q.  Okay.  Did you review any documents?
20     A.  Yes, I did.
21     Q.  What documents did you review?
22     A.  I reviewed my prior deposition
23 testimony with respect to the Wick Phillips
24 disqualification and the related exhibits.
25     Q.  Did you -- other than your lawyers,

M. PATRICK

1
2  did you speak to anybody else to prepare for
3  this deposition?
4      A.  No.
5      Q.  Okay.  Mr. Patrick, are you currently
6  employed?
7      A.  Yes, I am.
8      Q.  Where are you employed?
9      A.  In Dallas, Texas.
10     Q.  Can you tell me the name of the
11 company you're employed by?
12     A.  Yes.  Skyview Group, I believe, is
13 the name.
14     Q.  Okay.  And when did you become
15 employed by Skyview Group?
16     A.  In March of 2021.
17     Q.  Okay.  And who was your employer
18 before Skyview?
19     A.  Highland.
20     Q.  Okay.  How long were you employed by
21 Highland?
22     A.  A little over ten years, I believe.
23     Q.  Okay.  And what was your role at
24 Highland?
25     A.  I worked in the tax department,

M. PATRICK

1
2  and -- and I helped facilitate any tax issues
3  that -- and address tax issues that may arise
4  from time to time, as well as doing a variety
5  of tax planning.
6      Q.  Okay.  Were there any other people
7  who worked in that department with you?
8      A.  Yes.
9      Q.  Who were they?
10     A.  Well, personnel changed from time to
11 time, but at the end of my employment, I
12 believe Rick Swadley, he is our chief
13 compliance officer of tax, chief tax compliance
14 officer.  Paul Broaddus was also in the tax
15 department as a senior tax manager.  I'm not
16 exactly sure the status of the other folks as
17 far as who else was there at the time that I
18 left, because there were people kind of coming
19 and going from time to time.  So I might be
20 mistaken.
21     Q.  Okay.
22     A.  But I believe there were at least two
23 other tax professionals at the time of my
24 termination from Highland.
25     Q.  While you were employed at Highland,

M. PATRICK

1
2  did you ever perform any services for any
3  affiliates of Highland?
4          MS. DANDENEAU:  Objection to form.
5      A.  I'll take a -- I guess a broad
6  definition of affiliates and say yes.
7  BY MS. WINOGRAD:
8      Q.  Okay.  What's your definition of
9  affiliates?
10     A.  I guess any -- any entity that might
11 have either a relationship or ownership with
12 Highland.
13     Q.  So while you were employed at
14 Highland, were you ever involved in any
15 projects undertaken by affiliates of Highland?
16     A.  Involved in --
17         MS. DANDENEAU:  Objection to form.
18 BY MS. WINOGRAD:
19     Q.  Any projects undertaken by affiliates
20 of Highland.
21     A.  Yeah, I apologize.  I'm missing the
22 second word of your question.
23     Q.  While you were employed by Highland,
24 were you ever involved in any projects
25 undertaken by those affiliates?

Page 14

M. PATRICK

1
2     A.  Oh, oh, undertaken.  Excuse me.  That
3  was the word that was tripping me up.  I
4  apologize.  Yes.
5     Q.  Is it fair to say that while you were
6  employed at Highland, you performed services
7  for entities owned and controlled by James
8  Dondero?
9          MS. DANDENEAU:  Objection to form.
10    A.  Yes.
11  BY MS. WINOGRAD:
12    Q.  Okay.  Have you heard of the term
13  Project Unicorn?
14    A.  Yes.
15    Q.  Are you familiar with the term
16  Project Unicorn?
17    A.  Yes.
18    Q.  Do you have an understanding of what
19  Project Unicorn is?
20    A.  Yes.
21    Q.  What is your understanding of Project
22  Unicorn?
23    A.  It was a special purpose vehicle
24  organized to acquire certain real estate
25  assets.

Page 15

M. PATRICK

1
2     Q.  Okay.  So is it fair to say the
3  purpose of Project Unicorn was to acquire
4  certain real estate assets?
5     A.  Yes.
6     Q.  Did you play a role in any aspect of
7  Project Unicorn?
8     A.  Yes, I did.
9     Q.  What role did you play?
10    A.  I helped coordinate and facilitate
11  the underlying LLC agreement with respect to
12  Project Unicorn.
13    Q.  Highland was involved in Project
14  Unicorn, right?
15    A.  Who?
16    Q.  Highland.
17    A.  That is correct.
18    Q.  Do you know why Highland was involved
19  in Project Unicorn?
20    A.  From my review of the documentation
21  yesterday, it did refresh my recollection.
22  What you'll find is a variety of personnel at
23  Highland that was involved in Project Unicorn,
24  from the legal department to the tax department
25  to corporate financing.

Page 16

M. PATRICK

1
2     Q.  What specific role did Highland play
3  in Project Unicorn?
4     A.  As I indicated, you have personnel
5  that helped facilitate the organization of
6  Project Unicorn and other aspects of it.  But
7  in addition, Highland became a partner in
8  subsequent LLC agreements that, you know, did
9  not use the word "Unicorn" in it.  So Highland
10  was also a partner in the predecessor entity,
11  for lack of a better word.
12    Q.  Okay.
13          MS. WINOGRAD:  La Asia, could we
14     please show Exhibit 2?
15          (Exhibit 2 displayed and to be
16     marked.)
17  BY MS. WINOGRAD:
18    Q.  Mr. Patrick, do you see the document
19  on the screen?
20    A.  Yes, I do.
21    Q.  Okay.  Have you seen this document
22  before?
23    A.  Yes, I have.
24    Q.  Are you familiar with this document?
25    A.  Yes, I am.

Page 17

M. PATRICK

1
2     Q.  This is the SE Multifamily Holdings
3  LLC Limited Liability Company Agreement,
4  correct?
5     A.  Correct.
6     Q.  You're aware that this agreement was
7  subsequently amended and restated, correct?
8     A.  Correct.
9     Q.  Can we refer to this as the LLC
10  agreement going forward, and at times I might
11  refer to it as the original LLC agreement?
12    A.  Yeah, I prefer --
13          MS. DANDENEAU:  And, Ms. Winograd, I
14     think -- yeah, I was going to say the same
15     thing.  I think to avoid confusion, if we
16     refer to the original LLC agreement and
17     the amended LLC agreement, that would be
18     easier --
19          MS. WINOGRAD:  Sure.
20          MS. DANDENEAU:  -- for the record.
21          MS. WINOGRAD:  We can refer to this
22     as the original LLC agreement, and if
23     there's ever a question about which one
24     I'm referring to, just let me know and
25     I'll specify, if I forget to use the word

Page 18

1                M. PATRICK
2   "original."
3   BY MS. WINOGRAD:
4       Q.   It's dated August 23rd, 2018,
5   correct?
6       A.   Correct.
7           MS. WINOGRAD:  La Asia, can we please
8   scroll to page 17 of the agreement, which
9   is PDF page 17?
10  BY MS. WINOGRAD:
11      Q.   Okay.  The original LLC agreement is
12  signed by Mr. Dondero on behalf of Highland,
13  correct?
14      A.   Correct.
15      Q.   And it's signed by Mr. Dondero on
16  behalf of HCRE Partners, LLC, correct?
17      A.   Correct.
18      Q.   Can we refer to HCRE Partners, LLC as
19  HCRE going forward?
20      A.   Yes.
21      Q.   Would you be surprised if I said I
22  have documents to and from you in regard to the
23  original LLC agreement?
24      A.   No.
25          MS. DANDENEAU:  Objection to form.

Page 19

1                M. PATRICK
2   BY MS. WINOGRAD:
3       Q.   So you were involved in the process
4   of drafting the LLC agreement, correct?
5       A.   No.
6       Q.   Were you involved with any aspect of
7   the original LLC agreement?
8       A.   Yes, I was.
9       Q.   What part of the process were you
10  involved with?
11          MS. DANDENEAU:  Objection to form.
12      A.   Yeah, I -- I was involved in the
13  coordination, the putting together, if you
14  will, of using a variety of professionals,
15  internal and external, to review and comment
16  and draft this document.
17  BY MS. WINOGRAD:
18      Q.   Okay.  How did you get involved with
19  the original LLC agreement?
20      A.   It came to my attention that this
21  transaction, Project Unicorn, was occurring,
22  and that there would be a need for a joint
23  venture type entity, and -- and then I reached
24  out to Hunton & Williams to prepare the LLC
25  agreement, the original LLC agreement.

Page 20

1                M. PATRICK
2       Q.   When you were involved in this, did
3   you report to anyone?
4       A.   I reported to the CFO of Highland,
5   Frank Waterhouse.
6       Q.   Okay.
7           MS. WINOGRAD:  La Asia, could we
8   scroll back to page 2 of the agreement,
9   which is PDF page 2?
10  BY MS. WINOGRAD:
11      Q.   Do you know the purpose of the
12  original LLC agreement?
13          MS. DANDENEAU:  Objection to form.
14      A.   Are we on page 2?
15  BY MS. WINOGRAD:
16      Q.   This is page 2 and PDF page 2.
17      A.   Okay.  Okay.  I just couldn't see the
18  page number.
19          Generally speaking, again, the
20  purpose of this LLC was to acquire certain real
21  estate assets.
22      Q.   Pursuant to the original LLC
23  agreement, SE Multifamily LLC was created,
24  correct?
25      A.   Correct.

Page 21

1                M. PATRICK
2       Q.   Can we refer to this entity as SE
3   Multifamily?
4       A.   Yes.
5       Q.   Do you know the purpose of SE
6   Multifamily?
7       A.   Was to acquire certain real
8   estate assets.
9       Q.   Is it fair to say that SE Multifamily
10  was a part of Project Unicorn?
11      A.   I believe so.  I believe they're --
12  yes.
13      Q.   At the time the original LLC
14  agreement was executed, the members of SE
15  Multifamily were Highland and HCRE, correct?
16      A.   Correct.
17      Q.   Do you know if the original LLC
18  agreement was subject to negotiations between
19  HCRE and Highland?
20          MS. DANDENEAU:  Objection to form.
21      A.   Mr. Dondero was the manager of HCRE,
22  and he was also, I believe, the president of
23  Strand Advisors, the GP of Highland.  So if
24  there was a -- if you want to use the word
25  "negotiation," it was an internal negotiation,

Page 22

M. PATRICK

1  if you will, with himself balancing the
2  equities between the two parties.
3  BY MS. WINOGRAD:
4  
5  Q.  Okay.  Do you know if Highland got
6  independent legal advice with respect to the
7  original LLC agreement?
8  A.  Yeah, I would ask you to restate the
9  question.  The word "independent," is sort of
10 confusing to me.
11 Q.  Sure.  Do you know if any particular
12 individual was responsible for reviewing the
13 original LLC agreement to make sure it
14 reflected Highland's intent?
15 A.  Yes.  I would say internal and
16 external professionals.
17 Q.  Who was that internal professional?
18 A.  I would begin with the legal team.
19 Tim Cournoyer, he was a corporate attorney.  I
20 believe he reported to Thomas Surgent, and
21 another gentleman named Freddy Chang.  He was a
22 more real estate lawyer, I imagine, during this
23 time period.  They were effectively responsible
24 for conveying Highland's overall intent with
25 respect to this documentation.

Page 23

M. PATRICK

1  
2  Q.  Do you know if any particular
3  individual was responsible for reviewing the
4  original LLC agreement to make sure it
5  reflected HCRE's intent?
6  A.  Professionals -- professionals that
7  were a part of the real estate team would be
8  responsible for -- for at least providing input
9  and comments to Mr. Dondero in his capacity as
10 the manager of HCRE to provide HCRE's, if you
11 will, intent.
12 Q.  Can you identify any of those
13 individuals?
14 A.  The head of the real estate team
15 would be Matt McGraner.  There were other
16 folks, Matt Goetz, and some others that I
17 cannot recall offhand.
18 Q.  Did Matt McGraner work at Highland?
19 A.  Unfortunately, I don't really know
20 what legal entity he worked for and received a
21 W-2 income, if you will.
22 Q.  And do you know what entity Matt
23 Goetz worked at?
24 A.  Again, it would be the same answer.
25 I'm not sure what legal entity he was employed

Page 24

M. PATRICK

1  at.
2  
3  Q.  Are you familiar with the entity
4  HCRE?
5  A.  Yes, I am.
6  Q.  Do you know what it stands for?
7  A.  No, I do not.
8  Q.  Do you know when HCRE was formed?
9  A.  I cannot recall.
10 Q.  Do you know who controls HCRE?
11 A.  Yes, I do.
12 Q.  Who is that?
13 A.  Mr. James Dondero.
14 Q.  Does Mr. Dondero also manage HCRE?
15 A.  Yes.
16 Q.  Do you know who is authorized to make
17 decisions on behalf of HCRE?
18 A.  Mr. Dondero.
19 Q.  Do you know if the identity of the
20 decision maker has ever changed since HCRE was
21 formed?
22 A.  Not to my knowledge that it has
23 changed.
24 Q.  Do you know whether HCRE has ever had
25 any employees?

Page 25

M. PATRICK

1  A.  I do not know whether or not it has
2  had employees.
3  
4  Q.  At the time HCRE became a member of
5  SE Multifamily, do you know if HCRE was
6  capitalized?
7  MS. DANDENEAU:  Objection to form.
8  A.  I do not know.
9  BY MS. WINOGRAD:
10 Q.  Do you know who owns HCRE?
11 A.  I have a general understanding of the
12 ownership.
13 Q.  What is your general understanding of
14 the ownership?
15 A.  That it is owned by principally three
16 individuals.
17 Q.  Who are those three individuals?
18 A.  Mr. James Dondero, Matthew McGraner,
19 and Scott Ellington.
20 Q.  Do you know what percentage interest
21 Scott Ellington has in HCRE?
22 A.  I do not.
23 Q.  Do you know the percentage interest
24 of the other owners?
25 A.  I do not.

Page 26

M. PATRICK

1
2    Q.  Do you know if any of the owners ever
3    put any capital in the form of debt or equity
4    into HCRE?
5    A.  I cannot recall.
6    Q.  Do you know if the owners of HCRE
7    have ever changed?
8    A.  Not to my knowledge.
9    Q.  During the time the original LLC
10   agreement was being drafted, did HCRE rely on
11   Highland employees to perform services for
12   HCRE?
13   A.  I would -- I would at least say some
14   services.  There may be other services that I'm
15   not aware of that HCRE relied upon other
16   entities.
17   MS. WINOGRAD:  La Asia, can we scroll
18   to PDF page 18 of the agreement?  That's
19   it.  Okay.
20   BY MS. WINOGRAD:
21   Q.  Mr. Patrick, do you see Schedule A?
22   A.  Yes, I do.
23   Q.  Do you see the column that says
24   "Capital Contribution"?
25   A.  Yes, I do.

Page 27

M. PATRICK

1
2    Q.  Do you know what this means?
3    A.  Yes, I do.
4    Q.  What does it mean?
5    A.  It generally refers to the initial,
6    if you will, capital which could be reflective
7    of either cash or assets that were placed into
8    the partnership.
9    Q.  Okay.  So if it says 51 for HCRE,
10   that means HCRE put in $51 to SE Multifamily;
11   is that correct?
12   A.  That would be --
13   MS. DANDENEAU:  Objection to form.
14   THE REPORTER:  I'm sorry.  I didn't
15   hear the end of your answer.  That would
16   be --
17   A.  That would be correct.
18   THE WITNESS:  And I'll slow down to
19   give Debra a chance to object.  I
20   apologize, Debra.
21   BY MS. WINOGRAD:
22   Q.  Do you know where that $51 came from?
23   A.  From -- I do not know.
24   Q.  As we discussed earlier, Highland was
25   a member of SE Multifamily under the original

Page 28

M. PATRICK

1
2    LLC agreement, correct?
3    A.  Correct.
4    Q.  Do you know why Highland was involved
5    in SE Multifamily?
6    A.  Yes.
7    Q.  Can you explain?
8    A.  Highland -- Highland provided
9    infrastructure, if you will, and support, as
10   well as a partner that had resources.
11   Q.  What kind of resources are you
12   referring to?
13   A.  I refer generally to what I would
14   call structural resources as well as monetary
15   resources.  And so it essentially allowed
16   flexibility within this joint venture between
17   the two parties.
18   Q.  What do you mean by the term
19   "flexibility"?
20   A.  It allowed the opportunity to
21   allocate cash, tax, and potentially any -- any
22   other items or issues that may come up with
23   respect to a complex real estate transaction
24   like this.  It's essentially a big -- big
25   partner, well resourced.

Page 29

M. PATRICK

1
2    Q.  Do you know whose idea it was to
3    involve Highland in SE Multifamily?
4    A.  Do I know who -- I'm sorry?
5    Q.  Do you know whose idea it was to
6    involve Highland?
7    MS. DANDENEAU:  Objection to form.
8    A.  No, I -- no, I cannot recall.
9    BY MS. WINOGRAD:
10   Q.  Do you know if there were tax
11   advantages to Highland's involvement in SE
12   Multifamily?
13   A.  Yes.
14   MS. DANDENEAU:  And, Hayley, I'm
15   just -- I'm going to -- the only reason
16   I'm objecting to form is the use of the
17   term "involvement," which is somewhat --
18   it's ambiguous to me.  So I don't really
19   want to interrupt the flow of this, but --
20   because Mr. Patrick has testified that
21   involvement also means providing services.
22   I think you're referring to the ownership.
23   So I just -- again, I don't want to
24   interrupt the flow, but...
25

Page 30

1          M. PATRICK
2    BY MS. WINOGRAD:
3        Q.   Okay.  Mr. Patrick, just to go back
4    for a minute, I'm going to rephrase the
5    question to see if it's more clear to you.
6        Do you know whose idea it was to
7    involve Highland as a member in SE Multifamily?
8        A.   No, I do not recall.
9        Q.   Okay.  So you mentioned there were
10   tax advantages to Highland's involvement in SE
11   Multifamily?
12       A.   Well, look, let me sort of explain
13   what -- how I interpret the word "tax
14   advantages."  As I indicated, Highland Capital
15   Management is a well resourced entity.  It had
16   a strong balance sheet, if you will, as well as
17   it had structural advantages of being a
18   partnership.
19       And so in these types of joint
20   ventures where you may have, you know, a
21   smaller partner, if you will, owned by
22   individuals and a larger partner, a partnership
23   that's well resourced, it can allow for
24   flexibility from time to time to allocate
25   taxable income in accordance with Subchapter K

Page 31

1          M. PATRICK
2    of the Internal Revenue Code to one of the
3    partners.
4        So it adds -- it adds a tremendous
5    amount of flexibility, if you will, in those
6    sorts of allocations.
7        That's how I view tax advantages.
8    It's very common in a variety of joint
9    ventures, including real estate ventures.
10       Q.   Okay.  So just -- just to make sure
11   that I understand, why did -- do you know why
12   HCRE wanted this flexibility to do -- to have
13   this tax flexibility that you explained?
14       MS. DANDENEAU:  Objection to form.
15       A.   I'm not -- it's -- it's hard for me
16   to say that I was in a position to know what
17   HCRE wanted.  So maybe you can rephrase your
18   question.
19   BY MS. WINOGRAD:
20       Q.   Sure.  You said that the
21   transaction -- that Highland's -- Highland as a
22   member in SE Multifamily allowed the
23   transaction flexibility.  So I'm asking, why
24   did HCRE want this flexibility?
25       MS. DANDENEAU:  Objection to form.

