# EXHIBIT 70

1        JAMES DONDERO - 10/4/22

2     IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3             DALLAS DIVISION

4   _____
                          )
5   IN RE:              )   CHAPTER 11
                          )
6   HIGHLAND CAPITAL      )   CASE NO.
    MANAGEMENT, L.P.,     )
7                         )   19-34054-SGJ11
      Reorganized Debtor.    )
8                         )
    _____   )
9

10

11

12        REMOTE VIDEOTAPED DEPOSITION OF

13            JAMES DONDERO

14         Tuesday, October 4, 2022

15

16

17

18

19

20   Reported by:

21   KIM A. McCANN, RMR, CRR, CSR

22   JOB NO. 217518

23

24

25

Page 2

```
1          JAMES DONDERO - 10/4/22
2              October 4, 2022
3              10:02 a.m.
4
5          Remote Videotaped Deposition of JAMES
6    DONDERO, held via Zoom Videoconference, pursuant
7    to the Federal Rules of Civil Procedure before
8    Kim A. McCann, Registered Merit Reporter,
9    Certified Realtime Reporter and Certified
10   Shorthand Reporter in and for the State of Texas.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1          JAMES DONDERO - 10/4/22
2     R E M O T E   A P P E A R A N C E S:
3    APPEARING FOR THE REORGANIZED DEBTOR/PLAINTIFF:
4    John Morris, Esq.
     Hayley Winograd, Esq.
5    Jeff Pomerantz, Esq.
     Gregory Demo, Esq.
6    PACHULSKI STANG ZIEHL & JONES LLP
     10100 Santa Monica Blvd.,
7
     Los Angeles, California 90067
8
9    APPEARING FOR NEXPOINT REAL ESTATE PARTNERS, LLC
     AND THE WITNESS:
10
     CHARLES GAMEROS, JR., ESQ.
11   Hoge & Gameros LLP
     6116 North Central Expressway
12   Dallas, Texas 75206
13
     Also Present:
14
     Deborah Newman, Esq., Quinn Emanuel
15   La Asia Cantey - Pachulski Stang Ziehl & Jones
     LLP
16   Philip Rizzuti, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          JAMES DONDERO - 10/4/22
2             I N D E X
3                          PAGE
4    Examination by Mr. Morris          7
5
6        E X H I B I T S
7    NUMBER    DESCRIPTION          PAGE
8    Exhibit 1  Subpoena to appear for      8
            Mr. Dondero
9
     Exhibit 2  Limited Liability Company   24
10          Agreement for SE Multifamily
            Holdings, LLC
11
     Exhibit 3  Bridge Loan Agreement of 9/26/18   63
12
     Exhibit 4  Email dated 2/28/19 from Mark   87
13          Patrick
14   Exhibit 5  Email dated 2/28/19 from Mark   89
            Patrick
15
     Exhibit 6  Email dated 3/14/19 from    94
16          Mr. Broaddus
17   Exhibit 9  First Amended and Restated LLC   99
            Agreement
18
     Exhibit 12  Schedule K-1 for 2018 for SE   123
19          Multifamily Holdings, LLC
20   Exhibit 20  HCRE Proof of Claim       127
21
22
23
24
25
```

Page 5

```
1          JAMES DONDERO - 10/4/22
2          P R O C E E D I N G S
3          THE VIDEOGRAPHER:  Good morning,
4    Counsel.  My name is Philip Rizzuti.  I am
5    a legal videographer in association with
6    TSG Reporting, Inc.  Because this is a
7    remote deposition, and that it will not be in the
8    same room with the witness.  Instead, I
9    will record this videotaped deposition
10   remotely.  The reporter, Kim McCann, also
11   will not be in the same room and will swear
12   the witness remotely.
13          Do all parties stipulate to the
14   validity of this video recording and remote
15   swearing, and that it will be admissible in
16   the courtroom as if it had been taken
17   following Rule 30 of the Federal Rules of
18   Civil Procedure and the State's rules where
19   this case is pending?
20          MR. MORRIS:  This is John Morris,
21   counsel to Highland Capital Management,
22   L.P.  Highland consents.
23          MR. GAMEROS:  This is Bill Gameros,
24   counsel to NexPoint Real Estate Partners,
25   LLC.  We consent.
```

Page 6

1    JAMES DONDERO - 10/4/22
2    THE VIDEOGRAPHER: Thank you. This
3 is the start of media labeled Number 1 of
4 the video-recorded deposition of Mr. James
5 Dondero in the matter of In Re: Highland
6 Capital Management LP, in the United States
7 Bankruptcy Court for the Northern District
8 of Texas, Dallas Division, Case Number
9 19-34054-SGJ-11.
10    Today -- this deposition is being
11 held on October 4, 2022, at approximately
12 10:02 a.m. My name is Phil Rizzuti. I'm
13 the legal video specialist from TSG
14 Reporting, Inc. The court reporter is
15 Kim McCann in association with TSG
16 Reporting.
17    Counsel, please introduce
18 yourselves.
19    MR. MORRIS: This is John Morris
20 from Pachulski Stang for Highland. I've --
21 I've identified all the other folks for
22 side who are on this call. Can we just --
23 go ahead, Bill.
24    MR. GAMEROS: No problem.
25    MR. MORRIS: We've got to get this

Page 7

1    JAMES DONDERO - 10/4/22
2 started, we really do.
3    THE VIDEOGRAPHER: I gotcha.
4 Sorry. Sorry.
5    Would you swear in the witness,
6 Kim.
7    THE REPORTER: Mr. Dondero, may I
8 get you to raise your right hand.
9    JAMES DONDERO,
10 Having been first duly sworn, testified as
11 follows:
12    EXAMINATION
13 BY MR. MORRIS:
14    Q. Good morning, Mr. Dondero. Can you
15 hear me okay?
16    A. Yes.
17    Q. Is there anybody in the room with you
18 today?
19    A. Just my lawyer.
20    Q. Do you have any phone with you or any
21 other devices with you right now?
22    A. No.
23    Q. Okay. Can --
24    MR. MORRIS: Can -- Ms. Canty, can
25 you please put up on the screen Exhibit 1,

Page 8

1    JAMES DONDERO - 10/4/22
2 which is a subpoena.
3    (Exhibit 1 was marked.)
4    Q. Okay. Do you see the sub -- subpoena
5 on the screen, sir?
6    A. Yes.
7    Q. Have you seen it before?
8    A. Not that I recall.
9    Q. Are you aware that today's deposition
10 was supposed to begin at 9:30 Central time?
11    A. Yes.
12    Q. And how come you didn't show up until
13 9:55 Central time?
14    A. I had other things going on.
15    Q. What other things did you have going
16 on that prevented you from timely attending
17 today's deposition?
18    A. There were things at my house I had
19 to deal with.
20    Q. When did you realize that?
21    A. This morning.
22    Q. Is there any reason you didn't
23 instruct your lawyer to give me advance notice so
24 that I and my colleagues didn't sit around for
25 25 minutes waiting for you?

Page 9

1    JAMES DONDERO - 10/4/22
2    A. Not any -- I -- I did not consider
3 that.
4    Q. Is there any reason why you cannot
5 give complete and accurate testimony today?
6    A. No.
7    Q. Did you do anything to prepare for
8 today's deposition?
9    A. I just met with my lawyer.
10    Q. Did you review any documents?
11    A. No.
12    Q. You didn't review any documents to
13 prepare for today's deposition, do I have that
14 right?
15    A. We went over a couple of things with
16 my lawyer. I don't remember exactly which
17 documents.
18    Q. Did you look at the Proof of Claim
19 that was filed by HCRE?
20    A. Not specifically.
21    Q. Can you identify any document that
22 you reviewed in connection with your preparation
23 for today's deposition?
24    A. No.
25    Q. Did you speak with anybody in the

Page 10

1        JAMES DONDERO - 10/4/22
2  world about today's deposition other than your
3  lawyer?
4        A.  Just my lawyer.
5        Q.  You didn't speak with Mr. Broaddus?
6        A.  No.
7        Q.  You didn't speak with Mr. McGraner?
8        A.  No.
9        Q.  You didn't speak with anybody at
10  BH Equities?
11        A.  No.
12        Q.  You didn't speak with anybody at
13  Barker Viggato?
14        A.  I didn't speak with anybody.  You can
15  keep listing people, but, no, I did not.
16        Q.  Okay.  Are you familiar with an
17  entity that goes by the acronym HCRE?
18        A.  Yes.
19        Q.  Do you know if that acronym stands
20  for anything?
21        A.  Highland Capital Real Estate.
22        Q.  Okay.  Do you know when HCRE was
23  formed?
24        A.  Two years ago.
25        Q.  And do you know who owns HCRE today?

Page 11

1        JAMES DONDERO - 10/4/22
2        A.  I -- yes.
3        Q.  Who owns HCRE?
4        A.  It's partly Highland, partly B&H, and
5  partly NexPoint.
6        Q.  All right.  I just want to clarify to
7  make sure we're on the same page.  I'm not asking
8  about SE Multifamily.  I'm asking about HCRE
9  Part- -- Partners.
10        A.  Oh.  I believe -- I believe that's
11  myself and McGraner.
12        Q.  And what -- what percentage of the
13  membership interest do you own in HCRE?
14        A.  I -- 70 or 75 percent, I believe.
15        Q.  And do you have an understanding of
16  what percentage interests Mr. McGraner holds in
17  HCRE?
18        A.  The balance.
19        Q.  Does Mr. Ellington -- Scott Ellington
20  own any membership interests in HCRE?
21        A.  That's a good question.  I -- I don't
22  remember.  He may own 5 percent.  I don't
23  remember.
24        Q.  Okay.  Do you know if HCRE has ever
25  had any person or entity that owned membership

Page 12

1        JAMES DONDERO - 10/4/22
2  interests other than you, Mr. McGraner, and
3  perhaps Mr. Ellington?
4        A.  I don't believe so.
5        Q.  Have -- have the ownership interests
6  amongst and between you and Mr. McGraner and
7  perhaps Mr. Ellington changed at any time since
8  HCRE was formed?
9        A.  Not that I'm aware of.
10        Q.  So to the best of your knowledge, the
11  owners of HCRE have not changed since the time it
12  was formed; is that fair?
13        A.  Not -- not that I remember.
14        Q.  Okay.  Did you personally invest any
15  capital in HCRE at any time in exchange for your
16  membership interests?
17        A.  I don't know.
18        Q.  Do you recall ever investing any
19  capital in HCRE in exchange for your membership
20  interests in that entity?
21        A.  I don't know.
22        Q.  Do you recall whether Mr. McGraner
23  ever invested directly or indirectly any capital
24  into HCRE in exchange for his membership
25  interests?

Page 13

1        JAMES DONDERO - 10/4/22
2        A.  I don't know.
3        Q.  Do you have an understanding as to
4  who controls HCRE?
5        A.  I -- beyond control that would be
6  parallel with the ownership, I don't -- I don't
7  know the -- I don't remember the terms of the
8  document.
9        Q.  Well, and -- and on a day-to-day
10  basis, who is authorized to make decisions on
11  behalf of HCRE?
12        A.  I don't -- I don't know.
13        Q.  Did you ever authorize anybody to
14  make any decisions on behalf of HCRE?
15        A.  I don't know what the document says.
16        Q.  Have you ever looked at the document?
17        A.  No, not that I recall.  And, no, not
18  since it was originally formed and I don't -- I
19  don't remember.
20        Q.  So -- so how -- how has HCRE made
21  decisions since the time it was formed if you as
22  the majority owner don't know who's authorized to
23  make decisions without reference to -- to a
24  document you haven't reviewed?
25        A.  Could you repeat the question again?

Page 14

JAMES DONDERO - 10/4/22

1
2  How what?
3      Q.  Sure.  I'm just trying to be
4  practical here.  So you own a majority of HCRE;
5  correct?
6      A.  Yes.
7      Q.  Does HCRE have any officers today?
8      A.  I -- I don't know.  It's a
9  partnership but I don't -- I don't -- I don't
10  recall it having officers.
11      Q.  Does any -- does HCRE -- withdrawn.
12      Do you know whether HCRE has ever had
13  any officers?
14      A.  I don't know.
15      Q.  Did you ever appoint any officers to
16  HCRE?
17      A.  I don't remember appointing anybody.
18  If they were part of the original formation
19  documents, I -- I don't remember.
20      Q.  Does HCRE have any employees today?
21      A.  I don't believe so.
22      Q.  Do you know if HCRE has ever had any
23  employees since the moment it was formed?
24      A.  I don't know.
25      Q.  Can you identify any person in the

Page 15

JAMES DONDERO - 10/4/22

1
2  world who you believe was authorized on behalf --
3  withdrawn.
4      Can you identify any person in the
5  world who you as the majority of -- owner of HCRE
6  was authorized to act on behalf of HCRE other
7  than you and Mr. McGraner?
8      A.  Other than me and Mr. McGraner, I
9  don't believe there would be anybody else who
10  would be authorized.
11      Q.  Is it fair to say that as the
12  majority owner, nobody was authorized to act on
13  behalf of HCRE without your knowledge and
14  approval?
15      A.  I -- I -- I don't want to -- I don't
16  want to agree with that.
17      Q.  You can't identify anybody who was
18  authorized to act on behalf of HCRE other than
19  you and Mr. McGraner; correct?
20      A.  Right, which is a different question.
21      Q.  I appreciate that.  But -- but that's
22  correct -- right? -- you're not aware of anybody
23  who was authorized to act on behalf of HCRE other
24  than you and Mr. McGraner; correct?
25      A.  That's correct.

Page 16

JAMES DONDERO - 10/4/22

1
2      Q.  Did you ever discuss with
3  Mr. McGraner whether he ever authorized anybody
4  to act on behalf of HCRE?
5      A.  Not that I recall.
6      Q.  Did Mr. McGraner ever inform you that
7  he had authorized anybody to act on behalf of
8  HCRE?
9      A.  I -- you know, I don't recall, but
10  depending upon what the task was, depending if it
11  was a less significant, noninvestment-related
12  task, he wouldn't have necessarily told me.  I
13  wouldn't have necessarily needed to know, and I
14  -- I don't -- I don't recall him authorizing
15  somebody else, but it wouldn't have been unless
16  it's -- it wouldn't have been necessarily
17  uncommon or inappropriate for him to have
18  delegated lesser responsibilities to somebody.
19      Q.  Okay.
20      MR. MORRIS:  I move to strike.  And
21  I'd just ask you to listen carefully to my
22  question.
23      Q.  (BY MR. MORRIS)  Did Mr. McGraner ever
24  tell you that he had authorized anybody in the
25  world to act on behalf of HCRE?

Page 17

JAMES DONDERO - 10/4/22

1
2      A.  Same answer.
3      Q.  He never told you that; correct?
4  I'll -- I'll restate the question.
5      Mr. McGraner never identified any
6  person to whom he had authorized to act on behalf
7  of HCRE; correct?
8      A.  I -- I would have the same answer.  I
9  don't recall.  And it wouldn't have been
10  appropriate for him to on lesser activities.
11      MR. MORRIS:  And I'll move to
12  strike everything after "I don't recall."
13      Q.  Are you familiar with the phrase
14  "Project Unicorn"?
15      A.  I'm sorry, what?
16      Q.  You have an under -- have you ever
17  heard the term "Project Unicorn"?
18      A.  Yes.
19      Q.  Do you have an -- do you have an
20  understanding of what Project Unicorn refers to?
21      A.  Just generally.
22      Q.  What's your understanding of what
23  Project Unicorn refers to generally?
24      A.  I believe a couple billion dollars in
25  multi-family properties.

Page 18

JAMES DONDERO - 10/4/22

1
2    Q.   And did -- did you personally play
3    any role in Project Unicorn?
4    A.   I was involved in the investment
5    decision and the discussions around -- the
6    general discussions around the allocation.
7    Q.   And what do you recall about your
8    participation in the investment decision?  What
9    facts do you recall about that?
10    A.   That's about all I recall.
11    Q.   Who did you have these discussions
12    with?
13    A.   Mr. McGraner.
14    Q.   Anybody else?
15    A.   I don't believe so.
16    Q.   Did Mr. McGraner explain to you the
17    economics of the proposed transaction known as
18    Project Unicorn?
19    A.   Yes, it would -- him and his team did
20    the analytics and the cost and tax allocations
21    and those kinds of things.
22    Q.   Do you remember anything about the
23    presentation that you just described?
24    A.   No.
25    Q.   I think you said that you

Page 19

JAMES DONDERO - 10/4/22

1
2    participated in the general discussion about
3    allocations, do I have that right?
4    A.   Yes.
5    Q.   What do you recall about that topic?
6    A.   Not much.  Nothing specific.  It's
7    just some -- some assets were sold, some were
8    retained, and the -- the ones that were sold were
9    sold to different parties.
10    Q.   And when you use the term
11    "allocations," what are you referring to?
12    A.   There's an -- there was an overall
13    price and then there was a cost and tax
14    allocations to specific assets.
15    Q.   And among who -- who were the
16    allocations being made?  Was it the members of
17    SE Multifamily?  Was it something else?
18    A.   No, it was -- it was to the specific
19    assets.
20    Q.   Okay.  Was the creation of
21    SE Multifamily part of the execution of the
22    Project Unicorn strategy or deal?
23    A.   I don't recall.
24    Q.   Do you recall that you signed an --
25    an LLC agreement that resulted in the formation

Page 20

JAMES DONDERO - 10/4/22

1
2    of SE Multifamily Holdings, LLC in August 2018?
3    A.   No, I don't re -- recall the specific
4    structuring.
5    Q.   Okay.  Do you recall that you signed
6    a document on behalf of HCRE that related to the
7    formation of SE Multifamily?
8    A.   I'm not denying that I did.  It's
9    logical that I did but I don't remember it.
10    Q.   Okay.  And -- and you haven't -- have
11    you -- have you been following the developments
12    in the litigation over HCRE's Proof of Claim?
13    A.   I was at the hearings I'm required to
14    be at.
15    Q.   Have you read any of the pleadings in
16    the case?
17    A.   No.  But I've been at the -- I've
18    been at -- I think I understand the gist from the
19    hearings.
20    Q.   Okay.  But my question is whether you
21    recall ever reading any of the pleadings that
22    have been filed in connection with the litigation
23    of HCRE's Proof of Claim?
24    A.   No, I do not.
25    Q.   You controlled HCRE at all times

Page 21

JAMES DONDERO - 10/4/22

1
2    since its formation; is that fair?
3    A.   My ownership has been consistent but
4    I -- and my ownership's been majority, but I -- I
5    don't want to -- I don't want to agree with the
6    word "control."  I -- I'd prefer a more specific
7    verb, I guess.
8    Q.   What word would you prefer to use?
9    A.   Ownership.
10    Q.   So you've owned a majority of
11    interests in -- in that entity since it was
12    formed; correct?
13    A.   Yes.
14    Q.   Is there anybody in the world who can
15    -- who -- who might have controlled HCRE other
16    than you since the time it was formed?
17        MR. GAMEROS:  Objection.  Vague and
18    ambiguous as to "controlled."
19    A.   I -- can you ask the question again,
20    please?
21    Q.   Sure.  You're reluctant to say that
22    you control HCRE; is that fair?
23        MR. GAMEROS:  Same objection.
24        MR. MORRIS:  Withdrawn.
25    Q.   Do you understand the word "control"

Page 22

1        JAMES DONDERO - 10/4/22
2  in the context of -- of corporate governance?
3        A.  Well, I want -- I want to draw the
4  distinction between ownership majority, majority
5  ownership and day-to-day operations.  But that's
6  -- that's all.
7        Q.  Well, other than you and Mr. Graner
8  -- Mr. McGraner, can you identify anybody who is
9  authorized to control HCRE on a day-to-day basis?
10       A.  Nobody else would have ownership
11  other than McGraner or I or control on a
12  day-to-day basis.  But, again, there are tasks
13  that he may have delegated and authorized people
14  to perform on his team for anything from
15  investment analysis to structuring to tax to
16  whatever.
17       Q.  But you have no personal knowledge of
18  that; is that fair?
19       A.  That's right.  That's why I don't
20  want to agree that I'm the only one or he and I
21  are the only ones that have specific day-to-day
22  because I don't know that.
23       Q.  So -- so as you sit here right now,
24  you have no personal knowledge that anybody in
25  the world ever acted on behalf of HCRE on a

Page 23

1        JAMES DONDERO - 10/4/22
2  day-to-day basis other than you and Mr. McGraner;
3  correct?
4        MR. GAMEROS:  Could you repeat
5     that?  I'm sorry.
6        MR. MORRIS:  Sure.
7        Q.  As you sit here right now, you have
8  no personal knowledge that anybody in the world
9  ever controlled HCRE on a day-to-day basis other
10  than you and Mr. McGraner; correct?
11       MR. GAMEROS:  Objection.  Vague and
12     ambiguous as to "controlled" again.
13       A.  Yeah, the -- the answer I'd like to
14  give, which is similar to the other answers, is
15  that it would have been impossible to perform all
16  the activities that HCRE did and does with just
17  McGraner and myself.  It takes other people and
18  other activities to purchase and operate that
19  many properties.  But I don't know specifically
20  who else was involved.
21       Q.  You can't name anybody -- is that
22  fair? -- who was authorized to act on behalf of
23  HCRE at any time since it was formed other than
24  you and Mr. McGraner; correct?
25       A.  I don't have specific awareness.

Page 24

1        JAMES DONDERO - 10/4/22
2        Q.  I appreciate that.  Is it fair to say
3  that you controlled Highland at all times up
4  until January 9, 2020?
5        A.  I -- I've -- I had majority
6  ownership -- or not even majority ownership -- I
7  had the most senior executive position.
8        Q.  Okay.
9        MR. MORRIS:  Can we put up
10     Exhibit 2, please, which is the original
11     LLC agreement for SE Multifamily.
12        (Exhibit 2 was marked.)
13       Q.  Mr. Dondero, we've done this before,
14  and I just want to remind you that this is not,
15  you know, any -- any attempt to trick you, right.
16  We're going to put up some documents on the
17  screen today.  If there's anything that you think
18  you need to me -- to read in order to have
19  context in the rest of it, will you let me know?
20       A.  Sure.
21       Q.  Do you see that this is a Limited
22  Liability Company Agreement for SE Multifamily
23  Holdings, LLC, and it's dated as of August 23,
24  2018?
25       A.  Yes.

Page 25

1        JAMES DONDERO - 10/4/22
2        Q.  You've seen this document before;
3  correct?
4        A.  Just generally.
5        Q.  Okay.
6        MR. MORRIS:  Can we go to page 17,
7     please.
8        Q.  Those are your signatures; correct?
9        A.  Yes.
10       Q.  And you signed this agreement on
11  behalf of Highland Capital Management, L.P. and
12  HCR -- HCRE Partners, LLC; correct?
13       A.  Yes.
14       Q.  I'm just going to refer to
15  Highland Capital Management, L.P. today as
16  Highland.  Is that okay with you?
17       A.  Yeah.
18       Q.  Do you know why Highland was included
19  in this agreement?
20       A.  They were one of the partners.
21       Q.  Do you know why they became one of
22  the partners?
23       A.  I -- I -- they provided -- they
24  provided, I believe, a guaranty, and it's a
25  nominal amount of money, if I -- if I remember

Page 26

JAMES DONDERO - 10/4/22

1
2 correctly.
3    Q.  Who decided that HCMLP or Highland
4 would be a party to the SE Multifamily Holdings,
5 LLC agreement?
6    A.  Who decided -- it was -- the guaranty
7 was a necessary part of the transaction.
8    Q.  And that's --
9    A.  So it was -- the guaranty was a
10 necessary part of the transaction; so they needed
11 -- they needed to be involved.
12    Q.  Who determined that the guaranty was
13 a necessary part of the transaction?
14    A.  It was -- it was precipitated by the
15 -- I'm not sure who they precipitated -- like, I
16 don't want to speculate.  Typically it's --
17 typically it's a borrow -- I mean, the lender or
18 the seller, but I don't remember in this case.
19    Q.  And when you say that the guaranty
20 was nec- -- a necessary part of the transaction,
21 is it fair to say that the transaction could not
22 have happened without Highland's guaranty?
23    A.  I'm not saying that.  I think that
24 was -- it was the simplest, most elegant way to
25 get the transaction done, but if for some reason

Page 27

JAMES DONDERO - 10/4/22

1
2 we couldn't use the Highland guaranty, we would
3 have figured out some other way to do it.
4    Q.  Okay.  But you made the decision on
5 behalf of Highland to participate in
6 Project Unicorn; correct?
7    A.  Yes.
8    Q.  And you knew that Highland's guaranty
9 was a necessary part of the transaction at the
10 time you signed this document; correct?
11    A.  Yes.
12    Q.  And so you knew that Highland was
13 going to be part of SE Multifamily at the time
14 you signed this document; correct?
15    A.  That -- that part I didn't -- I don't
16 know.  I didn't know at that moment if -- when I
17 signed the document.
18    Q.  Before you signed the document, did
19 you have any recollection of speaking with
20 anybody in the world about whether Highland would
21 or should be part of the SE Multifamily Holdings,
22 LLC entity?
23    A.  I -- I don't remember having any
24 conversations about this transaction with anybody
25 other than Mr. McGraner.

