# EXHIBIT 71

1    MATT McGRANER - 10/11/2022

2    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION

4    _____
                      )
5    IN RE:           )   CHAPTER 11
                      )
6    HIGHLAND CAPITAL        )   CASE NO.
     MANAGEMENT, L.P.,       )
7                     )   19-34054-SGJ11
      Reorganized Debtor.    )
8                     )
     _____  )
9

10

11

12       REMOTE 30(b)(6) VIDEOTAPED DEPOSITION OF

13            HCRE PARTNERS, LLC

14           THROUGH MATT McGRANER

15         Tuesday, October 11, 2022

16

17

18

19

20

21   Reported by:

22   KIM A. McCANN, RMR, CRR, CSR

23   JOB NO. 217519

24

25

Page 2

1        MATT McGRANER - 10/11/2022

2

3          October 11, 2022

4          9:28 a.m.

5

6        Remote Videotaped Deposition of MATT

7   McGRANER, held via Zoom Videoconference, pursuant

8   to the Federal Rules of Civil Procedure before

9   Kim A. McCann, Registered Merit Reporter,

10  Certified Realtime Reporter and Certified

11  Shorthand Reporter in and for the State of Texas.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1        MATT McGRANER - 10/11/2022
2        R E M O T E   A P P E A R A N C E S:
3   APPEARING FOR THE REORGANIZED DEBTOR/PLAINTIFF:
      John Morris, Esq.
4   PACHULSKI STANG ZIEHL & JONES
      780 Third Avenue
5   New York, New York 10017
6
7   APPEARING FOR NEXPOINT REAL ESTATE PARTNERS
      AND THE WITNESS:
8
      Charles Gameros Jr., Esq.
9   HOGE & GAMEROS
      6116 North Central Expressway
10  Dallas, Texas 75206
11
      Also Present:
12
      Deborah Newman, Esq., Quinn Emanuel
13  La Asia Cantey - Pachulski Stang Ziehl & Jones
      LLP
14  Philip Rizzuti, Videographer
      Lisa Lambert, US Trustees Office
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        MATT McGRANER - 10/11/2022
2        I N D E X
3                    PAGE
4   Examination by Mr. Morris            7
5
6        E X H I B I T S
7
8   NUMBER   DESCRIPTION           PAGE
9   Exhibit 1A  30(b)(6) Notice of HCRE Partners,   15
            LLC
10
      Exhibit 2  SE Multifamily Holdings, LLC       98
11        Limited Liability Company
          Agreement dated 8/23/18
12
      Exhibit 4  Email dated 2/28/19       114
13
      Exhibit 5  Email dated 2/28/19       117
14
      Exhibit 6  Email dated 3/14/19       131
15
      Exhibit 7  Email dated 3/15/19       145
16
      Exhibit 8  Email dated 3/15/19       146
17
      Exhibit 9  SE Multifamily Holdings, LLC       159
18        First Amended and Restated
          Limited Liability Company
19        Agreement dated 8/23/18
20  Exhibit 10  Email dated 11/19/20       174
21  Exhibit 11  Email dated 6/19/21       189
22  Exhibit 17  Email dated 9/13/21       212
23  Exhibit 20  Proof of Claim           41
24
25

Page 5

1        MATT McGRANER - 10/11/2022
2        P R O C E E D I N G S
3        THE VIDEOGRAPHER:  Good morning,
4   Counsel.  My name is Phil Rizzuti.  I am a
5   legal videographer in association with TSG
6   Reporting, Inc.  Because this is a remote
7   deposition, I will not be in the same room
8   with the witness.  Instead, I will record
9   this videotaped deposition remotely.  The
10  reporter, Kim McCann, also will not be in
11  the same room and will swear the witness
12  remotely.
13        Do all parties stipulate to the
14  validity of this video recording and remote
15  swearing, and that it will be admissible in
16  the courtroom as if it had been taken
17  following Rule 30 of the Federal Rules of
18  Civil Procedure and the State's rules where
19  this case is pending?
20        MR. MORRIS:  John Morris for
21  Pachulski Stang Ziehl & Jones on behalf of
22  Highland Capital Management, L.P.  We
23  consent.
24        MR. GAMEROS:  Bill Gameros of Hogan
25  Gameros on behalf of NexPoint Real Estate

Page 6

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  Partners, LP.  We also consent.
3      THE VIDEOGRAPHER:  Thank you.  This
4  is the start of media labeled Number 1 of
5  the video-recorded deposition of
6  Mr. Matt McGraner in the matter of Highland
7  Capital Management -- In re:  Highland
8  Capital Management, L.P. in the
9  United States Bankruptcy Court for the
10  Northern District of Texas, Dallas
11  Division, Case Number 19-34054-SGJ 11.
12      This deposition is being held on
13  October 11, 2022, at approximately
14  9:31 a.m.  My name is Phil Rizzuti.  I am
15  the legal video specialist from
16  TSG Reporting, Inc.  The court reporter is
17  Kim McCann in association with
18  TSG Reporting.
19      Counsel's appearances have already
20  been noted on the record by the court
21  reporter.  Will the court reporter please
22  swear in the witness.
23      MATT McGRANER,
24  Having been first duly sworn, testified as
25  follows:

Page 7

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2      EXAMINATION
3  BY MR. MORRIS:
4      Q.  Good morning, Mr. McGraner.  Can you
5  hear me?
6      A.  I can.  Good morning.
7      Q.  Okay.  My name is John Morris.  I'm
8  an attorney at Pachulski Stang Ziehl & Jones.  We
9  represent Highland Capital Management, L.P.
10      Do you understand that?
11      A.  Yes, sir.
12      Q.  And do you understand that we're here
13  for your deposition today?
14      A.  I do.
15      Q.  Do you understand that we're -- I'm
16  going to be asking questions in both your
17  individual capacity and in your capacity as
18  HCRE's corporate representative?
19      A.  I do.
20      Q.  Have you ever been deposed before,
21  sir?
22      A.  I have.
23      Q.  How many times?
24      A.  Twice, I believe.
25      Q.  And can you tell me, to the extent

Page 8

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  you can recall, approximately when those
3  depositions took place?
4      A.  Both were during COVID, I believe
5  March of 2020 and then a follow-up maybe in the
6  fall 2020.
7      Q.  And were they personal or were they
8  business related?
9      A.  They were business.
10      Q.  And can you -- were they in
11  connection with the same case or with different
12  cases?
13      A.  They were in connection with a
14  different case.
15      Q.  Can you tell me generally what that
16  case is?
17      A.  It was an eminent domain dispute in
18  McKinney, Texas, with an -- with an energy
19  company.
20      Q.  Did you testify in your individual
21  capacity or as a corporate representative, if you
22  recall?
23      A.  As a corporate rep.
24      Q.  And which corporation did you testify
25  on behalf of?

Page 9

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2      A.  I believe the same one, NexPoint Real
3  Estate Partners.
4      Q.  From time to time today, I may refer
5  to that entity as HCRE; will you understand that
6  I'm referring to the same entity?
7      A.  Sure.
8      Q.  And did NexPoint Real Estate Partners
9  succeed through a name change from HCRE?
10      A.  It did.
11      Q.  And do you know when that happened?
12      A.  I believe sometime in 2020.
13      Q.  So -- so you've been deposed before,
14  but let me just give you some general ground
15  rules to make sure that we're on the same page
16  here.  I'm going to ask you a series of questions
17  today, and it's very important that you allow me
18  to finish my question before you begin your
19  answer.  Is that fair?
20      A.  It is.
21      Q.  And I will try to make sure that you
22  have sufficient time to answer the question
23  before I begin the next one.  But if I fail to do
24  so, will you let me know that.
25      A.  I will.

Page 10

MATT McGRANER - 10/11/2022

2 Q. If there's anything that I -- that I
3 ask that you don't understand, will you let me
4 know that as well.
5 A. I will.
6 Q. Okay. Because this deposition is
7 being taken remotely, we're going to be posting
8 documents up on the screen from time to time
9 today. I don't know in advance which of the
10 documents you will have seen previously, but I
11 just want to give you assurances that if there's
12 anything in any document that you believe you
13 need to see in order to have a full context, will
14 you just let me know that.
15 A. I will.
16 Q. Okay. Because I'm not here to trick
17 you; I'm here to just elicit testimony from you
18 on -- on the topics that are at issue in this
19 case.
20 Are you currently employed today,
21 sir?
22 A. I am.
23 Q. And who's your employer?
24 A. NexPoint Advisors.
25 Q. Is that different from the NexPoint

Page 11

MATT McGRANER - 10/11/2022

2 Real Estate company you mentioned earlier?
3 A. It is.
4 Q. And what is NexPoint Advisors?
5 A. It is the investment manager that
6 manages most of our real estate vehicles on
7 behalf of investors at NexPoint.
8 Q. Do you have a title?
9 A. Chief investment officer.
10 Q. When did you obtain that title?
11 A. March -- March or April of 2015.
12 Q. Have you held the title of chief
13 investment officer at NexPoint Advisors on a
14 continuous basis since March 2015?
15 A. I have.
16 Q. Have --
17 A. Can I make a clarification? It --
18 NexPoint -- I'm the chief investment officer of
19 NexPoint Real Estate Advisors, which is a
20 subsidiary of NexPoint Advisors.
21 Q. So NexPoint Real Estate Advisors, to
22 the best of your knowledge, is wholly-owned by
23 NexPoint Advisors?
24 A. It is.
25 Q. Have you served as the chief -- chief

Page 12

MATT McGRANER - 10/11/2022

2 investment officer for NexPoint Real Estate
3 Advisors on a continuous basis since March 2015?
4 A. I have.
5 Q. Have you been employed by any other
6 person or any other entity since March of 2015?
7 A. I became -- started working at
8 Highland Capital Management in May of 2013 and
9 that's who paid me my salary. And then on June
10 -- in June of 2016 was I believe when I started
11 getting paid by NexPoint Advisors.
12 Q. And the entity that pays you is the
13 entity that you personally identify as your
14 employer. Do I have that right?
15 A. Yeah, that's right.
16 Q. Were you employed prior to March --
17 withdrawn.
18 Were you employed prior to May 2013?
19 A. I was.
20 Q. Can you just describe for me
21 generally both your educational background and
22 your employment history until the time you joined
23 Highland in 2013?
24 A. You bet. Yeah, I did undergrad at --
25 at Vanderbilt University and then went to law

Page 13

MATT McGRANER - 10/11/2022

2 school at Washington University in St. Louis. I
3 practiced, I think, a year or so at Brian Cave in
4 St. -- in St. Louis before joining Jones Day's
5 private equity and M&A group in Dallas in 2011.
6 Q. Do you hold a license to practice law
7 today?
8 A. I do.
9 Q. And have you held a license to
10 practice law on a continuous basis since the time
11 you joined Brian Cave?
12 A. I have.
13 Q. Have you held any title at NexPoint
14 Real Estate Advisors at any time since
15 March 2015?
16 A. Any other title?
17 Q. Yes. I apologize. Other than chief
18 investment officer.
19 A. No.
20 Q. Who do you report to today?
21 A. Jim Dondero.
22 Q. Have you reported to Mr. Dondero on a
23 continuous basis since the time you became the
24 chief investment officer in March of 2015?
25 A. I have.

Page 14

MATT McGRANER - 10/11/2022

1
2  Q. Have you ever reported to anybody
3  else during that period?
4  A. I reported -- sorry, since what
5  period?
6  Q. Have you reported to anybody other
7  than Mr. Dondero since you became the chief
8  investment officer at NexPoint Real Estate
9  Advisors in March of 2015?
10  A. No.
11  Q. And who did you report to prior to
12  the time you became chief investment officer at
13  least during the period that you were at
14  Highland?
15  A. Tom Sergent.
16  Q. And did you begin reporting to
17  Mr. Sergent when you joined Highland in 2013?
18  A. I did.
19  Q. And did you report to Mr. Sergent on
20  a continuous basis until March 2015 when you
21  became the chief investment officer?
22  A. I did.
23  Q. Did you ever report to Mr. Sergent at
24  any time after March 2015?
25  A. Not formally.

Page 15

MATT McGRANER - 10/11/2022

1
2  Q. Apologies.
3  A. No worries.
4  (Exhibit 1A was marked.)
5  Q. All right. I'm going to put up on
6  the screen a document that we've marked as
7  Exhibit 1-A. And are you aware that I took
8  Mr. Dondero's deposition last week?
9  A. Yes, I am.
10  Q. Okay.
11  MR. MORRIS: So -- so, Bill, we're
12  just going to use the same exhibit
13  numbers -- they may not be in the same
14  order -- but the same exhibit numbers that
15  we used last week, although this one is
16  new. So in Mr. Dondero's deposition,
17  Exhibit 1 was his subpoena, and we'll call
18  this 1A here, this Rule 30(b)(6) notice.
19  Q. Can you see the document --
20  MR. GAMEROS: That's fine.
21  Q. Can you see the document that's up on
22  the screen, Mr. McGraner?
23  A. I -- I can.
24  Q. Okay. We're going to scroll down to
25  the -- to the topics. While we're doing that,

Page 16

MATT McGRANER - 10/11/2022

1
2  can you tell me when the first time you saw this
3  -- have you seen this document before today?
4  A. I have.
5  Q. Okay. When did you see it for the
6  first time?
7  A. I don't recall specifically.
8  Q. Okay. But do you understand that
9  you're here to testify as HCRE's 30(b)(6) witness
10  on the topics that are listed in this notice?
11  A. I do.
12  Q. Okay. So this can be a little tricky
13  sometimes because I'm asking you questions both
14  in your individual capacity and in your capacity
15  as a corporate representative. So this is the
16  ground rule that I'd like to try to establish,
17  but if you have -- ever have any questions just
18  let me know. And the ground rule is pretty
19  simple: Unless I specifically ask you about you
20  personally, all of the questions are about you in
21  your corporate capacity as HCRE's representative.
22  Okay?
23  A. Okay.
24  Q. Okay. But for this series of
25  questions, all of the questions are going to be

Page 17

MATT McGRANER - 10/11/2022

1
2  personal just about the things that you
3  personally did. Okay?
4  A. Okay.
5  Q. Is there any reason -- is there any
6  reason today that you can't give complete,
7  honest, and truthful testimony?
8  A. No.
9  Q. Did you personally do anything to
10  prepare for today's deposition?
11  A. I did.
12  Q. What did you do?
13  A. I met with our counsel. I reviewed
14  testimony of Jim Dondero, Mark Patrick,
15  Austin Thomas, Jim Seery, Mark Barker. I
16  reviewed the LLC agreement of HCRE. I reviewed
17  the KeyBank loan documents, including the pledge
18  -- pledge agreements, collateral package,
19  guaranty documents. I reviewed our original
20  underwriting on the transaction -- the
21  transaction I believe we're speaking about today.
22  And that's -- that's about it.
23  Q. Did you review any tax returns?
24  A. No.
25  Q. Did you review any emails or other

Page 18

1      MATT McGRANER - 10/11/2022
2   written communications?
3      A. I did. I reviewed emails from the
4   time of the transaction -- the original
5   transaction the summer of -- of 2018, the emails
6   or -- go ahead.
7      Q. Did you review any emails that have
8   not been previously marked as an exhibit in a
9   deposition?
10     A. I don't think so.
11     Q. Did you review all of the documents
12  that were marked in prior depositions?
13     A. I did.
14     Q. Did you speak with anybody other than
15  counsel in connection with your preparation for
16  today's deposition?
17     A. No.
18     Q. You didn't speak with Mr. Dondero?
19     A. No.
20     Q. You didn't speak with Mr. Broaddus?
21     A. No.
22     Q. You didn't speak with anybody at
23  BH Equities?
24     A. No.
25     Q. You didn't speak with anybody at

Page 19

1      MATT McGRANER - 10/11/2022
2   Barker Viggato?
3      A. No.
4      Q. Okay. I want to speed this up a
5   little bit and just ask you generally is there
6   any topic that is in the 30(b)(6) deposition
7   notice that you reviewed before today that you do
8   not believe you're able to answer questions about
9   on behalf of HCRE?
10     A. I didn't memorize the -- the topics.
11  So...
12     Q. Okay. Can we scroll down slowly?
13  And I'll -- I'll try to summarize them, but,
14  again, if you need to read, I don't mean to rush
15  you. But Topic 1 --
16     A. Okay.
17     Q. -- deals with the execution and
18  drafting of the original LLC agreement in
19  August 2018.
20        Are you -- are you prepared to
21  testify as to those issues?
22     A. Yes.
23     Q. Topic 2 concerns the KeyBank loan
24  agreement. I think you said that you've reviewed
25  that, and are you prepared to answer questions on

Page 20

1      MATT McGRANER - 10/11/2022
2   those topics?
3      A. I am.
4      Q. Topic 3 deals with the removal of
5   Highland as a borrower under the KeyBank loan
6   agreement. Are you able to testify about that?
7      A. Yes.
8      Q. Topic 4 deals with the amended LLC
9   agreement, that's the agreement that was signed
10  with BH Equities in March of 2019.
11        Are you prepared to testify about
12  that?
13     A. Yes.
14     Q. And Number 5 addresses assertions
15  that were made in HCRE's response concerning
16  alleged improper allocations of ownership
17  interests.
18        Are you prepared to testify about
19  that?
20     A. Yes.
21     Q. Are you prepared to testify about
22  SE Multifamily distributions as set forth in
23  paragraph 6 and Topic 6?
24     A. Yes.
25     Q. Are you prepared to testify about

Page 21

1      MATT McGRANER - 10/11/2022
2   SE Multifamily's allocation of profits and losses
3   among its members?
4      A. Yes.
5      Q. Okay. Topics 8 and 9 deal with --
6   well, we'll take them one at a time. Are you
7   prepared to testify about any errors that HCRE
8   alleges or asserts are contained in the amended
9   LLC agreement?
10     A. Yes.
11     Q. Are you prepared to testify about the
12  allocation of interests and whether or not there
13  was an inaccurate description of those interests
14  in the amended LLC agreement as set forth in
15  Topic 9?
16     A. Yes.
17     Q. Are you prepared to testify to
18  communications concerning the allocation of
19  membership interests in SE Multifamily?
20     A. Yes.
21     Q. Topic 11 deals with tax filings. Are
22  you generally prepared to testify as to
23  SE Multifamily's tax filings?
24     A. Yeah, generally.
25     Q. Okay. 12, sources of capital, are

Page 22

MATT McGRANER - 10/11/2022

1  you prepared to testify as to --
2  A. Yes.
3  Q. -- HCRE's sources of capital?
4  A. Yes.
5  Q. Okay. Are you prepared to testify as
6  to HCRE's responses to Highland's discovery
7  requests?
8  A. Yes.
9  Q. And 14, 15, 16 all ask you to
10 identify certain individuals -- actually, 17 as
11 well -- as to whether, you know, they were
12 authorized to act on behalf of HCRE or Highland
13 and who was employed.
14     Are you prepared to testify as to
15 those topics?
16 A. Yes.
17 Q. Okay.
18     MR. MORRIS: We can take that down
19 now. We may go back to it from time to
20 time.
21 Q. (BY MR. MORRIS) So we've been talking
22 about this entity, HCRE. I assume that that's an
23 entity with which you are familiar?
24 A. Yes.

Page 23

MATT McGRANER - 10/11/2022

1  Q. Okay. And -- and these questions
2  again, are just going to you in your individual
3  capacity.
4  A. Okay.
5  Q. It's -- unless I say otherwise.
6     Do you know -- does HCRE stand for
7  anything? Is that an acronym?
8  A. Highland Capital Real Estate.
9  Q. Okay. And do you know when HCRE was
10 formed?
11 A. November -- I believe, November 2014.
12 Q. And do you have an understanding as
13 to the business of HCRE?
14 A. To invest in -- in real estate assets
15 generally.
16 Q. Do you know who owns HCRE today?
17 A. I do.
18 Q. Who owns HCRE?
19 A. I believe it is -- the ultimate
20 beneficiaries are Jim, myself, and Scott
21 Ellington.
22 Q. Do you know what percentage interest
23 each of the three of you directly or indirectly
24 has in HCRE?

Page 24

MATT McGRANER - 10/11/2022

1  A. 70/25/5, respectively.
2  Q. Has that changed since the time HCRE
3  was formed?
4  A. No.
5  Q. To the best of your knowledge, has
6  HCRE had any owners other than the three of you?
7  A. No.
8  Q. So it's fair to say that since HCRE
9  was formed in 2014, the only owners have been
10 you, Mr. Dondero, and Mr. Ellington, and you've
11 owned your respective interests on a 70/25/5
12 basis?
13 A. That's fair.
14 Q. Okay. Did you personally ever invest
15 any capital -- any of your own money directly or
16 indirectly into HCRE?
17 A. Years ago --
18 Q. How much --
19 A. I mean, what I've had. Sorry.
20 Q. I didn't mean to cut you off.
21     When did you put money into HCRE?
22 A. The first -- the first deal we did
23 back in 2014.
24 Q. Do you recall how much money you

Page 25

MATT McGRANER - 10/11/2022

1  invested?
2  A. I think it was 25,000.
3  Q. Do you know whether Mr. Dondero or
4  Mr. Ellington invested any money into HCRE at any
5  time?
6  A. I don't know whether Mr. Ellington
7  did, but I do know that Jim has over the years
8  contributed capital. I don't know the amounts,
9  though.
10 Q. How do you know that he contributed
11 capital?
12 A. Whenever we needed, you know, capital
13 or equity capital from time to time, he would
14 step up and contribute.
15 Q. And do you know if that money came
16 from his own personal assets or did they come
17 from a different source other than Mr. Dondero?
18 A. I believe they came from his personal
19 assets and then the loans -- equity loans from
20 various -- various of his affiliates.
21 Q. Would those affiliates include
22 Highland?
23 A. Yes. I believe so.
24 Q. Are you aware that Highland's loaned

Page 26

1    MATT McGRANER - 10/11/2022
2  money from HCRE from time to time?
3    A. Yes.
4    Q. Are you familiar with the notes that
5  HCRE issued in favor of Highland in exchange for
6  those loans?
7    A. I'm aware of a note.
8    Q. What note are you aware of?
9    A. I think the original note was -- was
10  Highland and then as deals -- as we did more
11  deals, I believe it was either Highland or this
12  other affiliate, Rand contributed capital or --
13  or made loans.
14    Q. Has Mr. Dondero made -- withdrawn.
15      It's your understanding that
16  Mr. Dondero made investments in HCRE from his own
17  personal assets. Do I have that right?
18    A. You -- you do.
19    Q. But you don't have any understanding
20  as to the aggregate amount of those investments;
21  correct?
22    A. Of his personal contributions?
23    Q. Yeah.
24    A. I -- I think it is substantial, I
25  would say seven figures, but I don't know the

Page 27

1    MATT McGRANER - 10/11/2022
2  exact amount.
3    Q. Is it reflected in HCRE's books and
4  records anywhere?
5    A. I believe so.
6    Q. Was the money given in the form of
7  loans or in the form of equity or in some other
8  form?
9    A. I think equity, but I'm not
10  specifically sure.
11    Q. Would it be reflected on HCRE's
12  balance sheet?
13    A. It -- it should be, yes.
14    Q. Do you ever review HCRE's balance
15  sheet?
16    A. I used to. When this bankruptcy
17  happened, it was transferred to Highland and so
18  they -- they kept the books.
19    Q. As Mr. Dondero put additional equity
20  contributions in HCRE, was your membership
21  interest in HCRE ever diluted?
22    A. Not that I'm aware of.
23    Q. Did you ever discuss with Mr. Dondero
24  whether your equity interests would be diluted as
25  a result of his additional capital contributions?

Page 28

1    MATT McGRANER - 10/11/2022
2    A. No.
3    Q. Did you ever discuss with him the
4  timing or amount of any additional equity
5  investment that he personally made into HCRE?
6    A. Did I -- can you be a little bit more
7  specific.
8    Q. Sure. So from time to time he would
9  make these additional equity investments, to the
10  best of your knowledge; right?
11    A. That's right.
12    Q. Did you ever discuss that with him?
13    A. Yeah, if we needed additional capital
14  for -- for a purchase or an investment, we
15  discussed -- we discussed it.
16    Q. And did -- did HCRE ever repay any of
17  the money that Mr. Dondero put into HCRE?
18    A. I don't -- I don't know.
19    Q. How did it come to be that you and
20  Mr. Ellington and Mr. Dondero formed this company
21  to make real estate investments?
22    A. I think you'd have to ask Jim why he
23  set it up the way he did. I don't -- I don't
24  know.
25    Q. Was the opportunity given to anybody

Page 29

1    MATT McGRANER - 10/11/2022
2  other than the three of you?
3    A. No.
4    Q. Can you think of any reason why
5  Highland couldn't have made the real estate
6  investments that HCRE made?
7    A. Yes.
8    Q. Why couldn't Highland have made the
9  real estate investments that HCRE made?
10    A. I don't believe Highland had any
11  specific real estate investment mandate at the
12  time HCRE was formed.
13    Q. What do you mean by the word
14  "mandate"?
15    A. Highland Capital Management as an
16  investment manager managing various funds did not
17  have a dedicated real estate fund at that time.
18    Q. But is there any reason it couldn't
19  have created one, to the best of your knowledge?
20    A. No.
21    Q. Okay.
22    A. Well, I think it -- Highland hasn't
23  had a great track record in real estate
24  investments prior to my -- my joining Highland.
25    Q. Do you know who controls HCRE today?

Page 30

MATT McGRANER - 10/11/2022

1        MATT McGRANER - 10/11/2022
2        A. Jim does.
3        Q. To the best of your knowledge, has
4   Mr. Dondero controlled HCRE since the time it was
5   formed in 2014?
6        A. Yes.
7        Q. To the best of your knowledge, has
8   anybody other than Mr. Dondero ever controlled
9   HCRE since the time it was formed?
10       A. No.
11       Q. What's the basis for your
12   understanding that Mr. Dondero has controlled
13   HCRE on a continuous basis since the time it was
14   formed?
15       A. He's the sole manager.
16       Q. Has he been the sole manager, to the
17   best of your knowledge, since the time that HCRE
18   was formed?
19       A. Yes.
20       Q. All right. Now these questions are
21   in your capacity as HCRE's corporate
22   representative as they relate to some of the
23   topics that we just looked at.
24       Do you know whether HCRE has any
25   officers today?

Page 31

1        MATT McGRANER - 10/11/2022
2        A. I think when we formed it, I -- I may
3   have been vice president and secretary.
4        Q. And is it your understanding that
5   you've served as HCRE's vice president and
6   secretary on a continuous basis since it was
7   formed in 2014?
8        A. Yes.
9        Q. Have you ever prepared any corporate
10   minutes?
11       A. No.
12       Q. To the best of your knowledge, has
13   there ever been a -- a meeting -- a corporate
14   meeting of HCRE?
15       A. No formal meetings but informal, yes.
16       Q. Has -- has HCRE ever adopted any
17   resolutions, to the best of your knowledge?
18       A. Yeah, whenever we enter into a real
19   estate transaction, you have to have written
20   consents and authority and representations of
21   authority for -- for borrowing money and -- and
22   transacting.
23       Q. And --
24       A. So I would -- I would characterize
25   those as resolutions.

Page 32

1        MATT McGRANER - 10/11/2022
2        Q. And was it your responsibility as the
3   secretary to prepare those resolutions?
4        THE WITNESS: Bless you. Bless
5   you.
6        MR. GAMEROS: Thank you.
7        A. It was either the legal team or -- or
8   our outside counsel -- external counsel usually
9   prepared those written consents in connection
10   with real estate investments.
11       Q. Okay. Are you aware of any
12   resolutions that are -- have ever been prepared
13   or written consents other than those that you've
14   described?
15       A. No.
16       Q. Are you aware of any officers of HCRE
17   other than yourself as the vice president and
18   secretary at any time since it was formed?
19       A. I don't know if Jim has a formal
20   title, but he's the manager. And I don't -- I
21   don't know if Scott has a title.
22       Q. But you're not aware of any officer
23   of HCRE at any time since it was formed other
24   than Mr. Dondero and you?
25       A. That's right.

Page 33

1        MATT McGRANER - 10/11/2022
2        Q. Okay. Does HCRE have any employees
3   today?
4        A. No.
5        Q. Has HCRE ever had any employees since
6   the time it was formed in 2014?
7        A. No.
8        Q. How many investments has HCRE made
9   since the time it was formed, approximately?
10       A. Would you consider portfolio
11   acquisitions to be one investment or multiple
12   investments?
13       Q. Let's just call that one for
14   simplicity.
15       A. Okay. Say 20, 25.
16       Q. Do you have a ballpark as to the
17   aggregate value, plus or minus a few billion?
18       A. A few million or billion. It's not a
19   billion. I would say probably a billion three
20   billion, a billion four.
21       Q. Okay. So how did HCRE make 20 to 25
22   investments worth an aggregate of a billion three
23   to a billion four if it had no employees and no
24   officers other than you and Mr. Dondero?
25       A. It utilized Highland vis-a-vis a

Page 34

MATT McGRANER - 10/11/2022

1    shared services agreement, I think, and then also
2    NexPoint Advisors as well, the real estate team
3    at NexPoint.
4        Q.  What shared services --
5        A.  In -- in addition -- in addition to
6    our, you know, external operating part --
7    parties.
8        Q.  Which -- which shared services
9    agreement are you referring to?
10       A.  There's a shared services -- there
11   was a shared services agreement, I believe, with
12   NexPoint Advisors and Highland.
13       Q.  Is that one agreement or is it two
14   different agreements?
15       A.  I believe it's one agreement.
16       Q.  Was that an oral agreement or a
17   written agreement?
18       A.  I believe it was put in place -- a
19   written agreement was put in place following the
20   initial public offering of NexPoint Residential
21   Trust.
22       Q.  Have you ever seen it?
23       A.  Yes.
24       Q.  And has --

Page 35

MATT McGRANER - 10/11/2022

1        A.  It's been awhile.
2        Q.  Pardon me?
3        A.  Been awhile.
4        Q.  When -- when -- when was that
5    transaction that you just described -- when --
6    when was this written agreement entered into?
7        A.  I don't know when the agreement was
8    written or entered into, but the IPO was in April
9    of 2015.
10       Q.  Do you recall whether that agreement
11   required HCRE to pay Highland for services
12   rendered?
13       A.  I don't.
14       Q.  Do you recall if HCRE ever paid
15   Highland any money for services rendered?
16       A.  I don't -- I don't -- I don't recall.
17       Q.  Did you ever authorize HCRE to pay
18   Highland anything of value in exchange for
19   services rendered?
20       A.  No.
21       Q.  Do you know if Mr. Dondero ever
22   authorized anybody on behalf of HCRE to pay
23   anything of value to Highland for services
24   rendered?

Page 36

MATT McGRANER - 10/11/2022

1        A.  No.
2        Q.  Does HCRE contend that Highland ever
3    breached its agreement with HCRE -- the shared
4    services agreement you just described?
5        A.  No.
6        Q.  When was the last time you saw this
7    written agreement?
8        A.  I believe it was probably around the
9    time it was entered into.  I'm aware of
10   amendments made because we increased -- as
11   NexPoint got bigger and generated income, we --
12   we -- we gave more money to Highland.
13       Q.  Gave more money -- money to Highland?
14       A.  Yeah, the fees were increased --
15   those shared services fees were increased as
16   NexPoint fees were increased, I believe.
17       Q.  Those fees were from NexPoint
18   Advisors, not from HCRE; correct?
19       A.  That's right.
20       Q.  Do you know who -- who is authorized
21   to act on behalf of HCRE today?
22       A.  Jim or myself.
23       Q.  Has anybody ever been authorized to
24   act on behalf of HCRE other than you and Jim

Page 37

MATT McGRANER - 10/11/2022

1    since the time it was formed in 2014?
2        A.  Not that I'm aware of.
3        Q.  Did you ever delegate any authority
4    to act on behalf of HCRE to any person in the
5    world?
6        A.  Yeah, I -- yes.
7        Q.  And who did you -- who did you
8    delegate that responsibility to?
9        A.  In connection with investments from
10   time to time, I delegated to internal lawyers,
11   external lawyers, bankers, operating partners.
12       Q.  All right.  I'm not talking about --
13   and maybe it's in the question -- I'm not asking
14   you about delegating kind of work.  I'm asking
15   you whether you ever delegated --
16       A.  Sorry.
17       Q.  -- delegated decision-making
18   authority to any person in the world.  Did you
19   ever tell somebody that they could make the
20   decision on their own?
21       A.  Sure.
22       Q.  Okay.  Can you think of anything
23   having to do with SE Multifamily's set of
24   transactions that you specifically delegated

Page 38

MATT McGRANER - 10/11/2022

2 decision-making authority to another person?
3     A. Sure.
4     Q. Do you know who? Who and what issues
5 did you delegate?
6     A. Yeah, the daily management of the
7 properties to BH management, you know, they make
8 decisions on leasing, staffing, those -- those
9 sorts of things.
10     Q. Okay. Anything else?
11     A. I think generally that's it.
12     Q. Okay. So to the best of your
13 recollection, in connection with the
14 SE Multifamily transactions, the only delegation
15 of decision-making authority that you recall ever
16 making was to delegate to BH Equities the
17 decision-making over property management; is that
18 fair?
19     A. That's fair. I would say that
20 there's -- we were -- or HCRE was deferential to
21 experts or professionals with respect to certain
22 aspects of the structuring of the transaction,
23 the financing of the transaction, the negotiation
24 of the transaction, that we relied on advice.
25     Q. And you -- and you or Mr. Dondero

Page 39

MATT McGRANER - 10/11/2022

2 made the ultimate decision based on that advice;
3 is that fair?
4     A. Sure.
5     Q. With -- with the exception of the
6 property management issues for which you
7 delegated to BH Equities; fair?
8     A. Sure, yeah.
9     Q. Okay. Which professionals are you
10 referring to, to the extent you can recall? And
11 again, we're just talking about the
12 SE Multifamily series of transactions.
13     A. Okay. On the legal side, we -- we
14 deferred to Winston & Strawn, we deferred to
15 Wick Phillips, deferred to internal legal
16 counsel, deferred to Hunton & Williams for tax
17 structuring advice. That's generally about it.
18     Q. I just -- I just want to make sure
19 that I understand the list that you just
20 provided, Winston & Strawn, Wick Phillips,
21 internal legal counsel, and Hunton & Williams,
22 can I just refer to them collectively as the
23 professions?
24     A. You bet.
25     Q. Okay. Do I understand you correctly

Page 40

MATT McGRANER - 10/11/2022

2 that you and Mr. Dondero looked to the
3 professionals for advice, and based on that
4 advice, you and Mr. Dondero made decisions?
5     A. Sure.
6     Q. Does HCRE contend that any of the
7 professionals made any mistakes or errors in
8 connection with the advice that it provided to
9 you and Mr. Dondero?
10     A. That's -- that's a little bit
11 complicated.
12     Q. Have -- has HCRE put any of the
13 professionals on notice that HCRE contends that
14 they made a material mistake in connection with
15 any aspect of the SE Multifamily set of
16 transactions?
17     A. No.
18     Q. Does HCRE have any intention to put
19 any of the professionals on notice that they made
20 a mistake or an error of some kind in connection
21 with the advice that they provided to HCRE in
22 connection with the SE Multifamily transactions?
23     A. No.
24     Q. Are you generally familiar with
25 HCRE's Proof of Claim that was filed in the

Page 41

MATT McGRANER - 10/11/2022

2 Highland bankruptcy?
3     A. Yes.
4     Q. Have you seen it before?
5     A. Yes.
6         (Exhibit 20 was marked.)
7     Q. All right. Let's put it up on the
8 screen. It's previously been marked as
9 Exhibit 20. And let's just scroll down briefly,
10 you'll see that -- stop there -- that this was
11 the Proof of Claim. Go up to Number 1 on this
12 page. It's filed by HCRE Partner, LLC.
13         Do you see that?
14     A. Yes.
15     Q. That probably should have said
16 HCRE Partners, LLC; right?
17     A. Yes.
18     Q. Okay. If we can scroll down to the
19 next page, you'll see that --
20         MR. MORRIS: Keep going. Keep
21 going.
22     Q. -- that Mr. Dondero's electronic
23 signature has been placed on this.
24         Do you see that?
25     A. Yes.

Page 42

MATT McGRANER - 10/11/2022

1      MATT McGRANER - 10/11/2022

2     Q. And then if we continue to Exhibit A,

3 you'll see the basis of the claim.

4      Do you see that?

5     A. Yes.

6     Q. Do you recall when you first -- when

7 you saw this document for the first time?

8     A. No, I don't re-- I don't recall

9 when I saw it for the first time.

10     Q. Do you recall -- I'll represent to

11 you that this was filed in the Highland

12 bankruptcy in -- on April 8, 2020.

13      Do you recall if you saw this

14 document before it was filed or after it was

15 filed?

16     A. I don't recall.

17     Q. Do you recall the circumstances under

18 which you first saw this document? Do you recall

19 who showed it to you? where you were? how you

20 learned about it? Anything?

21     A. Yeah. Ms. -- Mr. Sauter, he works

22 here, showed it to me.

23     Q. Did he show you a hard copy of it?

24     A. I believe so.

25     Q. Without telling me of your

Page 43

1      MATT McGRANER - 10/11/2022

2 conversations with Mr. Sauter, can you recall if

3 there was an event occurring at a particular

4 moment in time that would have caused you to

5 speak with him about this document?

6     A. I believe there was a deadline

7 approaching, and we wanted to protect our

8 interest in the bankruptcy.

9     Q. Did you ever discuss this document

10 with Mr. Dondero?

11     A. No.

12     Q. Did you personally ever discuss this

13 document with any attorney at the law firm

14 Bonds Ellis?

15     A. No, I didn't.

16     Q. Did you ever discuss this document

17 with anybody in the world other than Mr. Sauter

18 and your lawyer?

19     A. No.

20     Q. Is there any -- anything in writing

21 that would reflect your communications with

22 Mr. Sauter about this document?

23     A. Not that I'm aware of.

24     Q. Do you know who authorized the filing

25 of this document?

Page 44

1      MATT McGRANER - 10/11/2022

2     A. I -- I don't.

3     Q. Did you approve of the filing of this

4 document?

5     A. No.

6     Q. Do you know who approved the filing

7 of this document?

8     A. I don't.

9     Q. And you don't recall if your

10 conversation with Mr. Sauter happened before or

11 after the document was filed; is that fair?

12     A. We had ongoing conversations about

13 this issue from the moment the bankruptcy was

14 filed. So...

15     Q. What issue are you referring to?

16 What issue are you referring to?

17     A. The fact that we wanted to protect

18 our interests in the bankruptcy.

19     Q. And how do you understand this

20 document protects your interests?

21     A. That's what we were advised by

22 counsel to -- to do.

23     Q. Okay. I'm just asking you for your

24 understanding as to how this document

25 accomplishes that objective?

Page 45

1      MATT McGRANER - 10/11/2022

2     A. I think it provides standing for

3 asserted claims.

4     Q. Anything else?

5     A. No.

6     Q. Do you recall if you had an

7 opportunity to comment on this document before it

8 was filed?

9     A. No.

10     Q. You don't recall? Or you weren't

11 given that opportunity?

12     A. I -- I -- I did -- I did not get the

13 opportunity.

14     Q. So then is it fair to say that you

15 didn't provide any comments on this document

16 before it was filed?

17     A. That's fair.

18     Q. Okay. If we can scroll down to

19 Exhibit A, have you seen this piece of the Proof

20 of Claim before?

21     A. I have.

22     Q. Are you personally aware of any

23 diligence that was done by HCRE to make sure that

24 the statement set forth on Exhibit A was truthful

25 and accurate before it was filed?

Page 46

1      MATT McGRANER - 10/11/2022
2      A. Yeah, I mean, I'm -- I've lived
3  transaction, I know what the intent of the
4  transaction was. So...
5      Q. All right. I'm not asking you about
6  the intent of the transaction. I'm talking about
7  what work was done by HCRE, if you know, to make
8  sure that the statements in Exhibit A were
9  truthful and accurate?
10     A. Yeah, I think we -- we advise -- or
11 we had conversations with counsel. I think that
12 was it.
13     Q. And who's we?
14     A. Mr. Sauter and I.
15     Q. Which counsel are you referring to?
16     A. Bonds Ellis.
17     Q. All right. I thought you testified
18 earlier that you didn't speak with Bonds Ellis
19 about this Proof of Claim. Am I wrong or are you
20 just --
21     A. No, you're not -- you're not wrong.
22 Yeah, you're not wrong, I didn't speak with them.
23 But DC would -- Mr. Sauter would speak with Bonds
24 Ellis and then relay it -- the conversations to
25 me.

Page 47

1      MATT McGRANER - 10/11/2022
2      Q. Okay. So just to make this cleaner
3  here, you never personally communicated with
4  Bonds Ellis about this Proof of Claim; correct?
5      A. Correct.
6      Q. To the best of your knowledge, the
7  only person who communicated with Bonds Ellis
8  about this Proof of Claim was Mr. Sauter;
9  correct?
10     A. Correct.
11     Q. You never gave any information to
12 Bonds Ellis to support this Proof of Claim;
13 correct?
14     A. I gave information to Mr. Sauter.
15     Q. Okay.
16     A. What -- what he did with it, I don't
17 know.
18     Q. Okay.
19     MR. MORRIS: So, again, I move to
20 strike. I'm just preserving the record and
21 I would just ask you to carefully listen to
22 my question.
23     Q. You never gave any information to
24 Bonds Ellis in connection with this Proof of
25 Claim; correct?

Page 48

1      MATT McGRANER - 10/11/2022
2      A. Correct.
3      Q. Do you know if Mr. Sauter ever gave
4  any documents -- just a yes-or-no answer: Do you
5  know whether Mr. Sauter ever gave any documents
6  to Bonds Ellis in connection with this Proof of
7  Claim?
8      A. No.
9      Q. Did you ever give Mr. Sauter any
10 documents in connection with this Proof of Claim?
11 Just yes or no.
12     A. No.
13     Q. Do you know if Mr. Sauter reviewed
14 any documents before this Proof of Claim was
15 filed? Withdrawn.
16     Do you know if Mr. Sauter reviewed
17 any documents in connection with this Proof of
18 Claim before it was filed?
19     A. Yeah, he was very aware of the LLC
20 agreement.
21     Q. Okay.
22     MR. MORRIS: I move to strike. I
23 don't want to know what he was aware of.
24     Q. (BY MR. MORRIS) Do you know if he
25 gave any documents to Bonds Ellis in connection

Page 49

1      MATT McGRANER - 10/11/2022
2  with this Proof of Claim?
3      A. I -- I don't know personally.
4      Q. Did you personally ever review any
5  documents in connection with your communications
6  with Mr. Sauter about this Proof of Claim?
7      A. I did.
8      Q. What documents did you review?
9      A. The LLC agreement.
10     Q. Did you review the original LLC
11 agreement, the amended LLC agreement, or both?
12     A. Both.
13     Q. Any others?
14     A. Yeah -- yes, the financials.
15     Q. Financial statements?
16     A. Yes.
17     Q. Anything else?
18     A. No.
19     Q. And when you use the phrase
20 "financial statements," do you mean balance
21 sheets, cash flow statements, or something else?
22     A. The -- the whole gamut. The whole
23 gamut. There's balance sheets, capital stacks,
24 equity LOCs, income statements, all of it.
25     Q. Did any of the documents that you

Page 50

MATT McGRANER - 10/11/2022

2 just described, to the best of your recollection,
3 ever state that Highland owed anything --
4 withdrawn.
5        Did any of the documents that you
6 just described ever set Highland's membership
7 interests in SE Multifamily at a percentage other
8 than 46.06 percent?
9    A. Yes. Yes.
10    Q. Which document do you recall that set
11 forth Highland's ownership interest in
12 SE Multifamily other than at 46.06 percent?
13    A. There were a set of documents sent to
14 DSI, I believe, around the same time as this
15 Proof of Claim was filed that I characterized the
16 ownership percentages in influx.
17    Q. So was this an email communication
18 that you're thinking of?
19    A. Yes. Well, it was actually a note
20 within a financial statement that was provided to
21 -- to DSI, I believe, Pachulski, Greg -- Greg was
22 on there, and Mr. Seery was also copied.
23    Q. And do you recall when this took
24 place?
25    A. Like I said, March -- I think March

Page 51

MATT McGRANER - 10/11/2022

2 or April. I want to say March of 2020.
3    Q. Do you recall -- DSI was the debtor's
4 financial advisors; correct?
5    A. That's right.
6    Q. Do you recall that DSI had made
7 requests for information concerning
8 SE Multifamily?
9    A. Yeah.
10    Q. And -- and do you know whether or not
11 those requests were fulfilled?
12    A. Yes.
13    Q. You believe they were?
14    A. I believe they were.
15    Q. Okay. Did you personally instruct
16 anybody to fulfill those requests?
17    A. No. Fred Caruso at the time came
18 over to our side of the office and elicit the --
19 elicited the information from one of my
20 teammates. And so my teammate sent all this
21 information -- everything we had to Fred in that
22 communication.
23    Q. And the communication that you're
24 describing -- I guess I just want to make sure I
25 have this right -- were -- were there two

Page 52

MATT McGRANER - 10/11/2022

2 documents that reflected an ownership interest
3 other than 46.06 percent, one of which would have
4 been in email that you sent that characterized
5 the percentage as being influx, and the other
6 document was a note in a financial statement. Do
7 I have that right?
8    A. Among other documents, yeah.
9    Q. What other documents can you recall
10 that had an ownership percentage interest other
11 than 46.06 percent for Highland?
12    A. I meant there was other documents
13 along with the communication note, the -- the
14 Excel spreadsheet that I mentioned about the
15 ownership percentage being influx, that's the --
16 that's what I'm talking about.
17    Q. And what does it mean when you --
18 when you told them that was influx, what does
19 that mean?
20    A. There were 28 assets. We had a
21 general business plan on how we would chop up the
22 portfolio, where assets would ultimately land,
23 what assets would be sold, that was thrown into a
24 tailspin when we got re-traded by KeyBank and
25 never got settled.

Page 53

MATT McGRANER - 10/11/2022

2    Q. Who got re-traded by KeyBank?
3    A. The Tuesday we were -- the Monday
4 before we were supposed to close the transaction
5 with Starwood Capital Group, one of the largest
6 in the -- asset managers in the country, KeyBank
7 called me and told me they couldn't close. And
8 so we had $40 million of hard earnest money up at
9 the time, and like I said, threw us into a
10 tailspin.
11    Q. But who was re-traded?
12    A. The -- the partner, the
13 SE Multifamily.
14    Q. Was SE Multifamily a signatory to the
15 KeyBank loan agreement?
16    A. I -- I don't think so. Or it -- I
17 don't know. I'll have to -- I'll have to look.
18 I know a lot of the members were, or at least the
19 people that pledged assets.
20    Q. And -- and did you on behalf of HCRE
21 -- withdrawn.
22        Did HCRE ultimately agree to whatever
23 re-trade you're referring to?
24    A. Yeah. We didn't have a choice.
25    Q. So that re-trade is reflected in the

Page 54

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  signed and executed KeyBank loan documentation
3  that you reviewed in connection with today's
4  deposition; correct?
5    A. Not entirely. But yes, partially.
6    Q. What part wasn't reflected in the
7  documentation?
8    A. The fact that we had 60 days to pay
9  down the $150 million of the note.
10    Q. When did you first learn that you had
11  60 days to pay that money down?
12    A. When we finally got them to close on
13  Thursday.
14    Q. Did you learn it before the closing
15  or after the closing?
16    A. Before.
17    Q. So --
18    A. They wouldn't close unless we agreed
19  to it.
20    Q. Okay. So is it fair to say that HCRE
21  knew of all of the components of the re-trade
22  prior to the time it made the decision to enter
23  into the loan agreement with KeyBank?
24    A. Every party knew. Every party that
25  was a part of SE Multifamily knew.

Page 55

1    MATT McGRANER - 10/11/2022
2    Q. So every party -- every party that
3  was a part of SE Multifamily knew on or before
4  September 26, 2018, of the entire scope of the
5  re-trade; correct?
6    A. Correct.
7    Q. And every party to multi --
8  SE Multifamily knew on or behalf September 26,
9  2018, they not only knew of the re-trade, they
10  agreed to it, as much as they didn't like it;
11  correct?
12    A. That's correct.
13    Q. Okay. There was no amendment to the
14  KeyBank loan documentation after September 26,
15  2018; correct?
16    A. There was, just not with us.
17    Q. Okay. Who was it with?
18    A. Walker & Dunlop.
19    Q. And is it fair to say that HCRE had
20  full knowledge of the re-trade and all of its
21  ramifications at the time that it entered into
22  the amended LLC agreement in March of 2019?
23    A. Sure.
24    Q. You mentioned that there was a note
25  in a financial statement that also deviated from

Page 56

1    MATT McGRANER - 10/11/2022
2  the 46.06 percent ownership interest for Highland
3  in SE Multifamily. Do I have that right?
4    A. There was a note about generally the
5  -- the ownership percentages, yes.
6    Q. And do you recall when that note was
7  created?
8    A. I think probably February.
9    Q. Was -- we'll look at a document,
10  maybe it will refresh your -- your recollection.
11  I'll just try it now probably.
12    Do you recall that in September 2020,
13  that HCRE told Barker Viggato, the accounting
14  firm, to include the note in its tax returns?
15    A. Yes.
16    Q. Does that re -- refresh your
17  recollection that the note was created in
18  September of 2020?
19    A. It was a different note.
20    Q. Okay. Do you recall what the note
21  said?
22    A. Which one? The September one or the
23  March one?
24    Q. I apologize. Fair question. The
25  original one that you recall being prepared

Page 57

1    MATT McGRANER - 10/11/2022
2  earlier in 2020, do you remember what it --
3    A. Yeah, we -- sure. It was an ongoing
4  discussion with BH about their ultimate
5  ownership.
6    Q. And can you describe generally what
7  that ongoing discussion was?
8    A. Yeah. Given the -- the re-trade,
9  given the -- the paydown, given the sales, I
10  think BH wanted to know and understand what their
11  ultimate ownership would be, and we weren't
12  prepared to -- to tell them.
13    Q. You weren't prepared to tell them?
14    A. Yeah, we weren't prepared to
15  negotiate ownership percentages.
16    Q. When did HCRE convey that to
17  BH Equities?
18    A. Consistently from the moment we
19  closed.
20    Q. So consistently from the end of
21  September 2018?
22    A. That's right.
23    Q. And was BH Equities' ownership
24  interest fixed at 6 percent in the Amended and
25  Restated LLC Agreement in March of 2019?

Page 58

1        MATT McGRANER - 10/11/2022
2        A. Yes.
3        Q. And that ownership interest was also
4    fixed with full knowledge of the KeyBank
5    re-trade; correct?
6        A. That's right.
7        Q. And that ownership interest never
8    changed; is that correct?
9        A. As far as I know.
10        Q. To the best of your knowledge, HCRE
11    never agreed to change BH Equities' 6 percent
12    ownership interest in SE Multifamily; correct?
13        A. Correct.
14        Q. I apologize if -- if I missed it, but
15    did you tell me what you recall about the note in
16    the financial statement that you believe was
17    created in early 2020?
18        A. Yeah, just that we -- we didn't have
19    final percentages set and that they were seeking
20    a larger percentage.
21        Q. Did any --
22        A. They being BH.
23        Q. I apologize. Did the note concern
24    any of the members of SE Multifamily other than
25    BH Equities?

Page 59

1        MATT McGRANER - 10/11/2022
2        A. Yeah, I mean, to the extent that they
3    got a larger percentage, everyone would have been
4    diluted.
5        Q. Is there any other way that the note
6    that you're describing would have impacted or
7    concerned any member other than BH Equities?
8        A. At the time, we were entering COVID,
9    we didn't know what was going to happen with the
10    remaining assets in -- in the portfolio.
11        Q. Is it your understanding that HCRE as
12    the manager could adjust the ownership
13    percentages of each of SE Multifamily's members
14    without anybody else's consent?
15        A. No.
16        Q. Is it your understanding that a
17    change in the ownership percentages would have
18    required the consent of all of the members of
19    SE Multifamily?
20        A. It's typical.
21        Q. And not only typical, but that's what
22    you understood to be the case; correct?
23        A. Correct.
24        Q. And that's what you understand to be
25    the case today; correct?

Page 60

1        MATT McGRANER - 10/11/2022
2        A. Correct.
3        Q. And you've never had a conversation
4    with anybody in the world where you told somebody
5    you thought HCRE could unilaterally change the
6    ownership interests of the members in
7    SE Multifamily; correct?
8        A. No.
9        Q. And it's not HCRE's position today
10    that it has the unilateral right to change the
11    ownership percentages of the members of
12    SE Multifamily; correct?
13        A. Yeah, that's right.
14        Q. Okay. So let's just look at this
15    Exhibit A for a minute. The second sentence
16    says, "Claimant may be entitled to distributions
17    out of SE Multifamily, but such distributions
18    have not been made because of the actions or
19    inactions of the Debtor."
20        Do you see that?
21        A. I do.
22        Q. Do you know any facts that support
23    that assertion? Are you aware of any facts that
24    support that assertion?
25        A. Yeah, I don't think we could do

Page 61

1        MATT McGRANER - 10/11/2022
2    anything while the -- while the bankruptcy and
3    the stay is in place is my understanding.
4        Q. What did Highland do or what did
5    Highland fail to do that would have caused
6    SE Multifamily to make distributions to HCRE?
7        A. Filed bankruptcy.
8        Q. And -- and it's HCRE's contention
9    that because Highland filed for bankruptcy, that
10    HCRE as the manager of SE Multifamily was
11    prevented from making distributions to
12    SE Multifamily's members. Do I have that right?
13        A. Yeah.
14        Q. Can you identify the lawyer who
15    provided that advice?
16        A. No.
17        Q. Did HCRE ever consider -- ever
18    consider asking the Bankruptcy Court for
19    authority to make the distributions?
20        A. I don't believe there was any
21    distributions to be made at the time. So...
22        Q. I'm just trying to understand what
23    this sentence means. If there's no distributions
24    to be made, why is this sent -- why -- do you
25    know why this sentence is included in HCRE's

Page 62

1    MATT McGRANER - 10/11/2022
2 Proof of Claim?
3    A. I don't know. I didn't draft it.
4    Q. Okay. Other than the fact that
5 Highland filed for bankruptcy, do you have any
6 basis to understand the assertion that's set
7 forth in this sentence that we're looking at? Do
8 you know why it's there?
9    A. No, but I think that's a -- that's a
10 pretty big reason.
11    Q. Right. But despite the reason, to
12 the best of your knowledge, HCRE never did
13 anything to address that reason; correct?
14    A. Yeah. That's right.
15    Q. And you never -- you never instructed
16 anybody to try to address the problem that's
17 identified in that sentence; correct?
18    A. Well, I think we are trying to add-
19 -- I think we tried to address the -- the problem
20 by filing the Proof of Claim. That is preserving
21 the right to -- to make a distribution.
22    Q. Well, you know, as a matter of fact,
23 that SE Multifamily has made distributions since
24 Highland filed for bankruptcy; correct?
25    A. I think it's paid down debt.

Page 63

1    MATT McGRANER - 10/11/2022
2    Q. And you specific- -- and you are the
3 person who authorized the payment to the members
4 in order to pay down the debt; correct?
5    A. That's correct.
6    Q. So what is the basis for HCRE's
7 contention that SE Multifamily could make
8 distributions to pay down debt but could not make
9 any other distributions?
10    A. I don't think we believe that the
11 distribution percentages were accurate.
12    Q. When did you learn that?
13    A. From the time of we entered into the
14 agreement.
15    Q. So you knew the moment that you
16 entered into the agreement that the percentages
17 were inaccurate? And I'm asking you now in your
18 capacity as HCRE's corporate representative.
19    A. Yeah, I think ultimately the intent
20 was that the percentages would change based upon
21 how the transaction unfolded, and the KeyBank
22 re-trade threw that in -- into a tailspin.
23    Q. The -- the KeyBank re-trade occurred
24 five or six months before you signed -- before
25 HCRE entered into the Amended and Restated LLC

Page 64

1    MATT McGRANER - 10/11/2022
2 Agreement; correct?
3    A. Correct.
4    Q. So you had full knowledge of that at
5 the time HCRE voluntarily entered into the
6 amended and restated agreement; correct?
7    A. Correct.
8    Q. So did HCRE enter into an agreement
9 that it knew was wrong?
10    A. No.
11    Q. Did HCRE believe the agreement was
12 true and accurate at the time it signed the
13 agreement?
14    A. Yes.
15    Q. So it knew it -- it knew all about
16 the KeyBank re-trade when it signed the
17 agreement; correct?
18    A. Correct.
19    Q. And HCRE signed the agreement
20 believing that it was true and accurate and
21 reflected the parties' intent when it signed it
22 in March of 2019; correct?
23    A. Except that we made a mistake that we
24 couldn't amend it later.
25    Q. What mistake are you referring to?

Page 65

1    MATT McGRANER - 10/11/2022
2    A. That the agreement should -- should
3 have provided that we could amend it to -- to
4 make amendments as -- as the transaction
5 unfolded, as assets were sold.
6    Q. Who made that mistake?
7    A. I think everyone.
8    Q. When did you realize that you made
9 that mistake?
10    A. Two weeks before the bankruptcy was
11 filed.
12    Q. And in the two weeks before the
13 bankruptcy was filed, did HCRE make any effort to
14 amend the agreement?
15    A. No. It should have.
16    Q. So there's only three members to the
17 SE Multifamily entity; correct?
18    A. Correct.
19    Q. And that would be Highland; correct?
20    A. Yes.
21    Q. And HCRE; correct?
22    A. Correct.
23    Q. And BH Equities; correct?
24    A. Correct.
25    Q. And prior to the petition date,

Page 66

1      MATT McGRANER - 10/11/2022
2  Mr. Dondero controlled both Highland and HCRE;
3  correct?
4      A.  Correct.
5      Q.  Did anybody acting on behalf of
6  Highland or HCRE ask BH Equities at any time
7  prior to the petition date whether they would be
8  willing to amend the ownership percentages set
9  forth in the amended and restated agreement?
10      A.  I think they were asking for
11  amendment the entire time since the closing back
12  in September of 2018.
13      MR. MORRIS:  I move to strike.
14      Q.  (BY MR. MORRIS) From the time that
15  you learned that this provision was amended --
16  withdrawn.
17      I believe you testified that you
18  realized approximately two weeks before the
19  petition date that the agreement didn't have a
20  provision that permitted it to be amended.  Do I
21  have that right?
22      A.  No.  At the time that we got Highland
23  off the loan -- the KeyBank loan, we should have
24  amended the -- the LLC agreement.
25      Q.  But -- but nobody acting on behalf of

Page 67

1      MATT McGRANER - 10/11/2022
2  HCRE did that; correct?
3      A.  Unfortunately not.
4      Q.  And nobody on behalf of HCRE made any
5  attempt to do that; correct?
6      A.  I think we -- and I'm speaking as a
7  corporate representative -- were hopeful that the
8  issues creating the bankruptcy's ultimate filing
9  would resolve themselves, and that never
10  happened.
11      MR. MORRIS:  I move to strike.
12      Q.  (BY MR. MORRIS) Did anybody acting on
13  behalf of HCRE take any steps prior to the
14  petition date to amend the agreement in order to
15  adjust the membership interest allocation?
16      A.  Can you repeat the first part?  Did
17  any who --
18      Q.  Sure.  Did anybody acting on behalf
19  of HCRE make any effort or take any step prior to
20  the petition date to amend the Amended and
21  Restated LLC Agreement to adjust the ownership
22  allocation?
23      A.  I -- I asked our internal legal team
24  to review and conduct all reverse due diligence
25  that was necessary amongst all of our real estate

Page 68

1      MATT McGRANER - 10/11/2022
2  agreements for provisions such as cross defaults,
3  what have you, prior to filing, and that didn't
4  happen.
5      MR. MORRIS:  Okay.  I'm going to
6  move to strike and ask you to just -- and
7  we'll take a break in a minute, sir -- just
8  listen carefully.
9      Q.  (BY MR. MORRIS) Did anybody acting on
10  behalf of HCRE make any effort or take any step
11  prior to the petition date to adjust the -- the
12  ownership allocation of SE Multifamily?
13      A.  Yes.
14      Q.  Okay.  What steps were taken to do
15  that?
16      A.  I specifically requested that our
17  internal legal team review all of our real estate
18  agreements, including this one, to determine what
19  consequences there would be as a result of a
20  bankruptcy filing, if it was -- could be
21  massively contagious and I was concerned about
22  it.
23      Q.  Did HCRE come to any view as to what
24  Highland's ownership interest should be prior to
25  the petition date?

Page 69

1      MATT McGRANER - 10/11/2022
2      A.  Because it received $1.14 million
3  60 days following the closing of the transaction,
4  I thought it should have been less.  I don't know
5  what percentage less, but it should have been
6  less.
7      Q.  Did you instruct anybody to draft an
8  amendment to the Amended and Restated LLC
9  Agreement to reflect the new -- newly formulated
10  allocation of ownership interests?
11      A.  No.  There wasn't any reason to --
12      Q.  All right.
13      A.  -- prior to the petition date.
14      Q.  Right.  Did -- did anybody acting on
15  behalf of HCRE ever inform BH Equities that they
16  believed there was a mistake and therefore wanted
17  to amend the agreement to reflect a different
18  allocation of membership interests?
19      A.  No.  I don't know why they would
20  care.
21      Q.  But you would need their consent to
22  make a change to the allocation; correct?
23      A.  They weren't -- I don't think they
24  were a part of the first LLC agreement; right?
25      Q.  No.  But that was amended and

1    MATT McGRANER - 10/11/2022
2 restated --
3    A. They were --
4    Q. -- about the second one; correct?
5    A. Yes.
6    Q. So you would have needed HCRE -- you
7 understood that in order to amend the Amended and
8 Restated LLC Agreement, you would have had to
9 obtained BH Equities' consent; correct?
10    A. Unless it was from September 2018 to
11 March of 2019.
12    Q. Sir, the amended and restated
13 agreement was effective retroactively to
14 August 23, 20 -- 2018. Are you aware of that?
15    A. I am. But why do I need BH's consent
16 if we would have made an amendment to the
17 allocation percentages in December of 2018?
18    Q. Well, first of all, you didn't do
19 that; correct?
20    A. Well -- well, no. But your -- your
21 question was hypothetical, too, I thought. So...
22    Q. It's -- it's actually not. I'm
23 asking for a specific fact.
24        At any time between March 2019 and
25 the petition date, did anybody acting on behalf

1    MATT McGRANER - 10/11/2022
2 of HCRE ever tell BH Equities that you wanted to
3 adjust the membership interests set forth in the
4 agreement?
5    A. Highland's percentage? Or just the
6 percentages in general?
7    Q. Any percentage.
8    A. Yeah, it was -- it was an ongoing
9 conversation about their percentage, their
10 promote, if they got a promote, what the
11 waterfall would look like, it was a -- it was a
12 conversation that brought up on -- almost on a
13 monthly basis.
14    Q. Correct. Other than the consequences
15 that would have resulted from an adjustment to
16 BH Equities' interests, did anybody acting on
17 behalf of HCRE ever tell BH Equities that it
18 wanted to adjust the percentages for Highland and
19 HCRE?
20    A. No.
21    MR. MORRIS: All right. Let's take
22 a break now then. It's 10:51 your time.
23 Let's just come back at 11:00 if we may.
24    THE WITNESS: Sure.
25    MR. MORRIS: Thank you,

1    MATT McGRANER - 10/11/2022
2 Mr. McGraner.
3    THE VIDEOGRAPHER: Okay. The time
4 is 10:53 a.m. and we are going off the
5 record.
6    (Break from 10:52 a.m. to 11:01 a.m.)
7    THE VIDEOGRAPHER: The time is
8 11:03 a.m. and we are back on the record.
9    MR. MORRIS: Bill, Mr. McGraner,
10 are we ready?
11    MR. GAMEROS: Yeah, we've been
12 ready.
13    THE VIDEOGRAPHER: Okay. We were
14 on the record, Mr. Morris.
15    MR. MORRIS: Okay. Let's get
16 started.
17    THE VIDEOGRAPHER: We -- we started
18 a minute ago, sir.
19    MR. MORRIS: Couldn't really start
20 without me.
21    THE VIDEOGRAPHER: No, I'm sorry.
22 You said to go. I'm sorry. We're on the
23 record.
24    MR. MORRIS: Okay.
25    Q. (BY MR. MORRIS) Mr. McGraner, let's

1    MATT McGRANER - 10/11/2022
2 step back a little bit and just, you know, get
3 some context to some of the issues that we were
4 talking about.
5        You're familiar with the term
6 "Project Unicorn"; is that right?
7    A. Yes.
8    Q. And do you have an understanding of
9 what that term means?
10    A. I do.
11    Q. What's your understanding of the term
12 "Project Unicorn"?
13    A. A term of art that was authored by
14 CBRE, the -- the brokerage firm.
15    Q. And what -- what does it refer to, if
16 you know?
17    A. I can tell you what I think they
18 think it refers to.
19    Q. Sure.
20    A. It was a portfolio of '80s and '90s
21 vintage multi-family assets, all garden style in
22 attractive Sunbelt markets that exhibited
23 value-added potential, renovation, rehab
24 potential and did so on scale. So there was
25 assets and clusters in markets that were -- were

Page 74

MATT McGRANER - 10/11/2022

1    geographically attractive.
2    Q. And do you know how this was brought
3    to the attention of HCRE?
4    A. I do.
5    Q. And how was it brought to HCRE's
6    attention?
7    A. We -- we being NexPoint Real Estate
8    received inbound portfolio solicitations from all
9    the major brokerage firms. This one in
10   particular was -- was one that we sourced out of
11   the local office here in Dallas.
12   Q. And did you --
13   A. The local CBRE office.
14   Q. Okay. And did you play any
15   particular role in the execution of Project
16   Unicorn?
17   A. I did.
18   Q. And can you describe for me just
19   generally what your role was?
20   A. You could say I was the quarterback
21   of the business plan and created the business
22   plan.
23   Q. Okay. And was the creation of
24   SE Multifamily one of the elements of executing
25

Page 75

MATT McGRANER - 10/11/2022

1    Project Unicorn?
2    A. It was.
3    Q. Okay. And do you recall that in
4    August of 2018, a -- a -- an original LLC
5    agreement was created for SE Multifamily?
6    A. Sure.
7    Q. And did you participate in the
8    creation of that document?
9    A. The creation, no.
10   Q. Did you review it before it was
11   signed?
12   A. Generally, yes.
13   Q. Do you have any reason to believe
14   that the document didn't reflect the intent of
15   the parties to that agreement?
16   A. No.
17   Q. Highland was a party to that
18   agreement; correct?
19   A. Yes.
20   Q. Do you have an understanding as to
21   why Highland became a signatory to the original
22   LLC agreement for SE Multifamily?
23   A. Sorry. Can you say that again?
24   Q. Sure. Do -- do you know why Highland
25

Page 76

MATT McGRANER - 10/11/2022

1    was a party to the original SE Multifamily LLC
2    agreement?
3    A. Yes, I do.
4    Q. And why was Highland a party to that
5    particular agreement?
6    A. It originally was going to pledge
7    assets as part of the -- the collateral package,
8    but later it -- it didn't because it didn't have
9    any assets to pledge that were unencumbered.
10   Q. And -- and when did that become clear
11   -- when did you learn that Highland didn't have
12   any unencumbered assets?
13   A. It was late -- late in the process.
14   Probably right before closing.
15   Q. So -- so Jim Dondero didn't know
16   prior to the time he signed the original LLC
17   agreement that Highland didn't have any
18   unencumbered assets, is that your testimony?
19   A. I don't think it's a -- a matter of
20   know -- of knowledge. It's a matter of --
21   Q. If you -- I'm sorry.
22   A. Yeah. It's a matter of what capital
23   is available at the time we had to close, and it
24   didn't -- at that time, it didn't have any
25

Page 77

MATT McGRANER - 10/11/2022

1    capital.
2    Q. Did it have capital at the time the
3    original LLC agreement was signed six weeks
4    earlier?
5    A. That -- that's what I'm referring to,
6    that time, time of closing.
7    Q. Is it your understanding that HCRE
8    knew prior to the time it signed the original LLC
9    agreement that Highland didn't have any
10   unencumbered assets?
11   A. Yeah, that's what I was told by
12   Dave Klos.
13   Q. And notwithstanding the knowledge
14   that Highland had no unencumbered assets, the
15   decision was still made to include Highland in
16   the SE Multifamily LLC agreement; correct?
17   A. That's correct.
18   Q. Nobody said, Well, since Highland has
19   no unencumbered assets, there's no reason for
20   them to participate in this transaction; correct?
21   A. I -- I think it's a little bit more
22   complicated than that.
23   Q. Did anybody --
24   A. Because it's --
25

Page 78

MATT McGRANER - 10/11/2022

1
2    Q. Did anybody suggest -- let me just
3 finish.
4         Do you have any recollection of
5 anybody suggesting that Highland should not be a
6 member of SE Multifamily given the fact that it
7 didn't have unencumbered assets?
8    A. No.
9    Q. Can you tell me why Highland was
10 included in the SE Multifamily original LLC
11 agreement?
12    A. Because we thought it was going to
13 pledge assets.
14    Q. But you knew it wasn't going to do
15 that before the agreement was signed; correct?
16    A. Yes. But, again, we got re-traded by
17 KeyBank and wanted the -- the -- as much
18 flexibility as possible to come up with
19 $150 million from any source possible.
20    Q. Okay. I want to just keep your
21 attention focused on the period of time prior to
22 August 23, 2018, when the SE Multifamily
23 agreement was signed. Okay?
24    A. Okay.
25    Q. At that time, you and Mr. Dondero

Page 79

MATT McGRANER - 10/11/2022

1
2 were aware that Highland did not have any
3 meaningful unencumbered assets. Do I have that
4 right?
5    A. That's right.
6    Q. And nevertheless, despite having that
7 knowledge, you and Mr. Dondero decided that
8 Highland would nevertheless be a member of
9 SE Multifamily; correct?
10    A. Yes, we needed the ultimate
11 flexibility under the circumstances.
12    Q. Was there any other reason than a
13 desire for ultimate flexibility that Highland was
14 made a member of SE Multifamily that you can
15 recall?
16    A. Yeah, purportedly to provided tax
17 benefits also.
18    Q. And why are you using the word
19 "purportedly"?
20    A. Because I'm not sure it did.
21    Q. Was that the intent?
22    A. I think it was -- it was a -- a
23 factor.
24    Q. But was that -- was the intent --
25 when the LLC agreement was signed, was the intent

Page 80

MATT McGRANER - 10/11/2022

1
2 that Highland would provide tax benefits?
3    A. Among other things like providing, to
4 the extent it could, sell assets to provide
5 capital to pay down $150 million in 60 days.
6    Q. But you didn't know that the -- did
7 the re-trade occur before or after the original
8 LLC agreement was signed for SE Multifamily? And
9 just to give you a point of reference on the
10 calendar, that agreement was signed on
11 August 23rd, and the KeyBank loan closed on
12 September 26th.
13         So with that time frame in mind, did
14 the re-trade occur before or after the LLC
15 agreement was signed, if you can recall?
16    A. It was signed -- or the re-trade
17 occurred after, but it didn't mean that we didn't
18 want the flexibility.
19    Q. Okay. So let's go back to the tax
20 benefits. What tax benefits were expected from
21 Highland?
22    A. I don't know.
23    Q. Did you ever ask anybody what tax
24 benefits there were?
25    A. I didn't.

Page 81

MATT McGRANER - 10/11/2022

1
2    Q. Did you ever -- anybody ever attempt
3 to quantify what the tax benefits were, to the
4 best of your knowledge?
5    A. No. I wished they would have.
6    Q. What's the -- what's the basis for
7 your belief that one of the reasons that Highland
8 was made a member of SE Multifamily was that
9 there were expected tax benefits?
10    A. That's what I was told.
11    Q. Who told you that?
12    A. Our tax team.
13    Q. Who's on the tax -- who's on the tax
14 team that told you that?
15    A. Mark Patrick, Rick Swadley.
16    Q. Did they tell you what tax benefits
17 would enure?
18    A. No.
19    Q. Did they tell you who the beneficiary
20 was of the tax benefits?
21    A. No.
22    Q. Did you ask?
23    A. I didn't.
24    Q. Did you ever discuss with Mr. Dondero
25 why Highland was being included in

Page 82

1      MATT McGRANER - 10/11/2022
2  SE Multifamily?
3      A. No.
4      Q. Did you ever ask him?
5      A. No.
6      Q. Are you aware of any reason that
7  Highland was included in SE Multifamily other
8  than the purported tax benefits and the, you
9  know, collateral issue that you discussed, any
10 other reasons?
11     A. No.
12     Q. Do you know who made the decision to
13 include Highland as a member of SE Multifamily in
14 August 2018?
15     A. Jim.
16     Q. But you don't recall having any
17 discussions as to why he made that decision;
18 correct?
19     A. I think we were deferential.
20     Q. You don't recall having any
21 discussions with Mr. Dondero about why he made
22 that decision; correct?
23     A. I -- I believe I answered that but
24 I'll -- I'll answer it again.  Because of the
25 flexibility for capital if we needed it under the

Page 83

1      MATT McGRANER - 10/11/2022
2  circumstances and purported tax benefit.
3      MR. MORRIS:  I move to strike.
4      Q. (BY MR. MORRIS)  I just want to know
5  if you had any discussions with Mr. Dondero
6  concerning his decision to include Highland in
7  SE Multifamily, did you talk to him about it?
8      A. Yes.  The same answer.  I mean, I
9  think we had a discussion among -- to include
10 the -- he wanted to include them because of
11 capital flexibility and purported tax benefits.
12     Q. So who -- who was part of the
13 conversation that you just described?
14     A. It was a one-off conversation between
15 he and I.
16     Q. Did it take place in person or on the
17 phone or in some other manner?
18     A. I -- I don't recall.
19     Q. Are there any notes of the
20 communication on this topic about why Highland
21 was included in SE Multifamily?
22     A. Not that I'm aware of.
23     Q. If Highland had no unencumbered
24 assets, how could they provide capital
25 flexibility?

Page 84

1      MATT McGRANER - 10/11/2022
2      A. They could sell assets, like they
3  could sell stock, need cash.  Just because
4  they're encumbered doesn't mean they don't have
5  value over and above the debt.
6      Q. And that value over and above the
7  debt was one of the reasons why Mr. Dondero made
8  the decision to include Highland; correct?
9      A. The potential to sell assets was one
10 of them, to have capital flexibility was a
11 reason, yes.
12     Q. Did HCRE have the ability to close on
13 the KeyBank loan based on its own financial
14 wherewithal?
15     A. No.
16     Q. Did HCRE need Highland to be a
17 co-borrower under the KeyBank loan in order to
18 close the transaction?
19     A. Absolutely not.
20     Q. Did KeyBank require Highland to be
21 added as a guarantor under the KeyBank loan as a
22 condition to closing?
23     A. They're not a guarantor.
24     Q. They're a borrower; correct?
25     A. Yeah.  You said guarantor, though.

Page 85

1      MATT McGRANER - 10/11/2022
2      Q. I apologize.  I appreciate the
3  distinction.  Did KeyBank require --
4      A. It's a big difference.
5      Q. Did KeyBank require Highland to be
6  added as a co-borrower under the KeyBank loan?
7      A. No.  I mean, I think they took
8  everything they could get at the time.
9      Q. And is -- is Highland one of the
10 things that Mr. Dondero offered in order to close
11 the transaction?
12     A. I think it was all -- it was already
13 contemplated.
14     Q. What was already contemplated?
15     A. For the -- their -- their inclusion
16 as a co-borrower be -- because of the
17 aforementioned reasons for capital flexibility.
18     Q. So to the best of your understanding,
19 Mr. Dondero made the decision to include Highland
20 as a co-borrower under the KeyBank loan because
21 he thought that would provide additional capital
22 flexibility; correct?
23     A. And that KeyBank insisted on.
24     Q. KeyBank insisted on Highland being
25 included as a co-borrower; correct?

Page 86

1     MATT McGRANER - 10/11/2022
2     A. Yeah, at -- at the ultimate finish
3 line, yeah.
4     Q. And HCRE and Mr. Dondero agreed to
5 include Highland as a co-borrower; correct?
6     A. Yes.
7     Q. And HCRE and Mr. Dondero agreed to
8 include Highland as a co-borrower in order to
9 respond to KeyBank's demand; correct?
10     A. Demand? Sorry, what -- what was the
11 reason?
12     Q. Demand to include Highland as a
13 borrower.
14     A. It's a -- it's a little bit more
15 complicated than that.
16     Q. It may or may not be, but it's kind
17 of a simple question. To the best of your
18 knowledge and understanding, HCRE and Mr. Dondero
19 agreed to include Highland as a co-borrower in
20 response to KeyBank's demand; correct?
21     A. They -- they demanded a lot from
22 everyone.
23     Q. And one of the things they demanded
24 was that Highland would be a borrower; correct?
25     A. A part -- sure, a portion or a

Page 87

1     MATT McGRANER - 10/11/2022
2 partial -- partial demand, yeah.
3     Q. That was -- let's just clean this up
4 a little bit.
5     One of the demands that -- withdrawn.
6     One of the conditions that KeyBank
7 placed on the closing of the loan was that
8 Highland be added as a co-borrower; correct?
9     A. Yeah, I don't think it was a material
10 condition, but it was a condition there.
11     Q. It was a condition; correct?
12     A. Yes, but not a material one.
13     MR. MORRIS: I move to strike the
14 reference to materiality.
15     Q. (BY MR. MORRIS) KeyBank demanded that
16 Highland be added as a co-borrower; correct?
17     A. No. It was already a co-borrower.
18     Q. When did it become a co-borrower?
19     A. It was -- it was -- it was all --
20 always contemplated to be a co-borrower.
21     Q. And that's because KeyBank insisted
22 on that; correct?
23     A. At first, no.
24     Q. So Mr. Dondero voluntarily included
25 Highland as a co-borrower at first?

Page 88

1     MATT McGRANER - 10/11/2022
2     A. Yes.
3     Q. And did Mr. Dondero try to remove
4 Highland as a co-borrower thereafter?
5     A. Yeah, we -- we did when we thought
6 that there was going to be a petition filing.
7     Q. But KeyBank would not agree; correct?
8     A. No, they agreed to remove Highland as
9 a borrower.
10     Q. You're -- you're -- maybe it's my
11 questioning, sir. But we're talking about
12 September 2018, not October 2019.
13     A. Got it. I apologize.
14     Q. Yeah. So going back to the period
15 leading up to the closing of the KeyBank loan in
16 September 2018, did KeyBank require Highland to
17 be added as a borrower -- as a co-borrower?
18     A. It was already a co-borrower.
19     Q. And that's because Mr. Dondero made
20 the decision to add Highland as a co-borrower;
21 correct?
22     A. That's right, yeah.
23     Q. And Mr. Dondero made that decision
24 because he thought it would provide capital
25 flexibility; correct?

Page 89

1     MATT McGRANER - 10/11/2022
2     A. That's right.
3     Q. And by that -- by adding Highland,
4 did -- was -- was the idea that that would
5 increase the likelihood that the loan would
6 close?
7     A. No.
8     Q. Then why did Mr. Dondero decide to
9 add Highland as a co-borrower to the KeyBank
10 loan?
11     A. For capital flexibility and tax
12 efficiency.
13     Q. Okay. How does including Highland as
14 a co-borrower in the KeyBank loan provide capital
15 flexibility?
16     A. I think -- I think you want symmetry
17 with your LLC agreement, and everyone in the LLC
18 agreement was providing or pledging assets other
19 than Highland, frankly. So that's why it be --
20 that's why it became a co-borrower.
21     Q. Which came first: The decision to
22 add Highland to the LLC agreement or the decision
23 to make Highland a co-borrower under the KeyBank
24 loan?
25     A. You know, I don't -- I don't recall.

Page 90

MATT McGRANER - 10/11/2022

1  I don't know which came first.
2     Q. In the one-off conversation that you
3  had with Mr. Dondero, did he describe for you in
4  any way that you can recall what the tax benefits
5  would be by adding Highland to the SE Multifamily
6  agreement?
7     A. No.
8     Q. Did you ask him?
9     A. No. I don't think he knew, either.
10     Q. So neither you nor Mr. Dondero knew
11  what the tax benefits were, but yet that was one
12  of the reasons that you made the decision to add
13  Highland to the original LLC agreement. Do I
14  have that right?
15     A. You have that right.
16     Q. And to the best of your knowledge,
17  neither you nor Mr. Dondero undertook any
18  diligence or investigation to determine the
19  nature of the tax benefits before the decision
20  was made to sign the original LLC agreement for
21  SE Multifamily; correct?
22     A. Correct.
23     Q. Other than the one-off conversation
24  that you've described with Mr. Dondero, do you --

Page 91

MATT McGRANER - 10/11/2022

1  do you recall having any discussions with anybody
2  else in the world about why Highland was made a
3  member of SE Multifamily?
4     A. No.
5     Q. Other than the one-off conversation
6  that you described with Mr. Dondero, do you
7  recall asking anybody in the world why Highland
8  was being made a party to the SE Multifamily
9  agreement?
10     A. No.
11     Q. Did you have any understanding that
12  Highland's inclusion as a member of
13  SE Multifamily would have a positive impact on
14  HCRE's tax burden?
15     A. Did I -- I have -- sorry -- the first
16  part, did I have a what?
17     Q. Yeah. You've mentioned purported tax
18  benefits; right?
19     A. Right.
20     Q. Okay. Who was going to ben -- be the
21  beneficiary of the tax benefits? Did you know?
22     A. No.
23     Q. Did you know if it was going to be
24  HCRE?

Page 92

MATT McGRANER - 10/11/2022

1     A. No.
2     Q. Did you ask anybody if HCRE was going
3  to benefit from the tax benefits that Highland's
4  inclusion was going to provide?
5     A. No.
6     Q. Did you -- did you -- did you ask
7  anybody if SE Multifamily was going to be the
8  beneficiary of these tax benefits?
9     A. No.
10     Q. Did SE Multifamily rely on Highland's
11  human resources to execute Project Unicorn?
12     A. You mean their personnel?
13     Q. Yeah.
14     A. Other than the tax piece, no.
15     Q. So -- so Highland's tax department is
16  the one who supported this transaction; correct?
17     A. When you say "the one," that there
18  was a -- a large, large effort, teams of people
19  internally and externally, bankers internally,
20  banker -- or lawyers internally, lawyers
21  externally.
22     Q. Were there any --
23     A. -- and there's brokers.
24     Q. Were there any internal lawyers --

Page 93

MATT McGRANER - 10/11/2022

1  any lawyers employed by Highland who participated
2  in Project Unicorn?
3     A. Everyone in the firm, Highland and
4  NexPoint knew about it. Tim Cournoyer, who I
5  believe works for -- for Highland still, was in a
6  lot of these conversations. Mr. Sergent was
7  aware of them also.
8     Q. It's interesting that the only two
9  people you identify are people still employed by
10  Highland. Is that a coincidence?
11     A. No. I -- I also mentioned that it
12  was our team -- our real estate team and the tax
13  team at Highland.
14     Q. What role did Mr. Cournoyer play?
15     A. He was Highland corporate counsel; so
16  I assumed he represented Highland.
17     Q. I don't want your assumptions, sir.
18  Tell me based on your personal knowledge, what do
19  you understand that Mr. Cournoyer did in
20  connection with Project Unicorn?
21     A. I believe he took place in the
22  conversations around the agreements -- the LLC
23  agreements, eventually the loan agreements.
24     Q. He took place in conversations.

Page 94

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  Anything else you got?
3      A. He helped with the allocations of --
4  the compliance allocations on where assets were
5  ultimately held.
6      Q. Does HCRE contend that Mr. Cournoyer
7  made any mistakes in any of the services he
8  provided in connection with Project Unicorn?
9      A. No.
10     Q. Did Mr. Cournoyer play any role in
11  the decision to include Highland as a member in
12  SE Multifamily?
13     A. Not that I'm aware of.
14     Q. Did Mr. Cournoyer play any role in
15  the allocation of membership interests among the
16  members of SE Multifamily?
17     A. No.
18     Q. Did Mr. Cournoyer -- was
19  Mr. Cournoyer given any decision-making authority
20  with respect to any aspect of SE Multifamily?
21     A. Any decision-make -- I don't know.
22     Q. Let me ask a better question.
23        Did you personally delegate any
24  decision-making authority to Mr. Cournoyer with
25  respect to Project Unicorn?

Page 95

1    MATT McGRANER - 10/11/2022
2      A. We were deferential, as we have to
3  be, to any protocols within this transaction.
4  The assets were chopped up amongst various
5  entities and funds' companies. So there was --
6  there was a compliance aspect to it that was --
7  that was in their realm of expertise that we --
8  that we didn't.
9      Q. But you made the decisions based on
10  the advice that you received; correct?
11     A. Sure.
12     Q. You didn't delegate decision-making
13  authority to anybody except BH Equities in terms
14  of property management; correct? That's what we
15  talked about earlier.
16     A. Yeah, that's right. I mean, there's
17  -- there's certain rules we had to follow based
18  upon compliance that, you know, it wasn't really
19  a -- my decision or anyone's decisions. We just
20  had to follow the rules.
21     Q. Do you have any reason to believe
22  that Mr. Cournoyer did anything wrong in
23  connection with anything that he did as part of
24  Project Unicorn?
25     A. No.

Page 96

1    MATT McGRANER - 10/11/2022
2      Q. Do you have any reason to believe
3  that Mr. Sergent did anything wrong in connection
4  with anything he may have done in connection with
5  Project Unicorn?
6      A. No.
7      Q. Mr. Sergent wasn't involved in the
8  decision to include Highland in SE Multifamily;
9  correct?
10     A. Correct.
11     Q. And he didn't have anything to do
12  with how the membership interests at
13  SE Multifamily would be allocated among its
14  members; correct?
15     A. Correct.
16     Q. I think you -- you mentioned earlier
17  that everybody knew about this Project Unicorn.
18  Do I have that right?
19     A. That's right.
20     Q. Okay. I want to distinguish between
21  what you think everybody knew and what you know
22  actually happened.
23        Other than the tax department at
24  HCMLP, were there any other groups or departments
25  at HCMLP that supported Project Unicorn? We've

Page 97

1    MATT McGRANER - 10/11/2022
2  got the tax group. Any other group?
3      A. The accounting group because Jim
4  pledged $400 million of assets on his -- on his
5  personal balance sheet. So the accounting team,
6  the finance team, Frank Waterhouse, David Klos,
7  those guys would have been intimately familiar
8  with it. His personal accountant, Melissa
9  Schroth, I think those were all Highland
10  employees.
11     Q. Okay. And does HCRE contend that any
12  Highland employee made a mistake or did anything
13  wrong in connection with any of their duties on
14  Project Unicorn?
15     A. I mean, other than, again,
16  collectively not amending the document filing
17  prior to the petition filing, no.
18     Q. And was anybody ever instructed to do
19  what you just described?
20     A. Yeah, I -- I think I've testified
21  earlier that I asked our internal legal team to
22  review -- to conduct a reverse due diligence on
23  our real estate agreements.
24     Q. And that was for all real estate
25  agreements. Do I have that right?

Page 98

MATT McGRANER - 10/11/2022

1
2      A.  Yeah, that's right.
3      Q.  But you can't think of anything else;
4  correct?
5      A.  No, correct.
6      Q.  All right.  Let's just look quickly
7  at the original LLC agreement.  It's Exhibit 2.
8  We can put that up on the screen.
9          (Exhibit 2 was marked.)
10     Q.  All right.  Do you see that this is
11  the original LLC agreement dated as of August 23,
12  2018?
13     A.  I do.
14     Q.  And you saw this before today; right?
15     A.  I have.
16     Q.  Yeah.  I'll represent to you that
17  this is the document bearing Mr. Dondero's
18  signatures on behalf of HCRE and Highland.
19         Did you personally see this document
20  before Mr. Dondero signed it?
21     A.  Iterations of it.
22     Q.  Did you ever tell anybody that you
23  thought there was a mistake in connection with
24  any provision of this document before Mr. Dondero
25  signed it?

Page 99

MATT McGRANER - 10/11/2022

1
2      A.  No.
3      Q.  Did anybody ever tell you before the
4  document was signed that they believed there was
5  a mistake in this document?
6      A.  No.
7      Q.  Did you -- did you provide any
8  comments to this document before it was signed?
9      A.  No.  I mean, other than just to
10  review the economic provisions, no.
11     Q.  And did the economic provisions
12  include the allocation of membership interests?
13     A.  Sure.
14     Q.  So you personally reviewed the
15  allocation of membership interests in this
16  document before it was signed; correct?
17     A.  Sure.
18     Q.  And you didn't -- you didn't believe
19  there was any error in that regard; correct?
20     A.  Not as of the date of this agreement,
21  no.
22     Q.  Okay.  In your -- these questions are
23  now specifically in your capacity as a 30(b)(6)
24  witness for HCRE.
25         Do you know whether -- were -- were

Page 100

MATT McGRANER - 10/11/2022

1
2  HCRE and HCMLP engaged in an arm's length
3  negotiation for this document?  Do you know?
4      A.  I -- I would say we were all in the
5  same rowboat.
6      Q.  Okay.  So -- so HCRE and HCMLP didn't
7  receive their own independent counsel, to the
8  best of your knowledge; correct?
9      A.  I think that's fair.
10     Q.  And it's fair to say that the two
11  entities were under the control of Mr. Dondero,
12  and everybody working on behalf of Mr. Dondero
13  was engaged in -- in this project; correct?
14     A.  That -- that's right.  As of the date
15  of this agreement, that's right.
16     Q.  That's right.  And that was true
17  until the petition date; isn't that right?
18     A.  I would say it was true a couple of
19  week -- until a couple of weeks before the
20  petition date when I learned that -- what was
21  going to happen, yeah.
22     Q.  Okay.  Do you know if any outside
23  counsel provided advice in connection with the
24  drafting of this document?
25     A.  Yeah, I think -- I think three law

Page 101

MATT McGRANER - 10/11/2022

1
2  firms that I mentioned earlier were -- were --
3  were part of this and laid eyes on it.  It's
4  Winston & Strawn is our public company, corporate
5  company, Wick Phillips, which generally does the
6  dirt work, quote/unquote, and Hunton & Williams.
7      Q.  And -- and to the best of your
8  knowledge and understanding, those three firms
9  provided the advice jointly to the Highland
10  enterprise, which included HCRE and HCMLP.  Is
11  that fair?
12     A.  I think that's fair.
13     Q.  Okay.  Do you know -- do you have an
14  understanding as to who was responsible for
15  looking out for HCRE's interests in the drafting
16  of this document?  Was it really just the
17  collective "we"?
18     A.  Yeah, I -- I mean, I think it was a
19  -- again, I think it was a collaborative -- as of
20  the date of this agreement, it was a
21  collaborative effort.
22     Q.  So that there wasn't one person or
23  one law firm who was looking out solely for
24  HCRE's interests; correct?
25     A.  Yeah, I think that's right.  I think

Page 102

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  that's right.
3      Q.  And there wasn't one person or one
4  law firm who was looking out solely for
5  Highland's interests; correct?
6      A.  I think I'd agree with that.
7      Q.  And is it -- would you be comfortable
8  in just characterizing the work of Winston,
9  Wick Phillips, and -- who was the law --
10     A.  Hunton & Williams.
11     Q.  -- Hunton & Williams as -- as being
12 kind of a joint representation?
13     A.  That was my perspective.
14     Q.  Let's turn to BH Equities.  You're
15 familiar with that entity; correct?
16     A.  I am.
17     Q.  Do you know how they got involved in
18 Project Unicorn?
19     A.  I do.
20     Q.  How did -- how did BH Equities get
21 involved in Project Unicorn?
22     A.  They -- they have -- BH Equities and
23 BH Management had from 2013 to 2014 been our sole
24 multi-family management partner.  They would
25 invest a sliver of equity in -- in the variety of

Page 103

1    MATT McGRANER - 10/11/2022
2  deals with us, and they'll still manage assets
3  for us today.
4      Q.  And BH Equities became a member of
5  SE Multifamily in March 2019; correct?
6      A.  That's correct.
7      Q.  Did you personally speak with folks
8  at BH Equities in connection with the negotiation
9  or drafting of the Amended and Restated
10 SE Multifamily LLC Agreement?
11     A.  Yes.
12     Q.  Can you recall the substance of your
13 communications with BH Equities on -- on -- just
14 on the topic of the Amended and Restated LLC
15 Agreement?
16     A.  Yeah, I can.
17     Q.  Please do so.
18     A.  My primary contact at the time was
19 Ben Rhode.  Ben was their acquisitions -- senior
20 acquisitions manager and -- and probably our best
21 relationship guy within BH.  Given that the
22 trauma that had occurred with the KeyBank
23 re-trade, having to go find $150 million in
24 60 days, he was -- he and BH were okay with
25 waiting to see how the transaction would

Page 104

1    MATT McGRANER - 10/11/2022
2  ultimately evolve.
3          And, you know, I think while they had
4  6 percent interest, that they probably wanted
5  more.  They did want more.  But, again, it was a
6  -- there was a lot of wood to chop to pay down --
7  pay down that debt.  So we kind of put that piece
8  -- the -- the extension or the increase in their
9  -- in their allocation off until we figured that
10 -- that paydown out.
11     Q.  And -- and you put it off until the
12 moment that you signed the Amended and Restated
13 LLC Agreement; is that fair?
14     A.  No.  The Amended and Restated LLC
15 Agreement just reflected what we believe their
16 capital contribution was as a percentage of the
17 equity.
18     Q.  So discussions continued about their
19 -- the extent of their interests post signing.
20 Do I have that right?
21     A.  That's correct.
22     Q.  But no -- but no agreement was ever
23 reached on an amendment of any kind; right?
24     A.  Post March, that's right, yeah.
25     Q.  Okay.  Other than the topic that you

Page 105

1    MATT McGRANER - 10/11/2022
2  just identified, which is whether BH Equities
3  would get more than the 6 percent, did you
4  personally participate in any discussions with
5  BH Equities regarding any aspect of the Amended
6  and Restated LLC Agreement?
7      A.  No.
8      Q.  Okay.
9      A.  Well, I think we wanted to make --
10 other than making sure that the waterfall to pay
11 off the debt was congruent with both of our
12 understandings.
13     Q.  So you -- you participated in the --
14 in communications regarding the waterfall.  Do I
15 have that right?
16     A.  Yes.
17     Q.  Okay.  We'll get to that in a minute.
18         Were you involved in the negotiation
19 of the terms of the KeyBank loan agreement?
20     A.  Yeah, very much so.
21     Q.  Okay.  Were you aware that Highland
22 was going to be jointly and severally liable for
23 all of the obligations under the KeyBank loan?
24     A.  I was, but there was a little nuance
25 to that piece.

Page 106

MATT McGRANER - 10/11/2022

2 Q. Okay. What was the nuance?

3 A. I think it's Section 5.12 of the loan
4 agreement lays out the collateral package which
5 describe the $400 million of assets that were
6 pledged off of Jim's balance sheet largely. We
7 wanted to make sure that in the event of a
8 default, that there wasn't contagion risk on a
9 joint and several basis.

10 So there's a provision in there that
11 mandates that Key has to foreclose on the
12 publicly traded stock first, sort of a priority,
13 if you will, of -- of exercising their
14 foreclosure rights in the event of default. So
15 while there's a joint and several piece to it,
16 there's -- it's a mitigating factor.

17 Q. And that mitigating factor was a
18 direction to KeyBank that they had to go after
19 the public stock before they could go after the
20 assets of any co-borrower. Do I have that right?

21 A. That's right. And the stock was
22 owned by -- by Jim.

23 Q. Okay. Other than -- and what was the
24 -- okay. So they have to go after that first,
25 but after that, KeyBank had the right to go after

Page 107

MATT McGRANER - 10/11/2022

2 any co-borrower on a joint and several basis. Do
3 I have that right?

4 A. Yeah, it's a million three shares
5 worth 75 million. After they get through their
6 75 million, they would have to -- they could
7 choose whatever -- wherever they wanted to go.

8 Q. Okay. Did Highland receive anything
9 in return, to the best of your knowledge, in
10 exchange for its commitment to be jointly and
11 severally liable under the KeyBank loan, subject
12 to the exception that you just described?

13 A. Yeah, they received $1.14 million
14 within 30 days of the transaction closing, which
15 was, I think, 23 times their investment.

16 Q. What did they receive that money for?

17 A. Pain and suffering for KeyBank
18 re-trading us, they -- KeyBank sent -- sent back
19 a piece of their commitment fees.

20 Q. And how was that -- how was that
21 calculated?

22 A. It was calculated on a daily
23 outstanding basis. They -- they sent us a
24 spreadsheet on how they calculated it, but they
25 realized that we had a traumatic experience,

Page 108

MATT McGRANER - 10/11/2022

2 Starwood was the seller, they're very well known.
3 We were becoming well known, and there was a lot
4 of reputational issues for them. So they tried
5 to do right by us and they sent the money back,
6 and we sent it to Highland.

7 Q. Was it to reimburse Highland for any
8 expenses?

9 A. No.

10 Q. Why was the decision made to give it
11 to Highland?

12 A. Jim asked me to -- when I told Jim
13 about the money, he said go -- go ask Klos where
14 he wants it to be sent, send it to Highland.

15 Q. What were the other options? Do you
16 know?

17 A. Didn't ask.

18 Q. Was any other money returned?

19 A. Just that.

20 Q. Okay. Did you understand at the time
21 that the KeyBank loan was entered into, that HCRE
22 was going to be designated as the lead borrower?

23 A. It was -- yeah, I did, yeah.

24 Q. And who made the decision to
25 designated HCRE as the lead borrower?

Page 109

MATT McGRANER - 10/11/2022

2 A. It was sort of out of necessity, if
3 you will, but it was ultimately Jim and myself.

4 Q. And why did you decide to designate
5 HCRE as the lead borrower among all of the
6 co-borrowers?

7 A. I think -- I think because it had the
8 most flexibility in its operating agreement and
9 the mandate. And it pledged -- sorry, just one
10 more -- and it pledged a significant amount of
11 its assets that it had at the time.

12 Q. Did Highland agree that HCMLP would
13 -- withdrawn.

14 Did Highland agree that HCRE should
15 be designated as the lead borrower?

16 A. I think they were deferential to Jim
17 and I on -- on that piece.

18 Q. In fact, Jim made that decision on
19 behalf of Highland; correct?

20 A. I -- yeah, I presume so.

21 Q. Did you have any understanding as to
22 how much money the lead borrower was going to
23 borrow under the KeyBank loan prior to the time
24 it was signed?

25 A. I did. There was a -- was a robust

Page 110

MATT McGRANER - 10/11/2022

2 collateral package that we put together.

3    Q. I'm -- I'm looking at it from the

4 other perspective, from the other side. How much

5 -- how much did you expect a need to borrow?

6    A. Sorry, say that again.

7    Q. How much -- how much did the

8 borrowers expect to need to borrow under the

9 KeyBank loan document before they signed it?

10 They have -- you had a plan; right?

11    A. Yeah, we did. We needed I think,

12 roughly, 330, 340 million dollars.

13    Q. And did you understand that under the

14 KeyBank loan documentation, HCRE as the lead

15 borrower would have the ability to allocate the

16 proceeds among the co-borrowers?

17    A. No, that's not how it worked.

18    Q. Ultimately, all of the loan proceeds

19 were allocated to HCRE; correct?

20    A. Loan proceeds? As the -- the loan --

21 the loan proceeds or the loan allocation?

22    Q. Loan allocation.

23    A. Okay. The allocation was made on a

24 per-asset basis tested by an LTV ratio that Key

25 and we on the real estate agreed.

Page 111

MATT McGRANER - 10/11/2022

2    Q. Then let's go to proceeds.

3    A. Okay.

4    Q. Right? I mean, $250 million was

5 allocated to HCRE for purposes of the Amended and

6 Restated LLC Agreement; correct?

7    A. Correct.

8    Q. Okay. And who made that decision?

9    A. I think it was collective --

10 collectively HCRE and -- and KeyBank.

11    Q. All right. We'll get to this in a

12 minute. Let's talk about the events leading up

13 to the signing of the amended and restated.

14    The KeyBank loan closed in

15 September 2018; correct?

16    A. Correct.

17    Q. And y'all had 60 days to pay back

18 $150 million; is that right?

19    A. That's right.

20    Q. And so you spent those 60 days

21 selling some of the real estate you had just

22 purchased in order to pay back the loan; is that

23 fair?

24    A. No. We went and got -- we went and

25 got the capital from a third party.

Page 112

MATT McGRANER - 10/11/2022

2    Q. Who did you get the capital from?

3    A. Walker & Dunlop.

4    Q. How much did Walker & Dunlop loan?

5    A. They -- KeyBank cut the -- cut the

6 $330 million loan into two pieces, an A and a B

7 note. They sold, if you will, 150 of the B note

8 to -- to Walker, and that counted towards our

9 paydown requirement.

10    Q. Okay. And BH Equities had put in

11 approximately $20 million towards Project

12 Unicorn; correct?

13    A. Sounds about right.

14    Q. And that money was funded before the

15 closing of the KeyBank loan; is that right?

16    A. Some of it was and I believe they

17 contributed some at closing to cover some -- some

18 prorations and some other costs.

19    Q. So let me restate the question. All

20 of BH Equities' $20 million capital contribution

21 was funded on or before the closing of the

22 KeyBank loan; correct?

23    A. That's fair.

24    Q. And they made that funding without

25 any written agreement of any kind; correct?

Page 113

MATT McGRANER - 10/11/2022

2    A. They did.

3    Q. And so following the closing and the

4 paydown of the $150 million, discussions

5 continued with BH Equities as to the scope of

6 their membership interests in to-be-formed or

7 to-be-amended SE Multifamily LLC agreement;

8 correct?

9    A. I think we all had questions on our

10 scope of what -- what was going on, yeah.

11    Q. But it's fair to say that by the time

12 the Amended and Restated LLC Agreement,

13 BH Equities had put in all of the capital that it

14 ever put into this project; correct?

15    A. I think that's -- I think that's

16 right.

17    Q. And prior to the time the Amended and

18 Restated LLC Agreement, Highland had put in all

19 of the capital that it was ever going to put into

20 the project; correct?

21    A. Correct.

22    Q. And prior to the time that the

23 Amended and Restated LLC Agreement was signed in

24 March of 2019, HCRE had put in all of the capital

25 that it was ever going to put into this project;

Page 114

MATT McGRANER - 10/11/2022

2 correct?

3    A. Turns out that way, yeah.

4    Q. Okay. So that at the time that the

5 agreement was signed, to the best of your

6 knowledge, HCRE, Highland, and BH Equities all

7 knew and understood how much capital each of the

8 members had contributed to SE Multifamily;

9 correct?

10    A. I can't -- I can't speak for what BH

11 thought the -- where the capital came from, from

12 what our -- from what our -- from our side.

13    Q. Okay. So let me restate the

14 question. So as of the date that the Amended and

15 Restated LLC Agreement is signed in March of

16 2019, to the best of your knowledge and

17 understanding, HCRE and Highland were aware of

18 the capital contributions that had been made

19 among all of the prospective members to the

20 agreement; correct?

21    A. I think that's right.

22    Q. Okay. Let's put up on the screen

23 Exhibit No. 4, which is a February 28, 2019,

24 email.

25    (Exhibit 4 was marked.)

Page 115

MATT McGRANER - 10/11/2022

2    Q. All right. I see we've -- we've put

3 up on the screen, Mr. McGraner, an email dated

4 February 28, 2019, between Mr. Patrick and

5 Mr. Raver.

6    Do you see that?

7    A. I do.

8    Q. Have you ever seen this email before?

9    A. No.

10    Q. Do you know who Mr. Raver is?

11    A. I think so.

12    Q. Who do you think Mr. Raver is?

13    A. I -- I feel bad. I -- I think he

14 works on the accounting team, but I know the

15 name, but I couldn't -- I couldn't pick him out

16 of a lineup.

17    Q. Okay. Do you see this page --

18    Yeah, we're not going to put him in a

19 lineup. Don't worry.

20    Do you see it says, quote, "Must keep

21 cash allocation below 50 percent to HCMLP to

22 avoid consolidation"?

23    A. Yes.

24    Q. Do you have any idea what's being

25 discussed in this brief email?

Page 116

MATT McGRANER - 10/11/2022

2    A. Only a guess, but...

3    Q. With the -- with the understanding

4 that it's a guess, what do you believe that --

5    A. Sure.

6    Q. -- they're discussing?

7    A. I think because of the -- the large

8 amount of leverage put on Project Unicorn, they

9 didn't want to have to -- or for Highland's

10 audited financials and the various, you know,

11 reports that they have to give out to

12 counterparties, they don't want to show that much

13 leverage. So if they were allocated more than

14 50, I'd assume that that's -- consolidation hurts

15 their -- hurts their financial reporting.

16    Q. Do you have any idea what the concept

17 of consolidation means in the context of -- of

18 SE Multifamily?

19    A. I don't think -- my -- my personal

20 view, I don't think that's what they're talking

21 about here.

22    Q. Do you have an understanding as to

23 what the phrase "cash allocation" refers to?

24    A. Yes.

25    Q. What's your understanding of that

Page 117

MATT McGRANER - 10/11/2022

2 phrase?

3    A. While it's not specific other than

4 the subject line being Unicorn, so I would say

5 the cash allocation of -- cash allocation of

6 profits and losses need to be below 50 percent.

7    Q. All right. Let's -- let's move on.

8 Let's look at the next email, Exhibit 5, please.

9 It's also dated February 28, 2019.

10    (Exhibit 5 was marked.)

11    Q. And you'll see this is an email from

12 Mr. Patrick to a number of people, including

13 yourself. Do you recall seeing this email

14 before?

15    A. Sure.

16    Q. And -- and do you -- do you recall

17 that the effort was made to have the Amended and

18 Restated LLC Agreement signed by March 15th so

19 that it could be made retroactive to August 23,

20 2018?

21    A. Yeah.

22    Q. And if we scroll down, you'll see

23 that there's a copy of the -- a draft amended and

24 restated agreement.

25    Do you see that?

Page 118

1     MATT McGRANER - 10/11/2022
2     A. I do.
3     Q. Do you have any understanding as to
4  who was responsible for the drafting of the
5  amended and restated agreement?
6     A. I believe Hunton & Williams.
7     Q. And who was instructing Hunton &
8  Williams, if you know?
9     A. Mark Patrick. He was the primary
10  contact.
11     Q. And did you know at the time that
12  Mark Patrick was the primary contact with
13  Hunton & Williams in the drafting of the Amended
14  and Restated LLC Agreement?
15     A. I believe so.
16     Q. Does HCRE contend that Mr. Patrick
17  made any errors or mistakes in the work that he
18  did in connection with the drafting of the
19  Amended and Restated LLC Agreement?
20     A. As of this date?
21     Q. Yep.
22     A. No.
23     Q. How about Hunton & Williams? Does
24  HCRE contend that Hunton & Williams made any
25  errors or mistakes in connection with the work

Page 119

1  that it did with respect to the First Amended and
2  Restated LLC Agreement for SE Multifamily?
3     A. No.
4     Q. Is -- do you recall is this the first
5  draft of the amended and restated agreement that
6  you saw?
7     A. Probably. But I don't -- I don't
8  recall.
9     Q. Do -- do you recall ever providing
10  any comments to anybody at any time concerning
11  any aspect of the first amended and restated
12  agreement before it was signed?
13     A. No.
14     Q. Did you personally review drafts of
15  this agreement before it was signed?
16     A. Just a waterfall.
17     MR. MORRIS: Can we go back to the
18  email, please?
19     Q. (BY MR. MORRIS) Do you see
20  Mr. Patrick has described four changes to the
21  agreement?
22     A. I do.
23     Q. And were you aware of those changes
24  at the time that he proposed them?

Page 120

1     MATT McGRANER - 10/11/2022
2     A. I was.
3     Q. Okay. Looking at the -- the last
4  line, there's a reference to the return preparer.
5     Do you see that?
6     A. Yes.
7     Q. Do you know who that refers to?
8     A. Mark Barker.
9     Q. At Barker Viggato?
10     A. Yes.
11     Q. Okay. Do you have an understanding
12  of why there was a need to get Barker Viggato
13  comfortable before executing the document with
14  respect to the anticipated tax allocations of the
15  P&L?
16     A. A billion-dollar complex
17  transaction --
18     Q. Well, but what about --
19     A. -- I guess.
20     Q. Again, it's not a guessing game. If
21  you remember, great; if you don't, that's fine.
22  But was there a discussion or any communications
23  concerning the anticipated tax allocations of the
24  P&L that you can recall?
25     A. No.

Page 121

1     MATT McGRANER - 10/11/2022
2     Q. Do you recall how the P&L was
3  ultimately allocated in the final amended and
4  restated agreement?
5     A. I think -- I think largely the
6  majority was went -- went to Highland --
7     Q. Okay.
8     A. -- passively.
9     Q. Okay. Can we go to page 12, which I
10  think is 13 of 55. And do you see --
11     MR. MORRIS: You can scroll up a
12  little bit. Okay. Stop there.
13     Q. -- that in paragraph 6.4(a), profits
14  and losses were allocated 94 percent to Highland
15  and 6 percent to BH.
16     Do you see that?
17     A. I do.
18     Q. Do you have an understanding that
19  that's the very provision that Mr. Patrick said
20  they needed to get Barker & Viggato comfortable
21  with?
22     A. I don't -- I don't agree with that
23  statement.
24     Q. Is there another provision in the
25  document that Barker & Viggato had to get

Page 122

MATT McGRANER - 10/11/2022

2 comfortable with that you're aware of?

3     A.   I think -- I think Mark's email

4 refers to those four items, not just the -- not

5 just 6.4(a) from my read of it, the inclusion of

6 new parties and all the other stuff.

7     Q.   Okay.  Did -- did you participate in

8 any discussions with anybody at any time

9 concerning Section 6.4?

10     A.   Yes.

11     Q.   Who did you discuss 6.4 with?

12     A.   Our tax team.

13     Q.   And what do you recall about those

14 conversations?

15     A.   Since Highland received the

16 1.14 million, BH receive the acquisition fees at

17 closing, that it made sense to allocate 2018 this

18 way.

19     Q.   Is your testimony that the reason

20 that 6.4 exists in the manner that it does is

21 because Highland got $1 million at closing?

22     A.   Yeah, that's -- that's my -- no one

23 else got any money.

24     Q.   Right.  And is there any reason that

25 you can think of that HCRE isn't being allocated

Page 123

MATT McGRANER - 10/11/2022

2 any of the profits and losses?

3     A.   No.

4     Q.   Did you ever discuss with anybody why

5 Highland was taking 94 percent of the profits and

6 losses other than the fact that it got $1 million

7 at closing?

8     A.   I mean, that it -- it's a lot of

9 money.

10     Q.   I didn't ask you if it was a lot of

11 money, sir.  Do you need me to restate the

12 question?

13     A.   Yes, please.

14     Q.   Is there any reason that Highland was

15 allocated 94 percent of the profits and losses

16 other than the fact that it got $1 million at

17 closing?

18     A.   I -- I think we -- I think they

19 looked at it -- the income and that's where it

20 went, that's how they allocated it.

21     Q.   I know.  I can read the document.

22 I'm asking if you know why they did that for any

23 reason other than the fact, according to you, it

24 was $1 million that was paid to Highland at

25 closing?

Page 124

MATT McGRANER - 10/11/2022

2     A.   No.  That -- that would be -- that

3 would be my perspective.

4     Q.   Do you know if the allocation of

5 94 percent of the profits and losses to Highland

6 had anything to do with the purported tax

7 benefits that you mentioned earlier, that was one

8 of the reasons Highland was included in this

9 deal?

10     A.   No.

11     Q.   Okay.  Who on behalf of Highland

12 agreed that -- did -- in all of the work that you

13 did, did you ever do an estimate as to what the

14 profits and losses were going to be from

15 SE Multifamily?

16     A.   Ultimately?

17     Q.   Yeah.

18     A.   Yeah, I -- we had a -- we had a

19 business plan.  We had a underwriting.

20     Q.   So under that business plan or under

21 that underwriting, do you recall what the

22 projected profits and losses were for

23 SE Multifamily?

24     A.   Over a five-year hold, I thought we

25 would make, given the market, and if we were able

Page 125

MATT McGRANER - 10/11/2022

2 to get through the Walker & Dunlop and KeyBank

3 issues, 20 to 40 million bucks.

4     Q.   20 to 40 million dollars of profits

5 and losses.  Do I have that right?

6     A.   Well, profits, right.

7     Q.   Right.  On a net basis it would have

8 been 20 to 40 million dollars of profit?

9     A.   That's right.  At the end of the

10 rainbow of a five-year hold, 20 to 40 million.

11     Q.   Did you do any analysis to see what

12 Highland's tax liability was going to be on 20 to

13 40 million dollars of tax profit?

14     A.   No.

15     Q.   Do you have any idea how the

16 projected tax liability from 20 to 40 million

17 dollars of tax profits correlates to the

18 $1 million that it received at the closing of the

19 KeyBank deal?

20     A.   Do I have any what?  Any -- sorry,

21 can you repeat the question.

22     Q.   Sure.  Do you have -- did you do any

23 analysis to see how Highland's tax liability on

24 20 to 40 million dollars of profits corresponds

25 to the $1 million that it received at the closing

Page 126

MATT McGRANER - 10/11/2022

1  MATT McGRANER - 10/11/2022
2  of the KeyBank that you say is the reason for
3  this provision?
4      A. I don't think I said that this was
5  the reason for this provision.
6      Q. I think you said that the reason for
7  -- for the 94 percent allocation to Highland was
8  because it got $1 million in connection with the
9  KeyBank closing; correct?
10     A. Right. For 2018, that's right.
11     Q. Okay. So now they're going to be
12 faced with tax liability on receipt -- on -- on
13 having 20 -- 94 percent of 20 to 40 million
14 dollars of profits being allocated to it;
15 correct?
16     A. No.
17     Q. Why not?
18     A. Because 2019 could have been a
19 different year. 2020 could have been a different
20 year. And it was. Coronavirus hit. It
21 sustained losses, I mean, there -- we didn't know
22 what was going to happen.
23     Q. You made a decision to sign an
24 agreement that allocated 94 percent of the
25 profits, correct, to Highland?

Page 127

MATT McGRANER - 10/11/2022

1  MATT McGRANER - 10/11/2022
2      A. For 2018, that's correct.
3      Q. That's what the document says; right?
4      A. For 2018, that's correct.
5      Q. And you -- and you did that with the
6  expectation, because you didn't know about Corona
7  in March of 2019; right?
8      A. No. But we knew about KeyBank and
9  Walker & Dunlop's, correct.
10     Q. And you've taken all of that -- and
11 you took -- and you took all of that into
12 account, though, already; right?
13     A. Yeah, sure.
14     Q. And yet -- and yet you still
15 projected 20 to 40 million dollars of profits;
16 correct?
17     A. We're real estate, we're optimists.
18     Q. Okay. You see where I'm going here;
19 right? Does it make any sense at all for
20 somebody to agree to take 94 percent of the tax
21 liability on projected 20 to 40 million dollars
22 of profits when they -- in exchange for
23 $1 million? Would you do that?
24     A. If I put in 49,000 and I got
25 $1 million back in 30 days, I might.

Page 128

MATT McGRANER - 10/11/2022

1  MATT McGRANER - 10/11/2022
2      Q. How much -- how much is 1 over 20?
3  That's 5 percent; right?
4      A. Sure.
5      Q. And 1 over 40 is 2.5 percent; right?
6      A. Right.
7      Q. Do you believe that Highland was
8  going to pay 2.5 to 5 percent -- withdrawn.
9          If -- if Highland's tax liability was
10 2.5 to 5 percent, then they would be made -- and
11 then it would be a wash -- right? -- and they
12 received 20 to 40 million dollars of -- of
13 profits, then Highland would be no better off
14 than it was before it received $1 million; right?
15     A. Under that narrow example, yeah.
16     Q. So why would Highland agree to do
17 that?
18     A. I think the -- again, the purpose was
19 the document was a living document to reflect the
20 transition of the portfolio, the first year is
21 allocated this way.
22     Q. Did you believe that the 94 percent
23 could be adjusted over time?
24     A. Yes.
25     Q. What's the basis for that belief?

Page 129

MATT McGRANER - 10/11/2022

1  MATT McGRANER - 10/11/2022
2      A. It's what I was told.
3      Q. What were you told?
4      A. That it could be adjusted over time.
5      Q. Did they -- who told you that?
6      A. Our tax team -- or Highland's tax
7  team.
8      Q. Who on the tax team told you that the
9  94 percent could be adjusted?
10     A. Mark Patrick.
11     Q. Did he tell you that HCRE had the
12 unilateral right to ad -- adjust that percentage?
13     A. No.
14     Q. Did he tell you how it would be
15 adjusted?
16     A. No.
17     Q. Did he tell you what factors would be
18 taken into account in making the adjustment?
19     A. No.
20     Q. Did he tell you whether or not their
21 consent of the other members would be required
22 before an adjustment would be made?
23     A. No.
24     Q. Do you know if this percentage was
25 ever adjusted since the time this agreement was

Page 130

MATT McGRANER - 10/11/2022

1
2 signed?
3       A. No, because the bankruptcy petition
4 was filed the next year.
5       Q. But between the time it was signed
6 and the petition date, it was never adjusted;
7 correct?
8       A. That six- or seven-month period, no.
9       Q. Did you ever ask them how -- how this
10 percentage could be adjusted?
11      A. I didn't.
12      Q. Did you ever ask him the bases that
13 would be taken into account, the factors that
14 would be taken into account to adjust this
15 percentage?
16      MR. MORRIS: I've lost you Mr. --
17      (Zoom technical difficulty.)
18      THE VIDEOGRAPHER: Yeah, I think we
19 lost the witness. Do you want to go off
20 the record, sir?
21      MR. MORRIS: Yeah.
22      THE VIDEOGRAPHER: The time is
23 12:21 p.m. and we are going off the record.
24      (Break from 12:19 p.m. to 12:30 p.m.)
25      THE VIDEOGRAPHER: The time is

Page 131

MATT McGRANER - 10/11/2022

1
2 12:32 p.m. and we're back on the record.
3       Q. (BY MR. MORRIS) Let's just go to the
4 next exhibit, Exhibit 6, please.
5       (Exhibit 6 was marked.)
6       Q. So if we can scroll down to the email
7 at the bottom right there, do you see this is an
8 email from Mr. Broaddus dated March 14, 2019?
9       A. I do.
10      Q. And you're copied on that email;
11 right?
12      A. Uh-huh, right.
13      Q. And Mr. Broaddus says, among other
14 things that "The contributions schedule in the
15 attached needs to be updated with the actual
16 contribution numbers."
17      Do you see that?
18      A. I do.
19      Q. Is it -- is it your recollection you
20 recall that just before the agreement was signed,
21 that Mr. Broaddus was working to update the
22 contributions schedule to include the actual
23 contribution numbers?
24      A. Yes.
25      Q. Okay. And did you have any

Page 132

MATT McGRANER - 10/11/2022

1
2 communications with him at around that time
3 concerning the updated contributions schedule?
4       A. I didn't but that's not to say he
5 didn't with my team.
6       Q. I'm just asking for your knowledge.
7 Did you have any conversations with him at around
8 that time on this topic?
9       A. I didn't.
10      Q. Was Mr. Broaddus working under your
11 direction?
12      A. In the scope of this email?
13      Q. Yeah.
14      A. Yes.
15      Q. Okay. And you understood that one of
16 the things that Mr. Broaddus was doing at this
17 time was updating the contributions schedule with
18 the actual contribution numbers; right?
19      A. Yes.
20      Q. And that was within the scope of
21 Mr. Broaddus' responsibilities at the time;
22 correct?
23      A. Yes.
24      Q. Okay. Does HCRE contend that
25 Mr. Broaddus ever made a mistake in connection

Page 133

MATT McGRANER - 10/11/2022

1
2 with the work he did updating the contributions
3 schedule to include the actual contribution
4 numbers?
5       A. No, but I don't see the actual
6 contribution numbers on the screen. So...
7       Q. Okay.
8       MR. MORRIS: Can we go to the top
9 of the page?
10      Q. Do you see you're copied again on a
11 follow-up email where he informs BH Equities that
12 he has attached the contributions schedule?
13      A. Yes.
14      Q. And if we can go to the next page, is
15 it your understanding that the document that
16 Mr. Broaddus sent to you and to BH Equities in
17 this email contains the capital contributions by
18 each of SE Multifamily's members?
19      A. Yes.
20      Q. And you saw this at the time;
21 correct?
22      A. Yes.
23      Q. Do you see where it shows HCRE
24 Partners contributed approximately $291 million?
25      A. Yes.

Page 134

MATT McGRANER - 10/11/2022

1      Q. In your capacity as HCRE's 30(b)(6)
2  witness, do you know what the source of funding
3  was for that capital contribution?
4      A. The KeyBank bridge and some cash that
5  -- that -- that we got from distributions from
6  NexBank -- NexVest, I mean.
7      Q. What's the name of that entity?
8  NexBank?
9      A. NexVest, I believe it was.
10      Q. Let's talk about the -- the first
11  piece, the KeyBank bridge. Am I right that
12  approximately 250 million of that $291 million is
13  the allocation to HCRE of a portion of the
14  proceeds under the KeyBank loan?
15      A. Yes, although I thought the number
16  was -- the total number was 332 million. So...
17      Q. Let me ask the question again then.
18      What portion of the 291 do you
19  understand to be sourced from the KeyBank loan?
20      A. That's probably all of the KeyBank
21  loan, but there should be another 30 in change in
22  there, I think.
23      Q. I was told -- I was told -- and you
24  can tell me if it doesn't comport with your

Page 135

MATT McGRANER - 10/11/2022

1  understanding -- but I think the prior testimony
2  was that approximately $250 million was the
3  allocation to HCRE of at least a portion of the
4  KeyBank loan, and the other 40 -- approximately
5  $40 million was sourced through a loan with
6  NexBank or with NexVest?
7      A. Yeah, generally that's right.
8      Q. Okay. So then let's try this again.
9  As HCRE's 30(b)(6) witness, would you agree that
10  approximately $250 million of the capital
11  contribution reflected on Schedule A was
12  allocated to HCRE Partners under the KeyBank loan
13  and the balance of approximately $40 million was
14  borrowed by HCRE from NexVest or NexBank?
15      A. Yes.
16      Q. And is NexVest or NexBank an
17  affiliate of Mr. Dondero's?
18      A. It is.
19      Q. And who made the decision to allocate
20  to HCRE approximately $250 million of the KeyBank
21  loan for purposes of setting the capital
22  contributions schedule here?
23      A. Highland and -- and HCRE.
24      Q. Would that be Mr. Dondero on behalf

Page 136

MATT McGRANER - 10/11/2022

1  of both parties?
2      A. In -- informed by professionals, but,
3  yeah, that's right.
4      Q. Do you know what factors Mr. Dondero
5  took into account in deciding to allocate HCRE
6  $250 million of the KeyBank loan?
7      A. I -- I don't know.
8      Q. Did you ever discuss with him why
9  HCRE was being allocated $250 million of the
10  KeyBank loan and Highland was being allocated
11  zero?
12      A. Yes.
13      Q. Yeah. What did you discuss?
14      A. I think it's the same reason that you
15  saw in the Mark Patrick consolidation email,
16  Highland didn't want to take on $250 million of
17  additional indebtedness.
18      Q. Well, it did so already, did it not?
19      A. No. It didn't have any guaranty,
20  there's nonrecourse debt to -- to Highland. You
21  don't -- you don't consolidate non -- nonrecourse
22  debt.
23      Q. I thought we established earlier that
24  but for the senior collateral, Highland was

Page 137

MATT McGRANER - 10/11/2022

1  jointly and severally liable for all obligations
2  under the KeyBank loan. Have I misunderstood
3  that?
4      A. I -- yeah, I think you have.
5      Q. So what part of the KeyBank loan was
6  Highland liable for as a co-borrower? Any
7  portion?
8      A. There's a -- yeah, so -- sorry.
9  There's a pledge and security agreement that
10  accompanies the KeyBank loan. And the recourse
11  provisions enure to the collateral package, which
12  was the NexBank stock, the NXRT stock, the
13  various assets that HCRE owned, all
14  these specific collateral package listed in 5.12,
15  that's -- that's the collateral. Those that --
16  that's the re -- that's the recourse KeyBank
17  would have against the borrowers.
18      Q. So that's --
19      A. And Highland didn't sign a guaranty.
20  So it wasn't -- wasn't a guarantor; so they
21  weren't ultimately liable.
22      Q. So it's your -- it's your testimony
23  under that KeyBank loan, if there was a default,
24  KeyBank would never have the right to go after

Page 138

MATT McGRANER - 10/11/2022

1 MATT McGRANER - 10/11/2022
2 Highland for any of the obligations that were the
3 then outstanding under the KeyBank loan, is that
4 your understanding?
5     A. To the extent that there were losses
6 that were beyond the value of the collateral
7 pledged under the pledge in the security
8 agreement and under the guaranty, you're right.
9 But there's 500 million of -- of collateral
10 there, none of which was pledged by -- by
11 Highland.
12     Q. How does -- how does your statement
13 about consolidation -- withdrawn.
14         Is there any reason -- withdrawn.
15         And of that collateral, how much of
16 it was pledged by HCRE?
17     A. Do you have the KeyBank loan
18 agreement by chance? There's a schedule of the
19 -- of the collateral listed.
20     Q. Do you know -- do you know if it was
21 more or less than $291 million?
22     A. It was less.
23     Q. Do you know if it was more or less
24 than $100 million?
25     A. It was probably right around 100.

Page 139

1 MATT McGRANER - 10/11/2022
2     Q. Okay. So even though HCRE had only
3 put up $100 million, it took $250 million of the
4 proceeds as credit for its interests in this
5 agreement; right?
6     A. No. Dugaboy Investment Trust was a
7 partner -- is a partner -- is Jim's -- Jim's
8 member of HCRE, and it's pledged the balance of
9 the collateral. So...
10     Q. They're not a member -- they're not a
11 member of this agreement; correct?
12         MR. GAMEROS: Which agreement,
13 John?
14         MR. MORRIS: The one that's on the
15 screen, the HCRE agreement.
16     A. The SE Multifamily?
17     Q. Yeah.
18     A. Yeah, they're -- they're not. But
19 we're talking, I thought, about HCRE's collateral
20 package. And so I think Jim could make a
21 determination what he wants to pledge as a member
22 of HCRE.
23     Q. Okay. So he decided to allocate
24 $291 million to HCRE; correct? Withdrawn.
25         Let me ask it this way: When you

Page 140

1 MATT McGRANER - 10/11/2022
2 received this, did you tell anybody that there
3 was a mistake?
4     A. No.
5     Q. Did you review it?
6     A. Yeah.
7     Q. Did it reflect your understanding of
8 what the terms were between Highland and HCRE?
9     A. At the time it was signed, yes.
10     Q. Okay. Did HCRE pay back the
11 approximately $40 million that it borrowed from
12 NexBank as part of the capital contribution?
13     A. I believe it did.
14     Q. And where did it get the money to do
15 that?
16     A. It sold assets -- the remaining
17 assets.
18     Q. It sold assets on behalf of
19 SE Multifamily; correct?
20     A. That's right.
21     Q. Okay. Did HCRE reach into its pocket
22 for any portion of the approximately $291 million
23 that's reflected on this document? Any -- a
24 single dollar, did it come out of HCRE's pocket?
25     A. Sure.

Page 141

1 MATT McGRANER - 10/11/2022
2     Q. How much?
3     A. I -- I don't know how much. But a
4 portion of the initial 10 million or 12 million
5 dollar -- million dollars of earnest money was --
6 was partially funded by HCRE for the deal.
7     Q. Anything else?
8     A. I'm sorry?
9     Q. Anything else other than that portion
10 of the earnest money?
11     A. Not that I -- not that I'm aware of.
12     Q. Okay. Who else contributed to the
13 earnest money you just mentioned?
14     A. I think BH did, too.
15     Q. And how much did BH contribute to
16 that 10 or 12 million dollars?
17     A. I bel- -- this is -- this is my
18 recollection -- I believe of the 40 that went
19 up -- or 30 or 40 that went up, we were -- we
20 were 20 or so and they were 10.
21     Q. Okay. I'm asking you -- it may be my
22 questioning, sir, and if it is, I apologize. I
23 really want to know how much money HCRE put into
24 this deal out of its own pocket, not what it
25 borrowed to fund and then repaid from the

Page 142

1      MATT McGRANER - 10/11/2022
2  proceeds at the sale of SE Multifamily property.
3        How much money did HCRE put into this
4  deal out of its own pocket?
5      A. I don't have the -- I don't have the
6  specific number.
7      Q. Is it more or less than $5 million?
8      A. I -- I honestly don't know. I -- we
9  could -- we could find it but I don't -- I don't
10 know sitting right here.
11     Q. Is it more or less than $1 million?
12     A. Same answer. I don't know. I do
13 know that it pledged every single asset that it
14 had that it was -- that was available to be
15 pledged.
16     Q. And all of that -- the entire loan
17 was repaid within a year; isn't that right?
18     A. Oh, no, I don't think so. No, it was
19 much longer than that.
20     Q. Has the loan been repaid as of today?
21     A. I think so.
22     Q. When was the loan fully repaid?
23     A. I saw correspondence on this. I'd --
24 I'd just be guessing. I don't -- I don't
25 remember.

Page 143

1      MATT McGRANER - 10/11/2022
2      Q. Wasn't the loan fully paid before
3  November 2019?
4      A. No, I doubt it. Are you talking
5  about the KeyBank bridge?
6      Q. Yeah.
7      A. Yeah. No, I doubt it.
8      Q. Let me restate it. Was the portion
9  that's -- was allocated to HCRE for purposes of
10 this agreement fully repaid back within a year?
11     A. No.
12     Q. Okay. Looking at -- at this
13 document, did you ever tell Mr. Broaddus that you
14 believed there was a mistake in this table?
15     A. Not at the time it was entered into,
16 no.
17     Q. Did you ever tell him that?
18     A. Ever? Like --
19     Q. From -- from the date you received
20 this document until today, did you ever say, Hey,
21 Mr. Broaddus, you know that document you would
22 create -- you created, it was wrong?
23     A. Yeah. I think we -- we -- we all
24 knew and all told each other that the -- the
25 $49,000 to receive a 46 percent interest was --

Page 144

1      MATT McGRANER - 10/11/2022
2  was wrong. I think that was pretty evident, and
3  that was discussed, yes.
4      Q. But you knew it at the time he sent
5  you this document; right?
6      A. Yeah.
7      Q. And you didn't tell him it was wrong
8  at the time he sent you the document; right?
9      A. You just asked me from the time it
10 was signed until today.
11     Q. You're saying everybody knew. So I'm
12 asking you specifically, at the time he sent you
13 this email, you thought that $49 million capital
14 contribution was accurately stated and you
15 thought Highland's 46.06 percent interest was
16 accurately stated; correct?
17     A. Yeah, at the time of the agreement,
18 that's right.
19     Q. Gotcha. Okay. There's nothing
20 ambiguous about this capital contributions
21 schedule; right?
22     A. No.
23     Q. You knew exactly what Highland was
24 credited as having contributed and you knew
25 exactly what percentage interest it was getting

Page 145

1      MATT McGRANER - 10/11/2022
2  under this draft of the contributions schedule;
3  right?
4      A. At the time it was entered into, yes.
5      Q. Let's go to the next email, please,
6  Exhibit 7.
7        (Exhibit 7 was marked.)
8      Q. Do you see this is an email from
9  Mr. Thomas to Mr. Broaddus. Now you're not
10 copied on this, but if you take a moment to read,
11 I hope you'll agree that you'll see that this
12 email concerns the waterfall that I think you
13 referred to earlier and how -- and how
14 distributions were going to be made.
15     A. Yeah, I remember this discussion.
16     Q. And do you remember just before the
17 deal was signed, that BH Equities was concerned
18 about the waterfall?
19     A. Yeah.
20     Q. And -- and did you personally
21 participate in conversations about the waterfall
22 at this time?
23     A. Sure, yeah.
24     Q. And do you recall that -- if we can
25 scroll down a little bit -- BH Equities had made

Page 146

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  a proposal concerning the waterfall?
3    A. Yeah.
4    Q. Okay. And here's their version of
5  6.1. Are you aware that Section 6.1 concerns the
6  waterfall?
7    A. Yeah.
8    Q. Okay. And are you aware that people
9  acting on behalf of the Highland group made a
10 counter proposal?
11   A. Yes.
12   Q. Okay. Can we go to the next exhibit,
13 Exhibit 8?
14      (Exhibit 8 was marked.)
15   Q. Do you see that at the bottom,
16 there's an email from Mr. Chang to Mr. Broaddus?
17   A. Yes.
18   Q. And is it your understanding that
19 notwithstanding the fact that it's Section 1.1
20 instead of 6.1, that this is the waterfall that
21 Highland provided to BH Equities as an
22 alternative to the one we just looked at?
23   A. The -- the email that we just looked
24 at was just that, it was a email, it wasn't
25 specific language.

Page 147

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2    Q. We can go back -- we can go back and
3  look if you want. There was a whole proposal.
4  It was -- they proposed the whole waterfall and
5  you guys -- do you want to go back and look at
6  it, we can do that.
7       If we can go back to Exhibit 7,
8  please. If we can go to the top of the email
9  itself.
10      Do you see Mr. Thomas tells
11 Mr. Broaddus, Attached is what we proposed in
12 October --
13   A. Yeah.
14   Q. -- try to handle this.
15   A. Yeah. You -- you can go back to
16 their -- their proposed language, if you don't
17 mind, please.
18   Q. Okay. Let's just scroll down a
19 little bit. And this is their version of 6.1.
20 So this is the way they wanted the waterfall to
21 set up. Do I have that right?
22   A. Yes.
23   Q. Okay. And if we can go back to the
24 top of this --
25   A. They --

Page 148

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2    Q. I'm sorry to interrupt. Go ahead,
3  sir.
4    A. No, that's all right. I -- go ahead.
5  I get it.
6    Q. Okay. So if we go back to the top of
7  this email, you'll see he sends this at, I guess,
8  3/15 at 9:00 in the evening. Do you see that?
9  Now, I can't adjust for time change as I don't
10 know what time zone.
11   A. Yeah, of course.
12   Q. But he says -- now, if we go to the
13 next email, you understood these discussions
14 about the waterfall were ongoing right up until
15 the last minute; right?
16   A. Yes.
17   Q. You'll see that Mr. Chang sent -- had
18 sent this email to Mr. Broaddus earlier in the
19 date on the 15th; right?
20   A. Yes.
21   Q. And if we could scroll to the top,
22 all Mr. Broaddus does is forward this to
23 Mr. Thomas at 11:00 on the 15th; correct?
24   A. Correct.
25   Q. And is it fair to say, based on your

Page 149

MATT McGRANER - 10/11/2022

1    MATT McGRANER - 10/11/2022
2  knowledge and recollection as -- and -- and in
3  your capacity as HCRE's 30(b)(6) witness, that
4  the version that Mr. Chang drafted is the version
5  that ultimately made its way into the agreement?
6    A. Yeah.
7    Q. Okay. And the language that
8  Mr. Chang forwarded to Mr. Broaddus, that was
9  language that was drafted by the Highland side;
10 correct?
11   A. The Highland tax team, that's
12 correct.
13   Q. And at this point, the Highland tax
14 team is working on behalf of Highland and HCRE;
15 correct?
16   A. Correct.
17   Q. Everybody's rowing in the same
18 direction -- direction for the Highland group of
19 companies that's the subject to this agreement;
20 correct?
21   A. At -- at this date, that's right.
22   Q. That's right. And --
23   A. It changed pretty dramatically six
24 months later.
25   Q. It did, didn't it. And you didn't

Page 150

MATT McGRANER - 10/11/2022

2 quite -- and you didn't anticipate that at the
3 time; correct?
4    A. That Highland filed bankruptcy?
5    Q. Correct.
6    A. Believe me, I did not.
7    Q. That's right. That's right. And
8 that -- that event was not foresee -- you did not
9 personally foresee that event in March of 2019;
10 correct?
11    A. I did not personally, no.
12    Q. Okay. And but for that bankruptcy
13 filing, we wouldn't be here today; is that fair?
14    A. Yeah, I think that's fair.
15    Q. Okay. So the dispute really is a
16 consequence of the bankruptcy filing -- do I have
17 that right? -- from your perspective?
18    A. Yeah, I mean, I think that's right.
19    Q. Okay. So it was -- it was the
20 Highland side that has -- do you see in Section A
21 here in Mr. Chang's email, it has the allocation
22 that we just looked at from the schedule that
23 Mr. Broaddus prepared; correct?
24    A. Correct.
25    Q. And at the time you believed that

Page 151

MATT McGRANER - 10/11/2022

2 this allocation of distributable cash was fair,
3 reasonable, and consistent with the parties'
4 intent; correct?
5    A. Correct.
6    Q. Okay. So did anything change your
7 view on that other than the filing of the
8 bankruptcy by Highland?
9    A. I mean, yeah, I -- I -- are you
10 talking about me personally or me -- or I guess
11 it's the same -- same answer.
12    Q. Yeah, it's a fair question. But in
13 your capacity as a 30(b)(6) witness, is there any
14 reason to believe that this -- you know, what
15 caused HCRE to believe that this was wrong other
16 than the bankruptcy filing as we just discussed?
17 Anything else? Any other fact that came to light
18 that you didn't have at the time?
19    A. Yeah, I mean, ultimately, again,
20 making a 400 million percent IRR on a real estate
21 transaction would not be a result in my --
22 in my view and HCRE's view, putting in 49,000,
23 receiving at a minimum 1.14 million 30 days
24 later, plus additional, you know, 46 percent
25 interest down the line, that's not -- I don't

Page 152

MATT McGRANER - 10/11/2022

2 know how that can stand up in a -- in a rational
3 investor's mind.
4    Q. Well, but are you a rational
5 investors?
6    A. Yeah, I think so.
7    Q. And that's exactly what you agreed to
8 in March of 2019; correct?
9    A. Yeah, at the time, that's correct.
10    Q. Okay. Okay. And so the only
11 thing that happened --
12    A. But under the circumstances it --
13    Q. The only thing that's happened is
14 that Highland has filed for bankruptcy, and HCRE
15 and Highland were no longer related entities
16 under the common control of Mr. Dondero; isn't
17 that right?
18    A. No, that's not right.
19    Q. Okay. So tell me -- tell me the
20 basis on which HCRE contends today that the
21 allocations set forth in Mr. Chang's email was
22 wrong at the time they made it.
23       Is there any fact that you're aware
24 of that you didn't have on March 15, 2019, that
25 leads you to believe today that that allocation

Page 153

MATT McGRANER - 10/11/2022

2 is incorrect?
3    A. I mean, yeah, there's 332 million of
4 debt outstanding that had to be retired.
5    Q. Did you know -- did you know that at
6 the time?
7    A. There wasn't -- I did. There was no
8 other additional services provided by Highland
9 really other than this. This is the last they
10 did and -- and look where we are. So, I mean,
11 this -- I wouldn't characterize that as -- as an
12 equitable percentage for -- for the work or -- or
13 the whatever you want to call the -- the
14 co-borrowing or whatever, purported tax benefits,
15 capital flexibility, they didn't do anything.
16    Q. Did you think to make it a condition
17 of their allocations to do any of the things you
18 just described?
19    A. There was -- there wasn't going to be
20 any distributable cash for years because you had
21 to retire debt, $322 million of debt and sell 20
22 assets over the course of years before you got
23 into this place, and Highland didn't do any of
24 that.
25    Q. Can I just ask you this question:

Page 154

MATT McGRANER - 10/11/2022

1      MATT McGRANER - 10/11/2022
2  Can you please identify a fact that HCRE did not
3  have when it entered into this agreement that
4  causes it today to say that there was a mistake?
5      A. Yeah. I mean, the intent was always
6  for this to be a living document and -- and
7  everyone knew that.
8      Q. Can you --
9      A. The tax team, the legal team, the
10  accounting team, the finance team.
11      Q. What does that mean, a legal doc --
12  living document? What does that mean?
13      A. It means as those facts change, as
14  the circumstances change, as assets are held,
15  sold, refinanced, that the economics can change.
16  It's not unique to this transaction, by the way.
17      Q. Did you on behalf of HCRE do anything
18  to make sure that intent was reflected in the
19  documentation?
20      A. I thought it was, because the people
21  that were my partners all understood what I
22  understood, there would be a living document.
23      Q. Did you do anything to make sure that
24  it was a living document?
25      A. I -- I relied on people to -- to make

Page 155

MATT McGRANER - 10/11/2022

1      MATT McGRANER - 10/11/2022
2  sure that it was.
3      Q. You're a lawyer; right?
4      A. Wasn't a very good one.
5      Q. So you made a mistake?
6      A. I think we all made a mistake.
7  That's the point.
8      Q. Is there any mistake that was made
9  other than the failure to include a provision
10  that would have allowed this agreement to be
11  amended, any other mistake you can identify?
12      A. I think that's the biggest one. The
13  intent was it -- for it to live on and adjust it
14  as economic -- economic conditions changed. That
15  intent was reflected. Everyone looked at this.
16  No one caught it.
17      Q. Do you think that you need a
18  provision saying that it can be amended in order
19  to amend the agreement? Can't you amend the
20  agreement without that provision? Can't you
21  amend the agreement anytime you have the
22  agreement of all of the member?
23      A. You can if there was automatic stay
24  in place.
25      Q. Did anybody on behalf of HCRE ever

Page 156

MATT McGRANER - 10/11/2022

1      MATT McGRANER - 10/11/2022
2  request Highland to amend this agreement?
3      A. During what? Prepetition?
4  Postpetition?
5      Q. Let's talk about the history of the
6  world. Did anybody from HCRE ever ask anybody
7  from Highland to amend this agreement at any time
8  in the history of the world?
9      A. I recall that I testified earlier
10  that I asked our internal legal team to review
11  these documents to make sure that there was no
12  issues with respect to the -- the petition filing
13  that could have caused contagion risk amongst
14  certainly of the -- the KeyBank loan agreement.
15  So had I not gotten them off of the KeyBank loan
16  agreement, we might not be sitting here saying
17  that this 46 percent interest is worth anything.
18      MR. MORRIS: I'm going to move to
19  strike, and I'll just ask you to listen
20  carefully to my question.
21      A. You got it.
22      Q. Do you know whether HCRE ever asked
23  the other members to the SE Multifamily agreement
24  that it wanted to amend the document for the
25  purpose of adjusting the allocated percentage

Page 157

MATT McGRANER - 10/11/2022

1      MATT McGRANER - 10/11/2022
2  interests?
3      A. Ever.
4      Q. Yeah.
5      A. Yeah, I'd ask -- I'd ask it right
6  now.
7      Q. But have you ever done it before
8  right now?
9      A. I -- other than what -- what I said
10  about the -- the reverse due diligence or the
11  prepetition review.
12      Q. I'm not asking about diligence.
13  Please, it's a very simple question.
14      Did HCRE ever ask the other members
15  in SE Multifamily to amend the amended and
16  restated agreement for purposes of changing the
17  allocation of membership interests?
18      A. We didn't need to.
19      MR. MORRIS: I move to strike.
20      Q. I'm going to ask you the question
21  again. It is a factual question.
22      A. It's a factual answer.
23      Q. To the best of your knowledge, as
24  HCRE's corporate representative, did HCRE ever
25  ask either of the members of the SE Multifamily

Page 158

1        MATT McGRANER - 10/11/2022
2  agreement whether or not they would consent to an
3  amendment for purposes of changing the allocation
4  of interests?  You either did or you didn't.
5        A. No.  No, because we didn't need to
6  because we knew it was a living document to the
7  agreement.
8        MR. MORRIS:  But I move to
9  strike -- I move to strike everything after
10  "no."  It's going to be a longer day -- I'm
11  sure counsel will let you know, it will be
12  a longer day when you continue to give the
13  answers you want as opposed to answers to
14  my questions.
15        Let's take a break now.  It's --
16  it's 12:00 -- it's 1:05.  Let's come back
17  at 1:30, please.
18        THE VIDEOGRAPHER:  Okay.  The time
19  is 12:07 p.m. and we're going off the
20  record.  Excuse me, 1:07 p.m. and we're
21  going off the record.
22        (Break from 1:06 p.m. to 1:31 p.m.)
23        THE VIDEOGRAPHER:  The time is
24  1:33 p.m. and we are back on the record.
25        Q. (BY MR. MORRIS)  Mr. McGraner, did

Page 159

1        MATT McGRANER - 10/11/2022
2  you talk to anybody about your deposition during
3  our break?
4        A. Not -- no, sir, I didn't.
5        Q. Okay.  Let's -- let's cut to the
6  chase now and let's take a look at the executed
7  Amended and Restated LLC Agreement.
8        MR. MORRIS:  If we can put
9  Exhibit 9 up on the screen.
10        (Exhibit 9 was marked.)
11        Q. I'll remind you, Mr. McGraner, if at
12  any time you think there is a portion of this
13  document that you think you need to review in
14  order to give a complete and accurate and
15  truthful answer, will you let me know that.
16        A. Of course.
17        Q. Okay.
18        MR. MORRIS:  Can we just quickly go
19  to page 18 so we can show Mr. McGraner that
20  this is the executed version.
21        Q. All right.  Do you see the signature
22  lines there by Mr. Dondero on behalf of Highland
23  and HCRE Partners?
24        A. I do.
25        Q. And do you understand that despite

Page 160

1        MATT McGRANER - 10/11/2022
2  the faint nature of the signatures, these are
3  Mr. Dondero's signatures and this is the final
4  agreement?
5        A. I do.
6        Q. Okay.  And you understood in March of
7  2019 that he was going to bind HCRE and Highland
8  to this agreement; correct?
9        A. I did.
10        Q. Did you have any discussions with him
11  about any of the terms of this agreement before
12  he put his pen to paper?
13        A. Sorry, the computer's acting up
14  again.  Can you repeat that, please.
15        Q. Sure.  Did you speak with Mr. Dondero
16  about any aspect of this agreement before he
17  signed it?
18        A. No.
19        Q. Did you review it with him before he
20  signed it?
21        A. Not with him.
22        Q. Did you review it of your own accord
23  before you understood he was signing it?
24        A. I reviewed the economic provision
25  again, the waterfall.

Page 161

1        MATT McGRANER - 10/11/2022
2        Q. Any -- any part of the agreement
3  other than Section 6.1 and the waterfall that you
4  recall reviewing?
5        A. That was the area of my focus.
6        Q. Okay.  But you had seen Schedule A in
7  its form from earlier the same day that this was
8  signed --
9        A. Sure.
10        Q. -- right?
11        A. Sure.
12        Q. Okay.  And were the same three law
13  firms that you identified earlier involved in the
14  preparation of this agreement?
15        A. As far as I know.
16        Q. So that's Winston --
17        A. Wick and Hunton.
18        Q. -- Wick and Hunton.  All right.  And
19  to the best of your knowledge and recollection
20  and as HCRE's 30(b)(6) witness, would it be fair
21  to say that those three law firms were all
22  working jointly on behalf of Highland and HCRE in
23  connection with the preparation of this document?
24        A. Yes.
25        Q. And would that be true of all of the

Page 162

MATT McGRANER - 10/11/2022

2 people in the Highland platform who were working
3 together to try to finalize this agreement?
4     A. Yes.
5     Q. So is it fair to say that neither
6 Highland nor HCRE received any independent advice
7 separate and apart from the other entity in
8 connection with this agreement?
9     A. Yes.
10     Q. And there wasn't, to the best of your
11 recollection, a singular person charged with the
12 responsibility for looking out for solely HCRE's
13 interests; correct?
14     A. That's correct.
15     Q. And there wasn't a singular person
16 who was charged, to the best of your knowledge,
17 with looking out for Highland's interests in
18 connection with this agreement; correct?
19     A. That's correct.
20     Q. Let's just look at a few of the
21 provisions of this document. If we can go to
22 Schedule A. Yeah, right there.
23         Do you see Schedule A, sir?
24     A. I do.
25     Q. Can you confirm for me that the tox

Page 163

MATT McGRANER - 10/11/2022

2 -- top box relating to the members' names and
3 capital contributions and percentage interests is
4 consistent with the version of the document that
5 Mr. Broaddus sent to you and to BH Equities
6 earlier on March 15th?
7     A. Yes.
8     Q. Okay. So you were aware before the
9 agreement was signed that this capital
10 contribution table was going to be included;
11 correct?
12     A. Yes.
13     Q. And there's nothing ambiguous about
14 the information that's on Schedule A, would you
15 agree with that?
16     A. I would.
17     Q. Is there anything about Schedule A
18 that you do not understand today?
19     A. No.
20     Q. Okay. And this -- to the best of
21 your knowledge and understanding as HCRE's
22 30(b)(6) witness, Schedule A reflects the
23 parties' intent at the time the agreement was
24 signed; correct?
25     A. Yes.

Page 164

MATT McGRANER - 10/11/2022

2     Q. Okay. Can we go to Section 1.7,
3 please. Do you see 1.7 concerns company
4 ownership?
5     A. Yes.
6     Q. Okay. And you are aware that this
7 provision was in the agreement before it was
8 signed; correct?
9     A. Yes.
10     Q. And there's nothing ambiguous about
11 Section 1.7 from your perspective; correct?
12     A. No.
13     Q. And at the time the agreement was
14 signed, did HCRE understand that Section 1.7
15 accurately reflected the parties' intent?
16     A. Yes.
17     Q. Okay. Go to 2.2(a), please. Do you
18 see there's a section for additional capital
19 contributions?
20     A. Yes.
21     Q. Did you understand before this
22 agreement was signed that SE Multifamily would
23 never look to HCRE or Highland for additional
24 capital contributions?
25     A. I mean, no, I don't think that was --

Page 165

MATT McGRANER - 10/11/2022

2 that wasn't my understanding.
3     Q. Do you understand that Section 2.2(a)
4 committed additional count -- capital -- capital
5 calls to Liberty?
6     A. Yes.
7     Q. Did you understand that the manager
8 wasn't given the right under 2.2(a) to make
9 capital calls of HCRE or Highland?
10     A. Yeah, that's what it says.
11     Q. And that was consistent with your
12 understanding of the parties' intent before they
13 signed this agreement; correct?
14     A. Yeah, that's right.
15     Q. Go to 3.1, please. Did you
16 understand before Mr. Dondero signed this
17 agreement that he would be the manager of
18 SE Multifamily in his capacity as an officer of
19 HCRE?
20     A. I did.
21     Q. And there's nothing ambiguous about
22 that provision, is there?
23     A. No.
24     Q. That was the intent of the parties;
25 correct?

Page 166

1    MATT McGRANER - 10/11/2022
2      A. Yes.
3      Q. And under 3.2, Mr. Dondero, in his
4  capacity as an officer of HCRE and as the manager
5  of SE Multifamily, was given the control that's
6  set forth in Section 3.2; correct?
7      A. Correct.
8      Q. And nobody else was given control of
9  SE Multifamily except for Mr. Dondero in his
10 capacity as an officer of HCRE?
11     A. Correct.
12     Q. And that never changed; correct?
13     A. As far as I know.
14     Q. And as far as you know, Section 3.2
15 reflected the parties' intent at the time this
16 agreement was entered into; correct?
17     A. Correct.
18     Q. Let's go to 6.1(a), please. All
19 right. 6.1(a) refers to distributable cash.
20     Do you see that?
21     A. I do.
22     Q. And will you agree that this
23 provision is consistent with the provision that
24 Mr. Chang forwarded to Mr. Broaddus on
25 March 15th?

Page 167

1    MATT McGRANER - 10/11/2022
2      A. I agree.
3      Q. And you were aware that this
4  provision was going to be included in the
5  agreement before Mr. Dondero signed it; right?
6      A. Yeah, at the time, yes.
7      Q. And there's nothing ambiguous about
8  Section 6.1(a) from your perspective; is that
9  fair?
10     A. That -- that's fair.
11     Q. And to the best of your knowledge and
12 understanding as HCRE's 30(b)(6) witness today,
13 Section 6.1(a) reflects the intent of the parties
14 -- correct? -- at the time the agreement was
15 signed?
16     A. Agree.
17     Q. All right. Can we scroll down just a
18 little bit to 6.1 -- hold on one second -- okay.
19 6.1(b) says that "Net cash from the sale,
20 refinancing, or other dis- -- disposition of a
21 specified company asset shall be distributed to
22 the members in the proration of their capital
23 percentage interests with -- with respect to such
24 specified company asset."
25     Do you see that?

Page 168

1    MATT McGRANER - 10/11/2022
2      A. I do.
3      Q. Is that another way of saying that
4  cash from the sale or refinancing or other
5  disposition of a specified company asset will be
6  distributed pro rata in accordance with the
7  percentage interests on Schedule A?
8      A. Assuming capital percentage interest
9  is defined as the interest on Schedule A, I
10 agree.
11     Q. Okay. And was it your understanding
12 that that was the intent of the parties at the
13 time this document was entered into?
14     A. Yeah.
15     Q. Okay. Can we go to 6.4(a), please.
16 I'll skip that. Actually, let me just ask this
17 question: In 6.4(a), is there anything ambiguous
18 from your perspective about that provision?
19     A. No.
20     Q. From your perspective as HCRE's
21 30(b)(6) witness, did you understand that 6.4(a)
22 reflected the intent of the parties at the time
23 this agreement was signed?
24     A. Yes.
25     Q. Okay. Let's go to 8.2, please. Do

Page 169

1    MATT McGRANER - 10/11/2022
2  you see 8.2 provides, among other things, that
3  the manager shall cause to be prepared and filed
4  all tax returns on behalf of SE Multifamily, and
5  I'm summarizing?
6      A. Yes.
7      Q. You were aware that this provision
8  was going to be included before Mr. Dondero
9  signed this document; correct?
10     A. Yes.
11     Q. Is there anything ambiguous about
12 Section 8.2 from your perspective?
13     A. No.
14     Q. Would you agree as HCRE's
15 Rule 30(b)(6) witness, that Section 8.2 was
16 consistent with the parties' intent?
17     A. Again, at the time of the agreement,
18 yeah.
19     Q. Okay. Can we go to 9.3(e), please.
20 So 9.3, is it fair to say is -- is the
21 liquidation waterfall?
22     A. Fair.
23     Q. Okay. And am I reading this
24 correctly that at the bottom of the waterfall
25 after 9.3(a) through (d) are taken into account,

Page 170

1        MATT McGRANER - 10/11/2022
2   any remaining assets will be distributed
3   consistently with the percentage interests set
4   forth on Schedule A?
5        A. Yes.
6        Q. And you understood that at the time
7   this agreement was signed; correct?
8        A. Yep.
9        Q. And there's nothing ambiguous about
10  that provision; correct?
11       A. Correct.
12       Q. And you understood that this
13  provision reflected the parties' intent; correct?
14       A. Correct.
15       Q. Okay. To the best of your knowledge,
16  has this agreement ever been amended?
17       A. Not that I'm aware of.
18       Q. Okay. Did HCRE ever request an
19  amendment of any kind to any other party of the
20  agreement that we're looking at right now? Did
21  it ever ask for an amendment?
22       A. Again, other than to -- to review the
23  documents for -- in connection with the
24  bankruptcy, no.
25       Q. Okay. And in connection with that

Page 171

1        MATT McGRANER - 10/11/2022
2   review of the doc -- of the documents in
3   connection with the bankruptcy, no request was
4   made to -- to amend this agreement; correct?
5        A. Not specifically, no.
6        Q. Okay. Are you prepared to testify as
7   HCRE's 30(b)(6) witness with regard to
8   distributions that have been made by
9   SE Multifamily?
10       A. Sure.
11       Q. SE Multifamily made distributions
12  after the date of this agreement; correct?
13       A. Only to satisfy debt.
14       Q. Those are distributions; correct?
15       A. Yeah, I just want to make sure we're
16  -- we're using the term, you know, correctly or
17  we mean the same thing.
18       Q. Okay. And -- and the distributions
19  that were made to repay debt are distributions
20  that are part of the waterfall that you
21  specifically had an interest in; correct?
22       A. Yes.
23       Q. Okay. Who authorized the making of
24  distributions?
25       A. Either Jim or myself.

Page 172

1        MATT McGRANER - 10/11/2022
2        Q. Nobody else was authorized to make a
3   distribution from SE Multifamily other than you
4   and Mr. Dondero; correct?
5        A. That's right.
6        Q. When you made it -- when you
7   authorized the distribution from SE Multifamily,
8   did you do so on your own or did you obtain
9   Mr. Dondero's agreement in advance?
10       A. Generally on my own with -- with --
11  but he knew -- he knew what the business plan
12  was.
13       Q. And he knew -- he knew -- withdrawn.
14          Did he know in advance of each
15  distribution that the distribution was going to
16  be made?
17       A. I'm not sure if he was aware, if he
18  knew.
19       Q. Did he ever -- did he ever give you
20  instructions as to whether to make a
21  distribution?
22       A. No, we -- we just had to pay down the
23  debt. So...
24       Q. Did he ever give you instructions as
25  to whether or not to make distributions as to

Page 173

1        MATT McGRANER - 10/11/2022
2   Highland?
3        A. No.
4        Q. Okay. Can you describe for me the
5   other people who were involved in -- not making
6   the decision but -- but involved in the topic of
7   distributions -- the amount? the date? the
8   parties?
9        A. In -- in general terms?
10       Q. Yeah.
11       A. Yeah, to the extent an asset was sold
12  or there was free cash flow that was above and
13  beyond what was needed to pay operating expenses,
14  there was a group of folks here at NexPoint and
15  at BH that would make that -- that -- or come up
16  with a calculation, if you will, of what we could
17  -- what we could pay down or what we could send
18  to -- to the debt -- the lenders. Those -- those
19  people were largely I think Bonner McDermett on
20  my team, Ken Superczynski at BH who's now
21  retired, probably Sean Jacobs -- Jacobson at BH.
22  Generally I think that's the -- that's the group
23  that came up with the calcs.
24       Q. Okay. Do you recall that the topic
25  of distributions came up between the Highland

Page 174

MATT McGRANER - 10/11/2022

2  side and BH Equities about -- later in 2019?

3     A. Vaguely.

4     Q. Okay. Let's see if we can refresh

5  your recollection a bit. Let's take a look at

6  Exhibit 10, please.

7        (Exhibit 10 was marked.)

8        MR. MORRIS: If we can scroll down

9  a little bit. Keep going. Let's just go

10  to the bottom.

11     Q. Okay. So were you aware in -- in

12  November 2000 -- I guess it's 2020 -- were you

13  aware in November 2020, that there were

14  discussions about distributions to repay debt?

15     A. They were always ongoing. So...

16     Q. Okay. And --

17     A. Generally, yes.

18        MR. MORRIS: All right. Scroll up,

19  please. Keep going.

20     Q. (BY MR. MORRIS) So -- so do you see

21  on November 10th, you're added to the email

22  string?

23     A. Yes.

24     Q. Okay. And a couple of days later,

25  there's a follow-up from BH management circling

Page 175

MATT McGRANER - 10/11/2022

2  up to see what the NexPoint team's availability

3  is to discuss distributions.

4        Do you see that?

5     A. I do.

6     Q. So that's the 12th. Keep going.

7  Okay. So a week later Mr. McDermett writes to

8  BH Equities that "They have confirmed internally

9  that you're standing by your position that

10  distributions may be returned to BH and HCRE in

11  order to extinguish their debts."

12        Is that a position that -- that HCRE

13  took?

14     A. Yes.

15     Q. And do you know who Mr. McDermett was

16  referring to when he used the -- the word "we"?

17     A. No.

18     Q. So was it HCRE's position in

19  November 2020 that SE Multifamily could make

20  distributions to extinguish debts?

21     A. Yes.

22     Q. What was that based on?

23     A. (No verbal response.)

24     Q. Why did -- yeah, let me ask a better

25  question.

Page 176

MATT McGRANER - 10/11/2022

2        Why did HCRE believe in November 2020

3  that distributions could be returned to B&H and

4  HCRE in order to extinguish their debts?

5     A. That was a consistent with the past

6  practices of what we've been doing since we

7  closed --

8     Q. Well, but that's --

9     A. -- of course.

10     Q. They had the debt repaid first under

11  the waterfall; right?

12     A. Right.

13     Q. And HCRE did not take the position

14  that Highland's bankruptcy prohibited the return

15  of capital that was used, you know, that was --

16  that was debt financed; correct?

17     A. Correct.

18     Q. Okay. Is there any reason -- do you

19  know what Highland's -- the source of Highland's

20  $49,000 was? Is that debt or did it come out of

21  their pocket?

22     A. I'm sure they had 49 grand laying

23  around back in 2018.

24     Q. You are or you're not?

25     A. No, I'm unsure.

Page 177

MATT McGRANER - 10/11/2022

2     Q. So it wasn't debt financed. Do I

3  have that right?

4     A. I don't know that specifically,

5  but...

6     Q. And then the next sentence says, "The

7  HCMLP bankruptcy is temporarily inhibiting our

8  ability to distribute a return of equity at this

9  time."

10        Do you see that?

11     A. I do.

12     Q. What's the basis for that position?

13     A. I think it was our position that it

14  was in just bankruptcy, there's a lot going on

15  that we didn't want to -- we didn't want to try

16  to -- we thought it was better just to let it

17  resolve itself and keep the -- keep the capital

18  and not make -- not make any other distribution.

19     Q. Did -- did -- is it HCRE's position

20  that there was a legal impediment that was caused

21  by the bankruptcy filing that prevented the

22  distribution of equity -- equity distribution?

23     A. I think all sides were concerned that

24  this -- any issue, frankly, would turn into more

25  litigation.

Page 178

MATT McGRANER - 10/11/2022

1      Q. Did you -- was that ever discussed
3  with Highland in November 2020? When you say all
4  sides, did you mean to include Highland or no?
5      A. Yeah.
6      Q. And who from Highland -- who from
7  Highland said that distributions shouldn't be
8  made?
9      A. I didn't say that.
10     Q. So you said all parties agreed. So
11  I'm asking you who agreed on behalf of Highland
12  that distributions should not be made?
13     A. Yeah, that's not what I said.
14     Q. What did you say?
15     A. That I think all sides were concerned
16  that any issue would spark more contentious
17  litigation.
18     Q. And -- and is Highland one of those
19  sides? Or is it just HCRE and BH Equities?
20     A. No, I'm including Highland in that.
21     Q. So who on behalf of Highland
22  expressed this concern?
23     A. I spoke to Fred Caruso at DSI about
24  this.
25     Q. And Fred said please don't make --

Page 179

MATT McGRANER - 10/11/2022

2  don't make distributions because it would lead to
3  litigation?
4      A. I said -- I think we both said that
5  we don't want to talk about it at this time, it
6  was our perspective. I guess, he answered to
7  someone and I answer to someone, and it didn't
8  seem like it was worth the fight -- another
9  fight.
10     Q. Do you have that in writing anywhere?
11     A. You can ask Fred if he has it.
12     Q. I'm asking you -- I'm asking you do
13  you recall communicating in writing to Mr. Caruso
14  that he expressed any concern at all about making
15  distributions from SE Multifamily where he said
16  that wouldn't be a good idea?
17     A. I don't -- it was a phone
18  conversation. I don't -- I think I just told you
19  that's what we said. That's -- that's how it
20  went.
21     Q. Does anybody -- did anybody else
22  participate in this phone conversation?
23     A. No, just -- it was just us.
24     Q. Just you and Mr. Caruso. Do I have
25  that right?

Page 180

MATT McGRANER - 10/11/2022

2      A. You have that right.
3      Q. And during that conversation,
4  Mr. Caruso said, Yeah, I agree with you, we
5  shouldn't make any distributions from
6  SE Multifamily because that might lead to
7  litigation? Did he say that in substance or
8  agree with you on that topic?
9      A. No. We just said we weren't going to
10  do anything. We weren't going to distribute
11  anything at the time, there would be a fight over
12  the percentages.
13     Q. Who would be having the fight?
14     A. The same people that are currently
15  having the fight.
16     Q. So it wasn't the bankruptcy that
17  inhibited the ability; it was just the decision
18  that HCRE made and that you're now testifying
19  that Mr. Caruso agreed that it's just going to be
20  -- it's just -- it's just going to lead to a
21  dispute; right? It's kind of irrelevant to this
22  isn't it?
23     A. No.
24     Q. What does a bankruptcy have to do
25  with this?

Page 181

MATT McGRANER - 10/11/2022

2      A. It's not a normal Chapter 11. It was
3  turned into a liquidation. It became very
4  contentious. I don't need to tell you this. We
5  decided that we weren't going to waste any more
6  time effort, money fighting this, that this --
7  this could just be put off.
8      Q. But you were still pursuing your
9  Proof of Claim; right?
10     A. I think -- I think you guys were
11  pursuing removing Wick Phillips as our counsel or
12  disqualifying them around this time.
13     Q. Okay. So let's talk about that for a
14  minute. You testified multiple times today that
15  Wick Phillips was jointly representing Highland
16  and HCRE; correct?
17     A. I think I've said that -- no, that's
18  not correct.
19     Q. I think it is, actually.
20     A. All the -- all -- all the law firms
21  were representing everyone.
22     Q. Okay.
23     A.
24     Q. I appreciate that. I appreciate the
25  clarification. I'm just focusing on

Page 182

1      MATT McGRANER - 10/11/2022
2   Wick Phillips right now. Because notwithstanding
3   the fact that Wick Phillips and the other law
4   firms were representing both HCRE and HCMLP in
5   connection with the drafting of the document,
6   HCRE decided to retain Wick Phillips for purposes
7   of pursuing its Proof of Claim against Highland;
8   correct?
9      A.   They were our -- yeah, they were our
10  primary counsel on the real estate side for a
11  while, yeah --
12     Q.   And notwithstanding --
13     A.   -- for a few years.
14     Q.   Notwithstanding the fact that HCRE
15  knew that Wick Phillips jointly represented
16  Highland and HCRE, it opposed Highland's motion
17  to disqualify Wick Phillips; correct?
18     A.   Yeah.
19     Q.   On what basis did HCRE have to oppose
20  a motion to disqualify a law firm that
21  represented both parties to the dispute?
22     A.   I don't know if you'll -- we can ask
23  Mr. Sauter or -- but --
24     Q.   Fair enough. I don't want to ask
25  Mr. Sauter. I'm going to ask you.

Page 183

1      MATT McGRANER - 10/11/2022
2      Do you know why --
3      A.   No.
4      Q.   -- HCRE opposed Highland's
5   disqualification motion?
6      A.   No.
7      Q.   As a lawyer, can you think of any
8   basis on which Wick Phillips could properly
9   represent HCRE against its former client on the
10  same subject matter?
11     A.   Not a matter of question given the --
12  given, I think, your firm's rep --
13  representation.
14     Q.   We've only had one client, sir. The
15  ownership -- or the management may have changed,
16  but we've only had one client. So let's go back
17  to my question.
18     A.   Sure.
19     Q.   As a lawyer, can you think of any
20  basis on which Wick Phillips could properly
21  represent HCRE on a matter adverse to its former
22  client, Highland, on the same subject matter?
23     A.   I don't know. I think -- I don't
24  know. I would assume we asked for a waiver and
25  you guys denied it.

Page 184

1      MATT McGRANER - 10/11/2022
2      Q.   Do you have any basis for -- for
3   saying that, or you just -- is that truly an
4   assumption?
5      A.   It's truly an assumption.
6      Q.   Did you ever suggest that maybe HCRE
7   should seek a waiver?
8      A.   Sure.
9      Q.   Do you know if it was ever done?
10     A.   I don't. I'd love to find out,
11  though.
12     Q.   Who made the decision to oppose
13  Highland's motion to disqualify Wick Phillips?
14     A.   I -- I don't know.
15     Q.   Did you ever ask anybody, we're --
16  we're going through all of this litigation, why
17  are we doing this? Who made the decision to do
18  this?
19     A.   I -- I don't know.
20     Q.   You -- you never asked anybody?
21     A.   I -- no, I didn't think it was a -- I
22  assumed it was for the same reason why the
23  bankruptcy was as contentious as it was, every
24  issue was litigated intent -- intensely.
25     Q.   But you personally knew that

Page 185

1      MATT McGRANER - 10/11/2022
2   Wick Phillips represented both HCRE and Highland
3   jointly in connection with the negotiation or
4   drafting of the Original LLC Agreement, the
5   KeyBank loan, and the Amended and Restated LLC
6   Agreement; correct?
7      A.   That's correct.
8      Q.   Okay. And despite that knowledge,
9   you didn't take any steps to try to have HCRE
10  stand down and retain a lawyer who was
11  independent of both parties; correct?
12     A.   That's correct. I don't believe we
13  fought it as intently as -- as you guys did, but
14  that's okay.
15     Q.   Well, y'all hired an expert, didn't
16  you?
17     A.   I mean -- I -- I think we were --
18  yeah, I mean, we -- I guess.
19     Q.   You fought it. I mean, is there
20  anything you could have done to fight that motion
21  that you didn't do?
22     A.   Was there any -- sorry, can you
23  repeat the question?
24     Q.   You took fact discovery; right? HCRE
25  took fact discovery to oppose the motion;

MATT McGRANER - 10/11/2022

2 correct?

3    A. I don't -- I don't think we intently

4 fought it as hard as you guys did.

5    Q. But you opposed the motion; correct?

6    A. Right. Okay?

7    Q. I don't know about your lawyers, I

8 fight to win.

9    A. I can tell.

10    Q. You see towards the end of

11 Mr. McDermett's email, it says, "DC Sauter and

12 the team is working towards a solution"?

13    A. Yep.

14    Q. Did DC Sauter and your team ever come

15 up with a solution?

16    A. No.

17    Q. Well, Mr. McDermett authorized

18 BH Equities to make distributions -- right? -- as

19 set forth in this email?

20    A. I think you're confusing the

21 sentences.

22    Q. Well, it says, "Please proceed to

23 distribute $5.3 million to BH and $14 million to

24 HCR NexVest."

25    Have I read that generally correctly?

MATT McGRANER - 10/11/2022

2    A. I think my read is different.

3    Q. What's your read?

4    A. DC and team are working on a

5 solution, and I took that to mean with respect to

6 the -- the parenthetical return of equity and

7 profits.

8    Q. Oh, okay. I apologize. Maybe it was

9 my fault. I was definitely staying within the

10 email, but just moving on to the -- the sentence

11 at the end.

12    HCRE authorized BH Equities to make

13 the distributions that are reflected in the last

14 sentence; correct?

15    A. Right, to extinguish the -- the debt.

16    Q. Okay. And looking at this and seeing

17 that money was going to pay NexVest, does that

18 refresh your recollection that the amount

19 allocated -- $250 million that was allocated to

20 HCRE from the KeyBank loan had been paid back in

21 full by this time?

22    A. Yeah, I don't -- I don't know if this

23 was the last and final distribution, but I -- I

24 think it has been paid back.

25    Q. Would any distribution have been made

MATT McGRANER - 10/11/2022

2 to NexVest before KeyBank was paid in full?

3    A. No.

4    Q. So is it fair to say that since HCRE

5 is authorizing a distribution to NexVest in

6 November 2020, that KeyBank was paid in full

7 prior to that time?

8    A. Probably fair.

9    Q. Okay. And do you recall if this is

10 extinguishing the last of HCRE's debt to NexVest?

11    A. I don't -- I don't know.

12    Q. Okay. Let's go down to --

13    A. I don't know if this is -- I don't

14 know if this was the last of it or not.

15    Q. Okay. Let's go to the mail above it.

16 Okay. So do you see BH Equities wants its

17 remaining 6.2 of capital returned; right? Is it

18 your understanding that as of this time, all of

19 BH Equities' debt financing had been repaid

20 in full and that what it wanted now, as of

21 November 2020, is the portion of its capital

22 contribution that was true equity?

23    A. That's what it says.

24    Q. Okay. And that -- that's exactly

25 what you recall happening at this time; right?

MATT McGRANER - 10/11/2022

2    A. Yeah.

3    Q. And under the waterfall, as you

4 understood it, because that was a provision that

5 you personally focused on, BH Equities would

6 never have any right to ask for the return of its

7 true equity contribution before all of the debt

8 financed equity was paid in full; correct?

9    A. That was the business deal, yeah.

10    Q. Okay. So does this refresh your

11 recollection that under the terms of the business

12 deal, as you understood it, that as of

13 November 2020, all of the debt financed capital

14 contributions had been paid in full and that BH

15 Equities was now looking for a path forward to

16 collect on its equity financed portion?

17    A. Yes.

18    Q. Okay. Let's go to the next exhibit,

19 Exhibit 11, please.

20    (Exhibit 11 was marked.)

21    Q. Okay. So here's a follow-up. It's

22 about seven months later. We're now in June of

23 2021. Do you recall that BH Equities again

24 requested the return of its equity capital?

25    A. I do.

Page 190

MATT McGRANER - 10/11/2022

1       MATT McGRANER - 10/11/2022
2       Q. Highland was still in bankruptcy;
3   right?
4       A. Yeah, I think we still are -- or
5   you -- still is now.
6       Q. Right. And so they're asking for the
7   return of their capital, and they're noting that
8   SE Multifamily has about $8 million in the bank.
9   And they're basically saying there's more -- more
10  than enough cash to -- to make us whole on our
11  capital contribution, can we do that -- right? --
12  that's what's happening here?
13      A. Yep.
14      Q. So if we can scroll up to the next
15  email, you're added to the email string.
16      Do you see that?
17      A. I do.
18      Q. Just four minutes later. So you're
19  aware of the request that's being made and the
20  justification for the request contemporaneously;
21  correct?
22      A. Yes.
23      Q. Okay. And let's go to the last mail
24  above. And Mr. McDermett writes -- and he's
25  copied you -- that upon review and discussion

Page 191

1   with Mr. McGraner, the return of all of the
2   equity portion of the capital contribution has
3   been approved; correct?
4       A. Correct.
5       Q. And so in June of 2021, you made the
6   decision that BH Equities could collect on the
7   remainder of its capital contribution, even the
8   portion that was equity financed that was
9   financed out of its own pocket; correct?
10      A. Correct.
11      Q. Is there any reason why you didn't
12  treat Highland the same way that you treated
13  BH Equities in June of 2021?
14      A. Because they got 23 times its money
15  30 days later after we closed.
16      Q. Any other reason?
17      A. Same reason about getting in
18  contentious, unnecessary, you know, fight.
19      Q. So the Highland bankruptcy didn't
20  prevent you in June of 2021 from authorizing
21  SE Multifamily to make a return of equity capital
22  to BH Equities; correct?
23      A. Correct.
24      Q. And the reason that you decided that

Page 192

1       MATT McGRANER - 10/11/2022
2   Highland would be treated differently is because
3   Highland had received that $1 million at the
4   KeyBank closing in September 2018. Do I have
5   that right?
6       A. In addition to the fact that we
7   didn't think 46 percent interest was the intent.
8       Q. This -- I'm just asking about the
9   $49,000. I'm just asking about the return of
10  capital. Okay? So maybe my questioning wasn't
11  clear.
12      A. Sure, I'd say that's right.
13      Q. As -- as of June of 2021, both HCRE
14  and BH Equities had all of the capital returned
15  to them as set forth on Schedule A; correct?
16      A. Correct. As did Highland.
17      Q. Highland got back -- I'm sorry.
18      Is it your testimony that Highland
19  got back its $49,000 in June of 2021?
20      A. I -- I think it got -- from my
21  perspective, I think it got its capital back with
22  the 1.14 million.
23      Q. Is that reflected in SE Multifamily's
24  books and records anywhere that part of that
25  million dollars was actually a return of capital?

Page 193

1       MATT McGRANER - 10/11/2022
2       A. I don't -- I don't know. I'll have
3   to look.
4       Q. You're just making that up, aren't
5   you?
6       A. I'm -- apologize, I don't make stuff
7   up.
8       Q. Well, you've mentioned that million
9   dollars several times today as a reason why it's
10  taking 94 percent of profits and losses, but not
11  once until now have you ever suggested that a
12  portion of that was actually a return of capital.
13      Was that just an oversight on your
14  part?
15      A. What, paying Highland 23 times their
16  money?
17      Q. Are you going to listen to my
18  question? Was it an oversight that you failed to
19  tell me that a portion of the million dollars was
20  a return of capital?
21      A. I don't think you ever asked me that
22  question.
23      Q. So -- so Highland agreed -- so -- so
24  about 5 percent of that million dollars was a
25  return of capital. Do I have that right?

Page 194

MATT McGRANER - 10/11/2022

1
2     A. I think it's a little less than that.
3  But I don't -- I don't know how Highland
4  characterized that cash that they got on their --
5  on their balance sheet.
6     Q. Is it -- is it -- is it Highland's
7  responsibility to do that? Or is it HCRE as the
8  manager of SE Multifamily to do that?
9     A. What, to -- to say what -- what the
10  cash is characterized on Highland's balance
11  sheet?
12     Q. No, distributions that are being made
13  from SE Multifamily. And, in fact, the money
14  that was paid to Highland in September 2018, that
15  didn't come from SE Multifamily, did it?
16     A. I mean, of course it did. How did it
17  -- how did it not?
18     Q. So -- so if we looked at
19  SE Multifamily's books and records, we would show
20  a million-dollar transfer from SE Multifamily to
21  Highland in September 2018.
22     A. I don't know.
23     Q. What's your basis for saying -- what
24  is your basis --
25     A. Again, this is one point --

Page 195

MATT McGRANER - 10/11/2022

1
2     Q. What is your basis for saying that
3  the million dollars paid from Highland came from
4  SE Multifamily in September 2018 as opposed to
5  KeyBank?
6     A. Well, because HCRE as the manager and
7  the lead borrower directed those funds to be paid
8  to one of the partners in the partnership.
9     Q. Did HCRE in its capacity as the
10  manager direct that capital to extinguish -- to
11  extinguish Highland's capital contribution?
12     A. (No verbal response.)
13     Q. Did -- did HCRE do that?
14     A. Not that I know of.
15     Q. They could not have done that --
16  isn't that right? -- under the terms of the
17  KeyBank loan?
18     A. But KeyBank is the one that sent us
19  the money.
20     Q. Sir --
21     A. So they -- they were at least
22  implicitly agreeing that we could distribute it
23  how we saw fit, if not explicitly.
24     Q. Sir, as the person who -- who was
25  involved in the negotiation of the KeyBank loan,

Page 196

MATT McGRANER - 10/11/2022

1
2  did the borrowers have the right to return equity
3  capital before KeyBank loan was paid back in
4  full? Could they have even done that?
5     A. I don't -- I don't understand your
6  question. They sent us the money back.
7     Q. Correct. And why did they do that?
8  Because your pain and suffering; right?
9     A. Yeah, I lived it. It wasn't fun.
10     Q. That's right. They didn't say, Here,
11  take this money and pay down the capital
12  contribution that Highland made to
13  SE Multifamily, did they?
14     A. No.
15     Q. And HCRE never said, Hey, Highland,
16  $49,000 of that money, you've just gotten your
17  capital paid back -- right? -- you never said
18  that?
19     A. I don't know if it was said or not.
20  I think they were happy to have it.
21     Q. That's not what I asked you.
22     MR. MORRIS: I move to strike.
23     Q. Do you have any personal knowledge
24  that HCRE made the determination that $49,000 of
25  the money paid by KeyBank to Highland in

Page 197

MATT McGRANER - 10/11/2022

1
2  September '18 was used to extinguish Highland's
3  capital contribution in SE Multifamily?
4     A. I -- I -- I think you're mixing words
5  but --
6     Q. Is my question unclear to you?
7     A. No, I don't.
8     Q. Is my question unclear to you?
9     A. Yeah.
10     Q. Okay. Did HCRE ever direct that
11  $49,000 of the payment made by KeyBank would be
12  characterized as a return of capital to Highland
13  under the SE Multifamily agreement?
14     A. Not specifically, no.
15     Q. Not generally; isn't that right?
16     A. Not specifically.
17     Q. You've never seen a document in your
18  life that reflects the treatment of $49,000 of
19  that September '18 payment as the return of
20  capital; correct?
21     A. It was a very, very complex,
22  fast-moving transaction at the time of it -- of
23  closing. So...
24     Q. Sir, can you identify a document in
25  the world that exists that reflects the return of

Page 198

MATT McGRANER - 10/11/2022

2 Highland's capital in September 2018?

3    A.  No.  But I'll look for one.

4    Q.  Okay.

5    A.  Because that email was probably sent

6 along with the capital back to -- back to

7 Highland.  I don't know what was stated.

8    Q.  So then why six months later did you

9 say that Schedule A was true and accurate?  Why

10 was Highland still getting credit for a $49,000

11 capital contribution that had already been

12 repaid?

13    A.  We didn't view it as that.  I mean,

14 we weren't concerned about it at the time.  It's

15 a very different circumstance than we're sitting

16 in today.

17    Q.  So at the time you didn't think that

18 the $49,000 had been returned to cap -- to

19 Highland; correct?  You only think that now?

20    A.  I think it got 23 times its original

21 investment.  That's what I think.

22    Q.  Sir, at the time HCRE signed the

23 amended and restated agreement, did it believe

24 that Highland had already received its capital as

25 a result of the payment made in September 2018?

Page 199

MATT McGRANER - 10/11/2022

2 Yes or no.

3    A.  I think the fact that it received 23

4 times its capital back, that that would include a

5 return of capital.

6    Q.  Did you think that in March of 2019?

7    A.  I don't know.

8    Q.  You didn't -- right? -- or you never

9 would have let Mr. Dondero sign an agreement that

10 still had a $49,000 capital contribution from

11 Highland -- isn't that right? -- you wouldn't

12 have done that?

13    A.  Yeah, I would have, because it was a

14 living document.

15    Q.  And --

16    A.  We all were working toward changed

17 circumstances and the transitional-like

18 portfolio.  That's -- that was the purpose.

19    Q.  How many lives does it have?  Because

20 it put in $49,000, it got it back, and you and

21 Mr. Dondero and everybody working on behalf of

22 Highland and HCRE is comfortable saying six

23 months later you should still get credit for the

24 $49,000 that you got repaid back, is that your

25 testimony?

Page 200

MATT McGRANER - 10/11/2022

2    A.  It's a $1.4 billion transaction,

3 $49,000 at the time with friendly affiliates, it

4 didn't really concern us.

5    Q.  Okay.  I'll take it.  So -- so the

6 reason that you didn't have Highland receive its

7 $49,000 at the same time BH Equities received its

8 equity contribution in June of 2021 is because

9 you decided at that time that Highland had

10 already received enough money -- right? --

11 through -- through that September 2018

12 distribution?

13    A.  Yeah, I think that's -- that's

14 partially true.  And the other is that we didn't

15 agree with the allocation.

16    Q.  Did you discuss this issue with

17 anybody in June of 2021 about why Highland wasn't

18 going to get its $49,000 capital contribution

19 back?

20    A.  We -- I just said the prior statement

21 that we viewed that as partially taking care of

22 their capital contribution.  And the other reason

23 is because we didn't want to fight the fight that

24 we're having now.

25    Q.  So you thought by not paying Highland

Page 201

MATT McGRANER - 10/11/2022

2 and treating it like the other members of HCRE,

3 that would help avoid a fight?

4    A.  I don't understand that, what you're

5 insinuating.

6    Q.  Okay.  Well, I'm going to ask my --

7 my earlier question.  Did you discuss with

8 anybody in June of 2021 about whether Highland

9 should receive a return of its $49,000?

10    A.  No.

11    Q.  Okay.  Did someone make a decision

12 that $49,000 of the payment made in December --

13 in September 2018 would be treated as a return of

14 capital?  Did somebody make that decision?

15    A.  No one is going to make a decision on

16 the character of return of capital or

17 distributions to Highland or HCRE as long as we

18 are disputing the percentages and the intent of

19 the document.  That's the point.

20    Q.  Are you aware that HCRE sent Highland

21 a check for $49,000 in June 2022?

22    A.  I am.

23    Q.  Did you authorize that payment?

24    A.  No.

25    Q.  Who authorized the payment to

Page 202

MATT McGRANER - 10/11/2022

1   MATT McGRANER - 10/11/2022
2   Highland in June of 2022 of $49,000?
3       A. I don't know.
4       Q. Did you ever discuss it with anybody
5   in the world?
6       A. No.
7       Q. How did you learn it happened?
8       A. Through this process.
9       Q. What part of this process informed
10  you that -- of that because that hasn't been in
11  any papers, I don't think -- where did you learn
12  that HCRE sent Highland $49,000 in June of 2022?
13      A. Maybe Jim's testimony or someone's
14  testimony. I don't specifically recall.
15      Q. Did you ever ask anybody why that
16  happened since Highland had already received so
17  much money?
18      A. No.
19      Q. You're not at all curious as to why
20  that payment was made in June of 2022, you didn't
21  ask anybody any questions at any time?
22      A. None of this makes any sense to me
23  anyway, so, no.
24      Q. It does or it doesn't make sense?
25      A. It doesn't.

Page 203

1   MATT McGRANER - 10/11/2022
2       Q. So as a 30 percent owner of HCRE,
3   which has at least 40 some-odd percent
4   interest --
5       MR. MORRIS: Did you leave? Who's
6   here?
7       THE WITNESS: I'm here. I'm here.
8       MR. MORRIS: Oh, I lost your face
9   for a second.
10      Q. So it doesn't make sense to you that
11  HCRE made this payment in June 2022?
12      A. It doesn't make sense to me.
13      Q. But -- but -- but despite the fact
14  that it doesn't make sense, you've never taken
15  the time to ask anybody what that was about; is
16  that fair?
17      A. That's fair. Say I'm petite.
18      Q. I share that. Were you involved in
19  the process of the preparation of
20  SE Multifamily's tax returns?
21      A. No.
22      Q. Who was responsible for acting on
23  behalf of HCRE in connection with the preparation
24  of SE Multifamily's tax returns?
25      A. For which year?

Page 204

1   MATT McGRANER - 10/11/2022
2       Q. At any time. So let's start from the
3   beginning and if -- if -- if the names of the --
4   if the identities of the people involved changed,
5   just let me know. So -- so, Mr. McGraner, I
6   don't mean to give you a hard time. Let me ask
7   you a cleaner question.
8       Can you -- can you tell me who since
9   HCRE was formed -- no. Withdrawn.
10      Can you tell me who, since
11  SE Multifamily was formed, was responsible for
12  preparing SE Multifamily's tax returns?
13      A. 2018 would have been Highland's tax
14  team. I guess 2019 is a little wishy washy in my
15  -- in my view because of the petition filing, but
16  probably the same answer. We lost shared
17  services in 2020. SkyView is formed, so perhaps
18  SkyView or Highland in 2020. And I think now
19  SkyView. But largely they're probably the same
20  general individuals.
21      Q. And that would include Mr. Patrick.
22  Do I have that right?
23      A. (No verbal response.)
24      Q. And who in addition to Mr. Patrick
25  would have been involved in the preparation of

Page 205

1   MATT McGRANER - 10/11/2022
2   SE Multifamily's tax returns since SE Multifamily
3   was first created?
4       A. I think Swadley, he's the leader of
5   the tax team, and then Broaddus, as long as he
6   was here. I don't remember when he left.
7       Q. Did Mr. Broaddus leave in 2022 or
8   before 2022?
9       A. I thought it was -- thought it was
10  right around COVID, 2020 maybe.
11      Q. Okay. Okay. Have you ever spoken
12  with anyone at Barker Viggato concerning
13  SE Multifamily's tax returns?
14      A. No.
15      Q. And when I use the phrase "tax
16  returns," I'm talking about not only
17  SE Multifamily's tax returns but the K-1s that
18  were prepared for SE Multifamily's members. Do
19  you understand?
20      A. I do.
21      Q. Okay. So you've never communicated
22  with anybody -- with that definition of tax
23  returns, you've never spoken with anybody at
24  Barker Viggato concerning SE Multifamily's tax
25  returns; is that right?

Page 206

1       MATT McGRANER - 10/11/2022
2       A. Right.
3       Q. Do you know if Mr. Dondero has ever
4 spoken with anybody at Barker Viggato concerning
5 SE Multifamily's tax returns as I've defined
6 that?
7       A. I don't know.
8       Q. Did you ever discuss with him any
9 communications that he ever had with
10 SE Multifamily with Barker Viggato?
11      A. No.
12      Q. Did you ever make any decisions
13 related to the preparation of SE Multifamily's
14 tax returns as I've defined it?
15      A. In -- in one instance, yeah.
16      Q. What decision did you make?
17      A. For one tax return, I think we wanted
18 to highlight the ambiguity of the -- the
19 percentage allocation. So I think that was noted
20 on -- on the return.
21      Q. And that happened in the fall of 2021
22 with respect to the 2020 returns; correct?
23      A. I think that's right.
24      Q. Okay. So to the best of your
25 knowledge, that issue was not raised with

Page 207

1       MATT McGRANER - 10/11/2022
2 Barker Viggato until the fall of 2021; correct?
3       A. I think that was right.
4       Q. Are there any other decisions that
5 you recall making with respect to any aspect of
6 SE Multifamily's tax returns?
7       A. No.
8       Q. Are you aware of any mistake or any
9 error that was made with respect to any of
10 SE Multifamily's tax returns?
11      A. No.
12      Q. Are you aware of any amendment that's
13 ever been made to any of SE Multifamily's tax
14 returns?
15      A. No.
16      Q. Are you aware of any discussion
17 that's ongoing now as to whether or not
18 SE Multifamily should amendment any of its tax
19 returns?
20      A. No.
21      Q. Has SE Multifamily completed the tax
22 returns for 2021?
23      A. I think so.
24      Q. They would have been due
25 September 15th; right?

Page 208

1       MATT McGRANER - 10/11/2022
2       A. Yeah, I think so.
3       Q. Do you know if Barker Viggato acted
4 as the tax preparer for the SE Multifamily tax
5 returns for 2021?
6       A. I think so.
7       Q. Was there ever any consideration
8 given to replacing Barker Viggato as the tax
9 preparer for SE Multifamily's tax returns?
10      A. Not as far as I'm aware.
11      Q. Are you aware of any concern by
12 Barker Viggato -- withdrawn.
13         Did -- do you know whether Barker
14 Viggato ever expressed any reluctance in
15 continuing on as SE Multifamily's tax preparer?
16      A. No.
17      Q. Did you ever review any draft tax
18 return for SE Multifamily?
19      A. Just the one where I directed the --
20 the note.
21      Q. What prompted you to do that at that
22 time?
23      A. I think -- I think we were trying to
24 resolve this to see what -- how this would shake
25 out. When I say "this," it's the dispute.

Page 209

1       MATT McGRANER - 10/11/2022
2       Q. I apologize if I asked this. It
3 would have been just a moment ago, but I'm a
4 little tired myself.
5         Did you ever see a draft of
6 SE Multifamily's tax returns before it was fin-
7 -- before they were finalized? Did they run them
8 by you? Did you kind of look at them?
9       A. Just the -- just per the
10 conversations with the tax team.
11      Q. Did you ever review --
12      A. They --
13      Q. I'm sorry. Go ahead.
14      A. We would -- we would have brief
15 conversations about it, and then that one
16 instance where I thought we should note that
17 there was a dispute.
18      Q. Did -- are you familiar -- withdrawn.
19         Did you ever see SE Multifamily's
20 final tax returns after they were filed?
21      A. I saw the HCRE K-1s, the ones that
22 had passed through to partnerships, but not the
23 -- not SE Multifamily's.
24      Q. Did you see any K-1s other than those
25 for HCRE?

Page 210

MATT McGRANER - 10/11/2022

1   MATT McGRANER - 10/11/2022
2   A. No.
3   Q. Did anybody discuss with you at any
4   time the allocation of profits and losses in
5   connection with the preparation of any of the
6   SE Multifamily tax returns?
7   A. Just the -- just the first year.
8   Q. Do you know how decisions were made
9   concerning the allocation of profits and losses
10   on SE Multifamily's tax returns?
11   A. Generally, no.
12   Q. Do you have any understanding at all
13   as to who made the decision as to how to allocate
14   SE Multifamily's profits and losses among its
15   members?
16   A. Did you ask for my understanding?
17   Q. No. I'm asking if you have any idea
18   as to who made those decisions as -- as to how to
19   allocate SE Multifamily's P&L across the members?
20   A. I -- I don't know what went into it.
21   Q. Did you ever give the tax group any
22   instructions of any kind as to how to prepare the
23   SE Multifamily's tax returns?
24   A. No.
25   Q. Did -- do you know if Mr. Dondero

Page 211

1   MATT McGRANER - 10/11/2022
2   gave any instructions of any kind to the tax
3   group as to how to prepare SE Multifamily's tax
4   returns?
5   A. No.
6   Q. From your perspective, did the tax
7   group have the authority to make the decisions as
8   to the content of SE Multifamily's tax returns?
9   A. Yeah, I think -- I think they know
10   what their job is.
11   Q. And neither you nor Mr. Dondero, to
12   the best of your knowledge, did anything to
13   ascertain whether or not they were doing their
14   job correctly; is that fair?
15   A. Fair.
16   Q. You just relied on them; is that
17   right?
18   A. Yes, that's right.
19   Q. Even though HCRE is ultimately the
20   manager of SE Multifamily, the job of causing
21   SE Multifamily's tax returns to be prepared and
22   filed was delegated to the tax group whether it
23   was at Highland or SkyView; correct?
24   A. Yeah, they're seasoned professionals,
25   we relied on -- on their experience and the

Page 212

1   MATT McGRANER - 10/11/2022
2   professionals' experience.
3   Q. Okay.
4   MR. MORRIS: All right. It's 2:38.
5   Give me ten minutes. I don't have a lot
6   left. So let me just take a -- a minute to
7   look at my notes. And let me see where we
8   are. If we can come back just to -- not to
9   be so arbitrary, let's call it 2:50 your
10   time.
11   THE WITNESS: Okay.
12   THE VIDEOGRAPHER: The time is
13   2:40 p.m. and we are going off the record.
14   (Break from 2:38 p.m. to 2:50 p.m.)
15   THE VIDEOGRAPHER: The time is
16   2:52 p.m. and we are back on the record.
17   Q. (BY MR. MORRIS) Mr. McGraner, can
18   you hear me okay?
19   A. I can.
20   Q. Okay. We're going to put up a
21   document on the screen that was premarked as
22   Exhibit 17, which is an email exchange.
23   (Exhibit 17 was marked.)
24   MR. MORRIS: If you just go towards
25   the bottom, you'll see -- all right. Start

Page 213

1   MATT McGRANER - 10/11/2022
2   there.
3   Q. (BY MR. MORRIS) Do you see there is
4   an email -- I guess you have to go to the top of
5   the -- the bottom of the broader page -- right
6   there -- from Mr. Broaddus to Herb -- Heriberto
7   Rios, Mark Barker, Ross Kirshner on September
8   13th.
9   Do you see that?
10   A. I do.
11   Q. And this is 2021. Is this around the
12   time that you recall getting involved in that one
13   issue relating to the SE Multifamily tax returns
14   concerning allocations?
15   A. I believe so, yeah.
16   Q. And you see that Mr. Broaddus is
17   asking whether the tax returns had been filed
18   because he says, "We want to add a statement to
19   the return and then file a superseded return on
20   or before Wednesday.
21   Do you see that?"
22   A. Yes.
23   Q. Okay. And if we can scroll up,
24   please. So then the response from Mr. Rios is
25   that the return hasn't been filed.

Page 214

MATT McGRANER - 10/11/2022

1        MATT McGRANER - 10/11/2022
2        Do you see that?
3    A. Yes.
4    Q. And then he asks some other -- he
5  asks some other questions. Can we go to the next
6  email, the response? All right. So Mr. Kirshner
7  says, "We haven't filed the return yet. We can
8  update addresses."
9        And he asks for the statement that
10  was requested to be included; right?
11    A. Yep.
12    Q. And then go up a little bit.
13  Mr. Rios says, "Paul will send it on when it's
14  ready."
15        Continue on to the next email.
16  Mr. Kirshner responds in a way that's not
17  substantive to my questions. And then keep
18  going. Mr. Rios, "That sounds good." Keep
19  going. Mr. Barker is still looking for the
20  statement on September 14th. Keep going. And we
21  have it. We finally have it.
22        So Mr. Broaddus writes to
23  Barker Viggato on September 14th and he includes
24  a statement.
25        Do you see that?

Page 215

MATT McGRANER - 10/11/2022

1        MATT McGRANER - 10/11/2022
2    A. I do.
3    Q. And -- and did you approve of this
4  statement before it was sent to Barker Viggato on
5  September 14, 2021?
6    A. I did.
7    Q. And is this the only substantive
8  issue you recall being involved with in
9  connection with SE Multifamily's tax returns?
10    A. It is.
11    Q. And this statement -- do you know if
12  this statement was adopted in any of
13  SE Multifamily's tax returns?
14    A. Do I -- do I know if it was in the
15  tax return?
16    Q. Yeah, do you know if this was
17  actually adopted and put into SE Multifamily's
18  tax returns?
19    A. I believe so.
20    Q. And was that done at your
21  instruction?
22    A. Yes.
23    Q. Okay. And this document refers to
24  the allocation of taxable income, that's the
25  first sentence; right?

Page 216

MATT McGRANER - 10/11/2022

1        MATT McGRANER - 10/11/2022
2    A. Yep.
3    Q. And -- and the second sentence refers
4  to the capital contributions of NexPoint Real
5  Estate Partners and Highland Capital Management;
6  right?
7    A. Right.
8    Q. You don't tell -- you don't tell
9  Barker Viggato at this time that you believe
10  Highland has received all of its capital back, do
11  you?
12    A. No.
13    Q. You never told -- nobody acting on
14  behalf of HCRE has ever told Barker Viggato that
15  Highland has ever received its capital back;
16  right? To the best --
17    A. Yeah, not that I'm aware of.
18    Q. You never instructed anybody to
19  inform SE Multifamily's tax preparers that
20  Highland had received its capital back; right?
21    A. No.
22    Q. But the important point for you is
23  the next sentence: "The economic ownership as
24  reflected herein and in the company agreement is
25  in dispute and subject to change."

Page 217

MATT McGRANER - 10/11/2022

1        MATT McGRANER - 10/11/2022
2        Have I read that correctly?
3    A. You have.
4    Q. And the manager there in the next
5  sentence is HCRE; correct?
6    A. Correct.
7    Q. And you reserve the right to amend
8  the returns of the partnership for the year 2019
9  and subsequent years upon a final determination,
10  is that substantively correct?
11    A. Yes.
12    Q. Is this the first time, to the best
13  of your knowledge, that HCRE has informed
14  Barker Viggato that the owner -- the economic
15  ownership was in dispute and is subject to
16  change?
17    A. I -- I don't know if Paul or Rick
18  said anything, but otherwise this is the first
19  time. They may have -- they may have said
20  something earlier.
21    Q. And HCRE had formed the belief prior
22  to the petition date that the allocation was
23  incorrect. Do I have that right?
24    A. Yes.
25    Q. And yet despite having that knowledge

Page 218

1     MATT McGRANER - 10/11/2022
2  prior to the petition date, it wasn't until
3  September 2021 that HCRE informed
4  SE Multifamily's tax preparer of that belief;
5  correct?
6     A. That's right.
7     Q. Okay. Did you have any discussion
8  with Barker Viggato about this statement?
9     A. I didn't personally.
10    Q. Do you know if anybody acting on
11 behalf of SE Multifamily or HCRE ever discussed
12 this statement with anybody at Barker Viggato?
13    A. Other than the email, I don't know.
14    Q. So did anybody -- did you ever
15 instruct anybody to explain to Barker Viggato the
16 nature of the dispute?
17    A. No. I just had the conversation with
18 our internal tax team.
19    Q. Right. And did you, during those
20 conversations, instruct them to explain to
21 Barker Viggato the nature of the dispute?
22    A. I think I just said, I want -- I want
23 to include this, can you do it? Oh, from -- I
24 guess they ran with it from there on.
25    Q. Do you know if anyone acting on

Page 219

1     MATT McGRANER - 10/11/2022
2  behalf of SE Multifamily or HCRE ever explained
3  to Barker Viggato the nature of the dispute?
4     A. I -- I don't know.
5     Q. Nobody ever told you that; right?
6     A. Right.
7     Q. And you never directed anybody to
8  have that conversation; correct?
9     A. That's right.
10    Q. So to the best of your knowledge,
11 Barker Viggato received this email, cut and
12 pasted the statement, then that was that. Is
13 that fair?
14    A. Fair.
15    Q. Has -- has the manager amended the
16 tax returns of the partnership for the tax year
17 2019 or any subsequent year?
18    A. Not that I'm aware of.
19    Q. Is the manager considering amending
20 the tax returns of the partnership for the tax
21 year 2019 or any subsequent year?
22    A. Not to my knowledge.
23    Q. Did you personally ever speak with
24 anybody at BH Equities concerning HCRE's
25 contention that the ownership as reflected in the

Page 220

1     MATT McGRANER - 10/11/2022
2  company agreement was in dispute?
3     A. I did.
4     Q. When did you do that?
5     A. Post petition filing, I think Joanna,
6  who is president of BH is -- was aware.
7     Q. Any idea when post petition you
8  personally spoke with BH Equities about the
9  dispute?
10    A. We -- we talk regularly, so it might
11 have been, you know, several occasions over the
12 course of the last couple of years.
13    Q. Was it before or after April 2020
14 when HCRE filed the Proof of Claim?
15    A. Was it -- was the conversation after
16 the Proof of Claim?
17    Q. Yep.
18    A. Yeah, probably.
19    Q. Probably after?
20    A. After, yeah.
21    Q. Okay. What do you recall about the
22 conversation?
23    A. I -- I was expressing my
24 disappointment in this outcome because of all the
25 work, years of effort that went into it and the

Page 221

1     MATT McGRANER - 10/11/2022
2  expectation -- my expectations of -- of what
3  value we're ultimately going to get is -- is in
4  dispute. And so, you know, you work on something
5  for four or five years, and, you know, at best is
6  half of what you -- you thought over a pretty --
7  pretty bad situation.
8     Q. Anything else you recall about the
9  conversation?
10    A. No.
11    Q. Did anybody else participate in the
12 conversation?
13    A. Not -- not with -- no, not with me.
14    Q. Did you share any information with
15 BH Equities about the dispute? Did you -- did
16 you send them any of the pleadings? Did you
17 describe for them the nature of the dispute? Or
18 did you just talk about your expectations and
19 disappointment?
20    A. Yeah. I characterize -- I
21 characterized it as internal collateral damage or
22 unintended consequence number 1000.
23    Q. And that internal collateral damage
24 and unintended consequences flow directly from
25 the bankruptcy filing; is that fair?

Page 222

MATT McGRANER - 10/11/2022

1
2     A. As it relates to this, that's fair.
3     Q. I mean -- I'm sorry, I didn't mean to
4  cut you off.
5     A. And -- and other things. I mean, our
6  -- you know, it's just been tough.
7     Q. I mean, look, if Highland didn't file
8  for bankruptcy and Mr. Dondero retained control
9  of Highland, this wouldn't be an issue; is that
10 fair?
11    A. I think that's fair.
12    Q. Did BH Equities indicate that they
13 were aware of the dispute before this
14 conversation, or were you actually calling to
15 inform them of the dispute?
16    A. It -- it was just in a conversation
17 -- it was a conversation topic amongst, you know,
18 the 30,000 units they -- they manage for us. So
19 they -- they from time to time inquire about how
20 it's going.
21    Q. Did you ever instruct anybody to
22 inform BH Equities of the substance of the
23 dispute?
24    A. Not specifically, I didn't -- I
25 didn't specifically tell anyone to discuss it.

Page 223

MATT McGRANER - 10/11/2022

1  Whether or not they did, I don't know.
2
3     Q. Did you ever ask BH Equities -- I'm
4  just focusing on BH Equities for the moment. Did
5  you ever ask BH Equities if they would consider
6  entering into an amendment for the amended and
7  restated agreement to adjust the membership
8  interests among the members?
9     A. Well, they -- they asked us. So it
10 naturally came up during the time where they were
11 seeking a incentive interests or promote
12 interests.
13    Q. Right. Forgive me, I forgot that.
14 They -- they were initiating conversations in
15 order to try to increase their 6 percent; is that
16 fair?
17    A. Right.
18    Q. Okay. But did you ever ask them if
19 they would agree to maintain their 6 percent but
20 nevertheless enter into an agreement that would
21 adjust the percentages as between Highland and
22 HCRE?
23    A. No.
24    Q. Okay.
25    A. Never considered it would be that

Page 224

MATT McGRANER - 10/11/2022

1
2  easy -- that simple.
3     Q. Yeah.
4     THE WITNESS: Bless you.
5     MR. MORRIS: All right. I have
6  nothing further, sir. I appreciate your
7  patience. I hope -- I hope you have a good
8  day otherwise.
9     THE WITNESS: Okay. Thank you very
10 much.
11    THE VIDEOGRAPHER: Okay. Anything
12 else?
13    MR. MORRIS: Before we go off, let
14 me just ask -- I know the U.S. Trustee is
15 on here -- does anybody else have any
16 questions for this witness?
17    Okay. We can go off the record.
18    THE VIDEOGRAPHER: Okay. The
19 time -- go ahead, sir, finish.
20    MR. GAMEROS: I was going to say,
21 we're going to reserve read and sign. And
22 I'll talk to the court reporter about
23 ordering after we get off the record.
24    THE VIDEOGRAPHER: Okay. The time
25 is 3:07 p.m. and this ends the deposition

Page 225

MATT McGRANER - 10/11/2022

1
2  of Mr. Matt McGraner.
3     (Time noted -  3:05 p.m.)
4
5
6
7     _____
8     MATT McGRANER
9
10 Subscribed and sworn to before me this _____
11 day of _____, 20____.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 226

1     MATT McGRANER - 10/11/2022

2     C E R T I F I C A T E

3     I, Kim A. McCann, RMR, CRR, CSR in and

4  for the State of Texas, do hereby certify:

5     That MATT McGRANER, the witness whose

6  deposition is hereinbefore set forth, was duly

7  sworn by me and that such deposition is a true

8  record of the testimony given by such witness;

9     That pursuant to FRCP Rule 30,

10  signature of the witness was requested by the

11  witness or other party before the conclusion of

12  the deposition;

13     I further certify that I am not

14  related to any of the parties to this action by

15  blood or marriage; and that I am in no way

16  interested in the outcome of this matter.

17     IN WITNESS WHEREOF, I have hereunto

18  set my hand this October 12, 2022.

19

20

21  _____

22     Kim A. McCann, RMR, CRR, CSR

23

24

25

Page 227

1     MATT McGRANER - 10/11/2022

2  ERRATA SHEET FOR THE TRANSCRIPT OF:

3  Case Name: In Re: Highland Capital Management, LP

4  Dep. Date: October 11, 2022

5  Deponent:  MATT McGRANER

6  Pg. Ln. Now Reads   Should Read    Reason

7  ___ ___ _____ _____ _____

8  ___ ___ _____ _____ _____

9  ___ ___ _____ _____ _____

10  ___ ___ _____ _____ _____

11  ___ ___ _____ _____ _____

12  ___ ___ _____ _____ _____

13  ___ ___ _____ _____ _____

14  ___ ___ _____ _____ _____

15  ___ ___ _____ _____ _____

16  ___ ___ _____ _____ _____

17  ___ ___ _____ _____ _____

18

19     _____

20     Signature of Deponent

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS _____ DAY OF _____, 20____.

23  _____

24  (Notary Public) MY COMMISSION EXPIRES: _____

25

**$**

**$1** 122:21 123:6,16, 24 125:18,25 126:8 127:23,25 128:14 142:11 192:3

**$1.14** 69:2 107:13

**$1.4** 200:2

**$100** 138:24 139:3

**$14** 186:23

**$150** 54:9 78:19 80:5 103:23 111:18 113:4

**$20** 112:11,20

**$250** 111:4 135:3,11, 21 136:7,10,17 139:3 187:19

**$291** 133:24 134:13 138:21 139:24 140:22

**$322** 153:21

**$330** 112:6

**$40** 53:8 135:6,14 140:11

**$400** 97:4 106:5

**$49** 144:13

**$49,000** 143:25 176:20 192:9,19 196:16,24 197:11,18 198:10,18 199:10,20, 24 200:3,7,18 201:9, 12,21 202:2,12

**$5** 142:7

**$5.3** 186:23

**$8** 190:8

**(**

**(d)** 169:25

**1**

**1** 6:4 15:17 19:15 41:11 128:2,5

**1-A** 15:7

**1.1** 146:19

**1.14** 122:16 151:23 192:22

**1.7** 164:2,3,11,14

**10** 141:4,16,20 174:6, 7

**10/11/2022** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1

**100** 138:25

**1000** 221:22

**10:51** 71:22

**10:52** 72:6

**10:53** 72:4

**10th** 174:21

**11** 6:11,13 21:21 181:2 189:19,20

**11:00** 71:23 148:23

**11:01** 72:6

**11:03** 72:8

**12** 21:25 121:9 141:4, 16

**12:00** 158:16

**12:07** 158:19

**12:19** 130:24

**12:21** 130:23

**12:30** 130:24

**12:32** 131:2

**12th** 175:6

**13** 121:10

**13th** 213:8

**14** 22:10 131:8 215:5

**14th** 214:20,23

**15** 22:10 152:24

**150** 112:7

**15th** 117:18 148:19, 23 163:6 166:25 207:25

**16** 22:10

**17** 22:11 212:22,23

**18** 159:19 197:2,19

**19-34054-SGJ** 6:11

**1:05** 158:16

**1:06** 158:22

**1:07** 158:20

**1:30** 158:17

**1:31** 158:22

**1:33** 158:24

**1A** 15:4,18

**2**

**2** 19:23 98:7,9

**2.2(a)** 164:17 165:3,8

**2.5** 128:5,8,10

**20** 33:15,21 41:6,9 70:14 125:3,4,8,10, 12,16,24 126:13 127:15,21 128:2,12 141:20 153:21

**2000** 174:12

**2011** 13:5

**2013** 12:8,18,23 14:17 102:23

**2014** 23:12 24:10,24 30:5 31:7 33:6 37:2 102:23

**2015** 11:11,14 12:3,6 13:15,24 14:9,20,24 35:10

**2016** 12:10

**2018** 18:5 19:19 55:4, 9,15 57:21 66:12 70:10,14,17 75:5 78:22 82:14 88:12,16 98:12 111:15 117:20

**122:17** 126:10 127:2, 4 176:23 192:4 194:14,21 195:4 198:2,25 200:11 201:13 204:13

**2019** 20:10 55:22 57:25 64:22 70:11,24 88:12 103:5 113:24 114:16,23 115:4 117:9 126:18 127:7 131:8 143:3 150:9 152:8,24 160:7 174:2 199:6 204:14 217:8 219:17,21

**2020** 8:5,6 9:12 42:12 51:2 56:12,18 57:2 58:17 126:19 174:12, 13 175:19 176:2 178:3 188:6,21 189:13 204:17,18 205:10 206:22 220:13

**2021** 189:23 191:6, 14,21 192:13,19 200:8,17 201:8 206:21 207:2,22 208:5 213:11 215:5 218:3

**2022** 6:13 201:21 202:2,12,20 203:11 205:7,8

**23** 70:14 78:22 98:11 107:15 117:19 191:15 193:15 198:20 199:3

**23rd** 80:11

**25** 33:15,21

**25,000** 25:3

**250** 134:13

**26** 55:4,8,14

**26th** 80:12

**28** 52:20 114:23 115:4 117:9

**291** 134:19

**2:38** 212:4,14

**2:40** 212:13

**2:50** 212:9,14

**2:52** 212:16

**3**

**3** 20:4

**3.1** 165:15

**3.2** 166:3,6,14

**3/15** 148:8

**30** 5:17 107:14
127:25 134:22
141:19 151:23
191:16 203:2

**30(b)(6)** 15:18 16:9
19:6 99:23 134:2
135:10 149:3 151:13
161:20 163:22
167:12 168:21
169:15 171:7

**30,000** 222:18

**330** 110:12

**332** 134:17 153:3

**340** 110:12

**3:07** 224:25

**4**

**4** 20:8 114:23,25

**40** 125:3,4,8,10,13,
16,24 126:13 127:15,
21 128:5,12 135:5
141:18,19 203:3

**400** 151:20

**46** 143:25 151:24
156:17 192:7

**46.06** 50:8,12 52:3,11
56:2 144:15

**49** 176:22

**49,000** 127:24 151:22

**5**

**5** 20:14 117:8,10
128:3,8,10 193:24

**5.12** 106:3 137:15

**50** 115:21 116:14
117:6

**500** 138:9

**55** 121:10

**6**

**6** 20:23 57:24 58:11
104:4 105:3 121:15
131:4,5 223:15,19

**6.1** 146:5,20 147:19
161:3 167:18

**6.1(a)** 166:18,19
167:8,13

**6.1(b)** 167:19

**6.2** 188:17

**6.4** 122:9,11,20

**6.4(a)** 121:13 122:5
168:15,17,21

**60** 54:8,11 69:3 80:5
103:24 111:17,20

**7**

**7** 145:6,7 147:7

**70/25/5** 24:2,12

**75** 107:5,6

**8**

**8** 21:5 42:12 146:13,
14

**8.2** 168:25 169:2,12,
15

**80s** 73:20

**9**

**9** 21:5,15 159:9,10

**9.3** 169:20

**9.3(a)** 169:25

**9.3(e)** 169:19

**90s** 73:20

**94** 121:14 123:5,15
124:5 126:7,13,24
127:20 128:22 129:9
193:10

**9:00** 148:8

**9:31** 6:14

**A**

**a.m.** 6:14 72:4,6,8

**ability** 84:12 110:15
177:8 180:17

**Absolutely** 84:19

**accompanies**
137:11

**accomplishes**
44:25

**accord** 160:22

**accordance** 168:6

**account** 127:12
129:18 130:13,14
136:6 169:25

**accountant** 97:8

**accounting** 56:13
97:3,5 115:14 154:10

**accurate** 45:25 46:9
63:11 64:12,20
159:14 198:9

**accurately** 144:14,
16 164:15

**acquisition** 122:16

**acquisitions** 33:11
103:19,20

**acronym** 23:8

**act** 22:13 36:22,25
37:5

**acted** 208:3

**acting** 66:5,25 67:12,
18 68:9 69:14 70:25
71:16 146:9 160:13
203:22 216:13
218:10,25

**actions** 60:18

**actual** 131:15,22

**132:18 133:3,5**

**ad** 129:12

**add** 88:20 89:9,22
90:13 213:18

**add-** 62:18

**added** 84:21 85:6
87:8,16 88:17 174:21
190:15

**adding** 89:3 90:6

**addition** 34:6 192:6
204:24

**additional** 27:19,25
28:4,9,13 85:21
136:18 151:24 153:8
164:18,23 165:4

**address** 62:13,16,19

**addresses** 20:14
214:8

**adjust** 59:12 67:15,
21 68:11 71:3,18
129:12 130:14 148:9
155:13 223:7,21

**adjusted** 128:23
129:4,9,15,25 130:6,
10

**adjusting** 156:25

**adjustment** 71:15
129:18,22

**admissible** 5:15

**adopted** 31:16
215:12,17

**advance** 10:9 172:9,
14

**adverse** 183:21

**advice** 38:24 39:2,17
40:3,4,8,21 61:15
95:10 100:23 101:9
162:6

**advise** 46:10

**advised** 44:21

**advisors** 10:24 11:4,
13,19,20,21,23 12:3,
11 13:14 14:9 34:3,
13 36:19 51:4

**affiliate** 26:12 135:18

**affiliates** 25:21,22
200:3

**aforementioned**
85:17

**aggregate** 26:20
33:17,22

**agree** 53:22 88:7
102:6 109:12,14
121:22 127:20
128:16 135:10
145:11 163:15
166:22 167:2,16
168:10 169:14 180:4,
8 200:15 223:19

**agreed** 54:18 55:10
58:11 86:4,7,19 88:8
110:25 124:12 152:7
178:10,11 180:19
193:23

**agreeing** 195:22

**agreement** 17:16
19:18,24 20:6,9 21:9,
14 34:2,10,12,14,16,
17,18,20 35:7,8,11
36:4,5,8 48:20 49:9,
11 53:15 54:23 55:22
57:25 63:14,16 64:2,
6,8,11,13,17,19 65:2,
14 66:9,19,24 67:14,
21 69:9,17,24 70:8,
13 71:4 75:6,16,19,
23 76:3,6,18 77:4,10,
17 78:11,15,23 79:20
80:8,10,15 89:17,18,
22 90:7,14,21 91:10
98:7,11 99:20 100:15
101:20 103:10,15
104:13,15,22 105:6,
19 106:4 109:8 111:6
112:25 113:7,12,18,
23 114:5,15,20
117:18,24 118:5,14,
19 119:3,6,13,16,22
121:4 126:24 129:25
131:20 137:10 138:8,
18 139:5,11,12,15
143:10 144:17 149:5,
19 154:3 155:10,19,
20,21,22 156:2,7,14,
16,23 157:16 158:2,7
159:7 160:4,8,11,16

161:2,14 162:3,8,18
163:9,23 164:7,13,22
165:13,17 166:16
167:5,14 168:23
169:17 170:7,16,20
171:4,12 172:9
185:4,6 197:13
198:23 199:9 216:24
220:2 223:7,20

**agreements** 17:18
34:15 68:2,18 93:23,
24 97:23,25

**ahead** 18:6 148:2,4
209:13 224:19

**alleged** 20:16

**alleges** 21:8

**allocate** 110:15
122:17 135:20 136:6
139:23 210:13,19

**allocated** 96:13
110:19 111:5 116:13
121:3,14 122:25
123:15,20 126:14,24
128:21 135:13
136:10,11 143:9
156:25 187:19

**allocation** 21:2,12,
18 67:15,22 68:12
69:10,18,22 70:17
94:15 99:12,15 104:9
110:21,22,23 115:21
116:23 117:5 124:4
126:7 134:14 135:4
150:21 151:2 152:25
157:17 158:3 200:15
206:19 210:4,9
215:24 217:22

**allocations** 20:16
94:3,4 120:14,23
152:21 153:17
213:14

**allowed** 155:10

**alternative** 146:22

**ambiguity** 206:18

**ambiguous** 144:20
163:13 164:10
165:21 167:7 168:17
169:11 170:9

**amend** 64:24 65:3,14

66:8 67:14,20 69:17
70:7 155:19,21
156:2,7,24 157:15
171:4 217:7

**amended** 20:8 21:8,
14 49:11 55:22 57:24
63:25 64:6 66:9,15,
20,24 67:20 69:8,25
70:7,12 103:9,14
104:12,14 105:5
111:5,13 113:12,17,
23 114:14 117:17,23
118:5,13,19 119:2,6,
12 121:3 155:11,18
157:15 159:7 170:16
185:5 198:23 219:15
223:6

**amending** 97:16
219:19

**amendment** 55:13
66:11 69:8 70:16
104:23 158:3 170:19,
21 207:12,18 223:6

**amendments** 36:11
65:4

**amount** 26:20 27:2
28:4 109:10 116:8
173:7 187:18

**amounts** 25:9

**analysis** 125:11,23

**answers** 158:13

**anticipate** 150:2

**anticipated** 120:14,
23

**anyone's** 95:19

**anytime** 155:21

**Apologies** 15:2

**apologize** 13:17
56:24 58:14,23 85:2
88:13 141:22 187:8
193:6 209:2

**appearances** 6:19

**approaching** 43:7

**approve** 44:3 215:3

**approved** 44:6 191:4

**approximately** 6:13

8:2 33:9 66:18
112:11 133:24
134:13 135:3,5,11,
14,21 140:11,22

**April** 11:11 35:9
42:12 51:2 220:13

**arbitrary** 212:9

**area** 161:5

**arm's** 100:2

**art** 73:13

**ascertain** 211:13

**asks** 214:4,5,9

**aspect** 40:15 94:20
95:6 105:5 119:12
160:16 207:5

**aspects** 38:22

**asserted** 45:3

**assertion** 60:23,24
62:6

**assertions** 20:14

**asserts** 21:8

**asset** 53:6 142:13
167:21,24 168:5
173:11

**assets** 23:15 25:17,
20 26:17 52:20,22,23
53:19 59:10 65:5
73:21,25 76:8,10,13,
19 77:11,15,20 78:7,
13 79:3 80:4 83:24
84:2,9 89:18 94:4
95:4 97:4 103:2
106:5,20 109:11
137:14 140:16,17,18
153:22 154:14 170:2

**association** 5:5 6:17

**assume** 22:23
116:14 183:24

**assumed** 93:17
184:22

**Assuming** 168:8

**assumption** 184:4,5

**assumptions** 93:18

**assurances** 10:11

**attached** 131:15
133:12 147:11

**attempt** 67:5 81:2

**attention** 74:4,7
78:21

**attorney** 7:8 43:13

**attractive** 73:22 74:2

**audited** 116:10

**August** 19:19 70:14
75:5 78:22 80:11
82:14 98:11 117:19

**Austin** 17:15

**authored** 73:13

**authority** 31:20,21
37:4,19 38:2,15
61:19 94:19,24 95:13
211:7

**authorize** 35:18
201:23

**authorized** 22:13
35:23 36:21,24 43:24
63:3 171:23 172:2,7
186:17 187:12
201:25

**authorizing** 188:5
191:21

**automatic** 155:23

**availability** 175:2

**avoid** 115:22 201:3

**aware** 15:7 25:25
26:7,8 27:22 32:11,
16,22 36:10 37:3
43:23 45:22 48:19,23
60:23 70:14 79:2
82:6 83:22 93:8
94:13 105:21 114:17
119:24 122:2 141:11
146:5,8 152:23 163:8
164:6 167:3 169:7
170:17 172:17
174:11,13 190:19
201:20 207:8,12,16
208:10,11 216:17
219:18 220:6 222:13

**awhile** 35:2,4

**B**

**B&h** 176:3

**back** 22:20 24:24
66:11 71:23 72:8
73:2 80:19 88:14
107:18 108:5 111:17,
22 119:18 127:25
131:2 140:10 143:10
147:2,5,7,15,23
148:6 158:16,24
176:23 183:16
187:20,24 192:17,19,
21 196:3,6,17 198:6
199:4,20,24 209:19
212:8,16 216:10,15,
20

**background** 12:21

**bad** 115:13 221:7

**balance** 27:12,14
49:20,23 97:5 106:6
135:14 139:8 194:5,
10

**ballpark** 33:16

**bank** 190:8

**banker** 92:21

**bankers** 37:12 92:20

**bankruptcy** 6:9
27:16 41:2 42:12
43:8 44:13,18 61:2,7,
9,18 62:5,24 65:10,
13 68:20 130:3
150:4,12,16 151:8,16
152:14 170:24 171:3
176:14 177:7,14,21
180:16,24 184:23
190:2 191:20 221:25
222:8

**bankruptcy's** 67:8

**Barker** 17:15 19:2
56:13 120:8,9,12
121:20,25 205:12,24
206:4,10 207:2
208:3,8,12,13 213:7
214:19,23 215:4
216:9,14 217:14
218:8,12,15,21
219:3,11

**based** 39:2 40:3 63:20 84:13 93:19 95:9,17 148:25 175:22

**bases** 130:12

**basically** 190:9

**basis** 11:14 12:3 13:10,23 14:20 24:13 30:11,13 31:6 42:3 62:6 63:6 71:13 81:6 106:9 107:2,23 110:24 125:7 128:25 152:20 177:12 182:19 183:8,20 184:2 194:23,24 195:2

**bearing** 98:17

**begin** 9:18,23 14:16

**beginning** 204:3

**behalf** 5:21,25 8:25 11:7 19:9 22:13 35:23 36:22,25 37:5 53:20 55:8 66:5,25 67:4,13,18 68:10 69:15 70:25 71:17 98:18 100:12 109:19 124:11 135:25 140:18 146:9 149:14 154:17 155:25 159:22 161:22 169:4 178:11,21 199:21 203:23 216:14 218:11 219:2

**bel-** 141:17

**belief** 81:7 128:25 217:21 218:4

**believed** 69:16 99:4 143:14 150:25

**believing** 64:20

**ben** 91:21 103:19

**beneficiaries** 23:21

**beneficiary** 81:19 91:22 92:9

**benefit** 83:2 92:4

**benefits** 79:17 80:2, 20,24 81:3,9,16,20 82:8 83:11 90:5,12, 20 91:19,22 92:4,9

**bet** 12:24 39:24

**BH** 18:23 20:10 38:7, 16 39:7 57:4,10,17, 23 58:11,22,25 59:7 65:23 66:6 69:15 70:9 71:2,16,17 95:13 102:14,20,22, 23 103:4,8,13,21,24 105:2,5 112:10,20 113:5,13 114:6,10 121:15 122:16 133:11,16 141:14,15 145:17,25 146:21 163:5 173:15,20,21 174:2,25 175:8,10 178:19 186:18,23 187:12 188:16,19 189:5,14,23 191:7, 14,23 192:14 200:7 219:24 220:6,8 221:15 222:12,22 223:3,4,5

**BH's** 70:15

**big** 62:10 85:4

**bigger** 36:12

**biggest** 155:12

**Bill** 5:24 15:11 72:9

**billion** 33:17,18,19, 20,22,23 200:2

**billion-dollar** 120:16

**bind** 160:7

**bit** 19:5 28:6 40:10 73:2 77:22 86:14 87:4 121:12 145:25 147:19 167:18 174:5, 9 214:12

**Bless** 32:4 224:4

**Bonds** 43:14 46:16, 18,23 47:4,7,12,24 48:6,25

**Bonner** 173:19

**books** 27:3,18 192:24 194:19

**borrow** 109:23 110:5,8

**borrowed** 135:15

**124:7 153:14**

**140:11 141:25**

**borrower** 20:5 84:24 86:13,24 88:9,17 108:22,25 109:5,15, 22 110:15 195:7

**borrowers** 110:8 137:18 196:2

**borrowing** 31:21

**bottom** 131:7 146:15 169:24 174:10 212:25 213:5

**box** 163:2

**breached** 36:4

**break** 68:7 71:22 72:6 130:24 158:15, 22 159:3 212:14

**Brian** 13:3,11

**bridge** 134:5,12 143:5

**briefly** 41:9

**Broaddus** 18:20 131:8,13,21 132:10, 16,25 133:16 143:13, 21 145:9 146:16 147:11 148:18,22 149:8 150:23 163:5 166:24 205:5,7 213:6,16 214:22

**Broaddus'** 132:21

**broader** 213:5

**brokerage** 73:14 74:10

**brokers** 92:24

**brought** 71:12 74:3,6

**bucks** 125:3

**burden** 91:15

**business** 8:8,9 23:14 52:21 74:22 124:19,20 172:11 189:9,11

---

**C**

**calcs** 173:23

**calculated** 107:21, 22,24

**calculation** 173:16

**calendar** 80:10

**call** 15:17 33:13 153:13 212:9

**called** 53:7

**calling** 222:14

**calls** 165:5,9

**cap** 198:18

**capacity** 7:17 8:21 16:14,21 23:4 30:21 63:18 99:23 134:2 149:3 151:13 165:18 166:4,10 195:9

**capital** 5:22 6:7,8 7:9 12:8 21:25 22:4 23:9 24:16 25:9,12,13,14 26:12 27:25 28:13 29:15 49:23 53:5 76:23 77:2,3 80:5 82:25 83:11,24 84:10 85:17,21 88:24 89:11,14 104:16 111:25 112:2,20 113:13,19,24 114:7, 11,18 133:17 134:4 135:11,22 140:12 144:13,20 153:15 163:3,9 164:18,24 165:4,9 167:22 168:8 176:15 177:17 188:17,21 189:13,24 190:7,11 191:3,8,22 192:10,14,21,25 193:12,20,25 195:10, 11 196:3,11,17 197:3,12,20 198:2,6, 11,24 199:4,5,10 200:18,22 201:14,16 216:4,5,10,15,20

**care** 69:20 200:21

**carefully** 47:21 68:8 156:20

**Caruso** 51:17 178:23 179:13,24 180:4,19

**case** 5:19 6:11 8:11, 14,16 10:19 59:22,25

**cases** 8:12

**cash** 49:21 84:3 115:21 116:23 117:5 134:5 151:2 153:20 166:19 167:19 168:4 173:12 190:10 194:4, 10

**caught** 155:16

**caused** 43:4 61:5 151:15 156:13 177:20

**causing** 211:20

**Cave** 13:3,11

**CBRE** 73:14 74:14

**chance** 138:18

**Chang** 146:16 148:17 149:4,8 166:24

**Chang's** 150:21 152:21

**change** 9:9 58:11 59:17 60:5,10 63:20 69:22 134:22 148:9 151:6 154:13,14,15 216:25 217:16

**changed** 24:3 58:8 149:23 155:14 166:12 183:15 199:16 204:4

**changing** 157:16 158:3

**Chapter** 181:2

**character** 201:16

**characterize** 31:24 153:11 221:20

**characterized** 50:15 52:4 194:4,10 197:12 221:21

**characterizing** 102:8

**charged** 162:11,16

**chase** 159:6

**check** 201:21

**chief** 11:9,12,18,25 13:17,24 14:7,12,21

Index: choice..corporate

**choice** 53:24

**choose** 107:7

**chop** 52:21 104:6

**chopped** 95:4

**circling** 174:25

**circumstance** 198:15

**circumstances** 42:17 79:11 83:2 152:12 154:14 199:17

**Civil** 5:18

**claim** 40:25 41:11 42:3 45:20 46:19 47:4,8,12,25 48:7,10, 14,18 49:2,6 50:15 62:2,20 181:9 182:7 220:14,16

**Claimant** 60:16

**claims** 45:3

**clarification** 11:17 181:25

**clean** 87:3

**cleaner** 47:2 204:7

**clear** 76:11 192:11

**client** 183:9,14,16,22

**close** 53:4,7 54:12,18 76:24 84:12,18 85:10 89:6

**closed** 57:19 80:11 111:14 176:7 191:16

**closing** 54:14,15 66:11 69:3 76:15 77:7 84:22 87:7 88:15 107:14 112:15, 17,21 113:3 122:17, 21 123:7,17,25 125:18,25 126:9 192:4 197:23

**clusters** 73:25

**co-borrower** 84:17 85:6,16,20,25 86:5,8, 19 87:8,16,17,18,20, 25 88:4,17,18,20 89:9,14,20,23 106:20 107:2 137:7

**co-borrowers** 109:6 110:16

**co-borrowing** 153:14

**coincidence** 93:11

**collaborative** 101:19,21

**collateral** 17:18 76:8 82:9 106:4 110:2 136:25 137:12,15,16 138:6,9,15,19 139:9, 19 221:21,23

**collect** 189:16 191:7

**collective** 101:17 111:9

**collectively** 39:22 97:16 111:10

**comfortable** 102:7 120:13 121:20 122:2 199:22

**comment** 45:7

**comments** 45:15 99:8 119:11

**commitment** 107:10,19

**committed** 165:4

**common** 152:16

**communicated** 47:3,7 205:21

**communicating** 179:13

**communication** 50:17 51:22,23 52:13 83:20

**communications** 18:2 21:18 43:21 49:5 103:13 105:14 120:22 132:2 206:9

**companies** 95:5 149:19

**company** 8:19 11:2 28:20 101:4,5 164:3 167:21,24 168:5 216:24 220:2

**complete** 17:6 159:14

**completed** 207:21

**complex** 120:16 197:21

**compliance** 94:4 95:6,18

**complicated** 40:11 77:23 86:15

**components** 54:21

**comport** 134:25

**computer's** 160:13

**concept** 116:16

**concern** 58:23 178:22 179:14 200:4 208:11

**concerned** 59:7 68:21 145:17 177:23 178:15 198:14

**concerns** 19:23 145:12 146:5 164:3

**condition** 84:22 87:10,11 153:16

**conditions** 87:6 155:14

**conduct** 67:24 97:22

**confirm** 162:25

**confirmed** 175:8

**confusing** 186:20

**congruent** 105:11

**connection** 8:11,13 18:15 32:9 37:10 38:13 40:8,14,20,22 47:24 48:6,10,17,25 49:5 54:3 93:21 94:8 95:23 96:3,4 97:13 98:23 100:23 103:8 118:18,25 126:8 132:25 161:23 162:8, 18 170:23,25 171:3 182:5 185:3 203:23 210:5 215:9

**consent** 5:23 6:2 59:14,18 69:21 70:9, 15 129:21 158:2

**consents** 31:20 32:9,13

**completed** 207:21

**consequence** 150:16 221:22

**consequences** 68:19 71:14 221:24

**consideration** 208:7

**considered** 223:25

**consistent** 151:3 163:4 165:11 166:23 169:16 176:5

**consistently** 57:18, 20 170:3

**consolidate** 136:22

**consolidation** 115:22 116:14,17 136:16 138:13

**contact** 103:18 118:10,12

**contagion** 106:8 156:13

**contagious** 68:21

**contained** 21:8

**contemplated** 85:13,14 87:20

**contemporaneously** 190:20

**contend** 36:3 40:6 94:6 97:11 118:16,24 132:24

**contends** 40:13 152:20

**content** 211:8

**contention** 61:8 63:7 219:25

**contentious** 178:16 181:4 184:23 191:19

**context** 10:13 73:3 116:17

**continue** 42:2 158:12 214:15

**continued** 104:18 113:5

**continuing** 208:15

**continuous** 11:14 12:3 13:10,23 14:20

30:13 31:6

**contribute** 25:15 141:15

**contributed** 25:9,11 26:12 112:17 114:8 133:24 141:12 144:24

**contribution** 104:16 112:20 131:16,23 132:18 133:3,6 134:4 135:12 140:12 144:14 163:10 188:22 189:7 190:11 191:3,8 195:11 196:12 197:3 198:11 199:10 200:8,18,22

**contributions** 26:22 27:20,25 114:18 131:14,22 132:3,17 133:2,12,17 135:23 144:20 145:2 163:3 164:19,24 189:14 216:4

**control** 100:11 152:16 166:5,8 222:8

**controlled** 30:4,8,12 66:2

**controls** 29:25

**conversation** 44:10 60:3 71:9,12 83:13, 14 90:3,24 91:6 179:18,22 180:3 218:17 219:8 220:15, 22 221:9,12 222:14, 16,17

**conversations** 43:2 44:12 46:11,24 93:7, 23,25 122:14 132:7 145:21 209:10,15 218:20 223:14

**convey** 57:16

**copied** 50:22 131:10 133:10 145:10 190:25

**copy** 42:23 117:23

**Corona** 127:6

**Coronavirus** 126:20

**corporate** 7:18 8:21,

23 16:15,21 30:21 31:9,13 63:18 67:7 93:16 101:4 157:24

**corporation** 8:24

**correct** 26:21 36:19 47:4,5,9,10,13,25 48:2 51:4 54:4 55:5, 6,11,12,15 58:5,8,12, 13 59:22,23,25 60:2, 7,12 62:13,17,24 63:4,5 64:2,3,6,7,17, 18,22 65:17,18,19, 21,22,23,24 66:3,4 67:2,5 69:22 70:4,9, 19 71:14 75:19 77:17,18,21 78:15 79:9 82:18,22 84:8, 24 85:22,25 86:5,9, 20,24 87:8,12,14,22 88:7,21,25 90:22,23 92:17 95:10,14 96:9, 10,14,15 98:4,5 99:16,19 100:8,15 101:24 102:5,15 103:5,6 104:21 109:19 110:19 111:6, 7,15,16 112:12,22,25 113:8,14,20,21 114:2,9,20 126:9,15, 25 127:2,4,9,16 130:7 132:22 133:21 139:11,24 140:19 144:16 148:23,24 149:10,12,15,16,20 150:3,5,10,23,24 151:4,5 152:8,9 160:8 162:13,14,18, 19 163:11,24 164:8, 11 165:13,25 166:6, 7,11,12,16,17 167:14 169:9 170:7,10,11, 13,14 171:4,12,14,21 172:4 176:16,17 181:16,18 182:8,17 185:6,7,11,12 186:2, 5 187:14 189:8 190:21 191:4,5,10, 11,23,24 192:15,16 196:7 197:20 198:19 206:22 207:2 211:23 217:5,6,10 218:5 219:8

**correctly** 39:25 169:24 171:16

186:25 211:14 217:2

**correlates** 125:17

**correspondence** 142:23

**corresponds** 125:24

**costs** 112:18

**counsel** 5:4 17:13 18:15 32:8 39:16,21 44:22 46:11,15 93:16 100:7,23 158:11 181:11 182:10

**Counsel's** 6:19

**count** 165:4

**counted** 112:8

**counter** 146:10

**counterparties** 116:12

**country** 53:6

**couple** 100:18,19 174:24 220:12

**Cournoyer** 93:5,15, 20 94:6,10,14,18,19, 24 95:22

**court** 6:9,16,20,21 61:18 224:22

**courtroom** 5:16

**cover** 112:17

**COVID** 8:4 59:8 205:10

**create** 143:22

**created** 29:19 56:7, 17 58:17 74:22 75:6 143:22 205:3

**creating** 67:8

**creation** 74:24 75:9, 10

**credit** 139:4 198:10 199:23

**credited** 144:24

**cross** 68:2

**curious** 202:19

**cut** 24:21 112:5 159:5

219:11 222:4

**D**

**daily** 38:6 107:22

**Dallas** 6:10 13:5 74:12

**damage** 221:21,23

**date** 65:25 66:7,19 67:14,20 68:11,25 69:13 70:25 99:20 100:14,17,20 101:20 114:14 118:20 130:6 143:19 148:19 149:21 171:12 173:7 217:22 218:2

**dated** 98:11 115:3 117:9 131:8

**Dave** 77:13

**David** 97:6

**day** 158:10,12 161:7 224:8

**Day's** 13:4

**days** 54:8,11 69:3 80:5 103:24 107:14 111:17,20 127:25 151:23 174:24 191:16

**DC** 46:23 186:11,14 187:4

**deadline** 43:6

**deal** 21:5 24:23 124:9 125:19 141:6,24 142:4 145:17 189:9, 12

**deals** 19:17 20:4,8 21:21 26:10,11 103:2

**debt** 62:25 63:4,8 84:5,7 104:7 105:11 136:21,23 153:4,21 171:13,19 172:23 173:18 174:14 176:10,16,20 177:2 187:15 188:10,19 189:7,13

**Debtor** 60:19

**debtor's** 51:3

**debts** 175:11,20 176:4

**December** 70:17 201:12

**decide** 89:8 109:4

**decided** 79:7 139:23 181:5 182:6 191:25 200:9

**deciding** 136:6

**decision** 37:21 39:2 54:22 77:16 82:12, 17,22 83:6 84:8 85:19 88:20,23 89:21,22 90:13,20 94:11 95:19 96:8 108:10,24 109:18 111:8 126:23 135:20 173:6 180:17 184:12, 17 191:7 201:11,14, 15 206:16 210:13

**decision-make** 94:21

**decision-making** 37:18 38:2,15,17 94:19,24 95:12

**decisions** 38:8 40:4 95:9,19 206:12 207:4 210:8,18 211:7

**dedicated** 29:17

**default** 106:8,14 137:24

**defaults** 68:2

**deferential** 38:20 82:19 95:2 109:16

**deferred** 39:14,15,16

**defined** 168:9 206:5, 14

**definition** 205:22

**delegate** 37:4,9 38:5, 16 94:23 95:12

**delegated** 37:11,16, 18,25 39:7 211:22

**delegating** 37:15

**delegation** 38:14

**demand** 86:9,10,12, 20 87:2

**demanded** 86:21,23 87:15

**demands** 87:5

**denied** 183:25

**department** 92:16 96:23

**departments** 96:24

**deposed** 7:20 9:13

**deposition** 5:7,9 6:5, 12 7:13 10:6 15:8,16 17:10 18:9,16 19:6 54:4 159:2 224:25

**depositions** 8:3 18:12

**describe** 12:20 57:6 74:19 90:4 106:5 173:4 221:17

**describing** 51:24 59:6

**description** 21:13

**designate** 109:4

**designated** 108:22, 25 109:15

**desire** 79:13

**determination** 139:21 196:24 217:9

**determine** 68:18 90:19

**deviated** 55:25

**difference** 85:4

**differently** 192:2

**difficulty** 130:17

**diligence** 45:23 67:24 90:19 97:22 157:10,12

**diluted** 27:21,24 59:4

**direct** 195:10 197:10

**directed** 195:7 208:19 219:7

**direction** 106:18 132:11 149:18

**directly** 23:24 24:16 221:24

**dirt** 101:6

**dis-** 167:20

**disappointment** 220:24 221:19

**discovery** 22:7 185:24,25

**discuss** 27:23 28:3, 12 43:9,12,16 81:24 122:11 123:4 136:9, 14 175:3 200:16 201:7 202:4 206:8 210:3 222:25

**discussed** 28:15 82:9 115:25 144:3 151:16 178:2 218:11

**discussing** 116:6

**discussion** 57:4,7 83:9 120:22 145:15 190:25 207:16 218:7

**discussions** 82:17, 21 83:5 91:2 104:18 105:4 113:4 122:8 148:13 160:10 174:14

**disposition** 167:20 168:5

**dispute** 8:17 150:15 180:21 182:21 208:25 209:17 216:25 217:15 218:16,21 219:3 220:2,9 221:4,15,17 222:13,15,23

**disputing** 201:18

**disqualification** 183:5

**disqualify** 182:17,20 184:13

**disqualifying** 181:12

**distinction** 85:3

**distinguish** 96:20

**distributable** 151:2 153:20 166:19

**distribute** 177:8 180:10 186:23 195:22

**distributed** 167:21 168:6 170:2

**distribution** 62:21 63:11 172:3,7,15,21 177:18,22 187:23,25 188:5 200:12

**distributions** 20:22 60:16,17 61:6,11,19, 21,23 62:23 63:8,9 134:6 145:14 171:8, 11,14,18,19,24 172:25 173:7,25 174:14 175:3,10,20 176:3 178:7,12 179:2,15 180:5 186:18 187:13 194:12 201:17

**District** 6:10

**Division** 6:11

**doc** 154:11 171:2

**document** 10:12 15:6,19,21 16:3 42:7, 14,18 43:5,9,13,16, 22,25 44:4,7,11,20, 24 45:7,15 50:10 52:6 56:9 75:9,15 97:16 98:17,19,24 99:4,5,8,16 100:3,24 101:16 110:9 120:13 121:25 123:21 127:3 128:19 133:15 140:23 143:13,20,21 144:5,8 154:6,12,22, 24 156:24 158:6 159:13 161:23 162:21 163:4 168:13 169:9 182:5 197:17, 24 199:14 201:19 212:21 215:23

**documentation** 54:2,7 55:14 110:14 154:19

**documents** 10:8,10 17:17,19 18:11 48:4, 5,10,14,17,25 49:5,8, 25 50:5,13 52:2,8,9, 12 156:11 170:23 171:2

**dollar** 140:24 141:5

**dollars** 110:12 125:4, 8,13,17,24 126:14 127:15,21 128:12 141:5,16 192:25 193:9,19,24 195:3

**domain** 8:17

**Dondero** 13:21,22 14:7 17:14 18:18 24:11 25:4,18 26:14, 16 27:19,23 28:17,20 30:4,8,12 32:24 33:24 35:22 38:25 40:2,4,9 43:10 66:2 76:16 78:25 79:7 81:24 82:21 83:5 84:7 85:10,19 86:4,7, 18 87:24 88:3,19,23 89:8 90:4,11,18,25 91:7 98:20,24 100:11,12 135:25 136:5 152:16 159:22 160:15 165:16 166:3, 9 167:5 169:8 172:4 199:9,21 206:3 210:25 211:11 222:8

**Dondero's** 15:8,16 41:22 98:17 135:18 160:3 172:9

**doubt** 143:4,7

**draft** 62:3 69:7 117:23 119:6 145:2 208:17 209:5

**drafted** 149:4,9

**drafting** 19:18 100:24 101:15 103:9 118:4,13,18 182:5 185:4

**drafts** 119:15

**dramatically** 149:23

**DSI** 50:14,21 51:3,6 178:23

**due** 67:24 97:22 157:10 207:24

**Dugaboy** 139:6

**duly** 6:24

**Dunlop** 55:18 112:3, 4 125:2

**Dunlop's** 127:9

**duties** 97:13

**E**

**earlier** 11:2 46:18 57:2 77:5 95:15 96:16 97:21 101:2 124:7 136:24 145:13 148:18 156:9 161:7, 13 163:6 201:7 217:20

**early** 58:17

**earnest** 53:8 141:5, 10,13

**easy** 224:2

**economic** 99:10,11 155:14 160:24 216:23 217:14

**economics** 154:15

**educational** 12:21

**effective** 70:13

**efficiency** 89:12

**effort** 65:13 67:19 68:10 92:19 101:21 117:17 181:6 220:25

**electronic** 41:22

**elements** 74:25

**elicit** 10:17 51:18

**elicited** 51:19

**Ellington** 23:22 24:11 25:5,7 28:20

**Ellis** 43:14 46:16,18, 24 47:4,7,12,24 48:6, 25

**else's** 59:14

**email** 50:17 52:4 114:24 115:3,8,25 117:8,11,13 119:19 122:3 131:6,8,10 132:12 133:11,17 136:16 144:13 145:5, 8,12 146:16,23,24 147:8 148:7,13,18 150:21 152:21 174:21 186:11,19

**Dunlop's** 127:9

**duties** 97:13

**emails** 17:25 18:3,5, 7

**eminent** 8:17

**employed** 10:20 12:5,16,18 22:14 93:2,10

**employee** 97:12

**employees** 33:2,5, 23 97:10

**employer** 10:23 12:14

**employment** 12:22

**encumbered** 84:4

**end** 57:20 125:9 186:10 187:11

**ends** 224:25

**energy** 8:18

**engaged** 100:2,13

**enter** 31:18 54:22 64:8 223:20

**entered** 35:7,9 36:10 55:21 63:13,16,25 64:5 108:21 143:15 145:4 154:3 166:16 168:13

**entering** 59:8 223:6

**enterprise** 101:10

**entire** 55:4 66:11 142:16

**entities** 95:5 100:11 152:15

**entitled** 60:16

**entity** 9:5,6 12:6,12, 13 22:23,24 65:17 102:15 134:8 162:7

**enure** 81:17 137:12

**equitable** 153:12

**Equities** 18:23 20:10 38:16 39:7 57:17 58:25 59:7 65:23 66:6 69:15 71:2,17

**187:10 190:15 198:5 212:22 213:4 214:6, 15 218:13 219:11**

95:13 102:14,20,22
103:4,8,13 105:2,5
112:10 113:5,13
114:6 133:11,16
145:17,25 146:21
163:5 174:2 175:8
178:19 186:18
187:12 188:16 189:5,
15,23 191:7,14,23
192:14 200:7 219:24
220:8 221:15 222:12,
22 223:3,4,5

**Equities'** 57:23
58:11 70:9 71:16
112:20 188:19

**equity** 13:5 25:14,20
27:7,9,19,24 28:4,9
49:24 102:25 104:17
177:8,22 187:6
188:22 189:7,8,16,24
191:3,9,22 196:2
200:8

**error** 40:20 99:19
207:9

**errors** 21:7 40:7
118:17,25

**establish** 16:16

**established** 136:24

**estate** 5:25 9:3,8
11:2,6,19,21 12:2
13:14 14:8 23:9,15
28:21 29:5,9,11,17,
23 31:19 32:10 34:3
67:25 68:17 74:8
93:13 97:23,24
110:25 111:21
127:17 151:20
182:10 216:5

**estimate** 124:13

**evening** 148:8

**event** 43:3 106:7,14
150:8,9

**events** 111:12

**eventually** 93:24

**Everybody's** 149:17

**evident** 144:2

**evolve** 104:2

**exact** 27:2

**EXAMINATION** 7:2

**Excel** 52:14

**exception** 39:5
107:12

**exchange** 26:5
35:19 107:10 127:22
212:22

**Excuse** 158:20

**execute** 92:12

**executed** 54:2
159:6,20

**executing** 74:25
120:13

**execution** 19:17
74:16

**exercising** 106:13

**exhibit** 15:4,7,12,14,
17 18:8 41:6,9 42:2
45:19,24 46:8 60:15
98:7,9 114:23,25
117:8,10 131:4,5
145:6,7 146:12,13,14
147:7 159:9,10
174:6,7 189:18,19,20
212:22,23

**exhibited** 73:22

**exists** 122:20 197:25

**expect** 110:5,8

**expectation** 127:6
221:2

**expectations** 221:2,
18

**expected** 80:20 81:9

**expenses** 108:8
173:13

**experience** 107:25
211:25 212:2

**expert** 185:15

**expertise** 95:7

**experts** 38:21

**explain** 218:15,20

**explained** 219:2

**explicitly** 195:23

**expressed** 178:22
179:14 208:14

**expressing** 220:23

**extension** 104:8

**extent** 7:25 39:10
59:2 80:4 104:19
138:5 173:11

**external** 32:8 34:7
37:12

**externally** 92:20,22

**extinguish** 175:11,
20 176:4 187:15
195:10,11 197:2

**extinguishing**
188:10

**eyes** 101:3

---

**F**

**face** 203:8

**faced** 126:12

**fact** 44:17 54:8 62:4,
22 70:23 78:6 109:18
123:6,16,23 146:19
151:17 152:23 154:2
182:3,14 185:24,25
192:6 194:13 199:3
203:13

**factor** 79:23 106:16,
17

**factors** 129:17
130:13 136:5

**facts** 60:22,23
154:13

**factual** 157:21,22

**fail** 9:23 61:5

**failed** 193:18

**failure** 155:9

**faint** 160:2

**fair** 9:19 24:9,14
38:18,19 39:3,7
44:11 45:14,17 54:20
55:19 56:24 100:9,10
101:11,12 104:13

111:23 112:23
113:11 148:25
150:13,14 151:2,12
161:20 162:5 167:9,
10 169:20,22 182:24
188:4,8 203:16,17
211:14,15 219:13,14
221:25 222:2,10,11
223:16

**fall** 8:6 206:21 207:2

**familiar** 22:24 26:4
40:24 73:5 97:7
102:15 209:18

**fast-moving** 197:22

**fault** 187:9

**favor** 26:5

**February** 56:8
114:23 115:4 117:9

**Federal** 5:17

**feel** 115:13

**fees** 36:15,16,17,18
107:19 122:16

**fight** 179:8,9 180:11,
13,15 185:20 186:8
191:19 200:23 201:3

**fighting** 181:6

**figured** 104:9

**figures** 26:25

**file** 213:19 222:7

**filed** 40:25 41:12
42:11,14,15 44:11,14
45:8,16,25 48:15,18
50:15 61:7,9 62:5,24
65:11,13 130:4 150:4
152:14 169:3 209:20
211:22 213:17,25
214:7 220:14

**filing** 43:24 44:3,6
62:20 67:8 68:3,20
88:6 97:16,17
150:13,16 151:7,16
156:12 177:21
204:15 220:5 221:25

**filings** 21:21,23

**fin-** 209:6

**final** 58:19 121:3

160:3 187:23 209:20
217:9

**finalize** 162:3

**finalized** 209:7

**finally** 54:12 214:21

**finance** 97:6 154:10

**financed** 176:16
177:2 189:8,13,16
191:9,10

**financial** 49:15,20
50:20 51:4 52:6
55:25 58:16 84:13
116:15

**financials** 49:14
116:10

**financing** 38:23
188:19

**find** 103:23 142:9
184:10

**fine** 15:20 120:21

**finish** 9:18 78:3 86:2
224:19

**firm** 43:13 56:14
73:14 93:4 101:23
102:4 182:20

**firm's** 183:12

**firms** 74:10 101:2,8
161:13,21 181:20
182:4

**fit** 195:23

**five-year** 124:24
125:10

**fixed** 57:24 58:4

**flexibility** 78:18
79:11,13 80:18 82:25
83:11,25 84:10
85:17,22 88:25
89:11,15 109:8
153:15

**flow** 49:21 173:12
221:24

**focus** 161:5

**focused** 78:21 189:5

**focusing** 181:25

223:4

**folks** 103:7 173:14

**follow** 95:17,20

**follow-up** 8:5 133:11 174:25 189:21

**foreclose** 106:11

**foreclosure** 106:14

**foresee** 150:8,9

**Forgive** 223:13

**forgot** 223:13

**form** 27:6,7,8 161:7

**formal** 31:15 32:19

**formally** 14:25

**formed** 23:11 24:4, 10 28:20 29:12 30:5, 9,14,18 31:2,7 32:18, 23 33:6,9 37:2 204:9, 11,17 217:21

**formulated** 69:9

**forward** 148:22 189:15

**forwarded** 149:8 166:24

**fought** 185:13,19 186:4

**frame** 80:13

**Frank** 97:6

**frankly** 89:19 177:24

**Fred** 51:17,21 178:23,25 179:11

**free** 173:12

**friendly** 200:3

**fulfill** 51:16

**fulfilled** 51:11

**full** 10:13 55:20 58:4 64:4 187:21 188:2,6, 20 189:8,14 196:4

**fully** 142:22 143:2,10

**fun** 196:9

**fund** 29:17 141:25

**funded** 112:14,21 141:6

**funding** 112:24 134:3

**funds** 29:16 195:7

**funds'** 95:5

---

**G**

**game** 120:20

**Gameros** 5:24,25 15:20 32:6 72:11 139:12 224:20

**gamut** 49:22,23

**garden** 73:21

**gave** 36:13,14 47:11, 14,23 48:3,5,25 211:2

**general** 9:14 52:21 71:6 173:9 204:20

**generally** 8:15 12:21 19:5 21:22,24 23:16 38:11 39:17 40:24 56:4 57:6 74:20 75:13 101:5 135:8 172:10 173:22 174:17 186:25 197:15 210:11

**generated** 36:12

**geographically** 74:2

**give** 9:14 10:11 17:6 48:9 80:9 108:10 116:11 158:12 159:14 172:19,24 204:6 210:21 212:5

**good** 5:3 7:4,6 155:4 179:16 214:18 224:7

**Gotcha** 144:19

**grand** 176:22

**great** 29:23 120:21

**Greg** 50:21

**ground** 9:14 16:16, 18

**group** 13:5 53:5 97:2,3 146:9 149:18

173:14,22 210:21 211:3,7,22

**groups** 96:24

**guarantor** 84:21,23, 25 137:21

**guaranty** 17:19 136:20 137:20 138:8

**guess** 51:24 116:2,4 120:19 148:7 151:10 174:12 179:6 185:18 204:14 213:4 218:24

**guessing** 120:20 142:24

**guy** 103:21

**guys** 97:7 147:5 181:10 183:25 185:13 186:4

---

**H**

**half** 221:6

**handle** 147:14

**happen** 59:9 68:4 100:21 126:22

**happened** 9:11 27:17 44:10 67:10 96:22 152:11,13 202:7,16 206:21

**happening** 188:25 190:12

**happy** 196:20

**hard** 42:23 53:8 186:4 204:6

**HCMLP** 96:24,25 100:2,6 101:10 109:12 115:21 177:7 182:4

**HCR** 186:24

**HCRE** 9:5,9 17:16 19:9 21:7 22:13,23 23:7,10,14,17,19,25 24:3,7,9,17,22 25:5 26:2,5,16 27:20,21 28:5,16,17 29:6,9,12, 25 30:4,9,13,17,24 31:14,16 32:16,23 33:2,5,8,21 35:12,15,

18,23 36:3,4,19,22, 25 37:5 38:20 40:6, 12,13,18,21 41:12,16 45:23 46:7 53:20,22 54:20 55:19 56:13 57:16 58:10 59:11 60:5 61:6,10,17 62:12 63:25 64:5,8, 11,19 65:13,21 66:2, 6 67:2,4,13,19 68:10, 23 69:15 70:6 71:2, 17,19 74:4 77:8 84:12,16 86:4,7,18 91:25 92:3 94:6 97:11 98:18 99:24 100:2,6 101:10 108:21,25 109:5,14 110:14,19 111:5,10 113:24 114:6,17 118:16,24 122:25 129:11 132:24 133:23 134:14 135:4, 13,15,21,24 136:6,10 137:14 138:16 139:2, 8,15,22,24 140:8,10, 21 141:6,23 142:3 143:9 149:14 151:15 152:14,20 154:2,17 155:25 156:6,22 157:14,24 159:23 160:7 161:22 162:6 164:14,23 165:9,19 166:4,10 170:18 175:10,12 176:2,4,13 178:19 180:18 181:16 182:4,6,14, 16,19 183:4,9,21 184:6 185:2,9,24 187:12,20 188:4 192:13 194:7 195:6, 9,13 196:15,24 197:10 198:22 199:22 201:2,17,20 202:12 203:2,11,23 204:9 209:21,25 211:19 216:14 217:5, 13,21 218:3,11 219:2 220:14 223:22

**HCRE's** 7:18 16:9,21 20:15 22:4,7 27:3,11, 14 30:21 31:5 40:25 60:9 61:8,25 63:6,18 74:6 91:15 101:15,24 134:2 135:10 139:19 140:24 149:3 151:22 157:24 161:20

162:12 163:21 167:12 168:20 169:14 171:7 175:18 177:19 188:10 219:24

**hear** 7:5 212:18

**held** 6:12 11:12 13:9, 13 94:5 154:14

**helped** 94:3

**Herb** 213:6

**Heriberto** 213:6

**Hey** 143:20 196:15

**Highland** 5:22 6:6,7 7:9 12:8,23 14:14,17 20:5 22:13 23:9 25:23 26:5,10,11 27:17 29:5,8,10,15, 22,24 33:25 34:13 35:12,16,19,24 36:3, 13,14 41:2 42:11 50:3 52:11 56:2 61:4, 5,9 62:5,24 65:19 66:2,6,22 71:18 75:18,22,25 76:5,12, 18 77:10,15,16,19 78:5,9 79:2,8,13 80:2,21 81:7,25 82:7, 13 83:6,20,23 84:8, 16,20 85:5,9,19,24 86:5,8,12,19,24 87:8, 16,25 88:4,8,16,20 89:3,9,13,19,22,23 90:6,14 91:3,8 93:2, 4,6,11,14,16,17 94:11 96:8 97:9,12 98:18 101:9 105:21 107:8 108:6,7,11,14 109:12,14,19 113:18 114:6,17 121:6,14 122:15,21 123:5,14, 24 124:5,8,11 126:7, 25 128:7,13,16 135:24 136:11,17,21, 25 137:7,20 138:2,11 140:8 144:23 146:9, 21 149:9,11,13,14,18 150:4,20 151:8 152:14,15 153:8,23 156:2,7 159:22 160:7 161:22 162:2,6 164:23 165:9 173:2, 25 178:3,4,6,7,11,18,

20,21 181:15 182:7, 16 183:22 185:2 190:2 191:13,20 192:2,3,16,17,18 193:15,23 194:3,14, 21 195:3 196:12,15, 25 197:12 198:7,10, 19,24 199:11,22 200:6,9,17,25 201:8, 17,20 202:2,12,16 204:18 211:23 216:5, 10,15,20 222:7,9 223:21

**Highland's** 22:7 25:25 50:6,11,20 68:24 71:5 91:13 92:4,11, 16 102:5 116:9 125:12,23 128:9 129:6 144:15 162:17 176:14,19 182:16 183:4 184:13 194:6, 10 195:11 197:2 198:2 204:13

**highlight** 206:18

**hired** 185:15

**history** 12:22 156:5, 8

**hit** 126:20

**Hogan** 5:24

**hold** 13:6 124:24 125:10 167:18

**honest** 17:7

**honestly** 142:8

**hope** 145:11 224:7

**hopeful** 67:7

**human** 92:12

**Hunton** 39:16,21 101:6 102:10,11 118:6,7,13,23,24 161:17,18

**hurts** 116:14,15

**hypothetical** 70:21

**I**

**idea** 89:4 115:24 116:16 125:15

179:16 210:17 220:7

**identified** 62:17 105:2 161:13

**identify** 12:13 22:11 61:14 93:10 154:2 155:11 197:24

**identities** 204:4

**impact** 91:14

**impacted** 59:6

**impediment** 177:20

**implicitly** 195:22

**important** 9:17 216:22

**improper** 20:16

**inaccurate** 21:13 63:17

**inactions** 60:19

**inbound** 74:9

**incentive** 223:11

**include** 25:22 56:14 77:16 82:13 83:6,9, 10 84:8 85:19 86:5,8, 12,19 94:11 96:8 99:12 131:22 133:3 155:9 178:4 199:4 204:21 218:23

**included** 61:25 78:10 81:25 82:7 83:21 85:25 87:24 101:10 124:8 163:10 167:4 169:8 214:10

**includes** 214:23

**including** 17:17 68:18 89:13 117:12 178:20

**inclusion** 85:15 91:13 92:5 122:5

**income** 36:12 49:24 123:19 215:24

**incorrect** 153:2 217:23

**increase** 89:5 104:8 223:15

**increased** 36:11,15,

16,17

**indebtedness** 136:18

**independent** 100:7 162:6 185:11

**indirectly** 23:24 24:17

**individual** 7:17 8:20 16:14 23:3

**individuals** 22:11 204:20

**influx** 50:16 52:5,15, 18

**inform** 69:15 216:19 222:15,22

**informal** 31:15

**information** 47:11, 14,23 51:7,19,21 163:14 221:14

**informed** 136:3 202:9 217:13 218:3

**informs** 133:11

**inhibited** 180:17

**inhibiting** 177:7

**initial** 34:21 141:4

**initiating** 223:14

**inquire** 222:19

**insinuating** 201:5

**insisted** 85:23,24 87:21

**instance** 206:15 209:16

**instruct** 51:15 69:7 218:15,20 222:21

**instructed** 62:15 97:18 216:18

**instructing** 118:7

**instruction** 215:21

**instructions** 172:20, 24 210:22 211:2

**intensely** 184:24

**intent** 46:3,6 63:19

64:21 75:15 79:21, 24,25 151:4 154:5,18 155:13,15 163:23 164:15 165:12,24 166:15 167:13 168:12,22 169:16 170:13 184:24 192:7 201:18

**intention** 40:18

**intently** 185:13 186:3

**interest** 23:23 27:21 43:8 50:11 52:2,10 56:2 57:24 58:3,7,12 67:15 68:24 104:4 143:25 144:15,25 151:25 156:17 168:8, 9 171:21 192:7 203:4

**interesting** 93:9

**interests** 20:17 21:12,13,19 24:12 27:24 44:18,20 50:7 60:6 69:10,18 71:3, 16 94:15 96:12 99:12,15 101:15,24 102:5 104:19 113:6 139:4 157:2,17 158:4 162:13,17 163:3 167:23 168:7 170:3 223:8,11,12

**internal** 37:11 39:15, 21 67:23 68:17 92:25 97:21 156:10 218:18 221:21,23

**internally** 92:20,21 175:8

**interrupt** 148:2

**intimately** 97:7

**invest** 23:15 24:15 102:25

**invested** 25:2,5

**investigation** 90:19

**investment** 11:5,9, 13,18 12:2 13:18,24 14:8,12,21 28:5,14 29:11,16 33:11 107:15 139:6 198:21

**investments** 26:16, 20 28:9,21 29:6,9,24 32:10 33:8,12,22

37:10

**investor's** 152:3

**investors** 11:7 152:5

**involved** 96:7 102:17,21 105:18 161:13 173:5,6 195:25 203:18 204:4, 25 213:12 215:8

**IPO** 35:9

**IRR** 151:20

**irrelevant** 180:21

**issue** 10:18 44:13,15, 16 82:9 177:24 178:16 184:24 200:16 206:25 213:13 215:8 222:9

**issued** 26:5

**issues** 19:21 38:4 39:6 67:8 73:3 108:4 125:3 156:12

**items** 122:4

**iterations** 98:21

**J**

**Jacobs** 173:21

**Jacobson** 173:21

**Jim** 13:21 17:14,15 23:21 25:8 28:22 30:2 32:19 36:23,25 76:16 82:15 97:3 106:22 108:12 109:3, 16,18 139:20 171:25

**Jim's** 106:6 139:7 202:13

**Joanna** 220:5

**job** 211:10,14,20

**John** 5:20 7:7 139:13

**joined** 12:22 13:11 14:17

**joining** 13:4 29:24

**joint** 102:12 106:9,15 107:2

**jointly** 101:9 105:22

Index: Jones..made

107:10 137:2 161:22
181:15 182:15 185:3

**Jones** 5:21 7:8 13:4

**June** 12:9,10 189:22
191:6,14,21 192:13,
19 200:8,17 201:8,21
202:2,12,20 203:11

**justification** 190:20

---

**K**

**K-1S** 205:17 209:21,
24

**Ken** 173:20

**Key** 106:11 110:24

**Keybank** 17:17
19:23 20:5 52:24
53:2,6,15 54:2,23
55:14 58:4 63:21,23
64:16 66:23 78:17
80:11 84:13,17,20,21
85:3,5,6,20,23,24
87:6,15,21 88:7,15,
16 89:9,14,23 103:22
105:19,23 106:18,25
107:11,17,18 108:21
109:23 110:9,14
111:10,14 112:5,15,
22 125:2,19 126:2,9
127:8 134:5,12,15,
20,21 135:5,13,21
136:7,11 137:3,6,11,
17,24,25 138:3,17
143:5 156:14,15
185:5 187:20 188:2,6
192:4 195:5,17,18,25
196:3,25 197:11

**Keybank's** 86:9,20

**Kim** 5:10 6:17

**kind** 37:15 40:20
86:16 102:12 104:7,
23 112:25 170:19
180:21 209:8 210:22
211:2

**Kirshner** 213:7
214:6,16

**Klos** 77:13 97:6
108:13

**knew** 54:21,24,25
55:3,8,9 63:15 64:9,
15 77:9 78:14 90:10,
11 93:5 96:17,21
114:7 127:8 143:24
144:4,11,23,24 154:7
158:6 172:11,13,18
182:15 184:25

**knowledge** 11:22
24:6 28:10 29:19
30:3,7,17 31:12,17
47:6 55:20 58:4,10
62:12 64:4 76:21
77:14 79:7 81:4
86:18 90:17 93:19
100:8 101:8 107:9
114:6,16 132:6 149:2
157:23 161:19
162:16 163:21
167:11 170:15 185:8
196:23 206:25
211:12 217:13,25
219:10,22

---

**L**

**L.P.** 5:22 6:8 7:9

**labeled** 6:4

**laid** 101:3

**land** 52:22

**language** 146:25
147:16 149:7,9

**large** 92:19 116:7

**largely** 106:6 121:5
173:19 204:19

**larger** 58:20 59:3

**largest** 53:5

**late** 76:14

**law** 12:25 13:6,10
43:13 100:25 101:23
102:4,9 161:12,21
181:20 182:3,20

**lawyer** 43:18 61:14
155:3 183:7,19
185:10

**lawyers** 37:11,12
92:21,25 93:2 186:7

**laying** 176:22

**lays** 106:4

**lead** 108:22,25 109:5,
15,22 110:14 179:2
180:6,20 195:7

**leader** 205:4

**leading** 88:15 111:12

**leads** 152:25

**learn** 54:10,14 63:12
76:12 202:7,11

**learned** 42:20 66:15
100:20

**leasing** 38:8

**leave** 203:5 205:7

**left** 205:6 212:6

**legal** 5:5 6:15 32:7
39:13,15,21 67:23
68:17 97:21 154:9,11
156:10 177:20

**lenders** 173:18

**length** 100:2

**leverage** 116:8,13

**liability** 125:12,16,23
126:12 127:21 128:9

**liable** 105:22 107:11
137:2,7,22

**Liberty** 165:5

**license** 13:6,9

**life** 197:18

**light** 151:17

**likelihood** 89:5

**lines** 159:22

**lineup** 115:16,19

**liquidation** 169:21
181:3

**list** 39:19

**listed** 16:10 137:15
138:19

**listen** 47:21 68:8
156:19 193:17

**litigated** 184:24

**litigation** 177:25
178:17 179:3 180:7
184:16

**live** 155:13

**lived** 46:2 196:9

**lives** 199:19

**living** 128:19 154:6,
12,22,24 158:6
199:14

**LLC** 17:16 19:18 20:8
21:9,14 41:12,16
48:19 49:9,10,11
55:22 57:25 63:25
66:24 67:21 69:8,24
70:8 75:5,23 76:2,17
77:4,9,17 78:10
79:25 80:8,14 89:17,
22 90:14,21 93:23
98:7,11 103:10,14
104:13,14 105:6
111:6 113:7,12,18,23
114:15 117:18
118:14,19 119:3
159:7 185:4,5

**loan** 17:17 19:23 20:5
53:15 54:2,23 55:14
66:23 80:11 84:13,
17,21 85:6,20 87:7
88:15 89:5,10,14,24
93:24 105:19,23
106:3 107:11 108:21
109:23 110:9,14,18,
20,21,22 111:14,22
112:4,6,15,22
134:15,20,22 135:5,
6,13,22 136:7,11
137:3,6,11,24 138:3,
17 142:16,20,22
143:2 156:14,15
185:5 187:20 195:17,
25 196:3

**loaned** 25:25

**loans** 25:20 26:6,13
27:7

**local** 74:12,14

**LOCS** 49:24

**long** 201:17 205:5

**longer** 142:19 152:15
158:10,12

**looked** 30:23 40:2
123:19 146:22,23
150:22 155:15
194:18

**losses** 21:2 117:6
121:12 123:2,6,15
124:5,14,22 125:5
126:21 138:5 193:10
210:4,9,14

**lost** 130:16,19 203:8
204:16

**lot** 53:18 86:21 93:7
104:6 108:3 123:8,10
177:14 212:5

**Louis** 13:2,4

**love** 184:10

**LP** 6:2

**LTV** 110:24

---

**M**

**M&a** 13:5

**made** 20:15 26:13,
14,16 28:5 29:5,6,8,9
33:8 36:11 39:2 40:4,
7,14,19 51:6 54:22
60:18 61:21,24 62:23
64:23 65:6,8 67:4
70:16 77:16 79:14
81:8 82:12,17,21
84:7 85:19 88:19,23
90:13,21 91:3,9 94:7
95:9 97:12 108:10,24
109:18 110:23 111:8
112:24 114:18
117:17,19 118:17,24
122:17 126:23
128:10 129:22
132:25 135:20
145:14,25 146:9
149:5 152:22 155:5,
6,8 171:4,8,11,19
172:6,16 178:8,12
180:18 184:12,17
187:25 190:19 191:6
194:12 196:12,24
197:11 198:25
201:12 202:20
203:11 207:9,13
210:8,13,18

**mail** 188:15 190:23

**maintain** 223:19

**major** 74:10

**majority** 121:6

**make** 9:15,21 11:17
28:9,21 33:21 37:20
38:7 39:18 45:23
46:7 47:2 51:24 61:6,
19 62:21 63:7,8 65:4,
13 67:19 68:10 69:22
89:23 105:9 106:7
124:25 127:19
139:20 153:16
154:18,23,25 156:11
165:8 171:15 172:2,
20,25 173:15 175:19
177:18 178:25 179:2
180:5 186:18 187:12
190:10 191:22 193:6
201:11,14,15 202:24
203:10,12,14 206:12,
16 211:7

**makes** 202:22

**making** 38:16 61:11
105:10 129:18
151:20 171:23 173:5
179:14 193:4 207:5

**manage** 103:2
222:18

**management** 5:22
6:7,8 7:9 12:8 29:15
38:6,7,17 39:6 95:14
102:23,24 174:25
183:15 216:5

**manager** 11:5 29:16
30:15,16 32:20 59:12
61:10 103:20 165:7,
17 166:4 169:3 194:8
195:6,10 211:20
217:4 219:15,19

**managers** 53:6

**manages** 11:6

**managing** 29:16

**mandate** 29:11,14
109:9

**mandates** 106:11

**manner** 83:17
122:20

**March** 8:5 11:11,14
12:3,6,16 13:15,24
14:9,20,24 20:10
50:25 51:2 55:22
56:23 57:25 64:22
70:11,24 103:5
104:24 113:24
114:15 117:18 127:7
131:8 150:9 152:8,24
160:6 163:6 166:25
199:6

**Mark** 17:14,15 81:15
118:9,12 120:8
129:10 136:16 213:7

**Mark's** 122:3

**marked** 15:4,6 18:8,
12 41:6,8 98:9
114:25 117:10 131:5
145:7 146:14 159:10
174:7 189:20 212:23

**market** 124:25

**markets** 73:22,25

**massively** 68:21

**material** 40:14 87:9,
12

**materiality** 87:14

**Matt** 5:1 6:1,6,23 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1

103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1

**matter** 6:6 62:22
76:20,21,23 183:10,
11,21,22

**Mccann** 5:10 6:17

**Mcdermett** 173:19
175:7,15 186:17
190:24

**Mcdermett's** 186:11

**Mcgraner** 5:1 6:1,6,
23 7:1,4 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1,22 16:1 17:1

18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1,9,25
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1,3
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1,25 159:1,11,19
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1,2 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1,5

205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1,17 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1

**Mckinney** 8:18

**meaningful** 79:3

**means** 61:23 73:9
116:17 154:13

**meant** 52:12

**media** 6:4

**meeting** 31:13,14

**meetings** 31:15

**Melissa** 97:8

**member** 59:7 78:6
79:8,14 81:8 82:13
91:4,13 94:11 103:4
139:8,10,11,21
155:22

**members** 21:3 53:18
58:24 59:13,18 60:6,
11 61:12 63:3 65:16
94:16 96:14 114:8,19
129:21 133:18
156:23 157:14,25
167:22 201:2 205:18
210:15,19 223:8

**members'** 163:2

**membership** 21:19
27:20 50:6 67:15
69:18 71:3 94:15
96:12 99:12,15 113:6
157:17 223:7

**memorize** 19:10

**mentioned** 11:2
52:14 55:24 91:18
93:12 96:16 101:2
124:7 141:13 193:8

**met** 17:13

**million** 33:18 53:8
54:9 69:2 78:19 80:5
97:4 103:23 106:5
107:4,5,6,13 110:12
111:4,18 112:6,11,20
113:4 122:16,21
123:6,16,24 125:3,4,

8,10,13,16,18,24,25
126:8,13 127:15,21,
23,25 128:12,14
133:24 134:13,17
135:3,6,11,14,21
136:7,10,17 138:9,
21,24 139:3,24
140:11,22 141:4,5,16
142:7,11 144:13
151:20,23 153:3,21
186:23 187:19 190:8
192:3,22,25 193:8,
19,24 195:3

**million-dollar**
194:20

**mind** 80:13 147:17
152:3

**minimum** 151:23

**minus** 33:17

**minute** 60:15 68:7
72:18 105:17 111:12
148:15 181:14 212:6

**minutes** 31:10
190:18 212:5

**missed** 58:14

**mistake** 40:14,20
64:23,25 65:6,9
69:16 97:12 98:23
99:5 132:25 140:3
143:14 154:4 155:5,
6,8,11 207:8

**mistakes** 40:7 94:7
118:17,25

**misunderstood**
137:3

**mitigating** 106:16,17

**mixing** 197:4

**moment** 43:4 44:13
57:18 63:15 104:12
145:10 209:3 223:4

**Monday** 53:3

**money** 24:16,22,25
25:5,16 26:2 27:6
28:17 31:21 35:16
36:13,14 53:8 54:11
107:16 108:5,13,18
109:22 112:14
122:23 123:9,11

140:14 141:5,10,13,
23 142:3 181:6
187:17 191:15
193:16 194:13
195:19 196:6,11,16,
25 200:10 202:17

**monthly** 71:13

**months** 63:24
149:24 189:22 198:8
199:23

**morning** 5:3 7:4,6

**Morris** 5:20 7:3,7
15:11 22:19,22 41:20
47:19 48:22,24
66:13,14 67:11,12
68:5,9 71:21,25 72:9,
14,15,19,24,25 83:3,
4 87:13,15 119:18,20
121:11 130:16,21
131:3 133:8 139:14
156:18 157:19 158:8,
25 159:8,18 174:8,
18,20 196:22 203:5,8
212:4,17,24 213:3
224:5,13

**motion** 182:16,20
183:5 184:13 185:20,
25 186:5

**move** 47:19 48:22
66:13 67:11 68:6
83:3 87:13 117:7
156:18 157:19 158:8,
9 196:22

**moving** 187:10

**multi** 55:7

**multi-family** 73:21
102:24

**Multifamily** 20:22
21:19 38:14 39:12
40:15,22 50:7,12
51:8 53:13,14 54:25
55:3,8 56:3 58:12,24
59:19 60:7,12,17
61:6,10 62:23 63:7
65:17 68:12 74:25
75:6,23 76:2 77:17
78:6,10,22 79:9,14
80:8 81:8 82:2,7,13
83:7,21 90:6,22 91:4,
9,14 92:8,11 94:12,
16,20 96:8,13 103:5,

10 113:7 114:8
116:18 119:3 124:15,
23 139:16 140:19
142:2 156:23 157:15,
25 164:22 165:18
166:5,9 169:4 171:9,
11 172:3,7 175:19
179:15 180:6 190:8
191:22 194:8,13,15,
20 195:4 196:13
197:3,13 204:11
205:2 206:10 207:18,
21 208:4,18 210:6
211:20 213:13
218:11 219:2

**Multifamily's** 21:2,
23 37:24 59:13 61:12
133:18 192:23
194:19 203:20,24
204:12 205:2,13,17,
18,24 206:5,13
207:6,10,13 208:9,15
209:6,19,23 210:10,
14,19,23 211:3,8,21
215:9,13,17 216:19
218:4

**multiple** 33:11
181:14

## N

**names** 163:2 204:3

**narrow** 128:15

**naturally** 223:10

**nature** 90:20 160:2
218:16,21 219:3
221:17

**necessity** 109:2

**needed** 25:13 28:13
70:6 79:10 82:25
110:11 121:20
173:13

**negotiate** 57:15

**negotiation** 38:23
100:3 103:8 105:18
185:3 195:25

**net** 125:7 167:19

**newly** 69:9

**Nexbank** 134:7,9
135:7,15,17 137:13
140:12

**Nexpoint** 5:25 9:2,8
10:24,25 11:4,7,13,
18,19,20,21,23 12:2,
11 13:13 14:8 34:3,4,
13,21 36:12,17,18
74:8 93:5 173:14
175:2 216:4

**Nexvest** 134:7,10
135:7,15,17 186:24
187:17 188:2,5,10

**nonrecourse**
136:21,22

**normal** 181:2

**Northern** 6:10

**note** 26:7,8,9 50:19
52:6,13 54:9 55:24
56:4,6,14,17,19,20
58:15,23 59:5 112:7
208:20 209:16

**noted** 6:20 206:19

**notes** 26:4 83:19
212:7

**notice** 15:18 16:10
19:7 40:13,19

**noting** 190:7

**notwithstanding**
77:14 146:19 182:2,
12,14

**November** 23:12
143:3 174:12,13,21
175:19 176:2 178:3
188:6,21 189:13

**nuance** 105:24 106:2

**number** 6:4,11 20:14
41:11 117:12 134:16,
17 142:6 221:22

**numbers** 15:13,14
131:16,23 132:18
133:4,6

**NXRT** 137:13

## O

**objective** 44:25

**obligations** 105:23
137:2 138:2

**obtain** 11:10 172:8

**obtained** 70:9

**occasions** 220:11

**occur** 80:7,14

**occurred** 63:23
80:17 103:22

**occurring** 43:3

**October** 6:13 88:12
147:12

**offered** 85:10

**offering** 34:21

**office** 51:18 74:12,14

**officer** 11:9,13,18
12:2 13:18,24 14:8,
12,21 32:22 165:18
166:4,10

**officers** 30:25 32:16
33:24

**one-off** 83:14 90:3,
24 91:6

**ongoing** 44:12 57:3,
7 71:8 148:14 174:15
207:17

**operating** 34:7 37:12
109:8 173:13

**opportunity** 28:25
45:7,11,13

**oppose** 182:19
184:12 185:25

**opposed** 158:13
182:16 183:4 186:5
195:4

**optimists** 127:17

**options** 108:15

**oral** 34:17

**order** 10:13 15:14
63:4 67:14 70:7
84:17 85:10 86:8
111:22 155:18
159:14 175:11 176:4
223:15

**ordering** 224:23

**original** 17:19 18:4 19:18 26:9 49:10 56:25 75:5,22 76:2, 17 77:4,9 78:10 80:7 90:14,21 98:7,11 185:4 198:20

**originally** 76:7

**outcome** 220:24

**outstanding** 107:23 138:3 153:4

**oversight** 193:13,18

**owed** 50:3

**owned** 24:12 106:22 137:14

**owner** 203:2 217:14

**owners** 24:7,10

**ownership** 20:16 50:11,16 52:2,10,15 56:2,5 57:5,11,15,23 58:3,7,12 59:12,17 60:6,11 66:8 67:21 68:12,24 69:10 164:4 183:15 216:23 217:15 219:25

**owns** 23:17,19

**P**

**P&I** 120:15,24 121:2 210:19

**p.m.** 130:23,24 131:2 158:19,20,22,24 212:13,14,16 224:25

**Pachulski** 5:21 7:8 50:21

**package** 17:18 76:8 106:4 110:2 137:12, 15 139:20

**paid** 12:9,11 35:15 62:25 123:24 143:2 187:20,24 188:2,6 189:8,14 194:14 195:3,7 196:3,17,25

**pain** 107:17 196:8

**paper** 160:12

**papers** 202:11

**paragraph** 20:23 121:13

**Pardon** 35:3

**parenthetical** 187:6

**part** 34:7 54:6,25 55:3 67:16 69:24 76:8 83:12 86:25 91:17 95:23 101:3 137:6 140:12 161:2 171:20 192:24 193:14 202:9

**partial** 87:2

**partially** 54:5 141:6 200:14,21

**participate** 75:8 77:21 105:4 122:7 145:21 179:22 221:11

**participated** 93:2 105:13

**parties** 5:13 34:8 75:16 122:6 136:2 165:24 167:13 168:12,22 173:8 178:10 182:21 185:11

**parties'** 64:21 151:3 163:23 164:15 165:12 166:15 169:16 170:13

**partner** 41:12 53:12 102:24 139:7

**partners** 6:2 9:3,8 37:12 41:16 133:24 135:13 154:21 159:23 195:8 216:5

**partnership** 195:8 217:8 219:16,20

**partnerships** 209:22

**party** 54:24 55:2,7 75:18 76:2,5 91:9 111:25 170:19

**passed** 209:22

**passively** 121:8

**past** 176:5

**pasted** 219:12

**path** 189:15

**patience** 224:7

**Patrick** 17:14 81:15 115:4 117:12 118:9, 12,16 119:21 121:19 129:10 136:16 204:21,24

**Paul** 214:13 217:17

**pay** 35:12,18,23 54:8, 11 63:4,8 80:5 104:6, 7 105:10 111:17,22 128:8 140:10 172:22 173:13,17 187:17 196:11

**paydown** 57:9 104:10 112:9 113:4

**paying** 193:15 200:25

**payment** 63:3 197:11,19 198:25 201:12,23,25 202:20 203:11

**pays** 12:12

**pen** 160:12

**pending** 5:19

**people** 53:19 92:19 93:10 117:12 146:8 154:20,25 162:2 173:5,19 180:14 204:4

**per-asset** 110:24

**percent** 50:8,12 52:3,11 56:2 57:24 58:11 104:4 105:3 115:21 117:6 121:14, 15 123:5,15 124:5 126:7,13,24 127:20 128:3,5,8,10,22 129:9 143:25 144:15 151:20,24 156:17 192:7 193:10,24 203:2,3 223:15,19

**percentage** 23:23 50:7 52:5,10,15 58:20 59:3 69:5 71:5, 7,9 104:16 129:12,24 130:10,15 144:25

**percentages** 50:16 56:5 57:15 58:19 59:13,17 60:11 63:11,16,20 66:8 70:17 71:6,18 180:12 201:18 223:21

**period** 14:3,5,13 78:21 88:14 130:8

**permitted** 66:20

**person** 12:6 37:5,19 38:2 47:7 63:3 83:16 101:22 102:3 162:11, 15 195:24

**personal** 8:7 17:2 25:17,19 26:17,22 93:19 97:5,8 116:19 196:23

**personally** 12:13 16:20 17:3,9 24:15 28:5 43:12 45:22 47:3 49:3,4 51:15 94:23 98:19 99:14 103:7 105:4 119:15 145:20 150:9,11 151:10 184:25 189:5 218:9 219:23 220:8

**personnel** 92:13

**perspective** 102:13 110:4 124:3 150:17 164:11 167:8 168:18, 20 169:12 179:6 192:21 211:6

**petite** 203:17

**petition** 65:25 66:7, 19 67:14,20 68:11,25 69:13 70:25 88:6 97:17 100:17,20 130:3,6 156:12 204:15 217:22 218:2 220:5,7

**Phil** 5:4 6:14

**Phillips** 39:15,20 101:5 102:9 181:11, 15 182:2,3,6,15,17 183:8,20 184:13 185:2

**phone** 83:17 179:17, 22

**phrase** 49:19 116:23 117:2 205:15

**pick** 115:15

**piece** 45:19 92:15 104:7 105:25 106:15 107:19 109:17 134:12

**pieces** 112:6

**place** 8:3 34:19,20 50:24 61:3 83:16 93:22,25 153:23 155:24

**plan** 52:21 74:22,23 110:10 124:19,20 172:11

**platform** 162:2

**play** 74:15 93:15 94:10,14

**pleadings** 221:16

**pledge** 17:17,18 76:7,10 78:13 137:10 138:7 139:21

**pledged** 53:19 97:4 106:6 109:9,10 138:7,10,16 139:8 142:13,15

**pledging** 89:18

**pocket** 140:21,24 141:24 142:4 176:21 191:10

**point** 80:9 149:13 155:7 194:25 201:19 216:22

**portfolio** 33:10 52:22 59:10 73:20 74:9 128:20 199:18

**portion** 86:25 134:14,19 135:4 137:8 140:22 141:4,9 143:8 159:12 188:21 189:16 191:3,9 193:12,19

**position** 60:9 175:9, 12,18 176:13 177:12, 13,19

153:12 156:25 163:3 167:23 168:7,8 170:3 206:19

Index: positive..realized

**positive** 91:14

**post** 104:19,24
220:5,7

**posting** 10:7

**Postpetition** 156:4

**potential** 73:23,24
84:9

**practice** 13:6,10

**practiced** 13:3

**practices** 176:6

**premarked** 212:21

**preparation** 18:15
161:14,23 203:19,23
204:25 206:13 210:5

**prepare** 17:10 32:3
210:22 211:3

**prepared** 19:20,25
20:11,18,21,25 21:7,
11,17,22 22:2,6,15
31:9 32:9,12 56:25
57:12,13,14 150:23
169:3 171:6 205:18
211:21

**preparer** 120:4
208:4,9,15 218:4

**preparers** 216:19

**preparing** 204:12

**prepetition** 156:3
157:11

**preserving** 47:20
62:20

**president** 31:3,5
32:17 220:6

**presume** 109:20

**pretty** 16:18 62:10
144:2 149:23 221:6,7

**prevent** 191:21

**prevented** 61:11
177:21

**previously** 10:10
18:8 41:8

**primary** 103:18
118:9,12 182:10

**prior** 12:16,18 14:11
18:12 29:24 54:22
65:25 66:7 67:13,19
68:3,11,24 69:13
76:17 77:9 78:21
97:17 109:23 113:17,
22 135:2 188:7
200:20 217:21 218:2

**priority** 106:12

**private** 13:5

**pro** 168:6

**problem** 62:16,19

**Procedure** 5:18

**proceed** 186:22

**proceeds** 110:16,18,
20,21 111:2 134:15
139:4 142:2

**process** 76:14
202:8,9 203:19

**professionals** 38:21
39:9 40:3,7,13,19
136:3 211:24

**professionals'**
212:2

**professions** 39:23

**profit** 125:8,13

**profits** 21:2 117:6
121:13 123:2,5,15
124:5,14,22 125:4,6,
17,24 126:14,25
127:15,22 128:13
187:7 193:10 210:4,
9,14

**prohibited** 176:14

**project** 73:6,12
74:16 75:2 92:12
93:3,21 94:8,25
95:24 96:5,17,25
97:14 100:13 102:18,
21 112:11 113:14,20,
25 116:8

**projected** 124:22
125:16 127:15,21

**promote** 71:10
223:11

**prompted** 208:21

**Proof** 40:25 41:11
45:19 46:19 47:4,8,
12,24 48:6,10,14,17
49:2,6 50:15 62:2,20
181:9 182:7 220:14,
16

**properly** 183:8,20

**properties** 38:7

**property** 38:17 39:6
95:14 142:2

**proposal** 146:2,10
147:3

**proposed** 119:25
147:4,11,16

**proration** 167:22

**prorations** 112:18

**prospective** 114:19

**protect** 43:7 44:17

**protects** 44:20

**protocols** 95:3

**provide** 45:15 80:2,4
83:24 85:21 88:24
89:14 92:5 99:7

**provided** 39:20 40:8,
21 50:20 61:15 65:3
79:16 94:8 100:23
101:9 146:21 153:8

**providing** 80:3 89:18
119:10

**provision** 66:15,20
98:24 106:10 121:19,
24 126:3,5 155:9,18,
20 160:24 164:7
165:22 166:23 167:4
168:18 169:7 170:10,
13 189:4

**provisions** 68:2
99:10,11 137:12
162:21

**public** 34:21 101:4
106:19

**publicly** 106:12

**purchase** 28:14

**purchased** 111:22

**purported** 82:8 83:2,

11 91:18 124:6
153:14

**purportedly** 79:16,
19

**purpose** 128:18
156:25 199:18

**purposes** 111:5
135:22 143:9 157:16
158:3 182:6

**pursuing** 181:8,11
182:7

**put** 15:5 24:22 27:19
28:17 34:19,20
40:12,18 41:7 98:8
104:7,11 110:2
112:10 113:13,14,18,
19,24,25 114:22
115:2,18 116:8
127:24 139:3 141:23
142:3 159:8 160:12
181:7 199:20 212:20
215:17

**putting** 151:22

**Q**

**quantify** 81:3

**quarterback** 74:21

**question** 9:18,22
37:14 47:22 56:24
70:21 86:17 94:22
112:19 114:14
123:12 125:21
134:18 151:12
153:25 156:20
157:13,20,21 168:17
175:25 183:11,17
185:23 193:18,22
196:6 197:6,8 201:7
204:7

**questioning** 88:11
141:22 192:10

**questions** 7:16 9:16
16:13,17,20,25 19:8,
25 23:2 30:20 99:22
113:9 158:14 202:21
214:5,17 224:16

**quickly** 98:6 159:18

**quote** 115:20

**quote/unquote**
101:6

**R**

**rainbow** 125:10

**raised** 206:25

**ramifications** 55:21

**ran** 218:24

**Rand** 26:12

**rata** 168:6

**ratio** 110:24

**rational** 152:2,4

**Raver** 115:5,10,12

**re-** 42:8

**re-trade** 53:23,25
54:21 55:5,9,20 57:8
58:5 63:22,23 64:16
80:7,14,16 103:23

**re-traded** 52:24
53:2,11 78:16

**re-trading** 107:18

**reach** 140:21

**reached** 104:23

**read** 19:14 122:5
123:21 145:10
186:25 187:2,3 217:2
224:21

**reading** 169:23

**ready** 72:10,12
214:14

**real** 5:25 9:2,8 11:2,6,
19,21 12:2 13:14
14:8 23:9,15 28:21
29:5,9,11,17,23
31:18 32:10 34:3
67:25 68:17 74:8
93:13 97:23,24
110:25 111:21
127:17 151:20
182:10 216:4

**realize** 65:8

**realized** 66:18

107:25

**realm** 95:7

**reason** 17:5,6 29:4, 18 62:10,11,13 69:11 75:14 77:20 79:12 82:6 84:11 86:11 95:21 96:2 122:19,24 123:14,23 126:2,5,6 136:15 138:14 151:14 176:18 184:22 191:12,17,18, 25 193:9 200:6,22

**reasonable** 151:3

**reasons** 81:7 82:10 84:7 85:17 90:13 124:8

**recall** 8:2,22 16:7 24:25 35:11,15,17 38:15 39:10 42:6,8, 10,13,16,17,18 43:2 44:9 45:6,10 50:10, 23 51:3,6 52:9 56:6, 12,20,25 58:15 75:4 79:15 80:15 82:16,20 83:18 89:25 90:5 91:2,8 103:12 117:13,16 119:5,9,10 120:24 121:2 122:13 124:21 131:20 145:24 156:9 161:4 173:24 179:13 188:9, 25 189:23 202:14 207:5 213:12 215:8 220:21 221:8

**receipt** 126:12

**receive** 100:7 107:8, 16 122:16 143:25 200:6 201:9

**received** 69:2 74:9 95:10 107:13 122:15 125:18,25 128:12,14 140:2 143:19 162:6 192:3 198:24 199:3 200:7,10 202:16 216:10,15,20 219:11

**receiving** 151:23

**recollection** 38:13 50:2 56:10,17 78:4 131:19 141:18 149:2 161:19 162:11 174:5 187:18 189:11

**record** 5:8 6:20 29:23 47:20 72:5,8, 14,23 130:20,23 131:2 158:20,21,24 212:13,16 224:17,23

**recording** 5:14

**records** 27:4 192:24 194:19

**recourse** 137:11,17

**refer** 9:4 39:22 73:15

**reference** 80:9 87:14 120:4

**referred** 145:13

**referring** 9:6 34:10 39:10 44:15,16 46:15 53:23 64:25 77:6 175:16

**refers** 73:18 116:23 120:7 122:4 166:19 215:23 216:3

**refinanced** 154:15

**refinancing** 167:20 168:4

**reflect** 43:21 69:9,17 75:15 128:19 140:7

**reflected** 27:3,11 52:2 53:25 54:6 64:21 104:15 135:12 140:23 154:18 155:15 164:15 166:15 168:22 170:13 187:13 192:23 216:24 219:25

**reflects** 163:22 167:13 197:18,25

**refresh** 56:10,16 174:4 187:18 189:10

**regard** 99:19 171:7

**regularly** 220:10

**rehab** 73:23

**reimburse** 108:7

**relate** 30:22

**related** 8:8 152:15 206:13

**relates** 222:2

**relating** 163:2 213:13

**relationship** 103:21

**relay** 46:24

**relied** 38:24 154:25 211:16,25

**reluctance** 208:14

**rely** 92:11

**remainder** 191:8

**remaining** 59:10 140:16 170:2 188:17

**remember** 57:2 120:21 142:25 145:15,16 205:6

**remind** 159:11

**remote** 5:6,14

**remotely** 5:9,12 10:7

**removal** 20:4

**remove** 88:3,8

**removing** 181:11

**rendered** 35:13,16, 20,25

**renovation** 73:23

**rep** 8:23 183:12

**repaid** 141:25 142:17,20,22 143:10 176:10 188:19 198:12 199:24

**repay** 28:16 171:19 174:14

**repeat** 67:16 125:21 160:14 185:23

**replacing** 208:8

**report** 13:20 14:11, 19,23

**reported** 13:22 14:2, 4,6

**reporter** 5:10 6:16, 21 224:22

**reporting** 5:6 6:16, 18 14:16 116:15

**reports** 116:11

**represent** 7:9 42:10 98:16 183:9,21

**representation** 102:12 183:13

**representations** 31:20

**representative** 7:18 8:21 16:15,21 30:22 63:18 67:7 157:24

**represented** 93:17 182:15,21 185:2

**representing** 181:15,21 182:4

**reputational** 108:4

**request** 156:2 170:18 171:3 190:19, 20

**requested** 68:16 189:24 214:10

**requests** 22:8 51:7, 11,16

**require** 84:20 85:3,5 88:16

**required** 35:12 59:18 129:21

**requirement** 112:9

**reserve** 217:7 224:21

**Residential** 34:21

**resolutions** 31:17, 25 32:3,12

**resolve** 67:9 177:17 208:24

**resources** 92:12

**respect** 38:21 94:20, 25 119:2 120:14 156:12 167:23 187:5 206:22 207:5,9

**respective** 24:12

**respond** 86:9

**responds** 214:16

**response** 20:15 86:20 175:23 195:12 204:23 213:24 214:6

**responses** 22:7

**responsibilities** 132:21

**responsibility** 32:2 37:9 162:12 194:7

**responsible** 101:14 118:4 203:22 204:11

**restate** 112:19 114:13 123:11 143:8

**restated** 57:25 63:25 64:6 66:9 67:21 69:8 70:2,8,12 103:9,14 104:12,14 105:6 111:6,13 113:12,18, 23 114:15 117:18,24 118:5,14,19 119:3,6, 12 121:4 157:16 159:7 185:5 198:23 223:7

**result** 27:25 68:19 151:21 198:25

**resulted** 71:15

**retain** 182:6 185:10

**retained** 222:8

**retire** 153:21

**retired** 153:4 173:21

**retroactive** 117:19

**retroactively** 70:13

**return** 107:9 120:4 176:14 177:8 187:6 189:6,24 190:7 191:2,22 192:9,25 193:12,20,25 196:2 197:12,19,25 199:5 201:9,13,16 206:17, 20 208:18 213:19,25 214:7 215:15

**returned** 108:18 175:10 176:3 188:17 192:14 198:18

**returns** 17:23 56:14 169:4 203:20,24 204:12 205:2,13,16, 17,23,25 206:5,14,22 207:6,10,14,19,22 208:5,9 209:6,20 210:6,10,23 211:4,8, 21 213:13,17 215:9,

13,18 217:8 219:16, 20

**reverse** 67:24 97:22 157:10

**review** 17:23,25 18:7,11 27:14 49:4,8, 10 67:24 68:17 75:11 97:22 99:10 119:15 140:5 156:10 157:11 159:13 160:19,22 170:22 171:2 190:25 208:17 209:11

**reviewed** 17:13,16, 19 18:3 19:7,24 48:13,16 54:3 99:14 160:24

**reviewing** 161:4

**Rhode** 103:19

**Rick** 81:15 217:17

**rights** 106:14

**Rios** 213:7,24 214:13,18

**risk** 106:8 156:13

**Rizzuti** 5:4 6:14

**robust** 109:25

**role** 74:16,20 93:15 94:10,14

**room** 5:7,11

**Ross** 213:7

**roughly** 110:12

**rowboat** 100:5

**rowing** 149:17

**rule** 5:17 15:18 16:16,18 169:15

**rules** 5:17,18 9:15 95:17,20

**run** 209:7

**rush** 19:14

───────

**S**

───────

**salary** 12:9

**sale** 142:2 167:19 168:4

**sales** 57:9

**satisfy** 171:13

**Sauter** 42:21 43:2, 17,22 44:10 46:14,23 47:8,14 48:3,5,9,13, 16 49:6 182:23,25 186:11,14

**scale** 73:24

**schedule** 131:14,22 132:3,17 133:3,12 135:12,23 138:18 144:21 145:2 150:22 161:6 162:22,23 163:14,17,22 168:7,9 170:4 192:15 198:9

**school** 13:2

**Schroth** 97:9

**scope** 55:4 113:5,10 132:12,20

**Scott** 23:21 32:21

**screen** 10:8 15:6,22 41:8 98:8 114:22 115:3 133:6 139:15 159:9 212:21

**scroll** 15:24 19:12 41:9,18 45:18 117:22 121:11 131:6 145:25 147:18 148:21 167:17 174:8,18 190:14 213:23

**Sean** 173:21

**seasoned** 211:24

**secretary** 31:3,6 32:3,18

**section** 106:3 122:9 146:5,19 150:20 161:3 164:2,11,14,18 165:3 166:6,14 167:8,13 169:12,15

**security** 137:10 138:7

**seek** 184:7

**seeking** 58:19 223:11

**Seery** 17:15 50:22

**sell** 80:4 84:2,3,9

153:21

**seller** 108:2

**selling** 111:21

**send** 108:14 173:17 214:13 221:16

**sends** 148:7

**senior** 103:19 136:25

**sense** 122:17 127:19 202:22,24 203:10,12, 14

**sentence** 60:15 61:23,25 62:7,17 177:6 187:10,14 215:25 216:3,23 217:5

**sentences** 186:21

**separate** 162:7

**September** 55:4,8, 14 56:12,18,22 57:21 66:12 70:10 80:12 88:12,16 111:15 192:4 194:14,21 195:4 197:2,19 198:2,25 200:11 201:13 207:25 213:7 214:20,23 215:5 218:3

**Sergent** 14:15,17,19, 23 93:7 96:3,7

**series** 9:16 16:24 39:12

**served** 11:25 31:5

**services** 34:2,5,9,11, 12 35:12,16,20,24 36:5,16 94:7 153:8 204:17

**set** 20:22 21:14 28:23 37:24 40:15 45:24 50:6,10,13 58:19 62:6 66:8 71:3 147:21 152:21 166:6 170:3 186:19 192:15

**setting** 135:22

**settled** 52:25

**seven-month** 130:8

**severally** 105:22

107:11 137:2

**shake** 208:24

**share** 203:18 221:14

**shared** 34:2,5,9,11, 12 36:4,16 204:16

**shares** 107:4

**sheet** 27:12,15 97:5 106:6 194:5,11

**sheets** 49:21,23

**show** 42:23 116:12 159:19 194:19

**showed** 42:19,22

**shows** 133:23

**side** 39:13 51:18 110:4 114:12 149:9 150:20 174:2 182:10

**sides** 177:23 178:4, 15,19

**sign** 90:21 126:23 137:20 199:9 224:21

**signatory** 53:14 75:22

**signature** 41:23 159:21

**signatures** 98:18 160:2,3

**signed** 20:9 54:2 63:24 64:12,16,19,21 75:12 76:17 77:4,9 78:15,23 79:25 80:8, 10,15,16 98:20,25 99:4,8,16 104:12 109:24 110:9 113:23 114:5,15 117:18 119:13,16 130:2,5 131:20 140:9 144:10 145:17 160:17,20 161:8 163:9,24 164:8,14,22 165:13, 16 167:5,15 168:23 169:9 170:7 198:22

**significant** 109:10

**signing** 104:19 111:13 160:23

**simple** 16:19 86:17 157:13 224:2

**simplicity** 33:14

**single** 140:24 142:13

**singular** 162:11,15

**sir** 7:11,21 10:21 68:7 70:12 72:18 88:11 93:18 123:11 130:20 141:22 148:3 159:4 162:23 183:14 195:20,24 197:24 198:22 224:6,19

**sitting** 142:10 156:16 198:15

**situation** 221:7

**six-** 130:8

**skip** 168:16

**Skyview** 204:17,18, 19 211:23

**sliver** 102:25

**slowly** 19:12

**sold** 52:23 65:5 112:7 140:16,18 154:15 173:11

**sole** 30:15,16 102:23

**solely** 101:23 102:4 162:12

**solicitations** 74:9

**solution** 186:12,15 187:5

**some-odd** 203:3

**someone's** 202:13

**sort** 106:12 109:2

**sorts** 38:9

**sounds** 112:13 214:18

**source** 25:18 78:19 134:3 176:19

**sourced** 74:11 134:20 135:6

**sources** 21:25 22:4

**spark** 178:16

**speak** 18:14,18,20, 22,25 43:5 46:18,22, 23 103:7 114:10

Index: speaking..time

160:15 219:23

**speaking** 17:21 67:6

**specialist** 6:15

**specific** 28:7 29:11
70:23 117:3 137:15
142:6 146:25

**specific-** 63:2

**specifically** 16:7,19
27:10 37:25 68:16
99:23 144:12 171:5,
21 177:4 197:14,16
202:14 222:24,25

**speed** 19:4

**spent** 111:20

**spoke** 178:23 220:8

**spoken** 205:11,23
206:4

**spreadsheet** 52:14
107:24

**St** 13:2,4

**stacks** 49:23

**staffing** 38:8

**stand** 23:7 152:2
185:10

**standing** 45:2 175:9

**Stang** 5:21 7:8

**start** 6:4 72:19 204:2
212:25

**started** 12:7,10
72:16,17

**Starwood** 53:5 108:2

**state** 50:3

**State's** 5:18

**stated** 144:14,16
198:7

**statement** 45:24
50:20 52:6 55:25
58:16 121:23 138:12
200:20 213:18 214:9,
20,24 215:4,11,12
218:8,12 219:12

**statements** 46:8
49:15,20,21,24

**States** 6:9

**stay** 61:3 155:23

**staying** 187:9

**step** 25:15 67:19
68:10 73:2

**steps** 67:13 68:14
185:9

**stipulate** 5:13

**stock** 84:3 106:12,
19,21 137:13

**stop** 41:10 121:12

**Strawn** 39:14,20
101:4

**strike** 47:20 48:22
66:13 67:11 68:6
83:3 87:13 156:19
157:19 158:9 196:22

**string** 174:22 190:15

**structuring** 38:22
39:17

**stuff** 122:6 193:6

**style** 73:21

**subject** 107:11 117:4
149:19 183:10,22
216:25 217:15

**subpoena** 15:17

**subsequent** 217:9
219:17,21

**subsidiary** 11:20

**substance** 103:12
180:7 222:22

**substantial** 26:24

**substantive** 214:17
215:7

**substantively**
217:10

**succeed** 9:9

**suffering** 107:17
196:8

**sufficient** 9:22

**suggest** 78:2 184:6

**suggested** 193:11

**suggesting** 78:5

**summarize** 19:13

**summarizing** 169:5

**summer** 18:5

**Sunbelt** 73:22

**Superczynski**
173:20

**superseded** 213:19

**support** 47:12 60:22,
24

**supported** 92:17
96:25

**supposed** 53:4

**sustained** 126:21

**Swadley** 81:15 205:4

**swear** 5:11 6:22

**swearing** 5:15

**sworn** 6:24

**symmetry** 89:16

---

**T**

**table** 143:14 163:10

**tailspin** 52:24 53:10
63:22

**taking** 123:5 193:10
200:21

**talk** 83:7 111:12
134:11 156:5 159:2
179:5 181:13 220:10
221:18 224:22

**talked** 95:15

**talking** 22:22 37:13
39:11 46:6 52:16
73:4 88:11 116:20
139:19 143:4 151:10
205:16

**tax** 17:23 21:21,23
39:16 56:14 79:16
80:2,19,20,23 81:3,9,
12,13,16,20 82:8
83:2,11 89:11 90:5,
12,20 91:15,18,22
92:4,9,15,16 93:13

96:23 97:2 120:14,23
122:12 124:6 125:12,
13,16,17,23 126:12
127:20 128:9 129:6,8
149:11,13 153:14
154:9 169:4 203:20,
24 204:12,13 205:2,
5,13,15,17,22,24
206:5,14,17 207:6,
10,13,18,21 208:4,8,
9,15,17 209:6,10,20
210:6,10,21,23
211:2,3,6,8,21,22
213:13,17 215:9,13,
15,18 216:19 218:4,
18 219:16,20

**taxable** 215:24

**team** 32:7 34:3 67:23
68:17 81:12,14
93:13,14 97:5,6,21
115:14 122:12 129:6,
7,8 132:5 149:11,14
154:9,10 156:10
173:20 186:12,14
187:4 204:14 205:5
209:10 218:18

**team's** 175:2

**teammate** 51:20

**teammates** 51:20

**teams** 92:19

**technical** 130:17

**telling** 42:25

**tells** 147:10

**temporarily** 177:7

**ten** 212:5

**term** 73:5,9,11,13
171:16

**terms** 95:13 105:19
140:8 160:11 173:9
189:11 195:16

**tested** 110:24

**testified** 6:24 46:17
66:17 97:20 156:9
181:14

**testify** 8:20,24 16:9
19:21 20:6,11,18,21,
25 21:7,11,17,22
22:2,6,15 171:6

**testifying** 180:18

**testimony** 10:17
17:7,14 76:19 122:19
135:2 137:23 192:18
199:25 202:13,14

**Texas** 6:10 8:18

**thing** 152:11,13
171:17

**things** 17:2 38:9 80:3
85:10 86:23 131:14
132:16 153:17 169:2
222:5

**thinking** 50:18

**Thomas** 17:15 145:9
147:10 148:23

**thought** 46:17 60:5
69:4 70:21 78:12
85:21 88:5,24 98:23
114:11 124:24
134:16 136:24
139:19 144:13,15
154:20 177:16
200:25 205:9 209:16
221:6

**threw** 53:9 63:22

**thrown** 52:23

**Thursday** 54:13

**Tim** 93:5

**time** 9:4,22 10:8
12:22 13:10,14,23
14:12,24 16:2,6 18:4
21:6 22:20,21 24:3
25:6,14 26:2 28:8
29:12,17 30:4,9,13,
17 32:18,23 33:6,9
36:7,10 37:2,11 42:7,
9 43:4 50:14 51:17
53:9 54:22 55:21
59:8 61:21 63:13
64:5,12 66:6,11,14,
22 70:24 71:22 72:3,
7 76:17,24,25 77:3,7,
9 78:21,25 80:13
85:8 103:18 108:20
109:11,23 113:11,17,
22 114:4 118:11
119:11,25 122:8
128:23 129:4,25
130:5,22,25 132:2,8,
17,21 133:20 140:9

143:15 144:4,8,9,12, 17 145:4,22 148:9,10 150:3,25 151:18 152:9,22 153:6 156:7 158:18,23 159:12 163:23 164:13 166:15 167:6,14 168:13,22 169:17 170:6 177:9 179:5 180:11 181:6,12 187:21 188:7,18,25 197:22 198:14,17,22 200:3,7,9 202:21 203:15 204:2,6 208:22 210:4 212:10, 12,15 213:12 216:9 217:12,19 222:19 223:10 224:19,24

**times** 7:23 107:15 181:14 191:15 193:9, 15 198:20 199:4

**timing** 28:4

**tired** 209:4

**title** 11:8,10,12 13:13, 16 32:20,21

**to-be-amended** 113:7

**to-be-formed** 113:6

**today** 7:13 9:4,17 10:9,20 13:7,20 16:3 17:6,21 19:7 23:17 29:25 30:25 33:3 36:22 59:25 60:9 98:14 103:3 142:20 143:20 144:10 150:13 152:20,25 154:4 163:18 167:12 181:14 193:9 198:16

**today's** 17:10 18:16 54:3

**told** 52:18 53:7 56:13 60:4 77:12 81:10,11, 14 108:12 129:2,3,5, 8 134:24 143:24 179:18 216:13,14 219:5

**Tom** 14:15

**top** 133:8 147:8,24 148:6,21 163:2 213:4

**topic** 19:6,15,23 20:4,8,23 21:15,21 83:20 103:14 104:25 132:8 173:6,24 180:8 222:17

**topics** 10:18 15:25 16:10 19:10 20:2 21:5 22:16 30:23

**total** 134:17

**tough** 222:6

**tox** 162:25

**track** 29:23

**traded** 106:12

**transacting** 31:22

**transaction** 17:20, 21 18:4,5 31:19 35:6 38:22,23,24 46:3,4,6 53:4 63:21 65:4 69:3 77:21 84:18 85:11 92:17 95:3 103:25 107:14 120:17 151:21 154:16 197:22 200:2

**transactions** 37:25 38:14 39:12 40:16,22

**transfer** 194:20

**transferred** 27:17

**transition** 128:20

**transitional-like** 199:17

**trauma** 103:22

**traumatic** 107:25

**treat** 191:13

**treated** 191:13 192:2 201:13

**treating** 201:2

**treatment** 197:18

**trick** 10:16

**tricky** 16:12

**true** 64:12,20 100:16, 18 161:25 188:22 189:7 198:9 200:14

**Trust** 34:22 139:6

**Trustee** 224:14

**truthful** 17:7 45:24 46:9 159:15

**TSG** 5:5 6:16,18

**Tuesday** 53:3

**turn** 102:14 177:24

**turned** 181:3

**Turns** 114:3

**typical** 59:20,21

---

**U**

**U.S.** 224:14

**Uh-huh** 131:12

**ultimate** 23:20 39:2 57:4,11 67:8 79:10, 13 86:2

**ultimately** 52:22 53:22 63:19 94:5 104:2 109:3 110:18 121:3 124:16 137:22 149:5 151:19 211:19 221:3

**unclear** 197:6,8

**undergrad** 12:24

**understand** 7:10,12, 15 9:5 10:3 16:8 39:19,25 44:19 57:10 59:24 61:22 62:6 93:20 108:20 110:13 134:20 159:25 163:18 164:14,21 165:3,7,16 168:21 196:5 201:4 205:19

**understanding** 23:13 26:15,19 30:12 31:4 44:24 59:11,16 61:3 73:8,11 75:21 77:8 85:18 86:18 91:12 101:8,14 109:21 114:17 116:3, 22,25 118:3 120:11 121:18 133:15 135:2 138:4 140:7 146:18 163:21 165:2,12 167:12 168:11 188:18 210:12,16

**understandings** 105:12

**understood** 59:22 70:7 114:7 132:15 148:13 154:21,22 160:6,23 170:6,12 189:4,12

**undertook** 90:18

**underwriting** 17:20 124:19,21

**unencumbered** 76:10,13,19 77:11, 15,20 78:7 79:3 83:23

**unfolded** 63:21 65:5

**Unicorn** 73:6,12 74:17 75:2 92:12 93:3,21 94:8,25 95:24 96:5,17,25 97:14 102:18,21 112:12 116:8 117:4

**unilateral** 60:10 129:12

**unilaterally** 60:5

**unintended** 221:22, 24

**unique** 154:16

**United** 6:9

**units** 222:18

**University** 12:25 13:2

**unnecessary** 191:19

**unsure** 176:25

**update** 131:21 214:8

**updated** 131:15 132:3

**updating** 132:17 133:2

**utilized** 33:25

---

**V**

**Vaguely** 174:3

**validity** 5:14

**value-added** 73:23

**Vanderbilt** 12:25

**variety** 102:25

**vehicles** 11:6

**verbal** 175:23 195:12 204:23

**version** 146:4 147:19 149:4 159:20 163:4

**vice** 31:3,5 32:17

**video** 5:14 6:15

**video-recorded** 6:5

**view** 68:23 116:20 151:7,22 198:13 204:15

**viewed** 200:21

**Viggato** 19:2 56:13 120:9,12 121:20,25 205:12,24 206:4,10 207:2 208:3,8,12,14 214:23 215:4 216:9, 14 217:14 218:8,12, 15,21 219:3,11

**vintage** 73:21

**vis-a-vis** 33:25

**voluntarily** 64:5 87:24

---

**W**

**waiting** 103:25

**waiver** 183:24 184:7

**Walker** 55:18 112:3, 4,8 125:2 127:9

**wanted** 43:7 44:17 57:10 69:16 71:2,18 78:17 83:10 104:4 105:9 106:7 107:7 147:20 156:24 188:20 206:17

**wash** 128:11

**Washington** 13:2

**washy** 204:14

**waste** 181:5

**waterfall** 71:11
105:10,14 119:17
145:12,18,21 146:2,
6,20 147:4,20 148:14
160:25 161:3 169:21,
24 171:20 176:11
189:3

**Waterhouse** 97:6

**Wednesday** 213:20

**week** 15:8,15 100:19
175:7

**weeks** 65:10,12
66:18 77:4 100:19

**wherewithal** 84:14

**wholly-owned**
11:22

**Wick** 39:15,20 101:5
102:9 161:17,18
181:11,15 182:2,3,6,
15,17 183:8,20
184:13 185:2

**Williams** 39:16,21
101:6 102:10,11
118:6,8,13,23,24

**win** 186:8

**Winston** 39:14,20
101:4 102:8 161:16

**wished** 81:5

**wishy** 204:14

**withdrawn** 12:17
26:14 48:15 50:4
53:21 66:16 87:5
109:13 128:8 138:13,
14 139:24 172:13
204:9 208:12 209:18

**wood** 104:6

**word** 29:13 79:18
175:16

**words** 197:4

**work** 37:15 46:7
101:6 102:8 118:17,
25 124:12 133:2
153:12 220:25 221:4

**worked** 110:17

**working** 12:7 100:12
131:21 132:10
149:14 161:22 162:2
186:12 187:4 199:16,
21

**works** 42:21 93:6
115:14

**world** 37:6,19 43:17
60:4 91:3,8 156:6,8
197:25 202:5

**worries** 15:3

**worry** 115:19

**worth** 33:22 107:5
156:17 179:8

**writes** 175:7 190:24
214:22

**writing** 43:20 179:10,
13

**written** 18:2 31:19
32:9,13 34:18,20
35:7,9 36:8 112:25

**wrong** 46:19,21,22
64:9 95:22 96:3
97:13 143:22 144:2,7
151:15 152:22

---

**Y**

---

**y'all** 111:17 185:15

**year** 13:3 126:19,20
128:20 130:4 142:17
143:10 203:25 210:7
217:8 219:16,17,21

**years** 24:18 25:8
153:20,22 182:13
217:9 220:12,25
221:5

**yes-or-no** 48:4

---

**Z**

---

**Ziehl** 5:21 7:8

**zone** 148:10

**zoom** 130:17