# EXHIBIT 82

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Kenneth Brown (CA Bar No. 100396) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

**DECLARATION OF KENNETH H. BROWN
IN SUPPORT OF SUPPLEMENTAL MOTION TO
DISQUALIFY WICK PHILLIPS GOULD & MARTIN, LLP AS
COUNSEL TO HCRE PARTNERS, LLC AND FOR RELATED RELIEF**

I, Kenneth H. Brown, pursuant to 28 U.S.C. § 1746(a) and under penalty of perjury, declare

as follows:

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel

to the above-referenced Debtor, and I submit this Declaration in support of the *Supplemental*



1934054211001000000000000004

*Motion to Disqualify Wick Phillips Gould & Martin, LLP as Counsel to HCRE Partners, LLC and for Related Relief* (the "Supplemental Motion") being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit A** is a true and correct copy of the August 11, 2021 Deposition Transcript of Rob Wills.

3.      Attached as **Exhibit B** is a true and correct copy of the *Debtor's Amended Notice of Rule 30(b))6) Deposition to Wick Phillips Gould & Martin, LLP* [Docket No. 2608], dated July 26, 2021.

4.      Attached as **Exhibit C** is a true and correct copy of the September 16, 2021 Deposition Transcript of Robert Kehr.

Dated: October 1, 2021.                    */s/ Kenneth H. Brown*
                                            Kenneth H. Brown

# EXHIBIT A

1

2     IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3            DALLAS DIVISION

4
  IN RE:
5                        CHAPTER 11
  HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,          CASE NO. 19-34054-SGI11
       Debtor.
7
   ----------------------------x
8
  HIGHLAND CAPITAL
9  MANAGEMENT, L.P.,
        Plaintiff,         ADVERSARY PROCEEDING
10
    vs.                NO: 21-03000-SGI
11
  HIGHLAND CAPITAL
12  MANAGEMENT FUND ADVISORS,
  L.P.; NEXPOINT ADVISORS,
13  L.P.; HIGHLAND INCOME
  FUND; NEXPOINT STRATEGIC
14  OPPORTUNITIES FUND;
  NEXPOINT CAPITAL, INC.;
15  AND CLO HOLDCO, LTD.,
        Defendants.
16  ---------------------------/

17

18       DEPOSITION OF ROB WILLS, ESQ.

19       VIA REMOTE VIDEOCONFERENCE

20              August 11, 2021

21              9:30 a.m., Central

22

23  Reported by:

24  Anne E. Vosburgh, CSR-6804, RPR, CRR

25  Job No. 197673

## Page 2

```
1
2    REMOTE APPEARANCES:
3
4    On behalf of the Debtor:
5        PACHULSKI STANG ZIEHL & JONES
6        150 California Street
7        San Francisco, California 94111
8        BY: KENNETH BROWN, ESQ.
9     - and -
10       PACHULSKI STANG ZIEHL & JONES
11       780 Third Avenue
12       New York, New York 10017
13       BY: HAYLEY WINOGRAD, ESQ.
14
15
16   On behalf of Unsecured Creditors Committee:
17       SIDLEY AUSTIN
18       2021 McKinney Avenue
19       Dallas, Texas 75201
20       BY: CHANDLER ROGNES, ESQ.
21
22
23
24
25
```

## Page 3

```
1
2    REMOTE APPEARANCES (Continued):
3
4    On behalf of HCRE Partners, LLC (n/k/a NexPoint Real
5    Estate Partners, LLC):
6        WICK PHILLIPS
7        100 Throckmorton Street
8        Fort Worth, Texas 76102
9        BY: BRANT MARTIN, ESQ.
10           LAUREN DRAWHORN, ESQ.
11
12   On behalf of the Senior Employees and CPCM, LLC:
13       BAKER MCKENZIE
14       1900 North Pearl Street
15       Dallas, Texas 75201
16       BY: DEBRA DANDENEAU, ESQ.
17
18   ALSO PRESENT:
19       LA ASIA CANTY, Paralegal from Pachulski Stang
20
21
22
23
24
25
```

## Page 4

```
1
2                I N D E X
3
4        ---------- EXAMINATIONS ----------
5    WITNESS:  ROB WILLS, ESQ.
6    Examination by Mr. Brown            6
7    Examination by Mr. Martin           113
8    Re-Examination by Mr. Brown         124
9
10
11
12
13       ---------- MARKED EXHIBITS ----------
14   NUMBER       DESCRIPTION          PAGE
15   Exhibit A    Amended Notice of 30(b)(6)   11
16                Deposition
17   Exhibit B    SE Multifamily Holdings LLC,   14
18                Limited Liability Company
19                Agreement, August 23, 2018
20   Exhibit C    Bridge Loan Agreement,    20
21                September 26, 2018
22   Exhibit D    Email chain, "RE:  Project   72
23                Unicorn - Final Org Charts,"
24                with attachments
25
```

## Page 5

```
1
2    EXHIBITS (Continued):
3    Exhibit E    Email chain, "RE: Unicorn -    90
4                DSTs"
5    Exhibit F    SE Multifamily Holdings LLC    98
6                First Amended and Restated
7                Limited Liability Company
8                Agreement
9    Exhibit H    Email chain, "FW: Draft LLC   101
10               Agreement"
11   Exhibit I    Email chain  "RE: SE       122
12               Multi-Family Holdings LLC:
13               Amended and Restated,"
14               beginning Bates
15               Highland136853
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    Wick Phillips 30(b)(6) - R. Wills
2        Remote Videoconference Deposition
3        August 11, 2021, 9:30 a.m., Central
4        --------------
5            PROCEEDINGS
6        --------------
7        ROB WILLS, ESQ.,
8    (Having been called to appear via
9    remote videoconference, declared his
10    testimony to be truthful under penalty
11    of perjury.)
12            ---
13            EXAMINATION
14    BY MR. BROWN:
15    Q.   Would you state your full name for
16    the record.
17    A.   Sure.  James Robert Wills, IV.
18    Q.   Mr. Wills, I'm counsel for Highland
19    Capital Management L.P.  I think I'll be
20    referring to that entity, the Debtor,
21    throughout the deposition as Highland.
22        Will you understand what I mean
23    when I refer to Highland as the Debtor?
24    A.   Yes, sir.
25    Q.   And your last name is pronounced

Page 7

1        Wick Phillips 30(b)(6) - R. Wills
2    Willis?
3    A.   Wills.
4    Q.   Mr. Wills, you're an attorney; is
5    that correct?
6    A.   Yes, sir.
7    Q.   Okay.  Can you tell me what your
8    current role is and position with
9    Wick Phillips?
10    A.   Sure.  I'm an equity partner here.
11    I'm one of two partners that run the real
12    estate group.
13    Q.   Okay.  Have you ever had your
14    deposition taken before?
15    A.   No, sir.
16    Q.   Have you ever taken a deposition
17    before?
18    A.   I have.
19    Q.   Okay.  So can we all assume that
20    you understand the rules, and I can
21    reasonably dispense with explaining to you
22    the protocol and procedures for a deposition?
23    A.   Yes.  That's fine with me.
24    Q.   Just very basically, you understand
25    you're under oath?

Page 8

1        Wick Phillips 30(b)(6) - R. Wills
2    A.   Yes, sir.
3    Q.   And that what you say here is like
4    what you say in a court of law?
5    A.   Yes, sir.
6    Q.   It's important for you to
7    understand my question.  Wait until I'm
8    finished before you answer.
9        We don't want to be talking at the
10    same time because that makes for an unclear
11    record for the court reporter.
12    A.   Not a problem.
13    Q.   You understand all that?
14    A.   Yes, sir.
15    Q.   You also understand that you'll
16    have an opportunity to review the transcript
17    of this deposition and make corrections?
18    A.   Yes, sir.
19    Q.   Okay.  And that I'll be able to
20    comment on those corrections at the time of
21    the hearing on this?
22    A.   Yes, sir.
23    Q.   Okay.  Do you understand that
24    you've been designated as the witness for
25    Wick Phillips pursuant to Federal Rule of

Page 9

1        Wick Phillips 30(b)(6) - R. Wills
2    Civil Procedure 30(b)(6), made applicable in
3    this proceeding by Bankruptcy Rule 9011?
4    A.   Yes, sir.
5    Q.   And you're aware that you're
6    required to provide complete and
7    knowledgeable answers on behalf of
8    Wick Phillips with respect to the topics that
9    have been designated in the Wick Phillips
10    Rule 30(b)(6) deposition notice?
11    A.   Yes, sir.
12    Q.   And you understand that your
13    responses will be binding on Wick Phillips in
14    this matter?
15    A.   Yes, sir.
16    Q.   And when I refer to "this matter,"
17    again, at the risk of stating the obvious,
18    this deposition is being taken today in
19    connection with the Debtor's motion to
20    disqualify Wick Phillips from representing an
21    adverse party in connection with their proof
22    of claim against the Debtor in the Debtor's
23    bankruptcy case.
24        Is that your understanding?
25    A.   Yes, sir.

Page 10

Wick Phillips 30(b)(6) - R. Wills

2   Q.   And you understand that what you
3  say today in your testimony represents the
4  testimony of the law firm of Wick Phillips
5  rather than your personal testimony?
6   A.   Yes, sir, I do.
7   Q.   Okay.  Do you know how you were
8  selected as Wick Phillips' designated witness
9  in connection with the disqualification
10  motion?
11   MR. MARTIN:  I'm going to object
12   and instruct the witness not to answer
13   based on the question of privilege.
14   That's the law firm's privilege and
15   we're not going to waive it.
16  BY MR. BROWN:
17   Q.   Well, do you -- can you answer that
18  question without disclosing the privilege?
19   A.   I'm one of two partners in the real
20  estate section of the firm.  This is a real
21  estate matter that we handled.
22   Q.   Okay.  What have you done to become
23  prepared to provide complete, knowledgeable,
24  and binding answers to the questions relating
25  to the topics in the deposition notice?

Page 11

Wick Phillips 30(b)(6) - R. Wills

2   A.   I reviewed the Motion to Disqualify
3  and the Brief in Support, my firm's
4  Opposition in that brief; as well as talking
5  with D.C. Sauter, a former partner of mine;
6  Rachel Sam, a current partner of mine; and
7  reviewing the exhibits and declarations
8  attached to all the briefs, as well as our
9  internal files and -- in relation.
10   Q.   Okay.  How much time did you spend
11  preparing for this deposition?
12   A.   It was over a couple of days.  I
13  would say several hours.
14   Q.   About five?
15   A.   I would say right about there.
16   MR. BROWN:  Could the court
17   reporter mark Exhibit A?
18   THE REPORTER:  As Exhibit A?
19   MR. BROWN:  Sure.  Mark Exhibit A
20   as Exhibit A.
21   (Amended Notice of 30(b)(6)
22   Deposition, marked as Exhibit A.)
23  BY MR. BROWN:
24   Q.   And housekeeping matter.  I don't
25  know --

Page 12

Wick Phillips 30(b)(6) - R. Wills

2   (Brief interruption.)
3  BY MR. BROWN:
4   Q.   So Mr. Wills, do you have this in
5  front of you or are you just looking at it on
6  the screen?
7   A.   No.  I've got the exhibits in front
8  of me.  It's also on the screen.
9   Q.   Okay.  So have you seen this?  It's
10  called Debtor's Amended Notice of 30(b)(6)
11  Deposition to Wick Phillips Gould & Martin
12  LLP.
13   Have you seen this before?
14   A.   Yes, sir.
15   Q.   And have you reviewed it?
16   A.   Yes, sir.
17   Q.   And if you scroll down to page 4,
18  that sets forth the topics that you have been
19  designated as the witness for Wick Phillips
20  on.
21   Have you reviewed those topics?
22   A.   Yes, sir.
23   Q.   And are you prepared to testify as
24  Wick Phillips' designated witness on those
25  topics today?

Page 13

Wick Phillips 30(b)(6) - R. Wills

2   A.   Yes, sir.
3   Q.   Okay.  Very good.
4   During the deposition today, you
5  are required to answer the questions
6  truthfully.  If you don't know the answer to
7  a question, that is a legitimate response if
8  it's a truthful response, and I'm sure you
9  know that.
10   But I want to make sure you
11  understand that if you say "I don't know" as
12  an answer to one of the questions about the
13  topics that have been designated, that I can
14  consider that and advance the argument at the
15  hearing that that is an admission by
16  Wick Phillips that Wick Phillips doesn't have
17  any knowledge or position with respect to the
18  question that you answer "I don't know" on,
19  and that I can argue that Wick Phillips can
20  be precluded -- should be precluded from
21  offering documents, evidence, or testimony at
22  the hearing on that matter.
23   Do you understand that?
24   A.   I do.
25   Q.   In this deposition, I may get a

Page 14

1    Wick Phillips 30(b)(6) - R. Wills
2    little sloppy and use the term "you" rather
3    than "Wick Phillips."  But because of the
4    nature of this deposition, when I do use the
5    term "you," I'm going to be referring to
6    Wick Phillips unless I specifically say I
7    want your knowledge rather than
8    Wick Phillips'.
9        Do you understand that?
10   A.  Yes, sir.
11       MR. BROWN:  Ms. Vosburgh, can you
12   please mark Exhibit B as Exhibit B.
13       (SE Multifamily Holdings LLC,
14       Limited Liability Company
15       Agreement, August 23, 2018, marked
16       as Exhibit B.)
17   BY MR. BROWN:
18   Q.  Mr. Wills, what has been marked as
19   Exhibit B is a copy of the SE Multifamily
20   Holdings LLC, Limited Liability Company
21   Agreement, dated August 23, 2018.
22       Have you seen this document before?
23   A.  Yes, sir.
24   Q.  And in what context did you see it?
25   A.  In connection with this motion.

Page 15

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  So is it accurate to say that
3    before you started preparing to be the Rule
4    30(b)(6) witness of Wick Phillips, you had
5    not seen this document before?
6    A.  That's correct.
7    Q.  So you personally, as opposed to
8    Wick Phillips, have had no role in connection
9    with this document, the preparation or
10   negotiation of this document, correct?
11   A.  Yes, sir.
12   Q.  Okay.  Do you understand what
13   Wick Phillips' role, if any, was in
14   connection with this document?
15   A.  Yes, sir.
16   Q.  Okay.  Could you tell me what
17   Wick Phillips' role was in connection with
18   the SE Multifamily Holdings Limited Liability
19   Company Agreement, which is Exhibit B.
20   A.  Yes.  Our – Wick Phillips' role
21   was using this LLC Agreement in connection
22   with the financing of the Project Unicorn
23   transaction.
24   Q.  Okay.  Do you know what the purpose
25   of the SE Family Holdings – let me make this

Page 16

1    Wick Phillips 30(b)(6) - R. Wills
2    simpler.
3        For this deposition, I would like
4    to refer to the SE Multifamily Holdings LLC
5    Limited Liability Company Agreement as the
6    LLC Agreement.
7        Is that acceptable to you, and will
8    we be talking about the same thing when we
9    talk about the LLC Agreement?
10   A.  Sure.  That works great.
11   Q.  What was the purpose of the
12   LLC Agreement?
13   A.  The purpose of the LLC Agreement
14   was, again, to use in connection with the
15   Project Unicorn structuring for the financing
16   of those acquisitions.
17   Q.  Do you know who the parties were to
18   the LLC Agreement?
19   A.  I know who the parties are from
20   reading the agreement, but I can't list them.
21   Q.  Okay.  So I think that Highland was
22   one of the parties.  And the other party was
23   an entity known as HCRE Partners LLC.
24       Is that your understanding?
25   A.  Yes, sir.

Page 17

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Okay.  So – and I'm going to refer
3    to HCRE Partners, LLC throughout this
4    deposition as "HCRE."
5        Will you understand what I'm
6    talking about and will we be talking about
7    the same thing when I refer to HCRE?
8    A.  Yes.
9    Q.  It's just the counterparty to
10   Highland in the LLC Agreement, or the other
11   party to the LLC Agreement.
12       Did Wick Phillips have any role in
13   connection with the negotiation and drafting
14   of the LLC Agreement?
15   A.  No, sir.
16   Q.  Okay.  It didn't represent any
17   party?
18   A.  Not at – no, sir.
19   Q.  Okay.  So it didn't represent
20   either Highland or HCRE, correct?
21   A.  Correct.
22   Q.  Do you know if Wick Phillips had
23   any communications with either of the parties
24   to the LLC Agreement while the agreement was
25   being negotiated and drafted?

Page 18

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I'm not sure.  I don't know.
3    Q.  Okay.  Did Wick Phillips have
4  occasion to at any time need to become aware
5  of the ownership percentages as between the
6  Debtor, Highland, and HCRE, that were
7  allocated in the LLC Agreement?
8    A.  My suspicion would be in connection
9  with the financing, the Loan Agreement with
10  KeyBank and with Freddie, Freddie Mac,
11  obviously, the organizational structure is
12  important to those lenders and, to a certain
13  extent, attached to those loan agreements.
14    And so as it relates to that, yes,
15  sir.
16    Q.  And do you know what the
17  ownership -- does Wick Phillips know what the
18  ownership percentages were in connection with
19  the LLC Agreement?
20    A.  I know what the LLC Agreement says,
21  yes, sir.
22    Q.  And what does the LLC Agreement
23  say?
24    A.  It says --
25    Q.  I think if we flip to page 18,

Page 19

1    Wick Phillips 30(b)(6) - R. Wills
2  scroll to page 18 of the LLC Agreement...
3    A.  Yes, sir.  Yes, sir.
4    Do you want me to read that?
5    Q.  Yeah, sure.
6    A.  It says that HCRE Partners, LLC has
7  a percentage interest of 51 percent, and
8  Highland Capital Management L.P. has a
9  percentage interest of 49 percent.
10    Q.  Okay.  And do you have any
11  understanding if those percentages were
12  correct or incorrect at the time the Limited
13  Partnership Agreement was executed?
14    A.  I assume they were correct at the
15  time, yes, sir.
16    Q.  Did Wick Phillips have any
17  communications with HCRE concerning the
18  capital contributions required by the
19  LLC Agreement?
20    A.  No, sir.
21    Q.  Did Wick Phillips have any
22  communications with HCRE concerning the
23  ownership interests set forth in the
24  LLC Agreement?
25    A.  Only in connection with -- as a

Page 20

1    Wick Phillips 30(b)(6) - R. Wills
2  conduit to KeyBank or Freddie Mac in terms of
3  who owns what.
4    Q.  Okay.  We'll talk about that later,
5  then, when we talk about the KeyBank
6  Loan Agreement.
7    A.  Okay.
8    Q.  But no communications --
9  Wick Phillips had no communications with the
10  parties with respect to the ownership
11  interests limited -- if we limit that to the
12  context of just the LLC Agreement, its
13  drafting, negotiation, formation; is that
14  correct?
15    A.  That's correct.
16    Q.  And the same answer if, instead of
17  asking about ownership percentages, I asked
18  about contributions?
19    A.  Yes, sir.  Same answer.
20    MR. BROWN:  Okay.  Ms. Vosburgh,
21  can we mark Exhibit C as Exhibit C.
22    (Bridge Loan Agreement, September
23    26, 2018, marked as Exhibit C.)
24  BY MR. BROWN:
25    Q.  Okay.  So Mr. Wills, up on the

Page 21

1    Wick Phillips 30(b)(6) - R. Wills
2  screen -- and I think you have a binder of
3  exhibits, I assume?
4    A.  Yes, sir.
5    Q.  So up on the screen marked as
6  Exhibit C, and hopefully in your binder also
7  as Exhibit C, is a document called the Bridge
8  Loan Agreement dated as of September 26,
9  2018, among a group of entities set forth on
10  the agreement that I won't repeat, who are
11  the borrowers, and also the lender, KeyBank
12  National Association, as agent, and KeyBanc
13  Capital Markets as the sole lead arranger and
14  bookrunner.
15    Is that the document you have as
16  Exhibit C?
17    A.  Yes, sir.
18    Q.  Okay.  Have you ever seen this
19  document before?
20    A.  Yes, sir.
21    Q.  Okay.  Are you familiar with it?
22    A.  Yes, sir.
23    Q.  Is it a true copy of -- let's --
24  this Exhibit C, for the rest of the
25  deposition, I'm going to refer to it as the

Page 22

1      Wick Phillips 30(b)(6) - R. Wills
2 Loan Agreement.
3      And will you understand and be
4 comfortable referring to Exhibit C as the
5 Loan Agreement?
6      A.  Yes, sir.
7      Q.  Is this a true copy of the
8 Loan Agreement?
9      A.  Yes, sir.  I believe so.
10      Q.  Okay.  Did Wick Phillips have any
11 role in connection with the Loan Agreement?
12      A.  Yes, sir.
13      Q.  Can you describe the role that
14 Wick Phillips played in connection with the
15 Loan Agreement?
16      A.  Sure.  We helped the property-level
17 borrowers here in connection with the
18 Project Unicorn acquisition.
19      This -- the Loan Agreement that
20 we're looking at was for a bucket of
21 properties that could not get agency
22 financing through Freddie Mac.  So we needed
23 KeyBank to come in and provide sort of some
24 additional financing in connection with the
25 Project Unicorn closing.

Page 23

1      Wick Phillips 30(b)(6) - R. Wills
2      Q.  Okay.  Did Wick Phillips represent
3 Highland in connection with the KeyBank -- in
4 connection with the Loan Agreement?
5      A.  Highland is a co-borrower, but not
6 separately, no, sir.
7      Q.  Okay.  So is the answer to the
8 question did Wick Phillips represent Highland
9 in connection with the Loan Agreement yes or
10 no?
11      A.  No.  No, sir.
12      Q.  It had no representation of
13 Highland?
14      A.  That's correct.
15      Q.  Can you turn to -- let's flip to
16 page 3 of the Loan Agreement.
17      Okay.  So I want to focus you on
18 the term "Borrower" under the Loan Agreement.
19      A.  Okay.
20      Q.  Do you see where the term
21 "Borrower" is defined to include
22 Highland Capital?
23      A.  Yes, sir.
24      Q.  And Highland Capital has been
25 defined earlier in the Loan Agreement, has it

Page 24

1      Wick Phillips 30(b)(6) - R. Wills
2 not, as Highland Capital Management, L.P.?
3      A.  Correct.
4      Q.  So Highland, the Debtor, was a
5 borrower under the Loan Agreement, correct?
6      A.  Yes, sir.
7      Q.  Did Wick Phillips represent the
8 borrowers under the Loan Agreement?
9      A.  Wick Phillips represented some of
10 the borrowers.
11      Q.  Okay.  And which borrowers did it
12 not represent?
13      A.  We did not represent what we've
14 been calling Highland.
15      Q.  Where does it say in the
16 Loan Agreement that you didn't represent
17 Highland?
18      A.  I don't know that the
19 Loan Agreement would say that.
20      Q.  Okay.
21      MR. MARTIN:  I don't think he
22 finished his answer, Counsel.
23      MR. BROWN:  I'm sorry.
24      MR. MARTIN:  The question on the
25 table was which borrowers did

Page 25

1      Wick Phillips 30(b)(6) - R. Wills
2 Wick Phillips not represent, and he was
3 in the middle of providing his answer.
4      MR. BROWN:  I apologize.  I didn't
5 mean to interrupt.
6      MR. MARTIN:  That's okay.
7 BY MR. BROWN:
8      Q.  Can you please provide a complete
9 answer to the question?
10      A.  Sure.
11      Initially we represented the
12 NexPoint entities and the property-level
13 entities all as co-borrowers.  And KeyBank
14 needed more credit from the borrower side
15 since this was such a large transaction, and
16 that's when Highland Capital was added as an
17 additional borrower to the loan.
18      Q.  Okay.  Can we scroll to page 51.
19      Can you please focus on
20 Section 4.01(b).
21      A.  Okay.
22      Q.  This is -- this discusses certain
23 conditions to the Loan Agreement.  And (b)
24 says:
25      "The Administrative Agent shall

Page 26

1          Wick Phillips 30(b)(6) - R. Wills
2     have received" -- as a condition -- "a
3     favorable written opinion (addressed
4     to the Administrative Agent and the
5     Lenders and dated the Effective Date)
6     of Wick Phillips Gould & Martin, LLP,
7     counsel for the Borrower."
8          Is that statement referring to
9     Wick Phillips as "counsel for the borrower"
10    and referencing back to the borrower as
11    several entities, including Highland, is that
12    statement in the Loan Agreement incorrect?
13       A.   I mean, that's what it says, yes,
14    sir.
15       Q.   Is it incorrect?
16       A.   It is incorrect as to who
17    Wick Phillips represented.  It is correct in
18    terms of providing a legal opinion.  You
19    wouldn't have multiple legal opinions from
20    different firms for the same borrower,
21    typically, or collection of borrowers.
22       Q.   So the Loan Agreement -- your
23    testimony today on behalf of Wick Phillips is
24    that this Loan Agreement, to the extent it
25    refers to Wick Phillips' representation of

Page 27

1          Wick Phillips 30(b)(6) - R. Wills
2     the borrower, is inaccurate to the extent the
3     borrower includes Highland; is that correct?
4          MR. MARTIN:  Objection, form.
5       A.   Yes, sir.  That's what we're
6     saying.
7     BY MR. BROWN:
8       Q.   Did Wick Phillips say anything,
9     ever raise the issue of the lack of accuracy
10    of these representations in the
11    Loan Agreement to anybody at any time?
12          MR. MARTIN:  Objection to form.
13       A.   Not to my knowledge.
14    BY MR. BROWN:
15       Q.   Okay.  Can we also scroll forward
16    to page 76.  This is Article IX of the
17    Loan Agreement.  Section 9.01 discusses
18    Notices.
19          And do you see at Section 9.01(a)
20    where it says, in the case of notices, "if to
21    the Borrower, in care of Highland Capital
22    Management," with copies to Wick Phillips?
23       A.   Yes, sir.  I see that.
24       Q.   Okay.  So I'm just trying to
25    ascertain Wick Phillips' position here.  Is

Page 28

1          Wick Phillips 30(b)(6) - R. Wills
2     it that Section 9.01(a) is inaccurate to the
3     extent it reflects that Wick Phillips
4     represented Highland Capital Management in
5     connection with the Loan Agreement?
6       A.   My suspicion is this was the same
7     notice provision as had been there in
8     previous loans that we had worked on -- we,
9     Wick Phillips, had worked on with KeyBank.
10          And once Highland was added as a
11    co-borrower, which had not been the case
12    previously, it was not changed.
13       Q.   Okay.  So was Wick Phillips
14    receiving notices on behalf of
15    Highland Capital Management relating to the
16    Loan Agreement or not?
17       A.   Not that I'm aware of.
18       Q.   Okay.  So did Wick Phillips ever
19    raise the issue with any of the parties to
20    the Loan Agreement that this Section 9.01(a)
21    of the Loan Agreement did not accurately
22    reflect the position of Wick Phillips with
23    respect to its representation of
24    Highland Capital Management?
25          MR. MARTIN:  Objection, form.

Page 29

1          Wick Phillips 30(b)(6) - R. Wills
2       A.   Well, I think we would want the
3     notices, with the borrower being a collection
4     of borrowers, of which we did represent some.
5     BY MR. BROWN:
6       Q.   And why wouldn't the notices be in
7     care of the entities that you represented as
8     opposed to an entity that you didn't
9     represent?
10       A.   I don't know.
11       Q.   Okay.  Give me a moment, please.
12          Do you have a copy of
13    Wick Phillips' Brief in Opposition to the
14    Debtor's Motion to Disqualify in front of
15    you?
16       A.   Not in front of me, no, sir.
17       Q.   I'm looking at it right now, and I
18    know that you have read it before.
19          And at page 4 of that Opposition,
20    Wick Phillips says:
21          "As a borrower under the bridge
22          loan, Wick Phillips was counsel to
23          HCM L.P."
24          So Wick Phillips' statement in a
25    document filed with the Court on May 6th,

Page 30

1    Wick Phillips 30(b)(6) - R. Wills
2    2021, is inconsistent with your testimony
3    today, is it not?
4        MR. MARTIN: Objection, form.
5    A. I'm sorry. Did you say HC L.P.
6    or –
7    BY MR. BROWN:
8    Q. HCM L.P., which is Highland Capital
9    Management, L.P., the Debtor, Highland.
10   A. Right.
11   Q. We're calling it Highland.
12       So in Wick Phillips' brief filed on
13   May 6th, 2021, in opposition to the Motion to
14   Disqualify, Wick Phillips said:
15       "As a borrower under the bridge
16   loan" – which is what we're referring
17   to as the Loan Agreement –
18       "Wick Phillips was counsel to HCM
19   L.P."
20       So that is, by my lights,
21   inconsistent with your testimony today.
22       Can you explain why you are
23   testifying in a manner that is not consistent
24   with an admission Wick Phillips has already
25   made in pleadings filed with the bankruptcy

Page 31

1    Wick Phillips 30(b)(6) - R. Wills
2    court?
3        MR. MARTIN: Objection, form.
4    A. Yes. I believe what I said was
5    that – I guess what we're calling here
6    Highland is a co-borrower under this
7    Loan Agreement that was added later on.
8        And, yes, we did represent the
9    co-borrowers in connection with this
10   Loan Agreement.
11   BY MR. BROWN:
12   Q. Okay. So you agree, then, with the
13   statement made in Wick Phillips' May 6th
14   filing in opposition to the disqualification
15   motion that Wick Phillips did represent the
16   borrower, Highland, under the bridge loan; is
17   that correct?
18   A. We represented all of the borrowers
19   as co-borrowers in this – with this loan.
20   Q. Okay. Other than the borrowers –
21   other than the co-borrowers, did
22   Wick Phillips represent any other entities in
23   connection with the Loan Agreement?
24   A. No, sir.
25   Q. Okay. Does Wick Phillips have a

Page 32

1    Wick Phillips 30(b)(6) - R. Wills
2    retention agreement in connection with the
3    work it did for the borrowers under the –
4    relating to the Loan Agreement?
5    A. No, sir.
6    Q. Why not?
7    A. I don't know the answer to that
8    question.
9    Q. Does Wick Phillips normally require
10   retention agreements when it undertakes a
11   client representation?
12   A. In an ideal world, we do, yes, sir,
13   but it's not a requirement.
14   Q. Can you tell me what Wick Phillips'
15   custom and practice is with respect to
16   obtaining retention agreements when it
17   undertakes the representation of a client?
18   A. A similar answer. We ideally would
19   have an engagement letter or retention
20   letter, as you mentioned. But it is not
21   required for us to open a matter, or a new
22   client matter.
23   Q. Okay. Do you personally get
24   retention agreements from your clients when
25   you undertake a representation?

Page 33

1    Wick Phillips 30(b)(6) - R. Wills
2    A. I certainly try to.
3    Q. Do you always do it?
4    A. I do not.
5    Q. Did Wick Phillips obtain a conflict
6    waiver from the borrowers, or any of them,
7    concerning its joint representation of them
8    in connection with the Loan Agreement?
9    A. I don't believe so.
10   Q. Have you ever seen a conflict
11   waiver?
12   A. Yes, sir.
13   Q. I'm sorry. I didn't mean it that
14   way. That's the problem with lawyers.
15   They're too literal.
16       Have you ever seen a conflict
17   waiver in connection with the Loan Agreement?
18   A. No, sir.
19   Q. Okay. Did you have – in your
20   preparation for this deposition and to be the
21   designated witness of Wick Phillips, was
22   there any discussion or reference to a
23   conflict waiver among Wick Phillips' joint
24   clients relating to the Loan Agreement?
25   A. Not that I'm aware of.

Page 34

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Do you know whether Wick Phillips
3  considered whether a conflict waiver was
4  necessary because of the joint representation
5  of clients under the Loan Agreement?
6    A.  I do not.
7    Q.  Do you know if Wick Phillips
8  undertook any analysis to determine if the
9  joint representation of the borrowers
10  presented a conflict or a potential conflict
11  for which a conflict waiver was required?
12    A.  I do not.
13    Q.  You don't know if it was done?
14    A.  I don't know.
15    Q.  Okay.  Were there any discussions
16  of the issue of the advisability or necessity
17  of a conflict waiver in connection with the
18  Loan Agreement that Wick Phillips had?
19    A.  I don't believe so.
20    Q.  Do you -- is Wick Phillips familiar
21  with the Texas Rules of Professional Conduct,
22  Section 1.07?
23    A.  Yes, sir.
24    Q.  And do you know if it's familiar
25  with Section 1.07(a) that requires written

Page 35

1  consent for common representations?
2    A.  Yes, sir.
3    MR. MARTIN:  Objection, form.
4    A.  Yes, sir.
5  BY MR. BROWN:
6    Q.  And do you know why Wick Phillips
7  did not obtain a written conflict waiver in
8  conformity and compliance with
9  Section 1.07 --
10    MR. MARTIN:  Objection, form.
11  BY MR. BROWN:
12    Q.  -- in connection with the joint
13  representation of clients under the
14  Loan Agreement?
15    MR. MARTIN:  Same objection.
16    A.  I do not know.
17  BY MR. BROWN:
18    Q.  Do you know if Wick Phillips had
19  any discussions with any of the borrowers --
20  as that term is defined under the
21  Loan Agreement -- about actual or potential
22  conflicts that could arise from
23  Wick Phillips' joint representation of them
24  under the Loan Agreement?
25    A.  I don't.

Page 36

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Did Wick Phillips undertake any
3  analysis of its responsibilities in
4  connection with the joint representation and
5  whether the representation could be
6  undertaken without an improper impact on its
7  responsibilities?
8    MR. MARTIN:  Objection, form.
9    A.  I'm not aware of that.
10  BY MR. BROWN:
11    Q.  Did Wick Phillips consult with any
12  of the borrowers concerning the implications
13  of the joint representation, for example, on
14  the attorney-client privilege?
15    A.  I don't know.
16    Q.  Do you know if Wick Phillips
17  consulted with any of the borrowers
18  concerning the advantages and risks to them
19  individually of having Wick Phillips jointly
20  represent them in connection with the Loan
21  Agreement?
22    MR. MARTIN:  Objection, form.
23    A.  I don't know.
24  BY MR. BROWN:
25    Q.  Do you have any understanding of

Page 37

1    Wick Phillips 30(b)(6) - R. Wills
2  whether the representation -- well, as you
3  sit here today on behalf of Wick Phillips, do
4  you have an opinion on whether or not the
5  joint representation of the multiple
6  borrowers under the Loan Agreement gave rise
7  to any actual or potential conflicts?
8    MR. MARTIN:  Objection, form.
9    A.  I don't have an opinion.
10  BY MR. BROWN:
11    Q.  Do you understand that HCRE was
12  designated as the lead borrower under the
13  Loan Agreement?
14    A.  Yes, sir.
15    Q.  It was, to your understanding,
16  designated as the lead borrower?
17    A.  Yes, sir.
18    Q.  Can we -- let's see.
19    MS. CANTY:  Ken, if you tell me the
20  section, I can probably jump to it
21  quickly.
22    MR. BROWN:  Yeah.  It's
23  Section 1.05, page 14.
24    MS. CANTY:  Sorry.  I have it as
25  page 25.

Page 38

1     Wick Phillips 30(b)(6) - R. Wills
2          MR. BROWN:  No, I'm sorry.  That –
3     let's first –
4          Okay.  That's fine.  That's fine.
5     BY MR. BROWN:
6     Q.   So if you -- could you review this
7     Section 1.05, Mr. Wills.
8     A.   Sure.  (Reviewing document.)
9          Okay.
10    Q.   Okay.  Did you have a chance to
11    look at both (a) and (b) of Section 1.05?
12    A.   Yes, sir.
13    Q.   Okay.  So the lead borrower under
14    the Loan Agreement is HCRE, correct?
15    A.   Correct.
16    Q.   And this Section 1.05 talks about
17    the appointment of the lead borrower and some
18    of the rights and obligations of the lead
19    borrower, correct?
20    A.   Yes, sir.
21    Q.   And Section (b) says:
22         "The proceeds of each loan and
23         advance provided under the Loans which
24         is requested by the Lead Borrower
25         shall be advanced as and when

Page 39

1     Wick Phillips 30(b)(6) - R. Wills
2          otherwise provided herein or as
3          otherwise indicated by the Lead
4          Borrower."
5          Correct?
6     A.   Correct.
7     Q.   And that "The Lead Borrower shall
8     cause the transfer of the proceeds to the
9     other borrowers on whose behalf such loan and
10    advance was obtained."
11         So is it your understanding that
12    under this Loan Agreement, the lead borrower
13    had the ability to both determine when the
14    advances were made and to direct where the
15    transfers went?
16    A.   Yes, sir, according to this
17    provision.
18    Q.   Okay.  And do you also have an
19    understanding that the other borrowers,
20    including Highland, were on the hook jointly
21    and severally for all amounts that were
22    borrowed under the Loan Agreement?
23    A.   Yes, sir.
24    Q.   So, in your mind, does the fact
25    that HCRE could determine when advances were

Page 40

1     Wick Phillips 30(b)(6) - R. Wills
2     made and direct how those advances were
3     applied, while Highland was jointly and
4     severally liable for those advances, does
5     that give rise to a conflict or potential
6     conflict between Highland and HCRE?
7          MR. MARTIN:  Objection, form.
8     A.   No, sir, not in my opinion.
9     BY MR. BROWN:
10    Q.   Okay.  Why not?
11    A.   Well, my understanding is the
12    Highland entity is more – was added as a
13    borrower more in a guarantee/guarantor
14    context.  And so the HCRE, or the lead
15    borrower, would just be directing the funds
16    to the property-level borrowers in connection
17    with each of the various acquisitions.
18    Q.   Do you know that's what occurred?
19    A.   That's the setup of the
20    Loan Agreement.
21    Q.   Do you have any knowledge on
22    whether HCRE used moneys that it obtained
23    under the Loan Agreement to make a capital
24    contribution to the Limited Partnership?
25    A.   I don't have that knowledge, no,

Page 41

1     Wick Phillips 30(b)(6) - R. Wills
2     sir.
3     Q.   You don't know one way or the
4     other?
5     A.   No, sir.
6     Q.   Do you know if Wick Phillips ever
7     explained to any of the borrowers the
8     operation of the Loan Agreement to the extent
9     that it permitted HCRE to direct the
10    advances, but that all of the other borrowers
11    were liable under the Loan Agreement,
12    irrespective of how the advances were
13    directed?
14         MR. MARTIN:  Objection, form.
15    A.   I don't know.
16    BY MR. BROWN:
17    Q.   Did Wick Phillips ever advise
18    Highland that it was liable for all amounts
19    due under the Loan Agreement whether or not
20    it received the proceeds or received the
21    benefit of the proceeds?
22    A.   I don't know.
23    Q.   Do you know whether or not Highland
24    received the benefit of the proceeds advanced
25    under the Loan Agreement?

Page 42

Wick Phillips 30(b)(6) - R. Wills

1    A.   I don't.
2    Q.   Who was Wick Phillips' client
3  contact at HCRE in connection with the
4  Loan Agreement?
5    A.   I believe there were several that
6  we typically deal with, Matt Goetz,
7  Matt McGraner.  Freddy Chang was at one point
8  some form of in-house counsel there.
9    Q.   So Matt Goetz.  Do you know if
10  Matt Goetz was an employee of Highland?
11    A.   I don't know.
12    Q.   Do you know who he was employed by?
13    A.   I don't.
14    Q.   What about Mr. McGraner; do you
15  know if he was an employee of Highland?
16    A.   I don't.
17    Q.   Do you know if he was an employee
18  of HCRE?
19    A.   I do not.
20    Q.   What about Freddy Chang; do you
21  know if he was an employee of Highland?
22    A.   I don't.
23    Q.   Do you know if he was an employee
24  of HCRE?

Page 43

Wick Phillips 30(b)(6) - R. Wills

1    A.   I do not.
2    Q.   You understand you're testifying on
3  behalf of Wick Phillips right now, correct?
4    A.   Yes, sir.
5    Q.   Who was Wick Phillips' client
6  contact at Highland in connection with the
7  Loan Agreement?
8    A.   I don't believe we have a client
9  contact for Highland.
10    Q.   And why was that?
11    A.   We -- I mean, our silo is the real
12  estate silo for NexPoint that handles loan
13  agreements like we're looking at right now.
14  Highland is a separate part of that company.
15    Q.   But Wick Phillips has already
16  acknowledged in its Opposition that it
17  represented Highland in connection with the
18  Loan Agreement.  And I'm just trying to
19  establish whether, in connection with that
20  acknowledged representation, Wick Phillips
21  had a client contact at Highland.
22    And so the question is did
23  Wick Phillips have a client contact and, if
24  so, who?

Page 44

Wick Phillips 30(b)(6) - R. Wills

1    A.   Not to my knowledge.
2    Q.   No client contact.  Okay.
3    Did Wick Phillips have contact with
4  James Dondero in connection with the
5  Loan Agreement?
6    A.   Not to my knowledge.
7    Q.   Okay.  With respect to Mr. Geotz,
8  who you did indicate was a client contact for
9  HCRE --
10    MR. MARTIN:  Objection, form.
11  BY MR. BROWN:
12    Q.   -- how did Wick Phillips determine
13  what hat, if you will, Mr. Geotz was wearing
14  and what entity he was speaking on behalf of,
15  communicating on behalf of?
16    MR. MARTIN:  Objection, form.
17    A.   My assumption is wearing a NexPoint
18  hat, as typically is the case.
19  BY MR. BROWN:
20    Q.   And what is that assumption based
21  on?
22    A.   Our prior representations and
23  dealings.
24    Q.   But is it true that in connection

Page 45

Wick Phillips 30(b)(6) - R. Wills

1  with this representation, Wick Phillips'
2  representation of the borrowers under the
3  Loan Agreement, you don't know how
4  Wick Phillips made a determination of what
5  hat the individuals it spoke to were wearing,
6  do you?
7    MR. MARTIN:  Objection, form.
8    A.   I don't know if a determination was
9  made at all, no, sir.
10  BY MR. BROWN:
11    Q.   And do you know whether
12  Wick Phillips made any distinction in terms
13  of people that -- the client contacts it
14  communicated with in connection with the
15  Loan Agreement, whether it made any
16  distinction whether those individuals were
17  communicating with it on behalf of Highland
18  or HCRE?
19    MR. MARTIN:  Objection, form.
20    A.   I don't know.
21    MR. MARTIN:  Is now a good time to
22  take a break?
23    (Recess taken.)

Page 46

Wick Phillips 30(b)(6) - R. Wills

1    Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3    Q.   Mr. Wills, do you know what the
4  purpose of the Loan Agreement was?
5    A.   To provide financing in connection
6  with the Project Unicorn property
7  acquisitions.
8    Q.   Which was going to be done by the
9  LLC?  The acquisitions were going to be by
10  the LLC?
11    A.   By some subsidiaries, but yes, sir.
12    Q.   And do you know what HCRE's role
13  was in connection with the Loan Agreement?
14    A.   They were the lead borrower.
15    Q.   Okay.  And we've already talked
16  about to some extent what that involved.
17    Do you know what Highland's role
18  was in connection with the Loan Agreement?
19    A.   It's a little bit like I've already
20  mentioned, but primarily to provide more
21  credit to the borrowing base, to the
22  collective definition of "borrower."
23    Q.   Do you know whether the ownership
24  structure of the Limited Partnership was an
25  issue that was addressed in the

Page 47

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3    A.   The Highland Limited Partnership?
4    Q.   I'm sorry.  Do you know -- let me
5  rephrase the question.  I misstated it.
6    Do you know whether or not the
7  ownership interests between -- as and between
8  Highland and HCRE in the LLC was an issue
9  that was part of the Loan Agreement?
10    A.   I'm not sure I understand your
11  question.  I apologize.
12    Q.   Okay.  Did the ownership interest
13  in the LLC between Highland and HCRE -- was
14  that a component of the Loan Agreement?
15    A.   Yes, sir.
16    Q.   Okay.  And in what way?
17    A.   Just as far as which party was
18  51 percent and which was 49 percent.
19    Q.   I'd like to scroll to Schedule 3.15
20  of the Loan Agreement.
21    MS. CANTY:  Do you know which page
22  that's on, Ken?
23    Never mind.  I see it.
24    MR. BROWN:  Yeah.
25

Page 48

1    Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3    Q.   Okay.  Let's go back to the prior
4  page, the caption page, Schedule 3.15.
5    Okay.  Mr. Wills, are you familiar
6  with Schedule 3.15?
7    A.   Yes, sir.
8    Q.   What role did Wick Phillips have in
9  connection with Schedule 3.15 of the
10  Loan Agreement?
11    A.   We provided these -- the
12  attachments to KeyBank to attach here as the
13  schedule.
14    Q.   Okay.  Let's look at the
15  attachments.
16    MR. BROWN:  Flip -- if we could
17  flip to the very next page.
18    Okay.  Is there any way we could
19  change the view on that so it's upright?
20  Okay.
21  BY MR. BROWN:
22    Q.   Is this one of the attachments?
23    A.   Yes, sir.
24    Q.   And Wick Phillips prepared this
25  attachment in connection with the

Page 49

1    Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3    MR. MARTIN:  Objection, form.
4    A.   No, sir.  We provided these
5  schedules to KeyBank.
6  BY MR. BROWN:
7    Q.   Okay.  You provided the schedules
8  to KeyBank.  Did Wick Phillips prepare the
9  schedules?
10    A.   No, sir.
11    Q.   Did it have any -- did it have any
12  role in connection with the preparation of
13  the schedules?
14    A.   Just as sort of the conduit between
15  the business folks and the lender.
16    Q.   The business folks at the borrower?
17    A.   Correct.
18    Q.   So did Wick Phillips make any
19  changes to these schedule -- to the schedules
20  attached as schedule -- to Schedule 3.15, did
21  it make any changes to them after it received
22  them from the borrowers?
23    A.   No, sir.
24    Q.   Did it review -- did it review
25  these attachments?

Page 50

Wick Phillips 30(b)(6) - R. Wills

1  
2   A.  Yes, sir.
3   Q.  And did it make any determination
4  as to their accuracy?
5   A.  I would assume so, yes, sir.
6   Q.  And, for example, this first
7  schedule reflects the ownership interests of
8  Highland and HCRE in the LLC; is that
9  correct?
10   A.  Yes, sir.
11   Q.  And it reflects the ownership
12  interest as 49 percent for Highland and
13  51 percent for HCRE; is that correct?
14   A.  Yes, sir.
15   Q.  And you don't have -- is it your
16  understanding that that ownership allocation
17  was correct at the time these schedules were
18  prepared?
19   A.  Yes, sir.
20   Q.  And let's scroll down to the next
21  attachment in the schedule.
22      This is the second attachment.  At
23  the bottom it says it's for Gulfstream Isles.
24      Do you see that?
25   A.  Yes, sir.

Page 51

Wick Phillips 30(b)(6) - R. Wills

1  
2   Q.  And that would be a reference to
3  the underlying property that was being
4  acquired; is that correct?
5   A.  Yes, sir.
6   Q.  Okay.  And, again, the ownership
7  percentages for HCRE and Highland in the LLC
8  are reflected as the same, 51 for HCRE and
9  49 percent for Highland.  Correct?
10   A.  Yes, sir.
11   Q.  And based on your prior review of
12  these attachments as Schedule 3.15, your
13  recollection is that they all -- I think
14  there's 22 of them, and they all reflect the
15  same ownership percentage in the LLC; is that
16  correct?
17   A.  I think so, yes, sir.  We can flip
18  through them, but I assume so.
19   Q.  Yeah.  Why don't we just briefly
20  flip through them.  If we go to the next one.
21      Again, this is for Victoria Park.
22      Same ownership percentage reflected
23  there, correct?
24   A.  Yes, sir.
25   Q.  And the next one, this is for the

Page 52

Wick Phillips 30(b)(6) - R. Wills

1  
2  Reserve at River Walk.
3      Same ownership percentage reflected
4  there, correct?
5   A.  Yes, sir.
6   Q.  The next one, Heights at
7  Olde Towne.
8      Same ownership percentage reflected
9  there, correct?
10   A.  Yes, sir.
11   Q.  Okay.  I don't think we have to
12  flip further after these.  They say what they
13  say.
14   A.  Okay.
15      MR. MARTIN:  Mr. Brown, I don't
16  pretend to know as much about these
17  transactions as you certainly do, but I
18  do believe that starting with some of
19  the properties from the back, there
20  are -- while some of the ownership
21  percentages may be the same, you may
22  want to go over them.  Governors Green,
23  Stoney Ridge, Oak Mill --
24      MR. BROWN:  Okay.
25      MR. MARTIN:  The structures do

Page 53

Wick Phillips 30(b)(6) - R. Wills

1  
2  change a little bit.
3  BY MR. BROWN:
4   Q.  Okay.  We can do that.  Let's look
5  through each one of them.  Let's just do a
6  page flip.
7      Again, this is Governors Green.
8      With respect to the interests that
9  are reflected in the LLC, they're the same,
10  correct, for Highland and HCRE, as the
11  others, 49 percent and 51 percent
12  respectively?
13   A.  Yes, sir.
14   Q.  Okay.  Let's go down to the next
15  one, Stoney Ridge.
16      Again, focusing just on the
17  ownership interest in the LLC, it's reflected
18  as 49 percent Highland and 51 percent HCRE,
19  correct?
20   A.  Yes, sir.
21   Q.  And the next one, Oak Mill.
22      Again, focusing just on the LLC,
23  the ownership interest is reflected at
24  49 percent for Highland and 51 percent for
25  HCRE.  Correct?

Page 54

```
1        Wick Phillips 30(b)(6) - R. Wills
2    A.  Yes, sir.
3    Q.  And the next one, which is
4  Battleground Park, and focusing again on the
5  LLC, the ownership interests are reflected as
6  49 percent Highland, 51 percent HCRE.
7  Correct?
8    A.  Yes, sir.
9    Q.  And for Lakes at Renaissance Park,
10 again focusing on the LLC, the ownership
11 percentage is reflected as 49 percent
12 Highland and 51 percent HCRE, correct?
13   A.  Yes, sir.
14   Q.  And for Brandywine -- huh.  Unless
15 I'm missing something, this doesn't even
16 address the LLC interests.
17       MR. MARTIN:  That's one of the
18 reasons I was asking.
19       MR. BROWN:  Pardon me?
20       MR. MARTIN:  That's one of the
21 reasons I was asking.
22       MR. BROWN:  Yeah.  Yeah.
23       MR. MARTIN:  I know you're trying
24 to make your record and I'm not trying
25 to interrupt you.
```

Page 55

```
1        Wick Phillips 30(b)(6) - R. Wills
2        MR. BROWN:  Thank you.  I
3    appreciate it.
4  BY MR. BROWN:
5    Q.  So Brandywine just doesn't -- in
6  this chart, the LLC is not even shown,
7  correct?
8    A.  Correct.
9    Q.  Scroll to the next one, please.
10       This one, which is
11 Glenview Reserve, with respect to the LLC, it
12 reflects the same ownership percentage,
13 49 percent in Highland and 51 percent in
14 HCRE, correct?
15   A.  Yes, sir.
16   Q.  Scroll down, please.
17       And, again, this is for Andros
18 Isles.
19       And with respect to the LLC, it is
20 again reflecting and repeating the same
21 ownership percentage of 49 percent in
22 Highland and 51 percent in HCRE.  Correct?
23   A.  Yes, sir.
24   Q.  Again, this is Arborwalk.
25       And with respect to the LLC, the
```

Page 56

```
1        Wick Phillips 30(b)(6) - R. Wills
2  same ownership percentages are reflected for
3  Highland and HCRE as on the prior charts,
4  correct?
5    A.  Yes, sir.
6    Q.  For Walker Ranch, which is the next
7  page, the same ownership percentages are
8  reflected for the LLC as on the prior charts,
9  correct?
10   A.  Yes, sir.
11   Q.  And with respect to Towne Crossing,
12 the next page, the same ownership percentages
13 are reflected in the LLC, correct?
14   A.  Yes, sir.
15   Q.  And with respect to the next page,
16 West Place, the same LLC percentages are
17 reflected for Highland and HCRE, correct?
18   A.  Yes, sir.
19   Q.  And the next page, Vista Ridge, the
20 same LLC percentages -- the same ownership
21 percentages are reflected for Highland as
22 HCRE as on the prior charts, correct?
23   A.  Yes, sir.
24   Q.  Next page, which is Hidden Lake.
25       With respect to the LLC, the same
```

Page 57

```
1        Wick Phillips 30(b)(6) - R. Wills
2  ownership percentages are reflected for HCRE
3  and Highland as on the prior charts, correct?
4    A.  Yes, sir.
5    Q.  The next page, Arbolita.
6        With respect to the LLC, the same
7  ownership percentages are reflected, correct?
8    A.  Yes, sir.
9    Q.  Next page, Fairways.
10       With respect to the LLC, the same
11 ownership percentages are reflected, correct?
12   A.  Yes, sir.
13   Q.  The next page, with respect to
14 Grand Oasis, it's the same ownership
15 percentages as on the prior charts, correct?
16   A.  Yes, sir.
17   Q.  And with respect to
18 Summers Landing, there is no indication
19 here -- no reflection of the LLC in the
20 chart; is that correct?
21   A.  Yes, sir.  That's correct.
22   Q.  Okay.  I think that takes us
23 through it.  And I apologize for dragging
24 everybody through that, but your counsel is
25 correct that they're not all -- they did not
```

Page 58

Wick Phillips 30(b)(6) - R. Wills

1    all reflect the ownership interests in the
2    LLC.
3    But is it correct to say that, with
4    respect to Schedule 3.15 of the
5    Loan Agreement, and the charts reflecting the
6    ownership interests of the subsidiaries that
7    do address the ownership interest in the LLC,
8    they all identically reflect that the
9    ownership interest is 41 percent --
10   49 percent in Highland and 51 percent in
11   HCRE?
12   A.   Yes, sir.
13   Q.   And that's consistent with the
14   ownership interest that is set forth in the
15   LLC Agreement, correct?
16   A.   Correct.
17   Q.   Did you become familiar with the --
18   with Schedule 3.15 of the Loan Agreement
19   before or after your designation as the -- as
20   Wick Phillips' Rule 30(b)(6) witness?
21   A.   After.
22   Q.   Did Wick Phillips have any
23   communications with HCRE concerning the
24   charts we just went through that comprise

Page 58

1    Wick Phillips 30(b)(6) - R. Wills
2    all reflect the ownership interests in the
3    LLC.
4    But is it correct to say that, with
5    respect to Schedule 3.15 of the
6    Loan Agreement, and the charts reflecting the
7    ownership interests of the subsidiaries that
8    do address the ownership interest in the LLC,
9    they all identically reflect that the
10   ownership interest is 41 percent --
11   49 percent in Highland and 51 percent in
12   HCRE?
13   A.   Yes, sir.
14   Q.   And that's consistent with the
15   ownership interest that is set forth in the
16   LLC Agreement, correct?
17   A.   Correct.
18   Q.   Did you become familiar with the --
19   with Schedule 3.15 of the Loan Agreement
20   before or after your designation as the -- as
21   Wick Phillips' Rule 30(b)(6) witness?
22   A.   After.
23   Q.   Did Wick Phillips have any
24   communications with HCRE concerning the
25   charts we just went through that comprise

Page 59

1    Wick Phillips 30(b)(6) - R. Wills
2    Schedule 3.15 of the Loan Agreement?
3    MR. MARTIN:  Objection, form.
4    A.   Yes, sir.
5    BY MR. BROWN:
6    Q.   And with whom did Wick Phillips
7    have those communications?
8    A.   I don't recall specific names, but
9    different people within both NexPoint and
10   from the in-house team at Highland.
11   Q.   And how do you -- what is the
12   distinction between NexPoint and Highland in
13   Wick Phillips' mind?
14   A.   The NexPoint distinction would be
15   we've always been hired in the real estate
16   silo, only operating on sort of what I would
17   call the property level.
18   And then, sort of like when we're
19   looking at the structure charts in 3.15, once
20   you get up to really the 49/51 percent
21   distinction, Mr. Brown, that you were talking
22   about, that structuring is beyond the scope
23   of our representation and typically goes to
24   in-house or a different law firm handling
25   that side of things for that portion of the

Page 60

1    Wick Phillips 30(b)(6) - R. Wills
2    company.
3    Q.   Did Highland have separate counsel
4    in connection with the Loan Agreement?
5    A.   I don't know.
6    Q.   So you, testifying here on behalf
7    of Wick Phillips, you don't know any of the
8    names of the individuals with whom
9    Wick Phillips communicated relating to the
10   HCRE representation; is that correct?
11   MR. MARTIN:  Objection, form.
12   A.   No.  That's -- I don't think that's
13   exactly what I said.  We've already gone over
14   a few of the Wick Phillips contacts at
15   NexPoint, Matt McGraner and Matt Goetz.
16   BY MR. BROWN:
17   Q.   Yes.
18   A.   In reviewing some of the
19   correspondence in preparation for this
20   deposition, yes, sir, there are some other
21   names that I'm not familiar with.  My partner
22   at the time would have been having those
23   communications within the context of this
24   transaction.
25   So there's a Paul Broaddus and a

Page 61

1    Wick Phillips 30(b)(6) - R. Wills
2    handful of other names that I believe had a
3    role in creating some of these charts and
4    passing them along to us, but I don't recall
5    their specific names.
6    Q.   Okay.  So, again, we'll get to
7    those emails and we can follow up on that.
8    But other than Mr. Geotz,
9    Mr. McGraner, Mr. Chang, and Mr. Broaddus,
10   did Wick Phillips have communications with
11   any other individuals that were
12   representatives of HCRE in connection with
13   the Loan Agreement?
14   MR. MARTIN:  Objection, form.
15   A.   Not that I'm aware of.
16   BY MR. BROWN:
17   Q.   Okay.  Did Wick Phillips have
18   communications with any individuals that were
19   representatives of Highland in connection
20   with the Loan Agreement other than Mr. Goetz,
21   Mr. -- well, strike that.
22   Did Wick Phillips have any
23   communications with representatives of
24   Highland in connection with the
25   Loan Agreement?

Case 19-34054-sgj11 Doc 3590-82 Filed 06/11/21 Entered 06/11/21 11:39:35 Page 18 of
Case 19-34054-sgj11 Doc 2895-32 Filed 06/11/21 Entered 06/11/21 23:41:13 Page 18 of
Exhibit 82    Page 21 of 126

Page 62

1      Wick Phillips 30(b)(6) - R. Wills
2          MR. MARTIN:  Objection, form.
3      A.  I think with Mr. Broaddus and
4   probably a handful of other folks in
5   connection with some of these charts and
6   structuring.
7   BY MR. BROWN:
8      Q.  When it spoke to, for example,
9   Mr. Broaddus, who was communicating on behalf
10  of Highland, was there another counsel
11  involved for Highland in the communications
12  that Wick Phillips had for Mr. Broaddus?
13     A.  I believe in connection with some
14  of the structuring, yes, sir.
15     Q.  And who would that have been?
16     A.  I believe it was Hunton & Williams.
17     Q.  So you believe that
18  Hunton & Williams was involved in the
19  representation of Highland in connection with
20  the Loan Agreement?
21         MR. MARTIN:  Objection, form.
22     A.  In connection with the
23  organizational structure, yes, sir.
24  BY MR. BROWN:
25     Q.  Are you sure you're not conflating

Page 63

1      Wick Phillips 30(b)(6) - R. Wills
2   that with the representation of Highland in
3   connection with the LLC?
4      A.  No, sir.  I mean – no, I guess, is
5   the short answer.
6      Q.  And are you aware of any writings
7   that reflect that the Hunton firm represented
8   Highland in connection with the
9   Loan Agreement?
10     A.  I'm not aware of those.
11     Q.  And what do you base your
12  conclusion on that the Hunton firm
13  represented Highland in connection with the
14  Loan Agreement?
15     A.  Because Hunton is typically the
16  Highland tax counsel that provides the
17  organizational charts that are attached to
18  the Loan Agreement.
19     Q.  And do you have independent – do
20  you have knowledge – did the organizational
21  charts that comprise Schedule 3.15 of the
22  Loan Agreement, did they come from Hunton?
23         MR. MARTIN:  Objection, form.
24     A.  They came from Highland.  So beyond
25  that, I'm not sure.

Page 64

1      Wick Phillips 30(b)(6) - R. Wills
2   BY MR. BROWN:
3      Q.  Okay.  So are you aware of any
4   communications that Wick Phillips had with
5   Hunton directly in connection with the
6   Loan Agreement?
7      A.  No, sir.
8      Q.  So you have no independent
9   knowledge – you have no knowledge, do you,
10  that Hunton represented Highland in
11  connection with the Loan Agreement, do you?
12         MR. MARTIN:  Objection, form.
13     A.  I don't know.  Section 3.15 is part
14  of the Loan Agreement.  So that's where I'm
15  getting a little hung up, I suppose.
16  BY MR. BROWN:
17     Q.  Okay.  And what part of Section –
18  of Schedule 3.15 leads you to believe that
19  Hunton represented Highland in connection
20  with the Loan Agreement?
21         MR. MARTIN:  Objection, form.
22     A.  I guess it's just a little bit of
23  deduction because Wick Phillips did not.  So
24  it's either Highland in-house or their
25  typical tax counsel, which is Hunton, or DST

Page 65

1      Wick Phillips 30(b)(6) - R. Wills
2   counsel or REIT counsel.
3          So I can't say for certain that
4   it's Hunton, but I can say for certain that
5   it's not Wick Phillips.
6   BY MR. BROWN:
7      Q.  So you can say – I'm sorry.  You
8   can say for certain that what is not
9   Wick Phillips?
10     A.  That we did not – we had no role
11  in these org charts, which you're saying did
12  Hunton represent Highland in connection with
13  the Loan Agreement.
14          And I'm saying, it looks like it
15  because these org charts were not prepared by
16  Wick Phillips, so somebody represented
17  Highland in connection with the
18  Loan Agreement, to answer that question.
19     Q.  But you're speculating that it was
20  Hunton, correct?
21     A.  That – I just said I don't know
22  for certain that it was Hunton.
23     Q.  You actually – as you sit here
24  today, you have no idea whether it was Hunton
25  or whether any firm was involved in preparing

Case 19-34054-sgj11 Doc 2895-82 Filed 01/12/21 Entered 01/12/21 13:45:15 Page 1 of
Case 19-34054-sgj11 Doc 3590-82 Filed 06/11/21 Entered 06/11/21 23:41:39 Page 1 of
Exhibit 82    Page 22 of 126

Page 66

Wick Phillips 30(b)(6) - R. Wills

1  those charts, do you?
2      A.  That's correct.
3      Q.  Okay.  Can you describe the
4  conversations that Wick Phillips had with
5  HCRE concerning the organization charts that
6  are attached to -- as Schedule 3.15 to the
7  Loan Agreement?
8      A.  Generally, yes.  To get an
9  understanding of what the structure was for
10  each of the properties so that we could
11  accurately communicate that to the lender.
12      Q.  Okay.  Can you give any more
13  detail as to what those communications were
14  beyond what you just testified to?
15      A.  You know, it would -- sort of like
16  we had just talked about, it would be whether
17  it was going to be part of the restructure, a
18  DST structure, you know, for purposes of
19  communicating which buckets those would fall
20  in, whether it's KeyBank or Freddie.
21      Q.  Are you aware that the
22  Loan Agreement contained representations and
23  warranties?
24      A.  Yes, sir.

Page 67

Wick Phillips 30(b)(6) - R. Wills

1      Q.  And are you aware that those
2  representations and warranties on multiple
3  occasions included reps and warranties by the
4  borrowers relating to the subsidiaries?
5      A.  Yes, sir.
6      Q.  Did Wick Phillips perform any
7  diligence on behalf of any of its clients in
8  connection with the Loan Agreement to
9  determine if the representations and
10  warranties in the Loan Agreement that related
11  to the subsidiaries were true and accurate?
12      A.  Diligence as far as asking the
13  client if their org chart is accurate?  Yes.
14      Q.  And what did it do to diligence the
15  reps and warranties and, in particular, the
16  reps and warranties relating to the
17  subsidiaries as they're reflected on
18  Schedule 3.15?
19      A.  Confirm with the people that
20  prepared the org charts.
21      Q.  So what were those communications?
22  What was the substance of those
23  communications?
24      A.  I don't know.

Page 68

Wick Phillips 30(b)(6) - R. Wills

1      Q.  Okay.  Do you know who
2  Wick Phillips had these discussions relating
3  to diligencing the reps and warranties
4  relating to the subsidiaries?
5      A.  Yes.  At the time it would have
6  been primarily D.C. Sauter.  And then --
7      Q.  Could you spell that?
8      A.  Sure.  It's just the initials D,
9  like dog, C, like Charles.
10      Q.  Yep.
11      A.  Sauter, S-a-u-t-e-r.
12      Q.  And who was D.C. Sauter a
13  representative of, what entity?
14      A.  He was a partner at Wick Phillips.
15      Q.  Oh, okay.  So he was the
16  Wick Phillips lawyer that would have
17  diligenced -- done the underlying work to
18  diligence the reps and warranties relating to
19  the subsidiaries, correct?
20      A.  Yes, sir.
21      Q.  Did you speak to him in connection
22  with your preparation for your testimony as
23  the designated witness of Wick Phillips?
24      A.  Yes, sir.  We spoke yesterday.

Page 69

Wick Phillips 30(b)(6) - R. Wills

1      Q.  Okay.  And so on behalf of
2  Wick Phillips, who did Wick Phillips speak to
3  in connection with diligencing the reps and
4  warranties in the Loan Agreement relating to
5  the subsidiaries?
6      MR. MARTIN:  Objection, form.
7      A.  It would have been the laundry list
8  of folks we've been over, whether it was
9  Paul Broaddus, Freddy Chang, Matt McGraner,
10  someone within the NexPoint or Highland team
11  that had created those charts and could tell
12  us that they were accurate.
13  BY MR. BROWN:
14      Q.  Okay.  It's your understanding that
15  Wick Phillips made a determination that the
16  charts that comprise Schedule 3.15 and the
17  reps and warranties in the Loan Agreement
18  relating to those charts were true and
19  accurate, correct?
20      A.  Yes, sir.
21      Q.  And do you know if Wick Phillips
22  had an understanding when it did this due
23  diligence and spoke to that group of people
24  you had identified earlier, Goetz, McGraner,

Page 70

1     Wick Phillips 30(b)(6) - R. Wills
2  Chang, and Broaddus, I believe were the
3  universe; is that correct?
4       MR. MARTIN:  Objection, form.
5    A.  Yes, sir.
6  BY MR. BROWN:
7    Q.  Okay.  So of those four people,
8  did -- how did Wick Phillips determine what
9  hat those individuals were wearing when it
10  spoke to them, i.e., were they speaking on
11  behalf of HCRE or were they speaking on
12  behalf of Highland or were they speaking on
13  behalf of some other borrower?
14       MR. MARTIN:  Objection, form.
15  BY MR. BROWN:
16    Q.  Do you understand the question,
17  Mr. Wills?
18    A.  Yes.  I can answer the question.
19       The Matt McGraner, Matt Goetz part
20  of things is NexPoint.  So they should
21  communicate to us from the borrower level --
22  I'm sorry, the SE Multifamily Holdings LLC
23  level down, as we got down to the property
24  level.
25       And then Paul Broaddus, on that

Page 71

1     Wick Phillips 30(b)(6) - R. Wills
2  side of things on the Highland level, is what
3  handles the chain up, or the chart up.  And
4  so we would rely on their understanding of
5  the chart and the accuracy of that chart.
6    Q.  Okay.  You said McGraner was
7  speaking on behalf of NexPoint; is that
8  correct?
9    A.  Yes, sir.
10    Q.  And who else did you say was
11  speaking on behalf of NexPoint?
12    A.  Matt Goetz.
13    Q.  Okay.  Do you know whether McGraner
14  was also a representative of Highland or had
15  any affiliation with Highland?
16    A.  I don't.
17    Q.  What about Geotz?  Do you know if
18  he had any affiliation with Highland?
19    A.  I don't know.
20    Q.  And Wick Phillips understood, did
21  it not, that the lender under the
22  Loan Agreement would be relying on the reps
23  and warranties made by the borrower, correct?
24    A.  Yes, sir.
25    Q.  And Wick Phillips understood that

Page 72

1     Wick Phillips 30(b)(6) - R. Wills
2  an incorrect or false representation or
3  warranty was an event of default under the
4  Loan Agreement, correct?
5    A.  Yes, sir.
6    Q.  And the event of default could lead
7  to acceleration of the amounts due, correct?
8    A.  Yes, sir.
9       MR. BROWN:  Can we attach -- or can
10  we mark Exhibit D.
11       (Email chain, "RE:  Project Unicorn
12       - Final Org Charts," with
13       attachments, marked as Exhibit D.)
14       MR. BROWN:  Okay.  So can we scroll
15  down to the first email in the chain?
16  Okay.  That's the one I want to focus on
17  for right now.
18  BY MR. BROWN:
19    Q.  Okay.  So Mr. Wills, focusing on
20  the email that's on the screen, it's the
21  Monday, September 17, 2018, email that is
22  sent by Rachel Sam at 4:21 p.m.
23    A.  Uh-huh.
24       MR. MARTIN:  You need to say "yes"
25  or "no."

Page 73

1     Wick Phillips 30(b)(6) - R. Wills
2       THE WITNESS:  Yes.
3  BY MR. BROWN:
4    Q.  Okay.  Have you seen that email
5  before?
6    A.  Yes.
7    Q.  Who is Rachel Sam?
8    A.  She is an attorney at
9  Wick Phillips.
10    Q.  Okay.  This email was sent by
11  Rachel Sam?
12    A.  Yes, sir.
13    Q.  And you have seen it before?
14    A.  Yes, sir.
15    Q.  Before or after your designation?
16    A.  After.
17    Q.  Okay.  And did you review this
18  email as part of your preparation to testify
19  today?
20    A.  Yes, sir.
21    Q.  So this email, the caption is
22  "Final Org Charts."
23       And if we scroll down further to
24  the attachments, they are either -- and I
25  can't tell, but they are either -- this is

Page 74

Wick Phillips 30(b)(6) - R. Wills
1    Wick Phillips 30(b)(6) - R. Wills
2    this first email, says -- I'm sorry, the
3    first attachment refers to Governors Green.
4        And this is either one of the
5    charts attached to Schedule 3.15 in the
6    Loan Agreement or some prior and very similar
7    version to it.
8        Would you say that's accurate?
9        MR. MARTIN:  Objection, form.
10   A.   Yes, sir.
11   BY MR. BROWN:
12   Q.   And, again, on the org chart, as
13   with all of the org charts attached as
14   Schedule 3.15 that contain a reference to the
15   LLC, this org chart provides that the
16   ownership interests are 51 percent HCRE and
17   49 percent Highland, correct?
18   A.   Yes, sir.
19   Q.   And if we could scroll down to the
20   next org chart.
21       Again, this one is Stoney Ridge.
22       And would you agree that this is
23   either the same chart that's attached to --
24   as Schedule 3.15 or a virtually identical
25   version and certainly identical with respect

Page 75

1    Wick Phillips 30(b)(6) - R. Wills
2    to the ownership interests in the LLC?
3    A.   Yes, sir.
4    Q.   Scroll down one more chart, please.
5        With respect to the attachment to
6    Rachel Sam's email regarding Oak Mill
7    Apartments, again, would you agree that this
8    is either identical to the schedule attached
9    as -- to the chart attached for -- to
10   Schedule 3.15 or a virtually identical
11   version, and certainly identical with respect
12   to the reflection of the ownership interests
13   in the LLC?
14   A.   Yes, sir.
15       MR. BROWN:  Okay.  Scroll down
16   again.  I think that's the end.  Yeah.
17   Okay.
18       Let's go back to the email, the
19   September 17 email.
20   BY MR. BROWN:
21   Q.   Okay.  So in her email, Ms. Sam is
22   writing or emailing to, if you look up to the
23   "To" line, Matt McGraner, who you've
24   referenced before.  There are two -- there's
25   an entry for him showing a Highland Capital

Page 76

1    Wick Phillips 30(b)(6) - R. Wills
2    email address, correct?
3    A.   Yes, sir.
4    Q.   And you had previously testified
5    that you believed he was a representative of
6    NexPoint, correct?
7    A.   Yes, sir.
8    Q.   Does this refresh your recollection
9    or change your conclusions as to whether or
10   not he was also a representative of Highland?
11       MR. MARTIN:  Objection, form.
12   A.   No, sir.
13   BY MR. BROWN:
14   Q.   Okay.  Do you have any idea why
15   Mr. McGraner has a Highland Capital email
16   address?
17   A.   No, sir.
18   Q.   And, again, it's also to Mr. Geotz,
19   who you also, I believe, testified that
20   Wick Phillips was communicating with on
21   behalf of NexPoint.
22       He also has a Highland Capital
23   email address, correct?
24   A.   Yes, sir.
25   Q.   And does that change your

Page 77

1    Wick Phillips 30(b)(6) - R. Wills
2    conclusion or refresh your recollection as to
3    whether or not Mr. Goetz was also a
4    representative of Highland Capital or
5    Highland?
6    A.   No, sir.  No, sir.
7    Q.   I want to make sure the record is
8    correct.  I meant to just say Highland
9    because we've defined the Debtor as Highland.
10       Does this refresh your recollection
11   or change your conclusion as to whether
12   Mr. Goetz was a representative of Highland?
13   A.   No, sir.
14   Q.   Okay.  And do you know who
15   Bonner McDermett is?
16   A.   Yes, sir.  I believe he is an
17   analyst with Mr. Goetz and Mr. McGraner.
18   Q.   And do you know whether or not he
19   is a representative of Highland or some other
20   entity?
21   A.   I do not know.
22   Q.   You also had referred to
23   Mr. Broaddus, who is another recipient of
24   this email, also with a Highland Capital
25   email address?

Wick Phillips 30(b)(6) - R. Wills

1       Wick Phillips 30(b)(6) - R. Wills
2       A.   Yes, sir.
3       Q.   Do you know whether Mr. Broaddus is
4   a representative of Highland?
5       A.   I believe that's correct.
6       Q.   Okay.  And also Freddy Chang, who I
7   believe you also referenced, with a
8   Highland Capital email address.
9           Do you know who Freddy Chang is a
10  representative of?
11      A.   I believe he's NexPoint, some sort
12  of in-house counsel role.
13      Q.   Okay.  And do you know why he has a
14  Highland Capital email address?
15      A.   No, sir.
16      Q.   Okay.  And the cc is to D.C. Sauter
17  of Wick Phillips, correct?
18      A.   Yes, sir.
19      Q.   And other than D.C. Sauter, there
20  are no other outside lawyers that are on –
21  that are recipients of this email, correct?
22      A.   That's correct.
23      Q.   So this email by Rachel Sam, the
24  Wick Phillips lawyer says:
25          "I made a couple of clean up

1       Wick Phillips 30(b)(6) - R. Wills
2   changes to the DST org charts and am
3   waiting for signoff from
4   Baker McKenzie.  Once I hear back from
5   Baker, I will circulate those updated
6   org charts."
7           So you, I believe, testified
8   earlier that Wick Phillips didn't make any
9   changes to the org charts.  Does this refresh
10  your recollection as to whether or not
11  Wick Phillips made changes to the org charts?
12      A.   Yeah.  It looks like Rachel may
13  have cleaned up some typos that she got from
14  DST counsel.
15      Q.   Does this refer to typos?
16      A.   "Clean up" is what I would
17  interpret as typo.
18      Q.   You're assuming that clean up means
19  typo?
20      A.   Yes, sir.
21      Q.   But you don't know, do you?
22      A.   I do not.
23      Q.   So, for example, you don't know
24  whether the changes related to substance, do
25  you?

1       Wick Phillips 30(b)(6) - R. Wills
2           MR. MARTIN:  Objection, form.
3       A.   Well, I do because we are not DST
4   counsel.  So we would not be making material
5   changes to the DST org chart.
6   BY MR. BROWN:
7       Q.   Whether DST – Delaware Statutory
8   Trust is what DST means, correct?
9       A.   Yes, sir.
10      Q.   And the reason you say you know
11  that the changes were, quote, "typos" is
12  because – tell me again?
13      A.   Well, they're attached and we just
14  went through and said they're substantially
15  similar to what's in the Loan Agreement.
16          And quite frankly, we don't have
17  DST counsel here.  We don't have that
18  capability.  So we wouldn't – we wouldn't be
19  making those changes.
20      Q.   Okay.  But again, you're
21  speculating, correct?  You don't know.
22          MR. MARTIN:  Objection, form.
23  BY MR. BROWN:
24      Q.   You don't know what changes Rachel
25  made, do you?

1       Wick Phillips 30(b)(6) - R. Wills
2       A.   No, sir.
3           MR. BROWN:  Okay.  Can we scroll up
4   to the next email.
5   BY MR. BROWN:
6       Q.   Again, this is a – appears to be
7   the next email on the chain.  It's just under
8   an hour later, at 5:16 p.m., to the same
9   group with a copy to D.C. Sauter, and it's
10  Rachel again here saying:
11          "Just wanted to follow up on the
12  org charts.  Let us know if you have
13  any comments or if these are okay to
14  submit to Freddie."
15          Does that – have you seen that
16  email before?
17      A.   Yes, sir.
18      Q.   And is that an email that
19  Rachel Sam of Wick Phillips sent to all the
20  people reflected on the "To" and "cc" line?
21      A.   Yes, sir.
22      Q.   Okay.  Let's scroll up to the next
23  email.  And this is – have you seen this
24  email before?
25          It's the September 18, 2018, email

Case 19-34054-sgj11 Doc 3590-82 Filed 01/12/27 Entered 01/12/27 23:41:34 Page 26 of
Case 19-34054-sgj11 Doc 3590-82 Filed 01/12/27 Entered 01/12/27 13:45 Page 26 of
Exhibit 82    Page 26 of 126

Page 82

1    Wick Phillips 30(b)(6) - R. Wills
2  from Freddy Chang with a Highland Capital
3  email address, to Rachel Sam, again,
4  regarding the final org charts.  And it's
5  Freddy Chang asking, "Are the DST org charts
6  ready to go?"  Asking Rachel.
7       Have you seen this before?
8    A.  Yes, sir.
9    Q.  And is this an email that was
10 received by Wick Phillips?
11   A.  Yes, sir.
12   Q.  Okay.  Next email.
13      This appears to be Rachel Sam's
14 response to Freddy Chang's prior email at
15 7:45.  It's like seven minutes later, at
16 7:52, from Rachel Sam to Freddy Chang,
17 copying D.C. Sauter.
18      Have you seen this email before?
19   A.  Yes, sir.
20   Q.  And was this email sent by
21 Wick Phillips?
22   A.  Yes, sir.
23   Q.  And in response to Mr. Chang's
24 inquiry to Rachel Sam if the DST org charts
25 were ready to go, Rachel says:

Page 83

1    Wick Phillips 30(b)(6) - R. Wills
2    "The only remaining question is
3  whether we will be converting or
4  merging the borrower-level DST owner
5  entities.  The org charts currently
6  reflect that the owner entities 'may
7  be converted.'"
8       Is that a -- is that a substantive
9  question regarding the structure of the
10 subsidiaries, in your opinion?
11   A.  A substantive question from --
12   Q.  Yeah.  I mean, you said all that
13 was done was reporting and passing on, you know,
14 information that other people provided.  You
15 said that that was all Wick Phillips did.
16      But here, this email seems to ask a
17 substantive question regarding converting or
18 merging borrower-level DST owner entities.
19      MR. MARTIN:  Objection, form.
20   A.  Yes, sir.  Again, we're at this
21 point a conduit between Baker McKenzie, DST
22 counsel, REIT counsel, and -- Rachel is
23 simply reiterating the outstanding item for
24 Baker McKenzie to complete on the org chart
25 so we can accurately deliver that to Freddie

Page 84

1    Wick Phillips 30(b)(6) - R. Wills
2  Mac.
3  BY MR. BROWN:
4    Q.  Is Baker McKenzie on any of these
5  emails?
6    A.  Yes, sir.  The first one we looked
7  at.
8    Q.  The initiating email by Rachel Sam
9  of September 17, 2018?
10   A.  Yes, sir.
11      MR. BROWN:  Okay.  Let's scroll --
12   I must be missing something.  Let's
13   scroll to the bottom.  There.  That
14   email.
15 BY MR. BROWN:
16   Q.  Can you point to the Baker McKenzie
17 recipient for me?
18   A.  No.  I'm sorry.  I may have been
19 speaking past you.  I'm referencing the
20 substance of the email.
21   Q.  Oh, I see.  Okay.  "I'm waiting for
22 signoff from Baker McKenzie."
23      Okay.  I got it.
24      And who did Baker McKenzie
25 represent?

Page 85

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I'm not certain.  I just know
3  they're DST counsel on the Highland side.
4    Q.  Delaware Statutory Trust counsel;
5  it's your understanding that that's who they
6  represented?
7    A.  Yes, sir.
8       (Telephonic interruption.)
9    Q.  Okay.  Let's go back to where we
10 were, the September 18 email, "The only
11 remaining question."
12      Okay.  Scroll up one email.  Okay.
13 And this is a September 18 email, again, one
14 minute after Rachel's email at 7:52, from
15 Freddie Chang to Rachel Sam copied to
16 D.C. Sauter.  And it's Rachel Sam saying:
17      "Thanks.  Are you working on the
18   REIT share acquisition org charts?"
19      And the only question I have for
20 you on that, Mr. Wills, is did Wick Phillips
21 receive that email?
22   A.  Yes, sir.
23   Q.  Okay.  And scroll up to
24 Rachel Sam's response.
25      Rachel Sam responds four minutes

Page 86

1    Wick Phillips 30(b)(6) - R. Wills
2    later, at 7:57, to the inquiry by
3    Freddie Chang:
4         "Yes, the current versions of
5    those" -- being the REIT share
6    acquisition charts -- "are attached.
7    Paul has previously reviewed and
8    approved these, but let us know if you
9    have any comments."
10        So did Wick Phillips receive this
11   email?
12   A.   Yes.
13   Q.   Do you know who Paul is?
14   A.   I believe Paul Broaddus.
15        MR. BROWN:  Okay.  So it's now
16   about an hour from the last time we took
17   a break, and I would like to take a
18   five-minute break, if that's okay with
19   everybody.
20        MR. MARTIN:  It's your deposition.
21   Sure.
22        MR. BROWN:  All right.  Let's
23   reconvene in about five minutes.
24        MR. MARTIN:  Okay.  Thank you.
25        (Recess taken.)

Page 87

1    Wick Phillips 30(b)(6) - R. Wills
2         MR. BROWN:  So let's get Exhibit D
3    back on the screen.  And let's go to the
4    bottom of the initiating email.
5    BY MR. BROWN:
6    Q.   So, again, Mr. Wills, I just want
7    to focus on these emails in particular, as
8    opposed to more generally, which I have
9    discussed in more general terms.
10        But Rachel Sam is communicating
11   here with the people on the "To" line:
12   Matt McGraner with the Highland Capital email
13   address, Matt Goetz with the Highland Capital
14   email address, Bonner McDermett with the
15   Highland Capital email address, Paul Broaddus
16   with the Highland Capital email address, and
17   Freddy Chang with the Highland Capital email
18   address.
19        Does Wick Phillips have knowledge
20   of the capacity that it was communicating
21   with these individuals in?
22        In other words, who were these
23   individuals representing -- who were these
24   individuals representing in these
25   communications, which entities?

Page 88

1    Wick Phillips 30(b)(6) - R. Wills
2         And I'm interested in Wick
3    Phillips' knowledge and not your speculation.
4    A.   Sure.  So from our knowledge,
5    Matt McGraner, Geotz, Bonner McDermett, and
6    Freddy Chang are NexPoint.  Paul Broaddus is
7    Highland.  And there's a shared services
8    agreement between the two companies, and so
9    they're operating somewhat together.
10   Q.   In other words, Highland and
11   NexPoint are operating together; is that what
12   you mean?
13   A.   Yes, sir.
14   Q.   And are any of these individuals
15   that Rachel Sam was communicating with in
16   these emails, are they representatives of
17   HCRE, the lead borrower?
18   A.   I don't know.
19   Q.   Would Wick Phillips have been
20   communicating with the lead borrower in
21   connection with its communications relating
22   to the Loan Agreement?
23   A.   I would assume so.
24   Q.   Do you know who Mark Patrick was or
25   is?

Page 89

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   I believe he's an attorney with
3    Highland.
4    Q.   Do you know why he wasn't included
5    on these emails?
6    A.   No, sir.
7    Q.   And this email string, which is
8    Exhibit D, this relates to Wick Phillips'
9    work on the Loan Agreement, correct?
10   A.   Yes, sir.
11   Q.   And did these emails reflect some
12   of the work that Wick Phillips did in
13   connection with the Loan Agreement?
14   A.   Yes, sir.
15   Q.   Other than what's reflected in
16   these emails, do you know what other work
17   Wick Phillips did relating to the org charts
18   that constitute Schedule 3.15 of the
19   Loan Agreement?
20        MR. MARTIN:  Objection, form.
21   A.   Yes.  I mean, just as part of the
22   legal diligence in connection with, you know,
23   a loan checklist, making sure that the org
24   charts that we receive and are delivering
25   back to the lender are approved by the

Page 90

1      Wick Phillips 30(b)(6) - R. Wills
2   business parties, and then, therefore, we can
3   get them to Freddie or KeyBank or whomever
4   needs to have those and then have them
5   checked off of the diligence portion of the
6   checklist.
7   BY MR. BROWN:
8      Q.   In connection with the org charts
9   that show up as Schedule 3.15 of the
10  Loan Agreement, who was Wick Phillips taking
11  instructions from on behalf of the borrowers?
12     A.   I think primarily the parties you
13  see here, both from The NexPoint side and
14  Mr. Broaddus.
15     Q.   On the Highland side?
16     A.   Yes, sir.
17     Q.   Other than this email, are you
18  aware of other -- I'm sorry.  Other than this
19  email string, are you aware of other
20  communications between Wick Phillips and any
21  of the borrowers concerning the org charts?
22     A.   No, sir.
23        MR. BROWN:  Can we put Exhibit E up
24  on the screen, please.
25        (Email chain, "RE: Unicorn - DSTs",

Page 91

1      Wick Phillips 30(b)(6) - R. Wills
2         marked as Exhibit E.)
3   BY MR. BROWN:
4      Q.   Okay.  Exhibit E appears to be an
5   August 18, 2018 [sic] email from
6   Paul Broaddus; is that correct?
7      A.   Yes, sir.
8      Q.   And have you seen this email
9   before?
10     A.   Yes, sir.
11     Q.   Before or after your designation?
12     A.   After.
13     Q.   Did you review it in connection
14  with your preparation for your testimony
15  today?
16     A.   Yes, sir.
17     Q.   And it appears that there are a
18  number of recipients to this.  One of them is
19  D.C. Sauter; is that right?
20     A.   Yes, sir.
21     Q.   So Wick Phillips did receive this
22  email from Paul Broaddus, correct?
23     A.   Yes, sir.
24     Q.   And Paul Broaddus is -- as you have
25  previously testified, was a representative of

Page 92

1      Wick Phillips 30(b)(6) - R. Wills
2   Highland in connection with Wick Phillips'
3   role representing the borrowers in the
4   Loan Agreement, correct?
5      A.   Yes, sir.
6      Q.   And the initiating email of
7   July 27, the first email in the string, which
8   is the second email on Exhibit E,
9   indicates -- it says:
10        "Hi.  Please see attached as
11     discussed for the basic DST charts.
12     Please note the open items.
13        "Should we have a call next week?
14        "Want to specifically discuss the
15     items that will need to be closed
16     out sooner rather than later.
17        "Thanks.  Paul."
18        So, again, did Wick Phillips
19  receive this email?
20     A.   Yes, sir.  It looks that way.
21     Q.   As well as the attachments,
22  correct?
23        And maybe we should look at the
24  attachments too.  So if we could scroll
25  further.

Page 93

1      Wick Phillips 30(b)(6) - R. Wills
2         Okay.  So let's -- the first page
3   of the attachment says "Open items:
4   Economics/ownership of JV LLC."
5         Do you know what that refers to?
6      A.   Not specifically, no.
7      Q.   Okay.  Could we scroll to the next
8   page of the attachment to Paul Broaddus'
9   email.  No.  We can --
10        Have you seen the attachments
11     before, Mr. Wills?
12     A.   Yes, sir.
13     Q.   Okay.  Let's scroll to the next
14  page.
15        Okay.  This attachment reverts to
16  the ownership interests of a JV -- of the JV
17  LLC, which was referred to in the first
18  document as being -- to be determined, but
19  approximately 51 percent for Partner 1 and
20  49 percent for Partner 2.
21        Do you know whether this is
22  referring to the LLC, which is the subject of
23  the, I think, Exhibit D in our case here?
24  It's the SE Multifamily LLC Agreement.
25        Is that what this refers to?

Case 19-34054-sgj11 Doc 3590-32 Filed 10/12/27 Entered 10/12/27 13:13:45 Page 26 of
Case 19-34054-sgj11 Doc 2839-30 Filed 04/12/21 Entered 04/12/21 21:41:39 Page 26 of
Exhibit 82    Page 29 of 126

Page 94

1     Wick Phillips 30(b)(6) - R. Wills
2     A.   That's what it looks like.  Yes,
3  sir.
4     Q.   Yeah.  And just to go back and
5  trace the history, the SE Multifamily
6  Holdings LLC Agreement was dated August 23.
7  The email that this was attached to is dated
8  August 1.  So this would have been -- this
9  email would have been sent prior to the
10  original LLC Agreement.
11        And this would have been the
12  discussions about the formation of it,
13  correct?
14     A.   Yes, sir.
15     Q.   Okay.  Can we scroll to the next
16  page.
17        And, again, this chart called DST
18  Properties LLC reflects ownership interest of
19  Partner 1 at 51 percent and Partner 2 at
20  49 percent for the LLC to be formed, correct,
21  which subsequently we learned was the SE
22  Multifamily Holdings LLC Agreement, correct?
23     A.   Yes, sir.
24     Q.   Okay.  Can we scroll forward again?
25        Again, this is another chart that

Page 95

1     Wick Phillips 30(b)(6) - R. Wills
2  refers to the ownership interests of the
3  to-be-formed LLC Agreement, ultimately which
4  became SE Multifamily Holdings LLC, correct?
5     A.   Yes, sir.
6     Q.   And it reflects the same ownership
7  interests as we saw in Schedule 3.15 to the
8  Loan Agreement and in the LLC Agreement,
9  correct?
10     A.   Yes, sir.
11     Q.   Okay.  Next chart.
12        That's not sufficiently legible to
13  me.  Let's see.  Yeah.  I think we can pass
14  on this.
15        Do you have any idea what these
16  represent?
17        MR. MARTIN:  Objection, form.
18     A.   It's tough to make it out, but -- I
19  don't know if this is the structure that
20  Starwood had, who was the owner of the
21  portfolio, and they're just reflecting that,
22  or if this is a proposed structure for the
23  acquisition itself.
24  BY MR. BROWN:
25     Q.   And this is Highland263748,

Page 96

1     Wick Phillips 30(b)(6) - R. Wills
2  correct?
3     A.   Yes, sir.
4     Q.   Of Exhibit E.
5     A.   Correct.
6     Q.   Okay.  Next chart, please.
7        And, again, this would be
8  Highland263749.
9        Do you know what this is?
10     A.   Similarly, it's tough to tell, but
11  more of the same if that was the existing
12  structure of the asset at the time of the
13  acquisition.
14     Q.   Next chart, please.  This is
15  263750.
16        Again, do you know what this is?
17     A.   Same thing, existing structure.
18     Q.   Next chart.  Same answer for
19  263751?
20     A.   Yes, sir.  It just looks like the
21  underlying property or asset changes.  But,
22  yes, sir.
23     Q.   Okay.  Next chart.
24        Go to the next chart after this.
25  And the next chart.  Next chart.  Keep going.

Page 97

1     Wick Phillips 30(b)(6) - R. Wills
2  Keep going.  Keep going.
3        Okay.  One more -- okay.  One more.
4        This is a different format.  Do you
5  know how this is different from the
6  other charts?
7     A.   I don't know why.  It just looks
8  like a different structure.
9     Q.   Okay.  Let's go back to the
10  original email.
11        Hold on a second.  It says
12  K&E Draft on all of these charts.
13        What does that mean?
14     A.   I believe Kirkland & Ellis.
15     Q.   Okay.  And were these generated by,
16  do you know, the seller -- the potential
17  seller of the assets to the limited -- to the
18  LLC?
19     A.   Yes, sir.  I believe this was the
20  existing structure in place.
21     Q.   I see.
22     A.   At the time.
23     Q.   Okay.  Let's go back to the
24  original email.
25        Okay.  On both these emails from

Page 98

1    Wick Phillips 30(b)(6) - R. Wills
2  Paul Broaddus, the July 27 email and the
3  August 1 email that constitute Exhibit E,
4  they were sent and received by D.C. Sauter of
5  Wick Phillips, correct?  They were sent to
6  and received by D.C. Sauter?
7    A.  Yes, sir.
8    Q.  And do you know if Wick Phillips
9  ever responded to these emails in any way?
10    A.  I don't believe so.
11    Q.  Okay.  Did Wick Phillips have any
12  communications with Paul Broaddus relating to
13  the charts attached on these emails?
14    A.  Not other than what we previously
15  discussed.
16    Q.  Okay.  Let's move on to Exhibit F.
17    (SE Multifamily Holdings LLC First
18    Amended and Restated Limited
19    Liability Company Agreement, marked
20    as Exhibit F.)
21  BY MR. BROWN:
22    Q.  So Exhibit F is the SE Multifamily
23  Holdings LLC First Amended and Restated
24  Limited Liability Company Agreement, dated as
25  of March 15, 2019, to be effective August 23,

Page 99

1    Wick Phillips 30(b)(6) - R. Wills
2  2018, correct?
3    A.  Yes, sir.
4    Q.  And is this a true copy of that,
5  this Agreement?
6    A.  It looks to be so, yes, sir.
7    MR. BROWN:  Let me just digress for
8  a moment.
9    Lauren, we had agreed by emails
10  that the documents attached to both
11  declarations, the Morris declaration and
12  the McGraner declaration, that we could
13  stipulate to their authenticity.
14    MS. DRAWHORN:  Yes.
15    MR. BROWN:  So with respect to
16  Exhibit B to this deposition, the
17  original LLC Agreement, the
18  Loan Agreement, I believe, which is
19  Exhibit C, and this Loan Agreement,
20  Exhibit F, the Amended and Restated
21  Limited Liability Agreement, we're
22  agreeing that they're authentic.
23    We're reserving whatever other
24  objections, but nobody -- we're agreeing
25  as to authenticity.  So I'm not going to

Page 100

1    Wick Phillips 30(b)(6) - R. Wills
2  worry about dealing with that in this
3  deposition.
4    Is that agreed, they're authentic?
5    MS. DRAWHORN:  Yes.  That's agreed.
6  BY MR. BROWN:
7    Q.  Okay.  So tell me what this
8  document is, Mr. Wills.
9    A.  Sure.  It's the Amended and
10  Restated LLC Agreement for SE Multifamily
11  Holdings.  My understanding in talking to
12  D.C. Sauter was that KeyBank retraded us at
13  the last minute and pulled back some of the
14  previously committed funds, and so we were
15  short about 20 million, which is why we
16  needed to bring in additional equity.
17    There was a previous relationship
18  with BH on some prior multifamily deals, and
19  so BH came in as the bridge equity, for lack
20  of a better term.  So the contributions
21  changed and it's memorialized here.
22    Q.  Do you know where they're
23  memorialized in the Agreement?  And I can
24  tell you if we flip to Schedule A.
25    A.  Yes, sir.  That's where I was going

Page 101

1    Wick Phillips 30(b)(6) - R. Wills
2  as well.
3    (Email chain, "FW: Draft LLC
4    Agreement," marked as Exhibit H.)
5  BY MR. BROWN:
6    Q.  Okay.  So you had referred to BH in
7  your testimony you just gave.
8    And if you look at Schedule A to
9  the Amended LLC Agreement, it provides the
10  capital contributions and percentage
11  interest, correct?
12    A.  Correct.
13    Q.  And is this Schedule A, the chart
14  on Schedule A reflecting current -- the
15  percentage interest, is that what you were
16  referring to in terms of changing the
17  ownership interest?
18    A.  Yes, sir.
19    Q.  And is that an accurate statement
20  regarding the ownership interest of the
21  parties?
22    A.  I believe it accurately shows the
23  BH portion, and on the remainder, I'm not
24  positive.
25    Q.  Okay.  Let me -- let's back up a

1    Wick Phillips 30(b)(6) - R. Wills
2 little bit.
3       Did -- what was Wick Phillips' role
4 in connection with the Amended and Restated
5 Limited Liability Company Agreement that's
6 Exhibit E?
7       Let's just -- I'm going to try to
8 make it simple.
9       Like we referred to the original
10 Agreement in this deposition as the
11 LLC Agreement, can we refer to this as -- if
12 I refer to this as the Amended LLC Agreement,
13 you'll understand I'm referring to Exhibit F,
14 correct?
15    A.   Yes, sir.
16    Q.   Okay.  So what was Wick Phillips'
17 role in connection with the Amended
18 LLC Agreement?
19    A.   We did not have one, other than
20 delivering, you know, and communicating with
21 KeyBank on the modified structure.
22    Q.   Okay.  So I don't believe I have
23 seen any -- well, let me back up.
24       How were the communications with
25 KeyBank on the modified structure?  What form

1    Wick Phillips 30(b)(6) - R. Wills
2 did those communications take?
3    A.   I would assume telephonic or email.
4       MR. BROWN:  Hayley, are you on the
5 call?
6       MS. WINOGRAD:  Yes.  I'm here.
7       MR. BROWN:  I have not seen and I
8 don't know if -- I don't think we've
9 received any communications between
10 Wick Phillips and KeyBank relating to
11 the Amended LLC Agreement, have we?
12       MS. WINOGRAD:  I haven't seen any,
13 no.
14 BY MR. BROWN:
15    Q.   So I guess, Mr. Wills, it raises
16 the question, we've asked for documents --
17 and maybe, Lauren, this is better addressed
18 to you --
19       MR. MARTIN:  Yeah.  Mr. Brown, I'll
20 represent to you, we haven't found any
21 of those communications.  I think
22 Mr. Wills is mistaken on that.
23       MR. BROWN:  Okay.
24       MR. MARTIN:  We're not withholding
25 anything, and if we were withholding

1    Wick Phillips 30(b)(6) - R. Wills
2 something, we would have produced a
3 privilege log or some other grounds for
4 withholding.  I'm never in the business
5 of withholding anything that you're
6 otherwise entitled to.
7       MR. BROWN:  And I'm not accusing.
8 I was just confused because --
9       MR. MARTIN:  I appreciate that.
10       MR. BROWN:  -- I'm familiar with
11 the documents that were produced and
12 I've looked at them fairly closely in
13 this deposition and I never saw any
14 communications between Wick Phillips and
15 KeyBank.
16       MR. MARTIN:  Yeah.  I think if you
17 ran the tape back, you would probably
18 see both Ms. Drawhorn and I raise our
19 eyebrows when Mr. Wills said that.  I
20 think he was simply mistaken.
21 BY MR. BROWN:
22    Q.   Mr. Wills, in light of that
23 discussion, let's talk about, again, what
24 your understanding is of Wick Phillips' role
25 in connection with the Amended LLC Agreement.

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   We did not have one.
3    Q.   You don't -- let me ask you this:
4 You indicated in your prior testimony that
5 you believed there were communications with
6 KeyBank regarding the Amended LLC Agreement.
7       Why did you think that?
8    A.   Well, that has been the siloed role
9 that we've maintained throughout the
10 Project Unicorn transaction as sort of the
11 conduit in between the lender and the various
12 borrowers.
13    Q.   Okay.  So I think your counsel has
14 represented that there were no emails between
15 Wick Phillips and KeyBank concerning the
16 Amended LLC Agreement.
17       Are you aware of whether there were
18 emails that took place in form -- I'm sorry,
19 whether there were communications that took
20 place in a form other than an email
21 communication?
22    A.   I'm not aware.
23    Q.   So is it true that Wick Phillips
24 did not represent any party to the Amended
25 LLC Agreement?

Page 106

1    Wick Phillips 30(b)(6) - R. Wills
2    A.    Correct.  We did not prepare it or
3  have anything to do with that agreement.
4    Q.    And is there any retention
5  agreement with respect to the LLC Agreement?
6    A.    No, sir.
7    Q.    Do you know if Wick Phillips had
8  any communications with James Dondero in
9  connection with the Amended LLC Agreement?
10    A.    I do not.
11    Q.    So let's focus again – I think
12  that before we established that
13  Wick Phillips – your testimony that
14  Wick-Phillips had no role in connection with
15  the Amended LLC Agreement.  We didn't
16  complete the questions with respect to your
17  knowledge of the percentage interest set
18  forth in the Amended LLC Agreement.
19      So what is your understanding
20  concerning the accuracy of the percentage
21  interest set forth in Schedule A to the
22  Amended LLC Agreement?
23    A.    In speaking with D.C., I believe
24  they modified this with the intent of
25  updating it prior to any distribution.  But

Page 107

1    Wick Phillips 30(b)(6) - R. Wills
2  other than that, I'm not aware of the
3  accuracy one way or the other.
4    Q.    I'm not sure I understand what that
5  means.  Can you help me understand?  When you
6  say, "they modified this with the intent of
7  updating it prior to the distribution."
8      Can you unpack that for me?
9  Because I don't understand what that means.
10  Modified what?
11    A.    Well, they added in the BH portion
12  and then, obviously, the HCRE contributions
13  and percentages and the Highland
14  contributions and percentages are different
15  from the original LLC Agreement.
16    Q.    Okay.  And they're – I mean, the
17  math, I'm sure if you did it on a calculator,
18  it would reflect that these percentages are
19  modified from the original percentages, 49
20  and 51, based on a proportional pro rata
21  reduction for the 6 percent given to
22  BH Management, correct?
23    A.    Yes.
24    Q.    Does Wick Phillips have any
25  knowledge concerning whether or not the

Page 108

1    Wick Phillips 30(b)(6) - R. Wills
2  percentages reflected in this Schedule A do
3  not accurately reflect what the parties
4  intended?
5      MR. MARTIN:  Objection, form.
6    A.    I don't know.
7    Q.    Okay.  I'd like to take
8  a brief recess.
9      And, Hayley, I'd like to talk on
10  the phone with you, so can we have a
11  separate phone call?
12      MS. WINOGRAD:  Sure.
13      MR. BROWN:  I'm going to put myself
14  on mute and stop the video.
15      And, Hayley, can you call me on my
16  cell?
17      MS. WINOGRAD:  Yeah.  I'll do that
18  right now.
19      (Recess taken.)
20  BY MR. BROWN:
21    Q.    Do you know who represented HCRE
22  and Highland in connection with the Amended
23  LLC Agreement?
24    A.    I believe it was Hunton & Williams.
25    Q.    And what do you base that

Page 109

1    Wick Phillips 30(b)(6) - R. Wills
2  understanding on?
3    A.    Review of some material in
4  connection with the deposition.
5    Q.    What material?
6    A.    Some of these exhibits.
7      (Technical interruption, 1:29 p.m.
8      to 1:34 p.m.)
9  BY MR. BROWN:
10    Q.    So Mr. Wills, we've covered
11  Wick Phillips' involvement in the
12  representation of the parties in connection
13  with the Loan Agreement, correct?
14    A.    Yes, sir.
15    Q.    And Wick Phillips represented the
16  borrowers in connection with the
17  Loan Agreement, correct?
18    A.    Yes, sir.
19    Q.    And Wick Phillips communicated with
20  both – with Highland, I think you've
21  acknowledged through Paul Broaddus, with
22  respect to the ownership interests in the LLC
23  in connection with the Loan Agreement,
24  correct?
25      MR. MARTIN:  Objection, form.

Page 110

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   I don't think that's accurate.  We
3  had -- we communicated with Mr. Broaddus as
4  it related to finalizing and forwarding the
5  org charts that are part of Schedule 3.15 to
6  the Loan Agreement.
7  BY MR. BROWN:
8    Q.   And those org charts contain a
9  reflection of the ownership interest as they
10  appear on the LLC Agreement, correct?
11    A.   Yes, sir.  That's what they said.
12    Q.   And those org charts that were
13  transmitted by Wick Phillips to
14  Paul Broaddus, among others, reflect an
15  ownership interest of 51 percent in HCRE and
16  49 percent in Highland, correct?
17    A.   Yes, sir.
18    Q.   And the percentage interests that
19  appear in Schedule A of the Amended
20  LLC Agreement reflect those same ownership
21  interests adjusted for the addition of
22  BH Management as a 6 percent owner, correct?
23    MR. MARTIN:  Objection, form.
24    I'm going to instruct the witness
25    to not answer the question as being

Page 111

1  outside the scope of the 30(b)(6)
2  notice.
3    And the record should probably
4  reflect, Mr. Brown, I think you would
5  agree with me, the court reporter lost
6  about five minutes' worth of testimony.
7    So I appreciate the fact that
8  you're trying to go back through it
9  methodically.  I certainly don't want to
10  get in the way with that.  But we got
11  into a scrap while she was offline about
12  this and about what the scope of the
13  30(b)(6) deposition notice is.
14    So we perhaps have to have that
15  discussion over again.
16    MR. BROWN:  Okay.  Well, if you're
17  instructing him not to answer --
18  BY MR. BROWN:
19    Q.   Are you going to follow your
20  counsel's instruction, Mr. Wills?
21    A.   Yes, sir.
22    MR. BROWN:  Okay.
23    All right.  I don't have any
24  further questions.

Page 112

1    Wick Phillips 30(b)(6) - R. Wills
2    MR. MARTIN:  Okay.  I've got a few
3  questions.
4    Are you passing the witness,
5  Mr. Brown?
6    MR. BROWN:  I'll pass the witness
7  and reserve my right to reexamine.
8    MR. MARTIN:  Okay.  Well, I guess I
9  should make it clear that we're going to
10  ask you to petition the Court for a
11  reexamination because we presented
12  Mr. Wills here and are giving you ample
13  opportunity to ask questions.
14    MR. BROWN:  Well, I may need to
15  clarify questions that you ask.
16    MR. MARTIN:  After the read and
17  sign, that would be standard procedure,
18  and I would not disagree with that.
19    MR. BROWN:  Well, you're going to
20  ask him some questions.
21    MR. MARTIN:  Oh, I'm sorry.  Yeah,
22  yeah.  I'm sorry.
23    After me?  Sure.
24    MR. BROWN:  That's what I mean.
25    MR. MARTIN:  I apologize.  I didn't

Page 113

1    Wick Phillips 30(b)(6) - R. Wills
2  understand what you were saying.  I
3  thought you were saying we'd get back
4  together at some point in the future.
5    MR. BROWN:  No.  I want the
6  opportunity to, essentially, redirect
7  after you --
8    MR. MARTIN:  Recross after my
9  direct?  Sure.
10    Does anybody else have any
11  questions before I go?  Ms. Dandeneau?
12    MS. DANDENEAU:  No, I do not.
13    MR. MARTIN:  Okay.  And I apologize
14  if I tortured your name.
15    MS. DANDENEAU:  You actually said
16  it perfectly -- well, pretty perfectly.
17    —
18    EXAMINATION
19  BY MR. MARTIN:
20    Q.   Okay.  Mr. Wills, most of my
21  questions are going to be just follow-up to
22  what Mr. Brown asked you.
23    Who is it your understanding that
24  Wick Phillips represented in connection with
25  the Loan Agreement?

Page 114

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   The borrowers.
3    Q.   And of those, was there any
4  representation -- Mr. Brown asked you a lot
5  of questions about Highland being the lead
6  borrower.
7       Do you remember that?
8       MR. BROWN:  That's an incorrect --
9  by the way, you're mischaracterizing.
10   It was HCRE, not Highland.
11      MR. MARTIN:  Okay.  HCRE.
12 BY MR. MARTIN:
13   Q.   Did HCRE have its own counsel
14 in-house or outside counsel?
15   A.   No.
16   Q.   Now, at Wick Phillips, at the time
17 of these transactions, who would have
18 consulted with the client about possible
19 conflicts or waiver of conflicts that
20 Mr. Brown was asking you about?
21   A.   D.C. Sauter.
22   Q.   Okay.  And at the time, Mr. Sauter
23 was a partner at Wick Phillips, correct?
24   A.   Yes, sir.
25   Q.   Is Mr. Sauter still a partner at

Page 115

1    Wick Phillips 30(b)(6) - R. Wills
2  Wick Phillips?
3    A.   No, sir.
4    Q.   And who would have consulted with
5  the client regarding Mr. Brown's questions
6  about the mechanics of the loan, who directed
7  what, where the money was going, what the
8  role of the lead borrower was compared to the
9  other borrowers, etc.?
10   A.   D.C. Sauter.
11   Q.   Now, to your knowledge -- and I'm
12 just going to try to make all of this crystal
13 clear.  Because I think this is where the
14 fight with Mr. Brown is going to come in.
15      To your knowledge, did
16 Wick Phillips have anything to do with the
17 formation of the LLC Agreement or the
18 negotiation of the LLC Agreement?
19   A.   No, sir.
20   Q.   Can you explain in
21 non-real-estate-lawyer terms what the scope
22 of the representation was of Wick Phillips in
23 the matter at issue?
24   A.   Yes.  Our -- the scope of our
25 representation was at specifically the real

Page 116

1    Wick Phillips 30(b)(6) - R. Wills
2  estate/property level, working with
3  essentially going through the
4  lender required --
5       MR. BROWN:  Can I just interpose
6  an -- ask for clarification?
7       You asked for Wick Phillips' role
8  in the matter at issue.
9       Could you clarify, please, what the
10      matter at issue is that you're referring
11      to?
12 BY MR. MARTIN:
13   Q.   Mr. Wills, who has Wick Phillips
14 represented while you're here today?
15   A.   NexPoint.
16      MR. BROWN:  Again, I'm going to
17 object.  It's vague and ambiguous.
18      Do you mean with respect to the
19 claim --
20      MR. MARTIN:  Make an objection.
21      MR. BROWN:  Do you mean with
22 respect to the Loan Agreement?  Do you
23 mean with respect to the LLC Agreement?
24      There's several -- Wick Phillips
25 has more than one representation.  I'm

Page 117

1    Wick Phillips 30(b)(6) - R. Wills
2  just trying to get the record clear on
3  what you're asking him.
4       MR. MARTIN:  Are you finished?
5       MR. BROWN:  Yes.
6       MR. MARTIN:  I would ask you to
7  keep your objections to the "objection,
8  form" called for by the Federal Rules of
9  Civil Procedure.  If I ask you for the
10 basis, then you can make a speaking
11 objection.
12      You are still trying to conflate
13 all of these issues.  I'm trying to
14 separate them out to make them clear.  I
15 get to ask my questions, and if you want
16 to come back and ask other questions,
17 you can.
18      MR. BROWN:  Thank you for the
19 lecture and for the instructions on how
20 to practice law.
21      MR. MARTIN:  Well, you started it.
22 BY MR. MARTIN:
23   Q.   Are you aware that NexPoint had a
24 shared services agreement with one of the
25 Highland entities, which is why their email

Page 118

Wick Phillips 30(b)(6) - R. Wills

1   Wick Phillips 30(b)(6) - R. Wills
2   addresses have Highland Capital in them?
3       A.  Yes.
4       Q.  Did Wick Phillips form the LLC that
5   Mr. Brown asked you about today?
6       A.  No.
7       Q.  Did Wick Phillips draft or
8   negotiate the Amended LLC Agreement that
9   Mr. Brown asked you about today?
10      A.  No.
11      Q.  If, in fact, another law firm
12  drafted the LLC Agreement, would that be
13  consistent with your understanding of how the
14  LLC was formed?
15      A.  Yes.
16      Q.  Regardless of who formed the LLC,
17  as a real estate lawyer, since Wick Phillips
18  was representing NexPoint and the borrowers,
19  would Wick Phillips had to have known the
20  ownership structure of the LLC in order to
21  work on Project Unicorn?
22      A.  Yes.
23      Q.  Why?
24      A.  So that we could accurately
25  communicate that to KeyBank, and because

Page 119

1   Wick Phillips 30(b)(6) - R. Wills
2   those same -- the structure charts are
3   attached as an exhibit to the Loan Agreement.
4       Q.  I'm going to direct your attention
5   to the exhibits that Mr. Brown provided prior
6   to this deposition and ask you to look at
7   Exhibit H.
8           And you were in the room when we
9   became aware that the court reporter was
10  offline for a little bit, correct?
11      A.  Yes, sir.
12      Q.  And if my memory of this is
13  correct, I think she was online when
14  Mr. Brown asked you a couple of questions
15  about Exhibit H.
16          Do you remember that?
17      A.  Yes, sir.
18      Q.  Can you please look at Exhibit H
19  and tell me, on the -- that's an email string
20  starting on July 27, 2018, correct?
21      A.  Yes, sir.
22      Q.  And who is the author of the first
23  email in that chain?
24      A.  Alexander McGeoch.
25      Q.  And Mr. McGeoch's email signature

Page 120

1   Wick Phillips 30(b)(6) - R. Wills
2   indicates he's a partner at Hunton Andrews
3   Kurth, correct?
4       A.  Yes, sir.
5       Q.  In Dallas, Texas, right?
6       A.  Correct.
7       Q.  Who is the email addressed to?
8       A.  Mark Patrick.
9       Q.  And Mark Patrick you previously
10  identified as being one of the in-house
11  people at Highland, correct?
12      A.  Yes, sir.
13      Q.  And is there a Wick Phillips
14  attorney on the email from Mr. McGeoch to
15  Mr. Patrick?
16      A.  No, sir.
17      Q.  And then the top email on Exhibit H
18  is from Mr. Patrick to Tim Cournoyer,
19  correct?
20      A.  Yes, sir.
21      Q.  And it's my understanding
22  Tim Cournoyer is a Highland person as well,
23  correct?
24      A.  Yes, sir.
25      Q.  And he doesn't work at

Page 121

1   Wick Phillips 30(b)(6) - R. Wills
2   Wick Phillips, does he?
3       A.  He does not.
4       Q.  And there's no Wick Phillips
5   attorney on either of these emails, correct?
6       A.  Correct.
7       Q.  Could you read Mr. McGeoch's email
8   beginning with the word "Mark"?
9       A.  (Reading.)
10          "Mark, a draft of the Unicorn LLC
11          agreement is attached.  We need to
12          select another name because Unicorn
13          is taken in Delaware.  It would be
14          helpful to schedule a call with you
15          to walk through our thoughts on the
16          allocation and distribution drafting
17          approach we took.  Please let me
18          know if you have time for a call
19          with Mark and me this morning.
20          "Thanks, Alex."
21      Q.  So does that indicate to you that
22  Hunton Andrews Kurth actually was involved in
23  the allocation and distribution drafting of
24  the LLC Agreement?
25      A.  Yes.

Page 122

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2      Q.   When Mr. Brown asked you questions
 3   about Mr. Wick Phillips' role in drafting the
 4   LLC Agreement, he didn't ask you about Hunton
 5   Andrews Kurth, did he?
 6      A.   No, sir.
 7          (Email chain "RE: SE Multi-Family
 8          Holdings LLC: Amended and
 9          Restated," beginning Bates
10          Highland136853, marked as Exhibit
11          I.)
12   BY MR. MARTIN:
13      Q.   If you would, please, look at
14   Exhibit I.
15      A.   Okay.
16      Q.   This is an email chain, several
17   pages long.  And if we're going by the Bates
18   numbers, from -- starting on Highland136853
19   through Highland136856.
20          Do you see that?
21      A.   Yes.
22      Q.   Will you page through any of those
23   emails and identify any email addresses from
24   Wick Phillips that are included in that
25   chain?
```

Page 123

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2      A.   There are no Wick Phillips' emails.
 3          MR. MARTIN:  Okay.  I'll pass the
 4   witness.
 5          MR. BROWN:  Ms. Vosburgh, could you
 6   go back to the first question that
 7   Counsel asked on his set of questions of
 8   Mr. Wills, to the first question, and
 9   read it back to me.
10          THE REPORTER:  (Reading back.)
11          "Question:  Okay.  Mr. Wills, most
12      of my questions are going to be
13      follow-up questions to what
14      Mr. Brown asked you.
15      "Who is it your understanding that
16      Wick Phillips represented in
17      connection with the Loan Agreement?"
18      "Answer:  The borrowers."
19          MR. BROWN:  Okay.  There's a
20      question regarding the matter at hand.
21      That's the one I want read back.
22          THE REPORTER:  (Reading back.)
23      "Question:  Can you explain in
24      non-real-estate-lawyer terms what
25      the scope of the representation was
```

Page 124

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2      of Wick Phillips in the matter at
 3      issue?"
 4          THE REPORTER:  Is that the one?
 5          MR. BROWN:  Yes.
 6          THE REPORTER:  (Reading back.)
 7      "Answer:  Yes.  Our -- the scope
 8      of our representation was at
 9      specifically the real
10      estate/property level working with
11      especially going through the lender
12      required --"
13          And then there was an interjection.
14          --
15          RE-EXAMINATION
16   BY MR. BROWN:
17      Q.   Okay.  Mr. Wills, I want to
18   understand what your understanding was when
19   you were asked about the scope of the
20   representation of the matter at issue.
21          What matter at issue did you
22   understand was being referred to?
23      A.   Wick Phillips' role with
24   Project Unicorn.
25      Q.   Okay.  So you were not answering
```

Page 125

```
 1      Wick Phillips 30(b)(6) - R. Wills
 2   the question in connection with
 3   Wick Phillips' role in connection with the
 4   Loan Agreement then, were you?
 5      A.   Well, to me, Project Unicorn
 6   incorporates really all of the topics on the
 7   depo notice, the Loan Agreement,
 8   LLC Agreements.  It's all sort of the same
 9   global project.
10      Q.   But you've already testified, have
11   you not, and Wick Phillips has already
12   acknowledged in its papers that it filed in
13   the bankruptcy court that it represented the
14   borrowers in connection with the
15   Loan Agreement, correct?
16      A.   Correct.
17          MR. BROWN:  I don't have any other
18   questions.
19          MR. MARTIN:  We'll reserve.  Thank
20   you.
21          (The deposition was concluded at
22          1:51 p.m.)
23
24
25
```

Page 126

```
 1    Wick Phillips 30(b)(6) - R. Wills
 2         C E R T I F I C A T E
 3
 4         I, ANNE E. VOSBURGH, Certified Shorthand
 5    Reporter, Registered Professional Reporter,
 6    Certified Realtime Reporter, and Closed
 7    Captioner, hereby certify:
 8         That ROB WILLS, via remote
 9    videoconference, solemnly affirmed and agreed to
10    testify to the truth, the whole truth and
11    nothing but the truth; that all counsel
12    stipulated to this process, notwithstanding the
13    location of reporter or witness at time of
14    deposition; and that this transcript is a true
15    and correct record of testimony given.
16         I further certify that I am not related
17    to any of the parties to this action and that I
18    am in no way interested in the outcome of this
19    matter. Dated: August 11th, 2021.
20
21    _____
22         ANNE E. VOSBURGH
23         Certified Shorthand Reporter No. 6804
24         Registered Professional Reporter
25         Certified Realtime Reporter
```

Page 127

```
 1              ERRATA SHEET
 2    Case Name:
 3    Deposition Date:
 4    Deponent:
 5    Pg.  No. Now Reads   Should Read  Reason
 6    ___ ___ _____   _____   _____
 7    ___ ___ _____   _____   _____
 8    ___ ___ _____   _____   _____
 9    ___ ___ _____   _____   _____
10    ___ ___ _____   _____   _____
11    ___ ___ _____   _____   _____
12    ___ ___ _____   _____   _____
13    ___ ___ _____   _____   _____
14    ___ ___ _____   _____   _____
15    ___ ___ _____   _____   _____
16    ___ ___ _____   _____   _____
17    ___ ___ _____   _____   _____
18    ___ ___ _____   _____   _____
19    ___ ___ _____   _____   _____
20
21              Signature of Deponent
22    SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2021.
24    _____
25    (Notary Public)  MY COMMISSION EXPIRES:_____
```

Index: (a)..agreements

**(**

**(a)** 38:11

**(b)** 25:23 38:11,21

**1**

**1** 93:19 94:8,19 98:3

**1.05** 37:23 38:7,11,16

**1.07** 34:22 35:9

**1.07(a)** 34:25

**11** 6:3

**14** 37:23

**15** 98:25

**17** 72:21 75:19 84:9

**18** 18:25 19:2 81:25
85:10,13 91:5

**1:29** 109:7

**1:34** 109:8

**2**

**2** 93:20 94:19

**20** 100:15

**2018** 14:15,21 20:23
21:9 72:21 81:25
84:9 91:5 99:2
119:20

**2019** 98:25

**2021** 6:3 30:2,13

**22** 51:14

**23** 14:15,21 94:6
98:25

**25** 37:25

**26** 20:23 21:8

**263750** 96:15

**263751** 96:19

**27** 92:7 98:2 119:20

**3**

**3** 23:16

**3.15** 47:19 48:4,6,9
49:20 51:12 58:5,19
59:2,19 63:21 64:13,
18 66:7 67:19 69:17
74:5,14,24 75:10
89:18 90:9 95:7
110:5

**30(b)(6)** 6:1 7:1 8:1
9:1,2,10 10:1 11:1,21
12:1,10 13:1 14:1
15:1,4 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1,
21 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1,2,14
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1

**4**

**4** 12:17 29:19

**4.01(b)** 25:20

**41** 58:10

**49** 19:9 47:18 50:12

51:9 53:11,18,24
54:6,11 55:13,21
58:11 74:17 93:20
94:20 107:19 110:16

**49/51** 59:20

**4:21** 72:22

**5**

**51** 19:7 25:18 47:18
50:13 51:8 53:11,18,
24 54:6,12 55:13,22
58:11 74:16 93:19
94:19 107:20 110:15

**5:16** 81:8

**6**

**6** 107:21 110:22

**6th** 29:25 30:13 31:13

**7**

**76** 27:16

**7:45** 82:15

**7:52** 82:16 85:14

**7:57** 86:2

**9**

**9.01** 27:17

**9.01(a)** 27:19 28:2,20

**9011** 9:3

**9:30** 6:3

**A**

**a.m.** 6:3

**ability** 39:13

**acceleration** 72:7

**acceptable** 16:7

**accuracy** 27:9 50:4
71:5 106:20 107:3

**accurate** 15:2 67:12,

14 69:13,20 74:8
101:19 110:2

**accurately** 28:21
66:12 83:25 101:22
108:3 118:24

**accusing** 104:7

**acknowledged**
43:17,21 109:21

**acquired** 51:4

**acquisition** 22:18
85:18 86:6 95:23
96:13

**acquisitions** 16:16
40:17 46:7,9

**actual** 35:21 37:7

**added** 25:16 28:10
31:7 40:12 107:11

**addition** 110:21

**additional** 22:24
25:17 100:16

**address** 54:16 58:8
76:2,16,23 77:25
78:8,14 82:3 87:13,
14,15,16,18

**addressed** 26:3
46:25 103:17 120:7

**addresses** 118:2
122:23

**adjusted** 110:21

**Administrative**
25:25 26:4

**admission** 13:15
30:24

**advance** 13:14 38:23
39:10

**advanced** 38:25
41:24

**advances** 39:14,25
40:2,4 41:10,12

**advantages** 36:18

**adverse** 9:21

**advisability** 34:16

**advise** 41:17

**affiliation** 71:15,18

**agency** 22:21

**agent** 21:12 25:25
26:4

**agree** 31:12 74:22
75:7 111:6

**agreed** 99:9 100:4,5

**agreeing** 99:22,24

**agreement** 14:15,21
15:19,21 16:5,6,9,12,
13,18,20 17:10,11,
14,24 18:7,9,19,20,
22 19:2,13,19,24
20:6,12,22 21:8,10
22:2,5,8,11,15,19
23:4,9,16,18,25 24:5,
8,16,19 25:23 26:12,
22,24 27:11,17 28:5,
16,20,21 30:17 31:7,
10,23 32:2,4 33:8,17,
24 34:5,18 35:14,21,
24 36:21 37:6,13
38:14 39:12,22
40:20,23 41:8,11,19,
25 42:5 43:8,19 44:6
45:4,16 46:4,13,18
47:2,9,14,20 48:10
49:2 58:6,16,19 59:2
60:4 61:13,20,25
62:20 63:9,14,18,22
64:6,11,14,20 65:13,
18 66:8,23 67:9,11
69:5,18 71:22 72:4
74:6 80:15 88:8,22
89:9,13,19 90:10
92:4 93:24 94:6,10,
22 95:3,8 98:19,24
99:5,17,18,19,21
100:10,23 101:4,9
102:5,10,11,12,18
103:11 104:25 105:6,
16,25 106:3,5,9,15,
18,22 107:15 108:23
109:13,17,23 110:6,
10,20 113:25 115:17,
18 116:22,23 117:24
118:8,12 119:3
121:11,24 122:4
123:17

**agreements** 18:13
32:10,16,24 43:14

Index: Alex..capital

**Alex** 121:20

**Alexander** 119:24

**allocated** 18:7

**allocation** 50:16 121:16,23

**ambiguous** 116:17

**amended** 11:21 12:10 98:18,23 99:20 100:9 101:9 102:4, 12,17 103:11 104:25 105:6,16,24 106:9, 15,18,22 108:22 110:19 118:8 122:8

**amounts** 39:21 41:18 72:7

**ample** 112:12

**analysis** 34:8 36:3

**analyst** 77:17

**Andrews** 120:2 121:22 122:5

**Andros** 55:17

**answering** 124:25

**answers** 9:7 10:24

**Apartments** 75:7

**apologize** 25:4 47:11 57:23 112:25 113:13

**appears** 81:6 82:13 91:4,17

**applicable** 9:2

**applied** 40:3

**appointment** 38:17

**approach** 121:17

**approved** 86:8 89:25

**approximately** 93:19

**Arbolita** 57:5

**Arborwalk** 55:24

**argue** 13:19

**argument** 13:14

**arise** 35:22

**arranger** 21:13

**Article** 27:16

**ascertain** 27:25

**asset** 96:12,21

**assets** 97:17

**Association** 21:12

**assume** 7:19 19:14 21:3 50:5 51:18 88:23 103:3

**assuming** 79:18

**assumption** 44:18, 21

**attach** 48:12 72:9

**attached** 11:8 18:13 49:20 63:17 66:7 74:5,13,23 75:8,9 80:13 86:6 92:10 94:7 98:13 99:10 119:3 121:11

**attachment** 48:25 50:21,22 74:3 75:5 93:3,8,15

**attachments** 48:12, 15,22 49:25 51:12 72:13 73:24 92:21,24 93:10

**attention** 119:4

**attorney** 7:4 73:8 89:2 120:14 121:5

**attorney-client** 36:14

**August** 6:3 14:15,21 91:5 94:6,8 98:3,25

**authentic** 99:22 100:4

**authenticity** 99:13, 25

**author** 119:22

**aware** 9:5 18:4 28:17 33:25 36:9 61:15 63:6,10 64:3 66:22 67:2 90:18,19 105:17,22 107:2 117:23 119:9

**B**

**back** 26:10 48:3 52:19 75:18 79:4 85:9 87:3 89:25 94:4 97:9,23 100:13 101:25 102:23 104:17 111:9 113:3 117:16 123:6,9,10, 21,22 124:6

**Baker** 79:4,5 83:21, 24 84:4,16,22,24

**bankruptcy** 9:3,23 30:25

**base** 46:21 63:11 108:25

**based** 10:13 44:21 51:11 107:20

**basic** 92:11

**basically** 7:24

**basis** 117:10

**Bates** 122:9,17

**Battleground** 54:4

**beginning** 121:8 122:9

**behalf** 9:7 26:23 28:14 37:3 39:9 43:4 44:15,16 45:18 60:6 62:9 67:8 69:2 70:11, 12,13 71:7,11 76:21 90:11

**believed** 76:5 105:5

**benefit** 41:21,24

**BH** 100:18,19 101:6, 23 107:11,22 110:22

**binder** 21:2,6

**binding** 9:13 10:24

**bit** 46:19 53:2 64:22 102:2 119:10

**Bonner** 77:15 87:14 88:5

**bookrunner** 21:14

**borrowed** 39:22

**borrower** 23:18,21 24:5 25:14,17 26:7,9, 10,20 27:2,3,21 29:3, 21 30:15 31:16 37:12,16 38:13,17, 19,24 39:4,7,12 40:13,15 46:14,22 49:16 70:13,21 71:23 88:17,20 114:6 115:8

**borrower-level** 83:4,18

**borrowers** 21:11 22:17 24:8,10,11,25 26:21 29:4 31:18,20 32:3 33:6 34:9 35:19 36:12,17 37:6 39:9, 19 40:16 41:7,10 45:3 49:22 67:5 90:11,21 92:3 105:12 109:16 114:2 115:9 118:18 123:18

**borrowing** 46:21

**bottom** 50:23 84:13 87:4

**Brandywine** 54:14 55:5

**break** 45:23 86:17,18

**bridge** 20:22 21:7 29:21 30:15 31:16 100:19

**briefly** 51:19

**briefs** 11:8

**bring** 100:16

**Broaddus** 60:25 61:9 62:3,9,12 69:10 70:2,25 77:23 78:3 86:14 87:15 88:6 90:14 91:6,22,24 98:2,12 109:21 110:3,14

**Broaddus'** 93:8

**Brown** 6:14 10:16 11:16,19,23 12:3 14:11,17 20:20,24 24:23 25:4,7 27:7,14 29:5 30:7 31:11 35:5, 11,17 36:10,24 37:10,22 38:2,5 40:9 41:16 44:12,20 45:11

**46:2 47:24 48:2,16, 21 49:6 52:15,24 53:3 54:19,22 55:2,4 59:5,21 60:16 61:16 62:7,24 64:2,16 65:6 69:14 70:6,15 72:9, 14,18 73:3 74:11 75:15,20 76:13 80:6, 20 81:3,5 84:3,11,15 86:15,22 87:2,5 90:7, 23 91:3 95:24 98:21 99:7,15 100:6 101:5 103:4,7,14,19,23 104:7,10,21 108:7, 13,20 109:9 110:7 111:5,17,19,23 112:5,6,14,19,24 113:5,22 114:4,8,20 115:14 116:5,16,21 117:5,18 118:5,9 119:5,14 122:2 123:5,14,19 124:5,16

**Brown's** 115:5

**bucket** 22:20

**buckets** 66:20

**business** 49:15,16 90:2 104:4

**C**

**calculator** 107:17

**call** 59:17 92:13 103:5 108:11,15 121:14,18

**called** 6:8 12:10 21:7 94:17 117:8

**calling** 24:14 30:11 31:5

**CANTY** 37:19,24 47:21

**capability** 80:18

**capacity** 87:20

**capital** 6:19 19:8,18 21:13 23:22,24 24:2 25:16 27:21 28:4,15, 24 30:8 40:23 75:25 76:15,22 77:4,24 78:8,14 82:2 87:12, 13,15,16,17 101:10

Index: caption..custom

118:2

**caption** 48:4 73:21

**care** 27:21 29:7

**case** 9:23 27:20 28:11 44:19 93:23

**cell** 108:16

**Central** 6:3

**chain** 71:3 72:11,15 81:7 90:25 101:3 119:23 122:7,16,25

**chance** 38:10

**Chang** 42:8,21 61:9 69:10 70:2 78:6,9 82:2,5,16 85:15 86:3 87:17 88:6

**Chang's** 82:14,23

**change** 48:19 53:2 76:9,25 77:11

**changed** 28:12 100:21

**changing** 101:16

**Charles** 68:10

**chart** 55:6 57:20 67:14 71:3,5 74:12, 15,20,23 75:4,9 80:5 83:24 94:17,25 95:11 96:6,14,18,23,24,25 101:13

**charts** 56:3,8,22 57:3,15 58:6,25 59:19 61:3 62:5 63:17,21 65:11,15 66:2,6 67:21 69:12, 17,19 72:12 73:22 74:5,13 79:2,6,9,11 81:12 82:4,5,24 83:5 85:18 86:6 89:17,24 90:8,21 92:11 97:6, 12 98:13 110:5,8,12 119:2

**checked** 90:5

**checklist** 89:23 90:6

**circulate** 79:5

**Civil** 9:2 117:9

**claim** 9:22 116:19

**clarification** 116:6

**clarify** 112:15 116:9

**clean** 78:25 79:16,18

**cleaned** 79:13

**clear** 112:9 115:13 117:2,14

**client** 32:11,17,22 42:3 43:6,9,22,24 44:3,9 45:14 67:14 114:18 115:5

**clients** 32:24 33:24 34:5 35:13 67:8

**closed** 92:15

**closely** 104:12

**closing** 22:25

**co-borrower** 23:5 28:11 31:6

**co-borrowers** 25:13 31:9,19,21

**collection** 26:21 29:3

**collective** 46:22

**comfortable** 22:4

**comment** 8:20

**comments** 81:13 86:9

**committed** 100:14

**common** 35:2

**communicate** 66:12 70:21 118:25

**communicated** 45:15 60:9 109:19 110:3

**communicating** 44:16 45:18 62:9 66:20 76:20 87:10,20 88:15,20 102:20

**communication** 105:21

**communications** 17:23 19:17,22 20:8, 9 58:24 59:7 60:23 61:10,18,23 62:11 64:4 66:14 67:22,24

87:25 88:21 90:20 98:12 102:24 103:2, 9,21 104:14 105:5,19 106:8

**companies** 88:8

**company** 14:14,20 15:19 16:5 43:15 60:2 98:19,24 102:5

**compared** 115:8

**complete** 9:6 10:23 25:8 83:24 106:16

**compliance** 35:8

**component** 47:14

**comprise** 58:25 63:21 69:17

**conclusion** 63:12 77:2,11

**conclusions** 76:9

**condition** 26:2

**conditions** 25:23

**Conduct** 34:21

**conduit** 20:2 49:14 83:21 105:11

**Confirm** 67:20

**conflate** 117:12

**conflating** 72:5

**conflict** 33:5,10,16, 23 34:3,10,11,17 35:7 40:5,6

**conflicts** 35:22 37:7 114:19

**conformity** 35:8

**confused** 104:8

**connection** 9:19,21 10:9 14:25 15:8,14, 17,21 16:14 17:13 18:8,18 19:25 22:11, 14,17,24 23:3,4,9 28:5 31:9,23 32:2 33:8,17 34:17 35:12 36:4,20 40:16 42:4 43:7,18,20 44:5,25 45:15 46:5,13,18 48:9,25 49:12 60:4 61:12,19,24 62:5,13,

19,22 63:3,8,13 64:5, 11,19 65:12,17 67:9 68:22 69:4 88:21 89:13,22 90:8 91:13 92:2 102:4,17 104:25 106:9,14 108:22 109:4,12,16,23 113:24 123:17

**consent** 35:2

**considered** 34:3

**consistent** 30:23 58:14 118:13

**constitute** 89:18 98:3

**consult** 36:11

**consulted** 36:17 114:18 115:4

**contact** 42:4 43:7,10, 22,24 44:3,4,9

**contacts** 45:14 60:14

**contained** 66:23

**context** 14:24 20:12 40:14 60:23

**contribution** 40:24

**contributions** 19:18 20:18 100:20 101:10 107:12,14

**conversations** 66:5

**converted.'** 83:7

**converting** 83:3,17

**copied** 85:15

**copies** 27:22

**copy** 14:19 21:23 22:7 29:12 81:9 99:4

**copying** 82:17

**correct** 7:5 15:6,10 17:20,21 19:12,14 20:14,15 23:14 24:3, 5 26:17 27:3 31:17 38:14,15,19 39:5,6 43:4 49:17 50:9,13, 17 51:4,9,16,23 52:4, 9 53:10,19,25 54:7, 12 55:7,8,14,22 56:4, 9,13,17,22 57:3,7,11,

19,22 63:3,8,13 64:5, 11,19 65:12,17 67:9 68:22 69:4 88:21 89:13,22 90:8 91:13 92:2 102:4,17 104:25 106:9,14 108:22 109:4,12,16,23 113:24 123:17

15,20,21,25 58:4,16, 17 60:10 65:20 66:3 68:20 69:20 70:3 71:8,23 72:4,7 74:17 76:2,6,23 77:8 78:5, 17,21,22 80:8,21 89:9 91:6,22 92:4,22 94:13,20,22 95:4,9 96:2,5 98:5 99:2 101:11,12 102:14 106:2 107:22 109:13, 17,24 110:10,16,22 114:23 119:10,13,20 120:3,6,11,19,23 121:5,6

**corrections** 8:17,20

**correspondence** 60:19

**counsel** 6:18 24:22 26:7,9 29:22 30:18 42:9 57:24 60:3 62:10 63:16 64:25 65:2 78:12 79:14 80:4,17 83:22 85:3,4 105:13 114:13,14 123:7

**counsel's** 111:21

**counterparty** 17:9

**couple** 11:12 78:25 119:14

**Cournoyer** 120:18, 22

**court** 8:4,11 11:16 29:25 31:2 111:6 112:10 119:9

**covered** 109:10

**created** 69:12

**creating** 61:3

**credit** 25:14 46:21

**Crossing** 56:11

**crystal** 115:12

**current** 7:8 11:6 86:4 101:14

**custom** 32:15

### D

**D.C.** 11:5 68:7,13
78:16,19 81:9 82:17
85:16 91:19 98:4,6
100:12 106:23
114:21 115:10

**Dallas** 120:5

**Dandeneau** 113:11,
12,15

**Date** 26:5

**dated** 14:21 21:8
26:5 94:6,7 98:24

**days** 11:12

**deal** 42:7

**dealing** 100:2

**dealings** 44:24

**deals** 100:18

**Debtor** 6:20,23 9:22
18:6 24:4 30:9 77:9

**Debtor's** 9:19,22
12:10 29:14

**declaration** 99:11,
12

**declarations** 11:7
99:11

**declared** 6:9

**deduction** 64:23

**default** 72:3,6

**defined** 23:21,25
35:20 77:9

**definition** 46:22

**Delaware** 80:7 85:4
121:13

**deliver** 83:25

**delivering** 89:24
102:20

**deposition** 6:2,21
7:14,16,22 8:17 9:10,
18 10:25 11:11,22
12:11 13:4,25 14:4
16:3 17:4 21:25
33:20 60:20 86:20

99:16 100:3 102:10
104:13 109:4 111:14
119:6

**describe** 22:13 66:4

**designated** 8:24 9:9
10:8 12:19,24 13:13
33:21 37:12,16 68:24

**designation** 58:20
73:15 91:11

**detail** 66:14

**determination** 45:5,
9 50:3 69:16

**determine** 34:8
39:13,25 44:13 67:10
70:8

**determined** 93:18

**digress** 99:7

**diligence** 67:8,13,15
68:19 69:24 89:22
90:5

**diligenced** 68:18

**diligencing** 68:4
69:4

**direct** 39:14 40:2
41:9 113:9 119:4

**directed** 41:13 115:6

**directing** 40:15

**directly** 64:5

**disagree** 112:18

**disclosing** 10:18

**discuss** 92:14

**discussed** 87:9
92:11 98:15

**discusses** 25:22
27:17

**discussion** 33:22
104:23 111:16

**discussions** 34:15
35:19 68:3 94:12

**dispense** 7:21

**disqualification**
10:9 31:14

**disqualify** 9:20 11:2
29:14 30:14

**distinction** 45:13,17
59:12,14,21

**distribution** 106:25
107:7 121:16,23

**document** 14:22
15:5,9,10,14 21:7,15,
19 29:25 38:8 93:18
100:8

**documents** 13:21
99:10 103:16 104:11

**dog** 68:10

**Dondero** 44:5 106:8

**draft** 97:12 101:3
118:7 121:10

**drafted** 17:25 118:12

**drafting** 17:13 20:13
121:16,23 122:3

**dragging** 57:23

**Drawhorn** 99:14
100:5 104:18

**DST** 64:25 66:19
79:2,14 80:3,5,7,8,17
82:5,24 83:4,18,21
85:3 92:11 94:17

**DSTS** 90:25

**due** 41:19 69:23 72:7

### E

**earlier** 23:25 69:25
79:8

**Economics/
ownership** 93:4

**effective** 26:5 98:25

**Ellis** 97:14

**email** 72:11,15,20,21
73:4,10,18,21 74:2
75:6,18,19,21 76:2,
15,23 77:24,25 78:8,
14,21,23 81:4,7,16,
18,23,24,25 82:3,9,
12,14,18,20 83:16
84:8,14,20 85:10,12,
13,14,21 86:11 87:4,

12,14,15,16,17 89:7
90:17,19,25 91:5,8,
22 92:6,7,8,19 93:9
94:7,9 97:10,24 98:2,
3 101:3 103:3 105:20
117:25 119:19,23,25
120:7,14,17 121:7
122:7,16,23

**emailing** 75:22

**emails** 61:7 84:5
87:7 88:16 89:5,11,
16 97:25 98:9,13
99:9 105:14,18 121:5
122:23 123:2

**employed** 42:13

**employee** 42:11,16,
18,22,24

**end** 75:16

**engagement** 32:19

**entities** 21:9 25:12,
13 26:11 29:7 31:22
83:5,6,18 87:25
117:25

**entitled** 104:6

**entity** 6:20 16:23
29:8 40:12 44:15
68:14 77:20

**entry** 75:25

**equity** 7:10 100:16,
19

**ESQ** 6:7

**essentially** 113:6
116:3

**establish** 43:20

**established** 106:12

**estate** 7:12 10:20,21
43:13 59:15 118:17

**estate/property**
116:2 124:10

**event** 72:3,6

**evidence** 13:21

**EXAMINATION** 6:13
113:18

**executed** 19:13

12,14,15,16,17 89:7
90:17,19,25 91:5,8,
22 92:6,7,8,19 93:9
94:7,9 97:10,24 98:2,
3 101:3 103:3 105:20
117:25 119:19,23,25
120:7,14,17 121:7
122:7,16,23

**exhibit** 11:17,18,19,
20,22 14:12,16,19
15:19 20:21,23 21:6,
7,16,24 22:4 72:10,
13 87:2 89:8 90:23
91:2,4 92:8 93:23
96:4 98:3,16,20,22
99:16,19,20 101:4
102:6,13 119:3,7,15,
18 120:17 122:10,14

**exhibits** 11:7 12:7
21:3 109:6 119:5

**existing** 96:11,17
97:20

**explain** 30:22 115:20
123:23

**explained** 41:7

**explaining** 7:21

**extent** 18:13 26:24
27:2 28:3 41:8 46:16

**eyebrows** 104:19

### F

**fact** 39:24 111:8
118:11

**fairly** 104:12

**Fairways** 57:9

**fall** 66:20

**false** 72:2

**familiar** 21:21 34:20,
24 48:5 58:18 60:21
104:10

**Family** 15:25

**favorable** 26:3

**Federal** 8:25 117:8

**fight** 115:14

**filed** 29:25 30:12,25

**files** 11:9

**filing** 31:14

**final** 72:12 73:22 82:4

**finalizing** 110:4

**financing** 15:22
16:15 18:9 22:22,24

46:5

**fine**  7:23 38:4

**finished**  8:8 24:22 117:4

**firm**  10:4,20 59:24 63:7,12 65:25 118:11

**firm's**  10:14 11:3

**firms**  26:20

**five-minute**  86:18

**flip**  18:25 23:15 48:16,17 51:17,20 52:12 53:6 100:24

**focus**  23:17 25:19 72:16 87:7 106:11

**focusing**  53:16,22 54:4,10 72:19

**folks**  49:15,16 62:4 69:9

**follow**  61:7 81:11 111:20

**follow-up**  113:21 123:13

**form**  27:4,12 28:25 30:4 31:3 35:3,10 36:8,22 37:8 40:7 41:14 42:9 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 102:25 105:18, 20 108:5 109:25 110:23 117:8 118:4

**format**  97:4

**formation**  20:13 94:12 115:17

**formed**  94:20 118:14,16

**forward**  27:15 94:24

**forwarding**  110:4

**found**  103:20

**frankly**  80:16

**Freddie**  18:10 20:2 22:22 66:21 81:14

**Freddy**  42:8,21 69:10 78:6,9 82:2,5, 14,16 87:17 88:6

**front**  12:5,7 29:14,16

**full**  6:15

**funds**  40:15 100:14

**future**  113:4

**FW**  101:3

---

**G**

**gave**  37:6 101:7

**general**  87:9

**generally**  66:9 87:8

**generated**  97:15

**Geotz**  44:8,14 61:8 71:17 76:18 88:5

**give**  29:11 40:5 66:13

**giving**  112:12

**Glenview**  55:11

**Goetz**  42:7,10,11 60:15 61:20 69:25 70:19 71:12 77:3,12, 17 87:13

**good**  13:3 45:22

**Gould**  12:11 26:6

**Governors**  52:22 53:7 74:3

**Grand**  57:14

**great**  16:10

**Green**  52:22 53:7 74:3

**grounds**  104:3

**group**  7:12 21:9 69:24 81:9

**guarantee/ guarantor**  40:13

**guess**  31:5 63:4 64:22 103:15 112:8

**Gulfstream**  50:23

---

**H**

**hand**  123:20

**handful**  61:2 62:4

**handled**  10:21

**handles**  43:13 71:3

**handling**  59:24

**hat**  44:14,19 45:6 70:9

**Hayley**  103:4 108:9, 15

**HC**  30:5

**HCM**  29:23 30:8,18

**HCRE**  16:23 17:3,4, 7,20 18:6 19:6,17,22 37:11 38:14 39:25 40:6,14,22 41:9 42:4, 19,25 44:10 45:19 47:8,13 50:8,13 51:7, 8 53:10,18,25 54:6, 12 55:14,22 56:3,17, 22 57:2 58:12,24 60:10 61:12 66:6 70:11 74:16 88:17 107:12 108:21 110:15 114:10,11,13

**HCRE's**  46:12

**hear**  79:4

**hearing**  8:21 13:15, 22

**Heights**  52:6

**helped**  22:16

**helpful**  121:14

**Hidden**  56:24

**Highland**  6:18,21,23 16:21 17:10,20 18:6 19:8 23:3,5,8,13,22, 24 24:2,4,14,17 25:16 26:11 27:3,21 28:4,10,15,24 30:8,9, 11 31:6,16 39:20 40:3,6,12 41:18,23 42:11,16,22 43:7,10, 15,18,22 45:18 47:3, 8,13 50:8,12 51:7,9 53:10,18,24 54:6,12

**Highland**  55:13,22 56:3,17,21 57:3 58:11 59:10,12 60:3 61:19,24 62:10, 11,19 63:2,8,13,16, 24 64:10,19,24 65:12,17 69:11 70:12 71:2,14,15,18 74:17 75:25 76:10,15,22 77:4,5,8,9,12,19,24 78:4,8,14 82:2 85:3 87:12,13,15,16,17 88:7,10 89:3 90:15 92:2 107:13 108:22 109:20 110:16 114:5, 10 117:25 118:2 120:11,22

**Highland's**  46:17

**Highland136853**  122:10,18

**Highland136856**  122:19

**Highland263748**  95:25

**Highland263749**  96:8

**hired**  59:15

**history**  94:5

**Hold**  97:11

**Holdings**  14:13,20 15:18,25 16:4 70:22 94:6,22 95:4 98:17, 23 100:11 122:8

**hook**  39:20

**hour**  81:8 86:16

**hours**  11:13

**housekeeping**  11:24

**hung**  64:15

**Hunton**  62:16,18 63:7,12,15,22 64:5, 10,19,25 65:4,12,20, 22,24 108:24 120:2 121:22 122:4

---

**I**

**i.e.**  70:10

**idea**  65:24 76:14 95:15

**ideal**  32:12

**ideally**  32:18

**identical**  74:24,25 75:8,10,11

**identically**  58:9

**identified**  69:25 120:10

**identify**  122:23

**impact**  36:6

**implications**  36:12

**important**  8:6 18:12

**improper**  36:6

**in-house**  42:9 59:10, 24 64:24 78:12 114:14 120:10

**inaccurate**  27:2 28:2

**include**  23:21

**included**  67:4 89:4 122:24

**includes**  27:3

**including**  26:11 39:20

**inconsistent**  30:2, 21

**incorrect**  19:12 26:12,15,16 72:2 114:8

**independent**  63:19 64:8

**indication**  57:18

**individually**  36:19

**individuals**  45:6,17 60:8 61:11,18 70:9 87:21,23,24 88:14

**information**  83:14

**Initially**  25:11

**initials**  68:9

**initiating**  84:8 87:4 92:6

inquiry 82:24 86:2

instruct 10:12
110:24

instructing 111:18

instruction 111:21

instructions 90:11
117:19

intended 108:4

intent 106:24 107:6

interest 19:7,9 47:12
50:12 53:17,23 58:8,
10,15 94:18 101:11,
15,17,20 106:17,21
110:9,15

interested 88:2

interests 19:23
20:11 47:7 50:7 53:8
54:5,16 58:2,7 74:16
75:2,12 93:16 95:2,7
109:22 110:18,21

interjection 124:13

internal 11:9

interpose 116:5

interpret 79:17

interrupt 25:5 54:25

interruption 12:2
85:8 109:7

involved 46:16
62:11,18 65:25
121:22

involvement 109:11

irrespective 41:12

Isles 50:23 55:18

issue 27:9 28:19
34:16 46:25 47:8
115:23 116:8,10
124:3,20,21

issues 117:13

item 83:23

items 92:12,15 93:3

IV 6:17

IX 27:16

J

James 6:17 44:5
106:8

joint 33:7,23 34:4,9
35:12,23 36:4,13
37:5

jointly 36:19 39:20
40:3

July 92:7 98:2 119:20

jump 37:20

JV 93:4,16

K

K&e 97:12

Ken 37:19 47:22

Keybanc 21:12

Keybank 18:10 20:2,
5 21:11 22:23 23:3
25:13 28:9 48:12
49:5,8 66:21 90:3
100:12 102:21,25
103:10 104:15 105:6,
15 118:25

Kirkland 97:14

knowledge 13:17
14:7 27:13 40:21,25
44:2,7 63:20 64:9
87:19 88:3,4 106:17
107:25 115:11,15

knowledgeable 9:7
10:23

Kurth 120:3 121:22
122:5

L

L.P. 6:19 19:8 24:2
29:23 30:5,8,9,19

lack 27:9 100:19

Lake 56:24

Lakes 54:9

Landing 57:18

large 25:15

laundry 69:8

Lauren 99:9 103:17

law 8:4 10:4,14 59:24
117:20 118:11

lawyer 68:17 78:24
118:17

lawyers 33:14 78:20

lead 21:13 37:12,16
38:13,17,18,24 39:3,
7,12 40:14 46:14
72:6 88:17,20 114:5
115:8

leads 64:18

learned 94:21

lecture 117:19

legal 26:18,19 89:22

legible 95:12

legitimate 13:7

lender 21:11 49:15
66:12 71:21 89:25
105:11 116:4 124:11

lenders 18:12 26:5

letter 32:19,20

level 59:17 70:21,23,
24 71:2 116:2 124:10

Liability 14:14,20
15:18 16:5 98:19,24
99:21 102:5

liable 40:4 41:11,18

light 104:22

lights 30:20

limit 20:11

limited 14:14,20
15:18 16:5 19:12
20:11 40:24 46:24
47:3 97:17 98:18,24
99:21 102:5

list 16:20 69:8

literal 33:15

LLC 14:13,20 15:21
16:4,6,9,12,13,18,23
17:3,10,11,14,24

18:7,19,20,22 19:2,6,
19,24 20:12 46:9,10
47:8,13 50:8 51:7,15
53:9,17,22 54:5,10,
16 55:6,11,19,25
56:8,13,16,20,25
57:6,10,19 58:3,8,16
63:3 70:22 74:15
75:2,13 93:4,17,22,
24 94:6,10,18,20,22
95:3,4,8 97:18 98:17,
23 99:17 100:10
101:3,9 102:11,12,18
103:11 104:25 105:6,
16,25 106:5,9,15,18,
22 107:15 108:23
109:22 110:10,20
115:17,18 116:23
118:4,8,12,14,16,20
121:10,24 122:4,16

LLP 12:12 26:6

loan 18:9,13 20:6,22
21:8 22:2,5,8,11,15,
19 23:4,9,16,18,25
24:5,8,16,19 25:17,
23 26:12,22,24
27:11,17 28:5,16,20,
21 29:22 30:16,17
31:7,10,16,19,23
32:4 33:8,17,24 34:5,
18 35:14,21,24 36:20
37:6,13 38:14,22
39:9,12,22 40:20,23
41:8,11,19,25 42:5
43:8,13,19 44:6 45:4,
16 46:4,13,18 47:2,9,
14,20 48:10 49:2
58:6,19 59:2 60:4
61:13,20,25 62:20
63:9,14,18,22 64:6,
11,14,20 65:13,18
66:8,23 67:9,11 69:5,
18 71:22 72:4 74:6
80:15 88:22 89:9,13,
19,23 90:10 92:4
95:8 99:18,19
109:13,17,23 110:6
113:25 115:6 116:22
119:3 123:17

loans 28:8 38:23

log 104:3

long 122:17

looked 84:6 104:12

lost 111:6

lot 114:4

M

Mac 18:10 20:2 22:22
84:2

made 9:2 30:25
31:13 39:14 40:2
45:5,10,13,16 69:16
71:23 78:25 79:11
80:25

maintained 105:9

make 8:17 13:10
15:25 40:23 49:18,21
50:3 54:24 77:7 79:8
95:18 102:8 112:9
115:12 116:20
117:10,14

makes 8:10

making 80:4,19
89:23

Management 6:19
19:8 24:2 27:22 28:4,
15,24 30:9 107:22
110:22

manner 30:23

March 98:25

mark 11:17,19 14:12
20:21 72:10 88:24
120:8,9 121:8,10,19

marked 11:22 14:15,
18 20:23 21:5 72:13
91:2 98:19 101:4
122:10

Markets 21:13

Martin 10:11 12:11
24:21,24 25:6 26:6
27:4,12 28:25 30:4
31:3 35:3,10,15 36:8,
22 37:8 40:7 41:14
44:11,17 45:8,20,22
49:3 52:15,25 54:17,
20,23 59:3 60:11
61:14 62:2,21 63:23
64:12,21 69:7 70:4,
14 72:24 74:9 76:11

Case 19-34054-sgj11 Doc 3590-32 Filed 10/27/22 Entered 10/27/22 13:19:45 Page 44 of
Case 19-34054-sgj11 Doc 2859-31 Filed 09/11/21 Entered 09/11/21 23:41:13 Page 44 of
Exhibit 82     Page 44 of 126

80:2,22 83:19 86:20, 24 89:20 95:17 103:19,24 104:9,16 108:5 109:25 110:23 112:2,8,16,21,25 113:8,13,19 114:11, 12 116:12,20 117:4, 6,21,22 122:12 123:3

**material** 80:4 109:3, 5

**math** 107:17

**Matt** 42:7,8,10,11 60:15 69:10 70:19 71:12 75:23 87:12,13 88:5

**matter** 9:14,16 10:21 11:24 13:22 32:21,22 115:23 116:8,10 123:20 124:2,20,21

**Mcdermett** 77:15 87:14 88:5

**Mcgeoch** 119:24 120:14

**Mcgeoch's** 119:25 121:7

**Mcgraner** 42:8,15 60:15 61:9 60:10,25 70:19 71:6,13 75:23 76:15 77:17 87:12 88:5 99:12

**Mckenzie** 79:4 83:21,24 84:4,16,22, 24

**means** 79:18 80:8 107:5,9

**meant** 77:8

**mechanics** 115:6

**memorialized** 100:21,23

**memory** 119:12

**mentioned** 32:20 46:20

**merging** 83:4,18

**methodically** 111:10

**middle** 25:3

**Mill** 52:23 53:21 75:6

**million** 100:15

**mind** 39:24 47:23 59:13

**mine** 11:5,6

**minute** 85:14 100:13

**minutes** 82:15 85:25 86:23

**minutes'** 111:7

**mischaracterizing** 114:9

**missing** 54:15 84:12

**misstated** 47:5

**mistaken** 103:22 104:20

**modified** 102:21,25 106:24 107:6,10,19

**moment** 29:11 99:8

**Monday** 72:21

**money** 115:7

**moneys** 40:22

**morning** 121:19

**Morris** 99:11

**motion** 9:19 10:10 11:2 14:25 29:14 30:13 31:15

**move** 98:16

**Multi-family** 122:7

**multifamily** 14:13,19 15:18 16:4 70:22 93:24 94:5,22 95:4 98:17,22 100:10,18

**multiple** 26:19 37:5 67:3

**mute** 108:14

**N**

**names** 59:8 60:8,21 61:2,5

**National** 21:12

**nature** 14:4

**necessity** 34:16

**needed** 22:22 25:14 100:16

**negotiate** 118:8

**negotiated** 17:25

**negotiation** 15:10 17:13 20:13 115:18

**Nexpoint** 25:12 43:13 44:18 59:9,12, 14 60:15 69:11 70:20 71:7,11 76:6,21 78:11 88:6,11 90:13 116:15 117:23 118:18

**non-real-estate-lawyer** 115:21 123:24

**note** 92:12

**notice** 9:10 10:25 11:21 12:10 28:7 111:3,14

**notices** 27:18,20 28:14 29:3,6

**number** 91:18

**numbers** 122:18

**O**

**Oak** 52:23 53:21 75:6

**Oasis** 57:14

**oath** 7:25

**object** 10:11 116:17

**objection** 27:4,12 28:25 30:4 31:3 35:3, 10,15 36:8,22 37:8 40:7 41:14 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 108:5 109:25 110:23 116:20 117:7, 11

**objections** 99:24 117:7

**obligations** 38:18

**obtain** 33:5 35:7

**obtained** 39:10 40:22

**obtaining** 32:16

**obvious** 9:17

**occasion** 18:4

**occasions** 67:4

**occurred** 40:18

**offering** 13:21

**offline** 111:12 119:10,13

**Olde** 52:7

**open** 32:21 92:12 93:3

**operating** 59:16 88:9,11

**operation** 41:8

**opinion** 26:3,18 37:4,9 40:8 83:10

**opinions** 26:19

**opportunity** 8:16 112:13 113:6

**opposed** 15:7 29:8 87:8

**opposition** 11:4 29:13,19 30:13 31:14 43:17

**order** 118:20

**org** 65:11,15 67:14, 21 72:12 73:22 74:12,13,15,20 79:2, 6,9,11 80:5 81:12 82:4,5,24 83:5,24 85:18 89:17,23 90:8, 21 110:5,8,12

**organization** 66:6

**organizational** 18:11 62:23 63:17,20

**original** 94:10 97:10, 24 99:17 102:9 107:15,19

**outstanding** 83:23

**owner** 83:4,6,18 95:20 110:22

**ownership** 18:5,17, 18 19:23 20:10,17 46:23 47:7,12 50:7, 11,16 51:6,15,22 52:3,8,20 53:17,23 54:5,10 55:12,21 56:2,7,12,20 57:2,7, 11,14 58:2,7,8,10,15 74:16 75:2,12 93:16 94:18 95:2,6 101:17, 20 109:22 110:9,15, 20 118:20

**owns** 20:3

**P**

**p.m.** 72:22 81:8 109:7,8

**pages** 122:17

**Pardon** 54:19

**Park** 51:21 54:4,9

**part** 43:15 47:9 64:13,17 66:18 70:19 73:18 89:21 110:5

**parties** 16:17,19,22 17:23 20:10 28:19 90:2,12 101:21 108:3 109:12

**partner** 7:10 11:5,6 60:21 68:15 93:19,20 94:19 114:23,25 120:2

**partners** 7:11 10:19 16:23 17:3 19:6

**Partnership** 19:13 40:24 46:24 47:3

**party** 9:21 16:22 17:11,17 47:17 105:24

**pass** 95:13 112:6 123:3

**passing** 61:4 83:13 112:4

**past** 84:19

**Patrick** 88:24 120:8,

9,15,18

**Paul** 60:25 69:10 70:25 86:7,13,14 87:15 88:6 91:6,22, 24 92:17 93:8 98:2, 12 109:21 110:14

**penalty** 6:10

**people** 45:14 59:9 67:20 69:24 70:7 81:20 83:14 87:11 120:11

**percent** 19:7,9 47:18 50:12,13 51:9 53:11, 18,24 54:6,11,12 55:13,21,22 58:10,11 59:20 74:16,17 93:19,20 94:19,20 107:21 110:15,16,22

**percentage** 19:7,9 51:15,22 52:3,8 54:11 55:12,21 101:10,15 106:17,20 110:18

**percentages** 18:5, 18 19:11 20:17 51:7 52:21 56:2,7,12,16, 20,21 57:2,7,11,15 107:13,14,18,19 108:2

**perfectly** 113:16

**perform** 67:7

**perjury** 6:11

**permitted** 41:9

**person** 120:22

**personal** 10:5

**personally** 15:7 32:23

**petition** 112:10

**Phillips** 6:1 7:1,9 8:1, 25 9:1,8,9,13,20 10:1,4 11:1 12:1,11, 19 13:1,16,19 14:1,3, 6 15:1,4,8 16:1 17:1, 12,22 18:1,3,17 19:1, 16,21 20:1,9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1, 6,9,17,23 27:1,8,22

28:1,3,9,13,18,22 29:1,20,22 30:1,14, 18,24 31:1,15,22,25 32:1,9 33:1,5,21 34:1,2,7,18,20 35:1, 6,18 36:1,2,11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1 43:1, 4,16,21,24 44:1,4,13 45:1,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,23 59:1,6 60:1, 7,9,14 61:1,10,17,22 62:1,12 63:1 64:1,4, 23 65:1,5,9,16 66:1,5 67:1,7 68:1,3,15,17, 24 69:1,3,16,22 70:1, 8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 19 89:1,12,17 90:1, 10,20 91:1,21 92:1, 18 93:1 94:1 95:1 96:1 97:1 98:1,5,8,11 99:1 100:1 101:1 102:1 103:1,10 104:1,14 105:1,15,23 106:1,7,13 107:1,24 108:1 109:1,15,19 110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 13,24 117:1 118:1,4, 7,17,19 119:1 120:1, 13 121:1,2,4 122:1, 24 123:1,16 124:1,2

**Phillips'** 10:8 12:24 14:8 15:13,17,20 26:25 27:25 29:13,24 30:12 31:13 32:14 33:23 35:23 42:3 43:6 45:2 58:21 59:13 88:3 89:8 92:2 102:3,16 104:24 109:11 116:7 122:3 123:2 124:23

**phone** 108:10,11

**place** 56:16 97:20

105:18,20

**played** 22:14

**pleadings** 30:25

**point** 42:8 83:21 84:16 113:4

**portfolio** 95:21

**portion** 59:25 90:5 101:23 107:11

**position** 7:8 13:17 27:25 28:22

**positive** 101:24

**potential** 34:10 35:21 37:7 40:5 97:16

**practice** 32:15 117:20

**precluded** 13:20

**preparation** 15:9 33:20 49:12 60:19 68:23 73:18 91:14

**prepare** 49:8 106:2

**prepared** 10:23 12:23 48:24 50:18 65:15 67:21

**preparing** 11:11 15:3 65:25

**presented** 34:10 112:11

**pretend** 52:16

**pretty** 113:16

**previous** 28:8 100:17

**previously** 28:12 76:4 86:7 91:25 98:14 100:14 120:9

**primarily** 46:20 68:7 90:12

**prior** 44:23 48:3 51:11 56:3,8,22 57:3, 15 74:6 82:14 94:9 100:18 105:4 106:25 107:7 119:5

**privilege** 10:13,14, 18 36:14 104:3

**pro** 107:20

**problem** 8:12 33:14

**procedure** 9:2 112:17 117:9

**procedures** 7:22

**proceeding** 9:3

**PROCEEDINGS** 6:5

**proceeds** 38:22 39:8 41:20,21,24

**produced** 104:2,11

**Professional** 34:21

**Project** 15:22 16:15 22:18,25 46:6 72:11 105:10 118:21 124:24

**pronounced** 6:25

**proof** 9:21

**properties** 22:21 52:19 66:11 94:18

**property** 46:6 51:3 59:17 70:23 96:21

**property-level** 22:16 25:12 40:16

**proportional** 107:20

**proposed** 95:22

**protocol** 7:2

**provide** 9:6 10:23 22:23 25:8 46:5,20

**provided** 38:23 39:2 48:11 49:4,7 83:14 119:5

**providing** 25:3 26:18

**provision** 28:7 39:17

**pulled** 100:13

**purpose** 15:24 16:11,13 46:4

**purposes** 66:19

**pursuant** 8:25

**put** 90:23 108:13

**Q**

**question** 8:7 10:13, 18 13:7,18 23:8 24:24 25:9 32:8 43:23 47:5,11 65:18 70:16,18 83:2,9,11, 17 85:11,19 103:16 110:25 123:6,8,11, 20,23

**questions** 10:24 13:5,12 106:16 111:25 112:3,13,15, 20 113:11,21 114:5 115:5 117:15,16 119:14 122:2 123:7, 12,13

**quickly** 37:21

**quote** 80:11

**R**

**Rachel** 11:6 72:22 73:7,11 75:6 78:23 79:12 80:24 81:10,19 82:3,6,13,16,24,25 83:22 84:8 85:15,16, 24,25 87:10 88:15

**Rachel's** 85:14

**raise** 27:9 28:19 104:18

**raises** 103:15

**ran** 104:17

**Ranch** 56:6

**rata** 107:20

**RE-EXAMINATION** 124:15

**read** 19:4 29:18 112:16 121:7 123:9, 21

**reading** 16:20 121:9 123:10,22 124:6

**ready** 82:6,25

**real** 7:11 10:19,20 43:12 59:15 115:25 118:17 124:9

**reason** 80:10

**reasons** 54:18,21

**recall** 59:8 61:4

**receive** 85:21 86:10 89:24 91:21 92:19

**received** 26:2 41:20, 24 49:21 82:10 98:4, 6 103:9

**receiving** 28:14

**recess** 45:24 86:25 108:8,19

**recipient** 77:23 84:17

**recipients** 78:21 91:18

**recollection** 51:13 76:8 77:2,10 79:10

**reconvene** 86:23

**record** 6:16 8:11 54:24 77:7 111:4 117:2

**Recross** 113:8

**redirect** 113:6

**reduction** 107:21

**reexamination** 112:11

**reexamine** 112:7

**refer** 6:23 9:16 16:4 17:2,7 21:25 79:15 102:11,12

**reference** 33:22 51:2 74:14

**referenced** 75:24 78:7

**referencing** 26:10 84:19

**referred** 77:22 93:17 101:6 102:9 124:22

**referring** 6:20 14:5 22:4 26:8 30:16 93:22 101:16 102:13 116:10

**refers** 26:25 74:3 93:5,25 95:2

**reflect** 28:22 51:14 58:2,9 63:7 83:6 89:11 107:18 108:3 110:14,20 111:5

**reflected** 51:8,22 52:3,8 53:9,17,23 54:5,11 56:2,8,13,17, 21 57:2,7,11 67:18 81:20 89:15 108:2

**reflecting** 55:20 58:6 95:21 101:14

**reflection** 57:19 75:12 110:9

**reflects** 28:3 50:7,11 55:12 94:18 95:6

**refresh** 76:8 77:2,10 79:9

**REIT** 65:2 83:22 85:18 86:5

**reiterating** 83:23

**related** 67:11 79:24 110:4

**relates** 18:14 89:8

**relating** 10:24 28:15 32:4 33:24 60:9 67:5, 17 68:3,5,19 69:5,19 88:21 89:17 98:12 103:10

**relation** 11:9

**relationship** 100:17

**rely** 71:4

**relying** 71:22

**remainder** 101:23

**remaining** 83:2 85:11

**remember** 114:7 119:16

**remote** 6:2,9

**Renaissance** 54:9

**repeat** 21:10

**repeating** 55:20

**rephrase** 47:5

**reporter** 8:11 11:17, 18 111:6 119:9

123:10,22 124:4,6

**represent** 17:16,19 23:2,8 24:7,12,13,16 25:2 29:4,9 31:8,15, 22 36:20 65:12 84:25 95:16 103:20 105:24

**representation** 23:12 26:25 28:23 32:11,17,25 33:7 34:4,9 35:13,23 36:4, 5,13 37:2,5 43:21 45:2,3 59:23 60:10 62:19 63:2 72:2 109:12 114:4 115:22, 25 116:25 123:25 124:8,20

**representations** 27:10 35:2 44:23 66:23 67:3,10

**representative** 68:14 71:14 76:5,10 77:4,12,19 78:4,10 91:25

**representatives** 61:12,19,23 88:16

**represented** 24:9 25:11 26:17 28:4 29:7 31:18 43:18 63:7,13 64:10,19 65:16 85:6 105:14 108:21 109:15 113:24 116:14 123:16

**representing** 9:20 87:23,24 92:3 118:18

**represents** 10:3

**reps** 67:4,16,17 68:4, 19 69:4,18 71:22

**requested** 38:24

**require** 32:9

**required** 9:6 13:5 19:18 32:21 34:11 116:4 124:12

**requirement** 32:13

**requires** 34:25

**reserve** 52:2 55:11 112:7

**reserving** 99:23

**respect** 9:8 13:17 20:10 28:23 32:15 44:8 53:8 55:11,19, 25 56:11,15,25 57:6, 10,13,17 58:5 74:25 75:5,11 99:15 106:5, 16 109:22 116:18,22, 23

**responded** 98:9

**responds** 85:25

**response** 13:7,8 82:14,23 85:24

**responses** 9:13

**responsibilities** 36:3,7

**rest** 21:24

**Restated** 98:18,23 99:20 100:10 102:4 122:9

**restructure** 66:18

**retention** 32:2,10,16, 19,24 106:4

**retraded** 100:12

**reverts** 93:15

**review** 8:16 38:6 49:24 51:11 73:17 91:13 109:3

**reviewed** 11:2 12:15, 21 86:7

**reviewing** 11:7 38:8 60:18

**Ridge** 52:23 53:15 56:19 74:21

**rights** 38:18

**rise** 37:6 40:5

**risk** 9:17

**risks** 36:18

**River** 52:2

**ROB** 6:7

**Robert** 6:17

**role** 7:8 15:8,13,17, 20 17:12 22:11,13

46:12,17 48:8 49:12 61:3 65:10 78:12 92:3 102:3,17 104:24 105:8 106:14 115:8 116:7 122:3 124:23

**room** 119:8

**Rule** 8:25 9:3,10 15:3 58:21

**rules** 7:20 34:21 117:8

**run** 7:11

---
**S**
---

**S-A-U-T-E-R** 68:12

**Sam** 11:6 72:22 73:7, 11 75:21 78:23 81:19 82:3,16,24 84:8 85:15,16,25 87:10 88:15

**Sam's** 75:6 82:13 85:24

**Sauter** 11:5 68:7,12, 13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 114:21,22,25 115:10

**schedule** 47:19 48:4,6,9,13 49:19,20 50:7,21 51:12 58:5, 19 59:2 63:21 64:18 66:7 67:19 69:17 74:5,14,24 75:8,10 89:18 90:9 95:7 100:24 101:8,13,14 106:21 108:2 110:5, 19 121:14

**schedules** 49:5,7,9, 13,19 50:17

**scope** 59:22 111:2, 13 115:21,24 123:25 124:7,19

**scrap** 111:12

**screen** 12:6,8 21:2,5 72:20 87:3 90:24

**scroll** 12:17 19:2 25:18 27:15 47:19 50:20 55:9,16 72:14

73:23 74:19 75:4,15
81:3,22 84:11,13
85:12,23 92:24 93:7,
13 94:15,24

**section** 10:20 25:20
27:17,19 28:2,20
34:22,25 35:9 37:20,
23 38:7,11,16,21
64:13,17

**select** 121:12

**selected** 10:8

**seller** 97:16,17

**separate** 43:15 60:3
108:11 117:14

**separately** 23:6

**September** 20:22
21:8 72:21 75:19
81:25 84:9 85:10,13

**services** 88:7 117:24

**set** 19:23 21:9 58:15
106:17,21 123:7

**sets** 12:18

**setup** 40:19

**severally** 39:21 40:4

**share** 85:18 86:5

**shared** 88:7 117:24

**short** 63:5 100:15

**show** 90:9

**showing** 75:25

**shown** 55:6

**shows** 101:22

**sic** 91:5

**side** 25:14 59:25 71:2
85:3 90:13,15

**sign** 112:17

**signature** 119:25

**signoff** 79:3 84:22

**silo** 43:12,13 59:16

**siloed** 105:8

**similar** 32:18 74:6
80:15

**Similarly** 96:10

**simple** 102:8

**simpler** 16:2

**simply** 83:23 104:20

**sir** 6:24 7:6,15 8:2,5,
14,18,22 9:4,11,15,
25 10:6 12:14,16,22
13:2 14:10,23 15:11,
15 16:25 17:15,18
18:15,21 19:3,15,20
20:19 21:4,17,20,22
22:6,9,12 23:6,11,23
24:6 26:14 27:5,23
29:16 31:24 32:5,12
33:12,18 34:23 35:4
37:14,17 38:12,20
39:16,23 40:8 41:2,5
43:5 45:10 46:11
47:15 48:7,23 49:4,
10,23 50:2,5,10,14,
19,25 51:5,10,17,24
52:5,10 53:13,20
54:2,8,13 55:15,23
56:5,10,14,18,23
57:4,8,12,16,21
58:13 59:4 60:20
62:14,23 63:4 64:7
66:25 67:6 68:21,25
69:21 70:5 71:9,24
72:5,8 73:12,14,20
74:10,18 75:3,14
76:3,7,12,17,24 77:6,
13,16 78:2,15,18
79:20 80:9 81:2,17,
21 82:8,11,19,22
83:20 84:6,10 85:7,
22 88:13 89:6,10,14
90:16,22 91:7,10,16,
20,23 92:5,20 93:12
94:3,14,23 95:5,10
96:3,20,22 97:19
98:7 99:3,6 100:25
101:18 102:15 106:6
109:14,18 110:11,17
111:22 114:24 115:3,
19 119:11,17,21
120:4,12,16,20,24
122:6

**sit** 37:3 65:23

**sloppy** 14:2

**sole** 21:13

**sooner** 92:16

**sort** 22:23 49:14
59:16,18 66:16 78:11
105:10

**speak** 68:22 69:3

**speaking** 44:15
70:10,11,12 71:7,11
84:19 106:23 117:10

**specific** 59:8 61:5

**specifically** 14:6
92:14 93:6 115:25
124:9

**speculating** 65:19
80:21

**speculation** 88:3

**spell** 68:8

**spend** 11:10

**spoke** 45:6 62:8
68:25 69:24 70:10

**standard** 112:17

**started** 15:3 117:21

**starting** 52:18
119:20 122:18

**Starwood** 95:20

**state** 6:15

**statement** 26:8,12
29:24 31:13 101:19

**stating** 9:17

**Statutory** 80:7 85:4

**stipulate** 99:13

**Stoney** 52:23 53:15
74:21

**stop** 108:14

**strike** 61:21

**string** 89:7 90:19
92:7 119:19

**structure** 18:11
46:24 59:19 62:23
66:10,19 83:9 95:19,
22 96:12,17 97:8,20
102:21,25 118:20
119:2

**structures** 52:25

**structuring** 16:15
59:22 62:6,14

**subject** 93:22

**submit** 81:14

**subsequently** 94:21

**subsidiaries** 46:11
58:7 67:5,12,18 68:5,
20 69:6 83:10

**substance** 67:23
79:24 84:20

**substantially** 80:14

**substantive** 83:8,11,
17

**sufficiently** 95:12

**Summers** 57:18

**Support** 11:3

**suppose** 64:15

**suspicion** 18:8 28:6

---

**T**

**table** 24:25

**takes** 57:22

**taking** 90:10

**talk** 16:9 20:4,5
104:23 108:9

**talked** 46:15 66:17

**talking** 8:9 11:4 16:8
17:6 59:21 100:11

**talks** 38:16

**tape** 104:17

**tax** 63:16 64:25

**team** 59:10 69:11

**technical** 109:7

**telephonic** 85:8
103:3

**term** 14:2,5 23:18,20
35:20 100:20

**terms** 20:2 26:18
45:13 87:9 101:16
115:21 123:24

**testified** 66:15 76:4,
19 79:7 91:25

**testify** 12:23 73:18

**testifying** 30:23 43:3
60:6

**testimony** 6:10 10:3,
4,5 13:21 26:23 30:2,
21 68:23 91:14 101:7
105:4 106:13 117:7

**Texas** 34:21 120:5

**thing** 16:8 17:7 96:17

**things** 59:25 70:20
71:2

**thought** 113:3

**thoughts** 121:15

**Tim** 120:18,22

**time** 8:10,20 11:10
18:4 19:12,15 27:11
45:22 50:17 60:22
68:6 86:16 96:12
97:22 114:16,22
121:18

**to-be-formed** 95:3

**today** 9:18 10:3
12:25 13:4 26:23
30:3,21 37:3 65:24
73:19 91:15 116:14
118:5,9

**top** 120:17

**topics** 9:8 10:25
12:18,21,25 13:13

**tortured** 113:14

**tough** 95:18 96:10

**Towne** 52:7 56:11

**trace** 94:5

**transaction** 15:23
25:15 60:24 105:10

**transactions** 52:17
114:17

**transcript** 8:16

**transfer** 39:8

**transfers** 39:15

**transmitted** 110:13

Index: true..yesterday

**true** 21:23 22:7 44:25
67:12 69:19 99:4
105:23

**Trust** 80:8 85:4

**truthful** 6:10 13:8

**truthfully** 13:6

**turn** 23:15

**typical** 64:25

**typically** 26:21 42:7
44:19 59:23 63:15

**typo** 79:17,19

**typos** 79:13,15 80:11
83:13

**U**

**Uh-huh** 72:23

**ultimately** 95:3

**unclear** 8:10

**underlying** 51:3
68:18 96:21

**understand** 6:22
7:20,24 8:7,13,15,23
9:12 10:2 13:11,23
14:9 15:12 17:5 22:3
37:11 43:3 47:10
70:16 102:13 107:4,
5,9 113:2 124:18,22

**understanding** 9:24
16:24 19:11 36:25
37:15 39:11,19 40:11
50:16 66:10 69:15,23
71:4 85:5 100:11
104:24 106:19 109:2
113:23 118:13
120:21 123:15
124:18

**understood** 71:20,
25

**undertake** 32:25
36:2

**undertaken** 36:6

**undertakes** 32:10,
17

**undertook** 34:8

**Unicorn** 15:22 16:15
22:18,25 46:6 72:11
90:25 105:10 118:21
121:10,12 124:24

**universe** 70:3

**unpack** 107:8

**updated** 79:5

**updating** 106:25
107:7

**upright** 48:19

**V**

**vague** 116:17

**version** 74:7,25
75:11

**versions** 86:4

**Victoria** 51:21

**video** 108:14

**videoconference**
6:2,9

**view** 48:19

**virtually** 74:24 75:10

**Vista** 56:19

**Vosburgh** 14:11
20:20 123:5

**W**

**Wait** 8:7

**waiting** 79:3 84:21

**waive** 10:15

**waiver** 33:6,11,17,23
34:3,11,17 35:7
114:19

**walk** 52:2 121:15

**Walker** 56:6

**wanted** 81:11

**warranties** 66:24
67:3,4,11,16,17 68:4,
19 69:5,18 71:23

**warranty** 72:3

**wearing** 44:14,18
45:6 70:9

**week** 92:13

**West** 56:16

**whomever** 90:3

**Wick** 6:1 7:1,9 8:1,25
9:1,8,9,13,20 10:1,4,
8 11:1 12:1,11,19,24
13:1,16,19 14:1,3,6,8
15:1,4,8,13,17,20
16:1 17:1,12,22 18:1,
3,17 19:1,16,21 20:1,
9 21:1 22:1,10,14
23:1,2,8 24:1,7,9
25:1,2 26:1,6,9,17,
23,25 27:1,8,22,25
28:1,3,9,13,18,22
29:1,13,20,22,24
30:1,12,14,18,24
31:1,13,15,22,25
32:1,9,14 33:1,5,21,
23 34:1,2,7,18,20
35:1,6,18,23 36:1,2,
11,16,19 37:1,3 38:1
39:1 40:1 41:1,6,17
42:1,3 43:1,4,6,16,
21,24 44:1,4,13 45:1,
2,5,13 46:1 47:1
48:1,8,24 49:1,8,18
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1,21,23 59:1,6,13
60:1,7,9,14 61:1,10,
17,22 62:1,12 63:1
64:1,4,23 65:1,5,9,16
66:1,5 67:1,7 68:1,3,
15,17,24 69:1,3,16,
22 70:1,8 71:1,20,25
72:1 73:1,9 74:1 75:1
76:1,20 77:1 78:1,17,
24 79:1,8,11 80:1
81:1,19 82:1,10,21
83:1,15 84:1 85:1,20
86:1,10 87:1,19 88:1,
2,19 89:1,8,12,17
90:1,10,20 91:1,21
92:1,2,18 93:1 94:1
95:1 96:1 97:1 98:1,
5,8,11,19 99:1 100:1
101:1 102:1,3,16
103:1,10 104:1,14,24
105:1,15,23 106:1,7,
13 107:1,24 108:1
109:1,11,15,19

**Wick-phillips**
106:14

**Williams** 62:16,18
108:24

**Willis** 7:2

**Wills** 6:1,7,17,18 7:1,
3,4 8:1 9:1 10:1 11:1
12:1,4 13:1 14:1,18
15:1 16:1 17:1 18:1
19:1 20:1,25 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1,7 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1,3 47:1 48:1,5
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1,17 71:1
72:1,19 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1,20
86:1 87:1,6 88:1 89:1
90:1 91:1 92:1 93:1,
11 94:1 95:1 96:1
97:1 98:1 99:1 100:1,
8 101:1 102:1 103:1,
15,22 104:1,19,22
105:1 106:1 107:1
108:1 109:1,10 110:1
111:1,21 112:1,12
113:1,20 114:1 115:1
116:1,13 117:1 118:1
119:1 120:1 121:1
122:1 123:1,8,11
124:1,17

**WINOGRAD** 103:6,
12 108:12,17

**withholding** 103:24,
25 104:4,5

**word** 121:8

**words** 87:22 88:10

**work** 32:3 68:18
89:9,12,16 118:21
120:25

**worked** 28:8,9

**working** 85:17 116:2
124:10

**works** 16:10

**world** 32:12

**worry** 100:2

**worth** 111:7

**writing** 75:22

**writings** 63:6

**written** 26:3 34:25
35:7

**Y**

**yesterday** 68:25

# EXHIBIT B

Case 19-34054-sgj11 Doc 2650-39 Filed 07/27/21 Entered 07/27/21 11:32:56 Page 1 of 6
Case 19-34054-sgj11 Doc 2608 Filed 07/26/21 Entered 07/26/21 17:45:21 Page 1 of 6
Exhibit 82    Page 50 of 126          Docket #2608  Date Filed: 07/26/2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Kenneth H. Brown (CA Bar No. 100396)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

## DEBTOR'S AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION TO
## WICK PHILLIPS GOULD & MARTIN, LLP

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Bankruptcy Procedure 7030,

incorporating by reference Federal Rule of Civil Procedure 30(b)(6), Highland Capital

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210726000000000007

Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned

chapter 11 case ("Bankruptcy Case"), shall take the deposition upon oral examination of Wick

Phillips Gould & Martin, LLP ("WPGM") in connection with the *Debtor's Motion to Disqualify*

*Wick Phillips Gould & Martin, LLP as Counsel to HCRE Partners, LLC and For Related Relief*

[Docket No. 2196] (the "Motion to Disqualify") through one or more officers, directors, partners,

agents or other representatives, who shall be designated to testify on WPGM's behalf regarding

all information known or reasonably available to WPGM with respect to the subject matters

identified in **Exhibit A** attached hereto on **August 11, 2021** commencing at **9:30 a.m. Central**

**Time**, or at such other day and time as the Debtor determines upon reasonable notice.

The Debtor requests that WPGM provide written notice at least five (5) business days

before the deposition of the name(s) and employment position(s) of the individual(s) designated

to testify on WPGM's behalf.

**The deposition will be taken remotely** via an online platform due to the coronavirus

pandemic such that no one will need to be in the same location as anyone else in order to

participate in the deposition and by use of Interactive Realtime.  Parties who wish to participate

in the deposition should contact **Kenneth Brown**, Pachulski Stang Ziehl & Jones LLP, at

kbrown@pszjlaw.com **no fewer than 48 hours before the start of the deposition** for more

information regarding participating in this deposition remotely.

Dated:  July 26, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
Kenneth H. Brown (CA Bar No. 100396)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
kbrown@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

## DEFINITIONS

1.      "<u>Allocation</u>" shall have the meaning ascribed to it in the Brief.

2.      "<u>Brief</u>" refers to the *Debtor's Memorandum of Law in Support of Motion to Disqualify Wick Phillips Gould & Martin, LLP as Counsel to HCRE Partners, LLC and For Related Relief* [Docket No. 2197].

3.      "<u>Concerning</u>" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

4.      "<u>LLC Agreement</u>" shall have the meaning ascribed to it in the Brief.

5.      "<u>Loan Agreement</u>" shall have the meaning ascribed to it in the Brief.

6.      "<u>Restated LLC Agreement</u>" shall have the meaning ascribed to it in the Brief.

7.      "<u>Revised Allocation</u>" shall have the meaning ascribed to it in the Brief.

## TOPICS

**Topic No. 1:**

WPGM's role Concerning the LLC Agreement.

**Topic No. 2:**

WPGM's role Concerning the Allocation.

**Topic No. 3:**

WPGM's role Concerning the Loan Agreement.

**Topic No. 4:**

WPGM's role Concerning the Restated LLC Agreement.

4

**Topic No. 5:**

      WPGM's role Concerning the Revised Allocation.

**Topic No. 6:**

WPGM's representation of parties in connection with the Loan Agreement.

**Topic No. 7:**

WPGM's representation of parties in connection with the LLC Agreement.

**Topic No. 7:**

WPGM's representation of parties in connection with the Restated LLC Agreement.

# EXHIBIT C

1          IN THE UNITED STATES BANKRUPTCY COURT

          FOR THE NORTHERN DISTRICT OF TEXAS

2                    DALLAS DIVISION

In re:                         )

3                                )

HIGHLAND CAPITAL MANAGEMENT,   )  Chapter 11

4  L.P.                          )

                                )

5    Debtor.                     )  Case No.:19-34054-sgj11

                                )

6  *******************************************************

7              ORAL ZOOM DEPOSITION OF

8                 ROBERT L. KEHR

9               SEPTEMBER 16, 2021

10                 Volume 1 of 1

   *******************************************************

11

12          ORAL ZOOM DEPOSITION OF ROBERT L. KEHR,

13  produced as a witness at the instance of the Debtor and

14  duly sworn, was taken in the above-styled and numbered

15  cause on the 16th day of September, 2021, from 10:30

16  a.m. to 2:01 p.m. , before ASHLEY ELIZONDO, CSR No. 9465

17  in and for the State of Texas, reported by machine

18  shorthand, in Los Angeles County, California, pursuant

19  to the Texas Rules of Civil Procedure and the provisions

20  stated on the record or attached hereto.

21

22  Job No. 4800824

23

24

25

                                        Page 1

APPEARANCES:

3 FOR NEXPOINT REAL ESTATE PARTNERS:
4      Brant C. Martin, Esq.
       Lauren K. Drawhorn, Esq.
5   WICK PHILLIPS
    100 Throckmorton Street
6   Suite 1500
    Fort Worth, Texas 76102
7 Telephone: 817-332-7788
  E-mail: brant.martin@wickphillips.com
8    lauren.drawhorn@wickphillips.com
9 FOR HIGHLAND CAPITAL MANAGEMENT:
10     Kenneth Brown, Esq.
       La Asia Canty, Esq.
11  PACHULSKI STANG ZIEHL AND JONES
    10100 Santa Monica Boulevard
12  Floor 13
    Los Angeles, California 90067
13 Telephone: 310-201-0760
   E-mail: kbrown@pszjlaw.com
14    lsc@pszjlaw.com
15 FOR UBS SECURITIES AND UBS AG LONDON BRANCH:
16     Shannon McLaughlin, Esq
    LATHAM AND WATKINS
17  885 3rd Avenue
    Suite 1000
18  New York, New York 10022
   Telephone: 212-906-4612
19 E-mail: shannon.mclaughlin@lw.com

Page 2

---

I N D E X

3  Appearances                              2
4  ROBERT L. KEHR
5       Examination by Mr. Brant C. Martin      6
6  Changes and Signature                   142
7  Reporter's Certificate                  144
8  Further Certificate                     146
9

EXHIBITS
10 NO.         DESCRIPTION              PAGE
11 Exhibit 1    Highland Expert Disclosure     51
12 Exhibit 2    Kehr Engagement Letter         96
13 Exhibit 3    HCMLP Expert Production         75
14 Exhibit 4    Release from Loan Agreement     98
15 Exhibit 5    Bridge Loan Agreement          100
16 Exhibit 6     Unicorn PSA's                 110
17 Exhibit 7    Email Re LLC's to be Formed    122
18 Exhibit 8    Email Re DST Structures        124
19 Exhibit 10   Mark Patrick Deposition        125
20 Exhibit 11    Original LLC Agreement        130
21 Exhibit 12   First Amended LLC Agreement    133
22 Exhibit 14    McGrander Declaration         116

Page 3

---

1    REQUESTED DOCUMENTS/INFORMATION
2  NO.      DESCRIPTION              PAGE
3       NONE
4
5       CERTIFIED QUESTIONS
6       NONE

Page 4

---

1 REPORTERS NOTE:  Please note this deposition was taken
2 via Zoom; therefore, due to the poor quality of the Zoom
3 videoconference, audio distortions, internet connections
4 freezing, extraneous room noise, et cetera,
5 unintelligent, indiscernible, or inaudibles may have
6 created inaccuracies in the transcription.
7       THE REPORTER:  Would the witness please raise
8 their right hand?  Do you solemnly swear to tell the
9 truth, the whole truth, and nothing but the truth?
10      THE WITNESS:  I do.
11        ROBERT L. KEHR,
12 having been first duly sworn was examined and testified
13 as follows:
14        EXAMINATION
15      THE REPORTER:  Will counsel present please
16 state their appearances for the record.
17      MR. MARTIN:  Good morning.  This is Brant
18 Martin from Wick, Phillips, Gould, and Martin, and with
19 me is also one of my partners, Ms. Lauren Drawhorn.  We
20 represent NexPoint Real Estate Partners, LLC.
21      MR. BROWN:  Good morning.  Kenneth Brown from
22 the Law Firm of Pachulski, Stang, Ziehl, and Jones
23 representing Highland Capital Management, the debtor.
24      MR. MARTIN:  Ms. McLaughlin, do you want to
25 make your appearance just for the record?

Page 5

2 (Pages 2 - 5)

1     MS. MCLAUGHLIN:  Certainly.  My name is Shannon
2 McLaughlin of Latham and Watkins, LLP, and we represent
3 UBS Securities, LLC, and UBS AG London Branch, as
4 creditors in the bankruptcy.
5 BY MR. MARTIN:
6     Q   All right.  Mr. Kehr, are you ready to proceed?
7     A   I am.
8     Q   Excellent.  Can you identify yourself for the
9 record please?
10    A   Yes.  I am Robert Kehr, and the last name is
11 spelled, K-E-H-R.
12    Q   And, Mr. Kehr, how are you employed?
13    A   I'm a partner in the law firm called Kehr,
14 Schiff, Crane, and Cohen.
15    Q   How long have you been a partner with that
16 particular firm, sir?
17    A   With slight name changes, this firm has existed
18 for 21 years.
19    Q   And are you a founder of the firm?
20    A   Yes.
21    Q   And where is the firm located?
22    A   In Los Angeles.
23    Q   Mr. Kehr, again, we haven't met prior to today;
24 is that correct?
25    A   Correct.

Page 6

1     A   Yes.
2     Q   So I'll represent for the record I am here at
3 my office is Fort Worth, Texas.  You, I believe, are in
4 your home in California; is that right?
5     A   I am actually in my office in --
6     Q   Oh --
7     A   -- In California.
8     Q   Excellent.  What city are you in in California?
9     A   Century City which is Los Angeles.
10    Q   I know it well.  And, Mr. Brown, I believe you
11 are in your home office in California; is that correct?
12        MR. BROWN:  Correct.  In Oakland.
13    Q   Mr. Kehr, if at any point in time during this
14 new day and age when we're doing many things remotely,
15 if at any time you can't understand me or there is a
16 technical difficulty, I want you to let me know; is that
17 all right?
18    A   Of course.
19    Q   And I'm going to assume from your curriculum
20 vitae that you have participated in depositions before
21 either as an attorney or as a witness; is that right?
22    A   It is.
23    Q   So -- and I'm going to also assume that there
24 have been many depositions that you have participated
25 in; is that accurate as well?

Page 8

1     Q   And other than me asking you how to pronounce
2 your name prior to us going on the record, that's the
3 only conversations you and I have ever had; is that
4 correct?
5     A   Yes.
6     Q   And you understand my name is Brant Martin, and
7 that I represent NexPoint Real Estate Partners in this
8 matter?
9     A   I understand.
10    Q   And I believe you've been retained as an expert
11 by Mr. Brown and his firm in support of their motion to
12 disqualify my firm from representing NexPoint Real
13 Estate Partners.  Do I have that correct?
14    A   You do.
15    Q   And we're here today on that matter, on the
16 motion to disqualify, and you are here to provide expert
17 opinions, correct?
18    A   Correct.
19    Q   And it's your understanding that you're not a
20 fact witness, right?
21    A   That is correct.
22    Q   I'm going to -- so -- and just for the clarity
23 of the record and since this is not being videotaped,
24 I'm going to clarify that this record is being taken --
25 taken by Zoom by videoconference.  You agree with that?

Page 7

1     A   Yes.
2     Q   Can you even estimate for the court how many?
3     A   I -- I couldn't begin.  It would be a blind
4 guess.  I've been practicing law for 50 years.
5     Q   What's your primary area of practice?
6     A   For the last many years, my practice has been
7 entirely transactional practice.  I started off thinking
8 I wanted to be a litigator.  Pretty quickly realized
9 that that was an unwise choice and transitioned into --
10 into transactional work.  Transition took, oh,
11 perhaps four or five years but was finished by -- was
12 finished at least 40 years ago.  So of the past 40
13 years, I've been a transactional lawyer and part of my
14 transactional practice, my non-litigation practice is
15 advising lawyers, law firms, and companies that provide
16 services to or through lawyers and law firms about
17 professional responsibility of lawyers.
18    Q   Excellent.  Since you are a transactional
19 lawyer, I am going to run through a couple of ground
20 rules that will make this hopefully go faster.  I'm
21 certainly aware that you're probably familiar with most
22 of them, but, again, in this day and age of Zoom and
23 pandemics, some of the ways we do things have changed.
24 So I'll ask for your patience as I go through some of
25 these.  Is that okay with you?

Page 9

3 (Pages 6 - 9)

1    A   Of course.  It's your deposition.
2    Q   Thank you.  I appreciate that.  First of all,
3  let me ask you this.  Is anybody else in the room with
4  you?
5    A   No.
6    Q   Are you in contact with anyone else in any way,
7  shape, or form whether electronically or otherwise --
8    A   No.
9    Q   -- While you're in the deposition?
10   A   No.  I'm not.  Well, my email is on the other
11  computer screen so I could receive an email I suppose.
12   Q   I understand.  That's fine.  That's kind of my
13  point, Mr. Kehr.  I would advise you that under the
14  rules, you're not allowed to contact anyone once you're
15  sworn in as a witness, that includes Mr. Brown, so
16  that -- and I would take the position that if you do
17  communicate with anyone while you're being deposed, that
18  I'm entitled to see those communications.  Whether you
19  agree with that or not, do you understand what my
20  position would be?
21   A   Yes.
22   Q   Again, if you have any technology issues, if I
23  happen to freeze up or Mr. Brown freezes up, I'll
24  represent to you that I'm more than willing to be
25  patient and to wait to make sure we get those taken care

Page 10

1  of so that we get your full and complete testimony; is
2  that fair?
3    A   Yes.
4    Q   You're doing a great job of it now, but I would
5  ask that you give me verbal answers to my questions
6  rather than uh-huh or huh-uh, because those are
7  difficult for Ms. Elizondo to take down.  Do you
8  understand?
9    A   I do.
10   Q   Sometimes, as you can probably already tell, I
11  tend to talk a little fast.  So if I don't -- if I do
12  talk fast or you don't understand one of my questions, I
13  welcome you to ask me to repeat it or rephrase it,
14  because if you answer one of my questions, I'm going to
15  assume that you understood it; is that fair?
16   A   It is.
17   Q   Excellent.  Is there any reason whether mental,
18  physical, or medical, that you cannot testify truthfully
19  today?
20   A   No.
21   Q   Have you ever gone by any other names other
22  than Robert Kehr?
23   A   No.
24   Q   Do you have any felony convictions or
25  convictions of moral turpitude in the last ten years?

Page 11

1    A   No.
2    Q   Have you ever been a party to a lawsuit in your
3  personal capacity outside of your law firm?
4    A   No.
5    Q   How many times have you testified either at
6  trial or a deposition or an arbitration?
7    A   I don't keep a running total of that.  I can
8  only say that I have testified at trial and at
9  deposition multiple times.
10   Q   Do you know what subject matters you've
11  testified on since you've come here to the cases?
12   A   Well, I've testified on the professional
13  responsibility of lawyers.  I testified on fiduciary
14  duties both in and outside of the lawyer context.  I've
15  testified several times on the reasonableness of legal
16  fees.  I've testified about some corporate law issues.
17  That's all I can think of at the moment.
18   Q   Fair enough.  When you've testified in those
19  previous matters, has it always been as an expert
20  witness?
21   A   I testified once that I can think of.  No.
22  Twice that I can think of as percipient witness.
23   Q   Just twice?
24   A   The only ones I can think of.  Yes.
25   Q   Okay.  Can you tell me when you testified as a

Page 12

1  percipient witness, what the matter that you were
2  testifying about was?  Rather than being as an expert
3  witness.
4    A   Yes.  These both involved transactions in which
5  I had been involved, and my client in each of these
6  situations was pursuing rights related to the
7  transaction that I had been involved in.
8    Q   All right.  So as a fact witness, which is what
9  we call it down here, you were testifying about what the
10  documents said, who was involved, what was going on,
11  rather than as an expert witness; is that right?
12   A   Correct.
13   Q   And if at any time, Mr. Kehr, you know the
14  drill.  If I summarize one of your answers, if I'm
15  putting words into your mouth, that's not my intention,
16  and I invite you to correct me.  Can you do that for me?
17   A   I can.
18   Q   Excellent.  The other times you testified other
19  than those two matters, to your knowledge as we sit here
20  today, the other times you testified were as an expert
21  witness; is that correct?
22   A   Yes.
23   Q   And you indicated that you had testified -- I'm
24  include -- I'm assuming that includes depositions or
25  trials; is that right?

Page 13

4 (Pages 10 - 13)

1  A   Yes.

2  Q   How many times have you testified at trial?

3  A   I don't keep a total.  I couldn't tell you.

4 Certainly it's been at least a dozen times over the past

5 30 years --

6  Q   All right.

7  A   -- A bit more than that, but I don't have any

8 number that you could rely on.

9  Q   I appreciate that.  When you testified in these

10 other matters as an expert witness, was it always either

11 about a lawyer's responsibilities and duties or as to

12 attorney's fees?  Is there any other areas that you've

13 testified as an expert witness other than those two?

14  A   Yes.  I've testified about fiduciary duty

15 several times outside of the lawyer context.

16  Q   Fair enough.  Anything else?

17  A   That's all I can think of at the moment.

18  Q   When you've testified in those others, have you

19 testified -- well, I lost my train of thought.  I

20 apologize.  Have all of those -- oh, I know what it

21 was -- I was going to ask.  Have you ever testified in a

22 tribunal other than open court?  For example, in front

23 of a disciplinary proceeding involving a state bar?

24  A   Yes.  I -- I did -- I think twice.  Yes.  I

25 have.

Page 14

1 presentations you've made primarily, if not solely,

2 involve the California rules and not the Texas rules; is

3 that correct?

4  A   Well, I would say they primarily involve the

5 California rules, but several of them have been

6 nationwide in scope where national -- where the rules of

7 other jurisdictions which I would say primarily would be

8 focused on the ABA model rules as the format that's the

9 basis for which all 50 states and the District of

10 Columbia on which they've based their -- their rules --

11        (Simultaneous speakers)

12  Q   And none of your articles or presentations

13 involve the Texas rules, correct?

14  A   You know, I can't say yes or no to that.  It's

15 certainly possible that -- that I've testified -- that

16 I've done programs in which the Texas rules have come

17 up, because I have done some programs that are not --

18 not California programs, but I just wouldn't remember

19 that after so many years.

20  Q   And, primarily, if you were testifying about

21 something other than the California rules, I took from

22 your previous answer that that testimony or analysis

23 would be based primarily on the ABA model rules,

24 correct?

25  A   I would say most commonly it would be, but I

Page 16

1  Q   And was that in California?

2  A   Both times in California.  Yes.  Once as a

3 percipient witness and once as an expert witness.

4  Q   How many times of the other episodes in which

5 you have testified as an expert witness regarding

6 lawyer's duties, how many times has that been in

7 California?

8  A   I don't think I've ever left California to

9 testify when I've been in court or in an arbitration.

10 It's always been in California.

11  Q   How many times have you testified regarding

12 anything related to the Texas Disciplinary Rules of

13 Professional Conduct?

14  A   I've advised on the Texas rules.  I have a

15 Texas client who I've advised several times.  I don't

16 offhand remember ever testifying about the Texas rules.

17     MR. MARTIN:  Objection.  Nonresponsive.

18  Q   So to the extent that we're sitting here today,

19 to the extent that you remember, you've never testified

20 at deposition or in open court regarding matters

21 involving the Texas Disciplinary Rules of Professional

22 Conduct; is that correct?

23  A   I think that's right.

24  Q   And I have a copy of your CV which we're going

25 to go over here in a second, but the articles and

Page 15

1 can't tell you that I haven't done comparisons in

2 testimony to the rules of other jurisdictions.  Whether

3 that includes Texas or not, I have no way of

4 identifying.

5  Q   I understand.  Thank you, Mr. Kehr.  And that

6 actually leads me to my next question.  You would agree

7 with me that the ABA model rules, while forming a basis

8 for the adoption of somewhat uniform rules across the

9 country, that in most, if not all, jurisdictions the ABA

10 model rules are modified somewhat from jurisdiction to

11 jurisdiction, correct?

12  A   They have been modified in every jurisdiction.

13  Q   Thank you.

14  A   In some jurisdictions, only a little, and other

15 jurisdictions, more, but they're all based on the same

16 premiss which are the underlying fiduciary duties that

17 lawyers have more or less in common with other

18 fiduciaries.

19  Q   All right.  I understand that, sir, and I agree

20 with you.  Have you ever had a grievance filed against

21 you?

22  A   Not that I know of.

23  Q   Have you ever been disciplined by any of the

24 professional or business organizations of which you are

25 or have been a member?

Page 17

5 (Pages 14 - 17)

Page 18

```
 1    A   No.
 2    Q   What's the procedure for grievances in
 3  California?  Do you know whether or not somebody files a
 4  grievance?  Do they dismiss it without telling you?
 5  What's the -- what's the procedure?
 6    A   Well, it depends on the nature of the
 7  grievance.  There is an online system for anyone in the
 8  world to file a complaint about a lawyer, and only --
 9  only if it rises to a level of interest do -- is the
10  complaint assigned to an investigator.  We have a
11  professional investigation group that are employed by
12  the -- what's called The Office of Chief Trial Counsel
13  and act under the supervision of a lawyer employed full
14  time by OCTC.
15    Q   Have you served as part of the California Bar's
16  disciplinary structure related to attorneys?
17    A   No.  It's not a voluntary arrangement.  Used to
18  be years ago.  But for many years, the disciplinary
19  system has been entirely professionalized.  There are
20  full-time lawyers, staff, full-time investigators,
21  separate bar courts with judges who wear robes and
22  patches like normal judges.
23    Q   That's interesting because here in Texas there
24  are -- there are tribunals.  There is actually lawyers
25  that serve as voluntary -- voluntary arbiters, if you
```

Page 19

```
 1  will, of determining whether or not grievances have
 2  merit.  You don't have that same system in California?
 3    A   We have it only in the rare situation in which
 4  The Office of Chief Trial Counsel declares a conflict
 5  and then there are some lawyers around the state,
 6  litigators, with some degree of experience in
 7  professional responsibility matters who undertake to act
 8  as the prosecutor, the investigator and prosecutor, in
 9  those matters.  I've never done that.  I'm not a
10  litigator.
11    Q   Well, I -- that was actually my next question,
12  and I almost interrupted you.  I apologize for that.
13  You're not a litigator, right?
14    A   Correct.
15    Q   So in terms of analyzing a conflict, you've
16  never actually had to analyze a conflict for a -- have
17  you ever had to analyze a conflict for a matter you were
18  taking on personally in terms of litigation?
19    A   Well, my firm, yes.
20    Q   Right.  But I mean in your practice.  Have you
21  sat down and analyzed, if I take on this transaction,
22  this is a, for instance, same or substantially related
23  matter?
24    A   Of course.
25    Q   All right.  Can you give me some examples of
```

Page 20

```
 1  that?
 2    A   I can't offhand.  No.
 3    Q   How much of your practice is providing expert
 4  testimony?
 5    A   Well, that varies enormously from month to
 6  month and year to year, but I would say it's a -- it's a
 7  small minority of all of my time.
 8    Q   Can you give a -- even a ballpark percentage of
 9  the amount of time you spend regarding expert testimony
10  in your practice?
11    A   I'm uncomfortable giving any number because
12  people will think I actually calculated it and I never
13  have, but I'm comfortable saying that it's a small
14  minority.  I'm largely a transactional lawyer and part
15  of that is advising lawyers, law firms, and others about
16  professional responsibility matters.
17    Q   I -- I do understand that, Mr. Kehr, and you've
18  made that very clear.  I'll give you a disclaimer.  I'm
19  not going to hold you to the number, but when you're
20  provided as an expert testimony trying to disqualify my
21  firm, I'm very interested in what your qualifications
22  are to provide that opinion.  You understand that,
23  right?
24    A   Of course.
25    Q   And if somebody was trying to disqualify your
```

Page 21

```
 1  firm, you would take that very seriously, correct?
 2    A   Of course.
 3    Q   And so if someone was proffered as an expert
 4  witness to disqualify your firm, you would want to know
 5  what experience they have analyzing the situation under
 6  which they were offering that opinion, correct?
 7    A   Fair enough.
 8    Q   All right.  So if you could even give me an
 9  estimate of the amount of time that you spend analyzing
10  litigation conflicts as an expert witness, I would
11  appreciate it.
12    A   Couldn't possibly do that because you've just
13  redefined your question from analyzing conflicts -- I'm
14  sorry.  From testifying as to expert witness to
15  analyzing conflicts in litigation for expert witness
16  purposes.  I couldn't begin to do that, but I can tell
17  you that the analysis of conflicts in the litigation and
18  non-litigation contexts, are -- are precisely the same.
19  The underlying fiduciary duties are the same.  The
20  expectations of the legal system with regard to the
21  conduct of lawyers is the same, and the importance of it
22  to the legal system and to the system of law and the
23  court system is the same whether it's litigation or a
24  non-litigation matter.
25    Q   Well, Mr. Kehr, I'll tell you I agree with that
```

6 (Pages 18 - 21)

1 statement as well, but let me ask you a question, and I
2 think it's important that you and I define some terms
3 right now. You keep coming back to the concept of
4 fiduciary duty, and I know what a fiduciary duty is, and
5 I think I know what you mean by it. Are you equating a
6 conflict under the Texas Rules of Disciplinary Procedure
7 as being the same as a breach of fiduciary duty?
8    A    Well, the -- the Texas rules are disciplinary
9 rules, and it -- it is generally the rule that a lawyer
10 cannot be professionally disciplined except for
11 violating an explicit standard that is contained in the
12 disciplinary rules. That's true everywhere that I've
13 ever looked. Disciplinary authorities don't have the
14 ability to fill in gaps or in effect invent new rules,
15 but in a courtroom setting, which would include the
16 disqualification setting, the trial court is free to do
17 whatever it wants. The rules of professional conduct
18 are important evidence of what lawyers are required to
19 do and are prohibited from doing, but they don't cover
20 the water front.
21      Those -- those rules are written in a fairly
22 narrow way for purposes of discipline. The idea of
23 being that a lawyer shouldn't be disciplined unless
24 there is a reasonable explicit rule that gives fair
25 notice to the lawyer what the lawyer is required to or

Page 22

1 prohibited from doing. But in a disqualification
2 setting, the court can ignore the rule. It can decline
3 to disqualify even if there is a -- an apparent
4 violation of the rule, or it can disqualify even if
5 there is no clear authority that the rule itself has
6 been violated.
7      These rules are based on the underlying
8 fiduciary duties of lawyers, and they exist for the
9 functioning of the legal system. That's a long
10 discussion I hope we don't need to have, but I think
11 it's important that the fiduciary duties are never
12 ignored.
13      MR. MARTIN: I object as nonresponsive.
14    Q    Mr. Kehr, I believe my question was, do you
15 equate a conflict under the disciplinary rules with a
16 breach of fiduciary duty?
17    A    I think that if there is ever a conflict under
18 the disciplinary rules, there is a breach of fiduciary
19 duty.
20    Q    Per say?
21    A    I think that's probably true. It would take a
22 long time to think about all of the possible
23 hypothetical's, but because the rules are based on
24 fiduciary duties, loyalty, confidentiality, full
25 disclosure, then I think it's -- it's probably going to

Page 23

1 be a correct statement that -- that there is going to be
2 a fiduciary breach if there is a violation -- a conflict
3 violation of one of the conflict rules.
4    Q    Okay. So I think you answered my question, but
5 I want to make it very clear, and let's get this on the
6 record. So you think that in this situation, my firm
7 breached a fiduciary duty by taking on the
8 representation that you think we should be disqualified
9 from pursuing, right?
10    A    Correct. That's correct.
11    Q    That's not in the summary of your findings.
12      MR. BROWN: Well, objection. All the findings
13 were -- they weren't findings. They were just a
14 disclosure of what he was going to express an opinion on
15 at trial, and he's not going to -- you've asked him
16 that, but he is not -- that's not something he is
17 expressing an opinion on at trial. That's why they're
18 not in what you call, "The findings." They're not
19 findings. They're just the disclosure of what he is
20 going to opine on at the hearing on this matter.
21      MR. MARTIN: Mr. Brown, respectfully, I would
22 ask you to keep your objection to that which is allowed
23 under the federal rules --
24      MR. BROWN: No. I was -- I think I'm entitled
25 to correct misstatements you make on the record, and --

Page 24

1      (Simultaneous speakers)
2      MR. BROWN: I'm going to continue to do that,
3 Mr. Martin. So every time you make a misstatement, I am
4 going to correct it on the record, and you made a
5 misstatement.
6      MR. MARTIN: I don't believe I made a
7 misstatement, but to the extent that you're objecting to
8 my use of the word findings, I'll withdraw it and I'll
9 rephrase it.
10    Q    Mr. Kehr, in the summary that was provided to
11 me of what you were going to testify about, I don't
12 believe it appeared that you were going to testify that
13 there was an actual breach of fiduciary duty by my firm.
14 Now, the reason this is important, and you and I may
15 disagree on this, but I draw a distinction between a
16 conflict under the disciplinary rules and a breach of
17 the fiduciary duty, and your answer to my previous
18 question takes this to an entirely new level for me. So
19 I need to make this very clear what I'm asking you.
20      Do you believe that the conflict that you're
21 testifying about today equates to a breach of fiduciary
22 duty by my firm?
23      MR. BROWN: Objection. Goes beyond the
24 designation that we've submitted. He is not going to
25 opine on that, and we have made it clear he is not.

Page 25

7 (Pages 22 - 25)

1    A    The answer to the question is, yes.
2    Q    Thank you.
3         MR. MARTIN:  Mr. Brown, are you willing to
4    stipulate that he's not going stipulate in this matter
5    that there was a breach of fiduciary duty by my firm?
6         MR. BROWN:  We're willing to live by the
7    designation.  That's what I'll -- what his opinions are
8    as set forth in the designation.
9         MR. MARTIN:  You can't have it both ways.
10         MR. BROWN:  I'm not willing to stipulate to
11    anything with you right now, Mr. Martin.
12         MR. MARTIN:  Okay.  Well, I need to put this on
13    the record.  So -- and Mr. Kehr, nobody is picking on
14    you just because Mr. Brown and I have having a fight.
15    My point in making this record is this:  When I was
16    preparing for this deposition to depose this witness, I
17    was operating off of the description that was given to
18    me by opposing counsel which was that this witness was
19    going to opine that there was a conflict.  Within the
20    first 20 minutes of this deposition, it appears that
21    this witness equates a violation of the disciplinary
22    rules with a breach of fiduciary duty.
23    A    You've -- you've overstated what I said before.
24    Q    Please clarify.
25    A    I talked only about the conflict rules.

Page 26

1    Q    Okay.  But I asked you --
2    A    There is lots of other rules, and -- and I'm
3    not able as I sit here to think about the -- I'm not
4    certain how many there are in Texas, roughly 65 rules of
5    professional conduct, and it would take me a good deal
6    of time to think through your question with regard to
7    each of the rules.
8    Q    Sure.
9    A    But with regard to conflict rules, they are
10    based on underlying fiduciary principles which are
11    confidentiality and loyalty principles, they're both
12    fiduciary duties, and if a lawyer were to violate
13    confidentiality or loyalty standards, creating -- as a
14    result of a conflict of interest, I believe that there
15    is both a disciplinary violation under the rules --
16    disciplinary rules of -- in Texas and of the fiduciary
17    duty on which those rules are based.
18         MR. MARTIN:  I -- I understand that, Mr. Kehr,
19    and I -- that's not the distinction I'm trying to make.
20    So I'll try to be even clearer about that.  My point
21    was, is that you've been disclosed as an expert witness
22    regarding conflict rules, right?  And then now you're
23    saying that there was a breach of fiduciary duty.  To
24    me, that takes it to another level in terms of the
25    accusations against my firm.

Page 27

1         So, therefore, I want to take it up with the
2    court which is why I'm making this record.  Mr. Brown
3    and I are not going to agree on this today, but I want
4    to take it up with the court that to the extent that
5    there is going to be any evidence offered that my firm
6    might have breached a fiduciary duty, which I believe is
7    separate from the conflict rules, then I'm going to
8    object to that, because to me, that's a far more serious
9    allegation.  That's all I was trying to put on to the
10    record.
11         MR. BROWN:  Yeah.  And -- and Brant -- Brant,
12    let me just -- I think that we may be able to clarify
13    this.  I need to talk to Mr. Kehr off the record,
14    because I don't believe we've designated him as an
15    expert on breach of fiduciary duty.  I don't believe
16    that we're going to offer any testimony by him with
17    respect to the firms breach of fiduciary duty other
18    than -- well, what he is going to testify to is that, in
19    a sense, that there was a violation of rule 109 of the
20    Texas Disciplinary Rules.  I don't think there is any
21    need for him to get into the breach of fiduciary duty.
22    The reason he answered that question is you specifically
23    asked him.  If you had asked him, "What are you going to
24    express an opinion on at the hearing?"  That wouldn't
25    have been included.

Page 28

1         So if you want a stipulation, I'm happy to
2    consider it, but I need to talk to Mr. Kehr off the
3    record.  So perhaps we can save this for a break and
4    come back to it, because I think we're -- I think
5    we're -- we're mashing gears here without the need to do
6    so, because I don't think that this is something that's
7    going to come up at the hearing.
8         MR. MARTIN:  Okay.  Well, I think we've made
9    our record regardless.  I appreciate that attempt at
10    clarification, Ken.  I think that, you know, we've made
11    our record, and we can move on so I appreciate the --
12    the dialogue.
13         MR. BROWN:  And I agree.  It's not in -- it's
14    not in the designation.  It's simply not.
15    Q    I understand.  I understand.  Mr. Kehr, thank
16    you for your patience.
17    A    No problem.
18    Q    Are you -- are you aware of -- in all your
19    other expert testimony regardless of the subject, are
20    you aware of any time that your opinion has been struck
21    by a court?
22    A    I can think of one time when I was not allowed
23    to testify.
24    Q    Tell me about that.
25    A    There was a criminal prosecution of a lawyer

Page 29

8 (Pages 26 - 29)

1 for -- I'm trying to think of what the term is in the
2 criminal law. Let's just call it blackmail.
3    Q    Oh.
4    A    That's probably not the statutory term. And
5 the defense lawyer wanted to offer testimony about
6 certain aspects of lawyer conduct, and the court ruled
7 that no expert testimony would be permitted. That's the
8 only instance I can think of.
9    Q    Thank you. I'm going to ask a little bit of a
10 separate question now so listen for the distinction, and
11 if you don't get it, I want you to ask me to clarify,
12 but there is a difference between being struck as an
13 expert and having an expert opinion of your's limited in
14 some way. Are you aware of any instance in which your
15 expert opinion has been limited in any way by a court or
16 a tribunal?
17    A    Oh, my. Well, it seems to me that it's -- it's
18 certainly possible that there have been limitations.
19 Quite possibly limitations I'm not even aware of as a
20 result of in limine motions and discussions among trial
21 counsel and the court. I can't think of an instance. I
22 can only say that I can't think of any as I sit here.
23    Q    Thank you. And you've never taught any classes
24 on the Texas Disciplinary Rules of Professional Conduct,
25 correct?

Page 30

1    A    That's correct.
2    Q    When were you retained in this case?
3    A    You know, I'd have to look at my computer to
4 try to figure out when I was first contacted. I'm just
5 not sure of that.
6    Q    Could you estimate it? Like, what season was
7 it? Was it cold? Was it football season? I mean,
8 it's -- it's kind of important to know.
9    A    You know, we don't have seasons in Los Angeles.
10    Q    Fair enough.
11    A    It [inaudible] stays the same.
12        (Simultaneous speakers)
13    MR. BROWN: You have his retention letter. I
14 know we produced it to you.
15    Q    Oh, you know what? That's a great idea,
16 because we do have that. I wasn't there yet, but let me
17 go ahead and go there. So, Mr. Kehr, I've got your
18 retention letter here as June 18th, 2021. As we sit
19 here today, it's September 16th, 2021. So that's --
20 let's see. July, August, September. That was three
21 months ago. Does that sound about right?
22    A    Fair enough. I can live with that.
23    Q    All right. In your memory as we sit here
24 today, can you remember how much time elapsed between
25 when you were first contacted about this and your

Page 31

1 retention letter?
2    A    I received a call from one of Ken's partners.
3 I'm going to -- I'm going to estimate two weeks before I
4 was retained.
5    Q    Okay.
6    A    And he -- he asked me questions that turned out
7 to be about this situation. Although, in those -- I
8 think we had two or three conversations. Give me a
9 moment to think about this because I'm trying to draw a
10 picture in my mind. I was somewhere out of doors on an
11 iPhone. I can't remember exactly what the context was.
12 I'm sorry.
13    Q    It's okay. That's usually how I ask people to
14 remember. That's why I always say was it football
15 season or was it basketball season because sometimes
16 that triggers people's memories on exactly the situation
17 that you're talking about. So please -- please take
18 your time.
19    A    My best estimate is I had perhaps three
20 phonecalls with one of Ken's partners asking me
21 questions about what turned out to be this situation
22 although he didn't tell me who was involved. And then
23 subsequently I got a call from -- I think one of the
24 other firm partners involved in the Highland Capital
25 Management situation, and I drew the connection between

Page 32

1 those roughly three calls I had with another partner.
2 So I'm going to say for -- as an estimate, two weeks
3 before I was retained.
4    Q    All right. So two weeks prior to your
5 retention -- your retention was on June 18th, 2021, and,
6 again, I'm not going to hold you to the exact date. Can
7 we agree that some time in early June 2021 is when you
8 think you were first contacted about this case?
9    A    I think that's a -- that's a fair estimate.
10    Q    Thank you. And what was the name of the
11 partner that first contacted you that you had the two or
12 three conversations with?
13    A    Stan Goldich, G-O-L-D-I-C-H.
14    Q    And is Mr. Goldich a professional colleague or
15 a friend?
16    A    He and I served on a LA County Bar Committee
17 together a number of years ago, and that's how we first
18 met.
19    Q    Are you friends? I mean, how -- how often do
20 you speak to Mr. Goldich?
21    A    Rarely.
22    Q    Okay. And what was the name of the second
23 colleague of Mr. Brown's that you spoke to when you put
24 it together that it was the same case that Mr. Goldich
25 had called you about?

Page 33

9 (Pages 30 - 33)

Page 34

```
 1   A   That I don't know.  There have been -- it seems
 2 like about a half a dozen firm lawyers who I've had
 3 contact with at one time or another, and I just don't
 4 remember the order of them, and these are all people who
 5 I've never physically seen so I have no mental picture
 6 to call on.
 7   Q   Fair enough.  Do you know whether or not it was
 8 a man or a woman?
 9   A   Man.
10   Q   And you said partner.  Do you know it was a
11 partner, or could it have been an associate?
12   A   I can't be certain.
13   Q   Fair enough.  Tell me about that conversation
14 when you put it together that this was the same case
15 Mr. Goldich had called you about.
16       MR. BROWN:  I'm going to caution you, Mr. Kehr.
17 Unless you considered the -- whatever information you
18 got in these calls and in forming the opinions that
19 you've been designated to testify on in this case, the
20 conversations that you had about this case with lawyers
21 from the Pachulski firm are work product and or are
22 privileged, and so I want you to be careful to not
23 disclose information that you did not consider in
24 forming your opinions.
25   A   Okay.  I'm fine with that.  But my answer was
```

Page 35

```
 1 going to be even less helpful than that.  There is no
 2 way I can distinguish individual conversations.  During
 3 the past three months, I've probably had, you know, 20
 4 or 30 conversations with different people at the firm
 5 with regard to the underlying circumstances, facts,
 6 their discovery of new facts, scheduling questions, and
 7 so on and so forth, and it's a complete jumble.  I can't
 8 distinguish conversations.
 9   Q   Have you had any conversations with anybody at
10 Mr. Brown's firms about any matter related to Highland
11 Capital other than this disqualification motion?
12   A   I'm just trying to distinguish -- give me a
13 moment.  I think the answer is yes.
14   Q   Okay.  Can you tell me what other matters
15 you've had conversations about other than this
16 disqualification motion?
17       MR. BROWN:  Again, I'm going to caution you,
18 Mr. Kehr.  The conversations -- this is even more
19 limited because to the extent you've had conversations
20 with Counsel at Pachulski on other matters, obviously
21 you had to consider them in forming your opinion.  So
22 those would either be work product or privileged.  And
23 so to the extent those communications relate to work
24 product or privilege, I'm instructing you not to answer.
25       MR. MARTIN:  Mr. Brown, I just want to get a
```

Page 36

```
 1 clarification in here.  So you're taking the position
 2 that any conversations that your firm had with an expert
 3 are not discoverable based on work product or privilege
 4 if they didn't form the basis of his opinion.
 5       MR. BROWN:  He didn't consider it in forming
 6 the opinions he's going to give in this case.  If my
 7 firm consulted with Mr. Kehr on legal issues unrelated
 8 to this matter, yes, those are privilege.
 9       MR. MARTIN:  All right.  Well, fair enough.
10 I'm not conceding that but I understand your position
11 and that's why I wanted the clarification.  Let me take
12 it one step further and ask you this.  If he has a
13 conversation with somebody from your firm about this
14 disqualification motion, are you instructing him not to
15 answer or to limit his testimony in any way if it
16 involved this disqualification motion?
17       MR. BROWN:  I'm -- he needs -- it's under Rule
18 26, it's not work product protected if he considered it
19 in forming his opinions.  So to the extent he considered
20 it, he can disclose it.  To the extent he had
21 conversations and communications with my firm that he
22 didn't consider in forming his opinions, it's work
23 product.
24   Q   Thank you.  Mr. Kehr, I think the question that
25 I originally asked you -- let me rephrase it --
```

Page 37

```
 1   A   Sure.
 2   Q   -- To perhaps assuage Mr. Browns concerns.  If
 3 you had any conversation -- without revealing the
 4 contents of any conversations, have you had
 5 conversations with anybody about -- from his firm about
 6 any matter other than this disqualification motion?
 7 Just give me the subject matter if you have.
 8   A   Well, I don't -- I don't think I can do that.
 9 I have known Stan Goldich for -- and I just going to
10 roughly estimate 20 years, and he has called me from
11 time to time with questions about the -- I think
12 probably always about the professional responsibilities
13 of lawyers.  Most of time I probably made no notes of
14 those things, and these are things that have been gone
15 from my memory for ages.  I have no practical way of
16 answering your question except I have been in touch from
17 time to time on a variety of matters --
18   Q   Are -- sorry.  I didn't want to interrupt you.
19 I apologize.  Go ahead.
20   A   No.  That's okay.  Please go ahead.
21   Q   Okay.  We established that you were first
22 contacted about this disqualification some time in early
23 June 2021, correct?
24   A   Yes.  I think that's a fair estimate.
25   Q   All right.  So that was three months ago,
```

1 right?

2   A   Right.

3   Q   Have you had any discussion with anybody at
4 Mr. Brown's firm in the last three months about anything
5 related to Highland that was not about this
6 disqualification motion?

7   A   Yeah. I think you asked me that before, and I
8 think the answer is, yes. I think there have been
9 conversations about the Highland situation that didn't
10 directly relate to the disqualification motion.

11   Q   Can you identify those matters by subject
12 matter without revealing the contents of the
13 conversation?

14   A   I really can't. I have -- I have no clear
15 recollection of what discussions there might have been,
16 but I'm pretty sure that's -- that's happened. Give me
17 one moment to turn off my phone which just tried to tell
18 me there was a call coming in. Okay. Go ahead.

19   Q   Sure. All right. Do you know whether or not
20 you've been designated as an expert by Mr. Brown's firm
21 in any other matters?

22   A   Not that I know of. I don't think so.

23   Q   Do you know whether or not -- or let me ask it
24 a different way. Have you prepared or reviewed
25 materials related to any matter from Mr. Brown's firm

Page 38

1 involving Highland other than this disqualification
2 motion?

3     MR. BROWN: I'm sorry. You broke up, Brant.
4 Could you just repeat it? I didn't get -- I didn't hear
5 the question.

6   Q   Sure. Mr. Kehr, have you reviewed any
7 materials or provided even a preliminary opinion on any
8 other matters involving Highland other than this
9 disqualification motion?

10   A   Prepared materials, I think the answer is, no.
11 Reviewed materials, possibly. That would require a
12 computer search to see whether I -- whether my
13 interactions with the firm have all been verbal or
14 whether I actually received something in writing. I'm
15 just not sure of the answer to that.

16   Q   Can you identify by subject matter what the
17 other matters might have been that you have worked with
18 Mr. Brown's firm on in involving Highland other than
19 this disqualification?

20     MR. BROWN: I think asked -- objection. Asked
21 and answered.

22   Q   You can answer it, Mr. Kehr.

23   A   The answer is, no. I can't.

24   Q   You can't identify the subject matter, right?

25   A   No.

Page 39

1   Q   Other than Highland and other than this
2 disqualification, how many other times have you been
3 retained by Mr. Brown's firm as an expert witness?

4   A   To the best of my memory, I never have been.

5   Q   When you were analyzing this matter and this
6 disqualification matter, did you analyze whether or not
7 it would have been more appropriate to have an expert on
8 the Texas rules be the expert in this case? Did you
9 consider that?

10   A   Well, I think I am an expert on the Texas
11 rules. My -- my involvement with the rules to
12 professional conduct is nationwide. I advise two
13 international law firms, other multi-branch law firms,
14 and one continuing Texas client. I -- I dealt -- I
15 regularly deal with the rules of professional conduct
16 all across the country. That's probably a slight
17 exaggeration. I don't offhand remember ever having
18 advised any -- anybody on the North Dakota rules, but I
19 have advised on the rules in Texas, Washington, DC,
20 Virginia, South Carolina, Massachusetts, New York,
21 Nevada.

22   Q   I -- I understand that, Mr. Kehr, but your
23 previous answer was that you do consider yourself an
24 expert on the Texas rules, correct?

25   A   Correct.

Page 40

1   Q   Okay. How many times have you consulted on the
2 Texas rules such that you believe it qualifies you as an
3 expert on the Texas rules?

4   A   Well, I don't think my expertise is based on
5 how many times I've consulted on the Texas rules. The
6 answer to that is, oh, maybe ten times as a very rough
7 estimate, but I have studied the rules around the
8 country when I was part of the commission that wrote the
9 California Rules of Professional Conduct and that
10 exercise, which went on for years, involved our
11 comparing the rules in all other 49 states and
12 Washington, DC, to look for ideas to see what the logic
13 was and so on. We did a -- a 50 jurisdiction comparison
14 and the Texas rules were certainly part of that. So
15 I -- I have studied these rules. I did it over a period
16 of years as well as consulting specifically on the Texas
17 rules on multiple occasions.

18   Q   Mr. Kehr, have you ever testified in a case as
19 an expert regarding the Texas rules specifically?

20   A   [inaudible]

21     (Simultaneous speakers)

22     MR. BROWN: Objection. Asked and answered.

23   A   Yeah.

24   Q   You have or you have not?

25   A   No. I don't believe I have.

Page 41

11 (Pages 38 - 41)

| | |
|---|---|
| 1  Q. Okay. Mr. Kehr, prior to this case, have you<br>2 ever worked with Mr. Brown before?<br>3  A. I don't think so.<br>4  Q. Have you ever worked with John Morris before?<br>5  A. I don't believe so.<br>6  Q. Have you ever worked with Jeffery Pomerantz<br>7 before?<br>8  A. I don't think so.<br>9  Q. How are you being compensated in this case?<br>10  A. Isn't -- isn't that in the court filing?<br>11  Q. It might be. I'm asking if you know.<br>12  A. I -- I send bills to Mr. Brown's firm which<br>13 then passes them on to Highland, and I'm paid by<br>14 Highland.<br>15  Q. And do you know what your rate is?<br>16  A. Not offhand. I don't remember.<br>17  Q. Do you know whether or not the bills have been<br>18 paid when they were submitted?<br>19  A. That's a good question. I don't offhand know<br>20 that. No.<br>21  Q. I own a firm too, Mr. Kehr, and I can -- you<br>22 know, that's one of the things I always look at is that<br>23 the client are paying or not. You don't know whether<br>24 or not this client has been paid?<br>25  A. I'd have to check.<br><div align=right>Page 42</div> | 1  Q. Is anyone else assisting you on this matter?<br>2  A. It's conceivable that my partner Rachelle Cohen<br>3 has spent a little bit of time on this. We often work<br>4 together, but I can't be certain without checking the<br>5 billing records.<br>6  Q. Do you know what parts of this case Ms. Cohen<br>7 may have worked on versus what parts you worked on<br>8 personally?<br>9  A. Either all or virtually all of the work has<br>10 been my personal work. If I've asked her to -- to<br>11 double check something for me, I -- I wouldn't be able<br>12 to identify that without looking at time records.<br>13  Q. And in connection with your work on this case,<br>14 when is the last time you read the Texas Rules of<br>15 Disciplinary Procedure?<br>16  A. You mean procedure?<br>17  Q. When is the last time you read the Texas rules<br>18 in connection with this case?<br>19  A. Okay. You asked the rules of procedure and<br>20 that's the reason I paused.<br>21  Q. Okay.<br>22  A. Yeah.<br>23  MR. BROWN: Objection. The question is vague<br>24 and ambiguous as to what rules you're referring to.<br>25  Q. I apologize. Let me get the name right. Your<br><div align=right>Page 44</div> |
| 1  Q. Do you know whether or not you charge a<br>2 different rate for analyzing the case versus providing<br>3 testimony?<br>4  A. I charge a single rate.<br>5  Q. But you don't know what that rate is, right?<br>6  A. I'd have to check to be certain.<br>7  Q. How many hours have you worked on this case?<br>8  A. Oh, I have no idea. That's by -- the computer<br>9 keeps track. I couldn't keep track without a --<br>10  Q. Well, that actually goes to my next question.<br>11 How frequently do you record your time on this case?<br>12  A. We have a billing system that allows us to<br>13 record time as we are performing services. It's -- it's<br>14 a written --<br>15  (Simultaneous speakers)<br>16  Q. That's [inaudible] but it doesn't always<br>17 happen. My question is how often do you record your<br>18 time on this case?<br>19  A. Whenever I'm spending time on the case.<br>20  Q. Okay. So that's on a daily basis? If you're<br>21 working on this case, you automatically -- you<br>22 immediately record the time?<br>23  A. It's a minute by minute basis. It's a clock in<br>24 the system. You punch the clock when you start working<br>25 on a new matter, and it keeps track of the time.<br><div align=right>Page 43</div> | 1 opinion in based on at least Rule 109 of the Texas<br>2 Disciplinary Rules of Professional Conduct, correct?<br>3  A. Correct.<br>4  Q. When is the last time you read them in<br>5 connection with this case?<br>6  A. Yesterday.<br>7  Q. Okay. And which rules did you read?<br>8  A. I think on that instance, I only looked at<br>9 1.09.<br>10  Q. How many other of the rules did you consider in<br>11 analyzing this case?<br>12  A. I'm pretty sure I looked at 1.05. Probably --<br>13 no. No. I'm not sure. 1.05, yes. It's the only one I<br>14 can think of offhand.<br>15  Q. So 1.05 and 1.09 and at -- I'm going to be<br>16 generous. I'm going to -- assuming -- your testimony<br>17 would be there might have been others, but you can't<br>18 remember them right now; is that right?<br>19  A. Yes. In order to be certain, I'd probably need<br>20 to put the rules in front of me and think through what<br>21 my analytical process was.<br>22  Q. Prior to working on this case, when was the<br>23 last time you had read the Texas rules?<br>24  A. I would estimate that the last time I got a<br>25 call specific to Texas was about a month before that.<br><div align=right>Page 45</div> |

<div align=right>12 (Pages 42 - 45)</div>

1 Q Was that from Mr. Brown's firm, or was it
2 related to another matter?

3 A Another matter.

4 Q And you didn't testify or get designated as an
5 expert witness in that other matter, correct?

6 A No. It was advising a law firm about a Texas
7 situation. It was not an expert witness engagement.

8 Q I'm still a little troubled by somebody
9 retaining a California expert in a case involving the
10 Texas rules. So I'm going to ask you, part of your
11 basis for claiming to be an expert in the Texas rules is
12 your work for a Texas law firm; is that correct?

13 A That's part of it. Yeah.

14 Q All right. What's the name of that firm?

15 A I think the names of my clients are
16 confidential.

17 Q Okay. And I thought that might be your answer.
18 Are you -- you would rather not or you're refusing -- in
19 a nice way, you're refusing to answer that question
20 based on confidentiality; is that correct?

21 A Correct.

22 Q Is your compensation dependent on the outcome
23 of this case?

24 A No.

25 Q Have you ever been retained to testify for

Page 46

1 James Seery before now?

2 A No.

3 Q Do you know who James Seery is?

4 A I think he's the CEO now, isn't he? Of
5 Highland.

6 Q When you were first contacted about this case
7 and you started considering this case and analyzing it,
8 what were you told about the disqualification motion?

9 A [inaudible]

10 (Simultaneous speakers)

11 MR. BROWN: Well, again, I'm going to object to
12 the extent you considered matters that were told to you
13 by lawyers of Pachulski in forming your opinions. You
14 can testify to the extent they were considered. Beyond
15 that, it's work product, it's privilege, and I'm
16 instructing you not to answer.

17 Q Let me try to fix his objection, Mr. Kehr,
18 before you answer. When you're contacted about a case,
19 do you ask what the facts of the case are?

20 A Well, I think that somewhere early in my
21 discussions with -- with a law firm about a potential
22 expert witness engagement, I'm going to be given
23 initially the names of the players so we can check for
24 possible conflicts.

25 Q Sure.

Page 47

1 A That's always the first step. And the second
2 step typically is a, kind of, high level 35,000-foot
3 overview of what the circumstances are.

4 Q And you take that into account in analyzing the
5 case, correct?

6 A It's -- it's -- to some degree, yes. But --
7 but the initial discussion of that kind, my
8 understanding generally is indefinite and often
9 incorrect because the lawyer who tries to give me the
10 overview of something that the lawyer has already spent
11 hundreds of hours on. It is not digestible. It's got
12 to be slowed down. It's only when I start receiving
13 copies of materials that I can appreciate the -- the
14 full context and the details of a potential expert
15 witness engagement.

16 Q So is it your testimony that you did not take
17 into account anything in those first two or three
18 conversations in analyzing this case?

19 A No. I can't say that. I can only say that I
20 can't distinguish that conversation from the dozens of
21 others I've had from the other sources of
22 information. The copies of the contracts that are
23 involved in this situation. It becomes a -- a -- a
24 combined source of information.

25 Q So because that is a combined source of

Page 48

1 information, you -- according to your lawyer's
2 instructions, don't want to testify as to what those
3 first conversations were. Do I have that correct?

4 A No. I'm telling you that I can't distinguish
5 those first conversations from other sources of
6 information and --

7 Q What do you remember -- sorry. Go ahead.

8 A That's okay. You go ahead.

9 Q What do you remember from those first
10 conversations that you were told that you did take into
11 account in analyzing this case?

12 A I -- I -- again, I can't distinguish first
13 conversations from other sources of information. There
14 are particular topics such as, you know, how the Bridge
15 Loan worked. I might have heard about multiple times.
16 There is no way I can distinguish what I might have
17 heard in a first or second conversation from the other
18 sources of information.

19 THE REPORTER: Did you say, "How the Bridge
20 Loan worked"?

21 A It's bridge, B-R-I-D-G-E. The Bridge Loan.

22 Q Mr. Kehr, I need to state this simply because
23 we might have to take up with the court. Are you
24 willing to tell me about those initial two or three
25 conversations when you were first contacted about this

Page 49

13 (Pages 46 - 49)

1 case, or do you feel that you can't do it because of
2 your lawyer's instruction?
3    A   I -- I'm delighted to tell you about them if I
4 could.  What I'm telling is I can't distinguish them
5 from other sources of information.
6    Q   Right.
7    A   I have an understanding today of what the
8 transactions involved and who the players were.  I
9 obtained that information over a period of time from
10 multiple sources.  I can't tell you which particular
11 source led to any particular element of my
12 understanding.
13    Q   I understand.  All right.  Let's go to -- and,
14 Mr. Kehr, this is the part where we might experience
15 some technical difficulties because I'm technologically
16 sometimes not very adept.  I'll just put it that way.
17 That's a nice way to say it.  And we've been going about
18 an hour so I think now might be a good time for a
19 personal convenience break for about five minutes if
20 that's okay with everybody and then we'll come back and
21 we'll talk about some of the documents.  Fair enough?
22    A   Whatever you want.
23    Q   Great.  Come back in five.
24       (Recess from 11:31 a.m. to 11:41 a.m.)
25    Q   Mr. Kehr, are you ready to proceed?

Page 50

1    A   I am.
2    Q   And you understand you're still under oath?
3    A   Correct.
4    Q   All right.  I'm going to ask you about some
5 documents now.  So let me explain to you to speed us up
6 how this is going to work.  Ms. Drawhorn is attending
7 this deposition with me in a different Zoom room, if you
8 will.  She is going to put the exhibit up there, and I'm
9 going to ask you questions about each exhibit.  To the
10 extent that I might be a little slow on the highlighting
11 or the emphasis on certain documents, I want you to ask
12 me to restate something.  Because if you don't get it,
13 then, you know, that's trouble for both of us.  Fair
14 enough?
15    A   Yes.
16    Q   All right.  And before we go there, you're not
17 licensed in the State of Texas, correct?
18    A   No.
19    Q   And how many other jurisdictions other than
20 California are you licensed in?
21    A   None.
22       (Exhibit No. 1 was marked for identification.)
23    Q   Okay.  All right.  I want to go to Exhibit 1,
24 and I believe these were provided to you ahead of time.
25 If you need time to catch up, I want you to let me know.

Page 51

1 Mr. Kehr, do you see a document appearing on your
2 screen?
3    A   I do.
4    Q   Excellent.  And if you'll see this documents
5 title -- and you're familiar with the style of cases in
6 litigation and where the title is on a document that's
7 filed in litigation, correct?
8    A   Yes.
9    Q   All right.  This document's titled -- read
10 along with me.  Is Highland Capital Management LP's
11 disclosure of intent to use as an expert witness at the
12 hearing on it's motion to disqualify Wick, Phillips,
13 Gould, and Martin, LLP.  Did I read that correctly?
14    A   Yes.
15    Q   And I assume that you've seen this documents
16 before?
17    A   Yes.
18    Q   And when did -- when did you see this document?
19    A   I think at about the time it was filed.
20    Q   All right.  And I'm going to direct your
21 attention on this document to page three.  As we move
22 down, you'll see the heading there says, Summary of
23 Opinions.  Did I read that correctly?
24    A   Yes.
25    Q   All right.  And you understand that this is the

Page 52

1 summary of opinions we were provided that Mr. Brown used
2 to disclose what you were going to testify about,
3 correct?
4    A   Yes.
5    Q   How much input, if any, did you have into the
6 drafting or the editing of this summary?
7    A   Well, I don't think I was involved in -- in
8 drafting or editing.  I was involved in explaining to
9 Mr. Brown what my opinions are, how I analyze the
10 situation, and that became his summary of my opinion.
11    Q   All right.  So I'm taking it from that answer
12 that as far as you are concerned, Mr. Brown drafted this
13 summary of opinions, correct?
14    A   Yes.  I probably commented on it at some point,
15 but I think it's based on communications that he and I
16 had had before he did his summary.
17    Q   Do you remember at any point editing this
18 document or a version of this summary prior to it being
19 filed?
20    A   I don't.
21    Q   Do you remember whether or not you provided any
22 red line comments or anything else to Mr. Brown
23 correcting a description of the summary?
24    A   I don't.
25    Q   You don't remember or you didn't do it?

Page 53

| | |
|---|---|
| 1    A   I don't remember whether I did. | 1   cannot assume a position hostile to the former client |
| 2    Q   All right.  So let's go to -- well, let me ask | 2   and one inimical to the interests the lawyer previously |
| 3   this question first.  Since this document has been | 3   was engaged to protect.  Am I correct in assuming that |
| 4   filed, had you reviewed this summary of your opinions? | 4   in your opinion those are two separate situations? |
| 5    A   I'm -- I'm not certain.  I might have seen it | 5    A   No.  I don't think that's right.  The -- there |
| 6   before it was filed.  I might have seen it afterwards. | 6   are -- let me try to do it this way. |
| 7   I'm just not certain. | 7    Q   Sure. |
| 8    Q   Do you know whether or not this section of this | 8    A   There are two continuing duties.  A narrow |
| 9   document accurately reflects what you think about this | 9   continuing duty of loyalty and a continuing duty of |
| 10   case? | 10   confidentiality.  Typically, the confidentiality issue |
| 11    A   I think it does in the summary fashion.  Yes. | 11   trumps everything else because, typically, in |
| 12    Q   All right.  I want to go to subsection B, and | 12   disqualification motions, it's all that the court needs |
| 13   I'm going to read the first bullet point under | 13   to look at in order to determine whether the law firm |
| 14   subsection B, and I want you to follow along. | 14   will be disqualified, but as the -- which sentence is |
| 15    A   If you could give me one -- if you could give | 15   this?  It's the final -- the long final sentence which |
| 16   me one moment.  I have a copy of it on my computer. | 16   is roughly one, two, three -- the fifth sentence of that |
| 17    Q   That would be great. | 17   paragraph I think.  The long one.  What that does is to |
| 18    A   And I'm going open it up because on the | 18   summarize that even if there is no confidential |
| 19   screen it's partly blocked by the -- by the images of | 19   information, the duty of loyalty does exist.  It's -- |
| 20   the participants.  Okay.  Go ahead.  I'm ready. | 20   it's not common for there to be a loyalty duty without |
| 21    Q   All right.  The first bullet point states, "A | 21   confidentiality but it does exist, and the two duties |
| 22   lawyer owes two duties to a former client.  These are | 22   have historically been recognized as being distinct. |
| 23   continuing duties of loyalty and of confidentiality. | 23    Q   And in this case, you didn't find any evidence |
| 24   Those are separate and independent duties.  A lawyer can | 24   that Wick Phillips was misusing confidential |
| 25   violate the continuing duty of loyalty even if the | 25   information, correct? |
| Page 54 | Page 56 |

| | |
|---|---|
| 1   lawyer possesses no confidential information of a former | 1    A   My view is that there is no confidential |
| 2   client.  An attorney who has acted as such for a former | 2   information that I'm aware of, because there would have |
| 3   client cannot render professional services adversely to | 3   been joint lawyer-client relationship, and in a joint |
| 4   the former client in the same or substantially related | 4   relationship, each client -- I'm sorry.  The lawyer has |
| 5   matter nor, in any event, whether it be in the same | 5   the same duty of full disclosure and loyalty to each |
| 6   matter or not, can the lawyer assume a position hostile | 6   jointly represented client, and that means that the |
| 7   to the former client and one inimical to the interest | 7   lawyer cannot favor the interest of one joint client |
| 8   the lawyer previously was engaged to protect."  Did I | 8   over the other.  So if the common lawyer obtains |
| 9   read that correctly? | 9   material information about the engagement from one |
| 10    A   You did. | 10   client, the lawyer probably is obligated to share that |
| 11    Q   All right.  I want to ask you some general | 11   information with the other joint client. |
| 12   questions about the statements of law that you put in | 12    Q   And you didn't find that in this case, correct? |
| 13   there. | 13    A   I -- I don't understand your question. |
| 14    A   Sure. | 14    Q   You didn't find any violation of the duty of |
| 15    Q   And, again, Mr. Kehr, I don't want to put words | 15   confidentiality in this case related to Wick Phillips, |
| 16   in your mouth, and I'm going to ask you these questions | 16   correct? |
| 17   knowing this is your shot to tell us what we did wrong. | 17    A   No.  I'm not aware of any evidence that there |
| 18   Okay?  So I want you to correct me if I say anything | 18   is any confidential information as between the jointly |
| 19   wrong.  But the way that I read that is that you | 19   represented clients. |
| 20   essentially identify two different situations there.  I | 20    Q   Right. |
| 21   read that one situation that you have a problem with is | 21    A   A law firm in a joint representation owes an |
| 22   an attorney who renders professional services adversely | 22   equal duty to each client to maintain the |
| 23   to a former client in the same or substantially related | 23   confidentiality.  So that would go only to the outside |
| 24   matter and then the second situation that you identify | 24   world.  It wouldn't go to the sharing of information |
| 25   is, whether it be in the same matter or not, the lawyer | 25   between the jointly represented clients. |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

1   Q   Right. And my question was, you didn't find
2 any evidence that Wick Phillips violated any duty
3 related to that sharing of confidential information,
4 correct?
5   A   Correct.
6   Q   All right. So that's -- and can you and I
7 agree that that's Texas Rule 105?
8   A   Well, not exactly. The duty of confidentiality
9 is in 1.05, but you don't need to look -- I'm sorry.
10 You can't look only at 1.05 to understand the interplay.
11 Part of the concept here is that the duty of loyalty to
12 each jointly represented client which is not in 1.05,
13 but is an underlying fiduciary duty of lawyers prohibits
14 the lawyer from favoring the interests of any one joint
15 client. So that's what creates the sharing of
16 information as a general principle, and that would be
17 true in every jurisdiction.
18   Q   You didn't find a violation of Texas Rule 1.05
19 in this case, correct?
20   A   Correct.
21   Q   All right. And, in fact, if I understand
22 your -- the summary of your opinions correctly, your
23 primary criticism is a violation, in your opinion, of
24 Texas Rule 1.09, correct?
25   A   Correct.

Page 58

1   Q   And you are stating and you stated earlier
2 today, that the obligation under Texas Rule 1.09 has, as
3 it's basis, the fiduciary duty that lawyers owe to
4 clients, correct?
5   A   I'm sorry. Would you say that again? It
6 didn't quite track for me.
7   Q   Absolutely. You stated earlier today, and I
8 think even in your answer just now that the limitations
9 of 1.09 on what a lawyer can or cannot do, are informed
10 and, in fact, based in a lawyer's fiduciary duty to it's
11 client's, correct?
12   A   Duties. Plural. Yes.
13   Q   I said plural. I'm not -- I'm not trying to
14 trick you, sir.
15   A   It came through as a singular. I think there
16 must have been -- the S was chopped off by the
17 electronics but yes. The answer is yes.
18   Q   Okay. Fair enough. So your primary criticism
19 in this case of my firms conduct is a violation of rule
20 .109 [sic], correct?
21   A   1.09. Yes.
22   Q   All right. Thank you. Now, I'm going to back
23 up because I asked you a question earlier about that
24 long sentence at the end of the first bullet point. So
25 take a look at it again.

Page 59

1   A   Okay.
2   Q   Because the way I read that sentence was that
3 you were identifying two possible scenarios, and you
4 disagreed with that. So I want to investigate that a
5 little bit because that's -- I read it differently than
6 apparently how you mean it. I read that as two
7 scenarios. One is that a lawyer cannot render
8 professional services adversely to the former client in
9 the same or substantially related matter. That's one
10 scenario. And then the second scenario would be whether
11 it's in the same matter or not, a lawyer cannot assume a
12 position hostile to the former client and one inimical
13 to the interest the lawyer previously was engaged to
14 protect. Is that not two scenarios?
15   A   Well, I think it is, but it's a highly unusual
16 situation for there to be a violation of the duty of
17 loyalty without the lawyer undertaking a representation
18 in the same or substantially related matter. There are
19 instances in which -- that would be outside that. And
20 this summary, which is actually a quotation from a case
21 or pretty close to a quotation from the case, covers the
22 water front. A -- what I thought was a rather
23 well-written summary of how these two duties -- two
24 former clients operate.
25   Q   I -- I understand and that -- and that's why

Page 60

1 I'm asking you the question, Mr. Kehr, is because I want
2 to make sure that I have the entire universe of what
3 you're criticizing Wick Phillips about. So I -- and I
4 will give you the opportunity by asking you an open
5 ended question. Based on that second sentence, what of
6 the duties of loyalty do you think Wick Phillips
7 violated? Is it -- did they render professional
8 services adversely to the former client in the same or
9 substantially related matter? Or did they assume a
10 position hostile to the former client and one inimical
11 to the interest the lawyer previously was engaged to
12 protect? Or was it both?
13   A   Well, I -- I don't draw any distinction among
14 those three elements in my analysis. It doesn't make
15 any difference whether one were to consider that the
16 position that your firm is in now in the -- in it's
17 creditors claim is the same matter as the prior
18 engagement whether it would be considered substantially
19 related or it's simply taking the position that is
20 hostile to the interests it was formerly engaged to
21 protect. It -- it's irrelevant to the analysis to
22 determine which of those it is.
23      It's my view that it's the same matter, but my
24 opinion doesn't depend on the court determining that
25 it's the same matter. I mean, if I were a judge, I -- I

Page 61

1 wouldn't pause over the question of whether it's the
2 same matter, substantially related, or simply hostile.
3 The question is -- or the answer, in my view, is the
4 same anyway that you want to look at it. But, again, I
5 view it as being the same matter.
6    Q   And you're getting to the heart of this -- this
7 line of questioning, Mr. Kehr, so I appreciate that
8 because your position is that my firm's representation
9 in this adversary proceeding is the same or
10 substantially related matter to the previous
11 representation, correct?
12    A   Yes.
13    Q   My hypothetical is, let's say the court says,
14 no. It was not the same or substantially related
15 matter. Is it going to be your testimony that we still
16 violated rule 109?
17    A   Yes.
18    Q   Why?
19    A   Because the creditor's claim and the effort to
20 reallocate ownership interest is hostile to the
21 interests that the firm previously was engaged to
22 protect in advance.
23    Q   Do you thank that a law firm cannot take a
24 position hostile to a former client even if the matter
25 is not the same or substantially related?

Page 62

1    A   Well, as this -- as this quote says, hostile to
2 the interest the lawyer previously was engaged to
3 protect. That I view as just being the, kind of,
4 umbrella statement that probably includes every matter
5 in which the lawyer is engaged in the same or
6 substantially related matter, but I think one difference
7 might be if the lawyer doesn't even have a lawyer-client
8 relationship is not acting as a lawyer but is acting in
9 some other way that is hostile to the interest that the
10 lawyer previously was engaged to protect or advance.
11    Q   All right. Let's -- let's --
12    A   You're trying to -- you're looking at an
13 analytical distinction that I don't think has any
14 application here. I think it's sufficient to say same
15 or substantially related, and -- but -- but the summary
16 that this court used in that final phrasing tells us
17 that you don't have to -- I'm sorry. That the law firm
18 doesn't have to have a client in the same or
19 substantially related matter. It's broader than that.
20    Q   I understand that's what you're saying, and
21 that's what I'm trying to flush out, Mr. Kehr. I'm
22 under no illusion that I'm going to convince you to be
23 on my side on this. All right? But my question is --
24 I'm trying to define, for the sake of the record, the
25 interests that you were saying were violated, right?

Page 63

1      And so we have this situation where a lawyer is
2 rendering services adversely to the client in the same
3 or substantially related matter, and what I'm taking
4 from your testimony is, yes, that's a no-no. You can't
5 do that. All right. But you're saying it's broader
6 than that. That even if it wasn't the same or
7 substantially related matter, there is a second
8 component to this according to this case you quoted.
9 That second component being, even if it's not the same
10 or substantially related matter, that the lawyer could
11 still be violating Texas Rule 1.09 if it takes a
12 position hostile to the former client and one inimical
13 to the interest the lawyer previously was engaged to
14 protect. So it's broader than just the same or
15 substantially related matter, rule, correct?
16    A   Right. And the distinction that I was trying
17 to explain a moment ago is the lawyer doesn't even need
18 to have a client. If the lawyer has a client, the
19 lawyer has been engaged by someone in a matter that is
20 the same or substantially related to the prior
21 engagement. That would be virtually every situation.
22 But one could imagine a situation in which the lawyer
23 doesn't even have a client but is acting in a way that
24 is hostile to the interest it previously was engaged to
25 protect or advance.

Page 64

1    Q   Okay.
2    A   So I -- I just -- I don't think that last
3 sentence really adds anything in this situation because
4 Wick Phillips does have a client. It is engaged by that
5 client. And the question is whether the engagement is
6 adverse to the former client with regard to the subject
7 of the former representation.
8    Q   What -- and you know what? I don't know that I
9 disagree with you, Mr. Kehr, because I think you're
10 going to agree with me that our position is going to be
11 our previous representation is not the same or a
12 substantially related matter. And the reason I'm asking
13 you these questions is not to pick on you, but to say if
14 the court says, you know what, Wick Phillips' previous
15 representation was not the same or substantially related
16 matter. Is it going to be your opinion that we still
17 violated rule 109?
18    A   The answer is yes.
19    Q   And I'm asking you why?
20    A   Well, this gets into a whole other element of
21 my analysis. What Wick Phillips has been attempting
22 to do is to -- to use a word that popped up in one of the
23 depositions. It's attempting to silo it's
24 representation. The silo concept was that it was
25 involved in the drafting and in providing legal advice

Page 65

17 (Pages 62 - 65)

1 with regard to the Bridge Loan. It was not involved in
2 the drafting or providing advice with regard to the --
3 the LLC agreement in which the ownership interests were
4 stated. And -- and, therefore, they are separate
5 matters, and my view is that they are not separate
6 matters.
7      They're part of a single transaction. The
8 single transaction included probably many dozens of
9 individual instruments, and they all existed for the
10 single purpose of acquiring 20 or 30, whatever the
11 number was, pieces of real property. The Bridge Loan
12 existed because, at least initially, Highland Capital's
13 credit was needed for the banks to make the loan, and
14 without that loan, the acquisition couldn't have taken
15 place. The -- the LLC agreement -- the multi --
16 multifamily -- SE Multifamily, whatever the name of it
17 is, LLC, agreement wouldn't have existed but for the
18 need for Highland's credit. The Bridge Loan wouldn't
19 have existed except for the other agreements. All of
20 them are part of a single transaction, and I don't think
21 that any of the law firms involved in the circumstances
22 are in a position to be adverse to any of the work that
23 they did previously.
24      So if there is a law firm, I don't know who it
25 was, that provided advice on income tax consequences, it

1 is not in the position, assuming that it's a former
2 client situation rather than a current client situation,
3 I should make that assumption with all of my explanation
4 here. So if there is a law firm that provided advice to
5 this overall transaction to any of the clients, to any
6 client whether it was Highland or any of the other
7 participants, or provided advice with regard to
8 hazardous material issues with regard to any of the
9 properties, or provided advice on any other topic that
10 was part of the overall package, that law firm cannot
11 now be adverse to the former client with regard to this
12 transaction.
13     Q   Right. Doesn't that conclusion require the
14 fundamental premiss that this was a single integrated
15 transaction?
16     A   Yes.
17     Q   Okay. So, again, hypothetical, if the court
18 finds this was not a single integrated transaction then
19 your theory fails, correct?
20     A   I agree with that. I view it --
21     Q   Okay.
22     A   -- It -- it's the same transactions. Then the
23 back up question is whether it's substantially related.
24 I view it as being a single transaction but the -- the
25 rule in Texas and everywhere else so far as I can

1 remember is the same or substantially related.
2     Q   Okay. But if it's not the same transaction,
3 then your back up position would be, well, it's at least
4 substantially related, and therefore Wick Phillips is
5 disqualified under that ground, correct?
6     A   That's correct. I view this -- if I may just
7 extend this a bit. I don't view the difference between
8 the same or substantially related as being meaningful.
9 The standard is the same. One doesn't have to conclude
10 it's the same as opposed to substantially related to
11 result -- I'm sorry. To reach the same result. My own
12 analysis is it's the same transaction.
13     Q   I understand. And I think you've been very
14 clear, Mr. Kehr, and I'm -- again, I'm not here to
15 convince you otherwise, but I am here to test what
16 your -- what your opinions are. You understand that,
17 right?
18     A   Of course.
19     Q   Okay. So I think coming from our same line, if
20 the court finds that this was not the same or
21 substantially related, then your opinion fails and it's
22 not a violation of 109, correct?
23     A   Well, no. You still have the concept of
24 hostile to the interests.
25     Q   Okay. And that's where -- I'm trying to make

1 that distinction. I'm trying to see how far you're
2 going to go, right? And so if it's not the same or
3 substantially related, then you've got this back up,
4 kind of, catch all of hostile to the former client
5 inimical to the interest standard, right?
6     A   Right. Part of that whether you look at it as
7 the same transaction or substantially related or just
8 other hostility is the concept that a lawyer cannot seek
9 to undercut the -- the validity of the work that the
10 lawyer previously did for the client. That's part of
11 the duty of loyalty. It's not the entire duty of
12 loyalty, but it's one prong of the duty of loyalty so --
13     Q   I understand what you're saying, Mr. Kehr, but
14 that's kind of -- that's my question. I've got a couple
15 questions about this. The first thing -- well, let me
16 back it up. You said you were quoting a case here.
17 What case are you quoting as to this standard?
18     A   I think that -- that language -- the -- that
19 long sentence comes from a 19th Century case called, In
20 Re Boone.
21     Q   Can you spell that please?
22     A   B-O-O-N-E.
23     Q   All right. And what jurisdiction is that Boone
24 case from?
25     A   It's a -- it's a federal case that preexisted

18 (Pages 66 - 69)

1 the current Courts of Appeal. The current -- what is
2 it? 11 circuits of Courts of Appeal. It's before the
3 federal courts were aligned that way.
4    (Simultaneous speakers)
5    Q  I understand. That wasn't my question. You
6 said it was a 19th Century case meaning that it was an
7 1800's case?
8    A  Correct.
9    Q  Okay. And do you know what court issued the
10 opinion that you're quoting here for this standard?
11    A  It is what was then called the Circuit Court
12 for Northern District of California and the site is 83
13 Fed 944.
14    Q  So 83 Fed meaning the first version of the
15 federal reporter and we're now on --
16    A  Correct.
17    Q  -- I think the fourth version, right?
18    A  That's right.
19    Q  All right. So it was a long time ago. You
20 agree with me on that, right?
21    A  I do.
22    Q  Okay. And it was from California and not from
23 Texas, correct?
24    A  It was from a federal court in California.
25 Yes. And it cites other older cases.

Page 70

1    Q  I understand. Can you tell me the year that
2 was issued?
3    A  1897.
4    Q  All right. So Texas was admitted as a state of
5 the Union, and, in fact, by then had succeeded and come
6 back after the Civil War, correct?
7    A  Yes.
8    Q  All right. Is there a reason you're using a
9 standard for disqualification from an 1897 case out of
10 California Federal Court rather than using, for
11 instance, a Texas Supreme Court case from somewhere
12 closer to the 22nd Century? 21st -- 21st Century.
13 Yeah. We're in the 21st.
14    A  I won't tell anyone you don't know what century
15 it is.
16    Q  You know, I went to law school because I can't
17 count.
18    A  It will be our secret. There are lots of Texas
19 authorities. I happen to like the rather poetic
20 phrasing of In Re Boone, but I can -- one well-known
21 Texas authority was cited by the Pachulski firm in its
22 original brief. It's the American Airlines case.
23 You'll find language in that.
24    Q  Well -- but this language that you've quoted --
25 or I'm sorry. That Mr. Brown quoted in the summary of

Page 71

1 your opinions to me, and you would agree, it's a broader
2 duty than just the same or substantially similar
3 transaction, correct?
4    A  Well, I just don't see any -- the difference
5 you're trying to draw I can't live with. There -- these
6 are all the same concept --
7    Q  Well, let me ask you --
8    A  -- And the concept is whether you look at it as
9 the same or substantially related, the loyalty concept
10 is that the lawyer cannot attack the matter on which he
11 previously was engaged by former client, and sometimes
12 that's phrased as attacking the lawyers own work.
13 Sometimes under the specific facts of a -- of an
14 opinion, that comes into play, but it's a more
15 generalized concept.
16    Q  I understand that, Mr. Kehr. Five minutes ago
17 you told me that the second dependent clause in that
18 quote was broader than the same or substantially related
19 matter concept. Do you remember that?
20    A  I do. But you're -- you're missing the reason
21 for the distinction. The reason for the distinction is
22 that one can imagine situations in which the lawyer or
23 law firm doesn't even have a client. So it's -- it's
24 not -- in a representation, the question is -- is it the
25 same or substantially related, but one could imagine

Page 72

1 non-representative situations in which a lawyer is
2 attacking work previously done for a former client, and
3 as I said before, it's going to be extremely rare, but I
4 think that the generalized statement and the In Re Boone
5 decision captures that broader concept.
6    In our situation, you don't have to go beyond
7 that because your law firm does have a client, and it's
8 possible to analyze whether the current representation
9 on the creditor's claim is in the same or substantially
10 related matter to the prior representation.
11    Q  I understand that, Mr. Kehr, but it goes back
12 to a question I asked you previously. If the court
13 finds it was not the same or substantially related
14 matter, you're still going to say that we're
15 disqualified. So it would have to be under this second
16 text, correct?
17    A  I'm not going to say you're disqualified.
18 That's a judicial decision. What I'm going to say is
19 that the same duty of loyalty issue arises without
20 regard to how one categorizes it. What -- what exists
21 in my view is that your law firm is acting in a way that
22 is adverse to its former client with regard to the
23 subject of the former representation.
24    Q  And if it's not the subject of the former
25 representation, it's going to be your position there is

Page 73

Page 74

1 still a violation of rule 109 because we were taking a
2 position hostile to the former client and one inimical
3 to the interests that we were previously engaged to
4 protect, correct?
5    A   Well, I'm not certain I can go quite that far
6 because it -- it -- it -- there is a representation.
7 You know, again, I've said this I guess twice before.
8 But I view the broader statement as being a fair summary
9 of the narrower statement, but it does include that, you
10 know, unusual situation, highly unusual situation, in
11 which there is no current representation.
12    Q   Does the broader statement, the second part of
13 this, the -- the lawyer cannot assume a position hostile
14 to the former client and one inimical to the interests
15 that the lawyer was previously engaged to protect, that
16 doesn't appear in rule 109, correct?
17    A   That's correct.
18    Q   It appears in In Re Boone from 1897, correct?
19    A   Well, I think it -- it exists in other places
20 too.
21       MR. MARTIN:  Objection.  Nonresponsive.
22    A   It exists in the American Airlines case.
23    Q   Those words exist in the American Airlines
24 case?
25    A   Not those words.  That concept.  And there are

Page 75

1 a number of other cases.  There is a Texas advisory
2 ethics opinion that has the broader concept.
3    Q   Okay.  Mr. Kehr, I was going to ask you about
4 this in a little while, but I noticed in the
5 documents -- well, first of all, Madam Court Reporter,
6 do we have Exhibit 1 marked?
7       THE REPORTER:  Yes.
8       (Exhibit No. 3 was marked for identification.)
9    Q   Okay.  I'm going to come back to that.  Let's
10 go to Exhibit 3 real quick.  Mr. Kehr, Exhibit 3 is a
11 list that was provided to us by Mr. Brown of the
12 documents that were considered by you in connection with
13 this Motion to Disqualify.  Do you see that?
14    A   I do.  I have it on my -- my screen on my
15 computer here.
16    Q   Perfect.  Have you seen this document before?
17    A   I think I saw it for the first time yesterday.
18       MR. BROWN:  Grant, excuse me for just a minute.
19 I just wanted to add that we also sent Lauren a
20 letter -- I'm sorry.  An email after we sent this that
21 added to this list with greater declaration and the
22 attached exhibits which was framed as an appendix and
23 was filed under seal as one additional document with the
24 attachments which Mr. Kehr considered, and it -- I mean,
25 it could be part of this list, because it was part of

Page 76

1 the opposition --
2       MR. MARTIN:  I understand.
3       MR. BROWN:  -- Of Wick Phillips.  But just for
4 clarity.
5       MR. MARTIN:  And, Mr. Brown, I'll stipulate I
6 saw that email.  I'm not disputing that those were also
7 part of the documents he reviewed.  That's not what I'm
8 going to ask him about, but thank you for the
9 clarification.  Mr. Kehr, do you have Exhibit 3 up in
10 front of you?
11    A   I do.
12    Q   Can you identify where Exhibit 3 lists In Re
13 Boone from 1897?
14    A   I didn't understand that that was the purpose
15 of this list.  This list documents.  It doesn't list
16 cases or advisory ethics opinions.
17    Q   I was going to ask you that next.  It doesn't
18 list American Airlines case.  It doesn't list the ethics
19 opinions, correct?
20    A   I think that's correct.
21    Q   All right.  So if I was going to test your
22 interpretation of these cases and test your
23 interpretation of the opinions, I don't have the
24 opportunity to do that because I don't know what you've
25 looked at, right?

Page 77

1    A   I -- I think that's a rhetorical question.
2       MR. BROWN:  I'm going to object to this line of
3 questioning to the extent -- to the extent it applies
4 that there was an agreement to produce authorities.
5 That's not the case.  We agreed to produce documents
6 that Mr. Kehr relied on.  We did not agree in our
7 stipulation to produce authorities or to list
8 authorities.
9       MR. MARTIN:  Mr. Brown -- Mr. Brown, is it your
10 position that under rule 26 you don't have to produce
11 everything he looked at in evaluating this and rendering
12 his opinions?
13       MR. BROWN:  We agreed to produce documents not
14 authorities.
15       MR. MARTIN:  And so you don't think you have
16 the obligation to produce the authorities; is that
17 correct?
18       MR. BROWN:  That's correct.  Neither party
19 produced any authorities.
20       MR. MARTIN:  Objection.  Okay.  That's fine.
21 You're on the record.  Anything else, Mr. Brown, before
22 I actually ask your witness a question?
23    Q   Mr. Kehr, you would agree with me that courts
24 sometimes disagree about what cases say, correct?
25    A   Yes.

20 (Pages 74 - 77)

| | |
|---|---|
| 1    Q And, in fact, even Supreme Court has majority<br>2 opinions and sense that can disagree about specific<br>3 provisions that a case might turn on, correct?<br>4    A Correct.<br>5    Q So if you and I were looking at the same<br>6 advisory opinions, you and I might have a different<br>7 interpretation of those advisory opinions, correct?<br>8    A Agreed.<br>9    Q And you and I might have a different opinion<br>10 about what the American Airlines case says, correct?<br>11    A Of course.<br>12    Q You and I might have a different opinion as to<br>13 the affect of In Re Boone from 1897 has on rule 109 of<br>14 the Texas rules, correct?<br>15    A Yes.<br>16    Q So it's difficult for me to question you about<br>17 your assumptions without knowing what you looked at.<br>18 You agree with that, right?<br>19    A I think, again, this is a rhetorical question.<br>20 I don't want to get involved in your debate with<br>21 Mr. Brown about whether either of the parties violated<br>22 some agreement between them. It's --<br>23       (Simultaneous speakers)<br>24    Q I'm not asking you for that. Mr. Kehr, I<br>25 appreciate that, but I'm not asking you for that. I'm<br><br>Page 78 | 1 cases or advisory opinions you looked at in reaching<br>2 your conclusions here today?<br>3    A I -- I couldn't possibly. I could read cases<br>4 and advisory ethics opinions and participated in writing<br>5 advisory ethics opinions for 40 years. Probably<br>6 slightly more than 40 years. So, I mean, the -- the<br>7 whole body of the -- roughly the 40 or so years that<br>8 I've been involved in the field of professional<br>9 responsibility, all of the work that I did on the two<br>10 commissions that wrote the California rules, all of that<br>11 comes into play.<br>12      When Mr. Brown ultimately files his brief,<br>13 there will be some sampling of particular opinions that<br>14 he's going to view important for the courts<br>15 understanding, but my opinion is based on 40 years of<br>16 experience in the field.<br>17      MR. MARTIN: Okay. I'm going to object as<br>18 nonresponsive.<br>19    Q Mr. Kehr, can you identify which authorities<br>20 you consulted in reaching your opinions in this case in<br>21 the last three months?<br>22    A I couldn't give you a complete answer.<br>23    Q Could you give me a partial answer other than<br>24 In Re Boone and the American Airlines case?<br>25    A Yes. I recall looking at the restatement third<br><br>Page 80 |
| 1 asking you whether or not I can test your opinions about<br>2 what a Texas case does or does not say if I don't know<br>3 what you looked at. I can't, right?<br>4    A I don't agree with that. You can test my<br>5 opinion. I will tell you the reason I think what I<br>6 think, and you can find out everything you need to know<br>7 about what my analytical process is. Whether a<br>8 particular opinion supports or contradicts my opinion is<br>9 something for you and Mr. Brown to work out in your<br>10 filings that I understand are due in a couple of weeks.<br>11 But I'm not going to have a debate with you here about<br>12 what particular cases say. I would -- would be totally<br>13 incapable of doing that except by written materials. I<br>14 can't do that spontaneously. What I can do is explain<br>15 what my thought process is.<br>16    Q I understand that and you testified earlier<br>17 that you consider yourself an expert on the Texas rules.<br>18 You remember that?<br>19    A I do.<br>20      [Zoom audio interference]<br>21    Q [inaudible] -- On disciplinary rules is<br>22 interpreting cases and interpreting advisory opinions,<br>23 correct?<br>24    A Yes.<br>25    Q Can you identify as we sit here today what<br><br>Page 79 | 1 of the law governing lawyers. I remember that offhand.<br>2 I recall the Texas advisory ethics opinion that I<br>3 mentioned a moment ago.<br>4    Q Do you remember which one that was?<br>5    A No. I don't remember the number.<br>6    Q Do you remember what it was about?<br>7    A I only remember that it is one of the sources<br>8 that talks about the lawyer and I'm going to -- these<br>9 are not the words of the opinion, but -- but a<br>10 paraphrase of the concept seeking to undo the lawyers<br>11 own work or attacking the lawyers own prior work.<br>12    Q What else?<br>13    A A fairly -- fairly common concern that pops up<br>14 around the country, and it's come up in any number of<br>15 cases and advisory ethics opinions.<br>16    Q What else did you look at?<br>17    A I can't tell you.<br>18    Q Okay. So as we sit here today, you've<br>19 identified everything that you can remember that you<br>20 looked at in interpreting the Texas rules to reach the<br>21 opinions you have in this case, correct?<br>22    A Yes.<br>23    Q All right. So I'm going to move on to<br>24 something else. Part of your opinions revolve around<br>25 this concept of -- that this was a single integrated<br><br>Page 81 |

**Page 82**

1 transaction, correct?
2 A  Yes.
3 Q  All right.  Now, I don't need to get into
4 another semantic discussion with you unless you find it
5 necessary after hearing my questions.  But in my opinion
6 or in my mind, there is a difference between a single
7 integrated transaction and different representations of
8 a lawyer.  Do you agree or disagree with that statement?
9 A  I agree.
10 Q  So you could have a single integrated
11 transaction and have different lawyers representing a
12 client in different parts of a single integrated
13 transaction, correct?
14 A  I agree with that.  Different lawyers in a
15 single law firm or different lawyers in different law
16 firms?
17 Q  So, for example, if you had a law firm that the
18 client loves for whatever reason to do their finance
19 work.
20 A  Excuse me.  But I missed one word in your
21 question.  Could you start it over again please?
22 Q  Absolutely.  I'm just giving you an example.
23 And one example I might have is that a client loves to
24 use certain -- certain law firm for their finance work
25 but doesn't use that lawyer for their intellectual

**Page 83**

1 property work, correct?
2 A  Yes.
3 Q  And so those lawyers perhaps in a single
4 transaction might have different representations.  Their
5 scope of representation would be different, correct?
6 A  Correct.
7 Q  And so, for example, if the lawyer -- if the
8 law firm doing the finance work doesn't have the
9 capability to do intellectual property work, then that
10 representation by definition would not involve
11 intellectual property, correct?
12 A  Correct.
13 Q  Now, I don't think I'm previewing anything that
14 anybody doesn't already know.  You understand that my
15 firm is taking a position that we represented,
16 regardless of -- we'll get into it, who was represented,
17 but the representation of my firm was limited to the
18 loan agreement, right?
19 A  Yes.
20 Q  And you understand that that's our position,
21 correct?
22 A  I do.
23 Q  So if that is the case and the court finds that
24 we represented whoever you're talking about just for the
25 purposes of the loan transaction, it is your opinion

**Page 84**

1 that rule 109 was still violated because the entirety of
2 it was a single integrated transaction or no?
3 A  Well, because it's a single integrated
4 transaction and what your firm is doing is attacking the
5 effectiveness or validity of work it did before.  What
6 you're -- what you're doing in my opinion is mixing the
7 concept of scope of representation, which is extremely
8 important, with the loyalty issue which is not limited
9 to the particular legal issues on which the lawyer
10 previously advised the client.  The scope of
11 representation is essential for -- primarily for
12 malpractice purposes.  Let's -- let's --
13      (Simultaneous speakers)
14 Q  Go ahead.  I'm sorry.
15 A  Yeah.  Let's just say to simplify the
16 discussion that there were ten law firms involved in
17 the -- what was it called?  The unicorn transaction?
18 Q  Project Unicorn.
19 A  Yeah.  And that one of them provided advice
20 about title insurance on properties that were being
21 acquired.  And let's assume that the other nine law
22 firms provided no advice on that subject and that a
23 that whomever or whichever their client was, didn't rely
24 on any of those other nine law firms to provide advice
25 on title insurance questions.

**Page 85**

1      If there was malpractice on the title
2 insurance, then it's only that one law firm that
3 provided that advice that would be in jeopardy.  That's
4 the scope of representation, and it's essential for
5 lawyers to carefully define the scope of representation
6 so that the client can not reasonably rely on the lawyer
7 to provide advice or representation with regard to any
8 other topic.
9      And as you said in your question, a lawyer
10 might not be competent to provide advice on some other
11 issue.  The finance lawyer might not know anything about
12 IP issues or might know nothing about title insurance or
13 might know nothing about Delaware trusts or any number
14 of other issues that were involved in Project Unicorn.
15 And the prudent lawyer will also always carefully limit
16 the scope so there is no reasonable reliance, and there
17 is no potential risk and so that the client is protected
18 and will know who to look to, who to communicate with,
19 and so on.
20      I view the loyalty issue as being a completely
21 unrelated analysis.  The question is whether the lawyer
22 is acting in a way that's hostile to the former
23 representation.
24 Q  Okay.
25 A  Either the lawyers work in it or in some other

22 (Pages 82 - 85)

1 fashion --
2        (Simultaneous speakers)
3    Q    But, Mr. Kehr, I think you're getting to the
4 heart of the matter --
5        MR. BROWN: Excuse me. Can you let the witness
6 finish answering before you interrupt?
7        MR. MARTIN: I didn't mean to interrupt him. I
8 apologize. I --
9        MR. BROWN: He wasn't finished.
10        (Simultaneous speakers)
11        MR. BROWN: Go ahead and finish, Mr. Kehr.
12    A    I -- actually, I thought I was, but please --
13 please go ahead, Mr. Martin.
14    Q    Thank you, Mr. Kehr, and, again, my apologies
15 if you believe that I interrupted you. I didn't think I
16 did either. So in your -- let's use your hypothetical
17 for a second so we're talking apples to apples. In your
18 hypothetical involving this title company that -- that
19 committed alleged malpractice, right? You're saying the
20 title -- that the law firm that did the title work was
21 in jeopardy, right?
22    A    Yes.
23    Q    In your hypothetical, would any of those other
24 nine firms be able to take some action to try to undo
25 that title -- the work that that law firm did regarding

Page 86

1 title?
2    A    No.
3    Q    And why is that? Because it's the same
4 transaction?
5    A    Correct.
6    Q    Okay. So your view is because those ten firms
7 worked on that transaction, all ten of those firms are
8 barred by the -- by the duty of loyalty from attacking
9 any parts of that transaction, correct?
10    A    Correct. Without client consent.
11    Q    I understand. And so -- and it's your view
12 that if one of those other nine firms took any other
13 action to try to undo that part of the transaction that
14 that would be a breach of their duty of loyalty,
15 correct?
16    A    Correct.
17    Q    And you believe that that standard that you're
18 testifying to is the standards that are required under
19 Texas Rule 1.09, correct?
20    A    I think the answer would be the same whether we
21 were looking at the Illinois rules or the New York rules
22 or the California rules because all the phrasings are
23 slightly different. Texas does have a unique twist on
24 the phrasing of it's 109. The underlying concepts are
25 the same and will be found in the equivalent rule in

Page 87

1 each of the other jurisdictions. What your -- while
2 you're thinking about that, can we take our second
3 break? I need to run down the hall.
4    Q    Sure. Let me ask one quick follow-up question
5 --
6    A    Of course.
7    Q    -- Because I have to object to that last
8 response as nonresponsive. Because what I asked you was
9 it is your testimony that those nine firms taking an
10 action to undo whatever the title law firm did wrong
11 that that is a violation of Texas Rule 1.09?
12    A    Well, that's only if the Texas rules are
13 applicable. You might have a law firm that's in
14 Illinois or Massachusetts or somebody else -- somewhere
15 else --
16    Q    I'm asking --
17    A    -- That's involved in a transaction in some
18 other jurisdiction.
19    Q    Yes, sir. I'm asking under Texas rules. It's
20 your opinion that scenario that you painted is violative
21 of Texas Rule 1.09 if Texas rule 1.09 applies, correct?
22    A    Correct.
23    Q    All right. Let's take a break.
24    A    Thank you.
25        (Recess from 12:34 p.m. to 12:43 p.m.)

Page 88

1    Q    All right. Mr. Kehr, we took a short break.
2 You understand you're still under oath?
3    A    I do.
4    Q    Did you communicate with anyone during the
5 break including Mr. Brown?
6    A    No.
7    Q    Excellent. All right. I want to go back to
8 what we've marked as Exhibit 1 which is the summary of
9 your opinions.
10    A    Give me one moment to get it back up on my
11 screen.
12    Q    Take your time.
13    A    Got it. Go ahead.
14    Q    All right. I want to go to the second bullet
15 point. I'm sorry. I apologize. The third bullet point
16 right at the bottom of page three where it states, "Wick
17 Phillips attempt to distinguish it's work for HCRE and
18 Highland in the negotiation and drafting of the loan
19 agreement from the work allegedly done by other lawyers
20 and law firms in connection with drafting the LLC
21 agreement is not supported by well-settled ethical
22 standards or the Texas Disciplinary Rules of
23 Professional Conduct." Did I read that correctly?
24    A    You did.
25    Q    What did you rely on in reaching that opinion

Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1 other than what we've already discussed? | 1 attorney general. I think it's from an ethics |
| 2   A  I don't think there is anything else. I think | 2 committee, but there is also other Texas authority. |
| 3 we've covered it. | 3   Q  And which are those? |
| 4   Q  Okay. Can you explain to me -- well, and you | 4   A  I -- I can't tell you offhand. |
| 5 didn't draft this summary. So what -- what I found | 5   Q  Okay. And those aren't listed in the -- what |
| 6 interesting there was the use of the phrase, | 6 you reviewed, correct? |
| 7 well-settled. Did you -- is that your phrase or | 7   A  In -- in that disclosure we talked about |
| 8 Mr. Brown's phrase? | 8 before? |
| 9   A  I don't know. But I do consider these concepts | 9   Q  Yes. |
| 10 all to be well-settled. | 10   A  No. That's a document disclosure not an |
| 11   Q  And you considered these concepts well-settled | 11 authority disclose. |
| 12 based on the authorities that you've discussed, correct? | 12   Q  I understand that. At no point have you |
| 13   A  Yes. I think that these are national standards | 13 provided us the list of authorities you relied on in |
| 14 that prohibits a lawyer from being adverse to the former | 14 reaching your opinion, correct? |
| 15 client as we've discussed. | 15   A  That's correct. |
| 16   Q  Right. And that includes the quote up above in | 16   Q  All right. Thank you. Let's now go to the |
| 17 the first bullet point that you identified came from the | 17 next bullet point on the next page. You state, "The |
| 18 In Re Brown [sic] case, correct? | 18 drafting of the LLC agreement, the 2018 joint |
| 19   A  Yes. | 19 investment, the various steps needed to effect their |
| 20   Q  All right. Let me ask you another | 20 terms, and the drafting and the negotiation of the loan |
| 21 hypothetical. If the court finds that that second | 21 agreement, and the various steps required to effect it's |
| 22 dependent clause from In Re Brown [sic] doesn't apply to | 22 terms including with respect to the preparation of |
| 23 Texas Rule 109 then your opinion failed, correct? | 23 multiple separate documents, schedules, and exhibits |
| 24   A  No. I don't think so unless I misunderstand | 24 attached to the loan agreement comprise a single |
| 25 what you're pointing at, because you still have the same | 25 integrated transaction. The subject of which was the |
| Page 90 | Page 92 |
| 1 or substantially related matter. | 1 acquisition of the mortgaged properties and the |
| 2   Q  That's a fair point. So let me give you a | 2 portfolio properties as defined in the loan agreement." |
| 3 different hypothetical. Let's say that the court finds | 3 Did I read that correctly? |
| 4 that the representation of Wick Phillips was not in the | 4   A  Yes. |
| 5 same or substantially related matter and finds that the | 5   Q  So if I was to summarize your previous |
| 6 second part of that last sentence is not settled while | 6 testimony, that bullet point addresses your concept that |
| 7 under Texas Rule 109, then your opinion fails, correct? | 7 because all of this was a single transaction, that |
| 8   A  Well, you still have the question of whether | 8 anybody that was involved in any step of this would be |
| 9 what your firm is doing is attacking the work that it | 9 disqualified from attacking any part of the transaction; |
| 10 previously did. Now, I -- I -- you're -- you're | 10 is that correct? |
| 11 attempting to create narrow distinctions here that I | 11   A  Well, any -- any lawyer or law firm. |
| 12 don't see. I view all of these concepts of being | 12   Q  Yeah. |
| 13 essentially the same loyalty duty to the former client, | 13   A  Yes. |
| 14 but there still is authority, including Texas authority, | 14   Q  That's what I meant. |
| 15 for the concept that a lawyer cannot attack the prior | 15   A  Yes. |
| 16 work. The prior work included on the allocation -- | 16   Q  All right. |
| 17 representing the allocation to the lender and all of | 17   A  I agree with that. |
| 18 that, and so there is still be that basis on which a | 18   Q  And you believe that that is called for and |
| 19 court might determine that disqualification would be | 19 required under Texas Rule 109, correct? |
| 20 appropriate. | 20   A  I do. |
| 21   Q  And the Texas authority you're relying on there | 21   Q  All right. And you have reached that opinion |
| 22 is the American Airlines case and the advisory opinion | 22 regardless of whether or not the scope of representation |
| 23 for the attorney general that you identified earlier, | 23 of any individual law firm was limited, correct? |
| 24 correct? | 24   A  Well, I would say I'd assume that the |
| 25   A  I think the advisory opinion is not from the | 25 representation of individual law firms was limited. I |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

Page 94

```
 1  would say that's -- that's a fundamental assumption that
 2  I'm making, and I'm prepared to assume that Highland did
 3  not actually or reasonably rely on your firm for legal
 4  advice or representation with regard to the drafting or
 5  the negotiation of the LLC agreement.
 6     Q   Right.  And actually that's a great point.  I
 7  wanted to get back to that.  You mentioned it earlier,
 8  and we didn't flush it out.  You agree with me that
 9  there is evidence in this case that Wick Phillips was
10  not involved in the negotiation drafting of the LLC
11  agreement, correct?
12     A   Yes.
13     Q   Do you have any evidence or anything to suggest
14  that Wick Phillips did, in fact, negotiate or draft the
15  LLC agreement?
16     A   No.
17     Q   And, in fact, there is evidence in this case
18  that another law firm and in-house lawyers from the
19  clients were the ones that actually negotiated and
20  drafted the LLC agreement, correct?
21     A   Yes.
22     Q   And your opinion that we are disqualified is
23  based on the fact that if we touched -- in laymen's
24  terms, if we touched any part of this transaction then
25  we can't attack any other part of the transaction,
```

Page 95

```
 1  right?
 2     A   Well, in part that's correct although you have
 3  to keep in mind that the part that your firm did handle,
 4  I think unquestionably handled, does involve the
 5  allocation of ownership interests.  You prepared
 6  documents that made those representations and
 7  representations and warranties to the lenders.  So you
 8  did touch the allocation even if you didn't advise about
 9  the allocation, it was among the things that you did.
10  So there were written representations and warranties by
11  the borrowers, plural, regarding that allocation.
12     Q   Have you seen a notice that Wick Phillips
13  touched the allocations after the amended LLC agreement
14  was done?
15     A   I mean, only that it was in the Bridge Loan.
16  So there would be a distinction between what your firm
17  did and our hypothetical firm that advised on title
18  insurance -- I'm sorry.  Title issues.  Not title
19  insurance but title issues with regard to one of the 20
20  or 30 properties.
21     Q   I -- I --
22     A   -- That -- that law firm that looked at a title
23  report wouldn't have seen -- wouldn't have known about
24  and wouldn't have drafted a piece of paper that talked
25  about the allocation of ownership interests.  Your firms
```

Page 96

```
 1  connection was closer because it did.
 2     Q   In connection with the original loan documents,
 3  right?
 4     A   Yes.
 5     Q   And that's when the first LLC agreement was in
 6  effect, correct?
 7     A   At least then, yes.  I'm not certain what your
 8  firm did when the new investor came in.
 9     Q   Do you have any evidence that my firm was
10  involved in the allocations aspect of it after the
11  amended LLC agreement was entered into?
12     A   I don't recall whether I've seen anything on
13  that, but I'm certainly prepared to assume that it did
14  not.
15     Q   All right.  So it's your testimony that even
16  assuming my firm did not touch the allocation issue
17  after the amended LLC agreement was entered into, that
18  our firm would still be disqualified because of it's
19  work on the original loan agreement, correct?
20     A   Correct.
21     (Exhibit No. 2 was marked for identification.)
22     Q   All right.  Let's do Exhibit 2.  Mr. Kehr, just
23  a couple of questions.  This is your engagement
24  agreement with --
25     A   Give me just one second to open it on my screen
```

Page 97

```
 1  so I can see all of it.
 2     Q   Take your time.
 3     A   Yes.  That is my engagement agreement.
 4     Q   Right.  And that's -- the addressee of that is
 5  Mr. Seery, the CEO of Highland Capital Management,
 6  correct?
 7     A   Correct.
 8     Q   And looking at this letter in the second
 9  paragraph it states that your time is billed at $775 per
10  hour; is that correct?
11     A   Yes.
12     Q   And Ms. Cohen, who I think you identified
13  earlier.  Her time would be billed at $575 per pour; is
14  that correct?
15     A   Yes.  Correct.
16     Q   Has anyone else worked on this besides you and
17  Ms. Cohen?
18     A   Well, I'm not certain that she has, but nobody
19  else would have.
20     Q   Fair enough.  That answered my question.  Thank
21  you.  Is $775 an hour your normal billing rate?
22     A   I don't really have a normal billing rate, but
23  it's in the range of what I am charging for expert
24  witness consultation and testimony.
25     Q   And that's my question.  Do you -- you charge a
```

25 (Pages 94 - 97)

**Page 98**

```
 1  higher rate for expert witness work than in your normal
 2  representation of clients providing legal services,
 3  correct?
 4     A   Yes.
 5     Q   And what's your normal rate for providing legal
 6  services to clients?
 7     A   It would be $100 or more lower except with some
 8  longterm clients who are billed at -- I think the lowest
 9  rate for -- I've got some clients.  One client in
10  particular I've had since about 1986, and I charge that
11  company I believe at 550.
12     Q   So your rates are higher for expert work,
13  right?
14     A   They are.
15     Q   Let's go to -- Madam Court Reporter, I just
16  want to make sure as we go through this that I don't
17  miss anything.  Can you please confirm that Exhibit 2
18  and 3 are marked as part of the record?
19        THE REPORTER:  They are.
20     (Exhibit No. 4 was marked for identification.)
21     Q   Thank you very much.  Mr. Kehr, now I want to
22  go to Exhibit 4 which is a document that has now been
23  Bates labeled Highland underscore WPEP000014, and it
24  runs through Highland underscore WPEP000018.
25     A   I have it open on my screen.
```

**Page 99**

```
 1     Q   Thank you.  I'm going to represent to you that
 2  there was no Bates label in this -- on this document in
 3  the production in the underlying adversary matter.  So
 4  how did you obtain this document?
 5     A   Either from Mr. Brown or from one of his
 6  colleagues.
 7     Q   And you used this document as part of reaching
 8  your opinions in this case?
 9     A   I think that's -- that's fair to say.  I had to
10  think through the implications of this.  So, yes, I
11  agree with you.
12     Q   Which of your opinions, if any, does this
13  document support?  Why is this document important to
14  your opinions?
15     A   Well, I don't think it is.  It's something I
16  had to think through.  That doesn't support any of my
17  opinions.  It doesn't undercut any of my opinions.  It's
18  part of the -- it's part of the underlying factual
19  situation.
20     Q   So does this -- I understand that you looked at
21  this document in reaching your opinions, but is it fair
22  to say that this document doesn't -- or it just has no
23  relevance whatsoever to your opinions?
24     A   Yes.
25     Q   Do you remember what you were told about that
```

**Page 100**

```
 1  document when you received it?
 2     A   I remember being told in a phonecall that there
 3  had been a release of Highland Capital Management, LP,
 4  from the Bridge Loan obligation, and I recall that
 5  Pachulski Stang didn't at first have the document
 6  although they understood it existed, and there was some
 7  delay in getting it to me.  I don't recall them saying
 8  anything else about it.
 9     Q   All right.  Now -- all right.  That document
10  doesn't relate to your opinions now in any way; is that
11  correct?
12     A   Yes.  That's correct.
13     (Exhibit No. 5 was marked for identification.)
14     Q   All right.  I want to go now to Exhibit 5, and
15  Madam Court Reporter, please mark Exhibit 4.  Mr. Kehr,
16  I'm going to represent to you I'm not going to go
17  through the Bridge Loan agreement page by page.  You're
18  welcome.
19     A   Everyone thanks you for that.
20     Q   But it is part of your opinion --
21     A   I --
22        MR. BROWN:  Brant, I think there may be some
23  self-interest involved there.
24     Q   A little bit.  A little bit.  I've got a
25  volleyball and football game to get to later today, and
```

**Page 101**

```
 1  I don't want to be here all night.
 2        We've established that one of your opinions is
 3  that the LLC agreement and the loan agreement and the --
 4  and by -- let me -- hold on.  Let me back up.  You agree
 5  with me that there is two LLC agreements involved in
 6  this case, correct?
 7     A   You mean the original and the amendment?
 8     Q   Yes.
 9     A   Yeah.  Okay.
10     Q   All right.  And as we go through these
11  questions, Mr. Kehr, I'm going to attempt to make a
12  distinction between the original LLC agreement and the
13  amended LLC agreement, and if I slip up and I don't make
14  that distinction or you think I'm missing something, I
15  want you to point it out to me.  Okay?
16     A   Yeah.
17     Q   All right.  But I think it's your opinion in
18  this case that between the original LLC agreement and
19  the loan agreement, in your opinion, those were
20  certainly, in your opinion, part of a single integrated
21  transaction, correct?
22     A   Yes.
23     Q   Is it your opinion that the subsequent amended
24  LLC agreement was also part of a single integrated
25  transaction?
```

26 (Pages 98 - 101)

| | |
|---|---|
| 1    A   Yes. | 1   least seven borrowers, correct? |
| 2    Q   And that forms part of the basis of your | 2    A   Correct. |
| 3   opinions in this case, correct? | 3    Q   And you agree with me that this loan agreement |
| 4    A   Well, I don't think it's -- it's significant | 4   is dated September 26th, 2018, correct? |
| 5   for my view of your firms duties, but if -- if we were | 5    A   Dated as of September 26th, 2018, yes. |
| 6   to imagine for a moment that a brand new law firm came | 6    Q   All right. And Mr. Brown and I covered this |
| 7   in to represent one of the parties to the agreement, | 7   earlier, but also part of the documents you reviewed |
| 8   then that other law firm having had no involvement with | 8   even if they're not on Exhibit 3 is what we've been |
| 9   the original LLC agreement or with the Bridge Loan | 9   calling the appendix which included the unicorn purchase |
| 10   agreement or with the many, many other underlying | 10   and sale agreements of the underlying assets, correct? |
| 11   elements to the -- to Project Unicorn, would have the | 11    A   Yes. |
| 12   same loyalty obligation with regard to the entire | 12    Q   All right. So you saw the unicorn PSA's, |
| 13   package. | 13   correct? |
| 14    Q   Well, let's talk about that for a second. | 14    A   I -- I didn't -- I don't think I really looked |
| 15    A   Sure. | 15   at them, but they were available to me, and I think the |
| 16    Q   If a new law firm came in to negotiate and | 16   content of the individual purchase agreements was not |
| 17   draft the amended LLC agreement that Wick Phillips was | 17   relevant to my analysis. |
| 18   involved in the original loan agreement, which was | 18    Q   Tell me why that is. |
| 19   executed at the same time as the original LLC agreement, | 19    A   What's relevant to my analysis is that Wick |
| 20   your positions -- I think I understand your position is | 20   Phillips represented Highland with regard to the loan |
| 21   that because Wick Phillips was involved in the original | 21   agreement that was a portion of Project Unicorn. |
| 22   loan agreement which necessarily involved the original | 22       (Simultaneous speakers) |
| 23   LLC agreement that at that point, at that snapshot in | 23    Q   What's the -- sorry. Go ahead. |
| 24   time, Wick Phillips is barred from representing | 24    A   The other underlying elements of this such as |
| 25   interests against Highland later on no matter what, | 25   the way in which the Delaware Statutory Trusts were |
| Page 102 | Page 104 |

| | |
|---|---|
| 1   correct? | 1   drafted and what the purchase agreements for individual |
| 2    A   With regard to Project Unicorn. | 2   properties said not relevant. |
| 3    Q   With regard to Project Unicorn. | 3    Q   All right. Let me give you -- let me ask you |
| 4    A   It would be adverse to Highland with regard to | 4   another question then. Let's assume that the DST's, the |
| 5   other matters. | 5   Delaware Statutory Trusts, were set up as part of |
| 6    Q   I understand. But if another law firm came in | 6   Project Unicorn and the original PSA's. Are you with me |
| 7   and negotiated or drafted the amended LLC agreement and | 7   so far? |
| 8   a subsequent arose about the amended LLC agreement, it | 8    A   I am. |
| 9   is your opinion Wick Phillips would still be | 9    Q   And that Wick Phillips worked on the loan |
| 10   disqualified because they were involved prior to the | 10   agreement to set up that structure in September of 2018. |
| 11   amended LLC agreement in Project Unicorn, correct? | 11   Okay? |
| 12    A   Correct. | 12    A   Very good. |
| 13    Q   I guess I need to make it clear for the record. | 13    Q   Later, an entirely different property that was |
| 14   I don't concede that I think you're right, but I think | 14   not involved in the original Project Unicorn PSA's was |
| 15   you -- | 15   purchased and shoved by Highland underneath one of those |
| 16       MR. BROWN: Brant -- Brant, we can stipulate | 16   DST's. You with me so far? |
| 17   that you're not conceding any of the positions that | 17    A   I'm not certain. I need you to repeat that. |
| 18   Mr. Kehr is stating here unless you so state. | 18    Q   Sure. I'm asking you to assume for the |
| 19       MR. MARTIN: Fair enough. | 19   purposes of this hypothetical that after September 26th, |
| 20       MR. BROWN: So you don't need to waste your | 20   2018, that there was another asset that was purchased by |
| 21   time or breath. | 21   a Highland entity and put under the ownership structure |
| 22    Q   Thank you, Ken. All right. Talking about this | 22   of one of the DST's, and that that asset that was later |
| 23   Bridge Loan agreement, Mr. Kehr. I'm assuming that part | 23   purchased had nothing to do with the original Project |
| 24   of your opinion on the conflict here is based on the | 24   Unicorn assets. Are you with me? |
| 25   fact that Highland Capital Management, LP, is one of at | 25    A   I am. |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

1   Q   Under your opinion, I assume you are going to
2   say that because Wick Phillips represented parties in
3   connection with the loan agreement originally setting up
4   Project Unicorn, that an after acquired asset which was
5   later put into one of those entities, that Wick Phillips
6   would be disqualified from being adverse in that matter
7   as well, correct?
8   A   I think that's probably correct.  I -- I want
9   to try to chart this out.  And I think I have some
10  related questions in order to be able to at least
11  mentally chart it out.  Was the later acquisition
12  related to the Bridge Loan in any way?
13  Q   I'm saying no.  Under my hypothetical, the
14  answer to that question would be no.
15  A   And your hypothetical is that -- that Highland
16  Capital Management, LP, acquired another property
17  unrelated to the 20 or 30 involved in Project Unicorn in
18  September of 2018 but put it into the SE Multifamily?
19  Q   Yes.  That is my hypothetical.
20  A   I have to think about that one.
21  Q   All right.  And -- and let's put a -- kind of a
22  fine point on it.  I'm -- I'm actually enjoying this
23  conversation.  Let's say it was something completely
24  unrelated to Multifamily.  All right.  Let's call it --
25  you don't have these in California that much, but let's

Page 106

1   to do with an oil and gas lease of which by way there
2   are many in California.
3   Q   Fair enough.
4   A   And -- and that's not related in any way that I
5   can see to the work that was done by your firm in and
6   around 2018.  It's not the same LLC agreement.  It's not
7   the same Bridge Loan.
8       Well, let's start with the Bridge Loan
9   agreement.  That's the entry point.  It's not the same
10  Bridge Loan agreement.  It doesn't affect that -- it
11  doesn't affect anything about the work that you did.
12  It's not part of the -- the integrated project that I
13  see.  You know, you -- if you look in the Bridge Loan
14  agreement, you'll see that there is a description of
15  purpose somewhere, and the purpose of the loan is to
16  acquire those 20 to 30 properties.  It has nothing to do
17  with the later acquisition of an oil and gas lease and
18  in California or Alaska, or wherever it might be.
19  Q   All right.  But the acquisition of those
20  properties occurred on or about September of 2018,
21  correct?
22  A   What's the antecedent for those properties?
23  The 20 or 30 you're talking about?
24  Q   Yes.
25  A   Yes.  That's correct.

Page 108

1   call it oil and gas lease.  Right?  They got a producing
2   oil and gas lease, and they don't know where to put it
3   so they put it under SE Multifamily.  It wasn't part of
4   Project Unicorn in September of 2018.  It wasn't part of
5   the loan agreement.  It wasn't anticipated by any of the
6   schedulers.  My question to you is, would Wick Phillips
7   be disqualified from representing a party about that
8   transaction of the oil and gas lease?
9   A   I think the answer to that one is probably not.
10  I'm finding -- I'm finding it difficult to see how
11  anyone would feel that -- that your firms being adverse
12  to Highland with regard to a later transaction not
13  involved in the -- the 2018 acquisitions or the Bridge
14  Loan could be considered as being part of the prior
15  representations.
16  Q   So how is it that the later changing of the
17  ownership allocations in the amended LLC agreement is
18  connected or related to my firms prior representation if
19  my firm had nothing to do with the amended LLC?  What's
20  the difference between those two scenarios?
21  A   Because this is the same Project Unicorn.  If
22  the day after September 26 the parties agreed to make
23  some change, either a change with the lender or a change
24  among the borrowers, that's part of Project Unicorn.
25  It's still Project Unicorn.  But your hypothetical had

Page 107

1   Q   All right.  So I think my question is why does
2   a change of the ownership allocations seven months after
3   the acquisitions of the properties were included, why is
4   that any more related to the original acquisition than
5   the acquisition of an oil and gas lease?
6   A   Well, because the Bridge Loan agreement still
7   exists.  And -- and your firms work had to do with the
8   Bridge Loan agreement and the acquisition of the
9   properties and the agreements that went with the
10  acquisition of the properties all were part of a single
11  integrated transaction as I view it.
12      (Simultaneous speakers)
13  Q   Sorry.
14  A   If there is a later transaction involving a
15  different property financed in a different way, I'm
16  finding the connection considerably thinner, and I think
17  it's unlikely that that would be viewed as a violation
18  of the duty of undivided loyalty.
19  Q   How is it in your opinion that the change of
20  the allocations in this amended LLC changed the
21  underlying terms of the Bridge Loan?
22  A   Well, I don't think it changed the underlying
23  terms of the Bridge Loan.
24  Q   All right.
25  A   A new investor came in and that resulted in a

Page 109

28 (Pages 106 - 109)

1 change in the allocations, but the loan still existed.
2 The promissory note still existed. It's still that same
3 integrated transaction. It's just been tinkered with a
4 bit.
5 Q All right. And the ownership allocations were
6 what were tinkered with, correct?
7 A Yes. But I would view the same answer if it
8 turned out that while this agreement says that the
9 purpose of the loan is to finance the acquisition of the
10 20 or 30 properties, if one of the properties dropped
11 out or a new property was dropped in its place, and
12 do some tinkering with the Bridge Loan as a result of
13 that, you still have the same essential transaction.
14 Q I understand. I understand your opinion, and I
15 appreciate the clarification, sir. I want to move to
16 Exhibit 6.
17 (Exhibit No. 6 was marked for identification.)
18 A You skipped 205 pages, you know.
19 Q I know you're disappointed.
20 A Okay. And this one is even longer. I have it
21 up on my screen.
22 Q All right. I'm going to represent to you that
23 this one is three separate PSA's. This is part of the
24 appendix which was provided to you that Mr. Brown
25 pointed out had been provided to you, and it wasn't on

Page 110

1 the list, but we can agree that you saw it ahead of
2 time, right?
3 A I had it available to me, but I did not really
4 look at it. I certainly didn't study it at all.
5 Q All right. Would you -- so if I ask you a
6 question about one of these and you don't want to opine
7 on it or you don't want to confirm it, I want you to
8 point that out to me. Can you do that?
9 A Of course.
10 Q All right. Because it's my understanding that
11 these PSA's, there is three of them in this one exhibit.
12 One starts on appendix page 7. The second starts on
13 appendix page 81, and the third one starts on appendix
14 page 150, but these PSA's were for the purchase of the
15 mortgaged properties and the portfolio properties. Do
16 you have that understanding or do you not?
17 A That is my understanding.
18 Q All right. And you would agree with me that
19 Highland Capital Management, LP, was not a party to the
20 PSA's, correct?
21 A That's my understanding, although, again, I
22 haven't actually looked at all three of them to confirm
23 that but that's my understanding.
24 Q All right. And so did you -- so since you
25 haven't really looked at them, I'm assuming that you

Page 111

1 didn't consider the content of these PSA's in making
2 your opinion that the loan agreement and the LLC
3 agreement were a single integrated transaction, correct?
4 A That is correct.
5 Q Don't you think that's important?
6 A No.
7 Q Why not?
8 A Well, because as the Bridge Loan says, it's
9 purpose was to acquire a -- portfolio of -- of
10 properties. The terms under which they were acquired
11 doesn't change the fact that the purpose of the Bridge
12 Loan was the acquisition, and that the acquisition
13 ultimately was for the LLC whose ownership interests
14 your creditor -- your client's creditor claim seeks to
15 adjust.
16 Q But the ownership allocation does affect the
17 Bridge Loan?
18 A Well, it does.
19 Q How?
20 A But that's not -- that's not the reason for my
21 analysis.
22 Q Well --
23 A The reason for my analysis is that the Bridge
24 Loan and the LLC agreement were part of an integrated
25 transaction.

Page 112

1 Q I understand that but I'm asking you a
2 different question. So it's my understanding that the
3 client we're bringing that Mr. Brown is trying to
4 disqualify us from is to say that the ownership
5 allocation changed in the amended LLC agreement. That
6 change was wrong in some way, shape, or form, and we're
7 getting disqualified or we're attempting to be
8 disqualified from that, because somehow that change in
9 the ownership allocation was related to the work that we
10 did on the Bridge Loan. Can we agree on that?
11 A Yes.
12 Q All right. So my question to you is how does
13 the change in the ownership allocation affect the work
14 that was done on the Bridge Loan other than your view
15 that this was a single integrated transaction?
16 A Well, I think the starting point is it was a
17 single integrated transaction, and what makes it a
18 single integrated transaction is that the Bridge Loan
19 existed for the purpose of the acquisitions.
20 Q Which occurred prior to the amending of the
21 LLC, correct?
22 A I'm sorry. Which occurred?
23 Q The acquisition of the properties. The
24 acquisition of the underlying assets occurred prior to
25 the amendment of the LLC, correct?

Page 113

29 (Pages 110 - 113)

Page 114

```
 1   A  I believe that's correct.
 2   Q  All right.  And so the work on the loan
 3 agreement from your prior testimony was, well, it's a
 4 single transaction because the loan agreement was used
 5 to purchase the underlying assets, right?
 6   A  Yes.  That's fair enough.
 7   Q  Okay.  And that work was done and then later --
 8 in fact, seven months later, the LLC agreement was
 9 amended, correct?
10   A  Correct.
11   Q  And it's your position that seven months later
12 when that LLC agreement was amended that that relates
13 back to the original Project Unicorn transaction such
14 that it was a single integrated transaction, correct?
15   A  Well, my -- my recollection of the amendment is
16 that it says it relates back, but even if it didn't, my
17 answer would be the same.
18   Q  And your answer would be yes, right?
19   A  Yes.  The LLC agreement still exists.  It's
20 been amended but it's the same LLC agreement.  It's the
21 same basic agreement, and the Bridge Loan still exists
22 and -- and it was -- the Bridge Loan was for the purpose
23 of carrying out the purpose of the LLC agreement.
24 That's all one thing.
25   Q  Did you take into account the lapse of time
```

Page 115

```
 1 between the original closing and the amendment of the
 2 LLC in reaching the conclusion that this was a single
 3 transaction?
 4   A  No.  In my view, it's irrelevant.
 5   Q  So are you aware that there are courts that
 6 consider the timing of two different transactions as a
 7 contributing factor of whether or not a transaction is
 8 considered a single integrated transaction?
 9   A  I think there -- no.  No.  I don't think I've
10 ever seen that.  Let me think about that for a moment.
11 Yes.  I think that that's true as to whether there is an
12 integration.  Yes.
13   Q  Right.  But you didn't take that into account
14 that the amendment of the LLC occurred seven months
15 after the original transaction, correct?
16   A  I -- I didn't because I think that for my
17 purposes it's not relevant.  It may be relevant for
18 other purposes in -- in contract interpretation, but
19 it's not relevant for purposes of my area analysis of
20 the loyalty duty that the law firms involved in the --
21 in the consummation of Project Unicorn have to their
22 clients or former clients in that project.
23   Q  I understand.  Because I think it's your
24 position that once Wick Phillips did work on that
25 original loan agreement, the Project Unicorn, that that
```

Page 116

```
 1 duty of loyalty attached from there until eternity as it
 2 related to Project Unicorn, correct?
 3   A  That is correct.
 4   Q  And therefore since the amendment of the LLC
 5 was related to Project Unicorn even though it was seven
 6 months later, in your opinion, that duty of loyalty
 7 still attached and therefore Wick Phillips can't
 8 represent anybody in trying to unwind the amendment of
 9 the LLC, correct?
10   A  Correct.
11   Q  All right.
12      THE REPORTER:  Can you slow down, counsel?
13   Q  Yeah.  Go ahead.
14      THE REPORTER:  I just said, can you slow down?
15   Q  Yes, ma'am.  Not the first or the last time
16 that's been said.  I apologize.  Mr. Kehr, are you aware
17 that the loan agreement was not the sole source of
18 funding to acquire the properties?
19   A  Yes.
20   Q  And, in fact, Freddie Mac also provided
21 financing, correct?
22   A  I -- I don't recall knowing that it was Freddie
23 Mac.
24      (Exhibit No. 14 was marked for identification.)
25   Q  All right.  All right.  Let's go to -- do we
```

Page 117

```
 1 have Mr. McGraner's declaration?  Fourteen.  All right.
 2 We're going to go out of order here for a second,
 3 Mr. Kehr, and I'm going to show you -- hold on.  Let's
 4 go back to the title.  Do you see a document on the
 5 screen in front of you?
 6   A  Yes.  And that's Exhibit 14?
 7   Q  Yes.
 8   A  Okay.  I've opened it on my computer.
 9   Q  Okay.  This is a declaration from Matthew
10 McGraner.  Do you know who that is?
11   A  I'm afraid -- well, yes.  Because it -- my
12 memory was -- was joggled by paragraph two.  I probably
13 would have gotten the answer wrong if it hadn't said it
14 right in front of me.  Senior vice president of
15 NexPoint.
16   Q  Right.  And that's -- NexPoint is the client
17 we're currently representing that Mr. Brown is trying to
18 disqualify us from representing.  You understand that,
19 correct?
20   A  Yes.
21      MR. BROWN:  Hold on.  Objection.  Hold on,
22 Brant.  I think that is a different entity.  NexPoint
23 Real Estate Advisers is a different entity than we're
24 trying to disqualify you from representing as --
25      (Simultaneous speakers)
```

30 (Pages 114 - 117)

1    Q    All right.  Mr. Kehr, let me ask it a different
2  way.  Mr. McGraner's statement says that he's the
3  executive vice president for NexPoint Real Estate
4  Advisers, LLC, correct?
5    A    It does.
6    Q    It states that he's been an employee of NREA
7  since June of 2016, correct?
8    A    Yes.
9    Q    All right.  And let me ask one question.  Since
10  you had never heard of this transaction prior to June of
11  2021, you would agree with me that the persons involved
12  in the transaction and the representation of Wick
13  Phillips have personal knowledge of what happened and
14  you don't, correct?
15    A    Of course.  As an expert witness, I never have
16  personal knowledge.
17    Q    Excellent.  All right.  I want to go to
18  paragraph six of Exhibit 14.  Paragraph six states, "In
19  connection with and to help fund the Unicorn
20  Acquisition, Key Bank National Association and Freddie
21  Mac provided various financing the loans.  Plural.  One
22  such financing was a Bridge Loan with Key Bank for
23  approximately half of the purchase price.  However, Key
24  Bank required additional borrowers on the Bridge Loan
25  and as a result, HCMLP, NexPoint Real Estate Partners,

Page 118

1  LLC, formally known as HRCE Partners, LLC, and five
2  other entities were included as co-borrowers under the
3  Bridge Loan with NREP.  NREP was the lead borrower under
4  the Bridge Loan agreement and the main point of contact
5  for the borrowing institutes."  Did I read that
6  correctly?
7    A    Yes.
8    Q    But that does, in fact, indicate that Freddie
9  Mac was apart of the financing for Project Unicorn,
10  correct?
11    A    It does.
12    Q    Did you consider that in making your opinion
13  that the loan agreement and the LLC agreement were a
14  single integrated transaction?
15    A    It's not relevant to my analysis that there
16  were other sources of financing.
17    Q    Why is that?  Once we touch the loan agreement
18  we were off limits?
19    A    Because the loan agreement is, in my view, part
20  of the same transaction as the LLC agreement.
21    Q    Right.  And so under your analysis then, a law
22  firm that was representing Freddie Mac in one of those
23  other loans related to Project Unicorn would also be
24  prevented under Texas rule 109 from representing anybody
25  in connection with the amended LLC agreement, correct?

Page 119

1    A    It would be prevented from being adverse to
2  Freddie Mac with respect to Project Unicorn.
3    Q    All right.  That's a fair point.  Let's say
4  that there was a borrower -- let me just pick one.  Go
5  back to the appendix to the purchase and sale agreements
6  which I believe is Exhibit 6.  So looking here on
7  Exhibit 6, we've got a purchase and sale contract, and
8  I'm going to pick one.  Let's say Sof-X Monument
9  Holdings, LP, which is a party to this.  Do you see
10  that?
11    A    Yes.
12    Q    Would their lawyers be prevented from attacking
13  the amended LLC agreement?
14    A    If doing so would be adverse to the interests
15  of their former client.
16    Q    All right.
17    A    Assuming that it's a former lawyer-client
18  relationship.
19    Q    And, in your opinion -- going back to the
20  PSA's.  Is it important to you that the loan agreement,
21  the Bridge Loan agreement, didn't have the -- the
22  Highland entity as a party?
23      MR. BROWN:  Objection.  Mischaracterizes the
24  loan agreement.
25    Q    Do you know whether or not the conflicting

Page 120

1  entity, the Highland entity, was a party to the Bridge
2  Loan agreement?
3      MR. BROWN:  Which -- which Highland entity?
4  Are you referring to the debtor, Grant --
5      MR. MARTIN:  Yes.
6      MR. BROWN:  Or another Highland entity?
7      MR. MARTIN:  I apologize, Mr. Brown.  Yes.  I'm
8  referring to the debtor.
9    A    Well, give me one moment.
10    Q    Yeah.  Take your time.
11    A    Highland Capital Management, LP, is the first
12  listed borrower.  Am I misunderstanding your question?
13  Not certain what you're driving at.
14    Q    You may be.  There is a bunch of documents and
15  sometimes, Mr. Kehr, honestly I get confused as well.
16  But I'm looking here at the Bridge Loan agreement which
17  is Exhibit 5.
18    A    I am also.
19    Q    All right.  So we got Highland Capital
20  Management, LP.  You see that?
21    A    Yes.  I do.
22    Q    We got HCRE Partners, LLC, the Dugaboy
23  Investment Trust, the SLHC Trust.  All -- all of these
24  parties were parties to the Bridge Loan agreement,
25  right?

Page 121

31 (Pages 118 - 121)

| | |
|---|---|
| 1   A   Right. | 1   Q   And you don't have any evidence that Wick |
| 2   (Exhibit No. 7 was marked for identification.) | 2  Phillips drafted the amended LLC agreement seven months |
| 3   Q   All right. I want to go to Exhibit 7. | 3  later, correct? |
| 4   THE REPORTER: Are you marking all of these, | 4   A   Correct. |
| 5  counsel? | 5   (Exhibit No. 8 was marked for identification.) |
| 6   MR. MARTIN: Yes. I'm sorry. Yes, ma'am. | 6   Q   Madam Court Reporter, please mark Exhibit 7. |
| 7   MR. BROWN: Brant, it's been another hour, and | 7  Let's go to Exhibit 8. Mr. Kehr, are you on Exhibit 8? |
| 8  at a convenient time, I would like to take another | 8   A   I have it. |
| 9  convenience break. | 9   Q   Have you seen this document before? |
| 10   MR. MARTIN: Absolutely. Why don't we just do | 10   A   Yes. |
| 11  that now. | 11   Q   Did you use this document -- did you review |
| 12   MR. BROWN: Okay. Five minutes? | 12  this documents in forming your opinions in this case? |
| 13   MR. MARTIN: Sure. | 13   A   I looked at it, but it's not essential to my |
| 14   (Recess from 1:27 p.m. to 1:36 p.m.) | 14  opinions. |
| 15   Q   Mr. Kehr, you understand you're still under | 15   Q   I understand. I'm going to ask you some |
| 16  oath, correct? | 16  questions about it anyway. It's dated Thursday, |
| 17   A   Yes. | 17  August 9th, 2018, at 12:58 p.m., correct? |
| 18   Q   All right. I want to move to Exhibit 7, and, | 18   A   Yes. |
| 19  Mr. Kehr, if you're bringing it up on your computer, let | 19   Q   And the author is Paul Broaddus, correct? |
| 20  me know when you're there. | 20   A   Correct. |
| 21   A   I have it. | 21   Q   And the addressees are Daniel Cullen at Baker |
| 22   Q   All right. You see Exhibit 7 is an email from | 22  McKenzie, David Gong at Baker McKenzie, Peter Matejcak |
| 23  Paul Broaddus dated Thursday, August 23rd, 2018, to | 23  at Baker McKenzie, and Brian Mitts and Bonner McDermett. |
| 24  Helen Kim. Copied on that is Matt McGraner, Mark | 24  Did I read that correctly? |
| 25  Patrick, Rick Swadley, and Jae Lee. Do you see that? | 25   A   Yes. |
| Page 122 | Page 124 |

| | |
|---|---|
| 1   A   I do. | 1   Q   I'm going to represent to you that none of |
| 2   Q   I'm going to represent to you that none of | 2  those people work for Wick Phillips either. Do have any |
| 3  those people work for Wick, Phillips, Gould, and Martin. | 3  tuning to dispute that statement? |
| 4  Do you have any reason to dispute that representation? | 4   A   No. |
| 5   A   No. | 5   Q   And you and I can agree that Baker McKenzie is |
| 6   Q   All right. And Mr. Broaddus, and, in fact, I'm | 6  not Wick Phillips, correct? |
| 7  going to represent to you that those were all internal | 7   A   Yes. We can agree on that. |
| 8  people. Mr. Broaddus says to Helen, "As discussed, can | 8   Q   Okay. Considering I used to work at Baker |
| 9  you please form the following LLC's? SC Multifamily | 9  McKenzie, I'm quite aware that they are very, very |
| 10  Holdings, LLC." And he lists an ownership percentage | 10  different firms. And so as far as you know, Wick |
| 11  down there. HCMLP at 49 percent and HCREP at | 11  Phillips had no involvement in the Delaware Statutory |
| 12  51 percent, correct? | 12  Trust structures involved in Project Unicorn, correct? |
| 13   A   Yes. | 13   A   Correct. |
| 14   Q   And then the second LLC he wants Ms. Kim to | 14   Q   And when this email refers to a DST, it's |
| 15  form is SE Multifamily REIT Holdings, LLC. Do you see | 15  referring to the formation of Delaware Statutory Trusts, |
| 16  that? | 16  correct? |
| 17   A   I do. | 17   A   Yes. |
| 18   Q   And the second bullet point under number 2A | 18   (Exhibit No. 10 was marked for identification.) |
| 19  states, "We are drafting the LLC agreement so we have | 19   Q   All right. Let's go to Exhibit 10. Mr. Kehr, |
| 20  that covered." Did I read that correctly? | 20  Exhibit 10 is excerpts -- actually, it might be the |
| 21   A   Yes. | 21  whole thing of a deposition of Mr. Mark Patrick. Do you |
| 22   Q   And I asked you this before. But you don't | 22  see that? |
| 23  have any evidence that Wick Phillips drafted the LLC | 23   A   Yes. I do. |
| 24  agreement, right? | 24   Q   Did you review this in reaching your opinions |
| 25   A   That is correct. | 25  in this case? |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

1  A   Give me one moment to look at it for a moment.
2 The answer is, yes.  I believe that I did.
3  Q   All right.  I want to direct your attention to
4 certain testimony in this deposition, and I'm going to
5 give you the disclaimer, Mr. Kehr, that I know that you
6 are not Mr. Patrick, and I know that you don't know
7 everything that's inside Mr. Patrick's head.  So I'm not
8 asking you to guess as to what Mr. Patrick may or may
9 not know outside of what he said in this deposition, but
10 I do want to get your opinion on some of the things he
11 said.  Do you understand the disclaimer that I gave you?
12  A   Yes.
13  Q   And if you don't feel comfortable giving me
14 your opinions on that, I want you to let me know.  Okay?
15  A   Very good.
16  Q   All right.  I want you to turn to page 25, and
17 I have these highlighted.  Are they highlighted on the
18 copies on your computer?
19  A   Yes.
20  Q   So starting on line 12, question, "Did you have
21 any role in connection with the LLC agreement?"  Line
22 15, answer, "Yes."  Question on line 17, "Please
23 describe it."  Answer, "I coordinated the document."
24 Question, "What does that mean?"  Answer, "It means I
25 helped facilitate this -- the creation of this document

Page 126

1 by coordinating with respective parties."  Question, "So
2 you coordinated with Highland and HCRE?"  Answer,
3 "Coordinated with Highland and HCRE.  I would describe
4 it as I was -- I was coordinating the deal between the
5 two parties and having that coordination reflect what
6 was desired in this LLC agreement."  Question, "Okay.
7 And what does your coordination actually involve in
8 practical terms?"  Answer, "Yes.  That's a good
9 question.  I recall calling up the law firm of Hunton
10 and Williams to draft and prepare this LLC agreement."
11 Question, "And why did you call the law firm of Hunton
12 and Williams?"  Answer, "It's generally the firm that I
13 worked with in the past."  Question, "And you worked
14 with Hunton and Williams in your capacity as an employee
15 of Highland?"  Answer, "Yes."  Did I read that
16 correctly?
17  A   You did.
18  Q   You and I agree that Hunton and Williams is not
19 Wick, Phillips, Gould, and Martin, correct?
20  A   Yes.
21  Q   So this would indicate, as I think you
22 indicated earlier, that Hunton and Williams drafted the
23 original LLC agreement, correct?
24  A   Well, it was at least involved in it.  There is
25 that earlier email that suggests that somebody in-house,

Page 127

1 one of the shared employees in the Highland
2 organization, might have been involved but --
3  Q   Fair enough.
4  A   -- Hunton and Williams definitely was involved.
5  Q   And you had no evidence that Wick Phillips was
6 involved, correct?
7  A   Correct.
8  Q   All right.  Let's go -- I'm going to try to
9 shorten this up for all of us, Mr. Kehr.  Let's go to
10 page 32.
11  A   I'm there.
12  Q   All right.  Looking -- starting on line 8.  The
13 highlighted portions of Mr. Patrick's deposition.
14 Question, "Did Wick Phillips have any involvement in the
15 representation of any party -- let me restate that.  Did
16 Wick Phillips represent Highland in connection with the
17 original LLC agreement?"  Answer, "No."  Question, "Did
18 Wick Phillips represent HCRE in connection with the
19 original LLC agreement?"  Answer, "No."  Did I read that
20 correctly?
21  A   You did.
22  Q   And as we sit here today, you have no
23 information to dispute what Mr. Patrick said under oath,
24 correct?
25  A   Well, I would -- I would say that the -- the

Page 128

1 questions and answers were a bit loose.  I think the
2 accurate statement would be that Wick Phillips was not
3 involved in the drafting of the LLC agreement or
4 providing legal advice to Highland with regard to
5 LLC agreement.  And as I also previously said, I'm not
6 aware of any evidence to suggest that Highland relied on
7 Wick Phillips for advice or representation concerning
8 the negotiation or drafting of the LLC agreement.  In
9 connection with is a much looser statement, and my view
10 is that the Bridge Loan is in connection with the LLC
11 agreement.
12  Q   I understand that, Mr. Kehr, and I think you've
13 made that very clear, but I appreciate the clarification
14 and I would encourage you to continue to clarify your
15 answers when you feel the need.  But you and I can agree
16 that this witness, who was there at the time, confirmed
17 that Wick Phillips did not represent Highland or anybody
18 else in connection with the drafting of the original LLC
19 agreement, correct?
20  A   Yes.
21  Q   All right.  Let's go quickly to page 63 of the
22 same exhibit.
23  A   I'm there.
24  Q   Line three.  Question, "Do you know if Wick
25 Phillips had any role in connection with the amended LLC

Page 129

33 (Pages 126 - 129)

1  agreement?" Answer, "My understanding they had no
2  role." Question, "Did you ever have any communications
3  with Wick Phillips in connection with the amended LLC
4  agreement?" Answer, "I do not recall ever having
5  communications with Wick Phillips on this amended LLC
6  agreement." Did I read that correctly?
7      A  Yes.
8      Q  You have no evidence to dispute what
9  Mr. Patrick said under oath there, correct?
10     A  That is correct.
11     (Exhibit No. 11 was marked for identification.)
12     Q  All right.  Let's go to Exhibit 11.  This is
13 the actual original limited liability company agreement
14 dated as of August 23rd, 2018, correct?
15     A  Yes.
16     Q  And you reviewed this, I presume, in connection
17 with your opinions in this case?
18     A  I did.
19     Q  All right.  I want you to turn to page 18 which
20 is Schedule A.
21     A  I have it.
22     Q  And this provides for the member name, the
23 capital contribution, and the percentage interest,
24 correct?
25     A  Yes.

Page 130

1      Q  And according to Schedule A on the original LLC
2  agreement, HCRE has a capital contribution of $51 or
3  51 percent percentage interest, correct?
4      A  Yes.
5      Q  And Highland has a $49 capital contribution for
6  a 49 percent percentage interest, correct?
7      A  Correct.
8      Q  Would you -- you would agree with me that these
9  are the ownership percentages that made it into the
10 Delaware Statutory Trust charts that were attached to
11 the loan agreement, correct?
12     A  Yes.
13     Q  And this is, at least in part, a basis of your
14 opinion that the loan agreement and the LLC agreement
15 were a single integrated transaction, correct?
16     A  Yes.
17     Q  All right.  What else supports your opinion, in
18 your view, that these were a single integrated
19 transaction such that Wick Phillips loan -- work on the
20 loan agreement implicates this document?
21     A  Well, I first want to make it clear that I'm
22 not here as an advocate, and I haven't attempted to
23 compile all of the information or arguments that might
24 support my opinion, but I -- I can give you a -- a
25 couple.

Page 131

1      One is that somewhere in this agreement there
2  is a statement of purpose, and the statement of purpose
3  is the acquisition of the properties that will go into
4  the LLC, and I think that that's the key point.  The
5  reason for the existence of this loan agreement with
6  Highland as a borrower and the reason for the -- the
7  Bridge Loan are a single project.  What you've called
8  Project Unicorn.  They're inextricably connected.  One
9  wouldn't exist without the other.
10     Q  I think you and I appreciate that, Mr. Kehr,
11 and I think we've -- we've spent a lot of time today
12 talking about your view of that, correct?
13     A  We have.
14     Q  All right.  And I know that earlier, in fact,
15 you mentioned that provision about the fact that the
16 purpose of the loan was for the acquisition of the
17 unicorn properties and that that formed the basis of
18 your opinion, correct?
19     A  It forms a basis for my opinion.  Yes.
20     Q  Right.  Okay.  And -- and -- so fair enough.
21 I'm asking for what else forms the basis for your
22 opinion that this was a single integrated transaction
23 other than what you've already testified to today?
24     A  I don't think there is anything that I haven't
25 testified to already.

Page 132

1      Q  Okay.
2      A  Nothing else I can think of as I sit here.
3      (Exhibit No. 12 was marked for identification.)
4      Q  Fair enough.  Thank you very much.  All right.
5  I'm going to go now to Exhibit 12.  You've seen this
6  document before, correct?
7      A  I see it.
8      Q  And this is the amended and restated limited
9  liability company agreement dated as of March 15th,
10 2019, to be effective as of August 23rd, 2018, correct?
11     A  Well, not precise [indiscernible].  Entered
12 into as of March 15 to be effective as of the prior
13 August.
14     Q  Okay.  I was just reading off the page itself.
15 It says dated as of, but I don't think that's -- it's
16 probably a distinction without a difference.  Can you
17 and I agree that this amended LLC agreement was executed
18 seven months after the original?
19     A  Yes.
20     Q  Thank you.  And if you would, I want you turn
21 to -- and of course page numbers on this are going to be
22 difficult.  If you look at the top of each page, there
23 is a page number because these were filed in court, and
24 I want you to look at page 22 of 30 on Exhibit 12.
25     A  Schedule A?

Page 133

34 (Pages 130 - 133)

1  Q  Yes.  Schedule A?
2  A  Very good.
3  Q  All right.  And we've talked about the fact
4  that you didn't -- you don't think that the fact that
5  this was executed six or seven months after the
6  transaction, in your mind, that doesn't change your
7  opinion that this was a single integrated transaction,
8  correct?
9  A  Correct.
10  Q  All right.  And this Schedule A includes
11  capital contributions and percentage interests that were
12  different from the original LLC agreement, correct?
13  A  That is correct.
14  Q  Now, you would also agree with me that these
15  are not the ownership percentages that were in the
16  original loan agreement and the DST charts in the
17  original loan agreement, correct?
18  A  Correct.
19  Q  And you would agree with me that Wick Phillips
20  had no involvement with this amended LLC agreement,
21  correct?
22  A  None that I know of.
23  Q  Now, are you aware that the claims that are
24  made in -- in the -- the lawsuit that -- that Mr. Brown
25  is trying to disqualify my firm from that those claims

Page 134

1  relate to these allocations that are in the amended LLC
2  agreement?
3  A  That's my understanding.
4  Q  All right.  And -- but in your opinion, the
5  fact that Wick Phillips was not involved in the amended
6  LLC agreement does not change your opinion as to the
7  fact that this was a single integrated transaction,
8  correct?
9  A  Correct.
10  Q  Other than what I have asked you about today,
11  and we've covered a lot of ground, do you have any other
12  opinions that you plan on testifying about if this
13  matter comes to a hearing?
14  A  Well, I can think of one thing that is part of
15  my analysis that might come up when I testify that
16  hasn't come up so far this morning.
17  Q  Please.
18  A  And that is with regard to the duty of loyalty.
19  It is common, and I think this is also true in the
20  American Airlines opinion, that the continuing duty of
21  loyalty is explained in terms of the interests of the
22  former client.  But it's my opinion that the duty of
23  loyalty has a much broader significance.
24      Enforcement of the continuing duty of loyalty
25  is important for the maintenance of public confidence in

Page 135

1  integrity of the bar, and if I may give you a slightly
2  long-winded answer.  It's not --
3      (Simultaneous speakers)
4  A  You're not going to complain.
5  Q  No.  It's fine.  I want to know what you're
6  going to say so please go ahead.
7  A  Sure.  The -- it's not intuitively obvious that
8  lawyers should be permitted to serve in the courts, and
9  there have been times in history when lawyers were
10  prohibited from appearing in courts.  Sure would
11  simplify things if there weren't any pesky lawyers
12  involved.  But one of the reasons that lawyers are
13  involved in the litigation process is that they are
14  important to the functioning of the legal system, and
15  part of that functioning is that they need to get from
16  clients all of the information that the lawyer needs to
17  provide an informed and reasonably well-rounded opinion
18  and advice to the client, and the lawyer will get that
19  information, and the lawyers opinion then will only be
20  trusted if the lawyer is viewed as being entirely loyal
21  to the client.  And that's, in my view, the essential
22  reason for the duty of undivided loyalty.
23      With a current client, the duty of undivided
24  loyalty prohibits the lawyer from being adverse to the
25  current client on any matter even if entirely unrelated

Page 136

1  to the subject matter of the current representation.
2  It's viewed as destructive of the lawyer-client
3  relationship, and, therefore, of the lawyer's role in
4  the legal system and the functioning of the legal
5  system.
6  Q  Can I -- can I ask you a question as you go
7  through this, or do you want me to wait until the end?
8  A  Well, I'm almost done and then by all means.
9  Q  All right.
10  A  It's -- it's -- it's considered to be
11  destructive if the client ever sees a current lawyer on
12  the other side of the table.  Figuratively speaking.
13  Q  No matter the type of matter?
14  A  Correct.  Without regard to whether it's
15  litigation, non-litigation, or some ambiguous in between
16  sort of thing such as foreclosure of a deed of trust
17  under a power of sale, which is a non-courtroom
18  proceeding.  I'm not certain whether that's
19  transactional or litigation.  It's somewhere in between.
20      With a former client, a lawyer is permitted to
21  be adverse to a former client, but not if it implicates
22  the lawyers work for the former client, and that's the
23  same or substantially related matter analysis in almost
24  every situation.  So I think it's important to keep in
25  mind, and courts do from time to time accurately capture

Page 137

35 (Pages 134 - 137)

Case 19-34054-sgj11 Doc 3593-82 Filed 10/01/21 Entered 10/01/21 13:19:45 Page 37 of 75
Case 19-34054-sgj11 Doc 2859-32 Filed 09/17/21 Entered 09/17/21 23:41:01 Page 37 of

Exhibit 82    Page 91 of 126

Page 138

1 the idea that the functioning of the legal system
2 depends on loyalty. There are some people in the ethics
3 committee -- I'm sorry. Community who actually say
4 there is only one duty. It's the duty of undivided
5 loyalty, and the other obligations, confidentiality and
6 full disclosure in particular, are viewed by some people
7 as simply being elements of the duty of undivided
8 loyalty.
9       But I would think broadly in terms of the
10 functioning of lawyers in the legal system, and the role
11 that they play and the expectations that the legal
12 system wants to have clients hold in order for the
13 clients to fully disclose themselves to their lawyers
14 and then to trust and rely on the advice that the lawyer
15 provides.
16   Q   All right. I'm going to ask you a couple
17 follow-up questions on that.
18   A   Sure. Go ahead.
19   Q   When you're talking about the legal systems
20 encouragement and incentives for clients to give their
21 lawyers full information, that necessarily implicates
22 the rational behind rules such as 105 and the
23 confidentiality, correct?
24   A   It does.
25   Q   And you're not alleging that there was a breach

Page 139

1 of confidentiality in this case, correct?
2   A   Correct.
3   Q   All right. Secondly, let me give you a
4 hypothetical, and I'm not sure I'm even arguing with you
5 on this. I just want to make sure I understand the full
6 scope of your soliloquy here which was, let's say that I
7 represent Client A, and Client A is in a transaction
8 with Client B, who I do not represent. Are you with me
9 so far?
10   A   Yes.
11   Q   Client A continues to be my client. Later on
12 there is a dispute between Client A and Client B related
13 to another matter. Do you think that because I
14 represented Client A in a joint -- in a common matter
15 with Client B originally, that I can't represent Client
16 A against client B?
17   A   In the same manner or an unrelated matter?
18   Q   Let's do both. I think I know what you're
19 going to say, but go -- let's do both. Let's say it's
20 in the same matter.
21   A   Then the answer is, no, unless there has been a
22 contractual, informed consent. Sometimes -- there
23 sometimes is and I can give you an example.
24   Q   No. I -- I know what informed consent is.
25 What if it's --

Page 140

1   A   No. No. I'm not saying -- I wasn't going to
2 tell you what an informed consent is --
3   Q   Okay.
4   A   I was going to give you an example of when
5 consent sometimes is given. It's irrelevant to this
6 situation, but it does happen in joint representations.
7 Outside -- if -- if clients -- if the lawyer were to
8 represent one of the former joint clients against the
9 other former joint client on an unrelated matter, there
10 would be no prohibition.
11   Q   I think you answered my follow-up question.
12 Mr. Kehr, I know that you and I have had disagreements
13 on the substance of your testimony, but have you been
14 treated with respect today?
15   A   Always.
16   Q   Thanks a lot. Okay. I pass the witness.
17       MR. BROWN: I don't have any questions of
18 Mr. Kehr.
19       MR. MARTIN: Okay. I gave you back some time,
20 Mr. Kehr.
21       MR. BROWN: Yeah. One thing I just wanted to
22 raise is, you know, you asked for other opinions, and I
23 think you said he didn't have any others. He has been
24 designated also as a rebuttal witness, and so after we
25 know what Mr. Sellman's testimony is, it is possible

Page 141

1 that Mr. Kehr will have opinions to rebut Mr. Sellman's
2 testimony.
3       MR. MARTIN: Duly noted, Mr. Brown. And I am
4 not going to dispute that he is allowed to present
5 rebuttal testimony to Mr. Sellman's and Mr. Sellman will
6 be allowed to present -- well, hopefully will be allowed
7 to present testimony to Mr. Kehr. But duly noted and
8 I'm not going to dispute that he can have additional
9 opinions that wouldn't violate the question I just asked
10 him if those opinions are in rebuttal to Mr. Sellman.
11       THE REPORTER: Off the record?
12       MR. MARTIN: I'm fine going off the record.
13       MR. BROWN: I'm fine.
14       (Deposition concluded at 3:02 p.m.)
15
16
17
18
19
20
21
22
23
24
25

36 (Pages 138 - 141)

```
 1          CHANGES AND SIGNATURE
 2  WITNESS NAME: ROBERT L. KEHR
 3  DATE OF DEPOSITION:  SEPTEMBER 16, 2021
 4
 5  PAGE   LINE   CHANGE          REASON
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
                                        Page 142
```

```
 1        I, ROBERT L. KEHR, have read the foregoing
    deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.
 3
 4
        _____
 5              ROBERT L. KEHR
 6
 7  THE STATE OF _____  )
 8  COUNTY OF _____    )
 9        Before me, _____, on this day
    personally appeared ROBERT L. KEHR, known to me (or
10  proved to me under oath or through _____)
    (description of identity card or other document) to be
11  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that he executed the
12  same for the purposes and consideration therein
    expressed.
13        Given under my hand and seal of office this
14  ____ day of _____, _____.
15
16
        _____
17              NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
18
19
20
21
22
23
24
25  Job No. TX4800824
                                        Page 143
```

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION
     In re:            )
 3                     )
     HIGHLAND CAPITAL MANAGEMENT,  )  Chapter 11
 4  L.P.               )
                       )
 5      Debtor.        )  Case No.:19-34054-sgj11
 6  *************************************************
 7            REPORTER'S CERTIFICATE
 8            DEPOSITION OF ROBERT L. KEHR
 9                SEPTEMBER 16, 2021
10
11       I, Ashley Elizondo, Certified Court Reporter,
12  in and for the State of Texas, hereby certify to the
13  following:
14       That the witness, ROBERT L. KEHR, was duly
15  sworn by the officer and that the transcript of the oral
16  deposition is a true record of the testimony given by
17  the witness;
18       That the deposition transcript was submitted
19  on _____, to the witness or to the attorney
20  for the witness for examination, signature, and returned
21  to me by _____;
22       That the amount of time used by each party at
23  the deposition is as follows:
24       MR. GRANT C. MARTIN-3 HOURS AND 2 MINUTES
25       That pursuant to information given to the
                                        Page 144
```

```
 1  deposition officer at the time said testimony was taken,
 2  the following includes counsel for all parties of
 3  record:
 4  FOR NEXPOINT REAL ESTATE PARTNERS:
 5     Brant C. Martin, Esq.
       Lauren K. Drawhorn, Esq.
 6     WICK PHILLIPS
       100 Throckmorton Street
 7     Suite 1500
       Fort Worth, Texas 76102
 8  Telephone: 817-332-7788
    E-mail: brant.martin@wickphillips.com
 9  lauren.drawhorn@wickphillips.com
10  FOR HIGHLAND CAPITAL MANAGEMENT:
11     Kenneth Brown, Esq.
       La Asia Canty, Esq.
12     PACHULSKI STANG ZIEHL AND JONES
       10100 Santa Monica Boulevard
13     Floor 13
       Los Angeles, California 90067
14  Telephone: 310-201-0760
    E-mail: kbrown@pszjlaw.com
15  lsc@pszjlaw.com
16  FOR UBS SECURITIES AND UBS AG LONDON BRANCH:
17     Shannon McLaughlin, Esq
       LATHAM AND WATKINS
18     885 3rd Avenue
       Suite 1000
19     New York, New York 10022
    Telephone: 212-906-4612
20  E-mail: shannon.mclaughlin@lw.com
21
22
23       I further certify that I am neither counsel
24  for, related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
                                        Page 145
```

37 (Pages 142 - 145)

Page 146 (left column):

1 taken, and further that I am not financially or
2 otherwise interested in the outcome of the action.
3     Certified to by me this 23rd day of
4 September, 2021.
5
6
7
8
9     Ashley Elizondo, Texas CSR No. 9465
    Expiration Date: 02/28/2022
10     VERITEXT LEGAL SOLUTIONS
    Veritext Registration No. 571
11     300 Throckmorton Street
    Suite 1600
12     Fort Worth, Texas 76102
    (817) 336-3042  (800) 336-4000
13
14
15
16
17         FURTHER CERTIFICATION
18 ----------------------------------------------------------
19     The original deposition was/was not returned
20 to the deposition officer on
21 _____;
22     If returned, the attached Changes and
23 Signature page contains any changes and the reasons
24 therefor;
25     If returned, the original deposition was

Page 146

Page 148 (right column):

1 kbrown@pszjlaw.com
2         September 23, 2021
3 RE: IN RE Highland Capital Management, L.P.
4 DEPOSITION OF: Robert L. Kehr (# 4800824)
5     The above-referenced witness transcript is
6 available for read and sign.
7     Within the applicable timeframe, the witness
8 should read the testimony to verify its accuracy. If
9 there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18         Yours,
19         Veritext Legal Solutions
20
21
22
23
24
25

Page 148

Page 147 (bottom column):

1 delivered to _____, ROBERT L. KEHR;
2     That $_____ is the deposition
3 officer's charges to the DEBTOR for preparing the
4 original deposition transcript and any copies of
5 exhibits;
6     That a copy of this certificate was served on
7 all parties shown herein and filed with the Clerk.
8     Certified to by me this _____ day of
9 _____, 2021.
10
11
12
13
14     Ashley Elizondo, Texas CSR No. 9465
    Expiration Date: 02/28/2022
15     VERITEXT LEGAL SOLUTIONS
    Veritext Registration No. 571
16     300 Throckmorton Street
    Suite 1600
17     Fort Worth, Texas 76102
    (817) 336-3042  (800) 336-4000
18
19
20
21
22
23
24
25

Page 147

38 (Pages 146 - 148)

**[02/28/2022 – 76102]**

| 0 |
|---|

**02/28/2022**   146:9
  147:14

| 1 |
|---|

**1**   1:10,10 3:11
  51:22,23 75:6
  89:8
**1.05**   45:13,15 58:9
  58:10,12,18
**1.05.**   45:12
**1.09**   45:15 58:24
  59:2,9 64:11
  87:19 88:11,21,21
**1.09.**   45:9 59:21
**10**   3:19 125:18,19
  125:20
**100**   2:5 3:15 98:7
  145:6
**1000**   2:17 145:18
**10022**   2:18 145:19
**10100**   2:11 145:12
**105**   58:7 138:22
**109**   28:19 45:1
  59:20 62:16 65:17
  68:22 74:1,16
  78:13 84:1 87:24
  90:23 91:7 93:19
  119:24
**11**   1:3 3:20 70:2
  130:11,12 144:3
**110**   3:16
**116**   3:22
**11:31**   50:24
**11:41**   50:24
**12**   3:21 126:20
  133:3,5,24
**122**   3:17
**124**   3:18
**125**   3:19

**12:34**   88:25
**12:43**   88:25
**12:58**   124:17
**13**   2:12 145:13
**130**   3:20
**133**   3:21
**14**   3:22 116:24
  117:6 118:18
**142**   3:6
**144**   3:7
**146**   3:8
**15**   126:22 133:12
**150**   111:14
**1500**   2:6 145:7
**15th**   133:9
**16**   1:9 142:3 144:9
**1600**   146:11
  147:16
**16773**   146:8
  147:13
**16th**   1:15 31:19
**17**   126:22
**18**   130:19
**1800's**   70:7
**1897**   71:3,9 74:18
  76:13 78:13
**18th**   31:18 33:5
**19-34054**   1:5
  144:5
**1986**   98:10
**19th**   69:19 70:6
**1:27**   122:14
**1:36**   122:14

| 2 |
|---|

**2**   3:3,12 96:21,22
  98:17 144:24
**20**   26:20 35:3
  37:10 66:10 95:19
  106:17 108:16,23
  110:10

**2016**   118:7
**2018**   92:18 104:4,5
  105:10,20 106:18
  107:4,13 108:6,20
  122:23 124:17
  130:14 133:10
**2019**   133:10
**2021**   1:9,15 31:18
  31:19 33:5,7
  37:23 118:11
  142:3 144:9 146:4
  147:9 148:2
**205**   110:18
**21**   6:18
**212-906-4612**   2:18
  145:19
**21st**   71:12,12,13
**22**   133:24
**22nd**   71:12
**23**   148:2
**23rd**   122:23
  130:14 133:10
  146:3
**25**   126:16
**26**   36:18 77:10
  107:22
**26th**   104:4,5
  105:19
**2:01**   1:16
**2a**   123:18

| 3 |
|---|

**3**   3:13 75:8,10,10
  76:9,12 98:18
  104:8 144:24
**30**   14:5 35:4 66:10
  95:20 106:17
  108:16,23 110:10
  133:24
**300**   146:11 147:16
**310-201-0760**   2:13
  145:14

**32**   128:10
**336-3042**   146:12
  147:17
**336-4000**   146:12
  147:17
**35,000**   48:2
**3:02**   141:14
**3rd**   2:17 145:18

| 4 |
|---|

**4**   3:14 98:20,22
  100:15
**40**   9:12,12 80:5,6,7
  80:15
**4800824**   1:22
  148:4
**49**   41:11 123:11
  131:5,6

| 5 |
|---|

**5**   3:15 100:13,14
  121:17
**50**   9:4 16:9 41:13
**51**   3:11 123:12
  131:2,3
**550**   98:11
**571**   146:10 147:15
**575**   97:13

| 6 |
|---|

**6**   3:5,16 110:16,17
  120:6,7
**63**   129:21
**65**   27:4

| 7 |
|---|

**7**   3:17 111:12
  122:2,3,18,22
  124:6
**75**   3:13
**76102**   2:6 145:7
  146:12 147:17

[775 - agreement]

**775**  97:9,21

**8**

**8**  3:18 124:5,7,7
128:12
**800**  146:12 147:17
**81**  111:13
**817**  146:12 147:17
**817-332-7788**  2:7
145:8
**83**  70:12,14
**885**  2:17 145:18

**9**

**90067**  2:12 145:13
**944**  70:13
**9465**  1:16 146:9
147:14
**96**  3:12
**98**  3:14
**9th**  124:17

**a**

**a.m.**  1:16 50:24,24
**aba**  16:8,23 17:7,9
**ability**  22:14
**able**  27:3 28:12
44:11 86:24
106:10
**absolutely**  59:7
82:22 122:10
**account**  48:4,17
49:11 114:25
115:13
**accuracy**  148:8
**accurate**  8:25
129:2
**accurately**  54:9
137:25
**accusations**  27:25
**acknowledged**
143:11

**acquire**  108:16
112:9 116:18
**acquired**  84:21
106:4,16 112:10
**acquiring**  66:10
**acquisition**  66:14
93:1 106:11
108:17,19 109:4,5
109:8,10 110:9
112:12,12 113:23
113:24 118:20
132:3,16
**acquisitions**
107:13 109:3
113:19
**act**  18:13 19:7
**acted**  55:2
**acting**  63:8,8
64:23 73:21 85:22
**action**  86:24 87:13
88:10 145:25
146:2
**actual**  25:13
130:13
**add**  75:19
**added**  75:21
**additional**  75:23
118:24 141:8
**addressee**  97:4
**addressees**  124:21
**addresses**  93:6
**adds**  65:3
**adept**  50:16
**adjust**  112:15
**admitted**  71:4
**adoption**  17:8
**advance**  62:22
63:10 64:25
**adversary**  62:9
99:3

**adverse**  65:6
66:22 67:11 73:22
90:14 103:4 106:6
107:11 120:1,14
136:24 137:21
**adversely**  55:3,22
60:8 61:8 64:2
**advice**  65:25 66:2
66:25 67:4,7,9
84:19,22,24 85:3,7
85:10 94:4 129:4
129:7 136:18
138:14
**advise**  10:13 40:12
95:8
**advised**  15:14,15
40:18,19 84:10
95:17
**advisers**  117:23
118:4
**advising**  9:15
20:15 46:6
**advisory**  75:1
76:16 78:6,7
79:22 80:1,4,5
81:2,15 91:22,25
**advocate**  131:22
**affect**  78:13
108:10,11 112:16
113:13
**affix**  143:1
**afraid**  117:11
**ag**  2:15 6:3 145:16
**age**  8:14 9:22
**ages**  37:15
**ago**  9:12 18:18
31:21 33:17 37:25
64:17 70:19 72:16
81:3
**agree**  7:25 10:19
17:6,19 21:25

28:3 29:13 33:7
58:7 65:10 67:20
70:20 72:1 77:6
77:23 78:18 79:4
82:8,9,14 93:17
94:8 99:11 101:4
104:3 111:1,18
113:10 118:11
125:5,7 127:18
129:15 131:8
133:17 134:14,19
**agreed**  77:5,13
78:8 107:22
**agreement**  3:14,15
3:20,21 66:3,15,17
77:4 78:22 83:18
89:19,21 92:18,21
92:24 93:2 94:5
94:11,15,20 95:13
96:5,11,17,19,24
97:3 100:17 101:3
101:3,12,13,18,19
101:24 102:9,10
102:17,18,19,22
102:23 103:7,8,11
103:23 104:3,21
105:10 106:3
107:5,17 108:6,9
108:10,14 109:6,8
110:8 112:2,3,24
113:5 114:3,4,8,12
114:19,20,21,23
115:25 116:17
119:4,13,13,17,19
119:20,25 120:13
120:20,21,24
121:2,16,24
123:19,24 124:2
126:21 127:6,10
127:23 128:17,19
129:3,5,8,11,19

Veritext Legal Solutions
800-336-4000

[agreement - arrangement]

130:1,4,6,13 131:2
131:11,14,14,20
132:1,5 133:9,17
134:12,16,17,20
135:2,6
**agreements** 66:19
101:5 104:10,16
105:1 109:9 120:5
148:14
**ahead** 31:17 37:19
37:20 38:18 49:7
49:8 51:24 54:20
84:14 86:11,13
89:13 104:23
111:1 116:13
136:6 138:18
**airlines** 71:22
74:22,23 76:18
78:10 80:24 91:22
135:20
**alaska** 108:18
**aligned** 70:3
**allegation** 28:9
**alleged** 86:19
**allegedly** 89:19
**alleging** 138:25
**allocation** 91:16
91:17 95:5,8,9,11
95:25 96:16
112:16 113:5,9,13
**allocations** 95:13
96:10 107:17
109:2,20 110:1,5
135:1
**allotted** 148:15
**allowed** 10:14
24:22 29:22 141:4
141:6,6
**allows** 43:12
**ambiguous** 44:24
137:15

**amended** 3:21
95:13 96:11,17
101:13,23 102:17
103:7,8,11 107:17
107:19 109:20
113:5 114:9,12,20
119:25 120:13
124:2 129:25
130:3,5 133:8,17
134:20 135:1,5
**amending** 113:20
**amendment** 101:7
102:7 113:25
114:15 115:1,14
116:4,8
**american** 71:22
74:22,23 76:18
78:10 80:24 91:22
135:20
**amount** 20:9 21:9
144:22
**analysis** 16:22
21:17 61:14,21
65:21 68:12 85:21
104:17,19 112:21
112:23 115:19
119:15,21 135:15
137:23
**analytical** 45:21
63:13 79:7
**analyze** 19:16,17
40:6 53:9 73:8
**analyzed** 19:21
**analyzing** 19:15
21:5,9,13,15 40:5
43:2 45:11 47:7
48:4,18 49:11
**angeles** 1:18 2:12
6:22 8:9 31:9
145:13

**answer** 11:14
16:22 25:17 26:1
34:25 35:13,24
36:15 38:8 39:10
39:15,22,23 40:23
41:6 46:17,19
47:16,18 53:11
59:8,17 62:3
65:18 80:22,23
87:20 106:14
107:9 110:7
114:17,18 117:13
126:2,22,23,24
127:2,8,12,15
128:17,19 130:1,4
136:2 139:21
**answered** 24:4
28:22 39:21 41:22
97:20 140:11
**answering** 37:16
86:6
**answers** 11:5
13:14 129:1,15
**antecedent** 108:22
**anticipated** 107:5
**anybody** 10:3 35:9
37:5 38:3 40:18
83:14 93:8 116:8
119:24 129:17
**anyway** 62:4
124:16
**apart** 119:9
**apologies** 86:14
**apologize** 14:20
19:12 37:19 44:25
86:8 89:15 116:16
121:7
**apparent** 23:3
**apparently** 60:6
**appeal** 70:1,2

**appear** 74:16
**appearance** 5:25
**appearances** 2:1
3:3 5:16
**appeared** 25:12
143:9
**appearing** 52:1
136:10
**appears** 26:20
74:18
**appendix** 75:22
104:9 110:24
111:12,13,13
120:5
**apples** 86:17,17
**applicable** 88:13
148:7,14
**application** 63:14
**applies** 77:3 88:21
**apply** 90:22
**appreciate** 10:2
14:9 21:11 29:9
29:11 48:13 62:7
78:25 110:15
129:13 132:10
**appropriate** 40:7
91:20
**approximately**
118:23
**arbiters** 18:25
**arbitration** 12:6
15:9
**area** 9:5 115:19
**areas** 14:12
**arguing** 139:4
**arguments** 131:23
**arises** 73:19
**arose** 103:8
**arrangement**
18:17

[articles - borrowers]

**articles** 15:25
16:12
**ashley** 1:16 144:11
146:9 147:14
**asia** 2:10 145:11
**asked** 24:15 27:1
28:23,23 32:6
36:25 38:7 39:20
39:20 41:22 44:10
44:19 59:23 73:12
88:8 123:22
135:10 140:22
141:9
**asking** 7:1 25:19
32:20 42:11 61:1
61:4 65:12,19
78:24,25 79:1
88:16,19 105:18
113:1 126:8
132:21
**aspect** 96:10
**aspects** 30:6
**asset** 105:20,22
106:4
**assets** 104:10
105:24 113:24
114:5
**assigned** 18:10
**assisting** 44:1
**associate** 34:11
**association** 118:20
**assuage** 37:2
**assume** 8:19,23
11:15 52:15 55:6
56:1 60:11 61:9
74:13 84:21 93:24
94:2 96:13 105:4
105:18 106:1
**assuming** 13:24
45:16 56:3 67:1
96:16 103:23

111:25 120:17
**assumption** 67:3
94:1
**assumptions** 78:17
**attached** 1:20
75:22 92:24 116:1
116:7 131:10
146:22 148:10,12
**attachments** 75:24
**attack** 72:10 91:15
94:25
**attacking** 72:12
73:2 81:11 84:4
87:8 91:9 93:9
120:12
**attempt** 29:9
89:17 101:11
**attempted** 131:22
**attempting** 65:21
65:23 91:11 113:7
**attending** 51:6
**attention** 52:21
126:3
**attorney** 8:21 55:2
55:22 91:23 92:1
144:19
**attorney's** 14:12
**attorneys** 18:16
145:25
**audio** 5:3 79:20
**august** 31:20
122:23 124:17
130:14 133:10,13
**author** 124:19
**authorities** 22:13
71:19 77:4,7,8,14
77:16,19 80:19
90:12 92:13
**authority** 23:5
71:21 91:14,14,21
92:2,11

**automatically**
43:21
**available** 104:15
111:3 148:6
**avenue** 2:17
145:18
**aware** 9:21 29:18
29:20 30:14,19
57:2,17 115:5
116:16 125:9
129:6 134:23

## b

**b** 49:21 54:12,14
69:22 139:8,12,15
139:16
**back** 22:3 29:4
50:20,23 59:22
67:23 68:3 69:3
69:16 71:6 73:11
75:9 89:7,10 94:7
101:4 114:13,16
117:4 120:5,19
140:19
**baker** 124:21,22
124:23 125:5,8
**ballpark** 20:8
**bank** 118:20,22,24
**bankruptcy** 1:1
6:4 144:1
**banks** 66:13
**bar** 14:23 18:21
33:16 136:1
**bar's** 18:15
**barred** 87:8
102:24
**based** 16:10,23
17:15 23:7,23
27:10,17 36:3
41:4 45:1 46:20
53:15 59:10 61:5
80:15 90:12 94:23

103:24
**basic** 114:21
**basis** 16:9 17:7
36:4 43:20,23
46:11 59:3 91:18
102:2 131:13
132:17,19,21
**basketball** 32:15
**bates** 98:23 99:2
**believe** 7:10 8:3,10
23:14 25:6,12,20
27:14 28:6,14,15
41:2,25 42:5
51:24 86:15 87:17
93:18 98:11 114:1
120:6 126:2
**best** 32:19 40:4
**beyond** 25:23
47:14 73:6
**billed** 97:9,13 98:8
**billing** 43:12 44:5
97:21,22
**bills** 42:12,17
**bit** 14:7 30:9 44:3
60:5 68:7 100:24
100:24 110:4
129:1
**blackmail** 30:2
**blind** 9:3
**blocked** 54:19
**body** 80:7
**bonner** 124:23
**boone** 69:20,23
71:20 73:4 74:18
76:13 78:13 80:24
**borrower** 119:3
120:4 121:12
132:6
**borrowers** 95:11
104:1 107:24
118:24 119:2

Veritext Legal Solutions
800-336-4000

[borrowing - cause]

**borrowing** 119:5
**bottom** 89:16
**boulevard** 2:11
  145:12
**branch** 2:15 6:3
  40:13 145:16
**brand** 102:6
**brant** 2:4 3:5 5:17
  7:6 28:11,11 39:3
  100:22 103:16,16
  117:22 122:7
  145:5
**brant.martin** 2:7
  145:8
**breach** 22:7 23:16
  23:18 24:2 25:13
  25:16,21 26:5,22
  27:23 28:15,17,21
  87:14 138:25
**breached** 24:7
  28:6
**break** 29:3 50:19
  88:3,23 89:1,5
  122:9
**breath** 103:21
**brian** 124:23
**bridge** 3:15 49:14
  49:19,21,21 66:1
  66:11,18 95:15
  100:4,17 102:9
  103:23 106:12
  107:13 108:7,8,10
  108:13 109:6,8,21
  109:23 110:12
  112:8,11,17,23
  113:10,14,18
  114:21,22 118:22
  118:24 119:3,4
  120:21 121:1,16
  121:24 129:10
  132:7

**brief** 71:22 80:12
**bringing** 113:3
  122:19
**broaddus** 122:23
  123:6,8 124:19
**broader** 63:19
  64:5,14 72:1,18
  73:5 74:8,12 75:2
  135:23
**broadly** 138:9
**broke** 39:3
**brown** 2:10 5:21
  5:21 7:11 8:10,12
  10:15,23 24:12,21
  24:24 25:2,23
  26:3,6,10,14 28:2
  28:11 29:13 31:13
  34:16 35:17,25
  36:5,17 39:3,20
  41:22 42:2 44:23
  47:11 53:1,9,12,22
  71:25 75:11,18
  76:3,5 77:2,9,9,13
  77:18,21 78:21
  79:9 80:12 86:5,9
  86:11 89:5 90:18
  90:22 99:5 100:22
  103:16,20 104:6
  110:24 113:3
  117:17,21 120:23
  121:3,6,7 122:7,12
  134:24 140:17,21
  141:3,13 145:11
**brown's** 33:23
  35:10 38:4,20,25
  39:18 40:3 42:12
  46:1 90:8
**browns** 37:2
**bullet** 54:13,21
  59:24 89:14,15
  90:17 92:17 93:6

123:18
**bunch** 121:14
**business** 17:24

**c**

**c** 2:4 3:5 33:13
  144:24 145:5
**calculated** 20:12
**california** 1:18
  2:12 8:4,7,8,11
  15:1,2,7,8,10 16:2
  16:5,18,21 18:3,15
  19:2 41:9 46:9
  51:20 70:12,22,24
  71:10 80:10 87:22
  106:25 108:2,18
  145:13
**call** 13:9 24:18
  30:2 32:2,23 34:6
  38:18 45:25
  106:24 107:1
  127:11
**called** 6:13 18:12
  33:25 34:15 37:10
  69:19 70:11 84:17
  93:18 132:7
**calling** 104:9
  127:9
**calls** 33:1 34:18
**canty** 2:10 145:11
**capability** 83:9
**capacity** 12:3
  127:14
**capital** 1:3 2:9
  5:23 32:24 35:11
  52:10 97:5 100:3
  103:25 106:16
  111:19 121:11,19
  130:23 131:2,5
  134:11 144:3
  145:10 148:3

**capital's** 66:12
**capture** 137:25
**captures** 73:5
**card** 143:10
**care** 10:25
**careful** 34:22
**carefully** 85:5,15
**carolina** 40:20
**carrying** 114:23
**case** 1:5 31:2 33:8
  33:24 34:14,19,20
  36:6 40:8 41:18
  42:1,9 43:2,7,11
  43:18,19,21 44:6
  44:13,18 45:5,11
  45:22 46:9,23
  47:6,7,18,19 48:5
  48:18 49:11 50:1
  54:10 56:23 57:12
  57:15 58:19 59:19
  60:20,21 64:8
  69:16,17,19,24,25
  70:6,7 71:9,11,22
  74:22,24 76:18
  77:5 78:3,10 79:2
  80:20,24 81:21
  83:23 90:18 91:22
  94:9,17 99:8
  101:6,18 102:3
  124:12 125:25
  130:17 139:1
  144:5
**cases** 12:11 52:5
  70:25 75:1 76:16
  76:22 77:24 79:12
  79:22 80:1,3
  81:15
**catch** 51:25 69:4
**categorizes** 73:20
**cause** 1:15

Veritext Legal Solutions
800-336-4000

[caution - compile]

**caution** 34:16 35:17
**century** 8:9 69:19 70:6 71:12,12,14
**ceo** 47:4 97:5
**certain** 27:4 30:6 34:12 43:6 44:4 45:19 51:11 54:5 54:7 74:5 82:24 82:24 96:7 97:18 105:17 121:13 126:4 137:18
**certainly** 6:1 9:21 14:4 16:15 30:18 41:14 96:13 101:20 111:4
**certificate** 3:7,8 144:7 147:6
**certification** 146:17
**certified** 4:5 144:11 146:3 147:8 148:16
**certify** 144:12 145:23
**cetera** 5:4
**change** 107:23,23 107:23 109:2,19 110:1 112:11 113:6,8,13 134:6 135:6 142:5
**changed** 9:23 109:20,22 113:5
**changes** 3:6 6:17 142:1 146:22,23 148:9
**changing** 107:16
**chapter** 1:3 144:3
**charge** 43:1,4 97:25 98:10

**charges** 147:3
**charging** 97:23
**chart** 106:9,11
**charts** 131:10 134:16
**check** 42:25 43:6 44:11 47:23
**checking** 44:4
**chief** 18:12 19:4
**choice** 9:9
**chopped** 59:16
**circuit** 70:11
**circuits** 70:2
**circumstances** 35:5 48:3 66:21
**cited** 71:21
**cites** 70:25
**city** 8:8,9
**civil** 1:19 71:6
**claim** 61:17 62:19 73:9 112:14
**claiming** 46:11
**claims** 134:23,25
**clarification** 29:10 36:1,11 76:9 110:15 129:13
**clarify** 7:24 26:24 28:12 30:11 129:14
**clarity** 7:22 76:4
**classes** 30:23
**clause** 72:17 90:22
**clear** 20:18 23:5 24:5 25:19,25 38:14 68:14 103:13 129:13 131:21
**clearer** 27:20
**clerk** 147:7
**client** 13:5 15:15 40:14 42:24 54:22

55:2,3,4,7,23 56:1 57:3,4,6,7,10,11 57:22 58:12,15 60:8,12 61:8,10 62:24 63:7,18 64:2,12,18,18,23 65:4,5,6 67:2,2,6 67:11 69:4,10 72:11,23 73:2,7,22 74:2,14 82:12,18 82:23 84:10,23 85:6,17 87:10 90:15 91:13 98:9 113:3 117:16 120:15,17 135:22 136:18,21,23,25 137:2,11,20,21,22 139:7,7,8,11,11,12 139:12,14,15,15 139:16 140:9
**client's** 42:23 59:11 112:14
**clients** 46:15 57:19 57:25 59:4 60:24 67:5 94:19 98:2,6 98:8,9 115:22,22 136:16 138:12,13 138:20 140:7,8
**clock** 43:23,24
**close** 60:21
**closer** 71:12 96:1
**closing** 115:1
**cohen** 6:14 44:2,6 97:12,17
**cold** 31:7
**colleague** 33:14,23
**colleagues** 99:6
**columbia** 16:10
**combined** 48:24 48:25

**come** 16:16 29:4,7 50:20,23 71:5 75:9 81:14 135:15 135:16
**comes** 69:19 72:14 80:11 135:13
**comfortable** 20:13 126:13
**coming** 22:3 38:18 68:19
**commented** 53:14
**comments** 53:22
**commission** 41:8
**commissions** 80:10
**committed** 86:19
**committee** 33:16 92:2 138:3
**common** 17:17 56:20 57:8 81:13 135:19 139:14
**commonly** 16:25
**communicate** 10:17 85:18 89:4
**communications** 10:18 35:23 36:21 53:15 130:2,5
**community** 138:3
**companies** 9:15
**company** 86:18 98:11 130:13 133:9
**comparing** 41:11
**comparison** 41:13
**comparisons** 17:1
**compensated** 42:9
**compensation** 46:22
**competent** 85:10
**compile** 131:23

Veritext Legal Solutions
800-336-4000

complain  136:4
complaint  18:8,10
complete  11:1
  35:7 80:22
completely  85:20
  106:23
component  64:8,9
comprise  92:24
computer  10:11
  31:3 39:12 43:8
  54:16 75:15 117:8
  122:19 126:18
concede  103:14
conceding  36:10
  103:17
conceivable  44:2
concept  22:3
  58:11 65:24 68:23
  69:8 72:6,8,9,15
  72:19 73:5 74:25
  75:2 81:10,25
  84:7 91:15 93:6
concepts  87:24
  90:9,11 91:12
concern  81:13
concerned  53:12
concerning  129:7
concerns  37:2
conclude  68:9
concluded  141:14
conclusion  67:13
  115:2
conclusions  80:2
conduct  15:13,22
  21:21 22:17 27:5
  30:6,24 40:12,15
  41:9 45:2 59:19
  89:23
confidence  135:25
confidential  46:16
  55:1 56:18,24

57:1,18 58:3
confidentiality
  23:24 27:11,13
  46:20 54:23 56:10
  56:10,21 57:15,23
  58:8 138:5,23
  139:1
confirm  98:17
  111:7,22
confirmed  129:16
conflict  19:4,15,16
  19:17 22:6 23:15
  23:17 24:2,3
  25:16,20 26:19,25
  27:9,14,22 28:7
  103:24
conflicting  120:25
conflicts  21:10,13
  21:15,17 47:24
confused  121:15
connected  107:18
  132:8
connection  32:25
  44:13,18 45:5
  75:12 89:20 96:1
  96:2 106:3 109:16
  118:19 119:25
  126:21 128:16,18
  129:9,10,18,25
  130:3,16
connections  5:3
consent  87:10
  139:22,24 140:2,5
consequences
  66:25
consider  29:2
  34:23 35:21 36:5
  36:22 40:9,23
  45:10 61:15 79:17
  90:9 112:1 115:6
  119:12

considerably
  109:16
consideration
  143:12
considered  34:17
  36:18,19 47:12,14
  61:18 75:12,24
  90:11 107:14
  115:8 137:10
considering  47:7
  125:8
consultation  97:24
consulted  36:7
  41:1,5 80:20
consulting  41:16
consummation
  115:21
contact  10:6,14
  34:3 119:4
contacted  31:4,25
  33:8,11 37:22
  47:6,18 49:25
contained  22:11
contains  146:23
content  104:16
  112:1
contents  37:4
  38:12
context  12:14
  14:15 32:11 48:14
contexts  21:18
continue  25:2
  129:14
continues  139:11
continuing  40:14
  54:23,25 56:8,9,9
  135:20,24
contract  115:18
  120:7
contracts  48:22

contractual
  139:22
contradicts  79:8
contributing
  115:7
contribution
  130:23 131:2,5
contributions
  134:11
convenience  50:19
  122:9
convenient  122:8
conversation
  34:13 36:13 37:3
  38:13 48:20 49:17
  106:23
conversations  7:3
  32:8 33:12 34:20
  35:2,4,8,9,15,18
  35:19 36:2,21
  37:4,5 38:9 48:18
  49:3,5,10,13,25
convictions  11:24
  11:25
convince  63:22
  68:15
coordinated
  126:23 127:2,3
coordinating
  127:1,4
coordination
  127:5,7
copied  122:24
copies  48:13,22
  126:18 147:4
copy  15:24 54:16
  147:6 148:16
corporate  12:16
correct  6:24,25
  7:4,13,17,18,21
  8:11,12 13:12,16

[correct - definitely]

13:21 15:22 16:3
16:13,24 17:11
19:14 21:1,6 24:1
24:10,10,25 25:4
30:25 31:1 37:23
40:24,25 45:2,3
46:5,12,20,21 48:5
49:3 51:3,17 52:7
53:3,13 55:18
56:3,25 57:12,16
58:4,5,19,20,24,25
59:4,11,20 62:11
64:15 67:19 68:5
68:6,22 70:8,16,23
71:6 72:3 73:16
74:4,16,17,18
76:19,20 77:17,18
77:24 78:3,4,7,10
78:14 79:23 81:21
82:1,13 83:1,5,6
83:11,12,21 87:5,9
87:10,15,16,19
88:21,22 90:12,18
90:23 91:7,24
92:6,14,15 93:10
93:19,23 94:11,20
95:2 96:6,19,20
97:6,7,10,14,15
98:3 100:11,12
101:6,21 102:3
103:1,11,12 104:1
104:2,4,10,13
106:7,8 108:21,25
110:6 111:20
112:3,4 113:21,25
114:1,9,10,14
115:15 116:2,3,9
116:10,21 117:19
118:4,7,14 119:10
119:25 122:16
123:12,25 124:3,4

124:17,19,20
125:6,12,13,16
127:19,23 128:6,7
128:24 129:19
130:9,10,14,24
131:3,6,7,11,15
132:12,18 133:6
133:10 134:8,9,12
134:13,17,18,21
135:8,9 137:14
138:23 139:1,2
143:2
**correcting** 53:23
**correctly** 52:13,23
55:9 58:22 89:23
93:3 119:6 123:20
124:24 127:16
128:20 130:6
**counsel** 5:15 18:12
19:4 26:18 30:21
35:20 116:12
122:5 145:2,23
**count** 71:17
**country** 17:9
40:16 41:8 81:14
**county** 1:18 33:16
143:8
**couple** 9:19 69:14
79:10 96:23
131:25 138:16
**course** 8:18 10:1
19:24 20:24 21:2
68:18 78:11 88:6
111:9 118:15
133:21
**court** 1:1 9:2
14:22 15:9,20
21:23 22:16 23:2
28:2,4 29:21 30:6
30:15,21 42:10
49:23 56:12 61:24

62:13 63:16 65:14
67:17 68:20 70:9
70:11,24 71:10,11
73:12 75:5 78:1
83:23 90:21 91:3
91:19 98:15
100:15 124:6
133:23 144:1,11
**courtroom** 22:15
137:17
**courts** 18:21 70:1
70:2,3 77:23
80:14 115:5 136:8
136:10 137:25
**cover** 22:19
**covered** 90:3
104:6 123:20
135:11
**covers** 60:21
**crane** 6:14
**create** 91:11
**created** 5:6
**creates** 58:15
**creating** 27:13
**creation** 126:25
**credit** 66:13,18
**creditor** 112:14,14
**creditor's** 62:19
73:9
**creditors** 6:4
61:17
**criminal** 29:25
30:2
**criticism** 58:23
59:18
**criticizing** 61:3
**csr** 1:16 146:9
147:14
**cullen** 124:21
**current** 67:2 70:1
70:1 73:8 74:11

136:23,25 137:1
137:11
**currently** 117:17
**curriculum** 8:19
**cv** 15:24

**d**

**d** 3:1 33:13 49:21
**daily** 43:20
**dakota** 40:18
**dallas** 1:2 144:2
**daniel** 124:21
**date** 33:6 142:3
146:9 147:14
**dated** 104:4,5
122:23 124:16
130:14 133:9,15
**david** 124:22
**day** 1:15 8:14 9:22
107:22 143:9,14
146:3 147:8
**dc** 40:19 41:12
**deal** 27:5 40:15
127:4
**dealt** 40:14
**debate** 78:20
79:11
**debtor** 1:5,13 5:23
121:4,8 144:5
147:3
**decision** 73:5,18
**declaration** 3:22
75:21 117:1,9
**declares** 19:4
**decline** 23:2
**deed** 137:16
**defense** 30:5
**define** 22:2 63:24
85:5
**defined** 93:2
**definitely** 128:4

Veritext Legal Solutions
800-336-4000

[definition - documents]

**definition** 83:10
**degree** 19:6 48:6
**delaware** 85:13
  104:25 105:5
  125:11,15 131:10
**delay** 100:7
**delighted** 50:3
**delivered** 147:1
**depend** 61:24
**dependent** 46:22
  72:17 90:22
**depends** 18:6
  138:2
**depose** 26:16
**deposed** 10:17
**deposition** 1:7,12
  3:19 5:1 10:1,9
  12:6,9 15:20
  26:16,20 51:7
  125:21 126:4,9
  128:13 141:14
  142:3 143:1 144:8
  144:16,18,23
  145:1 146:19,20
  146:25 147:2,4
  148:4
**depositions** 8:20
  8:24 13:24 65:23
**describe** 126:23
  127:3
**description** 3:10
  4:2 26:17 53:23
  108:14 143:10
**designated** 28:14
  34:19 38:20 46:4
  140:24
**designation** 25:24
  26:7,8 29:14
**desired** 127:6
**destructive** 137:2
  137:11

**details** 48:14
**determine** 56:13
  61:22 91:19
**determining** 19:1
  61:24
**dialogue** 29:12
**difference** 30:12
  61:15 63:6 68:7
  72:4 82:6 107:20
  133:16
**different** 35:4
  38:24 43:2 51:7
  55:20 78:6,9,12
  82:7,11,12,14,15
  82:15 83:4,5
  87:23 91:3 105:13
  109:15,15 113:2
  115:6 117:22,23
  118:1 125:10
  134:12
**differently** 60:5
**difficult** 11:7
  78:16 107:10
  133:22
**difficulties** 50:15
**difficulty** 8:16
**digestible** 48:11
**direct** 52:20 126:3
**directly** 38:10
**disagree** 25:15
  65:9 77:24 78:2
  82:8
**disagreed** 60:4
**disagreements**
  140:12
**disappointed**
  110:19
**disciplinary** 14:23
  15:12,21 18:16,18
  22:6,8,12,13 23:15
  23:18 25:16 26:21

27:15,16 28:20
  30:24 44:15 45:2
  79:21 89:22
**discipline** 22:22
**disciplined** 17:23
  22:10,23
**disclaimer** 20:18
  126:5,11
**disclose** 34:23
  36:20 53:2 92:11
  138:13
**disclosed** 27:21
**disclosure** 3:11
  23:25 24:14,19
  52:11 57:5 92:7
  92:10 138:6
**discoverable** 36:3
**discovery** 35:6
**discussed** 90:1,12
  90:15 123:8
**discussion** 23:10
  38:3 48:7 82:4
  84:16
**discussions** 30:20
  38:15 47:21
**dismiss** 18:4
**dispute** 123:4
  125:3 128:23
  130:8 139:12
  141:4,8
**disputing** 76:6
**disqualification**
  22:16 23:1 35:11
  35:16 36:14,16
  37:6,22 38:6,10
  39:1,9,19 40:2,6
  47:8 56:12 71:9
  91:19
**disqualified** 24:8
  56:14 68:5 73:15
  73:17 93:9 94:22

96:18 103:10
  106:6 107:7 113:7
  113:8
**disqualify** 7:12,16
  20:20,25 21:4
  23:3,4 52:12
  75:13 113:4
  117:18,24 134:25
**distinct** 56:22
**distinction** 25:15
  27:19 30:10 61:13
  63:13 64:16 69:1
  72:21,21 95:16
  101:12,14 133:16
**distinctions** 91:11
**distinguish** 35:2,8
  35:12 48:20 49:4
  49:12,16 50:4
  89:17
**distortions** 5:3
**district** 1:1 16:9
  70:12 144:1
**division** 1:2 144:2
**document** 52:1,6
  52:18,21 53:18
  54:3,9 75:16,23
  92:10 98:22 99:2
  99:4,7,13,13,21,22
  100:1,5,9 117:4
  124:9,11 126:23
  126:25 131:20
  133:6 143:10
**document's** 52:9
**documents** 4:1
  13:10 50:21 51:5
  51:11 52:4,15
  75:5,12 76:7,15
  77:5,13 92:23
  95:6 96:2 104:7
  121:14 124:12

Veritext Legal Solutions
800-336-4000

[doing - ethics]

**doing** 8:14 11:4
22:19 23:1 79:13
83:8 84:4,6 91:9
120:14
**doors** 32:10
**double** 44:11
**dozen** 14:4 34:2
**dozens** 48:20 66:8
**draft** 90:5 94:14
102:17 127:10
**drafted** 53:12
94:20 95:24 103:7
105:1 123:23
124:2 127:22
**drafting** 53:6,8
65:25 66:2 89:18
89:20 92:18,20
94:4,10 123:19
129:3,8,18
**draw** 25:15 32:9
61:13 72:5
**drawhorn** 2:4
5:19 51:6 145:5
**drew** 32:25
**drill** 13:14
**driving** 121:13
**dropped** 110:10
110:11
**dst** 3:18 125:14
134:16
**dst's** 105:4,16,22
**due** 5:2 79:10
**dugaboy** 121:22
**duly** 1:14 5:12
141:3,7 144:14
**duties** 12:14 14:11
15:6 17:16 21:19
23:8,11,24 27:12
54:22,23,24 56:8
56:21 59:12 60:23
61:6 102:5

**duty** 14:14 22:4,4
22:7 23:16,19
24:7 25:13,17,22
26:5,22 27:17,23
28:6,15,17,21
54:25 56:9,9,19,20
57:5,14,22 58:2,8
58:11,13 59:3,10
60:16 69:11,11,12
72:2 73:19 87:8
87:14 91:13
109:18 115:20
116:1,6 135:18,20
135:22,24 136:22
136:23 138:4,4,7

**e**

**e** 2:7,13,19 3:1
6:11 49:21 69:22
145:8,14,20
**earlier** 59:1,7,23
79:16 91:23 94:7
97:13 104:7
127:22,25 132:14
**early** 33:7 37:22
47:20
**editing** 53:6,8,17
**effect** 22:14 92:19
92:21 96:6
**effective** 133:10
133:12
**effectiveness** 84:5
**effort** 62:19
**either** 8:21 12:5
14:10 35:22 44:9
78:21 85:25 86:16
99:5 107:23 125:2
**elapsed** 31:24
**electronically** 10:7
**electronics** 59:17
**element** 50:11
65:20

**elements** 61:14
102:11 104:24
138:7
**elizondo** 1:16 11:7
144:11 146:9
147:14
**email** 3:17,18
10:10,11 75:20
76:6 122:22
125:14 127:25
**emphasis** 51:11
**employed** 6:12
18:11,13 145:24
**employee** 118:6
127:14
**employees** 128:1
**encourage** 129:14
**encouragement**
138:20
**ended** 61:5
**enforcement**
135:24
**engaged** 55:8 56:3
60:13 61:11,20
62:21 63:2,5,10
64:13,19,24 65:4
72:11 74:3,15
**engagement** 3:12
46:7 47:22 48:15
57:9 61:18 64:21
65:5 96:23 97:3
**enjoying** 106:22
**enormously** 20:5
**entered** 96:11,17
133:11
**entire** 61:2 69:11
102:12
**entirely** 9:7 18:19
25:18 105:13
136:20,25

**entirety** 84:1
**entities** 106:5
119:2
**entitled** 10:18
24:24
**entity** 105:21
117:22,23 120:22
121:1,1,3,6
**entry** 108:9
**episodes** 15:4
**equal** 57:22
**equate** 23:15
**equates** 25:21
26:21
**equating** 22:5
**equivalent** 87:25
**errata** 148:10,12
148:13
**esq** 2:4,4,10,10,16
145:5,5,11,11,17
**essential** 84:11
85:4 110:13
124:13 136:21
**essentially** 55:20
91:13
**established** 37:21
101:2
**estate** 2:3 5:20 7:7
7:13 117:23 118:3
118:25 145:4
**estimate** 9:2 21:9
31:6 32:3,19 33:2
33:9 37:10,24
41:7 45:24
**et** 5:4
**eternity** 116:1
**ethical** 89:21
**ethics** 75:2 76:16
76:18 80:4,5 81:2
81:15 92:1 138:2

[evaluating - file]

**evaluating** 77:11
**event** 55:5
**everybody** 50:20
**evidence** 22:18
28:5 56:23 57:17
58:2 94:9,13,17
96:9 123:23 124:1
128:5 129:6 130:8
**exact** 33:6
**exactly** 32:11,16
58:8
**exaggeration**
40:17
**examination** 3:5
5:14 144:20
**examined** 5:12
**example** 14:22
82:17,22,23 83:7
139:23 140:4
**examples** 19:25
**excellent** 6:8 8:8
9:18 11:17 13:18
52:4 89:7 118:17
**excerpts** 125:20
**excuse** 75:18
82:20 86:5
**executed** 102:19
133:17 134:5
143:11
**executive** 118:3
**exercise** 41:10
**exhibit** 3:11,12,13
3:14,15,16,17,18
3:19,20,21,22 51:8
51:9,22,23 75:6,8
75:10,10 76:9,12
89:8 96:21,22
98:17,20,22
100:13,14,15
104:8 110:16,17
111:11 116:24

117:6 118:18
120:6,7 121:17
122:2,3,18,22
124:5,6,7,7 125:18
125:19,20 129:22
130:11,12 133:3,5
133:24
**exhibits** 3:9 75:22
92:23 147:5
**exist** 23:8 56:19,21
74:23 132:9
**existed** 6:17 66:9
66:12,17,19 100:6
110:1,2 113:19
**existence** 132:5
**exists** 73:20 74:19
74:22 109:7
114:19,21
**expectations**
21:20 138:11
**experience** 19:6
21:5 50:14 80:16
**expert** 3:11,13
7:10,16 12:19
13:2,11,20 14:10
14:13 15:3,5 20:3
20:9,20 21:3,10,14
21:15 27:21 28:15
29:19 30:7,13,13
30:15 36:2 38:20
40:3,7,8,10,24
41:3,19 46:5,7,9
46:11 47:22 48:14
52:11 79:17 97:23
98:1,12 118:15
**expertise** 41:4
**expiration** 146:9
147:14
**explain** 51:5 64:17
79:14 90:4

**explained** 135:21
**explaining** 53:8
**explanation** 67:3
**explicit** 22:11,24
**express** 24:14
28:24
**expressed** 143:12
**expressing** 24:17
**extend** 68:7
**extent** 15:18,19
25:7 28:4 35:19
35:23 36:19,20
47:12,14 51:10
77:3,3
**extraneous** 5:4
**extremely** 73:3
84:7

**f**

**facilitate** 126:25
**fact** 7:20 13:8
58:21 59:10 71:5
78:1 94:14,17,23
103:25 112:11
114:8 116:20
119:8 123:6
132:14,15 134:3,4
135:5,7
**factor** 115:7
**facts** 35:5,6 47:19
72:13
**factual** 99:18
**failed** 90:23
**fails** 67:19 68:21
91:7 148:15
**fair** 11:2,15 12:18
14:16 21:7 22:24
31:10,22 33:9
34:7,13 36:9
37:24 50:21 51:13
59:18 74:8 91:2
97:20 99:9,21

103:19 108:3
114:6 120:3 128:3
132:20 133:4
**fairly** 22:21 81:13
81:13
**familiar** 9:21 52:5
**far** 28:8 53:12
67:25 69:1 74:5
105:7,16 125:10
135:16 139:9
**fashion** 54:11 86:1
**fast** 11:11,12
**faster** 9:20
**favor** 57:7
**favoring** 58:14
**fed** 70:13,14
**federal** 24:23
69:25 70:3,15,24
71:10
**feel** 50:1 107:11
126:13 129:15
**fees** 12:16 14:12
**felony** 11:24
**fiduciaries** 17:18
**fiduciary** 12:13
14:14 17:16 21:19
22:4,4,7 23:8,11
23:16,18,24 24:2,7
25:13,17,21 26:5
26:22 27:10,12,16
27:23 28:6,15,17
28:21 58:13 59:3
59:10
**field** 80:8,16
**fifth** 56:16
**fight** 26:14
**figuratively**
137:12
**figure** 31:4
**file** 18:8

[filed - further]

filed   17:20 52:7,19
53:19 54:4,6
75:23 133:23
147:7
files   18:3 80:12
filing   42:10
filings   79:10
fill   22:14
final   56:15,15
63:16
finance   82:18,24
83:8 85:11 110:9
financed   109:15
financially   146:1
financing   116:21
118:21,22 119:9
119:16
find   56:23 57:12
57:14 58:1,18
71:23 79:6 82:4
finding   107:10,10
109:16
findings   24:11,12
24:13,18,19 25:8
finds   67:18 68:20
73:13 83:23 90:21
91:3,5
fine   10:12 34:25
77:20 106:22
136:5 141:12,13
finish   86:6,11
finished   9:11,12
86:9
firm   5:22 6:13,16
6:17,19,21 7:11,12
12:3 19:19 20:21
21:1,4 24:6 25:13
25:22 26:5 27:25
28:5 32:24 34:2
34:21 35:4 36:2,7
36:13,21 37:5

38:4,20,25 39:13
39:18 40:3 42:12
42:21 46:1,6,12,14
47:21 56:13 57:21
61:16 62:21,23
63:17 66:24 67:4
67:10 71:21 72:23
73:7,21 82:15,17
82:24 83:8,15,17
84:4 85:2 86:20
86:25 88:10,13
91:9 93:11,23
94:3,18 95:3,16,17
95:22 96:8,9,16,18
102:6,8,16 103:6
107:19 108:5
119:22 127:9,11
127:12 134:25
firm's   62:8
firms   9:15,16
20:15 28:17 35:10
40:13,13 59:19
66:21 82:16 84:16
84:22,24 86:24
87:6,7,12 88:9
89:20 93:25 95:25
102:5 107:11,18
109:7 115:20
125:10
first   3:21 5:12
10:2 26:20 31:4
31:25 33:8,11,17
37:21 47:6 48:1
48:17 49:3,5,9,12
49:17,25 54:3,13
54:21 59:24 69:15
70:14 75:5,17
90:17 96:5 100:5
116:15 121:11
131:21

five   9:11 50:19,23
72:16 119:1
122:12
fix   47:17
floor   2:12 145:13
flush   63:21 94:8
focused   16:8
follow   54:14 88:4
138:17 140:11
following   123:9
144:13 145:2
follows   5:13
144:23
foot   48:2
football   31:7
32:14 100:25
foreclosure   137:16
foregoing   143:1
143:11
form   10:7 36:4
113:6 123:9,15
formally   119:1
format   16:8
formation   125:15
formed   3:17
132:17
former   54:22 55:1
55:2,4,7,23 56:1
60:8,12,24 61:8,10
62:24 64:12 65:6
65:7 67:1,11 69:4
72:11 73:2,22,23
73:24 74:2,14
85:22 90:14 91:13
115:22 120:15,17
135:22 137:20,21
137:22 140:8,9
formerly   61:20
forming   17:7
34:18,24 35:21
36:5,19,22 47:13

124:12
forms   102:2
132:19,21
fort   2:6 8:3 145:7
146:12 147:17
forth   26:8 35:7
found   87:25 90:5
founder   6:19
four   9:11
fourteen   117:1
fourth   70:17
framed   75:22
freddie   116:20,22
118:20 119:8,22
120:2
free   22:16
freeze   10:23
freezes   10:23
freezing   5:4
frequently   43:11
friend   33:15
friends   33:19
front   14:22 22:20
45:20 60:22 76:10
117:5,14
full   11:1 18:13,20
18:20 23:24 48:14
57:5 138:6,21
139:5
fully   138:13
functioning   23:9
136:14,15 137:4
138:1,10
fund   118:19
fundamental
67:14 94:1
funding   116:18
further   3:8 36:12
145:23 146:1,17

Case 19-34054-sgj11 Doc 2895-82 Filed 06/01/21 Entered 06/01/21 23:41:31 Page 52 of
Case 19-34054-sgj11 Doc 2895-82 Filed 06/01/21 Entered 06/01/21 23:41:31 Page 52 of
Exhibit 82    Page 106 of 126

[g - highland]

| g | | | |
|---|---|---|---|
| **g** 33:13 49:21 | 98:16,22 100:14 | 140:1,4 141:4,8,12 | **hcmlp** 3:13 118:25 |
| **game** 100:25 | 100:16 101:10 | **goldich** 33:13,14 | 123:11 |
| **gaps** 22:14 | 104:23 116:13,25 | 33:20,24 34:15 | **hcre** 89:17 121:22 |
| **gas** 107:1,2,8 | 117:2,4 118:17 | 37:9 | 127:2,3 128:18 |
| 108:1,17 109:5 | 120:4 122:3 124:7 | **gong** 124:22 | 131:2 |
| **gears** 29:5 | 125:19 128:8,9 | **good** 5:17,21 27:5 | **hcrep** 123:11 |
| **general** 55:11 | 129:21 130:12 | 42:19 50:18 | **head** 126:7 |
| 58:16 91:23 92:1 | 132:3 133:5 136:6 | 105:12 126:15 | **heading** 52:22 |
| **generalized** 72:15 | 137:6 138:18 | 127:8 134:2 | **hear** 39:4 |
| 73:4 | 139:19 | **gotten** 117:13 | **heard** 49:15,17 |
| **generally** 22:9 | **goes** 25:23 43:10 | **gould** 5:18 52:13 | 118:10 |
| 48:8 127:12 | 73:11 | 123:3 127:19 | **hearing** 24:20 |
| **generous** 45:16 | **going** 7:2,22,24 | **governing** 81:1 | 28:24 29:7 52:12 |
| **getting** 62:6 86:3 | 8:19,23 9:19 | **grant** 75:18 121:4 | 82:5 135:13 |
| 100:7 113:7 | 11:14 13:10 14:21 | 144:24 | **heart** 62:6 86:4 |
| **give** 11:5 19:25 | 15:24 20:19 23:25 | **great** 11:4 31:15 | **helen** 122:24 |
| 20:8,18 21:8 32:8 | 24:1,14,15,20 25:2 | 50:23 54:17 94:6 | 123:8 |
| 35:12 36:6 37:7 | 25:4,11,12,24 26:4 | **greater** 75:21 | **help** 118:19 |
| 38:16 48:9 54:15 | 26:19 28:3,5,7,16 | **grievance** 17:20 | **helped** 126:25 |
| 54:15 61:4 80:22 | 28:18,23 29:7 | 18:4,7 | **helpful** 35:1 |
| 80:23 89:10 91:2 | 30:9 32:3,3 33:2,6 | **grievances** 18:2 | **hereto** 1:20 |
| 96:25 105:3 121:9 | 34:16 35:1,17 | 19:1 | **high** 48:2 |
| 126:1,5 131:24 | 36:6 37:9 45:15 | **ground** 9:19 68:5 | **higher** 98:1,12 |
| 136:1 138:20 | 45:16 46:10 47:11 | 135:11 | **highland** 1:3 2:9 |
| 139:3,23 140:4 | 47:22 50:17 51:4 | **group** 18:11 | 3:11 5:23 32:24 |
| **given** 26:17 47:22 | 51:6,8,9 52:20 | **guess** 9:4 74:7 | 35:10 38:5,9 39:1 |
| 140:5 143:13 | 53:2 54:13,18 | 103:13 126:8 | 39:8,18 40:1 |
| 144:16,25 | 55:16 59:22 62:15 | **h** | 42:13,14 47:5 |
| **gives** 22:24 | 63:22 65:10,10,16 | | 52:10 66:12 67:6 |
| **giving** 20:11 82:22 | 69:2 73:3,14,17,18 | **h** 6:11 33:13 | 89:18 94:2 97:5 |
| 126:13 | 73:25 75:3,9 76:8 | **half** 34:2 118:23 | 98:23,24 100:3 |
| **go** 9:20,24 15:25 | 76:17,21 77:2 | **hall** 88:3 | 102:25 103:4,25 |
| 31:17,17 37:19,20 | 79:11 80:14,17 | **hand** 5:8 143:13 | 104:20 105:15,21 |
| 38:18 49:7,8 | 81:8,23 99:1 | **handle** 95:3 | 106:15 107:12 |
| 50:13 51:16,23 | 100:16,16 101:11 | **handled** 95:4 | 111:19 120:22 |
| 54:2,12,20 57:23 | 106:1 110:22 | **happen** 10:23 | 121:1,3,6,11,19 |
| 57:24 69:2 73:6 | 117:2,3 120:8,19 | 43:17 71:19 140:6 | 127:2,3,15 128:1 |
| 74:5 75:10 84:14 | 123:2,7 124:15 | **happened** 38:16 | 128:16 129:4,6,17 |
| 86:11,13 89:7,13 | 125:1 126:4 128:8 | 118:13 | 131:5 132:6 144:3 |
| 89:14 92:16 98:15 | 133:5,21 136:4,6 | **happy** 29:1 | 145:10 148:3 |
| | 138:16 139:19 | **hazardous** 67:8 | |

Veritext Legal Solutions
800-336-4000

[highland's - intellectual]

highland's  66:18
highlighted
  126:17,17 128:13
highlighting  51:10
highly  60:15 74:10
historically  56:22
history  136:9
hold  20:19 33:6
  101:4 117:3,21,21
  138:12
holdings  120:9
  123:10,15
home  8:4,11
honestly  121:15
hope  23:10
hopefully  9:20
  141:6
hostile  55:6 56:1
  60:12 61:10,20
  62:2,20,24 63:1,9
  64:12,24 68:24
  69:4 74:2,13
  85:22
hostility  69:8
hour  50:18 97:10
  97:21 122:7
hours  43:7 48:11
  144:24
house  94:18
  127:25
hrce  119:1
huh  11:6,6
hundreds  48:11
hunton  127:9,11
  127:14,18,22
  128:4
hypothetical
  62:13 67:17 86:16
  86:18,23 90:21
  91:3 95:17 105:19
  106:13,15,19

107:25 139:4
hypothetical's
  23:23

**i**

idea  22:22 31:15
  43:8 138:1
ideas  41:12
identification
  51:22 75:8 96:21
  98:20 100:13
  110:17 116:24
  122:2 124:5
  125:18 130:11
  133:3
identified  81:19
  90:17 91:23 97:12
identify  6:8 38:11
  39:16,24 44:12
  55:20,24 76:12
  79:25 80:19
identifying  17:4
  60:3
identity  143:10
ignore  23:2
ignored  23:12
illinois  87:21
  88:14
illusion  63:22
images  54:19
imagine  64:22
  72:22,25 102:6
immediately  43:22
implicates  131:20
  137:21 138:21
implications  99:10
importance  21:21
important  22:2,18
  23:11 25:14 31:8
  80:14 84:8 99:13
  112:5 120:20
  135:25 136:14

137:24
inaccuracies  5:6
inaudible  31:11
  41:20 43:16 47:9
  79:21
inaudibles  5:5
incapable  79:13
incentives  138:20
include  13:24
  22:15 74:9
included  28:25
  66:8 91:16 104:9
  109:3 119:2
includes  10:15
  13:24 17:3 63:4
  90:16 134:10
  145:2
including  89:5
  91:14 92:22
income  66:25
incorrect  48:9
indefinite  48:8
independent  54:24
indicate  119:8
  127:21
indicated  13:23
  127:22
indiscernible  5:5
  133:11
individual  35:2
  66:9 93:23,25
  104:16 105:1
inextricably  132:8
information  4:1
  34:17,23 48:22,24
  49:1,6,13,18 50:5
  50:9 55:1 56:19
  56:25 57:2,9,11,18
  57:24 58:3,16
  128:23 131:23
  136:16,19 138:21

144:25
informed  59:9
  136:17 139:22,24
  140:2
inimical  55:7 56:2
  60:12 61:10 64:12
  69:5 74:2,14
initial  48:7 49:24
initially  47:23
  66:12
input  53:5
inside  126:7
instance  1:13
  19:22 30:8,14,21
  45:8 71:11
instances  60:19
institutes  119:5
instructing  35:24
  36:14 47:16
instruction  50:2
instructions  49:2
instrument  143:11
instruments  66:9
insurance  84:20
  84:25 85:2,12
  95:18,19
integrated  67:14
  67:18 81:25 82:7
  82:10,12 84:2,3
  92:25 101:20,24
  108:12 109:11
  110:3 112:3,24
  113:15,17,18
  114:14 115:8
  119:14 131:15,18
  132:22 134:7
  135:7
integration  115:12
integrity  136:1
intellectual  82:25
  83:9,11

Veritext Legal Solutions
800-336-4000

Case 19-34054-sgj11 Doc 3959-32 Filed 04/01/27 Entered 04/01/21 12:34:39 Page 54 of
Case 19-34054-sgj11 Doc 3959-32 Filed 04/01/27 Entered 04/01/21 12:34:39 Page 54 of
Exhibit 82    Page 108 of 126

**[intent - kind]**

**intent** 52:11
**intention** 13:15
**interactions** 39:13
**interest** 18:9 27:14
  55:7 57:7 60:13
  61:11 62:20 63:2
  63:9 64:13,24
  69:5 100:23
  130:23 131:3,6
**interested** 20:21
  146:2
**interesting** 18:23
  90:6
**interests** 56:2
  58:14 61:20 62:21
  63:25 66:3 68:24
  74:3,14 95:5,25
  102:25 112:13
  120:14 134:11
  135:21
**interference** 79:20
**internal** 123:7
**international**
  40:13
**internet** 5:3
**interplay** 58:10
**interpretation**
  76:22,23 78:7
  115:18
**interpreting** 79:22
  79:22 81:20
**interrupt** 37:18
  86:6,7
**interrupted** 19:12
  86:15
**intuitively** 136:7
**invent** 22:14
**investigate** 60:4
**investigation**
  18:11

**investigator** 18:10
  19:8
**investigators**
  18:20
**investment** 92:19
  121:23
**investor** 96:8
  109:25
**invite** 13:16
**involve** 16:2,4,13
  83:10 95:4 127:7
**involved** 13:4,5,7
  13:10 32:22,24
  36:16 41:10 48:23
  50:8 53:7,8 65:25
  66:1,21 78:20
  80:8 84:16 85:14
  88:17 93:8 94:10
  96:10 100:23
  101:5 102:18,21
  102:22 103:10
  105:14 106:17
  107:13 115:20
  118:11 125:12
  127:24 128:2,4,6
  129:3 135:5
  136:12,13
**involvement** 40:11
  102:8 125:11
  128:14 134:20
**involving** 14:23
  15:21 39:1,8,18
  46:9 86:18 109:14
**ip** 85:12
**iphone** 32:11
**irrelevant** 61:21
  115:4 140:5
**issue** 56:10 73:19
  84:8 85:11,20
  96:16

**issued** 70:9 71:2
**issues** 10:22 12:16
  36:7 67:8 84:9
  85:12,14 95:18,19

**j**

**jae** 122:25
**james** 47:1,3
**jeffery** 42:6
**jeopardy** 85:3
  86:21
**job** 1:22 11:4
  143:25
**joggled** 117:12
**john** 42:4
**joint** 57:3,3,7,11
  57:21 58:14 92:18
  139:14 140:6,8,9
**jointly** 57:6,18,25
  58:12
**jones** 2:11 5:22
  145:12
**judge** 61:25
**judges** 18:21,22
**judicial** 73:18
**july** 31:20
**jumble** 35:7
**june** 31:18 33:5,7
  37:23 118:7,10
**jurisdiction** 17:10
  17:11,12 41:13
  58:17 69:23 88:18
**jurisdictions** 16:7
  17:2,9,14,15 51:19
  88:1

**k**

**k** 2:4 6:11 145:5
**kbrown** 2:13
  145:14 148:1
**keep** 12:7 14:3
  22:3 24:22 43:9

95:3 137:24
**keeps** 43:9,25
**kehr** 1:8,12 3:4,12
  5:11 6:6,10,12,13
  6:23 8:13 10:13
  11:22 13:13 17:5
  20:17 21:25 23:14
  25:10 26:13 27:18
  28:13 29:2,15
  31:17 34:16 35:18
  36:7,24 39:6,22
  40:22 41:18 42:1
  42:21 47:17 49:22
  50:14,25 52:1
  55:15 61:1 62:7
  63:21 65:9 68:14
  69:13 72:16 73:11
  75:3,10,24 76:9
  77:6,23 78:24
  80:19 86:3,11,14
  89:1 96:22 98:21
  100:15 101:11
  103:18,23 116:16
  117:3 118:1
  121:15 122:15,19
  124:7 125:19
  126:5 128:9
  129:12 132:10
  140:12,18,20
  141:1,7 142:2
  143:1,5,9 144:8,14
  147:1 148:4
**ken** 29:10 103:22
**ken's** 32:2,20
**kenneth** 2:10 5:21
  145:11
**key** 118:20,22,23
  132:4
**kim** 122:24 123:14
**kind** 10:12 31:8
  48:2,7 63:3 69:4

[kind - litigator]

| | | | |
|---|---|---|---|
| 69:14 106:21 | **label** 99:2 | 63:2,5,7,7,8,10 | 138:1,10,11,19 |
| **know** 8:10,16 | **labeled** 98:23 | 64:1,10,13,17,18 | 146:10 147:15 |
| 12:10 13:13 14:20 | **language** 69:18 | 64:19,22 69:8,10 | 148:19 |
| 16:14 17:22 18:3 | 71:23,24 | 72:10,22 73:1 | **lender** 91:17 |
| 21:4 22:4,5 29:10 | **lapse** 114:25 | 74:13,15 81:8 | 107:23 |
| 31:3,8,9,14,15 | **largely** 20:14 | 82:8,25 83:7 84:9 | **lenders** 95:7 |
| 34:1,7,10 35:3 | **latham** 2:16 6:2 | 85:6,9,11,15,21 | **letter** 3:12 31:13 |
| 38:19,22,23 42:11 | 145:17 | 90:14 91:15 93:11 | 31:18 32:1 75:20 |
| 42:15,17,19,22,23 | **lauren** 2:4 5:19 | 120:17 136:16,18 | 97:8 |
| 43:1,5 44:6 47:3 | 75:19 145:5 | 136:20,24 137:2 | **level** 18:9 25:18 |
| 49:14 51:13,25 | **lauren.drawhorn** | 137:11,20 138:14 | 27:24 48:2 |
| 54:8 65:8,8,14 | 2:8 145:9 | 140:7 | **liability** 130:13 |
| 66:24 70:9 71:14 | **law** 5:22 6:13 9:4 | **lawyer's** 14:11 | 133:9 |
| 71:16 74:7,10 | 9:15,16 12:3,16 | 15:6 49:1 50:2 | **licensed** 51:17,20 |
| 76:24 79:2,6 | 20:15 21:22 30:2 | 59:10 137:3 | **limine** 30:20 |
| 83:14 85:11,12,13 | 40:13,13 46:6,12 | **lawyers** 9:15,16 | **limit** 36:15 85:15 |
| 85:18 90:9 107:2 | 47:21 55:12 56:13 | 9:17 12:13 17:17 | **limitations** 30:18 |
| 108:13 110:18,19 | 57:21 62:23 63:17 | 18:20,24 19:5 | 30:19 59:8 |
| 117:10 120:25 | 66:21,24 67:4,10 | 20:15 21:21 22:18 | **limited** 30:13,15 |
| 122:20 125:10 | 71:16 72:23 73:7 | 23:8 34:2,20 | 35:19 83:17 84:8 |
| 126:5,6,6,9,14 | 73:21 81:1 82:15 | 37:13 47:13 58:13 | 93:23,25 130:13 |
| 129:24 132:14 | 82:15,17,24 83:8 | 59:3 72:12 81:1 | 133:8 |
| 134:22 136:5 | 84:16,21,24 85:2 | 81:10,11 82:11,14 | **limits** 119:18 |
| 139:18,24 140:12 | 86:20,25 88:1,15 | 82:15 83:3 85:5 | **line** 53:22 62:7 |
| 140:22,25 | 89:20 93:11,23,25 | 85:25 89:19 94:18 | 68:19 77:2 126:20 |
| **knowing** 55:17 | 94:18 95:22 102:6 | 120:12 136:8,9,11 | 126:21,22 128:12 |
| 78:17 116:22 | 102:8,16 103:6 | 136:12,19 137:22 | 129:24 142:5 |
| **knowledge** 13:19 | 115:20 119:21 | 138:10,13,21 | **list** 75:11,21,25 |
| 118:13,16 | 127:9,11 | **laymen's** 94:23 | 76:15,15,15,18,18 |
| **known** 37:9 71:20 | **lawsuit** 12:2 | **lead** 119:3 | 77:7 92:13 111:1 |
| 95:23 119:1 143:9 | 134:24 | **leads** 17:6 | **listed** 92:5 121:12 |
| **l** | **lawyer** 9:13,19 | **lease** 107:1,2,8 | **listen** 30:10 |
| **l** 1:8,12 3:4 5:11 | 12:14 14:15 18:8 | 108:1,17 109:5 | **lists** 76:12 123:10 |
| 33:13 142:2 143:1 | 18:13 20:14 22:9 | **led** 50:11 | **litigation** 9:14 |
| 143:5,9 144:8,14 | 22:23,25,25 27:12 | **lee** 122:25 | 19:18 21:10,15,17 |
| 147:1 148:4 | 29:25 30:5,6 48:9 | **left** 15:8 | 21:18,23,24 52:6,7 |
| **l.p.** 1:4 144:4 | 48:10 54:22,24 | **legal** 12:15 21:20 | 136:13 137:15,15 |
| 148:3 | 55:1,6,8,25 56:2 | 21:22 23:9 36:7 | 137:19 |
| **la** 2:10 33:16 | 57:3,4,7,8,10 | 65:25 84:9 94:3 | **litigator** 9:8 19:10 |
| 145:11 | 58:14 59:9 60:7 | 98:2,5 129:4 | 19:13 |
| | 60:11,13,17 61:11 | 136:14 137:4,4 | |

Veritext Legal Solutions
800-336-4000

[litigators - martin]

**litigators** 19:6
**little** 11:11 17:14
  30:9 44:3 46:8
  51:10 60:5 75:4
  100:24,24
**live** 26:6 31:22
  72:5
**llc** 3:20,21 5:20
  6:3 66:3,15,17
  89:20 92:18 94:5
  94:10,15,20 95:13
  96:5,11,17 101:3,5
  101:12,13,18,24
  102:9,17,19,23
  103:7,8,11 107:17
  107:19 108:6
  109:20 112:2,13
  112:24 113:5,21
  113:25 114:8,12
  114:19,20,23
  115:2,14 116:4,9
  118:4 119:1,1,13
  119:20,25 120:13
  121:22 123:10,14
  123:15,19,23
  124:2 126:21
  127:6,10,23
  128:17,19 129:3,5
  129:8,10,18,25
  130:3,5 131:1,14
  132:4 133:17
  134:12,20 135:1,6
**llc's** 3:17 123:9
**llp** 6:2 52:13
**loan** 3:14,15 49:15
  49:20,21 66:1,11
  66:13,14,18 83:18
  83:25 89:18 92:20
  92:24 93:2 95:15
  96:2,19 100:4,17
  101:3,19 102:9,18

102:22 103:23
104:3,20 105:9
106:3,12 107:5,14
108:7,8,10,13,15
109:6,8,21,23
110:1,9,12 112:2,8
112:12,17,24
113:10,14,18
114:2,4,21,22
115:25 116:17
118:22,24 119:3,4
119:13,17,19
120:20,21,24
121:2,16,24
129:10 131:11,14
131:19,20 132:5,7
132:16 134:16,17
**loans** 118:21
  119:23
**located** 6:21
**logic** 41:12
**london** 2:15 6:3
  145:16
**long** 6:15 23:9,22
  56:15,17 59:24
  69:19 70:19 136:2
**longer** 110:20
**longterm** 98:8
**look** 31:3 41:12
  42:22 56:13 58:9
  58:10 59:25 62:4
  69:6 72:8 81:16
  85:18 108:13
  111:4 126:1
  133:22,24
**looked** 22:13 45:8
  45:12 76:25 77:11
  78:17 79:3 80:1
  81:20 95:22 99:20
  104:14 111:22,25
  124:13

**looking** 44:12
  63:12 78:5 80:25
  87:21 97:8 120:6
  121:16 128:12
**loose** 129:1
**looser** 129:9
**los** 1:18 2:12 6:22
  8:9 31:9 145:13
**lost** 14:19
**lot** 132:11 135:11
  140:16
**lots** 27:2 71:18
**loves** 82:18,23
**lower** 98:7
**lowest** 98:8
**loyal** 136:20
**loyally** 138:8
**loyalty** 23:24
  27:11,13 54:23,25
  56:9,19,20 57:5
  58:11 60:17 61:6
  69:11,12,12 72:9
  73:19 84:8 85:20
  87:8,14 91:13
  102:12 109:18
  115:20 116:1,6
  135:18,21,23,24
  136:22,24 138:2,5
**lp** 100:3 103:25
  106:16 111:19
  120:9 121:11,20
**lp's** 52:10
**lsc** 2:14 145:15
**lw.com** 2:19
  145:20

  **m**

**ma'am** 116:15
  122:6
**mac** 116:20,23
  118:21 119:9,22
  120:2

**machine** 1:17
**madam** 75:5 98:15
  100:15 124:6
**mail** 2:7,13,19
  145:8,14,20
**main** 119:4
**maintain** 57:22
**maintenance**
  135:25
**majority** 78:1
**making** 26:15 28:2
  94:2 112:1 119:12
**malpractice** 84:12
  85:1 86:19
**man** 34:8,9
**management** 1:3
  2:9 5:23 32:25
  52:10 97:5 100:3
  103:25 106:16
  111:19 121:11,20
  144:3 145:10
  148:3
**manner** 139:17
**march** 133:9,12
**mark** 3:19 100:15
  122:24 124:6
  125:21
**marked** 51:22
  75:6,8 89:8 96:21
  98:18,20 100:13
  110:17 116:24
  122:2 124:5
  125:18 130:11
  133:3
**marking** 122:4
**martin** 2:4 3:5
  5:17,18,18,24 6:5
  7:6 15:17 23:13
  24:21 25:3,6 26:3
  26:9,11,12 27:18
  29:8 35:25 36:9

Veritext Legal Solutions
800-336-4000

[martin - nationwide]

52:13 74:21 76:2
76:5 77:9,15,20
80:17 86:7,13
103:19 121:5,7
122:6,10,13 123:3
127:19 140:19
141:3,12 144:24
145:5

**mashing** 29:5

**massachusetts**
40:20 88:14

**matejcak** 124:22

**material** 57:9 67:8

**materials** 38:25
39:7,10,11 48:13
79:13

**matt** 122:24

**matter** 7:8,15 13:1
19:17,23 21:24
24:20 26:4 35:10
36:8 37:6,7 38:12
38:25 39:16,24
40:5,6 43:25 44:1
46:2,3,5 55:5,6,24
55:25 60:9,11,18
61:9,17,23,25 62:2
62:5,10,15,24 63:4
63:6,19 64:3,7,10
64:15,19 65:12,16
72:10,19 73:10,14
86:4 91:1,5 99:3
102:25 106:6
135:13 136:25
137:1,13,13,23
139:13,14,17,20
140:9

**matters** 12:10,19
13:19 14:10 15:20
19:7,9 20:16
35:14,20 37:17
38:11,21 39:8,17

47:12 66:5,6
103:5

**matthew** 117:9

**mcdermett** 124:23

**mcgrander** 3:22

**mcgraner** 117:10
122:24

**mcgraner's** 117:1
118:2

**mckenzie** 124:22
124:22,23 125:5,9

**mclaughlin** 2:16
5:24 6:1,2 145:17

**mean** 19:20 22:5
31:7 33:19 44:16
60:6 61:25 75:24
80:6 86:7 95:15
101:7 126:24

**meaning** 70:6,14

**meaningful** 68:8

**means** 57:6 126:24
137:8

**meant** 93:14

**medical** 11:18

**member** 17:25
130:22

**memories** 32:16

**memory** 31:23
37:15 40:4 117:12

**mental** 11:17 34:5

**mentally** 106:11

**mentioned** 81:3
94:7 132:15

**merit** 19:2

**met** 6:23 33:18

**mind** 32:10 82:6
95:3 134:6 137:25

**minority** 20:7,14

**minute** 43:23,23
75:18

**minutes** 26:20
50:19 72:16
122:12 144:24

**mischaracterizes**
120:23

**missed** 82:20

**missing** 72:20
101:14

**misstatement** 25:3
25:5,7

**misstatements**
24:25

**misunderstand**
90:24

**misunderstanding**
121:12

**misusing** 56:24

**mitts** 124:23

**mixing** 84:6

**model** 16:8,23
17:7,10

**modified** 17:10,12

**moment** 12:17
14:17 32:9 35:13
38:17 54:16 64:17
81:3 89:10 102:6
115:10 121:9
126:1,1

**monica** 2:11
145:12

**month** 20:5,6
45:25

**months** 31:21 35:3
37:25 38:4 80:21
109:2 114:8,11
115:14 116:6
124:2 133:18
134:5

**monument** 120:8

**moral** 11:25

**morning** 5:17,21
135:16

**morris** 42:4

**mortgaged** 93:1
111:15

**motion** 7:11,16
35:11,16 36:14,16
37:6 38:6,10 39:2
39:9 47:8 52:12
75:13

**motions** 30:20
56:12

**mouth** 13:15
55:16

**move** 29:11 52:21
81:23 110:15
122:18

**multi** 40:13 66:15

**multifamily** 66:16
66:16 106:18,24
107:3 123:9,15

**multiple** 12:9
41:17 49:15 50:10
92:23

**n**

**n** 3:1 69:22

**name** 6:1,10,17
7:2,6 33:10,22
44:25 46:14 66:16
130:22 142:2
143:11

**names** 11:21 46:15
47:23

**narrow** 22:22 56:8
91:11

**narrower** 74:9

**national** 16:6
90:13 118:20

**nationwide** 16:6
40:12

[nature - opinion]

| | | | |
|---|---|---|---|
| **nature** 18:6 | **nice** 46:19 50:17 | 88:7 | 29:8 32:5,13 |
| **necessarily** 102:22 | **night** 101:1 | **objecting** 25:7 | 33:22 34:25 35:14 |
| 138:21 | **nine** 84:21,24 | **objection** 15:17 | 37:20,21 38:18 |
| **necessary** 82:5 | 86:24 87:12 88:9 | 24:12,22 25:23 | 41:1 42:1 43:20 |
| **need** 23:10 25:19 | **noise** 5:4 | 39:20 41:22 44:23 | 44:19,21 45:7 |
| 26:12 28:13,21 | **non** 9:14 21:18,24 | 47:17 74:21 77:20 | 46:17 49:8 50:20 |
| 29:2,5 45:19 | 73:1 137:15,17 | 117:21 120:23 | 51:23 54:20 55:18 |
| 49:22 51:25 58:9 | **nonresponsive** | **obligated** 57:10 | 59:18 60:1 65:1 |
| 64:17 66:18 79:6 | 15:17 23:13 74:21 | **obligation** 59:2 | 67:17,21 68:2,19 |
| 82:3 88:3 103:13 | 80:18 88:8 | 77:16 100:4 | 68:25 70:9,22 |
| 103:20 105:17 | **normal** 18:22 | 102:12 | 75:3,9 77:20 |
| 129:15 136:15 | 97:21,22 98:1,5 | **obligations** 138:5 | 80:17 81:18 85:24 |
| **needed** 66:13 | **north** 40:18 | **obtain** 99:4 | 87:6 90:4 92:5 |
| 92:19 | **northern** 1:1 | **obtained** 50:9 | 101:9,15 105:11 |
| **needs** 36:17 56:12 | 70:12 144:1 | **obtains** 57:8 | 110:20 114:7 |
| 136:16 | **notarize** 148:11 | **obvious** 136:7 | 117:8,9 122:12 |
| **negotiate** 94:14 | **notary** 143:17 | **obviously** 35:20 | 125:8 126:14 |
| 102:16 | **note** 5:1,1 110:2 | **occasions** 41:17 | 127:6 132:20 |
| **negotiated** 94:19 | 148:9 | **occurred** 108:20 | 133:1,14 140:3,16 |
| 103:7 | **noted** 141:3,7 | 113:20,22,24 | 140:19 |
| **negotiation** 89:18 | 143:2 | 115:14 | **older** 70:25 |
| 92:20 94:5,10 | **notes** 37:13 | **octc** 18:14 | **once** 10:14 12:21 |
| 129:8 | **notice** 22:25 95:12 | **offer** 28:16 30:5 | 15:2,3 115:24 |
| **neither** 77:18 | **noticed** 75:4 | **offered** 28:5 | 119:17 |
| 145:23 | **nrea** 118:6 | **offering** 21:6 | **ones** 12:24 94:19 |
| **nevada** 40:21 | **nrep** 119:3,3 | **offhand** 15:16 | **online** 18:7 |
| **never** 15:19 19:9 | **number** 14:8 | 20:2 40:17 42:16 | **open** 14:22 15:20 |
| 19:16 20:12 23:11 | 20:11,19 33:17 | 42:19 45:14 81:1 | 54:18 61:4 96:25 |
| 30:23 34:5 40:4 | 66:11 75:1 81:5 | 92:4 | 98:25 |
| 118:10,15 | 81:14 85:13 | **office** 8:3,5,11 | **opened** 117:8 |
| **new** 2:18,18 8:14 | 123:18 133:23 | 18:12 19:4 143:13 | **operate** 60:24 |
| 22:14 25:18 35:6 | **numbered** 1:14 | **officer** 144:15 | **operating** 26:17 |
| 40:20 43:25 87:21 | **numbers** 133:21 | 145:1 146:20 | **opine** 24:20 25:25 |
| 96:8 102:6,16 | | **officer's** 147:3 | 26:19 111:6 |
| 109:25 110:11 | **o** | **oh** 8:6 9:10 14:20 | **opinion** 20:22 21:6 |
| 145:19,19 | **o** 33:13 69:22,22 | 30:3,17 31:15 | 24:14,17 28:24 |
| **nexpoint** 2:3 5:20 | **oakland** 8:12 | 41:6 43:8 | 29:20 30:13,15 |
| 7:7,12 117:15,16 | **oath** 51:2 89:2 | **oil** 107:1,2,8 108:1 | 35:21 36:4 39:7 |
| 117:22 118:3,25 | 122:16 128:23 | 108:17 109:5 | 45:1 53:10 56:4 |
| 145:4 | 130:9 143:10 | **okay** 9:25 12:25 | 58:23 61:24 65:16 |
| | **object** 23:13 28:8 | 24:4 26:12 27:1 | 68:21 70:10 72:14 |
| | 47:11 77:2 80:17 | | |

[opinion - patrick]

75:2 78:9,12 79:5
79:8,8 80:15 81:2
81:9 82:5 83:25
84:6 88:20 89:25
90:23 91:7,22,25
93:21 94:22
100:20 101:17,19
101:20,23 103:9
103:24 106:1
109:19 110:14
112:2 116:6
119:12 120:19
126:10 131:14,17
131:24 132:18,19
132:22 134:7
135:4,6,20,22
136:17,19
**opinions** 7:17 26:7
34:18,24 36:6,19
36:22 47:13 52:23
53:1,9,13 54:4
58:22 68:16 72:1
76:16,19,23 77:12
78:2,6,7 79:1,22
80:1,4,5,13,20
81:15,21,24 89:9
92:14 99:8,12,14
99:17,17,21,23
100:10 101:2
102:3 124:12,14
125:24 126:14
130:17 135:12
140:22 141:1,9,10
**opportunity** 61:4
76:24
**opposed** 68:10
**opposing** 26:18
**opposition** 76:1
**oral** 1:7,12 144:15
**order** 34:4 45:19
56:13 106:10

117:2 138:12
**organization**
128:2
**organizations**
17:24
**original** 3:20
71:22 96:2,19
101:7,12,18 102:9
102:18,19,21,22
105:6,14,23 109:4
114:13 115:1,15
115:25 127:23
128:17,19 129:18
130:13 131:1
133:18 134:12,16
134:17 146:19,25
147:4
**originally** 36:25
106:3 139:15
**outcome** 46:22
146:2
**outside** 12:3,14
14:15 57:23 60:19
126:9 140:7
**overall** 67:5,10
**overstated** 26:23
**overview** 48:3,10
**owe** 59:3
**owes** 54:22 57:21
**ownership** 62:20
66:3 95:5,25
105:21 107:17
109:2 110:5
112:13,16 113:4,9
113:13 123:10
131:9 134:15

---

**p**

**p.m.** 1:16 88:25,25
122:14,14 124:17
141:14

**pachulski** 2:11
5:22 34:21 35:20
47:13 71:21 100:5
145:12
**package** 67:10
102:13
**page** 3:10 4:2
52:21 89:16 92:17
100:17,17 111:12
111:13,14 126:16
128:10 129:21
130:19 133:14,21
133:22,23,24
142:5 146:23
**pages** 110:18
148:12
**paid** 42:13,18,24
**painted** 88:20
**pandemics** 9:23
**paper** 95:24
**paragraph** 56:17
97:9 117:12
118:18,18
**paraphrase** 81:10
**part** 9:13 18:15
20:14 41:8,14
46:10,13 50:14
58:11 66:7,20
67:10 69:6,10
74:12 75:25,25
76:7 81:24 87:13
91:6 93:9 94:24
94:25 95:2,3
98:18 99:7,18,18
100:20 101:20,24
102:2 103:23
104:7 105:5 107:3
107:4,14,24
108:12 109:10
110:23 112:24
119:19 131:13

135:14 136:15
**partial** 80:23
**participants** 54:20
67:7
**participated** 8:20
8:24 80:4
**particular** 6:16
49:14 50:10,11
79:8,12 80:13
84:9 98:10 138:6
**parties** 78:21
102:7 106:2
107:22 121:24,24
127:1,5 145:2,24
147:7
**partly** 54:19
**partner** 6:13,15
33:1,11 34:10,11
44:2
**partners** 2:3 5:19
5:20 7:7,13 32:2
32:20,24 118:25
119:1 121:22
145:4
**parts** 44:6,7 82:12
87:9
**party** 12:2 77:18
107:7 111:19
120:9,22 121:1
128:15 144:22
**pass** 140:16
**passes** 42:13
**patches** 18:22
**patience** 9:24
29:16
**patient** 10:25
**patrick** 3:19
122:25 125:21
126:6,8 128:23
130:9

Veritext Legal Solutions
800-336-4000

[patrick's - previously]

| | | | |
|---|---|---|---|
| **patrick's** 126:7 | 102:17,21,24 | **plural** 59:12,13 | **potential** 47:21 |
| 128:13 | 103:9 104:20 | 95:11 118:21 | 48:14 85:17 |
| **paul** 122:23 | 105:9 106:2,5 | **poetic** 71:19 | **pour** 97:13 |
| 124:19 | 107:6 115:24 | **point** 8:13 10:13 | **power** 137:17 |
| **pause** 62:1 | 116:7 118:13 | 26:15 27:20 53:14 | **practical** 37:15 |
| **paused** 44:20 | 123:3,23 124:2 | 53:17 54:13,21 | 127:8 |
| **paying** 42:23 | 125:2,6,11 127:19 | 59:24 89:15,15 | **practice** 9:5,6,7,14 |
| **people** 20:12 | 128:5,14,16,18 | 90:17 91:2 92:12 | 9:14 19:20 20:3 |
| 32:13 34:4 35:4 | 129:2,7,17,25 | 92:17 93:6 94:6 | 20:10 |
| 123:3,8 125:2 | 130:3,5 131:19 | 101:15 102:23 | **practicing** 9:4 |
| 138:2,6 | 134:19 135:5 | 106:22 108:9 | **precise** 133:11 |
| **people's** 32:16 | 145:6 | 111:8 113:16 | **precisely** 21:18 |
| **percent** 123:11,12 | **phone** 38:17 | 119:4 120:3 | **preexisted** 69:25 |
| 131:3,6 | **phonecall** 100:2 | 123:18 132:4 | **preliminary** 39:7 |
| **percentage** 20:8 | **phonecalls** 32:20 | **pointed** 110:25 | **premiss** 17:16 |
| 123:10 130:23 | **phrase** 90:6,7,8 | **pointing** 90:25 | 67:14 |
| 131:3,6 134:11 | **phrased** 72:12 | **pomerantz** 42:6 | **preparation** 92:22 |
| **percentages** 131:9 | **phrasing** 63:16 | **poor** 5:2 | **prepare** 127:10 |
| 134:15 | 71:20 87:24 | **popped** 65:22 | **prepared** 38:24 |
| **percipient** 12:22 | **phrasings** 87:22 | **pops** 81:13 | 39:10 94:2 95:5 |
| 13:1 15:3 | **physical** 11:18 | **portfolio** 93:2 | 96:13 |
| **perfect** 75:16 | **physically** 34:5 | 111:15 112:9 | **preparing** 26:16 |
| **performing** 43:13 | **pick** 65:13 120:4,8 | **portion** 104:21 | 147:3 |
| **period** 41:15 50:9 | **picking** 26:13 | **portions** 128:13 | **present** 5:15 141:4 |
| **permitted** 30:7 | **picture** 32:10 34:5 | **position** 10:16,20 | 141:6,7 |
| 136:8 137:20 | **piece** 95:24 | 36:1,10 55:6 56:1 | **presentations** 16:1 |
| **person** 143:11 | **pieces** 66:11 | 60:12 61:10,16,19 | 16:12 |
| **personal** 12:3 | **place** 66:15 110:11 | 62:8,24 64:12 | **president** 117:14 |
| 44:10 50:19 | **places** 74:19 | 65:10 66:22 67:1 | 118:3 |
| 118:13,16 | **plan** 135:12 | 68:3 73:25 74:2 | **presume** 130:16 |
| **personally** 19:18 | **play** 72:14 80:11 | 74:13 77:10 83:15 | **pretty** 9:8 38:16 |
| 44:8 143:9 | 138:11 | 83:20 102:20 | 45:12 60:21 |
| **persons** 118:11 | **players** 47:23 50:8 | 114:11 115:24 | **prevented** 119:24 |
| **pesky** 136:11 | **please** 5:1,7,15 6:9 | **positions** 102:20 | 120:1,12 |
| **peter** 124:22 | 26:24 32:17,17 | 103:17 | **previewing** 83:13 |
| **phillips** 2:5 5:18 | 37:20 69:21 82:21 | **possesses** 55:1 | **previous** 12:19 |
| 52:12 56:24 57:15 | 86:12,13 98:17 | **possible** 16:15 | 16:22 25:17 40:23 |
| 58:2 61:3,6 65:4 | 100:15 123:9 | 23:22 30:18 47:24 | 62:10 65:11,14 |
| 65:14,21 68:4 | 124:6 126:22 | 60:3 73:8 140:25 | 93:5 |
| 76:3 89:17 91:4 | 135:17 136:6 | **possibly** 21:12 | **previously** 55:8 |
| 94:9,14 95:12 | | 30:19 39:11 80:3 | 56:2 60:13 61:11 |

Veritext Legal Solutions
800-336-4000

[previously - putting]

62:21 63:2,10
64:13,24 66:23
69:10 72:11 73:2
73:12 74:3,15
84:10 91:10 129:5
**price** 118:23
**primarily** 16:1,4,7
16:20,23 84:11
**primary** 9:5 58:23
59:18
**principle** 58:16
**principles** 27:10
27:11
**prior** 6:23 7:2 33:4
42:1 45:22 53:18
61:17 64:20 73:10
81:11 91:15,16
103:10 107:14,18
113:20,24 114:3
118:10 133:12
**privilege** 35:24
36:3,8 47:15
**privileged** 34:22
35:22
**probably** 9:21
11:10 23:21,25
30:4 35:3 37:12
37:13 40:16 45:12
45:19 53:14 57:10
63:4 66:8 80:5
106:8 107:9
117:12 133:16
**problem** 29:17
55:21
**procedure** 1:19
18:2,5 22:6 44:15
44:16,19
**proceed** 6:6 50:25
**proceeding** 14:23
62:9 137:18
145:25

**process** 45:21 79:7
79:15 136:13
**produce** 77:4,5,7
77:10,13,16
**produced** 1:13
31:14 77:19
**producing** 107:1
**product** 34:21
35:22,24 36:3,18
36:23 47:15
**production** 3:13
99:3
**professional** 9:17
12:12 15:13,21
17:24 18:11 19:7
20:16 22:17 27:5
30:24 33:14 37:12
40:12,15 41:9
45:2 55:3,22 60:8
61:7 80:8 89:23
**professionalized**
18:19
**professionally**
22:10
**proffered** 21:3
**programs** 16:16
16:17,18
**prohibited** 22:19
23:1 136:10
**prohibition**
140:10
**prohibits** 58:13
90:14 136:24
**project** 84:18
85:14 102:11
103:2,3,11 104:21
105:6,14,23 106:4
106:17 107:4,21
107:24,25 108:12
114:13 115:21,22
115:25 116:2,5

119:9,23 120:2
125:12 132:7,8
**promissory** 110:2
**prong** 69:12
**pronounce** 7:1
**properties** 67:9
84:20 93:1,2
95:20 105:2
108:16,20,22
109:3,9,10 110:10
110:10 111:15,15
112:10 113:23
116:18 132:3,17
**property** 66:11
83:1,9,11 105:13
106:16 109:15
110:11
**prosecution** 29:25
**prosecutor** 19:8,8
**protect** 55:8 56:3
60:14 61:12,21
62:22 63:3,10
64:14,25 74:4,15
**protected** 36:18
85:17
**proved** 143:10
**provide** 7:16 9:15
20:22 84:24 85:7
85:10 136:17
**provided** 20:20
25:10 39:7 51:24
53:1,21 66:25
67:4,7,9 75:11
84:19,22 85:3
92:13 110:24,25
116:20 118:21
**provides** 130:22
138:15
**providing** 20:3
43:2 65:25 66:2
98:2,5 129:4

**provision** 132:15
**provisions** 1:19
78:3
**prudent** 85:15
**psa's** 3:16 104:12
105:6,14 110:23
111:11,14,20
112:1 120:20
**pszjlaw.com** 2:13
2:14 145:14,15
148:1
**public** 135:25
143:17
**punch** 43:24
**purchase** 104:9,16
105:1 111:14
114:5 118:23
120:5,7
**purchased** 105:15
105:20,23
**purpose** 66:10
76:14 108:15,15
110:9 112:9,11
113:19 114:22,23
132:2,2,16
**purposes** 21:16
22:22 83:25 84:12
105:19 115:17,18
115:19 143:12
**pursuant** 1:18
144:25
**pursuing** 13:6
24:9
**put** 26:12 28:9
33:23 34:14 45:20
50:16 51:8 55:12
55:15 105:21
106:5,18,21 107:2
107:3
**putting** 13:15

Page 22

[qualifications - related]

**q**

**qualifications** 20:21
**qualifies** 41:2
**quality** 5:2
**question** 17:6 19:11 21:13 22:1 23:14 24:4 25:18 26:1 27:6 28:22 30:10 36:24 37:16 39:5 42:19 43:10 43:17 44:23 46:19 54:3 57:13 58:1 59:23 61:1,5 62:1 62:3 63:23 65:5 67:23 69:14 70:5 72:24 73:12 77:1 77:22 78:16,19 82:21 85:9,21 88:4 91:8 97:20 97:25 105:4 106:14 107:6 109:1 111:6 113:2 113:12 118:9 121:12 126:20,22 126:24 127:1,6,9 127:11,13 128:14 128:17 129:24 130:2 137:6 140:11 141:9
**questioning** 62:7 77:3
**questions** 4:5 11:5 11:12,14 32:6,21 35:6 37:11 51:9 55:12,16 65:13 69:15 82:5 84:25 96:23 101:11 106:10 124:16 129:1 138:17 140:17

**quick** 75:10 88:4
**quickly** 9:8 129:21
**quite** 30:19 59:6 74:5 125:9
**quotation** 60:20 60:21
**quote** 63:1 72:18 90:16
**quoted** 64:8 71:24 71:25
**quoting** 69:16,17 70:10

**r**

**r** 6:11 49:21
**rachelle** 44:2
**raise** 5:7 140:22
**range** 97:23
**rare** 19:3 73:3
**rarely** 33:21
**rate** 42:15 43:2,4,5 97:21,22 98:1,5,9
**rates** 98:12
**rational** 138:22
**reach** 68:11 81:20
**reached** 93:21
**reaching** 80:1,20 89:25 92:14 99:7 99:21 115:2 125:24
**read** 44:14,17 45:4 45:7,23 52:9,13,23 54:13 55:9,19,21 60:2,5,6 80:3 89:23 93:3 119:5 123:20 124:24 127:15 128:19 130:6 143:1 148:6 148:8
**reading** 133:14
**ready** 6:6 50:25 54:20

**real** 2:3 5:20 7:7 7:12 66:11 75:10 117:23 118:3,25 145:4
**realized** 9:8
**reallocate** 62:20
**really** 38:14 65:3 97:22 104:14 111:3,25
**reason** 11:17 25:14 28:22 44:20 65:12 71:8 72:20 72:21 79:5 82:18 112:20,23 123:4 132:5,6 136:22 142:5
**reasonable** 22:24 85:16
**reasonableness** 12:15
**reasonably** 85:6 94:3 136:17
**reasons** 136:12 146:23
**rebut** 141:1
**rebuttal** 140:24 141:5,10
**recall** 80:25 81:2 96:12 100:4,7 116:22 127:9 130:4
**receive** 10:11
**received** 32:2 39:14 100:1
**receiving** 48:12
**recess** 50:24 88:25 122:14
**recognized** 56:22
**recollection** 38:15 114:15

**record** 1:20 5:16 5:25 6:9 7:2,23,24 8:2 24:6,25 25:4 26:13,15 28:2,10 28:13 29:3,9,11 43:11,13,17,22 63:24 77:21 98:18 103:13 141:11,12 144:16 145:3
**records** 44:5,12
**red** 53:22
**redefined** 21:13
**referenced** 148:5
**referring** 44:24 121:4,8 125:15
**refers** 125:14
**reflect** 127:5
**reflects** 54:9
**refusing** 46:18,19
**regard** 21:20 27:6 27:9 35:5 65:6 66:1,2 67:7,8,11 73:20,22 85:7 94:4 95:19 102:12 103:2,3,4 104:20 107:12 129:4 135:18 137:14
**regarding** 15:5,11 15:20 20:9 27:22 41:19 86:25 95:11
**regardless** 29:9,19 83:16 93:22
**registration** 146:10 147:15
**regularly** 40:15
**reit** 123:15
**relate** 35:23 38:10 100:10 135:1
**related** 13:6 15:12 18:16 19:22 35:10 38:5,25 46:2 55:4

[related - right]

55:23 57:15 58:3
60:9,18 61:9,19
62:2,10,14,25 63:6
63:15,19 64:3,7,10
64:15,20 65:12,15
67:23 68:1,4,8,10
68:21 69:3,7 72:9
72:18,25 73:10,13
91:1,5 106:10,12
107:18 108:4
109:4 113:9 116:2
116:5 119:23
137:23 139:12
145:24
**relates** 114:12,16
**relationship** 57:3
57:4 63:8 120:18
137:3
**release** 3:14 100:3
**relevance** 99:23
**relevant** 104:17,19
105:2 115:17,17
115:19 119:15
**reliance** 85:16
**relied** 77:6 92:13
129:6
**rely** 14:8 84:23
85:6 89:25 94:3
138:14
**relying** 91:21
**remember** 15:16
15:19 16:18 31:24
32:11,14 34:4
40:17 42:16 45:18
49:7,9 53:17,21,25
54:1 68:1 72:19
79:18 81:1,4,5,6,7
81:19 99:25 100:2
**remotely** 8:14
**render** 55:3 60:7
61:7

**rendering** 64:2
77:11
**renders** 55:22
**repeat** 11:13 39:4
105:17
**rephrase** 11:13
25:9 36:25
**report** 95:23
**reported** 1:17
**reporter** 5:7,15
49:19 70:15 75:5
75:7 98:15,19
100:15 116:12,14
122:4 124:6
141:11 144:11
**reporter's** 3:7
144:7
**reporters** 5:1
**represent** 5:20 6:2
7:7 8:2 10:24 99:1
100:16 102:7
110:22 116:8
123:2,7 125:1
128:16,18 129:17
139:7,8,15 140:8
**representation**
24:8 57:21 60:17
62:8,11 65:7,11,15
65:24 72:24 73:8
73:10,23,25 74:6
74:11 83:5,10,17
84:7,11 85:4,5,7
85:23 91:4 93:22
93:25 94:4 98:2
107:18 118:12
123:4 128:15
129:7 137:1
**representations**
82:7 83:4 95:6,7
95:10 107:15
140:6

**representative**
73:1
**represented** 57:6
57:19,25 58:12
83:15,16,24
104:20 106:2
139:14
**representing** 5:23
7:12 82:11 91:17
102:24 107:7
117:17,18,24
119:22,24
**requested** 4:1
**require** 39:11
67:13
**required** 22:18,25
87:18 92:21 93:19
118:24
**respect** 28:17
92:22 120:2
140:14
**respectfully** 24:21
**respective** 127:1
**response** 88:8
**responsibilities**
14:11 37:12
**responsibility**
9:17 12:13 19:7
20:16 80:9
**restate** 51:12
128:15
**restated** 133:8
**restatement** 80:25
**result** 27:14 30:20
68:11,11 110:12
118:25
**resulted** 109:25
**retained** 7:10 31:2
32:4 33:3 40:3
46:25

**retaining** 46:9
**retention** 31:13,18
32:1 33:5,5
**return** 148:12
**returned** 144:20
146:19,22,25
**revealing** 37:3
38:12
**review** 124:11
125:24
**reviewed** 38:24
39:6,11 54:4 76:7
92:6 104:7 130:16
**revolve** 81:24
**rhetorical** 77:1
78:19
**rick** 122:25
**right** 5:8 6:6 7:20
8:4,17,21 13:8,11
13:25 14:6 15:23
17:19 19:13,20,25
20:23 21:8 22:3
24:9 26:11 27:22
31:21,23 33:4
36:9 37:25 38:1,2
38:19 39:24 43:5
44:25 45:18,18
46:14 50:6,13
51:4,16,23 52:9,20
52:25 53:11 54:2
54:12,21 55:11
56:5 57:20 58:1,6
58:21 59:22 63:11
63:23,25 64:5,16
67:13 68:17 69:2
69:5,6,23 70:17,18
70:19,20 71:4,8
76:21,25 78:18
79:3 81:23 82:3
83:18 86:19,21
88:23 89:1,7,14,16

Veritext Legal Solutions
800-336-4000

[right - sees]

90:16,20 92:16
93:16,21 94:6
95:1 96:3,15,22
97:4 98:13 100:9
100:9,14 101:10
101:17 103:14,22
104:6,12 105:3
106:21,24 107:1
108:19 109:1,24
110:5,22 111:2,5
111:10,18,24
113:12 114:2,5,18
115:13 116:11,25
116:25 117:1,14
117:16 118:1,9,17
119:21 120:3,16
121:19,25 122:1,3
122:18,22 123:6
123:24 125:19
126:3,16 128:8,12
129:21 130:12,19
131:17 132:14,20
133:4 134:3,10
135:4 137:9
138:16 139:3
**rights** 13:6
**rises** 18:9
**risk** 85:17
**robert** 1:8,12 3:4
5:11 6:10 11:22
142:2 143:1,5,9
144:8,14 147:1
148:4
**robes** 18:21
**role** 126:21 129:25
130:2 137:3
138:10
**room** 5:4 10:3
51:7
**rough** 41:6

**roughly** 27:4 33:1
37:10 56:16 80:7
**rounded** 136:17
**rule** 22:9,24 23:2,4
23:5 28:19 36:17
45:1 58:7,18,24
59:2,19 62:16
64:11,15 65:17
67:25 74:1,16
77:10 78:13 84:1
87:19,25 88:11,21
88:21 90:23 91:7
93:19 119:24
**ruled** 30:6
**rules** 1:19 9:20
10:14 15:12,14,16
15:21 16:2,2,5,6,8
16:10,13,16,21,23
17:2,7,8,10 22:6,8
22:9,12,14,17,21
23:7,15,18,23 24:3
24:23 25:16 26:22
26:25 27:2,4,7,9
27:15,16,17,22
28:7,20 30:24
40:8,11,11,15,18
40:19,24 41:2,3,5
41:7,9,11,14,15,17
41:19 44:14,17,19
44:24 45:2,7,10,20
45:23 46:10,11
78:14 79:17,21
80:10 81:20 87:21
87:21,22 88:12,19
89:22 138:22
148:14
**run** 9:19 88:3
**running** 12:7
**runs** 98:24

**s**

**s** 59:16
**sake** 63:24
**sale** 104:10 120:5
120:7 137:17
**sampling** 80:13
**santa** 2:11 145:12
**sat** 19:21
**save** 29:3
**saw** 75:17 76:6
104:12 111:1
**saying** 20:13 27:23
63:20,25 64:5
69:13 86:19 100:7
106:13 140:1
**says** 52:22 62:13
63:1 65:14 78:10
110:8 112:8
114:16 118:2
123:8 133:15
**sc** 123:9
**scenario** 60:10,10
88:20
**scenarios** 60:3,7
60:14 107:20
**schedule** 130:20
131:1 133:25
134:1,10
**schedulers** 107:6
**schedules** 92:23
**scheduling** 35:6
**schiff** 6:14
**school** 71:16
**scope** 16:6 83:5
84:7,10 85:4,5,16
93:22 139:6
**screen** 10:11 52:2
54:19 75:14 89:11
96:25 98:25
110:21 117:5

**se** 66:16 106:18
107:3 123:15
**seal** 75:23 143:13
**search** 39:12
**season** 31:6,7
32:15,15
**seasons** 31:9
**second** 15:25
33:22 48:1 49:17
55:24 60:10 61:5
64:7,9 72:17
73:15 74:12 86:17
88:2 89:14 90:21
91:6 96:25 97:8
102:14 111:12
117:2 123:14,18
**secondly** 139:3
**secret** 71:18
**section** 54:8
**securities** 2:15 6:3
145:16
**see** 10:18 31:20
39:12 41:12 52:1
52:4,18,22 69:1
72:4 75:13 91:12
97:1 107:10 108:5
108:13,14 117:4
120:9 121:20
122:22,25 123:15
125:22 133:7
**seek** 69:8
**seeking** 81:10
**seeks** 112:14
**seen** 34:5 52:15
54:5,6 75:16
95:12,23 96:12
115:10 124:9
133:5
**seery** 47:1,3 97:5
**sees** 137:11

**[self - speakers]**

**self** 100:23
**sellman** 141:5,10
**sellman's** 140:25
  141:1,5
**semantic** 82:4
**send** 42:12
**senior** 117:14
**sense** 28:19 78:2
**sent** 75:19,20
**sentence** 56:14,15
  56:16 59:24 60:2
  61:5 65:3 69:19
  91:6
**separate** 18:21
  28:7 30:10 54:24
  56:4 66:4,5 92:23
  110:23
**september** 1:9,15
  31:19,20 104:4,5
  105:10,19 106:18
  107:4,22 108:20
  142:3 144:9 146:4
  148:2
**serious** 28:8
**seriously** 21:1
**serve** 18:25 136:8
**served** 18:15
  33:16 147:6
**services** 9:16
  43:13 55:3,22
  60:8 61:8 64:2
  98:2,6
**set** 26:8 105:5,10
**setting** 22:15,16
  23:2 106:3
**settled** 89:21 90:7
  90:10,11 91:6
**seven** 104:1 109:2
  114:8,11 115:14
  116:5 124:2
  133:18 134:5

**sgj11** 1:5 144:5
**shannon** 2:16 6:1
  145:17
**shannon.mclaug...**
  2:19 145:20
**shape** 10:7 113:6
**share** 57:10
**shared** 128:1
**sharing** 57:24 58:3
  58:15
**sheet** 148:10
**short** 89:1
**shorten** 128:9
**shorthand** 1:18
**shot** 55:17
**shoved** 105:15
**show** 117:3
**shown** 147:7
**sic** 59:20 90:18,22
**side** 63:23 137:12
**sign** 148:6,11
**signature** 3:6
  142:1 143:1
  144:20 146:8,23
  147:13
**signed** 148:17
**significance**
  135:23
**significant** 102:4
**silo** 65:23,24
**similar** 72:2
**simplify** 84:15
  136:11
**simply** 29:14
  49:22 61:19 62:2
  138:7
**simultaneous**
  16:11 25:1 31:12
  41:21 43:15 47:10
  70:4 78:23 84:13
  86:2,10 104:22

109:12 117:25
  136:3
**single** 43:4 66:7,8
  66:10,20 67:14,18
  67:24 81:25 82:6
  82:10,12,15 83:3
  84:2,3 92:24 93:7
  101:20,24 109:10
  112:3 113:15,17
  113:18 114:4,14
  115:2,8 119:14
  131:15,18 132:7
  132:22 134:7
  135:7
**singular** 59:15
**sir** 6:16 17:19
  59:14 88:19
  110:15
**sit** 13:19 27:3
  30:22 31:18,23
  79:25 81:18
  128:22 133:2
**site** 70:12
**sitting** 15:18
**situation** 19:3 21:5
  24:6 32:7,16,21,25
  38:9 46:7 48:23
  53:10 55:21,24
  60:16 64:1,21,22
  65:3 67:2,2 73:6
  74:10,10 99:19
  137:24 140:6
**situations** 13:6
  55:20 56:4 72:22
  73:1
**six** 118:18,18
  134:5
**skipped** 110:18
**slhc** 121:23
**slight** 6:17 40:16

**slightly** 80:6 87:23
  136:1
**slip** 101:13
**slow** 51:10 116:12
  116:14
**slowed** 48:12
**small** 20:7,13
**snapshot** 102:23
**sof** 120:8
**sole** 116:17
**solely** 16:1
**solemnly** 5:8
**soliloquy** 139:6
**solutions** 146:10
  147:15 148:19
**somebody** 18:3
  20:25 36:13 46:8
  88:14 127:25
**somewhat** 17:8,10
**sorry** 21:14 32:12
  37:18 39:3 49:7
  57:4 58:9 59:5
  63:17 68:11 71:25
  75:20 84:14 89:15
  95:18 104:23
  109:13 113:22
  122:6 138:3
**sort** 137:16
**sound** 31:21
**source** 48:24,25
  50:11 116:17
**sources** 48:21 49:5
  49:13,18 50:5,10
  81:7 119:16
**south** 40:20
**speak** 33:20
**speakers** 16:11
  25:1 31:12 41:21
  43:15 47:10 70:4
  78:23 84:13 86:2
  86:10 104:22

Veritext Legal Solutions
800-336-4000

**[speakers - talk]**

109:12 117:25
136:3
**speaking** 137:12
**specific** 45:25
72:13 78:2
**specifically** 28:22
41:16,19
**speed** 51:5
**spell** 69:21
**spelled** 6:11
**spend** 20:9 21:9
**spending** 43:19
**spent** 44:3 48:10
132:11
**spoke** 33:23
**spontaneously**
79:14
**staff** 18:20
**stan** 33:13 37:9
**standard** 22:11
68:9 69:5,17
70:10 71:9 87:17
**standards** 27:13
87:18 89:22 90:13
**stang** 2:11 5:22
100:5 145:12
**start** 43:24 48:12
82:21 108:8
**started** 9:7 47:7
**starting** 113:16
126:20 128:12
**starts** 111:12,12
111:13
**state** 1:17 5:16
14:23 19:5 49:22
51:17 71:4 92:17
103:18 143:7,17
144:12
**stated** 1:20 59:1,7
66:4

**statement** 22:1
24:1 63:4 73:4
74:8,9,12 82:8
118:2 125:3 129:2
129:9 132:2,2
**statements** 55:12
**states** 1:1 16:9
41:11 54:21 89:16
97:9 118:6,18
123:19 144:1
**stating** 59:1
103:18
**statutory** 30:4
104:25 105:5
125:11,15 131:10
**stays** 31:11
**step** 36:12 48:1,2
93:8
**steps** 92:19,21
**stipulate** 26:4,4,10
76:5 103:16
**stipulation** 29:1
77:7
**street** 2:5 145:6
146:11 147:16
**struck** 29:20 30:12
**structure** 18:16
105:10,21
**structures** 3:18
125:12
**studied** 41:7,15
**study** 111:4
**style** 52:5
**styled** 1:14
**subject** 12:10
29:19 37:7 38:11
39:16,24 65:6
73:23,24 84:22
92:25 137:1
**submitted** 25:24
42:18 144:18

**subscribed** 143:11
**subsection** 54:12
54:14
**subsequent** 101:23
103:8
**subsequently**
32:23
**substance** 140:13
**substantially**
19:22 55:4,23
60:9,18 61:9,18
62:2,10,14,25 63:6
63:15,19 64:3,7,10
64:15,20 65:12,15
67:23 68:1,4,8,10
68:21 69:3,7 72:2
72:9,18,25 73:9,13
91:1,5 137:23
**succeeded** 71:5
**sufficient** 63:14
**suggest** 94:13
129:6
**suggests** 127:25
**suite** 2:6,17 145:7
145:18 146:11
147:16
**summarize** 13:14
56:18 93:5
**summary** 24:11
25:10 52:22 53:1
53:6,10,13,16,18
53:23 54:4,11
58:22 60:20,23
63:15 71:25 74:8
89:8 90:5
**supervision** 18:13
**support** 7:11
99:13,16 131:24
**supported** 89:21
**supports** 79:8
131:17

**suppose** 10:11
**supreme** 71:11
78:1
**sure** 10:25 27:8
31:5 37:1 38:16
38:19 39:6,15
45:12,13 47:25
55:14 56:7 61:2
88:4 98:16 102:15
105:18 122:13
136:7,10 138:18
139:4,5
**swadley** 122:25
**swear** 5:8
**sworn** 1:14 5:12
10:15 144:15
**system** 18:7,19
19:2 21:20,22,22
21:23 23:9 43:12
43:24 136:14
137:4,5 138:1,10
138:12
**systems** 138:19

**t**

**table** 137:12
**take** 10:16 11:7
19:21 21:1 23:21
27:5 28:1,4 32:17
36:11 48:4,16
49:10,23 59:25
62:23 86:24 88:2
88:23 89:12 97:2
114:25 115:13
121:10 122:8
**taken** 1:14 5:1
7:24,25 10:25
66:14 145:1 146:1
**takes** 25:18 27:24
64:11
**talk** 11:11,12
28:13 29:2 50:21

[talk - three]

| | | | |
|---|---|---|---|
| 102:14 | **testified** 5:12 12:5 | 79:2,17 81:2,20 | 46:15 47:4,20 |
| **talked** 26:25 92:7 | 12:8,11,12,13,15 | 87:19,23 88:11,12 | 50:18 52:19 53:7 |
| 95:24 134:3 | 12:16,18,21,25 | 88:19,21,21 89:22 | 53:15 54:9,11 |
| **talking** 32:17 | 13:18,20,23 14:2,9 | 90:23 91:7,14,21 | 56:5,17 59:8,15 |
| 83:24 86:17 | 14:13,14,18,19,21 | 92:2 93:19 119:24 | 60:15 61:6 63:6 |
| 103:22 108:23 | 15:5,11,19 16:15 | 144:1,12 145:7 | 63:13,14 65:2,9 |
| 132:12 138:19 | 41:18 79:16 | 146:9,12 147:14 | 66:20 68:13,19 |
| **talks** 81:8 | 132:23,25 | 147:17 | 69:18 70:17 73:4 |
| **taught** 30:23 | **testify** 11:18 15:9 | **text** 73:16 | 74:19 75:17 76:20 |
| **tax** 66:25 | 25:11,12 28:18 | **thank** 10:2 17:5,13 | 77:1,15 78:19 |
| **technical** 8:16 | 29:23 34:19 46:4 | 26:2 29:15 30:9 | 79:5,6 83:13 86:3 |
| 50:15 | 46:25 47:14 49:2 | 30:23 33:10 36:24 | 86:15 87:20 90:2 |
| **technologically** | 53:2 135:15 | 59:22 62:23 76:8 | 90:2,13,24 91:25 |
| 50:15 | **testifying** 13:2,9 | 86:14 88:24 92:16 | 92:1 95:4 97:12 |
| **technology** 10:22 | 15:16 16:20 21:14 | 97:20 98:21 99:1 | 98:8 99:9,10,15,16 |
| **telephone** 2:7,13 | 25:21 87:18 | 103:22 133:4,20 | 100:22 101:14,17 |
| 2:18 145:8,14,19 | 135:12 | **thanks** 100:19 | 102:4,20 103:14 |
| **tell** 5:8 11:10 | **testimony** 11:1 | 140:16 | 103:14 104:14,15 |
| 12:25 14:3 17:1 | 16:22 17:2 20:4,9 | **theory** 67:19 | 106:8,9,20 107:9 |
| 21:16,25 29:24 | 20:20 28:16 29:19 | **therefor** 146:24 | 109:1,16,22 112:5 |
| 32:22 34:13 35:14 | 30:5,7 36:15 43:3 | **thing** 69:15 114:24 | 113:16 115:9,9,10 |
| 38:17 49:24 50:3 | 45:16 48:16 62:15 | 125:21 135:14 | 115:11,16,23 |
| 50:10 55:17 71:1 | 64:4 88:9 93:6 | 137:16 140:21 | 117:22 127:21 |
| 71:14 79:5 81:17 | 96:15 97:24 114:3 | **things** 8:14 9:23 | 129:1,12 132:4,10 |
| 92:4 104:18 140:2 | 126:4 140:13,25 | 37:14,14 42:22 | 132:11,24 133:2 |
| **telling** 18:4 49:4 | 141:2,5,7 144:16 | 95:9 126:10 | 133:15 134:4 |
| 50:4 | 145:1 148:8 | 136:11 | 135:14,19 137:24 |
| **tells** 63:16 | **texas** 1:1,17,19 2:6 | **think** 12:17,21,22 | 138:9 139:13,18 |
| **ten** 11:25 41:6 | 8:3 15:12,14,15,16 | 12:24 14:17,24 | 140:11,23 |
| 84:16 87:6,7 | 15:21 16:2,13,16 | 15:8,23 20:12 | **thinking** 9:7 88:2 |
| **tend** 11:11 | 17:3 18:23 22:6,8 | 22:2,5 23:10,17,21 | **thinner** 109:16 |
| **term** 30:1,4 | 27:4,16 28:20 | 23:22,25 24:4,6,8 | **third** 80:25 89:15 |
| **terms** 19:15,18 | 30:24 40:8,10,14 | 24:24 27:3,6 | 111:13 |
| 22:2 27:24 92:20 | 40:19,24 41:2,3,5 | 28:12,20 29:4,4,6 | **thought** 14:19 |
| 92:22 94:24 | 41:14,16,19 44:14 | 29:8,10,22 30:1,8 | 46:17 60:22 79:15 |
| 109:21,23 112:10 | 44:17 45:1,23,25 | 30:21,22 32:8,9,23 | 86:12 |
| 127:8 135:21 | 46:6,10,11,12 | 33:8,9 35:13 | **three** 31:20 32:8 |
| 138:9 | 51:17 58:7,18,24 | 36:24 37:8,11,24 | 32:19 33:1,12 |
| **test** 68:15 76:21,22 | 59:2 64:11 67:25 | 38:7,8,8,22 39:10 | 35:3 37:25 38:4 |
| 79:1,4 | 70:23 71:4,11,18 | 39:20 40:10 41:4 | 48:17 49:24 52:21 |
| | 71:21 75:1 78:14 | 42:3,8 45:8,14,20 | 56:16 61:14 80:21 |

Veritext Legal Solutions
800-336-4000

[three - ultimately]

| | | | |
|---|---|---|---|
| 89:16 110:23 | 117:4 | 134:6,7 135:7 | **truthfully** 11:18 |
| 111:11,22 129:24 | **titled** 52:9 | 139:7 | **try** 27:20 31:4 |
| **throckmorton** 2:5 | **today** 6:23 7:15 | **transactional** 9:7 | 47:17 56:6 86:24 |
| 145:6 146:11 | 11:19 13:20 15:18 | 9:10,13,14,18 | 87:13 106:9 128:8 |
| 147:16 | 25:21 28:3 31:19 | 20:14 137:19 | **trying** 20:20,25 |
| **thursday** 122:23 | 31:24 50:7 59:2,7 | **transactions** 13:4 | 27:19 28:9 30:1 |
| 124:16 | 79:25 80:2 81:18 | 50:8 67:22 115:6 | 32:9 35:12 59:13 |
| **time** 8:13,15 13:13 | 100:25 128:22 | **transcript** 144:15 | 63:12,21,24 64:16 |
| 18:14,20,20 20:7,9 | 132:11,23 135:10 | 144:18 147:4 | 68:25 69:1 72:5 |
| 21:9 23:22 25:3 | 140:14 | 148:5,16 | 113:3 116:8 |
| 27:6 29:20,22 | **told** 47:8,12 49:10 | **transcription** 5:6 | 117:17,24 134:25 |
| 31:24 32:18 33:7 | 72:17 99:25 100:2 | **transition** 9:10 | **tuning** 125:3 |
| 34:3 37:11,11,13 | **top** 133:22 | **transitioned** 9:9 | **turn** 38:17 78:3 |
| 37:17,17,22 43:11 | **topic** 67:9 85:8 | **treated** 140:14 | 126:16 130:19 |
| 43:13,18,19,22,25 | **topics** 49:14 | **trial** 12:6,8 14:2 | 133:20 |
| 44:3,12,14,17 45:4 | **total** 12:7 14:3 | 18:12 19:4 22:16 | **turned** 32:6,21 |
| 45:23,24 50:9,18 | **totally** 79:12 | 24:15,17 30:20 | 110:8 |
| 51:24,25 52:19 | **touch** 37:16 95:8 | **trials** 13:25 | **turpitude** 11:25 |
| 70:19 75:17 89:12 | 96:16 119:17 | **tribunal** 14:22 | **twice** 12:22,23 |
| 97:2,9,13 102:19 | **touched** 94:23,24 | 30:16 | 14:24 74:7 |
| 102:24 103:21 | 95:13 | **tribunals** 18:24 | **twist** 87:23 |
| 111:2 114:25 | **track** 43:9,9,25 | **trick** 59:14 | **two** 13:19 14:13 |
| 116:15 121:10 | 59:6 | **tried** 38:17 | 32:3,8 33:2,4,11 |
| 122:8 129:16 | **train** 14:19 | **tries** 48:9 | 40:12 48:17 49:24 |
| 132:11 137:25,25 | **transaction** 13:7 | **triggers** 32:16 | 54:22 55:20 56:4 |
| 140:19 144:22 | 19:21 66:7,8,20 | **trouble** 51:13 | 56:8,16,21 60:3,6 |
| 145:1 148:15 | 67:5,12,15,18,24 | **troubled** 46:8 | 60:14,23,23 80:9 |
| **timeframe** 148:7 | 68:2,12 69:7 72:3 | **true** 22:12 23:21 | 101:5 107:20 |
| **times** 12:5,9,15 | 82:1,7,11,13 83:4 | 58:17 115:11 | 115:6 117:12 |
| 13:18,20 14:2,4,15 | 83:25 84:2,4,17 | 135:19 143:2 | 127:5 |
| 15:2,4,6,11,15 | 87:4,7,9,13 88:17 | 144:16 | **tx** 148:13 |
| 40:2 41:1,5,6 | 92:25 93:7,9 | **trumps** 56:11 | **tx4800824** 143:25 |
| 49:15 136:9 | 94:24,25 101:21 | **trust** 121:23,23 | **type** 137:13 |
| **timing** 115:6 | 101:25 107:8,12 | 125:12 131:10 | **typically** 48:2 |
| **tinkered** 110:3,6 | 109:11,14 110:3 | 137:16 138:14 | 56:10,11 |
| **tinkering** 110:12 | 110:13 112:3,25 | **trusted** 136:20 | |
| **title** 52:5,6 84:20 | 113:15,17,18 | **trusts** 85:13 | **u** |
| 84:25 85:1,12 | 114:4,13,14 115:3 | 104:25 105:5 | **ubs** 2:15,15 6:3,3 |
| 86:18,20,20,25 | 115:7,8,15 118:10 | 125:15 | 145:16,16 |
| 87:1 88:10 95:17 | 118:12 119:14,20 | **truth** 5:9,9,9 | **uh** 11:6,6 |
| 95:18,18,19,22 | 131:15,19 132:22 | | **ultimately** 80:12 |
| | | | 112:13 |

Veritext Legal Solutions
800-336-4000

**umbrella** 63:4
**uncomfortable**
  20:11
**undercut** 69:9
  99:17
**underlying** 17:16
  21:19 23:7 27:10
  35:5 58:13 87:24
  99:3,18 102:10
  104:10,24 109:21
  109:22 113:24
  114:5
**underneath**
  105:15
**underscore** 98:23
  98:24
**understand** 7:6,9
  8:15 10:12,19
  11:8,12 17:5,19
  20:17,22 27:18
  29:15,15 36:10
  40:22 50:13 51:2
  52:25 57:13 58:10
  58:21 60:25 63:20
  68:13,16 69:13
  70:5 71:1 72:16
  73:11 76:2,14
  79:10,16 83:14,20
  87:11 89:2 92:12
  99:20 102:20
  103:6 110:14,14
  113:1 115:23
  117:18 122:15
  124:15 126:11
  129:12 139:5
**understanding**
  7:19 48:8 50:7,12
  80:15 111:10,16
  111:17,21,23
  113:2 130:1 135:3

**understood** 11:15
  100:6
**undertake** 19:7
**undertaking** 60:17
**undivided** 109:18
  136:22,23 138:4,7
**undo** 81:10 86:24
  87:13 88:10
**unicorn** 3:16
  84:17,18 85:14
  102:11 103:2,3,11
  104:9,12,21 105:6
  105:14,24 106:4
  106:17 107:4,21
  107:24,25 114:13
  115:21,25 116:2,5
  118:19 119:9,23
  120:2 125:12
  132:8,17
**uniform** 17:8
**unintelligent** 5:5
**union** 71:5
**unique** 87:23
**united** 1:1 144:1
**universe** 61:2
**unquestionably**
  95:4
**unrelated** 36:7
  85:21 106:17,24
  136:25 139:17
  140:9
**unusual** 60:15
  74:10,10
**unwind** 116:8
**unwise** 9:9
**use** 25:8 52:11
  65:22 82:24,25
  86:16 90:6 124:11
**usually** 32:13

**v**

**vague** 44:23
**validity** 69:9 84:5
**varies** 20:5
**variety** 37:17
**various** 92:19,21
  118:21
**verbal** 11:5 39:13
**verify** 148:8
**veritext** 146:10,10
  147:15,15 148:12
  148:19
**veritext.com.**
  148:13
**version** 53:18
  70:14,17
**versus** 43:2 44:7
**vice** 117:14 118:3
**videoconference**
  5:3 7:25
**videotaped** 7:23
**view** 57:1 61:23
  62:3,5 63:3 66:5
  67:20,24 68:6,7
  73:21 74:8 80:14
  85:20 87:6,11
  91:12 102:5
  109:11 110:7
  113:14 115:4
  119:19 129:9
  131:18 132:12
  136:21
**viewed** 109:17
  136:20 137:2
  138:6
**violate** 27:12
  54:25 141:9
**violated** 23:6 58:2
  61:7 62:16 63:25
  65:17 78:21 84:1

**violating** 22:11
  64:11
**violation** 23:4 24:2
  24:3 26:21 27:15
  28:19 57:14 58:18
  58:23 59:19 60:16
  68:22 74:1 88:11
  109:17
**violative** 88:20
**virginia** 40:20
**virtually** 44:9
  64:21
**vitae** 8:20
**volleyball** 100:25
**volume** 1:10
**voluntary** 18:17
  18:25,25

**w**

**wait** 10:25 137:7
**want** 5:24 8:16
  21:4 24:5 28:1,3
  29:1 30:11 34:22
  35:25 37:18 49:2
  50:22 51:11,23,25
  54:12,14 55:11,15
  55:18 60:4 61:1
  62:4 78:20 89:7
  89:14 98:16,21
  100:14 101:1,15
  106:8 110:15
  111:6,7,7 118:17
  122:3,18 126:3,10
  126:14,16 130:19
  131:21 133:20,24
  136:5 137:7 139:5
**wanted** 9:8 30:5
  36:11 75:19 94:7
  140:21
**wants** 22:17
  123:14 138:12

**[war - zoom]**

| | | | |
|---|---|---|---|
| **war** 71:6 | 94:9,14 95:12 | **work** 9:10 34:21 | **x** |
| **warranties** 95:7 | 102:17,21,24 | 35:22,23 36:3,18 | **x** 3:1 120:8 |
| 95:10 | 103:9 104:19 | 36:22 44:3,9,10,13 | **y** |
| **washington** 40:19 | 105:9 106:2,5 | 46:12 47:15 51:6 | **yeah** 28:11 38:7 |
| 41:12 | 107:6 115:24 | 66:22 69:9 72:12 | 41:23 44:22 46:13 |
| **waste** 103:20 | 116:7 118:12 | 73:2 79:9 80:9 | 71:13 84:15,19 |
| **water** 22:20 60:22 | 123:3,23 124:1 | 81:11,11 82:19,24 | 93:12,13 101:9,16 |
| **watkins** 2:16 6:2 | 125:2,6,10 127:19 | 83:1,8,9 84:5 | 116:13 121:10 |
| 145:17 | 128:5,14,16,18 | 85:25 86:20,25 | 140:21 |
| **way** 10:6 17:3 | 129:2,7,17,24 | 89:17,19 91:9,16 | **year** 20:6,6 71:1 |
| 22:22 30:14,15 | 130:3,5 131:19 | 91:16 96:19 98:1 | **years** 6:18 9:4,6 |
| 35:2 36:15 37:15 | 134:19 135:5 | 98:12 108:5,11 | 9:11,12,13 11:25 |
| 38:24 46:19 49:16 | 145:6 | 109:7 113:9,13 | 14:5 16:19 18:18 |
| 50:16,17 55:19 | **wickphillips.com** | 114:2,7 115:24 | 18:18 33:17 37:10 |
| 56:6 60:2 63:9 | 2:7,8 145:8,9 | 123:3 125:2,8 | 41:10,16 80:5,6,7 |
| 64:23 70:3 73:21 | **williams** 127:10 | 131:19 137:22 | 80:15 |
| 85:22 100:10 | 127:12,14,18,22 | **worked** 39:17 42:2 | **yesterday** 45:6 |
| 104:25 106:12 | 128:4 | 42:4,6 43:7 44:7,7 | 75:17 |
| 108:1,4 109:15 | **willing** 10:24 26:3 | 49:15,20 87:7 | **york** 2:18,18 |
| 113:6 118:2 | 26:6,10 49:24 | 97:16 105:9 | 40:20 87:21 |
| **ways** 9:23 26:9 | **winded** 136:2 | 127:13,13 | 145:19,19 |
| **we've** 25:24 28:14 | **withdraw** 25:8 | **working** 43:21,24 | **z** |
| 29:8,10 50:17 | **witness** 1:13 5:7 | 45:22 | **ziehl** 2:11 5:22 |
| 89:8 90:1,3,15 | 5:10 7:20 8:21 | **world** 18:8 57:24 | 145:12 |
| 101:2 104:8 120:7 | 10:15 12:20,22 | **worth** 2:6 8:3 | **zoom** 1:7,12 5:2,2 |
| 132:11,11 134:3 | 13:1,3,8,11,21 | 145:7 146:12 | 7:25 9:22 51:7 |
| 135:11 | 14:10,13 15:3,3,5 | 147:17 | 79:20 |
| **wear** 18:21 | 21:4,10,14,15 | **wpep000014** | |
| **weeks** 32:3 33:2,4 | 26:16,18,21 27:21 | 98:23 | |
| 79:10 | 40:3 46:5,7 47:22 | **wpep000018** | |
| **welcome** 11:13 | 48:15 52:11 77:22 | 98:24 | |
| 100:18 | 86:5 97:24 98:1 | **writing** 39:14 80:4 | |
| **went** 41:10 71:16 | 118:15 129:16 | **written** 22:21 | |
| 109:9 | 140:16,24 142:2 | 43:14 60:23 79:13 | |
| **whatsoever** 99:23 | 144:14,17,19,20 | 95:10 | |
| **whichever** 84:23 | 148:5,7,9,11,15 | **wrong** 55:17,19 | |
| **wick** 2:5 5:18 | **woman** 34:8 | 88:10 113:6 | |
| 52:12 56:24 57:15 | **word** 25:8 65:22 | 117:13 | |
| 58:2 61:3,6 65:4 | 82:20 | **wrote** 41:8 80:10 | |
| 65:14,21 68:4 | **words** 13:15 55:15 | | |
| 76:3 89:16 91:4 | 74:23,25 81:9 | | |

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.