# EXHIBIT 84

Brant C. Martin
Texas State Bar No. 24002529
brant.martin@wickphillips.com
Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC**
**F/K/A HCRE PARTNERS, LLC**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

## SUPPLEMENTAL APPENDIX IN SUPPORT OF NEXPOINT REAL ESTATE PARTNERS, LLC'S RESPONSE AND BRIEF IN OPPOSITION TO DEBTOR'S SUPPLEMENTAL MOTION TO DISQUALIFY WICK PHILLIPS GOULD & MARTIN, LLP

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") hereby files this Supplemental Appendix in Support of its Response and Brief in Opposition to Debtor's Supplemental Motion to Disqualify Wick Phillips Gould & Martin, LLP.

| Tab | Document Description | | Appendix page number |
|---|---|---|---|
| B. | Declaration of Lauren K. Drawhorn | | Supp. App. 0394 – 0395 |
| | B-1 | Deposition Transcript for Mark Patrick taken 08/13/2021 | Supp. App. 0396 – 0475 |

**SUPPLEMENTAL APPENDIX IN SUPPORT OF NEXPOINT REAL ESTATE PARTNERS, LLC'S**
**RESPONSE AND BRIEF IN OPPOSITION TO DEBTOR'S SUPPLEMENTAL**
**MOTION TO DISQUALIFY WICK PHILLIPS GOULD & MARTIN, LLP**
**PAGE 1**

1934054211015000000000010

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Brant C. Martin
Texas Bar No. 24002529
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: brant.martin@wickphillips.com
        jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, a true and correct copy of the foregoing was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case:

Jeffrey N. Pomerantz
Ira D. Kharasch
Kenneth Brown
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        kbrown@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com

Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# TAB B

Supp. App. 0394

Brant C. Martin
Texas State Bar No. 24002529
brant.martin@wickphillips.com
Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Case No.: 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DECLARATION OF LAUREN K. DRAWHORN

I, Lauren K. Drawhorn, under 28 U.S.C. § 1746(a) and under penalty of perjury, declare as follows:

1.      My name is Lauren K. Drawhorn. I am an attorney in the law firm of WICK PHILLIPS GOULD & MARTIN, LLP ("Wick Phillips"). I have never been convicted of a felony, I am of sound mind, competent, and authorized to make this Declaration, the statements of which are based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit B-1** is a true and correct copy of the August 13, 2021 deposition of Mark Patrick, taken in the above-referenced Bankruptcy Case.

Dated: October 15, 2021

_Lauren Drawhorn_
Lauren K. Drawhorn

# TAB B-1

Supp. App. 0396

```
 1            IN THE UNITED STATES BANKRUPTCY COURT

 2          FOR THE NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4

 5

 6   In re                    §

 7                            §

 8   HIGHLAND CAPITAL         § Chapter 11

 9   MANAGEMENT, L.P.,        § Case No. 19-34054-SGJ11

10

11

12

13

14

15

16

17            Remote Oral Deposition of

18                  MARK PATRICK

19                 Dallas, Texas

20            Friday, August 13, 2021

21                  11:06 a.m.

22

23

24   Job No.:  197674
     Pages:  1 - 79
25   Reported by:  Micheal A. Johnson, RDR, CRR
```

1              Remote Oral Deposition of MARK

2     PATRICK, held via Zoom videoconference at the

3     location of the witness:

4

5              Dallas, Texas 75201

6

7              Pursuant to Notice, before Micheal A.

8     Johnson, Registered Diplomate Reporter and

9     Certified Realtime Reporter.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Supp. App. 0398

```
 1              REMOTE APPEARANCES

 2   ON BEHALF OF THE DEBTOR
     HIGHLAND CAPITAL MANAGEMENT, L.P.:
 3
             Kenneth Brown, Esq.
 4           Hayley Winograd, Esq.
             PACHULSKI STANG ZIEHL & JONES
 5           150 California Street
             San Francisco, California 94111
 6

 7

 8
     ON BEHALF OF
 9   UBS SECURITIES LLC AND
     UBS AG LONDON BRANCH:
10
             Shannon McLaughlin, Esq.
11           LATHAM & WATKINS
             1271 Avenue of the Americas
12           New York, New York 10020

13

14
     ON BEHALF OF THE
15   UNSECURED CREDITORS COMMITTEE:

16           Elliot Bromagen, Esq.
             SIDLEY AUSTIN
17           One South Dearborn Street
             Chicago, Illinois 60603
18

19

20   ON BEHALF OF CRE PARTNERS, LLC
     (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC):
21
             Lauren Drawhorn, Esq.
22           WICK PHILLIPS
             100 Throckmorton Street
23           Fort Worth, Texas 76102

24

25
```

Supp. App. 0399

```
 1           APPEARANCES CONTINUED

 2   ON BEHALF OF THE WITNESS:

 3         Debra Dandeneau, Esq.
           Michelle Hartmann, Esq.
 4         BAKER & McKENZIE
           452 Fifth Avenue
 5         New York, New York 10018

 6

 7

 8   ALSO PRESENT:

 9         La Asia Canty

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Supp. App. 0400

1                M. PATRICK - 8/13/2021

2                      PROCEEDINGS

3                      MARK PATRICK,

4    called as a witness, having been duly sworn, was

5    examined and testified as follows:

6                      EXAMINATION

7    BY MR. BROWN:

8         Q.   Mr. Patrick, my name is Kenneth Brown.

9    I am with the law firm of Pachulski Stang Ziehl &

10   Jones and I represent Highland Capital Management,

11   LP, the debtor, in a Chapter 11 case.  If I refer

12   to Highland during this deposition, you'll

13   understand that I'm referring to Highland Capital

14   Management, LP, will you?

15        A.   Yes.

16        Q.   Okay.  Have you ever had your

17   deposition taken before?

18        A.   Once before.

19        Q.   Okay.  I'm going to just briefly go

20   over some ground rules for the deposition before

21   we start.  You understand that you are under oath

22   and the court -- and the testimony you give today

23   in this deposition is the same as if you gave

24   it -- gave your sworn testimony in a court of law?

25        A.   Yes.

1                    M. PATRICK - 8/13/2021

2          Q.    And that you are obligated to tell the

3    truth?

4          A.    Yes.

5          Q.    Okay.  I'm going to be asking you a

6    series of questions and you're going to answer

7    those questions to the best of your knowledge and

8    as truthfully as you can.  It's important that you

9    understand the questions I ask you.  And so if you

10   don't understand, feel free to ask me or tell me

11   that you don't understand the question.  You

12   understand that --

13         A.    Yes.

14         Q.    -- you're free to ask me to restate

15   the question or tell me --

16         A.    Yes.

17         Q.    -- you don't understand?

18         A.    Yes.

19         Q.    It's also important, and especially

20   important in this format that we're using, using

21   the Zoom platform, that we get an accurate record

22   of what my questions are and what your testimony

23   is.  And in order to do that, it's important that

24   we don't -- we try not to speak at the same time.

25   So please allow me to finish my question before

```
 1                  M. PATRICK - 8/13/2021

 2    you begin to answer it, because the court reporter

 3    can't take down two people speaking at the same

 4    time.  You understand?

 5         A.   Yes.

 6         Q.   Okay.  Is there any reason that you

 7    can't give truthful and accurate testimony today

 8    to the best of your recollection?

 9         A.   No.

10         Q.   All right.  Have you done anything to

11    prepare for this deposition?

12         A.   Yes.

13         Q.   Can you tell me what you did?

14         A.   I spoke to the Baker firm yesterday

15    afternoon.

16         Q.   Okay.  And is the Baker firm your

17    counsel?

18         A.   Yes.

19         Q.   And does the Baker firm represent

20    other entities that are affiliated with

21    Jim Dondero?

22              MS. DANDENEAU:  Objection to form.

23         A.   I don't know.

24    BY MR. BROWN:

25         Q.   You can answer the question.
```

1                  M. PATRICK - 8/13/2021

2          A.    I don't know.

3          Q.    You have -- you don't know whether or

4    not -- well, who do you work for, Mr. Patrick?

5          A.    I work for Skyview.

6          Q.    Okay.  Do you work for any -- well,

7    let's do it this way.  Can you tell me what your

8    employment history is?

9          A.    It's --

10         Q.    Let's go back even further.  What's

11   your educational background?

12         A.    I went to the University of Miami for

13   college, I went to Boston University for law

14   school and then I went to NYU for a master of laws

15   and taxation.

16         Q.    Okay.  And tell me your employment

17   history.

18         A.    Well, I'll go back as far as when I

19   started with Highland, and that was in January of

20   2008.

21         Q.    When you say Highland, what -- are you

22   referring to Highland Capital Management, LP, the

23   debtor in the bankruptcy case?

24         A.    Yes.  As you indicated, we can use the

25   word Highland.

Supp. App. 0404

Page 9

```
1                M. PATRICK - 8/13/2021

2        Q.    Thank you.

3              MS. DANDENEAU:  Mr. Brown, I would

4   just ask that you please let the witness finish

5   his answer before interrupting -- before

6   interjecting.

7        A.    So my employment at Highland ended at

8   the end of February and then my employment began

9   with a company called Skyview.  I'm not sure if it

10  was legally formed as Highgate Consultants and

11  doing business as Skyview, but that is the company

12  I work for.

13  BY MR. BROWN:

14       Q.    Okay.  So in January 2008, you began

15  working for Highland and you ceased your

16  employment there in February of 2021?

17       A.    Yes.

18       Q.    Okay.  And while you were employed by

19  Highland, in what capacity were you employed?

20       A.    I was an employee in the tax

21  department.

22       Q.    Okay.  And did you -- is -- your

23  current employer is called, again -- can you tell

24  me what it is again?

25       A.    Skyview.
```

```
1                    M. PATRICK - 8/13/2021

2          Q.    Skyview.

3          A.    Skyview Group I believe is the full

4     name.  I could be incorrect.

