# EXHIBIT 88

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) *(admitted pro hac vice)*
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) *(admitted pro hac vice)*
Hayley R. Winograd (NY Bar No. 5612569) *(admitted pro hac vice)*
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## HIGHLAND CAPITAL MANAGEMENT L.P.'S NOTICE
## OF SUBPOENA DIRECTED TO BARKER VIGGATO LLP

**PLEASE TAKE NOTICE** that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, made applicable herein by Rule 9016 of the Federal Rules of Bankruptcy Procedure,

Highland Capital Management, L.P., the reorganized debtor ("Highland" or the "Reorganized

Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), by and through its

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and
service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

undersigned counsel, shall cause the *Subpoena to Appear and Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding)*, a copy of which is attached as **Exhibit A**, to be served upon Barker Viggato LLP for (i) the production of documents on or before **July 25, 2022** at 5:00 p.m. (Central Time), or at such other day and time as Highland may agree in writing; and (ii) a virtual appearance at a deposition on **July 28, 2022** commencing at 9:30 a.m. (Central Time), or at such other day and time as Highland may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

**The deposition will be taken remotely** via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.  Parties who wish to participate in the deposition should contact John A. Morris, Pachulski Stang Ziehl & Jones LLP, at jmorris@pszjlaw.com **no fewer than 72 hours before the start of the deposition** for more information regarding participating in this deposition remotely.

*[Remainder of Page Intentionally Left Blank]*

Dated:  July 1, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

Case 19-34054-sgj11 Doc 3859-88 Filed 07/04/22 Entered 07/04/22 09:42:17 Page 5 of 42
Case 19-34054-sgj11 Doc 3590-88 Filed 07/04/22 Entered 07/04/22 09:48:21 Page 6 of 42
Exhibit 88 Page 6 of 43

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF TEXAS

In re HIGHLAND CAPITAL MANAGEMENT, L.P.
Reorganized Debtor

Case No. 19-34054-sgj11

*(Complete if issued in an adversary proceeding)*

Chapter 11

Plaintiff
v.

Adv. Proc. No.

Defendant

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Barker Viggato LLP, 17300 Dallas Parkway, Suite 3035, Dallas, TX 75248

*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters:

| PLACE | DATE AND TIME |
|---|---|
| Deposition will be conducted virtually through Zoom | July 28, 2022 at 9:30 a.m. (CT) |

The deposition will take place before a court reporter and will be recorded by stenographic means, may be videotaped, and shall continue from day to day until it has been completed.

☒ *Production*: **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or object at the place, date and time specified below: **See Exhibit A attached.**

| PLACE: Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017, Attn: John A. Morris, Esq. | DATE AND TIME<br>July 25, 2022 at 5:00 pm Central Time |
|---|---|

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: June 30, 2022

CLERK OF COURT

OR

/s/ John A. Morris

Signature of Clerk or Deputy Clerk     Attorney's signature
John A. Morris, Esq.

The name, address, email address, and telephone number of the attorney representing *(name of party)* Highland Capital Management, L.P. , who issues or requests this subpoena, are:

John A. Morris, Esq., Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Fl, New York, NY 10017

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).


American LegalNet, Inc.
www.FormsWorkFlow.com

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any):* _____

on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

Barker Viggato LLP _____

_____ on *(date)* _____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.


      I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

American LegalNet, Inc.
www.FormsWorkFlow.com

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2)For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B)Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)


American LegalNet, Inc.
www.FormsWorkFlow.com

# **EXHIBIT A**

## **INSTRUCTIONS**

1.      For each Document (as defined below) withheld by reason of a claim of privilege, provide a privilege log identifying such Document together with:  (a) the date of the Document; (b) the identity of the author or preparer; (c) the identity of each person who was sent or furnished with the Document or who received or had possession or custody of the Document; (d) a description of the Document, including identification of any attachments or appendices; (e) a statement of the basis of the claim of privilege; and (f) the paragraph of this request to which the Document is responsive.  In the case of Documents concerning a meeting or conversation, identify all participants in the meeting or conversation.

2.      Each Document shall be produced in a fashion that indicates clearly the file in which it was located.

3.      If a Document cannot be produced in full, produce it to the extent possible, identify the portion that cannot be produced, and specify the reasons for Your (as defined below) inability to produce the remainder.

