Charles W. Gameros, Jr.
State Bar No. 00796956
Douglas Wade Carvell
State Bar No. 00796316
HOGE & GAMEROS, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  214-765-6002
Facsimile:  214-559-4905

**ATTORNEYS FOR NEXPOINT REAL ESTATE PARTNERS, LLC,**
**f/k/a HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | |
| Movant, | § | |
| | § | **Contested Matter** |
| v. | § | |
| | § | |
| **NEXPOINT REAL ESTATE** | § | |
| **PARTNERS, LLC, F/K/A HCRE** | § | |
| **PARTNERS, LLC,** | § | |
| | § | |
| Respondent. | § | |

### NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC WITNESS AND EXHIBIT LIST WITH RESPECT TO EVIDENTIARY HEARING TO BE HELD ON NOVEMBER 1 AND 2, 2022

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or "Claimant") files its list of potential witness and exhibits with respect to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims [Dkt. No. 906] as it relates to NREPS's Claim No 146, which the Court has set for hearing at 9:30 a.m. on November 1 and 2, 2022 (Central Time) in the above-styled bankruptcy case.

Respectfully submitted,

*/s/ Charles W. Gameros, Jr.*
Charles W. Gameros, Jr., P.C.
State Bar No. 00796596
Douglas Wade Carvell, P.C.
State Bar No. 00796316

HOGE & GAMEROS, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone: (214) 765-6002
Telecopier: (214) 559-4905
E-Mail BGameros@LegalTexas.com
WCarvell@LegalTexas.com

**ATTORNEYS FOR
NEXPOINT REAL ESTATE PARTNERS, LLC,
F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

This is to certify parties which have so registered with the Court, including counsel for the Debtor, the United States Trustee, and all persons or parties requesting notice and service shall receive notification of the foregoing via the Court's ECF system, and are considered served pursuant to the Administrative Procedures incorporated into the Order Adopting Administrative Procedures for Electronic Case Filing, General Order 2003-01.2.

*/s/ Charles W. Gameros, Jr.*
Charles W. Gameros, Jr., P.C.

# I.

## POTENTIAL WITNESSES

(1)     James Dondero

(2)     Mark Patrick

(3)     Matt McGraner

(4)     Tim Cournoyer

(5)     David Klos

(6)     Mark Barker (through deposition testimony only)

(7)     Dustin Thomas (through deposition testimony only)

(8)     Any witness designated or called by any other party

(9)     Any rebuttal or impeachment witnesses

# II.

## CLAIMANTS' POTENTIAL EXHIBITS

| Exhibit | Desc. | ID | Offer | Obj. | Stip. | Admit |
|---|---|---|---|---|---|---|
| Claimant's 1 | LLC Agreement | Patrick Exh. 2 | | | | |
| Claimant's 2 | First Amended LLC Agreement | Patrick Exh. 4 | | | | |
| Claimant's 3 | Proof of Claim No. 146 | Claim 146 | | | | |
| Claimant's 4 | Bridge Loan Agreement | Dondero Exh. 3 | | | | |
| Claimant's 5 | Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims | Dkt. No. 906 | | | | |

| Exhibit | Desc. | ID | Offer | Obj. | Stip. | Admit |
|---|---|---|---|---|---|---|
| Claimant's 6 | NexPoint Real Estate Partners, LLC's Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims | Dkt. No. 1212 | | | | |
| Claimant's 7 | Disclosure Statement for Fifth Amended Plan | Dkt. No. 1473 | | | | |
| Claimant's 8 | Notice of Executory Contracts to be Assumed | Dkt. No. 1648 | | | | |
| Claimant's 9 | Second Notice of Executory Contracts to be Assumed | Dkt. No. 1719 | | | | |
| Claimant's 10 | Third Notice of Executory Contracts to be Assumed | Dkt. No. 1749 | | | | |
| Claimant's 11 | Fifth Amended Plan of Reorganization | Dkt. No. 1808 | | | | |
| Claimant's 12 | Fourth Notice of Executory Contracts to be Assumed | Dkt. No. 1847 | | | | |
| Claimant's 13 | Fifth Notice of Executory Contracts to be Assumed | Dkt. No. 1873 | | | | |
| Claimant's 14 | Order Confirming Fifth Amended Plan | Dkt. No. 1943 | | | | |
| Claimant's 15 | Confirmation Date and Bar Date for Filing Objections | Dkt. No. 1948 | | | | |
| Claimant's 16 | Notice of Effective Date | Dkt. No. 2700 | | | | |
| Claimant's 17 | Responses and Objections to NexPoint Real Estate Partners, LLC's Second Set of Requests for Production and Interrogatories | | | | | |
| Claimant's 18 | Deposition Excerpts - Thomas | | | | | |
| Claimant's 19 | Deposition Excerpts - Barker | | | | | |

| Exhibit | Desc. | ID | Offer | Obj. | Stip. | Admit |
|---------|-------|-----|-------|------|-------|-------|
| | Documents entered or filed in this Bankruptcy Case or related cases and for which the Court may take judicial notice | | | | | |
| | Exhibits identified by any other party at hearing | | | | | |
| | Rebuttal Exhibits | | | | | |
| | Impeachment Exhibits | | | | | |

Claimant reserves the right to supplement this Witness and Exhibit List as necessary and appropriate.

# CLAIMANT'S EXHIBIT 1

**SE Multifamily Holdings LLC**
(A Delaware Limited Liability Company)

LIMITED LIABILITY COMPANY AGREEMENT

———————————

Dated as of August 23, 2018

———————————

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.


Claimant's
EXHIBIT
1

# SE MULTIFAMILY HOLDINGS LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of SE Multifamily Holdings LLC, a Delaware limited liability company (the "Company"), is entered into as of August 23, 2018 (the "Effective Date"), by Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP") and HCRE Partners, LLC, a Delaware limited liability company ("HCRE"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with HCMLP and HCRE, the "Members").

## RECITALS

WHEREAS, the Members deem it desirable to enter into this Agreement in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
Organization

1.1     Formation; Continuance.  The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act").  The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on August 23, 2018, and shall continue for the period of duration set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with Article IX.

1.2     Name.  The name of the Company is SE Multifamily Holdings LLC. The Manager may change the name of the Company from time to time.  In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

1.3     Purpose.  The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate-related investment property; (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable; and (iii) conduct any business or activity related to the foregoing activities that may lawfully be conducted by a limited liability company organized under the Act. Any or all of the

foregoing activities may be conducted directly by the Company or indirectly through another limited liability company, partnership, joint venture or other arrangement.

1.4    Registered Office and Agent; Principal Place of Business. The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The Company's registered agent at such address is The Corporation Trust Company. The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201. The Manager may change such registered agent, registered office or principal place of business from time to time. In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change. The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

1.5    No State-Law Partnership. The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

1.6    Management, Control and Voting Rights Vested Solely in HCRE and the Manager. HCRE shall have the exclusive right to appoint the Manager and the Manager shall have unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement.

1.7    Company Ownership: 51% to HCRE and 49% to HCMLP. Except with respect to particular items specified in this Agreement, HCRE shall have a 51% ownership interest and HCMLP shall have a 49% ownership interest, respectively, in all assets and activities of the Company, including, without limitation, rights to receive distributions of cash and assets in-kind in the process of winding down and liquidating the Company pursuant to Article 9 of this Agreement.

1.8    Anti-Consolidation For HCMLP. In the event that this Agreement at any time is interpreted to require consolidation of the Company with HCMLP under Generally Accepted Accounting Principles ("GAAP"), the Members agree to retroactively or prospectively, as the case may be,  amend this Agreement and to reallocate any economic or other items between HCMLP and HCRE to the extent necessary to cause the Company not to be consolidated with HCMLP for GAAP purposes and to the extent the reallocation involves items shared by percentage interests, the reallocation shall be made in an amount that is 1% more than the minimum reallocation necessary to cause the Company not to be consolidated for GAAP purposes with HCMLP. Any  amendment or reallocation made pursuant to this Section 1.8  shall be made in accordance with the Treasury Regulations under Code Section 704(b).

ARTICLE 2

Capital Contributions

2.1     Initial Capital Contributions.  Each Member shall make capital contributions on the Effective Date in the amounts that are set forth next to such Member's name on Schedule A hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2     Additional Capital Contributions.

(a)     The Manager may call capital contributions at any time from HCRE in order to carry out the business of the Company as set forth in Section 1.3; provided, however, that the Company shall issue "Preferred Membership Interests" in exchange for any additional capital contributions made under this Section 2.2(a). On each occasion the Manager desires that HCRE make additional capital contributions to the Company, the Manager shall give HCRE a written notice (a "Funding Notice") that shall include (i) the aggregate amount of additional capital contributions required, (ii) the date by which such additional capital contributions are required to be funded, and (iii) the address where additional capital contributions shall be sent. No other Member shall be required to make capital contributions at any time for any reason.

(b)     The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

2.3     No Return of Capital Contributions.  No Member shall be entitled to a withdrawal or return of its capital contributions.  Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4     No Interest.  No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5     Member Loans.  If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members.  Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6     Capital Accounts.

(a)     The Company shall maintain a separate capital account (a "Capital Account") for each Member in accordance with the following provisions:

4

(i)    to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii)    to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)    if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv)    in determining the amount of any liability for purposes of Sections 2.6(a)(i) and 2.6(a)(ii), Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b)    This Section 2.6 as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; provided, however, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this Article II. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; provided, however, that such modification is not likely to have a material effect on the amounts distributed to any person pursuant to Article IX upon the dissolution, liquidation and termination of the Company.  In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

ARTICLE 3
Rights and Obligations of the Manager

3.1    <u>Initial Manager; Term; Vacancies; Resignation; Removal</u>.  The initial manager of the Company (the "<u>Manager</u>") shall be James Dondero, in his capacity as an officer of HCRE. The Manager shall hold office for so long as HCRE is a member of the Company.  Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of HCRE so long as HCRE is a member of the Company.

3.2    <u>Management</u>.  The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3    <u>Powers</u>.  Subject to <u>Section 3.4</u>, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

(a)    to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

(b)    to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

(c)    to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

(d)    to establish reserves for contingencies and for any other proper purpose;

(e)    to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

(f)    to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

6

(g)     to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

(h)     to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

(i)     to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

(j)     to negotiate and effect a merger or consolidation of the Company with any other entity;

(k)     approve any transaction entered into by the Company and any Member, or affiliate of any Member;

(l)     to develop an annual budget and to approve any deviations from such budget; and

(m)     to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4     <u>Limitations on Manager's Authority</u>.  Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of all the Members:

(a)     enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

(b)     issue additional membership interests in the Company;

(c)     sell the Company or sell all or substantially all assets of the Company;

(d)     admit new Members to the Company;

(e)     permit a transferee of an interest in the Company to become a substitute Member of the Company under <u>Section 7.3</u>;

(f)     borrow funds or otherwise commit the credit of the Company; or

(g)     take any action in contravention of the provisions of this Agreement or take any other action that requires the approval of all the Members under the terms of this Agreement or the Act.

3.5    Liability of Manager.  No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6    Other Activities.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7    Officers.  The Manager may appoint and remove officers of the Company in his sole discretion.

3.8    Reimbursement.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.

3.9    Replacement of Manager.  Subject to Section 3.1, in the event that the Manager resigns for any reason, a replacement Manager may be appointed by HCRE.

ARTICLE 4
Rights and Obligations of Members

4.1    No Authority.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to an officer pursuant to Section 3.7); provided, however, that nothing contained in this Section 4.1 shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2    Liability of Members.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3    Consents and Limited Voting Rights.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager.  In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of HCRE.

ARTICLE 5
Exculpation and Indemnification

5.1    Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or otherwise to the Company or any Member by reason of, arising from or relating to the

8

operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2    Limitation of Liability. Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3    Indemnification.

(a)    Indemnifiable Claims. The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b)    Satisfaction; Capital Contributions. The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company. No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c)    Advancement of Expenses. Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; provided, however, that the affected Covered Person shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this Section 5.3.

(d)    Successors; Remedies. The indemnification provided by this Section 5.3 shall be in addition to any other rights to which any Covered Person may be entitled, in

9

any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person.  This <u>Section 5.3</u> shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)    <u>Amendment</u>.  Any repeal or amendment of this <u>Section 5.3</u> shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this <u>Section 5.3</u>.

5.4    <u>Other Agreements</u>.  Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this <u>Article V</u> shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5    <u>Guaranties</u>.  As used in this Agreement, a "<u>Guaranty</u>" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries.  No Member or Affiliate shall be required to execute any Guaranty.

ARTICLE 6
Distributions and Allocations

6.1    <u>Distributions of Cash</u>.

(a)    <u>Distributable Cash.</u>  Except as otherwise specifically provided in this Article VI and Article IX, all Distributable Cash shall be distributed 51% to HCRE and 49% to HCMLP at such time and in such amounts as determined by the Manager.

(b)    <u>Net Cash from Rental/Leasing Activities</u>. Net Cash from Rental/Leasing Activities shall be distributed 99% to HCMLP and 1% to HCRE at such time and in such amounts as determined by the Manager.

(c)    <u>Net Cash from Specified Company Assets</u>. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(d)    Notwithstanding <u>Sections 6.1(a), (b) and (c)</u>, if any "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution as determined in the sole discretion of the Manager shall be distributed to

HCRE with respect to HCRE's Preferred Membership Interest until HCRE has received cumulative distributions under this Sections 6.1(d) equal to HCRE's additional capital contributions plus an 8 percent simple preferred return on such additional capital contributions made to acquire such Preferred Membership Interest.

(e)    Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(c) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(f)    Tax Distributions.  Notwithstanding anything in Section 6.1(a), (b), (c) and (d), the Company shall first make minimum distributions of cash available from all sources as determined in the sole discretion of the Manager to the Members in an amount necessary for each Member to pay taxes on taxable income allocable to such Member, assuming each Member is subject to tax at the highest combined marginal federal, state and local tax for an individual living in Dallas, Texas.  Distributions to any Member under this Section 6.1(f) shall be treated as advances against any future distributions payable to such Member under Section 6.1(a), (b), (c) and (d).

6.2    Restrictions on Distributions.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

6.3    Withholding Taxes.  Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that he determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person.  Without limiting the provisions of this Section 6.3, if any such withholding requirement in respect of any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.  The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid.  Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law.  Notwithstanding the foregoing provisions of this Section 6.3, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4    <u>Allocations of Profits and Losses</u>.    Profits and Losses shall be allocated as follows:

(a)    Except as provided in <u>Section 6.4(b) and (c)</u> and after the special allocations set forth in Sections A.III.2 and A.III.3 of <u>Schedule B</u>, Profits and Losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated 51% to HCRE and 49% to HCMLP.

(b)    All Profits and Losses from the Company's Rental/Leasing Activities shall be allocated 99% to HCMLP and 1% to HCRE.

(c)    All Profits and Losses with respect to each Specified Company Asset will be allocated in accordance with each Member's Capital Percentage Interest in such Specified Company Asset.

ARTICLE 7
Admissions, Transfers and Withdrawals

7.1    <u>Admissions</u>.    New Members may be admitted to the Company only with the unanimous written consent of, and upon such terms and conditions as are approved by, the Members in accordance with <u>Section 3.3</u>.    Substituted Members shall not be deemed new Members for purposes of this <u>Section 7.1</u>.

7.2    <u>Transfer of Membership Interests</u>.

(a)    <u>No Transfers Without Consent</u>.    No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with <u>Section 3.3</u>; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee. For purposes hereof, "<u>Permitted Transferee</u>" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

(b)    <u>Death, Bankruptcy, etc. of Member</u>.    In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)    the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in <u>Section 9.1</u>;

(ii)    such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in <u>Section 7.3</u>, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)   the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)   the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)   any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3   <u>Substitution</u>.   A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with <u>Section 3.4</u>, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member. Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4   <u>Withdrawal</u>.   Except as permitted by this <u>Section 7.4</u>, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with <u>Section 7.3</u> or <u>7.5</u>.

## ARTICLE 8
### Accounting and Tax Matters

8.1   <u>Fiscal Year</u>.   The fiscal year of the Company ("<u>fiscal year</u>") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required.   The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2   <u>Books of Account; Tax Returns</u>.   The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations, business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act.   Except as otherwise expressly provided in this Agreement, such books and records shall

13

be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the: Manager be prepared on either a cash basis or accrual basis.

8.3    Place Kept; Inspection.    The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during the ordinary business hours of the Company.

ARTICLE 9
Dissolution, Liquidation and Termination

9.1    Dissolution.    The Company shall be dissolved upon the first to occur of the following events ("Dissolution Events"):  (i) the election of the Manager to dissolve the Company at any time in accordance with Section 3.3; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

9.2    Accounting.  After the dissolution of the Company pursuant to Section 9.1, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date.  The Manager shall serve as liquidator of the Company.  If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members.  The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity.  The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

9.3    Liquidation.  As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business), after the dissolution of the Company pursuant to Section 9.1, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company.  The proceeds of such liquidation shall be applied in the following order of priority:

(a)    first, in payment of the expenses of the liquidation;

(b)    second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

(c)    third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans);

(d)    fourth, to the Members in accordance with Sections 6.1(b), (c) and (d); and

(e)    thereafter, 51% to HCRE and 49% to HCMLP.

9.4    Termination.  At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the

Comptroller of the State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "Tax Certificate"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

9.5    No Deficit Capital Account Restoration Obligation. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

9.6    No Other Cause of Dissolution. The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this Article IX.

ARTICLE 10
Miscellaneous Provisions

10.1    Amendments and Waivers. This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and all the Members (a copy of which shall be promptly sent by the Manager to all the Members). For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in Section 1.3, (d) change any provision of this Agreement requiring the approval of all the Members or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2    Binding Effect. Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3    Counterparts. This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4    Entire Agreement. This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6    Venue.  To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7    Notices.  All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on Schedule A, and if to the Company, at the address of its principal place of business referred to in Section 1.4, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this Section 10.7.  Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this Section 10.7 shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent.  Notwithstanding the foregoing provisions of this Section 10.7 (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8    Remedies Cumulative No Waiver.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  No delay or omission on the part of any party hereto, whether in one or more instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9    Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law.  Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.10   Waiver of Partition.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

16

   IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

<u>MEMBERS:</u>

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., General Partner

By:    _____
Name: James D. Dondero
Title:  President

HCRE PARTNERS, LLC

By:    _____
Name: James D. Dondero
Title:  Manager

## Schedule A

**Capital Contributions and Percentage Interests**

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $51 | 51% |
| Highland Capital Management, L.P. | $49 | 49% |

**Capital Percentage Interests in Specified Company Assets**

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
|  |  |
|  |  |

## Schedule B

### Allocations

A.I.    *Definitions*.  Capitalized terms used and not defined in this Schedule B have the meanings ascribed to them in the Agreement, of which this Schedule B forms a part.  As used in this Schedule B, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)    Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; *provided, however,* if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and *provided, further,* if the Company is utilizing the remedial allocation method under Regulations Section 1304-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule B.

"Capital Percentage Interest" means, with respect to each Member, and with respect to each Specified Company Asset, the designated percentage listed next to such Member's name, in respect of such Specified Company Asset, on Exhibit A, attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and the rulings issued thereunder.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Distributable Cash" means all cash, revenues and funds received by the Company (including, without limitation, from sales, refinancings and other dispositions of Company property), less the sum of the following: (i) Net Cash from Rental/Leasing Activities (ii) all cash expenditures incurred in the operation of the Company's business; (iii) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; and (iv) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Distributable Cash shall include all principal and interest payments received by the Company with respect to any note or other obligation in connection with sales or other dispositions of Company property.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)    the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)    the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.7041(b)(2)(ii);

(c)    the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)    the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)    if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Net Cash from Rental/Leasing Activities" means the gross cash proceeds from Company rental and leasing activities less the portion thereof used to pay or establish reserves for Company expenses, property repairs, debt payments, capital improvements, replacements and contingencies, in each case determined by the Manager. Net Cash from Rental/Leasing Activities shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances. Net Cash from Rental/Leasing Activities shall not include net cash from sales or refinancings of Company property.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; provided that items of Profit and Loss specially allocated to a Member pursuant to Section 6.4 of the Agreement and Sections A.III.2 and A.III.3 of this Schedule B shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)  Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)  Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c)  In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d)  In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e)    Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's membership interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Specified Company Asset" means any capital asset owned by the Company with respect to which the Members have agreed to share proceeds from a sale, refinancing or other disposition thereof in a sharing ratio set forth with respect to each such Specified Company Asset from time to time on Schedule B.

A.II.    *Members' Capital Accounts.*

1.    There shall be established for each Member on the books and records of the Company a Capital Account. Each Member's initial Capital Account shall be zero and, without limiting the generality of the foregoing, shall be adjusted as follows:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions (net of any liabilities assumed by the Company or which are secured by any property contributed by such Member), such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections A.III.2 and A.III.3.

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement (net of any liabilities assumed by the Member or which are secured by any property distributed to such Member by the Company), such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections A.III.2 and A.III.3.

2.    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with such statutory and regulatory provisions.

3.    In the event all or a portion of an Interest in the Company is transferred in accordance with the terms of Section 7.2, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, adjusted as required by the aforementioned Treasury Regulations.

A.III.  *Allocations*.

1.    *Allocations of Net Profit and Net Loss.* After giving effect to the special allocations set forth in Sections A.III.2 and A.III.3, below, Profits and Losses for any fiscal year or other period shall be allocated among the Members such that each Member's Capital Account balance (computed after taking into account all distributions with respect to such taxable period and increased by such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain) would, as nearly as possible, be equal to the amount that each Member would receive if all of the remaining assets of the Company were sold for cash equal to their Gross Asset Values, all liabilities of the Company were satisfied (limited, with respect to Nonrecourse Liabilities, to the Gross Asset Values of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 9.3(d) to the Members immediately after making such allocation, in each case on a Company Asset-by-Company Asset basis; *provided, however,* that the Losses allocated to a Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year or other period.

2.    *Special Allocations.*  The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)    *Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.7042(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations.  This Section A.III.2(a) is intended to comply with the minimum gain Chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    *Member Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset.*  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each such Member in an

amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule B have been tentatively made as if this Section A.III.2(c) were not in the Agreement. This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)     *Nonrecourse Deductions.* Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)     *Member Nonrecourse Deductions.* Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3.     *Curative Allocations.* The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3. Therefore, notwithstanding any other provision of this Schedule B (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.III.1. In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A in that, although not yet made, are likely to offset other Regulatory Allocations previously made.

A.IV.   *Other Allocation Rules.*

1.     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits. Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2.     The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to, the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3.     Tax Allocations: Code Section 704(c).

(a)   For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule B except as otherwise provided in this Section A.IV.3.

(b)   Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company. Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)   In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)   Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.   *Company Representative*.

The partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager. (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative"). The Company Representative shall inform each Member of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity. The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law. Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company. The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager. The Company Representative shall not bind any Member to a settlement agreement without obtaining the consent of such Member. If any Member intends to flea notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.      *Tax Elections*.

      1 .      The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.

# CLAIMANT'S EXHIBIT 2

**SE Multifamily Holdings LLC**

(A Delaware Limited Liability Company)

FIRST AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

_____

Dated as of March 15, 2019

to be effective as of

August 23, 2018

_____

THE MEMBERSHIP INTERESTS ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND MAY NOT BE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS HEREOF.

IN ADDITION, THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE TRANSFER OF MEMBERSHIP INTERESTS IS PROHIBITED UNLESS SUCH TRANSFER IS MADE IN COMPLIANCE WITH THE SECURITIES ACT AND ALL SUCH APPLICABLE LAWS.



**SE MULTIFAMILY HOLDINGS LLC**

**FIRST AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

THIS FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of SE Multifamily Holdings LLC, a Delaware limited liability company (the "Company"), is entered into as of March 15, 2019, to be effective as of August 23, 2018 (the "Effective Date"), by Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP"), HCRE Partners, LLC, a Delaware limited liability company ("HCRE"), BH Equities, LLC ("BH"), and Liberty CLO HoldCo, Ltd., a Cayman Islands company ("Liberty"), and each of the other persons listed from time to time on Schedule A as members of the Company (together with HCMLP, HCRE, BH and Liberty, the "Members").

RECITALS

WHEREAS, the Company was formed by virtue of its Certificate of Formation, filed with the Secretary of State of the State of Delaware on August 23, 2018, and the Company's original limited liability company agreement dated August 23, 2018, pursuant to the terms of the Act.

WHEREAS, BH has acquired membership interests in the Company and each Member holds the membership interests set forth opposite its name on Schedule A.

WHEREAS, Liberty has acquired a preferred membership interest in the Company on the terms set forth herein and as set forth on Schedule A.

WHEREAS, the Members deem it desirable to, and do hereby, amend and restate in its entirety the Company's original limited liability company agreement as hereinafter provided in order to set forth certain agreements among themselves relating to the capitalization and governance of the Company and granting certain rights and imposing certain restrictions on themselves as set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of the premises and the covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
Organization

1.1      Formation; Continuance.  The Company was formed by filing a Certificate of Formation (the "Certificate") pursuant to and in accordance with the applicable provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "Act").  The Company's existence began upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware on August 23, 2018, and shall continue for the period of duration

2

set forth in the Certificate or until the earlier dissolution, liquidation and termination of the Company in accordance with <u>Article 9</u>.

1.2    <u>Name</u>.  The name of the Company is SE Multifamily Holdings LLC. The Manager may change the name of the Company from time to time.  In such event, the Manager shall (i) give prompt written notice thereof to the Members and (ii) promptly file or cause to be filed with the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting such change of name.

1.3    <u>Purpose</u>.  The purpose of the Company is to (i) acquire, invest, hold, maintain, finance, improve, manage, develop, operate, lease, sell, exchange or otherwise deal in financial and real estate-related investment property; (ii) engage or participate in such other activities related or incidental thereto as the Manager may from time to time deem necessary, appropriate or desirable; and (iii) conduct any business or activity related to the foregoing activities that may lawfully be conducted by a limited liability company organized under the Act. Any or all of the foregoing activities may be conducted directly by the Company or indirectly through another limited liability company, partnership, joint venture or other arrangement.

1.4    <u>Registered Office and Agent; Principal Place of Business</u>.  The address of the Company's registered office is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Company's registered agent at such address is The Corporation Trust Company.  The address of the Company's initial principal place of business is 300 Crescent Court, Suite 700, Dallas, TX 75201.  The Manager may change such registered agent, registered office or principal place of business from time to time.  In such event, the Manager shall (i) give prompt written notice of any such change to each Member and (ii) in the case of any change to the registered agent or registered office, promptly file or cause to be filed in the office of the Secretary of State of the State of Delaware an amendment to the Certificate reflecting any such change.  The Company may from time to time have such other place or places of business within or outside the State of Delaware as may be determined by the Manager.

1.5    <u>No State-Law Partnership</u>.  The Company shall not be a partnership or a joint venture, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any reason other than for U.S. federal income and state tax purposes, and no provision of this Agreement shall be construed otherwise.

1.6    <u>Management, Control and Voting Rights Vested Solely in HCRE and the Manager</u>. HCRE shall have the exclusive right to appoint the Manager and the Manager shall have unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement.

1.7    <u>Company Ownership: 47.94% to HCRE, 46.06% to HCMLP, and 6% to BH</u>. Except with respect to particular items specified in this Agreement, HCRE shall have 47.94% ownership interest, HCMLP shall have a 46.06% ownership interest, and BH shall have a 6% ownership interest, respectively, in all assets and activities of the Company, including, without limitation, rights to receive distributions of cash and assets in-kind in the process of winding down and liquidating the Company pursuant to Article 9 of this Agreement.

3

1.8    <u>Anti-Consolidation For HCMLP</u>.  In the event that this Agreement at any time is interpreted to require consolidation of the Company with HCMLP under Generally Accepted Accounting Principles ("GAAP"), the Members agree to retroactively or prospectively, as the case may be,  amend this Agreement and to reallocate any economic or other items between HCMLP and HCRE to the extent necessary to cause the Company not to be consolidated with HCMLP for GAAP purposes and to the extent the reallocation involves items shared by percentage interests, the reallocation shall be made in an amount that is 1% more than the minimum reallocation necessary to cause the Company not to be consolidated for GAAP purposes with HCMLP. Any amendment or reallocation made pursuant to this <u>Section 1.8</u>  shall be made in accordance with the Treasury Regulations under Code Section 704(b).

ARTICLE 2
Capital Contributions

2.1    <u>Initial Capital Contributions</u>.  Each Member has made capital contributions as of the Effective Date in the amounts that are set forth next to such Member's name on <u>Schedule A</u> hereto, which shall be amended from time to time by the Manager so that it sets forth the then current list of Members, the total amount of Capital Contributions made or deemed to be made by each member, the date(s) as of which each such Capital Contribution were made (or deemed made), and the Percentage Interests held by each Member.

2.2    <u>Additional Capital Contributions</u>.

(a)    The Manager may call capital contributions at any time from Liberty, up to a maximum cumulative amount of $16,000,000, in order to carry out the business of the Company as set forth in <u>Section 1.3</u>; <u>provided</u>, <u>however</u>, that the Company shall issue "Class B Preferred Membership Interests" in exchange for any additional capital contributions made under this Section 2.2(a). On each occasion the Manager desires that Liberty make additional capital contributions to the Company, the Manager shall give Liberty a written notice (a "<u>Funding Notice</u>") that shall include (i) the aggregate amount of additional capital contributions required, (ii) the date by which such additional capital contributions are required to be funded, and (iii) the address where additional capital contributions shall be sent. No other Member shall be required to make capital contributions at any time for any reason.  Schedule A hereto includes the current capital contributions made in consideration for Preferred Membership Interests and shall be amended from time to time to reflect additional capital contributions made in consideration for the issuance of additional Preferred Membership Interests.

(b)    The capital contributions commitments of the Members (if any, whether now or hereafter made) are solely for the benefit of the Members, as among themselves, and may not be enforced by any creditor, receiver or trustee of the Company or by any other person.

2.3    <u>No Return of Capital Contributions</u>.  No Member shall be entitled to a withdrawal or return of its capital contributions.  Instead, each Member shall look solely to distributions from the Company for such purpose.

2.4    <u>No Interest</u>.  No Member shall be entitled to interest on its capital contributions, and any interest actually received by reason of investment of any part of the Company's funds shall be included in the Company's property.

2.5    <u>Member Loans</u>.  If the Company shall have insufficient cash to pay its obligations, then the Members may, in their joint discretion, advance such funds to the Company on such terms and conditions as are approved by all the Members.  Each such advance shall constitute a loan from the Members to the Company and shall not constitute a capital contribution.

2.6    <u>Capital Accounts</u>.

(a)    The Company shall maintain a separate capital account (a "<u>Capital Account</u>") for each Member in accordance with the following provisions:

(i)    to each Member's Capital Account there shall be credited the amount of money and the initial Book Value of any other property contributed to the Company by such Member, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated hereunder and the amount of any liabilities of the Company assumed by such Member or that are secured by any property distributed to such Member;

(ii)    to each Member's Capital Account there shall be debited the amount of money and the Book Value of any other property distributed to such Member by the Company, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated hereunder and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)    if all or a portion of an interest in the Company is transferred in accordance with this Agreement, then the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest in the Company; and

(iv)    in determining the amount of any liability for purposes of <u>Sections 2.6(a)(i)</u> and <u>2.6(a)(ii)</u>, Section 752(c) of the Code and any other applicable provision of the Code and Regulations shall be taken into account.

(b)    This <u>Section 2.6</u> as it relates to the maintenance of Capital Accounts is intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations; <u>provided, however</u>, that nothing contained herein shall be construed as creating a capital account deficit restoration obligation or otherwise personally obligating any Member to make capital contributions in excess of the capital contributions provided for in this <u>Article 2</u>.  If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Regulations, then the Manager may make such modification; <u>provided, however</u>, that such modification is

not likely to have a material effect on the amounts distributed to any person pursuant to Article 9 upon the dissolution, liquidation and termination of the Company. In addition, the Manager shall (i) make any adjustment that is necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modification if unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

## ARTICLE 3
### Rights and Obligations of the Manager

3.1     Initial Manager; Term; Vacancies; Resignation; Removal.  The initial manager of the Company (the "Manager") shall be James Dondero, in his capacity as an officer of HCRE.  The Manager shall hold office for so long as HCRE is a member of the Company.  Any Manager may be removed, suspended or replaced at any time with or without cause solely with the written consent of HCRE so long as HCRE is a member of the Company.

3.2     Management.  The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable.

3.3     Powers.  Subject to Section 3.4, the Manager shall have the power generally conferred by law and/or as necessary to do all things and perform all acts necessary and appropriate for successful accomplishment of the purpose of the Company, including, without limitation, the following:

(a)     to negotiate, execute and deliver all documents determined appropriate or necessary to close acquisitions of real estate;

(b)     to acquire, own, hold, manage, maintain, operate, preserve or enhance the value of, seek and obtain zoning and other entitlements for, improve, develop, use, encumber, finance, market and ultimately lease, sell, contribute or otherwise dispose of real estate, or portions thereof, and engage in any and all activities as are related or incidental to the foregoing;

(c)     to obtain any and all financing for real estate, whether interim, permanent or otherwise, and to pledge the real estate, or a portion thereof, to a lender as collateral for such financing;

(d)     to establish reserves for contingencies and for any other proper purpose;

(e)     to employ such accountants, lawyers, managers, agents, and other management or service personnel as may, from time to time, be required or appropriate to carry on the business or purposes of the Company, including persons to manage real estate;

(f)      to negotiate and enter into agreements and contracts (including with any affiliate of the manager) in furtherance of the Company's business including, without limitation, all documents and agreements as may be required or appropriate in connection with the acquisition, ownership, management, leasing, maintenance, operation, improvement, development, construction, marketing, lease, sale or other disposition of real estate or interest therein, and any amendments, extensions or assignments thereof;

(g)      to purchase at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's assets and business, in such amounts and with such coverage as determined by the Manager;

(h)      to commence, defend and settle litigation or administrative proceedings on behalf of the Company;

(i)      to open, maintain, and close accounts with banks and other financial institutions, and to pay customary fees in conjunction with the use and termination of their services;

(j)      to negotiate and effect a merger or consolidation of the Company with any other entity;

(k)      approve any transaction entered into by the Company and any Member, or affiliate of any Member;

(l)      to develop an annual budget and to approve any deviations from such budget;

(m)      to appoint a "partnership representative" for purposes of interacting with, and representing the Company before, the Internal Revenue Service; and

(n)      to do any and all acts and things necessary, incidental, appropriate or convenient, as determined by the Manager in sole and absolute discretion, to carry on the business of the Company.

3.4      <u>Limitations on Manager's Authority</u>.  Notwithstanding the provisions of <u>Section 3.2</u> above or any other provision of this Agreement, the Manager shall not undertake, cause or allow the Company (or any entity in which the Company owns a direct or indirect interest) to do or agree to do any of the actions described in this <u>Section 3.4</u> without the express written approval of HCRE:

(a)      enter into any business or engage in any activity other than pursuant to the purpose of the Company as described in <u>Section 1.3</u>;

(b)      issue additional membership interests in the Company;

(c)      sell the Company or sell all or substantially all assets of the Company;

(d)      admit new Members to the Company;

7

(e)     permit a transferee of an interest in the Company to become a substitute Member of the Company under <u>Section 7.3;</u>

(f)     borrow funds or otherwise commit the credit of the Company; or

(g)     take any action that requires the approval of HCRE under the terms of this Agreement or the Act.

3.5    <u>Liability of Manager</u>.  No Manager (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

3.6    <u>Other Activities</u>.  Neither this Agreement nor any principle of law or equity shall preclude or limit, in any respect, the right of any Manager to engage in or derive profit or compensation from any activities or investments, nor give any other Manager, any Member or any other person any right to participate or share in such activities or investments or any profit or compensation derived therefrom.

3.7    <u>Officers</u>.  The Manager may appoint and remove officers of the Company in his sole discretion.

3.8    <u>Reimbursement</u>.  The Manager and any Officer shall be entitled to reimbursement for all reasonable expenses paid or incurred by it on behalf of the Company.

3.9    <u>Replacement of Manager</u>.  Subject to <u>Section 3.1</u>, in the event that the Manager resigns for any reason, a replacement Manager may be appointed by HCRE.

ARTICLE 4
Rights and Obligations of Members

4.1    <u>No Authority</u>.  No Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the Manager (subject to the Manager's right to delegate such powers to an officer pursuant to <u>Section 3.7</u>); <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 4.1</u> shall prohibit any Member from acting as a Manager or officer of the Company or its affiliates.

4.2    <u>Liability of Members</u>.  No Member (in its capacity as such) shall be personally liable for the debts and obligations of the Company.

4.3    <u>Consents and Limited Voting Rights</u>.  The Members (whether individually or in combination) shall not be entitled to consent to, vote on or approve any matter for which the action of such Members is not expressly required by the Act or this Agreement or requested by the Manager.  In the case of any matter for which the action of the Members is expressly required by the Act or this Agreement or requested by the Manager, such action shall (unless a different percentage is required by the Act or stated in this Agreement) be effective and binding against the Company, each Member and the Manager if taken with the consent, vote or approval of HCRE.

ARTICLE 5
Exculpation and Indemnification

5.1    Exculpation.  None of the Manager, the Members, their affiliates nor any of their respective officers, directors, stockholders, managers, members, partners, employees or agents (collectively, "Covered Persons") shall be liable, responsible or accountable in damages or otherwise to the Company or any Member by reason of, arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or its affiliates, except to the extent that any of the foregoing is determined by a final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct or bad faith of such Covered Person.

5.2    Limitation of Liability.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that any Covered Person has, whether at law or in equity, any duties (fiduciary or otherwise) or any liabilities relating thereto to the Company or any Member (i) such Covered Person shall not be held liable to the Company or any Member for any action taken or failure to act by such Covered Person in reliance upon the provisions of this Agreement, and (ii) such Covered Person's duties (fiduciary or otherwise) and liabilities are intended and shall be construed to be modified and limited to those duties (fiduciary or otherwise) and liabilities expressly specified in this Agreement, and no implied covenants, duties, liabilities or obligations shall be construed to be a part of this Agreement or to otherwise exist against any such Covered Person.

5.3    Indemnification.

(a)    Indemnifiable Claims.  The Company shall indemnify, defend and hold harmless each Covered Person against any claim, loss, damage, liability or expense (including reasonable attorneys' fees, court costs and costs of investigation and appeal) suffered or incurred by such Covered Person by reason of, arising from or relating to, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company or their respective affiliates, including, without limitation, as a result of such Covered Person's having executed a Guaranty, except to the extent any of the foregoing (i) is determined by final, nonappealable order of a court of competent jurisdiction to have been primarily caused by the willful misconduct, gross negligence, or criminal activity of such Covered Person or (ii) arises out of claim brought by one Member against another Member.

(b)    Satisfaction; Capital Contributions.  The satisfaction of any indemnification obligation shall be from and limited to the assets of the Company.  No Member shall have any obligation to make capital contributions to the Company to fund any indemnification obligations hereunder.

(c)    Advancement of Expenses.  Unless a determination has been made by final, nonappealable order of a court of competent jurisdiction that indemnification is not required, the Company shall, upon the request of any Covered Person, advance or promptly reimburse such Covered Person's reasonable costs of investigation, litigation or appeal, including reasonable attorneys' fees; provided, however, that the affected Covered Person

9

shall, as a condition of such Covered Person's right to receive such advances or reimbursements, undertake in writing to repay promptly the Company for all such advancements and reimbursements if a court of competent jurisdiction determines that such Covered Person is not then entitled to indemnification under this <u>Section 5.3</u>.

(d)     <u>Successors; Remedies</u>.  The indemnification provided by this <u>Section 5.3</u> shall be in addition to any other rights to which any Covered Person may be entitled, in any capacity, under any agreement, vote of the Manager or Members, as a matter of law or otherwise and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Covered Person.  This <u>Section 5.3</u> shall survive any termination of this Agreement and is for the benefit of the Covered Persons and their respective heirs, successors, assigns and administrators, and shall not be deemed to create any rights for the benefit of any other person.

(e)     <u>Amendment</u>.  Any repeal or amendment of this <u>Section 5.3</u> shall be prospective only and shall not limit the rights of any Covered Person or the obligations of the Company in respect of any claim arising from or related to the services of such Covered Person prior to any such repeal or amendment of this <u>Section 5.3</u>.

5.4     <u>Other Agreements</u>.  Notwithstanding anything contained herein to the contrary, the indemnification rights and exculpation contained in this <u>Article 5</u> shall not affect, nor provide indemnification for, liabilities of any Member, or their respective affiliates, arising out of any other agreement to provide services to the Company entered into by such Member, or its affiliate, and the Company.

5.5     <u>Guaranties</u>.  As used in this Agreement, a "<u>Guaranty</u>" means a partial or full guaranty of principal and/or interest in respect of any loan, a guaranty of completion or cost overruns or debt service, guaranty of "non-recourse carveouts", any other guaranty, indemnity or assurance of payment, or any reimbursement agreement in respect of a letter of credit or similar credit enhancement, in each case provided by a Member or its Affiliate on behalf of the Company or any of its subsidiaries.  No Member or Affiliate shall be required to execute any Guaranty.

ARTICLE 6
Distributions and Allocations

6.1     <u>Distributions of Cash</u>.

(a)     <u>Distributable Cash</u>.  Except as otherwise specifically provided in this Article 6 and Article 9, all Distributable Cash shall be distributed (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH, at such time and in such amounts as determined by the Manager.

(b)     <u>Net Cash from Specified Company Assets</u>. Net Cash from the sale, refinancing or other disposition of any Specified Company Asset shall be distributed to the

Members in proportion to their Capital Percentage Interests with respect to such Specified Company Asset.

(c)      Notwithstanding Sections 6.1(a) and (b), if any class of "Preferred Membership Interest" is issued and outstanding, cash from all sources that is available for distribution may, as determined in the sole discretion of the Manager, be distributed to Liberty with respect to one or more classes of Liberty's Preferred Membership Interest until Liberty has received cumulative distributions under this Sections 6.1(c) equal to the sum of (i) Liberty's capital contributions with respect to such Preferred Membership Interest, and (ii) with respect to Liberty's Class A Preferred Membership Interest, a 12 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest or, with respect to Liberty's Class B Preferred Membership Interest, a 6.25 percent per annum simple return on such capital contributions made to acquire such Preferred Membership Interest.

(d)      Distributions in Kind.  If at any time the Manager determines, with the written consent of all the Members, to make a distribution of any Specified Company Assets in-kind, such Specified Company Assets shall be distributed to the Members in the same respective proportions as distributions would at the time be made pursuant to Section 6.1(b) or Section 9.3, as the case may be, if the Specified Company Assets were sold and cash proceeds from such sale were distributed as Net Cash from Specified Company Assets.

(e)      Notwithstanding Sections 6.1(a), 6.1(b), 6.1(c) and 6.1(d), the first amounts of any Distributable Cash shall be deemed distributed to each Member (i) in proportion to the amounts paid by the Company directly to any lender on behalf of such Member to pay principal and interest on any loan incurred by such Member to fund such Member's capital contributions to the Company until such loans are fully extinguished, then (ii) pro rata in proportion to the Members' respective Capital Accounts until the Members' respective Capital Accounts are reduced to zero.

6.2     Restrictions on Distributions.  Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be required to make any distribution if such distribution would violate the Act or any law then applicable to the Company.

6.3     Withholding Taxes.  Notwithstanding any other provision of this Agreement to the contrary, the Manager is authorized to take any action that he determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding or deduction requirement in respect of any allocation, payment or distribution by the Company to any Member or other person.  Without limiting the provisions of this Section 6.3, if any such withholding requirement in respect of any Member exceeds the amount distributable to such Member under the applicable provision of this Agreement, then such Member and any successor or assignee in respect of such Member's membership interest in the Company shall, upon the request of the Manager, contribute such excess amount or amount required to be withheld to the Company and shall indemnify and hold harmless the Manager and the Company for such excess amount or such withholding requirement, as the case may be.  The Company may (but shall not be required to), where permitted by the rules of any taxing authority, file a composite,

11

combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the taxing authority, in which case the Company shall inform the Members of the amount of such tax, interest and penalties so paid. Each Member shall provide such identifying numbers and other certificates as are requested by the Company to enable it to comply with any tax reporting or withholding requirement under the Code or any applicable state, local or foreign tax law.  Notwithstanding the foregoing provisions of this Section 6.3, the Manager shall have no liability to the Company or any Member for failure to request or obtain such information from any Member, or to withhold in respect of any Member who has not furnished such information to the Manager.

6.4    Allocations of Profits and Losses.  Profits and Losses shall be allocated as follows:

(a)    Except as provided in Sections 6.4(b), (c) and (d) and after the special allocations set forth in Sections A.III.2 and A.III.3 of Schedule B, Profits and Losses (and items of income, gain, loss, deduction and credit relating thereto) shall be allocated 94% to HCMLP and 6% to BH.

(b)    Notwithstanding Section 6.4(a), Profits (and any items related thereto) shall be allocated to Liberty until the aggregate amount of Profits allocated to Liberty pursuant to this Section 6.4(b) equals the amount that has been distributed to Liberty pursuant to Section 6.1(c)(ii).

(c)    Notwithstanding Section 6.4(a), Losses (and any items related thereto) shall be allocated to Liberty, until the aggregate amount of Losses allocated to Liberty pursuant to this Section 6.4(c) equals the aggregate amount of Profits previously allocated to Liberty pursuant to Section 6.4(b).

(d)    All Profits and Losses with respect to each Specified Company Asset will be allocated in accordance with each Member's Capital Percentage Interest in such Specified Company Asset.

ARTICLE 7
Admissions, Transfers and Withdrawals

7.1    Admissions.  New Members may be admitted to the Company only with the written consent of, and upon such terms and conditions as are approved by, HCRE in accordance with Section 3.3.  Substituted Members shall not be deemed new Members for purposes of this Section 7.1.

7.2    Transfer of Membership Interests.

(a)    No Transfers Without Consent.  No Member may transfer or encumber all or any portion of such Member's membership interest in the Company without the prior written consent of the Manager in accordance with Section 3.3; provided, however, that no consent shall be required in connection with any transfer to a Permitted Transferee.  For purposes hereof, "Permitted Transferee" shall mean any affiliate of a Member, or immediately family member of ultimate beneficial owner of a Member.

(b)    Death, Bankruptcy, etc. of Member.   In the event of the death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination of any Member:

(i)    the Company shall not be dissolved, liquidated or terminated, and the remaining Members shall continue the Company and its operations, business and affairs until the dissolution thereof as provided in Section 9.1;

(ii)    such affected Member shall thereupon cease to be a Member for all purposes of this Agreement and, except as provided in Section 7.3, no officer, partner, beneficiary, creditor, trustee, receiver, fiduciary or other legal representative and no estate or other successor in interest of such Member (whether by operation of law or otherwise) shall become or be deemed to become a Member for any purpose under this Agreement;

(iii)    the interest in the Company of such affected Member shall not be subject to withdrawal or redemption in whole or in part prior to the dissolution, liquidation and termination of the Company;

(iv)    the estate or other successor in interest of such affected Member shall be deemed a transferee of, and shall be subject to all of the obligations in respect of, the interest in the Company of such affected Member as of the date of death, incompetence, insolvency, bankruptcy, dissolution, liquidation or termination, except to the extent the Manager releases such estate or successor from such obligations; and

(v)    any legal representative or successor in interest having lawful ownership of the assigned interest in the Company of such affected Member shall have the right to receive notices, reports and distributions, if any, to the same extent as would have been available to such affected Member.

7.3    Substitution.  A transferee of any interest in the Company may become a substituted Member, as to the interest in the Company transferred, in place of the transferor only with the written consent of the Manager and the Members in accordance with Section 3.4, provided, that no such consent shall be required in connection with any transfer to a Permitted Transferee, which such Permitted Transferee shall automatically become a substituted member.  Unless a transferee of any interest in the Company of a Member becomes a substituted Member in accordance with this Agreement, such transferee shall not be entitled to any of the rights granted to a Member hereunder other than the right to receive all or part of the share of the income, gains, losses, deductions, expenses, credits, distributions or returns of capital to which its transferor would otherwise be entitled in respect of the interest in the Company so transferred.

7.4    Withdrawal.  Except as permitted by this Section 7.4, no Member shall have any right to withdraw or resign from the Company, except that a Member may withdraw (a) after transfer of such Member's entire interest in the Company to one or more transferees, all of whom have been admitted as substituted Members in accordance with Section 7.3, and (b) after executing an indemnification agreement that indemnifies the Company for such Member's allocable share

of any tax arising during any tax period when such Member held a membership interest in the Company as a result of an adjustment issued by the IRS to the Company subsequent to such Member's withdrawal.

## ARTICLE 8
## Accounting and Tax Matters

8.1    <u>Fiscal Year</u>.  The fiscal year of the Company ("<u>fiscal year</u>") shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required.  The Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

8.2    <u>Books of Account; Tax Returns</u>.  The Manager shall cause to be prepared and filed, all U.S. federal, state and local income and other tax returns required to be filed by the Company and shall keep or cause to be kept complete and appropriate records and books of account in which shall be entered all such transactions and other matters relative to the Company's operations, business and affairs as are usually entered into records and books of account that are maintained by persons engaged in business of like character or are required by the Act.  Except as otherwise expressly provided in this Agreement, such books and records shall be maintained in accordance with the basis utilized in preparing the Company's U.S. federal income tax returns, which returns, if allowed by applicable law, may in the discretion of the: Manager be prepared on either a cash basis or accrual basis.

8.3    <u>Place Kept; Inspection</u>.  The books and records of the Company shall be maintained at the principal place of business of the Company, and all such books and records shall be available for inspection and copying at the reasonable request, and at the expense, of any Member during the ordinary business hours of the Company.

## ARTICLE 9
## Dissolution, Liquidation and Termination

9.1    <u>Dissolution</u>.  The Company shall be dissolved upon the first to occur of the following events ("<u>Dissolution Events</u>"):  (i) the election of the Manager to dissolve the Company at any time in accordance with <u>Section 3.3</u>; or (ii) the occurrence of any "event requiring winding up" (as defined by the Act) of the Company.

9.2    <u>Accounting</u>.  After the dissolution of the Company pursuant to <u>Section 9.1</u>, the books of the Company shall be closed, and a proper accounting of the Company's assets, liabilities and operations shall be made by the liquidator of the Company, all as of the most recent practicable date.  The Manager shall serve as liquidator of the Company.  If the Manager fails or refuses to serve as the liquidator, then one or more other persons may be elected to serve as liquidator with the consent of a majority in interest of all Members.  The liquidator shall have all rights and powers that the Act confers on any person serving in such capacity.  The expenses incurred by the liquidator in connection with the dissolution, liquidation and termination of the Company shall be borne by the Company.

9.3    <u>Liquidation</u>.  As expeditiously as practicable, but in no event later than one year (except as may be necessary to avoid unreasonable loss of the Company's property or business),

after the dissolution of the Company pursuant to <u>Section 9.1</u>, the liquidator shall wind up the operations, business and affairs of the Company and liquidate the assets and properties of the Company. Subject to Section A.III.4 of Schedule B, the proceeds of such liquidation shall be applied in the following order of priority:

      (a)      first, in payment of the expenses of the liquidation;

      (b)      second, in payment of the liabilities and obligations of the Company to creditors of the Company (other than to Members who are also creditors);

      (c)      third, in payment of liabilities and obligations of the Members who are also creditors (other than payments in respect of Member loans);

      (d)      fourth, to the Members in accordance with <u>Sections 6.1(b) and (c)</u>; and

      (e)      thereafter, (i) 47.94% to HCRE, (ii) 46.06% to HCMLP, and (iii) 6% to BH.

      9.4    <u>Termination</u>. At the time final distributions are made to the Members, a Certificate of Termination in respect of the Company, together with a certificate from the Comptroller of the State of Delaware to the effect that all franchise taxes in respect of the Company have been paid (the "<u>Tax Certificate</u>"), shall be filed in the office of the Secretary of State of the State of Delaware in accordance with the Act. Except as may be otherwise provided by the Act, the legal existence of the Company shall terminate upon the filing of the Certificate of Termination and the Tax Certificate with the Secretary of State of the State of Delaware.

      9.5    <u>No Deficit Capital Account Restoration Obligation</u>. Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Member who has a deficit balance in its Capital Account (after giving effect to all capital contributions, distributions and allocations for all periods, including the fiscal year during which the liquidation of the Company occurs), have any obligation to make any contribution to the capital of the Company, and such deficit shall not be considered a debt owed to the Company or any other person for any purpose whatsoever, except in respect of any deficit balance resulting from a failure to contribute capital or a withdrawal of capital in contravention of this Agreement.

      9.6    <u>No Other Cause of Dissolution</u>. The Company shall not be dissolved, or its legal existence terminated, for any reason whatsoever except as expressly provided in this <u>Article 9</u>.

<div align="center">

ARTICLE 10
Miscellaneous Provisions

</div>

      10.1    <u>Amendments and Waivers</u>. This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and HCRE (a copy of which shall be promptly sent by the Manager to all the Members). For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in <u>Section 1.3</u>, (d) change any provision of this Agreement requiring the approval of HCRE or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the

<div align="center">15</div>

Company or sell all or substantially all assets of the Company, or (g) otherwise materially and disproportionally impair the rights of such Member under this Agreement.

10.2    Binding Effect.  Except as otherwise specifically provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, successors and permitted assigns.

10.3    Counterparts.  This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.

10.4    Entire Agreement.  This Agreement constitutes the entire agreement between the Members in respect of the subject matter hereof and supersedes all prior agreements and understandings, if any, between them in respect of such subject matter.

10.5    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

10.6    Venue.  To the maximum extent permitted by applicable law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby, including tort claims, may be brought only in the courts of the State of Delaware and hereby expressly submits to the personal jurisdiction and the venue of those courts for the purposes thereof and expressly waives any claim of improper venue and any claim that those courts are an inconvenient forum.

10.7    Notices.  All notices, requests, demands, consents, votes, approvals, waivers and other communications required or permitted hereunder shall be effective only if in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by U.S. certified or registered mail, postage prepaid and return receipt requested, or (iv) by facsimile or e-mail, if to the Members, at the addresses, facsimile numbers or e-mail addresses set forth on Schedule A, and if to the Company, at the address of its principal place of business referred to in Section 1.4, or to such other address, facsimile number or e-mail address as the Company or any Member shall have last designated by notice to the Company and all other parties hereto in accordance with this Section 10.7.  Notices sent by hand delivery shall be deemed to have been given when received or delivery is refused; notices mailed in accordance with this Section 10.7 shall be deemed to have been given three (3) days after the date so mailed; notices sent by facsimile shall be deemed to have been given when electronically confirmed; notices sent by e-mail shall be deemed to have been given when electronically confirmed; and notices sent by overnight courier shall be deemed to have been given on the next business day after the date so sent.  Notwithstanding the foregoing provisions of this Section 10.7 (i) routine communications including tax information, financial statements and reports in respect of the Company may be sent by electronic mail and (ii) distributions will be made by check or wire transfer pursuant to the instructions provided by a Member.

10.8    Remedies Cumulative No Waiver.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  No delay or omission on the part of any party hereto, whether in one or more

instances, in exercising any right, power or remedy under any applicable law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.

10.9    <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid under the applicable law of any jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.  In addition, if any provision of this Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such law.  Any provision hereof that may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

10.10   <u>Waiver of Partition</u>.  Each Member hereby irrevocably waives all rights that it may have to maintain an action for partition of any of the Company's property.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., General Partner

By: _____

Name: James D. Dondero

Title: President

HCRE PARTNERS, LLC

By: _____

Name: James D. Dondero

Title: Manager

LIBERTY CLO HOLDCO, LTD.

By: _____

Name:

Title

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the Effective Date.

MEMBERS:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:     Strand Advisors, Inc., General Partner

By:     _____
Name: James D. Dondero
Title:   President

HCRE PARTNERS, LLC

By:     _____
Name: James D. Dondero
Title:   Manager

LIBERTY CLO HOLDCO, LTD.

By:     _____
Name:   GRANT SCOTT
Title     DIRECTOR

BH EQUITIES, LLC


By: _____
Name: Ben Roby
Title: Authorized Officer

## Schedule A

**Capital Contributions and Percentage Interests**

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $    291,146,036 | 47.94% |
| Highland Capital Management, L.P. | $    49,000 | 46.06% |
| BH Management | $    21,213,721 | 6.00% |

**Class A Preferred Interests**

| Member Name | Capital Contribution | Class A Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $    5,808,603 | 100% |

**Class B Preferred Interests**

| Member Name | Capital Contribution | Class B Preferred Percentage Interest |
|---|---|---|
| Liberty CLO HoldCo, Ltd. | $ ___ | 100% |

**Capital Percentage Interests in Specified Company Assets**

| Member Name and Specified Company Asset | Capital Percentage Interest in Specified Company Asset |
|---|---|
|  |  |
|  |  |

## Schedule B

### Allocations

A.I.    _Definitions_.  Capitalized terms used and not defined in this Schedule B have the meanings ascribed to them in the Agreement, of which this Schedule B forms a part.  As used in this Schedule B, the following additional terms have the following meanings:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(b)    Debit to such Capital Account the items described in Sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5) and 1.704-1 (b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Book Depreciation" for any asset means for any fiscal year or other relevant period an amount that bears the same ratio to the Gross Asset Value of that asset at the beginning of such fiscal year or other relevant period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other relevant period bears to the adjusted tax basis of that asset at the beginning of such year or other relevant period; _provided, however,_ if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other relevant period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager; and _provided, further,_ if the Company is utilizing the remedial allocation method under Regulations Section 1.704-3(d), Book Depreciation shall be determined under the rules described in Regulations Section 1.704-3(d)(2)

"Capital Account" means the capital account established and maintained for each Member pursuant to Section A.II of this Schedule B.

"Capital Percentage Interest" means, with respect to each Member, and with respect to each Specified Company Asset, the designated percentage listed next to such Member's name, in respect of such Specified Company Asset, on Schedule A, attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and the rulings issued thereunder.

"Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Distributable Cash" means all cash, revenues and funds received by the Company (including, without limitation, from sales, refinancings and other dispositions of Company property), less the sum of the following: (i) all cash expenditures incurred in the operation of the Company's business; (ii) all principal and interest due and owing to senior lenders holding first mortgages against the Company's underlying real estate properties; and (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Distributable Cash shall include all principal and interest payments received by the Company with respect to any note or other obligation in connection with sales or other dispositions of Company property.

"Gross Asset Value" means, with respect to any property of the Company (other than money), such property's adjusted basis for United States federal income tax purposes, except that:

(a)     the initial Gross Asset Value of each non-cash asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution, as determined by the agreement of the contributor(s) and the Manager;

(b)     the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Manager considers appropriate, whenever such adjustment is permitted under Treasury Regulations Section 1.704-1(b)(2)(ii);

(c)     the Gross Asset Value of any Company non-cash asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(d)     the Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of Company assets shall not be adjusted pursuant to this clause (d) to the extent the Manager determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e)     if the Gross Asset Value of any asset of the Company has been determined pursuant to either of clauses (a), (b) or (d) above, the Gross Asset Value of such asset shall thereafter be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Net Profit" and "Net Loss" mean, for each fiscal year or other period, the positive or negative difference, as applicable, between all items of Profit and all items of Loss for such period; provided that items of Profit and Loss specially allocated to a Member pursuant to Section 6.4 of the Agreement and Sections A.III.2 and A.III.3 of this Schedule B shall be excluded from the computation of Net Profit and Net Loss.

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or losses for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from United States federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or losses from the disposition of such property for purposes of computing Profits or Losses;

(d)     In lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation;

(e)     Gains or losses resulting from the disposition of Company property shall be computed by reference to the Gross Asset Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's membership interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Specified Company Asset" means any capital asset owned by the Company with respect to which the Members have agreed to share proceeds from a sale, refinancing or other disposition thereof in a sharing ratio set forth with respect to each such Specified Company Asset from time to time on Schedule B.

A.II.    *Members' Capital Accounts*.

1.     There shall be established for each Member on the books and records of the Company a Capital Account.  Each Member's initial Capital Account shall be zero and, without limiting the generality of the foregoing, shall be adjusted as follows:

(a)     To each Member's Capital Account there shall be credited such Member's Capital Contributions (net of any liabilities assumed by the Company or which are secured by any property contributed by such Member), such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections A.III.2 and A.III.3.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement (net of any liabilities assumed by the Member or which are secured by any property distributed to such Member by the Company), such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections A.III.2 and A.III.3.

2.     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts and allocations to Members (collectively, the "Allocation Provisions") are intended to comply with Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with such statutory and regulatory provisions.

3.     In the event all or a portion of an Interest in the Company is transferred in accordance with the terms of Section 7.2, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest, adjusted as required by the aforementioned Treasury Regulations.

A.III.   *Allocations*.

1.     *Reserved*.

2.    *Special Allocations.*   The following special allocations shall be made in the following order, in each case on a Company Asset-by-Company Asset basis:

(a)    *Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.7042(f) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2, if there is a net decrease in Company Minimum Gain during any fiscal year or other period, each Member shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(f) of the Treasury Regulations.  This Section A.III.2(a) is intended to comply with the minimum gain Chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    *Member Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section A.III.2(b), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year or other period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated Profits for such fiscal year or other period (and, if necessary, subsequent fiscal years or other periods) in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section A.III.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    *Qualified Income Offset.*  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, Profits shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section A.III.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Schedule B have been tentatively made as if this Section A.III.2(c) were not in the Agreement.  This Section A.III.2(c) is intended to comply with the qualified income offset requirement of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)    *Nonrecourse Deductions.*  Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in accordance with the method by which the Members share profits, as determined by the Manager.

(e)    *Member Nonrecourse Deductions.*  Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of losses with respect to the Member Nonrecourse Debt to which such Member

Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

3.    *Curative Allocations.*  The allocations set forth in clauses 2(a), 2(b), 2(c), 2(d) and 2(e) of Section A.III hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, losses or deduction pursuant to this Section A.III.3.    Therefore, notwithstanding any other provision of this Schedule B (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, losses or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 6.4.  In exercising its discretion under this Section A.III.3, the Manager shall take into account future Regulatory Allocations under clauses 2(a) and 2(b) of Section A in that, although not yet made, are likely to offset other Regulatory Allocations previously made.

4.    *Liquidating Allocations*.  It is intended that immediately prior to a distribution of proceeds from liquidation of the Company pursuant to Article 9 of this Agreement, the positive Capital Account balance of each Member shall be equal to the total amount that such Member would receive upon a liquidation pursuant to Section 6.1.  Accordingly, to the extent permissible under Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, Profits and Losses and, if necessary, items of gross income, gain, deduction, and loss, of the Company for the year of liquidation (or, if the liquidation or event spans more than a year, each such year) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive upon a liquidation pursuant to Section 6.1.  Notwithstanding the foregoing, to the extent a Member has been allocated Profits pursuant to Section 6.4(a) in excess of the amount of distributions received by such Member under Section 6.1(a), then such Member shall receive the first amount of distributions under Section 9.3(e), in proportion to the amount of the excess, until such excess has been eliminated, provided, that the aggregate amount of distributions pursuant to Section 9.3(e) upon a liquidation shall as close as possible be in proportion to the percentage shares set forth in Section 9.3(e).

A.IV.    *Other Allocation Rules*.

1.    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits.  Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

2.    The Company's "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to, the Members in accordance with the method by which the Members share profits, as determined by the Manager.

3.    Tax Allocations: Code Section 704(c).

(a)     For U.S. federal income tax purposes, items of Company income, gain, loss, and deduction shall be allocated among the Members in conformity with the book allocations described in the preceding sections of this Schedule B except as otherwise provided in this Section A.IV.3.

(b)     Solely for federal income tax purposes, items of taxable income, gain, loss and deduction shall be allocated among the Members in accordance with Section 704(c) of the Code to the extent necessary to reduce or eliminate any disparity between the Gross Asset Value and adjusted tax basis, at the time of contribution or pursuant to subparagraph (b) of the definition of Gross Asset Value, of any asset of the Company contributed to the Company or that has been revalued on the books of the Company.  Any elections or other decisions relating to such allocation shall be made by the Manager in any manner that reasonably reflects the purpose and intention of the Agreement.

(c)     In the event that the Company has taxable income that is characterized as ordinary income under the depreciation and amortization recapture provisions of Sections 1245 and 1250 of the Code, such income shall, to the maximum extent permissible under the Code and Regulations, be allocated to the Members that were allocated the depreciation and amortization giving rise to such recapture amounts.

(d)     Allocations pursuant to this Section A.IV.3 are solely for purposes of United States federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

B.     *Company Representative*.

The partnership representative of the Company pursuant to Code Section 6223 shall be a Person designated from time to time by the Manager subject to replacement by the Manager.  (Any Person who is designated as the partnership representative is referred to herein as the "Company Representative").  The Company Representative shall inform HCRE of all significant matters that may come to its attention in its capacity as Company Representative by giving notice thereof on or before the 20th day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity.  The Company Representative shall take no action without the authorization of the Manager, other than such action as may be required by law.  Any reasonable, documented cost or expense incurred by the Company Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Company Representative shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Manager.  If any Member intends to flea notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

C.     *Tax Elections*.

1 .     The Manager may cause the Company to make all elections required or permitted to be made by the Company under the Code (including but not limited to an election under Section 754 or Section 743(e) of the Code); provided, that, the Manager shall make an election under Section 754 of the Code if requested in writing by a Member, whether such Member is a transferor or transferee.

# CLAIMANT'S EXHIBIT 3

Claim #146  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern __ District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | HCRE Partner, LLC |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| | | ☐ Yes. From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | HCRE Partner, LLC<br>300 Crescent Court, Ste. 700<br>Dallas, TX 75201 | |
| | | Contact phone _____ | Contact phone _____ |
| | | Contact email bryan.assink@bondsellis.com | Contact email _____ |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes. Who made the earlier filing? _____ |

Claimant's
EXHIBIT
**3**

Official Form 410                          Proof of Claim

1934054200408000000000058

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**   $ _See attached Exhibit "A"_   . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See attached Exhibit "A"_

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410                                   Proof of Claim

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | | |
|---|---|---|---|---|
| | | | | **Amount entitled to priority** |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |
| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | | |

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date   04/08/2020
                   MM / DD / YYYY


/s/James D. Dondero
Signature

Print the name of the person who is completing and signing this claim:

Name     James D. Dondero
         First name          Middle name          Last name

Title    _____

Company  HCRE Partner, LLC
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone  _____     Email  _____

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:**<br>19-34054 - Highland Capital Management, L.P.<br>**District:**<br>Northern District of Texas, Dallas Division | |
| **Creditor:**<br>HCRE Partner, LLC<br><br>300 Crescent Court, Ste. 700<br><br>Dallas, TX, 75201<br>**Phone:**<br>**Phone 2:**<br>**Fax:**<br>**Email:**<br>bryan.assink@bondsellis.com | **Has Supporting Documentation:**<br>Yes, supporting documentation successfully uploaded<br>**Related Document Statement:** |
| | **Has Related Claim:**<br>No<br>**Related Claim Filed By:** |
| | **Filing Party:**<br>Authorized agent |
| **Other Names Used with Debtor:** | **Amends Claim:**<br>No<br>**Acquired Claim:**<br>No |
| **Basis of Claim:**<br>See attached Exhibit "A" | **Last 4 Digits:**<br>No  **Uniform Claim Identifier:** |
| **Total Amount of Claim:**<br>See attached Exhibit "A" | **Includes Interest or Charges:**<br>No |
| **Has Priority Claim:**<br>No | **Priority Under:** |
| **Has Secured Claim:**<br>No<br>**Amount of 503(b)(9):**<br>No<br>**Based on Lease:**<br>No<br>**Subject to Right of Setoff:**<br>No | **Nature of Secured Amount:**<br>**Value of Property:**<br>**Annual Interest Rate:**<br>**Arrearage Amount:**<br>**Basis for Perfection:**<br>**Amount Unsecured:** |
| **Submitted By:**<br>James D. Dondero on 08-Apr-2020 4:47:11 p.m. Eastern Time<br>**Title:**<br>**Company:**<br>HCRE Partner, LLC | |

**Exhibit A**

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an entity called SE Multifamily Holdings, LLC ("SE Multifamily").  Claimant may be entitled to distributions out of SE Multifamily, but such distributions have not been made because of the actions or inactions of the Debtor.  Additionally, Claimant contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does belong to the Debtor or may be the property of Claimant.  Accordingly, Claimant may have a claim against the Debtor.  Claimant has requested information from the Debtor to ascertain the exact amount of its claim.  This process is on-going.  Additionally, this process has been delayed due to the outbreak of the Coronavirus.  Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

# CLAIMANT'S EXHIBIT 4

**Execution Version**

BRIDGE LOAN AGREEMENT

dated as of

September 26, 2018

among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY
INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL
ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND CERTAIN
PROPERTY OWNERS LISTED HEREIN,
collectively, as Borrower

and

The Lenders Party Hereto

and

KEYBANK NATIONAL ASSOCIATION,
as Administrative Agent

and

KEYBANC CAPITAL MARKETS,
As Sole Lead Arranger and Bookrunner



## TABLE OF CONTENTS

ARTICLE I Definitions ............................................................................................................. 1

    Section 1.01 Defined Terms ................................................................................................ 1

    Section 1.02 Classification of Loans and Borrowings.................................................... 25

    Section 1.03 Terms Generally ........................................................................................... 25

    Section 1.04 Accounting Terms; GAAP.......................................................................... 25

    Section 1.05 Appointment of Lead Borrower.................................................................. 25

ARTICLE II The Loans ........................................................................................................... 26

    Section 2.01 [Intentionally Omitted] ................................................................................ 26

    Section 2.02 Commitments ................................................................................................ 26

    Section 2.03 Loans and Borrowings................................................................................. 27

    Section 2.04 [Intentionally Omitted] ................................................................................ 27

    Section 2.05 [Intentionally Omitted] ................................................................................ 27

    Section 2.06 [Intentionally Omitted] ................................................................................ 27

    Section 2.07 [Intentionally Omitted]. ............................................................................... 27

    Section 2.08 Interest Elections.......................................................................................... 27

    Section 2.09 Reserved......................................................................................................... 28

    Section 2.10 Repayment of Loans; Evidence of Debt. ................................................... 29

    Section 2.11 Prepayment of Loans. ................................................................................... 29

    Section 2.12 Fees. ................................................................................................................ 31

    Section 2.13 Interest. .......................................................................................................... 31

    Section 2.14 Alternate Rate of Interest ............................................................................ 32

    Section 2.15 Increased Costs. ............................................................................................ 33

    Section 2.16 Break Funding Payments ............................................................................ 34

    Section 2.17 Taxes. ............................................................................................................. 35

    Section 2.18 Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .......... 39

    Section 2.19 Mitigation Obligations; Replacement of Lenders................................... 40

    Section 2.20 Defaulting Lenders. ...................................................................................... 41

    Section 2.21 Extension of Tranche A Maturity Date...................................................... 42

    Section 2.22 Extension of Tranche B Maturity Date...................................................... 43

ARTICLE III Representations and Warranties..................................................................... 43

    Section 3.01 Organization; Powers................................................................................... 43

    Section 3.02 Authorization; Enforceability ..................................................................... 43

    Section 3.03 Governmental Approvals; No Conflicts .................................................... 44

    Section 3.04 Financial Condition; No Material Adverse Change. ................................ 44

    Section 3.05 Properties. ...................................................................................................... 44

    Section 3.06 Intellectual Property...................................................................................... 45

    Section 3.07 Litigation and Environmental Matters....................................................... 46

    Section 3.08 Compliance with Laws and Agreements ................................................... 48

    Section 3.09 Investment and Holding Company Status ................................................. 48

    Section 3.10 Taxes .............................................................................................................. 48

Section 3.11 ERISA ...................................................................................................... 48
Section 3.12 Disclosure ............................................................................................... 48
Section 3.13 Solvency .................................................................................................. 48
Section 3.14 Margin Regulations................................................................................. 49
Section 3.15 Subsidiaries ............................................................................................ 49
Section 3.16 OFAC; Anti-Money Laundering ............................................................ 49
Section 3.17 EEA Financial Institution ...................................................................... 49
Section 3.18 Single Asset Entity; Compliance With Laws ......................................... 49

ARTICLE IV Conditions ................................................................................................ 51

Section 4.01 Effective Date ......................................................................................... 51
Section 4.02 Each Borrowing ...................................................................................... 53

ARTICLE V Affirmative Covenants .............................................................................. 53

Section 5.01 Financial Statements; Ratings Change and Other Information ............... 53
Section 5.02 Financial Tests. ....................................................................................... 54
Section 5.03 Notices of Material Events ..................................................................... 54
Section 5.04 Existence; Conduct of Business .............................................................. 55
Section 5.05 Payment of Obligations .......................................................................... 55
Section 5.06 Maintenance of Properties; Insurance. ................................................... 55
Section 5.07 Books and Records; Inspection Rights. .................................................. 58
Section 5.08 Compliance with Laws ........................................................................... 58
Section 5.09 Use of Proceeds ...................................................................................... 58
Section 5.10 Fiscal Year .............................................................................................. 58
Section 5.11 Environmental Matters ........................................................................... 58
Section 5.12 Collateral Requirement. .......................................................................... 60
Section 5.13 Further Assurances ................................................................................. 62
Section 5.14 [Intentionally Omitted] ........................................................................... 62
Section 5.15 [Intentionally Omitted] ........................................................................... 62
Section 5.16 Approved Leases...................................................................................... 62
Section 5.17 Permanent Financing .............................................................................. 63
Section 5.18 Keepwell. ................................................................................................ 63
Section 5.19 DST Offerings.......................................................................................... 63

ARTICLE VI Negative Covenants .................................................................................. 65

Section 6.01 Liens........................................................................................................ 65
Section 6.02 Fundamental Changes ............................................................................. 66
Section 6.03 Investments, Loans, Advances and Acquisitions..................................... 66
Section 6.04 Hedging Agreements ............................................................................... 66
Section 6.05 Restricted Payments ............................................................................... 66
Section 6.06 Transactions with Affiliates.................................................................... 66
Section 6.07 [Intentionally Omitted] ........................................................................... 66
Section 6.08 Restrictive Agreements........................................................................... 67
Section 6.09 Indebtedness............................................................................................ 67
Section 6.10 Subordination of Claims ........................................................................ 68
Section 6.11 Amendment to Organizational Documents.............................................. 68

Section 6.12 Sanctions ........................................................................................ 68
Section 6.13 Specified DSTs. ............................................................................. 69

ARTICLE VII Events of Default ......................................................................... 70

ARTICLE VIII The Administrative Agent ........................................................... 73

ARTICLE IX Miscellaneous ............................................................................... 76

Section 9.01 Notices ........................................................................................... 76
Section 9.02 Waivers; Amendments.................................................................... 77
Section 9.03 Expenses; Indemnity; Damage Waiver........................................... 78
Section 9.04 Successors and Assigns. ................................................................. 79
Section 9.05 Survival .......................................................................................... 82
Section 9.06 Counterparts; Integration; Effectiveness. ....................................... 83
Section 9.07 Severability .................................................................................... 83
Section 9.08 Right of Setoff................................................................................ 83
Section 9.09 Governing Law; Jurisdiction; Consent to Service of Process. ......... 84
Section 9.10 WAIVER OF JURY TRIAL ........................................................... 85
Section 9.11 Headings ........................................................................................ 85
Section 9.12 Confidentiality ............................................................................... 85
Section 9.13 Interest Rate Limitation .................................................................. 86
Section 9.14 USA PATRIOT Act ....................................................................... 86
Section 9.15 Fiduciary Duty/No Conflicts. ......................................................... 87
Section 9.16 Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 87
Section 9.17 Multiple Borrowers; Joint and Several Liability. ............................. 88

SCHEDULES:

| | | |
|---|---|---|
| Schedule 1.01 | – | Property Owner Borrowers |
| Schedule 2.01 | – | Commitments |
| Schedule 3.05 | – | Portfolio Properties |
| Schedule 3.07 | – | Litigation Disclosure |
| Schedule 3.15 | – | Subsidiaries |
| Schedule 6.09 | – | Existing Indebtedness |
| Schedule 6.10 | – | Junior Claims |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | -- | Form of Assignment and Acceptance |
| Exhibit B | – | Form of Compliance Certificate |
| Exhibit C | – | Form of Guaranty |
| Exhibit D | – | Form of Note |
| Exhibit E | – | Form of Borrowing Request/Interest Rate Election |
| Exhibit F | – | Form of Tax Compliance Certificate |

BRIDGE LOAN AGREEMENT ("Agreement") dated as of

September 26, 2018, among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND THE PROPERTY OWNERS LISTED ON SCHEDULE 1.01 HERETO, individually and collectively, jointly and severally, as Borrower,

the LENDERS party hereto,

KEYBANK NATIONAL ASSOCIATION, as Administrative Agent,

And

KEYBANC CAPITAL MARKETS, as Sole Lead Arranger and Boookrunner

## ARTICLE I

## Definitions

Section 1.01 Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adjusted EBITDA" means (a) EBITDA for the most recently ended calendar quarter, annualized, less (b) the Capital Expenditure Reserve.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means KeyBank, National Association, in its capacity as administrative agent for the Lenders hereunder.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advisor" means, collectively, NexPoint Advisors, L.P. and NexPoint Real Estate Advisors IV, L.P.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, and (c) the applicable LIBO Rate for a one month Interest Period plus one percent (1%) per annum.  Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Anti-Corruption Laws" means all Legal Requirements of any jurisdiction concerning or relating to bribery or corruption, including without limitation, the Foreign Corrupt Practices Act of 1977.

"Anti-Money Laundering Laws" means all Legal Requirements related to the financing of terrorism or money laundering, including without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Commitments of the Lenders represented by such Lender's Commitment.  If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"Applicable Rate" means, a rate per annum equal to: (a) with respect to Tranche A Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 140 basis points, and for any ABR Borrowing, 40 basis points and (b) with respect to Tranche B Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 375 basis points, and for any ABR Borrowing, 275 basis points.

"Appraisal" (whether one or more) means a written appraisal of the Mortgaged Properties by an MAI appraiser satisfactory to the Administrative Agent.  Each Appraisal must comply with all Legal Requirements and, unless specifically provided to the contrary in this Agreement, must be in form and substance reasonably satisfactory to the Administrative Agent.

"Appraised Value" means the "as is" value of Real Property, as set forth in the most recent Appraisal for such Real Property.

"Approved Fund" has the meaning set forth in Section 9.04(b).

"Approved Lease" has the meaning set forth in Section 5.16.

"Arranger" means KeyBanc Capital Markets or any successors thereto.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Assignment of Leases and Rents</u>" means an assignment of leases and rents from the applicable Borrower to the Administrative Agent delivered to secure the Obligations, as may be modified or amended.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time, which is described in the EU Bail-In Legislation Schedule.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association, or such other form as may be reasonably requested by any Lender.

"<u>BH Pledgor</u>" means BHSL Holdings, LLC, an Iowa limited liability company.

"<u>BH Loan</u>" means that certain $10,000,000 loan from SE Multifamily Holdings, LLC, a Delaware limited liability company, to the BH Pledgor pursuant to the BH Loan Agreement.

"<u>BH Loan Agreement</u>" means that certain Promissory dated as of the Effective Date by SE Multifamily Holdings, LLC, a Delaware limited liability company, and BH Pledgor.

"BH Loan Documents" means, collectively, the BH Loan Agreement, the BH Pledges, and each other documents or certificate entered into in connection therewith.

"<u>BH Pledges</u>" means those certain Pledge and Security Agreements by the BH Pledgor and/or its Subsidiaries in favor of the Lender to secure the BH Loan, which have been assigned to the Administrative Agent as Collateral for the loan.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" means, individually and collectively, jointly and severally, Highland Capital, HCRE PARTNERS, LLC, a Delaware limited liability company, The Dugaboy Investment Trust, The SLHC Trust, NEXPOINT ADVISORS, L.P., a Delaware limited partnership, NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership, the REIT Borrower, and each Property Owner Borrower.

"<u>Borrowing</u>" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in accordance with <u>Section 2.03</u>.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts or New York, New York are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan or Daily LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditure Reserve" means, on an annual basis, an amount equal to $250 per unit with respect to each Real Property owned by the Borrower or any Subsidiary.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means, collectively, all shares of capital stock (whether denominated as common or preferred stock), equity interests, partnership, limited liability company, or membership interests, joint venture interests or other ownership interests in or equivalents of or in a Person (other than an individual), whether voting or non-voting, and to the extent not included in the foregoing, any of a member's or partner's control rights in such Person, including the rights to manage or participate in management, voting rights, inspection rights and other rights.

"Change in Control" means (a) a transfer or series of transfers of any legal or equitable interest since the Effective Date that results in a change of more than 50% of the ownership interests in any Borrower (other than the Property Owner Borrowers); (b) James Dondero ceases to be the manager of HCRE Partners, LLC, a Delaware limited liability company, the sole member of NexPoint Advisors GP, LLC, or the sole member of NexPoint Real Estate Advisors GP, LLC, in each case, unless replaced with an Affiliate thereof; (c) the acquisition of more than 50% of the ownership interests in HCRE Partners, LLC by any Person other than The Dugaboy Investment Trust, unless replaced with an Affiliate of James Dondero; (d) the failure of Highland Capital, HCRE Partners, LLC, and the REIT Borrower, in the aggregate, to own, directly or indirectly, free and clear of any Liens except those granted in favor of the Agent, 90% of the ownership interests in, and Control, each Property Owner Borrower, (e) the replacement, removal or resignation of NexPoint Real Estate Advisors GP, LLC as general partner of NexPoint Real Estate Advisors IV, L.P., unless replaced with an Affiliate thereof, (f) the replacement, removal or resignation of NexPoint Advisors GP, LLC as general partner of NexPoint Advisors, L.P., unless replaced with an Affiliate thereof, or (g) the replacement, removal or resignation of the trustee of the SLHC Trust as of the Effective Date, unless replaced with an Affiliate thereof.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement by any Governmental Authority, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline

or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.  Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property, tangible or intangible, real, personal or mixed, now or hereafter subject to the liens and security interests of the Loan Documents, or intended so to be, which Collateral shall secure the Obligations and Hedging Obligations.

"Collateral Assignment of Management Contract" means each Collateral Assignment of Management Contract by and among a Borrower, the applicable manager and the Administrative Agent previously, now or hereafter delivered to secure the Obligations, as the same may be amended, modified, supplemented or replaced from time to time.

"Collateral Subsidiary" means each Subsidiary of the Borrower which owns a direct or indirect interest in a Portfolio Property.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01.  As of the Effective Date, the aggregate amount of the Lenders' Commitments is $556,275,000.00.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communication" has the meaning set forth in ARTICLE VIII.

"Compliance Certificate" has the meaning set forth in Section 5.01(d) hereof and a form of which is attached hereto as Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, which includes the customary powers of a managing member of any limited liability company, any general partner of any limited partnership, or any board of directors of a corporation.  "Controlling" and "Controlled" have meanings correlative thereto.

"Cost To Repair" has the meaning set forth in Section 5.06(d).

"Current Survey" means a boundary survey of each Mortgaged Property.

"Daily LIBOR" means, for any Business Day, the LIBO Rate as determined by the Administrative Agent for a Loan with an Interest Period of one month in the amount of the subject Daily LIBOR Loan.

"Debtor Relief Laws" means any applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, fraudulent conveyance, reorganization, or similar laws affecting the rights, remedies, or recourse of creditors generally, including without limitation the Bankruptcy Code and all amendments thereto, as are in effect from time to time during the term of this Agreement.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that: (a) has failed to perform any of its funding obligations hereunder, including in respect of its Commitment, within two (2) Business Days of the date required to be funded by it hereunder; (b) has notified the Borrower or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder (unless such notification or public statement relates to such Lender's obligation to fund a Loan and indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular Default, if any) to funding a Loan is not or cannot be satisfied) or under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after written request by the Administrative Agent or a Borrower (and the Administrative Agent has received a copy of such request), to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations hereunder; or (d) has, or has a direct or indirect parent company that has: (i) become the subject of a proceeding under any Debtor Relief Law; (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it; or (iii) in the good faith determination of the Administrative Agent, taken any material action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; or (iv) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority; provided, further, that such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Lender.

"Designated Jurisdiction" means any country, region, or territory to the extent that such country, region, or territory itself, or its government, is the subject or target of any Sanction.

"Dollars" or "$" refers to lawful money of the United States of America.

"DST" means, a Delaware statutory trust.

"DST Depositor" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other Person approved by the Agent that becomes a depositor with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"DST Sale" has the meaning set forth in Section 6.13(a).

"DST Permitted Sale" has the meaning set forth in Section 6.13(a).

"EBITDA" means an amount derived from (a) net income, plus (b) to the extent included in the determination of net income, depreciation, amortization, interest expense and income taxes, plus or minus (c) to the extent included in the determination of net income, any extraordinary losses or gains, such as those resulting from sales of payment of Indebtedness, plus (d) to the extent not capitalized, the amount of non-recurring expenses, fees, costs and charges incurred in connection with the Loan, plus (e) to the extent not capitalized, the amount of all non-recurring expenses, fees, costs and charges incurred with any acquisition, issuance of debt or equity, asset disposition or investment permitted hereunder, or any proposed or actual amendment, modification or refinancing of any Indebtedness, plus or minus (f) to the extent included in the determination of net income, any realized or unrealized losses or gains on investments; in each case, as determined for Borrower and its Wholly-Owned Subsidiaries on a consolidated basis, and including (without duplication) the Equity Percentage of EBITDA for the Borrower's Unconsolidated Affiliates.

"Economic Interests Pledge" means that certain Pledge and Security Agreement (Economic Interests), dated as of the date hereof, by and among certain of the Borrowers and the Administrative Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Electronic System" has the meaning set forth in ARTICLE VIII.

"Environmental Assessment" shall mean a written assessment and report approved by the Administrative Agent as to the status of each Mortgaged Property regarding compliance with any Legal Requirements related to environmental matters and accompanied by a reliance letter satisfactory to the Administrative Agent.  Each Environmental Assessment must comply with all Legal Requirements.

"Environmental Claim" means any notice of violation, action, claim, Environmental Lien, demand, abatement or other order or direction (conditional or otherwise) by any Governmental Authority or any other Person for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restriction, resulting from or based upon (i) the existence, or the continuation of the existence, of a Release (including, without limitation, sudden or non-sudden accidental or non-accidental Releases) of, or exposure to, any Hazardous Material, or other Release in, into or onto the environment (including, without limitation, the air, soil, surface water or groundwater) at, in, by, from or related to any property owned, operated or leased by the Borrower or any of its Subsidiaries or any activities or operations thereof; (ii) the environmental aspects of the transportation, storage, treatment or disposal of Hazardous Materials in connection with any property owned, operated or leased by the Borrower or any of its Subsidiaries or their operations or facilities; or (iii) the violation, or alleged violation, of any Environmental Laws or Environmental Permits of or from any Governmental Authority relating to environmental matters connected with any property owned, leased or operated by the Borrower or any of its Subsidiaries.

"Environmental Indemnity" means that certain Environmental Compliance and Indemnity Agreement of even date herewith by the Borrower and delivered to the Administrative Agent, together with any other environmental risk or indemnity agreement hereafter executed with respect to any Mortgaged Property.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters and includes (without limitation) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §  9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §  1801 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §  136 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §  6901 et seq., the Toxic Substances Control Act, 15 U.S.C. §  2601 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. §  1251 et seq., the Occupational Safety and Health Act, 29 U.S.C. §  651 et seq., (to the extent the same relates to any Hazardous Materials), and the Oil Pollution Act of 1990, 33 U.S.C. §  2701 et seq., as such laws have been amended or supplemented, and the regulations promulgated pursuant thereto, and all analogous state and local statutes.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of

any Environmental Law, (b) exposure to any Hazardous Materials in violation of any Environmental Law, (c) the Release or threatened Release of any Hazardous Materials into the environment in violation of any Environmental Law or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" means any lien in favor of any Governmental Authority arising under any Environmental Law.

"Environmental Permit" means any permit required under any applicable Environmental Law or under any and all supporting documents associated therewith.

"Equity Interests" means, with respect to any Person, all of the shares, partnership or membership interests, economic and other rights, participations or other equivalents (however designated) of Capital Stock of such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of such Person, all of the securities convertible into or exchangeable for shares of Capital Stock of such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, membership or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Offering" means, any issuance and/or sale after the effective Date by any Person of any Equity Interests or equity securities of such Person, including, without limitation, (a) any new preferred securities, and (b) any conversion of equity interests or securities into equity interests in such Person.

"Equity Percentage" means the aggregate ownership percentage of Borrower in each Unconsolidated Affiliate, which shall be calculated as the greater of (a) Borrower's nominal capital ownership interest in the Unconsolidated Affiliate as set forth in the Unconsolidated Affiliate's organizational documents, and (b) Borrower's economic ownership interest in the Unconsolidated Affiliate, reflecting Borrower's share of income and expenses of the Unconsolidated Affiliate.

"Equity Proceeds Pledge" shall mean the pledge and security agreement dated as of even date herewith related to any equity issuance proceeds of the Borrower granted by the Borrower to the Administrative Agent, together with all other instruments, agreements and written obligations executed and/or delivered by any of the Borrowers in connection therewith.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to the liability of any Borrower with respect to a Swap Obligation, including the grant of a security interest to secure such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the liability or grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under an agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or its Commitment pursuant to Legal Requirements in effect on the date on which (i)

such Lender acquires such interest in the Loan or its Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.17 as a result of costs sought to be reimbursed pursuant to Section 2.17 or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17 amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.  Notwithstanding the foregoing, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed zero for the purposes of this Agreement.

"Fee Letter" means that certain Fee Letter dated as of the date hereof by and between the Borrower and the Agent, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Financing Statements" means all such Uniform Commercial Code financing statements as the Administrative Agent shall require, duly authorized by the Borrower, to give notice of and to perfect or continue perfection of the Lenders' security interest in all Collateral.

"Fixed Charge Coverage Ratio" means the ratio of (a) Adjusted EBITDA for the immediately preceding calendar quarter of Borrower and its Subsidiaries to (b) the sum of (i) all regularly scheduled principal due and payable and actually paid on Indebtedness (other than amounts paid in connection with balloon maturities and payments in respect of the Loans), including the Equity Percentage for such amounts for the Borrower's Unconsolidated Affiliates, plus (ii) all Interest Expense, plus (iii) the aggregate amount of all cash dividends payable on any preferred stock for the immediately preceding calendar quarter, in each case, for the Borrower and its Subsidiaries.

"Foreign Lender" means, if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"GAAP" means generally accepted accounting principles in the United States of America, subject to the provisions of Section 1.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law; provided, that Hazardous Materials shall not include any such substances or wastes utilized or maintained at the Real Property in the ordinary course of business and in accordance with all applicable Environmental Laws.

"HCRE Property" "individually, or collectively "HCRE Properties," means, as of the Effective Date, each of the Real Properties set forth in Schedule 1.01(A) hereto.

"Hedging Agreement" means any interest rate protection agreement (including an interest rate cap), foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Hedging Obligations" means, with respect to the any Borrower or any Subsidiary of the Borrower, any obligations arising under any Hedging Agreement entered into with the Administrative Agent or any Lender with respect to the Loans. Under no circumstances shall any of the Hedging Obligations secured or guaranteed by any Loan Document as to a surety or guarantor thereof include any obligation that constitutes an Excluded Swap Obligation of such Person.

"Highland Capital" means HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware limited partnership.

"Impacted Interest Period" has the meaning set forth in the definition of LIBO Rate.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, including mandatorily redeemable preferred stock, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, but excluding customary non-recourse, carveout guarantees and environmental indemnitees until such time as such guarantees or indemnitees become a recourse obligation, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations, contingent or otherwise, of such Person with respect to any Hedging Agreements (calculated on a mark-to-market basis as of the reporting date), and (l) payments received in consideration of sale of an ownership interest in Borrower when the interest so sold is determined, and the date of delivery is, more than one (1) month after receipt of such payment and only to the extent that the obligation to deliver such interest is not payable solely in such interest of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  For purposes of calculating the financial covenants set forth herein, Indebtedness shall not include any Indebtedness that has been expressly subordinated in right of payment to the Obligations on terms and conditions acceptable to the Administrative Agent, including, without limitation, intercompany Indebtedness that is subject to Section 6.10(b).  Indebtedness shall be calculated on a consolidated basis for the Borrower and its Wholly-Owned Subsidiaries, and including (without duplication) the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Information Materials" has the meaning set forth in ARTICLE VIII.

"Interest Election Request" means a request by the Borrower to convert or continue the then outstanding amount of the Loan in accordance with Section 2.07.

"Interest Expense" means, with respect to any Person, all paid, accrued or capitalized interest expense on such Person's Indebtedness (whether direct, indirect or contingent, and

including, without limitation, interest on all convertible debt), and including (without duplication) the Equity Percentage of Interest Expense for the Borrower's Unconsolidated Affiliates.

"Interest Payment Date" means the first Business Day of each calendar month.

"Interest Period" means with respect to any Eurodollar Loan, the period commencing on the date that the then outstanding portion of the Loan is converted to or continued as a Eurodollar Loan, and ending on the numerically corresponding day in the calendar month that is one or three months thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Loan that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Borrowing, thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded  to the same number of decimal places as the LIBO Rate)  determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Rate for the longest period for which the LIBO Rate is available that is shorter than the Impacted Interest Period; and (b) the LIBO Rate for the shortest period for which that LIBO Rate is available that exceeds the Impacted Interest Period, in each case, at such time.

"KeyBank" means KeyBank, National Association, in its individual capacity.

"Lead Borrower" means HCRE Partners, LLC.

"Legal Requirement" means any law, statute, ordinance, decree, requirement, order, judgment, rule, regulation (or interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" means, subject to Section 2.14(b),with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate

- 14 -

from time to time as selected by the Administrative Agent in its reasonable discretion; in each case the "LIBOR Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that (i) if the LIBOR Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement; provided further that if the LIBOR Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate; provided that if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement, and (ii) if no such rate administered by ICE Benchmark Administration (or by such other Person that has taken over the administration of such rate for U.S. Dollars) is available to the Administrative Agent, the applicable LIBO Rate for the relevant Interest Period shall instead be the rate determined by the Administrative Agent to be the rate at which KeyBank or one of its Affiliate banks offers to place deposits in U.S. dollars with first class banks in the London interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in the approximate amount of the relevant Eurodollar Loan and having a maturity equal to such Interest Period.

"LIBOR Screen Rate" is defined in the definition of LIBO Rate.

"Lien" means, with respect to an asset, (a) any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, negative pledge, collateral assignment, encumbrance, deposit arrangement, charge or security interest in, on or of such asset; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; (c) the filing under the Uniform Commercial Code or comparable law of any jurisdiction of any financing statement naming the owner of the asset to which such Lien relates as debtor; (d) any other preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation; and (e) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, including any dividend reinvestment or redemption plans.

"Liquidity" means the sum of (i) unencumbered and unrestricted cash and cash equivalents of the Borrower, excluding any debt service, capital improvement or other similar reserve funds held under or required by any loan documents entered in to by the Borrower or any Subsidiary, plus (ii) the market value of all common shares of NexPoint Residential Trust, Inc. or operating partnership units in NexPoint Residential Operating Partnership, LP, in each case, owned by The Dugaboy Investment Trust and which have been pledged as Collateral for the Obligations, plus (iii) the market value of all unencumbered and unrestricted marketable securities held by Borrower, plus (iv) the market value of all unencumbered and unrestricted marketable securities held by Borrower less all related outstanding Indebtedness.

"Loan" means the loans made by the Lenders to the Borrower pursuant to Section 2.02 of this Agreement, including, without limitation, the Tranche A Loan and Tranche B Loan.

"Loan Documents" means this Agreement, the Notes, the Mortgages, the Environmental Indemnity, the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interests Pledge, the Financing Statements, and all other instruments, agreements and written obligations executed and delivered by any of the Borrowers in connection with the transactions contemplated hereby.

"Management Company" means, each of BH Management Services, LLC, an Iowa limited liability company, and Milestone Management, LLC, a Delaware limited liability company.

"Mandatory Prepayment" has the meaning set forth in Section 2.11(d).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or financial condition of (i) the Borrower and its Subsidiaries taken as a whole, (b) the ability of any of the Borrowers to perform their obligations under the Loan Documents or (c) the rights of benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect: (A) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Borrower, and its Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (B) any change in applicable Law, rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) the failure, in and of itself, of the Borrower to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; or (D) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, the Administrative Agent.

"Material Contract" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which any Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the Tranche A Maturity Date or the Tranche B Maturity Date, as applicable.

"Maximum Rate" shall have the meaning set forth in Section 9.13.

"Mortgage" (whether one or more) means a deed of trust and security agreement, a mortgage and security agreement, or a security deed (or deed to secure debt) and security agreement granted by each Property Owner Borrower in favor of the Administrative Agent, for the benefit of the Lenders, covering each Mortgaged Property in the aggregate amount of the Tranche A Loan.

"Mortgaged Property" individually, or collectively "Mortgaged Properties," means, as of the Effective Date, each of the nine (9) Real Properties identified as "Mortgaged Properties" in Schedule 3.05 hereto.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Note</u>" means a promissory note in the form attached hereto as <u>Exhibit D</u> payable to a Lender evidencing certain of the obligations of the Borrower under the Loans to such Lender and executed by Borrower, as the same may be amended, supplemented, modified or restated from time to time; "<u>Notes</u>" means, collectively, all of such Notes outstanding at any given time.

"<u>Obligations</u>" means all liabilities, obligations, covenants and duties of any Borrower to the Administrative Agent and/or any Lender arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Borrower or any Affiliate thereof of any proceeding under any bankruptcy or other insolvency proceeding  naming such person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings.  For the avoidance of doubt, "Obligations" shall not include any indebtedness, liabilities, obligations, covenants or duties in respect of Hedging Obligations.

"<u>OFAC</u>" has the meaning set forth in <u>Section 3.16</u>.

"<u>Offering Documents</u>" means, each Private Placement Memorandum and any supplements thereto relating to the sale of beneficial interests in any Specified DST, all as approved by Agent.

"<u>Other Taxes</u>" means, all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.17</u> as a result of costs sought to be reimbursed pursuant to <u>Section 2.17</u>).

"<u>Patriot Act</u>" has the meaning set forth in <u>Section 9.14</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Permitted Encumbrances</u>" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with <u>Section 5.05</u>;

(b)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(c)     deposits to secure the performance of bids, trade contracts, purchase, construction or sales contracts, leases, statutory obligations, surety and appeal bonds,

performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(d)     the Title Instruments, Liens and other matters described in the Title Insurance Policy for each Portfolio Property or HCRE Property;

(e)     uniform commercial code protective filings with respect to personal property leased to the Borrower or any Subsidiary;

(f)     landlords' liens for rent not yet due and payable;

(g)     Liens on the Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc. securing the Stonebridge Term Loan; and

(g)     liens on a Portfolio Property (other than a Mortgaged Property) arising under the Senior Loan or on an HCRE Property arising under property-level Indebtedness secured by such Real Property;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than the Senior Loan and the Stonebridge Term Loan.

"Permitted Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having an investment grade credit rating on the date of acquisition;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 90 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     investments of a Borrower in Subsidiaries and Unconsolidated Affiliates made in accordance with this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Pledge Agreement</u>" means those certain Pledge and Security Agreements executed by the Borrower in favor of Administrative Agent pledging Borrower's interest in the Pledged Interests.

"<u>Pledged DST Account</u>" has the meaning set forth in <u>Section 6.13(d)</u>.

"<u>Pledged Interests</u>" means, collectively, the ownership (or in the reasonable discretion of the Administrative Agent, the economic) interests now or hereafter pledged by Borrower and each Collateral Subsidiary and the economic interest, including rights to receive cash and other distributions from each other Subsidiary of the Borrower hereunder and subject to the liens and security interests of the Loan Documents, or intended so to be.

"<u>Portfolio One DST</u>" means NREA Southeast Portfolio One, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Andros Isles, Arborwalk, Walker Ranch, and Towne Crossing properties.

"<u>Portfolio One DST Depositor</u>" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio One DST.

"<u>Portfolio Property</u>" individually, or "<u>Portfolio Properties</u>" collectively, means each of the twenty three (23) Real Properties listed on <u>Schedule 3.05</u> hereto, including, without limitation, the Mortgaged Properties.

"<u>Portfolio Three DST</u>" means NREA Southeast Portfolio Three, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Arboleda, Fairways, and Grand Oasis properties.

"<u>Portfolio Three DST Depositor</u>" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Three DST.

"<u>Portfolio Two DST</u>" means NREA Southeast Portfolio Two, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the West Place, Vista Ridge, and Hidden Lake properties.

"<u>Portfolio Two DST Depositor</u>" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Two DST

"<u>Prime Rate</u>" means the rate of interest per annum publicly announced from time to time by KeyBank, National Association, as its prime rate in effect at its principal office in Cleveland, Ohio; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Property Owner Borrower" means each of the Persons listed on Schedule 1.01 hereto, which own the Mortgaged Properties.

"Qualified ECP Party" means, in respect of any interest rate cap, swap or other hedging obligation, each Person which is a Borrower that has total assets exceeding $10,000,000 at the time such Borrower's guarantee, mortgage and/or other credit or collateral support, of such interest rate cap, swap or other hedging obligation secured pursuant to the Deed to Secure Debt becomes effective, or otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder.

"Real Property" means, collectively, all interest in any land and improvements located thereon (including direct financing leases of land and improvements owned by a Borrower or any of Borrower's Subsidiaries), together with all equipment, furniture, materials, supplies and personal property now or hereafter located at or used in connection with the land and all appurtenances, additions, improvements, renewals, substitutions and replacements thereof now or hereafter acquired by a Borrower or any of Borrower's Subsidiaries.

"Recipient" means, each of the Administrative Agent and any Lender.

"Register" has the meaning set forth in Section 9.04.

"REIT Borrower" means SE MULTIFAMILY REIT HOLDINGS, LLC, a Delaware limited liability company.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching or migration on or into the indoor or outdoor environment or into or out of any property in violation of applicable Environmental Laws.

"Remedial Action" means all actions, including without limitation any capital expenditures, required or necessary to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material so it does not migrate or endanger public health or the environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) bring facilities on any property owned or leased by the Borrower or any of its Subsidiaries into compliance with all Environmental Laws.

"Required Lenders" means, as of any date of determination, Lenders having more than 66 2/3% of the Commitments or, if the Commitments of each Lender to make Loans have been terminated pursuant to Article VII, Lenders holding in the aggregate at least 66 2/3% of the aggregate Obligations; provided that the Commitment of, and the portion of the Obligations held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any ownership interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such ownership interests in the Borrower or any option, warrant or other right to acquire any such shares of capital stock of the Borrower.

"<u>Senior Credit Agreement</u>" means, collectively, each of those certain Loan Agreements, as amended, with the Federal Home Loan Mortgage Corporation, as lender, set forth on Schedule 3.05 hereof with respect to the Portfolio Properties (other than the Mortgaged Properties).

"<u>Senior Loan</u>" means each loan made pursuant to a Senior Credit Agreement.

"<u>Senior Loan Documents</u>" means each Senior Credit Agreement and all other instruments, agreements and written obligations executed and delivered in connection with the transactions contemplated by a Senior Credit Agreement.

"<u>Specified DST</u>" means the Portfolio One DST, the Portfolio Two DST, the Portfolio Three DST, the Stonebridge DST, and any other DST approved by the Agent that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, o Portfolio Three DST, as of the Effective Date.

"<u>Specified DST Depositor</u>" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other depositor approved by the Agent with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Governmental Authority to which the Administrative Agent is subject, with respect to the Adjusted LIBO Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Stonebridge DST</u>" means NREA Retreat, DST, a Delaware statutory trust, which will own the Retreat at Stonebridge Ranch property located in McKinney, TX.

"<u>Stonebridge DST Depositor</u>" means NREA Retreat Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for Stonebridge DST.

"<u>Stonebridge Term Loan</u>" means the term loan made by KeyBank pursuant to that certain Second Amended and Restated Credit Agreement dated as of September 17, 2018 by and among NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust, as borrowers, and KeyBank National Association, as lender.

"<u>Subsidiary</u>" means, with respect to Borrower, as applicable (the "<u>parent</u>"), at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by parent, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.

"<u>Summers Landing Property</u>" means that certain Real Property known as Summers Landing and located at 3900 Centreport Drive, Fort Worth, Texas 76155, which is indirectly owned by the BH Pledgor.

"<u>Swap Obligation</u>" means, any Hedging Obligation that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"<u>Tangible Net Worth</u>" shall mean, with respect to the Borrowers and their Subsidiaries, (a) total assets (without deduction for accumulated depreciation and accumulated amortization of lease intangibles) less (b) all intangible assets and (c) all liabilities (including contingent and indirect liabilities), all determined in accordance with sound accounting principles, consistently applied.  The term "intangible assets" shall include, without limitation, (i) deferred charges such as straight-line rents and other non-cash items, and (ii) the aggregate of all amounts appearing on the assets side of any such balance sheet for franchises, licenses, permits, patents, patent applications, copyrights, trademarks, trade names, goodwill, treasury stock, experimental or organizational expenses and other like intangibles (other than amounts related to the purchase price of real property which are allocated to lease intangibles).  The term "liabilities" shall include, without limitation, (i) Indebtedness secured by Liens on property of the Person with respect to which Tangible Net Worth is being computed whether or not such Person is liable for the payment thereof, (ii) deferred liabilities, and (iii) Capital Lease Obligations.  Tangible Net Worth shall be calculated on a consolidated basis Borrower and their Wholly-Owned Subsidiaries and including the Borrower's Equity Percentage of Tangible Net Worth of the Borrower's Unconsolidated Affiliates.

"<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"<u>The Dugaboy Investment Trust</u>" means THE DUGABOY INVESTMENT TRUST, under trust agreement dated November 15, 2010.

"<u>The SLHC Trust</u>" means THE SLHC TRUST, under trust agreement dated December 27, 2016.

"<u>Title Instruments</u>" means true and correct copies of all instruments of record in the Office of the County Clerk, the Real Property Records or of any other Governmental Authority affecting title to all or any part of the Portfolio Properties, including but not limited to those (if any) which impose restrictive covenants, easements, rights-of-way or other encumbrances on all or any part of such Real Properties.

"<u>Title Insurance Policy</u>" means, collectively, (i) with respect to the Mortgaged Properties, the policies of title insurance in the aggregate face amounts equal to the Tranche A Loan, issued in favor of the Administrative Agent by a title insurance company satisfactory to the Administrative Agent and insuring that title to each Mortgaged Property is vested in the applicable Property Owner Borrower, free and clear of any Lien, objection, exception or requirement, and that each Mortgage creates a valid first and prior lien on all the applicable Mortgaged Property, subject only to the Permitted Encumbrances and such other exceptions as may be approved in writing by the Administrative Agent, and (ii) with respect to other Real Property,  the policies of title issued in favor of the respective Collateral Subsidiary by a title insurance company satisfactory to the lender under a Senior Credit Agreement or other Indebtedness secured by such Real Property and insuring that title to such Real Property is vested in such Collateral Subsidiary, free and clear of any Lien, objection, exception or requirement, subject only to the Permitted Encumbrances.

"<u>Titled Agents</u>" means, collectively, the Arranger and any syndication agents or documentation agent named as such on the cover page of this Agreement.

"<u>Total Asset Value</u>" means the sum of (without duplication) (a) the aggregate Appraised Value of all of the Portfolio Properties, plus (b) total assets (without deduction for accumulated depreciation and amortization) of the Borrowers (other than the Property Owner Borrowers) determined in accordance with sound accounting principles, consistently applied.  For any non-wholly owned Real Properties, Total Asset Value shall be adjusted for Borrower's and Subsidiaries' Equity Percentage thereof.

"<u>Total Leverage Ratio</u>" means the ratio (expressed as a percentage) of (a) the Indebtedness of Borrower to (b) Total Asset Value.

"<u>Tranche A Initial Maturity Date</u>" means March 26, 2019.

"<u>Tranche A Maturity Date</u>" means the earlier of (i) the Tranche A Initial Maturity Date, as such date may be extended as provided in <u>Section 2.21</u>, and (ii) the date on which the Tranche A Loans shall become due and payable pursuant to the terms hereof.

"<u>Tranche B Initial Maturity Date</u>" means September 26, 2019.

"<u>Tranche B Maturity Date</u>" means the earlier of (i) the Tranche B Initial Maturity Date, as such date may be extended as provided in <u>Section 2.22</u>, and (ii) the date on which the Tranche B Loans shall become due and payable pursuant to the terms hereof.

"Transactions" means the execution, delivery and performance by the Borrowers of the Loan Documents, the borrowing of the Loans, and the use of the proceeds thereof.

"Trust Agreement" means the Trust Agreement for the Portfolio One DST dated as of the Effective Date, the Trust Agreement for the Portfolio Two DST dated as of the Effective Date, the Trust Agreement for the Portfolio Three DST dated as of the Effective Date, the Amended and Restated Trust Agreement for Stonebridge DST dated as of the Effective Date, and the trust agreement for any other Specified DST.

"Trust Interests" means the beneficial interests in each Specified DST which will be (x) sold pursuant to the applicable Offering Document or (y) issued to an Affiliate of Borrower that owns any unsold beneficial interests.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowings, is determined by reference to the Adjusted LIBO Rate, the Daily LIBOR Rate, or the Alternate Base Rate.

"Unconsolidated Affiliate" means, without duplication, in respect of any Person, any other Person (other than a Person whose stock is traded on a national trading exchange) in whom such Person holds, directly or indirectly, an investment consisting of a voting equity or ownership interest, which investment is accounted for in the financial statements of such Person on an equity basis of accounting.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.  In determining whether a Subsidiary of a Person is a Wholly-Owned Subsidiary, all preferred shareholders of a Subsidiary that is organized as a real estate investment trust shall be disregarded.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02 <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03 <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04 <u>Accounting Terms; GAAP</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with sound accounting principles, consistently applied; provided that, if GAAP accounting is expressly required and the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until  such notice shall have been withdrawn or such provision  amended in accordance herewith.

Section 1.05 <u>Appointment of Lead Borrower</u>.

(a)    For the purpose of implementing the joint borrower provisions of this Agreement and the other Loan Documents, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for the purpose of requesting and obtaining Borrowings hereunder, including delivery of any Borrowing Request or Interest Election Request, and such Borrower shall be obligated to the Administrative Agent and the Lenders on account of Borrowings so made as if made directly by the Lenders to such Person.  Further, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for all other purposes under the Loan Documents, including the giving and receiving of notices and other communications, the giving of consents or approvals pursuant to the terms hereof, and

submitting Compliance Certificates and other similar certificates required hereunder.  Any request by the Lead Borrower for a Borrowing or an Interest Election Request shall in all events be deemed and construed as a request for such Borrowing by all Borrowers hereunder.

(b)     The proceeds of each loan and advance provided under the Loans which is requested by the Lead Borrower shall be advanced as and when otherwise provided herein or as otherwise indicated by the Lead Borrower.  The Lead Borrower shall cause the transfer of the proceeds thereof to the Borrower(s) on whose behalf such loan and advance was obtained.  Neither the Administrative Agent nor any Lender shall have any obligation to see to the application of such proceeds.

(c)     It is understood and agreed that the handling of this credit facility on a joint borrowing basis as set forth in this Agreement is solely as an accommodation to the Borrower and at their request.  Accordingly, the Administrative Agent and the Lenders are entitled to rely, and shall be exonerated from any liability for relying upon, any Borrowing Request, Interest Election Request, or any other request or communication made by a purported officer of any Borrower without the need for any consent or other authorization of any other Borrower and upon any information or certificate provided on behalf of any Borrower by a purported officer of such Borrower, and any such request or other action shall be fully binding on each Borrower as if made by it.

## ARTICLE II

### The Loans

Section 2.01 [Intentionally Omitted].

Section 2.02 Commitments.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make Loans to the Borrower on the Effective Date as follows:

(a)     a term loan (the "Tranche A Loan") to finance the acquisition of the Mortgaged Properties on the Effective Date in an aggregate principal amount not to exceed the lesser of (i) $231,400,000 and (ii) 65% of the lesser of (x) the allocated acquisition cost of the Mortgaged Properties as approved by the Administrative Agent and (y) the aggregate "as is" Appraised Value of the Mortgaged Properties; and

(b)     a term loan (the "Tranche B Loan") in an aggregate principal amount of $324,875,000 to finance a portion of the acquisition cost of the Portfolio Properties that is not financed by the Tranche A Loan or the Senior Loan;

Each Loan shall be made in immediately available funds in accordance with instructions provided by the Borrower.  The aggregate amount of the Loan shall not exceed the aggregate amount of the Commitments. Once repaid, no portion of the Loans may be reborrowed. Notwithstanding anything herein to the contrary, the Commitments shall terminate upon the making of the Loans described in this Section 2.02 on the Effective Date.

Section 2.03 <u>Loans and Borrowings</u>.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Subject to <u>Section 2.13</u>, each Borrowing shall be comprised of ABR Loans, Daily LIBOR Loans, and/or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)     Each Eurodollar Loan shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of six (6) Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.04 [Intentionally Omitted].

Section 2.05 [Intentionally Omitted].

Section 2.06 [Intentionally Omitted].

Section 2.07 [Intentionally Omitted].

Section 2.08 <u>Interest Elections</u>.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrower were requesting a Borrowing of the Type

resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in the form of a Borrowing Request (with proper election made for an interest rate election only) and signed by the Lead Borrower.

(c)      Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing;

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing, a Daily LIBOR Borrowing, or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Loan but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)      Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)      If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Eurodollar Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.09 Reserved.

Section 2.10 <u>Repayment of Loans; Evidence of Debt.</u>

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of (i) the Tranche A Loans on the Tranche A Maturity Date and (i) the Tranche B Loans on the Tranche B Maturity Date.

(b)    At the request of each Lender, the Loans made by such Lender shall be evidenced by a Note payable to such Lender in the amount of such Lender's Commitment.

(c)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)    The entries made in the accounts maintained pursuant to <u>paragraph (b)</u> or <u>(c)</u> of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

Section 2.11 <u>Prepayment of Loans.</u>

(a)    The Borrower shall have the right at any time and from time to time to prepay, without penalty, any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section, and subject to <u>Section 2.15</u>, if applicable.

(b)    The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing or a Daily LIBOR Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that is an integral multiple of $100,000 and not less than $200,000.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.12</u>.

(c)    In connection with the prepayment of any portion of the Loan prior to the expiration of the Interest Period applicable thereto, the Borrower shall also pay any applicable expenses pursuant to Section 2.15.

(d)    The Borrower shall prepay the Loans (a "Mandatory Prepayment") in an amount equal to with respect to any sale, finance, refinance or other recapitalization of (i) the Mortgaged Properties, the greater of (x) $381,000,000 and (y) one hundred percent (100%) of the net proceeds payable to Borrowers or any Subsidiary (after payment of usual and customary closing costs and expenses) from the sale, finance, refinance or other recapitalization of the Mortgaged Properties; it being understood that prepayments required under this clause (d)(i) are in addition to any prepayments under clause (f) below and prepayments required under clause (f) below shall not diminish the required prepayment amounts under this clause (d)(i), and (ii) any other Real Property, one hundred percent (100%) of the net proceeds payable to Borrower or any Subsidiary (after payment of usual and customary closing costs and expenses and repayment of any Indebtedness secured by such Real Property and including, with respect to any partial recapitalization of a Portfolio Property through a joint venture or similar structure whereby the Borrower will, directly or indirectly, retain an Equity Interest in such Portfolio Property (other than any DST structure whereby Borrower will retain an approximately 1% Equity Interest in such Portfolio Property), an amount equal to the value of the Equity Interest in such Portfolio Property that the Borrower will retain) generated by the sale, finance, refinance or other recapitalization of any such Real Property owned directly or indirectly by Borrower, including, without limitation, any net proceeds thereof to be redeployed into the acquisition of one or more real properties to complete a 1031 exchange transaction, and all payments under the BH Loan. All Mandatory Prepayments shall be applied, first, to the prepayment of the Tranche A Loans until the Tranche A Loans have been repaid in full.  Thereafter all Mandatory Prepayments shall be applied to the Tranche B Loans.

(e)    Without limiting the foregoing, the Borrower shall make prepayments of the Loans from time to time in the amounts necessary such that after giving effect to any such prepayments, the aggregate outstanding amount of the Loans on each of the dates listed below shall not be more than the "Maximum Principal Amount" set forth across from such date on the table below:

| Date | Maximum Principal Amount |
|------|--------------------------|
| March 26, 2019 | $150,000,000 |
| June 26, 2019 | $100,000,000 |
| September 26, 2019 | $50,000,000 |
| December 26, 2019 | $15,000,000 |

provided that, if the Tranche A Initial Maturity Date is extended pursuant to Section 2.21, the "Maximum Principal Amount" set forth in the table above for each applicable date during the term of such extension of the Tranche A Initial Maturity Date, shall be

increased by an amount equal to the aggregate outstanding principal amount of Loans that were funded to purchase the Mortgaged Properties.

(f)    In addition to any other payment or prepayment required by any of the foregoing, on or prior to October 26, 2018, the Borrowers shall make payments to the Administrative Agent for application to the outstanding principal balance of the Loans from proceeds of additional equity contributions received by the Borrowers (other than the Property Owner Borrowers) after the Effective Date in an aggregate amount not less than $150,000,000.

(g)    Amounts to be applied to the prepayment of the Loans pursuant to any of the preceding subsections of this Section shall be applied, first, to reduce outstanding ABR Loans, next, to the extent of any remaining balance, to reduce outstanding Daily LIBOR Loans, and next, to the extent of any remaining balance, to reduce outstanding Eurodollar Loans.  Any amounts repaid under this Section 2.11 may not be reborrowed.

Section 2.12 Fees.

(a)    In addition to all fees specified herein, the Borrower agrees to pay to KeyBank and the Arranger, for their own account, certain fees for services rendered or to be rendered in connection with the Loans as provided pursuant to the Fee Letter.

(b)    All fees payable hereunder shall be paid on the dates due in immediately available funds.  Fees paid shall not be refundable under any circumstances.

Section 2.13 Interest.

(a)    The ABR Loans shall bear interest at the lesser of (x) the Alternate Base Rate plus the Applicable Rate, or (y) the Maximum Rate.

(b)    The Loans comprising each Eurodollar Borrowing shall bear interest at the lesser of (x) the Adjusted LIBO Rate for the Interest Period in effect for such Eurodollar Loan plus the Applicable Rate, or (y) the Maximum Rate.

(c)    The Loans comprising each Daily LIBOR Borrowing shall bear interest at the lesser of (x) the Daily LIBOR plus the Applicable Rate, or (y) the Maximum Rate

(d)    Notwithstanding the foregoing, (A) if any principal of or interest on the Loans or any portion thereof or any other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of the Loans, the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate, or (ii) in the case of any other amount, the lesser of (x) 4% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section, or (y) the Maximum Rate; and (B) after the occurrence of any Event of Default, at the option of the Administrative Agent, or if the Administrative Agent is directed in writing by the Required Lenders to do so, the Loans shall bear interest at a rate per

annum equal to the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate.

(e)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Eurodollar Loan shall be payable on the effective date of such conversion.

(f)    All computations of interest on the Loans and of other fees to the extent applicable shall be based on a 360-day year and paid for the actual number of days elapsed.  The applicable Alternate Base Rate, Adjusted LIBO Rate, LIBO Rate, or Daily LIBOR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14  Alternate Rate of Interest.

(a)    If prior to the commencement of any Interest Period for a Eurodollar Borrowing or Daily LIBOR Borrowing:

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii)    the Administrative Agent is advised by any Lender that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Eurodollar Loan for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

(b)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in clause (a) of this Section 2.14 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a) of this Section 2.14 have not arisen but the supervisor for the administrator of LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBO Rate shall no longer be used for determining interest rates for loans (in the case of either such

- 32 -

clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Administrative Agent and the Borrowers shall endeavor to establish an alternate rate of interest to LIBO Rate, which rate may include adjustment (to be determined from time to time by Administrative Agent in its sole discretion) to effect an aggregate interest rate comparable to the LIBO Rate on a historical basis prior to such determination, and that gives due consideration to the then prevailing market convention for determining a rate of interest for similar dollar-denominated credit facilities in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Such amendment shall become effective without any further action or consent of any other party to this Agreement.  To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention; provided that, to the extent such prevailing market convention is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and the Borrowers. From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, any Interest Election Request that requests the conversion of any Loan to, or continuation of any Loan as, an Eurodollar Loan shall be ineffective; provided that (subject to clause (a) of this Section 2.14) LIBO Rate for such Interest Period is not available or published at such time on a current basis; provided, further, that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Section 2.15 Increased Costs.

(a)     If any Change in Law shall:

(i)     subject any Recipient to any Taxes or withholding of any nature with respect to this Agreement, the other Loan Documents, such Lender's Commitment or the Loans (other than for Indemnified Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and Connection Income Taxes), or

(ii)     materially change the basis of taxation (except for changes in taxes on gross receipts, income or profits or its franchise tax) of payments to any Recipient of the principal of or the interest on any Loans or any other amounts payable to any Lender under this Agreement or the other Loan Documents, or

(iii)     impose or increase or render applicable any special deposit, reserve, assessment, liquidity, capital adequacy or other similar requirements (whether or not having the force of law and which are not already reflected in any amounts payable by Borrowers hereunder) against assets held by, or deposits in or for the account of, or loans by, or commitments of an office of any Lender, or

(iv)     impose on any Recipient any other conditions or requirements with respect to this Agreement, the other Loan Documents, the Loans, such Lender's Commitment, or any class of loans or commitments of which any of the Loans or such Lender's Commitment forms a part;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or liquidity or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company would have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16 Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.10(b)), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.18, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the

period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

Section 2.17 Taxes.

(a)      All payments by the Borrower hereunder and under any of the other Loan Documents shall be made without setoff or counterclaim, and free and clear of and without deduction or withholding for any Taxes, except as required by Legal Requirements. If any Legal Requirement (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Legal Requirements and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      The Borrower shall timely pay to the relevant Governmental Authority in accordance with Legal Requirements, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)      The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error; provided that the determinations in such statement are made on a reasonable basis and in good faith.

(d)      Each Lender shall severally indemnify the Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Borrower has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that

are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this subsection.

(e)      As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)      (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Legal Requirements or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the immediately following clauses (ii)(2)(A), (ii)(2)(B) and (ii)(2)(D)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)      Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person:

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from

time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(A)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)     an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8ECI;

(C)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(D)     to the extent a Foreign Lender is not the beneficial owner, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which

such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by a Borrower or the Agent) of any other form prescribed by Legal Requirements as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Legal Requirements to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by Legal Requirements and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by Legal Requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all reasonable third party out-of-pocket expenses (including Taxes) of such indemnified party actually incurred and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund has not been deducted, withheld or otherwise

- 38 -

imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it reasonably deems confidential) to the indemnifying party or any other Person.

(h)      Each party's obligations under this <u>Section 2.17</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18 <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)      The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under <u>Section 2.15</u>, <u>Section 2.16</u> or <u>2.17</u>, or otherwise) prior to 1:00 p.m., Boston, Massachusetts time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its main offices in Cleveland, Ohio, except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> shall be made directly to the Persons entitled thereto.  If the Administrative Agent receives a payment for the account of a Lender prior to 1:00 p.m., Boston, Massachusetts time, such payment must be delivered to the Lender on the same day and if it is not so delivered due to the fault of the Administrative Agent, the Administrative Agent shall pay to the Lender entitled to the payment interest thereon for each day after payment should have been received by the Lender pursuant hereto until the Lender receives payment, at the Federal Funds Effective Rate.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are

purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.18(d), then the Administrative Agent may, in its reasonable discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19 Mitigation Obligations; Replacement of Lenders.

(a)    Each Lender will notify the Borrower of any event occurring after the date of this Agreement which will entitle such Person to compensation pursuant to Sections 2.13 and 2.15 as promptly as practicable after it obtains knowledge thereof and determines to request such compensation, provided that such Person shall not be liable for any costs, fees, expenses, or additional interest due to the failure to provide such notice. If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any such Person or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to avoid or minimize the amounts payable, including, without limitation, the designation of a different lending office for funding or booking its Loans hereunder or the assignment of its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If any Lender requests compensation under <u>Section 2.13</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.15</u>, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort (excluding any costs or expense incurred by such Defaulting Lender), upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 9.04</u>), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.13</u> or payments required to be made pursuant to <u>Section 2.15</u>, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20 <u>Defaulting Lenders</u>.

(a)      <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Credit Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Credit Agreement shall be restricted as set forth in <u>Section 9.02</u>.

(ii)      Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of a Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to ARTICLE VII or otherwise, and including any amounts made available to Administrative Agent by that Defaulting Lender pursuant to <u>Section 9.08</u>), shall be applied at such time or times as may be determined by Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to Administrative Agent hereunder; second, if so determined by Administrative Agent, to be held as cash collateral for future funding obligations of such Defaulting Lender; third, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Credit Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the applicable Borrower as a result of any judgment of a court

of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement; and fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section 2.20(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    Defaulting Lender Cure.  If the Borrower and Administrative Agent agree in writing in their reasonable discretion that a Defaulting Lender has taken such action that it should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Defaulting Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Defaulting Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no cessation in status as Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising during the period that such Lender was a Defaulting Lender.

Section 2.21 Extension of Tranche A Maturity Date.  The Borrower shall have the right and option to extend the Tranche A Maturity Date on no more than two occasions and for a term of 90 days on each occasion, first to June 26, 2019 and then to September 26, 2019, in each case, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of any extension of the Tranche A Initial Maturity Date:

(a)    Extension Request.  The Borrower shall deliver written notice of such request (the "Extension Request") to the Agent not later than the date which is thirty (30) days prior to the Tranche A Initial Maturity Date.

(b)    Payment of Extension Fee.  The Borrower shall pay to the Agent for the pro rata accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.10% of the outstanding principal amount of the Tranche A Loans on the date of each extension of the Tranche A Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)    No Default.  On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)    Purchase and Sale.  Borrower shall have, prior to the effective date of each such extension, entered in a legally binding purchase and sale agreement (or similar) with respect to the Mortgaged Properties, with the sale of the Mortgaged Properties pursuant to such agreement

being scheduled to occur prior to the latest date to which the Tranche A Initial Maturity Date could be extended in accordance with the provisions of this Section 2.21.

Section 2.22 Extension of Tranche B Maturity Date.  The Borrower shall have the right and option to extend the Tranche B Maturity Date on a single occasion to March 26, 2020, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of such extension of the Tranche B Initial Maturity Date:

(a)    Extension Request.  The Borrower shall deliver an Extension Request to the Agent not later than the date which is thirty (30) days prior to the Tranche B Initial Maturity Date.

(b)    Payment of Extension Fee.  The Borrower shall pay to the Agent for the pro rata accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.40% of the outstanding principal amount of the Tranche B Loans on the Tranche B Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)    No Default.  On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)    Principal Reduction.  On the date of such extension, the Tranche A Loans shall have been paid in full and the aggregate principal amount of the Tranche B Loans shall not exceed $50,000,000.

## ARTICLE III

### Representations and Warranties

The Borrower represents and warrants to the Lenders and the Administrative Agent that:

Section 3.01 Organization; Powers.  Each Borrower and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02 Authorization; Enforceability.  The Transactions are within the corporate, partnership or limited liability company powers (as applicable) of the respective Borrowers and their Subsidiaries and have been duly authorized by all necessary corporate, partnership or limited liability company action.  This Agreement and the Loan Documents have been duly executed and delivered by each Borrower which is a party thereto and constitute the legal, valid and binding obligation of each such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03 <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or which shall be completed at the appropriate time for such filings under applicable securities laws, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Borrower or any Collateral Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Borrower or any Collateral Subsidiary or its assets, or give rise to a right thereunder to require any payment to be made by any Borrower or any of the Borrower's Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Borrower or any Collateral Subsidiary, except pursuant to the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interest Pledge, and the Senior Loan.

Section 3.04 <u>Financial Condition; No Material Adverse Change</u>.

(a)     The Borrower has heretofore furnished to the Lenders audited financial statements for Highland Capital and management-prepared financial statements for all other Borrowers (other than the Property Owner Borrowers) as of and for the annual fiscal period ended December 31, 2017 and management-prepared financial statements as of and for the quarterly fiscal period ended June 30, 2018.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with sound accounting principles, consistently applied, subject to year-end audit adjustments.

(b)     To Borrower's actual knowledge, since December 31, 2017, no event has occurred which would reasonably be expected to have a Material Adverse Effect.

Section 3.05 <u>Properties</u>.

(a)     Each of the Borrower and its Subsidiaries has title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, or Liens permitted under <u>Section 6.01</u>.

(b)     To each Borrower's actual knowledge, all franchises, licenses, authorizations, rights of use, governmental approvals and permits (including all certificates of occupancy and building permits) required to have been issued by Governmental Authority to enable all Real Property owned or leased by Borrower or any of its Subsidiaries to be operated as then being operated have been lawfully issued and are in full force and effect, other than those which the failure to obtain in the aggregate would not be reasonably expected to have a Material Adverse Effect.  To each Borrower's actual knowledge, no Borrower or any Subsidiary thereof is in violation of the terms or conditions of any such franchises, licenses, authorizations, rights of use, governmental approvals and permits, which violation would reasonably be expected to have a Material Adverse Effect.

(c)     None of the Borrowers has received any notice or has any actual knowledge of any pending, threatened or contemplated condemnation proceeding affecting any of the Real

Properties or any part thereof, or any proposed termination or impairment of any parking (except as contemplated in any approved expansion approved by Administrative Agent) at the Real Properties or of any sale or other disposition of the Real Properties or any part thereof in lieu of condemnation, which in the aggregate, are reasonably likely to have a Material Adverse Effect.

(d)    Subject to the property conditions reports obtained by the Borrower at the time of acquisition with respect to the Mortgaged Property, to Borrower's actual knowledge, all components of all improvements included within the Mortgaged Property owned or leased, as lessee, by any Borrower, including, without limitation, the roofs and structural elements thereof and the heating, ventilation, air conditioning, plumbing, electrical, mechanical, sewer, waste water, storm water, paving and parking equipment, systems and facilities included therein, are in good working order and repair, subject to such exceptions which are not reasonably likely to have, in the aggregate, a Material Adverse Effect.  To Borrower's actual knowledge, all water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems serving the Mortgaged Property owned or leased by Borrower are installed and operating and are sufficient to enable the Mortgaged Property to continue to be used and operated in the manner currently being used and operated, and no Borrower has any knowledge of any factor or condition that reasonably would be expected to result in the termination or material impairment of the furnishing thereof, subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect.  To Borrower's actual knowledge, no improvement or portion thereof, or any other part of any Mortgaged Property, is dependent for its access, operation or utility on any land, building or other improvement not included in such Mortgaged Property, other than for access provided pursuant to a recorded easement or other right of way establishing the right of such access subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect.

(e)    Except for events or conditions not reasonably likely to, in the aggregate, materially impair the value or operation of the Mortgaged Property, to Borrower's actual knowledge (i) no portion of the Mortgaged Property has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition prior to such casualty, and (ii) no portion of the Mortgage Property is located in a special flood hazard area as designated by any federal Government Authorities unless the Administrative Agent shall have received evidence that such Mortgaged Property is insured by special flood insurance under the National Flood Insurance Program in an amount equal to the full replacement cost (subject to sublimits and exclusions approved by the Administrative Agent) or the maximum amount then available under the National Flood Insurance Program.

(f)    There are no Persons operating or managing the Mortgaged Property other than the Borrower and the Management Company pursuant to (i) the management agreements delivered to Administrative Agent as of the Effective Date, and (ii) such other management agreements in form and substance reasonably satisfactory to the Administrative Agent.

Section 3.06 Intellectual Property.  To the actual knowledge of each Borrower, such Borrower and its Subsidiaries owns, or is licensed to use, all patents and other intellectual property material to its business, and the use thereof by such Borrower or such Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that,

individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  To the actual knowledge of each Borrower, there are no material slogans or other advertising devices, projects, processes, methods, substances, parts or components, or other material now employed, or now contemplated to be employed, by any Borrower or any Subsidiary of any Borrower, with respect to the operation of any Real Property, and no claim or litigation regarding any slogan or advertising device, project, process, method, substance, part or component or other material employed, or now contemplated to be employed by any Borrower or any Subsidiary of any Borrower, is pending or threatened, the outcome of which could reasonably be expected to have a Material Adverse Effect.

Section 3.07 <u>Litigation and Environmental Matters</u>.

(a)        To the actual knowledge of the Borrower, except as set forth in <u>Schedule 3.07</u> attached hereto, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, threatened against or affecting any Borrower or any of the Borrower's Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)        Except as disclosed in the environmental reports obtained by the Borrower at the time of acquisition with respect to the Portfolio Property and with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)        to the actual knowledge of the Borrowers, all Real Property leased or owned by Borrower or any of its Subsidiaries is free from contamination by any Hazardous Material, except to the extent such contamination would not reasonably be expected to cause a Material Adverse Effect;

(ii)        to the actual knowledge of the Borrower, the operations of Borrower and its Subsidiaries, and the operations at the Real Property leased or owned by Borrower or any of its Subsidiaries are in compliance with all applicable Environmental Laws, except to the extent such noncompliance would not reasonably be expected to cause a Material Adverse Effect;

(iii)        neither the Borrower nor any of its Subsidiaries have known liabilities with respect to Hazardous Materials and, to the knowledge of each Borrower, no facts or circumstances exist which would reasonably be expected to give rise to liabilities with respect to Hazardous Materials, in either case, except to the extent such liabilities would not reasonably be expected to have a Material Adverse Effect;

(iv)        to Borrower's actual knowledge, (A) the Borrower and its Subsidiaries and all Real Property owned or leased by Borrower or its Subsidiaries have all Environmental Permits necessary for the operations at such Real Property and are in compliance with such Environmental Permits; (B) there

are no legal proceedings pending nor, to the knowledge of any Borrower, threatened to revoke, or alleging the violation of, such Environmental Permits; and (C) none of the Borrowers have received any notice from any source to the effect that there is lacking any Environmental Permit required in connection with the current use or operation of any such properties, in each case, except to the extent the nonobtainment or loss of an Environmental Permit would not reasonably be expected to have a Material Adverse Effect;

(v)      neither the Real Property currently leased or owned by Borrower nor, to the actual knowledge of any Borrower, are subject to any outstanding written order or contract, including Environmental Liens, with any Governmental Authority or other Person, or to any federal, state, local, foreign or territorial investigation of which a Credit Party has been given notice respecting (A) Environmental Laws, (B) Remedial Action, (C) any Environmental Claim; or (D) the Release or threatened Release of any Hazardous Material, in each case, except to the extent such written order, contract or investigation would not reasonably be expected to have a Material Adverse Effect;

(vi)      to the actual knowledge of each Borrower, none of the Borrowers are subject to any pending legal proceeding alleging the violation of any Environmental Law nor are any such proceedings threatened, in either case, except to the extent any such proceedings would not reasonably be expected to have a Material Adverse Effect;

(vii)      Borrower has not filed any notice under federal, state or local, territorial or foreign law indicating past or present treatment, storage, or disposal of or reporting a Release of Hazardous Material into the environment with respect to the Mortgaged Property, in each case, except to the extent such Release of Hazardous Material would not reasonably be expected to have a Material Adverse Effect;

(viii)      to the actual knowledge of each Borrower, none of the operations of the Borrower or any of its Subsidiaries or, of any owner of premises currently leased by Borrower or any of its Subsidiaries or of any tenant of premises currently leased from Borrower or any of its Subsidiaries, involve the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Part 261.3 (in effect as of the date of this Agreement) or any state, local, territorial or foreign equivalent, in violation of Environmental Laws; and

(ix)      to the knowledge of the Borrower, there is not now (except, in all cases, to the extent the existence thereof would not reasonably be expected to have a Material Adverse Effect), on, in or under any Real Property leased or owned by Borrower or any of its Subsidiaries (A) any underground storage tanks or surface tanks, dikes or impoundments (other than for surface water); (B) any friable asbestos-containing materials; (C) any polychlorinated biphenyls; or (D) any radioactive substances other than naturally occurring radioactive material.

Section 3.08 <u>Compliance with Laws and Agreements</u>.  Each of the Borrower and its Subsidiaries is in material compliance with all Legal Requirements (including all Environmental Laws) applicable to it or its property and all indentures, agreements and other instruments binding upon it or to its knowledge, its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.09 <u>Investment and Holding Company Status</u>.  Neither any of the Borrowers nor any of the Borrower's Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

Section 3.10 <u>Taxes</u>.  To Borrower's actual knowledge, each Borrower and each of the Borrower's Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Person has set aside on its books adequate reserves or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.11 <u>ERISA</u>.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.  Neither the Borrower nor any of its Subsidiaries have any Plans as of the date hereof.  As to any future Plan the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of all such underfunded Plans.

Section 3.12 <u>Disclosure</u>.  To the actual knowledge of the Borrower, the Borrower has disclosed or made available to the Lenders all agreements, instruments and corporate or other restrictions to which it, any other Borrower, or any of its Subsidiaries is subject, and all other matters known to it, that, in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 3.13 <u>Solvency</u>.  As of the Effective Date and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents (including any contribution rights under the Guaranty), including all Loans made or to be made hereunder, the Borrower is not insolvent on a balance sheet basis such that the sum of such Person's assets

exceeds the sum of such Person's liabilities, the Borrower is able to pay its debts as they become due, and the Borrower has sufficient capital to carry on its business.

Section 3.14 <u>Margin Regulations</u>.  Neither the Borrower nor any Subsidiary of Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no proceeds of the Loans will be used to purchase or carry any margin stock.

Section 3.15 <u>Subsidiaries</u>.  As of the Effective Date, no Person owns any Equity Interests in the Portfolio Properties, Summers Landing Property, or HCRE Properties except as set forth on <u>Schedule 3.15</u> attached hereto.

Section 3.16 <u>OFAC; Anti-Money Laundering.</u>  None of the Borrower, any of the other Subsidiaries, or any other Affiliate thereof is (or will be) (i) a Sanctioned Person, (ii) located, organized or resident in a Designated Jurisdiction, (iii) to the best of Borrower's knowledge, without any independent inquiry, is or has been (within the previous five (5) years) engaged in any transaction with any Sanctioned Person or any Person who is located, organized or resident in any Designated Jurisdiction to the extent that such transactions would violate Sanctions, or (iv) has violated any Anti-Money Laundering Law in any material respect. Each Borrower and its Subsidiaries, and to the knowledge of the Borrower, each director, officer, employee, agent and Affiliate of the Borrower and each such Subsidiary, is in compliance with the Anti-Corruption Laws in all material respects.  The Borrowers have implemented and maintain in effect policies and procedures designed to promote and achieve compliance with the Anti-Corruption Laws and applicable Sanctions.

Section 3.17 <u>EEA Financial Institution</u>.  No Borrower is an EEA Financial Institution.

Section 3.18 <u>Single Asset Entity; Compliance With Laws</u>.  Each Property Owner Borrower hereby represents and warrants to, and covenants with, Agent that as of the date hereof and until such time as the Loan shall be paid in full, that such Property Owner Borrower has not at any time, does not presently, and shall not:

(a)    own any asset or property other than (i) the Mortgaged Property owned by it as of the date hereof, and (ii) incidental personal property necessary for the ownership or operation of such Mortgaged Property;

(b)    engage in any business other than the ownership, management and operation of such Mortgaged Property;

(c)    enter into any contract or agreement with any Affiliate of Property Owner, any constituent party of such Property Owner Borrower or any Affiliate of any constituent party, except upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with third parties other than any such party;

(d)    incur any Indebtedness other than (i) the Loan, (ii) unsecured trade payables in the ordinary course of business not evidenced by a note, (iii) indebtedness incurred in the financing of equipment and other personal property used on the Property, and (iv) obligations to

tenants under Approved Leases; provided that any indebtedness incurred pursuant to subclauses (ii) and (iii) shall (x) be paid within ninety (90) days of the date incurred (or, in the case of equipment leases, such longer period as may be permitted by such leases), and (y) be incurred in the ordinary course of business.

(e)     make any loans or advances to any third party (including any Affiliate or constituent party), or acquire obligations or securities of its Affiliates;

(f)     fail to remain solvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; for the avoidance of doubt, nothing herein shall require any member of Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(g)     fail to do all things necessary to observe organizational formalities and preserve its existence, and such Property Owner Borrower shall not, nor shall such Property Owner Borrower permit any constituent party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such Property Owner Borrower or such constituent party without the prior consent of Lender in any manner that (i) violates the covenants set forth in this Section 3.17, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Administrative Agent's consent;

(h)     fail to maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party. Such Property Owner Borrower's assets will not be listed as assets on the financial statement of any other Person, provided, however, that such Property Owner Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i)  appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Property Owner Borrower and such Affiliates and to indicate that such Property Owner Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on such Property Owner Borrower's own separate balance sheet. Such Property Owner Borrower shall maintain its books, records, resolutions and agreements as official records;

(i)     fail to be, or fail to hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Property Owner Borrower or any constituent party of such Property Owner Borrower), fail to correct any known misunderstanding regarding its status as a separate entity, fail to conduct business in its own name, or fail to maintain and utilize separate stationery, invoices and checks bearing its own name, and such Property Owner Borrower shall not identify itself or any of its Affiliates as a division or part of the other;

(j)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; for the avoidance of doubt, nothing herein shall require any member of such Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(k)      seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of such Property Owner Borrower nor permit any constituent party of such Property Owner Borrower to do any of the foregoing; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower;

(l)      commingle the funds and other assets of such Property Owner Borrower with those of any Affiliate or constituent party or any other Person, and shall hold all of its assets in its own name;

(m)      fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person;

(n)      except with respect to the Obligations, guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person;

(o)      permit any Affiliate independent access to its bank accounts; or

(p)      fail to compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower.

<div align="center">ARTICLE IV</div>

<div align="center">Conditions</div>

Section 4.01 <u>Effective Date</u>.  The obligations of the Lenders to make the Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 9.02</u>):

(a)      The Administrative Agent (or its counsel) shall have received from each Borrower either (i) a counterpart of this Agreement and all other Loan Documents to which it is party signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of each such Loan Document other than the Notes) that such party has signed a counterpart of the Loan Documents, together with copies of all Loan Documents.

(b)      The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Wick Phillips Gould & Martin, LLP, counsel for the Borrower, and such other counsel as the Administrative Agent may approve, covering such matters relating to the Borrower, the Loan Documents or the Transactions as the Administrative Agent shall reasonably request.  The Borrower hereby requests such counsel to deliver such opinion.

<div align="center">- 51 -</div>

(c)      The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions and any other legal matters relating to the Borrower, this Agreement (including each Borrower's compliance with Section 9.14 and other customary "know your customer" requirements) or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d)      The Administrative Agent shall have received a Compliance Certificate, dated the date of this Agreement and signed by Borrowers or Lead Borrower, in form and substance satisfactory to the Administrative Agent.

(e)      The Administrative Agent shall have received searches of Uniform Commercial Code ("UCC") filings (or their equivalent) together with such other customary lien, litigation and bankruptcy searches as the Administrative Agent may require.

(f)      The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(g)      The Administrative Agent shall have received an Appraisal of each Mortgaged Property being included as Collateral in form and substance satisfactory to the Administrative Agent and the Lenders;

(h)      The Administrative Agent shall have received executed copies of all other Loan Documents, the Environmental Assessment, the Title Insurance Policy and the Current Survey (in each instance as delivered in connection with the original closing of the Loan, with the Administrative Agent receiving an acceptable endorsement to each Title Insurance Policy), property condition assessments, insurance certificates, and such other due diligence information as the Administrative Agent may require for each Mortgaged Property.

(f)      The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the Effective Date.

(g)      At the time of and immediately after giving effect to the making of the Loans, no Default shall have occurred and be continuing.

(h)      The Administrative Agent shall have received and approved executed copies of the Senior Loan Documents and sufficient evidence that the Senior Loan has closed and funded and that the proceeds thereof, together with the proceeds of the Loans hereunder, shall be sufficient to consummate the acquisition of the Portfolio Properties and the Summers Landing Property.

(i)      Upon the reasonable request of any Lender made at least ten (10) days prior to the Effective Date, each Borrower shall have provided to such Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money-

laundering rules and regulations, including the Patriot Act, in each case at least five (5) days prior to the Effective Date.

(j)      At least five (5) days prior to the Effective Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower to each requesting Lender.

Section 4.02 Each Borrowing.  The obligation of each Lender (as applicable) to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)      The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the date of such Borrowing.

(b)      At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)      With respect to any requested Borrowings, the Borrower shall have complied with Section 2.03.

(d)      Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section.

## ARTICLE V

## Affirmative Covenants

Until the principal of and interest on the Loans and all fees payable hereunder shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 5.01 Financial Statements; Ratings Change and Other Information.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)      within 120 days after the end of each fiscal year of the Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, together with all notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, which shall be (i) with respect to Highland Capital, reported on by Deloitte or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit), and (ii) with respect to each other Borrower other than the Property Owner Borrowers, certified by each such Borrower, in each case, to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the applicable Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with sound accounting principles, consistently applied;

(b)      within 60 days after the end of each fiscal quarter of each fiscal year of the Borrower, each Borrower's (other than the Property Owner Borrowers) consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of

and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and including supporting notes and schedules, all certified by each such Borrower as presenting fairly in all material respects the financial condition and results of operations of the applicable Borrower on a consolidated basis in accordance with sound accounting principles, consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with any delivery of financial statements under clause (a) or (b) above, a compliance certificate of the Borrowers (the "Compliance Certificate") in the form of Exhibit B attached hereto;

(d)     concurrently with any delivery of quarterly financial statements under clause (b) above, operating statements, rent roll and accounts receivable aging for each Mortgaged Property; and

(e)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Borrower or any Subsidiary of the Borrower, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request.

Section 5.02 Financial Tests.  The Borrower shall have and maintain at all times, on a consolidated basis in accordance with sound accounting principles, consistently applied, tested as of the close of each calendar quarter:

(a)     A Total Leverage Ratio not to exceed sixty-five percent (65%);

(b)     A minimum Fixed Charge Coverage Ratio of not less than 1.30:1.00;

(c)     Tangible Net Worth at all times of not less than $750,000,000; and

(d)     A minimum Liquidity at all times in an amount not less than $75,000,000; provided that, at any time when the aggregate outstanding principal amount of the Loans is $150,000,000 or less, Borrower shall maintain minimum Liquidity in an amount not less than the lesser of (i) $75,000,000 and (ii) 25% of the aggregate outstanding principal amount of the Loans.

Section 5.03 Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after it becomes aware of same (unless specific time is set forth below):

(a)     the occurrence of any Default under this Agreement or any default or event of default under a Senior Loan Document;

(b)     within fifteen (15) Business Days after the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any

Borrower or any Affiliate thereof that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)     within fifteen (15) Business Days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000.00; and

(d)     any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of such Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

At the Administrative Agent's option, after the happening of any of the events listed in clauses (a), (b) or (d) above which would reasonably be expected to result in a Material Adverse Effect on any of the Mortgaged Properties, the Administrative Agent may obtain, or cause the Borrower to obtain, an updated Appraisal for the Mortgaged Properties giving rise to such events, all at the Borrower's expense.

Section 5.04 <u>Existence; Conduct of Business</u>.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under this Agreement.  The Borrower may not be organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.  As an express inducement to Lenders to make and maintain the Loan, each Property Owner Borrower agrees at all times prior to payment and satisfaction of all Obligations to be and remain a single purpose entity in accordance with <u>Section 3.18</u> above.

Section 5.05 <u>Payment of Obligations</u>.  The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including Tax liabilities, that, if not paid, would result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with sound accounting principles, consistently applied, and (c) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect.  The Borrower will, and will cause each of its Subsidiaries to, comply with all of its obligations and liabilities (as applicable) under the Senior Loan Documents.

Section 5.06 <u>Maintenance of Properties; Insurance</u>.

(a)     The Borrower will, and will cause each of its Subsidiaries to, (i) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (ii) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are reasonable and

customary for similarly situated Properties.  Without limitation to the foregoing, the Borrower will, with respect to each Mortgaged Property, maintain, with financially sound and reputable insurance companies, insurance against such risks as are set forth below and in such amounts as are reasonably required by Administrative Agent from time to time, with Administrative Agent named as loss payee and a beneficiary of such insurance on substantially similar policies and programs as are acceptable to Administrative Agent.

(b)     The Borrower shall maintain the following insurance coverages for the Mortgaged Property:

(i)     An all-risk policy of permanent property insurance insuring the Mortgaged Property against all risks that are commonly covered under real property insurance except those permitted by the Administrative Agent in writing to be excluded from coverage thereunder.

(ii)     A boiler and machinery insurance policy covering loss or damage to all portions of the Mortgaged Property comprised of air-conditioning and heating systems, other pressure vessels, machinery, boilers or high pressure piping.

(iii)     An all-risk policy of insurance covering loss of earnings and/or rents from the Mortgaged Property in the event that the Mortgaged Property is not available for use or occupancy due to casualty, damage or destruction required to be covered by the policies of insurance described in (i) and (ii) above.

(iv)     Commercial general liability, auto liability, umbrella or excess liability and worker's compensation insurance against claims for bodily injury, death or property damage occurring on, in or about the Mortgaged Property in an amount and containing terms reasonably acceptable to the Administrative Agent.

(v)     Such other insurance against other insurable hazards, risks or casualties which at the time are commonly insured against in the case of owners and premises similarly situated, due regard being given to the financial condition of the Borrower, the height and type of the Mortgaged Property, its construction, location, use and occupancy.

(vi)     All required insurance with respect to the Mortgaged Property will be written on forms acceptable to the Administrative Agent and by companies having a Best's Insurance Guide Rating of not less than A or A+ and which are otherwise acceptable to the Administrative Agent, and such insurance (other than third party liability insurance) shall be written or endorsed so that all losses are payable to the Administrative Agent, as Administrative Agent for the Lenders. The original policies evidencing such insurance shall be delivered by the Borrower to the Administrative Agent and held by the Administrative Agent, unless Administrative Agent expressly consents to accept insurance certificates instead.  Each such policy shall expressly prohibit cancellation of insurance without thirty (30) days' written notice to the Administrative Agent.  The

- 56 -

Borrower agrees to furnish due proof of payment of the premiums for all such insurance to Administrative Agent promptly after each such payment is made and in any case at least fifteen (15) days before payment becomes delinquent.

(c)     The Borrower will pay and discharge, or cause to be paid and discharged, all taxes, assessments, maintenance charges, permit fees, impact fees, development fees, capital repair charges, utility reservations and standby fees and all other similar impositions of every kind and character charged, levied, assessed or imposed against any interest in any of the Mortgaged Property owned by it or any of its Subsidiaries, as they become payable and before they become delinquent.  The Borrower shall furnish receipts evidencing proof of such payment to the Administrative Agent promptly after payment and before delinquency.

(d)     All proceeds of insurance with respect to any Mortgaged Property shall be paid to Administrative Agent and, at Administrative Agent's option, be applied to Borrower's Obligations or released, in whole or in part, to pay for the actual cost of repair, restoration, rebuilding or replacement (collectively, "Cost To Repair").  If the Cost To Repair does not exceed thirty-five percent (35%) of the Appraised Value of the subject Mortgaged Property, provided no Event of Default is then in existence, Administrative Agent shall release so much of the insurance proceeds as may be required to pay for the actual Cost to Repair in accordance with and subject to the provisions of Section 5.06(e) below.

(e)     If Administrative Agent elects or is required to release insurance proceeds, Administrative Agent may impose, reasonable conditions on such release which shall include, but not be limited to, the following:

(i)     prior written approval by Administrative Agent, which approval shall not be unreasonably withheld or delayed of plans, specifications, cost estimates, contracts and bonds for the restoration or repair of the loss or damage;

(ii)     waivers of lien, architect's certificates, contractor's sworn statements and other evidence of costs, payments and completion as Agent may reasonably require;

(iii)     if the Cost To Repair does not exceed $500,000.00, the funds to pay therefor shall be released to Borrower. Otherwise, funds shall be released upon final completion of the repair work, unless Borrower requests earlier funding, in which event partial monthly disbursements equal to 90% of the value of the work completed shall be made prior to final completion of the repair, restoration or replacement and the balance of the disbursements shall be made upon full completion and the receipt by Administrative Agent of satisfactory evidence of payment and release of all liens;

(iv)     determination by Administrative Agent that the undisbursed balance of such proceeds on deposit with Administrative Agent, together with additional funds deposited for the purpose, shall be at least sufficient to pay for the remaining Cost To Repair, free and clear of all liens and claims for lien;

> (v)     all work to comply with the standards, quality of construction and Legal Requirements applicable to the original construction of the Mortgaged Property; and

> (vi)    in Administrative Agent's good faith judgment the repair work is likely to be completed at least three (3) months prior to the Maturity Date.

(f)     If there is any condemnation for public use of a Mortgaged Property, the awards on account thereof shall be paid to Administrative Agent and shall be applied to Borrower's obligations, or at Administrative Agent's discretion released to Borrower.  If, in the case of a partial taking or a temporary taking, in the sole judgment of Administrative Agent the effect of such taking is such that there has not been a material and adverse impairment of the viability of the Mortgaged Property or the value of such Collateral, so long as no Default exists Administrative Agent shall release awards on account of such taking to Borrower if such awards are sufficient (or amounts sufficient are otherwise made available) to repair or restore the Mortgaged Property to a condition reasonably satisfactory to Administrative Agent subject to the requirements of Section 5.06(e).

Section 5.07 Books and Records; Inspection Rights.

(a)     The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.

(b)     The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice and subject to rights of tenants, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.08 Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 5.09 Use of Proceeds.  The proceeds of the Loans will be used solely to fund a portion of the cost to consummate the acquisition of the Portfolio Properties, including to make a loan to the BH Pledgor to fund such Person's acquisition of the Summers Landing Property.  No part of the proceeds of the Loans will be used, whether directly or indirectly, for financing, funding or completing the hostile acquisition of publicly traded Persons or for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

Section 5.10 Fiscal Year.  Borrower shall maintain as its fiscal year the twelve (12) month period ending on December 31 of each year.

Section 5.11 Environmental Matters.

(a)      Borrower shall comply and shall cause each of its Subsidiaries and each Real Property owned or leased by such parties to comply in all material respects with all applicable Environmental Laws currently or hereafter in effect, except to the extent noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)      If the Administrative Agent or the Required Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law related to the Mortgaged Property, or Real Property adjacent to such Mortgaged Property, which would reasonably be expected to have a Material Adverse Effect, then Borrower agrees, upon request from the Administrative Agent (which request may be delivered at the option of Administrative Agent or at the direction of Required Lenders), to provide the Administrative Agent, at the Borrower's expense, with such reports, certificates, engineering studies or other written material or data as the Administrative Agent or the Required Lenders may reasonably require so as to reasonably satisfy the Administrative Agent and the Required Lenders that any Credit Party or Real Property owned or leased by them is in material compliance with all applicable Environmental Laws.

(c)      Borrower shall take such Remedial Action or other action as required by Environmental Law or any Governmental Authority except to the extent the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)      If the Borrower fails to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any action described in this Section, the Administrative Agent may, after notice to the Borrower, with the consent of the Required Lenders, make advances or payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so.  All sums so advanced or paid by the Administrative Agent (including reasonable counsel and consultant and investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will become due and payable from the Borrower ten (10) Business Days after demand, and shall bear interest at the Default Rate from the date any such sums are so advanced or paid by the Administrative Agent until the date any such sums are repaid by the Borrower.  Promptly upon request, the Borrower will execute and deliver such instruments as the Administrative Agent may deem reasonably necessary to permit the Administrative Agent to take any such action, and as the Administrative Agent may require to secure all sums so advanced or paid by the Administrative Agent.  If a Lien is filed against the Mortgaged Property by any Governmental Authority resulting from the need to expend or the actual expending of monies arising from an action or omission, whether intentional or unintentional, of the Borrower or for which the Borrower is responsible, resulting in the Releasing of any Hazardous Material into the waters or onto land located within or without the state where the Mortgaged Property is located, then the Borrower will, within thirty (30) days from the date that the Borrower is first given notice that such Lien has been placed against the Mortgaged Property (or within such shorter period of time as may be specified by the Administrative Agent if such Governmental Authority has commenced steps to cause the Mortgaged Property to be sold pursuant to such Lien), either (i) pay the claim and remove the Lien, or (ii) furnish a cash deposit, bond or such other security with respect thereto as is

satisfactory in all respects to the Administrative Agent and is sufficient to effect a complete discharge of such Lien on the Mortgaged Property.

Section 5.12 <u>Collateral Requirement.</u>

(a)    <u>General Requirement</u>.  The Obligations and the Hedging Obligations, if any, shall be secured by a perfected first priority lien and security interest to be held by the Administrative Agent for the benefit of the Lenders, pursuant to the terms of the Security Documents, in

(i)    each Mortgaged Property;

(ii)    the Equity Interests of each Property Owner Borrower, fifty percent (50%) of the Equity Interests in each Collateral Subsidiary other than the Property Owner Borrowers, and the Equity Interests held by HCRE Partners and its Subsidiaries in the HCRE Properties; <u>provided</u> that the Borrower shall not, pursuant to this subclause (i), be required to pledge any portion of the Equity Interests of any Collateral Subsidiary that is not a Property Owner Borrower or in any owner of an HCRE Property to the extent (and only to the extent) that such a grant of a security interest is prohibited by, or under the terms thereof, may give rise to a default, breach, right of recoupment, buyout, repurchase, purchase option, right of first refusal or similar rights (whether effective with the pledge or any related exercise of rights thereunder), claim, defense or remedy, or directly or indirectly results in the termination of or requires any consent not obtained under, the Senior Loans or Indebtedness secured by the HCRE Properties; <u>provided</u> further that, to the extent such pledge of any portion of such Equity Interests is restricted as set forth in the previous proviso, the Borrower shall, to the extent permitted under any such debt instruments, pledge to the Administrative Agent, pursuant to documentation reasonably acceptable to the Administrative Agent, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of such Collateral Subsidiary or owner of an HCRE Property;

(iii)    to the extent not included in clause (ii) above, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of each Collateral Subsidiary and each owner of a HCRE Property to the extent owned by HCRE;

(iv)    all of the Borrower's rights with respect to the pledge by the BH Pledgor and its Subsidiaries of their interests in the Summers Landing Property;

(v)    the proceeds of all Equity Offerings with respect to the Stonebridge DST on a pari passu basis with the Stonebridge Term Loan subject to the terms of this Agreement;

(vi)    the common shares in NexPoint Residential Trust Inc. or partnership units in NexPoint Residential Operating Partnership, LP that are

identified on Schedule 5.12 hereto, 1,000,000 of which shall be pledged on a pari passu basis with the Stonebridge Term Loan;

(vii)    the economic interests in NexPoint Advisors, L.P. subject to the terms of the Economic Interests Pledge; and

(viii)    all of the common shares in NexBank Capital, Inc. owned by The SLHC Trust.

Upon the occurrence and during the continuance of an Event of Default, if the Administrative Agent determines to exercise rights and remedies with respect to the Collateral in accordance with the terms of the Loan Documents, the Administrative Agent shall first exercise rights and remedies with respect to any Equity Interests in NexPoint Residential Trust Inc. before exercising rights and remedies against any other Collateral.

(b)    Release of Certain Collateral.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this Section 5.12(b), including any paydown of the Loans in connection with the transactions contemplated by this Section 5.12(b)), the Administrative Agent shall release the Collateral related to a Portfolio Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a sale, refinancing, or recapitalization of such Portfolio Property, subject to and upon the following terms and conditions:

(i)    The Borrower shall have provided the Administrative Agent with written notice of its intention to remove any specified Collateral at least five (5) Business Days (or such shorter period as the Administrative Agent may agree) prior to the requested release (which notice may be revoked by Borrower at any time);

(ii)    Borrower shall submit to the Administrative Agent with such request an executed Compliance Certificate adjusted in the best good faith estimate of Borrower solely to give effect to the proposed release and demonstrating that no Default or Event of Default with respect to the covenants referred to therein shall exist after giving effect to such release and if the Borrower would not be in compliance, then any reduction in the outstanding amount of the Loans in connection with such release;

(iii)    The Administrative Agent shall have determined in its reasonable discretion, and received such evidence acceptable to it as it shall reasonably request, that the proceeds from expected sale, refinancing, or recapitalization transactions with respect to the Portfolio Properties (or the Equity Interests therein) remaining as Collateral for the Obligations after giving effect to the requested release, shall be sufficient to repay the Obligations in full;

(iv)    Borrower shall make all Mandatory Prepayments required under Section 2.11(d) in connection with such sale, refinancing, or recapitalization;

(v)    Borrower shall pay all reasonable costs and expenses of the Administrative Agent in connection with such release, including without limitation, reasonable attorney's fees; and

(vi)    without limiting or affecting any other provision hereof, any release of a Collateral will not cause the Borrower to be in violation of the covenants set forth in Section 5.02.

(c)    Release of Collateral.  Upon the refinancing or repayment of the Obligations and Hedging Obligations in full, then the Administrative Agent shall release the Collateral from the lien and security interest of the Security Documents.

(d)    Release of Certain HCRE Properties.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this Section 5.12(b), including any paydown of the Loans in connection with the transactions contemplated by this Section 5.12(b)), the Administrative Agent shall release the Collateral related to a HCRE Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a Transfer of 100% of the indirect interest in any Borrower in conjunction with the formation of a publically traded real estate investment trust (the "**Transferee REIT**"), which Transferee REIT shall be under common Control with NexPoint Advisors, L.P. pursuant to a written management or advisory agreement; provided, such applicable Borrower shall pledge its Equity Interests in such Transferee REIT as Collateral for the Obligations pursuant to documentation reasonably acceptable to the Agent.

Section 5.13 Further Assurances.  At any time upon the request of the Administrative Agent, Borrower will, promptly and at its expense, execute, acknowledge and deliver such further documents and perform such other acts and things as the Administrative Agent may reasonably request to evidence the Loans made hereunder and interest thereon in accordance with the terms of this Agreement.

Section 5.14 [Intentionally Omitted].

Section 5.15 [Intentionally Omitted].

Section 5.16 Approved Leases.  Borrower shall not enter into any tenant lease of space in the Portfolio Properties unless approved by Administrative Agent or deemed approved pursuant to the provisions of this Section 5.16 (each such lease, an "Approved Lease"); provided, however, for the avoidance of doubt, certain master leases and residential leases entered into by Portfolio One DST, Portfolio Two DST, Portfolio Three DST, and Stonebridge DST or their subsidiaries for the purposes of a Specified DSTs' Equity Offering shall not require approval for the purposes of this Section 5.16.  Borrower's standard form of residential tenant lease, and any material revisions thereto, must have the prior written approval of Administrative Agent; it being understood that Borrower's standard form of residential tenant lease as of the Effective Date is approved.  Administrative Agent shall be "deemed" to have approved any tenant lease that (a) is on the standard form lease approved by Administrative Agent, with no material deviations except as approved by Administrative Agent; (b) is entered into in the ordinary course of

business with a bona fide unrelated third party tenant, and Borrower, acting in good faith and exercising due diligence, has determined that the tenant is financially capable of performing its obligations under the lease or is leased to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property; (c) is received by Administrative Agent (together with each guarantee thereof (if any) and financial information regarding the tenant and each guarantor (if any) received by Borrower) within fifteen (15) days after Administrative Agent's request; (d) reflects an arms-length transaction at then current market rate for comparable space (except for a lease to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property); and (e) contains no right to purchase the Real Property, or any present or future interest therein. Borrower shall provide to Administrative Agent a correct and complete copy of each tenant lease, including any exhibits, and each guarantee thereof (if any), prior to execution unless the lease in question meets the foregoing requirements for "deemed" approval by Administrative Agent. If requested by Administrative Agent, Borrower shall provide to Administrative Agent a fully executed copy of each tenant lease within fifteen (15) days of such request. Borrower shall, throughout the term of this Agreement, pay all reasonable costs incurred by Administrative Agent in connection with Administrative Agent's review and approval of tenant leases and each guarantee thereof (if any), including reasonable attorneys' fees and costs.

Section 5.17 Permanent Financing. Borrower agrees, on behalf of itself and its Affiliates, that it shall utilize KeyBank to place permanent debt (e.g. CMBS, Fannie/Freddie, life company placements) with respect to the Portfolio Properties and all other Real Property acquired with proceeds from the Loans.

Section 5.18 Keepwell. Each Borrower that is a Qualified ECP Party at the time that the Agreement becomes effective with respect to any Hedging Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower that is not then an "eligible contract participant" under the Commodity Exchange Act (a "Specified Party") to honor all of its obligations under the Agreement in respect of Hedging Obligations (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Party's obligations and undertakings under this Section 5.16 voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Party under this Section 5.16 shall remain in full force and effect until the Loans have been repaid in full. Each Qualified ECP Party intends this Section 5.16 to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Party for all purposes of the Commodity Exchange Act.

Section 5.19 DST Offerings.

(a)     Marketing. Borrower will cause each DST Depositor to use commercially reasonable efforts to market and sell its respective Trust Interests so as to achieve a DST Permitted Sale that will maximize the proceeds which can reasonably be expected to be obtained from a sale of such Trust Interests.

(b)  <u>Periodic Investor Reports</u>.  Borrower shall provide to the Agent a report, to be submitted for each two-calendar week period on or before each Friday of the succeeding calendar week after such two week period, identifying the amount paid by any investor in a Specified DST (but not the identity of such investor) and each such investor's and each other Borrower's percentage interest in each Specified DST, in form and substance reasonably satisfactory to Lender.

(c)  <u>Monthly Distributions</u>. During the existence of any Event of Default, Borrower shall, to the extent permitted by each applicable Trust Agreement, cause the applicable Specified DST to distribute all available cash under its Trust Agreement on a monthly basis to the holders of its Trust Interests in accordance with their percentage of ownership, and thereafter any Affiliate of Borrower directly or indirectly holding such Trust Interests shall cause such cash to be distributed to Borrower and, in the case of a DST Depositor, to its other members in accordance with the terms of such DST Depositor's organizational documents. All such distributions payable to Borrower during the existence of an Event of Default shall be paid directly to the Agent for application to the Obligations. The Borrower shall not permit any Indebtedness of any Specified DST (or its Subsidiaries) to prohibit such monthly distributions in the absence of a default or event of default thereunder; provided that the foregoing shall not apply to any Senior Loan in respect of the Portfolio Property owned directly or indirect by any Specified as of the Effective Date.

Section 5.20 <u>BH Loan.</u>

(a)  The Borrower shall require the BH Pledgor to comply with all material terms of the BH Loan Documents and shall enforce its rights as a lender thereunder in its reasonable discretion, unless otherwise agreed by the Administrative Agent.

(b)  The Borrower shall not permit any amendment or waiver of any material term of the BH Loan Documents without the prior consent of the Administrative Agent.

Section 5.21 <u>Post-Closing Covenant</u>.

(a)  The Borrowers shall use commercially reasonable efforts to, no later than fifteen (15) Business Days after the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver an estoppel certificate with respect to that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 340 and that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 324, in each case, in accordance with the provisions of such Declaration of Reciprocal Easements.

(b)  No later than ten (10) Business Days after the Effective Date, the Borrowers shall deliver to the Administrative Agent (i) a control agreement, duly executed by the applicable Borrower and the applicable custodian, securities intermediary, or other person holding any of the Equity Interests in NexPoint Residential Trust Inc., NexPoint Residential Operating Partnership, LP, or NexBank Capital Inc. that are required to be pledged to the Administrative Agent under the Loan Documents, in form and substance reasonably satisfactory to the

Administrative Agent, and (ii) such notices, stock powers, transfer documents and other documentation and take such action as may be reasonably required by the Administrative Agent in order to maintain a perfected, first priority Lien and security interest in such Equity Interests.

(c)     No later than two (2) Business Days after the Effective Date, the Borrowers shall execute such documents and take such further action as the Administrative Agent may request in order to pledge to the Administrative Agent, for the benefit of the Lenders, common shares owned by the Borrowers or their Affiliates in NexPoint Residential Trust, Inc. and NexPoint Strategic Opportunities Fund with an aggregate market value of no less than $10,000,000.

(d)     Notwithstanding anything herein to the contrary, the Borrowers acknowledge and agree that any breach of this Section 5.21 shall constitute an immediate Event of Default (subject only to notice from the Administrative Agent).

Section 5.22 Sufficiency of Funds.  Each Borrower hereby represents, warrants, and covenants that:

(a)     In connection with the required prepayment under Section 2.11(f) hereof, the Borrowers and their Affiliates will recommend to the appropriate investment committees of funds managed by any Borrower or such Affiliates to make investments in the Portfolio Properties in an aggregate amount as may be required for the Borrowers to make such prepayments in full when required hereunder;

(b)     such funds are permitted under their respective organizational documents to make investments, in the form of debt or equity, in assets similar to the Portfolio Properties; and

(c)     the Borrowers and their affiliates will promptly undertake such action to obtain the necessary funding from such related funds and Affiliates in order to make the prepayment under Section 2.11(f) when required hereunder.

## ARTICLE VI

### Negative Covenants

Until the principal of and interest on the Loans and all other amounts due and  payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 6.01 Liens.  No Borrower will create, incur, assume or permit to exist any Lien on the Collateral or the Portfolio Properties, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except solely with respect to the Portfolio Properties and the pledged Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc., Permitted Encumbrances.  The Dugaboy Investment Trust shall not, prior to the date when the Obligations shall have been reduced to no more than $150,000,000, create, incur, assume or permit to exist any Lien on any marketable securities owned by it, whether now owned or hereafter acquired, except the Lien in favor of the Administrative Agent to secure the Obligations.

Section 6.02 <u>Fundamental Changes</u>.  The Borrower will not, and will not permit any Collateral Subsidiary to:

(a)      merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Borrower or all or substantially all of the stock of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve;

(b)      sell, transfer, lease or otherwise dispose of any of its assets to the extent such transaction would result in a breach of <u>Section 5.02</u>; or

(c)      engage to any material extent in any business other than the ownership of interest in entities that own, develop, operate and manage the Properties and businesses reasonably related thereto, except as allowed by <u>Section 6.03</u>.

Section 6.03 <u>Investments, Loans, Advances and Acquisitions</u>.  The Borrower will not purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness (subject to <u>Section 6.09</u> below) or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments.

Section 6.04 <u>Hedging Agreements</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Hedging Agreement, other than Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks to which any Subsidiary of the Borrower is exposed in the conduct of its business or the management of its liabilities.

Section 6.05 <u>Restricted Payments</u>.  The Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment while any Default or Event of Default shall be in existence.

Section 6.06 <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than would be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its wholly owned Subsidiaries not involving any other Affiliate, (c) transactions related to the closing of and ongoing  activities necessary to implement the loan obligations and requirements of this Agreement,  and (d) any Restricted Payment permitted by <u>Section 6.05</u>.

Section 6.07 <u>[Intentionally Omitted]</u>.

- 66 -

Section 6.08 <u>Restrictive Agreements</u>.  No Borrower will, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that the restrictions contained in this <u>Section 6.08</u> shall not apply to (i) restrictions and conditions imposed by law or by this Agreement or as otherwise approved by the Administrative Agent, (ii) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness or Liens permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, or ownership interests in the obligors with respect to such Indebtedness, and (iv) solely with respect to clause (a), provisions in leases restricting the assignment thereof.

Section 6.09 <u>Indebtedness</u>.  Neither any Borrower nor any Collateral Subsidiary shall, without the prior written consent of the Required Lenders, create, incur, assume, guarantee or be or remain liable, contingently or otherwise with respect to any Indebtedness on a recourse basis, except:

(a)     Indebtedness under this Agreement;

(b)     Indebtedness of a Collateral Subsidiary (other than any Property Owner Borrower) under the Senior Loan Documents;

(c)     Indebtedness under any Hedging Obligations;

(d)     Indebtedness of NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust under the Stonebridge Term Loan;

(e)     Recourse Indebtedness of the The Dugaboy Investment Trust and Highland Capital in an amount not to exceed the aggregate principal amount of such Borrower's Indebtedness outstanding on the date hereof and set forth in <u>Schedule 6.09</u>; provided that, from an after the date that the aggregate outstanding principal amount of the Obligations shall be reduced to $150,000,000 or less, The Dugaboy Investment Trust and Highland Capital may incur additional recourse Indebtedness on a recourse basis, subject to compliance with the covenants in <u>Section 5.02</u>;

(f)     Customary non-recourse, carveout guarantees and environmental indemnitees entered into in connection with property-level secured Indebtedness of such Borrower's Subsidiaries; and

(g)     Indebtedness for trade payables and operating expenses incurred in the ordinary course of business.

Section 6.10 <u>Subordination of Claims</u>.

(a)    Prior to repayment in full of the Obligations, no Borrower or any Subsidiary may pay any advisory, asset management, property, acquisition, financing, and other fees and amounts due and payable to the Advisor in connection with the Portfolio Properties; <u>provided</u> that, so long as no Event of Default exists or would result therefrom, (i) the Advisor may receive asset management fees with respect to the Portfolio Properties (but not any acquisition, financing or similar fees with respect to the Specified DSTs) and (ii) from and after the date that the market value of the common shares of NexPoint Residential Trust Inc. are equal to an amount no less than 110% of the then aggregate outstanding balance of the Loans and the Stonebridge Term Loan has been repaid in full, the Borrower may pay acquisition, financing or similar fees with respect to a sellout of any DST offering occurring after such date.[1]

(b)    Each Borrower hereby expressly covenants and agrees for the benefit of the Administrative Agent and the Lenders that all obligations and liabilities of any Borrower or its Subsidiaries or Affiliates to such Borrower or its Subsidiaries or Affiliates of whatever description, including without limitation, all intercompany receivables of such Borrower from another Borrower or its Subsidiaries or Affiliates (collectively, the "<u>Junior Claims</u>") shall be subordinate and junior in right of payment to all Obligations; provided, however, that payment thereof may be made so long as no Event of Default shall have occurred and be continuing. If an Event of Default shall have occurred and be continuing, then no Borrower or its Subsidiaries or Affiliates shall accept any direct or indirect payment (in cash, property, securities by setoff or otherwise) from another Borrower or its Subsidiaries or Affiliates on account of or in any manner in respect of any Junior Claim until all of the Obligations have been indefeasibly paid in full.  Schedule 6.10 is, as of the Effective Date, a complete and correct listing of all Junior Claims, and if such Indebtedness is secured by any Lien, a description of the property subject to such Lien. Except as set forth in <u>Schedule 6.10</u> no default exists under any Junior Claims as of the Effective Date.

(c)    All such parties shall execute subordination agreements in form and substance acceptable to the Administrative Agent with respect to such fees and Junior Claims.

Section 6.11 <u>Amendment to Organizational Documents</u>.  Without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed, no Borrower will, nor will it permit any Collateral Subsidiary to, amend, modify or waive any rights under its certificate of incorporation, bylaws or other organizational documents in any manner, except: (a) modifications necessary to clarify existing provisions of such organizational documents; (b) modifications which would not have a Material Adverse Effect, and (c) modifications in connection with mergers, consolidations, investments and other transactions not otherwise prohibited by the other provisions of this Agreement.

Section 6.12 <u>Sanctions</u>.  No Borrower shall permit the proceeds of any Loan:  (a) to be lent, contributed or otherwise made available to fund any activity or business in any Designated Jurisdiction; (b) to fund any activity or business of any Sanctioned Person or any Person located,

---

[1] NTD: Key's understanding is that the fees would accrue but would not be paid until the 110% condition above is satisfied.

organized, formed, incorporated or residing in any Designated Jurisdiction or who is the subject of any Sanctions; (c) in any other manner that will result in any material violation by any Person (including any Lender or Administrative Agent) of any Sanctions; or (d) to be used in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws.

Section 6.13 Specified DSTs.

(a)    Sale of Trust Interests.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Documents, no DST Depositor may sell (or redeem the Trust Interests owned by such DST Depositor) or otherwise dispose of its Trust Interests or any portion thereof or interest (beneficial or otherwise) in any Trust Interests or Specified DST, or enter into a contract to sell or dispose of such Trust Interests or Specified DST, or any portion thereof or interest therein (collectively referred to as a "DST Sale"), unless:

(i)    the DST Sale is being made pursuant to the applicable Offering Documents;

(ii)    the DST Sale is not to an Affiliate (other than the redemption of Trust Interests held by the applicable DST Depositor in connection with a DST Permitted Sale to third party investors) unless the terms of the sale are no more favorable to the buyer than the terms upon which third party investors are acquiring the Trust Interests; and

(iii)    the DST Sale is for all cash and all proceeds are deposited into the applicable Pledged DST Account.

A DST Sale satisfying these conditions shall be defined as a "DST Permitted Sale".

(b)    Terms of DST Sales.  The Offering Documents shall set forth the terms of the possible sale of Trust Interests owned by the applicable DST Depositor or sold for purposes of redeeming a separate class of Trust Interests held by such DST Depositor. No other beneficial interests in any property owned by a Specified DST shall be sold by the applicable Specified DST or its Affiliates other than Trust Interests pursuant to the terms of this Agreement or other than resales of Trust Interests owned by Investors other than a DST Depositor or its Affiliates. Prior to commencing the marketing of Trust Interests of any Specified DST, Borrower shall deliver to Lender a proposed budget in a form reasonably approved by Lender for each Specified DST showing anticipated proceeds from any issuance of Trust Interests, anticipated equity contributions by Borrower and its Affiliates (other than to DST Depositor as the initial holder of unsold Class 2 Trust Interests in such Specified DST), the amount of any "presold" Trust Interests, and the amount of any property level Indebtedness of such Specified DST or its Subsidiaries.   There shall be no change in the purchase price or any other material terms of a DST Sale (other than the reduction of commissions and/or expenses) without the prior written consent of the Agent. Notwithstanding anything set forth in this Agreement to the contrary, the original issuance of Trust Interests to its respective DST Depositor shall not be prohibited by this Agreement.

(c)    No Changes to DST.  No Specified DST shall change its corporate form from a Delaware statutory trust, or transfer or permit its subsidiaries to transfer any of its interests in any Portfolio Property; provided however, that any Specified DST may consummate any Transfer Distribution (as the term is defined in the Trust Agreement) so long as the Agent shall have received notice of such Specified DST no more than ten (10) days following the occurrence thereof, the Borrower or an Affiliate thereof remains as the manager of any limited liability company resulting from such Transfer Distribution, and such resulting limited liability company shall have executed such additional documents as the Administrative Agent may reasonably require to preserve its rights under the Loan Documents.

(d)    Pledged DST Accounts.  No later than the date that is thirty days after the Effective Date (or, with respect to a Specified DST formed hereafter, the date such Specified DST is form, or, in each case, such later date that the Agent may agree), the Borrowers shall cause each DST Depositor to establish with KeyBank a deposit account into which all proceeds of the sale of Trust Interests owned by such DST Depositor shall be deposited (with respect to each DST Depositor, it's "Pledged DST Account"), which shall be pledged to the Agent and subject to the sole control of the Agent pursuant to documentation reasonably acceptable to the Agent.

(e)    Partial Release.  Notwithstanding any other term or provision of this Agreement, the parties agree that upon the sale of 100% of the Trust Interests in a Specified DST pursuant to a DST Permitted Sale, so long as no Event of Default has occurred and is continuing (such conditions, the "Release Provisions"), the Specified DST Depositor with respect to such Specified DST shall be automatically released from the Loan Documents, and such Person shall no longer be obligated to comply with any of the representations, warranties or covenants applicable to such Person under the Loan Documents, provided, however, that the release contained in this Section 6.13(e) shall not apply to the extent any such representations, warranties or covenants apply to Subsidiaries of the Borrower for as long as any such Person constitutes a Subsidiary thereof. Further, from and after satisfaction of the Release Provisions for any Specified DST Depositor and its respective properties, any proceeds received with respect to the properties of such Specified DST shall no longer constitute Collateral under the Loan Documents or remain subject to the rights of the Agent under the Loan Documents.

## ARTICLE VII

### Events of Default

If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure (other than the payment due on the Maturity Date, for which there shall be no grace period) shall continue unremedied for a period of over three (3) Business Days;

(b)    the Borrower shall fail to pay any interest on the Loans or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under any Loan

Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of over three (3) Business Days (such three Business Day period commencing after written notice from the Administrative Agent as to any such failure);

(c)      any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)      the Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Article V</u> or <u>VI</u> other than <u>Sections 5.04</u>, 5.<u>05</u>, <u>5.06</u>, <u>5.07(a)</u>, <u>5.08</u>, and <u>5.11</u>;

(e)      any Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in <u>clause (a), (b)</u> or <u>(d)</u> of this Article), and such failure shall continue unremedied for a period of over 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) and if such default is not curable within thirty (30) days and the Borrower is diligently pursuing cure of same, the cure period may be extended for thirty (30) days (for a total of 60 days after the original notice from the Administrative Agent) upon written request from the Borrower to the Administrative Agent;

(f)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Borrower or any Collateral Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Borrower or any Collateral Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)      any Borrower or any Collateral Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h)      any Borrower or any Collateral Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(i)      one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall be rendered against any Borrower, any Subsidiary of the Borrower or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of such Person to enforce any such judgment;

(j)      an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000;

(k)      [Intentionally Omitted];

(l)      any Borrower shall default under any agreement and such default would reasonably be expected to result in a Material Adverse Effect;

(m)      any Borrower shall (or shall attempt to) disavow, revoke or terminate any Loan Document to which it is a party or shall otherwise challenge or contest in any action, suit or proceeding in any court or before any Governmental Authority the validity or enforceability of any Loan Document;

(k)      any provision of any Loan Document with respect to the Collateral shall for any reason cease to be valid and binding on, enforceable against, any Borrower resulting in a Material Adverse Effect, or any lien created under any Loan Document ceases to be a valid and perfected first priority lien in any of the Collateral purported to be covered thereby;

(n)      a Change in Control shall occur;

(o)      (i) Any Borrower defaults under any recourse Indebtedness, or (ii) any Subsidiaries of a Borrower defaults under any non-recourse Indebtedness in an aggregate amount equal to or greater than $75,000,000 at any time (such $75,000,000 calculated based on the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates); or

(p)      An "event of default" occurs under any of the Senior Loan Documents or any other debt secured by the Portfolio Properties (excluding the Summers Landing Property);

then, and in every such event (other than an event described in clause (f) or (g) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take some or all of the following actions, at the same or different times:  (i) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, and (ii) exercise any other rights or remedies

provided under this Agreement or any other Loan Document, or any other right or remedy available by law or equity; and in case of any event described in clause (f) or (g) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

<div align="center">ARTICLE VIII</div>

<div align="center">The Administrative Agent</div>

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.  In the event of conflicting instructions or notices given to the Borrower by the Administrative Agent and any Lender, the Borrower is hereby directed and shall rely conclusively on the instruction or notice given by the Administrative Agent.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein,

<div align="center">- 73 -</div>

(iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.   The Administrative Agent agrees that, in fulfilling its duties hereunder, it will use the same standard of care it utilizes in servicing loans for its own account.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower, and may be removed by the Required Lenders in the event of the Administrative Agent's gross negligence or willful misconduct.  Upon any such resignation or removal, the Required Lenders shall have the right, with the approval of Borrower (provided no Default has occurred and is continuing), which approval shall not be unreasonably withheld, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or is removed, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a Lender, or a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.   The fees payable by the Borrower to a successor Administrative Agent for its own behalf shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.   After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was

acting as Administrative Agent.  The Administrative Agent shall cooperate with any successor Administrative Agent in fulfilling its duties hereunder.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.  Administrative Agent agrees to provide the Lenders with copies of all material documents and certificates received by the Administrative Agent from Borrower in connection with the Loans.

The Titled Agents shall not have any additional rights or obligations under the Loan Documents, except for those rights, if any, as a Lender.

Any material to be delivered pursuant to <u>Section 5.01</u> and <u>Section 5.03</u> (collectively, "<u>Information Materials</u>") may be delivered electronically directly to the Administrative Agent or made available to Administrative Agent pursuant to an accessible website and the Lenders provided that such material is in a format reasonably acceptable to Administrative Agent, and such material shall be deemed to have been delivered to Administrative Agent and the Lenders upon Administrative Agent's receipt thereof or access to the website containing such material. The Administrative Agent shall distribute any such information to the other Lenders after receipt thereof, and may do so by electronic form in the same manner as provided in this <u>Article VIII</u>. Upon the request of Administrative Agent, Borrower shall deliver paper copies thereof to Administrative Agent and the Lenders.  Borrower authorizes Administrative Agent and Arranger to disseminate any such materials through the use of Intralinks, SyndTrak or any other electronic information dissemination system provided that system is secure and access thereto is protected by a password that is only disclosed to the Lenders (an "<u>Electronic System</u>").  Any such Electronic System is provided "as is" and "as available."  The Administrative Agent and the Arranger do not warrant the adequacy of any Electronic System and expressly disclaim liability for errors or omissions in any notice, demand, communication, information or other material provided by or on behalf of Borrower that is distributed over or by any such Electronic System ("<u>Communications</u>").  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Administrative Agent or the Arranger in connection with the Communications or the Electronic System.  In no event shall the Administrative Agent, Arranger or any of their directors, officers, employees, agents or attorneys have any liability to the Borrower, any Lender or any other Person for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, the Administrative Agent's or Arranger's transmission of Communications through the Electronic System, and the Borrowers release Administrative Agent, the Arrangers and the Lenders from any liability in connection therewith.  Certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public

information with respect to the Borrowers, their Subsidiaries or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market related activities with respect to such Persons' securities. The Borrower hereby agrees that it will identify that portion of the Information Materials that may be distributed to the Public Lenders and that (i) all such Information Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Information Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lenders and the Arranger to treat such Information Materials as not containing any material non-public information with respect to the Borrowers, their Subsidiaries, their Affiliates or their respective securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Information Materials constitute confidential information, they shall be treated as provided in Section 9.12); (iii) all Information Materials marked "PUBLIC" are permitted to be made available through a portion of any electronic dissemination system designated "Public Investor" or a similar designation; and (iv) the Administrative Agent and the Arranger shall be entitled to treat any Information Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of any electronic dissemination system not designated "Public Investor" or a similar designation.

<div align="center">ARTICLE IX</div>

<div align="center">Miscellaneous</div>

Section 9.01 <u>Notices</u>. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Borrower, in care of Highland Capital Management, L.P., at 300 Crescent Court, Suite 700, Dallas, Texas 75201, Attention: Matt McGraner (Telephone No. (972) 419-6229 and Email: mmcgraner@highlandcapital.com); copies to: Wick Phillips Gould & Martin, LLP, 3131 McKinney, Suite 100, Dallas, Texas 75204, Attention: Chris Fuller (Telephone No. (214) 740-4023 and Email: cfuller@wickphillips.com);

(b)    if to the Administrative Agent, to KeyBank, National Association, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110, Attention: Christopher T. Neil, (Telephone No. (617) 385-6202 and Email: christopher_t_neil@keybank.com; and

(c)    if to any other Lender, to it at its address (or telecopy number) set forth on the signature pages of this Agreement, or as provided to Borrower in writing by the Administrative Agent or the Lender.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given (i) if given by telecopy, when such telecopy is transmitted to the telecopy number specified in this Section and the appropriate confirmation is received (or if

<div align="center">- 76 -</div>

such day is not a Business Day, on the next Business Day); (ii) if given by mail (return receipt requested), on the earlier of receipt or three (3) Business Days after such communication is deposited in the mail with first class postage prepaid, addressed as aforesaid; or (iii) if given by any other means, when delivered at the address specified in this Section; provided that notices to the Administrative Agent under Article II shall not be effective until received.

Section 9.02 Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any provision of any Loan Document may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.17(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, (vi) release any Borrower from its obligations under the Loan Documents or release any Collateral, except as specifically provided for herein, without the written consent of each Lender, (vii) subordinate the Loans or any Collateral without the written consent of each Lender, (viii) waive or modify any conditions of extending the Loan set forth in Section 2.21 or Section 2.22 without the written consent of each Lender affected thereby, or (ix) consent to the Collateral securing any other Indebtedness without the written consent of each Lender; provided further that no such agreement shall

amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

(c)      There shall be no amendment, modification or waiver of ARTICLE VIII or any other provision in the Loan Documents that affects the rights or duties of the Administrative Agent under this Agreement or any of the other Loan Documents without the written consent of the Administrative Agent.

(d)      Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender; and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Section 9.03 Expenses; Indemnity; Damage Waiver.

(a)      The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Arranger, and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the closing of the credit facilities provided for herein, the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all mortgage taxes and other charges incurred or required to be paid by the Administrative Agent in connection with the Loan Documents, and (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred (including any Appraisal costs) during any waivers, workout, restructuring or negotiations in respect of the Loans.

(b)      The Borrower shall indemnify the Administrative Agent, the Arranger, and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) the Loans or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim,

- 78 -

litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee as determined by a court of law in a final non-appealable judgment, or the failure of the Indemnitee to make Loans pursuant to its Commitment in breach of its obligations hereunder.

(c)       To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)       To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof.

(e)       All amounts due under this Section shall be payable not later than ten days after written demand therefor.

Section 9.04 Successors and Assigns.

(a)       The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)       (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)       the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Default has occurred and is continuing, any other assignee; and (ii) such consent shall be deemed granted unless the

Lead Borrower objects within five (5) Business Days of a receipt of written notice of the proposed assignment;

(B)    the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

Provided, no consent of the Borrower or Administrative Agent shall be required in connection with any assignment to an entity acquiring, or merging with, a Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000.00 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if a Default has occurred and is continuing and such consent shall not be unreasonably withheld;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500.00; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)  Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and

Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)      Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) Borrower's obligations hereunder shall not be increased.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to

paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that, except in the case of a Participant asserting any right of set-off pursuant to Section 9.08, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)      A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17(e) as though it were a Lender.

(e)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05 Survival.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loans or any fee or any other amount payable under this Agreement is

outstanding and unpaid.  The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06 Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

(c)     Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07 Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08 Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits of a Borrower (general or special, time or demand, provisional or final, but excluding any funds held by the Borrower on behalf of tenants or other third parties) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of a Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  Each Lender agrees promptly to notify the Borrower after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  In the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent

- 83 -

and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

Section 9.09 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the state and federal courts in Boston, Massachusetts and in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

Notwithstanding the foregoing choice of law:

(i)    matters relating to the creation, perfection, priority and enforcement of the liens on and security interests in a Mortgaged Property or other assets situated in another jurisdiction(s), including by way of illustration, but not in limitation, actions for foreclosure, for injunctive relief, or for the appointment of a receiver, shall be governed by the laws of such state;

(ii)    Administrative Agent shall comply with applicable law in such state to the extent required by the law of such jurisdiction(s) in connection with the foreclosure of the security interests and liens created under the Mortgages or exercising any rights with respect to the Mortgaged Property directly, and the other Loan Documents with respect to the Mortgaged Property or other assets situated in another jurisdiction; and

(iii)    provisions of Federal law and the law of such other jurisdiction(s) shall apply in defining the terms Hazardous Materials, Environmental Laws and Legal Requirements applicable to the Mortgaged Property as such terms are used in this Agreement, the Environmental Indemnity and the other Loan Documents

(c)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the

parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10 <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11 <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12 <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent  required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Borrower or (h) to any Person in connection with any Hedging Agreement to the (i) extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Borrower, and (j) to the National Association of Insurance Commissioners or any other similar organization or any nationally recognized rating agency that requires access to information about a Lender's or its Affiliates' investment portfolio in connection with ratings issued with respect to such Lender or its Affiliates  For the purposes of this Section, "Information" means all information received from any Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative

Agent or any Lender on a nonconfidential basis prior to disclosure by any Borrower; provided that, in the case of information received from any Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.13 <u>Interest Rate Limitation</u>.  If at any time there exists a maximum rate of interest which may be contracted for, charged, taken, received or reserved by the Lenders in accordance with applicable law (the "<u>Maximum Rate</u>"), then notwithstanding anything herein to the contrary, at any time the interest applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on the Loans under applicable law (collectively, the "<u>Charges</u>"), shall exceed such Maximum Rate, the rate of interest payable in respect of the Loans hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been paid in respect of the Loans but were not payable as result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders.  If, for any reason whatsoever, the Charges paid or received on the Loans produces a rate which exceeds the Maximum Rate, the Lenders shall credit against the principal of the Loans (or, if such indebtedness shall have been paid in full, shall refund to the payor of such Charges) such portion of said Charges as shall be necessary to cause the interest paid on the Loans to produce a rate equal to the Maximum Rate.  All sums paid or agreed to be paid to the holders of the Loans for the use, forbearance or detention of the Loans shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this Agreement, so that the interest rate is uniform throughout the full term of this Agreement.  The provisions of this Section shall control all agreements, whether now or hereafter existing and whether written or oral, between the parties hereto.  Without notice to the Borrower or any other person or entity, the Maximum Rate, if any, shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

Section 9.14 <u>USA PATRIOT Act</u>.  .  Each Lender that is subject to the Patriot Act (as hereinafter defined) and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Borrower in accordance with the Patriot Act.  Borrower shall, promptly following a request by Administrative Agent or any Lender, provide all documentation and other information that Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and Anti-Money Laundering  Laws, rules and regulations, including the Patriot Act.

Section 9.15 <u>Fiduciary Duty/No Conflicts.</u>

The Administrative Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Borrower, their stockholders and/or their affiliates.  Each Borrower agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Borrower, its stockholders or its affiliates, on the other.  The Borrower acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrowers, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Borrower, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Borrower, its stockholders or its Affiliates on other matters) or any other obligation to any Borrower except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting hereunder solely as principal and not as the agent or fiduciary of any Borrower, its management, stockholders, creditors or any other Person.  Each Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Borrower agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower, in connection with such transaction or the process leading thereto in its capacity as a Lender.

Section 9.16 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

- 87 -

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 9.17 <u>Multiple Borrowers; Joint and Several Liability.</u>

(a)    With respect to the definition of the "Borrower" hereunder or in any other Loan Document, except where the context otherwise provides, (a) any representations contained herein or in any other Loan Documents of Borrower shall be applicable to each Borrower, (b) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower and shall require performance by all Borrowers, (c) any negative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower, and shall be breached if any Borrower fails to comply therewith, (d) the occurrence of any Event of Default with respect to any Borrower shall be deemed to be an Event of Default hereunder or thereunder, and (e) any Obligations of Borrowers, including, without limitation, under the Note (i) shall be deemed to be Obligations of all of the Borrowers, and (ii) shall be joint and several.  Each Borrower recognizes that credit available to it under the Loan is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower, jointly and severally, hereby assumes and agrees fully, faithfully and punctually to discharge all Obligations of all of the Borrowers.

(b)    To the fullest extent permitted by Law, the obligations of each Borrower shall not be affected by (i) the failure of Administrative Agent to assert any claim or demand or to enforce or exercise any right or remedy against any other Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the collateral or other security held by or on behalf of Administrative Agent, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Borrower or that would otherwise operate as a discharge of any Borrower as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted).  The obligations of each Borrower shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.

(c)    To the fullest extent permitted by Law, each Borrower waives any defense based on or arising out of any defense of any other Borrower or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other

Borrower, other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Administrative Agent may, at its election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Borrower, or exercise any other right or remedy available to them against any other Borrower, without affecting or impairing in any way the liability of any Borrower hereunder except to the extent that all of the Obligations have been indefeasibly paid in full in cash, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Each Borrower waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Borrower against any other Borrower.

(d)      Notwithstanding the foregoing, it is the intent of each Borrower and the Lenders that in any proceeding under any Debtor Relief Laws, such Borrower's maximum obligation hereunder shall equal, but not exceed, the maximum amount which would not otherwise cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lenders under the Loan Documents) to be avoidable or unenforceable against such Borrower in such proceeding as a result of any Legal Requirements, including, without limitation, (i) Section 548 of the Bankruptcy Code of the United States and (ii) any state fraudulent transfer or fraudulent conveyance act or statute applied in such proceeding, whether by virtue of Section 544 of the Bankruptcy Code of the United States or otherwise. The Legal Requirements under which the possible avoidance or unenforceability of the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents) shall be determined in any such proceeding are referred to herein as "Avoidance Provisions". Accordingly, to the extent that the obligations of a Borrower hereunder would otherwise be subject to avoidance under the Avoidance Provisions, the maximum Obligations for which such Borrower shall be liable hereunder shall be reduced to the greater of (A) the amount which, as of the time any of the obligations of such Borrower are deemed to have been incurred by such Borrower under the Avoidance Provisions, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions or (B) the amount which, as of the time demand is made hereunder upon such Borrower for payment on account of the Obligations, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions. The provisions under this Section are intended solely to preserve the rights of the Lenders hereunder to the maximum extent that would not cause the obligations of any Borrower hereunder to be subject to avoidance under the Avoidance Provisions, and no Borrower or any other Person shall have any right or claim under this Section as against the Administrative Agent or any Lender that would not otherwise be available to such Person under the Avoidance Provisions.

(e)      Upon payment by any Borrower of any Obligations, all rights of such Borrower against any other Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and

junior in right of payment to the prior indefeasible payment in full in cash of all of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. In addition, any indebtedness of any Borrower now or hereafter held by any other Borrower is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted and no Borrower will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Borrower on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Borrower, such amount shall be held in trust for the benefit of Administrative Agent and shall forthwith be paid to Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers.  As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(f)     Each Borrower agrees that it shall never be entitled to be subrogated to any of the Administrative Agent's or any Lender's rights against any Borrower or other Person or any collateral or offset rights held by the Administrative Agent or the Lenders for payment of the Loans until the full and final payment of the Loans and all other obligations incurred under the Loan Documents and final termination of the Lenders' obligations, if any, to make further advances under this Agreement or to provide any other financial accommodations to any Borrower.  The value of the consideration received and to be received by each Borrower is reasonably worth at least as much as the liability and obligation of each Borrower incurred or arising under the Loan Documents.  Each Borrower has determined that such liability and obligation may reasonably be expected to substantially benefit each Borrower directly or indirectly.  Each Borrower has had full and complete access to the underlying papers relating to the Loans and all of the Loan Documents, has reviewed them and is fully aware of the meaning and effect of their contents.  Each Borrower is fully informed of all circumstances which bear upon the risks of executing the Loan Documents and which a diligent inquiry would reveal. Each Borrower has adequate means to obtain from each other Borrower on a continuing basis

information concerning such other Borrower's financial condition, and is not depending on the Administrative Agent or the Lenders to provide such information, now or in the future.  Each Borrower agrees that neither the Administrative Agent nor any of the Lenders shall have any obligation to advise or notify any Borrower or to provide any Borrower with any data or information regarding any other Borrower.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**BORROWERS**:

HCRE PARTNERS, LLC,
a Delaware limited liability company

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

SE MULTIFAMILY REIT HOLDINGS, LLC, a Delaware limited liability company

By:_____
Name: Matt McGraner
Title:   Authorized Signatory

NEXPOINT ADVISORS, L.P., a Delaware limited partnership

By:     NexPoint Advisors GP, LLC, a Delaware limited
liability company its general partner

By:_____

Name: Matt McGraner
Title:  Authorized Signatory

NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership

By:     NexPoint Real Estate Advisors GP, LLC, a
Delaware limited liability company, its general
partner

By:_____

Name: Matt McGraner
Title:  Authorized Signatory

HIGHLAND CAPITAL MANAGEMENT, L.P., a
Delaware limited partnership

By:      Strand Advisors, Inc., its general partner

By:_____
Name: James Dondero
Title:   President

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010

By: _____
Name:  Nancy Dondero
Title:    Family Trustee

THE SLHC TRUST,
under trust agreement dated December 27, 2016

By:_____
Name:  Grant James Scott
Title:    Trustee

RIVERVIEW PARTNERS SC, LLC
HAMPTON RIDGE PARTNERS, LLC
LAT BATTLEGROUND PARK, LLC
LANDMARK AT BATTLEGROUND PARK II, LLC
MAR QUAIL LANDING, LLC
G&E APARTMENT REIT THE MYRTLES AT OLDE
TOWNE, LLC
G&E APARTMENT REIT THE HEIGHTS AT OLDE
TOWNE, LLC
SE OAK MILL I OWNER, LLC
SE OAK MILL II OWNER, LLC
SE STONEY RIDGE, LLC
SE GOVERNORS GREEN, LLC
each a Delaware limited liability company

By:_____
Name: Matt McGraner
Title:   Authorized Signatory


[Signatures Continue on the Following Page]

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 1.01**
**PROPERTY OWNER BORROWERS**

1. RIVERVIEW PARTNERS SC, LLC, a Delaware limited liability company
2. HAMPTON RIDGE PARTNERS, LLC, a Delaware limited liability company
3. LAT BATTLEGROUND PARK, LLC, a Delaware limited liability company
4. LANDMARK AT BATTLEGROUND PARK II, LLC, a Delaware limited liability company
5. MAR QUAIL LANDING, LLC, a Delaware limited liability company
6. G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC, a Delaware limited liability company
7. G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC, a Delaware limited liability company
8. SE OAK MILL I OWNER, LLC , a Delaware limited liability company
9. SE OAK MILL II OWNER, LLC, a Delaware limited liability company
10. SE STONEY RIDGE, LLC, a Delaware limited liability company
11. SE GOVERNORS GREEN, LLC, a Delaware limited liability company

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 1.01(A)**
**HCRE PROPERTIES**

| | Property Owner | HCRE Property |
|---|---|---|
| 1. | HCRE Plano, LLC | Homewood Suites – Plano [2601 E President George Bush Hwy, Plano, TX 75074][ 4705 Old Shepard Pl, Plano, TX 75093] |
| 2. | HCRE Addison, LLC | Homewood Suites – Addison 4451 Belt Line Rd, Addison, TX 75001 |
| 3. | HCRE Las Colinas, LLC | Homewood Suites – Las Colinas 4300 Wingren Dr, Irving, TX 75039 |
| 4. | HCBH Buffalo Pointe, LLC, HCBH Buffalo Pointe II, LLC, HCBH Buffalo Pointe III, LLC | Connection at Buffalo Pointe, 10201 Buffalo Speedway, Houston, TX 77054 |
| 5. | Camelback Residential Partners, LLC | The Angela, 2727 E Camelback Road, Phoenix, AZ 85016 |
| 6. | | [McKinney Land] [Dallas Land] [Florida Land] |
| 7. | | |

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 2.01**

| LENDER | COMMITMENT (Percentage) |
|---|---|
| KeyBank, National Association | $556,275,000 (100%) |
| TOTAL: | $556,275,000 (100%) |

**SCHEDULE 3.05**
**PORTFOLIO PROPERTIES AND MORTGAGED PROPERTIES**

| | **Property Owner** | **Portfolio Property** | **Mortgaged Properties (Y/N)** | **Senior Credit Agreement** |
|---|---|---|---|---|
| 1. | Riverview Partners SC, LLC | Reserve at River Walk - 4501 Bentley Drive Columbia, South Carolina 29210 | Yes | N/A |
| 2. | Hampton Ridge Partners, LLC | Victoria Park - 4616 Stoney Trace Drive Charlotte, North Carolina 28227 | Yes | N/A |
| 3. | LAT Battleground Park and Landmark AT Battleground Park II, LLC | Landmark at Battleground Park - 3520 Drawbridge Parkway Greensboro, North Carolina 27410 | Yes | N/A |
| 4. | MAR Quail Landing, LLC | Quail Landing - 14200 North May Avenue Oklahoma City, Oklahoma 73134 | Yes | N/A |
| 5. | G&E Apartment REIT The Myrtles at Olde Towne, LLC | The Myrtles at Olde Towne - 850 Crawford Parkway Portsmouth, Virginia 23704 | Yes | N/A |
| 6. | G&E Apartment REIT The Heights at Olde Towne, LLC | The Heights at Olde Towne - 303 Effingham Street and 301 Green Street Portsmouth, Virginia 23704 | Yes | N/A |
| 7. | SE Oak Mill I, LLC and SE Oak Mill II, LLC | Oak Mill - 20010 Frederick Road Germantown, Maryland 20876 | Yes | N/A |
| 8. | SE Stoney Ridge LLC | Stoney Ridge - 14397 Westminster Lane Woodbridge, Virginia 22193 | Yes | N/A |
| 9. | SE Governors Green, LLC | Governor's Green - 16501 Governor Bridge Road Bowie, Maryland 20716 | Yes | N/A |

| 10. | SOF-X GSOwner, L.P. | Gulfstream Isles - 1601 Red Cedar Drive<br>Fort Meyers, Florida 33901 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
|-----|---------------------|---------------------------------------------------------------------|-----|--------------------------------------------------------------------------------------------------------------------------------------------------------|
| 11. | Lakes at Renaissance Park Apartments Investors, L.P. | Lakes at Renaissance Park - 1400 Renaissance Court<br>Austin, Texas 78728 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 12. | LATBriley Parkway, LLC | Glenview Reserve - 100 Arbor Creek Boulevard<br>Nashville, Tennessee 37217 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 13. | NREA SE1Andros Isles, DST<br>May be converted from DK Gateway Andros, LLC | Andros Isles - 100 Acklins Circle<br>Daytona Beach, Florida 32119 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 14. | NREA SE1Arborwalk, DST<br>May be converted from MAR Arborwalk, LLC | Arborwalk - 1318 SW Manor Lake Drive<br>Lee's Summit, Missouri 64082 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 15. | NREA SE1Walker Ranch, DST<br>May be converted from SOFWalker Ranch Owner, L.P. | Walker Ranch - 14500 Blanco Road<br>San Antonio, Texas 78216 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 16. | NREA SE1Towne Crossing, DST<br>May be converted from Apartment REIT Towne Crossing, L.P. | Towne Crossing - 1601 Town Crossing Boulevard<br>Mansfield, Texas 76063 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 17. | NREA SE2West Place, DST<br>May be converted from Landmark at West Place, LLC | West Place - 753 Sherwood Terrace Drive<br>Orlando, Florida 32818 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 18. | NREA SE2Vista Ridge, DST<br>May be converted from | Vista Ridge - 160 Vista Ridge Mall Drive<br>Lewisville, Texas 75067 | No | Loan Agreement dated as of the Effective Date between the Property Owner set |

| | MAR Vista Ridge, L.P. | | | forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
|---|---|---|---|---|
| 19. | NREA SE2Hidden Lake, DST May be converted from SOFHidden Lake SA Owner, L.P. | Hidden Lake - 8910 North Loop 1604 West San Antonio, Texas 78249 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 20. | NREA SE3Arboleda, DST May be converted from G&EApartment REIT Arboleda, LLC | Arboleda - 900 Discovery Boulevard Cedar Park, Texas 78613 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 21. | NREA SE3Fairways, DST May be converted from MAR Fairways, LLC | Fairways - 16501 Stonemason Drive Huntersville, North Carolina 28078 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 22. | NREA SE3Grand Oasis, DST May be converted from Landmark at Grand Oasis, L.P. | Grand Oasis - 400 McGinnis Ferry Road Suwanee, Georgia 30024 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |

**SCHEDULE 3.07**
**LITIGATION**

See attached.

# CAPITOL SERVICES

| | |
|---|---|
| **Date:** | 08/15/2018 |
| **Reference:** | 5470.06/JTB |
| **Copies Requested:** | Docket Sheet and Judgment |
| **Copy Cost Limit:** | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | RIVERVIEW PARTNERS SC, LLC |
| **Jurisdiction:** | Richland County, Circuit Court, SC |
| **Index Searched:** | Open & Closed Litigation by Defendant |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 03/09/2016 | 2016CP4001549 | Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*9-10984022S\***
9-10984022S



# Richland County
# Fifth Judicial Circuit
# Public Index



## Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al

| | | | | | |
|---|---|---|---|---|---|
| Case Number: | 2016CP4001549 | Court Agency: | Richland County Common Pleas | Filed Date: | 03/09/2016 |
| Case Type: | Common Pleas | Case Sub Type: | Personal Injury 350 | File Type: | Jury |
| Status: | Dismissed | Assigned Judge: | Clerk Of Court C P, G S, And Family Court | | |
| Disposition: | Dismissed per Rule 43(k) | Disposition Date: | 10/25/2017 | Disposition Judge: | Manning, L. Casey |
| Original Source Doc: | | Original Case #: | | | |
| Judgment Number: | | Court Roster: | | | |

## Case Parties

Click the ⊻ icon to show associated parties.

| Name | Address | Race | Sex | Year Of Birth | Party Type | Party Status | Last Updated |
|---|---|---|---|---|---|---|---|
| ⊻Bradshaw, James Andrew | One Liberty Square 55 Beattie Place, Suite 1200 Greenville SC 29601 | | | | Defendant Attorney | | 02/15/2017 |
| ⊻Hendrix, Jonathan R. | Hendrix & Steigner PO Box 6398 Cayce SC 29171 | | | | Plaintiff Attorney | | 02/15/2017 |
| ⊻Hendrix, Roy Paul Sr | | | | | Plaintiff | | 10/25/2017 |
| ⊻Jones, Roger | | | | | Defendant | | 03/10/2016 |
| ⊻Landmark Apartment Trust Inc | | | | | Defendant | | 03/10/2016 |
| ⊻Landmark Apartment Trust of America Inc | | | | | Defendant | | 03/10/2016 |
| Melton, Lawrence Caldwell(Inactive) | 747 Albion Rd. Columbia SC 292021913 | | | | Mediator | | 12/28/2016 |
| ⊻Milestone Apartments Reit | | | | | Defendant | | 03/10/2016 |
| ⊻Riverview Partners SC LLC | | | | | Defendant | | 03/10/2016 |
| ⊻Stallings, Daryl | | | | | Defendant | | 03/10/2016 |
| ⊻Starwood Capital Corp | | | | | Defendant | | 03/10/2016 |
| ⊻Starwood Capital Group Global I LLC | | | | | Defendant | | 03/10/2016 |
| Williams, Daryl L. (Inactive) | PO Box 456 Columbia SC 29202 | | | | Alternate Mediator | | 12/28/2016 |

## Actions

| Name | Description | Type | Motion Roster | Begin Date | Completion Date | Documents |
|---|---|---|---|---|---|---|
| Hendrix, Roy Paul Sr | Form 4 Order this Case has been Fully Settled at Mediation ( | Order | | 10/25/2017-08:42 | | 📄 |
| | | Filing | | | | 📄 |

| Hendrix, Roy Paul Sr | ADR/Mediation Results Report/Filing - case fully settled | | | 10/23/2017-08:32 | 10/25/2017-08:32 | |
| Hendrix, Jonathan R. | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Bradshaw, James Andrew | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Hendrix, Roy Paul Sr | Consent Scheduling Order trial not before October 1, 2017 | Order | | 02/27/2017-10:51 | 10/25/2017-10:51 | 📄 |
| Hendrix, Roy Paul Sr | Order/Order Filing Fee | Filing | | 02/23/2017-11:38 | 10/25/2017-11:38 | |
| Hendrix, Jonathan R. | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Bradshaw, James Andrew | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Hendrix, Roy Paul Sr | ADR/Notice of ADR | Filing | | 12/28/2016-00:00 | 10/23/2017-00:00 | |
| Hendrix, Roy Paul Sr | ADR/Alternative Dispute Resolution (Workflow) | Action | | 10/05/2016-14:33 | 12/28/2016-14:33 | |
| Riverview Partners SC LLC | Answer of Riverviwe Partners SC LLC, Landmark Apartment Trus | Filing | | 05/19/2016-16:38 | 10/25/2017-16:38 | 📄 |
| Starwood Capital Corp | Answer of Starwood Capital Group and Milestone Apartments Re | Filing | | 05/19/2016-16:22 | 10/25/2017-16:22 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/31/2016-15:38 | 10/25/2017-15:38 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APT TRUST INC | Filing | | 03/25/2016-10:05 | 10/25/2017-10:05 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/25/2016-10:04 | 10/25/2017-10:04 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail STARWOOD CAPITAL GROUP | Filing | | 03/25/2016-10:03 | 10/25/2017-10:03 | 📄 |
| Hendrix, Roy Paul Sr | Affidavit Of Service DARYL STALLINGS | Filing | | 03/25/2016-10:01 | 10/25/2017-10:01 | 📄 |
| Hendrix, Roy Paul Sr | Affidavit Of Service ROGER RAY JONES | Filing | | 03/25/2016-10:00 | 10/25/2017-10:00 | 📄 |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail MILESTONE MANAGEMENT L | Filing | | 03/16/2016-11:21 | 10/25/2017-11:21 | 📄 |
| Hendrix, Roy Paul Sr | Verification/Verified | Filing | | 03/11/2016-08:37 | 10/25/2017-08:37 | |
| Hendrix, Roy Paul Sr | Amended Summons And Complaint | Filing | | 03/10/2016-14:24 | 10/25/2017-14:24 | 📄 |
| Hendrix, Roy Paul Sr | Summons & Complaint | Filing | | 03/09/2016-14:27 | 10/25/2017-14:27 | 📄 |

## Financials

| Summary | | | | | |
|---|---|---|---|---|---|
| Fine/Costs: | $175.00 | Total Paid for fine/costs: | $175.00 | Balance Due: | $0.00 |

| Costs | | | | |
|---|---|---|---|---|
| Description | Cost Code | Amount | Charge Action | Disbursed Amount |
| Motion/Order Filing Fee $25 | MOTION | $25.00 | | $25.00 |
| SCJD Filing Fee Proviso $50 / $25 | SCJDPV | $50.00 | | $50.00 |

| Civil Filing Fee State 56% | CVFFST | $56.00 | | $56.00 |
|---|---|---|---|---|
| Civil Filing Fee County 44%/100% | CVFFCN | $44.00 | | $44.00 |

| Payments | | | | |
|---|---|---|---|---|
| Payment Date | Receipt Number | Entered By | Transaction Type Code | Payment Amount |
| 02/23/2017 | 219457 | C40BMETTS | PY | $25.00 |
| 03/09/2016 | 205131 | C40JMCMI LL | PY | $150.00 |

# CAPITOL
## SERVICES

| | |
|---|---|
| **Date:** | 08/15/2018 |
| **Reference:** | 5470.06/JTB |
| **Copies Requested:** | Docket Sheet and Judgment |
| **Copy Cost Limit:** | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| **Jurisdiction:** | Portsmouth City, Circuit Court, VA |
| **Index Searched:** | Open & Closed Litigation by Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 02/28/2011 | CL11000769-00 | G&E APARTMENT REIT v. CITY OF PORTSMOUTH |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

Portsmouth Circuit - Civil Division
**Case Details**

| Case Number:<br>CL11000769-00 | Filed:<br>02/28/11 |
|---|---|
| Filing Type:<br>Complaint - Catch-All | Filing Fee Paid |
| Number of Plaintiffs:<br>0003 | Number of Defendants:<br>0001 |
| Commenced By:<br>Initial Filing | |
| Bond: | Complex Case: |

**Plaintiffs**

Plaintiff 1:   **G&E APARTMENT REIT**
Trading as:
Attorney:   SMITH, SHANE L

Plaintiff 2:   **THE MYRTLES OLE TOWNE LLC**
Trading as:
Attorney:   SMITH, SHANE L

Plaintiff 3:   **THE HEIGHTS AT OLDE TOWNE LLC**
Trading as:
Attorney:   SMITH, SHANE L

**Defendants**

Defendant:   **CITY OF PORTSMOUTH**
Trading as:
Attorney:

**Hearings**

| # | Date | Time | Type | Room | Duration | Jury | Result |
|---|------|------|------|------|----------|------|--------|
| 1 | 01/27/12 | 9:59AM | Motion - Other-Pretrial | 3 | | | Granted |

**Date Ordered To Mediation:**

**Final Disposition**

- **Judgment:**          Other
- **Final Order Date:**  01/27/12
- **Appealed Date:**
- **Concluded By:**      Other

Portsmouth Circuit - Civil Division
**Pleadings/Orders Detail**

**Case Number:** CL11000769-00

| Filed | Type | Party | Judge | Book | Page | Remarks |
|---|---|---|---|---|---|---|
| 08/24/11 | Motion | | | GDH | SCAN | FOR LEAVE TO FILE AMNDD CO |
| 09/08/11 | Order | | KRM | GDH | SCAN | AGREED ODR FOR LEAVE TO FI |
| 10/20/11 | Scheduling Order | | JAC | GDH | SCAN | SCH ORDER |
| 10/24/11 | Demurrer | DEF | | NCT | SCAN | DEMURRER |
| 10/28/11 | Motion | | | JMW | SCAN | FILE SECOND COMPLAINT |
| 11/16/11 | Order | | KRM | GDH | SCAN | AGREED ORDER FOR LEAVE |
| 11/23/11 | Answer | DEF | | GDH | SCAN | CITY OF PORTSMOUTH |
| 11/29/11 | Other | | | GDH | SCAN | CC LTR |
| 12/27/11 | Other | | | GDH | SCAN | ATTORNY LTR |
| 01/04/12 | Notice Of Depositions | | | NCT | SCAN | NOTICE TAKE DEPOSITIONS |
| 01/25/12 | Notice Of Hearing | | | DLM | SCAN | HEARING 1/27/12 @10AM |
| 01/27/12 | Order | | DWS | DLM | SCAN | CONSENT ORDER |

# CAPITOL
# SERVICES

| | |
|---|---|
| **Date:** | 08/15/2018 |
| **Reference:** | 5470.06/JTB |
| **Copies Requested:** | Docket Sheet and Judgment |
| **Copy Cost Limit:** | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| **Jurisdiction:** | Portsmouth City, General District Court, VA |
| **Index Searched:** | Open & Closed Litigation by Defendant & Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|

See Attached Listing.

Includes results for both G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC and G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC. The cases are only indexed under G&E APARTMENT REIT. This specific index classifies THE HEIGHTS AT OLDE TOWNE and THE MYRTLES AT OLDE TOWNE as DBAs and does not include them on the index.

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH,D AVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH, DAVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11011695-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11011696-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013085-00 | G&E APARTMENT REIT | HUGHES, ERIKA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013086-00 | G&E APARTMENT REIT | ROBINSON, YOLANDA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11014139-00 | G&E APARTMENT REIT | BURTON, KIMBERLY | 12/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11014140-00 | G&E APARTMENT REIT | CONNOR, MICHAEL | 12/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002245-00 | G&E APARTMENT REIT | BASKIN, THOMAS | 03/08/2012 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV12002246-00 | G&E APARTMENT REIT | BROWN, JUSTIN | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002247-00 | G&E APARTMENT REIT | MARSHALL, TERRENCE | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12003326-00 | G&E APARTMENT REIT | ROUSE, WINSTON | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004722-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004723-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004724-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 05/10/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006011-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006012-00 | G&E APARTMENT REIT | MORTON, MICHAEL | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12007582-00 | G&E APARTMENT REIT | BROWN, WILLIAM | 07/12/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12007583-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 07/12/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008660-00 | G&E APARTMENT REIT | BENNETT, SHANEIKIA | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008661-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12011434-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12011435-00 | G&E APARTMENT REIT | JENKINS, REINA | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011436-00 | G&E APARTMENT REIT | PORTER, RYAN | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011437-00 | G&E APARTMENT REIT | WEBB, JAMES | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12012479-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012479-01 | G&E APARTMENT REIT | FULGHAM, CURTIS | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012479-02 | G&E APARTMENT REIT | FULGHAM, CURTIS | 03/12/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012811-01 | G&E APARTMENT REIT | MCCONNELL, BRENT | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-02 | G&E APARTMENT REIT | MCCONNELL, BRENT | 07/09/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12013780-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013781-00 | G&E APARTMENT REIT | BOONE, ALESHA | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013782-00 | G&E APARTMENT REIT | PORTER, RYAN | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013783-00 | G&E APARTMENT REIT | WEST, CASEY | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013784-00 | G&E APARTMENT REIT | HORTON, AMELIA | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013785-00 | G&E APARTMENT REIT | WEBB, JAMES | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014732-00 | G&E APARTMENT REIT | BOONE, ALESHA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014733-00 | G&E APARTMENT REIT | HAND, MARCUS | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014734-00 | G&E APARTMENT REIT | HARDY, CHARLETTE | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014735-00 | G&E APARTMENT REIT | HORTON, AMELIA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13000775-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13000776-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000777-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000778-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002968-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 03/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002969-00 | G&E APARTMENT REIT | NATION, DEBORAH | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13002970-00 | G&E APARTMENT REIT | ROMINIYI, MICHAEL | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003803-00 | G&E APARTMENT REIT | DONOHOE, ERYN | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003804-00 | G&E APARTMENT REIT | EDWARD, TONYA | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003805-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003806-00 | G&E APARTMENT REIT | HARRIS, GERALD | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003807-00 | G&E APARTMENT REIT | PORTER, RYAN | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003808-00 | G&E APARTMENT REIT | ROBINSON, KENNETH | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003809-00 | G&E APARTMENT REIT | DANIELS, HEATHER | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003810-00 | G&E APARTMENT REIT | RODGERS, PHILLIP | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005200-00 | G&E APARTMENT REIT | BROWN, KEVIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005201-00 | G&E APARTMENT REIT | HALEY, BENJAMIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005202-00 | G&E APARTMENT REIT | WEBB, JAMES | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006359-00 | G&E APARTMENT REIT | ALVAREZ, BRYANT | 06/06/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13006360-00 | G&E APARTMENT REIT | HAND, MARCUS | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006361-00 | G&E APARTMENT REIT | PORTER, RYAN | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13007830-00 | G&E APARTMENT REIT | BOONE, ALESHA | 07/11/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009056-00 | G&E APARTMENT REIT | BOONE, ALESHA | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009057-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009058-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009059-00 | G&E APARTMENT REIT | NATION, DEBORAH | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009060-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009061-00 | G&E APARTMENT REIT | REED, CASSIE | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009062-00 | G&E APARTMENT REIT | WANG, LEI | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010008-00 | G&E APARTMENT REIT | BOONE, ALESHA | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010009-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010010-00 | G&E APARTMENT REIT | NATION, DEBORAH | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010011-00 | G&E APARTMENT REIT | REED, CASSIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010012-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13011382-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13011383-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013265-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013266-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013267-00 | G&E APARTMENT REIT | HUNTER, LONNIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013972-00 | G&E APARTMENT REIT | FUTRELL, JARRON | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13013973-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13014023-00 | G&E APARTMENT REIT | BENNET, SHANEIKIA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014024-00 | G&E APARTMENT REIT | JENKINS, REINA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014025-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 12/05/2013 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV13014026-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014027-00 | G&E APARTMENT REIT | MCGHEE, TRAVONDA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014028-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13014029-00 | G&E APARTMENT REIT | SOTO, EDGAR | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015168-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015169-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015170-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015171-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015172-00 | G&E APARTMENT REIT | NELSON, INGRID | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015173-00 | G&E APARTMENT REIT | SMITH, MARVIN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000605-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000606-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000626-00 | G&E APARTMENT REIT | BRYANT, AXL | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000627-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001590-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001591-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001592-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14001593-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001594-00 | G&E APARTMENT REIT | BRYANT, AXL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001595-00 | G&E APARTMENT REIT | COUNTRYMAN, YAHCKEL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001596-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001597-00 | G&E APARTMENT REIT | SMITH, MARVIN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002092-00 | G&E APARTMENT REIT | LANE, JASON | 03/27/2014 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV14002092-01 | G&E APARTMENT REIT | LANE, JASON | 03/10/2016 | 02:00 PM | Closed | Garnishment |
| ☐ | GV14002728-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002729-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002730-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002742-00 | G&E APARTMENT REIT | GILES, KARL | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002743-00 | G&E APARTMENT REIT | HARDEE, BAILY | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002744-00 | G&E APARTMENT REIT | SMITH, MARVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003665-00 | G&E APARTMENT REIT | KOCH, LINDSAY | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14003666-00 | G&E APARTMENT REIT | FERNANDEZ, JOSE | 05/08/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003667-00 | G&E APARTMENT REIT | GREENE, JOSHUA | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14006009-00 | G&E APARTMENT REIT | FAULK, MELVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006010-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006011-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS; JR | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006904-00 | G&E APARTMENT REIT | CRUMBY, DON | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14006905-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010173-00 | G&E APARTMENT REIT | BARBER, VICTORIA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010174-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010175-00 | G&E APARTMENT REIT | HEDGES, BRUCE | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010176-00 | G&E APARTMENT REIT | SHEETLEWORTH, ALEXANDRA | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010177-00 | G&E APARTMENT REIT | WALKER, KYNDRA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013741-00 | G&E APARTMENT REIT | COOPER, SOROYA | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013742-00 | G&E APARTMENT REIT | BERRY, ZACH | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14013743-00 | G&E APARTMENT REIT | ADERHOLT, MICHAEL | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013744-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013745-00 | G&E APARTMENT REIT | HITE, DANIEL | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15000919-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 02/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002885-00 | G&E APARTMENT REIT | LOPEZ, PETER | 04/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002886-00 | G&E APARTMENT REIT | PETERSON, MARTHA | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15002921-00 | G&E APARTMENT REIT | DORFE, HARRY | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15003962-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 05/07/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004875-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004876-00 | G&E APARTMENT REIT | HADSELL, RICHARD | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004877-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004878-00 | G&E APARTMENT REIT | OWENS, BRIANNA | 06/04/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15004879-00 | G&E APARTMENT REIT | REED, WILLIAM | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004880-00 | G&E APARTMENT REIT | SCULLY, ANDREW | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006215-00 | G&E APARTMENT REIT | BRISCO, SHABREYA | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006216-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006217-00 | G&E APARTMENT REIT | JONES, DAVID | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15006218-00 | G&E APARTMENT REIT | FIGUROA, RAFAEL NIEVES | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006219-00 | G&E APARTMENT REIT | RAMUSSEN, CHARLES | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15007898-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 08/20/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009578-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009579-00 | G&E APARTMENT REIT | WILEY, STEFAN | 10/08/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009586-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009587-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009588-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009589-00 | G&E APARTMENT REIT | SHEPPHERD, TIFFANY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009590-00 | G&E APARTMENT REIT | WILLIAMS, GARY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012360-00 | G&E APARTMENT REIT | DORFE, HARRY | 11/05/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012361-00 | G&E APARTMENT REIT | WILEY, STEFAN | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15012362-00 | G&E APARTMENT REIT | LOPEZ, PETER | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014985-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014986-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15014987-00 | G&E APARTMENT REIT | WELLS, KARISHA | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014988-00 | G&E APARTMENT REIT | WHITEHEAD, LEVI | 02/11/2016 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000710-00 | G&E APARTMENT REIT | HOYAT, BLACK | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000711-00 | G&E APARTMENT REIT | LOPEZ, PETER | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000712-00 | G&E APARTMENT REIT | SMITH, VALERIE | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000713-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003560-00 | G&E APARTMENT REIT | MONDESIR, BECHIR | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003561-00 | G&E APARTMENT REIT | OTEY, KESHARA | 03/31/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16003562-00 | G&E APARTMENT REIT | SMITH, VALERIE | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004830-00 | G&E APARTMENT REIT | BETHEL, ANDREW | 05/05/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004831-00 | G&E APARTMENT REIT | COOPER, TIARIK | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004832-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004833-00 | G&E APARTMENT REIT | HEATH, JAMES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004834-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004835-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004836-00 | G&E APARTMENT REIT | POULOS, JARON | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004837-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006568-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006569-00 | G&E APARTMENT REIT | PACE, DERRICK | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006570-00 | G&E APARTMENT REIT | SIMMONS, STEVEN | 06/30/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16007396-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007397-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007398-00 | G&E APARTMENT REIT | PACE, DERRICK | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007399-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007400-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 07/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16007401-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008059-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008060-00 | G&E APARTMENT REIT | HEATH, JAMES | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008061-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008062-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010077-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010078-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010079-00 | G&E APARTMENT REIT | GREEN, JADA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010080-00 | G&E APARTMENT REIT | HEATH, JAMES | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010081-00 | G&E APARTMENT REIT | JONES, JASON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010082-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010083-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010084-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010085-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010086-00 | G&E APARTMENT REIT | TOSTENSON, HANNAH | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16012387-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012388-00 | G&E APARTMENT REIT | BUSACCO, SARAH | 12/15/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012389-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012390-00 | G&E APARTMENT REIT | GARRETT, JEFFERY | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012391-00 | G&E APARTMENT REIT | GREEN, JADA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012392-00 | G&E APARTMENT REIT | HEATH, JAMES | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012393-00 | G&E APARTMENT REIT | JONES, JASON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012394-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012395-00 | G&E APARTMENT REIT | PENN, PAMELA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012396-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012397-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012398-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012399-00 | G&E APARTMENT REIT | TREADWAY, GREG | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013427-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013428-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013429-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013430-00 | G&E APARTMENT REIT | ELGAMAL, ROSE | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013431-00 | G&E APARTMENT REIT | GREEN, JADA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013432-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013433-00 | G&E APARTMENT REIT | HINES, AARON | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16013434-00 | G&E APARTMENT REIT | JONES, JASON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013435-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013436-00 | G&E APARTMENT REIT | PAULA, JAVIER | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013437-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013438-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013439-00 | G&E APARTMENT REIT | TAYLOR, LISA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013440-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000636-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000637-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000638-00 | G&E APARTMENT REIT | GREEN, JADA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000639-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000640-00 | G&E APARTMENT REIT | JOHNSON, MANCY | 02/23/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000641-00 | G&E APARTMENT REIT | JONES, JASON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000642-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000643-00 | G&E APARTMENT REIT | PARKS, FRANCISCO | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000644-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000645-00 | G&E APARTMENT REIT | SCHLOSSER, KEITH | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000646-00 | G&E APARTMENT REIT | SUTTON, WANDA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000647-00 | G&E APARTMENT REIT | TREADWAY, GREG | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17002755-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17002756-00 | G&E APARTMENT REIT | GREEN, JADA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002757-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002758-00 | G&E APARTMENT REIT | JONES, JASON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002759-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002760-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002761-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002762-00 | G&E APARTMENT REIT | REID, RONNA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002763-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002764-00 | G&E APARTMENT REIT | SUTTON, WANDA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003602-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003603-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003604-00 | G&E APARTMENT REIT | GREEN, JADA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003605-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003606-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003607-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003608-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003609-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003610-00 | G&E APARTMENT REIT | SUTTON, WANDA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004895-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004896-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17008915-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008916-00 | G&E APARTMENT REIT | DESINCE, VANITY | 09/07/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17008917-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008918-00 | G&E APARTMENT REIT | SUTTON, WANDA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011350-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011351-00 | G&E APARTMENT REIT | DESINCE, VANITY | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011352-00 | G&E APARTMENT REIT | FIELDS, CHERI | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011353-00 | G&E APARTMENT REIT | FRITZINGER, KELLY | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011354-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011355-00 | G&E APARTMENT REIT | HESS, CHRISTOPHER | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011356-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011357-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011358-00 | G&E APARTMENT REIT | REID, RONNA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011359-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011360-00 | G&E APARTMENT REIT | SUTTON, WANDA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011361-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012212-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012213-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012214-00 | G&E APARTMENT REIT | CULLUMBER, SARAH | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012215-00 | G&E APARTMENT REIT | DESINCE, VANITY | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17012216-00 | G&E APARTMENT REIT | EDWARDS, TAMEKA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012217-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012218-00 | G&E APARTMENT REIT | HUBBLE, GARY | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012219-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012220-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012221-00 | G&E APARTMENT REIT | MCKINLAY, AIDAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012222-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012223-00 | G&E APARTMENT REIT | REED, SEAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012224-00 | G&E APARTMENT REIT | SMITH, JIA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013612-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013613-00 | G&E APARTMENT REIT | ALSTON, TRAVIS | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013614-00 | G&E APARTMENT REIT | DESINCE, VANITY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013615-00 | G&E APARTMENT REIT | DODSON, BRYAN | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013616-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013617-00 | G&E APARTMENT REIT | JONES, JASON | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013618-00 | G&E APARTMENT REIT | JORDAN, MALIK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013619-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013620-00 | G&E APARTMENT REIT | PHELAN, ERIN | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013621-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013622-00 | G&E APARTMENT REIT | RIDDICK, DEREK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17013623-00 | G&E APARTMENT REIT | SMITH, JIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013624-00 | G&E APARTMENT REIT | SUTTON, WANDA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013625-00 | G&E APARTMENT REIT | WILLIAMS, CARLA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013626-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014481-00 | G&E APARTMENT REIT | HEARN, KAMREE ALLEN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014482-00 | G&E APARTMENT REIT | ANDERSON, VIRGINIA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014483-00 | G&E APARTMENT REIT | DESINCE, VANITA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014484-00 | G&E APARTMENT REIT | DIAZ, LUIS | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014485-00 | G&E APARTMENT REIT | DODSON, BRYAN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014486-00 | G&E APARTMENT REIT | ERNEST, LACEY | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014487-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014488-00 | G&E APARTMENT REIT | JOHNSON, CHERYLE | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014489-00 | G&E APARTMENT REIT | JONES, JASON | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014490-00 | G&E APARTMENT REIT | MALONE-FREEMAN, SHANITA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014491-00 | G&E APARTMENT REIT | SMITH, JIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014492-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014493-00 | G&E APARTMENT REIT | WILLIAMS, CASEY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014494-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000813-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000814-00 | G&E APARTMENT REIT | DESINCE, VANITY | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18000815-00 | G&E APARTMENT REIT | DODSON, BRYAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000816-00 | G&E APARTMENT REIT | EBBA, LEONARD | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000817-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000818-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000819-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000820-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002735-00 | G&E APARTMENT REIT | CLARK, LAURA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002736-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002737-00 | G&E APARTMENT REIT | HOLLOMAN, SHAMONA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002738-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002739-00 | G&E APARTMENT REIT | JONES, JASON | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002740-00 | G&E APARTMENT REIT | JORDAN, MALIK | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002741-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002742-00 | G&E APARTMENT REIT | MOODY, JULIANA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004062-00 | G&E APARTMENT REIT | CLARK, LAURA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004063-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004064-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004065-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004066-00 | G&E APARTMENT REIT | JONES, DIAMOND | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004067-00 | G&E APARTMENT REIT | MACKLIBN, KAREN | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18004068-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004069-00 | G&E APARTMENT REIT | MANLEY-LEE, ISAIAH | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004070-00 | G&E APARTMENT REIT | MOODY, JULIANA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005037-00 | G&E APARTMENT REIT | BLACK, HOYAT | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005038-00 | G&E APARTMENT REIT | CLARK, LAURA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005039-00 | G&E APARTMENT REIT | HUGHES, CHARLOTTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005040-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005041-00 | G&E APARTMENT REIT | JONES, JASON | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005042-00 | G&E APARTMENT REIT | RUSSELL, KEYANTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005043-00 | G&E APARTMENT REIT | SELLERS-BROWN, SHAMIR | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005044-00 | G&E APARTMENT REIT | WELLS, NICHOLAS | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005074-00 | G&E APARTMENT REIT | GAMBOA, ELIZABETH | 06/07/2018 | 10:13 AM | Other | Unlawful Detainer |
| ☐ | GV08018432-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003334-00 | G&E APARTMENT REIT 1 | DURIO, ADRIAN | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003335-00 | G&E APARTMENT REIT 1 | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003336-00 | G&E APARTMENT REIT 1 | HALLEY, HOLLY | 04/09/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09003337-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003338-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003339-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018436-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08018437-00 | G&E APARTMENT REIT 2 | LOCK, TERRELL | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003340-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014903-00 | G&E APARTMENT REIT 2 | DEMARIO, EMILY | 01/13/2011 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014904-00 | G&E APARTMENT REIT 2 | MOSLEY, ALYSSIA | 12/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014905-00 | G&E APARTMENT REIT 2 | PAGE, JASON | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004682-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008951-00 | G&E APARTMENT REIT 1 | BARNETTE, ERIN | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008952-00 | G&E APARTMENT REIT 1 | KORLISON, OMENTUS | 08/06/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09008953-00 | G&E APARTMENT REIT 1 | SMITH, DAVID | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008954-00 | G&E APARTMENT REIT 1 | TERRY, MONIQUE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010897-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012910-00 | G&E APARTMENT REIT 1 | JAZWINSKI, BRUCE | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015719-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015720-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015721-00 | G&E APARTMENT REIT 1 | MURRAY, BARBARA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015722-00 | G&E APARTMENT REIT 1 | WILLIAMSON, ROY | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017160-00 | G&E APARTMENT REIT 1 | BEAULIEU, KENNETH | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017161-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017162-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017163-00 | G&E APARTMENT REIT 1 | VASQUEZ, MARIA | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10000692-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000693-00 | G&E APARTMENT REIT 1 | POLK, WILLIE | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002058-00 | G&E APARTMENT REIT 1 | CHAMPION, BOBBY | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10014902-00 | G&E APARTMENT REIT 1 | BULLOCK, TEAIRA | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000756-00 | G&E APARTMENT REIT 1 | ACOSTA, ENRIQUE | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000757-00 | G&E APARTMENT REIT 1 | JACKSON, KATHERINE | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000758-00 | G&E APARTMENT REIT 1 | KING-SMITH, RIQUITA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000759-00 | G&E APARTMENT REIT 1 | MCCONNELL, BRENT | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000760-00 | G&E APARTMENT REIT 1 | PAGE, JASON | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000761-00 | G&E APARTMENT REIT 1 | ROSKOWSKI, TARA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010013-00 | G&E APARTMENT REIT 1 | HUNTER, LONNIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010014-00 | G&E APARTMENT REIT 1 | ROLLINS, TYRONEE | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008455-00 | G&E APARTMENT REIT 1 | NEATHERY, DIANE | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004680-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004681-00 | G&E APARTMENT REIT 2 | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004683-00 | G&E APARTMENT REIT 2 | MURRAY, BARBARA | 05/07/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008955-00 | G&E APARTMENT REIT 2 | EDWARDS, DOUGLAS | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008956-00 | G&E APARTMENT REIT 2 | KARIKA, SARAH | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008957-00 | G&E APARTMENT REIT 2 | ROGERS, ALVALON | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008959-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010934-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010935-00 | G&E APARTMENT REIT 2 | RIUSECH, EDUARDO | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015723-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015724-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015725-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017164-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017165-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017166-00 | G&E APARTMENT REIT 2 | PRUITT, DUSTIN | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017167-00 | G&E APARTMENT REIT 2 | SAUCIER, JEREMY | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000694-00 | G&E APARTMENT REIT 2 | GRIFFINM, MICHAEL | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000695-00 | G&E APARTMENT REIT 2 | HENDERSON, JAMESHA | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000696-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002051-00 | G&E APARTMENT REIT 2 | BULLOCK, DARREN | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002052-00 | G&E APARTMENT REIT 2 | FOX, CHRISTIE | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002053-00 | G&E APARTMENT REIT 2 | GRAYSMITH CONSTRUCTION | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10002054-00 | G&E APARTMENT REIT 2 | HOLAS-SHORTER, ABIGAIL | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002055-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002056-00 | G&E APARTMENT REIT 2 | NUNES, SCOTT | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002057-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000807-00 | G&E APARTMENT REIT 2 | BULLOCK, TEAIRA | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11000808-00 | G&E APARTMENT REIT 2 | JAMES, SABRINA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000809-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000810-00 | G&E APARTMENT REIT 2 | MCCONNELL, JOHN | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003668-00 | G&E APARTMENT REIT 2 | SMITH, MARVIN | 09/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008456-00 | G&E APARTMENT REIT 2 | BRYANT, AXI | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008457-00 | G&E APARTMENT REIT 2 | DUNN, KEEGAN | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008458-00 | G&E APARTMENT REIT 2 | GOUGH, JOSEPH | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008459-00 | G&E APARTMENT REIT 2 | PIERCE, JOSHUA | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002059-00 | G&E APARTMENT REIT H | POLK, WILLIE | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006847-00 | G&E APARTMENT REIT H | HUTTMAN, STEVEN | 06/10/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10006848-00 | G&E APARTMENT REIT H | JEFFERSON, LLLITHIA | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006849-00 | G&E APARTMENT REIT H | JONATHAN, MCCOY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006850-00 | G&E APARTMENT REIT M | HOLAS-SHORTER, ABIGAIL | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006851-00 | G&E APARTMENT REIT M | PHELPS, LIN HERMAN | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006852-00 | G&E APARTMENT REIT M | SAUCIER, JEREMY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08008522-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 06/17/2008 | 11:00 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08008523-00 | G&E APARTMENT REIT THE | MAGEE, KENNETH | 06/05/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08014899-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 12/18/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016783-00 | G&E APARTMENT REIT THE | BARNETTE, ERIN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016784-00 | G&E APARTMENT REIT THE | DEGERAFF, GEORGE | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08016785-00 | G&E APARTMENT REIT THE | FLORES, MATTHEW | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016786-00 | G&E APARTMENT REIT THE | HECKER, ALISON | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016787-00 | G&E APARTMENT REIT THE | HUBBARD, DERIKISHA | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016788-00 | G&E APARTMENT REIT THE | JORDAN, SHAWN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016789-00 | G&E APARTMENT REIT THE | PARKER, JUSTIN | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016791-00 | G&E APARTMENT REIT THE | SMITH, DAVID | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016792-00 | G&E APARTMENT REIT THE | TAYLOR, LEROY | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016793-00 | G&E APARTMENT REIT THE | TAYLOR, SATASHA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016794-00 | G&E APARTMENT REIT THE | VINES, YOLANDA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010613-00 | G&E APARTMENT REIT THE | HEFFLEFINGER, LARRY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010614-00 | G&E APARTMENT REIT THE | HELMS, ERIC | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010615-00 | G&E APARTMENT REIT THE | PORTER, SHANICA | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010617-00 | G&E APARTMENT REIT THE | HOLAS-SHORTER, ABIGAIL | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010618-00 | G&E APARTMENT REIT THE | MORTON, MICHAEL | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010619-00 | G&E APARTMENT REIT THE | PARKS, KELLY | 09/09/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10010620-00 | G&E APARTMENT REIT THE | SAUCIER, JEREMY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011724-00 | G&E APARTMENT REIT THE | BALLIAT, TYLER | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011725-00 | G&E APARTMENT REIT THE | FRANKLIN, MAURICE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011726-00 | G&E APARTMENT REIT THE | JACKSON, KATHERINE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011727-00 | G&E APARTMENT REIT THE | SIMMONS, LARRY | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15001850-00 | G&E APARTMENT REITENTS LP | MATHIS, ANTONIO | 03/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12001049-00 | G&E APARTMENTS M | BASKIN, THOMAS | 03/08/2012 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001050-00 | G&E APARTMENTS M | CONNOR, MICHAEL | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001051-00 | G&E APARTMENTS M | ROBINSON, YOLANDA | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14011316-00 | G&E APARTMENTS REIT | HEDGES, BRUCE | 11/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008752-00 | G&E APARTMENTS REIT | GAGE, ALEXIS | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008774-00 | G&E APARTMENTS REIT | PLUMMER, ASHLEY | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008775-00 | G&E APARTMENTS REIT | SCULLY, ANDREW | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013384-00 | G&E APARTMENTS REIT | WILEY, STEFAN | 12/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013385-00 | G&E APARTMENTS REIT | BLACK, HOYAT | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013386-00 | G&E APARTMENTS REIT | CLOSE, RACHEL | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013387-00 | G&E APARTMENTS REIT | NOLAND, BENJAMIN | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004586-00 | G&E APARTMENTS REIT | MONDESIR, BECHIR | 04/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004587-00 | G&E APARTMENTS REIT | PAGEL, JAMES | 04/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001984-00 | G&E APARTMENTS REIT | CULLUMBER, SARAH | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001985-00 | G&E APARTMENTS REIT | DESINCE, VANITY | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001986-00 | G&E APARTMENTS REIT | JENNINGS, TANIA | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001987-00 | G&E APARTMENTS REIT | JONES, ERICA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001988-00 | G&E APARTMENTS REIT | JONES, JASON | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001989-00 | G&E APARTMENTS REIT | JORDAN, MALIK | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18001990-00 | G&E APARTMENTS REIT | LIEDKE, CHRISTINE | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001991-00 | G&E APARTMENTS REIT | MACKLIN, KAREN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001992-00 | G&E APARTMENTS REIT | WEBB, CHRISTIAN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001993-00 | G&E APARTMENTS REIT | WELLS, KARISHA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001994-00 | G&E APARTMENTS REIT | WHITE, HELEN | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

**SCHEDULE 3.15**
**LIST OF SUBSIDIARIES**

See attached.

Project Unicorn
Quail Landing



**Quail Landing**
14200 North May Avenue
Oklahoma City, Oklahoma 73134

Project Unicorn
Gulfstream Isles



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Victoria Park



**Victoria Park**
4616 Stoney Trace Drive
Charlotte, North Carolina 28227

Project Unicorn
Reserve at River Walk



**Reserve at River Walk**
4501 Bentley Drive
Columbia, South Carolina 29210

Project Unicorn
Heights at Olde Towne



**Heights at Olde Towne**
303 Effingham Street and 301 Green Street
Portsmouth, Virginia 23704

Project Unicorn
Myrtles at Olde Towne



**Myrtles at Olde Towne**
850 Crawford Parkway
Portsmouth, Virginia 23704



Project Unicorn
Governors Green

Governors Green
16501 Governor Bridge Road
Bowie, Maryland 20716



Project Unicorn
Stoney Ridge

**Stoney Ridge**
14397 Westminster Lane
Woodbridge, Virginia 22193



Project Unicorn
Oak Mill

Highland Capital
Management, L.P.
(DE)

49%

SE Multifamily Holdings,
LLC
(DE)

51%

Liberty CLO Holdco Ltd.

51%

49%

SE Multifamily REIT
Holdings, LLC
(DE)

100%                                100%

SE Oak Mill I, LLC
(DE)

SE Oak Mill II, LLC
(DE)

100%                                100%

SE Oak Mill I REIT, LLC
(DE)

SE Oak Mill II REIT, LLC
(DE)

100%                                100%

SE Oak Mill I Holdings, LLC
(DE)

SE Oak Mill II Holdings, LLC
(DE)

100%                                100%

SE Oak Mill I, LLC
(DE)

SE Oak Mill II, LLC
(DE)

Parcel 1            Parcel 2

**Oak Mill Apartments**
20010 Frederick Road
Germantown, Maryland 20876



Project Unicorn
Battleground Park



Project Unicorn
Lakes at Renaissance Park

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Lakes at Renaissance Park**
1400 Renaissance Court
Austin, Texas 78728

Project Unicorn
Brandywine



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Glenview Reserve



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Glenview Reserve**
100 Arbor Creek Boulevard
Nashville, Tennessee 37217

Project Unicorn
Andros Isles



James Dondero
(Beneficiary)

The Dugaboy
Investment
Trust (DE)
(Guarantor)

Highland Capital
Management Real
Estate Holdings I,
LLC (NV)

Highland Capital
Management Real
Estate Holdings II,
LLC (NV)

70%            25%            5%

Highland Capital
Management, L.P.
(DE)

HCRE Partners, LLC
(DE)

49%            51%

SE Multifamily Holdings, LLC
(DE)

100%

NREA SE Multifamily, LLC
(DE)

NREA SE1 Andros
Isles Leaseco, LLC
(DE)
Master Tenant

NREA SE1 Andros
Isles Manager, LLC
(DE)
Manager

100%

NREA SE MF Holdings, LLC
(DE)

100%

NREA SE MF Investment Co, LLC
(DE)
Class 2 Interest Holder

Class 1 Investors

0%            100%

NREA Southeast Portfolio One,
DST
(DE)

100%

NREA SE1 Andros Isles, DST
(DE)
May be converted from
DK Gateway Andros, LLC (DE)

**Andros Isles**
100 Acklins Circle
Daytona Beach, Florida 32119

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Arborwalk



James Dondero
(Beneficiary)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%      25%      5%

HCRE Partners, LLC (DE)

Highland Capital Management, L.P. (DE)

49%      51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE1 Arborwalk Leaseco, LLC (DE) Master Tenant

NREA SE1 Arborwalk Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%      100%

NREA Southeast Portfolio One, DST (DE)

100%

NREA SE1 Arborwalk, DST (DE) May be converted from MAR Arborwalk, LLC (DE)

**Arborwalk**
1318 SW Manor Lake Drive
Lee's Summit, Missouri 64082

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/1718

Project Unicorn
Walker Ranch



James Dondero
(Beneficiary)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%    25%    5%

Highland Capital Management, L.P. (DE)

HCRE Partners, LLC (DE)

49%    51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE1 Walker Ranch Leaseco, LLC (DE) Master Tenant

NREA SE1 Walker Ranch Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%    100%

NREA Southeast Portfolio One, DST (DE)

100%

NREA SE1 Walker Ranch, DST (DE) May be converted from SOF Walker Ranch Owner, L.P. (DE)

Walker Ranch
14500 Blanco Road
San Antonio, Texas 78216

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)    person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Towne Crossing



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Towne Crossing
1601 Town Crossing Boulevard
Mansfield, Texas 76063

Project Unicorn
West Place



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Vista Ridge



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Hidden Lake



James Dondero
(Beneficiary)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%   25%   5%

HCRE Partners, LLC (DE)

Highland Capital Management, L.P. (DE)

49%   51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE2 Hidden Lake Leaseco, LLC (DE) Master Tenant

NREA SE2 Hidden Lake Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%   100%

NREA Southeast Portfolio Two, DST (DE)

100%

NREA SE2 Hidden Lake, DST (DE) May be converted from SOF Hidden Lake SA Owner, L.P. (DE)

**Hidden Lake**
8910 North Loop 1604
West San Antonio, Texas 78249

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Arboleda



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 9/17/18

Project Unicorn
Fairways



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Grand Oasis



James Dondero
(Beneficiary)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%        25%        5%

HCRE Partners, LLC (DE)

Highland Capital Management, L.P. (DE)

49%        51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE3 Grand Oasis Leaseco, LLC (DE) Master Tenant

NREA SE3 Grand Oasis Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%        100%

NREA Southeast Portfolio Three, DST (DE)

100%

NREA SE3 Grand Oasis, DST (DE) May be converted from Landmark at Grand Oasis, L.P. (DE)

**Grand Oasis**
400 McGinnis Ferry Road
Suwanee, Georgia 30024

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)       person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)      person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Project Unicorn**
**Summers Landing Apartments**
**(AT CLOSING)**



Harry Bookey

85%
Managing
Member

BH EQUITIES, L.L.C.
(IA)

Other individuals owning 15% in the
aggregate and not more than 5% individually

100%

BHSL Holdings, LLC
(IA)

100%

100%

BH Summers Landing GP, LLC
(DE)

BH Summers Landing, LLC
(IA)

Sole LP

Summers Landing Apartments
Investors, L.P.
(DE)

Sole GP

**Summers Landing Apartments**

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 9/21/18

**SCHEDULE 5.12**
**PLEDGED NXRT SHARES**

1,300,000 common shares of NexPoint Residential Trust, Inc. (NXRT)

**SCHEDULE 6.09**
**EXISTING INDEBTEDNESS**


**[BORROWER TO UPDATE]**

**SCHEDULE 6.10**
**JUNIOR CLAIMS**

**[BORROWER TO UPDATE]**

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT A</u>

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the Bridge Loan Agreement identified below  (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all its Commitment and outstanding Loans and a corresponding interest in and to all other rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

Assignee, subject to the terms and conditions hereof, hereby assumes all obligations of Assignor with respect to the Assigned Interests from and after the Effective Date as if Assignee were an original Lender under and signatory to the Credit Agreement, which obligations shall include, but shall not be limited to, the obligation to make Loans to the Borrowers with respect to the Assigned Interest and to indemnify the Administrative Agent as provided therein (such obligations, together with all other obligations set forth in the Credit Agreement and the other Loan Documents are hereinafter collectively referred to as the "<u>Assigned Obligations</u>").  Assignor shall have no further duties or obligations with respect to, and shall have no further interest in, the Assigned Obligations or the Assigned Interests.

A-1

1.    Assignor:    _____

2.    Assignee:    _____
       [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.    Borrower:    [___]

4.    Administrative Agent:    KeyBank, National Association, as the administrative agent under the Credit Agreement

5.    Credit Agreement:    The Bridge Loan Agreement dated as of September 25, 2018, among the Borrower, the Lenders parties thereto, and KeyBank, National Association, as Administrative Agent

6.    Assigned Interest:

| Aggregate Amount of Tranche A Loan for all Lenders | Amount of Tranche A Loan Assigned | Percentage Assigned of Tranche A Loans[2] |
|---|---|---|
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |

| Aggregate Amount of Tranche B Loan for all Lenders | Amount of Tranche B Loan Assigned | Percentage Assigned of Tranche B Loans[3] |
|---|---|---|
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |
| $_____ | $_____ | _____% |

In consideration of the assignment made pursuant to this Assignment and Assumption, Assignee agrees to pay to Assignor on the Effective Date, an amount equal to the "Amount of Outstanding Loans Assigned" set forth in the table above.

Effective Date:    _____, 20____ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

---

[1] Select as applicable.
[2] Set forth, to at least 9 decimals, as a percentage of the Tranche A Loans of all Lenders thereunder.
[3] Set forth, to at least 9 decimals, as a percentage of the Tranche B Loans of all Lenders thereunder.

ASSIGNOR

[NAME OF ASSIGNOR]


By:_____
  Title:_____

ASSIGNEE

[NAME OF ASSIGNEE]


By:_____
  Title:_____

[Consented to and][4] Accepted:

[KeyBank, National Association], as
  Administrative Agent


By:_____
  Title:_____


[Consented to:][5]

[NAME OF LEAD BORROWER]


By:_____
  Title:_____

---

[4] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[5] To be added only if the consent of the Borrower and/or other parties is required by the terms of the Credit Agreement.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. <u>Representations and Warranties</u>.

1.1 <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers as are reasonably incidental thereto pursuant to the terms of the Loan Documents; and (c) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>.   From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. All payments to Assignee under the Credit Agreement shall be made as provided in the Credit Agreement in accordance with the separate instructions delivered to Administrative Agent.

3.   <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.   Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.   This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**BRIDGE LOAN AGREEMENT**

EXHIBIT B

FORM OF COMPLIANCE CERTIFICATE

Key Bank, National
Association
as Administrative Agent
225 Franklin Street
Boston, MA  02110

Attn:  Mr. Christopher Neil

        RE HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE
DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P.,
NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER
BORROWERS Compliance Certificate
    for _____ through _____

Dear Ladies and Gentlemen:

        This Compliance Certificate is made with reference to that certain Bridge Loan
Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise
modified from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL
MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT
TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE
ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the
"Borrower"), the financial institutions party thereto, as lenders, and KeyBank, National
Association, as Administrative Agent.  All capitalized terms used in this Compliance
Certificate (including any attachments hereto) and not otherwise defined in this Compliance
Certificate shall have the meanings set forth for such terms in the Credit Agreement.  All
Section references herein shall refer to the Credit Agreement.

        I hereby certify that I am the [_____] of [LEAD BORROWER], and that I
make this Certificate on behalf of the Borrower.  I further represent and certify on behalf of
the Borrower as follows as of the date of this Compliance Certificate:

        I have reviewed the terms of the Loan Documents and have made, or have caused to be
made under my supervision, a review in reasonable detail of the transactions and
consolidated and consolidating financial condition of the Borrower and its Subsidiaries,
during the accounting period (the "Reporting Period") covered by the financial reports
delivered simultaneous herewith pursuant to Section 5.01[(a)][(b)], and that such review
has not disclosed the existence during or at the end of such Reporting Period (and that I do
not have knowledge of the existence as at the date hereof) of any condition or event which
constitutes a Default or Event of Default.

(a)  Total Leverage Ratio
      1.    Indebtedness of Borrower and its Subsidiaries    $_____
      2.    Total Asset Value:
          (A)    Value of all real property
          (B)    other assets
                  TOTAL            $_____
      3.    Ratio:  1 divided by 2    _____
      4.    Required Ratio:  not greater than 65%

(b)  Fixed Charge Coverage Ratio
      1.    Adjusted EBITDA  $_____
      2.    Fixed Charges:
          (A)    Current Principal
          (B)    Interest Expense
          (C)    Cash Dividends on Preferred Stock
                  TOTAL            $_____
      3.    Ratio:  1 divided by 2    _____
      4.    Required Ratio:  not less than 1.6 to 1.0

(c)  Tangible Net Worth $_____
      1.    Actual  _____
      2.    Required $750,000,000

(d)  Minimum Liquidity $_____
      1.    Cash and Cash Equivalents (excluding reserve amounts)  $_____
      2.    market value of shares in NXRT and units in the OP    $_____
      3.    market value of all other unencumbered securities    $_____
      4.    market value of all other encumbered securities (net of any outstanding
             debt related thereto)                  $_____
      5.    Required Amount: $75,000,000 (or if  Loans are less than $150,000,000,
lesser of (i) $75,000,000 and (ii) 25% of outstanding Loan balance):    $_____

(e)  Recourse Debt                  $_____
Currently Defaulted Other Debt:
(i) Aggregate Defaulted Recourse Debt of the Borrower $_____
(ii) Aggregate Defaulted Recourse Debt of Borrower $_____
(iii) Aggregate Defaulted Non-recourse Debt of the Subsidiaries of Borrower or Borrower
(of $75,000,000 or greater in the aggregate)  $_____

        This Compliance Certificate has been executed and delivered as of the date set
        forth above.

                [Signature Page Follows]

LEAD BORROWER:

[__]


By:_____
Name:
Title:

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT C</u>

<u>[INTENTIONALLY OMITTED]</u>

**BRIDGE LOAN AGREEMENT**

**EXHIBIT D**

FORM OF NOTE

$_____                                                           _____, 2016

     **FOR VALUE RECEIVED, [___]** (the "Maker") jointly and severally promise to pay without offset or counterclaim to the order of [insert name of Lender], ("Payee"), the principal amount equal to the lesser of (x) _____ ($_____) or (y) the outstanding amount advanced by Payee as a Loan under the Credit Agreement (as hereinafter defined), payable in accordance with the terms of the Credit Agreement.

     Maker also promises to pay interest on the unpaid principal amount of this Note (this "Note") at the rates and at the times which shall be determined in accordance with the provisions of that certain Bridge Loan Agreement dated of September 25, 2018, among Maker, the Lenders named therein, and KeyBank, National Association, as Administrative Agent for itself and the Lenders (as hereafter amended, supplemented or otherwise modified from time to time, the "Credit Agreement").  Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

     The Loans are not revolving loans.  Amounts paid and prepaid may not be reborrowed.

     Payments hereunder shall be made to the Administrative Agent for the Payee at 127 Public Square, Cleveland, Ohio 44114-1306, or at such other address as Administrative Agent may designate from time to time, or made by wire transfer in accordance with wiring instructions provided by the Administrative Agent.

     This Note is subject to (a) mandatory prepayment and (b) prepayment at the option of the Maker, as provided in the Credit Agreement.

     This Note is issued pursuant to the Credit Agreement and is entitled to the benefits of the Credit Agreement, reference to which is hereby made for a more complete statement of the terms and conditions under which the Loan evidenced hereby is made and is to be repaid.

     THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  MAKER AGREES THAT JURISDICTION AND VENUE FOR ANY ACTION REGARDING THIS NOTE SHALL BE AS SET FORTH IN THE CREDIT AGREEMENT.

     Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

Maker promises to pay all reasonable fees, costs and expenses incurred in the collection and enforcement of this Note in accordance with the terms of the Credit Agreement.  Maker and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind (except such notices as may be expressly required under the Credit Agreement or the other Loan Documents) and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered by its duly authorized officer, as of the day and year first written above.

**BORROWERS**:

HCRE PARTNERS, LLC,
a Delaware limited liability company


By: _____
Name:
Title:

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010


By:_____
Nancy Dondero, Family Trustee


HIGHLAND CAPITAL MANAGEMENT, LP, a
Delaware limited partnership


By:      [____], its general partner

    By: _____
    Name:
     Title:

THE SLHC TRUST,
under trust agreement dated [____]

By:_____

Name:

Title:


NEXPOINT ADVISORS, L.P., a Delaware limited
partnership


By:      [____], its general partner

    By:   _____

    Name:

    Title:


NEXPOINT REAL ESTATE ADVISORS IV, L.P.,
a Delaware limited partnership


By:      [____], its general partner

    By:   _____

    Name:

    Title:

[**PROPERTY OWNER BORROWERS**]

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT E</u>

<u>[FORM OF] BORROWING REQUEST</u>

[Date]

KeyBank, National Association
as Administrative Agent
225 Franklin Street, 16th floor
Boston, Massachusetts 02110

Attn:  Mr. Christopher Neil

Re:    HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE
DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P.,
NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER
BORROWERS

Dear Ladies and Gentlemen:

This Interest Election Request is made with reference to that certain Bridge Loan
Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise modified
from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL MANAGEMENT,
LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST,
NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE
PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions
party thereto, as lenders, and KeyBank, National Association, as Administrative Agent.  All
capitalized terms used in this Interest Election Request (including any attachments hereto) and
not otherwise defined in this Interest Election Request shall have the meanings set forth for such
terms in the Credit Agreement.  All Section references herein shall refer to the Credit
Agreement.

The undersigned Lead Borrower hereby requests [check as applicable]

☐ a conversion of an existing Loan as provided below and/or

☐ a Borrowing under the Credit Agreement in the amount of $_____ [minimum
of $1,000,000.00 and in multiples of $100,000.00].

The advance or conversion is to be made as follows:

A.     <u>ABR Loan</u>.

1.     Amount of ABR Loan:                          $_____

2.     Amount of conversion of existing

E-1

           Loan to ABR Loan                                     $_____

3.       Date of ABR Loan conversion:             _____

B.      <u>Eurodollar Loan</u>:

1.       Amount of Eurodollar Loan:               $_____

2.       Amount of conversion of existing
          Loan to Eurodollar Loan:                $_____

3.       Number of Eurodollar
          Loans(s) now in effect:
          [cannot exceed six (6)]               _____

4.       Date of Eurodollar Loan conversion:     _____

5.       Interest Period:                         _____

6.       Expiration date of current Interest
          Period as to this conversion:           _____

C.      <u>Daily LIBOR Loan</u>.

1.       Amount of Daily LIBOR Loan:            $_____

2.       Amount of conversion of existing
          Loan to Daily LIBOR Loan              $_____

3.       Date of Daily LIBOR Loan conversion:    $_____

     The Borrower hereby represents and warrants that the amounts set forth above are true and correct, that the representations and warranties contained in the Credit Agreement are true and correct as if made as of this date (except to the extent relating to a specific date), and that the Borrower has kept, observed, performed and fulfilled each and every one of its obligations under the Credit Agreement as of the date hereof [except as follows: _____]

                Very truly yours,

                [LEAD BORROWER]

                By:_____
                Name:
                Title:

E-3

## EXHIBIT F-1

### [FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

   Name:

   Title:

Date: _____ __, 20[  ]

## EXHIBIT F-2

### [FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[  ]

**EXHIBIT F-3**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[  ]

**EXHIBIT F-4**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

    Name:

    Title:

    Date: _____ __, 20[  ]

2371788.5

# CLAIMANT'S EXHIBIT 5

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

**DEBTOR'S FIRST OMNIBUS OBJECTION TO CERTAIN**
**(A) DUPLICATE CLAIMS; (B) OVERSTATED CLAIMS;**
**(C) LATE-FILED CLAIMS; (D) SATISFIED CLAIMS; (E) NO-**
**LIABILITY CLAIMS; AND (F) INSUFFICIENT-DOCUMENTATION CLAIMS**

**\*\*\*CLAIMANTS RECEIVING THIS OBJECTION SHOULD LOCATE THEIR**
**NAMES AND CLAIMS IN THE SCHEDULES ATTACHED**
**TO THE PROPOSED ORDER ON THIS OBJECTION\*\*\***

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and s
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.





**A COPY OF YOUR CLAIM IS AVAILABLE ONLINE AT HTTP://WWW.KCCLLC.NET/HCMLP/CREDITOR/SEARCH OR BY EMAIL REQUEST TO JONEILL@PSZJLAW.COM**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON SEPTEMBER 10, 2020 AT 2:30 P.M. CENTRAL TIME.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, RM. 1254, DALLAS, TEXAS 75242-1496 BEFORE CLOSE OF BUSINESS ON SEPTEMBER 1, 2020 WHICH IS AT LEAST THIRTY-THREE (33) DAYS FROM THE DATE OF SERVICE HEREOF. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THIS NOTICE; OTHERWISE THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Highland Capital Management, L.P. (the "Debtor"), by and through its undersigned counsel, hereby files this omnibus objection (the "Objection"), seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) disallowing certain duplicate claims listed on **Schedule 1** to the Order (the "Duplicate Claims"), (ii) reducing and allowing certain overstated claims listed on **Schedule 2** (the "Overstated Claims") in amounts which comport with the Debtor's books and records, (iii) disallowing certain claims that were filed after the applicable bar date listed on **Schedule 3** to the Order (the "Late-Filed Claims"), (iv) disallowing certain claims that have already been satisfied listed on **Schedule 4** to the Order (the "Satisfied Claims"), (v) disallowing certain claims for which the Debtor's books and records show no liability listed on **Schedules 5** and **6** to the Order (the "No-Liability Claims"), and (vi) disallowing claims which contain insufficient documentation listed on **Schedule 7** to the Order (the "Insufficient-Documentation Claims," and together with the Duplicate Claims, the

2

Overstated Claims, the Late-Filed Claims, the Satisfied Claims, and the No-Liability Claims, the "Disputed Claims").  In support of this Objection, the Debtor respectfully represents as follows:

## I.    JURISDICTION

1.    The Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A), (B) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105(a) and 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 3007-1 and 3007-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

## II.    BACKGROUND

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[2]

---

[2] All docket numbers refer to the docket maintained by this Court.

DOCS_DE:229505.5 36027/001

6.       The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

7.       On March 2, 2020, the Court entered its *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488] (the "Bar Date Order").  The Bar Date Order fixed April 8, 2020 at 5:00 p.m. (prevailing Central Time) as the deadline for any person or entity, other than Governmental Units (as such term is defined in section 101(27) of the Bankruptcy Code), to file proofs of claim against the Debtor (the "General Bar Date").  For Governmental Units, the Bar Date Order fixed the deadline to file proofs of claim as April 13, 2020 at 5:00 p.m. (prevailing Central Time).  The Bar Date Order also set April 23, 2020 as the deadline to file claims for investors in funds managed by the Debtor (the "Fund Investor Bar Date").  The Debtor also sought and obtained the extended employee bar date of May 26, 2020 per the *Order Granting Debtor's Emergency Motion and Extending Bar Date Deadline for Employees to File Claims* [Docket No. 560].

8.       On March 3, 2020, the Debtor filed the *Notice of Bar Dates for Filing Claims* [Docket No. 498] (the "Bar Date Notice").  The Bar Date Notice was mailed to all known creditors and equity holders on March 5, 2020.  *See* Certificate of Service [Docket No. 530].

9.       The Debtor caused the Bar Date Notice to be published on two occasions each in *The New York Times* and *The Dallas Morning News*—once on March 12, 2020, and once on March 13, 2020.  *See Debtor's Notice of Affidavit of Publication of the Notice of Bar Dates for Filing Claims in The New York Times* [Docket No. 533] and *Debtor's Notice of Affidavit of Publication of the Notice of Bar Dates for Filing Claims in The Dallas Morning News* [Docket No. 534].

4

### The Claims Resolution Process

10.     In the ordinary course of business, the Debtor maintains books and records (the "Books and Records") that reflect, *inter alia*, the Debtor's liabilities and the amounts owed to its creditors.

11.     The Debtor's register of claims (the "Claims Register"), prepared and maintained by Kurtzman Carson Consultants LLC ("KCC")—the court-appointed notice and claims agent in this case—reflects that, as of the date of this Objection, 194 proofs of claim have been filed in the Debtor's chapter 11 case.

12.     The Debtor and its professionals have been reviewing and analyzing claims. This process includes identifying categories of claims that may be targeted for disallowance and expungement, reduction, and/or reclassification.

### III.     RELIEF REQUESTED

13.     The Debtor seeks entry of an order, pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, (i) disallowing the Duplicate Claims listed on Schedule 1 to the Order, (ii) reducing and allowing the Overstated Claims listed on Schedule 2 to the Order in amounts which comport with the Books and Records; (iii) disallowing the Late-Filed Claims listed on Schedule 3 to the Order, (iv) disallowing the Satisfied Claims listed on Schedule 4 to the Order, (v) disallowing the No-Liability Claims listed on Schedules 5 and 6 to the Order, and (vi) disallowing the Insufficient-Documentation Claims listed on Schedule 7 to the Order.

### IV.     OBJECTIONS

14.     Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). A chapter 11 debtor has the duty to object to the allowance of any

claim that is improper.  11 U.S.C. §§ 704(a)(5), 1106(a)(1), 1107(a); *see also Int'l Yacht & Tennis, Inc. v. Wasserman Tennis, Inc. (In re Int'l Yacht & Tennis, Inc.)*, 922 F.2d 659, 661-62 (11th Cir. 1991).

15.    As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and amount of the claim under section 502(a) of the Bankruptcy Code.  *See In re O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998); *In re Texas Rangers Baseball Partners*, 10-43400 (DML), 2012 WL 4464550, at *2 (Bankr. N.D. Tex. Sept. 25, 2012).  To receive the benefit of *prima fac*ie validity, however, "[i]t is elemental that a proof of claim must assert facts or allegations . . . which would entitle the claimant to a recovery." *In re Heritage Org., L.L.C.*, 04-35574 (BJH), 2006 WL 6508477, at *8 (Bankr. N.D. Tex. Jan. 27, 2006), *aff'd sub nom., Wilferth v. Faulkner*, 3:06 CV 510 K, 2006 WL 2913456 (N.D. Tex. Oct 11, 2006).   Additionally, a claimant's proof of claim is entitled to the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) only until an objecting party refutes "at least one of the allegations that is essential to the claim's legal sufficiency." *In re Am. Reit, Inc.*, 07-40308, 2008 WL 1771914, at *3 (Bankr. E.D. Tex. Apr. 15, 2008); *In re Starnes*, 231 B.R. 903, 912 (N.D. Tex. May 14, 2008).  "The ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006).

16.    Section 502(b)(1) of the Bankruptcy Code requires disallowance of a claim if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."  11 U.S.C. § 502(b)(1).

## The Disputed Claims Should Be Disallowed and Expunged or Reduced

17.    For the reasons set forth below, the Disputed Claims are not enforceable and should be disallowed, expunged, or reduced as set forth herein.

6

### A. Duplicate Claims

18.    The Debtor has identified 3 proofs of claim—listed on Schedule 1 to the Order—where each claimant filed multiple proofs of claim representing a single obligation of the Debtor. The Debtor is requesting that the listed Duplicate Claims be disallowed such that only the surviving claims listed on Schedule 1 remain, subject to any other objection the Debtor may bring in the future.  Disallowing and expunging these claims will prevent the claimants from receiving multiple recoveries for a single claim.

### B. Claims to be Reduced and Allowed

19.    The Debtor has examined the 4 proofs of claim listed on Schedule 2 to the Order and has determined that the amounts listed on the claims exceed the liability listed for each claimant on the Debtor's Books and Records.  The Debtor is requesting that the amount of each claim be reduced so that it correctly reflects the amount of the Debtor's books and records.

### C. Late-Filed Claims

20.    The Debtor has identified 1 proof of claim listed on Schedule 3 to the Order that was filed after the passage of the applicable Bar Date.

### D. Satisfied Claims

21.    The Debtor has identified 11 proofs of claim listed on Schedule 4 to the Order that, according to the Debtor's books and records, were fully satisfied in the ordinary course of business.  Disallowing and expunging such claims, therefore, will prevent the claimants from obtaining double-recovery on account of their claims.

### E. No-Liability Claims

22.    The Debtor has identified 63 proofs of claim listed on Schedules 5 and 6 to the Order that can be characterized as "No-Liability Claims"—*i.e.*, claims that erroneously assert a

DOCS_DE:229505.5 36027/001

liability that is not reflected in the Debtor's books and records.  Certain claims listed on Schedule 5 to the Order appear to be protective claims for claimants asserting claims related to agreements with the Debtor.  No amount is asserted on these claims and, although the claimants have indicated they would supplement the claims within ninety (90) days, that time has passed and no amendment or supplement has been filed and no additional documentation has been provided to support the claims.  Each claim listed on Schedule 6 to the Order erroneously asserts a claim against the Debtor which has no basis in the Books and Records and is not an obligation of the Debtor.  The Debtor has reviewed each No-Liability Claim listed on Schedules 5 and 6 to the Order and all supporting information and documentation provided therewith, made reasonable efforts to research each No-Liability Claim, and determined that the Debtor is not liable for such No-Liability Claims. Accordingly, the Debtor requests that each No-Liability Claim be disallowed and expunged.

<div align="center">F. <u>Insufficient-Documentation Claims</u></div>

23.     The Debtor was not able to determine the validity of the 10 claims listed on Schedule 7 to the Order because such claims were not filed with sufficient accompanying documentation and provided no explanation for the bases of the claims.  Additionally, no liability for these claims appears on the Debtor's books and records.  Accordingly, the Debtor requests that the Insufficient-Documentation Claims be disallowed and expunged because the claimants have failed to carry their burden to support their claims.

<div align="center">V.     <b><u>RESPONSES TO OBJECTIONS</u></b></div>

24.     To contest an objection, a claimant must file and serve a written response to this Objection (each, a "<u>Response</u>") so that it is received no later than **September 1, 2020 at 5:00 p.m. (Central Time)** (the "<u>Response Deadline</u>").  Every Response must be filed with the Office

<div align="center">8</div>

of the Clerk of the United States Bankruptcy Court for the Northern District of Texas (Dallas

Division), Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, TX

75242-1496 and served upon the following entities, so that the Response is received no later than

the Response Deadline, at the following addresses:

> **Pachulski Stang Ziehl & Jones LLP**
> Jeffrey N. Pomerantz
> Ira D. Kharasch
> Gregory V. Demo
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA  90067
> jpomerantz@pszjlaw.com
> ikharasch@pszjlaw.com
> gdemo@pszjlaw.com
> joneill@pszjlaw.com
>
> -and-
>
> **Hayward & Associates PLLC**
> Melissa S. Hayward
> Zachery Z. Annable
> 10501 N. Central Expy, Ste. 106
> Dallas, TX  75231
> mhayward@haywardfirm.com
> zannable@haywardfirm.com

25.     Every Response to this Objection must contain, at a minimum, the following

information:

    i.      a caption setting forth the name of the Court, the name of the Debtor, the
            case number, and the title of the objection to which the Response is
            directed;

    ii.     the name of the claimant, his/her/its claim number, and a description of the
            basis for the amount of the claim;

    iii.    the specific factual basis and supporting legal argument upon which the
            party will rely in opposing this Objection;

    iv.     any supporting documentation (to the extent it was not included with the
            proof of claim previously filed with the clerk of the Court or KCC) upon
            which the party will rely to support the basis for and amounts asserted in
            the proof of claim; and

9

v.      the name, address, telephone number, email address, and fax number of the person(s) (which may be the claimant or the claimant's legal representative) with whom counsel for the Debtor should communicate with respect to the claim or the Objection and who possesses authority to reconcile, settle, or otherwise resolve the objection to the disputed claim on behalf of the claimant.

26.     If a claimant fails to file and serve a timely Response by the Response Deadline, the Debtor will present to the Court an appropriate order disallowing such claimant's claim, as set forth in **Exhibit A**, without further notice to the claimant.

## VI.      REPLIES TO RESPONSES

27.     Consistent with Local Rules, the Debtor may, at its option, file and serve a reply to a Response by no later than 5:00 p.m. (prevailing Central Time) three (3) days prior to the hearing to consider the Objection.

## VII.      SEPARATE CONTESTED MATTERS

28.     To the extent that a Response is filed regarding any claim listed in this Objection and the Debtor is unable to resolve the Response, the objection by the Debtor to each such claim asserted herein shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  Any order entered by the Court regarding an objection asserted in the Objection shall be deemed a separate order with respect to each claim.

## VIII.      RESERVATION OF RIGHTS

29.     The Debtor hereby reserves the right to object in the future to any of the claims that are the subject of this Objection on any ground, including, but not limited to, 11 U.S.C. § 502(d), and to amend, modify, and/or supplement this Objection, including, without limitation, to object to amended or newly filed claims.

DOCS_DE:229505.5 36027/001

30.     Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that the Debtor may have to exercise rights of setoff against the holders of such claims.

## IX.     NOTICE

31.     Notice of this Objection shall be provided to (i) the Office of the United States Trustee for the Northern District of Texas; (ii) each of the claimants whose claim is subject to this Objection; and (iii) all entities requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor submits that no further notice is required.

## X.     COMPLIANCE WITH LOCAL RULES

32.     This Objection includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Objection.  The Debtor objects to no more than 100 proofs of claim herein. The Debtor has served notice of this Objection on those persons whose names appear in the signature blocks on the proofs of claim and in accordance with Bankruptcy Rule 7004.  Moreover, the Debtor has notified claimants that a copy of their claim may be obtained from the Debtor upon request. Accordingly, the Debtor submits that this Objection satisfies Local Rule 3007-2.

WHEREFORE, the Debtor respectfully requests the entry of the proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested and granting such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

DOCS_DE:229505.5 36027/001

Dated: July 30, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT A
**(Proposed Order)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket No. ____** |
| | ) | |

### ORDER SUSTAINING FIRST OMNIBUS OBJECTION TO CERTAIN (A) DUPLICATE CLAIMS; (B) OVERSTATED CLAIMS; (C) LATE-FILED CLAIMS; (D) SATISFIED CLAIMS; (E) NO-LIABILITY CLAIMS; AND (F) INSUFFICIENT-DOCUMENTATION CLAIMS

Having considered the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* (the "Objection"),[2] the claims listed on Schedules 1-7 attached hereto, any responses thereto, and the arguments of counsel, the Court finds that (i) notice of the Objection was good and sufficient upon the particular circumstances and that no other or further notice need be given; (ii) the Objection is a core proceeding under 28 U.S.C. § 157(b)(2); (iii) each holder of a claim listed on Schedules 1–7 attached hereto was properly and timely served with a copy of the Objection, the proposed form of this Order, the accompanying schedules, and the notice of hearing on the Objection; (iv) any entity known to have an interest in the claims subject to the Objection has been afforded reasonable opportunity to respond to, or be heard regarding, the relief requested in the Objection; and (v) the relief requested in the Objection is in the best interests of the Debtor's creditors, its estate, and other

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not defined in this Order shall have the meanings ascribed to them in the Omnibus Objection.

parties-in-interest.  Accordingly, the Court finds and concludes that there is good and sufficient cause to grant the relief set forth in this Order.  It is therefore **ORDERED THAT:**

1.     The Objection is **SUSTAINED** as set forth herein.

2.     Each of the claims listed as a Duplicative Claim on **Schedule 1** hereto is disallowed and expunged in its entirety.

3.     Each of the claims listed as an Overstated Claim on **Schedule 2** hereto is reduced and allowed in the amount as stated on Schedule 2.

4.     The claim listed as a Late-Filed Claim on **Schedule 3** hereto is disallowed and expunged in its entirety.

5.     Each of the claims listed as a Satisfied Claim on **Schedule 4** hereto is disallowed and expunged in its entirety.

6.     Each of the claims listed as a No-Liability Claim on **Schedule 5** and **Schedule 6** hereto is disallowed and expunged in its entirety.

7.     Each of the claims listed as an Insufficient-Documentation Claim on **Schedule 7** hereto is disallowed and expunged in its entirety.

8.     The official claims register in the Debtor's chapter 11 case shall be modified in accordance with this Order.

9.     The Debtor's rights to amend, modify, or supplement the Objection, to file additional objections to the Disputed Claims and any other claims (filed or not) which may be asserted against the Debtor, and to seek further reduction of any claim to the extent such claim has been paid, are preserved.  Additionally, should one or more of the grounds of objection stated in the Objection be overruled, the Debtor's rights to object on other stated grounds or any other grounds that the Debtor may discover are further preserved.

10.     Each claim and the objections by the Debtor to such claim, as addressed in the Objection and set forth on **Schedule 1** through **Schedule 7** attached hereto, shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  This Order shall be deemed a separate Order with respect to each claim.  Any stay of this Order pending appeal by any claimant whose claims are subject to this Order shall only apply to the contested matter which involves such claimant and shall not act to stay the applicability and/or finality of this Order with respect to the other contested matters listed in the Objection or this Order.

DOCS_DE:229505.5 36027/001

11.     The Debtor is authorized and empowered to take any action necessary to implement and effectuate the terms of this Order.

12.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

13.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

<div align="center">

###END OF ORDER###

</div>

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 1 - Duplicate Claims*

| Sequence No. | Claimant's Name | Claim No. to be Disallowed | Date Filed | Claim Amount | Surviving Claim No. | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | Daniel Sheehan and Associates, PLLC | 40 | 3/10/2020 | $ 32,433.75 | Claim 47 | 7 |
| 2 | Dun & Bradstreet | 18 | 12/27/2019 | $ 5,746.40 | Claim 25 | 7 |
| 3 | Eastern Point Trust Company, Inc. | 21 | 12/23/2019 | $ 34,875.91 | Claim 52 | 7 |

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 2 - Overstated Claims*

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Proposed Amount | Objection Page No. Reference |
|---|---|---|---|---|---|---|---|
| 1 | Collin County Tax Assessor/Collector | 34 | 2/24/2020 | $ 524.24 | Claim #34 includes an estimated fee of $300.00 for year 2020 property tax. In the ordinary course, the property tax for year 2020 would be due and payable in the calendar year 2021. | $ 224.24 | 7 |
| 2 | Collin County Tax Assessor/Collector | 35 | 2/24/2020 | $ 2,391.91 | Claim #34 includes an estimated fee of $400.00 for year 2020 property tax. In the ordinary course, the property tax for year 2020 would be due and payable in the calendar year 2021. | $ 1,991.91 | 7 |
| 3 | Dallas County | 6 | 11/6/2019 | $ 62,694.94 | Claim #6 includes tax statements for Highland Capital (5 Center Ave, Little Falls, NJ 07242). The Debtor is not affiliated with that party. | $ 60,592.37 | 7 |
| 4 | Opus 2 International Inc | 10 | 11/21/2019 | $ 51,156.88 | Claim #10 includes $11,943 of interest charges. Interest charges are not defined in The Amendment To Opus 2 Internationals Work Order signed on 9/19/2013 between an employee of the Debtor and Opus 2 International, Inc. | $ 39,214.00 | 7 |

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 3 - Late Filed Claims*

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | Parmentier, Andrew | 181 | 5/13/2020 | $ 150,000.00 | Claim #181 was filed past the April 8, 2020 bar date. | 7 |

***Highland Capital Management, L.P.***
***Case No. 19-34054-sgj11***
***Schedule 4 - Satisfied Claims***

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | 4CAST Inc | 12 | 11/26/2019 | $ 16,500.00 | Paid via wire on 2/14/2020 | 7 |
| 2 | Advent Software Inc | 29 | 12/30/2019 | $ 8,378.68 | Paid via wire on 3/20/2020 | 7 |
| 3 | ConvergeOne, Inc. | 61 | 03/24/2020 | $ 23,518.15 | Paid via wire on 5/19/2020 | 7 |
| 4 | Denton County | Scheduled | 12/13/2019 | $ 557.14 | Paid online on 2/5/2020 | 7 |
| 5 | Internal Revenue Service | 179 | 04/27/2020 | $ 10,386.87 | IRS assessed a late tax deposit penalty for the claim amount; Payroll provider Paylocity informed Debtor the penalty was removed. | 7 |
| 6 | Kaufman County | 9 | 11/06/2019 | $ 12,081.17 | Paid online on 2/4/2020 | 7 |
| 7 | Maples and Calder | Scheduled | 12/13/2019 | $ 25,800.11 | Paid via wire on 5/29/2020 | 7 |
| 8 | McLagen Partners, Inc. | 74 | 04/06/2020 | $ 16,400.00 | Paid via wire on 4/22/2020 | 7 |
| 9 | Microsoft Corporation and Microsoft Licensing GP, a Subsidiary of Microsoft Corporation | 76 | 04/03/2020 | $ 7,436.56 | Paid by NexBank via check | 7 |
| 10 | Moodys Analytics, Inc. | 91 | 04/08/2020 | $ 5,728.05 | Paid on 6/8/20 - Reference # 1259769 | 7 |
| 11 | Quintairos, Prieto Wood & Boyer | Scheduled | 12/13/2019 | $ 8,608.17 | Paid via wire on 5/13/2020 | 7 |

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 5 - No Liability Claims*

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | Advisors Equity Group, LLC | 111 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 2 | Eagle Equity Advisors, LLC | 110 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 3 | HCRE Partner, LLC | 146 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 4 | Highland Capital Management Fund Advisors, | 95 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 5 | Highland Capital Management Fund Advisors, | 119 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 6 | Highland Capital Management Services, Inc. | 175 | 04/23/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 7 | Highland Capital Management Services, Inc. | 176 | 04/23/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 8 | Highland Energy MLP Fund | 102 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 9 | Highland Fixed Income Fund | 109 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 10 | Highland Floating Rate Fund | 125 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 11 | Highland Funds I | 106 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 12 | Highland Funds II | 114 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 13 | Highland Global Allocation Fund | 98 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 14 | Highland Healthcare Opportunities Fund | 116 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 15 | Highland iBoxx Senior Loan ETF | 122 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 16 | Highland Income Fund HFRO | 105 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 17 | Highland Long/Short Equity Fund | 112 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 18 | Highland Merger Arbitrage Fund | 132 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 19 | Highland Opportunistic Credit Fund | 100 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 20 | Highland Small-Cap Equity Fund | 127 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 21 | Highland Socially Responsible Equity Fund | 115 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 22 | Highland Tax-Exempt Fund | 101 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 23 | Highland Total Return Fund | 126 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 24 | NexBank SSB | 178 | 04/23/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 25 | NexPoint Advisors, L.P. | 104 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 26 | NexPoint Advisors, L.P. | 108 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 27 | NexPoint Capital, Inc. | 107 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 28 | NexPoint Capital, Inc. | 140 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 29 | NexPoint Discount Strategies Fund | 117 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 30 | NexPoint Energy and Material Opportunities | 124 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 31 | NexPoint Event-Driven Fund | 123 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 32 | NexPoint Healthcare Opportunities Fund | 121 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 33 | NexPoint Latin America Opportunities Fund | 130 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 34 | NexPoint Real Estate Strategies Fund | 118 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 35 | NexPoint Strategic Opportunities Fund | 103 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 36 | The Dugaboy Investment Trust | 131 | 04/08/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |
| 37 | The Dugaboy Investment Trust | 177 | 04/23/20 | Unliquidated | No liability on the Debtor's books and records; no amount is asserted with respect to this claim | 7/8 |

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 6 - No Liability Claims*

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | Callan, Bentley | 157 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records; claim is for a stock appreciation unit related to a Non-Debtor party | 7/8 |
| 2 | City of Garland | 19 | 12/16/2019 | $ 254.58 | No liability on the Debtor's books and records; claim is filed against an entity with a similar name to Debtor, but not a Debtor party | 7/8 |
| 3 | Clay Callan | 162 | 04/08/2020 | $ 55,125.60 | No liability on the Debtor's books and records | 7/8 |
| 4 | Eastern Point Trust Company, Inc. | 52 | 03/18/2020 | $ 34,875.91 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 5 | Garland Independent School District | 20 | 12/16/2019 | $ 459.81 | No liability on the Debtor's books and records; claim is filed against an entity with a similar name to Debtor, but not a Debtor party | 7/8 |
| 6 | Grayson County | 3 | 11/06/2019 | $ 1,882.01 | No liability on the Debtor's books and records; claim is filed against an entity with a similar name to Debtor, but not a Debtor party | 7/8 |
| 7 | HarbourVest 2017 Global Fund L.P. | 143 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records | 7/8 |
| 8 | HarbourVest 2017 Global AIF L.P. | 147 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records | 7/8 |
| 9 | HarbourVest Partners L.P. on behalf of funds and accounts under management | 149 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records | 7/8 |
| 10 | HarbourVest Dover Street IX Investment L.P. | 150 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records | 7/8 |
| 11 | HarbourVest Skew Base AIF L.P. | 154 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records | 7/8 |
| 12 | Hartman Wanzor LLP | 42 | 03/10/2020 | $ 701.25 | No liability on the Debtor's books and records; claim appears to be filed against Non-Debtor estate | 7/8 |
| 13 | Irving ISD | 5 | 11/06/2019 | $ 827.96 | No liability on the Debtor's books and records; claim is filed against an entity with a similar name to Debtor, but not a Debtor party | 7/8 |
| 14 | John Morris | 60 | 03/23/2020 | $ 500,000.00 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 15 | John R. Watkins | 89 | 04/07/2020 | $ 322,701.12 | No liability on the Debtor's books and records; Never an employee of the Debtor and not an obligation of the Debtor | 7/8 |
| 16 | Linear Technologies, Inc. | 4 | 11/06/2019 | $ 489.94 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 17 | Mass. Dept. of Revenue | 45 | 03/13/2020 | $ 1,352.46 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 18 | Mediant Communications Inc. | 15 | 12/02/2019 | $ 1,755.57 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 19 | Oklahoma Tax Commission | 28 | 02/03/2020 | $ 2,706.93 | No liability on the Debtor's books and records; claim appears to be filed against Debtor affiliate, but not a Debtor obligation | 7/8 |
| 20 | Park, Jun | 73 | 04/06/2020 | $ 32,676.61 | No liability on the Debtor's books and records; claimant is an employee of a subsidiary of the Debtor | 7/8 |
| 21 | Paul N. Adkins | 65 | 03/30/2020 | $ 23,957.95 | No liability on the Debtor's books and records; claimant is an employee of a subsidiary of the Debtor | 7/8 |
| 22 | Paul N. Adkins | 66 | 03/31/2020 | $ 249,230.48 | No liability on the Debtor's books and records; claimant is an employee of a subsidiary of the Debtor | 7/8 |
| 23 | Tarrant County | 2 | 11/06/2019 | $ 8,267.52 | No liability on the Debtor's books and records; claim is filed against an entity with a similar name to Debtor, but not a Debtor party | 7/8 |
| 24 | Theodore N. Dameris | 85 | 04/07/2020 | Unliquidated | No liability on the Debtor's books and records; claimant does not list a proceeding that they are named as a deponent, witness, party, or any other type of participant in a proceeding. | 7/8 |
| 25 | Theodore N. Dameris | 174 | 04/08/2020 | Unliquidated | No liability on the Debtor's books and records; claim related to pension and should be asserted against pension, not the Debtor | 7/8 |
| 26 | Zang, Weijun | 170 | 04/09/2020 | $ 25,000.00 | No liability on the Debtor's books and records; individual not employed at time of bonus payout and not entitled to receive bonus | 7/8 |

*Highland Capital Management, L.P.*
*Case No. 19-34054-sgj11*
*Schedule 7 - Insufficient Documentation Claims*

| Sequence No. | Claimant's Name | Claim No. | Date Filed | Claim Amount | Notes | Objection Page No. Reference |
|---|---|---|---|---|---|---|
| 1 | Anish Tailor | 56 | 03/20/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 2 | Boyce-Field, Mollie | 43 | 03/12/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 3 | Charles Byrne | 44 | 03/13/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 4 | Donald Salvino | 41 | 03/10/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 5 | Garcia, Ericka | 71 | 04/03/2020 | $   2,000.00 | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 6 | Garman Turner Gordon | 161 | 04/08/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 7 | Joe Kingsley | 171 | 04/10/2020 | BLANK | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 8 | Mason, Frederic | 63 | 03/25/2020 | Unliquidated | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 9 | TDA Associates, Inc. | 55 | 03/20/2020 | $   7,000.00 | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |
| 10 | Wilkinson Center | 54 | 03/20/2020 | $        - | No supporting documentation or explanation of the basis of the claim was provided.  No liability for this claimant on the Debtor's books and records. | 8 |

# CLAIMANT'S EXHIBIT 6

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC**
**f/k/a HCRE PARTNERS, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

**NEXPOINT REAL ESTATE PARTNERS LLC'S RESPONSE TO DEBTOR'S**
**FIRST OMNIBUS OBJECTION TO CERTAIN (A) DUPLICATE CLAIMS;**
**(B) OVERSTATED CLAIMS; (C) LATE FILED CLAIMS; (D) SATISFIED CLAIMS;**
**(E) NO-LIABILITY CLAIMS; AND (F) INSUFFICIENT-DOCUMENTATION CLAIMS**

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("HCREP") files this

Response to the Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated

Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-

Documentation Claims (the "Objection") and respectfully states as follows:

**I. PROCEDURAL BACKGROUND**

1.      On or about April 8, 2020, HCREP filed its Proof of Claim with Highland Capital

Management, LP's (the "Debtor") claims agent, a copy of which is attached hereto as Exhibit 1.

[Claim No. 146] (the "Proof of Claim"). In the Proof of Claim, HCREP asserts a claim against the

Debtor based on the parties' interests and agreements in connection with an entity called SE

Claimant's
EXHIBIT

6

Multifamily Holdings, LLC ("SE Multifamily"). In the Proof of Claim, HCREP notes that it has requested information from the Debtor to ascertain the exact amount of its claim, such process is on-going, and has been delayed due to the outbreak of the Coronavirus. *See* Proof of Claim, Ex. A.

2.     On July 30, 2020, Debtor filed its Objection, objecting to various categories of claims that it seeks to disallow, expunge, or reduce. HCREP's Proof of Claim was included in Schedule 5 to the Objection, which the Debtor characterized as alleged "No-Liability Claims." Specifically, the Debtor claims that the Proof of Claim has no basis in the Debtor's Books and Records and is not an obligation of the Debtor. *See* Objection, ¶ 22. The Debtor seeks to disallow and expunge the Proof of Claim.

3.     After initial discussions between HCREP and the Debtor, the Debtor agreed to multiple extensions of HCREP's deadline to respond to the Objection, such that the agreed deadline for HCREP to respond to the Objection is now October 16, 2020. The parties have attempted to resolve the Objection; however, have not yet been able to do so.

4.     For the reasons set forth in detail below, HCREP respectfully requests the Court enter a scheduling order to allow for discovery in connection with HCREP's Proof of Claim, set an evidentiary hearing on HCREP's Proof of Claim, and overrule the Debtor's Objection and allow the claim in the amount determined at such evidentiary hearing.

## II. RESPONSE

5.     After reviewing what documentation is available to HCREP with the Debtor, HCREP believes the organizational documents relating to SE Multifamily Holdings, LLC (the "SE Multifamily Agreement") improperly allocates the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration. As such, HCREP has a claim to reform, rescind and/or modify the agreement.

6.    However, HCREP requires additional discovery, including, but not limited to, email communications and testimony, to determine what happened in connection with the memorialization of the parties' agreement and improper distribution provisions, evaluate the amount of its claim against the Debtor, and protect its interests under the agreement. Accordingly, HCREP requests the Court enter a scheduling order allowing for formal discovery and set an evidentiary hearing after such discovery has occurred.

### III.  CONCLUSION

For these reasons, the HCREP respectfully requests that the Court (i) hold a status conference at which it sets a scheduling order in connection with this contested matter; (ii) set a date for an evidentiary hearing on the Proof of Claim; (iii) overrule the Objection and allow HCREP's Proof of Claim in the amount established at such evidentiary hearing; and (iii) grant HCREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2020, a true and correct copy of the foregoing Joinder was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the following parties:

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com

Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com


*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT 1

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern _____ District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

HCRE Partner, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HCRE Partner, LLC<br>300 Crescent Court, Ste. 700<br>Dallas, TX 75201 | |
| Contact phone _____ | Contact phone _____ |
| Contact email  bryan.assink@bondsellis.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.  Claim number on court claims registry (if known) _____  Filed on ___/___/___
                                                                                      MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

---

Official Form 410                    **Proof of Claim**

1934054200040800000000000058

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _See attached Exhibit "A"_ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See attached Exhibit "A"_

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                              $_____

**Amount of the claim that is secured:**            $_____

**Amount of the claim that is unsecured:**          $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** |  | ☒ No |  | **Amount entitled to priority** |
|---|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No |
|---|---|---|

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date     04/08/2020
                     MM / DD / YYYY

/s/ James D. Dondero
Signature

Print the name of the person who is completing and signing this claim:

| Name | James D. Dondero | | |
|---|---|---|---|
|  | First name | Middle name | Last name |

Title _____

Company     HCRE Partner, LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____     Email _____

---

1934054200408000000000058

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |

| **District:** |
|---|
| Northern District of Texas, Dallas Division |

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HCRE Partner, LLC | Yes, supporting documentation successfully uploaded |
| 300 Crescent Court, Ste. 700 | **Related Document Statement:** |
| Dallas, TX, 75201 | **Has Related Claim:** |
| **Phone:** | No |
| **Phone 2:** | **Related Claim Filed By:** |
| **Fax:** | **Filing Party:** |
| **Email:** | Authorized agent |
| bryan.assink@bondsellis.com | |

| **Other Names Used with Debtor:** | **Amends Claim:** |
|---|---|
| | No |
| | **Acquired Claim:** |
| | No |

| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
|---|---|---|
| See attached Exhibit "A" | No | |

| **Total Amount of Claim:** | **Includes Interest or Charges:** |
|---|---|
| See attached Exhibit "A" | No |

| **Has Priority Claim:** | **Priority Under:** |
|---|---|
| No | |

| **Has Secured Claim:** | **Nature of Secured Amount:** |
|---|---|
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | **Arrearage Amount:** |
| **Based on Lease:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |
| **Subject to Right of Setoff:** | |
| No | |

| **Submitted By:** |
|---|
| James D. Dondero on 08-Apr-2020 4:47:11 p.m. Eastern Time |
| **Title:** |
| **Company:** |
| HCRE Partner, LLC |

VN: E06680EE00F9144D26F793E57FB2634B

## Exhibit A

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an entity called SE Multifamily Holdings, LLC ("SE Multifamily").  Claimant may be entitled to distributions out of SE Multifamily, but such distributions have not been made because of the actions or inactions of the Debtor.  Additionally, Claimant contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does belong to the Debtor or may be the property of Claimant.  Accordingly, Claimant may have a claim against the Debtor.  Claimant has requested information from the Debtor to ascertain the exact amount of its claim.  This process is on-going.  Additionally, this process has been delayed due to the outbreak of the Coronavirus.  Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

# CLAIMANT'S EXHIBIT 7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession



---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**ARTICLE I. EXECUTIVE SUMMARY** .............................................................................6

    **A.**    **Summary of the Plan** .............................................................................6

    **B.**    **An Overview of the Chapter 11 Process** .............................................8

    **C.**    **Purpose and Effect of the Plan** ..........................................................8

        1.    The Plan of Reorganization .....................................................8

        2.    Plan Overview ..........................................................................9

        3.    Voting on the Plan .................................................................10

        4.    Confirmation of the Plan .......................................................11

        5.    Confirming and Effectuating the Plan ...................................12

        6.    Rules of Interpretation ...........................................................12

        7.    Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests..................12

        8.    Instructions and Procedures for Voting ..................................14

        9.    The Confirmation Hearing......................................................15

        10.    The Deadline for Objecting to Confirmation of the Plan .........16

        11.    Notice Parties.........................................................................16

        12.    Effect of Confirmation of the Plan ........................................16

    **D.**    **Effectiveness of the Plan** ..................................................................17

    **E.**    **RISK FACTORS** ..............................................................................17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** ...............17

    **A.**    **Description and History of the Debtor's Business** ...........................17

    **B.**    **The Debtor's Corporate Structure** ...................................................17

    **C.**    **Business Overview** ............................................................................18

    **D.**    **Prepetition Capital Structure** ...........................................................18

        1.    Jefferies Margin Borrowings (Secured)..................................18

        2.    The Frontier Bank Loan (Secured) .........................................19

        3.    Other Unsecured Obligations .................................................19

|   | 4. | Equity Interests | 20 |
| E. | | **SEC Filings** | 20 |
| F. | | **Events Leading Up to the Debtor's Bankruptcy Filings** | 20 |
| G. | | **Additional Prepetition Litigation** | 21 |
| H. | | **The Debtor's Bankruptcy Proceeding** | 24 |
| I. | | **First Day Relief** | 24 |
| J. | | **Other Procedural and Administrative Motions** | 25 |
| K. | | **United States Trustee** | 25 |
| L. | | **Appointment of Committee** | 26 |
| M. | | **Meeting of Creditors** | 26 |
| N. | | **Schedules, Statements of Financial Affairs, and Claims Bar Date** | 26 |
| O. | | **Governance Settlement with the Committee** | 27 |
| P. | | **Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer** | 27 |
| Q. | | **Mediation** | 28 |
| R. | | **Postpetition Settlements** | 28 |
|   | 1. | Settlement with Acis and the Terry Parties | 28 |
|   | 2. | Settlement with the Redeemer Committee | 29 |
| S. | | **Certain Outstanding Material Claims** | 30 |
| T. | | **Treatment of Shared Service and Sub-Advisory Agreements** | 31 |
| U. | | **Portfolio Managements with Issuer Entities** | 32 |
| V. | | **Resignation of James Dondero** | 33 |
| W. | | **Exclusive Periods for Filing a Plan and Soliciting Votes** | 33 |
| X. | | **Negotiations with Constituents** | 34 |
| Y. | | **Highland Capital Management, L.P. Retirement Plan and Trust** | 34 |
| **ARTICLE III.** | | **SUMMARY OF THE PLAN** | 35 |
| A. | | **Administrative and Priority Tax Claims** | 35 |
|   | 1. | Administrative Expense Claims | 35 |
|   | 2. | Professional Fee Claims | 36 |
|   | 3. | Priority Tax Claims | 37 |
| B. | | **Classification and Treatment of Classified Claims and Equity Interests** | 37 |

|   | 1. | Summary | 37 |
|---|----|---------|-----|
|   | 2. | Elimination of Vacant Classes | 38 |
|   | 3. | Impaired/Voting Classes | 38 |
|   | 4. | Unimpaired/Non-Voting Classes | 38 |
|   | 5. | Impaired/Non-Voting Classes | 38 |
|   | 6. | Cramdown | 39 |
| C. | | Classification and Treatment of Claims and Equity Interests | 39 |
|   | 1. | *Class 1 – Jefferies Secured Claim* | 39 |
|   | 2. | *Class 2 – Frontier Secured Claim* | 39 |
|   | 3. | *Class 3 – Other Secured Claims* | 40 |
|   | 4. | *Class 4 – Priority Non-Tax Claims* | 40 |
|   | 5. | *Class 5 – Retained Employee Claims* | 41 |
|   | 6. | *Class 6 – PTO Claims* | 41 |
|   | 7. | *Class 7 – Convenience Claims* | 41 |
|   | 8. | *Class 8 – General Unsecured Claims* | 42 |
|   | 9. | *Class 9 – Subordinated Claims* | 43 |
|   | 10. | *Class 10 – Class B/C Limited Partnership Interests* | 44 |
|   | 11. | *Class 11 – Class A Limited Partnership Interests* | 44 |
| D. | | Special Provision Governing Unimpaired Claims | 45 |
| E. | | Subordinated Claims | 45 |
| F. | | Means for Implementation of the Plan | 45 |
|   | 1. | Summary | 45 |
|   | 2. | The Claimant Trust | 46 |
|   | (a) | *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* | 46 |
|   | (a) | *Claimant Trust Oversight Committee* | 47 |
|   | (b) | *Purpose of the Claimant Trust.* | 48 |

(c)     *Purpose of the Litigation Sub-Trust.* .........................................................48

(d)     *Claimant Trust Agreement and Litigation Sub-Trust*
        *Agreement.* ..................................................................................................48

(e)     *Compensation and Duties of Trustees.* .......................................................50

(f)     *Cooperation of Debtor and Reorganized Debtor.* .....................................50

(g)     *United States Federal Income Tax Treatment of the Claimant*
        *Trust.* ............................................................................................................50

(h)     *Tax Reporting.* .............................................................................................50

(i)     *Claimant Trust Assets.* ................................................................................51

(j)     *Claimant Trust Expenses.* ...........................................................................51

(k)     *Trust Distributions to Claimant Trust Beneficiaries.* ................................51

(l)     *Cash Investments.* ........................................................................................51

(m)     *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ....................52

3.      The Reorganized Debtor...............................................................................52

(a)     *Corporate Existence* ....................................................................................52

(b)     *Cancellation of Equity Interests and Release* ............................................53

(c)     *Issuance of New Partnership Interests* .......................................................53

(d)     *Management of the Reorganized Debtor* .....................................................53

(e)     *Vesting of Assets in the Reorganized Debtor*...............................................53

(f)     *Purpose of the Reorganized Debtor* ...........................................................54

(g)     *Distribution of Proceeds from the Reorganized Debtor Assets;*
        *Transfer of Reorganized Debtor Assets* ......................................................54

4.      Company Action.............................................................................................54

5.      Release of Liens, Claims and Equity Interests ..........................................55

6.      Cancellation of Notes, Certificates and Instruments ...............................55

7.      Cancellation of Existing Instruments Governing Security
        Interests..........................................................................................................56

- iv -

8.    Control Provisions ....................................................................56

9.    Treatment of Vacant Classes ....................................................56

10.   Plan Documents ........................................................................56

11.   Highland Capital Management, L.P. Retirement Plan and
      Trust ..........................................................................................56

A.    **Treatment of Executory Contracts and Unexpired Leases**...........................57

1.    Assumption, Assignment, or Rejection of Executory Contracts
      and Unexpired Leases ...............................................................57

2.    Claims Based on Rejection of Executory Contracts or
      Unexpired Leases ......................................................................58

3.    Cure of Defaults for Assumed or Assigned Executory
      Contracts and Unexpired Leases ..............................................58

B.    **Provisions Governing Distributions**................................................................59

1.    Dates of Distributions ..............................................................59

2.    Distribution Agent ....................................................................60

3.    Cash Distributions ....................................................................60

4.    Disputed Claims Reserve ..........................................................60

5.    Distributions from the Disputed Claims Reserve .....................61

6.    Rounding of Payments ..............................................................61

7.    *De Minimis* Distribution ............................................................61

8.    Distributions on Account of Allowed Claims ...........................62

9.    General Distribution Procedures ...............................................62

10.   Address for Delivery of Distributions ......................................62

11.   Undeliverable Distributions and Unclaimed Property...............62

12.   Withholding Taxes.....................................................................63

13.   Setoffs .......................................................................................63

14.   Surrender of Cancelled Instruments or Securities ....................63

15.   Lost, Stolen, Mutilated or Destroyed Securities .......................63

Case 19-34054-sgj11 Doc 3594 Filed 11/24/22 Entered 11/24/22 17:59:02 Page 1 of 78
Case 19-34054-sgj11 Doc 473594 Filed 11/24/20 2 Entered 11/24/20/22 17:59:02 Page 1 of 1
Main Document     Page 317 of 792

C.       **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** ........................................................................................... 64

      1.     Filing of Proofs of Claim ................................................................... 64

      2.     Disputed Claims ................................................................................. 64

      3.     Procedures Regarding Disputed Claims or Disputed Equity Interests ............................................................................................. 64

      4.     Allowance of Claims and Equity Interests ....................................... 64

*Allowance of Claims* ..................................................................................... 64

*Estimation* ..................................................................................................... 65

*Disallowance of Claims* ................................................................................ 65

D.       **Effectiveness of the Plan** ........................................................................ 66

      1.     Conditions Precedent to the Effective Date ..................................... 66

      2.     Waiver of Conditions ........................................................................ 67

      3.     Effect of Non-Occurrence of Conditions to Effectiveness ............... 67

      4.     Dissolution of the Committee ............................................................ 67

E.       **Exculpation, Injunction, and Related Provisions** ................................ 68

      1.     General .............................................................................................. 68

      3.     Exculpation ....................................................................................... 69

      4.     Releases by the Debtor ..................................................................... 70

      5.     Preservation of Rights of Action ...................................................... 71

*Maintenance of Causes of Action* ................................................................ 71

*Preservation of All Causes of Action Not Expressly Settled or Released* ......... 72

      6.     Injunction .......................................................................................... 72

      7.     Term of Injunctions or Stays ............................................................ 73

      8.     Continuance of January 9 Order ....................................................... 73

F.       **Article XII.D of the Plan** ....................................................................... 74

G.      **Binding Nature of Plan** .......................................................................... 74

H.      **Statutory Requirements for Confirmation of the Plan** ....................... 74

      1.     Best Interests of Creditors Test ........................................................ 75

- vi -

2.   Liquidation Analysis ..................................................................... 75

3.   Feasibility ..................................................................................... 76

4.   Valuation ....................................................................................... 77

5.   Acceptance by Impaired Classes .................................................. 77

6.   Confirmation Without Acceptance by Impaired Classes ............. 78

7.   No Unfair Discrimination .............................................................. 78

8.   Fair and Equitable Test ................................................................. 78

**ARTICLE IV.  RISK FACTORS** ....................................................................... 79

    **A.**   **Certain Bankruptcy Law and Other Considerations** ........................ 79

1.   Parties in Interest May Object to the Debtor's Classification of
Claims and Equity Interests, or Designation as Unimpaired. ..... 79

2.   The Debtor May Not Be Able to Secure Confirmation of the
Plan. .............................................................................................. 79

3.   The Conditions Precedent to the Effective Date of the Plan
May Not Occur. ............................................................................. 80

4.   Continued Risk Following Effectiveness. .................................... 80

5.   The Effective Date May Not Occur. ............................................. 80

6.   The Chapter 11 Case May Be Converted to Cases Under
Chapter 7 of the Bankruptcy Code .............................................. 81

7.   Claims Estimation ......................................................................... 81

8.   The Financial Information Contained Herein is Based on the
Debtor's Books and Records and, Unless Otherwise Stated,
No Audit was Performed. .............................................................. 81

    **B.**   **Risks Related to Recoveries under the Plan** ...................................... 81

1.   The Reorganized Debtor and/or Claimant Trust May Not Be
Able to Achieve the Debtor's Projected Financial Results ......... 81

2.   Claim Contingencies Could Affect Creditor Recoveries ............ 82

3.   If Approved, the Debtor Release Could Release Claims
Against Potential Defendants of Estate Causes of Action With
Respect to Which the Claimant Trust Would Otherwise Have
Recourse ........................................................................................ 82

C.    Investment Risk Disclaimer ........................................................82

    1.    Investment Risks in General. ........................................82

    2.    General Economic and Market Conditions and Issuer Risk. ..............82

D.    Disclosure Statement Disclaimer ................................................83

    1.    The Information Contained Herein is for Disclosure Purposes
Only. ..............................................................83

    2.    This Disclosure Statement was Not Approved by the SEC. ..............83

    3.    This Disclosure Statement Contains Forward-Looking
Statements. .......................................................83

    4.    No Legal or Tax Advice is Provided to You by This
Disclosure Statement. .............................................83

    5.    No Admissions Are Made by This Disclosure Statement. ...........84

    6.    No Reliance Should Be Placed on Any Failure to Identify
Litigation Claims or Projected Objections. ...................84

    7.    Nothing Herein Constitutes a Waiver of Any Right to Object
to Claims or Equity Interests or Recover Transfers and Assets. ..............84

    8.    The Information Used Herein was Provided by the Debtor and
was Relied Upon by the Debtor's Advisors. ....................84

    9.    The Disclosure Statement May Contain Inaccuracies. ...............84

    10.    No Representations Made Outside the Disclosure Statement
Are Authorized. ..................................................85

ARTICLE V. ALTERNATIVES TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN ........................................85

ARTICLE VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ....................................................................85

A.    Consequences to the Debtor ....................................................86

    1.    Cancellation of Debt ...............................................86

    2.    Transfer of Assets .................................................87

B.    U.S. Federal Income Tax Treatment of the Claimant Trust ...........87

C.    Consequences to Holders of Allowed Claims ................................88

    1.    Recognized Gain or Loss ...........................................88

2.  Distribution in Discharge of Accrued Unpaid Interest ............................. 89

3.  Information Reporting and Withholding ................................................... 89

**D.   Treatment of the Disputed Claims Reserve** ...................................................... 89

**ARTICLE VII. RECOMMENDATION** ................................................................................... 90

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the *Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated November 24, 2020, as the same may be amended from time to time (the "Plan").[2] The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents. Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS
DISCLOSURE STATEMENT FOR YOU TO READ**

---

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon**

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

the merits of the Plan. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.

This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.

- 3 -

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement.  Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted.  Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so.  Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent.  Information contained herein is subject to completion, modification, or amendment.  The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan.  Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

## <u>EXHIBITS</u>

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

<div style="border: 1px solid black; padding: 10px;">

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
FULLY SET FORTH HEREIN.

</div>

# ARTICLE I.
## EXECUTIVE SUMMARY

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders. The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value. **Accordingly, the Debtor strongly supports confirmation of the Plan.**

## A.      Summary of the Plan

The Plan represents a significant achievement for the Debtor. As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action. The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets. The Claimant Trust will – for the benefit of the Claimant Trust

Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor. This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by: The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner. On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds. The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $13,150,000). Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests. The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement. Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

## B.     An Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation. Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

## C.     Purpose and Effect of the Plan

### 1.     The Plan of Reorganization

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims. The Claimant Trust will hold the Claimant Trust Assets and manage the efficient monetization of, the Claimant Trust Assets. The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC. The Claimant Trust will also be the sole limited partner in the Reorganized Debtor. The Reorganized Debtor will manage the wind down

- 8 -

of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. The Claimant Trust will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries. The Litigation Sub-Trust will receive the Estate Claims. The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

    2.    <u>Plan Overview</u>

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below. For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|-------|---------------------------|----------------------------------------|----------|------------------|--------------------|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | $1,181,886 | No | No | 100% |
| 7 | Convenience Claims[4] | $12,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[5] | $180,442,199 | Yes | Yes | 85.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $318,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

    3.    <u>Voting on the Plan</u>

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan. Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of November 23, 2020 (the "Voting Record Date"). The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4.     Confirmation of the Plan

(a)     Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b)     The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an

announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

     5.    <u>Confirming and Effectuating the Plan</u>

It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "<u>Committee</u>"). Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

     6.    <u>Rules of Interpretation</u>

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

     7.    <u>Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests</u>

As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan. As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "<u>Solicitation Package</u>"):

- •     This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

On November 13, 2020, the Debtor filed the Plan Supplement [D.I. 1389] that included, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee. The Plan Supplement also includes a schedule of the Causes of Action that will be retained after the Effective Date. The Plan Supplement may be supplemented or amended through and including December 18, 2020. If the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

8.    Instructions and Procedures for Voting

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed November 23, 2020, as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is January 5, 2021 at 5:00 p.m. (prevailing Central Time) (the "Voting Deadline")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**If by first class mail, personal delivery, or overnight mail to:**

<div align="center">

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

</div>

**If by electronic voting:**

**You may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot. IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal. Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot. You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes. If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to

reflect that voter's intent and will supersede and revoke any prior Ballot. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement and other documents filed in these Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829. You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov. Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by January 11, 2021. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

9.      The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on January 13, 2021, and January 14, 2021, at 9:30 a.m. prevailing Central time.** The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

10.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has set a deadline of January 5, 2021, at 5:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline")**.  Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11.     Notice Parties

- Debtor:  Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn:  James P. Seery, Jr.);

- Counsel to the Debtor:  Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn:  Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

- Counsel to the Committee:  Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn:  Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

- Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12.     Effect of Confirmation of the Plan

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

## D.      Effectiveness of the Plan

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

## E.      RISK FACTORS

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

<div align="center">

### ARTICLE II.
### BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE

</div>

## A.      Description and History of the Debtor's Business

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams. Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

## B.      The Debtor's Corporate Structure

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors. None of these affiliates filed for Chapter 11 protection.  As of September 30, 2020, the Debtor provided money management and advisory services for approximately $1.641 billion of assets under management and shared services for approximately $7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets was approximately

$566.5 million. As of September 30, 2020, the total value of Debtor's Assets totaled approximately $328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| Asset | 10/16/2019 | 9/30/2020 |
|-------|------------|-----------|
| Investments (FV)[1] | $232,620,000 | $109,479,000 |
| Investments (Equity) | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | $2,529,000 | $5,888,000 |
| Management/Incentive Fees Receivable | $2,579,000 | $3,350,000 |
| Fixed Assets, net | $3,754,000 | $2,823,000 |
| Loan Receivables | $151,901,000 | $93,445,000[2] |
| Other Assets | $11,311,000 | $12,105,000 |
| **Totals** | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as Exhibit B. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

## C.    Business Overview

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("Jefferies"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

## D.    Prepetition Capital Structure

### 1.    Jefferies Margin Borrowings (Secured)

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "Brokerage Agreement"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with

- 18 -

Jefferies (the "Prime Account"). A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions. A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in liquid and illiquid securities (the "Securities") in the Prime Account. Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls. As of September 30, 2020, the equity value of the Securities in the Prime Account was approximately $23.3 million, and the Debtor owed no amounts to Jefferies. The Debtor has been actively selling Securities to cover operating expenses and professional fees.

2.    The Frontier Bank Loan (Secured)

The Debtor and Frontier State Bank ("Frontier Bank") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "Original Frontier Loan Agreement"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million. On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "Amended Frontier Loan Agreement"), amending and superseding the Original Frontier Loan Agreement. Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "Frontier Loan"). The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "Frontier Collateral").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million. As of September 30, 2020, the value of the Frontier Collateral was approximately $13.1 million, and approximately $318,000 in postpetition interest had accrued.

3.    Other Unsecured Obligations

As discussed below, the Plan provides for four Classes of unsecured claims: (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims. In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and

contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars. The Debtor is still assessing these claims and its liability for such amounts. These Claims have been classified as Convenience Claims and Subordinated Claims.

4.    Equity Interests

The Debtor is a Delaware limited partnership. As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C). The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner. The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940. As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV. The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.    Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "Panel"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "Crusader Funds") that were formed between 2000 and 2002. In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors. After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds

- 20 -

(the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011. As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors. The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award"). Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award. For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper. The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

## G.     Additional Prepetition Litigation

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation. Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim. To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable. The Debtor's major prepetition litigation is as follows:

- <u>Redeemer Committee</u>: The dispute with the Redeemer Committee is described in ARTICLE II.F above. As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves the Redeemer Committee's claims against the Estate; however, that order is currently subject to appeal.

- <u>Acis Capital Management, L.P., & Acis Capital Management GP, LLC</u>: On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("<u>Acis LP</u>") and its general partner, Acis Capital Management GP, LLC ("<u>Acis GP</u>," and collectively with Acis LP, "<u>Acis</u>") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "<u>Acis Case</u>"). Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP. Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis. Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed. The Debtor filed a proof of claim against Acis and an administrative claim. Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date. On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis. Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

  The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim. After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves Acis's claims against the Estate; however, that order is currently subject to appeal.

- <u>UBS Securities LLC and UBS AG London Branch</u>: UBS Securities LLC ("<u>UBS Securities</u>") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "<u>UBS Securities Claim</u>"), and UBS AG, London Branch ("<u>UBS London</u>," and together with UBS Securities, "<u>UBS</u>") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "<u>UBS London Claim</u>" and together with the UBS Securities Claim, the "<u>UBS Claim</u>"). The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008. Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by

- 22 -

Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds. The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration. Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[5] UBS responded to these motions on November 6, 2020 [D.I. 1341]. On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee. It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- Patrick Daugherty: Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6] Mr. Daugherty is a former limited partner and employee of the Debtor. The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor. The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of

---

[5] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42. On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

$3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit. The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

**H.    The Debtor's Bankruptcy Proceeding**

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[7] The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

**I.    First Day Relief**

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration"). At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168]. Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [D.I. 379]

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

---

[7] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

- 24 -

### J.    Other Procedural and Administrative Motions

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- _Interim Compensation Motion_.  On October 29, 2019, the Debtor filed the _Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals_ [D.I. 72] (the "Interim Compensation Motion").  The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code.  On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals.  On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion").  The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business.  On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- Retention Applications.  During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

### K.    United States Trustee

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Delaware U.S. Trustee").  Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Texas U.S. Trustee," and together with the

- 25 -

Delaware U.S. Trustee, the "U.S. Trustee"). The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

## L.     Appointment of Committee

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65]. The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP. Meta-E Discovery is a vendor to the Debtor. The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G. The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

## M.     Meeting of Creditors

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time). At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020. The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22, 2020 meetings.

## N.     Schedules, Statements of Financial Affairs, and Claims Bar Date

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248]. A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[8] Consequently, the bar date for filing proofs

---

[8] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

of claims has passed and any claims filed after the applicable bar date will be considered late filed.

## O.    Governance Settlement with the Committee

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

## P.    Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board. The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor. On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative.

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854]. Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

## Q.    Mediation

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators").  The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

## R.    Postpetition Settlements

### 1.    Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release.  On September 23, 2020, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

  o    Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

  o    Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

  o    Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [DI.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.    Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand, Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion").

The Redeemer Stipulation contains the following material terms, among others:

- The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $137,696,610 as a General Unsecured Claim;

- The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

- The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

- The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [DI.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

## S.    Certain Outstanding Material Claims

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

- Hunter Mountain Proof of Claim. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a $60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076 [D.I. 1646].

**T.    Treatment of Shared Service and Sub-Advisory Agreements**

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the

Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.2 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

## U.    Portfolio Managements with Issuer Entities

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer"  and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

## V. Resignation of James Dondero

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

## W. Exclusive Periods for Filing a Plan and Soliciting Votes

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

- Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020.  The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

## X.   Negotiations with Constituents

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in its current form.  Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation.  There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

## Y.   Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan.  As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC").  *See* 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430.  As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC.  *See* 29 U.S.C. §§ 1306, 1307.  The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential  unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC.  The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

- 34 -

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction, release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

## ARTICLE III.
## SUMMARY OF THE PLAN

> **THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

**A.    Administrative and Priority Tax Claims**

   1.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions

relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.    <u>Professional Fee Claims</u>

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

3.      Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.      Classification and Treatment of Classified Claims and Equity Interests**

1.      Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

2.    Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

3.    Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

4.    Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

5.    Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

- 38 -

6.     Cramdown

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.     Classification and Treatment of Claims and Equity Interests**

1.     *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2.     *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- 39 -

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms:  (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

   "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is

Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

  *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

  "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

  By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8. <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and

will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

  "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

  "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9. *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

  "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a

Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

## D.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## E.     Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## F.     Means for Implementation of the Plan

### 1.     <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

- 45 -

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

2.      The Claimant Trust[11]

(a)      *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

(a)      *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

(b)     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in Article IV.C of the Plan.

(c)     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- the payment of the Claimant Trust Expenses;

- the payment of other reasonable expenses of the Claimant Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- the orderly monetization of the Claimant Trust Assets;

- litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

•	the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

•	the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

•	the payment of other reasonable expenses of the Litigation Sub-Trust;

•	the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

•	the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee.  Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

(e)     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(f)     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

(g)     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(h)     *Tax Reporting.*

The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

- 50 -

The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

     (i)    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

     (j)    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

     (k)    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

     (l)    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(m)    *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

3.    The Reorganized Debtor

(a)    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

(b)    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c)    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d)    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e)    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

(f)      *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court

(g)      *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.      Company Action

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

5.      Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

6.      Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7. <u>Cancellation of Existing Instruments Governing Security Interests</u>

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

8. <u>Control Provisions</u>

To the extent that there is any inconsistency between the Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, the Plan shall control.

9. <u>Treatment of Vacant Classes</u>

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan shall receive no Plan Distributions.

10. <u>Plan Documents</u>

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

11. <u>Highland Capital Management, L.P. Retirement Plan and Trust</u>

The Highland Capital Management, L.P. Retirement Plan And Trust ("<u>Pension Plan</u>") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal

Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

## A.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts

and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

    2.    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

    3.    <u>Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases</u>

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## B.    **Provisions Governing Distributions**

1.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.     Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.     Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.     Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant

Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest and Mr. Daugherty have objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and the Daugherty Claim, respectively, and intend to press their objections at the hearing for confirmation of the Plan.

### 5.     Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

### 6.     Rounding of Payments

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

### 7.     *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

8.     Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9.     General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

10.     Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

11.     Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

12.  Withholding Taxes

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13.  Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14.  Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15.  Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with Article VI.O of the Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## C. Procedures for Resolving Contingent, Unliquidated and Disputed Claims

### 1. Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### 2. Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan.

### 3. Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### 4. Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

#### *Allowance of Claims*

After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and

defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### Estimation

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### Disallowance of Claims

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

## D.    Effectiveness of the Plan

### 1.    Conditions Precedent to the Effective Date

The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2.    <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3.    <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

- 67 -

E. **Exculpation, Injunction, and Related Provisions**

1. General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO

Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3. Exculpation

Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation  in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

4.    Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to Article IX.D of the Plan (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with

respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties. However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties. As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties. The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.      Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as

appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

6.    <u>Injunction</u>

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

7.      Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.      Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on

January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

## F.     Article XII.D of the Plan

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## G.     Binding Nature of Plan

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

## H.     Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the

approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.    <u>Best Interests of Creditors Test</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.    To make these findings, the Bankruptcy Court must:  (a) estimate the net Cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "<u>Liquidation Distribution</u>") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.    <u>Liquidation Analysis</u>

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "<u>Liquidation Analysis</u>") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests  at the projected amounts of Allowed Claims

and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests. The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims. This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate. The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business. A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan. Accordingly, the Debtor believes that the Plan is feasible.

4.    Valuation

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of September 30, 2020, was approximately $328.3 million.

5.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

6.      <u>Confirmation Without Acceptance by Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.      <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.      <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that:  (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed

amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

<div align="center">

**ARTICLE IV.**
**RISK FACTORS**

</div>

---

**ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

---

**A.       Certain Bankruptcy Law and Other Considerations**

      1.       <u>Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

      2.       <u>The Debtor May Not Be Able to Secure Confirmation of the Plan.</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a

need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

     3.    <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur.</u>

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

     4.    <u>Continued Risk Following Effectiveness.</u>

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

     5.    <u>The Effective Date May Not Occur.</u>

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

6.      The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the
        Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.   In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.   The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets in an orderly and controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7.      Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

8.      The Financial Information Contained Herein is Based on the Debtor's Books and
        Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

B.      **Risks Related to Recoveries under the Plan**

1.      The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the
        Debtor's Projected Financial Results

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve their projected financial results.  The Financial Projections represent the best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as well as the United States and world economies in general, and the investment industry in which the Debtor operates.  The Debtor's Financial Projections include key assumptions on (i) target asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan. In terms of achieving target asset monetization values, the Debtor faces issues including investment assets with cross-ownership across related entities and challenges associated with

collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19. Costs are based on estimates and may increase with delays or any other unforeseen factor. If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

2.      Claim Contingencies Could Affect Creditor Recoveries

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates. Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

3.      If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust. The Committee's investigation of potential Estate Claims is still ongoing. Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties. In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

C.      **Investment Risk Disclaimer**

1.      Investment Risks in General.

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds. No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

2.      General Economic and Market Conditions and Issuer Risk.

Any investment in securities carries certain market risks. Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall

market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19). The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions. All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust. Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.      Disclosure Statement Disclaimer**

       1.      <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

       The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

       2.      <u>This Disclosure Statement was Not Approved by the SEC.</u>

       Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

       3.      <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

       This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

       4.      <u>No Legal or Tax Advice is Provided to You by This Disclosure Statement.</u>

       **This Disclosure Statement is not legal or tax advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

- 83 -

5.       No Admissions Are Made by This Disclosure Statement.

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

6.       No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

7.       Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.       The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.       The Disclosure Statement May Contain Inaccuracies.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date. The Debtor may update this Disclosure Statement but is not required to do so.

10.     <u>No Representations Made Outside the Disclosure Statement Are Authorized.</u>

    No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

    If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

    Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

    The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims. This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances.  In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims  in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations.  The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

A.     **Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor.  The Debtor is a partnership for federal income tax purposes. Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.     Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  Due to the nature of the Impaired Claims, it is anticipated that

the Debtor will not recognize any material amount of COD income.  If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

    2.    <u>Transfer of Assets</u>

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust.  For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust.  The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes.  See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets.  As discussed above, the Debtor is a partnership for federal income tax purposes.  Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor.  The Debtor will not be required to pay any tax as a result of such disposition.

**B.**    **U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes.   In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes.  As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the

- 87 -

beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

## C.     Consequences to Holders of Allowed Claims

### 1.     <u>Recognized Gain or Loss</u>

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at

a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.        Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.  In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income.  Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income.  Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.        Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements.  Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%).  Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.        Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.  Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with

the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

<div align="center">

**ARTICLE VII.**
**RECOMMENDATION**

</div>

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan.  Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

Dated: November 24, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

## EXHIBIT A

**PLAN OF REORGANIZATION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
   ikharasch@pszjlaw.com
   gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
   ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................. 1

A.      Rules of Interpretation, Computation of Time and Governing Law ..................... 1

B.      Defined Terms ............................................................................................. 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

A.      Administrative Expense Claims ..................................................................... 16

B.      Professional Fee Claims ............................................................................... 17

C.      Priority Tax Claims ..................................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ................................................................... 18

A.      Summary .................................................................................................... 18

B.      Summary of Classification and Treatment of Classified Claims and
Equity Interests .......................................................................................... 18

C.      Elimination of Vacant Classes ...................................................................... 18

D.      Impaired/Voting Classes .............................................................................. 19

E.      Unimpaired/Non-Voting Classes ................................................................... 19

F.      Impaired/Non-Voting Classes ....................................................................... 19

G.      Cramdown .................................................................................................. 19

H.      Classification and Treatment of Claims and Equity Interests ............................ 19

I.      Special Provision Governing Unimpaired Claims ............................................ 24

J.      Subordinated Claims .................................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................... 24

A.      Summary .................................................................................................... 24

B.      The Claimant Trust ...................................................................................... 25

1.     *Creation and Governance of the Claimant Trust and Litigation Sub-
Trust.* ....................................................................................................... 25

2.     *Claimant Trust Oversight Committee* ............................................................ 26

**Page**

3.     *Purpose of the Claimant Trust.* .................................................................... 27

4.     *Purpose of the Litigation Sub-Trust.* ............................................................ 27

5.     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* ..................... 28

6.     *Compensation and Duties of Trustees.* ......................................................... 29

7.     *Cooperation of Debtor and Reorganized Debtor.* .......................................... 29

8.     *United States Federal Income Tax Treatment of the Claimant Trust.* ............... 30

9.     *Tax Reporting.* ......................................................................................... 30

10.    *Claimant Trust Assets.* ............................................................................. 30

11.    *Claimant Trust Expenses.* ......................................................................... 31

12.    *Trust Distributions to Claimant Trust Beneficiaries.* ..................................... 31

13.    *Cash Investments.* .................................................................................... 31

14.    *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ........................... 31

C.     The Reorganized Debtor ........................................................................... 32

1.     *Corporate Existence* ................................................................................. 32

2.     *Cancellation of Equity Interests and Release* ............................................... 32

3.     *Issuance of New Partnership Interests* ........................................................ 32

4.     *Management of the Reorganized Debtor* ...................................................... 32

5.     *Vesting of Assets in the Reorganized Debtor* ................................................ 33

6.     *Purpose of the Reorganized Debtor* ............................................................ 33

7.     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ................................................................... 33

D.     Company Action ...................................................................................... 34

E.     Release of Liens, Claims and Equity Interests ............................................... 34

F.     Cancellation of Notes, Certificates and Instruments ....................................... 35

G.     Cancellation of Existing Instruments Governing Security Interests ................... 35

**Page**

H.  Control Provisions ................................................................................ 35

I.  Treatment of Vacant Classes ............................................................. 36

J.  Plan Documents ................................................................................... 36

K.  Highland Capital Management, L.P. Retirement Plan and Trust ....... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ..................................................................................... 37

A.  Assumption, Assignment, or Rejection of Executory Contracts and
    Unexpired Leases .............................................................................. 37

B.  Claims Based on Rejection of Executory Contracts or Unexpired
    Leases ................................................................................................ 38

C.  Cure of Defaults for Assumed or Assigned Executory Contracts and
    Unexpired Leases .............................................................................. 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................ 39

A.  Dates of Distributions ........................................................................ 39

B.  Distribution Agent .............................................................................. 40

C.  Cash Distributions .............................................................................. 40

D.  Disputed Claims Reserve .................................................................... 40

E.  Distributions from the Disputed Claims Reserve ............................... 40

F.  Rounding of Payments ........................................................................ 41

G.  *De Minimis* Distribution ..................................................................... 41

H.  Distributions on Account of Allowed Claims ..................................... 41

I.  General Distribution Procedures ........................................................ 41

J.  Address for Delivery of Distributions ................................................ 41

K.  Undeliverable Distributions and Unclaimed Property ........................ 42

L.  Withholding Taxes .............................................................................. 42

M.  Setoffs ................................................................................................. 42

N.      Surrender of Cancelled Instruments or Securities ...................................... 43

O.      Lost, Stolen, Mutilated or Destroyed Securities ...................................... 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
            UNLIQUIDATED AND DISPUTED CLAIMS .......................................... 43

A.      Filing of Proofs of Claim ...................................................... 43

B.      Disputed Claims ...................................................... 43

C.      Procedures Regarding Disputed Claims or Disputed Equity Interests ............... 44

D.      Allowance of Claims and Equity Interests ...................................... 44

1.      *Allowance of Claims* ...................................................... 44

2.      *Estimation* ...................................................... 44

3.      *Disallowance of Claims* ...................................................... 45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...................................... 45

A.      Conditions Precedent to the Effective Date ...................................... 45

B.      Waiver of Conditions ...................................................... 46

C.      Effect of Non-Occurrence of Conditions to Effectiveness ...................... 47

D.      Dissolution of the Committee ...................................................... 47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ............... 47

A.      General ...................................................... 47

B.      Discharge of Claims ...................................................... 47

C.      Exculpation ...................................................... 48

D.      Releases by the Debtor ...................................................... 48

E.      Preservation of Rights of Action ...................................... 50

1.      *Maintenance of Causes of Action* ...................................... 50

2.      *Preservation of All Causes of Action Not Expressly Settled or Released* ........... 50

F.      Injunction ...................................................... 50

**Page**

    G.     Term of Injunctions or Stays...........................................................................51

    H.     Continuance of January 9 Order .....................................................................52

ARTICLE X. BINDING NATURE OF PLAN ...................................................................52

ARTICLE XI. RETENTION OF JURISDICTION .............................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................54

    A.     Payment of Statutory Fees and Filing of Reports ............................................54

    B.     Modification of Plan ........................................................................................55

    C.     Revocation of Plan ...........................................................................................55

    D.     Obligations Not Changed .................................................................................55

    E.     Entire Agreement .............................................................................................55

    F.     Closing of Chapter 11 Case .............................................................................55

    G.     Successors and Assigns.....................................................................................56

    H.     Reservation of Rights .......................................................................................56

    I.     Further Assurances ...........................................................................................56

    J.     Severability ......................................................................................................57

    K.     Service of Documents .......................................................................................57

    L.     Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
            the Bankruptcy Code........................................................................................58

    M.     Governing Law .................................................................................................58

    N.     Tax Reporting and Compliance .......................................................................58

    O.     Exhibits and Schedules ....................................................................................59

    P.     Controlling Document ......................................................................................59

---

### DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

### ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.  Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such affiliate. For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not

2

unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.  "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.  "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.  "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

5

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all

6

distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

57. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

58. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

59. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

60. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

61. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the

Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

62. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

64. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

65. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

66. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

67. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

68. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

69. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

70. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

71. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

72. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

73. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

75. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

76. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

77. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

78. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

79. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

80. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

81. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

82. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

83. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

84. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

85. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

86. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

87. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

88. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

89. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

90. "*Petition Date*" means October 16, 2019.

91. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

92. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

93. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

94. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of

11

Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

95. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

96. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

97. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

98. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

99. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

100. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

101. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

102. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

103. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

104.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

105.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

106.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

107.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

108.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

109.    "*Related Entity*" means, without duplication, (a) James Dondero, (b) Mark Okada, (c) Grant Scott, (d) Hunter Covitz, (e) any entity or person that was an insider of the

13

Debtor on the Petition Date under Section 101(31) of the Bankruptcy Code, including any non-statutory insider, (f) any entity that, after the Effective Date, is controlled directly or indirectly by James Dondero, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, and (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries.

110. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such.

111. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

112. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

113. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

114. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

115. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

116. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

117. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

118. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

119.     "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

120.     "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

121.     "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

122.     "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

123.     "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

124.     "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

125.     "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

126.     "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

127.     "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

128.     "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

129.     "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

130.     "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

131.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

132.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

135.    "*Voting Record Date*" means November 23, 2020.

# ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

## A.    <u>Administrative Expense Claims</u>

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

16

## B.      Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.      Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.     Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

### B.     Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

### C.     Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of

18

voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**      **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**      **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**      **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**      **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**      **Classification and Treatment of Claims and Equity Interests**

*1.*      *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan

19

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.   *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.   *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.   *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. <u>*Class 5 – Retained Employee Claims*</u>

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. <u>*Class 6 – PTO Claims*</u>

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

    Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.  **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.  **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

     *1.*             *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be

overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)    the payment of the Claimant Trust Expenses;

(ii)    the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)    the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

> (i)  the payment of other reasonable expenses of the Litigation Sub-Trust;

> (ii)  the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

> (iii)  the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

> 6.  *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

> 7.  *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.          *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.          *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.          *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the

30

Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

*11.* *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

*12.* *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

*13.* *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

*14.* *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the

31

Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

### 4. *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant

Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

### 5.   *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

### 6.   *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

### 7.   *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust

will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E.    Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the

Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## F.     Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## G.     Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

## H.     Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

I. **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

J. **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

K. **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

## C.      Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts

or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

## B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

### F. Rounding of Payments

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

### G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

### J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.**     **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**     **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**     **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to

such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.      Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS**

**A.      Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.      Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such

43

Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

## C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

## D.     Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.     *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.     *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.      *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

A.      **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering

45

into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized

Debtor, or the Claimant Trust, as applicable.

## C.    Effect of Non-Occurrence of Conditions to Effectiveness

Unless waived as set forth in ARTICLE VIII.B, if the Effective Date of this Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw this Plan and, if withdrawn, the Plan shall be of no further force or effect.

## D.    Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

## A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

## B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose

47

before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.   **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation  in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.   This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.   **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal

misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims

brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.     Preservation of Rights of Action

### 1.     *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.     Injunction

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest,

along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in ARTICLE XI, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

## G.    Term of Injunctions or Stays

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**H.** **Continuance of January 9 Order**

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

## C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

### I.    Further Assurances

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J.**     <u>**Severability**</u>

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**     <u>**Service of Documents**</u>

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

<u>**If to the Claimant Trust:**</u>

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

<u>**If to the Debtor:**</u>

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

<u>**with copies to:**</u>

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

## M.   Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

## N.   Tax Reporting and Compliance

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

O.  **Exhibits and Schedules**

  All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

P.  **Controlling Document**

  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  November 24, 2020

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
     James P. Seery, Jr.
     Chief Executive Officer and Chief
     Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

## **EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTOR**



## EXHIBIT C

## LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

    This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

    This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

    These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

    Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

    These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

11/13/2020

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is January 31 ,2021.
B. All investment assets are sold by December 31, 2022.
C. All demand notes are collected in the year 2021.
D. All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in the
   interim interest income and principal payments are collected as they become due.
E. Fixed assets used in daily business operations are sold in February 2021.
F. Accrual for employee bonuses as of January 2021 are reversed and not paid.
G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter
H. Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.
I. Litigation Trustee budget is $6,500,000.
J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.
K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100%
   of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or
   interest of junior priority.
L. Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").
M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV.
   Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets
N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.
O. Class 7  payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.
P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:
   o By September 30, 2021 - $50,000,000
   o By March 31, 2022 – additional $50,000,000
   o By June 30, 2022 – additional $25,000,000
   o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

11/13/2020

*Highland Capital Management, L.P.*
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 25,076 | $ 25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 – Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
| | | |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
| | | |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
| | | |
| Estimated amount remaining for distribution | - | - |
| | | |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

Footnotes:
[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
   Assumes Chapter 7 Trustee engages new professionals to help liquidate assets
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable
[3] Estimated expenses through final distribution exclude non-cash expenses:
   Depreciation of $462 thousand in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages
[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees
[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund

Notes:
All claim amounts are estimated as of November 20, 2020 and subject to change

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

11/13/2020

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Actual<br>Jan 2020 to June<br>2020 Total | Actual<br>3 month ended<br>Sept 2020 | Forecast --->  <br>3 month ended<br>Dec 2020 | Total 2020 | 3 month ended<br>Mar 2021 | 3 month ended<br>Jun 2021 | 3 month ended<br>Sept 2021 | 3 month ended<br>Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | $ 2,154 |
| | | | | | | | | | |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| | | | | | | | | | |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| | | | | | | | | | |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| | | | | | | | | | |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| | | | | | | | | | |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| | | | | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| | | | | | | | | | |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

*Footnotes:*
*[1] Operating expenses include an adjustment in January 2021 to account*
*    for expenses that have not been accrued or paid prior to effective date.*
*[2] Other income and expenses of $61.2 million in January 2021 includes:*
*    [a] $77.7 million was expensed to record for the increase of*
*        allowed claims.*
*    [b] Income of $15.8 million for the accrued, but unpaid payroll liability related to*
*        the Debtor's deferred bonus programs amount written-off.*

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

|  | Forecast ---> | | | | | |
|  | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | $ 2,154 |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) | $ (1,088) | $ (3,932) | $ (16,314) |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| Operating Gain/(Loss) | $ (3,823) | $ (3,013) | $ (1,613) | $ (2,193) | $ (10,641) | $ (94,780) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | $ (88,922) |
| Net Income | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) | $ (62,415) | $ (183,702) |

11/13/2020

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Forecast ----> | | | | | | | |
| Net (Loss) Income | $ (16,708) | $ (21,247) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) |
| **Cash Flow from Operating Activity** | | | | | | | | | | |
| **(Increase) / Decrease in Cash** | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| | | | | | | | | | | |
| **Cash Flow From Investing Activities** | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| | | | | | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) | $ 22,454 | $ (23,408) | $ 91,979 | $ (6,484) | $ 16,374 | $ (54,481) | $ (28,681) | $ (2,297) | $ (21,344) |
| Beginning Cash | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ 5,887 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |

11/13/2020

# CLAIMANT'S EXHIBIT 8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

<div align="center">

**NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

</div>

**PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No. 1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and s
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.





1934054201230000000000010

(the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on January 13, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan is January 5, 2021, at 5:00 p.m., prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s)

---

[2] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[3] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **January 11, 2021, at 5:00 p.m.**, prevailing Central Time.  Any objection to the assumption of your Executory Contract or Unexpired Lease must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection the assumption of the Executory Contract or Unexpired Lease, and, if practicable, a proposed modification such proposed assumption that would resolve such objection; (d) be served on counsel for the Debtor set forth in the signatory block below; and (e) be filed with the Court on or before January 11, 2021 at 5:00 p.m. prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the

Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line.  You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017.  Please specify whether you would like to receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: December 30, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

/s/ Zachery Z. Annable
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Schedule A</u>**

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Aberdeen Loan Funding Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | AT&T Corp. Attn: Peter Davis | Managed Internet Service | 927.16 |
| Highland Capital Management, L.P. | Bank of New York Mellon Trust Company Attn: Corporate Trust | Letter Agreement | 0.00 |
| Highland Capital Management, L.P. | Bank of New York Mellon Trust Company | Electronic Communications | 0.00 |
| Highland Capital Management, L.P. | Brentwood CLO Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Carey International, Inc. Attn: Gary Kessler | Advisory Services Agreement | 0.00 |
| Highland Capital Management, L.P. | CCS Medical, Inc. Attn: Steve Saft | Advisory Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Citibank N.A. Attn: Doug Warren | Reference Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Cornerstone Healthcare Group Holding, Inc. Attn: David Smith | Amended and Restated Advisory Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Crescent Investors LP Attn: Property Manager | Office Lease | 0.00 |
| Highland Capital Management, L.P. | Eastland CLO Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Falcon E&P Opportunities GP, LLC Attn: Marc Manzo | Amended and Restated Shared Services Agreement | 0.00 |
| Highland Capital Management, L.P. | FTI Consulting Inc. Attn: Ronald Greenspan | Letter Agreement | 0.00 |
| Highland Capital Management, L.P. | Gleneagles CLO, Ltd. Attn: The Directors | Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Grayson CLO Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Greenbriar CLO, Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Capital Multi-Strategy Fund LP | Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Capital Multi-Strategy Master Fund LP | Investment Management Agreement | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Highland Credit Opportunities CDO Ltd. | Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland HCF Advisors, Ltd. | Shared Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland HCF Advisors, Ltd. | Sub-advisory Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Legacy Limited Attn: Suzanne St. Thomas | Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Loan Funding V Ltd. Attn: The Directors | Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Multi Strategy Credit Fund Ltd., Highland Multi Strategy Credit Fund LP | Third Amended & Restated Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Park CDO I, Ltd. Attn: The Directors | Collateral Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Prometheus Master Fund LP, Highland Prometheus Feeder Fund I LP, Highland Prometheus Feeder Fund II LP, Highland SumBridge GP LLC | Amended & Restated Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Restoration Capital Partners LP, Highland Restoration Capital Partners Offshore LP, Highland Restoration Capital Partners Master LP, Highland Capital Parters GP LLC | Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland Select Equity Master Fund LP, High Select Equity Fund GP LP | Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Jaspar CLO Ltd. Attn: The Directors | Amended & Restated Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Jefferies LLC Attn: Chris Bianchi | Prime Brokerage Agreement | 0.00 |
| Highland Capital Management, L.P. | Liberty CLO, Ltd. Attn: The Directors | Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Liberty Life Assurance Company of Boston | Administrative Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Longhorn Credit Funding, LLC Attn: Secretary | Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Paylocity Corporation | Corporation Services Agreement | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Petrocap Partners II GP LLC Attn: William L. Britain | Amended and Restated Administrative Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO II Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO II Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Southfork CLO Ltd. Attn: The Directors | Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Stratford CLO Ltd. Attn: The Directors | Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | SunTrust Robinson Humphrey Inc. Attn: Documentation | Electronic Trading Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Trussway Holdings, Inc. Attn: Kendall Hoyd | Amended and Restated Advisory Services Agreement | 0.00 |
| Highland Capital Management, L.P. | Valhalla CLO, Ltd. Attn: The Directors | Reference Portfolio Management Agreement | 0.00 |
| Highland Capital Management, L.P. | ViaWest Attn: | Master Service Agreement | 0.00 |
| Highland Capital Management, L.P. | ViaWest Attn: John Greenwood | Master Service Agreement | 0.00 |
| Highland Capital Management, L.P. | Walkers Fund Services Limited | Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Westchester CLO, Ltd. Attn: The Directors | Servicing Agreement | 0.00 |

# CLAIMANT'S EXHIBIT 9

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

### SECOND[2] NOTICE OF (I) EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES TO BE ASSUMED BY THE
### DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
### IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH

**PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") entered an order [Docket No. 1476] (the "<u>Disclosure Statement Order</u>") that, among other things: (a) approved the *Disclosure*

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  This Second Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory contracts and unexpired leases identified previously in Docket No. 1648.

1



Claimant's
EXHIBIT
9

1934054210111000000000016

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on January 26, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496.  The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020.  Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.  Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto.  Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the

---

[3]  Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4]  Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **January 20, 2021, at 5:00 p.m.**, prevailing Central Time. Any objection to the assumption of your Executory Contract or Unexpired Lease must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection the assumption of the Executory Contract or Unexpired Lease, and, if practicable, a proposed modification such proposed assumption that would resolve such objection; (d) be served on counsel for the Debtor set forth in the signatory block below; and (e) be filed with the Court on or before January 20, 2021 at 5:00 p.m. prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

---

**PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

---

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017.  Please specify whether you would like to receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Dated: January 11, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
Email:       jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Schedule A</u>**

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | American Banknote Corporation Attn: Patrick J. Gentile | Stockholders' Agreement | 0.00 |
| Highland Capital Management, L.P. | Carey Holdings, Inc. Attn: General Counsel | Stockholders' Agreement and Amendment No. 1 | 0.00 |
| Highland Capital Management, L.P. | Cornerstone Healthcare Group Holding, Inc. Attn: Michael Brohm | Stockholders' Agreement and Amendment | 0.00 |
| Highland Capital Management, L.P. | Highland CLO Funding, Ltd. | Members' Agreement and Amendment | 0.00 |
| Highland Capital Management, L.P. | Progenics Pharmaceuticals, Inc. Attn: CEO | Stock Purchase and Sale Agreement and Amendment | 0.00 |
| Highland Capital Management, L.P. | JHT Holdings, Inc. Attn: Christopher Reehl | Stockholders' Agreement and Amendments | 0.00 |
| Highland Capital Management, L.P. | Highland Dynamic Income Fund GP, LLC | Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P. | 0.00 |
| Highland Capital Management, L.P. | Highland Multi-Strategy Fund GP, L.P. James Dondero | Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement | 0.00 |
| Highland Capital Management, L.P. | ENA Capital, LLC Ellman Management Group, Inc. Attn: Steve Ellman and Bob Kauffman | Operating Agreement of HE Capital, LLC First Amendment Second Amendment | 0.00 |
| Highland Capital Management, L.P. | Highland Multi-Strategy Master Fund, L.P. | Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC | 0.00 |
| Highland Capital Management, L.P. | Highland Multi-Strategy Master Fund, L.P. | Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC | 0.00 |
| Highland Capital Management, L.P. | Highland Capital Management, L.P. | Limited Liability Company Agreement of Highland Receivables Finance 1, LLC | 0.00 |
| Highland Capital Management, L.P. | Highland Restoration Capital Partners GP, LLC | Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments | 0.00 |
| Highland Capital Management, L.P. | Highland Select Equity Fund GP, LLC | Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P. | 0.00 |
| Highland Capital Management, L.P. | Penant Management GP, LLC | Agreement of Limited Partnership of Penant Management LP | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Petrocap Incentive Partners III GP, LLC<br>Petrocap Incentive Holdings III, LP<br>Attn: Lee Britain | Agreement of Limited Partnership of Petrocap Incentive Partners III, LP | 0.00 |
| Highland Capital Management, L.P. | Petrocap Partners II GP, LLC<br>Petrocap Incentive Partners II, LP | Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP | 0.00 |
| Highland Capital Management, L.P. | Highland Credit Opportunities CDO GP, LLC | Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P. | 0.00 |
| Highland Capital Management, L.P. | Highland Multi Strategy Credit Fund GP, L.P. | Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P. | 0.00 |
| Highland Capital Management, L.P. | DUO Security | 2 factor authentication | 0.00 |
| Highland Capital Management, L.P. | GoDaddy | Domain Registrations | 0.00 |
| Highland Capital Management, L.P. | Highland Loan Fund, Ltd. et al | Investment Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Mxtoolbox | E Mailflow Monitoring | 0.00 |
| Highland Capital Management, L.P. | Onelogin | Cloud single sign on for HR related employee login | 0.00 |
| Highland Capital Management, L.P. | Pam Capital Funding LP/Ranger Asset Mgt LP | Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Pamco Cayman Ltd./Ranger Asset Mgt LP | Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd. et al | Amendment No. 1 to Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO Ltd. | Interim Collateral Management Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO Ltd. | Amendment No. 1 to Servicing Agreement | 0.00 |
| Highland Capital Management, L.P. | Strand Advisors Inc. | 4th Amended & Restated Agreement of Ltd Partnership of HCMLP | 0.00 |
| Highland Capital Management, L.P. | Highland Park CDO I, Ltd.<br>The Bank of New York Trust Company, National Association | Collateral Administration Agreement | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Highland Park CDO I, Ltd. | Representations and Warranties Agreement | 0.00 |
| Highland Capital Management, L.P. | Aberdeen Loan Funding, Ltd. and State Street Bank and Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Greenbriar CLO, Ltd. and State Street Bank and Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Eastland CLO, Ltd. | Collateral Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Eastland CLO, Ltd. and Investors Bank and Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Grayson CLO, Ltd. | Collateral Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Grayson CLO, Ltd.; Investors Bank & Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO, Ltd. | Collateral Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO, Ltd.; U.S. Bank National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; Highland Special Opportunities Holding Company | Master Warehousing and Participation Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc. | Master Warehousing and Participation Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc. | Master Warehousing and Participation Agreement (Amendment No. 2) | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc. | Master Warehousing and Participation Agreement (Amendment No. 1) | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc. | Master Warehousing and Participation Agreement (Amendment No. 3) | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc. | Master Warehousing and Participation Agreement (Amendment No. 4) | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc. | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Red River CLO Ltd.; Grand Central Asset Trust | Master Participation Agreement | 0.00 |
| Highland Capital Management, L.P. | Salomon Smith Barney Inc.; Highland Loan Funding V Ltd. | A&R Asset Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Salomon Brothers Holding Company, Highland Loan Funding V Ltd. | A&R Master Participation Agreement | 0.00 |
| Highland Capital Management, L.P. | Jasper CLO Ltd. | Collateral Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Jasper CLO Ltd.; JPMorgan Chase Bank, National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc. | Master Warehousing and Participation Agreement | 0.00 |
| Highland Capital Management, L.P. | Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc. | Master Warehousing and Participation Agreement (Amendment No. 1) | 0.00 |
| Highland Capital Management, L.P. | Highland CDO Opportunity Fund, Ltd.; IXIS Financial Products Inc.; JPMorgan Chase Bank, National Association | Loan and Security Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association | Securities Account Control Agreement | 0.00 |
| Highland Capital Management, L.P. | Liberty CLO Ltd. | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO Ltd; JPMorgan Chase Bank, National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Rockwall CDO II, Ltd.; Investors Bank & Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Southfork CLO Ltd.; JPMorgan Chase Bank, National Association | Collateral Administration Agreement | 0.00 |
| Highland Capital | Stratford CLO Ltd.; State Street | Collateral Administration Agreement | 0.00 |

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Management, L.P. | Bank and Trust Company | | |
| Highland Capital Management, L.P. | Valhalla CLO, Ltd.; JPMorgan Chase Bank | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Citigroup Financial Products Inc.; Citigroup Global Markets Inc. | Extension/Buy-Out Agreement | 0.00 |
| Highland Capital Management, L.P. | Highland CDO and Structured Products Fund, Ltd.; Citigroup Financial Products Inc.; JPMorgan Chase Bank | Loan and Security Agreement | 0.00 |
| Highland Capital Management, L.P. | Westchester CLO, Ltd. | Collateral Acquisition Agreement | 0.00 |
| Highland Capital Management, L.P. | Westchester CLO, Ltd.; Investors Bank & Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | Brentwood CLO, Ltd.; Investors Bank & Trust Company | Collateral Administration Agreement | 0.00 |
| Highland Capital Management, L.P. | CenturyLink Communications, LLC | Order Addenda | 0.00 |
| Highland Capital Management, L.P. | Intex Solutions, Inc. | Service Agreement (as amended) | 0.00 |

# CLAIMANT'S EXHIBIT 10

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

<div align="center">

**THIRD[2] NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

</div>

**PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No. 1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Third Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory contract and unexpired lease identified previously in Docket Nos. 1648 and 1719.

Claimant's
EXHIBIT
10



1934054210115000000000004

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on January 26, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the

---

[3] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **January 24, 2021, at 5:00 p.m.**, prevailing Central Time. Any objection to the assumption of your Executory Contract or Unexpired Lease must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection the assumption of the Executory Contract or Unexpired Lease, and, if practicable, a proposed modification such proposed assumption that would resolve such objection; (d) be served on counsel for the Debtor set forth in the signatory block below; and (e) be filed with the Court on or before January 24, 2021 at 5:00 p.m. prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017.  Please specify whether you would like to receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: January 15, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:       jpomerantz@pszjlaw.com
                 ikharasch@pszjlaw.com
                 gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### Schedule A

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Strand Advisors, Inc. James Seery | Indemnification and Guaranty Agreement | 0.00 |
| Highland Capital Management, L.P. | Strand Advisors, Inc. John Dubel | Indemnification and Guaranty Agreement | 0.00 |
| Highland Capital Management, L.P. | Strand Advisors, Inc. Russell Nelms | Indemnification and Guaranty Agreement | 0.00 |

# CLAIMANT'S EXHIBIT 11

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Claimant's EXHIBIT 11

1934054210122000000000013

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ...........................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.    Administrative Expense Claims.....................................................................16

    B.    Professional Fee Claims.................................................................................17

    C.    Priority Tax Claims.........................................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ..............................................................................18

    A.    Summary........................................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ...........................................................................................19

    C.    Elimination of Vacant Classes .......................................................................19

    D.    Impaired/Voting Classes................................................................................19

    E.    Unimpaired/Non-Voting Classes ...................................................................19

    F.    Impaired/Non-Voting Classes .......................................................................19

    G.    Cramdown .....................................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests............................20

    I.    Special Provision Governing Unimpaired Claims ...............................................24

    J.    Subordinated Claims .....................................................................................25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .....................................25

    A.    Summary........................................................................................................25

    B.    The Claimant Trust ......................................................................................26

    *1.*    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ...........................................................................................26

    *2.*    *Claimant Trust Oversight Committee* ...............................................27

**Page**

3.    *Purpose of the Claimant Trust.* ...............................................................27

4.    *Purpose of the Litigation Sub-Trust.* .....................................................28

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* ......28

6.    *Compensation and Duties of Trustees.* ..................................................29

7.    *Cooperation of Debtor and Reorganized Debtor.* ................................30

8.    *United States Federal Income Tax Treatment of the Claimant Trust.* ...............30

9.    *Tax Reporting.* .........................................................................................30

10.   *Claimant Trust Assets.* ...........................................................................31

11.   *Claimant Trust Expenses.* .......................................................................31

12.   *Trust Distributions to Claimant Trust Beneficiaries.* ..........................31

13.   *Cash Investments.* ...................................................................................31

14.   *Dissolution of the Claimant Trust and Litigation Sub-Trust.* .............32

C.    The Reorganized Debtor ........................................................................32

1.    *Corporate Existence* ...............................................................................32

2.    *Cancellation of Equity Interests and Release* .......................................33

3.    *Issuance of New Partnership Interests* ..................................................33

4.    *Management of the Reorganized Debtor* ...............................................33

5.    *Vesting of Assets in the Reorganized Debtor* ........................................34

6.    *Purpose of the Reorganized Debtor* .......................................................34

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ................................................................34

D.    Company Action .....................................................................................34

E.    Release of Liens, Claims and Equity Interests ......................................35

F.    Cancellation of Notes, Certificates and Instruments .............................36

G.    Cancellation of Existing Instruments Governing Security Interests ......36

H.     Control Provisions ................................................................ 36

I.     Treatment of Vacant Classes ............................................... 36

J.     Plan Documents .................................................................. 36

K.     Highland Capital Management, L.P. Retirement Plan and Trust ...................... 37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ................................................................ 37

A.     Assumption, Assignment, or Rejection of Executory Contracts and
Unexpired Leases ................................................................ 37

B.     Claims Based on Rejection of Executory Contracts or Unexpired
Leases ................................................................ 38

C.     Cure of Defaults for Assumed or Assigned Executory Contracts and
Unexpired Leases ................................................................ 39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 39

A.     Dates of Distributions ......................................................... 39

B.     Distribution Agent ............................................................. 40

C.     Cash Distributions ............................................................. 41

D.     Disputed Claims Reserve ...................................................... 41

E.     Distributions from the Disputed Claims Reserve .............................. 41

F.     Rounding of Payments ........................................................ 41

G.     *De Minimis* Distribution ..................................................... 41

H.     Distributions on Account of Allowed Claims ................................ 42

I.     General Distribution Procedures .............................................. 42

J.     Address for Delivery of Distributions ........................................ 42

K.     Undeliverable Distributions and Unclaimed Property ....................... 42

L.     Withholding Taxes ............................................................. 43

M.     Setoffs ........................................................................... 43

**Page**

N.    Surrender of Cancelled Instruments or Securities ...............................................43

O.    Lost, Stolen, Mutilated or Destroyed Securities ..................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS............................................44

A.    Filing of Proofs of Claim ......................................................................................44

B.    Disputed Claims....................................................................................................44

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ...............44

D.    Allowance of Claims and Equity Interests............................................................44

*1.*    *Allowance of Claims* ...........................................................................................45

*2.*    *Estimation* ...........................................................................................................45

*3.*    *Disallowance of Claims* .....................................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN .................................................................46

A.    Conditions Precedent to the Effective Date .........................................................46

B.    Waiver of Conditions............................................................................................47

C.    Effect of Non-Occurrence of Conditions to Effectiveness**Error! Bookmark not defined.**

D.    Dissolution of the Committee ...............................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................48

A.    General ..................................................................................................................48

B.    Discharge of Claims..............................................................................................48

C.    Exculpation ...........................................................................................................48

D.    Releases by the Debtor..........................................................................................49

E.    Preservation of Rights of Action..........................................................................50

*1.*    *Maintenance of Causes of Action* .....................................................................50

*2.*    *Preservation of All Causes of Action Not Expressly Settled or Released* ...........50

F.    Injunction .............................................................................................................51

**Page**

    G.    Term of Injunctions or Stays ............................................................... 52

    H.    Continuance of January 9 Order ........................................................ 52

ARTICLE X. BINDING NATURE OF PLAN ............................................................. 52

ARTICLE XI. RETENTION OF JURISDICTION ...................................................... 53

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................... 55

    A.    Payment of Statutory Fees and Filing of Reports ............................. 55

    B.    Modification of Plan .......................................................................... 55

    C.    Revocation of Plan ............................................................................ 55

    D.    Obligations Not Changed .................................................................. 56

    E.    Entire Agreement .............................................................................. 56

    F.    Closing of Chapter 11 Case .............................................................. 56

    G.    Successors and Assigns ..................................................................... 56

    H.    Reservation of Rights ........................................................................ 56

    I.    Further Assurances ............................................................................ 57

    J.    Severability ....................................................................................... 57

    K.    Service of Documents ....................................................................... 57

    L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ..................................................... 58

    M.    Governing Law ................................................................................. 59

    N.    Tax Reporting and Compliance ........................................................ 59

    O.    Exhibits and Schedules ..................................................................... 59

    P.    Controlling Document ....................................................................... 59

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.  "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.  "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.  "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.  "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.  "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.  "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the

Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.   "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.   "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.   "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold

5

Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or

7

Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

8

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "*Petition Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

12

Case 19-34054-sgj11 Doc 3593 Filed 11/20/22 Entered 11/20/22 19:59:02 Page 1 of 66
Case 19-34054-sgj11 Doc 3593 Filed 11/22/22 Entered 11/22/22 19:59:02 Page 19 of 66
Main Document    Page 536 of 792

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any

13

damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized

Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

15

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by the Bankruptcy Court.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized

Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    **Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee

Case 19-34054-sgj11 Doc 3594 Filed 08/20/21 Entered 08/20/21 22:37:59 Page 24 of 66
Case 19-34054-sgj11 Doc 3591 Filed 08/20/21 Entered 08/20/21 22:17:59 Page 541 of 792
Main Document    Page 541 of 792

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.      Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

<div align="center">

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

**A.      Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

B.    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.    **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.    **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.    **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.    **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

19

Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**    **Classification and Treatment of Claims and Equity Interests**

    *1.*    *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

    *2.*    *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.     *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.     *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.     *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

21

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, (1) its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

22

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.


  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

23

Case 19-34054-sgj11 Doc 3594 Filed 10/27/22 Entered 10/27/22 19:59:02 Page 30 of 66
Case 19-34054-sgj11 Doc 808-1 Filed 11/23/20 Entered 11/23/20 21:37:59 Page 30 of 66
Main Document      Page 547 of 792

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

Case 19-34054-sgj11 Doc 808 Filed 04/22/20 Entered 04/22/20 23:39:59 Page 1 of 66
Case 19-34054-sgj11 Doc 803594 Filed 04/20/2722 Entered 04/28/20 23:37:59 Page 31 of 66
Main Document      Page 548 of 792

### J.      Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### A.      Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B.    **The Claimant Trust**[2]

### 1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.      *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)    the payment of the Claimant Trust Expenses;

(ii)    the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)    the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

28

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

        (i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

        (ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

        (iii)   the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.        *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.        *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.        *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

30

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.        *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.        *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.        *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.        *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

    *14.*        <u>*Dissolution of the Claimant Trust and Litigation Sub-Trust.*</u>

       The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

       Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    **The Reorganized Debtor**

    *1.*        <u>*Corporate Existence*</u>

       The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

    *2.*          *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

    *3.*          *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

    *4.*          *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.     *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

34

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

## E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of

doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## F.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## G.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

## H.    Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.**     **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

<center>

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</center>

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a

<center>37</center>

Case 19-34054-sgj11 Doc 3594 Filed 11/22/22 Entered 11/22/22 17:59:02 Page 4 of 66
Case 19-34054-sgj11 Doc 808-1 Filed 07/20/20 Entered 07/20/20 22:37:59 Page 44 of 66
Main Document    Page 561 of 792

contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed

and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

## C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity

Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.      Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the

Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.      Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.      Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.      Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**F.      Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G.      _De Minimis_ Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  _De minimis_ distributions for which no such request is timely received shall

revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.      Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order.  Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.      General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.      Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.      Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

42

L. **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

M. **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

N. **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

O. **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

43

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

</div>

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**     **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

**D.**     **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

<div align="center">44</div>

1.  *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.  *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.  *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

### A.    Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding

upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.**    **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

**C.**    **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's

Case 19-34054-sgj11 Doc 3593 Filed 08/20/21 Entered 08/20/21 22:37:59 Page 54 of 66
Case 19-34054-sgj11 Doc 3585 Filed 08/20/21 Entered 08/20/21 23:39:59 Page 571 of 792
Main Document    Page 571 of 792

Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

<div align="center">

**ARTICLE IX.**
**EXCULPATION, INJUNCTION AND RELATED PROVISIONS**

</div>

**A.**     **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.**     **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross

<div align="center">48</div>

negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

49

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.    Preservation of Rights of Action

### 1.    *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.    *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final

Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.    **Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or**

arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

G.     **Duration of Injunctions and Stays**

**ARTICLE II.** Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

H.     **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state,

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

53

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

54

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

55

executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this

Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego

58

the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

## M.    **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

## N.    **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## O.    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

## P.    **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

# CLAIMANT'S EXHIBIT 12

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

<div align="center">

**FOURTH[2] NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

</div>

   **PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No. 1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Fourth Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory contract and unexpired lease identified previously in Docket Nos. 1648, 1719, 1749 and 1811-8.



*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on February 2, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

PLEASE TAKE FURTHER NOTICE THAT you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

PLEASE TAKE FURTHER NOTICE THAT section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

PLEASE TAKE FURTHER NOTICE THAT, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and

---

[3] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **February 1, 2021, at 12:00 noon,** prevailing Central Time.  Any objection to the assumption of your Executory Contract or Unexpired Lease must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection the assumption of the Executory Contract or Unexpired Lease, and, if practicable, a proposed modification such proposed assumption that would resolve such objection; (d) be served on counsel for the Debtor set forth in the signatory block below; and (e) be filed with the Court on or before February 1, 2021 at 12:00 noon prevailing Central Time.

PLEASE TAKE FURTHER NOTICE THAT any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or

international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: January 27, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Schedule A</u>**

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Via West[5] | Master Service Agreement | $0.00 |
| Highland Capital Management, L.P. | Via West[6] Attn: John Greenwood | Master Service Agreement | $0.00 |
| Highland Capital Management, L.P. | Bloomberg Finance, L.P. Attn: Levi Halberstam | Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 | $0.00 |
| Highland Capital Management, L.P. | Markit WSO Corporation Attn: John Taylor | Fourth Amendment to Software License and Services Agreement | Parties are jointly confirming cure amount |
| Highland Capital Management, L.P. | Siepe Services, LLC Attn: Michael Pusateri | Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement | $80,184.00 |
| Highland Capital Management, L.P. | AT&T | Internet Agreement[7] Account No. 831-000-7888-651 | $0.00 |
| Highland Capital Management, L.P. | AT&T | Landline Fax Agreement 831-000-2532-176 | $0.00 |
| Highland Capital Management, L.P. | Amazon Web Services, Inc. | Account No. 353534426569 | $0.00 |
| Highland Capital Management, L.P. | WP Engine | Website Hosting Agreement Account No. 325667 | $0.00 |

---

[5] The Via West Master Service Agreements were erroneously included in the *Notice of Withdrawal of Certain Executory Contract(s) and Unexpired Lease(s) from List of Executory Contract(s) and Unexpired Lease(s) to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791].

[6] The Via West Master Service Agreements were erroneously included in the *Notice of Withdrawal of Certain Executory Contract(s) and Unexpired Lease(s) from List of Executory Contract(s) and Unexpired Lease(s) to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791].

[7] The Internet Agreement with AT&T corrects, replaces and supersedes the Executory Contract identified at #45 in Docket No. 1811-8.

# CLAIMANT'S EXHIBIT 13

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

<div align="center">

**FIFTH[2] NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

</div>

   **PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy
Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No.
1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Fifth Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory
contract and unexpired lease identified previously in Docket Nos. 1648, 1719, 1749, 1811-8 and 1847.



Claimant's
EXHIBIT
13

1934054210201000000000007

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on February 2, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and

---

[3] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **at the Confirmation Hearing**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line.  You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017.  Please specify whether you would like to

receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: February 1, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

/s/ Zachery Z. Annable
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Schedule A</u>**

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Bloomberg Finance, L.P<br>Attn: Levi Halberstam | Bloomberg (Terminal) Agreement No. 306371[5] | $0.00 |

---

[5] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

# CLAIMANT'S EXHIBIT 14

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

**ORDER (I) CONFIRMING THE FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF**

The Bankruptcy Court[2] having:

a. entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as d[efined] below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

Claimant's EXHIBIT 14

1934054210222000000000018

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.     set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.     set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.     initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.     reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.     reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.     reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

Case 19-34054-sgj11 Doc 3594 Filed 02/22/22 Entered 02/22/22 16:59:02 Page 3 of 61
Case 19-34054-sgj11 Doc 1943 Filed 02/20/21 Entered 02/20/21 23:57:20 Page 1 of 61
Main Document    Page 602 of 792

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.    reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.    reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.      reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.      conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.      heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.      considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

4

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case. Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021. The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board. The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders. The Claimant Trustee is responsible

5

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3. **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4. **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

6

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.     **The Debtor.** The Debtor is headquartered in Dallas, Texas. As of the

Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.     **The Highland Enterprise.** Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these

affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7.    **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8.    **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

8

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a.  **The Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer</u> <u>Committee</u>")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b.  **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("<u>Acis</u>")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

9

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.  **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.  **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.  **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10.  **Other Claims Asserted.**  Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11.  **Not Your Garden Variety Post-Petition Corporate Governance Structure**.  Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.     **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.  The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "<u>January 9 Order</u>" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "<u>Settlement Motion</u>").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "<u>Stipulation</u>").

12

13.      **Appointment of Independent Directors.**      As part of the Bankruptcy

Court-approved settlement, three eminently qualified independent directors were chosen to lead

Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen

by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are

each technically independent directors of Strand (Mr. Dondero had previously been the sole

director of Strand and, thus, the sole person in ultimate control of the Debtor).    The three

independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr.

Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and

Foreign Representative.    Suffice it to say that this settlement and the appointment of the

independent directors changed the entire trajectory of the case and saved the Debtor from the

appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent

directors.  They were the right solution at the right time.  Because of the unique character of the

Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent

directors was a far better outcome for creditors than the appointment of a conventional chapter 11

trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in

particular, knew and had vast experience at prominent firms with high-yield and distressed

investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring

large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not

only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver

through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis,

the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address).  The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.    **Conditions Required by Independent Directors.**  Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case.  The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically.  Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

14

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

      15.    **Not Your Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

16

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.  *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.  *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.  A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.  *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.  *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.  **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.**  To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan.  Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which the Debtor believes arise from Get Good's equity security interests and are subject to subordination as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor asserts should be subordinated. Another group of objectors that has joined together in one objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See* Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense claims against the estate that were filed shortly before the Confirmation Hearing on January 23, 2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No. 1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19.      **Background Regarding Dondero Objecting Parties.**  To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence.  Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing.  The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.      **Other Confirmation Objections.**  Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

20

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court notes that the Debtor resolved the following objections to the Plan:

    a.    *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

    b.    *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

    c.    *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

    d.    *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

    e.    *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

    f.    *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

    21.    **Capitalized Terms.**  Capitalized terms used herein, but not defined herein, shall have the respective meanings attributed to such terms in the Plan and the Disclosure Statement, as applicable.

DOCS_SF:104487.21 36027/002

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**   On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

22

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.**  Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.  The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.**  The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.**  In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

23

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's*

*Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications.  Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data.  The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.     **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.     **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

25

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

26

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.    **Classification of Priority Claims.**    Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.  Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.    **Classification of Unsecured Claims.**  Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.  Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.  Class 8 Creditors

27

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

28

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are

disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the

Bankruptcy Code with respect to such Class.  The purpose of this provision is to provide that a

Class that does not have voting members shall not be included in the tabulation of whether that

Class has accepted or rejected the Plan.  Pursuant to the Voting Certifications, the only voting

Class of Claims or Equity Interests that did not have any members is Class 5 (Retained

Employees).  As noted above, Class 5 does not have any voting members because any potential

Claims in Class 5 would not arise, except on account of any current employees of the Debtor who

may be employed as of the Effective Date, which is currently unknown.  Thus, the elimination of

vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy

Code.  Class 5 is properly disregarded for purposes of determining whether or not the Plan has

been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that

Class.  However, the Plan properly provides for the treatment of any Claims that may potentially

become members of Class 5 as of the Effective Date in accordance with the terms of the Plan.  The

Plan therefore satisfies section 1122 of the Bankruptcy Code.

38.       **Classification of Claims and Designation of Non-Classified Claims (11**

**U.S.C. §§ 1122, 1123(a)(1)).**  Section 1123(a)(1) of the Bankruptcy Code requires that the Plan

specify the classification of claims and equity security interests pursuant to section 1122 of the

Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the

Bankruptcy Code.  In addition to Administrative Claims, Professional Fee Claims, and Priority

Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests.  The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.    **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).**  Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan.  Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.    **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).**  Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes.  Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.    **No Discrimination (11 U.S.C. § 1123(a)(4)).**  The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest.  The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan.  Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

DOCS_SF:104487.21 36027/002

42. **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).** Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a. **The Claimant Trust.** The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner). The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee. Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement. The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b. **The Litigation Sub-Trust.** The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement. The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

31

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action.  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests).  Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan.  Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents.  Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

32

44.    **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker.  Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee.  Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties.  The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.     **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan.  Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.  Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.   The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

34

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.    **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**
Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.    **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

35

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

36

Interests.  Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data.  Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets.  The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.    **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.      The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.      Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.      While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.      On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.      On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.      The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.      Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.      Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

49.     **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims.  The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50.     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider.  The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51.     **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

52.    **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the Amended Liquidation Analysis/Financial Projections.  The Amended Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:

NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC

(n/k/a NexPoint Real Estate Partners, LLC).  Under the Plan, as of the Confirmation Date, (a) Class

7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)

Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on

account of their Claims.  Under a hypothetical chapter 7 liquidation, all general unsecured creditors

are projected to receive approximately 55% on account of their Claims.  The Bankruptcy Court

finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive

under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation

based on Mr. Seery's testimony, including the following credible reasons he posited, among

others:

   a.   The nature of the Debtor's assets is complex.  Certain assets relate to complicated
        real estate structures and private equity investments in operating businesses.  Mr.
        Seery's extensive experience with the Debtor during the thirteen months since his
        appointment as an Independent Director and later Chief Executive Officer and
        Chief Restructuring Officer, provides him with a substantial learning curve in
        connection with the disposition of the Debtor's assets and are reasonably expected
        to result in him being able to realize tens of millions of dollars more value than
        would a chapter 7 trustee.

   b.   Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's
        business under chapter 7 of the Bankruptcy Code and hire the necessary personnel
        with the relevant knowledge and experience to assist him or her in selling the
        Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's
        assets in a forced sale liquidation which would generate substantially less value for
        the Debtor's creditors than the asset monetization plan contemplated by the Plan.

   c.   A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals
        to assist in its efforts to monetize assets, resulting in delays, increased expenses,
        and reduced asset yields for the chapter 7 estate.

> d.    The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and
>
> e.    The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation.  Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**  Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan.  Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes.  However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan.  Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied.  The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).**  The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**   Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**   Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

43

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement.  Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.     **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58.     **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code).  Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59.     **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).**  Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60.     **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. §**
**1129(b)).**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

DOCS_SF:104487.21 36027/002

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy Code.

      a.      <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

      b.      <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10, and 11.

61.    **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan

confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy

Code are therefore satisfied.

62.    **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the

principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application

of section 5 of the Securities Act of 1933, and no governmental unit has objected to the

confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy

Code is inapplicable.

63.    **Satisfaction of Confirmation Requirements.**  Based upon the foregoing,

the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy

Code and should be confirmed.

64.    **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the

Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted

in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance

with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with

all of their respective activities relating to the solicitation of acceptances of the Plan and their

participation in the activities described in section 1125 of the Bankruptcy Code, and they are

entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.    **Discharge (11 U.S.C. § 1141(d)(3)).**  The Debtor is entitled to a discharge

of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant

Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.     **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.     **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.     **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

47

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.     **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.  The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

72.     **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").  As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.    **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

DOCS_SF:104487.21 36027/002

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74.    **The Exculpation Provision Complies with Applicable Law.** Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.    First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]). *Pacific Lumber's*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members. The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

52

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.      Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75.     **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.     **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

54

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

55

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

       78.    **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of

such litigation would cause.

79.    **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds

that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the

Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which

will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy

Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the

Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance.  Mr. Tauber

credibly testified that of all the insurance carriers that AON approached to provide D&O insurance

coverage after the Effective Date, the only one willing to do so without an exclusion for claims

asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the

Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper

Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr.

Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient

administration, implementation and consummation of the Plan and is appropriate pursuant to

*Carroll v. Abide (In re Carroll*) 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper

Provision will prevent baseless litigation designed merely to harass the post-confirmation entities

charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid

abuse of the court system and preempt the use of judicial time that properly could be used to

consider the meritorious claims of other litigants.  Any suit against a Protected Party would

effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

57

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.     **Statutory Authority to Approve Gatekeeper Provision.**     The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).   The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881).  The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue*

*Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81.     **Jurisdiction to Implement Gatekeeper Provision.**  The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge*

*Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas*

*v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

58

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

       82.    **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

    a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

    b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

    c.    The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.    The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.    Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.    Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court

at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.      **Confirmation of the Plan.**  The Plan is approved in its entirety and

**CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**    **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**    **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**    **Plan Supplements and Plan Modifications.**    The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

E.      **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

F.      **Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G.      **Effectiveness of All Actions.**   All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

H.      **Restructuring Transactions.**   The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

I. **Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J. **Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

65

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.      Cancellation of Equity Interests and Issuance of New Partnership Interests.**  On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

66

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed

consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.

The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee

will be the sole officer of New GP LLC on the Effective Date.

**L.     Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date,

the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the

Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in

accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall

automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or

interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided

for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate

transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following

the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the

Plan and the Claimant Trust Agreement.

**M.     Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the

Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have

irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and

interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance

with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the

Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to

the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

**N.      Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

**O.      Objections to Claims**.  The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

**P.      Assumption of Contracts and Leases.**  Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan.   Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.   Modifications, amendments, supplements, and restatements to any of the

68

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q.    **Rejection of Contracts and Leases.**  Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan.  To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R.    **Assumption of Issuer Executory Contracts.**  On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

69

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

a. $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

b. $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

**S.     Release of Issuer Claims.**  Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

      **T.**    **Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U.     **Authorization to Consummate.**  The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V.     **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

DOCS_SF:104487.21 36027/002

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall

determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity

for hearing in accordance with the procedures established by the Bankruptcy Code and the

Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan.

The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy

Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all

ordinary course professionals in the ordinary course of business without the need for further

Bankruptcy Court order or approval. From and after the Effective Date, any requirement that

Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy

Code in seeking retention or compensation for services rendered after such date shall terminate,

and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any

Professional or Entity employed in the ordinary course of the Debtor's business without any further

notice to or action, order, or approval of the Bankruptcy Court.

**W.     Release, Exculpation, Discharge, and Injunction Provisions.     The**

**following release, exculpation, discharge, and injunction provisions set forth in the Plan are**

**approved and authorized in their entirety, and such provisions are effective and binding on**

**all parties and Entities to the extent provided therein.**

**X.     Discharge of Claims and Termination of Interests.** To the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code,

except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration

distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

73

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y. **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.      Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

75

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.  Injunction.  Upon entry of this Confirmation Order, all Enjoined**

**Parties are and shall be permanently enjoined, on and after the Effective Date, from taking**

**any actions to interfere with the implementation or consummation of the Plan.  Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative**

**or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,**

**levying, attaching (including any prejudgment attachment), collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

76

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.  Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**BB.     Duration of Injunction and Stays.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

**CC.     Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

**DD.     No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

78

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE.     **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

79

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF.     **Cancellation of Notes, Certificates and Instruments.** Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

80

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

      **GG.**   **Documents, Mortgages, and Instruments.**   Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

      **HH.**   **Post-Confirmation Modifications.**   Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

      **II.**   **Applicable Nonbankruptcy Law.**   The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

      **JJ.**   **Governmental Approvals Not Required.**   This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

81

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.   Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.   Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.   Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

NN.    **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.    **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.    **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.    The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities
for tax year 2021 in accordance with and to the extent required under applicable
nonbankruptcy law. The Tax Authorities shall not be required to file and serve an
administrative expense claim and request for payment as a condition of allowance
of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D).
With regard to year 2019 ad valorem property taxes, the Tax Authorities will
receive payment of their prepetition claims within 30 days of the Effective Date of
the Plan. The payment will include interest from the Petition Date through the
Effective Date and from the Effective Date through payment in full at the state
statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable,
subject to all of the Debtor's and Reorganized Debtor's rights and defenses in
connection therewith. Notwithstanding any other provision in the Plan, the Tax
Authorities shall (i) retain the liens that secure all prepetition and postpetition
amounts ultimately owed to them, if any, as well as (ii) the state law priority of
those liens until the claims are paid in full.

b.    The Tax Authorities' prepetition claims and their administrative expense claims
shall not be discharged until such time as the amounts owed are paid in full. In the
event of a default asserted by the Taxing Authorities, the Tax Authorities shall
provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure
of any such asserted default. Subject to all of its rights and defenses, the Debtor or
Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure
the default. If the alleged default is not cured, the Tax Authorities may exercise
any of their respective rights under applicable law and pursue collection of all
amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all
respects to the Debtor's and Reorganized Debtor's applicable rights and defenses.
The Debtor/Reorganized Debtor shall be entitled to any notices of default required
under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor
and the Reorganized Debtor reserve any and all of their respective rights and
defenses in connection therewith. The Debtor's and Reorganized Debtor's rights
and defenses under Texas Law and the Bankruptcy Code with respect to this
provision of the Confirmation Order, including their right to dispute or object to the
Tax Authorities' Claims and liens, are fully preserved.

84

**RR.    Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all

respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior

Employee Claimant by written notice to such Senior Employee Claimant on or before the

occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern

the treatment of the Liquidated Bonus Claims.

a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d.    The Senior Employees' Objection is deemed withdrawn.

**SS.    No Release of Claims Against Senior Employee Claimants**.  For the

avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not

be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released

Party" under the Plan.

   **TT.    Resolution of Objection of Internal Revenue Service.**  Notwithstanding

any other provision or term of the Plan or Confirmation Order, the following Default Provision

shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its

claims, including any administrative claim (the "IRS Claim"):

   (a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor,
   or any successor in interest fails to pay when due any payment required to be made on
   federal taxes, the IRS Claim, or other payment required to be made to the IRS under the
   terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code
   (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of
   default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the
   Reorganized Debtor and/or any successor in interest and their counsel of record, by United
   States Certified Mail, written notice of the failure and/or default with demand that it be
   cured, and if the failure and/or default is not cured within 14 days of the date of said notice
   and demand, then the following shall apply to the IRS:

      (1) The administrative collection powers and the rights of the IRS shall
      be reinstated as they existed prior to the filing of the bankruptcy petition,
      including, but not limited to, the assessment of taxes, the filing of a notice
      of Federal tax lien and the powers of levy, seizure, and collection as
      provided under the Internal Revenue Code;

      (2) The automatic stay of 11 U.S.C. § 362 and any injunction of the
      Plan or in the Confirmation Order shall, with regard to the IRS only, lift or
      terminate without further notice or hearing by the Bankruptcy Court, and
      the entire prepetition liability owed to the IRS, together with any unpaid
      postpetition tax liabilities, may become due and payable immediately; and

      (3) The IRS shall have the right to proceed to collect from the Debtor,
      the Reorganized Debtor or any successor in interest any of the prepetition
      tax liabilities and related penalties and interest through administrative or
      judicial collection procedures available under the United States Code as if
      no bankruptcy petition had been filed and as if no plan had been confirmed.

   (b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to
   be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's
   obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim,
   together with any unpaid postpetition tax liabilities shall become due and payable

86

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c)  The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d)  The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e)  Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f)  The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU.    **IRS Proof of Claim.**  Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

**VV.    CLO Holdco, Ltd. Settlement**      Notwithstanding anything contained

herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations

of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO*

*Holdco, Ltd., and Highland Capital Management, L.P., dated January 25, 2021* [Docket No. 1838-

1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this

Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement

Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon

the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction

over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth

in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**    All fees

payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The

Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally

liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C.

§ 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the

Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not

be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C.

§ 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will

dissolve, and the members of the Committee and the Committee's Professionals will cease to have

DOCS_SF:104487.21 36027/002

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ.** **Miscellaneous.**  After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

89

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

### ###END OF ORDER###

**Exhibit A**

**Fifth Amended Plan (as Modified)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

---

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

---

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ..................... 1

    B.    Defined Terms ........................................................................................................ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ........................................................................... 16

    B.    Professional Fee Claims ....................................................................................... 17

    C.    Priority Tax Claims .............................................................................................. 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ................................................................... 18

    A.    Summary .............................................................................................................. 18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests ................................................................................................... 18

    C.    Elimination of Vacant Classes ............................................................................ 19

    D.    Impaired/Voting Classes ...................................................................................... 19

    E.    Unimpaired/Non-Voting Classes ......................................................................... 19

    F.    Impaired/Non-Voting Classes ............................................................................. 19

    G.    Cramdown ............................................................................................................ 19

    H.    Classification and Treatment of Claims and Equity Interests ............................. 19

    I.    Special Provision Governing Unimpaired Claims ............................................... 24

    J.    Subordinated Claims ............................................................................................ 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..................................... 24

    A.    Summary .............................................................................................................. 24

    B.    The Claimant Trust .............................................................................................. 25

        1.    Creation and Governance of the Claimant Trust and Litigation
Sub-Trust .................................................................................................. 25

        2.    Claimant Trust Oversight Committee ...................................................... 26

**Page**

3.   Purpose of the Claimant Trust. ...................................................27

4.   Purpose of the Litigation Sub-Trust. ..........................................27

5.   Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.   Compensation and Duties of Trustees. .........................................29

7.   Cooperation of Debtor and Reorganized Debtor. .........................29

8.   United States Federal Income Tax Treatment of the Claimant Trust. ......................................................................................29

9.   Tax Reporting. ...........................................................................30

10.  Claimant Trust Assets. ................................................................30

11.  Claimant Trust Expenses. ...........................................................31

12.  Trust Distributions to Claimant Trust Beneficiaries. ....................31

13.  Cash Investments. .......................................................................31

14.  Dissolution of the Claimant Trust and Litigation Sub-Trust. ........31

C.   The Reorganized Debtor .....................................................................32

1.   Corporate Existence ....................................................................32

2.   Cancellation of Equity Interests and Release ...............................32

3.   Issuance of New Partnership Interests .........................................32

4.   Management of the Reorganized Debtor ......................................33

5.   Vesting of Assets in the Reorganized Debtor ...............................33

6.   Purpose of the Reorganized Debtor .............................................33

7.   Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ......................................33

D.   Company Action ................................................................................34

E.   Release of Liens, Claims and Equity Interests ....................................35

F.   Cancellation of Notes, Certificates and Instruments ...........................35

**Page**

    G.      Cancellation of Existing Instruments Governing Security Interests ................. 35

    H.      Control Provisions ............................................................................................ 35

    I.       Treatment of Vacant Classes ............................................................................ 36

    J.       Plan Documents ................................................................................................ 36

    K.      Highland Capital Management, L.P. Retirement Plan and Trust ...................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ............................................................................................................ 37

    A.      Assumption, Assignment, or Rejection of Executory Contracts and
          Unexpired Leases ............................................................................................. 37

    B.      Claims Based on Rejection of Executory Contracts or Unexpired
          Leases .............................................................................................................. 38

    C.      Cure of Defaults for Assumed or Assigned Executory Contracts and
          Unexpired Leases ............................................................................................. 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 39

    A.      Dates of Distributions ...................................................................................... 39

    B.      Distribution Agent ........................................................................................... 39

    C.      Cash Distributions ........................................................................................... 40

    D.      Disputed Claims Reserve ................................................................................. 40

    E.      Distributions from the Disputed Claims Reserve ............................................ 40

    F.      Rounding of Payments ..................................................................................... 40

    G.      *De Minimis* Distribution .................................................................................. 41

    H.      Distributions on Account of Allowed Claims .................................................. 41

    I.       General Distribution Procedures ...................................................................... 41

    J.       Address for Delivery of Distributions .............................................................. 41

    K.      Undeliverable Distributions and Unclaimed Property ..................................... 41

    L.      Withholding Taxes ........................................................................................... 42

**Page**

M.    Setoffs ................................................................................................42

N.    Surrender of Cancelled Instruments or Securities ............................42

O.    Lost, Stolen, Mutilated or Destroyed Securities ..............................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS ...............................43

A.    Filing of Proofs of Claim .................................................................43

B.    Disputed Claims ...............................................................................43

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D.    Allowance of Claims and Equity Interests .......................................44

      1.    Allowance of Claims ...............................................................44

      2.    Estimation ................................................................................44

      3.    Disallowance of Claims ..........................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................45

A.    Conditions Precedent to the Effective Date .....................................45

B.    Waiver of Conditions .......................................................................46

C.    Dissolution of the Committee ...........................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................47

A.    General .............................................................................................47

B.    Discharge of Claims .........................................................................47

C.    Exculpation ......................................................................................47

D.    Releases by the Debtor .....................................................................48

E.    Preservation of Rights of Action .....................................................49

      1.    Maintenance of Causes of Action ...........................................49

      2.    Preservation of All Causes of Action Not Expressly Settled or
            Released ...................................................................................49

**Page**

F.       Injunction ................................................................................................50

G.      Duration of Injunctions and Stays..........................................................51

H.      Continuance of January 9 Order .............................................................51

ARTICLE X. BINDING NATURE OF PLAN ................................................................51

ARTICLE XI. RETENTION OF JURISDICTION ........................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ......................................................54

A.      Payment of Statutory Fees and Filing of Reports .................................54

B.      Modification of Plan...............................................................................54

C.      Revocation of Plan .................................................................................54

D.      Obligations Not Changed........................................................................55

E.      Entire Agreement....................................................................................55

F.      Closing of Chapter 11 Case ...................................................................55

G.      Successors and Assigns...........................................................................55

H.      Reservation of Rights..............................................................................55

I.       Further Assurances .................................................................................56

J.       Severability .............................................................................................56

K.      Service of Documents .............................................................................56

L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
         the Bankruptcy Code...............................................................................57

M.      Governing Law .......................................................................................58

N.      Tax Reporting and Compliance ..............................................................58

O.      Exhibits and Schedules ...........................................................................58

P.      Controlling Document .............................................................................58

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.     **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.      "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.      "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.      "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.      "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.      "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.  "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.  "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.  "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.  "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.  "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.     "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.     "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.     "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.     "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.     "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81.    "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.    "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.    "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.    "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.    "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.    "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.    "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.    "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.    "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.    "Petition *Date*" means October 16, 2019.

92.    "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.  "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.  "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.  "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.  "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.  "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.  "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.  "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.  "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.  "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

14

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A. Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.     Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.  Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

### B.  Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C. **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D. **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E. **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F. **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G. **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H. **Classification and Treatment of Claims and Equity Interests**

1. *Class 1 – Jefferies Secured Claim*

    - *Classification*: Class 1 consists of the Jefferies Secured Claim.

    - *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. *Class 5 – Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. <u>*Class 9 – Subordinated Claims*</u>

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. <u>*Class 10 – Class B/C Limited Partnership Interests*</u>

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. <u>*Class 11 – Class A Limited Partnership Interests*</u>

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.     Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.     Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.      *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.      *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)     the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trust makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. _Tax Reporting._

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.  *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.  *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.  *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.  *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.   The Reorganized Debtor

### 1.   *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.   *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.   *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

### D.  Company Action

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

E.   **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F.   **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G.   **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H.   **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I.     Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.     Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.     Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.      Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.     Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.     Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.     Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.     Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.     Rounding of Payments

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.      Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.      Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

O.    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

A.    **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

B.    **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

C.    **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.    **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE
DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE
WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF
THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT
RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH
LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

<div align="center">

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

</div>

**A.     Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the
Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the
Committee with such consent not to be unreasonably withheld), pursuant to the provisions of
ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the
  Reorganized Limited Partnership Agreement, and all schedules, documents,
  supplements and exhibits to this Plan shall have been Filed in form and substance
  reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and
  substance reasonably acceptable to the Debtor and the Committee. The Confirmation
  Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor,
  the Claimant Trustee, or the Litigation Trustee are authorized to take all actions
  necessary or appropriate to effectuate and consummate this Plan, including, without
  limitation, (a) entering into, implementing, effectuating, and consummating the
  contracts, instruments, releases, and other agreements or documents created in
  connection with or described in this Plan, (b) assuming the Executory Contracts and
  Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and
  issuances as required under this Plan; and (d) entering into any transactions as set forth
  in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are
  nonseverable and mutually dependent; (iii) the implementation of this Plan in
  accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy
  Code, the delivery of any deed or other instrument or transfer order, in furtherance of,
  or in connection with this Plan, including any deeds, bills of sale, or assignments
  executed in connection with any disposition or transfer of Assets contemplated under
  this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the
  Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the
  Reorganized Debtor, in each case as of the Effective Date free and clear of liens and
  claims to the fullest extent permissible under applicable law pursuant to section 1141(c)
  of the Bankruptcy Code except with respect to such Liens, Claims, charges and other
  encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without
  limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

<div align="center">45</div>

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B. <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.   General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.   Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.   Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**    **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

### E. **Preservation of Rights of Action**

1. *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    Injunction**

   **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

   **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

   **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

   **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**G.**     <u>**Duration of Injunctions and Stays**</u>

      **ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

**H.**     <u>**Continuance of January 9 Order**</u>

      Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

<div align="center">

**ARTICLE X.**
**<u>BINDING NATURE OF PLAN</u>**

</div>

      On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

# ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.     Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.     Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:   (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.     Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

D.     **Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

E.     **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

F.     **Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

G.     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.     **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.     **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.     **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
            Ira D. Kharasch, Esq.
            Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
            Ira D. Kharasch, Esq.
            Gregory V. Demo, Esq.

## L.  **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.   Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.** **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.** **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.** **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.** **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.  Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.  Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

# CLAIMANT'S EXHIBIT 15

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTICE OF (I) CONFIRMATION DATE AND
## (II) BAR DATE FOR FILING REJECTION CLAIMS

**PLEASE TAKE NOTICE** that, on February 22, 2021, the United States Bankruptcy
Court for the Northern District of Texas (the "Bankruptcy Court") entered the *Order Confirming
the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No.
1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of
Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as amended, supplemented,
or modified, the "Plan"). Unless otherwise defined in this notice, capitalized terms used in this
notice shall have the meanings ascribed to them in the Plan and the Confirmation Order.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service a
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.





1934054210224000000000008

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Date, as defined in the Plan, occurred on **February 22, 2021** upon entry of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that, unless previously assumed during the pendency of the Debtor's chapter 11 case or specifically assumed in the Confirmation Order, all Executory Contracts and Unexpired Leases were rejected pursuant to the Confirmation Order.  In accordance with the Confirmation Order, **any Rejection Claims must be filed within thirty (30) days after the Confirmation Date**.  Proofs of claim for Rejection Damages must be filed with the Bankruptcy Court by delivering the original executed proof of claim so as to be received on or before **March 24, 2021** at the following address:  HCMLP Claims Processing Center, c/o Kurtzman Carson Consultants ("KCC"), 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  Proofs of claim may also be filed electronically via the interface available at www.kccllc.net/HCMLP.  **Any Rejection Claims that are not timely filed shall be deemed automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of, the Court or any other Entity, and any Rejection Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.**

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order and the Plan are available for inspection.  If you would like to obtain copies you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (c) email HighlandInfo@kccllc.com and reference "Highland" in the subject line.  You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 24, 2021.         **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# CLAIMANT'S EXHIBIT 16

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (admitted *pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (admitted *pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF
## CONFIRMED FIFTH AMENDED PLAN OF REORGANIZATION
## OF HIGHLAND CAPITAL MANAGEMENT, L.P.

**PLEASE TAKE NOTICE** that on February 22, 2021, the United States
Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered the *Order
Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*
[Docket No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of
Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service a
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Claimant's
EXHIBIT
16



1934054210811000000000001

amended, supplemented, or modified, the "Plan"). Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on August 11, 2021.

**PLEASE TAKE FURTHER NOTICE** that, except with respect to Administrative Expense Claims that are Professional Fee Claims or as otherwise set forth in the Plan, requests for payment of an Administrative Expense Claim must be Filed with the Bankruptcy Court **no later than forty-five (45) days after the Effective Date** (the "Administrative Expense Claims Bar Date"). **HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR.**

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed **no later than sixty (60) days after the Effective Date**.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor or the Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan and Confirmation Order, including, without limitation: the injunction with respect to the commencement of claims and causes of action against Protected Parties set forth in Section IX.F of the Plan and Sections AA and BB of the Confirmation Order, the duration of injunction and stays set forth in Section IX.G of the Plan and Section AA of the Confirmation Order, and the continuance of the January 9 Order and July 16 Order set forth in Section IX.H of the Plan and Section CC of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that on the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order and the Plan

are available for inspection.  If you would like to obtain copies you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) call toll free: (877) 573-3984 or international: (310) 751-1829; or (c) email HighlandInfo@kccllc.com and reference "Highland" in the subject line.  You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated: August 11, 2021.            **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

# CLAIMANT'S EXHIBIT 17

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Fascimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

**RESPONSES AND OBJECTIONS TO NEXPOINT REAL ESTATE
PARTNERS, LLC'S SECOND SET OF REQUESTS FOR
PRODUCTION AND INTERROGATORIES**

Highland Capital Management, L.P., ("<u>Highland</u>" or the "<u>Reorganized Debtor</u>") hereby

responds to *NexPoint Real Estate Partners, LLC's Second Set of Requests for Production and*

*Interrogatories to Highland Capital Management, L.P.* (the "<u>Requests</u>")[2] served by NexPoint Real

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Requests.

Claimant's
EXHIBIT
17

Estate Partners, LLC f/k/a HCRE Partners LLC ("HCRE").  Highland's responses and objections

to the Requests (the "Responses") are made pursuant to Federal Rules of Civil Procedure

("FRCP") 26, 33, and 34, as made applicable in bankruptcy cases pursuant to Federal Rules of

Bankruptcy Procedure 7026, 7033, and 7034.

## **GENERAL OBJECTIONS**

Unless otherwise specified, the following general objections and caveats are applicable to

each and every Response and are incorporated into each Response as though set forth in full:

1.    The Responses contained herein are based upon information presently

known and ascertained by Highland.

2.    Highland objects to the Requests to the extent they seek information or

documents that are protected from discovery by the attorney-client privilege, the attorney work

product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of

any document that is protected from discovery by any privilege or immunity shall not constitute a

waiver of any such privilege or immunity.  All references in these objections and responses to

Highland agreement to produce documents shall be construed to mean non-privileged documents.

3.    Highland objects to the Requests to the extent they request information that

is not reasonably or readily available to it, in its possession, custody or control, or is more readily

available to HCRE from another source or for which the burden of obtaining such information is

not substantially greater for HCRE than it is for Highland.

4.    Highland objects to the Requests to the extent they call for legal conclusions

and/or legal analyses.

5.    All specific responses to the Requests are provided without waiver of, and

with express reservation of (a) all objections as to competency, relevancy, materiality, and

admissibility of the responses and the subject matter thereof as evidence for any purpose in any

further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      Highland objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      Highland's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Highland's possession, custody or control.

8.      These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 22:**

All e-mails from or to you, or anyone working for or on your behalf, regarding the preparation of the SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 22:**

Highland objects to Request No. 22 on the ground that the phrase "anyone working for or on your behalf" is vague and ambiguous and is subject to subjective interpretation under the circumstances.  Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 22, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 23**:

All e-mails from or to you, or anyone working for or on your behalf, regarding the preparation of the First Amended and Restated SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 23:**

Highland objects to Request No. 23 on the ground that the phrase "anyone working for or on your behalf" is vague and ambiguous and is subject to subjective interpretation under the circumstances.  Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 23, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 24**:

Any communications between you and NexPoint Real Estate Partners, LLC regarding the formation of SE Multifamily Holdings LLC.

**RESPONSE TO REQUEST NO. 24:**

Highland objects to Request No. 24 to the extent it assumes or implies that Highland and NexPoint Real Estate Partners, LLC ("NexPoint REP") were arm's-length, third-parties who had employees devoted to each respective entity. The evidence will show that anyone employed in the Highland complex prior to the Petition Date worked at the ultimate direction of James Dondero for the purpose of advancing his interests. Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 24, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 25**:

Any communications between you and NexPoint Real Estate Partners, LLC regarding the First Amended and Restated SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 25:**

Highland objects to Request No. 25 to the extent it assumes or implies that Highland and NexPoint REP were arm's-length, third-parties who had employees devoted to each respective entity. The evidence will show that anyone employed in the Highland complex prior to the Petition Date worked at the ultimate direction of James Dondero for the purpose of advancing his interests. Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 25, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 26**:

Any communications between you and BH Equities, LLC regarding SE Multifamily Holdings LLC.

**RESPONSE TO REQUEST NO. 26**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 26, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 27**:

Any communications between you and BH Equities, LLC regarding the SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 27**:

Highland objects to Request for Production No. 27 on the ground that BH Equities, LLC was not a party to the SE Multifamily Holdings LLC Limited Liability Company Agreement. Subject to the General Objections and this specific objection, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 27, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 28**:

Any communications between you and BH Equities, LLC regarding the First Amended and Restated SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 28**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request No. 28, including using search terms and identifying custodians that Highland believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 29**:

Any communications between you and Liberty CLO HoldCo, Ltd regarding SE Multifamily Holdings LLC.

**RESPONSE TO REQUEST NO. 29**:

Highland objects to Request No. 29 to the extent it assumes or implies that Highland and Liberty CLO HoldCo, Ltd ("Liberty") were arm's-length, third-parties who had employees

devoted to each respective entity.  The evidence will show that anyone employed in the Highland

complex prior to the Petition Date worked at the ultimate direction of James Dondero for the

purpose of advancing his interests.  Subject to the General Objections and these specific objections,

Highland will conduct a reasonable search for, and produce, documents responsive to Request No.

29, including using search terms and identifying custodians that Highland believes are most likely

to yield responsive information.

**REQUEST FOR PRODUCTION NO. 30**:

Any communications between you and Liberty CLO HoldCo, Ltd regarding the SE
Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 30:**

Highland objects to Request No. 30 to the extent it assumes or implies that Highland and

Liberty were arm's-length, third-parties who had employees devoted to each respective entity.  The

evidence will show that anyone employed in the Highland complex prior to the Petition Date

worked at the ultimate direction of James Dondero for the purpose of advancing his interests.

Subject to the General Objections and these specific objections, Highland will conduct a

reasonable search for, and produce, documents responsive to Request No. 30, including using

search terms and identifying custodians that Highland believes are most likely to yield responsive

information.

**REQUEST FOR PRODUCTION NO. 31:**

Any communications between you and Liberty CLO HoldCo, Ltd regarding the First
Amended and Restated SE Multifamily Holdings LLC Limited Liability Company Agreement.

**RESPONSE TO REQUEST NO. 31:**

Highland objects to Request No. 31 to the extent it assumes or implies that Highland and

Liberty were arm's-length, third-parties who had employees devoted to each respective entity.  The

evidence will show that anyone employed in the Highland complex prior to the Petition Date

worked at the ultimate direction of James Dondero for the purpose of advancing his interests.

Subject to the General Objections and these specific objections, Highland will conduct a

reasonable search for, and produce, documents responsive to Request No. 31, including using

search terms and identifying custodians that Highland believes are most likely to yield responsive

information.

## REQUEST FOR PRODUCTION NO. 32:

Your tax returns as they relate to your interest in SE Multifamily Holdings LLC for 2018
through the present.

## RESPONSE TO REQUEST NO. 32:

Subject to the General Objections, Highland will conduct a reasonable search for, and

produce, documents responsive to Request No. 32.

## REQUEST FOR PRODUCTION NO. 33:

Your tax returns as they relate to any distributions made to you by SE Multifamily Holdings
LLC for 2018 through the present.

## RESPONSE TO REQUEST NO. 33:

Subject to the General Objections, Highland will conduct a reasonable search for, and

produce, documents responsive to Request No. 33.

## REQUEST FOR PRODUCTION NO. 34:

Any tax analysis prepared by your or on your behalf as to your interest in SE Multifamily
Holdings LLC and any distributions made to you by SE Multifamily Holdings LLC for 2018
through the present.

## RESPONSE TO REQUEST NO. 34:

Subject to the General Objections, Highland will conduct a reasonable search for, and

produce, documents responsive to Request No. 34.

## REQUEST FOR PRODUCTION NO. 35:

Any written report prepared by any witness retained or specially employed to provide
expert testimony in the case or whose duties as your employee regularly involve giving expert

testimony, which report must contain, inter alia, (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

## RESPONSE TO REQUEST NO. 35:

Highland objects to Request for Production No. 35 on the ground that, pursuant to the

*Amended Stipulation and Proposed Scheduling Order Concerning Proof of Claim No. 146 Filed*

*by HCRE Partners, LLC* [Docket No. 3356] (the "Scheduling Order"), the deadline for the

disclosure of experts is August 5, 2022.

## REQUEST FOR PRODUCTION NO. 36:

Copies of all documents, electronically stored information, and tangible things within your possession, custody, or control which you intend to use in support of your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

## RESPONSE TO REQUEST NO. 36:

Highland objects to Interrogatory No. 36 on the ground that pursuant to the Scheduling

Order, the deadline to "exchange Witness and Exhibit Lists" is October 25, 2022, and information

responsive to this Request will be produced at that time.

## REQUEST FOR PRODUCTION NO. 37:

Any documents or things you intend to introduce as exhibits at the hearing on your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

## RESPONSE TO REQUEST NO. 37:

Highland objects to Interrogatory No. 37 on the ground that pursuant to the Scheduling

Order, the deadline to "exchange Witness and Exhibit Lists" is October 25, 2022, and information

responsive to this Request will be disclosed at that time.

**REQUEST FOR PRODUCTION NO. 38:**

Any documents or things you intend to offer as demonstrative exhibits at the hearing on your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

**RESPONSE TO REQUEST NO. 38:**

Highland objects to Interrogatory No. 38 on the grounds that (a) no responsive documents exist today, (b) no deadline exists for the production of responsive documents, (c) until completed, draft demonstrative exhibits are subject to attorney work-product protection, and (d) based on prior practice, demonstrative exhibits are unlikely to be completed until just prior to the commencement of any hearing.  Notwithstanding the foregoing, Highland will produce documents responsive to Request No. 38 on the condition that NexPoint REP do the same at the same time and in the same manner as Highland.

**REQUEST FOR PRODUCTION NO. 39:**

Any documents upon which you relied or reviewed in preparation for your answers to any Interrogatory.

**RESPONSE TO REQUEST NO. 39:**

Highland objects to Request for Production No. 39 on the grounds that information relevant to this Request (a) is subject to the attorney-client privilege and the attorney work-product doctrine, and (b) can be more appropriately discovered through a deposition.

**OBJECTIONS AND RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 6:**

Identify each person who negotiated the SE Multifamily Holdings LLC Limited Liability Company Agreement on behalf of Highland Capital Management, L.P.

**RESPONSE TO INTERROGATORY NO. 6:**

Highland objects to Interrogatory No. 6 to the extent it assumes or implies that (a) the SE Multifamily Holdings LLC Limited Liability Company Agreement (the "Original Agreement")

was the subject of arm's-length negotiations, or (b) there was a person or persons who "negotiated" the Original Agreement solely on behalf of Highland, or (c) Highland and NexPoint REP were arm's-length, third-parties who had employees devoted to each respective entity. The evidence will show that anyone employed in the Highland complex prior to the Petition Date worked at the ultimate direction of James Dondero for the purpose of advancing his interests. Subject to the General Objections and these specific objections, Highland believes the following individuals or legal or tax counsel were primarily involved in drafting the Original Agreement:

Freddie Chang

Mark Patrick

Paul Broaddus

Wick Phillips

Hunton & Williams

**INTERROGATORY NO. 7:**

Identify each person who negotiated the SE Multifamily Holdings LLC First Amended and Restated Limited Liability Company Agreement on behalf of Highland Capital Management, L.P.

**RESPONSE TO INTERROGATORY NO. 7:**

Highland objects to Interrogatory No. 7 to the extent it assumes or implies that (a) as between Highland and NexPoint REP, the SE Multifamily Holdings LLC First Amended and Restated Limited Liability Company Agreement (the "Amended Agreement") was the subject of arm's-length negotiations, or (b) there was a person or persons who "negotiated" the Amended Agreement solely on behalf of Highland, or (c) Highland and NexPoint REP were arm's-length, third-parties who had employees devoted to each respective entity. The evidence will show that anyone employed in the Highland complex prior to the Petition Date worked at the ultimate direction of James Dondero for the purpose of advancing his interests. Subject to the General

Objections and these specific objections, Highland believes the following individuals were primarily involved in drafting the Amended Agreement:

> Freddie Chang

> Mark Patrick

> Paul Broaddus

> BH Equities

> Grant Scott

## INTERROGATORY NO. 8:

Identify everything of value that Highland Capital Management, L.P. contributed to SE Multifamily Holdings LLC at the time of its formation, including the value in dollars and cents for anything so identified.

## RESPONSE TO INTERROGATORY NO. 8:

Highland objects to the phrase "everything of value" as vague and ambiguous.  Subject to the General Objections and this specific objection, and as intended, Highland contributed, and was expected to contribute, among other things, (a) capital, (b) credit enhancement, (c) liquidity, (d) good will, (e) tax benefits and advantages, and (f) human resources.

## INTERROGATORY NO. 9:

Identify everything of value that Highland Capital Management, L.P. contributed to SE Multifamily Holdings LLC subsequent to its formation, including the value in dollars and cents for anything so identified.

## RESPONSE TO INTERROGATORY NO. 9:

Highland objects to the phrase "everything of value" as vague and ambiguous.  Subject to the General Objections and this specific objection, and as intended, Highland contributed, among other things, (a) capital, (b) credit enhancement, (c) liquidity, (d) good will, (e) tax benefits and advantages, and (f) human resources.

**INTERROGATORY NO. 10:**

Identify everything of value that any member of SE Multifamily Holdings LLC contributed to SE Multifamily Holdings LLC at the time of its formation, including the value in dollars and cents for anything so identified.

**RESPONSE TO INTERROGATORY NO. 10:**

Highland objects to the phrase "everything of value" as vague and ambiguous. Subject to the General Objections and this specific objection, and as intended, Highland contributed and was expected to contribute, among other things, (a) the capital described on Schedule A to the Original Agreement, (b) credit enhancement, (c) liquidity, (d) good will, (e) tax benefits and advantages, and (f) human resources. NexPoint REP contributed the capital described on Schedule A to the Original Agreement.

**INTERROGATORY NO. 11:**

Identify everything of value that any member of SE Multifamily Holdings LLC contributed to SE Multifamily Holdings LLC subsequent to its formation, including the value in dollars and cents for anything so identified.

**RESPONSE TO INTERROGATORY NO. 11:**

Highland objects to the phrase "everything of value" as vague and ambiguous. Subject to the General Objections and this specific objection, and as intended, Highland contributed, among other things, (a) capital, (b) credit enhancement, (c) liquidity, (d) good will, (e) tax benefits and advantages, and (f) human resources. BH Equities LLC contributed the capital described on Schedule A to the Amended Agreement. NexPoint REP contributed the capital described on Schedule A to the Amended Agreement after acting in its own self-interest to allocate to itself all of the proceeds from the KeyBank Loan notwithstanding the fact that Highland (and others) was jointly and severally liable for the obligations under that loan and enabled NexPoint REP to obtain the loan proceeds.

**INTERROGATORY NO. 12:**

Identify and describe what you believe is your current ownership interest in SE Multifamily Holdings LLC.

**RESPONSE TO INTERROGATORY NO. 12:**

Highland objects to Interrogatory No. 12 to the extent that it assumes or implies that Highland's current ownership interest in SE Multifamily Holdings LLC ("SE Multifamily") is subject to dispute.  Subject to the General Objections and this specific objection, and as intended, the Amended Agreement consistently and unambiguously provides that Highland's current ownership interest in SE Multifamily Holdings LLC is 46.06% and the Amended Agreement has never been further modified or amended to change or alter Highland's ownership interest in SE Multifamily (or for any other purpose).  *See First Amended and Restated Limited Liability Company Agreement*, §§ 1.7, 6.1(a), 9.3(e), and Schedule A.

**INTERROGATORY NO. 13:**

Identify and describe the current members, together with their percentages, for each current member SE Multifamily Holdings LLC.

**RESPONSE TO INTERROGATORY NO. 13:**

Highland objects to Interrogatory No. 13 to the extent that it assumes or implies that the current members' respective ownership interests in SE Multifamily are subject to dispute.  Subject to the General Objections and this specific objection, and as intended, the Amended Agreement consistently and unambiguously provides that the current members' respective ownership interests in SE Multifamily are:

Highland; 46.06%

HCRE; 47.94%

BH Equities; 6%

Liberty CLO Holdco, Ltd.; Class A preferred interest of 100% and Class B preferred interest of 100%

*See First Amended and Restated Limited Liability Company Agreement*, §§ 1.7, 6.1(a), 9.3(e), and Schedule A.  Note that Highland believes that the Class A and Class B preferred interests initially held by Liberty CLO Holdco, Ltd. have been retired and are no longer outstanding.

## INTERROGATORY NO. 14:

In dollars and cents, identify and describe the current value of what you believe to be your current ownership interest in SE Multifamily Holdings LLC.

## RESPONSE TO INTERROGATORY NO. 14:

Highland objects to Interrogatory No. 14 on the ground that information concerning the current value of Highland's interest in SE Multifamily is in the exclusive possession of NexPoint REP and is the subject of ongoing discovery.  Subject to the General Objections and this specific objection, based upon SE Multifamily Holdings' LLC's financial statements as of December 31, 2021 (which Highland will produce and incorporates by reference herein), the value of Highland's 46% ownership interest in SE Multifamily Holdings LLC exceeded $15 million, as of December 31, 2021, exclusive of any adjustments for impropriety of previous distributions or other wrongful acts by HCRE or its affiliates.

## INTERROGATORY NO. 15:

Identify and describe what you believe is NexPoint Real Estate Partners, LLC's current ownership interest in SE Multifamily Holdings LLC.

## RESPONSE TO INTERROGATORY NO. 15:

Highland incorporates by reference its response to Interrogatory No. 13 as if fully set forth herein.

## INTERROGATORY NO. 16:

In dollars and cents, identify and describe the current value of what you believe to be NexPoint Real Estate Partners, LLC's current ownership interest in SE Multifamily Holdings LLC.

**RESPONSE TO INTERROGATORY NO. 16:**

Highland objects to Interrogatory No. 16 on the ground that information concerning the current value of NexPoint REP's interest in SE Multifamily is in the exclusive possession of NexPoint REP and is the subject of ongoing discovery. Subject to the General Objections and this specific objection, based upon SE Multifamily Holdings' LLC's financial statements as of December 31, 2021 (which Highland will produce and incorporates by reference herein), the value of NexPoint REP's 47% ownership interest in SE Multifamily Holdings LLC exceeded $15 million, as of December 31, 2021.

**INTERROGATORY NO. 17:**

In dollars and cents, identify each distribution you have received from SE Multifamily Holdings LLC and the date such distribution was received.

**RESPONSE TO INTERROGATORY NO. 17:**

Highland has never received a distribution from SE Multifamily Holdings LLC.

**INTERROGATORY NO. 18:**

Provide the name and, if known, the address and telephone number, of each individual likely to have discoverable information – along with a description of the subjects of that information and basis therefore – that that you may use in support of your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

**RESPONSE TO INTERROGATORY NO. 18:**

Highland objects to Interrogatory No. 18 on the grounds that (a) it has not made any assessment as to whom it may call as a witness in support of its objection and (b) the deadline to "exchange Witness and Exhibit Lists" is October 25, 2022. Subject to the General Objections and these specific objections, Highland believes the following individuals are likely to have discoverable information and are among the individuals or entities that Highland may use in support of its objection:

James Dondero

Matt McGraner

Bonner McDermott

Mark Patrick

Matthew Goetz

Freddie Chang

Paul Broaddus

Shawn Raver

Frank Waterhouse

A representative of BH Equities LLC (and potentially specific agents of that entity)

A representative of Wick Phillips (and potentially specific agents of that entity)

Hunton & Williams

Baker & Viggato, LLP

A representative of Highland

David Klos

Grant Scott

A representative of Development Specialists, Inc.

## INTERROGATORY NO. 19:

Identify any expert witness you intend to call at the hearing on your objection to NexPoint Real Estate Partners, LLC's Proof of Claim. For each such witness, state whether or not they will provide a written report.

## RESPONSE TO INTERROGATORY NO. 19:

Highland objects to Interrogatory No. 19 on the ground that, pursuant to the Scheduling

Order, the deadline for Highland and HCRE to disclose experts is August 5, 2022, and information

responsive to this Interrogatory will be disclosed at that time.

**INTERROGATORY NO. 20:**

Identify all witnesses you intend to call at the hearing on your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

**RESPONSE TO INTERROGATORY NO. 20:**

Highland objects to Interrogatory No. 20 on the ground that pursuant to the Scheduling Order, the deadline for Highland and HCRE to "exchange Witness and Exhibit Lists" is October 25, 2022, and information responsive to this Interrogatory will be disclosed at that time unless the parties agree otherwise.

**INTERROGATORY NO. 21:**

Identify and describe each exhibit or document you either intend to introduce into evidence at the hearing on your objection to NexPoint Real Estate Partners, LLC's Proof of Claim.

**RESPONSE TO INTERROGATORY NO. 21:**

Highland objects to Interrogatory No. 21 on the ground that pursuant to the Scheduling Order, Highland and HCRE "shall exchange Witness and Exhibit Lists" on October 25, 2022, and information responsive to this Request will be disclosed at that time unless the parties agree otherwise.

**INTERROGATORY NO. 22:**

State the full name, address and telephone number of all persons providing information in answering these interrogatories, including for which interrogatories they provided information.

**RESPONSE TO INTERROGATORY NO. 22:**

Subject to the General Objections, in response to Interrogatory No. 22, Highland identifies the following individuals:

James P. Seery, Jr. (reviewed all interrogatory responses), c/o Pachulski Stang Ziehl & Jones LLP

David Klos (reviewed all interrogatory responses), c/o Pachulski Stang Ziehl & Jones LLP

Thomas Surgent (reviewed all interrogatory responses), c/o Pachulski Stang Ziehl & Jones

LLP

Various attorneys at Pachulski Stang Ziehl & Jones LLP.

## INTERROGATORY NO. 23:

Identify each request for production for which you have not or are not providing responsive documents for any reason.

## RESPONSE TO INTERROGATORY NO. 23:

In response to Interrogatory No. 23, Highland refers HCRE to Highland's *Responses to Requests for Production of Documents* and incorporates those responses herein.

Dated:  June 27, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:     MHayward@HaywardFirm.com
            ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# CLAIMANT'S EXHIBIT 18

## (To Come)

# CLAIMANT'S EXHIBIT 19

## (To Come)