# EXHIBIT 23

**Appx. 02936**

```
1                 IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3                              )    Case No. 19-34054-sgj-11
     In Re:                    )    Chapter 11
4                              )
     HIGHLAND CAPITAL          )    Dallas, Texas
5    MANAGEMENT, L.P.,         )    January 9, 2020
                               )    9:30 a.m. Docket
6            Debtor.           )
                               )    DEBTOR'S MOTION TO COMPROMISE
7                              )    CONTROVERSY WITH OFFICIAL
                               )    COMMITTEE OF UNSECURED
8    _____)    CREDITORS [281]

9                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Debtor:           Jeffrey N. Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
13                             10100 Santa Monica Blvd.,
                                13th Floor
14                             Los Angeles, CA  90067-4003
                               (310) 277-6910
15
     For the Debtors:          Ira D. Kharasch
16                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
17                              13th Floor
                               Los Angeles, CA  90067-4003
18                             (310) 277-6910

19   For the Debtor:           John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
20                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
21                             (212) 561-7700

22   For the Debtors:          Melissa S. Hayward
                               Zachery Z. Annable
23                             HAYWARD & ASSOCIATES, PLLC
                               10501 N. Central Expressway,
24                              Suite 106
                               Dallas, TX  75231
25                             (972) 755-7104
```

2

1  APPEARANCES, cont'd.

2  For the Official Committee    Matthew A. Clemente
   of Unsecured Creditors:       Dennis M. Twomey
3                                SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
4                                Chicago, IL  60603
                                 (312) 853-7539
5
   For the Official Committee    Penny P. Reid
6  of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                 2021 McKinney Avenue, Suite 2000
7                                Dallas, TX  75201
                                 (214) 981-3413
8
   For the Issuer Group:         James T. Bentley
9  (Telephonic)                  SCHULTE ROTH & ZABEL, LLP
                                 919 Third Avenue
10                               New York, NY  10022
                                 (212) 756-2000
11
   For the Issuer Group:         James E. Bain
12 (Telephonic)                  JONES WALKER, LLP
                                 811 Main Street, Suite 2900
13                               Houston, TX  77002
                                 (713) 437-1820
14
   For Acis Capital             Rakhee V. Patel
15 Management GP, LLC:          Annmarie Antoinette Chiarello
                                WINSTEAD, P.C.
16                              2728 N. Harwood Street, Suite 500
                                Dallas, TX  75201
17                              (214) 745-5250

18 For Redeemer Committee of    Terri L. Mascherin
   the Highland Crusader        JENNER& BLOCK, LLP
19 Fund:                        353 N. Clark Street
   (Telephonic)                 Chicago, IL  60654-3456
20                              (312) 923-2799

21 For Redeemer Committee of    Mark B. Hankin
   the Highland Crusader        JENNER & BLOCK, LLP
22 Fund:                        919 Third Avenue
   (Telephonic)                 New York, NY  10022-3098
23                              (212) 891-1600

24

25

**Appx. 02938**

3

1   APPEARANCES, cont'd.:

2   For the U.S. Trustee:         Lisa L. Lambert
                                  Meredyth A. Kippes
3                                 OFFICE OF THE UNITED STATES
                                     TRUSTEE
4                                 1100 Commerce Street, Room 976
                                  Dallas, TX  75242
5                                 (214) 767-8967

6   For Jefferies, LLC:           Patrick C. Maxcy
    (Telephonic)                  DENTONS US, LLP
7                                 233 South Wacker Drive, Suite 5900
                                  Chicago, IL  60606-6361
8                                 (312) 876-8000

9   For Patrick Daugherty,        Patrick Daugherty
    Pro Se:
10

11  Recorded by:                  Hawaii S. Jeng
                                  UNITED STATES BANKRUPTCY COURT
12                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
13                                (214) 753-2006

14  Transcribed by:               Kathy Rehling
                                  311 Paradise Cove
15                                Shady Shores, TX  76208
                                  (972) 786-3063

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

4

1                  DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.

2              THE COURT:  All right.  Let's roll to Highland now.

3    Let's get appearances from lawyers in the courtroom, please.

4              MR. POMERANTZ:  Good morning, Your Honor.  Jeff

5    Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

6    Your Honor.

7              THE COURT:  Happy New Year.

8              MR. POMERANTZ:  Here on behalf of the Debtor.

9              THE COURT:  Okay.  Thank you.

10             MS. HAYWARD:  Good morning, Your Honor.  Melissa

11   Hayward and Zachery Annable on behalf of the Debtor.

12             THE COURT:  Good morning.

13             MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14   will be joining me, representing William Neary, the United

15   States Trustee.

16             THE COURT:  Thank you.

17             MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18   Chiarello and Rakhee Patel here on behalf of Acis Capital

19   Management, LP and Acis Capital Management GP, LLC.

20             THE COURT:  Thank you.

21             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22   Clemente from Sidley Austin on behalf of the Official

23   Committee of Unsecured Creditors.  With me today are my

24   partners Dennis Twomey and Penny Reid.

25             THE COURT:  Okay.  Good morning.  All right.  Is that

5

1  all of the courtroom appearances?

2      All right.  We have several people on the phone.  I think

3  most of them are just listening in.  If you're on the phone,

4  though, and you wish to appear, you may do so at this time.

5          MR. BENTLEY:  Good morning, Your Honor.  This is

6  James Bentley of Schulte Roth & Zabel.  Also on the line is my

7  co-counsel, Joseph Bain of Jones Walker.  We represent the

8  Issuers.

9          THE COURT:  Okay.  Good morning.

10         MS. MASCHERIN:  Good morning, Your Honor.  This is --

11         MR. MAXCY:  Good morning.  Patrick --

12         MS. MASCHERIN:  Good morning, Your Honor.  This is

13  Terri Mascherin of Jenner & Block.  Also on the line with me

14  is my partner, Mark Hankin.  We represent the Redeemer

15  Committee of the Highland Crusader Fund, which is one of the

16  members of the Unsecured Creditors' Committee.

17         THE COURT:  Okay.  Good morning.

18         MR. MAXCY:  Good morning, Your Honor.  This is

19  Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20  LLC.

21         THE COURT:  Okay.  Thank you.  All right.  Well, I

22  guess that is it for the phone appearances.

23      Mr. Pomerantz, we're -- we have just one matter on the

24  calendar, the motion to compromise with the Committee.  I saw

25  two limited objections, and then a U.S. Trustee's broader

6

1   objection.  I'll start with, Do you have any of these

2   objections worked out?

3           MR. POMERANTZ:  Yes, we do.

4           THE COURT:  Okay.

5           MR. POMERANTZ:  We believe we have the Jefferies

6   objection worked out, as well as the objection of the Issuers.

7   And I'll, during the course of my presentation, alert Your

8   Honor to how that's worked out.

9           THE COURT:  Okay.

10          MR. POMERANTZ:  And then we'll have a revised order

11  that basically addresses each of their concerns, or at least

12  Jefferies' concerns, but the statements on the record for the

13  Issuers' concerns.

14          THE COURT:  Okay.  Very good.

15          MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

16  Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the

17  courtroom by Ira Kharasch, Greg Demo, and John Morris from my

18  office.  I would also like to introduce the Court to the

19  proposed new members of the board of directors of Strand

20  Advisors, which is the Debtor's general partner.  They're all

21  sitting in the first row behind counsel's well.  And that's

22  Mr. James Seery, --

23          THE COURT:  Good morning.

24          MR. POMERANTZ:  -- Mr. John Dubel, --

25          THE COURT:  Good morning.

7

1          MR. POMERANTZ:  -- and the Honorable Russell Nelms.

2          THE COURT:  Yes.  I've met him before.

3          MR. POMERANTZ:  As have we.  We thought you would

4    remember him.

5       The resumes of Mr. Seery and Mr. Dubel were attached to

6    the motion filed on December 27th, and those two resumes and

7    the resume of the Honorable Judge Nelms were attached to the

8    reply that was filed last evening.  And while Mr. Seery and

9    Mr. Dubel may be new names to Your Honor, we know that you are

10   familiar with Judge Nelms, who sat with you in this district.

11         THE COURT:  Uh-huh.

12         MR. POMERANTZ:  Also in the courtroom, Your Honor, is

13   Brad Sharp, the Debtor's chief restructuring officer from DSI,

14   --

15         THE COURT:  Good morning.

16         MR. POMERANTZ:  -- and his colleague, Fred Caruso,

17   who spends most of his working hours at the Debtor's Dallas

18   headquarters.

19         THE COURT:  Good morning.

20         MR. POMERANTZ:  We have the declaration of Mr. Sharp

21   that we would move into evidence at this point in time.

22         THE COURT:  All right.  I've got a stack of paper.

23   If you have an extra copy for me to use, --

24         MS. HAYWARD:  Your Honor, may I approach with the --

25         THE COURT:  You may.

8

1          MS. HAYWARD:  Your Honor, it was filed, the

2    declaration was filed.  I'm not sure that we have a copy of --

3          MR. POMERANTZ:  Your Honor, we will also at the

4    appropriate time during my presentation, I'll bring up to Your

5    -- ask to bring up to Your Honor revisions to the term sheet

6    that was attached to the motion.

7          THE COURT:  Okay.

8          MR. POMERANTZ:  Copies have been given to Ms. Lambert

9    as well as the Committee.

10          THE COURT:  Okay.  Very good.  All right.  Well, what

11    was handed to me was the preliminary term sheet as well as the

12    CVs for the proposed new board members.  I don't see the

13    declaration --

14          MR. POMERANTZ:  Your Honor, if I may approach, I have

15    a copy.

16          THE COURT:  You may.  All right.  Very good.

17          MR. POMERANTZ:  So we would move that declaration

18    into evidence.

19          THE COURT:  All right.  The Court will admit this.

20    It was filed on the docket at 327, but I will additionally

21    admit it as Exhibit 1 today.

22      (Debtor's Exhibit 1 is received into evidence.)

23          THE COURT:  At some point in time, I want to give

24    parties the opportunity to cross-examine Mr. Sharp.  Do you

25    want to do that now, or shall we hear an opening statement?

9

 1          MR. POMERANTZ:  However Your Honor prefers.  I mean,

 2   maybe it's helpful to hear argument first, and then, before

 3   the Trustee --

 4          THE COURT:  I think I'd like to hear opening

 5   statements and then we'll --

 6          MR. POMERANTZ:  Thank you.

 7          THE COURT:  -- make the opportunity available.  Okay.

 8              OPENING STATEMENT ON BEHALF OF THE DEBTOR

 9          MR. POMERANTZ:  Your Honor, by way of background, we

10   appeared before Your Honor on December 6th and December 19th.

11   And during each of those hearings, we described for the Court

12   negotiations that were underway between the Committee and the

13   Debtor which, if successful, would have -- would eliminate the

14   need for contested and uncertain and costly litigation

15   regarding the appointment of a Chapter 11 trustee and really

16   put this case in a position where the Debtor and the Committee

17   would be able to work together constructively towards

18   negotiation of a plan.

19      As a result of our hearing on December 19th, Your Honor

20   entered a scheduling order that set deadlines for either the

21   filing of a motion to approve a settlement, or alternatively,

22   the filing of one or more motions for the appointment of a

23   trustee.

24      As set forth and required by the scheduling order, we

25   filed our motion on December 27th, and in that motion we

10

1   sought approval of a term sheet and ancillary documents

2   between the Debtor and the Committee, which I'll describe

3   shortly.

4       While a couple of items had not yet been agreed to at the

5   time the motion was filed, I'm pleased to report that over the

6   last couple of days we've been able to reach closure with the

7   Committee with respect to those items, and there would also be

8   some modifications to the term sheet, which I'll go through in

9   a few moments.

10      The motion, Your Honor, seeks approval of the term sheet,

11  which accomplishes a variety of things that, again, will allow

12  the Debtor and the Committee to put the acrimony that has

13  existed in this case for the first three months behind us and

14  allow us to focus on productive matters.  In the last 24

15  hours, as I mentioned, there have been a few changes to the

16  term sheet that I will describe.  And I would like to hand up

17  Your Honor a redline and a clean copy of the revised term

18  sheet and exhibits.  May I approach?

19          THE COURT:  All right.  You may.  Do you have an

20  extra for the law clerk?  Okay.  Thank you.

21      (Pause.)

22          MR. POMERANTZ:  Your Honor, the term sheet does a

23  number of things.  Would you like me to give Your Honor some

24  time to look through the redlines?

25          THE COURT:  No.  You may proceed.

1           MR. POMERANTZ:  Okay.  The term sheet does a number

2    of things.  The first thing the term sheet does is appointment

3    of an independent board at Strand Advisors.  Strand Advisors

4    is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5    previously had filed a motion to approve the retention of Brad

6    Sharp as the chief restructuring officer, and that initial

7    agreement and motion contain details regarding the scope of

8    Mr. Sharp's authority and the scope of what the Debtor could

9    do without Mr. Sharp's prior consent.

10          The Committee raised concerns that the structure was not

11   sufficient to ensure that decisions were being made for the

12   Debtor only in their best interests and without any

13   inappropriate influence from Mr. Dondero.

14          To address the Committee's concerns, a focal point of the

15   settlement was the Debtor's agreement to appoint an

16   independent board of directors at Strand who would be

17   responsible for managing the operations of the Debtor.

18          Over the last few weeks, a principal aspect of the

19   negotiations between the Committee and the Debtor have been

20   discussing who should the independent directors be.

