# EXHIBIT 24

**Appx. 03028**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                     )    Case No. 19-34054-sgj-11
In Re:                               )
                                     )
HIGHLAND CAPITAL                     )    Dallas, Texas
MANAGEMENT, L.P.,                    )    February 19, 2020
                                     )    9:30 a.m.
         Debtor.                     )
                                     )    MOTIONS
_____        )

                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:              Greg Demo
                             John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Debtor:              Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd., 13th
                               Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

For the Debtor:              Melissa S. Hayward
                             Zachery Z. Annable
                             HAYWARD & ASSOCIATES, PLLC
                             10501 N. Central Expressway,
                               Suite 106
                             Dallas, TX  75231
                             (972) 755-7104

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539
```

2

1   APPEARANCES, cont'd.:

2   For the Official Committee   Juliana Hoffman
    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
3                               2021 McKinney Avenue, Suite 2000
                                Dallas, TX  75201
4                               (214) 981-3413

5   For Acis Capital           Rakhee V. Patel
    Management GP, LLC,         Annmarie Antoinette Chiarello
6   et al.:                     Phillip L. Lamberson
                                WINSTEAD, P.C.
7                               2728 N. Harwood Street, Suite 500
                                Dallas, TX  75201
8                               (214) 745-5250

9   For Acis Capital           Brian Patrick Shaw
    Management GP, LLC,         ROGGE DUNN GROUP, P.C.
10  et al.:                     500 N. Akard Street, Suite 1900
                                Dallas, TX  75201
11                              (214) 239-2707

12  For the Issuer Group:      Amy K. Anderson
                                JONES WALKER, LLP
13                              811 Main Street, Suite 2900
                                Houston, TX  77002
14                              (713) 437-1866

15  For the Issuer Group:      James T. Bentley
    (Telephonic)                SCHULTE ROTH & ZABEL, LLP
16                              919 Third Avenue
                                New York, NY  10022
17                              (212) 756-2000

18  For Redeemer Committee of  Mark A. Platt
    the Highland Crusader       FROST BROWN TODD, LLC
19  Fund:                       100 Crescent Court, Suite 350
                                Dallas, TX  75201
20                              (214) 580-5852

21  For Redeemer Committee of  Marc B. Hankin
    the Highland Crusader       JENNER & BLOCK, LLP
22  Fund:                       919 Third Avenue
    (Telephonic)                New York, NY  10022-3098
23                              (212) 891-1600

24

25

3

1   APPEARANCES, cont'd.:

2   For the U.S. Trustee:        Lisa L. Lambert
                                 OFFICE OF THE UNITED STATES
3                                  TRUSTEE
                                 1100 Commerce Street, Room 976
4                                Dallas, TX  75242
                                 (214) 767-8967 Ext. 1080
5
     Recorded by:                Michael F. Edmond
6                                UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
7                                Dallas, TX  75242
                                 (214) 753-2062
8
     Transcribed by:             Kathy Rehling
9                                311 Paradise Cove
                                 Shady Shores, TX  76208
10                               (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

4

 1 |       DALLAS, TEXAS - FEBRUARY 19, 2020 - 9:43 A.M.

 2 |           THE COURT:  All right.  Well, we have Highland

 3 | matters.  Let's get lawyer appearances, in the courtroom

 4 | first.

 5 |           MR. DEMO:  Good morning, Your Honor.  Greg Demo;

 6 | Pachulski Stang Ziehl & Jones, on behalf of the Debtor.  With

 7 | me are Jeff Pomerantz and John Morris.

 8 |           THE COURT:  Okay.  Good morning.

 9 |           MR. POMERANTZ:  Good morning.

10 |           MR. CLEMENTE:  Good morning, Your Honor.  Matthew

11 | Clemente and Juliana Hoffman from Sidley Austin on behalf of

12 | the Official Committee of Unsecured Creditors.

13 |           THE COURT:  Good morning.

14 |           MS. HAYWARD:  Good morning, Your Honor.  Melissa

15 | Hayward and Zachery Annable also on behalf of the Debtor.

16 |           THE COURT:  Good morning.

17 |           MS. LAMBERT:  Lisa Lambert with the U.S. Department

18 | of Justice on behalf of the U.S. Trustee, William Neary.

19 |           THE COURT:  Good morning.

20 |           MS. PATEL:  Good morning, Your Honor.  Rakhee Patel,

21 | Phil Lamberson, and Annemarie Chiarello of Winstead, P.C., and

22 | also Brian Shaw of Rogge Dunn Group, on behalf of Acis Capital

23 | Management, LP and Acis Capital Management, GP, LLC.

24 |           THE COURT:  Thank you.

25 |           MR. PLATT:  Good morning, Your Honor.  Mark Platt

5

```
 1   from Frost Brown Todd on behalf of the Redeemer Committee of
 2   the Highland Crusader Fund.  I believe that at least Marc
 3   Hankin from Jenner & Block is on the line as well.
 4              THE COURT:  Okay.  Thank you.
 5              MS. ANDERSON:  Good morning, Your Honor.  Amy
 6   Anderson with Jones Walker on behalf of the Issuers.  And I
 7   believe Mr. James Bentley with Schulte Roth is also on the
 8   phone.
 9       And I apologize for interrupting the flow.  I would ask if
10   Mr. Bentley and I could be excused after the uncontested
11   matters are taken up this morning, just to avoid  --
12              THE COURT:  Okay.
13              MS. ANDERSON:  -- having us -- I don't want to re-
14   interrupt later, if that is all right with Your Honor.
15              THE COURT:  Okay.  That's fine.  Thank you.
16              MS. ANDERSON:  Okay.
17              THE COURT:  All right.  That looks like all the
18   courtroom appearances.  On the phone, we heard that James
19   Bentley is there.  Do you want to appear, Mr. Bentley?
20              MR. BENTLEY:  Yes, that's correct, Your Honor.  Good
21   morning.
22              THE COURT:  All right.
23              MR. BENTLEY:  Good morning, Your Honor.  James
24   Bentley; Schulte Roth & Zabel; for the Cayman Issuers.
25              THE COURT:  All right.  And someone else was there
```

6

 1   for the Redeemer Fund.  I can't remember.  Was it Mr. Clubok
 2   you said, or anyone else on the phone?
 3          MR. HANKIN:  Marc Hankin from Jenner & Block, --
 4          THE COURT:  Oh, okay.
 5          MR. HANKIN:  -- Your Honor.
 6          THE COURT:  All right.  Mr. Hankin.  Anyone else on
 7   the phone who wants to appear may go ahead.
 8      All right.  I guess we're good to go.  Well, I'll turn now
 9   -- Mr. Demo, are you going to start us off today?
10          MR. DEMO:  Yes, Your Honor.
11          THE COURT:  Someone delivered a wonderful notebook
12   and an easy-to-follow agenda.  I appreciate whosever hard work
13   was behind that.  It really helps us get prepared back in
14   chambers.  So, thank you.
15          MR. DEMO:  And we're happy to do it, Your Honor,
16   because, honestly, it helps us, I think, as much as it helps
17   you.
18          THE COURT:  Okay.
19          MR. DEMO:  And we do have extra copies if anybody
20   needs a copy of the agenda.
21          THE COURT:  Okay.
22          MR. DEMO:  Generally speaking, we'd kind of like to
23   go in the order of the agenda, I think, with two exceptions.
24   I know that Ms. Adams and Mr. Bentley have to move, so I
25   thought maybe we could do their objection to the settlement

7

1   motion first.

2           THE COURT:  Okay.  So that's the carryover matter.

3           MR. DEMO:  Correct, Your Honor.

4           THE COURT:  We obviously have an order in place, but

5   we kept it open to accommodate their issues.

6           MR. DEMO:  Correct.

7           THE COURT:  Okay.

8           MR. DEMO:  And that's Item 7 on Page 7.

9           THE COURT:  All right.

10          MR. DEMO:  And I think this one -- and anybody can

11  correct if I'm wrong -- will go pretty easily.  We've come to

12  an agreement with the Objecting Parties.

13          THE COURT:  All right.

14          MR. DEMO:  We are planning on submitting, under a

15  notice, a revised copy of the operating protocols that were

16  approved by this Court in connection with the settlement that

17  addresses those Objectors' concerns.  And then once that is

18  filed, the Objecting Parties will withdraw their objection.

19          THE COURT:  All right.  Anyone wish to speak up on

20  this matter?

21      All right.  Well, as I recall, the concern had been that

22  they didn't want the agreed-upon operating protocols with the

23  Committee to somehow change contractual rights of the parties,

24  and so --

25          MR. DEMO:  That is correct, Your Honor.  And we took

8

```
 1   their language and we carved out a small universe of CLO
 2   Issuers, --
 3              THE COURT: Okay.
 4              MR. DEMO:  -- exactly as they asked for.
 5              THE COURT:  All right.  Well, again, I'll ask:  Does
 6   anyone have any comment about this revised process?
 7       All right.  Well, that sounds perfectly fine to me, so
 8   we'll look for the revised copy of the operational procedures.
 9              MR. DEMO:  Okay.  Great, Your Honor.
10       And then I guess the only other exception to the order of
11   the agenda --
12       (Garbled phone noises.)
13              THE COURT:  Is someone on the phone wishing to speak
14   up?  (no response)  All right.  I guess not.
15              MR. DEMO:  Yeah.  I guess the only other exception to
16   the order in the agenda is the Foley Gardere retention
17   application.
18              THE COURT:  Okay.
19              MR. DEMO:  We would like to do that last.  It is a
20   contested hearing and I think we are going to have some
21   evidence on that.
22              THE COURT:  All right.  All right.  Sounds fine.
23              MR. DEMO:  Then, I guess, just going through the
24   agenda in the order that it's written, the first one is the
25   Lynn Pinker retention application.  We had originally filed
```

9

1   that retention application back in October.  We recently

2   withdrew it.  We're not going to go forward on it.

3              THE COURT:  All right.

4              MR. DEMO:  The second matter, and I guess the second

5   two matters, hopefully, we can take at the same time.  These

6   are two uncontested matters.  Certificates of no objection

7   have been filed for both of them.  The first is the foreign

8   representative motion.

9              THE COURT:  Yeah, and I will tell you, I don't know

10  if it's shown up on PACER yet, --

11             MR. DEMO:  Okay.

12             THE COURT:  -- but I actually already signed an order

13  on that, --

14             MR. DEMO:  Okay.

15             THE COURT:  -- as well as exclusivity.

16             MR. DEMO:  Perfect.

17             THE COURT:  But, you know, I saw the certificates of

18  no objection, but perhaps we need to talk about it in case

19  anyone wants to comment in any way.

20             MR. DEMO:  If anybody does, I mean, if you've already

21  entered them -- I know PACER was down, so I don't think we've

22  seen it yet.

23             THE COURT:  Okay.

24             MR. DEMO:  But we're fine moving on if --

25             THE COURT:  Well, yeah.  The foreign representative

10

1   motion looked like a no-brainer, if you will.

2             MR. DEMO:  Uh-huh.

3             THE COURT:  It was filed way back in October, right?

4             MR. DEMO:  Correct.  Right.

5             THE COURT:  And no one had ever objected.  It's just

6   that there are some foreign proceedings out there; --

7             MR. DEMO:  Right.  Right.

8             THE COURT:  -- you wanted to make sure that there was

9   a human being who had authority to act in those?

10            MR. DEMO:  Correct.

11            THE COURT:  All right.  So, if no one has any

12  comment, I did go ahead and sign the order approving that.

13            MR. DEMO:  Okay.

14            THE COURT:  Similarly, exclusivity.  I signed an

15  order on that yesterday.  In probably nine out of ten cases, I

16  would have had a hearing with evidence.

17            MR. DEMO:  Uh-huh.

18            THE COURT:  But, again, that one seemed like a no-

19  brainer.  We had no objections, and obviously you've been in

20  court a lot, with a lot of things happening.

21            MR. DEMO:  Yes.

22            THE COURT:  So it seemed like a no-brainer to give

23  more time on that.  So, does anyone have anything they wanted

24  to say about that?  (no response)  All right.

25            MR. DEMO:  Okay.

11

1      THE COURT:  So that is granted.  I can't remember,

2  off the top of my brain, what the extended time frame was.  Do

3  you want to say that on the record?  Because I've just blanked

4  out at the moment.

5      (Counsel confer.)

6      MR. DEMO:  It's -- we extended it for four months,

7  Your Honor.

8      THE COURT:  Okay.  All right.  So that was June, June

9  12th as the deadline for filing a plan, and then the

10 solicitation period would expire on August 11th, 2020.  That's

11 what I've approved.

12     MR. DEMO:  Yes.

13     THE COURT:  All right.

14     MR. DEMO:  Okay.  The next matter is the bar date

15 motion.  There was an automatic bar date set for April 8th --

16     THE COURT:  Uh-huh.

17     MR. DEMO:  -- in connection with the 341 notice.  We

18 just wanted to have procedures for filing claims approved by

19 this Court.

20     THE COURT:  Okay.

21     MR. DEMO:  You know, we filed the motion.  There are

22 no objections.  We did have some comments from the United

23 States Trustee, which we've incorporated into a redlined

24 order.

25     Something came up last night where, the way that it works

12

1   because we have a lot of investors, is that a lot of people

2   get notice through their custodians and through the different

3   administrators.

4           THE COURT:  Uh-huh.

5           MR. DEMO:  And so we worked that into the motion.

6   The United States Trustee has asked for an extension of 45

7   days for those folks to file their claim.  We're okay with

8   that.  We're going to work with her afterwards, and we will

9   submit a revised form of order.

10          THE COURT:  Okay.  So, just to be clear, the proposed

11  deadlines, as revised, would be what?

12          MR. DEMO:  It depends on when the notice is actually

13  able to be sent out.

14          THE COURT:  Okay.

15          MR. DEMO:  We need to work through some technical

16  issues on that.

17          THE COURT:  Okay.  Ms. Lambert?

18          MS. LAMBERT:  So, Judge Jernigan, I think the Court

19  is familiar with this from when we solicit Equity Committees.

20  It's the same issue here.  You go to TD Ameritrade and then

21  they send the notice to the direct holders, but also asked

22  that they include correspondence to the TD Ameritrade or

23  Merrill Lynch equivalents saying -- instructing them to send

24  the notice of the bar date to their direct holders.

25     So we're going to agree on the phrasing of the letter.

13

 1   I'm hopeful that we can attach that to the order so the Court

 2   can see what it looks like.

 3            THE COURT:  All right.

 4            MR. DEMO:  Okay.  And we'll work through those

 5   issues, Your Honor, and have something to you as soon as

 6   possible.

 7            THE COURT:  All right.  And you're also asking for

 8   bar dates, really, bar date for 503(b)(9) claims as well?

 9            MR. DEMO:  Yeah.  We don't think we're going to have

10   any.

11            THE COURT:  Okay.

12            MR. DEMO:  So it's really just out of an abundance of

13   caution.

14            THE COURT:  Okay.  All right.  Well, I'll look for

15   that form of order --

16            MR. DEMO:  Okay.

17            THE COURT:  -- and be happy to sign it as you all

18   have negotiated it.

19            MR. DEMO:  Okay.  And then skipping over Foley

20   Gardere, there is one still outstanding objection on that, so

21   we will hear that in due course.

22            THE COURT:  Okay.

23            MR. DEMO:  The next one is Item 6 on Page 6, and

24   that's the PensionDanmark motion to lift the stay.  We have an

25   agreement in principle with PensionDanmark that the Committee

14

1  has signed off on.  We're just going through and working

2  through the paperwork.  And so we would like to just push this

3  to the next hearing date, with the expectation that we would

4  get the paperwork filed in between then and we wouldn't have

5  to have it set.

6           THE COURT:  All right.  So we will carry this to our

7  next omnibus hearing date.  I don't know if we have one

8  automatically set at this point or --

9           MR DEMO:  It's March 13th.

10          THE COURT:  March--?

11          MR. DEMO:  12th.

12          MS. HAYWARD:  11th.

13          MR. DEMO:  11th.  I'm sorry.  I was in the ballpark.

14          THE COURT:  Okay.  So, carried to March 11th, as

15  necessary.

16          MR. DEMO:  Uh-huh.

17          THE COURT:  All right.

18          MR. DEMO:  And then I guess the next thing, skipping

19  over the CLO Issuers' objection, which we already addressed,

20  --

21          THE COURT:  Uh-huh.

22          MR. DEMO:  -- is the sealing conference motion.

23          THE COURT:  Okay.

24          MR. DEMO:  And I would turn this over to my

25  colleague, John Morris.

15

1          THE COURT:  All right.

2          MR. MORRIS:  Good morning, Your Honor.  John Morris,

3  Pachulski Stang Ziehl & Jones.

4          THE COURT:  Good morning.

5          MR. MORRIS:  I hope that this doesn't take too much

6  time.  But following the last hearing that we had, the Court

7  had rendered a ruling with respect to the Committee's sealing

8  motion.  And regrettably, the Debtor and the U.S. Trustee's

9  Office were unable to agree on a form of order.  And that led

10 to kind of a back-and-forth about the scope of the protective

11 order that had been entered.

12    So, because we couldn't come to an agreement, and because

13 the Debtor had concerns about the interpretation and the

14 position, frankly, that the U.S. Trustee was taking with

15 respect to the protective order, we filed our motion for the

16 entry of an order concerning the sealing motion and for a

17 conference.  And that was filed at Docket 397.

18    The Court subsequently entered the Debtor's proposed order

19 on the sealing motion, on the Committee's sealing motion.  So

20 that's moot.

21    The only issue, to the extent there is an issue, and I'm

22 not sure that there is, but to the extent that there is an

23 issue, it was just the Debtor's desire to make clear on the

24 record that the words of the protective order are clear and

25 unambiguous and that they apply to any party who receives

16

1  documents in this bankruptcy case, whether it's in connection

2  with a contested matter or an adversary proceeding, and that

3  order applies both to documents previously received and to

4  documents that will be received in the future.

5      We had asked the U.S. Trustee's Office to make -- just to

6  agree that they would abide by the protective order.  And I'm

7  not casting aspersions, I'm not saying, you know, they're bad

8  people or anything, but we never got the crystal-clear

9  response that we needed and expected, frankly, that the order

10  says what the order says and the U.S. Trustee's Office would,

11  you know, would abide by it.

12          THE COURT:  Okay.  So, --

13          MR. MORRIS:  So that's why we asked for this status

14  conference.

15          THE COURT:  So this is more than just the issue of

16  the Redeemer Committee arbitration award --

17          MR. MORRIS:  Correct.

18          THE COURT:  -- that was the attachment to the --

19          MS. LAMBERT:  No, Your Honor.

20          THE COURT:  Wait.  Oh, okay.  Well, what I was about

21  to say is I was understanding from your presentation that you

22  thought this was about more than just the arbitration award,

23  the Redeemer Committee arbitration award that had been

24  attached to that Committee objection and that was subject to

25  the motion to seal.

17

1      You think it is also about items marked Confidential that

2    the U.S. Trustee received before the entry of the protective

3    order?

4           MR. MORRIS:  As it explicitly provides for.  And I'll

5    just say that the concerns arise from the written

6    communications that we received, where the U.S. Trustee's

7    Office specifically said that they would file matters

8    unredacted and without seal.  And we asked them to simply

9    retract that statement, because the order says what the order

10   says.  And I think it's a fair concern that the Debtor has in

11   this regard, and it was really a very simple request.  Please,

12   please, I mean, you can't file documents unredacted and

13   without seal because there's a protective order in place.

14          THE COURT:  Okay.  Now, Ms. Lambert, you say -- what

15   were you about to say?

16          MS. LAMBERT:  First, Your Honor, I want to be clear

17   that the U.S. Trustee -- everyone in the U.S. Trustee's Office

18   intends to honor the Court's orders.  There are many things

19   that we debate hotly and that we feel animated about in terms

20   of legal advocacy, but we intend to honor both the office and

21   the individual that holds that office when the Court has made

22   a ruling.

23      The issue that is presented to the Court is what is the

24   effect of dismissing a motion to seal on the basis that it is

25   moot?  There's black-letter law that sealing should be for

18

1  limited time periods and things should be unsealed --

2          THE COURT:  Okay.  Can I stop you?  Are you saying

3  that you think the sole issue here is just the arbitration

4  award?

5          MS. LAMBERT:  Yes, Your Honor.

6          THE COURT:  Okay.  So, so --

7          MS. LAMBERT:  And this is how it springs back to the

8  protective order.

9          THE COURT:  Okay.  Let me --

10         MS. LAMBERT:  The U.S. --

11         THE COURT:  Let me stop you, because what about other

12  documents besides the arbitration award that the U.S. Trustee

13  might have received prior to the Court signing the protective

14  order?

15         MS. LAMBERT:  The U.S. Trustee did not receive any

16  other items that --

17         THE COURT:  Okay.  So we are just talking about the

18  arbitration?

19         MS. LAMBERT:  We have not to this date received any

20  other items than those items --

21         THE COURT:  Okay.

22         MS. LAMBERT:  -- that were subject to the motion to

23  seal.

24         THE COURT:  Okay.

25         MS. LAMBERT:  And this is the U.S. Trustee's

19

 1 | position.  The Court --

 2 |         THE COURT:  I will say that one of the Debtor's

 3 | lawyers is shaking his head.  I want to see if there's a

 4 | disagreement about, did the U.S. Trustee receive more items?

 5 | Was that --

 6 |         MR. MORRIS:  I would say, Your Honor, I don't know

 7 | exactly what was delivered, because I'm, --

 8 |         THE COURT:  Okay.

 9 |         MR. MORRIS:  -- right, I'm part of a team.  But I do

10 | know that we gave, for example, information about bonus --

11 | about, you know, personnel bonus motions that is confidential.

12 |         MS. LAMBERT:  But the issue about what was going to

13 | be filed unsealed was related to the items in the motion to

14 | seal and the U.S. Trustee's attendant motion for the

15 | appointment of a Chapter 11 Trustee, which had been redacted.

16 |         THE COURT:  Okay.  Let me -- I'm going to take a shot

17 | at making this go quicker.  What I meant when I ruled that,

18 | well, the objection of the Committee is moot now because it

19 | was resolved by other orders; therefore, I think the motion to

20 | file under seal the arbitration award is moot because it was

21 | connected to the Committee's objection; you know, that was a

22 | quick, off-the-cuff comment.  What I was trying to say is I

23 | didn't think this needed any more court time.  There was no

24 | case in controversy anymore.  I didn't know why I needed to

25 | resolve an objection to the motion to file under seal.

20

1       What I meant is it's going to be like it never even

2    happened, right?  And what I probably should have done is

3    said, Committee, you want to make an oral motion to withdraw

4    your objection and withdraw your motion to seal, you know,

5    orally, I'll grant it orally and just remove it from the

6    record, so to speak.

7       And I thought we were passing off to another day whether

8    that arbitration award, if someone wanted to file it and file

9    it publicly or disclose it, they could then file a motion

10   later.

11              MR. MORRIS:  Your Honor?

12              MS. LAMBERT:  Here's the -- here's the --

13              MR. MORRIS:  Your Honor, if I may?

14              THE COURT:  Uh-huh.

15              MR. MORRIS:  You've done exactly what you've said.

16              THE COURT:  Okay.

17              MR. MORRIS:  I don't think there is an issue now.

18              THE COURT:  Okay.

19              MR. MORRIS:  I've heard from the U.S. Trustee's

20   Office what I asked for probably three times in writing, that

21   they are going to abide by the terms of the protective order.

22   With respect to the sealing order, Your Honor has entered an

23   order.  It declared the Committee's motion to seal moot, and

24   it specifically provided that anybody who's received the

25   awards has to treat them in accordance with the protective

21

1  order.

2          THE COURT:  Yeah.

3          MR. MORRIS:  Nobody's appealed that order.

4          THE COURT:  Okay.

5          MR. MORRIS:  It's now the -- it's -- whatever the

6  U.S. Trustee's interpretation is of the law is kind of

7  irrelevant at this point because the order has been entered

8  and it hasn't been appealed.

9          THE COURT:  Okay.

10         MS. LAMBERT:  Here's the thing, Your Honor.  The case

11  law, *Omni Video*, similar things.  There are two issues.

12  Number one is whether the mootness of the underlying issue

13  means that the pleadings should be unredacted, which is black

14  letter that at some point pleadings should be unredacted and

15  made available to the public.  And the Court's ruling is that

16  by replacing the management the Court has mooted anything that

17  might be scandalous about that or that might be problematic

18  about it, and therefore --

19         THE COURT:  What is the it?  I'm not following.

20         MS. LAMBERT:  -- the arbitration award and the

21  pleadings attendant were redacted, but the --

22         THE COURT:  I haven't said anything about -- I mean,

23  I denied a Chapter 11 trustee motion because I thought the new

24  management was a correct way to go forward in this case.

25         MS. LAMBERT:  Correct.

22

