# EXHIBIT 25

**Appx. 03217**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

IN RE:                    .    Case No. 19-34054-11(SGJ)
                          .
HIGHLAND CAPITAL          .    Earle Cabell Federal Building
MANAGEMENT, L.P.,         .    1100 Commerce Street
                          .    Dallas, TX  75242-1496
                          .
          Debtor.         .    March 4, 2020
. . . . . . . . . . . . . ..    1:31 p.m.


 TRANSCRIPT OF HEARING ON MOTION OF THE DEBTOR FOR ENTRY OF AN
  ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
         DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"
          BEFORE HONORABLE STACEY G. JERNIGAN
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Highland Capital      Pachulski Stang Ziehl & Jones, LLP
Management:               By:  JEFF POMERANTZ, ESQ.
                               GREG DEMO, ESQ.
                          10100 Santa Monica Blvd., 13th Floor
                          Los Angeles, CA 90067


                          Hayward & Associates PLLC
                          By:  MELISSA HAYWARD, ESQ.
                               ZACHARY ANNABLE, ESQ.
                          10501 N. Central Expry, Ste. 106
                          Dallas, TX 75231




Audio Operator:           Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
             produced by a transcript service.

_____

                    J&J COURT TRANSCRIBERS, INC.
                        268 Evergreen Avenue
                     Hamilton, New Jersey 08619
                     E-mail:  jjcourt@jjcourt.com

            (609) 586-2311   Fax No. (609) 587-3599

Appx. 03218

2

```
APPEARANCES (Cont'd):

For Acis Capital            Winstead, P.C.
Capital Management:         By:  RAKHEE V. PATEL, ESQ.
                            2728 N. Harwood Street, Suite 500
                            Dallas, TX  75201

                            Rogge Dunn Group, PC
                            By:  BRIAN SHAW, ESQ.
                            500 N. Akard St., Suite 1900
                            Dallas, TX 75201

For Official Committee      Sidley Austin LLP
of Unsecured Creditors:     By:  MATT CLEMENTE, ESQ.
                                 DENNIS TWOMEY, ESQ.
                            One South Dearborn
                            Chicago, IL 60603

                            Sidley Austin LLP
                            By:  PENNY REID, ESQ.
                            2021 McKinney Avenue, Suite 2000
                            Dallas, TX 75201

For CalPERS:                Singer & Levick, P.C.
                            By:  MICHELLE SHRIRO, ESQ.
                            16200 Addison Road, Suite 140
                            Addison, TX 75001

For James Dondero:          Lynn, Pinker, Cox & Hurst, LLP
                            By:  MICHAEL LYNN, ESQ.
                                 JOHN BOND, ESQ.
                            2100 Ross Avenue, Suite 2700
                            Dallas, Texas 75201

For Redeemer Committee:     Frost Brown Todd LLC
                            By:  MARK PLATT, ESQ.
                            100 Crescent Court, Suite 350
                            Dallas, TX 75201

For Issuers Group:          Jones Walker LLP
                            By:  AMY ANDERSON, ESQ.
                            811 Main Street, Suite 2900
                            Houston, TX 77002
```

**WWW.JJCOURT.COM**

3

APPEARANCES (Cont'd):

TELEPHONIC APPEARANCES:

For CalPERS:              Nixon Peabody, P.C.
                          By:  LOUIS CISZ, ESQ.
                          One Embarcadero Center, 32nd Floor
                          San Francisco, CA 94111

                              - - -

Appx. 03220

4

**INDEX**

| WITNESSES | PAGE |
|---|---|

**JAMES P. SEERY, JR.**
| | |
|---|---|
| Direct Examination by Ms. Hayward | 60 |
| Cross-examination by Ms. Reid | 84 |
| Cross-examination by Ms. Patel | 97 |
| Examination by the Court | 103 |
| | |
| Closing argument by Mr. Pomerantz | 110 |
| Closing argument by Mr. Clemente | 113 |

| EXHIBITS | ID | EVID |
|---|---|---|

**FOR THE DEBTOR:**

| | | | |
|---|---|---|---|
| 1 | Chart of Dynamic Income Fund structure | | 83 |
| 2 | Partnership agreement for Dynamic Income Fund | | 83 |
| 3 | Chart of Latin America Argentina Fund | | 83 |
| 4 | Partnership agreement for Argentina Fund | | 83 |
| 5 | Chart Fund | | 83 |
| 6 | Limited partnership agreement | | 83 |
| 7 | Order re ordinary course governance procedures | | 83 |
| 8 | Final term sheet | | 83 |
| 9 | Notice of amended operating protocols | | 83 |
| | CVs of Board members | | 83 |

5

1          THE COURT:  -- set a motion of the debtor for entry

2  of an order authorizing but not directing the debtor to cause

3  distributions to certain related entities.

4          Let's get lawyer appearances in the courtroom.

5          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6  Pomerantz and Greg Demo, Pachulski Stang Ziehl & Jones, on

7  behalf of the debtors.

8          THE COURT:  Thank you.

9          MS. HAYWARD:  Good afternoon, Your Honor.  Melissa

10  Hayward and Zachary Annable of Hayward & Associates on behalf

11  of the debtor.

12          THE COURT:  Thank you.

13          MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

14  Clemente, Dennis Twomey, and Penny Reid from Sidley Austin on

15  behalf of the Official Committee of Unsecured Creditors.

16          THE COURT:  Thank you.

17          MS. SHRIRO:  Good afternoon, Your Honor.  Michelle

18  Shriro on behalf of CalPERS.  And I also have my co-counsel

19  Louis Cisz from Nixon Peabody, and he is -- he should be on the

20  line.

21          THE COURT:  Okay.  Thank you.

22          MR. LYNN:  Good afternoon, Your Honor.  Michel Lynn

23  and John Bonds for James Dundero.

24          THE COURT:  Okay.  Thank you.

25          MS. PATEL:  Good afternoon, Your Honor.  Rakhee

6

1 Patel, Winstead PC, on behalf of Acis Capital Management, LP,

2 and Acis Capital Management, GP, LLC.  Also, I have my co-

3 counsel Mr. Brian Shaw of the Rogge Dunn Firm on behalf of the

4 same clients.

5        THE COURT:  Thank you.

6        MR. PLATT:  Good afternoon, Your Honor.  Mark Platt

7 firm Frost Brown Todd on behalf of the Redeemer Committee of

8 the Highland Crusader Fund.  And I believe Terry Mascherin is

9 on the phone, as well --

10        THE COURT:  All right.

11        MR. PLATT:  -- from Jenner & Block.

12        THE COURT:  Thank you.

13        MS. ANDERSON:  Good afternoon, Your Honor.  Amy

14 Anderson with Jones Walker on behalf of the Issuers.  I believe

15 Mr. James Bentley with Schulte Roth is also on the phone on

16 behalf of the same parties.

17        THE COURT:  Okay.  Thank you.

18        All right.  We do have a large number of people on

19 the phone.  I'm just going to go through the live lines and

20 take roll.  Asif Attarwalla for UBS, are you there?

21        MR. ATTARWALLA:  Here.  Yes, Your Honor.

22        THE COURT:  All right.  James Bentley?

23        MR. BENTLEY:  Yes, Your Honor.  I'm here.

24        THE COURT:  Okay.  Also Jeff Bjork from Latham?

25 Yes/no?

7

1                         (No response)

2              THE COURT:  All right.  Earnestiena Cheng for FTI?

3              MS. CHENG:  Yes, Your Honor.

4              THE COURT:  Okay, thank you.  And Louis Cisz, I think

5    we heard he was CalPERS co-counsel.  Are you there?

6              MR. CISZ:  Yes, I am, Your Honor.

7              THE COURT:  All right.  Thank you.  Kimberly Gianis

8    for Contrarian?  Yes/no?

9                         (No response)

10             THE COURT:  All right.  Terry Mascherin, I think we

11   heard he was there for the Redeemer Committee.

12             MR. MASCHERIN:  Yes, Your Honor.

13             THE COURT:  Okay.  I'll just ask anyone else on the

14   phone who wishes to appear, go ahead at this time.

15                        (No response)

16             THE COURT:  All right.  That may be it.

17             All right.  Mr. Pomerantz, I see a 20-minute time

18   estimate on our calendar.  I'm not sure where that came from,

19   but that --

20             MR. POMERANTZ:  I think that's quite aggressive.

21             THE COURT:  Okay.

22             MR. POMERANTZ:  Good afternoon again, Your Honor.

23   Jeff Pomerantz, Pachulski Stang Ziehl & Jones.  First, I want

24   to thank Your Honor for scheduling the hearing on shortened

25   time.  I would also like to introduce once again the three

8

1  members of the independent board who have been appointed

2  pursuant to the settlement, Your Honor, that Your Honor

3  approved on January 9th.  That's James Seery, John Dubel, and

4  Russell Nelms.

5           THE COURT:  Okay.  Hello.

6           MR. POMERANTZ:  I thought it might be helpful, Your

7  Honor, to provide Your Honor with a brief background of each

8  board member, how they have been approaching their duties as

9  independent directors, and what the focus has been the first

10 two months of the case.  And then I will go into the background

11 of this present motion.

12          THE COURT:  Okay.

13          MR. POMERANTZ:  James Seery will be the debtor's

14 witness at today's hearing, and he's a 30-year restructuring

15 lawyer with extensive experience with high-yield and distressed

16 investing both as a principal and manager which is precisely

17 the business in which the debtors operate.  He is an attorney

18 licensed to practice in New York who has passed and held the

19 Series 7, 63, 79, SIE and Series 24 FINRA principal

20 designations.

21          From April 2012 to 2017, he was the president and

22 senior investing manager of RiverBirch Capital.  And RiverBirch

23 is an SEC-registered investment advisor managing a $1.3 billion

24 global long short fund that focused on high yield loans, bonds,

25 CLOs, and distressed investments.  Prior to that, Mr. Seery

**WWW.JJCOURT.COM**

9

1  spent ten years as a senior high yield manager at Lehman

2  Brothers, and he was the global head of Lehman Brothers fixed-

3  income loan business.

4        Accordingly, Mr. Seery brings to his role as an

5  independent director a unique combination of a legal

6  background, restructuring experience, and a deep knowledge of

7  the highly regulated business in which the debtor operates.

8        Mr. Dubel brings 35 years' practice in the

9  restructuring area.  His experience includes turnaround

10 management, crisis management, operational restructurings, and

11 corporate acquisitions and divestitures.  He's worked at both

12 sides of the table, both on the company side and other side.

13 And he brings a unique perspective to each situation, and he

14 spent the last ten years being an independent director for a

15 wide range of distressed companies including Purdue Pharma

16 which obviously is the newest in current Chapter 11, WMC

17 Mortgage, Wartaco (phonetic), FXI, and ResCap.

18       And as an independent board member, he's plated a

19 principle role in overseeing management, negotiating with

20 creditors, supervising and investigating resolution, either

21 consensually or through litigation of insider and affiliate

22 claims, and also spearheading reorganization efforts.

23       I'm sure Your Honor is familiar with Russell Nelms

24 but briefly he was a distinguished bankruptcy litigator with

25 Carrington Coleman for 20 years which followed a stint of six

10

1 years as a United States Army judge advocate, and also he sat

2 with the bankruptcy court here in Fort Worth from 2004 to 2018.

3         Your Honor, these individuals bring a complementary

4 skill set to the independent board that have made them uniquely

5 qualified to manage the debtor's restructuring efforts in this

6 case, that bring a combination of sophisticated asset

7 management experience, financial restructuring, a legal

8 insolvency background, and judicial experience.  They've been

9 involved in many cases on all sides of the aisle, whether it's

10 been alleged wrongdoing or questionable conduct with people

11 they've ever had to supervise as a board member, advise as a

12 restructuring lawyer, work with as a financial advisor, or

13 administer their cases as a judge.

14         Mr. Seery and Dubel were selected by the Committee

15 not only because of their relevant expertise but because of

16 their commitment to independence and ability to stand up to

17 strong personalities that exist on all sides of this case.  Mr.

18 Nelms, while originally identified by the debtor, was scheduled

19 by the Committee, and was ultimately chosen to be the third

20 board member by Mr. Seery and Dubel from a group of highly-

21 qualified candidates.

22         Your Honor, I provide this background to stress that

23 the independent board consists of individuals whose background

24 and experience speak to their independence, experience, and

25 strength, and who take their job seriously to do what they

**Appx. 03227**

11

1 believe is right for this debtor, and they're not bring

2 influenced by any party in this case, be that the debtor, Jim

3 Dondero, members of the management committee, members of the

4 debtor's management, or the creditors' committee.  The

5 reputations of each of these gentlemen at are stake in a case

6 like this, and they take their attendance very seriously.

7        Upon taking over on January 9th, 2020, the board

8 quickly made a few observations about the current circumstances

9 that have guided their actions today.  First, the board

10 understood that the debtor was where it was in part due to many

11 years of intense litigation arising out of sometimes aggressive

12 management decisions or failure to settle certain employee

13 disputes and that the litigation led to cost and diversion of

14 time and energy for what the debtor did best which was manage

15 assets.

16        The board concluded that for case to succeed, the

17 board would have to chance the culture from one of litigation

18 to reconciliation and consensus building.  It doesn't mean that

19 the debtor will back down from defending itself from claims

20 that it doesn't believe are legitimate but rather the

21 litigation that the company under their watch would be involved

22 in would need to be carefully vetted by the independent board,

23 outside advisors, and the results of which would guide the

24 board's conduct.

25        The board's focus has and continues to be operating

12

1 the debtor's business in accordance with its obligations of

2 their debtor in possession in conformance with its statutory,

3 contractual, and fiduciary obligations as an investment

4 advisor.  By scrupulously meeting its obligations as an

5 investment advisor, the debtor will continue to enhance the

6 asset management business and avoid the litigation that

7 contributed to this case.

8          Second, the board understood the relationship between

9 the debtor's largest creditors and senior management had

10 materially deteriorated and that there was severe lack of trust

11 that creditors had with respect to management.  The board

12 initially determined, has determined to continue retaining the

13 services of senior management because it believes that their

14 historical background and deep knowledge of the debtor's assets

15 provide material value to the estate.  However, the board's

16 decisions thus far have and will continue to be based upon

17 their independent review of the facts and circumstances and

18 based upon consultation with outside advisors as appropriate.

19          Third, the board believe that a lengthy stay in

20 Chapter 11 only would serve to erode asset value while at the

21 same time leading to extensive restructuring costs.  The Court

22 and the board developed a timeline that will hopefully lead to

23 a confirmed plan at the end of the year.

24          Against this backdrop, the board is focused on the

25 following things the first two months of the case.  Initially,

**WWW.JJCOURT.COM**

**Appx. 03229**

13

1  the board met with all department heads and other members of

2  senior management including Mr. Dondero and let them know that

3  the board was now in charge and that all business decisions

4  needed to be run by the board subject to the board delegating

5  authority as it deemed appropriate.

6       The board has had several calls with the committee

7  and its professionals to discuss among other things the board's

8  initial determination as to staffing levels and employee

9  compensation, time-sensitive transactions that needed the

10 committee's input under the Court's approved operating

11 protocols, and the proposed timeline for achieving

12 restructuring.  There is an in-person meeting scheduled next

13 week in New York City between all the committee members and

14 their professionals and the debtor and their professionals.

15      Members of the board have also reached out to

16 individual committee members and have had or will have meetings

17 with them to understand their specific concerns with the debtor

18 and to importantly have a dialogue about the claims they have

19 against the debtor, as resolving the claims against the debtor

20 is a key part of achieving a consensual restructuring in this

21 case.

22      The debtor's asset basis is also extremely complex,

23 and the board has worked hard to get a grasp on how best to

24 maximize their value.  The board has analyzed the debtor's

25 liquidity needs and worked with the debtor's chief

14

1  restructuring officer to develop a 13-week cash flow and

2  otherwise address how to enhance liquidity.  The board has also

3  conducted a thorough review of the debtor's employee basis,

4  including performance reviews and address ongoing staffing and

5  compensation in a manner that the board believes will sustain

6  the debtor's business operations and maximize value.

7       Related to the motion before the Court, the board has

8  evaluated the status of certain funds which were in the process

9  of being wound down at the commencement of the case and has

10  supervised their wind-down in a manner consistent with the

11  debtors' fiduciary, statutory, contractual liabilities.  The

12  board has also commissioned outside counsel to provide an

13  independent analysis of the significant litigation claims that

14  are facing the debtor.  And as I mentioned, the board

15  anticipates engaging with these creditors to seek a resolution.

16       The board is acutely aware that resolving

17  consensually claims of creditors and claims the estate has

18  against third parties is the only way to restructure this

19  debtor efficiently and economically.  I'll now turn Your Honor

20  to the background with respect to the motion, explain the

21  relief requested, and address the two objections that are

22  before the Court.

23       Your Honor will hear testimony from Mr. Seery that

24  the debtor is the asset manager of two hedge funds, Dynamic and

25  ARF, that are in liquidation because of redemption requests

**WWW.JJCOURT.COM**

15

1 from large non-affiliated investors that render the funds

2 economically not viable.  The term of the third fund, which is

3 a private equity fund, Restoration Capital expired, and the

4 governing board comprised of large institutional pension funds

5 has refused to grant further extensions.

6 Mr. Seery will testify that while these wind-downs

7 were already in process and fully disclosed to the Court prior

8 to the installation of the independent board, the board

9 evaluated the decision to wind down the funds independently of

10 the debtor's decision and decided that the prudent exercise of

11 the debtor's business judgment was to continue with the wind-

12 down.  Neither the committee nor Acis challenge the board's

13 selection to continue with the wind-down.

14 You will hear testimony from Mr. Seery that a

15 priority of the independent board was to make sure that the

16 debtor operated in accordance with applicable law to ensure

17 that the debtor fills its obligations to investors and doesn't

18 act or fail to act in a manner which could expose the debtor to

19 liability.  After all, as I mentioned, Your Honor, a material

20 reason why the debtor is before the Court is because of

21 litigation claims that have plagued it over the last several

22 years.

23 Mr. Seery will testify that in evaluating the

24 debtor's duties and obligations as an asset manager of these

25 three funds, the board consulted with bankruptcy counsel with

Appx. 03232

16

1  respect to the applicability of the operated protocols and

2  domestic and Cayman counsel specializing in advising funds with

3  respect to their obligations under the transactional documents,

4  the Advisors Act, and general fiduciary duty obligations.

