# EXHIBIT 29

Appx. 03414

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

                              )   Case No. 19-34054-sgj-11
In Re:                        )   Chapter 11
                              )
HIGHLAND CAPITAL              )   Dallas, Texas
MANAGEMENT, L.P.,             )   Tuesday, January 26, 2021
                              )   9:30 a.m. Docket
        Debtor.               )
                              )   MOTION FOR ENTRY OF ORDER
                              )   AUTHORIZING DEBTOR TO
                              )   IMPLEMENT KEY EMPLOYEE
                              )   PLAN [1777]
_____  )
                              )
HIGHLAND CAPITAL              )   Adversary Proceeding 21-3000-sjg
MANAGEMENT, L.P.,             )
                              )
                              )
        Plaintiff,            )
                              )
v.                            )   PLAINTIFF'S MOTION FOR A
                              )   PRELIMINARY INJUNCTION AGAINST
HIGHLAND CAPITAL              )   CERTAIN ENTITIES OWNED AND/OR
MANAGEMENT FUND ADVISORS,     )   CONTROLLED BY MR. JAMES
L.P., et al.                  )   DONDERO [5]
                              )
        Defendants.           )
_____  )
```

                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
              UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                           13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

2

```
1    APPEARANCES, cont'd.:

2    For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
3                                One South Dearborn Street
                                 Chicago, IL  60603
4                                (312) 853-7539

5    For CLO Holdco, Ltd.:       John J. Kane
                                 KANE RUSSELL COLEMAN LOGAN, P.C.
6                                901 Main Street, Suite 5200
                                 Dallas, TX  75202
7                                (214) 777-4261

8    For Certain Defendants:     Davor Rukavina
                                 Julian Vasek
9                                MUNSCH, HARDT, KOPF & HARR
                                 500 N. Akard Street, Suite 3800
10                               Dallas, TX  75201-6659
                                 (214) 855-7587
11
     For Certain Defendants:     A. Lee Hogewood, III
12                               Emily Mather
                                 K&L GATES, LLP
13                               4350 Lassiter at North Hills
                                   Avenue, Suite 300
14                               Raleigh, NC  27609
                                 (919) 743-7306
15
     For James D. Dondero:       John T. Wilson
16                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
17                               420 Throckmorton Street,
                                   Suite 1000
18                               Fort Worth, TX  76102
                                 (817) 405-6900
19
     For the U.S. Trustee:       Lisa L. Lambert
20                               OFFICE OF THE UNITED STATES
                                   TRUSTEE
21                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
22                               (214) 767-8967

23   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
24                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
25                               (214) 753-2062
```

**Appx. 03416**

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX   76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

4

1          <u>DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.</u>

2          THE COURT:  All right.  We have Highland settings

3  this morning:  a Motion for Approval of a KERP, which I didn't

4  see objections to, and then a Preliminary Injunction hearing.

5  Let me get appearances from the parties who have filed

6  pleadings.

7      For the Debtor team, I see Mr. Morris.  Who do we have

8  appearing?

9          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10  Pomerantz and John Morris appearing on behalf of the Debtor.

11  I will handle the KERP motion, which we'll propose goes first

12  and quickly, and then Mr. Morris will handle the adversary

13  proceeding.

14          THE COURT:  All right.  Very good.

15      All right.  Let me get appearances from the Defendants in

16  the preliminary injunction matter.  Do we have Mr. Kane or

17  someone for CLO Holdco?

18          MR. KANE:  Yes, Your Honor.  John Kane for CLO

19  Holdco, Ltd.

20          THE COURT:  All right.  What about for the Funds and

21  Advisors?  I guess we have a couple of law firms involved.

22  Who do we have appearing for the K&L Gates firm?

23          MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24  Hogewood with K&L Gates, and also with our firm appearing

25  today is Emily Mather.

**Appx. 03418**

5

1              THE COURT:  Okay.  I didn't get Emily's last name.

2   Could you repeat that?

3              MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

4   M-A-T-H-E-R.

5              THE COURT:  Thank you.

6       All right.  For the Munsch Hardt team, do we have Mr.

7   Rukavina or someone else appearing?

8              MR. RUKAVINA:  Your Honor, good morning.  This is

9   Davor Rukavina.  I represent all of the Defendants in the

10  adversary except CLO Holdco.

11      Pursuant to the Court's instructions, Mr. Dondero is also

12  present here in my conference room, so he is here.  He is not

13  on the camera, but he is here.

14             THE COURT:  Okay.  All right.  And does Mr. Dondero

15  have counsel, his individual counsel appearing today?

16             MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17             THE COURT:  Okay.  Thank you.  Do we have Creditors'

18  Committee lawyers on the phone today?

19             MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20  Matthew Clemente; Sidley Austin; on behalf of the Official

21  Committee of Unsecured Creditors.

22             THE COURT:  All right.  Thank you.

23      All right.  Well, obviously, if any other lawyer is dying

24  to chime in at some point today, I will consider letting that

25  happen.  But, again, I think we've got the parties who have

6

1  filed pleadings having appeared at this point.  So, let's turn

2  to the KERP motion.  Mr. Pomerantz?

3      MR. POMERANTZ:  Yes, Your Honor.  Good morning again.

4  On January 19th, the Debtor filed its motion for approval of a

5  Key Employee Retention Program which would substitute out its

6  annual bonus plan.

7      We have not received any opposition to the motion,

8  although the United States Trustee did ask some questions

9  which we are prepared to address in connection with the

10 proposed proffer of Mr. Seery's testimony.  I'm happy to make

11 a full presentation of the motion to Your Honor, if you would

12 like, or I could just present Mr. Seery's proffer, which I

13 should -- which I believe will establish the factual predicate

14 and the evidence to support the motion.

15      THE COURT:  All right.  Let's just go straight to the

16 proffer, please.

17      MR. POMERANTZ:  Okay.  Thank you, Your Honor.

18          PROFFER OF TESTIMONY OF JAMES P. SEERY

19      MR. POMERANTZ:  Mr. Seery is on the video today, and

20 if he was called to testify he would testify that his name is

21 James P. Seery, Jr. and that he is the chief executive officer

22 and chief restructuring officer of Highland Capital

23 Management.

24      He would also testify that he was one of the independent

25 directors appointed to the Court on January 9th, 2020.

7

1  Because of his role with the Debtor, he is familiar with the

2  company's day-to-day operations, including its -- the

3  company's employee and wage benefit and bonus plans relating

4  to the employees.

5      He would testify that he has been involved in the

6  negotiation and drafting of the company's plan of

7  reorganization, and is familiar with the expected operation of

8  the Claimant Trust and Reorganized Debtor post-confirmation in

9  connection with the plan.

10     He would testify that the plan generally provides for the

11 monetization of the company's assets for the benefit of

12 creditors and stakeholders, and he would testify that, as part

13 of the plan process, he worked closely with DSI, the company's

14 financial advisor, to assess both the costs of the Debtor's

15 current employee base and the projected cost of operations in

16 connection with the Reorganized Debtor and Claimant Trust

17 following the effective date.

18     He would testify that, to ensure the continued smooth

19 operation of the company in connection with the continuation

20 and consummation of the plan for the benefit of all

21 stakeholders, that he worked with DSI to determine the

22 appropriate staffing needs necessary for the company's

23 remaining operations.

24     He would testify that he analyzed the current employees to

25 determine which, if any, would need to be continued to be

8

1  retained by the Debtor and operate during the Reorganized

2  Debtor and Claimant Trust period following the effective date

3  of the plan.

4      He would testify as part of that analysis he reviewed the

5  roles and functions of the non-insider employees with respect

6  to the services that they needed, and he reviewed the wages,

7  benefits, and bonuses for those remaining non-insider

8  employees necessary for those functions.

9      He would testify, that based upon his review, the company

10 determined that it was in the best interests of the estate to

11 terminate the existing annual bonus plan, as it was no longer

12 necessary to effectively incentivize the remaining non-insider

13 employees who would be terminated prior to being entitled to

14 any further payments under the annual bonus plan.

15     He would testify that, instead, the company developed a

16 new retention plan that was designed to incentivize the non-

17 insider employees to remain with the company for as long as

18 they are needed to assist in the effectuation of the plan.

19     He would testify that Mr. Waterhouse and Surgent, arguably

20 two insiders of the Debtor, are not eligible for the retention

21 plan, and that's not because there is any concern regarding

22 their loyalty, but the Debtor is looking at ways to

23 appropriately incentivize and compensate those people as

24 appropriate in the future.

25     He would testify that there are a few persons on the list

9

1   of people who are part of the retention plan with a title that

2   includes director or manager; however, he would testify that

3   none of those individuals are corporate officers or directors

4   of the Debtors -- the Debtor, and that the titles are for

5   convenience only.  He would testify that the individuals who

6   are employed in these roles do not have any authority

7   whatsoever to make any decisions on behalf of the Debtor.

8       He would testify that in connection with the new retention

9   plan, the non-insider employees may be offered the opportunity

10  to enter into a termination agreement with the company that

11  will provide specified benefits and payments in return for the

12  non-insider employee remaining as an employee in good standing

13  with the company through the separation date.

14      He would testify that a key component of the retention

15  plan is that non-insider employees will be entitled to the

16  specific bonus payments provided that they do not voluntarily

17  terminate their employment with the Debtor prior to the

18  separation date and are not terminated for cause.

19      He would testify that that is in contrast to the existing

20  or the prior annual bonus plan, which provided that non-

21  insider employees would not receive their bonus payments if

22  they were not employed by the Debtor on the vesting date for

23  any reason except on account of disability, including

24  termination without cause.

25      Mr. Seery would further testify that the retention plan is

10

1    being offered to approximately 53 employees, and the projected

2    aggregate amount of payments under the retention plan is

3    approximately $1,481,000, which is $32,000 approximately less

4    than the amount that would have been paid to such employees

5    under the annual bonus plan.

6        He would testify that the retention plan includes 20

7    employees who are not entitled to benefits under the annual

8    bonus plan.  Fourteen employees are entitled to receive more

9    under the retention plan than they would have received under

10   the annual bonus plan.

11       With respect to the 20 employees I've previously mentioned

12   who are not otherwise entitled to receive anything under the

13   annual bonus plan, the vast majority of those -- 18 -- will be

14   entitled to payments of $2,500 each, and the other two

15   entitled to payments of $10,000 and $7,500, respectively.

16       Mr. Seery would testify that he believes that these

17   additional payments are reasonable in light of the current

18   status of the company and the value to be added to the estate

19   through the retention of these employees, and that this plan

20   is more accurately and narrowly-tailored to achieve the

21   company's reorganization goals.

22       On this basis, Your Honor, Mr. Seery would testify that he

23   presented the proposed retention plan to the independent

24   directors and they agreed with Mr. Seery's assessment that

25   entry into the retention plan was in the best interests of the

11

1  estate and its creditors.

2      He would also testify that he had negotiations with the

3  Creditors' Committee and its advisors regarding the retention

4  plan and that the Committee is supportive of the retention

5  plan.

6      And that would conclude my proffer of testimony from Mr.

7  Seery, Your Honor.

8          THE COURT:  All right.  Mr. Seery, if you could say

9  "Testing, one, two" so we can catch your audio and video,

10 please?

11         MR. SEERY:  Testing, one, two, Your Honor.

12         THE COURT:  All right.  There you are.  Please raise

13 your right hand.

14         JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Thank you.  Is there anyone

16 who has questions at this time for Mr. Seery?

17     (No response.0

18         THE COURT:  All right.  Well, I'll just double-check

19 with the Committee.  It's been represented that you all are in

20 support of this.  Mr. Clemente, if you could confirm that on

21 the record?

22         MR. CLEMENTE:  That's correct, Your Honor.  The

23 Committee has no objection to the motion, so Mr. Pomerantz's

24 statements are accurate.

25         THE COURT:  All right.  Anyone else?

12

1          MS. LAMBERT:  This is Lisa Lambert for the United

2    States Trustee.  The U.S. Trustee has reviewed the actual data

3    about the comparatives, and the U.S. Trustee, based on the

4    stipulations, has no objection.

5          THE COURT:  All right.  Thank you.  Anyone else?

6       All right.  Well, the Court will approve this motion.

7    First, while the notice was expedited, the Court finds that it

8    was sufficient under the circumstances.  We are many months

9    into the case, it's been vetted by the Committee, and the

10   Court is satisfied with the level of notice here.

11      The Court finds that this is a KERP that is justified by

12   all the facts and circumstance of this case, to use the

13   wording of Section 503(c)(3) of the Bankruptcy Code.  There

14   also appears to be a very sound business purpose justifying

15   the proposed KERP.  It appears to be reasonable in all ways,

16   and fair under the circumstances, so I do approve it.

17      All right.  So if you all will get the order uploaded

18   electronically, I will promise to sign it promptly.

19          MR. POMERANTZ:  We will do so, Your Honor.  Thank

20   you.

21          THE COURT:  All right.  So, the preliminary

22   injunction.  Mr. Morris, I heard you were going to be taking

23   the lead on that, so go ahead.

24          MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25   Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

13

1          THE COURT:  Good morning.

2          MR. MORRIS:  A few items before I give what I hope

3    will be an informative opening statement.  I trust that Your

4    Honor has not had the opportunity, because it was just filed a

5    moment ago, to see that the Debtor filed on the docket notice

6    of a settlement with CLO Holdco, Ltd., one of the Defendants

7    here today.

8          THE COURT:  I have not seen that.  Okay.

9          MR. MORRIS:  Right.  So you'll find that at Docket

10   1838.

11         THE COURT:  Okay.

12         MR. MORRIS:  It really is a very simple settlement,

13   Your Honor.  In exchange for the withdrawal of CLO Holdco's

14   objection to the Debtor's plan of reorganization, the Debtor

15   is dismissing CLO Holdco from this adversary proceeding with

16   prejudice.  There are, you know, some other bells and whistles

17   there, the most important of which to the Debtor is simply

18   that, under the CLO management agreements, most of them but

19   not all of them require that a level of cause be established

20   before the contracts can be terminated, and CLO Holdco has

21   agreed that, before it seeks to terminate a contract for

22   cause, there will be a gating provision or a gatekeeping

23   provision that requires them to come to this Court to simply

24   establish whether or not there is a colorable claim -- not for

25   a determination on the merits, but simply to protect the

14

1  Debtor from frivolous lawsuits.

2      So that's really the sum and substance of it.  Mr. Kane is

3  on the line now, and if I've either inaccurately or

4  incompletely characterized the settlement, I'm sure he'll take

5  the opportunity to supplement the record.  But we don't see

6  any need, really, to go through a full 9019 motion here.

7  There's no releases.  There's no exchange of money.  It's the

8  withdrawal of a plan objection in consideration for the

9  dismissal of an injunctive proceeding.

10     So we did want to alert you to that.  And as a result,

11 there was one witness that we intended to call today, Grant

12 Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13 resolution of the issues between the Debtor and CLO Holdco, we

14 have no intention of calling Mr. Scott today.  But I'd like to

15 give Mr. Kane an opportunity to be heard just in case he's got

16 anything to add.

17         THE COURT:  All right.  Mr. Kane, can you confirm?

18 Do you have anything to change about what you heard?

19         MR. KANE:  Your Honor, I do not.  The settlement

20 agreement speaks for itself.  We did reach an agreement with

21 Debtor's counsel and the Debtor yesterday evening, fairly late

22 in the evening.  Mr. Morris's synopsis of the proposed

23 settlement is accurate.  The Debtor has agreed to dismiss CLO

24 Holdco from the preliminary injunction adversary proceeding

25 with prejudice.

15

1          THE COURT:  All right.  Well, thank you.  I've pulled

2     it up on my screen.  It's very short and to the point.  And I

3     agree with the comment of Mr. Morris that I don't think a

4     formal 9019 motion is required here, given no consideration is

5     going back and forth, or releases.  It's just exactly as you

6     described orally.  So, I appreciate that.  It simplifies a

7     little bit what we have set today.  And we will accept this

8     settlement as being in place as we roll forward.  All right?

9     Thank you.

10          MR. MORRIS:  Thank you, Your Honor.

11       So, before I get to the substance of the argument, I would

12    like to take care of some housekeeping items relative to

13    today's proceedings.

14          THE COURT:  Okay.

15          MR. MORRIS:  You know, this has been a bit of a

16    challenge for me personally, and it's going to be a little bit

17    of a challenge today for Ms. Canty, my assistant, in part

18    because it's almost like Groundhog's Day.  This is, I think,

19    the third time that we're covering some of the same issues.

20    We had covered them the first time on December 16th in

21    connection with what I'll now just simply refer to as the

22    Defendants, the Defendants' motion to try to limit the Debtor

23    from trading the CLO assets.  We heard a lot of what we're

24    going to hear today again on January 8th in connection with

25    the preliminary injunction motion against Mr. Dondero.  And so

16

1  there's already a ton of evidence in the record.  We do

2  believe that we need to present our evidence today, but one of

3  the challenges that we'll face, and I think we'll be able to

4  do it efficiently, Your Honor, is there may just be some back

5  and forth between various documents.  But everything's gone

6  pretty smoothly, and I'm optimistic we'll get through that

7  part of it today.

8       So I want to deal with the exhibits themselves, Your

9  Honor.  As you may have seen, there have been a number of

10 different filings relating to the Debtor's exhibits for this

11 particular motion, and I just want to go through the exhibits

12 and make sure that we're all on the same page here.  I want to

13 tell the Court exactly what happened and why and where we are

14 today.

15      The Debtor timely filed its original witness and exhibit

16 list on January 22nd.  They filed that witness and exhibit

17 list at Docket 39 in this Adversary Proceeding 21-3000.  The

18 exhibit list referenced Exhibits A through I'll just say

19 AAAAA.  It was a lot of exhibits, and somebody had the wise

20 idea to convert them to numbers, but it wasn't me, so I can't

21 take credit.  But we're left with letters, and they go from A

22 through AAAAA.

23      After filing that initial exhibit list, we realized that

24 --

25      (Interruption.)

**Appx. 03430**

17

1          THE COURT:  All right.  Does someone have their

2     device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.

3          MR. MORRIS:  Thank you.  So, shortly after filing

4     that initial exhibit list, we realized that we forgot to file

5     among the exhibits AAAAA.  So at Docket #40 in the adversary

6     proceeding, the Court can find Debtor's Exhibit AAAAA.

7          And then we're going to -- I'm going to refer in a few

8     minutes -- I'm going to use in a few minutes some

9     demonstrative exhibits, and I'm going to use them again with

10    Mr. Seery.  And these exhibits concern trading in AVYA and SKY

11    securities that you've heard about previously.

12         But I'm pointing that out now because I'm kind of old

13    school, Your Honor, and I won't use a demonstrative exhibit if

14    it doesn't have the evidence in the record.  And what we

15    realized, Your Honor, is we made two additional mistakes on

16    Friday with all the papers that we filed.  The backup for

17    these demonstratives was mistakenly included on the exhibit

18    list for the confirmation hearing as opposed to the

19    preliminary injunction hearing.  That was error number one.

20    And error number two, we hadn't redacted the information to

21    show only the SKY and AVYA.

22         And that's why, Your Honor, at Docket #48, you will find

23    our amended exhibit list that includes what we have identified

24    as Exhibits BBBBB as in boy through SSSSS as in Sam.  And

25    those exhibits, Your Honor, are the backup to the

18

1   demonstrative exhibits.  I don't expect to use them at all,

2   but I do believe strongly that one should not use a

3   demonstrative exhibit unless the evidence is in the record to

4   support it, and now it is.

5       So that's why, Your Honor, I do appreciate your court

6   staff.  I do appreciate Your Honor.  I think you either had

7   before you and you may have signed an order on redacting.

8   This is what it was all about.  It was just to make sure we

9   had the proper evidence in the record, so I appreciate that.

10      At this time, Your Honor, I think, just because I'll be

11  referring to it in the opening, the Debtor would move for the

12  admission into evidence of Exhibits A through SSSSS.

13          THE COURT:  All right.  Is there any objection?

14          MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15  object to UUUU.  I'll object to VVVV as in Victor.  I object

16  to AAAAA.  That's it, Your Honor.

17      I will note that there are several exhibits in here of

18  relevance to CLO Holdco that may not be relevant to my

19  clients, but those are my limited objections for now.

20          THE COURT:  All right.  Before we ask the nature of

21  your objection, let me ask Mr. Morris:  Shall we just --

22          MR. MORRIS:  Yeah.

23          THE COURT:  -- carve these out for now, and then if

24  you want to offer them the old-fashioned way, we'll hear the

25  objection then?

19

```
 1        MR. MORRIS:  Yes, although I can make it very clear
 2   that UUUU should not be in there precisely because it's
 3   demonstrative.  We had talked that yesterday and I agreed; I
 4   just forgot that.  UUUU should not be part of the record.
 5        THE COURT:  Okay.  And so you'll just decide later do
 6   you want to offer VVVV and AAAAA the old-fashioned way?
 7        MR. MORRIS:  Correct.
 8        THE COURT:  All right.  So, for the record, I am
 9   admitting by stipulation -- with three exceptions I'll note --
10   all of the exhibits of the Debtor that appear at Exhibits 39
11   and, well, and 48.  And we're carving out of that admission
12   UUUU, VVVV, and AAAAA, which actually appears at Exhibit --
13   Docket Entry 40.  Those are not admitted at this time.
14      (Debtor's Exhibits A through SSSSS, exclusive of Exhibits
15   UUUU, VVVV, and AAAAA, are received into evidence.)
16        THE COURT:  All right.  Go ahead, Mr. Morris.
17        MR. MORRIS:  Yes.
18        MR. RUKAVINA:  Well, Your Honor, while we're talking
19   about housekeeping -- Mr. Morris, I apologize.  Is there more
20   housekeeping?
21        MR. MORRIS:  I'd like to continue.  I was going to
22   describe the witnesses.
23         OPENING STATEMENT ON BEHALF OF THE DEBTOR
24        MR. MORRIS:  So, Your Honor, the Debtor is going to
25   call three witnesses today.  The first witness will be Mr.
```

20

1   Dondero, the second will be Jason Post, and then the third

2   will be Mr. Seery.

3       Obviously, Mr. Dondero and Mr. Seery are very familiar to

4   the Court and they will cover much but not all of the same

5   ground that you've heard previously.

6       Mr. Post, I believe, is a new witness appearing in this

7   court for the first time.  I understand that he is the chief

8   compliance officer of each of the Debtors [sic].  He had

9   worked at Highland Capital Management, the Debtor, for more

10  than a decade, I believe, but moved over to NexPoint to work

11  with Mr. Dondero shortly after Mr. Dondero resigned from

12  Highland Capital on or about October 10th last year.

13      So those are the three witnesses that we plan to present

14  today, and I'd like to describe briefly kind of what we think

15  the evidence will show.

16      The theme from our perspective here, Your Honor, is that

17  this is a case that is about power and not rights.  The Debtor

18  brings this motion for preliminary injunction in order to

19  protect itself from the interference of Mr. Dondero and the

20  Defendants, entities that there will be no dispute he owns and

21  controls.

22      You may have read in the papers, and I suspect you will

23  hear today from the Defendants, the clarion call for

24  contractual rights and the need for this Court to protect

25  their contractual rights.  This is a red herring, Your Honor.

21

1   There are no contractual rights at issue here.  What Mr.

2   Dondero and the Defendants really want is to maintain control,

3   or at least to deny Mr. Seery from exercising the Debtor's

4   valuable contractual rights.  If there are any contractual

5   rights at issue here, it is the Debtor's.  The Debtor is the

6   party to the CLO management agreements, and it's those very

7   rights that are being infringed upon.

8        This was supposed to have been resolved 53 or 54 weeks ago

9   now, Your Honor, when Mr. Dondero agreed and this Court

10  ordered that Mr. Dondero could not use related entities to

11  terminate any of the Debtor's agreements.  There is no dispute

12  that each of the Defendants is a related entity for purposes

13  of the January 9th order, since Mr. Dondero and Mr. Norris

14  have already testified that the Defendants are owned and/or

15  controlled by Mr. Dondero.

16       Notwithstanding the plain language of the January 9th

17  order, which Mr. Dondero not only agreed to, but it may be one

18  of the very few orders in this case that he hasn't appealed,

19  notwithstanding the plain language, Your Honor, he persists,

20  and that is why we are here.

21       How do we know that this is about power and not rights?

22  How do we know that everything that's going to be described

23  for you, what the evidence is going to show that this is about

24  power and not rights, is very simple.  Mr. Dondero and Mr.

25  Post will testify -- I'm just going to give four, five, six

22

1   examples here -- are going to testify that Mr. Seery's AVYA

2   trades were not in the Funds' best interests.  It's an

3   irrelevant point, Your Honor.  There is no contractual right

4   that gives them the ability to terminate because they don't

5   like trades that are being made.  They can sell.  If they

6   don't like it, they can sell.  That's what's really funny

7   about this.

8        But what's -- what makes it even more clear that this is

9   about power and not rights is the evidence is going to show

10  that Mr. Dondero sold AVYA shares throughout 2020.  He sold

11  those shares right up until the day he resigned.  And yet six

12  days after resigning, NexPoint sends a letter saying, Don't

13  sell any assets.

14       Ms. Canty, can we put up Exhibit number -- Demonstrative

15  Exhibit 1, please?

16       Okay, Your Honor.  We have redacted this to shield from

17  public disclosure the name of each fund that's trading, but

18  the backup, as I alluded to earlier, in Exhibits BBBBB through

19  SSSSS, some portion of those documents, that's where these

20  demonstrative figures come from.

21       And as you can see, beginning on January 29, 2000,

22  continuing through the bottom of the page, October 9th, 2020,

23  when Mr. Dondero left Highland Capital, he traded millions and

24  millions and millions of dollars in AVYA stock.

25       Can we go to Demonstrative Exhibit #2, please?

23

1      This chart is really -- no, I apologize if I -- the other

2  one.  The AVYA trading activity chart.  Yeah.

3      This one is really interesting, Your Honor, because it

4  shows the trading throughout the year of AVYA stock, and you

5  can see the brown bars there represent Mr. Dondero's trades.

6  And you can see just how many trades there are.  There are

7  over a million shares, I think, if you added it up.  They're

8  represented by the brown bars.  You can see him selling AVYA

9  stock throughout the period, sometimes at a price really near

10  its bottom.

11      And then Mr. Seery tries and actually does sell some stock

12  toward the end of the year.  That's the green bars on the

13  right.  A very, very tiny amount compared to Mr. Dondero.  And

14  he sells it at a substantially greater price than Mr. Dondero

15  sold the AVYA stock.  And yet they're here telling you, Your

16  Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17  disagree with what he's doing and he's not acting in the best

18  interests of the investors.  That's what they want -- but this

19  is what the evidence shows, Your Honor.

20      With respect to SKY, if we could go to the next slide,

21  please.

22      So this is SKY.  Now, Mr. Dondero did not trade any SKY

23  securities, but Mr. Seery did.  And this was another security

24  -- and we'll get to the evidence in a moment -- that Mr.

25  Dondero interfered with and tried to stop.  So Mr. Seery

24

1   succeeded sometimes and he was stopped sometimes, but the

2   point is, Your Honor, look at the price that Mr. Seery sold.

3        And remember, you heard this before and you're going to

4   hear it again.  Nobody from the Defendants ever asked Mr.

5   Seery, Why do you want to trade this?  Not that they even had

6   to.  Not that Mr. Seery needs to defend himself, frankly.

7   He's got the authority under the management contracts to act

8   in the way that he thinks is in the best interest.  But look

9   at this chart.  He made these sales, Your Honor, at more than

10  twice the price of the bottom.

11       How can they have any credibility?  How can Mr. Dondero

12  and Mr. Post come into this courtroom and assert that Mr.

13  Seery is doing anything other than a fabulous job?  He is

14  selling at the top of the market.  Because they think that

15  some high -- in the future, it's going to go higher?  It's

16  prudent, Your Honor.

17       Mr. Seery is going to tell you the work that he did.  He

18  is going to give you the rationale for his decisions.  And the

19  only conclusion that I hope and believe the Court will be able

20  to reach is that these were not only rational decisions but

21  they were prudent, taking some money off the table when the

22  stock was near its high.

23       That's how we know, this is more evidence how we know this

24  is about power.  It's not about rights.  It's not about

25  justice.  It's not about anything having to do with anything

25

1  other than Mr. Dondero wanting to maintain control.

2      How else do we know?  What other evidence is there that

3  this is about power and not rights?  Again, the timing.  The

4  calendar here is going to be very, very important.  The first

5  demand from NexPoint from the Defendants that Mr. Seery stop

6  trading came on October 16th.  It was less than a week after

7  Mr. Dondero -- like, where does this come from?  There's no

8  right to demand stopping of trading.  You don't get to do it.

9  And they're going to minimize it.  They're going to spend the

10  whole day, Your Honor, either -- either focusing on the law or

11  trying to minimize.  And they'll say, well, it was just a

12  request, Your Honor.  And if it was a third-party request, I

13  bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14  third party, he wouldn't care.  But when you put all of this

15  together, it is oppressive.  It is an exertion -- it's an

16  attempt at exertion of control.  That's how it's perceived and

17  that's actually what happened.

18      Do you need more evidence?  Again, they'll talk about

19  termination for cause and how they have the right and the

20  Court -- you, Your Honor, don't have the power to infringe

21  upon their contractual rights.  But there will be no evidence.

22  Absolutely none.  Mr. Post is going to tell you, in fact, that

23  he has no evidence of any breach, of any default, of any

24  reason whatsoever that cause might exist for the termination

25  of these contracts.  That's how you know this is about power

1   and not rights.

2        Last point on the issue of power versus rights:  Who were

3   the counterparties to the CLO agreements?  Did the CLO Issuers

4   -- where are they?  They're not here.  They're not here to

5   tell the Court that Mr. Seery is breaching his duty.  They're

6   not here to tell the Court that the Debtor is in default.  In

7   fact, what Mr. Seery is going to tell you, and it won't be

8   rebutted, is that the CLO Issuers are close to finalizing a

9   deal that will permit the Debtor to assume the CLO management

10  contracts.

11       Mr. Post or Mr. Dondero might get up on the stand today

12  and say, oh, because people have left the firm, that somehow

13  they don't have the ability to service the contracts anymore.

14  You know who doesn't believe that?  The contractual

15  counterparty, the Issuers.  It's about power, Your Honor.

16  It's not about rights.

17       There is substantial evidence that warrants the imposition

18  of a preliminary injunction, substantial evidence, much of

19  which you've heard already.

20       The October and November letters demanding or requesting

21  that the Debtor halt trades.  There's no right to that.

22       Mr. Dondero's interference with the support of Joe Sowin,

23  the Advisors' trader, around Thanksgiving, when they actively

24  moved in.  And it's in the emails.  It's in the record.  We'll

25  put in the record again.

27

1        And then he made the threat to Thomas Surgent -- Mr.

2   Dondero made the threat to Thomas Surgent about potential

3   personal liability.

4        The ridiculous -- remember the ridiculous motion that was

5   heard on December 16th, a motion so devoid of factual or legal

6   basis that the Court granted the Debtor a directed verdict and

7   dismissed the motion as frivolous?  Notably, neither Mr.

8   Dondero nor Mr. Post testified at that hearing.  Yet, within a

9   week, Your Honor -- the hearing was on a Wednesday.  The

10  hearing was on Wednesday, December 16th.  The Court entered

11  the order on Friday, December 18th.  On Monday, December 21st,

12  the next business day, Mr. Dondero and Mr. Post and the

13  lawyers for the Defendants held conference calls to figure out

14  what to do next.

15       And the very next day, the evidence is going to show --

16  it's already in the record -- Mr. Dondero again actively

17  stopped Mr. Seery's trades from being effectuated.  They sent

18  their first letter.  This is less than a week after that

19  hearing, Your Honor.  They sent another letter asking the

20  Debtor -- again, they requested -- minimize -- this is what

21  you're going to hear:  Well, we just sent a letter requesting

22  no more trading.

23       What happened the next day, December 23rd?  They send

24  another letter and they say, We're thinking about terminating

25  the contracts.  Now we think we're going to terminate the

1  contracts.  And we just want to let you know we're thinking

2  about terminating the contracts.

3      And we call them -- and Mr. Seery is going to testify to

4  this -- we say, What are you doing?  Every time we just said,

5  Please withdraw your letter.  There's no basis for doing this.

6  Leave us alone and let us do our job.  They wouldn't -- they

7  refused to withdraw the letter.

8      And finally -- again, Mr. Seery will testify to this -- we

9  told them, If you think you really have a basis for

10  terminating the contract, make your motion to lift the stay.

11  And if you don't, the Debtor will file the motion that brings

12  us here today.

13      And that's how we got here, because they continued to

14  interfere with the trading.  They continued to send these

15  specious letters that are implicit threats.  Mr. Seery is

16  going to tell you that every one of these, he -- is an

17  implicit threat.  We asked them, Just withdraw the letters and

18  stop it.  We asked them to make their own motion if you think

19  so strongly of it.  They wouldn't do that, either.  They just

20  want it hanging out there.  They just want it all hanging out

21  there over Mr. Seery's head so that he knows somebody's --

22  somebody's watching and somebody's planning, you know, to take

23  action.

24      It's not right, Your Honor.  They have no right to any of

25  this.  There's nothing in the contract that allows them to

1   make even a good-faith -- to make any claim that they have

2   cause to terminate the contract.  They have no right under any

3   circumstances to stop Mr. Seery from trading.

4       What they are going to tell you is there's no agreement

5   between the Advisors and the Debtor that requires the Advisors

6   to execute the trades.  And they're right about that.  They're

7   actually right about that.  But here's the thing, Your Honor.

8   What Mr. Seery is going to tell you is that Advisors has the

9   trading desk.  For more than a decade, they executed the

10  trades.  Through the entirety of this bankruptcy case, until

11  Mr. Dondero left Highland, they executed the trades.  Even

12  after Mr. Dondero left Highland in October, they continued to

13  execute the trades.  And on December 22nd, they fold their

14  hands and they say, Nope, I don't care about the course of

15  dealing, I don't care what impact it has, you can't make me do

16  it.  So Mr. Seery has tried end-arounds, and that'll be in the

17  record, too, and that's when the threats to Surgent come.

18  That's when the threat to Surgent come, when we try to do the

19  workaround.  Cannot do it.

20      This is just not right, Your Honor.  It's just not right.

21  There's order -- there's the January 9th order.  There was the

22  TRO that was in effect that we're going to hear about again,

23  because that TRO not only applied to Mr. Dondero, it prevented

24  him from conspiring with or even encouraging a related entity

25  from engaging in prohibited conduct.  And that prohibited

 1   conduct, as Your Honor knows, because it's your order, is

 2   plain and as unambiguous as can possibly be:  Don't interfere

 3   with the Debtor's business.  It's all we're asking for.  It's

 4   the only reason we're here today.

 5       Interestingly, Your Honor, probably the best piece of

 6   evidence that I'll put in front of you today are going to be

 7   the words out of Mr. Post's mouth, because basically what he's

 8   going to tell you is that, as chief compliance officer, he has

 9   never once in the history of his employment told Mr. Dondero

10   to stop.  In fact, what he's going to tell you is that he

11   defers to the investment professionals, and that but for the

12   TRO that is consensually in place today, it would depend on

13   the facts and circumstances as to whether or not he actually

14   does anything as chief compliance officer to stop this

15   conduct.  Depends on the -- maybe he can explain to Your Honor

16   what facts and circumstances he thinks, as chief compliance

17   officer, would allow the Advisors to interfere with the

18   Debtor's business.  It'll be interesting to hear him answer

19   that question.

20       That's all I have, Your Honor.  I look forward to

21   presenting the evidence today.  I'd like this done once and

22   for all.  It's time to move on.  And the Debtor -- the Debtor

23   is in bankruptcy.  Your Honor, I think, has every power, every

24   right, and frankly, you know -- I feel very strongly about

25   this, obviously, Your Honor -- the Debtor needs the breathing

31

1  space and to be left alone so it can do its job.  And we'll

2  respectfully request at the end of this that the Court enter

3  an order allowing it to do so.

4      Thank you, Your Honor.

5          THE COURT:  All right.  We were hearing some

6  distortion there, I'm not sure where it was coming from, but

7  we'll try to keep it reined in.

8      Mr. Rukavina, your opening statement.

9          MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10 hear me?

11         THE COURT:  Yes.

12     OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13         MR. RUKAVINA:  Your Honor, I think it's important

14 first to note a few obvious things.  One, what we're talking

15 about today is enjoining future rights, future rights under a

16 contract.  Hearing Mr. Morris's opening, it sounds like we're

17 trying a breach of contract case.  There is no declaratory

18 relief sought for whether there is grounds for a breach of

19 contract case.  And prior to assumption and prior to

20 confirmation, the automatic stay applies.

21     So let me be clear that what they're asking the Court to

22 do today is to excise from these contracts our rights in the

23 future, effectively for all time, as I'll explain.

24     The second thing that merits real consideration is that it

25 is the Funds, Your Honor, not the Advisors, it is the Funds

32

 1  that have the right to remove the Debtor as manager.

 2       Those Funds, as you will hear, have independent boards.

 3  Mr. Dondero doesn't own those Funds.  He's not on those

 4  boards.  He doesn't control them.

 5       When Mr. Morris talks about Mr. Norris's prior testimony,

 6  that testimony was limited to the Advisors.  And yes, Mr.

 7  Dondero does own the Advisors, and Mr. Dondero, while I won't

 8  say controls the Advisors, certainly has a lot of input.  That

 9  is not the case for the Funds, which are the ones with the

10  contractual powers here to remove the Debtor.

11       You will hear that those -- that that board or those

12  boards meet frequently, they have independent counsel, and

13  they take separate actions, including very recently where they

14  did not do something that was advised and acted independently.

15       And the third thing that makes this case different and

16  that all of us should bear in mind is that we're talking today

17  about other people's money.  There's more than one billion

18  dollars of investment funds, retirement funds, pension funds,

19  firefighter funds, school funds, wealthy individuals, having

20  nothing in the world to do with Mr. Dondero or anyone in this

21  case.

22       So what we're talking about here today, Your Honor, is

23  that if my retirement manager files bankruptcy, that I for all

24  time would be effectively enjoined from removing him, no

25  matter what he may do in the future, just because he needs

33

1   that revenue.

2       That is an absolutely inappropriate use of a preliminary

3   injunction.  It is the modification of a contract that the

4   Debtor seeks to assume, and there is going to be no evidence

5   on the underlying elements that the Court must consider.

6       I say that, Your Honor, because I'm new to -- I'm late to

7   this case but I have studied in detail what Your Honor did in

8   the *Acis* case.  And I think that we have to qualitatively

9   differentiate today from *Acis*.  In *Acis*, there were

10   allegations of fraudulent transfer.  When Your Honor enjoined

11   future actions, I believe in part it was because the

12   legitimate owner of those rights might not have been having

13   those rights.

14       So that was a very important difference.  Here, there's no

15   question that we have more than billion dollars of other

16   people's funds at issue.

17       Also in *Acis*, as confirmed by the District Court, there

18   was the exercise of an optional redemption right, which could

19   have very well been used as a weapon to strip the manager of

20   its rights.  That's not the case here today.  We are talking

21   about removing the Debtor in the future -- not today, not

22   prior to assumption, in the future -- for such things as if

23   the Debtor commits fraud, if Mr. Seery is indicted for

24   felonies, if the Debtor absconds with our funds.  We are

25   talking about potential hypothetical actions in the future

34

1   that are not even ripe based on the Debtor's potential

2   wrongful actions, not based anything on our motivations or our

3   intentions.

4        So this is a different case than Your Honor has heard so

5   far in these cases.  And what it boils down to, Your Honor, is

6   will the Court give judicial immunity to the post-assumption,

7   post-confirmation Debtor over the next two or three years as

8   it manages and liquidates more than a billion dollars of other

9   people's funds?  It is their money at issue.

10       So, in order to do this, the Debtor first has to tell Your

11  Honor that it has a likelihood of merits on the success [sic]

12  of some claim.  The Debtor cannot just come to you -- because

13  the Debtor knows Your Honor's opinion on 105(a) and the

14  Supreme Court law -- and the Debtor cannot just say, Judge,

15  please give us an injunction because it's convenient or

16  because we don't want to comply with our obligations.  So they

17  concoct a tortious interference claim.  They argue that there

18  is an automatic stay violation, which, as Your Honor knows,

19  all of us bankruptcy lawyers take most seriously.  And they

20  argue that, well, whatever Mr. Dondero has been enjoined from

21  doing, somehow we *a priori* are also enjoined.  Basically, an

22  alter ego with no facts, law, trial, or due process.

23       On the tortious interference, Your Honor will hear

24  absolute evidence that cannot be refuted that all that we did,

25  all that we did was we refused, our employees refused to make

1   a ministerial entry into a computer program of two trades that

2   Mr. Seery authorized.  Those trades closed exactly as Mr.

3   Seery wanted.  Those trades closed, were executed, before Mr.

4   Seery asked our employees to do his bidding.  And the reason

5   why our employees were instructed not to do what Mr. Seery

6   wanted was because our chief compliance officer looked at it,

7   those employees looked at it, and they all said, What is this?

8   Our internal protocols were not followed.  We don't know

9   anything about these trades.  We have fiduciary duties, we

10  have SEC obligations, and Mr. Seery has his own employees whom

11  he can instruct to enter these two trades into the computer

12  and our employees aren't going to do it.  It's as simple as

13  that.

14      Mr. Dondero did not command that decision.  Mr. Dondero

15  did not instruct that decision.

16      Our employees not doing what Mr. Seery requested of them

17  is not tortious interference.  It is not interference as a

18  matter of law.  There was no breach of contract as a result.

19      So the two elements -- two of the elements required for

20  tortious interference, there will be zero evidence on.  But in

21  the bigger picture, what they're talking about again is

22  restraining our rights in the future.  And whether -- whether

23  we are party to these contracts or a third-party beneficiary,

24  it doesn't matter, because we are not a stranger to these

25  contracts.  These contracts expressly give us rights.  And a

36

1    party exercising their right under a contract, it could be

2    breaching that contract, but it cannot be tortious

3    interference as a matter of law.

4         And if Your Honor is concerned about us tortiously

5    interfering in the future, then the Court should enjoin us

6    from tortious interference in the future, not excise from the

7    contract the remedies that the Debtor must accept if it wants

8    to assume these contracts.

9         Moving to the automatic stay issue, the sole and exclusive

10   argument for why we violated the stay is because our counsel,

11   a seasoned, gentlemanly bankruptcy lawyer of many years'

12   experience, sent two letters to seasoned veteran bankruptcy

13   lawyers for the Debtor.  Communications.  Communications

14   amongst counsel.

15        The first, the December 22nd letter, is a request:  Okay,

16   we lost in front of Judge Jernigan, Judge Jernigan called our

17   motion frivolous, we get that, but we ask you to please stop

18   trading until the plan is confirmed.  A request which the

19   Debtor ignored.  Or that's not true, didn't ignore:  refused

20   to comply with.

21        The second letter, a day later, after various

22   communications, was:  Okay, we are going to initiate the

23   process of terminating you as the servicer.

24        Mr. Dondero had nothing in the world to do with these

25   letters.  Mr. Dondero did not direct these letters.  This was

37

1   professional advice from outside counsel and the independent

2   boards of the Advisors believing that their fiduciary duty

3   compelled that.

4      And guess what, that letter even said:  subject to the

5   automatic stay.  You heard from Mr. Morris that they basically

6   said, File your stay motion.

7      Our follow-up letter clarified anything that we might do

8   is subject to the automatic stay.  We never said we're going

9   to act in a way that the stay doesn't permit.  We said we're

10   going to come to this Court first.

11      But even all that, all those communications, while it may

12   be interesting, are irrelevant, because we never took any

13   action.  You will hear that we never communicated with the

14   CLOs, the Trustees, or the Issuers, anything like we went over

15   with the Debtor, anything like, Please start the process of

16   removing the Debtor.  We have done nothing of the sort, we

17   will do nothing of the sort, precisely because of the

18   automatic stay.

19      So I equate this, Your Honor, to your average home lender

20   whose lawyer sends a letter to the borrower saying, You don't

21   have insurance; we're going to start the process of

22   foreclosure.  You're past due on your post-petition adequate

23   protection payments; we're going to start the foreclosure

24   process; we're going to go seek a list of stay.  That is not

25   actionable.  It is not a stay violation.  Those are

38

1  communications, not actions.  And that is precisely what

2  seasoned professional counsel should be doing.

3      And now, Your Honor, we move to the Mr. Dondero issue.

4  The argument is, well, on January the 9th, Mr. Dondero,

5  apparently for all time, in perpetuity, agreed that he will

6  not cause the related entities to terminate these agreements.

7  And then the argument is, well, the Court entered a TRO

8  against Mr. Dondero and the Court entered a preliminary

9  injunction against Mr. Dondero.  Okay?

10      I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24      And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

39

1    controlled or owned, and Mr. Dondero is not on the board.  So

2    whatever he may have agreed to is between the Court and the

3    Debtor and him, but he never agreed to that on behalf of the

4    Funds.  He never agreed to that on behalf of the Advisors, who

5    have their own independent fiduciary duties and duties under

6    the law.

7        So, Your Honor, there will be no substantial likelihood of

8    success on the merits.  There will be no likelihood of success

9    on the merits.  And I'm talking about the post-assumption,

10   post-confirmation time frame.  The issue is fundamentally

11   different pre-assumption and pre-confirmation.  But post-

12   assumption and post-confirmation, the Debtor will not show a

13   likelihood of success on the merits.  The Debtor will not show

14   any irreparable injury.  None.

15       Mr. Seery will testify that managing these agreements for

16   the coming couple or three years will have some value to the

17   Debtor.  He doesn't know what the profitability of that is to

18   the Debtor.  You will hear that, in fact, managing these

19   contracts for the next two years does not bring any

20   profitability to the Debtor.  The Debtor will lose money

21   managing of them.  But whatever damages there are are monetary

22   damages, and monetary damages are not an irreparable injury as

23   a matter of law.

24       Now, the Debtor says, well, the Court can enter an

25   injunction in the aid of restructuring, but this injunction

40

1  will happen after restructuring.

2      On the balance of harm and public interest, Your Honor, I

3  think we're dealing with more than a billion dollars of clean,

4  innocent third-party funds.  The balance of harm here weighs

5  against granting this injunction.  If we try to do anything in

6  the post-confirmation world, the Debtor has all of its rights

7  and remedies to contest what we do.  If we do it wrong, we're

8  liable in contract or in tort, there's monetary damages, and

9  the Debtor has already successfully organized.

10      But if the Debtor does something wrong in the future and

11  we cannot take action to stop a gross mismanagement or a

12  denution [sic] of the Debtor or an abscondence with funds,

13  then think about the harm to the innocent investors here.

14  Because if we even go to court, your Court, any court, we will

15  be in violation of a federal court injunction.

16      Your Honor, this is not the appropriate purpose of an

17  injunction for the preservation of the status quo.  The status

18  quo, by definition, cannot extend post-assumption or post-

19  confirmation.  This is not a proper exercise of equity.  We

20  have done nothing wrong, we have threatened to do nothing

21  wrong, and we will do nothing wrong to justify forever being

22  prejudiced and enjoined from exercising our contractual and

23  statutory rights.

24      Your Honor, this TRO extends through February the 15th.

25  We asked the Debtor to continue this hearing.  We asked the

41

1 Debtor to go to our independent boards and seek approval of

2 the same settlement that the Debtor has with CLO Holdco, which

3 we learned about last night.  We simply haven't had the time

4 to get those boards aligned up and present a settlement to

5 them.  We're trying to put together a competing plan.

6    Your Honor, there is no reason to go forward today except,

7 like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8 Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9 judicial immunity, get out of jail free card.  Thank you.

10        THE COURT:  All right.  Mr. Morris, you may call your

11 witness.

12        MR. MORRIS:  Yeah.  I just want to make a motion to

13 strike the notion of a get out of jail free card.  I

14 appreciated everything counsel had to say, but I think that's

15 a little -- a little over the top.

16    We call Mr. James Dondero, please.

17        THE COURT:  Mr. Dondero, --

18        MR. RUKAVINA:  Your Honor, bear with me.

19        THE COURT:  Okay.

20        MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21 to get out of this chair.  Mr. Dondero will get in this chair.

22 And so that there's no reverberation, I will be sitting next

23 to Mr. Dondero in case I have to make any objections.

24        THE COURT:  Okay.  All right.  Good morning, Mr.

25 Dondero.

Dondero - Direct                            42

