# EXHIBIT 30

**Appx. 03672**

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3                               )   Case No. 19-34054-sgj-11
        In Re:                   )   Chapter 11
                                 )
 4      HIGHLAND CAPITAL         )   Dallas, Texas
        MANAGEMENT, L.P.,        )   Monday, February 8, 2021
 5                               )   9:00 a.m. Docket
                                 )
 6           Debtor.            )
                                 )   BENCH RULING ON CONFIRMATION
 7                               )   HEARING [1808] AND AGREED
                                 )   MOTION TO ASSUME [1624]
 8      _____ )

 9                       TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

        WEBEX APPEARANCES:
11
        For the Debtor:          Jeffrey Nathan Pomerantz
12                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
13                                 13th Floor
                                 Los Angeles, CA  90067-4003
14                               (310) 277-6910

15      For the Official Committee  Matthew A. Clemente
        of Unsecured Creditors:  SIDLEY AUSTIN, LLP
16                               One South Dearborn Street
                                 Chicago, IL  60603
17                               (312) 853-7539

18      For James Dondero:       D. Michael Lynn
                                 John Y. Bonds, III
19                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
20                                 JONES, LLP
                                 420 Throckmorton Street,
21                                 Suite 1000
                                 Fort Worth, TX  76102
22                               (817) 405-6900

23      For Get Good Trust and   Douglas S. Draper
        Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
24                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
25                               (504) 299-3300
```

Appx. 03673

2

```
 1   APPEARANCES, cont'd.:

 2   For Certain Funds and        Davor Rukavina
     Advisors:                    MUNSCH, HARDT, KOPF & HARR
 3                                500 N. Akard Street, Suite 3800
                                  Dallas, TX  75201-6659
 4                                (214) 855-7587

 5   For Certain Funds and        A. Lee Hogewood, III
     Advisors:                    K&L GATES, LLP
 6                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
 7                                Raleigh, NC  27609
                                  (919) 743-7306
 8
     Recorded by:                 Michael F. Edmond, Sr.
 9                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
10                                Dallas, TX  75242
                                  (214) 753-2062
11
     Transcribed by:              Kathy Rehling
12                                311 Paradise Cove
                                  Shady Shores, TX  76208
13                                (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

Appx. 03674

3

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M.</u> |
| 2 | THE COURT:  Please be seated. |
| 3 | (Beeping.) |
| 4 | THE COURT:  Someone needs to turn off their whatever. |
| 5 | All right.  Good morning.  This is Judge Jernigan, and we |
| 6 | have scheduled today a bench ruling regarding the Debtor's |
| 7 | plan that we had a confirmation trial on last week.  This is |
| 8 | Highland Capital Management, LP, Case No. 19-34054. |
| 9 | Let me first make sure we've got Debtor's counsel on the |
| 10 | line.  Do we have -- |
| 11 | MR. POMERANTZ:  Yes. |
| 12 | THE COURT:  -- Mr. Pomerantz? |
| 13 | MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your |
| 14 | Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on |
| 15 | behalf of the Debtor. |
| 16 | THE COURT:  Okay.  Good morning.  Do we have the |
| 17 | Creditors' Committee on the phone? |
| 18 | MR. CLEMENTE:  Good morning, Your Honor.  Matthew |
| 19 | Clemente of Sidley Austin on behalf of the Creditors' |
| 20 | Committee. |
| 21 | THE COURT:  Good morning.  All right.  We had various |
| 22 | Objectors.  Do we have Mr. Dondero's counsel on the phone? |
| 23 | MR. LYNN:  Yes, Your Honor.  Michael Lynn, together |
| 24 | with John Bonds and Bryan Assink, for Jim Dondero. |
| 25 | THE COURT:  Good morning.  For the Trusts, the |

4

1    Dugaboy and Get Good Trusts, do we have Mr. Draper?

2            MR. DRAPER:  Yes.  Douglas Draper is on the line,

3    Your Honor.

4            THE COURT:  Good morning.  Now, for what I'll call

5    the Funds and Advisor Objectors, do we have Mr. Rukavina and

6    your crew on the line?

7            MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

8    also on the line.

9            THE COURT:  All right.  Good morning to you.  All

10   right.  And we had objections pending from the U.S. Trustee as

11   well.  Do we have the U.S. Trustee on the line?

12       (No response.)

13           THE COURT:  All right.  If you're appearing, you're

14   on mute.  We're not hearing you.

15       All right.  Well, we have lots of other folks.  I don't

16   mean to be neglectful of them, but we're going to get on with

17   the ruling this morning.  This is going to take a while.  This

18   is a complex matter, so it should take a while.

19       All right.  Before the Court, of course, for consideration

20   is the Debtor's Fifth Amended Plan, first filed on November

21   24, 2020, as later modified on or around January 22, 2021,

22   with more amendments filed on or around February 1, 2021.  The

23   Court will hereinafter refer to this as the "Plan."

24       The parties refer to the Plan as a monetization plan

25   because it involves the gradual wind-down of the Debtor's

5

1   assets and certain of its funds over time, with the

2   Reorganized Debtor continuing to manage certain other funds

3   for a while, under strict governance and monitoring, and a

4   Claimants Trust will receive the proceeds of that process,

5   with the creditors receiving an interest in that trust.  There

6   is also anticipated to be Litigation Sub-Trust established for

7   the purpose of pursuing certain avoidance or other causes of

8   action for the benefit of creditors.

9       The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11      The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20      Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24      Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

1   of evidence, considering testimony from five witnesses and

2   thousands of pages of documentary evidence, in considering

3   whether to confirm the Plan pursuant to Sections 1129(a) and

4   (b) of the Bankruptcy Code.

5        The Court finds and concludes that the Plan meets all of

6   the relevant requirements of Sections 1123, 1124, and 1129 of

7   the Code, and other applicable provisions of the Bankruptcy

8   Code, but is issuing this detailed ruling to address certain

9   pending objections to the Plan, including but not limited to

10  objections regarding certain Exculpations, Releases, Plan

11  Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13  oral ruling in more detailed findings of fact, conclusions of

14  law, and an Order.

15       First, by way of introduction, this case is not your

16  garden-variety Chapter 11 case.  Highland Capital Management,

17  LP is a multibillion dollar global investment advisor,

18  registered with the SEC pursuant to the Investment Advisers

19  Act of 1940.  It was founded in 1993 by James Dondero and Mark

20  Okada.  Mr. Okada resigned from his role with Highland prior

21  to the bankruptcy case being filed.  Mr. Dondero was in

22  control of the Debtor as of the day it filed bankruptcy, but

23  agreed to relinquish control of it on or about January 9,

24  2020, pursuant to an agreement reached with the Official

25  Unsecured Creditors' Committee, which will be described later.

7

1      Although Mr. Dondero remained on as an unpaid employee and

2 portfolio manager with the Debtor after January 9, 2020, his

3 employment with the Debtor terminated on October 9, 2020.  Mr.

4 Dondero continues to work for and essentially control numerous

5 nondebtor companies in the Highland complex of companies.

