# EXHIBIT A

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) |
| | ) Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) |
| | ) |

---

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S
POST-TRIAL BRIEF ADDRESSING HCRE'S EXECUTORY CONTRACT DEFENSE**

Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>"), the reorganized debtor

in the above-captioned Chapter 11 case (the "<u>Bankruptcy Case</u>"), by and through its undersigned

counsel, hereby files this post-trial brief to address the "executory contract" defense raised by

---

[1] Highland's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

HCRE Partners LLC (n/k/a NexPoint Real Estate Partners LLC) ("HCRE") for the first time during the evidentiary hearing conducted on November 1, 2022 (the "Trial") in connection with Highland's objection to HCRE's proof of claim.

## PRELIMINARY STATEMENT[2]

1.      After nearly two years of active litigation, HCRE asserted for the first time during the Trial that Highland has no rights under the Amended Agreement because they were terminated when Highland did not assume that contract as part of the Plan (the "Defense"). The Defense is devoid of merit and should be rejected.

2.      The Amended Agreement was drafted by individuals employed in the "Highland complex" at a time when Mr. Dondero controlled both HCRE and Highland. The Amended Agreement provides that *all* managerial, operational, and voting control is placed exclusively in Mr. Dondero's hands the Manager of SEM. Furthermore, the Amended Agreement also expressly prohibits Members from managing SEM, stating that: "[n]o Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the manager."

3.      Despite the clear distinction between the active Manager (*i.e.*, HCRE/Dondero) and the passive Members (*e.g.*, Highland), HCRE suddenly contends that the Amended Agreement is an "executory contract" that should be deemed rejected because it was not assumed pursuant to the Plan back in early 2021. The last-second assertion of the Defense divulges its weakness. It is black-letter law that a contract is executory only if both parties have material unperformed obligations, the breach of which would excuse performance by the other party. Notably, contracts

---

[2] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

that only impose remote or hypothetical duties are not executory contracts.  As discussed below, because Highland has no material unperformed obligations under the Amended Agreement it is not executory and Highland's rights thereunder continue post-confirmation.

4.      Mr. Dondero (and HCRE) knows the Amended Agreement is not an executory contract because it was not listed on the Debtor's schedules when Mr. Dondero controlled that entity.  Mr. Dondero (and HCRE) should be estopped from taking a position today that contradicts the position he took when he was responsible for identifying executory contracts on behalf of the Debtor; at a minimum, the credibility of this last-second argument should be questioned.

5.      In his closing argument, HCRE's counsel identified five provisions of the Amended Agreement that HCRE now contends constitute independent "obligations" that render the Amended Agreement executory.  HCRE overreaches.  Four of the provisions simply serve to limit passive Members' rights.  The fifth provision is an "anti-consolidation" clause that imposes no affirmative duty on Highland whatsoever.  Instead, it automatically mandates a specified reallocation of interests as between HCRE and Highland if (and only if) Highland is required to consolidate SEM for its own financial reporting purposes under US GAAP.  But this provision is not an obligation of Highland to SME; it is an automatically prescribed mechanism in the unlikely event of possible consolidation (*e.g.*, majority ownership or significant minority ownership with control).  Even if the "anti-consolidation" clause were deemed to impose an obligation on Highland, the obligation is "remote and hypothetical" for the simple reason that critical to the "consolidation" analysis under US GAAP when holding a minority interest is ***control***, something that Highland will never obtain because it is prohibited by the Amended Agreement unless HCRE consents.  It is hard to imagine anything more "remote or hypothetical" than Mr. Dondero and Mr. McGraner voluntarily ceding managerial, economic, or voting control of SEM to Highland.

6.      The Amended Agreement is not an executory contract and HCRE's last-second attempt to contend otherwise should be rejected.

## RELEVANT BACKGROUND

7.      On March 15, 2019, HCRE, Highland, and BH Equities, LLC ("BH Equities") executed that certain *First Amended and Restated Limited Liability Company Agreement* (the "Amended Agreement").  Highland Ex. 7.[3]  As set forth in Schedule A to the Amended Agreement, HCRE holds 47.94% of the membership interests in SE Multifamily Holdings LLC ("SEM"), Highland holds 46.06% of the membership interests, and BH Equities holds the remaining 6% of the membership interests.  *Id*. (Schedule A).

8.      There is no dispute that at the time the Amended Agreement was executed, James Dondero ("Mr. Dondero") controlled both HCRE and Highland.  Morris Dec.[4] Ex. A (transcript) at 122:25-123:2.

## A.     HCRE Solely Controls SEM

9.      Under the Amended Agreement, HCRE has the exclusive right to appoint SEM's manager and appointed Mr. Dondero, in his capacity as an officer of HCRE, the Manager of SEM (the "Manager") (Highland Ex. 7 § 3.1).  As such, Mr. Dondero exclusively controls SEM:

- Under section 1.6, "HCRE shall have the exclusive right to appoint the Manager and the Manager shall have the unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement."

- Under section 3.2, the "management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company

---

[3] Citations to "Highland Ex. __" refer to the exhibits filed in the *Reorganized Debtor's Witness and Exhibit List with Respect to Trial to Be Held on November 1, 2022* [Docket No. 3590].

[4] Morris Dec." refers to the *Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Post-Trial Brief Addressing HCRE's Executory Contract Defense* attached hereto as **Exhibit 1**.

4

and to perform or refrain from performing any and all acts that the Manager may deem, necessary, appropriate or desirable."

- Under section 3.7, the Manager has the sole discretion to appoint and remove officers.

- Under Section 3.9, HCRE has the sole right to appoint a replacement Manager.

- Under section 10.1, the Amended Agreement cannot be modified or amended, and no provision can be waived, without the prior written consent of both the Manager and HCRE.

Based on the foregoing, Mr. Dondero and HCRE have exclusive managerial, operational, and voting control of SEM.

**B.**     <u>**Highland Is a Passive Investor with No Right to Control SEM and No Obligations as a Member**</u>

10.     In light of the exclusive and expansive rights, powers, and obligations granted to the Manager, the non-HCRE Members of SEM are passive investors without affirmative obligations or any ability to control SEM:

- Section 2.1 provides that Members may make future capital contributions to SEM, but they are not obligated to do so.[5]

- Section 2.5 provides that Members may loan funds to SEM, but they are not obligated to do so.

- Under section 4.1, "[n]o Member (in its capacity as such) shall participate in the management, control or direction of the Company's operations, business or affairs, transact any business for the Company, or have the power to act for or on behalf of or to bind the Company, such powers being vested solely and exclusively in the manager"

- Under section 5.5, Members are not obligated to guaranty any of SEM's obligations.

Based on the foregoing, Members (in their capacities as such) have no affirmative obligations or any ability to control SEM.

---

[5] In contrast, the Manager has the contractual right to call capital contributions from Liberty CLO Holdco Ltd. Highland Ex. 7 section 2.2(a).

C.      **With Mr. Dondero in Control, the Debtor Failed to Identify the Amended
        Agreement as an Executory Contract**

11.      On December 13, 2019, with Mr. Dondero in control, the Debtor filed its *Summary
of Assets and Liabilities*, including a list of 185 separate executory contracts and unexpired leases;
the Amended Agreement was not among them. [Docket No. 247].

12.      On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended
Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting
Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended
Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808]
(the "Plan").  The Plan included a list of executory contracts that were assumed by operation of
the Confirmation Order pursuant to Bankruptcy Code section 365.  All executory contracts not
listed in the Plan were deemed rejected.  Because the Amended Agreement is not an executory
contract, it was not listed as an executory contract to be assumed under the Plan.

## ARGUMENT

13.      There is no dispute that the Amended Agreement was not listed in the Plan as an
executory contract to be assumed.  That fact was known to all no later than February 1, 2021 when
the Debtor identified the last of the executory contracts it was assuming.   HCRE Ex. 13.[6]
Nevertheless, after more than two years of active litigation, HCRE argued for the first time during
the Trial that the Amended Agreement is an executory contract that should be deemed rejected
since it was not assumed pursuant to the Plan.  HCRE's argument is without merit.[7]

---

[6] Citations to "HCRE Ex. __" refer to the exhibits filed in *NexPoint Real Estate Partners LLC f/k/a HCRE Partners,
LLC Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on November 1 and November 2, 2022*,
[Docket No. 3591].

[7] Notably, HCRE never filed a claim for damages resulting from Highland's alleged rejection of the Amended
Agreement.

14.    Though the Bankruptcy Code does not define "executory contracts," this circuit, like others, has adopted the definition of "executory contract" first articulated by Professor Vern Countryman.  *See, e.g., Ebert v. Devries Family Farm LLC*, 2014 Bankr. LEXIS 3621 (N.D. Tex. 2014).  In *Ebert*, Judge Lynn stated that:

> [t]he 'Countryman definition' provides that a contract is executory 'if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'  Moreover, an 'executory contract' is a contract 'on which performance remains due to some extent on both sides."

*Id*. at *26 (citations omitted).[8]  "A contract that only imposes remote or hypothetical duties is not an executory contract," and whether an agreement is executory is based on the facts and circumstances of the case.  *Id*. at *27.

15.    Courts determine whether a limited liability operating agreement is an executory contract using the same test.  "'Factors relevant in evaluating an LLC operating agreement include whether the operating agreement imposes remote or hypothetical duties, requires ongoing capital contributions, and the level of managerial responsibility imposed on the debtor."  *Id*.

16.    On additional and unique factor is particularly relevant here: Mr. Dondero's failure to identify the Amended Agreement as an executory contract in the Debtor's schedules when he controlled the Debtor (and HCRE).  In light of that fact, Mr. Dondero (and HCRE) should be barred from pursing the Defense since it directly contradicts the position he took when he controlled the Debtor.  At a minimum, Mr. Dondero's failure to identify the Alleged Agreement as an executory contract when he controlled the Debtor calls into question the whole Defense as he offered no explanation for his sudden change of heart.

---

[8] See also *Matter of Falcon V, L.L.C.*, 44 F.4th 348, 352 (5th Cir. 2022) ("the test for an executory contract is whether, under the relevant state law governing the contract, each side has at least one material unperformed obligation as of the bankruptcy petition date.").

A.      **Section 1.8 Imposes No Obligation on Highland but Even if It Did, the Obligation
        Would Be "Remote or Hypothetical"**

17.     HCRE argues that section 1.8 of the Amended Agreement imposed an affirmative
obligation on Highland and makes the Amended Agreement executory.  HCRE is wrong.  Section
1.8 is an "anti-consolidation" clause pursuant to which the parties agreed that if (and only if)
consolidation of SEM and Highland was required under GAAP, then the Amended Agreement
would be further amended to reallocate the membership interests as between HCRE and Highland
in a specified manner and in accordance with Treasury Regulations.  Highland Ex. 7 § 1.8
("Section 1.8").  Section 1.8 does not transform the Amended Agreement into an "executory
contract" because no "performance" is required by Highland—the effect of consolidation occurs
automatically by operation of contract.

18.     In other words, if consolidation is required, then the membership interests held by
HCRE and Highland shall be reallocated as provided in the Amended Agreement without any act
by Highland.  To the extent anyone has an obligation to adjust SEM's books and records to reflect
the reallocation mandated by Section 1.8, that obligation falls on SEM and HCRE, as the Manager.
*See*, *e.g.*, *id*. §2.6 (SEM and the Manager are solely responsible for maintaining the Members'
capital accounts); § 3.2 (Manager exclusively controls SEM); § 8.3 (SEM maintains the company's
books and records).

19.     In sum, because the consequences of consolidation have been pre-determined, and
because control of SEM is vested exclusively in HCRE in its capacity as SEM's Manager,
Highland would have no obligation to do anything if it were ever determined that Highland was
required to consolidate SEM.  Accordingly, Highland could never breach Section 1.8 in a way that
excuses HCRE's performance.  HCRE can simply effectuate the change in the manner set forth in

the Amended Agreement.  Section 1.8 does not support a finding that the Amended Agreement is

an executory contract under *Countryman*.

20.    But assuming for the sake of argument only that Highland has some theoretical

obligation under Section 1.8, that obligation would be—and would have always been—"remote or

hypothetical."  While there are various ways to get there (*e.g.*, financial control, managerial

control, or voting control), "consolidation" is required under GAAP only when one party (*e.g.*,

Highland) is determined to "control" another party (*e.g.*, SEM).[9]  And given the terms of the

Amended Agreement, the likelihood that Highland would be deemed to "control" SEM was always

remote or hypothetical and became non-existent when Highland and HCRE ceased to be related

parties.  *See* Highland Ex. 7 §§ 1.6, 2.6, 3.2, 3.7, 3.9, 4.1, 8.3, and 10.1.

21.    Consistent with these requirements, David Klos testified that from his perspective,

consolidation was not expected and Section 1.8 was added as a "belt and suspenders" or "double

check" just in case Highland's analysis proved faulty.  Morris Dec. Ex. A at 160:2-20.[10]  To the

extent consolidation was theoretically possible at the time the Amended Agreement was entered

into, that theoretical possibility has now been extinguished because Highland has no ability to

---

[9] *See, e.g., 12.4 Consolidation Model* published by PricewaterhouseCoopers, February 28, 2022 (https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/ifrs_and_us_gaap_sim/ifrs_and_us_gaap_sim/Uchapter_12_consolida_US/124_consolidation_mo_US.html); *1.3 The consolidation models* published by PricewaterhouseCoopers, July 31, 2022 (https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/consolidation_and_eq/consolidation_and_eq_US/chapter_1_an_introdu_1_US/13_the_consolidation_US.html); Common Control Entities and Consolidation of Variable Interest Entities, published in the CPA Journal, August 2018 (https://www.cpajournal.com/2018/08/15/common-control-entities-and-consolidation-of-variable-interest-entities/).

[10] Notably, Mr. Klos testified that consolidation of Highland and SEM would have had severe business and operational consequences.  For example, from a business perspective, consolidation would have resulted in a "fairly large distortion of [Highland's] balance sheet.  We'd be putting on an additional billion dollars of assets, close to a billion dollars of liability," something that would have been "confusing."  From an operational perspective, consolidation would have resulted in an "exceptionally large" increases in the scope, cost, and time of any audit as well as additional time, money, and effort needed to build disclosures "from scratch."  Morris Dec. Ex. A at 147:17-150:3. Given the severe adverse consequences that would result from consolidation, Section 1.8 was prudently included in the Amended Agreement even though there was no expectation that consolidation would ever be required.  In the end, Section 1.8 is akin to a catastrophic health insurance policy, something one adopts because of the severely adverse consequences that would result from the occurrence of a "remote or hypothetical" event.

obtain "control" of SEM without HCRE's approval, and that is far beyond "remote or hypothetical."

22.    In sum, Section 1.8 does not create any affirmative obligation on Highland's part, but even assuming that it does, that obligation would have been "remote and hypothetical" when the Amended Agreement was signed and became even more so "at the time of the bankruptcy filing."

**B.    Other Sections that HCRE Relies Upon Impose No Obligations on Highland but Serve Only to Limit the Members' Rights**

23.    During exceedingly brief questioning of Timothy Cournoyer, and with passing references during closing argument, HCRE contends that Sections 4.3, 7.2, 7.4, and 10.1 each impose affirmative obligations on Highland that render the Amended Agreement "executory."[11] None of these provisions render the Amended Agreement "executory."  The lack of probative evidence and substantive argument reflects the flimsy nature of HCRE's contention.

24.    Sections 4.3 contains limitations on Members' voting rights.  Section 7.2 contains limitations on Members' ability to transfer interests.  And Section 7.4 contains limitations on Members' ability to withdraw from SEM.  Highland Ex. 7 §§ 4.3, 7.2, and 7.4.  None of these provisions impose obligations on Highland the failure of which "'would constitute a material breach of the contract, thereby excusing the performance of the other party.'"  *Ebert*, 2014 Bankr. LEXIS 3621 * 26 (*quoting Phx. Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62 (5th Cir. 1994).

---

[11] Mr. Cournoyer credibly testified that (a) he did not recall playing any role in the "structuring" of the original limited liability company agreement or the Amended Agreement and that (b) while he was one of numerous recipients of an early version of the Amended Agreement, he was not "deeply involved," did not serve as the "point person" on the matter, and had no recollection of even reviewing the draft Amended Agreement.  Morris Dec. Ex. A. at 135:4-137:14; 144:18-146:4).  In fact, the documentary evidence corroborates Mr. Cournoyer's recollection that he had no substantive involvement in drafting or commenting on the Amended Agreement.  Highland Ex. 13 (a lengthy e-mail string showing no response by Mr. Cournoyer).  Based on the foregoing, HCRE failed to establish a foundation on which the Court can rely on Mr. Cournoyer's testimony.

25.     If Highland ever attempted to vote, or transfer its interests, or withdraw from SEM in violation of any of the cited provisions, HCRE would have no right to just walk away from its extensive obligations to Highland and SEM; instead, such acts would simply be ignored or void *ab initio*.

26.     By analogy, sections 10.5 and 10.6 "obligate" Highland to apply Delaware law when enforcing the Amended Agreement and pursue claims only in "courts of the State of Delaware."   Highland Ex. 7 §§ 10.5, 10.6.   Yet, HCRE cannot credibly contend that its performance under the Amended Agreement would be excused if Highland advocated for the application of a different state's law or commenced an action outside of Delaware.   Instead, Highland's actions would be disregarded and either the proper law would be applied or venue would be transferred to Delaware.

27.     Finally, HCRE can find no succor in section 10.1, a "miscellaneous" provision addressing amendments and waivers to the Amended Agreement.   The first clause of section 10.1 provides that the Amended Agreement cannot be further amended, modified, or waived without "the prior written consent of the Manager and HCRE."   The second clause makes clear that certain amendments cannot be effectuated "without a Member's consent."   Highland Ex. 7 § 10.1.   Section 10.1 does not require any member to do anything; instead, it merely requires a Member's consent before certain amendments can be effective.   Highland can choose to consent or not on those matters; it is not obligated to do anything.   And regardless of whether or not Highland chooses to exercise its rights under section 10.1, that decision—which is exclusively Highland's to make— would never constitute a breach that would excuse HCRE's performance.

## **CONCLUSION**

Based on the foregoing, the Court should find as a matter of law and fact that the Amended Agreement is not an executory contract and reject the Defense.

11

Dated: November 10, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.'S POST-TRIAL
## BRIEF ADDRESSING HCRE'S EXECUTORY CONTRACT DEFENSE

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as

follows:

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and
service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. ("Highland"), the Reorganized Debtor in the above-captioned chapter 11 case (the "Bankruptcy Case").  I submit this Declaration in support of *Highland Capital Management, L.P.'s Post-Trial Brief Addressing HCRE's Executory Contract Defense*.  I submit this Declaration based on my personal knowledge and review of the document listed below.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the transcript of the Trial[2] held on November 1, 2022.


Dated: November 10, 2022                    */s/ John A. Morris*
                                            _____
                                               John A. Morris

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Post-Trial Brief.

DOCS_NY:46735.1 36027/003

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, CHIEF JUDGE

In Re:                                ) Case No. 19-34054-sgj11
                                       )
                                       ) <u>TRANSCRIPT of the HEARING</u>
HIGHLAND CAPITAL MANAGEMENT, L.P.,     ) <u>on DEBTOR'S OBJECTION to</u>
                                       ) <u>HCRE's PROOF Of CLAIM</u>
                                       )
                    Debtor.            )
                                       ) November 1, 2022
_____) Dallas, Texas


<u>Appearances</u>:

For the Debtor:          John A. Morris
                         Hayley Winograd
                         Pachulski Stang Ziehl & Jones LLP
                         780 Third Avenue, 39th Floor
                         New York, New York  10017-2024

                         Zachery Z. Annable
                         Hayward PLLC
                         10501 N. Central Expressway, Suite 106
                         Dallas, Texas  75231

For Creditor and         C. William "Bill" Gameros, Jr.
Claimant NexPoint        D. Wade Carvell
Real Estate Partners,    Hoge & Gameros, L.L.P.
also known as HCRE:      6116 N. Central Expressway, Suite 1400
                         Dallas, Texas  75206



Digital Court            United States Bankruptcy Court
Reporter:                Michael F. Edmond Sr., Judicial
                          Support Specialist
                         1100 Commerce Street, Room 1254
                         Dallas, Texas  75242


Certified Electronic     Susan Palmer
Transcriber:             Palmer Reporting Services


         Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

2

<u>I N D E X</u>

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| James Dondero |  |  |  |  |
| By Mr. Gameros: | 33 |  | 59 |  |
| By Mr. Morris: |  | 37 |  |  |
| Matthew McGraner |  |  |  |  |
| By Mr. Gameros: | 64 |  |  |  |
| By Mr. Morris: |  | 75 |  |  |
| Timothy Cournoyer |  |  |  |  |
| By Mr. Gameros: | 134 |  |  |  |
| By Mr. Morris: |  | 144 |  |  |
| David Kelly Klos |  |  |  |  |
| By Mr. Gameros: | 146 |  | 161 |  |
| By Mr. Morris: |  | 154 |  | 163 |

Exhibits Received in Evidence:

| | |
|---|---|
| Debtor's 70 and 71: | page    7 |
| One of Debtor's exhibits: | page  156 |
| Debtor's 62 - 65 and 75 - 86: | Page  165 |
| Claimant's 7 - 16: | Page  169 |

Statements/Arguments:

| | |
|---|---|
| Opening on behalf of the Claimant: | page   12 |
| Opening on behalf of the Debtor: | page   18 |
| Closing on behalf of the Claimant: | page  169 |
| Closing on behalf of the Debtor: | page  187 |
| Rebuttal on behalf of the Claimant: | Page  197 |

*Hearing on Debtor's Objection Claim* 3

1  Wednesday, April 20, 2022                         9:40 o'clock a.m.

2                        P R O C E E D I N G S

3        THE COURT:  All right.  We are here for a Highland

4  setting.  We have an objection to the proof of claim of HCRE.

5  Let's get lawyer appearances, please.  First in the courtroom.

6        MR. CARVELL:  Good morning, Your Honor.  Bill Gameros

7  and Wade Carvell for HCRE.

8        THE COURT:  Good morning.

9        MR. MORRIS:  Good morning, Your Honor.  John Morris,

10 Pachulski Stang Ziehl and Jones.  I'm here with my colleagues

11 Hayley Winograd and my co-counsel Zach Annable, for Highland

12 Capital Management, L.P.

13       THE COURT:  Good morning.

14       All right.  I'm guessing these are the only formal

15 appearances we have, but if you're on the WebEx and you feel you

16 need to appear, go ahead.

17       All right.  Well, again we have a two-day set aside

18 for the objection to the proof of claim of HCRE.  Do we have any

19 housekeeping matters before we begin?

20       MR. CARVELL:  Your Honor, I believe we have stipulated

21 to a large chunk of exhibits.  It may make sense to preadmit

22 them at this time.  And those are —

23       THE COURT:  Okay, let me pull —

24       MR. CARVELL:  — with respect to —

25       THE COURT:  — let me pull them out.  Okay, you're

*Hearing on Debtor's Objection Claim* 4

1   going to start with the plaintiff's?

2          MR. CARVELL:  I'll start with plaintiff's, Your Honor.

3          THE COURT:  Okay.

4          MR. CARVELL:  1 through 6 and 17 through 20 are

5   agreed.

6          THE COURT:  Okay, 1 through 6.  And then you said 17

7   through 20?

8          MR. CARVELL:  Yes, ma'am.

9          THE COURT:  Okay.  Okay, my list only goes through 19,

10  but I assume there has been one added overnight?

11         MR. CARVELL:  Yes, Your Honor.  And it does appear in

12  your notebook, the — which are the white notebooks for claimant.

13         THE COURT:  Okay, got it right here.

14         All right, will you confirm you have stipulated to

15  that?

16         MR. MORRIS:  We do, Your Honor.  Highland does

17  stipulate.  We do have our objection, which we can discuss at

18  the appropriate time, to 7 through 16, but Highland otherwise

19  has no objection.

20         And with respect to Highland's exhibits, they can be

21  found at Docket 3597, which was the amended witness and exhibit

22  list that we filed yesterday evening.  I am pleased to report

23  that the parties — the reason for the amendment is that the

24  parties agreed that Mark Patrick will not testify live today and

25  that instead we both designated portions of the deposition

*Hearing on Debtor's Objection Claim*                                    5

1    transcript of Mr. Patrick.  So we amended for the sole purpose

2    of adding that  document, which can be found, I think, that —

3    it's the last document — I think it's 103, in fact.

4                THE COURT:  Okay.

5                MR. MORRIS:  So there is no objection.  If I could

6    just get confirmation, there is no objection to the following

7    exhibits, and we would move for them to be admitted into

8    evidence.  Exhibits 1 through — excuse me —

9                THE COURT:  1 through what?

10               MR. MORRIS:  Exhibits 1 through 60.

11               THE COURT:  Okay, 1 through 60.  Okay.  Okay.

12               MR. MORRIS:  Exhibits 87 through 92.

13               THE COURT:  87 through 92, okay.

14               MR. MORRIS:  Exhibits 94, 95, and 103.

15               THE COURT:  All right.  Do you confirm?

16               MR. CARVELL:  I confirm.  I would note that there are

17   a couple of exhibits that are in there that have been omitted,

18   but were not included in the binder.  I conclude those aren't

19   admitted, but counsel is correct in his statement.

20               THE COURT:  Okay.

21               MR. MORRIS:  And I will confirm for the Court that

22   after meeting and conferring, Highland has — is going to

23   withdraw Exhibits 66,...

24               THE COURT:  Okay.

25               MR. MORRIS:  ...72, 73, and 74.

*Hearing on Debtor's Objection Claim*                                    6

1          The following exhibits are rebuttal exhibits, so we're

2     not offering them at this time.  That's 93 and 96 to 100.  It

3     will depend on how the evidence comes out and if I feel the need

4     at that time to move them, we'll have that discussion then.

5          THE COURT:  Um-hum.

6          MR. MORRIS:  There is an objection or at least there

7     was an objection to Exhibits 70 and 71.  Those are the

8     deposition transcripts of Mr. Dondero and Mr. McGraner, assuming

9     that HCRE is pressing that objection.  We would move for their

10    entry into evidence, pursuant to Federal Rule of Civil Procedure

11    32(a)(1), which provides that at a hearing or a trial, all or

12    part of a deposition may be used against the party on three

13    conditions.  Number one, that the party was present and

14    represented, and had notice of the deposition, which was true

15    for both of those deposition transcripts.  It may be used to the

16    extent provided under the Federal Rules of Evidence; there is no

17    objection to that piece.  And to the extent that use is allowed

18    under Federal Rule of Civil Procedure 32(a) through — (2)

19    through (8); and 32(a)(3) says that an adverse party can use for

20    any purpose the deposition of anyone who, when deposed, was a

21    party's officer or Rule 30(b)(6).

22         Mr. Dondero is HCRE's manager.  Mr. McGraner testified

23    in an individual capacity, and he is an officer of HCRE.  And he

24    also testified as a Rule 30(b)(6) witness.  So we would

25    respectfully move Exhibit 70 and 71 into evidence in their

*Hearing on Debtor's Objection Claim*                         7

1   entirety.

2          THE COURT:  Response.

3          MR. GAMEROS:  Go ahead.

4          MR. CARVELL:  Your Honor, both of those witnesses are

5   going to testify live.  If Mr. Morris has questions, he can ask

6   them.  I don't know if we need to throw in a whole deposition

7   transcript for witnesses who are going to be here.  That's the

8   basis of our objection.

9          THE COURT:  Okay.  But what about the rules he

10  referenced, do you have any contrary interpretation?

11         MR. CARVELL:  No, Your Honor.

12         THE COURT:  Okay.  Well, I'll overrule the objection

13  and allow those in then.

14     (Debtor's Exhibits 70 and 71 received in evidence.)

15         MR. MORRIS:  So then the last group of exhibits to

16  which HCRE has objected are Exhibits 63 — I apologize — 62, 63,

17  64, and 65, as well as Exhibits 75 to 86.  And all of those

18  documents, Your Honor, relate to the Wick Phillips

19  disqualification motion.  They're the transcripts, they're the

20  pleadings, they're the documents where parties took their

21  positions.  And while we understand that the basis for the proof

22  of claim is, you know, an alleged mistake in the documentation,

23  we believe that the entire Wick Phillips detour, if you will,

24  goes to the credibility of this entire process and the integrity

25  of the entire process.

*Hearing on Debtor's Objection Claim*                                    8

1        Mr. McGraner is going to testify later today that he
2    knew and understood that Wick Phillips jointly represented
3    Highland and HCRE in the drafting of the original LLC agreement,
4    in the negotiation of the KeyBank loan document, and in the
5    drafting of the very amended and restated LLC agreement that is
6    at issue today.

7        HCRE nevertheless went and hired Wick Phillips to
8    prosecute the proof of claim.  Mr. McGraner is going to testify
9    that they opposed Highland's disqualification motion and he's
10   going to testify that they did so not very hard.  And I think
11   having forced Highland to spend really a considerable amount of
12   money hiring an expert, taking discovery, putting on a whole
13   evidentiary hearing, having Your Honor go through the whole
14   process.  I think it goes directly to the integrity of this
15   proof of claim, the integrity of the positions that HCRE is
16   taking, and the credibility of the witnesses.

17       So that's why we believe that these documents are
18   relevant.  The only — the only objection here is relevance, by
19   the way.

20       THE COURT:  All right.  Mr. Carvell.

21       MR. CARVELL:  I think I think that's probably
22   something to take up when Mr. McGraner testifies.  It's
23   certainly not something to preadmit when our objection is
24   relevance.  We're actually here on the narrow issue.  It's a
25   proof of claim and what's the basis for the proof of claim.  The

1  debtor doesn't have any kind of affirmative claim to present

2  today.  So to the extent that the debtor wants to put in

3  pleadings and transcripts, I think they should bring them up in

4  the context of are they going to be relevance.  Right now, we

5  don't whether they will be or not.  So I don't think it's

6  appropriate to preadmit.  If he wants to bring them up at that

7  time, we can deal with it then.

8          THE COURT:  Okay.  Well, again, they're all pleadings

9  that were filed on the docket and I guess a transcript.

10         MR. GAMEROS:  And transcripts, that's the only

11 exception.

12         THE COURT:  Yeah.

13         MR. GAMEROS:  Correct.

14         THE COURT:  All right.  We'll I'll carry the

15 objection.  I mean I can take judicial notice of all of this.

16 I'm not sure this is, you know, a relevance objection.  It seems

17 sort of oddly placed to me.  I mean I take judicial notice.  It

18 happened, I have a memory of it.  But I'll carry the objection

19 and see if I think it's relevant — relevant before it's all

20 over.

21         All right.  Any other housekeeping matters?

22         MR. CARVELL:  Your Honor, with respect to Claimant's 7

23 through 16, to which the debtor has objected, these are all

24 pleadings.  They are on the docket sheet and they relate to the

25 plan and the debtor's decision on whether to accept or reject —

1   assume or reject executory contracts.  We'll want to make

2   reference to them.  And I believe the objection is the same —

3   the same that we have.  It's relevance.  If Your Honor is taking

4   judicial notice, then we would throw those into the same pile.

5          THE COURT:  Okay.  Can you repeat again which exhibits

6   you're talking about?

7          MR. CARVELL:  Sure.  Claimant's 7 through 16.

8          THE COURT:  Okay.  I had the wrong list out.

9   Claimant's 7 through 16, okay, again all pleadings, confirmation

10  related plan, executory contract.  Okay.  I was looking at the

11  wrong list when you were talking, so could you repeat your —

12  your —

13         MR. CARVELL:  Sure.  Your Honor, I just — if we're

14  arguing preadmission, and I don't know that we are asking to

15  preadmit at this point.  We'll bring them up during the course

16  of the hearing; I think that's the appropriate time to deal with

17  them.  I say the same thing that —

18         THE COURT:  Okay.

19         MR. CARVELL:  — Mr. Morris did, they're pleadings.

20         THE COURT:  Okay, got it.

21         MR. CARVELL:  Thank you.

22         MR. MORRIS:  And I'll just make the point now that

23  here we are two and a half years after the plan has been filed

24  and we're hearing about this argument for the first time.  And

25  it's not surprising that we're hearing about this argument for

*Hearing on Debtor's Objection Claim*                    11

1    the first time because, as often happens in these matters, we

2    get — we get a mix.  The defense changes, that the story

3    changes, and everything changes.  The only point that I want to

4    make to the Court is we met and conferred about these.  I made

5    the point that these are not execute — this is not an executory

6    contract.  There is no obligation, right, to be an executory

7    contract.  There has to be a mutuality of obligations, very

8    simple.  Highland has rights under the contract, but it doesn't

9    have the obligation to do anything.

10              I asked counsel to identify for me the specific

11    provisions in the agreement that they contend is an obligation,

12    an affirmative obligation that Highland has, and I have yet to

13    hear that.  So I just ask the Court to listen carefully.  I mean

14    I think they have waived this argument.  I think there's lots of

15    other things, but on the merits let's focus really on the

16    factual issue and let's see if they can identify a material

17    obligation that Highland has.

18              THE COURT:  Okay.  So —

19              MR. CARVELL:  Thank you, Your Honor.

20              THE COURT:  — I have to respond.  Yes, the objection

21    is carried on those.

