

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 5, 2023**

_____
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | CASE NO. 19-34054-SGJ-11 |
| | § | (Chapter 11) |
| Reorganized Debtor. | § | |

## MEMORANDUM OPINION AND ORDER DENYING "AMENDED RENEWED MOTION TO RECUSE, PURSUANT TO 28 U.S.C. § 455"

### (ruling on the most recent motion to recuse filed in the main bankruptcy case, *see* DE ## 3570 & 3571)

There have been multiple motions to recuse the presiding bankruptcy judge ("Presiding Judge") in the main bankruptcy case of Highland Capital Management, L.P. ("Highland," "Reorganized Debtor," or sometimes "Debtor"). Each one has been filed by James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE

1

Partners, LLC, a Delaware limited liability company (collectively, the "Movants").[1]   This

Memorandum and Order relates to the one entitled *Amended Renewed Motion to Recuse Pursuant*

*to 28 U.S.C. § 455* (with supporting Brief), filed October 17, 2022 [DE ## 3570 & 3571]—which

is either the second or third such motion filed in the main bankruptcy case, depending upon how

one counts.  For ease of reference, the court will refer to this motion and brief at DE ## 3570 &

3571 as the "Third Motion to Recuse."  This Memorandum Opinion and Order denies the Third

Motion to Recuse.

## I.    FOR CLARIFICATION, THE FOUR MOTIONS TO RECUSE FILED BY MOVANTS.

First Motion to Recuse.  Movants filed the first *Motion to Recuse Pursuant to 28 U.S.C. §*

*455* on March 18, 2021, along with a supporting Brief and an Appendix [DE ## 2060, 2061, &

2062] (hereinafter, the "First Motion to Recuse").  This was collectively 2,763 pages in length.

This was approximately one month after the bankruptcy court confirmed a Chapter 11 plan in this

case—specifically, the court confirmed a plan (the "Plan") on February 22, 2021.  This was also

approximately 17 months after the bankruptcy case was filed in October 2019.  The First Motion

to Recuse was also filed just two business days before the bankruptcy court was scheduled to hear

a motion of Highland to hold Mr. Dondero in contempt of a TRO.  The court denied the First

Motion to Recuse in an order dated March 23, 2021 ("First Order Denying Recusal") [DE # 2083].

The Movants appealed the First Order Denying Recusal, and that appeal was dismissed for lack

of jurisdiction on February 9, 2022 ("District Judge Kinkeade's Order") (reported at 2022 WL

---

[1]  An entirely separate, fourth Motion to Recuse the Presiding Bankruptcy Judge was filed February 27, 2023, by one of the Movants—Highland Capital Management Fund Advisors, L.P.—in related Adversary Proceeding # 21-3076 styled *Kirschner v. Dondero, et al*. [DE # 309]. This Memorandum Opinion and Order is not intended to address that motion.

394760).  District Judge Kinkeade's Order held that:  (a) an order denying a motion to recuse is

an interlocutory order; (b) it is not subject to the collateral order doctrine; (c) it is not an

appealable interlocutory order under 28 U.S.C. § 1292(a); (d) Movants were not entitled to leave

to appeal under 28 U.S.C. § 1292(b); (e) Movants were not entitled to withdrawal of the reference

on the First Motion to Recuse; and (f) Movants were not entitled to have their appeal construed

as a petition for writ of mandamus.

Second Motion to Recuse.  A new motion was filed on August 25, 2022, five months after

District Judge Kinkeade's Order.  It was entitled "Amended Motion for Final Appealable Order

and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support" [DE ##

3470 & 3471] ("Second Motion to Recuse").  This was six days after the Fifth Circuit ruled on the

appeal of the Highland Plan confirmation order, affirming it in substantial part.  The Second

Motion to Recuse, which, with Appendix, was 162 pages in length, expressed Movants'

interpretation of District Judge Kinkeade's Order: that the only reason the First Order Denying

Recusal was not final and appealable was because of one sentence at the end of the order, wherein

the bankruptcy court *reserved the right to supplement or amend the order*.  The bankruptcy court

promptly set a status conference (six days later—on August 31, 2022) regarding the Second

Motion to Recuse to clarify Movants' basis for its new motion.  For one thing, the bankruptcy

court questioned Movants' interpretation that this one sentence in the First Order Denying Recusal

was the actual basis for District Judge Kinkeade's Order,[2] since he cited a litany of authority for

the proposition that a recusal order does not become final until a final judgment has been entered

---

[2]  The bankruptcy court put that sentence in the First Order Denying Recusal because it expected the Movants might file a Rule 59 motion requesting a hearing or seeking more findings.

in the overall proceeding. District Judge Kinkeade's Order, penultimate paragraph ("Appellants must await final judgment, or other final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order."). In other words, could the bankruptcy court truly "fix" the lack of finality problem by simply deleting that one sentence in the First Order Denying Recusal? Moreover, the court questioned the procedural propriety of Movants' request to "supplement" the record on the First Motion to Recuse with approximately 154 pages of extra evidence. This request appeared to the court to be either a very untimely Rule 59 motion or, in essence, a new motion to recuse—urging consideration of new grounds/evidence that arose subsequent to the First Motion to Recuse. After a status conference, on September 1, 2022, the court issued an order denying the Second Motion to Recuse [DE # 3479] ("Second Order Denying Recusal") for *procedural defects*, but ruled that the order was:

> without prejudice to the Movants' right to file (1) a simple motion (without an appendix or attached proposed supplements to the record) under the appropriate procedural rule(s), seeking only a revised and amended Recusal Order that removes the following language contained at the end of the Recusal Order, but otherwise leaves the Recusal Order unchanged: "The court reserves the right to supplement or amend this ruling;" and/or (2) a new motion to recuse this bankruptcy judge based on any alleged new evidence or grounds for recusal that were not considered by this bankruptcy judge at the time of its consideration of the original Recusal Order.

Third Motion to Recuse. The Movants chose the latter option. Specifically, approximately six weeks later, on October 17, 2022, the Movants filed the current motion before the court entitled *Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* and supporting brief [DE ## 3570 & 3571] (the "Third Motion to Recuse"). This was 10 days after the Fifth Circuit had issued, on October 7, 2022, a denial of a request for a stay in connection with its ruling on the Plan and confirmation order. The court is aware that there is a petition for *writ of certiorari* pending at the

4

U.S. Supreme Court regarding the Plan and confirmation order.  In any event, the Third Motion to Recuse is 280 pages in length (the motion, brief and appendix combined)—with the additional appendix intended to supplement the 2,763 pages of materials filed with the First Motion to Recuse.  The Reorganized Debtor filed a Response and Brief objecting to the Third Motion to Recuse (56 pages in length) and filed an appendix in support (4,035 pages in length), both on October 31, 2022. DE # 3595 & 3596.  Movants then filed a motion to file a reply brief in excess of the page limit and a Reply [DE ## 3618 & 3623] on November 10, and November 14, 2022, respectively.  These documents were collectively 58 pages.  ***Because more than 7,000 pages of material were submitted***, and also because this court has other court business (including typically at least three Highland contested matters or adversary rulings under advisement at any given point in time), this court has had the Third Motion to Recuse under advisement (that is the subject of this Order).

