# Exhibit 1

**Exhibit 1 to Emergency Motion**

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § § § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § § § | |
| **HUNTER MOUNTAIN INVESTMENT TRUST, INDIVIDUALLY, AND ON BEHALF OF THE DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P. AND THE HIGHLAND CLAIMANT TRUST** | § § § § § § § § § | **Adversary Proceeding No. _____** |
| **PLAINTIFFS,** | § | |

1

|  | § |
| v. | § |
|  | § |
| **MUCK HOLDINGS, LLC, JESSUP** | § |
| **HOLDINGS, LLC, FARALLON** | § |
| **CAPITAL MANAGEMENT, LLC,** | § |
| **STONEHILL CAPITAL** | § |
| **MANAGEMENT, LLC, JAMES P.** | § |
| **SEERY, JR., AND JOHN DOE** | |
| **DEFENDANTS NOS. 1-10** | |
|  | |
| **DEFENDANTS.** | |

## VERIFIED ADVERSARY COMPLAINT

Hunter Mountain Investment Trust ("HMIT") files this Verified Adversary Complaint in its individual capacity and, as a derivative action on behalf of the Reorganized Debtor, Highland Capital Management L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust (collectively "Plaintiffs"), complaining of Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr., ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendants Nos. 1-10 are collectively "Defendants"), and would show:

## I. Introduction

1.    HMIT brings this Verified Adversary Complaint ("Complaint") on behalf of itself, individually, and as a derivative action benefitting the Reorganized Debtor and

2

on behalf of the Highland Claimant Trust ("Claimant Trust"), as defined in the Claimant

Trust Agreement (Doc. 3521-5) ("CTA").[1] This derivative action is specifically brought

pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and B. R. Rule 7023.1.  At

the time of the transactions at issue, HMIT held a 99.5% limited partnership in Highland

Capital Management, LP, the Original Debtor, as described herein. This derivative action

is not a collusive effort to confer jurisdiction that the Court would otherwise lack.

2.       Upon the Effective Date, the assets of the bankruptcy estate of Highland

Capital Management, L.P., as the Original Debtor (the "Debtor's Estate") were

transferred to the Highland Claimant Trust under the terms of the Fifth Amended Plan

of Reorganization of Highland Capital Management, L.P. (as Modified) [Doc. 1943,

Exhibit A] (the "Plan") and as defined in the CTA. These assets include all "causes of

action" that the Debtor's Estate had before the Effective Date including, without

limitation, the causes of action set forth in this Adversary Proceeding. Furthermore, the

Claimant Trust is managed by the Claimant Trustee, Seery. Therefore, any demand upon

Seery to prosecute the claims set forth in this Complaint would be futile because Seery is

a Defendant. Similarly, the Oversight Board exercises supervision over Seery as Claimant

---

[1] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate. Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed in HMIT's Emergency Motion for Leave (Doc. __).

Trustee, and Muck and Jessup are members of the Oversight Board. Any demand upon Muck and Jessup to prosecute these claims would be equally futile. All conditions precedent to bringing this derivative action have otherwise been satisfied.

3.      This action has become necessary because of Defendants' tortious conduct. This tortious conduct occurred before the Effective Date of the Plan, but its effects have caused damage both before and after the Effective Date. Prior to the Effective Date, HMIT owned 99.5% of the limited partnership interest in the Original Debtor and was the beneficiary of fiduciary duties owed by Seery.

4.      Seery, the Original Debtor's CEO and former Chief Restructuring Officer ("CRO"), wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends, Farallon and Stonehill. He did so by providing material non-public information to them concerning the value of the Original Debtor's Estate that other stakeholders did not know. Farallon and Stonehill, who were otherwise strangers to the bankruptcy proceedings, wrongfully purchased the claims through their special purpose entities, Muck and Jessup, based upon this inside information, and they are now profiting from their misconduct. Seery's dealings with the other Defendants were not arm's length, but instead were covert, undisclosed, and collusive.

5.      Motivated by corporate greed, the other Defendants aided and abetted or, alternatively, knowingly participated in Seery's wrongful conduct. They also breached their own duties as "non-statutory insiders." Because of their long-standing, historical

4

relationships with Seery, and their use of material non-public information, Farallon, Stonehill, Muck, and Jessup assumed positions of control over the affairs of the Debtor's bankruptcy, including compensation awards to Seery. As such, they became non-statutory insiders.

