# Exhibit 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## DECLARATION OF SAWNIE A. MCENTIRE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to 28 U.S.C. 1746 and declares

as follows:

1.  My name is Sawnie A. McEntire. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2.  I am a licensed attorney in good standing with the State Bar of Texas. I am a Director and Shareholder at the firm Parsons McEntire McCleary PLLC. I serve as lead counsel for Hunter Mountain Investment Trust ("HMIT") in these proceedings in regard to the motion described in Paragraph 3 below. I also served as lead counsel for HMIT in Rule 202 Proceedings filed in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004 ("Rule 202 Proceedings").

3.  I submit this declaration in support of HMIT's Emergency Motion for Leave to File Adversary Proceeding ("Emergency Motion") to which this Declaration is attached.

1

4. On January 20, 2023, HMIT filed its Verified Rule 202 Petition in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004. **A true and correct copy of HMIT's Verified Rule 202 Petition, with accompanying exhibits, is attached to this declaration as Exhibit 4-A.**

5. HMIT served notice of the Rule 202 Petition and hearing on Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings LLC ("Muck"), and Jessup Holdings LLC ("Jessup") in February 2023. Farallon and Stonehill entered an appearance, responded to the proceedings, and were represented by David Shulte of the law firm of Holland & Knight. Among other things, the Rule 202 Petition sought discovery related to Farallon and Stonehill's due diligence, if any, concerning the sale and transfer of four allowed bankruptcy claims in the above-referenced bankruptcy proceedings from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021.[1]

6. On February 22, 2023, HMIT's Verified Rule 202 Petition was heard by the Honorable Gena Slaughter of the 191st District Court of Dallas County, Texas. **A true and correct copy of the Hearing Transcript of the Rule 202 Proceedings on February 22, 2023, is attached to this declaration as Exhibit 4-B** ("Transcript'). At this hearing, I argued on behalf of HMIT and Mr. Shulte argued on behalf of Farallon and Stonehill. During this hearing, Farallon and Stonehill admitted they acquired the Claims through their respective "special purpose entities," as reflected in the Transcript. Farallon resisted the requested discovery in the state district court.

7. A true and correct copy of a certified copy of Muck's formation papers in the State of Delaware, showing Muck was created on March 9, 2021, is attached to this Declaration as **Exhibit 4-D**. A true and correct copy of a certified copy of Jessup's formation papers in Delaware, showing Jessup was created on April 8, 2021, is attached to this Declaration as **Exhibit 4-E**. Muck and Jessup's corporate formation documents do not identify their respective members or managing members. *See* Exhibit 4-D and 4-E.

8. On March 8, 2023, the state district court denied and dismissed HMIT's Verified Rule 202 Petition. This ruling was necessarily without prejudice. A true and correct copy of the related Order, dated March 8, 2023, is attached to this declaration as **Exhibit 4-C.**

---

[1] *See* Notices of Transfers [Docs. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

9. On March 9, 2023, my law partner, Roger McCleary sent correspondence to Mr. Schulte, as Farallon and Stonehill's counsel, requesting disclosure of the details of their respective legal relationships to Muck and Jessup. Farallon and Stonehill never responded to this inquiry. A true and correct copy of this email correspondence, dated March 9, 2023, is attached to this declaration as **Exhibit 4-F.**

10. I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 27, 2023.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the __27th__ day of March 2023.

Sawnie A. McEntire

3

# Exhibit 4-A

FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | 191st |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

### PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S
### VERIFIED RULE 202 PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified

Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking

pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and

Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively

"Respondents"), to allow HMIT to investigate potential claims against Respondents and

other potentially adverse entities, and would respectfully show:

### PARTIES

1.      HMIT is a Delaware statutory trust that was the largest equity holder in

Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership

interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

1

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of the events or omissions giving rise to HMIT's potential common law claims occurred in Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims against Farallon or Stonehill far exceeds this Court's minimum jurisdictional requirements. Without limitation, HMIT specifically seeks to investigate potentially actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.

[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.      This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, TEX. CIV. PRAC. & REM. CODE §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

**SUMMARY**

7.      HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

3

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8. The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9. HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

4

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-6339-7800.

### BACKGROUND[3]

**A.**   *Procedural Background*

10.   On or about October 16, 2019, HCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.

11.   On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM in the hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.   Following the venue transfer to Texas on December 27, 2019, HCM filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order approving HCM's Settlement Motion (the "Governance Order").[5]

13.    As part of the Governance Order, an independent board of directors—which included Seery as one of the UCC's selections—was appointed to the Board of Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general partner. Following the approval of the Governance Order, the Board then appointed Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") in place of the previous CEO.[6] Seery currently serves as Trustee of the Claimant Trust (HCM's sole post-reorganization limited partner) and, upon information and belief, continues to serve as CEO of HCM following the effective date of the HCM bankruptcy reorganization plan ("Plan").[7]

### B.    Seery's Relationships with Stonehill and Farallon

14.    Farallon and Stonehill are two capital management firms (similar to HCM) that, upon information belief, have long-standing relationships with Seery. Upon information and belief, they eventually participated in, directed and/or controlled the acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.     Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

## C.     *Claims Trading*

16.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.

[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17.     Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18.     Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.

[12] Dkt. 2697, 2698.

[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

   i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%* (down approximately $328.3 million);[15]

c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021[17] in the combined amount of approximately $163 million; and

e. Upon information and belief:

   i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

9

    ii.   The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

    iii.   HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

    iv.   UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19.    In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain **substantial** assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.

[20] Dkt. 3200.

[21] Dkt. 3582.

[22] Dkt. 2229.

[23] Dkt. 3382.

**D.**    *Material Information is Not Disclosed*

20.    Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.    As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23.    As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

**E.    *Seery's Compensation***

24.    Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

## DISCOVERY REQUESTED

25.     HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.     The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.     Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

a.  The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

b.  Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

13

c. The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d. The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e. Any internal valuations of Muck or Jessup's net asset value (NAV);

f. Any external valuation or audits of the NAV attributable to the Claims;

g. Any documents reflecting expected profits from the purchase of the Claims;

h. All communications between Farallon and Seery concerning the value and purchase of the Claims;

i. All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j. All documents reflecting the expected payout on the Claims;

k. All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l. All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m. All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n. All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o. All communications between Farallon and Stonehill regarding the purchase of the Claims;

14

p. All communications between Farallon and Stonehill and investors in their respective funds regarding purchase of the Claims or valuation of the Claims;

q. All communications between Seery and Stonehill or Farallon regarding Seery's compensation as the Trustee of the Claimant Trust;

r. All documents relating to, regarding, or reflecting any agreements between Seery and the Oversight Committee regarding compensation;

s. All documents reflecting the base fees and performance fees which Stonehill has received or may receive in connection with management of the Claims;

t. All documents reflecting the base fees and performance fees which Farallon has received or may receive in connection with management of the Claims;

u. All monies received by and distributed by Muck in connection with the Claims;

v. All monies received by and distributed by Jessup in connection with the Claims;

w. All documents reflecting whether Farallon is a co-investor in any fund which holds an interest in Muck; and

x. All documents reflecting whether Stonehill is a co-investor in any fund which holds an interest in Jessup.

### BENEFIT OUTWEIGHS THE BURDEN

28. The beneficial value of the requested discovery greatly outweighs any conceivable burden that could be placed on the Respondents. The requested information

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29.     The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30.     After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31.     Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

16

issue subpoenas duces tecum compelling the production of documents in connection

with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant

HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/ Sawnie A. McEntire_

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

17

<u>**VERIFICATION**</u>

STATE OF TEXAS              §
                           §
COUNTY OF DALLAS           §

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

Mark Patrick

Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

Notary Public in and for
the State of Texas



DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026

3116424.1

18

**EXHIBIT "A"**

**CAUSE NO. _____**

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner*, | § | |
| | § | **DALLAS COUNTY, TEXAS** |

<u>**NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC**</u>

TO:   Farallon Capital Management, LLC, by and through its attorney of record
_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,

Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral

examination under oath of Farallon Capital Management, LLC ("Farallon") on

_____, **2023 at** _____ _**.m.** before a notary public or other person authorized to

administer a proper oath and will be recorded by stenographic means. The deposition

will take place at _____ before a court reporter and videographer and will

continue from day to day until completed. The deposition may also be recorded by non-

stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Farallon is

requested to designate one or more person(s) most knowledgeable and prepared to testify

on behalf of Farallon concerning the topics identified on Exhibit "1", and to produce the

documents described in Exhibit "2", attached hereto.

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

***Attorneys for Petitioner Hunter Mountain
Investment Trust***

## CERTIFICATE OF SERVICE

I hereby certify that, on January ___, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

2

**EXHIBIT "A"**

**TO NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC**

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

**RULES OF CONSTRUCTION**

1.  The terms "all" and "each" shall be construed as all and each.

2.  The terms "all" and "any" shall be construed as all and any.

3.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.  The use of the singular form of any word includes the plural and vice versa.

**DEFINITIONS**

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

3

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon*, *you*, and *your*. The terms "Farallon," "you," and "your" shall mean Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill*. The term "Stonehill" refers to Stonehill Capital Management, LLC.

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

5

*UBS*. The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

## EXHIBIT "1"

## <u>TOPIC CATEGORIES</u>

The witness(es) designated by Farallon to testify on its behalf  is (are) requested to testify concerning the following Topic Categories:

a. The substance, types, and sources of information Farallon considered in making any decision to invest in any of the Claims on behalf of itself, Muck, and/or any fund with which Farallon is connected;

b. Whether Farallon conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c. Any and all communications with James Dondero;

d. The extent to which Farallon was involved in creating and organizing Muck in connection with the acquisition of any of the Claims;

e. The organizational structure of Muck (including identification of all members, managing members), as well as the purpose for creating Muck, including, but not limited to, regarding holding title to any of the Claims;

f. Any internal valuations of Muck's Net Asset Value (NAV), as well as all assets owned by Muck;

g. Any external valuation or audits of the NAV attributable to any of the Claims;

h. Any documents reflecting profit forecasts relating to any of the Claims;

i. All communications between Farallon and Seery relating to  any of the Claims;

7

j.   All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.   All communications between Farallon and any of the Settling Parties concerning any of the Claims;

l.   Any negotiations between Farallon and any of the Settling Parties concerning any of the Claims;

m.   All communications between Farallon and Stonehill regarding any of the Claims;

n.   All communications between Farallon and any investors in any fund managed by Farallon regarding any of the Claims or valuation of the Claims;

o.   All communications between Seery and Farallon regarding Seery's compensation as Trustee of the Claimant Trust;

p.   All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.   All base fees and performance fees which Farallon has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.   All monies received by Muck in connection with any of the Claims and any distributions made by Muck to any members of Muck relating to such Claims;

s.   Whether Farallon is a co-investor in any fund which holds an interest in Muck or otherwise holds a direct interest in Muck and all documents reflecting the same;

t.   All communications between Farallon and any of the following entities concerning any of the Claims:

   i.   UCC;

8

ii.   Highland;

iii.   Grosvenor;

iv.   Muck;

v.   the Oversight Board.

u.  The sources of funds used by Muck for the acquisition of any of the Claims;

v.  The terms and conditions of any agreements governing the transfers of any of the Claims to Muck;

w. Representations made by Farallon, Muck, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x.  Farallon's valuation or evaluation of HCM's Estate;

y.  Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z.  The appointment of Muck to the Oversight Board;

aa. Farallon's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Muck.

