

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 28, 2023**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| **Reorganized Debtor** | § | |

**MEMORANDUM OPINION AND ORDER SUSTAINING DEBTOR'S OBJECTION TO,
AND DISALLOWING, PROOF OF CLAIM NUMBER 146 [Dkt. No. 906]**

## I.      INTRODUCTION

Highland Capital Management, L.P. ("Highland," the "Debtor," or the "Reorganized

Debtor") is the reorganized debtor under its *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P. (as Modified)* (the "Plan")[1] and has objected to the allowance of the

proof of claim ("Proof of Claim") filed by NexPoint Real Estate Partners, LLC, f/k/a HCRE

---

[1] Dkt. No. 1808. *See Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Dkt. No. 1943].

Partners, LLC ("HCRE") on April 8, 2020.  An evidentiary hearing ("Trial") was held on the

Debtor's objection on November 1, 2022.  Thereafter, the parties submitted post-Trial briefing.

After consideration of the Proof of Claim, the Debtor's objection, the pleadings filed in this

contested matter, the evidence submitted and arguments of counsel at Trial, the court makes the

following findings of fact and conclusions of law as required by Rules 7052 and 9014 of the

Federal Rules of Bankruptcy Procedure in a contested matter.[2]

## II.    JURISDICTION

This court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C.

§§ 157 and 1334. The Objection is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and

(b)(2)(A), (B), and (O), and this court has statutory and Constitutional authority to enter final

orders and judgments in this proceeding.

## III.    PROCEDURAL HISTORY

### A.  The Parties

Highland, a Dallas-based investment firm that managed billion-dollar investment

portfolios and assets, was co-founded in 1993 by James D. Dondero ("Mr. Dondero") and Mark

Okada.  Highland's equity interest holders included Hunter Mountain Investment Trust (99.5%);

The Dugaboy Investment Trust, Dondero's family trust (0.1866%); Mark Okada, personally and

through trusts (0.0627%); and Strand Advisors, Inc., which was wholly owned by Mr. Dondero

and the only general partner of Highland (0.25%).  Mr. Dondero was the president and chief

---

[2] To the extent that any of the findings of fact should be construed as a conclusion of law, it shall be construed as such.  To the extent that any of the conclusions of law should be construed as a finding of fact, it shall be construed as such.

executive officer of Highland.   On October 16, 2019 (the "Petition Date"), Highland filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for

the District of Delaware, which was transferred to the Northern District of Texas, Dallas Division

on December 4, 2019.[3]   Highland continued in possession of its property and operating and

managing its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and

1108.

The claimant, HCRE, was one of the many non-debtor Dondero-controlled entities

affiliated with Highland.   Mr. Dondero was the president and sole manager of HCRE, and Matt

McGraner ("Mr. McGraner") was HCRE's vice president and secretary.   HCRE had no employees

of its own and relied on Highland's employees (and employees of other entities controlled by Mr.

Dondero) to conduct business on its behalf.

### B.  HCRE's Proof of Claim and Debtor's Objection Thereto

On March 2, 2020, this court entered an *Order (I) Establishing Bar Dates for Filing Claims*

*and (II) Approving the Form and Manner of Notice Thereof*,[4] setting April 8, 2020, as the general

deadline for filing proofs of claim.   The Debtor's claims register was prepared and maintained by

the Debtor's claims agent.   On April 8, 2020, HCRE filed its Proof of Claim on Official Form

410.[5]   HCRE described the basis of its claim in Exhibit A attached to its Proof of Claim:[6]

### Exhibit A

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an
entity called SE Multifamily Holdings, LLC ("SE Multifamily").   Claimant may be
entitled to distributions out of SE Multifamily, but such distributions have not been
made because of the actions or inactions of the Debtor.   Additionally, Claimant

---

[3] Dkt. No. 186.

[4] Dkt. No. 488.

[5] Claim No. 146.  *See* HCRE's Tr. Ex. 3 and Debtor's Tr. Ex. 8.

[6] *Id.*

contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does [not][7] belong to the Debtor or may be the property of Claimant. Accordingly, Claimant may have a claim against the Debtor. Claimant has requested information from the Debtor to ascertain the exact amount of its claim. This process is on-going. Additionally, this process has been delayed due to the outbreak of the Coronavirus. Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

Mr. Dondero signed and executed the Proof of Claim as the "person who is completing and signing this claim," checking the box that indicates he is "the creditor's attorney or authorized agent" and acknowledging that "I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct" and that "I declare under penalty of perjury that the foregoing is true and correct."[8] Yet, Mr. Dondero testified at Trial that he could not recall "personally [doing] any due diligence of any kind to make sure that Exhibit A was truthful and accurate before [he] authorized it to be filed."[9] He did not, prior to authorizing HCRE's law firm (Bonds Ellis) to affix his electronic signature on and to file the Proof of Claim (which was prepared by Bonds Ellis), review or provide comments to the Proof of Claim or its Exhibit A, or review the Amended LLC Agreement (defined below) or any documents.[10] Moreover, he did not know whose idea it was to file the Proof of Claim,[11] who at HCRE worked with, or provided information to, Bonds Ellis to enable Bonds Ellis to prepare the Proof of Claim, what information was given to Bonds Ellis that enabled them to formulate the Proof of Claim, or whether "Bonds Ellis ever

---

[7] HCRE's Proof of Claim states that "all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily **does belong** to the Debtor or may be the property of Claimant" (emphasis added), apparently leaving out the word "not" (because the claim would not make sense if HCRE were stating that these interests **did** belong to the Debtor). HCRE's Tr. Ex. 3; Debtor's Tr. Ex. 8, Ex. A.

[8] HCRE's Tr. Ex. 3, at 3; Debtor's Tr. Ex. 8, at 3.

[9] Trial Tr. 56:20-23.

[10] Trial Tr. 55:10-22, 56:15-57:6.

[11] Trial Tr. 57:7-9.

communicated with anybody in the real estate group regarding [the Proof of Claim]."[12]    Mr.

Dondero "never specifically asked anyone in the real estate group if [the Proof of Claim] was

truthful and accurate before [he] authorized it to be filed."[13]    Rather, Mr. Dondero testified that

he relied on counsel and on "systems and processes" and only assumed that "the Bonds Ellis people

dealt with whoever they thought were the appropriate people in our organization" because "[i]t

wasn't with my input" and "[Bonds Ellis] would have had to get input from somebody and have

rationale from somebody."[14]    Mr. Dondero admitted that he "didn't check with any member of the

real estate group to see whether or not they believed [the Proof of Claim] was truthful and accurate

before [he] authorized Bonds Ellis to file it" or do "anything . . . to make sure that this proof of

claim was truthful and accurate before [he] authorized [his] electronic signature to be affixed and

to have it filed on behalf of HCRE," even though he signed the Proof of Claim that contained "a

statement . . . that says a person who files a fraudulent claim could be fined up to $500,000,

imprisoned up to five years, or both," stating "I sign a lot of high-risk documents and I have to

rely on the process and the people and internally and externally as part of the process to sign it

without direct validation from or verification from me, and this is another one of those items."[15]

On July 30, 2020, the Debtor objected to the allowance of HCRE's Proof of Claim in the

*Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C)*

*Late-Filed Claims, (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-*

*Documentation Claims* ("Objection"),[16] contending it had no liability under HCRE's Claim.    In

---

[12] Trial Tr. 56:1-14.

[13] Trial Tr. 57:10-13.

[14] Trial Tr. 57:17-24.

[15] Trial Tr. 57:25-59:2.

[16] Dkt. No. 906.  *See* Objection, 7-8, Ex. A (Proposed Order), Schedule 5 (a schedule of "No Liability Claims," listing 37 proofs of claim, including HCRE's Proof of Claim).

connection with its objection to allowance of the claims listed on Schedule 5, the Debtor noted, in

an apparent reference to at least HCRE's Proof of Claim:

> Certain claims listed on Schedule 5 to the Objection appear to be protective claims
> for claimants asserting claims related to agreements with the Debtor.  No amount
> is asserted on these claims and, although the claimants have indicated they would
> supplement the claims within ninety (90) days, that time has passed and no
> amendment or supplement has been filed and no additional documentation has been
> provided to support the claims.

On October 19, 2020, HCRE responded to the Debtor's Objection ("Response").  The

Response was filed by the law firm of Wick Phillips Gould & Martin, LLP ("Wick Phillips") and

provided a somewhat more fleshed-out statement of HCRE's claim against the Debtor:[17]

> After reviewing what documentation is available to [HCRE] with the
> Debtor, [HCRE] believes the organizational documents relating to SE Multifamily
> Holdings, LLC (the "SE Multifamily Agreement") improperly allocates the
> ownership percentages of the members thereto due to mutual mistake, lack of
> consideration, and/or failure of consideration.  As such, [HCRE] has a claim to
> reform, rescind and/or modify the agreement.

> However, [HCRE] requires additional discovery, including, but not limited
> to, email communications and testimony, to determine what happened in
> connection with the memorialization of the parties' agreement and improper
> distribution provisions, evaluate the amount of its claim against the Debtor, and
> protect its interests under the agreement.

HCRE requested that the court "enter a scheduling order allowing for formal discovery and set an

evidentiary hearing after such discovery has occurred."[18]

### C. Debtor's Motion to Disqualify HCRE's Counsel

During the course of discovery, the Debtor became aware that Wick Phillips had jointly

represented HCRE and Highland in connection with at least some of the underlying transactions

that were the subject of HCRE's Proof of Claim.  On April 14, 2021, the Debtor moved to

---

[17] Response, 2-3, ¶¶ 5-6.

