**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs The Dugaboy Investment Trust and the
Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| | § | |
| DUGABOY INVESTMENT TRUST and | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | _____ |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| HIGHLAND CLAIMANT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**COMPLAINT TO (I) COMPEL DISCLOSURES
ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND
(II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND
(B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST**

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("HMIT" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against Defendants Highland Capital Management, L.P. ("HCM" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCM, the "Defendants"), seeking: (1) disclosures about all distributions and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of the assets and liabilities; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCM bankruptcy estate.

2.      Defendants' October 21, 2022, January 24, 2023, and April 21, 2023 post-confirmation reports show that even with inflated claims and below-market sales of assets, cash available – if not squandered in self-serving litigation – is more than enough to pay class 8 and class 9 creditors in full. With more than $100 million in assets left to monetize (not even counting related party notes), and almost $550,000 in assets already monetized, even after burning through more than $100 million in professional fees, there is and was more than enough money to pay the inflated $387 million in creditor claims the Debtor allowed. These numbers compel the question

---

[1] Capitalized terms not defined have the meanings set forth herein. If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

CORE/3524155.0004/178862860.20

– "What was all of this for, other than to justify outsize fees and bonuses for the professionals involved?" See paragraphs 17-18 below.  And despite repeated and increasingly specific requests, the Debtor has never provided granular enough information to specifically identify all of the monies raised and where all the money has gone, including another hundred million dollars that appears to be unaccounted. *Id*.

3.      Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities.  Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books ***at those crisis period values***, along with overstated liabilities, to justify continued litigation.   That litigation has served to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate (along with incentive fees), leaving little or nothing for the owners that built the company.

4.      Significantly, Kirschner seems to concede the merits of Plaintiffs' position.  After Plaintiffs began seeking the relief sought herein (originally by way of motion), Kirschner himself sought a stay of the massive litigation he instituted to evaluate whether the estate actually needed to collect additional funds.  Plaintiffs and other defendants in that litigation agreed to the stay but could not convince the Debtor to provide the kind of fulsome disclosure that would allow Plaintiffs to evaluate for themselves the status of the estate, which secrecy continues to leave Plaintiffs with suspicions that prevent an overall resolution of the bankruptcy with no further need for indemnification reserves. Rather, Debtor continues to provide summary information that is not sufficient to enable Plaintiffs to determine the amounts of money being spent on administration and litigation, and not sufficient to determine whether if all litigation ceased, the estate could pay all creditors with money to spare for equity.  Plaintiffs are especially concerned because the

information they have gleaned suggests inappropriate self-dealing that undermines confidence in

the Debtor's financial reporting, making the relief sought herein all the more important.

5.    While grave harm has already been done by the Defendants' excessive litigation

and unnecessary secrecy, valuation now would at least enable the Court to put an end to this already

long-running case and salvage some value for equity.  As this Court observed in *In re ADPT DFW

Holdings*, where there is significant uncertainty about insolvency, protections must be put in place

so that the conduct of the case itself does not deplete the equity.  In some cases, the protection is

in the form of an equity committee; here a prompt valuation of the estate is needed.

6.    Upon information and belief, during the pendency of HCM's bankruptcy

proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize

the potential return to the estate, including Plaintiffs.  Rather, Mr. Seery, first acting as Chief

Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee,

facilitated the sale of creditor claims to entities that had undisclosed business relationships with

Mr. Seery; entities that Mr. Seery knew would approve inflated compensation to him when the

hidden but true value of the estate's assets were realized.  Because Mr. Seery and the Debtor have

failed to operate the estate in the required transparent manner, they have been able to justify pursuit

of unnecessary avoidance actions (for the benefit of the professionals involved), even though the

assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

7.    Further, by understating the value of the estate and preventing open and robust

scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions

to further marginalize equity holders that otherwise would be in the money, such as including plan

and trust provisions that disenfranchise equity holders such as Plaintiffs by preventing them from

having any input or information unless the Claimant Trustee certifies that all other interest holders

have been paid in full.  Because of the lack of transparency to date, unless the relief sought herein

is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less

any process to ensure that the estate has been managed in good faith so as to enable all interest

holders, including the much-maligned equity holders, to receive their due.

8.    By demonizing the estate equity holders, withholding information, and

manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the

potential for a grave miscarriage of justice and at this time it appears their underhanded plan is

succeeding.

