Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S REPLY BRIEF IN SUPPORT OF
EMERGENCY MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING**

# TABLE OF CONTENTS

Overview ................................................................................................................................8

Objections to "Evidence" ...................................................................................................12

Argument............................................................................................................................14
I.    Standing .....................................................................................................................14
   A.  HMIT has standing to bring claims as a holder of a beneficial interest in the
       Claimant Trust both derivatively and in its own right .................................14
   B.  The Plan did not divest the Claimant Trust of any claims and specifically
       reserved claims regarding acts or omissions that constitute bad faith, fraud, or
       willful misconduct which were not released ...................................................18
   C.  The Litigation Sub-Trust Assignment of Claims is Flawed........................20

II.   The "Colorable" Standard ......................................................................................22
   A.  The plain language of the Plan's Gatekeeper provision states that the Court
       must determine whether a cause of action represents a colorable claim............22
   B.  The *Barton* Doctrine does not support an evidentiary hearing...............................23
   C.  Vexatious Litigant Pre-Filing Injunction Standard does not apply ......................29

III.  The Colorable Allegations and Factual Sufficiently of HMIT's Pleadings .........31
   A.  The Financial Allegations.......................................................................................31
   B.  HMIT's Allegations Concerning MGM and MNPI.............................................34
   C.  Allegations on "Information and Belief" ..............................................................36

IV.   Duties ........................................................................................................................38

V.    Remedies ...................................................................................................................40

VI.   Declaratory Relief ...................................................................................................41

VII.  Claims Trading .......................................................................................................43

VIII. Texas State Securities Board.................................................................................44

Reservation of Rights..........................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009)* ........................................................... 37

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) ................................................. 31

*Becker v. Noe*, No. CV ELH-18-00931, 2019 WL 1415483, at *18 (D. Md. Mar. 27, 2019) .............. 24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) .............. 37

*Brown v. State*, 36 A.3d 321, 325 (Del. 2012) ...................................................................................... 16

*Cheng v. K & S Diversified Investments (In re Cheng)*, 308 B.R. 448, 455 (9th Cir. BAP 2004), *aff'd*, 160 Fed.Appx. 644 (9th Cir.2005). ..................................................................................................... 39

*Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ..................................................................... 26

*Collins Cnty. Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 169-71 (5th Cir. 1990) ............................................................................................................................... 40

*Dantzler v. United States Dep't of Just.*, No. CV 22-2211, 2022 WL 4820404, at *2 (E.D. La. Sept. 7, 2022), *report and recommendation adopted*, No. CV 22-2211, 2022 WL 4605508 (E.D. La. Sept. 30, 2022) .................................................................................................................................................. 24

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ........................................................... 38

*Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) ..................................................................................................................................................... 20

*Est. of Tigani*, No. CV 7339-ML, 2016 WL 593169, at *14 (Del. Ch. Feb. 12, 2016) .................... 15, 16

*Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 360 (5th Cir. 1986) .................................................. 30

*Ferguson v. Texas Farm Bureau Bus. Corp.*, No. 6:17-CV-00111, 2017 WL 7053927, at *5 (W.D. Tex. July 26, 2017), *report and recommendation adopted*, No. 6:17-CV-111-RP, 2018 WL 1392703 (W.D. Tex. Mar. 20, 2018) ................................................................................................................ 26

*Foster v. Aurzada (In re Foster)*, 2023 WL 20872, at *1 (5th Cir. Jan. 3, 2023) ..................................... 27

*Giagnorio v. Emmett C. Torkelson Tr.*, 292 Ill. App. 3d 318, 686 N.E.2d 42 (1997) ........................... 17

*Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) ........................ 40

*Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012), ................................................................................................................................. 16

*Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, Civil Action No. 3:21-CV-1895-D, 2022 U.S. Dist. LEXIS 15648, at *5 (N.D. Tex. 2022) .............................................................................................................................................................. 22

*Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952) ................................................................................. 41

*In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002) ........................................................ 44

*In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 535 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Capital Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021) .............................................................................. 44

*In re Beck Indus., Inc.*, 725 F.2d 880, 886 (2d Cir. 1984) ........................................................................... 28

*In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) ............................................................ 22, 25

*In re Grodsky*, No. 09-13383, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019), *subsequently aff'd sub nom. Matter of Grodsky*, 799 F. App'x 271 (5th Cir. 2020) ...................................................... 27

*In re Johnson*, 433 B.R. 626 (S.D. tex. 2010) ............................................................................................. 38

*In re Kovacs*, 16 B.R. 203, 205 (Bankr.D.Conn.1981). ............................................................................. 39

*In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) ......................................................................................... 28

*In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020), ........................................ 16

*In re On-Site Fuel Serv., Inc.*, No. 18-04196-NPO, 2020 WL 3703004, at *12 (Bankr. S.D. Miss. May 8, 2020) ............................................................................................................................................ 24

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ........................................................ 24

*In re Provider Meds, LP*, 514 B.R. 473, 476-77 (Bankr. N.D. Tex. 2014) ................................................ 25

*In re SI Restructuring Inc.*, 714 F.3d 860, 864 (5th Cir. 2013) ................................................................ 20

*In re U.S. Brass Corp.*, 301 F.3d 296, 308-309 (5th Cir. 2002) ................................................................ 22

*In re VistaCare Grp., LLC*, 678 F.3d 218, 232 n.12 (3d Cir. 2012) ........................................................ 27

*In re World Mktg. Chi, LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) ................................................ 27

*In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016) .............................................. 35

*Ironshore Europe DAC v. Schiff Hardin*, L.L.P., 912 F.3d 759, 763 (5th Cir. 2019) .............................. 26

*ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 733 (Del. 2020) ...................... 19

*Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004) .................................................................... 37

*Kobach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942) .................................... 41

*League of United Latin Am. Citizens v. Abbott*, 604 F. Supp 463, 496-97 (W.D. Tex. 2022) .............. 37

*Leighton Hold. Ltd. v. Belofsky*, 2000 WL 1761020, at *1 (N.D. Ill. Nov. 30, 2000) ............................ 28

*Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988) ............ 23

*Mangano v. Pericor Therapeutics*, No. CIV.A. 3777-VCN, 2009 WL 4345149, at *5 (Del. Ch. Dec. 1, 2009) ........................................................................................................................................................ 15

*Matter of Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir. 1977) ................................................................ 40

*Mayfield v. Peek*, 446 S.W.3d 253 (Tex. App.—El Paso 2017, no pet.) ................................................ 17

*Metro Storage International, LLC v. Herron*, 275 A.3d 810 (Del. Ch. 2022) ........................................ 41

*Middaugh v. InterBank*, 528 F. Supp. 3d 509, 546 (N.D. Tex. 2021) ................................................ 18, 19

*Richardson v. United States*, 468 U.S. 317 (1984) ................................................................ 22, 25

*Scanlon v. Eisenberg*, 2012 WL 169765 (7th Cir. Jan. 20, 2012) ...................................................... 17

*Shin-Chi-Su v. Vantage Drilling Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015, pet. denied) ................................................................................................................ 41

*Siefert v. Leonhardt*, 975 S.W.2d 489, 492–93 (Mo. Ct. App. 1998) .................................................. 17

*Silver v. Bemporad*, No. SA-19-CV-0284-XR, 2019 WL 1724047, at *1-4 (W.D. Tex. Apr. 18, 2019), appeal dismissed, No. 19-50339 (5th Cir. July 15, 2019) .......................................................... 29

*Silver v. City of San Antonio*, No. SA-19-MC-1490-JKP, 2020 WL 3803922, at *6 (W.D. Tex. July 7, 2020) ............................................................................................................ 29, 30

*Silver v. Perez, No. SA-20-MC-0655-JKP*, 2020 WL 3790489, at *2 (W.D. Tex. July 7, 2020) .......... 29

*Smith v. Bank of Clearwater*, 479 So. 2d 755 (Fla. Dist. Ct. App. 1985) ............................................ 17

*Teacher's Retirement System of Louisiana v. Aidi off*, 900 A.2d 654 (Del. Ch. 2006) ........................... 41

*Trippodo v. SP Plus Corp.*, No. 4:20-CV-04063, 2021 WL 2446204, at *3 (S.D. Tex. May 21, 2021), *report and recommendation adopted*, No. 4:20-CV-04063, 2021 WL 2446191 (S.D. Tex. June 15, 2021) ............................................................................................................ 24

