PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris *(admitted pro hac vice)*
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.,*
*and the Highland Claimant Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

### HIGHLAND PARTIES' OBJECTION TO MOTION
### TO STAY AND MOTION TO COMPEL MEDIATION

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Highland Capital Management, L.P. ("HCMLP", "Highland", or, as applicable, the "Debtor"), the reorganized debtor in the above-referenced bankruptcy case, and the Highland Claimant Trust (the "Trust" and together with HCMLP, the "Highland Parties"), by and through their undersigned counsel, hereby file this opposition (the "Opposition") to the *Motion to Stay and Motion to Compel Mediation* [Docket No. 3752] (the "Motion") filed by James D. Dondero ("Dondero"), Dugaboy Investment Trust ("Dugaboy"), Get Good Trust ("Get Good"), and Strand Advisors, Inc. ("Strand").[1]  In support of their Opposition, the Highland Parties state as follows:

## PRELIMINARY STATEMENT[2]

1.      The Highland Parties would be thrilled to fully and finally resolve the Highland bankruptcy case and move on with their lives.  Unfortunately, there is no reason to believe that a consensual resolution is possible, and the tone and content of the Motion validate that view.  Of greater concern, however, is that granting the Motion will be counterproductive because (a) further information disclosures will undoubtedly generate further litigation, and (b) staying existing litigation will impede completion of Highland's asset-monetization Plan by delaying asset recoveries and the adjudication of Dondero's meritless claims and defenses.

2.      If granted, the Motion—built on a series of patently false statements and contrived grievances—will do nothing but serve Dondero's twin goals of (a) buying time in the hope that a higher authority curtails the Plan Protections and opens the gates thereby enabling him to flood courtrooms with baseless litigation against his perceived enemies, and (b) obtaining information that he otherwise has no legal or equitable right to obtain in order to gin up more claims against those same people and entities.

---

[1] Neither Dondero, Get Good, nor Strand hold any interests—unvested, vested, contingent, or otherwise—in the Trust, so it is unclear how those parties have standing to join the Motion. Nevertheless, since they are all controlled by Dondero, they (together with Dugaboy) are collectively referred to herein as "Dondero."

[2] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

3.      Dondero is no victim, and revenge is not a valid litigation strategy.  As described in more detail below, the Court should not grant any of the relief requested under the circumstances for at least the following reasons:

- Dondero has a poor record of fully and finally resolving disputes;

- Even when Dondero purports to settle a dispute, litigation often follows;

- Dondero lacks the credibility needed to negotiate due to his unlawful conduct throughout the Highland bankruptcy case;

- Highland has already publicly disclosed information sufficient to permit Dondero to craft a settlement proposal, but his quenchless demands for "financial information" (including historical "financial information") betrays his intent to manufacture more baseless claims;

- Dondero's allegations concerning the prior mediation process insult this Court, the mediators, and his own lawyers, but are ultimately baseless and irrelevant; and

- A stay of litigation will impede, not accelerate, final resolution of this case.

4.      The Plan was adopted with the support of creditors holding more than 99.8% in amount of claims—with Dondero and his affiliates and loyalists the only holdouts.  This Court's orders confirming the Plan and validating the Trust Agreement have been upheld on appeal in all relevant respects.  And under James P. Seery, Jr.'s leadership, Highland is successfully executing its asset-monetization plan such that stakeholders have obtained recoveries beyond those projected in early 2021. Regrettably, rather than celebrating these achievements, Dondero remains intent on

DOCS_NY:47598.12 36027/003

"burning down the house" by interfering with the Plan, impeding asset recoveries,[3] and launching meritless lawsuits.

5. With Highland's Public Information Disclosures, information available to investors in Highland-managed funds, and Dondero's knowledge of Trust assets that he actually controls (*e.g.*, SE Multifamily), Dondero has more than enough information to resolve this case. Mediation is unnecessary; if Dondero wants to try to resolve this case, he should make an offer. Regardless of whether he chooses to do so, the Court should deny the Motion and allow the Highland Parties to finish executing the Plan.[4]

## FACTS RELEVANT TO HIGHLAND'S OBJECTION

### A. Dondero Has a Poor Record of Resolving Disputes

6. History shows that Dondero is not a rational economic actor. He and his affiliates have wasted countless millions of dollars on an army of lawyers unsuccessfully litigating cases in

---

[3] In addition to interposing fabricated defenses to Highland's asset-recovery efforts (*e.g.*, the "oral agreement" defense in the Notes Litigation that caused this Court to invoke the "sham affidavit rule" or the HCRE proof of claim that alleged in bad faith that "all or a portion" of Highland's interest in SE Multifamily was HCRE's property), Dondero is interfering with the execution of the Plan by launching baseless litigation against third parties thereby preventing Highland from monetizing the assets controlled by those entities. In early 2021, a Dondero-controlled fund sued Acis Capital Management, L.P. ("Acis"), Joshua Terry, U.S. Bank, N.A. ("USB"), and Brigade Capital for allegedly mismanaging the Acis CLOs. This litigation spawned numerous other suits and caused Acis and USB to reserve (rather than distribute) approximately $40 million in cash from the Acis CLOs to Highland's material detriment since it is entitled to approximately 50.6% of the distributions through its interest in Highland CLO Funding Ltd. ("HCLOF"). In 2022, HCLOF entered into a settlement with Acis and USB to release a significant portion of the Acis CLO reserves. Predictably, CLO Holdco Ltd.—another Dondero affiliate in the "DAF" structure—immediately sued HCLOF and Acis, absurdly contending that they breached their duties by entering into the settlement.

