**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## REPLY IN SUPPORT OF JAMES D. DONDERO, DUGABOY INVESTMENT TRUST, GET GOOD TRUST, AND STRAND ADVISORS, INC.'S MOTION TO STAY AND TO COMPEL MEDIATION

## I.    INTRODUCTION

The Debtor's objection ("Objection") to the Dondero Defendants' Motion to Stay and to Compel Mediation (the "Motion") primarily recounts anecdotal incidents cherry picked to paint Mr. Dondero as unsavory, in an apparent effort to convince the Court that any mediation would be fruitless.  Likewise, the Dondero Defendants point to incidents demonstrating that the Debtor and its professionals have engaged in unsavory behavior solely for their own benefit.  In other words, neither side trusts the other.  That is not a reason to avoid mediation, but instead supports the notion that ordering the relevant parties to mediate would be more cost-effective than allowing them to continue their bitter disputes in various courts.

Mediation is also desirable because the Debtor's estate is trapped in a circular conundrum: The estate presently appears to have sufficient assets to pay Class 8 and Class 9 creditors in full, but the Debtor claims it cannot make such payments unless it resolves the claims asserted by the Dondero Defendants against indemnified parties.  Conversely, as long as the estate stays open, the Dondero Defendants must continue both to defend themselves against numerous lawsuits initiated by the Debtor and to pursue their claims either as contingent Class 10 and 11 creditors or as parties

1

to whom the Debtor owes fiduciary duties. Meanwhile, the sole beneficiaries of the open estate are the professionals being paid to administer it. A Court-ordered mediation can break the deadlock.

The Debtor's indignation does not change the fact that the Dondero Defendants have requested a global mediation several times since 2020. As discussed in the Motion, no such mediation has ever occurred, so it is difficult for any party-in-interest to argue that global mediation would be pointless. In any event, if the Debtor truly wants to stop litigating and resolve the estate (as opposed to continuing to run up legal fees to the detriment of all stakeholders), then mediation is the best method—the only method—to accomplish that goal at minimal cost and disruption. This Court is the only entity with the power to require these parties to make this effort. The Debtor offers no meaningful reason why a global mediation should not be attempted. The Dondero Defendants' Motion should be granted.

## II.    THE HISTORY OF MEDIATION

The Debtor has never mediated with Mr. Dondero or the Dondero Defendants. In the 2020 mediation with Sylvia Mayer and Judge Gropper ("2020 Mediation"), the Debtor engaged in bilateral negotiations with major creditors Acis, the Redeemer Committee, and UBS. Although Mr. Dondero was in a breakout room with his lawyers, the mediators did not solicit an offer from him, nor did any party make a demand on him. The Debtor does not dispute these facts.[1]

What is more, in the nearly three years since the 2020 Mediation, no party has articulated any settlement demands made on the Dondero Defendants. No party alleges that the Dondero

---

[1] Instead, the Debtor argues that it is "inconceivable" that Mr. Dondero's counsel, former Judge Lynn, "was unable to effectively communicate Dondero's position to the mediators," and Judge Lynn "could have and should have made it known" that Mr. Dondero felt "sidelined." Obj. at ¶ 25. The Debtor's musings aside, no party disputes that Mr. Dondero and his counsel were effectively non-participants in the 2020 Mediation.

Defendants responded unreasonably. Accordingly, the Debtor cannot argue that its non-existent history of prior mediations with the Dondero Defendants is evidence that a future mediation will fail, because the Debtor has never tried it. Indeed, the 2020 Mediation was designed to liquidate the Acis and UBS claims, not to settle with Mr. Dondero.[2] The Court itself stated that "the primary issues [were] the UBS proof of claim and the Acis proof of claim," that they were the "highest priorities," and that other claims and "satellite litigation out there" would be addressed later.[3] The Court's contemplated "second stage of mediation" never occurred, even though both the Acis and UBS claims were resolved.[4] It is about time that a second stage took place.

In 2021, Mr. Dondero again sought mediation. *See* Dkt. 2657. The Debtor responded that the Court should reject mediation or permit mediation only if the Dondero Defendants acceded to the Debtor's onerous conditions: (i) the Debtor alone would select the mediators, (ii) the Dondero Defendants would agree to stay or not assert any affirmative claims, (iii) the Debtor would be permitted to pursue its claims against the Dondero Defendants, and (iv) the Dondero Defendants would make a pre-mediation all cash offer including releases. *See* Dkt. 2756. As a result of these preconditions, no mediation occurred.

