Charles W. Gameros, Jr.
State Bar No. 00796956
Douglas Wade Carvell
State Bar No. 00796316
HOGE & GAMEROS, L.L.P.
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:  214-765-6002
Facsimile:  214-559-4905

**ATTORNEYS FOR NEXPOINT REAL ESTATE PARTNERS, LLC,
f/k/a HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | |
| **Movant,** | § | |
| | § | **Contested Matter** |
| **v.** | § | |
| | § | |
| **NEXPOINT REAL ESTATE** | § | |
| **PARTNERS, LLC, F/K/A HCRE** | § | |
| **PARTNERS, LLC,** | § | |
| | § | |
| **Respondent.** | § | |

## RESPONSE TO DEBTOR'S MOTION FOR (A) BAD FAITH FINDING
## AND (B) ATTORNEYS' FEES

# I.

## SUMMARY

With multiple lawyers working at billing rates in excess of $1,000 per hour, Highland Capital Management, L.P. ("Highland" or the "Debtor") defeated a proof of claim which NexPoint Real Estate Partners, LLC (f/k/a HCRE Partners, LLC) ("NREP") had sought to withdraw with prejudice. In other words, instead of taking a win, the Debtor and its lawyers chose to generate fees to get to the same result. The Debtor's attorneys' efforts, though totally unnecessary, were apparently very expensive. And so, through hundreds of additional pages at yet additional expense, the Debtor and its lawyers seek to invoke Rule 105(a) to saddle NREP with attorneys' fees which the Debtor never needed to incur with its Motion for (A) Bad Faith Finding and (B) Attorneys' Fees Against NexPoint Real Estate Partners, LLC [Docket No. 3851] (the "Motion").

Even the Debtor admits that the trial the Debtor insisted on "was a complete waste of judicial resources and of the Claimant Trust's assets."[1] But that waste of time and resources was the fault of the Debtor, not NREP, and there is no precedent for sanctioning NREP for hundreds of thousands of dollars under the circumstances of the case.

The Motion is without support in law or fact and should be denied.

---

[1]     *See* Motion at ¶ 3.

## II.

## PROCEDURAL HISTORY

1.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court"). The Delaware Court thereafter entered an order transferring venue of the Debtor's bankruptcy case (the "Bankruptcy Case") to this Court.

2.      On March 2, 2020, the Court entered its Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof [Docket No. 488] (the "Bar Date Order"), which, among other things, established April 8, 2020 as the deadline for all entities holding claims against the Debtor that arose before the Petition Date to file proofs of claim.

3.      On April 8, 2020, NREP timely filed its proof of claim (the "Proof of Claim") regarding its and the Debtor's interest in a limited liability company, SE Multifamily Holdings, LLC (the "Company"), pursuant to an amended limited liability company agreement (the "LLC Agreement").

4.      There is no other pending proceeding, lawsuit, or matter regarding the Proof of Claim or the claim made in the Proof of Claim. There is no other pending matter in the Bankruptcy Case involving NREP.

5.      On July 30, 2020, the Debtor objected to the Proof of Claim in its First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims [Docket No. 906] (the "Objection"). NREP responded to the objection on October 19, 2020 (the "Response").

6.    The Debtor's Fifth Amended Plan of Reorganization (the "Plan") [Docket. No. 1808] was confirmed by Order entered by the Bankruptcy Court on February 22, 2021 [Docket No. 1943], and the effective date of the Plan was August 11, 2021 [Docket No. 2700].

7.    A year after NREP filed its Proof of Claim, and eight months after the Debtor filed its Objection, the Debtor sought to disqualify NREP's then–counsel Wick Phillips Gould & Martin LLP [Docket Nos. 2196 and 2893]. Following notice and hearing, the Court entered an Order granting in part and denying in part the Debtor's motion to disqualify, in which the Court specifically denied the Debtor's request that NREP "reimburse all costs and fees incurred in making and prosecuting the Motion." [Docket No. 3106].[2] Thereafter, as directed by the Court, NREP secured new counsel, and, on January 14, 2022, the undersigned counsel appeared.

8.    Six months later in June of 2022, the Debtor and NREP entered a Scheduling Order regarding the Proof of Claim [Docket No. 3356], after which the parties engaged in six depositions, document and written discovery, and third-party discovery.

9.    On August 12, 2022, NREP filed a motion to withdraw its Proof of Claim [Docket No. 3442]. The Debtor opposed the withdrawal [Docket No. 3487]. After NREP filed its reply [Docket No. 3505], the motion was heard on September 12, 2022, and the Court entered a written order denying the motion on September 14, 2022 [Docket No. 3518].

10.    This contested matter was tried on November 1, 2022. At the time of the hearing, there was no other pending proceeding, lawsuit, or dispute regarding NREP's Proof of Claim, or the allegations made in the Proof of Claim, involving NREP.

---

[2]    The Court further denied the Debtor's request that NREP disclose all communications between the company or its then–attorneys and certain individuals regarding NREP's Proof of Claim. *See* Docket No. 3106, at p. 4 ("Highland's request that HCRE disclose all communications it (or anyone purporting to act on its behalf, including Wick Phillips) has had with Mark Patrick and Paul Broaddus concerning HCRE's Claim is **DENIED**.").

