**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |
| | § | |

**MOTION FOR LEAVE TO FILE A DELAWARE COMPLAINT**

---

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. No. 1808] (the "***Plan***"), filed by Highland Capital Management, L.P. ("***HCMLP***") became effective on August 11, 2021 (the "***Effective Date***").

## TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    STATEMENT OF FACTS ................................................................................... 1

   A.   Highland's Plan Contemplated Orderly "Monetization" of Highland's
        Assets, Payment of Eleven Classes of Claims, and Winding Up of
        Highland's Business .................................................................................. 1

   B.   The Confirmation Order and the Plan Contemplated the Creation of a
        Claimant Trust Managed by Mr. Seery under the Supervision of an Oversight
        Board ........................................................................................................ 3

   C.   The Plan Did Not Contemplate, but the Court Subsequently Approved, the
        Creation of an Indemnity Subtrust ............................................................ 6

   D.   Despite Governance Protections Contained in the Confirmation Order, the
        Plan, and the CTA, with Regard to Indemnification Issues, Mr. Seery
        Operates with Unfettered Discretion and without Supervision of the
        Contemplated Oversight Board .................................................................. 8

   E.   Mr. Seery Has Used the Indemnification Reserve to Avoid Paying Creditors
        in Full and to Benefit Himself .................................................................. 10

III.   ARGUMENT .................................................................................................... 14

   A.   The Proposed Complaint Alleges a Colorable Claim That Mr. Seery Should
        be Removed as Claimant Trustee .............................................................. 14

   1)  Movant's Delaware Complaint Sets Forth a *Prima Facie* Case for Removal of
       Mr. Seery as Claimant Trustee ................................................................ 15

   2)  Movant Has Standing to Seek Mr. Seery's Removal ................................. 15

   3)  Delaware Law Mandates Movant's Complaint Proceed in Delaware Court .......... 23

   4)  There Are Multiple Grounds for Seery's Removal .................................... 23

      a)  Mr. Seery Has Breached His Duty of Loyalty ...................................... 24

      b)  Mr. Seery's Continued Service Substantially Impairs the Administration
          of the Trust ...................................................................................... 28

      c)  Mr. Seery Is Hostile to Movant, the Largest Class 10 Equity Holder ................ 29

   B.   Movant Seeks to File its Delaware Complaint for a Proper Purpose .................... 30

IV.    CONCLUSION ................................................................................................. 31

CORE/3529447.0003/184885912.32

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Angstadt v. Red Clay Consol. Sch. Dist.*,
  4 A.3d 382 (Del. 2010)...................................................................................................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................13, 14

*Benerofe v. Cha*,
  No. 14614, 1998WL 83081 (Del. Ch. Feb. 20, 1998)...............................................20

*Estate of Cornell v. Johnson*,
  367 P.3d 173 (Idaho 2016)...........................................................................................21

*Coster v. UIP Companies, Inc.*,
  255 A.3d 952 (Del. 2021)..............................................................................................24

*Dunlap v. State Farm Fire and Cas. Co.*,
  878 A.2d 434 (Del. 2005).............................................................................................19

*Edwards v. Gillis*,
  146 Cal.Rptr.3d 256 (Cal.App. 4 Dist., 2012) ..........................................................21

*FMS Bonds, Inc. v. Bank of New York Mellon*,
  2016 WL 4059155 (S.D.N.Y. July 28, 2016) ......................................................27, 28

*Guiricich v. Emtrol Corp.*,
  449 A.2d 232 (Del. 1982).............................................................................................17

*Hardy v. Hardy*,
  No. CIV.A. 7531-VCP, 2014 WL 3736331 (Del. Ch. July 29, 2014) .....................24

*Matter of Highland Capital Management, L.P.*,
  48 F.4th 419 (5th Cir. 2022)....................................................................................6, 31

*Injective Labs Inc. v. Wang*,
  No. CV 22-943-WCB, 2023 WL 3318477 (D. Del. May 9, 2023)......................20, 21

*J.P. Morgan Tr. Co. of Delaware, Tr. of Fisher 2006 Tr. v. Fisher*,
  No. CV 12894-VCL, 2021 WL 2407858 (Del. Ch. June 14, 2021), *judgment
  entered sub nom* ....................................................................................................27, 28

*Matter of Jeremy Paradise Dynasty Tr.*,
  No. CV 2021-0354-KSJM, 2021 WL 3625375 (Del. Ch. Aug. 17, 2021) ................29

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*,
  616 B.R. 14 (Bankr. S.D.N.Y. 2020) ...................................................................27, 28

CORE/3529447.0003/184885912.32

*In re National Collegiate Student Loan Trusts Litigation*,
251 A.3d 116 (Del. Ch. 2020) ................................................................................................. 19

*Estate of Necastro*,
No. C.A. 10,538, 1991 WL 29958 (Del. Ch. Feb. 28, 1991) ..................................................... 18

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) .......................................................................................................... 25

*Paradee v. Paradee*,
No. 4988-VCL, 2010 WL 3959604 (Del. Ch. Oct. 5, 2010) ...................................................... 24

*Rende v. Rende*,
No. 2021-0734-SEM, 2023 WL 2180572 (Del. Ch. Feb. 23, 2023) ........................................... 19

*Schnell v. Chris-Craft Indus., Inc.*,
285 A.2d 437 (Del. 1971) .......................................................................................................... 24

*Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*,
No. CV 2020-0282-KSJM, 2021 WL 1714202 (Del. Ch. Apr. 30, 2021) ................................... 20

*Stegemeier v. Magness*,
728 A.2d 557 (Del. 1999).......................................................................................................... 25

*Taglialatela v. Galvin*,
No. 5841-MA, 2015 WL 757880 (Del. Ch. Feb. 23, 2015) ....................................................... 24

*Taglialatela v. Galvin*,
No. CIV.A. 5841-MA, 2013 WL 2122044 (Del. Ch. May 14, 2013)................................. 29, 30

*Tigani v. Tigani*,
No. CV 2017-0786-KSJM, 2021 WL 1197576 (Del. Ch. Mar. 30, 2021), *aff'd*,
271 A.3d 741 (Del. 2022).......................................................................................................... 16

*Estate of Tigani*,
No. CV 7339-ML, 2016 WL 593169 (Del. Ch. Feb. 12, 2016) .................................................. 18

*In re Tr. Under Will of Flint for the Benefit of Shadek*,
118 A.3d 182 (Del. Ch. 2015) ................................................................................................... 16

*Unit Trainship, Inc. v. Soo Line R. Co.*,
905 F.2d 160 (7th Cir. 1990) ............................................................................................... 20, 21

*United Bhd. of Carpenters Pension Plan v. Fellner*,
C.A. No. 9475-VCN, 2015 WL 894810 (Del. Ch. Feb. 26, 2015) ............................................. 23

*Walls v. Peck*,
Civ. A. No. 497, 1979 WL 26236 (Del. Ch. Oct. 24, 1979) ...................................................... 24

iii

*Wilmington Trust Co. v. Barry*,
    338 A.2d 575 (Del Super. 1975), *aff'd*, 359 A.2d 664 (Del. 1976) ............................................ 17

**Statutes**

11 U.S.C. § 524(e) .......................................................................................................... 6

Del. Code Ann. tit. 12, § 2302(d) ................................................................................ 17

Del. Code Ann. tit. 12, § 3327 ........................................................................ 15, 17, 22

Del. Code Ann. tit. 12, § 3327(1) ................................................................................ 24

Del. Code Ann. tit. 12, § 3327(2) ................................................................................ 24

Del. Code Ann. tit. 12, § 3327(3)(b) and (c) .............................................................. 24

Del. Code Ann. tit. 12, § 3804(e) ................................................................................ 23

Del. Code Ann. tit. 12, § 3806(c) ................................................................................ 19

Del. Code Ann. tit. 12, § 3809 ..................................................................................... 19

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 13, 14

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ..................................................................... 17

George Gleason Bogert, The Law of Trusts and Trustees, § 543 (3d ed. 2019) ................... 24

Restatement (Second) of Trusts, § 198 (1959) ........................................................ 21

Restatement (Third) of Trusts, § 48 cmt. a (2003) ................................................... 16

Restatement (Third) of Trusts, § 94 cmt. b (2012). ............................................. 16, 17

Restatement (Third) of Trusts, § 94, Reporter's Notes, cmt. a(1) (2012).................. 16

CORE/3529447.0003/184885912.32

## I.      PRELIMINARY STATEMENT

1.      Movant Hunter Mountain Investment Trust ("Movant") seeks leave to file a complaint in Delaware Chancery Court seeking the removal of James P. Seery, Jr. ("Mr. Seery") as Trustee of the Claimant Trust created pursuant to the plan of reorganization of Highland Capital Management, L.P. ("Highland" or the "Debtor"). Under applicable Delaware law, removal of a trustee is warranted when the trustee commits a breach of trust, substantially impairs the administration of the trust through the Trustee's continued service, is unwilling or unable to perform his duties properly, or has hostility toward one or more beneficiaries that threatens efficient administration of the trust. As set forth below in greater detail, all four of these circumstances exist here.

