# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, CHIEF JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| | ) <u>TRANSCRIPT of the HEARING</u> |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) <u>on DEBTOR'S OBJECTION to</u> |
| | ) <u>HCRE's PROOF Of CLAIM</u> |
| | ) |
| Debtor. | ) |
| | ) November 1, 2022 |
| | ) Dallas, Texas |

<u>Appearances</u>:

| | |
|---|---|
| For the Debtor: | John A. Morris |
| | Hayley Winograd |
| | Pachulski Stang Ziehl & Jones LLP |
| | 780 Third Avenue, 39th Floor |
| | New York, New York  10017-2024 |
| | |
| | Zachery Z. Annable |
| | Hayward PLLC |
| | 10501 N. Central Expressway, Suite 106 |
| | Dallas, Texas  75231 |
| | |
| For Creditor and | C. William "Bill" Gameros, Jr. |
| Claimant NexPoint | D. Wade Carvell |
| Real Estate Partners, | Hoge & Gameros, L.L.P. |
| also known as HCRE: | 6116 N. Central Expressway, Suite 1400 |
| | Dallas, Texas  75206 |
| | |
| Digital Court | United States Bankruptcy Court |
| Reporter: | Michael F. Edmond Sr., Judicial |
| |  Support Specialist |
| | 1100 Commerce Street, Room 1254 |
| | Dallas, Texas  75242 |
| | |
| Certified Electronic | Susan Palmer |
| Transcriber: | Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*Dondero - Cross/Morris* 54

1  was going to obtain six percent of the SE Multifamily's
2  membership interests, correct?
3  A. That B&H was going to take — yes, get six percent, correct —
4  Q. That's right. And you may not have known exactly how much
5  Highland was going to get, but you — you do admit that you knew
6  and
7  understood at the time you signed this document that Highland
8  was going to get a significant majority of the interests,
9  correct?
10 A. That there would be a dilution for B&H coming in, but the
11 percentages would be similar to the original —
12 Q. Okay.
13 A. — agreement, and I guess is what I knew in general.
14 Q. Right. So it was your understanding when you signed this
15 document that Highland's 49-percent interest was going to be
16 diluted by the six percent that was being granted to BH
17 Equities, correct?
18 A. Generally, yes.
19 Q. Okay. So even though you didn't read Schedule A before
20 signing the agreement, the schedule comports with your
21 expectations when you signed the agreement on behalf of Highland
22 and HCRE, correct?
23 A. Generally, yes.
24 Q. Okay. Let's just cut to the chase with the proof of claim.
25 That's Exhibit 8. Do you have that in front of you, sir?

*Dondero - Cross/Morris* 55

1  A. Yes.
2  Q. Okay. Your electronic signature is on the proof of claim,
3  correct?
4  A. It — I'll — I'll stipulate to that, I guess, on —
5  Q. It's on the bottom of the page wherein the top left it says
6  number 12.
7  A. Okay.
8  Q. Do you see your electronic signature?
9  A. Ye- — yes.
10 Q. Okay. And you authorized your electronic signature to be
11 affixed to this document, correct?
12 A. Yes.
13 Q. And you authorized this document to be filed on behalf of
14 HCRE, correct?
15 A. Yes.
16 Q. You didn't review this document before it was filed,
17 correct?
18 A. Correct.
19 Q. And so you didn't review Exhibit A, which is the last page
20 of the exhibit, you didn't review that before it was filed,
21 correct?
22 A. Not that I recall.
23 Q. You can't identify — now this agreement was prepared by
24 Bonds Ellis; do I have that right?
25 A. Correct.

*Dondero - Redirect/Gameros* 59

1 correct?

2 A.  I did not believe I needed to.

3       MR. MORRIS:  Okay, I have no further questions, Your

4 Honor.

5       THE COURT:  Redirect.

6       MR. GAMEROS:  Very briefly, Your Honor, I've only got

7 a couple of questions.

