# EXHIBIT 3
# Part 1

1 CIT SOS-ESERVE

FILED
8/15/2022 2:30 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

DC-22-10107

## CASE NO. _____

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | 116th |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this Original Petition and Jury Demand against Defendant Alvarez & Marsal CRF Management, LLC ("A&M" or "Defendant"), and respectfully shows the following:

### I. DISCOVERY PLAN

1.      Plaintiff asserts that discovery should be conducted under Level 3 pursuant to Texas Rules of Civil Procedure 190.1 and 190.4.

### II. PARTIES

2.      DAF is a limited partnership organized in the Cayman Islands. DAF conducts charitable activities in the State of Texas.

3.      A&M is a foreign limited liability company organized and existing under the laws of the State of Delaware. A&M engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas. A&M may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin,

Texas 78701, who is requested to forward process to A&M's Registered Agent for service

in the State of Delaware: Alvarez & Marsal CRF Management, LLC, Corporation Service

Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Tex. Civ. Prac. & Rem.

Code Ann. § 17.044.

### III. JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action as DAF seeks monetary relief

over $1,000,000.00. The damages sought by DAF are within the jurisdictional limits of the

Court.

5.      Venue is proper under Texas Civil Practice and Remedies Code §

15.002(a)(1) because all or a substantial part of the events or omissions giving rise to this

claim occurred in Dallas County, Texas.

6.      This Court has personal jurisdiction over A&M because: (i) A&M is and has

been doing business in Texas pursuant to section 17.042 of the Texas Civil Practices and

Remedies Code (ii) A&M has purposefully availed itself of the benefits and protections

offered by the State of Texas by conducting business in this State; (iii) A&M has

committed wrongful acts within this State, and (iv) A&M's conduct in and contacts with

this State give rise to or relate to the causes of action alleged herein.

### IV. FACTUAL BACKGROUND

7.      DAF's exclusive mission involves charity. Since 2012, DAF's supporting

organizations committed over $42 million to nonprofit organizations and funded

2

approximately $32 million of total commitments. These charitable causes include education, military veterans, first responders, health and medical research, economic and community development initiatives, and youth and family programs in the State of Texas. This lawsuit is necessary because of A&M's improper withholding of assets lawfully owned by and due to DAF and A&M's associated interference with DAF's charitable mission.

8.      On or about June 30, 2016, DAF purchased shares in the Highland Crusader Fund II, Ltd. ("Crusader Fund II") from the Promethee T Fund (formerly known as Promethee Tremont Fund) ("Promethee") for in excess of $1.0 million ("DAF's Direct Interest"). DAF is the lawful owner of all beneficial right, title, and interest in and to DAF's Direct Interest and to DAF's Full Direct Interest, as described below. The Crusader Fund II is a segregated, identifiable fund held separate from other funds managed by A&M. A&M has no legitimate claim to DAF's Full Direct Interest, as described below.

9.      A&M is the investment manager of the Crusader Fund II and has been so at all times relevant to the claims asserted in this lawsuit. As the investment manager, A&M receives payment from the Crusader Fund II for A&M's management services. Upon information and belief, A&M's compensation is based on the value of Crusader Fund II; accordingly, A&M earns more compensation if Crusader Fund II has more available funds. A&M is improperly exercising control over DAF's Full Direct Interest.

10.     DAF previously made a written demand to A&M, through A&M's legal counsel, for payment to DAF of the full value of DAF's Direct Interest, plus all related distributions and other withholdings owed DAF in regard to DAF's Direct Interest ("DAF's Full Direct Interest"). A&M refused to comply with this demand without legal justification.  In doing so, A&M continues to deprive DAF of DAF's access to and right to possess and use DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. In short, A&M is depriving DAF of DAF's property without any appropriate legal basis or justification.

11.     Upon information and belief, A&M is a registered investment advisor subject to the Investment Advisors Act of 1940. Notwithstanding its role as a registered investment advisor, A&M has continued to improperly withhold DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M refuses to distribute equivalent funds to the DAF. A&M entered into an informal confidential and special relationship with DAF. A&M controls and manages funds which DAF has a direct interest. DAF places trust and confidence in A&M to control, manage, and distribute DAF's Full Direct Interest. DAF's damages arise out of A&M's refusal to recognize DAF's right to control DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M's decision, instead, to unlawfully withhold the same even though it should be distributed to DAF.

## V. CAUSES OF ACTION

### Count One – Breach of Fiduciary Duties

12.    DAF incorporates all of the foregoing factual averments by reference as if set fully set forth herein.

13.    A&M is exercising dominion and control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M holds a position of special trust and confidence with DAF regarding DAF's Full Direct Interest. A&M owes DAF common law fiduciary duties arising out of A&M's position of trust and confidence.

14.    The fiduciary duties A&M owes DAF include, but are not limited to, the duty of loyalty - to always act in the best interest of the investor, the duty to act with utmost good faith, the duty to refrain from self-dealing, the duty of fair and honest dealing, the duty to act with integrity of the strictest kind, and the duty of candor and full disclosure. Central to the fiduciary duties A&M owes DAF is the duty to not deprive DAF of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M's failure and refusal to pay and return the same, even after DAF has made specific written demand for DAF's Full Direct Interest, is intentional misconduct that breaches one or more of the fiduciary duties A&M owes DAF and has caused damage to DAF.

15.     A&M is, therefore, liable to DAF for actual damages, punitive damages, and all other relief to which DAF is justly and legally entitled as the result of A&M's breach of fiduciary duties owed to DAF.

## Count Two – Conversion

16.     DAF respectfully incorporates by reference all of the foregoing factual and legal averments as if fully set forth herein.

17.     DAF has ownership of and a right to immediate possession of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M has no legitimate claim to DAF's Full Direct Interest or to the Crusader Fund II regarding DAF's Full Direct Interest.

18.     The Crusader Fund II funds were delivered to A&M for safekeeping and management. The Crusader Fund II funds were intended to be segregated from other funds managed by A&M.

19.     Upon information and belief, A&M continues to hold the Crusader Fund II funds in substantially the same form as received.

20.     DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, are separate and identifiable funds held by A&M for the benefit of DAF. DAF has made demand upon A&M to immediately relinquish possession of DAF's Full Direct Interest to DAF. A&M has ignored DAF's demand and A&M continues to

wrongfully exercise dominion and control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest.

21.    DAF has been deprived of its lawful right to ownership and control of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, by A&M's unauthorized withholding of the same without a legally correct basis to do so.

22.    As a proximate and/or direct result of A&M's conversion of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, DAF has suffered significant damages for which damages DAF now sues.

23.    A&M is, therefore, liable to DAF for actual damages, punitive damages, and all other relief to which DAF is justly and legally entitled as the result of A&M's conversion.

### Count Three – Money Had and Received

24.    DAF incorporates all of the foregoing factual averments, and the factual and legal averments in Counts One and Two above, by reference as if fully set forth herein and further alleges the following in the alternative.

25.    A&M has received and wrongfully holds and retains control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M has benefitted and continues to benefit from receipt of the same. Principles of equity and good conscience require that A&M should not be permitted to keep, in

whole or in part, DAF's Full Direct Interest or, in the alternative, the capital account value

of DAF's Direct Interest.

## VI. DAMAGES

26.    DAF incorporates the foregoing factual averments, and the factual and legal

averments in Counts One through Four above, as if fully set forth herein and further

alleges the following in the alternative.

27.    DAF requests judgment against A&M for all of DAF's actual damages,

including, without limitation, direct damages, special damages, consequential damages,

lost savings, lost profits, out-of-pocket damages, future damages, and incidental

damages, to which DAF is entitled, in addition to punitive or exemplary damages,

prejudgment and post-judgment interest at the highest legal rate, and costs of Court.

## VII. CONDITIONS PRECEDENT

28.    All conditions precedent, if any, to the claims asserted herein have been

performed, excused, waived, satisfied, or have otherwise occurred.

## VIII. JURY DEMAND

29.    DAF demands a trial by jury and tenders the jury fee pursuant to Rule 216

of the Texas Rules of Civil Procedure.

## IX. DAF'S RULE 193.7 NOTICE

30.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, DAF intends to use any and all documents produced in A&M's discovery responses as evidence at the time of any hearing or trial in this matter.

## X. REQUEST FOR DISCLOSURES

31.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, A&M is requested to disclose, within fifty (50) days of service of this request, the information or material described in Texas Rule of Civil Procedure l 94.2(a)-(I).

## PRAYER

Plaintiff, Charitable DAF Fund, L.P., respectfully requests that Defendant Alvarez & Marsal CRF Management, LLC be cited to appear and answer herein, that this Court grant judgment in DAF's favor over and against said Defendant as set forth herein, for all actual damages DAF has suffered, punitive or exemplary damages, prejudgment and post-judgment interest at the highest rate permitted by law, and that DAF be granted all other and further relief, at law and in equity, general and special, to which DAF may be justly entitled.

Dated: August 15, 2022        Respectfully submitted,

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY
PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY
PLLC**
One Riverway, Suite 1800 Houston,
Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

3106604.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicholle Trimbach on behalf of Sawnie Mcentire
Bar No. 13590100
ntrimbach@pmmlaw.com
Envelope ID: 67293009
Status as of 8/23/2022 5:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alejandra Godoy | | agodoy@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |
| Linda Kimball | | lkimball@pmmclaw.com | 8/15/2022 2:30:19 PM | SENT |
| Nicholle Trimbach | | ntrimbach@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/15/2022 2:30:19 PM | SENT |

FELICIA PITRE

DALLAS COUNTY DISTRICT CLERK

NINA MOUNTIQUE
CHIEF DEPUTY

## CAUSE NO. DC-22-10107

CHARITABLE DAF FUND LP

vs.

ALVAREZ & MARSAL CRF MANAGEMENT LLC

116th District Court

## <u>ENTER DEMAND FOR JURY</u>

JURY FEE PAID BY: PLAINTIFF

FEE PAID: $10

**FORM NO. 3534 CITATION**
**THE STATE OF TEXAS**

**To:    ALVAREZ & MARSAL CRF MANAGEMENT LLC**
**BY SERVING THE SECRETARY OF STATE**
**OFFICE OF THE SECRETARY OF STATE**
**CITATIONS UNIT - P.O. BOX 12079**
**AUSTIN, TX, 78711**

GREETINGS:
You have been sued. You may employ an attorney.  If you or your attorney do not file a written answer with    the clerk who issued this citation by 10 o'clock a.m. on the Monday next following the expiration of twenty days after you were served this citation and  petition, a default judgment may be taken against you.
 In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk.  Find out more at TexasLawHelp.org. Your answer should be addressed to the clerk of the **116th District Court**  at 600 Commerce Street, Dallas Texas, 75202.

   Said **PLAINTIFF** being   **CHARITABLE DAF FUND LP**

   Filed in said Court on the **15th day of August, 2022** against

 **ALVAREZ & MARSAL CRF MANAGEMENT LLC**
 For suit, said suit being numbered   **DC-22-10107**  the nature of which demand is as follows:
 Suit On  **OTHER (CIVIL)** etc.
as shown on said petition  a copy of which accompanies this citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.

 Given under my hand and the Seal of said Court at office **on this the 23rd day of September, 2022**
ATTEST: FELICIA PITRE Clerk of the District Courts of Dallas, County, Texas

      By_____, Deputy
        **SHELIA BRADLEY**

---

ESERVE  (SOS)

**CITATION**

| No.: **DC-22-10107** |
| --- |

**CHARITABLE DAF FUND LP**
vs.
**ALVAREZ & MARSAL CRF**
**MANAGEMENT LLC**

ISSUED
**ON THIS THE 23RD DAY OF**
**SEPTEMBER, 2022**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By **SHELIA BRADLEY**, Deputy

_____
Attorney for : Plaintiff
**SAWNIE A MCENTIRE**
PARSONS MCENTIRE MCCLEARY PLLC
1700 PACIFIC AVENUE SUITE 4400
DALLAS TX  75201
214-237-4300
smcentire@pmmlaw.com

**DALLAS COUNTY**
**SERVICE FEES**
**NOT PAID**

**OFFICER'S RETURN**
**FOR INDIVIDUALS**

Cause No. DC-22-10107
Court No: 116th District Court

Style: CHARITABLE DAF FUND LP
  vs.
ALVAREZ & MARSAL CRF MANAGEMENT LLC

Received this Citation the _____ day of_____, 20_____ at_____ o'clock.  Executed at _____, within the County of _____, State of_____, on the _____ day of _____, 20_____, at _____ o'clock, by delivering to the within named_____ each in person, a copy of this Citation together with the accompanying copy of Plaintiff's original petition, having first endorsed on same the date of delivery.

----------000000----------

**OFFICER'S RETURN**
**FOR CORPORATIONS**

Received this Citation the _____ day of_____, 20_____ at_____ o'clock ___.M.  Executed at _____, within the County of _____, State of_____, on the _____ day of _____, 20_____, at _____ o'clock _____.M. by summoning the within named Corporation, _____ _____ President - Vice President - Registered Agent - in person, of the said _____ a true copy of this citation together with the accompanying copy of Plaintiff's  original petition, having first endorsed on same the date of delivery.

----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:      To certify which witness by my hand.

| | | |
|---|---|---|
| For Serving Citation | $_____ | Sheriff_____ |
| For Mileage | $_____ | County of_____ |
| For Notary | $_____ | State of_____ |
| Total Fees | $_____ | By _____Deputy |

(Must be verified if served outside the State of Texas)
State of_____
County of_____
      Signed and sworn to me by the said _____ before me this _____ day of _____, 20_____, to certify which witness my hand and seal of office.

Seal                                                    _____
                                                              State & County of
                                                    _____

**FORM NO. 3534  CITATION**
**THE STATE OF TEXAS**

**To:**  **ALVAREZ & MARSAL CRF MANAGEMENT LLC**
       **BY SERVING THE SECRETARY OF STATE**
       **OFFICE OF THE SECRETARY OF STATE**
       **CITATIONS UNIT - P.O. BOX 12079**
       **AUSTIN, TX, 78711**

GREETINGS:
You have been sued. You may employ an attorney.  If you or your attorney do not file a written answer with    the clerk
who issued this citation by 10 o'clock a.m. on the Monday next following the expiration of twenty days after you were
served this citation and  petition, a default judgment may be taken against you.
 In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other
 parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with
 the clerk.  Find out more at TexasLawHelp.org. Your answer should be addressed to the clerk of the **116th District
 Court**  at 600 Commerce Street, Dallas Texas, 75202.

   Said **PLAINTIFF** being   **CHARITABLE DAF FUND LP**

   Filed in said Court on the **15th day of August, 2022** against

   **ALVAREZ & MARSAL CRF MANAGEMENT LLC**
   For suit, said suit being numbered   **DC-22-10107**  the nature of which demand is as follows:
   Suit On  **OTHER (CIVIL)** etc.
as shown on said petition  a copy of which accompanies this citation.  If this citation is not served, it shall be returned
unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.

   Given under my hand and the Seal of said Court at office **on this the 23rd day of September, 2022**
ATTEST: FELICIA PITRE Clerk of the District Courts of Dallas, County, Texas

        By_____ , Deputy
              **SHELIA BRADLEY**

---

ESERVE  (SOS)

**CITATION**

No.: **DC-22-10107**

**CHARITABLE DAF FUND LP**
vs.
**ALVAREZ & MARSAL CRF
MANAGEMENT LLC**

**ISSUED
ON THIS THE 23RD DAY OF
SEPTEMBER, 2022**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By **SHELIA BRADLEY**, Deputy

_____
Attorney for : Plaintiff
**SAWNIE A MCENTIRE**
PARSONS MCENTIRE MCCLEARY
CLARK PLLC
1700 PACIFIC AVENUE SUITE 4400
DALLAS TX  75201
214-237-4300
smcentire@pmmclaw.com
**DALLAS COUNTY
SERVICE FEES
NOT PAID**

**OFFICER'S RETURN**
**FOR INDIVIDUALS**

Cause No. DC-22-10107
Court No: 116th District Court

Style: CHARITABLE DAF FUND LP
 vs.
ALVAREZ & MARSAL CRF MANAGEMENT LLC

Received this Citation the _____day of_____, 20_____at_____o'clock.  Executed at _____, within the County of _____, State of_____, on the _____ day of _____, 20_____, at _____o'clock, by delivering to the within named_____ each in person, a copy of this Citation together with the accompanying copy of Plaintiff's original petition, having first endorsed on same the date of delivery.

----------000000----------

**OFFICER'S RETURN**
**FOR CORPORATIONS**

Received this Citation the _____day of_____, 20_____at_____o'clock____.M.  Executed at _____, within the County of _____, State of_____, on the _____day of _____, 20_____, at _____ o'clock _____.M. by summoning the within named Corporation, _____
_____ President - Vice President - Registered Agent - in person, of the said _____
a true copy of this citation together with the accompanying copy of Plaintiff's  original petition, having first endorsed on same the date of delivery.

----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:     To certify which witness by my hand.

For Serving Citation     $_____     Sheriff_____
For Mileage          $_____     County of_____
For Notary          $_____     State of_____
          Total Fees     $_____     By _____Deputy

(Must be verified if served outside the State of Texas)
State of_____
County of_____
          Signed and sworn to me by the said _____ before me this _____ day of _____, 20_____, to certify which witness my hand and seal of office.

Seal                          _____
                          State & County of

                          _____

FILED
8/24/2022 8:47 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

**ADDITIONAL $4 FEE
1 SOS/CIT/ESERVE**

# Parsons McEntire McCleary PLLC

1700 Pacific Ave., Ste. 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Nicholle Trimbach                                        (972) 885-2628
Paralegal                                                ntrimbach@pmmlaw.com

### August 24, 2022

Clerk, 116th District Court                              *Via E-file*
George L. Allen, Sr. Courts Building
600 Commerce Street, Suite 103
Dallas, Texas 75202

> Re:   Cause No. DC-22-10107; *Charitable Daf Fund, L.P. v. Alvarez & Marsal,
> CRF Management, LLC*; in the 116th Judicial District Court of Dallas
> County, Texas

Dear Clerk:

In the above-captioned matter, please email the Secretary of State citation to
ntrimbach@pmmlaw.com. In accordance with your instructions, there will be a $4.00
payment. The additional $8.00 was paid in envelope number 67293009. Thank you for
your attention on this matter.

