# EXHIBIT 3
# Part 2

Exhibit 5

| | |
|---|---|
| **QUINN EMANUEL URQUHART & SULLIVAN LLP** | **SIDLEY AUSTIN LLP** |
| Susheel Kirpalani (admitted *pro hac vice*) | Paige Holden Montgomery |
| Deborah J. Newman (admitted *pro hac vice*) | Juliana L. Hoffman |
| Robert S. Loigman (admitted *pro hac vice*) | 2021 McKinney Avenue |
| Benjamin I. Finestone (admitted *pro hac vice*) | Suite 2000 |
| Calli Ray (admitted *pro hac vice*) | Dallas, Texas 75201 |
| Alexandre J. Tschumi (admitted *pro hac vice*) | Telephone: (214) 981-3300 |
| 51 Madison Avenue, 22nd Floor | |
| New York, NY 10010 | |
| Telephone: (212) 849-7000 | |

*Co-Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST, | |
| Plaintiff, | |
| v. | |
| JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj

AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,

Defendants.

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    PARTIES .........................................................................................................4

III.   JURISDICTION, VENUE & STANDING ......................................................12

IV.   FACTUAL ALLEGATIONS ...........................................................................14

    A.    Dondero Creates HCMLP...................................................................14

    B.    HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ..........15

    C.    In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ..............................................................18

         1.    NexPoint ...................................................................................19

         2.    HCMFA ....................................................................................22

    D.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability ..........................................25

         1.    Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry................................................26

         2.    Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ......................29

         3.    Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS.....................................................................30

         4.    Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty .............................33

    E.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ....................................35

    F.    Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP ...................................................................................38

         1.    HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ...............................39

         2.    HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct .........................................................41

         3.    HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ......................42

i

G.    HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ...................................43

H.    At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ...........................................................................................46

    1.    Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ...........................................................................46

    2.    Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ..............................................................................47

I.    Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ....................................................................................................55

    1.    Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities .................................................55

        (a)    The Fraudulent CLO Holdco Transaction .....................................55

        (b)    Fraudulent Distributions ...............................................................58

        (c)    Fraudulent Transfers To Massand ...............................................63

J.    Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ....................................................................................65

K.    Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction .........................................................................................66

V.    CAUSES OF ACTION ...........................................................................................67

PRAYER FOR RELIEF ...................................................................................................141

Plaintiff Marc S. Kirschner (the "Litigation Trustee"), as Litigation Trustee of the Litigation Sub-Trust (the "Trust") established pursuant to the Fifth Amended Plan of Reorganization (the "Plan") of Highland Capital Management L.P. ("HCMLP" or the "Reorganized Debtor") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I.    INTRODUCTION[2]

1.    The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "Dondero Entities"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2.    HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading. Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities. The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3.    HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities. Even when HCMLP's full role was hidden—

---

[2]    Capitalized terms not defined in this section are defined later in the Amended Complaint.

either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4.      In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession.  The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5.      Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized.  The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation.  The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services.  The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6.      In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment.   Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, with the goal of moving funds to yet another Dondero Entity;

- Caused the fraudulent transfer of assets worth at least $100 million out of HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7.      Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8.      In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9.      In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity.  Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10.     HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists.  The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II.      PARTIES

11.     Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan.

12.     Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas.  Dondero is the co-founder of HCMLP and, prior to his removal on January 9, 2020, was the Chief Executive Officer and President of HCMLP.  From the time that HCMLP was founded through October

4

16, 2019, when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership of, or control over the owners of, HCMLP's limited partnership interests.  As set forth below, Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within the Highland web, including the dozens of Dondero Entities referenced herein.

13.     Defendant Mark A. Okada is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas.  Okada is the co-founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after which he assumed an advisory role through the end of that year.  After Dondero, Okada was the next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited partners.  Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14.     Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero.  Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP.  At all times relevant to this Amended Complaint, Strand's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

15.     Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited partnership.  NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited partner.  NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the remaining 0.1%.  NexPoint and NexPoint GP were both formed on March 20, 2012.  NexPoint concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint GP's sole member and president.  At all times relevant to this Amended Complaint, NexPoint's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

5

16.     Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy").  Dugaboy is a grantor trust established under the laws of the state of Delaware.  Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees.  Dondero is Dugaboy's primary beneficiary.  Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees.  Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee.  In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy.  Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9% economic interest in NexPoint.  At all times relevant to this Amended Complaint, Dugaboy's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17.     Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3]  HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest).   Dondero controls,

---

[3]   HCMFA was originally created by Dondero on February 9, 2009, as Highland Funds Asset Management, L.P. ("HFAM").  On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4]   Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

and is the sole stockholder and director of, Strand Advisors XVI, Inc.  Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5]  HCMFA has acknowledged that it is controlled by Dondero.  At all times relevant to this Amended Complaint, HCMFA's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

18.    Defendant Scott is an individual who currently resides in North Carolina.  At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities:  he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd.  Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding.  Scott has testified under oath that Dondero is his "closest friend."  Dondero personally selected Scott as his successor to run the Charitable DAF Fund.  Dondero also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc.  Scott is also the executor of Dondero's will.  Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date.  Scott has no training in finance or compliance and no investment experience.  Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

---

[5]    Dondero is the Director and President of Highland Capital Management Services, Inc.  Scott Ellington is its Secretary.

19.     Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.  At all times relevant to this Amended Complaint, Ellington was a Texas resident.

20.     Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests.  At all times relevant to this Amended Complaint, Leventon was a Texas resident.

21.     Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands.  Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021.  At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021.  According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

22.     Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands.  At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director.  DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

23.     Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010.  CLO Holdco is a wholly-owned subsidiary of the DAF.  CLO Holdco filed a proof of claim in HCMLP's bankruptcy case, which was subsequently amended to reduce the claim amount to zero.[6]  In January 2022, CLO Holdco attempted to further amend the proof of claim to reassert a positive claim amount.  CLO Holdco has no employees or officers.  According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract).  Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco, which would then be rubber-stamped by Scott.  At all times relevant to this Amended Complaint, CLO Holdco's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

24.     As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets.  Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected.  Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

25.     Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation.  The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick.  Dondero also acted

---

[6]   This proof of claim was signed by Grant Scott in his capacity as CLO Holdco's sole director. Grant Scott served in that capacity at all times relevant to this proceeding.

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26.     Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27.     Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (i.e., Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

10

28.    Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

29.    Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas.  Okada controls MAP #1, which he created for the benefit of his children.

30.    Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas.  Okada controls MAP #2, which he created for the benefit of his siblings.

31.    Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002.  Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon.  Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015.  Massand LLC received payments from HCMLP between February 25, 2015, and August 1, 2019.  Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

32.    Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas.  Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters.  SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic

interests in SAS, respectively.  Upon information and belief, Ellington is the Chief Executive Officer of SAS.

### III.    JURISDICTION, VENUE & STANDING

33.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code.  *See In re Highland Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

34.    Venue is proper in this Court under 28 U.S.C. § 1409(a).

35.    This Court has personal jurisdiction over the defendants because each of the Defendants:  (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

36.    The Plan created the Claimant Trust, which was vested with assets including substantially "all Causes of Action" and "any proceeds realized or received from such Assets." The Plan also created the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan.  The Plan defines Estate Claims to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing."  Proceeds

from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]"

37.    On October 8, 2021, the Claimant Trust confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Amended Complaint.  All of the claims asserted in this Amended Complaint belong to the Litigation Sub-Trust, not the Reorganized Debtor.

38.    Under the Plan, the Claimant Trust Beneficiaries are (i) the Holders of Allowed General Unsecured Claims and (ii) the Holders of Allowed Subordinated Claims, whose Claims are junior to those distributed to Holders of Allowed General Unsecured Claims.[7]  The Claimant Trust Beneficiaries' claims against the Reorganized Debtor's estate are substantial and exceed, in aggregate, $380 million.  To date, neither the Holders of Allowed General Unsecured Claims nor the Holders of Allowed Subordinated Claims have been paid at all.

39.    The Trustee has standing to avoid all transfers described herein pursuant to 11 U.S.C. § 544(b) and applicable law.  On the date of the Debtor's bankruptcy filing, at least one or more unsecured creditors who held an allowable claim, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis (all as defined herein), could have sought under state law to avoid each of the transfers made on or after October 16, 2015.  The Internal Revenue Service filed an amended Proof of Claim in the Debtor's bankruptcy case on October 6, 2021, which asserts unsecured claims including for the tax period of June 30, 2015.  Under applicable state and federal law, the IRS was entitled to seek to avoid all transfers at issue herein

---

[7]    Holders of certain Allowed Limited Partnership Interests may become Claimant Trust Beneficiaries but only if *all* Allowed General Unsecured Claims, Allowed Subordinated Claims, and costs and expenses are indefeasibly paid in full.

as a present or future creditor, including transfers that occurred on or before October 16, 2015, because the IRS's claim arose within a reasonable time of those transfers.

## IV.    FACTUAL ALLEGATIONS

### A.    Dondero Creates HCMLP

40.    HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada.  The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

41.    By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.  As of the Petition Date, HCMLP had three primary business lines:  (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

42.    Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP.  HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management.  Dondero

14

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

43.    As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for:  (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[8]  At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[9]

### B.    HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages

44.    Around 2008, HCMLP's business began to falter, as the financial crisis began to set in.  The funds that HCMLP managed faced large losses, followed by substantial redemptions.  In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

45.    At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages.  In March 2008, HCMLP and its managed funds Highland CDO

---

[8]  A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans.  A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations.  A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940.  A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security.  A separately-managed account ("SMA") is a managed investment vehicle that has only one investor.  A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries.  A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[9]  At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding

Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[10] had entered

into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of

debt issued by existing CLOs) and other assets, including credit default swaps ("CDS").  The

governing agreements required the Fund Counterparties to post collateral based on the mark-

to-market value of certain collateralized debt obligations.  The value of these assets dropped by

more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties

failed to meet UBS's margin demand.  In December 2008, UBS terminated the agreements, and

claimed that it was owed 100% of its losses—which UBS alleged was as much as $745

million—from HCMLP and the Fund Counterparties.

      46.     On February 24, 2009, UBS commenced an action against HCMLP and the Fund

Counterparties in New York state court.  As amended and consolidated, UBS asserted claims

against HCMLP for actual and constructive fraudulent transfer and breach of the implied

covenant of good faith and fair dealing.  Among other things, UBS alleged that in March 2009,

HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's

parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March

2009 Transfers").  UBS sought to disgorge those transfers, and also sought damages against

---

[10]   The CDO Fund is an indirectly-controlled subsidiary of HCMLP.  At all times relevant to this
proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory
agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner.  SOHC
is a subsidiary of Highland Financial Partners, L.P. ("HFP").  At all times relevant to this
proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and
its general partner and as a member of HFP's monitoring committee.  HFP's general partner is a
wholly-owned indirect subsidiary of HCMLP.  After 2010, Dondero was the sole member of
HFP's monitoring committee until his resignation in mid-2021.  At all times relevant to this
Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

47.     Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi.  Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral.  The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi.  On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls.  On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to:  (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

48.     In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action").  The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day.  Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

17

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

49.     Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

**C.     In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

50.     In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

51.     It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge funds, private equity funds, and retail funds;

- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;

- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and

- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as a healthcare equity advisor.

### 1. NexPoint

52.     NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

53.     Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

54.     For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low

fee payments. NexPoint continued to reap the vast majority of the generated fees, however. NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**



55.    Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow" to set up new entities controlled by Dondero and to "fund all their negative working capital."

56.    Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-

20

market, and had few to no covenants.  NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period.  At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

57.     Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement.  According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]"  By May 2017, NexPoint owed HCMLP more than $30 million.  Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period.  Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

58.     Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity, a low coupon rate, no covenants, and no security.  HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

59.     Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated.  On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan.  *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. Jan. 22, 2021).  NexPoint has raised

a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

60. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

## 2. HCMFA

61. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

62.     On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights

and obligations to provide investment advisory services for Highland Credit Strategies Fund,[11]

Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund),

Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland

Special Situations Fund to HCMFA.  HCMLP received no consideration for the transfer.  Prior

to the transfer, HCMLP received management and advisory fees under those agreements in

return for the services it performed.  Following the transfer, it was HCMFA rather than HCMLP

that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform

most services.  Thus, the effect of the transfer was to insert a new entity to reap the profits

earned from the same HCMLP employees performing the same work that had been performed

prior to the transfer.

63.     HCMFA collected management fees from its managed funds based on a

percentage of their net asset value ("NAV").  Meanwhile, HCMLP—whose employees

performed most services required by HCMFA—received a low fee that was only a small

fraction of the fees earned by HCMFA.  And HCMLP received no fee with respect to the

advisory services it provided to HCMFA, despite the fact that HCMLP's employees were

named portfolio managers, and constituted entire teams of supporting investment analysts, for

HCMFA-managed funds.  Indeed, HCMFA did not execute a sub-advisory agreement with

HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement

agreement to partially compensate HCMLP for the services of certain HCMLP employees.  If

---

[11]    On June 13, 2012, the management agreements for Highland Credit Strategies Fund were
purportedly "novated" to the newly-created NexPoint.  Highland Credit Strategies Fund's name
was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF."  The result of this
transfer was simply to shift management fees relating to NHF—which had previously been
diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**



64.     Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively).   Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021.   As of the Petition Date, $6.3 million was outstanding on the notes subject to the

24

forbearance agreement.  In May 2019, HCMFA borrowed an additional $7.4 million from

HCMLP pursuant to two additional demand notes.

65.     Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its

debt to HCMLP.  On January 22, 2021, HCMLP filed an adversary proceeding in the

Bankruptcy Court to collect on the debt.  HCMFA has raised a series of frivolous defenses to

HCMLP's claims, including that the notes were executed in error.  As of December 11, 2020,

approximately $7.7 million in principal and interest was due and owing to HCMLP on the

HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in

principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26,

2014, and February 26, 2016, and interest and fees continue to accrue.  HCMLP has moved for

summary judgment on this matter.

**D.     Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct
         That Exposes It To Additional Liability**

66.     As described more fully below, in addition to establishing the lifeboats to usurp

HCMLP's business and evade its contingent creditors, Dondero, along with Scott Ellington,

HCMLP's Chief Legal Officer and General Counsel, and Isaac Leventon, HCMLP's Assistant

General Counsel, engaged in other actions that meaningfully harmed HCMLP.  This included

exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived

adversaries, and carrying out schemes that personally benefitted Dondero and, in certain

instances, Ellington, but conferred no benefit on HCMLP.  Ellington and Leventon were also

financially rewarded by Dondero for faithfully serving Dondero's interest, rather than

HCMLP's, even where doing was detrimental to HCMLP.  As described below, these actions

ultimately resulted in more than one billion dollars in litigation and arbitration claims against

HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements for hundreds of millions of dollars.

**1.     Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry**

67.     In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP").  Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions.  Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis.  Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs.  HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees.  Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors.  In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation.  At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities.  As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

68.     By 2016, tensions between Dondero and Terry hit a boiling point.  Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs.  Terry was the investment manager for the CLOs, and

26

opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

69.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

70.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions

27

benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.

71.    Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018.  In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case.  This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").  Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

72.    Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs.  This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate.  Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's

advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and

expenses under Guernsey's "loser pays" regime.[12]

### 2.    Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

73.    Dondero and Ellington also exposed HCMLP to substantial liability to third-

party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P.,

HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P.,

HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively,

"HarbourVest").  At the same time that Dondero was surreptitiously transferring valuable rights

associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he

and Ellington were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of

HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for

approximately $75 million in cash, with a commitment to invest an additional $75 million in

HCLOF.[13]  In soliciting this investment, Dondero and Ellington failed to disclose material facts

---

[12]    Dondero's litigation crusade against Terry and Acis continues to date.  On May 14, 2021, NexPoint, acting under Dondero's direction, caused one of its managed retail funds, NSOF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged.  On May 20, 2021, NSOF then filed a motion in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization.  On September 9, 2021, the bankruptcy court conducted a lengthy hearing, and on September 24, 2021, declined to issue the order requested by NSOF and held that NSOF must amend its complaint to comply with the plan injunction.  On October 8, 2021, NSOF then filed a motion asking the Bankruptcy Court to reconsider its ruling, but withdrew the motion on December 1, 2021. NSOF filed an Amended Complaint in the SDNY action on November 23, 2021.  Acis, U.S. Bank, N.A., Brigade, and HCLOF (as defendant intervenor) filed motions to dismiss, which were fully briefed in March 2022, and remain pending.

[13]    CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[14]

74.   In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

75.   Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

###   3.   Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS

76.   In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties,

---

[14]   HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees. Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

and its fraudulent transfer claims against HCMLP, could proceed to trial.[15]  Shortly thereafter,

Dondero, Ellington, and Leventon, along with HCMLP employees Jean Paul Sevilla, Katie

(Irving) Lucas, and Matthew DiOrio, took steps to transfer the Fund Counterparties' remaining

assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and

controlled by Dondero and Ellington,[16] in order to ensure that such assets would be out of UBS's

reach in the event that a judgment was entered in its favor.[17]  In or around August 2017,

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer

of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and

a fair market value of at least $100 million—to Sentinel.

77.    The pretextual justification for these transfers was to satisfy a $25 million

premium on an "after the event" insurance policy issued by Sentinel that purportedly insured

the Fund Counterparties' first $100 million of liability to UBS.  The real goal of the transfer,

however, was to drain the Fund Counterparties' assets and render the Fund Counterparties

judgment-proof, while keeping the assets within Dondero's and Ellington's control.  There is

no legitimate explanation as to why the Fund Counterparties transferred assets worth at least

four times the premium payment to Sentinel.  And given that Dondero and Ellington indirectly

own and control Sentinel, they personally and improperly benefitted from this overpayment.

---

[15]  UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing
was subsequently also permitted to proceed.

[16]  Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington
through intermediate holding companies.  Sentinel has no employees or physical office space.
HCMLP employees, including Leventon, performed work on behalf of Sentinel.

[17]  In December 2017, Ellington caused Dilip Massand and DiOrio to be appointed as directors of
Sentinel.

78.     Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy.  Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it.   In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets.  Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy.

79.     As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, HCMLP inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS.  In March 2021, after the policy was uncovered through HCMLP's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy.  To date, Sentinel has refused to make any payments.

80.     On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

$1,042,391,031.79.   Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

### 4.    Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty

81.    HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees.  After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees.  With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis.  HCMLP contributed assets to HERA, which then distributed proceeds from time to time.  Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

82.    Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011.  Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity.  As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

83. Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs. In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to Highland ERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

84. When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

85. Daugherty then sued HCMLP, HERA, Highland ERA Management, and Dondero in the Delaware Chancery Court. A Vice Chancellor concluded that HCMLP, Dondero, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

86. In total, HCMLP suffered at least $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

34

**E.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

87.    Dondero, Ellington, and Leventon also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008.  Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors.   Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme").  As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

88.    The peace would not last, however.  On July 5, 2016, the Redeemer Committee (i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration")

35

against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

89.     The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit. For example, the "Barclays Claim"— which gave rise to over $30 million in liability for HCMLP—arose out of Dondero, Ellington, and Leventon causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement

36

of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

90.     In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused HCMLP to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR").  During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that HCMLP had purchased the Plan Claims.  Pursuant to the arbitration award, HCMLP was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

91.     Dondero's, Ellington's, and Leventon's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company").  Some of the Portfolio Company's stock was owned by the Crusader Funds.  Dondero, Ellington, and Leventon caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that Dondero controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in the Portfolio Company as their fiduciary duties required.  Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

92.     Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete.  Dondero, Ellington, and Leventon caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016.  The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

93.     The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award.  The hearing was subsequently continued to October 16, 2019.  HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

**F.     Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP**

94.     As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP.  As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington, Leventon, and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

95.     Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct.  HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

1.    **HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct**

96.    On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[18]    The UBS claim sought "damages arising from HCMLP's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

97.    In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting.  In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076.  Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

98.    Subsequently, HCMLP and UBS engaged in settlement discussions and mediation.  Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim.  That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing.  This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP.  But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

---

[18]    The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

99.    While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring.  Purportedly acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets.  The Independent Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

100.    When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS.  As a result, the parties reopened settlement discussions.  Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim.  In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer.  The Bankruptcy Court approved the UBS settlement on May 27, 2021.

**2.      HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct**

101.    On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things:  (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[19]  The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

---

[19]   Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award.  Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

102.    Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets.    Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account.  The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP.  Pursuant to that settlement, Acis received a $23 million allowed claim against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[20] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

103.    On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "HarbourVest Proofs of Claim") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP:  (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his

---

retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

[20]    Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

104.    HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million.  Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim.  The value of the HCLOF interests that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

**G.    HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy**

105.    The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy.  But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued.  As Dondero himself has acknowledged under oath, as a result of the economic recession of 2008 HCMLP "almost went under and . . . moved to a state of insolvency" from which HCMLP was still struggling to emerge in 2012.[21]  Indeed, as shown below, a valuation of HCMLP's assets and liabilities shows that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in

---

[21]    Mar. 28, 2012 H'rg Tr. 62:06-10 (J. Dondero), *In the Matter of the Marriage of I.C. and Q.C.*, Cause No. 11-16417-Z (Tex. Dist. [256th Dist.]).

2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value. Contemporaneous valuations performed by the company itself corroborate this conclusion.

106.   More specifically, these valuations show that when litigation liabilities resulting from claims by Barclays and UBS against HCMLP are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013.

| | Apr. 9, 2010 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Apr. 30, 2013 |
|---|---|---|---|---|---|
| Total Assets Less Financial Liabilities[22] | ($32M) | ($22) | $60M | $101M | $145M |
| Litigation Liabilities[23] | $365M | $365M | $365M | $145M | $145M |
| Net Value | ($397M) | ($387M) | ($305M) | ($44M) | ($1M) |

107.   The creation of the lifeboats and subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. HCMLP's financial condition began to improve in late 2013, due largely to

---

[22]   HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.
[23]   Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

successful proprietary trading and overall improving market conditions, but those gains began

to dissipate in 2015 due to Dondero's reckless trading.

108.    By December 2016, the company was again firmly insolvent, inadequately

capitalized, and/or unable to pay its debts as they came due, in large part because its CLOs were

generating diminishing returns, and the company was earning only minimal fees for servicing

other Dondero Entities rather than generating new business of its own, while continuing to bear

significant employee expenses.  HCMLP's financial condition deteriorated further between

2017 and 2019, as additional litigation claims were levied against the company, and it was

forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

109.    Specifically, as shown below, when litigation liabilities resulting from claims by

UBS, the Redeemer Committee, and Acis against HCMLP are taken into account in valuations

prepared on HCMLP's behalf, HCMLP was insolvent from no later than December 31, 2016,

until the date it filed for bankruptcy.

| | Dec. 19, 2016 | Dec. 31, 2017 | Dec. 31, 2018 | Oct. 16, 2019 |
|---|---|---|---|---|
| Total Assets Less Financial Liabilities[24] | $183M | $260M | $184M | $101M |
| Litigation Liabilities[25] | $212M | $365M | $365M | $365M |
| Net Value | ($29M) | ($105M) | ($181M) | ($264M) |

---

[24]    HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities.  HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner.  Figures are rounded to the nearest million.
[25]    Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

**H.     At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit**

110.     At all times relevant to this Amended Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes.   Dondero treated the elaborate corporate web he had created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

**1.     Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand**

111.     Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker.   Dondero made every material business, operational, management, and financial decision for HCMLP.   Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled.   Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020.   For eight years he was also its secretary and only officer.

112.     Strand did not even attempt to maintain the pretenses of observing corporate formalities.   As an initial matter, Strand did not hold regular board meetings.   Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date.   This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

113.   Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005.  The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

114.   Dondero was the only officer of Strand between 1993 and 2001.  Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero.  Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance."  Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

### 2.   Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form

115.   As of the Petition Date, the Highland complex spanned more than 2,000 entities.  For at least the last two decades, it has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct or indirect ownership stakes for his own personal benefit.  Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[26] to carry out his will.  As high-level HCMLP employees have testified under

---

[26]   *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

116.    Dondero managed the entities as a single integrated unit.  Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made.  Indeed, as far back as 2011, company projections provided to the valuation advisor CBIZ Valuation Group projected negative operating income for HCMLP.

117.    Dondero used his domination of his web of entities, operated as a single unit, to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created or controlled.  As described above, Dondero operated NexPoint and HCMFA for the purpose of siphoning off HCMLP's revenue and value; in addition, he used HCMLP as NexPoint's and HCMFA's direct piggy-bank, transferring not only HCMLP's business and agreements, but also its cash, which was used to seed new funds and investment vehicles, among other things.

118.    Dondero's control of the various entities within the Highland web was so pervasive that his own co-founder Okada remarked at one point in 2012, "I am not cool with you coming up with ideas, using Highland's cash flow to set them up, fund all their negative working capital and then somehow think the split shouldn't be 75 25 without some sort of negotiation and true up [(i.e., making new entities that Dondero owned entirely on his own)]."

Indeed, a 2016 draft accounting memo concluded that HCMLP, HCMFA, and NexPoint (and all of their subsidiaries) "are considered to be under common control ... James Dondero controls all 3 of the entities." This conclusion accords with statements NexPoint's and HCMFA's own funds have made in public filings,[27] as well as the Bankruptcy Court's finding that they are both "controlled by Dondero."[28]

119.    Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year. At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper. Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good. Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of NexPoint and HCMFA as described above, as well as for the benefit of his personal trusts. For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved

---

[27]  *See, e.g.*, NexPoint Real Estate Strategies Fund, Prospectus (Form 497) (as filed Apr. 29, 2022) ("NexPoint Advisors, L.P. ... is controlled by James Dondero by virtue of his control of its general partner, Nexpoint Advisors GP, LLC."); Highland Income Fund, Prospectus Supplement (To Prospectus dated July 1, 2019) (Form 497) (July 29, 2019) ("HCMFA is owned by Highland Capital Management Services, Inc. ("HCM Services")  and its general partner, Strand Advisors XVI, Inc., of which James Dondero is the sole stockholder. HCM Services is controlled by Mr. Dondero and Mr. Mark Okada by virtue of their respective share ownership.").
[28]  *See* Order Dismissing as Moot Debtor's Motion for a Mandatory Injunction, *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P. (In re Highland Capital Mgmt., L.P.)*, Adv. Proc. No. 21-03010-sgj11 (Bankr. N.D. Tex. Feb. 24, 2021) (Docket No. 25).

in creating, managing, and providing accounting services to Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources.

120.    This use of HCMLP's employees for Dondero's personal benefit continued even after the commencement of HCMLP's bankruptcy. For example, after the bankruptcy commenced, Schroth instructed Nancy Dondero to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to HCM AG authorizing this theft. Likewise, Dondero frequently instructed HCMLP's employees to perform services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

121.    Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. Employees shared the same office space in HCMLP's headquarters. Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address: 300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they

sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand. In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all. For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (e.g., in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[29] Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

122.    Additionally, Dondero delegated authority to his loyalists irrespective of their titles or roles. For example, Dondero delegated decision-making authority for Acis to Ellington, notwithstanding that he was not an officer, director, or employee of Acis. And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

123.    Dondero would also use HCMLP as his own personal piggy-bank. For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes. Dondero remains obligated on three of the demand notes and maintains an outstanding principal

---

[29]    Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS. SAS did not compensate any of these HCMLP employees for their work for SAS. Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated: "Thank you for calling SAS Asset Recovery. For reception press 0. For Scott [Ellington], press 1. For Dilip [Massand], press 2. For JP [Sevilla], press 3. For Tabor [Pittman, former HCMLP Associate GC], press 4. For Katie [Irving], press 5. For Isaac [Leventon], press 6. Thanks and have a good day."

balance of approximately $9 million.  HCMLP has demanded payment on all of the outstanding

demand notes, but to date, Dondero has failed to make any repayments on that debt.[30]

124.    Dondero also effectively paid himself and Okada distributions from HCMLP

through other Dondero Entities, including HCMS.  Between 2013 and 2017, HCMS issued

dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between

May 2017 through 2020, HCMS issued four additional promissory demand notes with an

aggregate face amount of $900,000.  Frequently, these notes functioned as disguised

distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by

a "loan" from HCMS to Dondero and Okada.  As with other intercompany notes between

HCMLP and other Dondero Entities, these notes had minimal covenants.  Moreover, Dondero

caused HCMLP to issue these loans to HCMS with minimal interest.

125.    To take yet another example, Dondero exploited HCMLP's employees and

capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade

HCMLP's creditors.[31]   HCRE pursued financial and real estate investments, failing to pay

---

[30]   In January 2021, HCMLP filed adversary proceedings against Dondero and four of his affiliated
entities (HCMFA, NexPoint, HCRE, and HCMS) in the Bankruptcy Court to collect on these
notes.  *See, e.g.*, *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj
(Bankr. N.D. Tex. Jan. 22, 2021).  Dondero and his affiliated entities have raised a series of
frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's
sister—agreed to forgive the notes as part of Dondero's compensation.  As of December 2021, the
defendants owed an aggregate of over $50 million in past-due principal and interest on the
notes.  In November 2021, HCMLP filed a second adversary proceeding against HCMFA to
collect on additional notes.  *See Highland Capital Management, L.P. v. Highland Capital
Management Fund Advisors, L.P.*, Adv. Pro. 21-03082-sgj.  In this second notes litigation,
HCMFA has raised a similarly frivolous defense.

[31]   HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate
Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned
by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by
Ellington).

52

HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment.   As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

126.   As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA.   Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust.   CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid.   The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats.   An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA-managed funds and entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

127.   Dondero used HCMLP's funds to support other entities in his web as well.   In or around 2013, HCM AG entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland

Capital Brasil Gestora de Recursos). With Dondero's approval, HCM AG acquired Brasilinvest

Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016.

However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or

Dugaboy.

128.    Dondero did not bother to distinguish between himself and HCMLP. After

Dondero was removed as HCMLP's Chief Executive Officer and President in January 2020, he

continued using his HCMLP email account and continued working out of HCMLP's

headquarters until his forced resignation in October 2020 and removal from HCMLP's premises

in December 2020. When the Court entered an order restraining Dondero from communicating

with HCMLP employees, Dondero flouted the order, including by communicating with

Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-

related document production requests, even though those documents were always kept on

HCMLP's computer system. Likewise, a temporary restraining order entered by this Court

prohibited Dondero from participating in, or encouraging others to participate in, any action

that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery

("Seery"), regarding the disposition of HCMLP assets. Nevertheless, Dondero did so multiple

times, including by contacting various employees and instructing them to act in a manner that

was inconsistent with Seery's directions.

129.    Dondero evinced no respect for HCMLP as an entity separate and apart from

himself. Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant

data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to

pursue claims benefitting HCMLP. In addition, Dondero interfered with document productions

of HCMLP and trespassed on HCMLP's property.

54

**I.**      **Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP**

      **1.**      **Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities**

130.   Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves.  As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

(a)      The Fraudulent CLO Holdco Transaction

131.   On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets valued by the company at approximately $24 million through a series of related assignments (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

132.   Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach.  Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction.  Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation.  Accordingly, Dondero caused Get Good

to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did.  Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco.  The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

133.    The Transferred CLO Holdco Assets consisted of:  (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer HCMLP valued at $12,625,395.44 (the "Crusader Interests").  The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.  Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

134.    Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note.  While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets.  The interest rate on the Dugaboy Note was a paltry 2.75%.  There was no security interest provided

in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections. No payments of principal or interest were required on the note until 2036. And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

135.    Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation in his capacity as trustee of Get Good. Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation. Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this document as managing member of DAF GP. As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the

requisite consent documents on behalf of each entity, in his capacities as director of DAF

Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and

belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good,

DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without

performing any independent analysis.

136.    The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**



(b)    Fraudulent Distributions

137.    Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars

in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between

2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the

detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was

insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and

were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

138.    Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions.  Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through certain trusts.  Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests.  As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand.  The distributions made after February 28, 2015, were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

139.    Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2.  As such, the distributions made to Okada between April 9, 2010, and February 28, 2015, (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2.  The distributions to Okada made after February 28, 2015, were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

140.    On or around April 9, 2010, HCMLP made distributions to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and

$405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").[32]

141.    On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

142.    On or around May 2, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 2, 2011 Distributions").

143.    On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

144.    On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

145.    On or around February 22, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 22, 2012 Distributions").

146.    On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

---

[32]  Plaintiff's original Complaint referred to the distributions as being made on or around the dates reflected on HCMLP's general ledger.  Plaintiffs have now located the bank transfer statements for each distribution, and use the bank transfer date instead.  The distributions being challenged, however, have not changed.

147. On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

148. On or around April 9, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 9, 2013 Distributions").

149. On or around December 19, 2016, HCMLP made distributions to Hunter Mountain,[33] Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 19, 2016 Distributions").

150. On or around January 5, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2,[34] in the amounts of $5,401, $1,087, and $466, respectively (the "January 5, 2017 Distributions").

---

[33] In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

[34] At the time of the December 19, 2016 distributions and thereafter, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children and siblings held economic interests in HCMLP. HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

61

151.    On or around February 7, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 7, 2017 Distributions").

152.    On or around June 15, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 15, 2017 Distributions").

153.    On or around December 21, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 21, 2017 Distributions").

154.    On or around March 9, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 9, 2018 Distributions").

155.    On or around December 19, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 19, 2018 Distributions").

156.    On or around March 28, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55,

and $156.66, respectively (the "March 28, 2019 Distributions,"  and together with the April 9,

2010 Distributions, April 13, 2011 Distributions, May 2, 2011 Distributions, September 13,

2011 Distributions, November 25, 2011 Distributions, February 22, 2012 Distributions,

February 29, 2021 Distributions, April 10, 2012 Distributions, April 9, 2013 Distributions,

December 19, 2016 Distributions, January 5, 2017 Distributions, February 7, 2017

Distributions, June 15, 2017 Distributions, December 21, 2017 Distributions, March 9, 2018

Distributions, December 19, 2018 Distributions, March 28, 2019 Distributions, the "HCMLP

Distributions").