Page 32

1          M. PATRICK
2        A.   I would characterize it as it was
3    beneficial for both parties.  When you have a
4    joint venture, two parties coming together, you
5    know, there's generally speaking a mutual
6    benefit.  So HCRE must have had some mutual
7    benefit from their perspective.  But that's
8    about as far as I can go.  I don't like to
9    speculate too much as to the intent of the
10   parties.  But I think in this case, it's clear
11   when you have a joint venture, there's some --
12   there is some mutual benefit.
13   BY MS. WINOGRAD:
14       Q.   What is your understanding of the
15   benefit of the flexibility?
16       MS. DANDENEAU:  Objection to form.
17       A.   I think I've answered that, but, you
18   know, again, when you have a partnership with a
19   large, well resourced entity as well as another
20   entity that, if you will, has the substantial
21   knowhow, which is what I would call HCRE, you
22   know, so that's the benefit.
23   BY MS. WINOGRAD:
24       Q.   Okay.  You mentioned a minute or so
25   ago that Highland benefited from this, correct?

Page 33

1          M. PATRICK
2        A.   Correct.
3        Q.   How did Highland benefit from this?
4        A.   Well, you know, it's one of those
5    situations where the -- the race ended
6    relatively quick before we could see how it
7    finished.  This entity was organized in August
8    of 2018.  Highland ended up filing for
9    bankruptcy in the fall of 2019.  You know,
10   but -- so it's -- at this window time period,
11   it is hard to say either one of the parties
12   really benefited, if you will, unless -- just
13   sort of -- the creation of this entity that
14   would help facilitate the acquisition of the
15   assets.
16       Q.   Do you know if Highland's
17   participation as a member in SE Multifamily was
18   expected to reduce or minimize HCRE's tax
19   liability arising from its investment in SE
20   Multifamily?
21       A.   No.  I would not characterize that it
22   was expected to -- yeah, I would not
23   characterize it in that format.
24       Q.   Is it your understanding that
25   Highland's bankruptcy filing changed the nature

Page 34

M. PATRICK

1    M. PATRICK
2    of the members' relationship?
3        MS. DANDENEAU:  Objection to form.
4    A.  I would say it definitely changed
5    the -- sort of the nature of when you have one
6    partner that files for bankruptcy, you know, it
7    causes unexpected outcomes, I suppose.
8    BY MS. WINOGRAD:
9    Q.  What were those unexpected outcomes
10   in the context of HCRE and Highland?
11   A.  Well, this document was designed to
12   be what I view as a fluid document.  From my
13   e-mails, you can -- fluid meaning that it would
14   change essentially annually, you know, upon the
15   discretion of its manager, Mr. James Dondero,
16   with respect to the variety of the activities
17   that would occur in it.
18       And so, like, for instance, you see
19   an e-mail when we're working on the amended LLC
20   agreement that we were amending -- there's a
21   tax rule that you can amend a partnership
22   agreement up until March 15th to apply
23   retroactively to the previous year.  As you can
24   see in this exhibit right here, we have blanks
25   for specified company assets which were left

Page 35

M. PATRICK

1    M. PATRICK
2    blank because this is the start of the joint
3    venture.  But the sort of view, presumably, as
4    there were sales going forward, then we would
5    have the opportunity to take a look at the
6    realizations, the tax consequences of those
7    sales, and amend the document from -- from time
8    to time.
9        So for -- so it appears that the
10   Highland bankruptcy sort of stalled that
11   original view of this sort of fluid document
12   that would be amended from time to time after
13   looking at, if you will, in a colloquial sense,
14   the P&L, the variety of sales within this
15   entity and then making adjustments according to
16   what the partners want to adjust.
17   Q.  Okay.
18       MS. WINOGRAD:  La Asia, can we stay
19   on this document but scroll to page 10,
20   which is also PDF page 10?  And if we go
21   down just a little bit.  There we go.
22   BY MS. WINOGRAD:
23   Q.  Mr. Patrick, do you see where it says
24   "Distributions of Cash" under Article 6?
25   A.  Yes, I do.

Page 36

M. PATRICK

1    M. PATRICK
2    Q.  Do you see where it says under
3    Article 6.1(a) "Distributable Cash"?
4    A.  Yes, I do.
5    Q.  It says:  Except as otherwise
6    specifically provided in this Article VI and
7    IX, all distributable cash shall be distributed
8    51 percent to HCRE and 49 percent to Highland
9    at such time and in such amounts as determined
10   by the manager.
11       Do you see that?
12   A.  Yes, I do.
13   Q.  Is it your understanding that these
14   allocations of distributable cash under Article
15   6.1 were intended to be consistent with the
16   members' percentage interest in SE Multifamily?
17       MS. DANDENEAU:  Objection to form.
18   A.  No.
19   BY MS. WINOGRAD:
20   Q.  Can you explain to me what
21   distributable cash means, then?
22   A.  Well, it's a defined term, so I would
23   ask that we would go to the definition and
24   point to that definition.
25   Q.  Okay.  But what -- if you could just

Page 37

M. PATRICK

1    M. PATRICK
2    explain it to me in simple terms.
3        MS. DANDENEAU:  Objection to form.
4    A.  Yeah.  Essentially, subject to all
5    the variety of definitions -- you know, the
6    formula for the distributable cash, essentially
7    it's the amount of cash, you know, that fits
8    within that definition that James Dondero, in
9    his discretion as the manager of HCRE, can
10   determine from time to time to take whatever
11   amount that he decides meets that definition
12   and cause a distribution.
13   BY MS. WINOGRAD:
14   Q.  Okay.  So is it your testimony that
15   the percentages under "Distributable Cash" have
16   nothing to do with the members' percentage
17   interest in SE Multifamily?
18       MS. DANDENEAU:  Objection to form.
19   A.  Yes.
20       MS. WINOGRAD:  Okay.  La Asia, can we
21   scroll down to PDF page 18?
22   BY MS. WINOGRAD:
23   Q.  Okay.  Do you see here Schedule A to
24   the original LLC agreement?
25   A.  Yes, I do.

Page 38

M. PATRICK

1
2    Q.  Do you see the "Percentage Interest"
3    column?
4    A.  Yes, I do.
5    Q.  Is it a coincidence that the
6    percentage interests in Schedule A are the same
7    as the percentage interests under
8    "Distributable Cash"?
9        MS. DANDENEAU:  Objection to form.
10    A.  Yeah, allow me to just sort of
11    describe how a lot of these partnership
12    agreements work.  You can have percentage
13    interests, you know, as scheduled out, you can
14    have different percentages in the cash
15    distribution, you can have different
16    percentages in sort of what I call the taxable
17    income allocations.
18        They don't necessarily have to be the
19    same numbers.  Partnership rules allow for that
20    flexibility.  They can be, they can match, but
21    they don't have to.  And so when you're showing
22    me the distributable cash, there's -- unless
23    I'm -- unless that word "percentage interest"
24    is somehow tied --
25

Page 39

M. PATRICK

1
2  BY MS. WINOGRAD:
3    Q.  Sorry, I apologize for interrupting,
4    but I'm going to move to strike that answer as
5    it's not responsive to my question.  I'm
6    just --
7        MS. DANDENEAU:  Well, Ms. Winograd,
8    this is why I objected to the form of your
9    question, because it's really not very
10    clear what you're asking.  And you're
11    right, he does not have to go -- go off on
12    a soliloquy explaining to you --
13    A.  I'll keep it -- I'll keep it short.
14  The percentage interest is not necessarily --
15        MS. DANDENEAU:  Well, why don't you
16    let Ms. Winograd --
17        THE WITNESS:  Okay.
18        MS. DANDENEAU:  Why don't you let
19    Ms. Winograd reask the question, and then
20    you can think about the answer to the
21    question.
22  BY MS. WINOGRAD:
23    Q.  Okay.  Mr. Patrick, I just -- I'm not
24    asking for generalities here, but I'm just
25    simply asking if it was a coincidence that the

Page 40

M. PATRICK

1
2    percentage interests in Schedule A are the same
3    as the percentage interests under 6.1 -- under
4    Article 6.1(a).
5    A.  Yeah, I would --
6        MS. DANDENEAU:  And objection to
7    form.
8  BY MS. WINOGRAD:
9    Q.  Mr. Patrick -- go ahead.
10    A.  The percentages in the "Distributable
11    Cash," if they do not refer to the same -- in
12    that definition, refer to percentage interest,
13    those numbers do not necessarily have to be the
14    same numbers.
15        So if they are the same numbers, they
16    can be, but they don't have to be.  That is my
17    answer.
18    Q.  Okay.  Here they are the same
19    numbers, though, correct?
20    A.  Correct.
21    Q.  Okay.  Have you ever seen a version
22    of a signed agreement for SE Multifamily where
23    the distributable cash percentages are
24    different than the percentage interest under
25    Schedule A?

Page 41

M. PATRICK

1
2    A.  I cannot recall.
3    Q.  Okay.
4        MS. WINOGRAD:  La Asia, can we scroll
5    to page 12, which is PDF page 12 of the
6    original LLC agreement?
7  BY MS. WINOGRAD:
8    Q.  Okay.  Do you see Article 6 where it
9    says "Allocations of Profits and Losses"?
10    A.  Yes, I do.
11    Q.  Okay.  Under Article 6.4(a), it says,
12    "Except as provided in Section 6.4(b) and (c),
13    and after the special allocations set forth in
14    Section A.III.2 and A.III.3 of Schedule B,
15    Profits and Losses (and items of income, gain,
16    loss, deduction and credit relating thereto)
17    shall be allocated 51 percent to HCRE and 49
18    percent to HCMLP."
19        Do you see that?
20    A.  Yes, I do.
21    Q.  HCMLP refers to Highland, correct?
22    A.  Correct.
23    Q.  Okay.  This allocation of profits and
24    losses is consistent with the members'
25    percentage interest in Schedule A, correct?

Page 42

M. PATRICK

1
2   A.  It is the same numbers, but it does
3 not have a definitional reference to the
4 percentage interest.
5   Q.  At the time the original LLC
6 agreement was entered into, was it your
7 understanding that the allocations of profits
8 and losses would be allocated in the same ratio
9 as the members' percentage interests?
10   A.  I do not recall my understanding.
11   Q.  You're aware that one of the
12 amendments to the original LLC agreement was
13 to -- was to the allocations of profits and
14 losses, correct?
15   A.  Correct.
16   Q.  Since the time SE Multifamily was
17 formed, were any of SE Multifamily's profits
18 and losses ever allocated to HCRE?
19   MS. DANDENEAU:  Objection to form.
20   A.  Both -- both the original and the
21 amended, I recall -- okay.  Okay.  I'm sorry,
22 I'm just getting -- you're referring to --
23 you're referring -- your question also
24 implicates the amended, but your question is
25 whether any profits and losses were allocated

Page 43

M. PATRICK

1
2 to HCRE.  And under 6.4(a), they were.
3 BY MS. WINOGRAD:
4   Q.  Okay.  But as we talked about, this
5 was later amended, which we'll get to later.
6   A.  Correct.
7   Q.  Okay.  Under Article 6.4(b), it
8 says all -- do you see Article 6.4(b)?
9   A.  Yes, I do.
10   Q.  It says, "All profits and losses from
11 the company's rental and leasing activities
12 shall be allocated 99 percent to HCMLP and 1
13 percent to HCRE."
14   Do you see that?
15   A.  Yes, I do.
16   Q.  Is it your understanding that at the
17 time the original LLC was entered into, the
18 members intended that the profits and losses
19 from SE Multifamily's rental and leasing
20 activities would be allocated 99 percent to
21 Highland and 1 percent to HCRE?
22   A.  Yes, because it's reflected in the
23 document.
24   Q.  Okay.  Do you know why the profits
25 and losses for the rental and leasing

Page 44

M. PATRICK

1
2 activities were allocated this way?
3   A.  No, I do not recall.
4   Q.  Okay.
5   MS. WINOGRAD:  La Asia, can we go to
6 Exhibit 4, please?
7   (Exhibit 4 displayed and to be
8   marked.)
9 BY MS. WINOGRAD:
10   Q.  Okay.  Mr. Patrick, do you recognize
11 this document?
12   A.  Yes, I do.
13   Q.  This is SE Multifamily Holdings LLC
14 First Amended and Restated Limited Liability
15 Company Agreement, correct?
16   A.  Correct.
17   Q.  Can we refer to this as the amended
18 LLC agreement going forward?
19   A.  Yes.
20   Q.  It's dated as of March 15th of 2019,
21 correct?
22   A.  Correct.
23   Q.  Do you know why it's dated March 15th
24 of 2019?
25   A.  Because the last amendments, it's my

Page 45

M. PATRICK

1
2 understanding, occurred on that date.
3   Q.  Was there -- was there a deadline for
4 amending the original LLC agreement?
5   A.  Yes, there was.  As I mentioned
6 earlier, there's a certain tax deadline where
7 the partners can come together and amend their
8 partnership agreement and make it effective for
9 the prior taxable year.  And that deadline is
10 March 15th.
11   Q.  Okay.  Did you have any role in
12 connection with the amended LLC agreement?
13   A.  Yes, I did.
14   Q.  Okay.  Were you involved in drafting
15 the amended LLC agreement?
16   A.  No, I was not.
17   Q.  What parts of the LLC agreement were
18 you involved with?
19   A.  The tax allocation part.  But I was
20 not involved in the part with respect to BH.
21   Q.  Okay.
22   MS. WINOGRAD:  La Asia, can we scroll
23 to page 18 of the amended LLC agreement?
24 BY MS. WINOGRAD:
25   Q.  Okay.  Do you see here that James

Page 46

M. PATRICK
1
2  Dondero signed on behalf of both Highland and
3  HCRE?
4     A.  Yes, I do.
5     Q.  Do you know if the amended LLC
6  agreement was subject to negotiations between
7  HCRE and Highland?
8     A.  I would again refer to my earlier
9  testimony, that Mr. Dondero, as far as his role
10  as the manager, weighed the equities between
11  the two entities and -- and reached a decision,
12  essentially negotiating with himself.  That's
13  what I'm saying.  You know, you can -- you can
14  weigh the variety of the equities when you have
15  these kind of situations and make decisions
16  upon it.  And, you know, so -- and I'm -- you
17  know, I'm sure he received input, if you will,
18  from other folks.
19     Q.  Uh-huh.  Do you know if Highland got
20  independent legal advice with respect to the
21  amended LLC agreement?
22     A.  Yes.
23     Q.  Who gave Highland this independent
24  legal advice?
25     A.  Alex McGeoch at Hunton & Williams.

Page 47

M. PATRICK
1
2     Q.  Do you know if HCRE got independent
3  legal advice with respect to the amended LLC
4  agreement?
5     A.  I do not.
6     Q.  So was it -- so is it your testimony
7  that Hunton Williams was only representing
8  Highland and not HCRE?
9     A.  I struggle with that word
10  "representing," especially in this sort of
11  context of an affiliate-type joint venture.
12     Q.  So let me rephrase that a little bit.
13  Was it your understanding that Hunton Williams
14  was giving independent legal advice only to
15  Highland and not HCRE in connection with the
16  amended LLC agreement?
17     A.  I would view it as they were giving
18  independent legal advice to the entity with
19  respect to the partnership agreement.
20     Q.  And when you say "to the entity," are
21  you referring to Highland --
22     A.  No, I'm -- yeah, I'm referring to SE
23  Multifamily Holdings LLC.
24     Q.  Do you know if any particular
25  individual was responsible for reviewing the

Page 48

M. PATRICK
1
2  amended LLC agreement to make sure it reflected
3  Highland's intent?
4     A.  Yes.
5     Q.  Who was that?
6     A.  Again, I would say the legal
7  department, Tim Cournoyer, who reported to
8  Thomas Surgent, and Freddy Chang.  Both lawyers
9  and legal professionals that reviewed this
10  document were involved in the review and
11  commenting of this document.
12     Q.  Do you know if any particular
13  individual was responsible for reviewing the
14  amended LLC agreement to make sure it reflected
15  HCRE's intent?
16     A.  I -- I do not.  The real estate team
17  was copied on the document, but I don't know if
18  there was anybody necessarily appointed for
19  that role.
20     Q.  Do you recall who the individuals on
21  the real estate team that were copied were?
22     A.  Well, I noted from my refresh
23  yesterday that Mr. Matthew McGraner was copied
24  on an e-mail that appears that I sent out on
25  this amended LLC agreement.

Page 49

M. PATRICK
1
2     MS. WINOGRAD:  Okay.  Could we scroll
3  to page 18, which is PDF page 19?
4  BY MS. WINOGRAD:
5     Q.  Okay.  Do you see that Liberty CLO
6  Holdco --
7     MS. WINOGRAD:  Actually, can you go
8  up a little bit, La Asia?  A little bit --
9  I guess, yeah, a little bit more.  Yeah,
10  sorry, down, down.  There we go.
11     Q.  Do you see that Liberty Holdco, Ltd.
12  was a party to the amended LLC agreement?
13     A.  Yes, I do.
14     Q.  Can I refer to them as Liberty?
15     A.  Yes, you can.
16     Q.  Do you know who Liberty was?
17     A.  Yes, I do.
18     Q.  Who was Liberty?
19     A.  Liberty is an entity, I believe, that
20  was directly owned by Charitable DAF Fund, L.P.
21     Q.  Do you know why Liberty was brought
22  in as a member of SE Multifamily?
23     A.  Yes.  Yes, I do.
24     Q.  Why?
25     A.  Two-fold.  One, it was -- it was

Page 50

M. PATRICK

1
2  presented for capital and receiving a nice
3  return with respect to it. Secondarily, what I
4  recall is that the purchase and sale agreement
5  with respect to the real estate assets
6  acquired, there was a section within that that
7  required a foreign entity, and -- and because
8  of the natural relationship that Highland had
9  with -- you know, I'll refer to -- with the
10 DAF, which included Liberty CLO Holdco, which
11 is organized as a foreign entity, it made it
12 very natural to make an offer to Liberty CLO
13 whether they, you know, wanted to participate
14 in this joint venture, receive a return, and
15 then sort of fulfill, if you will, the purchase
16 and sale agreement provision.
17    Q.  Okay.
18       MS. WINOGRAD:  Can we scroll to the
19 next page, La Asia?
20 BY MS. WINOGRAD:
21    Q.  Okay.  Do you see here that the BH
22 Equities, LLC was a party to the amended LLC
23 agreement?
24    A.  Yes, I do.
25    Q.  Can I refer to them as BH Equities?