Page 28

JAMES DONDERO - 10/4/22

1
2    Q.  So is it fair to say that your
3 understanding that the Highland guaranty was a
4 necessary part of the transaction, that's an
5 understanding that you gained from Mr. McGraner?
6    A.  I -- yes.
7    Q.  And do you recall if that
8 understanding was formed during the course of the
9 presentation that you described earlier?
10    A.  I -- I don't recall.
11    Q.  Do you recall if Mr. McGraner told
12 you -- withdrawn.
13        Did Mr. McGraner identify any reason
14 for including Highland in the SE Multifamily
15 Holdings, LLC entity other than that had to
16 guaranty the loan that was being taken from
17 KeyBank?
18    A.  That's the -- the primary thing I
19 recall.
20    Q.  Do you recall whether anybody ever
21 explained to you that there could be economic
22 benefits to HCRE by having Highland participate
23 as a member in SE Multifamily?
24    A.  I -- I don't recall.
25    Q.  Did you have a -- ever have any

Page 29

JAMES DONDERO - 10/4/22

1
2 discussions with anybody at any time as to
3 whether there would be tax benefits from
4 including Highland in SE Multifamily?
5    A.  I do recall there was -- there was
6 some benefit because as I believe Highland's
7 income was -- income that flowed through to
8 Highland was largely sheltered.
9    Q.  And what do you mean by that?
10    A.  Most of the equity interests in
11 Highland were owned by an insurance company.
12        MR. GAMEROS:  John, we're going to
13 -- we're going to take a quick break.
14        MR. MORRIS:  No, we're not,
15 actually.  You can ask for a break and then
16 I can decide that --
17        MR. GAMEROS:  Okay.  We are.
18        MR. MORRIS:  -- we could, but I
19 don't think it's appropriate for you to
20 tell when I'm taking a break in my
21 deposition that you and your client
22 appeared 25 minutes late for.  Okay?
23        (No verbal response.)
24        MR. MORRIS:  Can you please note on
25 the record that they just blacked me out

Page 30

1       JAMES DONDERO - 10/4/22
2   and shut down the deposition on their own
3   unilaterally. Will you please make a note
4   of that in the transcript.
5       THE VIDEOGRAPHER: Mr. Morris, this
6   is the videographer. Do you want to stay
7   on the record or do you want to go off?
8       MR. MORRIS: I want to stay on the
9   record.
10      THE VIDEOGRAPHER: Okay. I'll --
11  the camera's going.
12      MR. MORRIS: Yeah, please -- please
13  leave it rolling because this is just so
14  completely inappropriate.
15      THE VIDEOGRAPHER: No problem.
16      MR. GAMEROS: Thanks, John. We're
17  back.
18      MR. MORRIS: Hey, Bill, if it
19  happens again, I shut the deposition down
20  and we go to the Judge. Okay? I just want
21  to give you notice. I'm not asking for an
22  agreement.
23      Can I have the last question and
24  answer read back, please?
25      (Requested portion was read.)

Page 31

1       JAMES DONDERO - 10/4/22
2       Q. (BY MR. MORRIS) Mr. Dondero, did you
3   just speak with your counselor after he shut the
4   deposition down during the period the deposition
5   was shut down?
6       A. No. He ran to the bathroom.
7       Q. Really? Okay. What insurance
8   companies are you referring to?
9       A. I don't -- it's part of the Rand
10  transaction. I don't know the name of the
11  insurance company.
12      Q. How is Highland's income largely
13  sheltered through the -- through its ownership by
14  insurance companies?
15      A. I don't know.
16      Q. Well, what's -- what's your basis for
17  saying that Highland's income is largely
18  sheltered?
19      A. That -- that's my understanding,
20  that's what I was told by the tax people and the
21  people that put the Rand transaction together.
22      Q. And who are those people?
23      A. Mark Patrick and his team.
24      Q. So was it your understanding, at the
25  time that you entered into this LLC agreement on

Page 32

1       JAMES DONDERO - 10/4/22
2   behalf of Highland and HCRE, that there were tax
3   advantages by including Highland as the result of
4   the fact that its income was largely sheltered?
5       A. I -- I believe there was some
6   benefit. There -- I believe there was some tax
7   benefit, yes.
8       Q. And is that because Highland was not
9   likely to be a taxpayer? Withdrawn.
10      Is that because Highland was not
11  likely -- withdrawn.
12      Is that because the beneficial owners
13  of Highland were not likely to be income on any
14  distributions from SE Multifamily?
15      A. I -- I don't know if it was regarding
16  the distribution. I think it was regarding the
17  income, they wouldn't -- they wouldn't have to
18  pay tax on the income whether it was distributed
19  or not. But I -- I don't want to -- I don't want
20  to speculate as to questions for the tax guys.
21      Q. I don't want you to speculate either,
22  but I do want you to testify to your knowledge,
23  understanding, and beliefs as the person who
24  signed this agreement on behalf of the members.
25  Okay?

Page 33

1       JAMES DONDERO - 10/4/22
2       So with -- with that perspective,
3   what is your understanding as to the tax benefits
4   that resulted from Highland's inclusion in
5   SE Multifamily?
6       A. If you want my understanding and
7   belief and not speculate, then let me just shut
8   it down at -- by saying the -- I believe there
9   was a tax benefit to including Highland, but I
10  don't know the specifics.
11      Q. Okay. And who was the beneficiary of
12  that tax benefit? Like, HCRE is the one who --
13  who benefited by including Highland for this
14  purpose; correct?
15      MR. GAMEROS: Could you repeat
16  that, please?
17      A. Yeah, please repeat.
18      Q. Sure. By -- by directing the profits
19  and losses to Highland as opposed to HCRE, HCRE
20  is not going to have any tax burden with respect
21  to profits and losses, that was the intent;
22  correct?
23      A. I -- I don't know and I don't want to
24  speculate.
25      Q. I don't want you to speculate either.

Page 34

JAMES DONDERO - 10/4/22

1
2     Did you have any understanding at all
3  at the time you entered into this agreement as to
4  how HCRE would be impacted by the allocation of
5  profits to Highland as opposed to HCRE?
6     A. No.
7     Q. Did you have any understanding that
8  Highland's participation in SE Multifamily would
9  mitigate or otherwise limit the taxable income
10  for HCRE?
11     A. I did not have an understanding or
12  knowledge of the specifics.
13     Q. Do you recall whether you ever
14  discussed with anybody at any time the topic of
15  the expected tax consequences from including
16  Highland in this deal?
17     A. I don't remember.
18     Q. Did HCRE re -- rely on Highland's
19  human resources to execute Project Unicorn?
20     A. Yes.
21     Q. And you understood that at the time
22  you entered into the agreement; correct?
23     A. Yes.
24     Q. And SE Multifamily Holdings, LLC also
25  relied on Highland's human resources at least

Page 35

JAMES DONDERO - 10/4/22

1
2  until the year 2020; correct?
3     A. On some, yes.
4     Q. And you understood that at the time
5  you signed this agreement on behalf of Highland
6  and HCRE; correct?
7     A. Yes.
8     Q. Other than serving as a guarantor and
9  providing tax benefits and human resources, were
10  there any other benefits to including Highland in
11  this transaction that you haven't described and
12  -- and the modest capital contribution I think
13  you also mentioned?
14     A. Not that I recall.
15     Q. Okay. Let's take a look at some of
16  the provisions of this document.
17     Did you ever see a draft of it before
18  you signed it?
19     A. No.
20     Q. So you only saw the final version; is
21  that fair?
22     A. Yes.
23     Q. Did you instruct anybody to prepare
24  this document?
25     A. Not specifically.

Page 36

JAMES DONDERO - 10/4/22

1
2     Q. Was Mr. McGraner charged with the
3  responsibility of executing Project Unicorn on
4  behalf of HCRE?
5     A. Yes.
6     Q. Did you ever learn who drafted this
7  document?
8     A. No.
9     Q. So you had no personal knowledge as
10  to who the author was; is that fair?
11     A. Correct.
12     Q. Did you read it before you signed it?
13     A. Not that I recall.
14     Q. Did anybody explain to you what it
15  said before you signed it?
16     A. I'm sure generally.
17     Q. Do you have any recollection of
18  anybody explaining to you any of the terms or
19  conditions of this document before you signed it?
20     A. No.
21     Q. Did you receive any legal advice from
22  anybody in the world before you put the pen to
23  this paper?
24     A. No.
25     Q. Do you know whether Highland received

Page 37

JAMES DONDERO - 10/4/22

1
2  any legal advice before you signed this document
3  on Highland's behalf?
4     A. I'm -- anything of any significance
5  goes through Highland's Compliance and goes
6  through Highland Legal also. That's standard
7  procedure but I don't -- I wasn't involved in the
8  particulars.
9     Q. Can you identify any lawyer who
10  provided advice to Highland in connection with
11  the drafting of this document?
12     A. Highland Compliance.
13     Q. And what's the basis for your
14  knowledge? What do you know as opposed to what
15  practice there was or what you think might have
16  happened?
17     A. Just my knowledge and understanding
18  is we don't do transactions without Compliance
19  approval.
20     Q. Okay. Did you ever speak to anybody
21  in Compliance about this document before you
22  signed it?
23     A. I did not.
24     Q. Did Mr. McGraner tell you that he had
25  spoken with any particular person in Compliance

Page 38

JAMES DONDERO - 10/4/22

1
2 before you were presented this document to sign?
3    A. Not that I recall.
4    Q. Do you know the purpose of SE
5 Multifamily Holdings, LLC?
6    A. Not specifically.
7    Q. Do you know if this document was the
8 subject of any negotiations between HCRE and
9 Highland?
10    A. I believe there was some settlement
11 discussions a couple of weeks ago.
12    Q. I apologize. It may have been the
13 question, Mr. Dondero.
14    Do you know whether anybody acting on
15 behalf of Highland negotiated any aspect of this
16 agreement that's on the screen with anybody who
17 was authorized to act on behalf of HCRE prior to
18 the time that you signed it?
19    A. I don't know.
20    Q. You're not aware of any negotiations;
21 is that fair?
22    A. I don't remember.
23    Q. You never participated in the
24 negotiations; correct?
25    A. I don't remember.

Page 39

JAMES DONDERO - 10/4/22

1
2    Q. Nobody ever told you that they
3 participated in any negotiation of any term or
4 provision of this document; correct?
5    A. I'm not that. I'm just saying I
6 don't remember.
7    Q. That's all I'm asking you, if you
8 don't remember, you'll just say you don't
9 remember. We've done this enough, right. I'm
10 asking you for your personal knowledge.
11    Do you recall anybody telling you at
12 any time that they participated in a negotiation
13 over any term or provision of this agreement?
14    A. I don't recall specifically, but I --
15 I do know there was iteration and discussion on
16 terms, I just -- I don't remember.
17    Q. Can you identify a single term that
18 was the subject of negotiation?
19    A. I don't remember.
20    Q. Do you recall if there was a
21 particular person who was responsible for
22 reviewing this agreement to make sure that it
23 reflected HCRE's intent?
24    A. There's a process I'm not aware of by
25 which these things happen. But, I mean, there's

Page 40

JAMES DONDERO - 10/4/22

1
2 a process but the actual watching or -- not -- I
3 don't want watch and I'm not involved within the
4 process, but there is a process by which internal
5 lawyers at NexPoint, Highland's Compliance, and
6 external lawyers would all be involved. But I'm
7 not involved in that -- that sausage mix.
8    Q. I appreciate that. Can you identify
9 anyone in the world who you believe was
10 responsible to make sure that HCRE's interests
11 were reflected in this document?
12    A. Again, there was a process. I
13 imagine compliance and tax, but I don't know and
14 I wasn't watching and I wasn't involved in the
15 process.
16    Q. Do you know -- can you identify
17 anybody in the world who was responsible for
18 looking out for Highland's interests in
19 connection with the drafting and execution of
20 this document?
21    A. Same answer, please.
22    Q. Did you delegate to anybody the
23 responsibility for looking out for HCRE's
24 interests in the drafting and the preparation of
25 this agreement?

Page 41

JAMES DONDERO - 10/4/22

1
2    A. Same answer.
3    Q. Okay. Did you delegate -- and you
4 can't identify anybody to whom you delegated that
5 responsibility; correct? You just relied on the
6 process?
7    A. That's right, I wasn't directly
8 involved in the process, but there is a process
9 that would have included the people I mentioned
10 in the prior answers.
11    Q. Do you have any reason to believe the
12 process was not followed in connection with the
13 preparation of this document?
14    A. I do not.
15    Q. Let's just look at a few of the
16 sections. If we can go to 1.7, please.
17    Do you see 1.7 refers to the company
18 ownership?
19    A. Yes.
20    Q. You didn't see this before you signed
21 it because you didn't read the agreement;
22 correct?
23    A. Correct.
24    Q. Looking at it now, do you believe
25 that there's anything vague or ambiguous about

Page 42

JAMES DONDERO - 10/4/22

2 Section 1.7? Withdrawn.
3        Looking at it now, do you believe
4 that 1.7 accurately reflects the ownership
5 interests in SE Multifamily as of the time this
6 original LLC agreement was written?
7        A. Again, not having -- that's my
8 understanding. Is that your question?
9        Q. You don't believe there's anything
10 inaccurate about 1.7 in terms of the allocation
11 of ownership interests; correct?
12        A. Not -- no, I don't believe there's --
13 I have no reason to doubt it.
14        Q. And you never told anybody that you
15 believed the ownership interests in 1.7 were
16 drafted in error; correct?
17        A. I did not.
18        Q. Okay. Can we go to 2.2(a), please.
19        2.2(a), that refers to additional
20 capital contributions. Do you see that?
21        A. Yes.
22        Q. And do you see that it says that the
23 manager may call capital contributions at any
24 time from HCRE? Do you see that?
25        A. Yep.

Page 43

JAMES DONDERO - 10/4/22

2        Q. And so did you understand at the time
3 you signed the agreement, that the manager would
4 not make any capital contribution calls to
5 Highland?
6        A. I didn't have -- I didn't have an
7 understanding.
8        Q. Okay. But looking at it now, do you
9 have any reason to believe that the first
10 sentence there is vague and ambiguous in any way
11 in limiting the capital calls to HCRE?
12        A. It says what it says. I don't -- it
13 doesn't look ambiguous to me.
14        Q. That's fair. And -- and you don't
15 believe there's any error in that statement in
16 the first sentence of Section 2.2(a). Is that
17 also fair?
18        A. Not that I'm aware of.
19        Q. Can we go to Section 3.1, please.
20        Do you see that you have been
21 identified as the manager of SE Multifamily in
22 your capacity as an officer of HCRE?
23        A. Yes.
24        Q. Did you know at the time you signed
25 this document that you were designated as the

Page 44

JAMES DONDERO - 10/4/22

2 manager of H -- of SE Multifamily in the capacity
3 as an officer of HCRE?
4        A. Not specifically.
5        Q. So you signed this document and you
6 weren't specifically aware that you in your
7 capacity as an officer of HCRE was designated as
8 SE Multifamily's manager?
9        A. Not specifically.
10        Q. Do you have understanding of what it
11 means to be the manager of a limited liability
12 company?
13        A. I think the responsibilities and the
14 limits are usually outlined in the document, in
15 the paragraphs, right.
16        Q. Has SE Multifamily ever had a manager
17 other than HCRE?
18        A. Not that I'm aware of.
19        Q. If you'll look at paragraph 3.2, do
20 you know whether any person or entity in the
21 world, other than you in your capacity as an
22 officer of HCRE, have had those responsibilities
23 and powers set forth in -- in the rest of
24 Article 3? And you can look at the rest of it,
25 if you need to.

Page 45

JAMES DONDERO - 10/4/22

2        Do you understand my question, sir?
3 It may not have been clear.
4        A. 3.1 was --
5        Q. Well, let me -- let me try it
6 differently. And, again, we can scroll down, if
7 you'd like. Article 3 sets forth the rights and
8 obligations of the manager.
9        Do you see that?
10        A. Yes.
11        Q. And, again, happy to scroll down, but
12 my question is a simple one.
13        Are you aware of any person or entity
14 in the world, other than you in your capacity as
15 an officer of HCRE, who had the rights and
16 obligations that are set forth in Article 3?
17        MR. MORRIS: And, La Asia, if you
18    could just scroll down so Mr. Dondero can
19    see this.
20        (Witness reviewing document.)
21        Q. Okay. Have you had a chance to look
22 at 3.3 there, sir?
23        A. Yeah, I'm good.
24        Q. Okay. Can you identify anybody in
25 the world who had any of the rights and

Page 46

1    JAMES DONDERO - 10/4/22
2 responsibilities set forth in Article 3 other
3 than you in your capacity as an officer of HCRE?
4    A. It lists just me.
5    Q. Did -- do you recall whether you ever
6 delegated to anybody in the world any of the
7 powers that are set forth in Article 3.3?
8    A. Yes, I think we covered this earlier.
9 There were definitely investment processes I
10 delegated to Mr. McGraner, and there were, I
11 think, definitely execution responsibilities that
12 he delegated to people on his team and then
13 people at Highland also.
14    Q. Can you identify any explicit
15 delegation of powers that you made?
16    A. Yeah, and, again, the investment
17 analysis, the models, the allocations on the
18 portfolio purchase.
19    Q. Anything else?
20    A. That's all I remember myself
21 specifically delegating. But, again, there would
22 have been other delegation.
23    Q. Can you specifically identify any
24 delegation that Mr. McGraner made as a result of
25 your having delegated any of the powers in 3.3 to

Page 47

1    JAMES DONDERO - 10/4/22
2 him?
3    A. Again, there's a process. And
4 Mr. McGraner doesn't do the detailed financial
5 analysis on each individual property. He's had
6 analysts for that. And he doesn't do the tax or
7 the legal structuring himself; so there's a
8 process for that. So things that were
9 appropriately -- things that were appropriate for
10 his level, he did things that were appropriate
11 for my level, I did things that were appropriate
12 for other people's levels or skills that --
13    Q. You have --
14    A. -- I delegated to him as -- as any
15 normal organization would function.
16    Q. I apologize. Do you have any reason
17 to believe, as you sit here right now, that
18 Mr. McGraner did not appropriately handle the
19 powers and responsibilities that you delegated to
20 him?
21    A. No, I believe he appropriately
22 handled the responsibilities that were delegated
23 to him, and he appropriately delegated what
24 needed to be delegated.
25    Q. Okay. As you sit here right now, do

Page 48

1    JAMES DONDERO - 10/4/22
2 you have any basis to believe that any person to
3 whom Mr. McGraner delegated any responsibilities
4 failed to act appropriately?
5    A. I do not.
6    Q. Do you have any reason to believe
7 that Mr. McGraner made a mistake in performing
8 any of the responsibilities that you delegated to
9 him?
10    A. I'm -- I'm sorry, you broke -- the
11 verb broke up. Could you please repeat the
12 question?
13    Q. Sure. Do you have any reason to
14 believe, as you sit here right now, that
15 Mr. McGraner made a mistake in carrying out any
16 of the responsibilities that you delegated to
17 him?
18    A. I -- I don't know. I mean, mistake
19 is a hard thing to -- that's a hard thing to
20 know. I mean, error -- errors could be made even
21 with the best of intentions. Like, I don't -- I
22 don't know if there were any mistakes.
23    Q. I -- I appreciate that and I'm -- I'm
24 just asking you for your knowledge.
25    Do you know whether Mr. McGraner made

Page 49

1    JAMES DONDERO - 10/4/22
2 any mistakes in carrying out the duties and
3 responsibilities that you recall delegating to
4 him?
5    A. I don't know.
6    Q. Do you know whether any person to
7 whom Mr. McGraner delegated any of the
8 responsibilities that you delegated to him,
9 whether any such person ever made a mistake in
10 carrying out those duties and responsibilities?
11    A. I don't have specific knowledge.
12    Q. Can we go to 6.1(a), please.
13    Do you see 6.1(a) sets forth the
14 allocation of distributable cash?
15    A. Yes.
16    Q. And it's 51 percent to HCRE and
17 49 percent to Highland; correct?
18    A. Yes.
19    Q. Okay. And you knew -- did you know
20 that before you signed the agreement?
21    A. No, I didn't know. I wasn't aware of
22 the specific percentages.
23    Q. Did anybody ever tell you before you
24 signed the agreement how cash was going to be
25 distributed among the members of SE Multifamily?

Page 50

JAMES DONDERO - 10/4/22

1    A. No. I -- yeah -- no. I knew that
2    Highland's ownership interest was a large
3    minority, but I didn't know exactly how much and
4    then I didn't know that the ownership -- how the
5    ownership interests trickled through
6    distributable cash in the document.
7    Q. And you see the next paragraph
8    pertains to the dis -- net cash from rental and
9    leasing activities?
10    A. Yes.
11    Q. Do you see that 99 percent of the net
12    cash from rental and leasing activities was going
13    to be distributed to Highland and 1 percent to
14    HCRE?
15    A. Yes.
16    Q. Do you know why net cash from rental
17    and leasing activities was to be distributed
18    99 percent to Highland and 1 percent to HCRE?
19    A. No.
20    Q. Were you aware when you signed the
21    agreement that that is how the net cash from
22    rental and leasing activities was going to be
23    distributed?
24    A. No.
25

Page 51

JAMES DONDERO - 10/4/22

1    Q. And you never discussed this
2    provision with anybody before entering into the
3    agreement; correct?
4    A. No, not that I recall.
5    Q. Do you -- do you know whether this
6    provision relates to the issue of Highland's
7    income being largely sheltered that you mentioned
8    earlier?
9    A. I -- I don't know.
10    Q. Do you understand that by allocating
11    99 percent of the net cash from rental and
12    leasing activities, was it your understanding
13    that Highland would not likely -- or the
14    beneficial owners of Highland wouldn't pay taxes
15    on that cash?
16    A. I -- I don't know specifically. I do
17    know that Highland's income was largely
18    sheltered.
19    Q. Okay. Let's go to 6.4(a), please.
20    6.4(a) is the allocation of profits and losses.
21    Do you see that?
22    A. Yes.
23    Q. And do you see it -- it allocates 59
24    -- 51 to 49 HCRE to Highland?
25

Page 52

JAMES DONDERO - 10/4/22

1    A. Yes.
2    Q. And -- and is that your understanding
3    of what was expected at the time you signed this
4    original LLC agreement?
5    A. I mean, you keep coming back to the
6    same question in a different way. Let me -- let
7    me just give the same answer as before. I -- I
8    understood the ownership of Highland was a large
9    minority, HCRE had a majority. How it flew --
10    flowed through in the distributions and profits
11    and losses, I wasn't aware.
12    Q. Okay. So is it fair to say, then,
13    that you don't know why profits and losses from
14    the company's rental leasing activities were
15    allocated 99 percent to Highland and 1 percent to
16    HCRE as reflected in 64 -- 6.4(b)?
17    A. Again, not -- no, not -- yeah, not
18    specifically.
19    Q. Okay. Do you know who would know?
20    A. I -- I would -- I would assume if it
21    had a structuring and tax aspect, you would have
22    gotten to the bottom of that with Mark Patrick's
23    deposition, but I -- I don't know.
24    Q. Okay. Let's go to 8.2, please.
25

Page 53

JAMES DONDERO - 10/4/22

1    Do you see 8.2 -- and, again, feel
2    free to read -- read it all, but I'm just focused
3    on the first few words there -- it says, "Manager
4    shall cause and be prepared and filed, all US
5    federal, state and local income and other tax
6    returns required to be filed by the Company and
7    shall keep or cause to be kept complete and
8    appropriate records and books of account."
9    Do you see that?
10    A. Yes.
11    Q. Do you understand that one of your
12    responsibilities in your capacity as an officer
13    of HCRE was to prepare -- was to cause to be
14    prepared and filed all tax returns?
15    A. That -- that's what this says, yes.
16    Q. And -- and did you understand that at
17    the time you signed the agreement?
18    A. No.
19    Q. Did you ever learn that you in your
20    capacity as an officer of HCRE was responsible
21    for causing SE Multifamily's tax returns to be
22    prepared and filed?
23    A. Not specifically.
24    Q. Do you understand that HCRE was
25

JAMES DONDERO - 10/4/22

1      JAMES DONDERO - 10/4/22
2   responsible for preparing and -- withdrawn.
3         Do you understand today that HCRE was
4   responsible for causing SE Multifamily's tax
5   returns to be prepared and filed?
6      A. I don't know about today, but this
7   says what it says. But this is an original,
8   subsequently amended document that we're going
9   over, right. So I -- this says what it says, but
10  I -- I don't know what today's responsibilities
11  are.
12     Q. I'm just asking for your
13  understanding. At the time you signed it, did
14  you understand that HCRE would have the
15  responsibility for causing SE Multifamily's tax
16  returns to be prepared and filed?
17     A. Not specifically.
18     Q. Did you ever learn that HCRE had that
19  responsibility?
20     A. No.
21     Q. Do you have any understanding as to
22  who was responsible for causing SE Multifamily's
23  tax returns to be prepared and filed?
24     A. I did not have specific knowledge.
25     Q. Did you ever ask anybody in the world

1      JAMES DONDERO - 10/4/22
2   who was taking care of SE Multifamily's tax
3   returns?
4      A. No.
5      Q. Do you know the name of the firm that
6   prepared SE Multifamily's tax returns?
7      A. No, it would not have been my -- it
8   would not have been typical for me to know.
9      Q. Even though that -- even though you
10  were identified as the manager of SE Multifamily
11  in your capacity as an officer of HCRE; correct?
12     A. Correct.
13     Q. Let's go to 9.3(e), please. This is
14  liquidation. It's the same question,
15  Mr. Dondero.
16        Do you see in 9.3(e) at the bottom of
17  the liquidation waterfall, that the remaining
18  assets left in cash would be distributed 51/49
19  HCRE to Highland?
20     A. Yes.
21     Q. Okay. And -- and that's just
22  something that was in the document but you
23  weren't specifically aware of at the time you
24  signed it; correct?
25     A. Correct.

1      JAMES DONDERO - 10/4/22
2      Q. But as you sit here right now, you
3   don't have any reason to believe that there was
4   any mistake in the drafting of 9.3(e); correct?
5      A. I mean, I don't know.
6      Q. As you sit here right now, you have
7   no reason to believe that there's a mistake in
8   9.3(e); correct?
9      A. And, again, I don't know. I know
10  there was -- this whole agreement was amended. I
11  don't know full -- on the reasons for its
12  amendment. It could have been mistakes or other
13  things. I don't know.
14     Q. I'm not asking about the amendment.
15  I'm just asking about this document that bears
16  your signature.
17        As you sit here today, do you have
18  any reason to believe that there was a mistake
19  made in the drafting of Section 9.3(e)?
20     A. I don't know.
21     Q. Okay. Can we go to Schedule A,
22  please.
23        All right. Do you see Schedule A
24  sets forth the capital contributions and
25  percentage interests?