5          Q.    Okay.  And what is Skyview Group?

6                MS. DANDENEAU:  Objection to form.

7          A.    It's a business.

8     BY MR. BROWN:

9          Q.    And what does it do?

10         A.    It provides back office services.

11         Q.    For whom?

12         A.    For a variety of entities.

13         Q.    And are -- do you know if Jim Dondero

14    is involved with any of those entities in any way?

15               MS. DANDENEAU:  Objection to form.

16         A.    I'm sorry, what entities are you

17    referring to?

18    BY MR. BROWN:

19         Q.    Well, is he -- is Jim Dondero involved

20    in Skyview Group?

21               MS. DANDENEAU:  Objection to form.

22         A.    What do you mean by involved?

23    BY MR. BROWN:

24         Q.    Does he have any affiliation with it?

25               MS. DANDENEAU:  Objection to form.
```

Supp. App. 0406

```
 1                M. PATRICK - 8/13/2021

 2        A.    What do you mean by affiliation?

 3   BY MR. BROWN:

 4        Q.    What do you understand -- you're a

 5   lawyer, a tax lawyer.  What do you understand the

 6   term affiliation to mean?

 7              MS. DANDENEAU:  Objection to form.

 8        A.    I would define it as ownership.  And

 9   if that is the case, he has no affiliation with

10   Skyview, is my understanding.

11   BY MR. BROWN:

12        Q.    Does he have any other relationship to

13   Skyview separate and apart from ownership?

14        A.    What do you mean by relationships?

15        Q.    How would you define relationship,

16   Mr. Patrick?

17        A.    I'll define it as if -- whether he or

18   his entities have -- are clients of Skyview Group.

19        Q.    No, I'm talking about broader than

20   that.  Does he have any role at Skyview?

21              MS. DANDENEAU:  Objection to form.

22        A.    No.

23   BY MR. BROWN:

24        Q.    Do you communicate with Jim Dondero?

25        A.    Yes.
```

```
 1              M. PATRICK - 8/13/2021

 2         Q.   Let me state it another way.  Since

 3    February of 2021, have you had any communications

 4    with Jim Dondero?

 5         A.   Yes, I have.

 6         Q.   In what capacity have you had those

 7    communications?

 8         A.   Well, as an employee of Skyview Group.

 9         Q.   And why have you communicated with

10    Jim Dondero as an employee of the Skyview Group?

11         A.   We have back office service agreements

12    with respect to some of his entities.

13         Q.   Which entities?

14         A.   I don't know all of them.

15         Q.   State the ones you do know, please.

16         A.   Yeah.  I think NexAnnuity is one of

17    his entities that we have a back office

18    arrangement with.

19         Q.   Any others that you can recall?

20         A.   I have not seen the agreement, so I

21    would have to be making a lot of assumptions.

22         Q.   Well, you're required to testify to

23    the best of your recollection and that's what I

24    want.

25              MS. DANDENEAU:  Well, Mr. Brown, this
```

Supp. App. 0408

1                 M. PATRICK - 8/13/2021

2   deposition is ostensibly about the motion to

3   disqualify Wick Phillips.  And you are -- you are

4   quizzing Mr. Patrick about something that is

5   completely outside the scope of the motion to

6   disqualify Wick Phillips.  So you can go on this

7   path if you want, but I'm not really sure where

8   it's leading in connection with that motion.

9   BY MR. BROWN:

10       Q.   Mr. Patrick, can you please answer my

11  question?

12       A.   Can you please restate the question?

13            MR. BROWN:  Can you read back the

14  question, please, Mr. Johnson.

15            (Requested portion read back.)

16  BY MR. BROWN:

17       Q.   The question was what other entities

18  does Skyview Group provide services to that

19  Mr. Dondero is involved with?

20            MS. DANDENEAU:  Objection to form.

21       A.   I don't know because I've not seen the

22  service agreement, so I would have to be

23  speculating.  That's my answer.

24  BY MR. BROWN:

25       Q.   Okay.  Separate and apart from having

Case 19-34054-sgj11 Doc 4109-84 Filed 10/27/22 Entered 10/27/22 17:35 Page 19 of 84
Case 19-34054-sgj11 Doc 3599-41 Filed 02/10/23 Entered 02/10/23 22:17:45 Page 20 of 84
Exhibit 84   Page 20 of 85

1            M. PATRICK - 8/13/2021

2   reviewed the service agreement, do you have any

3   independent recollection of the entities that

4   Skyview Group provides services to that are in any

5   way related to Mr. Dondero?

6        A.   No, without speculating.

7        Q.   Well, go ahead.  You can speculate.

8   If you have an idea, you can tell me what that --

9   what those entities are.  I want to know to the

10  best of your recollection.

11       A.   Yeah, I -- I would -- I mean, I'm

12  just -- I would just speculate.  I don't really

13  know because I haven't seen the agreements.

14       Q.   Go ahead and tell me what you think.

15       A.   I think I don't really know.

16       Q.   What's your role at Skyview Group?

17       A.   Well, we're in -- we're a new start-up

18  company, so we're in transition.  So I don't think

19  my role has been clearly defined as of yet.

20       Q.   What do you do day to day?

21       A.   I do a lot of work on behalf of the

22  charitable investment vehicle that I'm director

23  of.

24       Q.   Okay.  What kind of work?

25       A.   Decisions and management.

1                    M. PATRICK - 8/13/2021

2          Q.    Do you do tax work?

3          A.    No, I have not -- to my best

4    recollection, I have not done a lot of tax work

5    since my transition.

6          Q.    Okay.  Have you ever done any work for

7    HCRE Partners, LLC?

8          A.    HCRE Partners, LLC, work for.  What do

9    you mean by work for?

10          Q.    How do you understand the term work?

11          A.    Well, I would say -- have I received a

12    W-2 statement from HCRE and the answer is no.

13          Q.    No.  Have you ever been involved in

14    providing any kinds of advice or service to HCRE

15    Partners, LLC?

16                    MS. DANDENEAU:  Objection to form.

17                    MS. DRAWHORN:  Ken, is there -- are

18    you talking about when he's Skyview or are you

19    talking completely --

20                    MR. BROWN:  Let's start --

21                    MS. DRAWHORN:  I don't know that's

22    clear.

23    BY MR. BROWN:

24          Q.    When you were at Highland?

25          A.    Advice or service to HCRE, if I

1          M. PATRICK - 8/13/2021

2    understand the question.

3          Q.   Yeah.  And we can refer -- again,

4    we'll refer to HCRE Partners, LLC, as HCRE.  Will

5    you understand -- will we be on the same page if I

6    do that?

7          A.   Yes.  I cannot recall specifically.

8          Q.   While you were at Highland, did you

9    ever have any communications with representatives

10   of HCRE?

11              MS. DANDENEAU:  Objection to form.

12         A.   Representatives?  What do you mean by

13   representatives?

14   BY MR. BROWN:

15         Q.   Anybody that was affiliated with HCRE,

16   either employed by or represented HCRE; employees,

17   officers, directors, managing agents, attorneys,

18   accountants, consultants.

19              MS. DANDENEAU:  Objection to form.

20              MR. BROWN:  I'm sorry?  Ms. Dandeneau,

21   did you say something?

22              MS. DANDENEAU:  No, I'm sorry, I kind

23   of lost the thread of that question, but just

24   objection to form.

25

Supp. App. 0412

```
 1                    M. PATRICK - 8/13/2021

 2   BY MR. BROWN:

 3        Q.   Do you understand the question,

 4   Mr. Patrick?  You were asking me to describe the

 5   individuals I was interested to know whether you

 6   communicated with in their capacity as the

 7   representatives of HCRE and I was giving you a

 8   noninclusive set of examples.

 9        A.   Yes, no.  Thank you.  Mr. Dondero in

10   his capacity as the manager and president of HCRE

11   is my recollection, as far as myself having a

12   conversation with him.

13        Q.   Okay.  And when you would speak to

14   Mr. Dondero as a representative of HCRE, how did

15   you know whether he was wearing an HCRE hat or a

16   Highland hat?

17             MS. DANDENEAU:  Objection to form.

18   BY MR. BROWN:

19        Q.   You understand by what I mean?

20        A.   Yeah.  Yeah.  No, I follow.  Because

21   at the time -- the time that I was talking to him,

22   he was -- he had both capacity as the general --

23   sort of as the president or the general partner of

24   Highland, if you will, and then knowing also that

25   he was also the manager, if you will, of HCRE.
```

1              M. PATRICK - 8/13/2021

2    So, you know, I was talking to Jim -- to Jim, is

3    the best way I can kind of describe it.

4         Q.   So when you talked to Jim, meaning

5    Jim Dondero, when you were employed by Highland,

6    there was no way for you to distinguish whether

7    Jim Dondero was acting as a representative of

8    Highland or HCRE; is that correct?

9         A.   I don't agree with that

10   characterization.

11        Q.   Well, that --

12        A.   I would -- when I think about the

13   conversations where -- if you -- you originally

14   asked me, have I had a conversation with a

15   representative of HCRE, the answer was yes, I

16   recall was my testimony, because I do know he held

17   that position.  So when -- when I -- I think -- I

18   think you have to be a little more specific as to

19   the context of asking me.  There's no way to

20   distinguish because, you know, I think certain

21   situations I could easily distinguish, but we're

22   really talking hypotheticals at this point.  You

23   have to give me some specific situations and then

24   I'll be happy to answer.

25        Q.   Okay.  Mr. Patrick, I understand.  And

1                    M. PATRICK - 8/13/2021

2    we'll get there.  Let's move on for right now,

3    though.  Okay.

4              So what did you do to prepare for this

5    deposition?

6         A.   Yesterday afternoon, I spoke to the

7    Baker McKenzie lawyers.

8         Q.   Who did you speak to at Baker &

9    McKenzie?

10        A.   Deb and Michelle.

11        Q.   And how long did you speak to them

12   for?

13        A.   About three hours.

14        Q.   Did you review any documents?

15        A.   Yes.

16        Q.   What documents did you review?

17        A.   I believe they're the exhibits to this

18   deposition.

19        Q.   Any other documents?

20        A.   No.

21        Q.   Did you have any conversations with

22   anyone from Wick Phillips?

23        A.   No.

24              MR. BROWN:  Court Reporter, could you

25   please mark Exhibit B and could we put that up on

```
 1                M. PATRICK - 8/13/2021

 2    the screen.