4.      You are required to produce ESI (as defined below) in searchable form on DVDs, CD-ROMs or other media to be mutually agreed by the parties.

5.      Documents may be produced in paper format or electronically.  If Documents are produced electronically, or if any ESI is produced, the following formatting should be used:

- Use .tif format for all Documents that were not originally in Excel format, in which case, use .xls or .xlsx format;


American LegalNet, Inc.
www.FormsWorkFlow.com

- If possible, without creating undue delay, please produce Documents in Summation-ready DVDs, CD-ROMs or other media to be mutually agreed by the parties with .tiff and text format, and with a Summation load file; and

- Transmit electronic Documents or ESI on DVDs, CD-ROMs or other media to be mutually agreed by the parties, or use an ftp site upload.

6. These Requests shall be deemed continuing and supplemental answers shall be required if You directly or indirectly obtain further information after Your initial response as required by Fed. R. Bankr. P. 7026(e).

7. The use of either the singular or plural shall not be deemed a limitation. The use of the singular includes the plural, and vice versa.

8. Unless otherwise noted, the requests for documents set forth herein seeks Documents and Communications created between January 1, 2018 and the date of Your responses to these Requests.

## DEFINITIONS

1. "Amended LLC Agreement" means the *First Amended and Restated Limited Liability Company Agreement for SE Multifamily Holdings LLC*, dated as of March 15, 2019, effective as of August 23, 2018, among Highland Capital Management, L.P. ("Highland"), NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("HCRE"), and BH Equities, LLC ("BH Equities") with respect to SE Multifamily, a copy of which is attached hereto as Exhibit 1.

2. "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails,


American LegalNet, Inc.
www.FormsWorkFlow.com

pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

       3.    "<u>Concerning</u>" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

       4.    "<u>Document</u>" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

       5.    "<u>ESI</u>" has the meaning ascribed to it in Federal Rules of Civil Procedure 16, 26, and 34(a).

       6.    "<u>HCRE</u>" means HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners LLC).

       7.    "<u>Members</u>" shall have the meaning ascribed to that term in the Amended LLC Agreement.

       8.    "<u>SE Multifamily</u>" means SE Multifamily Holdings, LLC.

       9.    "<u>You</u>" or "<u>Your</u>" refers to Barker Viggato LLP and anyone acting on Your behalf.

American LegalNet, Inc.
www.FormsWorkFlow.com

### DOCUMENT REQUESTS

**Request No. 1:**

All Documents and Communications Concerning each Member's respective interest in SE Multifamily.

**Request No. 2:**

All tax returns, including all draft tax returns, prepared for SE Multifamily.

**Request No. 3:**

All K-1s, including draft K-1s, prepared for each Member of SE Multifamily.

**Request No. 4:**

All Documents and Communications Concerning any distributions or allocations by SE Multifamily to any of its Members.

**Request No. 5:**

All Documents and Communications Concerning the allocation of SE Multifamily's profits and losses to each of its Members.

**Request No. 6:**

All Documents and Communications Concerning any statement, suggestion, assertion, or allegation made at any time by HCRE that there was any error in the Amended LLC Agreement.

**Request No. 7:**

All Documents and Communications Concerning any statement, suggestion, assertion, or allegation made at any time by HCRE that the Amended LLC Agreement did not accurately describe the respective interests of each Member in SE Multifamily.

**Request No. 8:**

All Documents and Communications describing, reflecting, or stating SE Multifamily's profits or losses for each year since 2018.



## RULE 30(b)6 TOPICS

**Topic No. 1:**

Each Member's respective interest in SE Multifamily.

**Topic No. 2:**

SE Multifamily's tax returns, including all draft tax returns.

**Topic No. 3:**

All K-1s, including draft K-1s, prepared for each Member of SE Multifamily.

**Topic No. 4:**

Any distributions or allocations by SE Multifamily to any of its Members.

**Topic No. 5:**

The allocation of SE Multifamily's profits and losses to each of its Members.

**Topic No. 6:**

Any statement, suggestion, assertion, or allegation made at any time by HCRE that there was any error in the Amended LLC Agreement.

**Topic No. 7:**

Any statement, suggestion, assertion, or allegation made at any time by HCRE that the Amended LLC Agreement, including Schedule A annexed thereto, did not accurately describe the respective interests of each Member in SE Multifamily.

**Topic No. 8:**

SE Multifamily's profits or losses for each year since 2018.