21   Conceptually, the Debtor and the Committee both agreed that

22   the board should include, first, a person with significant

23   industry experience in which the Debtor operates -- hedge

24   funds, money management; second, a person with deep

25   restructuring experience from the financial advisor side; and

12

1  third, a person with some sort of judicial or governmental

2  experience.

3      The Debtor originally provided the Committee with three

4  proposed candidates.  The Committee considered the Debtor's

5  request, but instead presented the Debtor with four different

6  candidates and asked the Debtor to choose from those four.

7  The Debtors interviewed each of those people and ultimately

8  agreed on Messrs. Dubel and Seery, who were each on the

9  original list.

10     As of the deadline to file the motion on December 27th,

11  the Committee and the Debtor had still not agreed on the

12  identity of the third board member, but the parties were

13  hopeful that an agreement could ultimately be reached and we

14  decided to go ahead and file the motion.  As I'm sure Your

15  Honor saw in the motion, it was contingent upon everyone

16  agreeing on the third board member.

17     Ultimately, the Debtor and the Committee both agreed that

18  Mr. Dubel and Mr. Seery could identify the third board member

19  out of a pool of four people:  Two of the people originally

20  requested by the Committee and two people identified by the

21  Debtor.  This week and over the weekend, Mr. Seery and Mr.

22  Dubel interviewed each of the four candidates, and ultimately

23  decided on the appointment of Judge Nelms as the third

24  independent board member.

25     The board, as it will be constituted going forward, in the

13

1  Debtor's opinion, consists of three exceptional individuals

2  who are independent of the Debtor, have a sterling reputation

3  in the community, and bring to the Debtor a variety of the

4  skills that we believe, and believe the Committee agrees,

5  gives the Debtor the best opportunity to achieve a consensual

6  restructuring and otherwise manage the affairs of the Debtor

7  in the best interests of the stakeholders.

8      It is contemplated that the Debtor will continue to retain

9  the services of DSI as the chief restructuring officer, and

10  ultimately the board will determine if it's important to

11  retain a CEO going forward.

12      The second thing that the term sheet does, Your Honor, was

13  the removal of Mr. Dondero as an officer and director of

14  Strand and eliminate all of his control over decision-making

15  of the Debtor.  The Debtor recognized early on in this case

16  that Mr. Dondero's continuing role with the Debtor in a

17  position of authority made the Committee extremely uneasy.

18  Accordingly, the term sheet provides for him removing himself

19  as an officer and director of Strand and that he would no

20  longer be in a position of control at the Debtor.

21      However, since the filing of the motion, over the last

22  several days, concerns have been raised about whether removing

23  Mr. Dondero from the business entirely would have unintended

24  consequences.  I believe I may have mentioned at prior

25  hearings that, because of his involvement as a portfolio

14

1   manager under various contracts with third parties, that there

2   could be adverse economic consequences to the Debtor if he

3   didn't stay in some role.

4       As a result of discussions over the last 24 hours, the

5   Committee has agreed and the Debtor agreed to modify the term

6   sheet to allow the new board to decide whether to retain Mr.

7   Dondero in his capacity as a portfolio manager, provided,

8   however, that he will not receive any compensation and he will

9   agree to resign if requested by the board.

10      In any event, he will have no decision-making control at

11  all and he will report to the independent board.

12      The corporate governance documents that create the new

13  independent board of Strand also provide that Mr. Dondero, as

14  the owner of the equity in Strand, may not replace the board

15  without the Committee consent or court order.

16      The third major aspect of the term sheet, Your Honor, was

17  the agreement on operating protocols, and it really relates to

18  the ground rules for the Debtor's operations going forward and

19  when notice to the Committee is required of certain

20  transactions that would otherwise be in the ordinary course of

21  business.

22      Importantly, Your Honor, we are not trying to modify the

23  Bankruptcy Code in any way.  Any transactions out of the

24  ordinary course of business would still be subject to Your

25  Honor's approval.

15

1          However, in this case, as we indicated in the initial

2     motion we filed when the case was in Delaware, whether or not

3     something is ordinary is not straightforward in a case such as

4     the Debtor's, given the nature of the Debtor's operations.  So

5     we thought it was important to establish ground rules up

6     front, and establishing those ground rules was one of the

7     things we did initially in the case.  We had opposition from

8     the Committee, and we've worked through the opposition and

9     ultimately arrived at the operating protocols that are

10    attached to the term sheet.

11          They have been slightly modified in nonmaterial ways in

12    the documents I handed up to Your Honor.

13          They were subject to substantial negotiations between the

14    Debtor and the Committee, and we also expect them to be the

15    subject of future discussions with the Committee and the

16    independent board after the independent board takes -- takes

17    place.  Takes over.

18          Two parties in interest, Your Honor, Jefferies and a group

19    of Issuers, the CLOs, have filed comments to the term sheet,

20    which I'll describe in a few moments.

21              THE COURT:  Okay.

22              MR. POMERANTZ:  The next aspect, Your Honor, of the

23    term sheet was the provision of standing to the Creditors'

24    Committee to pursue certain insider claims.

25          During the negotiations, the Committee requested immediate

16

1   standing to investigate and potentially prosecute claims

2   against insiders to the extent those insiders were not

3   employed by the Debtor.  Granting standing at this stage of

4   the case was a difficult give by the Debtor.  However, the

5   Committee impressed upon the Debtor the importance of them

6   being able to control the filing of any actions against the

7   insiders, and the Debtor decided to accede to the Committee's

8   request.

9       It still remains the Debtor's hope that, with the creation

10  of the independent board, that the Debtor, the Committee, and

11  any insiders who might be subject to any such claims will be

12  able to come together and negotiate a consensual resolution of

13  this case.  While all parties, I'm sure, can and know how to

14  litigate, hopefully they will agree that a negotiated outcome

15  is better than a litigated outcome.

16      The next aspect of the term sheet, Your Honor, was the

17  document preservation protocols, and it provides for certain

18  procedures to be put in place to address the Committee's

19  concerns about document preservation.  They are contained in

20  an exhibit to the term sheet.  Again, slight nonmaterial

21  modifications were made in what I handed up to Your Honor.

22  And essentially they provide also for the Committee's access

23  to privileged documents to aid in their investigation and

24  prosecution of claims to which they are granted standing, and

25  also sets forth a procedure to be followed to address concerns

17

1  if the information is subject to shared privileges by several

2  entities.

3      As I mentioned, Your Honor, three parties have filed

4  responses to the motion.  The first is Jefferies.  Jefferies

5  is a secured creditor of the Debtor with respect to its margin

6  account held at Jefferies, and also has a similar account held

7  by a non-debtor affiliate.  They have asked for clarification

8  that, one, nothing in the protocols or the motion affects its

9  rights under the underlying agreements or the safe harbor

10 provisions of the Bankruptcy Code entitling them to enforce

11 their remedies; and two, that the Debtors will not trade in

12 the prime account without Jefferies' consent, and if that

13 consent is sought and not obtained, only subject to court

14 order.

15     The Debtor has agreed to include language in the order to

16 address Jefferies' concern, and at the conclusion of my

17 presentation I'll submit to Your Honor an order and a redline

18 containing that language.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  The second objection -- or not

21 objection, Your Honor -- the second statement was filed by a

22 group of Issuers of CLO obligations.

23            THE COURT:  Uh-huh.

24            MR. POMERANTZ:  And they were concerned that certain

25 aspects of the operating protocols which require notice to the

18

1    Committee prior to the Debtor being able to take certain

2    actions could conflict with the provisions of the underlying

3    agreements which might require the Debtor to take action on a

4    more expedited basis.

5         Neither the Issuers or the Debtor are aware of any

6    potential transactions that will arise prior to the next

7    hearing before Your Honor on January 21st.  We understand --

8    we were not party to these discussions between the Committee

9    and the Issuers yesterday, but we understand the way it's been

10   resolved is that the Issuers will withdraw their objection as

11   it relates to going forward today, subject to being able to

12   come back to the Court on the 21st and revisit the issue if

13   additional changes are not made acceptable to them to resolve

14   their issues and concerns.

15             THE COURT:  Okay.

16             MR. POMERANTZ:  But I think all parties acknowledge

17   that over the next 12 days this is a theoretical issue rather

18   than a practical issue.

19             THE COURT:  Okay.

20             MR. POMERANTZ:  This brings us, Your Honor, to the

21   United States Trustee's opposition, which is really the only

22   true objection to the motion that has been filed.  No creditor

23   has filed an objection, no investor has filed an objection,

24   and no governmental agency -- which the U.S. Trustee in its

25   objection purports to be pursuing their interests -- has filed

19

1   an objection, either.

2       As Your Honor probably recalls, at the December 19th

3   hearing the Trustee indicated its intent to oppose any

4   agreement between the Debtor and the Committee that would

5   involve corporate governance and to file its own motion for

6   the appointment of the trustee.  That motion is currently

7   scheduled for hearing on January 21st.  We had asked the U.S.

8   Trustee to reserve judgment on the Committee's and Debtor's

9   agreement until after we had come to an agreement and after we

10  had presented it to the Trustee, in hopes that it would

11  address their concerns.  However, as the Court told us -- as

12  the U.S. Trustee told us and Your Honor at the December 19th

13  hearing, there was nothing short of appointment of a trustee

14  that would satisfy the Trustee.

15      The comments really didn't make sense to us, and I believe

16  it perplexed Your Honor, but here we are.

17      At its core, Your Honor, the U.S. Trustee's objection is

18  really a request that the Court substitute its business

19  judgment for that of the Debtor and the Committee, the

20  Committee who represents the substantial majority of all

21  claims in this case, when both of them have decided that

22  agreeing to certain changes in corporate governance, among

23  other things, is preferable to the uncertain, costly, and

24  time-consuming litigation over a trustee, and also the

25  uncertainty, even if a trustee was appointed, on how the case

20

1   would be administered.

2       To the contrary, under the corporate governance proposal,

3   we have three highly-qualified individuals who are poised to

4   take over management of the Debtor, and each bring with them

5   various skills that one trustee would not have.

6       The Trustee has filed its motion for appointment of a

7   trustee, and I'm sure on the 21st will argue that the Code

8   requires it.  However, that's not the issue before Your Honor

9   today.  It's not whether a trustee is appropriate.  It's

10  whether the motion and the term sheet is a sound exercise of

11  the Debtor's business judgment under Section 363, and,

12  importantly, a reasonable compromise of the pending disputes

13  between the Debtor and the Committee.

14      The Trustee's objection raises three general points, none

15  of which have any merit.  First, the Trustee argues that there

16  is a lack of disclosure of significant matters.  The first

17  aspect that the Trustee raises to, or points to, is the

18  absence of identification of the third board member and the

19  absence of disclosure of the compensation that the board

20  members will receive, which will be backstopped by the Debtor.

21      As I described before, Your Honor, the identity of the

22  third member of the board was a fluid process which was only

23  resolved earlier this week, and the Debtor did not believe

24  that it was appropriate to reach agreement on director

25  compensation until all board members could provide input.

21

1   Last night, we filed a reply to the Trustee's objection in

2   which we disclosed the identity of the third board member, and

3   we'll also disclose the proposed compensation to be provided

4   to them, which essentially is as follows.  Each member of the

5   board will receive $60,000 a month for the first three months

6   of the case, $50,000 a month for the next three months of the

7   case, and the presumption thereafter would be $30,000 a month.

8   However, people recognize that this case will look a lot

9   differently six months from now, and while the presumption is

10  $30,000, the Debtor, the independent board members, and the

11  Committee will sit down, see how the case looks, and decide

12  whether any modifications are appropriate.

13      The amount of compensation, which at first blush may seem

14  significant, really reflects the significant amount of work

15  that the Debtor, the Committee, and the independent directors

16  anticipate will be required from them not only to get up to

17  speed about the case, but to effectively manage this complex

18  Debtor's business operations.  The directors have heard from

19  the Debtor and the Committee of all the issues, of all the

20  concerns, and this is not an enviable task that they are

21  undertaking.  The compensation they are being provided thus

22  far we believe is appropriate under the circumstances and

23  commensurate with the work that they are going to be expected

24  to complete.

25      If they are successful and they are able to achieve a

**Appx. 02957**

22

1   consensual restructuring here, the million and a half or so

2   that will be spent on them will be best million and a half

3   dollars I think spent in this case.

4       Your Honor, we also have updated corporate governance

5   documents which --

6       (Pause.)

7           MR. POMERANTZ:  Your Honor, may I approach with the

8   updated corporate governance documents?

9           THE COURT:  You may.  Okay.

10          MR. POMERANTZ:  As I will discuss in a moment, Your

11  Honor, there is really no need for the Court to approve the

12  corporate governance documents, as they have been executed by

13  Strand, which is not a debtor before this Court.  However,

14  there are a couple of matters in those documents that I want

15  to bring to the Court's attention that do impact on the

16  Debtor.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  First, as is typical for board

19  members, Strand has agreed to indemnify the independent

20  directors to the full extent permitted by law.  The

21  independent directors have requested that the Debtors backstop

22  Strand's agreement, and the Debtor and the Committee agree,

23  and the documents so provide.