```
 1            THE COURT:  The arbitration award, what I meant was
 2    it's like it never happened now.  And if I --
 3            MS. LAMBERT:  Right.
 4            THE COURT:  -- need to do an amended order saying the
 5    Committee has permission to withdraw the objection and
 6    withdraw the motion to seal, I'll --
 7            MS. LAMBERT:  That's --
 8            THE COURT:  -- I'll do that, --
 9            MS. LAMBERT:  But --
10            THE COURT:  -- so there's nothing on the record to
11    make public.
12            MS. LAMBERT:  But withdrawing the motion, objection,
13    does not delete it from the record, Your Honor.
14            THE COURT:  Well, I'm going to make it so.  I'm going
15    to make it so.  And then if, one day, you or someone else --
16            MS. LAMBERT:  Your Honor, currently, --
17            THE COURT:  -- wants to be relieved from the
18    protective order and asks that it be publicly filed, I'll
19    consider --
20            MS. LAMBERT:  Your Honor?
21            THE COURT:  -- the merits of that.
22            MS. LAMBERT:  Your Honor, the thing is that the
23    Committee, when it filed its original objection, did not
24    redact.  So this information has been in the public domain for
25    months now.  And the arbitration --
```

23

1          THE COURT:  Wait.  Okay.  This all happened in

2    Delaware, so I don't know their procedure.  Are you saying it

3    was on the public PACER?

4          MS. LAMBERT:  They didn't redact.

5          MR. MORRIS:  No.  Your Honor, the Redeemer Award

6    (inaudible).  The order says what the order says.  It's been

7    entered.  I mean, this is the concern, is that we have this

8    never-ending debate.  I've heard -- the Debtor has heard what

9    it needed to hear, and that is the U.S. Trustee's Office will

10   abide by the terms of the protective order.

11      With respect to the Committee's motion to seal, we're done

12   with that.

13         MS. LAMBERT:  There is no --

14         MR. MORRIS:  An order has been entered.

15         MS. LAMBERT:  There is no motion to seal.  The normal

16   effect of -- the dismissal of a motion to seal on the basis

17   that it is moot is that everything attendant to that becomes

18   unredacted and unsealed.

19      In addition, there's a separate issue that the Debtor gets

20   to talk about what the amounts in the Redeemer awards were

21   unilaterally, without -- and the Committee gets to talk about

22   it unilaterally.  They've mentioned what the findings were in

23   four different spots in their objection that are not redacted.

24   And the U.S. Trustee is the only one that's held to the motion

25   to seal, which we have honored, but the --

24

1          THE COURT:  I don't understand why we're having this

2     discussion.  For now, I've made it a moot issue, a dead issue.

3     The objection to which the arbitration award was attached as

4     an exhibit became moot.  Maybe I'm not using the best legal

5     description, but it was resolved.  And I didn't feel the need

6     for us to have a dispute about whether that motion to seal,

7     which related to the objection --

8          MS. LAMBERT:  The motion to seal --

9          THE COURT:  -- was meritorious or not.  If -- again,

10    --

11         MS. LAMBERT:  But the motion to --

12         THE COURT:  -- to me, there's an easy fix.  If you're

13    -- if you think it's necessary, I'll grant the --

14         MR. MORRIS:  Your Honor?

15         THE COURT:  This seems like wasted energy, --

16         MS. LAMBERT:  But --

17         THE COURT:  -- granting the Committee authority to

18    withdraw their objection and their motion to seal --

19         MS. LAMBERT:  But, Your Honor, --

20         THE COURT:  -- so that it's off the record.

21         MS. LAMBERT:  -- the interim sealing order didn't

22    impact just their objection.  It impacted the U.S. Trustee's

23    motion to dismiss.  It impacted the evidence.  The finding

24    that these issues are moot because they're resolved means that

25    the Court should unredact them because it's no longer

1   confidential.  It's no longer a problem.  If the evidence is

2   --

3         THE COURT:  Why are we having this discussion?  Why

4   is this important in this Chapter 11 case?  The arbitration

5   award may get in one day, and someone may ask me, and I may

6   say yes, I may say no.  It depends on what the legal arguments

7   are.

8         MS. LAMBERT:  It's --

9         THE COURT:  Why is this relevant right now?

10         MS. LAMBERT:  It's important to the public's

11   perception, and the U.S. Trustee is charged with making the

12   information about a case available to the public.

13         MR. MORRIS:  Your Honor, there is no motion --

14         MS. LAMBERT:  This -- these -- these arbitration --

15         MR. MORRIS:  There's no relief that's been sought.

16         MS. LAMBERT:  The arbitration awards have been

17   discussed in the press, Your Honor.  And the press --

18         THE COURT:  Well, let me just say this.  Okay?  This

19   was obviously -- there was an arbitration award.  It was never

20   confirmed with a judgment by a court.  And I am presuming -- I

21   don't need to decide today -- but I'm presuming that there is

22   some legal argument that someone feels can be made about why

23   that arbitration award is confidential.  You know, it

24   obviously --

25         MR. MORRIS:  The Committee made that argument in

26

1   their motion.

2          THE COURT:  Obviously, if there had been a judgment,

3   it all would have been out in the world.  And I will say I

4   cannot remember ever being in a situation where someone wanted

5   to keep an arbitration award confidential in a bankruptcy

6   case.  Maybe it happens.  I'm just -- I've never seen it.  So

7   if there is a day where someone wants me to find this

8   arbitration award can be made public, I may very well do it.

9   I don't know.  I'll hear the legal arguments.  But I am just

10  asking, why are we arguing about this today?

11         MS. LAMBERT:  We're arguing about it today because it

12  remains a point of interest and a point of information sharing

13  to government creditors and other creditors that are involved

14  in the case, as well as the public.

15         THE COURT:  They're not in here, the SEC or whoever

16  you're --

17         MS. LAMBERT:  Well, how would they know to be in

18  here?

19         THE COURT:  Because maybe they've seen the press that

20  you're talking about.  All right.  I don't know --

21         MR. MORRIS:  Your Honor, we -- the Debtor's heard

22  what --

23         THE COURT:  The protective order governs.  And my

24  prior order with regard to the sealing motion I think made

25  clear, but if it didn't, I'm going to say right now:  As far

1   as I'm concerned, the arbitration award, nothing gets unsealed

2   on the Court's docket, and no one will file it or disclose it

3   without bringing a motion, and we'll have a legal argument and

4   evidence or whatever we need and I'll rule on the issue.

5           MS. LAMBERT:  So, Your Honor, my understanding is

6   that the Court is striking the objection to the CRO that the

7   Committee filed and striking the U.S. Trustee's motion to

8   dismiss, which was redacted, and striking the evidence, and

9   those will not be on the docket available to the public at

10  all.

11          THE COURT:  That's not what I'm doing.  I don't -- I

12  don't even know -- I don't understand why you're saying that.

13          MS. LAMBERT:  Well, you can't just withdraw the

14  objection.  The objection had the exhibits attached to it.

15  The issue that the U.S. Trustee -- I'm sorry, but I'm always

16  charged with this issue -- is trying to unseal documents and

17  trying to determine the proper date for unsealing them.  They

18  attached to the arbitration award, like a motion for summary

19  judgment.  That's the practice in Delaware.  And so the issue

20  is, at what point will that become unsealed?  It's a higher

21  standard --

22          THE COURT:  The answer is no, without an order from

23  this Court.

24          MS. LAMBERT:  It is a higher standard than for

25  confidentiality.  And in addition, --

28

1          THE COURT:  All right.  If you want to file a motion

2    and we set it for hearing and we have briefing, we'll do that.

3    But, for now, there's -- there are two orders that I will tell

4    you on the record what they mean is, right now, the

5    arbitration award is not to be publicly disclosed.  Not by the

6    Court on the docket system.  Not by any person.

7       If someone wants to publicly disclose it, they can file a

8    motion and we'll talk about whether it's protected or not.

9          MR. MORRIS:  Thank you.

10         THE COURT:  Whether there are grounds, legal grounds,

11   to protect it.

12         MR. MORRIS:  Thank you, Your Honor.

13         THE COURT:  I've told you I'm skeptical.  I'm

14   skeptical.  But, you know, we'll see.  Okay?

15         MS. LAMBERT:  Okay.  Your Honor, the FJC publication

16   is very clear that the Court should be trying, when issues are

17   moot, to unseal items.  And this is why our advocacy is this

18   way.  And I will move to unseal it.

19         THE COURT:  All right.

20         MR. DEMO:  For the record, Your Honor, again, Greg

21   Demo; Pachulski Stang Ziehl & Jones; for the Debtor.

22      Before we move on to the Foley retention, two quick

23   housekeeping matters.

24         THE COURT:  Uh-huh.

25         MR. DEMO:  We would like to set the next omnibus

29

1   hearing date on April 22nd.  At that date, we would do the

2   quarterly fee applications and whatever else comes up onto the

3   docket.

4           THE COURT:  All right.  Have you run that by Traci

5   Ellison yet?

6           MR. DEMO:  We have not.

7           THE COURT:  Okay.

8           MR. DEMO:  We've talked to the Committee about it,

9   though.

10           THE COURT:  So I will call her right now.

11           MR. DEMO:  And then, I guess, Your Honor, before you

12   do that, we are actually asking for a hearing date on March

13   4th at 1:30 as well.  We're going to have an expedited motion

14   that we'll be filing, I think, this week.  So if you're going

15   to check with her, I guess it might make sense to check on

16   both of those dates.

17           THE COURT:  Okay.

18       (Court confers with Clerk telephonically.)

19           THE COURT:  Okay.  We can give you April 22nd, as you

20   requested, at 9:30.

21           MR. DEMO:  Okay.  Thank you.

22           THE COURT:  Okay.  So that's going to be an omnibus.

23       (Court confers with Clerk telephonically.)

24           THE COURT:  All right.  We can give you March 4th at

25   1:30.

30

1       How about a preview of what we're going to -- what are we

2    going to be seeing?

3              MR. DEMO:  And, Your Honor, I guess we had also

4    reserved March 2nd, and we can release that date.

5              THE COURT:  What?  I'm sorry.

6              MR. DEMO:  We had previously reserved March 2nd at

7    9:30 for the expedited motion, which I'll describe briefly in

8    a second.  We don't need the March 2nd date.

9              THE COURT:  So, okay.

10             MR. DEMO:  Yeah.

11             THE COURT:  All right.  So I'll tell Traci that one

12   --

13             MR. DEMO:  Yeah.  Okay.  Perfect.  Thank you.

14             THE COURT:  -- is off.  Okay.  What is this going to

15   be?

16             MR. DEMO:  The expedited motion, we obviously run a

17   series of investment funds.  From time to time, those funds,

18   either through liquidation or just through normal proceeds

19   generation, make distributions out to their investors.

20       Under the protocols, distributions out to what are

21   related, called related entities under the protocols, which

22   include Mr. Dondero, entities owned by Mr. Dondero, and

23   numerous other categories, those entities cannot receive their

24   distributions from those investment vehicles if the Committee

25   objects to those distributions unless we come to the Court and

31

1  we get Your Honor's approval.

2       That issue has come up.  We are hoping to make those

3  distributions to these related entities.  The Committee has

4  said that they will object, but they've also agreed to the

5  motion to expedite.

6             THE COURT:  All right.

7             MR. DEMO:  So that's the issue that's going to be in

8  front of Your Honor on March 4th.

9             THE COURT:  All right.  When are you going to file

10 the motion?

11            MR. DEMO:  We are hoping to file it, I think, by

12 Friday.

13            THE COURT:  Okay.  So that would be -- what are we at

14 now, the 19th?

15            MR. DEMO:  Yeah.

16            THE COURT:  Okay.  So that'd be --

17            MR. DEMO:  Yeah.  And obviously, --

18            THE COURT:  -- a couple weeks.

19            MR. DEMO:  -- yeah, we'll endeavor to get it filed as

20 soon as possible.

21            THE COURT:  Okay.

22            MR. DEMO:  And then I guess the last item, Your

23 Honor, is the Foley Gardere retention application.

24            THE COURT:  Okay.

25            MR. DEMO:  And, you know, this should be a relatively

32

1  simple retention application.  You know, we'll get into it a

2  little bit more.  There are two objections that were

3  originally filed, one by the Committee and one by Acis.

4  Yesterday morning, the Committee withdrew their objection, so

5  the only objection to the Foley Gardere retention application

6  is by Acis.

7       In the courtroom with me are Holland O'Neil with Foley

8  Gardere -- she's the partner in charge of that representation

9  -- and then also The Honorable Russell Nelms, who's a member

10 of the Independent Board of Directors of Strand Advisors, the

11 party that manages the Debtor.  And I should be remiss if I

12 didn't mention that the two other independent directors, James

13 Seery and John Dubel, are also in the courtroom, --

14              THE COURT:  Okay.

15              MR. DEMO:  -- as is the Debtor's chief restructuring

16 officer.

17      And as I said, Your Honor, really, the only thing, the

18 only substantive thing we're here this morning on is this

19 retention application.  The retention application is under

20 Section 327 of the Bankruptcy Code, and it's to represent the

21 Debtor in three matters related to the Acis bankruptcy and the

22 resulting litigation.

23      Judge Nelms is going to be testifying in support of the

24 Foley retention this afternoon.

25              THE COURT:  Okay.

33

1          MR. DEMO:  We filed the retention application on

2    October 29th, along with the retention application of Lynn

3    Pinker.  As I mentioned earlier, the Lynn Pinker retention

4    application was withdrawn.  Two objections were filed to the

5    Foley retention:  One by the Committee, one by Acis.

6        The Committee -- or, sorry, the Debtor addressed those two

7    objections in an omnibus reply that we filed on November 21st.

8    The primary response to those objections was providing

9    additional disclosure to this Court concerning the parties

10   being represented by Foley, the proceedings in which Foley was

11   going to represent those parties, and the allocation of fees,

12   of Foley's fees, across those parties.

13       The reply disclosed, and Judge Nelms will also testify,

14   that the Debtor had originally intended to engage Foley on

15   four matters, not three.  The first matters is general matters

16   just relating to the Acis bankruptcy, status conferences,

17   proof of claim issues.  The second matter is the appeal to the

18   Fifth Circuit of the confirmation order.  The third matter was

19   the appeal, again to the Fifth Circuit, of the entry of the

20   involuntary petition.  And then the fourth matter was the

21   appeal of Winstead's retention as counsel to both Mr. Terry,

22   who is a pre-petition creditor of Acis, and Robert [sic]

23   Phelan as the Chapter 11 trustee.

24       The two appeals, the appeal of the confirmation order and

25   the appeal of the involuntary petition, have been fully

34

1   briefed to the Fifth Circuit, and some of that briefing was

2   done, by necessity, post-petition, because of the drag in time

3   between when we filed the retention and now.  And the Fifth

4   Circuit has actually set both of those appeals for oral

5   argument.  They've been consolidated for purposes of oral

6   argument, and both of the appeals are set for March 30th, so

7   about six weeks away.

8       Now, it's an understatement to say a lot has happened in

9   this case since we filed the reply on November 21st.  One of

10  the most major things in this case, as the Court knows, is the

11  appointment of the Board of Directors.  The Board of Directors

12  was appointed on January 9th and it oversees the management of

13  the Debtor.  Judge Nelms is in this courtroom and will be

14  testifying as to what the Board did to familiarize itself with

15  the Acis litigation and with Foley's retention.  And you'll

16  hear from Judge Nelms that the Board had extensive

17  conversation with the Debtor's employees, including the

18  Debtor's internal legal team, Ms. O'Neil with Foley Gardere,

19  attorneys from Pachulski regarding the status of the Acis

20  litigation and the bankruptcy and Foley's retention.

21      You'll also hear that Judge Nelms reached out directly to

22  Josh Terry, the major party in the Acis litigation, and that

23  Judge Nelms met with both Josh Terry and Ms. Patel to discuss

24  the status of the Acis litigation.

25      And then finally you'll hear, as part of that diligence,

1  that the Board analyzed the economic benefit of proceeding

2  with Foley's retention in all three of those matters that I

3  mentioned and also conducted their own diligence on the claims

4  that are being raised in those matters.

5      As a result of that diligence, and I'll discuss the

6  explicit reasons later, the Board determined that it is in the

7  best interest of the Debtor and its estate to proceed with

8  Foley's retention with respect to the three matters I

9  mentioned earlier:  the Acis general bankruptcy, the appeal of

10 the confirmation order, and the appeal of the involuntary

11 petition.

12     The Debtor has also asked for Foley's assistance on

13 certain ancillary matters, like including about disclosures of

14 the Acis litigation, including what needs to go on the

15 schedules and things like that.

16     As a result of this diligence, however, the Board decided

17 to drop the Winstead appeal.  So Acis -- I'm sorry, Foley is

18 not going to be retained to challenge Winstead's retention in

19 that proceeding.  And assuming that Foley is retained, Foley

20 will prepare the papers to withdraw that objection as soon as

21 possible.

22     As a quick aside, though, you know, Foley was directed by

23 the Debtor to continue with the Winstead matter post-petition.

24 Incurred about $25,000 of fees.  And we believe that Foley was

25 working in good faith on that.  So although we're not going to

36

1   proceed with the Winstead matter, we would still ask that

2   Foley be entitled to file a fee application for those fees.

3   The Committee has agreed with this, and we have a form of

4   proposed order with the Committee that contemplates Foley's

5   payment or Foley's receiving payment for the Winstead fees of

6   $25,000.

7          THE COURT:  Wait.  You're talking about, if I approve

8   their retention, rolling that into the retention order?

9          MR. DEMO:  We are, Your Honor.

10          THE COURT:  Okay.

11          MR. DEMO:  No?

12          THE COURT:  That's a no-go, I'll tell you right now.

13          MR. DEMO:  Okay.

14          THE COURT:  I mean, --

15          MR. DEMO:  And we can, we can deal with that.

16          THE COURT:  Yeah.

17          MR. DEMO:  But I --

18          THE COURT:  I'm not going to say yes or no to any

19   fees I haven't seen.

20          MR. DEMO:  Okay.  And -- well, I'm sorry.  What's

21   going to be rolled into the order is their ability to file for

22   those fees.  Everybody would still have the right to object to

23   those fees.  You would have the right to say yes or no on

24   those fees.  The only thing that we would be asking for is

25   that they would be able to apply for those fees and that the

37

1   fact that they weren't retained on that matter specifically

2   would not be a basis for an objection to those fees.  So it's

3   a little bit different.

4           THE COURT:  Okay.

5           MR. DEMO:  We're not trying to cut off anybody's

6   right to object to those fees.

7           THE COURT:  Okay.  But I don't want to put some

8   imprimatur on their ability to ask for them.

9           MR. DEMO:  Okay.

10          THE COURT:  Okay?  So, you know, it's just another

11  day.

12          MR. DEMO:  Yeah.

13          THE COURT:  If they ask for that in a fee app -- if I

14  approve their retention and they ask for it in a fee app,

15  we'll --

16          MR. DEMO:  Okay.  Understood, Your Honor.

17          THE COURT:  -- decide whether it's meritorious or

18  not.

19          MR. DEMO:  Okay.

20          THE COURT:  Okay.

21          MR. DEMO:  And then I guess, just moving on, you

22  know, as you'll hear from Judge Nelms, all of the elements of

23  227(e), you know, have been met.  You know, first, Foley is

24  being retained for a special purpose.  Nobody has objected on

25  that basis.

38

1    Second, Foley is not being retained to conduct the

2    Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3    Again, nobody has objected on that basis.

4    Third, Foley represented the Debtor prior to the petition

5    date on these matters.  Again, nobody has objected on that

6    basis.

7    And, fourth, you know, as Judge Nelms will testify, the

8    retention of Foley and Foley's continued prosecution of the

9    Acis matters is in the best interest of the Debtor's estate.

10    And then fifth and finally, Foley has no adverse interest

11    with respect to the matters on which it is being retained.

12    Now, as I mentioned, there were two omnibus objections

13    that were filed.  There was the Committee's objection and then

14    there was Acis's objection.  Both of these objections really

15    had one common theme, which was that there was insufficient

16    disclosure as to how the fees were going to be allocated, and,

17    honestly, whether or not Mr. James Dondero would benefit from

18    Foley's retention without paying his share of those fees.

19    Now, we had a meeting with the Committee on Friday and we

20    walked through this issue.  And as a result of that, the

21    Committee withdrew its objection.

22    What we told to the Committee is that, prior to the Acis

23    bankruptcy -- and this goes primarily to the retention -- or,

24    the prosecution of the involuntary petition appeal.  In that

25    appeal, Foley is representing just Neutra.  Foley is not

39

1  representing the Debtor.  Now, the economic benefit to the

2  estate, though, in that appeal accrues almost solely to the

3  Debtor.  It does not accrue to Neutra or to Neutra's economic

4  interest owners, which, full disclosure, are Mr. James Dondero

5  and Mr. Mark Okada.

6      The reason why the Debtor -- and you'll hear, again, hear

7  this from Judge Nelms -- believes that it's in the economic

8  best interest of its estate to pay for Neutra's fees in that

9  appeal is that, if Neutra is successful in that appeal, the

10 involuntary petition obviously will be struck, the involuntary

11 will be unwound, and the economic interest and the economic

12 ownership of Acis will revert to Neutra.

13     Upon that reversion, Highland Capital Management will be

14 reinstated as the advisor to Neutra.

15     Now, if Neutra -- I'm sorry, if Acis then generates fees,

16 those fees are going to be paid about 85 percent to satisfy

17 the contractual obligations under that advisory agreement.

18     So, on a go-forward basis, again, if Neutra is successful,

19 85 percent of the revenue generated by Acis will go to Neutra.

20 That remaining 15 percent will be used to satisfy the claim

21 that Acis -- I'm sorry, that Highland Capital Management has

22 against Acis for the pre-, post-petition, and gap period

23 services that it provided to Acis under the advisory

24 agreements.  That claim is about $8 million.

25     So, 85 percent of the revenue on a go-forward basis is

40

1  going to be used to satisfy the obligations under the

2  management agreement.  The balance of that is going to be used

3  to satisfy that $8 million claim.

4      That means that, you know, if our math is right -- and

5  obviously, the numbers are not static -- that there's not

6  going to be any contributions or any distributions to the

7  upstream equity, to Mr. Dondero or Mr. Okada, for about four

8  years.  After that four years, 85 percent of the revenue is

9  still going to go to Highland Capital Management, the Debtor,

10  under those advisory agreements.

11      So for that reason, we do believe, and Judge Nelms will

12  testify, that the true economic beneficiary of the Neutra

13  appeal of the involuntary petition is actually Highland

14  Capital Management.

15          THE COURT:  I don't want to jump ahead too much, but

16  are we going to talk today about mootness as a potential issue

17  with both of these appeals?  I mean, you know, I have to say

18  it's very compelling to me that you tell me all the briefing

19  has been done --

20          MR. DEMO:  Uh-huh.

21          THE COURT:  -- and oral argument is set in March, so

22  -- but is mootness a --

23          MR. DEMO:  We don't --

24          THE COURT:  Was there ever a motion to dismiss for

25  mootness or --

41

 1          MR. DEMO:  Not that I'm aware of, Your Honor.

 2          THE COURT:  Okay.

 3          MR. DEMO:  And all the briefing has been done.

 4          THE COURT:  Okay.

 5          MR. DEMO:  Again, oral argument is set.  And as far

 6   as I know, nobody has raised that issue.

 7          THE COURT:  Okay.

 8          MR. DEMO:  So I think that we're still proceeding as

 9   to whether --

10          THE COURT:  And, again, I'm leaping ahead, but I'm

11   just -- you know, you went through the scenario --

12          MR. DEMO:  Uh-huh.

13          THE COURT:  -- to show that, you know, Dondero and --

14   if the involuntary was reversed, you know, no money would ever

15   get there.  But you're painting a picture, to me, that, again,

16   it feels a little farfetched.  But the evidence will either,

17   you know, bear it out or not.

18          MR. DEMO:  Again, the evidence, you know, I think,

19   will bear it out.

20      And I think what's important also is, when you're thinking

21   about this, is to think of the actual universe of post-

22   petition fees that Foley is going to incur for those services,

23   for the briefing of the two appeals and then for the

24   bankruptcy services, versus the actual economic gain that the

25   Debtor could and hopefully will get if those appeals are

42

1   successful.

2        THE COURT:  Okay.

3        MR. DEMO:  So, Foley --

4        THE COURT:  And hopefully the evidence will really go

5   to this.

6        MR. DEMO:  Yes.

7        THE COURT:  I'm trying to think of -- I'm trying to

8   decide what life looks like --

9        MR. DEMO:  Right.

10        THE COURT:  -- if there is a successful reversal.

11        MR. DEMO:  Right.

12        THE COURT:  And I'm not at all clear.  So the

13   evidence and argument will hopefully make me clear.

14        MR. DEMO:  Yes.  And, honestly, Your Honor knows the

15   facts and circumstances --

16        THE COURT:  Right.

17        MR. DEMO:  -- better than me and probably better than

18   anyone.

19        THE COURT:  Uh-huh.

20        MR. DEMO:  But I think what's --

21        THE COURT:  I mean, we've had -- we had terminated

22   contracts --

23        MR. DEMO:  Right.

24        THE COURT:  -- with Highland.  We have a Reorganized

25   Debtor now, which, you know, --

43

1          MR. DEMO:  Right.

2          THE COURT:  -- has new contractual arrangements.

3          MR. DEMO:  Right.

4          THE COURT:  I just, I'm not sure how that all goes

5    away if there's a reversal.  So I'm --

6          MR. DEMO:  Right.

7          THE COURT:  I'm really wanting to drill down on the

8    benefit --

9          MR. DEMO:  Okay.  And --

10          THE COURT:  -- to Highland.

11          MR. DEMO:  And we can do that.  But I think --

12          THE COURT:  Okay.

13          MR. DEMO:  -- it's helpful to talk about --

14          THE COURT:  Uh-huh.

15          MR. DEMO:  -- the universe of fees first and then

16    talk about the related benefit for that.

17       Foley Gardere has helpfully filed two post-petition fee

18    applications.  Those fee applications disclose that, on all

19    three of these matters, Foley has billed about $330,000.  We

20    believe that Foley was probably going to bill, up through the

21    end of oral argument, about $500,000.

22       And then, you know, again -- and not getting too deep into

23    it, because I do think this is something that's better for

24    testimony because I think it goes to, you know, what the Board

25    believes is the economic benefit to the estate -- but if the

44

1  Neutra appeal is successful, if the confirmation order appeal

2  is successful, then the post-petition fees that are going to

3  accrue or we believe are going to accrue to Highland Capital

4  Management under those contracts are tens of millions of

5  dollars a year.

6      The post-petition and gap period and pre-petition fees

7  that we believe that Acis owes to Highland are $8 million a

8  year.  And then there's the go-forward fees.

9      So we believe that, for spending $500,000, the benefits to

10  the estate are actually going to be in the tens of millions of

11  dollars.  So, you know, even though, you know, reasonable

12  minds can differ as to the merits -- and, again, we'll put on

13  some testimony about that, although there's obviously

14  privilege issues and things like that -- the actual economic

15  benefit to the estate is $500,000 versus the possible benefit

16  of $50 million, possibly more dollars, plus the removal of a