5       Tim Silva, a partner of WilmerHale, the debtor's

6  outside firm that provides fund advice, is present in the

7  courtroom and will be available to answer any questions the

8  Court or the parties have.  Dennis Olarou, a partner with Carey

9  Olsen, is on the phone.  He is the debtor's Cayman counsel and

10 also available.

11      Importantly, Mr. Seery will testify that the

12 independent board made the decisions that led to the filing of

13 this motion based upon their own expertise and the advise of

14 outside counsel and did not rely on the advice of the debtor's

15 employees or any of the related parties.

16      He will further testify that based upon the input of

17 outside counsel, the independent board concluded, one, that the

18 operating documents governing the funds did not permit the

19 debtor to unilaterally withhold distributions from some

20 investors and not others; that, two, the debtor risked

21 breaching its fiduciary duty to investors under principles of

22 common law if it withheld distributions on its own; and that,

23 three, the debtor risked liability under the Advisors Act if it

24 essentially attempted to use its position as an investment

25 manager to gain leverage against investors in connection with

Appx. 03233

17

1  an unrelated matter, to wit, potential claims that the estate

2  may have.

3          The motion describes in detail the nature and extent

4  of the debtor's obligations, and I think the substance of that

5  is not challenged by either the Committee or Acis.  I didn't

6  read their objections to challenge that the debtor has these

7  obligations and seeks to fulfill them.

8          Based upon the foregoing and to make sure that the

9  debtor didn't expose itself to liability, Mr. Seery will

10 testify that the board decided that it was obligated to

11 exercise its authority as asset manager to distribute the funds

12 to all investors.  After consultation with the bankruptcy

13 counsel, Mr. Seery will testify that the independent board

14 decided to provide the Committee with notice prior to making

15 such distributions as were required by the operating protocols

16 approved as part of the settlement.

17         The Committee objected to the distributions which led

18 to the filing of this motion.  The objections relate to

19 distributions to be made as follows.  Mr. Seery will testify

20 that Dynamic proposes to distribute $35 million of investor

21 funds that are held by Dynamic of which CLO Holdco stands to

22 receive $872,000 and Mr. Okada stands to receive $4,176,000.

23         With respect to ARF, Mr. Seery will testify that they

24 propose to distribute $22 million of investor funds held by

25 ARF.  HoldCo stands to receive $1.5 million.  And with respect

18

1  to Restoration Capital Partners, it proposes to distribute

2  $123,250,000 of which 2.1 million will be received by ACM

3  Services and, importantly, the debtor will receive 18 and a

4  half million dollars, the balance of approximately 121 million

5  would be distributed to non -- or 103 million would be

6  distributed to non-related parties, including CalPERS which

7  filed the statement with the Court.

8           The Committee and Acis argue that the Court should

9  prohibit the debtor from making distributions to related

10  parties, notwithstanding the debtor has contractual, fiduciary,

11  statutory obligations to do so as an asset manager.  It is

12  important for the Court to understand that the money to be paid

13  to these related parties is not the debtor's money, it's not

14  property of the estate.  It's actually funds that are the

15  investors' funds that were invested in these various funds.

16           Essentially, the Committee argues and Acis argues

17  that because the debtor may assert claims against some of all

18  of these related parties at some time in the future, the Court

19  should prohibit the debtor from authorizing the distribution of

20  non-debtor estate funds.  Essentially as we said in our papers,

21  the objectors are asking this Court to issue a pre-judgment

22  write of attachment adjoining these distributions without the

23  filing of any complaint which would assert causes of action,

24  without the need to satisfy applicable standards for a pre-

25  judgment writ either under Federal Rule of Civil Procedure 64

**WWW.JJCOURT.COM**

19

1  estate law, and without appropriate notice to the parties and

2  an opportunity to object.

3          The objectors want to use the debtor's position as an

4  asset manager to stop distribution of funds in which the debtor

5  has no interest to gain a potential litigation advantage

6  against these related parties.  The debtor just submits that is

7  not appropriate.  The Committee and Acis spent a lot of time in

8  their papers talking about the allegations and in some estate

9  case findings against the debtor's prior management relating to

10  the operation of the debtor's business, some of which have

11  matured into claims against the estate.

12          However, the fact that the debtor's actions taken by

13  prior management led to claims against the debtor is not

14  legally relevant as to whether the debtor should be permitted

15  to make these distributions of non-estate funds.  Allegations

16  of prior wrongdoing would not be sufficient in the context of a

17  pre-judgment attachment, and it should not form the basis for

18  essentially the injunctive relief the Committee and Acis urge

19  to the Court.

20          The Committee also argues that because the

21  Committee's currently investigating claims against the released

22  parties and other insiders that the distribution should be held

23  up essentially indefinitely until the Committee completes its

24  investigation.  Whether or not the estate has claims against

25  the related parties and insiders is unknown at this point

20

1  except for the notes which I will address in a moment.

2          Also, whether or not there are claims and how the

3  related parties acquired their investment in the funds is also

4  unknown at this time.  Since January 9th, the Committee has had

5  standing to investigate and prosecute these claims and the

6  debtor is cooperating with the Committee in its investigation.

7  If legitimate claims exist, they should most certainly be

8  prosecuted, and the independent board will cooperate with the

9  Committee in its efforts.

10         However, at this point other than with respect to the

11 notes, there is no admissible evidence that any claims exist,

12 and no claims have been clearly articulated other than some

13 vague allegations of fraudulent conveyance, breach of fiduciary

14 duty, the garden variety of claims you would expect to be

15 asserted in a case like this.  Again, no bankruptcy court, no

16 non-bankruptcy court would be authorized to enjoin payments on

17 the basis of these vague and unasserted claims, and the Court

18 shouldn't accept the invitation to do so wither.

19         The Committee also points to certain demand notes

20 executed by Jim Dondero, Mark Okada, and ACM Services in favor

21 of the debtor as a basis for withholding the distributions.

22 The debtor has made a demand on Mr. Okada to pay back the note,

23 and he has asserted that he may have potential offsets and the

24 nature of potential service obligations and expense

25 reimbursements allegedly owed to.  At some point in time, we

**WWW.JJCOURT.COM**

21

1 suspect those issues will be resolved either consensually or

2 there will be litigation to recover the demand.

3          ACM Services which is owned 75 percent by Mr. Dondero

4 and 25 percent by Mr. Okada, executed several notes in favor of

5 the debtor of which 850,000 are demand notes. The total amount

6 is approximately seven and a half million. The remaining notes

7 are current and have been paid down over the years.

8          The debtor has not made demand on ACM Services for

9 payment of the notes, nor have they made demand on Mr. Dondero

10 for payment of the notes he issued in favor of the debtor.  Mr.

11 Seery will testify that the reason for that is that, as I

12 indicated before, the board recognizes that in order for there

13 to be a consensual restructuring in this case, it's going to

14 involve not only resolution with the creditors and their claims

15 but also resolution with Mr. Dondero or potential claims the

16 estate has.

17          The independent board at this early stage in the case

18 does not believe that commencement of an adversary proceeding

19 against Mr. Dondero at this time is in their best interest.  If

20 this case turns into a litigation case, and as Your Honor

21 experienced previously, then such litigation will be commenced.

22 However, until the board has the opportunity to try to forge a

23 consensual resolution, aggressive action is premature.   The

24 last thing, Your Honor, CLO Holdco is not a party to any demand

25 notes.

22

1          THE COURT:  Let me stop you.

2          MR. POMERANTZ:  Sure.

3          THE COURT:  You mentioned dollars on the notes.  The

4   note receivable from Okada I think is 1.3 million.

5          MR. POMERANTZ:  With credentials, yes.

6          THE COURT:  And then you mentioned roughly seven and

7   a half million of notes receivable from HCM Services.

8          MR. POMERANTZ:  Of which 950 are demand notes.  The

9   rest are currently before me in accordance with the terms.

10          THE COURT:  Okay.  You didn't mention a dollar amount

11   on the note receivable from Dondero.  My notes show 9.3

12   million.

13          MR. POMERANTZ:  Yeah, and so I think that's around

14   that --

15          THE COURT:  Is that a demand note or notes?

16          MR. POMERANTZ:  That is a demand note and then the

17   related party notes, yes --

18          THE COURT:  Okay.

19          MR. POMERANTZ:  -- Your Honor.  And, again, we're now

20   the board knows, fully aware.  The board could have commenced a

21   lawsuit.  Honestly, Your Honor, the Committee could have

22   commenced a lawsuit in the last two months.  I suspect the

23   Committee also would like to see a consensual restructuring.

24          And I think parties are taking the view of, again,

25   this can be a litigation case which would be like a lot of

23

1  money for all the professionals, not really do all that well

2  for the creditors.  Or the parties could cooperatively work

3  towards a restructuring to see based upon the leverage, based

4  upon the claims everyone has that it makes more sense.  And the

5  board's determination, again, made on its own coming into this

6  case in the last two months is that proceeding aggressively now

7  just does not make sense.

8         Even though it has not commenced any litigation

9  against the related parties nor presented any evidence of any

10 claims against the related parties, the Committee asks this

11 Court to use its equitable powers under Section 105 to enjoin

12 the distribution again of non-estate funds to the related

13 parties.  Your Honor, bankruptcy court -- bankruptcy

14 practitioners in certain cases love to use 105, assert 105.  My

15 experience has been when you assert 105 and that's all you

16 assert 105, it really means you don't have much authority and I

17 think that's the case here.

18        The courts have held that 105 is not -- grant the

19 court authority to be a roving commission to do equity because

20 it has to be tethered to something in the Bankruptcy Code.

21 Here the proper way for the Committee to obtain the relief they

22 sought was to file a complaint and seek pre-judgment remedy,

23 either an attachment under Rule 64 or an attachment under

24 applicable provisions of Texas law or other applicable law, or

25 an injunction under FRCP 65.

24

1    The debtor would not stand in the way if the

2  Committee decided to do that.  That's what the debtor bargained

3  for.  They gave the Committee the authority to do that.  The

4  Committee has not yet done that.  And the Court should just not

5  allow the debtor -- the Committee to use the debtor's position

6  as fiduciary to its investors as leverage.  That's what's

7  really happening.  The only reason we're here is because the

8  debtor is the asset manager of these other funds, and the

9  Committee and Acis want the debtor to use that leverage and

10 somehow to gain an advantage.

11    Your Honor, we would submit that the fiduciary duty

12 of the estate is to act in accordance with its obligations, and

13 that's the primary fiduciary duty and that the creditors are

14 best served if the company complies with its obligations and

15 doesn't expose the estate to any liability.

16    Lastly, Your Honor, I want to address the Committee

17 and Acis's allegations regarding the circumstances surrounding

18 the sale of the MGM shares, the proceeds of which the debtors

19 intend to use to distribute as part of the RCP fund.  Whether

20 or not Mr. Dondero's authorized to make that trade, it's really

21 irrelevant to the issues before the Court.  The independent

22 board first learned about the trade only a few weeks ago, and

23 the independent board -- and, again, this happened back in

24 November, two months before the independent board took over.

25 They promptly investigated the circumstances around the trade,

25

1  engaged counsel to advise whether it was binding and,

2  importantly, evaluated whether the trade was a sound exercise

3  in the debtor's business judgment at that time.

4          The board concluded that the trade was binding and

5  that it in fact was a good trade as of November 2019 and

6  disclosed that information to the Committee and engaged the

7  Committee in a dialogue to discuss the options that the debtor

8  had with respect to that trade.  The Committee, while I

9  understand was not unanimous, ultimately agreed with the

10 independent board that it was in the debtor's best interest to

11 consummate that trade.  While we understand that the Committee

12 and Acis may want to investigate the circumstances surrounding

13 that trade to determine whether the estate has any colorable

14 claims that could be asserted, that doesn't provide a basis for

15 enjoying the distribution of the funds.

16         Moreover, the allegation in Acis papers that Mr.

17 Dondero used his position on the board of MGM to facilitate the

18 trade so that ACM Services could receive $2.1 million of 123

19 and $250,000 sale, it just lacks and factual support.  And, in

20 fact, Mr. Dondero has steadfastly encouraged the investment

21 board not to sell the MGM shares because he believes they will

22 continue to appreciate and the estate and its creditors would

23 be benefitted thereby.

24         The reason that the RCP shares were sold is as I

25 mentioned before, the RCP, the term of that private equity fund

26

1  expired.  No more extensions were given, and the debtor as a

2  fiduciary and as an asset manager needed to liquidate the

3  assets in that estate which included the shares.  But, again,

4  if there are claims surrounding how that happened, we

5  understand there's concern that the creditors have about the

6  circumstances, they can investigate them and the independent

7  board will surely cooperate with such investigation.

8          In conclusion, Your Honor, this independent board was

9  installed because of its independence and sophistication in

10 managing a business as complex as the debtor's.  As you will

11 hear in the testimony, the independent board has been

12 thoughtful and thorough in its approach to the issues raised by

13 this motion and is trying to manage the debtor in a responsible

14 way to maximize value and prevent the estate from incurring any

15 liability.  The independent board understands and shares the

16 Committee's and Acis's decision to hold other parties

17 accountable for any liability they have against the debtor

18 arising out of conduct that occurred pre- or post-bankruptcy.

19 But trying to use the debtor's role as an independent asset

20 manager and fiduciary duty to investors is inappropriate and

21 create risks for the estate.

22          For these reasons, Your Honor, the debtor

23 respectfully requests that the Court approve the motion and

24 overrule the objections.

25          THE COURT:  All right, thank you.  Other opening

**WWW.JJCOURT.COM**

27

1  statements, Mr. Clemente?

2          MR. CLEMENTE:  Yes, Your Honor.  You actually touched

3  on a question that I had.  I assume I have more fulsome

4  comments that I had anticipated making after testimony, but so

5  I would reserve the opportunity to do that.  It was quite a

6  lengthy opening there, so I didn't know whether there was going

7  to be the opportunity for that after testimony, but --

8          THE COURT:  Certainly.

9          MR. CLEMENTE:  -- I certainly want to reserve that.

10  Thank you, Your Honor.

11          So I do have some opening remarks prepared, but I'm

12  going to react a little bit to what I just heard.  I and the

13  Committee do not dispute the credentials of the board.  We

14  obviously were involved in choosing them.  I heard a lot about

15  the duty to, quote/unquote, investors.  I don't think I heard a

16  word about the duty to the creditors and to the estate.  And I

17  think it's important when thinking about the investors that Mr.

18  Pomerantz keeps referring to, the Committee is not talking

19  about the legitimate third party investors, the CalPERS.  The

20  Committee is talking about the very people that were in charge

21  of this debtor while breaches of fiduciary duty were rampant

22  and their related entities that resulted in the filing of this

23  bankruptcy case.

24          And I find it a little bit rich, Your Honor, that

25  their debtor is using the duty to investors to include third

28

1  parties to try and come in here and passionately argue that

2  distribution should be made at this time to these insider

3  parties without a word at all about why it may actually be in

4  the creditors' best interest or this estate's best interest to

5  not make those distributions at this time.  So those were a

6  couple of comments that struck me as I was listening to what

7  Mr. Pomerantz said.

8         But let me be clear, Your Honor, as Your Honor is

9  aware the debtor is in bankruptcy because of the documented and

10  egregious breaches of fiduciary duties and contractual

11  obligations to its creditors and its propensity for fraudulent

12  and litigious conduct as documented.  Mr. Dondero and until

13  recently Mr. Okada dominated all aspects of the debtor and

14  controlled all of its decision-making, including the decision-

15  making that led various tribunals, including this Court, to

16  conclude that the debtor had breached its fiduciary duty,

17  engaged in fraudulent conduct, and employed persons who are not

18  credible and not truthful.

19         Against this backdrop, Your Honor, the debtor wants

20  to make distributions to investors, again, the investors we're

21  talking about here are Mr. Okada, and entities owned and/or

22  controlled by Mr. Dondero and Mr. Okada without regard

23  apparently because I didn't hear anything about that to the

24  interest of creditors under the rubric of a fiduciary duty that

25  is supposedly owed to those insider parties, the same insider

29

1  parties, Your Honor, who were found to have breached the duties

2  to the creditors of this estate or to the investors which then

3  resulted in them becoming creditors of this estate and led to

4  the bankruptcy.

5       Your Honor, I think the irony is fairly thick, and I

6  don't think the Court should allow the distributions at this

7  time.  These insider parties, and I'm glad Mr. Pomerantz

8  mentioned it to you because their papers did not mention the

9  notes that were owed, they owe the debtor millions of dollars.

10 The numbers that Your Honor read are just the direct notes

11 among those parties.  They do not include the notes that are

12 owed by, for example, affiliated entities of Mr. Dondero.  So

13 those numbers are even larger than what Mr. Pomerantz suggested

14 to Your Honor.

15      Second, as the debtors do finally disclose in their

16 papers, the insider parties receive certain of the insider

17 interests from the debtor pursuant to transactions that were

18 only recently disclosed to the Committee and not have been

19 examined by the Committee.  So in many of the circumstances,

20 the very interests that are giving rise to the basis for these

21 distributions once belonged to the debtor.

22      Third, obviously, the insider parties are the focus

23 of the Committee's ongoing investigation of the estate causes

24 of action, and that's entirely appropriate given the long

25 history and the findings made by this Court and others

30

1  regarding the behavior of this debtor prior to the bankruptcy.

2      Your Honor, instead of allowing the distributions to

3  be made, the Court should direct that the distributions that

4  the debtor seeks to make to the insider parties to be placed

5  into a segregated interest-bearing account pending the

6  resolution of potential claims against the insider parties

7  including the collection of notes owed by the insider parties

8  and the investigation into the validity of the insider

9  interests.

10     If the insider parties have an issue with this,

11 obviously, they can come before Your Honor, perhaps they'll

12 come before Your Honor today, and explain to you why what is

13 being proposed is unfair to them or why despite the

14 circumstances surrounding this case, the rampant breaches of

15 fiduciary duty, the questionable transactions, and the

16 existence of the notes they owe the debtor they should receive

17 those distributions now.  And we can do that after a fulsome

18 discovery of those parties, a fulsome record, full opportunity

19 to brief.

20     I believe, the Committee believes this is a very

21 sensible proposal, and it would seem to serve all interests.

22 The interests of the estate would be protected.  Let's talk

23 about those.  Obviously, we're more likely to recover on the

24 notes and any potential claims, including claims that the

25 insider interests were inappropriately obtained.

**WWW.JJCOURT.COM**

31

1           Mr. Pomerantz referred to the word "leverage."

2 Again, it's the estate, the estate should be thinking about how

3 it can actually collect on its claims and notes.  So the word

4 "leverage" I don't think is appropriate here.  It just seems

5 sensible.  The interest of the insider parties would also be

6 protected.  The money will be placed in a segregated account,

7 and the status quo would be preserved.  And legitimate third

8 party investors, we are all fully in support of the legitimate

9 third party investors receiving their distributions.  We've

10 never had an issue with that, Your Honor.