```
 1          MR. DONDERO:  Good morning.

 2          THE COURT:  Please raise your right hand.

 3              JAMES DONDERO, DEBTOR'S WITNESS, SWORN

 4          THE COURT:  Thank you.  Mr. Morris, go ahead.

 5          MR. MORRIS:  May I proceed, Your Honor?

 6          THE COURT:  Yes.

 7                      DIRECT EXAMINATION

 8  BY MR. MORRIS:

 9  Q    Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10  Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11  sir?

12  A    Yes.

13  Q    There are no board members here on behalf of any of the

14  Funds to testify or offer any evidence; isn't that right?

15  A    Not that I'm aware of.

16  Q    Okay.  And you knew the hearing was going to be today on

17  the preliminary injunction, right?

18  A    Yes.

19  Q    And you had an opportunity to confer with the boards of

20  the Funds in advance of this hearing, right?

21  A    No.

22  Q    There's no -- there's no -- no board member is expected to

23  testify, fair?

24  A    Correct.

25  Q    So the Court isn't going to hear any evidence as to the
```

Dondero - Direct                          43

1   board's perception of what's happening here, right?

2   A    Not that I'm aware of.

3   Q    Okay.  Until January 9th, 2020, you controlled the debtor

4   Highland Capital Management, LP; isn't that right?

5   A    I don't remember exactly when these -- when the

6   independent board was put in place, but up until around that

7   time, I believe.

8   Q    Okay.  So, January 2020?

9   A    Yes.

10  Q    And during that month, you completed an agreement with the

11  Creditors' Committee where you ceded control of the Debtor

12  pursuant to a court order, right?

13  A    Pursuant to a court ...?  I thought it was pursuant to a

14  negotiation where they would have fiduciary responsibility to

15  the estate in my absence.  That's -- that's what I think the

16  (garbled).

17  Q    Okay.  You're aware -- so you entered into an agreement

18  with the Creditors' Committee pursuant to which you ceded

19  control of the Debtor, right?

20       MR. RUKAVINA:  Your Honor, I'll object.  That

21  agreement speaks for itself.  And if Mr. Morris wants to

22  present it to Mr. Dondero, he can.

23       THE COURT:  Um, --

24       MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25  --

Dondero - Direct                              44

1           THE COURT:  All right.  Well, I --

2           MR. MORRIS:  I'm happy to put it up, Your Honor.

3           THE COURT:  I overrule that objection.  You can ask.

4    And then if he's not sure, you can present the agreement.  All

5    right?  Go ahead.

6           MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Mr. Dondero, is there any doubt in your mind that in

9    January of 2020 you gave up control of Highland in favor of an

10   independent board at the Strand Advisors level?

11   A    No.  I -- yes, I agree with that.

12   Q    Okay.  And do you recall that, in connection with that

13   agreement, the Court entered an order?

14   A    Several orders.  Which one?

15   Q    Okay.

16          MR. MORRIS:  Can we please put up Docket No. 339?

17          MS. CANTY:  Sure, just one second.

18          MR. RUKAVINA:  And you have it here.

19      John, I have the order if just want Mr. Dondero to review

20   it.

21          MR. MORRIS:  I think -- I think everybody should have

22   the benefit of seeing it.  But thank you very much.

23      Your Honor, while we take this moment, can you just remind

24   me of when the Court needs to take a break today, so that I'm

25   mindful of that and respectful of your time?

Dondero - Direct                    45

1          THE COURT:  11:30.

2          MR. MORRIS:  Okay.  And what time will we reconvene?

3          THE COURT:  Well, I have said 1:00.  I hope it can be

4    a little sooner, but let's just plan on 1:00, okay, so there's

5    no confusion.

6          MR. MORRIS:  Okay.  All right.  All right.  So, on

7    the screen here, we have Exhibit OOOO, which is in the record.

8    BY MR. MORRIS:

9    Q   This is an order that was entered by the Court on January

10   9th, 2020.  Do you see that, sir?

11   A   Yes.

12         MR. MORRIS:  Can we scroll down to Paragraph 9,

13   please?  (Pause.)  Are you having problems, Ms. Canty?

14         MS. CANTY:  It's on the screen.  You can't see it?

15         MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16   9?

17         MS. CANTY:  It's on Paragraph --

18         MR. MORRIS:  That's on Page 2, I believe.

19         MS. CANTY:  Yeah, I have it up.  I'm not sure what

20   the disconnect is, because I can see it on my screen.  I'm

21   going to stop it and reshare it.

22         MR. MORRIS:  Thank you very much.

23       (Pause.)

24         MS. CANTY:  Do you see it now?

25         MR. MORRIS:  Okay.  Beautiful.

Dondero - Direct                    46

1   BY MR. MORRIS:

2   Q    Mr. Dondero, if you'd just read Paragraph 9 out loud.

3   A    (reading)  Mr. Dondero shall not cause any related entity

4   to terminate any agreements with the Debtor.

5   Q    Okay.  So you understood, as part of the corporate

6   governance settlement pursuant to which you avoided the

7   imposition of a trustee, that you agreed that you wouldn't

8   cause any related entity to terminate any agreements with the

9   Debtor, right?

10  A    Uh, --

11  Q    Is that correct?  You understood that paragraph?

12  A    Yes.

13  Q    Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A    I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q    Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A    Yes.

20       (Pause.)

21  Q    Can you hear me, sir?

22  A    Yes.  Yes, I said, "Yes."

23            MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25            MR. MORRIS:  I asked whether NexPoint Advisors, LP

Dondero - Direct                          47

1   was an advisory firm.

2            THE WITNESS:  Yes.

3   BY MR. MORRIS:

4   Q    And you have a direct or indirect ownership interest in

5   NexPoint Advisors, LP, correct?

6   A    Yes.

7   Q    And you understand that, based on that direct or indirect

8   ownership interest, NexPoint Advisors, LP is a related entity

9   under Paragraph 9 of this order, right?

10  A    Yes.

11  Q    Okay.  Highland Capital Management Fund Advisors, LP is

12  one of the other defendants in this case, right?

13  A    Yes.

14  Q    And we'll refer to that entity as Fund Advisors; is that

15  fair?

16  A    Yes.

17  Q    And we'll refer to Fund Advisors together with NexPoint

18  Advisors, LP as the Advisors; is that fair?

19  A    Yes.

20  Q    Okay.  Fund Advisors is also an advisory firm; is that

21  (audio gap)?

22  A    I missed that last question.

23            MR. RUKAVINA:  John, you're freezing up on us.  Is it

24  on our end, Your Honor, or is it on Mr. Morris's end?

25            MR. MORRIS:  Just let me know -- just let me know

Dondero - Direct                              48

1   when it happens.

2           THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

3   Morris.  Let's try again.

4           MR. MORRIS:  Okay.

5   BY MR. MORRIS:

6   Q   You have a direct or indirect ownership interest in Fund

7   Advisors, correct, sir?

8   A   Yes.

9   Q   (audio garbled)  And based on that direct or indirect

10  interest, you would agree that Fund Advisors is a related

11  entity for purposes of this order, correct?

12  A   Yes.

13  Q   In addition to your ownership interest, you're also the

14  president of Fund Advisors; is that (audio gap)?

15          THE COURT:  All right.  Now --

16          THE WITNESS:  I believe so.

17          THE COURT:  Yes.  Now I'm starting to have some

18  trouble, Mr. Morris.  Every once in a while, you're freezing

19  towards the end of a sentence.  So I don't know what can be

20  done, but it's --

21          MR. MORRIS:  All right.  Let me know if that

22  continues.

23          THE COURT:  Okay.

24  BY MR. MORRIS:

25  Q   To use your words -- to use your words, Mr. Dondero, it's

Dondero - Direct                                49

1  fair to say that you generally control Fund Advisors, right?

2  A    Yes.

3  Q    And based on that, you acknowledge that Fund Advisors is a

4  related entity under the Court's order, correct?

5  A    Yes.

6  Q    And together, the Advisors that you own and control manage

7  certain investment funds, correct?

8  A    Yes.

9  Q    And three of those funds are defendants in this case,

10 correct?

11 A    Yes.

12 Q    And you are the portfolio manager of each of those funds;

13 is that right?

14 A    I believe so.

15 Q    Okay.  Let's talk about the events that led to this

16 matter.  CLO stands for Collateralized Loan Obligations,

17 correct?

18 A    I'm sorry.  Repeat that, please?

19 Q    Sure.  CLO stands for Collateralized Loan Obligations,

20 correct?

21 A    Yes.

22 Q    Years ago, the Advisors that you own and control caused

23 the investment funds that they manage to buy the interests in

24 CLOs that are managed by the Debtor, correct?

25 A    Yes.  Yes.

Dondero - Direct                    50

1   Q   Okay.  And those Funds still hold an equity interest

2   today, correct?

3   A   Yes.

4   Q   And K&L Gates is one of the law firms that represents the

5   Advisors and the Funds that are managed by the Advisors,

6   correct?

7   A   Yes.

8   Q   You would agree that the Debtor is party to certain

9   contracts that give it the right and the responsibility to

10  manage certain CLO assets, right?

11  A   Yes.

12  Q   And you recall that --

13          MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14  our end.

15          THE COURT:  Yes.  Mr. Morris, you just froze.

16          MR. RUKAVINA:  We heard nothing, Mr. Morris.

17          THE COURT:  Yes.

18          MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q   Sir, do you recall that you resigned from the Debtor on or

21  around October 10th, 2020?

22  A   Yes.

23  Q   Okay.  And shortly thereafter, K&L Gates sent a couple of

24  letters to the Debtor on behalf of the Advisors and the Funds,

25  correct?

Dondero - Direct                              51

1   A    Yes.

2   Q    Okay.

3        MR. MORRIS:  Can we take a look at these?  These are

4   documents that were admitted into evidence in a different

5   matter, but they're actually referred to in his prior

6   testimony, which is in evidence in this case.  So I would just

7   ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8   Adversary Proceeding 20-3190 at Docket 46.  And for the

9   record, it's PDF Page #184 out of 270.  I just want to take a

10  look at these two letters.

11  BY MR. MORRIS:

12  Q    Okay.  Do you see this letter, sir?

13  A    Yes.

14  Q    And NexPoint is one of the defendants here; is that right?

15  A    Yes.

16  Q    And that's one of the Advisors that you own and generally

17  control, correct?

18  A    Yes.

19  Q    And so this letter is sent less than a week after you've

20  left Highland Capital Management, right?

21  A    Yes.

22  Q    Do you recall this particular letter?

23  A    No.

24  Q    Can -- you're familiar with the substance of this letter

25  and the other one that was sent in November, correct?

Dondero - Direct                    52

1  A    Could you pull it a little higher and let me read it?

2  Q    Yes.  Sure.

3          MR. RUKAVINA:  If this is an exhibit, I can show it

4  to him as an exhibit, Mr. Morris.

5          MR. MORRIS:  I don't know that this is one of the

6  marked exhibits.  It's one of the exhibits that's used within

7  his prior testimony.  So, but I want to give Mr. Dondero a

8  chance to review it.  And please let us know if you need to

9  scroll further down.

10      (Pause.)

11         MR. RUKAVINA:  You're going to have to scroll down.

12         THE WITNESS:  Scroll down a little further, please.

13      (Pause.)

14         MR. RUKAVINA:  Mr. Morris, can you please scroll

15  down?  Neither Mr. Dondero nor I can read the balance.

16  BY MR. MORRIS:

17  Q    There you go.  (Pause.)  So, you see at the top of the

18  page there there is a reference to the sale of assets and a,

19  quote, "a rush to sell these assets at fire sale prices."  Is

20  that what you think -- did you think that Mr. Seery was

21  selling (audio garbled) CLO assets at fire sale prices in

22  October 2020, --

23         MR. RUKAVINA:  Your Honor, --

24         MR. MORRIS:  -- less than a week after --

25         MR. RUKAVINA:  Your Honor, I'll object.  We did not

Dondero - Direct                          53

1 │ hear Mr. Morris's question.

2 │        THE COURT:  All right.  Could you repeat the

3 │ question?

4 │        MR. MORRIS:  Okay.  Yes, Your Honor.

5 │ BY MR. MORRIS:

6 │ Q   Mr. Dondero, on or about October 16th, did you personally

7 │ believe that Mr. Seery was in a rush to sell CLO assets at

8 │ fire sale prices?

9 │ A   I believe he had no business purpose to sell any of the

10 │ assets, which I believe he stated that to Joe Sowin, our

11 │ trader.  I -- I -- there was no business purpose stated or

12 │ ever given or obvious from the sales.  And --

13 │ Q   Okay.

14 │ A   -- I (indecipherable) draft this letter.

15 │ Q   Okay.

16 │        MR. MORRIS:  I move to strike, Your Honor.  It's a

17 │ very simple question --

18 │        THE COURT:  Sustained.

19 │        MR. MORRIS:  -- and it has to do solely with Mr.

20 │ Dondero's state of mind.

21 │ BY MR. MORRIS:

22 │ Q   Mr. Dondero, on or about October 16th, did you personally

23 │ believe that Mr. Seery was in a rush to sell CLO assets at

24 │ fire sale prices?

25 │ A   He was in a rush to sell them for some reason with no

Dondero - Direct                                    54

1  business purpose.  I don't know the reason.

2          THE COURT:  All right.  Can you --

3  BY MR. MORRIS:

4  Q    Okay.  And you never asked him, right?

5          THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

6          THE WITNESS:  Never asked him.

7          MR. MORRIS:  Okay.  Can we turn to the next exhibit,

8  which is Exhibit C on that same docket?

9      (Pause.)

10  BY MR. MORRIS:

11  Q    While we're waiting, can you just read the last sentence

12  of the paragraph that ends at the top of the page, Mr.

13  Dondero, beginning, "Accordingly"?

14  A    (reading)  Accordingly, we hereby request that no CLO

15  assets be sold without prior notice and prior consent from the

16  Advisors.

17  Q    Are you aware of any contractual provision pursuant to

18  which the Funds or the Advisors can -- can expect that the

19  Debtor will refrain from any -- selling any assets without

20  giving prior notice and obtaining prior consent from those

21  entities?

22  A    I think the documents have an overall good-faith/fair-

23  dealing clause which would cover something like this, I

24  believe.

25  Q    Your -- is it your testimony, sir, that the duty of good

Dondero - Direct                                55

1  faith and fair dealing requires the Debtor to give notice to

2  the Advisors and to obtain the Advisors' prior consent before

3  they can sell any CLO assets?

4  A    Well, I think -- yes, I do.  I think --

5  Q    All right.

6  A    Yes.  Yeah.

7  Q    Okay.  And then the next month, another letter was sent by

8  NexPoint to Mr. Seery.  Do you recall that?

9  A    Not specifically.  If you bring it up, we can talk about

10  it.

11        MR. MORRIS:  Can we scroll down a little bit?

12      (Pause.)

13        MS. CANTY:  John, are you talking to me?  I was

14  frozen out.  I just got back on.  I apologize.

15        MR. MORRIS:  That's okay.  Can we just scroll down so

16  Mr. Dondero can see more of this particular letter?

17        MS. CANTY:  Okay.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Can you just read out loud, Mr. Dondero, out loud the last

21  two sentences, please, beginning with, "We understand"?

22  A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23  has made a similar request.  Accordingly, we hereby re-urge

24  our request that no CLO assets be sold without prior notice to

25  and prior consent from the Advisors.

Dondero - Direct                              56

1   Q    What's the Charitable DAF Holdco, Ltd.?

2   A    I think that's who you settled with yesterday.

3   Q    Do you have an interest in that entity?

4   A    No.  It's a bona fide charity.  It was one of the largest

5   in Dallas before it got cut in half by Acis.

6   Q    Does -- are you familiar with the Get Good and the Dugaboy

7   Investment Trusts?

8             MR. RUKAVINA:  Your Honor, at this time I would

9   object to relevance.  I don't see what this has to do with

10  tortious interference and stay violation on December 22nd and

11  December 23rd, 2020.

12            THE COURT:  Response?

13            MR. MORRIS:  Your Honor, I'm trying to establish that

14  Charitable DAF Holdco, Ltd. is another entity in which Mr.

15  Dondero holds a beneficial interest.

16            THE COURT:  Okay.  Overrule the objection.

17            MR. RUKAVINA:  John, you're not only frozen, now

18  you're off.

19            MR. MORRIS:  Yeah, I can see myself.  You can't hear

20  me?

21            MR. RUKAVINA:  We can now, but Your Honor, we lost

22  Mr. Morris for a bit there.

23            THE COURT:  All right.  I think we were --

24            MR. MORRIS:  Okay.

25            THE COURT:  -- waiting on an answer from Mr. Dondero,

Dondero - Direct                          57

1  actually.

2            THE WITNESS:  We didn't hear the question at --

3  BY MR. MORRIS:

4  Q    Sure.  Are you familiar with the Get Good and Dugaboy

5  Investment Trusts?

6  A    Yes.

7  Q    Are you the beneficiary of those trusts?

8            MR. RUKAVINA:  Your Honor, again, objection to

9  relevance.  These are non-parties, and what his personal

10  interests are has no relevance to this.

11           THE COURT:  Overruled.

12           THE WITNESS:  The Get Good Trust, Get -- I believe

13  those are defective grantor trusts.  I don't believe I have

14  any interest whatsoever in those.  Dugaboy is a perpetual

15  Delaware trust.  I don't know how that's set up, but I believe

16  I do have an interest there until I pass.

17  BY MR. MORRIS:

18  Q    In fact, you're -- you're the sole beneficiary of the

19  Dugaboy Investment Trust, right?

20  A    Until I pass.  It's a -- it's a estate planning trust.

21  Q    I appreciate that.  And the Dugaboy and the Get Good

22  Trusts are the owners of the Charitable DAF Holdco Ltd.,

23  correct?

24  A    No.  Not as far as I know.

25  Q    Okay.

Dondero - Direct                              58

1  A    (garbled) time at all.

2  Q    All right.  So we just looked at these two letters, sir.

3  And you were familiar with the substance of the letters before

4  they were sent, right?

5  A    Uh, just --

6              MR. MORRIS:  You can take it down, Ms. Canty.

7              THE WITNESS:  Just generally.  Again, I wasn't

8  involved directly with the letters.

9  BY MR. MORRIS:

10 Q    You were aware of the letters before they were sent,

11 right?

12 A    Yes.

13 Q    And you discussed the substance of the letters with

14 NexPoint, correct?

15 A    Not the substance of the letters, just the substance of

16 the issue.

17 Q    You actually discussed the substance of the letters with

18 NexPoint, correct?

19 A    I -- Again, I remember it being the substance of the

20 issue.  Generally, at most, the substance of the letters.

21 Q    And you discussed the substance of the letters with the

22 Advisors' internal counsel, too, right?

23 A    The sub -- generally, the substance, yes, but more the

24 issue than the letter.

25 Q    Okay.  If I pull up your transcript from the TRO hearing,

Dondero - Direct                                        59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A    I'd like to clarify with the testimony I just gave.

5   Q    Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A    I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12         MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15         MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17         MR. MORRIS:  Yeah.  It's four Ns.

18         MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20         MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23         MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25         MR. RUKAVINA:  Yes, the witness has it --

Dondero - Direct                              60

1          MR. MORRIS:  Okay.

2          MR. RUKAVINA:  -- in front of him.  This is NNNN,

3  just to confirm?

4          MR. MORRIS:  Yes.  And it is the January 8th

5  transcript.

6  BY MR. MORRIS:

7  Q   Mr. Dondero, were you asked these questions and did you

8  give these answers?  Question:  Are you familiar with --

9          MR. RUKAVINA:  Where are you, John?  Where are you?

10 Where are you?  We -- we -- we --

11         MR. MORRIS:  I apologize.  Page 40.  I'm going to

12 read Page 40, Lines 1 through 14.

13         MR. RUKAVINA:  Okay.  He has it in front of him, if

14 you just want him to read it.

15 BY MR. MORRIS:

16 Q   Did you give these answers at Page 40, beginning Line 1:

17     "Q   And were you -- and you were familiar, you were

18     aware of these letters before they were sent; is that

19     correct?

20     "A   Yes.

21     "Q   And you generally discussed the substance of these

22     letters with NexPoint; is that right?

23     "A   Generally, yes.

24     "Q   You discussed the letters with the internal

25     counsel; is that right?

Dondero - Direct                                61

1      "A    Yes.

2      "Q    That's D.C. Sauter?

3      "A    Yes.

4      "Q    And you have been on some calls with K&L Gates

5      about these letters, right?

6      "A    I believe so.

7      "Q    And you knew these letters were being sent,

8      correct?

9      "A    Yeah.  They're -- they're reported.

10     Q    Did you give those answers to those questions at the prior

11     hearing?

12     A    I -- I believe it's what I -- it's almost exactly what I

13     just said, but yes.

14     Q    And you supported the sending of the letters; isn't that

15     right?

16     A    Absolutely.

17     Q    And you encouraged the sending of the letters, right?

18     A    Absolutely.

19     Q    Around Thanksgiving, you learned that Mr. Seery had given

20     a direction to sell certain securities owned by CLOs managed

21     by the Debtor, correct?

22     A    Yes.

23     Q    And when you learned that, you personally intervened to

24     stop the trades, correct?

25     A    Yes.

Dondero - Direct                              62

1   Q    Let's -- I want to look at that email string that we

2   looked at once before.  It can be found at Trial Exhibit D

3   found on Docket No. 46 in the adversary proceeding. It's PDF

4   Number -- it's PDF Page 189 of two (garbled).

5            MR. RUKAVINA:  Did you catch that?

6            THE COURT:  Which -- which exhibit number -- letter

7   is it?

8            MR. MORRIS:  It's on the docket in the Adversary

9   Proceeding 20-3190.  And in that adversary proceeding, at

10   Docket No. 46, you've got the Debtor's exhibit list.  And

11   Exhibit D, which can be found at PDF Page 189 of 270, is the

12   email string I'm looking for.

13      I apologize, Your Honor.  It wasn't until I was reading

14   the transcript yesterday that I realized I needed these

15   documents.  But they are in the record.  Obviously, they're

16   referred to in the transcript that is in the record.

17            THE COURT:  Okay.

18            MR. RUKAVINA:  Your Honor, I would like to interject

19   for the record here that this is the first time my clients

20   have been sued.  They have a right to be confronted with the

21   witnesses and testimony and evidence against them.  So if Mr.

22   Morris wants to introduce this as an exhibit here today,

23   that's one thing, but I object to any notion that there's a

24   prior record that is going to tie my clients' hands.  It might

25   tie Mr. Dondero's hands, but not my clients' hands.

Dondero - Direct                                    63

1          MR. MORRIS:  I'd move for the introduction into

2     evidence of this document that has emails not only from Mr.

3     Dondero, but from Joe Sowin, the head trader of the

4     Defendants.

5          MR. RUKAVINA:  And Your Honor, I have no problem with

6     that admission.  I just want to make it clear that we're not

7     conceding that whatever happened in this case previous to this

8     is a part of today's record.  That's all.  So I do not have a

9     problem with the admission of this.  I would, however, ask

10    you, Mr. Morris, to have someone email it to us so that I can

11    use it today if I need to.

12          THE COURT:  All right.

13          MR. MORRIS:  Okay.  Will do.

14          THE COURT:  So, I'll --

15          MR. MORRIS:  We'll do that at the --

16          THE COURT:  I'll admit it into evidence.  You'll need

17    to not only email it Mr. Rukavina, but you'll need to file a

18    supplement to your exhibit and witness list after the hearing

19    showing the admission of --

20          MR. RUKAVINA:  And Mr. Morris, if you could email it

21    to Mr. -- if you could email it to Mr. Vasek as well, because

22    obviously I can't get to it now.  Thank you.

23          MR. MORRIS:  Sure.

24          THE COURT:  All right.  So this --

25          MR. MORRIS:  Okay.  So, --

Dondero - Direct                    64

1          THE COURT:  For the record, let's just be clear what

2     the record is -- this is going to be called on the record.  I

3     think you are up to SSSSS, so this would be TTTTT when you

4     file it on the record.  All right?  Go ahead.

5          MR. MORRIS:  Thank you very much, Your Honor.

6        (Debtor's Exhibit TTTTT is received into evidence.)

7     BY MR. MORRIS:

8     Q   Mr. Dondero, you recall looking at this email string at

9     the last hearing, right?

10    A   Yes.

11    Q   Let's start at the bottom, please, with Mr. Covitz's

12    email.

13        (Pause.)

14          MR. RUKAVINA:  Hey, John, real quick, now we've lost

15    you.  We've lost you and we're not seeing anything from your

16    assistant.  Do you have the email, Mr. Vasek?

17          MR. MORRIS:  I'm here.  Can you hear me?

18          MS. CANTY:  I'm here.  (garbled) on the screen.

19          MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20          MS. CANTY: I did.  I don't know why it's not showing

21    on you guys' screen.

22          MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23    never had this problem before, Your Honor.  I'm not sure what

24    the issue is, but I do apologize.

25          THE COURT:  All right.  Well, I can hear you, but we

Dondero - Direct                          65

1   don't see movement of the exhibit.

2          MR. MORRIS:  Yeah.  When I began earlier today by

3   suggesting that this was going to be challenging, this was not

4   one of the challenges I anticipated.

5          THE COURT:  Okay.  All right.

6          MR. RUKAVINA:  Do you have the email yet?

7          MS. CANTY: I'm sorry.  I don't know what's happening

8   on this end.  I have three streams of Internet going, and I

9   don't think it's the Internet.  I don't know what's going on.

10          MR. MORRIS:  Hmm.

11          MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12   that you have an associate email it to Mr. Vasek immediately

13   and then we can present it to Mr. Dondero.

14          MR. MORRIS:  I'll tell you what.  While that -- one

15   more try.

16          MR. CANTY:  Can you see it now?

17          MR. MORRIS:  Okay.  Yes.

18   BY MR. MORRIS:

19   Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20   the Debtor, right?

21          MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22      Your Honor, I believe that I have the right to see the

23   full email here.  I believe that Mr. Dondero does.  And we've

24   just seen the first little bit and now some middle piece.

25          THE COURT:  All right.  So are you saying --

Dondero - Direct                          66

1          MR. MORRIS:  And in the order that --

2          THE COURT:  -- you want to see the whole string?

3          MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4    need to see the whole string?  I don't know what this is, but

5    maybe you do.

6          MR. DONDERO:  It depends on what the question is.  I

7    can answer some questions off of this email.

8          THE COURT:  Okay, let's go.

9          MR. MORRIS:  Yeah.

10   BY MR. MORRIS:

11   Q    All right.  So, for the moment, Mr. Covitz is an employee

12   of the Debtor, correct?

13   A    Yes.

14   Q    And he's the author of this email in front of us, correct?

15   A    Yes.

16   Q    And Mr. Covitz helps to manage the CLO assets on behalf of

17   the Debtor, correct?

18   A    Yes.

19   Q    Mr. Covitz is giving directions to Matt Pearson and Joe

20   Sowin to sell certain securities held by the CLOs, correct?

21   A    Yes.

22   Q    And if we can scroll up, I think we can see that you

23   received a copy of this email?

24        (Pause, 11:15 a.m.)

25          MR. MORRIS:  What I would like to do instead, we'll

Dondero - Direct                              67

1   take a break in about 15 or 20 (audio gap).  When we

2   disconnect, we'll get a better connection after the break.

3   And in the interim, I've got testimony that I would like

4   that's already been admitted into the record but there's

5   portions of which I would like to read into the record from

6   Dustin Norris, who is the executive vice president for each of

7   the Defendants.  And maybe it would be easiest for me to do

8   that.

9            THE COURT:  Okay.

10           MR. MORRIS:  All right.  On Docket No. 39.

11           MR. RUKAVINA:  Your Honor, I apologize.  Your Honor,

12   I apologize.   We did not hear --

13           MR. MORRIS:  I'm going to read into the record a

14   portion of Mr. Norris' testimony from the December 16th

15   hearing.

16           MR. RUKAVINA:  Your Honor, I do not see that

17   transcript in the exhibits.  If Mr. Morris could give me an

18   exhibit.

19           MR. MORRIS:  Exhibit B as in boy.

20           MR. RUKAVINA:  Thank you.

21           MR. MORRIS:  All right.  Instead of putting it on the

22   screen, if we could take the exhibit down, Ms. Canty.  He can

23   just follow along.  Beginning at Page 38, Line 7 through  -- 7

24   through 17.

25       Are you there, Mr. Rukavina?

Dondero - Direct                                      68

1           MR. RUKAVINA:  I am.  Thank you.  I have it in front

2    of Mr. Dondero.

3           MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4        "Q   I think you testified that you're one of the

5        executive vice presidents at NexPoint Advisors, one of

6        the Movants.  Is that right?

7        "A   That's right.

8        "Q   Who is the president of NexPoint Advisors, LP?

9        "A   Mr. Dondero.

10       "Q   And you report directly to him; is that right?

11       "A   I do.

12       "Q   You're also the executive vice president of Fund

13       Advisors, another Movant; is that right?

14       "A   Correct."

15          MR. MORRIS:  Beginning on Page 38, Line 25:

16       "Q   You're also the executive vice president (audio

17       gap) that are managed by the Advisors here, right?

18       "A   Yes.  That is correct."

19          MR. MORRIS:  Then going back to Page 35, beginning at

20   Line 15:

21       "Q   To be clear here, there are five moving parties;

22       is that right?

23       "A   That's correct.  The two Advisors and the three

24       Funds.

25       "Q   And one of the advisory firms is Highland Capital

Dondero - Direct                           69

1    Management Fund Advisors, LP; is that right?

2    "A    That's correct.

3    "Q    And I'll refer to that as Fund Advisors; is that

4    okay?

5    "A    That's great.

6    "Q    James Dondero and Mark Okada are the beneficial

7    owners of Fund Advisors, correct?

8    "A    That is my understanding.

9    "Q    And your understanding is that Mr. Dondero

10   controls Fund Advisors, correct?

11   "A    That's correct.

12   "Q    And the other advisory firm that brought the

13   motion is NexPoint Advisors, LP; is that right?

14   "A    That is correct.

15   "Q    And Mr. Dondero is the beneficial owner of

16   NexPoint; is that right?

17   "A    A family trust where Jim is the sole beneficiary,

18   I believe, controls or owns NexPoint Advisors.

19   "Q    Okay.  And Mr. Dondero --

20   "A    Or 99 percent of NexPoint Advisors.

21   "Q    Mr. Dondero controls NexPoint; is that right?

22   "A    Correct."

23       MR. MORRIS:  Continuing at Line 16 on Page 36:

24   "Q    All right.  And I'm going to refer to Fund

25   Advisors and NexPoint as the Advisors going forward; is

Dondero - Direct                                70

1    that fair?

2    "A    That's fair.

3    "Q    Each of the Advisors manages certain funds; is

4    that right?

5    "A    That is correct.

6    "Q    And three of those funds that are managed by the

7    Advisors are Movants on this motion, correct?

8    "A    Correct.

9    "Q    All right.  The Advisors caused these three Funds

10   to invest in CLOs that are managed by the Debtor; is

11   that right?"

12   "A    --"

13        MR. RUKAVINA:  Your Honor, I object.  Is there a

14   question at the end of this?  I mean, Mr. Dondero can't

15   possibly remember all this and then be asked a question.

16        MR. MORRIS:  He doesn't have to answer any questions.

17   I'm just reading the evidence into the record.

18        THE COURT:  Okay.

19        MR. RUKAVINA:  Your Honor?

20        MR. MORRIS:  Since we're having difficulty --

21        MR. RUKAVINA:  Your Honor, that's a matter for

22   summation.  That's -- this is a question and answer, I submit.

23        THE COURT:  Well, I overrule.

24        MR. MORRIS:  Your Honor, here's -- here's --

25        THE COURT:  This has been admitted into --

Dondero - Direct                          71

1          MR. MORRIS:  Yeah.

2          THE COURT:  -- evidence.  And if he wants to

3    highlight to the Court portions of the evidence, he can.

4       Go ahead.

5          MR. MORRIS:  Thank you, Your Honor.

6       "A   The portfolio managers working for the Advisors

7       did.  That's correct.

8       "Q   And Mr. Dondero is the portfolio manager of the

9       Highland Income Fund; is that right?

10      "A   He is one of the portfolio managers for that Fund.

11      "Q   And he's also --

12      "A   I believe there are two.

13      "Q   And he's also a portfolio manager of NexPoint

14      Capital, Inc., one of the Movants here, right?

15      "A   That is correct.

16      "Q   And he's also the portfolio manager of NexPoint

17      Strategic Opportunities Fund, another Movant; is that

18      right?

19      "A   Yes.  That is correct."

20         MR. MORRIS:  Going to Line -- Page 41, Lines 6

21   through 9:

22      "Q   The whole idea for this motion initiated with Mr.

23      Dondero; isn't that right?

24      "A   The concern, yes, the concern originated, and his

25      concern was voiced to our legal and compliance team."

Dondero - Direct                          72

1        MR. MORRIS:   Page 42, Lines 4 through 11:

2     "Q   None of the Movants are parties to the agreements

3     between the Debtor and each of the Debtors pursuant --

4     each of the CLOs pursuant to which the Debtor serves as

5     portfolio manager; is that correct?

6     "A   I believe that is correct.   One, I think,

7     important -- even though they're not (audio gap), they

8     are the -- they have the economic ownership of each of

9     these CLOs.

10    "Q   But they're not party to the agreement; is that

11    right?

12    "A   Not that I am aware of."

13       MR. MORRIS:   Page 42, Line 25:

14    "Q   Okay.   It's your understanding, in fact, that

15    nobody other than the Debtor has the right or the

16    authority to buy and sell assets on behalf of the CLOs

17    listed on Exhibit B, correct?

18    "A   That is my understanding.

19    "Q   Okay.   And it's also your understanding, your

20    specific understanding, that holders of preferred

21    shares do not make investment decisions on behalf of

22    the CLO; is that right?

23    "A   (audio gap)

24    "Q   And that's something the Advisors knew when they

25    decided to invest in the CLOs on behalf of the Movant

Dondero - Direct                    73

1    Funds; is that fair?

2    "A   That's right.  And at that time, the knowledge in

3    the purchase was with Highland Capital Management, LP

4    and the portfolio management team at the time.

5    "Q   And it's still with Highland Capital Management,

6    LP; isn't that right?

7    "A   That's correct.  I'm not sure that the portfolio

8    management team looks the same, but it was HCMLP."

9        MR. MORRIS:  Moving on to Page 46, Line 22:

10   "Q   The only holders of preferred shares that are

11   pursuing this motion are the three Funds managed by the

12   Advisors, right?

13   "A   In this motion, yes.

14   "Q   You're not aware of any holder of preferred shares

15   pursuing this motion other than the three Funds managed

16   by the Advisors, correct?

17   "A   No, I'm not aware of any others.

18   "Q   You didn't personally inform any holder of

19   preferred shares, other than the Funds that are the

20   Movants, that this motion would be filed, did you?

21   "A   No, I did not.

22   "Q   You're not aware of any steps taken by either of

23   the Advisors to provide notice to holders of preferred

24   shares that this motion was going to be filed, are you?

25   "A   I'm not, no.

Dondero - Direct                               74