6      The Debtor is headquartered in Dallas, Texas.  As of the

7 October 2019 petition date, the Debtor employed approximately

8 76 employees.

9      Pursuant to various contractual arrangements, the Debtor

10 provides money management and advisory services for billions

11 of dollars of assets, including CLOs and other investments.

12 Some of these assets are managed pursuant to shared services

13 agreements with a variety of affiliated entities, including

14 other affiliated registered investment advisors.  In fact,

15 there are approximately 2,000 entities in the Byzantine

16 complex of companies under the Highland umbrella.

17      None of these affiliates of Highland filed for Chapter 11

18 protection.  Most, but not all, of these entities are not

19 subsidiaries, direct or indirect, of Highland.  And certain

20 parties in the case preferred not to use the term "affiliates"

21 when referring to them.  Thus, the Court will frequently refer

22 loosely to the so-called, in air quotes, "Highland complex of

23 companies" when referring to the Highland enterprise.  That's

24 a term many of the lawyers in the case use.

25      Many of the companies are offshore entities, organized in

8

1 such faraway jurisdictions as the Cayman Islands and Guernsey.

2  The Debtor is privately owned 99.5 percent by an entity

3 called Hunter Mountain Investment Trust; 0.1866 percent by the

4 Dugaboy Investment Trust, a trust created to manage the assets

5 of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6 personally and through family trusts; and 0.25 percent by

7 Strand Advisors, Inc., the general partner.

8  The Debtor's primary means of generating revenue has

9 historically been from fees collected for the management and

10 advisory services provided to funds that it manages, plus fees

11 generated for services provided to its affiliates.

12  For additional liquidity, the Debtor, prior to the

13 petition date, would sell liquid securities in the ordinary

14 course, primarily through a brokerage account at Jefferies,

15 LLC.  The Debtor would also, from time to time, sell assets at

16 nondebtor subsidiaries and distribute those proceeds to the

17 Debtor in the ordinary course of business.

18  The Debtor's current CEO, James Seery, credibly testified

19 that the Debtor was "run at a deficient for a long time and

20 then would sell assets or defer employee compensation to cover

21 its deficits."  This Court cannot help but wonder if that was

22 necessitated because of enormous litigation fees and expenses

23 that Highland was constantly incurring due to its culture of

24 litigation, as further addressed hereafter.

25  Highland and this case are not garden-variety for so many

9

1  reasons.  One is the creditor constituency.  Highland did not

2  file bankruptcy because of some of the typical reasons a large

3  company files Chapter 11.  For example, it did not have a

4  large asset-based secured lender with whom it was in default.

5  It only had relatively insignificant secured indebtedness

6  owing to Jefferies, with whom it had a brokerage account, and

7  one other entity called Frontier State Bank.

8       Highland did not have problems with trade vendors or

9  landlords.  It did not suffer any type of catastrophic

10 business calamity.  In fact, it filed Chapter 11 six months

11 before the COVID-19 pandemic was declared.  The Debtor filed

12 Chapter 11 due to a myriad of massive unrelated business

13 litigation claims that it was facing, many of which had

14 finally become liquidated or were about to become liquidated

15 after a decade or more of contentious litigation in multiple

16 fora all over the world.

17      The Unsecured Creditors' Committee in this case has

18 referred to the Debtor under its former chief executive, Mr.

19 Dondero, as a serial litigator.  This Court agrees with that

20 description.  By way of example, the members of the Creditors'

21 Committee and their history of litigation with the Debtor and

22 others in the Highland complex are as follows:

23      First, the Redeemer Committee of the Highland Crusader

24 Fund, which I'll call the Redeemer Committee.  This Creditors'

25 Committee member obtained an arbitration award against the

10

1  Debtor of more than $190 million, inclusive of interest,
2  approximately five months before the petition date from a
3  panel of the American Arbitration Association.  It was on the
4  verge of having that award confirmed by the Delaware Chancery
5  Court immediately prior to the petition date, after years of
6  disputes that started in late 2008 and included legal
7  proceedings in Bermuda.  This creditor's claim was settled
8  during the bankruptcy case in the amount of approximately
9  $137.7 million.  The Court is omitting various details and
10  aspects of that settlement.

11      The second Creditors' Committee member, Acis Capital
12  Management, LP, which was formerly in the Highland complex of
13  companies but was not affiliated with Highland as of the
14  petition date.  This UCC member and its now-owner, Josh Terry,
15  were involved in litigation with Highland dating back to 2016.
16  Acis was forced into an involuntary bankruptcy in the
17  Bankruptcy Court for the Northern District of Texas, Dallas
18  Division, by Josh Terry, who was a former Highland portfolio
19  manager, in 2018 after Josh Terry obtained an approximately $8
20  million arbitration award and judgment against Acis that was
21  issued by a state court in Dallas County, Texas.  Josh Terry
22  was ultimately awarded the equity ownership of Acis by the
23  Dallas Bankruptcy Court in the Acis bankruptcy case.

24      Acis subsequently asserted a multimillion dollar claim
25  against Highland in the Dallas Bankruptcy Court for Highland's

1   alleged denuding of Acis in fraud of its creditors, primarily

2   Josh Terry.

3      The litigation involving Acis and Mr. Terry dates back to

4   mid-2016, and has continued on, with numerous appeals of

5   bankruptcy court orders, including one appeal still pending at

6   the United States Court of Appeals for the Fifth Circuit.

7      There was also litigation involving Josh Terry and Acis in

8   the Royal Court of the Island of Guernsey and in a court in

9   New York.

10      The Acis claim was settled during this bankruptcy case in

11   court-ordered mediation for approximately $23 million.  Other

12   aspects and details of this settlement are being omitted.

13      Now, the third Creditors' Committee member, UBS

14   Securities.  It's a creditor who filed a proof of claim in the

15   amount of $1,039,000,000 in the Highland case.  Yes, over one

16   billion dollars.  The UBS claim was based on the amount of a

17   judgment that UBS received from a New York state court in 2020

18   after a multi-week bench trial which had occurred many months

19   earlier on a breach of contract claim against other entities

20   in the Highland complex.  UBS alleged that the Debtor should

21   be liable for the judgment.  The UBS litigation related to

22   activities that occurred in 2008.  The litigation involving

23   UBS and Highland and its affiliates was pending for more than

24   a decade, there having been numerous interlocutory appeals

25   during its history.

12

1       The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8       The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10  and discovery-related services to the Debtor over the years.

11  It had unpaid invoices on the petition date of more than

12  $779,000.

13      It is fair to say that the members of the Creditors'

14  Committee in this case all have wills of steel.  They fought

15  hard before and during the bankruptcy case.  The members of

16  the Creditors' Committee are highly sophisticated and have had

17  highly sophisticated professionals representing them.  They

18  have represented their constituency in this case as

19  fiduciaries extremely well.