22              All right.  Anything else or shall we go to opening

23    statements?

24              MR. MORRIS:  I would just say, Your Honor, we agreed

25    to opening statements.  And I think Mr. Dondero is going to

*Opening Statement on behalf of the Claimant*                    12

1   testify, then I think Mr. McGraner will Mr. McGraner will

2   testify, just so the Court has a picture of where we go today.

3   And then I think HCRE wants to examine Dave Klos and Tim

4   Cournoyer, and then we'll finish.  And we're cautiously

5   optimistic that we'll get done today.

6              THE COURT:  Oh, okay, lovely.

7              All right, well, I will hear your opening statements

8   then.

9              MR. GAMEROS:  Mr. Edmond.

10             THE COURT:  We're doing PowerPoint?  Okay, I got it

11  here.

12             MR. GAMEROS:  I'm going to do it from up there, at the

13  podium.

14             Your Honor, is it all right if I use the podium,

15  please?

16             THE COURT:  Yes, please.

17             MR. GAMEROS:  All right.  Thank you.

18             THE COURT:  You may proceed.

19             OPENING STATEMENT ON BEHALF OF THE CLAIMANT

20             MR. GAMEROS:  Good morning, Your Honor.

21             THE COURT:  Um-hum.

22             MR. GAMEROS:  My name is Bill Gameros and I represent

23  NexPoint Real Estate Partners, also called HCRE.  And I said

24  HCRE in the intro, but really their name is NexPoint Real Estate

25  Partners.  Today, throughout the presentation you're going to

*Opening Statement on behalf of the Claimant*                    13

1    hear NREP and HCRE, and they're interchangeable, they're the

2    same entity.  And that's the entity that filed the proof of

3    claim back in April of 2020.

4                Next slide.

5                What's this fight about?  This fight's about SE

6    Multifamily Holdings.  It is itself a Delaware LLC.  And at the

7    time of filing of the proof of claim, it was a single-purpose

8    LLC, still is.  It was formed to acquire 26 apartment complexes.

9    And you will hear some detail about that transaction.  This is a

10   relatively short fuse buy from Starwood.  And you're going to

11   hear about a big financing agreement called the KeyBank bridge

12   loan.  That is the vehicle that provided most of the money to

13   acquire the 26 apartment complexes, multifamily apartment

14   complexes.

15               The fight starts, if you will, with the formation of

16   SE Multifamily Holdings, LLC.  The original agreement is formed

17   in August of 2018.  It had only two members:  HCRE, now called

18   NREP, and Highland.  That's it.  It was literally formed so it

19   could capture what becomes — well, what is called Project

20   Unicorn and becomes SE Multifamily.

21               Next slide.

22               That agreement was amended in March of 2019, but a lot

23   happened between August of 2018 and March of 2019.  The

24   amendment is effective back to the original date.  And if you

25   read the deposition transcripts of Mr. Patrick, he is very clear

*Opening Statement on behalf of the Claimant* 14

1   about why this amendment happens in March of 2019, because

2   that's the date they have to make an amendment for tax purposes

3   to go back to 2018.  That's why March of 2019 happens on the

4   date that it happens.  It's an amendment to capture the

5   performance of the portfolio and the acquisition in 2018.

6           But what also happened?  As you can see on Schedule A,

7   this is lifted right out of the amended LLC agreement.  There

8   are now three members:  HCRE, Highland Capital, and BH

9   Management.  BH actually, and you'll see it's in the exhibits,

10  Exhibit 2, Claimant's 2, BH Management is actually BH Equities.

11  They sign it as BH Equities, but this is the capital

12  contribution table and who owns what.

13          Now, as we'll find out, BH put over $21 million in

14  this thing back in September of 2018 without a written

15  agreement.  So it's very informal how they operated at that

16  time.  They put in $21 million as a retrade from KeyBank.

17  You're going to hear all that testimony later, but it causes a

18  lot of stress in the agreement.  And they don't formalize this

19  agreement until March of 2019.

20          Next slide.

21          What was Highland's role?  The evidence is going to be

22  very clear:  Highland was not the lead borrower on the bridge

23  loan.  This Court's been told that Highland was brought in for

24  credit enhancement and it was a guarantor.  It was neither of

25  those things.  It was not a guarantor — it was a coborrower, and

*Opening Statement on behalf of the Claimant*                    15

1  we'll talk about that in a minute — but it didn't pledge any

2  assets.

3       When we look at the Key bridge loan agreement,

4  Highland contributes zero assets as collateral.  None.  In fact,

5  you're going to see folks that are coborrowers in the Key bridge

6  agreement that aren't even a member of SE Multifamily.  The

7  other borrowers made a whole series of pledges, including the 26

8  apartment complexes and a variety of other assets as a

9  collateral for KeyBank.  That was a demand from KeyBank, okay.

10  But Highland didn't have any unencumbered assets to pledge.  The

11  testimony will be crystal clear on that today:  It pledged

12  nothing for the KeyBank loan.

13       And, just as important, to the extent that Highland

14  wants to argue it was critical to the KeyBank loan, KeyBank let

15  Highland go before the bankruptcy was filed as a borrower.

16  Released them from the loam.  And that's because they had no

17  collateral up and they weren't doing anything there.  Things

18  changed over time.  That's part of the reason why this proof of

19  claim is here, things changed of time.  But let's be clear about

20  this, even though the document says they're a coborrower,

21  KeyBank had to burn through collateral before it could get to

22  any of the borrowers.  And the collateral it had was greater

23  than the obligation.  We're going to look at that paragraph

24  specifically — paragraph 5.12, I've looked at it too much.

25  We're going to look at that paragraph specifically in the

*Opening Statement on behalf of the Claimant*                    16

1    KeyBank bridge loan and see that.

2              Next slide, please.

3              What did Highland do?  First, it contributes $49,000.

4    That's what it shows in the first-amended LLC agreement.  In the

5    original LLC agreement, it contributed $49.  Four-nine-dot, not

6    four-nine comma thousand.

7              What did it get?  Well, within 45 days of the original

8    loan closing in September of 2018, Highland gets $750,000 as a

9    rebate from KeyBank.  It literally, first money out, and makes a

10   1400-percent return on investment within weeks.

11             The 46.6 percent interest that it carries today is in

12   assets held by SE Multifamily worth over $20 million, for which

13   it put up $49,000.  It's a pretty good deal for Highland.  Your

14   Honor, that is not adequate consideration for what it's getting

15   out of this agreement; 49,000 to get 1400-percent return on

16   investment within weeks and 46 percent going forward on 20

17   million in assets, that doesn't make any sense.  It makes zero

18   sense, unless — next slide, please — the agreement's intended to

19   be dynamic.  That testimony is going to be uncontroverted.

20   Everyone says this is a living document.  It's going to change,

21   could change annually based on the performance of the portfolio,

22   addition, subtractions, work of the members — BH.  You're going

23   to hear a little bit about BH today.  And actually there's

24   transcripts in the record already about it.

25             BH is the property management company.  They come in

*Opening Statement on behalf of the Claimant*                    17

1   and they physically manage the 26 apartment complexes.  That's

2   what they do.  They put in $21 million, they got six percent

3   back, and they management.  One of the things that BH wanted was

4   to increase its equity position in SE Multifamily as a result of

5   that work, not just the capital they put in, but also the work

6   they were doing.  That was one of the things they were looking

7   for.  And that would be a reason for amendment.  The testimony

8   will be clear:  They were constantly asking for an amendment,

9   and it just never happened.

10          Why?  I already explained why, but it was a dynamic

11  living document in the PowerPoint Slide.  Every single witness

12  is going to say that that's true.  No one is going to say,

13  'Nope, March of 2019 set in stone, we're done.'  No one's going

14  to say that, because the idea was we would look at the portfolio

15  and make changes to it on a go-forward basis based upon

16  performance as we needed to.  They brought in other members.

17  There's all sorts of circumstances.  New members didn't happen;

18  we know that.  We didn't admit any new members, undisputed.  But

19  the performance of SE Multifamily, that did go forward.  We'll

20  find out what happened to that along the way, but the idea was

21  that it could be amended, and that's now set in stone and

22  couldn't happen.

23          Next slide, please.

24          So HCRE or NREP filed a proof of claim to protect its

25  rights, prepared by Bonds Ellis.  The debtor objected to it;

*Opening Statement on behalf of the Debtor*                    18

1   filed a response.  We tried to withdraw the proof of claim; the

2   debtor objected to that.  So that's why we're here today.  We

3   tried to withdraw the proof of claim.  We didn't feel we needed

4   it anymore, quite frankly, but yet we're here today because they

5   denied or refused to allow us to withdraw the proof of claim.

6            Next slide, please.

7            What's the evidence going to be today?  It's going to

8   be very clear that the agreement was intended to be dynamic,

9   that Highland stopped providing any services whatsoever.

10  Remember, at the front end Highland was providing shared

11  services, employees, some expertise, et cetera.  After the

12  shared services agreement stopped and they filed bankruptcy, all

13  of that stopped.  And we're left in a position where they've got

14  $49,000 up yet looking to receive not only have they received

15  $750,000 back but millions more going forward while doing

16  nothing.  That doesn't make sense.  That is a good faith basis

17  reason to deny the debtor's objection and at the end of this

18  hearing today that's what we're going to ask you to do.  Thank

19  you, Your Honor.

20           THE COURT:  All right.  Thank you.

21           Mr. Morris.

22           OPENING STATEMENT ON BEHALF OF THE DEBTOR

23           MR. MORRIS:  Good morning, Your Honor.  John Morris,

24  Pachulski Stang Ziehl and Jones for Highland.  I have a deck as

25  well, and my assistant Ms. Canty will put it up on the screen,

*Opening Statement on behalf of the Debtor*                    19

1   but I can hold — I can hand up hard copies if you'd like.

2          THE COURT:  All right.

3          Did you, by chance, have hard copies of yours as well,

4   Mr. Gameros?

5          MR. GAMEROS:  I don't have them with me, Your Honor,

6   no, I don't.

7          THE COURT:  Okay, maybe you can get them during the

8   day, or something.

9          MR. GAMEROS:  We'll get them right down.

10          THE COURT:  Okay.  Thank you.

11          MR. MORRIS:  So, think about it, he just told you that

12   we've gotten this enormous, crazy return, and they filed their

13   proof of claim, and we litigated for two years, and it's

14   completely unjustified, and nobody anticipated that this would

15   happen, but they moved to withdraw their proof of claim?  How

16   does that make any sense?

17          This is an asset worth over $33 million.  And instead

18   of coming here to fight for it, they were ready to fold their

19   tent.  And the reason they were ready to fold their tent, Your

20   Honor, because they didn't want you to hear the evidence that

21   you're going to hear today because the evidence establishes that

22   the proof of claim was filed in bad faith and this whole matter

23   has been handled in bad faith.

24          And let me start with the facts that were just

25   presented to you; $750,000 that Highland received, 1400-percent

*Opening Statement on behalf of the Debtor*                    20

1    return on capital.  You know what happened to that $750,000, a

2    couple of days later Mr. Dondero signs a promissory note,

3    Highland gives it to HCRE, and it's part of the notes litigation

4    and they refuse to pay that.  Highland got not one nickel.  It

5    all went to HCRE.  Highland got stuck with the promissory note

6    that they're now fighting to get paid.  Seven hundred and fifty

7    thousand dollars, 1400-percent return.

8            KeyBank.  They want to minimize Highland's role in

9    KeyBank.  No collateral, we weren't a guarantor.  Mr. Dondero

10   thought we were a guarantor.  He's going to tell you that, but

11   whatever they were, they were a coborrower under the loan.  They

12   can minimize it all they want.  We were not the lead borrower,

13   right.  Here's the thing.  Think of all of that six months later

14   when they signed the agreement, all of that was known to them,

15   and they still gave Highland 46.06 percent.  You can't make this

16   stuff up.

17           Let's go to what's really at play here, if we can go

18   to the next slide, we start with the proof of claim.  This is

19   the proof of claim that they filed.  And this is all we're told,

20   right.  This is an adversary proceeding.  We don't have a full

21   pleading.  We don't know the contours of what the claim is, but

22   this is what HCRE filed in April of 2020 and they really make

23   two points.  The first is that the claimant may be entitled to

24   distributions, but they haven't been made because of Highland.

25   You're not going to hear any evidence to support that, other

*Opening Statement on behalf of the Debtor*                      21

1    than maybe somebody's going to testify because Highland was in

2    bankruptcy.

3          Highland was a member of SE Multifamily, but HCRE was

4    the manager.  SE Multifamily was not in bankruptcy.  I'll wait

5    with bated breath to find out what the theory is as to how

6    Highland's bankruptcy somehow prevented HCRE from causing SE

7    Multifamily to make distributions.  It's bizarre.

8          The second sentence says, "Claimant contends that all

9    our portion" — we don't really know what they're talking about,

10   is it one percent, is it 99 percent, is it a hundred percent,

11   don't know — "all our portion of the debtor's equity does

12   belong" — I think that's a typo.  If somebody had proofread the

13   document before it was filed they would have seen that.  I think

14   it means does not belong to the debtor.

15         Okay, so they're challenging Highland's interest in SE

16   Multifamily.  That's what we're told.  And Highland objects.

17         And if we can go to the next slide, Wick Phillips is

18   retained by HCRE to prosecute the proof of claim, and they file

19   a pleading.  It's Highland's Exhibit 2.  And if you go to

20   paragraph 5, this is really the entirety of what we're told is

21   the basis for the claim, that the organizational documents

22   improperly allocate the ownership percentages due to mutual

23   mistake, lack of consideration, and/or failure of consideration.

24   And these are the specific requests, and this is really

25   important.  I'll get to this in a moment, but the specific

*Opening Statement on behalf of the Debtor*                    22

1    requests is that they are asserting claims for recision,

2    reformation, or modification of the agreement.  That's what

3    we're told.

4              If we can go to the next slide.

5              But here is the thing, Your Honor.  You know it's

6    Exhibit 7 is the agreement itself, and we'll look at that in a

7    moment.  Exhibit 7 is the amended and restated LLC agreement.

8    There is Schedule A, which you have gotten a preview about.  And

9    it sets forth the parties' capital contributions as well as

10   their membership interests in the debtor — in the SE

11   Multifamily.  And what you're going to see, the evidence is

12   going to show, and here is a point I really need to emphasize,

13   Your Honor, if you will look at HCRE's exhibit list, consistent

14   with almost every single matter that we do here, there is not a

15   single contemporaneous piece of evidence that they're putting

16   before the Court, that they're putting in the record that

17   supports their case.  There is not an email, there is not a

18   draft document.  There is nothing except for pleadings and the

19   testimony that you're going to hear from the owners of the

20   company now that don't want to part with their $33 million

21   interest.

22             But I've got an awful lot of documentary evidence.

23   I've got here Exhibits 19, 30, 31, 32.  You're going to see,

24   you're going to hear from the witnesses, I'll walk you through

25   the documents, and it's going to show you that 46.06 percent was

*Opening Statement on behalf of the Debtor* 23

1   not an accident, it was actually negotiated, it was actually

2   drafted by people working under Mr. McGraner's control six

3   months after KeyBank, after — you know, Highland played no role

4   in all of that, you'll hear.

5           If we can go to the next slide.

6           There are multiple drafts of the agreement, and I want

7   to look at just the first one.  There are four sections of the

8   LLC agreement:  Sections 1.7, 6.1a, 9.3e in Schedule A, that set

9   — that sets forth the members' interests in SE Multifamily.  And

10  in each of those four sections it says that Highland has 46.06

11  percent of the membership interests.  And that 46.06 percent,

12  again not an accident, because the original agreement was 51-49,

13  HCRE to Highland.  And when BH Equity comes in and they get

14  their six point, all they do is reduce Highland and HCRE's

15  interest by six percent.  If you multiply, you know, 49 percent,

16  I guess by 94 percent, you get 46.06 percent.  It's not an

17  accident.

18          And let's just take a look quickly — do you have the

19  exhibit binders?

20          THE COURT:  I do.

21          MR. MORRIS:  If we can go to Highland's Exhibit 12.

22  So this is an email dated February 28th.  It's internal.  It's

23  to all different people working in the Highland complex.  The

24  evidence will be undisputed that they were all rowing the boat

25  in the same direction, all looking out for both HCRE and

*Opening Statement on behalf of the Debtor*                    24

1   Highland jointly.  It's an email from Mark Patrick to a whole

2   bunch of people.  And he attaches a draft of the to-be-amended

3   LLC agreement.

4        And if you turn to the back you will see that there is

5   actually a black line that Mr. Patrick attaches and shares with

6   everybody.  And that black line, if you take a look at page 3,

7   because there's two document, there's a clean document and then

8   there's a black line behind it, if you look at the bottom,

9   Section 1.7, relates the company interest.  And you will see

10  that they actually changed it.  Not an accident.  They change it

11  to 46.06 percent.  Black line.

12        If you go to Section 6.1, which can be found at the

13  bottom of page 10, you've got a black line.  They changed the

14  interest to 46, from 49 percent to 46.06 percent.  Section 9.3,

15  page 15.  9.3e, again you see the same change.  And of course

16  you see the same change in Schedule A, which is on page 19.

17        Now there is no change in the capital contribution

18  yet, and that's going to be really important, but they do change

19  the percentage interests.

20        Oh, I do want to point out one other change that I

21  hadn't focused on.  It's in Section 10.1, which can be found on

22  page 16.  And this is — this is also really important because

23  you've heard a little bit about this concept of a living

24  document.  I've heard that in some constitutional arguments.

25  I've never heard that about a contract.

*Opening Statement on behalf of the Debtor*                25

1    But here's the thing, and I'll get to this in a little

2    bit more detail, paragraph 10.1 absolutely permits this

3    agreement to be amended.  I'm not sure that an agreement ever

4    needs to say that.  If the parties agree, they can amend at any

5    time, right?  But here is the funny thing.  Look at this.  They

6    were really focused on 10.1, because the original draft said

7    that it could be amended only with the prior consent of the

8    manager and all the members, and they changed that.  They didn't

9    want BH Equities to have that right.  So now the only way it

10   could be amended is if the manager or HCRE, they wanted to limit

11   the consent that was required to HCRE, except for certain

12   circumstances, which we're going to talk about too because it's

13   very important.

14   This section, 10.1, absolutely obliterates any idea of

15   a living document.  Now you have an agreement.  You drafted it.

16   It says it can be amended.  It says it can only be amended with

17   HCRE's consent.  What are we talking about?

18   What you're not going to hear is that any attempt was

19   ever made to amend the agreement.  They never asked BH Equities

20   to amend the agreement.  They never suggested it was going to be

21   amended.  We'll get to that more in a moment.

22   Let's go to the next slide — so — so actually before

23   we do, so there are multiple versions of this document that are

24   being gloated around just among Highland people.  Before it even

25   makes its way to BH Equities, on February 28th, on March 4th, on

*Opening Statement on behalf of the Debtor*                                26

1    March 4th again, on March 7th, it's going to a whole litany of

2    people, and it says 46.06 percent, 46.06 percent, 46.06 percent.

3    And you know what Mr. — Mr. Dondero and Mr. McGraner are going

4    to tell you, because they don't really have a choice, that was

5    the intent of the parties at the time.  So notwithstanding

6    anything you're going to hear about minimizing Highland's role

7    in the KeyBank deal, or they didn't do this or they didn't do

8    that, they are going to confirm to you that this was the intent,

9    and they knew all of those facts at the time.

10          So if we go to the — we go to the final version of the

11   agreement, the next slide, right, this can be found at Exhibit

12   7.  These are all the different places in the agreement, 46.06

13   percent.  It's what the parties intended.

14          Next slide.

15          The parties' intent is confirmed in their tax returns.

16   HCRE is the manager of SE Multifamily.  Mr. Dondero, in his

17   capacity as the manager of the HCRE, was solely responsible for

18   causing SE Multifamily' tax returns to be prepared and filed.

19   It's in the agreement.

20          Barker Viggato is an accounting firm.  Their

21   deposition designations are now in the record.  You will see

22   that they specifically relied on HCRE for information concerning

23   the membership interests.  Based on that information, they

24   prepared what are called equity rolls.  They can be found at

25   Exhibits 42, 43, and 44, for each year that we have them.  And

*Opening Statement on behalf of the Debtor*                    27

1  in each year, of course it says 46.06 percent.  So their tax

2  accountants prepare tax returns based on HCRE's information that

3  said 46.06 percent.  Every single (k)(1) that was filed says

4  46.06 percent.

5          Next slide, please — actually before you go there, I

6  need to make a couple of points that aren't on the deck because

7  this will be unrebutted testimony.

8          Mr. Dondero is going to testify that he signed the

9  amended and restated agreement without reading it, without every

10  seeing a draft, and without receiving any legal advice.  He

11  deferred completely to Mr. McGraner.

12          Mr. McGraner is going to testify that Sections 1.7,

13  6.1a, 9.3b, and Schedule A, every time it says 46.06 percent,

14  are unambiguous position — provisions that he knew were going to

15  be in there and that were consistent with the parties' intent.

16          I don't know what we're doing here.

17          Then we're going to come to the proof of claim.  Mr.

18  Dondero is going to sit in the witness box and he's going to

19  say, he's going to testify he authorized a proof of claim to be

20  filed, he authorized his signature to be put on the document, he

21  authorized it to be filed on behalf of HCRE, but he didn't read

22  it.  He didn't review it.  He didn't review the exhibit.  He

23  can't identify anyone who provided Bonds Ellis with information

24  to prepare the proof of claim.  He doesn't know who at Bonds

25  Ellis worked on the proof of claim.  He has no personal

*Opening Statement on behalf of the Debtor*                    28

1   knowledge that Bonds Ellis ever communicated with anybody in the

2   real estate group regarding the proof of claim.  He doesn't know

3   what information was given to Bonds Ellis.  He provided no

4   comments.  He did no diligence.  He received no documents,

5   didn't even review the — the amended and restated agreement to

6   see what the mistake was.  He did nothing to ascertain whether

7   it was truthful or accurate.  He did nothing to verify it.

8   That's what we're going to hear today.

9           One of the claims they have here is for reformation.

10  As counsel pointed out, SE Multifamily is a Delaware entity, so

11  Delaware law applies. under Delaware law, reformation is a

12  really — it's hard, because they don't want people coming in and

13  saying, 'Oh, gee, you know, I had a mistake, I wanted something

14  different.'  It's a really hard thing to do.  So hard, the

15  burden of proof is clear and convincing.  It's not even

16  preponderance of the evidence.  It's clear and convincing.

17  We've given the citations here.

18          Look at the — in the third bullet point, the meet the

19  burden, the evidence must produce in the mind of the factfinder

20  a firm belief or conviction that the allegations in question are

21  true, highly probable, reasonably certain, and free from serious

22  doubt.  You will not have a single document supporting this

23  theory.  And, in fact, not only will there be no evidence to

24  support it other than the words out of Mr. Dondero and Mr.

25  McGraner's mouth, you will have a mountain of evidence, some of

*Opening Statement on behalf of the Debtor*                    29

1   which I have already presented to the Court, which will

2   contradict any notion that they had any intent other than to

3   give Highland a 46.06-percent interest.

4            Next slide, please.

5            The elements of reformation.  You know, again, pretty

6   hard.  When parties have ordered their affairs voluntarily

7   through a binding contract, they can't get any more voluntarily

8   than what we're going to look at, with Highland and all of these

9   people working at Mr. Dondero's direction, preparing these

10  documents, being vetted multiple, multiple, multiple times, it

11  can't be any more voluntary than that.  Delaware law with

12  strongly inclined to respect that agreement.

13           "Absent a showing of mutual mistake by clear and

14  convincing evidence, a party should not be able to escape the

15  consequences of an unambiguous contract that it has willingly

16  signed."  Aren't we done here?

17           They have no claim for reformation.  Recision is even

18  worse.  If we can go to the next slide.  Where is BH Equities?

19  You want to rescind a contract, the party's not even here.

20  Where is BH Equities?  They're a party to this agreement.  They

21  want it to just go away, then what happens?

22           Also clear and convincing evidence standard.  Lack of

23  consideration.  Please.  We can go to the next slide.  These are

24  the same people who came in and say that somehow when Jim Seery

25  sells one of three assets, that's consideration for $70 million

*Opening Statement on behalf of the Debtor* 30

1  of notes to be — that's — they say that's adequate

2  consideration, but here Highland actually puts in hard dollars.

3  And it's funny because they complain about hard dollars.  They

4  complain about the capital contributions.  HCRE did not put one

5  nickel into SE Multifamily, not one red cent.  All of it was

6  borrowed.  What they did is they took $250 million of the

7  borrowing under the KeyBank loan and they said, 'That's my

8  capital contribution to SE Multifamily.'  Highland is jointly

9  and severally liable under the loan, as are a whole host of

10  other entities.  But as between Highland and BH Equities, they

11  said, 'We're going to count that as our capital contribution.'

12  And the balance of it, 30,- or $40 million, it was borrowed from

13  one of Mr. Dondero's affiliates.  All of it was paid back in

14  less than two years, every single bank.  They put not one nickel

15  of their own money into the transaction.  Highland actually paid

16  $49,000.

17        But here's the thing, for consideration, you can call

18  it Peppercorn, you can call it in which they didn't have in the

19  Notes litigation, but here they had a lot.  They were cob- —

20  they were coborrowers.  They put in the $49,000.  They used the

21  entirety of the Highland platform.  And you heard a reference to

22  shared services agreement.  Your Honor, you've already made a

23  finding.  HCRE, unlike NexPoint, unless Highland Advisors, HCRE

24  didn't have a shared services agreement.  There's no such thing.

25  All they did was suck the human resources out of Highland

*Opening Statement on behalf of the Debtor*                    31

1    without compensation, which is another piece of consideration.

2         But the most important part, and there will be no

3    dispute about this, Highland was put into the deal for tax

4    purposes.  You will see it in Mr. Patrick's transcript.  You

5    will hear these folks testify about it today.  You will hear Mr.

6    Dondero say that, you know, the Highland ultimate beneficial

7    owners are not taxpayers.  So HCRE has no tax liability for

8    SEM's profit and losses.  All of that is put on to Highland, and

9    that's not an accident.  That's why they're in the deal.

10        There's so much consideration here, it's — it's

11   difficult to even — even deal with this, right.

12        The last slide, Section 10.1, this is the newly — the

13   latest and greatest defense that we have here, the living

14   document theory which we heard nothing about until these last

15   couple of depositions that they were forced to attend after

16   their motion to withdraw was denied.  This new living document

17   theory, don't even know what it means.  But to the extent that

18   they say they wanted to be able to change the agreement, they

19   could change it, here's 10.1.  But, you know what they couldn't

20   do, there was a limitation on that that they drafted, that the

21   people working under Mr. McGraner's direction drafted.

22        Look at the exception.  There's two exceptions that

23   are relevant here.  B, you can't do it without Highland's

24   consent "to increase our obligations or liabilities."  A is also

25   relevant; you can't screw around with Highland's distributions

*Opening Statement on behalf of the Debtor*                    32

1   "without our consent."  And the most important one is G, you

2   can't materially or disproportionally impair our rights.  'We're

3   46.06 percent.  How can you do that without our consent.'

4          They wrote a document that requires Highland to

5   consent to a change in our rights.  So not only is this a living

6   document because it can be amended, the one thing it can't do is

7   exactly what they're asking the Court to do and that is change

8   our percentage interest.  You can't do that without our consent,

9   and they know that.  And they know that because they drafted the

10  document.

11         At the end of this, Your Honor, we don't want just an

12  order disallowing their claim.  We are going to respectfully

13  request that the Court issue specific findings rejecting every

14  one of these theories, that there is no evidence where they

15  haven't met their burden of reformation, of recision, of

16  mistake.  I don't want to do this again.  And you know that

17  that's the playbook.  No matter what happens today, tomorrow

18  we'll have a complaint in federal court.  We'll have a new

19  adversary proceeding here.  Right, we've seen the playbook many

20  times.  So we're asking the Court to do what it can to make sure

21  that we never, ever deal with a challenging to Highland's

22  ownership interest in SE Multifamily ever again.

23         And we also, if the Court finds the evidence warrants

24  it, we also would like a specific finding that the proof of

25  claim was filed in bad faith, that there really is no plausible

*Dondero - Direct/Gameros*                                    33

1   basis for the proof of claim and to drag the Highland through

2   the hundreds of thousands of dollars through the time that we've

3   spent.  Wick Phillips is going to be a big piece because it's

4   total credibility here.  What they did with that is wrong.  And

5   so we're going to ask the Court at the end of this for bad faith

6   findings as well.

7           I have nothing further, Your Honor.

8           THE COURT:  Okay.  HCRE may call their first witness.

9           MR. GAMEROS:  Yes, Your Honor.  HCRE calls Mr. James

10  Dondero.

11          THE COURT:  All right.  Mr. Dondero, you know the

12  drill by now.  Regrettably, right?

13          MR. DONDERO:  Yup.

14      <u>JAMES DONDERO, CLAIMANT'S WITNESS, SWORN/AFFIRMED</u>

15          THE WITNESS:  I do.

16          THE COURT:  All right.  Please be seated.

17          You may proceed.

18          MR. GAMEROS:  Thank you, Your Honor.

19                  <u>DIRECT EXAMINATION</u>

20  BY MR. GAMEROS:

21  Q.  Mr. Dondero, please introduce yourself.

22  A.  My name is James Dondero.  I spent about a third of my time

23  on — as president of NexPoint and about a third of my time as

24  chairman of NexBank and about a third of my time trying to keep

25  the bankruptcy fair.

*Dondero - Direct/Gameros*                                                34

1   Q.   Thank you.   Are you familiar with SE Multifamily Holdings,

2   LLC?

3   A.   Yes.

4   Q.   What is it?

5   A.   It's — it was originally a joint venture between Highland

6   and HCRE.

7   Q.   Okay.   Where was it found?

8   A.   Delaware.

9   Q.   What's its purpose?

10  A.   To own direct interests in properties.

11  Q.   All right.   What is Project Unicorn?

12  A.   Unicorn was a portfolio of twenty-some-odd multifamily

13  properties, 26 I believe.

14  Q.   All right.   And is that why SE Multifamily was formed in

15  2018?

16  A.   Yes.

17  Q.   Okay.   Why was Highland a member?

18  A.   Primarily for financing and flexibility and for tax shelter

19  or tax — tax shelter and tax optimization.

20  Q.   Okay.   Did Highland contribute any capital to SE

21  Multifamily?

22  A.   Everybody talked about it in opening remarks.   However you

23  want to look at it, a nominal amount or net of fees, nothing,

24  but some small amount.

25  Q.   Okay.   Was Highland supposed to contribute anything else to

*Dondero - Direct/Gameros*                                                    35

1   SE Multifamily?

2   A.   Services and employ — yeah, services and employing expertise

3   in tax and other areas.

4   Q.   All right.  Did those contributions eventually stop?

5   A.   Yes.

6   Q.   Why?

7   A.   The bankruptcy.

8   Q.   Okay.  Why was HCRE a member of SE Multifamily?

9   A.   For portfolio management and real estate expertise.

10  Q.   Okay.  Do you know what BH Management is?

11  A.   Yes.

12  Q.   Okay.  Why is it a member of SE Multifamily?

13  A.   They're are one of our primary property managers in the

14  multifamily space.

15  Q.   Okay.  When did BH Management start working with SE

16  Multifamily?

17  A.   Early on or pretty much from the getgo, August '18.

18  Q.   So summer of '18?

19  A.   Yeah.

20  Q.   All right.  How much capital did BH Management contribute to

21  SE Multifamily?

22  A.   Fifteen, 20,-, $21 million, ultimately.

23  Q.   Okay.  Did BH Management have a written contract in the fall

24  of 2018?

25  A.   No.

*Dondero - Direct/Gameros*                                              36

1  Q.   In your — in your binder in front of you you've got Exhibit

2  1 and take a look at that, would you?

3  A.   Okay.

4  Q.   And that's the original agreement for SE Multifamily,

5  correct?

6  A.   Yes.

7  Q.   Let's take a look at Exhibit 2.

8  A.   Yes.

9  Q.   All right.  Why was it amended in March of 2019?

10 A.   To incorporate the contribution of BH and to address the —

11 the flows that happened with the fees from KeyBank, et cetera,

12 that were mentioned earlier.

13 Q.   Okay.  Was this agreement supposed to be amended in the

14 future?

15 A.   It — the — the — yes.  Yes, let me just say that.

16 Q.   All right.  Why could there be future — why could there be

17 future amendments?

18 A.   Operating partnerships are — if everybody is aware of the

19 word living documents that are working documents, things change.

20 People's contributions change.  Expectations and reality aren't

21 always as — as projected, and there's — I've never seen a static

22 partnership agreement or I've never — never experienced one on

23 either side.

24 Q.   Was the SE Multifamily agreement — agreement ever amended

25 after March 15, 2019?

*Dondero - Cross/Morris*                                    37

1   A.   No.

2   Q.   Why not?

3   A.   Everything was stayed in bankruptcy court.

4   Q.   Okay.  Did HCRE file a proof of claim?

5   A.   Yes.

6   Q.   All right.  I ask you to take a look at Exhibit 3.  That's

7   the proof of claim.  Is that correct?