Fourth Motion to Recuse.  Meanwhile a fourth motion to recuse the Presiding Judge was filed on February 27, 2023 in the separate Adversary Proceeding #21-3076 by one of the same Movants that is a defendant therein.[3]  It appears that some of the same arguments are made in the Fourth Motion to Recuse with one significant new argument: Movant believes that a character in one of the fiction legal thriller novels written by the Presiding Judge is based on Mr. James

---

[3] *See HCMFA's Motion to Recuse pursuant to [2]8 U.S.C. §§ 144 and 455* and brief in support [Adv. Pro. No. 21-3076 DE ## 309, 310]. The court notes anecdotally that this Fourth Motion to Recuse was filed several hours after the bankruptcy court issued an opinion and order conforming the Highland Plan to the ruling of the Fifth Circuit.  It may very well be coincidental, but the various motions to recuse have each followed on the heels of a significant case development that Movants may perceive to be adverse to their interests —*i.e.*, the Plan confirmation order; affirmance by the Fifth Circuit of the Plan confirmation order; denial of a stay by the Fifth Circuit of its ruling on the confirmation order; a ruling of the bankruptcy court conforming the Plan to the Fifth Circuit's ruling.  Again, this may be purely coincidental.

Dondero and, thus, shows the Presiding Judge has a bias towards him or the hedge fund industry generally. This court will separately rule on the Fourth Motion to Recuse in due course, after the parties have had the chance to respond.

## II.    THE SPECIFIC GROUNDS URGED IN THE CURRENT MOTION.

Movants are requesting that the Presiding Judge recuse herself from presiding over the Chapter 11 case of Highland (all of it). With regard to the specific grounds urged by Movants, they state that they perceive the Presiding Judge has animus towards Mr. Dondero and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264);[4] that those opinions have supposedly carried over to the Highland case; that the Presiding Judge has been unable to extricate those opinions from her mind; and that this has resulted in an actual bias against Mr. Dondero that has prejudiced or is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

## III.    RELEVANT CASE BACKGROUND.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for

---

[4]  Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("UCC") on December 4, 2019.  The UCC in this case consisted of non-insider creditors asserting more than $1 billion worth of claims against the Debtor.

On January 9, 2020, a significant corporate governance settlement between Highland and the UCC was reached and presented to this court.  It was approximately one month after the Highland case was transferred to the Presiding Judge.  The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, ***at the insistence of the UCC***, and an entirely new corporate governance structure was imposed on the Debtor, with extensive oversight by the UCC.  This new corporate governance structure was negotiated by the Debtor under pressure from both the UCC and the United States Trustee—both of whom expressed positions that a Chapter 11 Trustee should be appointed in this case due to Mr. Dondero's alleged conflicts of interest, inability to act as a fiduciary, and purported mismanagement.  Mr. Dondero signed off on the corporate governance settlement and this court approved it.  A new three-member independent board controlled the Debtor for the remainder of the bankruptcy case until the Plan went effective in August 2021. That board consisted of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience serving as an independent board member of companies undergoing bankruptcy or restructuring (John Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt investments and other products similar to what Highland managed (James P. Seery).  Mr. Dondero stayed on with Highland during the entire first year of the bankruptcy case (through October 2020), as an unpaid portfolio manager, but with no governance role, at the request of the Debtor.  The UCC acquiesced to that arrangement (although they had not negotiated this and expressed reservations about Mr. Dondero's role—albeit limited). The United States Trustee was opposed to the new corporate government structure and preferred a Chapter 11 Trustee instead.  This court overruled the United States Trustee's objection and determined that the corporate

governance structure negotiated by the UCC was more likely to preserve value and foster reorganization efforts than the more drastic step of appointing a Chapter 11 Trustee.

After more than a year, under direction of the new board, Highland obtained confirmation of a Chapter 11 Plan on February 22, 2021.  The Plan was proposed after many months of contentiousness with several large creditors and the UCC.  In fact, in August 2020, the bankruptcy court required the key parties to stand down and engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y. and Attorney/Mediator Sylvia Mayer, Houston).  Highland (either during or after mediation) reached key settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million disputed claim; the Redeemer Committee for the Crusader Fund, which asserted more than a $250 million claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland and certain affiliates for more than a decade).  Mr. Dondero participated in the mediation, but settlements were not reached with him.  The independent board members asked for Mr. Dondero's resignation from Highland in October 2020 (i.e., from his role as a portfolio manager).  At this point, things became very contentious among the Movants and the Debtor; dozens of contested motions and objections were filed among the Movants and Debtor.  Accusations were made by the Debtor that Mr. Dondero was interfering with Highland business, employees, and had even destroyed a company phone to hide evidence.  TROs were sought and obtained. Finally, the court confirmed the Plan in February 2021.  The Plan was supported by the UCC and overwhelmingly (99%+) by non-insider creditors.  Other large, non-insider creditors that supported the Plan, besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarbourVest—each of whom asserted multi-million dollar claims in this case.  In any event, the Movants appealed the confirmation order, and it was

affirmed in substantial part by the Fifth Circuit.  The plan has been in effect since August 2021.

### IV.    LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Third Motion to Recuse, the court will address the

governing legal authority:   28 U.S.C. § 455, Fed. R. Bankr. P. 5004(a), and certain case law

interpreting same.  The relevant portions of 28 U.S.C. § 455 provide that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

28 U.S.C. § 455(a) & (b)(1).

Bankruptcy Rule 5004(a) further provides that, "A bankruptcy judge shall be governed by

28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which

the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over

the case."

*A.   Timeliness?*

The court first notes that the applicable statute and rule do not address the concept of

timeliness of a motion to recuse.  However, several courts have taken timeliness into account.

The Fifth Circuit has noted, in *Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir. 1982),

that, while there were arguments in favor of not reading a timeliness requirement into the statute,

"the lack of a timeliness rule has its own problems."[5]   The Fifth Circuit, in concluding that it was

"convinced that timeliness may not be disregarded in all cases regarding disqualification under §

455(a)," stated,[6]

> Lack of a timeliness requirement encourages speculation and converts the serious
> and laudatory business of insuring judicial fairness into a mere litigation stratagem.
> Congress did not enact § 455 to allow counsel to make a game of the federal
> judiciary's ethical obligations; we should seek to preserve the integrity of the statute
> by discouraging bad faith manipulation of its rules for litigious advantage.