6. HMIT was formerly the largest equity holder in the Debtor, holding a 99.5% limited partnership interest. HMIT now holds an Allowed Class 10 Class B/C Limited Partnership Interest and a Contingent Trust Interest under the CTA. Given HMIT's' position as former equity, HMIT's right to recover from the Claimant Trust is junior to the Reorganized Debtor's unsecured creditors, now known as Claimant Trust Beneficiaries. However, the vast majority of the approved unsecured claims superior to HMIT's interest are the claims wrongfully acquired by insider trading and the breaches of duty at issue in this proceeding.

7. By wrongfully soliciting, fostering, and encouraging the wrongful insider trades, Seery violated his fiduciary duties to the Debtor's Estate, specifically his duty of loyalty and his duty to maximize the value of the Estate with corresponding recovery by legitimate creditors and former equity. Seery was motivated out of self-interest to garner personal benefit (to the detriment of the Debtor's Estate) by strategically benefitting his business allies with non-public information. He then successfully "planted" his allies onto the Oversight Board, which, as a consequence does not act as an independent board in the exercise of its responsibilities. Rather, imbued with powers to oversee Seery's

5

future compensation, the other Defendants are postured to reward Seery financially regarding Defendants' illicit dealings and, upon information and belief, they have done so.

8.      By receiving and acting upon material non-public information concerning the financial condition of the Debtor's Estate, Stonehill and Farallon, acting individually and through special purpose shell entities they created and controlled, directly or indirectly, are also liable for aiding and abetting Seery's breaches of fiduciary duties. By acquiring the claims at issue, Muck and Jessup, the shell entities created and controlled by Stonehill and Farallon, also became non-statutory insiders owing duties of disclosure which they also breached.

9.      HMIT separately seeks recovery against John Doe Defendant Nos. 1-10. Farallon actively concealed the precise legal relationship between Farallon and Muck. Stonehill actively concealed the precise legal relationship between Stonehill and Jessup. What is known, however, is that Farallon and Stonehill created these special purpose shell entities on the eve of the insider trades to acquire ownership of the claims and to otherwise control the affairs of the Oversight Board. Both Farallon and Stonehill rejected inquiries concerning the exact nature of their relationship with these special purpose entities. Accordingly, HMIT seeks equitable tolling of any statute of limitations concerning claims against unknown business entities that Farallon and Stonehill may have created and inserted as intermediate corporate layers in the transactions at issue.

10.     HMIT seeks to disgorge all Defendants' ill-gotten profits and equitable disallowance of the remaining unpaid balances on the following allowed claims: Claim Nos. 23, 72, 81, 143, 147, 149, 150, 153, 154, 190, and 191 (the "Claims") currently held by Muck and Jessup. Because Defendants received substantial distributions from the Claimant Trust in connection with these Claims, HMIT seeks to disgorge all such distributions above Defendants' initial investment—compelling restitution of such funds to the Claimant Trust for the benefit of innocent creditors and former equity pursuant to the waterfall established under the Plan and the CTA. HMIT also seeks to disgorge Seery's compensation from the date his collusive conduct first occurred. Alternatively, HMIT seeks damages on behalf of the Claimant Trust in an amount equal to all compensation paid to Seery from the onset of his collusive conduct to present.

## II. Jurisdiction and Venue

11.     Pursuant to *Misc. Order No. 33 Order of Reference of Bankruptcy Cases, U.S. District Court for N.D. Texas* (the "Order of Reference"), this Complaint is commenced in the Bankruptcy Court because it is "related to a case under Title 11." The filing of this Complaint is expressly subject to and without waiver of Plaintiff' rights and ability to seek withdrawal of the reference pursuant to 28 U.S.C. § 157(d), FED. R. BANKR. P. 5011, and Local Bankruptcy Rule 5011-1. Plaintiffs hereby demand a right to a trial by jury of all claims asserted herein and nothing in this Complaint, nor Plaintiffs' compliance with the Order of Reference, shall be deemed a waiver of this right.

12. This Court has jurisdiction of the subject matter and the parties as a "related to" proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Articles IX.F, and XI. of the Plan.

13. Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs do **not** consent to the entry of final orders or judgment by the bankruptcy court.

14. Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1408 and 1409, and Articles IX.F, and XI. of the Plan.

### III. Parties

15. HMIT is a Delaware statutory trust that was the largest equity holder in the Original Debtor, holding a 99.5% limited partnership interest. HMIT is also the holder of a Contingent Trust Interest in the Claimant Trust, but should be treated as a vested Claimant Trust Beneficiary due to Defendants' wrongful conduct.

16. Pursuant to the Plan and the CTA, the Claimant Trust holds the assets of the Reorganized Debtor, including the causes of action that accrued to the Original Debtor before the Effective Date. The Claimant Trust is established in accordance with the Delaware Statutory Trust Act and Treasury Regulatory Section 301.7701-4(d).

17. Muck is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Muck has made prior appearances in the Debtor's bankruptcy.

18.     Jessup is a Delaware limited liability company, with its principal office in New York, and may be served with process via its registered agent, Vcorp Services, LLC, at 108 W. 13th Street Suite 100, Wilmington, Delaware 19801. Jessup has made prior appearances in the Debtor's bankruptcy.

19.     Farallon is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Farallon is a capital management company that manages hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Farallon because Farallon's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts requirements and due process considerations.

20.     Stonehill is a Delaware limited liability company, with its principal office in New York, and may be served with process at 320 Park Avenue, 26th Floor, New York, NY 10022. Stonehill is a capital management company managing hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Stonehill because Stonehill's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts and all due process considerations.

21.     Seery is an individual citizen and resident of the State of New York. Mr. Seery may be served with process at 100 Crescent Court, Suite 1805, Dallas, Texas 75201.

9

22.    John Doe Defendant Nos. 1-10 are currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue.

## IV. Facts

### A.    *Procedural Background*

23.    On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court,[2] which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.[3]

24.    On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee of the Highland Crusader Fund ("Redeemer"); Acis Capital Management, L.P. and Acis Capital Management GP, LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS")—and an unpaid vendor, Meta-E Discovery.

25.    Following the venue transfer to Texas, on December 27, 2019, the Debtor filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of*

---

[2] Doc. 3. Unless otherwise referenced, all documents referencing "Doc." refer to the docket maintained in Case No. 19-34054-sgj11 (Bankr. N.D. Tex.).

[3] Doc. 1.

10

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* ("Governance Motion").[4] On January 9, 2020, the Court signed a Governance Order granting the Governance Motion.[5]

26.     As part of the Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditors Committee—was appointed to the Board of Directors (the "Board") of Strand, the Original Debtor's general partner. The Board then appointed Seery as the Chief Executive Officer in place of the previous CEO, Mr. James Dondero, as well as the CRO.[6] Seery currently serves as Trustee of the Claimant Trust under the terms of the CTA and the CEO of the Reorganized Debtor.[7]

### B.     *The Targeted Claims*

27.     In his capacity as the Original Debtor's CEO and CRO, Seery negotiated and obtained court approval for settlements with several large unsecured creditors including Redeemer, Acis, UBS, and another major unsecured creditor, HarbourVest (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed Claims:

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |

---

[4] Doc. 281.

[5] Doc. 339.

[6] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[7] *See* Doc. 1943, Order Approving Plan, p. 34.

| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

As reflected in these settlements, HarbourVest and UBS owned Class 9 claims in addition to Class 8 Claims. Class 9 Claims were subordinated to Class 8 Claims in the distribution waterfall in the Plan.

28.     Each of the Settling Parties sold their Claims to Farallon and Stonehill (or affiliated special purpose entities) shortly after receiving court approval of the settlements. One of these "trades" took place within just a few weeks before the Plan's Effective Date.[8] All of these trades occurred when HMIT held its 99.5% equity stake in the Debtor. Notice of these trades was first provided in filings in the records of the Original Debtor's bankruptcy proceedings, as follows: Claim No. 23 (Doc. 2211, 2212, and 2215), Claim Nos. 190 and 191 (Doc. 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (Doc. 2263), Claim No. 81 (Doc. 2262), Claim No. 72 (Doc. 2261).

29.     Farallon and Stonehill, both of whom are registered investment advisors that manage hedge funds, have fiduciary duties to their own investors. As such, they are acutely aware of their duties and obligation as fiduciaries. Yet, they both invested many tens of millions of dollars, directly or indirectly, to acquire the Claims in the absence of

---

[8] Docs. 2697, 2698.

any publicly available information that could provide any economic justification for their investment decisions.