**EXHIBIT "2"**

## <u>DOCUMENT REQUESTS</u>

1. Any and all documents created by, prepared for, or received by Farallon concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

   d. promises and representations made in connection with the transfer of the Claims;

   e. any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

   f. consideration for the transfer of the Claims;

   g. the value of HCM's Estate;

   h. the projected future value of HCM's Estate;

   i. past distributions and projected distributions from HCM's Estate;

   j. compensation earned by or paid to Seery in connection with or relating to the Claims;

   k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Farallon, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Stonehill, (vi) Grosvenor, or, (vii) the Oversight Board, concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

10

    d. promises and representations made in connection with the transfer of the Claims;

    e. any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

    f. consideration for the transfer of the Claims;

    g. the value of HCM's Estate;

    h. the projected future value of HCM's Estate;

    i. past distributions and projected distributions from HCM's Estate;

    j. compensation earned by or paid to Seery in connection with or relating to the Claims;

    k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Farallon and/or Muck and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Muck to acquire any of the Claims.

5. Organizational and formation documents relating to Muck including, but not limited to, Muck's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Muck approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Muck's NAV.

8. Agreements between Farallon and Muck regarding management, advisory, or other services provided to Muck by Farallon.

9. Any and all documents reviewed by Farallon as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Muck.

12. Muck's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Farallon in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

12

**EXHIBIT "B"**

**CAUSE NO. _____**

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **\_\_\_\_th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

**NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC**

TO:    Stonehill Capital Management, LLC, by and through its attorney of record

_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,

Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral

examination under oath of Stonehill Capital Management, LLC ("Stonehill") on

**_____, 2023 at \_\_\_\_\_ \_.m.** before a notary public or other person authorized to

administer a proper oath and will be recorded by stenographic means. The deposition

will take place at _____ before a court reporter and videographer and will

continue from day to day until completed. The deposition may also be recorded by non-

stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Stonehill is

requested to designate one or more person(s) most knowledgeable and prepared to testify

on behalf of Stonehill concerning the topics identified on Exhibit "1", and to produce the

documents described in Exhibit "2", attached hereto.

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

***Attorneys for Petitioner Hunter Mountain
Investment Trust***

## CERTIFICATE OF SERVICE

I hereby certify that, on January \_\_\_, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

2

**EXHIBIT "A"**
**TO NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC**

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

**RULES OF CONSTRUCTION**

1.      The terms "all" and "each" shall be construed as all and each.

2.      The terms "all" and "any" shall be construed as all and any.

3.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.      The use of the singular form of any word includes the plural and vice versa.

**DEFINITIONS**

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

3

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning.* The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI.* The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate.* The term "Estate" means HCM's bankruptcy estate.

*Farallon.* The term "Farallon," refers to Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees, representatives, attorneys, predecessors, successors,

4

assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill," "you," and "your."* The terms "Stonehill", "you," and "your" shall mean Stonehill Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to Jessup Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

5

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Stonehill is a general partner or owns an entities' general partner, or anyone else acting on Stonehill's behalf, now or at any time relevant to the response .

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

*UBS*. The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

**EXHIBIT "1"**

**TOPIC CATEGORIES**

The witness(es) designated by Stonehill to testify on its behalf is (are) requested to testify concerning the following Topic Categories:

a. The substance, types, and sources of information Stonehill considered in making any decision to invest in any of the Claims on behalf of itself, Jessup, and/or any fund with which Stonehill is connected;

b. Whether Stonehill conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c. Any and all communications with James Dondero;

d. The extent to which Stonehill was involved in creating and organizing Jessup in connection with the acquisition of any of the Claims;

e. The organizational structure of Jessup (including identification of all members, managing members), as well as the purpose for creating Jessup, including, but not limited to, regarding holding title to any of the Claims;

f. Any internal valuations of Jessup's Net Asset Value (NAV), as well as all assets owned by Jessup;

g. Any external valuation or audits of the NAV attributable to any of the Claims;

h. Any documents reflecting profit forecasts relating to any of the Claims;

i. All communications between Stonehill and Seery relating to any of the Claims;

j.  All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.  All communications between Stonehill and any of the Settling Parties concerning any of the Claims;

l.  Any negotiations between Stonehill and any of the Settling Parties concerning any of the Claims;

m. All communications between Stonehill and Farallon regarding any of the Claims;

n.  All communications between Stonehill and any investors in any fund managed by Stonehill regarding any of the Claims or valuation of the Claims;

o.  All communications between Seery and Stonehill regarding Seery's compensation as Trustee of the Claimant Trust;

p.  All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.  All base fees and performance fees which Stonehill has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.  All monies received by Jessup in connection with any of the Claims and any distributions made by Jessup to any members of Jessup relating to such Claims;

s.  Whether Stonehill is a co-investor in any fund which holds an interest in Jessup or otherwise holds a direct interest in Jessup and all documents reflecting the same;

t.  All communications between Stonehill and any of the following entities concerning any of the Claims:

   i.  UCC;

      ii.    Highland;

     iii.    Grosvenor;

     iv.    Jessup;

      v.    the Oversight Board.

u. The sources of funds used by Jessup for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Jessup;

w. Representations made by Stonehill, Jessup, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Stonehill's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Jessup to the Oversight Board;

aa. Stonehill's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Jessup.

**EXHIBIT "2"**

**DOCUMENT REQUESTS**

1. Any and all documents created by, prepared for, or received by Stonehill concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

   d. promises and representations made in connection with the transfer of the Claims;

   e. any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

   f. consideration for the transfer of the Claims;

   g. the value of HCM's Estate;

   h. the projected future value of HCM's Estate;

   i. past distributions and projected distributions from HCM's Estate;

   j. compensation earned by or paid to Seery in connection with or relating to the Claims;

   k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Stonehill, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Farallon, (vi) Grosvenor, or, (vii) the Oversight Board, concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

    d. promises and representations made in connection with the transfer of the Claims;

    e. any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

    f. consideration for the transfer of the Claims;

    g. the value of HCM's Estate;

    h. the projected future value of HCM's Estate;

    i. past distributions and projected distributions from HCM's Estate;

    j. compensation earned by or paid to Seery in connection with or relating to the Claims;

    k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Stonehill and/or Jessup and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Jessup to acquire any of the Claims.

5. Organizational and formation documents relating to Jessup including, but not limited to, Jessup's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Jessup approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Jessup's NAV.

8. Agreements between Stonehill and Jessup regarding management, advisory, or other services provided to Jessup by Stonehill.

9. Any and all documents reviewed by Stonehill as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Jessup.

12. Jessup's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Stonehill in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

# Exhibit 4-B

**REPORTER'S RECORD**

**VOLUME 1 OF 1**

**COURT OF APPEALS CAUSE NO. 00-00-00000-CV**

**TRIAL COURT CAUSE NO. DC-23-01004-J**

| | | |
|---|---|---|
| IN RE: | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| HUNTER MOUNTAIN | ) | |
| INVESTMENT TRUST, | ) | OF DALLAS COUNTY, TEXAS |
| | ) | |
| | ) | |
| Petitioner. | ) | 191ST JUDICIAL DISTRICT |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

**RULE 202 PETITION**

**which was heard on**

**Wednesday, February 22, 2023**

On the 22nd day of February 2023, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gena Slaughter, Judge Presiding, held in Dallas, Dallas County, Texas, and the following proceedings were had, to wit:

Proceedings reported by machine shorthand utilizing computer-assisted realtime transcription.

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

APPEARANCES:

MR. SAWNIE A. McENTIRE              ATTORNEYS FOR PETITIONER
State Bar No. 13590100             Hunter Mountain
PARSONS McENTIRE                   Investment Trust
     McCLEARY, PLLC
1700 Pacific Avenue
Suite 4400
Dallas, Texas  75201
Telephone:  (214) 237-4300
Facsimile:  (214) 237-4340
Email:  smcentire@pmmlaw.com

and

MR. ROGER L. McCLEARY
State Bar No. 13393700
PARSONS McENTIRE
     McCLEARY, PLLC
One Riverway
Suite 1800
Houston, Texas  77056
Telephone:  (713) 960-7315
Facsimile:  (713) 960-7347
Email:  rmccleary@pmmlaw.com

MR. DAVID C. SCHULTE               ATTORNEY FOR RESPONDENTS
State Bar No. 24037456             Farallon Capital
HOLLAND & KNIGHT, LLP              Management, LLC, and
1722 Routh Street                  Stonehill Capital
Suite 1500                         Management LLC
Dallas, Texas  75201
Telephone:  (214) 964-9500
Facsimile:  (214) 964-9501
Email:  david.schulte@hklaw.com

                    *      *      *

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

**VOLUME 1 INDEX**


**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

**RULE 202 PETITION**

**which was heard on**

**Wednesday, February 22, 2023**


PROCEEDINGS:                                    Page    Vol

Proceedings on the record...................... 8      1

Argument by Mr. Sawnie A. McEntire............. 9      1

Response by Mr. David C. Schulte............... 37     1

Response by Mr. Sawnie A. McEntire............. 65     1

Response by Mr. David C. Schulte............... 73     1

Response by Mr. Sawnie A. McEntire............. 76     1

The court takes the matter under consideration. 77    1

Adjournment.................................... 78     1

Reporter's Certificate......................... 79     1

Petitioner's Exhibits Index                    4

                    **PETITIONER'S EXHIBITS INDEX**

|          |                                      | | **(Excluded)** | |
| Number   | Description                          | Offered | Admitted | Vol |
| -------- | ------------------------------------ | ------- | -------- | --- |
| P-1      | Declaration of Mark Patrick          | 36      | 42       | 1   |
| P1-A     | Claimant Trust Agreement             | 36      | 42       | 1   |
| P1-B     | Division of Corporations - Filing    | 36      | 42       | 1   |
| P1-C     | Division of Corporations - Filing    | 36      | 42       | 1   |
| P1-D     | Order Approving Debtor's Settlement  | 36      | 42       | 1   |
| P1-E     | Order Approving Debtor's Settlement  | 36      | 42       | 1   |
| P1-F     | Order Approving Debtor's Settlement  | 36      | 42       | 1   |
| P1-G     | Order Approving Debtor's Settlement  | 36      | 42       | 1   |
| P1-H     | July 6, 2021, Alvarez & Marsal letter to Highland Crusader Funds Stakeholder | 36 -- | 41 42 | 1 1 |
| P1-I     | United States Bankruptcy Court Case No. 19-34054 | 36 | 42 | 1 |

**PETITIONER'S EXHIBITS INDEX   continued**

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|----------------------|-----|
| PI-J | Exhibit A Highland Capital Management, L.P. Disclaimer for Financial Projections | 36 | 42 | 1 |
| PI-K | United States Bankruptcy Court Case No. 19-34054 | 36 | 42 | 1 |
| P-2 | Declaration of James Dondero | 36 | 42 | 1 |
| P2-1 | Jim Dondero email dated Thursday, December 2020 | 36 | (41) | 1 |

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

## RESPONDENT'S EXHIBITS INDEX

| Number | Description | Offered | (Excluded) Admitted | Vol |
|---|---|---|---|---|
| R-1 | Cause No. DC-21-09543 Verified Amended Petition | 41 | 44 | 1 |
| R-2 | Cause No. DC-21-09543 Order | 41 | 44 | 1 |
| R-3 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-4 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-5 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-6 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-7 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-8 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-9 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-10 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

RESPONDENT'S EXHIBITS INDEX continued

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|---------------------|-----|
| R-11 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-12 | United State Bankruptcy Court Case No. 19-12239 | 41 | 44 | 1 |
| R-13 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-14 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-15 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-16 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-17 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |

P R O C E E D I N G S

THE COURT:  Okay.  Good morning, Counsel.

We are here in DC-23-01004, In re: Hunter Mountain Investment Trust.

And who is here for the plaintiff?

MR. McENTIRE:  For the petitioner, Your Honor, Sawnie McEntire and my partner Roger McCleary.