[18] *Id.*, at 3, ¶ 6.

disqualify Wick Phillips ("Original Disqualification Motion"),[19] and on May 6, 2021, HCRE filed

its opposition[20] to the Disqualification Motion. On October 1, 2021, the Debtor filed a

supplemental disqualification motion[21] ("Supplemental Disqualification Motion" and with the

Original Disqualification Motion, the "Disqualification Motion").    In both the Original

Disqualification Motion and the Supplemental Disqualification Motion, the Debtor sought the

entry of an order pursuant to the bankruptcy court's general equitable powers under Bankruptcy

Code § 105(a), directing the disqualification of Wick Phillips and granting related relief, including,

*inter alia*,  "directing HCRE to [ ] reimburse the Debtor all costs and fees incurred in making the

[Disqualification Motion], including reasonable attorneys' fees."[22]  The Disqualification Motion

was heavily contested, and the parties engaged in extensive discovery over the next five months,

including expert discovery.    Following a November 30, 2021 lengthy hearing on the

Disqualification Motion, on December 10, 2021, this court entered an *Order Granting in Part and*

*Denying in Part Highland's Supplemental Motion to Disqualify Wick Phillips Gould & Martin,*

*LLP As Counsel to HCRE Partners, LLC and for Related Relief* ("Disqualification Order"),[23]

resolving the Disqualification Motion by, among other things, disqualifying Wick Phillips from

representing HCRE in the contested matter concerning HCRE's Proof of Claim, but specifically

denying "Highland's request that HCRE reimburse it all costs and fees incurred in making and

prosecuting the [Disqualification Motion], including reasonable attorneys' fees."[24]

---

[19] Dkt. Nos. 2196-2198.

[20] Dkt. Nos. 2278 and 2279.

[21] Dkt. No. 2893.

[22] Original Disqualification Motion, 2; Supplemental Disqualification Motion, 2.

[23] Dkt. No. 3106.

[24] Disqualification Order, 4.

### D.  Debtor's Plan Is Confirmed

Meanwhile—actually just prior to and during this disqualification controversy—the Plan was confirmed, on February 22, 2021, over the objections of Mr. Dondero and his related entities (including HCRE).[25]  The effective date ("Effective Date") of the Plan occurred on August 11, 2021, and Highland became the Reorganized Debtor under the Plan.  Pursuant to the Plan, on or after the Effective Date, all or substantially all of the Debtor's assets vested in the Reorganized Debtor or the claimant trust ("Claimant Trust") created under the terms of the Plan, including the Debtor's 46.06% membership interest in SE Multifamily.   In addition, the Plan included a list of executory contracts to be assumed under the Plan and provided that any executory contract of the Debtor that was not on the list would be deemed rejected pursuant to Bankruptcy Code § 365.[26] The Amended LLC Agreement was not listed in the Plan or any Plan Supplement as an executory contract to be assumed, and it is undisputed that the Amended LLC Agreement was never identified in the Debtor's Schedule G of Executory Contracts and Unexpired Leases filed in the Bankruptcy Case.  Mr. Dondero and some of the Dondero-related entities that had objected to confirmation of the Plan (but not HCRE) appealed the Confirmation Order directly to the Fifth Circuit.  On August 19, 2022, the Fifth Circuit entered its original order in which it "affirm[ed] the confirmation order in large part" and "revers[ed] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ed] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug, 19, 2022).[27]

---

[25] HCRE, represented by Wick Phillips, filed its *Objection to Debtor's Fifth Amended Plan of Reorganization* [Dkt. No. 1673] on January 5, 2021.

[26] Plan, Art. V.A.

[27] On September 7, 2022, the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *In re Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022), which made one clarification in substituting

**E.  Parties Participate in Extensive Second Round of Discovery, and HCRE Files Motion to Withdraw its Proof of Claim (Which Is Denied)**

On January 14, 2022, HCRE's new law firm, Hoge & Gameros, LLP ("Hoge & Gameros") filed a notice of appearance on behalf of HCRE.[28]  Over five months later, on June 9, 2022, the parties filed a proposed amended scheduling order ("Amended Scheduling Order") that this court subsequently approved.[29]  Pursuant to the Amended Scheduling Order, the parties exchanged a second round of written discovery and document production and served various deposition notices and subpoenas.  On August 12, 2022, just two business days after HCRE completed the depositions of the Reorganized Debtor's witnesses with the deposition of Mr. Seery, and a day after HCRE made a supplemental production of more than 4,000 pages of documentation, and 2 business days before consensually scheduled depositions of HCRE's witnesses (Mr. Dondero, Matt McGraner, and HCRE's Rule 30(b)(6) witness) were set to occur on August 16 and 17,[30] HCRE filed a motion to withdraw its Proof of Claim ("Motion to Withdraw").[31]  HCRE noticed its Motion to Withdraw for hearing on September 12, 2022.  Counsel for HCRE informed counsel for Highland, on August

---

the sentence – "We now turn to the Plan's injunction and gatekeeper provisions." – for the following sentence from the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful."  In all other respects, the Fifth Circuit panel's original ruling remained unchanged.  On February 27, 2023, this court entered a memorandum opinion and order granting the Reorganized Debtor's motion to conform the Plan to the Fifth Circuit's mandate. Dkt. Nos. 3671 and 3672.  Two Dondero-related entities – Highland Capital Management Advisors, L.P. and NexPoint Advisors, L.P. (together, the "Advisors") – filed a notice of appeal to the district court of the order on the Debtor's motion to conform on March 13, 2023. Dkt. No. 3682.  On March 22, 2023, the Reorganized Debtor joined the Advisors in filing a *Joint Motion for Certification of Direct Appeal to the Fifth Circuit of Order on Reorganized Debtor's Motion to Conform Plan*. Dkt. No. 3688.  On March 28, 2023, this court entered an *Order Certifying Direct Appeal to the Fifth Circuit Court of Appeals of Order on Reorganized Debtor's Motion to Conform Plan*. Dkt. No. 3696.

[28] Dkt. No. 3181.

[29] Dkt. Nos. 3356 and 3368.

[30] HCRE's counsel had accepted service of subpoenas on behalf of Mr. Dondero and Mr. McGraner (the "Original Subpoenas") and a Rule 30(b)(6) notice for HCRE ("Original HCRE Deposition Notice" and together with the Original Subpoenas, the "Original Notices"). *See Declaration of John A. Morris in Support of Reorganized Debtor's (A) Objection to Motion to Quash and for Protection [Docket 3464] and (B) Cross-Motion to Enforce Subpoenas and to Compel a Deposition* ("Morris Dec.") [Dkt. No. 3465], Ex. 1.

[31] *See Motion to Withdraw Proof of Claim* [Dkt. No. 3442].

15, 2022, that HCRE would not produce Mr. Dondero, Mr. McGraner, or HCRE for the consensually scheduled depositions on August 16 and 17.[32]  Highland issued subpoenas and a Rule 30(b)(6) notice for the depositions of HCRE's witnesses regarding its Proof of Claim on August 15, 2022.  HCRE then filed a *Motion to Quash and for Protection* ("Motion to Quash")[33] on August 23, 2022, the day before the depositions were to begin, but did not request an emergency hearing on it or otherwise notice it for hearing.  On September 2, 2022, Highland filed an objection to HCRE's Motion to Withdraw ("Objection to Motion to Withdraw")[34] and an objection to HCRE's Motion to Quash and cross-motion to enforce the deposition subpoenas and compel the Rule 30(b)(6) deposition of HCRE.  Highland filed a notice of hearing on its cross-motion for the September 12, 2022 setting.[35]  Following the September 12 hearing, the court entered an order denying HCRE's Motion to Withdraw, for the reasons set forth on the record,[36] and directing the

---

[32] *See Reorganized Debtor's (A) Objection to Motion to Quash and for Protection [Docket 3464] and (B) Cross-Motion to Enforce Subpoenas and to Compel a Deposition* ("Objection to Motion to Quash and Cross-Motion to Compel") [Dkt. No. 3484], 8 at ¶19.

[33] Dkt. No. 3464.

[34] Dkt. No. 3487.

[35] Dkt. No. 3499.

[36] The court notes that, under Fed. R. Bankr. P. 3006, a creditor does not have an absolute right to withdraw a proof of claim "[i]f after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case, the creditor may not withdraw the claim except on order of the court after a hearing on notice to the trustee or debtor in possession . . . .  The order of the court shall contain such terms and conditions as the court deems proper."  Here, the Debtor timely objected to allowance of HCRE's proof of claim, and years of litigation ensued.  HCRE has also "participated significantly in the case" by, among other things:  actively objecting to the Debtor's proposed Plan; vigorously defending, along with other Dondero-related entities, the Debtor's suits on promissory notes (which suits are now pending at the district court on this court's report and recommendation that it grant the Reorganized Debtor's motion for summary judgment and to which HCRE has objected); opposing the Debtor's Disqualification Motion; and conducting several rounds of discovery, including depositions of the Debtor's witnesses--until abruptly filing its motion to withdraw its Proof of Claim just days prior to the consensually scheduled depositions of HCRE's witnesses.  The court entered its order denying HCRE's motion to withdraw its Proof of Claim only after HCRE was not willing to agree, at the hearing, to language in an order allowing it to withdraw its Proof of Claim stating, unequivocally, that HCRE waived the right to relitigate or challenge the issue of Highland's 46.06% ownership interest in SE Multifamily.  In announcing its ruling from the bench, the court noted its concerns regarding the integrity of the bankruptcy system and claims process if it allowed HCRE to withdraw its Proof of Claim after two and a half years of litigation, causing the Debtor to spend hundreds of thousands of dollars litigating its Objection to a proof of claim  The court expressed concerns about gamesmanship, but, at the same time, assured the parties that it

parties to "confer in good faith to complete the depositions of Mr. James Dondero, Mr. Matt McGraner, and HCRE at mutually convenient times between September 28 and October 12, 2022" and to "otherwise comply with certain items in the *Order Approving Amended Stipulation and Proposed Scheduling Order Concerning Proof of Claim 146 Filed by HCRE Partners, LLC* [Docket No. 3368], including appearing for an evidentiary hearing on November 1 and 2, 2002."[37]