9.    By June 30, 2022, the estate had $550 million in cash and approximately $120

million of other assets despite paying what appears in reports to be over $60 million in professional

fees and selling assets non-competitively, perhaps as much as $75 million below market price.[2]

As detailed below, total pre-confirmation professional fees are now over $100 million.

10.    On information and belief, the value of the assets in the estate as of June 1, 2022

was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | Low | High |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
|    Highland Select Equity | $55.00 | | |
|    Highland MultiStrat Credit Fund | $51.44 | | |
|    MGM Shares | $26.00 | | |
|    Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
|    Highland CLO Funding, LTD | | $37.50 | $37.50 |
|    Korea Fund | | $18.00 | $18.00 |
|    SE Multifamily | | $11.98 | $12.10 |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022.

CORE/3524155.0004/178862860.20

| | | | |
|---|---|---|---|
| Affiliate Notes[3] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

11.      By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| **Creditor** | **Class 8** | **Class 9** | **Beneficiary** | **Purchase Price** |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

12.      Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

13.      Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." These transactions are particularly suspect because, depending on the claim, the claims buyers paid amounts only fractionally higher, equivalent to, or, in some cases, less than the value the Plan estimated would be paid three years later.  Sophisticated claims buyers responsible to investors of their own would

---

[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale and/or have other defenses, but litigation continues over that also.

not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

14.    On information and belief, Mr. Seery provided such information to claims buyers, rather than buying the claims in to the estate for the roughly $150 million for which they were sold. By May 2021, when the claims transfers were announced to the Court, the estate had over $100 million in cash and access to additional liquidity that could have been used to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

15.    Specifically, Mr. Seery could and should have investigated seeking sufficient funds from equity to pay all claims and return the estate to the equity holders.  This was an obvious path because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were sold, much of the massive administrative costs run up by the estate would never have been incurred because the larger amounts would not have been needed.  One such avoided cost would be the post-effective date litigation pursued by Mr. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charged over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained from other cases because there has been no disclosure in the HCM bankruptcy of the cost of the Kirschner litigation). However, buying the claims to resolve the bankruptcy and enabling equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme contained: placing the decision on his incentive bonus, perhaps as much as $30 million or more, in the hands of grateful business colleagues who received outsized rewards for the claims they were steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item cloaked in secrecy, contrary to the general rule that the

hallmark of the bankruptcy process is transparency. These circumstance show why Plaintiffs are right to be concerned and why it is critical that transparency be achieved.

16.    But worse still, even with all of the manipulation that appears to have occurred, Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by unnecessary litigation, would still be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

17.    Set forth below is Plaintiffs' best estimate of the assets of the estate. Plaintiffs have been seeking information to enable to them to confirm the accuracy of their estimates, but the Debtor has refused to provide the necessary information to do so. Indeed, after the last quarterly report, in which Debtor provided some but not all of the information Plaintiffs were seeking, Plaintiffs sent a revised list, more precisely targeting the remaining information sought. Because Debtor failed to respond, it remained necessary to file this adversary proceeding.

18.    This is Plaintiffs' best estimate of the assets of the Highland estate and its cash flows. It is obvious that even if off by a significant percent, no further litigation to collect assets for the estate is needed to pay creditors. Moreover, the ample solvency of the estate was or should have been obvious to the estate professionals for quite some time, making the substantial cash burn in the estate utterly unconscionable.

| | Assets | | Amount | Backup |
|---|---|---|---|---|
| | **HCMLP Assets to be Monetized**[1] | | | |
| | **As of 3/31/23 (Est.)** | | | |
| | | | | |
| | Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF") | | $    25,000,000 | Debtor Pleading (re ACIS)  Dkt 1235 Filed 08/18/21 p.3n.10 ($25 m); 3/31/23 DAF Multi-Strat Statement ($19.5 m est); more value in the 1.0 CLOS (Brentwood – 17%;Gleneagles – 1%;Grayson – 5%;Greenbriar-23%;Liberty-18%;Rockwall-15%) |