*United States v. Contorinis*, 672 F.3d 136, 144 (2d Cir. 2012) ...................................................... 36

*US Bank Assoc. v. Verizon Commun., Inc.*, 817 F.Supp. 934, 944 (N.D. Tex. 2011) ........................... 41

*Yellowhouse Machinery Co. v. Mack (In re Hughes )*, 704 F.2d 820, 822 (5th Cir.1983) .................... 39

**Statutes**

Del. Code Ann. tit. 12, § 3816 ..................................................................................................15, 16

Del. Code Ann. tit. 12, § 3801 ................................................................................................... 15

11 U.S.C. § 1123(b)(3)(B) ......................................................................................................... 20

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 24

Fed. R. Civ. P. 56(d) ................................................................................................................. 28

**Other Authorities**

§ 22:28. Beneficial ownership and convertible securities, 1F Going Public Corp. § 22:28 .......... 16

2 Moore's Fed. Prac. § 8.04[4] (3d ed.).................................................................................... 37

5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1224 (4th ed.) ............................ 37

Restatement (Second) of Trusts Sec. 199 ................................................................................ 17

Hunter Mountain Investment Trust ("HMIT" or "Movant") files this Reply Brief in Support of its Emergency Motion for Leave to File Verified Adversary Proceeding, together with its Supplemental Motion (collectively "HMIT's Motion for Leave") in Reply to the Joint Opposition filed by Highland Capital Management, LP., Highland Claimant Trust and James P. Seery, Jr. (Doc. 3783) ("Joint Opposition") and the Claims Purchasers Objection (Doc. 3780) ("Claims Purchasers Objection"), and respectfully shows as follows:[1]

<u>Overview</u>

1.      This Reply Brief is submitted to address the many flaws and misleading arguments in the Joint Opposition and the Claims Purchasers Objection and is submitted in further support of HMIT's Motion for Leave.

2.      The Respondents do nothing to defeat, much less mount an argument against, the allegations that indict them:

- **The Claims Purchasers do not deny they invested over $163 Million in the claim trades;**

- **The Claims Purchasers do not deny they did no due diligence before investing this $163 Million;**

- **The Claims Purchasers do not deny they refused to sell their newly acquired claims at any price;**

- **The Claims Purchasers do not deny they invested in the claims when, at best, only low ROIs were projected -- not to speak of the**

---

[1] James P. Seery, Jr., Highland Capital Management, L.P., Highland Claimant Trust and the so-called "Claims Purchaser" are collectively referred to as "Respondents."

> **substantial risks generally associated with claims trading in a bankruptcy setting—all happening within a short-window and, notably, within just weeks before the public announcement relating to the MGM sale**;

Tellingly, these questions and issues are never addressed in over 86 pages of Respondents' collective briefing.

3.      The Joint Opposition states that HMIT is "harassing those individuals charged with maximizing value for creditors while (perversely) wasting Highland's resources." Joint Opposition ¶ 1. Nothing is further from the truth. It should be clear to all who seek fairness that HMIT seeks restitution to benefit (not hurt) the Claimant Trust, adding substantially to "Highland's resources." The fact that the Joint Opposition advances a contrary notion underscores the conflict that plagues the Pachulski law firm's involvement in this matter. That the "Highland Parties" are tying their knot to James Seery is a grave misjudgment, and the Pachulski firm should be disqualified as a result. If indulged, the Pachulski firm's arguments will damage the Reorganized Debtor, the Claimant Trust and innocent stakeholders.

4.      The Joint Opposition suggests that HMIT is guilty of *ad hominem* attacks on James Seery's character, notwithstanding the many plausible allegations against him. This is wildly ironic given the vitriol the Joint Opposition uses in its tiresome, ineffectual assault on Jim Dondero. The Joint Opposition uses hyperbolic references to Mr. Dondero on no less than 123 occasions in the first 29 pages, and the Claims Purchasers echo these exaggerations. Yet none of these attacks have anything to do with the current

proceedings. They are intended as a deflection: Mr. Dondero is not a party to HMIT's

Motion for Leave, and the Court's docket confirms that HMIT has not been held to be –

and is not - a "vexatious" litigant. There also is no viable basis for Respondents to contend

that HMIT is a "Dondero affiliate," much less that Jim Dondero has any current

connection with HMIT. The diatribe against Mr. Dondero underscores the irrelevance of

over 60% of the Joint Opposition. Rather than attempting to address the colorability of

HMIT's insider trading allegations, which they cannot effectively do, the Respondents

clearly want to litigate in an alternate dimension in the hope of inflaming the Court

against HMIT's Motion for Leave.

5.      The Respondents' arguments concerning standards of review are

misleading. An evidentiary hearing in this setting is highly inappropriate and would

open a Pandora's box of discovery and procedural issues. Relevant case law makes clear

that the determination of "colorability" does not allow the "weighing" of evidence. At

most, a Rule 12(b)(6) "plausibility" standard applies.

6.      To allow a full-blown evidentiary hearing on HMIT's Motion for Leave is

incorrect even if the *Barton* doctrine is applied, though it should not be applied. In the

absence of discovery, an evidentiary hearing would be akin to a mini-trial where HMIT

is deprived of basic discovery and due process. Respondents urge an amorphous (and

improper) standard of proof (*e.g.,* must every factual allegation be established by

admissible, credible evidence **before** leave to file is granted?). By doing so, Respondents

are inviting reversible error and encouraging an abuse of discretion. Their effort to turn

these proceedings into a 3-ring donnybrook will not withstand appellate scrutiny.

7.      Both the Joint Opposition and the Claims Purchasers Objection play fast

and loose with standing arguments. HMIT has constitutional standing to bring claims on

its individual behalf as an aggrieved party. Indeed, there is no question HMIT has

individual standing under Delaware statutory trust law as well as standing to seek

declaratory relief that it is "*in the money*," and that Seery's refusal to certify HMIT's status

as a beneficiary of the Claimant Trust is part of the larger conspiracy (Complaint ¶¶ 3-5,

Count III). The Respondents' conduct caused a non-speculative, legally cognizable injury

to HMIT, the Claimant Trust and the Reorganized Debtor.

8.      Seery and the Pachulski firm seek to keep HMIT in a box as a "contingent"

interest to fashion the argument that Seery does not owe direct duties to HMIT, post-

effective date. But this is inconsistent with pertinent Delaware trust law, which also

provides derivative standing.

9.      The suggestion that HMIT needed to sue on behalf of the Litigation Sub-

Trust is also wrong and distorts the plain language of the Assignment Agreement[2]

discussed in the Joint Opposition, a document which the Pachulski firm presumably

drafted.

---

[2] Document Number 211, Bankruptcy Adversary Proceedings (Case No. 21-03076-sgj (Bankr. N.D. Tex.)).

10.    The Respondents miss the boat in their discussions of MGM. First, HMIT alleges that the Claims Purchasers had access to MNPI far greater than just MGM. Respondents ignore this claim. Second, Respondents fail to distinguish between substantive MNPI that Seery received and provided to the Claims Purchasers and the indefinite, unconfirmed media reports regarding MGM. The former is actionable under relevant law.

11.    The Joint Opposition uses the last few pages of its briefing as a scatter gun attack on HMIT's Motion for Leave. None of these arguments have merit. In response, and without limitation, it is clear that HMIT can fairly represent the interests of the derivative parties; HMIT has standing to bring forth all of the claims set forth in the Complaint; HMIT does plausibly allege its claims as set forth in the Complaint; HMIT does plausibly set forth its claims for breach of fiduciary duty as set forth in the Complaint; HMIT has adequately plead the futility of making demands as a condition precedent to bringing a derivative action as set forth in the Complaint; HMIT does seek remedies that are available as a matter of law, including, without limitation, unjust enrichment, disgorgement, constructive trust, and declaratory relief. The Joint Opposition's discussion in paragraph 154 is frivolous.

### Objections to "Evidence"

12.    HMIT objects to the entirety of the Declaration of John Morris ("Morris Decl.") and all of the attached purported "evidence," which is appended to the Joint

Opposition, (collectively the "Opposition Evidence") on several grounds, and HMIT hereby request the Court strike all Opposition Evidence based upon the reasons set forth herein.