[4] Notwithstanding (but expressly taking into account) the foregoing and the facts and arguments below, the Highland Parties would be prepared to mediate on the following conditions: (a) the Highland Parties cannot be compelled to provide any further information by the Court or the mediator in connection with the mediation (*i.e.*, the disclosure of any further information is subject to the Highland Parties' sole discretion); (b) no litigation shall be stayed in support of mediation without the Highland Parties' consent, in their sole discretion; (c) any settlement will include, among other terms, (i) Dondero and all people and entities associated with or acting in concert with him shall grant broad and unconditional general releases to the Highland Parties (including the Claimant Oversight Trust Board members) and all related executives, employees, and professionals, (ii) an eight-figure reserve will be established and maintained until the Highland Parties determine, in their sole discretion, that the statutes of limitation applicable to potential claims have expired; (d) a new "gatekeeper" provision requiring leave of the Bankruptcy Court before *any* future actions can be commenced; and (e) broad indemnification provisions requiring Dondero to indemnify the Highland Parties for all claims and costs (including attorneys' fees) arising from any claim or action asserted against any released party by an person or entity associated with or acting in concert with Dondero.

forums across the globe for well over a decade.  Dondero does not litigate to preserve value, rectify

wrongs, vindicate rights, or even to seek leverage in an eventual litigation.[5]  Rather, Dondero and

his affiliates use litigation to extract revenge on perceived enemies and adversaries by driving up

costs (including his own), avoiding the payment of judgments and awards, asserting frivolous

claims and defenses, and launching baseless character assassinations—while engaging in all sorts

of wrongful and unlawful conduct along the way.

      7.     If Dondero had been unable to settle with one party or another, he might plausibly

blame the other side as unreasonable.  But that is not the case.  Instead, Dondero and his affiliates

continue to litigate with the same parties that they litigated with prior to the Petition Date—even

though independently-managed Highland has settled its disputes with all of them.  For example:

- <u>UBS Disputes</u>.  Dondero and related entities were mired in a decade-long litigation in New York State Supreme Court.  Rather than resolving the disputes, Dondero and Ellington sought to avoid an impending judgment by fraudulently transferring hundreds of millions of dollars to a Cayman Islands entity known as Sentinel.  Thirteen years later, and notwithstanding Highland's settlement with UBS, this litigation continues even *after* the discovery of the Dondero-orchestrated post-petition bankruptcy fraud.

- <u>Terry and Acis</u>.  After getting into a bitter personal dispute with a former partner, including the audacious theft of retirement accounts, an $8 million arbitration award was imposed against Acis, then dominated and controlled by Dondero.  Rather than satisfy the award, Dondero engineered an asset-stripping scheme, the result of which was an involuntary bankruptcy, the loss of a lucrative line of business, a litany of false allegations about Guernsey-based HCLOF and HarbourVest, and the accrual of tens of millions in legal fees.  Notwithstanding Highland's settlement with Terry and Acis, this litigation continues in new and multiple forms and forums, including New York State Supreme Court, the United States District Court for the Southern District of New York, the United States Court of Appeals for the Second Circuit, and, indirectly, the Isle of Guernsey.

- <u>Patrick Daugherty</u>.  Following another bitter personal dispute with a former partner, the parties took their disputes before a jury and then through the appellate process.  When it was over, Dondero and Highland could have simply collected the net $200,000 awarded. Instead, Dondero caused his lawyers to loot an escrow account, fraudulently transfer assets, and engage in such improper litigation tactics that the Delaware Chancery Court invoked

---

[5] If these were Dondero's goals, one would expect to find judgments or arbitration awards in his favor, or at least consensual settlements.  Such things do not exist.  Instead, Dondero's vengeful and wasteful litigation has spawned nothing but an uninterrupted stream of adverse rulings and judgments against him and his affiliates.

the rarely used "crime-fraud exception" to pierce the attorney-client privilege. Notwithstanding Highland's settlement with Daugherty, this Dondero-driven litigation continues in multiple forums.

8.     In each of these cases, Dondero and his affiliates "had their day in court," with the opportunity to present evidence, make their case, and try to convince a factfinder of the merits of their position.  But they lost.  And then—rather than acknowledging defeat and mitigating the losses by resolving the cases—Dondero and his affiliates chose to settle scores by failing to comply with the judgments and awards that were handed down leading to massive claims against Highland and perpetual litigation.