---

[2] July 14, 2020 Hr'g Tr., Ex. A, at 117:25 – 118:9 (Court: "So I feel like we've got to have mediation. We've got to get a strong shot at getting these two claims [Acis and UBS] liquidated, at least for voting purposes, if not overall. So, is this a pipe dream Mr. Seery, in your view, that mediation might get to resolution on these two claims? What do you think about it?" Seery: "The quick answer, Your Honor, is that I don't think it's a pipe dream. I think there's a legitimate shot to move parties together."); *id.* at 122:15 – 24 (Court: "Do you think we need to just zero in on Acis and UBS and maybe have one or two people to do formal video mediation with those two parties, or do we need sort of more of a grand pooh-bah, grand compromise-type person?" Seery: "My view, Your Honor, is that we should focus on the claims, but they're not just going to be two-party, because we do have other active constituents. I think Redeemer, with their party in interest status, is going to want to be part of it."); and at 129:3 – 5 (Court: "One would be the primary mediator on Acis, one would be the primary mediator on UBS, but they would both work together."). After 17 pages of discussion about mediation between the Debtor, Acis, and the UCC, the parties mentioned that Mr. Dondero would be a required party to the mediation, but only because he had filed a separate objection to the Acis claim. *Compare id.* at 116:9 – 132:22 *with id.* at 132:23 – 133:14.

[3] July 21, 2020 Hr'g. Tr., Ex. B, at at 100:2 – 7, 123:18 – 23.

[4] *Id.* at 124:1 – 4.

In its current Objection, the Debtor again urges the Court to reject mediation while offering an alternative to mediation with new one-sided preconditions. In particular, the Debtor offers mediation conditioned on (i) no provision of financial information, (ii) no stay, and (iii) a litany of pre-negotiation concessions regarding the terms of any ultimate settlement. *See* Obj. at ¶ 5, fn.4. For the reasons set forth below, the provision of financial information and a stay will create the highest likelihood of the parties entering into negotiations that result in a fair outcome for all parties and the highest cost savings to the estate. The Court should reject all prerequisite demands relating to terms that could be the subject of an ultimate settlement. That is for the parties to negotiate.

## III.   THE DEBTOR PROFFERS NO LEGITIMATE REASON WHY THE COURT SHOULD REFUSE A BRIEF STAY TO FACILITATE MEDIATION

The Debtor devotes the vast majority of its Objection to a recitation of Mr. Dondero's supposed litigation history, in an effort to prove that mediation would be pointless. That misleading history is largely irrelevant to the current issues in play, and so the Dondero Defendants address that history separately in Section IV, below. In terms of actual responsive legal argument, the Debtor provides no basis to deny the relief requested by the Dondero Defendants. The Debtor calls the Dondero Defendants' request for a stay "disingenuous" because of the Dondero Defendants' ongoing appeals and motion practice, but the Debtor misses the point: the Dondero Defendants are willing to engage in a stand-down—including a stay of the matters the Dondero Defendants have initiated in this bankruptcy proceeding—to facilitate a mediation. In fact, this is the second time the Dondero Defendants have offered up a total stand-down to facilitate a mediation, and the second time the Debtor has rejected the offer. As set forth below, the Debtor's two actual legal arguments provide no basis to deny the Dondero Defendants' Mediation Motion.

### A.    The Debtor's Argument Regarding Mediation Costs Is Meritless

Initially, the Debtor argues that it should not be compelled to mediate with *Mr. Dondero* (as opposed to the Dondero Defendants and other stakeholders more broadly) because the Debtor does not believe Mr. Dondero can be trusted to settle a dispute and because mediation would impose "significant additional costs on all parties involved."  Obj. at ¶¶ 33-35.  However, there is often mistrust between parties to litigation, and parties to litigation always vehemently disagree with positions taken by the other side.  Yet mediation is often successful even in the most acrimonious disputes, because parties in mediation do not deal directly with each other but deal with a neutral third party who can speak to the parties directly and give them an honest assessment of the circumstances of the case.  This process can facilitate settlement between parties that have monumental distrust between them or even cases with a myriad of parties that each have their own diverse interests, goals, and unique relationship histories with the other parties.  Distrust among parties is not a reason to refuse mediation; it is a reason to compel it.  Indeed, research shows that "the level of acrimony between the litigants in non-family civil cases does not seem to affect the likelihood of settlement in mediation."  Bobbi McAdoo, Nancy A. Welsh & Roselle L. Wissler, *Institutionalization: What do empirical studies tell us about court mediation?*, 9 DISP. RESOL. MAG. 8 (2003), at 9.  Nor does mandatory referral to mediation adversely affect settlement rates. *Id.* at 8.