11.     After the hearing, the Debtor and NREP submitted post-hearing briefs [Docket Nos. 3635 and 3641, respectively].

12.     The Court, by written Memorandum, Opinion and Order, sustained the Debtor's Objection to the Proof of Claim and disallowed the claim [Docket No. 3766] on April 28, 2023. The Court also denied the Debtor's then claim for its "costs" for alleged bad faith filing.[3]

13.     The Debtor filed the present Motion on June 16, 2023 [Docket No. 3581] along with a 436-page Declaration in support [Docket No. 3852].

14.     This Response follows.

## III.

## FACTUAL BACKGROUND

### A.     NREP Had a Good Faith Basis to File Proof of Claim No. 146

15.     Contrary to the Debtor's assertions, NREP had a good faith basis to file its single Proof of Claim in the Bankruptcy Case. As this Court has acknowledged, this is a complex bankruptcy involving numerous entities owned and managed by the Debtor.[4] At its peak, Highland had billions of dollars of assets under management.[5]

16.     As the Debtor's former CEO, James Dondero, has testified, he had a host of responsibilities across a sprawling and sophisticated corporate structure and relied on numerous

---

[3]     *See* Docket No. 3766 at p. 39 ("the Reorganized Debtor's motion at Trial for sanctions against HCRE in the form of reimbursement of the Reorganized Debtor's costs in connection with its Objection to the HCRE Proof of Claim allegedly filed in bad faith **BE, AND HEREBY IS, DENIED**, without prejudice, as being procedurally deficient.").

[4]     *See* Plan, Docket No. 1943 at ¶ 6 ("In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor.").

[5]     *See* Plan, Docket No. 1943 at ¶ 4 ("The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940."); at ¶ 5 ("Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments.").

individuals within that structure to help manage the day-to-day operations of Highland and its subsidiaries and managed funds.

17.     NREP is a Delaware limited liability company, distinct from the Debtor, with more than one member (*i.e.*, owner).[6] Although Mr. Dondero was a member and manager of NREP, he relied on others to help manage that entity as well.[7]

18.     It is undisputed that Mr. Dondero tasked the law firm Bonds Ellis (then led by former Northern District of Texas Bankruptcy Judge D. Michael Lynn) with filing NREP's Proof of Claim.[8]

19.     It is also undisputed that Mr. Dondero had authority to sign the Proof of Claim for and on behalf of NREP.[9]

20.     Although Mr. Dondero testified that he did not recall reviewing the Proof of Claim before it was filed,[10] he testified that he relied on the attorneys at Bonds Ellis to prepare the Proof of Claim.[11]

21.     Moreover, Mr. Dondero believed that Bonds Ellis had worked with some of the other staff to prepare NREP's Proof of Claim.[12] Specifically, Mr. Dondero testified at some length as to the process by which complex documents, such as NREP's Proof of Claim No. 146, were

---

[6]     *See* Hearing Transcript, p. 78, ll. 12 – 15.

[7]     *See* Hearing Transcript, p. 79, ll. 12 – 16.

[8]     *See* Hearing Transcript, p. 55, ll. 23 – 25.

[9]     *See* Claimant's Trial Exhibit 3 at p. 3; Hearing Transcript p. 55, ll. 10 – 15.

[10]    *See* Hearing Transcript, p. 55, ll. 19 – 22.

[11]    *See* Hearing Transcript, p. 56, ll. 1 – 18.

[12]    *See* Hearing Transcript, p. 57, ll. 14 – 24.

signed.[13] For example, Mr. McGraner, who also holds a membership interest in NREP, was consulted by Bond Ellis as a part of the process.[14]

22.    At trial, Mr. Dondero described the process as follows:

`I sign a lot of high-risk documents and I have to rely on the`
`process and the people and internally and externally as part`
`of the process to sign it without direct validation from or`
`verification from me, and this is another one of those items.`[15]

23.    There is no evidence in the record controverting that statement or suggesting it is untrue in any way.

24.    Indeed, Mr. Dondero testified that he neither interfered in the process of preparing NREP's Proof of Claim nor did Bonds Ellis seek his personal input in preparing the Proof of Claim.[16]

25.    In short, in signing NREP's Proof of Claim, NREP, through Mr. Dondero, relied on the advice of counsel, Bonds Ellis, who consulted with members of Mr. Dondero's staff in ascertaining the basis for the Proof of Claim.[17]

---

[13]    *See* Hearing Transcript, pp. 60 – 61, ll. 12 – 20, 1 – 5 ("Q. Mr. Dondero, you testified about the process for signing the LLC agreements, the KeyBank loan, and even the proof of claim. Would you please tell the Judge what the process is? A. Well, it's different in everything, but any significant transaction goes through compliance and any significant transaction that includes multiple entities goes through rigorous compliance whereby, by compliance, without direct input of the investment people, investigate the basis of the transaction in the fairness of tr- — of the transaction and then sign off on that transaction. You know, so on any kind of investment, a normal — I know it's changed in the new Highland, but — but a normally-compliant advisor goes through a rigid, rigorous process regarding any sale of an asset. As far as bankruptcy and the complexities of a bankruptcy that takes odd twists and turns, and just the complexities of this bankruptcy in particular and the betrayal of the estate by insiders, you know, et cetera, you have to rely on outside counsel and you have to rely on — you have to rely on outside counsel and you have to rely on their expertise in the bankruptcy process.").

[14]    *See* Hearing Transcript, p. 75, ll. 3 – 8.

[15]    *See* Hearing Transcript, p. 58, ll. 17 – 20.

[16]    *See* Hearing Transcript, p. 60, ll. 12 – 18.