2.      Mr. Seery has breached his duties, including his duty of loyalty by using Claimant Trust assets to fund a separate indemnity sub-trust (to pay his own potential legal expenses – in a blatant conflict of interest) instead of using those assets to pay the claims of Claimant Trust beneficiaries. In addition, Mr. Seery is overtly hostile to Movant—the holder of Class 10 claims and the largest holder of Contingent Trust Interests under the Claimant Trust. Either of these circumstances alone justifies Mr. Seery's removal, but the combination requires it. The attached proposed Delaware complaint states a "colorable" claim, and this Motion should be granted.

## II.      STATEMENT OF FACTS

### A.      Highland's Plan Contemplated Orderly "Monetization" of Highland's Assets, Payment of Eleven Classes of Claims, and Winding Up of Highland's Business

3.      The Bankruptcy Court entered an order (the "Confirmation Order") confirming the Fifth Amended Plan of Highland Capital Management, L.P. (as Modified) (the "Plan") on February 22, 2021.[2] In broad strokes, the Plan called for "the orderly wind-down of the Debtor's estate,

---

[2] Confirmation Order, Dkt. 1943.

including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board."[3]

4.    The Plan contemplated payment of 11 classes of claims. Classes 1 through 7 have already been paid. The remainder are: Class 8, comprising general unsecured claims, of which 93% of allowed claims have been paid;[4] Class 9, comprising subordinated claims; Class 10, comprising Class B/C limited partnership interest claims; and Class 11, comprising Class A limited partnership interest claims.[5] Highland's former equity holders were assigned Class 10 and 11 claims. Movant Hunter Mountain Investment Trust is the only holder of Class 10 claims and owner of the lion's share of the residual equity in Highland.[6]

5.    The Plan contemplated that all of Highland's assets would be managed through three entities: (1) a Claimant Trust, (2) a Litigation Sub-Trust, and (3) the Reorganized Debtor.[7] The Claimant Trust was tasked with administering "Claimant Trust Assets" and serving as the Reorganized Debtor's limited partner.[8] The Litigation Sub-Trust, a sub-trust of the Claimant Trust, was tasked with pursuing "Estate Claims."[9] And the Reorganized Debtor was tasked with

---

[3] *Id.*, ¶ 2.

[4] *See* Dkts. 3956 at p. 7 and 3757 at p. 13.

[5] *See* Plan, Ex. A to Dkt. 1943, at Art. III, §§ B, H.

[6] *See* Plan at Art. I, § B, ¶¶ 34-36.

[7] *See* Plan at Art. IV, § A.

[8] The Plan defines "Claimant Trust Assets" to mean all assets of the estate that are not "Reorganized Debtor Assets," including all causes of action, available cash, proceeds realized from such assets, any rights of setoff or recoupment and other defenses with respect to such assets, any assets transferred to the Claimant Trust by the Reorganized Debtor, the limited partnership interests in the Reorganized Debtor, and the ownership interests in the Reorganized Debtor's new general partner. *See* Plan at Art. I, § B, ¶ 26.

[9] *See* Plan at Art. IV, § A. The Plan defines "Estate Claims" to mean "any and all estate claims and causes of action against [James] Dondero, [Mark] Okada, other insiders of the Debtor, and any of their related entities, including any promissory notes held by any of the foregoing. Plan at Art. I, § B, ¶ 60; Dkt. 354, Ex. A at p. 4 (defining "Estate Claims" to mean "claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing.").

2

administering the "Reorganized Debtor Assets" and managing the wind down of the "Managed Funds."[10]

**B.      The Confirmation Order and the Plan Contemplated the Creation of a Claimant Trust Managed by Mr. Seery under the Supervision of an Oversight Board**

6.      The confirmed Plan contemplated the creation of a "Claimant Trust," to be created pursuant to a separate Claimant Trust Agreement, the "CTA."[11] According to the Bankruptcy Court, the whole reason for the Claimant Trust was to "manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders."[12] The Court further observed that, upon full payment of allowed claims, the Claimant Trust contemplated that "any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests)."[13]

7.      Beneficiaries of the Claimant Trust are termed "Claimant Trust Beneficiaries," a term defined to mean (1) holders of allowed general unsecured claims, (2) holders of allowed subordinated claims, and upon certification by the Claimant Trustee that holders of allowed general unsecured and allowed subordinated claims have been paid in full with interest, and (3) holders of allowed Class A and B/C limited partnership interests.[14] Notably, the CTA repeatedly instructs that the Claimant Trustee is to act "with a view toward maximizing value in a reasonable time" for the purpose of

---

[10] *See* Plan at Art. IV, § B.  The Plan defines "Reorganized Debtor Assets" to mean "any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust."  Plan at Art. I, § B, ¶ 115.  The Plan defines "Managed Funds" to mean Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Partners, L.P., and any other investment vehicle managed by Highland pursuant to an executory contract.  Plan at Art. I, § B, ¶ 84.

[11] *See* Plan at Art. IV, § B.

[12] *See* Confirmation Order, Dkt. 1943, at ¶ 2.

[13] *Id.* at ¶ 42(c).

[14] *See* CTA, Dkt. 3521-5, at ¶ 1.1(h).

CORE/3529447.0003/184885912.32

distributing the Claimant Trust assets to Claimant Trust Beneficiaries.[15] Consistent with the Confirmation Order's description of the Plan's waterfall, upon paying the holders of claims in Classes 1-9 in full with interest, the Claimant Trustee is obligated to file with the Bankruptcy Court a certification (called the "GUC Certification" in the CTA) deeming holders of Class A, B, and C limited partnership interests (*i.e.*, Class 10 and 11 claims holders) "Beneficiaries" of the CTA with entitlement to distributions of residual assets under the terms of the CTA.[16]

8.      Under the Plan, Mr. Seery is the designated Claimant Trustee tasked with the obligation to oversee the administration and distribution of Claimant Trust Assets to unsecured claims and equity interests represented by Classes 8 through 11.[17] Importantly, both the Confirmation Order and the Plan contemplated that Mr. Seery's management of the Claimant Trust would be supervised by a five-member committee (comprised of at least two disinterested members), referred to in the CTA as the "Oversight Board."[18]

9.      In its Confirmation Order, the Bankruptcy Court described the Oversight Board's role and its membership at some length. According to the Court, "[t]he Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor…**will all be managed and overseen by the Claimant Trust Oversight Committee**."[19] In terms of the Board's membership, the Court explained that the members of the Unsecured Creditors Committee ("UCC") had volunteered to serve as the initial members of the

---

[15] *Id.* at ¶ 2.3(b)(viii); *see also id.* at ¶ 2.3(b)(i) (Claimant Trustee must act "in an expeditious but orderly manner with a view toward maximizing value"), ¶ 3.2(a) ("Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.").

[16] *Id.* at § 5.1(c).

[17] *See* Plan, Ex. A to Dkt. 1943, at Art. I, § B, ¶ 28 and Art. IV, § B.1.

[18] *See Id* at Art. IV, § B.2; CTA, ¶¶ 1.1(ll), 4.1. Despite the CTA's mandate that the Oversight Board "shall" be comprised of at least two disinterested members, the initial Board's makeup consisted of four members of the UCC and only one disinterested member, David Pauker. *See id.*, ¶ 1.1(ll).

[19] *See* Confirmation Order, Dkt. 1943, at ¶ 42(a) (emphasis added).

4

Oversight Board.[20] The Confirmation Order goes on to discuss in detail the initial members and their qualifications to serve.[21] In approving their appointment, the Court emphasized Mr. Seery's testimony that "he believe[d] the selection of the . . . members of the Claimant Trust Oversight Board [was] in the best interests of Debtor's economic constituents."[22] Plainly, the Court believed that a five-member Board would oversee Mr. Seery's conduct as Claimant Trustee to ensure that the Plan would be fully performed.

10.    The Plan likewise contemplated that the five-member Oversight Board would supervise Mr. Seery's monetization of Claimant Trust assets and his management and distribution of those assets after monetization. Indeed, the Plan expressly stated that the Oversight Board would oversee "the management and monetization of the Claimant Trust Assets, [] the management of the Reorganized Debtor . . . and the Litigation Sub-Trust . . ., subject to the terms of the Claimant Trust Agreement."[23] The CTA, in turn, provides that the Oversight Board "shall," among other things: (1) "consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust;" and (2) "oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee."[24] The CTA further limits the Claimant Trustee's power to undertake certain actions without "vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements" of the Agreement.[25] Thus, the Claimant Trustee should consult the Oversight Board before terminating or extending the term of the Claimant Trust, litigating or settling any "Material Claims," selling or monetizing certain assets, including Reorganized Debtor

---

[20] *Id.* at ¶ 8.

[21] *Id.* at ¶ 44.

[22] *Id.* at ¶ 42.

[23] *See* Plan, Ex. A to Dkt. 1943, at Art. IV, § B.2.

[24] CTA, Dkt. 3521-5, at ¶ 4.2(a).

[25] *Id.* at ¶ 3.3(b).