8       THE COURT:  Okay.

9       <u>REDIRECT EXAMINATION</u>

10 BY MR. GAMEROS:

11 Q.  Mr. Dondero, you testified about the process for signing the

12 LLC agreements, the KeyBank loan, and even the proof of claim.

13 Would you please tell the Judge what the process is?

14 A.  Well, it's different in everything, but any significant

15 transaction goes through compliance and any significant

16 transaction that includes multiple entities goes through

17 rigorous compliance whereby, by compliance, without direct input

18 of the investment people, investigate the basis of the

19 transaction in the fairness of tr- — of the transaction and then

20 sign off on that transaction.  You know, so on any kind of

21 investment, a normal — I know it's changed in the new Highland,

22 but — but a normally-compliant advisor goes through a rigid,

23 rigorous process regarding any sale of an asset.

24       As far as bankruptcy and the complexities of a

25 bankruptcy that takes odd twists and turns, and just the

*Dondero - Redirect/Gameros* 60

1 complexities of this bankruptcy in particular and the betrayal
2 of the estate by insiders, you know, et cetera, you have to rely
3 on outside counsel and you have to rely on — you have to rely on
4 outside counsel and you have to rely on their expertise in the
5 bankruptcy process.
6 Q. So —
7     MR. MORRIS: Your Honor, I move to strike the portions
8 of the answer that refer to the new Highland's practices because
9 the witness has no personal knowledge. I move to strike his
10 reference to the betrayal of the estate as being outrageous.
11 It's got absolutely nothing to do with his inability to review
12 documents before he signs them.
13     THE COURT: Your response.
14     MR. GAMEROS: Your Honor, the witness was asked about
15 the process, and that was one of the views that he had in terms
16 of how he deals with external events, transactions. That's his
17 view of the bankruptcy proceeding. Mr. Morris may not like it
18 and Highland may not like that characterization or new Highland
19 may not like that characterization, but it's a fair summary of
20 the witness' answer. It's how he feels about what's going on.
21 I think it's wholly appropriate.
22     THE COURT: Okay. I overrule. It's his view of the
23 process, he was asked about the process, so —
24     MR. MORRIS: Your Honor, I'm going to try one more
25 time. He can testify to his process all he wants. This is

*Dondero - Redirect/Gameros* 62

1 and just grab my notebook.

2     THE COURT: You may, um-hum.

3     MR. GAMEROS: Thank you.

4     THE WITNESS: I got it. Oh, the — what —

5     MR. GAMEROS: That's Exhibit 8.

6 BY MR. GAMEROS:

7 Q. That's Highland's Exhibit 8, the proof of claim.

8 A. Yes.

9 Q. You relied on Bonds Ellis to draft the proof of claim,

10 correct?

11 A. Yes.

12 Q. Did you do anything to interfere with Bonds Ellis' access to

13 anyone at Highland or HCRE for drafting — Highland, I'm sorry —

14 anyone at HCRE for drafting a proof of claim?

15 A. No.

16 Q. Did they ever talk to you about the proof of claim?

17 A. No. I mean knew generally we were filing a bunch of proofs

18 of claims at the time, but not specifically.

19     MR. GAMEROS: All right. Thank you. I have no other

20 questions, Your Honor.

21     THE COURT: Recross.

22     MR. MORRIS: I have nothing, Your Honor.

23     THE COURT: All right. Mr. Dondero, you're excused

24 from the witness box.

25     THE WITNESS: Thank you.

*McGraner - Direct/Gameros*  74

1  with the DSI folks, Caruso, Fred Caruso, and my team.
2  Q.  Okay.  Who is DSI, just so the Court's clear on that?
3  A.  I don't know what — I think they were the CRO, the chief
4  reorg- — but this is the only part I really touched with them.
5  And so the couple conversations I had with Fred were I think we
6  both agreed that we're — it was going to be futile.
7  Q.  Okay.  And Mr. Caruso works for DSI?
8  A.  I believe so.
9  Q.  All right.  Did HCRE try to pay back Highlands Capital?
10 A.  I think so.
11 Q.  Okay.  What happened?
12         MR. MORRIS:  I apologize, Your Honor.  I didn't hear
13 the answer.
14         THE WITNESS:  I think so.
15         MR. MORRIS:  Thank you.
16         THE COURT:  Okay.
17         THE WITNESS:  You bet.
18 BY MR. GAMEROS:
19 Q.  What happened?
20 A.  I — I was told it was returned.
21 Q.  Okay.  Do you know why?
22 A.  I don't.
23 Q.  All right.  Why did HCRE file a proof of claim?
24 A.  I think we were trying to protect our interests, advice of
25 counsel.  Again, the important point is my partners weren't my