Sincerely,

*/s/ Nicholle Trimbach*

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicholle Trimbach on behalf of Sawnie Mcentire
Bar No. 13590100
ntrimbach@pmmlaw.com
Envelope ID: 67596808
Status as of 8/29/2022 9:13 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/24/2022 8:47:24 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |
| Nicholle Trimbach | | ntrimbach@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |
| Alejandra Godoy | | agodoy@pmmlaw.com | 8/24/2022 8:47:24 AM | SENT |

FILED
1/19/2023 3:02 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jeremy Jones DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED MOTION TO RETAIN

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this verified motion to retain, requesting that the Court retain this cause on the docket and not dismiss this cause for want of prosecution, and in support of which respectfully shows the following:

1.      This lawsuit is set on the January 24, 2023, dismissal docket for want of prosecution. This is the first dismissal docket setting in this case. DAF submits the Court should not dismiss DAF's lawsuit because there is good cause to retain it on the Court's docket, as demonstrated below. Tex. R. Civ. P. 165a.1.

2.      Plaintiff DAF conducts charitable activities in the State of Texas. DAF's charitable causes include education, military veterans, first responders, health and medical research, economic and community development initiatives, and youth and family programs in the State of Texas. In this lawsuit DAF alleges A&M improperly

withheld assets lawfully owned by and due to DAF and, in doing so, that A&M has

interfered with DAF's charitable mission.

3.      DAF filed this lawsuit on August 15, 2022. Defendant A&M is a foreign

limited liability company, whose home office is located in New York, New York.

According to the Texas Secretary of State's certificate of service, issued on or about

November 7, 2022, and filed among the papers of this lawsuit, ("Certificate of Service")

DAF was served with and physically received civil process in this matter by on or about

October 31, 2022. A true and correct copy of the Certificate of Service is attached to and

incorporated in its entirety in this motion by reference as Exhibit "A."

4.      DAF and A&M are actively engaged in settlement negotiations which, if

successful, will allow A&M to avoid the expense of answering. In connection with these

negotiations, and the day before the Dismissal Hearing Notice was issued in this matter,

DAF entered into an agreement, pursuant to Tex. R. Civ. P. Rule 11, extending A&M's

deadline to answer or otherwise respond to DAF's Original Petition to February 21, 2023

("Rule 11"). A true and correct copy of the Rule 11 is attached to and incorporated in its

entirety in this motion by reference as Exhibit "B."

5.      Accordingly, DAF is actively pursuing the matters that are the subject of

this lawsuit and respectfully submits good cause has been shown to retain this lawsuit.

DAF desires and respectfully requests that this lawsuit be retained on this Court's active

docket and not dismissed for want of prosecution. In the event the parties are unable to

reach an agreement resolving the matters in dispute, DAF intends to vigorously prosecute this lawsuit against A&M. This motion is not made as a means to delay, but only so that justice may be done.

Wherefore, premises considered, Plaintiff Charitable DAF Fund, L.P. respectfully requests that this cause be retained on the docket and for such other and further relief, at law and in equity, general or special, to which Plaintiff may be entitled.

Dated: January 19, 2023                    Respectfully submitted,

                                           /s/ Roger L. McCleary
                                           Sawnie A. McEntire
                                           Texas Bar No. 13590100
                                           smcentire@pmmlaw.com
                                           PARSONS MCENTIRE MCCLEARY PLLC
                                           1700 Pacific Avenue, Suite 4400
                                           Dallas, Texas 75201
                                           Tel. (214) 237-4300
                                           Fax (214) 237-4340

                                           Roger L. McCleary
                                           Texas Bar No. 133937000
                                           rmccleary@pmmlaw.com
                                           PARSONS MCENTIRE MCCLEARY PLLC
                                           One Riverway, Suite 1800
                                           Houston, Texas 78751
                                           Tel: (713) 960-7305
                                           Fax: (832) 742-7387

                                           *Counsel for Plaintiff*
                                           *Charitable DAF Fund, L.P.*

3

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S VERIFIED MOTION TO RETAIN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, on this day personally appeared Roger L. McCleary who, after being by me duly sworn, upon his oath, deposed and said:

1.      "I, Roger L. McCleary, am an attorney of record for the plaintiff, Charitable DAF Fund, L.P. ('DAF'), in the above-styled and numbered lawsuit ('Lawsuit'). l am over the age of 21 years, have never been convicted of a felony or any crime that would disqualify me from making this affidavit, and am in all ways competent to make this affidavit. I have personal knowledge of all facts stated in this affidavit, and each of the said facts, within my personal knowledge, is true and correct.

2.      I have read, in its entirety, the foregoing PLAINTIFF'S VERIFIED MOTION TO RETAIN ('Motion') in this Lawsuit. The statements made in the Motion are true and correct.

4

3.      Furthermore, Affiant sayeth not."

_____
Roger L. McCleary, Affiant

Subscribed and sworn to before me on the 19th day of January, 2023, by

 .

Linda Marshall Kimball
Notary Public, State of Texas

LINDA MARSHALL KIMBALL
Notary ID #568102
My Commission Expires
August 20, 2026

3116333.1

# Exhibit "A"

FILED
1/12/2023 2:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
CAROLYN SELLERS DEPUTY



# The State of Texas
### Secretary of State

2023-343855-2

I, the undersigned, as Secretary of State of the State of Texas, DO HEREBY CERTIFY
that according to the records of this office, a copy of the Citation and Plaintiffs Original
Petition and Jury Demand in the cause styled:

CHARITABLE DAF FUND LP vs ALVAREZ AND MARSAL CRF
MANAGEMENT LLC
116th Judicial District Court Of Dallas County, Texas
Cause No: DC2210107

was received by this office on October 11, 2022, and that a copy was forwarded on
October 27, 2022, by CERTIFIED MAIL, return receipt requested to:

Alvarez & Marsal CRF Management LLC
Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

The RETURN RECEIPT was received in this office dated October 31, 2022, According
to the USPS.Com Track & Confirm, the item was delivered.

Date issued: November 7, 2022

**John B. Scott**
**Secretary of State**
GF/mo

# Exhibit "B"

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
www.gibsondunn.com

Marshall King

January 10, 2022

Via Electronic Mail

Roger McCleary
PMM Law
One Riverway, Suite 1800
Houston, TX 77056
rmccleary@pmmlaw.com

RE:   *Charitable DAF Fund LP vs. Alvarez & Marsal CRF Management LLC*, Cause No.
DC-22-10107 in the 116th District Court, Dallas County, Texas

Dear Roger:

This letter is to confirm our agreement, under Texas Rule of Civil Procedure 11, that Plaintiffs
in the above-referenced action agree that the deadline for Alvarez & Marsal CRF Management
LLC to answer or otherwise respond to Plaintiff's Petition is extended to February 21, 2023 at
10:00 a.m. (Monday, February 20, 2023 being Presidents' Day).  If the foregoing conforms to
your understanding of our agreement, please sign below in the space provided and return a
copy of this letter to me by email.

Sincerely,

Marshall King
Attorney for Defendant Alvarez & Marsal CRF
Management LLC

**Agreed:**

Roger McCleary
Attorney for Plaintiff Charitable DAF Fund LP

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Timothy Miller on behalf of Sawnie Mcentire
Bar No. 13590100
tmiller@pmmlaw.com
Envelope ID: 71953685
Status as of 1/20/2023 8:56 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 1/19/2023 3:02:22 PM | SENT |

116TH DISTRICT COURT
GEORGE ALLEN COURTS BLDG.
600 COMMERCE STREET
DALLAS, TX 75202-4606
214-653-6015

1/11/2023

smcentire@pmmlaw.com; RMCCLEARY@PMMLAW.COM

Re: DC-22-10107: CHARITABLE DAF FUND LP vs. ALVAREZ & MARSAL CRF
MANAGEMENT LLC

DISMISSAL HEARING NOTICE

The above case is set for dismissal for want of prosecution 01/24/2023 at 8:45 AM. in the
116th District Court, Dallas County, Texas. This hearing will be conducted by phone.
Please see the call in information:

 Dial in Number:  425-436-6373

Access Code: 590035

If you have perfected service and no answer has been filed, you must have moved for or
have proved up a default judgment on or prior to the above date. Failure to do so prior to
dismissal hearing will automatically result in the dismissal of the case on the above date
and time and place.

If you have not perfected service on all parties prior to said dismissal date you **MUST
APPEAR AT THE DISMISSAL HEARING.** During said hearing you will have the
opportunity to show by way of verified motion, good cause for maintaining the case on
the docket. At the dismissal hearing the court **SHALL** dismiss for Want of Prosecution
unless there is a showing of good cause.

Sincerely

/s/ Shirl Townsend
Shirl Townsend,
Coordinator

FILED
2/16/2023 10:55 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Madison McCarrier DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this Verified Second Motion to Retain, requesting the Court retain this cause on the docket and not dismiss this cause for want of prosecution, and in support respectfully shows the following:

1.     This lawsuit is set on the February 22, 2023, dismissal docket for want of prosecution. The Court should not dismiss DAF's lawsuit because there is good cause to retain it on the Court's docket, as demonstrated below. Tex. R. Civ. P. 165a.1.

2.     Plaintiff DAF conducts charitable activities in the State of Texas. DAF's charitable causes include education, military veterans, first responders, health and medical research, economic and community development initiatives, and youth and family programs in the State of Texas. In this lawsuit DAF alleges that defendant Alvarez & Marsal, CRF Management, LLC ("A&M") improperly withheld assets lawfully owned

by and due to DAF and, in doing so, that A&M has interfered with DAF's charitable mission.

3.     DAF filed this lawsuit on August 15, 2022. Defendant A&M is a foreign limited liability company, whose home office is located in New York, New York. According to the Texas Secretary of State's certificate of service, issued on or about November 7, 2022, and filed among the papers of this lawsuit, ("Certificate of Service") A&M was served with and physically received civil process in this matter by on or about October 31, 2022. A true and correct copy of the Certificate of Service is attached to and incorporated in its entirety in this motion by reference as Exhibit "A."

4.     DAF and A&M were actively engaged in settlement negotiations which, if successful, would have allowed A&M to avoid the expense of answering the lawsuit. In connection with those negotiations, and the day before issuance of the first Dismissal Hearing Notice for the January 24, 2023, dismissal docket, DAF entered into an agreement extending A&M's deadline to answer or otherwise respond to DAF's Original Petition to February 21, 2023 ("Rule 11"). A true and correct copy of the relevant Rule 11 is attached to and incorporated in its entirety in this motion by reference as Exhibit "B."

5.     The parties' negotiations did not result in settlement. Accordingly, DAF anticipates that A&M will answer or otherwise respond to DAF's Original Petition and civil process in this lawsuit by A&M's agreed February 21, 2023, deadline. In the event

A&M does not do so, DAF will move for a default judgment on February 22, 2023, as required by this Court's Dismissal Hearing Notice dated January 25, 2023.

6.     DAF has been actively pursuing the matters that are the subject of this lawsuit, and DAF intends to vigorously prosecute this lawsuit against A&M. DAF respectfully submits good cause has been shown to retain this lawsuit. DAF desires and respectfully requests that this lawsuit be retained on this Court's active docket and not dismissed for want of prosecution. This motion is not made as a means to delay, but only so that justice may be done.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P., respectfully requests that this cause be retained on the docket and for such other and further relief, at law and in equity, general or special, to which Plaintiff may be entitled.

Dated: January 16, 2023.                         Respectfully submitted,

/s/ Roger L. McCleary
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 78751

3

Tel: (713) 960-7305
Fax: (832) 742-7387

**Counsel for Plaintiff**
**Charitable DAF Fund, L.P.**

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, on this day personally appeared Roger L. McCleary who, after being by me duly sworn, upon his oath, deposed and said:

1.      "I, Roger L. McCleary, am an attorney of record for the plaintiff, Charitable DAF Fund, L.P. ('DAF'), in the above-styled and numbered lawsuit ('Lawsuit'). l am over the age of 21 years, have never been convicted of a felony or any crime that would disqualify me from making this affidavit, and am in all ways competent to make this affidavit. I have personal knowledge of all facts stated in this affidavit, and each of the said facts, within my personal knowledge, is true and correct.

2.      I have read, in its entirety, the foregoing PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN ('Motion') in this Lawsuit. The statements made in the Motion are true and correct.

5

3.      Furthermore, Affiant sayeth not."

_____
Roger L. McCleary, Affiant

Subscribed and sworn to before me on the 16th day of February, 2023, by

Roger L. McCleary

_____
Notary Public, State of Texas

GAILYA BROOKS
My Notary ID # 3550703
Expires October 28, 2025

3117553.1

# Exhibit "A"

FILED
1/12/2023 2:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
CAROLYN SELLERS DEPUTY



# The State of Texas
## Secretary of State

2023-343855-2

I, the undersigned, as Secretary of State of the State of Texas, DO HEREBY CERTIFY that according to the records of this office, a copy of the Citation and Plaintiffs Original Petition and Jury Demand in the cause styled:

CHARITABLE DAF FUND LP vs ALVAREZ AND MARSAL CRF
MANAGEMENT LLC
116th Judicial District Court Of Dallas County, Texas
Cause No: DC2210107

was received by this office on October 11, 2022, and that a copy was forwarded on October 27, 2022, by CERTIFIED MAIL, return receipt requested to:

Alvarez & Marsal CRF Management LLC
Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

The RETURN RECEIPT was received in this office dated October 31, 2022, According to the USPS.Com Track & Confirm, the item was delivered.

Date issued: November 7, 2022

**John B. Scott**
**Secretary of State**
GF/mo

# Exhibit "B"

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
www.gibsondunn.com

Marshall King

January 10, 2022

Via Electronic Mail

Roger McCleary
PMM Law
One Riverway, Suite 1800
Houston, TX 77056
rmccleary@pmmlaw.com

RE:    *Charitable DAF Fund LP vs. Alvarez & Marsal CRF Management LLC*, Cause No.
DC-22-10107 in the 116th District Court, Dallas County, Texas

Dear Roger:

This letter is to confirm our agreement, under Texas Rule of Civil Procedure 11, that Plaintiffs
in the above-referenced action agree that the deadline for Alvarez & Marsal CRF Management
LLC to answer or otherwise respond to Plaintiff's Petition is extended to February 21, 2023 at
10:00 a.m. (Monday, February 20, 2023 being Presidents' Day).  If the foregoing conforms to
your understanding of our agreement, please sign below in the space provided and return a
copy of this letter to me by email.

Sincerely,

Marshall King
Attorney for Defendant Alvarez & Marsal CRF
Management LLC

**Agreed:**

Roger McCleary
Attorney for Plaintiff Charitable DAF Fund LP

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Roqui Brooks on behalf of Sawnie Mcentire
Bar No. 13590100
rbrooks@pmmlaw.com
Envelope ID: 72878354
Status as of 2/20/2023 8:14 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Linda Kimball | | lkimball@pmmclaw.com | 2/17/2023 1:09:50 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

BE IT REMEMBERED that on this day came on for consideration Plaintiff's

Verified Second Motion to Retain ("Motion to Retain"), and the Court, finding good

cause exists to retain this cause on the docket and not dismiss this cause for want of

prosecution, is of the opinion that the Motion to Retain should be granted. It is, therefore,

ORDERED, ADJUDGED, AND DECREED that the Motion to Retain is

GRANTED and this lawsuit is retained on the Court's docket.

_____
Judge Presiding

3117554.1

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Roqui Brooks on behalf of Sawnie Mcentire
Bar No. 13590100
rbrooks@pmmlaw.com
Envelope ID: 72878354
Status as of 2/20/2023 8:14 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 2/17/2023 1:09:50 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/17/2023 1:09:50 PM | SENT |

FILED
2/20/2023 8:45 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Madison McCarrier DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

## DEFENDANT ALVAREZ & MARSAL'S ANSWER TO PETITION

Defendant Alvarez & Marsal CRF Management, LLC ("A&M") respectfully files this original answer ("Answer") in response to Plaintiff Charitable DAF Fund, L.P.'s ("Plaintiff" or "DAF") Original Petition filed on August 15, 2022 ("Petition"), to respectfully show the Court the following:

### I.
### GENERAL DENIAL

1.      Pursuant to Texas Rule of Civil Procedure 92, Defendant generally denies all allegations, demands, causes of action, and claims for relief set forth in the Petition, and demands proof thereof as required by law.

### II.
### A&M'S AFFIRMATIVE DEFENSES

2.      A&M sets forth below its affirmative defenses. By setting forth these affirmative defenses, A&M does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff. Furthermore, all such defenses are pleaded in the alternative and do not constitute an admission of liability or an admission that Plaintiff is entitled to any relief whatsoever.

---

**DEFENDANT ALVAREZ & MARSAL'S ANSWER TO PETITION**                                    **Page 1**

3.      Plaintiff's Petition and each purported cause of action alleged therein fail to state any claims against A&M upon which relief can be granted.

4.      Plaintiff's claims against A&M were filed in an improper forum and/or are subject to arbitration.

5.      Plaintiff's claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019, issued by an arbitration panel under the rules of the American Arbitration Association.

6.      Plaintiff's claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

7.      Plaintiff's claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification, or consent.

8.      Plaintiff's claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds.

9.      Plaintiff's claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement

---

relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds

10.     Plaintiff's claims against A&M are barred, in whole or in part, because A&M's alleged obligations, if any, have been fulfilled and discharged.

11.     Plaintiff's claims against A&M are barred, in whole or in part, because of estoppel.

12.     Plaintiff's claims against A&M are barred, in whole or in part, by the doctrine of waiver.

13.     Plaintiff's claims against A&M are barred, in whole or in part, based on the doctrine of unclean hands.

14.     Plaintiff's claims against A&M are barred, in whole or in part, on the ground that any alleged damages were not proximately or legally caused by any action or omission by A&M.

15.     Plaintiff's claims against A&M are barred, in whole or in part, because it has failed to exercise reasonable efforts to mitigate, minimize, or avoid any of the harm alleged.

16.     A&M currently lacks sufficient knowledge or information that may serve as a basis for additional affirmative defenses or claims. Therefore, in addition to the affirmative defenses identified above, A&M reserves the right to later assert additional affirmative defenses or claims.