157.    All of these distributions were made at a time when HCMLP was insolvent and

as part of a scheme to transfer HCMLP's value to Dondero and Okada and divert value away

from HCMLP's current and potential future creditors.  The March 28, 2019 Distributions, which

were made shortly after the arbitration panel awarded the Redeemer Committee over $190

million, were the final distributions made by HCMLP.  The distributions ceased at that time—

the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-

long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c)    Fraudulent Transfers To Massand

158.    HCMLP also made payments of at least $519,000 per year to Massand Capital

from November 2014 through 2019.  On January 1, 2014, HCMLP entered into a one-year

consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand

Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell

phone expenses, and other "reasonable" expenses.  Then, on January 5, 2015, HCMLP entered

into a consulting agreement (together, the "Massand Consulting Agreements") on the same

terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per

month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses.  In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

159.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP.  Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

160.    The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman.  Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

161.    Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington.  The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[35]  As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

---

[35]    In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

162.    Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

**J.    Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

163.    HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona. Net of costs and expenses in connection with the transaction, HE Capital 232 was due $8,687,245.15. These proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

164.    On March 2, 2018, Ellington directed Wick Phillips to disburse from the escrow account $4,510,000 to HCMLP and $1,200,000 to an HCMLP managed fund to pay down mezzanine debt. This left $2,977,245.15 in the escrow account that was due and owing to HCMLP. On information and belief, Dondero and Ellington directed Wick Phillips to keep these funds in the escrow account so that they could funnel the money to themselves. For three months, Wick Phillips requested disbursement instructions for the remaining funds from Ellington, but Ellington demurred while "waiting for answers from others so can tell you where to send." Upon information and belief, during this period, Ellington and Dondero were determining how to direct the funds to themselves.

65

165.    On June 4, 2018, Ellington dropped HCMLP's Managing Director (Real Estate) from an email chain and directed Wick Phillips to disburse the remainder to an account in the name of MaplesFS—a fiduciary services company in the Cayman Islands acting as a payment agent—for further credit to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.  MaplesFS subsequently transferred the full amount to Grey Royale Ltd.  A Wick Phillips employee commented that the payment to Grey Royale Ltd. was "pretty suspicious."

166.    In September 2019, in connection with the preparation of HE Capital 232's tax return, HCMLP's Tax Director inquired about the missing funds owed to HCMLP as a result of the Arizona property sale.  Ellington responded that the "facts as I know them" were that the approximately $3 million in missing HCMLP funds were "additional cost[s] of sale, reducing the gain," and "used to pay various legal expenses and other closing costs."  Ellington did not disclose that he had directed that the funds be paid to a Cayman Islands shell company owned by Dondero and Ellington, which had no role in the real estate transaction and was not owed any legal expenses or closing costs.

167.    Neither Dondero, Ellington, nor Grey Royale Ltd. were parties to the escrow agreement or had any legal claim to the proceeds of the real estate sale held by the escrow agent.

**K.    Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction**

168.    HCMLP employees other than Dondero also engaged in, and improperly benefited from, self-interested transactions and schemes involving HCMLP.

169.    In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank,

DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement").  The Tall Pine

scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain

key employees, including Ellington and Leventon, loyal to Dondero during the bankruptcy.

Through the Tall Pine scheme, Ellington and Leventon ensured that they would profit off their

wrongdoing, and that Dondero would compensate them no matter what happened to HCMLP.

170.    Pursuant to the Tall Pine Services Agreement, HCMLP employees, including

Ellington and Leventon, would receive approximately $17 million through pass-through entities

that they created and owned over the course of two years.  When Tall Pine would receive a

payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine

contemporaneously transferred funds to Leventon's pass-through entity, Clairmont Holdings,

LLC ("Clairmont").  Ellington, who owned Tall Pine, profited from the amounts that remained

in Tall Pine after it had distributed sums to Clairmont and other pass-through entities controlled

by HCMLP employees.

171.    After the Petition Date, Dondero surreptitiously approved wire transfers from

accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself,

Ellington, and Leventon.  These payments were made to compensate Ellington and Leventon

for the amounts that would have been paid to them in 2020 but for the Committee's objection.

Ellington and Leventon did not disclose these payments to the Independent Board.

## V.    CAUSES OF ACTION

### COUNT I
**Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

172.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

67

173. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

174. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | | $107,429,122.12 | | | | | |

175.    At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

176.    HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above.  Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

69

177.    Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith.  To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due.  Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities.  Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

178.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

179.    Each HCMLP Distribution is voidable as a constructively fraudulent transfer.  Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**
**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers**
**Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

180.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

70

181.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

182.    As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

|  | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

183. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

184. To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     Dondero and Okada were insiders of HCMLP;

(b)     before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d)     HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e)     at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f)     The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g)     Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h)     Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming

73

contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

185.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

186.    Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT III
### Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act
*(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

187.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188.    The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

189.    Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and  who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

74

190.    As set forth below, between December 31, 2016 and the Petition Date, HCMLP

made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal

Distributions").

|  | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |
| Grand Total | | $34,583,651.57 | |

191.    Hunter Mountain, Dugaboy, and Strand knew that HCMLP made the Illegal

Distributions at a time that its liabilities exceeded the fair value of its assets.  As set forth herein

and in the counts below, each of Hunter Mountain, Dugaboy, and Strand were the alter egos of

Dondero.  Even if Hunter Mountain, Dugaboy, or Strand were not the alter egos of Dondero,

they would be imputed with Dondero's knowledge.  Dondero was the sole owner of Strand.

Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to

purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy

trust (among others).  Through Hunter Mountain, Dondero continued to receive the economic

75

benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

192.    Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

## COUNT IV
### Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme
*(Against Dondero and Strand)*

193.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

194.    During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner.  Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

195.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero or Strand set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given Strand's and Dondero's fiduciary obligations, neither the Estate nor the Litigation Trustee  was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.   By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit. Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA.  Pursuant to the scheme, the lifeboats utilized HCMLP's employees to

76

perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly.  As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services.  The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

196.    Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

197.    Strand was dominated and controlled by its sole owner, Dondero.  Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled.  As such, Dondero appeared on both sides of the agreements and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

198.    The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date.  Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

199.    HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared

services and other agreements. Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits. Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

200.    Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law. Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities To Third Parties**
*(Against Dondero, Strand, Ellington, and Leventon)*

201.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

202.    During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

203.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into

78

the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

204.    Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP. In total, these breaches resulted in more than $350 million in allowed claims against HCMLP. But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts. These breaches resulted in millions of dollars to Dondero, Ellington, and Leventon, either directly, through transfers from HCMLP to entities owned in whole or in part by Dondero and Ellington, or indirectly, through compensation paid to Ellington and Leventon in exchange for their loyalty to Dondero in perpetrating schemes that breached their duties to HCMLP.

205.    **Liabilities to UBS.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS. Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion. Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

206.    Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial,

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate the surreptitious transfer of assets worth at least $100 million to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington.  Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

207.   After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court.  Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

208.   **Liabilities to Acis.**  Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry.  As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP.  When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

209.   Dondero then embarked on a crusade to ensure Terry would not collect from Acis.  In connection therewith, Dondero acted through HCMLP to, among other things:  (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis

80

and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

210.    In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

211.    Beginning on October 24, 2017, four days after Terry's arbitration judgment was issued, Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award.  Ellington and Leventon implemented Dondero's directives and took the steps necessary to consummate the transactions.

212.    Leventon willfully and wantonly helped to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP,

which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO
Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites
that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis,
therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO
Management Ltd. agrees to step in to the collateral manager role. Given the timing of the
assignment—just days after Terry's arbitration award—Leventon knew that it was part of a
scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to
HCMLP.

213. **Liabilities to HarbourVest.** Dondero and Ellington also willfully and wantonly
caused harm to HCMLP by exposing it to substantial liability to HarbourVest. Dondero and
Ellington, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of
HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an
additional $75 million in the future, while concealing that Dondero was actively engaged in a
campaign against Terry that would significantly impair the value of HarbourVest's investment.
In addition, Dondero did not intend to use the $75 million that CLO Holdco received from
HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use
those funds as part of a scheme to infuse other Dondero Entities (including entities that
benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was
forced to settle with HarbourVest by providing it with $80 million in allowed claims, in
exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by
HCMLP. But for Dondero's and Ellington's conduct, HCMLP would not have incurred the
foregoing liabilities. As a result of their conduct, those interests in HCLOF were then worth
tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

214.   **Liabilities to Crusader Funds.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to their conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.  Among other things, Dondero, Ellington, and Leventon caused HCMLP to:  (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely.  Both Ellington and Leventon provided false narratives and misrepresentations in furtherance of Dondero's harm to the Crusader Funds.  The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated."   As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

215.   Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Ellington,

Leventon and Strand.  For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy.  As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy.  But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

216.    In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

### COUNT VI
### Declaratory Judgment That Strand Is Liable For HCMLP's Debts
### In Its Capacity As HCMLP's General Partner
*(Against Strand)*

217.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218.    Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners."  Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners."  *Id.*

219.    Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

84

220.    During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP.  Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

221.    Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

## COUNT VII
**Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego**
*(Against Dondero)*

222.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

223.    Between the formation of Strand and the Petition Date, Dondero, Strand's sole equity owner, dominated and controlled Strand such that Dondero and Strand operated as a single economic entity.  Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action.  Between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

224.    Dondero was the only officer of Strand between 1993 and 2001.  Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero.  Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance."  Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

85

225.    Strand did not observe corporate formalities.  Based on a review of HCMLP's

books and records, between the formation of Strand and the Petition Date, Strand never held a

board meeting.  Indeed, Dondero testified that he is not aware of attending a board meeting for

Strand and does not recall ever seeing board minutes for Strand.

226.    Strand did not comply with its own bylaws, which require annual meetings of

stockholders.

227.    Strand was a sham entity whose sole purpose was to serve as a vehicle through

which Dondero could dominate and control HCMLP.  Dondero used this abuse of the corporate

form to facilitate his scheme to make HCMLP act contrary to its own interests and in favor of

Dondero's interests by insulating assets from HCMLP's creditors, including those whose

liabilities were the direct result of Dondero's own wrongdoing.  As such, Dondero is Strand's

alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's

debts.

### COUNT VIII
### Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts
### In Their Capacities As HCMLP's Alter Ego
*(Against Dondero and Strand)*

228.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

229.    Dondero, using his alter ego Strand, dominated and exercised total control over

HCMLP through the Petition Date, such that Dondero, Strand, and HCMLP operated as a single

economic entity.  Dondero had total decision-making authority and governed HCMLP by

decree—using the lack of an independent Strand to render HCMLP a mere instrumentality of

Dondero.  HCMLP had no independence and could not exercise any business discretion separate

and apart from Dondero, in service of his personal interests and the interests of his integrated web of entities.

230.    Strand, like innumerable entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

231.    Dondero failed to observe corporate formalities with regard to HCMLP.  Indeed, he did not distinguish between HCMLP and his personal interests and businesses.  Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP.  For example, Dondero caused HCMLP to employ individuals to carry out roles serving Dondero personally.  Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

232.    Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

233.    Dondero siphoned value from HCMLP to other entities he owned and controlled by causing HCMLP's employees and resources to be used for his lifeboat businesses.  In connection with this fraudulent scheme to move assets out of the reach of HCMLP's creditors, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates.  In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees.  The purpose and effect of this scheme was to cause HCMLP to provide the employees and

infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

234.    Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero, through benefits conferred to entities he owned other than HCMLP.

235.    Dondero used his abusive domination and control to cause HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities.  By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

236.    By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP "judgment-proof."  Ultimately, this brazen disregard for HCMLP as an independent entity with its own obligations rendered HCMLP insolvent, including by resulting in multiple adverse awards such as the $190 million arbitration award that caused HCMLP to file for bankruptcy.

237.    Dondero further abused the corporate form to siphon assets from HCMLP by orchestrating intercompany transfers that were designed to siphon assets from HCMLP.  For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer assets valued by the company at approximately $24 million through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

88

238.    Because Dondero operated Strand and HCMLP as a single economic entity and used that domination to defraud HCMLP's creditors, Dondero and Strand are the alter egos of HCMLP and should be held liable for the full amount of HCMLP's obligations.

## COUNT IX
### Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero and HCMLP In Its Capacity As Dondero's Alter Ego
*(Against Dugaboy)*

239.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240.    Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and his alter ego HCMLP.  Dondero treated himself, Dugaboy, and HCMLP as a single economic entity.  Dondero dominated and controlled Dugaboy.  Under the terms of Dugaboy's trust agreement, Dondero has the power to remove trustees without cause—leverage that allowed him to control Dugaboy.  Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

241.    Dondero treated Dugaboy as a vehicle for his own interests.  For example, Dondero caused Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Dondero's sister, Nancy Dondero, allegedly caused HCMLP to enter into an agreement whereby the notes owed to HCMLP by various Dondero Entities would be forgiven as compensation to Dondero upon satisfaction of certain conditions subsequent.  Dondero also caused Dugaboy to help facilitate HCMLP's transfer of the Transferred CLO Holdco Assets to Get Good, by agreeing to provide the Dugaboy Note, purportedly but not actually equal to the value of the Transferred CLO Holdco Assets and with a paltry 2.75% interest rate and no security, covenants, lender protections provided to Dugaboy, or payments due until 2036.

89

242.   Dondero disregarded corporate formalities between Dugaboy and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP.   Dondero used HCMLP employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data.   Dugaboy shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

243.   With Dondero as the primary beneficiary of Dugaboy, there are no other innocent shareholders whose expectations could be impaired by holding Dugaboy liable for Dondero or HCMLP's debts.   There are no innocent third-party creditors of Dugaboy who would be harmed by holding Dugaboy liable for Dondero's or HCMLP's debts.

244.   Dugaboy is the alter ego of Dondero, and the Court should hold Dugaboy liable for Dondero's debts.   Because Dondero is also HCMLP's alter ego, and because Dugaboy knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, Dugaboy is also the alter ego of HCMLP and the Court should hold Dugaboy liable for the debts of HCMLP.

### COUNT X
### Declaratory Judgment That NexPoint Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Egos
*(Against NexPoint)*

245.   Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

246.   Dondero dominated and controlled NexPoint such that Dondero, NexPoint, and Dondero's alter ego HCMLP operated as a single economic entity.   NexPoint is owned and controlled by Dondero through Dugaboy and NexPoint GP.

247.    NexPoint knowingly participated in—and played a core role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating NexPoint as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled.   Dondero and NexPoint acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

248.    Dondero disregarded the corporate formalities and the distinctions between himself, NexPoint, and HCMLP.  Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP.  NexPoint shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.  NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.  Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

249.    For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees.  Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

250.    Dondero used NexPoint as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its

91

owner, Dugaboy.   Transferring funds from HCMLP to NexPoint funded distributions by NexPoint to Dondero's alter ego Dugaboy, draining HCMLP's value to Dondero with NexPoint's knowledge and participation.   Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.

251.   Dondero and NexPoint worked together to further extract value from HCMLP by causing HCMLP to lend to NexPoint on terms entirely determined by Dondero.   Dondero further caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief.   As of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero and NexPoint following a payment default that occurred January 2021.

252.   There are no other innocent shareholders whose expectations could be impaired by holding NexPoint liable for Dondero or HCMLP's debts.   Similarly, there are no innocent third-party creditors of NexPoint who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

253.   NexPoint is the alter ego of Dondero and the Court should hold NexPoint liable for the debts of its ultimate shareholder Dondero.   Because Dondero is also HCMLP's alter ego, and because NexPoint knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, NexPoint is also alter ego of HCMLP and the Court should hold NexPoint liable for the debts of HCMLP.

## COUNT XI
### Declaratory Judgment That HCMFA Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Ego
*(Against HCMFA)*

254.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

255.    Dondero dominated and controlled HCMFA such that Dondero, HCMFA, and Dondero's alter ego HCMLP operated as a single economic entity.  HCMFA is controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which owns a 1% interest in HCMFA and is wholly-owned by Dondero.  Dondero and Okada are the ultimate owners of the remaining stakes in HCMFA:  HCMS owns an 89.6667% ownership interest in HCMFA, and is itself owned 75% by Dondero and 25% by Okada; the Okada Family Revocable Trust owns the remaining 9.3333% ownership interest in HCMFA.  Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

256.    HCMFA knowingly participated in—and played a key role in accomplishing— Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating HCMFA as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero directly or indirectly through other entities he controlled.  Dondero and HCMFA acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

257.    Dondero disregarded the corporate formalities and the distinctions between HCMFA and HCMLP.  HCMFA was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.  Strand Advisors XVI, Inc., HCMFA's general partner, purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.  HCMFA shared its

93

principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA
and other Dondero Entities.

258.    HCMFA was effectively a shell entity created to replace HCMLP as the new
investment manager for open-ended retail investment funds.  Agreements between HCMLP and
HCMFA were structured to ensure that HCMFA retained the vast majority of profits for the
work performed by HCMLP and its employees.  To the extent that sub-advisory and shared
services agreements existed between HCMLP and HCMFA, they existed to lend credibility to
Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through
HCMFA.

259.    Dondero used HCMFA as a part of his scheme to extract value from HCMLP.
Dondero caused HCMLP to use its resources to support HCMFA.  Between 2011 and 2019,
HCMLP loaned HCMFA approximately $12 million; Dondero caused HCMLP to enter into
multiple forbearances on HCMFA's debts.  In May 2019, HCMLP loaned HCMFA an
additional $7.4 million, and HCMFA again failed to repay.  Dondero exerted his control and
dominance of these entities to direct both sides of those agreements, with the knowing
participation of HCMFA, to accomplish his own ultimate goal of siphoning value from HCMLP
to insulate it from creditors.

260.    There are no other innocent shareholders whose expectations could be impaired
by holding HCMFA liable for Dondero or HCMLP's debts.  Similarly, there are no innocent
third-party creditors of HCMFA who would be harmed by holding NexPoint liable for Dondero
or HCMLP's debts.

261.    HCMFA is the alter ego of Dondero and the Court should hold HCMFA liable
for Dondero's debts.  Because Dondero is also HCMLP's alter ego, and because HCMFA

94

knowingly participated in Dondero's scheme to abuse of the corporate form to defraud creditors,

HCMFA is also the alter ego of HCMLP and the Court should hold HCMFA liable for the debts

of HCMLP.

**COUNT XII**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

262.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

263.    On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held

an allowable unsecured claim other than one allowable under § 502(e) and could have sought

to avoid the transfers challenged in this Count.

264.    On December 15, 2011, HCMLP entered into a novation agreement, pursuant to

which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland

Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland

Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the

"Transferred Funds").    Dondero caused HCMLP to transfer these agreements to HCMFA as

part of his scheme to evade HCMLP's creditors.

265.    HCMLP received less than reasonably equivalent value in connection with the

novation agreement.    Prior to the transfer, HCMLP received management and advisory fees in

return for the services that its employees performed for the Transferred Funds.    After the

transfer, HCMLP's employees provided the same services for the Transferred Funds, except

that the vast majority of the profits were diverted to HCMFA following the extinguishment of

HCMLP's credit facility.

95

266.     At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

267.     On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

268.     The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds (the fair market value of which likely exceeded $25 million at the time of transfer) is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XIII
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

269.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

270.     On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.   On December 15, 2011, HCMLP entered into

96

a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

271.    Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP and HCMFA;

(b)    before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d)    at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

97

(f)    HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

272.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

273.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XIV
### Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes
*(Against Dondero, Strand, Ellington, and Okada)*

274.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

275.    During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP'S Chief Legal Officer and General Counsel; and (4) Okada owed fiduciary duties to HCMLP in his capacity as Chief Investment Officer.

98

276.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.  By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

277.    Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned.  Likewise, Dondero and Ellington oversaw and approved the Massand Transfers.  The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP.  In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

278.    Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

99

279.     Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

280.     As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including, but not limited to, the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

281.     By willfully and wantonly not returning the distributions made to Okada, MAP #1, and MAP #2 that were made at times that Okada knew that HCMLP was insolvent, and knowingly permitting unlawful distributions to Dondero and his controlled entities, Okada breached his fiduciary duties to HCMLP.

282.     Dondero and Okada further breached their fiduciary duties by using HCMLP employees for their own personal affairs and private business interests, on HCMLP's time and payroll.

283.     Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

284.     By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

## COUNT XV
### Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco,*
*DAF Holdco, DAF, Get Good, Highland Dallas)*

285.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

286.    NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand. NexPoint and HCMFA were each dominated and controlled by Dondero. As such, each of NexPoint and HCMFA knowingly participated in their breaches of their fiduciary duties to HCMLP. NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

287.    SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers. SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers. SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP. The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

288.    Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—

101

knowingly participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

289.    Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

## COUNT XVI
### Civil Conspiracy to Breach Fiduciary Duties Under Texas Law
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

290.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

291.   Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors. To effectuate the conspiracy, Dondero, Ellington, and Leventon acted outside the scope of their HCMLP employments, as agents of the non-HCMLP entities they owned and controlled, and for their personal benefits.

292.   Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.  By its nature, the conspiracy alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

293.   Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled, as well as to Ellington, Leventon, and the entities they owned and controlled.  NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP.  SAS—which is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively—received valuable services from Massand while HCMLP bore the expense. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the

fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

294.    Ellington and Leventon understood that their conduct was directed at enriching themselves and Dondero at the expense of HCMLP, and each of them were compensated in excess of their HCMLP salaries by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation.   NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities.   Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

295.    In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

(a)    Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties.   NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate

104

HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b)    Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c)    Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO Holdco for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas— consciously participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a

fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

(d)     Ellington and Dondero conspired to disburse to a Cayman Islands shell company they owned and controlled nearly $3 million of escrowed proceeds rightfully owing to HCMLP.

(e)     In furtherance of the conspiracy and to maintain loyalty to Dondero, Ellington and Leventon accepted benefits like minority ownership in entities (like Ellington's stake in SAS) and additional compensation via complex, circuitous schemes like the Tall Pine arrangement.

296.    Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions.  The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

## COUNT XVII
### Tortious Interference with Prospective Business Relations
*(Against Dondero, NexPoint, and HCMFA)*

297.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

298.    Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero.  The "lifeboats," which included

NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

299.   But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

300.   By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP.  In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA.  NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

301.   Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by NexPoint and HCMFA.  Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

302.   HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

## COUNT XVIII
### Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

303.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

304.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

305.    On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were valued by the company at approximately $24 million.  The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

306.    As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

307.    Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

108

308. Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

309. Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco. Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

310. Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction. Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

311. At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

312. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

313. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

314. The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XIX
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

315. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

316. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

110

317.   On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which the company valued at approximately $24 million.  The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

318.   As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

319.   After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco.  Dondero effected each transfer through his direct or indirect control of each of these entities.

320.   Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)   Dondero was an insider of HCMLP;

(b)   Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c)   before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d)   at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were

111

unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f)    The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

321.    None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

322.    At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

323.    The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively
Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

112

324.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

325.     On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

326.     On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC.  Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

327.     HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value).  Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

328.     At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

329.     HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

113

## COUNT XXI
### Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law
*(Against Massand Capital)*

330.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

331.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

332.    On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc.  On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

333.    Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP;

(b)    Dondero was an insider of SAS;

(c)    Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d)    before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

114

(e)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f)     at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g)     Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

334.    HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

### COUNT XXII
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

335.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

115

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

337.    HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant

to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The

transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
|  |  | Total | $1,742,082 |

338.    HCMLP did not receive any consideration in exchange for its payments to Massand Capital.  The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

339.    Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero.  As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

340.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

341.    At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

342.    The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXIII
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under
11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

343.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

117

344.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured

creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

345.    On January 5, 2015, HCMLP entered into a fraudulent consulting agreement,

pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per

month.  The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth

below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

346.    Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP and Massand Capital;

(b)    before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d)    at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

119

(f)    The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

347.    The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*(Against Hunter Mountain and Rand)*

348.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

349.    On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

350.    Rand is a guarantor on the Hunter Mountain Note.

351.    Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

352.    Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

353.    On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain

Note are immediately due and payable.  As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

354.    The Hunter Mountain Note is currently in default.  Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

**COUNT XXV**
**Conversion**
*(Against Dondero and Ellington)*

355.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

356.    In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

357.    On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account.  The Remaining HE Capital 232 Proceeds, worth approximately $2.98 million, were never disbursed to HCMLP.

358.    HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

359.    The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

360.    Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands.  Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to MapleFS, a fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

361.    Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

## COUNT XXVI
### Unjust Enrichment or Money Had and Received
*(Against Dondero)*

362.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

363.    As set forth above, Dondero caused HCMLP to enter into numerous intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits.  Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

364.    Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP.  Dondero orchestrated countless transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to:  (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and

122

controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP's money to seed business activities and investments that would inure to his own personal benefit. Dondero diverted millions or tens of millions of dollars to himself, at HCMLP's expense.

365.    Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

366.    Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

367.    Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

368.    There was no valid express contract governing the subject matter of this dispute.

369.    As a result of fraud, duress, or taking undue advantage of his own position of authority within HCMLP, Dondero holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched him and would be unconscionable to retain.

370.    Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

**COUNT XXVII**
**Unjust Enrichment or Money Had and Received**
*(Against Ellington and Leventon)*

371.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

372.    Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation.  However, each of them understood and performed their duties as functionaries for Dondero.  As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP.  Portions of Ellington's and Leventon's compensation, paid for by HCMLP, was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

373.    Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

374.    Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP.  Among other things, Ellington and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

375.    There was no valid express contract governing the subject matter of this dispute.

376.    As a result of fraud, duress, or taking undue advantage of their own positions of authority within HCMLP, Ellington and Leventon hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

124

377.    Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXVIII**
**Unjust Enrichment or Money Had and Received**
*(Against NexPoint and HCMFA)*

378.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379.    The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

380.    HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of below-market note agreements.  Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

381.    NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

382.    Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

383.    There was no valid express contract governing the subject matter of this dispute.

125

384.    As a result of fraud, duress, or taking undue advantage of HCMLP, NexPoint and HCMFA hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

385.    Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXIX**
**Unjust Enrichment or Money Had and Received**
*(Against Massand Capital and SAS)*

386.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

387.    Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements.  Nevertheless, Massand Capital was aware that it would not and never intended to perform any services on behalf of HCMLP.  Rather, Massand Capital was performing services on behalf of SAS, with HCMLP footing the bill.  HCMLP received no benefit under the Massand Consulting Agreements.

388.    Further, the value of the services provided to SAS were far less than HCMLP's payments, resulting in Massand receiving unearned profits to the tune of millions of dollars.

389.    HCMLP employees performed work for SAS.  Indeed, at least four HCMLP employees even received SAS email addresses.  SAS did not compensate HCMLP for these services.

390.    SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

391.    There was no valid express contract governing the subject matter of this dispute.

126

392.    As a result of fraud, duress, or taking undue advantage of HCMLP, Massand and

SAS hold or have held money that in equity and good conscience belongs to HCMLP, which

unjustly enriched them and would be unconscionable to retain.

393.    Plaintiff seeks restitution from Massand Capital and SAS and an order from this

Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of

value obtained by them as a result of the unjust conduct set forth above.

### COUNT XXX
### Unjust Enrichment or Money Had and Received
*(Against CLO Holdco)*

394.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

395.    Dondero, acting through HCMLP, fraudulently induced HarbourVest to

purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an

additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest.

HCMLP received no benefit from the HarbourVest investment.  Nevertheless, HarbourVest

filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment,

and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80

million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a

new entity designated by HCMLP.  As a result of Dondero's conduct, however, the HCLOF

interests were then worth significantly less than the face amount of HarbourVest's allowed

claim. HCMLP bore the consequences for Dondero and CLO Holdco in a scheme that deposited

$75 million into the coffers of CLO Holdco.

396.    CLO Holdco was aware that HarbourVest was fraudulently induced by Dondero

to make the $75 million investment. Nonetheless, CLO Holdco said nothing to HarbourVest

and received their money, all while leaving HCMLP on the hook when HarbourVest ultimately filed their proof of claim.

397.    There was no valid express contract governing the subject matter of this dispute.

398.    As a result of fraud, duress, or taking undue advantage of HCMLP, CLO Holdco holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched it and would be unconscionable to retain

399.    Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

### COUNT XXXI
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*(Against Dondero and Ellington)*

400.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

401.    Dondero and Ellington are insiders of HCMLP.

402.    As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,753,911 and payments to Ellington of $318,893 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |

128

| November 15, 2018 | Dondero | $65,078 |
| December 14, 2018 | Dondero | $115,481 |
| January 15, 2019 | Dondero | $96,786 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| May 15, 2019 | Dondero | $89,257 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| July 15, 2019 | Dondero | $47,006 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| October 15, 2019 | Dondero | $32,977 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,753,911 |
| Total | Ellington | $318,893 |
| Grant Total | | $5,072,804 |

403.    The One-Year Transfers were made on account of antecedent debt.

404.    HCMLP was insolvent when each One-Year Transfer was made.

405.    Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

406.    Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

407.    Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

**COUNT XXXII**
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

408.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

409.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

410.    At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

411.    HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers.  Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

412.    Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer.  Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

130

against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXXIII
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

413.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

414.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

415.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.    Dondero exercised complete control over HCMLP, and Ellington acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

416.    To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

    (a)    Dondero and Ellington were insiders of HCMLP;

    (b)    although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

131

(c)      before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d)      HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e)      HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f)      HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g)      at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h)      Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to

132

siphon value so that such value would not be available to satisfy HCMLP's
creditors.

417.   Each Alleged Expense Transfer is voidable as an intentionally fraudulent
transfer.  Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and
recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,
against all initial and subsequent transferees and/or entities for whose benefit the transfers were
made.

### COUNT XXXIV
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing
Participation in Breach of Fiduciary Duty under Texas Law Out Of Conduct That
Resulted in HCMLP Liabilities**
*(Against Ellington and Leventon)*

418.   Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully
set forth herein.

419.   Ellington and Leventon aided and abetted the breaches of fiduciary duty
committed by Dondero and Strand that foreseeably resulted in liability to HCMLP.  Ellington
and Leventon knowingly participated in Dondero's schemes that foreseeably resulted in liability
to HCMLP.  In total, these breaches that were aided and abetted by Ellington and Leventon
resulted in more than $350 million in allowed claims against HCMLP.

420.   Neither the Litigation Trustee nor the Estate could have discovered the conduct
by Ellington and Leventon set out herein with reasonable diligence prior to Dondero's removal
as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the
fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to
inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's
removal.  By its nature, the conduct alleged herein was inherently undiscoverable because of

133

the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

421.    **Liabilities to UBS.**  Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to UBS.  In 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Ellington and Leventon aided Dondero in causing HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington, ostensibly to pay a premium on the Sentinel insurance policy that was only $25 million.  Ellington and Leventon knew or willfully blinded themselves to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the transfer to Sentinel

422.    After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court.  When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

423.    **Liabilities to Acis.**  After the Terry arbitration award issued, Ellington and Leventon aided and abetted Dondero in causing HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took necessary steps to

134

consummate the transactions, knowingly or willfully blinding themselves to the fact that Dondero breached his fiduciary duties to HCMLP by stripping Acis of assets.

424.    Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement, approved by Dondero in a breach of his fiduciary duty, that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award.  The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role.  Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets and a breach of Dondero's fiduciary duty, which ultimately resulted in millions of dollars of damage to HCMLP.

425.    **Liabilities to HarbourVest.**  Ellington also aided and abetted Dondero in causing harm to HCMLP by exposing it to substantial liability to HarbourVest.  Ellington aided Dondero, acting through HCMLP, in fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment.  In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that

135

benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to an affiliate of HCMLP. As a result of Dondero's and Ellington's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them. Ellington either knew or willfully blinded himself to the fact that Dondero breach his fiduciary duties to HCMLP by fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash.

426.    **Liabilities to Crusader Funds.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance

of Dondero's harm to the Crusader Funds.  The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated."  As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.  Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero breached his duties to HCMLP through the foregoing acts.

427.   Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from Ellington's and Leventon's aiding and abetting the breaches of fiduciary duty committed by Dondero and Strand.  For example, the $190 million Redeemer arbitration award—which was itself caused by the Dondero's and Strand's breaches of their fiduciary duty to HCMLP and Ellington's and Leventon's aiding and abetting of those breaches—caused HCMLP to file for bankruptcy.  As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero and Strand breached their fiduciary duties to HCMLP through their actions that led to the $190 million Redeemer arbitration award.

428.   In light of the foregoing, Ellington and Leventon are liable for aiding and abetting Dondero's breaches of fiduciary duties to HCMLP in an amount to be determined at trial.

### COUNT XXXV
### Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law In Connection With Fraudulent Transfers And Schemes
*(Against Ellington and Okada)*

429.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

430.     Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal.  By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

431.     Ellington aided and abetted Dondero in causing HCMLP to enter into the Massand Consulting Agreements.  Likewise, Ellington aided and abetted Dondero in overseeing and approving the Massand Transfers.  The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP.  In addition, Ellington aided and abetted Dondero in causing HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.  Ellington either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP through the foregoing actions.

138

432.    Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

433.    As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors. Okada either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by approving hundreds of millions of dollars of distributions from HCMLP at a time HCMLP was insolvent.

**COUNT XXXVI**
**Disallowance or Subordination of Claims Under**
**Section 502 and 510 of the Bankruptcy Code**
*(Against CLO Holdco)*

434.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

435.    On April 8, 2020, CLO Holdco filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim").  The basis of the CLO Holdco Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

436.    HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme.  HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

139

437.    Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco

Claim.    Nevertheless, CLO Holdco has failed to date to actually withdraw the claim,

notwithstanding the Reorganized Debtor's request.    Accordingly, out of an abundance of

caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the

Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be

disallowed in its entirety or subordinated.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.    awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B.    setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C.    setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D.    setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E.    setting aside, avoiding, and granting recovery of the Massand Transfers;

F.    setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G.    setting aside, avoiding, and granting recovery of the One-Year Transfers;

H.    disallowing or subordinating, to the extent applicable, the CLO Holdco Claim;

I.    awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J.    awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K.    awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 19, 2022
      Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
 /s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexander J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for the Litigation Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent

via electronic mail via the Court's ECF system to parties authorized to receive electronic notice in

this case on May 19, 2022.

/s/ *Paige Holden Montgomery*
Paige Holden Montgomery

142

# Exhibit 6

**CAUSE NO. DC-21-09534**

| | | |
|---|---|---|
| IN RE JAMES DONDERO, | § | IN THE DISTRICT COURT |
| | § | |
| *Petitioner.* | § | 95th JUDICIAL DISTRICT |
| | § | |
| | § | DALLAS COUNTY, TEXAS |

**VERIFIED AMENDED PETITION TO TAKE DEPOSITION BEFORE SUIT
AND SEEK DOCUMENTS**

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives and/or employees of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant, documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth in below.

Petitioner would respectfully show the Court that:

**I.**

**PARTIES**

1.     Petitioner James Dondero ("Petitioner") is an individual resident in Dallas County, Texas, and is impacted by the potential acts and omissions.

2.     Respondent Alvarez & Marsal CRF Management, LLC ("A&M") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.     Respondent Farallon Capital Management, L.L.C. ("Farallon") is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111, and Respondent Michael Lin is a principal at Farallon.