Page 51

M. PATRICK

1
2    A.  Okay.
3    Q.  Do you know who BH Equities was?
4    A.  I have a general understanding.
5    Q.  What's your general understanding?
6    A.  I believe they provide property
7  management services.
8    Q.  Okay.  Do you know why BH Equities
9  was brought in as a member of SE Multifamily?
10   A.  No.
11   Q.  Do you have any understanding of what
12 role BH Equities played in SE Multifamily?
13   A.  No.
14   Q.  Do you know when BH Equities got
15 involved in SE Multifamily?
16   A.  I believe it was the last few -- the
17 last few days leading up to and including March
18 15th of -- of 2020.
19   Q.  Do you mean March 15th of 2019?
20   A.  Of 2019, excuse me, yes, that's
21 correct.
22   Q.  Did you ever have any communications
23 with anyone at BH Equities regarding Project
24 Unicorn?
25   A.  No, I did not.

Page 52

M. PATRICK

1
2    Q.  Do you know whether any entity
3  affiliated with Highland had previously entered
4  into any deals with BH Equities other than
5  Project Unicorn?
6    A.  I do not have specific knowledge.
7       MS. WINOGRAD:  Okay.  Can we go to
8  PDF page 21?  Yes.
9  BY MS. WINOGRAD:
10   Q.  Okay.  Have you seen Schedule A
11 before?
12   A.  Yes, I have.
13   Q.  Do you see that there's a column for
14 "Capital Contribution"?
15   A.  Yes, I have.
16   Q.  Do you see that it says HCRE's
17 capital contribution was $291,146,036?
18   A.  Yes, I do.
19   Q.  Do you know where HCRE got this 291
20 million?
21   A.  No.
22       MS. DANDENEAU:  Objection to form.
23 BY MS. WINOGRAD:
24   Q.  Do you know whether HCRE got the 291
25 million as proceeds from a bridge loan?

Page 53

M. PATRICK

1
2    A.  I have no --
3       MS. DANDENEAU:  Objection to form.
4       THE REPORTER:  I have no what?  I'm
5  sorry.
6    A.  I have no awareness of the bridge
7  loan.
8  BY MS. WINOGRAD:
9    Q.  So you have no knowledge of where
10 this 291 million came from; is that correct?
11   A.  That is correct, during the time of
12 the transaction.
13   Q.  Can you identify any source of
14 capital that HCRE used to fund its capital
15 contributions set forth on Schedule A?
16   A.  I had no personal visibility to the
17 capital contributions.
18   Q.  Okay.
19       MS. WINOGRAD:  Can we show Exhibit
20 18?
21       (Exhibit 18 displayed and to be
22       marked.)
23 BY MS. WINOGRAD:
24   Q.  Okay.  Mr. Patrick, do you see this
25 e-mail?

Page 54

M. PATRICK

2  A.  Yes, I do.

3  Q.  Did you write this e-mail?

4  A.  Yes, I did.

5  Q.  It's dated March 8th of 2019,

6  correct?

7  A.  Correct.

8  Q.  And this is in regard to the amended

9  LLC agreement, correct?

10  A.  Correct.

11  Q.  Okay.  Do you see where you say, "The

12  contribution provision schedule should reflect

13  the equity capital from the debt bridge"?

14  A.  Yes, I do.

15  Q.  And you say, the contribution

16  schedule should reflect -- oh, and then you

17  say, "So you will need to drop that amount into

18  Schedule A," correct?

19  A.  Correct.

20  Q.  Does the contribution schedule in

21  this e-mail refer to the contribution schedule

22  in Schedule A?

23  A.  Yes, it does.

24  Q.  And does this --

25  MS. DANDENEAU:  Ms. Winograd, can I

Page 55

M. PATRICK

2  just -- is it possible to scroll down and

3  see the rest of the document?

4  And also, Ms. La Canty, this is not a

5  document we've seen before.  Could you

6  please drop it into the chat at some point

7  or e-mail it to us?

8  BY MS. WINOGRAD:

9  Q.  Okay.  When you said --

10  MS. WINOGRAD:  Yeah, you can scroll

11  on down a little bit, La Asia, so that

12  they can see the rest of the e-mail.

13  BY MS. WINOGRAD:

14  Q.  What did you mean when you said

15  "equity capital from the debt bridge"?

16  A.  I don't recall -- and this is where

17  my recollection is being refreshed, you know,

18  several years later.  I didn't have any

19  historic knowledge of the bridge loan or the

20  debt bridge.  It looks -- from this e-mail, it

21  would appear that I did have some awareness of

22  it.  But as of right now, I have no memory of

23  having that knowledge.

24  Q.  Okay.  Have you heard of the KeyBank

25  loan?

Page 56

M. PATRICK

2  A.  Only in reference to these

3  depositions.  Prior to it, I had no

4  recollection because I was not involved.

5  Q.  Okay.  Well, when you see in this

6  e-mail that you refer to the debt bridge, does

7  that refresh your recollection --

8  A.  No.

9  Q.  -- about where HCRE's equity capital

10  came from?

11  A.  No.  No, no, no.  This is the --

12  yeah, no, I see it and I understand it.  It

13  appears that I did have knowledge back then,

14  but I do not remember that now.

15  MS. WINOGRAD:  Okay.  Let's take a

16  five-minute break.  Let's come back at

17  10:05 a.m. Eastern Time, if that works for

18  everyone.

19  MS. DANDENEAU:  That works for me.

20  MR. MORRIS:  Can we make it ten?  I'm

21  sorry.  I just --

22  MS. WINOGRAD:  10:10?

23  MR. MORRIS:  Yeah, please.

24  MS. WINOGRAD:  Yeah, that's fine.

25  I'll see everybody at 10:10 a.m. Eastern

Page 57

M. PATRICK

2  Time.

3  (Recess taken 8:59 a.m. Central Time

4  - 9:11 a.m. Central Time.)

5  MS. WINOGRAD:  La Asia, can we go

6  back to Exhibit 18, please?

7  BY MS. WINOGRAD:

8  Q.  Okay.  Mr. Patrick, do you see this

9  document?  It's the one we were just talking

10  about.

11  A.  Yes, I do.

12  Q.  Okay.  So you were aware that HCRE

13  was borrowing hundreds of millions of dollars

14  to finance their investment in SE Multifamily,

15  right?

16  A.  I do not have current knowledge of

17  that awareness.  You know, I see what the

18  e-mail expressed.

19  Q.  Does this e-mail that you wrote just

20  a few days before the execution of the amended

21  LLC agreement refresh your recollection as to

22  the fact that HCRE was borrowing hundreds of

23  millions of dollars?

24  A.  No, it did not.

25  Q.  Okay.  You gave this instruction to

Page 58

M. PATRICK

1
2 Paul Broaddus that the contribution schedule
3 should reflect the equity capital from the debt
4 bridge, did you not?
5    A.  Yes, it appears so in this e-mail.
6    Q.  Can you think of anything other than
7 the KeyBank loan that this debt bridge would
8 have been referring to?
9       MS. DANDENEAU:  Objection to form.
10    A.  I just don't have a recollection of
11 when I used that word "debt bridge" in this
12 e-mail, what I was referring to.
13 BY MS. WINOGRAD:
14    Q.  You know that HCRE's capital
15 contribution was proceeds from a loan, though,
16 right?
17    A.  No, I --
18       MS. DANDENEAU:  Objection to form.
19    A.  I do not have a recollection.
20 BY MS. WINOGRAD:
21    Q.  It's your testimony that you have no
22 recollection of where the $291 million came
23 from?
24    A.  That is correct.
25    Q.  And you have no recollection as to

Page 59

M. PATRICK

1
2 whether this was a loan?
3    A.  What is a loan?  I'm sorry, what --
4    Q.  The $291 million, was that proceeds
5 from a loan?
6    A.  Yeah, I have no recollection.
7    Q.  Can you think of any type of loan
8 that your e-mail would have been referring to
9 when you say debt bridge?
10       MS. DANDENEAU:  Objection to form.
11    A.  Again, I don't recall what I was
12 referring to when I wrote this e-mail.
13       MS. WINOGRAD:  La Asia, let's scroll
14 to page 12, PDF page 12.
15       MS. CANTEY:  You mean the amended
16 agreement or stay on --
17       MS. WINOGRAD:  I tell you, let's go
18 to Exhibit 4, the amended and restated LLC
19 agreement.
20       MS. CANTEY:  Okay.
21 BY MS. WINOGRAD:
22    Q.  Okay.  Do you see here where it says
23 Article 6.4, "Allocations of Profits and
24 Losses"?
25    A.  Yes, I do.

Page 60

M. PATRICK

1
2    Q.  Okay.  You were involved with
3 drafting this provision, right?
4    A.  No, I was not.
5       MS. WINOGRAD:  Okay.  Could we show
6 Exhibit 15, please?
7       (Exhibit 15 displayed and to be
8          marked.)
9       MS. WINOGRAD:  Okay.  Can we scroll
10 to the third e-mail down?
11 BY MS. WINOGRAD:
12    Q.  Do you see this e-mail, Mr. Patrick?
13    A.  Yes, I do.
14    Q.  Did you write this?
15    A.  Yes, I did.
16    Q.  It's dated March 4th of 2019, right?
17    A.  Correct.
18    Q.  Okay.  And it's to Freddy Chang,
19 right?
20    A.  Correct.
21    Q.  Okay.  And you say, "I'd like to get
22 this to the return preparer ASAP to get sign
23 off on the tax allocations," correct?
24    A.  Correct.
25    Q.  Does this refresh your recollection

Page 61

M. PATRICK

1
2 about your involvement in Article 6.4?
3       MS. DANDENEAU:  Objection to form.  I
4    think that the question that you asked him
5    was whether he was involved in drafting
6    Article 4.
7 BY MS. WINOGRAD:
8    Q.  Mr. Patrick, were you involved with
9 Article 6.4?
10    A.  Yes.
11       MS. DANDENEAU:  Objection to form.
12 BY MS. WINOGRAD:
13    Q.  How were you involved?
14    A.  I was involved in the discussions
15 with respect to the allocation percentages that
16 would be placed into 6.4.
17       MS. WINOGRAD:  Okay.  La Asia, could
18 we go back to Exhibit 4, PDF page 12,
19 please?
20 BY MS. WINOGRAD:
21    Q.  Okay.  Let's look at Article 6.4(a).
22 It says -- okay.  Well, first, who did you
23 discuss this article with?
24    A.  This article was discussed with Rick
25 Swadley, our chief of tax compliance; Paul

Page 62

M. PATRICK

1          M. PATRICK
2 Broaddus; Dave Klos in corporate. I cannot
3 recall offhand if anybody on the legal team was
4 involved. And then Mr. James Dondero.
5 BY MS. WINOGRAD:
6    Q. Okay. What was said during those
7 discussions?
8    A. The tax compliance team in 2019 had
9 made an assessment, if you will, of the taxable
10 income in loss from this entity, SE Multifamily
11 Holdings. And because we had the March 15th
12 date, it allows the partnership to make a
13 determination of the allocations of the taxable
14 income.
15     I recall that Mr. Swadley and
16 Mr. Broaddus gave a presentation with respect
17 to the dollar amounts of the taxable income,
18 and there was discussion with respect to how
19 that taxable income for 2018 could be allocated
20 amongst the partners. And the final
21 determination of that discussion is reflected
22 here at 6.4(a).
23    Q. Okay. And as we discussed earlier,
24 the profits and losses in the original LLC
25 agreement were 51 percent to HCRE and 49

Page 63

M. PATRICK

1          M. PATRICK
2 percent to Highland, right?
3    A. Correct.
4    Q. Okay. Do you know why the tax
5 allocations were changed?
6    A. Yes. So at the beginning of 2019,
7 the tax compliance team was able to take a look
8 at the taxable income, the profit and losses.
9 That's what 6.4 is referring to, taxable income
10 profit and losses under the definition.
11     So they had a -- they had an
12 assessment of what the profit and losses of the
13 partnership were. And so when I refer back to
14 my earlier testimony, this was a fluid document
15 intended to be amended annually with respect to
16 the variety of items, the sale and dispositions
17 of assets with respect to cash, with respect to
18 tax items. So this was going to be what I
19 would view as a reoccurring discussion.
20     So that's why it changed, because we
21 had information now that we didn't have, you
22 know, at the time of the original LLC agreement
23 with respect to the taxable income and loss of
24 this entity.
25    Q. How much taxable income was there?

Page 64

M. PATRICK

1          M. PATRICK
2    A. I don't -- I do not recall.
3    Q. Okay. So do you know who made the
4 decision to change the profits and losses?
5    A. To change -- so you're referring to
6 changing the original 6.4(a) allocation to the
7 6.4(a) allocation in the amended LLC agreement,
8 right? That's your --
9    Q. To change it, right.
10    A. Yeah, yeah, yeah, yeah. No, no, no,
11 that determination was made by the manager of
12 HCRE, Mr. James Dondero, per a presentation by
13 the Highland, you know, tax department.
14    Q. Okay. Do you know why 94 percent of
15 the profits and losses was allocated to
16 Highland?
17    THE REPORTER: I'm sorry. I saw your
18 lips move, but I didn't hear you.
19    MS. WINOGRAD: I said, do you know
20 why the 94 percent profits was allocated
21 to Highland.
22    THE REPORTER: Yes, I heard your
23 question. I didn't hear the answer.
24    A. Yeah. No, I was just formulating the
25 answer in my mind. When we made -- when that

Page 65

M. PATRICK

1          M. PATRICK
2 discussion with the tax team and Mr. Dondero
3 occurred, it's -- the -- the determination was
4 to make this allocation because Highland,
5 again, was a more well resourced entity,
6 resourced structurally as well as financially,
7 than HCRE. And I seem to recall that there was
8 not cash, if you will, available within the
9 overall entity to make -- for that entity to
10 make a, if you will, tax distribution.
11     And so you have HCRE, which is owned
12 by individuals, you have HCMLP, which is a well
13 resourced entity, and so it made a lot of sense
14 to make that allocation to Highland, at least
15 initially at the beginning of this discussion.
16    Q. Okay. Do you know if any profits
17 were ever allocated to HCRE?
18    A. Again, this sort of -- the race began
19 and ended relatively quick per the filing of
20 Highland's bankruptcy. You know, so the
21 expectation was that the 2019 P&L, there would
22 be a meeting sometime in 2020, before March
23 15th, where there would be an assessment with
24 respect to the allocation of cash, of the
25 properties being sold, as well as the taxable

Page 66

M. PATRICK

1   income.
2        Just during this time period, my
3   understanding is that the cash and these real
4   estate deals are, generally speaking, directed
5   to pay off the lending group. You know, so the
6   equity, unfortunately, receives the taxable
7   income, but there's not cash readily available
8   to make a tax distribution to its partners.
9   It's a very common problem that occurs in real
10  estate transactions.
11       MS. WINOGRAD: Okay. I'm going to
12  move to strike that answer because it
13  wasn't directly responsive to my question.
14  BY MS. WINOGRAD:
15    Q. Do you know if HCRE ever had profits
16  allocated to it?
17    A. If it had profits allocated to it.
18  There's only been -- ever had -- to my
19  understanding, there's only two documents.
20  There's the original and the amended. And
21  Highland filed for bankruptcy in the fall of
22  2019. So, again, there was not an opportunity
23  to allocate -- do different allocations.
24       So I guess what I'm saying is no, it

Page 67

M. PATRICK

1   was my understanding the -- HCRE has not been
2   allocated taxable income for the reasons that I
3   explained.
4     Q. Okay. Are you aware that the owners
5   of Highland purport to be charitable
6   foundations?
7        MS. DANDENEAU: Objection to form.
8     A. Purport -- the owners of Highland
9   purport to be charitable foundations. No,
10  I'm -- I'm not aware that the owners of
11  Highland purport themselves to be charitable
12  foundations.
13  BY MS. WINOGRAD:
14    Q. Are you aware that the owners -- the
15  ultimate owners of Highland are exempt from
16  paying taxes?
17       MS. DANDENEAU: Object to form.
18    A. I would say the ultimate owners of
19  Highland are subject to taxable income, is my
20  awareness.
21  BY MS. WINOGRAD:
22    Q. Has -- are you aware of any taxes
23  that Highland ever paid on SE Multifamily's
24  profits?

Page 68

M. PATRICK

1        MS. DANDENEAU: Objection to form.
2     A. No, I'm not aware of any taxes that
3   Highland has paid with respect to this because
4   it is a pass-through entity.
5   BY MS. WINOGRAD:
6     Q. Can you identify the owners of
7   Highland?
8        MS. DANDENEAU: Objection to the
9   form. And are you talking about a
10  specific time period?
11       MS. WINOGRAD: As of the time this
12  amended LLC agreement was entered into.
13    A. Please restate the question again.
14  BY MS. WINOGRAD:
15    Q. Are you aware of the owners of
16  Highland?
17       MS. DANDENEAU: Objection to form
18  unless you're going to qualify it as of
19  the time this LLC agreement was entered
20  into, the original LLC agreement.
21  BY MS. WINOGRAD:
22    Q. Mr. Patrick, can you identify the
23  owners of Highland as of the time the amended
24  LLC agreement was entered into?

Page 69

M. PATRICK

1     A. Yes, I believe it was Strand
2   Advisors, an entity called Hunter Mountain, and
3   then perhaps some other small interests. But I
4   don't have the precise amounts or the names.
5     Q. Can you identify the ultimate
6   beneficial owners of Highland as of the time
7   this amended LLC agreement was entered into?
8     A. Ultimate beneficial owners of
9   Highland. I would say Hunter Mountain.
10    Q. Was there any other beneficial owner
11  of Highland?
12    A. Any other beneficial owner. Any
13  other beneficial --
14    Q. Let me rephrase the question.
15    A. Okay, look, what do you mean by
16  "beneficial"? Please define that.
17    Q. Who owns Hunter Mountain?
18    A. My understanding, it's an entity
19  called Beacon, LLC. It might be Beacon
20  Mountain, LLC.
21    Q. Are you aware of any other beneficial
22  owners of Hunter Mountain?
23    A. No.
24    Q. Isn't the purpose of allocating 94

Page 70

M. PATRICK

1
2 percent of profits and losses to Highland to
3 eliminate the payment of taxes associated with
4 any of SE Multifamily's profits?
5        MS. DANDENEAU: Objection to form.
6    A.  No.
7 BY MS. WINOGRAD:
8    Q.  So can you explain to me again just
9 so that I have an understanding of what the
10 purpose of allocating 94 percent of profits to
11 Highland was?
12        MS. DANDENEAU: Objection to form.
13 Is that a question?
14        MS. WINOGRAD: Yes, it was a
15 question. I'm asking if he could explain
16 to me again the purpose of allocating 94
17 percent of the profits and losses to
18 Highland.
19    A.  The purpose was that Highland
20 vis-a-vis the other -- HCRE, if you will, was a
21 well resourced entity.
22 BY MS. WINOGRAD:
23    Q.  Was there -- was there a tax purpose
24 of allocating 94 percent of profits and losses
25 to Highland?