1      JAMES DONDERO - 10/4/22
2      A. Yes.
3      Q. Did you look at this before you
4   signed the agreement?
5      A. No.
6      Q. Do you have any reason to believe
7   there's any error on this page?
8      A. I don't know.
9      Q. Okay.
10        MR. MORRIS: Can we just take a
11  short five-minute break?
12        THE WITNESS: Well, let's make it
13  ten. Yes.
14        MR. MORRIS: Okay. It's 12:14 --
15  or 11:14 Central time. I'll see you at
16  11:24 Central time. Thank you very much.
17        THE VIDEOGRAPHER: Okay. The time
18  is 11:15 a.m., and we are going off the
19  record.
20        (Break from 11:14 a.m. to 11:28 a.m.)
21        THE VIDEOGRAPHER: The time is
22  11:31 a.m., and we are back on the record.
23     Q. (BY MR. MORRIS) Mr. Dondero, did you
24  speak with anybody about the substance of your
25  testimony during the break?

Page 58

JAMES DONDERO - 10/4/22

1
2    A. No.
3    Q. We're starting five minutes later
4 than the agreed upon start time. So that makes
5 30 minutes that we've been waiting for you, and
6 I'd just note that the U.S. Trustee's office is
7 on the -- on the deposition now. But let's
8 proceed.
9        Are you familiar with an entity
10 called BH Equities?
11   A. Yes.
12   Q. Do you know if BH Equities got
13 involved in Project Unicorn?
14   A. Yes.
15   Q. What is your understanding of
16 BH Equities' involvement in Project Unicorn?
17   A. They contributed -- they contributed
18 some cash, I believe they managed most of the
19 properties, and they were brought into the
20 partnership.
21   Q. Did you personally have any
22 conversation with anybody at any time who
23 purported to act on behalf of BH Equities
24 concerning any aspect of Project Unicorn?
25   A. Not that I recall.

Page 59

JAMES DONDERO - 10/4/22

1
2    Q. And I'm sorry if -- yeah, this is
3 kind of technical, but I think I used the word
4 "spoke with." Let me ask it broader.
5        Do you recall ever communicating with
6 anybody who purported to act on behalf of
7 BH Equities at any time concerning any aspect of
8 Project Unicorn? So now I mean written, oral, in
9 a meeting any time, any way.
10   A. I do not having any conversation --
11 any conversations or communication.
12   Q. Do you know why BH Equities was
13 brought in as a member -- withdrawn.
14        Are you aware that BH Equities was
15 brought in as a member of SE Multifamily?
16   A. Yes.
17   Q. Do you know why they were brought in
18 as a member of SE Multifamily?
19   A. I believe for the reasons just
20 outlined: They put some cash and they added some
21 value as property management also.
22   Q. Do you know when BH Equities got
23 involved in Project Unicorn?
24   A. Not long after the original
25 formation, but I don't remember exactly.

Page 60

JAMES DONDERO - 10/4/22

1
2    Q. Do you know if they contributed their
3 capital before or after the time the amended LLC
4 agreement was signed?
5    A. I -- I don't.
6    Q. Do you have an understanding of how
7 much capital BH Equities contributed?
8    A. It was a relevant amount. It was 10
9 or 20 million bucks. I believe 20 million bucks.
10   Q. Do you know what the proceeds of
11 their contribution were used for?
12   A. I do not remember.
13   Q. Did you ever know?
14   A. I don't remember.
15   Q. Did you ever consider getting the
16 capital from a source other than BH Equities?
17   A. I don't remember.
18   Q. Can you think -- I'm going to go back
19 to the original LLC agreement that we looked at.
20        Was -- was there ever a structure
21 that you considered that didn't include Highland
22 being a participant in the LLC agreement?
23   A. I don't remember.
24   Q. Do you recall that in September 2018,
25 a -- a loan was obtained from KeyBank in

Page 61

JAMES DONDERO - 10/4/22

1
2 connection with Project Unicorn?
3    A. On the -- yeah, I remember -- I
4 remember KeyBank financed -- was the finance --
5 was the financing behind the -- the transaction,
6 but I don't remember timing of the loan.
7    Q. Did you personally approve the entry
8 into the loan agreement with KeyBank?
9    A. I don't -- I -- I have an awareness
10 of that. I don't remember any specifics.
11   Q. Did you play a role in the
12 negotiation of the KeyBank loan documentation?
13   A. I did not. I was not involved in the
14 negotiation.
15   Q. Were you made aware of the general
16 terms of the loan?
17   A. I'm sure at the time I was. I -- I
18 don't remember today.
19   Q. Do you recall who -- withdrawn.
20        Can you identify the person or
21 persons who were responsible for negotiating the
22 KeyBank loan on behalf of the borrowers?
23   A. Mr. McGraner.
24   Q. And did you -- did you specifically
25 delegate and authorize Mr. McGraner to negotiate

Page 62

1     JAMES DONDERO - 10/4/22
2  the terms of the KeyBank loan on behalf of the
3  borrowers?
4     A. I don't specifically recall.
5     Q. Okay. As you sit here right now, do
6  you believe that Mr. McGraner made any mistakes
7  in connection with the negotiation and
8  documentation of the KeyBank loan?
9     A. Not that I'm aware.
10    Q. As you sit here right now, are you
11 aware of anybody making any mistake or any error
12 of any kind in negotiation and preparation of the
13 KeyBank loan on behalf of HCRE?
14    A. Not that I'm aware.
15    Q. Did you ever communicate with KeyBank
16 concerning the loan that was obtained in
17 connection with Project Unicorn?
18    A. I do not believe so.
19    Q. Do you have any understanding as to
20 whether the borrowers could have obtained the
21 loan from KeyBank without Highland acting as a
22 guarantor?
23    A. I don't know.
24    Q. Let's just look quickly at the
25 KeyBank document -- it's Exhibit 3 -- please.

Page 63

1     JAMES DONDERO - 10/4/22
2     (Exhibit 3 was marked.)
3     Q. I'm not going to ask you about the
4  details, but if we can go to page 97 of 205.
5  Just -- this is the signature line. I mean, and,
6  again, if you want to look at anything, just let
7  me know. But I'll represent to you that this was
8  the KeyBank loan document that was executed in
9  connection with Project Unicorn.
10    Do you -- do you see the signature
11 page, sir?
12    A. Yes.
13    Q. And is it your understanding that
14 Mr. McGraner was an authorized signatory to enter
15 into this loan document on behalf of
16 HCRE Partners, LLC?
17    A. Yes.
18    Q. And that he was also authorized to
19 enter into this loan document on behalf of
20 SE Multifamily REIT Holdings, LLC; correct?
21    A. Yes.
22    Q. Can we go to the next page, please.
23    Do you see that NexPoint Advisors,
24 L.P. and NexPoint Real Estate Advisors IV, L.P.
25 are also signatories on this agreement?

Page 64

1     JAMES DONDERO - 10/4/22
2     A. Yes.
3     Q. Neither of those entities ever had an
4  ownership interest in SE Multifamily Holdings,
5  LLC; correct?
6     A. I don't know.
7     Q. You have no reason to believe that
8  they did; correct?
9     A. I don't know. Full truth, I don't
10 have a reason to believe that they didn't either.
11 I don't know.
12    Q. Sir, you're not aware of any facts
13 that would cause you to believe that either of
14 the entities on this page ever had a membership
15 interest in SE Multifamily Holdings, LLC;
16 correct?
17    A. I don't know.
18    Q. Okay. And you're not aware of any
19 facts that would cause you to believe that either
20 of these entities had any membership interest in
21 ownership in SE Multifamily REIT, LLC; correct?
22    A. I don't know. And I don't know what
23 the -- I don't know. I don't know what the
24 surviving entities or how things have changed
25 since bankruptcy. I don't know.

Page 65

1     JAMES DONDERO - 10/4/22
2     Q. Do you know why these two entities
3  signed on to the loan agreement?
4     A. I don't know.
5     Q. Do you know if it was for credit
6  enhancement purposes?
7     A. I don't know.
8     Q. Okay. Do you know whether either of
9  these entities have any economic stake in any
10 aspect of the Project Unicorn other than as a
11 borrower under the KeyBank loan?
12    A. I don't know.
13    Q. Okay. Do you control each of the
14 entities that are listed on this page?
15    A. I have majority ownership in both
16 probably.
17    Q. Okay. Can we go to the next page,
18 please. And that's your signature on behalf of
19 Highland Capital Management, L.P.; correct?
20    A. Yes.
21    Q. And you authorized Highland to enter
22 into this loan agreement with KeyBank; correct?
23    A. Yes.
24    Q. Can we go to the next page, please.
25    Do you see the Dugaboy Investment

Page 66

JAMES DONDERO - 10/4/22

2 Trust here is also a signatory to the KeyBank
3 loan agreement?
4     A. Yes.
5     Q. Do you know if Dugaboy Investment
6 Trust is a signatory to any document related to
7 Project Unicorn other than the KeyBank loan
8 agreement?
9     A. No.
10    Q. Do you have any understanding as to
11 why the Dugaboy Investment Trust is a signatory
12 to the KeyBank loan agreement?
13    A. I don't know.
14    Q. Did anybody ever tell you that the
15 Dugaboy Investment Trust was a signatory for
16 credit enhancement purposes?
17    A. I don't know that. I don't remember
18 that, and I don't know if he included any
19 ownership interest or consideration. I -- I
20 don't know.
21    Q. Do you know if the Dugaboy Investment
22 Trust received anything in return for its
23 agreement to participate as a borrower in the
24 KeyBank loan?
25    A. I don't know.

Page 67

JAMES DONDERO - 10/4/22

2     Q. Did you ever discuss with Nancy why
3 Dugaboy Investment Trust signed this document?
4     A. Not that I recall.
5     Q. Were you aware that the Dugaboy
6 Investment Trust was signing on to the KeyBank
7 loan and taking the obligations thereunder?
8     A. Not that I recall or -- no.
9     Q. Can we go to the next page, please.
10 Do you know what the SLHC Trust is?
11    A. Yes.
12    Q. What's that?
13    A. I believe that's a trust that owns a
14 -- a bunch of NexPoint stock.
15    Q. Who's the beneficiary of the trust,
16 if you know?
17    A. I believe it's Dugaboy.
18    Q. And you're the lifetime beneficiary
19 of Dugaboy; correct?
20    A. I believe so.
21    Q. Do you know if the SLHC Trust signed
22 any documents in connection with Project Unicorn
23 other than this KeyBank loan document?
24    A. I don't know.
25    Q. Did you know that the SLHC Trust was

Page 68

JAMES DONDERO - 10/4/22

2 going to be a signatory to the KeyBank loan
3 document prior to the time you signed it on
4 behalf of Highland?
5     A. Not -- no, not that I recall.
6     Q. Okay. Can we go to the next page.
7 Okay. And then I guess there's a -- I guess a
8 bunch of other entities there.
9       Do you see that? And do you have
10 any --
11    A. Yes.
12    Q. -- understanding as to who those
13 entities are?
14    A. No, those are specific apartment
15 complexes.
16    Q. And were they the entities that were
17 going to be acquiring certain of the
18 Project Unicorn properties?
19    A. I don't know.
20    Q. Okay. Are you aware that all of the
21 signatories that we just looked at are borrowers
22 under the KeyBank loan?
23    A. Whether they're borrowers or
24 guarantors, I don't know.
25    Q. Was it -- was it your understanding

Page 69

JAMES DONDERO - 10/4/22

2 at the time that all of the signatories we just
3 looked at were either borrowers or guarantors of
4 the KeyBank loan?
5     A. I -- I don't know. I don't have a
6 specific recollection. As you were flipping the
7 pages, I was surprised that some of the entities
8 were on there. So I don't have a -- a specific
9 recollection at the time of them.
10    Q. All right.
11       MR. MORRIS: Can we go to PDF -- I
12 don't know if this is exactly right -- but
13 let's go to 12. We're looking for the
14 definition of "Borrowers." Let's go up.
15 Okay. There you go.
16    Q. (BY MR. MORRIS) Do you see that
17 Highland Capital is a borrower under the loan
18 documentation?
19    A. Yes.
20    Q. And HCRE Partners, LLC is a borrower;
21 correct?
22    A. HCRE Partners is a borrower, yes.
23    Q. And the Dugaboy Investment Trust is a
24 borrower; correct?
25    A. Yes.

Page 70

JAMES DONDERO - 10/4/22

1
2    Q. And the SLHC Trust was a borrower;
3    correct?
4    A. Yes.
5    Q. And NexPoint Advisors, L.P. was a
6    borrower; correct?
7    A. Yes.
8    Q. And NexPoint Real Estate Advisors IV,
9    L.P. was a borrower; correct?
10   A. Yes.
11   Q. And the REIT borrower and each
12   property owner were also borrowers; correct?
13   A. Yes.
14   Q. Did you understand at the time you
15   signed this document that all of the borrowers
16   were going to be jointly and separately liable
17   for all of the obligations set forth in the
18   agreement?
19   A. No, I don't -- I don't remember or
20   have awareness of that.
21   Q. Did you know at the time you signed
22   this agreement on behalf of Highland that
23   Highland was agreeing to be jointly and severally
24   liable for all obligations of the borrowers under
25   this document?

Page 71

JAMES DONDERO - 10/4/22

1
2    A. Not specifically.
3    Q. Did you ever ask anybody before
4    signing the document what Highland's rights and
5    obligations were under it?
6    A. Not that I remember.
7    Q. So you didn't specifically know. Did
8    you have any understanding at all that when you
9    put your pen to this document, that you were
10   binding Highland as a joint and several obligor
11   to all -- to satisfy all of the debts under this
12   agreement, you didn't know that?
13   A. No. I -- I knew Highland was the
14   primary counterparty on the agreement. I don't
15   -- I don't remember. I don't know if this is the
16   original version, I don't know if this a
17   subsequent KeyBank one. I don't -- my general
18   recollection is that originally it was largely
19   Highland and then -- I -- I thought there was
20   more than one iteration and then other -- on the
21   second iteration, other people were brought in.
22       I thought there was an original
23   intent to maybe sell more of the properties and
24   then the intent became to hold more of the
25   properties. So I thought there had to be some

Page 72

JAMES DONDERO - 10/4/22

1
2    enhancer. But this is all fuzzy. I could be
3    wrong. I don't remember the specifics. I don't
4    remember -- I don't remember the specifics.
5        Why don't we do this: Why don't you
6    re-ask the question and I'll give you a short
7    answer.
8    Q. Before you signed this document, did
9    you obtain any legal advice concerning -- and
10   just a yes-or-no answer -- concerning Highland's
11   rights and obligations under the KeyBank loan
12   document? Did you ever get any legal advice?
13   A. I -- I spec- -- I specifically did
14   not.
15   Q. And do you have any recollection of
16   anybody sitting you down and explaining to you
17   what Highland's rights and obligations were under
18   the KeyBank loan document before you signed it.
19   A. Not -- not specifically.
20   Q. Do you remember generally? Do you
21   have any recollection whatsoever of anybody
22   explaining any of Highland's rights and
23   obligations under the KeyBank loan document
24   before you signed it?
25   A. My recollection is that it wasn't

Page 73

JAMES DONDERO - 10/4/22

1
2    atypical. It was going through the normal
3    process with the normal input from
4    internal/external people and Compliance, and
5    there wasn't anything unusual that rose to my
6    desk that I recall.
7    Q. You didn't read this document before
8    you signed it; is that fair?
9    A. Correct.
10   Q. So is it fair to say, then, that
11   since you received in legal advice and you don't
12   have any recollection of anybody explaining the
13   terms and conditions to you before you signed it,
14   that you didn't know what Highland's rights and
15   obligations were under the agreement?
16   A. I didn't believe I needed to know. I
17   didn't believe that they were atypical or unusual
18   for this type of credit facility.
19   Q. And what's the basis for your belief
20   that they weren't -- that you didn't need to know
21   that information because it wasn't atypical?
22   A. The -- the process that we have in
23   place would have brought it to my attention if it
24   had been unusual.
25   Q. And nobody brought to your attention

Page 74

JAMES DONDERO - 10/4/22

1
2 that Highland was going to be jointly and
3 severally liable for all of the obligations under
4 this document before you signed it?
5     A. Not specifically. Not that I recall.
6     Q. Do you have any reason to believe, as
7 you sit here right now, that any mistake or error
8 was made in the drafting or negotiation of this
9 particular loan agreement on behalf of HCRE?
10     A. I -- I have no reason to think
11 there's an error in this particular section. I
12 do believe one of our defenses or responses is
13 that there's error or mistake in the document in
14 that it doesn't specifically provide for
15 amendments. But it -- it has been amended and
16 redone at least a couple of times, right.
17     Q. The KeyBank loan document has been
18 amended and redone a couple of times?
19     A. I was speaking -- I was -- I was
20 speaking more to the partnership agreements
21 but --
22     Q. Okay. Then -- then it's my fault,
23 Mr. Dondero. Let's just strike that answer, and
24 let me ask the question again.
25         Do you have any reason to believe, as

Page 75

JAMES DONDERO - 10/4/22

1
2 you sit here right now, that there was any
3 mistake or error made in the negotiation or the
4 drafting of the KeyBank loan document?
5     A. Not that I'm aware of.
6     Q. Thank you. Do you know who made the
7 decision to have HCMLP or Highland sign the
8 KeyBank loan document as a borrower? Who decided
9 that?
10     A. Who decided that? I think it was a
11 negotiation and it was required then by KeyBank,
12 and then ultimately I -- I agreed to.
13     Q. Do you have an understanding as to
14 why KeyBank required HCMLP to sign on the
15 agreement as a borrower?
16     A. Not specifically.
17     Q. Did you ever have any discussion with
18 anybody at any time as to why KeyBank required
19 Highland to be a borrower under the KeyBank loan
20 document?
21     A. Not specifically.
22     Q. Why did you agree that Highland would
23 sign on as a borrower to the KeyBank loan
24 document?
25     A. We didn't believe it was unreasonable

Page 76

JAMES DONDERO - 10/4/22

1
2 request. We're in the banking business
3 ourselves. Lenders look for a certain amount of
4 collateral and alignment of interests, and they
5 get that in a variety of ways with, you know,
6 hard assets and then with guaranties and shared
7 liability.
8     Q. So is it fair to characterize
9 Highland's participation as a borrower under the
10 KeyBank loan as another form of credit
11 enhancement for the borrowing parties?
12     A. I don't know. I don't know
13 specifically. I don't know specifically why --
14 why, you know, KeyBank was looking for it for. I
15 wasn't involved in those negotiations.
16     Q. Did you understand that under the
17 loan document, that HCRE was designated as the
18 lead borrower?
19     A. I did not have awareness of that.
20     Q. Do you have any input -- withdrawn.
21     MR. MORRIS: Can we just scroll
22 down, I think it's, like, 1.2 maybe. It's
23 going to be about 10 or 12 pages down.
24 Slow down. Yeah. Oh, I apologize, stop.
25 Okay. Go down to 1.05.

Page 77

JAMES DONDERO - 10/4/22

1
2     Q. (BY MR. MORRIS) Okay. Do you see in
3 1.05(a) it says that, among other things, "Each
4 borrower hereby irrevocably appoints the lead
5 borrower as its agent and attorney-in-fact for
6 purposes of requesting and obtaining borrowings."
7         Do you see that?
8     A. Yes.
9     Q. And then if you go back -- if you go
10 down to 1.05(b), just the next paragraph, it says
11 that the proceeds of each loan and advance -- if
12 you could scroll down to (b) -- (Reading) The
13 proceeds of each loan and advance which is
14 requested by the borrower shall be advanced as
15 and when otherwise provided herein or is
16 otherwise indicated by the Lead Borrower.
17         Do you see that?
18     A. Yes.
19     Q. So did you understand that all of the
20 borrowers designated the lead borrower as their
21 agent and the lead borrower was given the power
22 and authority to distribute the loan proceeds in
23 any way that the lead borrower saw fit?
24     A. I don't want to make that jump. I --
25 the paragraph says what it says. I -- I don't

Page 78

1    JAMES DONDERO - 10/4/22
2  want to make that jump.
3    Q.  Okay.  Can we go up and just look at
4  the definition of "Lead Borrower" quickly.
5       Do you see lead borrower is
6  HCRE Partners, LLC?
7    A.  Yes.
8    Q.  Did you have any understanding as to
9  whether any borrower was designated as the lead
10  borrower at the time you put your pen to this
11  agreement?
12    A.  I did not.
13    Q.  Did you give any instruction to
14  anyone at any time as to who should be designated
15  as the lead borrower, if anybody?
16    A.  I did not.
17    Q.  Did you have any understanding at the
18  time you signed this document how the loan
19  proceeds would be allocated among borrowers?
20    A.  I did not.
21    Q.  Did you ever have any discussion with
22  anybody at any time prior to signing this
23  document on the topic of how loan proceeds would
24  be allocated among borrowers?
25    A.  I did not.

Page 79

1    JAMES DONDERO - 10/4/22
2    Q.  Did you ever participate in any
3  discussion with anybody at any time concerning
4  how the loan proceeds would be allocated among
5  borrowers?
6    A.  I did not.
7    Q.  Do you know whether any loan proceeds
8  were ever allocated to Highland?
9    A.  I -- I -- I have no idea.  I can't
10  imagine why it would -- the loan was used to
11  purchase a bunch of multi-families.  The loan was
12  not to make distributions to partners.  I -- I --
13  I can't imagine why any of it would have been
14  allocated to Highland.  But that -- I have no
15  recollection of that.
16    Q.  Who -- did you have an understanding
17  as to who the beneficiary was of this loan?
18    A.  I -- I understood the loan to be for
19  the purchase of the multi-family apartments.
20    Q.  On whose behalf?  Who was purch- --
21  on whose behalf was that purchase being made?
22    A.  On behalf of the partnership or I
23  don't -- I don't know if it went through the SE
24  -- SE entity or not, but it was for the benefit
25  of -- it was for the purpose of purchasing

Page 80

1    JAMES DONDERO - 10/4/22
2  apartments.
3    Q.  I appreciate that.  And -- and if you
4  don't know, just say you don't know.  I'm just
5  asking you if you have an understanding as to who
6  the beneficiary was in connection with the loan
7  that was obtained to purchase the apartments.
8  Who was the bene- -- who did you intend to
9  beneficiary to be?
10    A.  I don't know.
11    Q.  Did you ever have any discussion with
12  anybody any time as to how the loan proceeds
13  would be allocated among borrowers?
14    A.  I don't believe the proceeds were
15  allocated to borrowers.
16    Q.  Okay.  So to the best of your
17  knowledge, if that -- no -- withdrawn.
18       Nobody, to your knowledge, was
19  charged with the responsibility of allocating the
20  loan proceeds among borrowers; correct?
21    A.  Not as far as I know.
22    Q.  All right.  Let's just -- to put this
23  in context, this is now September 2018, that's
24  the date of this document.
25       Do you -- do you have an

Page 81

1    JAMES DONDERO - 10/4/22
2  understanding as to whether, following the
3  closing of the loan, that SE Multifamily and
4  SE Multifamily REIT subsequently closed on the
5  acquisition of all the real estate that you've
6  described?
7    A.  I believe it did.
8    Q.  Okay.  And is it your understanding
9  that BH Equities had contributed its capital in
10  order to get to the closing of both the KeyBank
11  loan as well as the acquisition of the real
12  estate?
13    A.  I mean, yeah, I believe their
14  contribution was a part of the transaction.
15    Q.  And the transaction was completed by
16  the end of September 2018, at least for purposes
17  of the acquisition -- the borrowing and the
18  acquisition; correct?
19    A.  I mean, I don't remember the date.
20  That sounds about right, though.
21    Q.  Okay.  And -- and were you aware in
22  the fall of 2018 that there had been discussions
23  with BH Equities about BH Equities becoming a
24  member of SE Multifamily?
25    A.  As far as I know, that was always the

Page 82

JAMES DONDERO - 10/4/22

2 intent.

3    Q. That was always the intent; right?

4 And BH Equities in good faith put up their

5 $20 million or so to help finance the acquisition

6 of the properties, and they did that before they

7 entered into the written agreement; correct?

8    A. I imagine there was some agreement in

9 place. I don't know. I know there was -- then

10 there was a more formalized agreement later, but

11 I -- I -- I don't know if there was an initial

12 agreement.

13    Q. Okay. But ultimately you're aware

14 that on or about March 15, 2019, BH Equities

15 signed on to an Amended and Restated LLC

16 Agreement for SE Multifamily Holdings; correct?

17    A. Yes.

18    Q. Okay. And by the time they signed

19 that agreement, all of the capital from all of

20 the members had been contributed to

21 SE Multifamily; correct?

22    A. I believe so.

23    Q. There was no capital call after the

24 date of the Amended and Restated LLC Agreement;

25 correct?

Page 83

JAMES DONDERO - 10/4/22

2    A. I don't recall -- I don't recall any.

3    Q. And you don't have any recollection

4 of HCRE putting any capital into SE Multifamily

5 at any time after March 15, 2019; correct?

6    A. I don't know.

7    Q. And you don't have any knowledge that

8 Highland Capital put in any additional capital to

9 SE Multifamily after the amended and restated

10 agreement was signed; correct?

11    A. I don't know.

12    Q. And you don't have any knowledge that

13 BH Equities put in -- put in any additional

14 capital after the time it signed the Amended and

15 Restated LLC Agreement on March 15, 2019;

16 correct?

17    A. I don't know.

18    Q. Okay. Did you delegate to anybody

19 the responsibility for negotiating and drafting

20 the Amended and Restated LLC Agreement that

21 included BH Equities as a member?

22    A. I'd assume Matt and his team would

23 have used the same people internally and

24 externally.

25    Q. All right. I don't want to make

Page 84

JAMES DONDERO - 10/4/22

2 assumptions. I'm just asking for your personal

3 knowledge.