 3                (Deposition Exhibit B marked for

 4    identification.)

 5    BY MR. BROWN:

 6         Q.   Mr. Patrick, do you have a hard copy

 7    of Exhibit B?

 8         A.   I believe I do.  Let me get that.

 9         Q.   It might be easiest -- I'll leave it

10    up to you and your counsel, but feel free to look

11    at your hard copy if that's more comfortable for

12    you.

13         A.   Okay.  I have Exhibit B.

14         Q.   Okay.  So do you know what this

15    document is?

16         A.   Yes.

17         Q.   Can you tell us?

18         A.   It is the Limited Liability Agreement

19    for SE Multifamily Holdings LLC, dated as of

20    August 23rd, 2018.

21         Q.   Okay.  And you've seen it before?

22         A.   Yes.

23         Q.   You saw it before yesterday in

24    preparing for your deposition?

25         A.   Yes.
```

Supp. App. 0416

1              M. PATRICK - 8/13/2021

2         Q.   Okay.  And what was the purpose of

3    this LL -- oh, let's also -- just for purposes of

4    making sure we're on the same page.  This

5    Exhibit B, the SE Multifamily Holdings LLC,

6    Limited Liability Company Agreement, I would like

7    to refer to it as the LLC agreement for purposes

8    of this deposition.  Are you comfortable with that

9    and will you understand what I'm talking about?

10             MS. DANDENEAU:  Mr. Brown, can we call

11   it perhaps the original LLC agreement, given that

12   it was amended and restated subsequently and just

13   so there's no confusion?

14             MR. BROWN:  I'm fine with that.  We

15   can call this the original LLC agreement.

16        A.   Thank you.  Yes.

17   BY MR. BROWN:

18        Q.   I forgot what my question was.  I

19   think I was just getting the terms straight.  What

20   was the purpose of the original LLC agreement?

21             MS. DANDENEAU:  Objection to form.

22        A.   The purpose of the original LLC

23   agreement was to reflect the agreement between

24   Highland Capital Management and HCRE Partners LLC.

25

Supp. App. 0417

Case 19-34054-sgj11 Doc 2859-84 Filed 10/27/22 Entered 10/27/22 11:59:41 Page 27 of 84
Case 19-34054-sgj11 Doc 2035-10 Filed 10/15/21 Entered 10/15/21 17:13:45 Page 27 of 84
Exhibit 84   Page 28 of 85

```
1                   M. PATRICK - 8/13/2021

2    BY MR. BROWN:

3         Q.    And reflect the agreement concerning

4    what?

5         A.    Concerning the business of the LLC.

6         Q.    And what was the business of the LLC?

7         A.    Real estate.

8         Q.    And can you be more explicit?

9         A.    I recall holding real estate --

10   certain real estate assets.

11        Q.    Do you recall anything else about the

12   nature and purpose of the original LLC agreement?

13        A.    Not offhand.  You'll have to refresh

14   my recollection.

15        Q.    Do you recall who the parties were to

16   the original LLC agreement?

17        A.    Yes.  I was just looking at the

18   signature page and -- I just lost it.

19        Q.    It's page -- if we can -- it's

20   page 17.

21        A.    Yeah, page 17.  So Highland Capital

22   Management and HCRE Partners, LLC.

23        Q.    Okay.  And who signed on behalf of

24   Highland?

25        A.    James Dondero.
```

1                   M. PATRICK - 8/13/2021

2        Q.    And do you recognize that to be his

3   signature?

4        A.    I don't know.

5        Q.    Are you familiar with his signature?

6        A.    No.

7        Q.    Do you have any reason to believe it's

8   not his signature?

9        A.    No.

10       Q.    And who signed on behalf of HCRE?

11       A.    James Dondero.

12       Q.    And do you have any knowledge of

13  whether he was authorized to sign on behalf of

14  both entities?

15       A.    It's been my understanding generally

16  through the years, that Jim has always been

17  authorized to sign on behalf of Highland.  I just

18  don't have as much familiarity with HCRE.

19       Q.    Okay.  Do you understand what

20  Mr. Dondero's affiliation with HCRE was?

21       A.    Yes.  I understood him to be the

22  manager.

23       Q.    And what was the relationship between

24  Highland and HCRE?

25       A.    It's reflected in this LLC agreement.

1           M. PATRICK - 8/13/2021

2      Q.   Did they have any other connection

3  besides this LLC agreement?

4           MS. DANDENEAU:  Objection to form.

5      A.   Not that I can recall offhand.

6  BY MR. BROWN:

7      Q.   Well, other than the fact that they

8  both appear to have been entities for which --

9  that were controlled by Jim Dondero, correct?

10      A.   What do you mean by controlled?

11      Q.   Well, Jim Dondero was the president of

12  Highland, correct?

13      A.   Correct.

14      Q.   What role -- while you were at

15  Highland, what role did Jim Dondero play when you

16  were there?

17      A.   He was the owner and president of the

18  general partner, Strand Advisors.

19      Q.   Okay.  And he was the manager of HCRE

20  Partners -- of HCRE, correct?

21      A.   That is my understanding.

22      Q.   Okay.  So other than the fact that

23  Jim Dondero had a -- the role as president of

24  Highland and as manager of HCRE, did Highland and

25  HCRE have any other common employees?

Case 1:19-cv-04405-sjj-11 DoD 20-35901-84 10 Filed 10/27/22 Entered 10/15/21 03:29:17 Page 31 of 84
Exhibit 84   Page 31 of 85

Page 25

```
 1                 M. PATRICK - 8/13/2021

 2         A.   I do not know if they did have any

 3   other common employees.

 4         Q.   Do you know if they had a shared

 5   services agreement?

 6         A.   I do not know.

 7         Q.   Do you know if they had any other

 8   agreements other than the original LLC agreement

 9   and the amended LLC agreement, which we'll talk

10   about later?

11         A.   Offhand, I do not know.

12         Q.   Did you have any role in connection

13   with the LLC agreement?

14              MS. DANDENEAU:   Objection to form.

15         A.   Yes.

16   BY MR. BROWN:

17         Q.   Please describe it.

18         A.   I coordinated the document.

19         Q.   What does that mean?

20         A.   It means I helped facilitate this --

21   the creation of this document by coordinating with

22   respective parties.

23         Q.   So you coordinated with Highland and

24   HCRE?

25         A.   Coordinated with Highland and HCRE.   I
```

```
1                    M. PATRICK - 8/13/2021

2    would describe it as I was -- I was coordinating

3    the deal between the two parties and having that

4    coordination reflect what was desired in this LLC

5    agreement.

6           Q.   Okay.  And what did your coordination

7    actually involve in practical terms?

8           A.   Yes.  That's a good question.  I

9    recall calling up the law firm of Hunton &

10   Williams to draft and prepare this LLC agreement.

11          Q.   And why did you call the law firm of

12   Hunton & Williams?

13          A.   It's generally the firm that I worked

14   with in the past.

15          Q.   And you worked with Hunton & Williams

16   in your capacity as an employee of Highland?

17          A.   Yes.

18          Q.   Who did Hunton & Williams represent?

19   Let me -- let me strike that.

20               Did you act as counsel for any party

21   in connection with this LLC agreement, the

22   original LLC agreement?

23          A.   No.

24          Q.   Were any of the -- well, were either

25   party, either HCRE or Highland, represented by any
```

1          M. PATRICK - 8/13/2021

2   counsel in connection with the original LLC

3   agreement?

4          MS. DRAWHORN:  Objection, form.

5      A.   I understand your question.  I can

6   just answer with the facts.  It feels like a legal

7   conclusion.  The facts are I called up Hunton and

8   I told them that we needed an LLC agreement

9   drafted and they started working on it.

10  BY MR. BROWN:

11     Q.   Did they get a retention agreement?

12     A.   Not specifically for this -- for this

13  LLC agreement.

14     Q.   But you -- Highland had a retention

15  agreement with them for general matters?

16     A.   Yes, with Hunton.

17     Q.   And did that agreement -- okay.  So do

18  you have an understanding of whether Hunton was

19  representing HCRE in connection with the original

20  LLC agreement?

21     A.   Again, that's a legal conclusion.  I

22  called up Hunton and I told them that -- about

23  this transaction and a need for this LLC agreement

24  to be drafted.

25     Q.   So you are unable -- you have no --

1                    M. PATRICK - 8/13/2021

2    you have no ability to testify who you understood

3    Highland -- I'm sorry, Hunton firm was

4    representing in connection with the LLC agreement?

5          A.   I'm telling you the facts.  These are

6    the facts.  You can draw your own legal

7    conclusion, but the facts are I called up Hunton &

8    Williams and asked them to draft this LLC

9    agreement.

10         Q.   Okay.  Thank you for the facts,

11   Mr. Patrick.  I'm trying -- now I want your

12   understanding, if you had one, at the time you --

13         A.   I did not -- I'm sorry, I apologize.

14   I wasn't listening close enough to your question,

15   Mr. Brown.  I did not have an understanding of

16   what they were representing because I did not

17   think about that.  I just simply called them up

18   and asked them to prepare this LLC agreement.

19         Q.   Okay.  Was there any other lawyer

20   involved -- who was the lawyer for the Hunton firm

21   that you were dealing with?

22         A.   Alex McGeoch and I believe his

23   associate at the time, a gentleman named Mark

24   Melton.

25         Q.   Okay.  Were there any other lawyers

Case 1:19-cv-09340-VSB-VF Document 410 Filed 10/27/22 Page 34 of 84
Case 1:19-cv-09340-VSB-VF Document 415 Filed 10/25/22 Page 35 of 84
Exhibit 84   Page 35 of 85

Page 29

 1                 M. PATRICK - 8/13/2021

 2    involved for either Highland or HCRE in connection

 3    with the draft -- the drafting and negotiation of

 4    the LLC agreement?

 5         A.   There were lawyers involved.  It's

 6    hard to remember what lawyers were involved in the

 7    original LLC agreement versus the amended.  Let me

 8    think -- let my think.

 9              I believe internal Highland counsel,

10    Tim Cournoyer, I always mispronounce his name, but

11    that was -- my recollection was refreshed

12    yesterday from seeing one of the exhibits.  So I

13    believe he was involved in the original LLC

14    agreement.

15              I also -- my memory was refreshed

16    yesterday from looking at the exhibits.  It

17    appears Freddy Chang, another lawyer, he was

18    involved.

19              Tim, he worked in the legal

20    department.  I worked in the tax department.  And

21    so Tim was properly functioning as a lawyer and

22    Freddy Chang was a lawyer as well.  I don't recall

23    exactly what department or what entity he had

24    worked for.  So he was involved.

25         Q.   So the two lawyers you've identified,

```
 1                  M. PATRICK - 8/13/2021

 2   I believe are Freddy Chang and Tim -- can you

 3   pronounce that again for me?