# EXHIBIT 1

**SE Multifamily Holdings LLC**
(A Delaware Limited Liability Company)

FIRST AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

Dated as of March 15, 2019

to be effective as of

August 23, 2018

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.

# SE MULTIFAMILY HOLDINGS LLC

# FIRST AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

THIS FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of SE Multifamily Holdings LLC, a Delaware limited liability company (the "Company"), is entered into as of March 15, 2019, to be effective as of August 23, 2018 (the "Effective Date"), by Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP"), HCRE Partners, LLC, a Delaware limited liability company ("HCRE"), BH Equities, LLC ("BH"), and Liberty CLO HoldCo, Ltd., a Cayman Islands company ("Liberty"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with HCMLP, HCRE, BH and Liberty, the "Members").

## RECITALS

WHEREAS, the Company was formed by virtue of its Certificate of Formation, filed with the Secretary of State of the State of Delaware on August 23, 2018, and the Company's original limited liability company agreement dated August 23, 2018, pursuant to the terms of the Act.

WHEREAS, BH has acquired membership interests in the Company and each Member holds the membership interests set forth opposite its name on Schedule A.

WHEREAS, Liberty has acquired a preferred membership interest in the Company on the terms set forth herein and as set forth on Schedule A.

WHEREAS, the Members deem it desirable to, and do hereby, amend and restate in its entirety the Company's original limited liability company agreement as hereinafter provided in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
Organization

1.1     Formation; Continuance.  The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act").  The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on August 23, 2018, and shall continue for the period of duration

set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with Article 9.

 1.2 Name.  The name of the Company is SE Multifamily Holdings LLC. The Manager may change the name of the Company from time to time.  In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

 1.3 Purpose.  The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate-related investment property; (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable; and (iii) conduct any business or activity related to the foregoing activities that may lawfully be conducted by a limited liability company organized under the Act. Any or all of the foregoing activities may be conducted directly by the Company or indirectly through another limited liability company, partnership, joint venture or other arrangement.

 1.4 Registered Office and Agent; Principal Place of Business.  The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Company's registered agent at such address is The Corporation Trust Company.  The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201.  The Manager may change such registered agent, registered office or principal place of business from time to time.  In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change.  The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

 1.5 No State-Law Partnership.  The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

 1.6 Management, Control and Voting Rights Vested Solely in HCRE and the Manager. HCRE shall have the exclusive right to appoint the Manager and the Manager shall have unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement.

 1.7 Company Ownership: 47.94% to HCRE, 46.06% to HCMLP, and 6% to BH. Except with respect to particular items specified in this Agreement, HCRE shall have 47.94% ownership interest, HCMLP shall have a 46.06% ownership interest, and BH shall have a 6% ownership interest, respectively, in all assets and activities of the Company, including, without limitation, rights to receive distributions of cash and assets in-kind in the process of winding down and liquidating the Company pursuant to Article 9 of this Agreement.

1.8    <u>Anti-Consolidation For HCMLP</u>.  In the event that this Agreement at any time is interpreted to require consolidation of the Company with HCMLP under Generally Accepted Accounting Principles ("GAAP"), the Members agree to retroactively or prospectively, as the case may be,  amend this Agreement and to reallocate any economic or other items between HCMLP and HCRE to the extent necessary to cause the Company not to be consolidated with HCMLP for GAAP purposes and to the extent the reallocation involves items shared by percentage interests, the reallocation shall be made in an amount that is 1% more than the minimum reallocation necessary to cause the Company not to be consolidated for GAAP purposes with HCMLP. Any amendment or reallocation made pursuant to this <u>Section 1.8</u>  shall be made in accordance with the Treasury Regulations under Code Section 704(b).

ARTICLE 2
Capital Contributions

2.1    <u>Initial Capital Contributions</u>.  Each Member has made capital contributions as of the Effective Date in the amounts that are set forth next to such Member's name on <u>Schedule A</u> hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2    <u>Additional Capital Contributions</u>.