24      Strand has also committed to obtain directors and officers

25  coverage for the independent directors.  It has been located,

23

1   it's in the process of being finalized and bound, and the

2   Debtor will pay the cost of that coverage.

3       The independent directors have also asked for language in

4   the order approving the settlement that requires a party

5   seeking to assert a claim against the independent directors

6   relating to their role as an independent director to

7   demonstrate to this Court that a claim is colorable before

8   filing the claim and providing the Court with jurisdiction

9   over any such claim.  This is language that's similar in other

10  similar types of cases.

11          THE COURT:  Uh-huh.

12          MR. POMERANTZ:  That will be reflected in the order.

13      Next, the Trustee objects to the failure of the Debtor to

14  identify who the potential chief executive officer of the

15  Debtor will be.  And essentially, she's arguing that you have

16  to identify that CEO now; it has to be subject to court

17  approval.  However, there's no requirement that any company

18  retain a CEO.  It's not a corporate law requirement.  And the

19  fact that the board reserves the right to retain a CEO in the

20  future is consistent with corporate law and is not a basis to

21  deny the motion.  And in any event, normally, the retention of

22  a CEO is not a subject that is brought to the Court's

23  attention for Court approval.

24      So the lack of any clarity over the identity of the CEO is

25  a reflection of the fact that this independent board does not

24

1   know if a CEO is required.  They will come in, they are going

2   to interview all the employees, they're going to sit down with

3   the CRO, they're going to sit down with counsel, they're going

4   to sit down with the Committee, and ultimately they will

5   decide if a CEO is to be retained.  And if a CEO is to be

6   retained, they will go through the process of identifying who

7   that CEO is.  But again, it's not a reason to deny the motion.

8        The Trustee has also argued that because the Committee is

9   not granted standing to pursue claims against current

10  employees, as opposed to former employees, that there might be

11  some statute of limitations concerns with respect to claims

12  against those employees.  The argument doesn't really make

13  sense to us.  In the standard case, the Debtor retains causes

14  of action.  And the Committee can investigate causes of

15  action.  And at some point during the case, a Committee could

16  come in and could demand that the Debtor prosecute them, and

17  if the Debtor unreasonably refuses, could seek standing before

18  the Court.

19       In this case, the Debtors agreed up front that the

20  Committee has the standing to prosecute certain claims against

21  insiders that are not employees of the Debtor, which obviates

22  the need for standing.  So we've gone one step more.  But the

23  Trustee is arguing that that leaves a void for the claims that

24  are not subject to the agreement on standing.

25       However, the term sheet provides that the board is going

1  to make determinations on what employees should remain, what

2  employees should not remain.  To the extent the board

3  terminates any employees and there are claims against them,

4  then basically the Committee will have the ability to bring

5  those claims.

6      To the extent that those people aren't terminated, we have

7  no doubt that the Committee, in the course of its

8  investigation, will determine whether claims should be brought

9  against those people, and at some point in time may ask the

10  Debtor to prosecute those claims or ultimately seek standing.

11      In any event, these things are not being swept under the

12  rug.  There's no real legitimate concern that there's any

13  statute of limitations issue that will prevent those claims

14  from being prosecuted.

15      I am very much aware and have no doubt that the Committee

16  is going to be laser-focused on claims, and any concern that

17  statute of limitations is going to lapse I think is not well-

18  taken.

19      The Trustee next argues that the Court does not have the

20  jurisdiction to implement the corporate governance matters,

21  and for that reason the motion should be denied.  They -- she

22  argues that because Strand is not a debtor, that the Court has

23  no authority to appoint --

24          MS. LAMBERT:  Your Honor, I object.  The United

25  States Trustee is a he.  I am not the United States Trustee,

26

1   and the attacks *ad hominem* are inappropriate.

2          THE COURT:  All right.  Well, clarification, the U.S.

3   Trustee is the guy in Washington.  But anyway, you may

4   proceed.

5          MR. POMERANTZ:  I apologize to Ms. Lambert.

6          MS. LAMBERT:  Actually, he's downstairs right now.

7   Bill Neary.

8          MR. POMERANTZ:  I apologize to --

9          THE COURT:  Oh, well, I thought you meant the big guy

10  in Washington.  But anyway, you may proceed.

11         MR. POMERANTZ:  I apologize to Ms. Lambert and no

12  offense was meant.

13         THE COURT:  Okay.

14         MR. POMERANTZ:  So, the U.S. Trustee argues that

15  because Strand is not a debtor that the Court has no authority

16  to appointment the independent directors and limit Mr.

17  Dondero's right to remove the independent directors.  The

18  Debtor is not really seeking authority to appoint -- to have

19  court authority for the appointment of the directors at

20  Strand.  Again, as I mentioned before, that authority exists

21  outside of bankruptcy.  Strand is not a debtor.  Strand could

22  appoint anyone it wants to carry out its responsibility as the

23  general partner of the Debtor, and it's exercising its

24  corporate authority to do so by installing a board at Strand.

25     Nor is the Debtor seeking court authority for Strand to

27

1    enter into the corporate governance documents.  Other than the

2    couple of items I mentioned before, Your Honor, Strand can

3    enter into these documents without authority from this Court.

4    The only court authority that was required:  Debtor to

5    backstop the indemnification obligations, Debtor to pay

6    compensation to the board members, and Debtor to pay for the

7    D&O policy.

8        With respect to the Court's right to limit Mr. Dondero's

9    ability to terminate the independent directors, the term sheet

10   contemplates the Court approving a stipulation which limits

11   Mr. Dondero's ability to terminate the independent directors,

12   and if he does in fact seek to terminate the appointment of

13   the independent directors, he would be in violation of court

14   order.  But even more importantly, Your Honor, if he decided

15   to terminate the independent directors without the Committee's

16   consent and without the Debtor's consent, I wouldn't imagine

17   it would take anyone very long to come back before Your Honor

18   and ask Your Honor to very quickly appoint a trustee.

19       Accordingly, Your Honor, I think the argument of lack of

20   jurisdiction over Strand is a red herring and should be

21   denied.

22       Lastly, Your Honor, the Trustee makes a curious argument

23   that a trustee is needed to protect all investors and

24   governmental authorities.  The Trustee argues that this case

25   demands transparency which can only be accomplished by a

28

1   Chapter 11 trustee.

2       One thing I think the Debtor and the Committee and the

3   U.S. Trustee will agree on, this case does demand

4   transparency.  And we believe we've installed a corporate

5   governance structure, an operating protocol structure, a

6   document preservation structure, that does just that, provides

7   transparency that this Debtor has not been subject to and

8   which is quite different from the case that was before Your

9   Honor before.

10      So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13      And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17      Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22      In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

29

1        In conclusion, Your Honor, the only economic stakeholders

2    in this case believe that proceeding with the transactions

3    contemplated by the term sheet is in the best interest of the

4    estate, will maximize their ability to achieve a consensual

5    restructuring, and move this case through the system as

6    quickly and efficiently as possible.  The term sheet is a

7    valid exercise of the Debtor's business judgment under 363 and

8    an appropriate compromise of controversy, and the Trustee's

9    objections are really nothing more than a rehash of its

10   request for an appointment of a trustee.

11       For all these reasons, Your Honor, we request that the

12   Court overrule the U.S. Trustee's objection and approve the

13   motion.

14           THE COURT:  All right.  Well, before I hear from our

15   objectors, is there any friendly commentary?  Mr. Clemente, I

16   figured you might want to address this.

17           MR. CLEMENTE:  I do, Your Honor.  And good morning.

18           THE COURT:  Good morning.

19     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                     UNSECURED CREDITORS

21           MR. CLEMENTE:  For the record, Matthew Clemente from

22   Sidley Austin on behalf of the Official committee of Unsecured

23   Creditors.  I do have some comments that I would like to make,

24   Your Honor, some, so please bear with me.  I will try and be

25   brief.

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3   morning I wasn't sure that I would be in front of you with

4   this settlement fully in place in a manner that was

5   satisfactory to my Committee.  As I mentioned to you in my

6   prior appearances in front of you, every provision was

7   important to the Committee, and they all work together.  As

8   Your Honor can imagine, there was a lot of negotiation that

9   took place, including late in the day and early morning, to

10  come to that conclusion.

11      Some comments on our perspective as a committee, Your

12  Honor.  As an initial matter, we were absolutely not okay with

13  the governance structure that was in place when the petition

14  was filed.  As we detailed in our objections to the CRO motion

15  and the protocol motion back when the case was in Delaware,

16  the Committee has very real and identifiable concerns about

17  the Debtor's ability to dispatch its fiduciary duty.  And the

18  Committee very seriously contemplated moving for a Chapter 11

19  trustee daily.  That conversation is something that the

20  Committee continues to -- continued to engage in, Your Honor.

21  So it's something that they considered very, very carefully.

22      That was the lens through which the Committee was

23  approaching negotiations over the settlement agreement and the

24  independent director structure.  That's how they viewed it.

25  That's the backdrop against which they came to it.

31

1      The Committee had two primary goals that it had sought to

2    achieve with the settlement agreement.  The first was to

3    ensure that Mr. Dondero does not remain in a position of

4    management authority or control in any fashion with the

5    Debtor.  Goal number two was to ensure that the value of the

6    Debtor's estate is preserved and maximized.  Those two goals

7    needed to work together.

8      The Committee  believes that the carefully-crafted

9    settlement agreement achieves these objectives in a manner

10   that is more beneficial to the estate than a potential Chapter

11   11 trustee and a related fight over its appointment at this

12   time.

13     The lynchpin of the settlement, Your Honor, is the

14   appointment of the three independent directors.  And as Mr.

15   Pomerantz outlined for you, that was the subject of intense

16   discussion, negotiation, debate among the Committee and with

17   the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18   Judge Nelms are fully independent, highly qualified, and bring

19   relevant and complementary skillsets to this board.  Mr.

20   Pomerantz referred to that, but we believe that the three

21   directors all bring unique talents and attributes that will

22   allow them to function effectively as a board and provide the

23   appropriate oversight and direction that we believe is

24   necessary here.

25     However, regardless of how independent or highly skilled

32

1   they may be, they would be of no use if they weren't bestowed

2   with the appropriate power.  So that was another point that

3   was very important to the Committee, and we believe that the

4   settlement does this.  The settlement makes clear that the

5   independent directors are granted exclusive control over the

6   Debtor, including over all employees.  That's absolutely

7   critical to the Committee.

8        The settlement also provides that the CRO and the Debtor's

9   professionals shall report and serve at the direction of the

10  independent directors.  That is also very important.

11       And let me be clear, Your Honor, because I think you may

12  have raised this at a prior hearing:  This is not a board that

13  we expect to work at 50,000 feet, as demonstrated by the

14  compensation structure that Mr. Pomerantz outlined for you.

15  This will be a board that's hands-on, members of which will be

16  on the ground, at the Debtor, with a strong presence and a

17  clear message of who is in charge.  That is critical for this

18  Committee.

19       Additionally, as Mr. Pomerantz mentioned, the new board,

20  in consultation with the Committee, is empowered to determine

21  whether a CEO should be retained.  It's possible that one of

22  the independent directors could be that CEO, Your Honor.  But

23  we wanted to make clear that that was an important part of the

24  structure, should the board determine that that was the way it

25  wanted to go.

33

1      So, in sum, Your Honor, we believe that the independent

2    board has the clear authority and the skillset that's

3    necessary to take control and will be actively and

4    aggressively doing so.

5      But let me be clear, rest assured, Your Honor, this is not

6    going to be a board that answers to the Committee in that

7    sense.  I think that we will all be moving together

8    directionally, but it's very possible that I will be in front

9    of Your Honor arguing against a decision that this independent

10   board made.  So I want to assure Your Honor that although the

11   Committee was very active and in fact picked Mr. Seery and Mr.

12   Dubel, and then Mr. Pomerantz detailed how the third director

13   was picked, we understand who their duty -- what their duty is

14   and we also understand that they're not a rubberstamp for the

15   Committee, Your Honor.  And so I wanted to make that point to

16   you to assure Your Honor that that's not the structure that's

17   being set up here, nor are they the type of individuals that

18   would allow that to happen.

19     Additionally, Your Honor, the settlement grants the

20   Committee standing to pursue estate causes of action against

21   the related parties.  That was very important to us, Your

22   Honor.

23     And in addition to that, the settlement provides the

24   Committee access to privileged documents and sets forth a

25   discovery protocol that will assist the Committee in its

34

1  investigation.

2       The Committee strongly believes that Mr. Dondero's

3  repeated past behavior, that there are many questionable

4  transactions that will need to be thoroughly investigated and

5  pursued.  And so having those causes of action with the

6  economic party in interest related to those causes of action,

7  the Committee and its constituencies, we thought was very

8  important and very critical.

9       Granting standing, Your Honor, as I mentioned, avoids any

10  issues regarding who will be controlling those claims.

11       I'll touch on this in a moment, but Mr. Pomerantz talked

12  about Mr. Dondero remaining in name as an employee.  Let me

13  assure Your Honor that that is not a backdoor around the

14  Committee's ability to investigate and immediately pursue

15  claims against him should that be the course that we choose to

16  take.  So he's not part of that carve-out for current

17  employees.  That's not at all happening.  That would never be

18  something that my Committee would be comfortable with.  So I

19  wanted to make clear to Your Honor that that's not something

20  that's happening with sort of this late edition of Mr.

21  Dondero's continuing on in name as an employee.

22       Your Honor, the settlement also lays out a very detailed

23  set of operating protocols which we do believe are appropriate

24  and provides the Committee with transparency, which I've been

25  expressing to Your Honor we've needed since this case has

35

1  started.