17  substantial portion of Acis's proof of claim, which is -- I

18  think it says not less than $75 million.  So you're looking

19  at, if we're successful, fees into the estate --

20          THE COURT:  Well, that's a different issue, though.

21  Isn't that --

22          MR. DEMO:  It is, but it --

23          THE COURT:  Isn't that the Acis adversary proceeding

24  component?

25          MR. DEMO:  Yes.

45

1          THE COURT:  So, --

2          MR. DEMO:  But if the -- if the -- and, again, I

3     don't want to get too far into this --

4          THE COURT:  Uh-huh.

5          MR. DEMO:  -- because I don't want to get into, you

6     know, legal arguments that are going to be on appeal.

7          THE COURT:  Uh-huh.

8          MR. DEMO:  But what we believe is that, and what

9     Judge Nelms will testify to and what you'll hear, is that if

10    the confirmation order and the involuntary petition are

11    erased, especially the involuntary petition, and we go back to

12    status quo ante, the benefit to the estate is going to be in

13    the tens of millions of dollars, at a minimum, plus the

14    possible diminution, to a large extent, of a proof of claim

15    that is not less than $75 million, and we've heard numbers of

16    up to $300 million.

17       So you're looking to spend $500,000 on these two matters

18    for a benefit to the estate that's going to be astronomically

19    more than that.  So the benefit to the estate versus the money

20    that is going out of the estate, especially since everything

21    has been briefed and set for oral argument, I guess,

22    personally, I find it difficult to not see that benefit and

23    not to see that spending that half a million dollars to

24    possibly get back $50-plus million, I just don't see how

25    that's not a benefit to the estate and how that does not

46

1    warrant the retention of Foley Gardere in the limited matters

2    that we're honestly asking them to be retained for.

3            THE COURT:  All right.

4            MR. DEMO:  Okay.

5            THE COURT:  I'll hear other opening statements on

6    this.

7            MR. LAMBERSON:  Good morning, Your Honor.  Phillip

8    Lamberson on behalf of Acis Capital Management.

9        First of all, let me start off with outlining exactly what

10   our limited objection relates to.  We are not objecting to the

11   Debtor retaining Foley Gardere to handle the litigation

12   matters for the Debtor.  So, for example, the Acis litigation,

13   anything related to the Acis bankruptcy, that's fine.  We

14   don't have any objection to that.

15           THE COURT:  So the mega-adversary proceeding against

16   Highland and affiliates that is stayed, --

17           MR. LAMBERSON:  Uh-huh.

18           THE COURT:  -- I have a giant Report and

19   Recommendation on my desk that was ready to go about the time

20   the Highland bankruptcy was filed -- but it's stayed:  You

21   would have no objection to Gardere defending Highland --

22           MR. LAMBERSON:  Correct.

23           THE COURT:  -- in that if ever a motion to lift stay

24   is filed and that goes forward?

25           MR. LAMBERSON:  Correct.

47

1          THE COURT:  Okay.

2          MR. LAMBERSON:  And, for example, I believe counsel

3    mentioned this:  To the extent that there's a status

4    conference in the Acis case or something like that, we don't

5    have any issue with Foley representing the Debtor as it

6    relates to that.

7          We don't have any objection to the representation of the

8    Debtor as it relates to the Debtor's appeal of the

9    confirmation order.  We don't have any objection to Neutra's

10   retention of Foley at all.  In fact, we don't have any basis

11   to object to Neutra's retention of Foley Gardere.  Neutra is

12   not a debtor.

13         We fully expect and anticipate that we'll be opposite

14   Foley Gardere in the appeal which is going to be argued at the

15   end of next month, as well as any matters in front of this

16   Court.

17         What we do object to is the Debtor agreeing -- frankly,

18   pre-agreeing -- to pay Foley Gardere for litigation costs

19   incurred by non-debtors, and, specifically, Neutra.  And as

20   counsel outlined, and the reply filed by the Debtors is very

21   clear on this point, Neutra is not a subsidiary of the Debtor.

22   Neutra is ultimately owned one hundred percent by Mr. Dondero

23   and Mr. Okada.

24         So why, why are we objecting?  There's a couple of

25   reasons.  Number one, this is obviously an extremely unusual

48

1  request.  It's not really a --

2          THE COURT:  Okay.  Let me just make sure I heard you

3  correct.  The only thing that Acis is objecting to is the

4  Debtor paying fees for Gardere -- Foley Gardere's

5  representation of Neutra?

6          MR. LAMBERSON:  Correct.

7          THE COURT:  Okay.  So, --

8          MR. LAMBERSON:  Right.  And let me --

9          THE COURT:  -- you don't have a problem with Foley

10  representing the Debtor in these appeal -- well, the Debtor

11  isn't an appellant in the involuntary appeal, right?  Or no?

12          MR. LAMBERSON:  It is -- no.  So, the Debtor is an

13  appellant in the --

14          THE COURT:  The confirmation order.

15          MR. LAMBERSON:  -- confirmation order appeal.

16          THE COURT:  Uh-huh.

17          MR. LAMBERSON:  It's one of two appellants.

18          THE COURT:  Uh-huh.

19          MR. LAMBERSON:  The other one is Neutra.

20          THE COURT:  Uh-huh.

21          MR. LAMBERSON:  Neutra is the only appellant in the

22  confirmation order -- I'm sorry, in the order for relief

23  appeal.

24          THE COURT:  Okay.  So you don't have any problem with

25  Foley's retention; it's just you don't want the Debtor to pay

49

1   Neutra's legal fees?

2          MR. LAMBERSON:  Correct.

3          THE COURT:  And there needs to be some allocation in

4   the confirmation appeal between Neutra and the Debtor, and it

5   needs to all be paid by Neutra, --

6          MR. LAMBERSON:  Correct.

7          THE COURT:  -- not the Debtor?  Okay.

8          MR. LAMBERSON:  Yeah.  That's exactly correct, Your

9   Honor.

10         THE COURT:  Okay.  Just --

11         MR. LAMBERSON:  So I wanted to be clear on that, --

12         THE COURT:  Okay.

13         MR. LAMBERSON:  -- that we're not -- we understand

14   that they're --

15         THE COURT:  Okay.

16         MR. LAMBERSON:  -- going to be our opponents going

17   forward, and we're fine with that.

18         THE COURT:  Uh-huh.

19         MR. LAMBERSON:  I actually like Mrs. O'Neil.

20      So, why are we objecting?  So, there's a couple of

21   reasons.  One is procedural and one is really more

22   substantive.  So, this is obviously a strange request under

23   Section 327.  327 is to approve counsel for the Debtor, for

24   the estate.  And this request doesn't really fit.

25      So, for example, you engage Foley Gardere.  You agree that

50

1    the Debtor is going to pay fees under 330.  Okay.  Well, how

2    do we apply 330 in this situation, right?  What constitutes

3    reasonable and necessary as it relates to the Debtor when the

4    work wasn't done for the Debtor?  What constitutes a

5    determination of whether it was beneficial to the Debtor when,

6    again, the work wasn't done for the Debtor?

7        There's other issues, obviously.  Who controls Neutra?

8    It's not controlled by the Debtor.  The Debtor doesn't own any

9    of Neutra.  Who is making litigation decisions for Neutra?

10   All we know is that the Debtor is paying the freight for

11   whatever Neutra decides to do going forward.

12       The other issue, Your Honor, and this is probably the

13   broader issue, is this decision evidences a continuation of a

14   failed litigation strategy that precipitated this bankruptcy

15   in the first place.  Right?  So, we all heard that the reason

16   Highland Capital Management had to file bankruptcy is because

17   they couldn't pay the Crusader judgment.  Right?  They had a

18   $190 million judgment, or about to be judgment against them,

19   and they couldn't pay it.

20       So let's look at the Committee.  Right?  We have a

21   Committee with four members on it.  Three of them are

22   litigants.  Three of them are in active litigation against the

23   Debtor.

24       If you look at the Top 20 List in this case, of the Top

25   10, only one of them is not a litigation creditor, and that's

51

1  -- I'm trying to -- is an insider creditor.  The rest of the

2  Top 10 are either litigation adversaries or they're law firms

3  that were paid to fight the litigation adversaries.

4      So why is the Debtor continuing its strategy of fighting

5  every last issue, and using various instrumentalities to do

6  it, and then paying the freight for all of it?  That's exactly

7  how we got to where we are today in this case.

8      So, let me address also the benefit from the Neutra

9  appeal.  And, Your Honor, I think that's definitely an area

10 that we need to probe.  Because, like you, I don't get it.  I

11 think what they're outlining is sort of a fantasyland where

12 money is going to rain from the sky when they win this appeal,

13 or if they win this appeal.  And obviously, their reply goes

14 on for pages about the benefit to the Debtor.

15     So, just using basic odds of winning -- and I'm not going

16 to go to the substance of this appeal, which I think is

17 probably worse than the basic odds -- there's a 90 percent

18 chance that the Fifth Circuit just affirms the -- Judge

19 Fitzwater's ruling.  Right?  I mean, there's a 90 percent

20 chance that what the Debtor gets out of this is an affirmance

21 that says, "You lose."  Right?

22     But even if it's reversed, --

23         THE COURT:  What are you basing that on?  Because

24 Fitzwater affirmed 90 percent of the time?

25         MR. LAMBERSON:  Well, so, actually, Judge -- and Ms.

52

1   Chiarello can probably address this more specifically -- Judge

2   Fitzwater actually gets affirmed, I think, more than 90

3   percent of the time, --

4          THE COURT:  Probably, yes.

5          MR. LAMBERSON:  -- but the general reversal rate at

6   the Fifth Circuit is about ten percent.  So, and that

7   obviously includes things like 1983 appeals and things like

8   that.

9      But even if it is reversed, which I think we'd all agree

10  is fairly unlikely, again, money isn't just going to start

11  raining down on Highland Capital.  So what's most likely going

12  to happen if the Fifth Circuit decides to reverse -- and let

13  me, let me point out one issue, Your Honor.  The only issue on

14  appeal, I should say the only -- there are various issues on

15  appeal, and I'll just click through them.  So, one of them is

16  whether Neutra has standing to appeal.  Right?  Whether they

17  qualify under the person aggrieved standard that the Fifth

18  Circuit uses.  That's obviously a gating issue.  And, by the

19  way, that's the basis of Judge Fitzwater's ruling affirming

20  this Court's ruling, which was basically Neutra doesn't have

21  standing to appeal the order for relief.  They're not the

22  Debtor.

23     So the first issue is whether Neutra is a person

24  aggrieved.  Okay?

25     The second issue, and this is the substantive bankruptcy

53

1   issue, the only substantive bankruptcy issue, is whether the

2   order for relief should have been arbitrated.  Right?  So

3   that's the next issue.  That would be, frankly, the issue that

4   the Fifth Circuit would have to reverse on, is that well, yes,

5   this should have been arbitrated.  Right?  The order for

6   relief should have been arbitrated.

7       And then the final issue that we raised on appeal is

8   whether, even if Neutra has standing and even if there was

9   some right to arbitration, whether Neutra, via the putative

10  debtor, waived its right to arbitration by waiting until

11  literally, and you'll remember this, literally the day before

12  the order for relief file started, to raise its request for

13  arbitration.  Right?

14      So, assuming that they get some reversal, what's really

15  likely to happen is that the Court, the Fifth Circuit is going

16  to send it back to you on a remand and say, This is the

17  standard you should have applied, you need to make this

18  finding, or something like that, right?  It's very unlikely

19  the Fifth Circuit is going to say, We're going to reverse and

20  we're just going to render, right, and this thing just goes

21  away forever, particularly considering that the only live

22  substantive issue is whether the order for relief should have

23  been arbitrated, right?

24      But even if Neutra wins and its relief is wholly granted,

25  well, what does that mean?  That doesn't mean that the

54

1    involuntary goes away.  It doesn't mean the order for relief

2    permanently goes away.  It means that we go arbitrate it.

3    Right?  That's what they asked for, is that we go arbitrate

4    it.  So now we go arbitrate it.  Right?

5        So, basically, if you break it down, if, in the unlikely

6    event Neutra wins on appeal, it doesn't mean the bankruptcy

7    permanently goes away.  What it means is we have more

8    litigation.  Right?  And that's what normally happens when

9    there's a reversal on appeal, right?  You relitigate the

10   issues that were litigated in the first place.

11       So this concept -- you're exactly right, Your Honor.  This

12   sounds like fantasyland.  This concept that money is just

13   going to fall out of the sky and onto Highland because Neutra

14   got a reversal is just not going to happen.

15       There's some other problems here, obviously.  Counsel just

16   spent a lot of time talking about how all of Acis's funds are

17   going to get paid to Highland.  Well, that completely misses

18   the point that Josh Terry has an eight, probably somewhere in

19   the neighborhood of maybe $12 million judgment now against

20   Acis.  They're just going to ignore that?  They're just going

21   to ignore the fact that their largest creditor has a judgment

22   against them and is just hanging out there?  That's going to

23   have some impact on what happens to all that cash flow.

24       And then, finally -- and we'll talk about this in more

25   substance when we get to the testimony -- as you recall, this

55

1  was the entire basis of the Acis case:  Mr. Dondero and

2  Highland Capital were aggressively trying to liquidate Acis

3  when we showed up in your Court asking for relief.  So what

4  makes anybody think that that isn't going to continue

5  happening if there's not a bankruptcy anymore?  Right?

6      And Your Honor will recall that you had to twice enjoin

7  Dondero affiliates, HCLOF, from liquidating the PMAs and

8  Acis's assets during the bankruptcy.  Right?  So the concept

9  that if they win on appeal and there is no bankruptcy,

10 everything just goes away and we're not in this Court at all,

11 that Acis is going to have all of these valuable PMAs and cash

12 flow and it's all going to go to the benefit of Highland, is

13 completely contrary to what happened during the Acis case and

14 what precipitated the Acis case.

15     One other issue that we raised in the objection and in the

16 Debtor's omnibus reply is what we call the DAF litigation,

17 which is litigation filed in the Southern District  of New

18 York.  And Your Honor, I think you probably remember that from

19 the pleadings.  I do want to point out that -- so this, this

20 is a serious issue for Acis.  And the reason is because,

21 contrary to what was stated in the reply -- admittedly, this

22 happened after the reply -- but contrary to what happened --

23 was stated in the reply, that litigation has now been expanded

24 to include Acis and Mr. Terry and Brigade, and with basically

25 the same allegations of CLO mismanagement that were raised in

56

1    this Court during the confirmation hearing.

2        So this is a very significant matter to us.  We are very

3    concerned that this Debtor is involved in that and is

4    promoting it in some way.  And we want Your Honor to be aware

5    of that litigation and the actions that are taken challenging

6    your rulings in a court that's miles and miles away from here.

7        Thank you, Your Honor.

8            THE COURT:  All right.  Mr. Morris, are you ready to

9    call your witness?

10           MR. MORRIS:  Yes, I am, Your Honor.  The Debtor calls

11   Russell Nelms.

12           THE COURT:  All right.

13           MR. MORRIS:  Your Honor, I have some exhibit binders.

14   May I hand up?

15           THE COURT:  You may.  All right.  Well, odd as it is,

16   I suppose I in this context need to swear you in.

17               RUSSELL NELMS, DEBTOR'S WITNESS, SWORN

18           THE COURT:  All right.  Please be seated.

19           MR. MORRIS:  John Morris for Pachulski Stang Ziehl &

20   Jones on behalf of the Debtor, Your Honor.

21       Before we get to the testimony, the Debtor has put on its

22   exhibit list nine specific documents that are in the binder

23   before you, and the Debtor moves for the introduction of those

24   documents into evidence.

25           THE COURT:  All right.  Any objection?

Nelms - Direct                                    57

1          MR. LAMBERSON:  No objections, Your Honor.

2          THE COURT:  Exhibits 1 through 9 are admitted.

3      (Debtor's Exhibits 1 through 9 are received into

4  evidence.)

5          MR. MORRIS:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7  BY MR. MORRIS:

8  Q   Mr. Nelms, do you currently have a relationship to the

9  Debtor?

10  A   I do.

11  Q   And what is that relationship?

12  A   I am one of three independent directors of the Debtor.

13  Q   And when were you appointed?

14  A   January the 9th of this year.

15  Q   Did you just listen to the opening statement on behalf of

16  Acis?

17  A   I did.

18  Q   And did you hear the reference to the DAF litigation?

19  A   I did.

20  Q   And did you hear the allegation that the Debtor somehow

21  was involved in the prosecution of the DAF litigation?

22  A   I heard that, yes.

23  Q   Okay.  Did there come a time last week that the Board

24  learned of the possibility of a filing with respect to the DAF

25  litigation?

Nelms - Direct                                  58

1  A    We learned about the filing of the DAF litigation sometime

2  within the last two weeks.

3  Q    And what did the Board do in response to learning that

4  information?

5  A    Well, first of all, I -- we met with Ms. Patel and her

6  client, Josh Terry.  They expressed their concerns about the

7  DAF litigation.  And so the Board used its influence to

8  encourage the trustee of the DAF, Grant Scott, to dismiss that

9  litigation, and we have gotten Mr. Scott's commitment to

10 dismiss the litigation.

11     There's a little bit of an issue there concerning about

12 whether some of the claims can -- they may need to be

13 dismissed without -- the preference is, of course, to dismiss

14 them without prejudice, but there are some issues about that.

15 But I'm told by Mr. Scott that he's going to dismiss the

16 litigation.

17 Q    Let's go back in time before this was filed.  Did the

18 Board express its view as to whether there should be a filing

19 at all?

20 A    It was really a very brief thing.  This was probably a

21 couple weeks or so ago, kind of late in the day at the end of

22 a long, long day, one of those long days we've been having.

23 Someone brought into a board meeting I guess a copy of this

24 new DAF complaint.  It had not been filed at that time.  They

25 showed it to Mr. Dubel.  He looked at it and just kind of

Nelms - Direct                              59

1   asked what it was.  There was a brief explanation of what it

2   was.  And Mr. Dubel said, Tell them not to file this.  He

3   goes, This is only going to cause us problems.  And that's the

4   last we heard of it before it was filed.

5   Q    And what law firm filed that complaint?

6   A    That was filed by the Lynn Pinker firm.

7   Q    And after the Board learned that Lynn Pinker filed this,

8   in spite of the Board's instructions, did the Board take any

9   steps with respect to Lynn Pinker?

10  A    Well, of course, we -- one of the matters that previously

11  was before the Court was the Lynn Pinker application to be

12  retained in this case.  And I'll just say that it was -- it

13  was a factor that went into our deliberations concerning our

14  decision not to go forward with the Lynn Pinker litigation.

15  Q    So, I just want to make sure I have this right.  So the

16  Board, upon learning of a possible filing, gave instructions

17  not to do so; is that right?

18  A    It did.

19  Q    And upon learning that it was filed, it became one of the

20  factors that the Board relied upon in determining not to

21  pursue the Lynn Pinker retention; is that right?

22  A    That's correct.

23  Q    And you personally reached out to Mr. Terry and Ms. Patel

24  to discuss the issue; is that right?

25  A    Mr. Seery and I did, the two of us.

Nelms - Direct                              60

1    Q    And you used whatever influence you had to try to reach an

2    agreement for the withdrawal of that complaint without

3    prejudice; is that right?

4    A    That's correct.

5    Q    Okay.  Now, let's get back to the issues that are relevant

6    to the actual motion.  Are you aware that the Debtor has

7    sought the Court's approval to retain Foley Gardere as special

8    counsel?

9    A    I am.

10   Q    And have you reviewed the court filings with respect to

11   that motion?

12   A    Yes, I have.

13   Q    Okay.  Can you describe for the Court generally the

14   matters for which the Debtor seeks to retain Foley Gardere?

15   A    There are three matters, essentially.  One is an appeal in

16   the Fifth Circuit which concerns the entry of the order for

17   relief in the involuntary petition itself.  The second is an

18   appeal in the Fifth Circuit that concerns the confirmation of

19   the Acis plan.  And the third matter is the assertion of,

20   prosecution of a proof of claim that Highland Capital

21   Management would have in the Acis bankruptcy.

22   Q    Okay.  And are these the special purposes for which the

23   Debtor seeks to retain Foley?

24   A    Yes.

25   Q    Do you know whether there are matters that were part of

Nelms - Direct                                61

1   the original motion but which the Debtor no longer seeks to

2   pursue?

3   A    One of the matters that was pending when we took office

4   was an appeal, and I believe it was still in the District

5   Court, and that related to an alleged conflict of interest by

6   the Winstead firm.  And so there was an objection to their

7   fees and an appeal concerning payment of Winstead fees.  And

8   the Board has decided not to go forward with that appeal.

9   Q    Okay.  So the Board -- did you hear the opening from

10  Acis's counsel that charged that the Debtor was just doing

11  more scorched-earth litigation tactics?  Did you hear that

12  charge?

13  A    I heard that, yes.

14  Q    Okay.  But yet the Board has instructed Foley not to

15  pursue the Winstead matter; is that right?

16  A    That's correct.

17  Q    And just again, for the record, why did the Board make

18  that decision?

19  A    The Board made that decision because we just thought it

20  was in the best interest of the Debtor and this estate not to

21  do that.

22  Q    And did the Debtor see any benefit to pursuing that

23  particular litigation?

24  A    You know, there -- a benefit could be articulated, but we

25  decided not to pursue it.

Nelms - Direct                                                62

1   Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2   mean, I apologize, withdrawn.  That, plus the DAF matter, are

3   two examples where the Board exercised its judgment not to

4   pursue pending litigation; is that fair?

5   A    That's correct.

6   Q    Okay.  Is the Board supportive of the Debtor's application

7   to retain Foley for the three matters you have described?

8   A    It is.

9   Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

**Appx. 03090**

Nelms - Direct                                    63

1   upside of pursuing it?  And based upon that cost-benefit

2   analysis, we thought that this was the best thing to do.

3   Q    Okay.  Let's just focus on a couple of very narrow 327(e)

4   issues.  Is the Debtor seeking to retain Foley to act as

5   general bankruptcy counsel?

6   A    No.

7   Q    And which firm serves as general bankruptcy counsel?

8   A    That would be the Pachulski firm.

9   Q    Okay.  And do you know whether Foley Gardere represented

10  the Debtor's interest in each of the three matters that you've

11  described?

12  A    It has been representing the Debtor previously.

13  Q    Okay.  So let's talk about those three matters.  The first

14  one I believe you said was with respect to the representation

15  of the Debtor in connection with an $8 million claim that it

16  has against Acis; is that right?

17  A    That's correct.

18  Q    And is that the claim -- is that the subject of a formal

19  proof of claim?

20  A    Yes.

21  Q    Okay.

22  A    It is a claim filed in the Acis case.

23  Q    I've placed before you an exhibit binder, and I would ask

24  you to turn first to Exhibit 4.

25  A    Okay.

Nelms - Direct                                64

1  Q    And is that one of the proofs of claim that the Debtor has

2  filed against Acis?

3  A    It is.

4  Q    And you'll see that attached to the proof of claim a few

5  pages in there's a document called the Third Amended and

6  Restated Sub-Advisory Agreement.  Do you see that?

7  A    Yes.

8  Q    Do you know what that document is?  Generally?

9  A    Well, generally, I know what this document is.

10 Q    All right.  And what's your general understanding of the

11 document?

12 A    This is an advisory agreement that -- the only thing that

13 I know, I can tell you, really, about this agreement is it

14 gives rise to and generates fees that would inure to the

15 benefit of the Debtor.

16 Q    Okay.  And a few pages past that, you'll see something

17 called a Fourth Amended and Restated Shared Services

18 Agreement.  Do you see that?

19 A    Yes.

20 Q    Is it your understanding that that was another source of

21 revenue that the Debtor generated when it had this agreement

22 in place with Acis?

23 A    Yes.

24 Q    Okay.  Do you have an understanding as to, you know,

25 ballpark, what the annual fees were that the Debtor received

Nelms - Direct                              65

1  pursuant to these agreements prior to the Acis bankruptcy?

2  A    Well, I think, prior to the bankruptcy, it was more, and

3  perhaps significantly more, than it is today.  It may have

4  been in the $12 million range per annum.  I think it's less

5  than that today.

6  Q    Okay.  And can you turn to Exhibit 5, please?  Is that

7  another proof of claim that was filed in the bankruptcy case,

8  the Acis bankruptcy case?

9  A    Yes.  This is a little bit different.  This is an

10 application for an administrative expense claim.  The prior

11 proof of claim that we looked at related to a pre-petition

12 claim that the Debtor had, then a gap period claim that the

13 Debtor had, and this is post-petition.  So this is an

14 administrative claim.  It's basically for the same services,

15 but just different time periods.

16 Q    Okay.  And who was responsible for preparing Exhibits 4,

17 5, and 6?

18 A    Ms. O'Neil and the Foley firm.

19 Q    Okay.  And has the Board reached a conclusion that it's in

20 the Debtor's best interest to retain Foley on a post-petition

21 basis to prosecute these claims?

22 A    It has.

23 Q    And why -- what's the justification for that?  Why did the

24 Board reach that decision?

25 A    Well, we believe it's in the best interest of the Debtor.

Nelms - Direct                          66

1   Obviously, a couple of things there.  I realize we may have a

2   very long road ahead of us with respect to these things.  But

3   the overall aspirational goal is to have an income stream

4   that's associated with these agreements.  The goal is to have

5   an amount of money out there that's available to pay our pre-

6   petition claims, the gap claims, the administrative claims,

7   while at the same time acknowledging that this company has the

8   obligation to satisfy and fulfill Mr. Terry's claim as well.

9   Q    All right.  Let's just focus for the moment on the three

10  proofs of claim.  The aggregate amount is approximately $8

11  million.  Do I have that right?

12  A    Yes, that's right.

13  Q    And from the Board's perspective, is the -- are those

14  claims an asset of the estate?

15  A    They are.

16  Q    And does the Board want to retain Foley for the purpose of

17  trying to recover that asset?

18  A    It does.

19  Q    And has the Board concluded that Foley is familiar with

20  these particular claims?

21  A    Foley is familiar with these claims, yes.

22  Q    And -- okay.  Let's move on, then, to the second task for

23  which the Debtor seeks approval to retain Foley, and that is

24  with respect to the confirmation order.  That's one of the

25  tasks, right?

Nelms - Direct                                    67

1  A    It is.

2  Q    Okay.  And this is one of the Fifth Circuit arguments

3  that's scheduled for six weeks from now; is that right?

4  A    That's correct.

5  Q    Okay.  And has Foley represented the Debtor throughout the

6  proceedings that are leading up to this oral argument?

7  A    It has.

8  Q    And did Foley prepare all of the briefing in connection

9  with the arguments?

10  A    It did prepare the briefing.  It did that, in some

11  respects, along with Lynn Pinker.

12  Q    Okay.  Did you personally review the Debtor's briefs that

13  were filed in connection with the appeal?

14  A    I have reviewed those.

15  Q    Okay.  Have you reviewed every single piece of the record

16  on appeal?

17  A    I would doubt that I have.

18  Q    Okay.  Do you have a general understanding of the nature

19  of the appeal?  Of -- and this would --

20  A    Are we talking now about the confirmation appeal?