11          Mr. Pomerantz referred to the authority, Section 105.

12 I do believe the Court has ample authority under Section 105 of

13 the Bankruptcy Code to order the relief requested by the

14 Committee.  Obviously, Section 105 is broad and, as we'll

15 discuss further later, it's been interpreted by this Court and

16 other courts to apply very broadly and in circumstances similar

17 to this.

18          Additionally, Your Honor, although I do not believe

19 105 needs to be tethered, I believe is the word that was used,

20 to other sections of the Code.  I do believe that other

21 sections of the Code are implicated as the relief the Committee

22 requests impacts property of the estate which includes the

23 notes and potential claims against the insider parties as well

24 as the rights and obligations of the debtor under the various

25 contracts that Mr. Pomerantz referred to.

32

1          So, we have 105.  If we need to tether it to

2  something, we can tether it to 541 and we can tether it to 363.

3  What we're asking the Court to do impacts property of the

4  estate, impacts the rights and obligations of the debtor.

5          Finally, Your Honor, there was a long discussion or

6  somewhat of a discussion about the fact that the Committee has

7  not sought a preliminary injunction or has not filed claims

8  against the insider parties.  First, again, I believe Section

9  105 gives the Court the authority that it needs to provide the

10  relief.  Second, the Court has the flexibility should it choose

11  to construe or find it necessary to construe our objection as a

12  request for a preliminary injunction and the request satisfies

13  that standard.

14          Third, Your Honor, this has been an expedited process

15  initiated by the debtor.  If this Court believes that other or

16  further proceedings or processes are necessary or appropriate,

17  the Court should allow the parties the time for that.  We

18  agreed to an expedited motion practice under the protocols.

19  That's a fact.  The protocols cover a variety of circumstances

20  designed with the exigencies of the debtor's business in mind,

21  not designed with trying to speed distributions to Dondero,

22  Okada, and the insider parties.  There simply is no exigencies

23  surrounding that, and the Committee should not be prejudiced if

24  this Court believes a further or other procedural vehicle is

25  necessary.

**WWW.JJCOURT.COM**

1          And a moment, Your Honor, on the investigation, as

2   Your Honor is aware the insider parties have dominated the

3   debtor for years.  Only recently January 9th the Committee has

4   gotten the ability to investigate.  And to date, we've been

5   doing that.  I do dispute what Mr. Pomerantz said about the

6   debtor's cooperation.  I believe that they've used words to

7   that effect but we've not gotten the documents that we need.

8   This is a complicated enterprise as Your Honor is aware.  It's

9   unrealistic to think that we would be in a position to bring

10  claims against insider parties at this particular time in the

11  case.  And we cannot be prejudiced by saying we should have

12  completed our investigation and had brought claims every time

13  the debtor thinks it should make a distribution to Mr. Dondero

14  or one of its related entities.

15          And so, Your Honor, to sum up, we think that the most

16  logical solution here and frankly the one that I assume the

17  debtor would have agreed with me on would be to come to this

18  Court, allow the distributions to be made to all the third

19  party investors, to withhold the distributions to the related

20  parties while the investigation occurs, while the notes are

21  settled, and while the Committee determines and the Court may

22  perhaps ultimately determine whether the interest that gave

23  rise to those distributions were in fact appropriately with

24  those parties.

25          Instead, we're here talking about duties owed to,

34

1  quote/unquote, the investors without considering what it is

2  that's owed to these creditors and to this estate.  And with

3  that, Your Honor, we would ask that the motion be denied or

4  however you'd look at it but that the relief we noticed in our

5  paper be ordered by Your Honor.

6         THE COURT:  Let me follow up and make sure I

7  understand a couple of things.  You've said a couple of times

8  that it's just the distributions that would go to related

9  investors, Mark Okada, CLO Holdco, HCM Services.  And I got the

10 impression from your pleadings as well as your oral statements

11 that the Committee is not challenging in any way the decision

12 to wind down these three funds, if you will.  You know, my

13 reading of the pleadings was November 2019, you know, less than

14 a month after the bankruptcy was filed or about a month after

15 the bankruptcy was filed, you know, there were significant

16 redemptions.  In the face of significant redemptions, the

17 debtor decided it was appropriate to wind these down.

18         Is that going to be the subject of evidence and

19 testimony today?  Is the Committee at all concerned about how

20 that all played out, whether it was legitimate unaffiliated

21 investors seeking redemption or if it was by chance insider

22 investors?

23         MR. CLEMENTE:  No, Your Honor.  The Committee is not

24 challenging the wind-down as I believe you're referring to.  We

25 are not doing that, Your Honor.

35

1            THE COURT:  Okay.  And this may be one instance where
2    it's kind of hard for me to separate what happened in the
3    related case of Acis versus this where we had all of a sudden
4    we don't want Acis to, you know, manage these in that case CLOs
5    anymore until redemptions were happening.

6            MR. CLEMENTE:  I understand, Your Honor.

7            THE COURT:  And the business judgment of that --
8    well, it's complicated, right.

9            MR. CLEMENTE:  I completely understand.

10           THE COURT:  It was, in the end of the day, depriving
11   Acis debtor of management fees.  Same thing is happening here,
12   right?  Highland is being deprived of management fees by the
13   wind-down of these three funds, but you're not challenging the
14   business judgment of the --

15           MR. CLEMENTE:  That is correct, Your Honor.

16           THE COURT:  -- whole process of the redemptions
17   period?

18           MR. CLEMENTE:  That is correct, Your Honor.

19           THE COURT:  Okay.

20           MR. CLEMENTE:  There is a pot of funds sitting in
21   those funds, and there is a pot of funds sitting in RCP --

22           THE COURT:  It was a legitimate non-affiliated
23   entity's --

24           MR. CLEMENTE:  We're not challenging it, Your Honor.

25           THE COURT:  Okay.


**WWW.JJCOURT.COM**

Appx. 03252

36

1          MR. CLEMENTE:   What we are challenging obviously is

2   now the distribution of those funds to the related entities.

3   That's where we take issue with it at this particular moment in

4   time.

5          THE COURT:   Okay.

6          All right.   Who else wishes to make an opening

7   statement?   I know Acis had a joinder or a slightly different

8   objection, I think.

9          MS. PATEL:    Yes, Your Honor.   Good afternoon.

10  Again, Rakhee Patel on behalf of Acis.   And I'll address Your

11  Honor's question first.   Acis has concerns about the wind-down

12  of these funds.   I'll just clear with respect to it.   And Your

13  Honor referenced, you know, perhaps we need to separate what

14  happened in the Acis case and whether that's happening here or

15  not.

16         Your Honor, I'm not sure from Acis's perspective that

17  we don't object to the wind-down of these funds.   We just

18  frankly don't have enough information to kind of take a

19  position with respect to that whether these funds should be

20  wound down.   But the fact of the matter is is in the lead-in

21  into this motion -- and this is sort of the source and subject

22  of Acis's additional objection and not just plain vanilla

23  joinder and with the Committee -- is is that the transactions

24  happened.   The sale of the stock has happened.   So whether it's

25  in connection with the wind-down of the funds or whether it's

37

1  just a sale, it's happened now.

2      So I'm not sure that we can unring that bell, but

3  Acis's whole point and as we sort of set out in our joinder and

4  our separate comment or objection was, Your Honor, the light of

5  day needs to be cast on this transaction as a whole and we need

6  to be talking about it that the transaction needs to be

7  discussed here in open court.  And, frankly, the entire

8  creditor body needs to have and the Court needs to have

9  transparency with respect to that.

10      So to that point, Your Honor, the debtor filed the

11  motion to approve the distributions of the proceeds from the

12  sale in accordance with the procedures approved as part of the

13  broader settlement motion that Your Honor heard in January.

14  Now the debtor incredibly takes the position that this Court

15  and the creditors are effectively powerless to stop these

16  distributions.  And here's the problems with that position.

17      First, from a technical legal perspective, the debtor

18  ignores the language of Section 363.  Frankly, it's easy to

19  have a strong initial knee-jerk reaction that Section 363

20  doesn't apply here because there's no sale of property to the

21  estate.  The MGM stock was held down in a different entity.

22  Your Honor, frankly, I did it myself.  But when you analyze the

23  language of Section 363, it also prescribes the use of property

24  of the estate outside of the ordinary course of business.  And

25  here, the use of property of the estate is the debtor's

38

1  valuable management rights of the various entities, so Dynamic,

2  AROF or AROF or NRCP.

3          And let's just assume for argument's sake that the

4  debtor's statement is correct and enforceable and there's no

5  problem with it that the funds are in liquidation.  No one can

6  rationally argue that that liquidation of a fund or a manager's

7  actions in liquidating said fund are ordinary course.  So there

8  is sort of the Section 363 hook for lack of a better term.

9          Second, from an equity perspective, it is wholly

10 inequitable for the debtor in an attempt to derail the Court

11 and the creditors from inserting a Chapter 11 trustee -- and

12 recall, Your Honor, that this case was filed on October 16th of

13 2019 where the debtor filed to seek protection from the

14 imminent within minutes if not hours of entry of $189 million

15 judgment against the debtor.  And it's really frankly, and as

16 Mr. Pomerantz acknowledged, the product of failed -- numerous

17 other failed litigation strategies.  Acis, UBS, Pat Daugherty,

18 quickly all -- and all of those the pieces of litigation

19 quickly coming home to roost.

20         Acis was clear right out of the gate, Your Honor, at

21 the first day hearings held on October the 18th, 2019 that it

22 would seek the appointment of a trustee.  And in an attempt to

23 sort of take itself out of a trustee potentially being

24 appointed or, you know, as to forestall that happening, the

25 debtor filed an ordinary course protocol motion.  And this is

**WWW.JJCOURT.COM**

39

1  in October of 2019.  And as a part of that ordinary course

2  protocol motion, the proposal was that Mr. Sharp, the CRO of

3  the debtor, be appointed the CRO of the debtor and that he

4  would be the gatekeeper, he would be in charge of all related

5  party transactions, and he would oversee all of those

6  transactions.

7         And, Your Honor, indeed Mr. Sharp testified that he

8  was the gatekeeper.  He was the guy in charge, and that was on

9  I want to say like November 20th of 2019.  And commensurately,

10 Mr. Waterhouse, the CFO for Highland Capital Management, also

11 testified and Mr. Waterhouse was the first day declarant for

12 Highland as well.  He testified that everyone understood that

13 Mr. Sharp was to be the gatekeeper.  And, indeed, Mr. Sharp

14 would -- they had training at Highland Capital Management to

15 the effect that all employees knew if you've got a related

16 party transaction, it's got to go through Brad Sharp.

17        So in an attempt to sort of derail Acis from getting

18 a trustee appointed, they affirmatively sought out these

19 protocols and ultimately agreed to protocols that look similar,

20 not exactly but similar to those proposed ordinary course

21 protocols.  And the protocols that ultimately were approved

22 required court approval.  And now we've got them coming back

23 and saying, ha ha, just kidding, no one can do anything about

24 it anyway and we have to make these distributions because we've

25 got a fiduciary duty to do it.

40

1          On that note, the debtor who should be fully

2   transparent during this process while it seeks the benefit of

3   bankruptcy including the automatic stay, argues in its reply

4   brief filed this morning at Footnote 9 that the underlying sale

5   transaction in excess of $123.25 million is sacrosanct and

6   irrelevant because the Committee blessed it.  Acis objected,

7   Your Honor.  When that transaction was presented to the

8   Committee, Acis objected.

9          First, it would have its cake and eat it, too.  It

10  can't take advantage of the protocols it likes while at the

11  same time stiff-arming those that are inconvenient to it.  It

12  can't say the transaction's good because the Committee blessed

13  it, but the Committee didn't bless the distributions to the

14  insiders and, oh well, you can't do anything about that anyway.

15         Second, the broader transaction is violative of at a

16  minimum traditional notions of transparency in bankruptcy and

17  likely 363 along what the debtor's fiduciary duties to its

18  creditors.  As Mr. Clemente pointed out, the debtor has dueling

19  fiduciary duties, and we didn't hear nearly a word with respect

20  to the debtor's fiduciary duties to its creditors.  And, Your

21  Honor, we're not looking to generally micromanage what this

22  debtor is doing, but this transaction is fundamentally flawed

23  and at a minimum has red flags all over it.

24         As we now know from the CalPERS objection, Mr.

25  Dondero entered into a transaction with Highland Capital

41

1  Management buying CalPERS' interest and likely others'
2  interests at June 30 prices or by giving over a set number of
3  MGM shares to CalPERS.  That's the agreement that's attached to
4  the CalPERS objection.  The agreement was always a win-win for
5  Highland Capital Management because it could either make money
6  on the arbitrage of the stock -- it bought it at a particular
7  price, and if it's ordered at a different price, you got to
8  keep the differential -- or give over the stock if the stock be
9  valued and priced.  Win-win.

10        He then immediately the very next day fraudulently
11  transferred that agreement from Highland Capital Management to
12  Highland Capital Management Services, an entity in which he is
13  the 75-percent owner and Mr. Okada is the 25-percent owner.
14  That is 15 days before filing this Chapter 11 bankruptcy case.
15  The only purported consideration for the transfer, and I think
16  this is Exhibit B, to the CalPERS objection, was an indemnity
17  by Highland Capital Management Services.  That's the only
18  consideration that was transferred as a part of that
19  transaction, Your Honor.

20        Then when the stock price rises in November, he seeks
21  committee approval for a transaction that still benefits
22  Highland Capital Management Services.  Despite not having a
23  Committee response, he enters into a rogue unauthorized trade
24  of MGM stock on whose board he serves on and is thus privy to
25  information, violative of the very protocols that the debtor

42

1  was pressing so strenuously to avoid the appointment of a

2  trustee.  Indeed, Brad Sharp testified the day before the rogue

3  trade that this exact type of transaction had to go through

4  him.  And Mr. Waterhouse's testimony came right after that to

5  indicate that everybody at the debtor knew that Mr. Sharp had

6  to approve it.

7           Ultimately, the Committee rejected that transaction

8  in November, but the trade was already done.  If Mr. Dondero

9  had his way, Highland Capital Management Services would have

10 benefitted from the transaction.  Frankly, every one of these

11 transactions needs the light of day shed upon them here in

12 court to determine what is in the best interest of creditors.

13 The debtor's attempt to cloak itself in the Committee's non-

14 objection, and I want to be clear on this, it was a non-

15 objection.  I think reference was made that the Committee

16 agreed to the sale of the MGM stock.  That's not what happened.

17 The Committee just did not object to the transaction which can

18 likely best be characterized frankly as everyone plugging their

19 nose while simultaneously telling this Court it can't do

20 anything about the proceeds is the exact reason why the Court

21 should be inquiring into the transaction in the first place.

22          And not so incidentally, that stock that Mr. Dondero

23 traded without authority in November is trading approximately

24 20 percent higher today, around the low 90s.

25          THE COURT:  All right.  Thank you.


**WWW.JJCOURT.COM**

43

1           Thank you.  All right.

2           Do we have any other opening statements?  I'm

3    probably going to have to take a break before we do evidence

4    and hear my 2:30 matter, which I don't think is going to take

5    very long, at all.

6           All right.  Judge Lynn.

7           MR. LYNN:  Your Honor, thank you.

8           We're not opposed to the motion, and we understand

9    the concerns expressed both by the debtor, the debtor's

10   independent board, which feels that it's compelled to make the

11   distribution to insiders.  And while we don't necessarily agree

12   with them, we understand the Creditors Committee's concerns as

13   well.

14          We'd like to suggest the following should the Court

15   determine that the motion should be denied.  And that is that

16   instead of the debtor retaining the funds, that the debtor

17   distribute the funds into the registry of the Court.  That way,

18   they lose control over the funds and they can say that they've

19   distributed them in accordance with their agreements and

20   applicable law.

21          The funds would remain there until either a recipient

22   or prospective recipient posts a bond or other suitable

23   collateral or the Creditors Committee agrees to the

24   distribution to the insider or there is a Court entered for

25   another reason after a showing made before Your Honor.  The

**WWW.JJCOURT.COM**

44

1 debtor and the Creditors Committee would, of course, retain all

2 rights to seek the funds they would have had, which rights they

3 would have had immediately before the distribution to the

4 registry, plus any rights that would be gained by reason of the

5 distribution itself.

6       The debtor thus distributes, the Creditors Committee

7 retains its rights, the Court retains control, and this can all

8 be done, we believe, by a Court order and we hope this may give

9 the Court a suitable alternative.

10       THE COURT:  Okay.  Let me make sure I understand.

11 You said, if the Court is inclined to deny the motion.  Are you

12 offering, I guess Mr. Dondero's proposal that -- I mean, these

13 aren't disbursements that would all go to him, they would --

14 some would go to Okada, and -- who's not objected or appeared.

15 But -- let me cut to the chase.

16       Are you trying to avoid a hearing and evidence

17 altogether by saying, you know, these related entities agree

18 their distributions will go into the registry of the Court

19 right now?

20       MR. LYNN:  Mr. Dondero supports this position.  We do

21 not speak for Mr. Okada.

22       THE COURT:  Right.

23       MR. LYNN:  I understand that more than one of the

24 entities -- and Your Honor must forgive me.  We're relatively

25 new to this case.

**WWW.JJCOURT.COM**

45

1          THE COURT:  Yeah.  One is Holdco, and that is

2   technically a DAF, a charitable entity that --

3          MR. LYNN:  Yes.  I believe that's so, and I

4   understand there may have been communications between the

5   independent board and the trustee of a DAF, but I was not a

6   party to those communications.  I'm just trying to give the

7   Court an alternative -- Mr. Dondero is doing so -- that might

8   be acceptable to the debtor and at the same time would

9   accomplish what the Creditors Committee wants, which is to

10  retain control of the funds.

11         I must say, Your Honor, that having been there

12  myself, I have a great deal more confidence in the registry of

13  the Court protecting funds than I do in just about anyone else.

14         THE COURT:  All right.  Well, that would certainly

15  seem to give the Committee everything it's asking for, and --

16         MR. POMERANTZ:  Your Honor, if I may interrupt.

17         I understand from members of the debtor's independent

18  board who have spoken to Grant Scott, who is the principal in

19  charge of CLO Holdco, that CLO Holdco would also support the

20  proposal that has just been made by Judge Lynn.  We do not have

21  the agreement of Mr. Okada to support that proposal.