```
 1        "Q   And you're not aware of any attempt that was made
 2        to obtain the consent of all of the noteholder -- of
 3        all the holders of the preferred shares to seek the
 4        relief that is sought in this motion, correct?
 5        "A   That's correct.
 6        "Q   You don't have any personal knowledge, personal
 7        knowledge, as to whether any holder of preferred shares
 8        other than the Funds managed by the Advisors wants the
 9        relief sought in this motion, correct?
10        "A   Correct.
11        "Q   You don't have any personal knowledge as to
12        whether any of the CLOs that are subject to the
13        contracts that you described want the relief that's
14        being requested in this motion, right?
15        "A   That's correct.   I have not spoken or been
16        involved at all directly with the CLOs.   I'm
17        representing the Funds."
18             MR. MORRIS:  Moving to Page 49.  I just have a bit
19   more, Your Honor.  Page 49, Line 9.  And this is the reference
20   to his declaration.
21        "Q   And Paragraph 9 refers to a transaction involving
22        SSP Holdings, LLC; do I have that right?
23        "A   That's correct.
24        "Q   Do you know what SSP stands for?
25        "A   See if we say it in there.  SSP Holdings, LLC.
```

Dondero - Direct                           75

1    "Q   Right.  Do you know what SSP stands for?

2    "A   I don't.  Something Steel Products.  I --

3    "Q   Okay.  You don't need to guess.  These are the

4    only two transactions that the Movants question; is

5    that right?

6    "A   These   transactions,   as   well   as   certain

7    transactions around Thanksgiving time.

8    "Q   Okay.   We'll talk about those.   But those

9    transactions about -- around Thanksgiving time aren't

10   in your (audio gap)?

11   "A   Not specifically mentioned by name.

12   "Q   Okay.  Let's talk about the two that are mentioned

13   by name, Trussway and SSP.  The Movants do not contend

14   that either transaction was the product of fraudulent

15   conduct, do they?

16   "A   No.

17   "Q   The   Movants   do   not   contend   that   the   Debtor

18   breached   any   agreement   by   effectuating   these

19   transactions, do they?

20   "A   I don't believe so.

21   "Q   In fact, the Movants do not contend that the

22   Debtor   violated   any   agreement   at   any   time   in   the

23   management of the CLOs listed on Exhibit B; is that

24   right?

25   "A   That's right.

Dondero - Direct                          76

1      "Q   The  Movants  don't  even  question  the  Debtor's

2      business  judgment,  only  the  results  of  the  trans  --  of

3      these two transactions.  Is that right?

4      "A    That's right.  And the results is the key here,

5      and the approach."

6           MR. MORRIS:  Moving on to Page 51, Line 8:

7      "Q   Sir,  you  never  asked  the  Debtor  what  factors  it

8      considered in making these trades, right?

9      "A   I did not.

10     "Q   And you have no reason to believe that anyone on

11     behalf  of  the  Movants  ever  asked  the  Debtor  why  it

12     executed these (audio gap), right?

13     "A   I don't have any knowledge.  There could have been

14     somebody from (audio gap) Movants.  But I do not."

15          MR. MORRIS:  Page 54, Line 19:

16     "Q   Let's  just  talk  briefly  about  the  transactions

17     that  occurred  (garbled)  Thanksgiving.   They're  not

18     specifically referred to in your declaration; is that

19     right?

20     "A    That's correct.

21     "Q   And you have no knowledge about any transaction

22     that Mr. Seery wanted to execute around Thanksgiving;

23     is that right?

24     "A   I know there were transactions and there were

25     concerns from our management team, but I'm not aware of

Dondero - Direct                          77

1    what those transactions were.

2    "Q   In fact, you can't even identify the assets that

3    Mr. Seery wanted to sell around Thanksgiving, or at

4    least you couldn't at the time of your deposition

5    yesterday.  Is that right?

6    "A   That's correct.

7    "Q   And you have no knowledge as to why Mr. Seery

8    wanted to make particular trades around Thanksgiving?

9    "A   No, I don't.

10   "Q   And in fact, you don't even know if the

11   transactions that Mr. Seery wanted to close around

12   Thanksgiving ever in fact closed.  Is that fair?

13   "A   Correct."

14       MR. MORRIS:  Last one.  Page 56, Line 1:

15   "Q   Okay.  To the best of your knowledge, does this

16   document accurately reflect the composition of the

17   boards of each of the three Movant Funds?

18   "A   Yes, it does.

19   "Q   Okay.  John Honis, I think you mentioned him

20   earlier.  He's on all three boards.  Is that right?

21   "A   Yeah, that's correct.  And the reason we're --

22   we're being -- we have a unitary board structure, so --

23   which is very common in '40 Act Fund land, where the

24   board sits, for efficiency purposes, on multiple fund

25   boards, and there's a lot of economies of scale from an

**Appx. 03491**

Dondero - Direct                              78

1    operating standpoint.  So, yes, they sit on multiple

2    boards.

3    "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4    has been deemed to be an interested trustee.  Is that

5    right?

6    "A   That's correct.

7    "Q   Okay.  But you don't specifically know what (audio

8    gap) caused that designation; you only know that the

9    designation exists.  Right?

10   "A   That's right.  And I know they are disclosed in

11   the proxy -- or, in the -- the relative filings related

12   to those Funds.

13   "Q   Okay.  Three other people are common to all three

14   Movant Funds.  I think you've got Dr. Froehlich, Ethan

15   Powell, --

16       MR. MORRIS:  I think he -- pronunciation.

17   "A   Froehlich.

18   "Q   Ethan Powell and Bryan Ward.  Right?

19   "A   That is correct.

20   "Q   Okay.  All three of those individuals actually

21   serve on the 11 or 12 boards that you mentioned earlier

22   that are managed by the Advisors, right?

23   "A   That is correct.

24   "Q   And they're the same Funds for which you serve as

25   the executive vice president, right?

Dondero - Direct                    79

1        "A    This is correct -- yes.  That's correct.

2        "Q    So, for all of the Funds that are managed by the

3        Advisors, you serve as executive vice president and all

4        four of these directors -- trustees serve as trustees

5        on the boards, right?

6        "A    Yes, that's correct.

7        "Q    Okay.  In exchange for serving on all of these

8        boards, the three individuals -- Dr. Froehlich, Mr.

9        Ward, and Mr. Powell  -- each receive $150,000 a year

10       for services across the Highland complex; is that

11       right?

12       "A    That's correct.

13       "Q    Dr. Froehlich has been serving as a board member

14       across the Highland complex for seven or eight years

15       now; is that right?

16       "A    That's correct.

17       "Q    Mr. --

18       "A    I believe it's about seven or eight years.

19       "Q    Mr. Powell, he actually was employed by Highland

20       related -- Highland or related entities from about 2007

21       or 2008 until 2015, right?

22       "A    That's correct.

23       "Q    And Mr. Ward, the third of the independent

24       trustees, he's been serving on a board or various of --

25       on various Highland-related funds on a continuous basis

Dondero - Direct                                    80

1        since about 2004.  Do I have that right?

2        "A    Yeah, I believe that's correct."

3              MR. MORRIS:  Your Honor, that concludes the reading

4    of the portions of Mr. Norris's testimony that I wanted to

5    present to the Court.

6        I know it's 11:30 now, and I would respectfully request

7    that we simply adjourn and let Your Honor tend to your

8    business.

9              THE COURT:  Okay.

10             MR. MORRIS:  And hopefully when we come back at 1:00

11   o'clock, we'll have a better connection.

12             THE COURT:  All right.  So, we are going to go into

13   recess until 1:00 o'clock Central.  Mike, can people just stay

14   connected, or should they --

15             THE CLERK:  Yes.  They can stay.  Yes.

16             THE COURT:  You can stay or reconnect, whichever you

17   want.  But we'll see you at 1:00.

18             MR. MORRIS:  Thank you, Your Honor.

19             THE CLERK:  All rise.

20       (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21             THE CLERK:  All rise.  The United States Bankruptcy

22   Court for the Northern District of Texas, Dallas Division, is

23   now in session, the Honorable Stacey Jernigan presiding.

24             THE COURT:  Good afternoon.  Please be seated.

25   Apologies.  I was a little ambitious in my time estimate.  So,

                        Dondero - Direct                    81

1    anyway, I didn't have any control over getting in and out of

2    Parkland Hospital, so I'm just grateful to be here.

3        All right.  We were in the middle of direct examination of

4    Mr. Dondero.  Mr. Morris, are you ready to proceed?

5            MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6    the computer issues have resolved themselves.  It remains to

7    be seen once we try.  If problems arise again, I plan on just

8    putting this on mute and dialing in through the telephone,

9    kind of the other alternative.

10           THE COURT:  All right.

11           MR. MORRIS:  So (garbled) and I apologize to Mr.

12   Dondero, too.  I know I'm testing his patience.  But it's not

13   for any reason other than technological.

14           THE COURT:  All right.

15           MR. MORRIS:  And Your Honor, you don't have to

16   apologize for keeping us waiting.  That's okay.

17           THE COURT:  Okay.

18           MR. MORRIS:  But thank you.

19           THE COURT:  All right.  Mr. Dondero, --

20           MR. MORRIS:  All right.  So, --

21           THE WITNESS:  Yeah.

22           THE COURT:  I was just going to remind you, I have to

23   remind you you're still under oath.

24       Are you ready, Mr. Morris?

25           MR. MORRIS:  I am, Your Honor.

Dondero - Direct                           82

1          THE COURT:  All right.  You may proceed.

2          MR. MORRIS:  And we're going to begin with the

3  document that we had difficulty scrolling through earlier,

4  which we have now sent to counsel, and that would be what was

5  marked as Exhibit D on Docket No. 46.

6          THE COURT:  All right.

7          MR. MORRIS:  That's the email string that we had seen

8  earlier that I think Your Honor admitted into evidence.  Do I

9  have that right?

10          THE COURT:  Yes.

11          MR. MORRIS:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13  BY MR. MORRIS:

14  Q   So, let's just start at the bottom and see if we can do

15  this more easily, Mr. Dondero.  And again, I apologize for

16  keeping you waiting before.  Starting at the bottom, that's an

17  email from Hunter Covitz.  Do you see that?

18  A   Yeah, I see it.

19  Q   And he's an employee of the Debtor, right?

20  A   Yes.

21  Q   And your understanding is that Mr. Covitz actually helps

22  the Debtor manage the CLO assets, right?

23  A   Yes.

24  Q   And in this email, Mr. Covitz is giving directions to Matt

25  Pearson and Joe Sowin regarding certain securities held by the

Dondero - Direct                                83

1  CLOs, right?

2  A    Yes.

3  Q    And if we could scroll up, hopefully, we can see that you

4  received a copy of this email.

5           MR. MORRIS:  Yeah.  Right there.

6  BY MR. MORRIS:

7  Q    Do you see that?

8  A    Yes.

9  Q    And then -- and then you instructed the recipients of Mr.

10 Covitz's email not to sell the SKY securities as had been

11 instructed by Mr. Seery, correct?

12 A    Yes.

13 Q    And you understood when you gave that instruction that the

14 people on the email were trying to execute trades that Mr.

15 Seery had authorized, correct?

16 A    Incorrect.

17 Q    You didn't know that, sir?

18 A    What I knew was that Seery had not authorized the trade,

19 he had orchestrated the trade.  Hunter is not an analyst with

20 any particular knowledge.  I called Hunter, why would he sell

21 those?  And he said Seery told him to sell those.  So it

22 wasn't that Seery authorized Hunter trading it.  It was Seery

23 told Hunter to trade it, which is -- which is a material

24 difference in my mind.

25 Q    Okay.  So I'll ask you again.  At the time you gave the

Dondero - Direct                    84

1   instruction, "No, do not," you knew that you were stopping

2   trades that had been authorized and directed by Mr. Seery,

3   correct?

4   A    Yes.

5   Q    You didn't speak with Mr. Seery before sending this email,

6   did you?

7   A    No.

8   Q    And you took no steps to seek the Debtor's consent before

9   instructing the recipients of this email to stop executing the

10  SKY transactions.  Is that right?

11  A    I'm sorry.  I missed the first part of that question.

12  Q    Okay.  You took no steps to seek the Debtor's consent

13  before instructing the recipients of this email to stop

14  executing the SKY transactions that were authorized by Mr.

15  Seery, correct?

16  A    I don't -- I'm not sure I was permitted to talk to Seery

17  at this point, but I don't recall specifically, no.

18  Q    You didn't seek consent, did you, before stopping these

19  trades?

20  A    No.

21  Q    Okay.  In response to your instruction --

22          MR. MORRIS:  If we could scroll up to the next

23  response.

24  BY MR. MORRIS:

25  Q    You see the response from Mr. Pearson?

Dondero - Direct                    85

1   A    Yes.

2   Q    And in response to your instructions, Mr. Pearson canceled

3   all of the SKY and AVYA sales that the Debtor had directed but

4   which had not yet been executed, right?

5   A    Yes.

6   Q    Okay.

7            MR. MORRIS:  Can we scroll up to the next email,

8   please?

9   BY MR. MORRIS:

10  Q    And you responded again, right?  That's your response?

11  A    Yes.

12  Q    Can you read your response out loud, please?

13  A    (reading) HFAM and DAF have instructed Highland in writing

14  not to sell any CLO underlying assets.  There is potential

15  liability.  Don't do it again, please.

16  Q    And the writings that you refer to there are the two

17  letters that we looked at earlier, the October 16 and the

18  November 24 letter, right?

19  A    I believe so.  If not, if there's a third or fourth

20  letter, all the letters in aggregate.

21  Q    All right.  And you, you interpreted those letters not as

22  requests but, as you tell the recipients of your email here,

23  that they were actually instructions, right?

24  A    That was -- that was my choice of words.  I don't know if

25  I thought about it that clearly.

Dondero - Direct                        86

1  Q   Okay.  But the reci... you have no reason to believe that

2  the recipient of this email wouldn't understand that you

3  believed that Highland had been instructed not to do these

4  trades, right?

5  A   I'm sorry.  Can you ask that again?  I had no reason to

6  believe what?

7  Q   That's okay.  I'll move on.  At this juncture, the

8  reference to potential liability was intended for Mr. Pearson,

9  right?

10  A   Frankly, when you violate the Advisers Act, the CFO has

11  liability.  I mean, I'm sorry, the chief compliance officer

12  has liability, and anybody who has an awareness that it

13  violates the Advisers Act has potential liability also.

14  Q   And is it -- is it your testimony and your position that

15  Mr. Pearson had potential liability under the Advisers Act for

16  carrying out Mr. Seery's trade requests?

17  A   Yes, once he was informed that the underlying investors

18  didn't want assets sold and Seery had stated he had no

19  business purpose in selling those assets.

20        MR. MORRIS:  I move to strike the latter part of the

21  answer, Your Honor.  Mr. Dondero has testified repeatedly

22  multiple times that he has never communicated with Mr. Seery

23  about why he wanted to make these transactions.

24        THE COURT:  I grant that.

25  BY MR. MORRIS:

Dondero - Direct                        87

1    Q    Mr. Sowin responded and indicated that he would follow

2    your instructions, right, if we scroll to the next email?

3    A    I'm sorry.  What part are you saying, or what part are you

4    referring to?

5    Q    Mr. Sowin.  Who is Mr. Sowin?

6    A    He's Matt Pearson's boss.  He's the head trader.

7    Q    And he works for the Advisors, right?

8    A    Yes.

9    Q    He's one of your employees, right?

10   A    Yes.

11   Q    Mr. Sowin followed your instructions as set forth in this

12   email, right?

13   A    He did a bunch of things, but, yes, I believe -- yes,

14   that's a fair way to characterize.

15   Q    And the only information that you know of that he's

16   relying upon to state that Compliance should never have

17   approved this order was your email that preceded it, right?

18   A    No.

19   Q    No?  There's nothing else on this email other than your

20   email that preceded it, correct?

21   A    Correct.

22   Q    Okay.  A few days later, you learned that Mr. Seery was

23   trying a workaround to effectuate the trades anyway, right?

24   A    I believe so.

25            MR. MORRIS:  Can we scroll up to the next email?

                          Dondero - Direct                    88

1  BY MR. MORRIS:

2  Q    This is your response to Mr. Surgent, right?

3  A    Yes.

4  Q    Now, Mr. Surgent hasn't written anything.  He is not part

5  of this conversation, is he?

6  A    No.

7  Q    But you bring him into the conversation, right?

8  A    Because he's the chief compliance officer at Highland,

9  yes.

10 Q    He's not -- he's not the chief compliance officer for the

11 Advisors.  He's the chief compliance officer for a company

12 that you no longer work for, right?

13 A    Correct, but he has personal liability for violations of

14 the Advisers Act.

15 Q    Okay.  And you thought it was your responsibility to

16 remind him of that, right?

17 A    It was my view of the situation, and at least he could

18 evaluate it himself if I reminded him of it, yes.

19 Q    Uh-huh.  What does it mean to do a workaround?  What did

20 you mean by that?

21 A    There's a concept in compliance called you can't do

22 something indirectly that you can't do directly, and that's

23 what I was referring to there.

24 Q    Does that mean that he was trying to effectuate the trade

25 without the assistance of the Advisors?

**Appx. 03502**

Dondero - Direct                              89

1   A   I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4           MR. MORRIS:  I move to strike.

5           THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q   I'm asking you a very specific question.

8           MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10          THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q   Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A   No.

16  Q   Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A   Yes.

19  Q   Can you read the last line of your email?

20  A   (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q   Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A   For violating the Advisers Act, is what I meant.

25  Q   Uh-huh.  Did you report anybody to the SEC?

Dondero - Direct                              90

1  A    I would be happy to if it's permitted by the Court.

2  Q    But you didn't -- you never asked the Court to do that,

3  right?

4  A    No.

5  Q    It didn't seem important enough for you to take that step,

6  right?  But you wanted -- you had to make sure that you told

7  Mr. Surgent that he might be personally liable, right?  That

8  was what you needed to do?

9  A    Could you repeat that question, please?

10 Q    You needed to make sure that Mr. Surgent knew that you

11 were threatening him with personal liability if he followed

12 Mr. Seery's instructions, right?

13 A    No.

14 Q    As a factual matter, you never asked Mr. Seery why he

15 wanted to make these trades, right?

16 A    I asked Joe Sowin to ask him.

17 Q    As a factual matter, you never asked Mr. Seery why he

18 wanted to make these trades, correct?

19 A    I believe I wasn't permitted to talk to him.

20 Q    In November 2020?  What would have prevented that?

21 A    I believe Scott Ellington was the go-between at that

22 point in time.

23 Q    Is it your testimony that you never spoke with Jim Seery

24 in November 2020?

25 A    I believe in an unauthorized fashion, the day after

**Appx. 03504**

Dondero - Direct                               91

1   Thanksgiving I talked to him, but that's the only day I can

2   remember.

3   Q    Should we call up the email where you threatened him not

4   to do it again?

5   A    That was an email.

6   Q    Ah.  So you could communicate by email?  Did you ever send

7   Mr. Seery an email and say, Why do you want to do these

8   trades?

9   A    No.

10  Q    But somehow you thought you couldn't even speak to him?

11  You couldn't speak to him but you can send him emails?  That's

12  the world that you live in, right?  That's what you think?

13  A    I have no comment on that.

14  Q    All right.  So, after this exchange, --

15          MR. MORRIS:  And this is what I read out-of-order

16  before, Your Honor.  We moved to the December 16th hearing.

17  BY MR. MORRIS:

18  Q    And you remember, Mr. Dondero, that the Defendants made

19  that motion that asked the Court to stop the Debtor from

20  trading in the CLO assets?  Do you remember that?

21  A    I'm sorry.  You're asking me do I remember letters were

22  sent?  Yes.

23  Q    No.  Do you remember that there was a hearing in mid-

24  December?

25  A    Yes.

Dondero - Direct                              92

1   Q    Okay.

2         MR. MORRIS:  And Your Honor, for the record, Exhibit

3   A is the Debtor -- is the Defendants' motion.  Exhibit B is

4   the transcript that we had looked at earlier or that I had

5   read portions of earlier.

6         THE COURT:  Okay.

7         MR. MORRIS:  And Exhibit C is the order that the

8   Court entered denying the Defendants' motion.

9      Can we call up Exhibit C, please?

10  BY MR. MORRIS:

11  Q   All right.  Do you see --

12        MR. MORRIS:  If we could scroll to the very top,

13  please.  All right.

14  BY MR. MORRIS:

15  Q   Do you see this document is dated December 18th, sir?

16  A   Yes.

17  Q   And if we scroll down, this is the order denying the

18  motion of the Advisors and the Funds for an order trying to

19  temporarily restrict the Debtor's ability as portfolio manager

20  from initiating sales.  Do you see that?

21  A   Yes.

22  Q   Okay.  So, this is December 18th.  And if you'll recall,

23  the TRO was issued against you on December 10th.  Do you

24  remember that?

25  A   I don't believe it was the 10th.

Dondero - Direct                              93

1  Q   Okay.  It was in December, and it was just before this.

2  Is that fair?

3  A   I believe there was an intent, and then the actual filing

4  I think was much later.  I don't have -- I don't have the

5  knowledge.  I don't have the knowledge of when the TRO was put

6  in place.

7  Q   Okay.  (Pause.)  Okay.  We talked earlier about how you

8  interfered with Mr. Seery's trading activities around

9  Thanksgiving.  Do you remember that?

10  A   Yes, I do.  I do remember the trading then, also.

11  Q   Okay.  And do you remember that just before Christmas you

12  interfered with Mr. Seery's tradings again?

13  A   Yes.

14  Q   Okay.

15       MR. MORRIS:  If we can call up Exhibit K from Docket

16  No. 46, which I have shared with counsel?

17       THE WITNESS:  You know what?

18  BY MR. MORRIS:

19  Q   Yeah.

20  A   Let's handle these each incident one at a time.  And I

21  don't want to use the word "interfering" or accept the word

22  "interfering" as an answer because I think my participation in

23  each situation was very different.

24       MR. MORRIS:  All right.  Can we scroll down?

25  BY MR. MORRIS:

Dondero - Direct                                    94

1  Q    This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2  is your lawyer.  Is that right?

3  A    Yes.

4          MR. MORRIS:  And if we could start down at the first

5  page.  We've seen these letter before.  A little further.

6  BY MR. MORRIS:

7  Q    Do you see there is a reference there to the Debtor's

8  management of CLOs?

9  A    Yes.

10 Q    And there is a recitation of the history that we talked

11 about a bit earlier.  If we -- if we look further in that

12 paragraph to around Thanksgiving, when you intervened to block

13 the trades.

14 A    Yes, I see that sentence.

15 Q    Okay.

16          MR. MORRIS:  And then if we can go to the next page,

17 the next paragraph.  Yeah, that's where.

18 BY MR. MORRIS:

19 Q    Then we referred to the December 16th hearing, right?  And

20 then the next paragraph says, "On December 22, 2020" --

21          MR. MORRIS:  Can you scroll down just a little bit?

22 Nope, the other way.  Yeah, right there.

23 BY MR. MORRIS:

24 Q    "On December 22, 2020, employees of NPA and HCMFA" --

25 those are the Advisors, right?

Dondero - Direct                              95

1   A    Yes.

2   Q    -- "notified the Debtor that they would not settle the

3   CLO's sale of the AVYA and SKY security."  Have I read that

4   correctly?

5   A    Yes.

6   Q    All right.  On or about December 22nd, you personally

7   instructed employees of the Advisors not to trade the SKY and

8   AVYA securities that Mr. Seery had authorized.  Is that right?

9   A    No.

10  Q    You personally instructed, on or about December 22, 2020,

11  employees of those Advisors to stop doing the trades that Mr.

12  Seery had authorized with respect to SKY and AVYA, right?

13  A    No.  You know, we need to look at source documents.  My

14  recollection is I encouraged Compliance to look at those

15  trades.  But I'm willing to be -- I'm willing to be -- get

16  source documents again, if you'd like.

17  Q    All right.  My source document is your prior testimony.

18          MR. MORRIS:  Can we please call up Exhibit NNNN at

19  Page 73?  Beginning at Line 2?  Okay.

20  BY MR. MORRIS:

21  Q    Page 73, beginning at Line 2, did you give the following

22  answer to my question?

23          "Q    And  you  personally  instructed,  on  or  about

24          December  22nd,  2020,  employees  of  those  Advisors  to

25          stop  doing  the  trades  that  Mr.  Seery  had  authorized

Dondero - Direct                                96

1    with respect to SKY and AVYA, right?

2        "A    Yeah.    Maybe we're splitting hairs here, but I

3        instructed them not to trade them.    I never gave

4        instructions not to settle the trades that occurred,

5        but that's a different ball of wax."

6    Q    Did you give that answer, sir?

7    A    I believe I confused dates or misspoke there, but I did

8    give that answer.

9    Q    Okay.    Thank you.    Stated a different way, you personally

10   instructed the Advisors' employees not to execute the trades

11   that Mr. Seery had authorized but which had not yet been made,

12   right?

13   A    No.    Not -- not on December 22nd.    That was in November.

14   November 22nd, I did not do that.

15   Q    Okay.

16        MR. MORRIS:    Can we go to Page 76, please?    Line 15.

17   BY MR. MORRIS:

18   Q    Did you give this answer to my question?

19       "Q    And you would agree with me, would you not, that

20       you instructed the employees of the Advisors not to

21       execute the very trades that Mr. Seery identifies in

22       this email, correct?

23       "A    Yes."

24   Q    Did you give that answer, sir?

25   A    Well, like I said, I -- I confused the Thanksgiving

Dondero - Direct                                97

1  trades, the week of Thanksgiving, with my more nuanced

2  responses to later trades.

3          MR. MORRIS:  I move to strike, Your Honor.  It's a

4  very simple question.

5          THE COURT:  Granted.

6  BY MR. MORRIS:

7  Q   Did you give that answer to my question, sir?

8  A   I -- yes, I did.

9  Q   Thank you.  Now, all of this is just a week after that

10 December 16th hearing, right?

11 A   Yes.

12 Q   And right after that hearing, the K&L Gates firm sent, on

13 behalf of the Defendants, more letters to the Debtors, right?

14 A   Yes.

15         MR. MORRIS:  Can we please pull up the first letter?

16 It's Exhibit DDDD.  And if we can go not to our response but

17 to the original letter that was sent that's attached to this.

18 I think it is Exhibit A.  Right there.

19 BY MR. MORRIS:

20 Q   That's the first of the letters, December 22, 2020.  Do

21 you see that?

22 A   Yes.

23         MR. MORRIS:  And can we scroll down to the end of the

24 letter to see what the request is here?  Right there.

25 BY MR. MORRIS:

Dondero - Direct                                98

1  Q   Can you read the end of that letter right there, sir?

2  A   (reading)  Sincerely, A. Lee Hogewood, III.

3  Q   Nice.  I meant the actual substance.

4  A   (reading)  For the foregoing and other reasons, we request

5  that no further CLO transactions occur, at least until the

6  issues raised by and addressed in the Debtor's plan are

7  resolved at the confirmation hearing.

8  Q   Okay.  And that's similar in substance to the letter that

9  was sent on behalf of the Defendants on October 16th that you

10 saw and approved, right?

11 A   I did not see and approve.

12 Q   All right.  The record will speak for itself.  And it's

13 similar in substance to the letter that was sent on November

14 24th by the K&L Gates clients on behalf of the Defendants,

15 right?

16 A   I don't know.

17 Q   We looked at it before.  Should we get it again?

18 A   It's a -- all the letters, as far as I understand, were

19 similar in requesting that the -- the beneficial owners of the

20 CLOs were requesting that no wholesale liquidation of their

21 assets occur.  That's how I understand it.

22 Q   And that's --

23 A   You asked my understanding.  That's my understanding.

24 Q   Okay.  And notwithstanding the request in this letter,

25 when you were -- when you were talking to the traders at your

Dondero - Direct                              99

1  shop, you actually told them that the Debtor was instructed

2  not to do these trades, right?

3  A    Are you parsing "instructed" versus "requested"?  I don't

4  understand the question.

5  Q    I am, in fact.  You used a very different phrase when

6  speaking to your employees than you did -- then your lawyers

7  did when they wrote to the Debtor, right?

8  A    It seems to be a difference, yes.

9  Q    Okay.  So, this is on December 22nd.  Now, the night

10 before, you participated in a meeting with Grant Scott and

11 with the lawyers for the Defendants, right, to talk about what

12 you guys were going to do with respect to the Debtor's

13 management of the CLOs.  Isn't that right?

14 A    I don't remember specifically.

15 Q    Okay.  But is it fair to say it's true, is it not, that

16 during the week leading up to Christmas you participated in

17 several phone calls with the K&L Gates firm and with other

18 members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19 Post or Mr. Sauter, and the lawyers, right?  You were all

20 together talking about these issues during the week before

21 Christmas, right?

22        MR. RUKAVINA:  Your Honor, I'm going to object.  If

23 counsel is asking what was discussed with counsel present for

24 the purpose of legal advice, that is an inappropriate

25 question.

Dondero - Direct                                      100

1          THE COURT:  Okay.

2          MR. MORRIS:  I'm certainly not.  I'm asking if the

3  conversations took place.

4          MR. RUKAVINA:  And the conversations -- the question

5  was, did they discuss what to do with respect to the CLOs?

6  That would be privileged, Your Honor.  If they discussed

7  football, that's not privileged, but what to do with the CLO

8  management agreements is privileged.

9          THE COURT:  Okay.  I sustain.

10         MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11  sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12  Right there.

13  BY MR. MORRIS:

14  Q    Do you see -- this is an email from Grant Scott to Scott

15  Ellington; do you see that?

16  A    Yes.

17  Q    And at this point, Mr. Ellington is still working for the

18  Debtor, right?

19  A    Yes.  I believe he was settlement counsel.

20  Q    Uh-huh.  And do you see that this is an email that refers

21  to your availability for a 9:00 a.m. call?

22  A    Yes.

23  Q    And do you see that there's a question as to whether the

24  K&L people can make it?

25  A    Yes.

Dondero - Direct                                         101

1   Q    And you understand that refers to K&L Gates, right?

2   A    I -- I guess so.

3   Q    And so does this refresh your recollection that at or

4   around Christmas, or in the days leading up to Christmas, you

5   participated in calls with Mr. Scott, with Scott Ellington,

6   and with the K&L Gates folks?

7   A    I -- I don't know.  I don't know if -- if I actually did

8   or not.  But I was highly concerned with inappropriate

9   behavior.

10  Q    And you were available -- and did you tell somebody that

11  you were available for this call on the morning of the 23rd?

12  A    I don't know.

13  Q    This is the day after you stopped the trades, right?

14  A    Again, I didn't stop the trades on the 23rd.

15  Q    You stopped them on the 22nd, right?

16  A    No, I stopped them on the week of Thanksgiving.

17          MR. MORRIS:  Can we go back to Exhibit NNNN, the

18  transcript?  Page 73?

19  BY MR. MORRIS:

20  Q    Let me see if I can refresh your recollection.  Tab 2.

21  Did you give this answer to this question:

22          "Q    And  you  personally  instructed,  on  or  about

23          December 22, 2020, employees of those Advisors to stop

24          doing  the  trades  that  Mr.  Seery  had  authorized  with

25          respect to SKY and AVYA, right?

Dondero - Direct                                    102

1        "A    Yeah.   Maybe we're splitting hairs here, but I

2        instructed them not to trade them."

3   Q    Did you give that answer to the question?

4   A    Yes.

5   Q    Okay.

6   A    But we -- we corrected.

7   Q    All right.  You didn't correct it at the preliminary

8   injunction hearing, did you?

9   A    No, I did not.

10  Q    Okay.  So as far as the Court knows as of this moment,

11  that's the only testimony that you've ever given on the topic,

12  right?

13  A    I'm trying to give some now.

14  Q    Okay.  And on December 22nd, that's the date that the

15  first letter was also sent, right, we just looked at?

16  A    All right.  Okay.

17  Q    You agree with that, right?

18  A    I don't remember the date on the letter.  If you want to

19  pull it up, I'll say it is the 22nd or the 23rd, whatever it

20  says.  I don't know.

21  Q    Sure.

22          MR. MORRIS:  Let's go back to DDDD, please.  And if

23  we can just go to the top of the letter.  Thank you.

24  BY MR. MORRIS:

25  Q    K&L Gates.  December 22nd.  That's the letter, right?

Dondero - Direct                           103

1   A    Yes.

2   Q    And according to the testimony that you gave at the

3   preliminary injunction hearing on January 8th, that's the day

4   that you also stopped AVYA and SKY trades, right?

5   A    I'm not agreeing to that testimony.  I am changing the

6   testimony.

7   Q    Okay.  And then we just saw that other exhibit where they

8   were trying to arrange a phone call with you, the K&L Gates

9   lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10  you remember that one we just looked at?

11  A    Yes.

12  Q    And then later on the day on the 23rd, K&L Gates sends

13  another letter, right?

14          MR. MORRIS:  Can we call up EEEE?  And can we scroll

15  to the Exhibit A, to our response?  Right there.

16  BY MR. MORRIS:

17  Q    That's the 23rd.  Do you see that letter?

18  A    Yes.

19  Q    Again, this is one week after the hearing, right?

20  A    Yes.

21  Q    Okay.  And this is a letter where K&L Gates states on

22  behalf of the Defendants that they are contemplating taking

23  steps to terminate the CLO management agreements, right?

24  A    I don't know.  Can you scroll down, if you want to ask me

25  --

Dondero - Direct                              104

1   Q    Sure.

2         MR. MORRIS:  Can we flip to the next page, please?

3   Keep going.  Right there.

4   BY MR. MORRIS:

5   Q    Can you read the first sentence of the paragraph

6   beginning, "Consequently"?

7   A    (reading)  Consequently, in addition to our request of

8   yesterday, where appropriate and consistent with the

9   underlying contractual provisions, one or more of the entities

10  above intend to notify the relevant Trustees and/or Issuers

11  that the process of removing the Debtor as fund manager should

12  be initiated, subject to and with due deference to the

13  applicable provisions of the United States Bankruptcy Code,

14  including the automatic stay of Section 362.

15  Q    Okay.  So, on December 23rd, the Defendants told the

16  Debtor that they intended to notify the relevant Trustees

17  and/or the Issuers that the process of removing the Debtor as

18  the fund manager should be initiated, right?

19  A    That's what it says.

20  Q    And then the K&L Gates firm sent yet another letter to the

21  Debtor, right?  Do you remember that?

22  A    No.

23        MR. MORRIS:  Can we get up FFFF, please?

24  BY MR. MORRIS:

25  Q    This is dated December 31st.  Do you see that?

Dondero - Direct                    105

1  A    Yes.

2            MR. MORRIS:  Can we scroll down a bit?

3  BY MR. MORRIS:

4  Q    Do you recall this is the letter where they claim that

5  they've been damaged by the Debtor's eviction of you from the

6  Highland offices?

7  A    I don't remember specifically, but that's true.

8  Q    Okay.  So we just saw these three letters, in addition to

9  your -- the -- at least the testimony you gave regarding your

10 conduct on the 22nd of December.  You were aware that all of

11 these letters were being sent by K&L Gates, correct?

12 A    Yes, generally.

13 Q    And you were supportive of the sending of these letters,

14 right?

15 A    Absolutely.  They were appropriate.

16 Q    And you pushed and encouraged the chief compliance officer

17 and the general counsel to send these letters, right?

18 A    I'd like to think that they believed and they acted

19 largely on their own judgment, but I strongly believed it was

20 a violation of the Advisers Act, and stated that numerous

21 times.

22 Q    Sir, you pushed and encouraged the chief compliance

23 officer and the general counsel to send these letters,

24 correct?

25 A    No, I wouldn't use those words.

Dondero - Direct                                    106

1  Q    Do you understand that the Debtor demanded that the K&L

2  Gates clients or the Defendants withdraw these letters?

3  A    I believe they requested it.  I didn't -- I didn't know

4  the former, what you mean by demand, but --

5  Q    Well, it's fair to say you never instructed the K&L Gates