20      In addition to these Creditors Committee members, who were

21  all embroiled in years of litigation with Highland and its

22  affiliates in various ways, the Debtor has been in litigation

23  with Patrick Daugherty, a former limited partner and employee

24  of Highland, for many years in both Delaware and Texas state

25  courts.  Patrick Daugherty filed a proof of claim for "at

1  least $37.4 million" relating to alleged breached employment-

2  related agreements and for the tort of defamation arising from

3  a 2017 press release posted by the Debtor.

4      The Debtor and Patrick Daugherty recently announced a

5  settlement of the Patrick Daugherty claim in the amount of

6  $750,000 cash on the effective date, an $8.25 million general

7  unsecured claim, and a $2.75 million subordinated claim.

8  Other aspects and details of this settlement are being

9  omitted.

10     Additionally, an entity known as HarbourVest, who invested

11  more than $70 million with an entity in the Highland complex,

12  asserted a $300 million proof of claim against Highland,

13  alleging, among other things, fraud and RICO violations.  The

14  HarbourVest claim was settled during the bankruptcy case for a

15  $45 million general unsecured claim and a $35 million junior

16  claim.

17     Other than these claims just described, most of the other

18  claims in this case are claims asserted against the Debtor by

19  other entities in the Highland complex, most of which entities

20  the Court finds to be controlled by Mr. Dondero; claims of

21  employees who believe that they are entitled to large bonuses

22  or other types of deferred compensation; and claims of

23  numerous law firms that did work for Highland and were unpaid

24  for amounts due to them on the petition date.

25     Yet another reason this is not your garden-variety Chapter

14

1   11 case is its postpetition corporate governance structure.

2   Highland filed bankruptcy October 16, 2019.  Contentiousness

3   with the Creditors' Committee began immediately, with first

4   the Committee's request for a change of venue from Delaware to

5   Dallas, and then a desire by the Committee and the U.S.

6   Trustee for a Chapter 11 or 7 trustee to be appointed due to

7   concerns over and distrust of Mr. Dondero and his numerous

8   conflicts of interest and alleged mismanagement or worse.

9      After many weeks of the threat of a trustee lingering, the

10  Debtor and the Creditors' Committee negotiated and the Court

11  approved a corporate governance settlement on January 9, 2020

12  that resulted in Mr. Dondero no longer being an officer or

13  director of the Debtor or of its general partner, Strand.

14     As part of the court-approved settlement, three eminently-

15  qualified Independent Directors were chosen by the Creditors'

16  Committee and engaged to lead Highland through its Chapter 11

17  case.  They were James Seery, John Dubel, and Retired

18  Bankruptcy Judge Russell Nelms.  They were technically the

19  Independent Directors of Strand, the general partner of the

20  Debtor.  Mr. Dondero had previously been the sole director of

21  Strand, and thus the sole person in ultimate control of the

22  Debtor.

23     The three independent board members' resumes are in

24  evidence.  James Seery eventually was named CEO of the Debtor.

25  Suffice it to say that this changed the entire trajectory of

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4        Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15       By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1   could not get Highland and its affiliates to agree to any

2   actions taken in the case, and he finally obtained

3   confirmation of a plan over Highland and its affiliates'

4   objections in his fourth attempted plan, which confirmation

5   then was promptly appealed by Highland and its affiliates.

6        Suffice it to say it was not easy to get such highly-

7   qualified persons to serve as independent board members and

8   CEO of this Debtor.  They were stepping into a morass of

9   problems.  Naturally, they were worried about getting sued, no

10  matter how defensible their efforts might be, given the

11  litigation culture that enveloped Highland historically.  It

12  seemed as though everything always ended in litigation at

13  Highland.

14       The Court heard credible testimony that none of them would

15  have taken on the role of Independent Director without a good

16  D&O insurance policy protecting them, without indemnification

17  from Strand, guaranteed by the Debtor; without exculpation for

18  mere negligence claims; and without a gatekeeper provision,

19  such that the Independent Directors could not be sued without

20  the bankruptcy court, as a gatekeeper, giving a potential

21  plaintiff permission to sue.

22       With regard to the gatekeeper provision, this was

23  precisely analogous to what bankruptcy trustees have pursuant

24  to the so-called "Barton Doctrine," which was first

25  articulated in an old U.S. Supreme Court case.

17

1        The Bankruptcy Court approved all of these protections in

2    a January 9, 2020 order.  No one appealed that order.  And Mr.

3    Dondero signed the settlement agreement that was approved by

4    that order.

5        An interesting fact about the D&O policy came out in

6    credible testimony at the confirmation hearing.  Mr. Dubel and

7    an insurance broker from Aon, named Marc Tauber, both credibly

8    testified that the gatekeeper provision was needed because of

9    the so-called, and I quote, "Dondero Exclusion" in the

10   insurance marketplace.

11       Specifically, the D&O insurers in the marketplace did not

12   want to cover litigation claims that might be brought against

13   the Independent Directors by Mr. Dondero because the

14   marketplace of D&O insurers are aware of Mr. Dondero's

15   litigiousness.  The insurers would not have issued a D&O

16   policy to the Independent Directors without either the

17   gatekeeping provision or a "Dondero Exclusion" being in the

18   policy.

19       Thus, the gatekeeper provision was part of the January 9,

20   2020 settlement.  There was a sound business justification for

21   it.  It was reasonable and necessary.  It was consistent with

22   the Barton Doctrine in an extremely analogous situation --

23   *i.e.*, the independent board members were analogous to a three-

24   headed trustee in this case, if you will.  Mr. Dondero signed

25   off on it.  And, again, no one ever appealed the order

18

1  approving it.

2      The Court finds that, like the Creditors' Committee, the

3  independent board members here have been resilient and

4  unwavering in their efforts to get the enormous problems in

5  this case solved.  They seem to have at all times negotiated

6  hard and with good faith.  As noted previously, they changed

7  the entire trajectory of this case.

8      Still another reason why this was not your garden-variety

9  case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22      As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

19

1   settlement was laid, or at least helped, through the

2   mediation.  And as earlier noted, other enormous claims have

3   been settled during this case, including that of the Redeemer

4   Committee, who, again, had asserted approximately or close to

5   a $200 million claim; HarbourVest, who asserted a $300 million

6   claim; and Patrick Daugherty, who asserted close to a $40

7   million claim.

8        This Court cannot stress strongly enough that the

9   resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13       Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25       Among other things, there were changes to the projections

20

1   that the Debtor filed shortly before the confirmation hearing

2   that, among other things, show the estimated distribution to

3   creditors and compare plan treatment to a likely disbursement

4   in a Chapter 7.

5       These do not constitute a materially adverse change to the

6   treatment of any creditors or interest holders.  They merely

7   update likely distributions based on claims that have now been

8   settled, and they've otherwise incorporated more recent

9   financial data.  This happens often before confirmation

10  hearings.  The Court finds that it did not mislead or

11  prejudice any creditors or interest holders, and certainly

12  there was no need to resolicit the Plan.

13      The only Objectors to the Plan left at this time were Mr.

14  Dondero and entities that the Court finds are controlled by

15  him.  The standing of these entities to object to the Plan

16  exists, but the remoteness of their economic interest is

17  noteworthy, and the Court questions the good faith of the

18  Objectors.  In fact, the Court has good reason to believe that

19  these parties are not objecting to protect economic interests

20  they have in the Debtor, but to be disruptors.