8   A.   Yes.

9   Q.   All right.  Why did HCRE file a proof of claim?

10  A.   Advice of counsel and fear of interference regarding the

11  operations of SE Multifamily.

12  Q.   Okay.  To your knowledge, has the debtor attempted to

13  interfere in SE Multifamily?

14  A.   Not specifically there.

15          MR. GAMEROS:  Okay.  Pass the witness, Your Honor.

16          THE COURT:  All right.  Cross.

17                        CROSS-EXAMINATION

18  BY MR. MORRIS:

19  Q.   Good morning, Mr. Dondero.

20  A.   Good morning.

21  Q.   You signed the original LLC agreement, correct?

22  A.   Yes.

23  Q.   And I think in one of the binders that you have next to you,

24  if you can pull out Exhibit 5.

25  A.   Which binder?  Thank you.

*Dondero - Cross/Morris*                                        38

1          THE COURT:  So this is going to be debtor's?

2          MR. MORRIS:  Yes.

3          THE COURT:  Okay.

4   BY MR. MORRIS:

5   Q.  And page 17, those are your signatures, correct?

6   A.  I'm sorry.  Exhibit 5?

7   Q.  I believe that's correct.

8   A.  Or tab 5?

9   Q.  Yes.

10  A.  It only goes —

11  Q.  Yes.  Thank you for the clarification.

12  A.  It only goes —

13  Q.  Use — use the tabs.  So that's the original LLC agreement

14  dated August 23rd?

15  A.  It only goes up to page 8.  Oh, wait.  Oh, I am sorry.

16  That's the — that's the second part of it.

17          Page 17, yes, those are my signatures —

18  Q.  All right.  That's your signature, right?

19  A.  Yeah —

20  Q.  And, to be clear, Highland became a partner in SE

21  Multifamily because it was going to provide a KeyBank, and the

22  guaranty was a necessary part of their transaction, correct?

23  A.  I think it's been clarified there never was a guaranty,

24  right?

25  Q.  But it was your understanding before you got the

*Dondero - Cross/Morris*                                        39

1  clarification, it was your understanding as the signatory to the

2  document that Highland became a partner because it was going to

3  provide a guaranty to KeyBank and the guaranty was a necessary

4  part of the transaction, correct?  That was your understanding?

5  A.  Does it say that in here?

6  Q.  I'm just asking you if — that was your understanding,

7  correct?  That's what you've already testified to in the

8  deposition, right?

9  A.  I — I don't — I don't recall.  I don't know if we corrected

10 it, I don't know if there was an errata, I don't — don't know.

11           MR. MORRIS:  All right.  So in — in tab 70 — and you

12 may want to take this is out of the binder — tab 70 is Mr.

13 Dondero's transcript, which is now have been admitted into

14 evidence.

15 BY MR. MORRIS:

16 Q.  And I — I — tell me when you have that, sir.

17 A.  I have tab 70.

18 Q.  Okay.  And, again, you may just want to pull that out

19 because we may refer it to from time to time.  Were you asked

20 these questions and did you give these answers:

21           "QUESTION:  Do you know why Highland was included in

22 this agreement?

23           "ANSWER:  They were one of the partners.

24           "QUESTION:  Do you know why they became one of the

25 partners?

*Dondero - Cross/Morris*                                    40

1          "ANSWER:  I — I — they provided — they provided, I

2    believe, a guaranty, and it's a nominal amount of money, if I

3    remember correctly.

4          "QUESTION:  Who decided" —

5          MR. GAMEROS:  I'm sorry.  Your Honor, can we get a

6    page and line so I can —

7          MR. MORRIS:  Yes.  I apologize.

8          MR. GAMEROS:  Thank you.

9          MR. MORRIS:  So we're going from page 25, line 18.

10         MR. GAMEROS:  Thank you.

11         MR. MORRIS:  You bet.  To page 26, line 18.  So let me

12   begin again.

13         THE WITNESS:  Hold on one second.

14         MR. MORRIS:  Thank you, Your Honor.

15         THE WITNESS:  Page 25, the little page numbers in

16   the —

17         MR. MORRIS:  Yes.

18         THE WITNESS:  — in the little squares?

19         MR. MORRIS:  Yes, sir.

20         THE WITNESS:  Okay, hold on.

21   BY MR. MORRIS:

22   Q.  In the lower right-hand corner.

23   A.  Page 25, okay.

24   Q.  Okay.  So follow along with me and tell me if this was your

25   testimony a couple of weeks ago.  Beginning at line 18:

*Dondero - Cross/Morris*                                                          41

1              "QUESTION:  Do you know why Highland was included in

2     this agreement?

3              "ANSWER:  They were one of the partners.

4              "QUESTION:  Do you know why they became one of the

5     partners?

6              "ANSWER:  I — they provided — they provided, I

7     believe, a guaranty, and it's a nominal amount of money, if I

8     remember correctly.

9              "QUESTION:  Who decided that HCMLP or Highland would

10    be a party to the SE Multifamily's LLC agreement?

11             "ANSWER:  Who decided?  It was the guaranty, it was a

12    necessary part of the transaction.

13             "QUESTION:  And that's —

14             "ANSWER:  So it was — the guaranty was a necessary

15    part of the transaction, so they needed — they needed to be

16    involved."

17             Did you give those answers to my questions a couple

18    weeks ago?

19    A.   Yeah.  I was — yeah, it —

20    Q.   Okay.  And —

21    A.   I was on — yeah.

22    Q.   And so you personally made the decision on behalf of

23    Highland to participate in Project Unicorn, correct?

24    A.   Yes.

25    Q.   And you made that decision because you knew that Highland's

*Dondero - Cross/Morris*        42

1   guaranty was a necessary part of the transaction, correct?

2   A.   No.   There was no guaranty, right?   We have established

3   that.

4   Q.   They're a coborrower, correct?

5   A.   They're a coborrower, but there's —

6   Q.   And that's — and that's a mistake that you made, right, is

7   that they were a coborrower and not a guarantor, correct?

8   A.   I — I wasn't refreshed, I speculated incorrectly, correct —

9   Q.   Okay.   But you do admit that they were coborrower, correct?

10   A.   They were a coborrower, —

11   Q.   Okay.

12   A.   — they were — not a guaranty ever.

13   Q.   Okay.   And — but at the time I asked you questions in your

14   deposition, if you can go to line 27.

15   A.   The same page?

16   Q.   Yeah, lines 4 through 11.   "QUESTION:   But you made the

17   decision on behalf of Highland to participate in Project

18   Unicorn, correct?

19          "ANSWER:   Correct.

20          "And you knew that Highland's guaranty was a necessary

21   part of the transaction at the time you signed this document,

22   correct?

23          "ANSWER:   Yes."

24          You gave those answers to my questions a couple of

25   weeks ago; isn't that right?

*Dondero - Cross/Morris*                                             43

1    A.   Yes.

2    Q.   Okay.  And in addition to the guaranty, I think you've

3    already testified you recall that there would be tax benefits

4    from including Highland in SE Multifamily, correct?

5    A.   Yes.

6    Q.   And your understanding is that the benefit, the tax benefit

7    existed because income that flowed through to Highland was

8    largely sheltered, correct?

9    A.   That was my recollection.

10   Q.   Okay.  And so it was your understanding at the time you

11   signed the original LLC agreement on behalf of Highland and HCRE

12   that there were tax advantages by included Highland as a result

13   of the fact that its income was largely sheltered, correct?

14   A.   Yes.

15   Q.   And it was also your understanding when you signed this LLC

16   agreement that HCRE relied on Highland's human resources to

17   execute Project Unicorn, correct?

18   A.   Yes.

19   Q.   And you also understood that SE Multifamily relied on

20   Highland's human resources at least until 2020, correct?

21   A.   At least until — yes.

22   Q.   Okay.  You never saw or drafted this agreement before you

23   signed it; isn't that right?

24   A.   Correct, not that I recall.

25   Q.   And you don't know who drafted this original agreement,

*Dondero - Cross/Morris*                                                          44

1   correct?

2   A.   I do not.

3   Q.   You didn't read this agreement before you signed it,

4   correct?

5   A.   Correct.

6   Q.   You have no recollection of anybody explaining to you the

7   terms or conditions of this agreement before you signed it,

8   correct?

9   A.   No.   I had a — correct, I had a general understanding.

10  Q.   Okay.   You didn't receive any legal advice from anyone in

11  the world before you signed this document, correct?

12  A.   No.

13  Q.   You never spoke with anyone's in Highland's compliance

14  department before you signed this document, correct?

15  A.   No.   Nor would I — yes, it wouldn't — I did not, nor would

16  it be typical.

17  Q.   Okay.   You don't know whether this document was the subject

18  of any negotiations, correct?

19  A.   I believe it was subject to substantial negotiation.

20  Q.   The original document?

21  A.   Oh, I don't know.   I'm just saying the document along the

22  way was subject to negotiation —

23  Q.   So let me try and clean this up.   You don't know whether

24  this document was the subject of any negotiations, correct?

25  A.   I don't know whether it was or was not at this juncture.

*Dondero - Cross/Morris*                                    45

1    Ultimately it was heavily negotiated.

2    Q.  Okay.  You don't recall any negotiations about this

3    document; is that fair?

4    A.  I was not directly involved.

5    Q.  You don't remember participating in any negotiations,

6    correct?

7    A.  Not specifically with regard to the document, no.

8    Q.  Okay.  And you can't identify a single term of the agreement

9    that was ever subject to negotiations, right?

10   A.  I — no, I believe the responsibilities in the splits would

11   have been subject to significant negotiation, but I'm not

12   specifically aware.

13   Q.  Okay.  So — so this gets signed in August of 2018, August

14   23rd, 2018, and the next month there is the KeyBank loan, right,

15   September 2018?

16   A.  I — I don't know exactly when the KeyBank loan — I don't

17   know the timing.

18   Q.  Okay.  But shortly after this document is signed, without

19   regard to specific dates, you recall that a loan was taken out

20   from KeyBank in order to finance the acquisition of the real

21   estate in connection with Project Unicorn, right?

22   A.  Yes.

23   Q.  Okay.  If we can go to Exhibit 6.  And again I would

24   encourage you to take Exhibit 70 out of the binder.

25   A.  I took 70 out.

*Dondero - Cross/Morris*                                             46

1   Q.   Okay.  Thank you.

2   A.   What would you like me to look at now?

3   Q.   6.

4   A.   Which binder?

5   Q.   The same one.

6   A.   Okay.

7   Q.   And you signed this agreement on behalf of Highland,

8   correct?  The signature pages follow after page 90 or 91.

9   A.   90 or 91 at the bottom, not at the top?

10  Q.   Yeah, —

11  A.   Or —

12  Q.   — it's a couple of pages later.

13  A.   Okay, yeah.  Yes, all right, I see it.

14  Q.   Yeah, so you signed this loan document on behalf of

15  Highland, correct?

16  A.   Yes.

17  Q.   And — and you now understand that Highland was a borrower

18  under this agreement, correct?

19  A.   Yes.

20  Q.   But you didn't read this loan document before you signed it,

21  correct?

22  A.   Not specifically, no.

23  Q.   You didn't retain — you didn't personally obtain any legal

24  advice before signing this agreement on behalf of Highland,

25  correct?

*Dondero - Cross/Morris*                                                    47

1    A.   The advice I rely on I would describe as the process of a

2    transaction going through internal counsel, external counsel,

3    compliance every step along the way, and then being put in front

4    of me.   I can't recall a single transaction in Highland where I,

5    on an investment, where I ever had separate legal counsel

6    brought in.

7    Q.   Okay.   So I'm — I'm only concerned with this particular

8    transaction.   On this particular transaction, you did not

9    receive any legal advice before you signed this document on

10   behalf of Highland, correct?

11   A.   Not personally, no.

12   Q.   Okay.   So when you signed this agreement on behalf of

13   Highland, you weren't specifically aware that Highland was

14   agreeing to be jointly and severally liable for the obligations

15   at KeyBank, correct?

16   A.   Not specifically.

17   Q.   Okay.   In fact, you never asked anyone what Highland's

18   rights and obligations were under the KeyBank loan agreement

19   before you signed it on its behalf, correct?

20   A.   Correct.

21   Q.   And that's because you didn't believe you needed to know

22   what Highland's rights and obligations were under the KeyBank

23   agreement, correct?

24   A.   I — I believed it was appropriately handled by the process

25   and compliance and the relevant business people and their

*Dondero - Cross/Morris*                                                    48

1   various expert — experts and expertise internally and

2   externally.  It wouldn't have been appropriate for me to

3   secondguess everything.

4   Q.  Would it — it wouldn't have been appropriate for you to know

5   what Highland's rights and obligations were under an agreement

6   that they were going to be jointly and severally liable on

7   before you signed it; do I have that right?

8   A.  Exactly.  Not — not — correct, not exactly.  There would be

9   — assumed to be appropriate and balanced by the time it hit my

10  desk, having gone through a rigorous process.  Registered

11  investment advisors operate under a very rigorous process

12  typically.

13  Q.  And you as the control person of Highland didn't believe you

14  needed to know what Highland's rights and obligations were under

15  the KeyBank loan before you signed it, correct?

16  A.  Specifically, I did not need to know.

17  Q.  Okay.  But you did know that Highland was the primary

18  counterparty under the agreement, correct?

19  A.  No.

20  Q.  You did believe that KeyBank required Highland to be added

21  as a borrower, and you agreed to that, correct?

22  A.  I — I don't know whether it was KeyBank that required it.  I

23  assume they did, but I don't know.

24  Q.  A couple of weeks you recall that KeyBank did require

25  Highland to be added as a borrower, correct?

*Dondero - Cross/Morris*                                                49

1   A.   I don't remember.

2   Q.   Okay.  If we can go to page 75 of Exhibit 70.  Looking at

3   lines 6 through 12, were you asked this question and did you

4   give this answer:

5           "Do you know who made the decision to have HCLMP or

6   Highland sign the KeyBank loan document as a borrower?  Who

7   decided that?

8           "ANSWER:  Who decided that?  I think it was a

9   negotiation and it was required then by KeyBank, and then

10  ultimately I — I agreed to it."

11          Have I read that correctly, except for the addition of

12  the word "it" at the end of your answer.

13  A.   Yeah.  I think I was speculating, and I shouldn't have

14  speculated.

15  Q.   Okay.

16  A.   But that's what it says.

17  Q.   Okay.  But that was your testimony under oath at the time,

18  correct?

19  A.   I was — yeah, I speculated and —

20  Q.   Okay.

21  A.   — I — I didn't know —

22  Q.   So — so if you take a look at the KeyBank loan document,

23  it's signed in late September, September — it's dated as of

24  September 26th, if you want to look at the first page of Exhibit

25  6.  If that refreshes your recollection.  And then — and then

*Dondero - Cross/Morris*                                          50

1    once you had the financing, you closed on the acquisition of the

2    real estate; is that right?

3    A.   That would typically be the order of things.

4    Q.   Okay.  And as intended in the fall of 2018, Highland and BH

5    Equities continued their discussions over the terms on which BH

6    Equities would become a member of SE Multifamily?

7    A.   Yes.

8    Q.   And ultimately BH Equities signed on to the amended and

9    restated SE Multifamily, LLC agreement in March of the following

10   year, correct?

11   A.   I believe those dates are correct.

12   Q.   Okay.  So you were here for counsel's opening statement,

13   right?

14   A.   Yes.

15   Q.   And is it fair to say that during that six-month period, you

16   know, you and Mr. McGraner and everybody working on behalf of

17   HCRE, everybody knew exactly what Highland's role was with

18   respect to KeyBank, right?

19        They knew that they were a coborrower, for example,

20   right?

21   A.   Yes.

22   Q.   And they knew, for example, that — what the collateral

23   package was, right?

24   A.   Ah, —

25        MR. GAMEROS:  Your Honor, I'm just going to object as

*Dondero - Cross/Morris*                                                       51

1   vague and ambiguous.  Who — who is supposed to know what the

2   collateral package is —

3              MR. MORRIS:  That's a fair — that's a fair —

4              THE COURT:  Okay.

5              MR. MORRIS:  — that's a fair objection.

6   BY MR. MORRIS:

7   Q.  In your position, the KeyBank loan transaction had closed

8   six months before the new LLC agreement was signed, correct?

9   A.  Yes.

10  Q.  Okay, I'll deal with Mr. McGraner.

11             You do know that by the time the amended and restated

12  agreement was executed, all of the members of SE Multifamily had

13  contributed all of their respective capital to SE Multifamily,

14  correct?

15  A.  What — what was the when?

16  Q.  So the agreement is signed in March of 2019, right?

17  A.  Yes.

18  Q.  And you — and you knew at that time that HCRE and Highland

19  and BH Equities, they had all either made the capital

20  contributions or all of the capital contributions, they were

21  going to get credited with having been made, all of that was

22  known at the time this amended and restated agreement was

23  signed, right?

24  A.  I believe so.

25  Q.  And there was no expectation that any of the members would

*Dondero - Cross/Morris*                                                    52

1    put in any additional capital after the agreement was amended in

2    March of 2019, correct?

3    A.   Not that I'm aware of.

4    Q.   Nobody did — none of the members ever did put in additional

5    capital, correct?

6    A.   I — I don't believe so.  I don't have any awareness of that.

7    Q.   Okay.  In fact, — we'll get to this in a minute.

8             So all of the capital contributions were fully funded

9    when the amended and restated LLC agreement was signed, correct?

10   A.   I — I don't have awareness of anything different, but I'm

11   not sure I would anyway, under normal circumstances.

12   Q.   So let me state it a little bit differently.  To the best of

13   your personal knowledge, BH Equities, Highland, and HCRE had

14   either put in all of the capital they were going to put in or

15   all to the capital that was going to be credited to them before

16   this agreement was signed, before the amended agreement was

17   signed, to the best of your personal knowledge, correct?

18   A.   To the best of my personal knowledge.

19   Q.   Okay.  So let's take a quick look at the amended and

20   restated agreement.  It's Exhibit 7.  And if you turn to page

21   18, you've signed this document on behalf of both of Highland

22   and HCRE, correct?

23   A.   Yes.

24   Q.   Okay.  Before your recent deposition, you hadn't seen this

25   document since you signed it back in March of 2019, correct?

*Dondero - Cross/Morris*                                          53

1    A.   Yes.

2    Q.   And you didn't read this document before you signed it,

3    correct?

4    A.   Correct.

5    Q.   You didn't obtain any drafts of it before you signed it,

6    correct?

7    A.   Yeah, not that I recall.

8    Q.   You didn't obtain any legal advice before you signed this

9    document on behalf of HCRE or Highland, correct?

10   A.   I relied on a robust and normal process.  I didn't seek

11   independent counsel.

12   Q.   Okay.  Let's just take a quick look at Schedule A.  You

13   didn't review the schedule before you signed the agreement,

14   correct?

15   A.   No.

16   Q.   But even though you didn't review this schedule, you knew

17   and understood that BH Equities was going to receive six percent

18   of the membership interests in SE Multifamily and Highland was

19   going to receive a significant majority of the interests,

20   correct?

21   A.   Could you repeat that?  I don't think you said it correctly.

22   Q.   Okay.  So you didn't see this schedule before you signed the

23   agreement, right?

24   A.   Yes.

25   Q.   But you knew when you signed the agreement that BH Equities

*Dondero - Cross/Morris*                                                    54

1   was going to obtain six percent of the SE Multifamily's

2   membership interests, correct?

3   A.   That B&H was going to take — yes, get six percent, correct —

4   Q.   That's right.  And you may not have known exactly how much

5   Highland was going to get, but you — you do admit that you knew

6   and

7   understood at the time you signed this document that Highland

8   was going to get a significant majority of the interests,

9   correct?

10  A.   That there would be a dilution for B&H coming in, but the

11  percentages would be similar to the original —

12  Q.   Okay.

13  A.   — agreement, and I guess is what I knew in general.

14  Q.   Right.  So it was your understanding when you signed this

15  document that Highland's 49-percent interest was going to be

16  diluted by the six percent that was being granted to BH

17  Equities, correct?

18  A.   Generally, yes.

19  Q.   Okay.  So even though you didn't read Schedule A before

20  signing the agreement, the schedule comports with your

21  expectations when you signed the agreement on behalf of Highland

22  and HCRE, correct?

23  A.   Generally, yes.

24  Q.   Okay.  Let's just cut to the chase with the proof of claim.

25  That's Exhibit 8.  Do you have that in front of you, sir?

*Dondero - Cross/Morris*                                          55

1    A.   Yes.

2    Q.   Okay.  Your electronic signature is on the proof of claim,

3    correct?

4    A.   It — I'll — I'll stipulate to that, I guess, on —

5    Q.   It's on the bottom of the page wherein the top left it says

6    number 12.

7    A.   Okay.

8    Q.   Do you see your electronic signature?

9    A.   Ye- — yes.

10   Q.   Okay.  And you authorized your electronic signature to be

11   affixed to this document, correct?

12   A.   Yes.

13   Q.   And you authorized this document to be filed on behalf of

14   HCRE, correct?

15   A.   Yes.

16   Q.   You didn't review this document before it was filed,

17   correct?

18   A.   Correct.

19   Q.   And so you didn't review Exhibit A, which is the last page

20   of the exhibit, you didn't review that before it was filed,

21   correct?

22   A.   Not that I recall.

23   Q.   You can't identify — now this agreement was prepared by

24   Bonds Ellis; do I have that right?

25   A.   Correct.

*Dondero - Cross/Morris*                                            56

1   Q.   Okay.  You can't identify anyone who provided information to

2   Bonds Ellis that might have enabled that firm to put this proof

3   of claim together, correct?

4   A.   No, not — not that I know of.

5   Q.   And you don't know who at Bonds Ellis — who Bonds Ellis

6   worked with to prepare the proof of claim, correct?

7   A.   I — I do not.

8   Q.   You have no personal knowledge that Bonds Ellis ever

9   communicated with anybody in the real estate group regarding

10  this proof of claim, correct?

11  A.   Not that I know of.

12  Q.   You don't know what information was given to Bonds Ellis

13  that enabled them to formulate this proof of claim, correct?

14  A.   I do not.

15  Q.   You didn't provide any comments to this document before you

16  authorized your electronic signature to be affixed on behalf of

17  HCRE, correct?

18  A.   Correct.  I relied on counsel.

19  Q.   You didn't do anything personally — withdrawn.

20       You didn't personally do any due diligence of any kind

21  to make sure that Exhibit A was truthful and accurate before you

22  authorized it to be filed, correct?

23  A.   Not that I recall.

24  Q.   You didn't review any documents before authorizing this

25  proof of claim to be filed, correct?

*Dondero - Cross/Morris*                                             57

1   A.   I — I did not.

2   Q.   You didn't look at the amended and restated LLC agreement

3   before authorizing this document to be filed, correct?

4   A.   I relied on counsel.

5   Q.   So you didn't look at it; is that fair?

6   A.   I did not.

7   Q.   You don't know whose idea it was to file this proof of

8   claim, correct?

9   A.   I do not.

10  Q.   You never specifically asked anyone in the real estate group

11  if this document was truthful and accurate before you authorized

12  it to be filed, correct?

13  A.   I — I did not.

14  Q.   You took no steps to see if members of the real estate group

15  believed the document was truthful and accurate before you

16  authorized Bonds Ellis to file it, correct?

17  A.   I — I believe this happened below my level, where the Bonds

18  Ellis people dealt with whoever they thought were the

19  appropriate people in our organization.

20  Q.   You have no personal knowledge to support that, correct?

21  It's just an assumption that you're making; isn't that right?

22  A.   Yes.  It wasn't with my input.  They would have had to get

23  input from somebody and have rationale from somebody, so.  But I

24  — I was not involved.

25  Q.   And you didn't check with any member of the real estate

*Dondero - Cross/Morris*                                          58

1  group to see whether or not they believed this was truthful and

2  accurate before you authorized Bonds Ellis to file it, correct?

3  A.  I did not check.

4  Q.  Okay.  So you didn't check with Bonds Ellis and you didn't

5  check with anybody at Highland, fair?

6  A.  Correct.  I have to rely on systems and processes.  I — I

7  can't be directly involved in everything.

8  Q.  But you swore — if you go back to your signature, do you see

9  there is a statement there that says a person who files a

10  fraudulent claim could be fined up to $500,000, imprisoned up to

11  five years, or both; do you see that?

12  A.  Yes.

13  Q.  Okay.  But you can't identify anything that you did to make

14  sure that this proof of claim was truthful and accurate before

15  you authorized your electronic signature to be affixed and to

16  have it filed on behalf of HCRE, correct?

17  A.  I sign a lot of high-risk documents and I have to rely on

18  the process and the people and internally and externally as part

19  of the process to sign it without direct validation from or

20  verification from me, and this is another one of those items.

21  Q.  Okay.  So you did not do anything to ascertain whether or

22  not Exhibit A was truthful and accurate before you caused HCRE

23  to file it, correct?

24  A.  I did not.

25  Q.  You did nothing to verify this document before it was filed,

*Dondero - Redirect/Gameros*                                    59

1   correct?

2   A.   I did not believe I needed to.

3          MR. MORRIS:   Okay, I have no further questions, Your

4   Honor.

5          THE COURT:   Redirect.

6          MR. GAMEROS:   Very briefly, Your Honor, I've only got

7   a couple of questions.

8          THE COURT:   Okay.

9                      <u>REDIRECT EXAMINATION</u>

10  BY MR. GAMEROS:

11  Q.   Mr. Dondero, you testified about the process for signing the

12  LLC agreements, the KeyBank loan, and even the proof of claim.

13  Would you please tell the Judge what the process is?

14  A.   Well, it's different in everything, but any significant

15  transaction goes through compliance and any significant

16  transaction that includes multiple entities goes through

17  rigorous compliance whereby, by compliance, without direct input

18  of the investment people, investigate the basis of the

19  transaction in the fairness of tr- — of the transaction and then

20  sign off on that transaction.  You know, so on any kind of

21  investment, a normal — I know it's changed in the new Highland,

22  but — but a normally-compliant advisor goes through a rigid,

23  rigorous process regarding any sale of an asset.

24          As far as bankruptcy and the complexities of a

25  bankruptcy that takes odd twists and turns, and just the

*Dondero - Redirect/Gameros*                                            60

1   complexities of this bankruptcy in particular and the betrayal

2   of the estate by insiders, you know, et cetera, you have to rely

3   on outside counsel and you have to rely on — you have to rely on

4   outside counsel and you have to rely on their expertise in the

5   bankruptcy process.

6   Q.  So —

7            MR. MORRIS:  Your Honor, I move to strike the portions

8   of the answer that refer to the new Highland's practices because

9   the witness has no personal knowledge.  I move to strike his

10  reference to the betrayal of the estate as being outrageous.

11  It's got absolutely nothing to do with his inability to review

12  documents before he signs them.

13           THE COURT:  Your response.

14           MR. GAMEROS:  Your Honor, the witness was asked about

15  the process, and that was one of the views that he had in terms

16  of how he deals with external events, transactions.  That's his

17  view of the bankruptcy proceeding.  Mr. Morris may not like it

18  and Highland may not like that characterization or new Highland

19  may not like that characterization, but it's a fair summary of

20  the witness' answer.  It's how he feels about what's going on.

21  I think it's wholly appropriate.

22           THE COURT:  Okay.  I overrule.  It's his view of the

23  process, he was asked about the process, so —

24           MR. MORRIS:  Your Honor, I'm going to try one more

25  time.  He can testify to his process all he wants.  This is

*Dondero - Redirect/Gameros*                                                    61

1   about the process that he followed when he signed the document.

2   It has absolutely nothing to do with postbankruptcy Highland.

3   This is his document that he signed.  He can talk about his

4   process all you want, but he shouldn't be able to talk about the

5   process that Highland follows today that he has no personal

6   knowledge of.  And if he's going to start disparaging the new

7   Highland, it's going to be a longer day than I thought.  He

8   shouldn't be allowed to do that.  It's gratuitous.

9            THE COURT:  All right.  Well, —

10           MR. GAMEROS:  Your Honor, it's a couple sentences.  My

11   question was describe the process.  I think it's an appropriate

12   answer.  He may not like the answer, but it's an appropriate

13   answer.

14           THE COURT:  You can cross-examine if you choose to,

15   but I overrule the objection.

16           MR. GAMEROS:  Thank you.

17           THE COURT:  Um-hum.

18   BY MR. GAMEROS:

19   Q.  Mr. Dondero, let's take a look at the proof of claim and

20   talk about how is that on your desk or did it even get on your

21   desk.  So the exhibit is the proof of claim.  I can give you a

22   monitor, you can use this —

23   A.  No, I get — okay.  Well, what — what tab was it??

24   Q.  Exhibit 8, his Exhibit 8.

25           MR. GAMEROS:  Your Honor, may I approach over there

*Dondero - Redirect/Gameros*                                                                62

1   and just grab my notebook.

2          THE COURT:  You may, um-hum.

3          MR. GAMEROS:  Thank you.

4          THE WITNESS:  I got it.  Oh, the — what —

5          MR. GAMEROS:  That's Exhibit 8.

6   BY MR. GAMEROS:

7   Q.  That's Highland's Exhibit 8, the proof of claim.

8   A.  Yes.

9   Q.  You relied on Bonds Ellis to draft the proof of claim,

10  correct?

11  A.  Yes.

12  Q.  Did you do anything to interfere with Bonds Ellis' access to

13  anyone at Highland or HCRE for drafting — Highland, I'm sorry —

14  anyone at HCRE for drafting a proof of claim?

15  A.  No.

16  Q.  Did they ever talk to you about the proof of claim?

17  A.  No.  I mean knew generally we were filing a bunch of proofs

18  of claims at the time, but not specifically.

19          MR. GAMEROS:  All right.  Thank you.  I have no other

20  questions, Your Honor.

21          THE COURT:  Recross.

22          MR. MORRIS:  I have nothing, Your Honor.

23          THE COURT:  All right.  Mr. Dondero, you're excused

24  from the witness box.

25          THE WITNESS:  Thank you.

*McGraner - Direct/Gameros*                                   63

1              THE COURT:  All right.

2        (Witness excused.)

3              THE COURT:  Your next witness —

4              MR. GAMEROS:  Your Honor, may Mr. Dondero be excused?

5   He's under subpoena —

6              THE COURT:  Does anyone anticipate recalling him?

7              MR. MORRIS:  I have no objection.

8              THE COURT:  Okay.  You can be excused.  Okay.

9              MR. GAMEROS:  Your Honor, can we take a 10-minute

10  break?

11             THE COURT:  We'll take a 10-minute break.

12             COURT SECURITY OFFICER:  All rise.

13        (Recess taken from 11:09 to 11:24 a.m.)

14             COURT SECURITY OFFICER:  All rise.

15             THE COURT:  All right.  Please be seated.

16             Mr. Gameros, your next witness.

17             MR. GAMEROS:  Your Honor, HCRE calls Matt McGraner

18             THE COURT:  All right, Mr. McGraner.

19             MR. MCGRANER:  Good morning.

20             THE COURT:  Welcome.

21       MATTHEW MCGRANER, CLAIMANT'S WITNESS, SWORN/AFFIRMED

22             THE WITNESS:  I do.

23             THE COURT:  Okay.  Thank you.  Please be seated.

24                    DIRECT EXAMINATION

25  BY MR. GAMEROS:

*McGraner - Direct/Gameros*                                      64

1  Q.  Mr. McGraner, would you please introduce yourself.

2  A.  Yeah.  My full name's Matthew Ryan McGraner, a Dallas

3  resident, 38 years old.

4  Q.  Who is your current employer?

5  A.  NexPoint Real Estate Advisors.

6  Q.  And what's your current title?

7  A.  Chief investment officer.

8  Q.  How long have you had that position?

9  A.  Seven years.

10 Q.  Are you familiar with SE Multifamily Holdings, LLC?

11 A.  I am.

12 Q.  Okay.  How did HCRE get its capital for SE Multifamily

13 Holdings, LLC?

14 A.  Senior mortgages provided by KeyBank and Freddie Mac.  A

15 bridge loan from KeyBank and equity from affiliates.

16 Q.  Okay.  So it's not just the KeyBank loan?

17 A.  No.

18 Q.  All right.  Who were the borrowers on the KeyBank loan — and

19 so what I'd like you to do is take a look at Exhibit 4.

20 A.  In the white binder?

21      MR. GAMEROS:  Yes, please.  It's in — it's already

22 been admitted.

23      And if we could put Exhibit 4, paragraph 1, on page 3,

24 up on the monitor so that everyone could see it.

25      THE WITNESS:  Highland Capital, HCRE Partners, Dugaboy

*McGraner - Direct/Gameros*                                            65

1   Investment Trust, SLHC Trust, NexPoint Advisors, NexPoint Real

2   Estate Advisors, and the REIT borrower, and each property owner

3   borrower.

4              MR. CARVELL:  Your Honor, could I ask Mr. Evans to

5   give me the — so I can put it up on the screen.

6              MR. GAMEROS:  I just want to put the piece of the

7   exhibit up on the screen so we all could see it.