Regarding the specific motion for disqualification of a district court judge in that case, the Fifth

Circuit notes "that the motion raised for the first time on appeal, and after two full trials on the

merits, is too tardily made for us to consider it now."[7]

>    B.   Hearing Needed?  If So, Who Presides?

The court next notes that the applicable statute and rule do not expressly state whether the

presiding judge or some other judge should decide a motion to recuse/disqualify or whether a

hearing—evidentiary or otherwise—is required.

Case authority has interpreted the provisions set forth above to give the targeted judge

authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d

221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge,

and the denial of such motion will only be reversed upon the showing of an abuse of discretion);

*Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009)

(citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996) (the targeted judge has broad

---

[5] *Delesdernier*, 666 F.2d at 121.

[6] *Id.*

[7] *Id.* at 122-23. The Ninth Circuit and Tenth Circuit have also taken timeliness into account when considering a §
455 motion for recusal. *See Davies v. C.I.R.*, 68 F.3d 1129, 1130-31 (9th Cir. 1995)(a motion for recusal filed "one
year after a ruling was considered untimely."); *Willner v. Univ. of Kansas*, 848 F.2d 1023 (10th Cir. 1988).

discretion in determining whether disqualification is appropriate)).[8]

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing is required, if any.   Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990).   *See generally* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form).   The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate.   If a movant appeals a decision not to disqualify or recuse and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record.   Such procedure is consistent with *Levitt. See Lieb v.Tillman*, 112 B.R. at 836.

---

[8] The Fifth Circuit discourages transfer of a disqualification motion because "[t]he challenged judge is most familiar with the alleged bias or conflict of interest" and "is in the best position to protect the nonmoving parties from dilatory tactics." *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1162 (5th Cir. 1982).

*C.   Motions to Recuse are Very Fact-Specific.*

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized that section 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995).  Disqualification is appropriate if a reasonable person, knowing all of the relevant circumstances, would harbor doubts about the impartiality of the judge. *Chitimacha Tribe*, 690 F.2d at 1165.

*D.   On the Topic of Bias or Animus.*

As a matter of law, the existence of clashes between the court and counsel for a party is an insufficient basis for disqualification, and "Circuit Courts have refused to base disqualification under section 455 upon apparent animosity towards counsel." *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975)(holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel."))(other citations omitted); *see also, Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge).  More significant, the U.S. Supreme Court has stated that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish bias or partiality" and that[9]

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias

---

[9] *Liteky v. United States*, 510 U.S. 540, 555-556 (1994).

12

or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

What might amount to a "high degree of favoritism or antagonism"? The example given by the *Liteky* Court was a 1921, WWI-espionage case where the District Court Judge allegedly said of the German American defendants: "'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" A very recent Fifth Circuit case echoes these principles as well.  In *Brocato*, the court noted that "a judge is not generally required to recuse for bias, even if the judge is 'exceedingly ill disposed towards the defendant,' when the judge's 'knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings[.]'"[10]

## V.    THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Third Motion to Recuse and the previous motions to recuse have not been timely.  Again, the original one was filed more than 15 months after the Presiding Judge was transferred the Highland case from Delaware.  It was the 2060th pleading on the docket maintained in the bankruptcy case (this does not count the docket entries in the nine, separate adversary proceedings related to the Highland case), and it was filed after many dozens of orders had been issued by the court, including the confirmation order that was subsequently affirmed on appeal.  The current Third Motion to Recuse was the 3570th pleading on the docket of the bankruptcy case and was filed exactly three years after the bankruptcy case was filed.  The timing does not seem to pass muster—if, indeed, timeliness is a factor, as Circuit-level authority has suggested.

---

[10]*United States v. Brocato*, 4 F.4th 296, 302-03 (5th Cir. 2021).

But, since the Third Motion to Recuse—and all of them for that matter—raise serious issues, the court will nevertheless analyze the pending motion as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the bankruptcy court's impartiality. Would the claims asserted in the Third Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

    *A. The Acis Case.*

The Third Motion to Recuse revisits the Acis bankruptcy case and suggests that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during that case and that this has created animus or bias towards them in the Highland bankruptcy case and related adversary proceedings. Evaluating this contention requires some examination of just what the bankruptcy court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and Acis Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were two entities within the approximately 2,000-entity organizational structure of Highland that were forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr. Dondero was the president of the two Acis debtors, as well as the CEO of Highland at the time. The Presiding Judge's recollection is that Mr. Dondero testified ***only once*** during the lengthy Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all other times, various inhouse counsel at Highland (Scott Ellington, Isaac Leventon, and J.P. Sevilla) served as the witnesses for Acis and Highland.

14

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case was largely regarding the "CLO Industry." The court learned that Highland was a pioneer, among registered investment advisors, in the securitization investment product known as a "CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which Highland's CLO business was managed. The court learned about the typical structure of these CLOs (the various tranches of debt and the rights they enjoyed), the typical governing documents for and life cycle of a CLO, the typical portfolio management agreements, the shared services agreements, and the sub-advisory agreements that undergirded the whole operation. The court learned about Highland's role in these and the role of Acis, historically, and the role of an entity known as Highland CLO Funding "("HCLOF"). If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the Affected Entities during the Acis case, she cannot recall. The court certainly does recall accusations made by Acis against *Highland* and *HCLOF* with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart a judgment creditor, Josh Terry. The court has never ruled on the actual fraudulent transfer claims and, the claims (at least among Acis and Highland) have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreements that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge, at all times, has been aware that Mr. Dondero was a founder of Highland and was the President of Acis and CEO of Highland at relevant times. To be clear, a

Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

Assuming, *arguendo*, that the Presiding Judge gained some knowledge about Highland and at least one of the Movants (i.e., Mr. Dondero) from the Acis case, the governing case law suggests that this sort of awareness would not qualify as extrajudicial knowledge.[11] In *Tejero*, for example, the Fifth Circuit made it clear that a judge's knowledge of a party gained from previous cases involving that party does not qualify as extrajudicial knowledge.[12] There, the judge relied on knowledge gained from presiding over three previous cases involving the party that moved for the judge's recusal.[13]

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership." Thus, it is not *per se* improper (in fact, it is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

Without showing that the Presiding Judge relied on extrajudicial knowledge to form her opinion, the Movants bear the burden of showing that the Presiding Judge 'display[ed] a deep-

---

[11] *See, e.g., Liteky*, 510 U.S. at 555-556; *Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 463-64 (5th Cir. 2020).
[12] *See Tejero*, 955 F.3d at 463 (citing *United States v. Reagan* 725 F.3d 471, 491 (5th Cir. 2013)).
[13] *See id.*

seated favoritism or antagonism that would make fair judgment impossible.[14]

   *B. Bias or Animus, More Generally?*

   More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are implicated here.  The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants.  She does not believe she has displayed deep-seated favoritism or antagonism.