30.     Upon information and belief, Stonehill and Farallon collectively invested an estimated $160 million to acquire the Claims with a face amount of $365 million, and they did so in the absence of any meaningful due diligence. Indeed, Farallon has admitted that it conducted no due diligence but relied on Seery's guarantees.

31.     Stonehill and Farallon's investments become even more suspicious because the Plan provided the *only* publicly available information, which, at the time, included pessimistic projections that the Claims would ever receive full payment:

   a. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the projected value of HCM's assets dropped over $200 million from $566 million to $364 million.[9]

   b. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11.[10]

      o This meant that Farallon and Stonehill invested more than $163 million in Claims when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims.

   c. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% to 54%.

---

[9] Doc. 1473, Disclosure Statement, p. 18.

[10] Doc. 1875-1, Plan Supplement, Ex. A, p. 4.

d. Despite the stark decline in the value of the estate and in the midst of substantial reductions in the percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively, again, the "Claims") in April and August of 2021 in the combined amount of $163 million.[11]

32.   Upon information and belief, Stonehill, through its special purpose entity, Jessup, acquired the Redeemer Committee's claim for $78 million.[12] Upon information and belief, the $23 million Acis claim[13] was sold to Farallon/Muck for $8 million. Upon information and belief, HarbourVest sold its combined $80 million in claims to Farallon/Muck for $27 million. UBS sold its combined $125 million in claims for $50 million to both Stonehill/Jessup and Farallon/Muck. In the instance of UBS, *the total projected payout was only $35 million*. Indeed, as part of these transactions, both Farallon and Stonehill purchased Class 9 Claims at a time when the Debtor's Estate projected a zero dollar return on all such Claims.

---

[11] Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2215, 2297, 2298]. The Acis claim was transferred on April 16, 2021; the Redeemer, Crusader, and HarbourVest claims were transferred on April 30, 2021; and the UBS claims were transferred on August 9, 2021.

[12] July 6, 2021, letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

[13] Seery/HCM have argued that $10 million of the Acis claim is self-funding.

**C.** *Material Non-Public Information is Disclosed to Seery's Affiliates at Stonehill and Farallon.*

33. One of the significant assets of the Debtor's Estate was the Debtor's direct and indirect holdings in Metro-Goldwyn-Mayer Studios, Inc. ("MGM").[14]

34. On December 17, 2020, James Dondero, sent an email to Seery. At that time, Dondero was a member of the MGM board, and the email contained material non-public information regarding Amazon and Apple's interest in acquiring MGM.[15] Of course, any such sale would significantly enhance the value of the Original Debtor's estate.

35. Upon receipt of this material non-public information, Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in this Court seeking approval of the Original Debtor's settlement with HarbourVest - resulting in a transfer to the Original Debtor of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("HCLOF"), which held substantial MGM debt and equity.[16] Conspicuously, the HCLOF interest was not transferred to the Original Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[17]

---

[14] *See* Doc. 2229, p. 6.

[15] *See* Adversary Case No. 20-3190-sgj11, Doc. 150-1, p. 1674.

[16] Doc. 1625. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM.

[17] Doc. 1625.

36.    Upon information and belief, aware that the Debtor's stake in MGM afforded a new profit center, Seery saw an opportunity to increase his own compensation and enlisted the help of Stonehill and Farallon to extract further value from the Original Debtor's Estate at the expense of other innocent creditors and equity. This *quid pro quo* included, at a minimum, a tacit, if not express, understanding that Seery would be well-compensated.

37.    Until 2009, Seery was the Global Head of Fixed Income Loans at Lehman Brothers[18] where, on information and belief, he conducted substantial business with Farallon. Following the collapse of Lehman Brothers, Seery continued to work with, and indeed represented Farallon as its legal counsel. Seery ultimately joined a hedge fund, River Birch Capital,[19] which, along with Stonehill, served on the creditors committee in other bankruptcy proceedings. GCM Grovesnor, a global asset management firm, held four seats on the Redeemer Committee[20] and, upon information and belief, is a significant investor in Stonehill and Farallon. Grovesnor, through Redeemer, played a large part in appointing Seery as a director of Strand Advisors. Seery was beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farallon.