THE COURT:  Okay.  And then for Farallon?

MR. SCHULTE:  My name is David Schulte and I represent both of the respondents.  It's Farallon Capital Management, LLC, and Stonehill Capital Management, LLC.

THE COURT:  We are here today on a request for a 202 petition.  I know one of the issues is the related suit, but let's just plow into it and we'll go from there.

Okay.  Counsel?

MR. McENTIRE:  May I approach the bench?

THE COURT:  Yes, you may.

MR. McENTIRE:  And I've given Mr. Schulte copies of all these materials.

In the interest of time, I have all the key pleadings here, which I will give you a copy of.

THE COURT:  Thank you.

MR. McENTIRE:  And this is the evidentiary submission that we submitted about a week ago.

THE COURT:  Right.

MR. McENTIRE:  To the extent you are interested, it is cross-referenced by exhibit number to the references in our petition to the docket in the bankruptcy court.

THE COURT:  I appreciate that.  Otherwise, I go hunting for stuff.

MR. McENTIRE:  This is a PowerPoint.

THE COURT:  Okay.

MR. McENTIRE:  And, lastly, a proposed order.

THE COURT:  Wonderful.

MR. McENTIRE:  And Mr. Schulte has copies of it all.

THE COURT:  Okay.

MR. McENTIRE:  May I proceed, Your Honor?

THE COURT:  You may.

MR. McENTIRE:  All right.  Your Honor, we are here for leave of court to conduct discovery under Rule 202 to investigate potential claims.

The issue before the court is not whether we have an actual claim.

THE COURT:  Right.

MR. McENTIRE:  We do not even need to state a cause of action.  It is simply the investigation of potential claims.

Mr. Mark Patrick is here with us today.  He's behind me.  Mr. Patrick is the administrator of Hunter Mountain, which is a Delaware trust.

THE COURT:  Okay.

MR. McENTIRE:  He is the manager of Rand Advisors, which is also an investment manager of the trust.  And, in effect, for all intents and purposes, Mr. Patrick manages the assets of the trust on a daily basis.

THE COURT:  Okay.

MR. McENTIRE:  There are potential claims that we're investigating.  And I'll go through some of these because I know opposing counsel has raised standing issues.

THE COURT:  Right.

MR. McENTIRE:  And I think we can address all those standing issues.

Insider trading is in itself a wrong as recognized by courts.  And I'll refer you to the opinions.  We believe there's a breach of fiduciary duties, and that may take a little explanation.

At the time that Farallon and Stonehill acquired these claims, through their special purpose entities Muck and Jessup, they were outsiders.

THE COURT:  Right.

MR. McENTIRE:  But by acquiring the information in the manner in which we believe they did, they became insiders.  And when they became insiders, under relevant authorities they owe fiduciary duties.

And at the time they acquired the claims, my client Hunter Mountain Investment Trust was the 99.5 percent interest holder or stakeholder in Highland Capital.

THE COURT:  Right.

MR. McENTIRE:  We also believe a knowing participation of breach of fiduciary duties under another name, aiding and abetting.  But Texas recognizes it as knowing participation.  Unjust enrichment, constructive trust, and tortious interference.

THE COURT:  Okay.

MR. McENTIRE:  Farallon and Stonehill are effectively hedge funds.  And so is Highland Capital.

They were created.  They actually did create Muck and Jessup.  Those are the two entities that actually are titled with the claims.  They acquired it literally days before the transfers.

So the reason we're focusing our discovery effort on Farallon and Stonehill, we are confident that any meaningful discovery -- emails, letters, correspondence, document drafts, things of that nature -- probably predated the existence of Muck and Jessup.

THE COURT:  Right.

MR. McENTIRE:  That's why we're focusing our discovery effort on Farallon and on Stonehill.

But, needless to say, Farallon, Stonehill, Muck and Jessup, having all participated in this acquisition, they're all insiders for purposes of assuming fiduciary duties.

And as I said, outsiders become insiders under the relevant authority.  And one key case is the Washington Mutual case --

THE COURT:  Right.

MR. McENTIRE:  -- which we cited in our materials.

I would also just let you know, this is not something in total isolation.  We understand we're not privy to the details.  But we understand the Texas State Security Board also has an open investigation that has not been closed.

THE COURT:  Okay.

MR. McENTIRE:  And that's by way of background.

202 allows presuit discovery for a couple of reasons.  And I won't belabor the point.  One is to investigate potential claims.

There is no issue of notice or service here.  There's no issue of personal jurisdiction. Farallon and Stonehill made a general appearance.

THE COURT:  Right.

MR. McENTIRE:  There's no issue concerning subject-matter jurisdiction.  They actually concede that the court has jurisdiction on page 8 of their response.

The court's inquiry today is a limited judicial inquiry.  There are really two avenues which I'll explain, but, first, I think the salient avenue is does the benefit of the discovery outweigh the burden.

And I think as I will hopefully demonstrate, I think that we clearly do.

THE COURT:  Okay.

MR. McENTIRE:  The merits of a potential claim, the case law is clear, is not before the court.

Much of their brief and their response is devoted to trying to attack the fact that there is no duty or things such as standing.

But the reality of it is we are not required to actually prove up a cause of action to this court although I think I can.  In this process, I probably certainly can identify a potential cause of action.  That's not our obligation to carry our burden.

There was an issue about timely submission of evidence they raised in a footnote, but I think that was resolved before the court took the bench.

THE COURT:  Okay.

MR. McENTIRE:  I've handed you a binder with Mr. Mark Patrick's affidavit and Jim Dondero's affidavit.

As I understand it, correct me if I'm wrong, you're not objecting to the submission of that evidence.  Is that correct?

MR. SCHULTE:  Almost.

THE COURT:  Okay.

MR. SCHULTE:  Your Honor, I do object to the two declarations that were submitted I believe five days before the hearing.

THE COURT:  Okay.

MR. SCHULTE:  As Your Honor is aware, Rule 202 contemplates 15 days' notice.  The petition itself was required to be verified.  It was verified and then new substance was added by way of these

declarations five days before the hearing.

And so we would argue that that has the effect of amending or supplementing the petition within that 15-day notice period.

All that said, I don't have any issue with the majority of the documents attached to Mr. Patrick's declaration.

THE COURT:  Okay.

MR. SCHULTE:  So I do object on the grounds of hearsay and timeliness to the declarations.

On Exhibit H to Mr. Patrick's declaration, I object to that document on the grounds of hearsay.

THE COURT:  Okay.  Which one?

MR. SCHULTE:  Exhibit H to Mr. Patrick's declaration on the basis of hearsay.

All the other documents are I believe file-stamped copies of the pleadings filed in the bankruptcy, which I don't have any issue with that.

And then the exhibit to Mr. Dondero's declaration is an email that's objected to on the basis of hearsay.  And it hasn't been proven up as a business record or any other way that will get past hearsay.

THE COURT:  Okay.

MR. SCHULTE:  So those are the limited objections I have to what's in that filing, Your Honor.

MR. McENTIRE:  And I will address those objections.  And we're prepared to put Mr. Patrick on the stand, if necessary.

I would point out that the case law is very clear that there's no 15-day rule here.

THE COURT:  Okay.

MR. McENTIRE:  We have asked the court to take judicial notice of all of our evidence in our petition itself.

The 15 days is the amount of time you have to give notice before the hearing --

THE COURT:  Right.

MR. McENTIRE:  -- but the case law is clear that I can put live testimony on, I can put affidavit testimony on.

THE COURT:  This is an evidentiary hearing.

MR. McENTIRE:  That's correct.

And that includes affidavits.  And affidavits are routinely accepted in these types of proceedings and I have the case law I can cite to the court.

MR. SCHULTE:  Your Honor, in contrast, I think if this were, for example, an injunction hearing, I don't believe that an affidavit would be

the substitute in an injunction hearing for live testimony.

And so if this is an evidentiary standard, I don't think that these affidavits should come in for the truth of the matter asserted.  The witnesses should testify to the facts that they want to prove up.

MR. McENTIRE:  I could give the court a cite.

THE COURT:  Okay.

MR. McENTIRE:  It's Glassdoor, Inc. versus Andra Group.

THE COURT:  What was the name of it?

MR. McENTIRE:  Glassdoor, Inc. versus Andra Group.  It is 560 S.W.3d 281.  It specifically addresses the use and relies upon affidavits in the record for purposes of a Rule 202.

So, with that said, I will address it in more detail in a moment.  The evidentiary rule, to be clear, is it has to be supported by evidence.  Seven days was the date that I picked because it was well in advance.  It's the standard rule that's used for discovery issues.  It's seven days before a hearing.

So I picked it.  He's had it for seven days.  He's never filed any written objections to my evidence.  None.

And under the Local Rules I would think he would have objected within three business days. He did not do that, and so I'm a little surprised by the objection.

THE COURT:  Okay.

MR. McENTIRE:  All right.  We do have copies of all the certified records, but I gave you the agenda on that.  And we talked about the two declarations.

So the limited judicial inquiry is the only issue before the district court.  It's whether or not to allow the discovery, not the merits of any claim yea or nay.

THE COURT:  Right.

MR. McENTIRE:  There's no need for us to even plead a cause of action, although we did.

Mr. Schulte goes to great length in his response to take issue with our cause of action, suggesting we had none.  We do.  But we're not even under an obligation to plead it; nevertheless, we did.

This is actually a two-part test.  The first part was allowing the petitioner -- in this case, Hunter Mountain -- to take the requested deposition may prevent a failure or delay of justice, or the likely benefit outweighs the burden.  Both apply here.

These trades took place in April of 2021, three of the four.  The fourth I think took place in the summer.

And our goal is to obtain the discovery in a timely manner so we do not have any argument, valid or invalid, that there's a limitations issue.

THE COURT:  Okay.

MR. McENTIRE:  And so any further delay, such as transferring this to another court or back to the bankruptcy court, which it does not have jurisdiction, would cause tremendous delay.

THE COURT:  Okay.

MR. McENTIRE:  Hunter Mountain, a little bit of background.  It is an investment trust.  When it has money, it participates directly in funding the Dallas Foundation --

THE COURT:  Okay.

MR. McENTIRE:  -- which is a very I think well-respected and recognized charitable foundation.

Certain individuals and pastors from various churches are actually here because Hunter Mountain indirectly, but ultimately, provides a significant source of funding for their outreach programs and their charitable functions and programs.

THE COURT:  Okay.

MR. McENTIRE:  The empirical evidence in the documents that are before the court, regardless of what's in the affidavits, just screams that there was no due diligence here.

Now, we know in Mr. Dondero's affidavit he had a conversation with representatives of Farallon, which would be admissions against interest.  They're admissions basically against interest that they effectively did no due diligence.

Yet we believe, upon information and belief, that they invested over $167 million.  There are two sets of claims.  There's a Class 8 claim and a Class 9 creditor claim.

THE COURT:  Right.

MR. McENTIRE:  Their expectations at the time that they acquired these claims was that Class 9 would get zero recovery.

So who spends $167 million when their expectation on return of investment is zero?  Who spends $167 million even in Class 8 when the expected return is just 71 percent and is actually declining?  And I think it's actually admitted in the affidavit that Mr. Dondero provided.

So without being hyperbolic or exaggerating, the data that was available publicly

was extremely pessimistic and doubtful that there would be any recovery.

We have direct information -- admissions, frankly -- that Farallon had access to non-public material, non-public information.  And that was the fact that MGM Studios was up for sale.

Mr. Dondero was on the board of directors.

THE COURT:  Okay.

MR. McENTIRE:  He communicated, because of his responsibilities, this information to Mr. Seery.

And Mr. Seery, apparently, would have been restricted.  He couldn't use it or distribute it.