## F. Evidentiary Hearing Held and Post-Trial Briefing Filed by Parties on Executory Contract Issue

The Trial on HCRE's Proof of Claim and the Objection thereto was held on November 1, 2022. The court admitted into evidence HCRE's Exhibits 1-6, 17-20, and the Reorganized Debtor's Exhibits 1-65, 70-71, 75-96, and 103.[38] At the conclusion of the Hearing, HCRE asked the court "to grant the proof of claim and reallocate the equity [in SE Multifamily] based on the capital contribution[s]."[39] The Reorganized Debtor requested that the court enter an order disallowing HCRE's Proof of Claim and to include specific findings and conclusions that (1) HCRE had not met its burden of proof regarding its claims for reformation, rescission, and/or modification of the Amended LLC Agreement to re-allocate HCRE's and the Reorganized Debtor's membership percentages under the Amended LLC Agreement; and (2) HCRE filed its Proof of Claim in bad faith and awarding the Reorganized Debtor its "costs."[40] This was the Reorganized Debtor's first time, in this contested matter, to request reimbursement of its costs

---

was still open to signing an agreed order regarding withdrawal of the Proof of Claim, if counsel could work out mutually acceptable language that protected both parties "without the pressure of the Court hovering over you." *See* Transcript of Hearing on Motion to Withdraw [Dkt. No. 3519] 50:14-59:14. Apparently, counsel were unable to reach an agreement on the terms of an agreed order, and so the court signed the order at Dkt. No. 3525 that had been uploaded by Highland following the hearing denying HCRE's motion to withdraw its Proof of Claim .

[37] Dkt. No. 3525.

[38] *See* Dkt. No. 3611.

[39] Transcript of the November 1, 2022 Trial on Debtor's Objection to HCRE's Proof of Claim ("Trial Tr.")[Dkt. No. 3616] 179:23-25; 180:8-9.

[40] Trial Tr. 196:10-22.

incurred by it in objecting to HCRE's Proof of Claim allegedly filed in bad faith, and counsel did

not indicate whether the Reorganized Debtor was requesting reimbursement of attorneys' fees as

part of its "costs" or the statutory basis for its request.[41]  To be clear, Highland had not made the

request in any written pleading filed before the Hearing,[42] and the Reorganized Debtor did not

make such a request in its post-trial briefs (see below).  At Trial, HCRE's counsel objected to the

Reorganized Debtor's attempt to seek reimbursement of its costs in litigating the Objection based

on HCRE's alleged bad-faith filing of its proof of claim.  HCRE's counsel also argued that the

issues of reformation, rescission, and modification of the Amended LLC Agreement were not

before the court and that, if the court were to grant the Reorganized Debtor's Objection, it should

enter only a simple order denying the claim, without making any findings.[43]  Following the Trial,

the court took the matter under advisement.

On November 10, 2022, the Reorganized Debtor filed a motion for leave to file a post-trial

brief on an issue raised by HCRE for the first time at Hearing:  whether the amended limited

liability company operating agreement at issue was an executory contract that had been rejected

by the Debtor upon confirmation of the Plan.[44]  The Reorganized Debtor filed its *Post-Trial Brief*

---

[41] The Reorganized Debtor's only request for reimbursement of its "costs" related to HCRE's allegedly bad-faith filing of its proof of claim occurred during counsel's closing argument:  "And we want a finding of bad faith.  We shouldn't have been put through this.  We want our costs.  I think the Court has the ability, has the authority to award costs for a bad faith filing." Trial Tr. 196:17-22.

[42] The Debtor did make a written request for reimbursement of its costs, including attorneys' fees, in prosecuting its Disqualification Motion. *See* Original Disqualification Motion, 2; Supplemental Disqualification Motion, 2.  That request was denied by this Court in its December 10, 2021 Disqualification Order. *See supra* note 24 and accompanying text.

[43] Trial Tr. 179:21-24 ("They want you to make findings that we can't raise any of these other issues, rescissions, stays, et cetera, going forward.  That's not proper relief on a proof of claim."); 200:8-12 ("If Your Honor's going to deny the proof of claim, I would ask that you simply deny the proof of claim.  We don't have an adversary proceeding here.  There wasn't one started.  Mr. Morris considered that and then didn't follow that path, because all we have here today is a proof of claim.").

[44] Dkt. No. 3619.  The court entered an order granting the Reorganized Debtor's motion for leave to file post-trial briefs on November 22, 2022. *See* Dkt. No. 3634.

*Addressing HCRE's Executory Contract Defense* ("Post-Trial Brief")[45] on November 22, 2022.

HCRE filed its *Response to Debtor's Post-Hearing Brief* ("Response to Post-Trial Brief"),[46]

arguing that the court should not "consider[ ] or give[ ] any weight" to the Reorganized Debtor's

post-trial briefing because "the issue of whether or not the LLC Agreement is an executory contract

– and if it was rejected – is not before the Court, if for no other reason than because the Debtor

chose not to assume it" and "Debtor's supplemental brief is an attempt to reopen the evidence, to

relitigate issues and Orders already entered (*e.g.*, the Order denying its earlier request for fees),

and to add additional time, burden,  and attorneys' fees to a matter that could have been resolved

before hearing."[47]

The Reorganized Debtor filed its *Reply to HCRE's Post-Trial Brief* ("Reply to HCRE's

Post-Trial Brief")[48] on December 7, 2022, arguing that the executory contract issue *is* properly

before the court because counsel for HCRE specifically argued, during the Trial, that the Amended

LLC Agreement at issue is an executory contract that had been rejected under the terms of the Plan

and that "[a]ll [Highland] ha[s] left is an economic interest . . . , but they're not a member

anymore."[49]  The Reorganized Debtor also noted HCRE's previous "disingenuous[ ]" contention

by its counsel's during the Trial that, despite pleading, in support of its Proof of Claim, that the SE

Multifamily organizational documents "improperly allocate[] the ownership percentages of the

members thereof due to mutual mistake, lack or consideration and/or failure of consideration" and

that "[a]s such, [HCRE] has a claim to reform, rescind and/or modify the Agreement," the court

---

[45] Dkt. No. 3635.

[46] Dkt. No. 3641.

[47] Response to Post-Trial Brief, at 4, 5.

[48] Dkt. No. 3644.

[49] Reply to HCRE's Post-Trial Brief, at 2; Trial Tr. 181:11-182:22.

could not make specific findings and conclusions regarding such issues in the context of ruling on the HCRE Proof of Claim and the Reorganized Debtor's Objection.[50]

HCRE specifically asked the court, in pleadings and proceedings in connection with HCRE's Proof of Claim, to allow its claim against the Debtor and "reallocate the equity [in SE Multifamily] based on the capital contribution[s]"[51] pursuant to HCRE's alleged right of reformation, rescission, and/or modification of the Amended LLC Agreement due to alleged mutual mistake, lack of consideration, and/or failure of consideration and, at least in part, based upon HCRE's argument that the Amended LLC Agreement was an executory contract that had been rejected by the Debtor under the terms of the confirmed Plan. As such, these issues are properly before the court and may be determined in connection the court's adjudication of this contested matter.

As to the Reorganized Debtor's oral request during the Trial for sanctions against HCRE in the form of reimbursement of the Debtor's costs incurred in objecting to HCRE's Proof of Claim that it alleges was filed and prosecuted in bad faith, the court finds that the Reorganized Debtor's request for sanctions is procedurally defective and, thus, not properly before the court for its consideration.[52] Thus, the court will not address or make any determination regarding the Reorganized Debtor's request for sanctions in the form of reimbursement of the Reorganized Debtor's costs other than to deny the request, without prejudice, as being procedurally defective.

---

[50] Reply to HCRE's Post-Trial Brief, at 2 n.3.

[51] Trial Tr. 179:23-25; *see also* Trial Tr. 180:8-9.

[52] The court will address the improper procedural posture of the Reorganized Debtor's request below.

## IV.    FINDINGS OF FACT

### A.  Project Unicorn, the Formation of SE Multifamily Holdings, LLC, and the KeyBank Loan

In the summer of 2018, HCRE and Highland began moving forward with a plan to purchase a portfolio of 26 multifamily properties with an estimated value of $1.1 billion, which was referred to as Project Unicorn.[53]  Highland and HCRE entered into that certain *Limited Liability Company Agreement* for SE Multifamily Holdings LLC ("SE Multifamily"), dated as of August 23, 2018 ("Original LLC Agreement")[54] for the purpose of implementing Project Unicorn.[55]  Mr. Dondero signed the Original LLC Agreement on behalf of both HCRE and Highland.[56]  The Original LLC Agreement allocated 51% of SE Multifamily's membership interests to HCRE and 49% to Highland, with capital contributions by HCRE and Highland of $51 and $49, respectively.[57]  Mr. McGraner (a minority owner and vice president and secretary of HCRE), who described himself as the "quarterback of Project Unicorn . . . [who] made sure that the original LLC agreement was created for the purpose of creating SE Multifamily," agreed, on cross-examination, that he "personally reviewed the allocation of ownership interests in the document before it was signed" and "at the time the original agreement was signed, [he] didn't believe there were any mistakes in the allocation of membership interests" or "have [any] reason to believe that the original LLC

---

[53] Trial Tr. 34:1-15.

[54] HCRE's Tr. Ex. 1; Debtor's Tr. Ex. 5.

[55] Trial Tr. 34:11-16.