| | | | |
|---|---|---|---|
| Highland Multi Strategy Credit Fund, L.P. ("MS") | | 30,817,992 | ADV 3/31/23 (rev 4/24/2023) |
| Highland Restoration Capital Partners Master LP & Highland Restoration Capital Partners, L.P. ("RCP") | | 24,192,773 | ADV 3/31/23 (rev 4/24/2023) |
| Stonebridge-Highland Healthcare Private Equity Fund ( "Korea Fund") | | 5,701,330 | ADV 3/31/23 (rev 4/24/2023) |
| SE Multifamily Holdings LLC ("SE Multifamily") | | 12,400,000 | Communications with Debtor that apparently values it higher |
| Other | | 5,000,000 | Other investments on the post-confirmation report |
| | | | |
| **Assets as of 3/31/21 (Est.)[1]** | | $    103,112,095 | |
| | | | |
| **HCMLP Monetizations & Management Fees (est.)** | **Sale date if known** | | |
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Targa | October ?, 2021 | $    37,500,000 | Uptick from COVID; market communications |
| Trussway | Sept. 1, 2022 | 180,000,000 | 90% of sales price 200MM, net of debt; need confirmation |
| Cornerstone | Jan. 23, 2023 | 132,500,000 | Assume 53% of sales price obtained because: HCM owns about 50% of RCP and  60% of Crusader (and assume increase in value of MGM within Cornerstone should have been enough to offset its debt) Sale announced May 12, 2022 |
| SSP | Month/date/2020 | 18,000,000 | Market communications |
| MGM Direct | Mar. 17, 2022 | 25,000,000 | @ $145, **sale announced May 2021** |
| Petrocap | Aug. 10, 2021 | 2,684,886 | Dkt, 2537, sale motion |
| Uchi | Aug. 6, 2021 | 9,750,000 | Dkt 2687, sale order |
| Jefferies Account & DRIP | | 60,000,000 | FV form 206, net of debt, but NXRT moved from $40-$80ish; don't know when monetized, so number could be low |
| Terrell (raw land) | | 500,000 | FV Form 206 |
| Mgmt Fees/Dist/Fund loan repayments (est.) | | 30,000,000 | 3 years mgmt fees, misc distributions in MS/RCP/Korea, loan paybacks |
| Siepe | | 3,500,000 | Market communications |
| HCLOF | | 35,000,000 | Calculated based on DAF distributions |
| | | | |
| **Total Monetizations & Cash Flows (Est.)** | | $    534,434,886 | |
| **Total Assets as of 3/31/23 & Prior Monetizations & Management Fees** | | $    637,546,981 | |

CORE/3524155.0004/178862860.20

| Cash Roll | | | |
|---|---|---|---|
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Cash as of 10/31/2019 | | $          2,286,000 | |
| Monetizations & Cash Flows (10/31/19 - 3/31/23) | | 534,434,886 | |
| Less: Cash on Hand as of 3/31/23 | | (57,000,000) | ADV 3/31/23 |
| | | | |
| Fees, Distributions & Other Receipts (10/31/19 - 3/31/23)[2] | | $      479,720,886 | |
| | | | |
| Administrative Fees Paid | | $      100,781,537 | Dkt 3756 filed on 4/21/23 ($33,005,136 for Professional fees (bk); $7,604,472 for Professional fees (nonbk); $60,171,929 for all prof fees and exp (Debtor & UCC). Note: this appears to "Preconfirmation." What are the post confirmation amounts?) |
| Cumulative Payments to Creditors | | 276,709,651 | Dkt 3756 - Unsecured, priority, secured and admin. |
| Other Unknown Payments or ? | | 102,229,698 | The $102 million is calculated by subtracting cumulative payments to creditors and known pre conf prof fees and costs from the $479 million determined above. Where are these funds; what were they used for? |
| Fees & Distributions Paid (10/31/19 - 3/31/23) | | $      479,720,886 | |
| | | | |
| [1]*Does not include approximately $70MM in affiliate notes* | | | |
| [2]*Includes $100MM of fees paid during bankruptcy* | | | |

19.     In short, it appears that the professionals representing HCM, the Claimant Trust, and the Litigation Sub-Trust have been litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery. Even with the stay of

10

the Kirschner litigation, the Debtor continues to pursue litigation, such as its vexatious litigant motion, and presumably opposing this litigation, that unnecessarily depletes the estate.