13.    First, the Opposition Evidence is irrelevant to the Court's inquiry concerning "colorability." The Court should not weigh evidence outside the 4-corners of HMIT's proposed Complaint.

14.    Second, Respondent's suggestion that HMIT is allegedly a "vexatious" litigant is a red herring, and HMIT objects that Respondents' "Opposition Evidence" purportedly relating to Mr. Dondero is entirely irrelevant.  This Court has made no such finding – nor has any other court. There also is no indication in the Court's docket that HMIT should be pigeonholed in such a manner to impose unwarranted burdens on HMIT.

15.    Third, hypothetically, and for the sake of argument only, even if Respondents' contentions about Mr. Dondero's purported control over HMIT were correct (which HMIT denies), this would have no bearing on the "colorability" of HMIT's allegations under applicable legal standards. In any event, Respondents' blunderbuss of "Dondero evidence" is immaterial in the absence, at a minimum, of any showing that Jim Dondero exercises direct or functional control over the affairs of HMIT in connection with the specific proposed adversary proceeding at issue. Respondents make no such showing.

16.     In addition, numerous Opposing Evidence documents have been heavily redacted without any explanation or stated justification. The Joint Opposition is using both sword and shield in this proceeding, and this should not be allowed.

17.     HMIT provides notice that it withdraws all affidavits and other evidence attached to its Motion for Leave, subject to a reservation of rights that, in the event the Court concludes it will conduct an evidentiary hearing, HMIT may offer the same evidence at the hearing.  Further, if the Court concludes that it will conduct an evidentiary hearing on HMIT's Motion for Leave, HMIT reserves all rights to conduct merits-based discovery before the hearing – without waiving any of HMIT's substantive or procedural rights, and without admitting that an evidentiary hearing or discovery is proper.

<u>**Argument**</u>

I.     <u>**Standing**</u>

A. **HMIT has standing to bring claims as a holder of a beneficial interest in the Claimant Trust both derivatively and in its own right.**

18.     The Respondents assert, as a threshold legal matter, that the "contingent" nature of HMIT's interest in the Claimant Trust divests HMIT of any right or remedy to assert a derivative claim or a claim on its own behalf. *See* Joint Opposition, ¶3.[3] Their arguments are flat wrong.

---

[3] The Respondents *never* address HMIT's allegation that Seery refuses to certify HMIT's status as a Beneficiary as part of the scheme at issue.

19.     Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction. DEL. CODE ANN. tit. 12, § 3816. A "beneficial owner" means "*any* owner of a beneficial interest in a statutory trust, the fact of ownership to be determined and evidenced ... in conformity to the applicable provisions of the governing instrument of the statutory trust." DEL. CODE ANN. tit. 12, § 3801 (emphasis added). A "beneficial interest" is the "profit, benefit, or advantage resulting from a contract." *Mangano v. Pericor Therapeutics*, No. CIV.A. 3777-VCN, 2009 WL 4345149, at *5 (Del. Ch. Dec. 1, 2009) (citing favorably to Black's Law Dictionary 156 (6th ed. 1990)). As one Delaware court recognized when evaluating derivative standing, the statute "use[s] … the general term beneficiary, without any language restricting the class of beneficiary to whom it refers…" *Est. of Tigani*, No. CV 7339-ML, 2016 WL 593169, at *14 (Del. Ch. Feb. 12, 2016).

20.     Here, it is clear HMIT owns *some* benefit or advantage under the Claimant Trust Agreement [Doc. 3521-5]. The Respondents argue that the language of the Claimant Trust Agreement -- that the "Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust" -- is proof HMIT does not own a beneficial interest. *See* Joint Opposition, ¶105. But "Claimant Trust Beneficiaries" *includes* the Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests (*i.e.*, HMIT) *if* the Claimant Trustee pays Holders of Allowed Unsecured Claims and Holders of Allowed Subordinated Claims are paid. *See* Claimant

[15]

Trust Agreement, ¶1.1(h). While HMIT holds a different class of beneficial interest (*i.e.*, a contingent or secondary interest), it nonetheless owns a *type* of beneficial interest. Importantly, in the context of equity securities, courts reject "the argument that an investor cannot be considered a beneficial owner of an equity security when the investor's right to acquire the security is contingent upon a future event." § 22:28. *Beneficial ownership and convertible securitie*s, 1F Going Public Corp. § 22:28 (collecting cases).[4] Nor is there any reason for a different result here. The Delaware legislature easily could have restricted standing to limit derivative actions to a specific class of beneficial interests holders **but did not do so**. DEL. CODE ANN. tit. 12, § 3816; *Tigani*, 2016 WL 593169, at *14. Thus, this omission must be interpreted as an expression of legislative intent to include *any* owner of a beneficial interest, just as the statute says. *Brown v. State*, 36 A.3d 321, 325 (Del. 2012) (Delaware law follows the maxim of statutory interpretation "*expressio unius est exclusio alterius*"). The Claimant Trust Agreement is otherwise silent on derivative standing and, therefore, Delaware statutory trust law applies. HMIT therefore meets the requirements for derivative standing under Delaware law because HMIT owns a type of beneficial interest.

---

[4] Of note, **none** of the cases cited in the Joint Opposition involve contingent beneficiaries. Rather, in *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020), the applicable trust documents required holders of beneficial interests to be evidenced by a trust certificate and the court found that those who did not hold a trust certificate did not have derivative standing. This is **not** a "contingent beneficiary" case. In *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012), the court noted that certain investors no longer owned affected shares at all so they no longer had standing to pursue a derivative claim. Again, this is **not** a "contingent beneficiary" case.

21.     While the class of beneficial interest is distinct (*i.e.,* contingent), the Claimant Trust Agreement does not preclude HMIT, as a holder of a contingent beneficial interest, from asserting claims in its individual right. Leading trust authority and courts throughout the country recognize that a *contingent beneficiary* has standing to bring claims against a trustee of a trust. RESTATEMENT (SECOND) OF TRUSTS Sec. 199; *Scanlon v. Eisenberg*, 2012 WL 169765 (7th Cir. Jan. 20, 2012) (contingent, discretionary beneficiary of a trust has Article III standing to bring a suit against the trustee for breach of fiduciary duty in mismanaging the trust's assets); *Mayfield v. Peek*, 446 S.W.3d 253 (Tex. App.—El Paso 2017, no pet.); *Siefert v. Leonhardt*, 975 S.W.2d 489, 492–93 (Mo. Ct. App. 1998) (holders of contingent interest in trust have standing to bring suit against at trustee); *Smith v. Bank of Clearwater*, 479 So. 2d 755 (Fla. Dist. Ct. App. 1985) (contingent beneficiary was entitled to bring suit against trustee for alleged mismanagement of trust resulting in diminution of trust asset); *Giagnorio v. Emmett C. Torkelson Tr.*, 292 Ill. App. 3d 318, 686 N.E.2d 42 (1997) (contingent beneficiary had standing to bring action for breach of fiduciary duty). The same applies here.

22.     The Respondents' arguments -- that HMIT is excluded from the definition of a Claimant Trust Beneficiary -- leads only to the conclusion that subsection 5.10 of the Claimant Trust Agreement does not apply to HMIT. *See* Joint Opposition, n. 35. But the contingent nature of HMIT's beneficial interest does not divest it from having standing

to bring causes of action in its own right—contingent beneficial interest holders have standing to bring actions against trustees under Delaware law.

23.     The Claims Purchasers also argue there is no legal duty and no cognizable injury fairly traceable to their conduct, and that "only the transferor may object to a transfer." [Claims Purchaser Objection at ¶11) This is again not true. The Complaint involves more than just private trades between sellers and buyers outside of the purview of the Court. Seery's excessive compensation is a quid pro quo which causes a cognizable, legal injury to both the Claimant Trust and HMIT.[5] Furthermore, the Claims Purchasers have a duty to not aid and abet Seery's breaches of fiduciary duty.[6]

**B.  The Plan did not divest the Claimant Trust of any claims and specifically reserved claims regarding acts or omissions that constitute bad faith, fraud, or willful misconduct which were not released.**

24.     The Joint Opposition argues that the Plan did not reserve claims against Seery or the other Respondents and, as a consequence, neither HCMLP nor the Claimant

---

[5] The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims - but the best party to do so.