9.     Dondero's refusal to fully and finally resolve disputes has continued during the bankruptcy.  As just one example, Dondero rejected the Highland Parties' offer to avoid litigation of the manufactured dispute concerning Highland's interest in SE Multifamily—even though the offer was based on Dondero's own valuation.  As the Court will recall, Highland and an entity owned and controlled by Dondero (*i.e.*, HCRE) each held interests in SE Multifamily.  The issues concerning HCRE and SE Multifamily are straight-forward:

- <u>Dondero and HCRE solely controlled SE Multifamily</u>.  At all relevant times, Dondero and HCRE served as the Manager of SE Multifamily and solely controlled that entity.

- <u>HCRE filed a fraudulent proof of claim challenging Highland's ownership interest in SE Multifamily</u>.  HCRE filed a proof of claim (the "<u>POC</u>") baselessly asserting that all or some of Highland's ownership interest in SE Multifamily properly belonged to it.  Highland objected to HCRE's POC and litigation ensued.

- <u>On June 30, 2022, Dondero's family trust valued Highland's interest in SE Multifamily at $20 million</u>.  With sole control of all information concerning SE Multifamily, and in an effort to persuade this Court that Highland's former equity owners were "in the money," Dugaboy represented that Highland's interest in SE Multifamily was worth $20 million.[6]

- <u>Highland offers to sell its interest in SE Multifamily to HCRE based on Dugaboy's valuation</u>.  To avoid further litigation, Highland offered to sell its interest in SE Multifamily

---

[6] Morris Dec. Ex. 1 (the "<u>Valuation Motion</u>").  Citations to "Morris Dec. Ex. __" are to the exhibits attached to the *Declaration of John A. Morris in Support of Highland Parties' Objection to Motion to Stay and Motion to Compel Mediation* accompanying this Opposition.

to HCRE for $20 million.  Highland's offer was (a) based on Dugaboy's valuation, (b) not contingent on any due diligence, and (c) was made after HCRE sought to withdraw the POC but retain its claims to assert in other forums.

- <u>HCRE rejects Highland's offer and reduces the valuation by 80%.</u>  Even though Highland's offer was based on Dugaboy's valuation, Dondero and HCRE promptly rejected it and countered with $3.8 million—less than 20% of the value that Dugaboy presented to the Court just months earlier.[7]

10.     Based on Dondero's inability to resolve his disputes with UBS, Acis, and Daugherty, and based on their own experience trying to resolve disputes with Dondero, the Highland Parties do not believe Dondero is ready, willing, or able to "fully and finally" resolve this case.

**B.     Even When Dondero Purports to "Settle" a Dispute, Litigation Follows**

11.     Dondero has proven that on the rare occasion he settles a case, litigation follows anyway.  The Redeemer Committee's experience illustrates the point.

12.     There, after several years of litigation between Highland and the Crusader Funds, the Supreme Court of Bermuda approved a "Joint Plan of Distribution of the Crusader Funds" and a "Scheme of Arrangement" (together, the "<u>Joint Plan and Scheme</u>") that purported to resolve all disputes.  Under the Joint Plan and Scheme, Dondero-dominated Highland was authorized to continue as investment manager for the purpose of monetizing the Fund's assets for distribution, subject to the oversight of the newly formed Redeemer Committee.

13.     However, rather than fulfilling its duties and complying with its obligations under the Joint Plan and Scheme, Highland (with Dondero at the helm) wrongfully converted over $30 million for itself and otherwise engaged in a litany of wrongful conduct, including the breach of

---

[7] While Dondero makes "equitable" requests here and elsewhere for "financial information," he has failed to comply with his unambiguous obligations to provide information to Highland.  Specifically, in addition to re-trading his own SE Multifamily valuation, Dondero (and HCRE) failed to comply with his unambiguous contractual obligation to provide Highland with access to inspect and copy SE Multifamily's books and records—thereby necessitating more costly litigation.  Morris Dec. Ex. 2.

its fiduciary duties to the Redeemer Committee.  *See Memorandum Opinion and Order* entered in

*In re Highland Cap. Mgmt., L.P. (CLO Holdco, Ltd v. Kirschner)*, Case No. 3:22-cv-02051-B

(May 22, 2023 N.D. Tex.), Docket No. 18 at 2-3.

14.    As the Redeemer Committee's experience proves, even when Dondero settles, he

doesn't.