As for "significant additional costs," the Debtor does little more than say these costs exist.  But it does not give any examples or reasoning as to why this might be so.  Mediation requires little additional effort by parties.  In this case, mediation fees would be split by all participants, and the parties could agree—as at least one example of a cost-saving measure—to limit the scope of mediation statements to minimize cost.  Mediation, in any format, would be

5

relatively inexpensive when compared to the *millions* of dollars in attorneys' fees alone that the estate will incur on its current path. The estimated *monthly* cash burn on the estate is $3.8 million.[5] It is difficult to imagine how mediation could be more costly than the litigation that it would replace.

None of the cases cited by the Debtor warrant a different result. For example, in *Badaiki v. Schlumberger Holdings Corp.*, the court denied a motion to compel mediation because the moving party did not show that mediation would be cost effective. 2021 WL 2935072, at *2 (S.D. Tex. Apr. 6, 2021). By contrast, the Dondero Defendants' Motion sets forth a myriad of reasons why the cost of continuing litigation is significant and why a mediated resolution would be far more cost-efficient.

The Debtor also cites to *In re Smith*, where the court declined to order mediation because the estate had not first received approval from the court to pay for a mediator or for the cost of lawyers attending the mediation. 524 B.R. 689, 702-03 (Bankr. S.D. Tex. 2015). That situation is completely inapposite here, where the Dondero Defendants are seeking the Court's order and blessing for a global mediation. Additionally, the *Smith* court's decision was based in part on its concern that the parties have their day in court, particularly because an individual in that case was being accused of fraudulently signing checks and was psychologically impacted by that accusation. *Id*. The Debtor argues that the same concern applies in this case—i.e., that it is entitled to seek "vindication" in Court—but that argument is particularly disingenuous in a public bankruptcy with multiple stakeholders (including unsecured creditors) who have no reason to care whether the

---

[5] According to Post-Confirmation Reports for the quarter ending December 31, 2022, the Debtor and the Claimant Trust have spent $99.6 million since the Effective Date, not including disbursements to Class 8 creditors. *See* Dkts. 3652, 3653. Even assuming $20 million reserved for the indemnity trust, this accounts for $3.8 million per month in the 21 months since the Effective Date.

6

Debtor vindicates itself or its professionals in ongoing litigation with the Dondero Defendants. Nor has the Debtor even attempted to describe what "vindication" it is supposedly seeking and entitled to vis-à-vis the moving parties on the Motion at issue, or how a crusade to vindicate its rights (or the rights of its professionals) at significant cost to the estate could possibly comport with the Debtor's fiduciary duties to creditors.

In summary, the Debtor offers no legitimate reason why mediation should not occur or would not be beneficial in this case if it could be accomplished quickly and efficiently.

### B.    The Debtor's Argument Regarding Stay Misses The Point

Nothing in the Debtor's Objection changes the fact that it is within the Court's sound discretion to stay these proceedings pending mediation. *See* Motion at 9; *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants.")).  Contrary to the Debtor's assertions, the Dondero Defendants do not have to meet a "heavy burden" to demonstrate that stay is appropriate.[6]  Rather, the Court has the power to stay these proceedings pursuant to its inherent power to manage its own docket, on any basis that it deems appropriate. *Landis,* 299 at 254-55.

Moreover, the Debtor's opposition to a stay is inconsistent with its statements before the Court.  In one of the most recent hearings, the Debtor's counsel argued, "they complain about legal

---

[6] The cases cited by Debtor required a "heavy burden" only when the moving party was seeking a stay of a federal court proceeding in favor of a non-federal court proceeding such as regulatory courts or arbitration.  That is not the case here.  *See Trojan Battery Co., LLC v. Golf Carts of Cypress, LLC*, 4:21-CV-03075, 2022 WL 970240, at *2 (S.D. Tex. Mar. 31, 2022) (staying the case where there was concurrent jurisdiction with the Trademark Board); *see also Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) (stay vacated by Supreme Court while the case was on appeal)(cited in Obj. at ¶ 41).