[17]    *See* Hearing Transcript, p. 57, ll. 14 – 24.

---

**B.**    **NREP's Proof of Claim Sought to Reallocate Equity Holdings**

26.    At the time NREP filed its Proof of Claim, it had good reason to seek reallocation

of the equity ownership in SE Multifamily.

27.    The operative text of Proof of Claim No. 146 reads:

### Exhibit A

HCRE Partner, LLC ("Claimant") is a limited partner with the Debtor in an entity called SE Multifamily Holdings, LLC ("SE Multifamily"). Claimant may be entitled to distributions out of SE Multifamily, but such distributions have not been made because of the actions or inactions of the Debtor. Additionally, Claimant contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does belong to the Debtor or may be the property of Claimant. Accordingly, Claimant may have a claim against the Debtor. Claimant has requested information from the Debtor to ascertain the exact amount of its claim. This process is on-going. Additionally, this process has been delayed due to the outbreak of the Coronavirus. Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days.

*See* Claimant's Trial Exhibit 3 at p. 5.

28.    As NREP and its counsel previously explained, the central issue raised by the Proof

of Claim was whether Highland had an improperly large equity allocation in SE Multifamily given

the size of its investment and contribution.[18]

---

[18]    *See* Docket No. 1212, p. 2, ¶ 5 ("[NREP] believes the organizational documents relating to SE Multifamily Holdings, LLC (the 'SE Multifamily Agreement') improperly allocates the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration. As such, [NREP] has a claim to reform, rescind and/or modify the agreement.").

29.     Contrary to the implication of the Motion, this is exactly what Claimant's witnesses testified to at trial:

    a.     The Debtor provided only nominal capital;[19]

    b.     The Debtor was supposed to provide services, but it stopped doing so;[20]

    c.     The Debtor was to supposed provide IT and employees as needed, but stopped doing so;[21]

    d.     The SE Multifamily LLC agreement allowed amendment, but the bankruptcy was too contentious for the parties to agree to appropriate language amending the amendment.[22]

30.     In short, the deal should have changed by virtue of the performance of the portfolio and the lack of ongoing support from the Debtor, but it did not.[23]

31.     Moreover, given the contentious bankruptcy, NREP had legitimate concerns that the Debtor would interfere in the operations of SE Multifamily.[24]

32.     NREP's Proof of Claim was prepared by counsel, was filed on advice of counsel, and was signed and filed in good faith.

---

[19]     *See* Hearing Transcript at p. 30, ll. 20 – 24/

[20]     *See* Hearing Transcript at pp. 30 – 31, ll. 25, 1 – 7.

[21]     *See* Hearing Transcript at p. 71, ll. 18 – 22.

[22]     *See* Hearing Transcript, p. 73, ll. 6 – 15.

[23]     *See* Hearing Transcript, p. 117, ll. 4 – 25.

[24]     *See* Hearing Transcript, pp. 74 – 75, ll. 23 – 25, 1 – 2; p. 37, ll. 9 – 14.

C.      **The Debtor's Fee Demand is Excessive**

33.      Aside from the Motion to Disqualify, this entire dispute involved a single hearing — on NREP's Motion to Withdraw its Proof of Claim — and a one-day evidentiary hearing made necessary by the Debtor's objection to the withdrawal of NREP's claim. The Debtor also insisted on taking additional discovery in advance of that hearing that could and should have been avoided altogether. The Debtor now seeks attorneys' fees (excluding fees for the Motion to Disqualify)[25] totaling $809,776.50,[26] plus expenses of $16,164.05.[27]

34.      This is *per se* excessive for a single proof of claim objection.

35.      Nor is there sufficient evidence appended to the Debtor's Motion to ascertain why the Debtor incurred such extreme expense. For example, the identities of the timekeepers in Exhibit F to the Motion are not disclosed, and they only appear by initial. Some of those timekeepers are identifiable, but it is unclear who the initials "BEL," JMF," or "RMS" are meant to identify. No one with these initials receives notice of filing through the Court's ECF system associated with this dispute.

---

[25]      *See* Docket No. 3106 (denying fees for disqualification).

[26]      *See* Docket No. 3852-9, p. 2.

[27]      *See* Docket No. 3852-7, p. 2.