5

assets valued at greater than $3 million, making certain cash distributions to Claimant Trust Beneficiaries, making distributions on "Disputed Claims," reserving cash or cash equivalents to meet contingent liabilities (including indemnification obligations), borrowing, investing Claimant Trust assets, changing the Claimant Trustee's compensation, or retaining certain counsel, experts, advisors, or other professionals.[26] In other words, the Oversight Board, as originally conceived, was contemplated to have a substantial governance role in the day-to-day activities of the Claimant Trust and the Claimant Trustee.

11.    In its September 7, 2022 opinion, confirming the Plan in part, the Fifth Circuit likewise observed that, "[t]he whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor."[27] Notably, in the same opinion, the Fifth Circuit struck down a provision of the Plan purporting to exculpate from liability parties other than Highland, the UCC and its members, and the three independent directors appointed to manage Highland during bankruptcy, holding that broader exculpation was inconsistent with 11 U.S.C. § 524(e).[28] In short, the Fifth Circuit refused to exculpate Mr. Seery for actions taken in his role as Claimant Trustee and expressed the understanding that his post-confirmation conduct as Trustee of the Claimant Trust would be affirmatively overseen by an independent Oversight Board.

### C.    The Plan Did Not Contemplate, but the Court Subsequently Approved, the Creation of an Indemnity Subtrust

12.    One entity the Plan did not contemplate was an indemnity sub-trust designed to cover potential post-confirmation claims against estate professionals. Instead, Mr. Seery testified

---

[26] *Id.* at ¶ 3.3(b)(i)-(xii).

[27] *Matter of Highland Capital Management, L.P.*, 48 F.4th 419, 427 (5th Cir. 2022).

[28] *Id.* at 438. Nor is Mr. Seery exculpated for "any acts or omissions…arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct." Confirmation Order, Dkt 1943, at ¶ Y.

CORE/3529447.0003/184885912.32

extensively during the hearing on Plan confirmation that Highland would obtain director and officer ("D&O") insurance to cover any claims against or liabilities imposed on those individuals charged with implementing the Plan. Indeed, one of the conditions to the Plan becoming effective was "the Debtor obtaining D&O Insurance acceptable to the Debtor, the Committee, the Claimant Trust Oversight Committee, and the Litigation Trustee."[29] Nonetheless, four months after Plan confirmation, Highland filed a motion with the Bankruptcy Court seeking authorization to create a new "Indemnity Subtrust" designed to maintain an indemnity trust account with a balance of "not less than $25 million" that would conditionally indemnify post-confirmation professionals "in lieu of obtaining D&O insurance."[30]

13.     The parties to be conditionally indemnified under the Indemnity Subtrust include Mr. Seery as Claimant Trustee, the Oversight Board and its members (described below), their professionals, the Litigation Trustee, the Reorganized Debtor and its partners, members, directors, and officers, and the new general partner of the Reorganized Debtor and its partners, members, directors, and officers (including Mr. Seery).[31] In support of the Subtrust Motion, Mr. Seery testified that he and other post-confirmation management "intend[ed] to look for insurance coverage that would appropriately replace the Indemnity Trust if that's a more efficient vehicle."[32] Over various objections, the Court granted Highland's Subtrust Motion on July 21, 2021.[33]

---

[29] *See* Motion for Entry of an Order (I) Authorizing the (A) Creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II) Granting Related Relief (the "Subtrust Motion"), Dkt. 2491 at ¶ 13.

[30] *Id.* at ¶¶ 21, 26.

[31] *See id.* at ¶ 18 n.8; *see also* CTA, Dkt. 3521-5 at § 8.2.

[32] July 19, 2021 Hearing Transcript, Dkt. 2598 at 45:14-25.

[33] Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the (A) creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II) Granting Related Relief, Dkt. 2599.

CORE/3529447.0003/184885912.32

14.     The Subtrust Motion identified Mr. Seery as the "Indemnity Trust Administrator."[34] In his capacity as Administrator, Mr. Seery was given total control of the administration of the Indemnity Subtrust:

> …For any action contemplated or required in connection with the operation of the Indemnity Trust, and for any guidance or instruction to be provided to the Indemnity Trustee, **such function, rights and responsibility shall be vested in the Indemnity Trust Administrator, and the Indemnity Trustee will take written directions from the Indemnity Trust Administrator**, in such form specified in the Indemnity Trust Agreement and otherwise satisfactory to the Indemnity Trustee.[35]

And although Highland's motion assured the Court that **"[b]eneficiaries will not be involved in or have any rights with respect to the administration of the Indemnity Trust** or have any right to direct the actions of the Indemnity Trustee with respect to the Indemnity Trust or the assets held in the Indemnity Trust Account," Highland carved out Mr. Seery (to the extent he is acting in his capacity as Indemnity Trust Administrator) from that exclusion.[36]

**D.     Despite Governance Protections Contained in the Confirmation Order, the Plan, and the CTA, with Regard to Indemnification Issues, Mr. Seery Operates with Unfettered Discretion and without Supervision of the Contemplated Oversight Board**

15.     Notwithstanding that creditor constituencies voted to support, and the Bankruptcy Court approved, the Plan, understanding that there would be a partially independent, five-member Oversight Board supervising the monetization and distribution of estate assets, that contemplated governance structure has long since been ignored and has failed to safeguard the Claimant Trust. The representations in the Plan, the findings by this Court, and the belief of the Fifth Circuit that Mr. Seery's conduct as Claimant Trustee would be affirmatively overseen to assure that the Plan would be fully performed, are – at least as to the appropriate use of funds and indemnification -- all false.

---

[34] *See* Subtrust Motion, Dkt. 2491, at ¶ 21 under "Indemnity Trust Administrator" on p. 8.

[35] *Id.* (emphasis added) under "Governance of the Indemnity Trust" on p. 9.

[36] *Id.* (emphasis added).

CORE/3529447.0003/184885912.32

16.     The five-member Board no longer exists. Instead, the Board is comprised of two claims buyers (and current Claimant Trust Beneficiaries)—Muck Holdings and Jessup Holdings—and one ostensibly disinterested member, Richard Katz,[37] about whom no information demonstrating independence was provided with his appointment.[38] Although the CTA mandates that the Board includes two disinterested members, there has only ever been Mr. Katz. That contrivance creates potential governance problems. For example, the Board must in many instances approve actions undertaken by the Claimant Trustee by a "majority" vote.[39] But if any Board member has a conflict or *potential* conflict of interest with respect to an issue at hand (including, without limitation, a pecuniary interest in the issue), then the conflicted member cannot vote.[40] In the case of the current three-member Board, any potential conflict of interest thus derails a majority vote and precludes the Board from approving actions contemplated by the Claimant Trustee.

17.     Even without this governance problem, contrary to the impression left by the provisions of the Plan discussed above,[41] the Claimant Trust lacks the requisite safeguards to prevent abuse by the Claimant Trustee. That has proven particularly problematic when it comes to the Claimant Trust's indemnity obligations. Specifically, the CTA states:

> Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to the holders of Trust Interests at least annually the Cash on hand net of any amounts that…(d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement **(including, but not limited**

---

[37] While Movants have little to go on, if Mr. Katz is the Richard Katz of Torque Point Advisors, he may have interacted with Mr. Seery while he was at Lehman Brothers. *See* TORQUE POINT ADVISORS, https://www.torquepointllc.com/ (last visited Dec. 20, 2023) (involved in restructuring of Lehman Brothers Holdings Inc.) and Jim Seery, LINKEDIN, (listing Lehman Brothers, 1999-2009) [App. 110-112]. Furthermore, the Claims Purchasers, Muck and Jessup are proposed defendants, together with Mr. Seery and others, in a separate proposed adversary proceeding involving allegations of use of material non-public information. As such, Movant has alleged that at least two members of the Oversight Board are in an alleged conspiracy with Mr. Seery. *See* Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3816.

[38] *See* Notice of Appointment of Members of the Oversight Board of the Highland Claimant Trust, Dkt. 2801.

[39] *See* CTA, Dkt. 3521-5 at §§ 3.3(b)(i)-(xii), 3.4, 3.8, 3.9, and 4.6(a).

[40] *See id.* at § 4.6(c).

[41] See notes 18 to 28 *supra* and accompanying text.

CORE/3529447.0003/184885912.32

**to, indemnification obligations and similar expenses in such amounts
and for such period of time as the Claimant Trustee determines, in good
faith, may be necessary and appropriate, which determination shall not
be subject to consent of the Oversight Board, may not be modified
without the express written consent of the Claimant Trustee, and shall
survive the termination of the Claimant Trustee)….**[42]

18.     In other words, Mr. Seery, both as the Claimant Trustee and as the Indemnity Trust

Administrator, effectively has the sole authority to reserve for potential indemnification obligations

*without any* Oversight Board or other supervision. This is problematic because Mr. Seery (both as

claimant Trustee and as the owner of the Reorganized Debtor's general partner) is one of the principal

indemnified parties who stand to benefit from the funding of the indemnification reserve. That means

Mr. Seery has a vested financial interest in all decisions he makes regarding the indemnification

reserve, including how much to reserve and whether to pay out of the reserve to indemnified parties,

including himself. Mr. Seery's unfettered right over the Indemnity Sub-Trust is a material deviation

from the Plan: while the Plan always contemplated a conditional indemnification right to certain

parties, such right was to be supervised by the Oversight Board. Not only has the Oversight Board

with its mechanism for independent members been removed from the supervision of the

indemnification *res*, but the sole party with authority over the indemnification *res*, Mr. Seery, is

conflicted.