*McGraner - Cross/Morris* 75

1 partners, you know, in March of 2019. And then when the
2 bankruptcy started, it kind of took on a life of its own.
3 Q. Do you know the proof of claim worked through the HCRE side
4 of the house before it was filed?
5 A. Yeah. I mean our internal counsel at NexPoint, external
6 counsel, you know, came to me and said that they thought it
7 would be a good idea and generally told me what it was about,
8 and I said okay.
9       MR. GAMEROS: Pass the witness, Your Honor.
10       THE COURT: Okay. Cross.
11       <u>CROSS-EXAMINATION</u>
12 BY MR. MORRIS:
13 Q. Good morning, Mr. McGraner.
14 A. Good morning, Mr. Morris.
15       MR. MORRIS: So may I just approach the witness to
16 clean up the exhibits?
17       THE COURT: You may.
18       THE WITNESS: These are yours.
19 BY MR. MORRIS:
20 Q. Let's just do a little background here, Mr. McGraner. Since
21 the time HCRE was formed, it's only been owned by you, Mr.
22 Dondero, and Mr. Scott Ellington, correct?
23 A. Yes.
24 Q. And Mr. Dondero owns 70 percent, you own 25 percent, and Mr.
25 Ellington owns five percent, correct?

*McGraner - Cross/Morris* 109

1 A. I had good partners —

2 Q. — perspective, this dispute is really just a consequence of

3 Highland's bankruptcy filing; isn't that right?

4 A. I think it's an unintended consequence, yeah.

5 Q. Let's talk about the proof of claim for a moment.

6 A. Okay.

7 Q. If we can go to Exhibit 8. You mentioned D. C. Sauter

8 earlier. Did I hear that correctly?

9 A. Sure.

10 Q. And Mr. Sauter at the time the original LLC agreement was

11 prepared and at the time the KeyBank loan was prepared and at

12 the time the amended and restate LLC agreement was prepared, he

13 was at Wick Phillips, right?

14 A. I think so.

15 Q. And then in the fall of 2019, or thereabouts, he came over

16 to NexPoint; do I have that right?

17 A. I think so.

18 Q. Okay. And when he was at Wick Phillips he worked on Project

19 Unicorn, didn't he?

20 A. Yeah.

21 Q. Yeah. And he is the one who showed you this proof of claim

22 before it was filed on behalf of HCRE, correct?

23 A. I think so.

24 Q. Um-hum. You weren't given an opportunity to provide any

25 comments to the document before it was filed, correct?

|  | McGraner - Cross/Morris | 110 |
|---|---|---|

```
 1   A.  I think we — we spoke about it generally, conceptually.
 2   Q.  You — you weren't given the opportunity to provide any
 3   comments to the document before it was filed, correct?
 4   A.  I didn't think I needed to.  I'm not a bankruptcy attorney,
 5   I don't know the process or what should be said.  We relied on
 6   our counsel for that.
 7   Q.  Okay.  So a simple question:  You weren't given the
 8   opportunity to provide any comments to the document before it
 9   was filed, correct?
10   A.  My answer is I was deferential to — to our counsel.
11   Q.  You never gave Mr. Sauter any documents in connection with
12   the proof of claim, correct?
13   A.  Correct.
14   Q.  You don't know whether Mr. Sauter ever gave any documents to
15   Bonds Ellis in connection with this proof of claim, correct?
16   A.  I don't know.
17   Q.  You — you don't know, right?  You have no personal
18   knowledge —
19   A.  I don't know —
20   Q.  — of Mr. Sauter giving any documents to Bonds Ellis in
21   connection with the proof of claim, correct?
22   A.  Correct.
23   Q.  You never discussed this document with Mr. Dondero, correct?
24   A.  Correct.
25   Q.  You never discussed this document with anybody at Bonds
```

```
State of California          )
                             )     SS.
County of Stanislaus         )
```

I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am not a party to nor in any way interested in the outcome of this matter.

I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

*[Signature: Susan Palmer]*

Susan Palmer
Palmer Reporting Services
P.O. Box 4082
Modesto, California  95352
(209) 915-3065

Dated November 5, 2022