## II.
## PRAYER

WHEREFORE, Defendant prays for entry of judgment against Plaintiff and in favor of Defendant as follows:

17.     That Defendant is not liable under any of the Petition's claims, Plaintiff sustained no damages, and Plaintiff takes nothing;

18.     That Plaintiff is not entitled to damages, interest, attorneys' fees, or costs;

19.     That Defendant be awarded judgment in its favor against Plaintiff;

20.     That Defendant be awarded its attorney's fees and costs; and

21.     For such other and further relief as the Court deems just and proper.


DATED:  February 20, 2023              Respectfully submitted,


                                       */s/ John T. Cox III*
                                       John T. Cox III
                                       Texas Bar No. 24003722
                                       Andrew Bean
                                       Texas Bar No. 24097352
                                       GIBSON, DUNN & CRUTCHER LLP
                                       2001 Ross Avenue, Suite 2100
                                       Dallas, TX 75201-2923
                                       Telephone: 214.698.3256
                                       Facsimile: 214.571.2923
                                       TCox@gibsondunn.com
                                       ABean@gibsondunn.com

                                       *Counsel for Defendant*

---

**DEFENDANT ALVAREZ & MARSAL'S ANSWER TO PETITION**                     **Page 4**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20 day of February, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 72906387
Status as of 2/20/2023 9:09 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 2/20/2023 8:45:31 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 2/20/2023 8:45:31 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 2/20/2023 8:45:31 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/20/2023 8:45:31 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 2/20/2023 8:45:31 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 2/20/2023 8:45:31 AM | SENT |

FILED
2/20/2023 4:20 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rhonda Burks DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED SUPPLEMENT TO PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this, Plaintiff's Verified Supplement to Plaintiff's Verified Second Motion to Retain ("Supplement"), requesting the Court retain this cause on the docket and not dismiss this cause for want of prosecution, and in support respectfully shows the following:

1.      This lawsuit is set on the February 22, 2023, dismissal docket for want of prosecution. On February 16, 2023, DAF timely filed Plaintiff's Verified Second Motion to Retain ("Motion to Retain") more than two (2) days prior to the February 22, 2023, hearing and in accordance with the 116th District Court Policies and Procedures ("Policies").

2.      This Supplement is filed by way of supplement only to DAF's Motion to Retain, and this Supplement does not waive, amend, or supersede DAF's Motion to Retain in any way.

3.      On February 16, 2023, the undersigned counsel for DAF contacted Court Administrator Shirl Townsend by telephone, advised Ms. Shirl of the filing of the Motion to Retain, and offered to discuss the same, in accordance with the Policies.

4.      On Monday, February 20, 2023, Defendant Alvarez & Marsal, CRF Management, LLC ("A&M") filed and served Defendant Alvarez & Marsal's Answer to Petition ("A&M's Answer"). A true and correct copy A&M's Answer, served on DAF via e-file, is attached as Exhibit 1 to this Supplement for the limited purposes of this Supplement and the Motion to Retain, and not by way of admission of any kind by or on behalf of DAF. A true and correct copy of the February 20, 2023, e-file Notification of Service received by the undersigned regarding A&M's Answer is attached as Exhibit 2 to this Supplement.

5.      Accordingly, A&M has now appeared and answered. The Court should not dismiss DAF's lawsuit because there is good cause to retain it on the Court's docket, as demonstrated in DAF's Motion to Retain and this Supplement. Tex. R. Civ. P. 165a.1.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P., respectfully requests that this cause be retained on the docket and for such other and further relief, at law and in equity, general or special, to which Plaintiff may be entitled.

Dated: February 20, 2023.                    Respectfully submitted,

                                            /s/ Roger L. McCleary
                                            Sawnie A. McEntire
                                            Texas Bar No. 13590100

smcentire@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

*Counsel for Plaintiff*
*Charitable DAF Fund, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on **February 20, 2023**, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.


*/s/ Roger L. McCleary*
Roger L. McCleary

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S SUPPLEMENT TO PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned authority, on this day personally appeared Roger L. McCleary who, after being by me duly sworn, upon his oath, deposed and said:

1.      "I, Roger L. McCleary, am an attorney of record for the plaintiff, Charitable DAF Fund, L.P. ('DAF'), in the above-styled and numbered lawsuit ('Lawsuit'). I am over the age of 21 years, have never been convicted of a felony or any crime that would disqualify me from making this affidavit, and am in all ways competent to make this affidavit. I have personal knowledge of all facts stated in this affidavit, and each of the said facts, within my personal knowledge, is true and correct.

2.      I have read, in its entirety, the foregoing PLAINTIFF'S SUPPLEMENT TO

PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN ('Supplement') in this

Lawsuit. The statements made in the Supplement are true and correct.

3.      Furthermore, Affiant sayeth not."

_____

Roger L. McCleary, Affiant

Subscribed and sworn to before me on the 20th day of February 2023, by

Roger L. McCleary .

GAILYA BROOKS
My Notary ID # 3550703
Expires October 28, 2025

_____

Notary-Public, State of Texas

3117641.1

# Exhibit 1

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

## DEFENDANT ALVAREZ & MARSAL'S ANSWER TO PETITION

Defendant Alvarez & Marsal CRF Management, LLC ("A&M") respectfully files this original answer ("Answer") in response to Plaintiff Charitable DAF Fund, L.P.'s ("Plaintiff" or "DAF") Original Petition filed on August 15, 2022 ("Petition"), to respectfully show the Court the following:

### I.
### GENERAL DENIAL

1.    Pursuant to Texas Rule of Civil Procedure 92, Defendant generally denies all allegations, demands, causes of action, and claims for relief set forth in the Petition, and demands proof thereof as required by law.

### II.
### A&M'S AFFIRMATIVE DEFENSES

2.    A&M sets forth below its affirmative defenses. By setting forth these affirmative defenses, A&M does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff. Furthermore, all such defenses are pleaded in the alternative and do not constitute an admission of liability or an admission that Plaintiff is entitled to any relief whatsoever.

---

3.      Plaintiff's Petition and each purported cause of action alleged therein fail to state any claims against A&M upon which relief can be granted.

4.      Plaintiff's claims against A&M were filed in an improper forum and/or are subject to arbitration.

5.      Plaintiff's claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019, issued by an arbitration panel under the rules of the American Arbitration Association.

6.      Plaintiff's claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

7.      Plaintiff's claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification, or consent.

8.      Plaintiff's claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds.

9.      Plaintiff's claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement

relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds

10.     Plaintiff's claims against A&M are barred, in whole or in part, because A&M's alleged obligations, if any, have been fulfilled and discharged.

11.     Plaintiff's claims against A&M are barred, in whole or in part, because of estoppel.

12.     Plaintiff's claims against A&M are barred, in whole or in part, by the doctrine of waiver.

13.     Plaintiff's claims against A&M are barred, in whole or in part, based on the doctrine of unclean hands.

14.     Plaintiff's claims against A&M are barred, in whole or in part, on the ground that any alleged damages were not proximately or legally caused by any action or omission by A&M.

15.     Plaintiff's claims against A&M are barred, in whole or in part, because it has failed to exercise reasonable efforts to mitigate, minimize, or avoid any of the harm alleged.

16.     A&M currently lacks sufficient knowledge or information that may serve as a basis for additional affirmative defenses or claims. Therefore, in addition to the affirmative defenses identified above, A&M reserves the right to later assert additional affirmative defenses or claims.

## II.
## PRAYER

WHEREFORE, Defendant prays for entry of judgment against Plaintiff and in favor of Defendant as follows:

17.     That Defendant is not liable under any of the Petition's claims, Plaintiff sustained no damages, and Plaintiff takes nothing;

18.     That Plaintiff is not entitled to damages, interest, attorneys' fees, or costs;

19.     That Defendant be awarded judgment in its favor against Plaintiff;

20.   That Defendant be awarded its attorney's fees and costs; and

21.   For such other and further relief as the Court deems just and proper.


DATED:  February 20, 2023              Respectfully submitted,


                                 */s/ John T. Cox III*
                                 John T. Cox III
                                 Texas Bar No. 24003722
                                 Andrew Bean
                                 Texas Bar No. 24097352
                                 GIBSON, DUNN & CRUTCHER LLP
                                 2001 Ross Avenue, Suite 2100
                                 Dallas, TX 75201-2923
                                 Telephone: 214.698.3256
                                 Facsimile: 214.571.2923
                                 TCox@gibsondunn.com
                                 ABean@gibsondunn.com

                                 *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20 day of February, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.

<div style="margin-left:40%;">

/s/ *John T. Cox III*

John T. Cox III

</div>

# Exhibit 2

| | |
|---|---|
| **From:** | no-reply@efilingmail.tylertech.cloud |
| **To:** | Roger L. McCleary |
| **Subject:** | [EXTERNAL] Notification of Service for Case: DC-22-10107, CHARITABLE DAF FUND LP vs. ALVAREZ & MARSAL CRF MANAGEMENT LLC for filing Answer/Response, Envelope Number: 72906387 |
| **Date:** | Monday, February 20, 2023 8:46:15 AM |

# Notification of Service



Case Number: DC-22-10107
Case Style: CHARITABLE DAF FUND
LP vs. ALVAREZ & MARSAL CRF
MANAGEMENT LLC
Envelope Number: 72906387

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| **Case Number** | DC-22-10107 |
| **Case Style** | CHARITABLE DAF FUND LP vs. ALVAREZ & MARSAL CRF MANAGEMENT LLC |
| **Date/Time Submitted** | 2/20/2023 8:45 AM CST |
| **Filing Type** | Answer/Response |
| **Filing Description** | Defendant Alvarez & Marsal's Answer to Petition |
| **Filed By** | Wendy Cassidy |
| | CHARITABLE DAF FUND LP: Roqui Brooks (rbrooks@pmmlaw.com) Charitable DAF Fund, L.P. : Beatrice Candis (bcandis@pmmlaw.com) Other Service Contacts not associated with a party on the case: |

| Service Contacts | Linda Kimball (lkimball@pmmclaw.com) |
| | Gini Romero (gromero@pmmlaw.com) |
| | Andrew Bean (ABean@gibsondunn.com) |
| | Tim Miller (tmiller@pmmlaw.com) |
| | Wendy Cassidy (WCassidy@gibsondunn.com) |
| | Roger McCleary (rmccleary@pmmlaw.com) |
| | Sawnie McEntire (smcentire@pmmlaw.com) |
| | John Cox (TCox@gibsondunn.com) |
| | Marshall King (MKing@gibsondunn.com) |

| Document Details | |
| --- | --- |
| **Served Document** | [Download Document](#) |
| This link is active for 30 days. | |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Roqui Brooks on behalf of Sawnie Mcentire
Bar No. 13590100
rbrooks@pmmlaw.com
Envelope ID: 72926215
Status as of 2/20/2023 4:28 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 2/20/2023 4:20:18 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 2/20/2023 4:20:18 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 2/20/2023 4:20:18 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 2/20/2023 4:20:18 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 2/20/2023 4:20:18 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/20/2023 4:20:18 PM | SENT |

116TH DISTRICT COURT

GEORGE ALLEN COURTS BLDG.

600 COMMERCE STREET

DALLAS, TX 75202-4606

214-653-6015

1/25/2023

Emailed to:  smcentire@pmmlaw.com;

RMCCLEARY@PMMLAW.COM

Re:
 CHARITABLE DAF FUND LP

vs.

ALVAREZ & MARSAL CRF MANAGEMENT LLC
 DC-22-10107

<u>DISMISSAL HEARING NOTICE</u>

**SECOND AND FINAL NOTICE OF NEED TO DILIGENTLY PROSECUTE CASE: YOU ARE HEREBY ADVISED THAT STRICT COMPLIANCE WITH THE REQUIREMENTS OF THIS NOTICE IS NECESSARY TO AVOID, UPON SUFFICIENT SHOWING, DISMISSAL OF THE CASE**

The above case is set for dismissal for want of prosecution on  02/22/2023at 8:45 AM. in the 116th District Court, Dallas County, Texas. This hearing will be conducted by phone. Please see the call-in information:

 Dial in Number:  425-436-6373

Access Code: 590035

If you have perfected service and no answer has been filed, you must have moved for or have proved up a default judgment on or prior to the above date. Failure to do so prior to dismissal hearing will automatically result in the dismissal of the case on the above date and time and place.

If you have not perfected service on all parties prior to said dismissal date you **MUST APPEAR AT THE DISMISSAL HEARING.** During said hearing you will have the opportunity to show by way of **verified motion**, good cause for maintaining the case on the docket. At the dismissal hearing the court **SHALL** dismiss for Want of Prosecution unless there is a showing of good cause.

Sincerely

/s/ Shirl Townsend

Coordinator

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
|     *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
|     *Defendant.* | § | 116th JUDICIAL DISTRICT |

## **AGREED UNIFORM SCHEDULING ORDER (LEVEL 3)**
(Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following agreed order to control the schedule of this cause.

1. This case will be ready and is set for **Non-Jury/Jury Trial on February 26, 2024, at 9:00 a.m.(the" Initial Trial Setting")**. Reset or continuance of the Initial Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2. Pretrial matters will be complete by the following dates:

a.    amended pleadings asserting
new causes of action or defenses ....................120 days before the Initial Trial Setting
b.    fact discovery closes...............................105 days before the Initial Trial Setting
c.    party seeking affirmative relief
shall designate experts and
must provide reports ........................................105 days before the Initial Trial Setting
d.    party opposing affirmative relief
shall designate experts and
must provide reports .......................................90 days before the Initial Trial Setting
e.    party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports.................................75 days before the Initial Trial Setting
f.    all expert discovery closes.....................45 days before the Initial Trial Setting

g.      other amended pleadings ......................45 days before the Initial Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.      Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.      Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.      Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.      No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.  This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.      The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case _____whose phone number is _____ Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced.  Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8      Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony. **On or before ten (10)days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.** By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.      A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED ___/___/___.

_____
**District Judge**

**AGREED**:

By: */s/ Roger L. McCleary*_____
     Sawnie A. McEntire
     Texas Bar No. 13590100
     smcentire@pmmlaw.com
     **PARSONS MCENTIRE MCCLEARY PLLC**
     1700 Pacific Avenue, Suite 4400
     Dallas, Texas 75201
     Tel. (214) 237-4300
     Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,**
**CHARITABLE DAF FUND, L.P.**


By: */s/ Andrew Bean*_____
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,**
**ALVAREZ & MARSAL CRF MANAGEMENT, LLC**


**\*Signed by permission**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Roqui Brooks on behalf of Roger McCleary
Bar No. 13393700
rbrooks@pmmlaw.com
Envelope ID: 73727810
Filing Code Description: Non-Signed Proposed Order/Judgment
Filing Description: AGREED SCHEDULING ORDER
Status as of 3/16/2023 2:08 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 3/16/2023 12:45:43 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 3/16/2023 12:45:43 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 3/16/2023 12:45:43 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 3/16/2023 12:45:43 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 3/16/2023 12:45:43 PM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant* | § | 116th JUDICIAL DISTRICT |

**AGREED UNIFORM SCHEDULING ORDER (LEVEL 3)**
(Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following agreed order to control the schedule of this cause.

1. This case will be ready and is set for N̶o̶n̶-̶Jury/Jury Trial on **February 26, 2024, at 9:00 a.m.(the" Initial Trial Setting")**. Reset or continuance of the Initial Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2. Pretrial matters will be complete by the following dates:

a.    amended pleadings asserting
new causes of action or defenses ...................120 days before the Initial Trial Setting
b.    fact discovery closes...............................105 days before the Initial Trial Setting
c.    party seeking affirmative relief
shall designate experts and
must provide reports .....................................105 days before the Initial Trial Setting
d.    party opposing affirmative relief
shall designate experts and
must provide reports ......................................90 days before the Initial Trial Setting
e.    party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports.................................75 days before the Initial Trial Setting
f.    all expert discovery closes ......................45 days before the Initial Trial Setting

g.     other amended pleadings ......................45 days before the Initial Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.     Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.     Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.     Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.     No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.  This paragraph does not otherwise alter the requirements of Rule 38. The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.     The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case** __Bryan Haynes_____**whose phone number is** _214-649-9511___ **Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8      Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

---

Agreed Uniform Scheduling Order (Level 3)                                    2 | P a g e

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony. **On or before ten (10)days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.** By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.     A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED 03 /21 /23 .

_____
                                          **District Judge**

**AGREED:**

By: /s/ Roger L. McCleary_____
     Sawnie A. McEntire
     Texas Bar No. 13590100
     smcentire@pmmlaw.com
     **PARSONS MCENTIRE MCCLEARY PLLC**
     1700 Pacific Avenue, Suite 4400
     Dallas, Texas 75201
     Tel. (214) 237-4300
     Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,**
**CHARITABLE DAF FUND, L.P.**

By: */s/ Andrew Bean\**
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,**
**ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

**\*Signed by permission**

IN THE DISTRICT COURT
OF DALLAS COUNTY
116TH JUDICIAL DISTRICT

2/21/2023

smcentire@pmmlaw.com; RMCCLEARY@PMMLAW.COM;
TCox@gibsondunn.com

## NOTICE OF SUBMISSION OF SCHEDULING ORDER, OR ALTERNATIVELY DISMISSAL FOR WANT OF PROSECUTION

CAUSE N0 DC-22-10107

| | |
|---|---|
| CHARITABLE DAF FUND LP, et al<br>vs.<br>ALVAREZ & MARSAL CRF MANAGEMENT LLC, et al | In the District Court<br>of Dallas County, Texas<br>116TH Judicial District |

The Court will hold a scheduling conference on the date and time indicated below. *The Court prefers that counsel submit an agreed Scheduling Order in lieu of attending the scheduling conference hearing. Upon receipt of the signed order, the hearing will be canceled.* Scheduling conferences <u>WILL NOT</u> be rescheduled. The Court asks that you confer with opposing counsel, or litigant. In the event you are unable to communicate with the other side, you are required to submit your proposed scheduling order. **This hearing will be conducted by phone. Please see the call in information below:**

**Dial in Number:  425-436-6373**

**Access Code: 590035**

***PLEASE USE AND SUBMIT THE ATTACHED MODIFIED UNIFORM SCHEDULING ORDER***
.
IN THE EXERCISE OF THE COURT'S DISCRETION PURSUANT TO IT'S INHERENT POWER TO DISMISS CASES NOT DILIGENTLY PROSECUTED AND RULE 165A, Failure to submit a signed scheduling order, will result in the dismissal of this case on the date and time indicated below.

Scheduling Conference, or alternatively hearing for dismissal for want of prosecution: **03/22/2023 @ 8:45 a.m.** * *Trial dates may not be changed without Court approval.*

Sincerely,

/s/ Tonya Parker
TONYA PARKER, JUDGE

FILED
8/11/2023 4:17 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Martin Reyes DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

## DEFENDANT ALVAREZ & MARSAL'S
## MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Defendant Alvarez & Marsal CRF Management, LLC ("A&M") respectfully moves this Court for an order of protection from Plaintiff's numerous interrogatories and requests for production, which are overbroad, argumentative, and harassing. A&M also respectfully moves this Court for an order abating this action, which is now moot because A&M has already given Plaintiff all of the relief to which it is entitled on its claims. Texas Rule of Civil Procedure 192.6 does not allow this type of abusive discovery, and case law confirms that litigants should be protected from abusive discovery like this. *See In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 181 (Tex. 1999) (noting that parties may resist harassing discovery when they produce "some evidence" that a discovery request is harassing). Texas case law also confirms that a defendant need not produce discovery where the underlying litigation has been rendered moot. *See, e.g., In re Taylor*, No. 14-14-00600-CV, 2015 WL 576591, at *1 (Tex. App. Feb. 10, 2015); *In re Wells Fargo Bank*, N.A., No. 13-16-00691-CV, 2017 WL 541124, at *1 (Tex. App. Feb. 7, 2017). Accordingly, this Court should grant A&M's motion for protection and motion to abate the dispute.