---

## II.

## JURISDICTION AND VENUE

4.       The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.       The Court has personal jurisdiction over Respondent Alvarez & Marsal because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under Tex. Cir. Prac. Rem. Code § 17.003, and under §17.042(1)-(3) because A&M contracted with counterparties, Joshua Terry and Acis Capital Management, L.P., both of whom at the time had their principal place of business in Dallas County, Texas, and because its acts on behalf of the Crusader Funds (as defined below), if they occurred as believed they did, will have been tortious as to Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

6.       The Court has personal jurisdiction over Farallon because it contracted with A&M to purchase claims in the Highland Capital Management, L.P. Chapter 11 bankruptcy ("Highland bankruptcy") upon the recommendation of James Seery, Highland's CEO. Such acts, if shown to have occurred as believed and under the alleged circumstances, will have been tortious as to the Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

7.       Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

8.    Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition does not meet Article III of the United States Constitution's standing requirement.

## III.

## FACTUAL BACKGROUND

9.    This matter arises out of purchase of certain bankruptcy claims in the Highland Bankruptcy.

10.    Petitioner is the founder and former CEO of Highland Capital Management, L.P., currently a bankrupt debtor. He is also an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds"). Therefore, Petitioner has an interest in seeing to it that A&M properly marketed the claims for proper purposes and for the right price.

11.    Until recently, the Crusader Funds were managed by Highland, and then by A&M when those funds went into liquidation.

12.    Petitioner has an interest in the bankruptcy estate by virtue of his affiliation, and the fact that he is an adviser and/or manager of several trusts who own the equity of the debtor and therefore has an interest in seeing the equity properly protected in bankruptcy.

13.    Shortly after the Highland bankruptcy was filed, the Chapter 11 Trustee issued an invitation to creditors to serve on the unsecured creditors committee (the "UCC").

14.    The Trustee's invitation included a condition: namely, that anyone who served on the committee would have to agree that they would not sell their claims or in any way alienate them (including allowing them to be used as security) without leave of Court. Specifically, the United Trustee's instruction sheet stated:

> Creditors wishing to serve as fiduciaries on any official committee are advised that may not purchase, sell or otherwise trade in or transfer

claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed questionnaire and accepting membership on official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from the committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violation, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.

15. Upon information and belief, two of the Highland creditors – the Redeemer Committee and the Crusader Fund, who between them owned approximately $191 million in claims in the bankruptcy as well as other assets (the "Crusader Claims") – sold their Claims and assets to Jessup Holdings LLC, a subsidiary of Stonehill Capital Management, LLC. Alvarez and Marsal made this sale, which was in violation of the foregoing order.

16. Alvarez and Marsal arguably owe fiduciary duties to the funds and funds investors, and may have violated those duties by failing to conduct a sale for proper value, and/or by engaging in other acts that resulted in a sale of assets that was not authorized and/or not allowed by the terms of the funds or by law.

17. Around the same time, another Highland creditor—Joshua Terry and Acis Capital Management, who have approximately $25 million in claims—also sold their claims to Muck Holdings, LLC, set up by Farallon Capital Management (the "Acis Claims").

18. And a third creditor, HarbourVest, sold its $80 million worth of claims (the "HarbourVest Claims") to Muck Holding as well.

19. The above interests are generally referred to hereinafter as the "Claims".

20. The sales of the Claims were not reported contemporaneously as they were supposed to have been, nor was leave of the bankruptcy court ever sought, much less obtained, for the sales.

21.    However, Acis/Terry, and Crusader continued to serve on the UCC for a substantial period of time as if they hadn't sold their claims at all.

22.    As was discovered by the Petitioner, the current CEO of Highland, James Seery, has an age-old connection to Farallon and to Stonehill and, upon information and belief, advised Farallon and Stonehill to purchase the Claims.

23.    On a telephone call between Petitioner and Michael Lin, a representative of Farallon, Mr. Lin informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims.

24.    In other words, Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit.

25.    Mr. Seery's management duties come with a federally-imposed fiduciary duty under the Advisers Act of 1940.

26.    Mr. Seery had much to gain by Farallon holding the claims—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as CEO while Highland remains bankrupt and get paid (whereas plainly, the selling members of the UCC were ready to move on, thus truncating Seery's supposed gravy train). Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

27.    However, Mr. Seery is privy to material non-public information (i.e., "Inside Information") of many of the securities that Highland deals in, as well as in the funds that Mr. Seery manages through Highland. One of the assets was a publicly traded security that Highland was an insider of, and therefore, should not have traded (whether directly or indirectly), given its possession of insider information.

28.     Thus, his confidential tip to Farallon to purchase the claims may have violated certain of his duties as a Registered Investment Adviser, federal Securities laws, and his duties to the bankruptcy estate.

29.     Mr. Seery's duties also involve duties to manage the bankruptcy estate in a manner that would expeditiously resolve the bankruptcy. If the Unsecured Creditor Committee members (Acis, HarbourVest, and Redeemer) were indeed interested in selling their claims for less than the notional amount, then that would have been publicized in the required court filing. By failing to file them publicly and seeking court approval, the bankruptcy has been prolonged whilst Farallon seeks to reap a massive windfall return on its investment—a return that Seery apparently promised.

30.     The sale of assets authorized by A&M was not pursuant to normal means, and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold.

## IV.

## <u>RELIEF SOUGHT FROM ALVAREZ AND MARSAL</u>

31.     Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, on the following topics, and to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

      a.      A&M's rights and responsibilities and duties, including, but not limited to, under A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

      b.      The solicitation, offer, valuation, marketing, negotiation, and sale of the Highland bankruptcy claims or other assets by A&M on behalf of the Crusader Funds (and/or the Redeemer Committee) to any or all of Farallon, Stonehill Capital Management, LLC, Muck Holdings, LLC, Jessup Holdings, LLC, or any third party;

c.    A&M's valuation, and negotiation of the price, of the Claims, its bases therefor, and what it communicated to potential purchasers about the value of the Claims, if anything;

d.    The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to:

  i.    Any discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P., the Creditors Committee, Sidley Austin, LLP, and/or F.T.I. Consulting, regarding the Claims, any plans with regards to Highland Capital Management, L.P., the liquidation or the value of the Claims, the likelihood of and quantum of payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation;

  ii.    Any discussions with the purchasers of the Claims or other assets to, including, but not limited to, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC or Muck Holdings, LLC, regarding the Claims or other assets, Highland Capital Management, L.P., the value of the Claims, the likely payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation.

32.    As part of the Court's Order, Petitioner requests this Court to require A&M to produce the following documents at their respective depositions:

a.    All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.    A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

c.    Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

d.    Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims;

e.    All documents, agreements, contracts (including any drafts, letters of intent, confidentiality agreements, term sheets) or communications related to same,

relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

f.    Communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC, or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the claims, the liquidation of the Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

g.    Proofs of purchase of the Claims and other assets of the Crusader entities.

## V.

### RELIEF SOUGHT FROM FARALLON CAPITAL MANAGEMENT, L.L.C., MUCK HOLDINGS, LLC AND MICHAEL LIN

33.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of Farallon Capital Management, L.L.C. or Muck Holdings, LLC, and to depose Michael Lin, on the following topics, to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

a.    Farallon, Muck Holdings, LLC, and/or Lin's understanding of the value of the Claims, the assets held or controlled by or to be acquired by Highland Capital Management, L.P.., the liquidation value of the Estate of Highland Capital Management, L.P., and/or Claims, how and when the claims were expected to be paid and what the expected percentage payoff was going to be, and the bases for such understanding or belief, and what was communicated to them about the value of the Claims;

b.    The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to, any discussions with sellers of any of the Claims regarding the Claims and the sale/purchase of the Claims, discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P. regarding the Claims and his plans with regards to Highland, the value of the Claims, the likely payout of the Claims, the

pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation, or any disclosures by James Seery or Highland Capital Management, L.P. regarding how the Claims were going to be paid;

c.      Farallon and Michael Lin's awareness of material non-public information regarding Highland Capital Management, L.P. or securities held by Highland Capital Management, L.P.;

d.      Farallon and Michael Lin's relationship with James Seery or Highland Capital Management, L.P. and their knowledge of his role and their ongoing relationship with him.

34.      As part of the Court's Order, Petitioner requests this Court to require Farallon Capital Management, L.L.C., Muck Holdings LLC, and Michael Lin to produce the following documents at their respective depositions:

a.      All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.      Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

c.      Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims.

d.      All agreements, contracts, or other documents (including any drafts, letters of intent, confidentiality agreements, term sheets, or communications related to same) relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

e.      All communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings, LLC or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the Claims, the liquidation of the

Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

f.      Proofs of purchase of the Claims and other assets of the Crusader entities.

## VI.

## REQUEST FOR HEARING & ORDERS

35.     After service of this Amended Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition and order the requested relief.

36.     Document discovery is permitted by Rule 199.2. Rule 202.5 states that "depositions authorized by this Rule are governed by the rules applicable to depositions of nonparties in a pending suit. The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed…." Rule 199.2 governs such actions and "expressly allows a party noticing a deposition to include a request for production of documents or tangible things within the scope of discovery and within the witness's possession, custody, or control." *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App.—Tyler 2018) (holding that district court properly ordered document discovery in Rule 202 action). *See also* Tex. R. Civ. P. 205.1(c) (authorizing party to compel discovery from a nonparty by court order or subpoena, including a request for production served with a deposition notice). *See also City of Dall. v. City of Corsicana*, Nos. 10-14-00090-CV, 10-14-00171-CV, 2015 Tex. App. LEXIS 8753, at *15-16 (Tex. App.—Waco Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition…. Accordingly, the trial court's order is not an abuse of discretion to the extent that it allows Navarro to obtain documents in an oral deposition under rule 199 or a deposition on written questions under rule 200."); *In re Anand*, No. 01-12-01106-CV, 2013 Tex. App. LEXIS 4157, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2013) ("the language of these rules when read together

permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents").

37.    **FOR THESE REASONS**, Petitioner asks the Court to set a date for hearing on this Amended Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure.  Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of the Respondents after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as otherwise agreed to by the parties, and to produce the requested documents prior to said deposition. Petitioner also seeks any further relief to which he may be justly entitled.

Dated:  May 2, 2022                           Respectfully submitted,

                                              **SBAITI & COMPANY PLLC**

                                              */s/  Mazin A. Sbaiti*
                                              **Mazin A. Sbaiti**
                                              Texas Bar No. 24058096
                                              **Brad J. Robinson**
                                              Texas Bar No. 24058076
                                              2200 Ross Avenue – Suite 4900W
                                              Dallas, TX  75201
                                              T:  (214) 432-2899
                                              F:  (214) 853-4367
                                              E:  mas@sbaitilaw.com
                                                  bjr@sbaitilaw.com

                                              *Counsel for Petitioner*

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on this 2nd day of May, 2022.

                                              */s/ Mazin A. Sbaiti*
                                              Mazin A. Sbaiti

---

# VERIFICATION

STATE OF TEXAS   §
                 §
DALLAS COUNTY    §

Before me, the undersigned Notary Public, on this day personally appeared James Dondero (hereinafter "Affiant"), who is over the age of 21 and of sound mind and body, who being by me duly sworn, on his oath deposed and said that he has read the foregoing Amended Verified Petition to Take Deposition Before Suit, and that the statements of fact therein are within his personal knowledge and are true and correct as stated, Further, Affiant stated that the Affiant has personal knowledge because of Affiant's relationships and interactions as described therein.

_____
James Dondero

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of April, 2022, to certify which witness my hand and official seal.

My commission expires on _____ .

_____
Notary Public of the State of Texas

seal



Robin Morrison
My Commission Expires
12/9/2025
Notary ID
133483390

# Exhibit 7

CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| IN RE: | § § § | IN THE DISTRICT COURT |
| JAMES DONDERO, | § § | DALLAS COUNTY, TEXAS |
| Petitioner. | § § § | 95TH JUDICIAL DISTRICT |

## ORDER

Came on for consideration the *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* ("Petition") filed by petitioner James Dondero ("Dondero"). The Court, having considered the Petition, the responses filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Alvarez & Marsal CRF Management, LLC ("A&M"), the record, and applicable authorities, and having conducted a hearing on the Petition on June 1, 2022, concludes that Dondero's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that Dondero's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this ___ day of June, 2022.

HONORABLE MONICA PURDY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 78462315
Filing Code Description: Motion - Protect
Filing Description: AND MOTION TO ABATE
Status as of 8/12/2023 5:49 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/11/2023 4:17:48 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 8/11/2023 4:17:48 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/11/2023 4:17:48 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/11/2023 4:17:48 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/11/2023 4:17:48 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/11/2023 4:17:48 PM | SENT |

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | | |
| Defendant. | | |

---

## ORDER ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

---

On this day the Court considered Defendant Alvarez & Marsal's Motion for Protective Order and Motion to Abate. After considering the motion, and all evidence properly before it, the Court finds that Defendant Alvarez & Marsal's Motion for Protective Order and Motion to Abate should be and is hereby GRANTED.

IT IS THEREFORE ORDERED THAT Defendant Alvarez & Marsal's Motion for Protective Order and Motion to Abate is GRANTED.

Signed this _____ day of August, 2023 in Dallas County, Texas.


_____
JUDGE PRESIDING

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 78462953
Filing Code Description: Non-Signed Proposed Order/Judgment
Filing Description: PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE
Status as of 8/12/2023 5:44 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Roqui Brooks | | rbrooks@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Linda Kimball | | lkimball@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 8/11/2023 4:21:17 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/11/2023 4:21:17 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/11/2023 4:21:17 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/11/2023 4:21:17 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/11/2023 4:21:17 PM | SENT |

FILED
8/17/2023 12:08 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jenifer Trujillo DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

**NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S
MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 is hereby set for hearing on Thursday, October 12, 2023, at 9:00 a.m.  The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: August 17, 2023

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of August, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.


<u>/s/ *John T. Cox III*</u>
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 78618383
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: ON DEF MOTION TO PROTECT & ABATE
Status as of 8/17/2023 9:46 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/17/2023 12:08:17 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |

FILED
10/10/2023 7:33 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

**AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S
MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

---

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and originally set for hearing on Thursday, October 12, 2023, at 9:00 a.m. has been re-set for hearing on Thursday, December 7, 2023 at 9:30 a.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: October 10, 2023

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of October, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 80408950
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: AMENDED / MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE
Status as of 10/10/2023 8:16 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |

FILED
8/17/2023 12:08 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jenifer Trujillo DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

## NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 is hereby set for hearing on Thursday, October 12, 2023, at 9:00 a.m.  The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: August 17, 2023

Respectfully submitted,

/s/ John T. Cox III
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of August, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.


/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 78618383
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: ON DEF MOTION TO PROTECT & ABATE
Status as of 8/17/2023 9:46 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/17/2023 12:08:17 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 8/17/2023 12:08:17 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/17/2023 12:08:17 AM | SENT |

FILED
10/10/2023 7:33 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

## AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

---

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and originally set for hearing on Thursday, October 12, 2023, at 9:00 a.m. has been re-set for hearing on Thursday, December 7, 2023 at 9:30 a.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: October 10, 2023

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

---

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of October, 2023, a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 80408950
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: AMENDED / MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE
Status as of 10/10/2023 8:16 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 10/10/2023 7:33:28 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 10/10/2023 7:33:28 AM | SENT |



**FELICIA PITRE**
**DISTRICT CLERK**
George L. Allen, Sr. Courts Building
600 Commerce Street, Ste. 101
Dallas, Texas 75202-4606

**116th-F**

FILED

2023 OCT 17 AM 9: 25

FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Bryan Haynes DEPUTY



US POSTAGE PITNEY BOWES

ZIP 75202 **$ 000.54⁶**
02 4W
0000384306 MAR 23 2023

BRYAN HAYNES PC
8150 N CENTRAL EXPWY
10TH FLOOR
DALLAS TX

RETURN TO SENDER
NOT AT THIS ADDRESS

NIXIE        750    FE 1270        0010/10/23

RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD

_. 9327010708200771
9      CBTOIMP 75202 6604

BC: 75202660426        *2182-02331-10-21

116TH DISTRICT COURT
GEORGE L. ALLEN, SR. COURTS BUILDING
600 COMMERCE STREET, DALLAS, TEXAS  75202-4631

3/22/2023

Bryan Haynes
BRYAN HAYNES PC
8150 N CENTRAL EXPWY
10TH FLOOR
DALLAS TX  75206

Cause No. DC-22-10107
CHARITABLE DAF FUND LP, et al
vs.
ALVAREZ & MARSAL CRF MANAGEMENT LLC, et al

Please be advised that Haynes, Bryan has been appointed the mediator in the above styled and numbered cause. Attached is the scheduling order signed by the court.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Tonya Parker, Presiding Judge

**MEDIATOR:  Bryan Haynes @ Work: 214-649-9511**
**Update your information at:**
http://www.dallascounty.org/department/districtclerk/atty-add-form.html

SAWNIE A MCENTIRE
PARSONS MCENTIRE
MCCLEARY PLLC
1700 PACIFIC AVENUE
SUITE 4400
DALLAS, TX  75201
JOHN T III COX
Attn: GIBSON, DUNN &
CRUTCHER LLP
2001 ROSS AVE STE 2100
DALLAS, TX  75201
Bryan Haynes
BRYAN HAYNES PC
8150 N CENTRAL EXPWY
10TH FLOOR
DALLAS, TX  75206

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
|     *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
|     *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED UNIFORM SCHEDULING ORDER (LEVEL 3)
(Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following agreed order to control the schedule of this cause.

1. This case will be ready and is set for ~~Non-Jury~~/Jury Trial on **February 26, 2024, at 9:00 a.m.(the" Initial Trial Setting")**. Reset or continuance of the Initial Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2. Pretrial matters will be complete by the following dates:

a.    amended pleadings asserting
new causes of action or defenses ...................120 days before the Initial Trial Setting
b.    fact discovery closes...............................105 days before the Initial Trial Setting
c.    party seeking affirmative relief
shall designate experts and
must provide reports .......................................105 days before the Initial Trial Setting
d.    party opposing affirmative relief
shall designate experts and
must provide reports .......................................90 days before the Initial Trial Setting
e.    party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports..................................75 days before the Initial Trial Setting
f.    all expert discovery closes .....................45 days before the Initial Trial Setting

Agreed Uniform Scheduling Order (Level 3)          1 | P a g e

g.     other amended pleadings .......................45 days before the Initial Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.      Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.      Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.      Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.      No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.   This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.      The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case** __Bryan Haynes__ **whose phone number is** __214-649-9541__ **Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8      Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

Agreed Uniform Scheduling Order (Level 3)                                                    2 | P a g e

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony. **On or before ten (10)days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.** By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.    A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED 03 /21 /23 .

District Judge

**AGREED:**

By: /s/ Roger L. McCleary
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    PARSONS McENTIRE McCLEARY PLLC
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: /s/ Andrew Bean*
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

**\*Signed by permission**

FILED
11/6/2023 4:30 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF" or "Plaintiff"), and files this First Amended Petition against Defendant Alvarez & Marsal CRF Management, LLC ("A&M" or "Defendant"), and respectfully shows:

## I. DISCOVERY PLAN

1.     Plaintiff asserts that discovery should be conducted under Level 3 pursuant to Texas Rules of Civil Procedure 190.1 and 190.4.

## II. PARTIES

2.     DAF is a limited partnership organized in the Cayman Islands. DAF conducts charitable activities in the State of Texas.

3.     A&M is a foreign limited liability company organized and existing under the laws of the State of Delaware. A&M engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas. A&M has generally appeared and answered in this lawsuit.

### III. JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action as DAF currently seeks

monetary relief over $250,000 but not more than $1,000,000. The damages sought by DAF

are within the jurisdictional limits of the Court.

5.      Venue is proper under Texas Civil Practice and Remedies Code

§15.002(a)(1) because all or a substantial part of the events or omissions giving rise to this

claim occurred in Dallas County, Texas.

6.      This Court has personal jurisdiction over A&M because: (i) A&M is and has

been doing business in Texas pursuant to § 17.042 of the Texas Civil Practices and

Remedies Code (ii) A&M has purposefully availed itself of the benefits and protections

offered by the State of Texas by conducting business in this State; (iii) A&M committed

wrongful acts within this State, (iv) A&M's conduct in and contacts with this State give

rise to or relate to the causes of action alleged herein; and (v) A&M has submitted to this

Court's jurisdiction by appearing and answering in this lawsuit.

### IV. FACTUAL BACKGROUND

7.      DAF's exclusive mission involves charity. Since 2012, DAF's supporting

organizations committed over $42 million to nonprofit organizations and funded

approximately $32 million of total commitments. These charitable causes include

education, veterans, first responders, health and medical research, economic and

community development initiatives, and youth and family programs in the State of

Texas. This lawsuit is necessary because of A&M's improper withholding of assets lawfully owned by and due to DAF and A&M's associated interference with DAF's charitable mission.

8.      On or about June 30, 2016, DAF purchased shares in the Highland Crusader Fund II, Ltd. ("Crusader Fund II") from the Promethee T Fund (formerly known as Promethee Tremont Fund) ("Promethee") for in excess of $1.0 million ("DAF's Direct Interest"). In connection with DAF's acquisition of its interest in Crusader Fund II, DAF was required to execute certain Subscription Documents and became a party to (or beneficiary of) Crusader Fund II's Offering Memorandum, Memorandum of Association, By-Laws, and various other agreements governing the relationship between Crusader Fund II and its investors.

9.      DAF is the lawful owner of all right, title, and interest in and to DAF's Direct Interest and to DAF's Full Direct Interest, as described below. The Crusader Fund II is a segregated, identifiable fund held separate from other funds managed by A&M. A&M has no legitimate claim to DAF's Full Direct Interest, as described below.

10.     A&M is the investment manager of the Crusader Fund II and has been so at all times relevant to the claims asserted in this lawsuit. As the investment manager, A&M receives payment from the Crusader Fund II for A&M's management services. Upon information and belief, A&M's compensation is based on the value of Crusader

Fund II; accordingly, A&M earns more compensation if Crusader Fund II has more available funds.

11.     On or about July 12, 2021, A&M informed DAF that DAF's Direct Interest "will not exist as of June 30 NAV." A&M then refused to make distributions to DAF and treated DAF's Direct Interest as having been extinguished.

12.     DAF previously made a written demand to A&M, through A&M's legal counsel, for payment to DAF of the full value of DAF's Direct Interest, plus all related distributions and other withholdings owed DAF in regard to DAF's Direct Interest ("DAF's Full Direct Interest"). A&M initially refused to comply with this demand without legal justification.  In doing so, A&M deprived DAF of DAF's access to and right to possess and use DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. In short, A&M deprived DAF of DAF's property without any legal basis or justification.

13.     A&M's actions have deprived DAF of the use of its funds, namely the ability to earn profits on such funds to promote charitable causes, for the time period when A&M improperly exercised control over and withheld distributions—and, upon information and belief, while A&M continued to charge additional fees based on an inflated value of the Crusader Fund II.

14.     Upon information and belief, A&M is a registered investment advisor subject to the Investment Advisors Act of 1940. Notwithstanding its role as a registered

investment advisor, A&M improperly withheld DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M refused to distribute equivalent funds to DAF.

15.      A&M entered into an informal confidential and special relationship with DAF. A&M controls and manages funds in which DAF has a direct interest. DAF placed trust and confidence in A&M to control, manage, and distribute DAF's Full Direct Interest. DAF's damages arise out of A&M's refusal to recognize DAF's right to control DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M's decision, instead, to unlawfully withhold the same even though it should have been distributed to DAF.

16.      On or about February 17, 2023, after this lawsuit was filed, A&M belatedly transferred $951,060.82 to DAF, in acknowledgement of its prior breaches of its duties as manager of the Crusader Fund II. On or about March 29, 2023, A&M again transferred $139,101.94 to DAF in further acknowledgement of DAF's Direct Interests and effectively confirming A&M's prior breaches of duties.

## V. CAUSES OF ACTION

### Count One – Breach of Fiduciary Duties

17.      DAF incorporates all of the foregoing factual averments by reference as if set fully set forth herein.

18.     A&M has exercised and continues to exercise dominion and control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M holds a position of special trust and confidence with DAF regarding DAF's Full Direct Interest. A&M owes DAF common law fiduciary duties arising out of A&M's position of trust and confidence. Upon information and belief, as Investment Manager, the governing documents, including the Offering Memorandum and the advisory management agreements, required A&M to act fairly, equitably, and in accordance with reasonable commercial standards. Upon information and belief, these duties further obligated A&M to not unlawfully and improperly withhold investor's interests, including DAF Direct Interest.

19.     The fiduciary duties A&M owes DAF include, but are not limited to, the duty of loyalty—to always act in the best interest of the investor, the duty to act with utmost good faith, the duty to refrain from self-dealing, the duty of fair and honest dealing, the duty to act with integrity of the strictest kind, and the duty of candor and full disclosure. Central to the fiduciary duties A&M owed and continues to owe DAF is the duty to not deprive DAF of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M's failure and refusal to pay and return the same, even after DAF made specific written demand for DAF's Full Direct Interest, is intentional misconduct that breached one or more of the fiduciary duties A&M owed and continues to owe DAF and has caused damage to DAF.

20.     Because A&M knowingly committed a clear and serious breach of its fiduciary duties to garner additional fees for itself, DAF is entitled to disgorge fees, profits, and/or funds received by A&M in connection with its purported management of the Crusader Fund II during the period it unlawfully withheld DAF's funds.

21.     DAF also is entitled to an accounting of its interest in the Crusader Fund II to verify the accuracy of the distributions made to DAF by A&M after this suit was originally filed. This audit is also necessary to confirm all other benefits to which the DAF is entitled but which have been withheld by A&M.

22.     A&M is, therefore, liable to DAF for actual damages, disgorgement, exemplary damages, an accounting, and all other relief to which DAF is justly and legally entitled as the result of A&M's breach of fiduciary duties owed to DAF.

## Count Two – Conversion

23.     DAF incorporates by reference all of the foregoing factual and legal averments as if fully set forth herein.

24.     DAF owns and has a right to immediate possession of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M had no legitimate claim to DAF's Full Direct Interest or to the Crusader Fund II regarding DAF's Full Direct Interest.

25.    The Crusader Fund II funds were delivered to A&M for safekeeping and management. The Crusader Fund II funds were intended to be segregated from other funds managed by A&M.

26.    Upon information and belief, A&M held the Crusader Fund II funds in substantially the same form as received.

27.    DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, were separate and identifiable funds held by A&M for the benefit of DAF. DAF made demand upon A&M to immediately relinquish possession of DAF's Full Direct Interest to DAF. A&M ignored DAF's demand and A&M wrongfully exercised dominion and control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest.

28.    DAF was deprived of its lawful right to ownership and control of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, by A&M's unauthorized withholding of the same without a legally correct basis to do so.

29.    As a proximate and/or direct result of A&M's conversion of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, DAF has suffered significant damages for which damages DAF now sues.

30.     A&M is, therefore, liable to DAF for actual damages, punitive damages, and all other relief to which DAF is justly and legally entitled as the result of A&M's conversion.

### Count Three – Tortious Interference

31.     DAF respectfully incorporates by reference all of the foregoing factual and legal averments as if fully set forth herein.

32.     DAF's investment in, and relationship with, Crusader Fund II is the subject of various contracts, including, without limitation, the Crusader Fund II's Subscription Documents, Offering Memorandum, Memorandum of Association, and By-Laws.

33.     As investment manager of Crusader Fund II, A&M was and is in possession of these agreements and, during all material time, A&M was aware of the terms of these agreements.

34.     Despite knowing that A&M had no right to unilaterally cancel DAF's Direct Interest under any of the relevant transactional documents, A&M did so without justification or excuse.

35.     A&M's cancellation of DAF's Direct Interest is a direct interference with A&M's rights and expectancies under the relevant transactional documents, which has proximately caused DAF damages.

36.     Because A&M had no business justification for cancelling DAF's Direct Interest—a move that was calculated solely to harm DAF—the only conclusion is that

A&M acted with malicious intent in interfering in the relationship between DAF and Crusader Fund II.

37.     A&M is, therefore, liable to DAF for actual damages, punitive damages, and all other relief to which DAF is justly and legally entitled as the result of A&M's tortious interference.

## VI. DAMAGES

38.     DAF incorporates the foregoing factual averments, and the factual and legal averments in Counts One through Three above, as if fully set forth herein and further alleges the following in the alternative.

39.     DAF requests judgment against A&M for all of DAF's actual damages, including, without limitation, direct damages, special damages, consequential damages, lost savings, lost profits, out-of-pocket damages, future damages, and incidental damages, to which DAF is entitled, in addition to punitive or exemplary damages, prejudgment and post-judgment interest at the highest legal rate, and costs of Court.

40.     DAF further requests judgment against A&M for disgorgement of all of A&M's fees, profits, and/or other funds received in connection with its purported management of the Crusader Fund II with respect to DAF's interest in that fund during the relevant period when A&M unlawfully withheld DAF's funds, and an accounting of DAF's interest in the Crusader Fund II and of the related fees and expenses charged by A&M.

## VII. CONDITIONS PRECEDENT

41.     All conditions precedent, if any, to the claims asserted herein have been

performed, excused, waived, satisfied, or have otherwise occurred.

## VIII. JURY DEMAND

42.     DAF demands a trial by jury and tenders the jury fee pursuant to Rule 216

of the Texas Rules of Civil Procedure.

## IX.  RULE 193.7 NOTICE

43.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, DAF intends

to use any and all documents produced in A&M's discovery responses as evidence at the

time of any hearing or trial in this matter.

## PRAYER

Plaintiff, Charitable DAF Fund, L.P., respectfully requests that this Court grant

judgment in DAF's favor over and against Defendant Alvarez & Marsal CRF

Management, LLC as set forth herein, including but not limited to, for an accounting of

DAF's interest in the Crusader Fund II and the related fees and expenses charged by

A&M, for disgorgement of all of A&M's fees, profits, and/or other funds received by

A&M with respect to DAF's interest in that fund during the relevant period when A&M

unlawfully withheld DAF's funds, for all actual damages DAF has suffered, for

exemplary damages, for disgorgement, prejudgment and post-judgment interest at the

highest rate permitted by law, for DAF's costs of court, and that DAF be awarded all

other and further relief, at law and in equity, general and special, to which DAF may be

justly entitled.

Dated: November 6, 2023                    Respectfully submitted,

                                           */s/ Roger L. McCleary*
                                           Sawnie A. McEntire
                                           Texas Bar No. 13590100
                                           smcentire@pmmlaw.com
                                           **PARSONS MCENTIRE MCCLEARY
                                           PLLC**
                                           1700 Pacific Avenue, Suite 4400
                                           Dallas, Texas 75201
                                           Tel. (214) 237-4300
                                           Fax (214) 237-4340

                                           Roger L. McCleary
                                           Texas Bar No. 13393700
                                           rmccleary@pmmlaw.com
                                           **PARSONS MCENTIRE MCCLEARY
                                           PLLC**
                                           One Riverway, Suite 1800 Houston,
                                           Texas 77056
                                           (713) 960-7315 (Phone)
                                           (713) 960-7347 (Facsimile)

                                           **ATTORNEYS FOR PLAINTIFF
                                           CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

                                           */s/ Roger L. McCleary*
                                           ROGER L. MCCLEARY

3128760.3

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Roger McCleary
Bar No. 13393700
bcandis@pmmlaw.com
Envelope ID: 81355783
Filing Code Description: Amended Petition
Filing Description: FIRST
Status as of 11/7/2023 8:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 11/6/2023 4:30:26 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 11/6/2023 4:30:26 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 11/6/2023 4:30:26 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 11/6/2023 4:30:26 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 11/6/2023 4:30:26 PM | SENT |

FILED
11/13/2023 4:51 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED MOTION FOR CONTINUANCE AND FOR ENTRY OF AMENDED SCHEDULING ORDER

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this Verified Motion for Continuance and for Entry of Amended Scheduling Order ("Motion") pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, and respectfully shows the Court as follows:

## I.     REQUESTED RELIEF.

1.     Plaintiff requests a continuance of the current February 26, 2024 trial setting and entry of a First Amended Uniform Scheduling Order (Level 3), with a new trial date of August 5, 2024, (or the next available date for the Court that is mutually convenient to the parties) and with updated deadlines corresponding to the Uniform Scheduling Order (Level 3). A copy of the proposed First Amended Uniform Scheduling Order (Level 3) is attached hereto as Exhibit "A" (the "Amended Scheduling Order").

## II.     GROUNDS FOR RELIEF.

2.     This Motion is filed pursuant to Tex. R. Civ. P. 251.

3.      The current trial date is no longer feasible.

4.      On August 11, 2023, Defendant filed its *Motion for Protective Order and Motion to Abate* ("Defendant's Motion") seeking protection from Plaintiff's written discovery requests. Other than initial disclosures, no substantive discovery has occurred because of the filing of Defendant's Motion.

5.      Defendant's Motion was scheduled for hearing on October 12, 2023, but the hearing was rescheduled to December 7 because the parties entered into settlement discussions. These discussions are ongoing and Defendant's counsel has agreed that all deadlines in November and December 2023 are "pushed".

6.      In light of the foregoing, Plaintiff submits that the current Scheduling Order is no longer viable and a new scheduling order is needed.

## III.   CONCLUSION.

7.      Plaintiff respectfully requests that the Court continue the current trial setting and enter the Amended Scheduling Order attached as Exhibit "A." Plaintiff has submitted the proposed Amended Scheduling Order for agreement, but Defendant's counsel has not yet responded.

8.      This Motion is not for purposes of delay, but strictly so that justice may be done.

WHEREFOREPREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P. respectfully requests that this Motion for Continuance and Entry of Amended Scheduling

Order be granted; that the Court grant a continuance of the current trial setting; that the Court approve and enter the requested Amended Scheduling Order filed with this motion or, alternatively, a version of the Amended Scheduling Order with a trial date convenient to the Court and the parties no earlier than August 5, 2024, and with associated modification of other deadlines; and, that the Court grant Plaintiff such further relief to which it may show itself to be justly entitled to, either at law or in equity.

Dated: November 13 2023

Respectfully submitted,

/s/ Sawnie A. McEntire
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| Defendant. | § | 116th JUDICIAL DISTRICT |

## AFFIDAVIT OF SAWNIE A. MCENTIRE

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF DALLAS** | § |

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day there personally appeared Sawnie A. McEntire who, being by me first duly sworn, upon his oath deposes and states as follows:

1.      "My name is Sawnie A. McEntire. I am over twenty-one years of age and I am fully competent to make this affidavit. I am an attorney duly licensed to practice law in the State of Texas. I am a Shareholder with the law firm of Parsons McEntire McCleary PLLC, where I practice law in that firm's Dallas office located at 1700 Pacific Avenue, Suite 4400, Dallas, Texas 75201 (Tel.: 214-237-4300).  I am the lead counsel representing Plaintiff, Charitable DAF Fund, L.P. in the above-styled and numbered lawsuit ('Lawsuit'). All of the statements made in this affidavit are true and correct and are based on my personal knowledge.