Page 71

M. PATRICK

1
2        MS. DANDENEAU: Objection to form.
3    A.  Yeah, I don't -- I don't know what
4 you mean by "tax purpose."
5 BY MS. WINOGRAD:
6    Q.  Is it your understanding that the
7 allocation of profits and losses to Highland
8 was one of the reasons that Highland was
9 brought into this deal?
10        MS. DANDENEAU: Objection to form.
11    A.  One of the reasons. I cannot recall
12 precisely.
13 BY MS. WINOGRAD:
14    Q.  Okay.
15    A.  I mean, I heard you say one of the
16 reasons. And, you know, I do -- I would say
17 yes, because I think, as I earlier described,
18 the organizational nature of Highland being a
19 partnership.
20    Q.  Okay. And if I asked this already,
21 then I apologize, but I'm just trying to
22 understand this. Are you aware of any taxes
23 Highland has ever paid on SE Multifamily's
24 profits?
25        MS. DANDENEAU: Objection to form.

Page 72

M. PATRICK

1
2    A.  No.
3 BY MS. WINOGRAD:
4    Q.  Are you familiar with the term
5 "economic substance"?
6    A.  Yes, I am.
7    Q.  Do you know if there was any economic
8 substance in allocating 94 percent of the
9 profits and losses to Highland?
10    A.  Yes, there was.
11    Q.  What was that economic substance?
12    A.  The economic substance is that over
13 time within the partnership, as the partnership
14 would make sales and distributions, if you
15 will, of cash, that there's -- that there would
16 be an expectancy of such distribution in the
17 future, and that gives it economic substance to
18 the earlier allocation under Subchapter K.
19    Q.  Do you know if there were any -- ever
20 any projections that showed losses to SE
21 Multifamily?
22    A.  I'm sorry, say that again.
23    Q.  Do you know if there were ever any
24 projections that showed losses to SE
25 Multifamily?

Page 73

M. PATRICK

1
2    A.  I cannot recall, but I'm not clear --
3 I'm not clear what kind of projections you're
4 referring to.
5    Q.  Projections showing what the taxable
6 profits for SE Multifamily were.
7    A.  Yeah, I -- I don't recall.
8        MS. WINOGRAD: Okay. La Asia, can we
9 pull up Exhibit 12?
10        (Exhibit 12 displayed and to be
11 marked.)
12 BY MS. WINOGRAD:
13    Q.  Okay. Mr. Patrick, do you recognize
14 this e-mail?
15    A.  Yes, I do.
16    Q.  Okay. You wrote this e-mail, right?
17    A.  Correct.
18    Q.  This e-mail relates to the amended
19 LLC agreement that we've been discussing,
20 correct?
21    A.  Correct.
22    Q.  What's the date on the e-mail?
23    A.  February 28th, 2019.
24    Q.  Exactly. Okay. This is an e-mail
25 from you to Tim Cournoyer, Freddy Chang, David

Page 74

M. PATRICK

1    Klos, cc'ing some other Highland employees,
2    correct?
3    
4    A.  Correct.
5    Q.  In the first line of the e-mail, you
6    stated, "We have a March 15 tax deadline that
7    permits the retroactive amendment of this
8    partnership agreement."
9        Do you see that?
10   A.  Yes, I do.
11   Q.  And the partnership agreement is
12   referring to the LLC agreement, correct, the
13   original LLC agreement?  Correct?
14   A.  Correct.
15   Q.  And we discussed this tax deadline
16   earlier.  Can you help me understand again what
17   this tax deadline was?  I just want to make
18   sure I understand.
19   A.  Sure.  So after the close of a
20   year -- in this case it's 2018 -- the
21   partnership rules allow the partners to come
22   together and allocate to make cash allocations
23   and tax allocations effective for the prior
24   taxable year, so the 2018 year, doing it in the
25   subsequent year.  Here it would be 2019.  But

Page 75

M. PATRICK

1
2    you have until March 15th to amend your
3    partnership agreement to sort of decide how
4    you're going to split the pie amongst the
5    partnership.
6    Q.  Okay.  So to confirm, does it mean
7    that the amended LLC agreement had to be signed
8    by March 15th of 2019 to be effective as of
9    August 23rd of 2018?
10   A.  There needed to be an agreement
11   amongst the partners before March 15th to make
12   it effective in August of 2018.
13   Q.  Okay.  So do you know why the
14   original LLC agreement was being amended?
15   A.  Yes, because information after the
16   end of the year came to the -- came to the tax
17   department as far as having a general
18   understanding of the taxable income and loss of
19   the partnership, as well as availability of
20   cash.
21   Q.  Okay.  Did you -- did you draft the
22   amendments you refer to in your e-mail?
23   A.  No.
24   Q.  Okay.  Did you review them?
25   A.  I believe I did.

Page 76

M. PATRICK

1
2    Q.  Okay.  During your involvement in
3    these amendments, who did you report to?
4    A.  Frank Waterhouse, the chief financial
5    officer of Highland.
6    Q.  Okay.  Do you consider yourself to be
7    a careful professional?
8        MS. DANDENEAU:  Objection to form.
9    A.  Yes.
10   BY MS. WINOGRAD:
11   Q.  Yes, okay.  Do you pay attention to
12   detail when you draft documents?
13   A.  I don't draft documents.
14   Q.  Okay.  Let me rephrase the question.
15       Do you pay attention to detail when
16   you review documents?
17   A.  To the best of my ability.
18   Q.  Okay.  And when you're reviewing
19   documents in your professional capacity, are
20   you careful to make sure the documents reflect
21   the intent of the people you are working for?
22   A.  To the best of my ability.
23   Q.  Okay.  So the first amendment in this
24   e-mail you refer to is BH ownership.  Do you
25   see that?

Page 77

M. PATRICK

1
2    A.  Yes, I do.
3    Q.  Does this refer to BH Equities coming
4    in as an owner to SE Multifamily?
5    A.  I believe it would.
6    Q.  When BH Equities was coming in as an
7    owner to SE Multifamily, do you know if there
8    was ever discussions about whether HCRE would
9    make any additional capital contributions?
10   A.  I'm not aware of that.  I have no
11   knowledge.
12   Q.  Okay.  The third amendment you refer
13   to in this e-mail is the amendment to the cash
14   distributions and tax allocations section.
15       Do you see that?
16   A.  Yes, I do.
17   Q.  Okay.  And it looks like there's a
18   couple of attachments in this e-mail, right?
19   A.  Yes.
20       MS. WINOGRAD:  Okay.  La Asia, can we
21   scroll down to PDF page 29?
22   BY MS. WINOGRAD:
23   Q.  Okay.  Mr. Patrick, this is one of
24   the attachments that you attached to your
25   e-mail, correct?

Page 78

M. PATRICK

1
2    A.  Correct.
3       Q.  It's a redline of changes made to the
4  original LLC agreement, correct?
5    A.  Correct.
6       Q.  Did you make these changes?
7    A.  I don't believe I was involved in the
8  redline, of creating the redline.
9       Q.  But you reviewed them, right?
10   A.  Yes, I did review the redline.
11      Q.  Okay.
12         MS. WINOGRAD:  La Asia, can we scroll
13      to PDF 38, which is page 10 of this
14      redlined agreement.
15 BY MS. WINOGRAD:
16      Q.  Okay.  Do you see that the
17 distributable cash for HCRE has changed from 51
18 percent to 47.94 percent?
19   A.  Yes, I do.
20      Q.  Do you see that the distributable
21 cash for Highland has changed from 49 percent
22 to 46.06 percent?
23   A.  Wait, I think -- wait -- oh, correct.
24 Yes, I do.
25      Q.  Okay.  And these amended percentages

Page 79

M. PATRICK

1
2  for cash distributions were arrived at by
3  reducing Highland's and HCRE's respective
4  ownership interests by 6 percent, right?
5    A.  That would appear so, but I was not
6  kind of involved in these -- the creation of
7  these numbers or calculation of these numbers.
8       Q.  Okay.  That 6 percent, though, to the
9  best of your knowledge, based on this document,
10 was allocated to BH Equities, correct?
11   A.  It would appear so.
12      Q.  Okay.  The amendments to the cash
13 distributions you refer to in your e-mail that
14 we just talked about is referring to these
15 changes we are looking at in Article 6.1(a),
16 correct?
17   A.  Correct.
18      Q.  This isn't the only place the changes
19 are made, is it?
20   A.  No, I don't think so.
21      Q.  Do you know who was
22 responsible for making these changes?
23   A.  Like, actually drafting --
24      Q.  Yeah.
25   A.  -- the changes?  No, I -- I don't

Page 80

M. PATRICK

1
2  recall.  I just don't -- I just know I didn't
3  do it.
4       Q.  Okay.  And these -- like we just
5  talked about, the same percentage adjustments
6  are made throughout other sections of the
7  document, aren't they?
8    A.  Pardon?
9       Q.  These same percentage adjustments are
10 made throughout other sections of this
11 document, aren't they?
12   A.  The same -- I don't know, you'd have
13 to refresh my memory and show me the other
14 percentages.  I don't think they are the same
15 percentages.
16      Q.  Okay.
17         MS. WINOGRAD:  Can we scroll to PDF
18      page 47?
19 BY MS. WINOGRAD:
20      Q.  Do you see Schedule A here?
21   A.  Yes, I do.
22      Q.  And do you see that under "Percentage
23 Interest," do you see the same percentage
24 adjustments made here that were made to
25 distributions --

Page 81

M. PATRICK

1
2    A.  Yes, I do see the same numbers on
3  that Schedule A.
4       Q.  And these amended percentages were
5  arrived at by reducing Highland's and HCRE's
6  respective ownership interests in SE
7  Multifamily by 6 percent, right?
8    A.  I'm -- ownership interest is not -- I
9  don't believe is defined in this document.  So,
10 you know, I would answer no, because it's not
11 defined in the documents.  It's reducing the
12 percentage interest in Schedule A.
13      Q.  Okay.  So isn't percentage interest
14 the same thing as ownership interest in SE
15 Multifamily?
16   A.  I'd have to see --
17         MS. DANDENEAU:  Objection to form.
18   A.  I'd have to read --
19         MS. DANDENEAU:  Mr. Patrick, let
20      me -- give me time to state my objections,
21      please.
22         Objection to form.
23   A.  I would have to read the definition,
24 but I wouldn't -- if percentage interest in the
25 definitions does not refer to ownership, I

Page 82

1          M. PATRICK
2  would call that conflation.
3  BY MS. WINOGRAD:
4      Q.  Okay.  But it says percentage
5  interest, right?
6      A.  Yes.
7      Q.  And it's percentage interest in SE
8  Multifamily, right?
9      A.  Yes.
10      Q.  Okay.  And so these amended
11  percentages --
12          MS. DANDENEAU:  Objection.
13      Objection, misstates the document.  I'm
14      sorry for -- it does not in anywhere on
15      the page I'm looking at say percentage
16      interest in SE Multifamily.
17          THE WITNESS:  No.
18  BY MS. WINOGRAD:
19      Q.  Okay.  Mr. Patrick, do you have any
20  reason to think that the percentage interests
21  listed in Schedule A are anything other than
22  the members' percentage interests in SE
23  Multifamily?
24      A.  No.
25          MS. DANDENEAU:  Objection to form.

Page 83

1          M. PATRICK
2  BY MS. WINOGRAD:
3      Q.  Can you answer that again,
4  Mr. Patrick?
5      A.  Yes.  No, I do not.
6      Q.  Thank you.  And these amended
7  percentages under "Percentage Interest" were
8  arrived at by reducing Highland's and HCRE's
9  respective percentage interest in SE
10  Multifamily by 6 percent, right?
11      A.  It would appear so.
12      Q.  Okay.  And these -- these changes to
13  the members' percentage interest are made in
14  other places in this document, too, aren't
15  they?
16      A.  Changes in the -- can you restate
17  that question?
18      Q.  Sure.  So why don't we go to --
19          MS. WINOGRAD:  La Asia, let's go to
20      PDF page 31.
21  BY MS. WINOGRAD:
22      Q.  Okay.  Do you see Article 1.7?
23      A.  Yes.
24      Q.  Okay.  Do you see under Article 1.7,
25  it says "Company Ownership"?

Page 84

1          M. PATRICK
2      A.  Yes, I do.
3      Q.  Do you see these same percentages for
4  company ownership that were made to the other
5  provisions we just talked about in Schedule A
6  and in distributable cash?
7      A.  Yes.
8      Q.  Okay.  And to confirm, these amended
9  percentage ownerships of the members were
10  arrived at simply by reducing Highland's and
11  HCRE's respective ownership interests by
12  6 percent, correct?
13      A.  Correct.
14      Q.  Okay.  When you sent this e-mail out,
15  you knew all these percentage changes were made
16  throughout this document, right?
17      A.  Yes.
18      Q.  And when you sent this e-mail out,
19  those changes are what you intended, correct?
20          MS. DANDENEAU:  Objection to form.
21  BY MS. WINOGRAD:
22      Q.  You intended to make these changes?
23      A.  Yeah, I would -- you're saying these
24  changes are what I intended.  I did not intend
25  one way or another.  What I was trying to do,

Page 85

1          M. PATRICK
2  if you will, is just work with people that made
3  these changes and distributed out to see -- to
4  the larger group to see if this is consistent
5  with the overall intent.
6      Q.  Okay.  But you intended to send this
7  document out, correct?
8      A.  I intended to send -- yes, I intended
9  to send the document out for review and comment
10  that these percentages were consistent with the
11  overall intent.
12      Q.  Okay.
13          MS. WINOGRAD:  Could we go to PDF
14      page 1 of the e-mail?
15  BY MS. WINOGRAD:
16      Q.  Okay.  All of the recipients of this
17  e-mail were given the opportunity to look at
18  the changes in your attached documents,
19  correct?
20      A.  Correct.
21      Q.  Did any recipient of this e-mail ever
22  tell you there was a mistake in the percentage
23  changes that are set forth throughout the
24  attachment in your e-mail?
25      A.  I do not recall.

Page 86

M. PATRICK

1
2   Q.  Okay.  At the time you sent the
3   e-mail, did any of the recipients in this
4   e-mail work for HCRE?
5   A.  I didn't -- I didn't have visibility
6   as to who worked for HCRE.
7   Q.  Okay.  But they all have Highland
8   e-mail addresses, right?
9   A.  Yeah.
10  Q.  Does that indicate that they all
11  worked for Highland?
12  A.  Look, again --
13      MS. DANDENEAU:  Objection, asked and
14  answered -- objection, asked and answered.
15  You asked him this question already.
16      MS. WINOGRAD:  I did not ask this
17  specific question already.
18      MS. DANDENEAU:  You did.  You asked
19  him before who were -- he answered that he
20  thought maybe Freddy Chang worked for
21  HCRE.
22      MS. WINOGRAD:  I'm asking --
23      MS. DANDENEAU:  I'm just --
24      MS. WINOGRAD:  -- in this e-mail.  I
25  did not ask about the recipients on this

Page 87

M. PATRICK

1
2   e-mail.  I'm going to move forward,
3   though, because he already answered the
4   question.
5      MS. DANDENEAU:  Okay, I'm sorry.
6   Please answer -- okay.
7   BY MS. WINOGRAD:
8   Q.  Mr. Patrick, prior to the execution
9   of the amended LLC agreement, did anyone ever
10  tell you that the percentage changes made
11  throughout the attachment was -- were a
12  mistake?
13  A.  I do not recall.
14  Q.  These percentage changes were
15  accepted and adopted into the amended LLC
16  agreement, correct?
17  A.  Correct.
18  Q.  Did anyone ever discuss the changes
19  in these percentages before the amended LLC
20  agreement was executed?
21      MS. DANDENEAU:  Objection to form.
22  A.  Wait.  Restate the question one more
23  time.
24  BY MS. WINOGRAD:
25  Q.  Did anybody ever discuss the

Page 88

M. PATRICK

1
2   percentage changes in this document that we
3   just went through before the amended LLC
4   agreement was executed?
5      MS. DANDENEAU:  Objection to form.
6   A.  It's my understanding when Paul
7   Broaddus was, I guess, working to include BH
8   ownership in this transaction, he was
9   discussing with them and others.  I believe I
10  was on vacation or out of pocket during that
11  time period.  So I -- you know, all I know is
12  that Paul was interfacing with BH in discussing
13  those percentages.  I don't know who else
14  internally he spoke to about the percentages.
15  BY MS. WINOGRAD:
16  Q.  Okay.  From your perspective, at the
17  time you sent out this e-mail with this
18  attachment, the percentages reflected the
19  parties' intent.
20  A.  Correct.
21  Q.  Okay.
22  A.  Correct.
23  Q.  Otherwise, you would have said
24  something, right?
25  A.  I'm sorry, otherwise what?