4    Did you personally delegate to

5 Mr. McGraner the responsibility for negotiating

6 and drafting the Amended and Restated LLC

7 Agreement that included BH Equities as a member?

8    A. I don't remember formally delegating

9 it.

10    Q. Is there anybody who would have been

11 responsible for negotiating and drafting the LLC

12 ag- -- the Amended and Restated LLC Agreement

13 other than Mr. McGraner?

14    A. I -- I believe he would have

15 coordinated it, but, again, it would have gone

16 through, I believe, the same process with the

17 same people as the original one.

18    Q. But they all would have reported to

19 him -- right? -- as one of the owners of HCRE?

20    A. The external lawyers would have been

21 vendors. He has internal lawyers on the NexPoint

22 team, but the Compliance team doesn't report to

23 him, and the Tax team reports up through the CFO.

24    Q. Who does -- who does the Compliance

25 team report to?

Page 85

JAMES DONDERO - 10/4/22

2    A. The Compliance team reports to --

3 dotted line to myself and the SEC.

4    Q. And did you ever have any

5 conversations with anybody in the Compliance team

6 at any time concerning the Amended and Restated

7 LLC Agreement?

8    A. No, but I wouldn't have expected to

9 either.

10    Q. Okay. Did you have any

11 communications with anybody in the Compliance

12 team at any time concerning the Amended and

13 Restated LLC Agreement for SE Multifamily?

14    A. No, not that I recall.

15    Q. Did you give any instructions to

16 anybody in the Compliance department concerning

17 the drafting and negotiation of the Amended and

18 Restated LLC Agreement?

19    A. I did not.

20    Q. Do you know whether Mr. McGraner had

21 any communications with anybody in the Compliance

22 department concerning the negotiation and

23 drafting of the Amended and Restated LLC

24 Agreement for SE Multifamily?

25    A. Not specifically.

Page 86

JAMES DONDERO - 10/4/22

1
2     Q.  And he never told you of a specific
3  conversation that he had with anybody in the
4  Compliance department at any time concerning that
5  document; correct?
6     A.  Not specifically.
7     Q.  Were you informed by anybody at any
8  time regarding the negotiation of the Amended and
9  Restated LLC Agreement?
10     A.  I'm sorry, was I what?
11     Q.  Were you ever kept informed?  Did
12  anybody -- did anybody give you periodic reports
13  as to the state of negotiations with BH Equities?
14     A.  No.
15     Q.  Did anybody ever inform --
16     A.  Not that -- not that I recall, no.
17     Q.  I apologize.  Did anybody inform you
18  of any issues that BH Equities had with any
19  aspect of a draft of the Amended and Restated LLC
20  Agreement?
21     A.  No.
22     Q.  Can you identify anybody who gave
23  HCRE any legal advice in connection with the
24  negotiation or drafting of the Amended and
25  Restated LLC Agreement?

Page 87

JAMES DONDERO - 10/4/22

1
2     A.  No.  I don't know if Compliance would
3  have used internal staff or external staff.  I
4  don't have awareness.
5     Q.  Okay.  Can we go the next document,
6  please, which we've marked as Exhibit 4.
7        (Exhibit 4 was marked.)
8     Q.  And it's a pretty short document
9  there, and you're not copied on it, I see that,
10  Mr. Dondero.
11        So my first question is simply
12  whether you've ever seen this document before?
13     A.  No.
14     Q.  Who is Shawn Raver?
15     A.  I don't know, honestly.
16     Q.  That's fair.  And you're familiar
17  with Mr. Patrick; correct?
18     A.  Yes.
19     Q.  And is it fair to say that
20  Mr. Patrick would have been responsible for the
21  tax structuring of the Project Unicorn
22  documentation?
23     A.  Him or somebody on his team, yeah,
24  but I don't know.
25     Q.  But that's his area of expertise;

Page 88

JAMES DONDERO - 10/4/22

1
2  correct?
3     A.  Yeah, he's a tax attorney.
4     Q.  Okay.  Do you have any idea what this
5  email is about?  It just says, "Must keep cash
6  allocation below 50 percent for HCML -- HCMLP to
7  avoid for consolidation."
8        Do you see that?
9     A.  I do.
10     Q.  Do you have any --
11     A.  I do see that.
12     Q.  Do you have any understanding as to
13  what they're talking about?
14     A.  No.
15     Q.  Did anybody ever discuss with you --
16  withdrawn.
17        Did anybody ever communicate with you
18  at any time on the issue of consolidation, at
19  least in the context of the negotiation of the
20  Amended and Restated LLC Agreement?
21     A.  No.
22     Q.  Do you have any understanding as to
23  whether HCRE wanted to avoid consolidation?
24     A.  I don't recall.
25     Q.  Do you have an -- any understanding

Page 89

JAMES DONDERO - 10/4/22

1
2  as to whether consolidation referred to the
3  consolidation of Highland and HCRE for tax
4  purposes?
5     A.  I don't -- I don't know.  I don't
6  recall it.  I don't know the specifics.
7     Q.  Did you -- do you recall ever having
8  any conversations with anybody at any time about
9  the potential consequences of consolidation in
10  the context of the Amended and Restated LLC
11  Agreement?
12     A.  I do not.
13     Q.  Do you see where they used the phrase
14  "cash allocation"?
15     A.  Yes.
16     Q.  Do you have any understanding of what
17  cash allocation means in the context of this
18  email?
19     A.  No.  That's a -- that's a part that
20  puzzles me the most.
21     Q.  Okay.  Let's go to the -- next
22  Exhibit 5, please.
23        (Exhibit 5 was marked.)
24     Q.  Okay.  And do you see this is an
25  email from Mr. Patrick to a long list of people

Page 90

JAMES DONDERO - 10/4/22

2 dated at the end of February 2019?

3     A.  Yes.

4     Q.  And do you see that he attaches the

5  first Amended and Restated LLC Agreement for

6  SE Multifamily?

7     A.  Okay.  Yeah, I see this attachment.

8     Q.  And do you see in the first sentence

9  of Mr. Patrick's email, he refers to a March 15th

10  tax deadline that permits the retroactive

11  amendment of this partnership agreement?

12        Do you see that?

13     A.  Yes.

14     Q.  Were you ever aware in early 2019 of

15  this March 15th tax deadline that permitted the

16  retroactive amendment of SE Multifamily

17  partnership agreement?

18     A.  No.  Until I read it here, I wasn't

19  aware that that was the driver.

20     Q.  Okay.  So -- so this is the first

21  time that you're learning of that; is that fair?

22     A.  Yes.

23     Q.  So fair to say you've never seen this

24  document before; correct?

25     A.  Not that I recall.

Page 91

JAMES DONDERO - 10/4/22

2     Q.  Do you -- do you recall that you

3  signed an Amended and Restated LLC Agreement on

4  behalf of both Highland and HCRE?

5     A.  Yes.

6     Q.  Do you recall whether you personally

7  saw any drafts of it before receiving the version

8  that you signed?

9     A.  Not that I recall.

10     Q.  Do you see the last sentence refers

11  to the -- the return preparer?

12     A.  Yes.

13     Q.  Do you know whether that refers to

14  Barker Viggato, V-i-g-g-a-t-o?

15     A.  I have no idea of the preparer.

16     Q.  And do you see that Mr. Patrick

17  wrote, "We will need to get the return preparer

18  comfortable before executing this document with

19  respect to the anticipated tax allocations of the

20  P&L."

21        Do you see that?

22     A.  Yes.

23     Q.  Do you know if that allocation was

24  referring to the 94 percent to Highland and

25  6 percent to BH Equities that was ultimately

Page 92

JAMES DONDERO - 10/4/22

2  adopted?

3     A.  I don't know.

4     Q.  Well, if we go to PDF page 12 -- 13

5  of 55, do you see the draft of the agreement that

6  Mr. Patrick provided in Section 6.4(a), there was

7  an allocation of profits and losses, 94 percent

8  to Highland and 6 percent to BH Equities.

9        Do you see that?

10     A.  I see that.

11     Q.  Did -- did you participate in any

12  discussions at any time before signing the

13  Amended and Restated LLC Agreement concerning the

14  allocation of profits and losses?

15     A.  No.  Not -- not that I recall.

16     Q.  So is it fair to say that you did not

17  know at the time you signed the document how

18  profits and losses would be allocated among the

19  members to SE Multifamily?

20     A.  That's correct.

21     Q.  Do you know who decided to allocate

22  94 percent of SE Multifamily's profits to

23  Highland?

24     A.  I'm guessing now but I don't want to

25  guess.  The -- I don't know.

Page 93

JAMES DONDERO - 10/4/22

2     Q.  Okay.  Do you know why none of the

3  profits and losses were allocated to HCRE?

4     A.  I don't know.

5     Q.  Do you know whether the manager had

6  any power or authority to change that allocation

7  at any time after the agreement was signed?

8     A.  I just remember in general, you

9  covered it an hour or two ago.  But I think the

10  manager has broad powers -- very broad powers in

11  terms of operating and adjusting.

12     Q.  Operating and adjusting what?  The

13  numbers in 6.4(a), the allocation of profits and

14  losses?

15     A.  I don't -- I don't know specifically.

16     Q.  Did you ever discuss with anybody at

17  any time whether the allocation of profits and

18  losses from SE Multifamily should be something

19  other than 94 percent to Highland and 6 percent

20  to BH Equities?

21     A.  I do not.

22     Q.  Do you know, as you sit here right

23  now, whether profits and losses were ever

24  allocated among the members in a manner that

25  differs from 6.4(a)?

Page 94

JAMES DONDERO - 10/4/22

1
2    A. I don't have awareness.
3    Q. Did you ever make a decision to
4    allocate profits and losses in a manner that
5    differed from 6.4(a)?
6    A. I -- I have no awareness.
7    Q. Did you agree on behalf of Highland
8    to accept 94 percent of SE Multifamily's profits
9    and losses?
10    A. If this is the executed copy, I -- I
11    did.
12    Q. It's actually not, but I'll represent
13    to you that it didn't change -- this particular
14    provision didn't change.
15    Do you know why -- you know, we'll
16    get -- we'll get there when I get the executed
17    copy.
18    MR. MORRIS: Let's go to the next
19    exhibit, please. Okay. And if we could
20    just start on -- at the bottom email here.
21    No, the -- go back up. There you go.
22    (Exhibit 6 was marked.)
23    Q. (BY MR. MORRIS) Do you see that
24    Mr. Broaddus wrote an email to two people at BH
25    Management and he copied Mr. McGraner on

Page 95

JAMES DONDERO - 10/4/22

1
2    March 14, 2019?
3    A. Yes.
4    Q. And do you -- do you know who
5    Mr. Broaddus is?
6    A. Yes.
7    Q. And who's Mr. Broaddus?
8    A. He works in the Tax group with
9    Mark Patrick.
10    Q. And as you sit here right now, do you
11    have any reason to believe that Mr. Broaddus made
12    any errors or mistakes in the execution of his
13    responsibilities in connection with
14    Project Unicorn?
15    A. I don't have -- don't have an
16    awareness.
17    Q. And nobody's ever told you that they
18    believed Mr. Broaddus made a mistake in
19    connection with the execution of his
20    responsibilities on behalf of Project Unicorn;
21    correct?
22    A. No.
23    Q. And do you see in the third -- I -- I
24    guess it's the second sentence, Mr. Broaddus
25    wrote, quote, that "The contribution schedule in

Page 96

JAMES DONDERO - 10/4/22

1
2    the attached needs to be updated with the actual
3    contribution numbers."
4    Do you see that?
5    A. Yes.
6    Q. And then if we could scroll to the
7    email above that, you'll see that Mr. Broaddus
8    follows up and he attaches the contribution
9    schedule.
10    Do you see that in his email?
11    A. Yes.
12    Q. Now, let's take a look at the -- the
13    attachment. Do you see that's the contribution
14    schedule that sets forth the percentage interests
15    of each of the members of SE Multifamily?
16    A. Yes.
17    Q. And do you see it also sets forth the
18    capital contribution of each of the members?
19    A. Yes.
20    Q. Do you have any reason to believe
21    that any of the numbers on this page are -- are
22    wrong?
23    A. I do not.
24    Q. Do you see it shows HCRE Partners as
25    having made a capital contribution of

Page 97

JAMES DONDERO - 10/4/22

1
2    $291 million or thereabouts?
3    A. Yes.
4    Q. Do you have an understanding as to
5    the source of HCRE's capital?
6    A. No, not specifically.
7    Q. Do you have any understanding
8    generally as to where HCRE got $291 million to
9    fund its membership interests in SE Multifamily?
10    A. Generally your -- somewhere between
11    generally and speculating is assets contributed
12    or gains on assets contributed. That's generally
13    and that's speculating. I don't have specific
14    knowledge.
15    Q. Did anybody ever tell you that a
16    portion of the KeyBank loan proceeds were
17    allocated to HCRE and credited as a capital
18    contribution to SE Multifamily?
19    A. No.
20    Q. Did anybody ever tell you that
21    HCRE Partners borrowed money from another
22    affiliate in order to finance its acquisition of
23    the membership interests reflected on Schedule A?
24    A. I -- I don't remember that.
25    Q. Okay. Can you go back to the top of

Page 98

1      JAMES DONDERO - 10/4/22
2  the first page. Do you see Mr. McGraner was
3  copied on this email exchange between
4  Mr. Broaddus and BH Equities?
5      A. Yes.
6      Q. Did Mr. McGraner ever tell you that
7  he believed Mr. Broaddus had made a mistake in
8  the preparation of the contribution schedule that
9  we just looked at that was attached as
10  Schedule A?
11      A. We never had such conversations.
12      Q. Okay. Do you recall that one of the
13  issues that BH Equities was concerned with prior
14  to the time that it executed the Amended and
15  Restated LLC Agreement was the waterfall and how
16  cash would be distributed from SE Multifamily?
17      A. I have no awareness of that.
18      Q. Okay. So nobody ever informed you
19  that BH Equities was concerned about the
20  mechanics of the waterfall?
21      A. No, not -- no, not specifically.
22      Q. Did anybody ever share with you a
23  proposal that BH Equities made with respect to
24  the distribution of cash and the waterfall?
25      A. No.

Page 99

1      JAMES DONDERO - 10/4/22
2      MR. MORRIS: I'm just going to try
3  and speed this up a little bit and skip
4  Exhibits 7 and 8 and ask Ms. Canty to put
5  up what's been premarked as Exhibit 9,
6  which is the Amended and Restated LLC
7  Agreement.
8      MR. GAMEROS: John, so I'm clear,
9  you're skipping 7 and 8?
10      MR. MORRIS: Yeah, we'll just
11  intentionally omit it.
12      MR. GAMEROS: All right. Thank
13  you.
14      MR. MORRIS: It's because I
15  premarked this, and based on Mr. Dondero's
16  answer, I don't see the need to take the
17  time with that.
18      (Exhibit 9 was marked.)
19      Q. (BY MR. MORRIS) Okay. Do you see,
20  Mr. Dondero, we've put up on the screen a copy of
21  the First Amended and Restated LLC Agreement for
22  SE Multifamily that was dated as of March 15,
23  2019, to be effective as of August 23, 2018?
24      A. Yeah.
25      Q. Have you seen this document before?

Page 100

1      JAMES DONDERO - 10/4/22
2      A. No.
3      Q. Well, you signed it; right? If we
4  can go to page 18.
5      A. Yeah. No, I signed it but I have
6  not --
7      Q. Have you seen it since the day you
8  signed it?
9      A. No.
10      Q. Did you read it before you signed it?
11      A. No.
12      Q. Did you obtain any drafts of it
13  before signing this version?
14      A. No.
15      Q. Did you obtain any advice from
16  counsel on behalf of Highland before you signed
17  this agreement on Highland's behalf?
18      A. I'm sorry, what?
19      Q. Did you obtain any legal advice
20  before you signed this agreement on behalf of
21  Highland?
22      A. Not beyond Compliance.
23      Q. Did you obtain any legal advice
24  before signing this document on behalf of HCRE?
25      A. No.

Page 101

1      JAMES DONDERO - 10/4/22
2      Q. Okay. And with respect to Highland,
3  you said "Nothing beyond Compliance."
4      What does that mean?
5      A. Compliance would have reviewed this
6  transaction.
7      Q. Okay. Did you personally ever
8  communicate with anybody in Compliance about the
9  terms and provisions of this particular agreement
10  before you signed it?
11      A. No.
12      Q. Do you have any reason to believe, as
13  you sit here right now, that Compliance did
14  anything wrong, improper, or by mistake in
15  connection with whatever work it may have done in
16  connection with this agreement?
17      A. No. I believe they properly
18  represented Highland Capital Management's
19  interests and properly in a way that was
20  compliant with being a registered investment
21  advisor.
22      Q. Okay. And -- and who was looking out
23  for HCRE's interests? Withdrawn.
24      Do you know who reviewed this
25  document in order to make sure that it comported

Page 102

1       JAMES DONDERO - 10/4/22
2   with HCRE's intent?
3       A. I -- I trusted McGraner and his team
4   in that regard.
5       Q. And do you have any reason to believe
6   that McGraner and his team failed in their
7   efforts to create a document that reflected
8   HCRE's intent?
9       A. I -- I do not.
10      Q. Did you have any responsibility for
11  making sure that this agreement reflected HCRE's
12  intent before you signed it?
13      A. No.
14      Q. All right. Let's look at Schedule A,
15  please.
16      MR. MORRIS: I guess it's probably
17  the next page or two. Yeah, there you go.
18      Q. (BY MR. MORRIS) Do you see -- and I
19  can put them side by side if you'd like -- but do
20  you see that this Schedule A, at least for the
21  members' name in the top box and the capital
22  contributions and the percentage interests is
23  exactly the same as the document that
24  Mr. Broaddus provided to BH Equities?
25      A. It appears to be the same, yes.

Page 103

1       JAMES DONDERO - 10/4/22
2       Q. Did you review this Schedule A before
3   you signed the agreement?
4       A. No.
5       Q. Did you have any understanding at all
6   as to how the membership interests were allocated
7   among and between HCRE, Highland, and BH Equities
8   before you signed the agreement?
9       A. Not specifically.
10      Q. Did you have any understanding at
11  all, even if it's a general understanding, as to
12  how the equity interests were going to be
13  allocated among those three members?
14      A. Generally that B&H was going to be
15  6 percent and Highland was going to be a
16  significant minority.
17      Q. And by sig-- significant minority,
18  does 46.06 percent qualify as a significant
19  minority?
20      A. Yes.
21      Q. So is it fair to say that even though
22  you didn't read this, this schedule comports with
23  your expectations when you signed the agreement
24  on behalf of HCRE and Highland?
25      A. Generally.

Page 104

1       JAMES DONDERO - 10/4/22
2       Q. Okay. Can we go to 1.7, please.
3   Okay. Do you see the company ownership
4   provision? This is the same provision that we
5   looked at earlier, but now BH Equities is added.
6       Do you see that?
7       A. Yes.
8       Q. And is it your understanding that
9   when BH Equities became a 6 percent interest
10  holder in SE Multifamily, that HCRE and Highland
11  reduced their interests by 6 percent
12  respectively?
13      A. I -- I -- I wasn't involved in the
14  math on the reductions in Highland's piece and
15  HCRE's piece.
16      Q. Okay. But -- but is it fair to say
17  that 1.7 -- Section 1.7 reflects your
18  expectations at the time you signed it?
19      A. Generally, yes.
20      Q. We'll go to 2.2(a). Okay. And now
21  remember earlier in the original LLC agreement,
22  in 2.2(a) the capital contributions were limited
23  to HCRE?
24      A. Yes, I -- yeah, I --
25      Q. And now --

Page 105

1       JAMES DONDERO - 10/4/22
2       A. Yeah, the wording here is the same.
3       Q. And now it's been changed to Liberty.
4   Do you see that?
5       A. Yes.
6       Q. Do you have any knowledge or
7   information that you can share with me as to why
8   Liberty was substituted for HCRE as an entity
9   from whom the manager could call capital
10  contributions?
11      A. I have no awareness -- I have no
12  awareness of the regurgitations that went into
13  this.
14      Q. Nobody informed you that
15  SE Multifamily would no longer be able to make
16  capital calls against HCRE; correct?
17      A. Correct, I have no awareness of
18  conversation.
19      Q. Liberty became a holder of preferred
20  interests in SE Multifamily as a result of the
21  signing of this document; right?
22      A. It appears so.
23      Q. Do you know what Liberty is?
24      A. I do not have specific awareness.
25      Q. Okay. Let's go to 3.1, please.

Page 106

JAMES DONDERO - 10/4/22

1    JAMES DONDERO - 10/4/22
2    Okay.  Do you see that in this amended and
3    restated agreement, it has identified as the
4    manager of SE Multifamily here as an officer
5    of --
6        A.  You -- you broke up on us or you were
7    a little bit away from the microphone there.
8        Q.  Okay.  Sorry about that.  Do you see
9    in 3.1, you are still identified as the manager
10   of SE Multifamily --
11       A.  Yes.
12       Q.  -- in your capacity as an officer of
13   HCRE?
14       A.  Yes.
15       Q.  And did you delegate any of the
16   powers that you had as manager to anybody at any
17   time after signing this agreement?
18       A.  Well, I think we've gone over it,
19   right.  I mean, Matt McGraner and his team have
20   done the legal work regarding this amendment
21   versus the original, and his team and his analyst
22   did much of the investment work on the portfolio
23   with Unicorn and other specific assets.
24       Q.  Okay.  And did you delegate those
25   responsibilities to him and his team?

Page 107

1    JAMES DONDERO - 10/4/22
2        A.  Effectively, yes.  And then, like I
3    said, I think he delegates, you know, as
4    appropriate to his team, and then to internal and
5    external lawyers, tax accountants, finance,
6    et cetera.
7        Q.  Do you have any reason to believe --
8    and I know that I've asked these questions before
9    in the context of the original agreement, and I
10   -- I don't mean to burden you, but I just need to
11   ask the same questions now that we have a new
12   signed document.  So with that background, here's
13   the clean question:
14       Do you have any reason to believe, as
15   you sit here right now, that Mr. McGraner made
16   err -- any errors or mistakes in connection with
17   the execution of the authority that you delegated
18   to him?
19       A.  Okay.  I -- I think what I jumped the
20   gun on answer with regard to the KeyBank loan
21   maybe applies here.  I think one of the defenses
22   that we're making is that this -- this agreement
23   is -- the second one is agreed in -- is -- the
24   same one as amended and approved and cleaned up
25   from the first agreement, but it still lacks a

Page 108

1    JAMES DONDERO - 10/4/22
2    clause regarding the ability to amend and the
3    ability to amend or change in new course.  And
4    that that -- if you want to call it a mistake as
5    to the legal oversight or whatever, then it is a
6    living document.  It has been amended once, but
7    it should have a provision in there that
8    specifically allows for it and, yes, we're
9    calling that a legal mistake, I guess, a legal
10   error.
11       Q.  When you -- when you say that it's
12   been amended once, do you mean that this amended
13   and restated agreement was amended and -- amended
14   once?  Or do you mean that the original agreement
15   was amended once and we're looking at it right
16   now?
17       A.  The latter, the second thing you
18   said.
19       Q.  Okay.  So the original agreement was
20   only amended once, and that amendment is
21   reflected in Exhibit 9 that we're looking at;
22   correct?
23       A.  If -- you know, just so that I don't
24   overstep, as far as I know and as far as I
25   understand, I haven't seen another agreement.

Page 109

1    JAMES DONDERO - 10/4/22
2        Q.  Okay.
3        A.  It's a chance I don't know and you
4    might slip through a third agreement, but I -- I
5    think as far as I know it's --
6        Q.  I'll -- I'll give you some comfort.
7    Okay.  I'm not aware of any amendment.
8        And I'll just ask you in your
9    capacity as the manager of SE Multifamily, are
10   you aware of any amendment after this one?
11       A.  I am not.
12       Q.  Okay.  And -- and when you say you
13   believe a mistake was made, I think you've now
14   identified the mistake as the omission of a
15   provision that would have permitted a further
16   amendment of this Amended and Restated LLC
17   Agreement, do I have that right?
18       A.  Right, it is to specifically allow
19   for it to be easily amended as a living document
20   because it is an operating partnership.
21       Q.  Okay.  And when did you first learn
22   that this amended and restated agreement had
23   omitted a provision that would have allowed
24   amendment?
25       A.  Just recently as part of the POC

Page 110

JAMES DONDERO - 10/4/22

2 circus.

3    Q. Was it before or after you filed the
4 Proof of Claim?

5    A. Before or after we filed it? I'm not
6 the lawyer. I think it's stated in the Proof of
7 Claim, right, that that -- that's one of the
8 mistakes or errors in drafting. I don't know if
9 it was specifically -- the amendment provision is
10 specifically identified in the original POC.
11 I -- I'm not that involved in that stuff. I -- I
12 guess I don't know the answer to your question.

13    Q. Okay. Do you recall that -- that you
14 authorized Highland to file for bankruptcy in
15 October 2019?

16    A. Yes.

17    Q. Okay. I'm just using that as a --
18 kind of a data point. Do you recall whether you
19 learned of the omission of this provision before
20 or after the bankruptcy filing?

21    A. I -- I wasn't -- I wasn't directly
22 involved in the POCs and so I -- well, I'm sorry,
23 the question you're asking, I guess, is that I --
24 I didn't know about the lack of the amendment
25 paragraph until recently, I guess.

Page 111

JAMES DONDERO - 10/4/22

2    Q. Okay. I appreciate that. Let's go
3 to 6.1(a). Do you see 6.1(a) con- -- has a
4 provision concerning the distribution of cash?

5    A. Yes.

6    Q. Do you see that those percentages are
7 the same as the percentages on Schedule A that we
8 looked at?

9    A. Yes.

10    Q. Do you have any reason to believe
11 that there's any mistake in the drafting of
12 6.1(a)?

13    A. Not that I'm aware of.

14    Q. Okay. Let's look at 6.1(b), please.
15 Oh, that's -- I apologize, that is for net cash
16 from specific company assets.