 4        A.   I always mispronounce it.  It's a

 5   fault.  I've said it a million times and I

 6   mispronounce it differently each time.  I want to

 7   say Cournoyer.  Cournoyer.

 8             MS. DANDENEAU:  Mr. Brown, if it's

 9   helpful, it's Cournoyer.

10        A.   Cournoyer.  That's it.

11   BY MR. BROWN:

12        Q.   Thank you.  Save us a lot of grief.

13   Okay.  Freddy Chang and Tim Cournoyer are the two

14   lawyers I think you identified as being involved

15   in the original LLC agreement.  Anybody else?

16        A.   Besides Hunton & Williams?

17        Q.   I'm sorry, you're correct.  Aside from

18   the two lawyers from Hunton.

19        A.   Yeah.  No.

20        Q.   Okay.

21        A.   Oh, I'm sorry, I apologize.  I knew I

22   was missing somebody.  My colleague, he was an

23   independent contractor, an attorney, Shawn Raver.

24        Q.   Shawn, last name?

25        A.   Raver, R-a-v-e-r.  I knew it.  I knew
```

1              M. PATRICK - 8/13/2021

2    I was forgetting somebody.

3         Q.   So who did Shawn Raver represent in

4    connection with the original LLC agreement?

5         A.   I can tell you the facts.  And I don't

6    specifically remember with respect to what he had

7    done on the original or whatnot, but as -- just

8    sort of as a matter of practice, you know, I may

9    have told him the business deal, you know, as me

10   representing the client and then he -- and he may

11   have done some drafting, reflecting the business

12   deal in the original of it.  But I keep falling

13   back to, you know, those are the facts.  I don't

14   think neither he nor I -- you know, I won't speak

15   for him, but I certainly wasn't thinking about

16   anything in a, you know, who's representing who

17   capacity.  I think we were just doing the

18   transaction.

19        Q.   Okay.  What about Tim Cournoyer?

20        A.   Well, he was -- he worked in

21   Highland's legal department.

22        Q.   Okay.  And what about Freddy Chang?

23        A.   I don't know what department or what

24   entity he actually had worked for, so I can't

25   really -- you'll have to ask Tim.

Case 1:19-cv-03495-gjj-11-Do-202591-e-84-10 Filed 10/27/22 Filed Entered 10/15/21-04/23/22-17:13:45 Page 37 of 84
Exhibit 84    Page 38 of 85

Page 32

1                    M. PATRICK - 8/13/2021

2          Q.    Do you know if he had any -- any

3     affiliation with HCRE?

4          A.    I do not know.

5          Q.    And Shawn Raver, is he with a private

6     law firm?

7          A.    He's a sole practitioner.

8          Q.    Did Wick Phillips have any involvement

9     in the representation of any party -- let me

10    restate that.

11               Did Wick Phillips represent Highland

12    in connection with the original LLC agreement?

13         A.    No.

14         Q.    Did Wick Phillips represent HCRE in

15    connection with the original LLC agreement?

16         A.    No.

17         Q.    Okay.  Do you know if anyone reviewed

18    the amended LLC agreement on behalf of Highland?

19               MS. DANDENEAU:  Objection to form.

20    And I would note you referred to the amended LLC

21    agreement.

22               MR. BROWN:  I'm sorry.

23    BY MR. BROWN:

24         Q.    Did anyone review the original LLC

25    agreement on behalf of just Highland; in other

1                M. PATRICK - 8/13/2021

2   words, in connection with just protecting and

3   advancing the interests of Highland versus the

4   interests of HCRE?

5                MS. DANDENEAU:  I'm going to object to

6   form again.

7        A.   Look, I would say Tim, as his role

8   within the Highland's legal department when he

9   reviewed it.

10  BY MR. BROWN:

11       Q.   Okay.  So you -- you think that Tim

12  reviewed it on behalf of Highland, correct?

13       A.   Correct.

14       Q.   And your statement is based on -- your

15  statement is based on the fact that he was an

16  employee of Highland, correct?

17       A.   He was a lawyer working in the legal

18  department of Highland and employed by Highland.

19       Q.   Okay.  Did anyone review the original

20  LLC agreement on behalf of HCRE with regard to

21  protecting and/or advancing HCRE's interests,

22  separate and apart from Highland's?

23                MS. DANDENEAU:  Objection to form.

24       A.   And we're still talking about the

25  original LLC agreement, correct?

```
 1                    M. PATRICK - 8/13/2021

 2    BY MR. BROWN:

 3         Q.   Yes.  We're just talking about the

 4    original LLC agreement.

 5         A.   I do not know if -- I do not know if

 6    anyone did or did not.

 7         Q.   Did anybody negotiate the terms of the

 8    LLC agreement on behalf of Highland?

 9         A.   I think the premise of the question is

10    false in the case of the original LLC agreement

11    because as we both noted, on page 17 you have

12    Mr. Dondero's signature on both sides.  And so to

13    characterize this as a sort of negotiation, he

14    would have to be negotiating mentally with

15    himself.  So I did not view this as an adversarial

16    document.

17         Q.   I understand.

18         A.   The original.  The original.

19         Q.   Okay.  So the original document.

20    There was no negotiation back and forth between

21    representatives of Highland and representatives of

22    HCRE concerning the terms of the original LLC

23    agreement, correct?

24         A.   I would agree with that, correct.

25         Q.   Did you ever have any communications
```

```
 1                M. PATRICK - 8/13/2021

 2     with any lawyer from Wick Phillips with -- that

 3     concerned the original LLC agreement?

 4          A.   No.

 5          Q.   Can you turn to page 18, which is

 6     Schedule A of the original LLC agreement.

 7          A.   Okay.

 8          Q.   Have you ever seen Schedule A before?

 9          A.   Yes, I have.

10          Q.   Okay.  And --

11               MS. DRAWHORN:  Mr. Brown, I know that

12     you haven't lodged your question yet, but I just

13     want to state, to the extent that you're getting

14     into the underlying dispute, I don't think that's

15     proper here, since this is noticed specific to the

16     motion to DQ and if you are going to get into the

17     underlying dispute, I think that waives any motion

18     to disqualify Wick Phillips.  Again, I probably

19     should have waited for your question, but I do

20     want to raise that.

21               MR. BROWN:  How do you figure it --

22     how does it waive any motion to disqualify?

23               MS. DRAWHORN:  If you're continuing to

24     pursue your response to our proof of claim -- or

25     your objection to our proof of claim, then you're
```

1                    M. PATRICK - 8/13/2021

2    waiving the disqualification of us.  Because if

3    you're seeking to disqualify Wick Phillips from

4    representing HCRE Partners or -- now known as

5    NexPoint Real Estate Partners, then you're saying

6    that we can't represent them in the underlying

7    dispute.

8                    But if you're pursuing your objection

9    to our claim on that underlying dispute, then you

10   can't -- you can't do both at the same time.  It's

11   a waiver.

12                   MR. BROWN:  Yeah.  Well, I would

13   disagree.  It's not -- there's no intentional

14   waiver and -- and this all goes to the underlying

15   issue of the disqualification motion which has to

16   do with Wick Phillips representing -- now

17   representing HCRE, challenging the percentage

18   interest allocations in the amended LLC agreement.

19   So I don't know how -- they're all related.  I

20   mean, the whole idea of how we ended up with what

21   we ended up in in the amended LLC agreement is

22   related to the interests in the original LLC

23   agreement and that's the ultimate issue in terms

24   of the substantial relationship.  So I disagree

25   with you that this --

```
 1                    M. PATRICK - 8/13/2021

 2               MS. DRAWHORN:  No, the substantial

 3     relationship --

 4               MR. BROWN:  I'm not asking these

 5     questions with respect to the underlying objection

 6     to the proof of claim.  I'm asking these questions

 7     to understand the substantial relationship issue.

 8               MS. DRAWHORN:  The substantial

 9     relationship that you're arguing is the LLC

10     agreement to the extent that these -- the LLC

11     agreement is related to the loan agreement.

12     That's the relationship.  Wick Phillips

13     represented the borrowers and HCRE in the loan

14     agreement.  And you're saying this LLC agreement

15     is substantially related.  You don't have to go

16     through the substance of our dispute, which is

17     these capital -- these -- the capital

18     contributions and percentage interests.  It's

19     outside the scope of the deposition notice and if

20     you're pursuing the content, that's waiving your

21     motion to --

22               MR. BROWN:  The deposition notice

23     wasn't limited in scope in any way.

24               MS. DRAWHORN:  It says that you're

25     taking the deposition in connection with the
```

```
 1              M. PATRICK - 8/13/2021

 2   debtor's motion to disqualify Wick Phillips.

 3              MR. BROWN:  Right.  And that really is

 4   about -- the scope of the motion is whether or not

 5   the representation by Wick Phillips of Highland in

 6   connection with the loan agreement is

 7   substantially related to Wick Phillips' current

 8   adverse representation of HCRE challenging the

 9   percentage interest in the amended LLC agreement.

10   And those percentage interests in the LLC

11   agreement, which are the very core of the

12   substantial relationship test, flow through the

13   original LLC agreement, the loan agreement and the

14   amended LLC agreement.  They're at issue --

15   they're all part of a continuum.  And they're all

16   part of the -- they all are -- relate to the issue

17   of Wick Phillips' current adverse representation

18   of HCRE, which is the basis of the

19   disqualification motion.  I don't know how you can

20   separate them.