(a)    The Manager may call capital contributions at any time from Liberty, up to a maximum cumulative amount of $16,000,000, in order to carry out the business of the Company as set forth in <u>Section 1.3</u>; <u>provided</u>, <u>however</u>, that the Company shall issue "Class B Preferred Membership Interests" in exchange for any additional capital contributions made under this Section 2.2(a). On each occasion the Manager desires that Liberty make additional capital contributions to the Company, the Manager shall give Liberty a written notice (a "<u>Funding Notice</u>") that shall include (i) the aggregate amount of additional capital contributions required, (ii) the date by which such additional capital contributions are required to be funded, and (iii) the address where additional capital contributions shall be sent. No other Member shall be required to make capital contributions at any time for any reason.  Schedule A hereto includes the current capital contributions made in consideration for Preferred Membership Interests and shall be amended from time to time to reflect additional capital contributions made in consideration for the issuance of additional Preferred Membership Interests.

(b)    The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

2.3    <u>No Return of Capital Contributions</u>.  No Member shall be entitled to a withdrawal or return of its capital contributions.  Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4    <u>No Interest</u>.  No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5    <u>Member Loans</u>.  If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members.  Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6    <u>Capital Accounts</u>.

(a)    The Company shall maintain a separate capital account (a "<u>Capital Account</u>") for each Member in accordance with the following provisions:

(i)    to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii)    to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)    if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv)    in determining the amount of any liability for purposes of <u>Sections 2.6(a)(i)</u> and <u>2.6(a)(ii)</u>, Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b)    This <u>Section 2.6</u> as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; <u>provided, however</u>, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this <u>Article 2</u>.  If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; <u>provided, however</u>, that such modification is

not likely to have a material effect on the amounts distributed to any person pursuant to Article 9 upon the dissolution, liquidation and termination of the Company. In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

ARTICLE 3
Rights and Obligations of the Manager

3.1    Initial Manager; Term; Vacancies; Resignation; Removal. The initial manager of the Company (the "Manager") shall be James Dondero, in his capacity as an officer of HCRE. The Manager shall hold office for so long as HCRE is a member of the Company. Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of HCRE so long as HCRE is a member of the Company.

3.2    Management. The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3    Powers. Subject to Section 3.4, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

(a)    to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

(b)    to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

(c)    to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

(d)    to establish reserves for contingencies and for any other proper purpose;

(e)    to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

(f)    to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

(g)    to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

(h)    to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

(i)    to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

(j)    to negotiate and effect a merger or consolidation of the Company with any other entity;

(k)    approve any transaction entered into by the Company and any Member, or affiliate of any Member;

(l)    to develop an annual budget and to approve any deviations from such budget;

(m)    to appoint a "partnership representative" for purposes of interacting with, and representing the Company before, the Internal Revenue Service; and

(n)    to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4    <u>Limitations on Manager's Authority</u>.  Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of HCRE:

(a)    enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

(b)    issue additional membership interests in the Company;

(c)    sell the Company or sell all or substantially all assets of the Company;

(d)    admit new Members to the Company;

(e)    permit a transferee of an interest in the Company to become a substitute Member of the Company under Section 7.3;

(f)    borrow funds or otherwise commit the credit of the Company; or

(g)    take any action that requires the approval of HCRE under the terms of this Agreement or the Act.

3.5    Liability of Manager.  No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6    Other Activities.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7    Officers.  The Manager may appoint and remove officers of the Company in his sole discretion.

3.8    Reimbursement.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.

3.9    Replacement of Manager.  Subject to Section 3.1, in the event that the Manager resigns for any reason, a replacement Manager may be appointed by HCRE.

ARTICLE 4
Rights and Obligations of Members

4.1    No Authority.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to an officer pursuant to Section 3.7); provided, however, that nothing contained in this Section 4.1 shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2    Liability of Members.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3    Consents and Limited Voting Rights.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager.  In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of HCRE.

8

ARTICLE 5
Exculpation and Indemnification

5.1    Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or otherwise to the Company or any Member by reason of, arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2    Limitation of Liability.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3    Indemnification.

(a)    Indemnifiable Claims.  The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b)    Satisfaction; Capital Contributions.  The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company.  No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c)    Advancement of Expenses.  Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; provided, however, that the affected Covered Person

shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this <u>Section 5.3</u>.

(d)    <u>Successors; Remedies</u>.  The indemnification provided by this <u>Section 5.3</u> shall be in addition to any other rights to which any Covered Person may be entitled, in any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person.  This <u>Section 5.3</u> shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)    <u>Amendment</u>.  Any repeal or amendment of this <u>Section 5.3</u> shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this <u>Section 5.3</u>.