2      Finally, as we point out in our reply and as would always

3  be the case, should new facts develop or the situation demand

4  it, the Committee reserves the right to seek a Chapter 11

5  trustee, as does any other party in interest, to the extent it

6  may be appropriate at that time.

7      In short, Your Honor, the Committee very carefully and

8  diligently weighed the independent director option versus the

9  Chapter 11 trustee option.  The Committee had very clear goals

10  in mind, as I expressed to you, and determined that those

11  goals could be achieved in a value-maximizing manner through

12  the independent director structure.

13      The negotiations were very intense, and it was only after

14  the Committee determined that each piece of the settlement was

15  to its satisfaction did it ultimately conclude that the

16  settlement maximizes value for all stakeholders while at the

17  same time protecting those stakeholders from exposure to

18  continuing insider dealing, breaches of duty, and

19  mismanagement.

20      Therefore, the Committee believes approving the settlement

21  is in the best interest of the estate, and therefore it

22  believes it should be approved.

23      I do want to offer a word about Mr. Dondero continuing as

24  an employee.  As Your Honor was aware, the term sheet as

25  originally filed provided that Mr. Dondero would, among other

1   things, resign as an employee of the Debtor.  Mid to late

2   afternoon yesterday, Mr. Ellington called me and said that the

3   Debtor was now of the view that Mr. Dondero should remain on

4   as an employee in that capacity for the benefit of the estate.

5   The Committee was, very appropriately, very skeptical of this,

6   as well as the sort of last-minute offer, last-minute, you

7   know, addition, however you want to view it -- some might

8   argue retrade -- that Mr. Dondero was to leave the Debtor,

9   period.  That was our view.  That was the way that the term

10  sheet was initially structured.  And under no circumstances

11  was the Committee going to allow Mr. Dondero to have any

12  control over this Debtor.

13      Your Honor, the Committee doesn't know what, if any, the

14  consequences are of removing Mr. Dondero as an employee.  And

15  we're not conceding at all that there are any value lost by

16  removing Mr. Dondero as an employee.  Instead, what we're

17  doing is we're staying true to our structure with the

18  independent directors and we're empowering them to decide.

19  And so it's consistent with, you know, our goals of having the

20  independent director structure in place.  And under the

21  settlement as now constructed, even with this late addition or

22  adjustment, Mr. Dondero would remain as an employee in name

23  only, subject in all respects to the direction, oversight, and

24  removal by the independent board.  And importantly, should

25  they decide to do that, Mr. Dondero shall resign.  And he

37

1   shall receive no compensation.

2       So he will not be in control of this Debtor.  The

3   independent directors are.  And he's not going to be empowered

4   to make decisions on behalf of the Debtor.  Instead, we're

5   empowering our independent directors to make those decisions

6   and determinations on behalf of the Debtor.

7       I wanted -- I thought it was important that I provide that

8   perspective to Your Honor, as this is something that came in

9   at a very, very late hour.

10      Overall, Your Honor, for the reasons I have stated and the

11  reasons in our reply, the Committee, as a fiduciary of all

12  creditors in this case, believes that the settlement is in the

13  best interests of the creditors and should be approved.  And

14  at this time, it's the better alternative than the cost,

15  delay, and uncertainty resulting from a Chapter 11 trustee

16  fight and the potential appointment of a Chapter 11 trustee.

17      It is time to put the governance issues behind us, Your

18  Honor, and to move forward to determine how to maximize value

19  for the creditors and how to get them paid.

20      Your Honor, just regarding the specific resolutions of

21  objections that Mr. Pomerantz put on the record, I agree with

22  how Mr. Pomerantz characterized those, and the Committee is

23  supportive of those resolutions as well.

24      Those are all my remarks, Your Honor, but I am happy to

25  answer any questions or address any concerns Your Honor may

38

1   have.

2          THE COURT:  Okay.  Two follow-up questions.  First, I

3   know I asked you this at a previous hearing and you told me,

4   but your Committee, as I recall, is very well constituted.

5   Just remind me of the members.

6          MR. CLEMENTE:  Yes.

7          THE COURT:  You have a representative from the

8   Redeemer Committee, --

9          MR. CLEMENTE:  Yes, Your Honor.

10         THE COURT:  -- which is a $140 million or so

11  arbitration award?

12         MR. CLEMENTE:  Yes, Your Honor.

13         THE COURT:  Okay.  And who else is on the Committee?

14  Is an Acis representative?

15         MR. CLEMENTE:  Acis is on the Committee, Your Honor.

16         THE COURT:  Uh-huh.

17         MR. CLEMENTE:  Meta-e Discovery, who is a trade

18  vendor of the Debtor, is on the Committee.  And UBS

19  Securities, who is also --

20         THE COURT:  Okay.

21         MR. CLEMENTE:  -- a litigation claimant, is on the

22  Committee.

23      It was the U.S. Trustee in Delaware's parting gift to me

24  to name a four-member committee, Your Honor.

25      (Laughter.)

39

1          THE COURT:  Okay.  Makes it awkward at times.  And

2     then back to the Dondero subject.

3          MR. CLEMENTE:  Yes, Your Honor.

4          THE COURT:  I mean, again, both Mr. Pomerantz and you

5     clarified that the proposal now is the new board will decide

6     if he stays on, Mr. Pomerantz said as a portfolio manager.

7          MR. CLEMENTE:  That is correct, Your Honor.

8          THE COURT:  Am I -- I mean, I'm hearing that

9     correctly?

10         MR. CLEMENTE:  That is correct, Your Honor.

11         THE COURT:  So, right now, whatever officer positions

12    he has, he's technically not resigning?  Or --

13         MR. CLEMENTE:  He is resigning as an officer of the

14    company, Your Honor.

15         THE COURT:  Okay.  He's resigning?  So the board will

16    just decide, is he going to be a portfolio manager or some --

17    whatever the employee title is?

18         MR. CLEMENTE:  Or they could decide that he's not

19    necessary.

20         THE COURT:  Or not necessary?  In any event, no

21    compensation?

22         MR. CLEMENTE:  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MR. CLEMENTE:  And as you can see, the term sheet

25    provides that Mr. Dondero shall not cause any related entity

40

1  to terminate any agreements with the Debtor as well.  That was

2  language that was added last night as well.

3          THE COURT:  All right.  So they're going to make the

4  decision, does he help preserve value by staying in some

5  capacity or not?

6          MR. CLEMENTE:  That is correct, Your Honor.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  That, cutting through it, that is the

9  way that ultimately the Committee views it.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  And if there's an opportunity -- and

12  I'm not conceding that there is.  I'm not conceding that he

13  preserves any value.

14          THE COURT:  Uh-huh.

15          MR. CLEMENTE:  But we wanted to give the option to

16  our independent directors to make that determination.  Because

17  if there's an opportunity to preserve value, that's what we're

18  trying to achieve.

19          THE COURT:  Okay.  And I don't even know if you've

20  thought through this.  Would there be some sort of notice

21  filed on record in the case if --

22          MR. CLEMENTE:  If --

23          THE COURT:  -- if the decision is made to --

24          MR. CLEMENTE:  To -- to --

25          THE COURT:  -- hire him or keep him as a portfolio

41

1  manager?

2          MR. CLEMENTE:  So, I think the default under the term

3  sheet, as revised, is he stays in that capacity in terms of

4  name.  The independent directors will -- they're subject to

5  his control and direction, and they could decide to remove

6  him.

7          THE COURT:  Uh-huh.

8          MR. CLEMENTE:  Perhaps if Your Honor --

9          THE COURT:  Okay.

10          MR. CLEMENTE:  We could provide notice if they make

11  the determination to remove him, but I think the default is

12  that, you know, he's in that -- he's remaining as that

13  employee name currently.  So that's the current default.

14          THE COURT:  Okay.  All right.  Thank you.

15          MR. CLEMENTE:  Thank you very much, Your Honor.

16          THE COURT:  Well, Ms. Patel, you're getting up so

17  I'll hear -- I don't know who all has been in the loop over

18  this overnight development.

19      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20          MS. PATEL:  Your Honor, Acis has been in the loop as

21  a member of the Committee.  And I will be very brief with

22  respect to Acis's individual comments.  And I just want to be

23  clear:  Obviously, I'm here as counsel for Acis, and so this

24  is Acis's individual position.  Mr. Clemente aptly and very

25  ably handled the Committee's overall position with respect to

42

1  this.

2      But Your Honor, I just want to, on behalf of Acis, make

3  sure that, because of these developments, that's really -- I

4  really had hoped to have zero role today, but I want to make

5  sure that we're -- Acis is on record with respect to our

6  position.  And obviously, given Your Honor's knowledge and

7  oversight of the long history of Acis's bankruptcy case and

8  seeing some of the events that transpired there, I'm sure that

9  this will all, against that backdrop, make an awful lot of

10 sense.

11     But, you know, it's this continued role for Mr. Dondero

12 that is of concern.  You know, this issue even being raised

13 within like the last 48 hours by Mr. Ellington, the timing of

14 it just creates an issue.  I mean, did this -- how could this

15 possibly have come out of left field when this is such a huge

16 part of what the Debtor does in its ordinary course of

17 business, is serve as a portfolio manager, and these are

18 contracts that have been negotiated, generally speaking,

19 internally by Highland.  So the fact that if Mr. Dondero were

20 to exit the structure and there would be some potential

21 ramifications to that, I've got to wonder how much of a

22 surprise could that really have been to Highland folks.

23     But I just wanted to highlight, in connection with the

24 term sheet -- this is the preliminary term sheet that was

25 handed up Your Honor, and I believe Your Honor has a redline

43

1   version of it as well --

2           THE COURT:  Uh-huh.

3           MS. PATEL:  -- on Page 2, with respect to the role of

4   Mr. James Dondero, there's various provisions in there.  And I

5   guess I would be remiss, Your Honor, if I didn't say, at least

6   out of the gate, Acis obviously supports the implementation of

7   this independent board of directors.  We believe all the

8   candidates are very capable and are -- we put our reliance

9   upon them.

10      Obviously, we don't concede any issues.  We'll see what

11  we're going to do.  But certainly, for the time being, we do

12  support the entry of this agreement of the settlement -- or,

13  I'm sorry, approval of the settlement agreement by the Court

14  that lets the independent board be put into place.

15      But what I'll focus the Court on, on Page 2 under the role

16  of Mr. James Dondero, it goes through various provisions as to

17  what he'll resign to -- positions he'll resign from and that

18  he will remain as an employee of the Debtor, including

19  maintaining his title as portfolio manager for all funds and

20  investment vehicles for which he currently holds that title.

21  And then it goes on to provide as to who he'll report to and

22  how he will be governed, which includes by the independent

23  board, he will receive no compensation, and that he will be

24  subject to at all times the supervision, direction, and

25  authority of the independent directors.

44

1    Again, we have faith that the independent directors will

2   oversee this and will govern his role accordingly.  However,

3   given Acis's history with how transactions have transpired at

4   Highland, we remain highly cautious with respect to what

5   happens next.

6    And to that end, Your Honor, the very last sentence there

7   on Page 2, "Mr. Dondero shall not cause any related entity to

8   terminate any agreements with the Debtor," is a key provision

9   of this that keeps Acis, as a Committee member, on board with

10  this agreement.  I wanted to highlight that and note that, in

11  the last less than 48 hours, in the last 12 hours, or maybe a

12  little bit more than that, call it 18 to be safe, that's where

13  -- that's a provision that's been -- that's where we've ended

14  up.  It's all of these issues have been going at lightning

15  speed, but I did want to just, for the record and so everybody

16  is clear, that is an important piece of this agreement to --

17  for Acis.

18   And as Your Honor knows, this Debtor, Highland, is wont to

19  try to terminate agreements and to try -- in an attempt to try

20  and transfer valuable contracts away and valuable revenue

21  stream away from an entity to an alternate entity.  And that's

22  really the heart of our concern, Your Honor.

23   So, with that, I just wanted to be clear and be on record

24  as to Acis's position.  Thank you.

25        THE COURT:  Thank you.  All right.

1          MR. POMERANTZ:  Your Honor, if I briefly may respond

2    to the issues with Mr. Dondero while they are fresh in Your

3    Honor's mind?

4          THE COURT:  Okay.  Okay.

5          MR. POMERANTZ:  Your Honor, look, we appreciate the

6    timing of this coming to the attention of the Committee as

7    being less than optimal.  As Your Honor can appreciate, this

8    case that's been filed three months ago, a lot of people are

9    looking very carefully at what's happening to the Debtor.

10   Investors are looking.  There was a transfer of venue.  There

11   have been a lot of reports about potential trustee motions.

12   And we believe a lot of parties are waiting to see the outcome

13   of this hearing and the trustee hearing to determine whether

14   they will determine to continue to do business with the

15   Debtor.

16       It's not only an issue of contractual rights.  It's also

17   an issue of whether investors feel comfortable on who is

18   managing, who is managing their investments.

19       This issue of Mr. Dondero's continuing role has been

20   something that at the Debtor we've continued to grapple with

21   over the last several weeks.  It's always been our thought

22   that we should do nothing that would unduly harm the company

23   from an economic standpoint.  I think the Committee shares

24   that.  That if it's determined by an independent board -- and

25   don't take current Debtor professionals, don't take current

46

1  Debtor employees' word for it -- but if they determine that

2  there's an economic benefit by keeping him on to preserve

3  material revenue stream, they should be able to make that

4  determination.  I think that's really at the core here.  And I

5  think the Committee got ultimately comfortable with it because

6  it will be an independent board, the majority of the members

7  identified and chosen by them and accepted by the Debtor.