21  Q    Yes.  Just the confirmation.  Yeah.

22  Q    Well, the appeal has basically two broad elements, and the

23  first is an argument that the plan was not brought in good

24  faith.  Section 1129(a)(3).  And that goes back to the

25  arbitration issue.  Generally speaking, that because -- the

Nelms - Direct                                    68

1  allegation is that because Mr. Terry refused to arbitrate,

2  then the plan was tainted by that lack of good faith.  And the

3  second issue, broad issue that's involved in that appeal has

4  to do with, oh, the injunction, the breadth and scope of the

5  injunction, which the Debtor contends is -- was improper.

6  Q    And if the Fifth Circuit reverses the underlying decision,

7  has the Board made a determination of the possible benefits

8  that the Debtor may receive?

9  A    Well, there's two aspects of that appeal.  One would be a

10 narrower decision.  I suppose, if it's just related to the

11 injunction, it's -- it's hard to quantify exactly what that

12 would mean.

13 Q    Okay.

14 A    The bigger issue, of course, has to do with the

15 arbitration.  And if the -- theoretically, at least, the

16 arbitration, if the Fifth Circuit agreed on the issue of

17 arbitration, then the argument would be that we would -- that

18 in the arbitra... well, it is true to say that -- well, I

19 think I'm kind of getting ahead of myself here.

20 Q    You are, just a bit.  Let's just focus on the confirmation

21 appeal.  That's been consolidated for oral argument purposes

22 --

23 A    It has.

24 Q    -- with the appeal of the involuntary; is that right?

25 A    That's correct.

Nelms - Direct                                                      69

1  Q   Okay.  And just to sum up this piece of it, did Foley

2  represent the Debtor with respect to all of the underlying

3  proceedings?

4  A   It did.

5  Q   And why does the Board believe it's in the Debtor's best

6  interest to retain Foley to conduct the oral argument and to

7  finish up this proceeding?

8  A   Well, first of all, I think the Court would agree with me

9  that Foley is a very competent law firm.  It's competent to do

10 the work that they've been charged to do.

11     Second, pretty much all the work on the appeal is already

12 in the can.  The only thing that's left to be done at this

13 point in time is to make the oral argument.  Obviously, if we

14 didn't go forward with the Foley firm, we'd have to find

15 somebody who could make the argument.  So, we would -- but we

16 would lose the benefit of Foley's experience that they have in

17 the case so far.

18     I think there will be a cost element that would be

19 associated with bringing somebody new up to speed with respect

20 to this.

21     So, those, generally speaking, are the benefits that we

22 see.

23 Q   Okay.  Let's turn then, finally, to the Neutra appeal.  Do

24 you have a general understanding of that matter for which the

25 Debtor seeks to retain Foley?

Nelms - Direct                              70

1   A    Yeah.  The Neutra appeal, what happened in Neutra is that

2   Neutra, to my understanding, moved to intervene in the

3   involuntary proceeding.  I think that intervention was denied.

4   And so that appeal has to do with the fact that Neutra

5   contends that it should have been permitted to intervene, that

6   the matter of collections should have been arbitrated.

7        I think that one of the issues in there is this -- in that

8   appeal is who decides on the issue of arbitrability.  Is it

9   this Court, or is it the arbitrators themselves?

10       So, those are the issues that are present in the Neutra

11  appeal.

12  Q    Okay.  Is the Debtor named a party to the appeal?

13  A    The Debtor is not a named party in the Neutra appeal.

14  Q    But the Board nevertheless wants to retain Foley on a

15  post-petition basis to prosecute that appeal; is that right?

16  A    That's correct.

17  Q    And why is that?

18  A    Well, I think both -- we recognize and I think the Fifth

19  Circuit recognizes as well that these two things, that these

20  two appeals kind of go hand-in-glove.  The 1129(a)(3) argument

21  basically is dependent upon the arbitration issue, which is

22  fleshed out in the Neutra appeal.

23       And so, at the end of the day, the way that the Board sees

24  this is that the Debtor is the most immediate beneficiary of

25  the economic benefit of the Neutra appeal.  We see the

Nelms - Direct                               71

1   possibility of an income stream there.  We see the possibility

2   of the ability to pay our claims in the Acis case.  And I

3   think -- one of the things I think that is of particular focus

4   when it comes to all of this litigation is the fact that, as I

5   understand it, Mr. Terry started out with an $8 million claim,

6   and I think he bid $1 million of that claim for the interest

7   that he got in Acis, which reduced it, say, to $7 million.

8   And I think Mr. Terry's interest now over time I believe it's

9   been reduced to somewhere between $4 to $6 million.  So

10  that's, that's a claim.

11      But in this case, Mr. Terry has filed a proof of claim for

12  $70 million.  And my understanding from our visit with Mr.

13  Terry and his counsel is that that claim could get up to $300

14  million.  And so, as a board, we look at that and what we're

15  concerned about is the migration, the alleged migration of a

16  tremendous amount of value from Highland down to Acis.  So, at

17  the end of the day, it doesn't really matter who you regard as

18  the ultimate equity owner of Acis, whether it's Mr. Terry or

19  whether it's Mr. Dondero:  The migration of that value

20  downstream to Acis is of no real benefit to Highland Capital

21  at all.

22  Q   Is this one of the issues that the Board discussed with

23  the Committee last week in connection with this motion?

24  A   Yes.  It is.

25  Q   Okay.  And let's just go back to the income stream for a

Nelms - Direct                                   72

1  second.  The income stream that the Board is hoping it will

2  get if the decision is reversed, is that income stream derived

3  from the two agreements that we just looked at?

4  A    It is.

5  Q    So those are the two very agreements that the Board would

6  look to have reinstated if it were to succeed on the appeal;

7  is that right?

8  A    Yes.

9  Q    Now, does the Board know exactly the form of relief the

10 Fifth Circuit is going to grant?

11 A    I have no earthly idea.

12 Q    Right?  But has the Board made a determination that the

13 outcome of Neutra obtaining control of Acis is one

14 possibility?

15 A    It's certainly a possibility.

16 Q    And is that the potential benefit that the Board focused

17 on in deciding to pursue this motion?

18 A    Yes.  I mean, I'm glad to adopt the percentages that Mr.

19 Terry's counsel has mentioned today.  I guess if the cost-

20 benefit analysis is that we're going to pay a couple hundred

21 thousand dollars here to get to the end of the road, and the

22 benefit is millions of dollars, well, even if our chances are

23 only ten percent, I think that's a shot worth taking.

24 Q    Thank you very much.  If the Fifth Circuit reversed,

25 because this is a point that was also made in the Acis

Nelms - Direct                          73

1   opening, what would happen to Mr. Terry's claim?  Or what's

2   your understanding or what's the Board's view as to whether or

3   not it would intend to satisfy Mr. Terry's claim?

4   A    I know, speaking on my behalf, that I'd -- the claim that

5   Mr. Terry got through arbitration I regard as a valid claim.

6   I think it's one that would have to be addressed no matter who

7   is in charge of paying the obligations of Neutra.

8   Q    Has the Board concluded that it's in the Debtor's best

9   interest to retain Foley for the purpose of prosecuting the

10  Neutra appeal, or at least in issuing the oral argument?

11  A    Yes.

12  Q    Okay.  And when is the argument scheduled for?

13  A    March the 30th.

14  Q    And is the fact that that's all that's left with respect

15  to this aspect of the engagement a factor that the Board took

16  into account in its decision?

17  A    Yes.

18  Q    Has the Board reached a decision as to who the real

19  economic party in interest is with respect to the Neutra

20  appeal?

21  A    Yes.  We believe ultimately that our Debtor would bear the

22  most economic interest in the outcome.  And, really, because

23  of the amount of the obligations that are owed, both to Mr.

24  Terry, to Highland Capital, by the time that you have this

25  kind of runoff of all the revenue streams, I'm not really sure

Nelms - Direct                                    74

1  that there would be anything left for either Mr. Dondero or

2  Mr. Okada.

3  Q    So, --

4  A    That's -- that's a view from 50,000 feet, not even 30,000

5  feet.

6  Q    Okay.  Well, let's talk about the specific benefits,

7  potential benefits, if it's reversed on appeal.  Does the

8  Board believe it's possible that the two contracts get

9  reinstated?

10 A    It is possible.

11 Q    And is that a motivating factor in supporting this motion?

12 A    It is.

13 Q    What would happen to the $8 million claim that the Debtor

14 has against Acis right now in the Acis bankruptcy?  Does the

15 Board have a view as to what would happen to that?

16 A    It would be our aspiration to collect that claim on behalf

17 of our client, which is Highland Capital Management.

18 Q    And would -- is it the Board's expectation that if it was

19 in that position it would get paid hundred-cent dollars,

20 rather than at least a portion of it as a general unsecured

21 claim?

22 A    Again, that would be our aspiration.

23 Q    Uh-huh.  What would happen to the adversary proceeding?

24 Do you have an understanding as to what would happen in the

25 adversary proceeding with respect to Mr. Terry if the Fifth

1   Circuit reverses and Neutra regains control of Acis?

2   A    Well, I'm assuming -- I'm assuming that that adversary

3   proceeding would go away.

4   Q    Okay.  And would that -- is that a potential benefit to

5   the estate?

6   A    That would be a benefit to the estate if it did.

7   Q    And do all of the factors that we just discussed go into

8   the cost-benefit analysis that the Board did in deciding to

9   pursue only these three very limited aspects of the

10  engagement?

11  A    Yes.

12  Q    Okay.  Has the Board considered the potential harm to the

13  Debtor if the motion is denied?

14  A    We have.

15  Q    And have -- can you share with the Court the issues that

16  the Board has identified as potentially being adverse if the

17  motion is denied?

18  A    It's really just the other -- the flip side of the coin of

19  benefit, which is added expense, loss of the experience that

20  the Foley firm has, perhaps delay of time in finding somebody

21  else, bringing them up to speed, not just with respect to the

22  two appeals but with respect to the proof of claim.  And there

23  may be others that I'm not thinking of right now.

24  Q    Did the Board consider the potential loss of the

25  institutional knowledge that Foley has and the potential

Nelms - Direct                              76

1  adverse impact it would have on the quality of the oral

2  argument?

3  A    It did.

4  Q    Okay.  So, two of the three matters that the Debtor seeks

5  to retain Foley for are appeals to the Fifth Circuit; is that

6  right?

7  A    Yes.

8  Q    And did those matters originate in this courtroom?

9  A    They did.

10 Q    And you were colleagues with Judge Jernigan at one time,

11 weren't you?

12 A    Yes.  We were bench colleagues for twelve years.

13 Q    And do you believe Judge Jernigan is a good judge?

14 A    I do.

15 Q    Do you believe she's a fair judge?

16 A    I do.

17 Q    Do you believe she tries to get it right every single

18 time?

19 A    I know she tries to get it right every time.

20 Q    So then why is the Board seeking to prosecute these

21 appeals of Judge Jernigan's decision?

22 A    Well, it's in the best interest of our client to do that.

23 And I have not -- I have to say there's always a little bit of

24 discomfort that comes with something like this, but I do know

25 this from my time on the bench, and that is that when you take

Nelms - Direct                                77

1  the job that Judge Jernigan has, you take it with full

2  understanding of how the system works.  And in the system,

3  half the people lose at any one given time.  And when you

4  lose, you tend to be disappointed in the result, and the

5  result of that is that you get the right to go to the next

6  court and have someone say that the judge got it wrong.

7      So those of us that take the bench understand that that's

8  the system, and I don't think -- for the most part, we're not

9  threatened by that.  And so I, you know, as uncomfortable as

10  this may -- this may put -- a position it may put me in from

11  time to time, I think that -- I think Judge Jernigan

12  understands the roles that we all play in this system.  And so

13  --

14  Q   Just, okay, just to summarize:  If the motion is granted,

15  what's the absolute worst-case scenario here for the Debtor?

16  A   I'm sorry.  Would you say that again?

17  Q   If the motion is granted and the Debtor is allowed to

18  retain Foley for the three tasks which you have described, do

19  you have an understanding as to what -- what's the worst that

20  could happen?  They'd have to pay Foley's fees, right?

21  A   We'd have to pay -- well, subject to Judge Jernigan's

22  approval, --

23  Q   Right.

24  A   -- those fees would be paid.

25  Q   And subject to everybody's opportunity to object, right?

Nelms - Direct                                    78

1  A    Right.

2  Q    But if the fees were paid at a hundred percent, nobody

3  objected and Judge Jernigan approved of them, what's the

4  maximum exposure that the Debtor has from this?

5  A    I think Foley has about $311,000, I believe, right now in

6  time.  And I think they would probably have about maybe

7  another $100,000 more.  And I know -- I hate to scoff at the

8  notion that $400,000 is a lot of -- is not a lot of money.

9  But, you know, in the grand scheme of things in this case,

10  it's -- I won't say it's a rounding error, but it's not a lot

11  of money.

12  Q    And forget about, I mean, not forget about, but in

13  addition to its relative size to the overall case, how does

14  that compare to the relative economic benefit that the Debtor

15  believes it will recover if the appeal is successful?

16  A    Well, I think the cost is -- the cost is less than half a

17  million, and the potential benefits are in the millions.

18          MR. MORRIS:  Okay.  Just one moment, Your Honor, if I

19  may?

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  All right.  Just a few more questions,

23  Your Honor.

24          THE COURT:  Okay.

25  BY MR. MORRIS:

Nelms - Direct                                79

1   Q   Mr. Nelms, did Neutra pay a portion of the fees, Foley's

2   fees prior to the petition date in connection with an April

3   litigation?  Do you know?

4   A   If they did, I'm not aware of it.

5   Q   Okay.  Do you know what would happen to the appeal if

6   there was no funding for the appeal?

7   A   Well, I think I know what the result of the appellant not

8   showing up for an appellant argument would be.

9   Q   And what would that be?

10  A   Well, I think that would be a pretty quick resolution.

11  Q   Do you think the case would be dismissed, the appeal would

12  be dismissed?

13  A   I think so.

14  Q   And would that be the loss of a potential material benefit

15  and asset of the Debtor's estate?

16  A   It would be.

17  Q   Can you think of any way to ensure the appeal is

18  prosecuted today other than making sure the Debtor funds it?

19  A   I'll put it this way.  I think the most certainty can be

20  added to this case by having the Debtor fund this matter

21  through the end of March.

22  Q   And from --

23  A   I think that's -- that's -- for the time being, that's the

24  easiest, most simple path.

25  Q   And you say for the time being.  Has the Board reached an

Nelms - Direct                                    80

1   agreement to never request, from Neutra or anybody else,

2   contributions for the funding of this case?

3   A    No.  Ultimately, there is going to be at some point in

4   this case a settling of accounts between the Debtor and Mr.

5   Dondero, just as there are -- will be a settling of accounts

6   between the Debtor and other parties in interest.  We, as the

7   Board, have just chosen not to have that fight today.

8   Q    And why did the Board reach that decision?

9   A    Because we just thought it was in the best interest of the

10  Debtor to proceed that way.

11  Q    And is that because you need this appeal argued on March

12  30th?

13  A    It is.

14  Q    And that's because of all of the potential benefits that

15  you've identified; is that right?

16  A    Right.

17  Q    Okay.

18            MR. MORRIS:  I have no further questions, Your Honor.

19            THE COURT:  Okay.  Cross?

20            MR. LAMBERSON:  Yes, Your Honor.

21                         CROSS-EXAMINATION

22  BY MR. LAMBERSON:

23  Q    Good morning, Mr. Nelms.

24  A    Good morning.

25  Q    How's it to be on that side of the bench?

Nelms - Cross                                    81

1   A    Not so fun.

2   Q    It's not great, right?

3           MR. LAMBERSON:  And Your Honor, we have an exhibit

4   notebook, which we're not -- we're not going to use all these

5   exhibits.  We actually -- you'll notice that there are some

6   empty tabs in here.  We downsized the exhibits from the

7   exhibit list, and I'm not going to use all these.  So I'll

8   just introduce them as I get to them.

9           THE COURT:  Okay.

10  BY MR. LAMBERSON:

11  Q    Let me pick up on your last point.

12          MS. CHIARELLO:  Your Honor, may we approach?  We have

13  binders.

14          THE COURT:  You may.

15  BY MR. LAMBERSON:

16  Q    So, let me pick up on your last point, Mr. Nelms.  So, who

17  -- who owns Neutra?

18  A    Well, if you follow the stream all the way up, it is owned

19  75 percent by Mr. Dondero and 25 percent by Mr. Okada.

20  Q    Okay.  And Mr. Dondero is one of the richest men in

21  Dallas.  Correct?

22  A    I don't know.

23  Q    Presumably?  Mr. Okada is also one of the richest men in

24  Dallas?

25  A    I don't know.  I haven't lived in Dallas in 17 years.

Nelms - Cross                                82

1   Q    Okay.  Fair enough.  But they can't -- they can't pay the

2   litigation costs for their own entity?

3   A    Well, I don't know that they -- whether they can or

4   whether they can't.

5   Q    Right.  So, are you familiar with an entity called

6   Highland CLO Funding?

7   A    Vaguely, yeah.

8   Q    Okay.  And Highland CLO Funding is one of the appellants

9   in the appeal of the confirmation order, correct?

10  A    That's correct.

11  Q    Okay.  And one of the issues on appeal is actually the

12  plan injunction that's embedded in the confirmed plan,

13  correct?

14  A    That's correct.

15  Q    Right.  And is your understanding that that's really

16  Highland CLO Funding's main appeal issue?

17  A    I think it probably would be, yes.

18  Q    Okay.  And is there any reason that Highland CLO Funding

19  can't pay Neutra's legal fees to have -- have another

20  appellant in the Fifth Circuit?

21  A    I don't know the answer to that question.

22  Q    Okay.  So, let me -- let me -- I'm going to try to keep

23  this coordinated, but my notes are a little bit over the

24  place, so I apologize in advance if I move around a little

25  bit.

Nelms - Cross                                83

1       So, you had testified earlier that -- and I'm just trying
2   to synopsize your testimony -- that you -- that the Board
3   believes the primary benefit of paying Neutra's legal expenses
4   related to the order for relief appeal and the confirmation
5   appeal is the income stream that would be evidenced by the
6   sub-advisory agreement, right?
7   A    Yes.
8   Q    Okay.  And I'm -- when I say sub-advisory agreement, I'm
9   talking about this is the attachment to the Debtor's Exhibit
10  4, which is the proof of claim.
11  A    Right.
12  Q    Right?  And so it's your understanding that the way that
13  works is Acis Capital Management, my client, is the portfolio
14  manager for a bundle of CLOs, right?
15  A    That's my understanding.
16  Q    And that before the Acis bankruptcy, the sub-advisory
17  agreement allowed Highland Capital Management to sub-advise
18  those CLOs for a fee, correct?
19  A    That's correct.
20  Q    Okay.  So, I'm going to focus on the confirmation appeal.
21  So, you understand that the plan injunction prevents the
22  liquidation of the CLOs and the Acis portfolio management
23  agreement?
24  A    That is my understanding.
25  Q    Okay.  And the reason that, frankly, we had to get the

Nelms - Cross                          84

1   plan injunction is because HCLOF three times tried to

2   liquidate, redeem the CLOs, including twice in the bankruptcy

3   case?

4   A    I understand that was an issue.  But -- I have a general

5   understanding as to what you're saying, but not a specific

6   understanding.  But I'm not disagreeing with you.

7   Q    Yeah.  Okay.  And so if the plan goes away, the plan

8   injunction goes away, then is there any reason to think that

9   HCLOF isn't going to liquidate the CLOs?

10  A    I would not know.

11  Q    And in that case, there's not going to be any cash flow

12  under the portfolio management agreements or the sub-advisory

13  agreements, right?

14  A    If you're asking me if that's a possibility, I'd say it's

15  certainly within the realm of possibilities.

16  Q    Okay.  So, staying on the confirmation appeal, so let's --

17  let's assume that, for whatever reason, the Fifth Circuit

18  decides that the confirmation order needs to be reversed and

19  they send it back down to Judge Jernigan and say, "Try again."

20  Would you agree that that would effectively reactivate the

21  Acis case?

22  A    Well, I don't know, because, you know, one of the issues

23  in the appeal is who gets to make the decision with respect to

24  arbitrability.  Because I know that it's the Appellants'

25  position that the decision as to whether or not it should be

Nelms - Cross                          85

1  arbitrated, something such as collections, should they go to

2  be decided by the arbitrator, --

3  Q   Let me stop you, just to be clear.  I'm talking about the

4  confirmation appeal, the appeal of the confirmation order.

5  A   Uh-huh.

6  Q   Right?  Okay.  I'm not talking about the order for relief

7  appeal.

8  A   I may be conflating the two, so I'm sorry.

9  Q   Yeah, yeah, and I -- and it's -- yeah, it's -- but it is

10  confusing.  But I'm talking about the confirmation appeal.  So

11  the appeal of the Court's confirmation order confirming the --

12  I think was the third amended plan.  Okay?  So, I'm focusing

13  on that appeal only.  If the Fifth Circuit says, "Nope.  Try

14  again," then you would agree with me that that effectively

15  reactivates the Acis Chapter 11 case?

16  A   Well, I think it depends.  If you -- would you like me to

17  explain why I think it depends?

18  Q   Yeah.  Go ahead.  I don't -- because, I mean, honestly,

19  I'm not exactly sure what happened, so I would actually -- I

20  would like your opinion.

21  A   Well, given that the first issue in the confirmation

22  appeal is the issue of good faith, and the foundation of that

23  pretty much is the whole arbitration issue, if the Fifth

24  Circuit were to reverse on that basis, then I don't

25  necessarily know that it would go back to the Bankruptcy

Nelms - Cross                                   86

1   Court.

2       If it was reversed just on the narrower issue with respect

3   to the injunction, and maybe whether the injunction was too

4   broad or something like that, --

5   Q    Uh-huh.

6   A    -- and that was the only basis for reversal, I would agree

7   with you it would go back to Bankruptcy Court.

8   Q    Okay.  So there's some possibility that a result of the

9   confirmation appeal is that the Acis Chapter 11 case is

10  reactivated and we're back in front of Judge Jernigan on that

11  case, too?

12  A    That would be a possibility.

13  Q    Okay.  And then you'd get to talk with Mr. Phelan, right?

14  That would be fun.

15  A    Right.

16  Q    So, so how much money did Highland Capital spend in the

17  Acis bankruptcy case?

18  A    I don't know.

19  Q    Was it -- it was millions and millions, right?

20  A    I don't know, but I'm -- I'm assuming it exceeded a

21  million.

22  Q    Okay.  Well, aren't there -- aren't there claims of unpaid

23  fees just in the Top 20 list, which we'll point to here in a

24  minute, in the millions of dollars that relate to the

25  attorneys that represented Highland in the bankruptcy -- in

Nelms - Cross                                    87

1   the Acis bankruptcy case?

2   A    I don't know.

3   Q    Okay.  So, why, you know, assuming that a result of the

4   confirmation appeal is that the Acis bankruptcy case is

5   reactivated, how is that in Highland's best interest?  And I'm

6   not talking about Neutra, and I'm not talking about HCLOF.

7   I'm talking about Highland.

8   A    Well, the -- what would be in our best interest would be

9   to once again control the sub-advisory agreement and to

10  generate revenues for the benefit of this estate.  Use those

11  -- that revenue stream both to address any claims that

12  Highland might have, as well as Mr. Terry.  That would be the

13  benefit as we see it.

14  Q    Right.  But by the time of the confirmation order, --

15  A    But if your question is, oh, but you're going to be

16  involved in a lot of other litigation and so how does that

17  benefit, then I guess my answer to that is it's a -- my answer

18  is a "Yes, but," and but may exceed the scope of your

19  question, so I won't --

20  Q    Okay.

21  A    -- I won't give you the but answer unless you want me to

22  do it.

23  Q    That's fine.  I just -- if we go back, if we go back to

24  where we were before confirmation, I mean, I'm not talking

25  about the order for relief, I'm talking about confirmation,

Nelms - Cross                                      88

1   the sub-advisory agreement had been terminated.  Highland had

2   been fired and Brigade was managing everything.

3   A    Right.

4   Q    So, there wouldn't be any cash flow going to Highland

5   based on the -- just the reversal of the confirmation order.

6   A    Well, what would have to happen, of course, is that Neutra

7   would have to -- would have to appoint us as -- would have to

8   allow us to come in under the sub-advisory agreement to

9   perform those services.

10  Q    Right.  Except that there's a trustee, right?  Robin

11  Phelan was in charge of everything.

12  A    Well, you're assuming there's still a bankruptcy.

13  Q    Right.  Yeah.  Well, I am.  I mean, again -- and maybe I'm

14  being simplistic about this, but if the confirmation order is

15  reversed, --

16          THE COURT:  Counsel is standing.  Do you have an

17  objection?

18          MR. MORRIS:  Yeah.  I do, Your Honor, to this whole

19  line of hypothetical questions.  We do understand, I think

20  everybody understands, that we don't know if the appeal will

21  be granted.  I think we do all understand that we don't know

22  what the form of relief, the exact form of relief will be.

23  But the testimony here is that the Board has decided that one

24  possible form of relief is that -- is that Neutra will regain

25  control of Acis and get these contracts reinstated, get the

Nelms - Cross                                89

1    adversary proceeding dismissed, and get paid on its $8 million

2    claim.

3        If there's questions about that, I think it's relevant,

4    but I don't know why we're spending a lot of time on

5    hypotheticals with a fact witness.

6            THE COURT:  But the --

7            MR. MORRIS:  Not an expert witness.

8            THE COURT:  The business judgment of the Board of the

9    Debtor is at issue here, correct?

10           MR. MORRIS:  Correct.  Absolutely.

11           THE COURT:  Don't these hypotheticals go to, is

12   reasonable business judgment being exercised here?

13           MR. MORRIS:  I think he has to lay a foundation and

14   say, Is this -- is this a hypothetical you considered?  Is

15   this a hypothetical that you considered?  Because we're just

16   -- this is like expert testimony almost.  There is no evidence

17   that any of these factors were considered.  And at the end of

18   the day, there is no dispute that the scenario that the Board

19   is saying is worth the investment, basically, is also a

20   possibility.

21           THE COURT:  Okay.  I overrule the objection.

22           MR. LAMBERSON:  Okay.

23           THE COURT:  You can proceed.

24           MR. LAMBERSON:  And Your Honor, I'm just about done.

25           THE COURT:  Okay.

Nelms - Cross                                    90

1  BY MR. LAMBERSON:

2  Q   So, okay.  So, we -- but we can agree that -- okay.  Let

3  me -- let me hopefully do this.  Okay.  So, I mean, I think

4  that's fine for the confirmation appeal, so now I want to talk

5  about the order for relief appeal.  Right?  So this is the

6  appeal of the order for relief or the -- and I stated this

7  earlier to the Court, but the sole substantive issue in that

8  appeal is whether this Court should have compelled the order

9  for relief to arbitration.  Is that right?

10 A   The sole substantive issue?  I think, if you paint with a

11 broad brush, yeah.  I would agree with you, yes.

12 Q   Okay.  Well, and again, I'm not trying to --

13 A   I know.  So, --

14 Q   I'm not trying to trap anybody.  The three issues --

15 A   And I'm not trying to be evasive, either.

16 Q   Yeah.

17 A   Yeah.

18 Q   Are the standing issue, which, in my mind, isn't really a

19 substantive issue.  And then there's the issue about the

20 arbitration of the order for relief.  And then, finally, as I