22         THE COURT:  Okay.  Although, he has not weighed in

23  with any sort of -- well, I don't know.  How do we feel about

24  Mr. Okada's interest here?  I mean, he's obviously been given

25  notice of all of that, and --

**WWW.JJCOURT.COM**

Appx. 03262

46

1          MR. POMERANTZ:  Well, actually we asked him --

2          THE COURT:  Okay.

3          MR. POMERANTZ:  -- when we heard last night that this

4   might be a possibility.  He has rejected that.  And in light of

5   his rejection of that proposal, we as the debtor feel we need

6   to proceed with the motion.  I would think it substantially

7   narrows the issues that are going to be in evidence, all the

8   stuff we've heard about MGM Trade, which may at some point in

9   time be something that people don't testify from the podium and

10  that actually the subject of real evidence.  But with respect

11  to Mr. Okada, we will have to go forward with the motion.

12          MR. LYNN:  Yeah, so let me express that at this

13  point, Mr. Dondero is of course not supporting the Acis

14  suggestion that a trustee should be appointed.  We did not

15  understand that this hearing would address that issue.

16          THE COURT:  Yeah.  I'm not sure.  That's what they

17  were suggesting today.  I think they were just saying at one

18  point, they adamantly wanted a trustee, and these protocols

19  alleviated their concerns and caused them to back off.  And

20  now, they're upset that, you know, the debtor is resisting the

21  protocols in a way.  So -- all right.

22          Mr. Clemente, what say you?  I --

23          MR. CLEMENTE:  Your Honor, I --

24          MR. LYNN:  Thank you, Your Honor.

25          THE COURT:  Thank you.

**WWW.JJCOURT.COM**

47

1          MR. CLEMENTE:  -- I think you can tell from our

2   papers, this is effectively what we asked for.

3          THE COURT:  Right.

4          MR. CLEMENTE:  I don't even know why it took us to

5   get to this point for that.  It seemed so obvious to me.  But

6   when it was articulated by the former Judge here, it -- I think

7   it just held more -- maybe it made more sense.

8          As far as Mr. Okada's concerned, I think Your Honor

9   could clearly deposit the funds in the registry of the Court,

10  and he's free to come in.  I think that's what Counsel for

11  Mr. Dondero was actually suggesting.  So I'm not sure that

12  anything is required further with respect to Mr. Okada, unless

13  he has a representative here that would like to raise something

14  with Your Honor.  So, to me, on behalf of the Committee, I

15  think that accomplishes what the Committee was trying to do

16  with its objection.

17         THE COURT:  All right.

18         Anyone else wish to be heard?  Ms. Shriro, I know

19  that you filed something for CalPERS, but obviously, your

20  client is an unaffiliated investor in the private equity fund,

21  RCP.  You just want to get paid.

22         MS. SHRIRO:  That's correct.  We just want to get

23  paid, and I would defer to my co-counsel on the phone.  If he

24  has any comments, this would be the time to raise them.

25         THE COURT:  All right.

48

1          Co-Counsel on the phone, I think it's Mr. Cisz.  Is

2  that correct?

3          MS. SHRIRO:  Yes.

4          THE COURT:  Okay.  Anything you want to say about

5  what's (indiscernible)?

6          MR. CISZ:  That's correct, Your Honor.  This is Louis

7  Cisz on behalf of CalPERS, and Ms. Shriro is correct.  So long

8  as CalPERS receives its distribution relative to the sale of

9  the MGM stock, CalPERS otherwise doesn't take a position with

10  respect to the motion.

11          THE COURT:  Okay.  Thank you.

12          All right.  Well, turning to the literal terms of the

13  motion, the relief the motion sought was simply an order

14  authorizing distribution of the cash from these wind-downs of

15  the three funds to insider investors.  And so we have the

16  Committee objection, we have the Acis objection, we have

17  Dondero's counsel here appearing.  I think I can, given this

18  request for relief and the opposition of the Committee, as well

19  as one of the Committee members, Acis, and due to these

20  representations of Dondero's counsel and the board, I can order

21  that the money that would otherwise go to insider investors --

22  I think it's roughly about 8.6 million -- will, instead of

23  going to the insider investors, will go into the registry of

24  the Court with reservation of everyone's rights later to file

25  motions requesting that it be disbursed to them.  So everyone

49

1 understands, this is just kind of a holding place for the funds

2 right now.

3      MR. POMERANTZ:  Your Honor, we do not have

4 Mr. Okada's representation and the debtor is not modifying its

5 motion.  The debtor would like to proceed with respect to

6 Mr. Okada.  We asked him, he did not want to agree to the same

7 things that would be in consideration by CLO Holdco, and for

8 the reasons we've identified in the motion and I've expressed

9 to Your Honor, we feel we have the obligation, we have the duty

10 to proceed, and we would request the opportunity to put on

11 evidence so you can hear from Mr. Seery and ultimately make a

12 determination whether the Committee and Acis have laid out a

13 legitimate basis for use of 105.  I'll reserve my comments and

14 their comments until the end.

15      But we would want to proceed in that limited matter

16 because we don't have all agreements of the parties and the

17 same reasons stand for why we filed the motion to proceed with

18 the distribution for Mr. Okada.

19      THE COURT:  Okay.  Well, I guess I misinterpreted

20 everything that I thought was going on out there.  Mr. Okada, I

21 guess, you said is owed 4.176 million from the Dynamic Hedge

22 Fund, and then -- I don't know if that was the total amount

23 from the three funds, but you feel like you have a fiduciary

24 duty to pursue that disbursement.

25      MR. POMERANTZ:  Absolutely, Your Honor.

50

1          THE COURT:  All right.

2          MR. POMERANTZ:  And again, you know, we could get

3   this into argument.  Mr. Okada is in a much different position

4   than some of the other insiders.  We understand the comments

5   about Mr. --

6          THE COURT:  Well, I remember some of the dynamics

7   here, but let me tell you what I'm going to feel the need to

8   get into if we hear evidence.  And what we'll do is we're going

9   to take a short break in a minute.  Let me ask the Barker

10  people who I think are in the back.

11     (Off record discussion 2:34:51 to 2:35:01)

12          THE COURT:  Okay.  So we'll take a 10-minute break in

13  a minute.

14          But again, one reason I was sort of delighted to get

15  the suggestion of Judge Lynn is I see this evidentiary hearing

16  as being a little more involved than looking at contractual

17  obligations and whatnot, and you know, the fact that these are

18  non-property of the estate funds that we're talking about.  I

19  have fundamental questions having read the pleadings about the

20  decision to wind-down these funds that was made in November

21  2019, days after Highland filed bankruptcy.

22          Who made the decision?  Was it insider investors

23  seeking redemption?  Or was it, you know, did we have large

24  unaffiliated investors exercising redemptions, and so

25  therefore, it was reasonable business judgment, you know, we

51

1 need to wind down?

2 I know the issues are a little bit different with the
3 two hedge funds versus the RCP fund that had the term. And I
4 understand, I read the pleadings, how the term expired in April
5 2018, it was extended for one year, and then the advisory board
6 didn't consent to an additional extension.

7 Again, maybe the new board has thoroughly scrubbed
8 this and you're going to tell me that in evidence. And maybe
9 the Committee has thoroughly scrubbed this, and you're going to
10 tell me that with evidence. But I -- I'll want to hear that.
11 I'll want to hear that this was all legitimate, independent,
12 non-affiliated investors pressing for the wind-down of these
13 funds, and we didn't have what I refer to as the Acis situation
14 where -- well --

15 MR. POMERANTZ: Your Honor, Mr. Seery is prepared to
16 testify to each of those. And as I mentioned, the board did
17 thoroughly consider it and you will -- Your Honor will hear
18 evidence that led Mr. Seery and the board to conclude that each
19 of these were appropriate. But we intended to get into that in
20 the evidence.

21 THE COURT: Okay.

22 (Proceedings recessed from 2:37 p.m. to 3:01 p.m.)

23 THE COURT: All right. We're going back on the
24 record in Highland. Mr. Pomerantz, are you ready to call your
25 witness?

52

1          MR. CLEMENTE:  Your Honor, if I might before.

2          THE COURT:  Mr. Clemente?

3          MR. CLEMENTE:  Matt Clemente on behalf of the

4    Committee, again.

5          I would just like to revisit the colloquy we had

6    before we broke.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  I'm still confused as to why Your

9    Honor just can't enter or so order that the debtor has

10   satisfied its duty upon depositing the money into the Court

11   registry.  And we don't need to have any of this this

12   afternoon.  I see it as similar to the Foley hearing where Your

13   Honor expressed some frustration.  It's kind of maybe not the

14   best use of time.  I'm not sure what exactly we're trying to

15   accomplish here.

16         If the debtor's concerned about its duty to a

17   constituent who is not present in Court today, I think Your

18   Honor can deal with that by entering an order that says, you

19   know, based on the pleadings and the record so far, the debtor

20   has satisfied its duty and placed the money in the Court

21   registry.

22         And if Mr. Okada has an issue with that, he can come

23   back before Your Honor.  I'm just not quite sure what the point

24   is here, Your Honor.

25         THE COURT:  All right.  Well, let's turn back to

53

1  Mr. Pomerantz, and let's talk about what my, I guess, unrefuted

2  evidence is.  I have -- Mr. Okada would be due for the Dynamic

3  Hedge Fund, 4.176 million is what I read in the pleadings where

4  you told me.

5          And then, I don't know that I have written down what

6  he would be owed from either the Argentina Fund or the RCP

7  Fund.  Anything?

8          MR. POMERANTZ:  Zero.

9          THE COURT:  Zero.  So we're talking about the 4.176

10  from termination of the Dynamic Fund.

11          MR. POMERANTZ:  Right.

12          THE COURT:  Meanwhile, we know there is a $1.3

13  million demand note --

14          MR. POMERANTZ:  Correct.

15          THE COURT:  -- owing to Highland from Okada.  And I

16  feel like I heard that there was more, but that's the only --

17          MR. POMERANTZ:  That is the only note from Mr. Okada.

18          Your Honor, I think part of it is I stood up and gave

19  a lengthy presentation, and I told Your Honor what the

20  testimony would show.  Now there's been a lot of issues in this

21  case about what the board's doing, what it's not doing.  Part

22  of our reason for being here today and part of my presentation

23  was to get Your Honor comfortable with how the board is

24  handling its duties.  I didn't want you to hear that just from

25  me.  I wanted you to hear that from Mr. Seery.

54

1          There also have been allegations by Acis and concerns

2   Your Honor has raised as to what went into the wind-down of

3   these funds, given Your Honor's past experience with Acis.   And

4   I'm sure Ms. Patel's past experience with Acis.

5          I think it's important to hear from Mr. Seery because

6   he has good explanations of why each of these funds are in

7   wind-down.   And then, furthermore, look, Your Honor will decide

8   what Your Honor decides and whether the Committee and Acis have

9   met the showing under 105 to hold back the Okada funds.   If

10  Your Honor decides that, of course we will abide by that

11  decision.

12          But we didn't want any implication that we were sort

13  of laying down for that issue.   So I think it would be helpful

14  maybe to hear some testimony from Mr. Seery.   If Your Honor

15  then concludes that funds shouldn't be disbursed, Your Honor

16  will conclude that funds shouldn't be disbursed.   I don't think

17  this has to be very lengthy.   I think we've -- we've narrowed

18  the issues, given that we don't have an issue with respect to

19  RCP anymore.   We don't have the issue with HCM Services

20  receiving money on account of a trade that Acis is very

21  critical about.   Again, those issues at an appropriate time can

22  be raised in appropriate form, and Your Honor will have a full

23  evidentiary hearing, as opposed to a tail wagging the dog on

24  this motion when it's not even relevant anymore.

25          So what I would propose is that we allow Mr. Seery to

55

1 take the stand.  We allow him to address Your Honor's concerns.

2 We allow him to testify to the things that I said he would

3 testify to so it gives Your Honor some comfort, and hopefully

4 the other parties comfort, exactly how Mr. Seery and the other

5 board members are performing their duties.

6          THE COURT:  Okay.  Can we all agree to some

7 reasonable time limitations here?  I'm thinking we're done in

8 an hour.  Maximum 30 minute direct of debtor, or redirect, and

9 maximum 30 minute cross of all objectors.  Can we do that

10 today?

11          MR. POMERANTZ:  I think we can do that, Your Honor.

12          THE COURT:  Okay.  Then that's --

13          MR. CLEMENTE:  My only question, Your Honor -- Matt

14 Clemente on behalf of the Committee -- is what are we still

15 talking about here?  Are we just talking about the distribution

16 to Mr. Okada?  And the other distributions are off the table as

17 suggested by -- or as agreed to at least on behalf of

18 Mr. Dondero?  I don't even know what we're talking about.

19          MR. POMERANTZ:  That is correct, Your Honor.  It's

20 only the distributions to Mr. Okada.

21          THE COURT:  Although, I think he wanted the Court to

22 get some testimony from Mr. Seery about sort of the business

23 judgment of the three wind-downs, but I don't think that's

24 going to --

25          MR. POMERANTZ:  That shouldn't take a long time.

56

1          THE COURT:  -- be a probe today of MGM stock sales.

2          MR. POMERANTZ:  No, it won't be at all, Your Honor.

3    And again, look, we understand Your Honor has had experience

4    with Acis, and we understand the concerns, Your Honor, coming

5    in, seeing redemptions, and the questions you asked.

6          Again, it's important for the debtor to be able to

7    demonstrate to Your Honor that this board is doing its

8    appropriate things and hearing from Mr. Seery why he made these

9    decisions so Your Honor can get comfortable, not only in these

10   matters, but in other matters that brought before Your Honor in

11   the future that this board is doing exactly what they should be

12   doing acting as an independent fiduciary.

13         That's why I think some of our testimony, but we're

14   happy to live within the time frame that Your Honor has given

15   us.

16         THE COURT:  Okay.  All right.  Thank you.

17         MS. PATEL:  Your Honor, I just wanted to follow along

18   with one of the comments that I made during my opening

19   statement and hopefully, it will help further narrow the issues

20   and keep us within the time limits, is is that when -- in

21   responding to Your Honor's question about the wind-down of

22   these funds, and I said Acis had concerns, I want to say we've

23   got concerns with respect to the Argentina and the Dynamic

24   fund.  We frankly just don't understand or have that much

25   information with which to really evaluate the transaction, so

**WWW.JJCOURT.COM**

57

1  we're a little hamstrung today for purposes of cross-

2  examination because that's not something that necessarily Acis

3  has inquired into.

4            But separate and apart from that, just again so

5  everyone's clear, with respect to the wind-down of RCP, Acis

6  does not take issue with respect to the genesis of the wind-

7  down.  So the decision to wind it down is a find from Acis's

8  perspective that should probably have been wound down.  Now,

9  the methodology of how it's being wound-down, that's fair game.

10           THE COURT:  I don't know what that meant --

11           MS. PATEL:  Okay.

12      (Laughter)

13           THE COURT:  -- the methodology of how it's being

14  wound-down.

15           MS. PATEL:  Okay.  Let me --

16           THE COURT:  Very quickly because, you know --

17           MS. PATEL:  Yes.  Your Honor, what I meant by that

18  was, in terms of the decision to wind-down RCP, that makes

19  sense to Acis because it is a fund that should have been wound-

20  down.  How it is going about being wound-down, that is open for

21  dispute, and one of those things being here this MGM stock

22  sale, etcetera.

23           THE COURT:  We'll hear from Mr. Seery.  I thought

24  there was a pile of cash at this point, but maybe I misread the

25  pleadings.

58

1          Okay.

2          MR. POMERANTZ:  Your Honor, let's remember what this

3  motion is.  This motion wasn't a referendum on wind-down, it

4  was the ability to make a distribution.

5          THE COURT:  Right.

6          MR. POMERANTZ:  Mr. Dondero's counsel, who is

7  speaking on behalf of ACM Services, said they're prepared to

8  hold those distributions in the registry of the Court.  The

9  issues regarding what Ms. Patel testified from the podium, at

10 some point, they may very well be the subject of a hearing in

11 the Court.  We're happy to continue responding to the Committee

12 and Ms. Patel's comments and questions about how, but it's just

13 not relevant here.

14         And, Your Honor, there is no way if Ms. Patel is

15 going to go down that road that we will ever be here only an

16 hour.  That is a much longer discussion.

17         THE COURT:  And let me just clarify where I was

18 coming from.

19         I thought if we were evaluating whether insiders

20 should get $8.6 million of distributions, the bona fides of the

21 decision to go into wind-down mode needed to be explored a

22 little bit and see if some of these insiders were improperly

23 exercising control in that.

24         So I agree with what you're saying.  Now, that we're

25 just talking about deferring to another day all but maybe

59

1   Mr. Okada's disbursement, we don't need to hear great detail

2   about the whole decision-making process for the wind-down of

3   these three.  A little bit of background would be useful,

4   but --

5           MR. POMERANTZ:  Absolutely, Your Honor, and we

6   will --

7           THE COURT:  -- it doesn't need to be, you know --

8           MR. POMERANTZ:  -- tailor our testimony to the issues

9   that Your Honor was concerned about and the comments that I

10  made, and we will keep within the time limit that Your Honor

11  wants us to keep it to.

12          THE COURT:  All right.  Very good.

13          Mr. Seery?

14          MR. SEERY:  Yes, Your Honor.

15          THE COURT:  There you are.  If you could approach the

16  witness stand.  I know I've been introduced to you before.  I'm

17  not sure if you've taken the witness stand yet.

18          MR. SEERY:  I have not.

19          THE COURT:  I don't think you have.

20          Please raise your right hand.

21      JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please be seated.

23          MS. HAYWARD:  Your Honor, may I approach with an

24  exhibit binder?

25          THE COURT:  You may.

Seery - Direct/Hayward                              60

1          MS. HAYWARD:  Or two?

2          THE COURT:  Okay.  One for the Court.

3     Thank you.

4          MS. HAYWARD:  May I approach the witness?

5          THE COURT:  You may.

6                         DIRECT EXAMINATION

7   BY MR. HAYWARD:

8   Q    Well, good afternoon, Mr. Seery.  Since this is your first

9   time testifying, would you introduce yourself to the Court and

10  give her just a little bit of background?

11  A    I'll go pretty quickly because of the time constraints.

12  James P. Seery, Jr., for the record.  I am an independent

13  director for Highland Capital.  I've been in the asset

14  management restructuring business for about 32 years.

15          I started as a restructuring lawyer handling

16  everything from real estate to debtor's side to financial

17  transactions.  From there, I moved into asset management and

18  distressed investing.