6  clients or the Defendants to withdraw these letters, right?

7  A    No.  I still believe they are appropriate and accurate.  I

8  wouldn't withdraw them today.

9  Q    Okay.  Sir, throughout 2020, when you were still the

10 portfolio manager at Highland Capital Management, it's true

11 that you sold AVYA shares on numerous occasions on behalf of

12 both the CLOs and on behalf of the Funds outside of the

13 holdings of the CLOs?

14 A    Always with a business purpose, yes.  That is still a

15 small percentage of our total AVYA holdings, and we still

16 liked AVYA.

17 Q    Sir, I'm going to ask you just one more time.  In 2020,

18 you sold AVYA stock many times on behalf of the CLOs and on

19 behalf of the Funds?

20 A    Yes.

21 Q    Thank you.

22          MR. MORRIS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Rukavina?

24          MR. RUKAVINA:  Your Honor, I will reserve my

25 questions to my case in chief, and I would request a very

Dondero - Direct                    107

1    short restroom break.

2            THE COURT:  All right.  Mr. Dondero, we're --

3            MR. RUKAVINA:  And I do mean short.  I will --

4            THE COURT:  I'm sorry.  What?

5            MR. RUKAVINA:  And I do mean short, Your Honor.  I

6    just need to run and be back -- I can be back in three

7    minutes.

8            MR. MORRIS:  No problem, Your Honor.

9            THE COURT:  Okay.  You're finished for now, Mr.

10   Dondero, but you're going to be recalled, so hang tight.

11      Your next witness, Mr. Morris?

12           MR. MORRIS:  The Debtor calls Jason Post.

13           MR. RUKAVINA:  Your Honor, may I be excused to run to

14   the restroom and Mr. Vasek take over for a few minutes?

15           THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16   request, I didn't hear you.  So that's fine.

17      All right.  Mr. Post, --

18           MR. MORRIS:  Your Honor, can we just -- I apologize

19   for interrupting.  Can we just direct Mr. Dondero not to speak

20   with anybody about anything at any time?  Not by phone, not by

21   text, not by email, not by meeting, not by anything?  Because

22   he's still on the stand.

23           MR. RUKAVINA:  Well, Your Honor, anything at any

24   time.  I think I know that Mr. Morris is being facetious, but

25   if he's trying to get the rule invoked, that's different.

Post - Direct                                        108

1          MR. MORRIS:  Okay.  I'm trying to get the rule

2     invoked.

3          THE COURT:  Okay.  All right.  I'm not going to make

4     that instruction.  All right.  So, --

5          MR. RUKAVINA:  I've got to run to the restroom.  I'll

6     be -- listen for the instructions.

7          THE COURT:  Jason Post, you've been called to the

8     witness stand.  Could you say, "Testing, one, two"?

9          MR. POST:  (Indiscernible.)

10          THE COURT:  All right.  Please raise --

11          MR. POST:  Testing, one, two.

12          THE COURT:  Thank you.  Please raise your right hand.

13              JASON POST, DEBTOR'S WITNESS, SWORN

14          THE COURT:  All right.  Mr. Morris, go ahead.

15                     DIRECT EXAMINATION

16     BY MR. MORRIS:

17     Q   Good afternoon, Mr. Post.  We met the other day.  Do you

18     remember that?

19     A   I do.

20     Q   Okay.  So, again, just to remind you, my name is John

21     Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.

22     We represent the Debtor here.  You're the chief compliance

23     officer for each of the Defendants; is that right?

24     A   I am.

25     Q   And in your role as the chief compliance officer, your job

Post - Direct                                    109

1  is to act as a liaison between regulatory bodies and internal

2  working groups with respect to the rules and regulations for

3  the funds advised by the Advisors; is that correct?

4  A    Correct, that's -- that's the (inaudible).  Correct.

5  Q    All right.  And internally, you report to Mr. Dondero.

6  Isn't that right?

7  A    Correct.

8  Q    And you've been working with Mr. Dondero since 2008 when

9  you joined Highland Capital Management, correct?

10 A    I worked at Mr. Dondero's firm since 2008, but I reported

11 to other direct reports during that time outside of Mr.

12 Dondero.  I started to report to him directly in October of

13 2020.

14 Q    Okay.

15 A    (overspoken)

16 Q    But you've -- you've worked at Highland -- you worked at

17 Highland since 2008, fair?

18 A    Yes.

19 Q    Okay.  And you were employed by Highland up until October

20 2020, correct?

21 A    Yes.

22 Q    Okay.  And at that time, Mr. Dondero left and he went to

23 NexPoint and you went to NexPoint.  Is that right?

24 A    Shortly after Mr. Dondero left Highland, I transitioned

25 over to NexPoint.

Post - Direct                              110

1  Q    And that's where Mr. Dondero is, right?

2  A    Correct.

3  Q    Okay.  You joined Highland in 2008, and in around 2011 you

4  joined Highland's internal legal and compliance team, correct?

5  A    That's correct.

6  Q    And in 2015, while still employed by Highland, Mr. Dondero

7  appointed you as the chief compliance officer of the Advisors

8  and the Funds, right?

9  A    Technically, the retail board appointed me the CCO of the

10 Funds, and then I was appointed internally.  I believe Mr.

11 Dondero was part of that decision for the Advisors.

12 Q    Had you ever worked with the retail boards before that?

13 A    There was about -- I worked with them for about a year

14 prior to that.

15 Q    Okay.  And you've served as the CCO, the chief compliance

16 officer, of each of the Advisors and each of the Funds since

17 September 2015 on a continuous basis, right?

18 A    That is correct.

19 Q    You know Thomas Surgent; is that right?

20 A    I do.

21 Q    Mr. Surgent has been the Debtor's chief compliance officer

22 since around 2013 or 2014; is that right?

23 A    I believe -- uh -- I -- I think that's correct.  It may be

24 a year or two off.  He took the role after the former CO

25 resigned, which I don't know if that was 2011 or 2012.  I

Post - Direct                                    111

1  can't recall specifically.

2  Q    Okay.  But he's been -- he's been in that position for a

3  long time, right?  Fair enough?

4  A    Yes, that's fair.

5  Q    And during the whole time that you were employed by

6  Highland and serving as the chief compliance officer for the

7  Funds and the Advisors, you reported to Mr. Surgent?

8  A    Internally.  Yes, that's correct.

9  Q    Yeah.  And you respect Mr. Surgent; isn't that right?

10  A    During the time I reported to him, yes.

11  Q    Yeah.  And you believed that he did his job well, right?

12  A    As far as I could see, yes.

13  Q    You viewed it as -- you viewed him as a mentor, did you

14  not?

15  A    Yes.  I mean, when I joined the legal compliance team, you

16  know, he was there.  He was a senior member on the team.  And

17  he, you know, helped educate me, along with other, you know,

18  external sources, et cetera, on the compliance function.

19  Q    Uh-huh.  He trained you for the work you're doing now,

20  right?

21  A    With respect to the on-the-job training, yes.

22  Q    Uh-huh.  Despite all of that, throughout all the

23  proceedings, the court hearings, all of the issues that we're

24  talking about in this case, you never, ever stopped to discuss

25  any of these issues with your former mentor, Mr. Surgent; is

1  that right?

2  A   The -- with respect to, for example, the trade (garbled)

3  that you were talking about earlier?

4  Q   Let's do it this way.  From the time that you left

5  Highland until today, you've never discussed with Mr. Surgent

6  Mr. Seery's trades; is that right?

7  A   I believe there was a discussion after -- I can't recall

8  exactly the context.  There was a discussion after the trades

9  in the November time frame.  And then I believe there was a --

10 I responded to an email exchange in the December time frame

11 regarding booking of the trades.

12 Q   Sir, you -- you've never spoken with Mr. Surgent about any

13 issue concerning the Debtor's management of the CLOs, correct?

14 A   I don't recall directly, no.

15 Q   In fact, you're not aware of anyone acting on behalf of

16 the Advisors or the Funds who has reached out to Mr. Surgent

17 to get his views on any of the issues related to this motion.

18 Isn't that right?

19 A   I believe previously there's correspondence that Mr.

20 Dondero had with Surgent.  But aside from that, I'm not aware

21 of any.

22 Q   Is that the email where he reminded him of his personal

23 liability?  Is that the one you're thinking of?

24 A   Correct.

25 Q   Yeah.  Do you know of any other communication -- do you

Post - Direct                                113

1  know of any other communication that any of the Defendants had

2  with Mr. Surgent concerning the Debtor's management of the

3  CLOs?

4  A    With Mr. Surgent directly, I don't -- I don't -- I don't

5  believe so.

6  Q    Yeah.  You graduated from Baylor; is that right?

7  A    Correct.

8  Q    But you don't have any certifications or licenses

9  applicable to your work, correct?

10 A    Correct.

11 Q    You don't have any specialized training or education

12 that's relevant to your work as a chief compliance officer,

13 correct?

14 A    Correct.

15 Q    Your job -- your training is limited to on-the-job

16 training; isn't that right?

17 A    That is correct.

18 Q    You've never spoken at any conferences on compliance

19 matters, have you?

20 A    Spoken, no.  Attended, yes.

21 Q    You don't recall presenting any papers at any compliance-

22 related conferences, do you?

23 A    That is correct.

24 Q    You've never published anything in connection with your

25 work as a compliance officer; isn't that right?

Post - Direct                                    114

1  A    Not that I can recall.

2  Q    Let's talk about the CLO management agreements briefly.

3  You're aware that the Debtor is party to certain management

4  agreements pursuant to which it serves as the portfolio

5  manager for certain CLOs, correct?

6  A    Correct.

7  Q    And until your lawyers recently asked you to review them,

8  you last had reason to review a CLO management agreement about

9  five or six years ago; isn't that right?

10 A    I believe that's correct.

11 Q    And the request from your lawyers to look at the CLO

12 management agreements, that request came in late November/

13 early December; isn't that right?

14 A    I believe that's around the right time frame.

15 Q    And the portions of the management agreements that you

16 read were the portions that your counsel asked you to read;

17 isn't that right?

18 A    Correct.

19 Q    And other than the general recollection of having read

20 something about the rights of preference shareholders, you

21 don't recall much about the agreements at all; isn't that

22 right?

23 A    I mean, the agreements are very lengthy in nature.  You

24 know, I think it was probably rights that the preference

25 shareholders had, and, you know, possibly indemnification

Post - Direct                          115

1  provisions.  But aside from that, I don't recall anything else

2  specifically right now.

3  Q   As the chief compliance officer of the Advisors and the

4  Funds, you don't know whether any of them are party to the CLO

5  management agreements between the Debtors and -- between the

6  Debtor and the Issuers, correct?

7          MR. RUKAVINA:  And Your Honor, I would just object to

8  the extent that that calls for a legal conclusion.  This

9  witness is not a lawyer.

10          THE COURT:  Overruled.

11          THE WITNESS:  I'm sorry.  Can you repeat the

12  question, please?

13  BY MR. MORRIS:

14  Q   Sure.  As the chief compliance officer for each of the

15  Defendants, you don't know whether any of them are party to

16  the CLO management agreements between the Debtor and the

17  Issuers, correct?

18  A   They're not the named collateral manager, but they're a

19  security holder of the CLOs, so they should be entitled to,

20  you know, the rights that those security holders are afforded

21  under those agreements.

22          MR. MORRIS:  I move to strike, Your Honor.

23          THE COURT:  Granted.

24  BY MR. MORRIS:

25  Q   All right.  So, now, Mr. Post, I know this is difficult,

Post - Direct                                        116

1   and I do appreciate that it's difficult just to focus on the

2   question.  Your counsel will have the opportunity to ask you

3   whatever he wants.  But I would respectfully request that you

4   listen to my question and only answer my question.  It really

5   is very likely to require just a yes or no answer.

6       So, let me try again.  As the chief compliance officer of

7   the Advisors and the Funds, you don't know whether any of them

8   are a party to the CLO management agreements between the

9   Debtor and the Issuers, correct?

10  A    I don't believe they are, correct.

11  Q    Okay.  Let's talk about that prior hearing.  Now, by the

12  way, Mr. Post, did you listen in to Mr. Dondero's testimony

13  earlier?

14          MR. RUKAVINA:  Mr. Post was here with me --

15          MR. MORRIS:  Yeah.

16          MR. RUKAVINA:  -- as my representative..

17          MR. MORRIS:  Okay.  I -- there's no problem.  I just

18  -- I just -- that way there's some background and he has some

19  context.  That's the only reason I asked.

20  BY MR. MORRIS:

21  Q    You're aware that the Funds and the Advisors previously

22  filed a motion in the Bankruptcy Court asking the Court to

23  institute a pause in the Debtor's ability to sell CLO assets,

24  correct?

25  A    Correct.

Post - Direct                        117

1  Q    And you recall that that happened in mid-December, around

2  December 16th; is that right?

3  A    That sounds correct.

4  Q    And in connection with that motion, you provided

5  information to counsel that they requested from you, right?

6  A    Yes.  I was part of the working -- internal working group,

7  with internal and external counsel.

8  Q    Other than providing that information, you generally

9  agreed with the position being taken that it wasn't in the

10 best interest of the Funds involved for Highland to make any

11 trades; isn't that right?

12 A    Yes.  And that was based off of discussions with the

13 investment professionals.

14 Q    And the investment professionals are Mr. Sowin and Mr.

15 Dondero, correct?

16 A    Correct.

17 Q    Okay.  So you're the chief compliance officer, and they

18 made a motion that was based on the idea that the fund

19 manager, Highland Capital Management, shouldn't trade any

20 assets in the CLOs.  Do I have that right?

21 A    I believe that's what the motion contained.

22 Q    But you don't even remember who authorized the filing of

23 the motion; isn't that right?

24 A    I believe it was pursuant to discussions internally and

25 with external counsel, and I believe Mr. Norris signed the

Post - Direct                                    118

1  filing, if I -- if I recall correctly.

2  Q   Sir, you don't remember who authorized the filing of the

3  motion, correct?

4  A   It -- it was pursuant to a discussion with the investment

5  professionals and counsel, and it was in the best interest of

6  the Funds to make the filing.  So I think it was a

7  collaborative determination.

8           MR. MORRIS:  I move to strike, Your Honor.

9           THE COURT:  Granted.

10          MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11 Post's deposition transcript?  And let's go to Page 35.  Line

12 21.  Okay.

13 BY MR. MORRIS:

14 Q   Do you remember giving the following answer to the

15 following question:

16      "Q   Who authorized the filing of this motion?

17      "A   I can't recall specifically who authorized it."

18 Q   Did you give that answer to my question just the other

19 day?

20 A   That's -- that's what it says there, yes.

21 Q   And it says that because that's, in fact, what you

22 testified to under oath the other day, right?

23 A   Correct.

24 Q   Okay.  And the one thing that you know for certain is that

25 you didn't authorize the filing of the motion; isn't that

Post - Direct                                  119

1   right?

2   A    I didn't sign anything in connection with the filing.

3   Q    All right.  Listen carefully to my question.  The one

4   thing that you're certain of is that you did not authorize the

5   filing of the motion as the chief compliance officer of the

6   Debtors, correct?

7   A    Correct.

8   Q    Okay.  But you did participate in conversations with Mr.

9   Dondero and counsel concerning the motion; is that fair?

10  A    There were conversations with Mr. Dondero initially, and

11  then the conversations were then more so with internal and

12  external counsel in terms of the filing.

13  Q    Okay.  So they started just with Mr. Dondero, and then

14  they moved on to counsel.  Is that what you're saying?

15  A    I can't recall specifically.  It may have been part of a

16  discussion internally with internal counsel and Mr. Dondero.

17  I just -- I can't recall the specifics.

18  Q    Okay.  But Mr. Dondero certainly supported the filing of

19  the motion, right?

20  A    Yes.  From an investment perspective, it was in the best

21  interest of the Funds in terms of the sales that were

22  occurring.

23  Q    Okay.

24          MR. MORRIS:  I move to strike.

25          THE COURT:  Granted.

Post - Direct                                    120

1   BY MR. MORRIS:

2   Q    It's a very simple question.  Mr. Dondero supported the

3   filing of the motion; is that correct?

4   A    Yes.

5   Q    You did not file a declaration in support of the motion;

6   is that correct?

7   A    Me personally, no.

8   Q    Okay.  So you're the chief compliance officer of the

9   Defendants; is that right?

10  A    Correct.

11  Q    But instead of you filing a declaration, Mr. Norris filed

12  the declaration.  Do I have that right?

13  A    Correct.  My understanding is one person needs to sign the

14  declaration.

15  Q    And remind me, what is Mr. Norris's position?  He's the

16  executive vice president, right?

17  A    Correct.

18  Q    What responsibilities does he have?  Does he have trading

19  responsibility?

20  A    He does not.

21  Q    Does he have compliance responsibility?

22  A    Not directly, no.

23  Q    Does he have investment responsibility?

24  A    He's familiar with the composition of the portfolios in

25  his role as a product strategy team member.

Post - Direct                                121

1   Q    Does he have investment responsibility, sir?

2   A    He is not making direct investments for the -- for the

3   Funds.

4   Q    Okay.  So he doesn't -- and he's not a compliance person,

5   right?

6   A    Correct.

7   Q    And he's not a lawyer, right?

8   A    Correct.

9   Q    But nevertheless, as the chief compliance officer, you

10  believed that Mr. Norris's declaration contained all of the

11  information that was relevant to support the motion, right?

12  A    It was a determin... or a collaborative determination in

13  conjunction with counsel.  But I, you know, I don't -- yeah,

14  it was -- it was a collaborative determination.  There were

15  multiple elements that went into that -- the letter.

16  Q    Okay.  You believed that the motion and Mr. Norris's

17  declaration contained all the relevant facts that supported

18  the Advisors and the Funds' requests to the Court, correct?

19  A    Yes.

20  Q    In fact, you believed that Mr. Norris was the most

21  knowledgeable person to testify on behalf of the Movants;

22  isn't that right?

23  A    I think it was -- he was identified pursuant to

24  discussions with counsel to be the most knowledgeable.

25  Q    I'm going to ask you just about you and not counsel.  You

Post - Direct                                          122

1  believed at the time that Mr. Norris was the most

2  knowledgeable witness to testify on behalf of the Movants;

3  isn't that right?

4  A    Yes.

5  Q    And you didn't testify -- not only didn't you submit a

6  declaration, but you didn't testify at the hearing, did you?

7  A    Correct on both.

8  Q    Okay.  And you listened to parts of the hearing, but not

9  all of it, because you were busy doing other stuff, right?

10 A    Correct.

11 Q    You didn't listen to Mr. Norris's testimony at all, right?

12 A    I don't believe I did.

13 Q    You didn't listen to the Court when the Court rendered its

14 decision, did you?

15 A    I don't -- I don't believe I did.

16 Q    And you didn't read the transcript from the hearing, did

17 you?

18 A    I don't -- correct.  I did not.

19 Q    Okay.  So in your capacity as the chief compliance

20 officer, you didn't believe that you should take the time to

21 review the transcript, did you?

22 A    Correct.  I mean, just it was filed based off of the

23 belief that the -- that the trades weren't in the best

24 interest, and I -- and no, I didn't read it personally.

25 Q    And you didn't believe, in -- that in your capacity as the

Post - Direct                                    123

1  CCO, the chief compliance officer, that it was in the scope of

2  your responsibility to listen to the hearing, correct?

3  A    I was -- I wasn't asked to listen, and quite frankly, I

4  don't -- I don't recall if I remember the timing, but I did

5  not listen.

6  Q    Okay.  And in your capacity as the chief compliance

7  officer, you didn't believe that it was in the scope of your

8  responsibilities to listen to the hearing; isn't that right?

9  A    Correct.

10 Q    And because you didn't listen to the hearing or review the

11 transcript, you were unaware of what the Court said or how

12 Judge Jernigan described the motion or the people involved in

13 presenting the case on behalf of the Defendants, right?

14 A    Correct, but I -- I believe I probably would have received

15 some guidance from counsel who attended or listened to the

16 hearing.

17 Q    Well, after the hearing was over, you did speak to Mr.

18 Norris, right?

19 A    Very briefly.

20 Q    In fact, --

21 A    Very --

22 Q    In fact, the only thing you can remember about your

23 conversation with Mr. Norris following the hearing was

24 discussing with him how long the hearing took.  Isn't that

25 right?

Post - Direct                                124

1  A   Correct, because I -- I believe I heard it was a short

2  hearing.

3  Q   And that's -- that's all -- that's all you asked Mr.

4  Norris about, about the hearing, right?  That's all you

5  remember talking to him about?

6  A   I believe so, correct.

7  Q   You don't recall discussing with Mr. Norris any other

8  aspect of the hearing other than the length of time it took to

9  conduct, correct?

10 A   I don't recall specifically.

11 Q   And you have no recollection of ever discussing with Mr.

12 Dondero what happened at the hearing, right?

13 A   I don't think I talked with Jim, Jim Dondero about that.

14 Q   Nor did you talk to Mr. Dondero about the Court's ruling;

15 isn't that right?

16 A   Correct.

17 Q   Okay.  Let's talk about the events that occurred after the

18 hearing, in the two weeks following the hearing.  The

19 Defendants for which you serve as the chief compliance officer

20 sent three separate letters to the Defendant [sic], correct?

21 A   If you could bring them up, I can confirm.

22 Q   Sure.

23        MR. MORRIS:  Let's start with DDDD, please.  Okay.

24 Okay.  Can we scroll to the attachment, please?

25 BY MR. MORRIS:

Post - Direct                                    125

1    Q   All right.  So this is the first letter, Mr. Post.  Do you

2    recall, on or about December 22nd, the K&L Gates firm sent, on

3    behalf of the Advisors and Funds for which you serve as the

4    chief compliance officer, a letter to the Debtors?

5    A   Yes.

6    Q   Okay.

7         MR. MORRIS:  And can we call the next exhibit?  I

8    guess it's EEEE.

9         And I don't mean to be quick about these.  If there's any

10   reason that you want to read them, I wasn't planning on asking

11   any questions about the substance of the letters of this

12   witness.

13   BY MR. MORRIS:

14   Q   But Mr. Post, I don't mean to be quick here.  So if you

15   think there's a benefit to you to reading the letters, please

16   let me know.

17        Do you see, December 23rd, the next day, another letter

18   was sent by K&L Gates?

19   A   Yes.

20   Q   Okay.  And do you recall generally that the Advisors and

21   Funds for which you serve as chief compliance officer told the

22   -- told the Debtor that they were going to begin the process

23   of seeking to terminate the CLO management agreements?

24   A   I believe -- I believe that was contained in the letter,

25   so long as it was done in compliance with the Court.

Post - Direct                                    126

1    Q    Uh-huh.  And do you remember there was a third letter that

2    was sent?

3    A    If you wouldn't mind pulling it up.

4    Q    Yeah, not at all.

5          MR. MORRIS:  Can we get the December 31st letter?  I

6    think it might be -- yeah.

7    BY MR. MORRIS:

8    Q    Now, here's the December 31st letter.  Do you remember the

9    December 31st letter was the one where K&L Gates suggested

10   that the Advisors and the Funds had suffered damages because

11   the Debtor evicted Mr. Dondero from the Highland suite of

12   offices?

13   A    I -- I had heard of that letter being drafted, but I don't

14   recall -- I obviously don't recall a specific date.  But if it

15   says December 31st, --

16   Q    Okay.  Mr. Dondero was one of the main voices in the

17   decision to send these letters, correct?

18   A    He was part of the preliminary conversation and expressed

19   his opinion, and then myself and others internally, and with

20   external counsel, then worked to draft the letters.

21         THE COURT:  All right.  Mr. Post, I am going to

22   interject.  I have heard Mr. Morris give you this instruction

23   many times.  Maybe it's time for me to.  Maybe it's past time

24   for me to.

25      Most of his questions simply require a yes or no answer.

Post - Direct                                    127

1   If you feel like there are other things that you want to

2   supplement your testimony with, Mr. Rukavina is going to have

3   a chance to question you, and that would be the situation

4   where maybe you could give more fulsome answers.  But please

5   listen to the question.  If it's a yes or no answer, that's

6   all we want you to give right now.  Okay?  Got it?

7            THE WITNESS:  Understood.

8            THE COURT:  Okay.

9            MR. MORRIS:  Thank you, Your Honor.

10  BY MR. MORRIS:

11  Q   Mr. Post, Mr. Dondero was one of the main voices in the

12  decision to send the letters; isn't that correct?

13  A   He was a voice.

14           THE COURT:  That was not a yes --

15  BY MR. MORRIS:

16  A   And he was -- he --

17           THE COURT:  Okay.

18           THE WITNESS:  I'm --

19           THE COURT:  Please, just a yes or no answer, okay?

20           THE WITNESS:  No.

21           MR. MORRIS:  Okay.  Can we go to Mr. Post's

22  transcript, please, Page 47?  Line 22?

23       And Your Honor, when we pull it up on the screen, there is

24  an objection, and I would respectfully request that the Court

25  rule on the objection before I read the question and the

Post - Direct                          128

1    answer.

2              THE COURT:  All right.

3              MR. MORRIS:  So if we could just call up Page 47

4    beginning at Line 22.

5              MR. RUKAVINA:  Page 47, Line 22.

6              THE COURT:  Okay.

7              MR. MORRIS:  One moment.  Give her a moment.  She's

8    not there.

9              MR. RUKAVINA:  Do you remember what exhibit this is?

10             MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11   22, "Do you know?"  And there is Mr. Rukavina's objection.

12             MR. RUKAVINA:  Your Honor, it's very simple.  He

13   can't go into Mr. Dondero's head.  But he -- but if Mr.

14   Dondero told him something, that's different.  So I think

15   counsel can rephrase the question and it's perfectly fine, but

16   he can't go into Mr. Dondero's state of mind.

17             MR. MORRIS:  Your Honor, I'm not asking for Mr.

18   Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19   "Do you know?"

20             THE COURT:  Okay.  I'll overrule the objection.  He

21   can answer.

22   BY MR. MORRIS:

23   Q   All right.  So, Mr. Post, do you remember giving this

24   answer to the following question:

25       "Q   Do  you  know  whether  Mr.  Dondero  supported  the

Post - Direct                                      129

1        sending of each of these three letters?

2        "A   I don't -- I don't recall specifically.  I think

3        he had his views on certain of the transactions that

4        were occurring, and he wasn't in agreement with those

5        transactions, as one of the main voices."

6   Q    Do you see that?

7   A    I do.

8   Q    Does that refresh your recollection that Mr. -- that you

9   testified that Mr. Dondero was one of the main voices?

10  A    Yes.

11  Q    Okay.  Mr. Dondero --

12        MR. MORRIS:  You can take that down now for the

13  moment, please.

14  BY MR. MORRIS:

15  Q    Mr. Dondero had his views on certain of the transactions

16  that were occurring, and he wasn't in agreement with those

17  transactions.  Isn't that right?

18  A    Yes.

19  Q    All right.  Going back to the letters that we just looked

20  at quickly, you recall the Debtor responded to each of those

21  letters, but as the chief compliance officer, you couldn't

22  really recall what the Debtor said in response.  Is that fair?

23  A    I'm -- I believe they -- I'm sorry.  I can't recall

24  specifically without seeing the letters.

25  Q    Okay.  So you don't recall that, in response, the Debtor

Post - Direct                                    130

1  requested that the Advisors and the Funds withdraw the

2  letters, right?

3  A    I believe that was requested in the letters.

4  Q    Okay.  But the Funds and the Advisors didn't comply with

5  that request, right?

6  A    To my knowledge, they have not withdrawn the letters.

7  Q    You do recall that the Debtor specifically asked the

8  Defendants to file their lift stay motion so that they could

9  finally resolve the issue of whether or not the Advisors and

10  the Funds could actually terminate the agreement, right?

11  A    I -- I'm sorry.  Can you repeat that question, please?

12  Q    Do you recall that the Funds and the Advisors informed the

13  Debtor that they were going to initiate steps to terminate the

14  CLO management agreements, including moving to lift the stay?

15  A    I think they indicated that they were going to take steps,

16  but it would be pursuant to what was permitted in the court.

17  Q    And do you remember that the Debtor specifically asked the

18  Defendants to do exactly that, to bring this matter to a

19  conclusion, to file the motion so that the Court could resolve

20  the issue of whether or not they had a right to terminate the

21  agreement?  You remember that, right?

22         MR. RUKAVINA:  Objection, compound, Your Honor.

23         THE WITNESS:  I can't --

24         THE COURT:  I'm sorry.

25         MR. MORRIS:  I can't recall.

Post - Direct                                    131

1          THE COURT:  Was there an objection?

2          MR. RUKAVINA:  Yes, Your Honor.  That's four

3    questions in one.  That's compound.

4          MR. MORRIS:  I'll rephrase, Your Honor.

5          THE COURT:  Okay.  And let me interject a minute.

6    Mr. Post, you have this habit of not looking squarely at the

7    camera but looking over to your right.  And in a normal

8    courtroom setting, that might be fine, but I have no way of

9    knowing if some lawyer or some other person is -- you're

10   looking at them and they're somehow instructing you.  I would

11   certainly hope that's not what's going on, but it just kind of

12   leaves room for me to wonder when you're not looking squarely

13   at the camera.  So can you start looking squarely at the

14   camera, please?

15         MR. RUKAVINA:  Your Honor, I can explain that, and

16   certainly there's no funny business going on.  There are two

17   cameras on Mr. Post.  One is on a laptop.  We're looking at

18   the Court on the big camera.  I'm sitting behind Mr. Post.  So

19   if the Court would prefer that Mr. Post look directly into the

20   laptop, then that's what he'll do, or if the Court would

21   prefer that he look into the big camera.

22         THE COURT:  Okay.  Well, I prefer he look into the

23   big camera just because it --

24         MR. RUKAVINA:  So keep looking there?  Yeah.

25         THE COURT:  No, no, no, no.  Okay.  I don't know what

Post - Direct                                    132

1   -- I thought -- okay.  Do you see what I'm seeing?  I don't

2   know if you can see what I'm seeing.

3           MR. MORRIS:  Yes.

4           THE COURT:  I'm seeing the left side of his face.

5           THE WITNESS:  I'm sorry.  I'll just look at the

6   laptop.  Sorry.  I was -- I was looking at who was speaking to

7   me.

8           THE COURT:  Okay.  Well, I don't --

9           MR. MORRIS:  Okay.

10          THE COURT:  I don't know the setup, so it was

11  confusing to me.

12     All right.  This is better.  Thank you.

13          THE WITNESS:  Yeah.  I apologize.

14          MR. RUKAVINA:  We'll focus on the laptop, Judge.

15  BY MR. MORRIS:

16  Q   All right.  So the question, Mr. Post, is:  You do recall

17  that the Debtor specifically asked the Defendants to file

18  their motion to lift the stay so that the issue could finally

19  be resolved; isn't that right?

20  A   I can't recall that specifically.

21  Q   You believe that may be one of the options that the Debtor

22  specifically proposed, right?

23  A   It -- yes.

24  Q   Okay.  But the Defendants never filed their lift stay

25  motion to terminate the agreements; isn't that right?

Post - Direct                                133

1  A    I don't believe so.

2  Q    Right.  So the Debtor filed its complaint and its request

3  for the injunction, right?

4  A    Correct.

5  Q    As the CO -- as the CCO, you may have reviewed the

6  Debtor's complaint and motion, but you can't recall, given all

7  the documentation that's involved, right?

8  A    Correct.

9  Q    You can't recall any facts that the Debtor asserted in

10  support of its motion; isn't that right?

11  A    I can't recall specifically.  Correct.

12  Q    But the one thing you do know is that the Debtor's motion

13  is based on its entitlement to transact business pursuant to

14  their arrangement with the CLOs as collateral manager,

15  correct?

16  A    Yes.

17  Q    Now, you heard that there was supposed to be an initial

18  hearing on the Debtor's motion for a temporary restraining

19  order against the Defendants, right?

20  A    Correct.

21  Q    But you don't believe the motion for the TRO got heard,

22  and you presume it got resolved, right?

23  A    I don't believe it was heard.

24  Q    Okay.  And you understand that there is a TRO in place

25  now, pursuant to which the Advisors and the Funds are

Post - Direct                        134

1  prevented from interfering with the Debtor's execution of its

2  rights under the CLO management agreements, right?

3  A    Correct.

4  Q    Before the TRO was resolved, you weren't personally

5  involved in the process of deciding what witnesses would be

6  called and what exhibits would be offered into evidence; is

7  that right?

8  A    No.

9         MR. MORRIS:  During the deposition, Your Honor,

10  subject to correction from Mr. Rukavina, I believe that the

11  Defendants and the Debtor reached the following two

12  stipulations.

13     First, the Defendants and the Debtor stipulate that Mr.

14  Post was not going to be called as a witness at the TRO

15  hearing.

16         MR. RUKAVINA:  That is correct.

17         MR. MORRIS:  And second, the Defendants and the

18  Debtor stipulate that the Defendants were not going to offer

19  into evidence any exhibits other than those specifically

20  listed on their witness and exhibit list.

21         MR. RUKAVINA:  That being the witness and exhibit

22  list filed before the TRO.  That is correct.

23         MR. MORRIS:  Okay.

24  BY MR. MORRIS:

25  Q    Let's talk about Mr. Seery for a minute.  You know who Mr.

Post - Direct                            135

1  Seery is, correct?

2  A    Correct.

3  Q    You understand he's an independent director and the CEO of

4  the Debtor, right?

5  A    Correct.

6  Q    And you also understand that his -- in his capacity as the

7  Debtor's CEO, Mr. Seery is authorized to sell certain

8  securities and assets that are owned by the CLOs, correct?

9  A    Correct.

10  Q    In your opinion as the CCO, the chief compliance officer

11  of the Advisors and the Funds, Mr. Seery has the knowledge and

12  experience to trade securities on behalf of the CLOs, correct?

13  A    Correct.

14  Q    But you don't believe that it's in the Funds' best

15  interest for Mr. Seery to sell SKY and AVYA securities, right?

16  A    Correct.

17  Q    But even though you reached that decision about Mr. Seery,

18  you have no knowledge as to whether Mr. Dondero ever traded

19  either of those securities before he resigned from Highland;

20  isn't that right?

21  A    I saw some trades that were shown on the screen earlier.

22  I don't think I recalled at the time I was asked on Friday.

23  Q    As of the time -- as of Friday, you had no knowledge as to

24  whether Mr. Dondero had traded in AVYA securities prior to his

25  departure from Highland, correct?

Post - Direct                                    136

1   A    Correct.

2   Q    And before, before forming your view as the chief

3   compliance officer that Mr. Seery's trading of AVYA was not in

4   the best interest of the Funds, you made no effort to see if

5   Mr. Dondero had sold the exact same securities Mr. Seery was

6   selling, correct?

7   A    Correct.

8   Q    And the sole source of information that you relied upon to

9   reach your opinion that the trades weren't in the best

10  interest of the Funds is Jim Dondero and Joe Sowin, correct?

11  A    I'm sorry.  Can you repeat that?  You kind of cut out at

12  the beginning.

13  Q    Sure.  And please, any time that happens, let me know.  We

14  had some problems this morning.

15       The sole source of information that you relied upon to

16  reach your opinion that the trades weren't in the best

17  interest of the funds is Jim Dondero and Joe Sowin; isn't that

18  correct?

19  A    Correct.  They're the investment professionals, yes.

20  Q    And you have no understanding as to why Mr. Seery wanted

21  to sell the AVYA and SKY securities, do you?

22  A    I was told that -- I don't know why he wanted to sell them

23  personally, correct.

24  Q    Okay.  In fact, before reaching your conclusion as the CCO

25  that Mr. Seery's trades were not in the best interest of the

Post - Direct                     137

1   Fund, you did not undertake any investigation of any kind to

2   try to determine why Mr. Seery wanted to sell AVYA or SKY

3   stock, correct?

4   A    Correct.  I didn't reach out to Mr. Seery.

5   Q    All right.  You believe that Mr. Dondero and Mr. Sowin's

6   opinion that Mr. Seery's trades aren't in the Funds' best