21      Mr. Dondero wants his company back.  This is

22  understandable.  But it's not a good faith basis to lob

23  objections to the Plan.  The Court has slowed down

24  confirmation multiple times on the current Plan and urged the

25  parties to talk to Mr. Dondero.  The parties represent that

1  they have, and the Court believes that they have.

2      Now, to be specific about the remoteness of the objectors'

3  interests, the Court will address them each separately.

4  First, Mr. Dondero has a pending objection.  Mr. Dondero's

5  only economic interest with regard to the Debtor at this point

6  is an unliquidated indemnification claim.  And based on

7  everything this Court has heard, his indemnification claim

8  will be highly questionable at this juncture.

9      Second, a joint objection has been filed by the Dugaboy

10  Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11  was created to manage the assets of Mr. Dondero and his

12  family, and it owns a 0.1866 percent limited partnership

13  interest in the Debtor.  The Court is not clear what economic

14  interest the Get Good Trust has, but it likewise seems to be

15  related to Mr. Dondero, and it has been represented to the

16  Court numerous times that the trustee is Mr. Dondero's college

17  roommate.

18      Another group of Objectors that has joined together in one

19  objection is what the Court will refer to as the Highland and

20  NexPoint Advisors and Funds.  The Court understands they

21  assert disputed administrative expense claims against the

22  estate.  While the evidence presented was that they have

23  independent board members that run these companies, the Court

24  was not convinced of their independence from Mr. Dondero.

25  None of the so-called independent board members of these

22

1  entities have ever testified before the Court.  Moreover, they

2  have all been engaged with the Highland complex for many

3  years.

4       The witness who testified on these Objectors' behalves at

5  confirmation, Mr. Jason Post, their chief compliance officer,

6  resigned from Highland after more than twelve years in October

7  2020, at the same time that Mr. Dondero resigned or was

8  terminated by Highland.  And a prior witness recently for

9  these entities whose testimony was made part of the record at

10 the confirmation hearing essentially testified that Mr.

11 Dondero controlled these entities.

12      Finally, various NexBank entities objected to the Plan.

13 The Court does not believe they have liquidated claims.  Mr.

14 Dondero appears to be in control of these entities as well.

15      To be clear, the Court has allowed all of these objectors

16 to fully present arguments and evidence in opposition to

17 confirmation, even though their economic interests in the

18 Debtor appear to be extremely remote and the Court questions

19 their good faith.  Specifically on that latter point, the

20 Court considers them all to be marching pursuant to the orders

21 of Mr. Dondero.

22      In the recent past, Mr. Dondero has been subject to a TRO

23 and preliminary injunction by the Bankruptcy Court for

24 interfering with the current CEO's management of the Debtor in

25 specific ways that were supported by evidence.  Around the

23

1  time that this all came to light and the Court began setting

2  hearings on the alleged interference, Mr. Dondero's company

3  phone supplied to him by Highland, which he had been asked to

4  turn in, mysteriously went missing.  The Court merely mentions

5  this in this context as one of many reasons that the Court has

6  to question the good faith of Mr. Dondero and his affiliated

7  objectors.

8      The only other pending objection besides these objections

9  of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12      In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17      With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

24

1 objected to them.

2      First, a word about plan releases generally, since the

3 Objectors at times seem to gloss over, in this Court's view,

4 relevant distinctions, and seem to refer to the plan releases

5 in this Plan and the exculpations and the plan injunctions all

6 as impermissible third-party releases, when, in fact, they are

7 not, *per se*.

8      It has, without a doubt, become quite commonplace in

9 complex Chapter 11 bankruptcy cases to have three categories

10 of releases in plans.  These three types are as follows.

11      First, Debtor Releases.  A debtor release involves a

12 release by the debtor and its bankruptcy estate of claims

13 against nondebtor third-parties.  For example, a release may

14 be granted in favor of creditors, directors, officers,

15 employees, professionals who participated in the bankruptcy

16 process.  This is the least-controversial type of release

17 because the debtor is extinguishing its own claims, which are

18 property of the estate, that a debtor has authority to utilize

19 or not, pursuant to Sections 541 and 363 of the Bankruptcy

20 Code.

21      Authority for a debtor release pursuant to a plan arises

22 out of Section 1123(b)(3)(A), which indicates that a plan may

23 provide for "the settlement or adjustment of any claim or

24 interest belonging to the debtor or to the estate."

25      In this context, it would appear that the only analysis

25

1    required is to determine whether the release or settlement of

2    the claim is an exercise of reasonable business judgment on

3    that part of the debtor, is it fair and equitable, is it in

4    the best interest of the estate, given all the relevant facts

5    and circumstances?  Also relevant is whether there's

6    consideration given of some sort by the releasees.

7         Now, the second type of very commonplace Chapter 11 plan

8    release is an exculpation.  Chapter 11 plans also very often

9    have these exculpation provisions, and they're something much

10   narrower in scope and time than a full-fledged release.  An

11   exculpation provision is more like a shield for a certain

12   subset of key actors in the case for their acts during and in

13   connection with the case, which acts may have been merely

14   negligent.

15        Specifically, a plan may absolve certain actors -- usually

16   estate fiduciaries -- such as an Official Unsecured Creditors'

17   Committee and its members, Committee professionals, sometimes

18   Debtor professionals, senior management, officers and

19   directors of the Debtor, from any liability for postpetition

20   negligent conduct -- *i.e.*, conduct which occurred during the

21   administration of the Chapter 11 case and in the negotiation,

22   drafting, and implementation of a plan.  An exculpation

23   provision typically excludes gross negligence and willful

24   misconduct.  It is usually worded in a passive voice, so it

25   may seem a little unclear as to whether it is actually a

26

1  release and by whom.

2      In any event, the rationale is that parties who actively

3  participate in a court-approved process -- often, court-

4  approved transactions by court order -- should receive

5  protection for their work.  Otherwise, who would want to work

6  in such a messy, contentious situation, only to be sued for

7  alleged negligence for less-than-perfect end results?

8      Chapter 11 end results are not always pretty.  One could

9  argue that these exculpation provisions, though, are much ado

10  about nothing.  Why?  For one thing, again, the shield is only

11  as to negligent conduct.  There is no shield for other

12  problematic conduct, such as gross negligence or willful

13  misconduct.

14      Second, in many situations, any claims or causes of action

15  that might arise will belong to the Debtor or its estate.

16  Thus, they would already be released pursuant to a debtor

17  release.

18      Additionally, there is case law stating that, where a

19  claim is brought against an estate professional whose fees

20  have already been approved in a final fee application, any

21  claims are barred by *res judicata*.  Thus, exculpated

22  professionals would only have potential exposure for a very

23  short window of time, until final fee applications.

24      Additionally, certain case law in Texas makes clear that

25  an attorney generally does not owe any duties to persons other

1   than his own client.