8              THE COURT:  Oh, okay.  What are we waiting on —

9              MR. GAMEROS:  So it's an excerpt from Exhibit 4.

10             THE COURT:  Okay, there we go.

11             MR. GAMEROS:  And it's the borrower.

12  BY MR. GAMEROS:

13  Q.  They're co- — they're coborrowers under the loan agreement,

14  correct?

15  A.  Correct.

16  Q.  All right.  And, just so that we're clear, Dugaboy

17  Investment Trust, SLCH Trust, NexPoint Advisors, and NexPoint

18  Real Estate Advisors, and the REIT borrower, none of them have

19  an interest in HCRE; is that correct?

20  A.  Correct — well, the Dugaboy's, I believe, holds general

21  interest.

22  Q.  All right.

23  A.  But other — otherwise, no.

24  Q.  None of them have a direct interest in SE Multifamily; is

25  that correct?

*McGraner - Direct/Gameros*                                    66

1    A.   That's correct.

2    Q.   All right.  Why was Highland a coborrower under the loan

3    agreement?

4    A.   As Jim said, financial flexibility and tax efficiency.

5    Q.   Okay.  Under the loan agreement?  They're getting advantages

6    like that under the loan agreement?

7    A.   No, correct.

8    Q.   All right.  My question was why is Highland a co- — Highland

9    Capital, why is it a coborrower under the loan agreement that's

10   Exhibit 4?

11   A.   For — to provide financial flexibility.

12   Q.   Okay.  Whose idea was it that Highland be a coborrower under

13   the loan agreement?

14   A.   I think we offered it up originally —

15   Q.   Okay.

16   A.   — as the two parties to the original held agreements

17   (phonetic).

18   Q.   All right.  And you heard Mr. Morris ask Mr. Dondero if the

19   borrowers were jointly and severally liable; do you remember

20   that?

21   A.   I do.

22   Q.   Okay.  And it says that right here, doesn't it?

23   A.   It does.

24   Q.   All right.  But was Highland really ever going to be liable

25   for Exhibit 4, the obligations under Exhibit 4?

*McGraner - Direct/Gameros*                                           67

1          MR. MORRIS:  Objection to the form of the question.

2          THE COURT:  Sustained.

3    BY MR. GAMEROS:

4    Q.  Did Highland pledge any assets for Exhibit 4?

5    A.  No, it didn't.

6    Q.  Okay.  And did KeyBank have to reduce some of the pledged

7    collateral before it could get to the coborrowers?

8    A.  Yes.  There was a specific priority, if you will, of assets

9    that they had to execute or foreclose upon prior to — prior to

10   coming after any of the borrowers.

11         MR. GAMEROS:  Okay.  If we could put paragraph 5.12

12   up, please.

13   BY MR. GAMEROS:

14   Q.  Sir, is this the collateral that you were talking about, the

15   collateral package?

16   A.  That's right.

17   Q.  It's in Exhibit 4.  You've got it right in front of you if

18   you want to see a cleaner copy close up.  It's on page 60.

19   A.  Yeah, this and the exhibit.

20   Q.  All right.  So the first item of collateral is each

21   mortgaged property; is that correct?

22   A.  Correct.

23   Q.  All right.  What does that mean?

24   A.  Each of the 26 assets that were — that were part of the

25   Unicorn transaction.

*McGraner - Direct/Gameros*                                        68

1    Q.  All right.  Where did the Unicorn transaction come from,

2    while we're talking about?

3    A.  CBRE was marketing it on behalf of Starwood Capital Group.

4    Q.  Okay.  And you mentioned that they had to execute again some

5    collateral before they got to the borrowers.  Do you know where

6    that is in this agreement?

7    A.  Yeah.  I believe it's...

8    Q.  The bottom of 5.12, right?

9    A.  Yeah.  I think the genesis of what we negotiated with Key

10   was that we had to come after the publicly-traded securities

11   first in the event of a default prior to —

12           MR. GAMEROS:  Wade, would you highlight the first full

13   paragraph on that page, please.  "Upon the occurrence and

14   during..."

15   BY MR. GAMEROS:

16   Q.  Is that what you were talking about, how to get the stock

17   first?

18   A.  That's right, yeah.

19   Q.  And how much is the value of that stock?

20   A.  It would probably live in 70,-, 70 odd million at the time.

21   Q.  Okay.  This is the finally signed version of the KeyBank

22   loan agreement, correct?

23   A.  Correct.

24   Q.  All right.

25   A.  It was amended later but, yeah, correct.

*McGraner - Direct/Gameros*                                              69

1   Q.  Were there changes to the loan agreement before closing?

2   A.  There was, yeah, dramatic changes to the DON loan agreement,

3   correct.

4   Q.  Okay.  What were some of those changes?

5   A.  A couple days before closing, Key called and said they

6   couldn't fund unless we were — would agree to pay down $150

7   million in 90 days.

8   Q.  And that was a new term?

9   A.  It was a new term.

10  Q.  How — how far in advance of closing did they make that

11  demand?

12  A.  I remember vividly.  I was sitting in bed with my son and it

13  was the day before closing.

14  Q.  The day before closing?

15  A.  The day before closing.

16  Q.  All right.  Did they change any other terms than the $150

17  million paydown demand?

18  A.  That was the — the overwhelming, the biggest one.  I mean

19  they may have made — made other tweaks, but that was the biggest

20  one.

21  Q.  All right.  Ultimately, did KeyBank close and fund on time?

22  A.  It did.

23  Q.  All right.

24  A.  Well, on Thursday.  This was a Tuesday, so they got there —

25  Q.  All right.

*McGraner - Direct/Gameros*                                      70

1  A.  — on Thursday.

2  Q.  A couple of days after closing, KeyBank remitted $750,000 to

3  Highland?

4  A.  That's correct.

5  Q.  Okay.  Did Highland loan that $750 [sic] to HCRE?

6  A.  No, not that I'm aware of.

7  Q.  Did they give it to HCRE?

8  A.  Not that I'm aware of.

9  Q.  Are you aware of any transfer from Highland to HCRE of that

10  $750,000?

11  A.  No.

12  Q.  Okay.  A few weeks after closing did KeyBank refund

13  $992,000?

14  A.  Yeah.  They — they did when Walker and Dunlop came in.

15  Q.  Okay.  Why did they refund the 750,000?

16  A.  We were pretty upset.  It was — worried about our

17  reputation, with Starwood in the market about closing, and so I

18  characterized it as pain and suffering, damages.

19  Q.  Okay.  And do you know why they gave back the 992,000?

20  A.  I do.

21  Q.  Why?

22  A.  They — that was, I think, a few rebate that ultimately went

23  to Walker and Dunlop to get them to come into the deal to pay —

24  pay down 150 million.

25  Q.  Okay.  Just so the Court knows, who is Walker and Dunlop and

*McGraner - Direct/Gameros*                                          71

1   what do they do?

2   A.   Walker and Dunlop is a real estate financial services

3   business, publicly traded.  They originate loans, primarily in

4   the multifamily space, and were — were a partner of ours in a

5   number of transactions.  And they helped us out on this deal.

6   Q.   Okay.  Was Highland's participation in the loan agreement

7   necessary to keep the loan in place?

8   A.   No.  Did —

9   Q.   Why not?

10  A.   It didn't — it didn't pledge any assets.  The fact is, as

11  you heard or maybe you stated, we got them off of the loan

12  agreement prior to the petition filing.

13  Q.   Okay.  Why was Highland a member in SE Multifamily?

14  A.   The same reasons, financial flexibility.  I think there was

15  purported tax benefits, so.

16  Q.   Did Highland contribute any capital to SE Multifamily?

17  A.   I believe so.

18  Q.   Was it supposed to contribute anything other than capital to

19  SE Multifamily?

20  A.   We utilized the compliance team, given the complex nature of

21  the transaction.  Those were all Highland employees.  HR,

22  borrowed employees, largely, IT.

23  Q.   Okay.  Why was HCRE a member?

24  A.   Given the nature of the properties, there wasn't a perfect

25  fit for any one silo or any one fund.  They surely had

*McGraner - Direct/Gameros*                                      72

1    expertise, a track record, a track record with Key and with

2    Freddie Mac, and had assets to pledge.  They pledged a lot of

3    assets.

4    Q.  You just testified that HCRE also brought expertise to the

5    table.  What kind of expertise did it bring?

6    A.  Well, personally Jim and I were guarantors and knew Freddie

7    and Key really well, you know, so our — our relationship.  And

8    then, you know, I guess my — my track record.  That's —

9    Q.  Okay.  When did BH Management start working with SE

10   Multifamily on the Project Unicorn?

11   A.  Would have been August or September of '18.

12   Q.  Okay.  So prior to the KeyBank loan funding?

13   A.  Yeah.

14   Q.  Why were they on the ground so early?

15   A.  They had scale already and employees in each of the markets.

16   They were our primary partner on the property-management side.

17   They helped underwrite the transaction.

18   Q.  Did BH work with HCRE before?

19   A.  Yes.

20   Q.  How long?

21   A.  2014.

22   Q.  Okay.  You saw Mr. Morris' opening slide where he pointed to

23   paragraph 10 and said that this agreement can be amended with

24   the agreements of all the members.  Do you remember seeing that?

25   A.  Yes.

*McGraner - Direct/Gameros*                                    73

1   Q.   Okay.  If you would look at Exhibit 2 in the white binder.

2   That's the amended SE Multifamily agreement.

3   A.   Yup.

4   Q.   All right.  Paragraph 10.1.  Do you see that?

5   A.   Yup.

6   Q.   Okay.  Why didn't this work to amend the agreement, if you

7   needed to going forward?

8   A.   My understanding was we couldn't modify the agreement in

9   bankruptcy.

10  Q.   Okay.  Did you ever try to modify the agreement?

11  A.   No.

12  Q.   Why not?

13  A.   A pretty contentious bankruptcy.  The partners that were my

14  partners in August and in March of '19 weren't my partners after

15  the bankruptcy.  It would be futile.  That's what we thought.

16  Q.   Okay.  Did anybody that worked with Highland tell you that

17  you couldn't amend the agreement?  Did that conversation even

18  come up?

19  A.   No.

20  Q.   All right.  Was this agreement ever amended after March of

21  '19?

22  A.   No.

23  Q.   Did you ever discuss making distributions to Highland with

24  anyone?

25  A.   Yeah.  There were ongoing — so there was ongoing discussions

*McGraner - Direct/Gameros*                                             74

1    with the DSI folks, Caruso, Fred Caruso, and my team.

2    Q.   Okay.  Who is DSI, just so the Court's clear on that?

3    A.   I don't know what — I think they were the CRO, the chief

4    reorg- — but this is the only part I really touched with them.

5    And so the couple conversations I had with Fred were I think we

6    both agreed that we're — it was going to be futile.

7    Q.   Okay.  And Mr. Caruso works for DSI?

8    A.   I believe so.

9    Q.   All right.  Did HCRE try to pay back Highlands Capital?

10   A.   I think so.

11   Q.   Okay.  What happened?

12          MR. MORRIS:  I apologize, Your Honor.  I didn't hear

13   the answer.

14          THE WITNESS:  I think so.

15          MR. MORRIS:  Thank you.

16          THE COURT:  Okay.

17          THE WITNESS:  You bet.

18   BY MR. GAMEROS:

19   Q.   What happened?

20   A.   I — I was told it was returned.

21   Q.   Okay.  Do you know why?

22   A.   I don't.

23   Q.   All right.  Why did HCRE file a proof of claim?

24   A.   I think we were trying to protect our interests, advice of

25   counsel.  Again, the important point is my partners weren't my

*McGraner - Cross/Morris*                                         75

1    partners, you know, in March of 2019.  And then when the

2    bankruptcy started, it kind of took on a life of its own.

3    Q.  Do you know the proof of claim worked through the HCRE side

4    of the house before it was filed?

5    A.  Yeah.  I mean our internal counsel at NexPoint, external

6    counsel, you know, came to me and said that they thought it

7    would be a good idea and generally told me what it was about,

8    and I said okay.

9         MR. GAMEROS:  Pass the witness, Your Honor.

10         THE COURT:  Okay.  Cross.

11                    CROSS-EXAMINATION

12   BY MR. MORRIS:

13   Q.  Good morning, Mr. McGraner.

14   A.  Good morning, Mr. Morris.

15         MR. MORRIS:  So may I just approach the witness to

16   clean up the exhibits?

17         THE COURT:  You may.

18         THE WITNESS:  These are yours.

19   BY MR. MORRIS:

20   Q.  Let's just do a little background here, Mr. McGraner.  Since

21   the time HCRE was formed, it's only been owned by you, Mr.

22   Dondero, and Mr. Scott Ellington, correct?

23   A.  Yes.

24   Q.  And Mr. Dondero owns 70 percent, you own 25 percent, and Mr.

25   Ellington owns five percent, correct?

*McGraner - Cross/Morris* 76

1    A.   Yes.

2    Q.   The opportunity to become a member of HCRE was not given to

3    anybody except the three of you, correct?

4    A.   In 2014 or when it was formed, yeah, that's right.

5    Q.   Okay.  You're not aware of any reason why Highland couldn't

6    have created its own dedicated real estate fund to make the

7    investments that HCRE ultimately made, correct?

8    A.   Yeah.  As I testified in my deposition, it didn't have the

9    greatest track record.

10   Q.   Sir, you're not aware of any reason why Highland couldn't

11   have done with a dedicated real estate fund exactly what HCRE

12   did, correct?

13   A.   It wouldn't have been successful.

14   Q.   Okay.  So in your binder, if you go to Exhibit 71, you may

15   want to take it out, it's your deposition transcript.

16   A.   I don't have a 71.  Maybe — is this it?

17   Q.   See, I did it for you.  I took it out in anticipation we

18   might have to refer to it.  So if you'd be good enough, sir, to

19   turn to page 29.  And I'm going to ask you, tell me when you're

20   there.

21   A.   Okay.

22              MR. MORRIS:  Are you there, Your Honor?

23              THE WITNESS:  Yup.

24              MR. GAMEROS:  Um-hum.

25   BY MR. MORRIS:

*McGraner - Cross/Morris*                                  77

1   Q.  Okay.  Were you asked these questions and did you give these

2   answers:

3          "QUESTION:" — beginning at line 4 — "Can you think of

4   any reason why Highland couldn't have made the real estate

5   investments that HCRE made?

6          "ANSWER:  Yes.

7          "QUESTION:  Why couldn't Highland have made the real

8   estate investments that HCRE made?

9          "ANSWER:  I don't believe Highland had any specific

10  real estate investment mandate at the time HCRE was formed.

11         "QUESTION:  What do you mean by the word mandate?

12         "ANSWER:  Highland Capital Management as an investment

13  manager managing various funds did not have a dedicated —

14  dedicated real estate fund at that time.

15         "QUESTION:  But is there any reason it couldn't have

16  created one, to the best of your knowledge?

17         "ANSWER:  No."

18         Did you give those answers to my questions?

19         MR. GAMEROS:  Your Honor, I want to object and just

20  ask —

21         THE WITNESS:  Keep reading, yeah.

22         MR. GAMEROS:  — read the next four lines.

23         THE WITNESS:  Yeah, keep reading.

24         MR. MORRIS:  You can do that on — on your — I'm happy

25  to do it.  I'm happy to do it.  Happy to do it.

*McGraner - Cross/Morris*                                          78

1          THE COURT:  Keep on.

2     BY MR. MORRIS:

3     Q.   "QUESTION:  Okay.

4          "ANSWER:  Well, I think Highland hasn't had a great

5     track record in real estate investments prior to my joining

6     Highland.

7          "QUESTION:  Do you know who controls Highland today?

8          "ANSWER:  Jim does."

9          THE COURT:  "HCRE."

10         MR. MORRIS:  Yes.  Okay.

11    BY MR. MORRIS:

12    Q.   So — so that's fine, but the point is, Mr. McGraner, that a

13    decision was made to put the real estate opportunity not in

14    Highland but in HCRE, which you and Mr. Dondero and Mr.

15    Ellington were going to control, correct —

16    A.   What real estate opportunity?

17    Q.   Any real estate opportunity that HCRE wound up pursuing.

18    A.   In 2014?

19    Q.   Correct.

20    A.   Yeah.

21         MR. MORRIS:  Okay.

22         THE COURT:  I didn't hear the answer.  What was the

23    answer?

24         MR. MORRIS:  Yes.

25         THE COURT:  Yes, was that your answer?

*McGraner - Cross/Morris*                                      79

1              THE WITNESS:  Yes — yes, Your Honor.

2              THE COURT:  Okay.

3    BY MR. MORRIS:

4    Q.  At the time it was friend in 2014, you contributed $25,000

5    of your own money in exchange for your 25-percent membership

6    interest, correct?

7    A.  I think that's right.

8    Q.  And you've never contributed anything further, correct?

9    A.  Anything.

10   Q.  Any — dollars, any hard dollars?

11   A.  Sure, I think that's correct.

12   Q.  Okay.  Mr. Dondero is the sole manager of HCRE, correct?

13   A.  That's correct.

14   Q.  He's been the sole manager on a continuous basis since HCRE

15   was formed, correct?

16   A.  Yes.

17   Q.  And as the sole manager of HCRE, he controls that entity,

18   correct?

19   A.  Correct.

20   Q.  You have been the vice president and secretary of HCRE since

21   it was formed, correct?

22   A.  Correct.

23   Q.  Nobody other than the two of you has ever served as an

24   officer of HCRE, correct?

25   A.  Correct.

*McGraner - Cross/Morris*                                                  80

1   Q.   HCRE has never had any employees, correct?

2   A.   Correct.

3   Q.   The two of you, you and Mr. Dondero, are the only people who

4   have been ever authorized to act on behalf of HCRE, correct?

5   A.   Correct.

6   Q.   You are aware that as HCRE did more deals, Highland loaned

7   HCRE money from time to time, correct?

8   A.   Correct.

9   Q.   And when Highland loaned money to HCRE, HCRE gave Highland

10  promissory notes in exchange; isn't that right?

11  A.   That's right.

12  Q.   Okay.  Now I think you testified earlier that you're not

13  aware that Highland loaned $750,000 promptly after receiving it

14  in connection with the KeyBank loan?

15  A.   No.

16  Q.   Okay.  I've got Ms. Canty on the loan — on the line and I'm

17  hoping that she could put up on the screen one of the promissory

18  notes that Mr. Dondero signed on behalf of HCRE.  Do you see

19  that there is a promissory note for $750,000 on the screen?

20  A.   I do.

21  Q.   Do you see that it's money — it's a note that was given by

22  HCRE to Highland and it's dated October 15th, 2018?

23  A.   I do.

24  Q.   Is that around the time that Highland received the $750,000

25  from KeyBank?

*McGraner - Cross/Morris*                                              81

1    A.   A couple months after, but yeah — or a month after this.

2    Q.   A couple weeks after, right, because the KeyBank loan closed

3    as of September 26th, right?

4    A.   I think that's the final date of the amended.  See, we

5    closed that deal without even signing loan documents —

6    Q.   So — so how many days before this promissory note was signed

7    did Highland get the money?

8    A.   I don't know.

9    Q.   Did you even know this —

10   A.   I — I —

11   Q.   When you testified just now that you were unaware of

12   Highland loaning money to HCRE, you weren't aware of this note?

13   A.   Not specifically, no.

14   Q.   Are you aware that Highland sued HCRE to recover on a whole

15   series of notes?

16   A.   Yeah.

17   Q.   Isn't it a fact that Highland bankrolled HCRE's business?

18   A.   Yeah.

19   Q.   It did, right?

20   A.   Yeah.

21   Q.   And yet at the same time that Highland's bankrolling the

22   business, you're both trying to not pay back on the notes and

23   you're trying to divest Highland of its interest in SE

24   Multifamily, right?

25   A.   I — I don't —

*McGraner - Cross/Morris*                                          82

1   Q.   Didn't do enough, right?

2   A.   I'm not trying to do anything.

3   Q.   Okay.  You're an owner of HCRE, right?

4   A.   I am.

5   Q.   Are you aware that —

6   A.   Minority owner —

7   Q.   — Highland sued HCRE to recover on four notes that were

8   collectively worth of $4 million?

9   A.   I'm not specifically aware of all the different lawsuits

10  going on right now, no.

11  Q.   All right.

12  A.   I think there's a lot, though.

13  Q.   You were the quarterback of Project Unicorn, correct?

14  A.   You could say that.

15  Q.   You said that actually, right?

16  A.   Sure.

17  Q.   And as the quarterback, you made sure that the original LLC

18  agreement was created for the purpose of creating SE

19  Multifamily, correct?

20  A.   Correct.

21  Q.   You didn't create that document, but you reviewed it, right?

22  A.   Sure.  Internal and external lawyers created it, I reviewed

23  it.

24  Q.   Okay.  And you personally reviewed the allocation of

25  ownership interests in the document before it was signed,

*McGraner - Cross/Morris*                                        83

1    correct?

2    A.   I did.

3    Q.   And at the time the original agreement was signed, you

4    didn't believe there were any mistakes in the allocation of

5    membership interests, correct?

6    A.   Correct.

7    Q.   You have no reason to believe that the original LLC

8    agreement didn't fail to reflect the intent of the parties to

9    that agreement, correct?

10   A.   Correct.

11   Q.   Highland was an original party to that agreement, right?

12   A.   Yup.

13   Q.   And one of the reasons that you and Mr. Dondero decided to

14   include Highland as a member of SE Multifamily was that you

15   needed ultimate flexibility with KeyBank, the lender, correct?

16   A.   Just financial flexibility in general, yeah.

17   Q.   Another reason that you and Mr. Dondero decided to include

18   Highland as a member of SE Multifamily was that Highland was

19   intended to provide certain tax benefits, correct?

20   A.   That was what we were told — or what —

21   Q.   Okay.

22   A.   — I was told.

23   Q.   In fact, before the original LLC agreement was signed, the

24   tax team expressly told you that the inclusion of Highland as a

25   member of SE Multifamily was expected to provide tax benefits,

*McGraner - Cross/Morris*                                            84

1  correct?

2  A.  Sure.

3  Q.  In fact, before the original agreement was signed, you

4  believed you and Mr. Dondero discussed including Highland as a

5  member of SE Multifamily because of capital flexibility and

6  expected tax benefits, right?

7  A.  Yup.

8  Q.  So let's talk about the KeyBank loan for a moment.  HCRE did

9  not have the ability to close on the KeyBank loan based on its

10 own financial wherewithal, correct?

11 A.  Correct.

12 Q.  Okay.  And Mr. Dondero made the decision to add Highland as

13 a coborrower under the KeyBank loan, correct?

14 A.  As well as his trusts that had a lot of assets that we

15 pledge, yes.

16 Q.  Okay.  Listen carefully to my question.

17 A.  I am.

18 Q.  I don't care about the trusts.

19 A.  Okay.

20 Q.  I only represent Highland.  Mr. Dondero made the decision to

21 add Highland as a coborrower under the KeyBank loan, correct?

22 A.  Yes.

23 Q.  Okay.  And Mr. Dondero made the decision to add Highland as

24 a coborrower because it thought — because he thought it would

25 provide capital flexibility, correct?

*McGraner - Cross/Morris*                                                      85

1  A.  Yes.

2  Q.  And of course in the end KeyBank insisted on Highland being

3  a coborrower, correct?

4  A.  Correct.

5  Q.  Okay.  So that happens in late September, right?  So you're

6  the quarterback, right, and you know exactly what HCRE's role is

7  under the KeyBank loan, right?

8  A.  Yeah.

9  Q.  You know exactly what collateral they have pledged, right?

10  A.  Yes.

11  Q.  You know exactly that — that HCRE's been designated as the

12  lead borrower, correct?

13  A.  Correct.

14  Q.  You knew about Section 5.12 of the loan agreement that

15  counsel showed you, right?

16  A.  Yeah.

17  Q.  You knew about what collateral Highland pledged or didn't

18  pledge under the KeyBank loan document, right?

19  A.  Right.

20  Q.  All of that was known to you in September, right?

21  A.  Right.

22  Q.  The retrade that you talked about where you were there with

23  your child a day or two before, that all happened before you

24  signed the KeyBank loan, right?

25  A.  Yeah.

*McGraner - Cross/Morris*                                                  86

1  Q.  And that happened, even though it happened, you and Mr.

2  Dondero accepted the retrade, right?

3  A.  We didn't have a choice.

4  Q.  You accepted the retrade, right?

5  A.  Or we lost $40 million earnest money.

6  Q.  Okay.  So in the face of that potential tragedy, you

7  decided, 'I'll accept the retrade,' right?

8  A.  Yeah.

9  Q.  Okay.  So we get to the early part of 2019 and you guys are

10 negotiating with BH Equities, right?

11 A.  It was long before then, but yeah.

12 Q.  That's right.  They in good faith put up over $20 million in

13 the fall of 2018 without the benefit of an agreement, right?

14 A.  Um-hum.

15 Q.  You have to give an audible answer —

16 A.  Yes.  Yeah.

17 Q.  And so as — as fall turned to winter and winter began to

18 turn to spring, you continued your discussions with BH Equities

19 over the form of an amended and restated LLC agreement, right —

20 A.  Yes.

21 Q.  And there was a deadline and it had to be completed by March

22 15th so that it could be retroactive to August of 2018, correct?

23 A.  Correct.

24 Q.  Okay.  And you recall that as part of this process of

25 negotiations with BH Equities, Mr. Broaddus was working to

*McGraner - Cross/Morris*                                              87

1  update the contribution schedule to include the actual

2  contribution numbers, correct?

3  A.  Correct.

4  Q.  And so by the time you get to this point on the chronology,

5  you and everybody working on behalf of Highland at HCRE knows

6  exactly how much money Highland has contributed, correct?

7  A.  Correct.

8  Q.  And there's no expectation that Highland will ever put in

9  another nickel, correct?

10  A.  I — I wouldn't say that.

11  Q.  Well, we'll get to the agreement.  Can you just explain to

12  the Court who Mr. Broaddus is?

13  A.  Part of Highland's tax team back in 2018.

14  Q.  And was he working under your direction — for this purpose?

15  A.  I'd say we worked collaboratively, yeah.

16  Q.  Okay.  By — by the end of February 2019, HCRE was fully

17  aware of the capital contributions that had been made among all

18  of the prospective members to the agreement, correct?

19  A.  I'm sorry.  Can you say that what, at what '19?

20  Q.  By the end of February, so —

21  A.  Okay.  Sure —

22  Q.  — 2019, right?

23  A.  Yes.

24  Q.  When Mr. Broaddus was doing his work to update the

25  contribution schedule to include the actual contributions, he

*McGraner - Cross/Morris*                                      88

1  was working under your direction, correct?

2  A.  I think he was working to gather information on the

3  financials with my team to determine what allocations he wanted

4  to make.

5         MR. MORRIS:  Can you get Exhibit 30 in your binder.

6  Just looking at a few documents here.

7         THE COURT:  Is this claimant's binder?

8         MR. MORRIS:  This would be Highland's binder, binders.

9         THE WITNESS:  Okay.

10  BY MR. MORRIS:

11  Q.  Okay.  Now this an email chain between Mr. Broaddus and BH

12  Equities, and you're copied on it; is that generally correct?

13  A.  Yes.

14  Q.  And so there's two emails.  One is dated March 14th and then

15  there's follow-up on the 15th.  Is that right?

16  A.  Yes.

17  Q.  And so this is being done, you know, in the last moments

18  before you know that — you know, the clock strikes midnight and

19  you all have to get this agreement finished, right?

20  A.  Yes.

21  Q.  And the top of the email, the top of the exhibit is an email

22  from Mr. Broaddus, and that's the one that's on March 15th,

23  correct?

24  A.  Yes.

25  Q.  And you saw this at the time that it was sent, correct?

*McGraner - Cross/Morris* 89

1   A.   I was copied, I'm not sure I saw —

2   Q.   And — and you — and you actually saw it at the time; isn't

3   that right?

4   A.   Sure.

5   Q.   And Mr. Broaddus attached a copy of the contribution

6   schedule, correct?

7   A.   Yes.

8   Q.   And you understood that the document that Mr. Broaddus

9   attached contained the capital contributions by each of SE

10  Multifamily's members, correct?

11  A.   Yes.

12  Q.   And looking at Schedule A, HCRE is credited with having made

13  a capital contribution of $291 million, correct?

14  A.   Yes.

15  Q.   And all of the capital that HCRE is credited — is credited

16  with having contributed, all of that was borrowed, right?

17  A.   I don't think all of it was borrowed, but —

18  Q.   Well, —

19  A.   — a lot of.

20  Q.   — HCRE did not contribute any portion of this $291 million

21  out of its own pocket, correct?

22  A.   Correct.  But, as I stated in my deposition, Jim had assets

23  and cash that he put through from Dugaboy or the bank, or

24  somewhere else, I don't know where it came from, but it wasn't

25  just — just the loan.

*McGraner - Cross/Morris*                                                          90

1    Q.   Two hundred and fifty —

2    A.   So there was other cash —

3    Q.   Of the $291 million on this document, 250 million was

4    allocated to HCRE from a portion of the KeyBank loan, correct?

5    A.   Yeah.  KeyBank made the allocation.

6    Q.   Okay.  They didn't do it of their own accord, HCRE asked

7    them to do that, right?

8    A.   No, they did.  They — they allocated per property a loan

9    amount that they felt comfortable on an LTB ratio basis per

10   property, and that was how they — I mean we — we didn't make

11   that assess, they did.

12   Q.   Of the $291 million, approximately $250 million was

13   allocated to HCRE from a portion of the KeyBank loan, correct?

14   A.   Correct.

15   Q.   Okay.  The money was never sent by KeyBank to HCRE so that

16   HCRE could then deliver it to SE Multifamily, right?  It never

17   hit — never hit HCRE's bank account, did it?

18   A.   That's now how lenders work.  They fund — they fund a title.

19   They don't fund — they don't fund a partnership.

20   Q.   So they didn't give the money to HCRE.  HCRE is just taking

21   credit for $250 million of capital contribution, which was a

22   portion —

23   A.   In exchange for the pledging of asset —

24   Q.   — which was a portion of — which was a portion of the loan

25   that KeyBank made in order to enable the acquisition of the

*McGraner - Cross/Morris*                                    91

1   properties; is that fair —

2   A.   In exchange for pledging — yeah.  In exchange for pledging —

3   Q.   Okay.

4   A.   — assets, yes.

5   Q.   Okay.  Mr. Dondero personally made the decision to treat

6   $250 million of the KeyBank loan as a portion of HCRE's capital

7   contribution to SE Multifamily, correct?

8   A.   I don't — I don't know.

9            Is that reflected in here?

10  Q.   Yeah.  If you can go to your transcript, page 135, please.

11  A.   Is it reflected in a document?

12  Q.   I'm asking you to turn to Exhibit 71, the transcript, page

13  135, beginning at line 20.  Tell me when you're there.

14  A.   Okay.

15  Q.   Were you asked these questions and did you give these

16  answers:

17           "QUESTION:  Who made the decision to allocate to HCRE

18  approximately $250 million of the KeyBank loan for purposes of

19  setting the capital contribution schedule here?

20           "ANSWER:  Highland and H- — and HCRE.

21           "QUESTION:  Would that be Mr. Dondero on behalf of

22  both parties?

23           "ANSWER:  And informed by professionals, but, yeah,

24  that's right.

25           "QUESTION:  Do you know what factors Mr. Dondero took

*McGraner - Cross/Morris*                                    92

1   into account in deciding to allocate to HCRE $250 million of the

2   KeyBank loan?

3           "ANSWER:  I don't know."

4           Did you give those answers to my questions?

5   A.   Yeah, I did.

6   Q.   So Mr. Dondero is the one who decided to allocate to HCRE

7   $250 million as — of the KeyBank loan in order to fund — in

8   order to fund the capital contribution in SE Multifamily,

9   correct?

10  A.   I don't know what you mean by fund when you do air quotes.

11  Q.   Well, they're not actually taking money out of their pocket,

12  they're just allocating a portion of the KeyBank loan and saying

13  that's going to be as if HCRE made a capital contribution,

14  right?

15  A.   Again, it pledged a lot of assets.

16  Q.   Okay.  He made that decision, right?

17  A.   Informed by professionals under the circumstances, yes.

18  Q.   He didn't — HCRE didn't pledge $250 million of assets,

19  right?

20  A.   It pledged a lot, it pledged over a hundred million.

21  Q.   Okay.  It didn't pledge $250 million of assets, correct?

22  A.   No.  But he in his capacity as a member of Seery, Dugaboy

23  Investment Trust did pledge a lot of securities and other

24  assets.

25  Q.   But the balance of the $291 million, that didn't come from

*McGraner - Cross/Morris*                                        93

1   HCRE either, correct?

2   A.  When you say the balance, what do you mean, the difference

3   between 40,- —

4   Q.  The other 40 — the other 40 some odd million dollars, HCRE

5   didn't pay that either, did it?

6   A.  It was part of the collateral package.

7   Q.  Well, the balance of the capital contribution credited to

8   HCRE or approximately $40 million, that was borrowed from

9   another one of Mr. Dondero's affiliates, correct?