   As earlier mentioned, case law has held that clashes between a court and counsel for a party is an insufficient basis for disqualification, and courts "have refused to base disqualification under section 455 upon apparent animosity towards counsel." *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975)(holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel."))(other citations omitted).  Not only has this court shown proper respect for Mr. Dondero's and each of the Affected Entities' counsel, but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the Movants.  This court desperately wants to believe (and has, and always will, keep its mind open to the belief) that the foremost goal of the Movants is to preserve their economic and proprietary rights—even though, over time, things have gotten more and more contentious and even seemingly personal among certain parties (the court is reminded of when the former general counsel of Highland sued another prior general counsel of Highland for "stalking" him, and the suit was removed from the state court to the bankruptcy court; the bankruptcy court swiftly remanded it

---

[14] *Liteky*, 510 U.S. at 555.

back to state court—believing it had no place in a business reorganization).  In any event, the
Presiding Judge has commented several times that she believes Mr. Dondero, more than anything
else, just wanted to get the company he built back.  The Presiding Judge has said this, in spite of
hearing sworn testimony that Mr. Dondero has threatened out of court to "burn the place down" if
he cannot get what he believes he should get from the bankruptcy process.

This court has merely addressed motions, objections, and other pleadings as they have been
presented.  It has issued and enforced orders when requested and warranted.  This court has
provided Movants with a full and fair opportunity to present and pursue their objections and
motions.  In many situations, the court has issued very lengthy findings of fact and conclusions of
law, opinions, or reports and recommendations to the District Court.  Sometimes Movants have
appealed (in fact, more than two dozen times) and many times they did not.  This court's rulings
have mostly been affirmed or otherwise undisturbed in the appeals that have been resolved so far.

C.   *Misstatements, Partial Descriptions, or Misunderstandings of Various Case Events.*

Regrettably, the brief in support of the Third Motion to Recuse (filed by counsel who never
appeared during the bankruptcy case until filing the First Motion to Recuse) contains several
misstatements or partial descriptions of events during the case, in several places, that create
misimpressions.  Some of the more problematic examples of this are set forth below (in no
particular order).

The Bankruptcy Court's Orders Requiring Mr. Dondero's (and Allegedly His Sister's?)
Attendance at Bankruptcy Court Hearings.  In the brief in support of the Third Motion to Recuse,
Movants assert as one example of the Presiding Judge's alleged bias, certain of her orders—entered
in January 2021, May 2021, and June 2021—"target[ing] Mr. Dondero (as well as his sister Nancy

18

Dondero) by requiring their presence at all hearings, regardless of whether their presence is needed." Third Motion to Recuse (brief in support), at p. 16 [DE # 3542]. This entirely misstates what happened.

First, almost 100% of the dozens of Highland hearings over the last 3+ years have been conducted virtually through WebEx (due to COVID and the large number of out-of-town participants). The court does not believe Nancy Dondero has ever physically been in the bankruptcy court, and Mr. Dondero rarely has. Certainly, they have never been penalized for that.

More importantly, what Movants omit was that, during a January 8, 2021 hearing to determine whether the court should grant a requested preliminary injunction against Mr. Dondero (regarding his alleged interference with the Debtor's business and certain employees of the Debtor), Mr. Dondero testified that he had not attended an earlier TRO hearing regarding this alleged conduct, nor read the transcript from the hearing, nor read the TRO itself to know what conduct it addressed.[15] The bankruptcy court was concerned that Mr. Dondero's failure to attend or participate in bankruptcy court hearings that impacted him or might result in obligations imposed upon him would create an opportunity for "plausible deniability." Thus, this court ordered Mr. Dondero to appear at all hearings to ensure both awareness of and compliance with this court's orders. Again, these were almost always video hearings. Mr. Dondero subsequently failed to appear at a hearing, thereby validating the court's concerns. Consequently, this court entered an order on May 24, 2021, clarifying that Mr. Dondero was required to appear at all hearings in the bankruptcy case [DE # 2362]. Notably, Mr. Dondero did not appeal the preliminary injunction or

---

[15] See DE # 3596, Ex. 31, Appx. 3755 ("Q … At least as of today, you never bothered to read the TRO that was entered against you, correct? A Correct.").

the May 24, 2021 order.

More generally, it is not atypical for this bankruptcy court to order principals of a party to appear at hearings when there are concerns regarding: (a) the contentiousness of a case, or (b) whether clients and lawyers are completely in sync and in communication with each other.

As for Nancy Dondero, the bankruptcy court has never ordered Nancy Dondero to appear at any hearings. Instead, on June 17, 2021, the court ordered the trustee of the Dugaboy and Get Good Trusts (i.e., Mr. Dondero's family trusts) to appear at all hearings and proceedings but only "where either of the Trusts are a party or take a position" [DE # 2458]. The trusts (Dugaboy, in particular) have been very active during the bankruptcy case and the court believed their standing was very tenuous. The court provided a detailed rationale for its order and it was never appealed. Nevertheless, Movants now disturbingly assert that Nancy Dondero was required to appear at all hearings "regardless of whether [her] presence [was] needed."

<u>August 4, 2021 Order Finding Mr. Dondero in Contempt of Court</u>. In the brief in support of the Third Motion to Recuse, Movants cite an order entered by the bankruptcy court on August 4, 2021, holding Mr. Dondero in civil contempt of court [DE # 2660] (the "Contempt Order"), as "[p]erhaps one of the most telling" examples of the Presiding Judge's bias. Third Motion to Recuse (brief in support), at p. 14-15 [DE # 3571]. Movants do not accurately or fully describe the facts leading up to entry of this Contempt Order (which was appealed and affirmed in all material respects).[16]

First, the Contempt Order stemmed from an April 12, 2021 complaint (the "HarbourVest

---

[16] *Charitable DAF Fund L.P. v. Highland Cap. Mgmt.*, L.P., 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022). The only finding not affirmed was the payment of $100,000 if an unsuccessful appeal was filed.

Complaint") filed against Highland in the District Court, by an entity known as CLO Holdco and

its parent company that is referred to as the "DAF"—both believed to be under the control of Mr.

Dondero (more on that below).  The HarbourVest Complaint was filed less than two months after

Highland's Plan was confirmed and before it went effective.  Movants allege that the HarbourVest

Complaint addressed Highland's "brokering [during the bankruptcy case] the sale of CLO interests

held by HarbourVest … without prior notice to other CLO investors and without respecting those

investors' right of first refusal" in violation of some alleged duty.  Third Motion to Recuse (brief

in support), at 14.  This is an inaccurate description of the events in the bankruptcy case that are

the subject of the HarbourVest Complaint, and it also does not make clear why the bankruptcy

court was motivated to enter the Contempt Order regarding the filing of the HarbourVest

Complaint.