---

[18] Seery Resume [Doc. 281-2].

[19] *Id*.

[20] Declaration of John A. Morris [Doc. 1090], Ex. 1, pp. 15.

38.     As successful capital management firms, with advisory and fiduciary duties to their own clients, Stonehill and Farallon typically engage in robust due diligence before making significant investments. Yet, in this case, it would have been *impossible* for Stonehill and Farallon to forecast *any* profit at the time of their multi-million-dollar investments given the negative financial information disclosed by the Original Debtor's Estate. Seery, as the CEO, was aware of and involved in approving these negative financial projections. In doing so, Seery intentionally caused the publication of misleading, false information.

39.     Seery shared with Stonehill and Farallon *non-public* information concerning the value of the Original Debtor's Estate which was higher than publicly available information. Thus, the only logical conclusion is that all Defendants knew that the publicly available projections, which accompanied the Plan, were understated, false, and misleading. Otherwise, Farallon, Muck, Stonehill and Jessup would not have made their multi-million-dollar investments. None of the Defendants disclosed their knowledge of the misleading nature of these financial projections when they had a duty to do so. None of the Defendants disclosed the nature of their dealings in acquiring the Claims.

40.     By wrongfully exploiting non-public insider information, Stonehill and Farallon—acting through Muck and Jessup—became the largest holders of unsecured claims in the Debtor's Estate with resulting control over the Oversight Board and a front row seat to the reorganization and distribution of Claimant Trust Assets. As such, they

17

were given control (through Muck and Jessup) to approve discretionary bonuses and

success fees for Seery from these assets.

**D.** *Distributions*

41. The MGM sale was ultimately consummated in March 2022 for $6.1 billion

in cash, plus $2.5 billion in debt that Amazon assumed and immediately repaid.[21]

42. By the end of Q3 2021, just over $6 million of the projected $205 million

available for general unsecured claimants had been disbursed.[22] No additional

distributions were made to general unsecured claimholders until, suddenly, in Q3 2022

almost $250 million was paid toward Class 8 general unsecured claims—$45 million more

than was *ever* projected.[23] Thus, Stonehill (Jessup) and Farallon (Muck) have already

received returns that far eclipse their investment. They also stand to make further

significant profits on their investments, including payments on Class 9 Claims.

43. As of December 31, 2022, the Claimant Trust has distributed $255,201,228.

On a pro rata basis, that means that innocent creditors have received approximately

$22,373,000 in distributions against the stated value of their allowed claims. That leaves

a remaining unpaid balance of approximately $9,627,000.

---

[21] Amazon Q1 2022 10-Q.

[22] Doc. 3200.

[23] Doc. 3582.

44.    Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary.

45.    It is clear Seery facilitated the sale of the Claims to Stonehill (Jessup) and Farallon (Muck) at discounted prices and used misleading financial projections to facilitate these trades. This was part of a larger strategy to install Stonehill (Jessup) and Farallon (Muck), his business allies, onto the Oversight Board where they would oversee lucrative bonuses and other compensation for Seery in exchange for hefty profits they expected to receive.

### V. Causes of Action

*A.    Count I (against Seery): Breach of Fiduciary Duty*

46.    The allegations in paragraphs 1-45 above are incorporated herein as if set forth verbatim.

47.    As CEO and CRO of a debtor-in-possession, Seery owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate, including, without limitation, the duty of loyalty. Seery also was under a duty to avoid conflicts of interests, but Seery willfully and knowingly engaged in conduct which conflicted with his fiduciary duties—and he did so out of financial self-interest.

19

48. By fraudulently providing and/or approving negative projections of the Debtor's Estate when he knew otherwise, Seery willfully and knowingly breached his fiduciary duties.

49. By misusing and disclosing confidential, material non-public information to Stonehill and Farallon, Seery willfully and knowingly breached his fiduciary duties.

50. By failing to disclose his role in the inside trades at issue, Seery willfully and knowingly breached his fiduciary duties.

51. As a result of his willful misconduct, Seery was unfairly advantaged by receiving additional undisclosed compensation and bonuses from the assets of the Debtor's Estate and from the Claimant Trust Assets—to the detriment of other innocent stakeholders, including HMIT, as former equity and a contingent Claimant Trust Beneficiary.