THE COURT:  Right.

And I don't know a lot about securities law but, yeah, that would be insider information.  Right?

MR. McENTIRE:  Yes.

And it appears from the affidavit that Mr. Dondero submitted that Farallon was aware of the information before the sale closed, before they closed their acquisitions.

And Mr. Dondero asked the question are you willing to even sell your claims and they said no.  Or even 30 percent more and they said no.  We're told that they're going to be very valuable.

**Argument by Mr. McEntire**        **22**

Well, no one else had this information, so we have a problem here that we have two outsiders who are now insiders.  They've acquired potentially very valuable claims with the sale of MGM.

They also acquired information concerning the portfolios of these companies over which Highland Capital managed and had ownership interests, so we're talking about having access to information that any other bidder or suitor would not have.

So this is how they were divided up. $270 million in Class 8.  Each of the creditors right here are the unsecured creditors who sold. They were the sellers.

THE COURT:  Right.

MR. McENTIRE:  And these are the claims in the Class 9.

So you have $95 million in Class 9 claims that are being acquired when the expectation is that there will be zero return on investment.  You have $270 million where the expectation was extremely low and pessimistic.

And here are the documents.  And Mr. Schulte has not objected to these.  This particular document is Exhibit 1-J to Mr. Patrick's affidavit.

THE COURT:  Okay.

MR. McENTIRE:  This came out of the plan. So when the bankruptcy plan was confirmed in February 2021, Farallon, Stonehill, Muck and Jessup, the latter two weren't even in existence.

THE COURT:  Right.

MR. McENTIRE:  Farallon and Stonehill were complete strangers to the bankruptcy proceedings, yet they come in in the wake of this information and they invest tens if not hundreds of millions of dollars with no apparent due diligence.

The situation gets even worse.  And this is Exhibit 1-I to Mr. Patrick's affidavit.  And as I understand, Mr. Schulte does not object to these documents.  It's declining.  And then, suddenly, they're in the money.

And at the end of the third quarter last year, they're already making 255 million bucks.  And that's a far cry from the original investment.  This is for both Class 8 and Class 9.

So Mr. Patrick states the purpose of this is to seek cancellation.  Another word for it in bankruptcy-ese would be disallowance.  But the cancellation of these claims and disgorgement.

If these are ill-gotten gains, regardless of the rubric or the monicker that you place on it --

breach of fiduciary duty as insiders, aiding and abetting or knowing participation in fiduciary duties, because a lot of people have fiduciary duties on this stuff.  No matter what you call it, disgorgement is a remedy.

Wrongdoers should not be entitled to profit from their wrongdoing.

Mr. Schulte makes a big point that we can't prove damages.  Well, first of all, I don't agree with the conclusion.

THE COURT:  Right.

MR. McENTIRE:  But even if he was right, disgorgement is a proxy for damages.  And we have an entitlement and a right to explore how much they have actually received, when did they receive it.

The weathervane is tilting in one direction here, Judge.

Clearly, there is a creditor trust agreement.  That's a very important document.  It spells out rights and obligations.  It's part of the plan.

There's a waterfall.  And on page 27 of the creditor trust agreement a waterfall is exactly what it suggests.  You have one bucket gets full, you go to the next bucket all the way down.

THE COURT:  Class 1 or tier 1.

I can't remember the category.  I don't do bankruptcy.  But, yeah, those get paid, then the next level, then the next level.

So by the time you get down to level 10, which I think is what Hunter Mountain was, theoretically, there wouldn't have been anything left.

MR. McENTIRE:  That's correct.

But here, if Class 8 and Class 9 -- and I will say the big elephant in those two classes are Farallon and Stonehill or their special purpose entity bucket Jessup -- they have 95 percent of that category.

And suddenly they're not entitled to keep what they've got, and suddenly there's a disallowance, or suddenly a cancellation regardless of the theory or the cause of action -- and we have several avenues here -- a lot of money is going to flow into the coffers of Hunter Mountain, and a lot of money will flow into the Dallas Foundation, and a lot of money will flow into the coffers of charities.

So there is standing here.  Standing requires the existence of a duty.  We think we have duties.

And a concrete injury.  And if these claims were manipulated, we have a concrete injury and our proxy is disgorgement.

We've been deprived of an opportunity to share in category 10 or as we just described it in the waterfall under the creditor trust agreement.

THE COURT:  Right.

MR. McENTIRE:  Their burden is to show that this discovery has no benefit.  No.  That's my burden to show benefit.  But their burden would be to show that it's overly burdensome to them.

And I find that difficult to understand since part of their response is devoted to the fact that, hey, judge in Dallas County, you should turn this over to Judge Jernigan in the bankruptcy court.

THE COURT:  Because it's bankruptcy, you know.

MR. McENTIRE:  In bankruptcy, that's their invitation.

THE COURT:  Right.

MR. McENTIRE:  Well, if they're inviting us to go do the discovery in bankruptcy court, it doesn't seem to be that burdensome because it's going to be the same discovery.

And, by the way, Judge Jernigan actually does not have jurisdiction over these proceedings.  The other earlier proceeding, as you know, they attempted to remove it to her court and it was remanded.

Clearly, she does not have jurisdiction.

The problem with bankruptcy involved, in addition, if I wanted to do Rule 2004 discovery like they're suggesting, that's their invitation.  They would like you to push us down the road.

Well, we can't afford to push it down the road.  Because if they push it down the road, I've got to go file a motion with Judge Jernigan, get leave to issue subpoenas.

THE COURT:  Right.

MR. McENTIRE:  They have 14 days to file a motion to quash, then I have to file another motion.  And it's 21 days before their response is even filed.  And there's another 14 or 15 days before the reply is filed.  We're looking at 60, 70 days.  And that's one of the reasons we selected this procedure.

And, by the way, you hear the phrase forum shopping a lot.  Well, without engaging in the negative inference that that term suggests, a plaintiff, a petitioner, has the right to select its venue for a variety of reasons.

Our venue is the state district courts of Texas because it has an accelerated procedure.  And that's why we're here.

THE COURT:  Right.

Argument by Mr. McEntire                28

MR. McENTIRE:  I've identified the potential causes of action.  Entities or people that breach fiduciary duties and receive ill-gotten gains a constructive trust may be imposed, disgorgement. Then we do run into bankruptcy concepts.

But it's important to know that some of these are not bankruptcy.  Some of these are common law.

I suggest to the court, I don't have to go get Judge Jernigan's permission to sue Farallon or Stonehill for breach of fiduciary duties.  I don't have to get her permission to sue for knowing participation.

If I'm actually looking for equitable disallowance, probably, maybe.  But I can do the discovery here and then make that decision whether I need to go back to bankruptcy court.

I'm not foolish.  I'm not going to run afoul of Judge Jernigan's orders.  If I have to go back to Judge Jernigan to get permission, I will do it.

THE COURT:  Right.  Because only an idiot runs afoul of the bankruptcy court.

MR. McENTIRE:  Hopefully, I'm not that.

So I clearly understand what both my ethical and lawyer obligations are.  And I'm not going to run afoul of any court orders.

But some of these remedies don't require

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

an overview by Judge Jernigan or the bankruptcy court.

THE COURT:  Okay.

MR. McENTIRE:  They have a duty not to commit fraud, whether it's commit fraud against us or commit fraud against the estate.

They have a duty not to interfere with the expectancies that we have as a B/C beneficiary. That's a code name for a former Class 10 creditor.

They have a duty not to trade on inside information, and that's the Washington Mutual case.

And I've just already mentioned that because they were outsiders, they're insiders now.

These are their arguments.  Our evidence is timely.  It's not untimely.  It's not speculative. It's not speculative because the events have already taken place.  I'm not talking about something hypothetical.

THE COURT:  Right.

MR. McENTIRE:  My remedy flows from that.

So we're not projecting that I might have a claim later on.  I have a claim today.  If I have a claim today, I have it today.  I have it and I want to confirm it by this discovery.  Because their wrongdoing has already taken place, it's not hypothetical, it's not futuristic, it's already occurred.

When they say they have no duty to us, they're just wrong.  They have duties not to breach fiduciary duties.  We have direct standing I believe to bring a claim in that regard.

We have a right to bring direct standing under the Washington Mutual case, which I'll discuss.

And we also have a right to bring a derivative action.

THE COURT:  Right.

MR. McENTIRE:  And I notice that they made a comment about that in their response.  But I can sue individually.

And I can also bring an action in the alternative as a derivative action for the estate.  And these are all valid claims for the estate.

THE COURT:  Okay.

MR. McENTIRE:  Transfer.  This is not a related case because it's not the litigation.

So if you just go to the very first instance and you look at the Local Rule, it talks about litigation and causes of action.

THE COURT:  Right.

MR. McENTIRE:  We don't have a cause of action.  We're not asserting one in this petition.  So this is not a related case that falls within the

four corners of the Local Rule.

THE COURT:  Well, I guess the thing is it's still a related case.  Like if you file a 202 and then you file a lawsuit, that would be considered related.

I looked at it and you're right.  Technically, it's different parties.  I'll just say it's a grey zone at best.

MR. McENTIRE:  That's correct.

This is not a lawsuit in terms of causes of action.  It might be a related case if Mr. Dondero had come in and filed a lawsuit.  That would be a related case.  Mr. Dondero is not involved in this process, other than as a fact witness.

These are all the evidentiary issues that perhaps he's raised.  Live testimony, affidavit testimony is admissible.

The court considered numerous affidavits filed with the court.  And that's as recently as 2017.  These are all good cases, good law.

Equitable disallowance.  It's kind of a fuzzy image.  This is a bankruptcy court case, but this is simply to underscore the fact that in addition to my common law remedies there is a very substantial remedy in bankruptcy court.

It's not one I necessarily have to pursue, but if I wanted to I could.  But what it does do is it helps to find some duties.

And here, the court has the right to disallow a claim on equitable grounds in extreme instances, perhaps very rare, where it is necessary as a remedy.  And they did it in this case.

THE COURT:  Okay.

MR. McENTIRE:  This is simply an analogy to securities fraud and the 10b-5 statute.

Insiders of a corporation are not limited to officers and directors, but may include temporary insiders who have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.

Well, what about the MGM stock?  The court finds that the Equity Committee -- so here's the equity -- has stated a colorable claim.  We were 99.5 percent equity.

The Equity Committee has stated a colorable claim that the settlement noteholders became temporary insiders because they acquired information that was not of public knowledge in connection with their acquisition.

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

And allowed them to participate in negotiations with JPMC -- JPMorgan Chase -- for the shared goal of reaching a settlement.

So these were outsiders that suddenly became temporary insiders because of access to inside information.

This is not a new concept.  It comes from the United States Supreme Court.  Fiduciaries cannot utilize inside information.

THE COURT:  Right.

MR. McENTIRE:  And we believe we have enough before the court to support and justify a further investigation that this may have occurred.

THE COURT:  Okay.

MR. McENTIRE:  Now, not a related case. The Jim Dondero case is actually closed.

THE COURT:  Right.

MR. McENTIRE:  And I'll be frank with you. In all candor, I never thought this was a possible related case.

THE COURT:  I mean, we're talking about the same events, but there are differences, I agree.

MR. McENTIRE:  We're talking about one similar event dealing with Farallon.  Other events are different.

THE COURT:  Okay.

MR. McENTIRE:  So we have different dates.

THE COURT:  Right.

MR. McENTIRE:  Different parties on the petitioner's side, different law firms.

The only common party is Farallon. Alvarez & Marsal are not parties to this but Stonehill is.  Stonehill was not a party to the prior proceedings.

And the standing is manifest.  With no criticism of Mr. Dondero's lawyer, I searched in his argument where he was articulating standing.