[56] Trial Tr. 37:21-38:19; Original LLC Agreement, at 17.  Mr. Dondero testified at Trial that he signed the Original LLC Agreement without having participated in any negotiations or drafting of the agreement or having read the document prior to signing, and, further, that he did not (1) know who drafted the Original LLC Agreement, (2) have a recollection "of anybody explaining to [him] the terms or conditions of this agreement," (3) receive legal advice from anyone regarding the agreement, or (4) ever speak with anyone in Highland's compliance department prior to signing the agreement. *See* Trial Tr. 43:22-45:7.

[57] Schedule A to Original LLC Agreement, at 18.

agreement didn't fail to reflect the intent of the parties to that agreement."[58]   Under the terms of

the Original LLC Agreement, HCRE had "the exclusive right to appoint the Manager and the

Manager [had] unfettered control over all aspects of the business and operations of the Company

and . . . exclusive rights to appoint management personnel and exclusive voting rights, as further

specified under [the] Agreement."[59]   Mr. Dondero "in his capacity as an officer of HCRE," was

identified as the initial manager of SE Multifamily, with "[t]he management, control and direction

of the Company and its operations, business and affairs [vesting] exclusively in the Manager."[60]

In addition, the Original LLC Agreement contained a provision that outlined the specific

procedures for the parties amending or waiving any provisions under the agreement:[61]

> 10.1   <u>Amendments and Waivers</u>.  This Agreement may be modified or
> amended, or any provision hereof waived, only with the prior written consent of
> the Manager and all the Members (a copy of which shall be promptly sent by the
> Manager to all the Members).  For the sake of clarity, no such amendment shall
> without a Member's consent (a) reduce the amounts distributable to, timing of
> distributions to, or expectations to distributions of, such Member, (b) increase the
> obligations or liabilities of such Member, (c) change the purpose of the Company
> as set forth in <u>Section 1.3</u>, (d) change any provision of this Agreement requiring the
> approval of all the Members or reduce such approval requirement, (e) borrow funds
> or otherwise commit the credit of the Company, (f) sell the Company or sell all or
> substantially all assets of the Company, or (g) otherwise materially and
> disproportionally impair the rights of such Member under this Agreement.

To finance the acquisition of the real estate in connection with Project Unicorn, HCRE and

Highland, among other borrowers (the "<u>Borrowers</u>")[62] entered into that certain *Bridge Loan*

*Agreement* ("<u>Loan Agreement</u>")[63] with KeyBank, N.A. ("<u>KeyBank</u>"), as of September 26, 2018,

---

[58] Trial Tr. 82:13-83:10.

[59] Original LLC Agreement, §1.6, at 3.

[60] *Id.*, §§3.1 and 3.2, at 6.

[61] *Id.*, §10.1, at 15.

[62] Notably, SE Multifamily, itself, was not a "Borrower."

[63] Debtor's Tr. Ex. 6.

pursuant to which the Borrowers obtained a secured loan from KeyBank.[64]  Pursuant to the terms

of the Loan Agreement, KeyBank provided up to $556,275,000 in secured loans to the Borrowers,

including Highland and HCRE, and the Borrowers (including Highland) were jointly and severally

liable for all amounts owed under the Loan Agreement,[65] but HCRE was the "Lead Borrower"

with the sole authority to request and obtain borrowings and to determine how the loan proceeds

would be distributed among the Borrowers.[66]  Mr. Dondero confirmed that he did not read the

Loan Agreement or personally obtain any legal advice prior to signing it on behalf of Highland

but, instead, relied on "the process of a transaction going through internal counsel, external

counsel, compliance every step along the way, and then being put in front of me."[67]  Consequently,

Mr. Dondero was not "specifically aware that Highland was agreeing to be jointly and severally

liable for the obligations at KeyBank" when he signed the Loan Agreement on behalf of Highland,

and, in fact "never asked anyone what Highland's rights and obligations were under the KeyBank

loan agreement before [he] signed it on [Highland's] behalf."[68]  Notwithstanding this testimony,

---

[64] *See id.*, § 2.02(a) and (b), at 26 (providing that the purpose of the financing was "to finance the acquisition cost of the Mortgaged Properties" and "to finance a portion of the acquisition cost of the Portfolio Properties . . . ."); Trial Tr. 45:18-22.

[65] Debtor's Tr. Ex. 6, § 9.17, at 88.

[66] *Id.*, § 1.05(a) and (b), at 25-26.

[67] Trial Tr. 46:20-47:11

[68] Trial Tr. 47:12-20.  Mr. Dondero testified that he did not believe he needed to know what Highland's rights and obligations were under the Loan Agreement before signing it because it had gone through a "rigorous process" before he was asked to sign it:

> Q:  Okay.  In fact, you never asked anyone what Highland's rights and obligations were under the KeyBank loan agreement before you signed it on its behalf, correct?
>
> A:  Correct.
>
> Q:  And that's because you didn't believe you needed to know what Highland's rights and obligations were under the KeyBank agreement, correct?
>
> A:  I – I believed it was appropriately handled by the process and compliance and the relevant business people and their various expert – experts and expertise internally and externally.  It wouldn't have been appropriate for me to secondguess [sic] everything.
>
> . . .

he testified that he personally made the decision on behalf of Highland to participate in Project

Unicorn and become a member of SE Multifamily because (1) Highland's participation as an

obligor on the KeyBank loan was a necessary part of the KeyBank transaction,[69] (2) there would

be tax advantages in including Highland "as a result of the fact that Highland's income was largely

sheltered,"[70] and (3) "HCRE relied on Highland's human resources to execute Project Unicorn."[71]

Mr. McGraner agreed, during cross-examination, that among the reasons for including Highland

as a member of SE Multifamily included that "KeyBank insisted on Highland being a coborrower

[under the KeyBank loan]" because "HCRE did not have the ability to close on the KeyBank loan

based on its own financial wherewithal" and that including Highland as a member of SE

Multifamily gave Project Unicorn "capital flexibility and expected tax benefits."[72]

During the month between the formation of SE Multifamily on August 23, 2018, and the

closing of the KeyBank loan transaction on September 26, 2018, an entity known as BH Equities,

LLC ("BH Equities"), which was in the business of investing and sourcing investment

opportunities in real estate partnerships and managing multifamily properties, specifically worked

---

Q:  And you as the control person of Highland didn't believe you needed to know what Highland's rights and obligations were under the KeyBank loan before you signed, it, correct?

A:  Specifically, I did not need to know.

Trial Tr. 47:17-48:3, 48:13-16.

[69] Trial Tr. 38:20-43:1.  When asked by counsel for Highland if he had made the decision on behalf of Highland to participate as a member of SE Multifamily to participate in Project Unicorn "because [Highland] was going to provide a guaranty to KeyBank and the guaranty was a necessary part of the transaction," Trial Tr. 38:25-394, Mr. Dondero didn't recall that he understood at the time that Highland was going to provide a guaranty to KeyBank or that he had testified at his deposition, less than a month before the Trial, that Highland was included as a member of SE Multifamily because it was going to provide a guaranty to KeyBank and that "the guaranty was a necessary part of the transaction, so they needed – they needed to be involved," until counsel for Highland refreshed his recollection with his deposition testimony. Trial Tr. 41:1-19 (reading portions of Mr. Dondero's October 4, 2022 Deposition Transcript, Debtor's Trial Ex. 70, 25:18-26:11, into the record).  Mr. Dondero admitted that had been his deposition testimony but noted that "[w]e have established that [there was no guaranty]" before admitting that Highland was a coborrower instead of being a guarantor. Trial Tr. 41:17-42:25.

[70] Trial Tr. 43:2-14.

[71] Trial Tr. 43:15-18.  Mr. Dondero also affirmed that "SE Multifamily relied on Highland's human resources at least until 2020." Trial Tr. 43:19-21.

[72] Trial Tr. 83:13-85:4.

with Highland and HCRE in connection with Project Unicorn in anticipation of becoming a member of SE Multifamily.[73]  Prior to becoming a member of SE Multifamily and without any formal agreement in place, BH Equities contributed approximately $21 million in capital to SE Multifamily to fund Project Unicorn expenses leading up to the closing of the KeyBank loan (which facilitated the acquisition of the real estate).[74]

## B. Negotiation and Execution of an Amended LLC Agreement in March 2019

Following the closing of the KeyBank loan transaction and acquisition of the Project Unicorn properties and "as intended in the fall of 2018, Highland and BH Equities continued their discussions over the terms on which BH Equities would become a member of SE Multifamily."[75] Dustin Thomas ("Mr. Thomas"), managing director of capital markets and investor relations at BH Equities, described the discussions as "bilateral" negotiations between BH Equities, on one side, and the Highland-related entities (Highland, HCRE, and another Highland-related entity that was added as a member of SE Multifamily, Liberty CLO HoldCo, Ltd. ("Liberty")), on the other.[76]  In addition, since the closing of the KeyBank loan transaction and notwithstanding the joint and several liability of the Borrowers under the Loan Agreement, Mr. Dondero had determined that approximately $250 million of the KeyBank loan proceeds would be allocated as a capital contribution *by HCRE* to SE Multifamily.[77]  Mr. Dondero had credited another approximately $40

---

[73] Debtor's Trial Ex. 3, Deposition Excerpts of Dustin Thomas (BH Equities, LLC 8/4/22 Deposition), 33:9-16 ("Q: Did there come a time when BH Equities began to negotiate with Highland about a potential participation interest in SE Multifamily?  A: Yeah, it was always expected we would participate in the – in the LLC through capital and, you know, sharing of return of capital and profits and things, yes.").

[74] *Id.* at 34:5-36:10.

[75] Trial Tr. 49:22-50:7.

[76] Debtor's Trial Ex. 3, 26:13-22 ("Q: From BH Equities' perspective as you were negotiating this agreement, did BH Equities form a view that [Highland] and HCRE and Liberty were related parties?  A: Yes.  Q: And did – was this more of a bilateral negotiation between BH Equities on the one hand and [Highland] and HCRE and Liberty on the other hand?  A: Yes.").