20.     Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

21.     In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

## <u>JURISDICTION AND VENUE</u>

22.     This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

23.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

24.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

25.     In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

11

CORE/3524155.0004/178862860.20

## THE PARTIES

26.     Dugaboy is a trust formed under the laws of Delaware.

27.     HMIT is a trust formed under the laws of Delaware.

28.     HCM is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

29.     The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

30.     On October 16, 2019 (the "Petition Date"), HCM, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

31.     At the time of its chapter 11 filing, HCM had approximately $400 million in assets (ultimately monetized for much more as a result of market events, such as the sale of HCM's portfolio companies for substantial profits, as was always planned by Mr. Dondero) and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. [Dkt. No. 1943, ¶ 8]. HCM's reason for seeking bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

CORE/3524155.0004/178862860.20

32.     At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCM and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCM and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCM management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

33.     To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCM's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCM during its bankruptcy.  The three board members were:

a.  James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);
b.  John Dubel – (who was selected by Committee member UBS); and
c.  Former Judge Russell Nelms – (who was selected by the Debtor).

34.     The Bankruptcy Court almost immediately and then repeatedly let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by

---

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

Judge Nelms, suggesting he was bamboozled because he was under management's spell. Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

35.    At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121.]   In retrospect, this avoided scrutiny of the case by professionals who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case.  This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

36.    Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only

because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

37.    None of that happened.  Almost immediately, Mr. Seery emerged as the *de facto* leader of the Independent Board.  On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate.  [Dkt. No. 854].  And although Mr. Seery publicly represented that he intended to restructure and preserve HCM's business, privately he was engineering a much different plan.

38.    Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control.  For example, Mr. Seery initially reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team."  He also testified: "My experience with our employees has been excellent.  The response when we want to get something done, when I want to get something done, has been first-rate.  The skill level is extremely high."

39.    Yet, despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

40.    From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious

litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based on pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented on proposed settlements in the case, but had not himself initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

41.    In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that are the hallmark of bankruptcy were ignored.  Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held, bought or sold.   Amplifying the lack of transparency, Mr. Seery further engineered transactions that also served to hide the real value of the estate.

42.    For example, he authorized the Debtor to settle the claims of HarbourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarbourVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarbourVest's vote in favor of its Plan, and hide the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary.  This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $34.1 million at the time, about $40 million when the settlement was consummated, and over $55 million 90 days later when the MGM sale was announced.

16

43.      At the same time, Mr. Seery and the Independent Board deliberately shut out equity

holders from any discussion surrounding the plan of reorganization or HCM's efforts to emerge

from bankruptcy as a going concern.  Indeed, as noted above, Mr. Seery failed to meaningfully

respond to the many proposals made by residual equity holders to resolve the estate and never

encouraged any dialogue between creditors and equity holders.  These failures only contributed to

the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly

undermined an efficient exit from bankruptcy.

44.      Worse still, while knowing that HCM had sufficient resources to emerge from

bankruptcy as a going concern (and, on information and belief, while knowing that the estate was

solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that

contemplated HCM's continued post-confirmation existence.  Instead, and inexplicably, the very

first plan proposed contemplated liquidation of the company, as did all subsequent plans.

45.      While secretly engineering the total destruction of HCM, Mr. Seery also privately

settled multiple proofs of claim against the estate at inflated levels that were unreasonable

multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and

vehement objection to many of the claims as baseless.  But instead of litigating those objections in

a manner that would have exposed the true value of the claims, on information and belief, Mr.

Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values.

That is, the inflated values softened up claims sellers to induce them to sell. Had the Debtor instead

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true

value and ensured that the estate had sufficient resources to pay them.

46.      It is also no coincidence that virtually all original proofs of claim were sold to

buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (a

company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

47.    That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Dkt. 2949.  Given the sophistication of the claims-buyers, their purchases of claims at prices that in some cases exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

48.    And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million or more, while engineering the estate to prevent equity holders from objecting or even knowing.

49.    At the same time, the Claimant Trust has made no distributions to Contingent Claimant Trust Interest holders and has argued in various proceedings that no such distributions are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs,

CORE/3524155.0004/178862860.20

appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such distributions can occur, even though it can now be projected that the litigation is not needed to pay creditors. *See* Docket No. 3410-1.

50.     It is worth noting that it appears that virtually all of the claims trades brokered on behalf of Committee members seem to have occurred while those entities remained on the Committee. Yet at the outset of their service, Committee members were instructed by the United States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." Thus, the claims trades violated Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other Debtor professionals, to the detriment of creditors and residual equity holders.