[6]  *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (aider and abetter is liable if its participation in the breach of fiduciary duty is "knowing"). The Claims Purchasers also claim that even if Seery's compensation was excessive, HMIT cannot show that any disgorgement of these fees would inure to HMIT's benefit as a contingent beneficiary. [Claims Purchasers Objection ¶22] In making this argument, however, they obviously ignore the well-pleaded allegations that the Claims Purchasers aided and abetted Seery's breaches of fiduciary duty and they should be disgorged of their ill-gotten profits.

Trust has standing to bring claims based on pre-effective date conduct.[7] Joint Opposition ¶ 124. This is not true.

25. Article IX(D) of the Plan[8] specifically states that each of the "Released Parties" (which is defined by the Plan to include Seery) is released and discharged by the Debtor and the Estate (including by the Claimant Trust) from any and all Causes of Action, including derivative claims **except that** the forgoing "does not release ... any Causes of Action arising from the willful misconduct, criminal misconduct, actual fraud or gross negligence of such applicable Released Party." *See* Plan, Art. IX(D). Further, in the Confirmation Order, this Court ruled that the Plan does not purport to release any claim held by the Claimant Trust. *See* Confirmation Order[9] at ¶71.[10]

26. Claims brought derivatively on behalf of the Reorganized Debtor and the Claimant Trust were specifically retained by the Plan in keeping with applicable Fifth

---

[7] HMIT reserves all rights regarding the timing of the accrual of the causes of action, including whether the ultimate step in the fraudulent scheme occurred post-Effective Date -- with the payment of Seery's excess compensation -- a legal injury. *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 546 (N.D. Tex. 2021) (a claim for fraud accrues "when a wrongful act causes some legal injury"); *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 733 (Del. 2020) ("[a] cause of action in tort accrues at the moment when 'an injury, although slight, is sustained in consequence of the wrongful act of another.").

[8] The *Fifth Amended Plan Of Reorganization Of Highland Capital Management, L.P. (As Modified)* [Doc. 1943-1] (the "Plan").

[9] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief [Doc. 1943] (the "Confirmation Order").

[10] Furthermore, in the alternative, Section E of the Plan specifically preserves all causes of action not expressly settled or released, including all causes of action ". . .of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or be different from those the Debtor now believes to exist." Here, the principles requiring specificity in the identification of reserved claims do not apply for several reasons, *inter alia*, because Seery is part of the larger conspiracy. If Seery's willful misconduct is not released, then those who willfully aided and abetted his conduct is effectively also preserved.

Circuit law. *See In re SI Restructuring Inc.*, 714 F.3d 860, 864 (5th Cir. 2013) (quoting 11

U.S.C. § 1123(b)(3)(B)).[11] Therefore, the Plan does not affect HMIT's standing to bring

derivative claims because these claims are grounded in willful misconduct and fraud.

Furthermore, to the extent that claims against the Claims Purchasers accrued post-

effective date, then the Claimant Trust owns those claims, and HMIT may pursue those

claims derivatively. HMIT reserves its procedural rights to pursue such claims

accordingly.

### C.  The Litigation Sub-Trust Assignment of Claims [Doc. 211] is Flawed.

27.     The Joint Opposition argues that the so-called Litigation Sub-Trust

Assignment precludes HMIT's current derivative claims on behalf of the Claimant Trust.

Again, this is wrong.

28.     The Litigation Sub-Trust was charged with the responsibility to pursue

Estate Claims, but not other Causes of Action identified in Paragraph 19(a) of the Plan.

---

[11] *See, Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)* and its progeny deal with the
retention of *pre-confirmation* causes of action.  540 F.3d 351, 355 (5th Cir. 2008).  Specifically, in *United
Operating*, the Fifth Circuit explained:

> To facilitate this timely, comprehensive resolution of an estate, a debtor must put its
> creditors on notice of any claim it wishes to pursue after confirmation. Proper notice allows
> creditors to determine whether a proposed plan resolves matters satisfactorily before they
> vote to approve it—"absent 'specific and unequivocal' retention language in the plan,
> creditors lack sufficient information regarding their benefits and potential liabilities to cast
> an intelligent vote.

*Id*. at 354; But here, HMIT's claims are post-confirmation. The stated rationale for the specific claims
reservation being tied to notice in the confirmation process has no applicability to post-confirmation claims.

This is also made clear under Section 2.2 of the Sub-Trust Agreement where the Litigation Sub-Trust was established for purposes of monetizing the Estate Claims. [Doc. 1811-4] In this context, it is clear that the Assignment Agreement dated October 8, 2021 was intended to transfer only those causes of action necessary for the Litigation Sub-Trust to pursue its defined responsibilities. Any further expansion of the assignment language would constitute an impermissible effort to modify the Plan.

29.     The language of the Assignment Agreement recognizes the Plan's limitation by making clear that the assignment is only intended to transfer those causes of action "that will be included in the Litigation Trustee's complaint filed on or before October 15, 2021 are assigned to the Litigation Sub-Trust." This evinces the assignor's intent that all other causes of action were not assigned. Thus, the Claimant Trust still holds the claims which HMIT seeks to assert derivatively.

30.     It also appears that the Litigation Sub-Trust may not have standing to pursue non-Estate claims. *See* Plan, Section IV(D).[12] The Plan incorporates the Final Term Sheet (Doc. 354) which defines "Estate Claims" as "any and all Estate Claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor and each of the Released Parties." Clearly, this does not include breaches of fiduciary duty or aiding and

---

[12] HMIT has alleged, alternatively, that it seeks to bring the Adversary Proceeding in the name of the Litigation Sub-Trust only if it is determined that the Claimant Trust does not own the claims but the Sub-Trust does. It has also alleged that demand on the Trustee of the Litigation Sub-Trust would be futile.

abetting breaches of such duties against Seery, as well as Muck and Jessup as members

of the Oversight Board.

31.     In its arguments concerning the Assignment Agreement, the Joint

Opposition seeks to modify the Plan. The Fifth Circuit is clear that any modification of

the "rights obligations and expectations" under a Plan of Reorganization that was not

"specifically contemplated and negotiated by the Parties at confirmation" constitutes a

modification of the Plan. *See In re U.S. Brass Corp.*, 301 F.3d 296, 308-309 (5th Cir. 2002); *cf.*

*Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland*

*Capital Mgmt., L.P.)*, Civil Action No. 3:21-CV-1895-D, 2022 U.S. Dist. LEXIS 15648, at *5

(N.D. Tex. 2022).

## II.     The "Colorable" Standard

### A. The plain language of the Plan's Gatekeeper provision states that the Court must determine whether a cause of action represents a colorable claim

32.     The Fifth Circuit quoted *Richardson v. United States*, 468 U.S. 317 (1984), for

a definition of a "colorable" claim as one with "***some possible validity***." *See In re*

*Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (quoting *Richardson*, 468 U.S. at 326 n.

6). The Fifth Circuit also made clear that whether a claim is colorable is based on

*allegations* and not merits-based proof: "There is a distinction here between whether a

claim is colorable and whether it is meritorious. A plaintiff's claim is colorable if he can

*allege* standing and the elements necessary to state a claim on which relief can be

granted—**whether or not his claim is ultimately meritorious**—**whether he can** *prove* **his case**.” *Id*. at 341 (emphasis in original, bold emphasis added).

33.     Here, in an analysis under the “colorable” standard, the Court need not be satisfied there is an evidentiary basis on the merits of the claims to be asserted. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988) (allegations were sufficient, and no evidentiary hearing was necessary, to determine that breach of fiduciary duty claim against bankruptcy estate’s officers and directors for mismanagement of estate was colorable claim).[13] In *Louisiana World Exposition*, the Fifth Circuit explained: “[I]n light of our analysis, we find that the debtor-in-possession’s refusal to pursue LWE’s cause of action against its officers and directors for negligent management was indeed unjustified. The Committee outlined a colorable claim which, if pursued successfully, could have greatly increased the value of the estate.” *Id*. Similarly here, where the proposed claims are brought pursuant to the Plan and this Court’s exclusive jurisdiction, the more lenient colorability standard applies and an evidentiary hearing is neither warranted nor appropriate.