## C.    Dondero Lacks Credibility Due to His Unlawful Conduct Throughout the Bankruptcy Case

15.    Regrettably, Dondero lacks the credibility required to fully and finally resolve this

bankruptcy case in light of his unlawful conduct throughout the bankruptcy case.  For example,

after the Petition Date:

- Dondero conspired to surreptitiously pay $10 million to the Debtor's most senior employees without disclosure to (let alone approval of) the Independent Directors or the Court;[8]

- Dondero conspired to secretly indemnify six of the Debtor's employees through an offshore entity (*i.e.*, Sentinel) that he and Ellington controlled into which assets with a face amount of $300 million were fraudulently transferred in 2017 (some of which was later used to fund a portion of the senior-employee payments described above);[9]

- Dondero conspired with Ellington and Leventon to, among other things, hide from the Independent Board: (a) the existence of Sentinel, (b) Debtor assets, including control of the claims against Sentinel, and (c) the existence of the Sentinel indemnity and the significant legal fees and personal expenses paid from Sentinel;[10]

- Dondero conspired with Ellington and Leventon to act against the Debtor—even after the Court entered a temporary restraining order;[11]

---

[8] Morris Dec. Ex. 3 at 19:12-23:16.

[9] Morris Dec. Ex. 4 at 40:14-43:5; 59:19-61:10.

[10] *Id.* at 33:1-40:13.

[11] *See Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO* [Adv. Pro. No. 20-03190, Docket No. 190] (the "First Contempt Order") at 36-38.

- Dondero and his affiliates interfered with the Debtor's business and trading on numerous occasions;[12]

- Dondero directed former Highland employees to reject KERP payments, file baseless proofs of claim, and then transfer those claims to entities controlled by Dondero and Ellington as conditions to continued employment—and then forced the Debtor to spend considerable resources disallowing those claims;

- Dondero fabricated frivolous defenses to simple note-collection actions and caused the Debtor to spend more than two million dollars litigating over a two-year period;[13]

- Dondero's controlled entities breached contracts for investment and back-office services performed by Highland personnel by failing to pay for such services and then filed a meritless administrative claim—causing yet more costly litigation and resulting in yet another adverse decision against Dondero that he is reflexively and wastefully appealing;[14]

- Dondero has been held in contempt of court twice—with each contempt order upheld on appeal by the District Court;

- Dondero caused entities under his control to file baseless lawsuits and claims, such as Hunter Mountain's motion for leave to file a meritless suit against Seery, Stonehill, and Farallon;[15]

Dondero has the audacity to light all of these fires and then complain about the professional fees

needed to put them out and protect what remains. Actions have consequences. And based on these

---

[12] *See* First Contempt Order at 13-15, 30-36; *Memorandum Opinion and Order Holding Certain Parties and Their Attorneys in Civil Contempt of Court for Violation of Bankruptcy Court Orders* [Docket No. 2660] at 19-21, 26-27.

[13] *See Report and Recommendation to District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (with Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions* [Adv. Pro. No. 21-03003, Docket No. 191] at 23-33.

[14] *See Findings of Fact and Conclusions of Law in Support of Judgment: (A) Granting Breach of Contract Claims Asserted by the Reorganized Debtor; and (B) Denying Defendants' Requests for Allowance of Administrative Expenses Claims* [Adv. Pro. No. 21-03010-sgj, Docket No. 124].

[15] *Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3783].

DOCS_NY:47598.12 36027/003

actions (among others), the Highland Parties have concluded that Dondero lacks the credibility

needed to fully and finally resolve these disputes.[16]

**D.    Dondero's Request for Financial Information Is Merely His Latest Attempt to
Seek Information to Manufacture More Claims**

16.    Dondero asserts that "mediation is an opportunity for the Debtor to finally provide

information regarding the value of the estate and its current and contingent liabilities—information

that, for whatever reason has been shrouded in secrecy throughout these bankruptcy proceedings."

Motion at 1.  These assertions are misguided for numerous reasons.

17.    Most significantly, the day after Dondero filed the Motion, the Highland Parties

voluntarily and publicly disclosed much of the information Dondero demands in the Motion,

including:

- Cumulative amounts funded to the Highland Indemnity Trust and Disputed Claims Reserve as of March 31, 2023;

- Aggregate amounts paid, and remaining amounts owed, to allowed Class 8 and Class 9 claimholders as of March 31, 2023;

- Remaining pending disputed and administrative claims, including the claimholder and face amount of the claim, as of March 31, 2023;

- Cash balances as of March 31, 2023 (along with prior quarter-end dates);

- Total-interest bearing debt outstanding as of March 31, 2023; and

- List of material assets remaining. [17]

---

[16] Unfortunately, Dondero's most recent "demands" provide further proof that Dondero is uninterested in actually ending this saga.  Among other things, Dondero insisted that (a) the parties would mediate the "scope of releases" and (b) prior to mediation, Stonehill and Farallon would be required to re-pay to the Trust all distributions received beyond their respective costs in acquiring their claims. Morris Dec. Ex. 5. For the avoidance of doubt, the Highland Parties will not participate in a mediation for the purpose of "compromising" baseless "disputes" manufactured by Dondero nor will they ever agree to a settlement that does not include, among other things, broad and unconditional general releases from Dondero and every person and entity affiliated with him.  *See supra* n. 4.