7

fees? We've put our pens down… we're just playing defense." *See* Hrg. Trans. June 8, 2023, Ex.

C at 377:16 – 24. The Debtor's counsel continued, "if they put their pens down, maybe there

would be a conversation." *Id.* at 379:9 – 10. In other words, the Debtor's counsel appears to agree:

a "pens down" stay is the best route to have a "conversation."

Further, as set forth in the Motion, the Dondero Defendants' request for a short stay to

facilitate mediation would preserve private and judicial resources and conserve what remains in

the Debtor's estate for the benefit of creditors and residual equity holders. Notably, the Debtor

does not deny that a stay would conserve resources. Instead, the Debtor cites to a string of cases

purportedly standing for the proposition that the court should not issue a stay pending mediation.

Once again, the cases cited by the Debtor are largely inapposite.

In *Trojan Battery Co. v. Golf Carts of Cypress, LLC*, for example, the court found that a

stay was not warranted where another adjudicatory body had concurrent jurisdiction over the issue

being litigated. 2022 WL 970240, at *2-*3 (S.D. Tex. Mar. 31, 2022). Specifically, in *Trojan*,

the moving party sought a stay of proceedings because the Trademark Board was simultaneously

reviewing the same allegations of potential infringement being reviewed by the court. *Id.* The

court declined to enter a stay based on its finding that the Trademark Board's determination would

not impact the outcome of the court case and because the Trademark Board had no authority to

award a monetary judgment. *Id.* Accordingly, a stay would not have conserved resources. By

contrast, here, the Dondero Defendants are asking the Court to stay all proceedings involving these

parties for judicial efficiency and to prevent the continued waste of fees. If the Court grants a stay,

the various proceedings stemming from this bankruptcy can potentially be resolved without further

judicial proceedings of any kind, unlike the case in *Trojan*.

The next case cited by the Debtor, *Bayoil Supply and Trading of Bah. v. Jorgen Jahre Shipping AS*, is likewise distinguishable.  That case involved parallel proceedings about the same incident but involving different parties and different claims.  54 F. Supp. 2d 691, 694 (S.D. Tex. 1999).  On those facts, the court found that staying one of the proceedings would not serve the interests of efficiency.  Here, the Dondero Defendants are not asking this Court to stay these proceedings in favor of another litigation elsewhere; the Dondero Defendants are requesting a stay of all proceedings before this Court to allow all of the parties involved to resolve all of the remaining claims at issue.

The Debtor's only real argument is that a stay will delay resolution of the estate by delaying asset recoveries and adjudication of Mr. Dondero's claims.  *See* Obj. ¶¶ 1, 29.  But nobody has suggested that the Debtor should slow the pace of asset sales, which as the Dondero Defendants have asserted, should cover the Class 8 and 9 claims.  Nor would a stay delay resolution of the "notes" cases before the District Court.[7]  And the Parties' disputes before this Court are at every possible procedural stage, so a short stay would not prejudice ultimate resolution of those matters. Additionally, as demonstrated by recent events, continued proceedings have tended to expand, rather than narrow, the number of outstanding disputes.  A stay permits asset monetization to proceed apace while slowing the asset burn afflicting the estate.

In the end, the Debtor's opposition amounts to little more than its belief that a brief stay would be more costly than cost-saving.  But it is indisputable that a stay would stop the professional spend in the case, cause parties to put pencils down, and significantly curtail the Court's

---

[7] Contrary to the Debtor's suggestion, *see* Obj. at ¶ 29, the Dondero Defendants are not asking this Court to stay appeals pending before the U.S. District Court for the Northern District of Texas or the Fifth Circuit Court of Appeals, which the Dondero Defendants agree this Court has no power to do.

9

obligations to preside over multiple fights between these parties, all while allowing the Debtor to pursue asset monetization. The Debtor does not and cannot argue otherwise. And it provides no other reason, other than its own desire to keep fighting the good fight, to reject a stay. That is not sufficient to overcome the Dondero Defendants' Motion.

### C.    A Reasonable Exchange Of Financial Information Is Necessary To Facilitate Resolution

The Debtor asserts that it already publicly disclosed all of the financial information that would be necessary for the Dondero Defendants to evaluate the estate's value and to offer meaningful solutions during mediation. This is false. What the Debtor provided were gross numbers—untethered to any audited financials and without backup documentation that would allow stakeholders to truly evaluate the estate's financial position—that are a far cry from the financial information at the Debtor's disposal.