36.    Compiling the remaining entries from Debtor's Exhibit F into a table for easier review yields Table 1.

**Table 1.**

| INVOICE & DATE | GREG DEMO | JOHN MORRIS | LISA CANTY | HALEY WINOGRAD | JEFF POMERANTZ | JORDAN KROOP |
|---|---|---|---|---|---|---|
| | $1,095/hr | $1,395/hr | $495/hr | $750/hr | $1,445/hr | $1,195/hr |
| 128567 8/31/2021 | 0.2 $190 | 0 | 0 | 0 | 0 | 0 |
| 130114 4/30/2022 | 0 | 2.3 $3,015.00 | 0 | 0 | 0 | 0 |
| 130358 5/31/2022 | 1.1 $1,204.50 | 13.0 $18,135.00 | 3.0 $594.00 | 21.5 $16,125.00 | 0 | 0 |
| 130483 6/30/2022 | 2.1 $2,230.50 | 12.2 $17,019.00 | 2.3 $1,138.50 | 17.3 $12,975.00 | 0 | 0 |
| 130587 7/31/2022 | 1.2 $1,314.00 | 28.2 $39,339.00 | 33.9 $16,780.50 | 83.4 $62,550.00 | 0 | 0 |
| 130890 8/31/2022 | 13.8 $15,111.00 | 77.1 $107,554.50 | 43.3 $21,433.50 | 42.0 $31,500.00 | 10.9 $15,750.50 | 15.3 $18,283.50 |
| 131065 9/30/2022 | 3.5 $3,832.50 | 31.4 $43,803.00 | 0 | 18.1 $13,575.00 | 3.5 $5,057.50 | 6.0 $7,170.00 |
| 131290 10/31/2022 | 2.7 $2,956.50 | 79.8 $111,321.00 3.7 (travel) $2,580.75 | 5.3 $2,623.50 | 76.2 $57,150.00 3.5 (travel) $1,312.50 | 0.5 $722.50 | 0 |
| 131454 11/30/2022 | 8.5 $9,307.50 | 26.7 $37,246.50 5.3 (travel) $3,696.75 | 25.4 $12,573.00 | 23.9 $17,925.00 6.0 (travel) $2,250.00 | 0 | 0 |
| 131566 12/31/2022 | 0 | 5.7 $7,951.50 | 1.6 $792.00 | 2.2 $1,650.00 | 4.3 $6,213.50 | 0 |
| **Total Hours** | **33.1** | **285.4** | **114.8** | **294.1** | **19.2** | **21.3** |
| **Total Fees** | **$36,146.50** | **$391,662.00** | **$55,935.00** | **$217,012.50** | **$27,744.00** | **$25,453.50** |

37.     Two lawyers, Mr. Morris and Ms. Winograd, billed for travel at $6,277.50 and
$3,562.50 respectively.

38.     The combined fees from the unidentified timekeepers are as follows: (1) BEL: 1
hour at $1,045 per hour for a total of $1,045; (2) JMF: 15.1 hours at $1,145 per hour for a total of
$17,289.50; and (3) RMS: 0.6 hours at $1,025 per hour for a total of $615.00.

39.     Moreover, an examination of how these unidentified timekeepers spent their time
reveals that much of it was unrelated to the core issues involved in this dispute. For example,
"JMF" largely spent their time researching "IRS claims" and "3173 claims" and "veil piercing" in
the 5th Circuit.[28] None of these issues were germane to either NREP's Proof of Claim or the
Debtor's objection to it.[29]

40.     "RMS" billed for a phone conference with Ms. Winograd in October 28 on the eve
of the evidentiary hearing for "Legal research regarding contract."[30]

41.     "BEL" billed related to HCRE (NREP) discovery requests, but what they actually
did is unknown.[31]

42.     The Debtor also seeks fees for Mr. Agler for 39 hours of work he performed at $700
per hour in August of 2022 for tax analysis.[32] Notably, the presented invoice indicated that it was
"unbilled" work.[33] Whatever work he did, it did not manifest itself in the proceeding.

---

[28]     *See Docket No. 3852-6, pp. 67, 77, 78, and 79 of 127.*

[29]     "Veil Piercing" in particular was not argued at hearing, which may indicate the frailty of the
Debtor's implied argument in the Motion that the NREP is not the discrete entity that it is.

[30]     *See Docket No. 3852-6, p. 110 of 127.*

[31]     *See Docket No. 3852-6, pp. 21 and 32 of 127.*

[32]     *See Docket No. 3852-8.*

[33]     *See Docket No. 3852-8, p. 4 – 6 of 6.*

43.    After NREP's Motion to Withdraw was filed — which would have had the same

effect as sustaining the objection and disallowing NREP's claim — the Debtor's lawyers billed an

additional $371,870.50 from September to the end of December 2022.

44.    Of the costs of depositions sought, $16,164.50, $8,824.95 (just over half of the

total), was incurred after NREP's Motion to Withdraw was filed.[34]

45.    In short, some of the expenses that the Debtor seeks to make NREP pay for do not

relate to the parties' dispute at all, were incurred by layers of timekeepers whose identities and

roles have not been disclosed, and are otherwise extraordinarily high given that this dispute could

have been brought to a swift close many months ago.

## IV.

## ARGUMENT & AUTHORITIES

**A.    Standards**

46.    Alleging NREP's Proof of Claim No. 146 was filed in bad faith, the Debtor moves

the Court to sanction NREP solely under the Court's 11 U.S.C. § 105(a) "inherent powers." That

section of the Bankruptcy Code reads:

> The court may issue any order, process, or judgment that is necessary or appropriate to
> carry out the provisions of this title. No provision of this title providing for the raising of
> an issue by a party in interest shall be construed to preclude the court from, sua sponte,
> taking any action or making any determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of process.[35]

47.    "The Fifth Circuit has found that 'the 'bad faith' actions must occur in the course

of litigation' and that the bad faith exception 'does not address conduct underlying the substance

of the case; rather, it refers to the conduct of the party and the party's counsel during the litigation

---

[34]    *See* Docket No. 3852-7, p. 2 of 12.