### E.     Mr. Seery Has Used the Indemnification Reserve to Avoid Paying Creditors in Full and to Benefit Himself

19.     Mr. Seery has used the Claimant Trust and the Indemnity Subtrust to his own

pecuniary advantage. The Claimant Trust now has more than sufficient assets to pay holders of

Classes 8 and 9 in full with interest with surplus available to former equity. Yet it has failed to do so,

despite the mandate of the CTA that Mr. Seery act expeditiously to maximize value for Claimant

Trust Beneficiaries. Instead, he has been funding an increasingly sizeable indemnification reserve

---

[42] CTA, Dkt. 3521-5 at § 6.1(a) (emphasis added).

without any discernable justification other than as a subterfuge for avoiding certifying that holders of Class 10 and 11 claims (including Movant) are Claimant Trust Beneficiaries.

20.     Based on a consolidated balance sheet filed on July 6, 2023, the Claimant Trust has about $250 million in assets (of which an estimated $180 million is cash) and, at that time, only about $126 million in remaining non-Dondero-related Class 8 and 9 claims.[43]

**Highland Claimant Trust**
**Summarized Consolidated Balance Sheet** [(1)]
**As of May 31, 2023**
**The accompanying notes are integral to understanding this balance sheet**
**(Estimated and unaudited, $ in millions)**

| | | Balance per books | | adjustments (see notes) | | Adjusted balance |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and equivalents | $ | 13 | $ | - | $ | 13 |
| Disputed claims reserve [(2)] | | 12 | | - | | 12 |
| Other restricted cash | | 12 | | - | | 12 |
| Investments [(3)] | | 118 | | (12) [(a)] | | 106 |
| Notes receivable, net [(4)] | | 86 | | (83) [(a)] | | 3 |
| Other assets | | 6 | | - | | 6 |
| **Total assets** | $ | 247 | $ | (95) | $ | 152 |
| | | | | | | |
| **Liabilities** | | | | | | |
| Secured and other debt | $ | - | $ | - | $ | - |
| Distribution payable [(2)] | | 12 | | - | | 12 |
| Additional indemnification reserves | | - | | 90 [(5)] | | 90 |
| Other liabilities | | 15 | | 13 [(5)] | | 28 |
| **Total liabilities** [(5)] | $ | 27 | $ | 103 | $ | 130 |
| | | | | | | |
| Book/adjusted book equity (see accompanying notes) [(6)] | | 220 | | (198) | | 22 |
| | | | | | | |
| **Total liabilities and book/adjusted book equity** | $ | 247 | $ | (95) | $ | 152 |

| **Supplemental Info:** [(7)] | | |
|---|---|---|
| Sum of remaining allowed Class 8 Trust Beneficiaries, excluding interest | $ | 27 |
| Sum of remaining allowed Class 9 Trust Beneficiaries, excluding interest | | 99 |
| Sum of face amount of pending Class 8/9 potential Trust Beneficiaries, excluding interest | | 13 |
| Sub-total | $ | 139 |

21.     Since that time, the Post-Confirmation Reports for the period ending September 30, 2023 reflect that an additional $14,361,077 has been paid to GUCs, with $6,805,592 being paid to GUC Classes 6 and 7, leaving a balance of $119,222,451 remaining in Class 8 and 9 claims (subtracting the total "Paid Cumulative" from the "Total Allowed" amounts as reflected on page 7 of those Reports and adding in the amounts paid to GUC Classes 6 and 7).[44] The Reports do not disclose

---

[43] Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A. The Claimant Trust's asset balance is exclusive of any recovery on litigation against dozens of defendants by Marc S. Kirschner, the Trustee of the Litigation Sub-Trust (the "Kirschner Action").

[44] *See* Amended Post-Confirmation Reports of Reorganized Debtor and of the Highland Claimant Trust, Dkts. 3955 and 3956.

the current cash position of the Claimant Trust. Cash may have increased or decreased. But in the worst case, adjusting the cash from amounts shown in the May 31, 2023 Balance Sheet by the amount paid out to Classes 8 and 9, the Trust still has cash of at least $165 million, and remaining Class 8 and 9 claims that now total less than $120 million.

22.    Notably, the Claimant Trust's balance sheet assets do not include a fully cash-funded at least $35 million indemnity account (reportedly now $50 million) that presumably may be used to pay creditors in the event it is not consumed by the estate's professionals.[45] In addition, to reduce the Claimant Trust's book value, Highland purports to add "non-book" adjustments to the balance sheet. One such adjustment gives zero asset value to certain notes payable by Mr. Dondero and his alleged affiliates.[46] However, $70 million of those notes are now fully bonded by cash deposited in the registry of the District Court.[47]

23.    Another accounting "adjustment" creates a $90 million "additional indemnification reserve," on top of the at least $35 (or $50) million cash indemnity reserve, with no explanation.[48] Indeed, were it not for the at least $125-140 million in inappropriate indemnity reserves—which is $100 million more than Debtor originally proposed it would need in insurance coverage when it sought approval of the Indemnity Subtrust—Highland's creditors could have been paid, the estate closed, and the residual estate returned to equity months if not years ago.

---

[45] *See* Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A, Note 1. The information provided does not make it clear whether the $90 million reserve is reduced by the $15 million increase in the Indemnity Sub-Trust.

[46] *Id.* at Ex. A.

[47] *See* Order Granting Joint Agreed Emergency Motion for Order Approving Stipulation for the Bonding of Judgments and Stays of Executions Pending Appeals, Dkt. 149; Notices of Bonding, Case No. 3:21-cv-00881-X (N.D. Tex.), Dkts. 151, 152, 160-162 [App. 039-078].

[48] *See* Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A.

24.      As the Post-Confirmation Reports reveal, all of the administrative claims, secured claims, and priority claims have been paid in full.[49] Thus, as a practical matter, the Claimant Trust could pay the Class 8 and 9 claims in full with interest, Mr. Seery could file the GUC Certification,[50] and Movant (along with other Holders of Class A, B, and C of limited partnership interests) would become a fully vested Claimant Trust Beneficiary under the terms of the CTA.[51] All of these steps could be, and indeed, should have been, completed without any interference from the Indemnity Subtrust Administrator.

25.      The failure to pay creditors has had a material impact on the Movant and other Holders of Class A, B, and C of limited partnership interests. In the first nine months of 2023, Debtor and the Claimant Trust accumulated $48,447,234 in (undisclosed) expenses,[52] for an average of $5.4 million per month. Even after the voluntary stay of the *Kirschner* litigation, which appears to have been a significant cost-driver, the Debtor and the Claimant Trust have continued to accumulate $4.6 million per month in expenses. While monies to pay Class 8 and Class 9 Claims remain unimpaired, cash to pay the former equity holders continues to disappear as undisclosed expenses.

26.      As explained below in greater detail, the proposed Delaware Complaint sets forth claims that are both plausible under federal pleading standards[53] and "colorable" under this Court's articulated gatekeeping standard.

---

[49] *See* Amended Post-Confirmation Reports of Reorganized Debtor and of the Highland Claimant Trust, Dkts. 3955 and 3956.

[50] *See* CTA, Dkt. 3521-5 at §§ 1.1(aa), 5.1(c).

[51] *See id.*, §§ 1.1(h), 5.1.

[52] *See* Dkt. 3756, 3757, 3888, 3889, 3955, and 3956 (showing Claimant Trust expenditures of $60,421,756 and Debtor expenditures of $37,430,919 in Q1 – Q3 2023, then subtracting out $29,405,441 in distributions to creditors and $20 million presumably added to the Indemnity Sub-Trust).

[53] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss pursuant to Rule 12(b)(6)).

## III.    ARGUMENT

### A.    The Proposed Complaint Alleges a Colorable Claim That Mr. Seery Should be Removed as Claimant Trustee

27.    According to this Court, to state a "colorable" claim under the gatekeeping provision of the Plan (the "Gatekeeper Provision"), a moving party must do more than allege a "plausible" claim for relief—the standard applied by federal district courts in deciding whether a claim can proceed under Federal Rule of Civil Procedure 12(b)(6).[54] Instead, a movant in this Court must survive an "***additional level of review***."[55] Specifically, the movant bears the "burden of making a prima facie case that its proposed claims are ***not without foundation***, are ***not without merit***, and are ***not being pursued for any improper purpose such as harassment***."[56] And in deciding whether the movant has met this prima facie burden, the Court "may, and should, take into consideration its ***knowledge*** of the ***bankruptcy proceedings*** and ***the parties*** and any additional evidence presented at the hearing on the Motion for Leave."[57] The Court termed this new standard the "Gatekeeper Colorability Test."[58]

28.    As set forth below, Movant's Delaware complaint meets the Court's Gatekeeper Colorability Test because it sets forth a *prima facie* case under Delaware law that Mr. Seery should

---

[54] Movant has objected and continues to object to the Court's ruling with respect to the standard that should be applied under the Gatekeeper Provision. Movant has appealed the Court's rulings regarding this standard. *See* Hunter Mountain Investment Trust's Second Notice of Appeal, Dkt. 3945. No admission is made by or on behalf of Movant in connection with this Motion regarding the "colorability" standard applied by the Court or the Court's related substantive and procedural rulings. Movant expressly reserves all of Movant's substantive and procedural rights and waives none of the same in connection with this Motion, the proposed Complaint, or otherwise. Movant believes the proper standard is set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss pursuant to Rule 12(b)(6)), and that this standard is also satisfied by this Motion.