---

## I.    INTRODUCTION & BACKGROUND

This is not a live dispute.  Defendant A&M is the Investment Manager for the "Crusader Funds"[1] which includes the liquidating "Offshore Fund II," a Bermuda exempted mutual fund company.  On August 15, 2022, Plaintiff Charitable DAF Fund, L.P. ("Plaintiff" or "DAF") filed a petition, claiming to be an investor in Offshore Fund II.  Plaintiff claims it has allegedly purchased a limited partnership interest in Offshore Fund II in or about June 2016 and seeks the distributions on account of its interest that it contends were improperly withheld from Plaintiff. Notwithstanding the numerous deficiencies in the Plaintiff's Petition, A&M determined that the dispute was not worth the headache and expense of litigation and agreed to the relief that Plaintiff sought.  Thus, on February 17, 2023, the Crusader Funds distributed $951,060.82 to Plaintiff, representing the entirety of distributions that had previously been withheld from Plaintiff pursuant to an arbitration panel's ruling.  *See* Christopher Wells Decl. ¶ 5,  see also Exhibit 1[2]  (Letter dated 2/21/23) at 2-3.  A&M also agreed to treat Plaintiff as a limited partner in Offshore Fund II going forward, and to include Plaintiff in all future distributions to Crusader Funds investors.  *See* Wells Decl. ¶ 5.  Indeed on March 29, 2023, Plaintiff received $139,101.94 as part of the most recent distribution to Crusader Funds investors.  *See* Wells Decl. ¶ 6. Nevertheless, Plaintiff refused to dismiss this action, and has now issued ***forty-two requests for production and fifteen interrogatories*** on August 2, 2023 (collectively, "Discovery Requests," attached as Exhibit 2).

Plaintiff's continued pursuit of this action is part and parcel of an ongoing history of meritless, costly, and time-consuming litigation pursued by Plaintiff, its founder, James Dondero, and other entities affiliated with Dondero—often in violation of applicable court and arbitral orders

---

[1] The Crusader Funds include Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd. ("Offshore Fund II"), and Highland Crusader Offshore Partners, L.P.

[2] All Exhibit references herein refer to Exhibits to the Declaration of Andrew Bean filed in support of this motion unless otherwise indicated.

and for collateral purposes unrelated to the merits of the particular proceeding.  For starters, an

arbitration panel in *Redeemer Committee of the Highland Crusader Fund v. Highland Capital

Management, L.P.* concluded that Plaintiff's interest had been obtained in breach of the terms of

the Joint Plan of Distribution of the Crusader Funds (the "Plan") and the Scheme of Arrangement

relating to Highland Crusader Fund II, Ltd. (the "Scheme").  In May 2019, the panel directed that

Plaintiff's interest in Offshore Fund II be transferred for the benefit of the Crusader Funds, or that

the Crusader Funds "extinguish those claims."  Exhibit 3 at 17 (May 2019 Final Award).  In August

2019 and March 2020, Plaintiff was notified that the Crusader Funds would be making

distributions to investors in the Crusader Funds, but would be withholding amounts that might

otherwise be distributed to Plaintiff.  Plaintiff did not object or even respond to these letters.  As

part of a settlement in the bankruptcy of Highland Capital Management, L.P. ("Highland"),

Highland—which had once been controlled by Dondero and acted as Plaintiff's agent in the

wrongful acquisition of the limited partnership interest—agreed that it would not object to the

Crusader Funds cancelling or extinguishing Plaintiff's interest in the Crusader Funds.  *In re

Highland Capital Mgmt., L.P.*, No. 19-34054, Dkt. 1090-1 (Bankr. N.D. Tex. Sept. 23, 2020).

Plaintiff did not object to those settlement terms, and they were approved by the Bankruptcy Court

in February 2021.  Confirmation Order, *In re Highland Capital Mgmt., L.P.*, No. 19-34054, Dkt.

1943 (Bankr. N.D. Tex. Feb. 22, 2021) ("Confirmation Order") (attached as Exhibit 4).

Following further developments in the Highland bankruptcy, Dondero lost his controlling

interest in Highland, and since then he and his affiliates have been on a crusade against the

Highland estate and anyone associated with the bankruptcy.  The bankruptcy court characterized

Dondero as a "serial litigator" who is trying to "burn down the place," and issued an order requiring

Dondero and his affiliates to seek leave of court before initiating certain court proceedings. *See*

Confirmation Order at 9, 56.  But Dondero remains undeterred in his litigation crusade.  Plaintiff, along with Dondero and various other entities, was also held in contempt by the bankruptcy court for bringing a "wholly frivolous" lawsuit in violation of two Highland bankruptcy court orders.  *In re Highland Cap. Mgmt., L.P.*, No. 19-34054-SGJ11, 2021 WL 3418657, at *12, *14 (Bankr. N.D. Tex. Aug. 4, 2021), *aff'd in part, vacated in part sub nom. Charitable DAF Fund LP v. Highland Cap. Mgmt. LP*, No. 3:21-CV-01974-X, 2022 WL 4538466 (N.D. Tex. Sept. 28, 2022).  The Court noted that "this is the second time in the last several weeks that the court has found Mr. Dondero to be in contempt of court."  *Id.*  Litigation involving Plaintiff, Dondero, and his other affiliates continues in the bankruptcy court and on various appeals.  *See, e.g.*, Amended Complaint and Objection to Claims, *In re: Highland Capital Mgmt., L.P.*, Case No. 19-34054 (May 19, 2022) (attached as Exhibit 5).

Simultaneously, Dondero filed a petition in the 95th Judicial District seeking pre-suit discovery from A&M and others under Texas Rule of Civil Procedure 202.  Exhibit 6 (Dondero's Verified Amended Petition to Take Deposition Before Suit and Seek Documents).  Judge Monica Purdy denied that petition and dismissed Dondero's case on June 1, 2022.  Exhibit 7 (June 1, 2022 Order Denying Petition to Take Deposition and Dismissing Case).

Merely two months after Dondero's Rule 202 petition was dismissed, Plaintiff commenced this case.  As noted above, despite A&M thereafter making the distributions about which Plaintiff was complaining, Plaintiff refused to dismiss its action.  On August 2, 2023, Plaintiff served A&M with overbroad Discovery Requests.  Multiple requests for production seek electronically stored information ("ESI") from June 2016 to the present, a period of more than seven years, and require "all documents" on broad topics, such as "A&M's decision to withhold and/or refusal to distribute funds" (RFP No. 15).  Exhibit 2 (Discovery Requests).  The interrogatories cover similarly broad

topics such as "in general the alleged legal and factual bases" for various paragraphs in A&M's February 20, 2023 Answer (Interrogatory Nos. 9-14). This discovery is entirely unnecessary and inappropriate because Plaintiff has already received the funds it claims are owed. Rather, this overbroad and burdensome discovery is just the latest attempt by Dondero to use litigation as a tool to harass.

## II.    LEGAL STANDARD

A trial court has broad discretion to set the terms of discovery through a protective order. *See* Tex. R. Civ. P. 192.6(b); *In re Collins*, 286 S.W.3d 911, 918 (Tex. 2009) (noting that a trial judge may exercise discretion in the granting of a protective order and in controlling the nature and form of discovery). Among other things, a court can (1) prohibit the discovery sought in whole or in part, (2) limit the extent or subject matter of discovery, (3) order that discovery not be undertaken at the time or place specified, (4) set terms or conditions on the discovery, (5) order the results of discovery to be sealed or otherwise protected, and (6) make any other order in the interest of justice. *Id.* A party seeking a protective order must show particular, specific, and demonstrable injury by facts sufficient to justify a protective order. *Collins*, 286 S.W.3d at 918; *Blankinship v. Brown*, 399 S.W.3d 303, 312 (Tex. App.–Dallas 2013, pet. denied). For the reasons explained below, A&M has met its burden, and accordingly asks the Court to protect it from Plaintiff's interrogatories and requests for production.

"In the motion to abate, the defendant must (1) identify any impediment to the continuation of the suit, (2) identify an effective cure, and (3) ask the court to abate the suit until the defect is corrected." *Truong v. City of Houston*, 99 S.W.3d 204, 216 (Tex. App. 2002).

### III.    ARGUMENT

Plaintiff's overbroad Discovery Requests harass A&M for discovery in a moot dispute. These demands cannot be squared with the Texas Rules of Civil Procedure, as they seek information that cannot reasonably be calculated to lead to the discovery of admissible evidence. *See* Tex. R. Civ. P. 192.3(a). Indeed, Plaintiff's Discovery Requests are emblematic of the "unnecessary expense, harassment, [and] annoyance" the Texas Rules of Civil Procedure seek to prevent. Tex. R. Civ. P. 192.6(b).

#### A.  The case should be abated because it is moot.

Mootness presents an impediment to Plaintiff's lawsuit and therefore abatement is appropriate. "A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Growden v. Good Shepherd Health Sys.*, 550 S.W.3d 716, 722 (Tex. App. 2018) (citations omitted). In other words, a case is moot where the plaintiff "can no longer show an actual or threatened injury on her underlying claim, and any controversy between [the parties] as to that claim has been extinguished." *Id.*

Plaintiff's lawsuit has been rendered moot by Crusader Funds' distribution of funds and recognition of Plaintiff's interest. *See* Wells Decl.  Plaintiff must identify damages that could be reasonably sought through this lawsuit, which have not been already covered by Crusader Funds' actions.  There are no such damages.

#### B.  A&M should not have to answer Plaintiff's Discovery Requests due to undue burden, unnecessary expense, harassment, and annoyance.

Plaintiff's Discovery Requests are patently overbroad.  As noted above, multiple requests for production seek electronically stored information ("ESI") from June 2016 to the present, a period of seven years, and require "all documents" on broad topics, such as "A&M's decision to

withhold and/or refusal to distribute funds" (RFP No. 15). Exhibit 2 (Discovery Requests). The

interrogatories similarly cover broad topics such as "in general the alleged legal and factual bases"

for Paragraphs in A&M's February 20, 2023 Answer. *Id.*

These Discovery Requests demand information that is neither "relevant to the subject

matter of the pending action" nor "reasonably calculated to lead to the discovery of admissible

evidence." Tex. R. Civ. P. 192.3(a); *see also* Tex. R. Evid. 401(b) (evidence is relevant if "the fact

is of consequence in determining the action.").

A&M would be unduly burdened if it was forced to answer Plaintiff's Discovery Requests.

The Texas Rules of Civil Procedure provide that a trial court "should" limit discovery if "the

burden or expense of the proposed discovery outweighs its likely benefit, taking into account the

needs of the case, the amount in controversy, the parties' resources, the importance of the issues

at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

Tex. R. Civ. P. 192.4(b); *see also In re Pilgrim's Pride Corp.*, No. 10-21-00305-CV, 2022 WL

3092916, at *4 (Tex. App. Aug. 3, 2022) (citations omitted) ("Rule of Civil Procedure 192.4

imposes a proportionality standard that requires a case-by-case balancing of jurisprudential

considerations."). The burden imposed by discovery requests are "far out of proportion to any

benefit" where the "justification for seeking the documents is rendered moot." *In Re John Crane

Inc.*, No. 01-03-00698-CV, 2003 WL 22682613, at *3 (Tex. App. Nov. 13, 2003). Here, the

extreme burden on A&M far outweighs any benefit to Plaintiff, given that: (1) Plaintiff has been

paid $951,060.82, representing the entirety of distributions that had been purportedly withheld; (2)

Plaintiff has been recognized as a limited partner in Offshore Fund II and will receive any

distributions to investors going forward; and (3) Plaintiff did indeed receive the most recent

distribution to Crusader Funds investors on March 29, 2023, in the amount of $139,101.94. *See* Wells Decl. ¶ 6).

A&M should be relieved of any obligation to produce communications or materials in response to Plaintiff's Discovery Requests. Such demands constitute an undue burden and an attempt to harass the Defendant by acquiring business information removed from the purported damages.

## IV.    CONCLUSION

Accordingly, A&M respectfully request that this Court grant its motion for a protective order and motion to abate the dispute.

DATED:  August 11, 2023                Respectfully submitted,

                              */s/ John T. Cox III*
                              John T. Cox III
                              Texas Bar No. 24003722
                              Andrew Bean
                              Texas Bar No. 24097352
                              GIBSON, DUNN & CRUTCHER LLP
                              2001 Ross Avenue, Suite 2100
                              Dallas, TX 75201-2923
                              Telephone: 214.698.3256
                              Facsimile: 214.571.2923
                              TCox@gibsondunn.com
                              ABean@gibsondunn.com

                              *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11 day of August, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.


/s/ *John T. Cox III*
John T. Cox III

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

### DECLARATION OF CHRISTOPHER WELLS IN SUPPORT OF ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

1. My name is Christopher Wells, my date of birth is May 31, 1976, and my business address is 14850 N. Scottsdale Road Suite 390, Scottsdale, Arizona 85254. I am a Managing Director of Alvarez & Marsal CRF Management, LLC ("A&M"), which serves as the Investment Manager for certain funds collectively known as the "Crusader Funds," including Highland Crusader Fund II, Ltd. ("Offshore Fund II"). I am more than 21 years old and I am fully competent to make this declaration. All facts set forth in this Declaration are based on my personal knowledge.

2. I understand that in May 2019, the arbitration panel in *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* directed that Charitable DAF Fund, L.P.'s interest in Offshore Fund II be transferred to the Redeemer Committee of the Crusader Funds for the benefit of the Crusader Funds, or that the interest be extinguished by the Crusader Funds.

3. Thereafter, A&M, acting as investment manager for Offshore Fund II, withheld distributions on account of Charitable DAF Fund, L.P.'s interest, pursuant to the arbitration panel's

order. A&M gave notice of such withholding, and heard no timely objection from Charitable DAF Fund, L.P.

4.  The entirety of distributions that had been withheld from Charitable DAF Fund, L.P. totaled $951,060.82.

5.  On February 17, 2023, the Crusader Funds distributed $951,060.82 to Charitable DAF Fund, L.P., and thereafter advised Charitable DAF Fund, L.P. that it would be treated as an equity holder in Offshore Fund II going forward, and would be included in all future distributions to Crusader Funds investors.

6.  On March 29, 2023, the Crusader Funds distributed $139,101.94 to Charitable DAF Fund, L.P. as part of the most recent distributions to Crusader Funds investors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Maricopa County, State of Arizona on August 10, 2023.

/s/ _____

Christopher Wells

---

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

### DECLARATION OF ANDREW H. BEAN IN SUPPORT OF ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

1.  My name is Andrew Bean, my date of birth is December 13, 1987.  I am an associate attorney at Gibson Dunn & Crutcher LLP ("Gibson Dunn"), and my business address is 2001 Ross Ave, Dallas, Texas, 75201.  I am more than 21 years old and I am fully competent to make this declaration.  All facts set forth in this Declaration are based on my personal knowledge.

2.  Attached hereto as Exhibit 1 is a true and correct copy of the February 21, 2023 letter from Marshall R. King to Parsons McEntire McCleary LLP.

3.  Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff Charitable DAF Fund, L.P's Interrogatories and Requests for Production to Defendant Alvarez & Marsal, CRF Management, LLC, dated August 2, 2023.

4.  Attached hereto as Exhibit 3 is a true and correct copy of the April 29, 2019 Arbitration Final Award.

5.  Attached hereto as Exhibit 4 is a true and correct copy of the Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief, dated February 22, 2021.

---

6.    Attached hereto as Exhibit 5 is a true and correct copy of the Amended Complaint and Objection to Claims, In re: Highland Capital Mgmt., L.P., Case No. 19-34054, dated May 19, 2022.

7.    Attached hereto as Exhibit 6 is a true and correct copy of the Verified Amended Petition to Take Deposition Before Suit and Seek documents, In re: James Dondero, Case No. DC21-09534, dated May 2, 2022.

8.    Attached hereto as Exhibit 7 is a true and correct copy of the Order Denying Petition to Take Deposition and Dismissing Case, Case No. DC21-09534, dated June 1, 2022.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas on August 11, 2023.


/s/    _Andrew H. Bean_____

Andrew H. Bean

# Exhibit 1

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
www.gibsondunn.com

Marshall R. King
Direct: +1 212.351.3905
Fax: +1 212.351.5243
MKing@gibsondunn.com

Client: 05701-00003

February 21, 2023

<u>VIA E-MAIL</u>

Sawnie A. McEntire
Parsons McEntire McCleary PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201

Roger L. McCleary
Parsons McEntire McCleary PLLC
One Riverway, Suite 1800
Houston, TX  77056

Re:     *Charitable DAF Fund, L.P. v. Alvarez & Marsal CRF Management, LLC*

Dear Messrs. McEntire and McCleary:

I write on behalf of Alvarez & Marsal CRF Management, LLC ("A&M"), as Investment Manager for the "Crusader Funds."[1]

Your client, Charitable DAF Fund, L.P. ("DAF"), claims to be an investor in Offshore Fund II, having allegedly purchased a limited partnership interest in or about June 2016.  However, as you know, the arbitration panel in *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* concluded that DAF's interest had been obtained in breach of the terms of the Joint Plan of Distribution of the Crusader Funds (the "Plan") and the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd. (the "Scheme"). The panel ordered that DAF's interest be transferred to the Redeemer Committee for the benefit of the Crusader Funds, or that the interest be extinguished by the Crusader Funds.

By letters dated August 8, 2019 and March 2, 2020, we provided notice to DAF, at the address that DAF had on file with the Crusader Funds, that the Crusader Funds would be making distributions to investors in the Crusader Funds, but would be withholding amounts that might otherwise be distributed to DAF.  We further advised that the Crusader Funds reserved the right to extinguish DAF's interest, without further notice.  DAF did not object or even respond to these letters.

---

[1] The Crusader Funds include Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd. ("Offshore Fund II"), and Highland Crusader Offshore Partners, L.P.

**GIBSON DUNN**

Sawnie A. McEntire
Roger L. McCleary
Parsons McEntire McCleary PLLC
February 21, 2023
Page 2

Thereafter, as part of a settlement in the bankruptcy of Highland Capital Management, L.P. ("Highland"), Highland—which had acted as DAF's agent in the acquisition of the limited partnership interest—agreed that it would not object to the Crusader Funds cancelling or extinguishing DAF's interest in the Crusader Funds. DAF did not object to those settlement terms, and they were approved by the Bankruptcy Court.

The first we heard from DAF about these issues was in July 2021, when a law firm other than your own began raising questions. Your firm first appeared in November 2021.