2.      I have reviewed in its entirety the foregoing Plaintiff's Verified Motion for Continuance and for Entry of Amended Scheduling Order (the 'Motion') and the factual statements made in the Motion are true and correct.

Further affiant sayeth not."

_____
Sawnie A. McEntire

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by Sawnie

A. McEntire on this the ___ day of November, 2023.

GINI L ROMERO
Notary ID #7071241
My Commission Expires
September 29, 2026

_____
Notary Public, State of Texas

## CERTIFICATE OF CONFERENCE

I hereby certify that my office has contacted Trey Cox, Counsel for Defendant Alvarez & Marsal CRF Management, LLC, several times regarding the substance of this motion, including sending a proposed Amended Scheduling Order on October 24, 2023, November 1, 2023, and November 2, 2023, a revised proposed Amended Scheduling Order on November 9, 2023, related follow-up e-mail correspondence on November 13, 2023, and telephone communications with Defendant's counsel on November 2, November 8, and November 13, 2023, in an effort to resolve the issues described in this motion. Defendant's counsel has not agreed to the Amended Scheduling Order to date, therefore, this motion is necessary.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

3134332

6

# EXHIBIT A

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

**PROPOSED FIRST AMENDED UNIFORM SCHEDULING ORDER (LEVEL 3)**
(Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following first amended agreed order to control the schedule of this cause.

1.  This case will be ready and is set for **Non-Jury/Jury Trial on August 5, 2024, at 9:00 a.m. (the "Trial Setting")**. Reset or continuance of the Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2.  Pretrial matters will be complete by the following dates:

a.  amended pleadings asserting
new causes of action or defenses ..................... 120 days before the Trial Setting
b.  fact discovery closes .............................. 105 days before the Trial Setting
c.  party seeking affirmative relief
shall designate experts and
must provide reports.......................................... 105 days before the Trial Setting
d.  party opposing affirmative relief
shall designate experts and
must provide reports.......................................... 90 days before the Trial Setting
e.  party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports................................... 75 days before the Trial Setting
f.  all expert discovery closes...................... 45 days before the Trial Setting

g.      other amended pleadings ........................45 days before the Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.      Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.      Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.      Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.      No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.  This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.      The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case  Bryan Haynes                                              whose phone number is  214-649-9511                                             Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced.  Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8       Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned.  Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony.  **On or before ten (10) days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.**  By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.      A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED ___/___/___.


_____
**District Judge**

**AGREED**:


By: /s/ _____
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340


    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**


By: /s/ _____
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**


3133166.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 81590562
Filing Code Description: Motion - Continuance
Filing Description: AND ENTRY OF AMENDED SCHEDULING ORDER
Status as of 11/14/2023 8:11 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 11/13/2023 4:51:08 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 11/13/2023 4:51:08 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 11/13/2023 4:51:08 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 11/13/2023 4:51:08 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 11/13/2023 4:51:08 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 11/13/2023 4:51:08 PM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116TH JUDICIAL DISTRICT |

## ORDER FOR CONTINUANCE AND
## ENTERING AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") Verified Motion for Continuance and for Entry of Amended Scheduling Order ("Motion for Amended Scheduling Order"), and any response thereto, and arguments of counsel, the Court has determined that the Motion for Amended Scheduling Order is well taken and should be granted.

**IT IS THERFORE ORDERED** that DAF's Verified Motion for Continuance and for Entry of Amended Scheduling Order is in all things **GRANTED**.

Signed this _____ day of _____ 2023.

_____
Judge Presiding

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PROPOSED FIRST AMENDED UNIFORM SCHEDULING ORDER (LEVEL 3)
### (Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following first amended agreed order to control the schedule of this cause.

1. This case will be ready and is set for ~~Non-Jury~~/Jury Trial on **August 5, 2024, at 9:00 a.m. (the "Trial Setting")**. Reset or continuance of the Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2. Pretrial matters will be complete by the following dates:

a.    amended pleadings asserting
new causes of action or defenses .................... 120 days before the Trial Setting
b.    fact discovery closes ............................ 105 days before the Trial Setting
c.    party seeking affirmative relief
shall designate experts and
must provide reports.......................................... 105 days before the Trial Setting
d.    party opposing affirmative relief
shall designate experts and
must provide reports.......................................... 90 days before the Trial Setting
e.    party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports.................................... 75 days before the Trial Setting
f.    all expert discovery closes..................... 45 days before the Trial Setting

---

Agreed Uniform Scheduling Order (Level 3)                                    1 | P a g e

g.    other amended pleadings ........................ 45 days before the Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.    Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.    Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.    Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.    No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.  This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.    The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case  Bryan Haynes                            whose phone number is  214-649-9511                              Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8    Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned.  Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony.  **On or before ten (10) days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.**  By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.      A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED *11 / 25 / 23*.

**District Judge**

**AGREED**:

By: /s/ _____
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340


    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**


By: /s/ _____
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**


3133166.1

---

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116ᵗʰ JUDICIAL DISTRICT |

## **PROPOSED FIRST AMENDED UNIFORM SCHEDULING ORDER (LEVEL 3)**
### (Revised August 22, 2001)

In accordance with Rules 166, 190 and 192 of the Texas Rules of Civil Procedure, the Court makes the following first amended agreed order to control the schedule of this cause.

1. This case will be ready and is set for ~~Non-Jury~~/**Jury Trial on August 5, 2024, at 9:00 a.m. (the "Trial Setting").** Reset or continuance of the Trial Setting will not alter any deadlines established in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by order. If not reached as set, the case may be carried to the next week.

Trial announcements must be made in accordance with rule 3.02 Local Rules of the Civil Courts of Dallas County Texas. When no announcement is made for defendant, defendant will be presumed ready. If plaintiff fails to announce or to appear at trial, the case will be dismissed for want of prosecution in accordance with Rule 165a, Texas Rules of Civil Procedure.

2. Pretrial matters will be complete by the following dates:

a. amended pleadings asserting
new causes of action or defenses ..................... 120 days before the Trial Setting
b. fact discovery closes .............................. 105 days before the Trial Setting
c. party seeking affirmative relief
shall designate experts and
must provide reports........................................ 105 days before the Trial Setting
d. party opposing affirmative relief
shall designate experts and
must provide reports........................................ 90 days before the Trial Setting
e. party seeking affirmative relief
shall designation of rebuttal experts
and must provide reports.................................... 75 days before the Trial Setting
f. all expert discovery closes..................... 45 days before the Trial Setting

---

Agreed Uniform Scheduling Order (Level 3)                                    1 | P a g e

g.      other amended pleadings ....................... 45 days before the Trial Setting

The parties may by written agreement alter these deadlines. Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within two (2) weeks after the pleading to which they respond. Except by agreement of the party, leave of court, or where expressly authorized by the Texas Rules of Civil Procedure, no party may obtain discovery of information subject to disclosure under Rule 194 by any other form of discovery.

3.      Any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed no later than seven (7) days after the close of expert discovery, or such objection is waived. Such motions must be heard no later than thirty (30) days prior to trial. Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than seven (7) days after the close of fact discovery or such complaint is waived, except for the sanction of exclusion under Rule 193.6

4.      Motions for summary judgment or other dispositive motions must be heard no later than thirty (30) days prior to trial.

5.      Each side may have 75 hours of depositions and each party may have 50 interrogatories, subject to the conditions of Rule 190.3(b)(2) and (3).

6.      No additional parties may be joined more than eight (8) months after the commencement of this case except on motion for leave showing good cause.  This paragraph does not otherwise alter the requirements of Rule 38.  The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

7.      The parties shall mediate this case no later than thirty (30) days before the Initial Trial Setting, unless otherwise provided by court order. Named parties shall be present during the entire mediation process and each corporate party must be represented by an executive officer or corporate representative with authority to negotiate a settlement. **Unless, within 14 days of the date of this Order, the parties file and bring to the attention of the Court Coordinator a Joint Notice of Agreed Upon Substitute Mediator, the parties agree to mediate this case  Bryan Haynes                              whose phone number is  214-649-9511                          Any joint motion requesting appointment of a mediator should include a brief description of the nature of the dispute, and any novel legal, language, demographic, or other issues the parties desire to have the Court consider in appointing a mediator. The provisions contained herein regarding mediation will be strictly enforced. Parties violating the requirements of this Order will be required to show cause as to why they are in violation of same.**

8      Fourteen (14) days before the Initial Trial Setting, the parties shall exchange designations of deposition testimony to be offered in direct examination and a list of exhibits, including any demonstrative aids and affidavits, and shall exchange copies of any

exhibits not previously produced in discovery; over-designation is strongly discouraged and may be sanctioned.  Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Ten (10) days before the Initial Trial Setting, the parties shall exchange in writing their objections to the opposing party's proposed exhibits, including objections under Rule 193.7, and deposition testimony.  **On or before ten (10) days before the Initial Trial Setting, the attorneys in charge for all parties shall meet in person to confer on stipulations regarding the materials to be submitted to the Court under this paragraph and attempt to maximize agreement on such matters.** By 4 p.m. on the Thursday before the Initial Trial Setting, the parties shall file with the Court the materials stated in Rule 166(d)-(m), an estimate of the length of trial, designation of deposition testimony to be offered in direct examination, and any motions in limine. Failure to file such materials may result in dismissal for want of prosecution or other appropriate sanction. A courtesy copy of each party's pre-trial materials shall be delivered to the Judge's Chambers by 4 p.m. the Thursday before the trial setting.

9.     A pre-trial conference shall be conducted from 8 a.m. to 9 a.m. the morning of trial on all matters the parties could not resolve during their meet and confer. If, after the meet and confer between counsel, the parties anticipate more time will be needed for a pre-trial conference, a pre-trial conference shall be scheduled the week before the trial setting.

Plaintiff/Plaintiff's counsel shall serve a copy of this order on any currently named defendants all parties answering after the date of this order.

SIGNED _11_ / _25_ / _23_.

_____
                                            **District Judge**

**AGREED**:

By: /s/ _____
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340


    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**


By: /s/ _____
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**


3133166.1

---

FILED
11/30/2023 10:45 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY



**FELICIA PITRE**                                                    **NINA MOUNTIQUE**
District Clerk                                                           Chief Deputy

**DALLAS COUNTY DISTRICT CLERK'S OFFICE**

To: ALL ATTORNEYS/PARTIES

Please see the attached order signed and entered in your case.

Regards,

Felicia Pitre

Dallas County District Clerk

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82091792
Filing Code Description: Miscellanous Event
Filing Description: ESERVE COVER LETTER - ORDER 1ST AMENDED SCHEDULING
Status as of 11/30/2023 2:41 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 11/30/2023 10:45:02 AM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 11/30/2023 10:45:02 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 11/30/2023 10:45:02 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 11/30/2023 10:45:02 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 11/30/2023 10:45:02 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 11/30/2023 10:45:02 AM | SENT |

FILED
11/30/2023 7:24 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Elizabeth Ferguson DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

## SECOND AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and set for hearing on Thursday, December 7, 2023 at 9:30 a.m. has been re-set for hearing on Thursday, February 1, 2023 at 9:30 a.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: November 30, 2023

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of November, 2023, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

# Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 82126921
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: 2ND AMENDED ON MOTIONS PROTECT/ABATE
Status as of 12/1/2023 8:18 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 11/30/2023 7:24:29 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |

FILED
11/30/2023 7:24 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Elizabeth Ferguson DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

**SECOND AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ &
MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

---

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and set for hearing on Thursday, December 7, 2023 at 9:30 a.m. has been re-set for hearing on Thursday, February 1, 2023 at 9:30 a.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: November 30, 2023                    Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of November, 2023, a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 82126921
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: 2ND AMENDED ON MOTIONS PROTECT/ABATE
Status as of 12/1/2023 8:18 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 11/30/2023 7:24:29 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 11/30/2023 7:24:29 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 11/30/2023 7:24:29 PM | SENT |

FILED
1/26/2024 4:58 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

## THIRD AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and set for hearing on Thursday, February 1, 2024 at 9:30 a.m. has been re-set for hearing on Wednesday, March 6, 2024 at 1:15 p.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: January 26, 2024

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of January, 2024, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.

/s/ *John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 83859301
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: 3RD AMENDED  / MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE
Status as of 1/29/2024 8:06 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Gini Romero | | gromero@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 1/26/2024 4:58:34 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 1/26/2024 4:58:34 PM | ERROR |
| Maria Kountz | | MKountz@pmmlaw.com | 1/26/2024 4:58:34 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 1/26/2024 4:58:34 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 1/26/2024 4:58:34 PM | SENT |

FILED
2/29/2024 12:32 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Elizabeth Ferguson DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff, Charitable DAF Fund, L.P. ("DAF"), files this Motion to Compel Discovery ("Motion") pursuant to Rule 215 of the Texas Rules of Civil Procedure, seeking an order compelling Defendant, Alvarez & Marsal CRF Management, LLC's ("A&M" or "Defendant"), to provide discovery A&M refuses to answer, and would respectfully show:

## I.    INTRODUCTION & BACKGROUND

1.    DAF is suing for damages, disgorgement, and an accounting related to A&M's wrongful withholding of DAF's assets and interference with DAF's interest in an investment fund known as the "Crusader Fund."

2.    On August 2, 2023, DAF served Interrogatories and Requests for Production to A&M ("Discovery Requests"), as authorized by Rules 196 and 197 of the Texas Rules of Civil Procedure. A copy of these Discovery Requests, including proof of service, is attached to this Motion as **Exhibit A**.

1

3.      Although A&M was required to respond fully and in writing, and to produce all responsive, non-privileged documents by September 1, 2023, A&M refused to do so. Instead, A&M filed a Motion for Protective Order and Motion to Abate ("A&M's Motion") on August 11, 2023. A&M's Motion, which is procedurally inappropriate, is now scheduled to be heard on March 6, 2024. The parties engaged in extended, but ultimately unsuccessful, settlement negotiations during the interlude between the filing of A&M's Motion and the filing of this Motion.

4.      DAF's Discovery Requests involve appropriate and reasonable inquiries concerning the amount of funds and benefits A&M knowingly and wrongfully withheld. For example, Request for Production No. 1 requests A&M to "[p]roduce all account records for all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed which held any shares, funds, financial or beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016, to the present." A&M's apparent position is that it should not have to produce any records for financial accounts that it maintained, controlled, or supervised. But this is disingenuous, at best, because A&M now concedes that monies were owed to DAF.

5.      A&M cannot wrongfully withhold assets and deny DAF's ownership rights for nearly two years, forcing DAF to initiate this lawsuit, and then try to avoid basic discovery concerning currently live claims.

## II.    ARGUMENTS AND AUTHORITIES

6.      The purpose of discovery is to seek the truth so that disputes may be decided by what facts are revealed, "not by what facts are concealed." *In re K&L Auto Crushers, LLC*, 627 S.W.3d 239, 248 (Tex. 2021); *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 555 (Tex. 1990). A party may seek discovery of any matter that is relevant to the subject matter and proportional to the needs of the case. *See* Tex. R. Civ. P. 192.3(a), 192.4(b); *In re K&L Auto Crushers*, 627 S.W.3d at 247–48; *In re Turner*, 591 S.W.3d 121, 126 (Tex. 2019); *In re State Farm Lloyds*, 520 S.W.3d 595, 607 (Tex. 2017). Discovery can include evidence that may be inadmissible as long as it "appears reasonably calculated to lead to the discovery of admissible evidence." Tex. R. Civ. P. 192.3(a).

7.      A court may compel discovery pursuant to Tex. R. Civ. P. 215.1(b). A&M did not respond to Interrogatory Nos. 1-15 and Requests for Production Nos. 1-42, as required by Texas Rules of Civil Procedure 193.1. Therefore, the Court should compel A&M to respond.

8.      A&M did not timely serve objections to DAF's Discovery Requests. A party "should not move for protection when an objection to written discovery or an assertion of privilege is appropriate." Tex. R. Civ. P. 192.6. A&M was required to comply with the written discovery to the extent that it did not object. *Id.* A&M's complete refusal to provide any discovery or otherwise partially comply is impermissible under the discovery rules.

9.      A&M's proper course was to object to the extent it found any specific request(s) objectionable, instead of wholly refusing to respond to requests that are clearly relevant and within the permissible scope of discovery.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P., respectfully requests that the Court set this motion for hearing and, following the hearing, enter an Order compelling A&M to respond to the Discovery Requests and produce responsive documents within 20 days of the Court's order, and grant DAF such further relief to which it may show itself to be justly entitled to, either at law or in equity.

Dated: February 29, 2024                    Respectfully submitted,

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion and despite best efforts the counsel have not been able to resolve those matters presented.

*/s/ Roger L. McCleary*
Roger L. McCleary


## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

3134078

# EXHIBIT A

## CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

### PLAINTIFF CHARITABLE DAF FUND, L.P.'S INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT <u>ALVAREZ & MARSAL, CRF MANAGEMENT, LLC</u>

TO:   Defendant Alvarez & Marsal, CRF Management, LLC, by and through its attorneys of record, John T. Cox III and Andrew Bean, GIBSON, DUNN & CRUTCHER LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201-2923

Plaintiff, Charitable DAF Fund, L.P. ("DAF"), serves these Interrogatories and Requests for Production (collectively the "Requests") on Defendant, Alvarez & Marsal, CRF Management, LLC ("A&M") as authorized by Rules 196 and 197 of the Texas Rules of Civil Procedure. A&M is requested to respond fully and in writing, along with producing all responsive, non-privileged documents, within thirty (30) days of service.

1

## <u>INSTRUCTIONS</u>

1.      Each Request shall be construed and answered separately and shall not be combined for the purpose of supplying a common response thereto. Each answer shall set forth verbatim the Request to which it responds. The answer to a Request shall not be supplied by referring to the answer to another Request unless the Request referred to supplies a complete and accurate answer to the Request being answered. The specificity of any Request shall not be construed or understood as limiting the generality or breadth of any other Request.

2.      If you object to any part of a Request, state with particularity both the grounds and reasons for your objection, specify the portion(s) of the request to which you object, and answer so much of the Request as is not objectionable.

3.      These Requests require you to produce Documents and Communications and/or to provide information in your physical possession, custody, or control, as well as in the possession, custody, or control of any spouse, agents, employees, officers, directors, shareholders, partners, general partners, legal representatives, predecessors, successors, children, heirs, and assigns. All requested Documents, Communications, or information not subject to a valid objection that is known by, possessed by, or available to you that appears in your records must be provided.

4.      In addition to original and final versions of Documents and Communications, each Request includes all drafts, alterations, modifications, changes,

and amendments of such Documents and Communications, as well as copies non-identical to the original in any respect, including any copies bearing non-identical markings or notations of any kind.

5.      If any requested Document, Communication, or information was, but no longer is, in A&M's possession, state whether a copy thereof is in the possession, custody, or control of some other person, agency, entity, partnership, or corporation, and why such Document, Communication, or information is no longer available, who is responsible for the loss, and the circumstances under which the loss occurred.

6.      Responsive Documents and Communications are to be clearly designated so as to reflect their source, owner, and/or custodian.

7.      Each requested Document and Communication shall be produced in its entirety with an affixed bates stamp. If an identical copy appears in more than one person's files, each of the copies shall be produced or the extracted metadata shall reflect the source, owner, and/or custodian for all persons with identical copies. If a Document or Communication responsive to any Request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why the production of the remainder is not possible.

8.      In the event you do not answer any Request, in whole or in part, on the basis of an assertion of attorney-client privilege, the work-product doctrine, or any other claim of privilege or immunity, answer each Request to the extent consistent with the

privilege or immunity asserted and provide information sufficient to permit the Court to

make a determination of whether a proper basis exists for the assertion of privilege or

immunity. For all documents withheld on the basis of privilege, state the basis for your

claim with specificity that such a document need not be disclosed to permit the Court to

determine the legal sufficiency of your objection or position, and, for each such

document, identify:

a.  whether the document contains a request for legal advice and, if so,
    identify the person who requested the legal advice;

b.  whether the document contains advice as to the meaning or application
    of particular laws or rules in response to such request;

c.  any further information to explain and support the claim of privilege
    and to permit the adjudication of the propriety of that claim;

d.  the nature of the privilege (including work product) that is being
    claimed and if the privilege is being asserted in connection with a claim
    or defense governed by state law, indicate the state's privilege rule being
    invoked; and the type of document, e.g. letter or memorandum; the
    general subject of the document; and such other information as is
    sufficient to identify the document, including, where appropriate, the
    author, addressee, and other recipient of the document, and, where not
    apparent, the relationship of the author, addressee, and other recipient
    to each other.

9.    If there are no Documents or Communications responsive to a particular

Request, please provide a written response so stating.

10.    If you find the meaning of any term in any Request unclear, without waiver

of DAF's rights to seek a full and complete response to the Request, you shall assume a

reasonable meaning, state what the assumed meaning is, and respond to the Request according to the assumed meaning.

11.    DAF specifically reserves the right to serve additional Requests.

12.    These Requests are continuing in nature as to require supplemental responses in accordance with the Texas Rules of Civil Procedure if and when additional Documents, Communications, or information responsive to any of the Requests herein is/are obtained, discovered, or located between the time of responding to these Requests and the final disposition of this action.

## RULES OF CONSTRUCTION

Along with the rules of construction and instructions provided under applicable discovery rules and law, these rules of construction apply to the following written discovery:

1.    Unless specifically stated otherwise in a particular Request, the relevant time period is June 30, 2016, to Present.

2.    The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

3.    The terms "any," "all," and "each" shall each be construed as encompassing any and all.

4.      The use of the singular form of any word shall be construed to include the plural and vice versa.

5.      All phrases following the terms "including" are intended to illustrate the kinds of information responsive to each Request, and shall be construed as "including, but not limited to." Such examples are not intended to be exhaustive of the information sought and shall not in any way be read to limit the scope of a Request.

6.      The use of a verb in any tense, voice, or mood shall be construed as the use of the verb in all other tenses, voices, or moods, as necessary to bring within the scope of the Request all Documents and Communications that might otherwise be construed to be outside of its scope.

7.      These Requests specifically contemplate the production of all electronic or computer data, including associated metadata.

8.      References to an entity shall include past and present officers, directors, employees, agents, affiliates, subsidiaries, owners, partners, general partners, shareholders, representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, and/or any other person(s) acting on behalf of such entity.

## DEFINITIONS

For the purposes of these Requests, the following terms shall have the following definitions and meanings, unless expressly provided otherwise. The definition and meaning of each reference below to an entity shall automatically include the entity's past

and present officers, directors, employees, agents, affiliates, subsidiaries, owners, partners, general partners, shareholders, representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, and/or any other person(s) acting on behalf of such entity:

*A&M*, *you*, and *your*. The terms "A&M", "you" and "your" shall mean and refer to Alvarez & Marsal, CRF Management, LLC and its managing and other members, officers, agents, employees, representatives, attorneys, partners, predecessors, successors, assigns, and anyone else acting on A&M's behalf, now or at any time relevant to the response.

*Any* and *all or any and/or all*. The terms "any" and "all" and "and and/or all" should be understood and applied in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Communication(s)*. The term "communication(s)" shall mean any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, email, text message, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other

reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" shall mean reflecting, regarding, relating to, referring to, describing, evidencing, supporting, forming any basis for, or constituting.

*Crusader Fund*. The term "Crusader Fund" is defined as the Highland Crusader Fund II, Ltd., which is a subject of this Lawsuit and in which DAF purchased participating shares in or around June of 2016.

*Document or Documents*. The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the Texas Rules of Civil Procedure, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data

sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI.* The terms "Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) and/or all related metadata with respect to all such Documents/ESI.

*Identify* or *identity(ies)* (person(s)). The terms "identify" or "identity(ies)," when referring to a person, shall mean to provide the person's full first and last name; last known address, telephone number, and e-mail address; and last known place of employment.

*Identify or identity(ies)* (document(s)). The terms "identify" or "identity(ies)," when referring to a document, shall mean to provide the document's name; the date of the document's creation; the form of the document (e.g., letter, e-mail message, etc.); a

description of the substance of the document; and the identity of the person who currently possesses the document (and, if the document no longer exists, an explanation for why it no longer exists and the date on which it ceased to exist).

*Lawsuit*. The term "Lawsuit" shall mean and refer to the above-captioned lawsuit styled: *Charitable DAF Fund, L.P. v. Alvarez & Marsal, CRF Management, LLC*, Cause No. DC-22-10107; 116th Judicial District Court of Dallas County, Texas.

*Person*. The term "person" shall mean any natural person and/or any business, legal, or governmental entity or association.

*Plaintiff* and *Defendant*. The terms "Plaintiff" and "Defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, shall mean the party or parties, and where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

## FIRST SET OF INTERROGATORIES TO A&M

INTERROGATORY NO. 1:  Identify the person(s) providing the responses to these interrogatories, including all persons assisting in providing such answers and/or with whom the person(s) providing the responses consulted, interviewed, met with, or questioned in order to prepare the responses.

ANSWER:

INTERROGATORY NO. 2:  Identify by name, address, and telephone number all persons who you expect to call to testify at trial (excluding rebuttal or impeachment witnesses the necessity of whose testimony cannot be reasonably anticipated before trial) or any hearing in this Lawsuit.

ANSWER:

INTERROGATORY NO. 3:  Identify the total payments, for each calendar year from June 30, 2016, to the present and described by each most detailed category or description recorded, used, or otherwise recognized by A&M for the same, paid to or otherwise received by A&M, directly or indirectly, relating in any way to A&M's role as the investment manager for the Crusader Fund.

ANSWER:

INTERROGATORY NO. 4:  Identify by calendar year from June 1, 2016, to the present all sums of money A&M has received, directly or indirectly, from, or in connection with, the Crusader Fund that are not properly defined as management fees.

ANSWER:

INTERROGATORY NO. 5:  Identify the totals of all other payments, for each calendar year from June 1, 2016, to the present, by recipient(s) and the amount(s) for each most detailed category or description recorded, used, or otherwise recognized by A&M for the same as to each recipient, paid by, from, or on behalf of the Crusader Fund (including but not limited to from any Crusader Fund account(s)), that A&M has not included in A&M's answer to Interrogatory No. 4 above.

ANSWER:

INTERROGATORY NO. 6:  Identify all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed, which held any shares, funds, financial or

beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016, to the present.

ANSWER:

INTERROGATORY NO. 7:  Describe how A&M is compensated for its role as investment manager of the Crusader Fund and describe in general how such compensation fluctuates depending on the fund's size, performance, or other factors.

ANSWER:

INTERROGATORY NO. 8:  Identify each distribution A&M made, caused to be made, and/or authorized from the Crusader Fund (including but not limited to from any Crusader Fund account(s)) between June 1, 2016 and the present (include the amount of the distribution, the date the distribution was made, and the recipients of the distribution).

ANSWER:

INTERROGATORY NO. 9:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . ." as alleged in Paragraph 5 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 10:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel," as alleged in Paragraph 6 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 11:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent," as alleged in Paragraph 7 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 12:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds," as alleged in Paragraph 8 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 13:  Describe in general the alleged legal and factual bases, including identification of all alleged documents and communications, for your contention that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds," as alleged in Paragraph 9 of A&M's February 20, 2023 Answer.

ANSWER:

INTERROGATORY NO. 14:  Describe in general the legal and factual bases allegedly supporting your claim(s) for attorneys' fees against DAF in this Lawsuit, if any, including the terms of any fee agreement between you and your attorneys.

ANSWER:

INTERROGATORY NO. 15:  Identify the current value, including all components of the same, of DAF's capital account regarding the Crusader Fund.

ANSWER:

## FIRST SET OF REQUESTS FOR PRODUCTION TO A&M

<u>REQUEST FOR PRODUCTION NO. 1</u>:  Produce all account records for all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed which held any shares, funds, financial or beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016 to the present.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 2</u>:  Produce all documents and/or recordings concerning any communications between A&M and DAF, from June 1, 2016, to the present, concerning or relating to DAF's participating shares and/or interest in the Crusader Fund.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 3</u>:  Produce all documents and/or recordings concerning any communications between Christopher Wells and DAF, from June 1, 2016 to the present, concerning DAF's participating shares and/or interest in the Crusader Fund.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 4</u>:  Produce all documents you sent to or received from DAF from June 1, 2016, through the present.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 5</u>:  Produce all documents concerning fees paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, through the present.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 6</u>:  Produce all documents concerning any other monetary sums paid to A&M, directly or indirectly, concerning the Crusader Fund (other than those produced in response to Request No. 5 above) from June 1, 2016, through the present.

> <u>RESPONSE:</u>

<u>REQUEST FOR PRODUCTION NO. 7</u>:  Produce documents sufficient to evidence that A&M is a registered investment advisor subject to the Investment Advisors Act of 1940.

RESPONSE:

REQUEST FOR PRODUCTION NO. 8:    Produce all governing documents for the Crusader Fund, including any amendments thereto, in effect at any and all points from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 9:    Produce all awards or other decisions made by any arbitration panel or any other judicial proceeding or formal authority which you claim impacts the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 10:    Produce all documents purportedly evidencing DAF's acquisition of an interest in the Crusader Fund allegedly in violation of the Joint Plan of Distribution of the Crusader Funds and/or the Scheme of Arrangement relating to Offshore Fund II.

RESPONSE:

REQUEST FOR PRODUCTION NO. 11:    Produce all documents evidencing the capital account value of DAF's interest(s) in the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 12:    Produce all documents evidencing any distributions A&M made, caused to be made, and/or authorized from the Crusader Fund (including but not limited to from any Crusader Fund account(s)) between June 1, 2016 and the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 13:    Produce all documents evidencing each instance where A&M disclosed to DAF any of the distributions identified in Interrogatory No. 8.

RESPONSE:

REQUEST FOR PRODUCTION NO. 14:    Produce all documents purportedly evidencing any notice provided by A&M to DAF regarding A&M's intent to withhold distributions from DAF relating to the Crusader Fund between June 1, 2016, and the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 15:  Produce all documents concerning A&M's decision to withhold and/or refusal to distribute funds proportional to DAF's interest in the Crusader Fund to DAF between June 1, 2016, and the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 16:  Produce all documents concerning A&M's decision to distribute $951,060.82 to DAF on February 17, 2023.

RESPONSE:

REQUEST FOR PRODUCTION NO. 17:  Produce all documents referring, forming any basis for, or otherwise relating to A&M's decision to treat DAF as an equity holder in the Crusader Fund and to include DAF in any future distributions as reflected in the February 21, 2023 Letter from Gibson, Dunn & Crutcher LLP to Parsons McEntire McCleary PLLC (the "February 21 Letter").

RESPONSE:

REQUEST FOR PRODUCTION NO. 18:  Produce all documents referring, forming any basis for, or otherwise purportedly supporting your claim that DAF's interest(s) in the Crusader Fund had been extinguished in 2019 or 2020 as reflected in the February 21 Letter.

RESPONSE:

REQUEST FOR PRODUCTION NO. 19:  Produce a true and accurate copy of the Investment Management Agreement between the Crusader funds, House Hanover, LLC, A&M, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, dated August 4, 2016, as well as any amendments thereto.

RESPONSE:

REQUEST FOR PRODUCTION NO. 20:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . ." as alleged in Paragraph 5 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 21: Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the

doctrines of res judicata and collateral estoppel" as alleged in Paragraph 6 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 22:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent" as alleged in Paragraph 7 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 23:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds" as alleged in Paragraph 8 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 24:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds" as alleged in Paragraph 9 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 25:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, because A&M's alleged obligation, if any, have been fulfilled and discharged" as alleged in Paragraph 10 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 26:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrine of waiver" as alleged in Paragraph 12 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 27:  Produce all documents which form any basis for your contention that DAF's "claims against A&M are barred, in whole or in part, based on the doctrine of unclean hands" as alleged in Paragraph 13 of A&M's February 20, 2023, Answer.

RESPONSE:

REQUEST FOR PRODUCTION NO. 28:  Produce all documents which form any basis for your claim for attorneys' fees against DAF.

RESPONSE:

REQUEST FOR PRODUCTION NO. 29:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 30:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 31:  Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to shareholders and/or limited partners other than DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 32: Produce all documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding any distributions to shareholders and/or limited partners other than DAF in connection with Crusader Fund at any time(s) from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 33: Produce all documents accounting for or identifying any and/or all distributions from the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 34: Produce all documents showing the proportion of DAF's interest in all distributions from the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 35: Produce all documents accounting for or identifying any and/or all distributions from the Crusader Fund withheld from DAF from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 36: Produce all documents accounting for or identifying any and/or all fees earned, and expenses incurred, by A&M related to the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 37: Produce all documents accounting for or identifying all monetary sums paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, to the present, other than those reflected in any accounting produced by A&M in response to Request No. 36 above.

RESPONSE:

REQUEST FOR PRODUCTION NO. 38: Produce all documents concerning any third-party financial audits concerning the Crusader Fund from June 1, 2016, to the present.

RESPONSE:

<u>REQUEST FOR PRODUCTION NO. 39</u>:  Produce all documents concerning any internal financial audits concerning the Crusader Fund from June 1, 2016, to the present.

      <u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 40</u>:  Produce all documents concerning any analyses, from June 1, 2016, to the present, of the performance and/or valuation of the underlying assets held by the Crusader Fund.

      <u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 41</u>:  Produce all documents concerning any analyses from June 1, 2016, to the present, of the performance and/or valuation of the Crusader Fund overall.

      <u>RESPONSE</u>:

<u>REQUEST FOR PRODUCTION NO. 42</u>:  Produce all documents you may introduce as exhibits at trial in this Lawsuit.

      <u>RESPONSE</u>:

Respectfully submitted,

/s/ Roger L. McCleary
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**Counsel for Plaintiff Charitable DAF
Fund, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, a true and correct copy of this instrument
was served on Defendant's counsel of record in accordance with the Texas Rules of Civil
Procedure.