Page 89

M. PATRICK

1
2   Q.  Otherwise you would have said
3   something.
4   A.  I would have said something?
5      MS. DANDENEAU:  Objection, form.
6   A.  No --
7      MS. DANDENEAU:  Mr. Patrick, please
8   give me time to lodge my objection.
9      Objection to form.  You can slow
10  down.
11  A.  I was asked -- when I sent this
12  e-mail out, it's essentially I'm asking the
13  parties that are directed -- the "To" parties,
14  you know, Tim Cournoyer, Freddy Chang, Dave
15  Klos.  I'm also directing it at Paul Broaddus,
16  Matt McGraner, Rick Swadley, Frank Waterhouse
17  to review the document and tell me does this
18  reflect the intent.  I'm not telling them this
19  is the intent.  I'm asking them to provide
20  review to make sure it's consistent with the
21  overall agreement, if you will, understanding
22  of the agreement.
23  BY MS. WINOGRAD:
24  Q.  And when you were trying to get that
25  clear, nobody told you that it did not reflect

Page 90

M. PATRICK

1   the parties' intent, correct?
2   A.   I don't remember.  I mean, for all I
3   know, you could show me an e-mail with someone
4   saying something.  I just don't remember.
5   Q.   To the best of your knowledge today,
6   nobody told you that there was a mistake in
7   these percentages, correct?
8   A.   That is correct.
9   Q.   Okay.
10      MS. WINOGRAD:  Can we go to Exhibit
11   18, please?
12   BY MS. WINOGRAD:
13   Q.   Okay.  Do you see this e-mail,
14   Mr. Patrick?
15   A.   Yes, I do.
16   Q.   Did you write it?
17   A.   Yes, I did.
18   Q.   It's dated March 8th of 2019, right?
19   A.   Yes.
20   Q.   What's the subject?
21   A.   It says "Unicorn - LLC Agreement."
22   Q.   Okay.  This relates to the amended
23   LLC agreement, correct?
24   A.   Correct.
25

Page 91

M. PATRICK

1   Q.   This e-mail is sent to Paul Broaddus,
2   correct?
3   A.   Correct.
4   Q.   And he was in the tax department at
5   Highland, correct?
6   A.   Yes.
7   Q.   Do you see where you say, "Please
8   have this signed while Shawn and I are out"?
9   A.   Okay.
10      MS. WINOGRAD:  La Asia, can we scroll
11   a little bit down to the attachment?
12   BY MS. WINOGRAD:
13   Q.   Okay.  And, Mr. Patrick, is this the
14   attachment you were referring to in your
15   e-mail?
16   A.   I believe so.  Well, I --
17   Q.   When you said, "Please have this
18   signed" --
19   A.   Yeah, yeah, yeah.  I think so.
20      THE REPORTER:  Wait, wait, wait,
21   wait.  I didn't hear the question because
22   there was overspeak.
23
24
25

Page 92

M. PATRICK

1   BY MS. WINOGRAD:
2   Q.   When you said, "Please have this
3   signed," were you referring to this document?
4   I think you answered --
5   A.   Yeah, I'd have to kind of see the
6   rest of the document.  I'm a little unsure if
7   this was the document that I was -- I wanted
8   them to sign or the document that Paul would
9   have to work with during the time period of my
10   absence.
11   Q.   Okay.  This is the attachment,
12   though, you were referring to in your e-mail,
13   when you were directing them to a document,
14   correct?
15   A.   Yeah.  If it's electronically
16   attached to it, I would say yes.
17   Q.   Okay.
18      MS. WINOGRAD:  Can we scroll back up
19   to the e-mail, please?
20   BY MS. WINOGRAD:
21   Q.   In your e-mail you say, "The
22   contribution schedule should reflect the equity
23   capital from the debt bridge."
24      Do you see that?
25

Page 93

M. PATRICK

1   A.   Yes, I do.
2      MS. WINOGRAD:  And then could we
3   scroll back to PDF page 20?
4   BY MS. WINOGRAD:
5   Q.   Okay.  Can you explain to me what you
6   meant by that in terms of the capital
7   contribution?
8      MS. DANDENEAU:  Objection to form.
9   BY MS. WINOGRAD:
10   Q.   Well, let me rephrase it.
11   A.   Yeah.
12   Q.   The contribution schedule that you're
13   referring to in your e-mail, are you referring
14   to this "Capital Contribution" column on
15   Schedule A that we're looking at?
16   A.   Yeah.  I would -- I would believe so.
17   Q.   Okay.  So is it fair to say you
18   intended that column to be adjusted?
19   A.   Yes.
20      MS. DANDENEAU:  Objection to form.
21   Q.   MS. WINOGRAD:  And then can we go
22   back up to the e-mail a little bit, just
23   to the top one?
24
25

Page 94

1          M. PATRICK
2   BY MS. WINOGRAD:
3       Q.   Do you see here where you say the
4   percentage interests could remain?
5       A.   Yes.
6          MS. WINOGRAD:  La Asia, could we go
7       back to PDF page 20?
8   BY MS. WINOGRAD:
9       Q.   When you refer to the percentage
10  interests in your e-mail, are you referring to
11  the "Percentage Interest" column on Schedule A
12  that we're looking at?
13      A.   I would believe so.
14      Q.   Okay.  So when you sent this e-mail,
15  you intended for these percentage interests in
16  percentage interest -- in the "Percentage
17  Interest" column to stay the same, right?
18         MS. DANDENEAU:  Objection to form.
19      A.   No, not necessarily.  I think what I
20  was indicating is that they don't have to
21  adjust if the partners don't want them to
22  adjust.
23  BY MS. WINOGRAD:
24      Q.   Okay.  Did you have an idea when you
25  wrote this e-mail of whether the partners

Page 95

1          M. PATRICK
2   wanted them to adjust?
3       A.   I --
4          MS. DANDENEAU:  Objection to form.
5       A.   I did not.
6          MS. DANDENEAU:  Objection to form.
7          Mr. Patrick, please give me time.
8   BY MS. WINOGRAD:
9       Q.   Can you just explain, Mr. Patrick,
10  what you meant by the percentage interest can
11  remain the same?  I'm just trying to
12  understand.
13      A.   Yeah.  I think what I am doing is
14  educating the group about the flexibility with
15  respect to these LLC agreements, that the
16  amount of capital contributed may not
17  necessarily have to adjust the percentage,
18  although they can frequently.
19         You know, so all I'm indicating is
20  there is flexibility as to what the partners
21  want to do.
22      Q.   Okay.  But you directed them to
23  change the capital contribution, right?
24         MS. DANDENEAU:  Objection to form.
25      A.   Yes.  From -- yes.

Page 96

1          M. PATRICK
2   BY MS. WINOGRAD:
3       Q.   Okay.  So then why did -- why did you
4   say, then, the percentage interest can remain
5   the same?
6       A.   Because the capital contribution and
7   the percentage interest don't necessarily have
8   to adjust vis-a-vis the partners' committed or
9   contributed capital.  That's the flexibility of
10  partnership agreements.
11      Q.   Did anyone ever tell you the
12  percentage interests should be adjusted?
13      A.   I do not recall.
14         MS. WINOGRAD:  Okay.  Let's take a
15      five-minute break.  It is 10:56.  Let's
16      actually come back at 11:05, if that works
17      for everybody.
18         MS. DANDENEAU:  That's fine.
19         (Recess taken 9:56 a.m. Central Time
20         - 10:05 a.m. Central Time.)
21         MS. WINOGRAD:  La Asia, can we go
22      back to the document we were just on,
23      which I believe was Exhibit 18 and PDF
24      page 20?
25

Page 97

1          M. PATRICK
2   BY MS. WINOGRAD:
3       Q.   Okay.  Mr. Patrick, just going back
4   to something you were explaining before, I want
5   to make sure I understood you correctly.
6         From your perspective, the percentage
7   interests on Schedule A don't necessarily have
8   to correspond to the capital contribution,
9   correct?
10      A.   Correct.
11      Q.   It can be whatever the members decide
12  even if it's not consistent with the capital
13  contribution, correct?
14      A.   Correct.
15      Q.   And at the time you sent out this
16  document, was it your understanding that these
17  percentage interests were what the members
18  decided at the time?
19      A.   Yes.
20      Q.   Okay.  Okay.  So prior to the time
21  the amended LLC agreement was executed, did
22  anyone ever tell you the percentage interests
23  were wrong?
24      A.   No.
25      Q.   Did anyone ever tell you that there

Page 98

M. PATRICK

1  M. PATRICK
2  was a mistake with respect to any of the
3  percentages that we see here on Schedule A?
4  A.  No.
5  Q.  To the best of your knowledge, did
6  the parties ever amend Schedule A to change the
7  percentage interests?
8  MS. DANDENEAU:  Objection to form.
9  A.  I --
10  MS. DANDENEAU:  Are you referring
11  to -- are you referring to --
12  Ms. Winogard, are you referring to
13  Schedule A as on the amended LLC
14  agreement?
15  MS. WINOGRAD:  Exactly.  I'm
16  referring to the one we're looking at
17  right now that was -- that Mr. Patrick
18  testified was adopted and accepted into
19  the amended LLC agreement.
20  A.  My understanding is the last
21  amendment to the LLC agreement was the
22  amendment executed on March 15th, 2019.
23  BY MS. WINOGRAD:
24  Q.  Right.  But did the -- to the best of
25  your knowledge, did the parties ever amend the

Page 99

1  M. PATRICK
2  amended LLC agreement?
3  A.  To the best of my knowledge, the
4  parties have not made an amendment after March
5  15th, 2019 to the LLC agreement.
6  Q.  Okay.
7  MS. WINOGRAD:  Okay.  La Asia, could
8  we show Exhibit 28?
9  (Exhibit 28 displayed and to be
10  marked.)
11  BY MS. WINOGRAD:
12  Q.  Okay.  Do you see this e-mail,
13  Mr. Patrick?
14  A.  Yes, I do.
15  Q.  You were a recipient, correct?
16  A.  Yes, it appears so.
17  Q.  It's dated March 16th, 2019, correct?
18  A.  Correct.
19  Q.  This is the day after the amended LLC
20  agreement was executed, correct?
21  A.  Yes.
22  Q.  It's from Freddy Chang, correct?
23  A.  Correct.
24  Q.  And it's sent to Paul Broaddus and
25  Ben Roby, correct?

Page 100

1  M. PATRICK
2  A.  Correct.
3  Q.  And it's cc'd to a number of
4  individuals at both Highland and BH Equities,
5  correct?
6  A.  It appears so.
7  Q.  Okay.  So Freddy Chang says the fully
8  executed LLCA is attached.
9  Do you see that?
10  A.  Yes, I do.
11  Q.  He's referring to the amended LLC
12  agreement, correct?
13  A.  It appears so.
14  Q.  Okay.
15  MS. WINOGRAD:  And can you scroll
16  down a little, La Asia?  Up just a little
17  bit to show the attachment.
18  BY MS. WINOGRAD:
19  Q.  Okay.  So this is the amended LLC --
20  the fully executed amended LLC agreement was
21  circulated the day after execution, correct?
22  A.  It appears so, yes.
23  Q.  Do you know if anyone that was a
24  recipient of this e-mail ever said that any
25  part of the amended LLC agreement was a

Page 101

1  M. PATRICK
2  mistake?
3  A.  I have no knowledge whether or not.
4  Q.  Did anybody ever tell -- so let me
5  rephrase that.
6  So to confirm, nobody ever told you
7  that, correct?
8  A.  That is correct.
9  Q.  Okay.  Okay.  So moving on, are you
10  familiar with the firm Barker Viggato, LLP?
11  A.  That name is not coming to my
12  recollection.
13  Q.  Okay.  Are you aware that a firm
14  prepares SE Multifamily's tax returns?
15  A.  Yes.
16  Q.  Okay.  But you don't know if that's
17  Barker Viggato, correct?
18  A.  That is correct.
19  Q.  Okay.  Have you ever communicated
20  with anyone at the firm that prepares SE
21  Multifamily's tax returns?
22  A.  I do not recall.
23  Q.  Okay.  Is it your understanding that
24  the manager of SE Multifamily is responsible
25  for communicating with the firm -- with the

Page 102

M. PATRICK

1
2  preparer of their tax returns?
3      A.  I don't -- I don't recall what is
4  provided with respect to that.
5      Q.  Well, are you -- are you -- do you
6  know if any particular person at SE Multifamily
7  was responsible for making sure that the firm
8  that prepares its taxes received all relevant
9  information relating to SE Multifamily's taxes?
10     A.  I just don't recall.
11     Q.  Okay.  Do you know if -- do you know
12  if SE Multifamily's taxes -- tax returns were
13  ever amended?
14     A.  I do not know one way or the other.
15     Q.  Do you know if there was ever a
16  mistake in SE Multifamily's tax returns?
17     A.  Not to my knowledge.
18     Q.  Okay.
19         MS. WINOGRAD:  La Asia, can we show
20     Exhibit 5?
21         (Exhibit 5 displayed and to be
22         marked.)
23  BY MS. WINOGRAD:
24     Q.  Okay.  One more question.  Did you
25  ever discuss with anyone a possible amendment

Page 103

M. PATRICK

1
2  to SE Multifamily's tax returns?
3      A.  Not that I can recall.
4      Q.  Did you ever recommend to anyone that
5  SE Multifamily's tax returns be amended?
6      A.  Not that I can recall.
7      Q.  Did you ever hear any suggestion that
8  they should be amended?
9      A.  Just not that I can recall.
10     Q.  Okay.  So looking at Exhibit 5 here,
11  have you seen this document before?  And if you
12  need us to scroll down or up, we can.
13     A.  Yes.
14     Q.  You have seen it before?
15     A.  Yes.
16     Q.  Okay.  This is a proof of claim filed
17  by HCRE in the Highland bankruptcy, correct?
18     A.  It appears so.
19         MS. WINOGRAD:  Can we scroll up a
20     little bit to the date?
21  BY MS. WINOGRAD:
22     Q.  And it's dated April 8th of 2020,
23  correct?
24     A.  That's what the -- that's what the
25  document shows, correct.

Page 104

M. PATRICK

1
2      Q.  Okay.
3          MS. WINOGRAD:  So can we go down to
4      PDF page 5, which is Exhibit A to the
5      document?
6   BY MS. WINOGRAD:
7      Q.  Okay.  If you look at the third
8   sentence here, it says, "Claimant contends that
9   all or a portion of debtor's equity, ownership,
10  economic rights, equitable or beneficial
11  interests in SE Multifamily does" -- and there
12  should probably be a 'not' there, 'does not,'
13  it looks like a typo -- does not belong to the
14  debtor or may be the property of claimant."
15         So this is a proof of claim filed by
16  HCRE in which it alleges that there is a
17  mistake in Highland's equity in SE Multifamily,
18  correct?
19     A.  Where is the word "mistake"?
20     Q.  Well, let me ask it this way.  Did
21  you -- so strike that question.  Let me
22  rephrase it.
23         Did you have any involvement in
24  preparing this?
25     A.  No.

Page 105

M. PATRICK

1
2      Q.  Have you seen this before today?
3      A.  I saw it for the first time
4   yesterday.
5      Q.  Okay.  Did you ever discuss this with
6   anyone before yesterday?
7      A.  No.
8      Q.  Do you know who prepared this?
9      A.  It's come to my understanding
10  yesterday, the law firm of Bonds Ellis.
11         MS. WINOGRAD:  Okay.  I just want to
12     take three minutes to figure out if I'm
13     done or close to being done, so I will be
14     back at 11 -- just in three minutes,
15     11:19.
16         MS. DANDENEAU:  Okay.  Thank you,
17     Hayley.  We'll stay on the line.
18         (Recess taken 10:16 a.m. Central Time
19     - 10:19 a.m. Central Time.)
20  BY MS. WINOGRAD:
21     Q.  So I just want to go back to
22  something we discussed at the beginning of the
23  deposition, and I want to just understand it
24  more.  You mentioned earlier that you believed
25  that Tim Cournoyer and Freddy Chang were

Page 106

M. PATRICK

1 looking out for Highland's interests in
2 relation to the amended LLC agreement while it
3 was being drafted, correct?
4    A.  I would say that they were looking --
5 in their review, that they were reviewing the
6 document with respect that it reflected the
7 overall agreement of the parties.
8 BY MS. WINOGRAD:
9    Q.  Okay.  So they were looking out for
10 the interests of the joint venture of SE
11 Multifamily, then, correct?
12    MS. DANDENEAU:  Objection to form.
13    A.  What do you mean by "looking out"?
14 BY MS. WINOGRAD:
15    Q.  Making sure that the amended LLC
16 agreement reflected Highland's intent.
17    A.  I would agree with that.
18    Q.  You would agree with what exactly?
19    A.  That part of the responsibility was
20 to make sure that it reflected the overall
21 intent of the joint venture.
22    Q.  Okay.  So it's your understanding
23 that they were working on behalf of the joint
24 venture, correct?
25

Page 107

M. PATRICK

1    A.  On behalf of the joint venture, yes.
2    Q.  Okay.  And you had mentioned that
3 there was a real estate group that was looking
4 out for HCRE's interests, meaning that they
5 were looking out to make sure that the amended
6 LLC agreement reflected HCRE's intent, correct?
7    A.  I think -- like the legal team, I
8 think they were reviewing this document to make
9 sure that it reflected the overall business
10 arrangement of the joint venture.
11    Q.  Okay.  Do you know if there was any
12 lawyer who was looking out solely for HCRE's
13 interest in relation to the amended LLC
14 agreement?
15    A.  Again, Hunton & Williams, when they
16 were asked to draft this document, I think,
17 again, they were -- as any good lawyer, just
18 wanted to make sure it's reflective of the two
19 partners' agreement.
20    Q.  Okay.  So -- so they were looking out
21 for the joint venture the way you were
22 describing before, correct?
23    A.  They were -- they were in this
24 situation invariably making sure that the LLC
25

Page 108

M. PATRICK

1 agreement reflects both parties, both parties'
2 overall agreement.
3    Q.  Okay.  Both parties' agreement
4 meaning the agreement -- so both -- let me --
5 let me -- you know, I think that I have what I
6 need.  I don't think I have any more questions
7 on this.
8    I just want to clear up, when we say
9 the agreement, we mean the amended LLC
10 agreement, right?
11    A.  And the original.
12    Q.  And the original.  Okay.
13    MS. WINOGRAD:  All right.
14 Mr. Patrick, I'm done with my questioning.
15 Thank you very much for being here today.
16 I really appreciate it.
17    THE WITNESS:  You're welcome.
18    MS. DANDENEAU:  Did Mr. Gameros -- I
19 just want to make clear, is Mr. Patrick
20 dismissed?  Is there any further
21 questioning.
22    MR. GAMEROS:  I was going to say,
23 NexPoint Real Estate Partners reserves our
24 questions, if any, until the time of
25

Page 109

M. PATRICK

1 trial.
2    Thank you for your time today,
3 Mr. Patrick.
4    THE WITNESS:  You're welcome.
5    MS. DANDENEAU:  All right.  Thank
6 you.
7    THE REPORTER:  Before everyone
8 leaves, could I just get orders from
9 everyone?  I have a standing order, I
10 think, from you, Ms. Winograd.
11    MS. DANDENEAU:  I assume that
12 somebody will send us a transcript if they
13 want Mr. Patrick to review it.  I mean, I
14 don't otherwise need a copy.
15    THE REPORTER:  Okay.  Mr. Gameros?
16    MR. GAMEROS:  I'll take a copy, a
17 condensed.  We don't need the exhibits.
18 I've already got those.
19    THE REPORTER:  Okay.
20    (Time noted:  10:24 a.m.)
21
22
23
24
25

Page 110

```
1
2        IN THE UNITED STATES BANKRUPTCY COURT
3          FOR THE NORTHERN DISTRICT OF TEXAS
4              DALLAS DIVISION
5   IN RE:              )
                        ) CHAPTER 11
6   HIGHLAND CAPITAL    )
    MANAGEMENT, L.P.,   ) CASE NO. 19-34054-SGJ11
7                       )
      Reorganized Debtor. )
8   _____ )
                        )
9   HIGHLAND CAPITAL    )
    MANAGEMENT, L.P.,   )
10                      )
      Plaintiff,        ) ADVERSARY PROCEEDING
11                      )
      VS.               ) NO. 21-03000-SGJ
12                      )
    HIGHLAND CAPITAL    )
13  MANAGEMENT FUND ADVISORS, )
    L.P., NEXPOINT ADVISORS, )
14  L.P., HIGHLAND INCOME )
    FUND, NEXPOINT STRATEGIC )
15  OPPORTUNITIES FUND, )
    NEXPOINT CAPITAL, INC., )
16  AND CLO HOLDCO, LTD., )
                        )
17    Defendants.       )
18
19
20        REPORTER'S CERTIFICATION
21           MARK PATRICK
22          AUGUST 2, 2022
23
24      I, Janice K. McMoran, RDR, CRR, TCCR,
25  and Certified Shorthand Reporter in and for the
```