17    MR. MORRIS: Can we keep scrolling
18    down, please. Oh, it might be 6.4(a).
19    Just go to 6.4. Yeah. Okay.

20    Q. So 6.4(a), this is the final
21 agreement. This is consistent -- I'll represent
22 to you this is verbatim 6.4(a) with the version
23 that Mark Patrick sent around at the end of
24 February.

25    And do you see in 6.4(a) 94 percent

Page 112

JAMES DONDERO - 10/4/22

2 of the profits and losses were to be allocated to
3 Highland and 6 percent to BH Equities?

4    A. Yes.

5    Q. Okay. Do you have any knowledge as
6 to how that allocation was arrived at?

7    A. No.

8    Q. Did anybody ever communicate with you
9 what factors were considered in arriving at that
10 allocation?

11    A. No.

12    Q. Do you know who made the decision to
13 allocate SE Multifamily's profits and losses in
14 the manner set forth in 6.4(a)?

15    A. I'm -- I'm sorry, please repeat that
16 again.

17    Q. Do you know who made the decision to
18 allocate the P&L in this manner?

19    A. I believe that came from the tax
20 structuring team.

21    Q. And that would have been under the
22 direction of Mr. Patrick; correct?

23    A. Yes.

24    Q. Let's go to 8.2, please. Okay.
25 Do you see 8.2 in this amended and restated

Page 113

JAMES DONDERO - 10/4/22

2 agreement placed on the manager the
3 responsibility for causing SE Multifamily's tax
4 returns to be prepared and filed?

5    A. Yes.

6    Q. Okay. And do you know if the manager
7 fulfilled the responsibilities set forth in 8.2?

8    A. I -- I don't know. I have no reason
9 -- no reason to think we haven't, but I don't
10 know for sure.

11    Q. From your perspective, did anybody in
12 the world have any responsibility for causing
13 SE Multifamily to prepare and file its tax
14 returns other than the manager?

15    A. Again, I don't know.

16    Q. Do you have any reason to believe
17 that -- well, withdrawn.

18    Did you ever delegate to anybody the
19 responsibility for causing SE Multifamily's tax
20 returns to be prepared and filed?

21    A. No. Or not -- not specifically.
22 I've never focused on this paragraph before.

23    Q. Do you know who communicated --
24 withdrawn.

25    I think I asked you this earlier. Do

Page 114

1   JAMES DONDERO - 10/4/22
2   you know who Barker Viggato is?
3       A.  No.
4       Q.  You're not aware that that's the firm
5   that prepared SE Multifamily's tax returns and
6   K-1s?
7       A.  No.
8       Q.  Did you ever have any communication
9   with anybody at any time as to who was preparing
10  SE Multifamily's tax returns?
11      A.  No.
12      Q.  Do you know, as you sit here right
13  now, who took the responsibility for making sure
14  that SE Multifamily's tax returns were prepared
15  and filed?
16      A.  I do not.
17      Q.  Okay.  Have you ever seen a K-1 that
18  was issued in connection with SE Multifamily?
19      A.  I have not.
20      Q.  Did you ever discuss the contents of
21  any K-1 that was issued to any of
22  SE Multifamily's members at any time?
23      A.  No.
24      Q.  Has anybody ever told you that there
25  was a mistake in the preparation of any of

Page 115

1   JAMES DONDERO - 10/4/22
2   SE Multifamily's tax returns?
3       A.  No.
4       Q.  Has anybody ever told you that there
5   was a mistake in the preparation of any of the
6   K-1s that were issued to any of SE Multifamily's
7   members?
8       A.  No.
9       Q.  Are you aware of any amendment that
10  is being considered to any of SE Multifamily's
11  tax returns?
12      A.  No.
13      Q.  Have you ever discussed with
14  anybody --
15      A.  I was just going to say if there is
16  an issue you need to refresh me on or something
17  or -- or tell me about, but I don't have
18  awareness at all of what it seems like you're
19  dancing around.
20      Q.  I'm not dancing around any --
21  anybody -- anything.  I'm trying to -- to -- to
22  move this along and probably save us a whole lot
23  of time going over documents that you don't have
24  any recollection of ever seeing.  That's what I'm
25  trying to do.

Page 116

1   JAMES DONDERO - 10/4/22
2       A.  Okay.
3       Q.  No, if you tell me that you have
4   knowledge, we'll go down that path, but as long
5   as you continue to tell me that you have no
6   recollection of anything, that's fine.  Okay?
7       A.  Yeah, if -- but I'm almost curious if
8   there is an error in something that needs to be
9   corrected that I need to address, let me know.
10  But I'm not aware that there was -- that there
11  is, was, or might be an error or restatement or
12  anything on the taxes.  No one -- no one's ever
13  mentioned taxes on this entity being an issue to
14  me.
15      Q.  Okay.  And -- did anybody ever
16  ask you to make any decision as to the allocation
17  of the profits and losses from SE Multifamily to
18  its members?
19      A.  No.
20      Q.  And you don't know -- do you have any
21  personal knowledge as to how profits and losses
22  were allocated in fact among the SE Multifamily
23  members?
24      A.  No.
25      Q.  And who would have been responsible

Page 117

1   JAMES DONDERO - 10/4/22
2   for making those decisions?  Is that Mr. Patrick
3   and the Tax group?
4       A.  As far as I know, yes.
5       Q.  And they would have been working
6   under the direction of Mr. McGraner; correct?
7       A.  I mean, they would have gotten input
8   from McGraner.  Whether or not McGraner gets
9   involved in the tax allocations, I -- I have no
10  idea.  You'll have to ask him on that.
11      Q.  Well, in your capacity as a majority
12  owner of HCRE who is the manager of
13  SE Multifamily, would you have expected
14  Mr. Patrick to make decisions about the
15  allocation of profits and losses without having
16  some authority granted to him by one of the
17  owners?
18      A.  He -- he's -- like all good tax
19  accountants and tax attorneys, in -- in a
20  compliant way, he's trying to optimize or
21  minimize taxes in a compliant way subject to, you
22  know, a complex -- a complex structuring.  He's
23  -- he's not getting direction or approval or
24  looking for it on most of what he does.
25      Q.  So you're comfortable with whatever

Page 118

JAMES DONDERO - 10/4/22

1    JAMES DONDERO - 10/4/22
2    decisions Mr. Patrick made with respect to the
3    allocation of profits and losses to SE
4    Multifamily's members, you good with that?
5        A.  Yeah, I mean, generally, yes, he
6    does -- he does a good and appropriate job for
7    his role as to the Tax department.
8        MR. MORRIS:  So it's 1:00 or almost
9    1:00 Central.  Mr. Dondero, if we take a
10   break until 1:30 your time, I don't think
11   I'll have more than an hour after that.
12   I'm happy to continue, too, by the way.  If
13   you'd like to take a short break, if you'd
14   like to take a ten-minute break, we can do
15   that; if you'd like to take a short break
16   to grab a bite.
17       But I'm not going to need the whole
18   day here -- I want you just to know that --
19   and I'm happy to proceed in any way you
20   prefer.  I can keep going right now and try
21   to get to the end; we can take a short
22   break; we can take a medium break.  I just
23   don't want to take a long break.
24       THE WITNESS:  You want to keep --
25   how about we keep going, let's see if you

Page 119

1    can wrap it up.
2        MR. MORRIS:  Okay.  Good.
3        Q.  (BY MR. MORRIS) Did you have any
4    involvement in decisions concerning the time,
5    manner, and extent of distributions from
6    SE Multifamily to its members?
7        A.  No.
8        Q.  Do you know whether SE Multifamily
9    ever made any distributions to its members?
10       A.  I thought it hadn't, you know, but I
11   -- but I might not be correct on that.  So that's
12   why it would be good for me to know -- know I
13   hadn't -- any distributions --
14       MR. GAMEROS:  Excuse me.
15       Q.  I'm sorry, I didn't quite hear your
16   answer.  Let -- let me try and ask the question
17   again.
18       Did you ever make any decisions as to
19   whether or not SE Multifamily would make
20   distributions to its members?
21       A.  No.
22       Q.  Okay.  Do you know whether
23   SE Multifamily ever made any distributions to its
24   members?

Page 120

1    JAMES DONDERO - 10/4/22
2        A.  My recollection is that they haven't,
3    but I don't know for sure.
4        Q.  Did you ever have a discussion with
5    anybody at any time as to whether SE Multifamily
6    should make distributions to any of its members?
7        A.  No.
8        Q.  Did anybody ever tell you that
9    distributions had been made from SE Multifamily
10   to any of its members?
11       A.  None that I'm aware.
12       Q.  Do you know whether any distributions
13   have ever been made to Highland from
14   SE Multifamily?
15       A.  I don't believe any distributions
16   have made -- been made that would include
17   Highland.  So...
18       Q.  Did you ever participate in any
19   discussions as to whether or not distributions
20   should be made to Highland?
21       A.  No.
22       Q.  Did you have any discussions with
23   anybody at any time as to whether or not
24   Highland's bankruptcy filing had any impact or
25   effect on SE Multifamily's ability to make

Page 121

1    JAMES DONDERO - 10/4/22
2    distributions to its member -- members?
3        A.  No.
4        Q.  So nobody ever told you that they
5    believed that SE Multifamily couldn't make
6    distributions to its members as a consequence of
7    Highland's bankruptcy filing; is that fair?
8        A.  I had no such conversations.
9        Q.  And you never told anybody that
10   SE Multifamily shouldn't make any distributions
11   to its members as a result of Highland's
12   bankruptcy filing; correct?
13       A.  I -- I did not.  It sounds like a
14   factual thing, and I -- I'm not aware that
15   bankruptcy prevents it, but maybe it does.  I
16   don't know.
17       Q.  I'm not asking you for the legal
18   conclusion.  I'm just asking you about your
19   recollection of communications you've had with
20   others.  Do you understand that?
21       A.  Yes.  And I -- I did not.
22       Q.  Did you ever instruct anybody not to
23   make distributions to Highland from
24   SE Multifamily?
25       A.  No.

Page 122

JAMES DONDERO - 10/4/22

2  Q. Are you aware that SE Multifamily
3  distributed $49,000 to Highland earlier this
4  year?
5  A. No.
6  Q. So nobody ever discussed with you the
7  distribution of $49,000 from SE Multifamily to
8  Highland; is that correct?
9  A. Correct.
10  Q. And you have no understanding and
11  knowledge as to why such a distribution might
12  have been made; correct?
13  A. No.
14  Q. Did you delegate to anybody the
15  responsibility for making distributions from
16  SE Multifamily?
17  A. No, not -- not specifically.
18  Q. Generally?
19  A. No, I mean, the long-term investment
20  vehicle, distributions haven't been -- haven't
21  crossed my mind or impart by my conversation. A
22  $49,000 distribution probably had a legal or --
23  or taxable reason or a tax reason I'm not aware
24  of. But it -- it's a small amount that, you
25  know, I don't think I needed to be aware of it

Page 123

JAMES DONDERO - 10/4/22

2  either.
3  Q. Do you know whether HCRE has received
4  the $291 million capital contribution that was
5  shown on Schedule A as having been made on its
6  behalf?
7  A. I don't want to joke here but --
8  yeah, I'm not going to joke. I don't believe so.
9  I have no awareness of -- of such a thing.
10  Q. Okay. Do you know if -- if BH
11  Equities -- withdrawn.
12  Do you know if BH Equities has
13  received all or any of its capital back?
14  A. I -- I don't know. I don't -- I
15  don't believe so.
16  Q. Okay. I'm just going to show you one
17  document, just going by what I think you said
18  before at least, I can. I'm going to show you
19  what's been premarked as Exhibit 12.
20  (Exhibit 12 was marked.)
21  Q. All right. Do you see this is a K-1
22  for 2018 for SE Multifamily Holdings, LLC that
23  was given to Highland Capital Management, L.P.?
24  A. Yes.
25  Q. Okay. If we can go to the bottom of

Page 124

JAMES DONDERO - 10/4/22

2  the document, you'll see -- you'll see -- no,
3  just the -- I'm sorry, the bottom of the first
4  page -- you'll see there's in the lower
5  right-hand corner there's BVLLP. Do you see that
6  little Bates number?
7  A. Yeah.
8  Q. So I'll represent to you,
9  Mr. Dondero, that we obtained this document from
10  Barker Viggato, the firm that prepares
11  SE Multifamily's tax returns.
12  Looking at this document, can you
13  confirm for me that you've never seen a document
14  of this type for SE Multifamily? Look at all of
15  it if you want, whatever you want to see.
16  A. Yeah, I've -- I've never seen it.
17  Q. Okay. And can you confirm that you
18  still believe you've never seen a K-1 that was
19  ever issued on behalf of SE Multifamily to any of
20  its members?
21  A. I've -- I've never seen one before.
22  Q. Okay. And you didn't have any
23  personal involvement in the preparation of any of
24  SE Multifamily's tax returns; correct?
25  A. I did not.

Page 125

JAMES DONDERO - 10/4/22

2  Q. And you're not aware of what
3  information was given to Barker Viggato to enable
4  them to prepare SE Multifamily's tax returns;
5  correct?
6  A. Correct.
7  Q. You've never spoken with
8  Barker Viggato about any aspect of
9  SE Multifamily's tax returns; correct?
10  A. No.
11  Q. And nobody's ever told you that they
12  believe there was an error in any of
13  SE Multifamily's tax returns; correct?
14  A. Correct, no one's said that to me.
15  Q. And you have no knowledge of any
16  amendment that might be cons- -- that might be
17  being considered right now -- withdrawn.
18  Do -- do you know whether any
19  consideration was ever given to amending any of
20  SE Multifamily's tax returns?
21  A. I -- I have no awareness. I have no
22  awareness there's an issue. I still don't know
23  if there really is a mistake or not, but -- but
24  no one's -- no one's -- but no one's talked to me
25  about correcting what might or might not be a

Page 126

JAMES DONDERO - 10/4/22

2 mistake.

3     Q. Do you know if SE Multifamily's tax

4 returns for 2001 have been completed?

5     A. You don't mean 2001.

6     Q. I don't, you're absolutely right. I

7 appreciate that.

8        Do you know whether SE Multifamily's

9 tax returns for 2021 have been completed?

10    A. I do not know.

11    Q. Do you know whether Barker Viggato

12 has prepared or is preparing SE Multifamily's tax

13 returns for 2021?

14    A. I have no idea.

15    Q. Do you have any knowledge as to

16 whether or not the tax preparer for

17 SE Multifamily has been replaced?

18    A. I have no idea.

19    Q. Have you been involved in any

20 discussions with anybody at any time as to

21 whether or not Barker Viggato was going to resign

22 from its position as tax preparer for

23 SE Multifamily?

24    A. I have no idea.

25    Q. Do you know -- did you ever

Page 127

JAMES DONDERO - 10/4/22

2 participate in any communications with anybody at

3 any time as to whether Barker Viggato should be

4 replaced as SE Multifamily's tax preparer?

5     A. No.

6     Q. Okay.

7        MR. MORRIS:  Can we put up what's

8 been premarked as Exhibit 20, please.

9        (Exhibit 20 was marked.)

10    Q. All right.  This is the HCRE Proof of

11 Claim.  Do you see in the upper right, it's filed

12 on April 8, 2020?

13    A. Yes.

14    Q. Okay.  And if we can scroll down to

15 page 3.  A little further.

16        That's your electronic signature, do

17 I have that correct?

18    A. Yes.

19    Q. Did you authorize your electronic

20 signature to be affixed to this document?

21    A. Yes.

22    Q. Did you authorize your electronic

23 signature to be affixed on behalf of HCRE?

24    A. Yes.

25    Q. Did you authorize Bonds Ellis to file

Page 128

JAMES DONDERO - 10/4/22

2 this document on behalf of HCRE?

3     A. I'm sorry, what?

4     Q. Did you authorize Bonds Ellis to file

5 this Proof of Claim on behalf of HCRE?

6     A. Yes.

7     Q. Did you -- did you ask Bonds Ellis to

8 prepare this document?

9     A. Yes.

10    Q. Okay.  Did you review it before it

11 was filed?

12    A. I'm -- no, I -- I viewed it as a

13 legal document.  I let the lawyers put it

14 together.

15    Q. So you didn't review it before it was

16 filed?

17    A. No.

18    Q. Do you see in the left it says, "A

19 person who files a fraudulent claim could be

20 fined up to $500,000, imprisoned up to 5 years,

21 or both"?

22    A. Yes.

23    Q. Okay.  Did you understand that this

24 document was being signed and filed subject to

25 those potential penalties at the time you signed

Page 129

JAMES DONDERO - 10/4/22

2 it?

3     A. Yes.  Or no.  I mean, I -- I -- I

4 know it has to be accurate.  I didn't

5 specifically read that section, though.

6     Q. Did you provide -- let's go to

7 Exhibit A.  So -- so you didn't really read this

8 exhibit before you authorized this document to be

9 filed; is that right?

10    A. Correct.  I trusted the lawyers to

11 prepare a proper POC.

12    Q. And did the lawyers rely on you for

13 the information that they used to formulate this

14 document?

15    A. Not me specifically, but our firm

16 here for sure.

17    Q. So do you know who provided -- and I

18 just want the identify -- the identity of -- of

19 the person or persons that you're aware of who

20 provided the information to Bonds Ellis that

21 enabled them to formulate this Proof of Claim?

22    A. I -- I don't know who it would have

23 been -- it would -- it wasn't me, because it

24 would have been somebody in the Real Estate or

25 Legal team -- on the Real Estate team.

Page 130

JAMES DONDERO - 10/4/22

2  Q. Did you ask somebody to work with
3  Bonds Ellis to formulate this Proof of Claim?
4     A. Yes.
5     Q. Who did you --
6     A. I del -- I delegated it to
7  Bonds Ellis to work with our Real Estate team.
8     Q. So -- so you don't know who
9  Bonds Ellis worked with; is that fair?
10    A. That's fair.
11    Q. Do you know what information was
12 given to Bonds Ellis that enabled them to
13 formulate this Proof of Claim?
14    A. I do not.
15    Q. Did you provide any comments to this
16 Proof of Claim before you authorized your
17 electronic signature to be affixed to it and
18 filed on behalf of HCRE?
19    A. I did not.
20    Q. Did you do any diligence of any kind
21 to make sure that Exhibit A was truthful and
22 accurate before you authorized it to be filed?
23    A. I relied on my attorneys. I -- I
24 didn't do separate diligence.
25    Q. Did you personally look at any

Page 131

JAMES DONDERO - 10/4/22

2  documents before authorizing this document to be
3  filed?
4     A. I did not.
5     Q. So is it fair to say that you didn't
6  look at the Amended and Restated LLC Agreement
7  before authorizing this document to be filed?
8     A. I personally did not. I delegated it
9  to Bonds Ellis to work with my real estate guys
10 and I relied on Bonds Ellis.
11    Q. Is it fair to say that the idea for
12 filing this Proof of Claim originated with you?
13    A. I don't -- I don't think so. At this
14 time we're -- it was early in the case, this was
15 -- I -- all the entities were coming up with POCs
16 if they thought they had relevant POCs.
17    Q. Whose idea was it to file this Proof
18 of Claim on behalf of HCRE?
19    A. I don't remember. I don't remember
20 back then. It might have been come from the real
21 estate group. It might have come -- it might
22 have come from Bonds Ellis. I don't know.
23    Q. So you don't know where the idea
24 originated; correct?
25    A. Correct.

Page 132

JAMES DONDERO - 10/4/22

2  Q. You didn't review any documents
3  before authorizing this to be filed; correct?
4     A. I did not.
5     Q. You don't recall delegating to
6  anybody the specific responsibility for providing
7  information to -- to Bonds Ellis so that they
8  could prepare a truthful and accurate Proof of
9  Claim; correct?
10    A. Not specific -- well, not -- Bonds
11 Ellis was given full access and Bonds Ellis spoke
12 with people in the real estate group.
13    Q. What people in the --
14    A. That's correct.
15    Q. What people are you referring?
16    A. Like I said, I -- I don't know. But
17 there's no way Bonds Ellis could have created
18 this on their own.
19    Q. But you don't know who helped them
20 create it; is that fair?
21    A. Correct.
22    Q. Did you speak with Mr. McGraner
23 before authorizing Bonds Ellis to file this
24 document on behalf of HCRE?
25    A. Not -- no, not specifically.

Page 133

JAMES DONDERO - 10/4/22

2  Q. Did you ever tell Mr. McGraner that
3  you were going to file this Proof of Claim on
4  behalf of HCRE before authorizing Bonds Ellis to
5  do just that?
6     A. I don't -- I don't remember telling
7  him. I know he was aware of it, but I don't
8  remember telling him.
9     Q. Did you show it to him before you
10 filed it?
11    A. I -- yeah, I didn't prepare it. I
12 didn't -- I assume him and his group saw it
13 before it came to me from Bonds Ellis.
14    Q. What's the basis for that assumption?
15    A. Because Bonds Ellis could not have
16 prepared this on their own.
17    Q. And Bonds Ellis would have relied on
18 people that you can't identify in the real estate
19 group; correct?
20    A. Correct. I don't -- I don't know for
21 sure. It -- it was probably -- it was probably
22 the lawyers in the real estate group, but I don't
23 know for sure. I don't want to speculate.
24    Q. Okay. I appreciate that. Did you do
25 anything in your -- did you -- did you personally

Page 134

JAMES DONDERO - 10/4/22

2 do anything to ascertain whether or not Exhibit A
3 was truthful and accurate before you caused HCRE
4 to file it?
5      A. I did not do anything. I -- I feel
6 it's a bona fide POC period but -- you know, but
7 I didn't do anything to verify it.
8      Q. How about Mr. Broaddus? Did you
9 speak with him at all before authorizing HCRE to
10 file this document?
11      A. No, not that I recall.
12      Q. Do you know if Mr. Broaddus saw a
13 copy of this before it was filed?
14      A. I have no idea.
15      Q. Did anybody in -- did you ever ask
16 anybody in the real estate group whether this
17 document was truthful and accurate before you
18 authorized HCRE to file it?
19      A. I still believe it's truthful and
20 accurate. But I -- I did not specifically ask
21 anybody in the real estate group; my
22 conversations were with Bonds Ellis.
23      Q. And I apologize, I know that I asked
24 you this, but I either don't remember the answer
25 or I don't believe I got an answer.

Page 135

JAMES DONDERO - 10/4/22

2      Where did the idea for filing this
3 Proof of Claim originate?
4      A. I don't know. I mean, like I said,
5 it was early in the case, all the entities were
6 coming up with different claims that different
7 entities might have. This is back when our legal
8 team still worked and supported us as a paying
9 client. And the lawyers were going through all
10 the different entities and evaluating claims and
11 working with the business professional on all the
12 different entities.
13      Bonds Ellis filed it, but Bonds Ellis
14 wouldn't have been able to do it without keeping
15 in close contact and communication with the real
16 estate team, either the professionals or the
17 lawyers on the real estate team.
18      Q. Mr. Dondero, other than the folks at
19 Bonds Ellis, did you discuss this Proof of Claim
20 with anybody in the world that you can recall
21 prior to the time it was filed?
22      A. No, not beyond Bonds Ellis, no.
23      Q. And so you didn't take any steps to
24 see if members in the real estate group believed
25 that this was truthful and accurate before you

Page 136

JAMES DONDERO - 10/4/22

2 authorized Bonds Ellis to file; correct?
3      A. I did not. But I believe Bonds Ellis
4 did that; they -- they handled the communication
5 with the real estate team.
6      Q. Do you know who at Bonds Ellis was
7 responsible for communicating with the real
8 estate team?
9      A. No.
10      Q. Do you know whether anybody from
11 Bonds Ellis ever communicated with the real
12 estate team?
13      A. Again, they had to; they could not
14 have come up with this on their own.
15      Q. I'm just asking you -- I don't want
16 do you surmise or to assume or anything like
17 that. I'm asking you for personal knowledge.
18      Do you have any personal knowledge
19 that Bonds Ellis communicated with anybody in the
20 real estate group regarding this Proof of Claim?
21      A. I don't have personal knowledge.
22      Q. Let's just look at a couple of the
23 sentences -- the statements that are in here.
24 The second sentence says, "Claimant may be
25 entitled to distributions out of SE Multifamily,

Page 137

JAMES DONDERO - 10/4/22

2 but such distributions have not been made because
3 of the actions or inactions of the Debtor."
4      Do you see that?
5      A. Yes.
6      Q. What's the factual basis for that
7 statement?
8      A. I don't know.
9      Q. Can you identify any actions or
10 inactions that Highland took or didn't take that
11 prevented SE Multifamily from making
12 distributions?
13      A. Only the bankruptcy itself and the
14 stay on contracts would fall into that category.
15      Q. Anything else?
16      A. That's -- that's all I got.
17      Q. Then it says, "Claimant contends that
18 all or a portion of the Debtor's equity,
19 ownership, economic rights, equitable with
20 beneficial interests in SE Multifamily does" --
21 and I think the word not is omitted -- "belong to
22 the Debtor or maybe the property of the
23 Claimant."
24      Do you see that?
25      A. Yes.