21              MS. DRAWHORN:  I mean, Mr. Patrick

22   testified that Wick Phillips was not involved in

23   the drafting of this agreement.  If you're asking

24   questions about Wick Phillips' representation in

25   connection with this document or involvement in
```

1                    M. PATRICK - 8/13/2021

2    connection with this document, I think that

3    absolutely relates to the disqualification issue.

4              MR. BROWN:  I don't know how --

5              MS. DRAWHORN:  Let me finish,

6    Mr. Brown, please.  Please let me finish my

7    statement before you interrupt me.

8              If you are asking about the underlying

9    substance of the LLC agreement, that is outside

10   the scope of the disqualification.  That goes to

11   the merits of our proof of claim and the debtor's

12   objection to our proof of claim and you cannot

13   pursue that while pursuing a disqualification.

14             MR. BROWN:  Well, I disagree and you

15   can argue that we -- that this shouldn't come in

16   as -- if you're disqualified, and I would agree,

17   this would not be evidence that could come in if

18   you're disqualified in connection with the

19   underlying proof of claim because the argument

20   would be that HCRE wasn't represented at the

21   deposition on the issue of the underlying claim

22   objection.  That's very different from waiver of

23   the disqualification motion.

24             So if HCRE ultimately wants to say,

25   no, we don't think that deposition testimony can

1              M. PATRICK - 8/13/2021

2    be used against us, I can understand that, but

3    that's not at issue today.

4              MS. DRAWHORN:  Okay.  Mr. Brown, if

5    you want to pursue the underlying substance of the

6    objection, that's fine.  I'm informing you that we

7    will use that as a waiver.  We consider that a

8    waiver and we'll present that with --

9              MR. BROWN:  I'm not pursuing --

10             MS. DRAWHORN:  Again, Mr. Brown,

11   please stop interrupting me.  If you pursue the

12   underlying merits of the claim objection, we

13   will -- we will perceive that as a waiver and we

14   will present that argument to the Court.

15             MR. BROWN:  Okay.  Let me be -- are

16   you finished?

17             MS. DRAWHORN:  Yes.

18             MR. BROWN:  Let me be very clear.  I

19   am not pursuing the underlying merits of the claim

20   objection.  I am asking questions that relate to

21   the substantial relationship between Wick

22   Phillips' current adverse representation of HCRE

23   challenging the percentage interest allocation in

24   the amended LLC agreement, which relates solely to

25   the disqualification motion.  And we are -- you

1                  M. PATRICK - 8/13/2021

2   know, we're not -- if you're disqualified, yes, we

3   acknowledge that HCRE may have -- may have a

4   legitimate objection to the use of this deposition

5   testimony in the underlying merits.

6               MS. DRAWHORN:  And I disagree with

7   that position.  But I have stated that and I will

8   have -- we'll -- I'll object to the testimony as

9   needed --

10               MR. BROWN:  Okay.

11               MS. DRAWHORN:  -- and the questions as

12   needed.

13               MR. BROWN:  Well, we've been going for

14   an hour.  So let's take a short recess and return

15   in ten minutes.

16               MS. DRAWHORN:  Okay.

17               THE REPORTER:  We're off the record.

18                  (Recess taken from 11:55 a.m. CDT to

19   12:08 p.m. CDT)

20               MR. BROWN:  Can you mark Exhibit G as

21   Exhibit G.

22                  (Deposition Exhibit G marked for

23   identification.)

24   BY MR. BROWN:

25         Q.   Mr. Patrick, back on the record.  Can

1              M. PATRICK - 8/13/2021

2    you -- have you ever seen what has been marked as

3    Exhibit G before?

4         A.   Well, it has my name on it, so

5    presumably at some point I did see it.  I just

6    don't recall it offhand.

7         Q.   Okay.  You're a recipient of this

8    August 23, 2018, e-mail from Paul Broaddus,

9    correct?

10        A.   Yes.  My name is on the e-mail.

11        Q.   Okay.  And you received the e-mail,

12   correct?

13        A.   I assume I did.

14        Q.   Do you have any reason to believe you

15   didn't receive it?

16        A.   That's correct, I have no reason that

17   I didn't receive it.

18        Q.   And the e-mail is to Helen Kim with

19   copies to Matt McGraner, you, Michael [sic]

20   Patrick, Rick Swadley and Jae Lee, correct?

21        A.   Correct.

22        Q.   Who is Helen Kim?

23        A.   She is a paralegal in the Highland

24   legal department.

25        Q.   Okay.  Does she work for anybody else

1                    M. PATRICK - 8/13/2021

2    other than Highland, or did she as of August 23,

3    2018?

4              MS. DANDENEAU:  Objection.

5         A.   I do not know.

6    BY MR. BROWN:

7         Q.   Okay.  And who is Matt McGraner?

8         A.   Matt McGraner leads the real estate

9    team.

10        Q.   At -- for what entity?

11        A.   I don't know.

12        Q.   Okay.  So you don't know -- was he --

13   was he employed by Highland?

14        A.   I don't know.

15        Q.   Okay.  And what about Rick -- who is

16   Rick Swadley?

17        A.   He's -- I believe he's compliance

18   officer -- a chief tax compliance officer, excuse

19   me, at Highland.  He works in the tax department.

20        Q.   Is he a lawyer?

21        A.   No.

22        Q.   And Matt McGraner is not a lawyer

23   either?

24        A.   Matt McGraner is a lawyer.

25        Q.   Okay.

1             M. PATRICK - 8/13/2021

2        A.   I mean, he has a legal degree is my

3   understanding.

4        Q.   I understand.  What about Jae or Jae

5   Lee?

6        A.   Yeah.

7        Q.   Who is --

8        A.   Yeah.  He is a tax manager in the tax

9   department.  Excuse me for interrupting you before

10   you asked the question.

11        Q.   Thank you.  Who is -- who is he

12   employed by -- who was he employed by on

13   August 23, 2018?

14        A.   It is my understanding he was employed

15   by Highland Capital Management.

16        Q.   Okay.  So what did you understand the

17   purpose of this e-mail was?

18             MS. DANDENEAU:  Objection to form.

19        A.   I think the e-mail speaks for itself.

20   BY MR. BROWN:

21        Q.   You're right, I think it does.  What

22   did Paul Broaddus do?

23        A.   He is a tax manager within the tax

24   department of Highland Capital Management.

25        Q.   Did he have any affiliation with HCRE?

1              M. PATRICK - 8/13/2021

2              MS. DANDENEAU:  Objection to form.

3        A.   I do not -- I do not know if he does

4   or does not.

5   BY MR. BROWN:

6        Q.   Okay.

7        A.   I don't know if it matters, but,

8   Mr. Brown, I cannot see you on my screen.

9        Q.   Well, I think it does -- I mean, I'd

10  like you to be able to see me and I'm wondering if

11  you changed the view.  Are you looking at --

12  what's -- are you -- are you using a gallery or

13  speaker or full screen?

14       A.   Yeah, I'm using a -- I'm using a full

15  screen.  I see the document and I see myself.  I

16  apologize for this technical problem.

17       Q.   No, no, I --

18              MS. DANDENEAU:  Perhaps we should go

19  just briefly offline and maybe we can help

20  Mr. Patrick work through the view.

21              MR. BROWN:  Yeah.

22              MS. DANDENEAU:  I don't know if we

23  need to --

24              MR. BROWN:  To the extent it's

25  helpful, I had the same problem on Wednesday and

Case 1:19-cv-03049-RDM Document 84-10 Filed 10/27/22 Page 51 of 64
Case 1:19-cv-03049-RDM Document 91-11 Filed 10/25/22 Page 51 of 64
Exhibit 84   Page 52 of 85

```
 1                   M. PATRICK - 8/13/2021

 2   it was fixed by changing the view.

 3        A.   I got it fixed.  I'm going to the step

 4   boxes instead of something else.  Okay.  We're all

 5   good.  I'm fine.  I apologize.

 6   BY MR. BROWN:

 7        Q.   I totally get it.  I had the same

 8   issues.

 9             MR. BROWN:  Can we -- what exhibit are

10   we -- we were on exhibit --

11             MS. DANDENEAU:  We were on Exhibit G.

12             MR. BROWN:  G.  Let's go to Exhibit H.

13             (Deposition Exhibit H marked for

14   identification.)

15             MR. BROWN:  Mr. Johnson, I want to

16   make sure I'm accommodating your needs here too in

17   terms of marking.  When I say let's go to

18   Exhibit H, can we mark it as Exhibit H?  I meant

19   to do that for each exhibit that we've discussed

20   so far.  Is that -- has that been clear?

21             THE REPORTER:  Yes.

22             MR. BROWN:  So let's mark Exhibit H,

23   which is the July 30, 2018, e-mail from Mark

24   Patrick.

25
```

```
 1              M. PATRICK - 8/13/2021

 2   BY MR. BROWN:

 3        Q.   Mr. Patrick, can you tell me if you've

 4   ever seen this e-mail that has been marked as

 5   Exhibit H before?

 6        A.   Yes.  I saw it yesterday.

 7        Q.   Okay.  Did you receive it?  I'm sorry,

 8   did you send it?

 9        A.   To the best of my knowledge, I did.

10        Q.   Okay.  And it's to Tim --

11        A.   Cournoyer.

12        Q.   Tim Cournoyer.  It's to Tim Cournoyer?

13        A.   Yeah.

14        Q.   And it says regarding draft LLC

15   agreement, correct?

16        A.   Correct.

17        Q.   And is that a draft of the original

18   LLC agreement that we have been talking about for

19   most of this deposition?

20        A.   I believe it is.

21        Q.   And the next e-mail in the string,

22   which is Exhibit H, is an e-mail from Alex McGeoch

23   to you?