5.4    <u>Other Agreements</u>.  Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this <u>Article 5</u> shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5    <u>Guaranties</u>.  As used in this Agreement, a "<u>Guaranty</u>" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries.  No Member or Affiliate shall be required to execute any Guaranty.

ARTICLE 6
Distributions and Allocations

6.1    <u>Distributions of Cash</u>.

(a)    <u>Distributable Cash</u>.    Except as otherwise specifically provided in this Article 6 and Article 9, all Distributable Cash shall be distributed (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH, at such time and in such amounts as determined by the Manager.

(b)    <u>Net Cash from Specified Company Assets</u>. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the

Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(c)    Notwithstanding <u>Sections 6.1(a) and (b)</u>, if any class of "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution may, as determined in the sole discretion of the Manager, be distributed to Liberty with respect to one or more classes of Liberty's Preferred Membership Interest until Liberty has received cumulative distributions under this <u>Sections 6.1(c)</u> equal to the sum of (i) Liberty's capital contributions with respect to such Preferred Membership Interest, and (ii) with respect to Liberty's Class A Preferred Membership Interest, a 12 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest or, with respect to Liberty's Class B Preferred Membership Interest, a 6.25 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest.

(d)    <u>Distributions in Kind</u>.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to <u>Section 6.1(b)</u> or <u>Section 9.3</u>, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(e)    Notwithstanding Sections 6.1(a), 6.1(b), 6.1(c) and 6.1(d), the first amounts of any Distributable Cash shall be deemed distributed to each Member (i) in proportion to the amounts paid by the Company directly to any lender on behalf of such Member to pay principal and interest on any loan incurred by such Member to fund such Member's capital contributions to the Company until such loans are fully extinguished, then (ii) pro rata in proportion to the Members' respective Capital Accounts until the Members' respective Capital Accounts are reduced to zero.

6.2    <u>Restrictions on Distributions</u>.    Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

6.3    <u>Withholding Taxes</u>.  Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that he determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person.  Without limiting the provisions of this <u>Section 6.3</u>, if any such withholding requirement in respect of any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.  The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite,

combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid. Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law.  Notwithstanding the foregoing provisions of this Section 6.3, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4    Allocations of Profits and Losses.  Profits and Losses shall be allocated as follows:

(a)    Except as provided in Sections 6.4(b), (c) and (d) and after the special allocations set forth in Sections A.III.2 and A.III.3 of Schedule B, Profits and Losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated 94% to HCMLP and 6% to BH.

(b)    Notwithstanding Section 6.4(a), Profits (and any items related thereto) shall be allocated to Liberty until the aggregate amount of Profits allocated to Liberty pursuant to this Section 6.4(b) equals the amount that has been distributed to Liberty pursuant to Section 6.1(c)(ii).

(c)    Notwithstanding Section 6.4(a), Losses (and any items related thereto) shall be allocated to Liberty, until the aggregate amount of Losses allocated to Liberty pursuant to this Section 6.4(c) equals the aggregate amount of Profits previously allocated to Liberty pursuant to Section 6.4(b).

(d)    All Profits and Losses with respect to each Specified Company Asset will be allocated in accordance with each Member's Capital Percentage Interest in such Specified Company Asset.

ARTICLE 7
Admissions, Transfers and Withdrawals

7.1    Admissions.  New Members may be admitted to the Company only with the written consent of, and upon such terms and conditions as are approved by, HCRE in accordance with Section 3.3.  Substituted Members shall not be deemed new Members for purposes of this Section 7.1.

7.2    Transfer of Membership Interests.

(a)    No Transfers Without Consent.  No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with Section 3.3; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee.  For purposes hereof, "Permitted Transferee" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

12

(b)    Death, Bankruptcy, etc. of Member.    In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)    the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in Section 9.1;

(ii)    such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in Section 7.3, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)    the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)    the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)    any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3    Substitution.    A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with Section 3.4, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member.  Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4    Withdrawal.    Except as permitted by this Section 7.4, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with Section 7.3, and (b) after executing an indemnification agreement that indemnifies the Company for such Member's allocable share

of any tax arising during any tax period when such Member held a membership interest in the Company as a result of an adjustment issued by the IRS to the Company subsequent to such Member's withdrawal.