8      So, again, we apologize to the parties and the Court for

9  bringing this on late.  It wasn't my intent to come here and

10 present modified versions of the term sheet that hadn't been

11 filed.  But that's where we are, and that's why it has come

12 up, and that's why it's an extremely important issue, because

13 preserving whatever revenue we can for the Debtor is

14 important.

15     Now, at the end of the day, the board may either decide

16 that he doesn't preserve the revenue, or the negatives from

17 keeping him involved with the company outweigh any benefits.

18 And that's a decision they will have to make, and it'll be

19 their province to make.  So I just wanted to give Your Honor

20 that perspective.

21          THE COURT:  Okay.

22          MR. DAUGHERTY:  Your Honor, may I approach?

23          THE COURT:  Mr. Daugherty?  You may.

24      OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25          MR. DAUGHERTY:  I apologize.  I was not planning to

1  address the Court at all today.  I would have had my attorney

2  here for it.  But I just ask a little bit of indulgence to

3  represent myself *pro se* for this issue.

4      This is the first I've heard that Mr. Dondero would stay

5  with the company.  I think it's an awful idea.  There's a

6  litany of reasons for that.

7      By the way, I'm completely in support of this -- of this

8  board that's been chosen.  I have every confidence that

9  they'll be able to make good decisions eventually.  But

10  they're stepping into this thing new.  Obviously, I've been

11  through this in your court with *Acis* and other matters, and I

12  have deep, deep concerns about Mr. Dondero continuing in that

13  role, simply because of the influence it has on the rest of

14  the organization and the message that it sends, both

15  internally and externally, of where the company goes from

16  here.

17      So I just wanted to let you know my thoughts.  I wasn't

18  planning to make them.  I haven't filed anything.  But that's

19  where I stand.

20          THE COURT:  All right.  Thank you, Mr. Daugherty.

21      All right.  Before we hear from the U.S. Trustee, who I

22  know is going to have a lot to say, let me just circle back

23  briefly to Jefferies counsel and the CLO Issuers' counsel.

24  You heard the representations of Mr. Pomerantz earlier about,

25  well, first, in the case of Jefferies, that the Debtor has

48

1 agreed to language to address your concerns.  Do you want to

2 weigh in on that and confirm that you're content that you're

3 going to have language to work out your concerns?

4          OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

5          MR. MAXCY:  Thank you, Your Honor.  Patrick Maxcy for

6 Jefferies.

7     No, I don't have anything additional to add to what Mr.

8 Pomerantz said.  The language that we have worked out will

9 speak for itself and will be included in the order.

10          THE COURT:  All right.  Thank you.

11     And counsel for the CLO and CDO Issuers, do you confirm

12 that you would be in agreement to basically withdraw your

13 objections for now, but perhaps come back and make argument on

14 the 21st if you have not worked out language with the

15 Committee that you think works?

16          OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17          MR. BENTLEY:  James Bentley from Schulte Roth for the

18 Issuers, Your Honor.

19     I believe the deal that Mr. Pomerantz and Mr. Clemente

20 and I have discussed was adjourning our objection to the 21st,

21 --

22          THE COURT:  Okay.

23          MR. BENTLEY:  -- rather than withdrawing it.

24          THE COURT:  Okay.

25          MR. BENTLEY:  We're -- we believe we will be able to

1  come up with language acceptable to the Issuers, but we would

2  like to reserve the right to come back to the Court on our

3  limited objection if we cannot, given that our issue is really

4  -- really only relates to the 25 Issuers we represent.

5        THE COURT:  Okay.  Thank you very much.

6     All right.  Ms. Lambert?

7    OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8        MS. LAMBERT:  May it please the Court.  As the Debtor

9  acknowledges, the motion that they are settling, the issues

10 that they are settling, are the issues that the U.S. Trustee

11 has raised in his motion to appoint a Chapter 11 trustee.  As

12 a matter of statutory construction, Section 1104 does not

13 contemplate settlement of these issues.  1112, in contrast,

14 has a provision that if the Court finds and determines that

15 there is cause to convert a case, there are unusual

16 circumstances and the Court can find a reasonable

17 justification for the wrongdoing or the error that occurred

18 that led to cause -- for example, administrative defects in

19 1112, not filing monthly operating reports -- and that can be

20 cured.  The Court has to make a finding that those -- these

21 defects can be cured within a reasonable period of time.

22 Section 1104 contains no analog to his.

23    If the Court finds cause to direct the appointment of a

24 Chapter 11 trustee, then the Court is supposed to appoint a

25 Chapter 11 trustee.  And *Trailer Ferry* and *AWECO* both stand

50

1   for the proposition that, on today's day, we're supposed to

2   have evidence about what the management issues are that led to

3   this agreement.  There's been no evidence.  There's been no

4   allegations in the motion for settlement.  And so the U.S.

5   Trustee is prepared to put that evidence on.

6        And Your Honor, one aspect of this is that the arbitration

7   agreement has been sealed.  And there are people on the phone.

8   I don't know who's on the phone.  The U.S. Trustee has opposed

9   the sealing of the arbitration -- not arbitration agreement,

10  the arbitration judgment -- has opposed the sealing of that.

11  And then they referenced a confidentiality order as the basis

12  to seal it.  The U.S. Trustee also opposed that

13  confidentiality motion, which was filed subsequently to the

14  motion to seal.

15       There is no confidentiality order.  An interim order was

16  entered sealing the arbitration award, but -- and the U.S.

17  Trustee has honored that by redacting all of the pleadings

18  that we filed relating to that, but it's important today for

19  the U.S. Trustee to be able to discuss it in argument, and it

20  is here -- and we have it prepared to be admitted into an

21  exhibit.

22       So, to proceed with my argument, Your Honor, I need some

23  clarification about what I can say.

24            THE COURT:  You want clarification from me on what

25  you can say?

51

```
 1              MS. LAMBERT:  Well, I mean, either that or we need to
 2    clear the room.
 3              THE COURT:  I've read the arbitration award.
 4              MS. LAMBERT:  Right.
 5              THE COURT:  It's in my brain.
 6              MS. LAMBERT:  Right.  Okay.
 7              THE COURT:  Uh-huh.
 8              MS. LAMBERT:  And so one of the arguments here today
 9    is that the U.S. Trustee is representing the SEC and
10    representing other Government agencies and things.  No.
11    Obviously, that is not the U.S. Trustee --
12              THE COURT:  I didn't hear that.
13              MS. LAMBERT:  Okay.  The -- one of the positions has
14    been, in the papers, is, well, that we don't have standing to
15    raise their issues.  And that's true.
16              THE COURT:  Okay.
17              MS. LAMBERT:  But the problem is that the U.S.
18    Trustee has been constrained from discussing those issues with
19    the SEC.  The arbitration award is very relevant to the SEC's
20    oversight.  I anticipate the evidence today will be that the
21    SEC, after the financial crisis of 2008, imposed restrictions
22    on this Debtor on breach of fiduciary duty issues.  I
23    anticipate that the arbitration findings would be very
24    relevant to whether those issues are ongoing or not.
25              THE COURT:  Okay.  Let me weigh in.  I view the legal
```

52

1    standard that this Court has to weigh today as being:  Is the

2    Debtor proposing something that is reflective of sound

3    business judgment, reasonable business judgment?  And to the

4    extent this is a compromise of controversies with the

5    Committee, is this fair and equitable and in the best interest

6    of the estate?

7        And as Mr. Pomerantz has said, you know, a lot of this

8    maybe doesn't even need Court approval.  But to the extent

9    there are aspects of this that are appropriate to seek Court

10   approval on, you know, this is my task.  I have to look at

11   what's presented, and is this reflective of sound business

12   judgment?  Is this fair and equitable?  Is it in the best

13   interest?

14       So, assuming there are tons of bad facts here reflected in

15   the arbitration award, reflected in other evidence, bad facts

16   that might justify a trustee, a Chapter 11 trustee, is this

17   nevertheless, what's proposed today, a reasonable compromise

18   of, you know, the trustee arguments the Committee could make

19   or, you know, is this a reasonable framework for going

20   forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22   know, do I need to look at the arbitration award?  Do we need

23   to have evidence of all of that?  I can assume that there are

24   terrible facts out there that might justify a trustee, but I'm

25   looking at what's proposed.  Is this a fair and equitable way

53

 1   to resolve the disputes?  Is it sound business judgment?
 2   Frankly, is it a pragmatic solution here to preserve value?
 3   So that's the legal standard I have in my mind here.
 4            MS. LAMBERT:  Yes, Your Honor.
 5            THE COURT:  Okay.
 6            MS. LAMBERT:  The standard is whether it is fair and
 7   equitable to resolve the issues in the Chapter 11 trustee
 8   motion, and it is the U.S. Trustee's position that they are
 9   not resolved by this.  And how are they not resolved?  Number
10   one, they're not resolved because the problems that led to the
11   breach of fiduciary duty issues and findings are more
12   pervasive, both based on this Court' finding in the *Acis* case
13   and in the arbitration court's finding in Mr. Dondero.  Other
14   officers are implicated.
15            THE COURT:  But how --
16            MS. LAMBERT:  Other employees are implicated.
17            THE COURT:  Okay.  I feel like maybe we're talking at
18   each other, not getting each other.  I've got a proposed
19   solution here to totally change the playing field, if you
20   will.  Bring in incredibly qualified people to --
21            MS. LAMBERT:  Those people --
22            THE COURT:  -- to change out the, you know, the
23   person that you say breached fiduciary duties, the, you know,
24   mismanagement, whatever bad labels we have here, but bring in
25   a clean slate.

54

1          MS. LAMBERT:  No, Your Honor, because employees

2    remain at the Debtor who are problematic.  The board that is

3    appointed owes a fiduciary duty to whom?  Strand.  Dondero.

4    He's still the board -- he is the sole stockholder.  Yes.  In

5    addition, --

6          THE COURT:  And they won't be taking directions from

7    him.

8          MS. LAMBERT:  In addition, --

9          THE COURT:  The term sheet is they won't be taking

10   directions from him.

11         MS. LAMBERT:  Your Honor, there is no evidence before

12   the Court today that Mr. Dondero has entered a stipulation.

13   This is part of the problem.  This continues --

14         THE COURT:  Well, if he doesn't, in five minutes the

15   Committee is going to be filing their trustee motion, right?

16         MS. LAMBERT:  Well, then we haven't saved any time or

17   any money.  This is the whole issue.  They have to put on

18   evidence that this is a resolution of issues.  We're going to

19   have the motion to appoint a Chapter 11 trustee either way.

20         THE COURT:  All right.  Well, we did have the

21   evidence of Mr. Sharp.  Would you like to cross-examine him at

22   this point?

23         MS. LAMBERT:  Your Honor, I would like to put the

24   U.S. Trustee's exhibits into evidence and then cross-examine

25   him.

Appx. 02990

55

1          THE COURT:  All right.  Your exhibits?

2          MR. POMERANTZ:  Your Honor, we would object to any

3   exhibits.  The Trustee has not filed an exhibit list.

4          MS. LAMBERT:  Your Honor, this matter was set on an

5   expedited basis and the Court does not require exhibit and

6   witnesses lists when a matter is filed on an expedited basis.

7   It's impossible, when a response is filed at 5:00 o'clock the

8   evening before and supplements are made in the morning of the

9   hearing, for the U.S. Trustee to put on a witness and exhibit

10  list.

11         MR. POMERANTZ:  Your Honor, we were here on the 19th.

12  We set out a briefing schedule.  And maybe it was a couple

13  days short of normal notice.  Ms. Lambert agreed to issue

14  discovery by a certain date, and she at no point said that

15  because there was 13 days' notice as opposed to longer period

16  that she couldn't comply and provide a witness list.

17     We provided with a witness list.  We provided an exhibit

18  list.  The Trustee's effort and attempt to now submit exhibits

19  and rely on maybe there were some changes this morning, that

20  just doesn't cut it, and that's not fair and that's not due

21  process.

22         THE COURT:  Okay.  I sustain the objection.  The

23  exhibits won't be admitted since there was no exhibit list.

24         MS. LAMBERT:  Your Honor, I do not have an exhibit

25  list from them.  And they --

56

1          THE COURT:  Well, they haven't offered any.

2          MS. LAMBERT:  They put on new exhibits this morning.

3     The exhibits that the U.S. Trustee has are all things that

4     they are familiar with.

5          THE COURT:  Let me back up.  They didn't introduce

6     any exhibits.  They --

7          MS. LAMBERT:  But they introduced the declaration,

8     they introduced the supplements to the agreement that were

9     drafted this morning, they've introduced the new corporate

10    resolutions, all of which they handed me this morning.

11         THE COURT:  All right.  Well, the declaration of Mr.

12    Sharp, it's two pages long.  It is, I don't think, any kind of

13    surprise information.

14         MS. LAMBERT:  Your Honor, --

15         THE COURT:  I'll allow you to cross-examine him.

16         MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17    surprise, either.  The *Acis* opinion is no surprise to anybody

18    in this courtroom.

19         THE COURT:  Okay.  Well, what are your exhibits?

20         MS. LAMBERT:  The --

21         THE COURT:  I probably should have asked.

22         MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23    arbitration awards or the determinations, both the partial and

24    the final, and the SEC's original judgment.  There are four

25    exhibits.