21 mentioned, we've raised a waiver argument that basically, if

22 they had a right to arbitrate, which we think they don't, they

23 waited too long to raise it.  Right?  Those are the three

24 issues.  Correct?

25 A   That's correct.

Nelms - Cross                              91

1    Q    Okay.  So, let me ask you.  And I'm not going to -- I'm

2    not going to hold this against you at the Fifth Circuit level,

3    but, I mean, do you -- do you think an order for relief is

4    subject to arbitration?

5          MR. MORRIS:  Objection, Your Honor.  Calls for a

6    legal conclusion.

7          THE COURT:  Overruled.

8          MR. LAMBERSON:  Sure it does.

9          THE COURT:  Overruled.

10         THE WITNESS:  I think the -- I think it's a -- I

11   think there's a colorable argument.

12   BY MR. LAMBERSON:

13   Q    Uh-huh.

14         MR. MORRIS:  Objection withdrawn.

15   BY MR. LAMBERSON:

16   Q    So you don't think *National Gypsum* and *Gandy* would apply

17   to an involuntary petition and order for relief?

18   A    Well, I'll put it this way.  I guess they'll apply if the

19   Fifth Circuit tells us they do.

20   Q    Right.

21   A    That's as much as I can tell you.

22   Q    Okay.  So, so if that ruling is reversed, right, as I

23   mentioned earlier -- and let me ask you, actually, another

24   thing.  So, how often, when you were a judge, how often were

25   -- I shouldn't say how often -- how many times were your

Nelms - Cross                                        92

1  rulings reversed?  Just roughly?

2  A    Was I reversed?

3  Q    Yeah.

4  A    I think six.

5  Q    Not very many claims, right?

6  A    No.

7  Q    So how many times was there a reverse and a render?

8  A    I'm sorry.  Say again?

9  Q    How many times was there a reverse and a render, where

10 nothing came back to you, that basically the higher court just

11 said, It's done?

12 A    Well, it was rendered every time except on one occasion,

13 and that --

14 Q    Uh-huh.

15 A    -- *Stern v. Marshall* had just been decided, and so --

16 gosh, I can't remember the district judge.

17 Q    Okay.

18 A    One of the judges reversed but sent it back to me to

19 reconsider it under the light of the ruling in *Stern v.*

20 *Marshall*, a jurisdictional issue.  So, in all those instances,

21 it was rendered.

22 Q    Okay.  So there was nothing -- there was no issue that

23 came back to you?  The case was just resolved?

24 A    No.  No issue came back to me.

25 Q    Okay.

Nelms - Cross                                    93

1   A    No, you know what, there was a second one.  I think the

2   second one was *In re Mirant*.  *Commerzbank versus -- MCAR v.*

3   *Commerzbank*.  That came back as well.

4   Q    Right.  Okay.  So, again, but focusing on the order for

5   relief appeal, one possibility is that the Fifth Circuit says,

6   okay, this may be subject to arbitration, and sends it back to

7   Judge Jernigan to make additional findings, apply a different

8   standard, right?  That's possible, right?

9   A    That's possible.

10  Q    Okay.  So, in that case, nothing necessarily came out of

11  the appeal, right?  Like you're just basically back in front

12  of her on the same issues?

13  A    Well, I -- that may very well be the case, but --

14  Q    Okay.  Well, let's assume that the Fifth Circuit does

15  reverse and render.  Wouldn't -- isn't what they would render

16  would be a -- compelling this case to arbitration?  Right?

17  Not that the bankruptcy goes away, disappears.  It would

18  basically be, "Should have been arbitrated.  Go arbitrate."

19  A    It's a good question, what the effect of reversing it

20  would be and sending it back, remanding it.  They -- I mean,

21  one of the things that they might decide is to say that the

22  whole issue of arbitration should be decided by an arbitrator.

23  Q    Uh-huh.

24  A    That's a possibility.

25  Q    Right.  But in that situation, the bankruptcy doesn't go

Nelms - Cross                                    94

1  away.  It just moves to a different forum, right?

2  A    No, I mean, you're probably right.  That, in and of

3  itself, would not eviscerate the bankruptcy filing.

4  Q    Uh-huh.

5  A    That's true.

6  Q    And so, in that situation, the result is -- and this is --

7  that's, frankly, the best situation, is --

8  A    But, of course, I mean -- can I go back to that?  Just,

9  I'm not sure about that.  Because, after all, this was an

10  involuntary petition.

11  Q    Uh-huh.

12  A    If it was a voluntary petition, then I would certainly

13  agree with you wholeheartedly.  Inasmuch as it was an

14  involuntary petition, I'm not sure about the answer to that

15  question.

16  Q    Uh-huh.  Okay.

17  A    That's a good question.

18  Q    But you would agree with me that a possible result of even

19  a reversal of the order for relief appeal would just be more

20  litigation?

21  A    Yes.  That's certainly a possibility.

22  Q    Right.  In this Court?  Maybe in front of an arbitrator?

23  Maybe both?

24  A    Yes.  That's possible.

25  Q    Okay.  All right.  So, still focusing on the order for

Nelms - Cross                                    95

1  relief appeal, but I want to go to this idea that, again,

2  there's this cash flow stream that is going to be reinstated

3  for the benefit of Highland Capital under the sub-advisory

4  agreement.  Okay?

5  A    Right.

6  Q    All right.  So, before the Acis bankruptcy was filed,

7  Dondero, and at that time, in control of Highland, were

8  actually in the process of liquidating Acis, weren't they?

9  A    Were they in the process of liquidating Acis?

10 Q    Uh-huh.

11 A    And I take it these are the transfers that were --

12 concerning your client that prompted the filing of the

13 involuntary petition itself?

14 Q    Correct.

15 A    Is that what you're referring to as the --

16 Q    Yes.

17 A    -- liquidation?

18 Q    Yes.

19 A    Well, I certainly know that -- I understand those

20 transfers were taking place.  Now, whether you'd call that a

21 liquidation or not, I don't know, but I know what you're

22 referring to --

23 Q    Okay.

24 A    -- and I think the answer to your --

25 Q    So, --

Nelms - Cross                                96

1   A    Yeah.

2   Q    Yeah.  So there were a variety of transfers of assets away

3   from Acis before --

4   A    Right.

5   Q    -- the Acis bankruptcy filing, right?  And, actually, are

6   you aware that there was actually an agreement between

7   Highland CLO Management and Acis to transfer those PMAs to

8   HCLOF Management?

9   A    No, I'm not aware of that.

10  Q    Okay.  And as we talked about earlier, HCLOF repeatedly

11  attempted to redeem the CLOs, even during the Acis bankruptcy,

12  right?

13  A    I read about that in Judge Jernigan's opinion, so I'm

14  assuming that's the case.

15  Q    Right.  Okay.  And then -- and, in fact, if HCLOF was

16  successful, that would liquidate the CLOs and it would

17  effectively terminate the Acis portfolio management

18  agreements, right?

19  A    I don't know.

20  Q    Okay.  But if that was the case, if the portfolio

21  management agreements went away or no longer had assets to

22  manage, then the sub-advisory agreement would have no income,

23  right?

24  A    If you're asking me if that's something within the realm

25  of possibilities, I suppose so.

Nelms - Cross                                97

1  Q    Okay.  So, if, because of the appeal, the Acis bankruptcy

2  -- because of the order for relief appeal, if the bankruptcy

3  -- if the Acis bankruptcy just went entire away, just

4  disappeared, right, so Mr. Dondero would be in control of

5  Acis, not you, right?

6  A    He would be in control.  That's correct.

7  Q    Okay.  And so if he wanted to terminate the PMAs and enter

8  new PMAs with Dondero Capital Management, you couldn't keep

9  him from doing that, could you?

10  A    Well, I -- no, I could not keep him from doing that.

11  Q    Okay.  Or if he wanted to terminate the sub-advisory

12  agreement and enter into a different agreement, I mean, you

13  couldn't keep him from doing that, either, could you?

14  A    No, I couldn't.

15  Q    Right.  So what makes you think that Highland Capital

16  Management, a debtor that he lost control of, just like Acis,

17  would benefit from Acis's PMAs, when he was actively trying to

18  take Acis's PMAs away from Acis?

19  A    Well, I have -- I spoke to Mr. Dondero about this, and he

20  -- I asked him the question, and he said that he would

21  reinstate Highland under the sub-advisory agreement and the

22  shared services agreement.

23  Q    Okay.  So, on that point, you did mention earlier that, as

24  part of your -- as part of the Board's diligence, you talked

25  with Mrs. O'Neil and you talked to Pachulski.  Obviously,

Nelms - Cross                                    98

1   you've analyzed the issues.  I can tell you're familiar with

2   all these, all of the pleadings.  But you also talked with

3   different Highland Capital employees about the litigation and

4   the appeals, correct?

5   A   I did.

6   Q   Okay.  Who did you talk with?

7   A   Well, I have to say that the interaction with Highland

8   employees was actually fairly abbreviated.

9   Q   Uh-huh.

10  A   We spoke very, very briefly about this with Isaac Leventon

11  on the day that we were appointed.  I don't know if the Court

12  is aware of this or not, but we spoke about it very briefly,

13  and then he was injured later that night and he really hasn't

14  been back at the office since then.  So, --

15  Q   Oh.

16  A   -- I would say, for the most part, I have relied mainly on

17  Pachulski.

18  Q   Okay.  But you did indicate you talked to Mr. Dondero as

19  well?

20  A   I talked to him about this issue about reinstatement, yes.

21          MR. LAMBERSON:  So, Your Honor, I'd like to turn to

22  --

23          THE WITNESS:  Oh, you don't have to call me Your

24  Honor.

25          THE COURT:  There are two Your Honors.

Nelms - Cross                                    99

1           MR. LAMBERSON:  Your Honors.  How about that?

2           THE COURT:  Okay.

3           THE WITNESS:  Yeah, there's only one judge in the

4    court today.

5    BY MR. LAMBERSON:

6    Q    Could you turn to Exhibit 16, please?  This is Acis's

7    Exhibit 16.  I'm sorry.  Do you have that, Mr. Nelms?

8    A    I do.

9    Q    And could you identify Acis Exhibit 16?

10   A    Yes.  This is Official Form 204 in the current case, the

11   one we're here for today.

12   Q    Right.  So it's the Top 20 List of Creditors for Highland

13   Capital Management?

14   A    Yes, that's correct.

15   Q    Okay.  And have you seen Exhibit 16 before?

16   A    Pardon me?

17   Q    Have you seen Exhibit 16 before, the Top 20 List?

18   A    No, I have not seen it before.

19   Q    Okay.

20          MR. LAMBERSON:  Your Honor, we'd ask for the

21   admission of Exhibit 16.

22          THE COURT:  Any objection?

23          MR. MORRIS:  Just on relevance grounds.  Can we at

24   least establish a foundation as to which element of 327(e)

25   this goes to?

Nelms - Cross                                    100

1           THE COURT:  Response?

2           MR. LAMBERSON:  Well, Your Honor, what I'm going to

3  point out is that the top ten creditors, other than an insider

4  creditor, are all litigation-based, and that the, as I pointed

5  out in my opening, the origin of this case was a bad

6  litigation strategy.

7           MR. MORRIS:  No objection to the introduction of this

8  exhibit for that limited purpose.

9           THE COURT:  All right.  It's admitted.

10       (Acis Capital Management GP, LLC's Exhibit 16 is received

11  into evidence.)

12  BY MR. LAMBERSON:

13  Q   All right.  So, Mr. Nelms, you said you hadn't seen this

14  before, but I think you'll probably be familiar with the

15  information on it generally.  So let's walk through this

16  quickly.  So, this is the Top 20 List of Creditors.  The first

17  creditor is Redeemer Committee, listed as litigation, do you

18  see that, for about $190 million?

19  A   Yes.

20  Q   And that's the arbitration award that precipitated this

21  filing, correct?

22  A   It is.

23  Q   Okay.  So the next claim is Pat Daugherty, litigation

24  claim.  It's $11.7 million.  Do you see that?

25  A   Yes.

Nelms - Cross                              101

1   Q   So, do you know what is Mr. Daugherty's history with

2   Highland Capital?  And try to keep it under five minutes.

3   A   Yeah.  Mr. Daugherty is a former employee.  And I know he

4   has some contractual disputes with the company based upon his

5   separation.

6   Q   Right.  And he's a long-time litigant with Highland

7   Capital, correct?

8   A   He is, yes.

9   Q   Yes.  So the next one is CLO HoldCo.  This is about $11.5

10  million.  CLO HoldCo is an insider of the Debtor, correct?  If

11  you know.

12  A   Is -- is it an insider?  I don't know.

13  Q   Okay.  Well, Grant Scott, the party here, is Mr. Dondero's

14  college roommate.  Do you know that?

15  A   That's my understanding, yes.

16  Q   Okay.  So, Creditor #4, McKool Smith, for two point --

17  roughly $2.1 million.  Do you see this?  This is for

18  attorneys' fees incurred by Highland Capital, correct?

19          MR. MORRIS:  Objection, Your Honor.  I still fail to

20  see how this is at all connected to any of the elements of

21  327(e) or the retention of Foley.

22          THE COURT:  Okay.  I overrule.

23  BY MR. LAMBERSON:

24  Q   So, this is -- this -- these are fees incurred by Highland

25  Capital, you know, a variety of venues, right, including this

Nelms - Cross                                              102

1   one, state court fights against Mr. Terry, right?

2   A    I thought -- McKool Smith, I thought they were involved in

3   the Redeemer litigation, but they may be involved in other

4   litigation as well.

5   Q    Okay.  Fair enough.  And do you know, this claim is

6   disputed by the Debtor, correct?

7   A    Yes.

8   Q    Okay.  And do you know, obviously subject to the stay, but

9   do you know if this claim is being arbitrated or has been sent

10  to arbitration?

11  A    No, I don't know any -- no, I don't know.

12  Q    Okay.  That's fair enough.  So, then #5 -- I'll move it

13  along here.  Meta Discovery, Meta-e Discovery, they're a

14  litigation vendor, right?

15  A    I'm sorry, would you ask your question again?

16  Q    Meta-e Discovery, the next creditor.  They're a litigation

17  vendor and they provide litigation support services?

18  A    I don't know what they do.

19  Q    Okay.  Fair enough.  Foley Gardere.  Obviously, that's the

20  law firm you all are seeking to have engaged.  DLA Piper.

21  This relates to fees incurred in connection with the Terry

22  arbitration award, correct?

23  A    I think so.

24  Q    Okay.  Reid Collins.  These are fees related to the UBS

25  lawsuit, correct?

Nelms - Cross                                103

1  A    I don't know.

2  Q    Okay.  Josh and -- Joshua and Jennifer Terry.  This is a

3  litigation claim, right?  This is -- this is an IRA claim,

4  right?

5  A    It is.

6  Q    NWCC.  This is also a litigation claim?  In other words, a

7  litigant fighting with Highland?

8  A    I can only intuit that just because of the fact that it's

9  a law firm.

10 Q    Okay.  Fair enough.  So, out of the Top 20 -- or, out of

11 the Top 10 Creditors, basically, they're all litigants or

12 attorneys paid to fight litigants, with the exception of

13 Dondero's college roommate.  Right?

14 A    With the exception of what?

15 Q    Mr. Dondero's college roommate that has a claim based on

16 some entity.

17 A    Yes.  They're -- they all have some nexus to litigation.

18 Q    Okay.  And let me just ask you:  If you were able to

19 completely set aside all of Highland Capital's litigation

20 issues, right, just like -- just like the concept of the order

21 for relief appeal makes the Acis bankruptcy go away forever,

22 if you could snap your fingers and make all of Highland's

23 litigation go away forever, would Highland have any financial

24 problems at all?

25 A    Well, I don't know that I know the answer to that, but I

Nelms - Cross                                104

1  | -- but it's certainly to say that litigation up to this point
2  | has been the driving force behind its bankruptcy filing.
3  | Q   Okay.  Fair enough.  Okay.  So, Mr. Nelms, would you turn
4  | -- could you turn to Acis Exhibit 27?
5  | A   Okay.
6  | Q   Do you have that?
7  | A   I do.
8  | Q   Okay.  And can you identify Exhibit 27?
9  | A   Yes.  My understanding is that this was the lawsuit that
10 | was filed by the DAF and CLO HoldCo in the Southern District
11 | of New York.
12 | Q   Okay.  And so I had mentioned this in my opening, and I
13 | believe counsel had asked you about what we call the DAF
14 | litigation.  Is this the complaint that's the basis of the DAF
15 | litigation?
16 | A   Yeah, that's my understanding.  It is.
17 | Q   Okay.  And I think you had testified earlier that the
18 | board was actually shown a copy of this complaint, was before
19 | it was filed, and --
20 | A   I wouldn't call it -- I'm sorry, go ahead, ask your
21 | question.
22 | Q   No, no, I -- that's fine.
23 | A   I wouldn't call it a board presentation.  I just remember
24 | it being handed to Mr. Dubel and Mr. Dubel looking at it,
25 | asking what it was, and saying, Tell them not to do this.

Nelms - Cross                                    105

1  Q    Okay.  Thank you.  And -- but it's your understanding that

2  the complaint was filed anyway?

3  A    It is my understanding it was filed later.

4  Q    Okay.  And in fact, this has a file-stamp at the top,

5  which I'm sure you're very familiar with.  Correct?  Has a

6  PACER file-stamp at the top.

7  A    Right.

8  Q    Right.

9         MR. LAMBERSON:  So, Your Honor, we'd ask for the

10  admission of Exhibit 27.

11         THE COURT:  Any objection?

12         MR. MORRIS:  No objection.

13         THE COURT:  Admitted.

14     (Acis Capital Management GP, LLC's Exhibit 27 is received

15  into evidence.)

16         MR. LAMBERSON:  And I'll be relatively quick.

17  BY MR. LAMBERSON:

18  Q    I had mentioned in my opening that we -- I should say Acis

19  was concerned that Highland Capital Management had some

20  participation in this, and I probably should have been clearer

21  in saying that Highland Capital Management employees had some

22  participation in Exhibit 27.  Has the Board done any

23  investigation as to whether any Highland Capital employees

24  were involved in the preparation of Exhibit 27 or the filing

25  of Exhibit 27?

Nelms - Cross                                                  106

1   A    No, we have not.  At least, let me speak for myself.  I

2   haven't done that investigation.

3   Q    Uh-huh.  And your counsel had mentioned that -- I believe

4   this is correct -- your counsel had mentioned that you all had

5   reached out -- the Board, I should say -- reached out to Grant

6   Scott, who's the -- who's in control of the DAF as well as CLO

7   HoldCo, and, you know, had sort of convinced them that it

8   probably -- to dismiss this lawsuit.  Correct?

9   A    Yes.

10  Q    Okay.  And but do you -- as far as you know, it hasn't

11  been dismissed yet?

12  A    It hasn't been dismissed.  There's some kind of technical

13  things there, and I don't know if you want to go into them or

14  not, but it hasn't been dismissed, but I have a high degree of

15  certainty that this is going to get dismissed.

16  Q    Okay.  Fair enough.  And are you aware that there was

17  already a press release issued related to this lawsuit that

18  was picked up by various CLO publications?

19  A    When you say "already," are you talking about a specific

20  time?

21  Q    Well, that -- I guess what's I'm getting at is are you

22  aware that the filing of this lawsuit has already resulted in

23  various articles in CLO journals, periodicals?

24  A    I'm aware of it having appeared in one publication.

25  Q    Okay.  And so is it fair to say that the damage is already

Nelms - Cross                                    107

 1   done and that, you know, dismissal of these claims probably

 2   isn't really all that -- isn't really all that significant

 3   when they've already, you know, put it in the press?

 4   A    I don't know if the damage has already been done or not.

 5   Q    Okay.

 6          MR. LAMBERSON:  Give me just a second, Your Honor.

 7          THE COURT:  Okay.

 8      (Pause.)

 9   BY MR. LAMBERSON:

10   Q    So, there is actually one other -- there is one point.

11   And I told you in advance that I was afraid I might be jumping

12   around a little bit, so I'm going to jump around a little bit.

13   Let me go back to the order for relief appeal.  So, this is

14   the appeal of the Court's order for relief that started the

15   Acis bankruptcy.

16      One of the things you testified about related -- on your

17   direct testimony is one of the benefits, one of the potential

18   benefits, understanding we don't know what's going to happen,

19   of the order for relief appeal is that if the -- if that

20   ruling was reversed and the Acis bankruptcy went away, then

21   the adversary would go away, the adversary between Acis

22   Capital Management and Highland Capital Management.  Correct?

23   A    Well, yes.  In my opinion, the adversary opinion -- excuse

24   me, the adversary proceeding would go away.  Would a lawsuit

25   under TUFTA be avoided altogether by Mr. Terry?

Nelms - Cross                                    108

1  Q    Right.

2  A    I don't know that it would take that away.

3  Q    Okay.  And that's -- you actually anticipated my question,

4  --

5  A    Uh-huh.

6  Q    -- which was:  It's fair to say that, even if the

7  adversary went away between Acis and Highland Capital

8  Management, that the -- certain of the claims in the adversary

9  -- for example, the fraudulent transfer claims or derivative

10  claims -- would not necessarily go away because they could be

11  asserted by Mr. Terry as a judgment creditor, correct?

12  A    They could, but the consequences of asserting that claim

13  outside of bankruptcy are vastly different than asserting them

14  inside of a bankruptcy case.

15  Q    Uh-huh.  Right.

16  A    At least potentially.

17  Q    And just to close the thought here, are you aware that one

18  of Acis's main arguments during the order for relief trial was

19  that we didn't need an involuntary, that Mr. Terry could just

20  go litigate all that stuff in state court?

21  A    Yeah, I think so.  I think I am aware of that.  Yes.

22  Q    Okay.  So you'd agree with me that, even on your possible

23  day on the order for relief appeal, that doesn't make the --

24  what I'll call the Terry litigation, right, the judgment

25  litigation, go away?

Nelms - Redirect                                    109

1   A    No.   No.   The reversal on appeal would not necessarily

2   make the Terry litigation go away.

3   Q    Okay.   Thank you.

4            MR. LAMBERSON:   That's all I have, Your Honor.

5            THE COURT:   All right.   Redirect?

6            MR. MORRIS:   I just have a few questions, Your Honor.

7            THE COURT:   Okay.

8                      REDIRECT EXAMINATION

9   BY MR. MORRIS:

10  Q    Can you turn to Exhibit 16 in your binder, sir?

11  A    Which one?

12  Q    I guess it's the Acis exhibits.

13  A    The Acis?   Okay.

14  Q    Yeah.   The List of Top 20 Creditors.

15  A    Okay.

16  Q    You were taken through each and every one of those to make

17  the point that they're largely litigation claims.   Is that

18  fair?

19  A    Say again, please?

20  Q    You were taken through many of those creditors to

21  establish that --

22  A    I was.

23  Q    -- that the Debtor was involved in a lot of litigation; is

24  that right?

25  A    It was.

Nelms - Redirect                              110

1   Q    Okay.  And the Board was appointed on January 9th; is that

2   right?

3   A    Yes.

4   Q    Did the Board have anything to do with any of the claims

5   that are set forth in Exhibit 16?

6   A    No.

7   Q    Did the Board authorize the filing of any suits that are

8   related to any of the claims that are set forth in Exhibit 16?

9   A    No.

10  Q    Did the Board direct the defense of any suits that were

11  commenced against Highland with respect to Exhibit 16?

12  A    No.

13  Q    Okay.  Has the Board been trying to diminish and eliminate

14  litigation where it thought it was in the Debtor's best

15  interests?

16  A    It has.

17  Q    And is that, for example, why the Board decided not to

18  pursue the Winstead matter?

19  A    It is.

20  Q    Is that why the Board has used its efforts to try to

21  thwart the DAF litigation?

22  A    Yes.

23  Q    Does the Debtor control DAF?

24  A    The Debtor does not control the DAF.

25  Q    Okay.  Did the Debtor authorize -- withdrawn.  Did the

Nelms - Redirect                                    111

1  Board authorize the filing of the DAF complaint?

2  A    It did not.

3  Q    Did the Board know the DAF complaint was going to be

4  filed?

5  A    Well, I mean, I know Mr. Dubel was presented with a copy

6  of the complaint.  We had noticed that that document existed.

7  But it came as somewhat of a surprise to us when it got filed.

8  Q    It came as a surprise to you?

9  A    It did.

10 Q    Because that's not what was expected after Mr. Dubel said,

11 Don't file it.  Right?

12 A    Right.

13 Q    Okay.  You were asked a bunch of questions on cross about

14 different possibilities and results and potential orders from

15 the Fifth Circuit on the assumption that the appeal was

16 granted.  Do you remember that?

17 A    Yes.

18 Q    And some of them were purported to be better or worse for

19 the Debtor.  Do you remember that?

20 A    Yes.

21 Q    If the appeal is not prosecuted, is there any chance that

22 the contracts that the Board has focused on will be

23 reinstated?

24 A    No.

25 Q    Is it fair to say that if the appeal is not prosecuted the

Nelms - Redirect                          112

1   chances of the Debtor recovering the tens of millions of

2   dollars of revenue will be exactly zero?

3   A    Well, I don't know that it's exactly zero, but severely

4   diminished.

5   Q    Yeah.  How about getting paid a hundred-cent dollars on

6   the $8 million claim that's in the Acis litigation?  If the

7   appeal is not prosecuted, is there any chance that the Debtor

8   is likely to recover hundred-cent dollars?

9   A    Again, that possibility is severely diminished.

10  Q    Uh-huh.  How about with respect to terminating the

11  adversary proceeding in the Acis litigation?  If the appeal is

12  not prosecuted, is there any possibility of that adversary

13  proceeding just going away and being left with the arbitration

14  that you've described?

15  A    Again, a severely diminished possibility.

16  Q    You mentioned that the $8 million fraudulent transfer as

17  part of an arbitration would be very different outside of a

18  bankruptcy case.  Do you remember saying that?

19  A    I do.

20  Q    Can you explain to the Court why you believe it would be

21  different outside of a bankruptcy case?

22  A    Well, it actually goes to a case that started in my court.

23  This was the *MCAR v. Commerzbank* case in *In re Mirant*, and the

24  issue in that case, Mirant, when it filed its petition in

25  bankruptcy, was insolvent, but by the time that its bankruptcy

Nelms - Redirect                         113

1  concluded, Mirant was a solvent entity.  And so all of its

2  creditors were paid in full, but the trust that was

3  established in the *Mirant* case brought some fraudulent

4  transfer claims that were predicated on solvency, where these

5  were constructively fraudulent as opposed to actual.

6      And so the question was, if all the creditors had been

7  paid in full, is there standing to bring fraudulent transfer

8  claims that would basically not benefit creditors but would go

9  to equity?

10     I originally -- I ruled that there was no such -- that you

11 couldn't bring such a cause of action, that the satisfaction

12 of claims in full extinguished those claims.  And I do recall

13 that one of the interesting things about that case is that a

14 lady named Elizabeth Warren wrote -- or proposed -- she

15 submitted -- they submitted an expert opinion on her behalf,

16 which I wouldn't let them file because I took the position

17 that I was an expert, the expert in the Court.

18     And in any event, it turns out I wasn't the expert.  I was

19 reversed by Judge Means on that, who said that it's not

20 limited.  It went up to the Fifth Circuit, and the Fifth

21 Circuit ruled the same thing.

22     So my takeaway from all of this is that, in a bankruptcy

23 setting, as opposed to just a state court setting, that the

24 potential recovery on account of fraudulent transfers is much

25 broader, much more unlimited than it would be in the context

Nelms - Redirect                    114

1  of a state court lawsuit.

2      So, now, there may be things that would distinguish that,

3  but that's something to be -- that's something to be troubled

4  about if you're a director of this company.

5  Q    And are these the types of things that, without, you know,

6  just divulging privileged communications, are these the type

7  of experiences and perspectives that you've shared with the

8  other board members in the context of considering the various

9  motions, the various matters for which Foley's retention is

10 sought?

11 A    Yes.

12 Q    Okay.

13         MR. MORRIS:  Just one second, Your Honor.

14         THE COURT:  Okay.

15     (Pause.)

16         MR. MORRIS:  Nothing further, Your Honor.

17         THE COURT:  All right.  Any recross on that redirect?

18         MR. LAMBERSON:  No, Your Honor.

19         THE COURT:  All right.  Thank you, Mr. Nelms.

20     (The witness steps down.)

21         THE COURT:  Any other evidence from Highland?

22         MR. MORRIS:  Your Honor, we have had admitted our

23 exhibits.  Among those exhibits are two declarations from Ms.

24 O'Neil, and so she's available in the courtroom today if

25 anybody wants to cross-examine on those issues.

O'Neil - Cross                              115