19          From there, I moved into managing a large global loan

20  portfolio for a big investment bank.  That included teams of

21  people who both underwrote, distributed, held, managed,

22  restructured, and traded both loans, indicated loan assets,

23  primarily, but also high end bonds, distressed assets, as well

24  as CLO assets.

25          After that, I went into a hedge fund.  We had a

Seery - Direct/Hayward                    61

1  billion, three long-short credit fund.  I was the senior

2  investment partner and president of that firm.  We did similar

3  types of investments, high yield, high yield loans, distressed

4  loans, CLO assets, and some other structured products, long-

5  shorts.  So we were domestic primarily, but we also had a

6  global investment view and an office in London.

7          Subsequent to that, I was a co-head of a credit

8  business for an investment bank.  And then, in the last six

9  months, I've decided to do this job.

10 Q   So of the three board members, you're kind of the stock

11 guy.  Would that be a fair --

12 A   I think -- stock isn't really my stock and trade, but I do

13 know my way a little bit around the stock market.  But it's

14 primarily been credit products, but I do -- I am familiar with

15 equities and equity trade.

16 Q   Okay.  So since coming onto the board, give the Court a

17 day in the life, if you don't mind, and maybe starting with the

18 day that the board took over on January 9th.

19 A   I think, as Your Honor will recall, when we left and we

20 talked about what the role would be and what the compensation

21 would be, I think your comment was, Your Honor, that it -- we

22 wouldn't be 50,000 feet.  Well, we -- we're actually fully on

23 the ground.  We're not even five feet above.  We don't keep

24 track of our hours like lawyers, but probably logged about 190

25 hours in January starting on the 9th, and then about 150 hours,

Seery - Direct/Hayward                                    62

1  160 hours in February.  And I know my fellow board members are

2  similar time commitments.

3         We're involved day-to-day in each of the decisions

4  that the debtor makes from assets management decisions,

5  understanding how the funds are being managed and what the ways

6  that they could either be walled off if they're in liquidation,

7  or if what the proper way to treat them on a day-to-day basis

8  is, evaluating assets that the debtor owns directly or through

9  funds, be thinking about ways to monetize those assets;

10  employee issues, what they're doing, who they're reporting to,

11  how they're -- how they're performing, how they're being paid;

12  claims issues.

13         This case got started, as we all know, by three major

14  litigations, and they're not all easy to understand.  They've

15  got the redeemer arbitration, which I think is fairly

16  straightforward in terms of liability and amount.  There's a

17  number of offsets that are complicated.

18         We've got the UVS litigation that is a lot more

19  complicated because it's not against the debtor.  The judgment

20  is against two offshore funds that are, in essence, shells, and

21  there's a very complex history around the 10-year litigation

22  that that is.

23         Then we have the Acis litigation, which comes out of

24  the Acis bankruptcy, but is an unliquidated claim.  So

25  understanding those thinking about what the pros and cons of

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                                          63

1  those claims are, how we would manage them down the road, how

2  we would go forward.  Thinking about how to resolve them has

3  been a key part of what we're doing on a day-to-day basis.

4  Q    So has the board done an independent analysis of all these

5  various litigation claims?

6  A    Not yet.  So we've -- we've done a preliminary analysis,

7  and then we've gone further.  So with respect -- we haven't sat

8  down with -- frankly with Redeemer, yet, although one of the

9  board members has had a call with them separately.  But we have

10  sat down with the Acis creditors, and we've done some

11  significant analysis around that.  And we have sat down with

12  UBS claimants, and we've done significant analysis around that.

13       All three of those require a ton more work, and not

14  because it's not easy to figure out what the numbers are.  It's

15  really difficult to figure out what the liability is, how it

16  rolls up to the debtor, and then how to satisfy it, and so

17  we're trying to get our hands around that.  But that is a

18  critical component of resolving this case.

19  Q    When the board took over, did -- what types of things did

20  you do immediately upon taking over control of this debtor?

21  Did you meet with people at the facility?

22  A    Oh, sure.  So the first thing we did, actually, is have

23  lunch with the Committee and with Acis, and we wanted to get

24  their perspective because they were here and it was easier to

25  do that than to run back to the debtor and try to -- try to

Seery - Direct/Hayward                                    64

1  then set up another meeting.

2         And so we wanted to get their perspective.  They'd

3  been living with the debtor from the litigations and through

4  the time in Delaware and the litigation in this case.  So we

5  got a feel for them of what their desires were, how they

6  thought the case would work out or potentially resolve, and

7  also, how they thought about our role.

8         One of the things we stressed at that time, and I

9  stressed when I was interviewed for the role, is that -- I know

10  my fellow directors feel the same way, but I'm a pretty

11  independent person, and I wasn't going to be certainly the

12  management of Highlands guy, nor would I be the guy of the

13  Committee.  So we're going to -- I'm going to work

14  independently make decisions with the fellow board members in

15  what I think is the best way.

16         I'm going to try to exercise my duty in both care and

17  loyalty to the estate, but then if the estate has duties, I'm

18  going to make sure we exercise those.  And I feel very strongly

19  about that because this is just one -- a decent sized matter,

20  but one small piece of a career, and I'm not going to

21  compromise myself to satisfy either people on the management

22  side or people on the Committee side.

23  Q   Yeah.  Well, and I want to talk a little bit about the

24  duties since you mentioned them, because we heard I think the

25  Committee say that we -- the debtor has not mentioned the

**WWW.JJCOURT.COM**

Appx. 03281

Seery - Direct/Hayward                                    65

1  fiduciary duties to the estate in the opening statement.   Do

2  you think that by presenting this motion the debtor -- does

3  this motion contemplate protecting the fiduciary duties that

4  the debtor owes to the estate?

5  A    To me, it absolutely does.   But to be fair, I think that

6  the rhetorical flair and opening remarks and missing the duties

7  to the estate, we're very conscious as a board of our duties to

8  the estate.   We're also very conscious of our duties as an

9  asset manager.   And what is in the pleadings is absolutely the

10 case, it's been -- it's my experience, my understanding of the

11 law, and it's being confirmed by both Cayman counsel, and by

12 fund counsel in the U.S. separate from bankruptcy counsel.

13         We owe a duty under the Advisor's Act to the funds

14 and to the investors in those funds.   That duty actually

15 supercedes the benefit to the estate, but it doesn't undercut

16 it because by vindicating the duty to the funds, you actually

17 vindicate the duty to the estate.   If you create liability at

18 the funds, it will roll to the estate.   So by exercising your

19 duty correctly, you do in fact, vindicate the duty of the

20 estate.

21         And what's important in the Advisor's Act, and it's

22 an interesting part of U.S. law.   At least my understanding,

23 it's been confirmed by outside counsel, is if the manager,

24 which would be Highland, has an interest, it's actually

25 required to subordinate that interest to the interest of the

Appx. 03282

Seery - Direct/Hayward                              66

1  investors in the funds it managed.  And it makes sense.

2          If you have funds invested in a fund with an outside

3  investor, you want to make sure that that investor is not --

4  that manager is not using your funds to aggrandize itself as

5  opposed to looking out for your best interest.  And so, I think

6  by vindicating our obligations with respect to the funds, we

7  actually enhance our obligations with respect to the estate.

8  Q    Let's talk a little bit about the funds now.  So

9  originally, the motion pertained to three different funds.

10 Could you just briefly explain to the Court the status of those

11 funds and how they got there?

12 A    Yeah.  I'll try to go quickly, and if I skip something or

13 I go too quickly, Your Honor, please let me know.

14         The Highland Dynamic Fund, which is the primary one

15 we're talking about now, I think you'll see at the end of Tab 1

16 how it's set up right before Tab 2.  And I haven't looked at

17 these exhibits in a long time, so I apologize.  I didn't know I

18 was getting this.  But it's really straightforward.

19         These funds are set up, and this is a pretty typical

20 structure.  It's a limited partnership structure.  It's got a

21 master feeder structure.  And what does that mean?  The master

22 is the main fund.  That's the King Exemptive Limited

23 Partnership at the bottom.

24         It's fed by two feeders, a domestic feeder and an

25 offshore feeder.  Why is it done that way?  Purely tax.

Seery - Direct/Hayward                                    67

1 | Offshore investors, non-taxables in the U.S. who are worried

2 | about ECI or UVTI, or unrelated business income, we want to

3 | make sure that there's no withholding or any tax ramifications

4 | with respect to the distributions they get off the fund.  Since

5 | it's a pass-through entity, both of those investors, either

6 | domestic or foreign, are non-taxables in the U.S., will have

7 | their own tax treatment when it gets up to them.  So they don't

8 | want anything withheld.

9 | When you look at the left side of the page, Dynamic

10 | domestic feeder, the other investors is where you'd include

11 | Mark Okada.  This fund was founded originally under a different

12 | name.  I believe it was called the Highland Loan Fund.  It

13 | might have been CLO Loan Fund, I apologize.  And then that was

14 | in 2013.

15 | Mark Okada put $2 million cash into the fund at that

16 | time.  Why did he put it in?  This fund was designed to own CLO

17 | assets and loan assets.  Okada was the founder of that part of

18 | the business and the driver of that business.  It was pretty

19 | essential that he put some money in.

20 | However, in '13, they did get third-party investors,

21 | but this fund never got real scale.  I think it was only a bit

22 | over $100 million.  Not insignificant, but not a big fund.  And

23 | they went out looking for loan funds, loan opportunities, and

24 | CLO paper.  So the CLO papers, the debt of the CLOs, generally

25 | (indiscernible) type paper that was higher yielding unless

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                    68

1  there was some interesting opportunity in the -- in the higher

2  rated tranches.

3         In 2018, the fund got restructured, and they -- I'm

4  pretty sure that's when the name change occurred.  Okada put

5  another two and a half million dollars of cash in.  So he

6  didn't get this as free-carry or anything.  This was actually

7  cash that he deposited in the fund.

8         In 2019, Okada in the spring of 2019, determined that

9  he was leaving Highland.  And his separation was finally

10 completed in September of 2019.  So he is no longer an employee

11 of the debtor.  He has no influence, say, discussion, he's not

12 involved in anything.  He hasn't been since we've been there.

13        The investor, I think it was late summer, either

14 understood that or the fund hadn't performed that well.

15 Frankly, it was undersized anyway.  Realdania, a third-party, I

16 believe they're European, issued a redemption notice.  This was

17 a hedge fund style fund.  So we've got three different funds

18 here, two of them are hedge fund, and we explained a little bit

19 in the papers, but the real dynamic, no pun intended,

20 difference between the two is that Dynamic and Argentina are

21 hedge funds which provide liquidity to the investor.

22        What does that mean?  Monthly, quarterly, semi-

23 annually, they can look for redemptions.  The fund manager

24 sales assets because the assets are supposed to be a little bit

25 more liquid, makes distributions per the redemptions.

1     If the redemptions are too big and the sales will

2 somehow disadvantage the remaining investors, either gates come

3 down or you put the fund into liquidation.  Realdania had made

4 a, I believe it's a $65 million -- it was initially a smaller

5 one, then there was a $65 million redemption, and it -- this is

6 prepetition.  The debtor determined we've got to wind this fund

7 up because we can't basically more than halve it and then

8 continue to try to function.  It would have been far too

9 undersized.

10     So the debtor then went about selling the assets,

11 creating a pool of cash, and then this motion is to liquidate

12 it and pay the investors, including Okada.  When it's done,

13 assuming they made the full distributions, about 80-something

14 percent of the assets will have been distributed.  There's a

15 few small assets that are left.  They're not particularly

16 liquid, but they're small and I'm relatively certain we can

17 unload those at decent prices, create cash for the investors,

18 make the final distribution, so it would be a hold cash to

19 wind-down and then dissolve the various little limited

20 partnerships.

21     Argentina is similar.  The basically different

22 premise of why that fund existed, the original theory was post

23 the Argentina crisis with the election of Macri in '15.  Late

24 '15, Argentina started going through a number of changes in its

25 economy and the thought was that Argentina would start to grow

Seery - Direct/Hayward                           70

1 and really be able to realize the potential of its people and

2 its resources.  That didn't work out that well, and then at the

3 end of, I think it was '18, Macri was voted out and the former

4 Kirchner, effectively, government is going to back.  Argentina

5 economy has slid into basically -- certainly recession over

6 multiple quarters, but even some would say depression.

7           Very difficult time.  This was not a unique fund for

8 Highland.  There were a lot of these Argentina-type opportunity

9 funds, and that -- that performance has not been particularly

10 good.  The decision there was made to wind-down a third-party

11 investor who made a 15 percent withdrawal, and that a number of

12 other funds that I forget the percentage, but they're managed

13 by UBS, third parties made a -- indicated that they were going

14 to have full redemptions, as well, so that fund was put into

15 liquidation.

16           Importantly, I think something that was mentioned

17 before, there's no benefit to keeping these funds around.  They

18 don't make any fees.

19 Q    Why is that?

20 A    And once they've gone into liquidation, they're not paying

21 any fees.  Similarly, RCP -- now, RCP is a different style of

22 fund, and I think Your Honor, you mentioned it in the papers,

23 you saw that it was a 10-year old fund.  That term was

24 extended.  It was originally a 2008 fund.  It was done as a

25 distressed for control.  Very different opportunity,

Seery - Direct/Hayward                              71

1  (indiscernible), at the time, they probably didn't see the

2  global financial crisis, but saw it as distressed and the

3  opportunity to do distressed for control positions had to be

4  long term.  So that fund had no liquidity provisions for

5  investors.  Typical PE-style fund.

6         The -- when it got to the end of its life, the 10-

7  year life, Highland didn't have the ability to extend the term.

8  A steering committee of third-party institutional investors

9  with no Highland influence whatsoever, Ontario Teachers,

10 CalPERS, some of the biggest, most sophisticated investors in

11 the world in both debt, equity, and distress were driving that.

12 There was also a couple of other funds that are third parties

13 on that steering group.  And they still exist.  They gave a

14 one-year extension.  Highland had no ability to do anything

15 about that.

16        In exchange for the extension, Highland waived fees.

17 So there are no fees being paid on the RCP Fund.  There was a

18 series of one-month extensions that went -- was finished in

19 November of 2019.  And with this distribution, there's still a

20 lot of assets in RCP that have to be managed, about 175

21 million.  And so we're going to -- after we make the

22 distribution -- we've had a few calls and I've been on them,

23 with the steering group.

24        We've told them we're coming to Court to make the

25 distribution.  We were confident that we would be able to -- to

Seery - Direct/Hayward                                    72

1  be able to make a distribution to them subject to the Court's

2  order, that we make that distribution and somewhere in the next

3  two weeks we're going to have a steering group meeting to talk

4  about the other assets and how we monetize them.

5          They are different types of assets.  Some have more

6  liquidity than others, so we're going to need to come up with a

7  plan.  It's 85 percent, roughly, third parties.  Highland

8  Capital Management, the debtor, actually has a roughly 15

9  percent interest in HCM Services, has as a couple percentage,

10 because I think there would have been about 2 percent of the

11 distribution.

12         So it's vast -- the vast majority of the owners of

13 the fund are outsiders, and we're going to need to come up with

14 a structured plan to get them their cash because they've been

15 invested for 12 years in this fund.

16 Q    Do you agree, having had the chance to come in and look

17 over all these things, that these funds should be wound-down?

18 A    Oh, absolutely.  So I think it's easiest to say,

19 Dynamic -- Okada was the driver.  It never got to where it

20 wanted.  The biggest investor wanted out.  It's not big enough

21 to support itself.  Even if one were to look today, and say, it

22 should have, frankly, owning CLO paper when this fund was

23 started until today, there should have been good appreciation

24 in it, and it just didn't -- I don't know the reasons it

25 didn't, but it didn't perform the way it should have, and it

Seery - Direct/Hayward                                73

1  didn't attract the investors it should have.  Perhaps that had

2  something to do with it, you know, the way the other cases or

3  litigations were going on and the public nature of them.

4         And frankly, coming out of the global financial

5  crises, Highland had had a tough time of it, so it wasn't as if

6  it was the easiest thing to raise funds.  Argentina, there's

7  absolutely no question that the purpose and structure of that

8  fund and what it set out to do doesn't work, just doesn't work.

9  So it makes no sense to keep that going, and that's why the

10 investors -- third-party investors sought redemptions.

11        The insider interests, while not immaterial, are

12 pretty small.  Okada's interest is about 12 percent in the

13 fund, and he's not driving it.  Like I said, he's not even at

14 the debtor.  These two -- but to be fair -- both the decisions

15 to wind-down Dynamic and Argentina were made before the board

16 was involved and before the petition was filed, and they really

17 related to the withdrawals from third parties.

18 Q    So why are we here today?  Do you -- do these funds wind-

19 down in the ordinary course of their business?

20 A    Well, it -- they all have life.  So I'd say in the case of

21 RCP, it's pretty clearly in the ordinary course because it

22 reached the end of its life.  And the investors were very clear

23 that they wanted to be cashed out.  So the difficult part is

24 that it -- because of its structure and in the way it was

25 originally set up as a PE-style fund, it has illiquid, a number

Seery - Direct/Hayward                                74

1  of illiquid assets.

2          And the challenge in any of the PE funds is to time

3  your exit, and the timing on this hasn't been opportune because

4  the opportunity to sale has not been as good as one might hope

5  and the investors are just at the point where they want to get

6  cashed out as we've heard today from CalPERS.  But we've seen

7  it in the documents and our discussions -- and my discussions

8  directly with them.

9          The other funds, once they've reached this -- it's an

10 ordinary course thing for funds.  When funds either they're --

11 they've reached their life or investors redeem and they get to

12 this state where they really can't support themselves, it's a

13 very ordinary thing for managers to wind-down funds.

14 Q    And as part of the winding down of the funds, is it also

15 ordinary then to make distributions once the funds have become

16 liquid?

17 A    Well, I mean one of the questions you started to ask, or

18 maybe did ask, and I didn't answer, was why are we here?

19         Our view as an independent board, my view as an

20 independent board member, is we have an obligation to all

21 investors.  It would be really easy if the documents or the law

22 said all investors, other than ones who might have been related

23 somehow to the asset manager.  It just doesn't say that.  And

24 as we talked about, this is -- these are not funds from

25 Highland.  If they were funds from Highland, again, it would be

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                              75

1  really easy.

2          As I described for Highland Dynamic, I don't need to

3  hold and carry water for Mark Okada.  But I do need to carry my

4  own fiduciary duties and make sure that I exercise them well.