7   interest should be heard pursuant to the Advisers Act, right?

8   A    Correct.

9   Q    Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A    Correct.

12  Q    Have you ever read Section 206 of the Advisers Act?

13  A    Yes.

14  Q    Okay.

15        MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17        MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19        THE COURT:  Okay.

20        MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q    I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

Post - Direct                                    138

1    A    It would be Number 4.

2    Q    Do you believe that Mr. Seery engaged in fraudulent,

3    deceptive, or manipulative practices by trying to trade AVYA

4    and SKY securities?

5    A    The -- as collateral manager for the CLOs, they're

6    supposed to maximize returns for the preference shares, which

7    we didn't believe the sales reflected that, and so they

8    weren't acting, --

9              THE COURT:  Okay.

10             THE WITNESS:  -- you know, pursuant to their duties

11   --

12             THE COURT:  Here I -- here I go --

13             THE WITNESS:  -- under the collateral management --

14             THE COURT:  Here I go again.  Here you go again.

15             THE WITNESS:  I'm sorry.

16             THE COURT:  It really was a yes or no question.  All

17   right?

18   BY MR. MORRIS:

19   Q    You're the -- you're the chief compliance officer, right?

20   A    Yes.

21   Q    And this is the provision in Section 4 that you cite to as

22   the provision that Mr. Seery violated when he attempted to

23   sell SKY and AVYA securities, correct?

24   A    Yes.

25   Q    Did Mr. Seery engage in an act, practice, or course of

Post - Direct                    139

1  business which was fraudulent when he looked to sell those

2  securities?

3  A    No.

4  Q    Do you believe that Mr. Seery engaged in an act, a

5  practice, or a course of business which was deceptive when he

6  went to sell the SKY and the AVYA securities?

7  A    Yes.

8  Q    Who did he deceive?

9  A    The investors of the CLOs, --

10  Q    How?

11  A    -- the preference shareholders.

12  Q    How?

13  A    By selling securities that the preference shareholder

14  investors believed had further upside to them.

15  Q    Did he lie to them?

16  A    I don't believe he talked to the investors.

17  Q    But you're putting your reputation on the line here and

18  you're swearing under oath that Mr. Seery deceptively tried to

19  sell SKY and AVYA securities?

20  A    I believe that based off of a review and discussion with

21  counsel.

22  Q    Do you think he was manipulative?

23  A    No.

24  Q    Did you -- did you check in with the SEC to tell them that

25  you had a bad actor here?

Post - Direct                                    140

1   A    No.

2   Q    You first formed your view that the Debtor violated

3   Section 206 of the Advisers Act after the sales started to

4   occur in the CLOs, correct?

5   A    Correct.

6   Q    But you don't know when the sales actually started, right?

7   A    I believe there were sales --

8   Q    And I assume, since you were the chief compliance officer

9   since 2015, you don't believe that Mr. Dondero's sale of AVYA

10  stock was deceptive, right?

11  A    You would have to ask Mr. Dondero that, but I believe he

12  was selling for cash, cash needs for other funds.

13           MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14  not --

15           THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    I'm asking about you.  I'm asking about you.  You're the

18  chief compliance officer, right?

19  A    Yes.

20  Q    And you don't believe that when Mr. Dondero sold AVYA

21  stock that he was engaged in deceptive practices, do you?

22  A    No.

23  Q    And that's because you don't even know whether he sold

24  AVYA stock; isn't that right?

25  A    On Friday, I -- that is correct.

Post - Direct                                          141

1    Q    In fact, the only reason you learned that Mr. Seery wanted

2    to sell AVYA and SKY stock is because Mr. Dondero told you;

3    isn't that right?

4    A    I believe I was forwarded the email after -- after there

5    was communications on the sales.

6    Q    And that's the email where Mr. Dondero told Mr. Surgent

7    that he had personal liability, correct?

8    A    I -- I believe it was an email prior to that about were

9    trades being requested and Mr. Dondero responding.

10   Q    You're familiar with the email where Mr. Dondero

11   interfered with Mr. Seery's trades?

12   A    Yes.

13   Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14   that he faced potential liability if he continued to follow

15   Mr. Seery's instructions, correct?

16   A    Correct.  Based off of Mr. Dondero's view.

17   Q    Notwithstanding all of that, in your capacity as the chief

18   compliance officer, you don't believe it's ever appropriate

19   for an investor to step in and impede transactions that have

20   been authorized by the portfolio manager unless the contract

21   permits the investor to step in; isn't that right?

22   A    I believe -- I'm sorry, can you repeat that, please?

23   There was a lot of question.

24   Q    Sure.  Sure.  In your capacity as the chief compliance

25   officer, you don't believe it's ever appropriate for an

Post - Direct                                142

1   investor to step in and impede transactions that were

2   authorized by the portfolio manager unless the contract

3   permits the investor to do so; isn't that correct?  Isn't that

4   correct?

5   A    Yes.

6   Q    Okay.  I know you're not a lawyer, but you are the chief

7   compliance officer of the Funds; isn't that right?

8   A    Correct.

9   Q    And you can't point to anything in any contract that gives

10  Mr. Dondero the right to step in and impede transactions that

11  have been authorized by Mr. Seery; isn't that correct?

12  A    He's entitled rights as preference shareholders for the --

13  for the Funds that hold those preference shareholders.  So,

14  indirectly, he should be afforded those rights as portfolio

15  manager for those Funds.

16  Q    Sir, you can't point to anything in any contract that

17  gives Mr. Dondero the right to step in and impede transactions

18  that have been authorized by Mr. Seery; isn't that correct?

19  A    Correct.

20  Q    Okay.  But yet you have never told Mr. Dondero that he

21  should not interfere with Mr. Seery's trades; isn't that a

22  fact?

23  A    Correct.

24  Q    In fact, you never personally took any steps at any time

25  to make sure that there would be no further interference with

Post - Direct                                    143

1   the Debtor's trading activities; isn't that correct?

2   A    Correct.

3   Q    And that's because you believe, as the chief compliance

4   officer of the Funds, that Mr. Dondero should have the leeway

5   to make the determination as to whether or not the

6   transactions are appropriate; isn't that correct?

7   A    He should be able to be heard in the transactions that are

8   being made, correct.

9   Q    Sir, not to be heard, but to make the determination.  Let

10  me ask the question again.  You believe, as the CO -- CCO of

11  the Funds, that Mr. Dondero should have the leeway to make the

12  determination as to whether or not the transactions are

13  appropriate; isn't that correct?

14  A    Yes.

15  Q    Okay.  And you completely deferred to Mr. Dondero; isn't

16  that right?

17  A    For the investment determination, yes.

18  Q    And based on that deference, you never took any steps at

19  any time to make sure no one on behalf of the Advisors or the

20  Funds impeded or stopped transactions authorized by Mr. Seery,

21  correct?

22  A    Correct.

23  Q    You understand there's a TRO in place today that prevents

24  Mr. Dondero and the Advisors and the Funds from interfering

25  with Mr. Seery's trading activities; isn't that right?

Post - Direct                                    144

1        MR. RUKAVINA:  I'm going to object to that, Your

2   Honor, to the extent that calls for a legal conclusion.  And I

3   do think it mischaracterizes the testimony.  I'm sorry.  The

4   TRO.

5        THE COURT:  Overruled.

6   BY MR. MORRIS:

7   Q    You can answer, sir.  Would you like me to repeat the

8   question?

9   A    Yes, please.

10  Q    You understand that there is a TRO in place -- TRO in

11  place today that prevents Mr. Dondero, the Advisors, and the

12  Funds from interfering with Mr. Seery's trading activities on

13  behalf of the CLOs, correct?

14  A    Correct.

15  Q    But in the absence of the TRO, in your view, whether you

16  tell Mr. Dondero not to interfere with Mr. Seery's trades

17  depends on the facts and circumstances that exist at the time,

18  right?

19  A    Correct.  From a -- yes.

20  Q    Okay.  And up until this point, there have been no facts

21  and circumstances that have caused you to tell Mr. Dondero not

22  to interfere with Mr. Seery's trades on behalf of the CLOs,

23  correct?

24  A    He can't because of the TRO.

25  Q    Correct.  But if the TRO wasn't in place, it's possible

Post - Direct                          145

1  that you wouldn't take any steps to stop Mr. Dondero from

2  impeding Mr. Seery's trades; isn't that right?

3  A    I mean, if Mr. Dondero or other investment professionals

4  have a view, that they should be -- they should have a right

5  to be heard as preference shareholders of the CLOs.

6  Q    Okay.  But if the TRO wasn't in place, you wouldn't act to

7  stop Mr. Dondero from interfering or impeding the Debtor's

8  trades on behalf of the CLO; isn't that right?

9  A    He would -- if he would be permitted to talk to Mr. Seery.

10 Q    Okay.  Prior to the imposition of the TRO, you took no

11 steps to stop Mr. Dondero from interfering with Mr. Seery's

12 trades, correct?

13 A    Correct.

14 Q    And if the TRO wasn't in place, it's possible you wouldn't

15 take any steps to stop Mr. Dondero from impeding -- impeding

16 Mr. Seery's trades again; isn't that right?

17 A    If there's an investment rationale as to why they feel the

18 trades shouldn't be done, I -- again, I feel like Mr. Dondero

19 or the other investment professionals should be able to raise

20 those points with Mr. Seery.

21 Q    Do you think they should be able to stop the trades?

22 A    I -- I -- I think they should be able to question the

23 trades.  But flat-out stop them, I'd probably say no.

24 Q    Then why didn't you do anything before the TRO was

25 entered?

Post - Direct                                    146

1   A   Um, I'm sorry, can you repeat the -- do anything in -- in

2   what manner?

3   Q   Why didn't you take any steps before the TRO was entered

4   to stop Mr. Dondero from interfering and stopping and impeding

5   the Debtor's trades?

6   A   I think, as I recall, there was only one -- one set of

7   trades in question that he stepped in on.

8   Q   So, one is okay?  How about two?

9   A   Or, sorry.  There were two trades on one day that -- that,

10  you know, he questioned.  Or stepped in on.  I don't -- I

11  don't recall him stopping any other trades thereafter.

12  Q   That's all you know about, right?

13  A   Correct.

14  Q   And with that knowledge, it never occurred to you to tell

15  Mr. Dondero to knock it off, did it?

16  A   He believed the trades weren't in the best interest for

17  the investors, so I did not.

18  Q   And that's what you mean by deferring to him; isn't that

19  right?

20  A   From the investment perspective, yes.

21  Q   Thank you for your -- thank you for your honesty.  As the

22  CCO, you have never communicated with the Issuers about the

23  Debtor's performance under the CLO management agreements;

24  isn't that right?

25  A   Correct.

Post - Direct                                    147

1  Q   And that's because you didn't believe it was in your

2  responsibility as the CCO to check with the Issuers to see if

3  the Issuers believed that the Debtor was in compliance with

4  the CLO management agreements, correct?

5  A   That communication would have involved counsel and that

6  communication didn't occur.  I wouldn't have reached out to

7  them directly.

8  Q   Yeah.  You didn't believe it was within your

9  responsibility as the chief compliance officer to communicate

10  with the Issuers to see if they had any views as to Mr.

11  Seery's performance as portfolio manager, correct?

12  A   Correct, because it would have involved me working with

13  counsel and there was never direction to do that.

14  Q   As the chief compliance officer of the Defendants, you

15  have no idea if anyone on behalf of the Advisors or the Funds

16  ever asked the Issuers whether they believed the Debtor was in

17  default under the CLO management agreements, correct?

18  A   Correct.

19  Q   As the CCO, you have no idea if anyone on behalf of the

20  Advisors or the Funds ever asked the Issuers whether they

21  believed was in breach under the CLO management agreements,

22  correct?

23  A   Correct.  I believe there was a call that I wasn't a part

24  of, that it was just involving lawyers, that I don't know what

25  was discussed on the call.  So, correct.

Post - Direct                    148

1  Q    As the CCO, you have no idea if anyone on behalf of the

2  Advisors or Funds ever asked the Issuers whether they believed

3  it was appropriate to try to take steps to terminate the CLO

4  management agreements; isn't that right?

5  A    Correct.

6  Q    None of the Issuers joined any of the letters that were

7  sent on behalf of the Funds and the Advisors, right?

8  A    I didn't -- I don't recall seeing their names listed.

9  Q    As the CCO, you don't have any understanding as to what

10 the standard is for terminating the CLO management agreements

11 unless you get legal advice; isn't that right?

12 A    Yes.  It was -- it would be a discussion with counsel,

13 given the complexity of the agreements.

14 Q    But as a factual matter, you're not aware of any facts

15 that would support the termination of the CLO management

16 agreements except that there were trades that Mr. Dondero

17 didn't think were in the best interests of the Funds; isn't

18 that right?

19 A    Yes.  And because the belief was those trades weren't

20 maximizing value for the preference shareholders.

21         MR. MORRIS:  I move to strike everything after the

22 word yes, Your Honor.

23         THE COURT:  Granted.

24         MR. MORRIS:  I have no further questions.

25         THE COURT:  All right.  Mr. Rukavina?

Post - Direct                              149

1           MR. RUKAVINA:  Your Honor, I'll reserve my questions

2    for my case in chief.

3           THE COURT:  All right.  Mr. Post, that concludes your

4    testimony for now.  Stick around.

5      Mr. Morris?

6           MR. MORRIS:  Your Honor, last witness, and I hope

7    it's rather brief, actually.  The Debtor calls James Seery.

8           MR. RUKAVINA:  Your Honor, may we have a brief

9    restroom break, all of us in this room, before we start the

10   next witness?

11          THE COURT:  All right.  We'll take a five-minute

12   restroom break.  I know part of the long day is because of my

13   commitment at the lunch hour, but you all did estimate three

14   or four hours for this hearing, right?  That's what I recall.

15          MR. MORRIS:  We did.

16          MR. RUKAVINA:  Your Honor, I was never consulted on a

17   time estimate.  I had no idea that someone said three to four

18   hours.

19          THE COURT:  All right.

20          MR. MORRIS:  And part -- part of that is my fault and

21   the technological problems we had this morning, so I take

22   responsibility for that, Your Honor, and I sincerely

23   apologize.

24          THE COURT:  Okay.  Well, just so you know, we cannot

25   come back tomorrow.  I've got two -- too booked today tomorrow

150

1  to come back, so --

2         MR. MORRIS:  I don't expect Mr. Seery to be more than

3  about 15 minutes.

4         THE COURT:  Okay.  We'll take a five-minute break.

5         THE CLERK:  All rise.

6     (A recess ensued from 3:22 p.m. until 3:32 p.m.)

7         THE CLERK:  All rise.

8         THE COURT:  All right.  Please be seated.  I wanted

9  to clarify one thing I said, just so no one is confused.  I

10 know that originally you had today, Wednesday, and Thursday,

11 26th, 27th, and 28th, for confirmation.  So if anyone thought,

12 oh, we're coming back tomorrow on this if we don't finish,

13 because originally you had all three of those days, you know,

14 as soon as we continued the confirmation hearing, we started

15 filling in Wednesday.  So we have three different Chapter 11

16 case matters set tomorrow.  And so it was, you know, you give

17 up time and we have people usually wanting to get that time,

18 so that's what happened.

19    But anyway, people, we'll talk fast and we'll get it done

20 today, right?

21        MR. RUKAVINA:  Your Honor, my -- Your Honor?  Oh,

22 wait.  I need to --

23        THE COURT:  Ooh, it sounds like you're in a cave.

24 Let's get those headphones on.

25        MR. MORRIS:  I promise to be as quick as I can, Your

151

1  Honor.

2          THE COURT:  Okay.  Mr. Rukavina, were you trying to

3  say something?

4          MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5          THE COURT:  Yes.

6          MR. RUKAVINA:  This darn video.  Too many -- Your

7  Honor, we have an agreed TRO that goes through February the

8  15th.  And I'm certainly not suggesting taking any more of the

9  Court's time than is necessary, but I cannot commit to

10  finishing today, especially because Mr. Morris has taken so

11  much time.  So I think we will do our best, but I just want

12  the Court to know that there's no urgency to this, and if we

13  have to come back at some point after Tuesday or Wednesday,

14  there's no possible harm to the Debtor.

15          MR. MORRIS:  Your Honor, it's my hope that we can get

16  this done, and I think the sooner we begin the better.

17          THE COURT:  Okay.  Well, we're going to try to get it

18  done.  All right, Mr. Seery.  You've called Mr. Seery to the

19  stand now?

20          MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21  Seery.

22          THE COURT:  All right.  Mr. Seery, please raise your

23  right hand.

24              JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

Seery - Direct                                     152

1              MR. MORRIS:  May I proceed?

2              THE COURT:  You may.

3              MR. MORRIS:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MR. MORRIS:

6    Q    Good afternoon, Mr. Seery.  Can you hear me okay?

7    A    I can, yes.

8    Q    Okay.  Let's just cut to the chase here.  You're the CEO

9    of the Debtor; is that right?

10   A    That's correct.

11   Q    And in that capacity, do you understand that the Debtor is

12   party to contracts pursuant to which it manages certain CLO

13   assets?

14   A    Yes.

15   Q    And are you personally involved in the management of those

16   assets?

17   A    Yes.

18   Q    Do you have any prior experience managing other people's

19   money or other people's assets?

20   A    Yes.

21   Q    Can you please explain to the Court your experience and

22   your knowledge as to investing other people's money?

23   A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24   okay.  I can fill in later, if you like.  I was a finance and

25   bankruptcy lawyer for ten years before I went to Lehman on the

Seery - Direct                              153

1  business side in 1999.

2      In that role, I started immediately in distressed

3  investing.  I worked as part of a team of analysts and traders

4  to build distressed positions in prop (phonetic) business,

5  trading Lehman Brothers balance sheet at the time.  This was

6  in 1999 and 2000.  We were one of the most significant

7  investors on the Street, and I was part of that team, and a

8  leading part of the team, putting on significant investments

9  of our balance sheet, which was Lehman's money, into different

10 kinds of stressed, distressed, high yield investments.  That

11 included bonds, that included loans, unsecured, subordinated.

12 Sometimes equity.  Typically, we stayed in credit, but a lot

13 of this was very distressed credit, which often ended up as

14 reorg equity.

15     After that, I began running different teams for making

16 distressed loans to companies that no one else would lend

17 money to.  These investments were significant, anywhere from

18 fifty to a billion dollars.  Some of the largest transactions

19 in the world at the time were transactions I ran, like a

20 rescue loan to PG&E for a billion dollars.  That was in 2000.

21     After that, I continued to grow my career there, running

22 distressed investments.  In 2005, I took over the loan

23 business at Lehman.  That included all high-grade loans, high-

24 yield loans, trading and sales of those loans; managing that

25 portfolio, which was in excess of $10 or $20 billion,

Seery - Direct                    154

1   depending on the time; exposure both in committed transactions

2   as well as funded loans; the hedging of that portfolio;

3   traders and salespeople working for me.  In addition, I had

4   significant responsibility for the distressed book, as well as

5   all restructuring business at Lehman.

6       After Lehman, I -- and I was one of the people who sold

7   Lehman -- I became a senior investing partner at RiverBirch

8   Capital.  We were about a billion and a half dollar long/short

9   investor, mostly stressed and distressed, but a lot of high-

10  grade trades as well, particularly in preferred stocks.  That

11  was a global business, but primarily U.S., Europe, some Asian

12  investments as well.

13      Since then, I've gotten to Highland.  I've been

14  responsible for Highland's investments.  After the first

15  quarter, when the performance managed by Mr. Dondero was

16  absolutely disastrous -- we lost about $80 million in equity

17  securities, positions that he managed, about $50 million in

18  the Select Equity Fund, and about $30 million in the -- in the

19  Highland internal account.  After Jefferies seized the Select

20  account, I took over the --

21          A VOICE:  I think Mr. Seery has sort of gone beyond

22  the question of his background.

23          THE WITNESS:  He's asked me if I was experienced in

24  investing other people's money.  I was giving that background.

25  But we -- I can stop or I can keep going, if you like.

Seery - Direct                              155

1            THE COURT:  Okay.  If that was an objection, --

2            MR. MORRIS:  Let's --

3            THE COURT:  -- I overrule it.  Go ahead.

4            THE WITNESS:  I've been managing that portfolio.  In

5    addition, after Mr. Dondero left, but I actually started

6    looking at it before that, started taking over the CLO

7    portfolio, or taking a look at it, frankly.  We have a -- we

8    have an experienced professional sitting on top of it, Hunter

9    Covitz, who manages the day-to-day exposure.  But those

10   portfolios -- we call them CLOs, Your Honor, but I think

11   you've heard testimony before, they're not really.  Acis 7 is

12   a CLO.  The 1.0 CLOs are very old investment vehicles that are

13   primarily structured as, right now, closed-end investment

14   funds.  They don't have the typical diverse portfolio of loans

15   that a CLO has.  They have mostly reorg equity or positions in

16   real estate and in MGM.  So the -- the securities we've been

17   talking about in these trades are publicly-traded liquid

18   securities that Highland took as post-reorganization equity.

19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA

20   and the SKY.  Nobody seems to have asked you this question,

21   but did you -- have you looked to sell AVYA and SKY securities

22   since the time that Mr. Dondero left in October?

23   A    I have, yes.

24   Q    Can you please explain to the Court your investment

25   rationale, the reason why you wanted to sell -- let's just

Seery - Direct                              156

1  take them one at a time.  Let's start with AVYA.  In the last

2  couple of months, why have you wanted to sell AVYA?

3  A    Well, the original impetus to sell AVYA came from Mr.

4  Covitz when it started moving up as a post-reorg security in

5  the communications space that had -- had really performed

6  extremely poorly post its Chapter 11.  Mr. Covitz over the

7  summer felt we should start lightening up on that position.  I

8  agreed.  He did that.  And Mr. Dondero eventually cut him off.

9       As it got to the fall, what I did was I got Mr. Covitz, as

10  well as then the analyst -- the analyst on that is Kunal

11  Sachdev.  That's the Highland analyst on the position -- as

12  well as Joe Sowin and Matthew Gray, who's another senior

13  analyst.  And I looked at all of the equity positions in the

14  CLOs and wondered why we had them.  What was the view?  Were

15  they worth keeping?

16       Primarily, the ones we looked at were four of the post-

17  reorg equities that were liquid.  A company called Vistra, a

18  company called Arch Coal.  Vistra is the old TXU, a well-known

19  bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20  a bankruptcy; and Sky Champion, a less -- less-known

21  bankruptcy but came out of there.

22       Mr. Gray is the analyst on Vistra and Arch.  We

23  determined, based upon his recommendations, not to sell those.

24  Mr. Sachdev was the analyst on Avaya, and he believed that it

25  had reached its peak, and even though it could continue to go

Seery - Direct                                    157

1   up or down -- stocks often do that -- he did not think that

2   the value was there.  His recommendation was to sell.

3       Mr. Sowin was in those meetings.  Prior testimony to the

4   contrary or any statements that were said before are

5   completely false, they're completely made up, so I know it's

6   frustrating and I apologize for -- for being frustrated.

7       So we decided that we would sell the Sky Champion.  A

8   pretty simple answer.  Highland didn't have an analyst.

9   Literally didn't have an analyst.  Nobody had a view as to

10  what the stock was.  It just sat in there, in two CLOs,

11  without anybody paying any attention to it.

12      I had Matthew Gray take a look.  He felt that it was at

13  fair value.  I did my own work on it, felt it was at fair

14  value, notwithstanding some good tailwinds in -- secular

15  tailwinds in the home building space, and determined that that

16  CLO should sell those securities.

17  Q   Thank you, sir.  Prior to his departure at Highland, did

18  Mr. Dondero have responsibility over the management of any of

19  the CLO assets?

20  A   He did, yes.

21  Q   And do you understand, do you know whether Mr. Dondero

22  sold AVYA securities on behalf of the CLOs and on behalf of

23  the Funds during the time that he was employed as the

24  portfolio manager from January until October 2020?

25  A   I do.  And he did sell those securities.  The chart you

Seery - Direct                    158

1   put up, based upon our business record, is accurate, and he

2   engaged in significant sales of those securities throughout

3   the year.

4   Q   Okay.

5         MR. MORRIS:  Can we please put upon Demonstrative #1?

6   BY MR. MORRIS:

7   Q   Okay.  And can you just explain to the Court what this

8   document is?

9   A   It's a trade report, one of Highland's -- this shows the

10  whole platform, so it's the aggregate sales.  The name of the

11  email -- I apologize, I forgot the system; it just left my

12  mind.  But the email you saw before is anybody on the platform

13  used for various trades if they're part of a trading group.

14  And that's to make sure that, across the portfolio, in its

15  corporate platform, you aren't running into either compliance

16  problems or allocation problems that could lead to a

17  compliance problem.

18  Q   So this shows sales of Avaya on these particular dates.

19  The trade is -- the trade symbol is AVYA.  This is a liquid

20  security.  Trades in, you know, liquid equity markets.  I

21  believe its average trading volume is somewhere about a

22  million and a half a day, approximately.  So you have a trade

23  date.  You have the type of transaction.  It could be a buy or

24  a sell.  These are all sales.  The quantity.  And then the

25  price.  And then it would have the Fund, and then the

Seery - Direct                                159

1  aggregate dollars, which is simply multiplying the price times

2  the quantity.

3  Q    And if we just scroll down to the end of the document,

4  October 9th, is that around the time that Mr. Dondero left

5  Highland?

6  A    Right around that time.  This was coming into a number of

7  hearings that we thought it was most important to have Mr.

8  Dondero depart, particularly in light of some of the positions

9  that he and his companies were taking vis-à-vis the Debtor.

10            MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11  please?

12  BY MR. MORRIS:

13  Q    Can you explain to the Court what this is?

14  A    Uh, --

15            MR. MORRIS:  And again, just for -- just for the

16  record -- sorry to interrupt, Mr. Seery -- the backup for this

17  information can be found at Debtor's Exhibits BBBBB to SSSSS

18  BY MR. MORRIS:

19  Q    Go ahead, sir.  Could you explain to the Court what this

20  is?

21  A    Yeah.  This is just a pretty straightforward chart showing

22  the bars being sales and the lines being the -- the closing

23  sale price of a buy on that day.  And so you can see, you

24  know, with the market fallout in the early part of the year,

25  AVYA hit a low, but like most of the securities in the market,

Seery - Direct                    160

1    it has come back very strongly.  And you see Mr. Dondero's

2    trades earlier in the year, the rest of it during the middle

3    part of the year, sales in the third quarter, and then, when

4    he's gone, I began selling in November and December.

5    Q    Now, so is it fair to say that Mr. Dondero and the

6    Defendants didn't completely impede and stop the Debtor from

7    selling AVYA shares?

8    A    That's fair.  What -- there's a little bit of confusion.

9    The way the trading desk worked previously is that you have

10   these separate companies but they're not really separate

11   companies.  HCFMA is populated by about seven employees.  Many

12   of them have functions across a number of different companies.

13   HCFMA exists solely because Highland funds it.  They haven't

14   paid fees of about three million bucks this year.  They owe

15   $10 million related to a disastrous bailout of what was an

16   open-end fund called Global Al a couple years ago where the

17   SEC, you know, came in and took significant action, almost

18   shut significant parts of Highland down.  And these traders do

19   the trading of all the equities across the platform.

20        So I typically would call them, and this is how we worked

21   in the spring when I took over the internal account after the

22   seizure by Jefferies of Mr. Dondero's management of the Select

23   Equity account.  I would work with Joe Sowin as the trader,

24   make decisions on what we wanted to do for the day, he would

25   execute those trades by going out in the market with a broker,

Seery - Direct                    161

1   selling them to -- to the dealer on the other side, run it

2   through our automated system, and then the trades get closed

3   with the back office.

4       So there's the trade, which is your agreement to buy or

5   sell at a particular dollar price.  That gets inputted into

6   the OMS system, and then from there it's the back office takes

7   over, and then ultimately securities are delivered versus

8   payment to the counterparty.

9   Q   Okay.  And can you just describe, you know, in one or two

10  sentences, your interpretation of this chart and how your

11  sales and the green bars compare to Mr. Dondero's sales and

12  the brown bars?

13  A   Well, the two simple obvious answers are, one, they're

14  smaller, and two, they're at higher prices.

15  Q   Okay.  You also traded, since Mr. Dondero's departure,

16  securities known as SKY; is that right?

17  A   That's correct.  It's Sky Champion Corp.  The ticker is

18  SKY.

19  Q   And did Mr. -- to the best of your knowledge, Dr. Mr.

20  Dondero trade in SKY securities prior to his departure?

21  A   I don't believe so.  As I said earlier, we didn't appear

22  to have an analyst on that for some time.  I don't even know

23  how far back it goes.  It was a bit of an orphan security

24  sitting in the portfolio.  It's only -- it was only in two of

25  the CLOs.

Seery - Direct                                    162

1  Q    Okay.

2          MR. MORRIS:  Can we please put up Demonstrative #3,

3  please?  Okay.

4  BY MR. MORRIS:

5  Q    And can you just explain to the judge what's depicted on

6  this page?

7  A    Again, similar to the last chart, you have the dollar

8  price of the security at the close each day, throughout the

9  year, and then the green bar showing where we began to sell

10  securities for those CLOs.

11  Q    And so, again, is it fair to say that Mr. Dondero and the

12  Defendants haven't completely stopped the Debtor from engaging

13  in SKY transactions?

14  A    That's correct.  What we did was the so-called workaround

15  previously mentioned, was that we decided that I would have to

16  do the trading directly.  So I'd literally look at the stock

17  each day, talk to the broker at Jefferies, determine what

18  level to sell at, communicate with him throughout the day,

19  work through transactions.  Then he reports in whether he's

20  been able to sell and execute on our behalf.  When he's done

21  that, then we have the back office manually enter the trades,

22  as opposed to doing it from the automated trading desk, and

23  then have those trades close.  So, so far, knock on wood, we

24  haven't failed on any trades.

25  Q    Okay.

Seery - Direct                              163

1          MR. MORRIS:  We can the demonstrative down, please.

2    BY MR. MORRIS:

3    Q    Just two more topics here, sir.  Can we talk briefly about

4    what efforts, if any, the Debtors have made to avoid this

5    litigation?  I'll just ask them one at a time.  Has the Debtor

6    made any attempt to transfer the CLO management agreements to

7    the Defendants or to others?

8    A    Well, our original construct of our plan was to do that.

9    We've since determined, when we tried to do that, we got

10   virtually no response from the Dondero interests.  The

11   structure of the original thought of the plan was if we didn't

12   get a grand bargain we would effectively transition a

13   significant part of the business to Dondero entities, they

14   would assume employee responsibilities and the operations, and

15   then assure that the third-party funds were not impacted.

16        As I think I testified on the -- I can't recall if it was

17   the deposition or my prior testimony in court -- Mr. Dondero,

18   true to his word, told me that would be very difficult, he

19   would not agree, and he has made that very difficult.

20        So we examined it.  We've determined that we're going to

21   maintain the CLOs and assume them.  But we originally tried to

22   contemplate a way to assign those management agreements.

23   We've had --

24   Q    All right.

25   A    -- significant discussions with the CLO Issuers, and

Seery - Direct                          164

1  they're supportive of us retaining them.

2  Q    Okay.  You were on the -- you've been participating or

3  listening in to the hearing throughout the day; is that right?

4  A    I have, yes.  I apologize.  I didn't leave the screen on

5  because I didn't want to suck up bandwidth.

6  Q    Are you familiar with all of the K&L Gates letters that

7  that were reviewed today?

8  A    I am, yes.

9  Q    Did the Debtor request that the Defendants withdraw those

10 letters?

11 A    Yes, we did.

12 Q    Had the Defendants withdrawn those letters, might that

13 have avoided this whole litigation?

14 A    I think it would have.  What we wanted to have here is a

15 withdrawal of the letters and an agreement by the clients for

16 the -- the K&L Gates clients that they wouldn't interfere with

17 the operations of the Debtor and our drive towards a plan.

18 They could take their legal positions and object to the plan,

19 if they like, but interfering on a day-to-day basis was

20 unacceptable to us in terms of trying to operate this business

21 in the most efficient manner.

22     We specifically requested that they do that.  This is, I

23 don't think, lost on anybody, certainly not on me in my

24 experience here for years:  These entities are all dominated

25 and controlled by Mr. Dondero, and each of these attacks is

Seery - Direct                                    165

1  specifically coordinated for the purpose of diverting the

2  Debtor, causing confusion, and forcing us to spend estate

3  resources.

4  Q    Do you know if the Debtor also asked the Defendants to

5  avoid this whole injunction proceeding by simply filing their

6  motion to lift the stay and see if they could actually win a

7  motion to terminate the contract?

8  A    Well, what we did was we contemplated the best, most

9  efficient way out, and it was either withdrawing the

10 agreement; if they didn't agree, then we'd said you should

11 file your stay motion immediately and let's have this

12 determined.  We told them, short of that, if they weren't

13 willing to do that, then we would have to put this in front of

14 the Court to try to make sure that we could operate the

15 business.

16 Q    All right.  So, just to summarize, you attempted to sell

17 the CLO management agreements, but were unable to do so; is

18 that right?

19 A    I would say assign.  We would have looked for a payment,

20 there is a cure payment that we have to make, but we didn't

21 we didn't conduct an auction for the CLO assets.

22 Q    And to the best of your knowledge, the Defendants never

23 withdrew the letters; is that right?

24 A    They did not.

25 Q    And to the best of your knowledge, the Debtors -- the

Seery - Direct                    166

1   Defendants never brought their contemplated lift stay motion,

2   right?

3   A    They have not, no.

4   Q    And so why did the Debtor bring this action?

5   A    Well, quite clearly, to try to prevent the managers and

6   Mr. Dondero and the Funds from interfering with the way that

7   we operate the business.  We intend to continue to manage the

8   CLOs, we intend to assume those contracts, we intend to manage

9   them post-confirmation, after exit from bankruptcy.  And

10  causing confusion among the employees, preventing the Debtor

11  from consummating trades in the ordinary course, deferring

12  those transactions, we thought put the estate at significant

13  risk, in addition to the cost.

14  Q    Did you hear Mr. Rukavina in the opening suggest that

15  these might, in fact, be money-losing contracts?

16  A    I did, yes.

17  Q    Why would the Debtor want to assume money-losing

18  contracts?

19  A    They're not money losing contracts.

20  Q    And why, why do you say that?

21  A    They generate fee income.  So the fees on each of these