2       All of this suggests that the shield of a typical

3   exculpation provision may rarely become useful or needed.

4       Moving now to the third type of release, a true third-

5   party release, Chapter 11 plans also sometimes contain third-

6   party releases.  A true third-party release involves the

7   release of claims held by nondebtor third parties against

8   other nondebtor third parties, and there is often no

9   limitation on the scope and time of the claims released.

10      This is the most heavily scrutinized of the three types of

11  plan releases.  Much of the case authority focuses on whether

12  a third-party release is consensual or not in analyzing their

13  propriety and/or enforceability.

14      In Highland, there are no third-party releases.  Rather,

15  there are debtor releases and exculpations.  There also happen

16  to be plan injunctions and gatekeeper provisions that have

17  been challenged.  The Objectors argue that these provisions

18  violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19  otherwise beyond the jurisdiction or authority of the

20  bankruptcy court.  These arguments are now addressed.

21      First, the debtor release is found at Article IX.D of the

22  Plan.  The language, in pertinent part, reads as follows.  "On

23  and after the effective date, each Released Party is deemed to

24  be hereby conclusively, absolutely, unconditionally,

25  irrevocably, and forever released and discharged by the Debtor

1   and the Estate, in each case on behalf of themselves and their

2   respective successors, assigns, and representatives, including

3   but not limited to the Claimant Trust and the Litigation Sub-

4   Trust, from any and all causes of action, including any

5   derivative claims, asserted on behalf of the Debtor, whether

6   known or unknown, foreseen or unforeseen, matured or

7   unmatured, existing or hereafter arising, in law, equity,

8   contract, tort, or otherwise, that the Debtor or the Estate

9   would have been legally entitled to assert in their own right,

10  whether individually or collectively, or on behalf of the

11  holder of any claim against, or interest in, a debtor or other

12  person."

13      There are certain exceptions discussed, and then Released

14  Parties are defined at Definition 113 of the Plan collectively

15  as:  the Independent Directors; Strand, solely from the date

16  of the appointment of the Independent Directors through the

17  effective date; the CEO/CRO; the Committee, the members of the

18  Committee, in their official capacities; the professionals

19  retained by the Debtor and the Committee in the Chapter 11

20  case; and the employees.  This is a defined term in the Plan

21  Supplement and does not include certain employees.

22      To be clear, these are not third-party releases such as

23  addressed in the *Pacific Lumber* case.  These are the Debtor's

24  and/or the bankruptcy estate's causes of action that are

25  proposed to be released.  Releases by a debtor are

1   discretionary and can be provided by a debtor to persons who

2   have provided consideration to the debtor and the estate.

3   Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4        The evidence here supported the notion that these releases

5   are a *quid pro quo* for the Released Parties' significant

6   contributions to a highly complex and contentious

7   restructuring.  The Debtor is releasing its own claims.  Some

8   of the Released Parties would have indemnification rights

9   against the Debtor.  And the Debtor's CEO, James Seery,

10  credibly testified that he does not believe any claims exist

11  as to the Released Parties.  The Court approves the Debtor

12  releases and overrules the objections to them.

13       Next, the exculpations appear at Article IX.C of the Plan

14  and provide as follows:  Subject in all respects to Article

15  XII.D of the Plan, to the maximum extent permitted by

16  applicable law, no Exculpated Party will have or incur, and

17  each Exculpated Party is hereby exculpated from, any claim,

18  obligation, suit, judgment, damage, demand, debt, right, cause

19  of action, remedy, loss, and liability for conduct occurring

20  on or after the petition date in connection with or arising

21  out of the filing and administration of the Chapter 11 case,

22  the negotiation and pursuit of a disclosure statement, the

23  Plan, or the solicitation of votes for or confirmation of the

24  Plan, the funding or consummation of the Plan, or any related

25  agreements, instruments, et cetera, et cetera, whether or not

30

1   such Plan distributions occur following the effective date,

2   the implementation of the Plan, and any negotiation,

3   transactions, and documentation in connection with the

4   foregoing clauses, provided, however, the foregoing will not

5   apply to any acts or omissions of any Exculpated Party arising

6   out of or related to acts or omissions that constitute bad

7   faith, fraud, gross negligence, criminal misconduct, or

8   willful misconduct; or Strand or any employee other than with

9   respect to actions taken by such entities from the date of

10  appointment of the Independent Directors through the effective

11  date.

12      Exculpated Parties are later defined at Section -- or,

13  earlier defined at Section 62 of the Plan, Definition No. 62

14  of the Plan, as later limited by the Debtor, as announced in

15  the confirmation hearing.  And so these are the Exculpated

16  Parties:  the Debtor and its successors and assigns; the

17  employees, certain employees, as defined; Strand; the

18  Independent Directors; the Committee, the members of the

19  Committee, in their official capacities; the professionals

20  retained by the Debtor and the Committee in the Chapter 11

21  case; the CEO and CRO; and the related persons as to each of

22  these parties listed in Part (iv) through (viii) above;

23  provided, for the avoidance of doubt, and it goes on to say

24  Dondero, Mark Okada, and various others aren't Exculpated

25  Parties.

1    Now, as earlier mentioned, the Objectors argue that

2  *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3  categorically rejects the permissibility of nonconsensual

4  exculpations as well as third-party releases in a Chapter 11

5  plan.  So the Court is going to take a deep dive into that

6  assertion.

7    In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8  numerous challenges to a confirmed plan of affiliated debtors

9  known as Palco and Scopac and four subsidiaries.   The debtor

10  Palco owned and operated the sawmill, a power plant, and even

11  a town called Scotia, California.  The debtor Scopac owned

12  timberlands.  A creditor, a secured creditor called Marathon

13  had a claim against Palco's assets.  Marathon estimated

14  Palco's assets were worth $110 million.  Its claim was $160

15  million.  Meanwhile, other parties had large secured claims

16  against the other debtor, Scopac.

17    The plan that the bankruptcy court confirmed, which was on

18  appeal to the Fifth Circuit, was filed by both the secured

19  creditor Marathon and a joint plan proponent called MRC.  MRC

20  was a competitor of the debtor Palco.  The Marathon/MRC plan

21  proposed to dissolve all the debtors, cancel intercompany

22  debts, and create two new entities, Townco and Newco.  Almost

23  all of the debtor Palco's assets, including the town of

24  Scotia, California, would be transferred to Townco.  The

25  timberlands and other assets, including the sawmill, would be

32

1  placed in Newco.

2      Marathon and MRC proposed to contribute $580 million to

3  Newco to pay claims against Scopac.  And Marathon would

4  convert its secured claim against Palco's assets into equity,

5  giving it full ownership of Townco, a 15 percent stake in

6  Newco, and a new note for the sawmill's working capital.  MRC

7  would own the other 80 percent of Newco and would manage and

8  run the company.

9      An indenture trustee for the secured indebtedness against

10  Scopac -- which, by the way, had also been a plan proponent of

11  a competing plan -- appealed the confirmation order, raising

12  eight distinct issues on appeal.  One of the eight issues

13  pertained to what the Fifth Circuit referred to as a

14  "nondebtor exculpation and release clause."  This issue is

15  discussed on the last two pages of a very lengthy opinion.