10  A.  Yeah.  Again, the collateral package was the LTB test, and

11  KeyBank gave us credit for a variety of the assets pledged —

12  Q.  Okay.

13  A.  — by the — by the pledgers.

14  Q.  All right.

15  A.  And there was a specific LTB calculation per property.

16          MR. MORRIS:  I'm going to move to strike.

17          And ask you to listen carefully to my question.

18          THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q.  The balance of the capital contribution credited to HCRE, or

21  approximately $40 million, was borrowed from another of Mr.

22  Dondero's affiliates, NexVest, correct?

23  A.  Sure.

24  Q.  Okay.  And when you received Mr. Broaddus' email in Schedule

25  A, you reviewed it, didn't you?

*McGraner - Cross/Morris*                                                94

1    A.   Yes.

2    Q.   And you could see that Highland is shown as having made a

3    $49,000 capital contribution and was being given a 46.06-percent

4    interest in SE Multifamily, correct?

5    A.   Yes.

6    Q.   There's nothing ambiguous about this capital contribution

7    schedule, correct?

8    A.   No.

9    Q.   After receiving the schedule, you never told anybody that

10   you thought there was a mistake, correct?

11   A.   Correct.

12   Q.   At the time this agreement was signed, this Schedule A

13   reflected your understanding of the terms between Highland and

14   HCRE, correct?

15   A.   Correct.

16   Q.   At the time the amended and restated agreement was entered

17   into, you knew exactly what Highland was credited as having

18   contributed and you knew exactly what percentage interest it was

19   getting, correct?

20   A.   At the time, yes.

21   Q.   Okay.  Let's turn to the waterfall.  The amended and

22   restated agreement contains something called a waterfall, right?

23   A.   Yes.

24   Q.   And the waterfall in general terms is simply the priority of

25   distributions that are going to be made from the company, from

*McGraner - Cross/Morris*                                                95

1   SE Multifamily, right?

2   A.   Right.

3   Q.   And you're aware that just before the deal was signed, BH

4   Equities expressed concerns about the waterfall, correct?

5   A.   Yeah.  Well, they wanted more.

6   Q.   And they were concerned about the priority of distributions

7   in addition to wanting a greater percentage interest, right?

8   A.   They were — they wanted the same thing that we wanted, to be

9   able to pay out lenders back first.

10  Q.   Okay.  And so you personally participated in discussions on

11  the topic of a waterfall, —

12  A.   Sure.

13  Q.   — correct?

14  A.   Yeah.

15  Q.   And at the time you recall that BH Equities made a proposal

16  on the waterfall, correct?

17  A.   Yes.

18          MR. MORRIS:  And so let's take a quick look at that.

19  That's Exhibit 31.

20          Your Honor, at the request of BH Equities, we have

21  redacted portions of this document for confidentiality purposes.

22  Nobody's expressed any concern about that.  It's not relevant to

23  anything I'm doing.  I'm just wanted —

24          THE COURT:  Okay.

25          MR. MORRIS:  — you to know.

*McGraner - Cross/Morris*                                      96

1          THE COURT:   Okay.

2    BY MR. MORRIS:

3    Q.  So — so this is an email from Dusty Thomas.  Mr. Thomas is

4    at BH Equities, right?

5    A.  At the time, yes.

6    Q.  Yeah.  And — and is it fair to simply say that, you know, as

7    — as the clock is approaching midnight, it's 8:59 p.m. on the

8    15th, he's still trying to negotiate the waterfall, and he sends

9    a proposal.  And that's what's attached to his email, correct?

10   A.  I don't see an attachment, but —

11   Q.  If you turn to the page after —

12   A.  — the substance is —

13   Q.  If you turn to the page after —

14   A.  Okay.  Yes.

15   Q.  — you'll see —

16   A.  Yup.

17   Q.  — 6.1.  6.1 in the amended and restated agreement is the

18   waterfall, right?

19   A.  Correct.

20   Q.  So this is the provision of the waterfall that BH Equities

21   wanted as — as midnight was approaching on the 15th of March,

22   correct?

23   A.  Yes.

24   Q.  Okay.  And people acting on behalf of Highland rejected BH

25   Equities' proposal, right?

*McGraner - Cross/Morris*                                           97

1    A.  I think we all did, yeah.

2    Q.  Yeah.  We all meaning everybody on the Highland-HCRE side of

3    the coin?

4    A.  Yeah.

5    Q.  Okay.  And — and you all made a counterproposal, right?

6    A.  Yes.

7    Q.  Okay.  Can you go to Exhibit 32, please?  And can you

8    explain to the Court who Freddy Chang is?

9    A.  He's a former corporate counsel in the real estate

10   department.

11   Q.  So he was a lawyer, he was working in the real estate group,

12   and he wrote to Mr. Broaddus on the afternoon of the 15th with

13   his own version of what ultimately became 6.1, correct?

14   A.  Sorry.  He was — he was a real estate attorney but he was

15   employ by Highland and he reported to Tom Surgent, Tim.  Yes.

16   Q.  I'm not sure that the Court heard that answer.  Can you just

17   repeat that?  I apologize —

18   A.  Yeah.  He — I wanted to clarify.  I said he was a lawyer on

19   the real estate team, but he was actually a lawyer at Highland

20   that was junior to Tim and — Mr. Cournoyer and Tom Surgent.

21   Q.  Okay.  And he drafted an alternative to 6.1, correct?

22   A.  I don't know who drafted it.  But I assume counsel and him,

23   yeah.

24   Q.  Well, Mr. — Mr. Chang certainly forwarded it to Mr.

25   Broaddus, correct?

*McGraner - Cross/Morris*                                            98

1   A.   Yes.

2   Q.   And there was nobody other than Highland people who are

3   included in the email that was sent in the afternoon of the

4   15th, correct?

5   A.   That's right.

6   Q.   Okay.  And you understand that Mr. Chang's version of the

7   waterfall as reflected in this exhibit is the version that

8   ultimately made its way in the agreement, correct?

9   A.   Yes.

10  Q.   And Mr. Chang's version of the waterfall includes the exact

11  same allocations that were in Schedule A that we just looked at

12  that Mr. Broaddus had prepared, correct?

13  A.   Yes.

14  Q.   And at the time you believe that the allocation of

15  distributable cash set forth in Section A of Mr. Chang's email

16  was fair, reasonable, and consistent with the parties' intent,

17  correct?

18  A.   You're asking if that was my belief.

19  Q.   At — at the time, —

20  A.   Sure.

21  Q.   — you personally believed that the allocation of

22  distributable cash, as set forth in Mr. Chang's email, was fair,

23  reasonable, and consistent with the parties intent, correct?

24  A.   Yes.  As of 2018, yeah.

25  Q.   This is March 15th, 2019.  Even as of that time, you thought

*McGraner - Cross/Morris*                                          99

1   it was fair, reasonable, and consistent with the party's intent,

2   correct?

3   A.   Right, but allocates the cash between September of '18 to

4   March of this date, right?  That's what we're talking about, the

5   six-month span?

6   Q.   No.  Maybe it's my questioning.

7   A.   Probably.

8   Q.   Okay.  So Mr. Chang wrote, sent this version of the

9   waterfall, correct?

10  A.   Yes.

11  Q.   And in Section — he has it as 1.1, but it ultimately becomes

12  6.1.  In 6.1a, he has an allocation of distributable cash:

13  Under certain circumstances, distributable cash would be

14  distributed to the prospective members of SE Multifamily in the

15  manner set forth in — in A, correct?

16  A.   Correct.

17  Q.   And at the time that this was being drafted, you knew

18  everything about KeyBank, right?

19  A.   Yeah.  But we still — we still owed them a lot of money, but

20  yeah.

21  Q.   And you knew — you knew all about the collateral issues,

22  right?  You knew about Section 5.2 of the KeyBank loan, right?

23  A.   Yeah.

24  Q.   And despite the fact that you took — you knew all of that,

25  you still believed that a distribution of distributable cash as

*McGraner - Cross/Morris*                                    100

1   set forth in A, 46.06 percent to Highland, was fair, reasonable,

2   and consistent with the parties' intent, correct?

3   A.  Yeah.  I mean we didn't think that there would be any

4   distributable cash.

5          MR. MORRIS:  I move to strike everything beyond

6   "Yeah."

7          THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q.  The people who were working on the waterfall were working on

10  behalf of Highland and HCRE, correct?

11  A.  Yes.

12  Q.  At the time, everybody was rowing in the same direction for

13  the Highland group of companies that are subject to the SE

14  Multifamily agreement, correct?

15  A.  Yeah.  Different partners, yes.

16  Q.  Okay.  So this is taking place late in the evening on the

17  15th and, ultimately, Mr. Chang's version of 6.1 gets

18  incorporated into the final version of the amended and restated

19  agreement, and it gets signed; is that right?

20  A.  Yes.

21  Q.  Okay.  Let's look at that agreement for a few minutes.  I

22  believe it's 7 in your binder, tab 7.  Let me know when you are

23  there.

24  A.  Yup.  I'm here.

25  Q.  Okay.  If you could turn to Schedule A, please.  Right after

*McGraner - Cross/Morris* 101

1   the signature pages.

2   A.  Okay.

3   Q.  Schedule A is consistent with the version of the capital

4   contribution schedule that Mr. Broaddus sent to you and to BH

5   Equities earlier in the day on the 15th of March 2019, correct?

6   A.  Yes.

7   Q.  So you were aware before this agreement was signed that this

8   capital contribution was going to be included in the final

9   version of the document, correct?

10  A.  Yes.

11  Q.  There's nothing ambiguous about the information on Schedule

12  A, correct?

13  A.  Correct.

14  Q.  There's nothing about Schedule A that we don't understand

15  today, correct?

16  A.  Correct.

17  Q.  And to the best of your knowledge and understanding,

18  Schedule A as set forth in the executed and amended restated

19  agreement reflected the parties' intent at the time it was

20  signed, correct?

21  A.  At the time it was signed, yes.

22  Q.  Okay.  Let's go to Section 1.7.  That's at the bottom of

23  page 3.  Are you there, sir?

24  A.  Yeah.

25  Q.  Okay.  So Sections 1.7 fixes the members' ownership

*McGraner - Cross/Morris* 102

1 interests in SE Multifamily, correct?

2 A.  Yes.

3 Q.  And Section 1.7 specifically affixed Highland's ownership in

4 SE Multifamily at 46.06 percent, correct?

5 A.  Yes.

6 Q.  And you knew this provision would be included before the

7 agreement was signed, correct?

8 A.  Correct.

9 Q.  There's nothing about this provision, from your perspective,

10 that makes it ambiguous, correct?

11 A.  Again as of the — at the time it was signed, no.

12 Q.  You don't think there is anything ambiguous about this

13 today, do you?

14 A.  I don't know what the intro except with respect to

15 particular item specified in this agreement, you know, —

16 Q.  All right, but — but the —

17 A.  — provides exceptions to anything in the agreement —

18 Q.  Okay.

19 A.  — that specific.  So I — I'd have to go back and read it —

20 Q.  Are you — are you aware as — as one of the owners of HCRE

21 that there is anything exceptions that apply — as you sit here

22 today, are you aware of any exceptions that apply?

23 A.  The — I believe in the — in the SE Multifamily agreement

24 there was provisions relating to a partner filing bankruptcy,

25 yeah.  So I'm not sure how that affects this.  I didn't spend

*McGraner - Cross/Morris*                                           103

1    any time on it, but —

2    Q.   Okay.

3    A.   — there are exceptions.

4    Q.   Okay.   Anything else?

5    A.   I mean that's — that's the big one.

6    Q.   I'm just asking if there is anything else.

7    A.   I — I'm sure there are.

8    Q.   Do you have any personal knowledge that there's anything

9    else?

10   A.   I have personal knowledge that there is that one, the

11   bankruptcy one.

12   Q.   Okay.   I'm going to ask you to listen carefully to my

13   question, because I know it's hard.   You've already testified to

14   that.   Are you aware, do you have any personal knowledge of

15   anything else?

16   A.   No.

17   Q.   Thank you.   At the time the agreement was signed, HCRE

18   understood that Section 1.7 accurately reflected the parties'

19   intent, correct?

20   A.   At the time, yeah.

21   Q.   Now we talked about how at the time the agreement was signed

22   HCRE had full information about the capital contributions of all

23   of the members, correct?   And if we turn to Section 2.2, 2.2

24   discusses future additional capital contributions, correct?

25   A.   Yes.

*McGraner - Cross/Morris*                                                104

1    Q.  And the only party to this agreement from whom additional

2    future capital contributions could be sought is an entity called

3    Liberty, right?

4    A.  I struggle with characterizing the word only.

5    Q.  Well, is there anybody named in 2.2a from whom the manager

6    could call capital contributions from other than Liberty?

7    A.  It said in the 2.1 section any member could make additional

8    capital calls.

9    Q.  Okay, so any member could.  But 2.2 talks about who the

10   manager you make capital calls from, correct?

11   A.  2.2 is specific to four assets that were syndicated into our

12   DSD channel, and Liberty was the provider of that capital —

13   Q.  Okay, and there was no —

14   A.  — because it had to be.

15   Q.  Okay.  Did — did you — did HCRE ever make any additional

16   capital contributions to SE Multifamily after March 15, 2019?

17   A.  I don't — I mean we recycled cashflow, so I don't know.

18   Q.  Did you ever increase your capital contribution, you know,

19   for purposes of filing tax returns and that kind of thing?  Did

20   HCRE ever increase their capital contribution, make an

21   additional capital investment in exchange for an additional

22   interest in SE Multifamily?

23   A.  I don't think so.

24   Q.  Did anybody ever ask HCRE to do that?

25   A.  Prepetition, I don't think so.  I don't think we needed — we

*McGraner - Cross/Morris*                                                   105

1    didn't need to.

2    Q.  They haven't made any additional capital contributions and

3    they haven't been asked to do that, correct?

4    A.  I have — I can't sit here and tell you.  I don't — I don't

5    know who's made the capital calls.

6    Q.  All right.  So I'll ask it this way.  Did you have any

7    personal knowledge of HCRE making any additional capital

8    contributions after this agreement was signed?

9    A.  Other than recycling of the cashflow that was in the

10   portfolio, no.

11   Q.  Do you have any personal knowledge that anybody acting on

12   behalf of SE Multifamily ever asked Highland to make an

13   additional capital contribution after this agreement was signed?

14   A.  No.

15   Q.  Did you have any reason to believe when this agreement was

16   signed that Highland would be asked to make additional capital

17   contributions?

18   A.  Sure.  I mean if we needed — I mean COVID hit in 2020.  If

19   we had to float the properties or carry them because we still

20   owned at least three assets at the time.

21   Q.  Is there any — is there any obligation on Highland's part to

22   meet that capital call?

23   A.  You know other than being a good partner, no.

24   Q.  Okay.  So there is no legal obligation that you're aware of

25   that would have required Highland to make an additional capital

*McGraner - Cross/Morris*                                          106

1  contribution, correct?

2  A.  As far as I know.

3  Q.  Okay.  And you knew that and that was your understanding at

4  the time the agreement was signed, correct?

5  A.  Sure, in —

6  Q.  Okay.

7  A.  — March of '19.

8  Q.  All right.  Let's go to 6.1, please.  6.1a is on page 10.

9  From your perspective, 6.1a is consistent with Mr. Chang's

10 waterfall that we just saw in the email, correct?

11 A.  Yes.

12 Q.  And you knew this provision was going to be included in the

13 agreement before Mr. Dondero signed it, correct?

14 A.  Yes.

15 Q.  There's nothing ambiguous about Section 6.1a from your

16 perspective, correct?

17 A.  I mean, again, with the exception of the exception and in

18 Article 6 and Article 9, correct.

19 Q.  Sir, when you testified in your deposition you said that

20 there's nothing ambiguous about 6.1a from your perspective; is

21 that fair?

22 A.  Fair.

23 Q.  Okay.  And at the time of your deposition you told me that

24 to the best of your knowledge, 6.1a reflected the parties'

25 intent at the time the agreement was signed, correct?

*McGraner - Cross/Morris*                                              107

1   A.   Yes.

2   Q.   Okay, go to 9.3, please.   And do you see 9.3e?   That's the

3   liquidation waterfall, correct?

4   A.   Correct.

5   Q.   I apologize.   I don't mean 9.3e, but 9.3 generally is the

6   liquidation waterfall, right —

7   A.   I got it, yeah.

8   Q.   And so this is the waterfall that would occur if there was a

9   liquidation of SE Multifamily, right?

10  A.   Correct.

11  Q.   And at the bottom of the waterfall, in 9.3e, it sets forth

12  the manner in which any residual cash or assets would be

13  distributed to the members, correct?

14  A.   Correct.

15  Q.   And you understood that at the time this agreement was

16  signed, correct?

17  A.   Yes.

18  Q.   And there's nothing ambiguous about Section 9.3e, correct?

19  A.   Correct.

20  Q.   And you understood that 9.3e reflected the parties' intent

21  to sign at the time the agreement was signed, correct?

22  A.   Correct.

23  Q.   The agreement's never been amended, correct?

24  A.   Correct.

25  Q.   HCRE never asked any other party to the agreement to amend

*McGraner - Cross/Morris*                                          108

1   it in any way, correct?

2   A.  Correct.

3   Q.  Things changed pretty dramatically six months after this

4   agreement was signed, right?

5   A.  I'll say.

6   Q.  And that's because Highland filed for bankruptcy, right?

7   A.  That's right.

8   Q.  And Mr. Dondero, the majority owner and the manager of HCRE,

9   is the person who decided to hire — to file Highland for

10  bankruptcy, correct?

11  A.  Correct.

12  Q.  You didn't anticipate Highland would file for bankruptcy at

13  the time you signed at the time the amended and restated

14  agreement was executed, correct?

15  A.  In March?

16  Q.  Um-hum.

17  A.  No, I have no idea.

18  Q.  But for Highland's bankruptcy filing, we wouldn't be here

19  today, correct?

20  A.  Yeah.  If my partners were the same partners, that's

21  probably fair.

22  Q.  So your partners are no longer the same partners and that's

23  the reason that we're here; is that fair?

24  A.  Yeah.  Otherwise I think we could have worked through it.

25  Q.  Okay.  So from your —

*McGraner - Cross/Morris*                                            109

1   A.   I had good partners —

2   Q.   — perspective, this dispute is really just a consequence of

3   Highland's bankruptcy filing; isn't that right?

4   A.   I think it's an unintended consequence, yeah.

5   Q.   Let's talk about the proof of claim for a moment.

6   A.   Okay.

7   Q.   If we can go to Exhibit 8.  You mentioned D. C. Sauter

8   earlier.  Did I hear that correctly?

9   A.   Sure.

10  Q.   And Mr. Sauter at the time the original LLC agreement was

11  prepared and at the time the KeyBank loan was prepared and at

12  the time the amended and restate LLC agreement was prepared, he

13  was at Wick Phillips, right?

14  A.   I think so.

15  Q.   And then in the fall of 2019, or thereabouts, he came over

16  to NexPoint; do I have that right?

17  A.   I think so.

18  Q.   Okay.  And when he was at Wick Phillips he worked on Project

19  Unicorn, didn't he?

20  A.   Yeah.

21  Q.   Yeah.  And he is the one who showed you this proof of claim

22  before it was filed on behalf of HCRE, correct?

23  A.   I think so.

24  Q.   Um-hum.  You weren't given an opportunity to provide any

25  comments to the document before it was filed, correct?

*McGraner - Cross/Morris*                                110

1    A.  I think we — we spoke about it generally, conceptually.

2    Q.  You — you weren't given the opportunity to provide any

3    comments to the document before it was filed, correct?

4    A.  I didn't think I needed to.  I'm not a bankruptcy attorney,

5    I don't know the process or what should be said.  We relied on

6    our counsel for that.

7    Q.  Okay.  So a simple question:  You weren't given the

8    opportunity to provide any comments to the document before it

9    was filed, correct?

10   A.  My answer is I was deferential to — to our counsel.

11   Q.  You never gave Mr. Sauter any documents in connection with

12   the proof of claim, correct?

13   A.  Correct.

14   Q.  You don't know whether Mr. Sauter ever gave any documents to

15   Bonds Ellis in connection with this proof of claim, correct?

16   A.  I don't know.

17   Q.  You — you don't know, right?  You have no personal

18   knowledge —

19   A.  I don't know —

20   Q.  — of Mr. Sauter giving any documents to Bonds Ellis in

21   connection with the proof of claim, correct?

22   A.  Correct.

23   Q.  You never discussed this document with Mr. Dondero, correct?

24   A.  Correct.

25   Q.  You never discussed this document with anybody at Bonds

*McGraner - Cross/Morris*                                            111

1    Ellis, correct?

2    A.   Correct.

3    Q.   You never personally gave any information to Bonds Ellis in

4    connection with this proof of claim, correct?

5    A.   Correct.

6    Q.   In fact, you never discussed this document with anybody in

7    the world other than Mr. Sauter and your lawyers in connection

8    with this matter, correct?

9    A.   I mean if you're saying this document, I would characterize

10   this document as our dis- — like a dispute.

11   Q.   Let me restate the question.

12   A.   Because —

13   Q.   Prior to the time the proof of claim was filed, you didn't

14   talk to anybody in the world except for Mr. Sauter, correct —

15   about — about the proof of claim?

16   A.   The proof — the substance of the proof of claim was a

17   terrifying event that we worked five years to create it asset

18   and it's going to wind up in the hands of our — not our partners

19   anymore.  Yes, that was discussed often.

20   Q.   You never discussed this document with anyone in the world

21   other than Mr. Sauter, correct?

22   A.   This document, no, but the substance —

23   Q.   Thank you.

24   A.   — of the document, yes.

25            MR. MORRIS:  I'll move to strike everything after

*McGraner - Cross/Morris*                                                112

1   "no."

2           THE COURT:   Sustained.

3   BY MR. MORRIS:

4   Q.  You didn't authorize this proof of claim to be filed, did

5   you?

6   A.  Again, I was deferential to our counsel.

7   Q.  So you didn't authorize this proof of claim to be filed;

8   isn't that correct?

9   A.  Again, it was — we were advised that this would help protect

10  our interests, so we were deferential to that advice.

11          MR. MORRIS:   Can you go to page 44 of Exhibit 71,

12  please.

13  BY MR. MORRIS:

14  Q.  I'm going to read from lines 3 to lines 8.  Did you give

15  these answers to my questions?

16          "QUESTION:   Did you approve of the filing of this

17  document?

18          "ANSWER:   No.

19          "QUESTION:   Do you know who approved the filing of

20  this document?

21          "ANSWER:   I don't."

22          Was that truthful testimony at the time you gave it?

23  A.  Yes.

24  Q.  Thank you.  But your understanding is that this document was

25  filed to protect HCRE's interests in the bankruptcy, correct?

*McGraner - Cross/Morris*                                                           113

1   A.   Yeah, that is the mechanism by which we could sort this out.

2   Q.   Well, —

3   A.   That's what — that's what —

4   Q.   — your specific understanding is that the proof of claim

5   provides standing; isn't that right?

6   A.   Yeah, that's what I was told.

7   Q.   Okay.  So it was filed for standing.  HCRE now contends that

8   the mistake in the agreement wasn't that the allocations were

9   wrong in the original agreement, but that it should have

10  provided HCRE with the ability to amend the agreement as the

11  transaction unfolded and assets were sold, correct?

12  A.   Correct.

13  Q.   Okay.  Can you go to Section 10.1 of the agreement.  We

14  looked at that before, it's Exhibit 7.  You'll agree with me

15  that Section 10.1 provides for the amendment of this agreement,

16  correct?

17  A.   Sure, yes.

18  Q.   And, in fact, it can only be amended if HCRE approves; isn't

19  that right?

20  A.   That's what, yeah, it looks to be.

21  Q.   So Highland and BH Equities can't amend this agreement by

22  themselves, right?

23  A.   I think that's generally the case, but yes.

24  Q.   Okay.  And you'll agree with me that there are exceptions

25  even to HCRE's authority to amend the agreement, right?

*McGraner - Cross/Morris*                                                  114

1   A.   Yes.

2   Q.   And 10.1 is a provision that was drafted by people rowing in

3   the same direction on behalf of Highland and HCRE, right?

4   A.   I think this was a Hunton and Williams, yeah, —

5   Q.   Okay.  And —

6   A.   — provision.

7   Q.   — all of the professionals, the process that Mr. Dondero

8   talked about, 10.1 was part of that process, right?

9   A.   Sure.

10  Q.   And it got vetted by the real estate team and the lawyers

11  and the tax folks at HCRE, at Highland, at NexPoint, everybody,

12  Mr. Sauter, right, everybody reviewed this, right?

13  A.   Yeah.  In March '19, —

14  Q.   Yeah.

15  A.   — yeah.

16  Q.   And it specifically says that unless all of the members

17  agree, you can't do anything in — in g, to material — materially

18  or disproportionately impair — impair the rights of each member

19  under the agreement, right?

20  A.   That's right.

21  Q.   Okay.  And you knew that, this was known at the time the

22  agreement was signed, right?

23  A.   Right.

24  Q.   Why don't you explain to Judge Jernigan what provision you

25  think is missing from here.

*McGraner - Cross/Morris*                                                115

1   A.   What provision is missing from the document?

2   Q.   Yeah.  What's the mistake, what are we — what's the proof of

3   claim about?  What is the mistake?

4   A.   I think, again, our partners aren't our partners anymore.

5   We worked for four and a half years to — to create this value

6   and a lot of people worked on it.  The bad faith argument is a

7   terrible argument because they didn't live it.  They're coming

8   in now and trying to paint this as a — as a waste of the Court's

9   time.  We created so much value.  A lot of people touched this

10  deal.  They didn't, none of them did.  And for them to come in

11  now and get 400 million percent IRI is crazy and unjust, and so

12  that's why we filed a proof of claim.  And that's not bad faith.

13  That's in good faith, to protect our efforts.  That's — that's

14  the problem.

15          So when the bankruptcy was filed and we can't amend

16  it, that's a mistake.  Our partners aren't our partners.  This

17  guy that's being condescending the entire day here, what — what

18  he's protected, they didn't work on a single thing over the last

19  four years, a single thing.  I betcha they couldn't say one

20  property that exists in the partnership today or existed ever.

21  Q.   Did you know when Highland — Jim Dondero decided to file for

22  bankruptcy for Highland, right?

23  A.   Yeah, I'm aware —

24  Q.   And did you know that all of Highland's assets would be

25  marshaled and distributed to creditors at the end of the

*McGraner - Cross/Morris*                                                116

1  bankruptcy process?  Did you know that?

2  A.  I had — I had no knowledge of the bankruptcy, no.  I didn't

3  prepare the filing —

4  Q.  Is there anything — is there — do you have any reason to

5  believe that the distribution of Highland's assets to its

6  creditors is something that doesn't happen in every single

7  bankruptcy case?

8  A.  My understanding this was a reorganization and not a

9  liquidation at first, and then it morphed into something.  I

10 don't — I'm not here to talk about that.  That's — that's way

11 above my head.  I'm not — believe me, I don't want to be here

12 talking about this.

13 Q.  I appreciate that.

14 A.  So I'm just telling the bad faith — the bad faith thing is —

15 hear me when I say this, that's — and for you, for someone to

16 take that stance is beyond me.

17 Q.  Well, I'm going to ask you again.  When the decision was

18 made to file for bankruptcy, did you understand that Highland's

19 interest in SE Multifamily would be part of its bankruptcy

20 estate?  Did you understand that?

21 A.  I — I was made aware of the potential bankruptcy filing a

22 week or so prior to the filing.  And I — that's why I got

23 KeyBank off the loan, because I knew there were cross-default

24 provisions and all of our real estate documents, and if one

25 affiliate filed for bankruptcy there could be contagion risk.

*McGraner - Cross/Morris*                                          117

1  Over the next couple weeks, things transpired, I thought we were

2  going to resolve it, I wasn't kept in the loop on it, and then

3  here we are.  That's — that's the truth.

4  Q.  So this is really just, as you testified to earlier, it's

5  just a consequence of the bankruptcy filing, it's not a failure

6  of the document; —

7  A.  Look, if —

8  Q.  — is that fair — is that fair?

9  A.  No.  It's — it's — the — the portfolio changes over time.

10  Assets are sold, assets are retained.  Assets are, you know,

11  performing poorly or performing great.  People make different

12  contributions.  Partners make different contributions over time.

13  Your client didn't make any other than the tax structuring of

14  10.1 that came into this document that we're talking about.

15  That's — that's the genes- — I mean that's the only contribution

16  that they made.

17  Q.  So if my client made no contribution, why did you approve of

18  the granting of the 46.06 —

19  A.  Because it was six —

20  Q.  — percent interest —

21  A.  — it was — it was six months — it was six — it is a

22  six-month window.  This is a $1.2 billion transaction.  We were

23  running around with our tails cut off on a KeyBank retrade.

24  And, look, I know you — I know you find this humorous, Mr.

25  Morris, but I don't.

*McGraner - Cross/Morris*                                              118

1    Q.  You know what, what I — it's not about me —

2    A.  No, please.

3    Q.  It's not about me.  You — you can say whatever you want.

4    I'll — I'll keep my tongue tied.

5    A.  That's a first.

6    Q.  And I'll just ask again, because I'm not quite sure I heard

7    the answer, what provision is either wrong or did you forget to

8    add that would have solved the problem that you're talking

9    about?

10   A.  Look, I think if you have good partners and you're working

11   with partners that are — that are known to you, then you make

12   amendments to reflect the contributions of those partners,

13   whether monetary or otherwise.

14   Q.  Okay.

15   A.  And my understanding is I can't do that right now.

16   Q.  Okay.

17   A.  And if I were to try, it would — we're trying — we're trying

18   to buy an asset right now back, and it just — it's going

19   nowhere.  There — your client's team won't even engage with us

20   on it.

21            MR. MORRIS:  He's opened the door, Your Honor.

22   BY MR. MORRIS:

23   Q.  We offered to sell this back to you; isn't that right?

24   A.  When?  For —

25   Q.  You don't know?

*McGraner - Cross/Morris*                                                   119

1    A.   Prior —

2    Q.   Six weeks ago.

3    A.   Six weeks ago?

4    Q.   Yeah.

5    A.   For — yeah, for more than — for more than the value that's

6    in the — that's in the partnership, yeah, I guess.  I guess

7    thanks for the offer.  It's more — it's more than the offer.

8    Q.   You're — you're aware that Mr. Dondero filed a valuation

9    motion with the Court which placed the value on SE Multi- — on

10   Highland's interest in SE Multifamily alone at $20 million,

11   right —

12   A.   Are you aware of the market right now?

13   Q.   Oh, are you —

14   A.   Oh, no, no, no.

15   Q.   Please answer my question.

16   A.   No.  Are you aware of the market?

17          THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q.   Answer my question.

20          THE COURT:  Just answer the question.

21   BY MR. MORRIS:

22   Q.   Are you aware that Mr. Dondero —

23   A.   When — when was it filed?

24   Q.   — are you aware that Mr. Dondero placed a value, he told

25   this Court —

*McGraner - Cross/Morris*                                    120

1    A.   Yeah, I am.

2    Q.   — that this doc- — that this asset was —

3    A.   I am.  I am, yes, yes.

4    Q.   — worth $20 million?

5    A.   Yes.

6    Q.   Okay.

7    A.   Yes.

8    Q.   And — and are you aware that Highland put in other assets in

9    the package that you all wanted — that Mr. Dondero wanted,

10   anyway, right?

11   A.   Sure.

12   Q.   And we offered to compromise on the HCRE notes that remain

13   unpaid, right?

14   A.   I don't remember that piece of it.

15   Q.   Are you familiar with the package?  If you're not familiar

16   with the settlement offer, that's fine.

17          MR. GAMEROS:  Your Honor, I'm going to object exactly

18   on the grounds, this is 408, and —

19          MR. MORRIS:  He opened the door.

20          MR. GAMEROS:  — it has nothing to do with the proof of

21   claim.  I'm sorry.

22          THE COURT:  Okay.  What about his comment that he

23   opened the door?

24          MR. GAMEROS:  He opened the door on something else.

25   He didn't open the door on a settlement offer that was made.  He

1  opened the door on valuation, on something else, not the

2  settlement offer.

3        MR. MORRIS:  He said — Your Honor, my recollection is

4  that he specifically said that they made an offer and we didn't

5  respond, and the facts are the exact opposite.  If he —

6        MR. GAMEROS:  I think he's talking about something

7  else.

8      (Simultaneous talking.)

9        MR. MORRIS:  He —

10       THE WITNESS:  We — we made — we — no, we made an offer

11 specifically on an asset, and you didn't respond.  That's

12 specifically on an asset.

13       THE COURT:  Well, I don't know what we're talking

14 about when he says that way —

15       MR. MORRIS:  You know what, I'll move on, Your Honor.

16       THE COURT:  Okay.

17       MR. MORRIS:  It doesn't really matter.

18       THE COURT:  We'll sustain it because he's moving on —

19       MR. MORRIS:  I'll — we did what we did, they did what

20 they did —

21       MR. GAMEROS:  Thank you, Your Honor.

22       MR. MORRIS:  If they don't want to talk, they'll let

23 us know.

24 BY MR. MORRIS:

25 Q.  Mr. Dondero was in control of both HCRE and Highland prior

*McGraner - Cross/Morris* 122

1  to the bankruptcy, correct?