The facts were that, prior to Highland's bankruptcy case, a third-party unrelated to

Highland called HarbourVest purchased a 49.98% equity interest in a non-Debtor entity called

HCLOF for approximately $80 million.  Highland and the entity CLO Holdco also owned equity

interests in HCLOF.  After Highland's bankruptcy, HarbourVest filed claims against Highland in

excess of $300 million and sought rescission of its investment in HCLOF, alleging it was

fraudulently induced by factual misrepresentations and omissions made by Mr. Dondero and

certain of Highland's employees prior to the bankruptcy case.  Highland and HarbourVest settled

HarbourVest's claims, and Highland filed a Rule 9019 motion seeking court approval of the

settlement.  DE # 1625.  The motion for approval of the settlement went out on normal notice to

creditors and parties-in-interest in the bankruptcy case.  Under the settlement, HarbourVest

received allowed claims in the bankruptcy case totaling $80 million in the aggregate and

transferred its interests in HCLOF to a Highland subsidiary, effectively rescinding HarbourVest's

investment in HCLOF.  All aspects of the settlement were publicly disclosed in Highland's motion.

DE # 1625.  Mr. Dondero, his family trusts, and CLO Holdco (the same entity that later filed the

HarbourVest Complaint) all objected to the settlement with HarbourVest.  CLO Holdco argued it

had a right of first refusal to HarbourVest's 49.98% interest in HCLOF.  However, after reviewing

Highland's pleadings, HCLOF's governing documents, and applicable law, CLO Holdco

announced through counsel at a bankruptcy court hearing on the settlement that it had determined

it had no such right and withdrew its objection.  The bankruptcy court approved the settlement,

including the transfer of HarbourVest's 49.98% interest in HCLOF to Highland and/or its

designee.

Then, three months later, CLO Holdco and its parent company DAF filed the HarbourVest

Complaint seeking, among other things, to enforce CLO Holdco's alleged right of first refusal—a

right CLO Holdco had conceded did not exist in open bankruptcy court.  The HarbourVest

Complaint raises claims against Highland for breaches of fiduciary duty under the Investment

Advisers Act[17] and/or state law, breach of contract, negligence, violations of the Racketeer

Influenced and Corrupt Organizations statute (15 U.S.C. § 1961, et seq. ("RICO")), and tortious

interference—all relating to the settlement that the bankruptcy court had approved on notice to

creditors and after an evidentiary hearing.  With regard to the RICO count, CLO Holdco and DAF

---

[17] While specific statutory references to the federal Investment Advisers Act are sparse in the HarbourVest Complaint, subsequent pleadings of the Plaintiffs made clear they are referring to at least 15 U.S.C. § 80b-6 and 80b-15(a) (which they cite as imposing both a duty of care and a duty of loyalty, each unwaivable, on investment advisors, in favor of funds and its investors, citing *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008)); 15 U.S.C. § 206(2) (which they cite as requiring investment advisers to seek "best execution" for all their clients' transactions, citing *SEC v. Ambassador Advisors, LLC,* 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021)); and 15 U.S.C. § 215 (which they cite as recognizing "a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act").

alleged that Highland and certain co-Defendants it named were an "association-in-fact" engaged in a pattern of racketeering activity for failing to disclose the valuation of the 49.98% equity interest and ultimately effectuating the HarbourVest Settlement. Shortly thereafter, CLO Holdco sought to add Mr. James Seery (Highland's CEO) as a defendant in clear violation of various bankruptcy court orders [e.g., DE # 854]. Accordingly, the bankruptcy court, after an evidentiary hearing, issued the Contempt Order finding Mr. Dondero and others in contempt. To be clear, not only were the Plaintiffs seeking to sue Mr. Seery in violation of bankruptcy court orders, but this had the appearance of an end-run around the bankruptcy court—i.e., suing a Debtor (Highland was still a Debtor, with a confirmed plan that had not reached its effective date) for post-petition conduct that had been approved by the bankruptcy court after notice to creditors, and, all the while, one of the plaintiffs had objected to the post-petition conduct, by objecting to the HarbourVest Settlement, and then withdrew such objection. Moreover, even if there was a legal theory to pursue claims against Highland regarding the whole HarbourVest Settlement, there was a process for pursuing administrative claims in the confirmation order and Plan, and this process had not been followed.

Movants state in their brief in support of their Third Motion to Recuse, at p. 15, that Mr. Dondero credibly testified "he was not involved at all in authorizing or preparing the motion to add Mr. Seery" to the HarbourVest Complaint and that there was no evidence to the contrary. This is directly contradicted by the actual record. As the District Court explained when affirming the bankruptcy court's Contempt Order:

> Ample evidence supports the bankruptcy court's factual findings. Dondero has had a significant role in DAF for over a decade. DAF's assets come in part from Dondero and his "family trusts." Dondero "was DAF's managing member

until 2012," and he remains "DAF's informal investment advisor." After Dondero stepped down as managing member, that role went to Grant Scott, "Dondero's long-time friend, college housemate, and best man at his wedding." Scott ultimately resigned due to "disagreements with … Dondero."

[Mark] Patrick replaced Scott as "DAF's general manager on March 24, 2021"—19 days before the Seery Motion. Patrick initially had "no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction." Only once "Dondero told [him] that an investment opportunity was essentially usurped" did Patrick "engage[] the Sbaiti firm to launch an investigation" and ask "Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts." After that, Dondero "communicated directly with the Sbaiti firm"—Patrick did not. Dondero "saw versions of the complaint before it was filed" and had "conversations with attorneys" about the complaint pre-filing. That complaint focused on "Seery's allegedly deceitful conduct" and "mention[ed] Mr. Seery 50 times." Further, when listing the parties, the complaint listed each party named in the caption along with "[p]otential party James P. Seery, Jr.," providing his citizenship and domicile.

Further, although Dondero averred that he did not direct the Sbaiti firm to add Seery to the complaint, Dondero also contradicted himself, first claiming that he did not know that "the Sbaiti firm intended to file a motion for leave to amend their complaint to add Mr. Seery," but then agreeing during the hearing that he "[p]robably" was "aware that that motion was going to be filed prior to the time that it actually was filed." He also testified to conversations about the Seery Motion, noting that it involved a "very complicated legal preservation" issue.

Based on all that evidence, the Court is not left with a definite and firm conviction that the bankruptcy court erred. After being stymied in the bankruptcy court, Dondero manufactured the exigency for the lawsuit that challenged Seery's conduct. Dondero's claim that he "did not suggest that Mr. Seery should be added as a defendant" is not credible. Dondero gave Patrick the idea of challenging Seery's conduct, and he worked with the Sbaiti firm to bring that idea to fruition in the complaint—a complaint that clearly contemplated adding Seery to the lawsuit. Likewise, his plea that he "had no involvement with the Seery Motion" is not credible. Dondero himself testified to the contents of attorney communications concerning the Seery Motion, eventually admitting that he "probably" had knowledge of the Motion before it was filed. In short, the bankruptcy court did not err, after considering the "totality of the evidence," in finding that Dondero had "the idea of" suing to "challenge Mr. Seery's … conduct," that he "encouraged Mr. Patrick to do something wrong," and that Patrick "abdicated responsibility to Mr. Dondero with regard to . . . executing the litigation strategy."[18]

---

[18] *Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at **18-21.