52. To remedy these breaches, Seery is liable for disgorgement of all compensation he received since his collusion with Farallon and Stonehill first began. Alternatively, Seery should be disgorged of all compensation paid to him under the terms of the CTA since the Effective Date of the Plan in August 2021.

53. Alternatively, Plaintiffs are entitled to recover damages measured by all ill-gotten compensation which Seery has received since his first collusive conduct began.

B.      *Count II (against Stonehill, Farallon, Jessup and Muck): Breaches of Fiduciary Duty and Knowing Participation in Breach of Fiduciary Duty*

54.     The allegations in paragraphs 1-53 above are incorporated herein as if set forth verbatim.

55.     Seery owed fiduciary duties to HMIT and the Debtor's Estate, and he willfully and knowingly breached these duties. Without limiting the foregoing, Seery owed a duty of loyalty which he willfully and knowingly breached. Seery also owed a duty to not engage in self-interested conduct to the detriment of the Debtor's Estate and innocent stakeholders. Seery also willfully and knowingly breached this duty.

56.     Stonehill and Farallon were aware of Seery's fiduciary duties and, by purchasing the Claims and approving bonuses and other compensation for Seery, Stonehill (acting through Jessup) and Farallon (acting through Muck), willfully and knowingly participated in Seery's breaches or, alternatively, willfully aided and abetted such breaches.

57.     Stonehill (Jessup) and Farallon (Muck) unfairly received many millions of dollars in profits and fees—and stand to earn even more profits and fees—to the detriment of innocent stakeholders, including HMIT.

58.     Stonehill and Farallon are liable for disgorgement of all profits earned from their purchase of the Claims. In addition, they are liable in damages for excessive compensation paid to Seery as part of the covert *quid pro quo* with Seery.

21

C.     **Count III (against all Defendants): Fraud by Misrepresentation and Material Nondisclosure**

59.     The allegations in paragraphs 1-58 above are incorporated herein as if set forth verbatim.

60.     Based on Seery's duties as CEO and CRO of a debtor-in-possession, and the other Defendants' duties as non-statutory insiders, Seery, Stonehill (Jessup), and Farallon (Muck) had a duty to disclose Stonehill and Farallon's plans to purchase the Claims, but they deliberately failed to do so. Seery also had a duty to disclose correct financial projections but, rather, misrepresented such values or failed to correct false and misleading projections. These factual misrepresentations and omissions were material.

61.     The withheld financial information was material because it has had an adverse impact on control over the eventual distributions to creditors and former equity, as well as the right to control Seery's compensation. By withholding such information, Seery was able to plant friendly business allies on the Oversight Board to the detriment of innocent stakeholders.

62.     Defendants knew that HMIT and other creditors were ignorant of their plans, and HMIT and other stakeholders did not have an equal opportunity to discover their scheme. HMIT and the other innocent stakeholders justifiably relied on misleading information relating to the value of the Original Debtor's Estate.

22

63. By failing to disclose material information, and by making or aiding and abetting material misrepresentations, Seery, Stonehill, Farallon, Muck, and Jessup intended to induce HMIT to take no affirmative action.

64. HMIT justifiably relied on Seery, Stonehill, Farallon, Muck, and Jessup's nondisclosures and representations, and HMIT was injured as a result and the Debtor's Estate was also injured.

65. As a result of their frauds, all Defendants should be disgorged of all profits and ill-gotten compensation derived from their fraudulent scheme. Seery is also liable for damages measured by excessive compensation he has received since he first engaged in willful misconduct.

### D. Count IV (against all Defendants): Conspiracy

66. The allegations in paragraphs 1-65 above are incorporated herein as if incorporated herein verbatim.

67. Defendants conspired with each other to unlawfully breach fiduciary duties to HMIT and the Debtor's Estate, to conceal their fraudulent trades, and to interfere with HMIT's entitlement to the residual of the Claimant Trust Asset.

68. Seery's disclosure of material non-public information to Stonehill and Farallon, and Muck and Jessup's purchase of the Claims, are each overt acts in furtherance of the conspiracy.

69.     HMIT's interest in the residual of the Claimant Trust Assets has been adversely impacted by this conspiracy. The assets have been depleted by virtue of Seery's compensation awards.