And without going further, I will tell you I think our standing is clear.  We're in the money.

THE COURT:  Okay.

MR. McENTIRE:  We are in the money if there's a disgorgement or a disallowance.

THE COURT:  Okay.

MR. McENTIRE:  We have all types of claims, including insider trading and a creation of fiduciary duties.

Our remedies, as far as I can tell, he didn't identify any.  We have several.  Disgorgement, disallowance, subordination, a variety.  And damages.

So we suggest strongly that it is not a related case.

And I must tell you, the reference to say send this to bankruptcy court or defer to the bankruptcy court or send us over to Judge Purdy, with all due respect to opposing counsel, it's really just a delay mechanism.

And what they're seeking to do through their invective, their criticisms, the references to these other courts, is seeking an opportunity to push us down the road and put us in a bad position potentially and a not enviable position in connection with statute of limitations.

Your Honor, we would offer the binder of exhibits that we submitted on February 15, 2022, including the affidavits and all the attached exhibits.

I would ask the court to take judicial notice of all the exhibits that we referred to in our petition, which I think is appropriate since we were specifying with particularity what we were requesting the court to take judicial notice of.  And that's the large index, that's the list.

THE COURT:  Obviously, I can take judicial notice of any kind of court pleadings, whether they're state or federal.

MR. McENTIRE:  That's correct.

THE COURT:  That's clear.

MR. McENTIRE:  We would offer both affidavits and all the attachments into evidence at this time.

THE COURT:  Okay.  Do you have exhibit numbers for them?

MR. McENTIRE:  Yes.  It's Exhibit 1 with attachments.  1-A, 1-B, 1-C, 1-D, 1-E, 1-F and then Exhibit 1-G, Exhibit 1-H, Exhibit 1-J, Exhibit 1-K.

Everything in the binder, Your Honor.  It's Exhibit 1 and Exhibit 2 with the attachments.

THE COURT:  Okay.

MR. McENTIRE:  I believe they're all identified.  I can put a sticker on them, if you'd like.

THE COURT:  Yeah.  To admit them, it will need a sticker.

So I'm going to hold off on admitting them for just a minute because I do want to hear his objections and then we can go back to it.  So just make sure we do that.

I'm not trying to not admit them, but I do want to let him have his objections.

Okay.  Anything else, Counsel?

MR. McENTIRE:  That's all I have right now, Judge.

THE COURT:  Okay.  Counsel?

MR. SCHULTE:  Should I start with those exhibits, Your Honor?

THE COURT:  Why don't you do that.  That's probably the easiest way.

MR. SCHULTE:  In light of the authorities that Mr. McEntire shared about the affidavits, I'll withdraw the objections to the affidavits or the declarations.

THE COURT:  Okay.

MR. SCHULTE:  I'm taking Mr. McEntire's word that those cases say what he says they say.

THE COURT:  I'll tell you because 202 is not a lawsuit, you don't necessarily have a right to cross-examine, et cetera.  So, yeah, affidavits are frequently used on 202s.

MR. SCHULTE:  And that's fine, Your Honor. I'll take Mr. McEntire's word what those cases say.

But I will maintain the objection to Exhibit H -- it's the declaration of Mr. Patrick -- on the grounds of hearsay.  That is not a court record or a file-stamped pleading from federal or state court. It's just a letter.  So that's hearsay.  And it hasn't been properly authenticated.

The other issue is the exhibit to Mr. Dondero's declaration.  That's just an email

from Mr. Dondero, so I object on the grounds of hearsay.

THE COURT:  Mr. McEntire, what's your response specifically to Exhibit H as attached to the Patrick declaration and then the attachment to the Dondero declaration?

MR. McENTIRE:  Exhibit H to Mr. Patrick's affidavit would be hearsay, but there's an exception that it's not controversial.

THE COURT:  Okay.

MR. McENTIRE:  And there's no indication that there's any challenge of the reliability of the document.

THE COURT:  What is the exhibit?  I'm trying to pull it up.  Sorry.

MR. McENTIRE:  It's Exhibit 1-H.  It is a letter from Alvarez & Marsal simply indicating what they paid for the claim.

THE COURT:  Is it the July 6th, 2021, letter?

MR. McENTIRE:  Yes, Your Honor.

THE COURT:  I've got it.

MR. McENTIRE:  And the exhibit to Mr. Dondero's is not being offered for the truth of the matter asserted, just the state of mind of Farallon.

THE COURT:  Okay.

MR. McENTIRE:  He has proved it up that it's authentic.  It's a true and accurate copy.

And it goes to the state of mind of Farallon and it goes to the state of mind of Mr. Seery as well who are basically individuals who are trading on inside information.

And Mr. Seery would not have known about the MGM sale but for that email.  And Farallon and Stonehill would not know about MGM but for Mr. Seery.

THE COURT:  Okay.  So the response to hearsay is that it goes to state of mind.

MR. McENTIRE:  It goes to state of mind.

THE COURT:  Okay, Counsel.  How do you respond to that?

MR. SCHULTE:  I'll start with the last one, Your Honor.  I think that's the definition of hearsay, is that you're purporting to establish the state of mind of the parties who are not before the court.

It's been emphasized that Mr. Dondero has no relation to HMIT.  And none of the recipients of the email are parties to this proceeding.

This purports to establish the state of mind of Mr. Seery, who is not before the court, and the state of mind of Farallon, just based on the say so of

Mr. Dondero in this email.  That's hearsay.

And as for the first letter, this is a letter on the letterhead of A&M which, by the way, is one of the parties in the Dondero Rule 202 petition.

And it's not on the letterhead of any of the parties to this case so the letter isn't properly authenticated.

And I'm not aware of the not controversial exception to hearsay.

THE COURT:  Well, there is a thing that talks about if you're admitting something that's just not controverted.  Right?  It's everybody agrees "X" happened.  We're just admitting evidence to have that. So what this basically is is just showing the claim of the funds.

And I guess my question is what's the objection.  Is there an objection to the substance of it?

MR. SCHULTE:  I don't think there's any dispute that Farallon and Stonehill, through their respective special purpose entities, purchased the claims that are at issue here.

And if that's the sole purpose of admitting this letter into evidence, I don't think that's a matter that's genuinely in dispute.

THE COURT:  Okay.

MR. SCHULTE:  So if that's the only issue as raised by this letter, I don't know that there's a dispute there.

THE COURT:  Right.  Well, that's the whole thing.

MR. McENTIRE:  I think we're almost solving the issue on the fact of how much they paid, $75 million.

THE COURT:  Okay.  So I will sustain the objection to the email to Mr. Dondero's declaration, Exhibit P 2-1.

I am going to overrule the objection to -- I don't know what the letter is of the attachment.

MR. McENTIRE:  It's Exhibit P 1-H to Mr. Patrick's affidavit.

THE COURT:  Correct.  Sorry.

Okay, Counsel.  If you'll proceed.

MR. SCHULTE:  May I approach the bench, Your Honor?  I have a binder of exhibits also.

THE COURT:  Yes, you may.

MR. SCHULTE:  These have all been marked with exhibit stickers already.  There are tabs for each of the exhibits.  They're marked R1 through 17, I believe.  And "R," of course, stands for Respondents.

Response by Mr. Schulte                42

THE COURT:  I take the shortcut of calling everybody "Plaintiff" and "Defendant" just because I'm so used to using that language in court.

But I do agree.  It's Petitioner and Respondent.  You're not technically a defendant.

Okay.  So, first of all, I'm going to admit Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2, with the sole exception of the email to Mr. Dondero's declaration that I sustained.

And then are there objections to the respondent's exhibits?

MR. McENTIRE:  Very few.

I object to Exhibit No. 1 and Exhibit No. 2 as irrelevant.

THE COURT:  What's the objection to 1?

MR. McENTIRE:  They're offering the order from Judge Purdy.

THE COURT:  Okay.  I can take judicial notice of that.  I mean, it's a court record from Dallas County.  So I don't think that that's particularly relevant.

To be bluntly honest, I looked at it last night.  Right?  Because of the issue that there's a related case, I pulled that file too and looked at everything.

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

So I can take judicial notice of that. Whether it's relevant or not, I can look at it. And, obviously, if it's not relevant, I'll disregard it.

MR. McENTIRE: Fair enough.

THE COURT: I'll overrule that objection.

What's next?

MR. McENTIRE: The only other objections are Exhibit 12 and 13. I just don't know what they are or for what purpose they would be offered.

THE COURT: Okay. So 12 is a notice of appearance and request for service in the bankruptcy court on behalf of Hunter Mountain Trust.

So what's the issue, Counsel?

MR. SCHULTE: Your Honor, these are notices of appearance filed by Hunter Mountain in the bankruptcy court.

And the purpose of these notices is simply to show -- and maybe this is not genuinely in dispute -- that Hunter Mountain, through its counsel, would have received notice of all the activity that was going on in the bankruptcy court.

THE COURT: It's the same issue I've got with everything that Plaintiff submitted. It's a bankruptcy pleading. I can take notice of it. If it's irrelevant, I'll disregard it.

So I'll overrule that objection.

And then what's 13?

MR. McENTIRE:  The same objection.

THE COURT:  I'll overrule it because again, I can take judicial notice of those.

MR. McENTIRE:  No other objections, Your Honor.

THE COURT:  So Respondent's Exhibits 1 through 17 are so admitted.

MR. SCHULTE:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

MR. SCHULTE:  HMIT -- Hunter Mountain -- races into this court seeking extensive and burdensome presuit discovery about claims trading that took place in the Highland bankruptcy two years ago.

Mr. McEntire has talked about the harm that would result from delay if a different court were to consider this request for presuit discovery.  That is a function of waiting two years after the subject claims transfers to seek relief in this court.

The exact same allegations of claims trading and misconduct by Jim Seery -- those allegations are not on the slides that you looked at.  But those allegations are common in Mr. Dondero's Rule 202 petition and this petition.

**Response by Mr. Schulte**                45

THE COURT:  Right.  They're common.

I know you make the allegation that Dondero is related to Hunter Mountain, but I guess I don't have any evidence of that.

Or do you have evidence of that?  Because otherwise, while it involves some of the same issues in the sense of the underlying facts, technically Farallon is the common respondent.

But there's a different respondent and there's a different petitioner in that case.

MR. SCHULTE:  Yes.  That's true, Your Honor.  And we've said that on information and belief.

THE COURT:  Okay.

MR. SCHULTE:  That's our suspicion.

We believe that to be the case, but I don't have evidence of it.  I didn't hear a denial of it, but, nevertheless, that is where things stand.

But what's important about the case is even if this court and Judge Purdy determined that the cases are not related, what is important is that the same allegations related to this claims trading and the same allegations of inside information being shared by Mr. Seery, those were front and center in the July 2021 petition filed by Mr. Dondero.

Even if there are other dissimilarities between the cases, those are issues that are common.

THE COURT:  Okay.

MR. SCHULTE:  And it's important to note that as HMIT has filed this petition, it has glossed over issues of its own standing and the assertion of viable claims that will justify this discovery.

Now, I know that HMIT has cited these cases that say, Your Honor, I don't have to state a really specific claim right now.

But you do have to articulate some ground for relief, some theory, that would justify the expense and the burden that you're trying to put the respondents to in responding to all this discovery.

And this isn't simple discovery. We're talking about deposition topics with I believe 29 topics each and 13 sets of really broad discovery requests with a bunch of subcategories.

THE COURT:  Right.

MR. SCHULTE:  We're not talking about some minimal burden here.  This is an intrusion into entities that are not parties to a lawsuit, but rather this investigation.

And HMIT has ignored that there is a specific mechanism in the bankruptcy court that's

available to it under federal bankruptcy Rule 2004 and that the substance of HMIT's petition, which is claims trading and bankruptcy, falls squarely within the expertise of Judge Jernigan, the presiding bankruptcy judge.