[77] Testimony of Matt McGraner on Cross-Examination, Trial Tr.  89:12-92:24.

million that been borrowed from a Dondero-related entity as a capital contribution *by HCRE* to

SE Multifamily, for a total of over $291 million credited as an HCRE capital contribution to SE

Multifamily, none of which came "out of its own pocket."[78]   Highland had made a $49,000 cash

capital contribution to SE Multifamily.

Six months after the KeyBank loan transaction closed, the parties executed a *First

Amended and Restated Limited Liability Agreement* for SE Multifamily Holdings, LLC, dated as

of March 15, 2019, to be effective as of August 23, 2018 ("Amended LLC Agreement")[79] to add

BH Equities and Liberty as members of SE Multifamily and "to set forth certain agreements among

themselves relating to the capitalization and governance of the Company and granting certain

rights and imposing certain restrictions on themselves as set forth herein."[80]   On March 8, 2019,

Mark Patrick (tax counsel for Highland) sent an email to Paul Broaddus, a Highland employee in

its tax department who, "as part of th[e] process of negotiations with BH Equities, . . . was working

to update the contribution schedule to include the actual contribution numbers,"[81] telling him that

"[t]he contribution provision schedule should reflect the equity capital from the debt bridge.  So

you will need to drop that amount into Schedule A.  The percentage interest can remain."[82]   On

March 15, 2019, Mr. Broaddus emailed Mr. Thomas and Ben Roby at BH Management the revised

contribution schedule, "updated with the actual contribution numbers."[83]   The updated Schedule

---

[78] *Id.* at 89:20-22, 92:25-93:23.

[79] HCRE's Trial Ex. 2; Debtor's Trial Ex. 7.  Mr. McGraner testified that the parties needed to execute the Amended LLC Agreement by March 15, 2019, so that it could be retroactive to August 23, 2018, the date of the Original LLC Agreement.

[80] *Id.* at 2.

[81] Trial Tr. 86:24-87:3.

[82] Debtor's Trial Ex. 19.

[83] Debtor's Trial Ex. 30.

A identified each of the parties' capital contributions and respective percentage ownership interests as follows:

| Member Name | Capital Contribution | Percentage Interest |
|---|---|---|
| HCRE Partners, LLC | $291,146,036 | 47.94% |
| Highland Capital Management, L.P. | $49,000 | 46.06% |
| BH Management | $21,213,721 | 6.00% |

and Liberty obtained 100% of newly issued "Class A Preferred Interests" in exchange for a capital contribution of $5,808,603.[84]   Schedule A to the Amended LLC Agreement reflected all of the capital contributions that had been made, or credited as having been made, to SE Multifamily between the date of the Original LLC Agreement (August 23, 2018) and March 15, 2019, the date the parties executed the Amended LLC Agreement.

Mr. Dondero signed the Amended LLC Agreement on behalf of HCRE and Highland, and, again, did so without having first reviewed or read it or any drafts of it and without having obtained any legal advice before he signed it, instead, relying on "a robust and normal process."[85]  However, as brought out in testimony at Trial, Mr. Dondero was aware, prior to signing, that "HCRE and Highland and BH Equities . . . had all either made the capital contributions or all of the capital contributions, [sic] they were going to get credited with having been made" with "no expectation that any of the members would put in any additional capital after the agreement was amended in March of 2019."[86] And, even though Mr. Dondero did not read Schedule A to the Amended LLC Agreement with its table of capital contributions attributed to HCRE, Highland, and BH Equities and their respective percentages of membership interests in SE Multifamily, Mr. Dondero agreed

---

[84] *Id.*, Sch. A.

[85] Trial Tr. 52:19-53:15.

[86] Trial Tr. 51:11-52:3.  Mr. Dondero further testified that he did not have any awareness of any of the members ever putting in additional capital after March 2019, Trial Tr. 52:4-6, and agreed that during six months between the closing of the KeyBank loan transaction, "he and Mr. McGraner and everybody working on behalf of HCRE . . . knew exactly what Highland's role was with respect to KeyBank . . . that they were a coborrower." Trial Tr. 52:15-21.

that the schedule comported with his expectations when he signed the Amended LLC Agreement

on behalf of HCRE and Highland, including his expectation that Highland's 49% interest was

going to be diluted by the 6% interest being granted to BH Equities.[87]  Mr. McGraner testified that

he had reviewed the proposed Schedule A on March 15, 2019, prior to the execution of the

Amended LLC Agreement, and he "could see that Highland is shown as having made a $49,000

capital contribution and was being given a 46.06-percent interest in SE Multifamily."[88]  He further

testified that, at the time the Amended LLC Agreement was signed (later that day), "Schedule A

reflected [his] understanding of the terms between Highland and HCRE" and that "[a]fter receiving

the schedule, [he] never told anybody that [he] thought there was a mistake," even though he "knew

exactly what Highland was credited as having contributed and . . . exactly what percentage interest

it was getting,"[89]  Specifically with respect to the allocations of membership interests contained in

Schedule A, Mr. Thomas (of BH Equities) testified in his prior deposition, that "BH Equities

agreed that [Highland] would hold a 46.06 percentage interest in SE Multifamily while making a

capital contribution of $49,000" and "believed Schedule A accurately reflected the intent of the

parties" and, further, that BH Equities "[n]ever hear[d] from anybody acting on behalf of Highland

that Highland believed Schedule A was inaccurate in any way."[90]  Mr. Thomas testified in his

deposition, more generally regarding the intent of the parties in executing the Amended LLC

Agreement in March 2019, that (1) BH Equities understood, at the time the parties executed the

---

[87] Trial Tr. 53:12-54:23.

[88] Trial Tr. 93:24-94:5.

[89] Trial Tr. 94:2-20; *see also* Trial Tr. 101:3-21 (where Mr. McGraner testified, on cross-examination, that the revised draft of Schedule A setting forth the updated capital contributions of HCRE, Highland, and BH Equities was the version that was to be included in the final version of the Amended LLC Agreement, that there was nothing ambiguous about the information contained in Schedule A, and that, "to the best of [his] knowledge and understanding, Schedule A as set forth in the executed and amended restated agreement reflected the parties' intent at the time it was signed.").

[90] Debtor's Trial Ex. 3, Deposition Excerpts of Dustin Thomas (BH Equities, LLC 8/4/22 Deposition), 52:4-53:4, 54:4-19.

Amended LLC Agreement that they were getting a 6% residual interest in SE Multifamily "that could only be changed if the parties agreed in the future to amend the agreement," (2) he was not aware of anybody acting on behalf of the Highland entities ever having informed BH Equities that "any aspect of the amended agreement was inconsistent with Highland's intent," and (3) BH Equities had "[no] reason to believe that the agreement did not reflect the intent of all of the members of [SE Multifamily] . . . [or] that the amended agreement contained any errors or mistakes."[91]

Section 1.7 of the Amended LLC Agreement identified the same percentage ownership interests in SE Multifamily—47.94% to HCRE, 46.06% to Highland, and 6% to BH Equities— that had been identified in the updated and revised Schedule A, which represented a reduction of HCRE's and Highland's previous ownership interests of 51% and 49% to reflect a dilution of their original interests by BH Equities' new 6% ownership interest.[92] Mr. McGraner testified that (1) he was aware, before the Amended LLC Agreement was signed, that the provisions of section 1.7 that specifically allocated a 46.06% ownership interest in SE Multifamily to Highland were going to be included in the final version of the agreement, (2) there was nothing about section 1.7 that was ambiguous at the time it was signed, and (3) "[a]t the time the agreement was signed, HCRE understood that Section 1.7 accurately reflected the parties' intent."[93]

Shortly before the Amended LLC Agreement was executed, BH Equities expressed concerns over the priority of distributions under the "waterfall" provisions in section 6.1 of the

---

[91] *See, id.*, 46:3-51:7.

[92] *See id.*, §1.7, at 3 and Sch. A. Liberty obtained 100% of newly issued "Class A Preferred Interests" in exchange for a capital contribution of $5,808,603.

[93] Trial Tr. 101:22-102:11, 103:17-20.

agreement and made a proposal regarding the waterfall.[94]  The people acting on behalf of HCRE and Highland rejected BH Equities' proposal and made a counterproposal.[95]  In response to Mr. Thomas' email, Mr. Broaddus forwarded to Mr. Thomas new waterfall provisions that had been prepared by Freddy Chang (counsel in Highland's legal department) that showed distribution percentages equal to the percentage membership interests identified on Schedule A: HCRE (47.94%), Highland (46.06%), and BH Equities (6%).[96]  During his Trial testimony, Mr. McGraner affirmed that he believed that the distribution percentages contained in Mr. Chang's proposed waterfall provisions, including a distribution percentage of 46.06% allocated to Highland, were "fair, reasonable, and consistent with the parties' intent."[97]

Section 9.3 of the Original LLC Agreement, which provides the manner in which residual cash would be distributed to the members in the event of a SE Multifamily liquidation, was also revised and updated to show a liquidation distribution to the members under section 9.3(e) in accordance with the newly allocated percentage ownership interests of HCRE, Highland, and BH Equities of 47.94%, 46.06%, and 6%, respectively.[98]  As he did with respect to section 1.7, Schedule A, and section 6.1, Mr. McGraner testified that the liquidation waterfall percentages contained in section 9.3(e) reflected the parties' intent at the time the agreement was signed and

---

[94] Trial Tr. 94:21-95:17; Debtor's Trial Ex. 31, Email from Mr. Thomas to Mr. Broaddus sent on March 15, 2019, at 8:59 p.m.

[95] Trial Tr. 96:24-97:6.

[96] Trial Tr. 98:10-13; Debtor's Trial Ex. 32, Email from Mr. Broaddus to Mr. Thomas sent on March 15, 2019, at 11:00 p.m.