51.     The sales of claims were not the only transactions shrouded in secrecy. As further detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding, no data room, and without inviting equity (which may have at one time had the knowledge to make the highest bid) to participate in the sales process. Indeed, on occasion assets were sold for amounts less than Mr. Dondero's written offers. This exacerbated the harms caused by the lack of transparency characterized by the Court's indifference to the Debtor's complete failure to abide by its Rule 2015 disclosure obligations.

52.     In short, the lack of transparency combined with at least the appearance of bias, if not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that, but for that manipulation, could have been resolved with money left over for equity.

## STATEMENT OF FACTS

### A.    Plaintiffs Hold Contingent Claimant Trust Interests

53.    As of the Petition Date, HCM had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

54.    The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCM's general partner.  The Class B and C interests were held by HMIT.  *Id.*

55.    In the aggregate, HCM's limited partnership interests were held: (a) 99.5% by HMIT; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

56.    On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

57.    In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

58.    In the Plan, HCM classified HMIT's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

59.    According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.  *See* Plan, Article I, ¶44.

60.    In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCM and

Case 19-34054-sgj11    Doc 3778    Filed 05/10/23    Entered 05/10/23 23:33:49    Desc
Main Document    Page 21 of 28

different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement").  Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

61.      The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy.  In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCM and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

62.      Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

63.      The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCM became the Reorganized Debtor (as defined in the Plan) on the Effective Date.  *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

64.      The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

CORE/3524155.0004/178862860.20

65.    Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

66.    Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

67.    The Post Confirmation Quarterly Reports for the First Quarter of 2023 [Docket No. 3756 and 3757], show distributions of $270,205,592 to holders of general unsecured claims, which is 68% of the total allowed general unsecured claims of $397,485,568. This amount is far greater than was anticipated at the time of confirmation of the Plan. About $277 million has been distributed to creditors when secured, priority and administrative creditors are also considered.

**B.    Debtor Has Failed To Disclose Claimant Trust Asse**ts

68.    Upon information and belief, the value of the estate, as held in the Claimant Trust, has changed markedly since Plan confirmation. Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

69.    The estate is solvent and has always been solvent. Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.

70.    As noted above, by June of 2022, starting with $125 million in cash, the estate liquidated other assets of over $416 million, building a cash war chest of over $541 million. Thus, with the remaining less-liquid assets, the total value of the estate's assets as of June 2022 was over $600 million, excluding related party notes.

71.      Contrasting those assets with the claims against the estate demonstrates that further collection of assets was (and is) unnecessary.

72.      As set forth above, while the inflated face amount of the claims sold was $365 million, the sale price was about $150 million.  The estate therefore easily had the resources to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

73.      Instead, Mr. Seery liquidated estate assets at less-than-optimal prices, without competitive process, without including residual equity holders, and in all cases required strict non-disclosure agreements from the buyers to prevent any information flowing to the public, the residual equity, or the Court. This uncharacteristic secrecy enabled Mr. Seery and the professionals to maintain the delicate balance of keeping just enough assets to pay professionals and incentive fees but still maintain the pretense that further litigation was needed.

74.      Each effort by Plaintiffs, Mr. Dondero and related companies to obtain information to assess whether interference was necessary to stop the continued looting has been vigorously opposed, and ultimately rejected by an apparently biased Court.  Plaintiffs were unable to cause the Debtor to provide the most basic of reports, including Rule 2015 statements, and Plaintiffs' efforts to obtain even the most basic details regarding asset sales and professional fees have all been denied.  Rather, such details are in the hands of a select few, such as the Oversight Board of the Claimant Trust.

75.      The Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate.  *See* Plan, ¶Art. IV(B)(9).

CORE/3524155.0004/178862860.20

76.     But no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests, even though Plaintiffs, as contingent beneficiaries of a Delaware statutory trust, are entitled to financial information relating to the trust.

**C.      Plaintiffs Are Kirschner Adversary Proceeding Defendants**

77.     On October 15, 2021, Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust, commenced the Kirschner Adversary Proceeding against twenty-three defendants, including Plaintiffs, alleging various causes of action.  *See Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust vs. James Dondero*, *et al.*, Adv. Pro. No. 21-03076-sgj, Adv. Proc. No. 21-03076, Docket No. 1 (as amended by Docket No. 158).

78.     The Litigation Sub-Trust was established within the Claimant Trust as a wholly owned subsidiary of the Claimant Trust for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, with any proceeds therefrom to be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries.  *See* Plan, Article IV, ¶ (B)(4).