   **B.  The *Barton* Doctrine does not support an evidentiary hearing.**

34.     The Respondents urge application of the Barton Doctrine. They complain that HMIT’s stated authority -- that the colorable standard is lower than a FED. R. CIV. P.

---

[13] In *Louisiana World Exposition*, when stating that an evidentiary hearing was unnecessary, the court noted that there were no objections to the claim other than the debtor-in- possession’s “grave” conflict of interest and his unjustified refusal to bring the claims. *Id*.

12(b)(6) analysis -- cannot apply because these authorities do not arise in a "gatekeeper"

context.[14] Joint Opposition, ¶97. Claim Purchasers Objection, ¶44. However, as the

drafters of the Plan and the "gatekeeper" provisions, the Highland Parties could easily

have incorporated a *Barton* doctrine standard, but they instead elected to use the

"colorable" standard. This choice must be construed as having some consequence,

particularly because the applied standard should be what the Plan says: *colorable*.  *In re*

*Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) (noting the general rule that

ambiguities in plans are interpreted against the drafters).

35.    HMIT's authorities directly address the "colorable" standard, while

Respondents provide no persuasive argument that a standard higher than a Rule 12(b)(6)

standard should apply in the context of the Gatekeeper order.  *See, e.g., In re On-Site Fuel*

*Serv., Inc.*, No. 18-04196-NPO, 2020 WL 3703004, at *12 (Bankr. S.D. Miss. May 8, 2020)

(derivative standing for a creditor's committee); *Trippodo v. SP Plus Corp.*, No. 4:20-CV-

04063, 2021 WL 2446204, at *3 (S.D. Tex. May 21, 2021), *report and recommendation adopted*,

No. 4:20-CV-04063, 2021 WL 2446191 (S.D. Tex. June 15, 2021) (amending a complaint

where the amendment would destroy diversity jurisdiction); *Dantzler v. United States*

*Dep't of Just.*, No. CV 22-2211, 2022 WL 4820404, at *2 (E.D. La. Sept. 7, 2022), *report and*

*recommendation adopted*, No. CV 22-2211, 2022 WL 4605508 (E.D. La. Sept. 30, 2022)

---

[14] The Highland Parties also assert that the Court must essentially consider HMIT a vexatious litigant.  Such a finding would of course be procedurally improper and unsupported by the record before this Court which shows that HMIT has had extremely limited participation in the Bankruptcy Case.

(dismissal for lack of federal question jurisdiction); *In re Deepwater Horizon*, 732 F.3d 326, 342 (5th Cir. 2013) (inclusion of claims into a class); *Richardson v. United States*, 468 U.S. 317, , 104 S. Ct. 3081, 3086, 82 L. Ed. 2d 242 (1984)(appealability of a double jeopardy claim); *Becker v. Noe*, No. CV ELH-18-00931, 2019 WL 1415483, at \*18 (D. Md. Mar. 27, 2019) (Reliance on the nationwide service of process provision in a RICO case).

36.      It is clear that courts apply the "colorable" standard in the **same** manner in a variety of different factual and procedural contexts. Yet Respondents argue that the Court should ignore this abundant precedent. Respondents also ask the Court to disregard the choice to incorporate a "colorable" standard in the Gatekeeper provisions.

37.      There is yet another flaw in Respondents' arguments. Even if the *Barton* doctrine applies, the *prima facie* standard used in *Barton*, like the "colorable" standard, is **lower** than a FED. R. CIV. P. 12(b)(6) standard. In *Provider Meds, LP*, Judge Houser analyzed the *Barton* doctrine and ultimately concluded that it did not apply to a suit before the appointing court. 514 B.R. 473, 476 (Bankr. N.D. Tex. 2014). Importantly in reaching this conclusion, Judge Houser explained that:

> **Federal Rule of Civil Procedure 12(b)(6)…provides a more stringent standard in evaluating whether a legitimate claim for relief has been stated than is applied when leave [under the Barton doctrine] is sought**. Specifically, when a party seeks leave to sue a trustee, that party must make a prima facie case against the trustee, showing that its claim is not without foundation.  And, while the standard for granting leave is similar to the standard courts employ when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), **the standard for granting leave to sue is more flexible than the standard for granting a motion to dismiss**.

*Id*. at 476-77. (Emphasis added) Therefore, contrary to the Respondents' analysis, a *Barton* doctrine analysis is not appropriate but even then, it is *less* stringent than FED. R. CIV. P. 12(b)(6).

38.     The Respondents cite cases where the bankruptcy court considered evidence in the context of a *Barton* doctrine analysis as support for the idea that a higher standard than a FED. R. CIV. P. 12(b)(6) applies. But the case law is clear that -- under a FED. R. CIV. P. 12(b)(6) analysis -- courts may consider certain types of evidence: *i.e.* documents attached to the complaint and any documents that are central to the claim *and* referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (emphasis added). Further, courts can consider matters of public record as judicially noticed. *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). And a court cannot weigh it at a Fed. R. Civ. P. 12(b)(6) hearing.  *Ferguson v. Texas Farm Bureau Bus. Corp.*, No. 6:17-CV-00111, 2017 WL 7053927, at *5 (W.D. Tex. July 26, 2017), *report and recommendation adopted*, No. 6:17-CV-111-RP, 2018 WL 1392703 (W.D. Tex. Mar. 20, 2018) (weighing evidence at the 12(b)(6) stage is wholly improper under the 12(b)(6) framework). But none of these authorities suggest an evidentiary hearing is appropriate, much less an open-ended 3-ring evidentiary circus as Respondents urge.

39.     A cursory look at the cases cited in the Joint Opposition confirms that Courts do *not* weigh evidence but rather conduct a Fed. R. Civ. P. 12(b)(6) type analysis.

- In *VistaCare*, the Third Circuit indicated that while a court can decide to a hold a hearing, there is no mention of the type of hearing the

court should conduct. *In re VistaCare Grp., LLC*, 678 F.3d 218, 232 n.12 (3d Cir. 2012).

- In *Foster v. Aurzada (In re Foster)*, 2023 WL 20872, at *1 (5th Cir. Jan. 3, 2023) the bankruptcy court considered filed pleadings, *i.e.,* matters of public record, and the bankruptcy court expressly stated that in considering the evidence it was giving "great latitude for what amounts to evidence" on the issue because the movant was a pro se litigant.  *See In re Foster*, Case No. 12-43804-elm7 (Bankr. N.D. Tex.), Dkt. Nos. 544 and 539 (witness and exhibit lists); 547 (Transcript, p. 18:22-25).

- In *Grodksy*, again, the bankruptcy court expressly reviewed transcripts (*i.e.,* the record before the bankruptcy court)[15] and documents submitted with the proposed complaint, i.e., exactly what a court would do in a FED. R. CIV. P. 12(b)(6) analysis.  No. 09-13383, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019), *subsequently aff'd sub nom. Matter of Grodsky*, 799 F. App'x 271 (5th Cir. 2020).

Here, HMIT does not dispute that this Court can conduct a hearing, and that it can look at documents incorporated into the Complaint and the record in the Bankruptcy Case that is referred to in support the allegations in the Complaint. But what the Court cannot do is consider and weigh evidence outside the boundaries of a FED. R. CIV. P. 12(b)(6) analysis.

40.     The Joint Opposition brief (at para. 95) misconstrues the cases suggesting that HMIT must meet a prima facia standard. *In re World Mktg. Chi*, LLC, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (holding that Barton doctrine only applies to a request to bring

---

[15] Of note, bankruptcy courts can and do consider the record in a bankruptcy case in a Barton doctrine analysis and the record can often be dispositive.  If a trustee is acting pursuant to court orders (which are matters of public record), there can be no ultra vires act.

a suit outside of the bankruptcy court); *Leighton Hold. Ltd. v. Belofsky*, 2000 WL 1761020, at *1 (N.D. Ill. Nov. 30, 2000) (same). Additionally, the cases cited to state that *Barton* requires more than a Rule 12(b)(6) review are distinguishable. *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (discussing particular problem of bringing suit against trustee in a Chapter 7 while the bankruptcy was ongoing as a threat to the trustee); *In re beck Indus., Inc.*, 725 F.2d 880, 886 (2d Cir. 1984) (deciding whether a California court would have jurisdiction without leave of bankruptcy court and finding that "*Barton* has long been the subject of statutory exception").