[17] While Dondero will undoubtedly contend that the asset listing is insufficient to evaluate the value of Highland's remaining assets, Dondero indisputably has other sources of information through his investments in Highland-managed funds and otherwise that enable him to value most of those assets.  *See, e.g.*, *Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets,*

*Compare Post-Confirmation Report, Addendum to Global Notes for March 31, 2023 Quarterly Operating Report* [Docket No. 3757] (the "Public Information Disclosures") at Items 1-5 *with* Motion at 11-12.

18.     Highland publicly disclosed this information for all interest holders to see and in the hope that HMIT and Dugaboy would "declare victory" and terminate their "valuation" litigation.  Unfortunately, proving yet again that Dondero can never compromise or resolve a dispute, HMIT and Dugaboy took the information and promptly filed a new lawsuit.  *See Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*, Adv. Pro. No. 23-03038-sgj, Docket No. 1.

19.     Dondero's assertions are misguided for following additional reasons:

- Dondero has no legal right to any of the information requested.  This Court denied as procedurally improper Dugaboy's and HMIT's earlier motion to force the Highland Parties to divulge "valuation information" precisely because they had no legal right to such information;[18] those parties have since commenced an adversary proceeding seeking "valuation information" on an equitable basis;[19]

- Dondero is the only person to complain about the disclosure of information.  Other than Dondero and those acting in concert with him, no party-in-interest (including the Office of the United States Trustee, the Official Committee of Unsecured Creditors, or holders of Beneficial Interests in the Trust) has ever complained about the disclosures made by the Debtor or the Highland Parties;

- With one exception, the Debtor complied with all disclosure obligations.  Like any debtor, the Debtor was required by applicable Bankruptcy Rules and guidelines to make certain disclosures.  As Dondero knows,[20] the Debtor complied with all disclosure obligations prior to the Effective Date, except for Rule 2015.3.  Indeed, other than Rule 2015.3,

---

*and (B) Nature of Plaintiffs' Interests in Claimant Trust* [Adv. Pro. No. 23-03038-sgj, Docket No. 1] at 5-6 (providing precise values for most of the Trust's remaining assets).

[18] *See Order Denying Motion [DE #3382] and Supplemental Motion [DE #3533] of Dugaboy Investment Trust Due to Procedural Deficiency: Adversary Proceeding is Required* [Docket No. 3645].

[19] *See Dugaboy Investment Trust v. Highland Capital Management, L.P.* [Adv. Pro. No. 23-03038, Docket No. 1].

[20] Dugaboy recently argued to the Fifth Circuit—with no evidentiary support—that the Highland bankruptcy case was a "black box" that enabled Highland and its professionals to "pilfer" the estate.  Highland responded with extensive facts proving that Dugaboy's arguments were meritless.  *See Highland Capital Management, L.P.'s Motion to Strike Reply Brief of the Dugaboy Investment Trust or for Alternative Relief* [Case No. 22-10831 (5th Cir.) Docket No. 00516596871] (while Highland's motion to strike was denied, Highland was granted leave to file a sur-reply, which it subsequently filed).  Dondero's canard that Highland has not complied with its disclosure obligations is demonstrably false; the lack of consequences from his continued assertion of such false statements serves only to prolong this case.

-10-

Dondero has never identified any disclosure obligation that he contends the Debtor failed to comply with; notably, at all relevant times, Dondero had access to the information that would have been included in a Rule 2015.3 report; and

- The Highland Parties have complied with all disclosure obligations. The Highland Parties came into existence on August 11, 2021, when the Plan went effective. As a consequence, the Highland Parties' disclosure obligations are now more limited and are governed by different rules, including the terms of the Trust Agreement. Dondero has never identified any disclosure obligation that he contends the Highland Parties failed to comply with.

20.     The forgoing facts are indisputable.  What is also indisputable is that—as his lawyers have made crystal clear—***Dondero seeks the remaining information to second-guess the Highland Parties' decisions and manufacture more claims, not for purposes of resolving disputes***.  For example, Dugaboy argued to the Fifth Circuit that it needed the information that would have been disclosed under Bankruptcy Rule 2015.3 to determine whether "Highland or any of its professionals acted in a manner detrimental to Dugaboy's ownership interest."[21]  And before filing this Motion, Dondero's lawyers contended that the Highland Parties' Public Information Disclosures were insufficient because they did not enable them to determine (a) "if any asset sales [were] materially mismanaged" and (b) "whether any particular transactions need further scrutiny."[22]

21.     The Court should take Dondero's lawyers' threats seriously.  Dondero seeks to review—and then litigate into perpetuity—every decision made, and every expense paid, by the Debtor and the Highland Entities and then attack Seery personally.[23]  That is not the way the process works, in this case or any other.  The Court should permit the Highland Parties to do what

---

[21] *See Reply Brief of Appellant, The Dugaboy Investment Trust* [Case No. 22-10831 (5th Cir.), Document No. 00516578672] at 4.  The Fifth Circuit ultimately found that Dugaboy lacked standing to appeal the order denying its motion to compel compliance with Bankruptcy Rule 2015.3.