In any event, the parties' dispute regarding disclosure of financial information only underscores why a mediator would be beneficial. A mediator could evaluate the Dondero Defendants' requests for information in the context of a potential global settlement, facilitate the exchange of information deemed necessary to resolution by the mediator, and allow the information to be exchanged in a manner that ensures confidentiality and protects the estate. Even if the Debtor is not inclined to share this information directly with Mr. Dondero and the other Dondero Defendants, any mediator would need to be provided with financial information sufficient to reassure the mediator that his or her understanding of the estate value and assets is correct so that he or she could fashion a resolution that makes economic sense. The Debtor has not and cannot articulate a real reason why it is unable to share basic financial information about the estate's value in order to bring these proceedings to a close.

10

D.     **The Debtor's Admissions About The Value Of The Estate Support Compelling Mediation**

Finally, the Debtor contends that resolution of the Dondero parties' affirmative claims against parties indemnified by the Debtor is the key gating issue to resolution of the estate. The Debtor does not dispute that the assets of the estate exceed its liabilities.[8] Instead, the Debtor points to the indemnity liabilities as the sole barrier to resolving the estate. At a recent hearing, the Debtor's counsel told the Court that estate assets "may" or "may not" exceed liabilities but that the issue was "irrelevant at the end of the day because of the indemnification claims." *See* Hr'g. Tr. dated Apr. 24, 2023, Ex. D, at 29:4 – 10. The Debtor's counsel repeated that mantra several times during the March 31, 2023 hearing in the Kirchner Adversary Proceeding:

- "The solvency of the estate will not be determined until indemnification obligations are finally determined." *See* Hr'g Tr. dated Mar 31, 2023 in Adv. 21-3076, Ex. E at at 21:23 – 25.

- "Creditors will not be paid anything as long as there are indemnification obligations, because they come first." *Id.* at 22:4 – 5.

- "We remain committed to fully implementing the plan, which, you know, at the risk of repeating myself, requires indemnification obligations to be satisfied before creditors are paid. And we remain committed to defending, you know, all charges against us." *Id.* at 32:16 – 20.

---

[8] Indeed, in all of the briefing regarding the Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets and (B) Nature of Plaintiffs' Interests in the Claimant Trust (the "Valuation Complaint"), filed by The Dugaboy Investment Trust and Hunter Mountain Investment Trust, the Debtor has never disputed that the estate's asset value exceeds the total claims. Moreover, the Valuation Complaint included a spreadsheet of assumed assets and liabilities of the estate, *see* Dkt. 3778, ¶ 18, and counsel for Dugaboy and HMIT has asked the Debtor to indicate where, if at all, the claimants' understandings about the assets and liabilities of the estate are incorrect. *See* Email dated May 10, 2023 from D. Deitsch-Perez to J. Morris, Ex. F ("As discussed at the hearing, and I reviewed the transcript to be sure, attached is the complaint you agreed to accept. You never responded to my last request for information so we have filed. However, if you look at the chart in paragraph 18, and can work with us on understanding the open issues and confirming the accuracy of our surmises, perhaps, particularly in conjunction with the mediation motion, we can resolve this. I look forward to hearing from you."). The Debtor has never done so.

11

Only mediation can resolve the indemnification obligations.  Otherwise, the parties will be faced with years of litigation and appeals.  Additional disputes continue to arise out of the historical business connections between the Debtor-related entities and the Dondero-related entities, as evidenced by the Debtor's recent Chapter 7 filing on behalf of a fund that owes money to one of the Dondero Defendants and the Debtor's newly-filed action for books and records related to SE Multifamily.  These, and any fresh disputes, will need to be litigated before this Court and others.

The Debtor continually observes that no other creditors join in the complaints filed by the Dondero Defendants.  However, in an estate where there are sufficient assets to pay all of Class 8 and 9 creditors, there is no one else to complain.  Dondero affiliates represent the estate's sole remaining impaired creditor classes: the Class 10 and 11 creditors.  As of now, the estate value in excess of the Class 8 and 9 claims may be directed either to Class 10 and 11 creditors through mediated settlement or to legal fees, professional fees, and indemnification through ongoing litigation.  The Dondero Defendants urge the Court to select the first path.