[35]    *See* 11 U.S.C. § 105(a).

of the case.' Moreover, the Fifth Circuit has described that the conduct required to invoke the exception to the American Rule must be 'callous and recalcitrant, arbitrary, and capricious, or will-full, callous, and persistent.'[36]

48.    Notably, the Debtor must demonstrate by "clear and convincing" evidence that the Court should invoke its inherent powers to issue a sanction.[37]

49.    The Debtor cannot meet this burden.

## B.    NREP Did Not Act In "Bad Faith" In Filing The Proof Of Claim

50.    The Debtor's evidence is insufficient to demonstrate that NREP filed its claim in bad faith. Notably, a creditor may file a proof of claim in bankruptcy even without "conclusive proof of the claim at the time of filing."[38] Indeed, a "good-faith belief based on a reasonable inquiry is sufficient if the factual contentions . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."[39] A successful objection to a claim is not a sufficient reason to order sanctions because "[t]he process of objecting to claims is a normal proceeding within the Bankruptcy Court and not one which should normally subject the claimant

---

[36]    *See In Re Rastan*, 462 B.R. 201, 210 (Bankr. N. D. Tex. 2011) (citations omitted).

[37]    *See National Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 219 (5th Cir. 2023) ("We review de novo a district court's invocation of its inherent power and the sanctions granted under its inherent power for an abuse of discretion." The courts have certain implied and inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' These powers include the 'outright dismissal of a lawsuit' and a court's ability to 'vacate its own judgment upon proof that a fraud has been perpetrated upon the court.' 'Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.' Accordingly, we uphold a lower court's decision to invoke its inherent sanctioning power only if *clear and convincing* evidence supports the court's finding of bad faith or willful abuse of the judicial process.") (citations omitted) (emphasis added).

[38]    *In re Wingerter*, 594 F.3d 931, 941 (6th Cir. 2010).

[39]    *In re Wingerter*, 594 F.3d at 941.

---

to sanctions if he loses."[40] Further, the proof of claim process "does not exist to discipline those

who file erroneous proofs of claim."[41]

51.     For example, where a creditor filed a proof of claim but later withdrew it after the

debtor objected that no supporting documentation existed to support the claim, the Sixth Circuit

held that sanctions were unwarranted.[42] In that case, the creditor relied on a third–party's

representation that the claim was valid, but even that did not merit the sanction requested. As the

Court explained, "even weak evidence is generally enough to avoid sanctions."[43] Similarly, courts

have declined to issue sanctions where a claimant files a claim based on a mistaken belief or

unenforceable debt.[44]

52.     In the Motion, the Debtor argues that sanctions are appropriate for two reasons: (1)

the SE Multifamily Amended LLC Agreement rendered NREP's claim legally unenforceable; and

(2) Mr. Dondero allegedly signed the Proof of Claim "without a reasonable basis to believe the

Proof of Claim was 'true and correct."[45] However, filing a proof of claim that turns out to be

legally unenforceable is not sanctionable conduct.[46] Moreover, Mr. Dondero testified that he relied

on counsel (who he believed had investigated the claim, including by talking to other responsible

employees) when signing the Proof of Claim.[47] These circumstances are akin to *In re Wingerter*,

---

[40]     *In re Lawler*, 73 B.R. 515, 521 (Bankr. N.D. Tex. 1987).

[41]     *In re Trevino*, 535 B.R. 110, 138 (Bankr. S.D. Tex. 2015).

[42]     *In re Wingerter*, 594 F.3d at 940-41.

[43]     *In re Wingerter*, 594 F.3d at 940 (citing *Davis v. Carl*, 906 F.2d 533, 536-37 (11th Cir. 1990)).

[44]     *See Countrywide Homes Loans, Inc. v. McDermott*, 426 B.R. 267, 278 (N.D. Ohio 2010) ("[I]t was
an abuse of discretion for the bankruptcy court to hold that the mistaken filing of two documents amounted to
sanctionable conduct under Section 105."); *In re Pearce*, 411 B.R. 303, 308 (Bankr. E.D. La. 2008) ("[T]he court does
not find that merely filing a proof of claim on a prescribed debt, with nothing more, is evidence of bad faith.").

[45]     *See* Docket No. 3851 at ¶ 2.

[46]     *In re Pearce*, 411 B.R. at 308.

[47]     *See* Hearing Transcript, p. 58, ll. 17 – 20.

---

a case that is more similar to this one than any of the cases the Debtor cites. Here, as in *Wingerter*, the claimant reasonably relied on others when filing the proof of claim, which ultimately proved unsuccessful.[48] The Sixth Circuit held that reliance on others was not sanctionable conduct, any more than it is here.[49]

53.      Notably, at the evidentiary hearing on NREP's Proof of Claim, counsel for the Debtor repeatedly asked for a "bad faith" finding.[50] The Court's Order sustaining the Debtor's Objection and disallowing Proof of Claim 146 did not make a finding of bad faith.[51] The Court has already had an opportunity to weigh in on this, and after hearing the testimony, declined to make the finding requested. There is no basis for the Court to do so now.

54.      For its part, Debtor cites four cases for the Court's exercise of its inherent powers under Section 105 of the Bankruptcy Code: *In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008); *In re Brown*, 444 B.R. 691, 695 (Bankr. E.D. Tex. 2009); *In re Paige*, 365 B.R. 632 637 – 639 (Bankr. N.D. Tex. 2007), and *In Re Lopez*, 576 B.R. 84, 93 (S.D. Tex. 2017). *None* of these cases support imposing any sanction on NREP under inherent powers.

55.      *In re Yorkshire, LLC* involved a manager's surreptitious bankruptcy filing of a limited liability company made expressly to harm some of the members of the company. Specifically, the Fifth Circuit found that "the Bankruptcy Court concluded that 'the bankruptcy cases were filed when Knight got dissatisfied with his state law remedies and decided to inflict injury on the Luedtkes. Accordingly, the bankruptcy cases were filed with a bad motive and with

---

[48]      *In re Wingerter*, 594 F.3d at 940-941.