[55] Memorandum Opinion, Dkt. 3903 at p. 91 (emphasis in original).

[56] *Id.* (emphases in original).

[57] *Id.* (emphases in original).

[58] Movant disagrees with this new test and is challenging this test on appeal at this time. Nothing in this current Motion should be deemed an admission or an acknowledgment of the propriety of this test. *See* Dkt. 3915.

CORE/3529447.0003/184885912.32

be removed as Claimant Trustee. Moreover, Movant's Delaware complaint is not brought for any improper purpose but, rather, to protect Movant's sizeable residual interest in the Claimant Trust.

**1)    Movant's Delaware Complaint Sets Forth a *Prima Facie* Case for Removal of Mr. Seery as Claimant Trustee**

29.    Under Delaware law, the Court of Chancery may remove the trustee of a Delaware statutory trust "on [its] own initiative or on petition of a trustor, another officeholder, or beneficiary" in any of five circumstances:

a)    *The officeholder has committed a breach of trust*; or

b)    *The continued service of the officeholder substantially impairs the administration of the trust*; or

c)    The court, having due regard for the expressed intention of the trustor and the best interests of the beneficiaries, determines that notwithstanding the absence of a breach of trust, there exists:

i.    A substantial change in circumstances;

ii.    *Unfitness, unwillingness or inability of the officeholder to administer the trust or perform its duties properly; or*

iii.    *Hostility between the officeholder and beneficiaries or other officeholders that threatens the efficient administration of the trust*.

Del. Code Ann. tit. 12, § 3327 (emphases added). As set forth below in greater detail, Movant is an intended beneficiary of the Claimant Trust and, as such, Movant is entitled to ask a Delaware court to remove Mr. Seery as Claimant Trustee because he has engaged in multiple acts warranting his removal under Delaware statute. Accordingly, Movant's complaint sets forth a *prima facie* case, and the Court should grant its Motion and allow the case to proceed.

**2)    Movant Has Standing to Seek Mr. Seery's Removal**

30.    At the outset, in reality, Movant should be recognized as being "in the money" and a vested beneficiary with the associated standing to pursue the proposed Delaware complaint. In any event, however, Movant also has standing to seek removal of Mr. Seery because Movant is an intended (albeit contingent) beneficiary of the Claimant Trust under the CTA. *All* beneficiaries,

15

including contingent beneficiaries, have standing under Delaware law to seek to remove a trustee. To

argue otherwise – that only "vested" beneficiaries under the CTA may bring such an action – is to

impermissibly limit the statute.

31.    The Delaware Code does not define the term "beneficiary," but Delaware courts

follow the RESTATEMENT (THIRD) OF TRUSTS,[59] which defines beneficiaries to include contingent

beneficiaries:

> *Persons who are beneficiaries: in general.* The "beneficiaries" of a trust are the
> persons or classes of persons, or the successors in interest of persons or class members,
> upon whom the settlor manifested an intention to confer beneficial interests (vested **or
> contingent**) under the trust, plus persons who hold powers of appointment (special or
> general) or have reversionary interests by operation of law. Also included are persons
> who have succeeded to interests of beneficiaries by assignment, inheritance, or
> otherwise.[60]

32.    Further, the RESTATEMENT expressly contemplates that contingent beneficiaries may

file suit to enforce a private trust:

> *"Beneficiaries."* A suit to enforce a private trust ordinarily (see Reporter's Note) may
> be maintained by any beneficiary whose rights are or may be adversely affected by the
> matter(s) at issue. The beneficiaries of a trust include any person who holds a
> beneficial interest, present or future, vested or contingent.[61]

And "enforcement" extends to "enforcement proceedings in a more comprehensive sense, such as

petitions for removal of a trustee . . . even though no breach-of-trust issue is involved."[62]

33.    Delaware courts routinely hold that, in interpreting undefined statutory terms, courts

must give those terms a "reasonable and sensible meaning in light of their intent and purpose."

*Angstadt v. Red Clay Consol. Sch. Dist.*, 4 A.3d 382, 390 (Del. 2010). In ascertaining the "reasonable

---

[59] *See, e.g.*, *In re Tr. Under Will of Flint for the Benefit of Shadek*, 118 A.3d 182, 195 (Del. Ch. 2015); *Tigani v. Tigani*,
No. CV 2017-0786-KSJM, 2021 WL 1197576, at *14 (Del. Ch. Mar. 30, 2021), *aff'd*, 271 A.3d 741 (Del. 2022).

[60] RESTATEMENT (THIRD) OF TRUSTS, § 48 cmt. a (2003) (emphasis added).

[61] RESTATEMENT (THIRD) OF TRUSTS, § 94 cmt. b (2012).

[62] *Id.*, § 94, Reporter's Notes, cmt. a(1).

and sensible meaning" of terms, Delaware courts rely on dictionaries as a source of interpretation. *See id.*

34.    Black's Law Dictionary defines "beneficiary" as, among other things, "[s]omeone who is designated to receive the advantages from an action or change . . . or to receive something as a result of a legal arrangement or instrument" and includes both "contingent benficiar[ies]" and "direct benficiar[ies]" within the definition without any qualification regarding their rights.[63] By contrast, Black's distinguishes an "incidental beneficiary" as a "third-party beneficiary, who, though benefiting indirectly, is not intended to benefit from a contract and thus does not acquire rights under the contract."[64] Nothing in the CTA indicates that Movants are merely "incidental beneficiaries."

35.    In light of the RESTATEMENT and the definition in Black's Law Dictionary, it is reasonable and sensible to interpret the word "beneficiary" used in Section 3327 of the Delaware statute to include contingent beneficiaries. Rules of statutory interpretation support this conclusion. As the Delaware Supreme Court has explained, a court "may not engraft upon a statute language which has been clearly excluded therefrom by the Legislature." *Guiricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) (citing *Wilmington Trust Co. v. Barry*, 338 A.2d 575, 578 (Del Super. 1975), *aff'd*, 359 A.2d 664 (Del. 1976)). If the Delaware Legislature had intended that only "vested" beneficiaries could bring an action to remove a trustee, as opposed to any beneficiary (whether residual or contingent), it would have so specified. In this case, the relevant statute—Del. Code Ann. tit. 12, § 3327—uses the term "beneficiary" without defining or limiting it. Accordingly, a court may not do what the Delaware Legislature refused to do by engrafting the term "vested" into the statute to qualify the term "beneficiary."

---

[63] *Black's Law Dictionary* (11th ed. 2019).

[64] *Id.*

CORE/3529447.0003/184885912.32

36.     Delaware courts refuse to read statutory language restrictively to exclude certain classes of beneficiaries. *See Estate of Tigani*, No. CV 7339-ML, 2016 WL 593169, at *14 (Del. Ch. Feb. 12, 2016) (holding that the "statute's use of the general term beneficiary, without any language restricting the class of beneficiary to whom it refers, fairly encompasses a vested beneficiary subject to divestiture"); *Estate of Necastro*, No. C.A. 10,538, 1991 WL 29958, at *1 (Del. Ch. Feb. 28, 1991) (rejecting a "restrictive reading" of "beneficiary" under 12 Del.C. § 2302(d) and instead holding that "Exceptants [whom the parties characterized as "contingent beneficiaries"] have standing . . . based upon their indirect interest in a share of the estate through their status as beneficiaries of a testamentary trust").

37.     In short, neither the applicable Delaware statute nor Delaware case law limits the term "beneficiary" to "vested" beneficiaries to the exclusion of contingent ones.

38.     The Claimant Trustee will no doubt argue that the language of the CTA purportedly strips Movant of its standing to seek removal of the Trustee. In particular, the CTA states that holders of Contingent Trust Interests (including Movant) "shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the 'GUC Payment Certification')."[65] The Agreement further states that "Equity Holders will only be deemed 'Beneficiaries' under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court."[66] But Delaware law makes clear that a trust agreement, however worded, may

---

[65] CTA, Dkt. 3521-5 at § 5.1(c).

[66] *Id.*

CORE/3529447.0003/184885912.32

not strip the trustee's duty of good faith and fair dealing.[67] And in this case, observance of that duty

precludes any argument that the language of the CTA undercuts Movant's standing.