Notwithstanding the ruling of the arbitration panel, you and we engaged in productive settlement discussions, which included A&M making several settlement offers. Those discussions were still underway when DAF, for some reason, decided to file suit. Your Petition is deficient in numerous respects, including by completely ignoring the terms of the Plan and the Scheme, which govern DAF's rights with respect to its limited partnership interests.

Again, notwithstanding the deficiencies of DAF's Petition, and the ruling of the arbitration panel, A&M made several further settlement offers, which included offering to have the Crusader Funds pay to DAF all distributions that had been withheld from DAF, to recognize DAF's limited partnership in Offshore Fund II going forward, and additionally to pay DAF's attorneys' fees up to $60,000. In essence, A&M agreed to all of the relief that DAF could possibly hope to obtain by pursuit of its Petition, plus reimbursement of attorneys' fees—all of this despite the fact that DAF acquired its interest in breach of the Plan and the Scheme.

Nevertheless, DAF declined A&M's offers, insisting that A&M additionally agree to make available a witness for an interview relating to A&M's communications with James Seery, Highland's Chief Executive Officer and Claimant Trustee of the Claimant Trust established by Highland's plan of reorganization, concerning the Redeemer Committee's and the Crusader Funds' claims against Highland and the sale of those claims. DAF's request for such an interview followed the denial of James Dondero's petition seeking pre-suit discovery from A&M on the same topics.

Given these events, it is apparent that DAF's Petition is not being pursued in good faith. Instead, it appears that DAF is simply trying to harass A&M, cause needless expense to the Crusader Funds (to the detriment of the Crusader Funds' other investors), and obtain discovery for purposes of some other proceeding and Mr. Dondero's ongoing feud with James Seery.

As you know, on February 17, 2023, the Crusader Funds distributed $951,060.82 to DAF, representing the entirety of distributions that had been withheld from DAF pursuant to the

**GIBSON DUNN**

Sawnie A. McEntire
Roger L. McCleary
Parsons McEntire McCleary PLLC
February 21, 2023
Page 3

arbitration panel's ruling.  The Crusader Funds also intend to treat DAF as a limited partner in Offshore Fund II going forward, and to include DAF in all future distributions to Crusader Funds investors.  Put differently, the Crusader Funds have decided not to extinguish DAF's interest, despite the arbitration ruling and DAF's violation of the Plan and the Scheme in its acquisition of such interest.

Accordingly, DAF's Petition is effectively moot, and we urge you to dismiss the Petition. Failing that, we will have no hesitation in bringing your client's bad faith conduct to the attention of the Court and seeking appropriate sanctions.

A&M reserves all of its rights and remedies.

Sincerely,

Marshall R. King

# Exhibit 2

## CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

### PLAINTIFF CHARITABLE DAF FUND, L.P.'S INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT <u>ALVAREZ & MARSAL, CRF MANAGEMENT, LLC</u>

TO:   Defendant Alvarez & Marsal, CRF Management, LLC, by and through its attorneys of record, John T. Cox III and Andrew Bean, GIBSON, DUNN & CRUTCHER LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201-2923

Plaintiff, Charitable DAF Fund, L.P. ("DAF"), serves these Interrogatories and Requests for Production (collectively the "Requests") on Defendant, Alvarez & Marsal, CRF Management, LLC ("A&M") as authorized by Rules 196 and 197 of the Texas Rules of Civil Procedure. A&M is requested to respond fully and in writing, along with producing all responsive, non-privileged documents, within thirty (30) days of service.

## INSTRUCTIONS

1.      Each Request shall be construed and answered separately and shall not be combined for the purpose of supplying a common response thereto. Each answer shall set forth verbatim the Request to which it responds. The answer to a Request shall not be supplied by referring to the answer to another Request unless the Request referred to supplies a complete and accurate answer to the Request being answered. The specificity of any Request shall not be construed or understood as limiting the generality or breadth of any other Request.

2.      If you object to any part of a Request, state with particularity both the grounds and reasons for your objection, specify the portion(s) of the request to which you object, and answer so much of the Request as is not objectionable.

3.      These Requests require you to produce Documents and Communications and/or to provide information in your physical possession, custody, or control, as well as in the possession, custody, or control of any spouse, agents, employees, officers, directors, shareholders, partners, general partners, legal representatives, predecessors, successors, children, heirs, and assigns. All requested Documents, Communications, or information not subject to a valid objection that is known by, possessed by, or available to you that appears in your records must be provided.

4.      In addition to original and final versions of Documents and Communications, each Request includes all drafts, alterations, modifications, changes,

2

and amendments of such Documents and Communications, as well as copies non-identical to the original in any respect, including any copies bearing non-identical markings or notations of any kind.

5.      If any requested Document, Communication, or information was, but no longer is, in A&M's possession, state whether a copy thereof is in the possession, custody, or control of some other person, agency, entity, partnership, or corporation, and why such Document, Communication, or information is no longer available, who is responsible for the loss, and the circumstances under which the loss occurred.

6.      Responsive Documents and Communications are to be clearly designated so as to reflect their source, owner, and/or custodian.

7.      Each requested Document and Communication shall be produced in its entirety with an affixed bates stamp. If an identical copy appears in more than one person's files, each of the copies shall be produced or the extracted metadata shall reflect the source, owner, and/or custodian for all persons with identical copies. If a Document or Communication responsive to any Request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why the production of the remainder is not possible.

8.      In the event you do not answer any Request, in whole or in part, on the basis of an assertion of attorney-client privilege, the work-product doctrine, or any other claim of privilege or immunity, answer each Request to the extent consistent with the

privilege or immunity asserted and provide information sufficient to permit the Court to

make a determination of whether a proper basis exists for the assertion of privilege or

immunity. For all documents withheld on the basis of privilege, state the basis for your

claim with specificity that such a document need not be disclosed to permit the Court to

determine the legal sufficiency of your objection or position, and, for each such

document, identify:

    a.  whether the document contains a request for legal advice and, if so, identify the person who requested the legal advice;

    b.  whether the document contains advice as to the meaning or application of particular laws or rules in response to such request;

    c.  any further information to explain and support the claim of privilege and to permit the adjudication of the propriety of that claim;

    d.  the nature of the privilege (including work product) that is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked; and the type of document, e.g. letter or memorandum; the general subject of the document; and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, and other recipient of the document, and, where not apparent, the relationship of the author, addressee, and other recipient to each other.

    9.     If there are no Documents or Communications responsive to a particular

Request, please provide a written response so stating.

    10.     If you find the meaning of any term in any Request unclear, without waiver

of DAF's rights to seek a full and complete response to the Request, you shall assume a

reasonable meaning, state what the assumed meaning is, and respond to the Request according to the assumed meaning.

11.    DAF specifically reserves the right to serve additional Requests.

12.    These Requests are continuing in nature as to require supplemental responses in accordance with the Texas Rules of Civil Procedure if and when additional Documents, Communications, or information responsive to any of the Requests herein is/are obtained, discovered, or located between the time of responding to these Requests and the final disposition of this action.

## RULES OF CONSTRUCTION

Along with the rules of construction and instructions provided under applicable discovery rules and law, these rules of construction apply to the following written discovery:

1.    Unless specifically stated otherwise in a particular Request, the relevant time period is June 30, 2016, to Present.

2.    The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

3.    The terms "any," "all," and "each" shall each be construed as encompassing any and all.

4.      The use of the singular form of any word shall be construed to include the plural and vice versa.

5.      All phrases following the terms "including" are intended to illustrate the kinds of information responsive to each Request, and shall be construed as "including, but not limited to." Such examples are not intended to be exhaustive of the information sought and shall not in any way be read to limit the scope of a Request.

6.      The use of a verb in any tense, voice, or mood shall be construed as the use of the verb in all other tenses, voices, or moods, as necessary to bring within the scope of the Request all Documents and Communications that might otherwise be construed to be outside of its scope.

7.      These Requests specifically contemplate the production of all electronic or computer data, including associated metadata.

8.      References to an entity shall include past and present officers, directors, employees, agents, affiliates, subsidiaries, owners, partners, general partners, shareholders, representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, and/or any other person(s) acting on behalf of such entity.

## DEFINITIONS

For the purposes of these Requests, the following terms shall have the following definitions and meanings, unless expressly provided otherwise. The definition and meaning of each reference below to an entity shall automatically include the entity's past

6

and present officers, directors, employees, agents, affiliates, subsidiaries, owners, partners, general partners, shareholders, representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, and/or any other person(s) acting on behalf of such entity:

*A&M, you,* and *your.* The terms "A&M", "you" and "your" shall mean and refer to Alvarez & Marsal, CRF Management, LLC and its managing and other members, officers, agents, employees, representatives, attorneys, partners, predecessors, successors, assigns, and anyone else acting on A&M's behalf, now or at any time relevant to the response.

*Any* and *all or any and/or all.* The terms "any" and "all" and "and and/or all" should be understood and applied in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Communication(s).* The term "communication(s)" shall mean any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, email, text message, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other

reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" shall mean reflecting, regarding, relating to, referring to, describing, evidencing, supporting, forming any basis for, or constituting.

*Crusader Fund*. The term "Crusader Fund" is defined as the Highland Crusader Fund II, Ltd., which is a subject of this Lawsuit and in which DAF purchased participating shares in or around June of 2016.

*Document or Documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the Texas Rules of Civil Procedure, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data

sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI.* The terms "Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) and/or all related metadata with respect to all such Documents/ESI.

*Identify* or *identity(ies)* (person(s)). The terms "identify" or "identity(ies)," when referring to a person, shall mean to provide the person's full first and last name; last known address, telephone number, and e-mail address; and last known place of employment.

*Identify or identity(ies)* (document(s)). The terms "identify" or "identity(ies)," when referring to a document, shall mean to provide the document's name; the date of the document's creation; the form of the document (e.g., letter, e-mail message, etc.); a

description of the substance of the document; and the identity of the person who currently possesses the document (and, if the document no longer exists, an explanation for why it no longer exists and the date on which it ceased to exist).

*Lawsuit*. The term "Lawsuit" shall mean and refer to the above-captioned lawsuit styled: *Charitable DAF Fund, L.P. v. Alvarez & Marsal, CRF Management, LLC*, Cause No. DC-22-10107; 116th Judicial District Court of Dallas County, Texas.

*Person*. The term "person" shall mean any natural person and/or any business, legal, or governmental entity or association.

*Plaintiff* and *Defendant*. The terms "Plaintiff" and "Defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, shall mean the party or parties, and where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

## FIRST SET OF INTERROGATORIES TO A&M

INTERROGATORY NO. 1:  Identify the person(s) providing the responses to these interrogatories, including all persons assisting in providing such answers and/or with whom the person(s) providing the responses consulted, interviewed, met with, or questioned in order to prepare the responses.

ANSWER:

INTERROGATORY NO. 2:  Identify by name, address, and telephone number all persons who you expect to call to testify at trial (excluding rebuttal or impeachment witnesses the necessity of whose testimony cannot be reasonably anticipated before trial) or any hearing in this Lawsuit.

ANSWER:

INTERROGATORY NO. 3:  Identify the total payments, for each calendar year from June 30, 2016, to the present and described by each most detailed category or description recorded, used, or otherwise recognized by A&M for the same, paid to or otherwise received by A&M, directly or indirectly, relating in any way to A&M's role as the investment manager for the Crusader Fund.

ANSWER:

INTERROGATORY NO. 4:  Identify by calendar year from June 1, 2016, to the present all sums of money A&M has received, directly or indirectly, from, or in connection with, the Crusader Fund that are not properly defined as management fees.

ANSWER:

INTERROGATORY NO. 5:  Identify the totals of all other payments, for each calendar year from June 1, 2016, to the present, by recipient(s) and the amount(s) for each most detailed category or description recorded, used, or otherwise recognized by A&M for the same as to each recipient, paid by, from, or on behalf of the Crusader Fund (including but not limited to from any Crusader Fund account(s)), that A&M has not included in A&M's answer to Interrogatory No. 4 above.

ANSWER:

INTERROGATORY NO. 6:  Identify all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed, which held any shares, funds, financial or

beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016, to the present.

ANSWER:

INTERROGATORY NO. 7: Describe how A&M is compensated for its role as investment manager of the Crusader Fund and describe in general how such compensation fluctuates depending on the fund's size, performance, or other factors.

ANSWER:

INTERROGATORY NO. 8: Identify each distribution A&M made, caused to be made, and/or authorized from the Crusader Fund (including but not limited to from any Crusader Fund account(s)) between June 1, 2016 and the present (include the amount of the distribution, the date the distribution was made, and the recipients of the distribution).

ANSWER:

INTERROGATORY NO. 9: Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . ." as alleged in Paragraph 5 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 10: Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel," as alleged in Paragraph 6 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 11: Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent," as alleged in Paragraph 7 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 12:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds," as alleged in Paragraph 8 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 13:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds," as alleged in Paragraph 9 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 14:  Describe in general the legal and factual bases allegedly supporting your claim(s) for attorneys' fees against DAF in this Lawsuit, if any, including the terms of any fee agreement between you and your attorneys.

ANSWER:

INTERROGATORY NO. 15:  Identify the current value, including all components of the same, of DAF's capital account regarding the Crusader Fund.

ANSWER:

## FIRST SET OF REQUESTS FOR PRODUCTION TO A&M

<u>REQUEST FOR PRODUCTION NO. 1</u>:  Produce all account records for all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed which held any shares, funds, financial or beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016 to the present.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 2</u>:  Produce all documents and/or recordings concerning any communications between A&M and DAF, from June 1, 2016, to the present, concerning or relating to DAF's participating shares and/or interest in the Crusader Fund.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 3</u>:  Produce all documents and/or recordings concerning any communications between Christopher Wells and DAF, from June 1, 2016 to the present, concerning DAF's participating shares and/or interest in the Crusader Fund.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 4</u>:  Produce all documents you sent to or received from DAF from June 1, 2016, through the present.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 5</u>:  Produce all documents concerning fees paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, through the present.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 6</u>:  Produce all documents concerning any other monetary sums paid to A&M, directly or indirectly, concerning the Crusader Fund (other than those produced in response to Request No. 5 above) from June 1, 2016, through the present.

<u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 7</u>:  Produce documents sufficient to evidence that A&M is a registered investment advisor subject to the Investment Advisors Act of 1940.

RESPONSE:

REQUEST FOR PRODUCTION NO. 8:  Produce all governing documents for the Crusader Fund, including any amendments thereto, in effect at any and all points from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 9:  Produce all awards or other decisions made by any arbitration panel or any other judicial proceeding or formal authority which you claim impacts the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 10:  Produce all documents purportedly evidencing DAF's acquisition of an interest in the Crusader Fund allegedly in violation of the Joint Plan of Distribution of the Crusader Funds and/or the Scheme of Arrangement relating to Offshore Fund II.

RESPONSE:

REQUEST FOR PRODUCTION NO. 11:  Produce all documents evidencing the capital account value of DAF's interest(s) in the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 12:  Produce all documents evidencing any distributions A&M made, caused to be made, and/or authorized from the Crusader Fund (including but not limited to from any Crusader Fund account(s)) between June 1, 2016 and the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 13:  Produce all documents evidencing each instance where A&M disclosed to DAF any of the distributions identified in Interrogatory No. 8.

RESPONSE:

REQUEST FOR PRODUCTION NO. 14:  Produce all documents purportedly evidencing any notice provided by A&M to DAF regarding A&M's intent to withhold distributions from DAF relating to the Crusader Fund between June 1, 2016, and the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 15:  Produce all documents concerning A&M's decision to withhold and/or refusal to distribute funds proportional to DAF's interest in the Crusader Fund to DAF between June 1, 2016, and the present.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 16:  Produce all documents concerning A&M's decision to distribute $951,060.82 to DAF on February 17, 2023.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 17:  Produce all documents referring, forming any basis for, or otherwise relating to A&M's decision to treat DAF as an equity holder in the Crusader Fund and to include DAF in any future distributions as reflected in the February 21, 2023 Letter from Gibson, Dunn & Crutcher LLP to Parsons McEntire McCleary PLLC (the "February 21 Letter").

    RESPONSE:

REQUEST FOR PRODUCTION NO. 18:  Produce all documents referring, forming any basis for, or otherwise purportedly supporting your claim that DAF's interest(s) in the Crusader Fund had been extinguished in 2019 or 2020 as reflected in the February 21 Letter.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 19:  Produce a true and accurate copy of the Investment Management Agreement between the Crusader funds, House Hanover, LLC, A&M, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, dated August 4, 2016, as well as any amendments thereto.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 20:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . ." as alleged in Paragraph 5 of A&M's February 20, 2023, Answer.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 21:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the

doctrines of res judicata and collateral estoppel" as alleged in Paragraph 6 of A&M's February 20, 2023, Answer.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 22:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent" as alleged in Paragraph 7 of A&M's February 20, 2023, Answer.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 23:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds" as alleged in Paragraph 8 of A&M's February 20, 2023, Answer.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 24:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds" as alleged in Paragraph 9 of A&M's February 20, 2023, Answer.

    RESPONSE:

REQUEST FOR PRODUCTION NO. 25:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because A&M's alleged obligation, if any, have been fulfilled and discharged" as alleged in Paragraph 10 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 26:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrine of waiver" as alleged in Paragraph 12 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 27:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, based on the doctrine of unclean hands" as alleged in Paragraph 13 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 28:  Produce all documents which form any basis for your claim for attorneys' fees against DAF.

RESPONSE:

REQUEST FOR PRODUCTION NO. 29:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 30:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 31:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to shareholders and/or limited partners other than DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 32: Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding any distributions to shareholders and/or limited partners other than DAF in connection with Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 33: Produce all documents accounting for or identifying any and/or all distributions from the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 34: Produce all documents showing the proportion of DAF's interest in all distributions from the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 35: Produce all documents accounting for or identifying any and/or all distributions from the Crusader Fund withheld from DAF from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 36: Produce all documents accounting for or identifying any and/or all fees earned, and expenses incurred, by A&M related to the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 37: Produce all documents accounting for or identifying all monetary sums paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, to the present, other than those reflected in any accounting produced by A&M in response to Request No. 36 above.

RESPONSE:

REQUEST FOR PRODUCTION NO. 38: Produce all documents concerning any third-party financial audits concerning the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 39:  Produce all documents concerning any internal financial audits concerning the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 40:  Produce all documents concerning any analyses, from June 1, 2016, to the present, of the performance and/or valuation of the underlying assets held by the Crusader Fund.

RESPONSE:

REQUEST FOR PRODUCTION NO. 41:  Produce all documents concerning any analyses from June 1, 2016, to the present, of the performance and/or valuation of the Crusader Fund overall.

RESPONSE:

REQUEST FOR PRODUCTION NO. 42:  Produce all documents you may introduce as exhibits at trial in this Lawsuit.