/s/ Roger L. McCleary
Roger L. McCleary

3125360.6

| From: | no-reply@efilingmail.tylertech.cloud |
|---|---|
| To: | Roqui Brooks |
| Subject: | [EXTERNAL] Notification of Service for Case: DC-22-10107, CHARITABLE DAF FUND LP, et al vs. ALVAREZ & MARSAL CRF MANAGEMENT LLC, et al for filing Service Only, Envelope Number: 78141502 |
| Date: | Wednesday, August 2, 2023 3:17:49 PM |



# Notification of Service

Case Number: DC-22-10107
Case Style: CHARITABLE DAF FUND
LP, et al vs. ALVAREZ & MARSAL CRF
MANAGEMENT LLC, et al
Envelope Number: 78141502

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| Case Number | DC-22-10107 |
| Case Style | CHARITABLE DAF FUND LP, et al vs. ALVAREZ & MARSAL CRF MANAGEMENT LLC, et al |
| Date/Time Submitted | 8/2/2023 3:16 PM CST |
| Filing Type | Service Only |
| Filing Description | DAF Written Discovery Requests to A&M |
| Filed By | Ian Salzer |
| | CHARITABLE DAF FUND LP: Roqui Brooks (rbrooks@pmmlaw.com) Other Service Contacts not associated with a party on the case: Linda Kimball (lkimball@pmmclaw.com) Gini Romero (gromero@pmmlaw.com) Andrew Bean (ABean@gibsondunn.com) |

| Service Contacts | Tim Miller (tmiller@pmmlaw.com) |
|---|---|
| | Wendy Cassidy (WCassidy@gibsondunn.com) |
| | Roger McCleary (rmccleary@pmmlaw.com) |
| | Sawnie McEntire (smcentire@pmmlaw.com) |
| | John Cox (TCox@gibsondunn.com) |
| | Marshall King (MKing@gibsondunn.com) |
| | |
| | Charitable DAF Fund, L.P. : |
| | Beatrice Candis (bcandis@pmmlaw.com) |

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 30 days. | |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Roger McCleary
Bar No. 13393700
bcandis@pmmlaw.com
Envelope ID: 85050938
Filing Code Description: Motion - Compel
Filing Description: DISCOVERY
Status as of 3/1/2024 8:18 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 2/29/2024 12:32:06 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 2/29/2024 12:32:06 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 2/29/2024 12:32:06 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 2/29/2024 12:32:06 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 2/29/2024 12:32:06 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 2/29/2024 12:32:06 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/29/2024 12:32:06 PM | SENT |

FILED
2/29/2024 9:25 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Elizabeth  Ferguson  DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
PROTECTIVE ORDER AND MOTION TO ABATE,
AND EVIDENTIARY OBJECTIONS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this
Response (the "Response") in Opposition to Defendant Alvarez & Marsal CRF
Management, LLC's ("A&M" or "Defendant") Motion for Protective Order and Motion
to Abate ("Motion"), and Evidentiary Objections, and would respectfully show the
following:

## INTRODUCTION AND BACKGROUND

A&M devotes significant energy in its Motion discussing matters irrelevant to the
present dispute, including the bankruptcy of Highland Capital Management, and
factually unsupported attempts to link DAF with James Dondero. It is also curious that
A&M elects to criticize DAF for filing this lawsuit when A&M effectively admitted it
wrongfully failed to make distributions to DAF until *after* DAF was forced to file this
lawsuit. A&M's criticisms are even more illogical in light of its ultimate concession to

1

treat DAF as a vested equity holder in "Offshore Fund II." Indeed, A&M's conduct

following the filing of this lawsuit screams volumes that DAF's claims had and continue

to have substantial merit. Under any analysis, this lawsuit is not moot.

A&M's Motion is also weighed down by irrelevant and misleading rhetoric. This

Response is supported by the Declaration of Mark Patrick, which is attached as **Exhibit**

**1**, and which establishes that: (1) Mr. Dondero did not, and does not, control DAF; (2) Mr.

Dondero's purported actions which A&M alleges are linked to DAF have no relevance to

the issues in this lawsuit; (3) there remains a live controversy between DAF and A&M;

and (4) discovery from A&M is necessary to protect DAF's interests as an investor in

Offshore Fund II.

This Response is further supported by the Declaration of Roger L. McCleary,

which is attached as **Exhibit 2**, and which establishes that: (1) DAF provided early notice

to A&M that DAF disputed A&M's interpretation of the arbitration award (referred in

A&M's Motion) and whether that award allegedly extinguished DAF's *direct* (as opposed

to *indirect*) interest in Offshore Fund II (*see* "July 16, 2021, Letter" attached as **Exhibit 2-**

**A**);[1] and (2) DAF did not waive any, and in fact expressly reserved all, of its rights against

A&M when receiving distributions owed to DAF, which would include the February 17,

2023 and March 29, 2023 distributions (*see* "February 13, 2023, E-Mail" attached as **Exhibit**

---

[1] Exhibit 2-A is correspondence from counsel for DAF to A&M making clear DAF's position that its direct interest could not be extinguished and could not be cancelled.

**2-B**).[2] In sum, for a variety of factual and legal reasons, the Arbitration Award referenced in the Motion does not impact DAF's direct interests.[3]

## <u>RESPONSE TO MOTION TO ABATE</u>

A&M's request to abate is procedurally defective. The Motion fails to comply with basic requirements for an abatement:

- there is no indication of how long the case should be abated; and

- there is no indication of what would be required to remove or terminate the abatement.

The case law cited by A&M confirms that an abatement must "identify an effective cure, and . . . ask the court to abate the suit until the defect is corrected." *Truong v. City of Houston*, 99 S.W.3d 204, 216 (Tex. App.—Hous. [1st Dist.] 2002). The failure to address these two requirements is fatal to the Motion.

Rather than engage in legitimate discovery, A&M attempts to stop DAF from obtaining an audit of all benefits to which DAF may be entitled as an equity owner. Indeed, A&M opted to file its Motion rather than providing basic discovery that should allow DAF to make these determinations. Under these circumstances, neither DAF nor this Court should accept A&M's unilateral *ipsi dixit* that no more benefits are forthcoming.

---

[2] Exhibit 2-B is an e-mail from Roger McCleary, counsel for DAF, to A&M counsel Marshall King (and others).
[3] Exhibits 1, 2, 2-A, and 2-B to this Response are incorporated herein by reference in their entirety.

DAF recently filed an Amended Petition that makes clear that the prior distributions to it as an equity holder do not resolve DAF's causes of action or the damages at issue. As the Amended Petition alleges:

- A&M breached an informal fiduciary duty owed to DAF.

- A&M tortiously inferred with DAF's rights as an equity holder in Offshore Fund II.

- A&M diverted monies owed to DAF, and DAF is entitled to recover damages for the loss of use of all wrongfully withheld funds.

- DAF is entitled to an audit to confirm whether additional distributions or other benefits are owed to DAF and that DAF has received all past and current benefits to which it is entitled. *See Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 674 (Tex. App.—Hous. [14th Dist.] 2016); *T.F.W. Mgt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717-18 (Tex. App.—Hous. [14th Dist.] 2002).

- Because A&M has breached its informal fiduciary duties, DAF also seeks disgorgement of fees taken by A&M during the period of its breaches.

## RESPONSE TO REQUEST FOR PROTECTIVE ORDER

A&M's request for a protective order is equally infirm. A&M largely relies on the false premise that this case is moot. *Growden*, the sole case upon which A&M relies, involved a defendant's "unconditional waiver" of the debt underlying a declaratory judgment action. *Growden v. Good Shepherd Health Sys.*, 550 S.W.3d 716, 722 (Tex. App.—Texarkana 2018, no pet.) (emphasis added). But that factual scenario is far removed from A&M's unilateral representation that it has paid DAF everything that DAF owes while

refusing to supply any backup documentation. Indeed the plaintiff here—DAF—

disputes that A&M's obligations here have been fully satisfied.

*Growden* clarifies that a case is moot "if the court's ruling on the merits can no

longer affect the parties' rights or interests." *Id.* But that is not the case here. In *Picton v.*

*Excel Group, Inc.,* a defendant-employer argued that a plaintiff-employee's FLSA claim

based on a dispute over overtime pay was moot because the defendant-employer

"offered to provide plaintiff with the exact relief requested" in the form of a corrected tax

return and even payment of the cost to file an amended tax return. 192 F. Supp. 2d 706,

710 (E.D. Tex. 2001). The court found, however, that the defendant-employer did *not*

provide the "exact relief requested" because there remained claims for "statutory

attorney's fees and liquidated damages, among other damages, because Defendant

committed a willful violation of the FLSA." *Id.* at 711.

As described above, there are several remaining issues in this case, including

claims for disgorgement, equitable relief and exemplary damages. Moreover, A&M does

not argue that it provided DAF the "exact relief requested." Motion, p. 1. By attempting

to unilaterally dictate what A&M believes to be the relief to which DAF is entitled, A&M

is invading the province of this Court and the jury. This case is not moot. *See also Martinez*

*v. Allstate Vehicle & Prop. Ins. Co.,* No. 4:19-CV-2975, 2020 WL 6887753, *2 n.1 (S.D. Tex.

Nov. 20, 2020) (Insurer's attempt to make additional payment to plaintiff "for a tactical

reason: to moot her TPPCA claim" did not dispose of plaintiff's claim; "[n]otwithstanding

the [additional] payment, [the plaintiff] was forced to hire a lawyer only due to [the insurer's] initial errors . . . forcing [plaintiff] to file suit to recover her damages." The insurer "belatedly attempted to resolve the case" by making the additional payment, which "failed to make [the plaintiff] whole, because she had been forced—by [the insurer's] initial refusal to pay . . . to pursue litigation and pay an attorney." Further, insurer's position that the additional payment constituted a settlement was rejected due to lack of "evidence of a mutual intent to avoid litigation by accepting a contract and relinquishing the relevant legal claims.").

It is also noteworthy that the Motion for Protection attaches a declaration that does not support any purported discovery burden or any other procedural objection to DAF's discovery. A&M carries the burden to demonstrate the legitimacy of its objections, which it has failed to do. *See In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 248 (Tex. 2021), *reh'g denied* (Sept. 3, 2021) ("[A] party resisting discovery must do more than 'make conclusory allegations that the requested discovery is unduly burdensome.'"). The attached declaration does nothing to carry this burden, and any attempt to do so at this late date violates Tex. R. Civ. P. 193.4.

Notwithstanding the flawed premise on which A&M's Motion is founded, A&M's specific arguments concerning discovery fail for the following reasons:

- Of the 15 interrogatories—10 less than the amount permitted under the Texas Rules (*see* Tex. R. Civ. P. 190.3(b)(3), 190.4(b))—seven (7) are ordinary contention interrogatories under Rule 197.1 that are

specifically targeted at A&M's own allegations.[4] *See In re Sting Soccer Group, LP*, 05-17-00317-CV, 2017 WL 5897454, at *5 (Tex. App.—Dallas Nov. 30, 2017) ("Rule 197.1 permits a party to serve contention interrogatories . . .").

- Nine (9) of DAF's requests for production are directed at A&M's defenses in this case.[5] A&M cannot claim any burden is imposed by requests seeking documents and information supporting A&M's alleged defenses in this lawsuit. *Sting Soccer*, 2017 WL 5897454 at *7 ("[T]he rules permit parties to seek discovery supporting its adversary's specific factual and legal contentions.").

- Regarding the remaining (non-contention-based) discovery requests, A&M has made no showing that the requests are harassing, abusive, or anything other than ordinary discovery requests. A&M contends that DAF's requests are overbroad because they encompass "a period of more than seven years," but this is not an arbitrary timeframe: it is directly tied to DAF's acquisition of its interest in the Offshore Fund II.[6] *See id.* at 251-52 ("[T]he sheer volume of a discovery requests does not in itself render the request irrelevant or overbroad as a matter of law . . . discovery requests and orders are overbroad if they are not properly 'tailored with regard to time, place, or subject matter.'").

- A&M's complaint that DAF seeks "'all documents' on broad topics, such as 'A&M's decision to withhold and/or refusal to distribute funds'"[7] is a red herring—not only does A&M conveniently omit the remainder of RFP 15, which explicitly limits the request to "funds proportional to DAF's interest in [Offshore Fund II],"[8] this topic goes to the very heart of this matter. *See Sting Soccer*, 2017 WL 5897454 at *7 ("[R]equests for production may properly ask a party to provide 'all,' 'each,' or 'every' document pertaining to a relevant, narrow subject of the litigation."); *K & L*, 627 S.W.3d at 248 ("Evidence is relevant if it has 'any tendency' to make 'more or less probable' a fact that is 'of consequence in determining the action.'").

---

[4] Motion, Ex. 2, pp. 12-13, Interrogatory Nos. 9-15.
[5] Motion, Ex. 2, pp. 16-18, RFP Nos. 17-28.
[6] Plaintiff's Original Petition, filed August 15, 2022 ("Petition"), ¶ 8.
[7] Motion, p. 4
[8] Motion, Ex. 2, p. 16.

In any event, A&M fails to provide any evidence to support any alleged burden imposed by DAF's discovery requests. *See K & L*, 627 S.W.3d at 253 ("[A] party resisting discovery must do more than 'make conclusory allegations that the requested discovery is unduly burdensome.'"). Thus, A&M's argument is reduced to the incorrect notion that A&M should not be required to respond to any discovery because it contends it has no liability. This defies the entire structure and purpose of civil litigation in Texas. *Sting Soccer*, 2017 WL 5897454 at *6 ("The purpose of discovery is to find the truth and parties are permitted to choose which discovery devices to use in the search for the truth.").

For these reasons, A&M's Motion for Protective Order should be denied.

## <u>EVIDENTIARY OBJECTIONS</u>

Attached to A&M's Motion is the Declaration of Christopher Wells ("Wells Declaration") that purports to demonstrate (in conclusory fashion) the basis for A&M's misguided argument that DAF's claims are moot. However, the Wells Declaration is objectionable in several respects and should be stricken:

- Paragraphs 2-4 of the Wells Declaration include rank hearsay. *See* Tex. R. Evid 801, 802. These paragraphs are also unsupported by an adequate foundation upon which personal knowledge could be demonstrated, and they are not supported by any references to any purported supporting documentary evidence.

- Paragraphs 2-3 of the Wells Declaration are also conclusory and include unqualified, self-serving, and impermissible legal conclusions as to (1) what the Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P. arbitration ("Redeemer Arbitration") panel purportedly "directed" regarding DAF's interest in Offshore Fund II (*see* ¶ 2 of the Wells Declaration)

in an arbitration to which DAF was not a party; (2) A&M's purported actions "pursuant to the arbitration panel's order"; and (3) that A&M purportedly "heard no timely objection from [DAF]" (*see* ¶ 3 of the Wells Declaration).

▪ Paragraphs 2-4 of the Wells Declaration also fail to provide any support for A&M's argument that DAF's discovery requests are unduly burdensome, which is the only pertinent inquiry. Paragraphs 2-4 should be stricken as irrelevant. *See* Tex. R. Evid. 401, 402.

Also attached to A&M's Motion is the Declaration of Andrew H. Bean ("Bean Declaration") to which DAF objects and moves to strike, together with the various exhibits in purported support of the Motion. DAF objects to and moves to strike the Bean Declaration and the attachments as follows:

▪ Exhibit 1 (February 21, 2023, Marshall King letter), Exhibit 3 (April 29, 2019, Award), Exhibit 4 (February 22, 2021, Order), Exhibit 5 (May 19, 2022, Amended Complaint and Objection to Claims), Exhibit 6 (May 2, 2022, Verified Amended Petition to Take Deposition), and Exhibit 7 (Order Denying Petition to Take Deposition) to the Bean Declaration contain inadmissible hearsay, hearsay within hearsay, and are not relevant. *See* Tex. R. Evid. 801, 802, 401, 402, and 405.

▪ Also as to Exhibit 1 to the Bean Declaration, DAF already had notified A&M that DAF's receipt of any distribution from or on behalf of A&M was without prejudice to or waiver of any of DAF's claims, causes of action, rights, or damages against A&M. *See* Exhibit 2-B. In any event, Exhibit 1 to the Bean Declaration is conclusory and also inadmissible on the grounds of hearsay, hearsay within hearsay, and relevance. *See* Tex. R. Evid. 801, 802, 401, 402 and 405.

▪ Exhibit 1 to the Bean Declaration also impermissibly contains references to settlement discussions in violation of Tex. R. Evid. 408.

▪ Exhibits 5 and 6 to the Bean Declaration amount to no more than irrelevant hearsay and provide no justification for A&M's

withholding of the funds at issue or any basis for the Motion. Exhibits 5 and 6 to the Bean Declaration should be stricken. *See* Tex. R. Evid. 801, 802, 401, 402 and 405.

A&M is fully aware that DAF was not a party to the Redeemer Arbitration—and A&M never suggests otherwise. The Redeemer Arbitration award (which does not identify the interests described in confidential arbitration exhibit "RC411"—which DAF did not possess at any relevant time—referred to in paragraph F.a.v., p. 17, of Exhibit 3 to the Bean Declaration) and Exhibits 3-4 from the Bean Declaration afford no justification for A&M's withholding of the funds at issue or any basis for the Motion.

## PRAYER

Plaintiff, Charitable DAF Fund, L.P., respectfully requests that its evidentiary objections be sustained, and that Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate be denied in their entirety, and that DAF be awarded all other and further relief, at law and in equity, general and special, to which DAF may be justly entitled.

Dated: February 28, 2024

Respectfully submitted,

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*
SAWNIE A. MCENTIRE

3128876

# EXHIBIT 1

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## DECLARATION OF MARK PATRICK

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to Texas Civil Practice and

Remedies Code Section 132.001 and declares as follows:

1. My name is Mark Patrick. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct. I submit this declaration in support of Charitable DAF Fund, L.P.'s ("DAF") Response in Opposition to Defendant Alvarez & Marsal CRF Management, LLC's ("A&M") Motion for Protective Order and Motion to Abate ("Motion").

2. Since approximately March 24, 2021, I have been the Managing Member of Charitable DAF GP, LLC ("DAF GP") and/or related control entity over DAF. In connection with my duties as DAF GP's Managing Member, I am generally familiar with the ownership and organizational structure of DAF GP and the other entities described in this declaration. DAF GP has been the general partner of DAF continuously from at least March 24, 2021, through the present. DAF GP, as DAF's general partner, has controlled DAF continuously since at least March 24, 2021, through the present.

1

3.   As the Managing Member of DAF GP (or related control entity), I am the duly authorized person to act on behalf of DAF. As such, I am familiar with the organizational structure of DAF and its present and historical status. DAF is a charitable fund that helps fund several charitable causes throughout the country, including veteran's welfare associations, women's shelters, public works, and education.

4.   Since approximately March 24, 2021, I have also been the Director of Charitable DAF HoldCo, Ltd. ("DAF HoldCo"). DAF HoldCo is the sole (100%) limited partner of DAF.

5.   Before I assumed the position of Director for DAF, DAF's sole director was Grant J. Scott, a resident of North Carolina. James Dondero has never been a director of DAF. Mr. Dondero was the original managing member of DAF GP, but has not held that role since 2012. Mr. Dondero has not been a member, manager, or director of DAF, DAF GP, or DAF HoldCo since he relinquished his position as the managing member of DAF GP in 2012.

6.   Since at least March 24, 2021, as the Managing Member of DAF GP and the Director of DAF HoldCo, I have continuously had exclusive control to make operational decisions for DAF GP, DAF HoldCo, and DAF, including (but not limited to) the decision of whether to cause DAF to file suit upon claims it may have, including the above-captioned lawsuit against A&M ("Lawsuit"). I did not consult with Mr. Dondero in connection with my decision to file this Lawsuit.

7.   Attached as Exhibit 3 to A&M's Motion is a copy of an arbitration award ("Arbitration Award") that was entered in a matter (the "Arbitration") involving the Redeemer Committee of the Highland Crusader Fund ("Redeemer Committee") and Highland Capital Management, L.P. ("HCM"). DAF was not a party to this Arbitration. DAF's Direct Interest in the Crusader Fund was acquired directly by DAF.

8.   In this Lawsuit, among other relief, DAF seeks an accounting of all distributions made since 2016, when the Arbitration was commenced. This information is necessary for DAF to ensure that it has been treated fairly as a full shareholder in the Crusader Fund. DAF also seeks disgorgement of fees paid to A&M during the period when A&M was refusing to honor DAF's interest in the Crusader Fund, as well as its interest in all distributions owed to DAF for the period in which the funds were withheld from DAF by A&M.

9.  The Rule 202 Petition attached as Exhibit 6 to A&M's Motion has nothing to do with this Lawsuit. Indeed, DAF also was not a party to that proceeding. I had no knowledge concerning the filing of the Rule 202 Petition.

10. Nor does the contempt proceeding referenced on page 4 of A&M's Motion have anything to do with this Lawsuit. Further, the contempt proceeding is currently on appeal before the 5th Circuit as Case No. 22-11036.

11. My name is Mark Patrick my date of birth is April 23, 1972, and my address is 6716 Glenhurst Drive, Dallas, Texas 75254, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 28th day of February 2024.

_____

Mark Patrick

# EXHIBIT 2

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## DECLARATION OF ROGER L. MCCLEARY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to Texas Civil Practice and Remedies Code Section 132.001 and declares as follows:

1. My name is Roger L. McCleary. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct. I submit this declaration in support of Charitable DAF Fund, L.P.'s ("DAF") Response in Opposition ("Response") to Defendant Alvarez & Marsal CRF Management, LLC's ("A&M") Motion for Protective Order and Motion to Abate ("Motion"). I am a counsel of record for DAF in this matter and I have read the Response in its entirety.

2. Attached hereto as Exhibit 2-A is a true and correct copy of what is described in the Response as the "July 16, 2021, Letter" from DAF to A&M.

3. Attached hereto as Exhibit 2-B is a true and correct copy of what is described in the Response as the "February 13, 2023, E-Mail" from DAF counsel Roger L. McCleary to A&M counsel Marshall King (and others).

1

4.  My name is Roger L. McCleary, my date of birth is July 3, 1959, and my business address is One Riverway, Suite 1800, Houston, Texas 77056, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.


Executed in Harris County, State of Texas, on the 28th day of February 2024.


_____
Roger L. McCleary


3152686

2

# EXHIBIT 2-A



July 16, 2021'


**Via Email:** **cwells@alvarezandmarsal.com**


Christopher Wells
Alvarez and Marsal-NACR
One East Washington Street
Suite 1850
Phoenix, AZ  85004

<strong>Re:</strong> <em>The Charitable DAF Fund Ltd. Interest in the Highland Crusader Fund II, Ltd.</em>

Dear Mr. Wells:

I write on behalf of the Charitable DAF Fund, Ltd. As you know, the DAF owns a percentage interest in the Crusader Funds which we understand is undergoing a liquidation and potential distribution on July 30, 2021.

We further understand that you have taken the position that the DAF's interests was extinguished via an arbitration award between Crusader, the Redeemer Committee, and Highland Capital Management, LP. We write to inform you that the DAF was not a party to the arbitration, nor does the arbitral panel have jurisdiction over the DAF.  As such, the arbitral award is of no effect as to the DAF. This is made further true given that no one has ever sought to confirm the award in any court against the DAF. At most, the settlement between the Redemer Committee, Crusader Fund, and Highland Capital Management, LP, posits that Highland would not object to the cancelation of the DAF's interest. But that is not equivalent to an action to cancel the DAF's interest. To highlight the problematic you face: if the DAF's interest has indeed been rescinded, then why has no one has even sought to tender the DAF the consideration it paid for the interest?

Were a cancellation to unilaterally occur by you, the DAF would be entitled to damages directly from your firm under a myriad of theories of liability, including under several breaches of fiduciary duty under state and federal law, including the Advisers Act of 1940.

The purpose of this letter is to seek your confirmation by close of business Eastern Time, Monday, July 19, 2021, that you will not make any distribution of any capital or assets on behalf of the Crusader Funds to any investor in Crusader before we are able to resolve the question of the DAF's ownership.

October 25, 2016
Page 2


     Please reach out to me if you have any questions or concerns. Pls cc my paralegal Kim James on any email correspondence (krj@SbaitiLaw.com).

          Sincerely,


          */s/ Mazin A. Sbaiti*
          Mazin A. Sbaiti, Esq.

# EXHIBIT 2-B

**Roger L. McCleary**

| | |
|---|---|
| **From:** | Roger L. McCleary |
| **Sent:** | Monday, February 13, 2023 5:08 PM |
| **To:** | King, Marshall R. |
| **Cc:** | Cox, Trey; Rosenthal, Michael A.; Bean, Andrew; Sawnie A. McEntire |
| **Subject:** | RE: [EXTERNAL] Crusader Funds distribution |

Marshall,

Please be advised that Charitable DAF Fund, L.P.'s ("DAF") receipt of this or any other distribution from Alvarez & Marsal CRF Management, LLC ("A&M"), or on its behalf, is without prejudice to or waiver of any of DAF's claims, causes of action, rights, or damages against A&M. DAF expressly reserves the same.

Subject to the foregoing, we do not know what wire instructions are on record for DAF - or if they have changed - but the wire instructions are as follows (for confirmation purposes only):

> Bank: NexBank SSB
> Bank Address: 2515 McKinney Avenue, 11th Floor, Dallas, TX 75201
> Account: Charitable DAF Fund LP
> Account No: 1623057
> Routing: 311973208

Please let us know if these wire instructions are the same as those currently on record.

Regards, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmlaw.com

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** King, Marshall R. <MKing@gibsondunn.com>
**Sent:** Saturday, February 11, 2023 8:05 AM
**To:** Sawnie A. McEntire <smcentire@pmmlaw.com>; Roger L. McCleary <rmccleary@pmmlaw.com>
**Cc:** Cox, Trey <TCox@gibsondunn.com>; Rosenthal, Michael A. <MRosenthal@gibsondunn.com>; Bean, Andrew <ABean@gibsondunn.com>
**Subject:** [EXTERNAL] Crusader Funds distribution

Sawnie, Roger:

Please provide us with current wire instructions for Charitable DAF so that the forthcoming distribution can be made at the end of the week.  If I don't hear from you by Tuesday it will go via the wire instructions that the Funds have on record for your client.

**Marshall R. King**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3905 • Fax +1 212.351.5243
MKing@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

# Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Roger McCleary
Bar No. 13393700
bcandis@pmmlaw.com
Envelope ID: 85035815
Filing Code Description: Response
Filing Description: IN OPPOSITION TO PROTECTIVE ORDER, MOTION
TO ABATE, AND EVIDENTIARY OBJECTIONS
Status as of 2/29/2024 2:28 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 2/29/2024 9:25:03 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 2/29/2024 9:25:03 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 2/29/2024 9:25:03 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 2/29/2024 9:25:03 AM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 2/29/2024 9:25:03 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 2/29/2024 9:25:03 AM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PROPOSED ORDER DENYING DEFENDANT'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

The Court, having considered Defendant Alvarez & Marsal CRF Management, LLC's ("A&M" or "Defendant") Motion for Protective Order and Motion to Abate ("Motion"), Plaintiff Charitable DAF Fund, L.P.'s ("DAF") Response in Opposition ("Response"), any reply, and any arguments of counsel, is of the opinion that the Motion should be DENIED.

**IT IS THEREFORE ORDERED** that A&M's Motion for Protective Order and Motion to Abate are DENIED in their entirety.

**IT IS FURTHER ORDERED** that Defendant, Alvarez & Marsal CRF Management, LLC shall serve full and complete answers to all served interrogatories (Nos. 1-15) and full and complete responses to all requests for production, (Nos. 1-42), and produce responsive documents to DAF's document requests within thirty (30) days.

SIGNED on this _____ day of _____, 2024.

_____
**District Judge**

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL DISCOVERY

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") Motion to Compel Discovery ("Motion"), seeking an order compelling Defendant, Alvarez & Marsal CRF Management, LLC's ("A&M" or "Defendant") to respond and produce discovery, any response, and any arguments of counsel, is of the opinion that the Motion should be GRANTED.

**IT IS THEREFORE ORDERED** that DAF's Motion to Compel Discovery is GRANTED.

**IT IS FURTHER ORDERED** that Defendant, Alvarez & Marsal CRF Management, LLC shall serve full and complete answers to all served interrogatories (Nos. 1-15) and full and complete responses to all requests for production, (Nos. 1-42), and produce responsive documents to DAF's document requests within twenty (20) days.

SIGNED on this _____ day of _____, 2024.

_____
**District Judge**

FILED
3/1/2024 11:52 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Plaintiff Charitable DAF Fund, L.P.'s Motion to Compel Discovery, filed February 29, 2024, is set for hearing on **April 3, 2024, at 1:15 p.m.**, before the Honorable Judge Tonya Parker in the 116th Judicial District Court of Dallas County, Texas at 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

[1]

Dated: March 1, 2024

Respectfully submitted,

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

3152748

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Roger McCleary
Bar No. 13393700
bcandis@pmmlaw.com
Envelope ID: 85098137
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: MOTION TO COMPEL SET 4/3/1:15 P.M.
Status as of 3/4/2024 8:51 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 3/1/2024 11:52:50 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 3/1/2024 11:52:50 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 3/1/2024 11:52:50 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 3/1/2024 11:52:50 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 3/1/2024 11:52:50 AM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 3/1/2024 11:52:50 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 3/1/2024 11:52:50 AM | SENT |

FILED
3/5/2024 1:46 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

**FOURTH AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ &
MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

---

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023 and set for hearing on Wednesday, March 6, 2024 at 1:15 p.m. has been re-set for hearing on Wednesday, April 3, 2024 at 1:15 p.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: March 5, 2024

Respectfully submitted,

*/s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Patrick A. Vickery
Texas Bar No. 24115905
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
pvickery@gibsondunn.com

*Counsel for Defendant*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of March, 2024, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.


*/s/ John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 85211847
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: 4TH AMD / MOTION PROTECT SET 4/3/@ 1:15 P.M.
Status as of 3/6/2024 8:37 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 3/5/2024 1:46:43 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 3/5/2024 1:46:43 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 3/5/2024 1:46:43 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 3/5/2024 1:46:43 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 3/5/2024 1:46:43 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 3/5/2024 1:46:43 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 3/5/2024 1:46:43 PM | SENT |

FILED
3/29/2024 2:08 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kryshawna Charleston DEPUTY

CAUSE NO. DC-22-10107

CHARITABLE DAF FUND, L.P.,

    Plaintiff,

    v.

ALVAREZ & MARSAL, CRF
MANAGEMENT, LLC

    Defendant.

IN THE DISTRICT COURT

DALLAS COUNTY, TEXAS

116TH JUDICIAL DISTRICT

## **DEFENDANT'S COMBINED OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

Defendant Alvarez & Marsal CRF Management, LLC ("A&M") files this combined opposition to Plaintiff Charitable DAF Fund, L.P.'s ("DAF") Motion to Compel Discovery and reply in support of its own Motion for Protective Order and Motion to Abate, and would respectfully show as follows:

## INTRODUCTION & SUMMARY OF ARGUMENT

In Plaintiff's own words, the reason for this case was Plaintiff's assertions about "A&M's improper withholding of assets lawfully owned by and due to DAF." FAC ¶¶ 7, 12–14. That issue is long resolved. As DAF acknowledges, A&M agreed to treat it as a limited partner in Offshore Fund II, has *already paid* DAF for its entire share of distributions previously withheld, and has made subsequent distributions to DAF—in total, well over $1 million. *See* Pltf's Resp. to Def's Mot. at 1–2; FAC ¶¶ 16. And although DAF is entitled to nothing more, A&M has even offered to pay DAF hundreds of thousands in attorneys' fees and interest to compensate it for the lost value of that money.

Yet, in its usual spirit of wanting to "burn down the place," DAF presses on. *See* Def's Mot. for Protection at 3. Despite getting exactly what it wanted from A&M, DAF demands responses to **forty-two requests for production and fifteen interrogatories**—the bulk of which seek information having nothing to do with this case. Its sole justification: developing a supposedly "unresolved" claim for breach of fiduciary duty and the equitable remedies that purportedly follow, including disgorgement, exemplary damages, and an accounting. *See* Pltf's Resp. at 5.

But that justification implodes when considered with even minimal scrutiny. Just because DAF *says* A&M owes it a fiduciary duty doesn't make it so. Relationships of "trust and confidence" (FAC ¶ 15) do not arise out of thin air, and it is *DAF's burden* to identify the legal authority establishing such a relationship. It has not done so, and indeed A&M is not aware of any such authority creating a fiduciary duty between a third-party fund manager and downstream investors in the subject fund. DAF's breach of fiduciary duty claim should be seen for what it is: a ploy to harass A&M with pointless discovery and prolong a suit that's been resolved for months.

The Court should abate this matter until DAF identifies a live controversy between the parties justifying any kind of discovery at all. At minimum, however, the Court should deny DAF's motion to compel discovery and enter an order protecting A&M from DAF's broad and harassing requests bearing little resemblance to the issues identified in the First Amended Petition.

## RESPONSE TO EVIDENTIARY OBJECTIONS

The Court should disregard DAF's objections to the Declarations of Christopher Wells and Andrew Bean to the extent they relate to publicly available information that is not in dispute and whose accuracy cannot reasonably be questioned. That includes Exhibits 4 and 5 of the Bean Declaration, which are judicial opinions issued by the United States Bankruptcy Court for the Northern District of Texas, *see* Tex. R. Evid. 202(a) (obligating court to judicially notice federal court decisions when requested by a party and supplied with the necessary information); as well as Exhibit 6 to the Bean Declaration, which is a verified petition filed by Mr. James Dondero in the 95th Judicial District of Dallas County, Texas, and Exhibit 7 to the Bean Declaration, which is an order issued by the same court denying Mr. Dondero's request for pre-suit discovery, *see* Tex. R. Evid. 201 (permitting court to judicially notice facts generally known within its territorial jurisdiction and that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). A&M respectfully requests that the Court take judicial notice of the findings and conclusions contained within those public documents.

The Court should also reject DAF's Rule 408 and 801 objections to Exhibit 1 of the Bean Declaration, which is a letter from A&M's counsel to DAF's. The letter provides the background of the parties' dispute and explains A&M's position that the Crusader Funds' distributions to DAF and agreement to recognize its limited partnership interests in the Offshore Fund II going forward render the present controversy moot. The letter does not run afoul of Rule 408 or 801 because it is not being offered "to prove or disprove the validity or amount of a disputed claim," *see* Tex. R.

Evid. 408, nor is it being offered for the truth of any statements it contains, *see id.* 801. Instead, it is being offered to establish DAF's bad faith in pursuing its claim even after receiving over $1 million in distributions and full recognition as a limited partner in Offshore Fund II—facts DAF does not and cannot dispute. In fact, DAF attaches similar correspondence from its counsel as an exhibit to its opposition to A&M's motion.