Page 111

```
1
2   State of Texas, hereby certify to the following:
3        That the witness, MARK PATRICK, was duly
4   remotely sworn by the officer, and that the
5   transcript of the oral deposition is a true record
6   of the testimony given by the witness;
7        I further certify that pursuant to
8   Federal Rules of Civil Procedure, Rule 30(e)(1)(A)
9   and (B) as well as Rule 30(e)(2), that review of
10  the transcript and signature of the deponent:
11      __X___ was requested by the deponent or
12  a party before the completion of the deposition and
13  is to be returned within 30 days from date of
14  receipt of the transcript if returned, the
15  attached Errata contains any changes and the
16  reasons therefor;
17      _____ was not requested by the deponent
18  or a party before the completion of the deposition.
19      I further certify that I am neither
20  counsel for, related to, nor employed by any of the
21  parties or attorneys to the action in which this
22  proceeding was taken. Further, I am not a
23  relative or employee of any attorney of record in
24  this cause, nor am I financially or otherwise
25  interested in the outcome of the action.
```

Page 112

```
1
2        Subscribed and sworn to on this the 2nd
3   day of August, 2022.
4
5
6        _____
7        JANICE K. McMORAN, RDR, CRR, TCRR
8        Texas CSR #1959
9        Expiration Date: 2/28/23
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 113

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, MARK PATRICK, do hereby certify that I
4   have read the foregoing pages, and that the same is
5   a correct transcription of the answers given by me
6   to the questions therein propounded, except for the
7   corrections or changes in form or substance, if
8   any, noted in the attached Errata Sheet.
9
10
11   _____
12   MARK PATRICK           DATE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 114

```
1      ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads    Should Read  Reason

6   ___ ___ _____    _____  _____

7   ___ ___ _____    _____  _____

8   ___ ___ _____    _____  _____

9   ___ ___ _____    _____  _____

10  ___ ___ _____    _____  _____

11  ___ ___ _____    _____  _____

12  ___ ___ _____    _____  _____

13  ___ ___ _____    _____  _____

14  ___ ___ _____    _____  _____

15  ___ ___ _____    _____  _____

16  ___ ___ _____    _____  _____

17  ___ ___ _____    _____  _____

18  ___ ___ _____    _____  _____

19  ___ ___ _____    _____  _____

20

21              _____

22              Signature of Deponent

   SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2022.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

**$**

**$291** 58:22 59:4

**$291,146,036** 52:17

**$51** 27:10,22

**(**

**(c)** 41:12

**1**

**1** 43:12,21 85:14

**1.7** 83:22,24

**10** 35:19,20 78:13

**10:05** 56:17 96:20

**10:10** 56:22,25

**10:16** 105:18

**10:19** 105:19

**10:24** 109:21

**10:56** 96:15

**11** 105:14

**11:05** 96:16

**11:19** 105:15

**12** 41:5 59:14 61:18
73:9,10

**15** 60:6,7 74:6

**15th** 34:22 44:20,23
45:10 51:18,19 62:11
65:23 75:2,8,11
98:22 99:5

**16th** 99:17

**17** 18:8,9

**18** 26:18 37:21 45:23
49:3 53:20,21 57:6
90:12 96:23

**19** 49:3

**1959** 6:12

**2**

**2** 16:14,15 20:8,9,14,

**16**

**20** 93:4 94:7 96:24

**2018** 18:4 33:8 62:19
74:20,24 75:9,12

**2019** 33:9 44:20,24
51:19,20 54:5 60:16
62:8 63:6 65:21
66:23 73:23 74:25
75:8 90:19 98:22
99:5,17

**2020** 51:18 65:22
103:22

**2021** 11:16

**2022** 6:4

**21** 52:8

**23rd** 18:4 75:9

**28** 99:8,9

**28th** 73:23

**29** 77:21

**291** 52:19,24 53:10

**2nd** 6:4

**3**

**31** 83:20

**38** 78:13

**4**

**4** 44:6,7 59:18 61:6,18

**46.06** 78:22

**47** 80:18

**47.94** 78:18

**49** 36:8 41:17 62:25
78:21

**4th** 60:16

**5**

**5** 102:20,21 103:10
104:4

**51** 27:9 36:8 41:17
62:25 78:17

**6**

**6** 35:24 41:8 79:4,8
81:7 83:10 84:12

**6.1** 36:15 40:3

**6.1(a)** 36:3 40:4
79:15

**6.4** 59:23 61:2,9,16
63:9

**6.4(a)** 41:11 43:2
61:21 62:22 64:6,7

**6.4(b)** 41:12 43:7,8

**8**

**8:02** 6:5

**8:59** 57:3

**8th** 54:5 90:19 103:22

**9**

**94** 64:14,20 69:25
70:10,16,24 72:8

**99** 43:12,20

**9:11** 57:4

**9:56** 96:19

**A**

**A.iii.2** 41:14

**A.iii.3** 41:14

**a.m.** 6:5 56:17,25
57:3,4 96:19,20
105:18,19 109:21

**ability** 76:17,22

**absence** 92:11

**accepted** 87:15
98:18

**accordance** 30:25

**acquire** 14:24 15:3
20:20 21:7

**acquired** 50:6

**acquisition** 33:14

**activities** 34:16
43:11,20 44:2

**addition** 16:7

**additional** 77:9

**address** 12:3

**addresses** 86:8

**adds** 31:4

**adjust** 35:16 94:21,
22 95:2,17 96:8

**adjusted** 93:19
96:12

**adjustments** 35:15
80:5,9,24

**administering** 6:12

**adopted** 87:15 98:18

**advantages** 29:11
30:10,14,17 31:7

**advice** 7:23 22:6
46:20,24 47:3,14,18

**Advisors** 21:23 69:3

**affiliate-type** 47:11

**affiliated** 52:3

**affiliates** 13:3,6,9,15,
19,25

**agree** 7:11 106:18,19

**agreement** 15:11
17:3,6,10,11,16,17,
22 18:8,11,23 19:4,7,
19,25 20:8,12,23
21:14,18 22:7,13
23:4 26:10,18 28:2
34:20,22 37:24 40:22
41:6 42:6,12 44:15,
18 45:4,8,12,15,17,
23 46:6,21 47:4,16,
19 48:2,14,25 49:12
50:4,16,23 54:9
57:21 59:16,19 62:25
63:22 64:7 68:13,20,
21,25 69:8 73:19
74:8,11,12,13 75:3,7,
10,14 78:4,14 87:9,
16,20 88:4 89:21,22
90:22,24 97:21
98:14,19,21 99:2,5,

**20** 100:12,20,25
106:3,8,17 107:7,15,
20 108:2,3,4,5,10,11

**agreements** 16:8
38:12 95:15 96:10

**ahead** 40:9

**Alex** 46:25

**alleges** 104:16

**allocate** 28:21 30:24
66:24 74:22

**allocated** 41:17
42:8,18,25 43:12,20
44:2 62:19 64:15,20
65:17 66:17,18 67:3
79:10

**allocating** 69:25
70:10,16,24 72:8

**allocation** 41:23
45:19 61:15 64:6,7
65:4,14,24 71:7
72:18

**allocations** 31:6
36:14 38:17 41:9,13
42:7,13 59:23 60:23
62:13 63:5 66:24
74:22,23 77:14

**allowed** 28:15,20
31:22

**ambiguous** 29:18

**amend** 34:21 35:7
45:7 75:2 98:6,25

**amended** 17:7,17
34:19 35:12 42:21,24
43:5 44:14,17 45:12,
15,23 46:5,21 47:3,
16 48:2,14,25 49:12
50:22 54:8 57:20
59:15,18 63:15 64:7
66:21 68:13,24 69:8
73:18 75:7,14 78:25
81:4 82:10 83:6 84:8
87:9,15,19 88:3
90:23 97:21 98:13,19
99:2,19 100:11,19,
20,25 102:13 103:5,8
106:3,16 107:6,14
108:10

**amending** 34:20
45:4

**amendment** 74:7 76:23 77:12,13 98:21,22 99:4 102:25

**amendments** 42:12 44:25 75:22 76:3 79:12

**amount** 31:5 37:7,11 54:17 95:16

**amounts** 36:9 62:17 69:5

**annually** 34:14 63:15

**answering** 9:25

**apologize** 13:21 14:4 27:20 39:3 71:21

**appearances** 6:18

**appears** 35:9 48:24 56:13 58:5 99:16 100:6,13,22 103:18

**applicable** 8:8

**apply** 34:22

**appointed** 48:18

**April** 103:22

**arise** 8:4 12:3

**arising** 33:19

**arrangement** 107:11

**arrived** 79:2 81:5 83:8 84:10

**article** 35:24 36:3,6, 14 40:4 41:8,11 43:7, 8 59:23 61:2,6,9,21, 23,24 79:15 83:22,24

**ASAP** 60:22

**Asia** 16:13 18:7 20:7 26:17 35:18 37:20 41:4 44:5 45:22 49:8 50:19 55:11 57:5 59:13 61:17 73:8 77:20 78:12 83:19 91:12 94:6 96:21 99:7 100:16 102:19

**aspect** 15:6 19:6

**aspects** 16:6

**assert** 8:7

**assessment** 62:9 63:12 65:23

**assets** 14:25 15:4 20:21 21:8 27:7 33:15 34:25 50:5 63:17

**assume** 109:12

**attached** 77:24 85:18 92:17 100:8

**attachment** 85:24 87:11 88:18 91:13,16 92:12 100:17

**attachments** 77:18, 24

**attention** 19:20 76:11,15

**attorney** 8:21 22:19

**attorney-client** 8:5

**August** 6:4 18:4 33:7 75:9,12

**authorized** 24:16

**availability** 75:19

**avoid** 17:15

**aware** 17:6 26:15 42:11 57:12 67:5,11, 15,23 68:3,16 69:22 71:22 77:10 101:13

**awareness** 53:6 55:21 57:17 67:21

**B**

**back** 20:8 30:3 56:13, 16 57:6 61:18 63:13 92:19 93:4,23 94:7 96:16,22 97:3 105:14,21

**Baker** 7:2 10:17

**balance** 30:16

**balancing** 22:2

**bankruptcy** 33:9,25 34:6 35:10 65:20 66:22 103:17

**Barker** 101:10,17

**based** 79:9

**Beacon** 69:20

**began** 65:18

**begin** 22:18

**beginning** 63:6 65:15 105:22

**behalf** 6:15 18:12,16 24:17 46:2 106:24 107:2

**believed** 105:24

**believes** 8:8

**belong** 104:13

**Ben** 99:25

**beneficial** 32:3 69:7, 9,11,13,14,17,22 104:10

**benefit** 32:6,7,12,15, 22 33:3

**benefited** 32:25 33:12

**BH** 45:20 50:21,25 51:3,8,12,14,23 52:4 76:24 77:3,6 79:10 88:7,12 100:4

**big** 28:24

**Bill** 7:4

**bit** 35:21 47:12 49:8,9 55:11 91:13 93:23 100:17 103:20

**blank** 35:2

**blanks** 34:24

**Bonds** 105:10

**borrowing** 57:13,22

**break** 10:9 56:16 96:15

**bridge** 52:25 53:6 54:13 55:15,19,20 56:6 58:4,7,11 59:9 92:24

**broad** 13:5

**Broaddus** 12:14 58:2 62:2,16 88:7 89:15 91:2 99:24

**brought** 49:21 51:9 71:9

**business** 107:10

**C**

**calculation** 79:7

**call** 28:14 32:21 38:16 82:2

**called** 69:3,20

**CANTEY** 59:15,20

**Canty** 55:4

**capacity** 23:9 76:19

**capital** 6:22 7:24 8:23 9:3 26:3,24 27:6 30:14 50:2 52:14,17 53:14,17 54:13 55:15 56:9 58:3,14 77:9 92:24 93:7,15 95:16, 23 96:6,9 97:8,12

**capitalized** 25:6

**careful** 76:7,20

**case** 32:10 74:20

**cash** 27:7 28:21 35:24 36:3,7,14,21 37:6,7,15 38:8,14,22 40:11,23 63:17 65:8, 24 66:4,8 72:15 74:22 75:20 77:13 78:17,21 79:2,12 84:6

**cc'd** 100:3

**cc'ing** 74:2

**Central** 6:5 57:3,4 96:19,20 105:18,19

**CFO** 20:4

**chance** 27:19

**Chang** 22:21 48:8 60:18 73:25 86:20 89:14 99:22 100:7 105:25

**change** 34:14 64:4,5, 9 95:23 98:6

**changed** 12:10 24:20,23 26:7 33:25

**34:4 63:5,20 78:17, 21**

**changing** 64:6

**characterize** 32:2 33:21,23

**charitable** 49:20 67:6,10,12

**chat** 55:6

**chief** 12:12,13 61:25 76:4

**circulated** 100:21

**City** 6:23 7:3

**claim** 103:16 104:15

**claimant** 104:8,14

**clear** 8:10 30:5 32:10 39:10 73:2,3 89:25 108:9,20

**CLO** 49:5 50:10,12

**close** 74:19 105:13

**Code** 31:2

**coincidence** 38:5 39:25

**colloquial** 35:13

**column** 26:23 38:3 52:13 93:15,19 94:11,17

**comment** 19:15 85:9

**commenting** 48:11

**comments** 23:9

**committed** 96:8

**common** 31:8 66:10

**communicated** 101:19

**communicating** 101:25

**communications** 51:22

**company** 11:11 17:3 34:25 44:15 83:25 84:4

**company's** 43:11

**complete** 9:9

**complex** 28:23

**compliance** 12:13
61:25 62:8 63:7

**condensed** 109:18

**conducted** 6:7

**confirm** 75:6 84:8
101:6

**conflation** 82:2

**confusing** 22:10

**confusion** 17:15

**connection** 45:12
47:15

**consequences** 35:6

**considered** 8:5

**consistent** 36:15
41:24 85:4,10 89:20
97:12

**contends** 104:8

**context** 34:10 47:11

**contributed** 95:16
96:9

**contribution** 26:24
52:14,17 54:12,15,
20,21 58:2,15 92:23
93:8,13,15 95:23
96:6 97:8,13

**contributions**
53:15,17 77:9

**controlled** 14:7

**controls** 24:10

**conveying** 22:24

**coordinate** 15:10

**coordination** 19:13

**copied** 48:17,21,23

**copy** 109:15,17

**corporate** 15:25
22:19 62:2

**correct** 15:17 17:4,5,
7,8 18:5,6,13,14,16,
17 19:4 20:24,25
21:15,16 27:11,17

28:2,3 32:25 33:2
40:19,20 41:21,22,25
42:14,15 43:6 44:15,
16,21,22 51:21
53:10,11 54:6,7,9,10,
18,19 58:24 60:17,
20,23,24 63:3 73:17,
20,21 74:3,4,12,13,
14 77:25 78:2,4,5,23
79:10,16,17 84:12,
13,19 85:7,19,20
87:16,17 88:20,22
90:2,8,9,24,25 91:3,
4,6 92:15 97:9,10,13,
14 99:15,17,18,20,
22,23,25 100:2,5,12,
21 101:7,8,17,18
103:17,23,25 104:18
106:4,12,25 107:7,23

**correctly** 97:5

**correspond** 97:8

**counsel** 6:17 7:11
8:22

**couple** 77:18

**Cournoyer** 22:19
48:7 73:25 89:14
105:25

**created** 20:23

**creating** 78:8

**creation** 33:13 79:6

**credit** 41:16

**CSR** 6:12

**current** 57:16

---

**D**

**DAF** 49:20 50:10

**Dallas** 6:9 7:6 11:9

**Dandeneau** 6:24,25
7:14,16 10:18 13:4,
17 14:9 17:13,20
18:25 19:11 20:13
21:20 25:7 27:13
29:7,14 31:14,25
32:16 34:3 36:17
37:3,18 38:9 39:7,15,
18 40:6 42:19 52:22
53:3 54:25 56:19

58:9,18 59:10 61:3,
11 67:8,18 68:2,9,18
70:5,12 71:2,10,25
76:8 81:17,19 82:12,
25 84:20 86:13,18,23
87:5,21 88:5 89:5,7
93:9,21 94:18 95:4,6,
24 96:18 98:8,10
105:16 106:13
108:19 109:6,12

**date** 6:4 45:2 62:12
73:22 103:20

**dated** 18:4 44:20,23
54:5 60:16 90:19
99:17 103:22

**Dave** 62:2 89:14

**David** 73:25

**day** 99:19 100:21

**days** 51:17 57:20

**deadline** 45:3,6,9
74:6,15,17

**deal** 71:9

**deals** 52:4 66:5

**Debra** 6:24 10:18
27:19,20

**debt** 26:3 54:13
55:15,20 56:6 58:3,7,
11 59:9 92:24

**debtor** 8:23 104:14

**debtor's** 104:9

**decide** 75:3 97:11

**decided** 97:18

**decides** 37:11

**decision** 24:20 46:11
64:4

**decisions** 24:17
46:15

**deduction** 41:16

**define** 69:17

**defined** 36:22 81:9,
11

**definition** 13:6,8
36:23,24 37:8,11
40:12 63:10 81:23

**definitional** 42:3

**definitions** 37:5
81:25

**department** 11:25
12:7,15 15:24 48:7
64:13 75:17 91:5

**deposition** 6:6,13
7:18 8:3,24 10:5,14,
22 11:3 105:23

**depositions** 7:20
56:3

**describe** 38:11

**describing** 107:23

**designed** 34:11

**detail** 76:12,15

**determination**
62:13,21 64:11 65:3

**determine** 37:10

**determined** 36:9

**directed** 66:5 89:13
95:22

**directing** 89:15
92:14

**directly** 49:20 66:14

**discretion** 34:15
37:9

**discuss** 61:23 87:18,
25 102:25 105:5

**discussed** 27:24
61:24 62:23 74:15
105:22

**discussing** 73:19
88:9,12

**discussion** 62:18,21
63:19 65:2

**discussions** 61:14
62:7 77:8

**dismissed** 108:21

**displayed** 16:15
44:7 53:21 60:7
73:10 99:9 102:21

**dispositions** 63:16

**disqualification**

10:24

**distributable** 36:3,7,
14,21 37:6,15 38:8,
22 40:10,23 78:17,20
84:6

**distributed** 36:7
85:3

**distribution** 37:12
38:15 65:10 66:9
72:16

**distributions** 35:24
72:14 77:14 79:2,13
80:25

**document** 9:8 16:18,
21,24 19:16 34:11,12
35:7,11,19 43:23
44:11 48:10,11,17
55:3,5 57:9 63:14
79:9 80:7,11 81:9
82:13 83:14 84:16
85:7,9 88:2 89:17
92:4,7,8,9,14 96:22
97:16 103:11,25
104:5 106:7 107:9,17