Page 138

JAMES DONDERO - 10/4/22

1
2    Q. What's the factual basis for that
3    statement or that contention anyway?
4    A. I think what ultimately got woven
5    into our responses was that Highland's
6    contribution for its ownership may not have been
7    adequate and on an ongoing basis may not be
8    adequate relative to the contributions of -- of
9    HCRE.
10    Q. Anything else?
11    A. That's -- that's -- that's it for
12    that one, I think.
13    Q. That's a subjective determination
14    concerning adequacy, do I have that right?
15    A. I wouldn't say subjective versus
16    adequacy. There's the initial adequacy, which
17    you could say is maybe subjective of, well,
18    what's a guaranty worth and what's 49,000 worth.
19    You know, when the -- if the guaranty
20    rolls off fairly quickly, you know, was that --
21    was -- was the guaranty worth that equity
22    interest. You could call it subjective, but it's
23    definitely debatable or arguable.
24    But on an ongoing basis, if HCRE
25    isn't -- isn't taking out management fees or

Page 139

JAMES DONDERO - 10/4/22

1
2    asset acquisition fees or disposition fees or
3    other expenses, you could make the argument that
4    the equity ownership should be different, but
5    ultimately, I guess, it's shared, you could get
6    to the same place by just, you know, putting
7    expenses into it.
8    But at this point in time, it was a
9    bona fide reason for arguing Proof of Claim
10    because I don't -- I don't think in the
11    bankruptcy the State allowed contracts or
12    expenses to be added. But --
13    Q. You mentioned earlier that you
14    thought there was a mistake in the agreement
15    because it didn't contain a provision that
16    allowed for amendments. Do I have that right?
17    A. Yes.
18    Q. Okay. Having --
19    A. Yeah, it -- yeah. I'm sorry. Go
20    ahead.
21    Q. Having looked at some of the
22    provisions of the agreement that you signed on
23    behalf of HCRE and -- and Highland, putting you
24    back in the time that you signed it in March of
25    2019, is there any other provision of the

Page 140

JAMES DONDERO - 10/4/22

1
2    agreement that was included or omitted that you
3    think was a mistake?
4    A. Having somewhat on counsel --
5    counsels for this, but I believe the only
6    highlighted one is there should be a provision in
7    there that allows the -- that manager -- the
8    amendments. But beyond that, I don't have an
9    awareness of what else mistake that should be
10    corrected.
11    Q. Are you aware of -- do you see it
12    says in the next sentence accordingly, "Claimant
13    may have a claim against the Debtor."
14    Do you see that?
15    A. Yes.
16    Q. As you sit here today, as the
17    majority owner of HCRE, does HCRE contend that it
18    is entitled to all or any portion of Highland's
19    membership interests in SE Multifamily as set
20    forth in the Amended and Restated LLC Agreement?
21    A. Well, I think we're dropping the POC,
22    right. And so we're dropping POC. So the -- the
23    answer is we don't think we have a claim at the
24    moment.
25    Q. Okay.

Page 141

JAMES DONDERO - 10/4/22

1
2    MR. MORRIS: Let's take a
3    ten-minute break and I just want to check
4    my notes. But I'm either done or I just
5    have some cleanup. So right now it is 1 --
6    1:30 your time. Let's come back at 1:40,
7    if we can.
8    THE WITNESS: Okay.
9    THE VIDEOGRAPHER: The time is
10    1:29 p.m., and we are going off the record.
11    (Break from 1:27 p.m. to 1:37 p.m.)
12    THE VIDEOGRAPHER: The time is
13    1:39 p.m. and we are back on the record.
14    Q. (BY MR. MORRIS) All right.
15    Mr. Dondero, just a few more questions.
16    Are you aware that back in June,
17    Highland made a request to SE Multifamily for
18    access to books and records?
19    A. No.
20    Q. This is the first time you're hearing
21    of this?
22    A. They didn't come to me, I -- yeah.
23    Q. Are you aware that members, under the
24    LLC agreement, have a right to access and copy
25    SE Multifamily's records?

Page 142

JAMES DONDERO - 10/4/22

1    A.  You mean in the agreement members
2  have a right, is that what you're asking?
3    Q.  Yes.
4    A.  Yes.
5    Q.  Can you think of any reason why
6  Highland wouldn't be given that right, right now?
7    A.  No.
8    Q.  So as the manager of SE Multifamily,
9  do you authorize SE Multifamily to provide access
10  to Highland to inspect and copy SE Multifamily's
11  books and records?
12    A.  Well, let me say I'm not aware of the
13  issue.  I'll research the issue and see if
14  there's a bona fide reason why they aren't.  But
15  if there isn't a bona fide reason and you're
16  entitled to it by the document, I'll make sure
17  Highland gets it.
18    Q.  Okay.  I appreciate that.  And last
19  couple of questions.
20    Did there come a time when you made a
21  decision on behalf of HCRE not to pursue the
22  Proof of Claim against Highland?
23    A.  At the -- at the -- on the advice of
24  counsel, I state that they made the decision.

Page 143

JAMES DONDERO - 10/4/22

1    Q.  Okay.  Well, you made the decision on
2  the advice of counsel; correct?
3    A.  Correct.
4    Q.  Okay.  And do you recall when you
5  made that decision?
6    A.  No.  No.
7    Q.  It was recently; is that fair?
8  Sometime in late August, mid-August.
9    A.  Yeah, I believe it was relatively
10  recently.  I don't remember when.
11    Q.  I don't know -- I -- I really don't
12  want to know about what advice you may have
13  received on the topic.  But I do want to know if
14  there are any facts that you relied upon in
15  making your decision not to pursue the Proof of
16  Claim on behalf of HCRE?
17    A.  Well, it was advice of counsel.  I --
18  I don't want to talk about the variables --
19    Q.  No, I appreciate that.
20    A.  -- there may have been.
21    Q.  I don't want to know about the
22  advice.  But I'm asking you if you -- if you
23  learned of a fact that caused you to change your
24  view as to the validity of the Proof of Claim.

Page 144

JAMES DONDERO - 10/4/22

1  Was there a fact or was it just legal advice?
2    A.  There isn't a fact that I recall
3  other than legal advice.
4    Q.  Okay.  I appreciate that.
5    MR. MORRIS:  I have nothing
6  further, Mr. Dondero.  Sorry for the rocky
7  start.  Always appreciate your -- you know,
8  your -- your attention and your -- your
9  efforts, I really do.
10    I don't know if anybody else has
11  any questions here.
12    MR. GAMEROS:  No, we don't have any
13  questions.  We'll reserve our questions for
14  the time of trial.  We'll also re --
15  reserve read and sign.  And if we're off
16  the record, I need to give my contact
17  information to TSG.
18    THE VIDEOGRAPHER:  Okay.  Do you
19  want to close the record at this point, the
20  video?
21    MR. MORRIS:  Thank you, Bill.
22  Thank you, Mr. Dondero.
23    THE VIDEOGRAPHER:  Okay.  The time
24  is -- hold on -- the time is 1:43 p.m., and

Page 145

JAMES DONDERO - 10/4/22

1  this ends of the deposition of Mr. James
2  Dondero.
3    (Time noted - 1:41 p.m.)
4
5
6
7    _____
8    JAMES DONDERO
9
10  Subscribed and sworn to before me this _____
11  day of _____, 20____.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2       C E R T I F I C A T E
3       I, Kim A. McCann, RMR, CRR, CSR in and
4   for the State of Texas, do hereby certify:
5       That JAMES DONDERO, the witness whose
6   deposition is hereinbefore set forth, was duly
7   sworn by me and that such deposition is a true
8   record of the testimony given by such witness;
9       That pursuant to FRCP Rule 30,
10  signature of the witness was requested by the
11  witness or other party before the conclusion of
12  the deposition;
13      I further certify that I am not
14  related to any of the parties to this action by
15  blood or marriage; and that I am in no way
16  interested in the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto
18  set my hand this October 4, 2022.
19
20  _____
21      Kim A. McCann, RMR, CRR, CSR
22
23
24
25

1
2   ERRATA SHEET FOR THE TRANSCRIPT OF:
3   Case Name: HIGHLAND CAPITAL MANAGEMENT, L.P.,
4   Dep. Date: October 4, 2022
5   Deponent:  JAMES DONDERO
6   Pg. Ln. Now Reads   Should Read   Reason
7   ___ ___ _____ _____ _____
8   ___ ___ _____ _____ _____
9   ___ ___ _____ _____ _____
10  ___ ___ _____ _____ _____
11  ___ ___ _____ _____ _____
12  ___ ___ _____ _____ _____
13  ___ ___ _____ _____ _____
14  ___ ___ _____ _____ _____
15  ___ ___ _____ _____ _____
16  ___ ___ _____ _____ _____
17  ___ ___ _____ _____ _____
18
19  _____
20          Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS _____ DAY OF _____, 20_____.
23
24  _____
25  (Notary Public) MY COMMISSION EXPIRES: _____

## $

**$20** 82:5

**$291** 97:2,8 123:4

**$49,000** 122:3,7,22

**$500,000** 128:20

## (

**(b)** 77:12

## 1

**1** 6:3 7:25 8:3 50:14,
19 52:16 141:5

**1.05** 76:25

**1.05(a)** 77:3

**1.05(b)** 77:10

**1.2** 76:22

**1.7** 41:16,17 42:2,4,
10,15 104:2,17

**10** 60:8 76:23

**10/4/22** 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1

106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1

**10:02** 6:12

**11:14** 57:15,20

**11:15** 57:18

**11:24** 57:16

**11:28** 57:20

**11:31** 57:22

**12** 69:13 76:23 92:4
123:19,20

**12:14** 57:14

**13** 92:4

**14** 95:2

**15** 82:14 83:5,15
99:22

**15th** 90:9,15

**17** 25:6

**18** 100:4

**19-34054-SGJ-11**
6:9

**1:00** 118:8,9

**1:27** 141:11

**1:29** 141:10

**1:30** 118:10 141:6

**1:37** 141:11

**1:39** 141:13

**1:40** 141:6

**1:43** 144:25

## 2

**2** 24:10,12

**2.2(a)** 42:18,19 43:16
104:20,22

**20** 60:9 127:8,9

**2001** 126:4,5

**2018** 20:2 24:24
60:24 80:23 81:16,22
99:23 123:22

**2019** 82:14 83:5,15
90:2,14 95:2 99:23
110:15 139:25

**2020** 24:4 35:2
127:12

**2021** 126:9,13

**2022** 6:11

**205** 63:4

**23** 24:23 99:23

**25** 8:25 29:22

## 3

**3** 44:24 45:7,16 46:2
62:25 63:2 127:15

**3.1** 43:19 45:4 105:25
106:9

**3.2** 44:19

**3.3** 45:22 46:7,25

**30** 5:17 58:5

## 4

**4** 6:11 87:6,7

**46.06** 103:18

**49** 49:17 51:25

**49,000** 138:18

## 5

**5** 11:22 89:22,23
128:20

**50** 88:6

**51** 49:16 51:25

**51/49** 55:18

**55** 92:5

**59** 51:24

## 6

**6** 91:25 92:8 93:19
94:22 103:15 104:9,
11 112:3

**6.1(a)** 49:12,13
111:3,12

**6.1(b)** 111:14

**6.4** 111:19

**6.4(a)** 51:20,21 92:6
93:13,25 94:5
111:18,20,22,25
112:14

**6.4(b)** 52:17

**64** 52:17

## 7

**7** 99:4,9

**70** 11:14

**75** 11:14

## 8

**8** 99:4,9 127:12

**8.2** 52:25 53:2
112:24,25 113:7

## 9

**9** 24:4 99:5,18 108:21

**9.3(e)** 55:13,16 56:4,
8,19

**94** 91:24 92:7,22
93:19 94:8 111:25

**97** 63:4

**99** 50:12,19 51:12
52:16

**9:30** 8:10

**9:55** 8:13

## A

**a.m.** 6:12 57:18,20,22

**ability** 108:2,3
120:25

**absolutely** 126:6

**accept** 94:8

**access** 132:11
141:18,24 142:10

**account** 53:9

**accountants** 107:5
117:19

**accurate** 9:5 129:4
130:22 132:8 134:3,
17,20 135:25

**accurately** 42:4

**acquiring** 68:17

**acquisition** 81:5,11,
17,18 82:5 97:22
139:2

**acronym** 10:17,19

**act** 15:6,12,18,23
16:4,7,25 17:6 23:22
38:17 48:4 58:23
59:6

**acted** 22:25

**acting** 38:14 62:21

**actions** 137:3,9

**activities** 17:10
23:16,18 50:10,13,
18,23 51:13 52:15

**actual** 40:2 96:2

**added** 59:20 104:5
139:12

**additional** 42:19
83:8,13

**address** 116:9

**adequacy** 138:14,16

**adequate** 138:7,8

**adjusting** 93:11,12

**admissible** 5:15

**adopted** 92:2

**advance** 8:23 77:11, 13

**advanced** 77:14

**advantages** 32:3

**advice** 36:21 37:2,10 72:9,12 73:11 86:23 100:15,19,23 142:24 143:3,13,18,23 144:2,4

**advisor** 101:21

**Advisors** 63:23,24 70:5,8

**affiliate** 97:22

**affixed** 127:20,23 130:17

**ag-** 84:12

**agent** 77:5,21

**agree** 15:16 21:5 22:20 75:22 94:7

**agreed** 58:4 75:12 107:23

**agreeing** 70:23

**agreement** 19:25 24:11,22 25:10,19 26:5 30:22 31:25 32:24 34:3,22 35:5 38:16 39:13,22 40:25 41:21 42:6 43:3 49:20,24 50:22 51:4 52:5 53:18 56:10 57:4 60:4,19,22 61:8 63:25 65:3,22 66:3,8, 12,23 70:18,22 71:12,14 73:15 74:9 75:15 78:11 82:7,8, 10,12,16,19,24 83:10,15,20 84:7,12 85:7,13,18,24 86:9, 20,25 88:20 89:11 90:5,11,17 91:3 92:5, 13 93:7 98:15 99:7, 21 100:17,20 101:9, 16 102:11 103:3,8,23 104:21 106:3,17 107:9,22,25 108:13, 14,19,25 109:4,17,22 111:21 113:2 131:6 139:14,22 140:2,20

141:24 142:2

**agreements** 74:20

**ahead** 6:23 139:20

**alignment** 76:4

**allocate** 92:21 94:4 112:13,18

**allocated** 52:16 78:19,24 79:4,8,14 80:13,15 92:18 93:3, 24 97:17 103:6,13 112:2 116:22

**allocates** 51:24

**allocating** 51:11 80:19

**allocation** 18:6 34:4 42:10 49:14 51:21 88:6 89:14,17 91:23 92:7,14 93:6,13,17 112:6,10 116:16 117:15 118:3

**allocations** 18:20 19:3,11,14,16 46:17 91:19 117:9

**allowed** 109:23 139:11,16

**ambiguous** 21:18 23:12 41:25 43:10,13

**amend** 108:2,3

**amended** 54:8 56:10 60:3 74:15,18 82:15, 24 83:9,14,20 84:6, 12 85:6,12,17,23 86:8,19,24 88:20 89:10 90:5 91:3 92:13 98:14 99:6,21 106:2 107:24 108:6, 12,13,15,20 109:16, 19,22 112:25 131:6 140:20

**amending** 125:19

**amendment** 56:12, 14 90:11,16 106:20 108:20 109:7,10,16, 24 110:9,24 115:9 125:16

**amendments** 74:15 139:16 140:8

**amount** 25:25 60:8 76:3 122:24

**analysis** 22:15 46:17 47:5

**analyst** 106:21

**analysts** 47:6

**analytics** 18:20

**answers** 23:14 41:10

**anticipated** 91:19

**apartment** 68:14

**apartments** 79:19 80:2,7

**apologize** 38:12 47:16 76:24 86:17 111:15 134:23

**appeared** 29:22

**appears** 102:25 105:22

**applies** 107:21

**appoint** 14:15

**appointing** 14:17

**appoints** 77:4

**appropriately** 47:9, 18,21,23 48:4

**approval** 15:14 37:19 117:23

**approve** 61:7

**approved** 107:24

**approximately** 6:11

**April** 127:12

**area** 87:25

**arguable** 138:23

**arguing** 139:9

**argument** 139:3

**arrived** 112:6

**arriving** 112:9

**Article** 44:24 45:7,16 46:2,7

**ascertain** 134:2

**Asia** 45:17

**aspect** 38:15 52:22 58:24 59:7 65:10 86:19 125:8

**asset** 139:2

**assets** 19:7,14,19 55:18 76:6 97:11,12 106:23 111:16

**association** 5:5 6:15

**assume** 52:21 83:22 133:12 136:16

**assumption** 133:14

**assumptions** 84:2

**attached** 96:2 98:9

**attaches** 90:4 96:8

**attachment** 90:7 96:13

**attempt** 24:15

**attending** 8:16

**attention** 73:23,25 144:9

**attorney** 88:3

**attorney-in-fact** 77:5

**attorneys** 117:19 130:23

**atypical** 73:2,17,21

**August** 20:2 24:23 99:23 143:9

**author** 36:10

**authority** 77:22 93:6 107:17 117:16

**authorize** 13:13 61:25 127:19,22,25 128:4 142:10

**authorized** 13:10,22 15:2,6,10,12,18,23 16:3,7,24 17:6 22:9, 13 23:22 38:17 63:14,18 65:21 110:14 129:8 130:16, 22 134:18 136:2

**authorizing** 16:14 131:2,7 132:3,23 133:4 134:9

**avoid** 88:7,23

**aware** 8:9 12:9 15:22 38:20 39:24 43:18 44:6,18 45:13 49:21 50:21 52:12 55:23 59:14 61:15 62:9,11, 14 64:12,18 67:5 68:20 75:5 81:21 82:13 90:14,19 109:7,10 111:13 114:4 115:9 116:10 120:11 121:14 122:2, 23,25 125:2 129:19 133:7 140:11 141:16, 23 142:13

**awareness** 23:25 61:9 70:20 76:19 87:4 94:2,6 95:16 98:17 105:11,12,17, 24 115:18 123:9 125:21,22 140:9

---

**B**

**B&h** 11:4 103:14

**back** 30:17,24 52:6 57:22 60:18 77:9 94:21 97:25 123:13 131:20 135:7 139:24 141:6,13,16

**background** 107:12

**balance** 11:18

**banking** 76:2

**bankruptcy** 6:7 64:25 110:14,20 120:24 121:7,12,15 137:13 139:11

**Barker** 10:13 91:14 114:2 124:10 125:3,8 126:11,21 127:3

**based** 99:15

**basis** 13:10 22:9,12 23:2,9 31:16 37:13 48:2 73:19 133:14 137:6 138:2,7,24

**Bates** 124:6

**bathroom** 31:6

**bears** 56:15

**begin** 8:10

**behalf** 13:11,14 15:2, 6,13,18,23 16:4,7,25 17:6 20:6 22:25 23:22 25:11 27:5 32:2,24 35:5 36:4 37:3 38:15,17 58:23 59:6 61:22 62:2,13 63:15,19 65:18 68:4 70:22 74:9 79:20,21, 22 91:4 94:7 95:20 100:16,17,20,24 103:24 123:6 124:19 127:23 128:2,5 130:18 131:18 132:24 133:4 139:23 142:22 143:17

**belief** 33:7 73:19

**beliefs** 32:23

**believed** 42:15 95:18 98:7 121:5 135:24

**belong** 137:21

**bene-** 80:8

**beneficial** 32:12 51:15 137:20

**beneficiary** 33:11 67:15,18 79:17 80:6, 9

**benefit** 29:6 32:6,7 33:9,12 79:24

**benefited** 33:13

**benefits** 28:22 29:3 33:3 35:9,10

**BH** 10:10 58:10,12, 16,23 59:7,12,14,22 60:7,16 81:9,23 82:4, 14 83:13,21 84:7 86:13,18 91:25 92:8 93:20 94:24 98:4,13, 19,23 102:24 103:7 104:5,9 112:3 123:10,12

**Bill** 5:23 6:23 30:18 144:22

**billion** 17:24

**binding** 71:10

**bit** 99:3 106:7

**bite** 118:16

**blacked** 29:25

**bona** 134:6 139:9 142:15,16

**Bonds** 127:25 128:4, 7 129:20 130:3,7,9, 12 131:9,10,22 132:7,10,11,17,23 133:4,13,15,17 134:22 135:13,19,22 136:2,3,6,11,19

**books** 53:9 141:18 142:12

**borrow** 26:17

**borrowed** 97:21

**borrower** 65:11 66:23 69:17,20,22,24 70:2,6,9,11 75:8,15, 19,23 76:9,18 77:4,5, 14,16,20,21,23 78:4, 5,9,10,15

**borrowers** 61:22 62:3,20 68:21,23 69:3,14 70:12,15,24 77:20 78:19,24 79:5 80:13,15,20

**borrowing** 76:11 81:17

**borrowings** 77:6

**bottom** 52:23 55:16 94:20 123:25 124:3

**box** 102:21

**break** 29:13,15,20 57:11,20,25 118:10, 13,14,15,22,23 141:3,11

**broad** 93:10

**Broaddus** 10:5 94:24 95:5,7,11,18, 24 96:7 98:4,7 102:24 134:8,12

**broader** 59:4

**broke** 48:10,11 106:6

**brought** 58:19 59:13, 15,17 71:21 73:23,25

**bucks** 60:9

**bunch** 67:14 68:8 79:11

**burden** 33:20 107:10

**business** 76:2 135:11

**BVLLP** 124:5

---

### C

**call** 6:22 42:23 82:23 105:9 108:4 138:22

**called** 58:10

**calling** 108:9

**calls** 43:4,11 105:16

**camera's** 30:11

**Canty** 7:24 99:4

**capacity** 43:22 44:2, 7,21 45:14 46:3 53:13,21 55:11 106:12 109:9 117:11

**capital** 5:21 6:6 10:21 12:15,19,23 25:11,15 35:12 42:20,23 43:4,11 56:24 60:3,7,16 65:19 69:17 81:9 82:19,23 83:4,8,14 96:18,25 97:5,17 101:18 102:21 104:22 105:9,16 123:4,13,23

**care** 55:2

**carefully** 16:21

**carrying** 48:15 49:2, 10

**case** 5:19 6:8 20:16 26:18 131:14 135:5

**cash** 49:14,24 50:7,9, 13,17,22 51:12,16 55:18 58:18 59:20 88:5 89:14,17 98:16, 24 111:4,15

**category** 137:14

**caused** 134:3 143:24

**causing** 53:22 54:4, 15,22 113:3,12,19

**Central** 8:10,13 57:15,16 118:9

**cetera** 107:6

**CFO** 84:23

**chance** 45:21 109:3

**change** 93:6 94:13, 14 108:3 143:24

**changed** 12:7,11 64:24 105:3

**characterize** 76:8

**charged** 36:2 80:19

**check** 141:3

**circus** 110:2

**Civil** 5:18

**claim** 9:18 20:12,23 110:4,7 127:11 128:5,19 129:21 130:3,13,16 131:12, 18 132:9 133:3 135:3,19 136:20 139:9 140:13,23 142:23 143:17,25

**Claimant** 136:24 137:17,23 140:12

**claims** 135:6,10

**clarify** 11:6

**clause** 108:2

**clean** 107:13

**cleaned** 107:24

**cleanup** 141:5

**clear** 45:3 99:8

**client** 29:21 135:9

**close** 135:15 144:20

**closed** 81:4

**closing** 81:3,10

**collateral** 76:4

**colleagues** 8:24

**comfort** 109:6

**comfortable** 91:18 117:25

**comments** 130:15

**communicate** 62:15 88:17 101:8 112:8

**communicated** 113:23 136:11,19

**communicating** 59:5 136:7

**communication** 59:11 114:8 135:15 136:4

**communications** 85:11,21 121:19 127:2

**companies** 31:8,14

**company** 24:22 29:11 31:11 41:17 44:12 53:7 104:3 111:16

**company's** 52:15

**complete** 9:5 53:8

**completed** 81:15 126:4,9

**completely** 30:14

**complex** 117:22

**complexes** 68:15

**compliance** 37:5,12, 18,21,25 40:5,13 73:4 84:22,24 85:2,5, 11,16,21 86:4 87:2 100:22 101:3,5,8,13

**compliant** 101:20 117:20,21

**comported** 101:25

**comports** 103:22

**con-** 111:3

**concerned** 98:13,19

**conclusion** 121:18

**conditions** 36:19 73:13

**confirm** 124:13,17

**connection** 9:22 20:22 37:10 40:19 41:12 61:2 62:7,17 63:9 67:22 80:6 86:23 95:13,19

Index: cons-..document

101:15,16 107:16
114:18

cons- 125:16

consent 5:25

consents 5:22

consequence 121:6

consequences
34:15 89:9

consideration 66:19
125:19

considered 60:21
112:9 115:10 125:17

consistent 21:3
111:21

consolidation 88:7,
18,23 89:2,3,9

contact 135:15
144:17

contend 140:17

contends 137:17

contention 138:3

contents 114:20

context 22:2 24:19
80:23 88:19 89:10,17
107:9

continue 116:5
118:12

contracts 137:14
139:11

contributed 58:17
60:2,7 81:9 82:20
97:11,12

contribution 35:12
43:4 60:11 81:14
95:25 96:3,8,13,18,
25 97:18 98:8 123:4
138:6

contributions
42:20,23 56:24
102:22 104:22
105:10 138:8

control 13:5 21:6,22,
25 22:9,11 65:13

controlled 20:25

21:15,18 23:9,12
24:3

controls 13:4

conversation 58:22
59:10 86:3 105:18
122:21

conversations
27:24 59:11 85:5
89:8 98:11 121:8
134:22

coordinated 84:15

copied 87:9 94:25
98:3

copy 94:10,17 99:20
134:13 141:24
142:11

corner 124:5

corporate 22:2

correct 14:5 15:19,
22,24,25 17:3,7
21:12 23:3,10,24
25:3,8,12 27:6,10,14
33:14,22 34:22 35:2,
6 36:11 38:24 39:4
41:5,22,23 42:11,16
49:17 51:4 55:11,12,
24,25 56:4,8 63:20
64:5,8,16,21 65:19,
22 67:19 69:21,24
70:3,6,9,12 73:9
80:20 81:18 82:7,16,
21,25 83:5,10,16
86:5 87:17 88:2
90:24 92:20 95:21
105:16,17 108:22
112:22 117:6 119:12
121:12 122:8,9,12
124:24 125:5,6,9,13,
14 127:17 129:10
131:24,25 132:3,9,
14,21 133:19,20
136:2 143:3,4

corrected 116:9
140:10

correcting 125:25

correctly 26:2

cost 18:20 19:13

counsel 5:4,21,24
6:17 100:16 140:4

142:25 143:3,18

counselor 31:3

counsels 140:5

counterparty 71:14

couple 9:15 17:24
38:11 74:16,18
136:22 142:20

court 6:7,14

courtroom 5:16

covered 46:8 93:9

create 102:7 132:20

created 132:17

creation 19:20

credit 65:5 66:16
73:18 76:10

credited 97:17

crossed 122:21

curious 116:7

D

Dallas 6:8

dancing 115:19,20

data 110:18

date 80:24 81:19
82:24

dated 24:23 90:2
99:22

day 100:7 118:18

day-to-day 13:9
22:5,9,12,21 23:2,9

deadline 90:10,15

deal 8:19 19:22 34:16

debatable 138:23

Debtor 137:3,22
140:13

Debtor's 137:18

debts 71:11

decide 29:16

decided 26:3,6 75:8,
10 92:21

decision 18:5,8 27:4
75:7 94:3 112:12,17
116:16 142:22,25
143:2,6,16

decisions 13:10,14,
21,23 117:2,14 118:2
119:5,19

defenses 74:12
107:21

definition 69:14 78:4

del 130:6

delegate 40:22 41:3
61:25 83:18 84:4
106:15,24 113:18
122:14

delegated 16:18
22:13 41:4 46:6,10,
12,25 47:14,19,22,
23,24 48:3,8,16 49:7,
8 107:17 130:6 131:8

delegates 107:3

delegating 46:21
49:3 84:8 132:5

delegation 46:15,22,
24

denying 20:8

department 85:16,
22 86:4 118:7

depending 16:10

deposition 5:7,9 6:4,
10 8:9,17 9:8,13,23
10:2 29:21 30:2,19
31:4 52:24 58:7

designated 43:25
44:7 76:17 77:20
78:9,14

desk 73:6

detailed 47:4

details 63:4

determination
138:13

determined 26:12

developments
20:11

devices 7:21

differed 94:5

differently 45:6

differs 93:25

diligence 130:20,24

directing 33:18

direction 112:22
117:6,23

directly 12:23 41:7
110:21

dis 50:9

discuss 16:2 67:2
88:15 93:16 114:20
135:19

discussed 34:14
51:2 115:13 122:6

discussion 19:2
39:15 75:17 78:21
79:3 80:11 120:4

discussions 18:5,6,
11 29:2 38:11 81:22
92:12 120:19,22
126:20

disposition 139:2

distinction 22:4

distributable 49:14
50:7

distribute 77:22

distributed 32:18
49:25 50:14,18,24
55:18 98:16 122:3

distribution 32:16
98:24 111:4 122:7,
11,22

distributions 32:14
52:11 79:12 119:6,
10,14,21,24 120:6,9,
12,15,19 121:2,6,10,
23 122:15,20 136:25
137:2,12