24        A.   McGeoch.  Yeah, it's another funny

25   one.
```

Supp. App. 0443

1                M. PATRICK - 8/13/2021

2          Q.    McGeoch.  McGeoch to you dated

3    July 27, 2018, correct?

4          A.    Correct.

5          Q.    Did you receive that e-mail?

6          A.    To the best of my knowledge, I did.

7          Q.    Okay.  The subject line is draft LLC

8    agreement.  And am I correct that this is

9    Mr. McGeoch of Hunton Andrews & Kurth, his

10   transmission of a draft LLC agreement to you?

11         A.    The original LLC agreement, correct, a

12   draft of it.

13         Q.    Okay.  And the second sentence of the

14   e-mail says:  It would be helpful to schedule a

15   call with you to walk through our thoughts on the

16   allocation and distribution drafting approach we

17   took.  Please let me -- and then the next sentence

18   says:  Please let me know if you have another --

19   if you have time for a call with Mark and me this

20   morning.

21              Do you recall if you ever had that

22   call with McGeoch?

23         A.    I don't recall specifically, but I am

24   confident we did have that call.

25         Q.    Okay.  Do you recall anything about

```
 1                M. PATRICK - 8/13/2021

 2   what was discussed in the call?

 3        A.   No.

 4             MR. BROWN:  Can we put up Exhibit C

 5   and mark it.

 6             (Deposition Exhibit C marked for

 7   identification.)

 8   BY MR. BROWN:

 9        Q.   Mr. Patrick, have you ever seen

10   this -- what's been marked as Exhibit C?

11        A.   Yesterday I did.

12        Q.   Before yesterday, had you ever seen

13   it?

14        A.   Not that I can recall seeing it.

15        Q.   Okay.  So did you have -- did you have

16   any role in connection with the -- any role of any

17   type in connection with the bridge loan

18   agreement -- well, hold on.  Let me start over

19   again.

20             So this Exhibit C is the bridge loan

21   agreement dated as of September 26th, 2018, among

22   various entities, borrower entities and Keybank

23   National Association and KeyBanc Capital Markets,

24   correct?

25        A.   Well, what exhibit is this?  I
```

Page 50

1                   M. PATRICK - 8/13/2021

2    apologize because I don't see those dates.  I

3    can't scroll.

4         Q.   Okay.  If you look -- can you see it

5    on the screen?

6         A.   Yes.  But I couldn't see the date.

7         Q.   Okay.  It says the Bridge Loan

8    Agreement dated as of September 26, 2018.

9         A.   Okay.  Fair enough.  I see it.  I just

10   didn't notice it.  Thank you.

11        Q.   Just like we've done with some of the

12   other terms that are a mouthful, I'd like to refer

13   to this as the loan agreement.  If I refer to

14   Exhibit C as the loan agreement in this

15   deposition, you'll understand what I am referring

16   to, correct?

17        A.   Correct.

18        Q.   So did you have any role in connection

19   with the loan agreement?

20        A.   No.

21        Q.   And to your recollection, you never

22   saw it before yesterday?

23        A.   That is correct.

24        Q.   Okay.  Prior to yesterday, did you

25   ever talk to anybody about the loan agreement?

1                M. PATRICK - 8/13/2021

2        A.   No.

3        Q.   Did you ever e-mail with anybody about

4   the loan agreement?

5        A.   Not that I can recall.

6        Q.   Okay.  Did you ever have any

7   communications of any nature with anybody about

8   the loan agreement?

9        A.   Not that I can recall.

10        Q.   Do you have -- do you know who drafted

11   the loan agreement?

12        A.   I do not.

13        Q.   Do you know anything about the loan

14   agreement?

15             MS. DANDENEAU:  Objection to form.

16        A.   No, I do not.

17   BY MR. BROWN:

18        Q.   Do you have any understanding of what

19   role Wick Phillips played in connection with the

20   representation of any of the borrowers to the loan

21   agreement?

22        A.   I do not.

23             MR. BROWN:  Let's put up on the

24   screen, please, and mark Exhibit D.

25

1                  M. PATRICK - 8/13/2021

2                  (Deposition Exhibit D marked for

3      identification.)

4                  MR. BROWN:  And if we could scroll to

5      the bottom and the first e-mail on the string,

6      please.

7      BY MR. BROWN:

8          Q.   Mr. Patrick, have you ever seen these

9      e-mails before?  Have you ever seen this e-mail,

10     which is the first e-mail on Exhibit D?

11         A.   I believe we might have gone through

12     that yesterday.

13         Q.   But other than yesterday, you haven't

14     seen it?

15         A.   Correct.

16         Q.   Okay.  And I'll note, you're not a

17     recipient or a sender on any of the e-mails in

18     Exhibit D and so I'm not going to ask you about

19     their substance.  What I am going to ask you about

20     is whether or not you have an understanding of who

21     the entity -- the sender and recipients of the

22     e-mail are.  So Matt McGraner, I believe we've

23     already discussed him, but just to refresh -- to

24     make sure, do you know who Matt McGraner is?

25         A.   Yes.

1                    M. PATRICK - 8/13/2021

2          Q.    And who is he?

3          A.    The head of real estate.

4          Q.    And he has a Highland Capital e-mail

5     address.  Do you know if he works for Highland

6     Capital?

7          A.    I do not know.

8          Q.    Okay.  What about M. Goetz, do you

9     know who he is?

10         A.    Yes.

11         Q.    Who is he?

12         A.    I believe he works in the real estate

13    team.

14         Q.    For what entity?

15         A.    I do not know.

16         Q.    And Bonner McDermett, who is he?

17         A.    He works in the real estate team as

18    well.

19         Q.    For what entity?

20         A.    I do not know.

21         Q.    Paul Broaddus we have discussed.

22    Freddy Chang we have discussed.  Do you know D.C.

23    Sauter?

24         A.    Yes.

25         Q.    Who is he?

Supp. App. 0449

1                    M. PATRICK - 8/13/2021

2          A.   He is the current general counsel of

3     NexPoint Advisors.

4          Q.   Do you know how long he's been there?

5          A.   I do not know.

6          Q.   Okay.  Do you know, what is NexPoint

7     Real Estate Advisors, LLC?

8          A.   I don't know what it is.

9          Q.   Have you ever heard of it?

10         A.   I'm not sure.

11         Q.   Do you know if you've ever

12    communicated with any representatives of NexPoint

13    Real Estate Advisors, LLC?

14         A.   I cannot recall.

15              MR. BROWN:  Can we put up and mark

16    Exhibit E.

17                   (Deposition Exhibit E marked for

18    identification.)

19    BY MR. BROWN:

20         Q.   Have you ever seen the e-mail chain

21    marked as Exhibit E?

22         A.   I see my name on it.  Hold on a

23    second.  Let me see if I...

24                   (Witness reviews document.)

25         A.   I can't recall if I saw it yesterday

1              M. PATRICK - 8/13/2021

2    or not.

3    BY MR. BROWN:

4         Q.    Okay.

5         A.    I don't think I did.

6         Q.    The first e-mail is from Paul Broaddus

7    dated January -- I'm sorry, July 27, 2018.  One of

8    the recipients is Daniel Cullen at Baker &

9    McKenzie.  Do you know who Daniel Cullen is?

10        A.    Yes.

11        Q.    And who did he represent in the

12   context of this e-mail; do you know?

13        A.    I do not know.

14        Q.    The subject line or his e-mail is

15   Unicorn - DSTs.  Do you know what that means?

16        A.    Not specifically.

17        Q.    Unspecifically can you describe what

18   your understanding is?

19        A.    Yeah.  Like a DST is generally an

20   acronym for Delaware Statutory Trusts.  And

21   Unicorn is generally an overall description of

22   this purchase involving these real estate assets.

23        Q.    Okay.  And the -- there's an

24   attachment to the e-mail.  If we flip to the --

25   scroll to the next page.

```
1              M. PATRICK - 8/13/2021

2              MR. BROWN:  And can we change the

3    view?

4    BY MR. BROWN:

5         Q.   Do you know what the attachment is?

6    It says Project Unicorn DST Detail.

7         A.   No.

8         Q.   Do you know who prepared it?

9         A.   No.

10             MR. BROWN:  Can we go to -- put up and

11   mark Exhibit I.

12             (Deposition Exhibit I marked for

13   identification.)

14             MR. BROWN:  And could we scroll to the

15   first e-mail on this string.

16   BY MR. BROWN:

17        Q.   So, Mr. Patrick, Exhibit I is an

18   e-mail string which you appear to have initiated

19   on February 28, 2019.  The re line is SE

20   Multi-Family Holdings LLC:  Amended and Restated.

21             Have you ever seen this e-mail before?

22        A.   Yesterday.

23        Q.   And you saw it -- did you ever see it

24   before yesterday?

25        A.   I assume I did because it appears I
```

Supp. App. 0452

Case 1:19-cv-03457-JPB   Document 34-11   Filed 10/27/22   Page 63 of 84
Case 1:19-cv-03457-JPB   Document 40-15   Filed 01/23/23   Page 62 of 63
Exhibit 84   Page 63 of 85

Page 57

```
 1              M. PATRICK - 8/13/2021

 2   wrote it.

 3        Q.   Yeah.  And did you write it?

 4        A.   I would have -- I would believe so.

 5        Q.   No reason to think you didn't,

 6   correct?

 7        A.   Correct.

 8        Q.   And why did you write it?

 9        A.   As I read it, it appears that I am

10   highlighting certain issues that need to be

11   addressed before a tax deadline.

12        Q.   And this relates to an amended and

13   restated LLC agreement?

14        A.   Correct.

15        Q.   And the amended -- this is an

16   amendment that -- to the LLC agreement -- the

17   original LLC agreement that we've been talking

18   about, correct?

19        A.   Correct.

20        Q.   And why was an amendment required?

21        A.   Because as specified here, there were

22   certain issues that needed to be addressed.