ARTICLE 8
Accounting and Tax Matters

8.1    Fiscal Year.    The fiscal year of the Company ("fiscal year") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required.  The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2    Books of Account; Tax Returns.    The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations, business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act.  Except as otherwise expressly provided in this Agreement, such books and records shall be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the: Manager be prepared on either a cash basis or accrual basis.

8.3    Place Kept; Inspection.    The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during the ordinary business hours of the Company.

ARTICLE 9
Dissolution, Liquidation and Termination

9.1    Dissolution.    The Company shall be dissolved upon the first to occur of the following events ("Dissolution Events"):  (i) the election of the Manager to dissolve the Company at any time in accordance with Section 3.3; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

9.2    Accounting.    After the dissolution of the Company pursuant to Section 9.1, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date.  The Manager shall serve as liquidator of the Company.  If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members.  The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity.  The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

9.3    Liquidation.    As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business),

14

after the dissolution of the Company pursuant to Section 9.1, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company. Subject to Section A.III.4 of Schedule B, the proceeds of such liquidation shall be applied in the following order of priority:

        (a)      first, in payment of the expenses of the liquidation;

        (b)      second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

        (c)      third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans);

        (d)      fourth, to the Members in accordance with Sections 6.1(b) and (c); and

        (e)      thereafter, (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH.

        9.4     Termination. At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the Comptroller of the State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "Tax Certificate"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

        9.5     No Deficit Capital Account Restoration Obligation. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

        9.6     No Other Cause of Dissolution. The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this Article 9.

ARTICLE 10
Miscellaneous Provisions

        10.1    Amendments and Waivers. This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and HCRE (a copy of which shall be promptly sent by the Manager to all the Members). For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in Section 1.3, (d) change any provision of this Agreement requiring the approval of HCRE or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the

15

Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2    Binding Effect.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3    Counterparts.  This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4    Entire Agreement.  This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6    Venue.  To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7    Notices.  All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on Schedule A, and if to the Company, at the address of its principal place of business referred to in Section 1.4, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this Section 10.7.  Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this Section 10.7 shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent.  Notwithstanding the foregoing provisions of this Section 10.7 (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8    Remedies Cumulative No Waiver.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  No delay or omission on the part of any party hereto, whether in one or more

instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9    <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law.  Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.10    <u>Waiver of Partition</u>.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., General Partner

By:    _____
Name: James D. Dondero
Title:  President

HCRE PARTNERS, LLC

By:    _____
Name: James D. Dondero
Title:  Manager

LIBERTY CLO HOLDCO, LTD.

By:    _____
Name:
Title

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., General Partner

By:    _____
Name: James D. Dondero
Title:  President

HCRE PARTNERS, LLC

By:    _____
Name: James D. Dondero
Title:  Manager

LIBERTY CLO HOLDCO, LTD.

By:    _____
Name:  GRANT SCOTT
Title   DIRECTOR

18

BH EQUITIES, LLC


By: _____

Name: Ben Roby

Title: Authorized Officer

## Schedule A

### Capital Contributions and Percentage Interests

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $    291,146,036 | 47.94% |
| Highland Capital Management, L.P. | $    49,000 | 46.06% |
| BH Management | $    21,213,721 | 6.00% |

### Class A Preferred Interests

| Member Name | Capital Contribution | Class A Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $    5,808,603 | 100% |

### Class B Preferred Interests

| Member Name | Capital Contribution | Class B Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $___ | 100% |

### Capital Percentage Interests in Specified Company Assets

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
|  |  |
|  |  |

## Schedule B

## Allocations

A.I.    *Definitions*.  Capitalized terms used and not defined in this Schedule B have the meanings ascribed to them in the Agreement, of which this Schedule B forms a part.  As used in this Schedule B, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)    Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; *provided, however,* if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and *provided, further,* if the Company is utilizing the remedial allocation method under Regulations Section 1.704-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule B.