57

1          THE COURT:  All right.  Well, Mr. Pomerantz, what

2     would you like to say?  One of them I have obviously seen,

3     since I wrote it.

4          MR. POMERANTZ:  Yes, you've written it.  You wrote

5     it.

6        (Laughter.)

7          MR. POMERANTZ:  Your Honor, I think this is a tempest

8     in a teapot.  The Committee's brief that it filed in

9     opposition to the CRO retention, the ordinary course

10    protocols, and the cash management motion had a litany of

11    description of the Redeemer litigation, of the SEC litigation.

12    There are plenty of bad facts out here.  Okay?  We have an

13    interim order to seal.  There was no hearing set today for our

14    final hearing.

15       The Trustee has objected to that order, and I suspect that

16    will be heard on the 21st.  We don't think it's appropriate to

17    introduce the Redeemer award.  However, we have read the

18    redacted provisions or portion of the U.S. Trustee's brief,

19    and we have no problem if the U.S. Trustee limits its argument

20    to the redacted portion in presenting that to the Court.

21       In other words, we don't believe that the few sentences

22    that were redacted need to be redacted.

23       However, to the extent they intend to submit the

24    arbitration award, we don't think it's appropriate, we don't

25    think it's necessary, we think Your Honor hit it right, that

58

1   the issues today are not whether there's mismanagement at the

2   Debtor.  Okay?

3       The U.S. Trustee's position is, notwithstanding this new

4   structure, it doesn't work.  She has a trustee motion on.  She

5   can argue on the 21st that it doesn't work.  Nobody is

6   prejudicing her right to do so.

7       We think it's prejudicial, it's unfair, it's procedurally

8   improper to submit the Redeemer arbitration award and to allow

9   the Trustee to do anything other than describe exactly what

10  she has in her pleading.

11          THE COURT:  Okay.  I sustain the objection to those

12  exhibits.  Again, I've read them.  They're in my brain.  I

13  wrote one of them.  But I will allow you to cross-examine Mr.

14  Sharp.  So, Mr. Sharp, would you please come to the witness

15  stand?  Please raise your right hand.

16          BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Please be seated.

18          MS. LAMBERT:  To clarify, Your Honor, has the Court

19  considered the *Acis* opinion and the arbitration opinions based

20  on judicial notice?

21          THE COURT:  And we're doing a lot of hair-splitting

22  here.  I'm just letting you know I -- the facts are in my

23  brain.  You can't extract them from my brain.  Okay?

24          MS. LAMBERT:  Okay.

25          THE COURT:  I know there have been a lot of bad

Sharp - Cross                                    59

1  things, arguably bad things.  But to me, the real issue here

2  today is whether this framework that has been heavily

3  negotiated with the Committee reflects reasonable business

4  judgment on the part of the Debtor, is a fair and equitable

5  resolution of the Committee's, you know, arguments in favor of

6  a trustee, and whether this makes, you know, sense going

7  forward to allow this Debtor to go forward without a trustee.

8  Okay?

9      So I really think that the evidence you want is not

10 terribly relevant.  We technically aren't here on a trustee

11 motion today.  We're here on whether a new board and the

12 terms, the protocols suggested, reflect reasonable business

13 judgment and reflect a fair compromise of arguments the

14 Committee has raised.  All right?  So I don't know how much

15 more clear I can make that.  I guess the technical answer is

16 I'm not taking judicial notice of those things for purposes of

17 today.

18      All right.  You may proceed.

19                    CROSS-EXAMINATION

20 BY MS. LAMBERT:

21 Q    Mr. Strand, can you state your name for --

22 A    Sorry.  Bradley Sharp, S-H-A-R-P.

23 Q    Sharp.  Mr. -- oh, sorry.

24 A    No relation to Strand.

25 Q    All right.  Strand is the general partner of the Debtor,

Sharp - Cross                                60

1  right?

2  A    That is correct.

3  Q    And there has been no change in the board of the Debtor

4  except Mr. Dondero's resignation; is that right?

5  A    Well, it's a little different, because the -- Strand is

6  the general partner of the Debtor.

7  Q    Yes.

8  A    So the new board will be acting and in control of the

9  Debtor.

10  Q    Yes.  And there is -- Strand is a non-debtor, correct?

11  A    That is correct.

12  Q    And the stock of the non-debtor, Strand, is owned by

13  Dondero?

14  A    Mr. Dondero owns Strand Advisors.

15  Q    In its entirety?

16  A    That is correct.

17  Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18  Dondero?

19  A    The board will have a fiduciary duty to the Debtor and to

20  Strand Advisors.

21  Q    All right.

22  A    Their duty is to the entity.

23  Q    The -- Strand, as the general partner, as an entity, owes

24  a fiduciary duty to the Debtor, right?

25          MR. MORRIS:  Objection to the extent it calls for a

Sharp - Cross                                61

1   legal conclusion.

2            THE COURT:  Sustained.

3   BY MS. LAMBERT:

4   Q    Do you know?

5   A    As a lay person.  I'm not an attorney.

6   Q    Okay.  So you don't know what the fiduciary roles of the

7   board will be; is that right?

8   A    Well, the fiduciary board will be acting -- you know,

9   looking at it from my perspective as the chief restructuring

10  officer, the new board will be acting as the Debtor-in-

11  Possession.  And, you know, they will be directing the Debtor-

12  in-Possession.  You know, the Debtor-in-Possession has duties

13  to all parties in interest, and they will be directing the

14  Debtor.  They will be directing me as CRO.

15  Q    And, in addition, there may be a CEO, right?

16  A    That is contemplated, correct.

17  Q    It is contemplated?  It --

18  A    It is -- it is an option that the board has if they think

19  a CEO is necessary.

20  Q    But you don't know whether a CEO is going to be appointed

21  or not?

22  A    That's up to the board.

23  Q    And you don't know what the compensation for that

24  individual might be, right?

25  A    Again, that's up to the board.

Sharp - Cross                                   62

1  Q    Mr. Dondero is going to be an employee of the Debtor,

2  right?

3  A    That's correct.

4  Q    And Mr. Dondero started the Debtor, correct?

5  A    I believe so.

6  Q    And he also started Strand, right?

7  A    I believe that's correct.

8  Q    And he is also in control of a number of entities that the

9  Debtor does business with; is that right?

10 A    That is correct.

11 Q    Mr. Ellington is going to remain on with the Debtor?

12 A    That -- Mr. Ellington is an employee.  All employees are

13 now subject to the board.

14 Q    Okay.  And Mr. Ellington's role with the Debtor is what?

15 A    He is general counsel with the Debtor.

16 Q    And there are other in-house attorneys with the Debtor,

17 right?

18 A    That's correct.

19 Q    And who else is there currently?

20 A    I don't have the list in front of me, you know, the

21 employee list.  As of now, because obviously this is still --

22 hasn't been effected, so the board has not made any decisions

23 with respect to any employees going forward.

24 Q    And the CFO remains the same?

25 A    Yeah, that is, again, as of now.  I don't know what the

Sharp - Cross                                  63

1   board is going to do, if anything.

2   Q    Do you have any anticipation of what you would recommend

3   to the board regarding the CFO?

4   A    You know, I have many recommendations I have not made to

5   the board yet.  I just met them this morning.

6   Q    Are you aware that historically this Court has found that

7   the lawyers provided bad advice to the Debtor?

8            MR. MORRIS:  Objection to the form of the question.

9            THE COURT:  Sustained.

10  BY MS. LAMBERT:

11  Q    Do you have any knowledge about whether there have been

12  findings that the law firm gave erroneous advice to the

13  Debtor?  Or, I mean, the in-house counsel gave erroneous

14  advice.

15           MR. MORRIS:  Objection to the form of the question.

16           THE COURT:  Sustained.

17           MS. LAMBERT:  Your Honor, I'm asking for the

18  foundation.

19           THE COURT:  Rephrase.

20  BY MS. LAMBERT:

21  Q    Do you -- are you aware of any concerns about the in-house

22  counsel?

23  A    Yes.

24  Q    What is your knowledge?

25  A    I have read the rulings from this Court.

Sharp - Cross                          64

1   Q    And what is your understanding of those rulings?

2   A    I don't recall specifically.  I read that early on when I

3   was first employed.  But there have been concerns with respect

4   to, you know, management of the Debtor.

5   Q    As the CRO, have you made any recommendations to change

6   employees to date?

7   A    As of now, I don't have a -- the board.  You know, the

8   board has just been employed.  We have not made

9   recommendations up to this point.  We are still -- obviously,

10  have been evaluating our position and what needs to happen.  I

11  think it's important for the Debtor at this time, a little

12  stability would be a good thing for -- until we develop the

13  direction going forward.

14  Q    Are you familiar with the compensation terms for the

15  directors?

16  A    Yes.

17  Q    And the directors are employees of Strand but paid by the

18  Debtor; is that right?

19  A    Oh, I'm not sure they're employees of Strand, but they are

20  paid by the Debtor, their compensation.  That's correct.

21  Q    And yet the compensation is technically through Strand,

22  right?

23  A    They -- they are.  They have to act through the general

24  partner of the Debtor because of the corporate structure.

25  Q    One of the portions of the agreement is that the Committee

Sharp - Cross                                65

1   acquires litigation claims.  Are you familiar with that?

2   A    I am.

3   Q    Have you parsed out which litigation claims those might be

4   at this point?

5   A    I think the agreement says they have litigation claims

6   against insiders and related parties.  So I don't know what

7   those individual claims are.  I don't know what exists.

8   Q    Are you aware that the Committee obtains the attorney-

9   client privilege and work product privilege?

10  A    Yeah.  Subject to the terms of those agreements, correct.

11  Q    Have you gone through the documents and determined which

12  ones would fall on -- which attorney files would fall on which

13  side?

14  A    Not as of yet.

15  Q    Have you been taking direction from Mr. Dondero?

16  A    We've had -- I've had limited interaction with Mr. Dondero

17  since my retention.  You know, we have been complying with the

18  protocols that we had been negotiating with the Committee and

19  providing information to the Committee.  We have been, as a

20  result of those protocols, instructing management of the

21  company on compliance with those protocols.  So they have

22  brought to us transactions that they would like to do.  We

23  have reviewed those transactions and compared it to the

24  proposed protocols and have been enforcing those.  So if

25  management has asked to do a transaction that does not meet

Sharp - Cross                              66

1  within those protocols, we have been declining the

2  transaction.  And that -- you know, the company has agreed

3  with that decision and accepted that decision.

4  Q    When you say management, who are you -- to whom are you

5  referring?

6  A    You know, the whole management team at the company.  In-

7  house counsel.  The CFO.  You know, I've had limited

8  interaction with Mr. Dondero.  One interaction was he did

9  question one of my decisions that I made.  We discussed it and

10 he accepted my conclusion.

11 Q    You're at the Debtor every day?

12 A    My team is.

13 Q    You are not?

14 A    I have had some travel restrictions due to a medical

15 issue, but I have three of my team there every day.

16 Q    Is Mr. Dondero there every day?

17 A    I don't know.  I don't think so.  In the few days I'm

18 there, I've not seen him.

19 Q    Is Mr. Ellington there every day?

20 A    No.

21 Q    Who on the management team is there every day?

22 A    You know, our primary interaction is with Isaac Leventon,

23 Frank Waterhouse, the CFO.  You know, primary interaction, you

24 know, with David Klos, who is the controller, in dealing with

25 the financial issues.

Sharp - Cross                            67

1      Obviously, we spend a lot -- my team spends a lot of time

2   with the head of compliance.

3   Q   Were you surprised by this addition that Mr. Dondero would

4   remain as an employee?

5   A   I can't say I was surprised.  It is an issue that we

6   struggle with, given the nature of this company's business.

7   You know, I see the change in the language and, you know, as

8   CRO, I am comfortable with it.

9   Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10  that he was necessary three weeks ago?

11  A   I'm not saying that he's necessary.  I'm saying that it is

12  important for the board to be able to make that decision.

13  Q   And it wasn't important when the settlement was filed?

14  A   It was the -- it was a struggle at the time.  I was

15  concerned at the time it was filed the unintended consequences

16  of Mr. Dondero resigning completely and disappearing, because

17  there are a significant number of funds that the Debtor deals

18  with related parties that are controlled by Mr. Dondero, and I

19  was worried about the financial impact with it.  I knew this

20  issue was important to the Committee.  And if that's something

21  that the Debtor agreed to and the Committee agreed to, so be

22  it.

23      You know, I think the last-minute compromise is acceptable

24  and appropriate.  I think the language as negotiated is going

25  to be very helpful to the Debtor.  And I think, then, it's up

Sharp - Cross                             68

1  to the board to make the decision, with full knowledge on

2  what's the best avenue forward.

3  Q    And the language as negotiated was added because, in the

4  past, there have been problems with Mr. Dondero changing or

5  terminating agreements with related entities, right?

6  A    There was that -- I've seen that -- issues raised in the

7  *Acis* case.

8           MS. LAMBERT:  No further questions.

9           THE COURT:  All right.  Any redirect?

10          MR. POMERANTZ:  Not from the Debtor.

11          THE COURT:  Anyone have examination?  No?  All right.

12  Thank you, Mr. Sharp.  You're excused.

13          THE WITNESS:  Thank you.

14      (The witness steps down.)