```
 1        THE COURT:  All right.  Well, I will accept those
 2  declarations as direct evidence.  Any desire to cross-examine
 3  Ms. O'Neil?
 4        MS. PATEL:  Yes, Your Honor.
 5        THE COURT:  All right.  Ms. O'Neil, we'll go ahead
 6  and swear you in on this today.
 7           HOLLAND O'NEIL, DEBTOR'S WITNESS, SWORN
 8        THE COURT:  All right.  Please be seated.
 9                     CROSS-EXAMINATION
10  BY MS. PATEL:
11  Q   Good afternoon, Ms. O'Neil.
12  A   Good afternoon.
13  Q   Ms. O'Neil, do you concurrently represent both Highland
14  Capital Management and Neutra, which is a Cayman entity,
15  correct?
16  A   Yes.
17  Q   Okay.  There are other entities that you either represent
18  or have represented that are kind of affiliated or within the
19  Highland umbrella; is that correct?
20  A   Yes.
21  Q   Okay.  And that includes, for example, CLO HoldCo was one
22  such representation.  Isn't that right?
23  A   Previous.  Previously.
24  Q   Okay.
25  A   Not currently.
```

O'Neil - Cross                          116

1   Q    Okay.  So, and I believe you say that in your declaration,

2   right, that you didn't -- that you no longer represent CLO

3   HoldCo?

4   A    Correct.

5   Q    Okay.  And when did that representation cease?

6   A    It was -- it was very brief.  I came into the case after

7   the involuntary -- after the orders for relief were entered.

8   And at that time, there had been the motion to intervene that

9   included that entity, and it was determined to proceed with an

10  appeal on that motion to intervene, or the denial of the

11  motion to intervene, as well as the orders for relief.

12  Actually, there was a compendium of orders that were appealed

13  all at the same time.

14      And so, because that entity had also filed a motion to

15  intervene, we had included that in the appeal.  And at that

16  time I was retained, but then by the time we kind of analyzed

17  the issues, determined it was not necessary to proceed with

18  that appeal, then I no longer represented that entity and

19  disengaged.

20  Q    Okay.  But CLO -- to be clear, CLO HoldCo was actually an

21  appellant for the order for relief appeal that we've been

22  talking about today, correct?

23  A    Initially, yes.

24  Q    Okay.  And it still remains an appellant; it just didn't

25  file a brief in the involuntary appeal.  Isn't that right?

O'Neil - Cross                          117

1   A   It has not filed any brief.  And I would have to look at

2   the record if it even filed a notice to the Fifth Circuit.  It

3   did -- was included in the notice to the District Court.  I

4   just honestly can't recall if it was included in the -- in any

5   notice to the Fifth Circuit.

6   Q   Okay.  And did you ever withdraw from your representation

7   of CLO HoldCo in the District Court appeal?

8   A   What do you mean, withdraw?

9   Q   Well, I mean, you entered an appearance.

10  A   You mean file a notice with the -- with the Court?

11  Q   Right.

12  A   I can't recall.

13  Q   Okay.  Ms. O'Neil, with respect to Neutra, you understand

14  and you've heard testimony, and I believe it's in the

15  declarations in support of the retention papers for Foley, and

16  if you need to look at that I can direct you to the exhibit

17  book, but it's -- is it your understanding that ultimately

18  Neutra is owned 75 percent by Mr. Dondero and 25 percent by

19  Mr. Okada?

20  A   Yes.

21  Q   Okay.  And Ms. O'Neil, in connection with your

22  representation of Neutra, who are the human beings that you

23  interact with?  Who directs your services?

24  A   At -- currently?  Are you --

25  Q   Just on behalf of Neutra.

O'Neil - Cross                                118

1   A    Predominantly, I get direction from Highland's in-house

2   counsel.

3   Q    Okay.  And who would that be?  Who are the people?

4   A    The people are Mr. J.P. Sevilla, Mr. Isaac Leventon, Ms.

5   Stephanie Vitiello.  Those are the primary individuals that

6   direct vis-à-vis Neutra.

7   Q    Okay.  Have you ever spoke with Mr. Dondero regarding your

8   representation of Neutra?

9   A    Yes.

10  Q    Okay.  And when was that?  When was the last time?

11  A    It has -- it's been a while.  Certainly, it hasn't been

12  since this bankruptcy was commenced.  I think the last time I

13  recall discussing that specifically is when we were together

14  at the mediation during the course of the bankruptcy.  And I'd

15  have to look at my calendar.  I can't recall exactly when that

16  was.

17  Q    Okay.  And what about Mr. Okada?  Have you -- when was the

18  last time you spoke with Mr. Okada?

19  A    I have never spoken with Mr. Okada.

20  Q    During the course of your entire representation of Neutra,

21  you've never spoken with Mr. Okada?

22  A    That is correct.

23  Q    Okay.  And under -- do you have an understanding of under

24  what authority Mr. Sevilla or Mr. Leventon or Ms. Vitiello

25  would have to direct your legal services on behalf of Neutra?

O'Neil - Cross                              119

1   A    Generally, yes, through the direction from the owners of

2   Neutra.

3   Q    Okay.  That would be Mr. Dondero and Mr. Okada?

4   A    Correct.

5   Q    Okay.  And it's your understanding, then, that Mr. Dondero

6   and Mr. Okada have directed Highland's legal department to

7   direct your services?

8   A    Yes.  Previously, yes.

9   Q    Okay.  Do you have -- is there a contract between Neutra

10  and Highland, or --

11  A    I don't know.

12  Q    Okay.  Did you ever ask if there was one?

13  A    No, I did not.

14  Q    Okay.  In connection with your representation of Neutra,

15  do you bill separately for the Neutra representation?

16  A    Since the bankruptcy was -- since the Highland bankruptcy

17  was commenced, we set up a separate task code to track the

18  fees being incurred on the Neutra appeal.  Prior to the

19  bankruptcy, we did not have a reason to do that.

20  Q    Okay.  So let's talk about prior to the bankruptcy.  I

21  believe in your declaration it was disclosed that there were

22  approximately $2.1 million in billings relating to your

23  representation of Highland, Neutra, and certain of the

24  Highland Cayman entities:  Highland CLO Management, Highland

25  CLO Holdings, and HCF Advisor, amongst others.  Right?

O'Neil - Cross                          120

1  A    That sounds about right.  I might want to look at the

2  declaration just to confirm on the number, but that sounds

3  about right.

4  Q    Okay.  Well, your declaration can be found under Tab 10.

5  A    Okay.  (Pause.)  And are you referring to Paragraph 16?

6  Q    Well, if you look at Page -- at the bottom, you'll see

7  that there's page numbers, and it says Page 15 of 48.  And

8  this would be your declaration.

9  A    Oh, thank you.  I was looking at the --

10  Q    Uh-huh.  Paragraph 3.

11  A    -- at the application, that's all.  Correct.  Yes.  Thank

12  you.

13  Q    Firm-earned fees of two point -- roughly $2.15 million,

14  almost, correct?

15  A    Yes.

16  Q    Okay.  And there's about $1.4 million of that that was

17  unpaid from the pre-petition period, correct?

18  A    Correct.

19  Q    Okay.  And is it your testimony that, of the $2.15 million

20  in fees, that there was no apportionment between Highland,

21  Neutra, and the Cayman defendants?

22  A    Correct.

23  Q    Okay.  So, --

24  A    Not -- not in my account -- not through my accounting

25  processes.  Obviously, the time entries, you could parse them

O'Neil - Cross                            121

1  out, if need be.

2  Q    Okay.  But you didn't keep your time necessarily that way,

3  where they were already apportioned and parsed?

4  A    Not under separate task codes, --

5  Q    Okay.

6  A    -- as we have done post-bankruptcy.

7  Q    So, in connection with the billings that would have

8  represented that $2.15 million, were those bills submitted to

9  Highland, to Neutra, to the Cayman defendants?

10 A    They are submitted through an e-billing process that it

11 goes through a Highland portal and -- in the aggregate.  So

12 they're submitted through that portal.

13 Q    Okay.  But the portal goes to Highland, correct?

14 A    I do not know.  I honestly -- our e-billing department

15 handles it and I just know it goes through e-billing, an e-

16 billing portal, and I don't know exactly.  I'm assuming

17 obviously it goes to Highland.  They certainly get copies of

18 it.

19 Q    Okay.  Did you or Foley ever submit a bill to Neutra?

20 A    I mean, my understanding is that, going through the

21 portal, we would go to the various parties that are affiliated

22 with Highland.

23 Q    Okay.  But you've never directly sent a bill to Neutra for

24 your representation of Neutra?

25 A    As I said, it goes through e-billing, so that could be

O'Neil - Cross                                122

1   interpreted to go directly to them if it goes through an e-
2   billing process.
3   Q    Okay.  But I'm asking, have you ever --
4   A    I'm -- maybe I'm being hyper-technical, but I'm just --
5   Q    Right.
6   A    It's being submitted through --
7   Q    I understand, but I just -- here's where I want to just
8   direct us, is:  Have you ever addressed a bill to Neutra, Ltd.
9   care of either Mr. Dondero, Mr. Okada, or its formal business
10  address?
11  A    As I indicated, post-petition, we have been segregating
12  them under a different task code and indicating it's Neutra.
13  Pre-petition, it was all under the same invoice.
14  Q    That was submitted to Highland only?
15  A    Submitted through the e-billing process.
16  Q    To Highland only, right?
17          MR. LAMBERSON:  Objection to the form of the
18  question.  This has been asked about four times.  The witness
19  is very clear.
20          THE COURT:  Overruled.  I think she's trying to get
21  an exact answer to her question, and she feels like she's not
22  getting it.  So, overruled.
23          THE WITNESS:  Okay.  Then I apologize, Your Honor.
24  I'm not -- I just don't know technically, once it goes through
25  the e-billing, how it's distributed on the other side.  I

O'Neil - Cross                                123

1  just, I honestly --

2           THE COURT:  I think the question is, to whom was the

3  invoice directed?

4           THE WITNESS:  In terms of the -- not where it was

5  sent, but who it's directed to?

6  BY MS. PATEL:

7  Q    Yes.

8  A    It would have -- I believe it has the entities on it.  It

9  definitely has Highland on it for sure.

10  Q    Okay.  Does it have Neutra on it?

11  A    Neutra is subject to the engagement letter, so it would be

12  applicable to -- if our accounting department didn't

13  technically put Neutra on it, that is not necessarily at any

14  moment being -- as the engagement letter is -- was with all

15  those parties.  So I would have to look at the invoice, if it

16  has all of the clients listed on there.  I honestly -- I just

17  can't remember right now.

18  Q    Okay.  Well, --

19  A    We do have some post-petition invoices, and you'll see

20  where they're segregated with Neutra.

21  Q    You raise an interesting point.  If Highland and Neutra

22  and the other entities are all part of the engagement letter,

23  is Neutra also liable for all of Highland's legal fees?

24  A    I don't know the answer to that.

25  Q    Okay.  Is it your position that because Highland, Neutra,

O'Neil - Cross                                    124

1  and the Cayman defendants are all part of the engagement

2  letter, that Highland is responsible for Neutra's legal fees?

3  A    From my firm's standpoint?

4  Q    Yes.

5  A    I think the, you know, our perspective is that they were

6  -- we were primarily working for Highland, so the beneficial

7  work, and as I think the Court knows, most of the work here

8  was on behalf of Highland Capital Management.  And it's in our

9  engagement letter to that effect, effectively.

10 Q    Sitting here today, Ms. O'Neil, post-petition, who's

11 calling the legal shots for purposes of Neutra?

12 A    The -- well, where we have been is the process with the

13 Fifth Circuit.  The Fifth Circuit schedule was already set

14 pre-petition, and we have just been complying with the pre-

15 petition -- or, rather, that schedule, which has rolled post-

16 petition.  And so our direction pre-petition has just

17 continued in terms of proceeding with the briefing.  And so,

18 again, going back to who it was pre-petition, it's the same

19 legal team giving instructions on behalf of Neutra.

20 Q    Okay.  And if the question were to be posed, for example,

21 whether the Neutra involuntary or the order for relief appeal

22 should be dismissed, for example, who would call the legal

23 shots on that?  Who would make the decision on that?

24 A    To dismiss the appeal?

25 Q    Yeah.

O'Neil - Cross                                    125

1   A    Not proceed with it up to this point?  Despite where we

2   are at this point, to just -- to just drop it?

3   Q    Yes.

4   A    It would be the owners of Neutra.

5   Q    So that would be Mr. Dondero and Mr. Okada, right?

6   A    Yes.

7   Q    Okay.  You -- Ms. O'Neil, were you in the courtroom when

8   Mr. Demo or -- and Mr. Nelms -- when Mr. Demo made the opening

9   statement and then when Mr. Nelms was testifying?

10  A    Yes.

11  Q    Okay.  And you heard, again, the opening statement and

12  then the testimony regarding the benefit to Highland of

13  Highland paying for Neutra's legal fees in connection with the

14  appeals, correct?

15  A    I did hear that, yes.

16  Q    Okay.  All right.  And can you, in your words, then,

17  articulate, from your perspective as legal counsel to both

18  entities, what the benefit is to Highland in this bankruptcy

19  for Foley's representation of Neutra and Highland paying the

20  bill for it?

21  A    I just want to make sure I'm not, you know, getting onto

22  attorney-client privileged discussions in terms of the

23  benefit.  I think I would agree with what has been stated in

24  court today.

25  Q    Okay.  So, so, and just to kind of recap that, if I

O'Neil - Cross                          126

1   understand it, it's that if Neutra is successful in its appeal

2   of the involuntary orders for relief and also its appeal of

3   the confirmation order, then everything goes back and Highland

4   gets this revenue stream, correct, of about $12 million, plus

5   it gets paid on an $8 million, approximately, purported claim.

6   Right?

7   A    That the -- the agreements would be reinstated, which

8   would then yield approximately that type of revenue stream as

9   -- pursuant to the sub-advisor and sub-management agreements

10  that were in place.

11  Q    Okay.  And one of the entities -- and I know that the

12  retention application doesn't actually go to, anymore, Foley's

13  representation of the Cayman entities, but -- that's kind of

14  been put to the side.  But you do -- and you do represent

15  Highland CLO Management, correct, which is a Cayman entity?

16  A    Correct.

17  Q    All right.  And it's one of the defendants in the Acis

18  adversary proceeding, right?

19  A    And that is the only engagement that we have for that

20  party, is in conjunction with that adversary proceeding, which

21  is stayed.  So nothing is going on with that right now.

22  Q    Well, I understand that, but you --

23  A    Okay.

24  Q    My question was, you represent Highland CLO Management,

25  correct?

O'Neil - Cross                    127

1  A    In that adversary proceeding.

2  Q    Okay.  So -- but you also represent it in connection with

3  -- in -- generally with the bankruptcy as well, Acis's

4  bankruptcy?

5  A    There was no involvement until the adversary proceeding,

6  until they were sued in the adversary proceeding.

7  Q    Okay.  And in the adversary proceeding, Highland CLO

8  Management was sued for a few things, correct?

9  A    In the adversary proceeding?

10 Q    Yes.

11 A    Yes.

12 Q    Okay.  Highland CLO Management, for example, received a

13 $9.5 million note that Acis was previously the holder of and

14 that was transferred after Mr. Terry's judgment, correct?

15 A    Are you asking if that was an allegation in the adversary

16 proceeding?

17 Q    Sure.

18 A    I --

19 Q    Right.

20 A    That sounds right.  That's been stayed, and I would have

21 to defer to the -- obviously, the second amended complaint and

22 the allegations therein.  So, --

23 Q    Okay.  And are you aware that your client, Highland CLO

24 Management, was also sued because it was to receive the

25 portfolio management agreements under which Acis represents --

O'Neil - Cross                                           128

1   or, I'm sorry, manages the Acis CLOs?

2   A    That was -- that sounds like one of the allegations from

3   that point in time.

4   Q    Okay.  So I guess let me -- let me ask you a slightly

5   different way.  Are you aware that there was a pre-petition

6   agreement that was entered into and signed by Mr. Dondero that

7   transferred the PMAs from Acis to Highland CLO Management?

8   A    I cannot recall the -- all the evidence at the -- in

9   conjunction with that at this time, but if that's one of your

10  representations.  I wasn't representing any of the parties at

11  that time, but I do recall that there may have been some

12  evidence presented in that regard.  But I would have to look.

13  It's been a long time.  And that record is hundreds of

14  thousands of pages.  I would need to check back on that.

15  Q    Okay.  But if there were such an agreement, for example,

16  that transferred the portfolio management agreements from Acis

17  to another entity, a Cayman entity, can you agree with me,

18  then, that Mr. Dondero's ownership interest in Neutra would

19  really be of no import anymore because there wouldn't be a $12

20  million revenue stream anymore, would there, if Acis wasn't

21  the portfolio manager of the Acis CLOs?

22  A    I don't agree with the premi... at the end, when you said,

23  if Acis isn't the CLO manager, then there would be no revenue

24  stream from the CLOs if it's not reinstated as the -- as the

25  manager.

O'Neil - Cross                               129

1  Q   Okay.  So you agree that if Acis isn't the portfolio

2  manager of the Acis CLOs, there's no $12 million revenue

3  stream potential to Highland by virtue of Highland coming back

4  in as the sub-advisor and shared services provider, right?

5  A   Okay.  Now, the -- no, I don't know that that's

6  necessarily the case.

7  Q   Well, why not?

8  A   It could be appointed to be the sub-advisor, sub-manager

9  for -- through a different entity.

10 Q   Okay.  So it would basically be -- but, again, going back,

11 it would be through a different entity.  Again, Mr. Dondero's

12 ownership of Neutra would be of no import then, right?

13 A   Perhaps I'm not understanding your question.

14 Q   Well, --

15 A   I -- it's a hypothetical, and I --

16 Q   If Acis -- if Acis didn't have these portfolio management

17 agreements, it doesn't matter if Mr. Dondero wins the Neutra

18 appeal or not, right?  Because he wouldn't have control of the

19 Acis entity within which to redirect, through Acis, the sub-

20 advisory and the shared services agreements, correct?

21 A   He could direct it through another entity, as I think it's

22 been well-discussed that Highland had -- Highland had the

23 personnel to manage the CLOs.  In fact, Mr. Terry was a

24 Highland employee when he managed the CLOs.  So he could

25 certainly direct that management through another entity, even

O'Neil - Cross                    130

1  if it wasn't Acis.  But vis-à-vis Neutra, Neutra would be --

2  well, before the confirmation of the plan, Neutra owned Acis.

3  So, vis-à-vis through Neutra, I believe your statement would

4  be correct.

5  Q    Okay.  Ms. O'Neil, also as sort of a participant during

6  the Acis bankruptcy cases --

7            MS. PATEL:  And Your Honor, I know you're intimately

8  familiar with all of these.

9  BY MS. PATEL:

10 Q    But Ms. O'Neil, do you recall the multiple attempts during

11 the bankruptcy case to effectuate what was called an optional

12 redemption, which sought to liquidate the Acis CLOs?

13 A    By HCLOF, I believe there were two instances, yes.

14 Q    Okay.  HCLOF executed those optional redemptions, correct?

15 Mr. Bill Scott, one of the independent directors?  Is that

16 right?

17 A    I believe the evidence was presented before the Court --

18 Q    Okay.

19 A    -- in that regard.

20 Q    And during the course of the -- all of those proceedings

21 with the optional redemptions, Highland was the ultimate

22 advisor to HCLOF, was it not?

23 A    I'm not sure I understand what you mean by the ultimate

24 advisor.

25 Q    Well, the technical contractual advisor was an entity by

O'Neil - Cross                            131

1    the name of Highland HCF Advisor, right?  Is the portfolio

2    manager for Highland CLO Funding?

3    A    It has been a while since I looked at that org chart or

4    those issues, so I do not recall off the top of my head.

5    Q    Okay.  Well, you said that you interacted, for example,

6    with Neutra -- on your Neutra issues with JP Sevilla, Mr.

7    Leventon, and Stephanie Vitiello, correct?

8    A    Yes.

9    Q    Okay.  Wasn't it really, from a legal perspective, at

10   least, Mr. Sevilla, Mr. Leventon, who were all advising

11   Highland CLO Funding as well?

12   A    I don't know the answer.  You'd have to inquire of them.

13   Q    So, is it your testimony, then, that Highland had nothing

14   to do with the optional redemption notices that were issued

15   during the course of the Acis bankruptcy cases?

16   A    I'm not sure that I understand the relevance of that as to

17   whether Highland had any -- had nothing to do with it.  I

18   think they were certainly involved and were aware.  But they

19   weren't the -- independently making those determinations.

20   Q    Okay.

21   A    As you know, Ms. Patel, there were directors that were

22   involved.  They testified before this Court.  There -- HCLOF

23   was represented by counsel as well.  King & Spalding.  So

24   there were multiple parties involved.

25   Q    Okay.  So is it, again, your testimony that Highland had

O'Neil - Cross                          132

1   nothing to do with the optional redemption notices that were

2   issued during the Acis bankruptcy case?

3          MR. MORRIS:  Objection, Your Honor.  It may be me,

4   but I don't understand what this has to do with the Foley

5   retention application.

6          THE COURT:  Okay.  We do seem like we're getting a

7   little far afield.  What's your response to that?

8          MS. PATEL:  Your Honor, the contention has been made

9   that if these bankruptcy appeals are somehow granted or in the

10  District Court and this Court are reversed, --

11         THE COURT:  Uh-huh.

12         MS. PATEL:  -- that these cases are going to come

13  back and that suddenly, magically, there's going to be a $12

14  million revenue stream flowing out of Acis back into Highland,

15  and they're going to be able to collect on an $8 million

16  objected-to claim.

17     I'm just trying to get to how likely is that really to

18  happen.  I mean, given the course -- and again, I know Your

19  Honor was a viewer of all of this -- of the multiple attempts

20  to try to liquidate these assets, --

21         THE COURT:  Okay.  I'll allow the question, but it'll

22  be the end of the line of questioning.  Okay?

23         MS. PATEL:  Understood.  And Your Honor, just

24  additionally, it's -- that's part of the appeal that Foley is

25  handling on the confirmation appeal.  As Mr. Nelms said, it's

O'Neil - Cross                                    133

1   also based on the plan injunction.

2         THE COURT:  All right.  She can answer the question,

3   but then we move on to another area.

4         MS. PATEL:  Okay.

5   BY MS. PATEL:

6   Q   So is it your testimony, Ms. O'Neil, that Highland had

7   absolutely nothing to do with the optional redemptions --

8   A   I did not --

9   Q   -- during the bankruptcy case?

10  A   That is not what I said.

11  Q   Okay.  So, -- and I get it.  Highland CLO Funding is a

12  different entity, and the Bankruptcy Court made findings with

13  respect to the fact that it is controlled in every way by

14  Highland.  Do you recall that finding?

15  A   Preliminary findings in conjunction with determining

16  whether there was a likelihood of success on the merits.  I do

17  recall that --

18  Q   Okay.

19  A   -- those conclusions by the Court.

20  Q   As a part of the bench memorandum in support of the

21  confirmation order, correct?

22  A   Yes.

23  Q   Okay.

24  A   Actually, I will -- I will -- I'll correct that.  I'll let

25  that -- the Court's order speak for itself.  You may have said

O'Neil - Cross                           134

1   a few things that were more or less than what the Court's

2   order said, so I'd just defer to what the Court's order said.

3   Q    Okay.  Well, part of the representation for Foley here is

4   to represent Highland and Neutra in connection with the

5   confirmation appeal, correct?

6   A    Yes.

7   Q    And part of that confirmation appeal is also -- one of the

8   grounds there is that you're appealing the plan injunction,

9   which the plan injunction is what stops the CLOs from being

10  redeemed, correct?

11  A    Correct.

12  Q    Okay.  So, how is Highland damaged by the plan injunction?

13  A    I think it's fairly obvi... again, I want to not tread too

14  much on attorney-client privilege.  But, obviously, I have yet

15  to have a client over my 30-plus years of practicing law that

16  likes to be subject to any kind of injunction.  It limits --

17  that injunction is more than just on the -- it's a very broad

18  injunction.  So I'd like -- if I had the injunction in front

19  of me, there's -- there's lots of restrictions under that

20  injunction, and that is prejudicial to Highland to be able to

21  act freely.

22  Q    Able to act freely to liquidate CLOs?

23  A    Among other things, as it may do in the ordinary course of

24  business, in its opinion, that may be beneficial to his

25  clients.

O'Neil - Cross                                    135

1    Q    Okay.  Now, Ms. O'Neil, --

2    A    If I may, may I add one more thing?

3         THE COURT:  You may.

4         THE WITNESS:  Okay.  Highland, at least in that role,

5    could not liquidate CLOs.  So I think that was an improper

6    statement.  Or suggestion.

7    BY MS. PATEL:

8    Q    Okay.  Well, then, what specific actions that Highland

9    would like to take is it being damaged by the injunction?

10   A    I would need to look at the -- the injunction is very,

11   very broad.  So, anything that it can't do freely that is

12   covered by the injunction is obviously a detriment to

13   Highland.

14   Q    Okay.  Now, Ms. O'Neil, if you would turn to Tab 31 in the

15   book, --

16   A    All right.

17   Q    -- please.  And I will ask you, this is the declaration of

18   Bradley Sharp that was in support of the order authorizing the

19   retention of Foley Gardere.  Have you had an opportunity to

20   review this?

21   A    Yes.

22   Q    Any dispute with any of the statements in here?

23   A    I don't recall having a -- I don't -- I think it was

24   accurate, but --

25   Q    Okay.  Well, when you read it, did you have any disputes

O'Neil - Cross                          136

1  with the statements that were in here?

2  A   I did not see it before it was filed, so -- but having

3  read it after it was filed, I don't recall having any disputes

4  with anything that was in it.

5  Q   Okay.  And I'll turn you specifically to Paragraph 13,

6  which is found on Page 4 of 5.

7  A   Okay.

8  Q   And I'll -- well, let's look at this together.  (reading)

9  Prior to the petition date, the majority of Foley's and Lynn

10 Pinker's fees and expenses were paid by a non-debtor entity,

11 Highland CLO Funding Limited.

12     Do you see that?

13 A   Yes.

14 Q   Okay.  And were Foley's bills sent to Highland CLO

15 Funding?

16 A   Yes.

17 Q   Okay.  And is -- were those bills separate and apart from

18 the $2.15 million that we talked about earlier that were

19 remitted through the Highland e-billing system?

20 A   Separate, yes.

21 Q   Okay.  About how much in fees has Highland CLO Funding

22 paid to Foley to date?

23 A   Nothing post-petition.  Prior -- I mean, during -- from

24 the inception of the representation of Highland, probably

25 approximately -- over a million dollars, for sure.

O'Neil - Cross                     137

1   Q    Over $2 million?

2   A    I do not believe it is over $2 million.  It's somewhere

3   between $1 and $2 million.

4   Q    Okay.  And those separate matters that were billed to

5   Highland CLO Funding, how did those differ from what was

6   billed to Highland or to Neutra or to the Cayman defendants?

7   A    If it was a matter that was clearly of some benefit to

8   HCLOF, it was billed directly.  Otherwise, there was an

9   allocation billing for just the general work.  And that was

10  primarily through an indemnity agreement, as I understood it,

11  between Highland and HCLOF.

12  Q    Okay.  And who did the allocation between Highland and

13  Highland CLO Funding?

14  A    I was instructed as to what the allocation should be or

15  asked what I thought the allocation should be on any given

16  time, and I believe it was the -- it was discussed with the

17  board of HCLOF as to the allocation.

18  Q    Okay.  And who were you directed as to the categories of

19  allocation by that you just referenced?

20  A    You mean in terms of a person?

21  Q    Yes.

22  A    I most frequently discussed this with Mr. Sevilla, but

23  also had conversations with Mr. Maloney, with King & Spalding,

24  who was representing HCLOF, and occasionally would have direct

25  conversations with Mr. Maloney and Mr. Scott and Ms. Bestwick,

O'Neil - Cross                          138

1   who were the two independent directors of HCLOF.

2   Q    Okay.  And what types of work generally either were

3   allocated or apportioned or billed in full to Highland CLO

4   Funding.  What was the benefit there?

5   A    The work was -- the work that was going on in the

6   bankruptcy case.

7   Q    Okay.  But I -- I understand that it was work in the

8   bankruptcy case because that's where Foley represented

9   Highland and various other entities, but I'm asking you

10  specifically:  What types of categories, and I don't -- you

11  don't have to go task by task -- but categories of work that

12  you performed for Highland or Neutra or for the Highland

13  Cayman defendants that benefited and were billed to Highland

14  CLO Funding?

15          MR. MORRIS:  Your Honor, I'm going to again assert a

16  relevance objection to any of this post-petition stuff.  This

17  is an application to retain Foley on a post-petition basis

18  for the benefits to this estate, not with respect to what

19  happened on a pre-petition basis.

20          THE COURT:  Your response?

21          MS. PATEL:  Your Honor, there's been much discussion

22  about what -- whether Neutra should have to pay this bill or

23  whether it should not have to pay its own way here.  This is

24  -- this is, in my mind, a bit of an extraordinary application

25  in that we're asking a debtor entity to pay for non-debtor

O'Neil - Cross                                139

1   representation.

2       I want to inquire as to sort of this jumbled mix of work

3   that's been performed.  There's -- clearly, Ms. O'Neil said

4   she hasn't been paid by HCLOF post-petition, but I think we

5   need to separate out all of these representations, who's

6   controlling what, and how -- how these bills really should be

7   paid.

8            THE COURT:  How the allocation has worked --

9            MS. PATEL:  Yes.

10           THE COURT:  -- thus far?

11           MS. PATEL:  Yes, Your Honor.

12           THE COURT:  I overrule the relevance objection, but

13   let me tell you a pickle we're getting into timewise.  I have

14   a confirmation hearing starting at 1:30.  And we've gone three

15   hours on this without a bathroom break.  How much longer do

16   you think you're going to need?  Because we might have to stop

17   and come back at 2:30 if you're going to need much longer.

18           MS. PATEL:  Your Honor, I would say give me ten

19   minutes and I can wrap it up.

20           THE COURT:  Okay.  Ten minutes.

21           MS. PATEL:  Okay.

22           THE WITNESS:  I'm sorry.  What was the question?  I

23   apologize.

24   BY MS. PATEL:

25   Q   I'm trying to remember it myself, Ms. O'Neil.  The

O'Neil - Cross                    140

1   question was, what specifically -- what -- and I don't -- you

2   don't have to go task by task.  But categorically, what was

3   the work that was performed that you would have billed

4   directly to HCLOF?

5   A    Prior to King & Spalding's involvement, you may recall

6   that we were representing HCLOF as well.  So there was direct

7   bill for the work during the bankruptcy by Foley Gardere for

8   specific work for HCLOF.

9       The -- the -- pursuant to the indemnification, as I

10  understood it, although I never read the indemnification

11  personally, that there would be an allocation between Highland

12  to HCLOF for that, for work that they performed that was of

13  benefit to HCLOF or its equity interest in the CLOs.

14      And so I was more directed as to what that allocation

15  should be vis-à-vis the work that was going on.  I think,

16  generally speaking, because the CLOs were being impacted, as

17  was well-discussed during the course of the Acis bankruptcy,

18  by the issues in the bankruptcy, by the temporary injunction

19  that were in place vis-à-vis their inability to seek an

20  optional redemption during the course of the bankruptcy, that

21  they were being significantly impacted by the actions in the

22  bankruptcy, even though they were not specifically a creditor

23  in the bankruptcy.

24  Q    So you performed services on behalf of your client,

25  Highland, that you then billed to Highland CLO Funding because

O'Neil - Cross                                141

1  Highland CLO Funding couldn't effectuate an optional

2  redemption?

3  A    It was -- it was in conjunction with the overall

4  activities that were going on in the bankruptcy.

5  Q    Okay.

6  A    Not that specifically, no.

7  Q    All right, Ms. O'Neil.  I've only got a few minutes left.

8  So let me ask you:  Towards the end of January, did there come

9  a time where you sent me an email regarding Acis's quarterly

10 operating reports?

11 A    Yes.

12 Q    Okay.  And you copied Mr. Hurst on that email as well,

13 correct?

14 A    Correct.

15 Q    Okay.  And your email was to say, hey, can we set up a

16 time to talk because I've got -- Highland's got some questions

17 about the quarterly operating report.  Do you recall that?

18 A    Yes.

19 Q    Okay.  And again, just so we're clear, this is around end

20 of January 2020, right, after the appointment of the Board?

21 A    Yes.  You --

22 Q    Okay.

23 A    I think there's an exhibit.  One of your exhibits is that.

24 Q    There is.  If you turn to --

25 A    Or it's a portion of that email communication.

O'Neil - Cross                                    142

1    Q    It is.  It's -- if you turn to Tab 28, this is sort of

2    your initial email to me, correct?

3    A    Yeah.  This is not the entire email dialogue, because --

4    Q    There were other emails afterward.

5    A    -- I did not get a response and sent a couple of emails

6    later, several days later, asking for a response.

7    Q    Right.  And I actually did respond to you after that,

8    correct?

9    A    Approximately a week later, yeah.

10   Q    Okay.  Because I was out sick, actually.

11   A    Yeah.  That's what you said.

12   Q    Right.  So, --

13   A    You didn't say sick, but you were out, so it's okay.

14   Q    Yeah.  I was out.  And so -- and I will tell you, I was

15   sick.  So I responded, albeit a little bit late, but I did

16   respond to you and say, Ms. O'Neil, could you tell me what

17   your questions are so that I can be prepared?

18        Does that sound about right?

19   A    Yeah.

20   Q    Okay.

21   A    Yes.

22   Q    And I never -- I never got a response to that.  You never

23   told me what your questions were with respect to the quarterly

24   operating report, right?

25   A    Yes.  And I --

O'Neil - Cross                                    143

1  Q    Okay.

2  A    I can explain that.  Because Mr. -- I believe Mr.

3  Pomerantz said that there was a meeting that was -- and they

4  would discuss it then, so --

5  Q    Okay.

6  A    Or Mr. Demo.  I'm sorry.  Somebody from Pachulski told me

7  that that would be addressed.  Also, the status conference --

8  I mean, the questions we had were because there was a February

9  3rd status conference coming, and I wanted to see if we could

10 get some clarity so that when we appeared before the status

11 conference we could limit what we were going to be discussing

12 with the Court, if anything.

13 Q    Okay.  Well, what were -- what were the nature of your

14 questions?  Because there was a conversation between Mr. Terry

15 and myself and the Board and -- well, certain members of the

16 Board.  But what were your questions pertaining to?

17 A    Oh, okay.  Happy to discuss that.  It's kind of awkward to

18 have it in -- on this, in this --

19 Q    On Q and A.

20 A    -- forum, but --

21 Q    I hear you.

22 A    We sent -- as the Court will recall, the confirmation

23 injunction can be lifted if all the claims are paid.  So,

24 since the plan, the Acis plan was confirmed, we have been

25 tracking -- and the only way to track it is through the QORs

O'Neil - Cross                    144

1  -- what the revenues were coming in and what has been paid.

2  And so -- in terms of expenses and then claims.  And so we

3  have been -- my paralegal has been tracking this.

4      As the Court may know from looking at the record, almost

5  all of -- any other claims that were in the case were either

6  disallowed or withdrawn.  And so, really, the only claim,

7  other than Highland's, was Mr. Terry's that was really left to

8  be paid, other than administrative claims.  And I believe the

9  administrative claimants had agreed to deferral on some of

10 their payments after the effective date.

11     So we had been tracking the payments, which you can track

12 through the QORs, and it appeared that all of -- including Oak

13 Tree's most recently allowed administrative claim -- that all

14 of the administrative claims had been paid, and it appeared at

15 least approximately a half of Mr. Terry's claim had been paid.

16     When you look at the QORs, it doesn't specifically say,

17 "Here's who got what payment," but it shows the claims being

18 paid down, in addition to just general expenses of the post-

19 confirmation Debtor.  And I'm -- this is taking a little bit,

20 but in the disclosure statement to the plan, there had also

21 been plan projections that set forth the revenues that were

22 anticipated post-confirmation to pay the claims.  And so

23 likewise -- as well as the expenses, including to Brigade or

24 just general operating expenses for Acis.

25     So, likewise, through the QORs, we had been comparing

O'Neil - Cross                    145

1   those against what was in the plan projection.  And there were

2   some things that weren't matching and we simply were having

3   questions about the expenses seemed to be much higher.

4   However, the claims were being paid down, so it looked like

5   Mr. Terry was the only claimant left and was probably owed, by

6   our calculation, around $4-1/2 million, and that was the only

7   thing left to be paid.  And, but the revenues per the QOR was

8   showing cash available of over five and -- $5.3 million.

9        So, one of the things we wanted to discuss was the

10  application of using the cash to go ahead and pay down what

11  was left of Mr. Terry's claim so that the injunction could be

12  lifted.  But wanted to discuss that with you.  That was the

13  purpose of that.

14  Q   Okay.  And I guess let me back up.  One, let me kind of

15  correct you on a technical point, which is Mr. Terry's claim

16  isn't the only claim that's left outstanding.  There were also

17  law firm claims that were lodged as against Acis, correct?

18  A   I believe there were two --

19          MR. MORRIS:  Objection, Your Honor.  Just relevance.

20  I don't get it.

21          THE COURT:  Okay.  Sustained.  You've gone seven

22  minutes.  So, three more minutes and we need to wrap it up.

23          MS. PATEL:  Okay.

24  BY MS. PATEL:

25  Q   Well, I guess, Ms. O'Neil, kind of in line with the email,

O'Neil - Cross                          146

1  the email came in shortly before Acis was sued by your co-

2  counsel, Lynn Pinker, on behalf of the Charitable DAF and CLO

3  HoldCo.  Are you aware of this lawsuit?

4  A    After it was filed.  I was not aware of it before it was

5  filed.  The second one.  I had seen the first one after it was

6  filed.  I had not seen the second one until after it was

7  filed.  We have a conflict with one of the defendants in that,

8  so --

9  Q    Okay.  So, and when you say "the first one," are you

10  talking about when it was originally the Charitable DAF versus

11  U.S. Bank National Association and Moody's Investors Service?

12  A    Yes.

13  Q    Okay.  And that all involved claims by the DAF brought

14  against U.S. Bank and Moody's at the time relating to the Acis

15  bankruptcy, right?  It's claims that U.S. Bank didn't manage

16  --

17  A    Ms. --

18  Q    -- as a trustee correctly, correct?

19  A    Ms. --

20        MR. MORRIS:  Objection, Your Honor.  She's got no

21  foundation.  She said she has a conflict and wasn't involved

22  with this case.

23        THE COURT:  Sustained.

24        THE WITNESS:  That's correct.

25  BY MS. PATEL:

O'Neil - Cross                                    147

1   Q    Okay.  I guess, Ms. O'Neil, let me just ask you:  Did you

2   have any involvement with -- if you look at Tab 27, that's a

3   copy of the lawsuit, so that we're all clear exactly which one

4   I'm asking you about.  This is the lawsuit between the

5   Charitable DAF and CLO HoldCo, your former client, versus U.S.

6   Bank National Association, Moody's Investors Service, Acis

7   Capital Management, Brigade, and Josh Terry.  Did Foley have

8   any involvement in the drafting or formulation of this

9   lawsuit?

10  A    None.

11  Q    Okay.

12         MS. PATEL:  No further questions, Your Honor.

13         THE COURT:  All right.  Any redirect?

14         MR. MORRIS:  Very briefly.

15         THE COURT:  Okay.

16                     REDIRECT EXAMINATION

17  BY MR. MORRIS:

18  Q    Ms. O'Neil, you've been representing a number of different

19  entities associated with Highland since 2018, right?

20  A    Correct.

21  Q    And are those entities identified in Plaintiff's Exhibit

22  #2 in the engagement letter?

23  A    Plaintiff's 2 or -- sorry.

24  Q    The Debtor's.

25  A    The Debtor's 2.  Okay.  Let me switch.  They are.

O'Neil - Redirect                          148

1  Q    Okay.  And since the Board has been appointed, have you

2  met with board members to discuss the status of the matters

3  that your firm has been handling?

4  A    Yes.

5  Q    And without disclosing attorney-client communications, did

6  that involve providing a history of the work that you'd done?

7  A    Yes.

8  Q    Did that involve providing a history of the work that you

9  expected to do in the future?

10 A    Yes.

11 Q    Did the Board have an opportunity to ask questions of you?

12 A    Yes.

13 Q    And did you, in fact, answer the Board's questions?

14 A    I endeavored to do so to the best of my ability, yes.

15 Q    Okay.

16 A    Or I followed up if -- with information via email if I

17 needed to get additional information.

18 Q    And is it your understanding that the Board supports your

19 retention for the purposes that were described earlier by Mr.

20 Nelms?

21 A    Yes.

22 Q    Okay.

23          MR. MORRIS:  I have nothing further, Your Honor.

24          THE COURT:  Any recross on that redirect?

25          MS. PATEL:  No, Your Honor.

O'Neil - Redirect                    149

1              THE COURT:  All right.  Ms. O'Neil, you're excused.

2              THE WITNESS:  Thank you.

3         (The witness steps down.)

4              THE COURT:  All right.  Highland, any more evidence?

5              MR. MORRIS:  No, Your Honor.  We rest.

6              THE COURT:  All right.  Is there any evidence from

7    Acis?

8              MR. LAMBERSON:  No, ma'am.

9              THE COURT:  All right.  Let's take a five-minute --

10   please, five-minute break -- and then we'll hear your closing

11   arguments.

12             THE CLERK:  All rise.

13        (A recess ensued from 12:47 p.m. until 12:56 p.m.)

14             THE CLERK:  All rise.

15             THE COURT:  All right.  Please be seated.  We're

16   going back on the record in Highland.  I'll hear closing

17   arguments.

18        I'm going to ask a question.  I need clarification --

19             MR. DEMO:  Of course.

20             THE COURT:  -- on this.  First off, in the Acis

21   adversary that's stayed in the Acis bankruptcy case, Foley,

22   it's proposed, would represent Highland.  But is Foley also

23   representing co-defendants in that adversary?  You know, I

24   think King & Spalding is representing all the co-defendants,

25   or someone else is, but am I wrong or right about that?

150

1           MR. DEMO:  Yes and no, Your Honor.  I think there's

2   been some miscommunication on that.  The adversary, as we

3   understand it, is stayed, and because of that we are not

4   seeking to represent -- or retain Foley in that adversary,

5   although we will if that comes up again.  So, in the

6   adversary, pre-petition, Foley did represent the Debtor and

7   then a handful of other creditors who were brought into that

8   adversary, as we understand it, as defendants.  On a go-

9   forward basis, though, we are proposing to retain Foley on

10  three things:  General matters in the bankruptcy proceeding;

11  the appellate --

12          THE COURT:  General matters in the Acis bankruptcy

13  proceeding?

14          MR. DEMO:  Correct, Your Honor.  The appeal involving

15  the confirmation order.  And the appeal involving the Neutra

16  litigation.  And --

17          THE COURT:  Okay.  On the appeal of the involuntary,

18  --

19          MR. DEMO:  Yes, ma'am.

20          THE COURT:  -- only Neutra --

21          MR. DEMO:  That is correct.

22          THE COURT:  -- is an appellant.  Okay.  So what

23  you're asking is for authority for Highland to pay the legal

24  fees of Neutra on that?

25          MR. DEMO:  Yes, Your Honor.

151