5  The gentleman put $2 million in -- this is April 2013, put 2

6  million -- 2.5 million in cash in 2018, and the fund is being

7  wound down.  It's not the debtor's money.  If it was the

8  debtor's money, it would be really easy to say, you know,

9  Mr. Okada, I'm not going to give you the money because we may

10  have claims against you, and a different discussion would

11  ensue.

12  Q    Well, I want to walk through that just a little bit.  You

13  say it's not the debtor's money.  Where is the money?

14  A    This money sits in funds or in bank accounts.  Its assets

15  are denominated and they're held in trust.  And the cash that's

16  in accounts, they're denominated in the name of the fund.  The

17  asset manager, Highland, has the ability to access the accounts

18  and use the funds in accordance with the fund documents.  It

19  does not have the ability to access the accounts and use the

20  funds however it see fit.

21  Q    So it's like an authorized signer?

22  A    It's certainly an authorized signer in terms of what its

23  ability to do in terms of accessing the funds.  Typically,

24  that's done through the trustee.  But it can manage the funds.

25  It couldn't take the funds and make an unrelated investment.

**WWW.JJCOURT.COM**

1 It couldn't take the funds and use it for its own purposes and

2 pay them back later.  It's just simply not permitted.

3 Q    Well, taking that to the next level.  If the Court did not

4 allow these distributions to be made, would the distributions

5 then go to the debtor?

6 A    No.

7 Q    Where would they go?

8 A    There's really no provision for it.  There are certain

9 provisions in the underlying documents that would enable the

10 manager to withhold funds.  If there was a change in law that

11 didn't permit a distribution.  If there was some other reason

12 that it became unfeasible to make the distribution.  If you

13 couldn't find the investor, and sometimes that happens.  There

14 are provisions of how you deal with those funds.  But they

15 never would go to the manager.

16 Q    So what is the -- why is the primary reason then that

17 we're here today asking this Court for permission to distribute

18 these funds?

19 A    It's pretty straightforward.  We have a fiduciary duty and

20 we've confirmed that with outside counsel, both Cayman and

21 domestic fund counsel, to make distributions and treat all

22 investors in the funds pro rata.  And we're here to make sure

23 we vindicate our duties, not exercising our fiduciary duties,

24 doing things that were not permitted.  One, we don't think

25 that's right or appropriate.  Two, that's not going to help

Seery - Direct/Hayward                          77

1  resolve this case that probably contributes to some of the

2  things that led to this case.  So we're not real interested as

3  an independent board in doing things that are close to the

4  edge, along the margin, try to use our positions to leverage

5  investors.

6  Q    Are you familiar with the protocols?

7  A    I am.

8  Q    Okay.  But for the protocols, do you believe that the

9  debtor would need to obtain the Court's permission in order to

10 makes these distributions on behalf of these funds?

11 A    I don't think so, no.

12 Q    So then, why are we asking the Court's permission?

13 A    Well, the protocols require it, and I think the Committee,

14 you know, with due respect and I mean that truly, would like us

15 to withhold the funds, and that provides certain leverage

16 potentially over insiders.  I think when I look at the

17 protocols, I think the main function of the protocols is to

18 assure that there isn't undue influence by insiders over the

19 actions of the company, and that insiders are not somehow

20 benefitting themselves by virtue of their control over the

21 company.

22       The independent board has control over the company.

23 We're not naive and think we have control over every single

24 persons every single second of every day, but we do have

25 control over what happens with the accounts, how payments are

Seery - Direct/Hayward                          78

1  made, when we wind something down, when an asset is sold, how

2  the proceeds will be used.  That's the board.  That's not

3  anybody in management.  The decision around these distributions

4  was made by the board independently.  We did consult with the

5  CCO, and that was important to make sure we got all the facts

6  with respect to these funds.

7          We then sought outside counsel to inform our

8  decision, both Cayman and domestic.  We didn't have any

9  influence whatsoever and we didn't speak to Mr. Dondero nor

10 Mr. Okada other than to tell Mr. Okada that we were coming to

11 court and then to ask him if he would defer his distribution.

12 And we know his response.

13 Q   I want to ask you just a couple -- I know I'm almost at my

14 30 minutes here, so I just want to ask you a few quick

15 questions because one of the issues that came up were these

16 demand notes.  I understand that Mr. Okada does have a demand

17 note.

18 A   He does.  We've --

19 Q   And has the board --

20 A   And we've sent a demand.

21 Q   Okay.  And what was -- what is the status of that demand

22 note?

23 A   He acknowledges that he signed it and he said that he's

24 owed certain things from the company.  He's asked how we work

25 those through because he was severed -- or severed himself in

Seery - Direct/Hayward                    79

1  September, and he has -- they reached a severance agreement

2  according to Mr. Okada.  I haven't personally investigated it

3  yet, but we will get to it quickly.  And he has some expenses

4  that are owed, but I don't think those are material.

5       I'm quite confident.  He said his severance was

6  agreement not money, but terms, was very standard.  We'll take

7  a look at that and make sure there's agreement on that.

8       I think it would be covered by the protocol, but it's

9  probably a transaction, so we'd have to talk to the Committee

10 about it, but we'll work -- I'm confident that we can work our

11 way through a standard severance agreement very quickly and

12 resolve that issue and collect on the note.

13 Q   Now, to be clear, the demand note is payable to whom?

14 A   The demand note is payable to the debtor.

15 Q   Okay.

16 A   It was actually a note that was -- he didn't receive cash

17 for the note.  It's basically a tax -- rather than gross-up

18 salary sometime in the past, for whatever reason they decided

19 not to gross it up to cover taxes.

20      Because of the structure of the limited partnership,

21 they could have had taxable income without matching cash, and

22 so they issued notes back to Highland to cover certain of those

23 obligations rather than actually making a distribution.

24 Q   To you knowledge, does Mr. Okada owe any money to the

25 fund?

Seery - Direct/Hayward                    80

1  A    No.  Not a -- my knowledge is that he does not.  So I am

2  knowledgeable of it, and he does not owe any money to the fund.

3  Q    Okay.  Quickly, I just want to talk a little bit about

4  Mr. Dondero.  One of I think the points that was made at the

5  very beginning of opening statements was that Mr. Dondero is

6  still around.  Why is that?

7  A    He's around because he has incredible knowledge about the

8  investments.  He is a portfolio manager for the fund.  He does

9  work with respect to non-Highland unrelated funds, some of

10 which Highland employees do work under shared services

11 arrangement and we get paid for them.  But Mr. Dondero is

12 around for those reasons and his knowledge about a number of

13 the investments in which we're involved.

14 Q    Does the Debtor -- or does the board have the power to

15 terminate Mr. Dondero if it decides to?

16 A    Yeah, he's -- we could, he's unpaid so there's no cost to

17 his involvement.  His expertise around certain investments,

18 particularly the equity funds as well as some of the larger

19 investments, including the PE investments, is really important.

20 Q    And with respect to the Dondero notes, what are the status

21 of those demand notes?

22 A    We've done an investigation of the notes and I wouldn't

23 say it's as exhaustive as -- it's in similar stages as our

24 examination of other assets.  We've looked at Dondero's notes,

25 we made a decision to send a demand letter to Okada because

1 he's no longer a part of the company and there's no real

2 benefit that we saw strategically to not making that demand.

3 It's a small amount of money relative to the size of the case,

4 it's real money, but it's a small amount of money relative to

5 the size of the case.  We should clean that up and move on from

6 Mr. Okada.

7        With respect to the Dondero notes on Dondero entity

8 notes, we want to think about those strategically.  They're a

9 sizable amount of money, not just the ones that are demand, but

10 also there's a number of the notes that ate notes with

11 maturities and they're actually current, they're all current,

12 but how can we use those cash, can we collect those, and I

13 think that's more strategic in terms of how we resolve this

14 case.

15        I agree with Mr. Pomerantz's statement that I think

16 it evolves into a pure litigation case and we really hope it

17 doesn't.  That then -- those can just be sued on and the demand

18 notes are pretty clear as to how they work and even include

19 cost of collection.  So they're pretty straightforward notes.

20 Q    But so for now the board --

21 A    Well, we thought about it, we don't think it makes sense

22 to make that demand at this time.  There's -- our initial --

23 we're not -- we haven't come up with what the plan is for this

24 case, but we have ideas.  We do think they involve Mr. Dondero

25 and they involved contributions from Mr. Dondero whether in the

Seery - Direct/Hayward                          82

1  form of notes, whether in the form of cash, whether in the form

2  of other assets.  We haven't discussed those with him, but we

3  do think that's ultimately, at least preliminarily, where we're

4  going to end up somewhere.  So strategically we think that

5  that'll make sense to include in that sort of a resolution.

6  Q    Okay.  And --

7              THE COURT:  You have one minute.

8              MS. HAYWARD:  Yes, thank you, Your Honor.

9  BY MS. HAYWARD:

10  Q    Last question I'm going to ask you, are you aware of any

11  legal basis to withhold these funds now from Mr. -- from these

12  investors and these related parties?

13  A    I'm not aware of any, but as the Court has contemplating,

14  as the Committee has said, perhaps now that Section 105, you

15  know, grants that sort of authority, but that'll be up to the

16  Judge.

17             MS. HAYWARD:  Your Honor, a housekeeping matter.  I

18  move for the admission of Exhibits 1 through 12.  I don't think

19  any of them are controversial.  But I will let --

20             THE COURT:  You want me to look through

21             MS. HAYWARD:  Your Honor, they are --

22             THE COURT:    -- all of these.

23        (Laughter.)

24             MS. HAYWARD:  Your Honor, just for the record, they

25  are Number -- Exhibit 1 is the chart showing the structure of

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                            83

1  the Dynamic Income Fund.

2          THE COURT:  Right.  We looked at that.

3          MS. HAYWARD:  Exhibit 2 is the partnership agreement,

4  so I know they're large documents, but they're not numerous

5  documents.  Exhibit 3 is just the chart of the Latin America

6  Argentina Fund.  Four, the partnership agreement for that fund.

7  Five, the chart (indiscernible) Third Fund.  Six would be the

8  agreement, the limited partnership agreement for that fund.

9  Seven, Your Honor, is Your Honor's order on the ordinary course

10 governance procedures.

11         THE COURT:  Okay.

12         MS. HAYWARD:  Eight is the final term sheet.  Nine is

13 the notice of amended operating protocols that was filed last

14 week.

15         THE COURT:  All right.  And then CVs of our board

16 members.

17         MS. HAYWARD:  And then the CVs for the board members.

18         THE COURT:  Any objections to these?

19         MS. REID:  No objection, Your Honor.

20         THE COURT:  Okay.  They're admitted.

21         MS. HAYWARD:  Okay.

22         THE COURT:  All right.  Any cross-examination?

23         MS. REID:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MS. REID:  Good afternoon, Your Honor.  Penny Reid on

Seery - Cross/Reid                                        84

1  behalf of the Creditors Committee.

2                      CROSS-EXAMINATION

3  BY MS. REID:

4  Q    Good afternoon, Mr. Seery.

5  A    Good afternoon.

6  Q    You are aware, Mr. Seery, aren't you, of the Acis

7  bankruptcy?

8  A    I'm aware of it, yes.

9  Q    Okay.  And you're aware that prior to that bankruptcy Mr.

10 Terry obtained an arbitration award in October of 2017.

11 Correct?

12 A    I'm aware of that, yes.

13 Q    And, Mr. Seery, are you aware that four days after that

14 arbitration award assets started being transferred away from

15 Acis, stripping it of its value at that time?

16 A    I've read the judge's decision in the Acis case but I'm

17 not aware of any of the underlying facts, other than from

18 reading that case.

19 Q    So you aren't aware of all the assets that went out of

20 Acis the day after an arbitration award was entered.

21 A    No, I haven't looked at any of those.

22 Q    Okay.  And you're not aware that the day after a final

23 judgment was entered more assets were stripped from Acis.   Is

24 that correct?

25 A    Other than reading the Judge's decision I'm not aware of

Seery - Cross/Reid                                          85

1  any of the specific assets, no.

2  Q    Are you aware that two days after that, or entry of the

3  final judgment was ordered, Acis' entire risk retention

4  structure was transferred away from it and into the ownership

5  of Highland CLO Holdings?

6  A    I'm aware of some of the facts relating to the Acis case

7  from the decision and I'm aware of some of the facts from the

8  Acis case because of my discussions with Ms. Patel and Mr.

9  Terry.  I'm not aware of the specific transfers to which you're

10 referring without having -- looking at them.

11 Q    Okay.  So you're not aware that some of the assets that

12 were stripped from Acis went to one of the entities you're

13 wanting to send money to today.  Is that right?

14        MS. HAYWARD:  Objection.  Your Honor, I'm not sure

15 how this is relevant to the Debtor's distribution motion --

16        MS. REID:  Well, it's relevant to the distributions

17 that you're trying to give to the same entity.

18        MS. HAYWARD:  Your Honor, I think right now Mr.

19 Okada --

20        THE WITNESS:  What I --

21        THE COURT:  Just a minute.

22        THE WITNESS:  Sorry.

23        THE COURT:  We have an objection.  Let me hear the

24 objection.

25        MS. HAYWARD:  Your Honor, I think at this point Mr.

Seery - Cross/Reid                                    86

1  Okada is the only one getting a distribution at issue in this

2  case as of now in light of the representation that was made by

3  Judge Lynn.

4         THE COURT:  All right.  Well, what is your response

5  to the relevance objection?  She's saying that this line of

6  inquiry has kind of been taken off the table since -- I'm not

7  sure which entity, I think you're talking about the Holdco, CLO

8  Holdco.  Right?

9         MS. HAYWARD:  Yes, Your Honor.

10        THE COURT:  Since now the disbursement that would

11 have gone to it is being put off the table and would go into

12 the registry of the Court.  So what is your response?

13        MS. REID:  Well, Your Honor, and I can take it off,

14 but currently it's my understanding that Mr. Okada is a 25

15 percent owner in Holdco.  But I can move on to the next

16 question.

17 BY MS. REID:

18 Q    Which is, are you aware that Mr. Okada right after the

19 final judgment was entered transferred their entire interest to

20 Nutra Limited?

21 A    Who transferred to whom?

22 Q    Right after the final judgment --

23 A    Right.

24 Q    -- that Mr. Terry obtained, Mr. Okada transferred their

25 entire limited partner interest in Acis, LP to Nutra.

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                                87

1  A    So I apologize.  A couple of things.  One is it goes to

2  what you said, I don't believe Mr. Okada has any interest in

3  sale of Holdco, but you're saying Mr. Okada and their in your

4  question, and so it doesn't make sense.  He's an individual.

5  So I just don't know what you're asking me.  You said Mr. Okada

6  transferred their interest.   Who's their?

7  Q    Are you aware that Acis -- that you're aware that after

8  the entry of the Acis judgment that Mr. Okada's limited

9  partners interest in Acis was transferred to Nutra?

10         MS. HAYWARD:  Again, Your Honor, I lodge the same

11  objection to relevance.

12         THE COURT:  All right.  Again, what is your response

13  to the relevance objection?

14         MS. REID:  I think it's very relevant because I mean

15  he has been saying that they have a fiduciary duty to

16  investors.  Mr. Okada is not your normal independent investor.

17  It's a related party that has engaged in prior improper acts in

18  this court which you're aware, aren't you -- well.

19         THE COURT:  Yeah, I'll overrule the objection and

20  allow a little latitude.

21         THE WITNESS:  So I think what you're referring to is

22  the position in Nutra and I'm aware of some of those issues.

23  Mr. Okada apparently owns 25 percent of Nutra, Mr. Dondero owns

24  75 percent of it.  The control in Nutra is actually vested in

25  Highland Capital Management through a control agreement.   So

Seery - Cross/Reid                                    88

1  I'm not -- I'm aware that they made a transfer and that Nutra

2  owns that interest now, and I'm aware that that split is 75-25,

3  I assume because of that split just like ATM Services, Mr.

4  Okada doesn't have any say in how it's run.  And the control in

5  that entity anyway is vested in Highland, the Debtor.

6  BY MS. REID:

7  Q    So you're aware there were improper transfers made at --

8  during -- before the Acis bankruptcy.  Is that correct?

9  A    I'm aware --

10 Q    You're not aware?

11 A    I'm aware of the decision and I'm aware of the transfers.

12 The designation of it then as improper, I'm not sure that I can

13 say one way or the other because I've looked at the transfers

14 and I can't tell you whether that transfer was improper.  So if

15 you're asking me if I'm aware that that transfer occurred, I

16 think I said I was.  I don't think it's fair for you to color

17 that the transfer was improper.  If somebody --

18 Q    Are you aware of the Court's decision --

19 A    I am --

20 Q    -- that they were improper?

21 A    -- I don't recall the Court's decision with respect to

22 that transfer.  There were a lot of transfers, a number of

23 which the Judge ruled were improper.

24 Q    Okay.  So you are aware that there were improper transfers

25 made from Acis that the Judge found were improper.  Correct?

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                    89

1  A     Yes, I am.

2  Q     Okay.  And you're aware that Mr. Okada was the Chief

3  Investment Officer at the time those transfers were made.

4  Correct?

5  A     Of which entity?

6  Q     Of Highland, of the Debtor.

7  A     I believe he was -- I believe he was a co-CIO of the

8  Debtor at that time, but I'm not positive.

9  Q     So you don't know.

10 A     I'm not sure, no.

11 Q     Okay.  Do you know he was -- he was the Debtor's -- so you

12 do not know one way or the other.

13 A     I am aware that at some time he was the CIO and then the

14 co-CIO.  I don't know the specific time that he was the sole

15 CIO.  I just don't know.

16 Q     Do you know if he was involved with the Debtor at the time

17 these improper transfers were made?

18 A     He definitely worked for the Debtor at that time.

19 Q     Okay.  You -- the reply that was filed today by the --

20 this morning by the Debtor states that the making of these

21 distribution to Mr. Dondero and Mr. Okada is essential to

22 rebuilding the Debtor's reputation in the marketplace.  Is that

23 correct?

24 A     I believe that's what it says, yes.  I assume you're

25 reading it?

Seery - Cross/Reid                                    90

1  Q    I am.

2  A    Okay.

3  Q    Aren't you -- is the marketplace not well aware of

4  Highland's history including the Acis and the Redeemer

5  Committee litigation?

6  A    I believe the market is aware of the Acis and Redeemer

7  litigations.

8  Q    Okay.  And is the marketplace well aware of the extensive

9  wrongdoing that Mr. Okada and Mr. Dondero engaged in as found

10 by this Court and the other tribunals?

11 A    I don't know how the marketplace -- I know that they're

12 aware of the decisions, I can't tell you whether the

13 marketplace as a large general matter knows the specifics.  I

14 don't know.