22  CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23  mentioned earlier, are -- none of them are ordinary CLOs,

24  other than Acis 7.  But not all -- because they don't all have

25  liquid assets that are able to pay their fees each quarter,

Seery - Direct                                167

1   some are deferred.  There are some CLOs that will probably

2   never pay any deferred fee because they are underwater.  Those

3   are not CLOs that Mr. Dondero or the Funds own any of.  That's

4   not really a surprise.  But we will continue to manage those

5   and look for ways to exit for those investors who are

6   noteholders who are underwater in those CLOs.

7   Q    Okay.  Can you describe for the Court the Debtor's

8   contentions as to how the conduct that has been adduced

9   through today's evidence, how is the Debtor harmed by Mr.

10  Dondero's interference in the trades and the sending of these

11  letters?

12  A    I think it's clear in terms of operational risk.  Being

13  forced to construct a workaround to consummate trades that we

14  think are in the best interest of the Funds.

15       It's telling not only that neither Mr. Dondero nor Mr.

16  Sowin nor -- Mr. Sowin was on the calls and agreed to the

17  analyst view, by the way -- nor anybody from MHF ever asked me

18  a question, their lawyers in the deposition never asked me why

19  we were selling these securities.  They simply want to get in

20  the way, cause additional risk to the estate, and cause

21  additional exposure with respect to legal fees, divert our

22  attention from trying to consummate the case.  I think that's,

23  in my opinion, that's pretty clear.

24  Q    Is there any concern on the part of the Debtor that

25  that Mr. Dondero's emails and conduct is creating uncertainty

Seery - Direct                                168

1  among the staff as to who's in charge?

2  A    I think they did initially, and if they continued, they

3  would.  Right now, the workaround is working pretty well.  We

4  still do keep Mr. Sowin on the emails to make sure that, you

5  know, from a compliance perspective, that our sales, he knows

6  about; that we're not stepping on each other's markets, if you

7  will; that we're not getting in the way that -- in the way if

8  he wants to sell assets from a different MHF other managed

9  asset holding, but we do have a workaround that works right

10 now.

11     I think the biggest risk is, because it's much more

12 manual, you have risk of so-called fat-finger trades, where

13 you think you're selling a thousand and you sell 10,000, you

14 think you're executing a sale and you're executing a buy, you

15 think you're executing from an account that has the securities

16 and end up selling short from an account that doesn't.  So

17 we've got to be very careful of that, but the team is doing

18 that now.  There certainly was confusion at the start.

19 Q    And can you just explain to the Court your view as to how

20 the Debtor is able to -- how the Debtor will be able to

21 service the contract on a go-forward basis?

22 A    The CLO contracts?

23 Q    Yes.

24 A    We'll have a team of folks able to manage these assets

25 with professionals that are experienced credit analysts,

Seery - Direct                                     169

1   equity analysts.  I think we'll be able to manage this --

2   these assets in a pretty straightforward manner.  It's not

3   going to be very difficult.

4   Q    Has the Debtor been harmed through the diversion of your

5   personal attention as CEO in responding to all of this?

6   A    I like to think that I can juggle a lot of different

7   things.  I would prefer not to have to be looking at the

8   securities levels each day and feeding out securities that we

9   determine to sell through the broker at Jefferies, who,

10  notwithstanding, is doing a great job.  It's the job of the

11  trader to actually do that and day-to-day -- throughout the

12  day monitor the markets and look for the best place to sell.

13      So do I think I'm getting the best execution?  I think the

14  trader at Jefferies is excellent.  Do I think if a trader on

15  the Highland side was involved every step of the way, I think

16  it would be better.

17  Q    Have the Debtor's professionals' attention and resources

18  been diverted to deal with all of this stuff?

19  A    That -- I think that's -- that's quite clear as well.

20  It's a significant expense.

21  Q    Okay.

22          MR. MORRIS:  Your Honor, I have no further questions

23  of this witness.

24          THE COURT:  All right.  Mr. Rukavina?

25          MR. HOGEWOOD:  Your Honor, if you please, Lee

**Appx. 03583**

Seery - Cross                                        170

1   Hogewood from North Carolina.  You've admitted me *pro hac*

2   *vice*.  If I may do cross-examination, I would appreciate it.

3             THE COURT:  All right.  Go ahead.

4             MR. HOGEWOOD:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6   BY MR. HOGEWOOD:

7   Q   Mr. Seery, let me ask you about the letters that came from

8   our firm, and especially from me, beginning on December 22nd.

9   I think you spoke about those generally.  If you need them to

10  be called up, I think my questions will be crisp as to the

11  letters generally, but we could certainly look at them

12  specifically, if need be.

13      There was initially a letter dated December 22nd, 2020,

14  that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've

15  read that letter?

16  A   I have, yes.

17  Q   And it's fair to say that was a request you had seen

18  before?

19  A   I don't think that's fair to say, no.

20  Q   You had not seen a request to discontinue trades until the

21  confirmation hearing?

22  A   I don't believe so, no.

23  Q   Okay.  So that, that was the first time a request had been

24  made not to trade in the CLO securities prior to confirmation?

25            MR. MORRIS:  Objection to the form of the question.

Seery - Cross                              171

1              THE COURT:  Overruled.

2              THE WITNESS:  I --

3              THE COURT:  Go ahead.  You can answer.

4              THE WITNESS:  I don't recall you sending me a letter

5    before that, but I -- if you have, then I apologize.  I

6    thought I was pretty familiar with them, but I don't recall

7    you sending me that request previously.

8    BY MR. HOGEWOOD:

9    Q    Okay.  I'm sorry.  That was the first request you had

10   received from me, is that -- that's correct?

11   A    Yes.

12   Q    But there had been prior requests of a similar nature?

13   A    Not to my recollection.  Is there a letter?

14   Q    All right.  Well, let me -- let me move on.  You

15   weren't intimidated by my letter, were you?

16   A    Was I intimidated by your letter?  No, I was not

17   intimidated.

18   Q    And it didn't cause -- the letter itself did not cause you

19   or the Debtor to alter your investment strategy?

20   A    It did not, no.

21   Q    And it did not cause you or the Debtor to refrain from

22   operating the company in the manner that you perceived to be

23   in its best interest?

24   A    It did not.

25   Q    It did not cause you to change any of your trading

Seery - Cross                                    172

1   decisions?

2   A    No.

3   Q    You and your counsel responded -- or, your counsel

4   responded to the letter a couple of days later; isn't that

5   correct?

6   A    Yes.

7   Q    And the response rejected the request that had been made

8   and demanded that the letter be withdrawn; is that right?

9   A    Yes.

10  Q    So the range of communication is a set of lawyers

11  representing adverse parties asserting their respective

12  positions?  Is that a fair characterization of that set of

13  communications?

14  A    No.

15  Q    Okay.  Would you characterize it differently?

16  A    Yes.

17  Q    All right.  How so?

18  A    I believe you sent a letter with no good-faith basis,

19  knowing what the contracts say as an experienced lawyer,

20  knowing there was not cause, yet still making the same

21  threats, basically couching them as a request.  But I don't

22  think there was any good-faith exchange of ideas.  No one even

23  asked me why I was making the trades.  I think you were aware

24  of that.

25  Q    You -- but you testified that, nonetheless, the letter did

Seery - Cross                          173

1  not cause you to conduct yourself in any other manner than you

2  would have conducted had you not received the letter; isn't

3  that right?

4  A    That's correct.

5  Q    So I think there's some confusion, then, and I just want

6  to clear this up.  There was earlier testimony, both at your

7  deposition, that -- that my clients actually interfered with

8  and caused trades not to occur on or around December 22nd and

9  23rd of 2020.  And that's not correct.

10        MR. MORRIS:  Objection.  Your Honor, the evidence is

11 in the record.

12        MR. HOGEWOOD:  Okay.  Well, let me --

13        THE COURT:  All right.  You're going to have to

14 rephrase.

15 BY MR. HOGEWOOD:

16 Q    Yeah.  Let me -- let me say it differently.  Focusing

17 solely on December of 2020, every trade that you initiated

18 closed; isn't that correct?

19 A    Every trade.  Yes.  We did not fail one trade.

20 Q    Okay.  And so the issue that you have raised in your

21 pleading is that there were -- there was an expectation that

22 employees of my clients would book trades, which is

23 essentially a backroom operation, after the trade has closed.

24 Isn't that right?

25 A    That's incorrect.

Seery - Cross                              174

1   Q    Okay.  So, once again, let me just get -- there were no

2   trades that you initiated that failed to close; is that right?

3   A    That's correct.

4   Q    And nothing that was done by the Defendants resulted in a

5   trade that you wished to make in December of 2020 to fail to

6   occur or fail to close; isn't that right?

7   A    That incorrect.

8   Q    So you initiated a trade that did not close?

9   A    Yes.

10  Q    In December of 2020?  And when was that?

11  A    I believe that's the case, yes.

12  Q    And specifically what trade did not close that you

13  initiated?

14  A    I'd have to check the notes, but the specific trades were

15  my attempt to initiate the trade with the desk.  Then the

16  trading desk goes into the market and makes the sale.  Once

17  it's inputted into the order management system, referred to as

18  an OMS, then it gets processed for closing.  In November and

19  in December, Mr. Dondero instructed those employees not to

20  initiate those trades.  So there was never an agreement.  When

21  I initiated a trade, which was the workaround you saw referred

22  to, I quite simply called Jefferies directly and I had the

23  back-office folks manually input it instead of the trading

24  desk.

25       Sorry.  I just wanted to make sure we cleared that up.

Seery - Cross                                      175

1  Q   No, just -- that -- that's helpful to understand.  But I

2  think, focusing again solely on December, every trade you

3  initiated closed?

4  A   Every trade that I actually went and made in the market

5  closed.

6  Q   And indeed, if --

7        MR. HOGEWOOD:  I observed your demonstrative

8  exhibits, and if I could ask that the one related to the Avaya

9  trades be called up, Mr. Morris.  is that possible?

10        MR. MORRIS:  Yeah, sure.  Is that the first one with

11  Mr. Dondero's trades, or do you want the chart?

12        MR. HOGEWOOD:  The -- the -- I think it was your

13  Demonstrative #2 that showed the timeline of the trades.

14        MR. MORRIS:  Yeah.  You bet.

15     (Pause.)

16        MR. HOGEWOOD:  Thank you.  Thank you very much.

17  BY MR. HOGEWOOD:

18  Q   So, just so I understand this document, the bottom axis is

19  the passage of time, and when we get into the period between

20  November of 2020 and the end of 2020, 12/31/2020, there are --

21  there's a green bar that has the numbers 50,000 at the top of

22  it.  That reflects what, Mr. Seery?  The number of shares or

23  the dollar amount of the trades?

24  A   Number of shares.

25  Q   And while this is not date-specific, do you know when

Seery - Cross                              176

1  those sets of $50,000 trades happened?  Or --

2  A    I don't --

3  Q    -- 50,000 shares trades happened?

4  A    I don't know the specific dates off the top of my head,

5  no.

6  Q    But looking at it just in comparison to the calendar, that

7  -- that's awfully close to December 22nd and 23rd, is it not?

8  A    It appears to be, yes.

9         MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10  the SKY document could be pulled up as well?  I just want to

11  be clear --

12         MR. MORRIS:  Demonstrative #3, please.

13         MR. HOGEWOOD:  Yes.  Thank you.

14  BY MR. HOGEWOOD:

15  Q    The  timeline on this demonstrative is similar, is it not?

16  A    Yes, it is.

17  Q    It's showing trades by day throughout the course of the

18  year?

19  A    That's correct.

20  Q    And again, there are a significant number of trades in SKY

21  on what looks awfully close to the few days before Christmas

22  of 2020; is that right?

23  A    That's correct.

24  Q    Okay.  And this is the period of time that we're talking

25  about there being interference by the Defendants' employees;

Seery - Cross                                        177

1   is that right?

2   A    Yes.

3   Q    Okay.  I'll move on.  So, the next letter in question was

4   one that came the day after, on December 23rd.  Again, that

5   was a letter from me to your counsel.  Do you recall that

6   letter?

7   A    Yes.

8   Q    And the letter of the 23rd, if we need to look at it, is

9   the EEEE, Docket 39.  You read that letter as well?

10  A    Yes.

11  Q    And you disagreed with the position taken in the letter?

12  A    I'm trying to remember the specific position in that one.

13  Was that the one threatening to try to terminate the CLOs

14  without having checked whether there's cause?  I just don't

15  recall.

16  Q    Why don't we call it up, if we can?

17          MR. HOGEWOOD:  Mr. Morris, if you could help us,

18  because it's one of your exhibits, that would be great.  But

19  Ms. Mather has got it up, so that's great.

20  BY MR. HOGEWOOD:

21  Q    Mr. Seery, can you see the December 23rd letter?

22  A    I can, yes.

23  Q    And I think you referred to it as a threat to terminate

24  the portfolio management contracts?

25  A    I wasn't sure.  That's why I was just asking if this was

Seery - Cross                                178

1   that one.  I don't -- I don't recall.

2   Q   Right.  And if you review the first page and the second

3   page, does that confirm your recollection that that is the one

4   related to portfolio management contracts?

5   A   I can't see the second page.  I believe it is.  I'm not

6   trying to --

7   Q   Yeah, no, --

8   A   If you represent, I'll accept it.

9   Q   Take your time.

10  A   (Pause.)  Yes.

11  Q   Okay.  And I think you already said this:  You strenuously

12  disagreed with the positions stated in the letter?

13  A   Yes.

14  Q   But again, you were not intimidated by the letter?

15  A   Intimidated?  No.

16  Q   The letter didn't cause you to change your investment

17  strategy?

18  A   No.

19  Q   It didn't cause you to trade or not trade in a particular

20  manner?

21  A   No.

22  Q   You continued to function the Debtor's operations as you

23  deemed appropriate?

24  A   Yes.

25  Q   To your knowledge, no CLO or Issuer has taken any steps to

Seery - Cross                                     179

1    remove the Debtor as the portfolio manager?

2    A    The CLO or the Issuers?

3    Q    Yeah.  No one's -- no one's taken a position that you

4    should -- that the Debtor should be removed as a portfolio

5    manager?

6    A    Not -- not from the Issuers, no.

7    Q    And -- or, I'm sorry.  And so when you -- when you brought

8    a distinction between the Issuer and the CLO, are you -- are

9    you referring to CLO Holdco?

10   A    No.

11   Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12   portfolio manager?

13   A    The CLO is the Issuer.

14   Q    Okay.

15   A    So the answer is no.

16   Q    Okay.  So no one has -- no one has acted to take any -- to

17   do anything as it relates to the removal of the Debtor as the

18   portfolio manager?

19         MR. MORRIS:  Objection to the form of the question.

20         THE COURT:  Overruled.

21         THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22   as they agreed and we've been working with them on an

23   assumption.  With respect to what your clients have done, I

24   don't know.

25   BY MR. HOGEWOOD:

Seery - Cross                              180

1  Q    But you don't have any evidence that my clients have taken

2  any action in violation of the automatic stay to -- to move or

3  encourage the removal of the Debtor as the portfolio manager,

4  do you?

5  A    Other than the letter?  No.

6  Q    Other than the letter between me and your counsel?

7  A    Correct.

8  Q    All right.  So, and that letter expressly states that any

9  of those actions that would be taken are subject to the

10 automatic stay and the Bankruptcy Code; is that right?

11 A    That's correct.

12 Q    And as we sit here today, the Debtor is not in breach of

13 any contract with any of the Issuers; is that right?

14 A    That's correct.

15 Q    And the letter didn't cause the Debtor to breach any

16 contract with any Issuer, did it?

17 A    Did not.

18 Q    And I think you've already testified today and you also

19 testified in deposition that you anticipate that the -- all of

20 the CLOs will consent to the assumption of the portfolio

21 management agreements in the context of confirmation; is that

22 right?

23 A    Yes.

24 Q    And the plan supplement that you recently filed, you

25 provide a mechanism by which the issue of for-cause

Seery - Cross                          181

1  termination is to be resolved, do you not?

2  A    I don't recall if there's a specific provision in the plan

3  supplement.  We certainly have, either in the plan or in the

4  plan supplement, a provision related to the gatekeeper

5  function.

6  Q    And that's similar to the settlement that you entered into

7  with CLO Holdco in terms of resolving both their objection to

8  confirmation and the lawsuit against them today; is that

9  right?

10  A    I believe it's similar.

11  Q    Okay.  And the gatekeeper is the Bankruptcy Court to

12  determine, short of a full-blown trial, that if cause exists,

13  isn't that correct, under the plan?

14  A    Among other functions, yes.

15  Q    So if the Court confirms the plan, then the concerns that

16  you have are resolved by the gatekeeper function that is the

17  subject of this motion; is that right?

18  A    I think it depends on the contents of the confirmation

19  order.

20  Q    And if the Court denies confirmation, then the stay

21  remains in effect and the letter related to the removal of the

22  portfolio manager was expressly subject to the stay; isn't

23  that right?

24  A    If the letter says it's subject to the stay?  It does say

25  that, but it says other false things as well, so I'm not sure

Seery - Cross                              182

1  -- I don't know exactly what you're asking me there.

2  Q   All right.  It wasn't a very good question, frankly.

3     Your counsel responded to the December 23rd letter as well

4  and demanded a retraction; isn't that right?

5  A   Yes.

6  Q   And that was sort of a separate (audio gap) with counsel?

7  A   I'm sorry.  You broke up for a second there, sir.  I'm

8  sorry.

9  Q   I'm sorry.  That -- that' -- let's just skip that.  You

10 had testified that neither letter was withdrawn?

11 A   I believe that's correct, yes.

12 Q   Are you familiar -- and -- are you familiar with the fact

13 that, in the response letters, your counsel insisted that

14 there be a response and withdrawal by not later than, I

15 believe, 5:00 on December 28th?  Do you recall that?

16 A   I don't recall that specifically, but I accept your

17 representation.

18 Q   And do you know whether or not there was a response dated

19 December 28th?

20 A   I don't believe there was a written response.  I don't --

21 I don't recall.

22 Q   All right.

23        MR. HOGEWOOD:  Ms. Mather, can you call up

24 Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25 you.

Seery - Cross                                    183

1   BY MR. HOGEWOOD:

2   Q    So, Mr. Seery, have you ever seen this letter dated

3   December 28?

4   A    I believe I have, yes.

5   Q    And this letter was not attached to the complaint nor your

6   declaration nor the request for a TRO or preliminary

7   injunction, was it?

8   A    If you say it wasn't.  I don't recall specifically.

9   Q    Okay.  So, you, by seeing this, you realize now there was

10  a response by the 28th.  Is that right?

11  A    Yes.

12  Q    And in the -- let me just direct your attention to the

13  final sentence of the first paragraph.  It says -- it makes

14  once again clear that the -- any efforts to remove the Debtor

15  as manager would be subject to applicable orders of the

16  pending bankruptcy case, provisions of the Bankruptcy Code,

17  and specifically, the automatic stay.  Do you see that?

18  A    I apologize.  I don't see it.  Which paragraph?

19  Q    I'm at the very last sentence of the first paragraph.

20  There's a sentence that --

21  A    (reading)  Subject to applicable orders in the pending

22  bankruptcy case, provisions of the Bankruptcy Code,

23  specifically, the automatic stay.

24       I read that, yes.

25  Q    Yes.  Okay.  There was some testimony about the letter

Seery - Cross                                184

1  related to Mr. Dondero's eviction.  I don't intend to belabor

2  that.  But once again, that was a letter between counsel, was

3  it not?

4  A   I believe it -- I believe it was.  I don't recall

5  specifically now.  I assume -- I assume all of these were

6  directed to counsel.

7  Q   Right.  And again, the fact that counsel wrote a letter

8  requesting that the eviction not occur did not change your

9  process and you proceeded with the eviction, did you not?

10 A   I think the letter came after Mr. Dondero was no longer

11 permitted.  Eviction is an odd word.  He was no longer an

12 employee, so employee not being able to come into the office

13 and hang around and disrupt business isn't exactly an

14 eviction.  So I disagree with your characterization there.

15 Q   Okay.  Well, so I'll just leave that.  I mean, the --

16 since this exchange of letters, are you aware -- I mean, there

17 was some testimony about the Debtors presenting the Defendants

18 with the choice of either filing a motion for relief from stay

19 or this injunction proceeding would be brought.  Isn't that

20 right?

21 A   Yes.

22 Q   And no motion for relief from stay was filed, and

23 therefore this injection proceeding was brought.  Is that

24 correct?

25 A   Yes.

Seery - Cross                                    185

1  Q    So the other thing that you know was filed by the

2  Defendants was an objection to confirmation, which was due on

3  January 5th of 2020, correct?

4  A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5  other paper or pleading that was filed?

6  Q    The pleading that was filed by the -- these who are

7  Defendants as well as other parties to this case was an

8  objection to confirmation, the deadline for which was January

9  5, 2020.  Are you familiar that an objection to confirmation

10 was filed?

11 A    I'm familiar that one was filed, yes.

12 Q    And so the objection to confirmation raised many of these

13 same issues regarding the circumstances under which the

14 various CLO agreements could be assumed; isn't that right?

15 A    I'm not aware of the specifics of the objection.

16 Q    Okay.  But nonetheless, my client was under no obligation

17 to initiate yet another motion or lawsuit or pleading against

18 the Debtor beyond objecting to confirmation, was it?

19 A    An obligation?  No.

20 Q    And since the objection to confirmation has been filed,

21 there have been a number of pleadings filed in the case.  We

22 obviously were required to respond to the motion for

23 preliminary injunction, and it says there's been an objection

24 filed to that.  Are you aware of that?

25 A    That -- that you objected to the preliminary injunction?

Seery - Cross                              186

1   Q    Yes.

2   A    Yes, yes, I'm aware of that.

3   Q    And --

4   A    I'm very aware.

5   Q    And you're aware that there was a proposed settlement with

6   HarbourVest; is that correct?

7   A    We have an approved settlement with HarbourVest.

8   Q    Right.  And there were objections filed to that particular

9   -- or, to that particular settlement agreement, were there

10  not?

11  A    Yes.

12  Q    But none of my clients participated in that objection, did

13  they?

14  A    I don't recall the specifics of your clients versus the

15  other Dondero entities, but I'm certain Mr. Dondero

16  participated.

17  Q    But the De... the parties that we represent did not object

18  to the settlement?

19  A    I don't recall specifically.

20  Q    Okay.  And another motion that was filed was for an

21  examiner.  Isn't that correct?

22  A    I believe that's the case, yes.

23  Q    Yeah.  And my clients didn't join that motion, either?

24  A    No.  It's a bit of whack-a-mole, but they did not -- they

25  did not -- I don't -- I don't know.  To be honest, I don't

Seery - Cross                                    187

1  know if they did or not.

2  Q    All right.  Toward the end of your testimony, you were

3  giving some information about the value of these management

4  contracts in terms of income over the course of the coming

5  year or two.  What is the projected revenue with respect to

6  these management contracts?

7  A    Do you mean the CLO 1.0 management contracts?

8  Q    Yes.

9  A    They generate about four-and-a-half to five million

10 dollars a year, depending on the asset base in total, but

11 that's accrual, as I mentioned earlier.  It doesn't all come

12 in in cash.  It depends on the waterfall.  Expect about two-

13 and-a-half to 2.7 million to come in per year during the

14 course of the projected time period.

15      (Echoing.)

16 Q    Have you done any sort of profitability analysis on the

17 management contracts?

18 A    Not specifically on those contracts, no.  We look at the

19 --

20 Q    Okay.

21 A    -- aggregate of the Debtor's receipts versus its costs.

22 Q    Can you -- so, --

23      MR. HOGEWOOD:  Ms. Mather, can you call up the

24 disclosure statement?  This is Docket 1473.  And in

25 particular, Page 176.

Seery - Cross                          188

1  BY MR. HOGEWOOD:

2  Q    So, I'm, Mr. Seery, I'm trying to square the 779 for the

3  month ended -- month period ended in March '21 and no further

4  revenue coming in on management fees with what you just said.

5  A    I'm not -- I'm not sure why.  This should -- certainly

6  should have the management fees according to the CLOs if this

7  was included in the assumption of those.  We have revenue,

8  they do generate revenue, they currently generate and they

9  will continue to generate.

10 Q    But this is the disclosure statement approved by the

11 Court, right?

12 A    Yes.  I'll have to come back and check why that for the

13 year doesn't have it, unless we were assuming that we wouldn't

14 receive any into the -- into this vehicle.  I just, I don't

15 know the answer.

16        MR. HOGEWOOD:  Your Honor, that's all the questions I

17 have.  Thank you very much.

18        THE COURT:  All right.  Redirect?

19        MR. MORRIS:  Can we just leave this up on the screen

20 for a second, very quickly, for Mr. Seery?  Can we put the

21 document back?

22                    REDIRECT EXAMINATION

23 BY MR. MORRIS:

24 Q    Mr. Seery, do you recall that the disclosure statement was

25 approved back in November?

Seery - Redirect                                189

1    A    Yes.

2            THE COURT:  Could you repeat the question?  I

3    couldn't hear it.

4            MR. MORRIS:  Yeah.  That is -- I don't know if

5    somebody's phone is not on mute.

6            THE COURT:  Yes.  Please put your device on mute if

7    you're not the one talking.  Okay.  Someone did.  Go ahead.

8            MR. MORRIS:  Thank you.

9    BY MR. MORRIS:

10   Q    Mr. Seery, do you recall that this disclosure statement

11   was approved back in November?

12   A    Yeah.  What I'd said earlier was that I'm not sure if the

13   -- this plan projection conforms with our decision to maintain

14   the CLO management contracts, and so there certainly should be

15   revenue, while it comes in quarterly on the management fee,

16   the base management fee.  And it's not always -- each CLO is

17   not always able to pay it in cash.  It will depend on our

18   ability to monetize assets, because they don't -- a lot of the

19   assets are not cash-generative.  Some are.  For example, the

20   Trussway loan is cash generative.  The CCS loan is not.

21       But I'm just not sure why this doesn't show the management

22   fees at all.  At least for the whole year, we certainly will

23   have them, unless this is prior to the determination to assume

24   those agreements.

25   Q    Okay.  So if the assumption in November was that the

**Appx. 03603**

Seery - Redirect                    190

1   agreements would be assigned, there would be no revenue shown.

2   Is that fair?

3   A    That would have been the assumption prior to us

4   determining that we wanted to assume them, yes.

5   Q    Okay.  And do you recall whether the Debtor became more

6   convinced that it would assume the contracts rather than

7   assign them before or after the disclosure statement was

8   approved?

9   A    I don't recall the specific timing, but a number of things

10  happened around this time.  First, the Dondero entities were

11  unwilling to even engage on assignment because they were on a

12  much more aggressive, quote, blow up the place strategy.

13  That's Mr. Dondero's quote.

14       Number two, we settled with HarbourVest, and that

15  significantly increased the value of maintaining the CLO

16  management.  The HarbourVest --  or the HCLOF entities own

17  significant preferred shares in the 1.0 CLO structures, and

18  having management of those and being able to monetize those in

19  accordance with the agreement, maximizing value for the

20  benefit of HCLOF, would be far, far better for the estate than

21  letting these assets just sit.  We're not trying to drive the

22  price down, because we wouldn't be in the business of trying

23  to buy back those securities on the cheap.  We're in the

24  business of trying to maximize value.

25  Q    All right.

Seery - Examination by the Court                191

1          MR. MORRIS:  I have nothing further, Your Honor.

2          THE COURT:  Any recross on that redirect?

3          MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4    the opportunity to appear before you.

5          THE COURT:  All right.  Thank you.

6       Mr. Seery, before we let you go, I have a couple of

7    follow-up questions.

8                    EXAMINATION BY THE COURT

9          THE COURT:  These CLOs, I mean, you've said a couple

10   of times they're not really traditional CLOs, except for the

11   Acis 7 one.  But I have this question.  I've learned back in

12   the Acis case most of what I know about CLOs, I suppose.  And

13   what the witnesses told me there were they typically had a 12-

14   year life, and then, yeah, there was some period, you know,

15   the first five years, seven years, something like that, where

16   it was in a reinvestment/refinancing phase, but then after

17   that, you know, we couldn't do that anymore and it was kind of

18   heading towards wind-down.

19      Anyway, my long-winded question is:  Do these CLOs work

20   generally like that or not?  Because you said they're

21   atypical.

22          THE WITNESS:  They -- they --

23          THE COURT:  Go ahead.

24          THE WITNESS:  They used to.

25          THE COURT:  Okay.

Seery - Examination by the Court                192

1          THE WITNESS:  So these are extremely old.  These go

2    back to 2006, '07, '08.  These are very old CLOs.  So they're

3    far beyond their investment periods.  Some of them are coming

4    up on their maturities on their debt.  Many of them don't have

5    any debt at all.

6        So you'll recall, Your Honor, that a CLO is a vehicle

7    where you take x-hundred million -- we'll use 400 for fun --

8    million dollars.  You ramp up $400 million of assets.  You

9    sell off, for our purposes, $350 million of securities.  You

10   have the AAA securities, the AAs, all the way down.  And then

11   you have these preference shares.

12       During a period of time, as cash is generated in the CLO,

13   the CLO is entitled to reinvest it.  And that keeps it going.

14   And then it gets beyond its reinvestment period and it's in

15   what folks usually refer to as its harvest period.  That's

16   when oftentimes, depending on where rates are, depending on

17   asset value, the rates for the debt obligations or the rate

18   you can receive on your assets, you may see refinancings or

19   resets.  Otherwise, the CLOs begin to wind down.  They have --

20   they don't have a life, like a partnership with a final date,

21   but there's maturities on the debt and then there's an

22   expectation that they would wind down.

23       These CLOs -- which typically CLOs only invest in

24   performing loans, and oftentimes, particularly Highland -- and

25   I could regale you with stories how Highland would take

Seery - Examination by the Court          193

1  virtually non-interest-bearing, seventh lien debt -- that's a

2  bit of an exaggeration -- but just to keep the fees going, and

3  not actually convert to equity.  A lot of these, that wasn't

4  an option, so they've converted to equity.  So I just have one

5  that I happen to have on my screen, Your Honor, Gleneagles.

6  The assets in Gleneagles (echoing) are 16 -- MGMs.

7          THE COURT:  Okay.  Someone needs to put their phone

8  on mute.  All right.  I'm sorry.

9          THE WITNESS:  So it has -- it has -- the specifics

10  aren't particularly important, but its assets are -- just this

11  one I just pulled up; they're all a little different, and --

12  but mostly the same -- MGM stock.  This is MGM Studios, which

13  you read about with James Bond, a very valuable asset.  Across

14  the Highland platform, there's roughly $500 million worth of

15  stock.  It doesn't pay off any income.  So if it had debt --

16  and I'm not sure if Gleneagles still has any; I'd have to

17  switch screens; I don't believe it does; if it does, it's

18  small -- it wouldn't get any income-generating -- that's not

19  income generating asset.

20      Vistra, which is the TXU stock I talked about before, is

21  the next biggest asset.  Skyline Corporation, which was the

22  one we were selling.  That's no longer in there.  TCI

23  portfolio, which is a Dondero real estate asset it has, it's

24  an old Las Vegas and Phoenix, Arizona real estate

25  developments.  Not income-generating.  Not that they don't

Seery - Examination by the Court          194

1  have value, but this is much more like what would be referred

2  to as a closed-end fund.  It's not going to go out and buy

3  anything.  It can't.  It can only generate cash by selling

4  assets, give that cash to the trustee, and then the trustee

5  pays it through the waterfall.  And that's the way all of

6  these CLOs work.

7      Now, some of them do have debt.  And some of them have a

8  lot of debt, and the preferred shares will never be worth any

9  money, so we refer to those as being underwater.  No surprise,

10  the Dondero-related entities don't own any of those junior

11  securities.

12      The -- some do have debt.  A lot of that debt is going to

13  get paid off in the first half of the year because there'll be

14  refinancings at Trussway and a refinancing at Cornerstone.

15  They own debt, and that'll generate cash.  It'll go to the

16  CLOs, go to the trustee.  First it goes to pay the obligations

17  for the outstanding debt of the CLO, and then the asset

18  dollars, they get put through the waterfall to pay the more

19  junior securities.

20          THE COURT:  Okay.  And --

21          THE WITNESS:  And I --

22          THE COURT:  The --

23          THE WITNESS:  I was going to give you -- I contrast

24  that to a more typical CLO, which is whether it's beyond its

25  investment period or not, will have something like 150 to 250,

Seery - Examination by the Court          195

1   sometimes more, loans in it.  150 would be on the loan side.

2   It'll own -- own those in smaller amounts.  It has

3   requirements as to what its concentrations are in different

4   buckets of types of assets.  It has to return -- it has to

5   have an income-generating ability to satisfy certain covenants

6   in its debt obligations and in the indenture.  And then it

7   will, once it gets past its investment period, it will start

8   to harvest those assets.

9        There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14       So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21            THE COURT:  Okay.  All right.  And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24            THE WITNESS:  It's not a hard -- it's not a hard

25  period.

Seery - Examination by the Court                    196

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3   going to -- we're going to manage these assets, as any asset

4   manager would, and we've had direct discussions with some of

5   the underlying holders, including one of the biggest investors

6   in the world who's an investor in the CLO but also has a

7   couple separate accounts which they want us to manage, and

8   we'll look for opportunities, depending on the market.  We're

9   not going to -- we're not going to just sell.  It's not a

10  liquidation.  We're going to find opportunities where, if we

11  believe it's the right value, we'll sell.  That doesn't mean

12  we'll sell it all in a big chunk.  We may manage pieces.  We

13  may hold on to some.

14     Some of them may perform -- some of the assets may

15  actually do things differently than others.  For example,

16  Cornerstone, for unknown reasons, has $60 million of MGM

17  stock, not an asset that you'd think you'd stuff into a

18  healthcare business, but this is Highland.  That may be sold

19  before, for example, Gleneagles sells its MGM.  It'll just

20  depend on, you know, market and the need of the specific

21  investor.

22          THE COURT:  All right.  Thank you.  That's all the

23  questions I have.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court                197

1    done with you, but we hope you'll stick around for however

2    longer this goes.

3            THE WITNESS:  I will indeed.

4            THE COURT:  Okay.

5            THE WITNESS:  Thank you.

6            THE COURT:  Does the Debtor rest, Mr. Morris?

7            MR. MORRIS:  Yes, Your Honor.  There were those

8    couple of documents that we had used from the different docket

9    that we'll certainly put on the docket with the supplement