16      While the complained-of provision is not quoted verbatim

17  in the *Pacific Lumber* opinion, it appears to have been a

18  typical exculpation clause.  Not a third-party release; a

19  typical exculpation clause.  The Fifth Circuit stated, "The

20  plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21  Creditors' Committee, and their personnel, from liability,

22  other than for willful and gross negligence related to

23  proposing, implementing, and administering the plan" at Page

24  251.

25      The Fifth Circuit held that "the nondebtor releases must

33

1   be struck except with respect to the Creditors' Committee and

2   its members."

3        Footnote 26 of the opinion also states that the appellants

4   had "not briefed why Newco and Townco or their officers and

5   directors should not be released," and so "we do not analyze

6   their position."  Rather, the Fifth Circuit merely analyzed

7   why the exculpation provision was not permissible as to the

8   two plan proponents, MRC and Marathon.

9        Thus, the Court views *Pacific Lumber* as being a holding

10  that squarely addressed the propriety of two plan proponents,

11  a secured lender and a third-party competitor purchaser of the

12  Debtors, obtaining nonconsensual exculpation in the plan.

13  However, its reasoning certainly cannot be ignored, strongly

14  suggesting it would not be inclined to approve an exculpation

15  for any party other than a Creditors' Committee or its

16  members.

17       As far as the Fifth Circuit's reasoning, it relied on

18  Bankruptcy Code Section 524(e) for striking down the

19  exculpations, stating, "The law states, however, that

20  discharge of a debt of the debtor does not affect the

21  liability of any other entity on such debt."  Page 251.  The

22  opinion suggests that MRC and Marathon may have tried to argue

23  that 524(e) did not apply to their exculpations because MRC

24  and Marathon were not liable as co-obligors in any way on any

25  of the debtor's debt.

34

1    The Fifth Circuit seemed dismissive of this argument,

2    stating as follows, "MRC/Marathon insist the release clause is

3    part of their bargain because, without the clause, neither

4    company would have been willing to provide the plan's

5    financing.  Nothing in the records suggests that MRC/Marathon,

6    the Committee, or the Debtor's officers and directors were co-

7    liable for the Debtor's prepetition debts.  Instead, the

8    bargain the proponents claim to have purchased is exculpation

9    from any negligence that occurred during the course of the

10   case.  Any costs the released parties might incur defending

11   against suits alleging such negligence are unlikely to swamp

12   either of these parties or the consummated reorganization.  We

13   see little equitable about protecting the released nondebtors

14   from negligence suits arising out of the reorganization."

15   The Court goes on to note that, in a variety of cases,

16   that releases have been approved, but these cases "seem

17   broadly to foreclose nonconsensual nondebtor releases and

18   permanent injunctions."

19   The Court then adds at Footnote 27 that the Fifth Circuit

20   in the past did not set aside challenged plan releases that

21   were in final nonappealable orders and were the subject of

22   collateral attack much later, citing its famous *Republic

23   Supply v. Shoaf* case, where the Fifth Circuit ruled that *res

24   judicata* barred a debtor from bringing a claim that was

25   specifically and expressly released by a confirmed

35

1   reorganization plan because the debtor -- the objector failed

2   to object to the release at confirmation.

3       The Fifth Circuit in *Pacific Lumber* also noted that the

4   Bankruptcy Code permits bankruptcy courts to enjoin third-

5   party asbestos claims under certain circumstances, 524(g),

6   which the Court said suggests nondebtor releases are most

7   appropriate as a method to channel mass tort claims towards a

8   specific pool of assets, citing numerous cases, including

9   *Johns-Manville*.

10      In reach its holding, the Fifth Circuit saw no reason to

11  uphold exculpation to the plan proponents MRC and Marathon,

12  seeming to find it inconsistent with 524(e) under the facts at

13  bar, but the Court did uphold exculpation for the Creditors'

14  Committee and its members, stating, "We agree, however, with

15  courts that have held that 1103(c) under the Code, which lists

16  the Creditors' Committee's powers, implies Committee members

17  have qualified immunity for actions within the scope of their

18  duties."  Numerous cites.  "The Creditors' Committee and its

19  members are the only disinterested volunteers among the

20  parties sought to be released here.  The scope of protection,

21  which does not insulate them from willful and gross

22  negligence, is adequate."

23      Thus, the Court held that the exculpation provisions in

24  *Pacific Lumber* must be struck except with regard to the

25  Creditors' Committee and its members.

1      Now, after all of that, this Court believes the following

2  can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3  hinted that consensual exculpations and/or consensual

4  nondebtor third-party releases are permissible.  The Court

5  was, of course, dealing with nonconsensual exculpations in

6  *Pacific Lumber*.  In this regard, I note Page 252, where the

7  Court cited various prior Fifth Circuit authority and then

8  stated, "These cases seem broadly to foreclose nonconsensual

9  nondebtor releases and permanent injunctions."

10      The second thing that can be gleaned from *Pacific Lumber*:

11  The Fifth Circuit hinted that nondebtor releases may be

12  permissible in cases involving global settlements of mass

13  claims against the debtors and co-liable parties.  The Court,

14  of course, referred to 524(g), but various other cases which

15  approved nondebtor releases where mass claims were channeled

16  to a specific pool of assets.

17      Third, the Fifth Circuit outright held that exculpations

18  from negligence for a Creditors' Committee and its members are

19  permissible because the concept is both consistent with

20  1103(c), "which implies Committee members have qualified

21  immunity for actions within the scope of their duties," and a

22  good policy result, since "if members of the Committee can be

23  sued by persons unhappy with the outcome of the case, it will

24  be extremely difficult to find members to serve on an official

25  committee."

37

1       Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2   that *res judicata* may bar complaints regarding an

3   impermissible plan release, citing to its earlier *Republic*

4   *Supply v. Shoaf* opinion.

5       Now, being ever-mindful of the Fifth Circuit's words in

6   *Pacific Lumber*, this Court cannot help but wonder about at

7   least three things.

8       First, did the Fifth Circuit leave open the door that

9   facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21      Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

1 | Chapter 11 case, did this rationale leave open the door to

2 | sometimes permitting exculpations to other parties in a

3 | particular Chapter 11 case besides Creditors' Committees and

4 | their members?  For example, in a situation such as the

5 | Highland case, in which Independent Directors, brought in to

6 | avoid a trustee, are more like a Creditors' Committee than an

7 | incumbent board of directors.

8 |     Third, the Fifth Circuit's sole statutory basis was

9 | Section 524(e).  This Court would humbly submit that this is a

10 | statute dealing with prepetition liability in which some

11 | nondebtor is liable with the Debtor.  Exculpation is a concept

12 | dealing with postpetition liability.