2  A.  Yup.

3  Q.  And despite being in control of both entities and despite

4  all of the fears that you had, HCRE made no effort to amend the

5  agreement, correct?

6  A.  Post bankruptcy?

7  Q.  Before the bankruptcy.

8  A.  Pre bankruptcy, no.  Post bankruptcy, we didn't think it

9  would be worth it.

10  Q.  Okay.  So let me ask this question.  At no time in the

11  history of the world did HCRE ever try to amend the restated LLC

12  agreement that we've looked at, correct?

13  A.  Correct.

14  Q.  Okay.  You never instructed anyone to draft an amendment,

15  correct?

16  A.  To present to Highland?

17  Q.  For any purpose.  You never said, 'Let's draft an amendment

18  to this agreement'?

19  A.  No.

20  Q.  HCRE never told BH Equities that HCRE believed that there

21  was a mistake and wanted to amend the agreement to reflect a

22  different allocation of membership interests, correct?

23  A.  They knew.  They knew that there — we had this — you asked

24  me about this in the deposition, so that's where you're going.

25  Yeah, we — we spoke often to Ben and Joanna at BH about this

*McGraner - Cross/Morris*                                                123

1  being right here, right now in this circumstance.  But, no, we

2  never presented them.

3  Q.  You never even told them that you believed there was a

4  mistake and wanted to amend; isn't that right?

5  A.  I think we — I think they knew that putting on — putting in

6  $49,000 of capital and receiving, you know, 30 times that would

7  be not the result anyone wanted or underwrote or expected —

8        MR. MORRIS:  I move to strike to the extent that he's

9  purporting to testify —

10        THE COURT:  Sustained.

11        MR. MORRIS:  — to what they knew.

12  BY MR. MORRIS:

13  Q.  And I'm going to ask you to listen carefully to the

14  question, sir.  HCRE never informed BH Equities that HCRE

15  believed there was a mistake and wanted to amend the agreement

16  to reflect different allocations of membership interests,

17  correct?

18  A.  I don't know.

19  Q.  Can you grab page 69 of Exhibit 71.  Lines 14 through 20,

20  did I ask this question, did you give this answer?

21        "QUESTION:  Did you anyone acting on behalf of HCRE

22  ever inform BH Equities that they believed there was a mistake

23  and therefore wanted to amend the agreement to reflect different

24  — a different allocation of membership interests?

25        "ANSWER:  No.  I don't know why they would care."

*McGraner - Cross/Morris*                                                   124

1           Did you give that answer to my question?

2    A.  I did, but I later gave a question — I gave a different

3    answer —

4    Q.  Please stop.

5    A.  Well, I mean you asked me a different time, and I said

6    Joanna knew about this dispute.

7           MR. MORRIS:   Okay.  So I would move to strike whatever

8    he thinks Joanna knew.

9           THE COURT:   Sustained.

10   BY MR. MORRIS:

11   Q.  In fact, HCRE never told BH Equities that it wanted to

12   adjust the percentages for Highland and HCRE, correct?

13   A.  As of what date?

14   Q.  As of the date of your deposition.

15          Sir, it's a pretty simple question.   HCRE never told —

16   A.  Nothing about this is simple.

17   Q.  If you want — if you want, I could just read it into the

18   record, at line — at page 71, lines 14 through 20, did you give

19   this answer to my question?

20   A.  Go to page 2 — 19.

21   Q.  Sir, can you stick with me?  Your counsel can do whatever he

22   wants on redirect.

23   A.  Okay.

24   Q.  That's the way this works.

25   A.  Got it.

*McGraner - Cross/Morris*                                    125

1  Q.  So answer my question.  HCRE never told BH Equities that it

2  wanted to adjust the percentages for Highland and HCRE, correct?

3  A.  As of the date of the March agreement, but you asked the

4  same question later.  That's why I'm trying to get you there.

5  Q.  That's right.  And so — and so later on you had continuing

6  discussions with — this is your point — you had continuing

7  discussions with BH Equities over their interest, right?

8  A.  No.  No, this is —

9  Q.  So — so let me ask you this.  Page 71, line 14 to line 20:

10         "QUESTION:  Another than the consequences that would

11  have resulted from an adjustment to BH Equities' interest, did

12  anybody acting on behalf of HCRE ever tell BH Equities that it

13  wanted to adjust the percentages for Highland and HCRE?

14         "ANSWER:  No."

15         Did you give that answer to my question?

16  A.  I did.

17  Q.  Okay.  And the reason that Highland made — withdrawn.

18         The reason HCRE made no effort to amend the agreement

19  is because you hoped that the issues that caused the bankruptcy

20  filing would resolve themselves; isn't that right?

21  A.  Sure.

22  Q.  Okay.  So you've got the bankruptcy filing.  You're hoping

23  that things resolve themselves.  And then the proof of claim

24  gets filed, right?

25         And the proof of claim is filed by Bonds Ellis, right?

*McGraner - Cross/Morris*                                            126

1  A.  Yeah.

2  Q.  Okay.  But Bonds Ellis doesn't prosecute the proof of claim,

3  correct?

4  A.  I mean I think that — it could be —

5  Q.  What — what —

6  A.  — I could have this wrong, but I think the — our counsel,

7  like, passed away.

8  Q.  Okay.  Wick Phillips was one of the firms that provided

9  legal advice in connection with Project Unicorn, correct?

10  A.  Yeah.  They worked on the — on what we call the dirt work.

11  Q.  From your perspective, Wick Phillips provided that legal

12  advice jointly to HCRE and Highland, correct?

13  A.  To the — yeah.

14  Q.  Okay.  And all of the law firms were working on behalf of

15  both HCRE and Highland jointly, correct?

16  A.  Yeah.

17  Q.  You personally knew that Wick Phillips represented both HCRE

18  and Highland jointly in connection with the negotiation or

19  drafting of the original LLC agreement, the KeyBank loan, and

20  the amended and restated LLC agreement, correct?

21  A.  I think what we said was we were rowing in the same boat

22  together, all working together.

23  Q.  I will ask the question one more time.  You personally knew

24  that Wick Phillips represented both HCRE and Highland jointly in

25  connection with the negotiation or drafting of the original LLC

*McGraner - Cross/Morris*                                               127

1  agreement, the KeyBank loan, and the amended and restated LLC

2  agreement, correct?

3  A.  I would say generally a transaction, yeah.

4  Q.  I apologize.  What did you...

5  A.  I would say they represented us generally in the

6  transaction.  Us being the partnership.

7  Q.  In all of — in all of those — in all of those matters,

8  correct?

9  A.  Primarily the dirt work, the KeyBank loan and the purchase

10  and sale.

11  Q.  Okay.  Can you go to page 184, please, of the exhibit.

12  Beginning at line 25 and continuing through line 7 of page 185,

13  were you asked this question and did you give this answer?

14        "QUESTION:  But you personally knew that Wick Phillips

15  represented both HCRE and Highland jointly in connection with

16  the negotiation or drafting of the original LLC agreement, the

17  KeyBank loan, and the amended and restated LLC agreement,

18  correct?

19        "ANSWER:  That's correct."

20        Did you give my answer — did you give that answer to

21  my question during your deposition?

22  A.  Sure.

23  Q.  Okay.  And even though Wick Phillips had jointly represented

24  Highland and HCRE in connection with those matters, HCRE decided

25  to retain Wick Phillips to prosecute the proof of claim against

*McGraner - Cross/Morris*                                      128

1   Highland, correct?

2   A.   Again I wasn't part of that determination.

3   Q.   But you own a piece of HCRE, right?

4   A.   I own 25 percent, yeah.

5   Q.   And you knew that Wick Phillips was going to represent HCRE

6   in the prosecution of the proof of claim, didn't you?

7   A.   I — I didn't make the determination.

8   Q.   I'm not asking you who made the determination, I'm just

9   asking if you were aware of it.

10  A.   I mean, again, like I said in my deposition, I think we

11  probably sought a waiver, and you guys denied.

12  Q.   And you went ahead anyway, right?

13         You're a lawyer, aren't you —

14  A.   Ironic.  This is ironic, yeah.

15  Q.   You're a lawyer, aren't you?

16  A.   Yeah.

17  Q.   And it's your — it's your testimony that you asked for a

18  waiver and you didn't get one, and you went ahead and hired —

19  hired Wick Phillips anyway?

20  A.   I don't know — I don't know the sequencing of this.  Again,

21  as I said earlier to Your Honor, I wasn't — I do other things

22  besides this transaction.  I wasn't making determinations on a

23  day-to-day basis on who we chose for counsel to prosecute a

24  complex bankruptcy.

25  Q.   You know who made the decision to hire Wick Phillips to

*McGraner - Cross/Morris*                                              129

1   represent HCRE in the prosecution of the proof of claim arising

2   out of matters that Wick Phillips had jointly represented

3   Highland and HCRE on?

4   A.   I don't.

5   Q.   Did you ever ask?

6   A.   No.

7   Q.   HCRE not only hired Wick Phillips but made the decision to

8   oppose Highland's motion for disqualification; isn't that right?

9   A.   Again, I'm not — I don't know the bankruptcy sequencing.

10  Q.   Are you aware that HCRE opposed Highland's motion to

11  disqualify Wick Phillips on conflict-of-interest grounds?

12  A.   No.

13  Q.   You don't know that?

14  A.   I mean I'm — I'm not aware of the various motions and

15  objections and everything going back and forth in this

16  bankruptcy.  I'm not aware of it.

17  Q.   You don't know why HCRE opposed Highland's disqualification

18  motion, do you?

19  A.   No.

20  Q.   And when I asked you that question in your deposition, you

21  referred me to D. C. Sauter, correct?

22  A.   I guess.

23  Q.   You did, didn't you?

24  A.   Well, if I did, I did.

25  Q.   Okay.  And Mr. Sauter at the time was at NexPoint, right?

*McGraner - Cross/Morris*                                          130

1   A.   At what time?  Sorry.

2   Q.   At the time of the opposition to the disqualification

3   motion.

4   A.   Sure.

5   Q.   And he's the one who had been the partner at Wick Phillips

6   when the advice was being given —

7   A.   D. C. —

8   Q.   — the transaction —

9   A.   D. C. is a real estate attorney.  He's — he does purchase

10  and sales and financing.  He's not a — he's not a LLC agreement

11  guy or a corporate lawyer.

12  Q.   I'm not asking you that.

13  A.   Well, I'm telling you that.

14          MR. MORRIS:  Okay.  So I move to strike because I want

15  you to answer my question.

16          THE COURT:  Sustained.

17  BY MR. MORRIS:

18  Q.   Mr. —

19  A.   Okay.

20  Q.   — Mr. Sauter was at Wick Phillips when Wick Phillips was

21  jointly representing Highland and HCRE; is that right?

22  A.   Yeah.

23  Q.   Okay.  And — and when I asked you why HCRE opposed the

24  disqualification motion, you told me to talk to D. C.; isn't

25  that right?

*McGraner - Cross/Morris*                                    131

1   A.   No, I said it was ironic that you guys were making that

2   statement.

3   Q.   Can you go to page 182 of your transcript, please.

4              THE COURT:   You said 122?

5              MR. MORRIS:   182.  I apologize, Your Honor.

6              THE COURT:   182.

7   BY MR. MORRIS:

8   Q.   You may want to amend your testimony, sir.  Line — page 182,

9   lines 14 through 23.  We asked these questions and did you give

10  these answers?

11             "QUESTION:   Notwithstanding the fact that HCRE knew

12  that Wick Phillips jointly represented Highland and HCRE, it

13  opposed Highland's motion to disqualify Wick Phillips, correct?

14             "ANSWER:  Yes."

15             So you knew that, right?

16  A.   Yeah.

17  Q.   Okay.  And then it goes on, "QUESTION:   On what basis did

18  HCRE have to oppose a motion to disqualify a law firm that

19  represented both parties to the dispute?

20             "ANSWER:  I don't know.  If you'll — we can ask D. C.

21  Sauter."

22             That was the answer you gave, right?

23  A.   Yup.

24  Q.   So you didn't personally know, but you thought Mr. Sauter

25  would have the answer as to why HCRE was opposing Highland's

*McGraner - Cross/Morris*                                               132

1   disqualification motion, correct?

2   A.   Yeah.   I mean this was — he was my primary contact with the

3   bankruptcy, so.

4            MR. MORRIS:   Give me just one moment, Your Honor.   I

5   may be done.

6            THE COURT:   Okay, because we're going to be — take a

7   lunch break.

8            MR. MORRIS:   That's fine.

9            THE COURT:   So —

10            MR. MORRIS:   I went a little bit longer than I —

11            THE COURT:   Okay.

12            MR. MORRIS:   — than I intended.   Go me just one

13   moment.

14            I have nothing further, but I would respectfully

15   request that the Court instruct the witness not to speak with

16   anybody or communicate with anybody about his testimony because

17   he's still under oath on the stand.

18            THE COURT:   Well, let me see if we can sidestep that.

19            How much redirect do you have?

20            MR. GAMEROS:   It's not going to be very long, Your

21   Honor, but I wouldn't mind taking a lunch break.

22            THE COURT:   All right.   Well, I'm going to instruct

23   you not to talk about your testimony with counsel during our

24   break.

25            We'll take a one-hour break.   We'll come back at...

*McGraner - Cross/Morris*                                    133

1             MR. MORRIS:  Thank you, Your Honor.

2             THE COURT:  We'll come back at 1:52.

3             MR. MORRIS:  Okay.  Thank you, Your Honor.

4             COURT SECURITY OFFICER:  All rise.

5        (Luncheon recess taken from 12:51 to 1:55 p.m.)

6             COURT SECURITY OFFICER:  All rise.

7             THE COURT:  All right.  Welcome back from lunch.

8    Please be seated.  We're going back on the record in the

9    Highland-HCRE matter.

10            Are we ready to have Mr. McGraner back on the witness

11   stand?

12            MR. GAMEROS:  Your Honor, we're not going to do

13   redirect for Mr. McGraner.  Is it possible —

14            THE COURT:  No redirect?

15            MR. GAMEROS:  None, Your Honor.

16            THE COURT:  All right.  So —

17            MR. GAMEROS:  But there —

18            THE COURT:  — he is excused.

19       (Witness excused.)

20            MR. GAMEROS:  Thank you, Your Honor.  I think he's

21   going to stay, but I appreciate your excusing him.

22            We call Mr. Cournoyer.

23            THE COURT:  Mr. Cournoyer —

24            MR. GAMEROS:  Cournoyer.

25            THE COURT:  — Cournoyer.

*Cournoyer - Direct/Gameros*                                      134

1        All right, sir, if you could approach the witness box.

2    TIMOTHY JOSEPH COURNOYER, CLAIMANT'S WITNESS, SWORN/AFFIRMED

3        THE WITNESS:  I do.

4        THE COURT:  All right.  Please be seated.

5                        DIRECT EXAMINATION

6    BY MR. GAMEROS:

7    Q.  Good afternoon, sir.  Would you please introduce yourself to

8    the jury —

9    A.  My name is —

10   Q.  — to the Judge?

11   A.  — Timothy Joseph Cournoyer.

12   Q.  And are you a lawyer?

13   A.  I am.

14   Q.  How long have you been licensed?

15   A.  Since 2010.

16   Q.  Okay.  And you've been continuing licensed for that entire

17   time?

18   A.  Yes.  First in New York and now both in New York and Texas.

19   Q.  Who's your current employer?

20   A.  Highland Capital Management.

21   Q.  And what's your current title?

22   A.  Managing director and assistant general counsel.

23   Q.  Have you had that title — how long have you had that title?

24   A.  I have been an assistant general counsel for the entirety of

25   my tenure, managing director, I think some time post bankruptcy.

*Cournoyer - Direct/Gameros*                                          135

1    Q.   Okay.  Sir, are you familiar with the SE Multifamily

2    Holdings, LLC?

3    A.   Generally, yes.

4    Q.   Did you have any role in structuring the original LLC

5    agreement?

6    A.   Not that I recall specifically.

7    Q.   Did you ever see it before it was signed?

8    A.   See the agreement?

9    Q.   Yes, sir.

10   A.   I don't recall specifically.

11   Q.   All right.  Did you have any role in structuring the amended

12   LLC agreement?

13   A.   In structuring it?

14   Q.   Yes, sir.

15   A.   No, not that I recall.

16   Q.   Did you see it before it was signed?

17   A.   See the document?

18   Q.   Yes, sir.

19   A.   I may have, but I don't have a specific recollection.

20   Q.   Okay.  Sir, would you go ahead in the black binder there

21   open up Exhibit Number 12.

22   A.   Okay.

23   Q.   Just let me know when you've found it.

24   A.   I'm here.

25   Q.   All right.  The first page is an email from Mark Patrick to

Cournoyer - Direct/Gameros                                        136

 1   you; do you see that?

 2           Hold on one second.

 3   A.  Yes, I see it.

 4   Q.  Okay.

 5           MR. MORRIS:  Your Honor, at the risk of pointing out

 6   the obvious, it's not an email to Mr. Cournoyer.  It's an email

 7   to Mr. Cournoyer and about a half a dozen other people.

 8           THE COURT:  Okay, fair enough.  It is indeed.

 9   BY MR. GAMEROS:

10   Q.  Mr. Cournoyer, you're the first person named on the "To"

11   line, right?

12   A.  In the list of recipients, yes.

13   Q.  And the substance of the email as well, correct?

14   A.  Yes.

15   Q.  All right.  Do you deny having received this email from Mr.

16   Patrick?

17   A.  No.

18   Q.  All right.  Sir, I'd like to go back, and if you look at the

19   top of the page there's page numbers.  Let's go back to page 33.

20   A.  In tab 12?

21   Q.  Yes, sir, page 33.

22   A.  33 of 56?

23   Q.  Yes, sir.

24   A.  Okay.

25   Q.  So I represent to you this is a red line that Mr. Patrick

*Cournoyer - Direct/Gameros*                                          137

1    had.  You know what a red line is, right?

2    A.  I do.

3    Q.  Okay.  And did you make any of these changes?

4    A.  I don't recall one way or the other.

5    Q.  You could have, but you just don't know?

6    A.  I don't have any specific recollection.

7    Q.  Is it possible that you did?

8    A.  I suppose, but I have no personal recollection.

9    Q.  If you had any objections to any of these changes, would you

10   have said so in an email responding to Mr. Patrick?

11   A.  I may or may not have.  There were other attorneys copied on

12   this and my general recollection is not something that I was

13   deeply involved or the point person on, so it's not clear to me

14   I ever even reviewed this.

15   Q.  Okay.  Sir, I'd like you to take a look at paragraph 1.8.

16   A.  Okay.

17   Q.  Can you explain to the Judge what paragraph 1.8 does?

18   A.  Let me read it.

19            MR. MORRIS:  I apologize.  One point section?

20            MR. GAMEROS:  1.8.

21            THE COURT:  1.8, um-hum.

22            THE WITNESS:  It appears to be a provision intended to

23   prevent HCMLP from having to consolidate this entity on its

24   financial statements.

25   BY MR. GAMEROS:

*Cournoyer - Direct/Gameros*                                                                138

1    Q.  And how did it prevent that consolidation?

2          MR. MORRIS:  Objection, Your Honor.  I think we need a

3    foundation that this witness has any connection to this

4    particular provision.  He hasn't testified that he's seen it

5    before, he hasn't testified that he's drafted it.  If they

6    wanted an expert — I mean the document speaks for itself.  If

7    they wanted an expert, they could have called an expert.  If

8    they wanted to put on their witness who had personal knowledge,

9    they should have done that, but I don't think it's terribly fair

10   to ask a lawyer to interpret a document that he hasn't testified

11   yet that he's ever seen before.

12         THE COURT:  What is your response?

13         MR. GAMEROS:  Your Honor, he has seen it before.  He

14   says he's seen it before.  He said he's familiar with the

15   agreement.  He may not have drafted it, but I'm just asking him

16   what 1.8 does.  That's all.

17         THE COURT:  Okay, I overrule.

18         THE WITNESS:  Okay.  I did not deny that I received

19   the document and the email, but I never said I was familiar with

20   the document.  And I'll say it right now, I was not familiar

21   with this particular provision.  The intent of the provision

22   appears to be to prevent some sort of consequence under GAAP.

23   And I would not —

24         MR. GAMEROS:  Your Honor, —

25         THE WITNESS:  — purport to be any kind of expert

*Cournoyer - Direct/Gameros*                                              139

1   whatsoever on GAAP or whether this provision is satisfactory to

2   accomplish that —

3          MR. GAMEROS:  I'm going to object to the entirety of

4   this answer as nonresponsive.  Your Honor asked him —

5          THE COURT:  Overruled.

6          MR. GAMEROS:  — how does it accomplish it.

7          THE COURT:  He — he gave his answer to the question.

8          MR. GAMEROS:  My question was how does it accomplish

9   it.  He hasn't answered that.  How —

10          THE WITNESS:  My answer is I don't know how to even

11   begin to accomplish this under GAAP because I'm not an expert at

12   GAAP.

13   BY MR. GAMEROS:

14   Q.  Okay.  So you'd agree that this particular provision,

15   though, requires Highland to reallocate economic and other items

16   between Highland and HCRE, right?

17          MR. MORRIS:  Objection, no foundation.

18          THE COURT:  Overruled.  He can answer if he has an

19   answer.

20          THE WITNESS:  The — the words in the provision say

21   that.  Like I said, the intention or the goal of this provision

22   is not something I can really opine on.

23   BY MR. GAMEROS:

24   Q.  Sir, if you could turn two more pages to page 37 and take a

25   look at paragraph 4.3.  You see there are no changes on that,

*Cournoyer - Direct/Gameros*                                        140

1   right?

2   A.   I do see that, yes.

3   Q.   And just like 1.8, there's no changes on that one either,

4   right?

5   A.   What page was it on?

6   Q.   That was back on 33.  This is on 37 now.

7   A.   Yeah.

8   Q.   Okay.  If you could go back to 7.2, which is on page 42.

9   A.   Okay.

10  Q.   That says that members can't transfer their interests in SE

11  Multifamily, right?

12  A.   Yeah, with some exceptions.

13  Q.   Right, there's exceptions.

14  A.   Yes.

15  Q.   But generally it —

16  A.   Generally, yes.

17  Q.   It limits the ability of members to transfer their

18  interests, right?

19  A.   Correct.

20  Q.   And then paragraph 7.4, it also limits the ability of

21  members to withdraw, right?

22  A.   It governs their ability to withdraw or not withdraw, yes.

23  Q.   Right.  It let's them withdraw provided that they provide an

24  indemnity, correct?

25  A.   Reading this on the fly, that appears to be one of the

*Cournoyer - Direct/Gameros*                                          141

1   conditions to withdraw.

2   Q.   And, just so we're clear, though, you didn't draft this

3   change?

4   A.   Not that I recall.

5   Q.   Okay.  And then the last thing I'd like you to look at in

6   the red line is on page 45, Article 10.1.

7   A.   Okay.

8   Q.   Okay.  And you see there are changes there and it requires

9   HCRE to approve, but also requires the members, including

10  Highland, to vote in favor of the small letter changes, correct?

11  A.   Repeat the second part of your.

12  Q.   Sure.  It requires the members to vote to approve the small

13  letter changes, so starting on line 4, a going all the way

14  through to f — or g.  I'm sorry.  Right?

15  A.   Yeah.  I'm reading it here live, but, yeah, it appears that

16  if — if a particular member's rights were affected in one of the

17  ways enumerated in a through g, that member would need to

18  consent.

19  Q.   All right.  Do you know why the LLC agreement was amended in

20  March of 2019?

21  A.   I saw the email from Mark Patrick that you just referenced,

22  and he, I think, referenced a tax deadline, but beyond that, no.

23  Q.   So, in other words, beyond your just reading Exhibit 12, you

24  have no idea why it was amended in March of 2019?

25  A.   I recall that another entity, Liberty CLO Holdco, came in I

*Cournoyer - Direct/Gameros*                                          142

1   think as a preferred member, so it, I believe, had something to

2   do with that.  And I've been watching the testimony.  I know

3   there was a third party that became a member of this entity, and

4   I believe that was part of it as well, but —

5   Q.   BH Equities, right?

6   A.   Yes.

7   Q.   Okay.  And prior to today, you hadn't reviewed any

8   documents, hadn't reviewed the LLC agreement, and —

9   A.   I would say prior to last week.  Once I found out I may be

10  called as a witness, I looked through the witness and exhibits

11  lists and saw this document, you know, again for the first time

12  in, whatever, three or four years.

13  Q.   Okay.  Did you have an understanding that the LL- — LLC

14  agreement to be amended going forward?

15  A.   Did I have an understanding?

16  Q.   Yes, sir.

17  A.   I know folks had talked about the amendment provision today,

18  during the proceedings, and it appears to require the members'

19  consent to do so depending on the — what the amendment is.

20  Q.   Okay.  And, I'm sorry, my question wasn't — wasn't fair.

21  A.   So — yeah.

22  Q.   Back in March of 2019, when the —

23  A.   Um-hum.

24  Q.   — agreement was signed, did you have an understanding that

25  the agreement would be amended going forward?

*Cournoyer - Direct/Gameros*                                                      143

1    A.   I have no specific recollection back in March of 2019 about

2    what the amendment provision did or did not say.

3    Q.   So you don't have a recollection either way?  You don't know

4    that it wasn't going to be amended, you're not saying that, are

5    you?

6    A.   No.  I have no recollection specifically about amendments at

7    all with respect to this document.

8    Q.   In your capacity as the assistant general counsel at

9    Highland, did you do anything to make sure that the LLC

10   agreement protected Highland's interests?

11   A.   The only — I recall having very tangential involvement of

12   this and my recollection is that Freddy Chang became the point

13   person who was really reviewing this from a legal perspective.

14   Q.   And did Mr. Chang work for you?

15   A.   No.

16   Q.   You're just colleagues?

17   A.   Yeah.

18   Q.   And he was at Highland, right?

19   A.   I don't know of his specific employer but, yeah, we worked

20   in the same building, you know, as all these folks.

21   Q.   When you say all these folks, who do you mean?

22   A.   Matt McGraner, other people that have been around Highland

23   or NexPoint, et cetera.

24   Q.   Did you have any role in removing Highland as a borrower in

25   the KeyBank loan?

*Cournoyer - Cross/Morris*                                    144

1    A.   No, not that I recall.

2    Q.   Did you know that Highland was a coborrower on the KeyBank

3    loan?

4    A.   I know from having listened today, but I don't recall

5    whether I knew that before —

6    Q.   So you weren't involved in that at all back in 2018?

7    A.   Again, I don't have any specific recollection.

8    Q.   And you weren't involved in removing them as a borrower in

9    2019 — in 2019?

10   A.   Not that I recall.

11             MR. GAMEROS:   Thank you, sir.

12             I have no other questions, Your Honor.

13             THE COURT:   Okay.   Cross.

14                         <u>CROSS-EXAMINATION</u>

15   BY MR. MORRIS:

16   Q.   Good afternoon, Mr. Cournoyer.

17   A.   Hello.

18   Q.   You weren't deposed in this case, were you?

19   A.   I was not.

20   Q.   So the questions that you were being asked today have never

21   been asked of you before, correct?

22   A.   Correct.

23   Q.   You were asked to look at Exhibit 12.   You had that in front

24   of you and you were told initially that it was sent to you,

25   right?

*Cournoyer - Cross/Morris*                                              145

1    A.   Yes.

2    Q.   And do you see there is a whole bunch of other people who

3    were copied on that email?

4    A.   I do.

5    Q.   Could I trouble you to just turn to Exhibit 13 for a moment.

6    And do you see —

7    A.   Okay.

8    Q.   — on about the third or fourth page of the document, you'll

9    see Mr. Patrick's email to you and the others replicated on the

10   page before the back page.  In fact just to help you, it's

11   Bates-stamped APP0336.

12   A.   Yes, I see it.

13   Q.   So that's the exact same email that you were just shown,

14   right?

15   A.   It — it is, yes.

16   Q.   And if you turn the page forward to APP0335, you will see

17   that there is an email string of responses to Mr. Patrick's

18   email that pushes this forward from February 28th to March 4th.

19   The last one there is from Mr. Raver (phonetic).  Do you see

20   that?

21   A.   I do see that.

22   Q.   Is there a single email from you?

23   A.   There is not a single email from me.

24   Q.   Is there a single email that references you?

25   A.   Other than the initial email from Mark Patrick, no.

*Klos - direct/Gameros*                                              146

1   Q.  Do you have any understanding — did you personally have any

2   direct involvement in the drafting of the amended and restated

3   LLC agreement?

4   A.  Not that I recall, no.

5          MR. MORRIS:  I have no further questions, Your Honor.

6          THE COURT:  Okay.  Redirect.

7          MR. GAMEROS:  None, Your Honor.

8          THE COURT:  All right.  Thank you, Mr. Cournoyer.  You

9   are excused.

10     (Witness excused.)

11         MR. GAMEROS:  Your Honor, we call Mr. Klos.

12         THE COURT:  I'm sorry.  Who?

13         MR. GAMEROS:  Mr. Klos.

14         THE COURT:  Mr. Klos, okay.

15         All right.  Welcome.

16     <u>DAVID KELLY KLOS, CLAIMANT'S WITNESS, SWORN/AFFIRMED</u>

17         THE WITNESS:  I do.

18         THE COURT:  All right.  Thank you.

19                    <u>DIRECT EXAMINATION</u>

20  BY MR. GAMEROS:

21  Q.  Good afternoon, Mr. Klos.  Would you please introduce

22  yourself.

23  A.  Hi.  My name is David Kelly Klos.

24  Q.  And is your current employer?

25  A.  Highland Capital Management.

*Klos - direct/Gameros* 147

1   Q.   What's your current title?

2   A.   CFO and COO.

3   Q.   How long have you had those positions?

4   A.   Since March of 2021.

5   Q.   Where did you work before March of 2021?

6   A.   Also at Highland Capital Management.

7   Q.   And what were you before then?

8   A.   Prior to that I was chief accounting officer.

9   Q.   When did you become the chief accounting officer?

10  A.   March or April of 2020.

11  Q.   What position were you holding in August of 2018?

12  A.   Oh, I believe I was holding a position of controller.

13  Q.   At Highland?

14  A.   At — at Highland Capital.

15  Q.   Sir, are you familiar with SE Multifamily Holdings, LLC?

16  A.   Yes, generally.

17  Q.   Okay.  Did you have any role in structuring either the

18  original agreement or the amended agreement?

19  A.   Exceptionally limited, but yes.

20  Q.   What role did you have?

21  A.   I provided some input with respect to a consolidation

22  provision.

23  Q.   So the one we were just looking at, 1.8?

24  A.   Yeah.

25  Q.   Okay.  And why were you having input with respect to 1.8?

*Klos - direct/Gameros*                                                    148

1   A.   The reason we had input on that was that he had concerns

2   about consolidating the entire structure on to Highland Capital,

3   Highland Capital audited financials.

4   Q.   Okay.  And what are those concerns based on?

5   A.   The concerns were — were twofold really, both from a — I'll

6   call it from a business and from an operational perspective.

7   Q.   You know I'm going to ask you:  So what are the business

8   concerns versus the operational concerns?

9   A.   Sure, sure.  So the business concerns were it was a large

10  transaction, it was over a billion dollars, as I think everyone

11  is familiar with.  And so to consolidate that — that structure

12  on to Highland Capital's audited financials would mean literally

13  taking every asset and every liability of the underlying

14  properties and all the P&L activity from those properties and

15  put those on to the Highland financial statement, which the —

16  from a business perspective, you know, audited financials were

17  something that we would provide from time to time and would have

18  resulted in a fairly large distortion of our balance sheet.

19  We'd be putting on an additional billion dollars of assets,

20  close to a billion dollars of liability.

21        P&L, for example, when people look at an investment

22  manager's financial statements, they expect to see things like

23  management fees and incentive fees.  And Highland's financials

24  would have been turned into maybe rental income being the

25  largest P&L item.  So from a practical business standpoint,

1   being able to explain that to potential existing investors would

2   have been confusing and unnecessarily — unnecessary if we could

3   avoid it, depending on where the business people were on the —

4   you know, the sharing of the economic.

5   Q.   And you mentioned from an operating concern as well.  What's

6   the operating concern?

7   A.   So the operating concern is that it was my understanding

8   that SE Multifamily itself wouldn't be audited, so, I hate to

9   like drill into accounting issues, but when you consolidate an

10  unconsolidated — sorry — when you consolidate an entity that

11  hasn't been audited, when you go to get that entity audited,

12  that means that your auditor needs to test what's being

13  consolidated.  So an auditor is generally able to take some

14  comfort if you're consolidating an audited set of books.  But if

15  they're not audited, then the auditor has to basically test all

16  that activity.  So it would have been an exceptionally large

17  scope increase to Highland's audit, which would have meant more

18  fees, much longer time — time line to ultimately being able to

19  produce an audit.

20          And then from a disclosure standpoint, because you

21  don't have underlying audited financial statements that have

22  their own disclosures, that would mean someone from my team

23  having to go basically build those disclosures from scratch and

24  having to work with people that were more familiar with the deal

25  to be able to put those disclosures together, so I had a

*Klos - direct/Gameros*                                                    150

1  practical concern about time, money, as well as, you know,

2  potentially risking under disclosure if there was something

3  material that wasn't disclosed in Highland's financial.