24

The District Court, like the bankruptcy court, included ample citations to the record, including the direct testimony of both Mr. Dondero and Mr. Mark Patrick, to support its factual findings concerning Mr. Dondero's direct involvement in violating the bankruptcy court's orders and processes.

Finally, Movants allegations about the lack of support for the amount of bankruptcy court's sanctions is incorrect. Movants alleged that Highland submitted invoices showing it had incurred just $38,796.50 defending against Mr. Dondero's contempt in connection with the HarbourVest Complaint. But, in fact, Highland submitted invoices for $187,795. [DE # 2421-1, 2421-2; Ex. 34, Appx. 4048-4102]. The bankruptcy court added to that amount to compensate for additional costs, and the bankruptcy court's sanction of $239,655 was affirmed by the District Court.[19]

<u>Hearing on Debtor's Application to Employ Foley Gardere as Special Counsel on February 19, 2020.</u> The bankruptcy court held a hearing early in the bankruptcy case on Debtor's application to retain the law firm Foley Gardere to pursue appeals of the Acis involuntary petition and the Acis confirmation order (the "Application to Employ") on behalf of ***Neutra Ltd. (which is or was a company owned by Mr. Dondero***). During this hearing, retired Bankruptcy Judge Russell Nelms, one of the three independent directors appointed to Debtor's new board, testified that, as to the board's business judgment, the Application to Employ was considered by the independent directors, and they concluded that it was in the ***Debtor's*** best interest for Foley Gardere to perform this legal work. Movants assert that, despite this testimony, the bankruptcy court displayed a predisposition to contest positions that could possibly benefit Mr. Dondero on the pre-determined

---

[19] *Id.* at **13-17.

basis that any person sharing an opinion with Mr. Dondero (including, apparently, a member of the independent board) was somehow being unduly influenced by him).

Movants are less-than-clear regarding the bankruptcy court's comments and concerns regarding the Foley Gardere Application. To be clear, through the Foley Gardere Application, Highland sought to retain Foley Gardere on behalf of **both** Highland and the non-Debtor entity, Neutra Ltd., in the appeal of the Acis confirmation order and related matters (the "Acis Appeal"). In support of the Foley Gardere Application, Highland disclosed that: (a) Neutra Ltd. was owned by Mr. Dondero and his partner, Mark Okada, and (b) **Highland** intended to pay for Foley Gardere's representation of Neutra Ltd. in the Acis Appeal. The UCC and Acis objected to the Foley Gardere Application on the ground that **Highland** should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity. [DE # 120]

Mr. Nelms testified in support of the Foley Gardere Application and was subject to a lengthy cross-examination.[20]   The bankruptcy court approved Highland's retention of Foley Gardere but determined that the evidence was insufficient to justify expending estate assets to pay **Neutra, Ltd.'s** legal fees, a non-Debtor entity in which Highland held no interest.[21]   The bankruptcy court's ruling on the Foley Gardere Application was based on its determination that Highland failed to prove that the estate would benefit by paying a non-Debtor's (Neutra Ltd.'s) legal fees. The bankruptcy court stated: "I cannot believe there is a chance in the world there is economic benefit to Highland if these things get reversed. Economic benefit to Neutra: Yeah, maybe. . . . But benefit to Highland? I just don't think the evidence has been there to convince me

---

[20]  DE # 3596, Ex. 24, Appx. 3086-3142.
[21]  *Id*. Appx. 3204-3209.

it's reasonable business judgment for Highland to pay the legal fees associated with the appeal."[22]

The bankruptcy court is at a loss to understand how its comments on the Foley Gardere Application constitute a manifestation of bias towards Mr. Dondero or Movants.

The January 2021 Examiner Motion.  On January 14, 2021, Mr. Dondero's family trusts, requested the bankruptcy court exercise its discretion to direct the appointment of a neutral third-party examiner pursuant to 11 U.S.C. § 1104(c) as an allegedly less costly means to resolve various issues that had arisen in the Highland bankruptcy (the "Examiner Motion").  The Examiner Motion was made 15 months after the case was filed, after months of global mediation had occurred, where most of the significant claims against the estate had been settled, and less than three weeks before the scheduled confirmation hearing, which the court had been told was likely to have support of the major creditor constituencies.  Despite the family trusts' request, the bankruptcy court declined to set that motion for an emergency hearing, meaning it was set for hearing in the ordinary course, after the date of the confirmation hearing.  It became moot after confirmation of the Plan—although it would not have been moot if confirmation had been denied.  Movants assert that the court's failure to set the Examiner Motion on an emergency basis shows bias.  No creditor supported the Examiner Motion.  When the court ultimately denied the Examiner Motion, nobody appealed.

Questioning of Highland About Possibility of PPP Loans at the July 2020 Exclusivity Hearing.  Movants contend that certain questions of the bankruptcy court regarding COVID-related "PPP loans" at a July 8, 2020 exclusivity hearing were evidence of bias against Mr.

---

[22] *Id.* Appx. 3205-3206.

Dondero.  As fully disclosed by this court, the inquiries were prompted by an extrajudicial source

(a newspaper article) that the Presiding Judge happened to read one day, which noted that "Mr.

Dondero or affiliates" received PPP loans.  Because of the vagueness of the article, the bankruptcy

court sought information from Highland—not Movants—and ordered Highland to disclose any

PPP loans it had received post-petition.  Highland responded to the court at a subsequent hearing

that Highland had not obtained any PPP loans.  Neither Mr. Dondero nor any of his affiliated

entities were directed to provide any information, no action was taken against them, and the issue

was never raised again by the bankruptcy court.  Movants' suggestion that this somehow showed

biased towards them is hard to understand.  The court was merely inquiring about the possibility

of Highland having obtained a post-petition COVID loan.  Mr. Dondero was not even in control

of Highland at this time.[23]

    <u>Court's Usage of Terms Such as "Litigious" or "Vexatious."</u>  This court and all courts

sometimes use strong words as part of managing complex and contentious cases.  Did the Presiding

Judge ever refer to Mr. Dondero or Movants as "litigious"?  Yes.  This was based on evidence.

This was a view formed against the backdrop of having heard about more than a decade of

litigation with UCC members and certain other creditors in courts in Texas, Delaware, New York,

the Cayman Islands, Bermuda, and Guernsey.[24]  For example, one of the new, independent

directors of the Debtor, John Dubel—a man with decades of experience working on some of the

---

[23] In mid-2020, it was very unclear whether Chapter 11 debtors were eligible for PPP loans.  The Presiding Judge was hearing different things in different court hearings and in the press.  The Presiding Judge was partly simply curious as to whether Highland had been able to get one—in addition to being concerned it should be disclosed to creditors if it did.