### E.     Count V (against Muck and Jessup): Equitable Disallowance

70.     The allegations in paragraphs 1-69 above are incorporated herein as if set forth verbatim.

71.     By purchasing the Claims based on material non-public information, Stonehill and Farallon, through Jessup and Muck, engaged in inequitable conduct.

72.     By earning significant profits on their purchases, Muck and Jessup have been unfairly advantaged to the detriment of the remaining stakeholders, including HMIT.

73.     Given this inequitable conduct, equitable disallowance of Muck's and Jessup's Claims to the extent over and above their initial investment is appropriate and consistent with the purposes of the Bankruptcy Code.

74.     Pleading in the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

**F.** ***Count VI (against all Defendants): Unjust Enrichment and Constructive Trust***

75. The allegations in paragraphs 1-74 above are incorporated herein as if set forth verbatim.

76. By acquiring the Claims using material non-public information, Stonehill and Farallon breached a relationship of trust with the Original Debtor's Estate and other innocent stakeholders and were unjustly enriched and gained an undue advantage over other creditors and former equity.

77. Allowing Stonehill, Farallon, Muck and Jessup to retain their ill-gotten benefits at the expense of other innocent stakeholders and HMIT, as former equity, would be unconscionable.

78. Stonehill, Farallon, Muck, and Jessup should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment.

79. The proceeds Stonehill, Farallon, Muck, and Jessup have received from the Claimant Trust are traceable and identifiable. A constructive trust should be imposed on such proceeds to secure the restitution of these improperly retained benefits.

**F.** ***Count VI (Against all Defendants): Declaratory Relief***

80. The allegations in paragraphs 1-79 are incorporated herein as if set forth verbatim.

81.     HMIT seeks declaratory relief. The Court has jurisdiction to provide declaratory judgment relief when there is an actual controversy that has arisen and exists relating to the rights and duties of the parties.

82.     Bankruptcy Rule 7001 provides that "a proceeding to recover property or money," may include declaratory relief.  *See*, Fed. R. Bank P. 7001(1), (9).

83.     The Claimant Trust Agreement is governed under Delaware law. The Claimant Trust Agreement incorporates and is subject to Delaware trust law. HMIT seeks a declaration, as follows:

    a. There is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement;

    b. As a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered contingent;

    c. HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill;

    d. HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments. Alternatively, HMIT's status as a Claimant Trust Beneficiary is fully vested when all of Muck's and Jessup's trust interests are subordinated to the trust interests held by HMIT;

    e. Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of Seery's fraudulent conduct, bad faith, willful misconduct and unclean hands;

f. Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct and unclean hands;

g. All Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct and unclean hands.

## VI. Punitive Damages

84. The allegations in paragraphs 1-74 are incorporated herein as if set forth verbatim.

85. The Defendants' misconduct was intentional, knowing, willful and fraudulent and in total disregard of the rights of others. An award of punitive damages is appropriate and necessary under the facts of this case.

86. All conditions precedent to recovery herein have been satisfied.

## VII. Prayer

WHEREFORE, HMIT prays for judgment as follows:

1. Equitable disallowance of the Claims over and above Muck's and Jessup's original investments (or, alternatively, subordination of their Claimant Trust Interests, as addressed herein);

2. Disgorgement of all funds distributed from the Claimant Trust to Muck and/or Jessup over and above their original investments;

3. Disgorgement of compensation paid to Seery in managing or administering the Original and Reorganized Debtor's Estate;

4. Imposition of a constructive trust;

27

5.      Declaratory relief as described herein;

6.      An award of actual damages as described herein;

7.      An award of exemplary damages as allowed by law;

8.      Pre- and post-judgment interest; and,

9.      All such other and further relief to which HMIT may be justly entitled.


Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**


By: /s/ _____

     Sawnie A. McEntire
     Texas State Bar No. 13590100
     smcentire@pmmlaw.com
     1700 Pacific Avenue, Suite 4400
     Dallas, Texas 75201
     Telephone: (214) 237-4300
     Facsimile: (214) 237-4340

     Roger L. McCleary
     Texas State Bar No. 13393700
     rmccleary@pmmlaw.com
     One Riverway, Suite 1800
     Houston, Texas 77056
     Telephone: (713) 960-7315
     Facsimile: (713) 960-7347

     *Attorneys for Hunter Mountain Investment Trust*

28