THE COURT:  And I agree.  You could do this in federal court.  But there's a lot of things that can be done in state court or done in federal court.

They get to choose the method of getting the information, so why should I say, theoretically, yes, this is a good thing, I should do it, but, hey, send it to bankruptcy.  Why?

MR. SCHULTE:  The bankruptcy judge has actually answered that question directly.

THE COURT:  Okay.

MR. SCHULTE:  It is true, as HMIT has said, the federal bankruptcy court doesn't have jurisdiction over a Rule 202 proceeding.  That's not in dispute.

THE COURT:  Right.

MR. SCHULTE:  We tried to remove the last case to federal bankruptcy court and it was a state claim.

But what the bankruptcy judge pointed out

when she remanded the case back to Judge Purdy, who

ended up dismissing Dondero's petition, is it pointed

out, one, there's this mechanism in bankruptcy where

they can do the exact same thing, Rule 2004.

And the bankruptcy judge pointed out that

it is in the best position to consider Hunter Mountain's

request.

It pointed out when it remanded the

case that it had grave misgivings about doing so.

It confirmed that it is in the best position to

consider this presuit discovery.

THE COURT:  Okay.  This is part of one of

the exhibits?

MR. SCHULTE:  Yes, Your Honor.  This is

in one of the opinions that I included in the binder,

a courtesy copy of one of those opinions.

THE COURT:  Oh, at the back?

MR. SCHULTE:  Yes, Your Honor.

THE COURT:  Okay.

MR. SCHULTE:  It's 2022 Bankruptcy

Lexis 5.

THE COURT:  Okay.  I got it.

And real quick, for the record,

it's Dondero versus Alvarez & Marsal.  It's

2022 Bankruptcy Lexis 5.

MR. SCHULTE:  Right.

And in particular, Your Honor, I'm looking at pages 31 to 32 of that order.

THE COURT:  Okay.

MR. SCHULTE:  What the judge is pointing out here is it has grave misgivings about remanding the case because it knows a thing or two about the Highland bankruptcy, having presided over the case and all the related litigation for over what's now three years.

And it's familiar with the legal and factual issues.  It's familiar with the parties.  It's familiar with claims trading in a bankruptcy case, which was the very crux of the Dondero petition.  It's also the crux of this petition by Hunter Mountain.

And it observed, the bankruptcy court did, that any case that could be fashioned from the investigation would end up in bankruptcy court anyway because it would be related to the Highland bankruptcy.

So you ask a really good question, Your Honor.  Why should I ship it off to the bankruptcy court.  The answer is Judge Jernigan is in a position to efficiently and practically deal with this request because she deals with it all the time and she is intimately familiar with the legal and factual issues and with claims trading.

Response by Mr. Schulte                    50

It's not like Hunter Mountain gets poured out if it goes to bankruptcy court.  It has a mechanism to seek the exact same discovery from Judge Jernigan who is very familiar with these very particular issues.

Now, Hunter Mountain says, well, bankruptcy court is too time-consuming and cumbersome. It's going to take 60 days to even get this before the bankruptcy court.

Well, we're talking about the fact that they've waited two years to file this proceeding related to these claims transfers that took place in 2021.

So, again, what HMIT is asking this court to do is inefficient and is impractical.  This court would need to devote a lot of resources to understand what the proper scope of any discovery should be, whether the claims are cognizable.

And that's just a tall order, Your Honor. The request is more appropriately dealt with by the bankruptcy judge, according to a proper bankruptcy filing.

It's undisputed that while the bankruptcy court doesn't have jurisdiction over a 202 petition, there's no question that it has jurisdiction over a Rule 2004 request for discovery, which is the counterpart for this type of discovery in bankruptcy court.

THE COURT:  Right.

MR. SCHULTE:  The real issue, Your Honor, and this is the part that Hunter Mountain is dancing around, is that Hunter Mountain doesn't want to be in front of Judge Jernigan.

Judge Jernigan held Mark Patrick -- that is HMIT's principal who verified this petition. She held him along with Dondero and Dondero's counsel and others in civil contempt and sanctioned them nearly $240,000 for trying to join Seery to a lawsuit in violation of Judge Jernigan's gatekeeping orders.

HMIT is trying to dodge the bankruptcy court and its scrutiny of what HMIT is doing as this petition also targets Seery and the inside information that he purportedly gave to Farallon and Stonehill.

This is forum shopping, plain and simple. And the court should dismiss the petition so that HMIT can seek this discovery in bankruptcy court.

Now, I don't want to spend a lot of time on the related case, but I will emphasize just what I've mentioned, which is while some of the parties may be different, we're still talking about the same claims trading activity that took place in 2021 and the same allegations of insider dealing by Seery.

And Judge Purdy, on remand, dismissed

that petition where some of the same arguments were made about judicial efficiency and that the case should be filed in bankruptcy court.

And it bears noting, by the way, that after Judge Purdy dismissed Dondero's Rule 202 petition, where we had argued that this ought to be in the bankruptcy court, Dondero didn't file in the bankruptcy court, which sort of makes the point that they didn't want to be in front of Judge Jernigan on this either.

Okay.  Now let's turn to the merits, Your Honor.  While Mr. McEntire has gone to great lengths to say we don't have to state claims, he stated five or six on that PowerPoint presentation of claims that he envisions.

But what made it all really crystal clear is in that notice of supplemental evidence, and that includes the declaration of Mr. Patrick, there in paragraphs 15 and 16 it's made clear what Hunter Mountain really wants.

THE COURT:  Okay.

MR. SCHULTE:  What the goal of this discovery is is to invalidate the claims that Farallon and Stonehill's entities purchased.

So let's unpack what it is they purchased.

THE COURT:  Okay.

MR. SCHULTE:  These are claims that were not ever held by Hunter Mountain.  These are claims that were held by Redeemer, Acis, UBS, and HarbourVest.

THE COURT:  Right.  They were the Class 8 and 9.  Right?

MR. SCHULTE:  I believe that's correct.

THE COURT:  Okay.

MR. SCHULTE:  Those claims were always superior to whatever it was that Hunter Mountain held.

So Redeemer, Acis, UBS, and HarbourVest held those claims.  The parties in the bankruptcy had the opportunity to file objections to those claims.  And they did.

And Seery, on behalf of the debtor, negotiated with Redeemer, Acis, UBS, and HarbourVest and reached settlements that resolved the priority and amounts of those claims.

THE COURT:  Right.

MR. SCHULTE:  And then filed what's referred to -- and I'm sure Your Honor knows this -- as a Rule 9019 motion to approve those settlements in the bankruptcy court.

THE COURT:  Actually, I don't.  I've never done bankruptcy but I read it.  I know the general process and I did read it.

MR. SCHULTE:  All right.

THE COURT:  Just FYI, I've never done bankruptcy law.  They've got their own rules.

MR. SCHULTE:  Well, the parties in the bankruptcy had the opportunity to object to those settlements and some did so.

And after evidentiary hearings, the bankruptcy court granted those motions and allowed and approved those claims.

That is really important, Your Honor.

THE COURT:  Okay.

MR. SCHULTE:  That's Exhibits 14 through 17 in the binder that I handed you.

And these are the same exhibits that are referenced in Hunter Mountain's petition.  And it bears noting that the U.S. District Court affirmed those orders after appeals were taken.

But the bankruptcy court's approval of the very same claims that Hunter Mountain now seeks to investigate and invalidate is entitled to res judicata.

HMIT can't now second-guess the bankruptcy court's orders approving those very same claims.  That's the effect of the investigation that Hunter Mountain seeks, the invalidation of claims that are already bankruptcy court approved.

And it bears noting that each of those four orders, Exhibits 14 through 17, provides the following:  quote, "The court" -- the bankruptcy court -- "shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this order."

This would include HMIT's stated goal of conducting discovery to try to invalidate these very claims.

This is yet another reason, Your Honor, to answer your question earlier of why this request for discovery should be posed to the bankruptcy court.

Judge Jernigan, I suspect, would have views on whether her own orders authorizing these claims should be overturned.

Okay.  So HMIT -- Hunter Mountain -- alleges that after the bankruptcy court approved these claims, Seery disclosed inside information to Farallon and to Stonehill to encourage them to buy these claims from the original claimants.  Again, UBS, Redeemer, Acis, and HarbourVest.

Farallon, through Muck, which is its special purpose entity, and Stonehill through Jessup, which is Stonehill's special purpose entity, acquired those transferred claims in 2021.

Response by Mr. Schulte                56

And there's no magic in bankruptcy court to claims transfers.  It's a contractual matter between the transferors and the transferees.  It's strictly between them.

THE COURT:  Okay.

MR. SCHULTE:  And there's no bankruptcy court approval that's even required.

The transferee, so in this case Muck and Jessup, had simply to file under federal bankruptcy Rule 3001(e) a notice saying these claims were transferred to us.  And they did so.

Your Honor, that's Exhibit 6 through 11 in the binder that I handed to you.

THE COURT:  Okay.

MR. SCHULTE:  The filings evidencing those claims transfers were public.  And Hunter Mountain received the claims transfer notices.

And that's the exhibits that we were talking about, Exhibits 12 through 13, where Hunter Mountain's lawyers had appeared in the case before those claims transfer notices were filed.

So not surprisingly, Hunter Mountain did not file any objections to those claims transfers.  And that's not surprising because under Rule 3001, the only party that could object to the claims transfers were

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

the transferors themselves.

THE COURT:  Right.

MR. SCHULTE:  Essentially saying, hold on.
We didn't transfer these claims.  But of course there's
no dispute that the transfers were made.

Here, HMIT was neither the transferor nor
the transferee of the claims.  It had no interest in
these claims.  It never did.  It didn't before the
claims transfers and it didn't after the claims
transfers.

The claims originally belonged to
Redeemer, Acis, UBS, and HarbourVest, and they were then
transferred to Muck and Jessup, which are Farallon's and
Stonehill's entities.

THE COURT:  Right.

MR. SCHULTE:  So why does that matter?
That matters because these claims were approved by the
bankruptcy court.  The claims didn't change or become
more valuable after they were transferred.  The only
difference is who is holding the claims.

So Hunter Mountain says, hold on.  What
we're alleging here is that the claims that Farallon and
Stonehill purchased with the benefit of this purported
inside information from Mr. Seery, they're secretly
worth more than expected.

Those allegations, they're disputed, to be sure. But let's assume they're true. That situation has zero impact on Hunter Mountain.

THE COURT: Okay.

MR. SCHULTE: And that's because this is a matter that's strictly between the parties to the claims transfers. Again, Redeemer, Acis, UBS, and HarbourVest on the one hand and Farallon and Stonehill on the other.

And the way we know this is let's pretend that Muck and Jessup didn't buy these claims, Your Honor, and that the claims instead have remained with UBS, HarbourVest, Acis, and whatever the other one I'm forgetting. The claims wouldn't have been transferred, and they would have remained with those entities.

In that case, the original claimants would have held those claims for longer than they wanted. And if HMIT is right, then the claims would have ended up being worth more than even they expected.

So why does that matter? Well, that matters because if that is all true, Hunter Mountain would be in the exact same place today. Neither better nor worse off, it would be in the exact same place.

Either Farallon and Stonehill's entities are gaining more on these claims than they expected

or UBS, HarbourVest, Acis, and Redeemer, they are realizing more on these claims than they expected.

But Hunter Mountain never stood to be paid on these claims to which it was a stranger.  These are claims in which Hunter Mountain never had any interest.

THE COURT:  So presuming that Hunter Mountain had expressed interest in buying these claims and there was insider trading, you don't think that would be a tortious interference in a potential contract?