[97] Trial Tr. 98:6-24.

[98] Section 9.3(e) of the Original LLC Agreement provided for liquidation distributions of residual cash to the members in the same percentages as HCRE's and Highland's ownership interests under Original LLC Agreement: "(e) thereafter, 51% to HCRE and 49% to [Highland]." Debtor's Trial Ex. 5, Original LLC Agreement, §9.3(e), at 14. Section 9.3(e) of the Amended LLC Agreement was revised and updated to read, "(e) thereafter, (i) 47.94% to HCRE, (ii) 46.06% to [Highland], and (iii) 6% to BH." Debtor's Trial Ex. 7, Amended LLC Agreement, § 9.3(e), at 15.

that this provision was not ambiguous[99] and, further, that the agreement had never been amended

and "HCRE never asked any other party to the agreement to amend it in any way. . . .  because

Highland filed for bankruptcy"[100] and "[HCRE's] partners are no longer the same partners and

that's the reason that we're here."[101]

Finally, SE Multifamily's tax filings for the tax years 2018-2020 confirm that the parties

intended that Highland, having made a capital contribution of $49,000, owned 46.06% of the SE

Multifamily membership interests.  Mr. Dondero, in his capacity as an officer of HCRE, was the

manager of SE Multifamily, who was charged under the terms of the Amended LLC Agreement

with the preparation and filing of SE Multifamily's tax returns.[102]  In preparing SE Multifamily's

tax returns, the accounting firm Barker Viggato, LLC ("Barker Viggato") relied on HCRE for

information concerning member contributions and distributions and the allocations of income

reflected in the tax returns.[103]  "Equity Rolls" that were prepared by Barker Viggato showed

ownership percentages, capital contribution ratios, and distributions, for purposes of each GAAP

accounting and tax accounting, in tax years 2018, 2019, and 2020, and each of those showed

Highland having a 46.06% membership interest, a 0.02% capital contribution ratio, and a 94%

income allocation ratio per "Section 6.4(a) of LLC Agreement."[104]  Moreover, Barker Viggato

---

[99] Trial Tr. 107:2-22.

[100] Trial Tr. 107:23-108:2.

[101] Trial Tr. 108:18-24.

[102] Debtor's Trial Ex. 7, Amended LLC Agreement, §§3.1, 8.2, at 6, 14.

[103] Debtor's Trial Ex. 4, Deposition Excerpts of Mark Barker (Barker Viggato, LLP 8/5/22 Deposition), 23:16-24:10.

[104] Debtor's Trial Exs. 42-44.  Section 6.4(a) of the Amended LLC Agreement provides for the allocation of profits and losses 94% to Highland and 6% to BH Equities, with 0% allocated to HCRE. Debtor's Trial Ex. 7, Amended LLC Agreement, §6.4(a), at 12.

fixed Highland's capital interest at 46.06% in every K-1 prepared for Highland for tax years 2018-2020.[105]

Mr. McGraner ultimately affirmed on cross-examination that "HCRE now contends that the mistake in the agreement wasn't that the allocations were wrong in the original agreement, but, that [the Amended LLC Agreement] should have provided HCRE with the ability to amend the agreement as the transaction unfolded and assets were sold."[106]  But, as brought out in the cross-examination of Mr. McGraner--same as the Original LLC Agreement[107]--the Amended LLC Agreement ***does contain*** a provision for the amendment or waiver of any of the provisions under the agreement.  In fact, section 10.1 had been revised and updated from the original version to change the consent requirements, so that the prior written consent of "the Manager [Mr. Dondero] and ***HCRE***" (emphasis added) would be required for any modification, amendment, or waiver or any of the provisions of the Amended LLC Agreement—as opposed to the requirement in the Original LLC Agreement of the prior written consent of "the Manager [Mr. Dondero] and ***all the Members***" (emphasis added), as reflected in the following black-lined version of section 10.1:[108]

> 10.1    <u>Amendments and Waivers</u>.  This Agreement may be modified or amended, or any provision hereof waived, only with the prior written consent of the Manager and ~~all the Members~~ ***HCRE*** (a copy of which shall be promptly sent by the Manager to all the Members).  For the sake of clarity, no such amendment shall without a Member's consent (a) reduce the amounts distributable to, timing of distributions to, or expectations to distributions of, such Member, (b) increase the obligations or liabilities of such Member, (c) change the purpose of the Company as set forth in <u>Section 1.3</u>, (d) change any provision of this Agreement requiring the approval of ~~all the Members~~ ***HCRE*** or reduce such approval requirement, (e) borrow funds or otherwise commit the credit of the Company, (f) sell the Company or sell all or substantially all assets of the Company, or (g)

---

[105] Debtor's Trial Exs. 46, 50, and 55.

[106] Trial Tr. 113:7-12.

[107] *See supra* at note 61 and accompanying text.

[108] Debtor's Trial Ex. 7, §10.1, at 15-16 (emphasis and stricken text added to show comparison of §10.1 in the Amended LLC Agreement with §10.1 in the Original LLC Agreement).

otherwise materially and disproportionally impair the rights of such Member under this Agreement.

Mr. McGraner admitted that section 10.1 of the Amended LLC Agreement "provides for the amendment of th[e] [Amended LLC Agreement,"[109] that section 10.1 was part of the process that Mr. Dondero talked about that "got vetted by the real estate team and the lawyers and the tax folks at HCRE, at Highland . . . ,"[110] and that he was specifically aware of the prohibition in section 10.1(g) against materially and disproportionally impairing the rights of any member absent the consent of that member when the Amended LLC Agreement was signed in March 2019.[111]  He could not point to any provision of the Amended LLC Agreement that was either "wrong" or a "mistake;" rather, he testified that the "mistake" was "when the bankruptcy was filed and we can't amend it" because "[o]ur partners aren't our partners" – "if you have good partners and you're working with partners that are – that are known to you, then you make amendments to reflect the contributions of those partners, whether monetary or otherwise . . . [a]nd my understanding is I can't do that right now."[112]   Mr. McGraner further testified that despite Mr. Dondero being in control of both HCRE and Highland prior to the bankruptcy filing, and despite "all of the fears [he] had [related to Highland's bankruptcy filing]," HCRE made no effort to amend the agreement before the bankruptcy or post-bankruptcy (because "we didn't think it would be worth it").[113]  Mr. McGraner confirmed that "[a]t no time in the history of the world did HCRE ever try to amend the restated LLC agreement" and that he "never instructed anyone to draft an amendment [to the

---

[109] Trial Tr. 113:14-17.

[110] Trial Tr. 114:2-13.

[111] Trial Tr. 114:16-23.

[112] Trial Tr. 114:24-115:16, 118:6-15.

[113] Trial Tr. 121:24-122:9.

agreement].”[114]    Mr. McGraner also admitted (after being impeached by his prior deposition

testimony) that nobody acting on behalf of HCRE ever told BH Equities that there was a mistake

in the Amended LLC Agreement or that HCRE wanted to amend it to reflect a different allocation

of membership interests for Highland and HCRE and that “[t]he reason HCRE made no effort to

amend the agreement is because [it] hoped that the issues that caused the bankruptcy filing would

resolve themselves.”[115]

## V.    CONCLUSIONS OF LAW

### A. HCRE Has Failed To Meet Its Burden of Proof Regarding Its Claim for Reformation or Rescission of the Amended LLC Agreement to Reallocate the Membership Interests in SE Multifamily

HCRE has failed to meet its burden of proof under Delaware law[116] regarding its claim

against the Debtor to reallocate the equity in SE Multifamily in accordance with the capital

contributions of the members pursuant to HCRE's alleged right of reformation[117] or rescission of

the Amended LLC Agreement due to alleged mutual mistake, lack of consideration, or failure of

consideration.  HCRE did not cite any legal authority (under Delaware law or any other law for

that matter) in its briefing with the court or at Trial in support of its alleged right to reformation or

rescission of the Alleged LLC Agreement.  The Reorganized Debtor, on the other hand, cited legal

authority at Trial that supports a conclusion that HCRE does not have a right to the relief sought

---

[114] Trial Tr. 122:10-19.

[115] Trial Tr. 122:20-125:21.

[116] The Amended LLC Agreement provides that it will be “governed by and construed and enforced in accordance
with [Delaware law].” Debtor's Trial Ex. 7, Amended LLC Agreement, §10.5, at 16.

[117] HCRE has asserted an alleged right to “reformation, rescission, and/or modification” of the Amended LLC
Agreement.  While there is a distinction under the law between the concepts of reformation and rescission of an
agreement, the court sees no real distinction between reformation and *modification* of an agreement—HCRE is asking
the court to apply the legal concept of reformation of a contract when it asks the court to modify the Amended LLC
Agreement.

in its Proof of Claim—the reallocation of the membership interests in SE Multifamily via reformation or rescission of the Amended LLC Agreement.