79.     Any recovery from the Kirschner Adversary Proceeding will be distributed to Claimant Trust Beneficiaries.

80.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

81.     The Litigation Sub-Trust is pursuing claims against Plaintiffs in the Kirschner Adversary Proceeding, which, if they become Claimant Trust Beneficiaries, would be the recipients of distributions of such recovery (less the cost of litigation).  Therefore, Plaintiffs require the requested information in order to properly analyze and evaluate the claims asserted against

CORE/3524155.0004/178862860.20

them in the Kirschner Adversary Proceeding and to determine whether those claims have any

validity.

## <u>FIRST CLAIM FOR RELIEF</u>
**(Disclosures of Claimant Trust Assets and Request for Accounting)**

82.    Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as

though fully set forth herein.

83.    Due to the lack of transparency into the assets of the Claimant Trust, Plaintiffs are

unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust

Interests.

84.    Certain information about the Claimant Trust Assets has already been provided to

others, including Claimant Trust Beneficiaries and the Oversight Board for the Claimant Trust.

85.    Information about the Claimant Trust Assets would help Plaintiffs evaluate whether

settlement of the Kirschner Adversary Proceeding and other proceedings is feasible, which would

further the administration of the bankruptcy estate, benefitting all parties in interest.

86.    This Court specifically retained jurisdiction to ensure that distributions to Holders

of Allowed Equity Interests are accomplished pursuant to the provisions of the Plan.  *See* Plan,

Article XI.

87.    The Plan provides that distributions to Allowed Equity Interests will be

accomplished through the Claimant Trust and Contingent Claimant Trust Interests.  *See* Plan

Article III, (H)(10) and (11).

88.    The Defendants should be compelled to provide information regarding the Claimant

Trust assets, including the amount of cash and the remaining non-cash assets, and details of all

transactions that have occurred since the wall of silence was erected, and all liabilities.

CORE/3524155.0004/178862860.20

## SECOND CLAIM FOR RELIEF
**(Declaratory Judgment Regarding Value of Claimant Trust Assets)**

89.     Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.     Once Defendants are compelled to provide information about the Claimant Trust assets, Plaintiffs seek a determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations.

91.     If the value of the Claimant Trust assets exceeds the obligations of the estate, then several pending adversary proceedings aimed at recovering value for HCM's estate can be justly deemed unnecessary to pay creditors in full.  As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close, ultimately stopping the bloodshed.

92.     In addition, professionals associated with the estate—including but not limited to Mr. Seery, Pachulski, Development Specialists, Inc., Kurtzman Carson Consultants, Quinn Emanuel, Mr. Kirschner, and Hayward & Associates—are continuing to incur and receive millions of dollars a month in professional fees, thereby further eroding an estate that is either solvent or could be bridged by a settlement that would pay the spread between current assets and current allowed creditor claims.  Fees for Pachulski range from $460 an hour for associates to $1,265 per hour for partners, and fees for Quinn Emanuel lawyers range from $830 an hour for first year associate to over $2100 per hour for senior partners.  At these rates, depletion of the estate will occur rapidly.

CORE/3524155.0004/178862860.20

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment and Determination Regarding Nature of Plaintiff's Interests)

93.      Plaintiffs repeat and re-allege the allegations in each of the foregoing paragraphs as though fully set forth herein.

94.      In the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid, Plaintiffs seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries.[6]

95.      Such a declaration and a determination by the Court would further assist parties in interest, such as Plaintiffs, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement.

WHEREFORE, Plaintiffs pray for judgment as follows:

(i)      On the First Claim for Relief, Plaintiffs seek an order compelling Defendants to disclose the assets currently held in the Claimant Trust, transactions completed that affect the Claimant Trust directly or indirectly, and all liabilities of the Claimant Trust;; and

(ii)      On the Second Claim for Relief, Plaintiffs seek a determination of the relative value of those assets in comparison to the claims of the Claimant Trust Beneficiaries; and

(iii)      On the Third Claim for Relief, Plaintiffs seek a determination that the conditions are such that all current Claimant Trust Beneficiaries could be paid in full, with

---

[6] To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement.

such payment causing Plaintiffs' Contingent Claimant Trust Interests to vest into

Claimant Trust Interests; and

(iv)     Such other and further relief as this Court deems just and proper.

Dated: May 10, 2023

Respectfully submitted,

**STINSON LLP**

*Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust
and the Hunter Mountain Investment Trust*

28