41.    When undertaking a *Barton* doctrine analysis (which is a ***more lenient*** standard than a FED. R. CIV. P. 12(b)(6)), there is ***no*** authority that courts should conduct a full evidentiary hearing. In a FED. R. CIV. P. 12(b)(6) context, considering matters that are outside of the Complaint or not matters of public record would convert a FED. R. CIV. P. 12(b)(6) motion to dismiss into a motion for summary judgement. FED. R. CIV. P. 12(d).[16] But a motion for summary judgment requires that parties have adequate opportunity for discovery, which of course has not occurred here.  FED. R. CIV. P. 56(d).

42.    Accordingly, an evidentiary hearing on the HMIT's Motion for Leave is wholly improper and it, and any associated discovery, would result in a waste of judicial

---

[16] Indeed, the Claims Purchasers aggressively opposed discovery in the related Rule 202 proceedings in Texas State Court.

time and resources, along with unnecessary and burdensome delay, inconvenience, and

expense to HMIT (calculated to deny HMIT's due process rights).

## C. Vexatious Litigant Pre-Filing Injunction Standard does not apply.

43.    The Respondents next argue that -- rather than the colorable standard

contained in the Gatekeeper provisions (or even the plausible claim *Barton* doctrine

analysis) -- the Court should conduct a heighted analysis because the Confirmation Order

states that the Gatekeeper is "consistent with" the notion of a pre-filing injunction to deter

vexatious litigants, and the Fifth Circuit stated the Gatekeeper provisions screen and

prevent bad faith litigation. Joint Opposition, ¶4.

44.    The Joint Opposition cites two cases that involve the *same* pro se litigant

with an extensive, documented history of an "abuse of the judicial process," who after

notice and hearing was deemed a "vexatious litigant," and who then proceeded to violate

the pre-filing injunction on numerous occasions. *See Silver v. Bemporad*, No. SA-19-CV-

0284-XR, 2019 WL 1724047, at *1-4 (W.D. Tex. Apr. 18, 2019), *appeal dismissed*, No. 19-50339

(5th Cir. July 15, 2019) (finding filer to be a vexatious litigant); *Silver v. City of San Antonio*,

No. SA-19-MC-1490-JKP, 2020 WL 3803922, at *6 (W.D. Tex. July 7, 2020); *Silver v. Perez*,

No. SA-20-MC-0655-JKP, 2020 WL 3790489, at *2 (W.D. Tex. July 7, 2020). In such a case,

the court did afford itself greater latitude than a FED. R. CIV. P. 12(b)(6) analysis finding

that, based on the facts before it, "merely satisfying the minimal requirements to survive

screening or a motion to dismiss may not always carry a sanctioned litigant's burden to

persuade the Court that it should permit a proposed action to be filed." *City of San Antonio*, 2020 WL 3803922 at *6. But the *Silver* courts do not purport to establish some standard for all pre-filing injunctions. Rather, the *Silver* courts make clear that the standard imposed is begot by its previous specific, extensive findings regarding this particular litigant's behavior. Importantly, citing the Fifth Circuit, the *Silver* court cautioned that an "injunction against future filings must be ***tailored*** to protect the courts and innocent parties, while preserving the legitimate rights of litigants." *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 360 (5th Cir. 1986).

45.     Here, however, the Gatekeeper protocol was tailored by the Highland Parties to include the ***colorable*** standard as a predicate. And this is the standard ordered by the Court based upon the record before it, and this is the standard that was affirmed by the Fifth Circuit. Notably, given the breadth of the Gatekeeper protocol (applying to likely hundreds of parties including any entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case and any entity related thereto),[17] any higher standard would never been found to have been "tailored" to preserve legitimate rights of hundreds of parties under *Farguson*.

---

[17] "Enjoined Parties" (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

46.     The time to advocate for a higher standard for a pre-filing injunction was at confirmation of the Plan—not years later, particularly where there is *no finding* of HMIT being a vexatious litigant. *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (noting that in modifying a pre-filing injunction, after appropriate notice and an opportunity for hearing, a court must consider the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits).

### III.   The Colorable Allegations and Factual Sufficiency of HMIT's Pleadings

#### A.  The Financial Allegations

47.     Applying the correct "colorable" standard which, at most, is consistent with Rule 12(b)(6) standards for plausibility, the Court should focus on the four corners of HMIT's proposed Adversary Complaint and not weigh extraneous evidence. When doing so, it is clear HMIT pleads sufficient factual allegations to raise more than a colorable claim.

48.     Notwithstanding over 85 pages of collective briefing, Respondents *do not deny* that the Claims Purchasers failed to undertake due diligence (Complaint ¶40). Respondents *also never deny* that the Claims Purchasers invested $163 million, a very significant sum with low annualized projected returns within optimistic timeframes, in the absence of due diligence (Complaint ¶¶40, 49). This is particularly curious because the purchased claims related to a Debtor whose assets are contained in numerous portfolio companies, advised funds and whose fee revenue is dependent upon numerous

sources. This was and is not a typical "one business" bankruptcy where investors can review comparable investments to make an informed decision to buy claims. This alone provides compelling support for the colorable nature of the allegations that the Claims Purchasers used Material Non-Public Information ("MNPI") provided by Seery.[18] Otherwise, they cannot economically justify their significant financial investment and the attendant risks.

49.     But the strength of HMIT's claims is even more robust. As the Complaint alleges, information made public by the Debtor at the time of the claims trades forecasted pessimistic returns: 71% for Class 8 Creditor Claims and 0% for Class 9 Creditor Claims (Complaint ¶¶38-43). Focusing on Class 8 Claims, Farallon purchased the HarbourVest Class 8 Claim ($45 million par value) for $27 million (Complaint ¶¶38-43). Based on the modeling publicly provided by the Debtors, the face value of this Claim must be discounted by at least 29% because of the payout projections (if not even more because of inherent risk). The Debtor's disclosures indicated, at the very best, a payout of only $31.9 million. Thus, a buyer relying on this publicly available information provided by the Debtor could not reasonably expect more than $4.9 million in return, best case, over

---

[18] Respondents argue that only the claim Sellers have a gripe. This is not so. The Court can take judicial notice that Claims Purchase Agreements frequently contain MNPI waivers or "Big Boy" letters, whereby the buyer and sellers acknowledge potential access to MNPI, but then waive or release rights, accordingly. The Claims Purchase Agreements have never been produced and the Claims Purchasers have openly resisted such discovery. This lack of openness and candor reinforces the colorable nature of HMIT's claims.

several years. This is a paltry payout over time that does not account for the inherent

uncertainties and risks in any bankruptcy (Complaint ¶¶38-43).

50.     Similarly, Farallon and Stonehill collectively invested $50 million to acquire

UBS' Class 8 Claim with a par value of $65 million which, again, must be reduced due to

the 71% payout projections (Complaint ¶¶38-43). In this instance, the best-case ROI is no

more than $46 million. Thus, Farallon and Stonehill invested $50 million to acquire a

Claim that was projected by the Debtor to be worth only $46 million – less than their

investment. Of course, this begs the question -- who would do this? Both Farallon and

Stonehill are fiduciaries to their investors (Complaint ¶ 3). As sophisticated investors,

Farallon and Stonehill traditionally undertake extensive due diligence before committing

to an investment. It is therefore mindboggling that this was not done. It also defies

common sense that Farallon and Stonehill invested a huge sum ($50 million) to realize a

loss.

51.     The Joint Opposition also plays an arithmetic shell game when it argues a

potential return of 30%. Joint Opposition ¶ 70. This is trickery because the Claims

Purchasers would never have reasonably considered a payout for Class 9 Claims unless,

of course, they had access to MNPI. It also makes no sense because Farallon does not

deny HMIT's allegations that it was not interested in selling at even a higher premium –

40% above their purchase price (Complaint ¶43). Stated differently, the known

circumstantial evidence (as alleged in the Complaint) more than plausibly supports the

notion that Farallon and Stonehill had information that was unavailable to others.