[22] Morris Dec. Ex. 6.

[23] Dondero will never be able to reconcile his relentless assertions that Seery has "mismanaged" the Debtor and the Trust with his assertions that Class 8 and Class 9 creditors can be paid in full and that HMIT and Dugaboy are "in the money."

was always intended and what was approved by creditors:  execute the Plan in accordance with its terms and those of the Trust (including, to the extent necessary, engaging in litigation to marshal the Trust's assets and defend against spurious claims).  In the end, distributions will be made pursuant to the Trust waterfall and HMIT and Dugaboy will receive the residual value of the Trust, if any, **after** payment of all obligations (including all indemnification obligations) and payment in full, plus interest, of all Class 8 and Class 9 claims.

22.     In sum, the Court should deny Dondero's request that the Highland Parties divulge additional information because (a) Highland has already made the Public Information Disclosures, providing sufficient information to resolve the case, (b) he has no right to the information, and (c) he has already betrayed nefarious intent.

## E.     **Dondero's Allegations Concerning the Prior Mediation Process Are Baseless and Irrelevant**

23.     Dondero criticizes this Court's decision to appoint former bankruptcy judge Alan Gropper and Sylvia Mayer as mediators, denigrates the mediation process that resulted in settlements with others, and disingenuously contends that he was effectively excluded.[24]  Motion at 2-4.  These belated allegations provide no basis to grant any of the relief requested.

24.     ***First***, the Court plainly had the discretion to appoint whomever it wanted as mediators.  While the parties may have suggested others, Judge Gropper and Ms. Mayer were

---

[24] Dondero also complains that the Debtor excluded Ellington and Leventon from the mediation.  According to Dondero, Ellington and Leventon had "deep knowledge regarding HCMLP's pre-petition litigation [that] may have proven useful in discussions regarding a global resolution."  Motion at 3 n.1.  While Ellington and Leventon were the Debtor's most senior in-house lawyers who owed the Debtor unqualified fiduciary duties of loyalty, the Independent Directors did not fully trust them at that time.  In hindsight, the Independent Directors' instincts were prescient.  Indisputable evidence eventually established that in the spring and summer of 2020—just weeks ahead of the mediation—Ellington and Leventon were covertly working to advance their own interests and those of Dondero by facilitating (i) the payment of $10 million to themselves and other insiders without disclosure to the Independent Directors or the Bankruptcy Court, and (ii) the secret indemnification of certain of the Debtors' employees by Sentinel.  Subsequent evidence also established that Ellington and Leventon continued to conspire with Dondero even after Dondero was forced to resign; indeed, their unlawful communications were the basis for their termination and were some of the evidence supporting this Court's contempt order against Dondero.  *See, e.g.*, Adv. Proc. No. 21-03020-sgj, Docket Nos. 177, 180, 183.

eminently qualified, and the Court obviously believed they could bring this case to successful conclusion.[25] Dondero does not—and cannot—dispute these facts, and his suggestion that others may have achieved more success is rank speculation, and completely irrelevant.

25.    ***Second,*** Dondero asserts—as usual, with no evidence—that "[a]t no point during the mediation process did any party ever make any demand of Mr. Dondero, nor did the mediators solicit any offer from Mr. Dondero." Motion at 3-4.[26] Suffice it to say that Dondero was represented by former bankruptcy Judge Michael Lynn (and the Bonds Ellis firm), and it is inconceivable that former Judge Lynn was unable to effectively communicate Dondero's position to the mediators. If Dondero felt "sidelined" at the time, he or former Judge Lynn could have and should have made that known. They did not, and their failure to do so (assuming they actually believed this) provides no basis for mandating mediation now.

26.    ***Finally***, Dondero alleges that "the Debtor and its management refused to respond to Mr. Dondero's numerous offers to settle the estate and pay creditors in full. When pressed by Mr. Dondero's lawyers for a response, the Debtor made clear that any global resolution involving Mr. Dondero would come at an unreasonable price." Motion at 3. Putting aside the inherent contradiction of these two sentences (and the false assertion that Dondero ever offered to "pay creditors in full"), these allegations unintentionally betray the real reason why there has never been a global settlement, and why there likely never will be one: Dondero's obstinate refusal to acknowledge his wrongdoing; his narcissistic belief that his views are the only valid views; and his peculiar insistence that he is actually a victim.

---

[25] Of course, the mediation was successful as it led to the resolution of some of the largest claims in the case (*e.g.*, Acis, the Redeemer Committee, and UBS) and paved the way for a plan supported by 99.8% in amount of creditors.

[26] The mediation is covered by the mediation privilege and the Highland Parties have no interest in revisiting what occurred—nor would the proposals and counterproposals exchanged during mediation be relevant to deciding the Motion. Suffice it to say that the Court (and Dondero) knows from prior unrebutted testimony that Seery spent countless hours trying in vain to engineer what he called "the grand bargain" with Dondero and the creditors.