## IV.    THE DEBTOR'S ARGUMENTS REGARDING THE PARTIES' LITIGATION HISTORY ARE MISLEADING AND IRRELEVANT

As explained above, this case's history, and probable future, of bitter litigation is a reason to compel mediation, rather than to avoid it.  The Dondero Defendants nevertheless are compelled to address the Debtor's misleading recitation of that history.  To avoid wasting the Court's time on irrelevant issues, the Dondero Defendants address only the most egregious allegations of the Debtor's Objection.

### A.    The Debtor's Allegations Regarding Pre- And Post-Petition Litigation Involving UBS, Josh Terry, Acis, and Patrick Daugherty Are Wrong

The Debtor initially suggests that Mr. Dondero is "unable to settle" disputes, citing as examples litigation involving UBS, Acis/Josh Terry, and Patrick Daugherty.  *See* Obj. at ¶ 7.  It is

12

unclear how various other lawsuits not implicated by the Dondero Defendants' Motion (and which did not even involve most of the Dondero Defendants) are relevant to whether the Dondero Defendants are willing and able to resolve the *current* disputes actually involving the litigants in *this* Court. Putting that aside, the Debtor's suggestion that Mr. Dondero continues to litigate despite prior settlements is misleading at best.

*Litigation initiated by UBS.* The Debtor initially alleges that Mr. Dondero continues to litigate with UBS in New York "notwithstanding Highland's settlement with UBS." *See id.* However, the Debtor, not Mr. Dondero, has perpetuated that litigation:

- First, the Debtor's settlement with UBS explicitly permitted additional litigation against Mr. Dondero and his affiliates, including an 1,100-word, eight sub-section cooperation clause requiring the Debtor to assist UBS in such litigation. *See* Dkt. 2200 at Ex. 1, §1(c).

- Second, as part of that cooperation, UBS and the Debtor participated in intra-party litigation where the Debtor agreed to all the relief sought by UBS as plaintiff and also agreed on the first day of the case to a temporary restraining order that was substantively identical to the final relief granted—namely, an injunction that prevented the Debtor from paying an alleged affiliate of Mr. Dondero. *Compare* Adv. Pro. No. 21-03020 at Dkt. 21 *with* Dkt. 184. No Dondero-related entity was a party to this litigation, in which the Debtor incurred an undisclosed amount of legal fees for the benefit of UBS.

- Third, UBS launched a claim against an alleged Dondero affiliate, Sentinel Reinsurance. Even though Sentinel settled with UBS for amounts in excess of the alleged fraudulent transfer, UBS still wanted more. *See* Dkt. 3482 at Ex. 1.

- Fourth, after taking extensive pre-suit discovery through document and deposition subpoenas in Texas, UBS launched new litigation in New York against Mr. Dondero and others. Presumably, the Debtor continues to accrue legal fees behind the scenes as part of its ongoing cooperation obligations.

In short, the Debtor and UBS engineered a settlement that perpetuates litigation between UBS and Dondero affiliates, with the Debtor's cooperation, for years to come. It is thus UBS (assisted by the Debtor), and not Mr. Dondero, that has continued to pursue recovery against Mr. Dondero and

others, more than a decade after it initially sued the Debtor and other managed funds, and despite being paid three times over to settle the very claims it continues to pursue. That continued litigation says nothing about *Mr. Dondero's* ability or desire to resolve disputes out of court, and nobody has ever approached Mr. Dondero regarding settlement of the current UBS litigation. If anything, the continuing litigation might say something about *UBS's* proclivity to litigate post-settlement, but that has nothing to do with the Dondero Defendants' settlement behavior.

**Litigation initiated by Acis and Josh Terry.** Next, the Debtor argues that continued lawsuits between the Debtor, Joshua Terry, and Acis show that Mr. Dondero uses lawsuits to "extract revenge on perceived enemies." *See* Obj. at ¶ 6. However, it was Mr. Terry who sued the Debtor and others (forcing Mr. Dondero to defend the lawsuit) and Mr. Terry who forced Acis into involuntary bankruptcy. It was then the trustee for Acis that initiated a number of lawsuits to recover additional money for the Acis bankruptcy estate, even after creditors had been paid 102%, as detailed in Debtor's own objection to Acis's proof of claim in this bankruptcy. *See* Dkt. 771 at ¶ 2. As the Debtor explained in that objection, the only beneficiary of Acis's claims would have been Mr. Terry, whose individual claim was already paid in full. *Id.* Additionally, Acis sued Mr. Dondero individually in 2020 and initiated lawsuits against Mr. Dondero and others in New York even after the Debtor settled with Mr. Terry and Acis. Once again, this is evidence of Acis's proclivities for unending litigation, not Mr. Dondero's.[9]

**Litigation involving Patrick Daugherty.** The Debtor also points to a "bitter personal dispute" involving Patrick Daugherty but omits that it was Mr. Daugherty who filed the lawsuit.