[49]      *In re Wingerter*, 594 F,3d at 940-941.

[50]      *See* Hearing Transcript, pp. 32 – 33, ll. 23 – 25, 1 – 6; p. 196, ll. 17 – 22.

[51]      *See generally* Docket No. 3766.

no meaningful thought being given to the actual purposes of chapter 11 bankruptcy.'"[52] Here, by contrast, there was no way for NREP to protect its interests in light of the HCMLP bankruptcy but to file its proof of claim in an already existing bankruptcy case; moreover, there was no testimony adduced that demonstrated any animus, bad faith, or ill motive on the part of NREP.

56.     *In re Brown* is even farther afield. There, the bankruptcy court sanctioned a loan servicer without, as prayed for here, a finding of bad faith;[53] instead, the sanction was driven by the servicer's conduct with respect to a consumer's home.[54] Notably, *Brown* did not deal with a single proof of claim in a case in which, as here, many, many proofs of claim have been filed.[55]

57.     *In re Paige* dealt with a Chapter 7 debtor surreptitiously selling cars from a bankruptcy estate without authority to do so.[56] Unlike the instant case, Paige knew he lacked authority to sell the cars and knowingly sold them anyway without the Trustee's "knowledge or

---

[52]     *See In re Yorkshire, LLC*, 540 F.3d 328, 331 (5th Cir. 2008).

[53]     *See In re Brown*, 444 B.R. 691 695 (Bankr. E.D. Tex. 2009) ("The Court, having considered the evidence and arguments presented by the parties, finds that Citi and Hughes Watters Askanase did not act in bad faith or with improper motive. However, the Court concludes that Citi and Hughes Watters Askanase did act with reckless disregard of their duty to this Court by attempting to remedy their lapses in a careless fashion and only after the debtor challenged Citi's standing. Citi and Hughes Watters Askanase failed to present any testimony or other evidence establishing that their motions seeking relief from the automatic stay and the co-debtor stay had a reasonable basis in fact and law.").

[54]     This Court has previously noted that the rationale for sanctions in *In re Brown* was that court's concern about the "high degree" of reliability of a motion for relief from the automatic stay to foreclose on a debtor's home. *See In Re Rastan*, 462 B.R. at 211. In another loan servicer case, this Court declined to impose sanctions on facts similar to *In re Brown*. *See In re Cunningham*, Adversary No. 07–03012 2008 WL 1696756, * 16 (Bankr. N. D. Tex. Apr. 9, 2008) ("The court is not sufficiently convinced that Dovenmuehle's conduct has been anything more than grossly inattentive in this matter (as opposed to egregious or in bad faith). Dovenmuehle was inattentive in the Cunningham matter, no doubt, because of the relatively small dollars involved. This is very sad—since this was Ms. Cunningham's home for 25 years, and she deserved for people to be more attentive to her situation than they apparently have been, during her three-year nightmare in bankruptcy.").

[55]     *See* Hearing Transcript, p. 62, ll. 12 – 18.

[56]     *See In re Paige*, 365 B.R. 632, 634 (Bankr. N. D. Tex. 2007) ("The Court considers the motion of Kent Ries ('Ries'), the chapter 7 trustee, requesting that the Court sanction the debtor, Robert Paige ('Paige'), for his unauthorized taking and selling of four classic cars.").

consent."[57] The fact that Paige tried to purchase the cars from the Trustee[58] prior to selling them

surreptitiously highlighted Paige's knowing misconduct, such that the *Paige* court concluded his

"conduct was intentional, deceitful, and done in bad faith and falls squarely within the Court's

purview and power under section 105 of the Bankruptcy Code." [59] By contrast here, NREP filed

its legitimate proof of claim on advice of counsel. There was no attempt by NREP to steal from

any estate, and no intentional, deceitful, or bad faith conduct.

58.     Lastly, *In re Lopez* concerned a debt collector's actions in an adversary proceeding

in which it was accused of violating the automatic stay and of discovery misconduct.[60] Notably,

the cause(s) of the sanctions involved over 1,000 attempts to improperly contact a debtor in

violation of the automatic stay,[61] and during the course of the case, the defendant was repeatedly

warned, compelled, and ultimately sanctioned for its discovery misconduct.[62] Although the *Lopez*

---

[57]     *See In re Paige*, 365 B.R. at 636 ("The issue before the Court is whether the Court can and should sanction Paige for his conduct in taking and selling the four cars without the trustee's, Ries', consent or knowledge, and, in fact, before he had entered into the settlement agreement with the trustee. Ries contends that Paige's actions 'were unconscionable, lacked any resemblance of the good faith required by the settlement agreement he signed with the Estate, and are in direct violation of his statutory duties under Bankruptcy Code § 521.' Severe sanctions are justified, according to Ries, because Paige's actions were taken in an attempt to profit himself at the estate's expense and are consistent with Paige's conduct throughout the case that has resulted in "generally meritless litigation at every turn.").

[58]     *See In re Paige*, 365 B.R. at 639 ("Paige wrongfully took and sold the four cars without the trustee's consent. His offers to purchase the four cars from the trustee reflect an intent to both conceal the sale from the trustee and to profit himself from the sale. Paige's conduct constitutes a failure to cooperate with the trustee and to account to the trustee regarding estate property.").

[59]     *See In re Paige*, 365 B.R. at 639.