39.     Under Delaware law, unless the governing trust agreement says otherwise, the trustee

of a statutory trust has those duties set forth in common law, including the duties of loyalty, good

faith, and due care. *See* Del. Code Ann. tit. 12, § 3809; *Rende v. Rende*, No. 2021-0734-SEM, 2023

WL 2180572, at *11 (Del. Ch. Feb. 23, 2023). And while a governing trust agreement may expressly

disclaim these duties (although this one does not), Delaware law prohibits the elimination of the duty

of good faith and fair dealing. *In re National Collegiate Student Loan Trusts Litigation*, 251 A.3d

116, 185-86 (Del. Ch. 2020) ("While parties may agree to waive default fiduciary duties, the DSTA

forbids parties from eliminating the "implied contractual covenant of good faith and fair dealing.")

(citing Del. Code. Ann. tit. 12, § 3806(c)).

40.     The duty of good faith and fair dealing is particularly important here, where Movant's

status as a "beneficiary" under the CTA is purportedly dependent upon Mr. Seery's discretion to file

a GUC Certification declaring Movant's status as such. "Stated in its most general terms, the implied

covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable

conduct which has the effect of preventing the other party to the contract from receiving the fruits of

the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal

quotations omitted). "Thus, parties are liable for breaching the covenant when their conduct frustrates

the overarching purpose of the contract by taking advantage of their position to control

implementation of the agreement's terms." *Id.* (internal quotations omitted).

41.     Given the purpose of the covenant, "it is possible to rest a claim of breach of the

implied covenant of good faith and fair dealing on the assertion that defendants have deliberately

---

[67] The CTA is governed by Delaware law. *Id.* at § 11.10.

prevented the occurrence of conditions precedent." *Injective Labs Inc. v. Wang*, No. CV 22-943-WCB, 2023 WL 3318477, at *7 (D. Del. May 9, 2023) (quoting *Benerofe v. Cha*, No. 14614, 1998 WL 83081, at *6 (Del. Ch. Feb. 20, 1998)). *See also Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-KSJM, 2021 WL 1714202, at *53 (Del. Ch. Apr. 30, 2021) (noting the duty of good faith and fair dealing "requires some cooperation ... either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence") (internal quotes omitted).

42.     Mr. Seery's failure and refusal to pay the Class 8 and 9 creditors, in an attempt to prevent the Contingent Interest Holders' interests from vesting under the terms of the CTA, falls squarely within the scope of the duty of good faith and fair dealing. In *Injective Labs Inc. v. Wang*, the defendant asserted a counterclaim for the breach of the implied duty of good faith and fair dealing. The defendant argued that plaintiff breached the implied duty by "sending a belated request that [defendant] satisfy a condition precedent, knowing that it was effectively impossible for him to do so." *Injective Labs Inc. v. Wang*, 2023 WL 3318477, at *7. The court rejected plaintiff's motion to dismiss the counterclaim, holding "[t]hat allegation, and in particular the allegation that [plaintiff] knew that [defendant] would be unable to satisfy the condition precedent . . . is directed to the type of conduct that typically falls within the scope of the implied duty of good faith and fair dealing." *Id.*

43.     In another case, the Court of Appeals for the Seventh Circuit affirmed summary judgment against a defendant because the defendant "did not exercise good faith under the contract by attempting to hinder the occurrence of the condition precedent in the contract." *Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 162-63 (7th Cir. 1990). There, the parties entered a contract for the running of a unit-train between Chicago and Seattle. *Id.* at 161. Because the running of the unit-train required the approval of the Interstate Commerce Commission ("ICC"), the parties filed a joint petition with the ICC seeking approval. *Id.* Thereafter, one party moved to withdraw from the ICC

proceeding and failed to participate in the joint petition, thereby stymieing the condition precedent to the performance of the contract. *Id.* The Seventh Circuit, applying Illinois law, which is similar in this regard to Delaware law, held that "where a party's obligation is subject to a condition precedent, a duty of good faith and fair dealing is imposed upon that party to cooperate and to not hinder the occurrence of the condition." *Id.* at 163.

44.    These cases inform the Claimant Trustee's contractual duties under Delaware law. In *Injective Labs Inc.*, the plaintiff/counterclaim defendant prevented the performance of a condition precedent, which violated the duty of good faith and fair dealing. 2023 WL 3318477, at *7. In *Unit Trainship*, one of the parties to the relevant contract prevented the occurrence of a condition precedent, which violated the duty of good faith and fair dealing. 905 F.2d at 163. Similarly, here the Claimant Trustee is deliberately refusing to pay the unsecured creditors in Classes 8 and 9 with interest, thereby breaching his duty to pay Classes 10 and 11. That violates the Trustee's duty of good faith and fair dealing and fatally undermines any argument that Movant lacks standing to seek removal of the Trustee.

45.    As other RESTATEMENT jurisdictions have recognized, Mr. Seery's conduct warrants treating those classes as fully vested. "[V]esting cannot be postponed by unreasonable delay in distributing an estate and [] when there is such delay, contingent interests vest at the time distribution *should* have been made." *Estate of Cornell v. Johnson*, 367 P.3d 173, 178 (Idaho 2016) (emphasis added) (discussed in RESTATEMENT (SECOND) OF TRUSTS, § 198 (1959)); *see also Edwards v. Gillis*, 146 Cal.Rptr.3d 256, 263 (Cal.App. 4 Dist., 2012) ("when there is [unreasonable] delay contingent interests vest at the time distribution should have been made."). As set forth above, the Claimant Trust had sufficient assets to pay unsecured creditors in Classes 8 and 9 in full with interest at least as early

CORE/3529447.0003/184885912.32

as July 2023, and in all probability as early as September 2022.[68] And the CTA requires Mr. Seery as Claimant Trustee to "make timely distributions and not unduly prolong the duration of the Claimant Trust."[69] Had Mr. Seery fulfilled that mandate, he could and should have distributed remaining funds to Classes 8 and 9 by July 2023, filed the GUC Certification with the Court, and begun distributing remaining assets to Classes 10 and 11. In short, Movant's interests were properly vested under the CTA many months ago, and Delaware law therefore treats Movant as a Claimant Trust Beneficiary, regardless of the language of the CTA.

46.     Indeed, any argument that the CTA precludes Movant from vindicating its rights (including by seeking removal of the Trustee) only underscores why Delaware law is crafted the way it is. Were it not for the duty of good faith and fair dealing imposed by Delaware law, Mr. Seery arguably could increase the funds set aside for indemnification continually, hold final distributions to Class 8 and Class 9 creditors in abeyance, and refuse to file the GUC Certification based on the theoretical possibility that he might in the future need to draw upon more than the originally contemplated indemnity reserve of $25 million to pay his own legal expenses (all while drawing a salary of $150,000 per month). And it appears that, for now, Mr. Seery is content to do just that. This is exactly the kind of conflict that Section 3327 of the Delaware Code was designed to prevent, and the duty of good faith and fair dealing in Delaware precludes the Claimant Trustee from relying on the language of the CTA to prevent the Delaware courts from remedying the conflict. Under these circumstances, Movant has standing to proceed under Delaware law.

---

[68] Two of the estate's major private equity positions sold in May 2022, and the remaining largest positions sold in September 2022.  The May 2022 assets were Cornerstone Healthcare Group [*see* App. 013-017] and MGM [*see* App. 009-012].  The September 2022 positions were CCS Medical [*see* App. 018-022] and Trussway [*see* App. 023-025].

[69] CTA, Dkt. 3521-5 at § 3.2(a).

### 3) Delaware Law Mandates Movant's Complaint Proceed in Delaware Court

47.     Under Delaware law, beneficial owners of a trust are entitled to seek redress in the courts of Delaware, regardless of the language of the relevant trust agreement: "Except by agreeing to arbitrate any arbitrable matter in a specified jurisdiction or in the State, *a beneficial owner who is not a trustee may not waive its right to maintain a legal action or proceeding in the courts of the State with respect to matters relating to the organization or internal affairs of a statutory trust*." Del. Code Ann. tit. 12, § 3804(e) (emphasis added). This is because the removal of a trustee is a "matter[] relating to the organization or internal affairs of a statutory trust." *United Bhd. of Carpenters Pension Plan v. Fellner*, C.A. No. 9475-VCN, 2015 WL 894810, at *2 n. 13 (Del. Ch. Feb. 26, 2015). Where a company's internal affairs are involved, Delaware law disregards the forum selection clause in the parties' trust agreement. *Id.*

48.     Because Movant's Delaware complaint seeks relief relating to the internal affairs of the Claimant Trust, Movant is entitled to have its dispute decided by the courts of Delaware, regardless of any contrary choice of forum clause in the CTA.[70] The Court should permit Movant to file its Delaware complaint in the Delaware Chancery Court.

### 4) There Are Multiple Grounds for Seery's Removal

49.     As set forth in the proposed Delaware Complaint, Mr. Seery's removal as Claimant Trustee is warranted for multiple reasons. Specifically, Mr. Seery has breached his duty of loyalty by failing to pay creditors, failing to file the GUC Certification, and failing to certify that equity holders in Classes 10 and 11 (of which Movant is the largest) are vested under the CTA. Seery has failed to act expeditiously as required under the terms of the CTA,[71] and has failed to maximize the value of the Claimant Trust for the benefit of the Claimant Trust Beneficiaries by filing unnecessary

---

[70] *See* CTA, Dkt. 3521-5 at § 11.11.