RESPONSE:

Respectfully submitted,

*/s/ Roger L. McCleary*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**Counsel for Plaintiff Charitable DAF
Fund, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, a true and correct copy of this instrument was served on Defendant's counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ Roger L. McCleary*
Roger L. McCleary

3125360.6

# Exhibit 3

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.                                    Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with
Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into
between the above-named parties and adopted in July 2011, and having been duly sworn, and
having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

    A.  On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland
Capital Management, L.P. ("Respondent") liable in a number of respects and awarding
damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the
Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft]
the hearing open until all issues set forth ... have been agreed upon by the Parties or
decided by the Tribunal."

    B.  In response to an email from Claimant, dated March 7, 2019, seeking clarification on an
apparent omission from the Partial Final Award, we issued a Disposition of Application
for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

    C.  This Final Award incorporates the Partial Final Award and the Modification of Award
(together, the "Partial Award"). We re-adopt all prior findings and conclusions of the
Partial Award, except as specifically modified hereinafter.

    D.  We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of
Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of
Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

a. Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b. Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c. Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d. Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e. Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f. Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g. On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

2

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

   h.  Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E.  Issues

   a.  Fees and costs

      1.  In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

      2.  During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

      3.  Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

3

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

    1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.S.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker, 186 F.3d 1261, 1270-71 & n.4* (10th Cir. 1999) (*Functus*

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i. Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a. Claimant seeks the following in fees and costs:

        i. Jenner & Block Fees - $9,278,248.99

            1. In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii. FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00

            1. In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp.*

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award

i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

8

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4.  With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5.  First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6.  Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7.  In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at
\*3, \*9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had
the authority under the AAA Rules to reopen the hearing to accept
further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the
record, Rule 40 authorizes the Panel to do so "upon the application
of a party," so long as doing so did not violate "the specific time
agreed to by the parties in the arbitration agreement" for the
making of the award. No such time period is set forth in the
arbitration agreement. Finally, we interpret Rule 40 to be speaking
to the instance of reopening the hearing after the final award is
made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally
correct the clerical error by re-adopting the additional paragraph,
previously included in the Panel's March 16 Modification of Award, as
follows:

1. "Insert the following paragraph at page 54, immediately after
VII.B.2.f: "3. The transfer of Barclays Fund interests: By
transferring, without the required Committee approval, Barclays'
fund interests to itself through entities it controlled as part of the
settlement, Highland breached the Plan and Scheme. We award the
Committee damages measured by the benefits Highland received
in excess of the amount it would have been entitled to receive from
the Redeemer Trust Account because Barclays claim was settled
for less than its value. In Table 11, Version 2, Claimant's damages
expert, Basil Imburgia, calculated that such an amount totaled
$34,661,749. RC-522. As with other amounts awarded, the Parties
are to confer to determine the actual amount of damages including
the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set
forth below, as to which Respondent does not object. The motion is
granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees
improperly taken from the Fund by Highland as "$33,313,000"
(Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article
33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise
that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs
presented but omitted from the award." We had found liability as to two claims involving the Barclays LP
interests but omitted the damages component of one of the two liability findings. That does not constitute
an award as to a claim argued by Claimant but omitted from the partial final award.

2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv.  Eames

1. In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

9. Second, although Eames is not a party in this proceeding, that is irrelevant to the relief we grant. The operating party throughout all of the machinations that resulted in the transfer of Barclays' LP interests to an entity it created solely for the purpose of holding such interests was, and remains, Respondent. It is completely within its power to unwind the transfer and re-transfer those interests back to the Fund for the benefit of its investors, as we now order.

10. Regarding the appropriate amount upon which to award interest, for reasons set forth below, we reject Claimant's argument that $29,609,015 is the appropriate amount upon which to award interest, as to do so would be to violated well-settled law in New York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the amount of $21,768,743, plus 9% simple prejudgment interest from the date of the breach until the earlier of either (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant within sixty (60) days from the date of transmittal of this Final Award to the Parties.

v. Interest

1. In the March 6 Partial Final Award, we awarded damages and interest through the date of that award, but then, as already referred to, directed the Parties to confer regarding all damages and interest issues. Claimant now urges that we award 9% prejudgment interest on the damage amounts awarded until the earlier of: (1) the date on which the amounts due are paid to the Committee for the benefit of the Fund; or (2) the date on which a court of competent jurisdiction enters a final judgment on the Final Award.

2. However, as Respondent points out, Claimant is, in effect, arguing for a compounding of interest upon interest. We agree. The effect of Claimant's interest calculations would violate New York law, as an award of 9% interest post-March 6 on an amount that already includes 9% interest from the breach through March 6, would amount to compound interest after March 6, 2019. "[T]he statutory

14

scheme [in New York] for awarding ..., where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest. It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

## F. FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

i.  Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii.  Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

1.  The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

2.  The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3.  The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4.  The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

5.  In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii.  For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv.  For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v.  For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi. For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii. For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii. For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix. For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

17

x.  For the Barclays Claim, the Panel awards the following relief:

1.  The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

2.  Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

1.  Jenner & Block Fees - $9,278,248.99;
2.  FTI Expert Fees - $1,274,853.26;
3.  A&M Arbitration Fees - $655,160.00;
4.  Court Reporter Hr'g Costs - $114,697.77;
5.  Court Reporter Dep. Costs - $28,890.04

xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.

_____
Michael D. Young

State of New York        )
                              )  SS:

County of New York      )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____                                 _____
Date                                          David M. Brodsky, Chairperson

State of New York        )
                              )  SS:

County of New York      )

On this _9_ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

State of Florida    )
                  )   SS:
County of Lee     )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our       Final Award.

_Date April 29,2019

_____
John S. Martin, Jr., Arbitrator

State of Florida    )
                  )   SS:
County of Lee     )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

State of New York          )
                           )   SS:
County of New York         )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is our          Final Award.

4/29/19
Date

_Michael Young_
Michael D. Young, Arbitrator

State of New York          )
                           )   SS:
County of New York         )

On this  29  day of April, 2019, before me personally came and appeared Michael D. Young,
to me known and known to me to be the individual described in and who executed the foregoing
instrument and he acknowledged to me that he executed the same.

_Vickie L. Johnston_
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

22

# Exhibit 4



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 22, 2021

_____
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

## ORDER (I) CONFIRMING THE FIFTH AMENDED
## PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
## MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.   entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the
Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended
Plan of Reorganization (C) Establishing Deadline for Filing Objections to
Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and
Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket
No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy
Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined
below).  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

DOCS_SF:104487.21 36027/002


1934054210222000000000018

*Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.     set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.     set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.     initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.     reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii)  *otice of I  ntry of  rder Approving Disclosure Statement  II Hearing to Confirm  and III Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.     reviewed: (i) the *Debtor s  otice of Filing of Plan Supplement for the Third Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor s  otice of Filing of Plan Supplement for the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor s  otice of Filing of Plan Supplement for the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv)  *otice of Filing Plan Supplement to the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.  with Technical Modifications  t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor s  otice of Filing of Plan Supplement to the Fifth Amended Plan of Reorgani ation of Highland of Highland Capital Management, L.P.  As Modified*  on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.     reviewed: (i) the  *otice of I  xecutory Contracts and  nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan,  II Cure Amounts, if Any, and  III Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second  otice of I  xecutory Contracts and*

2

*nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, II Cure Amounts, if Any, and III Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third otice of I xecutory Contracts and nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, II Cure Amounts, if Any, and III Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *otice of Withdrawal of Certain xecutory Contracts and nexpired Leases from List of xecutory Contracts and nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth otice of I xecutory Contracts and nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan II Cure Amounts, if Any, and III Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *otice of Hearing on Agreed Motion to I Assume onresidential Real Property Lease with Crescent TC Investors, L.P. pon Confirmation of Plan and II xtend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth otice of I xecutory Contracts and nexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan II Cure Amounts, if Any, and III Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.   reviewed: (i) the *Debtor s Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor s mnibus Reply to b ections to Confirmation of the Fifth Amended Chapter Plan of Reorgani ation of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of otes on the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of otes on the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.   reviewed: (i) the *otice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.  reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.  conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.  heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.  considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

4

## FINDINGS OF FACT AND CONCLUSIONS OF LA

1.     **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.     **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor s Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

5

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.       **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan.  As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.       **Not  our Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

6

bankruptcy case being filed on October 16, 2019 (the "Petition Date").  Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below.  Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020.  Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.     **The Debtor**.  The Debtor is headquartered in Dallas, Texas.  As of the

Petition Date, the Debtor employed approximately 76 employees.  The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.     **The   ighland Enterprise.**  Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments.  Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella.  None of these

affiliated entities filed for chapter 11 protection.  Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor.  Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

       7.    **Debtor's Operational  istory.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

       8.    **Not  our Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

8

The Debtor also did not suffer any type of catastrophic business calamity.  In fact, the Debtor filed

for Chapter 11 protection six months before the onset of the COVID-19 pandemic.  Rather, the

Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation

claims that it faced—many of which had finally become liquidated (or were about to become

liquidated) after a decade or more of contentious litigation in multiple forums all over the world.

The Committee in this case has referred to the Debtor—under its former chief executive, Mr.

Dondero—as a "serial litigator."  The Bankruptcy Court agrees with that description.  By way of

example, the members of the Committee (and their history of litigation with the Debtor and others

in the Highland complex) are as follows:

a.  **The Redeemer Committee of the  ighland Crusader Fund  the  Redeemer
    Committee** .  This Committee member obtained an arbitration award against the
    Debtor in the amount of $190,824,557, inclusive of interest, approximately five
    months before the Petition Date, from a panel of the American Arbitration
    Association. It was on the verge of having that award confirmed by the Delaware
    Chancery Court immediately prior to the Petition Date, after years of disputes that
    started in late 2008 (and included legal proceedings in Bermuda).  This creditor's
    claim was settled during this Chapter 11 Case in the amount of approximately
    $137,696,610 (subject to other adjustments and details not relevant for this
    purpose).

b.  **Acis Capital Management, L.P., and Acis Capital Management GP, LLC
      Acis** .  Acis was formerly in the Highland complex of companies, but was not
    affiliated with Highland as of the Petition Date.  This Committee member and its
    now-owner, Joshua Terry, were involved in litigation with the Debtor dating back
    to 2016.  Acis was forced by Mr. Terry (who was a former Highland portfolio
    manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for
    the Northern District of Texas, Dallas Division before the Bankruptcy Court in
    2018, after Mr. Terry obtained an approximately $8 million arbitration award and
    judgment against Acis.  Mr. Terry ultimately was awarded the equity ownership of
    Acis by the Bankruptcy Court in the Acis bankruptcy case.  Acis subsequently
    asserted a multi-million dollar claim against Highland in the Bankruptcy Court for
    Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry.
    The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

9

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c. **UBS Securities LLC and UBS AG London Branch** <u>UBS</u> . UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d. **Meta E Discovery** <u>Meta E</u>"). Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9. **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

10

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of

employment-related agreements and for defamation arising from a 2017 press release posted by

the Debtor.  The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's

claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an

$8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other

details not relevant for this purpose).  Additionally, entities collectively known as "HarbourVest"

invested more than $70 million with an entity in the Highland complex and asserted a $300 million

proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO

violations.  HarbourVest's claim was settled during the bankruptcy case for a $45 million general

unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed

by a Dondero Entity.

   10. **Other Claims Asserted.**  Other than the Claims just described, most of the

other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the

Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr.

Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred

compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date

and had outstanding amounts due for their prepetition services.

   11. **Not  our  Garden  Variety  Post  Petition  Corporate  Governance**

**Structure**.  Yet another reason this is not your garden variety chapter 11 case is its post-petition

corporate governance structure.  Immediately from its appointment, the Committee's relationship

with the Debtor was contentious at best.  First, the Committee moved for a change of venue from

<div align="center">11</div>

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its

then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr.

Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and

perhaps worse).

12.     **Post Petition Corporate Governance Settlement with Committee.**  After

spending many weeks under the threat of the potential appointment of a trustee, the Debtor and

Committee engaged in substantial and lengthy negotiations resulting in a corporate governance

settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement,

among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as

an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero

agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any

Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.

The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the

commencement of any litigation against the three independent board members appointed to

oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the

exculpation of those board members by limiting claims subject to the "gatekeeper" provision to

those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020
[Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with  fficial Committee of  nsecured
Creditors Regarding the Governance of the Debtor and Procedures for  peration in the  rdinary Course* [Docket
No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the  fficial Committee of
 nsecured Creditors Regarding Governance of the Debtor and Procedures for  perations in  rdinary Course*
[Docket No. 338] (the "Stipulation").

13.    **Appointment of Independent Directors.**    As part of the Bankruptcy
Court-approved settlement, three eminently qualified independent directors were chosen to lead
Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen
by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are
each technically independent directors of Strand (Mr. Dondero had previously been the sole
director of Strand and, thus, the sole person in ultimate control of the Debtor).   The three
independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr.
Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and
Foreign Representative.   Suffice it to say that this settlement and the appointment of the
independent directors changed the entire trajectory of the case and saved the Debtor from the
appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent
directors.  They were the right solution at the right time.  Because of the unique character of the
Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent
directors was a far better outcome for creditors than the appointment of a conventional chapter 11
trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in
particular, knew and had vast experience at prominent firms with high-yield and distressed
investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring
large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not
only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver
through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis,
the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.    **Conditions Required by Independent Directors.** Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case. The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically.  Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

14

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

15.    **Not   our Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See   rder Approving the Debtor s Motion   nder Bankruptcy Code Sections   a  and   b Authori ing
Retention of James P. Seery, Jr., as Chief  xecutive  fficer, Chief Restructuring  fficer, and Foreign Representative
  unc Pro Tunc to March  ,*    [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not our Garden Variety Plan Objectors That Is, Those That Remain** . Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

16

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.　　　　*b ection to Confirmation of the Debtor s Fifth Amended Plan of Reorgani ation* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.　　　　*b ection to Confirmation of Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.  filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare pportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland pportunistic Credit Fund, Highland Small Cap uity Fund, Highland Socially Responsible uity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan TF, exPoint Advisors, L.P.,  exPoint Capital, Inc.,  exPoint Real state Strategies Fund,  exPoint Strategic pportunities Fund* [Docket No. 1670];

c.　　　　A *Joinder to the b ection filed at      by:  exPoint Real state Finance Inc., exPoint Real state Capital, LLC,  exPoint Residential Trust, Inc.,  exPoint Hospitality Trust,  exPoint Real state Partners, LLC,  exPoint Multifamily Capital Trust, Inc.,  ineBrook Homes Trust, Inc.,  exPoint Real state Advisors, L.P.,  exPoint Real state Advisors II, L.P.,  exPoint Real state Advisors III, L.P.,  exPoint Real state Advisors I , L.P.,  exPoint Real state Advisors , L.P.,  exPoint Real state Advisors  I, L.P.,  exPoint Real state Advisors  II, L.P.,  exPoint Real state Advisors  III, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.　　　　*exPoint Real state Partners LLC s b ection to Debtor s Fifth Amended Plan of Reorgani ation  filed by  exPoint Real state Partners LLC f/k/a HCR Partners LLC* [Docket No. 1673]; and

e.　　　　*exBank s b ection to Debtor s Fifth Amended Plan of Reorgani ation  filed by exBank Title, Inc.,  exBank Securities, Inc.,  exBank Capital, Inc., and exBank* [Docket No. 1676].  The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "<u>Dondero Related Entities</u>").

17.　　**uestionability of Good Faith as to Outstanding Confirmation**

**Ob ections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

17

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections.  In fact,

the Bankruptcy Court has good reason to believe that these parties are not objecting to protect

economic interests they have in the Debtor but to be disruptors.  Mr. Dondero wants his company

back.  This is understandable, but it is not a good faith basis to lob objections to the Plan.  As

detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged

the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred

to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring.  The Debtor and

the Committee represent that they have communicated with Mr. Dondero regarding a grand

bargain settlement, and the Bankruptcy Court believes that they have.

18.     **Remote Interest of Outstanding Confirmation Ob ectors.**  To be specific

about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy

Court will address them each separately.  First, Mr. Dondero has a pending objection to the Plan.

Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification

claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would

be highly questionable at this juncture).  Mr. Dondero owns no equity in the Debtor directly.  Mr.

Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the

total equity in the Debtor.  Second, a joint objection has been filed by The Dugaboy Trust

("Dugaboy") and the Get Good Trust ("Get Good").  The Dugaboy Trust was created to manage

the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the

Debtor.  *See* Disclosure Statement at 7, n.3.  The Bankruptcy Court is not clear what economic

interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero.  Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

19

Inline

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero

owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan.

The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr.

Dondero appears to be in control of these entities as well.

19.     **Bac ground Regarding Dondero Ob ecting Parties.**  To be clear, the

Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in

opposition to confirmation, even though their economic interests in the Debtor appear to be

extremely remote and the Bankruptcy Court questions their good faith.   Specifically, the

Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In

the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary

injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in

specific ways that were supported by evidence.  Around the time that this all came to light and the

Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company

phone, which he had been asked to turn in to Highland, mysteriously went missing.  The

Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy

Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to

confirmation of the Plan.

20.     **Other Confirmation Ob ections.**  Other than the objections filed by Mr.

Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the

*nited States Trustee s Limited   b ection to Confirmation of Debtor s Fifth Amended Plan of*

*Reorgani ation* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

DOCS_SF:104487.21 36027/002

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

    a.    *CL Holdco, Ltd. s Joinder to b ection to Confirmation of Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P. and Supplemental b ections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

    b.    *b ection of Dallas County, City of Allen, Allen ISD, City of Richardson, and aufman County to Confirmation of the Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

    c.    *Senior mployees Limited b ection to Debtor s Fifth Amended Plan of Reorgani ation filed by Scott llington, Thomas Surgent, Frank Waterhouse, Isaac Leventon* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

    d.    *Limited b ection of Jack ang and Brad Borud to Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

    e.    *nited States IRS Limited b ection to Debtor s Fifth Amended Plan of Reorgani ation* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

    f.    *Patrick Hagaman Daugherty s b ection to Confirmation of Fifth Amended Plan of Reorgani ation* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

    21.    **Capitali ed Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

21

22.     **urisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the

Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper

in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a

voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19,

2019.  The Debtor continues to operate its business and manage its property as debtor in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the

Committee on October 29, 2019.

24.     **udicial Notice.**  The Bankruptcy Court takes judicial notice of the docket

in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed

claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all

pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments

made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter

11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure

Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents

filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings

held before the Bankruptcy Court or the District Court for the Northern District of Texas in

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorgani ation of Highland Capital Management, L.P.*

23

DOCS_SF:104487.21 36027/002

*as Modified* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor s*

*otice of Filing of Plan Supplement to Fifth Amended Plan of Reorgani ation of Highland Capital*

*Management, L.P. as Modified* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications.  Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data.  The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.    **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *otice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.    **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Ban ruptcy Rule 3 16 a .**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Ban ruptcy Code  11 U.S.C.  1129 a 1 .**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification  11 U.S.C.    1122, 1123 a 1 .**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.    **Classification of Priority Claims.**   Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.   Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.    **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.   Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).   The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.   Class 8 Creditors

27

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan.

Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or

below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The

Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially

similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are

appropriately separately classified. Valid business reasons also exist to classify creditors in Class

7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or

service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to

the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly

unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated

created an expectation of expedited payment relative to the largely unliquidated Claims in Class

8, which consists in large part of parties who have been engaged in years, and in some cases over

a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was

the subject of substantial arm's-length negotiations between the Debtor and the Committee to

appropriately reflect these relative differences.

36.     **Classification of Equity Interests.** The Plan properly separately classifies

the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests

in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity

security interests in the Debtor and different payment priorities.

37.     **Elimination of Vacant Classes.** Section III.C of the Plan provides for the

elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non Classified Claims 11 U.S.C. 1122, 1123 a 1 .** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

29

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.     **Specification of Unimpaired Classes 11 U.S.C. 1123 a 2 .** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.     **Specification of Treatment of Impaired Classes 11 U.S.C. 1123 a 3 .** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.     **No Discrimination 11 U.S.C. 1123 a 4 .** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

30

42. **Implementation of the Plan 11 U.S.C. 1123 a 5 .** Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a. **The Claimant Trust.** The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner). The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee. Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement. The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b. **The Litigation Sub Trust.** The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement. The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

c.    **The Reorganized Debtor**.    The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action.  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests).  Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan.  Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents.  Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

32

44. **Selection of Officers and Directors 11 U.S.C. 1123 a 7 .** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.    **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record. The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee. Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks. Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally. Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date. The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae. Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per

month for the first three months and $20,000 per month thereafter, plus a success fee related to

litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the

post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the

selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight

Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of

the Bankruptcy Code is satisfied.

46.    **Debtor's Compliance with Bankruptcy Code 11 U.S.C. 1129 a 2 .**

Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the

applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and

1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order

governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure

Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in

connection with this Chapter 11 Case.

47.    **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure

Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered

the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced

by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation

Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7,

8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan;

and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order.  The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan.  The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan.  The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.  The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan.  The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity

36

DOCS_SF:104487.21 36027/002

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law 11 U.S.C. 1129 a 3 .** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.    The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.    Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.    While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.    On August 3, 2020, the Bankruptcy Court entered the *rder Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.    On August 12, 2020, the Debtor filed its *Chapter    Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.    The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.    Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.    Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

38

49.     **Payments for Services or Costs and Expenses  11 U.S.C.  1129 a  4  .**
Article II.B of the Plan provides that Professionals will file all final requests for payment of
Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an
adequate period of time for interested parties to review such claims.  The procedures set forth in
the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in
connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter
11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy
Code.

50.     **Directors, Officers, and Insiders  11 U.S.C.  1129 a  5  .** Article IV.B
of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the
Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully
explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of
section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation
of any insider to be employed or retained by the Reorganized Debtor, if applicable, and
compensation for any such insider.  The appointment of such individuals is consistent with the
interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section
1129(a)(5) of the Bankruptcy Code.

51.     **No Rate Changes  11 U.S.C.  1129 a  6  .** The Plan does not provide for
any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is
thus not applicable.

52.    **Best Interests of Creditors 11 U.S.C.  1129 a  7 .** The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the Amended Liquidation Analysis/Financial Projections.    The Amended Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

40

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:

NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC

(n/k/a NexPoint Real Estate Partners, LLC).  Under the Plan, as of the Confirmation Date, (a) Class

7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)

Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on

account of their Claims.  Under a hypothetical chapter 7 liquidation, all general unsecured creditors

are projected to receive approximately 55% on account of their Claims.  The Bankruptcy Court

finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive

under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation

based on Mr. Seery's testimony, including the following credible reasons he posited, among

others:

a.   The nature of the Debtor's assets is complex.  Certain assets relate to complicated real estate structures and private equity investments in operating businesses.  Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b.   Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c.   A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

     d.     The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

     e.     The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.     **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.     **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy
Code.

55.    **Acceptance by Impaired Class 11 U.S.C.    1129 a 1   .**  Class 2
(Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims
that voted to accept the Plan, determined without including any acceptance of the Plan by any
insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.    **Feasibility 11 U.S.C.    1129 a 11   .**  Article IV of the Plan provides for
the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the
Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize
and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation
Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing
provide a reasonable probability of success that the Debtor will be able to effectuate the provisions
of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective
Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that
the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier
Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this
note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly
opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the
Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to
receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

43

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement.  Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.    **Payment of Fees  11 U.S.C.  1129 a  12 .**  All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58.    **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code).  Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59.    **Miscellaneous Provisions  11 U.S.C.  1129 a  14  16 .**  Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60.    **No Unfair Discrimination  Fair and Equitable Treatment  11 U.S.C.**

**1129 b .**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

a.     Class 8.  The Plan is fair and equitable with respect to Class 8 General Unsecured
Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent
interest in the Claimant Trust under the Plan (the "Contingent Interests"), the
Contingent Interests will not vest unless and until holders of Class 8 General
Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to
100% of the amount of their Allowed Claims plus interest as provided under the
Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity
Interests that are junior to the Claims in Class 8 and Class 9 will not receive or
retain under the Plan on account of such junior claim interest any property unless
and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest,
the Plan is fair and equitable with respect to holders of Class 8 General Unsecured
Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning
of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

b.     Class 10 and Class 11.  There are no Claims or Equity Interests junior to the Equity
Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither
receive nor retain any property under the Plan unless Allowed Claims in Class 8
and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan
and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority
rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section
1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As
noted above, separate classification of the Class B/C Partnership Interests from the
Class A Partnerships Interests is appropriate because they constitute different
classes of equity security interests in the Debtor, and each are appropriately
separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

DOCS_SF:104487.21 36027/002

61.    **Only One Plan  11 U.S.C.    1129 c  .**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.    **Principal Purpose  11 U.S.C.    1129 d  .**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.    **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.    **Good Faith Solicitation  11 U.S.C.    1125 e  .**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.    **Discharge  11 U.S.C.    1141 d  3  ).**  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.    **Retention of urisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.    **Additional Plan Provisions 11 U.S.C. 1123 b .**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.    **Executory Contracts and Unexpired Leases 11 U.S.C. 1123 b 2 .**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

47

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts").  With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8]  Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

      69.     **Compromises and Settlements Under and in Connection with the Plan 11 U.S.C.  1123 b  3 .**  All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

      70.     **Debtor Release, Exculpation and In unctions 11 U.S.C.  1123 b .**  The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See   otice of Withdrawal of James Dondero s   b ection Debtor s Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

DOCS_SF:104487.21 36027/002

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

49

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").   Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *uid pro  uo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.   The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

      72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").   As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

50

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these

parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order.

The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor

up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the

appointment of the Independent Directors in an already contentious and litigious case, the January

9 Order set the standard of care for the Independent Directors and specifically exculpated them for

negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the

January 9 Order and would not have agreed to their appointment as Independent Directors if the

January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order.

Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent

Directors or their agents and advisors must first seek approval from the Bankruptcy Court before

doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case

and exculpated the Independent Directors for acts other than willful misconduct or gross

negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims

of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not

expire by its terms.

      73.    **Existing Exculpation of Independent Directors.**  The Bankruptcy Court

also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy

Court concludes its previous approval of the exculpation of the Independent Directors, their agents,

advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res udicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74.    **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res udicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.    First, the statutory basis for *Pacific Lumber* s denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]).  *Pacific Lumber s*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members.  The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

DOCS_SF:104487.21 36027/002

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order.  The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee.  In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation.  The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order.  Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors.  The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity.  Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber s* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.      Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252.  If ever there was a risk of that happening in a chapter 11 reorganization, it is this one.  Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down."  The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

DOCS_SF:104487.21 36027/002

75.    **In unction.**  Section IX.D of the Plan provides for a Plan inunction to
implement and enforce the Plan's release, discharge and release provisions (the "Injunction
Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr.
Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize
their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this
objective without the interference and harassment of Mr. Dondero and his related entities,
including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was
subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's
assets and those assets could be monetized for less money to the detriment of the Debtor's
creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent
with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and
1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction
Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the
circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The
Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither
vague nor ambiguous

76.    **Gate eeper Provision**.  Section IX.F of the Plan contains a provision
contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a
gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that
Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action
against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy

Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient

administration, implementation, and consummation of the Plan. The Bankruptcy Court also

concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the

Gatekeeper Provision.

77.     **Factual Support for Gate eeper Provision.** The facts supporting the need

for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior

to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr.

Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for

years and, in some cases, over a decade. Substantially all of the creditors in this case are either

parties who were engaged in litigation with the Debtor, parties who represented the Debtor in

connection with such litigation and had not been paid, or trade creditors who provided litigation-

related services to the Debtor. During the last several months, Mr. Dondero and the Dondero

Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and

time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary

restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190

Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees

and interference with the Debtor's business operations; (ii) a contempt motion against Mr.

Dondero for violation of the temporary restraining order, which motion is still pending before the

Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's

controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.    **Findings Regarding Dondero Post Petition Litigation.** The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.  **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("<u>AON</u>"), regarding his efforts to obtain D&O insurance.  Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide  In re Carroll*) 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.  Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gate eeper Provision.** The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue*

*Moon entures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81. **urisdiction to Implement Gate eeper Provision.** The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*nited States Brass Corp. v. Travelers Ins. Group, Inc. In re nited States Brass Corp.*, 301 F.3d

296 (5th Cir. 2002) and *P Colonnade of Dallas Ltd. P Ship v. Faulkner In re Stonebridge*

*Techs., Inc.*, 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *illegas*

*v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.    **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c.    The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

DOCS_SF:104487.21 36027/002

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.      The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.      Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.      Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

60

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, AD UDGED AND DECREED T AT**

      **A.     Confirmation of the Plan.** The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**    **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**    **Ob ections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**    **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

DOCS_SF:104487.21 36027/002

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.   The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

> E.      **Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

> F.      **Vesting of Assets in the Reorgani ed Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

DOCS_SF:104487.21 36027/002

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G.    **Effectiveness of All Actions.**   All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

.    **Restructuring Transactions.**   The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

I.       **Preservation of Causes of Action.**  Unless a Cause of Action against a

Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released,

compromised or settled in the Plan or any Final Order (including, without limitation, this

Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the

Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may

presently be unaware or that may arise or exist by reason of additional facts or circumstances

unknown to the Debtor at this time or facts or circumstances that may change or be different from

those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without

limitation, the doctrines of *res udicata*, collateral estoppel, issue preclusion, claim preclusion,

waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as

a consequence of the confirmation, effectiveness, or consummation of the Plan based on the

Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action

have been expressly released in the Plan or any other Final Order (including, without limitation,

this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or

the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor

is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the

plaintiffs or co-defendants in such lawsuits, is expressly reserved.

.       **Independent Board of Directors of Strand.**  The terms of the current

Independent Directors shall expire on the Effective Date without the need for any further or other

action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

DOCS_SF:104487.21 36027/002

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell elms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K. Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

DOCS_SF:104487.21 36027/002

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

   **L.**  **Transfer of Assets to Claimant Trust.** On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax. Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

   **M.**  **Transfer of Estate Claims to Litigation Sub Trust**. On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses. The Litigation Trustee will

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms

of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor

or Committee, as applicable, in any litigation commenced prior to the Effective Date in which

Estate Claims are asserted.

      **N.**    **Compromise of Controversies.**  In consideration for the distributions and

other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a

good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved

under the Plan and the entry of this Confirmation Order constitutes approval of such compromise

and settlement under Bankruptcy Rule 9019.

      **O.**    **Ob ections to Claims**.  The Claims Objection Deadline shall be the date

that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline

may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise

provided under the Plan.

      **P.**    **Assumption of Contracts and Leases.**  Effective as of the date of this

Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the

need for any further notice to or action, order, or approval of the Bankruptcy Court, under section

365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the

Plan.  Each Assumed Contract shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including

all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and

any other interests.  Modifications, amendments, supplements, and restatements to any of the

DOCS_SF:104487.21 36027/002

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not

be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or

amount of any Claims that may arise in connection therewith.   Assumption of the Assumed

Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to

the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed

Contracts.

.    **Re ection of Contracts and Leases.**  Unless previously assumed during the

pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and

Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant

to the terms of the Plan.   To the extent that any party asserts any damages resulting from the

rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty

 3    days** following entry of this Confirmation Order, or such claim will be forever barred and

disallowed against the Reorganized Debtor.

**R.    Assumption of Issuer Executory Contracts.**  On the Confirmation Date,

the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer

Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.

In full and complete satisfaction of its obligation to cure outstanding defaults under section

365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

69

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.** Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits,

remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals

retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the

CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related

Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts,

liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses

(including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions,

and causes of action of whatever kind or nature, whether known or unknown, suspected or

unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in

equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative

defenses, whether known or unknown, including, without limitation, those which were or could

have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the

"Issuer Released Claims").

    **T.**    **Release of Debtor Claims against Issuer Released Parties.**  Upon entry

of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally,

fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and

covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura

Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit

Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David

Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch,

(xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U.     **Authori ation to Consummate.**  The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V.     **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty  6    days after the Effective Date**.  The Bankruptcy Court shall

determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity

for hearing in accordance with the procedures established by the Bankruptcy Code and the

Bankruptcy Court.  The Debtor shall fund the Professional Fee Reserve as provided under the Plan.

The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy

Court allows.  The Debtor is authorized to pay the pre-Effective Date fees and expenses of all

ordinary course professionals in the ordinary course of business without the need for further

Bankruptcy Court order or approval.  From and after the Effective Date, any requirement that

Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy

Code in seeking retention or compensation for services rendered after such date shall terminate,

and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any

Professional or Entity employed in the ordinary course of the Debtor's business without any further

notice to or action, order, or approval of the Bankruptcy Court.

.    **Release, Exculpation, Discharge, and In unction Provisions.    The**

**following release, exculpation, discharge, and in unction provisions set forth in the Plan are**

**approved and authori ed in their entirety, and such provisions are effective and binding on**

**all parties and Entities to the extent provided therein.**

.    **Discharge of Claims and Termination of Interests.**  To the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code,

except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration

distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against

the Debtor or any of its Assets or properties, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except

as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date,

the Debtor and its Estate will be deemed discharged and released under and to the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code

from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not

limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the

kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

.    **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the

maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each

Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage,

demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after

the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter

11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation

of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including

the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation

of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be

issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan

Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any

negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

DOCS_SF:104487.21 36027/002

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.    Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person. Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

      **AA.   In unction.  Upon entry of this Confirmation Order, all En oined**

**Parties are and shall be permanently en oined, on and after the Effective Date, from ta ing**

**any actions to interfere with the implementation or consummation of the Plan.  Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Ban ruptcy Court, all En oined Parties are and shall be permanently en oined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly i commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any ind including any proceeding in a udicial, arbitral, administrative**

**or other forum against or affecting the Debtor or the property of the Debtor, ii enforcing,**

**levying, attaching including any pre udgment attachment , collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**udgment, award, decree, or order against the Debtor or the property of the Debtor, iii**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any ind against the Debtor or the property of the Debtor, iv asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Ban ruptcy Code, and v acting or proceeding in any manner,**

in any place whatsoever, that does not conform to or comply with the provisions of the Plan.
The in unctions set forth in the Plan and this Confirmation Order shall extend to, and apply
to any act of the type set forth in any of clauses  i   v  of the immediately preceding
paragraph against any successors of the Debtor, including, but not limited to, the
Reorgani ed Debtor, the Litigation Sub Trust, and the Claimant Trust and their respective
property and interests in property.  Sub ect in all respects to Article   II.D of the Plan, no
En oined Party may commence or pursue a claim or cause of action of any  ind against any
Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation
of the Plan, the administration of the Plan or property to be distributed under the Plan, the
wind down of the business of the Debtor or Reorgani ed Debtor, the administration of the
Claimant Trust or the Litigation Sub Trust, or the transactions in furtherance of the
foregoing without the Ban ruptcy Court  i  first determining, after notice and a hearing,
that such claim or cause of action represents a colorable claim of any  ind, including, but
not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross
negligence against a Protected Party and  ii  specifically authori ing such En oined Party to
bring such claim or cause of action against any such Protected Party *provided, however*, the
foregoing will not apply to a claim or cause of action against Strand or against any Employee
other than with respect to actions ta en, respectively, by Strand or by such Employee from
the date of appointment of the Independent Directors through the Effective Date.  The
Ban ruptcy Court will have sole and exclusive  urisdiction to determine whether a claim or
cause of action is colorable and, only to the extent legally permissible and as provided for in

**Article  I of the Plan, shall have  urisdiction to ad udicate the underlying colorable claim or cause of action.**

**BB.    Duration of In unction and Stays.  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Ban ruptcy Court,  i  all in unctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms  and  ii  the automatic stay arising under section 362 of the Ban ruptcy Code shall remain in full force and effect sub ect to Section 362 c  of the Ban ruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Ban ruptcy Court will enter an equivalent order under Section 1 5.**

**CC.    Continuance of  anuary 9 Order and  uly 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the  *rder Approving Settlement with  fficial Committee of  nsecured Creditors Regarding Governance of the Debtor and Procedures for  perations in the  rdinary Course, entered by the Bankruptcy Court on January  ,* [Docket No. 339] and  *rder Approving the Debtor s Motion  nder Bankruptcy Code Sections  a and  b Authori ing Retention of James P. Seery, Jr., as Chief  xecutive  fficer, Chief Restructuring  fficer, and Foreign Representative  unc Pro Tunc to March  ,* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

**DD.    No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

78

any state and local authority whatsoever, including without limitation any claim arising under the

Internal Revenue Code, the environmental laws or any criminal laws of the United States or any

state and local authority against any party or person, nor shall anything in this Confirmation Order

or the Plan enjoin the United States or any state or local authority from bringing any claim, suit,

action, or other proceedings against any party or person for any liability of such persons whatever,

including without limitation any claim, suit, or action arising under the Internal Revenue Code,

the environmental laws or any criminal laws of the United States or any state and local authority

against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party

or person from any liability to the United States Government or any of its agencies or any state

and local authority whatsoever, including any liabilities arising under the Internal Revenue Code,

the environmental laws, or any criminal laws of the United States or any state and local authority

against any party or person.