Relatedly, DAF's Rule 801 objection to Exhibit 3 of the Bean Declaration—the April 29, 2019 Arbitration Final Award—is meritless. A&M attaches the arbitration decision to aid the court in its understanding of the background of this case, not for the truth of any facts set forth in the award. DAF is free to dispute the legal significance of any part of the award it wishes, but it cannot dispute the existence of the award or that it affects a host of entities with legal relationships to one or both parties in this case.

Finally, the Court should reject DAF's objections to the Wells Declaration. Paragraphs 3–6 of the Wells Declaration set forth matters within Mr. Wells' personal knowledge—as A&M's Managing Director—regarding A&M's understanding of the arbitration decision and the monies that the Crusader Funds subsequently distributed to DAF as limited partner of the Offshore Fund II. No rule of civil procedure or evidence prohibits a party (or a party representative) from executing a declaration as to matters within their personal knowledge; indeed, parties do so all the time at varying stages of litigation prior to presenting live testimony, just as DAF has done in presenting declarations in response to A&M's motion. *See Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997). And notably, DAF does not and cannot dispute the key contents of the Wells Declaration: the Crusader Funds' recognition of DAF as a limited partner in Offshore Fund II, the amounts distributed to DAF, and the existence of an arbitration award.

## ARGUMENT

**I.     The Court should abate this action because there is no live controversy.**

This case cannot proceed in its current posture because there is no live dispute between the parties with respect to the underlying controversy. *See Growden v. Good Shepherd Health Sys.*, 550 S.W.3d 716 (Tex. App.—Texarkana 2018, no pet.) (explaining that a case is moot when the plaintiff "can no longer show an actual or threatened injury on her underlying claim, and any controversy between [the parties] as to that claim has been extinguished").

The underlying controversy that forms the basis of DAF's Amended Petition is DAF's naked assertion that A&M improperly withheld assets to which it was entitled as limited partner of Offshore Fund II.  *See* FAC ¶ 7 ("This lawsuit is necessary because of A&M's improper withholding of assets lawfully owned by and due to DAF and A&M's associated interference with DAF's charitable mission.").  A&M did so in furtherance of its duties to the Crusader Funds, and in recognition of the arbitration award that investors in the Crusader Funds had obtained *directing* the extinguishment of DAF's partnership interest.  *See* Wells Decl. ¶¶ 2-3.  But after DAF complained, A&M has since distributed to DAF everything that it is owed as a limited partner in the Offshore Fund II, and it has agreed to make all appropriate distributions to DAF going forward. This case is therefore moot.

The best that DAF can do to avoid that inevitability is to manufacture an "unresolved" breach of fiduciary duty claim and assert entitlement to various forms of relief that might flow from such a breach, such as disgorgement, exemplary damages, and an audit.  *See* FAC ¶ 22 ("A&M is, therefore, liable to DAF for actual damages, disgorgement, exemplary damages, an accounting, and all other relief to which DAF is justly and legally entitled *as the result of A&M's breach of fiduciary duties owed to DAF*.") (emphasis added).  But DAF's own pleadings doom its breach of fiduciary duty claim from the start because they do not identify the source of the

4

supposed fiduciary relationship between A&M—the investment manager of the Crusader Funds—

and DAF—a limited partner in one of the funds, Offshore Fund II, which is a Bermuda company.

*Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)

(explaining that the "existence of a fiduciary relationship between the plaintiff and defendant" is

a required element of a breach of fiduciary duty claim).

And without an underlying fiduciary duty owed to DAF, much less an intentional breach

of that duty, DAF is not entitled to the remedies of disgorgement, exemplary damages, or an

accounting.  *See Pennington v. Ray*, No. 05-98-01168-CV, 2001 WL 33067, at *2 (Tex. App.—

Dallas Jan. 16, 2001, no pet.) (concluding that plaintiff was not entitled to an accounting because

she could not prevail on her breach of fiduciary duty claim, among others); *Power v. Chapman*,

994 S.W.2d 331, 336 (Tex. App.—Texarkana 1999, no pet.) (denying request for accounting when

plaintiff could not establish underlying fiduciary relationship forming the basis of the request);

*Bohatch v. Butler & Binion*, 905 S.W.2d 597, 604 (Tex. App.—Houston [14th Dist.] 1995), *aff'd*

*as modified*, 977 S.W.2d 543 (Tex. 1998) (declining to consider the issue of exemplary damages

because evidence was insufficient to support jury's finding of breach of fiduciary duty); *see*

*Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P.*, 255 S.W.3d 807, 821 (Tex. App. 2008) (holding

that disgorgement was not proper remedy absent an underlying fiduciary relationship).[1]

Accordingly, there is no live controversy as to DAF's invented breach of fiduciary duty

claim or any of the associated equitable remedies DAF seeks.  This case is therefore moot and

should be abated until DAF can identify a live dispute between the parties.

---

[1] DAF's request for an "accounting" is especially perplexing, since DAF receives, as every limited partner does, annual audited financial statements concerning the Crusader Funds and periodic reports from A&M, as investment manager, of the Funds' assets and financial activity.

**II.     At minimum, a protective order is necessary to protect A&M from the cost, burden, and harassment that would result from responding to DAF's discovery requests.**

The Court should, at a minimum, enter an order protecting A&M from having to respond to DAF's harassing and overbroad discovery requests, which are largely untethered from the single (and now moot) issue underlying DAF's petition.   Some examples of DAF's overbroad and harassing requests are illustrative.

In particular, DAF's interrogatories seek information on broad and irrelevant topics such as:

- "the total payments . . . from June 30, 2016 to present and described by each most detailed category or description . . . paid to or otherwise received by A&M . . . relating in any way to A&M's role as the investment manager for the Crusader Fund"

- "each distribution A&M made . . . from any Crusader Fund account(s)"

*See* Bean Decl. Exh. 2 at 11–13.  The scope of DAF's requests for production is equally broad and disconnected from the allegations in the First Amended Petition:

- "all documents concerning any other monetary sums paid to A&M, directly or indirectly, concerning the Crusader Fund"

- "all awards or other decisions made by any arbitration panel or any other judicial proceeding or formal authority, which you claim impacts the Crusader Fund"

- "all documents evidencing any distributions A&M made, caused to be made, and/or authorized from the Crusader Fund"

*Id.* at 14–15.

DAF cannot provide a single reason (and indeed there is none) why topics like (i) payments to A&M by the Crusader Funds (not by DAF) for serving as the Crusader Funds' investment manager and (ii) distributions that A&M has made to *other* limited partners are relevant or will lead to the discovery of relevant evidence.  Any such reasons—to the extent they ever existed— no longer have any force now that A&M has given DAF everything to which it is entitled.

These examples simply spotlight some of the more egregious discovery requests served by DAF. There are more. The burden imposed by these requests is "far out of proportion to any benefit" to DAF, given that their "justification . . . is rendered moot." *In re John Crane Inc.*, No. 01-03-00698-CV, 2003 WL 22682613, at *3 (Tex. App. Nov. 13, 2003); *In re Taylor*, No. 14-14-00600-CV, 2015 WL 576591, at *1 (Tex. App. Feb. 10, 2015) (confirming that a defendant need not produce discovery when the underlying litigation has become moot). But even absent the issue of mootness, DAF's discovery requests are out of touch with the dispute pleaded on the face of the First Amended Petition, which simply concerns A&M's treatment of *DAF* in A&M's capacity as investment manager of the Crusader Funds. Discovery concerning topics outside the bounds of that dispute—including but not limited to distributions to *other* limited partners—is irrelevant and prohibited. Tex. R. Civ. P. 192.3(a).

## CONCLUSION

The Court should grant A&M's motion and abate this case until DAF can articulate a live legal dispute between the parties that has not already been fully resolved. Alternatively, and at a minimum, it should deny DAF's motion to compel and enter an order protecting A&M from having to serve responses and objections to DAF's broad and harassing discovery requests.

Dated: March 29, 2024

Respectfully submitted,

By: */s/ John T. Cox III*
John T. Cox III
Texas Bar No. 24003722
Patrick A. Vickery
Texas Bar No. 24115905
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Ste. 2100
Dallas, Texas 75201-2923
Telephone: (214) 698-3256
Facsimile: (214) 571-2923
TCox@gibsondunn.com
PVickery@gibsondunn.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of March, 2024, the foregoing document was electronically filed with the Court using CM/ECF, which will send notification of this filing to counsel of record in the above-captioned case.

*/s/ John T. Cox III*
John T. Cox III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 86111851
Filing Code Description: Objection
Filing Description: DEFENDANTS' COMBINED OPPOSTION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY & REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER & MOTION TO ABATE
Status as of 3/31/2024 5:32 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 3/29/2024 2:08:21 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 3/29/2024 2:08:21 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 3/29/2024 2:08:21 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 3/29/2024 2:08:21 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 3/29/2024 2:08:21 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 3/29/2024 2:08:21 PM | SENT |

FILED
4/1/2024 4:42 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and files this Reply in Support ("Reply") of its Motion to Compel ("Motion") and in response to Defendant, Alvarez & Marsal CRF Management, LLC's ("A&M") Combined Opposition to Plaintiff's Motion to Compel Discovery and Reply in Support of Motion for Protective Order and Motion to Abate ("Combined Opposition"), and respectfully shows the Court as follows:

1.    Although A&M never moved to dismiss under Rule 91a and is not entitled to seek summary judgment at this early stage, A&M nevertheless improperly attacks the merits of DAF's claims and does so without any support under Texas law or the Texas Rules of Civil Procedure. A&M certainly knows it is not entitled to seek dispositive relief under Rule 166a because A&M has completely barred DAF from any meaningful discovery. *See Levinthal v. Kelsey-Seybold Clinic, P.A.*, 902 S.W.2d 508, 512 (Tex. App.—Houston [1st Dist.] 1994, no writ) ("[Rule 166a] clearly contemplates that the trial court will allow the parties a reasonable opportunity to conduct discovery before granting summary judgment."). The timetable to seek dismissal under Rule 91a also has long since

[1]

passed. Thus, A&M is forced to fabricate a procedural attack which is not recognized by Texas law. Fundamentally, A&M simply seeks to avoid discovery and what it may show.

2.      Although DAF is not required to provide specific legal authorities to support the merits of its claims at this early stage, DAF has plainly alleged the elements for a breach of informal fiduciary duty claim. *See Matter of Est. of Poe*, 648 S.W.3d 277, 287 (Tex. 2022) ("[A]n 'informal' fiduciary duty may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence.'"); *Mary E. Bivins Found. v. Highland Capital Mgt. L.P.*, 451 S.W.3d 104, 113 (Tex. App.—Dallas 2014) (leaving open possibility that a fund's investment manager could be a fiduciary of the fund's investors upon proof of "informal trust or confidential relationship").

3.      It is curious that A&M only focuses on DAF's fiduciary duty claim and ignores DAF's other claims for conversion and tortious interference.[1] Indeed, in the alternative, to the extent necessary, DAF is entitled to damages arising from A&M's wrongful conduct.[2] *See R.J. Suarez Enterprises Inc. v. PNYX L.P.*, 380 S.W.3d 238, 342 (Tex. App.—Dallas 2012) (loss of use damages for conversion); *Winkle Chevy-Olds-Pontiac, Inc. v. Condon*, 830 S.W.2d 740, 746 (Tex. App.—Corpus Christi 1992), *writ dismissed* (Sept. 9, 1992) (lost profits damages for conversion); *Fluor Enterprises, Inc. v. Conex Intern. Corp.*, 273 S.W.3d 426, 446-47 (Tex. App.—Beaumont 2008, pet. denied) (lost profits for tortious

---

[1] Plaintiff's First Amended Petition, ¶¶ 23-37.
[2] Plaintiff's First Amended Petition, ¶¶ 39-40.

interference). DAF also has claims for punitive damages and an accounting.[3]  DAF is entitled to recover, at a minimum, lawful pre-judgment interest. *See Associated Tel. Directory Publishers, Inc. v. Five D's Pub. Co., Inc.*, 849 S.W.2d 894, 898 (Tex. App.—Austin 1993, no writ) ("The measure of damages for conversion is the fair-market value of the property at the time of conversion, plus legal interest."); *Sandare Chem. Co., Inc. v. WAKO Intern., Inc.*, 820 S.W.2d 21, 25 (Tex. App.—Fort Worth 1991, no writ) (awarding prejudgment interest to victim of tortious interference).

4.      In its Combined Opposition, A&M confuses discovery burdens and is again attempting to require DAF to affirmatively support DAF's discovery requests even though A&M wholly failed to timely object or respond to specific discovery requests. In any event, DAF is entitled to broad discovery, "to allow parties to obtain the fullest knowledge of facts and issues before the disposition of their case." *Levinthal*, 902 S.W.2d at 512; *see* Tex. R. Civ. P. 192.3(a). Each of the requests A&M now highlights in its Combined Opposition relate to the heart of the dispute between DAF and A&M—the failure to make distributions to DAF and the associated liability issues.[4] The only objections A&M now belatedly raises in its Combined Opposition—*for the first time*—relate to the breadth of DAF's requests.[5] But A&M's objection in this regard was waived because A&M failed to timely object when it had a duty to do so. Tex. R. Civ. P. 193.2(e).

---

[3] Plaintiff's First Amended Petition, ¶¶ 39-40.
[4] Combined Opposition, 6.
[5] Combined Opposition, 6-7.

Moreover, A&M's proper remedy was to object to the purported breadth of DAF's requests and otherwise respond to the extent not objected to. Tex. R. Civ. P. 192.6, 193.1, 193.2. Even further, A&M's declarations do nothing to support any purported burden other than to provide conclusory statements without describing the nature of the purported burden on a request-by-request basis. Accordingly, this objection was also waived.

WHEREFORE PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P. respectfully requests that the Court grant DAF's Motion, enter an Order compelling A&M to respond to the Discovery Requests and produce responsive documents within 20 days of the Court's order, and grant DAF such further relief to which it may show itself to be justly entitled to, either at law or in equity.

Dated: April 1, 2024

Respectfully submitted,

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

3154908

[5]

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 86165826
Filing Code Description: Response
Filing Description: REPLY IN SUPPORT OF ITS MOTION TO COMPEL
Status as of 4/2/2024 9:15 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Roqui Brooks | | rbrooks@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 4/1/2024 4:42:10 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Linda Kimball | | lkimball@pmmclaw.com | 4/1/2024 4:42:10 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 4/1/2024 4:42:10 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 4/1/2024 4:42:10 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 4/1/2024 4:42:10 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 4/1/2024 4:42:10 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Beatrice Candis | | bcandis@pmmlaw.com | 4/1/2024 4:42:10 PM | SENT |

FILED
4/8/2024 4:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the "Parties") file this Agreed Motion for Continuance and Entry of Amended Scheduling Order ("Motion") pursuant to Tex. R. Civ. P. 251 and respectfully shows the Court as follows:

## I.    REQUESTED RELIEF

1.    The Parties request a continuance of the current August 5, 2024 trial setting to no earlier than January 27, 2025, and a corresponding extension of the deadlines on the Court's First Amended Uniform Scheduling Order (Level 3), entered November 25, 2023, in accordance with the proposed Order Granting Agreed Motion for Continuance attached as **Exhibit A**.

## II.    GROUNDS FOR RELIEF

2.    On August 11, 2023, A&M filed its *Motion for Protective Order and Motion to Abate* ("A&M's Motion") seeking protection from DAF's written discovery requests.

Other than initial disclosures, no substantive discovery has occurred because of the filing of A&M's Motion.

       3.      A&M's Motion was scheduled for hearing on October 12, 2023, but the hearing was rescheduled to December 7, 2023, because the Parties entered into settlement discussions. In the interim, A&M's counsel agreed that all deadlines in November and December 2023 were "pushed," and DAF filed a Verified Motion for Continuance and for Entry of Amended Scheduling Order on November 13, 2023. The Court entered the First Amended Uniform Scheduling Order the following week.

       4.      The hearing on A&M's Motion was then rescheduled again to March 6, 2024, because the Parties' settlement discussions were ongoing.

       5.      Prior to the March 6, 2024 hearing, last-minute conflicts necessitated again rescheduling the hearing on A&M's Motion. The hearing was rescheduled for April 3, 2023, but by mutual agreement the hearing was postponed to explore the possibility of further negotiations.

       6.      Because no discovery has occurred while A&M's Motion has been pending, the current case deadlines are no longer tenable.

## III.    CONCLUSION

       7.      The Parties respectfully request that the Court continue the current trial setting to no earlier than January 27, 2025 and enter the attached order extending the case deadlines.

8.    This Motion is not for purposes of delay, but strictly so that justice may be done.

WHEREFORE PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P. and Defendant, Alvarez & Marsal CRF Management, LLC respectfully request that this Agreed Motion for Continuance be granted; that the Court grant a continuance of the current trial setting to no earlier than January 27, 2025; that the Court grant a continuance of all other case deadlines in accordance with the attached proposed order; and that the Court grant the Parties all such further relief to which they may show themselves to be justly entitled, either at law or in equity.

Respectfully submitted,

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: */s/  John T. Cox*
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

3152925

# EXHIBIT A

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER GRANTING AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the "Parties") Agreed Motion for Continuance and Entry of Amended Scheduling Order ("Motion"), and noting that this Order is agreed, is of the opinion that the Motion should be GRANTED.

**IT IS THEREFORE ORDERED** that the current trial setting is reset for January 27, 2025.

**IT IS FURTHER ORDERED** that the deadline to file amended pleadings asserting new causes of action or defenses is extended to September 29, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete fact discovery is extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate experts and provide reports is extended to October 14, 2024.

[1]

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this _____ day of _____, 2024.


_____
**District Judge**

[2]

**AGREED**:

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,**
**CHARITABLE DAF FUND, L.P.**

By: */s/ John T. Cox*
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,**
**ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

3155689

[3]

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 86416913
Filing Code Description: Motion - Continuance
Filing Description: AGREED / AND ENTRY OF AMENDED SCHEDULING ORDER
Status as of 4/8/2024 4:23 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 4/8/2024 4:00:58 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 4/8/2024 4:00:58 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 4/8/2024 4:00:58 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 4/8/2024 4:00:58 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 4/8/2024 4:00:58 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 4/8/2024 4:00:58 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 4/8/2024 4:00:58 PM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER ~~GRANTING~~ Denying AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and

Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the

"Parties") Agreed Motion for Continuance and Entry of Amended Scheduling Order

("Motion"), and noting that this Order is agreed, is of the opinion that the Motion should

be ~~GRANTED~~ DENIED.

IT IS THEREFORE ORDERED that the current trial setting is reset ⌐not⌐ ~~reset for January 27, 2025.~~

IT IS FURTHER ORDERED that the deadline to file amended pleadings asserting

new causes of action or defenses is extended to September 29, 2024.

IT IS FURTHER ORDERED that the ~~deadline~~ to complete fact discovery is

extended to October 14, 2024.

IT IS FURTHER ORDERED that the deadline for parties seeking affirmative relief

to designate experts and provide reports is extended to October 14, 2024.

[1]

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this 18th day of April, 2024.

**District Judge**

[2]

AGREED:

By: /s/ Sawnie A. McEntire
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: /s/ John T. Cox
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

3155689

[3]

FILED
4/24/2024 9:24 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY



**FELICIA PITRE**

District Clerk

**NINA MOUNTIQUE**

Chief Deputy

## DALLAS COUNTY DISTRICT CLERK'S OFFICE

To: ALL ATTORNEYS/PARTIES

Please see the attached order signed and entered in your case.

Regards,

Felicia Pitre

Dallas County District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 86996400
Filing Code Description: E-SERVED COPY OF ORDER
Filing Description:
Status as of 4/24/2024 11:34 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 4/24/2024 9:24:29 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 4/24/2024 9:24:29 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 4/24/2024 9:24:29 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 4/24/2024 9:24:29 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 4/24/2024 9:24:29 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 4/24/2024 9:24:29 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 4/24/2024 9:24:29 AM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER ~~GRANTING~~ Denying AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and

Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the

"Parties") Agreed Motion for Continuance and Entry of Amended Scheduling Order

("Motion"), and noting that this Order is agreed, is of the opinion that the Motion should

be ~~GRANTED~~. DENIED.

IT IS THEREFORE ORDERED that the current trial setting is [not] ~~reset for January 27, 2025.~~

IT IS FURTHER ORDERED that the deadline to file amended pleadings asserting

new causes of action or defenses is extended to September 29, 2024.

IT IS FURTHER ORDERED that the deadline to complete fact discovery is

extended to October 14, 2024.

IT IS FURTHER ORDERED that the deadline for parties seeking affirmative relief

to designate experts and provide reports is extended to October 14, 2024.

[1]

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this 18th day of _April_, 2024.

**District Judge**

[2]

AGREED:

By: _/s/ Sawnie A. McEntire_
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: _/s/ John T. Cox_
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**

3155689

[3]

FILED
4/24/2024 10:39 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Plaintiff Charitable DAF Fund, L.P.'s Motion to Compel Discovery, filed February 29, 2024, is set for hearing on **May 8, 2024, at 1:15 p.m.**, before the Honorable Judge Tonya Parker in the 116th Judicial District Court of Dallas County, Texas at 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

[1]

Dated: April 24, 2024

Respectfully submitted,

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire

3157897

[2]

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Sawnie Mcentire
Bar No. 13590100
bcandis@pmmlaw.com
Envelope ID: 87002916
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: PLAINTIFF MOTION TO COMPEL SET 5/8 @ 1:15 P.M.
Status as of 4/24/2024 12:05 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Linda Kimball | | lkimball@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 4/24/2024 10:39:11 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 4/24/2024 10:39:11 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 4/24/2024 10:39:11 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 4/24/2024 10:39:11 AM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Roqui Brooks | | rbrooks@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 4/24/2024 10:39:11 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Beatrice Candis | | bcandis@pmmlaw.com | 4/24/2024 10:39:11 AM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER GRANTING AMENDED AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the "Parties") Amended Agreed Motion for Continuance and Entry of Amended Scheduling Order ("Motion"), and noting that this Order is agreed, is of the opinion that the Motion should be GRANTED.

**IT IS THEREFORE ORDERED** that the current trial setting is reset for January 27, 2025.

**IT IS FURTHER ORDERED** that the deadline to file amended pleadings asserting new causes of action or defenses is extended to September 29, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete fact discovery is extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate experts and provide reports is extended to October 14, 2024.

1

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this 29th day of ____April____, 2024.

_____
**District Judge**

2

AGREED:

By: */s/ Sawnie A. McEntire*

    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: */s/ John T. Cox III\**

    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**
*Signed by permission

FILED
5/1/2024 1:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY



**FELICIA PITRE**                                     **NINA MOUNTIQUE**
District Clerk                                            Chief Deputy

### DALLAS COUNTY DISTRICT CLERK'S OFFICE

To: ALL ATTORNEYS/PARTIES

Please see the attached order signed and entered in your case.

Regards,

Felicia Pitre

Dallas County District Clerk

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 87264771
Filing Code Description: E-SERVED COPY OF ORDER
Filing Description:
Status as of 5/1/2024 1:45 PM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 5/1/2024 1:29:57 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 5/1/2024 1:29:57 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 5/1/2024 1:29:57 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 5/1/2024 1:29:57 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 5/1/2024 1:29:57 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 5/1/2024 1:29:57 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 5/1/2024 1:29:57 PM | SENT |

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER GRANTING AMENDED AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and

Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the

"Parties") Amended Agreed Motion for Continuance and Entry of Amended Scheduling

Order ("Motion"), and noting that this Order is agreed, is of the opinion that the Motion

should be GRANTED.

**IT IS THEREFORE ORDERED** that the current trial setting is reset for January 27,

2025.

**IT IS FURTHER ORDERED** that the deadline to file amended pleadings asserting

new causes of action or defenses is extended to September 29, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete fact discovery is

extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief

to designate experts and provide reports is extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this 29th day of April, 2024.

_____
**District Judge**

2

AGREED:

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    PARSONS MCENTIRE MCCLEARY PLLC
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,**
**CHARITABLE DAF FUND, L.P.**

By: */s/ John T. Cox III\**
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,**
**ALVAREZ & MARSAL CRF MANAGEMENT, LLC**
*Signed by permission

9

FILED
4/24/2024 4:30 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AMENDED AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("DAF"), and Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the "Parties") file this Amended Agreed Motion for Continuance and Entry of Amended Scheduling Order ("Motion"), and respectfully shows the Court as follows:

## I.    REQUESTED RELIEF

1.    Pursuant to Tex. R. Civ. P. 251, the Parties request a continuance of the current August 5, 2024 trial setting to no earlier than January 27, 2025, and a corresponding extension of the deadlines on the Court's First Amended Uniform Scheduling Order (Level 3), entered November 25, 2023, in accordance with the proposed Order Granting Amended Agreed Motion for Continuance attached as **Exhibit A** ("Proposed Agreed Order").

## II.    GROUNDS FOR RELIEF

2.    On August 11, 2023, A&M filed its *Motion for Protective Order and Motion to Abate* ("A&M's Motion") seeking protection from DAF's written discovery requests.

1

Other than initial disclosures, no substantive discovery has occurred because of the filing of A&M's Motion.

3.     A&M's Motion was scheduled for hearing on October 12, 2023, but the hearing was rescheduled to December 7, 2023, because the Parties entered into settlement discussions. In the interim, A&M's counsel agreed that all deadlines in November and December 2023 were "pushed," and DAF filed a Verified Motion for Continuance and for Entry of Amended Scheduling Order on November 13, 2023. The Court entered the First Amended Uniform Scheduling Order the following week.

4.     The hearing on A&M's Motion was then rescheduled again to March 6, 2024, because the Parties' settlement discussions were ongoing.

5.     Prior to the March 6, 2024 hearing, last-minute conflicts necessitated again rescheduling the hearing on A&M's Motion. The hearing was rescheduled for April 3, 2023, along with a hearing on DAF's Motion to Compel Discovery (filed March 1, 2024), but by mutual agreement the hearing on these motions was postponed to explore the possibility of further settlement negotiations.

6.     The Parties have agreed to schedule a prompt mediation, subject to entry of the Proposed Agreed Order. To facilitate the potential for resolution through mediation rather than through trial, the Parties wish to conduct that mediation without incurring significant additional costs and expenses in conducting discovery or otherwise developing this case, if possible, in advance of mediation.

7.      Moreover, because the Parties have engaged in settlement negotiations, without the benefit of mediation, no discovery has occurred while A&M's Motion has been pending and the current August 5, 2024, trial setting and case deadlines are no longer tenable for the Parties. Accordingly, the Parties consent and agree to a continuance pursuant to Rule 251 of the Texas Rules of Civil Procedure.

8.      The Parties will not request any further agreed continuances absent unforeseen and compelling reasons.

## III.    CONCLUSION

9.      The Parties respectfully request that the Court continue the current trial setting to no earlier than January 27, 2025 and enter the Proposed Agreed Order filed with this Motion resetting the trial date and extending the case deadlines.

10.      This Motion is not for delay only, but so that justice may be done.

WHEREFORE PREMISES CONSIDERED, Plaintiff, Charitable DAF Fund, L.P. and Defendant, Alvarez & Marsal CRF Management, LLC respectfully request that this Amended Agreed Motion for Continuance be granted; that the Court grant a continuance of the current trial setting to no earlier than January 27, 2025; that the Court grant a continuance of all other case deadlines in accordance with the Proposed Agreed Order filed with this Motion; and that the Court grant the Parties all such further relief to which they may show themselves to be justly entitled, either at law or in equity.

Respectfully submitted,

By: */s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 133937000
rmccleary@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
One Riverway, Suite 1800
Houston, Texas 78751
Tel: (713) 960-7305
Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: */s/ John T. Cox III\**
John T. Cox III
Texas Bar No. 24003722
Andrew Bean
Texas Bar No. 24097352
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF
MANAGEMENT, LLC**

*Signed by permission

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

<u>/s/ *Roger L. McCleary*</u>
Roger L. McCleary

# EXHIBIT A

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## AGREED ORDER GRANTING AMENDED AGREED MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF") and Defendant, Alvarez & Marsal CRF Management, LLC ("A&M") (collectively the "Parties") Amended Agreed Motion for Continuance and Entry of Amended Scheduling Order ("Motion"), and noting that this Order is agreed, is of the opinion that the Motion should be GRANTED.

**IT IS THEREFORE ORDERED** that the current trial setting is reset for January 27, 2025.

**IT IS FURTHER ORDERED** that the deadline to file amended pleadings asserting new causes of action or defenses is extended to September 29, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete fact discovery is extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate experts and provide reports is extended to October 14, 2024.

**IT IS FURTHER ORDERED** that the deadline to file motions to compel is extended to October 21, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties opposing affirmative relief to designate experts and provide reports is extended to October 29, 2024.

**IT IS FURTHER ORDERED** that the deadline for parties seeking affirmative relief to designate rebuttal experts is extended to November 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to complete expert discovery is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the deadline to file other amended pleadings is extended to December 13, 2024.

**IT IS FURTHER ORDERED** that the mediation deadline is extended to December 28, 2024.

**IT IS FURTHER ORDERED** that the deadlines set forth in paragraph 8 of the Court's First Amended Uniform Scheduling Order, entered November 25, 2023, shall be based on the reset trial date of January 27, 2025, not the Initial Trial Setting.

**IT IS FURTHER ORDERED** that all deadlines other than the new trial date may be revised by written agreement of the parties.

SIGNED on this _____ day of _____, 2024.


_____
**District Judge**

8

**AGREED**:

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas Bar No. 13590100
    smcentire@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Tel. (214) 237-4300
    Fax (214) 237-4340

    Roger L. McCleary
    Texas Bar No. 133937000
    rmccleary@pmmlaw.com
    **PARSONS MCENTIRE MCCLEARY PLLC**
    One Riverway, Suite 1800
    Houston, Texas 78751
    Tel: (713) 960-7305
    Fax: (832) 742-7387

**COUNSEL FOR PLAINTIFF,
CHARITABLE DAF FUND, L.P.**

By: */s/ John T. Cox III\**
    John T. Cox III
    Texas Bar No. 24003722
    Andrew Bean
    Texas Bar No. 24097352
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201-2923
    Telephone: 214.698.3256
    Facsimile: 214.571.2923
    TCox@gibsondunn.com
    ABean@gibsondunn.com

**COUNSEL FOR DEFENDANT,
ALVAREZ & MARSAL CRF MANAGEMENT, LLC**
*Signed by permission

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Sawnie Mcentire
Bar No. 13590100
bcandis@pmmlaw.com
Envelope ID: 87032974
Filing Code Description: Motion - Continuance
Filing Description: AMENDED AGREED
Status as of 4/25/2024 9:01 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 4/24/2024 4:30:50 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 4/24/2024 4:30:50 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 4/24/2024 4:30:50 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 4/24/2024 4:30:50 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 4/24/2024 4:30:50 PM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 4/24/2024 4:30:50 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 4/24/2024 4:30:50 PM | SENT |

FILED
7/3/2024 11:30 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Plaintiff Charitable DAF Fund, L.P.'s Motion to Compel Discovery, filed February 29, 2024, is set for hearing on **August 7, 2024, at 1:15 p.m.,** before the Honorable Judge Tonya Parker in the 116th Judicial District Court of Dallas County, Texas at 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

[1]

Respectfully submitted,

/s/ Sawnie A. McEntire
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Sawnie Mcentire
Bar No. 13590100
bcandis@pmmlaw.com
Envelope ID: 89465025
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: PLAINTIFF MOTION TO COMPEL SET 8/7 @ 1:15
Status as of 7/3/2024 11:59 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 7/3/2024 11:30:13 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 7/3/2024 11:30:13 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 7/3/2024 11:30:13 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 7/3/2024 11:30:13 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 7/3/2024 11:30:13 AM | SENT |
| Juslyn Young | | jyoung@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 7/3/2024 11:30:13 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 7/3/2024 11:30:13 AM | SENT |

FILED
7/9/2024 5:24 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

## CERTIFICATE OF CONFERENCE ON DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

---

I hereby certify that on July 9, 2024, I spoke with counsel for Plaintiff regarding the relief requested in this motion, who responded that Plaintiff is opposed to the relief requested in this motion.

*/s/ Patrick A. Vickery*
Patrick A. Vickery

Dated: July 9, 2024

Respectfully submitted,

*/s/ Patrick A. Vickery*
John T. Cox III
Texas Bar No. 24003722
Patrick A. Vickery
Texas Bar No. 24115905
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
pvickery@gibsondunn.com

*Counsel for Defendant Alvarez & Marsal*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of July, 2024, a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ Patrick A. Vickery*
Patrick A. Vickery

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 89607548
Filing Code Description: Certificate Of Conference
Filing Description: ON DEFENDANT MOTION FOR PROTECTIVE ORDER AND ABATE
Status as of 7/10/2024 8:09 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| Juslyn Young | | jyoung@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 7/9/2024 5:24:15 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 7/9/2024 5:24:15 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 7/9/2024 5:24:15 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 7/9/2024 5:24:15 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 7/9/2024 5:24:15 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 7/9/2024 5:24:15 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 7/9/2024 5:24:15 PM | SENT |

FILED
7/10/2024 8:48 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jenifer Trujillo DEPUTY

CAUSE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| Defendant. | § | |

---

**FIFTH AMENDED NOTICE OF HEARING ON DEFENDANT ALVAREZ &
MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE**

---

Please take notice that *Defendant Alvarez & Marsal CRF Management, LLC's Motion for Protective Order and Motion to Abate* filed on August 11, 2023, is set for hearing on Wednesday, August 7, 2024 at 1:15 p.m. The hearing will take place before the Honorable Judge Tonya Parker in the 116th District Court, 600 Commerce Street, 6th Floor New Tower, Dallas, Texas 75202.

Dated: July 10, 2024

Respectfully submitted,

*/s/ Patrick A. Vickery*
John T. Cox III
Texas Bar No. 24003722
Patrick A. Vickery
Texas Bar No. 24115905
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Telephone: 214.698.3256
Facsimile: 214.571.2923
TCox@gibsondunn.com
pvickery@gibsondunn.com

*Counsel for Defendant*

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of July, 2024, a true and correct copy of the

foregoing document was served on all counsel of record in accordance with the Texas Rules of

Civil Procedure.