**documentation**
15:20 22:25

**documents** 9:6
10:19,21 18:22 66:20
76:12,13,16,19,20
81:11 85:18

**dollar** 62:17

**dollars** 57:13,23

**Dondero** 14:8 18:12,
15 21:21 23:9 24:13,
14,18 25:18 34:15
37:8 46:2,9 62:4
64:12 65:2

**draft** 19:16 75:21
76:12,13 107:17

**drafted** 26:10 106:4

**drafting** 19:4 45:14
60:3 61:5 79:23

**drop** 54:17 55:6

**duly** 8:13

## E

**e-mail** 34:19 48:24 53:25 54:3,21 55:7, 12,20 56:6 57:18,19 58:5,12 59:8,12 60:10,12 73:14,16, 18,22,24 74:5 75:22 76:24 77:13,18,25 79:13 84:14,18 85:14,17,21,24 86:3, 4,8,24 87:2 88:17 89:12 90:4,14 91:2, 17 92:13,20,22 93:14,23 94:10,14,25 99:12 100:24

**e-mails** 34:13

**earlier** 27:24 45:6 46:8 62:23 63:14 71:17 72:18 74:16 105:24

**easier** 17:18

**Eastern** 56:17,25

**economic** 72:5,7,11, 12,17 104:10

**educating** 95:14

**effective** 45:8 74:23 75:8,12

**effectively** 22:23

**electronically** 92:16

**eliminate** 70:3

**Ellington** 25:19,21

**Ellis** 105:10

**employed** 11:6,8,11, 15,20 12:25 13:13,23 14:6 23:25

**employee** 8:3

**employees** 24:25 25:3 26:11 74:2

**employer** 11:17

**employment** 12:11

**end** 12:11 27:15 75:16

**endeavor** 65:15

**ended** 33:5,8 65:19

**entered** 42:6 43:17 52:3 68:13,20,25 69:8

**entities** 14:7 26:16 46:11

**entity** 13:10 16:10 19:23 21:2 23:20,22, 25 24:3 30:15 32:19, 20 33:7,13 35:15 47:18,20 49:19 50:7, 11 52:2 62:10 63:24 65:5,9,13 68:5 69:3, 19 70:21

**equitable** 104:10

**equities** 22:3 46:10, 14 50:22,25 51:3,8, 12,14,23 52:4 77:3,6 79:10 100:4

**equity** 26:3 54:13 55:15 56:9 58:3 66:7 92:23 104:9,17

**essentially** 28:15,24 34:14 37:4,6 46:12 89:12

**estate** 7:5 14:24 15:4 20:21 21:8 22:22 23:7,14 28:23 31:9 48:16,21 50:5 66:5, 11 107:4 108:24

**EXAMINATION** 8:15

**excuse** 14:2 51:20

**executed** 21:14 87:20 88:4 97:21 98:22 99:20 100:8,20

**execution** 57:20 87:8 100:21

**exempt** 67:16

**exhibit** 16:14,15 34:24 44:6,7 53:19, 21 57:6 59:18 60:6,7 61:18 73:9,10 90:11 96:23 99:8,9 102:20, 21 103:10 104:4

**exhibits** 10:24 109:18

**expectancy** 72:16

**ended** 33:5,8 65:19

**expectation** 65:21

**expected** 33:18,22

**explain** 28:7 30:12 36:20 37:2 70:8,15 93:6 95:9

**explained** 31:13 67:4

**explaining** 39:12 97:4

**expressed** 57:18

**external** 19:15 22:16

## F

**facilitate** 12:2 15:10 16:5 33:14

**fact** 57:22

**fair** 9:20 10:11 14:5 15:2 21:9 93:18

**fall** 33:9 66:22

**familiar** 14:15 16:24 24:3 72:4 101:10

**February** 73:23

**figure** 105:12

**filed** 66:22 103:16 104:15

**files** 34:6

**filing** 33:8,25 65:19

**final** 62:20

**finance** 57:14

**financial** 76:4

**financially** 65:6

**financing** 15:25

**find** 15:22

**fine** 56:24 96:18

**finish** 9:18,23

**finished** 33:7

**firm** 6:20 7:2,19 10:17 101:10,13,20, 25 102:7 105:10

**fits** 37:7

**five-minute** 56:16 96:15

**flexibility** 28:16,19 30:24 31:5,12,13,23, 24 32:15 38:20 95:14,20 96:9

**flow** 29:19,24

**fluid** 34:12,13 35:11 63:14

**folks** 12:16 23:16 46:18

**foreign** 50:7,11

**forget** 17:25

**form** 13:4,17 14:9 18:25 19:11 20:13 21:20 25:7 26:3 27:13 29:7,16 31:14, 25 32:16 34:3 36:17 37:3,18 38:9 39:8 40:7 42:19 52:22 53:3 58:9,18 59:10 61:3,11 67:8,18 68:2, 10,18 70:5,12 71:2, 10,25 76:8 81:17,22 82:25 84:20 87:21 88:5 89:5,9 93:9,21 94:18 95:4,6,24 98:8 106:13

**format** 33:23

**formed** 24:8,21 42:17

**formula** 37:6

**formulating** 64:24

**forward** 9:4 17:10 18:19 35:4 44:18 87:2

**foundations** 67:7, 10,13

**Frank** 20:5 76:4 89:16

**Freddy** 22:21 48:8 60:18 73:25 86:20 89:14 99:22 100:7 105:25

**frequently** 95:18

**fulfill** 50:15

**fully** 100:7,20

**fund** 49:20 53:14

**future** 72:17

## G

**gain** 41:15

**Gameros** 7:4 108:19,23 109:16,17

**gave** 46:23 57:25 62:16

**general** 25:11,13 51:4,5 75:17

**generalities** 39:24

**generally** 20:19 27:5 28:13 32:5 66:5

**gentleman** 22:21

**give** 7:22 9:9 27:19 81:20 89:8 95:7

**giving** 47:14,17

**Goetz** 23:16,23

**good** 8:17 107:18

**GP** 21:23

**Granbury** 6:15

**group** 11:12,15 66:6 85:4 95:14 107:4

**guess** 13:5,10 49:9 66:25 88:7

## H

**hard** 31:15 33:11

**Hayley** 6:19 8:20 29:14 105:17

**HCMLP** 41:18,21 43:12 65:12

**HCRE** 18:16,18,19 21:15,19,21 23:10 24:4,8,10,14,17,20, 24 25:4,5,10,21 26:4, 6,10,12,15 27:9,10 31:12,17,24 32:6,21 34:10 36:8 37:9 41:17 42:18 43:2,13, 21 46:3,7 47:2,8,15

52:19,24 53:14
57:12,22 62:25 64:12
65:7,11,17 66:16
67:2 70:20 77:8
78:17 86:4,6,21
103:17 104:16

**HCRE's** 23:5,10
33:18 48:15 52:16
56:9 58:14 79:3 81:5
83:8 84:11 107:5,7,
13

**head** 23:14

**hear** 8:18 27:15
64:18,23 91:23 103:7

**heard** 14:12 55:24
64:22 71:15

**helped** 12:2 15:10
16:5

**Highland** 6:22 7:23
8:7,23 9:3,4 11:19,
21,24 12:24,25 13:3,
12,14,15,20,23 14:6
15:13,16,18,23 16:2,
7,9 18:12 20:4 21:15,
19,23 22:5 23:18
26:11 27:24 28:4,8
29:3,6 30:7,14 31:21
32:25 33:3,8 34:10
35:10 36:8 41:21
43:21 46:2,7,19,23
47:8,15,21 50:8 52:3
63:2 64:13,16,21
65:4,14 66:22 67:6,9,
12,16,20,24 68:4,8,
17,24 69:7,10,12
70:2,11,18,19,25
71:7,8,18,23 72:9
74:2 76:5 78:21 86:7,
11 91:6 100:4 103:17

**Highland's** 22:14,24
29:11 30:10 31:21
33:16,25 48:3 65:20
79:3 81:5 83:8 84:10
104:17 106:2,17

**historic** 55:19

**Holdco** 49:6,11
50:10

**Holdings** 17:2 44:13
47:23 62:11

**hundreds** 57:13,22

**Hunter** 69:3,10,18,23

**Hunton** 19:24 46:25
47:7,13 107:16

---

**I**

**idea** 29:2,5 30:6
94:24

**identify** 23:12 53:13
68:7,23 69:6

**identity** 24:19

**imagine** 22:22

**implicates** 42:24

**include** 88:7

**included** 50:10

**including** 31:9 51:17

**income** 23:21 30:25
38:17 41:15 62:10,
14,17,19 63:8,9,23,
25 66:2,8 67:3,20
75:18

**independent** 22:6,9
46:20,23 47:2,14,18

**indicating** 94:20
95:19

**individual** 22:12
23:3 47:25 48:13

**individuals** 23:13
25:16,17 30:22 48:20
65:12 100:4

**information** 63:21
75:15 102:9

**infrastructure** 28:9

**initial** 27:5

**initially** 65:15

**input** 23:8 46:17

**instance** 34:18

**instruction** 57:25

**intend** 84:24

**intended** 36:15
43:18 63:15 84:19,
22,24 85:6,8 93:19
94:15

**intent** 22:14,24 23:5,
11 32:9 48:3,15
76:21 85:5,11 88:19
89:18,19 90:2
106:17,22 107:7

**interest** 25:20,23
36:16 37:17 38:2,23
39:14 40:12,24 41:25
42:4 80:23 81:8,12,
13,14,24 82:5,7,16
83:7,9,13 94:11,16,
17 95:10 96:4,7
107:14

**interests** 38:6,7,13
40:2,3 42:9 69:4 79:4
81:6 82:20,22 84:11
94:4,10,15 96:12
97:7,17,22 98:7
104:11 106:2,11
107:5

**interfacing** 88:12

**internal** 19:15 21:25
22:15,17 31:2

**internally** 88:14

**interpret** 30:13

**interrupt** 29:19,24

**interrupting** 39:3

**invariably** 107:25

**investment** 33:19
57:14

**involve** 29:3,6 30:7

**involved** 13:14,16,24
15:13,18,23 19:3,6,
10,12,18 20:2 28:4
45:14,18,20 48:10
51:15 56:4 60:2 61:5,
8,13,14 62:4 78:7
79:6

**involvement** 29:11,
17,21 30:10 61:2
76:2 104:23

**issues** 12:2,3 28:22

**items** 28:22 41:15
63:16,18

**IX** 36:7

**J**

**James** 14:7 24:13
25:18 34:15 37:8
45:25 62:4 64:12

**Janice** 6:11

**John** 7:7

**joint** 19:22 28:16
30:19 31:8 32:4,11
35:2 47:11 50:14
106:11,22,24 107:2,
11,22

**Jones** 6:21 7:8 8:22

**K**

**Keybank** 55:24 58:7

**kind** 12:18 28:11
46:15 73:3 79:6 92:6

**Klos** 62:2 74:2 89:15

**knew** 84:15

**knowhow** 32:21

**knowledge** 24:22
26:8 52:6 53:9 55:19,
23 56:13 57:16 77:11
79:9 90:6 98:5,25
99:3 101:3 102:17

**L**

**L.P.** 6:22 8:24 9:4
49:20

**La** 16:13 18:7 20:7
26:17 35:18 37:20
41:4 44:5 45:22 49:8
50:19 55:4,11 57:5
59:13 61:17 73:8
77:20 78:12 83:19
91:12 94:6 96:21
99:7 100:16 102:19

**lack** 16:11

**large** 32:19

**larger** 30:22 85:4

**law** 10:17 105:10

**lawyer** 7:21,22 22:22

107:13,18

**lawyers** 10:25 48:8

**leading** 51:17

**leasing** 43:11,19,25

**leaves** 109:9

**left** 12:18 34:25

**legal** 7:22 15:24 22:6,
18 23:20,25 46:20,24
47:3,14,18 48:6,9
62:3 107:8

**lending** 66:6

**liability** 17:3 33:19
44:14

**Liberty** 49:5,11,14,
16,18,19,21 50:10,12

**Limited** 17:3 44:14

**lips** 64:18

**listed** 82:21

**LLC** 15:11 16:8 17:3,
9,11,16,17,22 18:11,
16,18,23 19:4,7,19,
24,25 20:12,20,22,23
21:13,17 22:7,13
23:4 26:9 28:2 34:19
37:24 41:6 42:5,12
43:17 44:13,18 45:4,
12,15,17,23 46:5,21
25 49:12 50:22 54:9
57:21 59:18 62:24
63:22 64:7 68:13,20,
21,25 69:8,20,21
73:19 74:12,13 75:7,
14 78:4 87:9,15,19
88:3 90:22,24 95:15
97:21 98:13,19,21
99:2,5,19 100:11,19,
20,25 106:3,16
107:7,14,25 108:10

**LLCA** 100:8

**LLP** 6:21 101:10

**loan** 52:25 53:7
55:19,25 58:7,15
59:2,3,5,7

**located** 6:9,23 7:3,6

**locations** 6:18

Index: lodge..participation

**lodge** 89:8

**long** 11:20

**loss** 41:16 62:10 63:23 75:18

**losses** 41:9,15,24 42:8,14,18,25 43:10, 18,25 59:24 62:24 63:8,10,12 64:4,15 70:2,17,24 71:7 72:9, 20,24

**lot** 38:11 65:13

---

**M**

**made** 50:11 62:9 64:3,11,25 65:13 78:3 79:19 80:6,10, 24 83:13 84:4,15 85:2 87:10 99:4

**make** 7:17 8:9 22:13 23:4 24:16 31:10 45:8 46:15 48:2,14 50:12 56:20 62:12 65:4,9,10,14 66:9 72:14 74:17,22 75:11 76:20 77:9 78:6 84:22 89:20 97:5 106:21 107:6,9,19 108:20

**maker** 24:20

**making** 35:15 79:22 102:7 106:16 107:25

**manage** 24:14

**management** 6:22 8:23 9:4 30:15 51:7

**manager** 12:15 21:21 23:10 34:15 36:10 37:9 46:10 64:11 101:24

**March** 11:16 34:22 44:20,23 45:10 51:17,19 54:5 60:16 62:11 65:22 74:6 75:2,8,11 90:19 98:22 99:4,17

**Mark** 6:6,25 8:12

**marked** 16:16 44:8 53:22 60:8 73:11

**99:10 102:22**

**match** 38:20

**Matt** 23:15,16,18,22 89:16

**Matthew** 25:18 48:23

**Mcgeoch** 46:25

**Mcgraner** 23:15,18 25:18 48:23 89:16

**Mckenzie** 7:2 10:18

**Mcmoran** 6:11

**meaning** 34:13 107:5 108:5

**means** 6:14 27:2,10 29:21 36:21

**meant** 93:7 95:10

**meeting** 65:22

**meets** 37:11

**member** 25:4 27:25 30:7 31:22 33:17 49:22 51:9

**members** 21:14 43:18 84:9 97:11,17

**members'** 34:2 36:16 37:16 41:24 42:9 82:22 83:13

**memory** 55:22 80:13

**mentioned** 7:17 30:9 32:24 45:5 105:24 107:3

**met** 10:17

**middle** 10:10

**million** 52:20,25 53:10 58:22 59:4

**millions** 57:13,23

**mind** 64:25

**minimize** 33:18

**minute** 30:4 32:24

**minutes** 105:12,14

**missing** 13:21

**misstates** 82:13

**mistake** 85:22 87:12

**90:7 98:2 101:2 102:16 104:17,19**

**mistaken** 12:20

**monetary** 28:14

**morning** 8:17

**Morris** 7:7,17 56:20, 23

**Mountain** 69:3,10, 18,21,23

**move** 39:4 64:18 66:13 87:2

**moving** 101:9

**Multifamily** 17:2 20:23 21:3,6,9,15 25:5 27:10,25 28:5 29:3,12 30:7,11 31:22 33:17,20 36:16 37:17 40:22 42:16 44:13 47:23 49:22 51:9,12,15 57:14 62:10 72:21,25 73:6 77:4,7 81:7,15 82:8, 16,23 83:10 101:24 102:6 104:11,17 106:12

**Multifamily's** 42:17 43:19 67:24 70:4 71:23 101:14,21 102:9,12,16 103:2,5

**mutual** 32:5,6,12

---

**N**

**named** 22:21

**names** 69:5

**natural** 50:8,12

**nature** 33:25 34:5 71:18

**necessarily** 38:18 39:14 40:13 48:18 94:19 95:17 96:7 97:7

**needed** 75:10

**negotiating** 46:12

**negotiation** 21:25

**negotiations** 21:18 46:6

**Nexpoint** 7:5 108:24

**nice** 50:2

**noted** 48:22 109:21

**number** 20:18 100:3

**numbers** 38:19 40:13,14,15,19 42:2 79:7 81:2

---

**O**

**oath** 6:12 10:6

**object** 27:19 67:18

**objected** 39:8

**objecting** 29:16

**objection** 13:4,17 14:9 18:25 19:11 20:13 21:20 25:7 27:13 29:7 31:14,25 32:16 34:3 36:17 37:3,18 38:9 40:6 42:19 52:22 53:3 58:9,18 59:10 61:3, 11 67:8 68:2,9,18 70:5,12 71:2,10,25 76:8 81:17,22 82:12, 13,25 84:20 86:13,14 87:21 88:5 89:5,8,9 93:9,21 94:18 95:4,6, 24 98:8 106:13

**objections** 81:20

**occur** 34:17

**occurred** 45:2 65:3

**occurring** 19:21

**occurs** 66:10

**offer** 50:12

**offhand** 23:17 62:3

**officer** 12:13,14 76:5

**opportunity** 28:20 35:5 66:23 85:17

**oral** 6:6

**order** 9:8 109:10

**orders** 109:9

**organization** 16:5

**organizational** 71:18

**organized** 14:24 33:7 50:11

**original** 17:11,16,22 18:2,11,23 19:7,19, 25 20:12,22 21:13,17 22:7,13 23:4 26:9 27:25 35:11 37:24 41:6 42:5,12,20 43:17 45:4 62:24 63:22 64:6 66:21 68:21 74:13 75:14 78:4 108:12,13