District 6:7

Division 6:8

document 9:21 13:8,
15,16,24 20:6 25:2
27:10,14,17,18
35:16,24 36:7,19

37:2,11,21 38:2,7
39:4 40:11,20 41:13
43:25 44:5,14 45:20
50:7 54:8 55:22
56:15 62:25 63:8,15,
19 66:6 67:3,23 68:3
70:15,25 71:4,9 72:8,
12,18,23 73:7 74:4,
13,17 75:4,8,20,24
76:17 78:18,23 80:24
86:5 87:5,8,12 90:24
91:18 92:17 99:25
100:24 101:25 102:7,
23 105:21 107:12
108:6 109:19 123:17
124:2,9,12,13 127:20
128:2,8,13,24 129:8,
14 131:2,7 132:24
134:10,17 142:17

**documentation**
61:12 62:8 69:18
87:22

**documents** 9:10,12,
17 14:19 24:16 67:22
115:23 131:2 132:2

**dollars** 17:24

**Dondero** 5:1 6:1,5
7:1,7,9,14 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1,13
25:1 26:1 27:1 28:1
29:1 30:1 31:1,2 32:1
33:1 34:1 35:1 36:1
37:1 38:1,13 39:1
40:1 41:1 42:1 43:1
44:1 45:1,18 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1,15 56:1 57:1,23
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1,23 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1,10
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1,
20 100:1 101:1 102:1
103:1 104:1 105:1

106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1,9 119:1 120:1
121:1 122:1 123:1
124:1,9 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1,18
136:1 137:1 138:1
139:1 140:1 141:1,15
142:1 143:1 144:1,7,
23

**Dondero's** 99:15

**dotted** 85:3

**doubt** 42:13

**draft** 35:17 86:19
92:5

**drafted** 36:6 42:16

**drafting** 37:11 40:19,
24 56:4,19 74:8 75:4
83:19 84:6,11 85:17,
23 86:24 110:8
111:11

**drafts** 91:7 100:12

**draw** 22:3

**driver** 90:19

**dropping** 140:21,22

**Dugaboy** 65:25 66:5,
11,15,21 67:3,5,17,
19 69:23

**duly** 7:10

**duties** 49:2,10

---

**E**

**earlier** 28:9 46:8 51:9
104:5,21 113:25
122:3 139:13

**early** 90:14 131:14
135:5

**easily** 109:19

**economic** 28:21
65:9 137:19

**economics** 18:17

**effect** 120:25

**effective** 99:23

**Effectively** 107:2

**efforts** 102:7 144:10

**electronic** 127:16,
19,22 130:17

**elegant** 26:24

**Ellington** 11:19 12:3,
7

**Ellis** 127:25 128:4,7
129:20 130:3,7,9,12
131:9,10,22 132:7,
11,17,23 133:4,13,
15,17 134:22 135:13,
19,22 136:2,3,6,11,
19

**email** 88:5 89:18,25
90:9 94:20,24 96:7,
10 98:3

**employees** 14:20,23

**enable** 125:3

**enabled** 129:21
130:12

**end** 81:16 90:2
111:23 118:21

**enhancement** 65:6
66:16 76:11

**enhancer** 72:2

**enter** 63:14,19 65:21

**entered** 31:25 34:3,
22 82:7

**entering** 51:3

**entities** 64:3,14,20,
24 65:2,9,14 68:8,13,
16 69:7 131:15
135:5,7,10,12

**entitled** 136:25
140:18 142:17

**entity** 10:17 11:25
12:20 21:11 27:22
28:15 44:20 45:13
58:9 79:24 105:8
116:13

**entry** 61:7

**equitable** 137:19

**Equities** 10:10
58:10,12,23 59:7,12,
14,22 60:7,16 81:9,
23 82:4,14 83:13,21
84:7 86:13,18 91:25
92:8 93:20 98:4,13,
19,23 102:24 103:7
104:5,9 112:3
123:11,12

**Equities'** 58:16

**equity** 29:10 103:12
137:18 138:21 139:4

**err** 107:16

**error** 42:16 43:15
48:20 57:7 62:11
74:7,11,13 75:3
108:10 116:8,11
125:12

**errors** 48:20 95:12
107:16 110:8

**estate** 5:24 10:21
63:24 70:8 81:5,12
129:24,25 130:7
131:9,21 132:12
133:18,22 134:16,21
135:16,17,24 136:5,
8,12,20

**evaluating** 135:10

**EXAMINATION** 7:12

**exchange** 12:15,19,
24 98:3

**Excuse** 119:15

**execute** 34:19

**executed** 63:8
94:10,16 98:14

**executing** 36:3
91:18

**execution** 19:21
40:19 46:11 95:12,19
107:17

**executive** 24:7

**exhibit** 7:25 8:3
24:10,12 62:25 63:2
87:6,7 89:22,23
94:19,22 99:5,18
108:21 123:19,20

127:8,9 129:7,8
130:21 134:2

**Exhibits** 99:4

**expectations**
103:23 104:18

**expected** 34:15 52:4
85:8 117:13

**expenses** 139:3,7,12

**expertise** 87:25

**explain** 18:16 36:14

**explained** 28:21

**explaining** 36:18
72:16,22 73:12

**explicit** 46:14

**extent** 119:6

**external** 40:6 84:20
87:3 107:5

**externally** 83:24

---

**F**

**facility** 73:18

**fact** 32:4 116:22
143:24 144:2,3

**factors** 112:9

**facts** 18:9 64:12,19
143:15

**factual** 121:14 137:6
138:2

**failed** 48:4 102:6

**fair** 12:12 15:11 21:2,
22 22:18 23:22 24:2
26:21 28:2 35:21
36:10 38:21 43:14,17
52:13 73:8,10 76:8
87:16,19 90:21,23
92:16 103:21 104:16
121:7 130:9,10
131:5,11 132:20
143:8

**fairly** 138:20

**faith** 82:4

**fall** 81:22 137:14

Index: familiar..identify

**familiar** 10:16 17:13 58:9 87:16

**fault** 74:22

**February** 90:2 111:24

**federal** 5:17 53:6

**feel** 53:2 134:5

**fees** 138:25 139:2

**fide** 134:6 139:9 142:15,16

**figured** 27:3

**file** 110:14 113:13 127:25 128:4 131:17 132:23 133:3 134:4, 10,18 136:2

**filed** 9:19 20:22 53:5, 7,15,23 54:5,16,23 110:3,5 113:4,20 114:15 127:11 128:11,16,24 129:9 130:18,22 131:3,7 132:3 133:10 134:13 135:13,21

**files** 128:19

**filing** 110:20 120:24 121:7,12 131:12 135:2

**final** 35:20 111:20

**finance** 61:4 82:5 97:22 107:5

**financed** 61:4

**financial** 47:4

**financing** 61:5

**fine** 116:6

**fined** 128:20

**firm** 55:5 114:4 124:10 129:15

**fit** 77:23

**five-minute** 57:11

**flew** 52:10

**flipping** 69:6

**flowed** 29:7 52:11

**focused** 53:3 113:22

**folks** 6:21 135:18

**form** 76:10

**formalized** 82:10

**formally** 84:8

**formation** 14:18 19:25 20:7 21:2 59:25

**formed** 10:23 12:8, 12 13:18,21 14:23 21:12,16 23:23 28:8

**formulate** 129:13,21 130:3,13

**fraudulent** 128:19

**free** 53:3

**fulfilled** 113:7

**full** 56:11 64:9 132:11

**function** 47:15

**fund** 97:9

**fuzzy** 72:2

---

**G**

**gained** 28:5

**gains** 97:12

**Gameros** 5:23 6:24 21:17,23 23:4,11 29:12,17 30:16 33:15 99:8,12 119:15 144:13

**gave** 86:22

**general** 18:6 19:2 61:15 71:17 93:8 103:11

**generally** 17:21,23 25:4 36:16 72:20 97:8,10,11,12 103:14,25 104:19 118:5 122:18

**gist** 20:18

**give** 8:23 9:5 23:14 30:21 52:8 72:6 78:13 85:15 86:12 109:6 144:17

**good** 5:3 7:14 11:21 45:23 82:4 117:18 118:4,6 119:3,13

**gotcha** 7:3

**governance** 22:2

**grab** 118:16

**Graner** 22:7

**granted** 117:16

**group** 95:8 117:3 131:21 132:12 133:12,19,22 134:16, 21 135:24 136:20

**guaranties** 76:6

**guarantor** 35:8 62:22

**guarantors** 68:24 69:3

**guaranty** 25:24 26:6, 9,12,19,22 27:2,8 28:3,16 138:18,19,21

**guess** 21:7 68:7 92:25 95:24 102:16 108:9 110:12,23,25 139:5

**guessing** 92:24

**gun** 107:20

**guys** 32:20 131:9

---

**H**

**hand** 7:8

**handle** 47:18

**handled** 47:22 136:4

**happen** 39:25

**happened** 26:22 37:16

**happy** 45:11 118:12, 19

**hard** 48:19 76:6

**HCML** 88:6

**HCMLP** 26:3 75:7,14 88:6

**HCR** 25:12

**HCRE** 9:19 10:17,22, 25 11:3,8,13,17,20, 24 12:8,11,15,19,24 13:4,11,14,20 14:4,7, 11,12,16,20,22 15:5, 6,13,18,23 16:4,8,25 17:7 20:6,25 21:15, 22 22:9,25 23:9,16, 23 25:12 28:22 32:2 33:12,19 34:4,5,10, 18 35:6 36:4 38:8,17 42:24 43:11,22 44:3, 7,17,22 45:15 46:3 49:16 50:15,19 51:25 52:10,17 53:14,21,25 54:3,14,18 55:11,19 62:13 63:16 69:20,22 74:9 76:17 78:6 83:4 84:19 86:23 88:23 89:3 91:4 93:3 96:24 97:8,17,21 100:24 103:7,24 104:10,23 105:8,16 106:13 117:12 123:3 127:10, 23 128:2,5 130:18 131:18 132:24 133:4 134:3,9,18 138:9,24 139:23 140:17 142:22 143:17

**HCRE's** 20:12,23 39:23 40:10,23 97:5 101:23 102:2,8,11 104:15

**hear** 7:15 119:16

**heard** 17:17

**hearing** 141:20

**hearings** 20:13,19

**held** 6:11

**helped** 132:19

**Hey** 30:18

**Highland** 5:21,22 6:5,20 10:21 11:4 24:3 25:11,15,16,18 26:3 27:2,5,12,20 28:3,14,22 29:4,8,11 32:2,3,8,10,13 33:9, 13,19 34:5,16 35:5, 10 36:25 37:6,10,12 38:9,15 43:5 46:13 49:17 50:14,19 51:14,15,25 52:9,16

**55:19 60:21 62:21 65:19,21 68:4 69:17 70:22,23 71:10,13,19 74:2 75:7,19,22 79:8, 14 83:8 89:3 91:4,24 92:8,23 93:19 94:7 100:16,21 101:2,18 103:7,15,24 104:10 110:14 112:3 120:13, 17,20 121:23 122:3,8 123:23 137:10 139:23 141:17 142:7, 11,18,23**

**Highland's** 26:22 27:8 29:6 31:12,17 33:4 34:8,18,25 37:3, 5 40:5,18 50:3 51:7, 18 71:4 72:10,17,22 73:14 76:9 100:17 104:14 120:24 121:7, 11 138:5 140:18

**highlighted** 140:6

**hold** 71:24 144:25

**holder** 104:10 105:19

**Holdings** 20:2 24:23 26:4 27:21 28:15 34:24 38:5 63:20 64:4,15 82:16 123:22

**holds** 11:16

**honestly** 87:15

**hour** 93:9 118:11

**house** 8:18

**human** 34:19,25 35:9

---

**I**

**idea** 79:9 88:4 91:15 117:10 126:14,18,24 131:11,17,23 134:14 135:2

**identified** 6:21 17:5 43:21 55:10 106:3,9 109:14 110:10

**identify** 9:21 14:25 15:4,17 22:8 28:13 37:9 39:17 40:8,16 41:4 45:24 46:14,23 61:20 86:22 129:18 133:18 137:9

**identity** 129:18

**imagine** 40:13 79:10, 13 82:8

**impact** 120:24

**impacted** 34:4

**impart** 122:21

**impossible** 23:15

**imprisoned** 128:20

**improper** 101:14

**inaccurate** 42:10

**inactions** 137:3,10

**inappropriate** 16:17 30:14

**include** 60:21 120:16

**included** 25:18 41:9 66:18 83:21 84:7 140:2

**including** 28:14 29:4 32:3 33:9,13 34:15 35:10

**inclusion** 33:4

**income** 29:7 31:12, 17 32:4,13,17,18 34:9 51:8,18 53:6

**indirectly** 12:23

**individual** 47:5

**inform** 16:6 86:15,17

**information** 73:21 105:7 125:3 129:13, 20 130:11 132:7 144:18

**informed** 86:7,11 98:18 105:14

**initial** 82:11 138:16

**input** 73:3 76:20 117:7

**inspect** 142:11

**instruct** 8:23 35:23 121:22

**instruction** 78:13

**instructions** 85:15

**insurance** 29:11 31:7,11,14

**intend** 80:8

**intent** 33:21 39:23 71:23,24 82:2,3 102:2,8,12

**intentionally** 99:11

**intentions** 48:21

**interest** 11:13 50:3 64:4,15,20 66:19 104:9 138:22

**interests** 11:16,20 12:2,5,16,20,25 21:11 29:10 40:10, 18,24 42:5,11,15 50:6 56:25 76:4 96:14 97:9,23 101:19,23 102:22 103:6,12 104:11 105:20 137:20 140:19

**internal** 40:4 84:21 87:3 107:4

**internal/external** 73:4

**internally** 83:23

**introduce** 6:17

**invest** 12:14

**invested** 12:23

**investing** 12:18

**investment** 18:4,8 22:15 46:9,16 65:25 66:5,11,15,21 67:3,6 69:23 101:20 106:22 122:19

**involved** 18:4 23:20 26:11 37:7 40:3,6,7, 14 41:8 58:13 59:23 61:13 76:15 104:13 110:11,22 117:9 126:19

**involvement** 58:16 119:5 124:23

**irrevocably** 77:4

**issue** 51:7 88:18 115:16 116:13 125:22 142:14

**issued** 114:18,21 115:6 124:19

**issues** 86:18 98:13

**iteration** 39:15 71:20,21

**IV** 63:24 70:8

---

**J**

**James** 5:1 6:1,4 7:1, 9 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1

**January** 24:4

**job** 118:6

**John** 5:20 6:19 29:12 30:16 99:8

**joint** 71:10

**jointly** 70:16,23 74:2

**joke** 123:7,8

**Judge** 30:20

**jump** 77:24 78:2

**jumped** 107:19

**June** 141:16

---

**K**

**K-1** 114:17,21 123:21 124:18

**K-1S** 114:6 115:6

**keeping** 135:14

**Keybank** 28:17 60:25 61:4,8,12,22 62:2,8,13,15,21,25 63:8 65:11,22 66:2,7, 12,24 67:6,23 68:2, 22 69:4 71:17 72:11, 18,23 74:17 75:4,8, 11,14,18,19,23 76:10,14 81:10 97:16 107:20

**Kim** 5:10 6:15 7:6

**kind** 59:3 62:12 110:18 130:20

**kinds** 18:21

**knew** 27:8,12 49:19 50:2 71:13

**knowledge** 12:10 15:13 22:17,24 23:8 32:22 34:12 36:9 37:14,17 39:10 48:24 49:11 54:24 80:17,18 83:7,12 84:3 97:14 105:6 112:5 116:4,21 122:11 125:15 126:15 136:17,18,21

---

**L**

**L.P.** 5:22 25:11,15 63:24 65:19 70:5,9 123:23

**La** 45:17

**labeled** 6:3

**lack** 110:24

**lacks** 107:25

**large** 50:3 52:9

**largely** 29:8 31:12,17 32:4 51:8,18 71:18

**late** 29:22 143:9

**lawyer** 7:19 8:23 9:9, 16 10:3,4 37:9 110:6

**lawyers** 40:5,6 84:20,21 107:5 128:13 129:10,12 133:22 135:9,17

**lead** 76:18 77:4,16, 20,21,23 78:4,5,9,15

**learn** 36:6 53:20 54:18 109:21

**learned** 110:19 143:24

**learning** 90:21

**leasing** 50:10,13,18, 23 51:13 52:15

**leave** 30:13

**left** 55:18 128:18

**legal** 5:5 6:13 36:21 37:2,6 47:7 72:9,12 73:11 86:23 100:19, 23 106:20 108:5,9 121:17 122:22 128:13 129:25 135:7 144:2,4

**lender** 26:17

**Lenders** 76:3

**lesser** 16:18 17:10

**level** 47:10,11

**levels** 47:12

**liability** 24:22 44:11 76:7

**liable** 70:16,24 74:3

**Liberty** 105:3,8,19, 23

**lifetime** 67:18

Index: limit..Nancy

**limit** 34:9

**limited** 24:21 44:11
104:22

**limiting** 43:11

**limits** 44:14

**liquidation** 55:14,17

**list** 89:25

**listed** 65:14

**listen** 16:21

**listing** 10:15

**lists** 46:4

**litigation** 20:12,22

**living** 108:6 109:19

**LLC** 5:25 19:25 20:2
24:11,23 25:12 26:5
27:22 28:15 31:25
34:24 38:5 42:6 52:5
60:3,19,22 63:16,20
64:5,15,21 69:20
78:6 82:15,24 83:15,
20 84:6,11,12 85:7,
13,18,23 86:9,19,25
88:20 89:10 90:5
91:3 92:13 98:15
99:6,21 104:21
109:16 123:22 131:6
140:20 141:24

**loan** 28:16 60:25
61:6,8,12,16,22 62:2,
8,13,16,21 63:8,15,
19 65:3,11,22 66:3,7,
12,24 67:7,23 68:2,
22 69:4,17 72:11,18,
23 74:9,17 75:4,8,19,
23 76:10,17 77:11,
13,22 78:18,23 79:4,
7,10,11,17,18 80:6,
12,20 81:3,11 97:16
107:20

**local** 53:6

**logical** 20:9

**long** 59:24 89:25
116:4 118:23

**long-term** 122:19

**longer** 105:15

**looked** 13:16 60:19

68:21 69:3 98:9
104:5 111:8 139:21

**losses** 33:19,21
51:21 52:12,14 92:7,
14,18 93:3,14,18,23
94:4,9 112:2,13
116:17,21 117:15
118:3

**lot** 115:22

**lower** 124:4

**LP** 6:6

_____

**M**

**made** 13:20 19:16
27:4 46:15,24 48:7,
15,20,25 49:9 56:19
61:15 62:6 74:8 75:3,
6 79:21 95:11,18
96:25 98:7,23 107:15
109:13 112:12,17
118:2 119:10,24
120:9,13,16,20
122:12 123:5 137:2
141:17 142:21,25
143:2,6

**majority** 13:22 14:4
15:5,12 21:4,10 22:4
24:5,6 52:10 65:15
117:11 140:17

**make** 11:7 13:10,14,
23 30:3 39:22 40:10
43:4 57:12 77:24
78:2 79:12 83:25
94:3 101:25 105:15
116:16 117:14
119:19,20 120:6,25
121:5,10,23 130:21
139:3 142:17

**makes** 58:4

**making** 62:11 102:11
107:22 114:13 117:2
122:15 137:11
143:16

**managed** 58:18

**management** 5:21
6:6 25:11,15 59:21
65:19 94:25 123:23
138:25

**Management's**
101:18

**manager** 42:23 43:3,
21 44:2,8,11,16 45:8
53:4 55:10 93:5,10
105:9 106:4,9,16
109:9 113:2,6,14
117:12 140:7 142:9

**manner** 93:24 94:4
112:14,18 119:6

**March** 82:14 83:5,15
90:9,15 95:2 99:22
139:24

**Mark** 31:23 52:23
95:9 111:23

**marked** 8:3 24:12
63:2 87:6,7 89:23
94:22 99:18 123:20
127:9

**math** 104:14

**Matt** 83:22 106:19

**matter** 6:5

**Mccann** 5:10 6:15

**Mcgraner** 10:7
11:11,16 12:2,6,22
15:7,8,19,24 16:3,6,
23 17:5 18:13,16
22:8,11 23:2,10,17,
24 27:25 28:5,11,13
36:2 37:24 46:10,24
47:4,18 48:3,7,15,25
49:7 61:23,25 62:6
63:14 84:5,13 85:20
94:25 98:2,6 102:3,6
106:19 107:15 117:6,
8 132:22 133:2

**means** 44:11 89:17

**mechanics** 98:20

**media** 6:3

**medium** 118:22

**meeting** 59:9

**member** 28:23
59:13,15,18 81:24
83:21 84:7 121:2

**members** 19:16
32:24 49:25 82:20
92:19 93:24 96:15,18

103:13 114:22 115:7
116:18,23 118:4
119:7,10,21,25
120:6,10 121:2,6,11
124:20 135:24
141:23 142:2

**members'** 102:21

**membership** 11:13,
20,25 12:16,19,24
64:14,20 97:9,23
103:6 140:19

**mentioned** 35:13
41:9 51:8 116:13
139:13

**met** 9:9

**microphone** 106:7

**mid-august** 143:9

**million** 60:9 82:5
97:2,8 123:4

**mind** 122:21

**minimize** 117:21

**minority** 50:4 52:10
103:16,17,19

**minutes** 8:25 29:22
58:3,5

**mistake** 48:7,15,18
49:9 56:4,7,18 62:11
74:7,13 75:3 95:18
98:7 101:14 108:4,9
109:13,14 111:11
114:25 115:5 125:23
126:2 139:14 140:3,9

**mistakes** 48:22 49:2
56:12 62:6 95:12
107:16 110:8

**mitigate** 34:9

**mix** 40:7

**models** 46:17

**modest** 35:12

**moment** 14:23 27:16
140:24

**money** 25:25 97:21

**morning** 5:3 7:14
8:21

**Morris** 5:20 6:19,25

7:13,24 16:20,23
17:11 21:24 23:6
24:9 25:6 29:14,18,
24 30:5,8,12,18 31:2
45:17 57:10,14,23
69:11,16 76:21 77:2
94:18,23 99:2,10,14,
19 102:16,18 111:17
118:8 119:3,4 127:7
141:2,14 144:6,22

**move** 16:20 17:11
115:22

**multi-families** 79:11

**multi-family** 17:25
79:19

**Multifamily** 11:8
19:17,21 20:2,7
24:11,22 26:4 27:13,
21 28:14,23 29:4
32:14 33:5 34:8,24
38:5 42:5 43:21 44:2,
16 49:25 55:10
59:15,18 63:20 64:4,
15,21 81:3,4,24
82:16,21 83:4,9
85:13,24 90:6,16
92:19 93:18 96:15
97:9,18 98:16 99:22
104:10 105:15,20
106:4,10 109:9
113:13 114:18
116:17,22 117:13
119:7,9,20,24 120:5,
9,14 121:5,10,24
122:2,7,16 123:22
124:14,19 126:17,23
136:25 137:11,20
140:19 141:17 142:9,
10

**Multifamily's** 44:8
53:22 54:4,15,22
55:2,6 92:22 94:8
112:13 113:3,19
114:5,10,14,22
115:2,6,10 118:4
120:25 124:11,24
125:4,9,13,20 126:3,
8,12 127:4 141:25
142:11