23        Q.   And what were those issues?

24        A.   As the e-mail reflects.

25        Q.   And so can you explain those issues?
```

1                    M. PATRICK - 8/13/2021

2   What does BH ownership mean?

3        A.   My understanding, BH came in as a

4   partner into this LLC.

5        Q.   Why were they brought in as a partner?

6        A.   I do not know.

7             MS. DRAWHORN:  Objection, form.

8   Again, Mr. Brown, this is reiterating my objection

9   and position earlier.  To the extent you start

10  getting into the substance of the amendment and

11  why it was amended, I think that exceeds the scope

12  of the disqualification and starts getting into

13  the substance of the underlying proof of claim and

14  objection, and I think that results in a waiver of

15  the disqualification.

16  BY MR. BROWN:

17       Q.   What did you mean when you referred to

18  Liberty CLO ownership?

19            MS. DRAWHORN:  Same objection.

20       A.   That was an additional partner.

21  BY MR. BROWN:

22       Q.   And were they ever brought in?

23       A.   Yes.

24       Q.   As part of this amendment?

25       A.   I seem to recall, yes.

1                    M. PATRICK - 8/13/2021

2          Q.    And the amendments to the cash

3     distribution and tax allocation sections?

4                MS. DRAWHORN:  Objection, form.  Same

5     objection.

6          A.    What's the question?

7     BY MR. BROWN:

8          Q.    What does that mean?

9                MS. DRAWHORN:  Same objection.

10         A.    It means those sections can be amended

11    if it's desired to be, but it has to be amended

12    before March 15th.

13    BY MR. BROWN:

14         Q.    Okay.  And in terms of the recipients

15    of this e-mail, let's see if there's -- who's

16    D. Klos?

17         A.    I don't know if this is a correct

18    title, but I think he's the -- what I would call

19    the corporate controller of Highland Capital

20    Management.  He reported to the CFO, Frank

21    Waterhouse.

22         Q.    Okay.  And Shawn Raver -- does this

23    refresh your recollection of when Shawn Raver

24    became involved?

25         A.    If the question implies was this

Page 60

1                    M. PATRICK - 8/13/2021

2       the -- I think he became involved with respect to

3       the original LLC agreement from that point

4       forward.

5            Q.    Okay.  And Frank Waterhouse?

6            A.    CFO of Highland.

7            Q.    Did he have any role at any other

8       entity that you know of that was related to

9       Jim Dondero?

10                MS. DANDENEAU:  Objection to form.

11           A.    Not specifically.

12                MR. BROWN:  If we can scroll up to

13      Mr. Patrick's e-mail of March 4, 2019, at

14      7:39 a.m.

15      BY MR. BROWN:

16           Q.    Mr. Patrick, have you seen this

17      March 4, 2019, e-mail that is from you?

18           A.    Yes.

19           Q.    When did you see it?

20           A.    I saw it yesterday and presumably I

21      saw it when I sent it.

22           Q.    Yeah.  Did you send it?

23           A.    Yes.

24           Q.    And the e-mail says:  Today?  I'd like

25      to get this to the return preparer ASAP to sign

```
 1                 M. PATRICK - 8/13/2021

 2   off on the tax allocations.  Shawn and I are both

 3   out next week and if we don't get to sign off on

 4   this, outside counsel will need to be brought in

 5   and keep fall in Paul's lap next to meet the

 6   March 15 deadline.

 7                 Can you explain what you -- what that

 8   means, why you were saying that outside counsel

 9   might need to be brought in?

10        A.   I don't -- I don't recall.  I'd have

11   to speculate.

12        Q.   Well, I want your understanding --

13   your best understanding.

14        A.   Yeah, I -- I don't recall my

15   understanding.

16        Q.   Okay.  Was outside counsel ever

17   brought in in connection with any amendments to

18   the original LLC agreement?

19        A.   I don't recall whether Hunton was

20   involved at this point or not and if that was the

21   reference.  I'm having trouble remembering what

22   that reference was.

23        Q.   Okay.

24                 MR. BROWN:  Can we please put up and

25   mark Exhibit F.
```

Page 62

1               M. PATRICK - 8/13/2021

2               (Deposition Exhibit F marked for

3      identification.)

4      BY MR. BROWN:

5          Q.   Mr. Patrick, have you ever seen what's

6      been marked as Exhibit F?

7          A.   Yes.

8          Q.   Can you tell me what it is?

9          A.   It's the First Amended and Restated

10     LLC Agreement of SE Multifamily Holdings LLC.

11         Q.   And will you understand that -- will

12     you understand that I am -- if I refer to this as

13     the amended LLC agreement, that that's what I'm

14     referring to, is this -- the Exhibit F?

15         A.   Sounds good.

16         Q.   What role did you have in connection

17     with the amended LLC agreement?

18         A.   Part of it, I was involved in

19     coordinating certain provisions and terms, I

20     recall.

21         Q.   What terms were you involved in

22     coordinating?

23         A.   Certain provisions in the tax

24     allocations.

25         Q.   Anything else?

Page 63

1                    M. PATRICK - 8/13/2021

2         A.   I cannot recall precisely.

3         Q.   Do you know if Wick Phillips had any

4    role in connection with the amended LLC agreement?

5         A.   My understanding, they had no role.

6         Q.   Did you ever have any communications

7    with Wick Phillips in connection with the amended

8    LLC agreement?

9         A.   I do not recall ever having

10   communications with Wick Phillips on this amended

11   LLC agreement.

12        Q.   And why was -- why was the LLC

13   agreement amended?

14             MS. DRAWHORN:  Objection, form.  Same

15   objection as previously stated.

16             MS. DANDENEAU:  Objection, that's

17   already answered.

18        A.   I believe it was amended to reflect

19   the understanding with respect to those issues

20   that I had previously sent an e-mail out to

21   address some of those issues.

22   BY MR. BROWN:

23        Q.   Did you represent any party as legal

24   counsel in connection with the -- let me finish

25   the question.

1                    M. PATRICK - 8/13/2021

2         A.    I'm sorry.

3         Q.    Did you represent -- well, state it

4    this way.  Is it correct that you did not

5    represent any party to the amended LLC agreement

6    as a lawyer?

7         A.    That is correct.

8         Q.    Was Highland represented by counsel in

9    connection with the amended LLC agreement?

10        A.    I do not know.

11        Q.    Was HCRE represented by counsel to the

12   amended LLC agreement?

13        A.    I do not know.

14             MR. BROWN:  Can we scroll down to the

15   signature pages, which begins at 18.

16   BY MR. BROWN:

17        Q.    So in addition to the signature of

18   James Dondero on behalf of Highland Capital

19   Management, LP, and on behalf of HCRE, there's a

20   signature line --

21             MR. BROWN:  Can we scroll one more

22   page down.

23   BY MR. BROWN:

24        Q.    There's a signature line for Liberty

25   CLO Holdco, Ltd.  Do you see that?

1                    M. PATRICK - 8/13/2021

2          A.   Yes.

3          Q.   Do you know if Liberty was represented

4    by counsel?

5          A.   I do not -- I do not know if they were

6    or were not.

7          Q.   Okay.

8               MR. BROWN:   And scroll down one more

9    page, please.

10   BY MR. BROWN:

11         Q.   And the last signature page is for

12   BH Equities, LLC.  Do you know if they were

13   represented by counsel?

14         A.   I do not know if they were or were

15   not.

16         Q.   Do you know if any negotiations --

17   well, do you know if negotiations took place

18   between HCRE and Highland concerning the terms of

19   this amended LLC agreement?

20         A.   I think my -- my answer is the same as

21   with respect to the original.  I did not view that

22   there were negotiations between Highland and HCRE.

23         Q.   So the answer is no?

24         A.   No.

25         Q.   Did you have communications with

1                    M. PATRICK - 8/13/2021

2   James Dondero in connection with the amended LLC

3   agreement?

4        A.   Yes.

5        Q.   Can you describe the nature of those

6   communications, please.

7             MS. DRAWHORN:  Objection to form.

8   Same objection as previously with regards to

9   waiver.

10       A.   To discuss the tax allocations.

11  BY MR. BROWN:

12       Q.   And did you -- were you able to make

13  any distinction with respect to what hat

14  Mr. Dondero was wearing when you communicated to

15  him; in other words, were you communicating with

16  him as a representative of HCRE or as a

17  representative of Highland or was it

18  indistinguishable in your mind?

19            MS. DANDENEAU:  Objection to form.

20       A.   My thought at the time was that I was

21  talking to Mr. Dondero, that I was aware that he

22  was the manager of HCRE as well as I was aware

23  that he was the general partner, president and

24  general partner of Highland.  That's how I thought

25  about it.

1          M. PATRICK - 8/13/2021

2    BY MR. BROWN:

3         Q.   So you were unable to make a

4    distinction?

5              MS. DANDENEAU:  Objection to form.

6         A.   I don't know what that means.

7              MR. BROWN:  Ms. Dandeneau, did you

8    want to say something?

9              MS. DANDENEAU:  No, I just wanted to

10   make sure that was the end of the question.  You

11   said so you were unable to make a distinction.  Is

12   that the entire question?

13             MR. BROWN:  I think the testimony and

14   the voices may have got confused or they were

15   confusing to me, so let me ask again.

16   BY MR. BROWN:

17        Q.   Is it correct to say that when you

18   spoke to Mr. Dondero, you were unable to make --

19   in connection with the amended LLC agreement, you

20   were unable to determine whether or not he was

21   speaking as a representative of Highland or as a

22   representative of HCRE?

23             MS. DANDENEAU:  Objection to form.

24        A.   No, I disagree with that

25   characterization.

```
1                  M. PATRICK - 8/13/2021

2   BY MR. BROWN:

3         Q.   Okay.  How were you able to

4   distinguish whether he was speaking on behalf of

5   HCRE or Highland?

6              MS. DANDENEAU:  Objection to form.

7         A.   He was making -- he was making

8   decisions, and so I guess I would distinguish

9   between whether those decisions were -- just based

10  upon his decisions.

11  BY MR. BROWN:

12        Q.   Okay.  Elaborate more on how his

13  decisions enabled you to make a distinction

14  between -- as to whether he was communicating to

15  you on behalf of Highland or HCRE.

16        A.   Yeah, I cannot recall specifically

17  offhand how.

18        Q.   So your testimony is that you are

19  unable to testify on how you made a determination

20  on whom -- on whose behalf Mr. Dondero was

21  communicating with you in connection with the

22  amended LLC agreement, correct?