"Capital Percentage Interest" means, with respect to each Member, and with respect to each Specified Company Asset, the designated percentage listed next to such Member's name, in respect of such Specified Company Asset, on Schedule A, attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and the rulings issued thereunder.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Distributable Cash" means all cash, revenues and funds received by the Company (including, without limitation, from sales, refinancings and other dispositions of Company property), less the sum of the following: (i) all cash expenditures incurred in the operation of the Company's business; (ii) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; and (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Distributable Cash shall include all principal and interest payments received by the Company with respect to any note or other obligation in connection with sales or other dispositions of Company property.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)     the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)     the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.704-1(b)(2)(ii);

(c)     the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)     the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)     if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; provided that items of Profit and Loss specially allocated to a Member pursuant to Section 6.4 of the Agreement and Sections A.III.2 and A.III.3 of this Schedule B shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d)     In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e)     Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(f)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to
Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-
1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining
Capital Accounts as a result of a distribution other than in complete liquidation of a
Member's membership interest, the amount of such adjustment shall be treated as an item
of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment
decreases the basis of the asset) from the disposition of the asset and shall be taken into
account for purposes of computing Profits or Losses.

"Specified Company Asset" means any capital asset owned by the Company with
respect to which the Members have agreed to share proceeds from a sale, refinancing or other
disposition thereof in a sharing ratio set forth with respect to each such Specified Company Asset
from time to time on Schedule B.

A.II.    *Members' Capital Accounts.*

1.      There shall be established for each Member on the books and records of the
Company a Capital Account.  Each Member's initial Capital Account shall be zero and, without
limiting the generality of the foregoing, shall be adjusted as follows:

(a)     To each Member's Capital Account there shall be credited such Member's Capital
Contributions (net of any liabilities assumed by the Company or which are secured by
any property contributed by such Member), such Member's distributive share of Profits
and any items in the nature of income or gain which are specially allocated pursuant to
Sections A.III.2 and A.III.3.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the
Gross Asset Value of any property distributed to such Member pursuant to any provision
of this Agreement (net of any liabilities assumed by the Member or which are secured by
any property distributed to such Member by the Company), such Member's distributive
share of Losses and any items in the nature of expenses or losses which are specially
allocated pursuant to Sections A.III.2 and A.III.3.

2.      The foregoing provisions and the other provisions of this Agreement relating to the
maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation
Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations
thereunder, and shall be interpreted and applied in a manner consistent with such statutory and
regulatory provisions.

3.      In the event all or a portion of an Interest in the Company is transferred in
accordance with the terms of Section 7.2, the transferee shall succeed to the Capital Account of
the transferor to the extent it relates to the transferred interest, adjusted as required by the
aforementioned Treasury Regulations.

A.III.   *Allocations.*

1.      *Reserved.*

2.      *Special Allocations.*   The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)      *Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.7042(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations.  This Section A.III.2(a) is intended to comply with the minimum gain Chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)      *Member Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)      *Qualified Income Offset.*  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule B have been tentatively made as if this Section A.III.2(c) were not in the Agreement.  This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)      *Nonrecourse Deductions.*  Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)      *Member Nonrecourse Deductions.*  Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt to which such Member

---

5

Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3.      *Curative Allocations.*  The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3.   Therefore, notwithstanding any other provision of this Schedule B (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 6.4.  In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A in that, although not yet made, are likely to offset other Regulatory Allocations previously made.

4.      *Liquidating Allocations*.  It is intended that immediately prior to a distribution of proceeds from liquidation of the Company pursuant to Article 9 of this Agreement, the positive Capital Account balance of each Member shall be equal to the total amount that such Member would receive upon a liquidation pursuant to Section 6.1.  Accordingly, to the extent permissible under Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, Profits and Losses and, if necessary, items of gross income, gain, deduction, and loss, of the Company for the year of liquidation (or, if the liquidation or event spans more than a year, each such year) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive upon a liquidation pursuant to Section 6.1.  Notwithstanding the foregoing, to the extent a Member has been allocated Profits pursuant to Section 6.4(a) in excess of the amount of distributions received by such Member under Section 6.1(a), then such Member shall receive the first amount of distributions under Section 9.3(e), in proportion to the amount of the excess, until such excess has been eliminated, provided, that the aggregate amount of distributions pursuant to Section 9.3(e) upon a liquidation shall as close as possible be in proportion to the percentage shares set forth in Section 9.3(e).

A.IV.   *Other Allocation Rules*.

1.      For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits.  Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2.      The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to, the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3.      Tax Allocations: Code Section 704(c).

(a)     For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule B except as otherwise provided in this Section A.IV.3.

(b)     Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company.  Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)     In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)     Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.     *Company Representative*.

        The partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager.  (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative").  The Company Representative shall inform HCRE of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity.  The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law.  Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager.  If any Member intends to flea notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.     *Tax Elections*.

1 .    The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.