15          THE COURT:  All right.  Are we going to have any

16  other, I guess, witnesses, evidence?

17          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18          MR. POMERANTZ:  No, Your Honor.  I just had a couple

19  points.  One, Ms. Lambert mentioned that she hadn't seen a

20  copy of the stipulation referred to, which was prohibiting Mr.

21  Dondero from terminating the board.  There's a good reason for

22  her not having seen it.  I hadn't provided it to her.  It just

23  came this morning, right before the hearing.  I have one

24  signed copy.  I have other copies that I could represent, even

25  though they're unsigned, are the same, so I would like to

69

 1  provide Your Honor.  I'll keep the signed copy but provide you

 2  with an unsigned copy, but it's the same, and also give one to

 3  the U.S. Trustee.

 4          THE COURT:  But you've got a signature of Mr. Dondero

 5  on that?

 6          MR. POMERANTZ:  Yes, I do.

 7          THE COURT:  Okay.

 8          MR. POMERANTZ:  May I approach?

 9          THE COURT:  You may.  Thank you.

10          MR. POMERANTZ:  Your Honor, maybe for the record it

11  would be appropriate for me to show Your Honor the signature,

12  so you could say that you've seen it?

13          THE COURT:  Yes.  Yes.

14          MR. POMERANTZ:  May I approach again?

15          THE COURT:  You may.  (Pause.)  Okay.  Thank you.

16  The record will reflect I've seen Mr. Dondero's signature.

17          MR. POMERANTZ:  Your Honor, one of the threads that

18  Ms. Lambert said to Your Honor is that there were employees

19  still remaining at the Debtor and that those employees may

20  have been involved in some wrongdoing.

21      I submit, Your Honor, if Your Honor appointed a Chapter 11

22  trustee today, what would a Chapter 11 trustee do?  A Chapter

23  11 trustee wouldn't terminate every employee at the Debtor.  A

24  Chapter 11 trustee, if he or she was doing what they should

25  do, would go down to the company, would interview members of

70

1    the company, senior management, and decide who should stay on

2    and who should not stay on.

3        That, I submit, Your Honor, is exactly what this board

4    will do.  So the concept of there being something different

5    done, if you have a board here or not, I don't think makes

6    sense.

7        And lastly, Your Honor, Ms. Lambert expressed the issue as

8    whether it's fair and equitable to resolve the U.S. Trustee

9    issues in this way.  I don't think that's the standard.  The

10   only fair and equitable I understand is in plan confirmation.

11   I think Your Honor said it straight, which is:  Is this a

12   valid exercise of the Debtor's business judgment and is it an

13   appropriate compromise of controversy?  That is the standard.

14   And, again, we have always acknowledged that, notwithstanding

15   how Your Honor rules today, the Trustee reserves the right to

16   come back to court and argue a trustee is appropriate on the

17   21st.

18       We believe, Your Honor, that many of the cases, in this

19   circuit and elsewhere, look to the continuing management of

20   the company and whether management issues have been addressed

21   as a significant factor in determining whether a trustee is

22   appointed.  And it'll come as no surprise, of course, if Your

23   Honor grants our motion today, this will be a lynchpin of our

24   opposition to the trustee motion.

25       But, again, those issues are for another day, and we

71

1  believe that we have satisfied our standard, and we request

2  that Your Honor approve the motion.

3        THE COURT:  All right.  Other closing arguments?

4    CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

5        MS. LAMBERT:  Yes, Your Honor.  As the Debtor

6  acknowledges, the Court has no jurisdiction over Strand.  This

7  is a complicated structure.  A trustee avoids all of the

8  complications involved in the Court exercising jurisdiction

9  over an entity that it doesn't have jurisdiction over.

10     To enter a stock stipulation related to a non-debtor is

11  highly irregular, and Mr. Dondero is the person behind that.

12  It has happened in cases where people have been in these kinds

13  of structures, like that FSLIC used to put in these kinds of

14  structures -- there's published opinion, the *Goubert*

15  (phonetic) case -- where the person continued to exercise

16  control even though they had a stock trust.

17     The Court needs a person beholden to the Court.  The

18  evidence is that, historically, this Debtor has entered into

19  things that breached its fiduciary duty and resulted in self-

20  dealing and liability for the Debtor.  The evidence is that

21  these go beyond Mr. Dondero and the Court does not have

22  jurisdiction over his stock.  The Court does not have

23  jurisdiction over Strand.  The board members of Strand are not

24  employees of the Court, they're employees of Strand, a non-

25  debtor.  These members have a fiduciary duty to Strand.

1    Yes, Strand is the general partner of this Debtor and has

2    a fiduciary duty, but all these fiduciary duties intermix in

3    ways that result in conflicts for this case.  These conflicts

4    are unnecessary.  The Court could just appoint a trustee who

5    only owes a fiduciary duty to the members and creditors of

6    this case, as well as the next (inaudible).

7    There is no evidence that this is cheaper.  There is no

8    evidence that this is a total resolution, because issues are

9    left open, such as whether or not a CEO is going to be

10   appointed, how much that person is going to cost.

11   Finally, Your Honor, the sealing has constrained the

12   ability of some of the parties to understand what's going on

13   in this case.  And that is material to the argument about who

14   is here, because we don't know who -- that all the people who

15   would have participated in this discussion had an opportunity

16   to participate in it.

17   Yes, the creditors have a fiduciary duty, and I believe

18   that they represented to the best of their ability, but they

19   are not charged with the issues that others are charged with,

20   such as the SEC.

21   There is no evidence that the officers are disinterested.

22   Rather, the new officers are going to be conflicted by the

23   nature of their position.  There's no evidence that it's

24   cheaper.  And a trustee, if appointed, could be appointed on

25   an hourly basis.  This is a Chapter 11 trustee.

73

1        They argue that the trustee would not have the knowledge,

2    and yet they've been able to find three candidates to serve

3    for the board who are qualified.  So there's no evidence that

4    it would not be better to have a trustee for that reason as

5    well.

6        The evidence is that, historically, the Redeemer Committee

7    was set up to prevent these kinds of transactions and have

8    oversight.  Historically, the evidence is it did not work.

9    For this reason, the statute provides a solution, and the

10   Court should impose it.  The Court should deny this motion as

11   not being in the interest of the estate, as not being a sound

12   exercise of discretion, because it's really the discretion of

13   Strand, not the Debtor, and it will remain the discretion of

14   Strand, not the Debtor.

15       Thank you.

16           THE COURT:  All right.  Anyone else have comments?

17           MR. POMERANTZ:  Your Honor, just a couple of minor

18   points.

19           THE COURT:  Okay.

20            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21           MR. POMERANTZ:  Ms. Lambert started by saying the

22   Court doesn't have jurisdiction over Strand.  I know I just

23   handed her the stipulation, but the last paragraph of the

24   stipulation specifically says that the parties stipulate and

25   agree that the Court shall have exclusive jurisdiction over

74

1   all matters arising from or related to the interpretation and

2   implementation of this stipulation and the adjudication of any

3   parties breaching the stipulation.

4       So the Court does have jurisdiction now that the

5   stipulation has been signed, assuming that the Court enters

6   it, so I think that addresses that issue.

7       Your Honor, the evidence of the disinterestedness of the

8   members of the board, we've provided their *curriculum vitaes*.

9   We've made representations that they have no connections with

10  the Debtor or any of the parties in interest.  We don't think

11  that, just because they become appointed and become a director

12  of Strand, that that renders them disinterested [sic], and we

13  think that the Trustee's arguments that being at a different

14  level creates different duties is just not -- is not accurate.

15  I don't think that the Committee would have had any appetite

16  for this type of structure had they believed that each of

17  these board members wouldn't feel that their fiduciary duty

18  was to the Debtor's estate.  And they all are seasoned

19  restructuring people from different aspects, all understand

20  their fiduciary duties well, and all are prepared to carry

21  them out.

22      Lastly, the Trustee points to the historic issues, and

23  specifically mentioned the Redeemer Committee and that

24  structure didn't work.  Well, I think it speaks volumes, Your

25  Honor, that not only the Redeemer Committee, are they on the

75

1   Committee and the Committee has supported this motion, but the

2   Redeemer Committee hasn't come to Your Honor and said that,

3   notwithstanding that structure that may or may not have been

4   effective, this structure is ineffective.

5       And at the end, Your Honor, the Trustee is trying to

6   replace the business judgment of the Debtor.  The Debtor is

7   entitled to deference of the judgment, again, focusing on the

8   correct standard.  And, again, the Trustee will have her day

9   in -- his day in court in connection with the ultimate trustee

10  motion on the 21st.

11      Thank you, Your Honor.

12          THE COURT:  Anyone else?

13      All right.  Well, the Court is going to note a few things

14  as part of its ruling, obviously.  The new proposed

15  independent board members for Strand, Strand obviously being

16  the general partner of the Debtor, Highland -- Mr. James

17  Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18  highly-qualified individuals with respect to the industry.

19  Some of them with respect to restructuring.  Certainly, in the

20  case of retired Judge Nelms, with regard to fiduciary duties

21  and the Bankruptcy Code requirements.

22      These three individuals were chosen by the Creditors'

23  Committee, whose constituency is broad, whose constituency is

24  owed well over $100 million.  And they were chosen by the

25  Committee after literally months of negotiation.  Obviously,

76

1  this bankruptcy was filed in October, and it appears to this

2  Court, from the representations of counsel, that from the very

3  beginning of the case -- the Committee was, I guess, appointed

4  a week or two after the case was filed in October -- there's

5  been haggling over corporate governance of this Debtor.

6      So we have highly-qualified individuals.  We have

7  individuals who were chosen by the well-constituted Creditors'

8  Committee.  And what has been proposed to the Court is that it

9  is these independent directors that would have sole and

10  exclusive management and control of the Debtor.

11      An interesting jurisdictional argument has been made, and

12  it's one of those arguments that, frankly, you know, sounds

13  good when you first hear it, but when you really drill down

14  about the governance structure here, I mean, obviously, this

15  Debtor is a limited partnership and it acts through a general

16  partner.  It's the general partner that controls the Debtor

17  entity.  And while Strand Advisors, Inc., the general partner,

18  may not technically be in bankruptcy, it's the structure of

19  these entities such that it controls the Debtor.  So the

20  jurisdictional argument, when you drill down, feels a little

21  off.

22      Moreover, we have language in the stipulation where Strand

23  is stipulating and consenting, if you will, to this Court's

24  exercise of jurisdiction over it.

25      There are many things about the compromise here that have

77

1  very compelling appeal.  Among them, certainly, the Committee

2  that's negotiated this term sheet retains the right at any

3  time to move for a Chapter 11 trustee if it believes there are

4  grounds.  The Committee is granted standing to pursue estate

5  claims, certain estate claims right off the bat, without

6  having to come back and ask the Court, without having to rely

7  on the Debtor to pursue that.  There are document production

8  provisions, document preservation provisions, a shared

9  privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

78

1   business justification for proposing the independent slate of

2   directors at the GP level for the Debtor, the protocols, the

3   negotiation with the Committee, the document sharing, the

4   standing given to them?  Does all of this reflect reasonable

5   business judgment?  And I find, quite clearly, it does.  I

6   find it to be a pragmatic solution to the Committee's concerns

7   about existing management and control.

8       And I think I used the words "fair and equitable," not

9   just Ms. Lambert, because it is also presented to the Court as

10  a 9019 compromise of disputes with the Committee, and we

11  traditionally use a fair and equitable and best interest of

12  the estate analysis in this context.  So, to the extent that

13  applies, I do find this a fair and equitable way of resolving

14  the disputes with the Committee, and I find this to be in the

15  best interest of the estate.  So I do approve this.

16      And by approving this motion, I'm approving the term sheet

17  as it's been presented, the various terms therein, the

18  exhibits thereto.  I'm specifically approving the new

19  independent directors, the document management and

20  preservation process, the standing to the Committee over

21  certain of the estate claims, the reporting requirements, the

22  operating protocols, the whole bundle of provisions.

23      Now, there is one specific thing I want to say about the

24  role of Mr. Dondero.  When Ms. Patel got up and talked about

25  the newest language that has been added to the term sheet, she

79

1    highlighted in particular the very last sentence on Page 2 of

2    the term sheet, the sentence reading, "Mr. Dondero shall not

3    cause any related entity to terminate any agreements with the

4    Debtor."  Her statement that that was important, it really

5    resonated with me, because, you know, as I said earlier, I

6    can't extract what I learned during the *Acis* case, it's in my

7    brain, and we did have many moments during the *Acis* case where

8    the Chapter 11 trustee came in and credibly testified that,

9    whether it was Mr. Dondero personally or others at Highland,

10   they were surreptitiously liquidating funds, they were

11   changing agreements, assigning agreements to others.  They

12   were doing things behind the scenes that were impacting the

13   value of the Debtor in a bad way.

14        So not only do I think that language is very important,

15   but I am going to require that language to be put in the

16   order.  Okay?  So we're not just going to have an order

17   approving the term sheet that has that language.  I want

18   language specifically in the order.  You know, you can figure

19   out where the appropriate place to stick it in the order is,

20   but I want specific language in here regarding Mr. Dondero's

21   role.  I also -- the language in there that his role as an

22   employee of the Debtor will be subject at all times to the

23   supervision, direction, and authority of the Debtors, I want

24   that language in there as well.  Let's go ahead and put the

25   language in there that at any time, in any event, the

80

1    independent directors can determine he's no longer going to be

2    retained.  I want that in the order.