```
 1            THE COURT:  Okay.

 2            MR. DEMO:  We are.  And we, again, to the --

 3            THE COURT:  And let me -- let me -- and then the

 4   appeal of the confirmation order, are the appellants Highland

 5   and Neutra only, or is HCLOF an appellant?

 6            MR. DEMO:  In terms of Foley's representation, it's -

 7   -

 8            THE COURT:  No, no, no.  Just answer the question.

 9   Who are the appellants in the confirmation order?

10            MR. DEMO:  Highland, Neutra, and HCLOF.

11            THE COURT:  Okay.  Who is representing HCLOF?

12            MR. DEMO:  King & Spalding.

13            THE COURT:  Okay.  And Foley has thus far been

14   representing Neutra and Highland?

15            MR. DEMO:  Correct, Your Honor.

16            THE COURT:  Okay.  Well, okay.  You may proceed.

17            MR. DEMO:  And I will be brief.  And I think

18   ultimately this, this is a relatively simple thing, and I

19   think you've nailed it.

20       What are the benefits to the estate of -- because nobody

21   has objected, again, to Foley representing the Debtor.  What

22   are the benefits to the estate for Foley representing Neutra

23   and being paid for that by the Debtor?  And to answer that

24   question, I think you have to look to all the testimony that

25   we've heard today, and you also have to look at who's
```

152

1   objecting, Your Honor.  The Committee is not objecting.  There

2   is no other committee member objecting besides Acis.  The only

3   party objecting to Neutra -- or, I'm sorry, to Highland paying

4   Neutra's fees in the appeal, which, again, are a portion of

5   the $500,000 that we think is going to be incurred post-

6   petition on this, excluding today, because today has obviously

7   gone a little bit long -- the only party objecting to paying a

8   portion of that $500,000 to have Foley represent Neutra in an

9   appeal that is happening less than six weeks from now is Acis.

10      Acis is the party opponent in that.  Acis is the party

11  that stands to benefit, not just because the involuntary

12  petition will not be overturned, but because there will be a

13  lack of leverage and a lack of ability to contest their $75

14  million, which is where it started, but it keeps growing.

15  It's at $300 million now.  The only party who's objected to

16  that is Acis.  None of the other creditors have objected.

17          THE COURT:  Well, until the past 24 hours, the

18  Committee was objecting.

19          MR. DEMO:  Correct, Your Honor.  And we had a --

20  finally had a chance, with the new Board in place, to discuss

21  it with the Committee.  And the new Board explained to the

22  Committee that, in their business judgment, spending this

23  money, this $500,000 -- which, again, is going to be allocated

24  across these three matters; not all of it's going to be

25  allocated to Neutra; a portion of it is going to be allocated

153

1  to Neutra -- $500,000 for the possibility of a recovery to the

2  estate, the possibility of the ability to challenge a $300

3  million proof of claim that impacts not just the estate but

4  the other creditors in the estate, substantially, because

5  there's only so much money here.  So, --

6          THE COURT:  Okay.  Let me ask you to recap what the

7  evidence was on benefit to Highland --

8          MR. DEMO:  On benefit --

9          THE COURT:  -- from the overturning of the order for

10  relief in Acis.

11          MR. DEMO:  In terms of the overturning of the order

12  for relief in Acis, there were -- there was testimony on the

13  possibility -- and again, it's a possibility, and we're not

14  disputing that.  Acis's attorneys said it was 10 percent.

15  That's fine.  Maybe it's 10 percent.  There was evidence

16  presented by Mr. Nelms on the possibility that if the Acis

17  involuntary is overturned, that the contracts at issue, the

18  advisory and the sub-management agreements, --

19          THE COURT:  Well, let's take it sequentially, because

20  you've got to, you know, look at benefit of the estate --

21          MR. DEMO:  Understood.

22          THE COURT:  -- versus time and cost, to some degree,

23  right?

24          MR. DEMO:  Right.

25          THE COURT:  So, Neutra wins.

154

1            MR. DEMO:  Okay.

2            THE COURT:  Okay?  That means, according to Mr.

3    Lamberson's argument, which I think is the correct argument,

4    that we send to arbitration whether it's appropriate for Acis

5    to be in a bankruptcy.

6            MR. DEMO:  Correct, Your Honor.

7            THE COURT:  Okay.

8            MR. DEMO:  Well, may be correct.

9            THE COURT:  So, --

10           MR. DEMO:  I think we did hear there's a different

11   possibility from Mr. Nelms.

12           THE COURT:  Well, what is the other possibility?

13           MR. DEMO:  Well, okay.  Understood, Your Honor.

14   Okay.

15           THE COURT:  Okay.

16           MR. DEMO:  So, say we -- assuming we send it to

17   arbitration, --

18           THE COURT:  So that means an arbitration panel is

19   convened, and at some point, many months from now, an

20   arbitration panel will either say yes or no, involuntary, you

21   know, should have gone forward.

22           MR. DEMO:  Okay.

23           THE COURT:  Okay?  Let's say the arbitration panel

24   says no, should not have gone forward.  Then what does the

25   world look like for Highland?

155

1              MR. DEMO:  I guess, taking it a step back, Your

2    Honor, assuming that this does go to arbitration, it also

3    means that the involuntary petition was not entered.  If the

4    involuntary petition was not entered, which means that the

5    Acis equity did not go to Mr. Terry, it stayed under Neutra,

6    at that point --

7              THE COURT:  Wait, wait, wait.

8              MR. DEMO:  -- you also go into arbitration.

9              THE COURT:  Wait, wait.  Wait, wait.  So you're

10   saying that everything is wiped out in the involuntary, the

11   Acis bankruptcy case?

12             MR. DEMO:  Your Honor, and I do want to be really,

13   honestly, very, very clear about this.  I am -- I am not

14   saying anything.  I'm not -- trying very hard not to draw a

15   legal conclusion.  What I'm saying is that the Board has

16   analyzed this, the Board has applied business --

17             THE COURT:  But I'm trying to understand --

18             MR. DEMO:  -- judgment to this, and that there is a -

19   - there is a possibility.  Now, --

20             THE COURT:  I'm trying --

21             MR. DEMO:  -- obviously, reasonable minds can --

22             THE COURT:  Okay.  Here's where I'm coming from.  And

23   you can tell me if I'm analyzing this incorrectly, in your

24   view.  Okay.  We used to have this terrible Fifth Circuit case

25   -- you know, God help me if this transcript gets sent -- but

156

1    called *Pro-Snax*.  Okay?

2              MR. DEMO:  Okay.

3              THE COURT:  I think the Fifth Circuit has decided

4    itself that it was terrible, so it's not going to come back to

5    haunt me, saying that.  So, *Pro-Snax* said basically the

6    Bankruptcy Court is a Monday-morning quarterback in looking at

7    the reasonableness of fees.  You know, did it provide a

8    benefit to the estate?

9              MR. DEMO:  Uh-huh.

10             THE COURT:  And then that got reversed a few years

11   ago.  I think it was the *Woerner* case -- *Baron & Newburger*

12   *(Woerner)* -- where the Court said, no, you don't do a

13   hindsight look.  You look at, at the time fees were expensed,

14   --

15             MR. DEMO:  Uh-huh.

16             THE COURT:  -- was there something like a reasonable

17   possibility they would benefit the estate?

18             MR. DEMO:  Yes.

19             THE COURT:  Okay?  So I'm looking through it in that

20   lens, so to speak, and I'm like, what benefit to the Highland

21   estate could there be if the confirmation -- well, if the

22   order for relief is unwound or the confirmation order is

23   unwound?  And I'm not there.  I'm not there understanding any

24   benefit for Highland.

25        I can understand a benefit, maybe, for Neutra, although I

1  am even hard-pressed to see that, because it looks like years
2  of more litigation.
3          MR. DEMO:  And Your Honor, I mean, I do think that
4  there was -- and again, I'm not going to challenge your legal
5  conclusions -- I do think that there was evidence that in the
6  Board's business judgment they did analyze this and they see
7  it, I think, a little bit differently.
8          THE COURT:  And I should defer heavily to a Board's
9  reasonable exercise of business judgment.  I've got trouble.
10 So I'm just trying to --
11         MR. DEMO:  Understood.  And I think, when you look at
12 that business judgment, --
13         THE COURT:  Uh-huh.
14         MR. DEMO:  -- you know, obviously, I don't disagree.
15 I do think that when you have a three-person independent board
16 of this caliber who's come into a difficult situation, has
17 reviewed all of the evidence, talked to all the applicable
18 people, when things happened with the DAF litigation that they
19 didn't like, they took action to stop that.  When they looked
20 at the Winstead appeal and they said, you know, there's not a
21 benefit to the estate here, let's drop they, they dropped it.
22         THE COURT:  But again, work with --
23         MR. DEMO:  When they --
24         THE COURT:  Work with me.  Fifth Circuit reverses the
25 order for relief.  I don't think you have disagreed with

158

```
1   Lamberson's argument that best-case scenario in that reversal
2   scenario is that an arbitration panel now looks at, should
3   this Acis -- you know, should it have gone forward in a
4   bankruptcy?
5           MR. DEMO:  Well, I guess, Your Honor, then maybe I --
6           THE COURT:  So, in that many --
7           MR. DEMO:  -- I'm not being clear.
8           THE COURT:  -- months, let's say eight months that an
9   arbitration panel takes to decide, what happens during that
10  eight months?
11          MR. DEMO:  Well, then I guess, Your Honor, I need to
12  step back, because I have not -- absolutely not been clear.
13  If it goes to an arbitration panel, our view -- and I think
14  Ms. O'Neil's briefs to the Fifth Circuit are clear on this --
15  the arbitration panel is going to arbiter or arbitrate whether
16  or not there was a fraudulent conveyance.  It's going to
17  arbitrate how to resolve the claims.  It's not going to
18  arbitrate whether or not the involuntary petition should ever
19  have been entered.
20          THE COURT:  Wait, wait.  What does that mean?  Of
21  course.  That's the starting point of it all, right?  The
22  appeal is the Bankruptcy Court wrongly held a trial on the
23  involuntary petition and ordered for relief.  It should have
24  deferred to an arbitration panel to do that.  Isn't that
25  appeal number one that we're talking about?
```

159

1          MR. DEMO:  Yes, but --

2          THE COURT:  Neutra's appeal?

3          MR. DEMO:  Yes, it is.

4          THE COURT:  Okay.

5          MR. DEMO:  But I do think there's a nuance.  And I do

6   want to defer to the pleadings that were filed with the Fifth

7   Circuit, because I don't want here to get myself out in front

8   of that Fifth Circuit appeal, because obviously I do very much

9   want that appeal to go forward.  And maybe we lose and maybe

10  we win, but if we win, I think the --

11         THE COURT:  If Neutra wins.

12         MR. DEMO:  If Neutra wins, one of the outcomes -- and

13  again, I understand that, you know, reasonable minds can

14  differ that there --

15         THE COURT:  Okay.

16         MR. DEMO:  -- of the outcomes.

17         THE COURT:  But one of the outcomes.

18         MR. DEMO:  One of the outcomes is that the

19  involuntary petition is unwound, withdrawn, and the parties go

20  to arbitration on the claims.  If that were to happen, --

21         THE COURT:  Wait.  It's unwound and they go to

22  arbitration on what claims?  The claims in the adversary

23  proceeding that's been filed in Acis?

24         MR. DEMO:  Again, Your Honor, I'm not the appellate

25  lawyer here.  I mean, this is why we are here.

160

1          THE COURT:  But how do you skip over the arbitration

2   of the order for relief?  Because if Joshua Terry, who

3   commenced it, you know, he has the right now to argue to an

4   arbitration panel that this should have been in bankruptcy,

5   right?  He doesn't have to just agree that the adversary

6   proceeding is now arbitrated.  Right?

7          MR. DEMO:  Well, again, Your Honor, I don't want to

8   substitute my judgment for the judgment of the Board.  I think

9   the judgment of the Board is that there is a scenario and that

10  it's worth exploring and that it's worth the -- what we

11  honestly think is a limited amount of money to explore.

12  Because I think, if we explore that, we explore the

13  possibility, quite honestly, of taking it out of bankruptcy,

14  then, yes, in that scenario, and which we do it think is

15  possible, in that scenario, and call it whatever probability

16  you want, but if you're going to spend half a million dollars

17  to get to a scenario that could reap you -- and I don't want

18  to put a number on it -- but millions of dollars in future

19  revenue, millions of dollars in terms of --

20         THE COURT:  You're melding.  You're collapsing.  And

21  we all know as lawyers that's not how it works.  Things happen

22  sequentially, okay?

23         MR. DEMO:  Okay.  Then I guess, going --

24         THE COURT:  There's a setting aside -- well, there's

25  a reversal of the Bankruptcy Court's issuance of an order for

161

1 relief.

2         MR. DEMO:  Okay.

3         THE COURT:  And that means you should have deferred

4 to an arbitration panel, Judge Jernigan.  And so they remand

5 so that I can, consistent with that appellate ruling, say,

6 We're staying the bankruptcy and it's going to arbitration to

7 decide whether an order for relief.  Is there really any

8 realistic scenario where we skip that step?

9         MR. DEMO:  We think that there's a scenario that is

10 worth exploring.

11         THE COURT:  I feel like your colleagues are really

12 dying to chime in because they think they've got the answer to

13 my question, no offense to you.

14         MR. MORRIS:  I really -- I don't, Your Honor, but if

15 I may.

16         THE COURT:  Uh-huh.

17         MR. MORRIS:  I think Ms. O'Neil is the appellate

18 lawyer.  Maybe she should speak on this very precise point, --

19         THE COURT:  Okay.  Because --

20         MR. MORRIS:  -- if that's okay with the Court.

21         THE COURT:  Because I see many miles --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- to go before we sleep if there's a

24 reversal, and I'm trying to figure -- well, you know, we all

25 know that, right?

162

```
 1           MS. O'NEIL:  Your Honor, if I may.

 2           THE COURT:  Uh-huh.

 3           MS. O'NEIL:  And I did not want to interrupt Mr.

 4    Demo, and he's done a great job, but obviously we've been

 5    involved with the appeal.

 6           THE COURT:  Right.

 7           MS. O'NEIL:  We've prepared the briefs.

 8           THE COURT:  So how does it play out if there's a

 9    reversal in favor of Neutra --

10           MS. O'NEIL:  If I may, Your Honor.

11           THE COURT:  -- of the order for relief?

12           MS. O'NEIL:  The issue on the appeal is not to send

13    the concept to arbitration of the involuntary petitions.

14           THE COURT:  Okay.

15           MS. O'NEIL:  It is that Mr. Terry was not a qualified

16    petitioner because he was bound by an arbitration, a binding

17    arbitration agreement, and that the issue that he -- by

18    proceeding with these involuntary petitions, he commenced a

19    suit, a proceeding that was, at its core, about fraudulent

20    transfers, and that that should have gone to arbitration.  And

21    to proceed and try to engage this Court's jurisdiction on

22    something that he had contractually agreed to go to

23    arbitration on was improper.