15 Q    Have any non-insider investors expressed concern to you

16 over the possibility of Mr. Okada not receiving the

17 distribution?

18 A    No, I don't believe so.  I think -- just to make sure I

19 answered your question, have the non-insiders raised issues

20 about Mr. Okada --

21 Q    Not getting distribution.

22 A    No, there won't --

23 Q    No one is really concerned about that except Mr. Okada.

24 Correct?

25 A    I think each investor is concerned about their own

Seery - Cross/Reid                                                91

1 distributions, so like with respect to RCP I don't CalPERS

2 referred at all to the distributions to Ontario, they probably

3 don't care, they care about their own distributions.

4 Q    And the only one we're talking about right now is the one

5 to Mr. Okada.  Correct?

6 A    That's correct.  I hope so.  Right?  Meaning I'm under the

7 impression that the Committee doesn't object to the investment,

8 to the release of funds and the distribution to third-party

9 investors.

10 Q    Mr. Seery, you testified that one of the reasons you're

11 seeking to distribute these funds is because the Debtor has

12 fiduciary duties to investors.  Correct?

13 A    Yes.

14 Q    Okay.  But these funds aren't being distributed to just

15 regular investors.  Correct?  They're being distributed to

16 insiders.

17 A    Again, unfortunately these are things one has to be

18 precise with.  The question is insider under some securities

19 law, or insider under the Bankruptcy Code?  So --

20 A    Insider under the protocols.

21 Q    I believe the term there, again, we should be precise, is

22 related party.  So he's a related party under the protocols.

23 As far as I know there's no separation under the Investment

24 Advisors Act, under the Cayman law, under Delaware law, or

25 under the contracts with respect to persons who might have

Seery - Cross/Reid                                                    92

1 worked for the investment manager who made an investment in the

2 fund.

3 Q    Are you aware that the Debtor also has duties to the

4 Creditors Committee?

5 A    I don't believe the Debtor has any duties to the Creditors

6 Committee.

7 Q    To the estate?

8 A    I believe the Debtor has significant and overriding

9 duties, but that's what we're here for, to the estate.

10 Q    To the estate.  And were very conscious of those duties.

11 Correct?

12 A    I am indeed.

13 Q    That's what you testified.  Right?

14 A    Yes.

15 Q    Okay.  So can you explain to me what -- how you consider

16 the estate's considerations in deciding to distribute these,

17 what was your consideration of the estates, how does this

18 benefit the estate?

19 A    This benefits the estate because we have an obligation to

20 the funds and to the investors in the funds to perform

21 according to the terms of the funds.  Unfortunately there is no

22 provision in the fund documents or in the law that allows us to

23 treat the investors in the funds in a disparate way.  And we

24 believe, after consulting with outside counsel, domestic and

25 Cayman, considering federal law under the Advisors Act, as well

Seery - Cross/Reid                          93

1  as Delaware law, that the only way to make distributions, other

2  than if there was a law change, was pro rata to all of the

3  investors.

4          So in order to vindicate our obligations to the

5  outside investors, we also have to pay the inside investors.

6  In addition, if we don't pay the inside investors, there's no

7  basis not to do that.  Now there may ultimately be no liability

8  because it will be hard to bring a case.  But it seems to me

9  that incurring potentially liability is not in the best

10 interest of the estate.  Holding up a distribution from non-

11 estate property doesn't seem to do anything to help the estate.

12 In fact, it puts it at risk.

13         And so we did the work and that's how we determined,

14 exercising what I think is our duty of care, which is really

15 researching this, and we spent a lot of time and a lot of money

16 making sure we got this right.  And our duty of loyalty.  Is

17 there some good reason that the fund could hold up the

18 distribution.  Until we have a claim is there a valid to attack

19 these distributions.

20         By the way, there were $8 million out of 180 million.

21 Now if there had been 180 -- if there had been 172 out of 180,

22 maybe we would come in here and say, We should something a

23 little bit different because we're really letting the small

24 outside investors dictate us and force us to make distributions

25 to related parties that the Committee has some concern about.

1    But while $8 million is real money, and I don't deny

2 that, again, it's not huge in this case.  And it seemed to us,

3 after doing the work, that we were putting the estate at risk

4 by no exercising our fiduciary duties.  Moreover, we each have

5 reputations, and they're important to us, and they don't

6 override our fiduciary duties.  We're not going to do things to

7 aggrandize ourselves, to help our reputation versus the estate.

8 But running this Debtor correctly seems to us, looking at the

9 history, was the right thing to do.

10 Q    Has anyone, Mr. Seery, threatened to bring a fiduciary

11 duty claim against you if you don't pay these funds?

12 A    No.

13 Q    Has any -- has Mr. Okada said he's going to bring a claim

14 against you if you don't distribute these funds?

15 A    No, and nor did I consult him about it.  We just told him

16 what we were doing.  We're not -- I'm not inviting someone to

17 sue us.  That I think would be, you know, grossly wrong for us.

18 Q    Now we've touched a little bit on this, Mr. Okada owes the

19 Debtor 1.3 million.  Correct?  In the demand note?

20 A    Approximately, yes.

21 Q    All right.  And you have made a demand on Mr. Okada.

22 Correct?

23 A    That's correct.

24 Q    And he hasn't paid it.  Right?

25 A    No, he has not.

Seery - Cross/Reid                               95

1  Q    And that's money into the estate.  Correct?

2  A    That will be, yes.

3  Q    Now do you still think it's okay to just hand him off, you

4  know, $4 million and even though he's not paying the estate

5  that you have a duty to?

6  A    There's no such thing in my life as just handing off $4

7  million.  This is fund money --

8  Q    Distributable.

9  A    -- that will be distributed to the owners of the fund pro

10 rata.  We're not handing off anything to Mr. Okada or anybody

11 else.

12 Q    But Mr. Okada has not agreed to pay back his note.

13 Correct?

14 A    He's not agreed to pay it back, no.  Technically I would

15 say no.

16 Q    Okay.  And that's because of some severance agreement that

17 you're not aware of what the terms are.  Is that right?

18 A    I have not -- we have not -- I have not looked at the

19 terms, I don't believe many of my fellow directors yet have.

20 It's something that is on the burner for us to get to as soon

21 as this is over.

22 Q    And are --

23 A    He's pushing for it.

24 Q    -- are you aware that the Committee has asked for that

25 severance agreement?

Seery - Cross/Reid                                              96

1  A    I was not aware of that, no.

2  Q    You're not aware of that.

3  A    I haven't seen it.

4  Q    And you don't know that it hasn't been produced to us.   Is

5  that correct?

6  A    I don't -- I have not seen it myself, I don't -- didn't

7  know that you'd asked for it, nor do I know that it hadn't been

8  produced.

9  Q    Okay.  And you haven't looked at it.

10  A    I haven't seen it.

11  Q    So you don't know if his failure to pay that money back is

12  valid or not.  Is that correct?

13  A    That's -- I don't -- he still owes the money whether he

14  has appropriate setoffs and whether a settlement agreement

15  would actually work as one.  I don't -- haven't really analyzed

16  that and I don't know that our counsel has either.  It may be

17  that he owes the money and we're holding a severance agreement,

18  but those aren't mutual obligations that are subject to setoff.

19  Q    You don't know one way or the other whether he has a right

20  of setoff.  Correct?

21  A    I don't believe he -- other than perhaps expenses I

22  don't -- haven't heard any articulated monetary setoff against

23  the obligations he owes.

24  Q    If the Court orders that his distribution be put into the

25  Court registry, do you still think you've breached your duty to

**WWW.JJCOURT.COM**

Seery - Cross/Patel                                    97

1  the estate somehow by that?

2  A    I think if the Court orders it, I don't think we would be

3  subject to a breach of liability.  I think that we're here

4  vindicating our responsibilities and our duties to investors.

5  If there's an interceding court order, we will follow it.

6  Q    Thank you.

7            MS. HAYWARD:  I have no further questions.

8            THE COURT:  All right.  I think that was about 17

9  minutes.  Any other examination?  Okay.  You'll have 13

10  minutes.

11            MS. PATEL:  Just a few questions, Your Honor.

12                        CROSS-EXAMINATION

13  BY MS. PATEL:

14  Q    Good afternoon, Mr. Seery.

15  A    Good afternoon.

16  Q    Mr. Seery, I think your testimony was that the fund, let's

17  use RCP -- or I'm sorry, that's the wrong one --

18  A    Dynamic?

19  Q    I think it was the Dynamic --

20  A    Dynamic.

21  Q    -- Income Fund is the one that Mr. Okada has an

22  investment in.  Correct?

23  A    That's correct.

24  Q    Okay.  And the fund has duties to Mr. Okada including

25  fiduciary duties as an investor.  Right?

Seery - Cross/Patel                                    98

1   A    That's correct.

2   Q    Okay.  Does Mr. Okada have duties to the fund?

3   A    I don't believe he does, no.

4   Q    Okay.  Did he ever?

5   A    I believe he did.

6   Q    Okay.  That was during his tenure at Highland Capital

7   Management.  Right?

8   A    I think as an officer of Highland Capital Management, the

9   investment manager, he would have had duties to the fund, yes.

10  Q    Okay.  And have you investigated whether he's breached any

11  of his duties to the fund?

12  A    We have looked, we have not seen anything.  We know that

13  the redemptions came in without any objection.  We have not

14  spoken to the individual investors.

15  Q    Okay.  So would it be fair to say then that you haven't

16  concluded your investigation of whether Mr. Okada has breached

17  any of his duties to the fund itself?

18  A    I don't think that would be fair.  I think what would be

19  fair to say is we've taken a look, we see no evidence

20  whatsoever that there were any breaches by Mr. Okada of his

21  duty to that fund, so there would be no reason to undertake an

22  investigation that we had yet to complete.

23  Q    Okay.  And who undertook that investigation, was it just

24  the board or did you have others involved?

25  A    It was the board.

Seery - Cross/Patel                                99

1 Q    Okay.  No one else?

2 A    The investigation with respect to the -- we got data from

3 other people but I'm the one who looked at whether there were

4 any claims related to the redemptions, any objections to any of

5 the other distributions, any objections to the fees, and we

6 found none.

7 Q    Okay.  So no outside counsel advised you with respect to

8 whether Mr. Okada had potentially breached any duties to the

9 fund?

10 A    No, again, it's not something that we would have looked at

11 with no evidence whatsoever that there was any sort of

12 complaint or breach.

13 Q    Okay.  All right.  Mr. Seery, with respect to the, I'll

14 call it the agreement because I'm assuming that it is an

15 agreement, that Mr. Dondero's counsel announced on the record

16 regarding putting the funds that would otherwise be payable to

17 Mr. Dondero into the registry of the Court.  Do you have an

18 understanding whether that agreement also extends to Highland

19 Capital Management Services?

20 A    Yeah, just to be clear because, again, we should be

21 precise, Mr. Dondero was not going to receive any money.  The

22 CLO Holdco, which is owned by the charitable DAF has

23 investments in the Argentina Fund and the Dynamic Fund.  It was

24 going to receive money.  Highland Capital Services has around a

25 2 percent interest in RCP, it was going to receive money.

Seery - Cross/Patel                    100

1          I understand that Mr. Dondero, through his counsel,

2   directed that the distribution to Highland Capital Services

3   would not be made.  Mr. Okada owns 25 percent of that, he was

4   not consulted.  I know that because I spoke to Mr. Okada.  The

5   distribution with respect to the CLO Holdco has been similarly

6   treated, but that was done by Grant Scott talking to Mr. Nelms

7   (phonetic) for the charitable DAF that controls the CLO Holdco.

8   Q     Okay.  So, again, to be clear, Mr. Okada has not consented

9   to the agreement that was announced on the record with respect

10  to any distributions to Highland Capital Management Services.

11  Correct?

12  A     He has not, but since he doesn't control it and Mr.

13  Dondero does, the agreement is binding.

14  Q     Okay.  And how do you know that Mr. Dondero controls

15  Highland Capital Management Services?

16  A     Mr. Okada told me.

17  Q     Okay.  All right.  Mr. Seery, with respect to Mr. Okada, I

18  believe your testimony was he separated from Highland Capital

19  Management in September of 2019.  Correct?

20  A     I believe I testified that he originally began his

21  separation in the spring, I don't know exactly when it was, and

22  I believe his official resignation was some time around

23  September.

24  Q     Okay.  Would September 30 of 2019 sound about right?

25  A     It -- approximately, I don't know the date.

**WWW.JJCOURT.COM**

Seery - Cross/Patel                          101

1  Q    Okay.  So it was towards the end of September though.

2  Correct?

3  A    I don't -- I don't know whether it was September 1,

4  September 15 or September 30, I just don't know the answer.

5  Q    Okay.  And at the time Mr. Okada separated from Highland

6  or any time before then, did Mr. Okada have a non-compete

7  agreement?

8  A    I have not looked at Mr. Okada's contract.

9  Q    Okay.

10 A    So I don't know.

11 Q    All right.  Does -- did Mr. Okada have something called a

12 non-solicit --

13 A    I don't know.

14 Q     -- where he wouldn't solicit clients for example of

15 Highland Capital Management?

16 A    I don't know.

17 Q    Okay.  Did Mr. Okada have what's called a non-recruit

18 where he wouldn't come in and try and recruit employees of

19 Highland Capital Management?

20 A    Again, because I haven't looked at his contract, if he had

21 one, I don't know that he did, and because I haven't looked at

22 it, and I testified that I haven't seen this severance

23 agreement he's talking about, I don't have any understanding of

24 the terms of Mr. Okada's employment with Highland Capital

25 Management.

**WWW.JJCOURT.COM**

Seery - Cross/Patel                    102

1  Q     Okay.  So you just haven't looked at any of those things.

2  A     That's correct.

3  Q     All right.  Are you aware -- well, did you have an

4  opportunity to look at -- I believe there was a press release

5  that was somewhere around September 2019 where Mr. Okada said

6  he was actually retiring from Highland Capital Management?

7  A     I would have no reason to have looked at such a thing in

8  September.

9  Q     Okay.  All right.  So you haven't seen that.  Let me ask

10 you another question, are you aware that Mr. Okada has a new

11 business by the name of Sycamore Tree Capital?

12 A     I'm aware that he intends to start a new fund, I have no

13 idea what the name is and I'd have no idea what development --

14 stage of development it's in.

15 Q     Okay.  Are you aware if any Highland employees have been

16 engaged by Sycamore Tree Capital

17 A     I'm aware that at least one maybe, I'd have no idea

18 whether that employee, ex-employee now, is involved or not.

19 Q     And isn't that employee Troy Parker?

20 A     That's correct, yes.

21 Q     Okay.  What did Troy Parker do for Highland Capital

22 Management?

23 A     Most recently he ran the PE book.

24 Q     Okay.

25         MS. PATEL:  No further questions, Your Honor.


**WWW.JJCOURT.COM**

Seery - By the Court                                           103

1          THE COURT:  All right.  We have seven minutes.  Do

2   you have questions, Judge Lynn?  We have a little bit of time?

3          JUDGE LYNN:  No, but I just want to make clear Mr.

4   Dondero's suggestion for resolving the motion was not a

5   dickered agreement, it was a suggestion that we would hope

6   would make life easier for the parties and the Court.

7          THE COURT:  Okay.  Thank you.  Thank you.

8          I had one or two questions.  Is there going to be

9   redirect?  Well, no, you used all your time, you don't get

10  redirect.

11     (Laughter.)

12

13         MS. HAYWARD:  And, Your Honor, I don't have redirect.

14         THE COURT:  Oh, very good.

15                        EXAMINATION

16  BY THE COURT:

17  Q    Let me ask you, sir, I want to revisit Dynamic, that's the

18  one I hear most about obviously since that's the one that Mr.

19  Okada --

20  A    Yes.

21  Q     -- has the distribution rights from.  You know, I was

22  fixated before I came out here a little on the time line.

23  Right?  So the pleadings said Dynamic, the termination date was

24  November 15, 2019.

25  A    Correct, Your Honor.

**WWW.JJCOURT.COM**

Seery - By the Court                                          104

1  Q    About 30 days after the Highland bankruptcy was filed.

2  What I heard your testimony to be was that pre-petition the

3  largest third-party investor -- I wrote it down phonetically --

4  A    Realdania.

5  Q     -- Realdania --

6  A    I'm not sure if there's someone in the courtroom who know

7  them.

8  Q    Sounds like a Spanish company maybe.

9  A    I believe they're a European company, it's an investor I'm

10 not familiar with, Your Honor, but I have seen the redemption

11 notices.

12 Q    Okay.  They issued a $65 million --

13 A    I believe it was in the neighborhood of 65 million, yes.

14 Q    And it was pre-petition?  You wouldn't know?

15 A    It was pre-petition, I think it was around 40 percent of

16 the fund.

17 Q    Okay.  I mean do you remember when?  Was I t --

18 A    I believe it was in the spring and it followed a -- spring

19 or early summer and it followed a separate redemption from a

20 different investor.

21 Q    Okay.  So there was another third-party investor, even

22 before Realdania that --

23 A    That's my recollection, yes, Your Honor.

24 Q     -- that was unaffiliated with Highland.

25 A    That's correct.

Seery - By the Court                                105

1  Q    Okay.  So it's your business judgment that once these two

2  biggies issued their redemptions, it just wasn't worthwhile to

3  keep this fund going anymore.

4  A    That's correct, Your Honor.  And as I said, Mr. Okada was

5  a driver to that fund and he had left.  He did not actually

6  redeem, but he was being compulsory redeemed as the fund went

7  into liquidation.  So all of the investors, redeemed and non,

8  will be treated the same.

9  Q    All right.  So I guess one thing I'm getting at is timing

10  of Mr. Okada leaving versus timing of these third-party

11  redemptions happening.

12  A    Right.  I could --

13  Q    Is there any --

14  A    I see no connection whatsoever.  And, again, his piece of

15  the fund was about -- I believe it was round 12 percent of the

16  fund.

17  Q    Yeah, his --

18  A    And it's a material amount of money I suppose to most

19  folks, including myself, but it's not -- it wasn't a driver

20  whatsoever that we could see, and he did not redeem.  So the

21  third-party redeemed, Okada was leaving having been the driver

22  of the fund, it was an undersized fund anyway, there was no

23  real valid reason to keep a small fund trying to do this around

24  after Mr. Okada left.

25  Q    Okay.  I'm just wondering whether I should or not, you

Seery - By the Court                    106

1  know, the timing of this.  So this is -- starts spring of 2019,

2  but then a month post-petition let's terminate this thing.   I

3  mean who actually makes that decision?