10   witness and exhibit list.  I just wanted to point that out.

11   And I, you know, I don't recall, frankly, if I moved into

12   evidence each of those extras, and I'm happy to go through it,

13   but it's very important to me that those documents be part of

14   the record.  So --

15           THE COURT:  Okay.  I think what you added was TTTTT,

16   and I think I admitted it.  You moved to admit it, and I said

17   yes, but you're going to have to file it on the docket --

18           MR. MORRIS:  Yeah.

19           THE COURT:  -- as a supplemental exhibit.

20           MR. MORRIS:  Right.  And then there were the couple

21   from the other -- let me see if I can get them.

22           THE COURT:  I admitted everything else that you filed

23   on the docket except UUUU, VVVV, and AAAAA.

24           MR. HOGEWOOD:  Yeah.  And that's fine.

25         Can we, Ms. Canty, going from Docket No. 46, can we just

198

1  call up Exhibit K to make sure that that's in evidence?

2  Docket 46 from the Dondero adversary proceeding.

3     Okay.  So this was the letter, Your Honor, that I used

4  earlier today with Mr. Dondero.  If you scroll down, where I

5  examined him on the trading.  This is what led into the

6  December 22nd trading, if you go to the next page.  So if it's

7  not in evidence, I would respectfully request that this

8  document be admitted into evidence, Your Honor.

9            MR. RUKAVINA:  Your Honor, I object.  This document

10  is hearsay of Mr. Pomerantz.

11            THE COURT:  Okay.

12            MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13  Your Honor.

14            THE COURT:  Okay.  So this is -- I wholesale-admitted

15  all of your exhibits with those three carved out that I

16  mentioned.  So you're saying I've not admitted this one yet?

17            MR. MORRIS:  I just don't recall, because this wasn't

18  on the exhibit list. I will point out that we had no objection

19  to the entry into the evidence of all of K&L Gates letters,

20  and I'm really a little surprised, having heard the testimony

21  from Mr. Dondero on this particular letter, that there would

22  be an objection.  But I would respectfully request that it be

23  admitted as an exception to the hearsay rule.

24            THE COURT:  All right.  Well, I'm going to overrule

25  the objection.  I'll admit it.

199

1       So, again, it has to be supplemented on the docket.

2       (Debtor's Exhibit K is received into evidence)

3              MR. MORRIS:  Yes.  And there's just one other

4    document, Your Honor, from that same docket.  It's Exhibit D,

5    Ms. Canty.  I just want to make sure that's in the record as

6    well.  And I do apologize again, Your Honor.

7              THE COURT:  Okay.

8              MR. MORRIS:  I didn't realize until I was reading --

9              THE COURT:  We're getting terrible distortion.   I

10   don't know where it's coming from, but --

11             MR. MORRIS:  Okay.  And this is, this is the email

12   that I -- it's Mr. Dondero's own statement, so it's not even

13   hearsay, but I just want to make sure this is part of the

14   evidentiary record, Your Honor.  So I move for the admission

15   of this document as well to our exhibit list.

16             MR. RUKAVINA:  I believe this document has been

17   admitted.  I believe -- I believe --

18       (Echoing.)

19             MR. RUKAVINA:  Is that us?  Testing.

20             THE COURT:  All right.  Mike, where is that coming

21   from?

22       (Clerk advises.)

23             THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24   -- so put yourself on mute.

25       Mr. Rukavina, go ahead.

200

1            MR. RUKAVINA:  Your Honor, I think this exhibit is in

2     already.  If it's not, no objection.

3            THE COURT:  All right.  So it will be admitted, and

4     again, you need to file it as a supplement, Mr. Morris.

5        (Debtor's Exhibit D is received into evidence)

6            MR. MORRIS:  Yeah.  Thank you, Your Honor.  The

7     Debtor rests.

8            THE COURT:  All right.  Mr. Rukavina, I want to go a

9     while longer, so let's at least -- do you have Mr. Dondero as

10    well as Mr. Post?

11           MR. RUKAVINA:  I do, Your Honor.  I have both.

12           THE COURT:  Okay.  Well, let's go.  You may call your

13    witness.

14           MR. RUKAVINA:  Your Honor, we'll call Jason Post.

15           THE COURT:  All right.  Mr. Post, I swore you in

16    earlier and I consider you still under oath.  Do you

17    understand that?

18           MR. POST:  I do.

19           THE COURT:  All right.  Go ahead.

20       JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

21           MR. RUKAVINA:  Oh, turn on the video.  Can you see

22    how to do that?  Is Jason on the video?  Okay.  All right.

23    Mr. Post?  Hold on a second.  I'm hearing myself.

24           THE WITNESS:  I'm hearing the same.

25           MR. RUKAVINA:  Let me turn down my volume.  Testing.

Post - Direct                                    201

1    Okay.  Mr. Post, can you hear me?

2             THE WITNESS:  Yes.

3             MR. RUKAVINA:  Okay.

4                     DIRECT EXAMINATION

5    BY MR. RUKAVINA:

6    Q   You were asked about some of your background and

7    qualifications.  Just so that the record is clear, you are the

8    chief compliance officer for both two Advisors and each of the

9    Funds, correct?

10   A   Correct.

11   Q   And I think we refer to these three defendant funds as

12   retail funds; is that correct?

13   A   Correct.

14   Q   Describe what we mean or what you mean by a retail fund.

15   A   I look at it two ways.  There's private funds, which are

16   institutional in nature, and retail funds, which are comprised

17   of open-end funds, closed-end funds, BDCs, ETFs, and that

18   constitutes the suite of funds that are advised by Highland

19   Capital Management Fund Advisors and NexPoint Advisors.  And

20   they generally have a broad swath of investors, including

21   institutional investors, but also, you know, just regular mom-

22   and-pop investors.

23   Q   Okay.  So, for the Highland -- I'm sorry, for the three

24   retail funds, how much in ballpark investments do they have in

25   the CLOs that are at issue today?  Ballpark.

Post - Direct                                                    202

1  A    Maybe call it a hundred million, ballpark.  Or a hundred

2  million, give or take.

3  Q    Okay.  And for all of the CLOs that Highland manages that

4  the Advisors and other Funds have an interest in, do you have

5  an estimate of how much it manages of CLO assets?

6  A    I believe it's approximately a billion, a little over a

7  billion that HCMLP manages for its CLO assets.

8  Q    Do you have an estimate of how many individual investors

9  there are in the three retail funds?

10 A    I -- thousands.  I don't have an exact number.

11 Q    Okay.  And I think you mentioned some of the types.  Do

12 you have any names of the types of investors that Her Honor

13 might know or have heard of before?

14 A    Off the top of my head, I do not, just -- but they're

15 generally constituted or characterized of the investor types

16 that I mentioned earlier.

17 Q    Okay.  Now, these three retail funds, do they own voting

18 preference shares in any of the CLOs that the Debtor manages?

19 A    Yes.

20 Q    Okay.  Do they own a majority in any of those CLOs' voting

21 preference shares?

22 A    In aggregate, across the three, they would.

23 Q    Okay.

24 A    With other CLOs.

25 Q    What are those three CLOs, sir?

Post - Direct                                     203

1   A    I believe it's Greenbrier, Graceland, and Stratford, if I

2   recall correctly.

3          MR. RUKAVINA:  Your Honor, have you received a

4   couriered binder of our exhibits?

5          THE COURT:  I have.  I've got them right here.

6          MR. RUKAVINA:  Now I can't hear the judge.  What's

7   she saying?

8          THE COURT:  Yes.  I've got them.

9          MR. RUKAVINA:  I think you're on mute, Judge.

10         MR. VASEK:  No, you turned your volume down.

11         MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12      So, Mr. Vasek, if you'll please put Exhibit 2 up.

13  BY MR. RUKAVINA:

14  Q    Mr. Post, are you the custodian of records for the Funds

15  and Advisors?

16  A    Yes.  We're required to keep records of ownership and

17  trades for the Funds involved.

18  Q    And you are an actual officer of these Funds and Advisors,

19  correct?

20  A    Correct.

21  Q    Okay.  Are you familiar with this Exhibit 2?

22  A    I am.

23  Q    Did you participate in pulling together the underlying

24  information with others to prepare Exhibit 2?

25  A    I did.

Post - Direct                                           204

1  Q    Does Exhibit 2 accurately reflect the current ownership of

2  the various CLOs by the three retail funds that are --

3  A    At the time it was put together, I believe it did.

4  Q    And approximately when was that?

5  A    I believe it was in the November time frame, middle of

6  November, end of November.

7  Q    Do you have reason to believe that the numbers we're

8  referring to would be materially different today?

9  A    I don't believe they would be materially different.

10        MR. RUKAVINA:  Your Honor, I move for the admission

11  of Exhibit 2 as a summary of underlying data.

12        THE COURT:  All right.  Any objection?

13        MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14  understand that the witness has testified to it, but just as I

15  put in the backup for my demonstrative, where's the backup?

16  We're just supposed to take his word for it?  There's no

17  ability to check this.  This is not evidence.  It's a

18  demonstrative.

19        THE COURT:  All right.  Mr. Rukavina, do you have

20  backup?

21        MR. RUKAVINA:  Let me ask the witness a couple more

22  questions.

23  BY MR. RUKAVINA:

24  Q    What would be the backup for this Exhibit 2?

25  A    We'd have to pull the holdings from the intranet and that

Post - Direct                                        205

1   would identify the quantity that's held by each of the

2   respective funds and then an aggregate that, over the

3   preference shares outstanding, would give you the percentages

4   that are outlined in this exhibit.

5   Q    Okay.  And is that a database that you have personal

6   access and authority over?

7   A    I have personal access to it.  Yes.

8   Q    Okay.

9         MR. MORRIS:  Your Honor, *voir dire*?

10  BY MR. RUKAVINA:

11  Q    Can you easily take that data from a computer and show it

12  to the Court here today?

13  A    Yes.  It would just require the CUSIPs for each of the

14  preference shares and then plug it into the intranet and then

15  that would provide a screenshot of the ownership of the CLOs.

16  Q    And is this what that is, basically?

17  A    This is an aggregation -- or, this is a percentage of the

18  shares outstanding, the preference shares.  So what would be

19  shown on the intranet would be the quantity and then you'd

20  have to tie that back to the shares outstanding and that would

21  give you the percentages that are shown on this exhibit.

22        MR. MORRIS:  *Voir dire*, Your Honor?

23        THE COURT:  I'm sorry?

24        MR. MORRIS:  May I inquire before this --

25        THE COURT:  Mr. Morris, is that you?  Okay.  You want

Post - Voir Dire                                206

1  to take him on *voir dire*?

2              MR. MORRIS:  Yes.

3              THE COURT:  Go ahead.  Uh-huh.

4                      VOIR DIRE EXAMINATION

5  BY MR. MORRIS:

6  Q    Yes.  Mr. Post, did you prepare this document?

7  A    I provided information and the document was ultimately

8  prepared by counsel.

9  Q    So you didn't personally prepare this, right?

10 A    I didn't personally put this chart together.

11 Q    And you didn't personally make the calculations on this

12 chart, right?

13 A    I would have supplied or assisted in supplying the

14 holdings with reference to the shares outstanding and then

15 they would have done the math to place the percentages.

16 Q    I'm asking a very specific question.  You didn't do the

17 calculations necessary to come up with the percentages on this

18 chart, right?

19 A    Me personally, no, I did not.

20 Q    And you can't verify that this chart is accurate, can you?

21 A    I provided, provided the information.  Then it's a

22 mathematical calculation.

23 Q    Okay.  You didn't take any steps to determine the accuracy

24 of this chart, right?  You relied on others?

25 A    There's a -- I would have cross -- you know, maybe cross-

Post - Voir Dire                                        207

1   referenced some of the percentages against another spreadsheet

2   that was -- that we had internally.

3   Q    Sir, I didn't want to know what you would have done.  You

4   didn't do anything to confirm the accuracy of all of the

5   numbers on this page, correct?

6   A    I believe I may have spot-checked a couple of them.  I

7   can't recall specifically.

8          MR. MORRIS:  Your Honor, not only don't we have the

9   backup, but this witness isn't even competent to testify to

10  the accuracy of the chart.  I renew my objection.

11         THE COURT:  All right.  I sustain the objection.

12         MR. RUKAVINA:  Your Honor, I'll --

13         THE COURT:  It's not allowed.

14         MR. RUKAVINA:  Going back to the -- take that down.

15         THE COURT:  All right.  Mr. Rukavina, we're -- our

16  connection to your office is suddenly not very good.  Both you

17  and Mr. Post are very hard to hear.  So let's see what we can

18  to improve.

19         MR. RUKAVINA:  Is it a question of loudness or

20  quality?

21         THE COURT:  Quality.  And I heard you fine just then,

22  but -- so let's try again.

23                  DIRECT EXAMINATION, RESUMED

24  BY MR. RUKAVINA:

25  Q    Mr. Post, let's go back to those retail funds.  How are

Post - Direct                                                    208

1   those funds managed at the top level?

2   A    They're overseen by a board of trustees.

3   Q    Okay.  Do you interact with that board of trustees

4   periodically?

5   A    I do.

6   Q    Okay.  Approximately how often?

7   A    At least quarterly, and generally intervening periods.

8   I'd probably say anywhere from every five to six weeks, if not

9   more frequent.

10  Q    Have you been communicating with them more frequently

11  recently?

12  A    Yes.

13  Q    As the CCO of the funds, who do you ultimately report to?

14  A    The board.

15  Q    Is Mr. Dondero on any of those boards?

16  A    He is not.

17  Q    Okay.  Are those boards capable, to your experience, of

18  making independent decisions?

19         MR. MORRIS:  Objection to the form of the question.

20         THE COURT:  Overruled.

21         THE WITNESS:  I think the question, is are they

22  capable of making independent determinations?  Yes.

23  BY MR. RUKAVINA:

24  Q    Okay.  Explain the interaction between the Fund Advisors

25  and the retail funds.  What -- what does the one do for the

Post - Direct                                    209

1   other, if you will?

2   A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

3   hear the question.

4   Q    So, we have the three retail funds.

5   A    Yes.

6   Q    What relationship, if any, is there between the two

7   Advisor defendants and any retail fund defendants?

8   A    So, there's an investment advisory agreement that the

9   Funds have entered into with the investment advisor, and the

10  investment advisor performs investment functions on behalf of

11  those Funds, along with other noninvestment functions.

12  Q    Okay.  So is it fair to conclude that, for investment

13  purposes, the Advisors make pretty much all, if not all,

14  decisions for the three Funds?

15  A    Yes.

16  Q    Okay.  What about other matters that the board might

17  consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18  make other decisions for the Funds, or is it an advisory role?

19  A    The Advisors may make other decisions or recommendations,

20  which they then set forth to the board for their approval, if

21  needed.

22  Q    Okay.  Does the board have independent counsel?

23  A    They do.

24  Q    Okay.  Have you interacted before?

25  A    I have.

Post - Direct                                     210

1  Q    And is it fair to conclude that the board not only is

2  capable of making independent decisions but has made

3  independent decisions recently?

4              MR. MORRIS:  Objection.  Leading.

5              THE COURT:  Sustained.

6              THE WITNESS:  They have.

7              MR. RUKAVINA:  Okay.

8              THE COURT:  That was --

9              MR. RUKAVINA:  And we'll get --

10             THE COURT:  You don't answer.

11             MR. RUKAVINA:  Go into that in another bit.

12             THE WITNESS:  Oh.  Sorry.

13             MR. RUKAVINA:  Okay.

14 BY MR. RUKAVINA:

15 Q    Explain to the Court what your role as the chief

16 compliance officer for the Advisors and the Funds is.

17 A    I think, as you mentioned earlier, it's interaction with

18 the board.  Also with regulatory bodies to the extent

19 examinations occur.  It could be to ensure oversight and

20 compliance with a fund's prospectus and SAI limitations, and

21 then it's establishing policies and procedures and ensuring

22 that those policies and procedures are adequate to detect any

23 sort of violations that could occur by the Funds.

24 Q    And are you an attorney?

25 A    I am not.

Post - Direct                                                211

1  Q    Do you frequently work with attorneys?

2  A    I do.

3  Q    Both in-house and external?

4  A    Yes.

5  Q    Good.  And do you frequently rely on the advice of

6  counsel?

7  A    I do.  At times will present, you know, if there is a

8  question or an issue, present the background to either

9  internal or external counsel and then request their advice on

10 certain matters.

11 Q    So when counsel was asking about why you wouldn't appear

12 at a hearing or listen to a hearing or read a transcript of a

13 hearing, are those the kinds of things that you would rely on

14 counsel?

15 A    Yes.  If counsel were to tell me to, you know, attend the

16 hearing, I would have attended the hearing.

17 Q    Okay.  Does -- do the Funds and Advisors also have in-

18 house counsel?

19 A    Yes.

20 Q    I think we established that's D.C. Sauter?

21 A    He's been the primary point of in-house counsel more

22 recently, I'd say, within the past three to four months.

23 Q    Okay.  And would you expect that perhaps he would be

24 attending hearings and reading transcripts instead of you for

25 some of these litigated matters?

Post - Direct                                          212

1              MR. MORRIS:  Objection to the form of the question.

2              THE COURT:  Overruled.

3              MR. MORRIS:  Leading.

4              THE COURT:  Overruled.

5              THE WITNESS:  I believe he would be.

6    BY MR. RUKAVINA:

7    Q    Okay.  Well, the implication was made, Mr. Post, that

8    somehow you were negligent as CCO by not following the

9    December 16th hearing.  I'd like to know, --

10             THE COURT:  Okay.  Could you -- could you repeat --

11   BY MR. RUKAVINA:

12   Q    -- Did you have counsel at the hearing and did you hear

13   from --

14             THE COURT:  Mr. Rukavina, start over with your

15   question.  It was a little hard to hear.

16             MR. RUKAVINA:  Okay.

17   BY MR. RUKAVINA:

18   Q    Mr. Post, the implication had been made that, because you

19   weren't at the December 16th hearing and because you had not

20   read the transcript, that you were somehow deficient as a CCO.

21   I'd like to know, Did you have the benefit of outside

22   counsel's views both before and after that hearing as to that

23   hearing and what happened?

24   A    Yes.

25   Q    It's not that you put your head in the sand and ignored

Post - Direct                                          213

1    what's happening, is it?

2    A    That is correct.

3    Q    Okay.  And is it fair to say that when you deal with

4    compliance, you deal with complicated statutes and

5    regulations?

6    A    That is correct.

7    Q    Okay.

8         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9    (garbled).

10        (Pause.)

11   BY MR. RUKAVINA:

12   Q    Okay.  Taking you back to Mr. Morris's questions, do you

13   recall Mr. Morris asking you whether you believe that any of

14   the trades that were being discussed were deceptive?

15        MR. MORRIS:  Hold on one second, Your Honor.  What

16   exhibit is this?

17        THE COURT:  I don't know.  What is it?

18        MR. RUKAVINA:  Can you hear me, Mr. Post?

19        THE WITNESS:  They're asking a question as to what

20   exhibit this is.

21        MR. RUKAVINA:  Your Honor, this is not an exhibit.

22   This is a Commission Interpreting Regarding Standard of

23   Conduct for Investment Advisors, an SEC regulation in

24   conjunction with 17 CFR 276.

25        THE COURT:  Okay.  How are we --

Post - Direct                           214

1        MR. RUKAVINA:  So, Your Honor, these are the actual

2   regulations.

3        THE COURT:  I mean, it's -- okay.  The answer to the

4   question is it's not an exhibit.  You have pulled up 17 CFR

5   part 276.  Is that what the answer is?

6        MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7   offered this as an exhibit.

8        THE COURT:  All right.

9        MR. MORRIS:  You have -- Your Honor, I don't know why

10  this is being put up on the screen now.  It's not an exhibit.

11  It's not in the record like a couple of those that I had.  I

12  used the statute that he relied on to cross-examine him with

13  the 206.  I don't know what this is.  I don't know if it's

14  accurate.  I don't know anything about it.

15       MR. RUKAVINA:  Your Honor, this is a rule and

16  regulation.  This is not an exhibit.  If it is an exhibit, I

17  haven't moved to admit it yet.  I'm going to use this to

18  refresh his memory and explain why he believed that the

19  actions were deceptive, a door opened solely by Mr. Morris.

20       MR. MORRIS:  His recollection hasn't -- there's no

21  need to refresh it yet.  He hasn't even answered a question

22  where he says, "I don't remember."

23       THE COURT:  Okay.  I sustain the objection here.  I

24  mean, you can ask him a question, but, again, it's kind of

25  hard for us to tell what this is, actually.  I mean,

Post - Direct                            215

 1  Commission Interpretation Regarding Standard of Conduct for

 2  Investment Advisors.  I mean, is this actually a -- I mean,

 3  it's not a statute.  I'm not even sure it's a reg.  It's --

 4          MR. MORRIS:  Okay.

 5          THE COURT:  I don't know what it is.  So, --

 6          MR. RUKAVINA:  Your Honor, we'll lay a predicate

 7  later.  First, let me ask some other questions.

 8  BY MR. RUKAVINA:

 9  Q   Again, you recall that you were asked whether, pursuant to

10  Section 206 of the Advisers Act, you believed the trades that

11  have been discussed were deceptive.  Do you recall?

12  A   Yes.

13  Q   Okay.  And you answered that you believed that they were

14  deceptive?

15  A   Correct.  I did.

16  Q   As the CCO, do you have an understanding of what role, if

17  any, conflicts of interest play in an advisor's duties under

18  the Advisers Act?

19  A   Yes.

20  Q   Okay.  What is your understanding?

21  A   All -- all known material conflicts of interests need to

22  be disclosed -- need to be disclosed by the advisor to the

23  underlying investors.

24  Q   Okay.  And why, why do those conflicts of interests have

25  to be disclosed?

Post - Direct                                                216

1   A    Because an advisor could have a view that may deviate from

2   the underlying investors' view of how the portfolio could be

3   managed and in contradiction to it.

4   Q    And do you have an understanding as to whether, pursuant

5   to your experience as the CEO [sic], the Advisers Act and the

6   SEC regulations (garbled) it require an advisor to adopt the

7   principal's goals as opposed to his or her own goals?

8           MR. MORRIS:  Objection to the form of the question.

9   Your Honor, he has not been offered as an expert.  He

10  shouldn't be permitted to provide -- this is -- this would be,

11  at best, expert testimony.  I asked him 30 different questions

12  about his background.  He's got no training.  He's got no

13  licenses.  He's taken no special courses.  He doesn't have

14  anything except on-the-job training.  This is not right.

15          MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16  and-no questions all day, leading questions, and the witness

17  was told that he could explain his answers.  The Court told

18  him that.  And I am trying to explain his answer as to why he

19  believed that these transactions were deceptive, especially

20  because the allegation is that we willfully and intentionally

21  violated the stay by sending letters that this witness

22  authorized.  So understanding his understanding is very

23  important to Your Honor's determination of the actual --

24          THE COURT:  Well, I sustain the objection.

25          MR. RUKAVINA:  And Mr. Morris opened this door.

Post - Direct                                    217

1          THE COURT:  You can ask him why he thought the

2    actions were deceptive, but he's starting to go into what may

3    or may not be CFRs and conflicts of interest.  No.  This is

4    going well beyond asking him, Why do you think it was

5    deceptive?  And I agree:  It's straying into expert testimony.

6    BY MR. RUKAVINA:

7    Q    Mr. Post, you are familiar with the December 22nd AVYA

8    and SKY sales and transactions which you were asked about by

9    Mr. Morris and that you previously have testified about,

10   correct?

11   A    Correct.

12   Q    Okay.  How are you familiar with those sales and

13   transactions as they were occurring?  How did you learn about

14   them?

15   A    There was some internal email correspondence.  If I recall

16   from memory, at the bottom it provided fill information that

17   Jefferies provided to, I believe, Mr. Seery and others on the

18   email.  And then it kind of worked its way up to get the

19   trades that had been executed administratively booked into the

20   OMS.

21   Q    Why did you get involved with those transactions?

22   A    They were requesting that employees of HCMFA book those --

23   I'm sorry, Highland Capital Management Fund Advisors -- book

24   those into the system.  And those employees were not a party

25   to the trade.  I don't believe --

Post - Direct                                    218

1  Q    Well, let me pause you.  Let me pause you.  Those two

2  employees, who were they?

3  A    Joe Sowin and Matt Pearson.

4  Q    Were they at that time employees of the Debtor?

5  A    They were not.

6  Q    Okay.  So, how did you come to learn about this ask that

7  those two employees book -- book it?

8  A    I believe there was an email that was sent to me, or I was

9  on it.  I can't recall specifically.

10 Q    Okay.  And did you undertake any review as to whether

11 those two employees should or should not do what was being

12 asked of them?

13 A    Once it was brought to my attention, I discussed with -- I

14 looked at it.  It looked like, pursuant to prior

15 correspondence with -- that Joe Sowin made, he wasn't aware of

16 the trades.

17     You know, I also had a discussion with K&L based off of --

18 our legal counsel based off of a prior letter that was sent,

19 and just it didn't -- it didn't look right that they would be

20 booking trades on behalf of the two Advisors that are named in

21 the letters when they had nothing to do with it and weren't --

22 weren't a part of any of the pre-trade compliance checks, et

23 cetera.

24 Q    What is a pre-trade compliance check?

25 A    Well, there's an electronic system, a -- or a management

1  system we have, the OMS, which is called Verda (phonetic).

2  And generally, trades are entered into the system by the

3  portfolio manager, and they then go through pre-trade

4  compliance checks.  And once those compliance checks are

5  passed, they're then routed to the trading desk for direction

6  or execution, where the executing brokers and the trading desk

7  will then monitor that execution over the course of the day.

8  And at the conclusion of the trading day, those trades, if

9  they weren't already allocated, would be allocated, and then a

10 trade would be sent to custodian prime brokers to identify the

11 trades that occurred in the respective Funds for those -- or,

12 on that day, and then they would then be dropped into the

13 database and our -- the settlement team would kind of work to

14 settle those trades or ensure that those trades were settled

15 based off of the stipulated time frame for settlement on the

16 trades.

17 Q    So, in all that course of a transaction, what exactly was

18 it that those two employees of the Advisors were being asked

19 to do on behalf of the Debtor?  What exactly were they being

20 asked to do?

21 A    To just book them in the system because they are trades

22 that already have been executed.

23 Q    Did you stop that?

24 A    I believe I responded and said, you know, it -- they're

25 employees of, if I recall, employees of one of the named

Post - Direct                                       220

1   Advisors, and believe those trades are in the best interest of

2   those Advisors, and separately, you know, the Debtor has

3   designated operators/traders that should be able to enter

4   those trades as well, aside from Mr. Sowin and Matt Pearson.

5   Q    So can you think of any reason why Mr. Seery would ask

6   your employees, as with his own employees, to book these

7   trades?

8   A    I believe based off of past practice.

9   Q    Okay.  But nevertheless, those two trades did not comply

10  with internal compliance?

11  A    They weren't run through the OMS.  We try and route trades

12  through the order management system because there's pre-trade

13  compliance checks that can be performed, and it reduces any

14  sort of back-end reallocation or trade errors that may occur

15  as a result of, you know, trades being entered after the fact,

16  because quantities could be, you know, referenced incorrectly

17  or funds could be identified incorrectly.

18  Q    Based on prior practices, have these internal policies

19  been followed when perhaps employees of the Debtor asked

20  employees of the Advisors to take a particular action in the

21  course of a transaction?

22  A    Yes.

23  Q    When internal practices are not followed, what is your

24  job?  What are you supposed to do?

25  A    When internal practices are followed, --

Post - Direct                              221

1  Q    Are not followed.

2  A    Oh.  Not followed?  To the extent that they're not

3  followed, we would question, you know, number one, why weren't

4  they followed?  You know, we -- we try and have all trades

5  booked in the OMS so that the necessary checks could be

6  performed, and as I mentioned earlier, to avoid any

7  reallocation or trade errors.  So I would then question, you

8  know, why was this done outside of the system?

9  Q    And if you did not get an appropriate response back to

10 your question, what are you supposed to do?

11 A    If I didn't get an appropriate response, would, you know,

12 research it further and elevate it to senior management and/or

13 any of the board if it was ultimately an issue.

14 Q    Are you supposed to stop trades or stop the process if you

15 see something that you believe is not compliant with your

16 obligations and the fiduciary obligations of the Advisors?

17 A    Yes.

18 Q    Have you done that in the past?

19 A    Yes.

20 Q    Have you done that frequently, or infrequently?

21 A    I would say it's -- it's infrequent, but they do occur.

22 For example, if a fund is trading in a security that it's not

23 permitted to invest in based off of a prospectus limitation,

24 it would get flagged in the OMS and we would then not permit

25 the trade to go forward because it could cause the breach to

Post - Direct                                        222

1  go further offsides or it could cause it to go offsides.

2  Q    Okay.  And these December 22nd trades, were they the type

3  of, in your past experience, problematic trades like you have

4  interfered or stopped or intervened to stop in other

5  situations in the past?  Do you understand my question?  That

6  was an inartful question.  Do you understand it?

7  A    If the question is because they were done outside of the

8  system?

9  Q    Yes.

10  A    And repeatedly?

11  Q    Yes.

12  A    I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q    Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18          THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20          MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q    For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24          MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

Post - Direct                                    223

1  to answer this question.

2          THE COURT:  Overruled.  If he knows.

3          THE WITNESS:  I do not know.

4  BY MR. RUKAVINA:

5  Q    Okay.  Do you have a reason to believe that he did?

6  A    I don't know.  I just saw the email traffic and Mr. Sowin,

7  I believe, was questioning the trades, you know, more in the

8  sense that he wasn't aware of them.  So, I don't -- I don't

9  know what kind of conversations, what happened in the

10 background, just that he -- he didn't recognized that rates.

11 Q    Let me try it this way.  You determined that these trade

12 would have violated the Advisors' policies and procedures,

13 correct?

14 A    Yes, because they were done outside of the OMS.

15 Q    Did Mr. Dondero tell you to come to that conclusion?

16 A    He did not.

17 Q    Did Mr. Dondero pressure you to come to that conclusion?

18 A    He did not.  He had indicated that there -- there are

19 these trades, and you should take a look at it from a legal

20 compliance perspective, which I did.

21 Q    And you talked to K&L Gates?

22 A    Correct.

23 Q    And when Mr. Dondero told you to look at these trades, did

24 he suggest to you in any way, shape, or form what you should

25 conclude or decide to do, if anything, with respect to these

Post - Direct                                    224

1  trades?

2  A    I don't believe so.

3  Q    Okay.  Let's go back to that question about your view that

4  some of what Mr. Seery was doing was deceptive under the 1940

5  Investors Act.  When did you form that view?

6  A    I believe it was after it was identified that there was

7  not (inaudible) on certain of the trades that were entered

8  into at the end of the November time frame, the SKY and AVYA

9  trades.

10 Q    And why did you form the opinion that those trades that

11 Mr. Seery was attempting to do or had done were deceptive

12 under the statute that Mr. Morris asked you about?

13 A    It was pursuant to reviewing them and supplemental

14 discussion.  A review with the portfolio managers and then

15 supplemental discussion with K&L be it from a (inaudible)

16 perspective, through, you know, perform in the best interest

17 of your clients, it was expressed that, at least with respect

18 to preference shareholders, they were supposed to maximize

19 value, and those sales, they're not really maximizing value.

20      And it was also identified that the Debtor was planning to

21 liquidate the CLOs based off of a filing within the Court

22 within a few-year period.  And the investors -- or, the Funds

23 that invested and the preference shareholders, or preference

24 shares, had a longer-time view in those assets.

25      So the sales, coupled with the short duration, or the

Post - Direct                                            225

1  anticipated, you know, two-year duration, didn't line up with

2  the investment objective that they were seeking to maximize

3  returns.

4  Q   To your understanding and your experience, does the

5  servicer of the CLOs owe fiduciary duties to anyone?

6          THE COURT:  Okay.  I cannot -- someone is flipping

7  paper.  Please stop flipping paper.  Okay.  Repeat your

8  question, Mr. Rukavina.

9          MR. RUKAVINA:  Thank you, Your Honor.

10 BY MR. RUKAVINA:

11 Q   In your experience and in your knowledge, does the

12 servicer of the CLOs owe fiduciary duties to anyone?

13 A   They should, yeah, the underlying investors in the CLO,

14 whether it be the Debtor or the equity holders.

15 Q   Do the Advisors owe fiduciary duties to anyone?

16         MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I

17 really do move to strike.  He's not a lawyer.  There is no

18 foundation.  He's not here as an expert.  There's no basis for

19 this witness to be talking about who owes who fiduciary

20 duties.  I don't even think that's the law, what's just been

21 stated.

22         THE COURT:  Okay.  I sustain.

23         MR. RUKAVINA:  Okay.

24 BY MR. RUKAVINA:

25 Q   Well, let me make it very easy, then.  Do you have an

Post - Direct                                226

1  understanding as to whether Advisors subject to the 1940 Act

2  owe a fiduciary duty?

3  A    Yes.

4  Q    Do you have an understanding of how a conflict of interest

5  plays into a fiduciary duty?

6  A    Yes.

7  Q    What is your understanding?

8  A    If there's a material conflict of interest, it should be

9  disclosed.

10 Q    And what did you conclude with respect to Mr. Seery and

11 the Debtor once the Debtor stated that it will liquidate

12 within two years?

13 A    That's not the investment horizon that the underlying

14 preference shareholders have, especially with respect to the

15 underlying assets held in those CLOs.  More or less, you're --

16 they're now put on a clock, and those preference shareholders

17 may have a longer-term view on the underlying assets of those

18 CLOs.

19 Q    Let's move on to those December 22nd and December twenty

20 -- well, let me strike that.  You heard Mr. Seery testify that

21 those December 22nd trades closed, correct?

22 A    I did.

23 Q    And did you independently look at whether that's true?

24 A    I did.

25 Q    And what did you conclude?

Post - Direct                                          227

1   A    They showed a sale in the -- on the intranet.

2   Q    Okay.  Let's move on to the December 22nd and December

3   23rd letters.  Are you familiar with those letters from K&L

4   Gates to counsel for the Debtor?

5   A    I am.

6   Q    And did you participate in preparing those letters?

7   A    I did.

8   Q    Okay.  And I think Mr. Morris asked you and I think you

9   testified you supported or agreed with the sending of those

10  letters.  Is that generally accurate?

11  A    Yes.

12  Q    Why?  Why did you support sending those letters?

13  A    It wasn't in the best interest of the Funds pursuant to

14  discussions with the portfolio managers and the investment

15  objectives that they were looking to seek any of those

16  investment in the preference -- preference securities and

17  CLOs.

18  Q    Was that a purpose that you were trying to achieve by

19  sending those?

20          THE COURT:  Repeat the question.