13 |     The Ninth Circuit recently, in a case called *Blixseth v.*

14 | *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15 | validity of an exculpation clause incorporated into a

16 | confirmed Chapter 11 plan that purported to absolve certain

17 | nondebtor parties that were "closely involved" in drafting the

18 | plan.  They were the largest secured creditor, a purchaser,

19 | and an individual who was an indirect owner of certain of the

20 | debtor companies.  The exculpation was from any negligence,

21 | liability, for "any act or omission in connection with,

22 | related to, or arising out of the Chapter 11 cases."

23 |     By the time the appeal was before the Ninth Circuit, the

24 | only issue was the propriety of the exculpation clause as to

25 | the large secured creditor, which was also a plan proponent,

39

1   since all the other exculpated parties had settled with the

2   appellant.

3      The Court, in determining that the exculpation clause was

4   permissible as to the secured lender, concluded that Section

5   524(e) "does not bar a narrow exculpation clause of the kind

6   here at issue -- that is, one focused on actions of various

7   participants in the plan approval process and relating only to

8   that process," Page 1082.  Why?  Because "Section 524(e)

9   establishes that discharge of a debt of the debtor does not

10   affect the liability of any other entity on such debt."  In

11   other words, the discharge in no way affects the liability of

12   any other entity for the discharged debt.  By its terms,

13   524(e) prevents a bankruptcy court from extinguishing claims

14   of creditors against nondebtors over the very discharged debt

15   through the bankruptcy proceedings.

16      The Court went on to explicitly disagree with *Pacific*

17   *Lumber* in its analysis of 524(e), reiterating that an

18   exculpation clause covers only liabilities arising from the

19   bankruptcy proceedings and not of any of the debtor's

20   discharged debt.  Footnote 7, Page 1085.

21      Ultimately, the Court held that under Section 105(a),

22   which empowers a bankruptcy court to issue any order, process,

23   or judgment that is necessary or appropriate to carry out the

24   provisions of Chapter 11 and Section 1123, which establishes

25   the appropriate content of the bankruptcy plan, under these

40

1  sections, the bankruptcy court had authority to approve an

2  exculpation clause intended to trim subsequent litigation over

3  acts taken during the bankruptcy proceedings and so render the

4  plan viable.

5      This Court concludes that, just as the Fifth Circuit left

6  open the door for consensual exculpations and releases in

7  *Pacific Lumber*, just as it left open the door for consensual

8  exculpations and releases in *Pacific Lumber*, its dicta

9  suggests that an exculpation might be permissible if there is

10  a showing that "costs that the released parties might incur

11  defending against suits alleging such negligence are likely to

12  swamp either the Exculpated Parties or the reorganization."

13  Again, that was a quote from the Fifth Circuit.

14      If ever there were a risk of that happening in a Chapter

15  11 reorganization, it is this one.  The Debtor's current CEO

16  credibly testified that Mr. Dondero has said outside the

17  courtroom that if Mr. Dondero's own pot plan does not get

18  approved, that he will "burn the place down."  Here, this

19  Court can easily expect the proposed exculpated parties might

20  expect to incur costs that could swamp them and the

21  reorganization process based on the past litigious conduct of

22  Mr. Dondero and his controlled entities.

23      Additionally, this Court concludes that the Fifth

24  Circuit's rationale in *Pacific Lumber* for permitted

25  exculpations to Creditors' Committees and their members, which

41

1   was clearly policy-based based on their implied qualified

2   immunity flowing from Section 1103 and their importance in a

3   Chapter 11 case, leaves the door open to sometimes permitting

4   exculpations to other parties in a particular Chapter 11 case

5   besides a UCC and its members.

6        Again, if there was ever such a case, the Court believes

7   it is this one, in which Independent Directors were brought in

8   to avoid a trustee and are much more like a Creditors'

9   Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14       The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22       Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

42

1    governance structure for this case, and which is incorporated

2    into the Plan at Article IX.H, provided as follows:  "No

3    entity may commence or pursue a claim or cause of action of

4    any kind against any Independent Director, any Independent

5    Director's agents, or any Independent Director's advisors

6    relating in any way to the Independent Director's role as an

7    Independent Director of Strand without the Court (1) first

8    determining, after notice, that such claim or cause of action

9    represents a colorable claim of willful misconduct or gross

10   negligence against Independent Director, any Independent

11   Director's agents, or any Independent Director's advisors; and

12   (2) specifically authorizing such entity to bring such a

13   claim.  The Court will have sole jurisdiction to adjudicate

14   any claim for which approval of the Court to commence or

15   pursue has been granted."

16        This was both an exculpation from negligence as to the

17   Independent Directors and their agents and advisors, as well

18   as a gatekeeping provision.  This Court believes that this

19   provision basically approved an exculpation for the

20   Independent Directors way back on January 9, 2020 for their

21   postpetition conduct that might be negligent.  And this is the

22   law of the case and has *res judicata* preclusive effect now.

23        Thus, as to the three Independent Directors, as well as

24   the other named parties in the January 9, 2020 order, their

25   agents, their advisors, we have a situation that fits within

43

1   *Republic Supply v. Shoaf*, and we fit within the exception

2   articulated in *Pacific Lumber*.

3       The Court reserves the right to supplement these findings

4   and conclusions as to the exculpations, but based on the

5   foregoing, they are approved and the objections are overruled.

6       Now, turning to the Plan objection, it appears at Article

7   IX.F of the Plan and provides, in pertinent part, as follows:

8   Upon entry of the confirmation order, all enjoined parties are

9   and shall be permanently enjoined on and after the effective

10  date from taking any action to interfere with the

11  implementation or consummation of the Plan.  Except as

12  expressly provided in the Plan, the confirmation order, or a

13  separate order of the Bankruptcy Court, all Enjoined Parties

14  are and shall be permanently enjoined on and after the

15  effective date, with respect to any claims and interests, from

16  directly or indirectly -- and then commencing, conducting,

17  continuing any suit, action, proceeding of any kind, and

18  numerous other acts of that vein.

19      The injunction set forth herein shall extend to and apply

20  to any act of the type set forth in any of the causes above

21  against any successors to the Debtor, including but not

22  limited to the Reorganized Debtor, the Litigation Sub-Trust,

23  and the Claimant Trust, and their respective property and

24  interests in property.

25      Plan injunctions like this are commonplace and

44

1   appropriate.  They are entirely consistent with and

2   permissible under Bankruptcy Code Sections 1123(a)(5),

3   1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4   Rule 3016(c), which articulates the form that a plan

5   injunction must be set forth in a plan.

6       The Court finds the objections to the Plan Injunctions to

7   be unfounded, and they are thus overruled without much

8   discussion here.