4  Q.  Okay.  Sir, could you take that white notebook and take a

5  look at Exhibit 2.  That's the amended LLC agreement, the one

6  that was signed.

7  A.  Yes, I'm there.  You said tab 2?

8  Q.  Yes, please.

9  A.  Okay.

10  Q.  Tab 2?

11  A.  Yes.

12  Q.  And that's the amended LLC agreement, right?

13  A.  It appears to be.

14  Q.  Okay.  Could you turn to Section 1.8.

15  A.  Okay, I'm there.

16  Q.  All right.  Did you have any role in drafting that section?

17  A.  I don't believe I had a role in drafting it, per se.

18  Q.  Did you review it to make sure it complied with IRS regs and

19  stuff like that?

20  A.  I don't recall specifically.

21  Q.  So what role did you have with respect to 1.8?

22  A.  My role with respect to 1.8 was — was voicing the concern

23  that this — these — the SE multicomplex would be consolidated

24  and that would be something that would be problematic if it

25  could be avoided.

*Klos - direct/Gameros*                                          151

1    Q.  Would it be fair to say that your role was ensuring that

2    paragraph 1.8 was in the agreement to stop consolidation?

3    A.  I don't — I don't — I don't know that I agree with that

4    characterization.

5    Q.  How would you characterize your relationship with paragraph

6    1.8?

7    A.  That I would have communicated prior to this document being

8    executed that — that, you know, it would be a preference not to

9    have this entity consolidated, if it could be avoided.

10   Q.  And those would be for the business and accounting

11   operations reasons you mentioned before?

12   A.  Correct.

13   Q.  Okay.  Sir, are you aware of any rebates from KeyBank

14   related to the bridge loan agreement?

15   A.  Yes.

16   Q.  What rebates were there?

17   A.  There was — I'm not sure if it was technically a rebate or

18   what exactly what it was called, but there was $750,000 received

19   within, I want to say, days of the closing of the original

20   transaction.  And then there was an amount that was just under a

21   million dollars, I want to say, like $992,193 that was received

22   in mid to late November.

23   Q.  Any others?

24   A.  There would have been receipts of earnest money deposits.

25   We — we — Highland had put up earnest money prior to the

*Klos - direct/Gameros*                                                152

1   transaction closing.  Those moneys were returned either before

2   or at or shortly after closing.

3   Q.  Okay.  Why did KeyBank make a $750,000 — I'm calling it a

4   rebate unless you'd like — unless you have a different word

5   you'd rather use, sir.  Why did KeyBank make a $750,000 rebate

6   payment?

7   A.  My understanding was — was from Mr. McGraner who said it was

8   basically a pain and suffering fee.

9   Q.  Okay.  Did you ever ask KeyBank why they were doing that?

10  A.  No.

11  Q.  Okay.  And that — that rebate went straight from KeyBank to

12  Highland, correct?

13  A.  I'm not a hundred percent certain, but I believe so.

14  Q.  It was directed by you as to where it would go, though,

15  right?

16  A.  I believe I provided the wire instructions for Highland.

17  Q.  So it was directed by you as to where it would go, right?

18  A.  If I can — if I can explain a little bit.  I don't recall

19  specifically who sent it.  I remember that HCMLP received, but

20  you asked that — whether KeyBank had sent it to Highland.  I

21  just don't — the piece I wasn't sure of was whether it was

22  KeyBank or something.

23  Q.  It could have been a different KeyBank entity, not the

24  KeyBank we borrowed from, right?

25  A.  C- — correct.

*Klos - direct/Gameros*                                                              153

1   Q.   Okay.   And what about the 992,000?

2   A.   Received at Highland Capital Management, L.P.   Again, I

3   believe it was sent from a KeyBank entity, but I'm not a hundred

4   percent sure of that.

5   Q.   And why did they send 992,000 to Highland?

6   A.   My understanding at the time was that it was basically to be

7   forwarded on to the replacement lender, which was Walker and

8   Dunlop.

9   Q.   So the 992,- was from KeyBank to Highland to be sent to the

10  holder of the B note, Walker and Dunlop, right?

11  A.   Correct.

12  Q.   Okay.   Did you have any involvement in calculating either

13  the $750,000 rebate or the $992,000 rebate?

14  A.   No, not that I recall.

15  Q.   Okay.   Did you have any role — other than your comments as

16  to Section 1.8, did you have any other role in structuring the

17  amended or the original LLC agreements?

18  A.   No, not that I can remember.

19  Q.   What about the KeyBank loan, did you have any role in

20  that?

21  A.   No, no role that I can recall.

22           MR. GAMEROS:  Pass the witness.  Thank you, Your

23  Honor.

24           THE COURT:  All right.  Cross?

25           MR. GAMEROS:  Thank you, sir.

*Klos - Cross/Morris*                                        154

CROSS-EXAMINATION

BY MR. MORRIS:

Q.  Good afternoon, Mr. Klos.

A.  Good afternoon.

Q.  Did you prior to today have an opportunity to read Mr.
McGraner's deposition transcript?

A.  Yes.

Q.  And when you read that transcript, did you read the portions
where he talked about the rebate, as counsel defined it?

A.  Yes.

Q.  After reading the portions of Mr. McGraner's testimony about
the rebate, did you do any work on that issue?

A.  Yeah.  I searched my emails and my recollection, there
wasn't much in the recollection, but there were some emails that
I was able to find.

        MR. MORRIS:  Okay.  And, Your Honor, this is a portion
of the exhibits that we said we would defer to, so now this is
basically rebuttal.  So I'm going to put them in front of Mr.
Klos and he can testify to what they are.  And then I'll move
them for admission.  I just wanted you to know what I was going
to do with them.

        THE COURT:  Okay.

BY MR. MORRIS:

Q.  So if you can — if you can find one of the binders there,
one of the black binders.

1   A.   Okay.

2   Q.   We're looking for the latter portion of exhibits, starting

3   with Exhibit 96.

4   A.   Sorry.  I'm getting there.  Okay, I'm there.

5   Q.   Is this one of the documents that you found on the Highland

6   system after reviewing Mr. McGraner's testimony?

7   A.   Yes, it appears so.

8   Q.   Take a moment, if you need to, but once you're comfortable,

9   can you explain to the Court just generally what's happening

10  with this?  This is the $750,000 portion of the rebate that Mr.

11  — that counsel referred to, right?

12  A.   Sure.  Some — I'm going to back to the beginning of the

13  chain, from Rosemarie Barelli (phonetic), who sent an email to a

14  KeyBank individual as well as Matthew Goetz and Matt McGraner

15  saying that "I'm prepared to release 750,000.  We need to verify

16  account number."  It looks like — it looks like probably — I'm

17  not seeing it in the chain, but I'm guessing either Matt Goetz

18  or Matt McGraner indicated that I'd be the person that could

19  help by providing the wire information for Highland.

20  Q.   Um-hum.

21  A.   It looks like I was out of the office, so my — my colleague

22  Kristen was able to handle that for me.

23  Q.   Okay.  So — so this is on September 27th; is that right?

24  A.   It appears so.

25  Q.   And this document you found on the Highland system; is that

*Klos - Cross/Morris*                                                            156

1   fair?

2   A.  Yes.

3          MR. MORRIS:  Okay.  Your Honor, I would move this

4   document into evidence.

5          THE COURT:  Any objection?

6          MR. GAMEROS:  No objection, Your Honor.

7          THE COURT:  It's admitted.

8      (Debtor's Exhibit, referred to above, received in

9   evidence.)

10  BY MR. MORRIS:

11  Q.  Mr. Klos, do you have any knowledge as to whether or not

12  after this $750,000 was received by Highland, whether Highland

13  subsequently loaned money to HCRE?

14  A.  Yes.

15  Q.  Can you describe for the Court your knowledge about that

16  loan?

17  A.  Yes.  On October 15th of 2018, Highland lent HCRE $750,000

18  via promissory note.

19  Q.  And so the $750,000 that was received as part of the rebate

20  was turned around and just transmitted back to HCRE, but this

21  time in the form of a loan; do I have that right?

22  A.  Yes.  Cash is fungible, but yes.

23  Q.  And — and who made the decision to transfer that 750,- from

24  Highland to HCRE?

25  A.  I don't — I don't remember specifically who did.

*Klos - Cross/Morris*                                            157

1    Q.   Were you watching from the office on this morning's

2    testimony?

3    A.   Yes.  Yes, I was.

4    Q.   Did you see the promissory note on the screen?

5    A.   Yes.

6    Q.   And you've submitted declarations in connection with notes

7    litigation; is that right?

8    A.   Yes.  Yes, I have.

9    Q.   And can you describe to the Court — I don't have the

10   documents, but was that promissory note one of the series of

11   notes that HCRE gave to Highland in exchange for loans?

12   A.   Yes, it —

13              MR. GAMEROS:  Your Honor, I'm going to —

14              THE WITNESS:  — it was one of several.

15              MR. GAMEROS:  — object on relevance grounds.  What

16   does this have to do with the $750,000 rebate with other notes

17   and other relationships?  They're just not related.

18              THE COURT:  Response —

19              MR. MORRIS:  If I may, Your Honor?

20              THE COURT:  Um-hum.

21              MR. MORRIS:  It goes to the absolute injustice of this

22   whole proceeding.  Highland is the entity that's actually

23   financing HCRE.  Your Honor has before you in Adversary

24   Proceeding 21-03007 the complaint, which is lodged at Docket

25   Number 1, four different promissory notes amounting to more than

*Klos - Cross/Morris*                                                    158

1   $4 million that HCRE owes to Highland, including the promissory

2   note that transferred the very $750,000 that we're told is some

3   kind of windfall to Highland.  I think it's just — it's just

4   indicative of the injustice of this whole thing.

5          THE COURT:  All right.  I overrule the objection.

6   BY MR. MORRIS:

7   Q.  And let's talk about the second piece, the $992,000.  Can

8   you tell me, generally, do you have any personal knowledge as to

9   the ultimate disposition of the $992,000 that you testified was

10  received by Highland by a KeyBank affiliate?

11  A.  Yes.  It was — it was turned around and forwarded, for lack

12  of a better term, to Walker and Dunlop same day.

13  Q.  Okay.  Can you explain to the Court who Walker and Dunlop

14  are?

15  A.  They were a lender that came in to solve the problem of the

16  retrade where there was 150 million that had to be paid within

17  90 days, so effectively Walker and Dunlop came in as a

18  replacement financing counterparty to help pay down that KeyBank

19  facility.  So as I understood it, this was basically taking a

20  portion of KeyBank's origination fees and basically sending them

21  to Walker and Dunlop as an origination fee for them.

22  Q.  And did you participate in that transfer?

23  A.  Similar to the 750,-, to the extent of confirming wire

24  instructions and I don't recall who from my team would have

25  processed the payment out to Walker and Dunlop.  It wouldn't

*Klos - Cross/Morris*                                                      159

1   have been me, but it would have been under my direction or under

2   my team.

3   Q.  Do you have any recollection as to who gave the instruction

4   to transfer the $992,000 that Highland had received for that

5   company on the same day?

6   A.  My recollection, it was Matt Goetz, but I'm not a hundred

7   percent certain.

8   Q.  Can you just help the Court understand who Mr. Goetz is?

9   A.  He's an investment professional that works under — under Mr.

10  McGraner.

11  Q.  So out of, you know, 750,000 plus 992,-, whatever that adds

12  up to, did Highland have one penny of that money just a couple

13  weeks after receiving this?

14  A.  No, not after October 15th, or the date of that promissory

15  note.

16  Q.  Okay.  And is it fair to say that based on your knowledge

17  and understanding of Highland at the time that transfers of

18  that, would they have required either Mr. McGraner or Mr.

19  Dondero's approval?

20  A.  Mr. McGraner or Mr. Dondero, my boss Mr. Waterhouse at the

21  time, one of those three, I would look for them to be part of

22  that.

23  Q.  You and your team wouldn't make these transfers without the

24  direction or authorization of either Mr. Waterhouse or Mr.

25  Dondero, correct —

*Klos - Cross/Morris* 160

1    A.   No, certainly — certainly not.

2    Q.   Okay.  You were asked some questions about 1.8 and the

3    consolidation.

4    A.   Yes.

5    Q.   Has there ever been consolidation?

6    A.   No.

7    Q.   And — and has HCRE taken steps, to the best of your

8    knowledge, to actively avoid consolidation?

9    A.   No.

10   Q.   Do you have an understanding as to why there has been no

11   consolidation at this point?

12   A.   At the time, the — the view that I had was that, as written,

13   the document probably wouldn't require consolidation.  This was

14   a little bit of a belt and suspenders to make sure that

15   basically our — our read of the situation wasn't wrong, because

16   if it was wrong, we would have the business and operational

17   issues that I was describing earlier.  So this was a double

18   check to make sure that basically the fact that we weren't going

19   to consolidate at Highland was — was going to be how it actually

20   played out.

21   Q.   And are you generally familiar with the financial statements

22   — withdrawn.

23        Have you received any financial data concerning SE

24   Multifamily in the last — you know, since the agreement was

25   signed?

*Klos - Redirect/Gameros*                                    161

1    A.   Yes.

2    Q.   Do you have any reason to believe that consolidation is

3    anticipated in the future based on your —

4    A.   No.

5    Q.   — reading of the documentation?

6    A.   No, it's not — it's not expected.

7    Q.   Okay.  And if consolidation would occur, would the steps set

8    forth in 1.8, does that kind of just trigger automatically?

9    A.   I don't know exactly how it works from a legal perspective,

10   but —

11   Q.   Okay.

12   A.   — so I'm not sure.

13   Q.   Okay.  But — but it's — it hasn't happened and it's not

14   expected to happen; is that fair?

15   A.   That's — that's fair.  That's correct.

16        MR. MORRIS:  Okay.  No further questions, Your Honor.

17        THE COURT:  All right.  Redirect.

18        MR. GAMEROS:  Your Honor, I only have two questions.

19   I just want to make sure I understood his testimony.

20        THE COURT:  Okay.

21        MR. GAMEROS:  It's probably a function of my hearing

22   and not his testimony, so I want to make sure I got it right.

23                    REDIRECT EXAMINATION

24   BY MR. GAMEROS:

25   Q.   Sir, earlier you testified, I think, and I want to make sure

*Klos - Redirect/Gameros*                                                          162

1   this is correct, you don't know who authorized the payment of

2   the 750,000 to HCRE; is that correct?

3   A.   No.

4   Q.   So I'm wrong.   Do you know who authorized the payment of the

5   $750,000 to HCRE?

6   A.   Sorry.   We've been talking about different payments.   Which

7   — which payment?

8   Q.   The 750,000.

9   A.   There's a few different 750,000 payments.   Which?

10  Q.   The one that — when the rebate comes in, okay, Highland has

11  said and that money turned around and went out to HCRE, and you

12  testified about that.   And I want to know who authorized that

13  transfer.

14  A.   I don't have a specific recollection — recollection of that.

15  Q.   Okay, just want to make sure I got that right.   The second

16  thing you testified to, you said the money is fungible, right?

17  A.   Yes, I did.

18  Q.   The 750,- that came in didn't hit a segregated account some

19  special place where it's going to sit all by itself and then

20  from that separate, segregated account it went to HCRE; is that

21  correct?

22  A.   Correct, it wouldn't have gone to a segregated account.

23           MR. GAMEROS:   All right.   Thank you.

24           I have no other questions, Your Honor.

25           THE COURT:   Recross.

*Klos - Recross/Morris*                                            163

<u>RECROSS EXAMINATION</u>

BY MR. MORRIS:

Q.   I appreciate that you don't have a specific recollection,
but based on your experience at Highland, is it fair to say that
the person whose signature appears on the $750,000 promissory
note, dated October 2018, is at least one person who authorized
the transfer of the $750,000 from Highland to HCRE?

A.   Yes.

Q.   So whosoever name is on that is the person who authorized; is
that fair?

A.   That's fair.

          MR. MORRIS:   Okay.   Thank you.

          No further questions.

          THE COURT:   All right.   Thank you, Mr. Klos.   You are
excused.

          THE WITNESS:   Thank you.

     (Witness excused.)

          THE COURT:   Your next witness.

          MR. GAMEROS:   Your Honor, I don't intend to call
another witness.   If I could confer with my team for five
minutes and figure out where we go from here, that would be
great.

          THE COURT:   Okay, five-minute break.

          MR. GAMEROS:   Thank you.

          COURT SECURITY OFFICER:   All rise.

*Hearing on Debtor's Objection Claim*                        164

1       (Recess taken from 2:33 to 2:42 p.m.)

2              COURT SECURITY OFFICER:  All rise.

3              THE COURT:  All right, please be seated.

4              All right.  Anything else from claimant?

5              MR. GAMEROS:  At this point, Your Honor, the claimant

6       rests, and I'm pretty sure we have some housekeeping we need to

7       do.  And then whatever you'd like to do.

8              MR. MORRIS:  Your Honor, the only housekeeping items

9       that I'm aware of are back to those Wick Phillips documents.

10      Let me see if I can identify the exhibit numbers so —

11             THE COURT:  Okay.

12             MR. MORRIS:  — we're all on the same page.  They were

13      Exhibits 62, 63, 64, 65, 75 through 86.  62, 63, 65, and 65.

14             THE COURT:  Um-hum.

15             MR. MORRIS:  And then inclusive 75 to 86.

16             THE COURT:  All right.  So you are reoffering them at

17      this time?

18             MR. MORRIS:  Yes.  In light of the testimony, we

19      believe that the entirety of the Wick Phillips — I'll call it

20      charitably — detour goes to the credibility of the prosecution

21      of this proof of claim.  We believe that that was — that the

22      hiring of Wick Phillips was completely in bad faith, given Mr.

23      McGraner's very clear testimony, that he understood Wick

24      Phillips jointly represented Highland as well as HCRE.  They

25      were prosecuting a claim that related to the same subject

*Hearing on Debtor's Objection Claim*                                165

1    matter.  We were forced to bring a motion to disqualify.  The

2    motion was opposed.  We don't even know why.  We spent hundreds

3    of thousands of dollars and I can't tell you how much hiring

4    experts, taking discovery, making a very lengthy presentation to

5    the Court.  I think it goes to the credibility and integrity of

6    the process, and we'd move for the admission of those documents

7    into evidence.

8           THE COURT:  All right.  Mr. Gameros.

9           MR. GAMEROS:  Your Honor, first — first of all, they

10   won the disqualification motion and what they have here today is

11   one person's opinion as opposed to what they had presented the

12   first time.  Wick Phillips had retained an ethics expert to

13   explain why they weren't or shouldn't have been disqualified.

14   They ended up losing that motion, but the disqualification

15   motion hearing, all that, doesn't come in here for the proof of

16   claim because it doesn't impugn anything that Mr. McGraner said.

17   If anything, Mr. Morris likes what Mr. McGraner said.  That

18   doesn't make him a liar.  They thought and resisted a motion to

19   disqualify and ultimately lost has nothing to do with anything

20   he said today with respect to the proof of claim.  They're just

21   not related.  It's a separate part of this proceeding.

22          THE COURT:  All right.  I overrule the objection.  I'm

23   admitting them, 62 through 65 and 75 through 86.

24       (Debtor's Exhibits 62 through 65 and 75 through 86 received

25   in evidence.)

*Hearing on Debtor's Objection Claim*                                166

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. MORRIS:  With that, I believe that takes care of —

4    we'll — we officially withdraw 96 to 100, just because I didn't

5    feel the need to do that with Mr. Klos.

6          THE COURT:  Okay.  So 96 through 100 are withdrawn.

7          MR. MORRIS:  Right.  So I want to make a really clean

8    record for you, —

9          THE COURT:  Okay.

10         MR. MORRIS:  — so you have it in one spot.

11         THE COURT:  Okay.

12         MR. MORRIS:  I think what's now either been admitted

13   over a Seery objection or by consent are Exhibits 1 through 65,

14   70 and 71, 73 and 74, — no, apologies.

15         THE COURT:  No, 73 was withdrawn.

16         MR. MORRIS:  70 and 71.

17         THE COURT:  Um-hum.

18         MR. MORRIS:  75 through 92.

19         THE COURT:  Um-hum.

20         MR. MORRIS:  Actually just 75 to 95 and then 103.

21         THE COURT:  Wait.  75 through 92.

22         MR. MORRIS:  It's really 90 — through 95, because the

23   only objection was to 93, and we just admitted that with Mr.

24   Klos.

25         MR. CARVELL:  Your Honor, I don't believe 93 was put

1   up.

2           THE COURT:  It was not.

3           MR. MORRIS:  Which was the one that we did with —

4           MR. CARVELL:  96.

5           MR. MORRIS:  Oh, thank you.  I stand corrected.

6   So 75 through 96 with the exception of 93.

7           THE COURT:  Oh, okay, yes.

8           MR. MORRIS:  And then 103.

9           THE COURT:  And then 103.  So no 101 or 102?  I don't

10  think you —

11          MR. MORRIS:  Oh, there were no objections to that, so.

12          THE COURT:  Oh, 101 and 102, they were not —

13          MR. MORRIS:  There were no objection.

14          THE COURT:  — agreed to?

15          MR. CARVELL:  No, we did not stipulate to 101 and 102.

16          MR. GAMEROS:  What are they?

17          MR. CARVELL:  Emails.

18          MR. MORRIS:  Were they on the objection or did I miss

19  it?

20          MR. CARVELL:  No, we —

21      (Simultaneous talking.)

22          MR. MORRIS:  You know what, Your Honor, we won't — we

23  won't offer them.  That's fine.

24          THE COURT:  Okay.

25          MR. CARVELL:  Yeah, you withdrew them.

*Hearing on Debtor's Objection Claim*                                       168

1          THE COURT:  Okay.  I just had them not addressed until

2    now, so — but they're withdrawn now.

3          All right.  So no additional witness testimony?

4          MR. MORRIS:  No, Your Honor.  We rest.

5          THE COURT:  Okay.

6          MR. MORRIS:  And we're prepared to go to closing.

7          THE COURT:  Okay, I'll hear closing arguments —

8          MR. GAMEROS:  Before we do that, Your Honor, I'd like

9    to get the rest of our exhibits in, 9 through 16.  That's the

10   rejection and those orders.  I just want the Court to take

11   judicial notice of them under 201.  They're all orders and

12   pleadings, just like the Wick Phillips DQ stuff.

13         THE COURT:  Okay, let me get them in front of me.

14         Okay.  If you could just repeat the numbers?

15         MR. GAMEROS:  Sure, it's 9 through 16.

16         I'm sorry?

17         MR. CARVELL:  7 through 16.

18         MR. GAMEROS:  7 through 16.  I'm sorry.

19         THE COURT:  Okay.  Disclosure statement, executory

20   contract, plans, more stuff about executory contracts,

21   confirmation order, notice of effective date.  All right.  Any —

22   any objection —

23         MR. MORRIS:  No, no objection.

24         THE COURT:  Okay.

25         MR. GAMEROS:  All right.

*Closing Argument on behalf of the Claimant*                              169

1          THE COURT:  They will be admitted.

2      (Claimant's Exhibits 7 through 16 received in evidence.)

3          MR. CARVELL:  Thank you, Your Honor.

4          THE COURT:  Okay, closing arguments.

5      (Counsel briefly confer.)

6          MR. GAMEROS:  Your Honor, if we do 10 minutes a side,

7  I'd like to split mine up and go eight and two.  Is that all

8  right?

9          THE COURT:  That's fine, um-hum.

10         MR. GAMEROS:  Great.

11         THE COURT:  You may proceed.

12          <u>CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT</u>

13         MR. GAMEROS:  May it please the Court.

14         Your Honor, we're here today on a proof of claim.  And

15 I admit the procedural posture of today is odd, but a lot of the

16 testimony is completely undisputed.  Every single witness that

17 testified here today said the agreement is supposed to be

18 flexible.

19         In the deposition excerpts that Your Honor has now

20 that were submitted last night, from Mark Patrick, he talks

21 about how the agreement should have been fluid and how it should

22 have been flexible and should have been amended on a go-forward

23 basis.  What he also says that I think is important is the event

24 of the bankruptcy prevented all of that.

25         Mr. McGraner talked about it in a different way.  What

*Closing Argument on behalf of the Claimant*                    170

1    he told you was that was great when we had a partner that we

2    knew and we could work with, and now we don't have that.

3            But what's undisputed is they were going to use an

4    annual lookback period to take a look at the performance of SE

5    Multifamily to see what it would do.  That is undisputed.  That

6    it's not accounted for in the agreement is a mistake.  There

7    should have been some mechanism in the agreement to do it.  It's

8    been frustrated by the bankruptcy, and I think that's undenied.

9    But it's also undisputed that the intention of the parties,

10   everyone who signed, said it was going to be amended on a

11   go-forward basis as needed.

12           THE COURT:  I guess I'm going to see that in Mark

13   Patrick's designation?

14           MR. GAMEROS:  You will, Your Honor.  It's in there

15   also.

16           THE COURT:  Okay.

17           MR. GAMEROS:  It's — it's —

18           THE COURT:  Because I'm not sure I crystal clear heard

19   that today.

20           MR. GAMEROS:  Okay.  It's definitely in Mark Patrick.

21           THE COURT:  Okay.

22           MR. GAMEROS:  I can't speak to what Highland has

23   designated.  I can speak to what I have designated and I know

24   it's in there.

25           THE COURT:  Okay.

*Closing Argument on behalf of the Claimant*                   171

1          MR. GAMEROS:  You will see that.

2          The capital invested by Highland was not adequate

3    consideration; 49,000 for a piece of today, an entity worth more

4    than 20 million.

5          The testimony about the $750,000 rebate, I thought was

6    interesting.  First of all, Mr. Klos tells you it's fungible.

7    They can do it whenever they want, that they may have given it

8    for loans rather to Highland is a use they chose to do.  It

9    doesn't deny the fact that their $49,000 stake in this deal got

10   them 750 grand for the pain and suffering of Mr. McGraner.  He's

11   the one who worked all that time trying to make that deal in

12   what he calls the KeyBank retrade.  And you will see that if you

13   read his deposition transcript.  It's in now.

14         I don't want to put too soft a point on it.  Mr.

15   McGraner worked really hard.  This is years of work that he

16   feels, and I think accurately feels, is blowing up in smoke

17   right now because of this bankruptcy, because SE Multifamily

18   can't do anything to change the way the agreement is phrased

19   right now.  That doesn't mean that Highland gave adequate

20   consideration for its 46.06 percent.  I think the testimony was

21   very clear that Highland was on it, sure.  Highland got off it,

22   no problem, in front of the bankruptcy, but did nothing in terms

23   of credit enhancement.  All of the collateral at 5.12 comes from

24   someone else.  All of the collateral is in play at 5.12 before

25   you hit the coborrowers.

*Closing Argument on behalf of the Claimant*                    172

1          I know what it says in paragraph 3.  It calls them a

2   coborrower and it says they're jointly and severally liable.  I

3   get it.  But before you can hit those coborrowers, you got to

4   burn through the collateral package, which was huge.

5          THE COURT:  And I assume that's all explained in the

6   document.  It didn't come out in the testimony.

7          MR. GAMEROS:  But it — I think it did, Your Honor.

8          THE COURT:  Okay.

9          MR. GAMEROS:  5.12 will take you right there.  There's

10  hundreds of million dollars of dollars in bank stock, the first

11  thing to get hit, and it's right there.  None of that, none of

12  that comes from Highland.  All they've got in this deal is

13  49,000 and some shared words —

14         THE COURT:  But am I going to see where it came from?

15  Because I got the impression that it was Dondero Trust or other

16  Dondero resources, not HCRE.

17         MR. GAMEROS:  Oh, that's correct, Your Honor, and I

18  understand that.

19         THE COURT:  Okay.

20         MR. GAMEROS:  HCRE is the lead borrower, undenied.

21  And if you look in the collateral package, you will see

22  reference to the various trusts that are involved.  And all

23  those trusts, Mr. Dondero's trusts, WLSLCH, are coborrowers.

24  KeyBank wanted them involved as well.  They asked for Highland,

25  sure.  But they wanted those trusts involved because those

*Closing Argument on behalf of the Claimant*                    173

1    trusts have a huge amount of collateral to pledge to support the

2    loan.

3         The retrade was the 150 million to get a paydown in 90

4    days.  That caused a fire drill.  So we're trying to explain

5    what happened between September and March.  It's consumed

6    largely with the fire drill.  And then we got a tax deadline

7    bumping up against it.  There's no dispute that any of that

8    happened.  Not a single witness said that that didn't happen

9    literally just like that.

10        It's also undisputed that Highland stopped providing

11   any services at all.  I noticed the magic term, the shared

12   services agreement.  I shouldn't have used those words.  Shared

13   employees, shared expertise, I should have used that inside,

14   because shared services is a magic word.  Highland stopped doing

15   that too.

16        THE COURT:  What is my evidence of that and when did

17   that happen?

18        MR. GAMEROS:  When did they stop?

19        THE COURT:  Um-hum, and what is my evidence they

20   stopped.

21        MR. GAMEROS:  The evidence of it is Mr. Dondero

22   testified to it, as did Mr. McGraner, both of them here today.

23   Both of them testified to it in their depositions that are also

24   in the record as well, but they both testified that they stopped

25   getting any support from Highland.  And —

*Closing Argument on behalf of the Claimant*                              174

1            THE COURT:  When?  When?

2            MR. GAMEROS:  After the bankruptcy, Your Honor.  They

3    don't put a time on it, they don't give a —

4            THE COURT:  Okay, I'll go back and listen to it.  I

5    wasn't crystal clear on that.

6            MR. GAMEROS:  Okay, I'm sorry.  They didn't — I am

7    sure they did not say, 'And starting in March of '21, they did

8    nothing.'  There is no testimony that will say a fine point in

9    the sand, but we know the bankruptcy in late '19.  And we know

10   that at some point in time thereafter, they stopped working with

11   them.  That's all the testimony says.  I don't give a specific

12   date.  And to the extent that omission is there, I apologize to

13   the Court.  But it's very clear and no one disputes that

14   Highland is not providing anything to them anymore.  That's not

15   in dispute at all.  And there is plenty of testimony in the

16   deposition transcript of Mr. Dondero, Mr. McGraner on that exact

17   issue.

18           THE COURT:  Okay.

19           MR. GAMEROS:  I don't know how much time I have left

20   and I don't want to —

21           THE COURT:  You know, you set the 10-minute time

22   limit.  I don't — I don't care.

23           MR. MORRIS:  Take as much time as you want.

24           THE COURT:  Take as much time as you want.

25           MR. MORRIS:  Take as much time as you want.

*Closing Argument on behalf of the Claimant* 175

1          THE COURT:  Yeah.

2          MR. GAMEROS:  Well, I'll just — okay.  I'm wait for

3    the light to turn on me at that point, but —

4          MR. MORRIS:  No.

5          THE COURT:  This is not the Supreme Court.  I doubt

6    anyone ever said it was, but go ahead.

7          MR. GAMEROS:  We have a living document in here.

8    That's got to be the Supreme Court.

9          THE COURT:  According to a few of them, not all nine

10   of them, right?

11         MR. GAMEROS:  That's right, Your Honor.  It is

12   somewhat subject to dispute.

13         THE COURT:  Um-hum.

14         MR. GAMEROS:  But how are we here?  We're here because

15   Highland filed a proof of claim because it was worried about

16   interference from the debtor.  Clear testimony from both Mr.

17   McGraner and Mr. Dondero on that.  And that interference never

18   came.  Also clear testimony, it didn't happen.  What they were

19   worried about hasn't come to pass.  That's part of the whole

20   proof of claim process.  When they describe the process, they

21   rely on outside lawyers, they rely on people in the tax

22   department, they rely on the real estate department.  All of

23   them do that.  And what they did in this case was they relied on

24   outside counsel who said 'In order for you to protect your

25   rights, you've got to file a proof of claim.'  And they did what

*Closing Argument on behalf of the Claimant*                    176

1    outside counsel told them.  They said, okay, file the proof of

2    claim.

3           Later on, Wick Phillips disqualified.  So that period

4    of time between April of '20 and January of '22, when the

5    disqualification process goes on, I'm not involved at that

6    point.  I don't show up until January of '22.  And from January

7    of '22, really until June, May-June of '22, nothing happens.

8           Then we start doing discovery, start looking into it.

9    Some depositions are taken, some document production goes back

10   and forth.  This Court knows we filed a motion to withdraw the

11   proof of claim.  We filed it in good faith in August.  We had a

12   hearing, the Court denied it, we're here.

13          I think that's instructive to the Court for one thing

14   only, that there is a history of bitter opposition between

15   anything Dondero and Highland.  I don't represent Mr. Dondero in

16   his fight with Highland.  I represent HCRE, now NexPoint Real

17   Estate Partners, on a proof of claim.  It's a very small issue,

18   a singular issue.  We filed a proof of claim, they objected.  We

19   filed a response, they disq'd prior — disqualified prior

20   counsel.  This Court signed an order that disqualified them.