[24] An overview of prepetition litigation involving Highland and other Dondero-related parties is set forth in the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., DE # 1473 at 20-24.

largest, most complex Chapter 11s around the country—credibly testified as follows:

> Q Did you form a view as to the causes of the bankruptcy filing?

> A Litigation. That was my clear view. This company had been in litigation with multiple parties, various different parties, since around 2008. Generally, you would see litigation like the types that were, you know, that were here, you know, you'd litigate for a while, then you'd try and settle it. It did not appear to me that there was any intention on the—the Debtor to settle these litigations, but would rather just continue the process and proceed forward on the litigation until the very last minute. And so it was obvious that this was going to—that the Debtor was a, as I said, a highly-litigious shop, and that was one of the causes, obviously, the cause of the filing, along with the fact that judgments were about to be entered against the Debtor.[25]

Continuing on, Mr. Dubel elaborated:

> Q And can you elaborate a little bit on I think you said you had done some diligence and you had formed a view as to the causes of the bankruptcy filing, but did this case present any specific concerns or issues that you and the board members had to address perhaps above and beyond what you experienced in some of the other cases you described?

> A Well, as I said earlier, the fact that the litigation -- the various litigations with the creditors have been going on for what I viewed as an inordinate amount of years, and that it was clear from my diligence that I had done that this had been directed by Mr. Dondero, to keep this moving forward in the litigation, and to, in essence, just, you know, never give up on the litigation.

> It was important that the types of protections that we were afforded in the January 9th order were put in place, because we—none of us—none of the three of us, and myself in particular, did not want to be in a position where we would be sued and harassed through lawsuits for the next, you know, ten years or so. That's not something anybody would want to sign up for.[26]

Did the Presiding Judge ever use the term "vexatious"? Yes. This was as a result of

learning of the decade of unresolved litigation in the multiple fora set forth above. But it was also

---

[25] DE # 1894, pp. 271-272 (Transcript of Confirmation Hearing, 2/2/21, Testimony of Independent Director John Dubel).
[26] *Id.* at 274.

a perception formed after witnessing Movants and other Dondero-affiliates file over 50 proofs of

claim (most of which were later withdrawn).  It was also a view that any reasonable person might

develop after reading the many dozens of motions; the many dozens of objections; and the many

dozens of appeals that were pursued by Movants in the bankruptcy case.  It was also borne out

when multiple witnesses testified that there was a phenomenon in the insurance industry

colloquially referred to as *the "Dondero Exclusion"*—meaning that cost-effective liability

insurance could not be obtained for the officers of Highland because of the company's historical

inclination toward litigation.

For example, the new Highland CEO, Mr. James Seery, credibly testified on direct

examination by Debtor's counsel as follows:

> Q Did you have any involvement in the Debtor's efforts to obtain D&O insurance for the independent board?
>
> A I did.
>
> Q Can you just describe for the Court what role you played and what issues came up as the Debtor sought to obtain that insurance?
>
> A Sure.  The Debtors had been looking to get an insurance policy in place. They were not able to do that.  I happen to have worked with an insurance broker on D&O situations in some very difficult situations over the years and brought them into the mix.  They were able to go out to the market and find a policy that would cover us, the—kind of the key components of that policy, though, were, number one, the guaranty that HCMLP would give--I'm sorry, the guaranty that HCMLP would give to Strand's obligations, and also the--I'll call it the gatekeeper provision was very important because these parties did not want to have—they wanted to have what was referred to, commonly referred to as the Dondero Exclusion.
>
> So while we were—we purchased a policy that covered us, it did have an exclusion, unless there were no assets left, and then the what I'll call—we refer to as kind of a Side A policy would kick in.
>
> Q OK. What do you mean by the Dondero Exclusion?

A The insurers did not want to cover the—any litigation that Mr. Dondero would bring against directors. It was pretty commonly known in the marketplace that Mr. Dondero was very litigious, and insurers were not willing to write the insurance without the protections that this order afforded because they did not want to be hit with frivolous—hit with claims on the policy for frivolous litigation that might be brought.[27]

Q And do you recall at confirmation what impediments were described to the Court in terms of obtaining D&O insurance at that time?

A Yes. I think the main impediment which was discussed by Mr. Tauber is what they colloquially refer to in insurance markets as the Dondero Exclusion. Basically, getting coverage to cover Mr. Dondero's actions is very difficult because of his litigious nature. And so one of the keys was to build in and continue the gatekeeper function.[28]

And then, again, more testimony about the "Dondero Exclusion" came on direct examination

of Debtor's counsel from an executive in the insurance industry, Marc Tauber, of Aon

Financial:

Q Okay. And, finally, you mentioned Mr. Dondero. What role did he play in your ability to obtain insurance for the Strand board?

A Well, that's a very significant role. As, you know, as mentioned, the underwriters are very risk-averse, so the litigiousness of Mr. Dondero is a very strong red flag prohibiting a number of people from writing the insurance at all. And the ones that were writing, that were willing to provide options, were looking for protections from Mr. Dondero.

Q And what kind of protections were they looking for?

A Well, the gatekeeper function was a key factor. That was really the only way we could even start a conversation with any of the people that we were able to engage. And in addition, they wanted a, you know, sort of a belts and suspenders additional protection of having an exclusion preventing any litigation brought by or on behalf of Mr. Dondero.

Q Were you able to identify any carrier who was prepared to underwrite D&O insurance for Strand without the gatekeeper provision or without a Dondero

---

[27] *Id.* at 276-277.
[28] DE # 2598, Transcript from 7/21/21 hearing (direct examination of James P. Seery).

31

exclusion?

        A We were not.[29]

        In any event, Movants' statement that this court found the Movants to be "vexatious litigants" is not consistent with the record. This court did not specifically find or conclude that Movants are "vexatious litigants." Rather, this court determined that Mr. Dondero's litigation history supported the inclusion of a gatekeeper provision in the Plan. *See* Confirmation Order, at ¶¶ 80-81 [DE # 1943]. All of the above-quoted testimony was in connection with the bankruptcy court considering whether gatekeeper provisions proposed in the Plan were necessary and appropriate. Significantly, the Fifth Circuit affirmed this court's findings and concluded that the gatekeeper provision was justified and "sound."[30]

        The fact that the Presiding Judge commented on litigiousness (often—by the way—in the context of yearning for settlement) should not be interpreted as "bias" or "prejudice" toward Movants or any other party, for that matter. Not only was there significant credible evidence of this, but it is simply about rule enforcement and managing a docket consistent with this court's duty to the public.