MR. SCHULTE:  If there was insider trading of the type that Hunter Mountain alleges in this case, it would have no impact on the rights of Hunter Mountain.

If that's true, maybe there was a fraud on the bankruptcy court.  The bankruptcy court would surely be interested in that.  Maybe there was a fraud on the transferors.  I mean, maybe UBS, Redeemer, Acis -- why do I always forget the third one? -- and HarbourVest.

THE COURT:  Like I said, I had a chart last night of all the names.  Obviously, I haven't been involved in this case up until now, and there's a lot of names.

MR. SCHULTE:  Yes.

The transferors of the claims might say,

**Response by Mr. Schulte**          60

well, wait a minute.  I wish I would have known this inside information.  I'm the one that was really injured here.

Because if there was really meat on this bone, Your Honor, then the injured parties would be the transferors of the claims:  Redeemer, Acis, UBS, and HarbourVest.

Because the crux of HMIT's petition is that those entities, the transferors, were duped into selling their claims for too little when the claims were secretly worth more.

Well, if that's true, you would expect that the transferors would be screaming up and down the hallway, saying we didn't get paid enough.

THE COURT:  Right.

MR. SCHULTE:  We are the injured parties here, we are the ones with damages, we want to unwind these claims transfers, or we want to be paid more on these claims transfers.

But the rights of those entities, the transferors, to complain about these allegations doesn't mean that Hunter Mountain can also stand up and say, well, I want to complain too.  Because Hunter Mountain never stood to be paid on these claims.

The question is if somebody was duped,

Response by Mr. Schulte                61

if somebody was injured, if anybody it was the transferors, not Hunter Mountain.  The transferors would be the only real parties in interest that would have been injured by what Hunter Mountain alleges.

But it's notable that none of those transferors has filed an objection to these transfers.

THE COURT:  Right.

MR. SCHULTE:  None of them has filed a Rule 202 proceeding.  None of them has filed a Rule 2004 proceeding seeking discovery about inside information that Farallon and Stonehill allegedly had.  It is Hunter Mountain who is an absolute stranger to these claims trading transactions.

And so HMIT is trying to inject itself into a transaction to which it was never a party and which it never had any interest.

The sellers were entitled to sell those claims to any buyer they wanted to on whatever terms they agreed to.

And if there was some information that they didn't have the benefit of that the buyers did, you would expect the transferors, if anyone at all, to be the ones complaining about it.  But that's not what we have here.

THE COURT:  Okay.

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

MR. SCHULTE:  All right.  Another note that Hunter Mountain glosses over is duty.

So all the claims that were listed on the PowerPoint all require that there must have been some kind of a duty owed by Farallon and Stonehill to Hunter Mountain.  But there's no duty owed to a stranger to a claims trading transaction.

Yet again, if anybody were to have a duty owed to it, I guess it would be the transferors of the claims even though that was an arm's length transaction.

But it's not a stranger to the transaction and a stranger that has no interest in the claims that we're talking about here.

THE COURT:  Okay.

MR. SCHULTE:  Nor has Hunter Mountain identified any authority for a private cause of action belonging to Hunter Mountain related to these claims transfers.

Hunter Mountain doesn't have the right to assert claims on behalf of other parties.  It only has the right to assert claims on behalf of itself when it has been personally aggrieved.

I heard Mr. McEntire say several times during his presentation that Hunter Mountain had a

99.5 percent equity interest in Highland Capital.

THE COURT:  Right.

MR. SCHULTE:  I think it's important to point out that that equity interest was completely extinguished by the confirmed plan in the bankruptcy case.

As Your Honor pointed out, we have the waterfall, and Classes 1 through 9 have to be paid in full.  And you know what Classes 8 and 9 are?  General unsecured claims and subordinated claims.

And the only way that Hunter Mountain is ever in the money, as Mr. McEntire was saying, with its Class 10 claim is if Seery, the claimant trustee, certifies that all claims in 1 through 9 are paid in full 100 percent with interest and all indemnity claims are satisfied.

There has been no such certification by Mr. Seery, and there may never be such a certification by Mr. Seery.

THE COURT:  Okay.

MR. SCHULTE:  So that is real important because the idea that Hunter Mountain stands to somehow gain from this transaction is flawed for the reasons we've already talked about.

But it's also flawed because they have

what is, at best, a contingent interest.  It's contingent on things that have not yet occurred.  And under the case law, they don't have standing conferred on them in that interest.

THE COURT:  Okay.

MR. SCHULTE:  So for all those reasons why there is no interest in the claims, no legal damages, no duty owed to it, no private cause of action belonging to it and a hypothetical and contingent interest, HMIT lacks standing to investigate or challenge these claims and claims transfers to which it was not a party and in which it had zero interest.

And for any or all of the reasons we've talked about, Your Honor, their petition should be dismissed.  I welcome any questions the court may have.

THE COURT:  No.  My head is kind of spinning.  Like I said, I spent all day yesterday reading stuff.  As I said, I will admit I've never practiced bankruptcy law.

I mean, my joking statement is I pretty much know enough to not be in contempt of bankruptcy court.  Because I have cases where one of the defendants or one of the parties ends up in bankruptcy court and whether or not I can proceed with my case, et cetera.  That's my whole goal is not to be in contempt of court.

MR. SCHULTE:  That should be the goal, is to not be in contempt of the bankruptcy court.

MR. McENTIRE:  May I have just five or ten minutes?

THE COURT:  I don't have another hearing, so we're fine on time.

MR. McENTIRE:  All right.  In all due deference to Mr. Schulte, the last 15 minutes of his argument misstates the law.

THE COURT:  Okay.

MR. McENTIRE:  The Washington Mutual case addresses almost 90 percent of what he just talked about.  Their equity was entitled to bring an action to basically disallow an interest that was acquired by inside information.

Okay.  And so he has not addressed the Washington Mutual case at all.

THE COURT:  Well, okay.  So my question is let's say that the insider trading didn't happen.

I mean, when I was playing with the numbers last night, it doesn't appear that Hunter Mountain, being Class 10, would have gotten anything anyways even if.  Right?

Like I said, I did a lot of reading last night, so I want to make sure I understand.

Response by Mr. McEntire                    66

MR. McENTIRE:  Fair enough.  I think I can address that.

The bottom line is a wrongdoer should not be entitled to profit from his wrong.  That's the fundamental premise behind the restatement on restitution.  That's the fundamental purpose of the <u>Washington Mutual</u> case.

You have remedies, including disgorgement, disallowance or subordination.

THE COURT:  I'm just trying to be devil's advocate because I'm trying to work through this.

So let's say it did happen and the court ordered disgorgement and invalidated these transfers, then the money would just go to the Class 8 and Class 9.  Right?  To Acis, UBS, HarbourVest, etc.

MR. McENTIRE:  No, they would not.  Because those claims have already been traded.

THE COURT:  Okay.  Well, that's what I'm saying.

If the court said there was insider trading and to disallow the transfer and ordered disgorgement, theoretically, back to Highland Capital, then the money is there.

Okay.  So then it would just go to Acis and UBS.  Right?

MR. McENTIRE:  The remedy here is to subordinate their claims.  HarbourVest, UBS, Acis, and the Redeemer committee have sold their claims.  They can intervene if they want and that's up to them.  If they want to take the position that they were defrauded, that's up to them.

THE COURT:  Okay.

MR. McENTIRE:  Otherwise, the remedy is to disgorge the proceeds and put them back into the coffers of the bankruptcy court in which case Category 8 and 9 would be brimful, overflowing, and flow directly into the coffers in Class 10.

And that's the purpose of 15 and 16 in Mr. Patrick's affidavit.

THE COURT:  Okay.

MR. McENTIRE:  I find it amazing that he refers to Judge Jernigan's orders where he said anything dealing with these claims must come back to me.  I have exclusive jurisdiction.  I recall that argument.

THE COURT:  Right.

MR. McENTIRE:  Well, she could have accepted the removal of Mr. Dondero in that other proceeding.  She didn't.  She said I don't have jurisdiction over this.  I'm sending it back to the state court.

THE COURT:  Okay.  Because it was filed as a 202.  If it had been filed as a Rule 404, then she would have had jurisdiction because you're specifically invoking a state court process.  Right?

MR. McENTIRE:  I'm invoking exclusively a state court process because of the benefit it provides.  That is a strategic choice that this petitioner has elected.  It has nothing to do with bankruptcy court, other than bankruptcy court is too slow.

All the invective about the prior contempt order has nothing to do with these proceedings. Mr. Dondero is not involved in these proceedings.

If HarbourVest and UBS want to intervene in some subsequent lawsuit, they have a right to do so. I can't stop them.

But until then, we have stated a cause of action or at least a potential cause of action which is insider trading.  That from an outsider makes them an insider that owes fiduciary duties to the equity.

Washington Mutual allowed equity to come in and disallow those claims.  And if those claims are disallowed, the Class 10 is going to be overflowing on the waterfall.  And that's my client.

A couple of other things.  Hunter Mountain

is not a stranger.  Hunter Mountain was the big elephant in the room until the effective date of the plan.

We held 99.5 percent of the equity stake and when all of these wrongdoings occurred, Hunter Mountain was still the 99.5 percent equity stakeholder.

It's only after the bankruptcy plan had gone effective, after these claims had already been --

THE COURT:  Wait.  The insider trading happened after the bankruptcy had been filed but before the bankruptcy was resolved.

So it's during that process.  Right?

MR. McENTIRE:  You have filing a bankruptcy.  You have a bankruptcy plan.  You have confirmation of the plan, but it doesn't go effective until six months later.

THE COURT:  Right.

MR. McENTIRE:  After the bankruptcy plan was confirmed and they had dismal estimates of recovery -- 71 percent on Class 8, zero percent on Class 9 -- that's when Farallon and Stonehill purchased the claims.

But they purchased the claims at a time before the bankruptcy wasn't effective.  And so the so-called claimant trust agreement had not gone into effect until several months later.

THE COURT:  Okay.

MR. McENTIRE:  And during this period of time Hunter Mountain was the very, very largest stakeholder.

THE COURT:  Okay.

MR. McENTIRE:  And so to call it a stranger is just not right and it's not fair because we're anything but a stranger.

They make an argument that Hunter Mountain didn't object to the settlements.  Well, so what?  I'm not attacking the underlying settlements.  I'm attacking the claims transfers.

And then he says, well, why didn't they object to the claims transfers.  Well, he finally conceded that the claims transfers are not actually subject to a judicial scrutiny by the bankruptcy court.

This court is uniquely qualified to review these claims transfers as is Judge Jernigan.  Insider information is insider information as a rose is a rose is a rose.  And any court of law is qualified to determine whether insider information was used.

Judge Jernigan did not say, okay, Farallon, you can buy this claim.  There was no judicial process here.

THE COURT:  Right.  I mean, it's a motion.

We want to do this, just get approval.

MR. McENTIRE:  They don't even have to get approval.

THE COURT:  Okay.

MR. McENTIRE:  All they have to do is file notice.

THE COURT:  Okay.  File the notice.

MR. McENTIRE:  Judge Jernigan was not involved at all.

We had no reason to object.  All we know there's a claims transfer.  It's not until later that we discover that inside information was used and that's why we're here.

So we didn't object to the original claims.  There was no need to.  The original settlements rather.  There was no need to.  There was no objection to the claims transfers.

There was no mechanism to object, other than what we're doing here today.  This is our objection.  This is our attempt to object.

Because we believe that they have acquired hundreds of millions of dollars of ill-gotten gain and if that is true, not only will Hunter Mountain be benefited tremendously, but other unsecured creditors. They are very few but they will be also benefited.

Frankly, Judge Jernigan may want that to happen.