### 1. HCRE Is Not Entitled to Reformation of the Amended LLC Agreement

HCRE has asked the court to allow its Proof of Claim and to reallocate the SE Multifamily membership interests in accordance with the members' capital contributions pursuant to HCRE's alleged right to reformation of the Amended LLC Agreement based on alleged mutual mistake, lack of consideration, and/or failure of consideration. Under Delaware law, ordinarily, "parties who sign contracts and other binding documents . . . are bound by the obligations that those documents contain," *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 890-90 (Del. 2015) (quoting *Official Comm. of Unsecured Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1015 (Del. 2014)),[118] and "[w]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement." *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 715 (Del. 2019) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *rev'd on other grounds*, 892 A.2d 1068 (Del. 2006) (cited by *Nationwide Emerging Managers*, 112 A.3d at 881)). "To succeed in a claim for contract reformation, the 'plaintiff must show . . . that the parties came to a specific prior understanding that differed materially from the written agreement.'" *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 710 (Del. 2019) (quoting *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 890-91 (Del. 2015) (quoting *Cerebus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002)). The burden of proof is by clear and

---

[118] The court also cited 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS, §31.5 (4th ed. 2003) for the proposition that "[w]hile the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding, based entirely on direct evidence of intention, and often on hindsight, the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make."

convincing evidence (and not by the lower standard of the preponderance of the evidence), which "requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable." *Id.* (citing *Nationwide Emerging Managers*, 112 A.3d at 891, and quoting *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (internal quotations and brackets omitted)).   The plaintiff must show, by clear and convincing evidence, the "precise mistake" and "a specific meeting of the minds regarding a term that was not accurately reflected in the final, written agreement." *Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *19 (Del. Ch. Dec. 13, 2021) (citations omitted).   Absent such a showing, a party should not be able "to escape the clear consequences of an unambiguous contract that it has willingly signed." *See Parke Bancorp*, 217 A.3d at 715.

HCRE did not produce any evidence, much less clear and convincing evidence, that the parties to the Amended LLC Agreement – HCRE, Highland, BH Equities, and Liberty – had come to a specific and understanding, prior to the execution of the Amended LLC Agreement in March 2019, that the allocation of percentage membership interests in SE Multifamily was different from the percentage allocations contained in the Amended LLC Agreement.   When asked on cross-examination, Mr. McGraner, HCRE's officer and co-owner who was most involved in the negotiations of the terms of the Amended LLC Agreement, was unable to identify any specific mistake made in the drafting of the Amended LLC Agreement.   Neither he nor HCRE's other witness, Mr. Dondero, were able to point to a specific meeting of the minds of the members of SE Multifamily prior to (or after, for that matter) the execution of the Amended LLC Agreement that the parties intended Highland's allocation of SE Multifamily membership interests to be any percentage other than the 46.06% allocation attributed to Highland in the written Amended LLC Agreement.   To the contrary, the evidence overwhelmingly points to the conclusion that both Mr.

Dondero and Mr. McGraner understood that the allocation of 46.06% membership interest to
Highland, and a total capital contribution by Highland of $49,000 in the Amended LLC
Agreement, reflected the intent of the parties prior to, and at the time of, the execution of the
Amended LLC Agreement.[119]  Mr. Thomas of BH Equities, the SE Multifamily member who
participated on the other side (from the Highland entities) of the "bilateral" negotiations of the
terms of the Amended LLC Agreement, and specifically the heavily negotiated allocations of
membership interests, testified in his deposition that the allocation of membership interests
contained in Schedule A of the Amended LLC Agreement (and other provisions of the Amended
LLC Agreement, including the percentage ownership provisions in section 1.7 and the "waterfall"
distribution provisions under sections 6.1(a) and 9.3(e)) of 47.94% to HCRE, 46.06% to Highland,
and 6% to BH Equities accurately reflected the intent of the parties.  Moreover, SE Multifamily's
tax filings made at the behest of Mr. Dondero, in his capacity as an officer of HCRE and as the
Manager of SE Multifamily, after the execution of the Amended LLC Agreement, confirm that the
parties intended that Highland own a 46.06% of the SE Multifamily membership interests.  Finally,
as did the Original LLC Agreement, the Amended LLC Agreement contains a provision (section
10.1 entitled "Amendments and Waivers") that specifically sets forth the procedures and consent
requirements for amending any provision of the agreement, and that provision prohibits the
Manager and HCRE from, among other things, modifying or amending any provision of the
Amended LLC Agreement that reduces the amounts distributable to a member (or the timing of
such distributions), increasing the liabilities or obligations of a member, or "otherwise materially

---

[119] While Mr. Dondero testified that he did not read the Amended LLC Agreement before he signed it on behalf of
HCRE and Highland, he testified that the capital contributions and membership allocations contained in Schedule A
of the Amended LLC Agreement comported with his understanding and intent when he signed the Amended LLC
Agreement on behalf of HCRE and Highland, including his expectation that Highland's 49% interest was going to be
diluted by the 6% interest being granted to BH Equities.  Thus, the court need not address whether Mr. Dondero's
failure to read the Amended LLC Agreement before signing it precludes any claim for reformation as a matter of law.

and disproportionally impair[ing] the rights of such Member under this Agreement" without the consent of that member.  The testimony of both HCRE's witness, Mr. McGraner, and BH Equities' witness, Mr. Thomas, confirmed that nobody from HCRE ever notified the other members after the Amended LLC Agreement was executed (prior to HCRE alleging "mutual mistake, lack of consideration, and/or failure of consideration" for the first time in its Response to the Objection) that HCRE believed that the 46.06% membership allocation to Highland was incorrect, a mistake, or needed to be amended.  Mr. McGraner also testified that he never directed anyone at HCRE to draft an amendment to the Amended LLC Agreement and that HCRE never tried to amend the Amended LLC Agreement.

HCRE has failed to show by clear and convincing evidence (1) that the Amended LLC Agreement contained a precise mistake with respect to the 46.06% allocation of SE Multifamily membership interests to Highland and (2) that there had been a specific meeting of the minds of the parties to the Amended LLC Agreement that the allocation of SE Multifamily membership interests to Highland was ever supposed to be any percentage other than the 46.06% identified in the Amended LLC Agreement.  Therefore, HCRE is not entitled to reformation of the Amended LLC Agreement to reallocate the members' membership percentages in accordance with the stated capital contributions of the respective members (or to reformation of any provision of the Amended LLC Agreement).[120]

---

[120] Because neither lack of consideration nor failure of consideration are bases for reformation of a contract under Delaware law (which is what HCRE is seeking in its Proof of Claim), the court concludes that HCRE is not entitled to reformation of the Amended LLC Agreement to reallocate the members' membership interests as requested based on its allegations of lack of consideration and/or failure of consideration.  In any event, HCRE has not shown that there was a lack or failure of consideration on behalf of Highland in connection with the Amended LLC Agreement. As noted above, HCRE did not cite to any legal authority in support of its Proof of Claim in its briefing or at Trial. The Reorganized Debtor, however, did point the court at Trial to Delaware law regarding the concept of lack or failure of consideration as a basis for relief from the terms of a written agreement.  Under Delaware law, the courts "limit [their] inquiry into consideration to its existence and not whether it is fair or adequate," *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotations omitted), and "[a]bsent fraud or unconscionability, the

### 2. HCRE Has Not Sought a Rescission of the Amended LLC Agreement

Despite HCRE's use of the term "rescission" in its stated basis for its claim, the remedy sought by HCRE—allowance of its Proof of Claim and a judicial reallocation of the SE Multifamily membership interests under the Amended LLC Agreement in accordance with the members' capital contributions—is not for rescission of the Amended LLC Agreement; rather, it is reformation of the Amended LLC Agreement that HCRE seeks.  As the Delaware Supreme Court explained in *Parke Bancorp*, while the concepts of rescission and reformation are similar in many ways, there are some important differences.  Rescission, under Delaware law, involves an attempt to "unmake" an agreement and "return the parties to the *status quo [ante]*" while "reformation entails an attempt to 'correct[ ] an enforceable agreement's written embodiment to reflect the parties' true agreement." 217 A.3d at 710.  And, while both reformation claims and rescission claims are based on the concept that the parties' basic assumption or prior understanding mistakenly is not reflected in the written agreement, "one substantive and relevant difference between the two claims . . . is that . . . while a failure to read prevents a plaintiff from proceeding with [a rescission] claim as a *prima facie* matter, a failure to read bars a reformation claim only if '[the plaintiff's] fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.'" *Parke Bancorp*, 217 A.3d at 711 (citations omitted).[121]  Thus, if HCRE had stated a claim for rescission of the Amended LLC Agreement (which it has not), Mr.

---

adequacy of consideration is not a proper subject for judicial scrutiny." *Acker v. Transurgical, Inc.*, 2004 WL 1230945 (Del. Ch. Apr. 22, 2004).  "[E]ven if the consideration exchanged is grossly unequal or of dubious value, the parties to a contract are free to make their bargain." *Id.* (internal quotations omitted).  Here, it is undisputed that Highland made a cash capital contribution of $49,000, that Highland was a jointly and severally liable coborrower under the KeyBank Loan, and that SE Multifamily (and HCRE), having no employees of their own, relied on Highland's employees to conduct business.  Thus, HCRE's claim, to the extent it is based on alleged lack and/or failure of consideration fails.

[121] *See id.* (where the court identified the requirements of a rescission (or avoidance) claim as proof by the plaintiff that "(1) there was a mutual mistake that relates to a basic assumption on which the contract was made, (2) the mistake has a material effect on the agreed exchange of performances, and (3) it did not bear the risk of mistake.") (citing *Hicks v. Sparks*, 2014 WL 1233698, at *2 (Del. Mar. 25, 2014)).

Dondero's admission that he did not read the Amended LLC Agreement (or even have the terms explained to him by counsel or anyone else) prior to signing it on behalf of HCRE and Highland would bar any claim by HCRE for rescission of the Amended LLC Agreement.  Moreover, even if HCRE's claim for rescission was not barred by Mr. Dondero's failure to read the Amended LLC Agreement prior to signing it, HCRE did not present any evidence of the other elements of a rescission claim:  that the parties were mistaken as to a basic assumption on which the Amended LLC Agreement was made and that the mistake had a material effect on the agreed-upon exchange of performances.[122]

### B.  The Amended LLC Agreement Is Not an Executory Contract under Bankruptcy Code § 365 That Was Deemed Rejected under the Terms of the Plan

As noted above, HCRE, for the first time during the two and a half years that the parties had been litigating the Debtor's Objection to HCRE's Proof of Claim, argued that it was entitled to allowance of its Proof of Claim and reformation of the Amended LLC Agreement to reallocate the membership interests in SE Multifamily in accordance with each member's capital contribution ratio, in part, because the Amended LLC Agreement is an executory contract that was rejected by Highland and, thus, Highland is no longer a member of SE Multifamily, but has only an "economic interest" in SE Multifamily.[123]  HCRE did not cite any legal authority to support its position that the Amended LLC Agreement is an executory contract that had been rejected by Highland under

---

[122] See discussion of HCRE's claim of "mutual mistake" and lack of evidence by HCRE to support its reformation claim, *supra*, at 30-32.