### B. HMIT's Allegations Concerning MGM and MNPI

52.     The draft Complaint includes allegations, both plausible and colorable, that

Seery transferred MNPI to the Claims Purchasers.[19] At no point do any of the Claims

Purchasers dispute they conducted no due diligence, nor do they deny they relied upon

Seery. Instead, both the Joint Opposition and the Claim Purchasers devote significant

efforts to allege that the information they received relating to MGM was already public.

*See* Joint Opposition at 13-15; Claims Purchasers Objection at ¶50.[20] But, as shown below,

this is simply not true. Also, they ignore the broader allegations in the Complaint that

**MNPI other than MGM** also was involved (Complaint at ¶43-54). Stated differently,

HMIT alleges that Seery gave MNPI to the Claim Purchasers *in addition* to MGM.

53.     The Respondents' arguments concerning MGM are also anemic. The "news

articles" upon which they rely are only rumor, and not direct information from an MGM

board member, such as Mr. Dondero. The Wall Street Journal Article (December 2020),

which is the basis for the other articles which Respondents rely, cites no sources, other

than people who are allegedly "familiar" with the matter—with no other explanation or

---

[19] This includes, but is not limited to information concerning MGM. *See* proposed Adversary Complaint
[Doc. 3760-1] at ¶¶ 3, 13, 14, 16,17, 43.
[20] *See* Joint Opposition Exhibits 25-30.

expansion on the (lack of) reliability of the source.[21] These same articles also make clear that a sale is in no way imminent and that MGM has been allegedly trying to solicit a sale for years:

- In 2018, MGM tried selling to Apple but the "preliminary talks fell apart"[22]

- "MGM has been shopping itself for years"[23]

- In 2019, MGM again tried selling to Apple but "those talks didn't appear to bear any fruit."[24]

Thus, on their face, these media articles are nothing more than interesting and unconfirmed rumors. On the other hand, the information Seery received from James Dondero, an MGM board member with access to verified information and communications that are not available to the public, is qualitatively different. In fact, the Dondero email discusses the sale in terms of "probability" within a specific defined time period. This is a far cry from the speculative indefinite nature of the media reports. This information is clearly MNPI and would provide a significant advantage to any investor.

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.

> *Probably* first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

---

[21] Joint Opposition, Ex. 27.
[22] *Id.*
[23] Joint Opposition, Ex. 34.
[24] Joint Opposition, Ex. 29.

54.    Courts consistently hold that speculative media reports about "potential" transactions are materially distinct from information possessed by corporate insiders:

> "Insiders often have special access to information about a transaction. *Rumors or press reports about the transaction may be circulating but are difficult to evaluate because their source may be unknown. A trier of fact may find that information obtained from a particular insider, even if it mirrors rumors of press reports, is sufficiently more reliable, and, therefore is material and nonpublic, because the insider tip alters the mix by confirming the rumor or reports.*"[25]

The Respondents' argument that a rumor transforms Respondents' use of MNPI concerning MGM into public information is simply not the law.

### C.  Allegations on "Information and Belief"

55.    Respondents next try to argue that HMIT's pleadings concerning Seery's compensation are not colorable or factually insufficient. The opposite is true.

56.    First, it is clear that Muck and Jessup purchased claims that placed them on the Oversight Board. In this capacity, it is clear that Muck and Jessup could control compensation awards relating to Seery. It is also clear that the Plan was modified to provide Seery with the opportunity to receive open-ended "performance" compensation. It is also undisputed that the Claims Purchasers have resisted discovery on their communications with Seery that would shed further light on the compensation awards.

---

[25] *United States v. Contorinis*, 672 F.3d 136, 144 (2d Cir. 2012) (emphasis added).

57.     HMIT has undoubtedly asserted various of its *quid pro quo* allegations based

upon information and belief. *See, e.g.*, Complaint at 47. This was necessary because of the

discovery blockade erected by the Claims Purchasers. But "pleading on information and

belief is accepted in the Fifth Circuit and throughout the federal courts." *See League of*

*United Latin Am. Citizens v. Abbott*, 604 F. Supp 463, 496-97 (W.D. Tex. 2022) (citing *Johnson*

*v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004); 5 Charles Alan Wright & Arthur R. Miller,

Fed. Prac. & Proc. § 1224 (4th ed.), 2 Moore's Fed. Prac. § 8.04[4] (3d ed.).

58.     Even in a motion to dismiss context, the argument that "information and

belief" pleadings should be disregarded is properly rejected. *See id.* ("*Second*, Defendants

say that the Court must disregard any factual allegations in MALC's complaint that are

made on information and belief. Dkt. 80 at 12. In their telling, that form of pleading is

impermissible unless MALC specifies the "basis" for its factual allegations. Dkt. 80 at 12

(quotation omitted). But information-and-belief pleading is accepted in the Fifth Circuit

and throughout the federal courts. That's because the Court must accept all factual

allegations as true at the motion-to-dismiss stage; the time to dispute their truth is at

summary judgment. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. The Court therefore declines

Defendants' invitation to disregard factual allegations pleaded on information

and belief—so long as they are truly factual and not "legal conclusion[s] couched as ...

factual allegation[s]." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))."). Moreover, "[i]f the

facts pleaded in a complaint are peculiarly within the opposing party's knowledge, as

often with fraud allegations, they may be based on information and belief." *Dorsey v.

Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008). That is particularly true here.

59.     Applying these established principles to determine the sufficiency of

HMIT's Complaint, it is clear that HMIT's allegations concerning Respondents' quid pro

quo agreements regarding compensation must be accepted as true at this stage. HMIT

has not had access to the actual financial records detailing Seery's actual compensation.

HMIT has not had access to email communications between Seery, Farallon, Stonehill,

Muck, and Jessup concerning his compensation and agreements relating to his

compensation. The Joint Opposition has produced documents that are highly redacted

and otherwise not properly considered at this stage of the proceeding. The Claims

Purchasers also strenuously objected to discovery of these matters in the Rule 202 state

court proceedings. To now challenge HMIT's allegations concerning Seery's

compensation is the epitome of unfairness and, if indulged, a denial of due process.

## IV. Duties

60.     The proposed Complaint focuses on post-Plan trades which resulted in

unjustified compensation to Seery and the Claims Purchasers' ill-gotten gains. HMIT, and

the Reorganized Debtor and Claimant Trust, seek disgorgement of those gains. Seery, as

Trustee, owed fiduciary duties to act in the Debtor's Estate's and HMIT's best interest

and to maximize the value of the Debtor's Estate. *In re Johnson*, 433 B.R. 626 (S.D. tex. 2010)

("The term 'best interest of the estate' is not defined in the Bankruptcy Code.  The Court

therefore looks to the general duties of the debtor in possession regarding his Chapter 11

estate. 'The debtor in possession performing the duties of the trustee is the representative

of the estate and is saddled with the same fiduciary duty as a trustee to maximize the

value of the estate available to pay creditors.' *Cheng v. K & S Diversified Investments (In re

Cheng)*, 308 B.R. 448, 455 (9th Cir. BAP 2004), aff'd, 160 Fed.Appx. 644 (9th Cir.2005). '[A]

debtor in possession holds its powers in trust for the benefit of creditors. The creditors

have the right to require the debtor in possession to exercise those powers for their

benefit.' *Yellowhouse Machinery Co. v. Mack (In re Hughes)*, 704 F.2d 820, 822 (5th Cir.1983),

*quoting In re Kovacs*, 16 B.R. 203, 205 (Bankr.D.Conn.1981).").

61.    There is no doubt Seery owed the Original Debtor's Estate, as well as equity

(including HMIT), fiduciary duties, including the duty of loyalty and the duty to avoid

conflicts of interest. *See In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016)

(detailing fiduciary duties owed by corporate officers and directors under Delaware law);

*Louisiana World*, 858 F.2d at 245-46 (detailing duties owed by debtors-in-possession).

62.    Likewise, the Claims Purchasers owed a legal duty to not knowingly aid

and abet breaches of these fiduciary duties. [26]

---

[26] *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (aider and abetter is liable if its participation in the breach of fiduciary duty is "knowing").