27.     Dondero was mediating with entities he had wronged for years—by asserting meritless claims and defenses against them; engaging in fraudulent transfers and other wrongful conduct; and unjustifiably forcing them to devote time, money, and effort protecting their interests. The proof of Dondero's wrongdoing is reflected in the litany of uninterrupted decisions and awards issued in favor of UBS, the Redeemer Committee, and Josh Terry.  Regrettably, Dondero remains wedded to the same tired, destructive, and self-defeating strategy he has been clinging to for years: filing a torrent of meritless lawsuits, this time against Seery, Stonehill, Farallon, and the Highland Parties.  With their integrity and reputations repeatedly challenged, the stakeholders have nothing to compromise and will seek and obtain vindication through the judicial process.

**F.     Staying Litigation Will Delay Resolution of this Case, Not Accelerate It**

28.     Dondero disingenuously seeks a stay of all litigation pending mediation.  Motion at 8-10.  This request should be denied for the following reasons.

29.     *First*, there are countless proceedings and appeals pending in the United States District Court and the United States Court of Appeals for the Fifth Circuit—nearly all of which are being prosecuted by Dondero.  It is unclear that this Court has the authority to stay litigation pending in those Courts, but, even assuming it does, a stay of those matters would plainly be counterproductive because it would delay the resolution of substantial issues such as the Notes Litigation or the appeal of the order denying HCMFA's and NexPoint's administrative claims and granting Highland's breach of contract claims.  Indeed, final adjudication of pending matters will aid the process by eliminating uncertainty and narrowing the areas purportedly "in dispute."

30.     ***Second,*** little remains to be litigated in this Court, and what has not already been stayed is, of course, being prosecuted by Dondero.  As the Highland Parties previously explained to the Court, the full and final adjudication of those matters (including (a) HMIT's motion for leave to commence an adversary proceeding against Seery, Stonehill and Farallon [Docket No.

-14-

3699, as amended], and (b) HMIT's and Dugaboy's complaint for equitable relief, including a

declaration as to their rights under the Trust Agreement [Adv. Pro. No. 23-03038-sgj]) will aid in

the final resolution of this case by further resolving purported claims and disputes and reaffirming

HMIT's and Dugaboy's unvested and continent interests under the Plan and Trust Agreement.

31.     *Finally*, the "litigation burn rate" is a product of Dondero's own conduct and

nothing more.  He alone refused to settle with the creditors.  He alone objected to the Plan.  And

he alone has been engaged in active litigation with the Highland Parties since confirmation more

than two years ago.  As has always been the case, Dondero can either (a) shut down his litigation

machine, let the process play out as intended, and recover whatever remains (if anything) after

implementation of the Trust Agreement's waterfall (including the satisfaction of indemnification

obligations), or (b) he can continue his value-destructive strategy of scorched-earth litigation.  If

he chooses the latter, Dondero should know (based on experience) that the Highland Parties will

vigorously prosecute their claims and assert their defenses and that doing so will not be cheap.

32.     The Court should not save Dondero from himself.  A stay will be counterproductive

by leaving uncertain the parties' respective claims, defenses, and appeals; that branch of the

Motion should be denied.

## ARGUMENT

### A.     The Highland Parties Should Not Be Compelled to Mediate with Dondero

33.     Contrary to Dondero's assertions, mediation of the parties' remaining "disputes"

would be wasteful and counterproductive—and courts in this District have declined to order

mediation in exactly such circumstances.

34.     As established above, Dondero's track record of fully and finally resolving disputes

is abysmal; he has engaged in a laundry list of judicially-determined misconduct that has impaired

his credibility and fostered grave mistrust; he shows no contrition and instead is initiating more

-15-

outlandish and baseless litigation in this Court and elsewhere; and he admittedly seeks more "financial information" for the purpose of concocting even more meritless claims.

35.     In this context, compelling mediation is unlikely to actually resolve any issues but would impose significant additional costs on all parties involved while likely further interfering with the Trust's execution of the Plan.  *See Sec. and Exch. Comm'n v. Stanford Intl. Bank, Ltd.*, 3:09-CV-0298-N, 2017 WL 9989249, at *6 (N.D. Tex. May 16, 2017) (denying motion to compel mediation where "ordering such mediation at this stage and on these issues is unlikely to resolve the [movants'] concerns while assuredly imposing significant additional costs on all parties involved"); *Badaiki v. Schlumberger Holdings Corp.*, 4:20-CV-2216, 2021 WL 2935072, at *2 (S.D. Tex. Apr. 6, 2021), report and recommendation adopted, 2021 WL 2379685 (S.D. Tex. June 10, 2021) (denying motion to compel mediation, noting "the Federal Rules of Civil Procedure do not require mediation," and "mediation would be a waste of time and resources"); *In re Smith*, 524 B.R. 689, 702-03 (Bankr. S.D. Tex. 2015) (finding mediation inappropriate, noting, among other things, "parties should only pursue mediation after first attempting to reach a settlement without third-party intervention," and that even if no settlement can be reached, "mediation is not necessarily appropriate" because of the significant costs associated therewith); *Avila v. Allstate Tex. Lloyd's*, EP-16-CV-00321-DCG, 2016 WL 9414124, at *3 (W.D. Tex. Oct. 14, 2016) (denying motion to compel mediation, finding "compelling the parties to mediate at this juncture may prove inefficient").

36.     Moreover, the Highland Parties are entitled to see their cases through the judicial process in an effort to obtain vindication on their behalf and on behalf of all stakeholders.  *See Smith*, 524 B.R. at 703 (explaining that "the psychological costs of mediation may outweigh the monetary costs of litigation. Some clients do not want to be forced into mediation; rather, they

simply want their day in court because they want vindication from a judge that their actions were legal, or at least not illegal").

37.    Finally, based on the Redeemer Committee's experience, the Highland Parties remain concerned that even a mediated resolution would be nothing but another launching pad for further disputes rather than a true global settlement.  *See Smith*, 524 B.R. at 704 (noting "[t]he losing party, by learning a hard lesson in the courtroom … may stop behaving in the manner that created the dispute in the first place. However, if that same party does not lose in the courtroom, but rather settles at a mediation … the party is more likely to continue the same behavior and foment future disputes similar to the one that has settled in mediation. Thus, in certain instances, it is appropriate for a court to deny mediation in the interest of pushing a 'winner take all' scenario").

38.    Under the circumstances, the Highland Parties should not be compelled to mediate and that branch of the Motion should be denied.

**B.     Dondero Fails to Demonstrate that Any Stay Is Warranted**

39.    Dondero's request for a stay of proceedings should be denied for several reasons.

40.    ***First***, if the Court denies Dondero's request for a mediation order (as the Highland Parties believe it should), then the Court should also deny his request for a stay on the ground that it would serve no purpose.

41.    ***Second***, even if the Court ordered mediation over the Highland Parties' objection, Dondero's request for a stay should still be denied because he has failed to meet his "heavy burden" of demonstrating that a stay is warranted. *Trojan Battery Co., LLC v. Golf Carts of Cypress, LLC*, 4:21-CV-03075, 2022 WL 970240, at *2 (S.D. Tex. Mar. 31, 2022) (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 203 n.6 (5th Cir. 1985)); *see also Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) ("A stay is not a matter of right, even if

-17-

irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the

party requesting a stay bears the burden of showing that the circumstances justify an exercise of

that discretion") (internal quotations omitted).

42.     "Only where there is something close to genuine necessity should a [] court grant a

discretionary stay based on its inherent power to do so[.]" *Badaiki*, 2021 WL 2935072 at *2

(internal quotations omitted); *see also Fed. Deposit Ins. Corp. v. Belcher*, CV 19-12561, 2020 WL

242781, at *3 (E.D. La. Jan. 16, 2020) ("Where 'there is even a fair possibility that the stay ... will

work damage to someone else,' the party seeking a stay 'must make out a clear case of hardship

or inequity in being required to go forward'") (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255

(1936)); *Bayoil Supply and Trading of Bah. v. Jorgen Jahre Shipping AS*, 54 F. Supp. 2d 691, 694

(S.D. Tex. 1999) (same).

43.     Dondero does not and cannot meet his high burden of demonstrating that a broad

stay is necessary even if mediation was ordered.  In fact, Dondero has already admitted as much.

In a motion filed shortly before this one, Dondero sought a substantially more limited stay.  *See

Defendants James D. Dondero, Dugaboy Investment Trust, and Strand Advisors, Inc.'s Motion for

Stay and Response to Plaintiff's Motion to Stay* [Docket No. 3702] at 5.  Moreover, Dondero's

unsupported and conclusory assertion that a stay is "necessary to preserve private and judicial

resources, and to preserve what is left of the Debtor's estate," Motion at 8, is both cynical (given

that he and his affiliates are the plaintiffs and appellants in nearly all of the litigation) and

insufficient to meet this high threshold.  *See Badaiki*, 2021 WL 2935072 at *2 (declining to

exercise its "wide discretion" to issue a stay pending mediation, finding any stay "inappropriate"

and explaining "[movant] has failed to even argue why a stay would be necessary should the Court

order mediation. Courts frequently direct parties to mediate without staying the case").

-18-

44.     Dondero's request for a stay is without merit and should be denied.

## **<u>CONCLUSION</u>**

45.     For the foregoing reasons, the Highland Parties respectfully request that the Court

deny the Motion in its entirety and grant such other and further relief as the Court deems just and

proper under the circumstances.

Dated: May 25, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:     jpomerantz@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and the*
*Highland Claimant Trust*

-20-