---

[9] Notably, the original arbitration award that prompted Mr. Terry to put Acis into involuntary bankruptcy was only $8 million. *See* Dkt. 771, ¶ 1. As set forth above, Mr. Terry (like all other creditors) received payment in full of his claim in the Acis bankruptcy. *Id.* at ¶ 2. Yet in this bankruptcy case, Mr. Terry also received a $23 million Class 8 claim that will pay in full, plus reimbursement of significant legal fees he personally incurred.

*See* Dkt. 1099 at ¶ 1. The Debtor also fails to mention that the Delaware Chancery Court dismissed Mr. Daugherty's claims at the pleading stage, and the case continues only because *Mr. Daugherty* appealed the dismissal order. *Daugherty v. Dondero*, No. CV 2019-0956-MTZ, 2023 WL 461112 (Del. Ch. Jan. 27, 2023). Further, the only litigation initiated against Mr. Daugherty since the Debtor filed its petition was filed by Mr. Ellington, when he was forced to sue Mr. Daugherty for stalking him and his family members. In that litigation, Mr. Ellington has obtained a temporary restraining order and temporary injunction against Mr. Daugherty, based on the Court's finding that the lawsuit is likely to succeed on the merits. Once again, the Debtor's attempt to paint this litigation as "Dondero-fueled" is patently false.

**B.    The Debtor's Contention That "Litigation Follows" Even When Mr. Dondero Settles Also Rings Hollow**

The Debtor next suggests that Mr. Dondero fails to honor or comply with settlement agreements by pointing to litigation initiated by the Crusader Funds in Bermuda that occurred well prior this bankruptcy. *See* Obj. at ¶¶ 11-14. The now long-since-resolved litigation involving the Crusader Funds was instigated, both times over, by the funds and their constituents, not Mr. Dondero. What is more, Mr. Dondero neither objected to the Debtor's settlement with the Redeemer Committee for the Crusader Funds, nor disputed that money was owed to the Redeemer Committee as a result of the pre-petition litigation between the Redeemer Committee and Highland.[10] In short, Mr. Dondero has long since accepted that he lost the battle with the Crusader Funds/Redeemer Committee and has not attempted to unravel any settlement relating to them.

---

[10] By contrast, UBS *did* object to the Debtor's settlement with the Redeemer Committee and then appealed the Bankruptcy Court's ruling denying its objection. *See* Dkt. 2389 at p. 11. But nobody has ever challenged that objection as "frivolous." Notably, the Debtor's subsequent settlement with UBS was conditioned upon UBS's withdrawal of its appeal. *Id.*

**C.**     **The Debtor's Contention That All Professional Costs In The Case Were Occasioned By Mr. Dondero's Conduct Is Wrong**

Lastly, the Debtor insists the current "litigation burn rate" is "a product of Dondero's own conduct and nothing more." *See* Obj. at ¶ 31.  This contention is also false. The Debtor's conduct has driven much of the massive litigation burn rate in these proceedings.  Indeed, in *less than two months* since the Dondero Defendants' Motion was filed the Debtor has:

- Insisted on holding a full-day evidentiary hearing to resolve the channeling motion filed by Hunter Mountain Investment Trust, when the issue of channeling should be decided as a matter of law by the Bankruptcy Court;[11]

- Sought bankruptcy protection for two managed funds, setting The Dugaboy Investment Trust ("Dugaboy") up for multiple fights with Debtor that Debtor well knows only serve to erode Dugaboy's interest in those funds; and

- Filed a separate lawsuit against SE Multifamily Holdings LLC ("SE Multifamily") and HCRE Partners, LLC in Delaware Chancery Court seeking to inspect the books and records of SE Multifamily, notwithstanding that counsel for the relevant parties were engaged in negotiations regarding the inspection requested.[12]

In addition to these actions, the Debtor over the years has initiated multiple offenses, increasing the bankruptcy estate's professional fee spend without any real return to the estate. These actions by the Debtor include but are not limited to:

- Facilitating the Kirschner litigation, a lawsuit seeking to recoup funds that would only benefit defendants in the same litigation;[13]

- Filing multiple motions and fighting a multi-month battle to disqualify Wick Phillips Gould & Martin, LLP from serving as counsel to HCRE Partners, LLC;[14]

---

[11] Dkt. 3784.

[12] *See Highland Capital Mgmt., L.P. v. SE Multifamily Holdings, LLC, et al.*, Cause No. 2023-0493 (filed May 5, 2023).  Contrary to the Debtor's assertion (*see* Obj. at ¶ 9 n.7), HCRE did not "fail[] to comply" with the Debtor's request to inspect SE Multifamily's books and records but was in the process of negotiating with the Debtor regarding which books and records should be provided when, instead of responding to HCRE's correspondence, the Debtor chose to file its lawsuit.

[13] Dkt. 2934.

[14] Dkt. 2196, 2913.

16

- Promising to pay key employees their earned bonuses, and then terminating those employees and reneging on its payment obligations, leading to months of briefing and motion practice;[15]

- Filing multiple motions for sanctions against Mr. Dondero, his counsel, and others, forcing fights in multiple fora that continue to this day;[16]

- Filing an objection to HCRE's proof of claim, only to refuse to accept HCRE's later withdrawal of the proof of claim, and thereafter insisting on a multi-day trial to determine whether the claim was filed in "bad faith," leading to hundreds of thousands of dollars of unnecessary expense;[17]

- Filing an adversary proceeding seeking to compel NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA") to implement a "transition plan" (and to explain to the Debtor how to run its business) following the Debtor's decision to terminate its shared services agreement with NPA and HCMFA, resulting in countless depositions and a full-day evidentiary hearing;[18] and

- Filing a so-called "vexatious litigant" motion in the notes litigation against dozens of entities, despite the fact that the District Court has only limited appellate jurisdiction over the notes litigation and despite that many of the supposed "vexatious" litigants have never appeared in that litigation and are not parties to it.[19]

In short, the Debtor is at least equally guilty of running up unnecessary fees in this bankruptcy case. And as set forth in the Dondero Defendants' Motion, this wasteful pattern of conduct will undoubtedly continue until either the Debtor has either drained the estate of all residual value or the proceedings are stayed to facilitate mediation.[20]

---

[15] Dkt. 3001.

[16] Dkt. 2235, 2247, 2349.

[17] Dkt. 906, 3487.

[18] Dkt. 1935.

[19] Dkt. 102 at Ex. A.

[20] As depicted in the chart attached as Exhibit G, the Debtor and its professionals have systematically compromised with creditors, facilitated claims trades, and run up professional fees, all to the detriment of the estate.

## V.        CONCLUSION

The tenor of the Debtor's Objection only underscores why a short stay and mediation is appropriate in this case.  The Debtor's mistrust of Mr. Dondero, whether or not legitimate, prevents the Debtor from making any meaningful strides toward resolution of pending disputes involving the Dondero Defendants.  The Dondero Defendants, on the other hand, filed their Motion because they distrust the Debtor, its management, and other estate professionals, making involvement of a neutral mediator critical to any movement toward resolution by the Dondero Defendants.  The Debtor's only real response to the Motion is that the Debtor doesn't think mediation can work, which isn't an answer at all.  Often parties to litigation disagree about whether and how to resolve the disputes between them, but mediators are uniquely equipped to find paths to resolution.  For all the foregoing reasons, the Court should grant the Dondero Defendants' Motion.


Dated: June 16, 2023


DLA PIPER LLP (US)

/s/ *Amy L. Ruhland*
Amy L. Ruhland
Texas Bar No. 24043561
303 Colorado Street, Suite 3000
Austin, TX 78701
Tel: 512-457-7000
Fax: 512-457-7001
Email: amy.ruhland@us.dlapiper.com

Jason M. Hopkins
Texas Bar No.24059969
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Tel: 214-743-4500
Fax: 214-743-4545
Email: jason.hopkins@us.dlapiper.com

*Attorneys for Movants James D. Dondero, Strand
Advisors, Inc., The Dugaboy Investment Trust, and
Get Good Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 16, 2023, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.


/s/ *Amy L. Ruhland*
Amy L. Ruhland