[60]     *See In re Lopez*, 576 B.R. 84, 88 (S.D. Tex. 2017) (incorporating by reference three prior Memoranda, "ECF No. 93 at 2–5 (the "*First Memorandum Opinion*"); *In re Lopez*, 2015 WL 1207012, at *1 (Bankr. S.D. Tex. Mar. 12, 2015); ECF No. 145 at 1–3 (the "*Second Memorandum Opinion*"); *In re Lopez*, 2015 WL 5438850, at *1 (Bankr. S.D. Tex. Sept. 14, 2015); ECF No. 158 at 2–11 (the "*Third Memorandum Opinion*"); *In re Lopez*, 2015 WL 7572097, at *1 (Bankr. S.D. Tex. Nov. 24, 2015).").

[61]     *In re Lopez*, Case No. 13–07019, 2015 WL 1207012, *1 (Bankr. S.D. Tex. Mar. 12, 2015) ("Although Portfolio wishes to be relieved of all liability for attempting approximately 1,000 communications with Marcos Lopez because it now claims that Marcos Lopez owes nothing to Portfolio, the Court will not allow such absolution until there has been a full exposition of the facts that would justify amnesty for Portfolio's alleged conduct.").

[62]     *In re Lopez*, 2015 WL 1207012, at *1 ("At a May 20, 2014 hearing, the Court granted the emergency motion and informed counsel for Portfolio that "[y]ou-all are not complying with discovery."). *In re Lopez*, 2015 WL 5438850, at *1 ("Plaintiff again requested sanctions in a Motion for Sanctions ("Second Motion for Sanctions"). [ECF

---

court cites Rule 105, its sanctions were also derived from its powers to sanction under Bankruptcy Rule 9037,[63] which has no applicability here. Also, unlike this matter – in which there were no discovery sanctions or even motions – *Lopez* involved multiple motions to compel and for sanctions as well as multiple hearings thereon. Accordingly, the factual bases that resulted in sanctions in *In re Lopez* do not lend themselves to a finding of bad faith herein.

## C.   The Attorneys' Fees Demand Is Excessive

59.     Although the Court should decline to issue any sanction in the context of this dispute, it should most certainly decline to award the fees sought by the Debtor, for several reasons.

60.     First, a bankruptcy court's inherent authority to award fees as a sanction for bad-faith "is limited to the fees the innocent party incurred solely because of the misconduct – or put another way, to the fees that party would not have incurred but for the bad faith."[64] Accordingly, there must be "a causal link" between the sanctionable conduct and the opposing party's attorneys' fees through a "but–for test," such that the complaining party may only recover the portion of fees that they would not have paid but for the allegedly sanctionable conduct.[65] In addition, any such

---

No. 54]. Plaintiff's allegations essentially assert that Defendant has still withheld requested discovery documents, put up incompetent or "no-show" witnesses, and otherwise stonewalled the discovery process. Plaintiff's Second Motion for Sanctions gives rise to this immediate dispute over the admissibility of evidence in support thereof."); *In re Lopez*, 2015 WL 5438850, at *9 ("Plaintiff requests that this Court issue sanctions in the form of fact deeming, pursuant to Rule 37(b)(2)(A)(ii), or by prohibiting PRA from introducing evidence, pursuant to Rule 37(b)(2)(A)(ii).").

[63]     *See In re Lopez*, 576 B.R. at 93.

[64]     *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103–04 (2017) ("In this case, we consider a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees. We hold that such an order is limited to the fees the innocent party incurred solely because of the misconduct— or put another way, to the fees that party would not have incurred but for the bad faith."); *In re ABC Dentistry, P.A.*, No. 16-34221, 2023 WL 1851157, at *2 (Bankr. S.D. Tex. Feb. 8, 2023) (citing Haeger); *In re Lopez*, 576 B.R. at 93.

[65]     *See Haeger*, 581 U.S. at 102 ("That kind of causal connection is appropriately framed as a but-for test, meaning a court may award only those fees that the innocent party would not have incurred in the absence of litigation misconduct."); *see also Fox v. Vice*, 563 U.S. 826, 836 (2011) ("So if a frivolous claim occasioned the attorney's fees at issue, a court may decide that the defendant should not have to pay them. But if the defendant would have incurred those fees anyway, to defend against non-frivolous claims, then a court has no basis for transferring the expense to the plaintiff.")

---

awarded fees must be compensatory rather than punitive.[66] Here, it is undisputed that, had the Debtor agreed to the withdrawal of the Proof of Claim many months ago — before engaging in costly additional discovery and preparing for and attending a trial on the merits of the claim — the Debtor would have been exactly in the same position that it is in now, but at far less expense. The real, practical difference between refusing to consent to the withdrawal of NREP's Proof of Claim and instead prosecuting the Objection to its end is several hundred thousand dollars in attorneys' fees. The Motion abjectly fails any "but–for" analysis.

61.    Second, when seeking fees in bankruptcy courts in the Fifth Circuit,[67] an applicant must establish, and the courts will consider, so–called *Johnson* factors.[68] The party seeking fees further bears the burden to prove reasonableness of both the hourly rates sought and hours requested.[69] Among other issues, the Debtor's offer is silent as to whether rates charged in the

---

[66]    *See Haeger*, 581 U.S. at 108 ("This Court has made clear that such a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature."); *In re Lopez*, 576 B.R. at 93.

[67]    *See In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298–99 (5th Cir. 1977).

[68]    *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974) (considering which include (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases); *see also* TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(b) ("Factors that may be considered in determining the reasonableness of a fee include, but not to the exclusion of other relevant factors, the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.").

[69]    *See In re Lopez*, 576 B.R. 84, 92 (Bankr. S.D. Tex. 2017); *In re Rodriguez*, 517 B.R. 724, 731 (Bankr. S.D. Tex. 2014) ("The burden is on the fee applicant to produce evidence that the rates are in line with the prevailing rates in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.") (citing *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011)); *see id.* at 734 ("The burden is on the party seeking payment of attorneys' fees to show that the hours requested are reasonable.") (citing *In re Skyport Glob. Communications, Inc.*, 450 B.R. 637, 647 (Bankr. S.D. Tex. 2011), *aff'd sub nom. In re SkyPort Glob. Communications, Inc.*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob. Commc'n, Inc.*, 642 Fed. Appx. 301 (5th Cir. 2016)).

---

matter or the fees sought are reasonable or necessary.[70] All but two of the timekeepers in Table 1

(a paralegal and an associate) billed in excess of $1,000 per hour, and there is no evidence that

those rates are appropriate or any explanation as to how multiple $1,000–plus–per–hour

timekeepers could outstrip the time spent by any associate on the file.

62.     Third, an applicant has the burden to apply, and show it has applied, "billing

judgment."[71] There are a plethora of entries in Exhibit F describing emails and conferences

between counsel yet no reduction in the fee request.[72] The travel time, even at a reduced rate, is

inappropriate. The unidentified timekeepers' work was either unrelated to any issue in the

proceeding or without significant value. Similarly, having as many as five attorneys at any single

hearing[73] shows, in fact, an utter lack of billing judgment.

63.     The Debtor fails all three tests, and the Motion should be denied.

## CONCLUSION

The Debtor's effort to meet a clear and convincing standard for demonstrating sanctionable

"bad faith" fails, especially when the unrebutted testimony was that NREP filed its Proof of Claim

on advice of sophisticated bankruptcy counsel bound by the rules of procedure and professional

---

[70]     *See* Declaration of John Morris at Docket No. 3852, pp. 3 – 4 of 5, ¶¶ 8 – 12.

[71]     *See In re Lopez*, 576 B.R. at 92–93 (Bankr. S.D. Tex. 2017) ("Even with such documentation, however, courts may find the hours expended to be unreasonable under a variety of circumstances: to wit, (1) hours spent on issues in which the attorneys did not prevail; (2) travel time; (3) lumped and vague entries; and (4) interoffice communications. If the applicant does not demonstrate billing judgment, the court should reduce the fee award by a percentage to account for the lack of billing judgment and result in a reasonable number of hours.") (citing *Saizan v. Delta Concrete Products Co.*, 448 F.3d 795, 799 (5th Cir. 2006)).

[72]     *See generally* Docket No. 3852-6

[73]     For the hearing on NREP's Motion to Withdraw on September 12, 2022, the following attorneys billed the following amounts: John Morris, 2.3 hours, Jeff Pomerantz, 2.1 hours, Greg Demo, 2.6 hours, Haley Winograd, 2.0 hours, and Jordan Kroop, 2.2 hours. *See* Docket No. 3852-6, at pp. 86 – 87 of 127. Given their rates, the combined bill for the hearing to the Debtor in attorneys' fees was $13,219.00. Lisa Canty also billed 2.1 hours for an additional $1,039.50. That yields an astounding total of $14,258.50 for a single hearing. That total is just for attendance at the hearing and does not consider the briefing, meetings, conferences, and other billing associated responding to NREP Motion to Withdraw.

---

ethics to ensure that their filings are made in good faith. And the Debtor's Motion falls woefully

short of demonstrating that the fees sought were reasonable, necessary, or, in some cases, even

germane to these proceedings. There is no evidence that the rates are appropriate, that the work

therein was necessary, or that any effort was made to consider the "but–for" implications of the

bad faith motion.

NREP filed a single Proof of Claim, which it attempted to support through a short discovery

process. When NREP tried to withdraw the Proof of Claim, the Debtor resisted that effort, leading

to a trial on a claim that NREP no longer wished to pursue. Now, the Debtor asks the Court to

saddle NREP with the bills occasioned by the Debtor's own intransigence. The Court should

decline to do so.

WHEREFORE, NREP prays that the Court deny the Motion and grant such other relief as

may be appropriate.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Charles W. Gameros, Jr.
Charles W. Gameros, Jr.
State Bar No. 00796596
Douglas Wade Carvell
State Bar No. 00796316

**HOGE & GAMEROS, L.L.P.**
6116 North Central Expressway, Suite 1400
Dallas, Texas 75206
Telephone:     (214) 765-6002
Telecopier:    (214) 559-4905
E-Mail         BGameros@LegalTexas.com
               WCarvell@LegalTexas.com

**ATTORNEYS FOR**
**NEXPOINT REAL ESTATE PARTNERS, LLC,**
**F/K/A HCRE PARTNERS, LLC**

</div>

## <u>CERTIFICATE OF SERVICE</u>

This is to certify parties which have so registered with the Court, including counsel for the Debtor, the United States Trustee, and all persons or parties requesting notice and service shall receive notification of the foregoing via the Court's ECF system, and are considered served pursuant to the Administrative Procedures incorporated into the Order Adopting Administrative Procedures for Electronic Case Filing, General Order 2003-01.2.

/s/ Charles W. Gameros, Jr.
Charles W. Gameros, Jr.