[71] *See, e.g.*, *id.* at §§ 2.2(b), 2.3(b)(i), 3.2(a).

CORE/3529447.0003/184885912.32

proceedings, including the Kirschner Action, and spending inordinate amounts of cash. Those breaches of duty warrant Mr. Seery's removal under Del. Code Ann. tit. 12, § 3327(1). Further, Mr. Seery's roles as both Claimant Trustee and as Indemnity Subtrust Administrator substantially impairs the administration of the Claimant Trust, warranting his removal under Del. Code Ann. tit. 12, § 3327(2). In addition, Mr. Seery's removal is warranted under Del. Code Ann. tit. 12, § 3327(3)(b) and (c) because he is unwilling to perform his duties as Claimant Trustee, and has manifested a personal hostility toward, and conflict with, Movant and the holders of Contingent Trust Interests.

### a)     Mr. Seery Has Breached His Duty of Loyalty

50.     The facts set forth above demonstrate without doubt that Mr. Seery has breached his duty of loyalty in administering the Claimant Trust. A trustee breaches the duty of loyalty by acting in his own self-interest "[i]nstead of evaluating what was in the best interests of [a] [t]rust." *Paradee v. Paradee*, No. 4988-VCL, 2010 WL 3959604, at *10 (Del. Ch. Oct. 5, 2010). "Self-interested transactions involving a fiduciary or one in a confidential relationship with another are presumptively fraudulent and voidable in equity. If the transaction is challenged, the burden of persuasion to justify upholding the transaction is on the fiduciary." *Hardy v. Hardy*, No. CIV.A. 7531-VCP, 2014 WL 3736331 at *8 (Del. Ch. July 29, 2014) (internal quotations omitted). Significantly, and importantly in this case, an inequitable action taken "does not become permissible simply because it is legally possible" within the letter of the law or the language of an agreement. *Coster v. UIP Companies, Inc.*, 255 A.3d 952, 953 (Del. 2021) (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971)). Self-dealing amounts to a breach of duty of loyalty. *See Taglialatela v. Galvin*, No. 5841-MA, 2015 WL 757880, at *4 (Del. Ch. Feb. 23, 2015); *Walls v. Peck*, Civ. A. No. 497, 1979 WL 26236, at *4 (Del. Ch. Oct. 24, 1979); GEORGE GLEASON BOGERT, THE LAW OF TRUSTS AND TRUSTEES, § 543 (3d ed. 2019) ("The trustee must administer the trust with complete loyalty to the

CORE/3529447.0003/184885912.32

interests of the beneficiary, without consideration of the personal interests of the trustee or the interests of third persons.").

51.     Indeed "[u]nlike corporate law, '[u]nder trust law, self-dealing on the part of a trustee is virtually prohibited.'" *Stegemeier v. Magness*, 728 A.2d 557, 563 (Del. 1999) (citing *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991). As a result, the interested trustee bears the burden of persuasion to justify upholding the transaction. *Id.*

52.     In this case, as the Delaware Complaint alleges, Mr. Seery has breached his duty of loyalty. That breach was inevitable given the manner in which Mr. Seery and Highland constructed the Claimant Trust and the Indemnity Subtrust. As set forth above, Mr. Seery is the Trustee of the Claimant Trust with an absolute duty to manage and administer that trust for the benefit of the Trust's beneficiaries. But Mr. Seery is also the Indemnity Trust Administrator charged with funding and spending an indemnity reserve for the benefit of Indemnified Parties, including himself. His duties as Claimant Trustee and Indemnity Subtrustee are in hopeless conflict as a result of this arrangement.

53.     As now apparent, that conflict has manifested to the detriment of the intended beneficiaries of the Claimant Trust, including Movant. Essentially, Mr. Seery is seeking to hold the assets of the Claimant Trust hostage by reserving an increasing and inexplicably gigantic indemnity reserve to benefit the Indemnified Parties, including himself.

54.     But consider the nature of claims potentially triggering indemnification, such as the insider trading claims against Mr. Seery, Muck and Jessop.[72] If the potentially indemnified parties prevail, there can be no judgment to indemnify. If the potentially indemnified parties lose, the nature of the claim is such that there would be no indemnity owed – so how could $125 million in

---

[72] *See* Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3816.

CORE/3529447.0003/184885912.32

indemnification reserves be needed? That large indemnity reserve is antithetical to the interests of the intended beneficiaries of the Claimant Trust.

55.     Moreover, Mr. Seery's conduct in contravention of his duty of loyalty to beneficiaries of the Claimant Trust contravenes the language and intent of the Plan itself. The Plan does not require holders of Class 10 and 11 claims (or parties related thereto) to grant releases of liability to the Claimant Trustee or the Indemnified Parties, but by refusing to pay out Classes 8 and 9 and refusing to issue the required GUC Certification in favor of funding up to $125 million in indemnity reserves, that is functionally what Mr. Seery is seeking to leverage Classes 10 and 11 (and even other non-parties) to provide.[73]

56.     Forcing Classes 10 and 11 to bear the cost of Mr. Seery's indemnification reserve also goes beyond what the CTA allows. Paragraph 8.2 of that Agreement expressly allows parties to sue Mr. Seery and other indemnified parties for actions that constitute fraud, willful misconduct, or gross negligence, provided that they seek Bankruptcy Court approval to proceed on such claims. In other words, not even the CTA contemplates that Classes 10 and 11 would grant full, general releases to the Indemnified Parties, much less fund their defense for cognizable claims under the Agreement. By trying to insulate himself from *all* claims as a condition of performing his mandatory duties under the CTA, Mr. Seery is putting his personal self-interest ahead of the beneficiaries of the Trust.

57.     There is ample case law holding that a trustee may not make a release (or its equivalent) a condition of performing his duties to a trust. Indeed, as the Delaware Chancery Court has explained, "[a]lthough the practice of demanding a release is widespread, a trustee who insists on a release as the price [of] doing what is in the best interests of the trust—and what the trustee's fiduciary duties therefore require—engages in self-interested conduct by extracting a personal benefit

---

[73] Highland Parties' Objection to Motion to Stay and Motion to Compel Mediation, Dkt. 3796, at fn. 4.

CORE/3529447.0003/184885912.32

at the expense of the trust and its beneficiaries." *J.P. Morgan Tr. Co. of Delaware, Tr. of Fisher 2006 Tr. v. Fisher*, No. CV 12894-VCL, 2021 WL 2407858, at \*22 n.9 (Del. Ch. June 14, 2021), *judgment entered sub nom* (noting that "[t]he trustee's insistence on a release may also fuel the beneficiaries' concern about improper conduct, as it did in this case").

58.     Similarly, the Southern District of New York has held that a fiduciary's refusal to distribute assets without getting a release can constitute a breach of fiduciary duty:

> Defendants also argue that the demand for a release was not a breach of fiduciary duty because there is no merit to KeyBank's underlying claims. I have held for the reasons stated above that some of KeyBank's claims have been properly pleaded and survive a motion to dismiss. Even if that were not the case, however, the First Amended Complaint properly alleges that the refusal to deliver stock to which KeyBank was entitled – based on the defendants' self-interested insistence that they be released from KeyBank's claims – was an abuse of defendants' control of the buyer that had nothing to do with the buyer's legitimate business interests and that instead served only the self-interests of the defendants themselves.

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, 44 (Bankr. S.D.N.Y. 2020).

59.     In yet another similar case, the Southern District of New York held that a trustee breached its fiduciary duties by insisting on indemnification before carrying out its contractual obligations. In *FMS Bonds, Inc. v. Bank of New York Mellon*, the plaintiffs, holders of industrial revenue bonds, filed suit for breach of contract and breach of fiduciary duty against the indenture trustee responsible for servicing the bonds. No. 15 CIV. 9375 (ER), 2016 WL 4059155, at \*1 (S.D.N.Y. July 28, 2016). The plaintiffs alleged the trustee failed to file a timely proof of claim in the bankruptcy proceedings on behalf of the entities obligated to make payments under the bonds. *Id.* at 7. The trustee offered to file a late proof of claim, but only if the plaintiffs agreed to "further indemnification protection" for the trustee. *Id.* The plaintiffs argued that "where the Trustee's 'gross negligence' prevented bondholders from collecting on the Bonds, the Trustee's inaction and insistence on further indemnification in order to rectify that gross negligence was a breach of the Trustee's fiduciary duties." *Id.* at 13. The trustee moved to dismiss plaintiffs' breach of fiduciary duty

27

claim, and the court denied the motion, stating that the plaintiffs' allegations "that the Trustee . . . breached its fiduciary duties by insisting on indemnification before taking further action" properly pleaded a breach of fiduciary duty claim. *Id.* at 14.

60.     The reasoning of these cases applies with equal force here. Mr. Seery is obligated under the CTA to administer the Claimant Trust expeditiously, with an aim toward maximizing value for the Trust's intended beneficiaries, and to distribute the Claimant Trust's assets to those beneficiaries within a reasonable time. Instead of doing so, Mr. Seery is increasing the indemnity reserve so he can indemnify himself and others against future, unidentified lawsuits, potentially in perpetuity. In other words, like the trustees in *Fisher*, *Keybank National Association*, and *FMS Bonds*, Mr. Seery is refusing to comply with his obligations under the relevant trust agreement to extract some benefit for himself. That is a breach of the duty of loyalty, and that is a sufficient basis for Movant to seek Mr. Seery's removal under Delaware law.

### b)      Mr. Seery's Continued Service Substantially Impairs the Administration of the Trust

61.     Mr. Seery's dual roles as Claimant Trustee and Indemnity Subtrust Administrator create an irreconcilable conflict of interest that substantially impairs the administration of the trust. As Claimant Trustee, Mr. Seery has duties to the Claimant Trust Beneficiaries to timely pay the remaining Class 8 and 9 claims, and file the GUC Certification. However, Mr. Seery, as an Indemnified Party as well as Indemnity Subtrust Administrator, instead is using the assets of the Claimant Trust to fund a $35-50 million cash reserve to the Indemnity Subtrust and create an additional $90 million "indemnity reserve." In other words, Mr. Seery has chosen to pursue creation of an "indemnity wall" rather than perform his duties as Claimant Trustee. Under these circumstances, Mr. Seery's continued service as Claimant Trustee while he also serves as Indemnity Subtrust Administrator impairs the administration of the Claimant Trust, warranting his removal as Trustee.

CORE/3529447.0003/184885912.32

### c)    Mr. Seery Is Hostile to Movant, the Largest Class 10 Equity Holder

62.    "Removal of a trustee is appropriate where 'there exists . . . hostility between the trustee[] and the beneficiaries that threatens the efficient administration of the trust.'" *Matter of Jeremy Paradise Dynasty Tr.*, No. CV 2021-0354-KSJM, 2021 WL 3625375, at *1 (Del. Ch. Aug. 17, 2021). Where, as here, hostility rises to the point of preventing trust funds from being distributed, removal is appropriate. *See, e.g.*, *Taglialatela v. Galvin*, No. CIV.A. 5841-MA, 2013 WL 2122044, at *3 (Del. Ch. May 14, 2013) ("The ongoing hostility and lack of communication and trust between the Trustee and three of her siblings have prevented the trust funds from being distributed to the six beneficiaries in a reasonable time after the settlor's death. . . . I conclude that it is in the best interest of the beneficiaries here to remove [the Trustee.]").

63.    There can be no doubt that Mr. Seery is hostile to Movant and the holders of Class 10 and 11 claims (the holders of Contingent Trust Interests under the CTA). Among other things:

- Mr. Seery has provided testimony on repeated occasions accusing Class 10 and 11 claims holders of "bad faith" and other misconduct;

- Mr. Seery has helped facilitate lawsuits against Class 10 and 11 claims holders, including the *Kirschner* Action;

- Mr. Seery has helped facilitate the filing of motions against Class 10 and 11 claims holders, including a Motion to Deem the Dondero Parties Vexatious Litigants, currently pending in the United States District Court for the Northern District of Texas;

- Mr. Seery not only has failed to communicate with the Class 10 and 11 claim holders about the estate's finances, but opposes their efforts to obtain such information;[74] and

- Mr. Seery has resisted and opposed relief sought by Class 10 and 11 claims holders, even where that relief was reasonable and designed to benefit the estate as a whole.[75]

---

[74] Memorandum of Law in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Motion to Dismiss Complaint Case No. 23-03038 (N.D. Tex.) at Dkt. 14 [App. 079-109]. The claim holders have requested this information since at least June 2022 (Dkt. 3382), which was approximately $80 million in estate expenses ago. *See* ¶ 25 *supra*.

[75] *See* Highland Capital Management, L.P.'s Memorandum of Law in Support of its Motion to Deem the Dondero Entities Vexatious Litigants and for Related Relief, Case No. 21-00881 (N.D. Tex.), Dkt. 137 [App. 031-038] (wherein the Reorganized Debtor (under the control of the Claimant Trust), defines "Dondero Entities" as including HMIT (Movant herein) at fn. 1; states "The Dondero Entities—all of which are dominated and controlled by or acting in concert with

CORE/3529447.0003/184885912.32

64.    The hostility described herein between Mr. Seery and the beneficiaries of the Claimant Trust is more than sufficient to warrant Mr. Seery's removal. In *Taglialatela*, the court removed the trustee because "ongoing hostility and lack of communication" between the trustee and beneficiaries "prevented the trust funds from being distributed" to the beneficiaries in a reasonable time. 2013 WL 2122044, at *3. Similarly, here, the hostility between Mr. Seery and the beneficiaries is so extreme that Mr. Seery refuses to administer the trust funds without first establishing an indemnity fund with potentially more than one hundred million dollars. That is impermissible under Delaware law.

65.    For all the foregoing reasons, Movant's Delaware complaint sets forth a *prima facie* claim for removal of Mr. Seery as Trustee of the Claimant Trust, consistent with the applicable legal standard and also even consistent with this Court's new Gatekeeper Colorability Test.

**B.    Movant Seeks to File its Delaware Complaint for a Proper Purpose**

66.    Even though Movant does not agree with the Court's Gatekeeper Colorability Test, Movant can readily satisfy the next element of that test because it has a legitimate and proper reason to seek Mr. Seery's removal under Delaware law. As the allegations above make clear, Movant has no other legal avenue available to protect its sizeable interest in the assets of the Claimant Trust.

67.    The latest information from the Highland Parties is that the Indemnity Subtrust now holds reportedly $50 million in cash, and that an additional $90 million of the Claimant Trust assets have been held in an indemnity reserve. That means that at least $140 million is currently being held for indemnity—on the sole authority of Mr. Seery in order to protect himself. Contrary to the

---

Dondero, HCMLP's co-founder and ousted Chief Executive Officer—are engaged in a coordinated litigation strategy spanning nearly three years to wear down HCMLP and its management and undermine HCMLP's confirmed Plan." *Id.*, at ¶ 1.; "Thereafter, directly and through the Dondero Entities, he began interfering with the management of the estate, threatening HCMLP employees, challenging nearly every action taken to further HCMLP's reorganization, commencing new (and frivolous) litigation against HCMLP and its management both insider and outside of Bankruptcy Court…" *Id.* at ¶ 4; "Separately, in March 2023, HMIT sought leave to sue HCMLP for allegedly breaching its fiduciary duty and other obligations to HMIT—a prepetition equity holder…. However, HMIT's putative complaint is emblematic of the Dondero Entities' unceasing litigation--…" *Id.* at ¶ 30); Dec. 14, 2020 Depo. Tr. at 37:22-25 [App. 003]; Aug. 4, 2021 Hr'g Tr. At 66:15-18 [App. 007]; June 2, 2023 Depo. Tr. At 113:17-20 [App. 028].

30

representations in the Subtrust Motion, the amount now held for indemnity is 560% of the original $25 million represented. By comparison, for the pre-effective date period, the entire bankruptcy case only cost approximately $40 million in administrative fees through August 10, 2021.[76]

68.     The Plan and Trusts have now turned into nothing more than vehicles for Mr. Seery to leverage to seek to force Class 10 and 11 Equity Holders, and even related party non-equity holders, to deliver releases and other consideration to Mr. Seery and the Indemnified Parties. By his conduct, Mr. Seery seeks the complete exculpation the Fifth Circuit denied him.[77] Under the guise of "indemnity," he holds assets that belong to beneficiaries, vested and contingent, entirely hostage at his sole and unfettered discretion. Meanwhile, Seery continues to collect his monthly compensation of $150,000 per month, plus authorize over $5 million in undisclosed monthly expenses. The present circumstances demonstrate that, if not stopped, Seery will continue to use his position in this manner until the Trusts are exhausted and the Plan is entirely frustrated. The creation of the Trusts and limitless authority of Mr. Seery have resulted in a conflict of interest which cannot be resolved without a court's appropriate, and entirely necessary, equitable resolution.

69.     In short, the claims to remove Mr. Seery as Claimant Trustee are not without foundation, not without merit, and not being pursued for an improper purpose. Based on the Delaware law described herein, Movant meets the applicable legal standard, and also even this Court's Gatekeeper Colorability Test, and the Court should allow Movant to proceed with its complaint in Delaware.

## IV.    CONCLUSION

For all of the forgoing reasons, this Motion should be granted.

---

[76] September 30, 2023, Post-confirmation Reports, Dkt. Nos. 3955 and 3956, p.2.
[77] *In re Highland Capital Management, L.P.,* 48 F.4th 419, 435 (5th Cir. 2022).

CORE/3529447.0003/184885912.32

WHEREFORE, Movant requests the entry of an order i) granting this Motion for Leave; ii) determining that the Gatekeeping Provision is satisfied as applied to the Delaware Proceeding; and iii) authorizing Movant to file the Delaware Complaint.

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
*Counsel for The Hunter Mountain Investment Trust*

32

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on December 21, 2023, counsel for Hunter Mountain Investment Trust conferred with opposing counsel regarding this motion and opposing counsel indicated that the Debtor is opposed.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 1, 2024, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3529447.0003/184885912.32