> **EE.    Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the

Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any

other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or

exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor;

(b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification,

consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other

security interest, or the securing of additional indebtedness by such or other means; (d) the making,

assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any

deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in

connection with any transaction arising out of, contemplated by, or in any way related to the Plan,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or

similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial

Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental

assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon

entry of this Confirmation Order, the appropriate state or local governmental officials or agents

shall forego the collection of any such tax or governmental assessment and accept for filing and

recordation of any of the foregoing instruments or other documents without the payment of any

such tax, recordation fee, or governmental assessment.

      **FF.    Cancellation of Notes, Certificates and Instruments.**  Except for the

purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in

the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements,

instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest

and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no

force or effect.  The holders of or parties to such cancelled instruments, Securities, and other

documentation will have no rights arising from or related to such instruments, Securities, or other

documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and

the obligations of the Debtor thereunder or in any way related thereto will be fully released,

terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG.    Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**.    Post Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.    Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II.    Applicable Nonban ruptcy Law.**    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**.    Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

DOCS_SF:104487.21 36027/002

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.**   **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.**   **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.**   aiver of Stay.  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

<div align="center">82</div>

**NN.    References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**OO.    eadings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**PP.    Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

**.    Resolution of Ob ection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

83

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

    a.      The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

    b.      The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

**RR.    Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d.    The Senior Employees' Objection is deemed withdrawn.

**SS.    No Release of Claims Against Senior Employee Claimants**.  For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

85

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT.    Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

86

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c)  The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d)  The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e)  Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f)  The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

     **UU.**   **IRS Proof of Claim.**  Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

**VV.    CLO    oldco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CL Holdco, Ltd., and Highland Capital Management, L.P., dated January    ,    * [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

.    **Retention of  urisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

.    **Payment of Statutory Fees Filing of  uarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

.    **Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

ZZ.    **Miscellaneous.**    After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

89

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

**END OF ORDER**

**Exhibit A**

**Fifth Amended Plan  as Modified**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AS MODIFIED

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ............................................................................................... 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ..................................................................... 16

    B.    Professional Fee Claims ................................................................................ 17

    C.    Priority Tax Claims ....................................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ................................................... 18

    A.    Summary ...................................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests ............................................................................................ 18

    C.    Elimination of Vacant Classes ...................................................................... 19

    D.    Impaired/Voting Classes ............................................................................... 19

    E.    Unimpaired/Non-Voting Classes .................................................................. 19

    F.    Impaired/Non-Voting Classes ....................................................................... 19

    G.    Cramdown ................................................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests ......................... 19

    I.    Special Provision Governing Unimpaired Claims .......................................... 24

    J.    Subordinated Claims .................................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................. 24

    A.    Summary ...................................................................................................... 24

    B.    The Claimant Trust ....................................................................................... 25

        1.    Creation and Governance of the Claimant Trust and Litigation
Sub-Trust ........................................................................................... 25

        2.    Claimant Trust Oversight Committee .................................................. 26

**Page**

3.    Purpose of the Claimant Trust. ................................................................27

4.    Purpose of the Litigation Sub-Trust. .......................................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ..................................................29

7.    Cooperation of Debtor and Reorganized Debtor. ..................................29

8.    United States Federal Income Tax Treatment of the Claimant Trust. ......................................................................................................29

9.    Tax Reporting. ........................................................................................30

10.   Claimant Trust Assets. ...........................................................................30

11.   Claimant Trust Expenses. .......................................................................31

12.   Trust Distributions to Claimant Trust Beneficiaries. .............................31

13.   Cash Investments. ...................................................................................31

14.   Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.    The Reorganized Debtor .................................................................................32

1.    Corporate Existence ...............................................................................32

2.    Cancellation of Equity Interests and Release ........................................32

3.    Issuance of New Partnership Interests ...................................................32

4.    Management of the Reorganized Debtor ................................................33

5.    Vesting of Assets in the Reorganized Debtor ........................................33

6.    Purpose of the Reorganized Debtor .......................................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ................................................33

D.    Company Action ..............................................................................................34

E.    Release of Liens, Claims and Equity Interests .................................................35

F.    Cancellation of Notes, Certificates and Instruments ........................................35

**Page**

G.      Cancellation of Existing Instruments Governing Security Interests...................35

H.      Control Provisions ........................................................................35

I.      Treatment of Vacant Classes ...........................................................36

J.      Plan Documents ...........................................................................36

K.      Highland Capital Management, L.P. Retirement Plan and Trust ......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ........................................................................................37

A.      Assumption, Assignment, or Rejection of Executory Contracts and
        Unexpired Leases..........................................................................37

B.      Claims Based on Rejection of Executory Contracts or Unexpired
        Leases........................................................................................38

C.      Cure of Defaults for Assumed or Assigned Executory Contracts and
        Unexpired Leases..........................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS...........................................39

A.      Dates of Distributions ....................................................................39

B.      Distribution Agent ........................................................................39

C.      Cash Distributions ........................................................................40

D.      Disputed Claims Reserve .................................................................40

E.      Distributions from the Disputed Claims Reserve .............................................40

F.      Rounding of Payments....................................................................40

G.      *De Minimis* Distribution ..................................................................41

H.      Distributions on Account of Allowed Claims................................................41

I.      General Distribution Procedures.........................................................41

J.      Address for Delivery of Distributions....................................................41

K.      Undeliverable Distributions and Unclaimed Property ......................................41

L.      Withholding Taxes........................................................................42

**Page**

M.   Setoffs ...................................................................................................42

N.   Surrender of Cancelled Instruments or Securities ...........................................42

O.   Lost, Stolen, Mutilated or Destroyed Securities ..............................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
     UNLIQUIDATED AND DISPUTED CLAIMS.............................................43

A.   Filing of Proofs of Claim ..........................................................................43

B.   Disputed Claims.......................................................................................43

C.   Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D.   Allowance of Claims and Equity Interests.....................................................44

    1.   Allowance of Claims......................................................................44

    2.   Estimation ...................................................................................44

    3.   Disallowance of Claims .................................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN .................................................45

A.   Conditions Precedent to the Effective Date ..................................................45

B.   Waiver of Conditions................................................................................46

C.   Dissolution of the Committee .....................................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS .................47

A.   General...................................................................................................47

B.   Discharge of Claims..................................................................................47

C.   Exculpation .............................................................................................47

D.   Releases by the Debtor..............................................................................48

E.   Preservation of Rights of Action.................................................................49

    1.   Maintenance of Causes of Action .....................................................49

    2.   Preservation of All Causes of Action Not Expressly Settled or
       Released ......................................................................................49

**Page**

F.    Injunction ........................................................................................................50

G.    Duration of Injunctions and Stays ................................................................51

H.    Continuance of January 9 Order ...................................................................51

ARTICLE X. BINDING NATURE OF PLAN ...............................................................51

ARTICLE XI. RETENTION OF JURISDICTION .........................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ......................................................54

A.    Payment of Statutory Fees and Filing of Reports ........................................54

B.    Modification of Plan .....................................................................................54

C.    Revocation of Plan ........................................................................................54

D.    Obligations Not Changed ..............................................................................55

E.    Entire Agreement ..........................................................................................55

F.    Closing of Chapter 11 Case ..........................................................................55

G.    Successors and Assigns .................................................................................55

H.    Reservation of Rights ....................................................................................55

I.    Further Assurances .........................................................................................56

J.    Severability ....................................................................................................56

K.    Service of Documents ...................................................................................56

L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code .....................................................................................57

M.    Governing Law ..............................................................................................58

N.    Tax Reporting and Compliance .....................................................................58

O.    Exhibits and Schedules ..................................................................................58

P.    Controlling Document ...................................................................................58

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

      HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

      Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

      If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.**    **Rules of Interpretation, Computation of Time and Governing Law**

      For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative xpense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative xpense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative xpense Claims b ection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or    uity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.    "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.    "*Bar Date Order*" means the *Order I Establishing Bar Dates for Filing Proofs of Claim and II Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.    "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.    "*Chapter Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.    "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.    "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24.     "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.     "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.     "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.     "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.     "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.     "*Claimant Trust  xpenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.     "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.    "*Claimant Trust  versight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.    "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.    "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.    "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.    "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.    "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.    "*Confirmation  rder*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.    *Convenience Claim* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42.    "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43.    "*Convenience Class  lection*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44.    "*Contingent Claimant Trust Interests*  means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45.    "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46.    *Delaware Bankruptcy Court*  means the United States Bankruptcy Court for the District of Delaware.

47.    "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor s Fifth Amended Chapter    Plan of Reorgani ation*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48.    "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49.    "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50.    "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims.  The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.    "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.    "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.    "*ffective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.    "*mployees*" means the employees of the Debtor set forth in the Plan Supplement.

56.    "*n oined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.    "*ntity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.    "*uity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.    "*uity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.    "*state*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.    "*state Claims*" has the meaning given to it in <u>Exhibit A</u> to the *otice of Final Term Sheet* [D.I. 354].

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.     "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69.    "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.    "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.    "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.    "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.    "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81.    "*Litigation Sub Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.    "*Litigation Sub Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.    "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.    "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.    "*ew Frontier  ote*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.    "*ew GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.    "*ew GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.    "*rdinary Course Professionals  rder*" means that certain  *rder Pursuant to Sections  a ,  ,  , and  of the Bankruptcy Code Authori ing the Debtor to Retain,  mploy, and Compensate Certain Professionals  tili ed by the Debtor in the  rdinary Course* [D.I. 176].

89.    "*ther  nsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.    *Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.    "Petition *Date*" means October 16, 2019.

92.    "*Plan*" means this *Debtor s Fifth Amended Chapter  Plan of Reorgani ation*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.    "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.    "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.    "*Priority  on Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.    "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.    "*Professional Fee Claims   b ection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PT Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced mployee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Re ection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related  ntity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related  ntity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorgani ed Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorgani ed Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorgani ed Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

14

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    " *BS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    " *nexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    " *nimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    " *oting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    " *oting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE E  PENSES AND PRIORIT   TA   CLAIMS

### A.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

16

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND E UIT INTERESTS**

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.      **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.      **Impaired Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.      **Unimpaired Non Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.      **Impaired Non Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.      **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

.       **Classification and Treatment of Claims and Equity Interests**

1.      *Class    – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

19

full and final payment of such Allowed Class 1 Claim is made as provided
herein.

- *Impairment and  oting*: Class 1 is Unimpaired, and the Holders of Class 1
  Claims are conclusively deemed to have accepted this Plan pursuant to
  section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1
  Claims are not entitled to vote to accept or reject this Plan and will not be
  solicited.

2.  *Class   – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date,
  each Holder of an Allowed Class 2 Claim will receive in full satisfaction,
  settlement, discharge and release of, and in exchange for, such Allowed
  Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid
  interest on the Frontier Claim through and including the Effective Date and
  (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will
  retain the Liens securing its Allowed Class 2 Claim as of the Effective Date
  until full and final payment of such Allowed Class 2 Claim is made as
  provided herein.

- *Impairment and  oting*:  Class 2 is Impaired, and the Holders of Class 2
  Claims are entitled to vote to accept or reject this Plan.

3.  *Class   –  ther Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the
  later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on
  the Effective Date or (ii) the date on which such Class 3 Claim becomes an
  Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will
  receive in full satisfaction, settlement, discharge and release of, and in
  exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or
  following the Effective Date, the Reorganized Debtor or Claimant Trustee,
  as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the
  collateral securing its Allowed Other Secured Claim, plus postpetition
  interest to the extent required under Bankruptcy Code Section 506(b), or
  (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and  oting*:  Class 3 is Unimpaired, and the Holders of Class 3
  Claims are conclusively deemed to have accepted this Plan pursuant to
  section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3
  Claims are not entitled to vote to accept or reject this Plan and will not be
  solicited.

4.   *Class   – Priority   on Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and   oting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.   *Class   – Retained   mployee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and   oting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.   *Class   – PT   Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and   oting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class     – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and  oting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class     – General  nsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and  oting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.    *Class    – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

   *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall
   receive either (i) their Pro Rata share of the Subordinated Claimant Trust
   Interests or, (ii) such other less favorable treatment as to which such Holder
   and the Claimant Trustee may agree upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date
   and subject to the other provisions of this Plan, the Debtor, the Reorganized
   Debtor, and the Claimant Trust, as applicable, will have and will retain any
   and all rights and defenses under bankruptcy or nonbankruptcy law that the
   Debtor had with respect to any Subordinated Claim, except with respect to
   any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and  oting*:  Class 9 is Impaired, and the Holders of Class 9
  Claims are entitled to vote to accept or reject this Plan.

10.    *Class     – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership
  Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date,
  each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement,
  discharge and release of, and in exchange for, such Claim shall receive (i)
  its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such
  other less favorable treatment as to which such Holder and the Claimant
  Trustee shall have agreed upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date
   and subject to the other provisions of this Plan, the Debtor, the Reorganized
   Debtor, and the Claimant Trust, as applicable, will have and will retain any
   and all rights and defenses under bankruptcy or nonbankruptcy law that the
   Debtor had with respect to any Class B/C Limited Partnership Interest
   Claim, except with respect to any Class B/C Limited Partnership Interest
   Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and  oting*:  Class 10 is Impaired, and the Holders of Class 10
  Claims are entitled to vote to accept or reject this Plan.

11.    *Class      – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership
  Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and  oting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.      Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## .      Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF T  IS PLAN

## A.      Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

1.    *Creation and Governance of the Claimant Trust and Litigation Sub Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3. *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4. *Purpose of the Litigation Sub Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5. *Claimant Trust Agreement and Litigation Sub Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)   the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee.  Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    _Cooperation of Debtor and Reorgani ed Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.    _nited States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.    *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.    *Claimant Trust  xpenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.    *Dissolution of the Claimant Trust and Litigation Sub Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.      The Reorgani ed Debtor

### 1.      *Corporate  xistence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.      *Cancellation of   uity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.      *Issuance of   ew Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.    *Management of the Reorgani ed Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *esting of Assets in the Reorgani ed Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorgani ed Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorgani ed Debtor Assets  Transfer of Reorgani ed Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

E.    **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F.    **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G.    **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

.    **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

I.    **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

.    **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *rder Directing Mediation* entered on August 3, 2020 [D.I. 912].

K.    **ighland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

## C.     Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.**    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.**    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.**    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**F.**    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G.  _e   i   i_ **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

.  **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I.  **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

.  **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K.  **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.      ithholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.      Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.      Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan, as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLI  UIDATED AND DISPUTED CLAIMS**

</div>

**A.**    **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**    **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**    **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

<div align="center">43</div>

### D.    Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERISE PROVIDED HEREIN OR AS AGREED TO BT THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

AN  AND ALL PROOFS OF CLAIM FILED AFTER T E BAR DATE S ALL BE
DEEMED DISALLO ED AND E PUNGED AS OF T E EFFECTIVE DATE
 IT OUT AN  FURT ER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF
T E BANKRUPTC  COURT, AND  OLDERS OF SUC  CLAIMS MA  NOT
RECEIVE AN  DISTRIBUTIONS ON ACCOUNT OF SUC  CLAIMS, UNLESS SUC
LATE PROOF OF CLAIM  AS BEEN DEEMED TIMEL  FILED B  A FINAL ORDER.

## ARTICLE VIII.
## EFFECTIVENESS OF T IS PLAN

### A.    Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the
Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the
Committee with such consent not to be unreasonably withheld), pursuant to the provisions of
ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the
Reorganized Limited Partnership Agreement, and all schedules, documents,
supplements and exhibits to this Plan shall have been Filed in form and substance
reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and
substance reasonably acceptable to the Debtor and the Committee.  The Confirmation
Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor,
the Claimant Trustee, or the Litigation Trustee are authorized to take all actions
necessary or appropriate to effectuate and consummate this Plan, including, without
limitation, (a) entering into, implementing, effectuating, and consummating the
contracts, instruments, releases, and other agreements or documents created in
connection with or described in this Plan, (b) assuming the Executory Contracts and
Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and
issuances as required under this Plan; and (d) entering into any transactions as set forth
in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are
nonseverable and mutually dependent; (iii) the implementation of this Plan in
accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy
Code, the delivery of any deed or other instrument or transfer order, in furtherance of,
or in connection with this Plan, including any deeds, bills of sale, or assignments
executed in connection with any disposition or transfer of Assets contemplated under
this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the
Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the
Reorganized Debtor, in each case as of the Effective Date free and clear of liens and
claims to the fullest extent permissible under applicable law pursuant to section 1141(c)
of the Bankruptcy Code except with respect to such Liens, Claims, charges and other
encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without
limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

# ARTICLE I .
# E CULPATION, IN UNCTION AND RELATED PROVISIONS

## A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

## B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided, however,* the foregoing

47

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.     Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.    **Preservation of Rights of Action**

### 1.    *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.    *Preservation of All Causes of Action  ot  xpressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    In unction**

**Upon entry of the Confirmation Order, all En oined Parties are and shall be permanently en oined, on and after the Effective Date, from ta ing any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Ban ruptcy Court, all En oined Parties are and shall be permanently en oined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly i commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any ind including any proceeding in a udicial, arbitral, administrative or other forum against or affecting the Debtor or the property of the Debtor, ii enforcing, levying, attaching including any pre udgment attachment , collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any udgment, award, decree, or order against the Debtor or the property of the Debtor, iii creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any ind against the Debtor or the property of the Debtor, iv asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Ban ruptcy Code, and v acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The in unctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses i v of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorgani ed Debtor, the Litigation Sub Trust, and the Claimant Trust and their respective property and interests in property.**

**Sub ect in all respects to ARTICLE    II.D, no En oined Party may commence or pursue a claim or cause of action of any ind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorgani ed Debtor, the administration of the Claimant Trust or the Litigation Sub Trust, or the transactions in furtherance of the foregoing without the Ban ruptcy Court**

i  first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any  ind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and  ii specifically authori ing such En oined Party to bring such claim or cause of action against any such Protected Party *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions ta  en, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Ban ruptcy Court will have sole and exclusive  urisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE  I, shall have  urisdiction to ad udicate the underlying colorable claim or cause of action.

G.      Duration of In unctions and Stays

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Ban ruptcy Court,  i  all in unctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms  and  ii  the automatic stay arising under section 362 of the Ban ruptcy Code shall remain in full force and effect sub ect to Section 362 c  of the Ban ruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 1 5.

.      Continuance of  anuary 9 Order

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the  *rder Approving Settlement with  fficial Committee of  nsecured Creditors Regarding Governance of the Debtor and Procedures for  perations in the  rdinary Course,* entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

ARTICLE  .
BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

# ARTICLE I.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

53

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE  II.
## MISCELLANEOUS PROVISIONS

### A.     Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.     Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.     Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## .    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.    Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**.    Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.    Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**If to the Reorgani ed Debtor**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**L.**   **Exemption from Certain Transfer Taxes Pursuant to Section 1146 a  of the Ban  ruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.   Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*Remainder of Page Intentionally Blank*

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

## Exhibit B

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.  Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.  Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

36.  Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.  Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.  Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.  Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.  Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.  Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.  Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.  Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.  Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.  Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.  A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.  A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.  Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.  Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.  Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

51.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

4