/s/ *Patrick A. Vickery*
Patrick A. Vickery

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 89615404
Filing Code Description: Notice Of Hearing / Fiat
Filing Description: 5TH AMENDED ON MOTION TO PROTECT
Status as of 7/10/2024 9:34 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roqui Brooks | | rbrooks@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| Juslyn Young | | jyoung@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 7/10/2024 8:48:15 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 7/10/2024 8:48:15 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 7/10/2024 8:48:15 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 7/10/2024 8:48:15 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 7/10/2024 8:48:15 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 7/10/2024 8:48:15 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 7/10/2024 8:48:15 AM | SENT |



**SCHEEF & STONE**
SOLID COUNSEL

FILED

2024 JUL 19 AM 10: 16

**Writer's Email:**
bryan.haynes@solidcounsel.com

DISTRICT CLERK
DALLAS CO., TEXAS

_____ DEPUTY

**Direct Dial:**
(214) 649-9511

July 16, 2024

**Via: E-Mail**
Honorable Tonya Parker
116th Judicial District Court
George L. Allen, Sr. Courts Building
600 Commerce Street
6th Floor New Tower
Dallas, TX 75202

     Re:   *Charitable DAF Fund, L.P. v. Alvarez & Marsal CRF Management,*
         *LLC*; Cause No. 22-10107; In the 116th Judicial District Court of Dallas
         County, Texas.

Judge Parker:

     The above-referenced case was mediated on July 18, 2024. The case did not
settle, but I will keep the mediation open and follow up with them in August.

     Thank you for the appointment.

          Sincerely,

          /s/ *Bryan Haynes*

          Bryan Haynes

cc:    Sawnie A. McEntire (Via Email)
       Roger L. McCleary (Via Email)
       John T. Cox III (Via Email)
       Marshall R. King (Via Email)
       Patrick A. Vickery (Via Email)

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PROPOSED ORDER DENYING DEFENDANT'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

The Court, having considered Defendant Alvarez & Marsal CRF Management, LLC's ("A&M" or "Defendant") Motion for Protective Order and Motion to Abate ("Motion"), Plaintiff Charitable DAF Fund, L.P.'s ("DAF") Response in Opposition ("Response"), any reply, and any arguments of counsel, is of the opinion that the Motion should be DENIED.

**IT IS THEREFORE ORDERED** that A&M's Motion for Protective Order and Motion to Abate are DENIED in their entirety.

**IT IS FURTHER ORDERED** that Defendant, Alvarez & Marsal CRF Management, LLC shall serve full and complete answers to all served interrogatories (Nos. 1-15) and full and complete responses to all requests for production, (Nos. 1-42), and produce responsive documents to DAF's document requests within thirty (30) days.

SIGNED on this _____ 7 *th* _____ day of _____ August _____, 2024.

_____
District Judge

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| _Plaintiff,_ | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| _Defendant._ | § | 116th JUDICIAL DISTRICT |

## ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL DISCOVERY

The Court, having considered Plaintiff, Charitable DAF Fund, L.P.'s ("DAF")

Motion to Compel Discovery ("Motion"), seeking an order compelling Defendant,

Alvarez & Marsal CRF Management, LLC's ("A&M" or "Defendant") to respond and

produce discovery, any response, and any arguments of counsel, is of the opinion that

the Motion should be GRANTED.

**IT IS THEREFORE ORDERED** that DAF's Motion to Compel Discovery is

GRANTED.

**IT IS FURTHER ORDERED** that Defendant, Alvarez & Marsal CRF Management,

LLC shall serve full and complete answers to all served interrogatories (Nos. 1-15) and

full and complete responses to all requests for production, (Nos. 1-42), and produce

responsive documents to DAF's document requests within twenty (20) days.

SIGNED on this _____7th_____ day of _____August_____, 2024.

District Judge

FILED
8/7/2024 10:00 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## <u>NOTICE OF APPEARANCE</u>

COMES NOW, Plaintiff Charitable DAF Fund, L.P. ("DAF") and hereby adds

attorneys James J. McGoldrick and Ian B. Salzer as additional counsel on behalf of DAF.

The address, telephone number, facsimile number, email address, and State Bar of

Texas identification number for James J. McGoldrick and Ian B. Salzer are:

James J. McGoldrick
State Bar No. 00797044
jmcgoldrick@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
(214) 237-4300 (Telephone)
(214) 237-4340 (Facsimile)

Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
(214) 237-4300 (Telephone)
(214) 237-4340 (Facsimile)

DAF respectfully requests that the Court and all parties include the above counsel on any future notices and copies of pleadings, papers, and other materials relevant to this matter. Sawnie A. McEntire shall remain as the attorney in charge and lead trial counsel for DAF, and Roger L. McCleary shall also remain as counsel of record for DAF.

Respectfully submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

*/s/ Ian B. Salzer*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
James J. McGoldrick
State Bar No. 00797044
jmcgoldrick@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**
**CHARITABLE DAF FUND, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Ian B. Salzer*

IAN B. SALZER

3164616.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Beatrice Candis on behalf of Sawnie Mcentire
Bar No. 13590100
bcandis@pmmlaw.com
Envelope ID: 90619779
Filing Code Description: Notice Of Appearance
Filing Description:
Status as of 8/7/2024 10:06 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/7/2024 10:00:48 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/7/2024 10:00:48 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/7/2024 10:00:48 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/7/2024 10:00:48 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 8/7/2024 10:00:48 AM | SENT |
| James J.McGoldrick | | jmcgoldrick@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Juslyn Young | | jyoung@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 8/7/2024 10:00:48 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 8/7/2024 10:00:48 AM | SENT |

FILED
8/28/2024 1:21 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL CRF | § | |
| MANAGEMENT, LLC, | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## PLAINTIFF'S SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Charitable DAF Fund, L.P. ("**DAF**" or "**Plaintiff**"), and files this Second Amended Petition against Defendant Alvarez & Marsal CRF Management, LLC ("**A&M**" or "**Defendant**"), and for causes of action would respectfully show:

## I. DISCOVERY PLAN

1.      Plaintiff asserts that discovery should be conducted under Level 3 pursuant to Texas Rules of Civil Procedure 190.1 and 190.4.

## II. PARTIES

2.      DAF is a limited partnership organized in the Cayman Islands. DAF conducts charitable activities in the State of Texas.

3.      A&M is a foreign limited liability company organized and existing under the laws of the State of Delaware. A&M engages in business in Texas but has not

1

designated or maintained a resident agent for service of process in Texas. A&M has generally appeared and answered in this lawsuit.

### III. JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action as DAF currently seeks monetary relief over $1,000,000. The damages sought by DAF are within the jurisdictional limits of the Court.

5.      Venue is proper under Texas Civil Practice and Remedies Code §15.002(a)(1) because all or a substantial part of the events or omissions giving rise to this claim occurred in Dallas County, Texas.

6.      This Court has personal jurisdiction over A&M because: (i) A&M is and has been doing business in Texas pursuant to § 17.042 of the Texas Civil Practices and Remedies Code, (ii) A&M has purposefully availed itself of the benefits and protections offered by the State of Texas by conducting business in this State, (iii) A&M committed wrongful acts within this State, (iv) A&M's conduct in and contacts with this State give rise to or relate to the causes of action alleged herein, and (v) A&M has submitted to this Court's jurisdiction by appearing and answering in this lawsuit.

### IV. FACTUAL BACKGROUND

7.      DAF's exclusive mission involves charity. Since 2012, DAF's supporting organizations committed over $42 million to nonprofit organizations and funded approximately $32 million of total commitments. These charitable causes include

education, veterans, first responders, health and medical research, economic and community development initiatives, and youth and family programs in the State of Texas. This lawsuit is necessary because of A&M's improper withholding of assets lawfully owned by and due to DAF and A&M's associated interference with DAF's charitable mission.

8.     On or about June 30, 2016, DAF purchased shares in the Highland Crusader Fund II, Ltd. ("**Crusader Fund II**")[1] from the Promethee T Fund (formerly known as Promethee Tremont Fund) ("**Promethee**") for in excess of $1.0 million ("**DAF's Direct Interest**"). In connection with DAF's acquisition of this interest, DAF became a party to (or beneficiary of) Crusader Fund II's Subscription Documents, Offering Memorandum, Memorandum of Association, By-Laws, and various other agreements governing the relationship between Crusader Fund II and its investors.

9.     DAF is the lawful owner of all right, title, and interest in and to DAF's Direct Interest and to DAF's Full Direct Interest, as described below. The Crusader Fund II is a segregated, identifiable fund held separate from other funds managed by A&M. A&M has no legitimate claim to DAF's Full Direct Interest.

10.    A&M is the investment manager of the Crusader Fund II and has been so at all times relevant to the claims asserted in this lawsuit. As the investment manager,

---

[1] Crusader Fund II is part of an investment scheme with an "Onshore Fund," an "Offshore Fund" (Crusader Fund II), and a "Master Fund," which is collectively referred to as the "**Crusader Funds**."

A&M receives payment from the Crusader Fund II for A&M's management services. Upon information and belief, A&M's compensation is based on the value of Crusader Fund II; accordingly, A&M earns more compensation if Crusader Fund II has more available funds.

### A.    Withheld Distributions

11.    On or about July 12, 2021, A&M informed DAF that DAF's Direct Interest "will not exist as of June 30 NAV."[2] A&M then refused to make distributions to DAF and treated DAF's Direct Interest as having been extinguished.

12.    DAF previously made a written demand to A&M, through A&M's legal counsel, for payment to DAF of the full value of DAF's Direct Interest, plus all related distributions and other withholdings owed to DAF in regard to DAF's Direct Interest ("**DAF's Full Direct Interest**"). A&M initially refused to comply with this demand and did so wrongfully without legal justification.  In doing so, A&M deprived DAF of DAF's access to and right to possess and use DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. In short, A&M deprived DAF of DAF's property without any legal basis or justification.

13.    A&M's actions deprived DAF of the use of its funds, namely the ability to earn profits on such funds to promote charitable causes, for the time period when A&M

---

[2] NAV stands for Net Asset Value.

improperly exercised control over and withheld distributions—and, upon information and belief, while A&M continued to charge additional fees based on an inflated value of the Crusader Fund II due to A&M's failure to make timely distributions to DAF.

14.    Upon information and belief, A&M is a registered investment advisor subject to the Investment Advisors Act of 1940. Notwithstanding its role as a registered investment advisor, A&M improperly withheld DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M refused to distribute equivalent funds to DAF.

15.    A&M entered into an informal confidential and special relationship with DAF. A&M controls and manages funds in which DAF has a direct interest. DAF placed trust and confidence in A&M to control, manage, and distribute DAF's Full Direct Interest. DAF's damages arise out of A&M's refusal to recognize DAF's right to control DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and A&M's decision, instead, to unlawfully withhold these funds even though they should have been distributed to DAF.

16.    On or about February 17, 2023, after this lawsuit was filed, A&M belatedly transferred $951,060.82 to DAF, effectively acknowledging its prior breaches of its duties as manager of the Crusader Fund II. On or about March 29, 2023, A&M again transferred $139,101.94 to DAF in further acknowledgement of DAF's Direct Interest and again confirming A&M's prior breaches of duties.

B.    <u>Sale of Claims</u>

17.    Upon information and belief, A&M also preferred the interests of one or more other Crusader Fund II interest holders. When doing so, A&M created, and violated, separate and independent fiduciary duties which should have ensured, but did not, that all Crusader Fund investors were treated fairly, regardless of class.

18.    A&M's claimed basis for withholding DAF's Direct Interest was an award issued in a prior arbitration involving Crusader Fund II, styled *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* This arbitration was a dispute between certain investors in the Crusader Funds, known as the "**Redeemer Committee**," and the Fund's previous investment manager, Highland Capital Management, L.P. ("**HCM**"), which was replaced as investment manager by A&M during the pendency of the arbitration.

19.    Ultimately the arbitration panel issued a partial final award, followed by a final award, against HCM in favor of the Redeemer Committee on behalf of the Crusader Funds. Neither DAF nor A&M were parties to the arbitration, and no party ever attempted to confirm the arbitration award against DAF in any civil court. DAF is also not referenced in either the partial or the final awards issued by the arbitration panel.

20.    Several months after the final arbitration award was issued, HCM filed bankruptcy and the Redeemer Committee and the Crusader Funds filed overlapping claims in the amount of $190,824,557 against HCM's estate (Claim Nos. 72 and 81) based

on the arbitration award (the "**Claims**"). The Crusader Funds' claim was filed by A&M and also included a claim for $23,483,446 in additional damages for management fees, resulting in a total claim of over $214 million.

21.     A&M and the Redeemer Committee then entered into a settlement with HCM which reduced the Claims to the allowed amounts of $136.7 million—in favor of the Redeemer Committee—and $50,000—in favor of the Crusader Funds. A motion to approve the Claims was filed in the bankruptcy court by HCM [Dkt. 1089] ("**Settlement Motion**"), which confirms that A&M allowed the Redeemer Committee to control negotiations concerning funds to which the Crusader Funds asserted entitlement.[3]

22.     In doing so, the Redeemer Committee became one of the largest creditors in HCM's bankruptcy estate and held a position on the Unsecured Creditors' Committee, while A&M effectively sat on the sideline abdicating its responsibilities. In effect, A&M abdicated—to the Redeemer Committee—its duties to manage Crusader Fund II's assets, thereby failing to ensure fair treatment of all interest holders and maximization of recovery.

23.     In or around April 2021, the approved Claims were sold to a special purpose entity, Jessup Holdings, LLC ("**Jessup**"), which is owned and controlled by a hedge fund, Stonehill Capital Management, LLC ("**Stonehill**"). On July 6, 2021, A&M

---

[3] Settlement Motion, ¶ 27 (emphasis added).

issued a letter ("**July 6 Letter**") notifying the investors of the Crusader Funds that A&M had brokered this sale, and further disclosing that A&M and the Redeemer Committee sold both Claims for approximately 50% of the allowed amount of the Redeemer Committee's claim alone, or approximately one third of the Crusader Funds' total original claim.

24.    HCM has since paid out almost $320 million—$255 million of which had been distributed by the end of Q3 2022.[4] Had A&M done nothing and simply held the Claims for one year after HCM's plan was confirmed the Crusader Funds' investors would have received an additional $10 million, and if A&M had held the Claims through Q2 2024, the Crusader Funds' investors would have received an additional $30 million over what was paid for the Claims. Investors not on the Redeemer Committee, such as DAF, were never consulted about the sale to Jessup nor the timing of the sale.

25.    A&M's July 6 Letter concludes by informing investors that a distribution of $78 million in funds received from the sale of the Claims to Jessup would occur by July 31, 2021, and would be "based on the [NAV] as of June 30, 2021"—the same NAV date that A&M later informed DAF would reflect the cancellation of DAF's interests. It appears the sale was timed deliberately to either (a) avoid any distributions to DAF, or (b) appease the Redeemer Committee's apparent need for liquidity rather than holding onto the Claims to maximize the realization on those assets.

---

[4] HCM Dkts. 3582, 4131.

26.     One or more of A&M's foregoing acts or omissions proximately caused or, alternatively, contributed to cause DAF to be damaged in an amount far exceeding the jurisdictional limit of this Court.

## V. CAUSES OF ACTION

### Count One – Breach of Fiduciary Duties

27.     DAF incorporates all foregoing factual averments by reference as if set fully set forth herein.

28.     A&M has exercised and continues to exercise dominion and control over DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M holds a position of special trust and confidence with DAF regarding DAF's Full Direct Interest. A&M owes DAF common law fiduciary duties arising out of A&M's position of trust and confidence. Upon information and belief, as Investment Manager, the governing documents, including the Offering Memorandum and the advisory management agreements, required A&M to act fairly, equitably, and in accordance with reasonable commercial standards. Upon information and belief, these duties further obligated A&M to not unlawfully and improperly withhold investor's interests, including DAF's Direct Interest.

29.     The fiduciary duties A&M owed, and continues to owe, to DAF include, but are not limited to, the duty of loyalty—to always act in the best interests of the investor, the duty to act with utmost good faith, the duty to refrain from self-dealing, the

duty of fair and honest dealing, the duty to act with integrity of the strictest kind, and the duty of candor and full disclosure. Central to the fiduciary duties A&M owed and continues to owe DAF are the duties to not deprive DAF of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest, and to not wrongfully reduce the values of those interests.

30.     A&M's failure and refusal to pay or return DAF's Full Direct Interest, even after DAF made specific written demand, is intentional misconduct that breached one or more of the fiduciary duties A&M owed and continues to owe DAF and has caused damage to DAF.

31.     By abdicating its responsibility to manage the recovery and sale of the Redeemer Committee's and Crusader Funds' bankruptcy Claims, A&M further breached its fiduciary duties to the investors of Crusader Fund II, including DAF. Furthermore, by preferring certain equity holders (*i.e.*, various members of the Redeemer Committee), A&M breached its fiduciary duties to Crusader Fund II's other shareholders like DAF, including the duty of loyalty. A&M assumed independent fiduciary duties to DAF by preferring the interests of other interest holders to those of DAF. When A&M solicited offers to purchase the Claims and entered into exclusive negotiations with buyers, A&M was required to ensure that the sale of the Claims was in the best interests of all investors, not just for various members of the Redeemer Committee, yet it appears A&M either (a) orchestrated and timed the sale of the Claims to freeze-out DAF and retain proceeds

owed to DAF for A&M's own benefit or the benefit of other investors (such as the Redeemer Committee), or (b) allowed the Redeemer Committee to dominate the management of the Claims in derogation of A&M's fiduciary duties as investment manager, to DAF's detriment, so that the Redeemer Committee could quickly liquidate its interest, rather than managing the Claims to maximize the return on those assets.

32.     Because A&M knowingly committed a clear and serious breach of its fiduciary duties, DAF is entitled to disgorge fees, profits, and/or funds received by A&M in connection with its purported management of Crusader Fund II and the Claims.

33.     DAF also is entitled to an accounting of its interest in the Crusader Fund II to verify the accuracy of the distributions made to DAF by A&M after this suit was originally filed. This audit is also necessary to confirm all other benefits to which the DAF is entitled but which have been withheld by A&M.

34.     A&M is liable to DAF for actual damages, disgorgement, exemplary damages, an accounting, and all other relief to which DAF is justly and legally entitled as the result of A&M's breach of fiduciary duties owed to DAF.

### Count Two – Conversion

35.     DAF incorporates by reference the foregoing factual and legal averments as if fully set forth herein.

36.     DAF owns and has a right to immediate possession of DAF's Full Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest. A&M

had no legitimate claim to DAF's Full Direct Interest or to the Crusader Fund II regarding

DAF's Full Direct Interest.

37.     The Crusader Fund II funds were delivered to A&M for safekeeping and

management. The Crusader Fund II funds were intended to be segregated from other

funds managed by A&M.

38.     Upon information and belief, A&M held the Crusader Fund II funds in

substantially the same form as received.

39.     DAF's Full Direct Interest or, in the alternative, the capital account value of

DAF's Direct Interest, were separate and identifiable funds held by A&M for the benefit

of DAF. DAF made demand upon A&M to immediately relinquish possession of DAF's

Full Direct Interest to DAF. A&M ignored DAF's demand and A&M wrongfully

exercised dominion and control over DAF's Full Direct Interest or, in the alternative, the

capital account value of DAF's Direct Interest.

40.     DAF was deprived of its lawful right to ownership and control of DAF's

Full Direct Interest or, in the alternative, the capital account value of DAF's Direct

Interest, by A&M's unauthorized withholding of the same without a legally correct basis

to do so.

41.     As a proximate and/or direct result of A&M's conversion of DAF's Full

Direct Interest or, in the alternative, the capital account value of DAF's Direct Interest,

DAF has suffered significant damages for which damages DAF now sues.

42.     A&M is liable to DAF for actual damages, punitive damages, and all other

relief to which DAF is justly and legally entitled as the result of A&M's conversion.

### Count Three – Tortious Interference

43.     DAF respectfully incorporates by reference the foregoing factual and legal

averments as if fully set forth herein.

44.     DAF's investment in, and relationship with, Crusader Fund II is the subject

of various contracts, including, without limitation, the Crusader Fund II's Subscription

Documents, Offering Memorandum, Memorandum of Association, and By-Laws.

45.     As investment manager of Crusader Fund II, A&M was and is in possession

of these agreements and, during all material times, A&M was aware of the terms of these

agreements.

46.     Despite knowing that A&M had no right to unilaterally cancel DAF's Direct

Interest under any of the relevant transactional documents, A&M did so without

justification or excuse.

47.     A&M's cancellation of DAF's Direct Interest is a direct interference with

A&M's rights and expectancies under the relevant transactional documents, which has

proximately caused or, alternatively, contributed to cause DAF damages.

48.     Upon information and belief, A&M timed the sale of the Claims to further

interfere with DAF's Direct Interest by attempting to ensure that DAF would not receive

its pro rata proceeds from the sale, enabling A&M to instead retain those proceeds for A&M's own benefit or the benefit of other investors (such as the Redeemer Committee).

49.     Because A&M had no business justification for cancelling DAF's Direct Interest and A&M timed the sale of the Claims either (a) around the cancellation of DAF's Direct Interest or (b) when the Redeemer Committee wanted to liquidate rather than when it would be prudent to monetize the Claims for all investors—moves that were calculated solely to harm DAF—the only conclusion is that A&M acted with malicious intent in interfering in the relationship between DAF and Crusader Fund II.

50.     A&M is liable to DAF for actual damages, punitive damages, and all other relief to which DAF is justly and legally entitled as the result of A&M's tortious interference.

## VI. DAMAGES

51.     DAF incorporates the foregoing factual averments, and the factual and legal averments in Counts One through Three above, as if fully set forth herein and further alleges the following in the alternative.

52.     DAF requests judgment against A&M for all of DAF's actual damages, including, without limitation, direct damages, special damages, consequential damages, lost savings, lost profits, out-of-pocket damages, future damages, and incidental damages, to which DAF is entitled, in addition to punitive or exemplary damages, prejudgment and post-judgment interest at the highest legal rate, and costs of Court.

53.     DAF further requests judgment against A&M for disgorgement of all of A&M's fees, profits, and/or other funds received in connection with its purported management of the Crusader Fund II with respect to DAF's interest in that fund, and an accounting of DAF's interest in the Crusader Fund II and of the related fees and expenses charged by A&M.

## VII. CONDITIONS PRECEDENT

54.     All conditions precedent, if any, to the claims asserted herein have been performed, excused, waived, satisfied, or have otherwise occurred.

## VIII. JURY DEMAND

55.     DAF has demanded a trial by jury and tendered the jury fee pursuant to Rule 216 of the Texas Rules of Civil Procedure.

## IX.  RULE 193.7 NOTICE

56.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, DAF intends to use any and all documents produced in A&M's discovery responses as evidence at the time of any hearing or trial in this matter.

## PRAYER

Plaintiff, Charitable DAF Fund, L.P., respectfully requests that this Court grant judgment in DAF's favor over and against Defendant Alvarez & Marsal CRF Management, LLC as set forth herein, including but not limited to, for an accounting of DAF's interest in the Crusader Fund II and the related fees and expenses charged by

A&M, for disgorgement of all of A&M's fees, profits, and/or other funds received by A&M with respect to DAF's interest in that fund, for all actual damages DAF has suffered, for exemplary damages, prejudgment and post-judgment interest at the highest rate permitted by law, for DAF's costs of court, and that DAF be awarded all other and further relief, at law and in equity, general and special, to which DAF may be justly entitled.

Dated: August 28, 2024

Respectfully submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
James J. McGoldrick
State Bar No. 00797044
jmcgoldrick@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
CHARITABLE DAF FUND, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, a true and correct copy of this instrument was filed and served on all known counsel of record in accordance with the Texas Rules of Civil Procedure via the Court's E-File system.

*/s/ Sawnie A. McEntire*
SAWNIE A. MCENTIRE

3166176.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 91423897
Filing Code Description: Amended Petition
Filing Description: 2ND
Status as of 8/29/2024 8:48 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Juslyn Young | | jyoung@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 8/28/2024 1:21:25 PM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| James J.McGoldrick | | jmcgoldrick@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 8/28/2024 1:21:25 PM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 8/28/2024 1:21:25 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 8/28/2024 1:21:25 PM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 8/28/2024 1:21:25 PM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 8/28/2024 1:21:25 PM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 8/28/2024 1:21:25 PM | SENT |

FILED
9/4/2024 8:30 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Rosa Delacerda DEPUTY

CAUSE NO. DC-22-10107

| | |
|---|---|
| CHARITABLE DAF FUND, L.P., | |
| Plaintiff, | IN THE DISTRICT COURT |
| v. | DALLAS COUNTY, TEXAS |
| ALVAREZ & MARSAL CRF MANAGEMENT, LLC | 116TH JUDICIAL DISTRICT |
| Defendant. | |

## DEFENDANT'S MOTION TO QUASH PLAINTIFF'S FIRST AMENDED NOTICE OF DEPOSITION OF DEFENDANT'S CORPORATE REPRESENTATIVE

Pursuant to Texas Rule of Civil Procedure 199.4, Defendant Alvarez & Marsal CRF Management, LLC (A&M) moves to quash the First Amended Notice of Deposition of A&M, served on A&M by Plaintiff Charitable DAF Fund, L.P. (DAF) on August 29, 2024. A true and correct copy of the Notice is attached hereto as Exhibit A and is incorporated herein by reference.

A&M objects to the time of the deposition under Texas Rule of Civil Procedure 199.4 because DAF has not provided a reasonable date and time for the depositions as required by Texas Rule of Civil Procedure 199.2(b)(2). DAF did not confer with A&M before it served the Notice, and A&M's corporate designee is not available on the date listed in the Notice (September 13, 2024). A&M's designee is, however, available on October 8, 2024 and October 10, 2024, and A&M proposes one of those two dates to hold the deposition. A&M will meet and confer in good faith with DAF about those dates.

A&M therefore respectfully requests that the Court grant this motion and order the Notice quashed. As this motion has been filed within three business days of the receipt of the Notice, the

deposition sought by the Notice is automatically stayed unless and until the Court rules otherwise.

Tex. R. Civ. P. 199.4.

Dated: September 4, 2024                              Respectfully submitted,

                                                      By: */s/ John T. Cox III*
                                                      John T. Cox III
                                                      Texas Bar No. 24003722
                                                      Patrick A. Vickery
                                                      Texas Bar No. 24115905
                                                      GIBSON, DUNN & CRUTCHER LLP
                                                      2001 Ross Avenue, Ste. 2100
                                                      Dallas, Texas 75201-2923
                                                      Telephone: (214) 698-3256
                                                      Facsimile: (214) 571-2923
                                                      TCox@gibsondunn.com
                                                      PVickery@gibsondunn.com

                                                      *Counsel for Defendant Alvarez & Marsal CRF*
                                                      *Management, LLC*


## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September, 2024, the foregoing document was
electronically filed with the Court using CM/ECF, which will send notification of this filing to
counsel of record in the above-captioned case.

                                         */s/ Patrick A. Vickery*
                                         Patrick A. Vickery

# Exhibit A

CASE NO. DC-22-10107

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ALVAREZ & MARSAL, CRF | § | |
| MANAGEMENT, LLC | § | |
| | § | |
| *Defendant.* | § | 116th JUDICIAL DISTRICT |

## FIRST AMENDED NOTICE OF DEPOSITION OF ALVAREZ & MARSAL, CRF MANAGEMENT, LLC

TO:   Defendant Alvarez & Marsal, CRF Management, LLC, by and through its attorneys of record, John T. Cox III and Andrew Bean, GIBSON, DUNN & CRUTCHER LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, Plaintiff Charitable DAF Fund, L.P. ("DAF") will take the deposition on oral examination under oath of Defendant Alvarez & Marsal, CRF Management, LLC ("A&M") on **September 13, 2024, at 9:00 a.m.,** before a notary public or other person authorized to administer a proper oath and will be recorded by stenographic means. The deposition will take place at Gibson, Dunn & Crutcher LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201, before a court reporter and videographer and will continue from day to day until completed. The deposition may also be recorded by non-stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), A&M is requested to designate one or more person(s) most knowledgeable and prepared to testify

1

on behalf of A&M concerning the topics identified on **Exhibit 1**, and to produce the

documents described in **Exhibit 2**, attached hereto.

Respectfully submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

*/s/ James J. McGoldrick*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
James J. McGoldrick
State Bar No. 00797044
jmcgoldrick@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

Roger L. McCleary
Texas Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315 (Phone)
(713) 960-7347 (Facsimile)

**COUNSEL FOR PLAINTIFF CHARITABLE
DAF FUND, L.P.**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2024, a true and correct copy of this instrument was served on Defendant's counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ James J. McGoldrick*
JAMES J. MCGOLDRICK

**EXHIBIT A**
**TO NOTICE OF DEPOSITION OF ALVAREZ & MARSAL,**
**CRF MANAGEMENT, LLC**

For purposes of the attached Exhibits 1 and 2, the following rules and definitions shall apply, along with the rules of construction and instructions provided under applicable discovery rules and law:

## RULES OF CONSTRUCTION

1.      Unless specifically stated otherwise in a particular Topic or Request, the relevant time period is June 30, 2016, to Present.

2.      The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the topic or document request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

3.      The terms "any," "all," and "each" shall each be construed as encompassing any and all.

4.      The use of the singular form of any word shall be construed to include the plural and vice versa.

5.      All phrases following the terms "including" are intended to illustrate the kinds of information responsive to each Topic or Request, and shall be construed as "including, but not limited to." Such examples are not intended to be exhaustive of the information sought and shall not in any way be read to limit the scope of a Topic or Request.

4

6.      References to an entity are intended to include past and present officers, directors, employees, agents, affiliates, subsidiaries, owners, partners, general partners, shareholders, representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, and/or any other person(s) acting on behalf of such entity.

## **DEFINITIONS**

For the purposes of these Topics and Requests, the following terms shall have the following definitions and meanings, unless expressly provided otherwise:

*A&M*, *you*, and *your*. The terms "A&M", "you" and "your" shall mean and refer to Alvarez & Marsal, CRF Management, LLC and its managing and other members, directors, officers, agents, employees, representatives, attorneys, partners, predecessors, successors, assigns, and anyone else acting on A&M's behalf, now or at any time relevant to the topic matters in this notice *Big Boy Clause*. The term "Big Boy Clause" shall mean and refer to any agreement, or provision in any agreement, that purports to waive claims based on one party's superior knowledge and the non-disclosure of that superior knowledge to the other transacting party.

*Bankruptcy*. The term "Bankruptcy" shall mean and refer to the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean and refer to collectively the "Redeemer Committee Claim," as defined herein, and the "Crusader Funds Claim," as defined herein.

*Communication(s)*. The term "communication(s)" shall mean any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, email, text message, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" shall mean reflecting, regarding, relating to, referring to, describing, evidencing, supporting, forming any basis for, or constituting.

*Crusader Fund*. The term "Crusader Fund" is defined as the Highland Crusader Fund II, Ltd., which is a subject of this Lawsuit and in which DAF purchased participating shares in or around June of 2016.

*Crusader Funds Claims*. The term "Crusader Funds Claims" shall mean and refer to the Crusader Funds' allowed general unsecured claim of $50,000 against Highland Capital Management L.P., as referred to in the July 6 Letter.

*Document or Documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the Texas Rules of Civil Procedure, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the

original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI.* The terms "Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) and/or all related metadata with respect to all such Documents/ESI.

*Governing Documents.* The term "Governing Documents" shall mean and include all documents, including any amendments or supplements thereto, governing the relationship(s) between the Crusader Fund and its parent(s), subsidiaries, affiliates, partners, limited partners, shareholders, investors, members, managers, directors, officers, or employees, including, by way of example, (1) the Memorandum of Association of the Fund, (2) the Crusader Fund's By-Laws, (3) the Master Fund's Limited Partnership Agreement, (4) the Investment Management Agreement, (5) the Administration Agreement, (6) the Subscription Documents investors must execute to obtain an interest in the Fund; (7) the Offering Memorandum for the Crusader Fund dated September 1, 2006, and (8) the Crusader Fund's partnership agreement.

*Grosvenor.* The term "Grosvenor" shall mean and refer to Grosvenor Capital Management, L.P. and its managing and other members, directors, officers, agents, employees, representatives, attorneys, general and limited partners, predecessors,

successors, assigns, and anyone else acting on Grosvenor Capital Management, L.P.'s behalf, now or at any time relevant to the topic matters in this notice.

*HCM.* The term "HCM" shall mean and refer to Highland Capital Management L.P. and its managing and other members, directors, officers, agents, employees, representatives, attorneys, general and limited partners, predecessors, successors, assigns, and anyone else acting on its behalf, now or at any time relevant to the topic matters in this notice.

*Identify* or *identity(ies)* (person(s)). The terms "identify" or "identity(ies)," when referring to a person, shall mean to provide the person's full first and last name; last known address, telephone number, and e-mail address; and last known place of employment.

*Identify or identity(ies)* (document(s)). The terms "identify" or "identity(ies)," when referring to a document, shall mean to provide the document's name; the date of the document's creation; the form of the document (e.g., letter, e-mail message, etc.); a description of the substance of the document; and the identity of the person who currently possesses the document (and, if the document no longer exists, an explanation for why it no longer exists and the date on which it ceased to exist).

*Jessup.* The term "Jessup" shall mean and refer to Jessup Holdings LLC and its managing and other members, officers, directors, agents, employees, representatives, attorneys, general and limited partners, predecessors, successors, assigns, and anyone

9

else acting on Jessup Holdings LLC's behalf, now or at any time relevant to the topic matters in this notice.

*July 6 Letter*. The term "July 6 Letter" shall mean and refer to the letter sent by A&M to Highland Crusader Funds Stakeholders re: "Update & Notice of Distribution" dated July 6, 2021.

*Lawsuit*. The term "Lawsuit" shall mean and refer to the above-captioned lawsuit styled: *Charitable DAF Fund, L.P. v. Alvarez & Marsal, CRF Management, LLC*, Cause No. DC-22-10107; 116th Judicial District Court of Dallas County, Texas.

*Person*. The term "person" shall mean any natural person and/or any business, legal, or governmental entity or association.

*Plaintiff* and *Defendant*. The terms "Plaintiff" and "Defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, shall mean the party or parties, and where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

*Redeemer Committee*. The term "Redeemer Committee" shall mean the Redeemer Committee of the Crusader Funds.

*Redeemer Committee Claim*. The term "Redeemer Committee Claim" shall mean and refer to the Redeemer Committee's allowed general unsecured claim of $137,696,610 against HCM, as referred to in the July 6 Letter.

*Sale of the Claims*. The term "Sale of the Claims" shall mean and refer to the sale of

the Claims that occurred on or about April 30, 2021, as described in the July 6 Letter.

*Seery*. The term "Seery" shall mean and refer to James P. Seery, individually and/or in any representative capacity.

*Stonehill*. The term "Stonehill" shall mean and refer to Stonehill Capital Management, LLC and its managing and other members, officers, directors, agents, employees, representatives, attorneys, general and limited partners, predecessors, successors, assigns, and anyone else acting on Stonehill Capital Management, LLC's behalf, now or at any time relevant to the topic matters in this notice.

**EXHIBIT 1**
**TOPIC CATEGORIES**

The witness(es) designated by A&M to testify on its behalf is (are) requested to testify concerning the following Topic Categories:

1.  The current value of DAF's capital account in the Crusader Fund;

2.  The total payments, from June 30, 2016, to the present, paid to or otherwise received by A&M relating to A&M's role as the investment manager for the Crusader Fund;

3.  All sums of money, from June 1, 2016, to the present, A&M has received, directly or indirectly, from, or in connection with, the Crusader Fund;

4.  All payments, from June 1, 2016, to the present, and the identity of the recipient(s) and the amount(s) paid by, from, or on behalf of the Crusader Fund;

5.  Identification of all financial accounts that A&M opened, maintained, controlled, supervised, and/or closed, which held any shares, funds, other financial interests, or assets of DAF from June 1, 2016, to the present;

6.  A&M's compensation for its role as investment manager of the Crusader Fund and how this compensation fluctuates depending on the fund's size, performance, or other factors;

7.  Each distribution A&M made, caused to be made, and/or authorized from the Crusader Fund between June 1, 2016 and the present (including the amount of the distribution, the date the distribution was made, and the recipients of the distribution);

8.  The alleged legal and factual bases for the contentions made by A&M in A&M's February 20, 2023 Answer, including but not limited to the following:

    i.  that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . .";

12

ii. that DAF's "claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel";

iii. that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent";

iv. that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds";

v. that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds";

9. The substance, types, and sources of information A&M considered in making any decision impacting DAF's interest in the Crusader Fund;

10. Whether A&M conducted due diligence, and the details of any due diligence, when evaluating any decision impacting DAF's interest in the Crusader Fund;

11. Any and all communications with Jim Seery relating in any way to the Crusader Fund and/or the Redeemer Committee;

12. Any and all communications with Grosvenor relating in any way to the Crusader Fund, the Redeemer Committee and/or Stonehill;

13. Grosvenor's legal and/or other financial interest in the Crusader Fund and/or the Redeemer Committee;

14. The legal and/or other relationship (financial or otherwise) by and between Grosvenor, Stonehill, and Jessup;

15. The relationship between Grosvenor, Stonehill, Jessup, and A&M;

16. Communications with the Redeemer Committee, or anyone on the Redeemer Committee, relating in any way to DAF's interest in the Crusader Fund;

17. All communications relating to the Sale of the Claims, or the brokerage of any claim in the Bankruptcy held by the Redeemer Committee or the Crusader Fund;

18. A&M's role in the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

19. Seery's role the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

20. Grosvenor's role in the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

21. Stonehill's role in the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

22. Jessup's role in the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

23. The Redeemer Committee's, and anyone on the Redeemer Committee's, role in the Sale of the Claims, including solicitation and/or participation in the negotiation of bids or offers to purchase the Claims;

24. All bids or offers received to purchase the Claims, whether collectively or individually, including all material terms of each such offer or bid;

25. The value of each of the Claims, including all valuations performed by A&M or others, prior to the Sale of the Claims;

26. Valuations of the Crusader Fund's Net Asset Value (NAV), as well as all assets owned by the Crusader Fund, including identification of such valuations, the amounts of such valuations, and the methodology for such valuations;

27. Any external valuation or audits of the NAV attributable to the Crusader Fund;

28. Any documents reflecting profit forecasts relating to any of the Claims;

29. The factual and legal bases for any and all defenses A&M attends to assert in this Lawsuit; and

30. All communications between A&M and DAF.

## EXHIBIT 2
## DOCUMENT REQUESTS

1. All financial records for all accounts that A&M opened, maintained, controlled, supervised, and/or closed which held any shares, funds, financial or beneficial interest(s), or other assets of DAF at any and/or all times from June 1, 2016 to the present.

2. All documents and/or recordings concerning any communications between A&M and DAF, from June 1, 2016, to the present, concerning or relating to DAF's participating shares and/or interest in the Crusader Fund.

3. All documents and/or recordings concerning any communications between Christopher Wells and DAF, from June 1, 2016 to the present, concerning DAF's participating shares and/or interest in the Crusader Fund.

4. All documents you sent to or received from DAF from June 1, 2016, through the present.

5. All documents concerning fees paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, through the present.

6. All documents concerning any other sums paid to A&M, directly or indirectly, concerning the Crusader Fund (other than those produced in response to Request No. 5 above) from June 1, 2016, through the present.

7. Documents sufficient to evidence that A&M is a registered investment advisor subject to the Investment Advisors Act of 1940.

8. All Governing Documents for the Crusader Fund in effect at any point in time from June 1, 2016, to the present.

9. All awards or other decisions made by any arbitration panel or any other judicial proceeding or formal authority which you claim impacts the Crusader Fund from June 1, 2016, to the present.

10. All documents purportedly evidencing DAF's acquisition of an interest in the Crusader Fund allegedly in violation of the Joint Plan of Distribution of the Crusader Funds and/or the Scheme of Arrangement relating to Offshore Fund II.

11. All documents evidencing the capital account value of DAF's interest(s) in the Crusader Fund from June 1, 2016, to the present.

12. All documents evidencing any distributions A&M made, caused to be made, and/or authorized from the Crusader Fund (including but not limited to from any Crusader Fund account(s)) between June 1, 2016 and the present.

13. All documents evidencing each instance where A&M disclosed to DAF any of the distributions identified in Topic No. 7 above.

14. All documents purportedly evidencing any notice provided by A&M to DAF regarding A&M's intent to withhold distributions from DAF relating to the Crusader Fund between June 1, 2016, and the present.

15. All documents concerning A&M's decision to withhold and/or refusal to distribute funds to DAF proportional to DAF's interest in the Crusader Fund between June 1, 2016, and the present.

16. All documents concerning A&M's decision to distribute $951,060.82 to DAF on February 17, 2023.

17. All documents concerning A&M's decision to distribute $139,101.94 to DAF on March 29, 2023.

18. All documents referring, forming any basis for, or otherwise relating to A&M's decision to treat DAF as an equity holder in the Crusader Fund and to include DAF in any future distributions as reflected in the February 21, 2023 Letter from Gibson, Dunn & Crutcher LLP to Parsons McEntire McCleary PLLC (the "February 21 Letter").

31. All documents and communications with or including Jim Seery relating in any way to the Crusader Fund.

32. Any documents and communications with the Redeemer Committee relating in any way to the Crusader Fund.

19. All communications relating to the sale or brokerage of any claim in the Bankruptcy held by the Redeemer Committee or the Crusader Fund.

20. All documents referring, forming any basis for, or otherwise purportedly supporting your claim that DAF's interest(s) in the Crusader Fund had been allegedly extinguished in 2019 or 2020 as reflected in the February 21 Letter.

21. A true and accurate copy of the Investment Management Agreement between the Crusader funds, House Hanover, LLC, A&M, Alvarez & Marsal Asset

Management Services, LLC, and the Redeemer Committee of the Crusader Funds, dated August 4, 2016, as well as any amendments thereto.

22. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, by the Partial Final Award, dated March 6, 2019, and the Final Award, dated May 9, 2019 . . ." as alleged in Paragraph 5 of A&M's February 20, 2023, Answer.

23. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel" as alleged in Paragraph 6 of A&M's February 20, 2023, Answer.

24. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, because of agreement, acquiescence, ratification or consent" as alleged in Paragraph 7 of A&M's February 20, 2023, Answer.

25. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, by, or for failure to comply with, the express terms and conditions of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., the Investment Management Agreement between Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., Highland Crusader Fund II, Ltd., Highland Crusader Offshore Partners, L.P., House Hanover, LLC, Alvarez & Marsal CRF Management, LLC, Alvarez & Marsal Asset Management Services, LLC, and the Redeemer Committee of the Crusader Funds, and any other document or agreement that governs Plaintiff's ownership of any interest in the Crusader Funds" as alleged in Paragraph 8 of A&M's February 20, 2023, Answer.

26. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, because of accord and satisfaction under the terms of the Amended and Restated Bye-Laws of Highland Crusader Fund II, Ltd., the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement relating to Highland Crusader Fund II, Ltd., and any other document or agreement that governs Plaintiff's ownership of an interest in the Crusader Funds" as alleged in Paragraph 9 of A&M's February 20, 2023, Answer.

27. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, because A&M's alleged obligation, if

any, have been fulfilled and discharged" as alleged in Paragraph 10 of A&M's February 20, 2023, Answer.

28. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, by the doctrine of waiver" as alleged in Paragraph 12 of A&M's February 20, 2023, Answer.

29. All documents which you claim support your contention that DAF's "claims against A&M are barred, in whole or in part, based on the doctrine of unclean hands" as alleged in Paragraph 13 of A&M's February 20, 2023, Answer.

30. All documents which you claim support your claim for attorneys' fees against DAF.

31. All documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

32. All documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding one or more distributions to DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

33. All documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding issuance of one or more distributions to shareholders and/or limited partners other than DAF in connection with the Crusader Fund at any time(s) from June 1, 2016, to the present.

34. All documents concerning any meeting minutes, Board minutes, notes, or other documents relating to any decision by A&M regarding withholding any distributions to shareholders and/or limited partners other than DAF in connection with Crusader Fund at any time(s) from June 1, 2016, to the present.

35. All documents accounting for or identifying any and/or all distributions from the Crusader Fund from June 1, 2016,to the present.

36. All documents showing the proportion of DAF's interest in all distributions from the Crusader Fund from June 1, 2016, to the present.

37. All documents accounting for or identifying any and/or all distributions from the Crusader Fund withheld from DAF from June 1, 2016, to the present.

38. All documents accounting for or identifying any and/or all fees earned, and expenses incurred, by A&M related to the Crusader Fund from June 1, 2016, to the present.

39. All documents accounting for or identifying all monetary sums paid to A&M, directly or indirectly, related to the Crusader Fund from June 1, 2016, to the present, other than those reflected in any accounting produced by A&M in response to Request No. 36 above.

40. All documents concerning any third-party financial audits concerning the Crusader Fund from June 1, 2016, to the present.

41. All documents concerning any internal financial audits concerning the Crusader Fund from June 1, 2016, to the present.

42. All documents concerning any analyses, from June 1, 2016, to the present, of the performance and/or valuation of the underlying assets held by the Crusader Fund.

43. All documents concerning any analyses from June 1, 2016, to the present, of the performance and/or valuation of the Crusader Fund overall.

44. All reports generated for the Crusader Fund and distributed to shareholders from June 1, 2016 to present, including but not limited to all annual and monthly reports.

45. All documents and communications concerning the solicitation and negotiation of offers to purchase the Claims.

46. All documents and communications concerning A&M's involvement in the solicitation and negotiation of offers to purchase the Claims.

47. Any and all bids, offers, solicitation packages, term sheets, or similar documents, relating to the Sale of the Claims.

48. All documents and communications concerning or reflecting the value of each of the Claims prior to or after the Sale of the Claims, or in connection with the solicitation or negotiation of offers as described in the July 6 Letter.

49. Any and all agreements granting the Redeemer Committee, or any member of the Redeemer Committee, and/or the Crusader Fund the right to participate in the ultimate recoveries on the Claims, and all Communications relating to any such grant.

50. All documents and communications concerning or reflecting Seery's role in the solicitation or negotiation of any of the offers made in connection with the Sale of the Claims.

51. All documents and communications concerning or reflecting Grosvenor's and/or anyone on the Redeemer Committee's role in the solicitation or negotiation of any of the offers made in connection with the Sale of the Claims.

52. All documents reflecting any communications involving and/or including Seery, on the one hand, and A&M, on the other hand, regarding the Sale of Claims or the Claims.

53. All documents reflecting any communications involving and/or including Grosvenor, on the one hand, and A&M, on the other hand, regarding the Sale of Claims or the Claims.

54. All documents reflecting any communications involving and/or including Stonehill, on the one hand, and A&M, on the other hand, regarding the Sale of Claims or the Claims.

55. All documents reflecting any communications involving and/or including Jessup, on the one hand, and A&M, on the other hand, regarding the Sale of Claims.

56. All documents reflecting any communications between and/or among one or more of A&M, Seery, Grosvenor, Stonehill, and/or Jessup regarding any Big Boy Clause proposed or agreed to in connection with the Sale of the Claims or the Claims.

57. All documents reflecting any communications between and/or among one or more of A&M, Seery, Grosvenor, Stonehill, and/or Jessup regarding any risks of recovery on the Claims.

58. All documents reflecting any communications between and/or among one or more of A&M, Seery, Grosvenor, Stonehill, and/or Jessup regarding any deferred payment(s) for the Claims, including but not limited to, any agreement to pay any additional money based on the ultimate/percentage of recovery on the Claims from HCM's bankruptcy estate.

59. All documents and communications concerning or reflecting all persons and/or entities that communicated with A&M concerning DAF's Direct Interest, DAF's Full Direct Interest, DAF's capital account value, and/or DAF's shares in the Crusader Fund.

60. All documents and communications concerning or reflecting Grosvenor's interest in the Crusader Fund.

61. All documents and communications concerning or reflecting Grosvenor's interest, if any, in Stonehill.

62. All documents and communications concerning or reflecting Grosvenor's interest, if any, in Jessup.

3164221.2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Wendy Cassidy on behalf of John Cox
Bar No. 24003722
WCassidy@gibsondunn.com
Envelope ID: 91610158
Filing Code Description: Motion - Quash
Filing Description:
Status as of 9/4/2024 8:39 AM CST

Associated Case Party: CHARITABLE DAF FUND LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Juslyn Young | | jyoung@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| TRACY CRATTY | | TCRATTY@PMMLAW.COM | 9/4/2024 8:30:19 AM | SENT |
| Maria Kountz | | MKountz@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| James J.McGoldrick | | jmcgoldrick@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |

Associated Case Party: Charitable DAF Fund, L.P.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Beatrice Candis | | bcandis@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Kimball | | lkimball@pmmclaw.com | 9/4/2024 8:30:19 AM | SENT |
| Tim Miller | | tmiller@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 9/4/2024 8:30:19 AM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 9/4/2024 8:30:19 AM | SENT |
| Roger LMcCleary | | rmccleary@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| Sawnie McEntire | | smcentire@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| Ian Salzer | | isalzer@pmmlaw.com | 9/4/2024 8:30:19 AM | SENT |
| Marshall R.King | | MKing@gibsondunn.com | 9/4/2024 8:30:19 AM | SENT |
| Pat A.Vickery | | PVickery@gibsondunn.com | 9/4/2024 8:30:19 AM | SENT |

## Case Information

DC-22-10107 | CHARITABLE DAF FUND LP, et al vs. ALVAREZ & MARSAL CRF MANAGEMENT LLC, et al

| Case Number | Court | Judicial Officer |
|---|---|---|
| DC-22-10107 | 116th District Court | PARKER, TONYA |
| File Date | Case Type | Case Status |
| 08/15/2022 | OTHER (CIVIL) | OPEN |

## Party

PLAINTIFF
CHARITABLE DAF FUND LP

Active Attorneys ▾
Lead Attorney
MCENTIRE, SAWNIE A
Retained

Attorney
MCCLEARY, ROGER L
Retained

Attorney
MCGOLDRICK, JAMES J
Retained

Attorney
SALZER, IAN B.
Retained

PLAINTIFF
Charitable DAF Fund, L.P.

Active Attorneys ▾
Lead Attorney
MCENTIRE, SAWNIE A
Retained

DEFENDANT
ALVAREZ & MARSAL CRF MANAGEMENT LLC

Active Attorneys ▾
Lead Attorney
COX, JOHN T III
Retained

DEFENDANT
Alvarez & Marsal CRF Management, LLC

Active Attorneys ▾
Lead Attorney
BEAN, ANDREW
Retained

## Events and Hearings

08/15/2022 NEW CASE FILED (OCA) - CIVIL

08/15/2022 ORIGINAL PETITION ▾

ORIGINAL PETITION

08/15/2022 ISSUE CITATION COMM OF INS OR SOS ▾

ISSUE CITATION SOS - ALVAREZ & MARSAL CRF MANAGEMENT LLC

ISSUE CITATION SOS - ALVAREZ & MARSAL, CRF MANAGEMENT, LLC

Comment
SEE NOTES TAB

08/15/2022 JURY DEMAND ▾

FP FILE DESK JURY DEMAND FORM

08/24/2022 CORRESPONDENCE - LETTER TO FILE ▾

COVER LETTER

09/23/2022 CITATION SOS/COI/COH/HAG ▾

Unserved

Anticipated Server
ESERVE

Anticipated Method
Comment
ALVAREZ & MARSAL, CRF MANAGEMENT, LLC

09/23/2022 CITATION SOS/COI/COH/HAG ▾

Unserved

Anticipated Server
ESERVE

Anticipated Method
Comment
UPDATED ONLY - ALVAREZ & MARSAL, CRF MANAGEMENT, LLC

01/12/2023 CERTIFICATE OF SERVICE ▾

Comment
SOS - ALVAREZ & MARSAL CRF MANAGEMENT LLC

01/19/2023 MOTION - RETAIN ▾

VERIFIED MOTION TO RETAIN

01/19/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER VERIFIED MOTION TO RETAIN

Comment
PROPOSED ORDER VERIFIED MOTION TO RETAIN

01/24/2023 DISMISSAL FOR WANT OF PROSECUTION ▾

Original Type
DISMISSAL FOR WANT OF PROSECUTION

dism letter (116th)

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
8:45 AM

Result
HEARING HELD

Comment
MOTION TO RETAIN PENDING

02/16/2023 MOTION - RETAIN ▾

PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

Comment
VERIFIED SECOND

02/16/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER GRANTING PLTFS 2ND VERIFIED MOTION RETAIN

Comment
PROPOSED ORDER GRANTING PLAINTIFFS VERIFIED SECOND MOTION TO RETAIN

02/20/2023 ORIGINAL ANSWER - GENERAL DENIAL ▾

ORIGINAL ANSWER

02/20/2023 MOTION - RETAIN ▾

PLAINTIFF-SUPPLEMENT TO 2ND M/RETAIN

Comment
PLAINTIFF'S VERIFIED SUPPLEMENT TO PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

02/22/2023 DISMISSAL FOR WANT OF PROSECUTION ▾

DISM NOTICE FINAL

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
8:45 AM

Cancel Reason
BY COURT ADMINISTRATOR

03/16/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

NON-SIGNED PROPOSED ORDER-AGREED SCHEDULING ORDER

Comment
AGREED SCHEDULING ORDER

03/21/2023 SCHEDULING ORDER ▾

SCHEDULING ORDER

Comment
AGREED - LEVEL 3

03/22/2023 Scheduling Conference ▾

116 Sched Conf

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
8:45 AM

Cancel Reason
BY COURT ADMINISTRATOR

03/28/2023 VACATION LETTER

08/11/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Comment
PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

08/11/2023 MOTION - PROTECT ▾

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Comment
AND MOTION TO ABATE

08/17/2023 NOTICE OF HEARING / FIAT ▾

NOTICE OF HEARING ON DEF MOTION TO PROTECT & ABATE

Comment
ON DEF MOTION TO PROTECT & ABATE

10/10/2023 NOTICE OF HEARING / FIAT ▾

AMENDED NOH MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Comment
AMENDED / MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

10/12/2023 Motion - Protect ▾

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

NOTICE OF HEARING ON DEF MOTION TO PROTECT & ABATE

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
9:00 AM

Cancel Reason
HEARING RESCHEDULED

Comment
SET BY WENDY CASSIDY 214-906-8196, MOTION PROTECT/ABATE, IN PERSON

10/18/2023 RETURNED MAIL ▾

NOTICE OF TRIAL / SCHEDULING ORDER - BRYAN HAYNES

Comment
NOTICE OF TRIAL / SCHEDULING ORDER - BRYAN HAYNES

---

11/06/2023 AMENDED PETITION ▾

PLAINTIFF'S FIRST AMENDED PETITION

Comment
FIRST

---

11/13/2023 MOTION - CONTINUANCE ▾

MOTIONFOR CONTINUAND AND FOR ENTRY OF AMENDED SCHEDULING ORDER

Comment
AND ENTRY OF AMENDED SCHEDULING ORDER

---

11/13/2023 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER FOR CONTINUANCE

Comment
PROPOSED ORDER FOR CONTINUANCE AND AMENDED SCHEDULING ORDER

---

11/25/2023 SCHEDULING ORDER ▾

SCHEDULING ORDER

Comment
FIRST AMENDED LEVEL 3

---

11/30/2023 MISCELLANOUS EVENT ▾

E-SERVE COVER LETTER

E-SERVE ORDER 1ST AMENDED SCHEDULNG

Comment
ESERVE COVER LETTER - ORDER 1ST AMENDED SCHEDULING

---

11/30/2023 NOTICE OF HEARING / FIAT ▾

2ND AMENDED NOTICE OF HEARING ON MOTIONS PROTECT/ABATE

Comment
2ND AMENDED ON MOTIONS PROTECT/ABATE

---

12/07/2023 Motion - Protect ▾

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

AMENDED NOH MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
09:30 AM

Cancel Reason
HEARING RESCHEDULED

Comment
30 MIN / SET BY WENDY CASSIDY 214-906-8196, MOTION PROTECT/ABATE, / CC REQ / IN PERSON

01/03/2024 RETURNED MAIL ▾

NOTICE OF NOTICE OF AGREED MEDIATOR WITH ATTACHED SCHEDULING ORDER FOR BRYAN
HAYNES

Comment
NOTICE OF NOTICE OF AGREED MEDIATOR WITH ATTACHED SCHEDULING ORDER FOR
BRYAN HAYNES

01/26/2024 NOTICE OF HEARING / FIAT ▾

3RD AMENDED NOH-MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Comment
3RD AMENDED / MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

02/01/2024 Motion - Protect ▾

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

2ND AMENDED NOTICE OF HEARING ON MOTIONS PROTECT/ABATE

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
09:30 AM

Cancel Reason
HEARING RESCHEDULED

Comment
30 MIN / SET BY WENDY CASSIDY 214-906-8196, MOTION PROTECT/ABATE, / CC REQ / IN PERSON

02/29/2024 RESPONSE ▾

PLTF'S RESPONSE IN OPPOSITION TO PROTECTIVE ORDER, MOTION TO ABATE, AND
EVIDENTIARY OBJECTIONS

Comment
IN OPPOSITION TO PROTECTIVE ORDER, MOTION TO ABATE, AND EVIDENTIARY OBJECTIONS

02/29/2024 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER DENYING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

Comment
PROPOSED ORDER DENYING MOTIONS FOR PROTECTIVE ORDER AND TO ABATE

02/29/2024 MOTION - COMPEL ▾

PLTF'S MOTION TO COMPEL DISCOVERY

Comment
DISCOVERY

03/01/2024 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

PROPOSED ORDER COMPELLING DISCOVERY

Comment
PROPOSED ORDER COMPELLING DISCOVERY

03/01/2024 NOTICE OF HEARING / FIAT ▾

NOH-MOTON TO COMPEL SET 4/3 @ 1:15 P.M.

Comment
MOTION TO COMPEL SET 4/3/1:15 P.M.

03/04/2024 NOTE - CLERKS ▾

Comment
REC CC RESPONSE TO MOTION FOR PROTECTIVE ORDER FOR FOR 3/6 @ 1:15 A.M HEARING

03/05/2024 NOTICE OF HEARING / FIAT ▾

4TH AMD NOH / MOTION PROTECT SET 4/3/@ 1:15 P.M.

Comment
4TH AMD / MOTION PROTECT SET 4/3/@ 1:15 P.M.

03/06/2024 NOTE - CLERKS ▾

Comment
CC REC' FOR 4/3 1:15PM HEARING ON MOTION TO COMPEL

03/29/2024 OBJECTION ▾

DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY ETC

Comment
DEFENDANTS' COMBINED OPPOSTION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY &
REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER & MOTION TO ABATE

9/13/24, 11:58 AM

Case 19-34054-sgj11    Doc 4162-4    Filed 09/13/24    Entered 09/13/24 19:28:22    Desc
Exhibit 3 - State Court Filings (Part 2)    Page 417 of 423

**04/01/2024 RESPONSE** ▾

PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

Comment
REPLY IN SUPPORT OF ITS MOTION TO COMPEL

---

**04/03/2024 Motion - Protect** ▾

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

3RD AMENDED NOH-MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

PROPOSED ORDER DENYING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

PLTF'S RESPONSE IN OPPOSITION TO PROTECTIVE ORDER, MOTION TO ABATE, AND
EVIDENTIARY OBJECTIONS

4TH AMD NOH / MOTION PROTECT SET 4/3/@ 1:15 P.M.

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Cancel Reason
REQUESTED BY ATTORNEY/PRO SE

Comment
'DEFT ALVAREZ M/PROTECTIVE ORDER" SET BY WENDY CASSIDY 214-906-8196/ CC REQ / IN
PERSON. PARTIAL COURTESY COPY (ST)

---

**04/03/2024 Motion - Compel** ▾

PROPOSED ORDER COMPELLING DISCOVERY

PLTF'S MOTION TO COMPEL DISCOVERY

NOH-MOTON TO COMPEL SET 4/3 @ 1:15 P.M.

DEFENDANTS' COMBINED OPPOSTION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY ETC

PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Cancel Reason
REQUESTED BY ATTORNEY/PRO SE

Comment
'PLTF'S M/COMPEL DISCVOERY" SET BY BEATRICE 214.237.4369; NOH AND CC REQ'D; IN-PERSON.
CC RECEIVED (ST)

---

**04/08/2024 MOTION - CONTINUANCE** ▾

MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

Comment
AGREED / AND ENTRY OF AMENDED SCHEDULING ORDER

04/18/2024 ORDER - DENY CONTINUANCE ▾

ORDER - DENY CONTINUANCE

Comment
AND ENTRY OF AMENDED SCHEDULNG ORDER

04/24/2024 E-SERVED COPY OF ORDER ▾

E-SERVE COVER LETTER

ESERVE ORDER DENY CONTINUANCE

04/24/2024 NOTICE OF HEARING / FIAT ▾

NOH-PLAINTIFF MOTION TO COMPEL

Comment
PLAINTIFF MOTION TO COMPEL SET 5/8 @ 1:15 P.M.

04/24/2024 MOTION - CONTINUANCE ▾

AMENDED AGREED MOTION FOR CONTINUANCE

Comment
AMENDED AGREED

04/26/2024 NOTE - CLERKS ▾

Comment
COURTESY COPY FOR MOTION TO COMPEL ON 5/8 RECEIVED

04/29/2024 Status Conference ▾

Judicial Officer
PARKER, TONYA

Hearing Time
1:30 PM

04/29/2024 ORDER - GRANTING CONTINUANCE ▾

ORDER - GRANTING CONTINUANCE

Comment
AMENDED

05/01/2024 E-SERVED COPY OF ORDER ▾

E-SERVE COVER LETTER

E-SERVE ORDER CONTINUANCE

---

05/08/2024 Motion - Compel ▾

PROPOSED ORDER COMPELLING DISCOVERY

PLTF'S MOTION TO COMPEL DISCOVERY

DEFENDANTS' COMBINED OPPOSTION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY ETC

PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

NOH-PLAINTIFF MOTION TO COMPEL

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Cancel Reason
REQUESTED BY ATTORNEY/PRO SE

Comment
214-237-4315 IAN SALZER / CC REQ / IN PERSON. CC RECEIVED

---

05/23/2024 Motion - Continuance ▾

AMENDED AGREED MOTION FOR CONTINUANCE

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
09:30 AM

Cancel Reason
REQUESTED BY ATTORNEY/PRO SE

Comment
15 MIN / 214-237-4315 IAN SALZER / CC REQ / IN PERSON

---

07/03/2024 NOTICE OF HEARING / FIAT ▾

NOH-PLAINTIFF MOTION TO COMPEL

Comment
PLAINTIFF MOTION TO COMPEL SET 8/7 @ 1:15

---

07/09/2024 CERTIFICATE OF CONFERENCE ▾

CERTIFICATE OF CONFERENCE ON DEFENDANT MOTION FOR PROTECTIVE ORDER AND ABATE

Comment
ON DEFENDANT MOTION FOR PROTECTIVE ORDER AND ABATE

---

07/10/2024 NOTICE OF HEARING / FIAT ▾

5TH AMENDED NOTICE OF HEARING ON MOTION TO PROTECT

5TH AMENDED ON MOTION TO PROTECT

---

07/19/2024 CASE NOT SETTLED AT MEDIATION ▾

CASE NOT SETTLED AT MEDIATION

---

08/02/2024 NOTE - CLERKS ▾

Comment
COURTESY COPY FOR MOTION TO PROTECT/COMPEL ON 8/7 RECEIVED

---

08/07/2024 Motion - Compel ▾

PLTF'S MOTION TO COMPEL DISCOVERY

NOH-PLAINTIFF MOTION TO COMPEL

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Comment
'PLTF'S M/COMPEL DISCOVERY" 214-237-4369 BEATRICE CANDIS / CC REQ / IN PERSON. CC
RECEIVED (ST)

---

08/07/2024 Motion - Protect ▾

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

CERTIFICATE OF CONFERENCE ON DEFENDANT MOTION FOR PROTECTIVE ORDER AND ABATE

5TH AMENDED NOTICE OF HEARING ON MOTION TO PROTECT

Judicial Officer(s)
PARKER, TONYA, PARKER, TONYA

Hearing Time
1:15 PM

Comment
214-906-8196 WENDY CASSIDY / CC REQ / IN PERSON. CC RECEIVED (ST)

---

08/07/2024 NOTICE OF APPEARANCE ▾

PLAINTIFF'S NOTICE OF APPEARANCE

---

08/07/2024 ORDER - DENY ▾

ORDER - DENY

Comment
MOTION FOR PROTECTIVE AND ABATE

---

08/07/2024 ORDER - COMPEL ▾

ORDER - COMPEL

08/09/2024 E-SERVED COPY OF ORDER

08/28/2024 AMENDED PETITION ▾

2ND AMENDED PETITION

Comment
2ND

09/04/2024 MOTION - QUASH ▾

DEFENDANT'S MOTION TO QUASH

01/27/2025 Jury Trial - Civil ▾

Judicial Officer
PARKER, TONYA

Hearing Time
9:00 AM

Comment
(Level 3)

## Financial

CHARITABLE DAF FUND LP
    Total Financial Assessment         $368.00
    Total Payments and Credits      $368.00

| 8/23/2022 | Transaction Assessment | | | $368.00 |
| 8/23/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 52334-2022-DCLK | CHARITABLE DAF FUND LP | ($231.00) |
| 8/23/2022 | STATE CREDIT | | | ($137.00) |

Charitable DAF Fund, L.P.
    Total Financial Assessment       $4.00
    Total Payments and Credits     $4.00

| 8/29/2022 | Transaction Assessment | | | $4.00 |

| 8/29/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 53740-2022-DCLK | Charitable DAF Fund, L.P. | ($4.00) |

## Documents

ORIGINAL PETITION

FP FILE DESK JURY DEMAND FORM

COVER LETTER

ISSUE CITATION SOS - ALVAREZ & MARSAL CRF MANAGEMENT LLC

ISSUE CITATION SOS - ALVAREZ & MARSAL, CRF MANAGEMENT, LLC

dism letter (116th)

VERIFIED MOTION TO RETAIN

PROPOSED ORDER VERIFIED MOTION TO RETAIN

DISM NOTICE FINAL

PLAINTIFF'S VERIFIED SECOND MOTION TO RETAIN

PROPOSED ORDER GRANTING PLTFS 2ND VERIFIED MOTION RETAIN

ORIGINAL ANSWER

PLAINTIFF-SUPPLEMENT TO 2ND M/RETAIN

116 Sched Conf

NON-SIGNED PROPOSED ORDER-AGREED SCHEDULING ORDER

SCHEDULING ORDER

PROPOSED ORDER GRANTING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

DEFENDANT ALVAREZ & MARSAL'S MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

NOTICE OF HEARING ON DEF MOTION TO PROTECT & ABATE

AMENDED NOH MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

NOTICE OF TRIAL / SCHEDULING ORDER - BRYAN HAYNES

PLAINTIFF'S FIRST AMENDED PETITION

PROPOSED ORDER FOR CONTINUANCE

MOTIONFOR CONTINUAND AND FOR ENTRY OF AMENDED SCHEDULING ORDER

SCHEDULING ORDER

E-SERVE COVER LETTER

E-SERVE ORDER 1ST AMENDED SCHEDULNG

2ND AMENDED NOTICE OF HEARING ON MOTIONS PROTECT/ABATE

NOTICE OF NO...ROF OF AGREED MEDIATOR WITH... AMENDED SCHEDULING ORDER FOR BRYAN HAYNES

3RD AMENDED NOH-MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

PROPOSED ORDER DENYING MOTION FOR PROTECTIVE ORDER AND MOTION TO ABATE

PLTF'S RESPONSE IN OPPOSITION TO PROTECTIVE ORDER, MOTION TO ABATE, AND EVIDENTIARY OBJECTIONS

PROPOSED ORDER COMPELLING DISCOVERY

PLTF'S MOTION TO COMPEL DISCOVERY

NOH-MOTON TO COMPEL SET 4/3 @ 1:15 P.M.

4TH AMD NOH / MOTION PROTECT SET 4/3/@ 1:15 P.M.

DEFENDANTS' COMBINED OPPOSTION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY ETC

PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

MOTION FOR CONTINUANCE AND ENTRY OF AMENDED SCHEDULING ORDER

ORDER - DENY CONTINUANCE

E-SERVE COVER LETTER

ESERVE ORDER DENY CONTINUANCE

NOH-PLAINTIFF MOTION TO COMPEL

AMENDED AGREED MOTION FOR CONTINUANCE

ORDER - GRANTING CONTINUANCE

E-SERVE COVER LETTER

E-SERVE ORDER CONTINUANCE

NOH-PLAINTIFF MOTION TO COMPEL

CERTIFICATE OF CONFERENCE ON DEFENDANT MOTION FOR PROTECTIVE ORDER AND ABATE

5TH AMENDED NOTICE OF HEARING ON MOTION TO PROTECT

CASE NOT SETTLED AT MEDIATION

PLAINTIFF'S NOTICE OF APPEARANCE

ORDER - DENY

ORDER - COMPEL

2ND AMENDED PETITION

DEFENDANT'S MOTION TO QUASH