**outcomes** 34:7,9

**outset** 8:10

**overspeak** 91:24

**owned** 14:7 25:15 30:21 49:20 65:11

**owner** 69:11,13 77:4, 7

**owners** 25:24 26:2,6 67:5,9,11,15,16,19 68:7,16,24 69:7,9,23

**ownership** 13:11 25:12,14 29:22 76:24 79:4 81:6,8,14,25 83:25 84:4,11 88:8 104:9

**ownerships** 84:9

**owns** 25:10 69:18

---

**P**

**P&I** 35:14 65:21

**Pachulski** 6:20 7:8 8:21

**paid** 67:24 68:4 71:23

**Pardon** 80:8

**part** 19:9 21:10 23:7 45:19,20 100:25 106:20

**participate** 50:13

**participation** 33:17

**parties** 22:3 28:17
32:3,4,10 33:11
89:13 98:6,25 99:4
106:8 108:2

**parties'** 88:19 90:2
108:2,4

**partner** 16:7,10
28:10,25 30:21,22
34:6

**partners** 7:5 18:16,
18 31:3 35:16 45:7
62:20 66:9 74:21
75:11 94:21,25 95:20
108:24

**partners'** 96:8
107:20

**partnership** 27:8
30:18,22 32:18 34:21
38:11,19 45:8 47:19
62:12 63:13 71:19
72:13 74:8,11,21
75:3,5,19 96:10

**parts** 45:17

**party** 49:12 50:22

**pass-through** 68:5

**Patrick** 6:1,7,25 7:1,
20,21 8:1,12,17 9:1
10:1 11:1,5 12:1 13:1
14:1 15:1 16:1,18
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1,21 27:1
28:1 29:1,20 30:1,3
31:1 32:1 33:1 34:1
35:1,23 36:1 37:1
38:1 39:1,23 40:1,9
41:1 42:1 43:1 44:1,
10 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1,24 54:1
55:1 56:1 57:1,8 58:1
59:1 60:1,12 61:1,8
62:1 63:1 64:1 65:1
66:1 67:1 68:1,23
69:1 70:1 71:1 72:1
73:1,13 74:1 75:1
76:1 77:1,23 78:1
79:1 80:1 81:1,19
82:1,19 83:1,4 84:1
85:1 86:1 87:1,8 88:1
89:1,7 90:1,15 91:1,

15 92:1 93:1 94:1
95:1,7,9 96:1 97:1,3
98:1,17 99:1,13
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1,
15,20 109:1,4,14

**Paul** 12:14 58:2
61:25 88:6,12 89:15
91:2 92:9 99:24

**pay** 66:6 76:11,15

**paying** 67:17

**payment** 70:3

**PDF** 18:9 20:9,16
26:18 35:20 37:21
41:5 49:3 52:8 59:14
61:18 77:21 78:13
80:17 83:20 85:13
93:4 94:7 96:23
104:4

**people** 12:6,18 76:21
85:2

**percent** 36:8 41:17,
18 43:12,13,20,21
62:25 63:2 64:14,20
70:2,10,17,24 72:8
78:18,21,22 79:4,8
81:7 83:10 84:12

**percentage** 25:20,
23 36:16 37:16 38:2,
6,7,12,23 39:14 40:2,
3,12,24 41:25 42:4,9
80:5,9,22,23 81:12,
13,24 82:4,7,15,20,
22 83:7,9,13 84:9,15
85:22 87:10,14 88:2
94:4,9,11,15,16
95:10,17 96:4,7,12
97:6,17,22 98:7

**percentages** 37:15
38:14,16 40:10,23
61:15 78:25 80:14,15
81:4 82:11 83:7 84:3
85:10 87:19 88:13,
14,18 90:8 98:3

**perform** 13:2 26:11

**performed** 14:6

**period** 22:23 33:10
66:3 68:11 88:11
92:10

**permits** 74:7

**person** 102:6

**personal** 53:16

**personnel** 12:10
15:22 16:4

**perspective** 32:7
88:16 97:6

**Phillips** 10:23

**pie** 75:4

**place** 79:18

**places** 83:14

**planning** 12:5

**play** 15:6,9 16:2

**played** 51:12

**pocket** 88:10

**point** 36:24 55:6

**portion** 9:8 104:9

**position** 31:16

**potentially** 28:21

**practice** 7:22

**precise** 69:5

**precisely** 71:12

**predecessor** 16:10

**prefer** 17:12

**prepare** 10:13,16
11:2 19:24

**prepared** 105:8

**preparer** 60:22 102:2

**prepares** 101:14,20
102:8

**preparing** 104:24

**presentation** 62:16
64:12

**presented** 50:2

**president** 21:22

**previous** 34:23

**previously** 52:3

**principally** 25:15

**prior** 7:20 10:22 45:9
56:3 74:23 87:8
97:20

**privilege** 8:7

**privileged** 8:5,6

**problem** 66:10

**proceeds** 52:25
58:15 59:4

**process** 19:3,9

**professional** 22:17
76:7,19

**professionals** 12:23
19:14 22:16 23:6
48:9

**profit** 63:8,10,12

**profits** 41:9,15,23
42:7,13,17,25 43:10,
18,24 59:23 62:24
64:4,15,20 65:16
66:16,18 67:25 70:2,
4,10,17,24 71:7,24
72:9 73:6

**Project** 14:13,16,19,
21 15:3,7,12,13,19,
23 16:3,6 19:21
21:10 51:23 52:5

**projections** 72:20,
24 73:3,5

**projects** 13:15,19,24

**proof** 103:16 104:15

**properties** 65:25

**property** 51:6 104:14

**provide** 23:10 51:6
89:19

**provided** 28:8 36:6
41:12 102:4

**providing** 23:8 29:21

**provision** 50:16
54:12 60:3

**provisions** 84:5

**pull** 73:9

**purchase** 50:4,15

**purport** 67:6,9,10,12

**purpose** 14:23 15:3
20:11,20 21:5 69:25
70:10,16,19,23 71:4

**Pursuant** 20:22

**put** 26:3 27:10

**putting** 9:6 19:13

**Q**

**qualified** 7:21

**qualify** 68:19

**question** 9:13,16,24
10:11 13:22 17:23
22:9 30:5 31:18 39:5,
9,19,21 42:23,24
61:4 64:23 66:14
68:14 69:15 70:13,15
76:14 83:17 86:15,17
87:4,22 91:23 102:24
104:21

**questioning** 108:15,
22

**questions** 8:4 9:19
108:7,25

**quick** 33:6 65:19

**R**

**race** 33:5 65:18

**ratio** 42:8

**reached** 19:23 46:11

**read** 81:18,23

**readily** 66:8

**real** 7:5 14:24 15:4
20:20 21:7 22:22
23:7,14 28:23 31:9
48:16,21 50:5 66:4,
10 107:4 108:24

**realizations** 35:6

**reask** 39:19

**reason** 29:15 82:20

**reasons** 67:3 71:8,
11,16

**recall** 23:17 24:9
26:5 29:8 30:8 41:2

42:10,21 44:3 48:20
50:4 55:16 59:11
62:3,15 64:2 65:7
71:11 73:2,7 80:2
85:25 87:13 96:13
101:22 102:3,10
103:3,6,9

**receive** 50:14

**received** 23:20 46:17
102:8

**receives** 66:7

**receiving** 50:2

**recess** 57:3 96:19
105:18

**recipient** 85:21
99:15 100:24

**recipients** 85:16
86:3,25

**recognize** 44:10
73:13

**recollection** 15:21
55:17 56:4,7 57:21
58:10,19,22,25 59:6
60:25 101:12

**recommend** 103:4

**record** 6:3,18 17:20

**redline** 78:3,8,10

**redlined** 78:14

**reduce** 33:18

**reducing** 79:3 81:5,
11 83:8 84:10

**refer** 9:3 17:9,11,16,
21 18:18 21:2 28:13
40:11,12 44:17 46:8
49:14 50:9,25 54:21
56:6 63:13 75:22
76:24 77:3,12 79:13
81:25 94:9

**reference** 42:3 56:2

**referring** 17:24
28:12 29:22 42:22,23
47:21,22 58:8,12
59:8,12 63:9 64:5
73:4 74:12 79:14
91:16 92:4,13 93:14
94:10 98:10,11,12,16
100:11

**refers** 27:5 41:21

**reflect** 54:12,16 58:3
76:20 89:18,25 92:23

**reflected** 22:14 23:5
43:22 48:2,14 62:21
88:18 106:7,17,21
107:7,10

**reflective** 27:6
107:19

**reflects** 108:2

**refresh** 15:21 48:22
56:7 57:21 60:25
80:13

**refreshed** 55:17

**regard** 18:22 54:8

**related** 10:24

**relates** 73:18 90:23

**relating** 41:16 102:9

**relation** 106:3
107:14

**relationship** 13:11
34:2 50:8

**relevant** 102:8

**relied** 26:15

**rely** 8:6 26:10

**remain** 94:4 95:11
96:4

**remember** 56:14
90:3,5

**remotely** 6:8,13 7:12
8:13

**rental** 43:11,19,25

**reoccurring** 63:19

**reorganized** 8:22

**repeat** 9:12

**rephrase** 30:4 31:17
47:12 69:15 76:14
93:11 101:5 104:22

**report** 20:3 76:3

**reported** 20:4 22:20
48:7

**REPORTER** 6:3 7:10

27:14 53:4 64:17,22
91:22 109:8,16,20

**reporting** 6:13,16

**represent** 6:21

**representative** 8:2

**representing** 6:25
47:7,10

**required** 50:7

**reserves** 108:24

**residence** 6:14

**resourced** 28:25
30:15,23 32:19 65:5,
6,13 70:21

**resources** 28:10,11,
14,15

**respect** 10:23 15:11
22:6,25 28:23 34:16
45:20 46:20 47:3,19
50:3,5 61:15 62:16,
18 63:15,17,23 65:24
68:4 95:15 98:2
102:4 106:7

**respective** 79:3 81:6
83:9 84:11

**responsibility**
106:20

**responsible** 22:12,
23 23:3,8 47:25
48:13 79:22 101:24
102:7

**responsive** 39:5
66:14

**rest** 55:3,12 92:7

**restate** 22:8 68:14
83:16 87:22

**restated** 17:7 44:14
59:18

**restroom** 10:9

**retroactive** 74:7

**retroactively** 34:23

**return** 50:3,14 60:22

**returns** 101:14,21
102:2,12,16 103:2,5

**Revenue** 31:2

**review** 10:19,21
15:20 19:15 48:10
75:24 76:16 78:10
85:9 89:17,20 106:6
109:14

**reviewed** 10:22 48:9
78:9

**reviewing** 22:12
23:3 47:25 48:13
76:18 106:6 107:9

**Rick** 12:12 61:24
89:16

**rights** 104:10

**Roby** 99:25

**role** 11:23 15:6,9
16:2 45:11 46:9
48:19 51:12

**rule** 34:21

**rules** 38:19 74:21

**S**

**sale** 50:4,16 63:16

**sales** 35:4,7,14 72:14

**schedule** 26:21
37:23 38:6 40:2,25
41:14,25 52:10 53:15
54:12,16,18,20,21,22
58:2 80:20 81:3,12
82:21 84:5 92:23
93:13,16 94:11 97:7
98:3,6,13

**scheduled** 38:13

**Scott** 25:19,21

**screen** 9:7 16:19

**scroll** 18:8 20:8
26:17 35:19 37:21
41:4 45:22 49:2
50:18 55:2,10 59:13
60:9 77:21 78:12
80:17 91:12 92:19
93:4 100:15 103:12,
19

**second-chairing**
7:9

**Secondarily** 50:3

**section** 41:12,14
50:6 77:14

**sections** 80:6,10

**send** 85:6,8,9 109:13

**senior** 12:15

**sense** 35:13 65:13

**sentence** 104:8

**services** 13:2 14:6
26:11,14 29:21 51:7

**set** 41:13 53:15 85:23

**Shawn** 91:9

**sheet** 30:16

**short** 39:13

**show** 16:14 53:19
60:5 80:13 90:4 99:8
100:17 102:19

**showed** 72:20,24

**showing** 38:21 73:5

**shows** 103:25

**sign** 60:22 92:9

**signed** 18:12,15
40:22 46:2 75:7 91:9,
20 92:4

**simple** 37:2

**simply** 39:25 84:10

**situation** 107:25

**situations** 33:5
46:15

**Skyview** 11:12,15,18

**slow** 27:18 89:9

**small** 69:4

**smaller** 30:21

**sold** 65:25

**solely** 107:13

**soliloquy** 39:12

**sort** 22:9 30:12 33:13
34:5 35:3,10,11
38:10,16 47:10 50:15
65:18 75:3

**sorts** 31:6

**source** 53:13

**speak** 11:2

**speaking** 20:19 32:5
66:5

**special** 14:23 41:13

**specific** 16:2 52:6
68:11 86:17

**specifically** 36:6

**speculate** 32:9

**split** 75:4

**spoke** 10:18 88:14

**stalled** 35:10

**standing** 109:10

**stands** 24:6

**Stang** 6:21 7:8 8:21

**start** 9:19,24 35:2

**starts** 7:19

**state** 6:17 81:20

**stated** 74:6

**statement** 7:18

**status** 12:16

**stay** 35:18 59:16
94:17 105:17

**stenographic** 6:14

**Strand** 21:23 69:2

**strike** 39:4 66:13
104:21

**strong** 30:16

**structural** 28:14
30:17

**structurally** 65:6

**struggle** 47:9

**Subchapter** 30:25
72:18

**subject** 21:18 37:4
46:6 67:20 90:21

**subsequent** 16:8
74:25

**subsequently** 17:7

**substance** 72:5,8,
11,12,17

**substantial** 32:20

**suggestion** 103:7

**support** 28:9

**suppose** 34:7

**Surgent** 22:20 48:8

**surprised** 18:21

**Swadley** 12:12 61:25
62:15 89:16

**swear** 7:11

**sworn** 7:15 8:13

———————

**T**

**taking** 8:24

**talked** 43:4 79:14
80:5 84:5

**talking** 57:9 68:10

**tax** 11:25 12:2,3,5,13,
14,15,23 15:24 28:21
29:10 30:10,13 31:7,
13 33:18 34:21 35:6
45:6,19 60:23 61:25
62:8 63:4,7,18 64:13
65:2,10 66:9 70:23
71:4 74:6,15,17,23
75:16 77:14 91:5
101:14,21 102:2,12,
16 103:2,5

**taxable** 30:25 38:16
45:9 62:9,13,17,19
63:8,9,23,25 65:25
66:7 67:3,20 73:5
74:24 75:18

**taxes** 67:17,23 68:3
70:3 71:22 102:8,9,
12

**team** 22:18 23:7,14
48:16,21 62:3,8 63:7
65:2 107:8

**telling** 89:18

**ten** 11:22 56:20

**tenure** 7:23

**term** 14:12,15 28:18
29:17 36:22 72:4

**termination** 12:24

**terms** 37:2 93:7

**testified** 8:14 29:20
98:18

**testimony** 10:23
37:14 46:9 47:6
58:21 63:14

**Texas** 6:10,11,15 7:6
11:9

**thereto** 41:16

**thing** 17:15 81:14

**Thomas** 22:20 48:8

**thought** 86:20

**tied** 38:24

**Tim** 22:19 48:7 73:25
89:14 105:25

**time** 6:5 7:10 9:7
12:4,10,11,17,19,23
21:13 22:23 25:4
26:9 30:24 33:10
35:7,8,12 36:9 37:10
42:5,16 43:17 53:11
56:17 57:2,3,4 63:22
66:3 68:11,12,20,24
69:7 72:13 81:20
86:2 87:23 88:11,17
89:8 92:10 95:7
96:19,20 97:15,18,20
105:3,18,19 108:25
109:3,21

**times** 17:10

**today** 7:9 8:24 90:6
105:2 108:16 109:3

**today's** 6:4 10:5

**told** 89:25 90:7 101:6

**top** 93:24

**transaction** 19:21
28:23 31:21,23 53:12
88:8

**transactions** 66:11

**transcript** 109:13

**tremendous** 31:4

**trial** 109:2

**tripping** 14:3

**TSG** 6:15

**Two-fold** 49:25

**type** 19:23 59:7

**types** 30:19

**typo** 104:13

———————

**U**

**Uh-huh** 46:19

**ultimate** 67:16,19
69:6,9

**underlying** 15:11

**understand** 8:25
9:15 10:4 31:11
56:12 71:22 74:16,18
95:12 105:23

**understanding**
14:18,21 25:11,13
32:14 33:24 36:13
42:7,10 43:16 45:2
47:13 51:4,5,11 66:4,
20 67:2 69:19 70:9
71:6 75:18 88:6
89:21 97:16 98:20
101:23 105:9 106:23

**understood** 97:5

**undertaken** 13:15,
19,25 14:2

**unexpected** 34:7,9

**Unicorn** 14:13,16,19,
22 15:3,7,12,14,19,
23 16:3,6,9 19:21
21:10 51:24 52:5
90:22

**unsure** 92:7

———————

**V**

**vacation** 88:10

**variety** 12:4 15:22
19:14 31:8 34:16
35:14 37:5 46:14
63:16

**vehicle** 14:23

**venture** 19:23 28:16
32:4,11 35:3 47:11
50:14 106:11,22,25
107:2,11,22

**ventures** 30:20 31:9

**version** 40:21

**VI** 36:6

**view** 31:7 34:12 35:3,
11 47:17 63:19

**Viggato** 101:10,17

**vis-a-vis** 70:20 96:8

**visibility** 53:16 86:5

———————

**W**

**W-2** 23:21

**wait** 9:22 78:23 87:22
91:22,23

**wanted** 8:9 31:12,17
50:13 92:8 95:2
107:19

**Waterhouse** 20:5
76:4 89:16

**weigh** 46:14

**weighed** 46:10

**Wick** 10:23

**Williams** 19:24 46:25
47:7,13 107:16

**window** 33:10

**Winogard** 98:12

**Winograd** 6:19,20
7:9,13,16,25 8:11,16,
20 13:7,18 14:11
16:13,17 17:13,19,21
18:3,7,10 19:2,17
20:7,10,15 22:4 25:9
26:17,20 27:21 29:9
30:2 31:19 32:13,23
34:8 35:18,22 36:19
37:13,20,22 39:2,7,
16,19,22 40:8 41:4,7
43:3 44:5,9 45:22,24
49:2,4,7 50:18,20
52:7,9,23 53:8,19,23
54:25 55:8,10,13

56:15,22,24 57:5,7
58:13,20 59:13,17,21
60:5,9,11 61:7,12,17,
20 62:5 64:19 66:12,
15 67:14,22 68:6,12,
15,22 70:7,14,22
71:5,13 72:3 73:8,12
76:10 77:20,22
78:12,15 80:17,19
82:3,18 83:2,19,21
84:21 85:13,15
86:16,22,24 87:7,24
88:15 89:23 90:11,13
91:12,14 92:2,19,21
93:3,5,10,22 94:2,6,
8,23 95:8 96:2,14,21
97:2 98:15,23 99:7,
11 100:15,18 102:19,
23 103:19,21 104:3,6
105:11,20 106:9,15
108:14 109:11

**word**  13:22 14:3
16:9,11 17:25 21:24
22:9 30:13 38:23
47:9 58:11 104:19

**work**  23:18 38:12
85:2 86:4 92:10

**worked**  11:25 12:7
23:20,23 86:6,11,20

**working**  34:19 76:21
88:7 106:24

**works**  56:17,19
96:16

**write**  54:3 60:14
90:17

**wrong**  97:23

**wrote**  57:19 59:12
73:16 94:25

Y

**year**  34:23 45:9
74:20,24,25 75:16

**years**  11:22 55:18

**yesterday**  15:21
48:23 105:4,6,10

**York**  6:23 7:3

Z

**Ziehl**  6:21 7:8 8:21