_____

**N**

**Nancy** 67:2

**nec-** 26:20

**necessarily** 16:12, 13,16

**needed** 16:13 26:10, 11 47:24 73:16 122:25

**negotiate** 61:25

**negotiated** 38:15

**negotiating** 61:21 83:19 84:5,11

**negotiation** 39:3,12, 18 61:12,14 62:7,12 74:8 75:3,11 85:17, 22 86:8,24 88:19

**negotiations** 38:8, 20,24 76:15 86:13

**net** 50:9,12,17,22 51:12 111:15

**Nexpoint** 5:24 11:5 40:5 63:23,24 67:14 70:5,8 84:21

**nobody's** 95:17 125:11

**nominal** 25:25

**noninvestment-related** 16:11

**normal** 47:15 73:2,3

**Northern** 6:7

**note** 29:24 30:3 58:6

**notes** 141:4

**notice** 8:23 30:21

**number** 6:3,8 124:6

**numbers** 93:13 96:3, 21

---

**O**

**objection** 21:17,23 23:11

**obligations** 45:8,16 67:7 70:17,24 71:5 72:11,17,23 73:15 74:3

**obligor** 71:10

**obtain** 72:9 100:12, 15,19,23

**obtained** 60:25 62:16,20 80:7 124:9

**obtaining** 77:6

**October** 6:11 110:15

**office** 58:6

**officer** 43:22 44:3,7, 22 45:15 46:3 53:13, 21 55:11 106:4,12

**officers** 14:7,10,13, 15

**omission** 109:14 110:19

**omit** 99:11

**omitted** 109:23 137:21 140:2

**one's** 116:12 125:14, 24

**ongoing** 138:7,24

**operate** 23:18

**operating** 93:11,12 109:20

**operations** 22:5

**opposed** 33:19 34:5 37:14

**optimize** 117:20

**oral** 59:8

**order** 24:18 81:10 97:22 101:25

**organization** 47:15

**original** 14:18 24:10 42:6 52:5 54:7 59:24 60:19 71:16,22 84:17 104:21 106:21 107:9 108:14,19 110:10

**originally** 13:18 71:18

**originate** 135:3

**originated** 131:12, 24

**outlined** 44:14 59:20

**oversight** 108:5

**overstep** 108:24

**owned** 11:25 21:10 29:11

**owner** 13:22 15:5,12 70:12 117:12 140:17

**owners** 12:11 32:12 51:15 84:19 117:17

**ownership** 12:5 13:6 21:3,9 22:4,5,10 24:6 31:13 41:18 42:4,11, 15 50:3,5,6 52:9 64:4,21 65:15 66:19 104:3 137:19 138:6 139:4

**ownership's** 21:4

**owns** 10:25 11:3 67:13

---

**P**

**P&I** 91:20 112:18

**p.m.** 141:10,11,13 144:25

**Pachulski** 6:20

**pages** 69:7 76:23

**paper** 36:23

**paragraph** 44:19 50:8 77:10,25 110:25 113:22

**paragraphs** 44:15

**parallel** 13:6

**part** 14:18 19:21 26:7,10,13,20 27:9, 13,15,21 28:4 31:9 81:14 89:19 109:25

**Part-** 11:9

**participant** 60:22

**participate** 27:5 28:22 66:23 79:2 92:11 120:18 127:2

**participated** 19:2 38:23 39:3,12

**participation** 18:8 34:8 76:9

**particulars** 37:8

**parties** 5:13 19:9 76:11

**partly** 11:4,5

**partners** 5:24 11:9 25:12,20,22 63:16 69:20,22 78:6 79:12 96:24 97:21

**partnership** 14:9 58:20 74:20 79:22 90:11,17 109:20

**party** 26:4

**path** 116:4

**Patrick** 31:23 87:17, 20 89:25 91:16 92:6 95:9 111:23 112:22 117:2,14 118:2

**Patrick's** 52:23 90:9

**pay** 32:18 51:15

**paying** 135:8

**PDF** 69:11 92:4

**pen** 36:22 71:9 78:10

**penalties** 128:25

**pending** 5:19

**people** 10:15 22:13 23:17 31:20,21,22 41:9 46:12,13 71:21 73:4 83:23 84:17 89:25 94:24 132:12, 13,15 133:18

**people's** 47:12

**percent** 11:14,22 49:16,17 50:12,14,19 51:12 52:16 88:6 91:24,25 92:7,8,22 93:19 94:8 103:15,18 104:9,11 111:25 112:3

**percentage** 11:12, 16 56:25 96:14 102:22

**percentages** 49:22 111:6,7

**perform** 22:14 23:15

**performing** 48:7

**period** 31:4 134:6

**periodic** 86:12

**permits** 90:10

**permitted** 90:15 109:15

**person** 11:25 14:25 15:4 17:6 32:23 37:25 39:21 44:20 45:13 48:2 49:6,9 61:20 128:19 129:19

**personal** 22:17,24 23:8 36:9 39:10 84:2 116:21 124:23 136:17,18,21

**personally** 12:14 18:2 58:21 61:7 84:4 91:6 101:7 130:25 131:8 133:25

**persons** 61:21 129:19

**perspective** 33:2 113:11

**pertains** 50:9

**Phil** 6:12

**Philip** 5:4

**phone** 7:20

**phrase** 17:13 89:13

**piece** 104:14,15

**place** 73:23 82:9 139:6

**play** 18:2 61:11

**pleadings** 20:15,21

**POC** 109:25 110:10 129:11 134:6 140:21, 22

**POCS** 110:22 131:15,16

**point** 110:18 139:8 144:20

**portfolio** 46:18 106:22

**portion** 30:25 97:16 137:18 140:18

---

**position** 24:7 126:22

**potential** 89:9
128:25

**power** 77:21 93:6

**powers** 44:23 46:7,
15,25 47:19 93:10
106:16

**practical** 14:4

**practice** 37:15

**precipitated** 26:14,
15

**prefer** 21:6,8 118:20

**preferred** 105:19

**premarked** 99:5,15
123:19 127:8

**preparation** 9:22
40:24 41:13 62:12
98:8 114:25 115:5
124:23

**prepare** 9:7,13 35:23
53:14 113:13 125:4
128:8 129:11 132:8
133:11

**prepared** 53:5,15,23
54:5,16,23 55:6
113:4,20 114:5,14
126:12 133:16

**preparer** 91:11,15,17
126:16,22 127:4

**prepares** 124:10

**preparing** 54:2
114:9 126:12

**presentation** 18:23
28:9

**presented** 38:2

**pretty** 87:8

**prevented** 8:16
137:11

**prevents** 121:15

**price** 19:13

**primary** 28:18 71:14

**prior** 38:17 41:10
68:3 78:22 98:13
135:21

**problem** 6:24 30:15

**procedure** 5:18 37:7

**proceed** 58:8 118:19

**proceeds** 60:10
77:11,13,22 78:19,23
79:4,7 80:12,14,20
97:16

**process** 39:24 40:2,
4,12,15 41:6,8,12
47:3,8 73:3,22 84:16

**processes** 46:9

**professional** 135:11

**professionals**
135:16

**profits** 33:18,21 34:5
51:21 52:11,14 92:7,
14,18,22 93:3,13,17,
23 94:4,8 112:2,13
116:17,21 117:15
118:3

**Project** 17:14,17,20,
23 18:3,18 19:22
27:6 34:19 36:3
58:13,16,24 59:8,23
61:2 62:17 63:9
65:10 66:7 67:22
68:18 87:21 95:14,20

**Proof** 9:18 20:12,23
110:4,6 127:10 128:5
129:21 130:3,13,16
131:12,17 132:8
133:3 135:3,19
136:20 139:9 142:23
143:16,25

**proper** 129:11

**properly** 101:17,19

**properties** 17:25
23:19 58:19 68:18
71:23,25 82:6

**property** 47:5 59:21
70:12 137:22

**proposal** 98:23

**proposed** 18:17

**provide** 74:14 129:6
130:15 142:10

**provided** 25:23,24
37:10 77:15 92:6

102:24 129:17,20

**providing** 35:9 132:6

**provision** 39:4,13
51:3,7 94:14 104:4
108:7 109:15,23
110:9,19 111:4
139:15,25 140:6

**provisions** 35:16
101:9 139:22

**purch-** 79:20

**purchase** 23:18
46:18 79:11,19,21
80:7

**purchasing** 79:25

**purported** 58:23
59:6

**purpose** 33:14 38:4
79:25

**purposes** 65:6 66:16
77:6 81:16 89:4

**pursue** 142:22
143:16

**put** 7:25 24:9,16
31:21 36:22 59:20
71:9 78:10 80:22
82:4 83:8,13 99:4,20
102:19 127:7 128:13

**putting** 83:4 139:6,
23

**puzzles** 89:20

---

**Q**

**qualify** 103:18

**question** 11:21
13:25 15:20 16:22
17:4 20:20 21:19
30:23 38:13 42:8
45:2,12 48:12 52:7
55:14 72:6 74:24
87:11 107:13 110:12,
23 119:17

**questions** 32:20
107:8,11 141:15
142:20 144:12,14

**quick** 29:13

**quickly** 62:24 78:4
138:20

**quote** 95:25

---

**R**

**raise** 7:8

**ran** 31:6

**Rand** 31:9,21

**Raver** 87:14

**re-ask** 72:6

**read** 20:15 24:18
30:24,25 36:12 41:21
53:3 73:7 90:18
100:10 103:22 129:5,
7 144:16

**reading** 20:21 77:12

**real** 5:24 10:21 63:24
70:8 81:5,11 129:24,
25 130:7 131:9,20
132:12 133:18,22
134:16,21 135:15,17,
24 136:5,7,11,20

**realize** 8:20

**reason** 8:22 9:4
26:25 28:13 41:11
42:13 43:9 47:16
48:6,13 56:3,7,18
57:6 64:7,10 74:6,10,
25 95:11 96:20
101:12 102:5 107:7,
14 111:10 113:8,9,16
122:23 139:9 142:6,
15,16

**reasons** 56:11 59:19

**recall** 8:8 12:18,22
13:17 14:10 16:5,9,
14 17:9,12 18:7,9,10
19:5,23,24 20:3,5,21
28:7,10,11,19,20,24
29:5 34:13 35:14
36:13 38:3 39:11,14,
20 46:5 49:3 51:5
58:25 59:5 60:24
61:19 62:4 67:4,8
68:5 73:6 74:5 83:2
85:14 86:16 88:24
89:6,7 90:25 91:2,6,9
92:15 98:12 110:13,

18 132:5 134:11
135:20 143:5 144:3

**receive** 36:21

**received** 36:25 66:22
73:11 123:3,13
143:14

**receiving** 91:7

**recently** 109:25
110:25 143:8,11

**recollection** 27:19
36:17 69:6,9 71:18
72:15,21,25 73:12
79:15 83:3 115:24
116:6 120:2 121:19

**record** 5:9 29:25
30:7,9 57:19,22
141:10,13 144:17,20

**recording** 5:14

**records** 53:9 141:18,
25 142:12

**redone** 74:16,18

**reduced** 104:11

**reductions** 104:14

**refer** 25:14

**reference** 13:23

**referred** 89:2

**referring** 19:11 31:8
91:24 132:15

**refers** 17:20,23 41:17
42:19 90:9 91:10,13

**reflected** 39:23
40:11 52:17 97:23
102:7,11 108:21

**reflects** 42:4 104:17

**refresh** 115:16

**regard** 102:4 107:20

**registered** 101:20

**regurgitations**
105:12

**REIT** 63:20 64:21
70:11 81:4

**related** 20:6 66:6

**relates** 51:7

**relative** 138:8

**relevant** 60:8 131:16

**relied** 34:25 41:5 130:23 131:10 133:17 143:15

**reluctant** 21:21

**rely** 34:18 129:12

**remaining** 55:17

**remember** 9:16 11:22,23 12:13 13:7, 19 14:17,19 18:22 20:9 25:25 26:18 27:23 34:17 38:22,25 39:6,8,9,16,19 46:20 59:25 60:12,14,17,23 61:3,4,6,10,18 66:17 70:19 71:6,15 72:3,4, 20 81:19 84:8 93:8 97:24 104:21 131:19 133:6,8 134:24 143:11

**remind** 24:14

**remote** 5:7,14

**remotely** 5:10,12

**rental** 50:9,13,17,23 51:12 52:15

**repeat** 13:25 23:4 33:15,17 48:11 112:15

**replaced** 126:17 127:4

**report** 84:22,25

**reported** 84:18

**reporter** 5:10 6:14 7:7

**Reporting** 5:6 6:14, 16

**reports** 84:23 85:2 86:12

**represent** 63:7 94:12 111:21 124:8

**represented** 101:18

**request** 76:2 141:17

**requested** 30:25 77:14

**requesting** 77:6

**required** 20:13 53:7 75:11,14,18

**research** 142:14

**reserve** 144:14,16

**resign** 126:21

**resources** 34:19,25 35:9

**respect** 33:20 91:19 98:23 101:2 118:2

**response** 29:23

**responses** 74:12 138:5

**responsibilities** 16:18 44:13,22 46:2, 11 47:19,22 48:3,8, 16 49:3,8,10 53:13 54:10 95:13,20 106:25 113:7

**responsibility** 36:3 40:23 41:5 54:15,19 80:19 83:19 84:5 102:10 113:3,12,19 114:13 122:15 132:6

**responsible** 39:21 40:10,17 53:21 54:2, 4,22 61:21 84:11 87:20 116:25 136:7

**rest** 24:19 44:23,24

**restate** 17:4

**restated** 82:15,24 83:9,15,20 84:6,12 85:6,13,18,23 86:9, 19,25 88:20 89:10 90:5 91:3 92:13 98:15 99:6,21 106:3 108:13 109:16,22 112:25 131:6 140:20

**restatement** 116:11

**result** 32:3 46:24 105:20 121:11

**resulted** 19:25 33:4

**retained** 19:8

**retroactive** 90:10,16

**return** 66:22 91:11, 17

**returns** 53:7,15,22 54:5,16,23 55:3,6 113:4,14,20 114:5, 10,14 115:2,11 124:11,24 125:4,9, 13,20 126:4,9,13

**review** 9:10,12 103:2 128:10,15 132:2

**reviewed** 9:22 13:24 101:5,24

**reviewing** 39:22 45:20

**right-hand** 124:5

**rights** 45:7,15,25 71:4 72:11,17,22 73:14 137:19

**Rizzuti** 5:4 6:12

**rocky** 144:7

**role** 18:3 61:11 118:7

**rolling** 30:13

**rolls** 138:20

**room** 5:8,11 7:17

**rose** 73:5

**Rule** 5:17

**rules** 5:17,18

---

**S**

**satisfy** 71:11

**sausage** 40:7

**save** 115:22

**schedule** 56:21,23 95:25 96:9,14 97:23 98:8,10 102:14,20 103:2,22 111:7 123:5

**Scott** 11:19

**screen** 7:25 8:5 24:17 38:16 99:20

**scroll** 45:6,11,18 76:21 77:12 96:6 127:14

**scrolling** 111:17

**SEC** 85:3

**section** 42:2 43:16, 19 56:19 74:11 92:6 104:17 129:5

**sections** 41:16

**sell** 71:23

**seller** 26:18

**senior** 24:7

**sentence** 43:10,16 90:8 91:10 95:24 136:24 140:12

**sentences** 136:23

**separate** 130:24

**separately** 70:16

**September** 60:24 80:23 81:16

**serving** 35:8

**set** 44:23 45:16 46:2, 7 70:17 112:14 113:7 140:19

**sets** 45:7 49:13 56:24 96:14,17

**settlement** 38:10

**severally** 70:23 74:3

**share** 98:22 105:7

**shared** 76:6 139:5

**Shawn** 87:14

**sheltered** 29:8 31:13,18 32:4 51:8, 19

**short** 57:11 72:6 87:8 118:13,15,21

**show** 8:12 123:16,18 133:9

**shown** 123:5

**shows** 96:24

**shut** 30:2,19 31:3,5 33:7

**side** 6:22 102:19

**sig-** 103:17

**sign** 38:2 75:7,14,23 144:16

**signatories** 63:25 68:21 69:2

**signatory** 63:14 66:2,6,11,15 68:2

**signature** 56:16 63:5,10 65:18 127:16,20,23 130:17

**signatures** 25:8

**signed** 19:24 20:5 25:10 27:10,14,17,18 32:24 35:5,18 36:12, 15,19 37:2,22 38:18 41:20 43:3,24 44:5 49:20,24 50:21 52:4 53:18 54:13 55:24 57:4 60:4 65:3 67:3, 21 68:3 70:15,21 72:8,18,24 73:8,13 74:4 78:18 82:15,18 83:10,14 91:3,8 92:17 93:7 100:3,5,8, 10,16,20 101:10 102:12 103:3,8,23 104:18 107:12 128:24,25 139:22,24

**significance** 37:4

**significant** 16:11 103:16,17,18

**signing** 67:6 71:4 78:22 92:12 100:13, 24 105:21 106:17

**similar** 23:14

**simple** 45:12

**simplest** 26:24

**simply** 87:11

**single** 39:17

**sir** 8:5 45:2,22 63:11 64:12

**sit** 8:24 22:23 23:7 47:17,25 48:14 56:2, 6,17 62:5,10 74:7 75:2 93:22 95:10 101:13 107:15 114:12 140:16

**sitting** 72:16

**skills** 47:12

**skip** 99:3

**skipping** 99:9

**SLHC** 67:10,21,25 70:2

**slip** 109:4

**Slow** 76:24

**small** 122:24

**sold** 19:7,8,9

**sounds** 81:20 121:13

**source** 60:16 97:5

**speak** 9:25 10:5,7,9, 12,14 31:3 37:20 57:24 132:22 134:9

**speaking** 27:19 74:19,20

**spec-** 72:13

**specialist** 6:13

**specific** 19:6,14,18 20:3 21:6 22:21 23:25 49:11,22 54:24 68:14 69:6,8 86:2 97:13 105:24 106:23 111:16 132:6,10

**specifically** 9:20 23:19 35:25 38:6 39:14 44:4,6,9 46:21, 23 51:17 52:19 53:24 54:17 55:23 61:24 62:4 71:2,7 72:13,19 74:5,14 75:16,21 76:13 85:25 86:6 93:15 97:6 98:21 103:9 108:8 109:18 110:9,10 113:21 122:17 129:5,15 132:25 134:20

**specifics** 33:10 34:12 61:10 72:3,4 89:6

**speculate** 26:16 32:20,21 33:7,24,25 133:23

**speculating** 97:11, 13

**speed** 99:3

**spoke** 59:4 132:11

**spoken** 37:25 125:7

**staff** 87:3

**stake** 65:9

**standard** 37:6

**stands** 10:19

**Stang** 6:20

**start** 6:3 58:4 94:20 144:8

**started** 7:2

**starting** 58:3

**state** 53:6 86:13 139:11 142:25

**State's** 5:18

**stated** 110:6

**statement** 43:15 137:7 138:3

**statements** 136:23

**States** 6:6

**stay** 30:6,8 137:14

**steps** 135:23

**stipulate** 5:13

**stock** 67:14

**stop** 76:24

**strategy** 19:22

**strike** 16:20 17:12 74:23

**structure** 60:20

**structuring** 20:4 22:15 47:7 52:22 87:21 112:20 117:22

**stuff** 110:11

**subject** 38:8 39:18 117:21 128:24

**subjective** 138:13, 15,17,22

**subpoena** 8:2,4

**subsequent** 71:17

**subsequently** 54:8 81:4

**substance** 57:24

**substituted** 105:8

**supported** 135:8

**supposed** 8:10

**surmise** 136:16

**surprised** 69:7

**surviving** 64:24

**swear** 5:11 7:5

**swearing** 5:15

**sworn** 7:10

———————

**T**

**takes** 23:17

**taking** 29:20 55:2 67:7 138:25

**talk** 143:19

**talked** 125:24

**talking** 88:13

**task** 16:10,12

**tasks** 22:12

**tax** 18:20 19:13 22:15 29:3 31:20 32:2,6,18, 20 33:3,9,12,20 34:15 35:9 40:13 47:6 52:22 53:6,15, 22 54:4,15,23 55:2,6 84:23 87:21 88:3 89:3 90:10,15 91:19 95:8 107:5 112:19 113:3,13,19 114:5, 10,14 115:2,11 117:3,9,18,19 118:7 122:23 124:11,24 125:4,9,13,20 126:3, 9,12,16,22 127:4

**taxable** 34:9 122:23

**taxes** 51:15 116:12, 13 117:21

**taxpayer** 32:9

**team** 18:19 22:14 31:23 46:12 83:22 84:22,23,25 85:2,5, 12 87:23 102:3,6 106:19,21,25 107:4

**112:20 129:25 130:7 135:8,16,17 136:5,8, 12**

**technical** 59:3

**telling** 39:11 133:6,8

**ten** 57:13

**ten-minute** 118:14 141:3

**term** 17:17 19:10 39:3,13,17

**terms** 13:7 36:18 39:16 42:10 61:16 62:2 73:13 93:11 101:9

**testified** 7:10

**testify** 32:22

**testimony** 9:5 57:25

**Texas** 6:8

**thereabouts** 97:2

**thereunder** 67:7

**thing** 28:18 48:19 108:17 121:14 123:9

**things** 8:14,15,18 9:15 18:21 39:25 47:8,9,10,11 56:13 64:24 77:3

**thought** 71:19,22,25 119:11 131:16 139:14

**time** 8:10,13 12:7,11, 15 13:21 21:16 23:23 27:10,13 29:2 31:25 34:3,14,21 35:4 38:18 39:12 42:5,24 43:2,24 52:4 53:18 54:13 55:23 57:15, 16,17,21 58:4,22 59:7,9 60:3 61:17 68:3 69:2,9 70:14,21 75:18 78:10,14,18,22 79:3 80:12 82:18 83:5,14 85:6,12 86:4, 8 88:18 89:8 90:21 92:12,17 93:7,17 98:14 99:17 104:18 106:17 114:9,22 115:23 118:10 119:5 120:5,23 126:20

**127:3 128:25 131:14 135:21 139:8,24 141:6,9,12,20 142:21 144:15,24,25**

**timely** 8:16

**times** 20:25 24:3 74:16,18

**timing** 61:6

**today** 6:10 7:18 9:5 10:25 14:7,20 24:17 25:15 54:3,6 56:17 61:18 140:16

**today's** 8:9,17 9:8, 13,23 10:2 54:10

**told** 16:12 17:3 28:11 31:20 39:2 42:14 86:2 95:17 114:24 115:4 121:4,9 125:11

**top** 97:25 102:21

**topic** 19:5 34:14 78:23 143:14

**transaction** 18:17 26:7,10,13,20,21,25 27:9,24 28:4 31:10, 21 35:11 61:5 81:14, 15 101:6

**transactions** 37:18

**transcript** 30:4

**trial** 144:15

**trick** 24:15

**trickled** 50:6

**trust** 66:2,6,11,15,22 67:3,6,10,13,15,21, 25 69:23 70:2

**trusted** 102:3 129:10

**Trustee's** 58:6

**truth** 64:9

**truthful** 130:21 132:8 134:3,17,19 135:25

**TSG** 5:6 6:13,15 144:18

**type** 73:18 124:14

**typical** 55:8

**typically** 26:16,17

---

**U**

**U.S.** 58:6

**ultimately** 75:12
82:13 91:25 138:4
139:5

**uncommon** 16:17

**understand** 20:18
21:25 43:2 45:2
51:11 53:12,17,25
54:3,14 70:14 76:16
77:19 108:25 121:20
128:23

**understanding**
11:15 13:3 17:20,22
28:3,5,8 31:19,24
32:23 33:3,6 34:2,7,
11 37:17 42:8 43:7
44:10 51:13 52:3
54:13,21 58:15 60:6
62:19 63:13 66:10
68:12,25 71:8 75:13
78:8,17 79:16 80:5
81:2,8 88:12,22,25
89:16 97:4,7 103:5,
10,11 104:8 122:10

**understood** 34:21
35:4 52:9 79:18

**Unicorn** 17:14,17,20,
23 18:3,18 19:22
27:6 34:19 36:3
58:13,16,24 59:8,23
61:2 62:17 63:9
65:10 66:7 67:22
68:18 87:21 95:14,20
106:23

**unilaterally** 30:3

**United** 6:6

**unreasonable** 75:25

**unusual** 73:5,17,24

**updated** 96:2

**upper** 127:11

---

**V**

**V-I-G-G-A-T-O**

91:14

**vague** 21:17 23:11
41:25 43:10

**validity** 5:14 143:25

**variables** 143:19

**variety** 76:5

**vehicle** 122:20

**vendors** 84:21

**verb** 21:7 48:11

**verbal** 29:23

**verbatim** 111:22

**verify** 134:7

**version** 35:20 71:16
91:7 100:13 111:22

**versus** 106:21
138:15

**video** 5:14 6:13
144:21

**video-recorded** 6:4

**view** 143:25

**viewed** 128:12

**Viggato** 10:13 91:14
114:2 124:10 125:3,8
126:11,21 127:3

---

**W**

**waiting** 8:25 58:5

**wanted** 88:23

**watch** 40:3

**watching** 40:2,14

**waterfall** 55:17
98:15,20,24

**ways** 76:5

**weeks** 38:11

**whatsoever** 72:21

**withdrawn** 14:11
15:3 21:24 28:12
32:9,11 42:2 54:2
59:13 61:19 76:20
80:17 88:16 101:23
113:17,24 123:11

125:17

**word** 21:6,8,25 59:3
137:21

**wording** 105:2

**words** 53:4

**work** 101:15 106:20,
22 130:2,7 131:9

**worked** 130:9 135:8

**working** 117:5
135:11

**works** 95:8

**world** 10:2 15:2,5
16:25 21:14 22:25
23:8 27:20 36:22
40:9,17 44:21 45:14,
25 46:6 54:25 113:12
135:20

**worth** 138:18,21

**woven** 138:4

**wrap** 119:2

**written** 42:6 59:8
82:7

**wrong** 72:3 96:22
101:14

**wrote** 91:17 94:24
95:25

---

**Y**

**year** 35:2 122:4

**years** 10:24 128:20

**yes-or-no** 72:10