23        A.   No.

24             MS. DANDENEAU:  Objection to form and

25  misstates his testimony.
```

1              M. PATRICK - 8/13/2021

2        A.   Yeah, it is kind of too vague.  If you

3    gave me something very specific, I could answer.

4    BY MR. BROWN:

5        Q.   Well, okay.  That's fine.  You're

6    saying -- the question was you're unable -- you're

7    unable to determine on whose behalf Mr. Dondero

8    was speaking when you talked to him concerning --

9    or when you communicated with him concerning the

10   amended LLC agreement, and you said that's not

11   true.  So tell me how it was you were able to make

12   a distinction.

13       A.   Based upon what he -- based upon what

14   he said.

15       Q.   Okay.  Can you give me an example of

16   what he said that enabled you to distinguish on

17   whose behalf he was communicating to you?

18       A.   I just cannot recall factually

19   specifically.  It's just more or less the

20   impression that I had in my mind.

21       Q.   Did you ever have any discussions with

22   Mr. Dondero in connection with the amended LLC

23   agreement, where you did not have an understanding

24   on whose behalf he was communicating; in other

25   words, there was -- you were unable to make a

```
 1                    M. PATRICK - 8/13/2021

 2    distinction?

 3         A.   I cannot recall specifically.

 4              MS. DANDENEAU:  Patrick, please let me

 5    make my objection for the record.

 6              Objection to form.

 7              You can go ahead and answer.

 8         A.   I just cannot recall specifically.

 9    BY MR. BROWN:

10         Q.   Is it accurate to say that there was

11    no arm's-length negotiation that took place

12    between Highland and HCRE with respect to the

13    terms of the amended LLC agreement?

14              MS. DRAWHORN:  Objection, form.

15              MS. DANDENEAU:  And objection to form,

16    and I do think that this is going well astray of

17    the motion to disqualify Wick Phillips, which is

18    what you assured me would be the topic of this

19    deposition.

20    BY MR. BROWN:

21         Q.   Do you understand the question,

22    Mr. Patrick?

23         A.   Yes.  I'm just waiting to see if I can

24    answer.

25              MS. DANDENEAU:  You can go ahead and
```

1                    M. PATRICK - 8/13/2021

2    answer.

3                    THE WITNESS:  Okay.

4         A.   Please restate the question again

5    because I want to answer it precisely because I

6    think I was formulating an answer.

7    BY MR. BROWN:

8         Q.   Were you aware of any arm's-length

9    negotiations that took place between Highland and

10   HCRE with respect to the amended LLC agreement?

11                   MS. DRAWHORN:  Objection to form.

12        A.   With respect to those two entities,

13   no.

14                   MR. BROWN:  Can we put up and mark

15   Exhibit J, please.

16                   (Deposition Exhibit J marked for

17   identification.)

18   BY MR. BROWN:

19        Q.   Mr. Patrick, this is an e-mail from

20   you dated March 4, 2019, to Paul Broaddus, copied

21   to Shawn Raver and Rick Swadley.  Did you send

22   this -- well, have you seen this e-mail before?

23        A.   Yes, I did, yesterday.

24        Q.   Did you ever see it before?

25        A.   Presumably, yes, because I believe I

Page 72

```
 1                    M. PATRICK - 8/13/2021

 2    wrote it.

 3          Q.    Okay.  Did you send this e-mail with

 4    the attachment?

 5          A.    To the best of my knowledge, I did.

 6          Q.    Okay.

 7                MR. BROWN:  Let's take a short break.

 8    You know, give me about ten minutes, and I think

 9    I'm done or almost done with my questions.

10                MS. DANDENEAU:  Thank you.

11                (Recess taken from 12:56 p.m. CDT to

12    1:04 p.m. CDT)

13                MR. BROWN:  At present I have no

14    further questions.

15                MS. DRAWHORN:  I have a few questions

16    for you, Mr. Patrick.

17                THE WITNESS:  Sorry, who is speaking?

18                MS. DRAWHORN:  This is Lauren

19    Drawhorn.  I'm with Wick Phillips.  Can you see

20    me?

21                THE WITNESS:  Okay.

22                         EXAMINATION

23    BY MS. DRAWHORN:

24          Q.    Do you need outside counsel to form an

25    entity when you were at Highland?
```

1                  M. PATRICK - 8/13/2021

2          A.   Do I need outside counsel to form an

3    entity when I was at Highland?  No.

4          Q.   Did you need -- while you were at

5    Highland, did you need outside counsel to amend a

6    limited liability company agreement?

7          A.   We're talking hypothetically, nothing

8    specifically, correct?

9          Q.   That's correct.

10         A.   Yeah.  The answer is no, we did not

11   need that.  We had sufficient internal legal help

12   in the legal department.

13         Q.   Okay.  And I'd like to -- I just had

14   one follow-up question on Exhibit I that Mr. Brown

15   looked at, and I will try and share my screen with

16   it really quick.  Can you see it up on screen?

17         A.   Yes, I can.

18         Q.   So I'm scrolling to the May -- the

19   March 4th, 2019, that you spoke about previously

20   on Exhibit I.  It's Highland136853 on the bottom

21   right.  Can you see that?

22         A.   Yes.

23         Q.   Okay.  So the e-mail from you to

24   Freddy Chang copying Shawn Raver and Paul

25   Broaddus, Mr. Brown had pointed out a sentence

1                    M. PATRICK - 8/13/2021

2    where you said:  Shawn and I are both out next

3    week and if we don't get sign off on this, outside

4    counsel will need to be brought in.

5              Who -- what -- who would outside

6    counsel have been?  Would that have been Hunton?

7              MS. DANDENEAU:  Objection to form.

8         A.   Again, I'm not sure.  I just don't

9    remember what I was thinking when I wrote that.

10   BY MS. DRAWHORN:

11        Q.   Okay.  But it would not have been

12   Wick Phillips, correct?

13        A.   I didn't even know -- that is correct.

14             MS. DRAWHORN:  I have no further

15   questions, and I will try to see if I can figure

16   out how to stop sharing.  Hold on.  How do I stop

17   sharing the screen?

18             MS. CANTY:  At the top, there should

19   be a red little bar that says stop share.  Just

20   rub your mouse over the -- hover it over the top

21   of your screen and see if you see it.

22             MS. DRAWHORN:  There we go.  Thank

23   you.

24             MS. CANTY:  You're welcome.

25             MR. BROWN:  No further questions from

Supp. App. 0470

1              M. PATRICK - 8/13/2021

2    me.

3              MS. DANDENEAU:  Thank you.

4              MR. BROWN:  Thank you-all.

5              MS. DANDENEAU:  No questions.  No

6    questions from Baker McKenzie either.

7              MS. DRAWHORN:  And no further

8    questions from Wick Phillips.

9                   (Deposition concluded at

10   1:08 p.m. CDT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Supp. App. 0471

```
1            C E R T I F I C A T E

2

3      STATE OF _____)
                             )
4                            )  ss.:
                             )
5      COUNTY OF _____)

6

7            I, MICHEAL A. JOHNSON, a Notary

8      Public within and for the State of Texas, do

9      hereby certify:

10           That MARK PATRICK, the witness whose

11     deposition is hereinbefore set forth, was duly

12     sworn by me and that such deposition is a true

13     record of the testimony given by such witness.

14           I further certify that I am not

15     related to any of the parties to this action by

16     blood or marriage; and that I am in no way

17     interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19     set my hand this 13th day of August, 2021.

20

21

22     _____

23           MICHEAL A. JOHNSON, RDR, CRR

24

25
```

```
 1    -------------------- I N D E X --------------------

 2    EXAMINATION OF MARK PATRICK:

 3    BY MR. BROWN                                        5

 4    BY MS. DRAWHORN                                     72

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Supp. App. 0473

Page 78

```
1     --------------- E X H I B I T S ----------------

2     NUMBER              DESCRIPTION              MARKED

3     Exhibit B      Limited Liability Company         20
                     Agreement, August 23,
4                    2018

5     Exhibit C      Bridge Loan Agreement             49
                     dated as of September 26,
6                    2018

7     Exhibit D      09/17/2018 through                52
                     09/18/2018 E-mail Chain,
8                    with Attachment

9     Exhibit E      07/27/2018 through                54
                     08/01/2018 E-mail Chain,
10                   with Attachments
                     Highland263740 -
11                   Highland263768

12    Exhibit F      First Amended and                 62
                     Restated Limited
13                   Liability Company
                     Agreement, Dated as of
14                   March 15, 2019

15    Exhibit G      08/23/2018 E-mail, Paul           41
                     Broaddus to Helen Kim
16                   Highland209134

17    Exhibit H      07/27/2018 through                46
                     07/30/2018 E-mail Chain,
18                   with Attachments
                     Highland246786 -
19                   Highland246818

20    Exhibit I      02/28/2019 through                56
                     03/04/2019 E-mail Chain,
21                   with Attachments
                     Highland136853 -
22                   Highland136883

23    Exhibit J      03/04/2019 E-mail, Mark           71
                     Patrick to Paul Broaddus,
24                   with Attachment
                     Highland136795 -
25                   Highland136822
```

Supp. App. 0474

Page 79

1                         ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads      Should Read  Reason

6  ____ ____ _____    _____   _____

7  ____ ____ _____    _____   _____

8  ____ ____ _____    _____   _____

9  ____ ____ _____    _____   _____

10 ____ ____ _____    _____   _____

11 ____ ____ _____    _____   _____

12 ____ ____ _____    _____   _____

13 ____ ____ _____    _____   _____

14 ____ ____ _____    _____   _____

15 ____ ____ _____    _____   _____

16 ____ ____ _____    _____   _____

17 ____ ____ _____    _____   _____

18 ____ ____ _____    _____   _____

19 ____ ____ _____    _____   _____

20

21                        _____
                          Signature of Deponent

22 SUBSCRIBED AND SWORN BEFORE ME

23 THIS _____ DAY OF _____, 2021.

24 _____

25 (Notary Public)   MY COMMISSION EXPIRES:_____