3        And I'm sure most of you can read my mind why, but I want

4    it crystal clear that if he violates these terms, he's

5    violated a federal court order, and contempt will be one of

6    the tools available to the Court.  He needs to understand

7    that.  Mr. Ellington needs to understand that.  You know, if

8    there are any games behind the scene, not only do I expect the

9    Committee  is going to come in and highlight that to the Court

10   and file a motion for a trustee or whatever, but we're going

11   to have a contempt of court issue.

12       So, anybody want to respond to that?

13           MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14   Stang Ziehl & Jones.

15       We hear Your Honor.  What I thought I'd do now is I have a

16   clean redline of the order, of course not including the

17   provision you just requested, --

18           THE COURT:  Uh-huh.

19           MR. POMERANTZ:  -- which we will go back and upload

20   and hope to get an order signed by Your Honor today, if you're

21   around.  But to go over the other changes, the changes to

22   Jefferies, the other language changes I discussed before.  I

23   gave a copy to Ms. Lambert and to the Committee.  May I

24   approach with a --

25           THE COURT:  You may.

81

1          MR. POMERANTZ:  Thank you.

2          THE COURT:  Okay.  All right.  (Pause.)  All right.

3   The form of order looks fine to me.  Obviously, you'll add the

4   Dondero-related language, and we may have further wording

5   tweaks negotiated with the CLO Issuers.  But, again, I approve

6   all of this.  I didn't say on the record the compensation, but

7   certainly I am approving that as reasonable.  I expect these

8   three directors are going to be working very, very hard.  And

9   so, as you said, not 50,000-foot level monitoring, actually

10  rolling up sleeves on-site, so I think the compensation is

11  reasonable.

12         MR. POMERANTZ:  Thank you, Your Honor.  We will

13  submit an order shortly that includes Your Honor's language

14  requested.

15         THE COURT:  Okay.

16         MR. POMERANTZ:  Are you around this afternoon?

17         THE COURT:  I am around, --

18         MR. POMERANTZ:  Okay.

19         THE COURT:  -- so just pick up the phone or send an

20  email to Traci, my courtroom deputy, --

21         MR. POMERANTZ:  Yes.

22         THE COURT:  -- so she can tell me, "It's in your

23  queue to sign."

24         MR. POMERANTZ:  She has been extremely helpful and

25  responsive.

82

1          THE COURT:  Good.  I'm glad to hear that.

2          MR. POMERANTZ:  Yes.

3          THE COURT:  Now, as far as future scheduling, I did

4    have her sitting by, listening, in case we needed to discuss

5    anything.  Obviously, we're going to have a kind of a

6    carryover placeholder on the 21st as part of the trustee

7    motion hearing for any remaining issues with the CLO Issuer.

8    And, you know, that's just a placeholder if necessary to hear

9    language controversies.

10     My courtroom deputy was concerned, because you have a lot

11   of pending motions that have just sort of sat there pending

12   because this was the big issue, right?  She wants to make sure

13   she sets anything you need a setting on.  And I don't know if

14   you want to discuss that today or go back as a group and --

15         MR. POMERANTZ:  We're happy to -- I think, you know,

16   I think that's appropriate to do.  We had the motion to

17   appoint the CRO.

18         THE COURT:  Uh-huh.

19         MR. POMERANTZ:  That was pending.  That gets resolved

20   by this motion.  We will submit an order --

21         THE COURT:  Okay.

22         MR. POMERANTZ:  -- with the new agreement that was

23   attached to the term sheet.

24     We had the cash management order which Judge Sontchi had

25   issued an interim order.  We will have a final order with

83

1   respect to that.

2           THE COURT:  Okay.

3           MR. POMERANTZ:  We will be withdrawing the motion to

4   approve ordinary course protocols which was originally on for

5   hearing.

6           THE COURT:  Uh-huh.

7           MR. POMERANTZ:  I think on the 21st we have currently

8   set a motion to approve the retention or Mercer, which is the

9   Debtor's compensation consultant, --

10          THE COURT:  Uh-huh.

11          MR. POMERANTZ:  -- and an analog motion that was

12  originally set for today with respect to insiders, non-

13  insiders, but is on for non-insiders and insiders on the 21st,

14  --

15          THE COURT:  Uh-huh.

16          MR. POMERANTZ:  -- which is the motion to approve

17  bonuses.

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  Of course, the Debtor's new board is

20  going to be wanting to very carefully review that.  And we are

21  going back and today having our first new board meeting with

22  the board to start bringing them up to speed.  But we

23  presently intend, subject to, obviously, their direction, to

24  go forward on the 21st.

25      We also have the retention of Lynn Pinker and Foley

84

1   Gardere, which had been filed and was brought on for hearing

2   previously.  It had been delayed, again, for the board to look

3   at the issues.  We expect to have that on for the 21st.  And I

4   believe, I believe that would be it.

5            MS. LAMBERT:  No, Your Honor, the --

6            MR. POMERANTZ:  No?

7            MS. LAMBERT:  -- U.S. Trustee has objected to the

8   motion to seal, which was the second item on the Wilmington

9   Court's docket that got -- and it got transferred here.  The

10   U.S. Trustee has also objected to the motion for protective

11   order.  The issues overlap.  We request that they be set as

12   quickly as possible.

13           MR. POMERANTZ:  We're happy to set both of those for

14   the 21st as well.

15           THE COURT:  All right.  So I think what I'm going to

16   ask you to do is just get on the phone, one of you, with Traci

17   and just make sure she's clear on everything you need set on

18   the 21st, and then you can do a big notice of hearing, just

19   kind of listing all of these matters.

20           MR. POMERANTZ:  Your Honor, with respect to the CRO

21   motion -- order and the cash management order, I was wondering

22   if it would be helpful for my colleague Mr. Demo to go over

23   the amendments to those orders -- we would like those to be

24   entered today -- to see if Your Honor has any questions.

25           THE COURT:  All right.  That would be good.  Mr.

85

1  Clemente, did you have something first?

2          MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3  filed our retention applications for the Committee

4  professionals and filed CNOs, and your office had indicated

5  you wanted to get through today, which I totally understand,

6  but I just wanted to make sure that Your Honor didn't lose

7  sight of those.  I don't believe there were any objections to

8  those, but I think your intent was probably to deal with them

9  after today, but I just wanted to --

10         THE COURT:  All right.  Yes, it was to get through

11  today.

12         MR. CLEMENTE:  Yes.

13         THE COURT:  So, since you've had plenty of time run

14  on those, you can submit orders and I'll get them signed in

15  chambers.

16         MR. CLEMENTE:  Thank you very much, Your Honor.

17  Appreciate it.

18         THE COURT:  Okay.  Thank you.  Counsel?

19         MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20  Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21  this as brief as possible, but I think walking through the

22  cash management motion has the most changes.

23         THE COURT:  Okay.

24         MR. DEMO:  The biggest change there, and we had

25  discussed this with the United Stated Trustee in Delaware, is

86

1   that in our initial motion we disclosed that the Debtor had

2   bank accounts at BBVA and then also at NexBank.  Those

3   accounts have been moved to East West Bank, --

4              THE COURT:  Okay.

5              MR. DEMO:  -- which is a party to a depository

6   agreement with the United Stated Trustee.

7              THE COURT:  Okay.

8              MR. DEMO:  The only exception to that is a

9   certificate of deposit that is at NexBank.  It's a relatively

10  small amount of money.  It's $135,000.  But it also is pledged

11  as collateral on a lease.  So that has been -- proven

12  problematic to move.  The Trustee for Delaware did say that

13  was okay.  I would hope that the Trustee for Texas would agree

14  with that.  We did disclose it in the initial debtor

15  interview.

16      But those are the bank accounts.  The bank accounts at

17  BBVA and NexBank, with the exception of that CD, were all

18  closed as of yesterday.

19             THE COURT:  Okay.

20             MR. DEMO:  So now we are going to be using East West

21  Bank for all operating accounts, all cash, going forward.

22      The other two accounts are the account at Jefferies, which

23  is the prime brokerage account.

24             THE COURT:  Uh-huh.

25             MR. DEMO:  That account, we are keeping open.

87

1   Obviously, there have been conversations with Jefferies that

2   are going to be reflected in the proposed order on the

3   settlement, but we do propose to keep the Jefferies prime

4   brokerage account open as well.

5       And then we filed a supplement for another prime brokerage

6   account that we have at a prime broker called Maxim Group.

7   That account has $30 million in securities in it, give or

8   take, and then literally like $100 in cash.  The Debtor

9   considers that account more an investment than actual

10  operating account, but we would like to keep that account open

11  as well, just so it can continue holding those securities.

12      Jefferies and Maxim, neither of them are on the depository

13  list, so we are requesting a waiver of 345(b) for those two

14  accounts, and then also requesting a waiver of 345(b) with

15  respect to the certificate of deposit at NexBank.

16          THE COURT:  Okay.

17          MR. DEMO:  That's where we're at at cash management.

18  And I guess, sorry, one more thing.  In the original cash

19  management motion, we had a series of intercompany

20  transactions that we disclosed, and we had gotten interim

21  relief from the Delaware court to make those payments up to a

22  hundred -- or, $1.7 million.  We are below that account, and

23  on a go-forward basis, all of those intercompany transactions

24  are getting subsumed into the settlement motion and the

25  operating protocols and all of that.  But we are asking for

88

1   final relief on the intercompany transactions that we made

2   under the interim order.

3         THE COURT:  Okay.  All right.  Who wishes to be heard

4   on this?  I don't know how much discussion we've had outside

5   the courtroom on this.

6         MS. LAMBERT:  We haven't -- normally, a bond would be

7   appropriate for the Jefferies and the other small account.

8   The estate is at risk on the CD, but it's not that much money.

9   It's not worth bonding.  It'll be more expensive to bond it.

10        NexBank, as you know, Your Honor, is a bank where Mr.

11  Dondero is the CEO.  So that was part of the reason that

12  NexBank was carved out.  But the -- so I would like them to

13  bid bonds on the Jefferies and the other account.  And if we

14  -- let's carry it on those issues so that we can see how

15  expensive bonding it would be, and if it's cost-prohibitive,

16  maybe we reconsider.  But in the past, the bonds haven't been

17  very expensive, relatively.

18        MR. DEMO:  We're happy to discuss that with the U.S.

19  Trustee.  I mean, just for the record, the Jefferies account,

20  you know, does support a margin loan.  It's $80 million in

21  securities.  It's $30 million at Maxim.  They're SIPC.  I

22  mean, it's Jefferies and, you know, another large prime

23  broker.  Again, we're happy to discuss it with the Trustee.  I

24  don't know that it's necessary, but we will discuss it.

25        THE COURT:  Okay.  Well, you all can discuss it, and

89

1  if you have an unopposed order, an agreed order, --

2          MR. DEMO:  Uh-huh.

3          THE COURT:  -- you can upload it and I'll sign it.

4  Otherwise, if you need hearing time on the 21st, --

5          MR. DEMO:  Okay.

6          THE COURT:  -- we'll get it all figured out then and

7  --

8          MR. DEMO:  Okay.  All right.

9          THE COURT:  -- resolve it then.

10          MR. DEMO:  Thank you, Your Honor.  And then I guess

11  the other motion is the CRO retention.  This one should

12  hopefully be pretty brief.  We are just filing a new proposed

13  order that attaches the engagement letter, as has been

14  modified by all of the settlement discussions.  I believe the

15  Committee is on board with that, and it's consistent.  It was

16  one of the attachments that you approved this morning in

17  connection with the settlement.

18          THE COURT:  All right.  Comments on that?

19          A VOICE:  None, Your Honor.

20          THE COURT:  Committee,  you're good?

21          MS. LAMBERT:  The U.S. Trustee had also objected to

22  the CRO motion, but it's some of the same issues that the

23  Committee raised.  And the CRO, my understanding, is now not

24  an employee of the board but totally overseen by the board,

25  and with that, we can withdraw our objection.

90

1          THE COURT:  All right.  Very good.  I'll sign your

2   order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5   else, I'll be on the lookout for your orders.  And, again, if

6   you could coordinate with Traci to make sure she's clear on

7   everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10          MR. CLEMENTE:  Thank you, Your Honor.

11          MR. DEMO:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13      (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                          CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                      12/10/2020

24   _____     _____
    Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

91

INDEX

1

PROCEEDINGS                                                    4

2

OPENING STATEMENTS

3

By Mr. Pomerantz                                             9
By Mr. Clemente                                             29
By Ms. Patel                                               41
By Mr. Pomerantz                                           45
By Mr. Daugherty                                           46
By Mr. Maxcy                                               48
By Mr. Bentley                                             48
By Ms. Lambert                                             49

4

5

6

7

8

WITNESSES

9

Debtor's Witnesses

10

Bradley Sharp

11

- Direct Testimony by Declaration                            8
- Cross-Examination by Ms. Lambert                          59

12

EXHIBITS

13

14

Debtor's Exhibits                          Identified Received

15

1    Bradley Sharp Declaration                8        8

16

CLOSING ARGUMENTS

17

By Mr. Pomerantz                                           68
By Mr. Clemente                                            71
By Mr. Pomerantz                                           73

18

19

RULINGS                                                    75

20

END OF PROCEEDINGS                                         90

21

INDEX                                                      91

22

23

24

25