24       So, if Neutra wins on that argument, and I would encourage

25    the Court, we -- I think the briefs are in one of the
```

163

1  exhibits, but certainly I would provide them to the Court

2  before the Court makes a determination if it would help.  If

3  there -- if Neutra wins on that appeal, then our position

4  would be that yes, the bankruptcy is effectively void *ab*

5  *initio*, and that's what we believe the case law supports.

6       Where that would put the parties, potentially -- and

7  again, we're speculating what the Fifth Circuit may or may not

8  due to instruct this Court to do -- could reverse and render,

9  as it were, as Mr. Nelms testified happened to him previously,

10  but could instruct this Court to abstain, which I think was --

11  and that is one of the various motions and the orders that the

12  Court had denied.  All of these are wrapped up in the appeal,

13  Your Honor.  And in doing so, instruct the petitioner, Mr.

14  Terry, and Acis to go arbitrate the issue of the fraudulent

15  transfers.  That would reinstate Acis.  Acis could reinstate

16  Highland as the manager of the CLOs.

17       THE COURT:  So every single order in the Acis case

18  would be null and void?

19       MS. O'NEIL:  We believe that the case law is that it

20  would be void *ab initio*.  And now, Your Honor, practically

21  speaking, --

22       THE COURT:  Void *ab initio*?  Okay.  That could only

23  -- is that hinged to a subject matter jurisdiction, lack of

24  subject matter jurisdiction --

25       MS. O'NEIL:  Partially, that's part of the argument.

164

1              THE COURT:  -- theory?

2              MS. O'NEIL:  That's part of the argument.  Yes, Your

3     Honor.

4              THE COURT:  Okay.

5              MS. O'NEIL:  Practically speaking, it is our belief,

6     although it is not clear, is what I've tried to kind of convey

7     to the Court, and in conjunction with this conversation I was

8     trying to have with Mr. Terry's counsel/Acis's counsel, is

9     that we believe Mr. Terry has been paid down.  Practically

10    speaking, if that happens and he's only left with a claim or

11    currently has a claim of $4 million, $4-1/2 million, which is

12    what we think it is, or it's somewhere in that neighborhood,

13    that -- and there's sufficient cash in Acis to pay that claim

14    off -- it is a claim Judge -- Mr. Nelms testified to the fact

15    that it would need to be paid -- then there may not even need

16    to be a fraudulent transfer lawsuit because the claim would --

17    what's left of the claim would just be paid off.  And then

18    Acis -- Neutra would be back in ownership of Acis, Acis would

19    engage Highland to come back in and do what it was doing

20    before, Mr. Terry got his claim paid off, and there we are.

21             THE COURT:  Okay.

22             MR. DEMO:  That's honestly pretty much it, Your

23    Honor.  And we think that -- and the Board thinks that the

24    benefit of pursuing that is worth it, quite honestly.  And

25    they think, in their business judgment, that it's worth paying

165

1  those Neutra fees -- which again, are a portion of the

2  $500,000, only a portion -- because that benefit accrues to

3  the estate, or could accrue to the estate in a situation

4  where, in their business judgment, it's worth going forward on

5  this.

6          THE COURT:  Okay.  The appeal -- okay.  Let me make

7  sure I heard this correctly.  The appeal of the confirmation

8  order, whereas we have Neutra only on the appeal --

9          MR. DEMO:  Correct.

10          THE COURT:  -- of the order for relief, the appeal of

11  the confirmation order is Highland, Neutra, and HCLOF.

12          MR. DEMO:  Correct.

13          THE COURT:  And King & Spalding still represents

14  HCLOF in connection with that appeal.

15          MR. DEMO:  Correct.  And they're the only law firm

16  representing HCLOF in that appeal.

17          THE COURT:  So here's what I'm struggling with.  You

18  know, what initially seemed like kind of a compelling argument

19  -- all the briefing has been done, oral argument is set in

20  March -- it feels like to me the main beneficiaries of a

21  reversal of that confirmation order are HCLOF and Neutra.

22  Foley can represent Neutra.  Neutra can pay.  King & Spalding

23  can represent HCLOF.  HCLOF can pay.  And that seems like the

24  reasonable scenario to me.

25          MR. DEMO:  And I hear that.  But I think -- and I

166

1    think Mr. Nelms --

2              THE COURT:  Because let's --

3              MR. DEMO:  -- testified to it, but --

4              THE COURT:  Work with me.  Let's say they don't

5    reverse the order for relief --

6              MR. DEMO:  Okay.

7              THE COURT:  -- but they do reverse the confirmation

8    order.

9              MR. DEMO:  Okay.

10             THE COURT:  So, Chapter 11 Trustee is in place

11   representing Highland, and he can -- I'm sorry -- he is the

12   spokesperson for the Acis, the controller of the Acis estate.

13   He might go forward with plan number four, five, whatever it

14   would be.

15             MR. DEMO:  Okay.

16             THE COURT:  Or say, I think it's time to convert this

17   to 7.  I mean I'm just trying to figure out --

18             MR. DEMO:  And I guess I do want to go back to one

19   thing, --

20             THE COURT:  Uh-huh.

21             MR. DEMO:  -- because I do not think there is another

22   economic beneficiary that would pay Neutra's fees.  I think if

23   the Debtor is not allowed to pay Neutra's fees, nobody will

24   pay Neutra's fees, and that portion of the appellate argument

25   will fall by the wayside.  Because --

167

```
 1              THE COURT:  So Neutra loses, but I don't see how
 2   Highland loses.  You have not painted a scenario where it's
 3   clear to me there's any economic benefit to the estate.
 4              MR. DEMO:  I would, I would, with all --
 5              THE COURT:  And you're telling me, Defer to the
 6   Board's business judgment.  But I'm --
 7              MR. DEMO:  Well, I --
 8              THE COURT:  I'm concerned that the evidence hasn't
 9   shown me --
10              MR. DEMO:  I would also ask, Your Honor, --
11              THE COURT:  -- all of the --
12              MR. DEMO:  -- in all --
13              THE COURT:  -- scenarios that lead to their
14   reasonable business judgment on this.
15              MR. DEMO:  As Ms. O'Neil just said, I mean, this is
16   above the Fifth -- to the Fifth Circuit.  The Fifth Circuit is
17   set to hear this in six weeks.  And if the Fifth Circuit rules
18   the way that Ms. O'Neil just said, I do think, and I think the
19   Board thinks -- actually, I know the Board thinks -- that
20   there is a tangible benefit to the estate here.  And so I know
21   that I'm asking you to defer to their judgment, --
22              THE COURT:  All I heard was --
23              MR. DEMO:  -- but I'm also asking just for --
24              THE COURT:  -- that they'd reinstate the sub-advisory
25   and shared services agreements.
```

168

```
 1            MR. DEMO:  Which are --

 2            THE COURT:  Which, by the way, Highland moved to

 3    terminate, moved to compel rejection at one point during the

 4    case, and then, when that didn't work, HCLOF started calling

 5    for redemption.

 6            MR. DEMO:  And it's not the --

 7            THE COURT:  This is nuts for me --

 8            MR. DEMO:  It's not -- it's not the -- Your Honor,

 9    it's --

10            THE COURT:  Tell me why it's not nuts for me to think

11    --

12            MR. DEMO:  Because it's not the same Highland.

13            THE COURT:  -- that Highland would be thrilled to

14    have Acis back managing the CLOs and subcontracting with

15    Highland.  I mean, that --

16            MR. DEMO:  It's not, it's not the same Highland.  The

17    stuff that happened prior to the institution of the Board was

18    the stuff that happened prior to the institution of the Board.

19    There is new management of Highland.  That new management is

20    working very hard.  As you've seen, Your Honor, that new

21    management is willing to push back.  That new management, with

22    the DAF, which you've heard testimony of, that new management

23    is working to get that motion withdrawn.  That new management

24    is not going forward with Lynn Pinker because of actions that

25    it took that it thought subverted their control and their
```

169

1  management of the Debtor.  The new management decided to drop

2  an appeal that they did not think had any merit.

3      It's not the same Debtor, Your Honor.  It is a board

4  consisting of three highly-qualified people who are exercising

5  their own judgment.  So all of that stuff that happened prior

6  to January 9th, I don't want to say hey, it's a clear line in

7  the sand, but it is.  Mr. Dondero is not in control of

8  Highland Capital Management.

9          THE COURT:  But he is in control of Neutra.

10         MR. DEMO:  He is the economic beneficiary of Neutra.

11 That is correct.  But Mr. Dondero did tell Mr. Nelms, as Mr.

12 Nelms testified, that he would reinstate those contracts.  And

13 I understand that.  But again, as you've seen, Mr. Nelms and

14 the Board have been able to push back, have been able to exert

15 control, to exert influence, and to exert management over an

16 institution that is very difficult to manage.

17     And I do think that deference to that is something that

18 should very much be considered, because it's very easy to

19 think of this as Old Highland, but this is New Highland, who

20 has done an independent, objective review of these claims, who

21 has sat with Ms. O'Neil, who has sat with Pachulski, who has

22 sat with Mr. Terry and Ms. Patel and talked about this stuff,

23 and still thinks that there is a benefit here to the estate,

24 and that spending the $500,000 to pursue that benefit, which

25 is not just a benefit to Highland but it's a benefit to

170

1    Highland other -- to Highland's other creditors, I guess, Your

2    Honor, quite honestly, I would ask that you to defer to that

3    new management, because it is not -- it is not Old Highland.

4         All that stuff that people have talked about -- I mean,

5    you've seen today in court, you've heard testimony about very

6    qualified people working to stop that and working to put this

7    estate into a position where it can reorganize, where it can

8    come to agreements with its creditors, where it can work

9    through this process, where it can come out the other side.

10        But if we take away that Board's ability to manage

11   litigation with one of their biggest creditors, whose

12   litigation claim keeps growing, all you're doing is

13   benefitting that one creditor, not to the detriment of Mr.

14   Dondero but to the detriment of the other creditors in this

15   case.

16        UBS has a claim.  Redeemer has a claim.  Meta-e has a

17   claim.  McKool's has a claim.  You can run through that whole

18   list.  And if you take away the Board's right to direct

19   litigation that is going directly to the Board's ability to

20   control runaway claims, to negotiate with creditors, and to

21   come up with an idea of how to split the pie, then, with all

22   respect, Your Honor, you are infringing on that Board's

23   business judgment and that Board's ability to reorganize this

24   case.

25        This case isn't just about --

171

1          THE COURT:  It wouldn't be taking away.  And here is

2    a nuance that -- I think it is perfectly reasonable, in case

3    you don't know where I'm heading on this, for Foley to

4    represent Highland in the Acis case, in that adversary

5    proceeding, if it goes forward, because heck yeah, Highland

6    has been sued for huge amounts of money.

7          MR. DEMO:  Understood.

8          THE COURT:  Their claim, that is many millions, has

9    been objected to.  So, heck yeah, this estate needs good

10   representation of Highland in that case, where there are many

11   unresolved issues still in the Acis case.

12       But on the appeal, I am just still lost as to how there is

13   any chance in the world Highland benefits in those appeals.

14   Neutra, heck yeah.  Maybe they get their Acis back and can

15   instruct it to, you know, stop suing Highland or whatever.

16   Dondero controlling Neutra can do that.  Okay?  And HCLOF, it

17   doesn't want Acis to have anything to do anymore with managing

18   its equity piece of those CLOs.  Sure.  But how -- I mean,

19   you're telling me that there could be a scenario -- here's

20   what I'm hearing.  That there is a benefit in having all those

21   fraudulent transfer claims arbitrated, I guess, not litigated

22   in the Bankruptcy or District Court, and there's a benefit in

23   having all of the management agreements, portfolio management

24   agreements reinstated.  And I just, I don't see how that

25   happens anytime soon based on how I perceive a reversal of

172

 1  orders on appeal happening.

 2         MR. DEMO:  And I guess I don't know what else to say

 3  on that point.  We do think there's a $12 million tangible

 4  benefit to reinstating those contracts.  We think there's a

 5  tangible benefit to allowing Neutra to go forward with its

 6  appeal.  And again, there is nobody else who I think would pay

 7  that freight besides the Debtor, because that benefit, we

 8  believe, goes to the Debtor.

 9         THE COURT:  How many years of life are there left on

10  the CLOs that Acis manages?

11         MR. DEMO:  I would have to check, Your Honor.  I

12  don't know off the top of my head.  I can ask.  But --

13         THE COURT:  I mean, you're saying $12 million.  I

14  mean, I don't --

15         MR. DEMO:  I, you know, --

16         THE COURT:  There's not a -- I'm just not sure where

17  that number is coming from.  I never heard direct evidence of

18  that.

19         MR. DEMO:  Okay.  Well, I guess, Your Honor, I mean,

20  again, I would just ask that you defer to the business

21  judgment of the Board and allow them to position this

22  litigation in a way that best enables them to deal with every

23  creditor's claim, and not just the claims of one creditor.

24  And if they cannot fight the claims of the creditor, then they

25  can't negotiate how that pot is going to be split in a fashion

173

1   that benefits everybody.

2        So I guess, Your Honor, I mean, I don't know what else to

3   say about the benefits of the Neutra appeal except that the

4   testimony, I think, speaks for itself.  But, you know, I --

5   and in terms of --

6             THE COURT:  Again, fight the claim of a creditor.

7   Foley can represent Highland in the adversary proceeding,

8   wherever that goes forward.

9             MR. DEMO:  Yeah.

10            THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14            MR. DEMO:  And conversely, Your Honor, if -- if --

15            THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17            MR. DEMO:  Right.

18            THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20            MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24       And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

174

1  receiving a benefit from this, the Committee has standing to

2  pursue that.

3      So it's not a null set, Your Honor, whereas cutting off

4  the appeal now does take away that possibility.

5          THE COURT:  How would I be cutting off the appeal?

6  I'm not cutting off the appeal.  King & Spalding can go in

7  there and fight hard.  Foley can go in there and fight hard

8  for Neutra.  So, --

9          MR. DEMO:  One second, Your Honor.

10     (Counsel confer.)

11         MR. DEMO:  And I guess, you know, Your Honor, and I

12  do want to reiterate that there is no other party with an

13  economic incentive to fight the Neutra appeal the way that the

14  Debtor has an economic incentive.

15         THE COURT:  That makes no sense to me.  HCLOF is the

16  one who hated this injunction.

17         MR. DEMO:  That's not the Neutra appeal, Your Honor.

18  That's the confirmation order.

19         THE COURT:  Well, okay.  Neutra gets its company back

20  if they win.

21         MR. DEMO:  And we would get our contracts back.

22         THE COURT:  And arguably, it can control Acis, maybe,

23  okay, and it can assign management contracts to whoever it

24  wants.  That just -- and it says it'll assign them to

25  Highland.  If you can trust Jim Dondero, then Highland's going

175

1    to benefit if Neutra wins that appeal.  Right?

2            MR. DEMO:  Yes.  Yes, Your Honor.

3            THE COURT:  Okay.  So that --

4            MR. DEMO:  Highland would benefit greatly --

5            THE COURT:  Okay.

6            MR. DEMO:  -- if Neutra were to win that appeal.

7            THE COURT:  Okay.  Okay.  Well, but first Neutra

8    benefits, right?  And then --

9            MR. DEMO:  No.

10           THE COURT:  -- Highland only secondarily benefits --

11           MR. DEMO:  I -- I --

12           THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14           MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17           THE COURT:  Okay.

18           MR. DEMO:  So, worst case, --

19           THE COURT:  It would have been nice to have him

20   testify as to all of this.

21           MR. DEMO:  Worst --

22           THE COURT:  It would be more compelling if I had him.

23           MR. DEMO:  Well, --

24           THE COURT:  Okay?  But I don't think --

25           MR. DEMO:  -- I can only do so much, Your Honor.

1          THE COURT:  -- that's going to happen anytime soon.

2          MR. DEMO:  But I guess worst-case scenario is that

3     it's $8 million in hundred-cent dollars.

4          THE COURT:  Okay.

5          MR. DEMO:  And that's not nothing for $500,000.  And

6     only a portion of that $500,000.

7          THE COURT:  Okay.

8          MR. DEMO:  Thank you, Your Honor.

9          THE COURT:  Okay.  Mr. Lamberson?

10         MR. LAMBERSON:  Your Honor, do you want a closing

11    from me?  Or no?

12         THE COURT:  I don't really need it.  Thank you.

13         MR. LAMBERSON:  Okay.

14         THE COURT:  Okay.

15         MR. LAMBERSON:  Because I know your hearing starts in

16    about two minutes.

17         THE COURT:  All right.  So, I just hate it that we

18    spent so much time on this.  I hate it that we spent so much

19    time, but, I mean, I understand.  I understand.  You know, I

20    think the employment application was filed pretty early in the

21    case, right, and -- October 29th.  And it was continued,

22    continued, continued, because we were getting objections from

23    the Committee, or they wanted time to look at it, I guess.

24    And now you're kind of up against the wire, right, because

25    oral arguments are set at the Fifth Circuit next month.  So I,

177

1  you know, I hate it that we were here, but I understand it.

2      But I'm concerned.  I'm concerned -- well, here's the

3  deal.  We have a great board, and I totally get that

4  Bankruptcy Courts should defer heavily to the reasonable

5  exercise of business judgment by a board.  And we've got great

6  professionals.  And we've got this case, I think, on a good

7  track as a general matter now.  But I'm concerned that Dondero

8  or certain in-house counsel has -- you know, they're smart,

9  they're persuasive -- that -- what are the words I want to

10 look for -- they have exercised their powers of persuasion or

11 whatever to make the Board and the professionals think that

12 there is some valid prospect of benefit to Highland with these

13 appeals, when it's really all about Neutra, HCLOF, and Mr.

14 Dondero.  That's what I believe.

15     I mean, this is awkward, right, because you want to defer

16 to the debtor-in-possession, but I have this long history, and

17 I can think through the scenarios.  If this is reversed, here

18 is how it will play out.  If this is reversed, here is how it

19 might play out.  And I know, you know, there are multiple ways

20 it might play out, but I cannot believe there is a chance in

21 the world there is economic benefit to Highland if these

22 things get reversed.  Economic benefit to Neutra:  Yeah,

23 maybe.  Economic benefit to HCLOF:  Well, they'll get what

24 they want.  You know, whether it's an economic benefit, I

25 don't know.  But benefit to Highland?  I just don't think the

178

1   evidence has been there to convince me it's reasonable

2   business judgment for Highland to pay the legal fees

3   associated with the appeal.

4       And even more concerning to me is a valid point was made

5   that Highland is in bankruptcy because of litigation,

6   litigation, litigation.  The past officers and directors and

7   controls' propensity to fight about everything.  This isn't a

8   balance sheet restructuring, okay?  It's not a Chapter 11

9   caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13      Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18      So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

179

1  that's my ruling.

2      I will additionally rule, for the avoidance of doubt, that

3  if Foley wants to represent Neutra in the appeals and get paid

4  by Neutra, I don't have any problem with that.  In other

5  words, I'm not going to find something like there's a conflict

6  with the estate, you know, because of its simultaneous

7  representation of Neutra.  That's fine.  But I'm not going to

8  approve Highland paying anything in connection with either of

9  those appeals.  So that is the ruling of the Court.

10     Have I left any gaps here?

11             MR. DEMO:  Your Honor, just one clarification.

12             THE COURT:  Uh-huh.

13             MR. DEMO:  Foley is representing Highland Capital

14 Management in the appeal of the confirmation order to the

15 Fifth Circuit.  I just want to clarify that your ruling that

16 Highland can represent -- I'm sorry -- Foley can represent

17 Highland in all Acis matters extends to their representation

18 of Highland Capital Management in the appeal of the

19 confirmation order that's set for March 30th.

20             THE COURT:  Okay.  Let me think through that.

21             MR. DEMO:  And again, Your Honor, there's been no

22 objection to that.

23             THE COURT:  King & Spalding is in there representing

24 HCLOF.  Foley would be representing both Neutra and Highland

25 in connection with the confirmation order?

180

1          MR. DEMO:  Technically, but Neutra really has

2    nothing.  It's a coattail party in that case.  Highland

3    Capital Management, to the extent that they could bifurcate

4    Neutra, it would still be doing the exact same work.  So if

5    there is an issue there with the representation of Neutra,

6    we'd still ask that Foley be allowed to represent Highland

7    Capital Management in that appeal.

8          THE COURT:  Okay.  So you're telling me Neutra

9    doesn't really benefit from that appeal, so you want Highland

10   to pay all of the fees of Foley in connection with the

11   confirmation order appeal?

12         MR. DEMO:  All I'm asking, Your Honor, is that Foley

13   can represent Highland Capital Management in that appeal.  And

14   again, there's been no objection to that.  What happens with

15   Neutra, I, you know, I understand your position.  I am simply

16   asking for a clarification that Foley can continue

17   representing the Debtor in the Debtor's appeal of the

18   confirmation order.

19         THE COURT:  All right.  I will say yes to that, but

20   they need to be prepared to have their fees split.  I'm not

21   saying 50/50, I don't know what the percentage is, but they

22   are going to be allocated between Neutra and Highland, and

23   they should not expect to get a hundred percent of those

24   covered by Highland at the end of the day.  Okay?  There's

25   going to be a deep dive into looking at how that allocation

181

1  should work, okay?

2        MR. DEMO:  And they will be filing fee apps,

3  obviously, on all of the matters that they are --

4        THE COURT:  Okay.  Anything else?

5        MR. POMERANTZ:  One moment, Your Honor.

6        THE COURT:  Okay.

7     (Pause.)

8        MR. DEMO:  Yeah.  And Your Honor, I do just want to

9  clarify that when we talk about the involuntary petition

10 appeal, that when we talk about its effect on the fraudulent

11 conveyance action, to the extent that -- and I would like to

12 clarify your position on this, Your Honor.  Is your position

13 that the appeal of the involuntary, if successful, would have

14 no impact on the fraudulent conveyance actions in the Acis

15 litigation?

16    Because I do think that it is clear that --

17       THE COURT:  I think we don't know.  We would have to

18 see --

19       MR. DEMO:  And I guess that's -- that's --

20       THE COURT:  -- what the Fifth Circuit states.

21       MR. DEMO:  And my --

22       THE COURT:  And it may be:  Bankruptcy Court, stay

23 the proceedings and defer, send it to arbitration.  "It" being

24 re-litigation of --

25       MR. DEMO:  Understood.

182

1           THE COURT:  -- the involuntary.

2           MR. DEMO:  And --

3           THE COURT:  That may be, to me, a likely scenario,

4    but maybe not.

5           MR. DEMO:  And -- and --

6           THE COURT:  Maybe they'll say something else.

7           MR. DEMO:  Understood.  And I think we're honestly on

8    the same page with that.

9           THE COURT:  Uh-huh.

10          MR. DEMO:  Because to the extent that it does put it

11   into arbitration, to the extent that there is that

12   possibility, that it changes the color of those fraudulent

13   conveyance claims, changes the color of Acis's $300 million

14   proof of claim, which goes to settlement strategy, which goes

15   to the benefits to other creditors, which goes to a whole

16   panoply of other things that tie into a benefit to the estate.

17   And I don't want to re-argue what we've already argued, but I

18   think, as Your Honor said, that chance that there is going to

19   be a change to the fraudulent conveyance, either because it

20   throws them into an arbitration or because it somehow

21   otherwise colors it, is, in and of itself, a substantial

22   benefit to the estate -- leaving aside the dollars from the

23   contracts, leaving aside the $8 million proof of claim --

24   because that benefit goes to, again, that $300 million proof

25   of claim that Acis has filed, which impacts the estate, which

183

1   impacts other creditors, and which impacts the settlement

2   mechanics in this case.

3       So to the extent that there is a chance that the

4   involuntary changes that and recolors it, there is a

5   substantial benefit to the estate in that, because it allows

6   the estate to work with creditors --

7           THE COURT:  I mean, --

8           MR. DEMO:  -- to figure out a way to settle claims in

9   a way that are --

10          THE COURT:  I get what you're saying, but guess what?

11  You can object to that $300 million proof of claim.  And we

12  might have a very interesting conversation about --

13          MR. DEMO:  What --

14          THE COURT:  Well, it's the same judge either way, but

15  -- well, I guess I don't get what you're saying.  You have the

16  ability to object to the proof of claim whether there's

17  affirmance or --

18          MR. DEMO:  Yeah.  But --

19          THE COURT:  -- reversal, right?  I'm just --

20          MR. DEMO:  We don't have a -- you know, we may not

21  have to get -- I'm sorry, Your Honor, and I'll stop it -- but

22  we may not have to get there.  Objecting to the proof of claim

23  is quali... it is quantitatively and qualitatively different

24  than a Fifth Circuit order saying that there are changes to

25  the fraudulent conveyance, there are changes to the

184

 1  distribution of equity under the plan.  Maybe there is no plan
 2  -- or maybe there is no bankruptcy at all.
 3      Those things fundamentally change the dynamics of this
 4  case in a way that's good for the estate.  And those things
 5  can only happen if there's an order from the Fifth Circuit
 6  entering that.  We can object all down the pipe, and we are
 7  going to object, Your Honor, and I assume other people will
 8  object as well.  But our objecting does not have the same
 9  benefit to the estate as a Fifth Circuit opinion saying,
10  Fraudulent conveyance claims go to arbitration; saying, There
11  is no involuntary petition.
12      Now, I understand that there are questions as to the
13  probability of those things, but the fact that there is a
14  probability of those things happening and the cost to the
15  estate is a hundred thousand dollars, I understand what Your
16  Honor has said and I don't want to overstay my welcome, but I
17  do think we are -- at least maybe I am presenting it wrong --
18  but that Fifth Circuit order either way is going to calcify
19  and solidify this in ways that are beneficial to the estate
20  and beneficial to how this bankruptcy is going to progress.
21          THE COURT:  Okay.  I understand you feel passionately
22  about that, but just so you know, for future purposes or not,
23  I'm not there because, you know, among other things, we -- you
24  know, life has changed.  You know, if the Fifth Circuit says
25  reversal, not a darn thing should happen in a bankruptcy case

185

 1   of Acis, you know, it can all go to arbitration, well, that's

 2   the Acis litigation, right?  But Acis has filed a proof of

 3   claim now.  And are you going to tell me the Fifth Circuit is

 4   going to say the arbitration that should have happened in the

 5   earlier Acis case trumps, if you will, adjudication of a proof

 6   of claim now in a new case?

 7           MR. DEMO:  And the claims are --

 8           THE COURT:  I mean, I'm just -- someone mentioned

 9   *Gandy* and *National Gypsum*, and there's even a more recent

10   Fifth Circuit case dealing with arbitration which --

11           MR. DEMO:  The claims, Your Honor, are state law

12   claims if there's no bankruptcy, and I think --

13           THE COURT:  But there is a bankruptcy.  There's a

14   Highland bankruptcy now.  And there's a proof of claim --

15           MR. DEMO:  Not if the Fifth Circuit --

16           THE COURT:  -- in the Highland case.

17           MR. DEMO:  -- overturns the involuntary petition.

18           THE COURT:  Yeah.  I just -- okay.  We're just, we're

19   having academic conversations, and I'm probably guilty for

20   going down this trail.  So, anyway, is there anything further,

21   then?

22           MR. LAMBERSON:  No, Your Honor.

23           THE COURT:  I need a few orders.

24           MR. LAMBERSON:  If they want to prepare an order and

25   send it to us, we're happy to look --

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24  _____      _____

Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

187

INDEX

PROCEEDINGS                                                      4

WITNESSES

Debtors' Witnesses

Russell F. Nelms
- Direct Examination by Mr. Morris                              57
- Cross-Examination by Mr. Lamberson                           80
- Redirect Examination by Mr. Morris                          109

Holland O'Neil
- Direct Testimony via Declaration                            115
- Cross-Examination by Ms. Patel                              115
- Redirect Examination by Mr. Morris                          147

EXHIBITS

Debtor's Exhibits                          Identified Received

1 through 9                                      57        57

Acis Capital Management GP's Exhibits      Identified Received

16   Top 20 List of Creditors                    99       100
27   DAF Lawsuit                                 104       105

RULINGS

Motion to Compromise Controversy with Official Committee       8
of Unsecured Creditors filed by Debtor Highland Capital
Management, L.P. (carryover issues) (281) - *Revised
Operating Protocols to be Submitted*

Lynn Pinker Retention Application - *Withdrawn*                8

Foreign Representative Motion - *Order Signed*               10

Motion to Extend Exclusivity Period filed by Debtor          11
Highland Capital Management, L.P. (395)- *Order Signed*

Debtor's Motion for an Order (i) Establishing Bar Dates      13
for Filing Claims, Including 503(b)(9) Claims; and (ii)
Approving the Form and Manner of Notice Thereof (421) -
*Agreed Order to be Uploaded*

**Appx. 03215**

188

```
 1                              INDEX
                              Page 2
 2
     RULINGS, cont'd.
 3
     Motion for Relief from Stay by Creditor PensionDanmark      14
 4   (218) - Continued to March 11, 2020

 5   Status Conference Re: Motion of the Debtor for the Entry    28
     of an Order Concerning the "Sealing Motion" and for a
 6   Conference Concerning the Substance, Scope, and Intent
     of Certain Recent Rulings (397)
 7
     Motion to Employ/Retain Foley Gardere, Foley & Lardner     176
 8   LLP as Special Texas Counsel filed by Highland Capital
     Management, L.P. (68)
 9
     END OF PROCEEDINGS                                         186
10
     INDEX                                                  187-188
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```