4  A    Well, the decision to continue forward is made by the

5  board.  Before that it would have been made by the managers of

6  the funds or the compliance group.  So I have not looked into

7  specifically who said, Let's terminate it.  To be perfectly

8  frank, I don't know --

9  Q    But it would --

10  A     -- the specifics.

11  Q     -- the manager, Highland?

12  A    It's Highland who determines to terminate it.  Ultimately,

13  if all the investors issued redemption notices, then the fund

14  would have to liquidate --

15  Q    Right.

16  A     -- on its own.  So Highland --

17  Q    Right.

18  A     -- wouldn't have any say about it.  But to put it into

19  liquidation, I believe it was Highland that did it.  Some of

20  the funds, it could be foreign directors, but that's not what

21  happened.

22  Q    Uh-huh.  Okay.  So there are third-party non-affiliated

23  investors still in it, there's 35 million that would go out the

24  door and --

25  A    It's about -- there's a couple of assets that still have

**WWW.JJCOURT.COM**

Seery - By the Court                                    107

1  to be liquidated.  Approximately 85 percent of the distribution

2  is to third-party un-affiliated investors.  And then we --

3  we'll have -- we'll retain some cash to make sure that we can

4  manage the liquidation of the fund and the dissolution of the

5  entities.  But we still have to get rid of a small amount of

6  assets that are pretty liquid.

7  Q    Okay.  Now I heard you also say that Highland isn't owning

8  any fees anymore on these refunds.  Did I not hear you say

9  that?

10 A    Yeah, certainly -- so I think on ours I think.  On Dynamic

11 and on AROF, the Argentina Recovery Opportunity Fund, once they

12 were put into liquidation they don't earn any fees anymore.

13 The --

14 Q    Okay.  Let me -- okay, so when did that stop, when were

15 they "put into liquidation" so the management fees stop?

16 A    I believe that Dynamic would have been in the fall, I

17 don't know the exact date, and Argentina --

18 Q    Well --

19 A    -- was before that.

20 Q    -- the Court termination date used in the pleadings was

21 November 20, 2019.

22 A    Yeah, but I don't recall the exact date, Your Honor.  We

23 can certainly figure that out, I just don't recall off the top

24 of my head.  When the fee cutoff date -- the fee cutoff date

25 for RCP was I believe in April of 2018 when the one-year

```
                            Seery - By the Court                     108
 1  extension was given.  That was the trade for the extension.
 2  Q    Okay.  But you don't know for sure when the management fee
 3  cutoff was --
 4  A    No.
 5  Q    -- on either Argentina or Dynamic.
 6  A    No, that's correct, Your Honor.
 7  Q    I mean would it have been in November 2019 you think?
 8  A    I think it was before that, but I don't -- I believe so
 9  but I don't know for sure.
10  Q    Okay.
11  A    If I'm wrong, I'll figure that out and correct it to you.
12  Q    Okay.  All right.  Thank you.  You're --
13  A    Thank you.
14  Q    -- excused.
15  A    Thank you.
16         THE COURT:  Does anyone in the room know the answer
17  to that?
18         MS. HAYWARD:  Your Honor, we can figure it out very
19  quickly I think.
20         THE COURT:  Really?  Okay.
21     (Pause in the proceedings.)
22         THE COURT:  Actually I had one more question for Mr.
23  Seery.
24         THE WITNESS:  Yes.
25  BY THE COURT:
```

Appx. 03325

Seery - By the Court                         109

1  Q    Do we have any other Highland managed funds out there that

2  are imminently going to be going into wind-down mode?  Is that

3  easy to answer?

4  A    We have a number of CLO funds that are what we call 1.0

5  CLOs.  They're old and they're effectively winding down.  And a

6  number of those we don't get fees off of, but they had --

7  because they own very illiquid assets, we have to realize on

8  those assets.  May of those have cross-ownership to funds that

9  we do get fees on.  We need --

10 Q    Let me back you up.  Why didn't Highland get fees on

11 those?

12 A    Because sometimes in the CLO structure it depends on what

13 kind of asset gets treated under the net asset value, so for

14 example if it's equity, it may not count, even if it has a

15 value, you don't get paid a fee on it.  So if you had a loan

16 that converted to equity, some of those CLOs you  may not get a

17 fee on because you don't own any loans anymore.  So, but most

18 of those assets, if a CLO owned equity for example in a PE

19 company, we would have other funds that owned additional equity

20 in that same PE company.

21         We do have other assets where they aren't necessarily

22 wind-down, but there will be distributions to entities that may

23 or may not be related parties under the protocols, and we are

24 in the process, and the Committee's aware of it, selling

25 certain assets, and hopefully those sales will go the way we

                              Seery - By the Court                    110

1  want them to.  They're valuable assets so we feel we have a

2  good opportunity to realize good value for the estate.   There

3  would be requirements on certain of them to pay off debt from

4  certain entities before we can distribute money back up to

5  Highland Capital.

6  Q    All right.  Thank you.

7  A    Thank you.

8          THE COURT:  You're excused.

9          All right.  Anything else today?

10         MR. POMERANTZ:  Do you want to hear closings, or have

11 you heard enough, Your Honor?

12         THE COURT:  I mean if you  have a quick one or two

13 minute closing, I'll hear that, to recap anything.   Did you

14 have that quick answer that Ms. Hayward --

15         MR. POMERANTZ:  We are --

16         THE COURT:   -- was confident about?

17         MR. POMERANTZ:  We are trying to find it.

18         THE COURT:  Okay.

19         MR. POMERANTZ:  We have a couple of emails out,

20 hopefully by, we get a couple of answers.

21         THE COURT:  Okay.  Okay.

22          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23         MR. POMERANTZ:  Your Honor, I just wanted the

24 highlight the fiduciary duty as you -- I know it was a subject

25 of discussion with Mr. Seery, cross-examination.  Again, as you

                         **WWW.JJCOURT.COM**

111

1 heard, and as the only evidence before Your Honor is, Mr.

2 Seery, who as Your Honor knows is a restructuring lawyer,

3 practice in it.  He's fully aware of what the fiduciary duty

4 requires.

5        And first and foremost, I think it may even be 28 USC

6 959, the Debtor has to operate in accordance with applicable

7 law.  Every debtor before Your Honor has to act in accordance

8 with applicable law, and if the debtor is not acting in

9 accordance with applicable law, then they are creating

10 liability.  As Mr. Seery testified, that is exactly what that

11 the Debtor is doing. And this concept of dueling fiduciary

12 duties or the board taking certain actions that just happened

13 to benefit insiders as indicating that they are not looking out

14 for the estate is just not accurate.  That's not how the law

15 works and I think Mr. Seery said it correctly, that the Debtor

16 fulfills its fiduciary duty to the estate by operating in

17 accordance with applicable law.

18        With respect to 105, Your Honor, the cases cited by

19 the Committee don't support granting injunctive relief forward

20 of attachment without going through the necessary process.

21 They do cite the DeLorean case which at first blush sounds like

22 a court authorized the holding of money, but if you read that

23 case carefully, it was done because there was a complaint and

24 because the Court ultimately determined that the evidence

25 before the Court established grounds for preliminary

112

1  injunction.

2          Mr. Clemente has asked Your Honor to hold that the

3  objection filed satisfies the standard.  But the objection

4  isn't a legal document.  The Committee has not put on any

5  evidence to support any claims that exist.  The testimony from

6  Mr. Seery is that there's a claim under a note and that there

7  are defenses to the note.  So Your Honor does not have the

8  sufficient evidentiary basis in order to meet the standards of

9  the injunction of which irreparable harm -- there's a whole

10 host of reasons.

11         So while we understand what the Committee wanted to

12 do.  If they wanted to file an action, they could have.  We

13 don't expect them to have completed their investigation on all

14 the types of claims they're looking at.  But they've been aware

15 of this Okada note for a couple of months.  It would not have

16 been difficult for them to file, as they have standing, a

17 lawsuit to recover any.  They asked us to issue a demand note,

18 we did, and we got the answer.

19         So, Your Honor, I don't think there's a basis under

20 105, the way it's being used here and the lack of evidentiary

21 record to support it.  And for those reasons, Your Honor, we

22 would ask that Your Honor support the motion and other than the

23 distributions that are being held in the registry, allow the

24 distribution to be made to Mr. Okada.

25         THE COURT:  Okay.

**WWW.JJCOURT.COM**

113

1          MR. POMERANTZ:  Thank you, Your Honor.

2          THE COURT:  All right.  Other quick closings?

3          MR. CLEMENTE:  Your Honor, I'll be very quick.

4          CLOSING ARGUMENT ON BEHALF OF THE COMMITTEE

5          MR. CLEMENTE:  There's obviously a lot more that I

6  could say, but I'll be respectful and be very quick.

7          First of all, Your Honor is the judge and you're the

8  one that determines what the law is and what the duties

9  ultimately are for this Debtor.  Mr. Seery I think indicated in

10  his testimony that, for what it's worth, he does not believe

11  that there would be a viable claim for breach of fiduciary duty

12  if Your Honor ordered the distribution to Mr. Okada be put in

13  the Court registry.

14          I think the testimony was clear from Mr. Seery that

15  Mr. Okada, at all times relevant, when all the things that

16  happened that involved the Redeemer Committee, that involved

17  Acis, that involved UBS, Mr. Okada was at least co-Chief

18  Investment Officer and we all know he was co-founder of

19  Highland.  I think Your Honor's questions, and perhaps

20  frustration with sort of trying to figure out some of the

21  answers, show how interrelated all of these things are and the

22  various capacities and roles that Mr. Okada had back at the

23  time when all these different transactions occurred.

24          I think the testimony we heard is that Mr. Seery did

25  a lot of work around why we should pay Mr. Okada, but almost no

**WWW.JJCOURT.COM**

114

1  work around why we shouldn't pay Mr. Okada.  And so I go back

2  to what I said earlier, Your Honor, I think Mr. Okada is

3  perfectly capable of coming into this court and arguing that

4  once the monies that were put into this Court's registry should

5  be distributed to him, he can come in and do that.

6          But I think for purposes of today, Your Honor has

7  heard more than enough to come to the conclusion that the

8  appropriate remedy here is to place the money within the

9  registry of this Court.  It satisfies the fiduciary duty of the

10 Debtor and it protects the interest of Mr. Okada, who is free

11 to come into this court and make whatever argument he so

12 chooses as to his entitlement to those funds.

13         Unless Your Honor has any questions of me, I'll sit

14 down.

15         THE COURT:  Thank you.

16         MR. CLEMENTE:  Thank you.

17         THE COURT:  Anything else?

18         MR. POMERANTZ:  Your Honor, in answer to you

19 question, November 11 was the date that the fees were no longer

20 payable to the Debtor in the Dynamic Fund.

21         THE COURT:  November 11 post-petition.

22         MR. POMERANTZ:  Correct.

23         THE COURT:  I like being transparent and I -- and so

24 I sometimes share my thoughts hoping that it will help.  But

25 I'm -- you all get why I'm fixated on this point?  Maybe I'm

115

1 sharing my thoughts when I don't have to.  But the time line

2 looks suspect, whether it should be or not, it looks maybe

3 problematic.  Do you see what I'm saying?

4        We had this fund that I understand never got to real

5 scale and in spring 2019 we have a couple of big unrelated

6 third-parties -- third-party investors issue redemptions and

7 that makes it really not a very worthwhile fund, so maybe it

8 should go into wind-down mode.  Nevertheless, Highland has been

9 continuing to get its management fee.  I don't know how much

10 management fee, but it's been getting a management fee until it

11 files bankruptcy, and then, Oh, let's wind this sucker down.

12        Do you see what -- you know, I don't know.  I mean

13 again, a hearing for another day.  But this is the kind of

14 thing I get concerned about, and maybe kind of want to look

15 into the bona fides of the decision making process to wind

16 down, let's terminate this thing and make disbursements.  And,

17 you know, did we have any fingerprints of this on insiders that

18 should make me troubled.  I don't know.  I mean if I'm going

19 out on a lark here, just stop me.

20        MR. POMERANTZ:  Well, look, Your Honor, I certainly

21 understand why you're concerned.  As you said at the first

22 hearing, you have stuff in your head that you can't forget, and

23 I understand.  I wasn't around but I understand the history and

24 especially the history with certainly similar things that may

25 have happened in the Acis case.

116

1           The facts are that Realdania made its redemption

2   request on August 15, the fees that the -- August 15, but that

3   the liquidation was the time where the management fees stopped,

4   which incidentally were $12,000 a month based upon the level of

5   this spot.

6           THE COURT:  Okay.

7           MR. POMERANTZ:  So, Your Honor, I understand your

8   concerns, however, what I would say is, you have Mr. Seery here

9   answering your questions.  You have Mr. Seery who said he's

10  conducted an thorough investigation.  At some point, and I'm --

11  you know, obviously you brought up a couple of questions, at

12  some point the creditors -- Your Honor has to accept that if

13  the board has done a thorough analysis, and we're coming into

14  this hearing today, and before we filed the motion, as Mr.

15  Seery said, we crossed all our Ts and dotted all our Is.

16          We spent a lot of money collectively, the different

17  firms that are involved, because we wanted to make sure it's

18  the right thing.  We understood that coming to Your Honor

19  asking to pay investors who are related parties, given the

20  context of this case and given the Committee's opposition, was

21  going to be a big challenge.  We thought it was the right thing

22  to do, but we wanted to make sure Your Honor knows that the

23  board actually did a thorough investigation, again, spearheaded

24  by Mr. Seery, who is not just someone off the street, but as he

25  testified, this is what he's done over the last 10-15 years.

117

1           So I certainly understand Your Honor's concerns.   Mr.

2   Seery I think has testified about the thorough investigation,

3   and that the 12,000 a month, that I think if he got back on the

4   stand, he would testify that would be a breach of duty to the

5   investors to continue on getting fees.   There's an obligation

6   at some point, when the redemptions happened, to either pay the

7   redemptions, put the fund in liquidation, and that's what

8   happened.

9           And just because it wasn't done by the board, it was

10  done before, it was important, as I mentioned in my opening,

11  and as Mr. Seery testified, he looked at that carefully and

12  thoroughly.   He didn't want to be embarrassed, we didn't want

13  to be embarrassed coming in and not having those answers.   So,

14  Your Honor, this is a long way of saying I think at some point

15  the board is entitled to the deference of business judgment if

16  they can demonstrate that they've gone through the process

17  necessary to earn the deference to business judgment, which I

18  think Mr. Seery has done.

19          THE COURT:   Okay.   And while we're on the subject, I

20  mean 12,000 a month was the management fee to Highland from

21  Dynamic.   What was the management fee from Argentina, do you

22  have that off the top of your head?

23          MR. SEERY:   It would have been in the same -- these

24  are approximately --

25          THE COURT:   The same range?

**WWW.JJCOURT.COM**

118

1          MR. SEERY:    -- the same neighborhood.

2          THE COURT:   Okay.

3          MR. SEERY:   That the meetings would be based upon

4  fees.

5          THE COURT:   Okay.

6          MR. SEERY:   Or the redemptions (indiscernible)

7  variable asset now (indiscernible).

8          THE COURT:   Okay.

9          MR. SEERY:   (indiscernible).

10          THE COURT:   Okay.  All right.  Just a minute while I

11  do some math.

12      (Pause in the proceedings.)

13          THE COURT:   All right.  I'm doing this math in my

14  head.  There's a $7.4 million note receivable from HCM Services

15  of which Okada is the 25 percent owner of.

16          MR. POMERANTZ:   Your Honor, 7.4 is not the demand

17  notes.  Again, 985,000 is the demand notes.  The rest of those

18  notes are performing and not in the fall.

19          THE COURT:   Okay.  All right.  With regard to the

20  motion and the objection and the Committee there's been a lot

21  of argument about 105 and what it permits the Court to do and

22  what it doesn't as far as fashioning an equitable remedy here.

23  Here I mean it's clear that this Debtor has receivables owed by

24  these related parties, although they don't necessarily match up

25  perfectly with the amount of disbursements that are owed by

**WWW.JJCOURT.COM**

119

1  these funds and of course the funds are separate legal entities

2  than the Debtor.  So I'm not glossing over that fact or

3  ignoring that fact.

4          But I do think the Court has broad equitable powers

5  to remedy -- to fashion remedies that preserve the status quo

6  and I think it is appropriate here to order that most of this

7  money, that most of the 8.6 million that would go to related

8  investors in these three funds, be put into the registry of the

9  court pending further motions, orders, adversary proceedings

10  anyone wants to file to make a claim to that money.  I said

11  most of it.

12          I am going to order that with regard to the amount

13  that would be payable to Mr. Okada, the 4.176 million, we will

14  subtract from that the 1.3 million that represents the demand

15  note receivable that the Debtor has so that I'm essentially

16  doing an equitable offset at that point.  So he can only be

17  paid -- he should only be paid from the Dynamic Fund whatever

18  4.176 million minus 1.3 million is, and the rest shall be put

19  into the registry of the court.  And everybody's rights are

20  reserved on anything and everything with regarding to do tos

21  and do froms.

22          I reserve the right to supplement in more detail in a

23  written form of order to justify the Court's 105 action here.

24  But, Mr. Pomerantz, I'd ask you to upload a form of order on

25  this, please.

120

1          MR. POMERANTZ:  We'll be happy to, Your Honor.  We'll

2   circulate it to the Committee and Ms. Patel as well.

3          THE COURT:  All right.  Well, thank you all, and --

4          MR. CLEMENTE:  Your Honor, but just to be clear

5   though, the other amounts, correct, to HCM Services and CLO

6   Holdco, would that be part of the order or what did Your Honor

7   have in mind with respect to that?

8          THE COURT:  Well --

9          MR. CLEMENTE:  Because I believe those are to be

10  deposited with the Court as well, yes.

11          THE COURT:   -- all of -- everything gets deposited

12  in the registry of the court, except Mr. Okada will get

13  whatever the differential is of 4.176 minus 1.3.  Okay?

14          MR. CLEMENTE:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          COURT SECURITY OFFICER:  All rise.

17                         *****

18

19

20

21

22

23

24

25

121

# C E R T I F I C A T I O N

We, DIPTI PATEL, KAREN WATSON and TERRI STARKEY,
court approved transcriber, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter, and to the
best of my ability.


/s/ Dipti Patel
DIPTI PATEL


/s/ Karen Watson
KAREN WATSON


/s/ Terri Starkey
TERRI STARKEY

J&J COURT TRANSCRIBERS, INC.        DATE:  March 6, 2020

Appx. 03338