21          THE WITNESS:  Ah, --

22          THE COURT:  Repeat the question.

23  BY MR. RUKAVINA:

24  Q    Was that a purpose that you were trying to achieve by

25  sending those letters?

Post - Direct                          228

1  A    Yes.  I believe there was something towards the end of one

2  or both letters that said, to the extent, you know,

3  transactions occur, if, for lack of better words, a courtesy

4  heads up could be given to the Funds and the Advisor.

5  Q    Did you intend in any way to intimidate the Debtor by

6  authorizing or supporting the sending of those letters?

7  A    No.

8  Q    Did you intend in any way to violate the automatic stay by

9  sending those letters?

10  A    No.

11  Q    Were you trying to engage the Debtor in a dialogue at that

12  time as to what to do with these CLO management agreements?

13  A    Yes.  I believe that was stated at one -- at the end of

14  one or both of the letters.

15  Q    And I think Mr. Morris discussed with you that the Debtor

16  sent back letters asking you to withdraw these two letters.

17  Do you recall that discussion?

18  A    Yes.

19  Q    And do you recall saying that we never withdrew these

20  letters, right?

21  A    Correct.

22  Q    Why did we not withdraw these letters?

23  A    Because we don't believe that the trades that are being

24  entered into are in the best interest of the shareholders --

25  *i.e.*, the Funds.

Post - Direct                                        229

1  Q    To your knowledge, did we ever, or did you ever,

2  communicate to the Trustees or Issuers anything in the nature

3  of instructing them to terminate the CLO management agreements

4  with the Debtor?

5  A    I did not.

6  Q    To your knowledge, did anyone, for the Funds or Advisors?

7  A    I don't believe so.

8  Q    Did you or anyone to your knowledge communicate to the

9  Issuers or Trustees that the process of removing the Debtor as

10 manager should commence?

11 A    I don't believe so.

12 Q    Okay.  To your knowledge, have any of the Issuers or

13 Trustees undertaken any steps to remove the Debtor or

14 terminate these contracts?

15        MR. MORRIS:  Objection to the extent it calls for the

16 conduct or knowledge of the Issuers.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I don't believe so.

19 BY MR. RUKAVINA:

20 Q    Had they, is that something that you would have expected

21 them to inform the Funds of?

22 A    Yes.  The Funds would have received some type of

23 notification if there was a new Advisor on the CLOs.

24 Q    So, other than these two letters -- let me stop there.

25 Did any discussion of trying to terminate these contracts

Post - Direct                                    230

1    basically cease with the sending of these two letters and the

2    Debtor's responsive letters?

3    A    That's my understanding, yes.

4    Q    Okay.  And we never did file a motion for lift stay.  Can

5    you explain to the judge why we didn't file a motion for

6    relief from the stay?

7    A    It's my understanding that the intent was that the

8    management of the CLOs was going to be heard in conjunction

9    with the confirmation hearing.

10   Q    And do you recall when that confirmation hearing was

11   originally set for?

12   A    I believe it was supposed to start today.  Or tomorrow.

13   Q    Well, wasn't it earlier in January?  Around January 11th?

14   A    Uh, I -- I don't recall specifically.

15        MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16   Form CLO agreement.  What exhibit is that?

17        (Pause.  Counsel confer.)

18        MR. RUKAVINA:  No, that's not.

19        THE COURT:  Can I ask what we're about to start

20   doing?

21        MR. RUKAVINA:  Eight.

22        THE COURT:  Can I ask what we are about to start

23   doing?

24        MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25   to find one of the CLO portfolio management agreements.  I'm

Post - Direct                                    231

1  trying to pull it up for you.

2          THE COURT:  Okay.

3          MR. RUKAVINA:  It should be in your binder.

4          THE COURT:  All right.  Well, --

5          MR. RUKAVINA:  Where is it, Julian?

6          MR. VASEK:  It should be 8.

7          MR. RUKAVINA:  I'm sorry?

8          MR. VASEK:  8.

9          MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10  binder.

11          THE COURT:  Exhibit --

12  BY MR. RUKAVINA:

13  Q    And Mr. Post, you have that in front of you, right?

14          MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15  please.  Section 14.  Termination by the Issuer for Cause.

16          MR. VASEK:  Okay.

17          MR. RUKAVINA:  Your Honor, the contract speaks for

18  itself, and I'm not about to read the contract to the Court.

19  The Court can read.  I want to ask him certain questions about

20  this.  And you'll note that the contract gives the requisite

21  holders of voting preference shares certain rights.

22          MR. MORRIS:  Your Honor, respectfully, the witness

23  has testified that he hadn't seen any of these contracts for

24  five or six years, until the lawyers asked him to look at it,

25  and they told him which specific provisions to look at.

Post - Direct                                    232

1      The document does speak for itself.  Counsel should just

2  make it part of his closing argument.  There's no evidence

3  that there's a quote/unquote Form CLO Management Agreement.

4  And I would just respectfully suggest that this is better

5  saved for closing argument.

6           THE COURT:  Yes.  What are we going to do here?  He

7  did not seem like he was an expert on these CLOs in his

8  earlier testimony.  He hadn't read much of them until

9  recently.  So where are we going with this?

10          MR. RUKAVINA:  Well, Your Honor, the question, again,

11 is -- can you hear me?  The question again is, Are we going to

12 be enjoined from exercising any rights in the future, so I

13 would like to take the witness through the importance from a

14 regulatory perspective and a fiduciary perspective of some of

15 these rights.  If Your Honor thinks that that's for closing

16 argument, that's fine.  But I will note that that Your Honor

17 allowed Mr. Morris for some forty minutes to read prior

18 testimony into the record.

19          MR. MORRIS:  I'm happy to respond if Your Honor needs

20 me to.

21          THE COURT:  Go ahead.

22          MR. MORRIS:  There is a complete difference, Your

23 Honor.  To read statements against interest, to read defense's

24 own sworn statements that they made at a prior proceeding, as

25 opposed to trying to get a witness who has admitted that he's

Post - Direct                              233

1  not familiar with these documents, to try to convince the

2  Court that they said something that the witness doesn't have

3  any personal knowledge or expertise about.  It's completely

4  different.

5          THE COURT:  All right.  I sustain the objection.  You

6  can make whatever argument you want in the closing arguments

7  about whatever provisions of whichever CLO agreements justify

8  actions.  I guess that's where we're going.

9          MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10 and if Your Honor could turn to Exhibit 78.

11         THE COURT:  All right.

12         MR. RUKAVINA:  Is this a confidential -- Julian, what

13 does it mean, it's confidential?  78.  Is this confidential?

14         MR. VASEK:  It says confidential on the --

15         MR. RUKAVINA:  Your Honor, apparently this is a

16 confidential document, so how does the Court want to proceed

17 on this WebEx?

18         THE COURT:  All right.  We're stopping.  We're

19 stopping.  We have protocols in place in this case, and people

20 usually file motions to present things under seal or

21 redactions.  My patience is shot, so we're going to stop.

22 Let's talk about where we go from here.

23         MR. MORRIS:  If I may, Your Honor?

24         THE COURT:  Yes.

25         MR. MORRIS:  John Morris from Pachulski Stang --

234

1          THE COURT:  Uh-huh.

2          MR. MORRIS:  -- for the Debtor.

3          MR. RUKAVINA:  We filed this under seal, right?

4          MR. MORRIS:  We were --

5          MR. RUKAVINA:  Oh, I thought we had.

6          MR. MORRIS:  -- hoping that we would get this

7  finished today, Your Honor, and the Debtor was really hoping

8  to get a ruling before confirmation.  But given all that's in

9  front of us, including the contempt hearing next Friday, just

10 a couple of days after the confirmation hearing, I think the

11 Debtor at this point is prepared to agree, if it's okay with

12 the Defendants' counsel, to push this to the following week,

13 since the -- you know, with the understanding that everybody

14 stipulate on the record that the TRO stays in place.  And if

15 we could have this particular motion heard, I guess, somewhere

16 -- it's the week of February 8th, the Debtor would consent to

17 that.

18         THE COURT:  All right.  Do we already have a --

19         MR. RUKAVINA:  Your Honor, can the Court --

20         THE COURT:  -- setting that week?  Because I know we

21 have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22 Three days next week.

23         MR. MORRIS:  I believe -- yeah.  I think it's just

24 two, Your Honor.  I think --

25         THE COURT:  Okay.

235

1          MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

2   and then I think the 5th is the contempt hearing.  I'm not

3   aware, but I don't -- I don't profess to know the entirety of

4   the calendar.  I'm not aware of anything that's on for the

5   following week.

6          THE COURT:  Does it make sense to continue this to

7   the 5th?  Because the issues are so overlapping here.  I feel

8   like it's been a contempt hearing half of today, actually.

9          MR. MORRIS:  Yeah.

10          THE COURT:  So, shall we just set it for -- is it

11  Friday, the 5th?

12          MR. MORRIS:  It is.

13          THE COURT:  At 9:30?

14          MR. MORRIS:  And I think that's a great idea, yeah.

15  Yeah.

16          THE COURT:  What do you want to say about that, Mr.

17  Rukavina?

18          MR. RUKAVINA:  Thank you, Your Honor.  We're fine

19  with that.

20      Let me just point out, so that if the Court is impatient

21  or frustrated, we did move Exhibit 78 to be filed under seal.

22  The Court did enter an order allowing it to be filed under

23  seal.  So that the Court doesn't think that somehow we were

24  negligent in that.

25      But February the 5th works for us.

1          THE COURT:  Okay.  All right.  So I have an

2    unredacted clean copy up here, which, if and when I admit it,

3    we will put it under seal in our exhibit room, or I guess our

4    electronic exhibit room.

5        So, we'll come back on the 5th at 9:30.  But I am not -- I

6    am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

7    have asked myself "Why are we here?" so many times today.  Why

8    are we here?  I mean, I've had this conversation before.  I

9    mean, we had a, as you know, a very lengthy hearing on the

10   motion for a TRO or preliminary injunction against Mr. Dondero

11   personally.  And I think it was Mr. Morris who said, it's a

12   little bit like Groundhog Day.  You know, that was actually a

13   more flattering way of describing it than I might have.  I

14   might have said this is reminding me of Albert Einstein's

15   definition of insanity.  You all know what I'm talking about?

16   When you're doing the same thing over and over again and

17   expecting a different result.

18       And, you know, no offense, Mr. Dondero, if you're still

19   there listening, but that's what it feels like to me.  I mean,

20   it is -- it's the same thing over and over again.  And we've

21   spent very, very, very little time talking about the January

22   9th, 2020 corporate governance settlement agreement.  Of

23   course, it was mentioned extensively in the pleadings, at

24   least by the Debtor.  But, you know, I've heard all of this

25   evidence today, and I'm going to hear more evidence,

1   apparently, on the 5th.  But Paragraph -- was it 9? --

2   Paragraph 9 of the January 9th, 2020 settlement agreement.

3   The order directed Mr. Dondero not to "cause any related

4   entity to terminate any agreements with the Debtor."

5        And, you know, I thought to myself as I was reading,

6   preparing for this hearing, that, you know, I seem to remember

7   those words meant so, so much to me.  And then this reply

8   brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9   night, and it gave an excerpt of the transcript, the hearing

10  where I approved this corporate governance settlement

11  agreement, and I said, that language is so important to me

12  because of my history in the *Acis* case, I want it in the

13  order.  I don't even -- I don't want it merely in the term

14  sheet, and then, of course, the order cross-references,

15  approves the term sheet.  I want that in the order.  Because,

16  you know, I knew, even with this highly-qualified independent

17  board of directors, and even with this very sophisticated

18  Creditors' Committee with very sophisticated professionals

19  monitoring everything that happened, and having not just the

20  monitoring rights but the standing to pursue things, I knew,

21  even with this great system that had been negotiated in the

22  January term sheet, there was the possibility of things

23  happening through Dondero-controlled entities indirectly.  And

24  so that's why we had that Paragraph 9.  So, --

25       (Interruption.)

238

1           THE COURT:  I don't know what that was I just heard,

2   but someone needs to put me on mute.

3       So, I mean, we've heard a lot.  We've heard a lot, but --

4           MR. DONDERO:  Hello?  Your Honor?  Your Honor?

5           THE COURT:  Okay.  I --

6           MR. DONDERO:  Hi.  Jim Dondero.

7           THE COURT:  Oh, okay.  I'm still talking.  I'm still

8   talking.  But I --

9           MR. DONDERO:  Okay.

10          THE COURT:  But I said --

11          MR. DONDERO:  I'm sorry.

12          THE COURT:  I said at the hearing on the preliminary

13  injunction as to Mr. Dondero personally, do you remember what

14  I said, I said life changed when you put your company in

15  Chapter 11.  And, you know, even if you had stayed on as

16  president of the Debtor, life changed.  Okay?  Because you're

17  a debtor-in-possession.  You have to say, "Mother, may I?" to

18  the Court.  Creditors get to object to things.  So things

19  changed.

20      But things really, really, really changed, you know, they

21  changed in October 2019, and then they changed dramatically in

22  January 2020, when independent board members were put in place

23  and you were taken out of management.

24      So, the reason I'm coming back to that concept is this:

25  I've heard a lot about the preferred shareholders didn't like

239

1  the trades Mr. Seery was implementing, the sale of AVYA, the

2  sale of SKY.  They didn't like it.  Well, I mean, I hate to

3  say something flippant like tough luck, but really:  Tough

4  luck.  Okay?  We all know that with a company like this, with

5  a company like Acis, it's complicated, right?  Because you've

6  got a fiduciary duty to your creditors to maximize value of

7  the estate so creditors get paid in Chapter 11, right?  But

8  meanwhile, you know, you've got to have fiduciary duties, I

9  don't know if it's directly to preferred shareholders or just

10 to the CLOs.  But whatever it is, you know, there may be

11 differing views that individual preferred shareholders have.

12 But Mr. Seery is in charge.  The Debtor is in charge.  You

13 don't like it, I'm sorry, but he's in charge.

14     So, you know, I thought, am I going to come in here today

15 and see all kinds of specific contractual references, where, I

16 don't know, somehow you have an argument that you can control

17 buys and sells?  Of course, in this case, it would just be

18 sells at this point.  You know, no.  I knew I wasn't going to

19 see that.  And I haven't.

20     So I don't know what I'm going to hear more on the 5th

21 that is going to tilt me a different way, but right now, if I

22 had to rule right now, this would be a total no-brainer to

23 issue this preliminary injunction.  Okay?  I feel like it's

24 been teed up almost like find Dondero in contempt, find these

25 entities in contempt.  What I'm here on today is whether I

240

1   should issue a preliminary injunction, and the December

2   letters, the emails, the communications, they lead me to

3   believe that this preliminary injunction is needed because

4   someone doesn't understand that Mr. Seery is in charge and the

5   preferred shareholders, the Funds, the Advisors, they don't

6   have the ability to interfere with what he's doing in running

7   the company.

8       And the threats of we're going to, you know, direct -- we

9   may direct the CLO Issuer to terminate the Debtor:  I mean,

10  it's just -- there's no sound business justification for that.

11  Okay?  I don't know what we're doing, where we're going.

12      Mr. Dondero, I said to you in December, you know, I really

13  wanted to encourage good-faith negotiations on your possible

14  pot plan because I thought you wanted to save your baby.  But

15  the more I hear, the more I feel you're just trying to burn

16  the house down.  Okay?  Maybe it's an either/or proposition

17  with you:  I'll either get my company back or I'll burn the

18  house down.  That's what it feels like.  And I have no choice

19  but to enter preliminary injunctions with this kind of

20  behavior.

21      So, I'm very frustrated.  I'm very frustrated.  I don't

22  know if anyone wants to say anything or we just end it on this

23  frustrating note.

24      Mr. Rukavina, did you want to let your client speak, or

25  no?

1          MR. RUKAVINA:  Your Honor?

2          THE COURT:  Not your client.

3          MR. RUKAVINA:  No, but --

4          THE COURT:  The client representative.

5          MR. RUKAVINA:  Your Honor, I take issue with what the

6    Court has said, but we did file a motion yesterday to file a

7    plan under seal.  It is -- Mr. Dondero, can you mute your

8    phone?  The Court should have seen that by now.  It is a pot

9    plan with much more cash consideration.  We have discussed it

10   with the Debtor and the Committee.  We are in earnest

11   negotiations.  I have no reason to believe or disbelieve that

12   we're close to a settlement.

13       But recall what I said at the beginning.  We asked the

14   Debtor to continue this hearing.  We said, You have a TRO that

15   ends February the 15th.  Why are you doing this?  Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it.  And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views.  So there is a competing plan.  We

20   want to try --

21          THE COURT:  You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23          MR. RUKAVINA:  That's fine.

24          THE COURT:  -- to permit that.

25          MR. RUKAVINA:  And I understand, Your Honor.  I don't

242

 1   want -- Your Honor has made her evidentiary rulings.  I'm not

 2   here to second-guess them.

 3       I'm telling you that Mr. Dondero -- and more importantly,

 4   the other companies, *i.e.*, NexPoint -- we heard you loud and

 5   clear.  We did not just send forward some cocktail-napkin term

 6   sheet.  I spent the weekend and Friday preparing a

 7   comprehensive plan and disclosure statement.  I hope that the

 8   Court will allow it to be filed under seal.  Exclusivity has

 9   expired.  I am asking to file it under seal only.

10           THE COURT:  Tell me what utility that has.  What

11   utility does that have if you don't have one plan supporter?

12   I mean, where are we going with this?  I have invited, I have

13   encouraged, I have directed good-faith negotiations with the

14   Committee.  If you don't have the Committee on board, what

15   utility is there in allowing you to file a plan under seal?

16           MR. RUKAVINA:  Well, if it's filed under seal, Your

17   Honor, then, really, no one is going to be prejudiced or hurt.

18   But we have not been told --

19           THE COURT:  Then why --

20           MR. RUKAVINA:  -- from the Committee --

21           THE COURT:  Then why are we doing it?  Help me to

22   understand the strategy.  Maybe I'm just naïve.

23           MR. RUKAVINA:  Your Honor, there is no strategy and

24   the Court is not naïve.  Pursuant to an agreement of the

25   Committee and the Debtor, I sent that draft plan to them over

243

1  the weekend, and they agree it's not solicitation.  It has not

2  gone to the creditors.  No one has seen it.

3      The reason why we sent it to the Committee and the Debtor

4  was to foster ongoing negotiations.  We had negotiations last

5  night.  The Committee and the Debtor had negotiations last

6  night.  We've been promised a response in the next couple of

7  days, and we have a follow-up meeting scheduled for Thursday.

8      The reason why I wanted the plan filed under seal is so

9  that there is a record of what is being discussed so the U.S.

10  Trustee can see it, if she wants to, and so that other key

11  constituents, if they want to or have a reason to, can see it.

12      But I agree with you:  That plan ain't going nowhere if we

13  don't have some material creditor support.  We won't know that

14  for a couple more days.

15      So my only point in saying this to Your Honor is that we

16  are working earnestly, we are increasing our consideration, we

17  have heard you loud and clear, and all the parties are

18  negotiating.

19      Again, we did not want this hearing to happen today

20  because it's a step backwards from negotiations, not a step

21  forward.  Thank you.

22          MR. POMERANTZ:  Your Honor, may I be heard?

23          THE COURT:  Go ahead, Mr. Pomerantz.  Go ahead.

24          MR. POMERANTZ:  Mr. Rukavina sent us over the plan,

25  and we had no problem with it being sent to the Committee.  He

1   then sent us over the motion.  Now, aside from the fact that

2   the motion contains some statements which the Debtor strongly

3   disagrees with, with respect to the ability of administrative

4   claims or other claims to be assumed, but putting that aside,

5   we were concerned that the filing of a plan on the docket,

6   unsealed, would be a distraction.

7       Having said that, we also saw utility in the plan being

8   put in the hands of the largest creditors so that they can

9   evaluate what was being proposed.

10      We told Mr. Rukavina we have no problem if the plan was

11  filed under seal, stayed under seal until after confirmation,

12  and then, in exchange, we would agree to something that we

13  don't think we had to agree:  That he could send the plan to

14  UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15  Daugherty.  Essentially, all the players in the case.  Mr.

16  Rukavina said he would consider that, and then just filed his

17  motion.

18      We don't have any problem with him doing that still,

19  sending it to the six creditors so they can look at it.  We

20  don't think it should be unsealed on the docket.

21      And the discussion of status of negotiations, Your Honor,

22  as we've told you many times before, we would love there to be

23  a plan.  We would love there to be support of a plan.  Mr.

24  Dondero asked to approach the board and speak to the board

25  yesterday.  We heard him out.  The plan essentially is the

1   same document and the same term sheet, I think, that has been

2   floating around for several weeks.

3        Having said that, we said, We are not going to stand in

4   the way of Mr. Dondero and the Creditors' Committee.  And if

5   the Creditors' Committee and Mr. Dondero have a meeting of the

6   minds, if there's any desire of them to have more time, we

7   would be supportive of it.  I'll let Mr. Clemente respond as

8   to whether there's any negotiation -- (echoing.)  But when Mr.

9   Rukavina said that last night there were negotiations between

10  the Debtor and Mr. Dondero, that's just not accurate.  We, we

11  look at ourselves as the honest broker.  But at the end of the

12  day, as Your Honor has remarked many times throughout this

13  case and just remarked a few moments ago, unless the

14  Creditors' Committee supports this plan, it is DOA.  And we

15  have communicated that several times to Mr. Dondero and his

16  team.

17       So, I just wanted to speak to correct the record.  We're,

18  again, supportive of a plan if there can be one.  But at this

19  point, we haven't seen anything, the parties coming any closer

20  or any more negotiations, and we just have to get confirmed

21  sooner rather than later (echoing), prepared to go forward.

22            MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23  Sidley.  I'm happy to make some comments to Your Honor, --

24            THE COURT:  Okay.

25            MR. CLEMENTE:  -- if you -- if you wish.

246

1          THE COURT:  Please do.

2          MR. CLEMENTE:  I think it's fair to say that the

3   Committee believes the plan needs to go forward next week,

4   Your Honor.  We have, of course, taken your direction very

5   seriously, and we very seriously consider all of the

6   communications we get from Mr. Dondero.  There exists still a

7   material value gap in what is being offered under Mr.

8   Dondero's plan, as well as a quality of the value.

9       So, Your Honor, while we continue to consider the plan and

10  what we receive from Mr. Dondero, I do not want to leave Your

11  Honor with the impression that the Committee feels like we are

12  close to an agreement, and we anticipate going forward with

13  the plan next week.

14      That being said, we of course will respond to Mr. Dondero

15  as we review the plan, but as I sit here today, I don't

16  believe that we are close.  But, again, the Committee will

17  continue to review it, and we should anticipate going forward

18  with confirmation next week.

19          THE COURT:  All right.  So, you don't have any

20  problem with the plan being filed under seal?

21          MR. CLEMENTE:  Your Honor, we -- the Committee does

22  have the plan, and I guess I'm not sure I'd see the point of

23  having it filed it under seal.  I think it serves to confuse

24  issues.  But, you know, hearing what Your Honor said earlier,

25  I don't think we need to continue to bring different fights in

247

1   front of Your Honor, so I'm not sure that I see necessarily

2   the harm in a plan being filed under seal, again, with the

3   idea that, you know, why bring -- continue to bring fights to

4   Your Honor if we don't need to?

5            THE COURT:  All right.

6            MR. CLEMENTE:  But what I do think is clear, Your

7   Honor, that I do want to express to you is that the

8   representations in that motion the Committee do not believe

9   are accurate.  We do not believe that there's been a

10   significant value increase.  We do not believe that we are

11   close.  That would be the point that I would make in

12   connection with a response to that motion.  So, but in terms

13   of filing it under seal, I'm not sure the Committee has a

14   strong feeling that that should not happen.

15            THE COURT:  Yes.

16            MR. RUKAVINA:  And Your Honor, very quickly, --

17            THE COURT:  The words --

18            MR. RUKAVINA:  -- I never represented that we're

19   close.

20            THE COURT:  The words I remember in the motion were

21   significant value increase, something to that effect.  But

22   also more recovery than the plan that's on file.

23       (Echoing.)

24            THE COURT:  So I was kind of darn curious to see it

25   just for that.

248

1          MR. RUKAVINA:  And Your Honor, obviously, because

2   there's many people on this call, I don't want to run afoul of

3   any kind of procedures.  I'd be happy to walk Your Honor

4   through, but I can't, not with 90 people on the call.

5          THE COURT:  Right.

6          MR. RUKAVINA:  I did not represent that we're close

7   to a settlement in that motion, and I did not send the plan to

8   those people that Mr. Pomerantz mentioned.

9      So, right now, the Committee, the Debtor, and the

10  employees, because they requested it after Mr. Pomerantz

11  approved it, have what I would like to file under seal.  I'm

12  not suggesting here today that it go any farther than being

13  filed under seal, but at least it be there for some record.

14         THE COURT:  Well, didn't you -- did I dream this? --

15  didn't you say that there would be something like 48 hours for

16  people to object or then it would be filed not under seal?

17  Did I dream that?

18         MR. RUKAVINA:  Your Honor, that was my proposal, and

19  Your Honor can certainly reject that.  Mr. Pomerantz asked

20  that the plan should never be unsealed pending confirmation of

21  the Debtor's plan.  I have a different proposal.  Your Honor

22  will rule and we'll comply with Your Honor's ruling.

23         MR. DONDERO:  Jim Dondero here.  Can I have two --

24  two quick minutes and just say two quick things?

25         THE COURT:  Well, only if your counsel permits it.  I

249

1   don't want to get in --

2          MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3   you would please just not describe the substance, the economic

4   substance of our proposed plan, not with so many people on the

5   line.

6          MR. DONDERO:  Sure.  I just want to make two quick

7   points.  I couldn't apologize more for taking the Court's time

8   today.  It wasn't our 'druthers.  You heard, I think, at least

9   five or six hours from the Debtor.  You never once heard them

10  say that their activities didn't violate the Advisers Act.

11  And they never once said that violating the Advisers Act

12  wasn't a big deal.  You know, they never said that.

13     What they tried to say, oh, we have these other contracts.

14  Let's try and turn this into an injunction against Dondero

15  interfering.  But they never -- they never denied that Dondero

16  and the NexPoint team was trying to do what was in the best

17  interest of investors and that they had violated the Advisers

18  Act.

19     I think, in normal course, each side would have had an

20  expert and you could have opined on whether it was a violation

21  of the Advisers Act, but they know they did something wrong so

22  they're trying to make it an injunction against me.   Okay.

23  That's all I have to say about that point.

24     As far as the alternative plan, Your Honor, we heard you

25  loud and clear.  And the economics that we put forward, I

250

1   can't talk them about specifically, but they're at least 20

2   percent better than what the Debtor has put forward as far as

3   a plan.  And what we put forward is elegant, it's simpler, it

4   treats the employees fairly, it gives the business continuity,

5   it gives investors continuity, and it's not just a harsh,

6   punitive liquidation that's going to end up in a myriad of

7   litigation.

8        We're paying a premium, it's a capitulation price, to try

9   and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17       You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23            THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

**Appx. 03664**

251

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10  it's not going to be unsealed absent an order of the Court.

11  Okay?  So we'll just leave it at that for now.  And while I

12  still encourage good-faith negotiations here, I've said it

13  umpteen times, where you're tired of the cliché, probably:

14  The train is leaving the station.  And if you want the Court

15  to have patience in the process and if you want the parties to

16  cooperate in good faith, it might help if we didn't have

17  things like Dugaboy and Get Good Trust filing a motion for an

18  examiner 15 months into the case.

19       I mean, it feels to me, Mr. Dondero, whether I'm right or

20  wrong, that it's like you've got a twofold approach here:  I

21  either get the company back or I burn the house down.  And I'm

22  telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25  come back on the 5th for a continuation of this hearing and a

252

1 || motion to hold you in contempt, you know, I'm leaning right

2 || now, based on what I've heard so far, and I know I haven't

3 || heard everything, but I'm leaning right now towards finding

4 || contempt and shifting a whole bundle of attorneys' fees.

5 || That, to me, seems like the likely place we're heading.

6 ||     I mean, I commented at the December hearing on the

7 || preliminary injunction against you personally that it had been

8 || like a $250,000 hearing, I figured, okay, just guesstimating

9 || everybody's billable rate times the hours we spent.  Well,

10 || here we were again, and I know we've got all this time outside

11 || the courtroom preparing, taking depositions.  I mean, what

12 || else is a judge to think except, by God, let's drive up

13 || administrative expenses as much as we can; if we can't win,

14 || we're going to go down fighting?  That's what this looks like.

15 || Okay?  So if it's not really what's going on, then you've got

16 || to work hard to change my perceptions at this point.

17 ||          MR. RUKAVINA:  Your Honor, I hear everything what

18 || you're saying, and I'm going to discuss it very bluntly with

19 || my clients.  But we're being asked not to exercise contract

20 || rights in the future.  This is not a contempt hearing.  And

21 || Your Honor, we did ask and offered the estate a million

22 || dollars, found money, plus to waive almost all our plan

23 || objections, if they would just put this case on pause for 30

24 || days.

25 ||     So we are trying.  We are trying creative solutions here.

253

1  We know that the train is leaving.  We've put our money where

2  our mouth is.  We will continue trying.  But Your Honor, this

3  is not a contempt proceeding, and my clients are not Mr.

4  Dondero.  You've heard they're independent boards.

5          MR. POMERANTZ:  I can't leave that last comment

6  without a response.  Yes, there was an offer of a million

7  dollars, by an entity that owes the estate multiples of that.

8  So they are offering to pay us something that they already owe

9  us.  So Mr. Rukavina continues try to do this.  We will not

10  stand for it.

11          MR. RUKAVINA:  That is not a fair statement, sir.  I

12  misrepresented nothing.  We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability.  So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17          THE COURT:  All right.

18          MR. POMERANTZ:  Should tell the Court --

19          THE COURT:  You know what?

20          MR. POMERANTZ:  -- that that entity owed the Debtor.

21          THE COURT:  You know what?  You know what?  I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

254

1   to terminate any agreements with the Debtor." Okay? That was

2   -- go back and look at the transcript. That was so meaningful

3   to me.

4       We were facing a possible trustee. And that's what I did

5   in the *Acis* case. Okay? I had a Chapter 11 trustee. And it

6   was not a perfect fit, to be sure. But it is where we were

7   heading in this case, had the lawyers and parties not

8   negotiated what they did. That was a very important

9   provision, convincing me that, you know what, I think the

10  structure they've got will be better than a trustee. And it

11  has, for the most part. But the fees have gone out the roof,

12  and I lay that at the feet of Mr. Dondero, for the most part.

13  Okay? We have a bomb thrown every five minutes by either him

14  personally or the Dugaboy or the Get Good Trust or the Funds

15  or the Advisors or I don't know who else. Okay?

16      So the train is leaving the station, unless you all come

17  to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18  -- grand solution here. Okay? If you get there in the next

19  few days, wonderful. Okay? But I don't know what else to say

20  except I'm tired of the carpet-bombing, and if I had to rule

21  this minute, there would be a huge amount of fee-shifting for

22  what we went through today, for what we went through in

23  December, for the restriction motion that, after I called it

24  frivolous, the lawyers were sending letters pretty much

25  regurgitating the same arguments. All right. So, not a happy

255

1  camper.

2      But upload your order on the motion to seal the plan.

3  And, again, it's not going to be unsealed absent a further

4  order of the Court.  And if you all come to me next week and

5  say, hey, we've got something in the works here, okay, I'll

6  consider unsealing it and letting you go down a different

7  path.  But I'm not naïve.  I feel like this is just more

8  burning the house down, maybe.  I don't know.  I hope I'm

9  wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11              MR. POMERANTZ:  Thank you, Your Honor.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  We're adjourned.

14              MR. RUKAVINA:  Thank you, Your Honor.

15              THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                              --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    /s/ Kathy Rehling                    01/28/2021

24  _____      _____
   Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                      4

OPENING STATEMENTS

- By Mr. Morris                                                 19
- By Mr. Rukavina                                              31

WITNESSES

Debtor's Witnesses

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz                  6

James D. Dondero
- Direct Examination by Mr. Morris                             42

Jason Post
- Direct Examination by Mr. Morris                            108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                            152
- Cross-Examination by Mr. Hogewood                           170
- Redirect Examination by Mr. Morris                          188
- Examination by the Court                                    191

Defendants' Witnesses

Jason Post
- Direct Examination by Mr. Rukavina                          201
  Voir Dire Examination by Mr. Morris                         206
  Direct Examination, Resumed, by Mr. Rukavina                207

EXHIBITS

Debtor's Exhibits A through SSSSS (exclusive of    Received  19
  Exhibits UUUU, VVVV, and AAAAA)
Debtor's Exhibit D (Email)                         Received 200
Debtor's Exhibit K (Letter)                        Received 198
Debtor's Exhibit TTTTT                             Received  64

257

                              INDEX
                             Page 2

RULINGS

19-34054-sgj11 - Highland Capital Management, L.P.

    Motion of the Debtor for Entry of an Order              12
    Authorizing the Debtor to Implement a Key Employee
    Retention Plan with Non-Insider Employees and
    Granting Related Relief filed by Debtor Highland
    Capital Management, L.P. (1777) - *Granted*


21-03000-sgj - Highland Capital Management, L.P. v.
Highland Capital Management Fund Advisors, L.P. et al.

    Agreed Settlement with CLO Holdco, Ltd.                 15

    Plaintiff's Motion for a Preliminary Injunction        233
    against Certain Entities Owned and/or Controlled
    by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS                                          255

INDEX                                                   256-257