9       Now, lastly, the Gatekeeper Provision.  It appears at

10  Paragraph 4 of Article IX.F of the Plan and provides, in

11  pertinent part, "Subject in all respects to Article XII.D, no

12  Enjoined Party may commence or pursue a claim or cause of

13  action of any kind against any Protected Party that arose or

14  arises from or is related to the Chapter 11 case, the

15  negotiation of the Plan, the administration of the Plan, or

16  property to be distributed under the Plan, the wind-down of

17  the business of the Debtor or Reorganized Debtor, the

18  administration of the Claimant Trust or the Litigation Sub-

19  Trust, or the transactions in furtherance of the foregoing,

20  without the Bankruptcy Court (1) first determining, after

21  notice and a hearing, that such claim or cause of action

22  represents a colorable claim of any kind, including but not

23  limited to negligence, bad faith, criminal misconduct and

24  willful misconduct, fraud, or gross negligence against a

25  Protected Party; and (2) specifically authorizing such

45

1   Enjoined Party to bring such claim or cause of action against

2   such Protected Party, provided, however, that the foregoing

3   will not apply to a claim or cause of action against Strand or

4   against any employee other than with respect to actions taken,

5   respectively, by Strand or any such employee from the date of

6   appointment of the Independent Directors through the effective

7   date.  The Bankruptcy Court will have sole and exclusive

8   jurisdiction to determine whether a claim or cause of action

9   is colorable and, only to the extent legally permissible and

10   as provided for in Article XI, shall have jurisdiction to

11   adjudicate the underlying colorable claim or cause of action."

12       This gatekeeper provision appears necessary and reasonable

13   in light of the litigiousness of Mr. Dondero and his

14   controlled entities that has been described at length herein.

15   Provisions similar to this have been approved in this district

16   in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17   provision is within the spirit of the Supreme Court's Barton

18   Doctrine.  And it appears consistent with the notion of a pre-

19   filing injunction to deter vexatious litigants that has been

20   approved by the Fifth Circuit in such cases as *Baum v. Blue*

21   *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22   850 F.3d 811, which arose out of a bankruptcy pre-filing

23   injunction.

24       The Fifth Circuit, in fact, noted in the *Carroll* case that

25   federal courts have authority to enjoin vexatious litigants

46

1   under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2   under the Bankruptcy Code, a bankruptcy court can issue any

3   order, including a civil contempt order, necessary or

4   appropriate to carry out the provisions of the Code, citing,

5   of course, 105 of the Bankruptcy Code.

6       The Fifth Circuit stated that, when considering whether to

7   enjoin future filings against a vexatious litigant, a

8   bankruptcy court must consider the circumstances of the case,

9   including four factors:  (1)  the party's history of

10  litigation; in particular, whether he has filed vexatious,

11  harassing, or duplicative lawsuits; (2) whether the party had

12  a good faith basis for pursuing the litigation, or perhaps

13  intended to harass; (3) the extent of the burden on the courts

14  and other parties resulting from the party's filings; and (4)

15  the adequacy of alternatives.

16      In the *Baum* case, the Fifth Circuit stated that the

17  traditional standards for injunctive relief -- *i.e.*,

18  irreparable harm and inadequate remedy at law -- do not apply

19  to the issuance of an injunction against a vexatious litigant.

20      Here, although I have not been asked to declare Mr.

21  Dondero and his affiliated entities as vexatious litigants *per*

22  *se*, it is certainly not beyond the pale to find that his long

23  history with regard to the major creditors in this case has

24  strayed into that possible realm, and thus this Court is

25  justified in approving this provision.

1      One of the Objectors' lawyers stated very eloquently in

2   closing argument, in opposing the plan injunction and

3   gatekeeping provisions, that "Even a serial killer has

4   constitutional rights," suggesting that these provisions would

5   deprive Mr. Dondero and his controlled entities of fundamental

6   rights or due process somehow.  But to paraphrase the district

7   court in the *Carroll* case, no one, rich or poor, is entitled

8   to abuse the judicial process.  There exists no constitutional

9   right of access to the courts to prosecute actions that are

10  frivolous or malicious.  The Plan injunction and gatekeeper

11  provisions in Highland's plan simply set forth a way for this

12  Court to use its tools, its inherent powers, to avoid abuse of

13  the court system, protect the implementation of the Plan, and

14  preempt the use of judicial time that properly could be used

15  to consider the meritorious claims of other litigants.

16      Accordingly, the Objectors' objections to this provision

17  are overruled.

18      As earlier stated, this Court reserves the right to alter

19  or supplement this ruling in a written order.  In this regard,

20  the Court directs Debtor's counsel -- I hope you are still

21  awake; it's been a long time -- the Court directs Debtor's

22  counsel to submit a form of order.  And specifically, I assume

23  that you've already prepared or have been in the process of

24  preparing a set of findings of fact, conclusions of law, and

25  confirmation order that tracks the confirmation evidence and

48

1   recites conclusions of law that the Plan complies with all the

2   various provisions of Section 1123, 1129, and other applicable

3   Code provisions.

4        What I want you to do is take this bench ruling and add it

5   to what you've prepared.  And what I mean is, as you can tell,

6   I've been reading:  I will have my courtroom deputy email to

7   you all a copy of what I just read.  I'll have her obviously

8   copy the Debtor's counsel, Creditors' Committee, Dondero and

9   the other Objectors, copy them on this written document she's

10  going to send out.  And, again, I want you to kind of meld it

11  into what you've already been preparing.

12       Obviously, I did not address in this oral ruling every

13  provision of 1129(a) and (b).  I did not address every 1123

14  objection.  I did not even address every single objection of

15  the Objectors.  But, again, any objection I've not

16  specifically addressed today is overruled.

17       The briefing, I should say, that the Debtor submitted,

18  there was a Memorandum of Law in Support of Confirmation filed

19  on January 22nd.  There was also a reply brief, a hundred

20  pages or so, separately filed, replying to all the objections.

21  I don't disagree with anything that was in that.  So, again,

22  to the extent you want to send me conclusions of law that are

23  along the lines of that briefing, I would consider that.

24       And so what I thought is you'll send me the melded

25  document and I will edit it if I see fit.  I recognize this

49

1  may take a few days, so I don't give you a strict timetable,

2  just hopefully it won't take too many days.

3      All right.  Is there anyone out there -- Mr. Pomerantz,

4  you had to go to jury duty, except I can't believe --

5          MR. POMERANTZ:  No, I --

6          THE COURT:  I can't believe you were called, but are

7  you there?

8          MR. POMERANTZ:  Your Honor, I am here.  I was luckily

9  excused, because I probably wouldn't have made it.

10      Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14          THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18          MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25          THE COURT:  Well, when I saw that Tom Brady was going

50

1   to win, I turned it off.

2       I'm sorry.  That's terrible.  You know, my law clerk, my

3   law clerk that you can't see, Nate, he is from Ann Arbor,

4   Michigan, University of Michigan, and he almost cried when I

5   said I didn't like Tom Brady the other day.  So, I apologize.

6           MR. POMERANTZ:  Your Honor, one other comment.  We

7   had our motion to assume our nonresidential real property

8   lease that was also on.  It got missed in all the fanfare, but

9   it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **02/09/2021**

24  _____     _____

    Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

51

INDEX

1

PROCEEDINGS 3

2

WITNESSES

3

-none-

4

EXHIBITS

5

-none-

6

RULINGS

7

Confirmation Hearing [1808] 3

Agreed Motion to (1) Assume Non-Residential Real Property 50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS 50

INDEX 51

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25