21   They're gone.  I am here.  We filed a motion to withdraw.  You

22   would think that's a win for Highland.  It's not.  They fought

23   the motion to withdraw.  I was very surprised by that, I have to

24   tell you.  But they fought —

25          THE COURT:  But you — you heard the very lengthy

*Closing Argument on behalf of the Claimant*                    177

1    argument they made.

2             MR. GAMEROS:  I — I understand, Your Honor.  I do.

3             THE COURT:  That — that you will turn around and sue

4    in some other court, Delaware, District Court here, New York,

5    who knows where, —

6             MR. GAMEROS:  Or they're going — or they're going to

7    sue us —

8             THE COURT:  — raising some of the same issues that

9    could have been raised in connection with the proof-of-claim

10   litigation.

11            MR. GAMEROS:  Your Honor, I —

12            THE COURT:  They were like if we want — if we're going

13   to litigate we want to litigate now, let's get it overwith.

14            MR. GAMEROS:  I understand that, Your Honor.  And I'm

15   not here to reargue the motion to withdraw.  I lost that one.  I

16   get it.  And I think the motion —

17            THE COURT:  Well, — well, I just want to be clear.

18   And went back and reread the transcript yesterday to remind

19   myself why are we here.  And the why we were here is because

20   your client wouldn't agree to an unequivocal 'We're withdrawing

21   the claim, we agree not to raise any issue we could raise in

22   connection with this claim litigation in the future, and we

23   won't appeal this order.'  We couldn't get an unequivocal

24   agreement to that, right?

25            I would have been so happy to find an order agreeing —

*Closing Argument on behalf of the Claimant*                    178

1  or allowing withdrawal, but — but it wasn't quite an unequivocal

2  withdrawal.

3         MR. GAMEROS:  And part of the problem that — of that,

4  Your Honor, is that that was not — first of all, I was not

5  prepared for the Court to be talking to Mr. Dondero individually

6  in that context, and we didn't have an order to look at and even

7  to work off of.  And, by the seat of his pants, —

8         THE COURT:  And so I said when we left:  I hope y'all

9  go out and talk some more, because if y'all can craft-magic

10  language, I would be happy.  If there's quid pro quo going back

11  and forth, I will want the U.S. Trustee to see it before I sign

12  an order.

13         MR. GAMEROS:  That's right, Your Honor.

14         THE COURT:  That's what I said.  I encouraged

15  continued dialogue.

16         MR. GAMEROS:  You — you did encourage that, and I

17  totally understand that.  I'm trying to explain what happened

18  that day.  And — and the pressure of being under the gun, it

19  just wasn't going to happen that way.  And there we are.  And

20  here we are.  We're here today.

21         But I did want to point to the Court and what I wanted

22  the Court to see was it's just — it's never going to be good

23  enough.  We're always going — not we.  HCRE, it seems in this

24  case, everything they do is bitterly opposed by Highland, and

25  it's — it's as if we hadn't filed a proof of claim it still

*Closing Argument on behalf of the Claimant*                                    179

1    wouldn't be good enough, and here we are.  That's the problem.

2            THE COURT:  What does that mean?  What has there been

3    other than the proof of claim?

4            MR. GAMEROS:  There's been nothing else, Your Honor.

5    My point was everything we do, try to pay them back their

6    capital — refused.  Why?  Something's got to be up.  That's just

7    not — to me, that's not — I have not seen that in litigation,

8    which I know is binary.  I know it is.  But that's unusual and

9    that's what's happened in this case.

10           THE COURT:  Okay, well, I don't really know about

11   that.  There were some allusions to it, sort of, but —

12           MR. GAMEROS:  Okay.

13           THE COURT:  — I don't — I don't know that I have in

14   evidence exactly what happened.

15           MR. GAMEROS:  All right.  I understand, Your Honor.  I

16   — I agree.  It was — it was not the cleanest section of

17   testimony, and I understand that.  And I objected on 408

18   grounds, and that probably doesn't help.

19           I did get testimony that we tried to return the

20   capital and it was refused.  And you will see that in Mr.

21   McGraner's testimony here in court today.  He also testified to

22   it, I believe, in his deposition.  It's in both places.

23           So with respect to the proof of claim, we would like

24   the Court to grant the proof of claim and reallocate the equity

25   based on the capital contribution.  That's what we would ask

*Closing Argument on behalf of the Claimant*                      180

1   for.

2          On the side would be Highland has asked for a series

3   of findings —

4          THE COURT:  Say that again.  Grant the proof of claim,

5   allow the proof of claim.

6          MR. GAMEROS:  Yes, Your Honor.

7          THE COURT:  And?

8          MR. GAMEROS:  Reallocate the equity in SE Multifamily,

9   pursuant to their capital contributions.

10          THE COURT:  So put a dollar figure on that for me.

11          MR. GAMEROS:  I can't, Your Honor.  I'm asking you to

12   move equity, I don't have a dollar number for it.  I understand

13   — I understand — I do understand what the Court is asking me,

14   and I do understand the issue, and we don't have a dollar figure

15   for that.

16          THE COURT:  Then how do I give you a ruling?

17          MR. GAMEROS:  What Highland would like, Your Honor, is

18   they would like a series of findings and extra things on denying

19   my proof of claim that I don't think they're entitled to.

20   They're asking for affirmative relief, essentially, in a denial

21   order, which I think is improper.  They want you to make

22   findings that we can't raise any of these other issues,

23   rescissions, stays, et cetera, going forward.  That's not proper

24   relief on a proof of claim.  If this was a declaratory judgment

25   action and we were defending it, I could see that.  But this is

*Closing Argument on behalf of the Claimant*                    181

1   not a declaratory judgment action.  This is simply a proof of

2   claim.

3          The same thing with a bad faith filing.  I think you

4   saw Mr. McGraner today, he's taking this very personally.  The

5   people on his real estate team are taking this very personally.

6   They relied on outside counsel to get a proof of claim on file.

7   It's not a bad faith filing at all.  And I think it's a mistake

8   to allow that to be lumped in because Wick Phillips hired ethics

9   counsel and fought a DQ, therefore it's bad faith.  I don't

10  think that's appropriate.  I think that they're blending too

11  much and it's not the way this thing should — should be

12  resolved.

13         I've really got two other points, and then I think I'm

14  not going to use my other two minutes.

15         First, I think this is a rejected executory contract.

16  That's why we asked the Court to take a look at it.  During the

17  examination of Mr. Cournoyer and Mr. Klos, I pointed out some of

18  the provisions in the agreement that require things of Highland.

19  In the event of a consolidation, Highland is obligated under

20  Section 1.8 to reallocate interests.  That it hasn't happened

21  yet doesn't mean it won't.  They have an affirmative obligation

22  under that paragraph and they have rejected it.  By not assuming

23  the SE Multifamily contract, they rejected it.

24         I point out several other places too during that

25  examination.  I pointed out Section 4.3 for voting, an

*Closing Argument on behalf of the Claimant*                    182

1    obligation to vote.   Section 2. — 7.2, they're not allowed, they

2    have a negative obligation to make transfers.   They simply can't

3    transfer their interest to somebody else.   Not proper.

4         And withdrawal is even worse.   They're not allowed to

5    withdraw Highland.   They're not allowed to withdraw, because if

6    they want to, they have to provide an indemnity for the tax

7    issues.   Here we are again:   1.8 and 7.4, all about taxes.

8    Taxes are an important part of this agreement.   And Highland has

9    affirmative obligations in both of those sections with respect

10   to tax obligations.   Your Honor, they have not assumed this

11   contract.   I think they have rejected it.

12        THE COURT:   So what is the consequences if they

13   rejected it —

14        MR. GAMEROS:   All they have left is an economic

15   interest, Your Honor.   That's what it says in the agreement.

16   They still have an economic interest in this thing, but they're

17   not a member anymore.   They have rejected it.   They have other

18   rights under the agreement, but my point is, is that this is a

19   rejected contract.   It's not even important enough to Highland

20   to assume it.   They have rejected it and that's in the orders

21   they showed because they have rejected these obligations that

22   they have.

23        My last point, Your Honor, I know that Mr. Morris

24   talked about the notes to litigation.   I want to go back and

25   talk about the HarborVest (phonetic) settlement, not because I

*Closing Argument on behalf of the Claimant*                    183

1   want to get into the weeds of it.  I just want to talk about how

2   the parties got there.  And they got there through some

3   testimony from Mr. Seery.

4           The opposing lawyer asked him before the omnibus

5   objection was filed —

6           MR. MORRIS:  I'm sorry, Your Honor.  I am loathe to do

7   this.  He has no knowledge of HarborVest, not one witness said

8   the word HarborVest.  I really don't think this is proper.

9           MR. GAMEROS:  It's —

10          THE COURT:  Why are we talking about HarborVest —

11          MR. GAMEROS:  — closing argument.  Bec- — well, if I

12   could finish the sentence and then the answer.  The question was

13   asked of Mr. Seery, "Did Highland educate itself on the

14   HarborVest proof of claim?"  He said, "Not especially, no."  He

15   didn't.  He filed the omnibus objection, not knowing anything

16   about the HarborVest proof of claim.

17          Later Mr. Morris asks him, "In your experience, don't

18   defendants and not a liability before any of the settlements

19   were reimbursed getting adverse judgments against them," he said

20   yes.  He didn't know what was going to happen with the objection

21   any more than Mr. Dondero knew that he was relying on his

22   lawyers when he filed the proof of claim.  But in resolving that

23   tension between the claimant, HarborVest, and Highland, and Mr.

24   Morris is right, I don't know anything else about it.  I just

25   know that's what happened at the hearing.  But in resolving that

*Closing Argument on behalf of the Claimant*                    184

1    tension, Your Honor, you concluded something that I think is apt

2    for here today.

3           This is what you said, "This is consistent with

4    everything I typically see in a bankruptcy case when there's a

5    claim objection.  The objector vehemently denies the claimant

6    should have a proof of claim, and then people sit down, think

7    about the risks and rewards of litigating things, and I believe

8    very fervently that that's what happened here."

9           Now that's obviously written approving a settlement,

10   an agreement that hasn't been reached yet between my client and

11   Highland.  But it does talk about the mechanics of how this

12   worked.  And it's no more of a bad faith proof of claim than

13   it's a bad faith objection from Highland to a HarborVest claim.

14   They worked it out —

15          THE COURT:  Well, one document is signed under penalty

16   of perjury.

17          MR. GAMEROS:  I understand that, Your Honor.  What it

18   says in that document, in that section in particular, it says

19   there's no fraudulent — your penalties are attached to a

20   fraudulent proof of claim, and it does say penalties of perjury,

21   I agree.  The language in the proof of claim is conditional.  H.

22   Seery may have a claim.  It's on Exhibit A.  May have a claim

23   for this, may have a claim for that.  And then it says we'll

24   figure it out later — literally, we'll figure it out later, and

25   then starts the DQ litigation.  But the block that Mr. Morris

*Closing Argument on behalf of the Claimant*                              185

1   pointed Mr. Dondero to that said you're onboard for a $500,000

2   fine talks about a fraudulent claim, not a bad faith claim.

3        It isn't a bad faith claim and it's sure not a

4   fraudulent claim.  There is clearly a relationship between HCRE

5   and Highland.  That's not disputed.  They're in this deal from

6   the beginning and they're in this deal right now.  They still

7   have an ongoing relationship.  It's not a fraudulent proof of

8   claim.  It's not a complete stranger.  It's not like me filing

9   one against Highland.  That would be a fraudulent proof of

10  claim.  I have no relationship with Highland and no entitlement

11  to any relief under any circumstance.

12        Not so with HCRE.  It's not a fraudulent proof of

13  claim, for sure.  And I think I have demonstrated to the Court

14  why it's not bad faith.  Subject to the Court's other questions,

15  I'm going to close —

16        THE COURT:  I want to go back to the computation that

17  you said you could not provide.

18        MR. GAMEROS:  Right.

19        THE COURT:  I mean we're here on a proof of claim

20  allowance or disallowance.  I — I need to have some guidance on

21  what you think your claim would be.

22        MR. GAMEROS:  Your Honor, I understand the question,

23  and we have asked for a reallocation of equity.  I don't have a

24  dollar figure for the Court.

25        THE COURT:  A reallocation of equity?

*Closing Argument on behalf of the Claimant*                          186

1          MR. GAMEROS:  Right.

2          THE COURT:  Elaborate.

3          MR. GAMEROS:  We take the combined contributed capital

4   and then switch the 41,- — or the 47,- and the 46,- to

5   correspond to those numbers.  So the 290,- plus 49,000 is one

6   number, and then they're percentages allocated after that.

7          THE COURT:  Oh, you're saying using 49,000 for

8   Highland?

9          MR. GAMEROS:  Yes, Your Honor, that's what I said.

10         THE COURT:  Okay.  All right, so it goes back to, I

11  guess, the original Exhibit A attached to the proof of claim,

12  that — that the —

13         MR. GAMEROS:  Well, the original is going to be 51,-,

14  49,- —

15         THE COURT:  — the theory — well, no.  That the theory

16  of there being a claim — well, actually, no, maybe that was in

17  your response to the objection, where you said the theory of the

18  claim is mistake or lack of consideration.  That was — that was

19  not in the Exhibit A to the proof of claim.  That was in your

20  response to the objection.

21         MR. GAMEROS:  That's correct, Your Honor.  It's in

22  paragraph 5 of the response, where HCRE argued there is three

23  things — three things for the Court to consider:  One of them is

24  mistake, one of them is lack of consideration, and the other one

25  is failure to consideration, —

*Closing Argument on behalf of the Debtor*                          187

1        THE COURT:  Right.

2        MR. GAMEROS:  — which is why I worked through that

3   today showing what the mistake is, what the lack of adequate

4   consideration is, and what the failure of consideration is, the

5   cessation of services.  You know it's not a good hearing until

6   somebody says, well, what about one peppercorn of consideration.

7   And Mr. Morris said that today, he's absolutely right.

8        I understand there's consideration paid.  The question

9   is, is it adequate, and that was what the argument was.

10        THE COURT:  Okay.  Thank you.

11        MR. GAMEROS:  Thank you, Your Honor.

12        THE COURT:  All right.  Mr. Morris.

13        <u>CLOSING ARGUMENT ON BEHALF OF THE DEBTOR</u>

14        MR. MORRIS:  I'm not exactly sure where to begin other

15   than that I know they're mad.  But here is the thing.  Mr.

16   McGraner may not know it, may not understand it, may not

17   appreciate it, but all that's happened here has been the

18   bankruptcy laws being appropriately applied.

19        Mr. Dondero, bless him, signed this agreement on

20   behalf of Highland and HCRE.  There is zero dispute that

21   everybody — that the document said exactly what everybody

22   intended at the time.  And then he decided, for whatever

23   reasons, to file Highland for bankruptcy.  One of Highland's

24   assets puts its ownership interest in SE Multifamily.  That

25   asset, like all assets of the debtor, become part of the

*Closing Argument on behalf of the Debtor*         188

1   debtor's estate and becomes subject to distribution to satisfy

2   the claims of the debtor's creditors.  That's all that's

3   happened.  That's not a basis to file a proof of claim.  If they

4   did, this process would never ever work.

5       We heard in closing argument and you heard the

6   testimony that the KeyBank loan and the collateral, HCRE was the

7   lead borrower, they decided that.  But be that as it may, it's

8   all completely irrelevant because, as Mr. McGraner was forced to

9   admit, as Mr. Dondero admitted, they had all of that knowledge

10   when they knowingly and intentionally drafted an amended and

11   restated agreement that gave Highland 46.06 percent.

12       Your Honor can make whatever findings you want about

13   the disposition of the $750,000 and the other 992,-.  I mean

14   it's really undisputed, other than the fact that money is

15   fungible for the 750,-, it's not disputed.  Highland gave every

16   penny to somebody else.  But it's also completely irrelevant.

17   Why is it irrelevant?  Because it was known to them at the time,

18   six months later, that they entered into this agreement

19   voluntarily, knowingly, and intentionally.  Who cares?  It's

20   just ridiculous, actually.

21       They're just mad.  They're mad about the bankruptcy

22   law.  And, you know what, that is true is of every equity owner

23   that's ever taken their company into bankruptcy.  You lose

24   control.  Assets are made available to satisfy the claims of

25   allowed claim holders.  That's what has happened.  It's not the

*Closing Argument on behalf of the Debtor*                              189

1    basis for us to be doing this.

2           Reformation, rescission, modification.  Where is BH

3    Equities?  Has a court ever in the history of the world only

4    reformed a contract with respect to some of the parties but not

5    all of them?  I'm not aware of it.  I'm not quite sure.  You

6    know, if they — if that's what they wanted, they should have

7    commenced an adversary proceeding, they would have given BH

8    Equities an opportunity to be heard.  They would have — right.

9    This notion of a living a document, he says everybody testified

10   to it.  No, his two clients testified to it, nobody else did.

11          And, again, look at their exhibit list.  Is there not

12   one piece of evidence in the world to corroborate this

13   self-serving testimony.  And it makes no sense because nobody

14   has explained to you what provision is missing.  I asked Mr.

15   McGraner that twice.  And you know what he said:  I'm mad

16   because of the bankruptcy filing.  He couldn't describe a

17   provision that should have been drafted.  He couldn't describe a

18   provision that was missing.  Nobody ever said that there is a

19   provision in the document that was wrong.  In fact, I point to

20   10.1.

21          10.1 was changed to protect HCRE so that amendments

22   would be permitted but only with HCRE's consent.  But there were

23   certain things, like messing around with membership interests

24   that they're barred from doing.  What — I don't even know what

25   to say.  They drafted a document that said they can't do what

*Closing Argument on behalf of the Debtor*                    190

1    they're asking the Court to do.

2         If the — you know I hope the Court reads our

3    designations, because BH Equities is really — I have nothing but

4    good things to say about them.  I think they're honorable

5    people.  I think they came to this transaction for all the right

6    reasons.  I think the testimony was truthful and I think it 100

7    percent supports Highland.  You will see that they will say the

8    document says exactly what they expected it to say, that they

9    negotiated for these provisions, it's not ambiguous, it reflects

10   the parties' intent.

11        They're going to tell you, you will see they testify

12   under oath they had no idea about any of these disputes.  They

13   found out about the bankruptcy filing by reading in the

14   newspapers, or something.  Highland didn't tell them there was a

15   bankruptcy.  I mean, you know, Mr. Dondero, HCRE.  They didn't

16   ask them to amend the agreement.  They didn't ask them to do

17   anything.  They want to reform an agreement with a party who

18   they didn't even tell they thought was a mistake.

19        a mistake, right.  I went through.  You've got

20   document after document after document that Mr. McGraner and Mr.

21   — Mr. Chang and Mr. Broaddus are drafting, not Mr. Klos, not Mr.

22   Cournoyer.  You'll see he's dropped from that chain in Exhibit

23   13.  He may have been copied initially.  He's nowhere to be

24   found in the days and weeks that follow.

25        The evidence completely contracts the notion that

*Closing Argument on behalf of the Debtor*                                      191

1   there was a mistake, both the testimonial evidence as well as

2   the documentary evidence.  It's all consistent with the intent

3   to give Highland a 46.06-percent interest.  And it's not a

4   mistake, it's not about $49,000.  That's, I guess, the

5   peppercorn.  It's about so much more.

6          And Mr. McGraner and Mr. Dondero told you why:

7   Financial flexibility and tax advantages.  And they're big, and

8   we'll get to that in a moment.

9          I asked Mr. McGraner, right, they say don't ask a

10  question you don't know the answer to, I did that a couple of

11  times with Mr. McGraner.  Tell the Court what provision of the

12  agreement, what do you think is missing, what evidence do you

13  have?  That it's a living document; what on Earth does that even

14  mean?

15         What he did testify to quite clearly is that we

16  wouldn't be here if there wasn't a bankruptcy filing.  What they

17  are mad at is the Bankruptcy Code.  They're mad that the

18  Bankruptcy Code says that the debtor's assets are part of an

19  estate for distribution of creditors.  That's all, that's it.

20  Nothing in the document could have been drafted to change that.

21  That's the law.  All we're asking this Court to do is enforce

22  the law.

23         Consideration, I guess I've touched on it.  Right?

24  The taxes.  Let's — let's look at a couple of tax returns,

25  because I think they'll be kind of illuminating.  This little —

*Closing Argument on behalf of the Debtor*                    192

1    little company that did nothing here, that put in $49,000, that

2    doesn't deserve anything, if you go to Exhibit 50, Your Honor —

3    actually, let's start — let's start at the agreement itself,

4    Exhibit 7.

5            And if you go to Section 6.4, you will see that except

6    as provided below, there is the important point, SE

7    Multifamily's profits and losses shall be allocated 94 percent

8    to Highland, six percent to BH Equities.  And you know how much

9    to HCRE, exactly, nothing.  This is called a tax shelter.  This

10   is why Highland is in this deal.  And Mr. Patrick was very

11   forthright about that.  So was Mr. Dondero in his deposition,

12   because you will see that he will — he testified very

13   explicitly, just look in the index under the word "shelter" — I

14   think it's "shelter."  He testifies very clearly that Highland

15   is here because they have — they're able to shelter income

16   because their ultimate beneficial owners are not taxpayers at

17   the end of the day.  So that this was a way, they bring Highland

18   into the deal so that HCRE doesn't have to pay taxes.

19           And how do I know that?  Go to Exhibit 50.  We'll see

20   it in practice.  The little guy who only put in a peppercorn.

21   Tell me if you're at Exhibit 50, which is the 2019 (k)(1) that

22   Mr. Dondero, as the officer of HCRE, the manager of SE

23   Multifamily Holdings was charged with the unilateral

24   responsibility to cause and prepare SE Multifamily's tax returns

25   to be prepared.  If you look in box 2, what do you know, $41

*Closing Argument on behalf of the Debtor* 193

1   million is allocated to Highland, 31 million bucks.  That's

2   because they put in a provision that said Highland is going to

3   get 34 percent of the taxable gains.  And it's done because, as

4   Mr. Dondero testified in his deposition, Highland wasn't going

5   to be a taxpayer.

6           And you will also see in Mr. Patrick's deposition that

7   the reason that they did that was because SE Multifamily didn't

8   have the cashflow to make tax payments, tax distributions.  I

9   don't want to get into too much tax stuff, that's not my area of

10  expertise.  But I will tell you if you looked at the original

11  LLC agreement, it provided that SE Multifamily would make tax

12  distributions to the taxpayer so that they didn't have to come

13  out of pocket.  That provision was dropped from the amended

14  agreement because, according to Mr. Patrick, SE Multifamily

15  wasn't going to have the tax — wasn't going to have the cashflow

16  to do that.  So they put the burden on Highland.  And they put

17  this $31 million in Highland's beneficial owner's pockets.

18          I don't know if Mr. Dondero is right, but ultimately

19  there is no tax owed, but what we do know is that Highland isn't

20  in this deal for their $49,000 of capital.  They're here for tax

21  purposes.  They told you that, you should believe it.

22          I am asking for very specific findings, Your Honor,

23  and I believe that Highland is entitled to them.  This isn't a

24  litigation over a proof of claim per se.  They filed the

25  response.  It was I our deck this morning.  It can be found at

*Closing Argument on behalf of the Debtor*                    194

1    Highland Exhibit 2, which is the response that was filed by Wick

2    Phillips, that can be found at Docket Number 1212.  And this is

3    how they describe their claim.

4              THE COURT:  Where is it again?

5              MR. MORRIS:  It's Exhibit 2 in the binder.

6              THE COURT:  No.

7              MR. MORRIS:  I think so.

8              THE COURT:  I don't see then.

9              MR. MORRIS:  And then if you go to paragraph 5.

10             THE COURT:  Oh, 5, okay.

11             MR. MORRIS:  It was in the deck that I probably used

12   in my opening this morning.  So this is Wick Phillips' response

13   on behalf of HCRE, it's former client.  And just look at the

14   last sentence, "As such, HCRE has a claim to reform, rescind, or

15   modify the agreement."  That's their plan.

16             We actually had a lot of discussion on this topic, as

17   to whether we should convert this to an adversary proceeding.

18   We just — there's only so much pain and suffering we can go

19   through.  But that's their claim.  The Court should disallow

20   their claim, including their claims for reformation, rescission,

21   modification, mistake.  This is what they're asking the Court

22   for.

23             And I would direct the Court back to the law that we

24   presented this morning.  Clear and convincing evidence, they're

25   required to show.  I think they fall a little short.

*Closing Argument on behalf of the Debtor*                              195

1        Consideration.  I have talked about that.  Mere

2   inadequacy of consideration doesn't justify denial.  There is

3   more than adequate consideration.  We have taken on 30 plus

4   million dollars of taxes.  They have taken on zero.  Whoever the

5   beneficial owners are, whether they pay taxes or not, I don't

6   know, I don't speak to them, I don't know who they are, but that

7   was their tax-avoidance scheme, 94 percent of the profits to the

8   company that they want to completely divest out of this thing.

9   Come on.

10       It's actually worse than that, because if you look at

11  in 2020, this is — this is really eye-opening, but I don't have

12  the stomach to pull out the documents, but it's in the evidence

13  now.  Look at HCRE's 2020 (k)(1) for — for — yeah, for 2020.

14  You know what happened in 2020?  There was a loss.  Guess who

15  took the loss.  HCRE.  Right?  That's the flexibility maybe they

16  were talking about.  Heads, I win.  Tails, you lose.  Lots of

17  taxable gains.  That's on Highland.  Losses that I can use to

18  offset my other gains, take that for myself.

19       This is what they thought they were going to be able

20  to do, I guess.  But now they're bound to an agreement that they

21  negotiated, that they drafted, that they understood, that they

22  signed.  That's just the way bankruptcy works.

23       There was no good faith basis to file that proof of

24  claim.  You don't file a proof of claim to say maybe what

25  happens, maybe possibly some day.  They don't have a basis for

*Closing Argument on behalf of the Debtor*                          196

1   doing it.  What's the basis for doing it other than you don't

2   like the bankruptcy process.  Have you heard any evidence to

3   support the filing of that proof of claim?  And don't let me get

4   started on Wick Phillips.

5          What a tragedy.  What a complete abdication of

6   responsibility by lawyers who should know better.  How do you do

7   that?  The fact that we won, I have to have my client spend

8   money hiring me to get people to do what they have an oath to

9   do?  Why?  The whole thing stinks, Your Honor.

10         And we ask not only for the proof of claim to be

11  disallowed.  We do want the specific findings that the entirety,

12  each element of their claim, rescission, reformation, mistake,

13  modification, call it whatever you want.  This is — Your Honor

14  was exactly right.  That's why we opposed their motion to

15  withdrew, because we knew, he basically said it.  He said don't

16  do that.  He — at least he was honest with you:  Don't do that.

17         And we want a finding of bad faith.  We shouldn't have

18  been put through this.  We want our costs.  I think the Court

19  has the ability, has the authority to award costs for a bad

20  faith filing.  A fraudulent filing, frankly.  No due diligence,

21  nothing.  There is no evidence in the record that anyone did

22  anything other than consult with Mr. Sauter.

23         I have nothing further, Your Honor.

24         THE COURT:  Thank you.

25         Your rebuttal.

*Closing Argument in Rebuttal on behalf of the Claimant*                    197

1    <u>CLOSING ARGUMENT IN REBUTTAL ON BEHALF OF THE CLAIMANT</u>

2         MR. GAMEROS:   Two points, Your Honor, very briefly.

3         The first point.  The process, and we heard a lot of

4    testimony about the process, was that Mr. Dondero, Mr. McGraner

5    were relying on subject matter experts, inhouse, outside

6    counsel, accountants, et cetera, in creating the documents at

7    issue.  I understand Mr. McGraner had some sound bites in his

8    testimony that he didn't like the bankruptcy process, but his

9    concern was that the agreement wasn't modified on a go-forward

10   basis, and he thought it should have been.  He should have had a

11   mechanism in there to do it, other than 10.1.

12        What he didn't account for was losing his partner at

13   Highland.  That's a mistake.  That's what he did.  And I think

14   all of the addressing about complaining about the Bankruptcy

15   Code and lack of control, those are true in every single case.

16   I get it.  But here, Mr. McGraner was very specific.  He said:

17   I used to have a partner and now I don't have the same partner.

18   And that partner — my new partner doesn't want to work with me

19   on anything.  And I think that's been clear throughout.

20        The second part of the process story, though, relying

21   on outside counsel, relying on accountants, tax/real estate

22   experts, et cetera, is actually the filing of the proof of claim

23   and the disqualification motion itself.  Again, in each

24   instance, HCRE relied on outside counsel.  Bonds Ellis filed the

25   proof of claim — or drafted the proof of claim, got Mr. Dondero

*Closing Argument in Rebuttal on behalf of the Claimant*          198

1   to sign it.  They had access to information internally.  If you

2   look at Mr. Dondero's deposition transcript, which is in

3   evidence now, he talks about that.  He didn't talk about it in

4   here today.  I didn't ask him about it.  It's in his deposition

5   transcript, though.  And he talks about how Bonds Ellis had

6   access to the folks in real estate, inhouse counsel, et cetera,

7   et cetera.  It's not just a one-liner that D. C. Sauter came up

8   with this on his own.  That's just not what happened.

9          Bonds Ellis had access internally to people at HCRE to

10  formality and file the proof of claim.  And that's all they did.

11  They were worried about what was happening in the bankruptcy,

12  what was coming down the road, and they wanted to protect

13  themselves against that as much as they could.  And that's how

14  they filed it.  That was the process that they followed.

15  Nothing else, nothing sinister about it.  Not some grand

16  conspiracy to do some other damage.  That's not it at all.

17  That's simply not what happened.  The time line doesn't bear

18  that out.

19         They filed a proof of claim.  The disqualification

20  litigation starts.  It lasts for however long it lasts.  But the

21  order for me to appear doesn't show up until January of '21 —

22  '22.  I'm sorry.  January of '22.

23         We arrive.  Again, nothing happens for six months.

24  Mr. Morris reaches out.  We start.  We're exchanging discovery.

25  We have depositions.  We file the motion to withdraw the proof

*Closing Argument in Rebuttal on behalf of the Claimant*          199

1   of claim.  That's all.  That's what happened.  That's the time

2   line.  There's nothing else to it.

3          HCRE has one proof of claim here.  I don't think it's

4   filed in bad faith.  I don't think the Court should find it's

5   filed in bad faith.  It certainly wasn't filed fraudulently.  It

6   was filed using the process, which relied on outside lawyers who

7   were giving their best advice to their client.

8          The Court disqualified Wick Phillips.  I understand

9   that.  They had a good faith basis to believe they didn't have a

10  conflict.  They had ethics counsel that they engaged that told

11  them the same thing.  That's not just a one-off crazy —

12         THE COURT:  And, by the way, you keep mentioning

13  ethics counsel.  Did I hear ethics counsel testify at the DQ

14  hearing?  I just can't remember —

15         MR. GAMEROS:  Mr. Selman (phonetic) did, Your Honor.

16  Yes, you did hear — Mr. Selman.

17         THE COURT:  Did —

18         MR. GAMEROS:  I wasn't at the DC hearing, but I assume

19  he —

20         MR. MORRIS:  That — nobody testified, technically.

21  Your Honor, we — we offered into evidence deposition testimony,

22  so that — viewed in that light, but you didn't hearing anybody

23  testify.

24         MR. GAMEROS:  They had an expert testify, Mr. Selman,

25  as the lawyer who testified on the DQ issues.  And his

*Closing Argument in Rebuttal on behalf of the Claimant*    200

1    transcript — I believe his transcript was filed in the DQ

2    proceeding.  I saw it on the exhibit list.  I wasn't involved in

3    that, I had nothing to do with it.  But that's what they did,

4    because they strongly believed they didn't have a conflict.

5            Just because it turns out that they're wrong doesn't

6    make them doing bad faith filings and being mistaken and evil,

7    and on and on.  That's not it.  That's not what happened.

8            If Your Honor's going to deny the proof of claim, I

9    would ask that you simply deny the proof of claim.  We don't

10   have an adversary proceeding here.  There wasn't one started.

11   Mr. Morris considered that and then didn't follow that path,

12   because all we have here today is a proof of claim.

13           Subject to the Court's questions, I thank you for your

14   time.

15           THE COURT:  All right.

16           MR. GAMEROS:  Thank you, Your Honor.

17           THE COURT:  No other questions.

18           All right.  Well, I would say thank you for giving us

19   a day back tomorrow, but we'll probably be spending tomorrow

20   looking through your documents, so that's — that's fine.  I'm

21   happy to do that back in chambers.  And that's probably more

22   efficient than hearing some of the witnesses live as opposed to

23   the transcripts.

24           So I'm officially taking this under advisement and

25   we'll let you know when we're ready to get a ruling out.

*Closing Argument in Rebuttal on behalf of the Claimant*                                    201

1          All right.  Thank you all very much.

2          MR. GAMEROS:  Thank you, Your Honor.

3          MR. MORRIS:  Thank you, Your Honor.

4          COURT SECURITY OFFICER:  All rise.

5      (The hearing was adjourned at 3:34 o'clock p.m.)

6                          —o0o—

State of California              )
                                 )      SS.
County of Stanislaus             )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services
                              P.O. Box 4082
                              Modesto, California  95352
                              (209) 915-3065

                              Dated November 5, 2022