        <u>The Presiding Judge's Fiction Novels.</u> As noted early on, there is now a Fourth Motion to Recuse filed February 27, 2023, in Adversary Proceeding No. # 21-3076 which is styled *Kirschner v. Dondero. et al*. The Presiding Judge intends to rule on that Fourth Motion to Recuse after all parties in that adversary proceeding have had the opportunity to respond.

---

[29] DE # 1905, at pp. 31-32 (Transcript from 2/3/21 Confirmation Hearing, Testimony of Marc Tauber of Aon Financial).

[30] *NexPoint v. Highland Capital Management*, 48 F.4th 419, 435 (5th Cir. 2022).

While the Presiding Judge had intended to remain silent on this subject until such time as the time had run for parties in the Adversary Proceeding to respond, the court observed that on March 3, 2023, Movants filed a new pleading entitled *Supplemental Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455*, in which Movants supplement their Third Motion to Recuse "with information regarding two books published by Judge Jernigan, which Movants recently learned about and read."  DE # 3673.  Movants state in this new pleading that the Presiding Judge's fiction novels "contain derisive commentary about financial industry executives, the financial industry generally, and the financial instruments specifically at issue in HCMLP's bankruptcy" and that the second novel in particular "appears based on Judge Jernigan's experiences with HCMLP and Mr. Dondero in the Bankruptcy Proceedings."   The Movants conclude that "any reasonable person would agree appear [that the Presiding Judge's novels are] patterned after Mr. Dondero, are additional evidence that the Court harbors exceedingly negative views about hedge fund managers and the hedge fund industry, generally, as well as Mr. Dondero specifically." *Id.*, at 4.

The Presiding Judge's novels—again entirely fiction—are not about Mr. Dondero or the hedge fund industry in general.  The first novel (*He Watches All My Paths*) is entirely about a federal judge who receives death threats and the impact of that on her family, as well as the U.S. Marshals who provide protection.  The ultimate perpetrator of the threats in the novel is not a person in the hedge fund industry but, rather, a young, former tort victim who feels wronged by the American justice system.  The second novel (*Hedging Death*) is partly a sequel to the first— in that it involves a manhunt for a criminal from the first book—and it also happens to involve a bio-medical research firm in a Chapter 11 case in the protagonist judge's court, whose president

33

is a Chechen immigrant to the U.S. and received funding from a hedge fund manager named Cade Graham. Cade Graham is the book character that Movants believe is "patterned" after Mr. Dondero. The character Cade Graham is an individual who fakes his own death in Mexico ("pseudocide") after linking up with Mexican drug cartels. He is described as a Dallas native, raised by an oil man, who graduated from Princeton. He has a Brazilian girlfriend with whom he has a son, Ethan, with whom he engages in business. The book mentions a "Ranger Capital" exactly seven times (on six pages in more than 300 pages) as a company of Cade Graham's. There is another hedge fund mentioned in the book called Toro Capital. Movants state now that Highland once did business under the name of "Ranger." This was never mentioned in the bankruptcy case. It is not in the Highland disclosure statement. The Presiding Judge cannot find the name in any of the numerous organizational charts that were presented to her in the last three years. The Presiding Judge has never once heard this.

The Presiding Judge regrets this sideshow. Many sitting judges write books—albeit it is more common for them to write legal nonfiction books than fiction books. Ironically, the former can be much more fraught with peril—creating the possibility that someone is going to infer a legal viewpoint that might signal how the judge might rule in a future case. The Presiding Judge made clear that everything in the two books should be viewed as fiction. For example, on the copyright information page of *Hedging Death*:

> Hedging Death is a work of fiction. Names, characters, places, and incidents are the products of the author's imagination or are used fictitiously. Any resemblance to actual events, locales, or persons, living or dead, is entirely coincidental.

Then, again on the Author's Page before the Prologue:

> Because I am a sitting United States judge, and I am also married to a police officer, I feel compelled, at the outset, to clarify certain points regarding this novel. First, with the exception of the Prologue herein (which describes real-life events that happened July 7, 2016, in Dallas, Texas) the following is a work of fiction. While some of the characters and events beyond the Prologue may be loosely based on actual persons and events, and some of the places (in my home state of Texas and in various other faraway spots) are certainly very real, the human characters in this novel are absolutely fictional. Judge Avery Lassiter, the main character in this novel, is not me. Second, one should not assume that any statement or opinion expressed or implied by any characters in this novel are necessarily mine or are somehow a reflection on how I might rule on any particular issue in any case in the future.

The author Oscar Wilde once wrote: "Life imitates art far more than art imitates life."[31]

That being true, many fiction authors do, indeed, write about "what they know." Many fiction authors write stories where characters are loosely based on real life people or weave plots that are loosely based on real life events. The examples are countless. Agatha Christie wrote a story line about a kidnapping of a child from a wealthy American family (based on the Lindberg child kidnapping) in *Murder on the Orient Express*. Practically, everything Ernest Hemingway ever wrote was a highly fictionalized story from his past: *A Farewell to Arms* (story of an American expatriate working as an ambulance driver in the Italian Army who is wounded and falls in love with an Italian nurse—Hemingway was wounded as an ambulance driver working for the Italian Army in World War I); *The Sun Also Rises* (story of a group of young American and British expatriates who become friends living in Paris and go to the bull fights in Pamplona—once again, Hemingway spent years in Paris, hanging out with the likes of F Scott Fitzgerald, Pablo Picasso, and Gertrude Stein, occasionally going to see the bull fights in Spain); *The Old Man and the Sea*

---

[31] Oscar Wilde, The Decay of Lying—An Observation (essay in his collection of essays titled *Intentions* in THE NINETEENTH CENTURY periodical (Jan. 1889)).

(story about an old fisherman in Cuba—again, Hemingway spent several years of his life fishing, writing, and drinking in Cuba on a boat called the *Pillar*).  The Presiding Judge is somewhat embarrassed to discuss these literary greats in the same paragraph in which she is mentioning her own fiction works—it is merely to make a point.  While the Presiding Judge's protagonist characters in her books (Judge Avery Lassiter and Max Lassiter) may resemble herself and her spouse, and while certain judges, lawyers, and U.S. Marshal characters in her books may resemble real life persons (i.e., heroes) that she has been honored to see or know during her lifetime, there are no characters or entities in her books that have been inspired by or modeled after the Movants.

## VI.    CONCLUSION.

The Presiding Judge has not specifically addressed herein every single ground asserted by the Movants as a manifestation of her alleged bias or animus.  The submissions on this issue are enormous (as mentioned, thousands of pages have been filed).  Distilled to its essence, the Third Motion to Recuse has failed to present any objective manifestations of bias or prejudice.

The court does not believe any of the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality. This court does not believe that any objective person would find that the Movants are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

WHEREFORE, it is hereby

ORDERED that the Third Motion to Recuse is denied.

It is so ORDERED.

### ### END OF MEMORANDUM OPINION AND ORDER ###

36