THE COURT:  Okay.

MR. McENTIRE:  But we're here to get the discovery so I can pull it all together within the next 30 days or 40 days.  So I can make decisions before somebody might suggest, hey, well, you should have filed this a little bit earlier.

And so, Judge, that's why we're here, in the interest of time.  And that was my decision.  That was my strategic decision to bring it here.

THE COURT:  Right.

MR. McENTIRE:  He says that Rule 3001 is the exclusive remedy.  Only transferors can complain about transferees or vice versa.

THE COURT:  You're not necessarily complaining about the actual transfer.  It's how the transfer came about.

MR. McENTIRE:  That's right.

And to suggest that that is the governing principle that this court should consider is an absolute contradiction to the Washington Mutual case.

Because if fraud is in play, if inside information is in play, then it impacts everyone who is a stakeholder.  Everyone.

Response by Mr. Schulte                    73

THE COURT:  Okay.

MR. McENTIRE:  And we are one of the largest stakeholders in the bankruptcy proceedings, even today.  So that's all I have.

I thank you for your attention, Your Honor.  Clearly, the benefit here is we get to uncover some things that need to be uncovered.  And we'd like to do it so in a timely fashion.

And if we don't have a claim, we don't have a claim.  If we have a claim, then we may file it in a state district court.

And if Judge Jernigan and her gate-keeping orders require us to go there, we'll go there.  I'm not going to run afoul of any rule she has, but we need to get this underway.

THE COURT:  Okay.

MR. SCHULTE:  Your Honor, may I make some rifle-shot responses?

THE COURT:  Yeah.  That's fine.

MR. SCHULTE:  Okay.  Mr. McEntire has said that they are one of the largest stakeholders in the Highland bankruptcy based on this 99.5 percent equity. That equity was extinguished in the fifth amended plan.

That's Exhibit 3 that I handed you, Your Honor.  That plan was filed in January of 2021

before any of these claims transfers took place.

The equity was extinguished by virtue of the plan.

THE COURT:  Okay.

MR. SCHULTE:  Mr. McEntire was talking

about this Washington Mutual case.  I read the case.

But what he said repeatedly, and I think

it's really important to listen to what Mr. McEntire

said about this case, is that that court allowed the

equity to come in and talk about these transfers.

Hunter Mountain doesn't have any equity.

That equity was extinguished in the plan for reasons

I just discussed.  So for being the largest stakeholder,

according to Mr. McEntire, in the bankruptcy what does

Hunter Mountain have to show for that?  A Class 10.

As Your Honor pointed out, a Class 10

interest, that is below everybody else.  And that's

where they've been relegated.

And to answer your question, Your Honor,

that you posed to Mr. McEntire that I'm not sure was

ever answered, HMIT -- Hunter Mountain -- at Class 10

stood to gain nothing when the plan was put together.

So the largest stakeholder stood to gain nothing.

I've pointed to the language in the

court's order about how the court has exclusive

jurisdiction.

And Your Honor nailed the answer to the concern raised by Mr. McEntire, which is the bankruptcy court didn't have jurisdiction over a 202 proceeding. But it unquestionably has authority over the counterpart, 2004 in bankruptcy court.

THE COURT:  Right.

MR. SCHULTE:  Finally, I have never argued and if I did say this, I apologize.  I have never argued that Hunter Mountain is somehow a stranger to the bankruptcy.

THE COURT:  Right.  They were obviously involved in the bankruptcy, but they're a stranger to these transfers.

MR. SCHULTE:  Exactly.  They were a stranger to these transactions.  They didn't have any interest in these claims.

They don't stand to gain anything if the claims are either rescinded or if the claims are invalidated or the transfers are invalidated.  They don't stand to get anything because they never had any interest in these claims.

The claims are the claims and either UBS, Redeemer, Acis, and HarbourVest stood to gain more than expected or Farallon and Stonehill stand to gain more than expected.

And if anybody is really injured here, it's not Hunter Mountain. It's the transferors who were duped into these transfers, according to Hunter Mountain. And they would be the ones that would have damage and have a claim along the lines of what Hunter Mountain is trying to assert on behalf of all stakeholders.

Your Honor, I have a proposed order, as Mr. McEntire does.

May I bring it up?

THE COURT: Yes, you may.

Okay, Mr. McEntire. Anything else?

MR. McENTIRE: His last few statements are inconsistent with the law, Your Honor.

THE COURT: Okay.

MR. McENTIRE: Because the law clearly, clearly indicates that we are a beneficiary. And that's what the Washington Mutual case stands for.

THE COURT: Okay. Wait. Let me make sure I know which one.

Do you have a cite for that case?

MR. McENTIRE: Yes, ma'am. It's in the PowerPoint.

THE COURT: That's fine. I just wanted to make sure I could find it.

MR. McENTIRE:  There's also a Fifth Circuit case that talks about subordination where a Class 8 and Class 9 would actually be subordinated, Your Honor, to our claim.

So that's another approach to this, is subordination.

THE COURT:  Okay.

MR. McENTIRE:  And that's the In re Mobile Steel case out of the Fifth Circuit.  I think there's a cite in our brief.

THE COURT:  Okay.

MR. McENTIRE:  I acknowledge that we're now classified with a different name.  We're a B/C limited partner.  And we're, in effect, a Class 10 beneficial interest.

But we're there having been a 99.5.  And the lion share of any money, 99.5 percent of any money that overflows into bucket No. 10 is ours.

THE COURT:  Right.

Okay.  I am processing.  Obviously, I need to take this into consideration.  I haven't had a chance to go through Respondent's exhibits.

I've looked through the plaintiff's exhibits, but now I have much more of a focus of what I'm doing.

So I will try to get you all a ruling by the end of next week.  I apologize.  I've got a special setting next week that's going to be kind of crazy, but I will do everything I can.

If you all haven't heard from me by next Friday afternoon, call my coordinator Texxa and tell her to bug me.

MR. McENTIRE:  Thank you for your time.

THE COURT:  You all are excused.  Have a great day.

(This completes the Reporter's Record, Petitioner Hunter Mountain Investment Trust's Rule 202 Petition, which was heard on Wednesday, February 22, 2023.)

**Reporter's Certificate**                    **79**

STATE   OF   TEXAS   )

COUNTY OF DALLAS   )

          I, Gina M. Udall, Official Court Reporter

in and for the 191st District Court of Dallas County,

State of Texas, do hereby certify that the above and

foregoing contains a true and correct transcription of

all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in

this volume of the Reporter's Record in the above-styled

and numbered cause, all of which occurred in open court

and were reported by me.

          I further certify that this Reporter's Record

of the proceedings truly and correctly reflects the

exhibits, if any, offered by the respective parties.

          I further certify that the total cost for the

preparation of this Reporter's Record is $750.00 and was

paid by the attorney for Respondents.

          WITNESS MY OFFICIAL HAND on this the 1st day of

March 2023.

                         _____/S/____Gina M. Udall_____
                         Gina M. Udall, Texas CSR  #6807
                         Certificate Expires: 10-31-2024
                         Official Reporter, 191st District
                         Court of Dallas County, Texas
                         George Allen Sr. Courts Building
                         600 Commerce St., 7th Floor
                         Dallas, Texas  75202
                         Telephone:  (214) 653-7146

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

# Exhibit 4-C

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | DALLAS COUNTY, TEXAS |
| | § | |
| Petitioner. | § | 191ST JUDICIAL DISTRICT |
| | § | |
| | § | |

## **ORDER**

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this _____ day of March, 2023.

_____
HONORABLE GENA SLAUGHTER

# Exhibit 4-D

State  of  Delaware
Secretary  of  State
Division  of  Corporations
Delivered  09:24 AM 03/09/2021
FILED  09:24 AM 03/09/2021
SR  20210838989  - File Number  5421257

CERTIFICATE OF FORMATION

OF

Muck Holdings, LLC

FIRST:  The name of the limited liability company is:

Muck Holdings, LLC

SECOND:  Its registered office in the State of Delaware is to be located at 251 Little Falls Drive, in the City of Wilmington, Delaware, 19808, and its registered agent at such address is CORPORATION SERVICE COMPANY.


IN WITNESS WHEREOF, the undersigned, being the individual forming the Company, has executed, signed and acknowledged this Certificate of Formation this 9th day of March, 2021.


By: /s/ Hanchang Sohn
      Name: Hanchang Sohn
      Title:  Authorized Person

6109645v.1 344/05975

# Exhibit 4-E

# CERTIFICATE OF FORMATION

## OF

## Jessup Holdings LLC

**FIRST:**   The name of the limited liability company is Jessup Holdings LLC.

**SECOND:**   The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**   Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 08, 2021.

*/s/Taylor Lolya*
Taylor Lolya, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:10 PM 04/08/2021
FILED 01:10 PM 04/08/2021
SR 20211222936 - File Number 5822640

# Exhibit 4-F

| | |
|---|---|
| **From:** | Roger L. McCleary |
| **To:** | Schulte, David C (DAL - X59419) |
| **Cc:** | Sawnie A. McEntire |
| **Subject:** | HMIT — court's order/HMIT"s request for information |
| **Date:** | Thursday, March 9, 2023 3:46:00 PM |

David,

Thank you. This ruling denies Hunter Mountain Investment Trust ("HMIT") the investigatory discovery sought from Farallon Capital Management, LLC ("Farallon") and Stonehill Capital Management, LLC ("Stonehill") under Tex. R. Civ. P. 202. Accordingly, HMIT requests that Farallon and Stonehill advise whether they will *voluntarily* provide some or all of the information and documents requested in HMIT's Rule 202 Petition and, if so, under what terms. Please let us know by Tuesday, March 14th, whether Farallon and Stonehill will consider doing so. If so, we are available to discuss this at your earliest convenience.

In any event, HMIT also requests that Farallon and Stonehill *voluntarily* respond to the following two specific requests, which they can answer in a matter of minutes:

1. A simple description of the legal relationship: a) between Farallon and Muck Holdings, LLC ("Muck"), and b) between Stonehill and Jessup Holdings, LLC ("Jessup").
2. Whether: a) Farallon is a co-investor in any fund in which Muck holds an interest related to the Claims at issue in the Rule 202 Petition; b) Stonehill is a co-investor in any fund which Jessup holds an interest related to the Claims at issue in the Rule 202 Petition.

We would also appreciate prompt written responses to these two specific requests. To the extent we do not receive written responses to these two requests by close of business on Tuesday, March 14th, this will be taken as Farallon and Stonehill's refusal to provide the requested responses. Similarly, to the extent we do not receive a written confirmation of Farallon and Stonehill's willingness to discuss voluntary production of more of the information and documents requested in HMIT's Rule 202 Petition by then, this will be taken as their refusal to consider doing so.

Please let us know if you or your clients have any questions about this request. Thank you.

Regards, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmlaw.com

This e-mail message is for the sole use of the intended  recipient(s) and may contain confidential and privileged  information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you

are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Schulte, David C (DAL - X59419) <David.Schulte@hklaw.com>
**Sent:** Wednesday, March 8, 2023 9:08 PM
**To:** Sawnie A. McEntire <smcentire@pmmlaw.com>; Roger L. McCleary <rmccleary@pmmlaw.com>
**Cc:** Timothy J. Miller <tmiller@pmmlaw.com>
**Subject:** [EXTERNAL] HMIT — court's order

Counsel--attached is a copy of the court's order in this case.

Dave

**David C. Schulte** | **Holland & Knight**
Partner
Holland & Knight LLP
1722 Routh St., Suite 1500 | Dallas, TX 75201
Cell 214-274-4141
Phone 214-964-9419
Fax 214-964-9501
david.schulte@hklaw.com | www.hklaw.com

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.