[123] *See* Trial Tr. 181:15-182:17:

> I think this is a rejected executory contract.  That's why we asked the Court to take a look at it. During the examination of Mr. Cournoyer and Mr. Klos, I pointed out some of the provisions in the agreement that require things of Highland. . . . They have an affirmative obligation under [section 1.8] and they have rejected it.  By not assuming the SE Multifamily contract, they rejected it. . . . All they have left is an economic interest . . . .  but they're not a member anymore.  They have rejected it.

the terms of the Plan.  After the Trial, the court granted the Reorganized Debtor's request for leave

of the parties to submit post-trial briefing on the executory contract issue and, while the

Reorganized Debtor provided extensive legal analysis containing relevant legal authority to

support its contention that the Amended LLC Agreement *is not* an executory contract under

Bankruptcy Code § 365 and, therefore, it could not have been a rejected executory contract under

the terms of the Plan, HCRE, again, ***cited no legal authority whatsoever***, in its post-trial briefing

on the executory contracts issue, to support its contention to the contrary – that the Amended LLC

Agreement *is* an executory contract under Bankruptcy Code § 365 that was rejected by Highland

pursuant to the terms of its Plan.  Perhaps HCRE did not provide any legal support for its position

because it hoped the court would not make any findings or conclusions with respect to this issue

that would then be binding on HCRE, but, as noted above, HCRE placed the issue before the court

in the prosecution of its Proof of Claim and in defense of the Reorganized Debtor's objection to

its Proof of Claim at Trial, and, therefore, it is proper for the court to make findings of fact and

conclusions of law with respect to this issue.

The Bankruptcy Code does not define the term "executory contract," but the Fifth Circuit

has adopted the definition first articulated by Professor Vern Countryman, known as the

"Countryman test," that "a contract is executory if 'performance remains due to some extent on

both sides' and if 'at the time of the bankruptcy filing, the failure of either party to complete

performance would constitute a material breach of the contract, thereby excusing the performance

of the other party.'" *Matter of Falcon V, L.L.C.*, 44 F.4th 348, 352-353 (5th Cir. 2022) (quoting *In

re Provider Meds*, 907 F.3d 845, 851 (5th Cir. 2018)).  "A contract that only imposes remote or

hypothetical duties is not an executory contract." *Ebert v. DeVries Family Farm LLC (In re

DeVries)*, No. 12-04015-DML, 2014 WL 4294540, *8 (Bankr. N.D. Tex. Aug. 27, 2014) (citing

*Meiburger v. Endeka Enters. LLC (In re Tsiaoushis)*, 383 B.R. 616, 618 (Bankr. E.D. Va. 2007)).

There is no *per se* rule governing whether a limited liability company operating agreement is an

executory contract; rather, "courts must look to the 'facts and circumstances of each case to

determine the status of a particular operating agreement.'" 2014 WL 4294540, at *9 (citing *In re*

*Tsiaoushis*, 383 B.R. at 618).  The "[f]actors relevant in evaluating an LLC operating agreement

include whether the operating agreement imposes remote or hypothetical duties, requires ongoing

capital contributions, and the level of managerial responsibility imposed on the debtor." *Id.*

(quoting *In re Warner*, 480 B.R. 641, 651 (Bankr. N.D. W.Va. 2012) (collecting cases)).

Here, the Debtor did not have any material unperformed obligations under Amended LLC

Agreement as of the Petition Date, and, thus, the court concludes that it is not an executory contract

under Bankruptcy Code § 365 that would have been deemed rejected upon confirmation of the

Plan.  Mr. Dondero and HCRE have exclusive managerial, operational, and voting control of SE

Multifamily under the terms of the Amended LLC Agreement.[124] Highland is a passive investor in

SE Multifamily with no right to manage or control SE Multifamily and no obligations as a member.

For example, under section 2.1 of the Amended LLC Agreement, Members may make future

capital contributions to SE Multifamily, but are not obligated to do so.  And, in fact, Mr. Dondero

testified on cross-examination that, at the time of the execution of the Amended LLC Agreement,

he believed that HCRE, Highland, and BH Equities "had all either made the capital contributions

---

[124] *See, e.g.*, Debtor's Trial Ex. 7, Amended LLC Agreement, §1.6 ("HCRE shall have the exclusive right to appoint the Manager and the Manager shall have the unfettered control over all aspects of the business and operations of the Company and shall have exclusive rights to appoint management personnel and exclusive voting rights, as further specified in this Agreement."), §3.2 ("The management, control and direction of the Company and its operations, business and affairs shall be vested exclusively in the Manager, who shall have the right, power and authority, to carry out any and all purposes of the Company and to perform or refrain from performing any and all acts that the Manager may deem necessary, appropriate or desirable."), §3.7 ("The Manager may appoint and remove officers of the Company in his sole discretion.), §3.9 (if the Manager resigns for any reason, a replacement Manager may be appointed by HCRE), and §10.1 (the Amended LLC Agreement cannot be amended, modified, or waived without the prior written consent of the Manager and HCRE).

or all of the capital contributions, [sic] they were going to get credited with having been made"
and that "there was no expectation that any of the members would put in any additional capital
after the agreement was amended in March of 2019," and, finally, that he was not aware of any
members ever putting in additional capital after the execution of the Amended LLC Agreement.[125]

At Trial and during closing argument, HCRE's counsel pointed to five provisions in the
Amended LLC Agreement—sections 1.8, 4.3, 7.2, 7.4, and 10.1—that HCRE contends imposed
material, affirmative obligations on the Debtor as of the Petition Date, making the Amended LLC
Agreement an executory contract.   In its Post-Trial Brief, Reorganized Debtor systematically
addressed each of these provisions and pointed out why none of them imposed on Highland any
material performance obligations as of the Petition Date, and, therefore, the Amended LLC
Agreement is not an executory contract under section 365 of the Bankruptcy Code.[126]   In its
Response to Highland's Post-Trial Brief, HCRE chose not to address Highland's arguments, and,
instead, disingenuously argued that the issue of whether the Amended LLC Agreement was an
executory contract that had been rejected by Highland upon confirmation of its Plan was not before
the court for its determination.[127]   The court concludes, after looking at the facts and circumstances
surrounding this particular agreement, and at the provisions of the Amended LLC Agreement cited,
that the Amended LLC Agreement is not an executory contract under Bankruptcy Code § 365 that
was subject to having been rejected or assumed under the terms of the Plan.

---

[125] Trial Tr. 51:18-52:6.

[126] *See*, Post-Trial Brief, 8-11.

[127] *See*, Response to Post-Trial Brief, 4.

**C. The Reorganized Debtor's Request for Sanctions Against HCRE, in the Form of Reimbursement of Its Costs in Litigating the Objection to HCRE's Proof of Claim, Is Procedurally Defective**

The Reorganized Debtor's oral request at Trial that the court make a finding that HCRE filed and prosecuted its proof of claim in bad faith and award the Debtor reimbursement of its costs, as a sanction for such bad-faith filing, is procedurally defective, and, therefore, it must be denied, without prejudice. "[A] person facing possible sanctions is entitled to due process. . . . At a minimum, the respondent is entitled to notice of the authority for the sanctions, notice of the specific conduct or omission that forms the basis of possible sanctions and the opportunity to respond." *In re Emanuel*, 422 B.R. 453, 464 (Bankr. S.D.N.Y. 2010). Specifically in the objection to claim context, a bankruptcy court in the Northern District of Texas denied, without prejudice, a request for sanctions that did not "articulate the legal basis for a sanctions award" that was contained in the trustee's written objection to a proof of claim and urged again during the hearing on the objection to the claim because the trustee had not provided the claimant adequate notice and an opportunity to respond. *See In re Magari*, 2010 WL 817327 at \*\*2-3 (Bankr. N.D. Tex. Mar. 4, 2010) (where the court stated, "A request for affirmative relief in the form of sanctions incorporated within an objection to claim must comply with Rule 9014, which, in turn, requires service of process in accordance with Rule 7004. . . . By requesting the sanctions award, the Trustee has raised due process concerns that can only be satisfied by providing to the affected party sufficient notice and opportunity to respond."). Here, where the Reorganized Debtor's generic oral request for a finding of bad faith and for "an award costs for a bad faith filing" did not articulate the legal basis for such an award and was raised for the first time during the Trial, HCRE was not given sufficient notice and an opportunity to respond, and, therefore, the court will deny,

without prejudice, the Reorganized Debtor's request for reimbursement of its costs incurred in connection with its objection to HCRE's Proof of Claim.

Accordingly, and based on the foregoing findings of fact and conclusions of law,

**IT IS ORDERED** that the Reorganized Debtor's objection to the HCRE's Proof of Claim, filed by HCRE in the above-referenced bankruptcy case, Claim No. 146, **BE, AND HEREBY IS, SUSTAINED** and that such claim **BE, AND HEREBY IS, DISALLOWED** for all purposes;

**IT IS FURTHER ORDERED** that the Reorganized Debtor's motion at Trial for sanctions against HCRE in the form of reimbursement of the Reorganized Debtor's costs in connection with its Objection to the HCRE Proof of Claim allegedly filed in bad faith **BE, AND HEREBY IS, DENIED**, without prejudice, as being procedurally deficient.

**###End of Memorandum Opinion and Order###**