## V.  <u>Remedies</u>

63.     Respondents self-servingly argue that no equitable remedy is available to remedy their breaches of fiduciary duty, and thus, they should be able to broker and purchase claims using MNPI without repercussions. That is not the law. The courts can fashion equitable remedies to deter and rectify this type of bad faith, willful misconduct.

64.     The Fifth Circuit's decision in *Mobile Steel* was premised on the notion that disallowance was not necessary because creditors "are fully protected by subordination" and "[i]f the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely* the claim is either invalid or the bankrupt possesses a clear defense against it." *Mobile Steel*, 563 F.2d at 699 n. 10 (emphasis added). The *Mobile Steel* factors are not present here,[27] which indicates that the Fifth Circuit would allow equitable disgorgement and declaratory judgment relief to assure creditors are "fully protected." *See id*. The Joint Opposition at paragraph 152 states that a declaratory judgment is only appropriate when is supported by an underlying cause of action. The brief cites *Green v. Wells Fargo*, a case which relies on and misinterprets *Collins Cnty. Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 169-71 (5th Cir. 1990) (requiring a party to have a cognizable interest in an actual controversy."

---

[27] Equitable subordination cannot effectively address the current facts where the Original Debtor's CEO and CRO conspired directly with close business allies who acquired the largest unsecured claims to the detriment of other innocent creditors and *former equity*. The reasoning in published cases from other circuits supports this conclusion. *See Adelphia*, 365 B.R. at 71-73; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998).

65.     The Respondents engaged in the alleged conduct which damaged the Reorganized Debtor and the Claimant Trust, including improper agreements to compensate Seery under the terms of the Claimant Trust Agreement. Under these circumstances, disgorgement is an available remedy for breach of fiduciary duty both under Texas Law, *see Kobach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942), and under Delaware law, *see Metro Storage International, LLC v. Herron*, 275 A.3d 810 (Del. Ch. 2022). Disgorgement is also an appropriate remedy for unjust enrichment under Texas law, *Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952). Disgorgement is also an appropriate remedy for aiding and abetting.[28]

66.     Imposition of a constructive trust also is proper for addressing unjust enrichment under both Delaware and Texas law, *see Teacher's Retirement System of Louisiana v. Aidi off*, 900 A.2d 654 (Del. Ch. 2006) and *Shin-Chi-Su v. Vantage Drilling Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015, pet. denied). The elements of unjust enrichment are: (1) the defendant must have gained a benefit (2) at the expense of plaintiff, (3) and retention of that benefit must be shown to be unjust. *See* Restatement (Third) of Restitution and Unjust Enrichment §321, cut. e (2011).

---

[28] Aiding and abetting is a derivative tort that is reliant upon the underlying tort. As a result, the damages for aiding and abetting a breach of fiduciary duty are the same as those available for breach of fiduciary duty.  *See US Bank Assoc. v. Verizon Commun., Inc.*, 817 F.Supp. 934, 944 (N.D. Tex. 2011) (applying Delaware law).

## VI.   **Declaratory Relief**

67.     The Joint Opposition devotes only a single conclusory paragraph to HMIT's requested declaratory relief (Joint Opposition ¶ 152). The Claims Purchasers Objection provides none. The singular argument presented by the Joint Opposition – that there is no case or controversy – is also weak. This is particularly so after considering over 85 pages of combined briefing, 44 exhibits, and over 1000 pages of heavily-redacted purported "evidence" dumped into the Court's record.

68.     Declaratory relief is appropriate here to address HMIT's rights and entitlements under the Claimant Trust Agreement. These rights and entitlements include whether (i) HMIT has standing to bring an action against a trustee even if its interest is considered "contingent;" (ii) HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill; (iii) HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments; (iv) Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of fraudulent conduct, bad faith, willful misconduct, and unclean hands; (v) Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful

misconduct, and unclean hands; and (vi) all of the Respondents are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct, and unclean hands.

### VII. <u>Claims Trading</u>

69.     The Respondents' discussion of claims trading – and the seller's right to object – avoids HMIT's allegations in the Complaint. The Respondents misapply the principle that the claims trades are a private transaction outside of the Court's purview (Claims Purchasers Objection ¶10. Respondents are wrong. The trades at issue were part of a pact that caused legal injury to the Reorganized Debtor, the Claimant Trust and HMIT.

70.     Here, the claims trading was highly irregular. HMIT alleges that the sophisticated Claims Purchasers did none of the typical, expected due diligence when purchasing multi-million-dollar claims; they purchased claims with low or non-existent ROI; they purchased the UBS claims when the public information projected a loss; and their claims trades were substantially different from a private transaction. It involved the Debtor's CEO and MNPI and promises of enhanced compensation as the *quid pro quo*.

71.     The information regarding the true value of the transferred claims also was not discovered until long after confirmation of the Plan and the limited opportunity to object to the trades. Discovery of relevant information has been withheld. The Respondents should not be allowed to refuse discovery of the Claims purchase

agreements and then rely on them as a basis for opposing the proposed Adversary Complaint. The agreements may very well provide important information as to why the claims sellers did not object to the claims—including potential mutual waivers and "Big Boy" agreements with releases.   But again, these agreements have been withheld.

72.    The Claims Purchasers mistakenly argue that Claims Purchasers were not non-statutory insiders because they did not have a sufficiently close relationship to the debtor. (Claims Purchasers ¶ 36). However, a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself.[29] The facts as alleged by HMIT are sufficient to establish a "sufficiently close relationship" with a statutory insider of the debtor.[30]

## VIII.    Texas State Securities Board

73.    The Joint Opposition improperly states that the Texas Securities Board ("TSSB") never "opened an investigation" and that the TSSB's determination on regulatory action is somehow indicative of the potential for a civil claim. In support of the contention, the Joint Opposition includes only a select portion of the communication it received from the TSSB instead of the entire communication. The reasons are obvious

---

[29] *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 535 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Capital Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021) (applying standard that relationship with statutory insider is sufficient); *In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).
[30] *See In re Smith*, 415 B.R. 222, 233 (Bankr. N.D. Tex. 2009).

– the TSSB regards its efforts as an "investigation" under the Texas Securities Act and the

TSSB specifically disclaims the relevance of its decision as to civil claims.

74.     Further, the closure of the "complaint" is not a determination of the validity

of any of the allegations in the proposed Adversary Complaint. The TSSB as a regulatory

body is responsible for investigating and enforcing violations of the Texas Securities Act

and pursuing regulatory action where it determines it to be appropriate. That

determination is distinct from the merits of HMIT's civil claims.

75.     To the extent that the Joint Opposition regards a TSSB "investigation" as

being more significant than a "review," this Court should not be misled by the Joint

Opposition's argument that the TSSB only conducted a "review."

76.     The Joint Opposition does not present any support for its claim that the

TSSB only conducted a "review." Instead, the Joint Opposition seek to argue that the

TSSB's use of the verb "reviewed" somehow morphs the TSSB's investigation into the

noun "review." The truth lies in the communications and requests issued by the TSSB,

which HMIT believes confirm the fact that the TSSB conducted an "investigation"

because there were sufficient indicia of wrongdoing to warrant one.

## Reservation of Rights

77.     The Joint Opposition and the Claims Purchaser's Objection (collectively the

"Responses") present a scatter-gun, chaotic approach to the law and the issues before the

Court. To the extent HMIT has not addressed every matter raised by and each case cited

by the Respondents in their Responses, HMIT specifically reserves all and does not waive any of its rights to present additional arguments and appropriate authorities to further demonstrate the flaws and errors in the Respondents' arguments and Responses.

WHEREFORE PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave to file its proposed Adversary Complaint, and also seeks such other and further relief to which HMIT may be justly entitled.

Dated: May 18, 2023.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie A. McEntire*
        Sawnie A. McEntire
        Texas State Bar No. 13590100
        smcentire@pmmlaw.com
        1700 Pacific Avenue, Suite 4400
        Dallas, Texas 75201
        Telephone: (214) 237-4300
        Facsimile: (214) 237-4340

        Roger L. McCleary
        Texas State Bar No. 13393700
        rmccleary@pmmlaw.com
        One Riverway, Suite 1800
        Houston, Texas 77056
        Telephone: (713) 960-7315
        Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain*
*Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on the 18th day of May 2023, a true and correct copy of the foregoing motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire