# Exhibit A



Amy L. Ruhland
515 Congress Ave.
Suite 1900
Austin, TX  78701
Direct Dial: (512) 739-6420
aruhland@reichmanjorgensen.com

August 20, 2024

*VIA EXPRESS MAIL*

Ms. Tara Twomey
Director
Executive Office for U.S. Trustees
Department of Justice
441 G Street, NW, Suite 6150
Washington, D.C. 20530

Re: *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.)

Dear Ms. Twomey:

I am writing to further update you on further developments in the Chapter 11 bankruptcy proceeding of Highland Capital Management, L.P. ("Highland") that we believe should be of interest to the Executive Office of the United States Trustee ("EOUST") and the acting United States Trustee.  As explained in previous correspondence to your office, my firm represents several stakeholders in the Highland bankruptcy, including The Dugaboy Investment Trust ("Dugaboy")—a former equity holder and a current Class 10 creditor—and Highland's co-founder, James D. Dondero.

This letter summarizes (1) my clients' view of why and how the Highland bankruptcy progressed as it did, (2) the problems endemic in that bankruptcy, (3) the problematic mechanics of Highland's plan of reorganization and post-confirmation structure, and (4) the developments that continue to detrimentally impact Highland's estate and stakeholders.

## SUMMARY OF BANKRUPTCY

The Highland bankruptcy is unusual for many reasons.  Proceedings continue nearly five years after the company's Chapter 11 petition was filed (on October 16, 2019).  The court-confirmed plan of reorganization calls for the total liquidation of what we now know is (and likely always has been) a solvent estate.  Over the course of the case, equity and pre-bankruptcy management were marginalized and silenced.  Key employees were retained then fired without being paid earned compensation.  And the estate's hired professionals have made hundreds of millions of dollars at the expense of estate stakeholders.

Much of this was facilitated by the predilections of the presiding judge, who at the outset harbored persistent negative opinions about Highland's pre-bankruptcy management.  As Highland's counsel no doubt realized, those opinions could be leveraged to pursue Highland's bankruptcy agenda so long as Mr. Dondero was painted as the villain along the way.  That perhaps

1

explains why Highland's counsel began referring to Mr. Dondero as "vexatious" and "litigious" early in the case and repeated the refrain so often that the Bankruptcy Court adopted those monikers in multiple rulings. Ironically, when those labels first appeared, Mr. Dondero was not a plaintiff in a single action against the estate but was a defendant in at least four. And the label worked: Mr. Dondero has been sidelined by the Bankruptcy Court, locked out of any meaningful participation in the reorganization of the estate, and robbed of any path to recovering any portion of the approximately $860 liquidation-value estate that should have emerged as a going concern from bankruptcy.

Prior to confirmation, Mr. Dondero spent tens of millions of his own money attempting to salvage and retrieve residual value from the company he founded and which he knew could emerge from bankruptcy viable and intact. For that reason, Highland's favorite refrain that Mr. Dondero threatened to "burn the place down" (a threat that only James P. Seery, Jr., Highland's current CEO, seemingly ever heard) makes no sense—Mr. Dondero has always argued that Highland is "highly solvent," and it was always his goal to retake the helm after repayment of creditors in full. It makes no sense that he would he threaten to burn down the company that he created and intended to return to after bankruptcy. Paradoxically, while Mr. Dondero was putting together dozens of settlement offers in an effort to resolve the company's bankruptcy, Highland and its post-bankruptcy management were planning to do the equivalent of burning the place down, by agreeing to a plan of liquidation at the demand of litigation creditors whose only goal was to see Mr. Dondero punished. All the while, neither post-bankruptcy management nor its counsel ever denied that Highland's estate was solvent.

What we know now is that, as a consequence of the obfuscation of estate solvency, the oversight of a biased judge, and a systemic indifference to the type of transparency that is supposed to be the hallmark of the public bankruptcy process, myriad problems have arisen and persisted. Among other things:

- Although Highland came into bankruptcy with more than $560 million in net assets and a single liquidated judgment creditor (holding an arbitration award of what was expected to be approximately $110 million), a quick restructuring of that debt and a reorganization did not occur as planned. Instead, a bankruptcy petition that was filed in Delaware (Highland's state of organization) landed in the United States Bankruptcy Court for the Northern District of Texas, over the objection of Highland's counsel (at a time when it was still aligned with pre-bankruptcy management) and has persisted unabated for nearly five years.

- Without any evidentiary hearing to ascertain the company's financial status or management adequacy, Mr. Dondero immediately was forced out of management (under the threat of the appointment of a chapter 11 trustee) and then unceremoniously fired from his position as an unpaid portfolio manager when he vocalized his disagreement with decisions being made by bankruptcy management.

- Mr. Dondero made dozens of unanswered offers to settle the estate, many of which projected greater recoveries to creditors than what bankruptcy management had promised and all of which would have allowed Highland to continue as a going concern. After refusing to respond to those offers, Highland unveiled its own liquidation plan and refused to change course. Because the Bankruptcy Court approved virtually everything Highland's new management proposed, the Court ignored prior management's claims of solvency, refused to appoint an examiner to

determine solvency, failed to insist that Highland file required Rule 2015.3 reports, and confirmed a plan calling for the total liquidation of Highland's assets and the winding up of its business.

- At a time when Highland's bankruptcy management was reporting massive losses in value to the estate (approximately $238 million over a less than 12-month period) and a $100 million increase in creditor claims (further eroding estate value), two hedge funds, Farallon Capital Management ("Farallon") and Stonehill Capital Management ("Stonehill") (through their proxies Muck Holdings and Jessup holdings, respectively) bought the majority of outstanding unsecured creditor claims for approximately $160 million.[1]   As far as we are aware, Farallon and Stonehill purchased the claims without conducting any due diligence.  Prior letters to your office have explained why our clients (and other bankruptcy stakeholders) believe that Farallon and Stonehill made these investments only because they had access to non-public information regarding the value of Highland's estate.  Yet to date, the Bankruptcy Court has foreclosed all efforts by former equity to obtain information or to pursue other relief (including lawsuits for insider trading, breach of fiduciary duty, and fraud) relating to the claims trades.  Notably, at the time of the trades, based on our clients' estimates, the estate had cash of over $100 million and could have instead resolved the selling unsecured creditors' claims and returned the remaining estate to equity.

- Remarkably, within 14 months of the effective date of Highland's plan of reorganization, the estate had paid out $250 million to unsecured creditors and has since paid out another $160 million, representing a windfall return to Farallon and Stonehill.

- And during the bankruptcy proceedings, estate professionals have earned more than $250 million in fees and continue to accrue fees at an astronomical rate.  Yet the post-confirmation estate has been structured in a way that precludes any checks on this unmitigated spend.  Ironically, Highland's counsel and the Unsecured Creditors Committee advocated removal of pre-bankruptcy management to avoid the cannibalization of the estate, but independent management seemingly has been permitted to do that very thing.

Against this backdrop, it is little wonder that Mr. Dondero and former equity (now deemed "Contingent Interest Holders" under the plan of reorganization) have refused to stand down.  They continue to demand information, explanations, and accountability from the management and professionals that have seen fit to liquidate a solvent company and rack up fees at the expense of residual equity holders.

## REGULATORY FRAMEWORK

As discussed at length in my prior letter of September 8, 2023, the USTP's mission is "to promote the integrity and efficiency of the nation's bankruptcy system for the benefit of all stakeholders."  USTP, *FY 2024 Performance Budget Congressional Submission* (March 2023)

---

[1] Our clients are informed and believe that Michael Linn and Rajev Patel at Farallon, and John Motulsky at Stonehill were involved in the transactions at issue and that Farallon and Stonehill purchased the claims based on representations made to them by Mr. Seery.

("USTP, *Congressional Submission*").  That mission depends in critical part on transparency, one of the core "linchpins" of the bankruptcy system.  *See* Clifford J. White, *USTP Focuses on Professional Fees, Corporate Governance, and Predictability and Transparency in Chapter 11*, ABI Journal Vol. XXXV, No. 5 (May 2016) ("White, *Transparency in Chapter 11*").

The need for transparency is particularly acute with respect to plan-created post-confirmation trusts.  Indeed, the USTP has recognized that the increasing use of post-confirmation trusts (which are often "thinly described in the disclosure statement and the plan of reorganization") has compromised transparency in bankruptcy.  White, *Transparency in Chapter 11*, at 9.   As a result, a Commission of the American Bankruptcy Institute ("ABI") has recommended changes in law that would require more detailed disclosures surrounding the management and operation of post-confirmation trusts.  *See* ABI Commission to Study the Reform of Chapter 11, *Final Report and Recommendations* (2012-2014) ("Commission Report").[2]  The goal of such changes would be to ensure that all stakeholders, including the public, can see what is transpiring and can have access to critical information.  *Id.*

The Commission Report identified several problems involving post-confirmation trusts like the ones that currently govern the Highland estate.  Specifically, the Report notes that, prior to confirmation, stakeholders have little or no time to review trust and organizational documents, and then after confirmation, courts do not actively oversee operations or administration of trusts.  Further, with respect to governance and operation of post-confirmation entities, disclosure is frequently inadequate.  As a result, the Report recommends amendment of the Bankruptcy Code to require, among other things, specific disclosures regarding the assets of the reorganized debtor or other post-confirmation entity, the details of the claims and interests in dispute, and the details of any reconciliation or distribution process.  And the U.S. Trustee's office has actively objected to post-confirmation trust structures that obfuscate transparency.  *See, e.g.*, *In re INFOW*, No. 22-60020 (Bankr. S.D. Tex. 2022) (criticizing debtor for creating a litigation trust structure that would "avoid shining a light on the entities" and urging court to reject the opaque structure).

In short, it is the duty of the EOUST to administer the USTP in a manner that effectuates the program's core mission, including by demanding transparency in the pre- and post-confirmation management of bankruptcy estates, ensuring that pre- and post-confirmation reports contain meaningful detail that will allow creditors and other stakeholders to evaluate the financial operations and health of the debtor's business, and promoting expediency in the resolution of bankruptcy estates.

## PLAN MECHANICS AND POST-REORGANIZATION STRUCTURE

This regulatory backdrop makes apparent that the structure of Highland's post-confirmation estate presents many of the transparency problems that the EOUST has sought to eliminate.

On February 22, 2021, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"), and that Plan became effective on August 11, 2021.  *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.), Dkts. 1943,

---

[2]  Notably, the acting CEO and Chief Restructuring Officer in the Highland bankruptcy, James P. Seery, Jr., was a Commission member and personally signed the Commission Report.  *See https://commission.abi.org/commission-members*.

2700.[3]  The Plan called for the timely and orderly liquidation of Highland's estate and the payment of 11 classes of claims.  Claims 1-7 consist of secured, priority, and convenience claims.  Class 8 consists of general unsecured claims.  Class 9 consists of subordinated claims.  And Highland's former equity holders, including Dugaboy and Hunter Mountain Investment Trust ("HMIT"), were assigned Class 10 and 11 claims.  *See* Dkt. 1943, Ex. A at Art. III, § B.

The Plan contemplated that most of Highland's assets would be monetized and managed by a Claimant Trust pursuant to a separate Claimant Trust Agreement ("CTA").  The CTA named Mr. Seery (Highland's acting CEO and Chief Restructuring Officer) as the Claimant Trustee, whose management of the Claimant Trust was to be overseen by a five-member Oversight Board, to include at least two disinterested members.  Dkt. 3521-1 at § 4.1.[4]

Under the terms of the Claimant Trust Agreement, "Claimant Trust Beneficiaries" include (1) holders of allowed general unsecured claims, (2) holders of allowed subordinated claims, and (3) upon certification by the Claimant Trustee that holders of allowed general unsecured claims and allowed subordinated claims have been paid in full with interest, the holders of Class 10 and 11 claims.  Dkt. 3521-5 at § 1.1(h).  Consistent with the Plan's waterfall, upon paying holders of claims in Classes 1-9 in full with interest, the Claimant Trustee is obligated to file with the Bankruptcy Court a certification (called the "GUC Certification" in the CTA) deeming Class 10 and 11 claimholders "Beneficiaries" of the CTA with entitlement to distributions of residual assets.  *Id.* at § 5.1(c).

The Plan also called for the creation of a Litigation Sub-Trust, managed by a Litigation Trustee, to litigate claims for the benefit of the estate, and a Reorganized Debtor, tasked with managing a smaller bucket of assets and winding down certain managed funds.  Dkt. 1943 at ¶ 42(b); *id.*, Ex. A at Art. IV, § B.1.

The Plan did not contemplate the creation of any other trusts or entities for the management of Highland's post-reorganization assets.  Nonetheless, four months after Plan confirmation, Highland filed a motion seeking the Bankruptcy Court's authorization to create an "Indemnity Subtrust" (the "Indemnity Subtrust Motion").  Dkt. 2491.  According to the Motion, the Indemnity Subtrust would be funded by the estate through an indemnity subtrust account with a balance of "not less than $25 million" that would conditionally indemnify post-confirmation professionals "in lieu of obtaining D&O insurance."  *Id.* at ¶¶ 21, 26.  The parties conditionally indemnified under the Indemnity Subtrust include Mr. Seery as Claimant Trustee, the Oversight Board and its members, their professionals, the Litigation Trustee, Reorganized Debtor and its partners, members, directors, and officers, and the new general partner of the Reorganized Debtor and its partners, members, directors, and officers (including Mr. Seery).  *Id.* at ¶ 18 n.8; *see also* CTA, Dkt. 3521-5 at § 8.2.  Over various objections, the Bankruptcy Court granted the Indemnity Subtrust Motion on July 21, 2021.  Dkt. 2599.

The Indemnity Subtrust Motion identified Mr. Seery as the "Indemnity Trust Administrator."  Dkt. 2491 at ¶ 21.  In his capacity as such, Mr. Seery was given total control over the administration of the Indemnity Subtrust:

---

[3] All references to "Dkt." Herein are to the docket in Highland's main bankruptcy case, unless otherwise specified.

[4] The original Oversight Board consisted of representatives of the Unsecured Creditors Committee, including representatives of Acis Capital Management, L.P., the Redeemer Committee, UBS AG London Branch, and Meta-E Discovery.  CTA, Dkt. 3521-5 at § 4.1.  David Pauker and Paul McVoy (the representative from Meta-E) were named the two "disinterested" members.  *Id.*

. . . For any action contemplated or required in connection with the operation of the Indemnity Trust, and for any guidance or instruction to be provided to the Indemnity Trustee, such functions, rights and responsibility shall be vested in the Indemnity Trust Administrator, and the Indemnity Trustee will take written directions from the Indemnity Trust Administrator, in such form specified in the Indemnity Trust Agreement and otherwise satisfactory to the Indemnity Trustee.

*Id.* And although Highland's Motion assured the Court that "[b]eneficiaries will not be involved in or have any rights with respect to the administration of the Indemnity Trust or have any right to direct the actions of the Indemnity Trustee with respect to the Indemnity Trust or the assets held in the Indemnity Trust Account," Highland carved out Mr. Seery (to the extent he is acting in his capacity as Indemnity Trust Administrator) from that exclusion. *Id.*

## RECENT DEVELOPMENTS

Since our last correspondence, there have been several additional developments in the Highland bankruptcy that should be of interest to the EOUST.

***Highland Remains Highly Solvent.*** As discussed in our last correspondence to your office, after being ordered by the Bankruptcy Court to do so, on July 6, 2023, Highland filed a consolidated balance sheet dated May 31, 2023 (the "Balance Sheet") disclosing, at a high level, the assets and liabilities of the Reorganized Debtor, its general partner, the Claimant Trust. That balance sheet revealed that Highland had approximately $152 million on hand with only $139 million in additional distributions to be made. Dkt. 3872. Since that time, Highland has made additional distributions to allowed unsecured creditors in Classes 8 and 9, bringing its total outstanding liabilities to unsecured creditors to $84 million and the estate's net value to $107 million. Notably, that value does not account for any recoveries in the *Kirschner v. Dondero, et al.* adversary proceeding, which was stayed by the Bankruptcy Court in April 2023, at the request of the Litigation Trustee, when it became apparent that additional funds might not be necessary to settle the estate. *See* Adv. Proc. No. 21-03076-sgj, Dkt. 338. The estate's reported net value also excludes any recovery from the so-called "notes litigation"—a series of adversary proceedings instituted by Highland to recover on various promissory notes—for which the defendants have already deposited security of approximately $72 million into the registry of the United States District Court for the Northern District of Texas. *See Highland Capital Mgmt., L.P. v. NexPoint Asset Mgmt., L.P., et al.*, Case No. 3:21-cv-00881-X (N.D. Tex.), Dkts. 149, 151, 160-162, 187.

That Balance Sheet disclosed that, contrary to the representations made by Highland and its management to the Bankruptcy Court and the public for years now, *Highland's estate is solvent.* According to the Balance Sheet, as of May 2023, the Claimant Trust has approximately $250 million in assets (of which an estimated $180 million is cash) and only about $126 million in remaining Class 8 and 9 claims. Dkt. 3872 at Ex. A. Since that time, the Post-Confirmation Reports reflect that an additional $29.3 million has been paid to general unsecured creditors. *See* Dkts. 3955, 3956, 4130, 4131. That leaves a balance of $84,138,939 in remaining Class 8 and 9 claims. *See* Post-Confirmation Reports, Dkts. 4130 at 7; 4131 at 7 (subtracting the total "Paid Cumulative" from the "Allowed Claims" amounts). The Reports do not disclose the current cash position of the Claimant Trust. Cash may have increased or decreased. But in the worst case, adjusting the cash from amounts shown in the Balance Sheet by the amounts paid to Classes 8 and 9, the Trust still has plenty of cash to resolve all outstanding Class 8 and 9 claims.

6

Nor do the assets disclosed in the Balance Sheet include a fully cash-funded indemnity account (reportedly now containing $50 million) that could be used to pay creditors if it is not consumed by the estate's professionals.  *See* Dkt. 3872 at Ex. A n.1.  In addition, to reduce the Claimant Trust's book value, Highland purported to add "non-book" adjustments to the balance sheet.  One such adjustment gives zero asset value to the notes payable in the "notes litigation." *Id.* at Ex. A.  However, as previously explained, $72 million of those notes are now fully bonded by cash deposited in the registry of District Court.

Another accounting "adjustment" includes a $90 million "additional indemnification reserve," on top of the at least $35 million (but perhaps as high as $50 million) cash indemnity reserve, with no explanation.  *See* Dkt. 3872 at Ex. A.  Importantly, were it not for the approximately $125-$140 million indemnity reserve—which is $100 million more than Highland originally told the Bankruptcy Court it would need to ensure estate professionals—Highland's creditors could have been paid and the estate returned to equity months if not years ago.

Highland's recent admission that it is solvent is significant for other reasons as well.  First, the admission flies in the face of representations repeatedly made to the Court, creditors, and other stakeholders—including in the Plan and supporting documents—that the estate was insolvent and incapable of paying creditors in full.[5]  That position led to the confirmation of a Chapter 11 Plan that did not call for the reorganization of Highland but instead called for its premature liquidation and winding up.  That position also allowed Highland's management to repeatedly argue to the courts (including the Bankruptcy Court and the relevant courts of appeal) that equity holders lacked standing to pursue any challenges to bankruptcy orders or management's actions.

Following is a picture of what we understand has actually happened to Highland's financial picture during the course of the Chapter 11 bankruptcy proceedings:

[*Remainder of Page Intentionally Left Blank*]

---

[5] As previous letters to your office have described, Mr. Dondero and other constituents close to the Highland enterprise have repeatedly told the Court that Highland has always been solvent and, with proper management, could have been reorganized in a manner enabling it to pay creditors in full, to retain key employees, and to continue in business for the benefit of investors and creditors.



***Mr. Seery Has Held the Estate Hostage to Protect His Own Interests.***  Despite the Plan's requirement that Mr. Seery's management of the Claimant Trust be supervised by a five-member, partially independent Oversight Board, that governance structure continues to be ignored.  The five-member Board no longer exists.  Instead, the Board is comprised of two claims buyers, Muck Holdings and Jessup Holdings, and one ostensibly disinterested member, Richard Katz, about whom no information demonstrating independence was provided with his appointment.  *See* Dkt. 2801.  The Board's current membership creates potential governance problems.  For example, the Board must in many instances approve actions undertaken by the Claimant Trustee by a "majority" vote.  *See* Dkt. 3521-5 at §§ 3.3(b)(i)-(xii), 3.4, 3.8, 3.9, and 4.6(a).  But if any Board member has a conflict or *potential* conflict of interest with respect to an issue at hand (including, without limitation, a pecuniary interest in the issue), then the conflicted member cannot vote.  *Id.* at § 4.6(c).  In the case of the current three-member Board, any potential conflict of interest derails a majority vote and precludes the Board from approving actions contemplated by the Claimant Trustee.[6]

Even without this governance problem, the Claimant Trust lacks the requisite safeguards to prevent abuse by the Claimant Trustee.  That has proven particularly problematic when it comes to the Claimant Trust's indemnity obligations.  Specifically, the CTA states:

> Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net

---

[6] There is ample risk of a potential conflict in this case.  Two of the three Board members, Muck Holdings and Jessup Holdings, are defendants in a proposed adversary proceeding involving allegations of use of material non-public information in connection with claims trading.  *See* Dkt. 3699.  Although the Bankruptcy Court denied HMIT leave to pursue the adversary proceeding (*see* Dkts. 3903, 3904), that ruling is currently on appeal.  *See Hunter Mountain Investment Trust v. Highland Capital Mgmt., L.P.*, Case No. 3:23-cv-02071-E.  And Muck and Jessup—as holders of the majority of remaining Class 8 and 9 claims—have a financial interest in how the estate is managed and when and how claims are paid.

> of any amounts that . . . (d) are necessary to satisfy the reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreements (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to the consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive the termination of the Claimant Trust) . . . .

CTA, Dkt. 3521-5 at § 6.1(a) (emphasis added). In other words, Mr. Seery, as both Claimant Trustee and the Indemnity Trust Administrator, has the sole authority to reserve for potential indemnification obligations *without any input from or approval by* the Oversight Board or other supervision. This is problematic because Mr. Seery (both as Claimant Trustee and the owner of the Reorganized Debtor's general partner) is one of the principal indemnified parties who stands to benefit from the funding of the indemnification reserve. That means Mr. Seery has a vested financial interest in all decisions he makes regarding the indemnification reserve, including how much to reserve and whether to pay out of the reserve to indemnified parties, including himself. Mr. Seery's unfettered right to control the Indemnity Subtrust is a material deviation from the Plan: while the Plan always contemplated a conditional indemnification right to certain parties, such right was to be supervised by the Oversight Board. But the Oversight Board now has no role in the supervision of the indemnification reserve, and the only person with supervisory authority has a conflict of interest.

There can be no doubt that this conflict of interest already has detrimentally impacted the estate and its stakeholders. The Claimant Trust has long had sufficient assets to pay Classes 8 and 9 in full with interest, which should have triggered the filing of a GUC Certificate and the payment of the surplus estate to Classes 10 and 11. Yet none of this has happened. Instead, Mr. Seery has chosen to fund an increasingly sizeable indemnification reserve without any discernable justification other than as a subterfuge to avoid certifying that holders of Classes 10 and 11 are Claimant Trust Beneficiaries.

***The Bankruptcy Court Has Abdicated Any Responsibility to The Estate.*** In light of the estate's solvency, it should come as no surprise that former equity holders (the current Class 10 and 11 claimholders) have redoubled their efforts to obtain meaningful financial information about the estate and to hold estate professionals accountable for their continued massive professional spend. After all, any continued erosion of the estate comes directly out of the pockets of Class 10 and 11 claimholders. To that end, on May 10, 2023, Dugaboy and HMIT filed an Adversary Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust ("Dugaboy Adversary Proceeding"). Dkt. 3778; *see also Dugaboy Investment Trust v. Highland Capital Mgmt., L.P.*, No. 23-03038-sgj, Dkt. 1. The Dugaboy Adversary Proceeding sought detailed information regarding the current assets of the Claimant Trust and a determination that estate assets are now sufficient to pay Class 8 and 9 claimholders in full with interest, such that Dugaboy and HMIT should be declared a Claimant Trust Beneficiary with a right to the surplus of the estate. Indeed, in that filing—which predated Highland's filing of the Balance Sheet by more than two months—Dugaboy provided the Court with an estimate of the value of the estate based on information Dugaboy and others had been able to gather from third-party sources (but that Highland has been unwilling to verify). *See* Dkt. 3778 at ¶ 10. Dugaboy

has continued to pursue that information despite persistent roadblocks erected by Highland and the Bankruptcy Court and now believes that Highland's financial picture is as follows:

**Estate as of June 2024**

| Sources | | Amount |
|---|---|---|
| Cash Sales Proceeds | | 693 |
| Non-Cash Assets Remaining | | 90 |
| Total Cash + Non-Cash Value of Estate | | 783 |
| | | |
| **Uses** | | |
| Distributions to Creditors | | 320 |
| Debtor Operating Costs | | 41 |
| Legal/Professional Fees | | 204 |
| Total | | 565 |
| | | |
| **Current Estate Value** | | 218 |
| Owed to Creditors | 84 | |
| **Remaning Value in the Estate** | **134** | |

In other words, any rational factfinder could and should conclude that the Claimant Trustee has sufficient funds to fulfill the directive of the Claimant Trust Agreement by completing the monetization of the estate, paying all unsecured creditors in full, and declaring Dugaboy and HMIT Claimant Trust Beneficiaries pursuant to the required GUC Certification. Instead, the Bankruptcy Court appears determined to conclude—based on no evidence—that the Claimant Trust may need an additional $120 million or more to defend litigation that does not yet exist and that nobody has been able to describe. *See* Feb. 14, 2024 Hr'g Tr., Ex. B, at 33:12-35:9.

On November 22, 2023, Highland filed a motion to dismiss the Dugaboy Adversary Proceeding, arguing among other things that the Bankruptcy Court lacks subject matter jurisdiction to order the relief sought and that Dugaboy lacks standing to seek any relief because it is not a Claimant Trust Beneficiary under the CTA. *See* Dugaboy Adversary Proceeding, Dkt. 14.

Thereafter, on January 1, 2024, HMIT filed a Motion for Leave to File Delaware Complaint (the "Delaware Motion for Leave"), in which it sought permission from the Bankruptcy Court to proceed with the removal of Mr. Seery as the Claimant Trustee because of Mr. Seery's hopeless conflict of interest in administering both the Claimant Trust and the Indemnification Subtrust, of which he is a primary beneficiary. *See* Dkt. 4000. In that motion, HMIT argued that, in light of the estate's cash position, Mr. Seery's failure to pay of Classes 8 and 9 and to certify that Dugaboy and HMIT are Claimant Trust Beneficiaries is a breach of fiduciary duty and a breach of the duty of good faith and fair dealing warranting his removal. *See id.*

Just over two weeks later, on January 16, 2024, Highland moved to stay the Delaware Motion for Leave, arguing that the issue of Dugaboy's status as a Claimant Trust Beneficiary and

its standing to proceed against the Claimant Trust should be resolved first in the context of the
Dugaboy Adversary Proceeding. *See* Dkt. 4013. Over HMIT's objection, the Court stayed
proceedings on the Delaware Motion for Leave pending the outcome of two other recent appeals
involving Dugaboy and HMIT. Dkt. 4033. In doing so, the Court repeatedly emphasized its
continuing belief that Dugaboy and HMIT lack standing to pursue any remedies against the estate
and its professionals because they are not "Claimant Trust Beneficiaries" under the CTA. *See,
e.g.*, Jan. 24, 2024 Hr'g Tr., Ex. A, at 24:21-25:5, 30:15-21. Given what we know about the timing
of appeals emanating from this bankruptcy, the Bankruptcy Court's stay order will be in place long
after the Claimant Trust is dissolved. In other words, the stay order is an effective dismissal of
HMIT's proposed complaint against Mr. Seery.

On February 14, 2024, the Bankruptcy Court held a hearing on Highland's motion to
dismiss the Dugaboy Adversary Proceeding. During that hearing, Judge Jernigan was overtly
hostile to counsel for Dugaboy and HMIT, repeatedly interrupting counsel and making numerous
negative comments about her clients. For example, in response to arguments by counsel that
Dugaboy is "in the money" based on Highland's own disclosures (including the Balance Sheet),
such that it should have standing to be heard on issues relevant to its entitlement to the estate's
surplus waterfall, the Judge retorted that "your client is its own worst enemy," had filed too many
appeals in the bankruptcy case, and that she could never value the Claimant Trust in view of the
amount being spent on attorneys' fees. *See* Feb. 14, 2024 Hr'g Tr., Ex. B, at 29:8-19. Judge
Jernigan also voiced her belief that the litigation stemming from Highland's bankruptcy "is never
going to end" and is "going to go on forever whether [Dugaboy] get[s] the information or not."
*Id.* at 44:19-45:3. For that reason, the Judge flatly refused to consider whether the indemnity
reserve (in the neighborhood of $125-140 million) being amassed by Mr. Seery far outstrips the
cost of any litigation that could possibly be pursued at this stage of bankruptcy proceedings.[7]

The consequence of the Bankruptcy Court's refusal to scrutinize—at any level—Mr.
Seery's management of the Claimant Trust and the value of the estate is significant. Any
reasonable observer could surmise that the Claimant Trust has sufficient assets to pay Class 8 and
9 claimholders in full with interest and to certify that Class 10 and 11 claimholders are "Claimant
Trust Beneficiaries" with a right to the surplus of the estate. That would mean Class 10 and 11
claimholders have standing to pursue claims against the estate and its professionals, to seek
removal of Mr. Seery as Claimant Trustee, and to obtain critical information about the value of the
Claimant Trust and the assets of the estate. But without the Court's willingness to examine the
value of the estate, Mr. Seery may continue to hold the Claimant Trust hostage to protect his own
interests—in direct contravention of his fiduciary duties under applicable Delaware trust law. That
is precisely the sort of problem that the USTP has attempted to address by demanding disclosures
and transparency from post-confirmation professionals charged with protecting debtor estates for
the benefit of stakeholders.

## CONCLUSION

The post-confirmation trust structure created by Highland has been the linchpin of its
efforts to obfuscate estate value and to prevent resolution of the estate for the benefit of all

---

[7] Notably, Judge Jernigan repeatedly asked what sort of damages are being sought in current litigation against the
estate and its professionals, but that question is not relevant to the determination of whether the indemnity reserve is
being appropriately funded. The estate and its professionals are not entitled to draw from the indemnity reserve to
pay damages for actions that constitute bad faith, fraud, gross negligence, criminal conduct, or willful misconduct—
precisely the sort of conduct at issue in current litigation. *See* Dkt. 1943 at Ex. A, Art. IX, § C.

creditors. At present, it looks as though post-confirmation management is content to increase the pot for the Indemnity Subtrust infinitely, so long as that creates enough of a drain to make the estate look insolvent and to prevent the payoff of creditor claims. Indeed, it appears that Mr. Seery is intent on disenfranchising former equity (Class 10 and 11 claimholders) rather than efficiently and timely monetizing and resolving the estate as required by the CTA. From the comments made by Judge Jernigan at the February 14, 2024 hearing, it appears the Bankruptcy Court is also content to allow Highland to continue along this path without the burden of Court oversight or scrutiny.

This is precisely the type of circumstance where the U.S. Trustee should intervene. Highland's use of post-confirmation trusts to avoid transparency, to avoid Court scrutiny, and to line the pockets of bankruptcy professionals is the sort of abuse the USTP counsels against. We urge your office to investigate the post-confirmation management of Highland's estate and to require the acting U.S. Trustee to intervene, take positions, and file appropriate briefing to encourage better oversight and transparency.

To the extent we can answer any questions about the contents of this letter or provide additional information that would be helpful the EOUST, we would be happy to do so. In addition, we are available to meet in person to discuss these issues at your convenience.

Best regards,

Amy L. Ruhland

Enclosure

12

# EXHIBIT A

```
1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                              DALLAS DIVISION

3                                    )    Case No. 19-34054-sgj-11
      In Re:                         )    Chapter 11
4                                    )
      HIGHLAND CAPITAL               )    Dallas, Texas
5     MANAGEMENT, L.P.,              )    January 24, 2024
                                     )    9:30 a.m. Docket
6           Reorganized Debtor.      )
                                     )    - HIGHLAND'S MOTION FOR
7                                    )      BAD FAITH FINDING [3851]
                                     )    - HIGHLAND'S MOTION TO STAY
8     _____)      CONTESTED MATTER [4013]

9                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11    APPEARANCES:

12    For the Reorganized        John A. Morris
      Debtor:                    PACHULSKI STANG ZIEHL & JONES, LLP
13                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
14                               (212) 561-7760

15    For NexPoint Real Estate   Charles William "Bill" Gameros,
      Partners, LLC:               Jr.
16                               HOGE & GAMEROS, LLP
                                 6116 N. Central Expressway,
17                                 Suite 1400
                                 Dallas, TX  75206
18                               (214) 765-6002

19    For Hunter Mountain        Deborah Rose Deitsch-Perez
      Investment Trust, The      Michael P. Aigen
20    Dugaboy Investment Trust:  STINSON, LLP
                                 2200 Ross Avenue, Suite 2900
21                               Dallas, TX  75201
                                 (214) 560-2201
22
      Recorded by:               Michael F. Edmond, Sr.
23                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
24                               Dallas, TX  75242
                                 (214) 753-2062
25
```

2

1    Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
2                                Shady Shores, TX  76208
                                 (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1          <u>DALLAS, TEXAS - JANUARY 24, 2024 - 9:32 A.M.</u>

2          THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6    right.  We have a video hearing this morning in certain

7    Highland Capital Management matters.  We're not going to do an

8    appearance roll call because we've started a new, I think,

9    more efficient system where we just have people log in their

10   appearance when they come onto the video WebEx.  And so we're

11   going to rely on that.

12      All right.  So we have two matters.  One has been long-

13   scheduled.  It's Highland's motion for a bad faith finding and

14   attorneys' fees against NexPoint Real Estate Partners in

15   connection with proof of claim litigation.  So we have that

16   set.

17      And then we had an expedited motion to stay a contested

18   matter set by Highland.  Highland is wanting to stay any

19   litigation on a newly-filed motion by Hunter Mountain

20   Investment Trust to sue Mr. Seery in the Delaware Chancery

21   Court or Delaware state court system.

22      I'm thinking it probably makes sense to consider that

23   expedited motion for a stay first.  Does anyone on the line

24   disagree with that sequence?

25          MR. MORRIS:  Your Honor, this is John Morris from

1    Pachulski for Highland.  I don't disagree with it.  I was

2    prepared to handle the other matter first, simply because it

3    was filed first, but I defer to the Court if that's the

4    Court's wishes.

5           THE COURT:  Well, I'm just thinking it's probably the

6    shorter matter and there may be folks who will drop off, I

7    don't know, maybe.

8           MR. MORRIS:  Oh.  Then that makes sense.

9           THE COURT:  Okay.  All right.  Well, I'll hear what

10   Highland wants to say first, please.

11          MR. MORRIS:  Okay.  Good morning, Your Honor.  Before

12   I get to that, just a couple of housekeeping matters.  I don't

13   mean to be the policeperson here, but there are, at least

14   showing on my screen, a number of participants just by phone

15   number.  There's somebody who's identified as Participant.  It

16   may be that the Court has the information as to the identity

17   of these folks, but I thought the purpose was to disclose the

18   identity of anybody who's attending this hearing.

19       So I see, for example, phone numbers beginning with 202 or

20   312.  There's somebody who's listed, at least on my screen, as

21   "Participant."  I don't think that was the intent of the rule.

22   And, again, I don't mean to be the policeperson here.

23   Somebody just joined with a telephone number beginning 469.

24       If I'm mistaken, you know, please just correct me, but I

25   thought the idea was that there would be transparency as to

1    who was here.

2              THE COURT:  Okay.  The idea is, because of national

3    rules at the Administrative Office of the Courts, post-

4    September 21, 2023, because of so-called anti-broadcasting

5    rules, if you're a participant in the case you may watch by

6    video a court proceeding, but if you're not a participant you

7    can only listen in, audio.

8         So it may be that those that you're seeing is just, you

9    know, they may have chosen to use the term Participant, but

10   they may be only audio.  Of course, it seems less --

11             MR. MORRIS:  Okay.

12             THE COURT:  -- significant when we don't have human

13   beings taking the witness stand in the courtroom.

14        So, Mike, can you answer, are the anonymous people, are

15   they all audio?

16             THE CLERK:  No.  They're not.  Not -- excuse me.  Let

17   me do this, Judge.

18        Okay.  Anyone with a number, you need to identify yourself

19   for the Court.  I see a 202, a 312, and a 469 and 703.  If you

20   cannot identify yourself, we will have to expel you from the

21   hearing.

22             THE COURT:  And, again, --

23        (Inaudible interruption.)

24             THE COURT:  Again, if you aren't identified, you're

25   going to be expelled from the WebEx.  You can always call in,

1    audio, but you -- not my rule.  A rule from Washington, DC.

2    So, does anyone at this point want to identify themselves?

3        (No response.)

4            THE COURT:  Okay.  Hearing no identification, they'll

5    be expelled.  And then, again, if they want to call in, they

6    can call in, but no video WebEx.

7        All right.  Any other housekeeping matters?

8            MR. MORRIS:  Just one other, Your Honor.  It's with

9    some very mixed feelings that I report to the Court that our

10   star paralegal, Aja Cantey, has left us.  She has moved on to

11   become the head bankruptcy paralegal at Paul Weiss.  You know

12   how much I rely on my paralegals.  But my sadness has been

13   assuaged a bit by Andrea Bates, who joined us recently.  She

14   is on the line today.  She'll be assisting me in today's

15   hearing.

16       I just wanted to, you know, let the Court knows that there

17   has been a change, that we have supreme confidence in Ms.

18   Bates, who joins us from Skadden Arps.

19           THE COURT:  Okay.

20           MR. MORRIS:  And I just -- I just didn't want there

21   to be any surprises there.

22           THE COURT:  All right.  Thank you for announcing

23   that.

24           MR. SANJANA:  Your Honor, I'm sorry to interrupt.

25   Your Honor?

1          THE COURT:  Yes?

2          MR. SANJANA:  I'm sorry to interrupt.

3          THE COURT:  Who is this?

4          MR. SANJANA:  Hi.  This is Jason Sanjana at Reorg --

5    this is Jason Sanjana at Reorg Research.  I was the 202

6    number.  And I just wanted to -- I was always on audio, and

7    I'm on audio now.

8          THE COURT:  Okay.

9          MR. SANJANA:  But I was on mute until now.  So, --

10          THE COURT:  Okay.

11          MR. SANJANA:  -- I just wanted to let you know that.

12          THE COURT:  Okay.

13          MR. SANJANA:  But it may have been appearing as on

14   WebEx for you, but it isn't.

15          THE COURT:  Okay.  All right.  I appreciate you

16   clarifying that for us, Jason.

17       Okay.  Anything else?

18          MR. MORRIS:  No, Your Honor.

19          THE COURT:  All right.  Well, we had this motion to

20   stay the contested matter of Hunter Mountain wanting relief

21   from the gatekeeper provision to sue Mr. Seery in Delaware.

22   So I'll hear what Highland has to say with regard to its

23   motion for a stay.

24          MR. MORRIS:  Okay.  Thank you, Your Honor.  John

25   Morris; Pachulski Stang Ziehl & Jones; for Highland Capital

1   Management.  We're here today on Highland's motion for a very

2   limited stay of Hunter Mountain's motion for leave to sue Mr.

3   Seery.

4       I have a short deck to use to assist in today's

5   presentation, and I would ask Ms. Bates to put that up on the

6   screen.

7       While we're waiting for that, just so it's clear, the

8   motion was originally filed at Docket No. 4013.

9               THE COURT:  Okay.

10              MR. MORRIS:  And, you know, as an overarching theme

11  here, the basis for the stay is that the issues in the motion

12  for leave pertaining to whether or not Hunter Mountain is a

13  beneficiary under the Claimant Trust Agreement are the very

14  issues that are going to be -- that have been fully briefed

15  and that are going to be argued just three weeks from now in

16  connection with Highland's motion to dismiss Hunter Mountain's

17  valuation complaint.

18      And I think that the easiest thing to do here, Your Honor,

19  if we can -- if we could go to the next slide, is just to

20  think about what's -- what the pleadings are.  What's the

21  relief that is being requested and what's the basis for the

22  relief?

23      And so you'll see -- and this is in our motion -- but I

24  find it helpful to actually focus on exactly what the

25  complaint is.  The complaint that we're seeking to stay

includes four or five causes of action.  You'll find up on the

screen Paragraph 35 of the proposed complaint.  It follows the

heading Roman Numeral V, Causes of Action.  And this is the

basis for the complaint.  It's solely relying on Delaware

corporate law, Section 3327 of the Delaware corporate law.

And that law allows, you know, certain people the ability to

seek the removal of the Trustee.

As set forth in Hunter Mountain's own pleading, under

Section 3327, relief can be sought only if it's in accordance

with the governing instrument, and Hunter Mountain is not

making that claim here, or by a trustor, another officeholder,

or a beneficiary.  There's no contention that Hunter Mountain

is a trustor, there's no contention that it's a court, there's

no contention that it's another officeholder.

Therefore, under Hunter Mountain's complaint that they

seek to file to remove Mr. Seery, they must be a beneficiary.

This Court must determine that Hunter Mountain is a

beneficiary.  That's what their complaint says, and there

really can't be any dispute about that because each of the

causes of action uses the very highlighted language that

follows from the statute that they're relying upon.

And let's compare that with Hunter Mountain's motion --

complaint for valuation information.  So if we can go to the

next slide.  They have three causes of action in that lawsuit,

and every one of those causes of action also requires a

1    determination that Hunter Mountain is a beneficiary under the

2    Claimant Trust Agreement.

3       The first cause of action can be found in Paragraphs 82 to

4    88, and it demands disclosure of trust assets and an

5    accounting.  They claim that they need the information, quote,

6    to determine whether their claimant -- contingent Claimant

7    Trust interests may vest into Claimant Trust interests.

8       You know, for me, Your Honor, that's already a --

9    shouldn't they know they're not beneficiaries?  They have

10   already conceded in Paragraph 83 that they are not holders of

11   Claimant Trust interests but merely have unvested contingent

12   Claimant Trust interests.

13      But beyond that, as the Court knows from prior litigation,

14   only Claimant Trust beneficiaries have rights to obtain

15   information, and those rights are severely limited.

16      So you have a concession that Hunter Mountain is not a

17   Claimant Trust beneficiary.  You have a document that's been

18   adopted by this Court, approved by this Court, approved by the

19   Fifth Circuit Court of Appeals, that expressly gives only

20   Claimant Trust beneficiaries very limited information rights.

21   And Hunter Mountain here seeks to ignore all of that.

22      They don't care that they're not a Claimant Trust

23   beneficiary.  They don't care that they're seeking more than

24   even Claimant Trust beneficiaries are entitled to.  They don't

25   care that they're seeking information that they have no right

1   to receive.

2        But the whole premise of Count One is dependent on whether

3   they're a Claimant Trust beneficiary, which is the exact same

4   issue that has to be decided in the motion to remove Mr.

5   Seery.

6        The second cause of action is for declaratory judgment on

7   the value of the trust assets.  That can be found in

8   Paragraphs 89 to 92.  And, you know, these are their words.

9   This isn't my -- these aren't my words.  This isn't argument.

10  This is just asking the Court to read Hunter Mountain's own

11  pleading.  And it depends -- the second cause of action

12  depends on whether the Defendants have been compelled to

13  provide the information about the Claimant Trust assets.  The

14  Court can't make a declaratory judgment unless Highland has

15  been compelled to provide the information.  But for the

16  reasons I just discussed, Highland can't be compelled to

17  provide any information to Hunter Mountain or Dugaboy because

18  they're not Claimant Trust beneficiaries.

19       For the same reasons, the third cause of action, which

20  seeks declaratory judgment regarding the nature of the

21  Plaintiffs' interests, you know, there's a whole host of

22  reasons why these causes of action are deficient and why the

23  motion to dismiss ought to be granted, but I'll save that for

24  February 14th.  The point now is that, just like the second

25  cause of action, they seek a determination that the Claimant

1  Trust interests are likely to vest, an advisory opinion if

2  I've ever heard of one.  But be that as it may, it -- still,

3  it's an acknowledgement that they're not Claimant Trust

4  beneficiaries.

5      And so, in both cases, in both lawsuits, the central

6  question is, is Hunter Mountain a Claimant Trust beneficiary?

7      If we can go to the next slide, let's look at the

8  briefing, because there's really no dispute about this.

9  There's no dispute about it at all.  Look at Highland's motion

10  to dismiss the valuation complaint.  Right up in Paragraph 2,

11  we say explicitly:  Despite holding only unvested contingent

12  trust interests with no rights in the Claimant Trust,

13  Plaintiffs stubbornly seek financial information regarding

14  Claimant Trust assets.  This is the basis for the motion to

15  dismiss, that they're not Claimant Trust beneficiaries.

16      And it's not as if this is the only place in the pleading

17  where this is discussed.  If you go to Docket No. 14 in this

18  adversary proceeding, as you can see in the footnote, there's

19  an extensive analysis that explains why Plaintiffs have no

20  rights to financial information, precisely because they're not

21  Claimant Trust beneficiaries.

22      And it's not as if Hunter Mountain says we're wrong, it's

23  not an issue.  They know it's an issue, and they go to great

24  lengths to address it.

25      If we can go to the next slide.  This is from their

1    opposition to the motion to dismiss.  In Paragraph 10, they

2    say the Claimant Trust Agreement evidences an intent that

3    Plaintiffs become Claimant Trust beneficiaries when Claimant

4    Trust assets are sufficient to pay all lower-ranked claims in

5    full, with interest.  Again, their pleading, not mine.  And it

6    shows that they understand the hurdle they have to come --

7         Now, there's lots of other stuff in these pleadings

8    regarding other theories for why these claims fail, but all of

9    them fail if they're not a Claimant Trust beneficiary.

10        And I'd ask the Court to pay particular attention to

11   Paragraphs 40 to 52 in Hunter Mountain's pleading in

12   opposition to the motion to dismiss.  As you can see in the

13   footnote, they have an extensive legal argument as to why

14   Plaintiffs are allegedly -- why Plaintiffs allegedly, quote,

15   have a legal right to obtain the information they seek.

16   That's the same issue that's got to be decided in the motion

17   for leave to sue Mr. Seery.

18        And what's really interesting, Your Honor, is not only do

19   they make the argument in opposition to the motion to dismiss,

20   they basically cut-and-pasted -- I credit Mr. Demo for helping

21   me out; he pointed this out to me this morning, so I want to

22   give credit where credit is due -- they cut-and-pasted the

23   exact same argument in their motion for leave to sue Mr.

24   Seery.  So if you just compare Paragraphs 41 to 46 of Hunter

25   Mountain's opposition to Highland's motion to dismiss the

valuation complaint to Paragraphs 31 to 37 of Hunter
Mountain's motion for leave to sue Mr. Seery, you'll see
they're making the exact same argument as to why they contend
they're a Claimant Trust beneficiary.

Again, don't take our word for it.  This isn't argument.
This is just looking at their own pleading.  Right?  They're
saying in both cases they're Claimant Trust beneficiaries.
They're fighting it, right?  They know they have to get over
that hurdle, because if they don't they can't pursue these
claims.

If we can go to the next slide.  You've got Highland's
reply.  Again, extensive discussion.  It's the very first
point in the very first paragraph, under the Trust Act,
whether a party is a beneficiary:  Here, a Claimant Trust
beneficiary is determined by the plain language of the
governing trust -- here, the Claimant Trust Agreement.

And, again, if you take a look at the footnote, our reply
in Paragraphs 5 through 9 provides further argument as to why
Plaintiffs are not beneficiaries of the Claimant Trust under
the plan, the Claimant Trust Agreement, or under applicable
law.

So I think it's pretty clear from the pleadings, it's
pretty clear from the parties' positions, it's pretty clear
from the Delaware law that Hunter Mountain relies upon to move
Mr. Seery, Section 3327, that the causes of action in that

1  proposed complaint and the causes of action in Hunter

2  Mountain's valuation complaint all depend on whether or not

3  Hunter Mountain is a beneficiary under the plan, under the

4  Claimant Trust Agreement, and under Delaware law.  And all of

5  those issues are going to be argued in just three weeks.  All

6  of those issues are going to be decided by the Court

7  thereafter.

8       If we can go to, yeah, this next slide.  So, yesterday,

9  Hunter Mountain filed its response to the motion for a stay.

10  And I just want to address some of the arguments that were

11  made.

12       You know, the first argument that they made concerned the

13  legal standard.  They said, oh, Highland didn't use the proper

14  legal standard.  We disagree.  This isn't a motion for

15  injunctive relief.  It's not a motion for a stay pending

16  appeal.  It's a motion asking the Court to prudently police

17  its own docket.

18       And here's, here's the irony, Your Honor.  Again, don't

19  take my word for it.  Take Ms. Deitsch-Perez and her clients'

20  word for it.  Because just last year, in connection with their

21  motion for a stay pending the mediation, in a pleading that

22  was filed on 4/20, they said that the Court has the discretion

23  to issue a stay.  They relied on *Clinton v. Jones*, exactly as

24  Highland has done to seek a stay in this case.  Okay?  So the

25  very standard and the case citation that they criticize today

1   is the very standard and case citation that they relied upon

2   last April.

3       And here, it gets even better.  Because Ms. Deitsch-Perez,

4   on behalf of her client, Hunter Mountain, joined in Dugaboy

5   and Mr. Dondero's motion for a stay.  She and her client

6   personally adopted the very standard that they're criticizing

7   today.  You can't make this stuff up.

8       The standard is the right standard.  The Court certainly

9   has the discretion to police its own docket.

10      The second point that they make is that, you know, they'll

11  be really prejudiced without a stay.  I say it's the exact

12  opposite.  Everybody will be prejudiced without a stay.  The

13  Court will be prejudiced.  Highland will be prejudiced.  Mr.

14  Dondero.  Hunter Mountain.  All of us will be prejudiced

15  because we will wind up litigating the exact same issue twice.

16  We will expend further resources.  And of greatest concern to

17  us is that we might wind up with inconsistent results.

18      There's no question that -- I shouldn't say there's no

19  question.  In all likelihood, a decision will be had on

20  Highland's motion to dismiss the valuation complaint in short

21  order, since argument is scheduled just three weeks from now

22  and the matter is fully briefed.  And as Your Honor knows,

23  that -- if we prevail and the Court finds, as it's indicated

24  in prior rulings, that Hunter Mountain is not a Claimant Trust

25  beneficiary and has no rights to this information, and they

1    appeal that, that'll get assigned to a particular district

2    judge.

3        If the stay is denied and we proceed with the litigation

4    of the Hunter Mountain complaint that seeks to remove Mr.

5    Seery and we prevail on that one, that'll go to a different

6    judge, in all likelihood, since there's more than, I think,

7    two dozen judges in the District Court.  They'll be on

8    completely separate tracks.  And you run the -- you run the

9    real risk -- I mean, actually, it's not a real risk, from our

10   point, given the substance -- but you definitely run the risk

11   of inconsistent decisions.

12       So I know, and I'll close in a moment with some comments

13   about the wisdom of this whole exercise, but I know -- I know

14   how much Mr. Dondero, you know, wants to challenge Mr. Seery.

15   But that doesn't -- that doesn't make it the efficient thing

16   to do.  It doesn't make it the fair thing to do, when we're

17   litigating the exact same issues right now.

18       The third, the third notion, the third argument they make

19   is really they attempt to rewrite their complaint.  They try

20   to suggest that the issues are not identical.  They suggest

21   that, you know, they've got theories of breach of fiduciary

22   duty and good faith and fair dealing.  You know what, Your

23   Honor?  You just have to go back to Paragraph 35 of the

24   proposed complaint.  That are the legal theories of their

25   case.  And to the extent that there's a notion of fiduciary

1    duty in there, it is predicated on Section 337.  In fact, it's

2    predicated -- if you'll give me just one moment -- it's

3    predicated on Section 337 -- 3327(1):  The officeholder has

4    committed a breach of trust.

5        It's not a stand -- there is no standalone breach of

6    fiduciary duty claim, nor could there be.  Because as the

7    Court is likely aware, there's a very specific provision in

8    the trust agreement that's been affirmed by this Court, the

9    District Court, the Fifth Circuit, that specifically

10    disclaimed any fiduciary duty to anybody but a Claimant Trust

11    beneficiary.  So you couldn't have a standalone breach of

12    fiduciary duty claim.  It just doesn't exist.

13        So they can try if they want to characterize their claims

14    however they want.  They should be held to the pleading that

15    they filed.  It's the one that we'll be defending if the

16    motion for stay is denied or if the Debtor sees the light of

17    day.

18        But I do want to close with just some general observations

19    about this.  Right?  They want to -- they suggest, you know,

20    Highland wants to avoid the suit to remove Mr. Seery.  No, we

21    don't.  What we want to do is the right thing here.  There is

22    no dispute that neither Mr. Dondero, Mr. Patrick, or Hunter

23    Mountain serve on the Claimant Trust Board.  They have no

24    personal knowledge of anything concerning the Claimant

25    Oversight Board.  And Hunter Mountain's proposed complaint

1  cites no facts concerning the governance of the Claimant

2  Oversight Board.

3      Instead, they seek to file another complaint, borne out of

4  grievances, based on rank speculation, untenable inferences,

5  and fabricated tales, lacking in common sense, frankly, that

6  is woefully ignorant of the evidence that has already been

7  admitted against it.

8      According to Hunter Mountain, the Claimant Trust Board is

9  missing in action.  They have abandoned their fiduciary duty.

10  They have ceded control of the Claimant Trust to Mr. Seery to

11  do what he wishes, even if it's acting against Stonehill and

12  Farallon's own interests.  Right?  The complaint said, oh, Mr.

13  Seery is arbitrarily withholding distributions so he can

14  supposedly enrich himself by getting the same salary that this

15  Court approved it'll be four years ago in July.

16      You can't make this stuff up, Your Honor.  The whole

17  premise doesn't make any sense at all.  Why doesn't it make

18  any sense at all?  Because Mr. Dondero [sic] is accountable.

19  He is fully accountable.  He's accountable for the Claimant

20  Oversight Board and he is accountable to every holder of an

21  actual vested claimant beneficial interest in the trust.  He

22  owes them fiduciary duties.  Hunter Mountain is not in that

23  group.  But Mr. Seery is most definitely accountable to the

24  people who had allowed claims and the people today who are

25  Claimant Trust beneficiaries.

 1          And here's the thing.  Hunter Mountain knows that the

 2    Claimant Oversight Board is not missing in action.  Hunter

 3    Mountain knows that Mr. Seery is not acting unilaterally.  How

 4    does it know that?  Because we had a trial last June.  And

 5    during that trial -- you can find this at Docket No. --

 6               MS. DEITSCH-PEREZ:  Your Honor?  I -- Your Honor, I

 7    regret --

 8               THE COURT:  Stop.

 9               MS. DEITSCH-PEREZ:  -- interrupting.

10               THE COURT:  Okay.  What do you want to say, Ms.

11    Deitsch-Perez?

12               MS. DEITSCH-PEREZ:  I regret interrupting Mr. Morris,

13    but this is not an evidentiary hearing and Mr. Morris is now

14    testifying to things that are not in his pleadings.  It's just

15    not a fair way to proceed and the Court should not allow it.

16    Thank you.

17               THE COURT:  Okay.

18               MR. MORRIS:  If I may, Your Honor, just to --

19               THE COURT:  Go ahead.

20               MR. MORRIS:  We received a response -- we received a

21    response yesterday --

22               THE COURT:  Uh-huh.

23               MR. MORRIS:  -- that accused Highland of filing this

24    motion for the stay in order to avoid having this heard.  I'd

25    like to -- all I'm doing is responding to the very argument

1  that they made yesterday.

2        THE COURT:  Okay.  You may respond.  I overrule that

3  objection.

4        MR. MORRIS:  Thank you.  So, and this is all really

5  important, because there's evidence in the record at Exhibits

6  39, 40, and 41 that were admitted last June that show a very

7  active, responsible Claimant Oversight Board fulfilling their

8  fiduciary duties in negotiating an incentive compensation

9  package for Mr. Seery.  And they want to file a complaint

10  that says the Claimant Oversight Board has abandoned its

11  responsibilities, that they're missing in action.

12      And I want to be really careful here.  I want to -- I

13  want to really be transparent here, frankly.  Stonehill and

14  Farallon are two of the biggest claimholders.  They both hold

15  seats on the board.  Does it make any sense at all that they

16  would allow Mr. Seery to do all this at their own expense if

17  they didn't think it was justified?

18      This is very important, Your Honor.  No one who holds a

19  valid, vested claim in the Claimant Trust, who is a Claimant

20  Trust beneficiary, not one of them is complaining about Mr.

21  Seery's management.  Not one of them is complaining about his

22  decisions concerning reserves.  Not one of them is

23  complaining about whether he has or hasn't made distributions

24  or how much he's distributing.  Not one of them has suggested

25  to the Court that Mr. Seery is acting unlawfully.  Nobody

1  holding a claim, a vested claim in the trust is complaining

2  about anything.  The only person complaining is Mr. Dondero,

3  the same person who has been the sole source of litigation

4  since the effective date.

5      He and his counsel should be careful for what they wish

6  for.  If Highland's motion for a stay is denied, Highland

7  will respond to the motion and will serve another Rule 11

8  motion, just as it did when Mr. Dondero filed his ridiculous

9  lawsuit claiming that my firm actually represented him

10 personally back in 2019.  Your Honor may have seen how this

11 ended.  It ended with the withdrawal of that motion.  And

12 this motion will head for the same result.

13     And I say all of this, Your Honor, because I want to be

14 respectful.  I want to make sure everybody's eyes are wide

15 open.  I want to ensure everybody understands that we're not

16 seeking a stay here because we're afraid of anything.  And I

17 want everybody to know that if the stay is denied or this

18 motion is ever heard, that the first thing that's going to

19 happen is there will be a response and a Rule 11 motion,

20 because it has no basis in law and it has no basis in fact.

21 Highland seeks a stay not to avoid a hearing on the merits

22 but because it makes no sense to keep litigating the same

23 issue over and over again.  We are not the same.  The stay

24 should be granted.

25     Thank you, Your Honor.

1          THE COURT:  I have two follow-up questions.  First,

2     I think I heard you say February 14th is when the Court --

3          MR. MORRIS:  Yes.

4          THE COURT:  -- is set to have a hearing on the

5     motion to dismiss the complaint seeking valuation.  Correct?

6          MR. MORRIS:  Yes.

7          THE COURT:  And --

8          MR. MORRIS:  Yes, Your Honor.

9          THE COURT:  And your motion for a stay here is

10    'Please stay hearing this latest Hunter Mountain motion to

11    file a complaint until not only this Court has ruled on the

12    February 14th matter but until all levels of appeals have

13    been exhausted on that.'  Am I correct about your request?

14         MR. MORRIS:  Yes, Your Honor.

15         THE COURT:  Okay.  And my second question:  When Ms.

16    Deitsch-Perez started objecting to your argument, I think you

17    were alluding to a trial this Court had on Hunter Mountain's

18    motion to sue Farallon and Stonehill as well as Mr. Seery

19    with regard to what I'll call claims purchasing activity.  Is

20    that what you were alluding to?

21         MR. MORRIS:  It was, Your Honor.

22         THE COURT:  Okay.

23         MR. MORRIS:  And I was alluding to it for the very

24    singular purpose of pointing out that there was evidence

25    admitted into the record against Hunter Mountain that shows

1   the Claimant Oversight Board fulfilling its fiduciary duties

2   and doing exactly what this Court would expect the Claimant

3   Oversight Board would do.

4        And I point that out only to contrast that evidence,

5   which has already been admitted, with allegations in the

6   proposed complaint that somehow the Claimant Oversight Board

7   has ceded control to Mr. Seery and they're missing in action.

8   It's just -- they know it's not true.  They have the

9   evidence.

10            THE COURT:  Okay.  And I said two follow-up

11  questions, but I actually have this additional question.

12  This was on my brain, this -- I couldn't remember what month

13  -- the trial, where I ruled on whether Hunter Mountain should

14  be granted leave to sue Farallon and Stonehill and Mr. Seery.

15  This was on my brain because, you know, I've issued a lot of

16  opinions during the Highland case, but I remembered writing

17  extensively on whether Hunter Mountain had standing back in

18  connection with that motion.  And in fact, I'm going to hold

19  it up.

20            MR. MORRIS:  Yep.

21            THE COURT:  I wrote a 105-page opinion -- which I

22  don't know if anyone besides my law clerk and I read it,

23  because it's not entertaining -- but I wrote a 105-page

24  opinion denying Hunter Mountain -- different lawyer at the

25  time, not Ms. Deitsch-Perez -- denying Hunter Mountain leave

1  to sue what I'll call the Claims Purchasers -- Farallon,

2  Stonehill, as well as Mr. Seery.  They wanted to sue Mr.

3  Seery for breach of fiduciary duty.  And I had multiple

4  reasons for denial, but lack of standing was one of those

5  reasons.

6       And I went and printed the opinion yesterday to refresh

7  my memory, did I rule on this already?  I thought I ruled on

8  this already.  And 23 pages of my 105-page opinion deals with

9  the lack of standing of Hunter Mountain.  Twenty-three pages,

10  and 85 footnotes, by the way, within that 23 pages, so it's a

11  very dense 23 pages.  I went through constitutional standing

12  and I went through prudential standing, and I said Hunter

13  Mountain failed under both tests.

14       So this is a very longwinded question:  What I'm hearing

15  you argue, Mr. Morris, is I'm going to rule one way or

16  another on February 14th, and then there will likely be

17  appeals, so let's don't have to reinvent the wheel.  But is

18  there something about my opinion, my 105-page opinion, that

19  isn't -- I mean, have I already addressed this, or is there

20  something I missed in that opinion regarding standing?  Has

21  something changed?  This was August 2023.

22       So maybe it's not fair to ask you, because this was more

23  the Claims Purchasers' lawyers' fight, right, and Mr.

24  Seery's, more than --

25            MR. MORRIS:  Right.

1          THE COURT:  -- the Reorganized Debtor?  They were

2     the ones who briefed it and argued it.  So maybe it's not

3     something that you bothered to read in detail.  But I feel

4     like I've ruled on this.  And --

5          MR. MORRIS:  So, --

6          MS. DEITSCH-PEREZ:  Your Honor, may --

7          THE COURT:  First Mr. Morris, and then I'll let you,

8     Ms. Deitsch-Perez.

9          MR. MORRIS:  So, a couple of observations, Your

10    Honor.

11         THE COURT:  Uh-huh.

12         MR. MORRIS:  First of all, I read every word that

13    Your Honor wrote, --

14         THE COURT:  I'm sorry.

15         MR. MORRIS:  -- as I do for all judicial.

16         THE COURT:  Okay.

17         MR. MORRIS:  Yeah, right?

18       Second of all, this issue was addressed by the Court.  It

19    was addressed pretty extensively.  It was addressed further,

20    frankly, on -- there was a subsequent post-trial motion by

21    Hunter Mountain challenging that very finding --

22         THE COURT:  The motion for reconsideration.

23         MR. MORRIS:  -- and it challenged that very finding.

24         THE COURT:  Uh-huh.

25         MR. MORRIS:  That's right.  It challenged that very

1    finding based on the same *pro forma* balance sheet that's at

2    -- that we're saying kind of moots this whole exercise, at

3    least the valuation proceeding.

4        But I'm sure Your Honor is not aware of it, but Hunter

5    Mountain has appealed that decision, and they are

6    challenging, you know, every word, I think, in your order.

7    Every word in seven interlocutory orders that preceded it.

8        And unlike the resolution of the issue that will be had

9    on February 14th, where Hunter Mountain's lack of beneficial

10   ownership in the Claimant Trust is front and center, that

11   issue is one of a very, very long laundry list of issues that

12   are going to the District Court.  And we have no reason to

13   believe, we have no -- right?  It's one of a million issues,

14   and there's no certainty at all that the District Court is

15   ever going to get to that issue.  Right?  We don't know how

16   they're going to -- it's just starting now.  I don't even

17   think the opening brief -- I think the opening brief might

18   have been filed a day or two ago.  I'll start looking at that

19   shortly.

20       But, so that's why we didn't think that was particularly

21   relevant.  We did note that in our footnote.  I mean, we did

22   point out that this -- that, you know, there is an appeal of

23   the Hunter Mountain decision of last June.  But given the

24   girth of the appeal and the number of matters that are being

25   adjudicated, you know, I wouldn't -- we're not here saying

1  you should stay the latest Hunter Mountain motion in order to

2  get a result there, because it doesn't seem, you know, maybe

3  they address it, maybe they don't.  There's no way to say

4  because it's just not -- it's just buried in there.  It's

5  buried in the laundry list.

6      Another thing I'll say is that you did, you did address

7  it.  You did address it pretty comprehensively.  But we have

8  new pleadings, you know, with arguably some new shades of

9  argument.  But the motion for leave to remove Mr. Seery is

10 based solely on Section 3327 of the Delaware law, which turns

11 right back to the terms of the Claimant Trust.

12     I'm sure that we're going to wind up at the same spot,

13 whether it's through res judicata, collateral estoppel.  I

14 mean, I think we've made a number of these arguments already.

15 But the point here is, why do we have to litigate these

16 issues for a third time?

17         THE COURT:  Okay.  Thank you.

18     All right.  Ms. Deitsch-Perez, I'll hear from you.

19         MS. DEITSCH-PEREZ:  Okay.  And Mr. Aigen is going to

20 pull up a PowerPoint.

21     Just to -- and go to Slide 2.  But just to jump ahead, the

22 motion for leave is predicated on Delaware Code 3327, and it

23 has in it a number of criteria for why a trustee should be

24 removed.  The issues are entirely different than in a

25 valuation proceeding, and a Delaware court may well have a

1   different view of what a beneficiary is for the purpose of

2   Delaware Code 3327 and the importance of making sure that

3   Delaware trustees are not hostile or unable to act.

4       I'm also going to jump ahead and answer one of the -- what

5   Mr. Morris added in his last slide, which was new, claiming

6   that, oh, no, it's perfectly clear that the Oversight Board is

7   on the job, so really you, as an equitable matter, you

8   shouldn't worry about this, because Mr. Seery is supervised.

9       One, that's not in his pleadings.  But more importantly,

10  he's mixing apples and oranges, because the evidence in the

11  former trial had to do with approving his compensation.  The

12  issue in the motion for leave to bring a suit to remove Mr.

13  Seery is the fact that the Claimant Trust structurally does

14  not -- it gives Mr. Seery complete discretion over the issue

15  of moving money into the indemnity subtrust.  It's an entirely

16  different issue than the issue that was raised in the trial in

17  June, and Mr. Morris should and probably does know that, and

18  so has been -- well, his comment was misleading at best.

19              THE COURT:  Okay.  Different --

20              MS. DEITSCH-PEREZ:  But let's take a look at --

21              THE COURT:  Different causes of action, different

22  theories, but still it boils down to whether Hunter Mountain

23  is a Claimant Trust beneficiary, right?

24              MS. DEITSCH-PEREZ:  Or whether it will be treated as

25  a Claimant Trust beneficiary, --

1          THE COURT:  Okay.

2          MS. DEITSCH-PEREZ:  -- which is an additional basis.

3          THE COURT:  I don't know what that distinction, where

4   it comes from.

5          MS. DEITSCH-PEREZ:  The distinction is that the

6   parties cannot waive, in Delaware, the duty of good faith and

7   fair dealing.  And so if Mr. Seery is taking actions that

8   prevent or attempt to prevent the Class 10 and 11 from

9   becoming beneficiaries, then under Delaware law he would not

10  be able to raise a lack of that status as a defense under

11  3327.

12         THE COURT:  You're talking about the cause of action

13  --

14         MS. DEITSCH-PEREZ:  And so if --

15         THE COURT:  Stop.  You're talking about the cause of

16  action and defenses thereto.  We're talking about standing,

17  which, as I mentioned, 23 pages, 85 footnotes, the last time

18  Hunter Mountain wanted to sue Mr. Seery and Farallon and

19  Stonehill.  Some of it was constitutional standing, but a few

20  pages was standing under Delaware law, and I said not a

21  Claimant Trust beneficiary.  Okay?

22      Regardless of what the causes of action and theories are,

23  Hunter Mountain has to be a Claimant Trust beneficiary.

24         MS. DEITSCH-PEREZ:  Or --

25         THE COURT:  I've written on that extensively already,

1    and it sounds like I'm going to have to write on it one way or

2    another extensively after February 14th.

3        Why should we not stay this new motion to file a new

4    lawsuit, rather than reinvent the wheel again?  Maybe it's

5    going to be different --

6              MS. DEITSCH-PEREZ:  Your Honor, --

7              THE COURT:  -- with the valuation motion versus what

8    I wrote in Summer 2023.  I don't know.  I haven't started

9    looking at the pleadings in depth.  But what is illogical --

10              MS. DEITSCH-PEREZ:  Your Honor?

11              THE COURT:  -- about this?  I mean, this is, again,

12    it's about judicial resources, efficiency, parties' resources.

13    Why on earth would --

14              MS. DEITSCH-PEREZ:  No, Your Honor, what it --

15              THE COURT:  Go ahead.

16              MS. DEITSCH-PEREZ:  The reason is there's a reason

17    that the Supreme Court has a very high standard to stay other

18    judicial proceedings.  So not only must the applicant make a

19    showing of likelihood of success, but the issue is whether

20    they will be irreparably harmed by not having a stay and

21    whether another party would be harmed by having a stay.

22        And here, because Highland seeks to stay this matter for

23    years, if it turns out in the end that Your Honor's decision

24    is overturned and Hunter Mountain is found to have standing,

25    it will be too late to do anything about it if the cases are

1  not allowed to proceed in tandem.

2       Parties have a right to have their cases heard.  The fact

3  that there are similar issues means at some point there may be

4  res judicata or collateral estoppel that deals with it.  But

5  there's not a rule that only one case can go forward.

6       Under Highland's theory, virtually Hunter Mountain could

7  not bring any claims, anymore, ever.  And that's not the law.

8  Hunter Mountain is entitled to have this decided.

9       It may well be that Your Honor thinks there's no

10 difference because of 3327 and is going to rule the same way.

11 We don't think that that's correct.  We think we will convince

12 you that because Hunter Mountain is moving under 3327, there

13 is a difference in standing.  And in any event, that it should

14 go to a Delaware court for that determination to be made.  But

15 if Your Honor stays this proceeding, --

16          THE COURT:  And by the way, by the way, what does the

17 Trust Agreement say about where things get litigated?

18          MS. DEITSCH-PEREZ:  Delaware law says that you --

19 that --

20          THE COURT:  I asked what the Trust Agreement said.

21          MS. DEITSCH-PEREZ:  Delaware law --

22          THE COURT:  I asked what the trust agreement said,

23 because it would trump, right?  A contractual agreement would

24 --

25          MS. DEITSCH-PEREZ:  No.  That's the -- exactly.  It

1   doesn't trump.  Under Delaware law, and we cite a case for

2   this, it's in the brief, a venue provision in an agreement

3   does not override having matters of Delaware internal affairs

4   decided in Delaware.  So, no, the Trust Agreement does not

5   automatically override Delaware law.

6       And so this goes back to the *Landis* -- the standard for

7   stay under *Landis*.  Who's harmed?  Which harm is irreparable?

8   Because Highland seeks to stay this matter for years.  And

9   Your Honor knows how long the Fifth -- the District Court and

10  the Fifth Circuit have been taking to get to rulings.  It

11  could be one, two, two and a half, three, if it goes up to the

12  Supreme Court.  It could be years.  And by that time, Mr.

13  Seery will have continued doing the very things that the

14  complaint seeks to challenge.  That's not fair.

15      I understand there may be a tiny amount of additional

16  work.  Mr. Morris says this is all the same.  Well, if it's

17  all the same, then he's already done the work.  And if Your

18  Honor is convinced it's all the same, well, then you cut-and-

19  paste the old opinion and put it down and the parties could go

20  forward with their appeals.

21      The prior standing decision is up on appeal.  The parties

22  are entitled to go forward and have -- and have their judicial

23  process.  There is -- the amount of money Highland spends on

24  these matters, such as bringing -- bringing the sanctions

25  claim against Mr. Ellington and then suddenly dropping it in

1   the middle, it defies belief that their -- the real interest

2   here isn't conserving resources.  If in fact these are

3   duplicative matters, then it will be easy enough to write them

4   up.

5        And because Highland waited two weeks after the motion to

6   leave was filed and only a week before its response was due,

7   is it really credible that it hasn't already largely written

8   its response?  Was it so sure that this Court would do as it

9   asked that it didn't bother to respond, that it set a hearing

10  for a date after its response was due?  That seems improbable,

11  Your Honor.  I certainly hope that they've gotten this largely

12  written.

13       But in any event, we've given them -- they asked for and

14  we've given them an additional week to write up its response

15  to the motion to leave.  I'd ask that the Court allow this to

16  proceed, because Highland simply doesn't meet the standard,

17  the very, very high standard for a motion to stay here.

18            THE COURT:  All right.

19            MR. MORRIS:  If I may, just a few comments, Your

20  Honor?

21            THE COURT:  Very briefly.  Two minutes.  Because I

22  thought this was going to be a short matter, and we've been

23  going --

24            MR. MORRIS:  Yeah.

25            THE COURT:  -- fifty minutes.  Five-oh minutes.  So,

1   go ahead.

2          MR. MORRIS:   Yeah.   Okay.   Just, it's not the exact

3   same thing.   It has the exact same legal gating issue:   Are

4   they a beneficiary?

5      If the Court denies the stay -- and I assure the Court, I

6   haven't written one word of this thing yet -- but if the Court

7   denies the stay, we are going to be in major litigation.   We

8   reserve the right to take discovery.   There will be an

9   evidentiary hearing, of that I'm absolutely certain, when we

10  get to that point, as appropriate under the gatekeeping order

11  that's been adopted by this Court.   So it will be expensive,

12  it will be time-consuming, and it will ultimately yield

13  absolutely nothing for the Movants here.

14     You know, we didn't set the date for today.   Ms. Deitsch-

15  Perez is exactly wrong about that.   The Court set the date for

16  today.   We filed an emergency motion a week ahead of time.

17  It's not like we waited until the last second.   Right?

18     So I just, I take offense with all of that.   I take

19  offense to the reference to the Ellington sanctions motion.

20  That got resolved because Mr. Ellington finally said he wasn't

21  going to sue Mr. Seery.   Had he done that when we asked him a

22  hundred times before that, we never would have filed the

23  motion.   He refused to do it.   That's why the motion was

24  filed.   And it was resolved -- not withdrawn, but resolved --

25  only after Mr. Ellington and his lawyer finally said they

1   weren't going to sue Mr. Seery.

2       So, you know, facts matter, Your Honor.  Facts are very

3   important to me.  And I want to make sure that the factual

4   record is a hundred percent accurate.

5       The fact of the matter is, at the end of the day, the

6   Court should grant the stay.  You know, if Hunter Mountain

7   really wanted Mr. Dondero [sic] out, they should have included

8   it in their complaint last summer and they shouldn't be

9   allowed to come up with new claims that aren't even in the

10  proposed complaint that's on file right now.  There is no

11  claim for breach of the duty of good faith and fair dealing.

12  There isn't.  And so they don't get to come here and argue

13  against the stay based on a pleading that has yet to be filed.

14      The Court should grant the stay.

15          THE COURT:  All right.

16          MS. DEITSCH-PEREZ:  Your Honor?

17          THE COURT:  No.  I'm done.  I've heard enough.

18      I am going to grant a stay.  It's going to be slightly

19  different from what is requested here.  I'm going to grant a

20  -- well, I'm going to grant a stay on this newest HMIT motion

21  to sue Mr. Seery until at least the time I rule on the

22  valuation motion, the motion to dismiss the valuation

23  complaint.  Okay?  So it's argued February 14th.  We know how

24  this case works.  I get voluminous submissions.  I try to

25  carefully go through them and make a careful ruling.  And so

1   will I get a ruling out in April?  That's just a wild guess,

2   okay, but it's probably a reasonable guess.

3       So what I envision doing is having something like a status

4   conference/scheduling conference shortly after I rule on the

5   motion to dismiss the valuation complaint and decide, are we

6   going to continue the stay to let maybe any appeals -- in

7   fact, I'll probably set a status/scheduling conference shortly

8   after the deadline for a notice of appeal.  And we'll see, is

9   there an appeal pending, what's going on big-picture, should I

10  continue the stay?  Okay?  So I'm not saying it's going to be

11  a two- or three-year stay, but I'm saying it's going to be at

12  least an until-later-this-year stay, and we'll see where

13  things stand in this case.

14      Now, let me give you a couple of reasons.  I don't think

15  the four-prong TRO standard test applies here:  Irreparable

16  harm; likelihood of success on the merits; balancing the

17  parties' interests; the public interest.  I don't feel the

18  need to make that evaluation here because I do think this is

19  just policing the Court's own docket, which of course any

20  court has the discretion to police its own docket, in the

21  interest of judicial economy and reducing expense.  And so I

22  am going to elaborate on that and why I'm exercising my

23  discretion as such.

24      As I've alluded to a couple of times, August 25, 2023,

25  Docket Entry No. 3903, this Court issued a 105-page opinion in

1   what I would call a very similar context, if not squarely down

2   the middle of the fairway the same context.  And the context,

3   for the record, was Hunter Mountain, through a different

4   attorney -- not Ms. Deitsch-Perez, a different attorney --

5   filed a motion for leave to sue Mr. Seery and Farallon and

6   Stonehill, Claims Purchasers, for different causes of action.

7   One of them was breach of fiduciary duty by Mr. Seery, I note,

8   but there were different causes of action.

9        As I've noted here, and I'm saying this for the record in

10  case there's an appeal of this order granting stay today, in

11  the 105-page opinion that I issued denying Hunter Mountain

12  leave to file the lawsuit against Mr. Seery and the Claims

13  Purchasers, I did spend 23 pages, dense pages with 85

14  footnotes, explaining why I thought in that context Hunter

15  Mountain has no constitutional standing as well as no

16  prudential standing to sue Mr. Seery and the Claims

17  Purchasers.

18       I note that the prior lawyer for Hunter Mountain, not Ms.

19  Deitsch-Perez, gave very little oral argument or written

20  argument on that.  In fact, as I remember, he said, The person

21  aggrieved standard is what applies and we're a person

22  aggrieved.

23       And the Fifth Circuit as well as the U.S. Supreme Court

24  seem to love the topic of standing.  Okay?  And I thought we

25  needed a very thorough discussion of standing, okay, because I

1   thought, more likely than not, that's going to be the first

2   issue -- of course, because it could be bear on subject matter

3   jurisdiction -- that's going to be the first issue that a

4   District Court, the Fifth Circuit, even the U.S. Supreme Court

5   is going to focus on.  So, 23 pages, 85 footnotes.

6       Now, there may be more or different things to say when we

7   have the motion to dismiss on the valuation complaint.  Okay?

8       (Echoing.)

9           THE COURT:  Please turn off your speakers, whoever

10  that is.

11      I will note that Delaware law, that would be the narrower

12  question of prudential standing, right?  And in my 23 pages, I

13  actually spent more time on constitutional standing than

14  prudential standing.  And as Mr. Morris notes, the 105-page

15  opinion is chock-full of other stuff besides standing.  Okay?

16  Colorability of the claim that Hunter Mountain wanted to bring

17  and what is the standard the Court should apply under the

18  gatekeeping provision.  Okay?  So, lots of other things.

19      Yes, it may be years before a higher court rules or

20  different courts rule.  And it may be slightly nuanced and

21  different for the valuation thing.  But I don't know why

22  anyone would reasonably think I would go down this trail a

23  third time for the same party.  Okay?  I went down it *ad*

24  *nauseam* August 25, 2023.  It sounds like I'm going to go down

25  it *ad nauseam* again February 14th and thereafter, as I decide

1   what to do.

2       As far as abuse of discretion, I think my bosses -- the

3   District Court, the Fifth Circuit, the Supreme Court -- would

4   want to slap my hand if I didn't grant the stay.  It's not

5   just judicial economy to me, it's not just efficiency of the

6   parties, but it's my bosses.  It's the District Court, the

7   Fifth Circuit.  Why are you going to make us look at this yet

8   again?  Okay?

9       Maybe I'll have something different to say.  Maybe I'll

10  have something more to say in connection with the valuation

11  motion.  I don't know.  And that's why I'm leaving open the

12  possibility that we're going to have a status conference after

13  I've ruled, after notices of appeal may have been filed, and

14  we'll figure out, do I go forward with this motion for leave?

15  I'll have a better idea, is there something new and different

16  at this point?

17      But there is no way any responsible court would go forward

18  a third time considering Hunter Mountain's standing under

19  Delaware law, under constitutional law, as a Claimant Trust

20  beneficiary.  Okay?  There's no way any reasonable court would

21  do that, with it twice having been teed up.  Okay?

22      So that is the ruling of the Court.  We will put it on our

23  tickler system to set a status conference on whether to

24  continue a stay in place after I've ruled on the valuation

25  motion to dismiss.

1      All right.  Please upload an order, Mr. Morris, that

2   reflects that.

3           MR. MORRIS:  Okay.  And just so there's no ambiguity,

4   any further briefing on the motion for leave is also

5   suspended?  Is that right?

6           THE COURT:  Correct.  Yes.  Correct.  And, again, --

7           MR. MORRIS:  All right.

8           THE COURT:  -- I just want to say one more thing,

9   actually, for the record.  Not whining to anyone, but it's

10  going to sound like whining.  I checked yesterday, and I'm not

11  even sure my numbers are perfectly accurate, it may be more

12  than this, but I counted in the Highland case I have issued 13

13  -- well, there are 13 published opinions from this Court.  And

14  then if you go back to *Acis*, which was, one might say, a

15  precursor to Highland, there were five more published

16  opinions.  And that's not even counting Reports and

17  Recommendations to the District Court, of which there are many

18  more, probably close to a dozen.  And then I've heard -- I've

19  heard; I've never checked it -- that there were something like

20  55 appeals.  And that was I think about a year ago someone

21  announced that in court.

22      So, again, I mean, this is not just about the parties,

23  although I care about the parties and the lawyers.  This is

24  about judicial efficiency.  This is overwhelming to the

25  system, so to speak.  Okay?  And so, again, I think it would

1    be an abuse of discretion for sure if I didn't grant the

2    motion to stay.

3        All right.  I've said enough.  And with that, we'll go on

4    to Highland's motion for a bad faith finding and attorneys'

5    fees against I call it HCRE, but I guess it's changed its name

6    a long time ago to NexPoint Real Estate Partners, LLC.  All

7    right.  Mr. Morris, are you presenting that?

8            MR. MORRIS:  I am, Your Honor.  Thank you very much.

9    John Morris, Pachulski Stang, for Highland.

10       We're here on this hearing, Your Honor, to argue

11   Highland's motion for a bad faith finding for an award of

12   attorneys' fees in connection with the proof of claim and the

13   prosecution of the proof of claim by HCRE.

14       The motion was originally filed at Docket 3851, and if Ms.

15   Bates can put up the next deck, I'll walk the Court through

16   this.  This is pretty straightforward.

17       The starting point, the starting point here, Your Honor,

18   as it ought to be, is HCRE's claim.  And if we could just,

19   yeah, go to this page.  What I've put up on the screen here,

20   or what Ms. Bates has put up on the screen, is a slide that

21   shows two pieces of evidence, two documents that were admitted

22   into evidence in this matter.  The first is HCRE's proof of

23   claim, and the second is HCRE's response to Highland's

24   objection to that proof of claim.  And these documents are

25   critical (chiming) because it sets forth the entire basis for,

1   you know, for this litigation.

2       In the proof of claim, HCRE said, among other things, that

3   it contends that all or a portion (chiming) of Highland's

4   interest in an entity called SE Multifamily, quote, does not

5   belong to the Debtor.  Or may be property of (garbled).

6       So this is the proof of claim.  They're saying all or a

7   portion of Highland's interest in SE Multifamily isn't

8   Highland's.  Right?  But Your Honor knows that that's just a

9   statement without regard to how they get there.  A proof of

10  claim -- and this is really simple, and it's why this motion,

11  I think, is pretty simple -- a proof of claim has to have some

12  basis in the law.  Somebody could have a breach of contract.

13  Somebody could have a slip and fall.  There could be a

14  personal injury case against the Debtor.  There could be a

15  claim for breach of fiduciary duty or other tortious conduct.

16  But there's got to be a legal theory on which a claimant is

17  seeking to recover against the Debtor.

18      And the claimant here, HCRE, set forth those legal

19  theories in their response.  And that's the box that's below

20  it.  And it's based on the very agreement that's at issue, the

21  Amended and Restated (garbled) LLC Agreement for SE

22  Multifamily.  It says, After reviewing the documentation,

23  HCRE, quote, believes the organizational documents relating to

24  SE Multifamily Holdings, LLC improperly allocates the

25  ownership percentages -- so that's the issue -- of the members

1    thereto due to mutual mistake, lack of consideration, and

2    failure of consideration.  And these are the legal theories.

3    They claim to reform, rescind, or modify the agreement.

4        Again, not argument, don't accept anything I say, just

5    accept what HCRE says.  These are their pleadings.  They told

6    the Court that they believed that Highland didn't have a right

7    to its interest in SE Multifamily.  They told the Court that

8    they believed the document improperly allocated the

9    percentages.  They told the Court that Highland provided no

10   consideration.  They told the Court that they had claims for

11   reformation, to rescind the agreement, or to modify the

12   agreement.  That's the whole basis for this litigation.

13       If we could go to the next slide.  Because let's just look

14   at some very simple terms of the agreement.  This is

15   unambiguous.  Right?  And this is an agreement that's drafted

16   by Highland, by HCRE, all under Mr. Dondero's control.

17   Everybody's rowing in the same direction.  The testimony here

18   was consistent, not only among Highland and HCRE witnesses

19   but also, and very, very importantly, BH Equities.  Right?

20   We haven't spent a lot of time talking about BH Equities, but

21   that evidence is in the record.  BH Equities testified up,

22   down, and sideways that the agreement was consistent with its

23   intent, that it was fully aware that Highland had only put in

24   $49,000, that Highland was getting a 46.0 percent interest.

25   Right?

1        But in addition to BH Equities, Mr. Dondero, and we'll

2    talk about this more in a moment, and Mr. McGraner testified

3    to the same thing.  And how could they not?  Just look at

4    these provisions.  The first box is Schedule A to the

5    agreement.  It says, right, in contrast to the $291 million

6    that was credited to HCRE Partners -- they actually didn't

7    put in any of that; that's what the testimony showed --

8    Highland actually put in $49,000.  But these are the

9    percentages that they wrote.

10       And Your Honor will recall that in the 48 hours before

11   the document was signed -- this is evidence in the record;

12   I'm sorry I don't have citations to the specific exhibits --

13   but there's a back-and-forth in emails between Freddy Chang,

14   I believe it was, and BH Equities about Schedule A and about

15   the contributions.

16       And so none of this is an accident.  And it's not just

17   stated in Section -- ii Schedule A.  It's set forth --

18   Highland's interest was set forth in Section 1.7, in Section

19   6.1A, in Section 9.3E, which is the liquidation provision.

20   Right?  This was the waterfall in the event of a liquidation.

21   So these are the plain, unambiguous, uncontested terms of the

22   agreement that everybody agreed to when the document was

23   signed.

24       We can go to the next slide.

25       Despite that, Mr. Dondero swore under the penalty of

1    perjury that the proof of claim was true and correct.

2    Remember, the proof of claim said that this really wasn't

3    Highland's interest in SE Multifamily.  I don't understand

4    how he could do that, given the plain terms of the agreement.

5    But his testimony was short and precise and unambiguous.  It

6    can be found at Pages 55 to 59.  It's quoted there -- it's

7    cited there in the footnote.  If you just read those four

8    pages, Your Honor.

9        And Your Honor cited to this pretty extensively on Pages

10   4 and 5 of the Court's decision in this matter.  I've

11   summarized just some of the Court's findings.  It's not the

12   Court's findings; it's Mr. Dondero's admissions.  He didn't

13   -- he didn't personally do any due diligence of any kind to

14   make sure that Exhibit A was truthful and accurate before he

15   authorized it to be filed.  He filed it.

16       He didn't review or provide comments to the proof of

17   claim or Exhibit A before it was filed.  He didn't review the

18   applicable agreements or any documents before signing the

19   proof of claim.  He had no idea whose -- where the genesis of

20   the proof of claim was, who at HCRE worked with or who

21   provided information to Bonds Ellis to allow Bonds Ellis to

22   prepare the proof of claim.  He had no information about what

23   information was given to Bonds Ellis to formulate the proof

24   of claim.  He didn't know whether Bonds Ellis ever

25   communicated with anybody the real estate group regarding the

1   proof of claim.

2       He also testified that he never specifically asked

3   anybody in the real estate group if the proof of claim was

4   truthful and accurate before he authorized it to be filed.

5   He didn't check with any member of the real estate group to

6   see whether or not they believed the proof of claim was

7   truthful and accurate.  He failed to -- he admitted he failed

8   to do anything to make sure the proof of claim was truthful

9   and accurate before he authorized his electronic signature to

10  be affixed and have it filed on behalf of HCRE.

11      That's bad faith, Your Honor.  You can't rely on some

12  vague process or say 'I'm just relying on others,' because if

13  that's the case, that's what I -- that's we said in our

14  reply, that's the very important person defense, right?  He's

15  too busy, he just relies on others, he just signs stuff, and

16  he's got no obligation to do anything.  How do you sign

17  something under the penalty of perjury in that milieu?

18      If the Court doesn't grant our motion here, it will be

19  sending a signal that people can sign proofs of claim with no

20  knowledge of the substance of the claim, with no knowledge of

21  whether the claim is valid, with no knowledge as to whether

22  or not the Court should take the time to adjudicate a

23  disputed claim.

24      That's what will happen.  Right?  That will be the

25  signal, that very important people are absolved of the

1   responsibility of doing basic due diligence before signing a

2   proof of claim.

3        I think the signing of the proof of claim, the filing of

4   the proof of claim, given what we know now, in particular

5   what we know now, is bad faith.

6        And I know that HCRE in their opposition said, oh, well,

7   you know, Mr. McGraner did stuff.  I would urge the Court to

8   look at Pages 109 to 112 of the transcript, because Mr.

9   McGraner kind of distanced himself from the proof of claim.

10  He said he didn't authorize it, he didn't approve the filing.

11  He said he never gave any documents to Mr. Sauter.  He never

12  discussed the proof of claim with Mr. Dondero or anybody at

13  Bonds Ellis.  He didn't provide any comments to the proof of

14  claim.  He deferred to counsel.  He didn't know if Mr. Sauter

15  gave any documents to Bonds Ellis.  He never gave the

16  information to Bonds Ellis.  He never discussed it with

17  anybody but D.C. Sauter.  Right?

18       So the two people, the only two people who are authorized

19  to act on behalf of HCRE did absolutely nothing to make sure

20  that there was at least a modicum of credibility, at least

21  some basic level of diligence, at least some good-faith basis

22  to assert that this interest that Highland has in SE

23  Multifamily could be subject to challenge.  Right?  They did

24  nothing.

25       If we can go to the next slide.

1      And then, as Your Honor will recall, they tried to

2   withdraw the proof of claim.  Right?  That in and of itself

3   we contend was an act of bad faith, and it was an act of bad

4   faith for multiple reasons.  There's no dispute that they

5   tried to -- they filed their motion to withdraw the proof of

6   claim immediately after taking Highland's depositions but

7   immediately before I was about to depose their witness.  It's

8   a naked attempt to try to procure a patently unfair

9   litigation advantage, particularly in light of the fact that

10  HCRE was simultaneously trying to preserve its claims for

11  another day.

12      If they had just -- and Your Honor made this point at the

13  hearing, right?  Just say unequivocally you're done with

14  this.  They couldn't do it.  They tried to save it for

15  another day.

16      And so the withdrawal of -- a motion to withdraw the

17  proof of claim we're not saying is always bad faith.  Look at

18  what I say in the title of this slide.  Under these

19  circumstances, when you file it after taking discovery but

20  before subjecting your people to discovery, and when you try

21  to preserve your claims for another day, the Court properly

22  denied that motion for leave to withdraw the proof of claim.

23  And it stunk.  And Your Honor I think rightly questioned

24  whether or not this was, you know, a threat to the integrity

25  of the bankruptcy system and the claims process, whether or

1   not this amounted to gamesmanship.

2       But it didn't end there.  In closing argument, HCRE

3   persisted with its attempt to try to preserve their claim.

4   This is bad faith.  They continued down the exact same path.

5   They told the Court in closing argument at Pages 180 to 181

6   of the transcript, quote, They want you to make findings that

7   we can't raise any of these other issues, decisions, et

8   cetera, going forward.  That's not proper on proofs of claim.

9   Going forward.  They wanted to preserve this issue for the

10  future.

11      But this issue is their proof of claim.  This issue is

12  based on the legal theory set forth in Paragraph 5 of HCRE's

13  response to the objection, the response that says they have

14  claims for rescission, to rescind, to modify the agreement.

15  Right?  That's the whole legal theory of it.  But they wanted

16  Your Honor to simply say the proof of claim is gone but you

17  all can go pursue another day the legal theories that

18  underlied the entire process.

19      That's (garbled), Your Honor.  That's what this is all

20  about, the claims process.  You have a claim.  You have legal

21  theories on which the claim is based.  If your claim is

22  denied or if the objection to the claim is sustained, done.

23  They wouldn't have it.  It's why the proof of -- it's why the

24  motion withdraw was denied and why the Court should find that

25  their attempt to preserve these claims for the future is bad

1  faith.

2      And the interesting thing, Your Honor, is this is

3  (chiming) one of the very few rulings in the case that Mr.

4  Dondero didn't appeal.  I think even he acknowledges, like,

5  like, this is just not -- that he didn't -- he didn't want

6  this seeing the light of day in the District Court.

7      If we can go to the next slide.  And this really

8  amplifies the bad faith in filing the proof of claim.  It's

9  the testimony about the nature of the claim.  And again, I --

10  we talk about this exhaustively in our papers, and so I

11  haven't cited to everything, but this is just some of the

12  nuggets from, you know, the testimony that's out there.

13  Right?

14      Consideration.  Mr. McGraner testified that Highland

15  bankrolled HCRE's business.  Your Honor can take judicial

16  notice that Highland loaned millions of dollars to HCRE.

17  Right?  Those are part of the Notes Litigation that HCRE is

18  now strenuously trying to avoid repaying in its appeal.

19  Right?  They're appealing that to the Fifth Circuit and

20  they're trying -- right?  We bankrolled the business, we

21  shouldn't have our interest, and they don't want to pay the

22  money back.  It really -- this is *chutzpa*, where I'm from.

23  Right?

24      Going on to the question of consideration -- because,

25  again, this is in Paragraph 5 of the pleading -- there's the

1    admission that HCRE didn't have the financial wherewithal to

2    close on the Key Bank loan by itself and it needed Highland

3    to provide capital -- flexibility by co-signing on the loan.

4    Right?  Couldn't have done the deal without Highland, but

5    they want to take the interest away from us.  Bankrolled the

6    whole project, but they want to take the deal away from us.

7         They include Highland in order to provide tax benefits,

8    but they want to take the deal away from us.  Both Mr.

9    Dondero and Mr. McGraner were very clear that tax benefits

10   was one of the reasons Highland was in this.  And if Your

11   Honor will recall, in the closing argument, I pointed Your

12   Honor to just one of the tax returns that showed something

13   like $30-plus million in income was allocated to Highland in

14   order to shelter it from taxes.  Right?  I don't know that

15   there's anything illegal about it.  I take no opinion about

16   it.  Right?  I have no view on it.  But *The Little Engine*

17   *That Could* that put in the $49,000 was suddenly stuck with

18   $31 million of income.  I'll wait to hear an explanation as

19   to why Highland was included in the deal and whether taxes

20   were a part of it.

21       Mr. McGraner also testified just --

22       (Audio cuts out.)

23           THE COURT:  Okay.  What happened?

24           MR. MORRIS:  (begins speaking)

25           THE COURT:  Okay.  Mr. Morris, we lost your sound

1   for about 20 seconds, so if you could kind of repeat the last

2   20 seconds.

3          MR. MORRIS:  Sure.  So I'll try and summarize.  On

4   the consideration piece, they know there was consideration.

5   They pursued a claim based on lack of consideration, but in

6   the first point there's an admission about Highland having

7   both bankrolled the whole operation, and in the second point

8   there's the admission from Mr. McGraner that the deal would

9   never have gotten done without Highland's financial

10  wherewithal.  And Mr. Dondero and Mr. McGraner admitted that

11  there were tax benefits.  And Your Honor saw those tax

12  benefits, right?  In my closing argument, I pointed to just

13  one of the tax returns showing that Highland -- I called it

14  *The Little Engine That Could*, who put in the $49,000, somehow

15  got -- somehow got $31 million of income assigned to it.

16  Right?

17       This was not an accident.  Highland was there for tax

18  reasons.  Again, I take no view as to the propriety of that

19  at this time, but the notion that there was no consideration

20  is just -- it was ridiculous then, and their admissions show

21  that it was ridiculous.

22       The next bullet point shows Mr. McGraner's admissions

23  that on March 15, 2019, the deadline was approaching to amend

24  the original LLC agreement to admit BH Equities and to have

25  it retroactive to the prior August.  He admitted that he

1    reviewed the draft Schedule A, which is what we looked at,

2    right?  It showed $49,000 and a 46.06 percent interest for

3    Highland.  He saw that it unambiguously showed Highland

4    making a $49,000 contribution, getting the 46.06 percent

5    interest.  He believed Schedule A reflected his understanding

6    of the terms between Highland and HCRE, and he knew of no

7    obligation that Highland had to make any future capital

8    contributions.  I've cited to all of the testimony very

9    specifically.

10    Mr. McGraner admitted that the allocation of the interest

11    in Schedule A was consistent with the parties' negotiation of

12    the waterfall and other provisions in the amended LLC

13    agreement, that HCRE understood it accurately reflected the

14    parties' intent.

15    How do you (garbled) proof of claim saying you have to

16    reform, rescind, modify the agreement, when all of this is in

17    your head?  How do you do that in good faith?  They both

18    admitted that Schedule A reflected the parties' intent at the

19    time it was signed.

20    It's the last bullet point that's really the head

21    scratcher.  What happened is Mr. Dondero, who also caused

22    Highland to file for bankruptcy, didn't like the consequences

23    of his decision.  Nothing happened here, as I said in my

24    closing argument, that doesn't happen in every bankruptcy

25    case.  The assets of the Debtor are marshaled for distribution

1    to the creditors.  Highland's interest in HCRE is an asset of

2    the estate.  HCRE challenged Highland's title to that asset.

3    That's what this litigation is about.  And the only reason

4    they challenged the title is because they didn't like the

5    consequences of Mr. Dondero's decision to file Highland for

6    bankruptcy.

7        That's not good faith.  If that were good faith, every

8    equity owner of every business would be able to claw back

9    everything they'd given to a company, every loan that they'd

10   given to a company, every -- like, they can't do that.  That's

11   not what the law -- there's no basis for that theory.

12       Finally, just deal with the attorneys' fees issues

13   quickly.  You know, the challenges to our fees are both petty

14   and baseless, frankly.  They said we should have avoided

15   discovery.  I don't know how you say that.  We shouldn't have

16   taken depositions.  They took depositions, and we shouldn't

17   have done that?  We should have gone to trial where they had

18   discovery and we didn't?  That doesn't make a lot of sense to

19   me, and I can't imagine it would make sense to any objective

20   participant.

21       They claim our legal fees are *per se* excessive.  The total

22   legal fee is less than five percent of the value of Highland's

23   interest in SE Multifamily, not according to us but according

24   to Mr. Dondero's family trust, Dugaboy.  They told this Court

25   in -- on June 30, 2022, I think, in the very first motion for

1    information, that Highland's interest in SE Multifamily was

2    $20 million.  So we spent less than five percent of the value

3    of that to get good, clean title.  I don't think that's

4    excessive by any means, particularly with the amount of hoops

5    we were required to jump through.

6        Unidentified timekeepers.  They say three people were not

7    identified.  It was a *de minimis* amount of money.  We've

8    addressed that in the brief.

9        Travel time.  You know, again, an even more *de minimis* --

10   I think that's right -- a more *de minimis* amount of money,

11   less than $10,000 for me and Ms. Winograd to go to Dallas.  We

12   billed out at half-time.  They admit it.  And ironically, you

13   know, our compensation for nonworking travel time was part of

14   the agreement that was authorized when Mr. Dondero was still

15   the head of Highland.  I don't know how you criticize that

16   today when it's part of Mr. Dondero's own agreement.

17       Finally, they take issue with Mr. Adler's relatively

18   modest invoice.  I think he charged $700 an hour.  He

19   (garbled) 30 hours or something in August 2022 as we were

20   preparing for depositions.  Mr. Dondero and Mr. McGraner have

21   admitted that tax issues were a driving force in including

22   Highland in this.  And if you look at the Amended and Restated

23   LLC Agreement in the section that comes after Section A, there

24   is a multipage tax analysis that I can't possibly get my head

25   around.  I'm not a tax lawyer.  And we needed some help to

1  understand kind of what the tax implications were.

2      I think, under the circumstances, the need for the tax

3  services was completely warranted, and the amounts here are

4  relatively modest to the whole.  You know, it's 30-some-odd

5  hours in connection with depositions at a $700 hourly rate,

6  when my firm doesn't provide tax advice.

7      So, you know, Your Honor, I think I'm done.  I think

8  there's multiple reasons for finding the bad faith here.  This

9  proof of claim should never have been filed.  You know, if

10  they wanted to withdraw it, they shouldn't have taken our

11  depositions and they should have given us a clean bill of

12  health without trying to reserve some right to bring future

13  challenges to our title to the asset.

14      And once we got to the trial, it became clear that there's

15  absolutely no basis for the claim, that through the admissions

16  there is no question that the document reflected the intent of

17  parties.  Highland provided more than adequate consideration

18  for its interest.  It continues to hold its interest today.

19  It continues, you know, to receive its allocation of income.

20  And there's a reason for all of that.

21      And for those reasons, Your Honor, I think the time has

22  come to start holding people to account here.  You know, we

23  did it, as I mentioned, with the Rule 11 on the motion for

24  leave to sue us.  We were able to get rid of that.  I think

25  the Court really needs to try to bring some discipline to this

1    process instead of allowing people -- instead of allowing Mr.

2    Dondero and those working at his direction to just file things

3    irresponsibly, without basis of fact, you know, just -- just

4    because.

5        It's not a thing.  You know, that's not what this Court

6    ought to be doing.  It's not what I ought to be doing.  It's

7    not what I want to be doing, I'll tell you that right now.

8    And so I think there's a real need for a bad faith finding in

9    this particular case.  I think there's a real need for there

10   to be consequences of putting the Court and the Reorganized

11   Debtor through this process.  Because this -- if Mr. Dondero

12   had only searched his own memory, if he had only asked Mr.

13   McGraner, hey, did the agreement actually reflect the intent

14   of the parties, how could this ever have gotten filed?  That's

15   all he had to do, was ask himself the question.  All he had to

16   do was ask Mr. McGraner.  Right?  We wouldn't be here, Your

17   Honor.

18       And for those reasons, we ask the Court to find that this

19   whole filing and prosecution of this claim was in bad faith

20   (chiming), that we should get an award of attorneys' fees.

21            THE COURT:  All right.

22            MR. MORRIS:  Thank you.

23            THE COURT:  A couple of follow-up questions.  Thank

24   you.  I think you just answered this question with your

25   closing comment, that you think there was bad faith in both

1  the filing and the prosecution.

2      So, as I understand it, the filing of the proof of claim

3  itself you say is bad faith because you say it was a baseless

4  proof of claim, and it was signed without any due diligence on

5  the part of the person who signed it, Mr. Dondero?  And then

6  we obviously had months of prosecution, if you will,

7  litigation, after Highland's objection.  And then the timing

8  of the withdrawal I would say is kind of a third thing I hear

9  being argued, correct?

10      MR. MORRIS:  Yeah.  I would just summarize it this

11  way.  The filing of the proof of claim itself was bad faith

12  for all of the reasons that I've stated.  The motion to

13  withdraw under these circumstances was also bad faith because

14  they did it after taking discovery and tried to protect their

15  own witnesses from discovery while trying to preserve the

16  claims.  They wanted to assert them at another day.  Counsel

17  said it in his closing.  You know, going forward.  That's what

18  he said.  And then the third thing is the substance.  There is

19  no basis to reform the contract.  There's, like, there's no

20  factual basis for the claim itself.

21      THE COURT:  Okay.  And my last question -- famous

22  last words, my last question -- if I were to award attorneys'

23  fees here, I'm looking at sort of a summary page for

24  Pachulski's fees.  I'm looking at Docket 2852-6.  I think this

25  was an Exhibit F to that motion.

1      So, I always use timelines in my life.  While HCRE filed

2    its proof of claim on April 8, 2020, and then Highland

3    objected to it in an omnibus pleading on July 30, 2020,

4    Pachulski has started the clock running, so to speak, August

5    21st.  So, to the extent there were fees incurred, looking at

6    this, after the proof of claim was filed, 2020, thereafter I

7    note HCRE filed a response to the objection October 19, 2020,

8    then the move to disqualify Wick Phillips, dah, dah, dah, dah,

9    dah, April 14, 2021.

10      I had understood you weren't billing time for the

11   disqualification motion, but in fact it looks like you're only

12   asking for time starting August 2021, correct?

13          MR. MORRIS:  That's right.  My intent -- and I think

14   we started the clock then because that's -- you know, we may

15   have filed an omnibus objection, I think we did file, and

16   we're not including time for that.  So that's when -- that's

17   when the fees started to become incurred.

18          THE COURT:  Okay.

19          MR. MORRIS:  And if I made a mistake anywhere, I

20   apologize, Your Honor, but the intent was certainly to

21   include, consistent with Your Honor's prior order, every

22   minute of time that was expended in connection with the

23   disqualification motion.

24          THE COURT:  Okay.  I just --

25          MR. MORRIS:  Okay.  I'm reminded, actually, I'm

1  actually reminded that August 7th was also the effective date,

2  so that's probably why we used that date.

3          THE COURT:  Okay.  Understood.  Understood.

4      All right.  I think those are all my questions, so I will

5  hear from HCRE, or NexPoint Real Estate, I think they may

6  prefer to be called.  Who is making the argument there?

7          THE CLERK:  He's on mute, Judge.

8          THE COURT:  Okay.  You're on mute.  Is it Mr.

9  Gameros?

10          THE CLERK:  Yes.

11          THE COURT:  Okay.  Mr. Gameros, you're on mute.

12          MR. GAMEROS:  No, I'm not.  There we go.

13          THE COURT:  Okay.  Here we go.

14          MR. GAMEROS:  Sorry.  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. GAMEROS:  Bill Gameros for NexPoint Real Estate.

17  I'm going to hopefully show a PowerPoint.  Let's see.  I just

18  want to make sure that this is showing.  Can everyone see it?

19          THE COURT:  Not yet.

20          MR. GAMEROS:  All right.  Nope.  How about that?  No.

21          THE COURT:  We're not here on our court equipment.

22  Do others -- Mr. Morris, do you see it?

23          MR. MORRIS:  I do not, Your Honor.

24          THE COURT:  Okay.

25          MR. GAMEROS:  Let me try it this way.  I'm sorry.

1          THE COURT:  We do not -- oops, now something is

2    starting to happen.  Or was.  For a --

3          MR. GAMEROS:  How about now?

4          THE COURT:  Here we go.  Oh.

5          MR. GAMEROS:  Is it showing now?

6          THE COURT:  Oh, here we go.  We have it now, yes.

7          MR. GAMEROS:  All right.  I'm sorry about that, Your

8    Honor.

9          THE COURT:  Okay.

10          MR. GAMEROS:  Hate to waste the Court's time.

11          THE COURT:  No problem.

12          MR. GAMEROS:  All right.  We're here in response to

13    HCMLP's motion for a bad faith finding and attorneys' fees.

14    First, what are they asking for?  Over $800,000 in fees to

15    defend a singular proof of claim that had for it as actions

16    six short depositions, not lengthy, limited written discovery,

17    and a single-day evidentiary hearing.

18       NREP only has one matter before this Court, the proof of

19    claim.  It has discrete ownership.  You've already seen that

20    from Mr. Morris's slides.  BH Equities.  Mr. McGraner actually

21    has a remote interest in it.  There are a bunch of folks that

22    have interests in it, so it's a discrete ownership structure.

23       And it's not a vexatious litigant.  It didn't appeal when

24    the Court denied and overruled the proof of claim.  It hasn't

25    done anything else.

1    It didn't file its claim in bad faith.  We're going to go

2    through that with some detail.  It's never conducted itself in

3    bad faith in front of this Court in any step in the process.

4    But most importantly today, Your Honor, two things.

5    First, there's not a single case cited in Mr. Morris's slide

6    deck, and it's -- there's none cited for a very simple reason.

7    There is no authority regarding fees for an alleged bad faith

8    proof of claim under 105.  We couldn't find it.  We looked for

9    it.  It hasn't happened.  There's no authority for it.  He

10   hasn't showed you any, and the authorities that he had showed,

11   there's none in his slide, but we're going to go through them

12   in detail, Your Honor, there's no basis to award attorneys'

13   fees.

14   I think intellectually the Court should look at this as a

15   two-step process.  First, is the proof of claim and its

16   prosecution done in bad faith?  I think the answer is going to

17   be a resounding no.  But if the Court thinks there is a bad

18   faith -- is bad faith activity, the second step is what fees

19   are possibly awardable.

20   First, it's styled as a bad faith finding.  You look at

21   when the proof of claim was filed and the process that got

22   there.  Your Honor, in our response brief, we provide detailed

23   citations to the trial transcript that says a variety of

24   things, including Bonds Ellis never talked to Mr. Dondero,

25   but, contrary to what Mr. Morris told you this morning, Mr.

1   McGraner did.  So there are folks at NREP that were working

2   with Bonds Ellis when they filed the proof of claim.

3       But he did so, candidly, with one of the best bankruptcy

4   -- that NREP filed its proof of claim with one of the best

5   bankruptcy shops in the Metroplex is telling.  They wanted to

6   do it, and they wanted to do it right, and they hired very

7   competent counsel to do that.

8       These two cases I think are important.  It's not just if

9   there's a mistake in the proof of claim, you don't sanction

10  them.  And just beating the proof of claim.  Is not enough if

11  they lose.  Undenied authority.  And I think it's telling

12  here.

13      This Court has seen a lot of litigation on proofs of

14  claim.  Objections to all of them, with a host of settlements.

15  That just didn't happen here, but that doesn't make those

16  prior proofs of claim in bad faith, even though they would

17  like you to think that that's true.  It's not true and it's

18  not fair.  It's also not right.

19      How did they do it?  First, they hired Bonds Ellis.  And

20  part of that process was Bonds Ellis did the drafting.  Mr.

21  Dondero testified as to how he signed it and the basis on

22  which he signed it.  Because despite all the derision from

23  HCMLP about the process and not believing in it, the reality

24  is the process exists, it's what happened, it's what was done,

25  and they coordinated with counsel in its filing.

1    Just because it's not enforceable, for whatever reason,

2    doesn't make it sanctionable.

3    What were they trying to accomplish?  They did try to

4    reallocate.  They wanted a reallocation because HCMLP only put

5    in a tiny amount of capital and it wasn't providing any

6    services.

7    I don't think it's in dispute that the bankruptcy case has

8    been adversarial.  I sat through the prior hour this morning.

9    Mr. Morris made reference to it during this particular motion

10   as well.  But it also made the amendment impractical.  Not in

11   dispute.

12   Importantly, Your Honor, in your opinion disallowing the

13   claim and sustaining HCMLP's objection, you didn't find that

14   it was done in bad faith, and Mr. Morris asked you to do it

15   several times at trial.  Quite frankly, Your Honor, this

16   ground has been plowed.  We don't need to plow it again.  The

17   chance for the bad faith finding was last year.  He didn't get

18   what he wanted, so now he's taking a second swing at this

19   particular piñata, and it's not right.

20   But look what happened in the reply brief.  These are what

21   are items of bad faith.  Bad motive, animus, ill will.  That's

22   *Yorkshire*.  That's the surreptitious bankruptcy filing.

23   *Brown*.  First, not bad faith.  What happens in *Brown*, of

24   course, it's a home case, a loan servicer looking to

25   foreclose.  And the sanction itself was tiny.  Not $800,000.

1   It was a small sanction.  And this Court, you, Your Honor,

2   specifically looked at that case in the past.

3   *Page* (phonetic) (garbled).  Intentional, deceitful, bad

4   faith, theft.  That is not what happened here.  Not even

5   close.

6   *Lopez*.  They don't discuss *Lopez* again.  They never

7   mention it.  Why?  Because *Lopez* has the 'but for' test in it

8   for fees.  But this case, unlike *Lopez*, which had multiple

9   motions to compel, had none.

10   Your Honor, this case had one hearing before the

11   evidentiary trial.  A scheduling conference.  I'm sorry, it

12   had two.  The motion to withdraw, which we believe should have

13   been granted.  Your Honor didn't grant it.  I understand the

14   Court's ruling.  We didn't appeal it.  I'm not appealing it

15   right now.  But we did try to withdraw the proof of claim.

16   But *Lopez* finds bad faith under 105 for discovery abuse.  It

17   doesn't even apply to these facts.

18   So, looking at the Court's inherent powers, it's not a

19   standard fee application under the Code, that matters, but

20   most importantly, they've got to provide a causal link for

21   'but for.'  *Lopez* tells you that.  *Hagar* in the Supreme Court

22   tells you that.

23   What happens instead at the motion to withdraw, Mr. Morris

24   tells you he wants to win on the merits.  The difference in a

25   withdrawn proof of claim and a disallowed proof of claim is

1    zero.  There would have been no difference at all.  Nothing

2    has changed.  Except for the 'but for' causation analysis on

3    fees.  They spent over $375,000 to get there.

4        I mentioned it in the reply brief.  It's on the slide.

5    The *Johnson* factors.  Completely absent from their reply

6    brief.  They genuflect at it in the initial motion.  But me

7    telling you the *Johnson* factors, Your Honor, is like telling

8    you the standard for summary judgment.  You don't want to hear

9    it.

10       However, eight out of twelve *Johnson* factors do not favor

11   this particular fee app.  Time and labor required for

12   everything after the withdrawal.  Not required.

13       Novelty and difficulty.  It's a proof of claim.  It's

14   neither novel nor difficult.

15       Preclusion of other employment.  There's no evidence of

16   that.

17       The customary fee for work in the community.  Candidly,

18   it's against it.  Eight hundred grand for fighting a proof of

19   claim is pretty stout.

20       Time limitations.  There were none.

21       The amount involved and the results obtained.  Candidly,

22   Your Honor, almost twice the fees for the same outcome.

23       Undesirability of the case.  No evidence of that.

24       And awards in similar cases.  Here, Your Honor, the

25   absence of 105 cases for proofs of claim, there are no

1   comparable awards.  And I think that's important.

2       What is the standard you should be using in assessing

3   whether to use your 105 powers?  Clear and convincing, Your

4   Honor.  Your Honor needs to have a firm belief or conviction

5   that this was done with malice, ill intent, bad faith, et

6   cetera.  That's not here.

7       Why do you know that?  Mr. McGraner had his deposition

8   taken.  He showed up at trial.  Mr. Dondero had his

9   deposition.  Showed up at trial.  At no instance were they

10  running away from testifying.  Quite the contrary.  They came

11  to court, they answered Mr. Morris's questions, they answered

12  my questions.  If Your Honor had questions, they would have

13  answered them, too.

14      They took this very seriously.  This wasn't some slapdash

15  proof of claim.  They were really trying to get something

16  accomplished.

17      Fees.  Your Honor, this is the fee table.  I turned it

18  sideways.  It's in our response to the motion.  I think it's

19  absolutely shocking.  The number of hours that were expended

20  and the fees that were expended, the cumulative total -- this

21  is just for selected timekeepers, not everybody -- but I'd

22  point Your Honor to the very bottom, post-motion to withdraw.

23  If they had just said yes, we'll take the win, they wouldn't

24  have had to spend $350,000 for these selected timekeepers,

25  over $375,000 with the rest.  That is a clear failure of the

1   'but for' test in *Lopez* and the cases that it cites.

2        So, our conclusion, Your Honor.  First, the reply doesn't

3   change anything.  They don't give you any new authority or any

4   basis to award sanctions or bad faith analysis, if for no

5   other reason than the record is already closed.  You've seen

6   this all before.  And when asked repeatedly for a bad faith

7   finding, you didn't give it to them.  No bad faith in the

8   filing of the claim.

9        The requested fees are reasonable and necessary.  Your

10   Honor, so they flunk the *Johnson* factors.  They fail the 'but

11   for' test.

12        Respectfully, Your Honor, their motion should be denied.

13   If it's not going to be denied, we would like an opportunity

14   to file supplemental briefing addressing the new authorities

15   in the reply brief.  Your Honor, I don't think we need to go

16   there.  I think you should deny it outright.

17        Subject to questions from the Court, that concludes my

18   presentation.

19            THE COURT:  All right.  A few follow-up questions.

20   In arguing about the size of the potential fees if I get to

21   bad faith, you've had a little bit of a theme of:  It was just

22   a proof of claim, it was not difficult, and this was not some

23   "slapdash proof of claim."  So you emphasize not reasonable

24   fees for addressing the proof of claim, and you also stress

25   can't find any authority where attorneys' fees have been

1    allowed for having to defend against a proof of claim.

2        Here's what I want you to address.  Here is what is going

3    through my brain here.  This wasn't a proof of claim where,

4    oops, they actually paid our invoice, we're not really owed

5    this amount, sorry, mistake.  It's not a situation where you

6    filed a $105,000 proof of claim and in fact only $97,000 was

7    due and owing.  And I just use those as very common examples

8    we see in the Bankruptcy Court.

9        This was, while not a liquidated amount, while not an

10   amount used in the proof of claim, it was basically a

11   multimillion-dollar issue, right?  And I don't know if it was

12   a tens-of-millions-of-dollar issue or more than that, but it

13   was a multimillion-dollar issue, right?

14           MR. GAMEROS:  Yes, Your Honor, I understand that.

15           THE COURT:  I mean, that's stating the obvious,

16   right, because you're saying that Highland wasn't really

17   entitled to a 46-percent-whatever ownership interest in

18   Multifamily, it would be something much, much lower than that.

19   Okay.  So I think we had in the record Mr. Dondero says the

20   equity interest is worth $20 million.  And we know there was a

21   Key Bank loan of up to $500 million-plus.  I mean, the proof

22   of claim seeking reformation was ultimately a many-

23   multimillion-dollar claim, if the theory prevailed, right?

24           MR. GAMEROS:  That's right, Your Honor.  It could

25   have been.

1            THE COURT:  Okay.  So, again, assuming I get to the

2    bad faith finding, I mean, shouldn't I look at these fees in

3    that context?  I mean, it wasn't just a proof of claim; it was

4    a potentially multimillion dollar hit to the estate, a bundle

5    of value that wouldn't be there for the creditors.  Is that

6    fair, or no?

7            MR. GAMEROS:  Your Honor, I think it's blending some

8    issues in a way that I don't think are appropriate.  I think

9    for analyzing whether or not it's a bad faith filing or bad

10   faith prosecution, you have to look to see ill motive, animus,

11   et cetera, and that's not present here.  Instead, --

12           THE COURT:  Yes.  I'm just saying --

13           MR. GAMEROS:   -- you've got Mr. Dondero --

14           THE COURT:  I'm just saying assuming I get there.

15   And I totally recognize I've got to look at the overall facts

16   of the filing of the claim, of the prosecution, of the

17   withdrawal.  I have to look at all that to see do we have bad

18   faith.

19       But assuming I get there, you've challenged the

20   reasonableness.  And it wasn't just some proof of claim.  It's

21   a complicated proof of claim, right?  It's potentially a multi

22   --

23           MR. GAMEROS:  Your Honor, I understand that.

24           THE COURT:  Okay, go ahead.

25           MR. GAMEROS:  I'm sorry for interrupting, Your Honor.

1  Go ahead.

2          THE COURT:  Oh, I'm just saying it was pretty darn

3  complicated, the proof of claim.  It wasn't quantified.  And

4  even though it wasn't quantified, it was clearly a

5  multimillion dollar claim being asserted at the end of the

6  day, the ownership interest that HCRE was trying to challenge.

7          MR. GAMEROS:  That's the position, Your Honor.  And

8  they looked at that particular position at the time of filing

9  and said the capital wasn't right, and their response to the

10  objection lays out the different legal arguments.  That's

11  exactly what happened.

12          THE COURT:  Okay.  My next question is I think you're

13  arguing that because I did not specifically find bad faith in

14  my opinion -- I'm in the mood to talk about lengthy opinions

15  today; it was a 39-page opinion, with 127 footnotes,

16  disallowing the proof of claim -- because I did not make a

17  finding of bad faith there, I'm somehow precluded at this

18  juncture.  Am I hearing your argument correctly?

19          MR. GAMEROS:  Your Honor, I didn't say precluded.  I

20  just said we don't need to plow that ground again.

21          THE COURT:  Well, --

22          MR. GAMEROS:  I think you left the door open for this

23  particular motion.

24          THE COURT:  Uh-huh.

25          MR. GAMEROS:  And that's what you did in your

1    opinion.  And I just think you were asked repeatedly to make a

2    bad faith finding, and at the time when you ruled disallowing

3    the proof of claim, you didn't do it.  You didn't say bad

4    faith.

5              THE COURT:  Okay.

6              MR. GAMEROS:  That's all.

7              THE COURT:  Okay.  And then I guess my last question

8    is you said if they, Highland, if they had just said yes, take

9    the win, we wouldn't have all these fees.  But I really want

10   to drill down.  Would that really have been a win, or would it

11   have been a temporary stand-down?  I mean, I begged you all to

12   wrap it all up with language in connection with the withdrawal

13   of the proof of claim.  You know, agreed you weren't going to

14   raise this issue again.  And your client wouldn't let you do

15   that.

16      So is it really fair to say, if they had just said yes and

17   taken the win, we wouldn't have had these fees, when it

18   appeared very likely that it was going to be new litigation in

19   a different forum?  What is your response to that?

20             MR. GAMEROS:  Your Honor, we're looking back at what

21   happened with hindsight, and I think if we're going to see the

22   maybe-bad we should also see the maybe-good.

23      What's happened, in hindsight?  Zero.  Nothing.  NREP

24   hasn't done anything.  Its proof of claim was disallowed last

25   year, and nothing else has happened.

1        I think what really happened at the hearing and the motion

2   to withdraw and what we were hearing from Highland, candidly,

3   is they wanted to put a pin in that's our number forever,

4   can't talk about it, don't want to do that.  And the agreement

5   allows for amendment.

6        And that was what we were hung up on.  What if we need to

7   amend this thing in the future?  We don't want to be stuck

8   with a 46 percent number that we can never get away from.  And

9   that was the problem.  That was it.

10            THE COURT:  All right.  Thank you, Mr. Gameros.

11       Any rebuttal, Mr. Morris?

12            MR. GAMEROS:  Thank you, Your Honor.

13            MR. MORRIS:  I do.  I'll be brief.  It's exactly a

14   $20 million issue.  It's not millions of dollars.  It's

15   exactly $20 million.  As I like to say, don't take my word for

16   it, take Mr. Dondero's word for it.

17       In Dugaboy's pleading that was filed under seal on June

18   30, 2022, he included his analysis of the value of Highland's

19   assets.  I don't want to go through them all, but I'm happy to

20   report that he valued Highland's interest in SE Multifamily in

21   that document that he represented to the Court was worth $20

22   million.  So, from our perspective, we were fighting to get

23   good, clean title to a $20 million asset.  That's Point #1.

24       Point #2, of course, the Court has inherent power under

25   105 to enter orders of this type.  I -- honestly, you know,

1   the cases are what the cases are.  So there's never been a

2   case exactly like this.  You know what?  I've been doing this

3   for a while.  I've never seen a proof of claim as baseless as

4   this one.

5       So the whole concept of the 'but for' thing, I'll talk

6   about in a minute, but there's no question that the Court has

7   the power to enter orders of this type, and I don't even think

8   counsel disputes that.

9       I do want to address the notion that we asked the Court

10  repeatedly for a bad faith finding and the Court declined to

11  do it.  That's because this Court does its job and does its

12  job well.  And I understood Your Honor when you denied it

13  without prejudice.  It was telling.  And apparently counsel

14  got the signal, too, that you want to make sure that, before

15  you enter an order of that type, that HCRE has due process.

16  And that's why it's denied without prejudice.  Because I was

17  raising the issue for the first time at the podium, and you

18  reluctantly, properly, prudently decided that probably isn't

19  fair.  And so you wanted to make sure that this thing was

20  fully briefed.  And it's been briefed, and that's why we're

21  here today, not because you made a decision back in November

22  of 2022 that there was no bad faith, but simply that you

23  wanted to make sure that HCRE had a full opportunity to

24  address the charge.

25      Getting to the 'but for' issue.  But for the filing of,

1   frankly, a fraudulent, baseless proof of claim, Highland would

2   have more than $800,000 in its pocket today.

3       But for the filing of a motion to withdraw that sought an

4   unfair litigation advantage while trying to preserve for the

5   future more challenges to Highland's clear and good title to

6   this asset, Highland would have more money in its pocket.

7       But for the conduct of a trial, the taking of depositions,

8   and all of the rest of it, we wouldn't be here today.

9   Highland would have more than $800,000 in its pocket.

10      The notion that we should have taken the win, frankly, is

11  offensive.  That we should have just allowed them.  He wants

12  the benefit of the $300,000 on the theory that we should have

13  allowed him to take our depositions, not take their

14  depositions, and fight another day.  I just -- I'm speechless.

15  I'll just leave it at that.  The argument speaks for itself.

16      No motive?  They had no motive here?  They don't have ill

17  will?  They showed up at the hearing?  Goodness, I hope that

18  doesn't absolve them from filing a proof of claim with no

19  basis in fact or law.  Of course they showed up at the

20  hearing.  They would have been in contempt of court at that

21  point had they not.

22      The only reason, apparently, they filed the proof of claim

23  is because they didn't like the unintended consequences of the

24  Highland bankruptcy that Mr. Dondero filed.  In what world, in

25  what courtroom, under what law, is that a good faith basis for

1   pursuing a proof of claim, because you don't like the

2   unintended consequences of your own decisions?  That's bad

3   motive right there.  To try to deny a debtor a $20 million

4   asset because you didn't like the way it turned out.

5       Mr. Dondero, Mr. McGraner, HCRE were perfectly happy for

6   Highland to have a 46.06 percent interest in exchange for a

7   $49,000 contribution right up until the day they filed that

8   proof of claim.  Maybe until the day they filed for

9   bankruptcy.  I didn't ask that particular question.

10      It's not good faith to come to this Court, to file a proof

11  of claim, to go through all of this, because you don't like

12  the consequences of your own decision.

13       The Court really needs to ask itself whether or not it

14  wants to sanction this.  Whether it wants to allow litigants,

15  claimants, to file proofs of claim with no due diligence, no

16  basis in fact, no basis in law.  I don't think the Court

17  should do that.  I think the bad faith finding is easy,

18  frankly.

19      And with respect to our legal fees, they are what they

20  are.  The notion that this was overstaffed is kind of crazy.

21  It was me, Ms. Winograd, and Ms. Cantey.  We billed, the three

22  of us, more than 82 percent of the total fee.  And if you take

23  out Mr. Adler, it's probably close to if not in excess of 90

24  percent of it.  It is what it is.

25      My rates are higher than some of the attorneys Mr. Dondero

1   hires.  It is what it is.  He knew about that when he hired

2   us.  They're market rates.  Clients from east coast to west

3   coast, from north to south, pay those rates every day, with

4   bankruptcy court approval.  I'm sorry if he doesn't like to

5   pay those kinds of rates at this point in time, but they are

6   what they are and my client is entitled to get reimbursed for

7   this bad faith conduct.

8        I have nothing further, Your Honor.

9            THE COURT:  Okay.  Thank you.

10       Well, no surprise, we'll take this under advisement and

11  issue a written opinion and order.

12       No surprise, I'm going to say like I always say, we'll get

13  to this as soon as our calendar will allow, but I'm not going

14  to promise a date on that.

15       Obviously, I'm going to be refreshing my memory, going

16  back and studying the memorandum opinion and order I issued

17  sustaining Highland's objection to this proof of claim and

18  going back and looking at the transcript from that hearing

19  that was submitted.

20       And I say this a lot, that timelines matter a heck of a

21  lot to me and they reveal a heck of a lot.  And I will be

22  studying the timeline here and considering its significance.

23       Some of the important facts that will matter here are that

24  the HCRE proof of claim, again, was filed timely in this case.

25  April 8, 2020.  It was signed by Mr. Dondero as the

1  representative of HCRE.

2      The evidence I do remember is that Mr. Dondero was

3  president and sole manager of HCRE and he had signed the

4  limited liability agreement for SE Multifamily Holdings, I

5  think is the name of the entity.  He had signed the agreement

6  for both Highland and HCRE.  There was an original LLC

7  agreement and there was also an amended LLC agreement.

8      And again, I always think timelines -- again, I've said it

9  a million times -- are very revealing.  This was not a very

10  ancient transaction, a very old transaction, in the Highland

11  universe.  The evidence I saw -- and again, I always create a

12  timeline -- was that it was actually August 23, 2018 that this

13  SE Multifamily entity was created, and then it was sometime

14  early first quarter of 2019 where there was an amendment of

15  the LLC agreement that brought in the BH entity and its six

16  percent interest.  And then, of course, it was October 2019

17  when the bankruptcy was filed.

18      Again, why am I mentioning this?  I'm mentioning it

19  because this was fairly recent in Highland history that this

20  whole SE Multifamily transaction, Project Unicorn, was done.

21  And that matters to me because I would think memories should

22  have been fresh relative to a lot of other things we've looked

23  at during this case.  And so that really is weighing on my

24  brain here with regard to the bad faith possibility on the

25  filing of the proof of claim and the prosecution.  It, in my

1    view, could have been a quick process, doing the due diligence

2    and assembling, you know, is there a good faith basis for this

3    proof of claim or not.  And that concerns me.  That concerns

4    me.

5        It, as I recall hearing the evidence, looked like, oh my

6    goodness, look at the consequences now of this bankruptcy, and

7    Highland falling out of the status of being a friendly partner

8    with HCRE.  We don't like this.  We don't like this and we

9    want to change this.

10       So, again, I'm sort of thinking out loud here.  I'm sort

11   of revealing where I'm leaning right now.  It seems like this

12   was a recent-enough transaction where someone could have

13   assembled information pretty quickly and figured out if there

14   was any basis to argue reformation.

15       And I never did have a clear idea why they would pack up

16   their marbles and want to go home if there was some evidence.

17   And again, the Bankruptcy Rules require the Court to enter an

18   order whether withdrawal should be permitted or not.  I very

19   much wanted this to go away, and then there wasn't --

20   wordsmithing could not come up with a sentence everyone would

21   agree on to make it go away.

22       So I will, again, be drilling down on the evidence here as

23   to whether we have bad faith, but that's some of the timeline

24   and evidence I'm going to be drilling down on here.

25       I think *The Little Engine That Could* was the phrase Mr.

1    Morris argued.  I remember very well the evidence was that

2    Highland put in $49,000 to get its membership interest in SE

3    Multifamily Holdings, but I already heard that it was required

4    ultimately to be a cosigner on a $500 million loan from Key

5    Bank.  It provided resources, at least until some point during

6    the bankruptcy, to SE Multifamily.  And again, the tax benefit

7    of absorbing the income from the entity, which, again, it's

8    nothing to sneeze at here.

9        All of that I think was addressed pretty thoroughly in my

10   earlier opinion, but again, I'm going to go back and look at

11   it and the evidence and give you a thorough ruling one way or

12   another on the indicia of bad faith as well as the

13   reasonableness of fee-shifting.

14       All right.  It sounds like I'm going to see you on

15   February 14th, or some of you, and so I shall see you then.

16   We're adjourned.

17               THE CLERK:  All rise.

18               MR. GAMEROS:  Your Honor?

19               THE COURT:  I'm sorry?

20               MR. GAMEROS:  Your Honor?

21               THE COURT:  Yes.

22               MR. GAMEROS:  Yeah, I'm sorry.  I did ask, if you

23   weren't going to deny it outright, if I could file a brief

24   surreply.  Is that allowed?

25               THE COURT:  No.  I've got enough on briefing on this.

1   Thank you.

2            MR. GAMEROS:  All right.  Thank you.

3       (Proceedings concluded at 11:41 a.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **01/24/2024**

24   _____    _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

83

INDEX

1

PROCEEDINGS                                                        3

2

WITNESSES

3

-none-

4

EXHIBITS

5

-none-

6

RULINGS

7

Highland's Motion to Stay Contested Matter (4013) -        36
*Granted*

8

9

Highland's Motion for (A) Bad Faith Finding and (B)        78
Attorneys' Fees Against NexPoint Real Estate Partners,
LLC (3851) - *Taken Under Advisement*

10

11

END OF PROCEEDINGS                                                82

12

INDEX                                                            83

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

<pre>
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                       )    Case No. 19-34054-sgj-11
     In Re:                              )    Chapter 11
 4                                       )
     HIGHLAND CAPITAL                    )    Dallas, Texas
 5   MANAGEMENT, L.P.,                   )    February 14, 2024
                                         )    9:30 a.m. Docket
 6        Reorganized Debtor.            )
     _____)
 7                                       )
     DUGABOY INVESTMENT TRUST,           )    Adversary Proc. 23-3038-sgj
 8   et al.,                             )
                                         )
 9        Plaintiffs,                    )
                                         )    THE HIGHLAND PARTIES' MOTION
10   v.                                  )    TO DISMISS COMPLAINT [13]
                                         )
11   HIGHLAND CAPITAL                    )
     MANAGEMENT, L.P., et al.,           )
12                                       )
          Defendants.                    )
13   _____)

14                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
15                    UNITED STATES BANKRUPTCY JUDGE.

     APPEARANCES:
16
     For the Defendants/          John A. Morris
17   Movants:                     PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
18                                New York, NY  10017-2024
                                  (212) 561-7760
19
     For the Plaintiffs/          Deborah Rose Deitsch-Perez
20   Respondents:                 Michael P. Aigen
                                  STINSON, LLP
21                                2200 Ross Avenue, Suite 2900
                                  Dallas, TX  75201
22                                (214) 560-2201

23   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
24                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
25                                (214) 753-2062
</pre>

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              Proceedings recorded by electronic sound recording;
                  transcript produced by transcription service.

1              DALLAS, TEXAS - FEBRUARY 14, 2024 - 9:33 A.M.

2              THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, The Honorable Stacey Jernigan presiding.

5              THE COURT:  Good morning.  Please be seated.  All

6    right.  We have a setting this morning in the adversary styled

7    Dugaboy Investment Trust and Hunter Mountain Investment Trust

8    versus Highland, Adversary 23-3038.

9         We have the Highland Parties' motion to dismiss the

10   adversary.

11        Who is appearing for the Movant, Highland?

12             MR. MORRIS:  Good morning, Your Honor.  It's John

13   Morris from Pachulski Stang Ziehl & Jones for the Movant.

14             THE COURT:  All right.  Thank you.  And who do we

15   have appearing for Plaintiffs/Respondents?

16             MS. DEITSCH-PEREZ:  Good morning, Your Honor.  It's

17   Deborah Deitsch-Perez from Stinson.

18             THE COURT:  All right.

19             MS. DEITSCH-PEREZ:  And I would ask:  Is anybody else

20   having a little trouble hearing?  The volume seems lower than

21   usual here.

22             THE COURT:  All right.  It's loud and clear for the

23   Court.  What about you, Mr. Morris?

24             MR. MORRIS:  It's no problem for me, Your Honor.

25             THE COURT:  Okay.

1           MS. DEITSCH-PEREZ:  Okay.  I'll just listen hard.

2           THE COURT:  All right.  Well, I assume these are the

3   only appearances we have.

4       As a reminder to folks on the WebEx, if you're a party in

5   interest, fine, you can use both video and audio.  But if you

6   are not a case party in interest, the rules from Washington

7   say it's supposed to be only an audio listen-in format for

8   you.

9       All right.  So let me quickly talk about our time issues.

10   I have to give a CLE presentation on the other side of

11   downtown at 12:00 noon today, so I really need to stop at

12   about 11:30 or 11:35.  You all have given a two-hour time

13   estimate, so do you all think that is what you're going to

14   need, an hour each?

15          MR. MORRIS:  I do, Your Honor.  I don't know that

16   I'll need all that time, but I'll try and limit my opening

17   remarks to 45 minutes and save 15 for rebuttal.

18          THE COURT:  All right.  What about you, Ms. Deitsch-

19   Perez?  Any issues there?

20          MS. DEITSCH-PEREZ:  I would say the same.

21          THE COURT:  Okay.  Very good.  Well, with that, Mr.

22   Morris, I'll hear from you.

23            OPENING STATEMENT ON BEHALF OF THE MOVANTS

24          MR. MORRIS:  Thank you, Your Honor.  John Morris;

25   Pachulski Stang Ziehl & Jones; for the Movant, Highland

1 | Capital.

2 | Your Honor, in the famous words of an old New Yorker, Yogi

3 | Berra, this is déjà vu all over again.  Less than eight months

4 | ago, this Court issued rulings that held that HMIT was not a

5 | Claimant Trust beneficiary because its contingent interests

6 | have not vested.  This Court ruled that HMIT was not in the

7 | money.  This Court ruled that HMIT's rights as a contingent

8 | trust holder were determined solely with reference to the

9 | Claimant Trust agreement, and under the Claimant Trust

10 | agreement's clear and unambiguous provisions, they have no

11 | rights today.

12 | Now, in their complaint, HMIT and Dugaboy basically ask

13 | for the same relief that they sought last year.  They want

14 | information for the purported purpose of establishing that

15 | they are in the money, even though they told this Court last

16 | summer, based on available information, that they were in the

17 | money.  They want a declaration that the value of trust assets

18 | exceeds the value of the trust liabilities, and they want a

19 | declaration that their contingent interests are likely to

20 | vest.

21 | And I'll talk more about this in a moment, but it's really

22 | interesting, if you look at the last footnote of their

23 | complaint, they expressly ask the Court not to rule as to

24 | whether or not they are Claimant Trust beneficiaries.  They

25 | only want the Court to rule in a declaratory judgment that

1 they're likely to vest. We'll talk about that more in a

2 minute.

3     We need clear rulings on each of these matters, on each of

4 the bases for which Highland moves to dismiss this complaint,

5 because, you know, obviously, saying it once or twice hasn't

6 been enough, so we need to say it one more time, loudly and

7 clearly.

8     I've got a deck that I'll ask Andrea Bates to put up on

9 the screen. I hope to go through it fairly quickly.

10         THE COURT: Okay.

11         MR. MORRIS: Ms. Bates, if you can put our deck up,

12 please.

13     And I'd like to begin, once it's on the screen, just going

14 through the three counts of the complaint. These are the

15 counts that we're seeking to dismiss. They're -- they are,

16 frankly, fairly straightforward.

17     (Pause.)

18         MS. BATES: Apologies. I got kicked out of the

19 WebEx.

20         MR. MORRIS: Okay. (Pause.) Okay, great. If we can

21 go to the next slide, please.

22     So, the first count, Your Honor, the first count of the

23 complaint seeks the disclosure of trust assets and accounting,

24 and an accounting. In Paragraph 83, they make it clear, they

25 say, due to the lack of transparency into the assets of the

1    Claimant Trust, Plaintiffs are unable to determine whether the

2    contingent Claimant Trust interests may vest into Claimant

3    Trust interests.  That's really an important allegation,

4    because it's a concession.  And there are other concessions.

5    If you look at Paragraph 66, for example, it's a concession

6    that they're not Claimant Trust beneficiaries.  They know

7    that.  Right?  No dispute.  But they're seeking information to

8    determine whether they may vest.  That's what they're asking

9    for.

10        And the next piece of this slide is also important because

11   they're not just asking for information about assets and

12   liabilities.  They're asking for "details of all transactions

13   that have occurred."  Even under their theory of trying to

14   figure out if they're in the money, why could that possibly be

15   relevant?  Details of transactions that have occurred.  You

16   know, Your Honor, we were here before the Court last spring on

17   the mediation motion, and I recall Your Honor specifically

18   asking Ms. Ruhland, what information?  Because they were

19   seeking information then for the mediation.  What information

20   could you possibly need other than assets and liabilities?

21   And she didn't really have an answer.

22        Your Honor asked us -- and ordered us, frankly -- to

23   produce that information, and we did.  And that's the

24   information that we'll talk about in a moment that HMIT relied

25   upon to represent to the Court that it believed that the

1  entity was in the money.

2       But the important point here is why are they asking for

3  details about transactions that have occurred?  It's just a --

4  it's just -- when we talk about the equities at the end, I'm

5  going to come back to that.

6       The important point here for Count One, Your Honor, they

7  don't cite to or rely on any provision of the plan.  They

8  don't cite to or rely upon any provision of the Claimant Trust

9  agreement.  They don't cite to or rely upon any statute.  This

10  is a purely equitable claim.

11       If we can go to the next slide, please.

12       Count Two seeks a declaratory judgment concerning the

13  value of the assets relative to the liabilities, but it's a

14  conditional request.  It requires that the Defendants be

15  compelled to provide the information.  And that's what it says

16  in Paragraph 90.  And it flows from that, according to them,

17  that if assets exceed liabilities, all kinds of great things

18  are going to happen.  All affirmative proceedings can be

19  deemed unnecessary.  The bankruptcy court -- case can be

20  brought to a close, and the bloodshed will stop.

21       But what's really interesting about this, and it portrays

22  the intent of Hunter Mountain in this proceeding, is that they

23  only want the affirmative proceeding to stop.  If you look at

24  Paragraph 91, and it's quoted there in the footnote, they only

25  want pending adversary proceedings and get recovering value of

1   the HCMF -- HC -- the Highland estate.

2       So, presumably, they'll be allowed, right, they'll get

3   paid.  All creditors, according to them, if assets exceed

4   liabilities, they get paid.  And then all of the indemnified

5   parties have nothing to use to defend themselves under the

6   indemnities.  That's what they're looking to do.  It's really

7   clear.  And the Court should understand that they're not

8   really ambiguous here.  They want to look at all of the

9   transactions.  They want to, even under their theory that

10  Class 8 and Class 9 should get paid, they should get

11  everything else, there should be nothing left, and they should

12  be able to continue to sue Mr. Seery and the Reorganized

13  Debtor and the Claimant Trust and my firm from now until the

14  end of time.  That's the motivation here.

15      Let's look at Count Three.  Count Three, they want a

16  declaratory judgment regarding the nature of their interests

17  in the Claimant Trust.  But not really.  But not really.  What

18  they want is a declaration and a determination that there are

19  conditions, that the conditions are such that the contingent

20  interests are "likely to vest."  Again, if you look at the

21  footnote, and we'll look at it in detail, they're again not

22  asking the Court, because they know what the answer is going

23  to be, they're not asking the Court to find that they are

24  Claimant Trust beneficiaries, just that they are likely to

25  vest at some point in the future.

1  They don't cite to or rely upon any provision of the plan.

2  Again, they don't cite to or rely upon any provision in the

3  Claimant Trust agreement or in any statute.  It's a purely

4  equitable claim.

5  If we can go to the next slide.

6  The terms of the Claimant Trust agreement determine when

7  and if Plaintiffs are Claimant Trust beneficiaries, full stop.

8  Under the Delaware Statutory Trust Act, whether a party is a

9  beneficiary here, a Claimant Trust beneficiary, is determined

10  by the plain language of the governing instrument -- here, the

11  Claimant Trust agreement.  And the plan, frankly, because the

12  plan provisions matter in Articles III and IV.  They also

13  provide the same conditions for vesting.

14  We cited in our papers a case called *Paul Capital*

15  *Advisors*.  *Paul Capital Advisors* is from the Delaware Chancery

16  Court.  And what's really interesting about that case, Your

17  Honor, is in that case the plaintiff was seeking to remove a

18  trustee.  A lawyer by the name of Michael Hurst defended that

19  case, and Mr. Hurst -- who's a -- Mr. Ellington's counsel

20  today; he was before Your Honor in December on the Ellington

21  stalking matter; he's a longtime lawyer for Mr. Dondero -- Mr.

22  Hurst actually urged the court to dismiss the case on the

23  grounds that the plaintiff wasn't a beneficiary under the

24  plain terms of that trust agreement.  And the court granted

25  the motion to dismiss, just like the Court should grant the

1   motion to dismiss today.

2        So one of Mr. Dondero's own lawyers was in the Delaware

3   Chancery Court making the exact same argument that we're

4   making today, and that is, even referring to the *Restatement*,

5   a trust's beneficiaries are the people who are defined as

6   beneficiaries in the trust governing documents or that are

7   otherwise reflective of the settlor's intent.  That's what

8   *Paul Capital Advisors* holds.

9        Here, the settlor specifically decided to exclude HMIT and

10  Dugaboy as holders of the Class 10 and 11 claims from the

11  definition of Claimant Trust beneficiaries.  We know that.

12  We're going to look at that language in a moment.

13       The Claimant Trust agreement includes very specific

14  provisions concerning vesting, none of which refer to,

15  concern, or are dependent on the value of the trust assets and

16  liabilities at any moment in time.

17       Being in the money is legally irrelevant under the plain

18  terms of the plan and under the plain terms of the Claimant

19  Trust agreement and on the plain terms of the case that Mr.

20  Hurst successfully argued in the Delaware Chancery Court known

21  as *Paul Capital Advisors*.

22       If we can go to the next slide.

23       Let's look at the provisions.  Let's see.  Right?  Because

24  one of the bases for the motion to dismiss is that they have

25  no rights under the plan.  Neither Hunter Mountain nor Dugaboy

 1  have any rights under the plan.  And, you know, if you follow

 2  *Capital Advisors*, and, really, just as the Court did last

 3  summer when it decided, I think properly and appropriately,

 4  that Hunter Mountain and Dugaboy's rights are determined

 5  solely under the provisions of the plan, let's just look at

 6  those provisions.

 7  The Claimant Trust agreement, in Section 3.12,

 8  specifically says that the agreement doesn't require the

 9  Claimant Trustee to file any accounting.  That's the reasoning

10  sought in Count One.  Can't do it.  No.  Right?  There's no

11  obligation to do it.

12  If we can go to the next slide.

13  Section 3.12(b) provides -- requires the Claimant Trustee

14  to provide quarterly reporting to Oversight Board and Claimant

15  Trust beneficiaries.  Again, no allegation that Hunter

16  Mountain or Dugaboy is an Oversight Board member.  No

17  allegation that they're Claimant Trust beneficiaries.  In

18  fact, the whole purpose of the complaint, supposedly, is to

19  get information so that they can determine whether or not

20  they're likely to vest.

21  So, there's a concession that they're not Claimant Trust

22  beneficiaries.  And so only those two groups of people,

23  Oversight Board members and Claimant Trust beneficiaries, are

24  entitled to receive these quarterly reports.  And because

25  Hunter Mountain and Dugaboy don't fall into either group, they

1   have no rights under Section 3.12(b).

2       Just to make it abundantly clear -- if we go to the next

3   slide -- let's look at the definition of Claimant Trust

4   beneficiary.  Again, this is right out of the Claimant Trust

5   agreement, Section 1.1(h).  And it says, holders of allowed

6   general unsecured claims or allowed subordinated claims, and

7   only upon the certification of the Claimant Trustee that all

8   holders of claims have been paid indefeasibly in full.  That's

9   a reference to Class 10 and 11 with the holders of the former

10  limited partnership interests.  Only then do they vest.

11  That's how they vest.  You've got to file this certification

12  saying that everybody has been paid in full.

13      And they say, oh, gee, well, if assets exceed liabilities,

14  that must mean they're in the money and the Trustee should

15  just pay them in full.

16      But that's not what that trust agreement says.  And let's

17  be clear.  The trust agreement and the plan were adopted and

18  confirmed by this Court more than three years ago now.  It was

19  the first week of February 2021.  Those documents were subject

20  to appeal, but nothing we're talking about today is -- was

21  ever the subject of appeals.  Right?  So these are the

22  agreements.  They're sacrosanct.  The Delaware Chancery Court

23  says you've got to follow the agreement.  So let's do that.

24      If we can go to the next slide.

25      Distributions.  So, right, the Claimant Trustee has to

 1    certify that everybody has been paid in full.  But what about

 2    distributions?  When are they going to get paid in full?

 3    According to the plain and unambiguous terms of the Claimant

 4    Trust agreement, the Claimant Trust agreement shall distribute

 5    to holders of trust interests at least annually the cash on

 6    hand -- here's the important word:  net -- net of any amounts

 7    that, among other things, if you go down to (d), are necessary

 8    to satisfy or reserve for other liabilities incurred or

 9    anticipated by the Claimant Trustee, in accordance with the

10    plan and this agreement, including but not limited to

11    indemnification obligations.

12        So it doesn't matter if assets exceed liabilities.  We

13    don't believe that they do.  We don't believe that there is

14    any reason to even engage in the debate.  And the reason for

15    that is because we've got substantial indemnification

16    obligations that must be reserved for.  And if -- and -- and

17    -- we'll talk about that more in a moment.

18        But that's the key.  That's the key here.  They don't

19    vest.  Right?  Class 10 and 11 does not vest until the

20    Claimant Trustee certifies that everybody has been paid in

21    full.  And nobody is going to be paid in full as long as the

22    Claimant Trust has indemnification obligations that must be

23    satisfied.  The Claimant Trustee is a fiduciary.  He owes the

24    beneficiaries of indemnification rights the duty to make sure

25    that the Claimant Trust has sufficient assets to satisfy the

1   indemnification obligations.

2         And do you know who's not here today, Your Honor?  Any

3   Claimant Trust beneficiary.  Any Claimant Trust beneficiary

4   who would -- there is nobody here complaining that Mr. Seery

5   is abusing his rights.  There's no -- nobody is complaining

6   that he should be distributing the cash.  Nobody is

7   complaining that, you know, he's overwithholding.  And we'll

8   talk more about why, actually, what he's doing is proper,

9   although that's not an issue before the Court today.  The only

10  issue before the Court, frankly, is Section 6.1.  And it says

11  the trust must reserve amounts necessary or deemed necessary

12  to satisfy indemnity obligations.

13        If we can go to the next slide, please.

14        So now let's get to the motion to dismiss itself now that

15  we have an understanding of exactly what the Claimant Trust

16  agreement and the plan provide.  Let's look back at what the

17  Court did.  The Court issued two very important rulings last

18  year on these very issues.  And in the Court's lengthy

19  decision on the Hunter Mountain motion for leave, the Court

20  concluded, quote, HMIT's status as a beneficiary of the

21  Claimant Trust was designed by the Claimant Trust agreement

22  itself, pure and simple.  The Court was right then, and the

23  Court will be right today when presumably it stands by its

24  prior ruling.

25        Under the Claimant Trust agreement, contingent trust

1  interests have no rights until they vest.  And there's no

2  dispute that they have not vested because the Claimant Trustee

3  has not filed a certification that everybody is getting paid

4  in full.  That's what the language of the document says.  We

5  really are done here.

6      But there's more, because after that hearing Hunter

7  Mountain made another motion and said, wait, Your Honor, those

8  disclosures that you required Highland to make in support of

9  mediation, they show we're in the money.  They've already

10  swung and they've missed at this.  They said, oh, we're in the

11  money.  And Your Honor, unlike HMIT, actually read the

12  disclosures and actually saw all of the contingencies in

13  there.

14      It's ironic that HMIT, of all people, would be telling the

15  Court that they're in the money when their beneficial owners

16  are actually appealing the $70 million Notes Litigation, when

17  their beneficial owners are playing fast and loose with the

18  value of assets that they control, such as HCRE.  Right?  But

19  they're still here with the same tired story, maybe we're in

20  the money.

21      Your Honor, you've ruled on this and we're done, as far as

22  I'm concerned.  You found, among other things, that they

23  failed to give proper attention to the notes to the financial

24  statements that were integral to understanding the numbers.  I

25  hope that they've done that now.

1    Your Honor ruled that they failed to take into account the

2    widespread litigation that's caused massive indemnification

3    claims and legal fees, all of which must be satisfied.

4    Based on this Court's decision less than five months ago

5    -- I think it was actually eight months ago -- Counts One and

6    Three are moot and they're otherwise barred by collateral

7    estoppel.

8    If we can go to the next slide, please.

9    Count Two must also be dismissed because it depends on

10   Highland being "compelled to provide information about the

11   Claimant Trust assets."  That's in Paragraph 90.  So if the

12   Court doesn't compel Highland, the Court has no ability to

13   make the declaration that's sought.

14   But even if you could, right, there's -- Plaintiffs have

15   no legally cognizable right.  They don't cite to anything.

16   They don't have an equitable claim to compel Highland to

17   provide trust -- the information.  There is no underlying

18   controversy to be resolved.  They have no right to this

19   information.  They have no equitable claim to this

20   information.

21   As we set forth in Paragraph 39 of our moving brief, they

22   can't come here seeking equity that's barred by the plain

23   terms of the trust agreement.  The trust agreement, again,

24   reflects the settlor's intent.  The settlor intended that he

25   would provide or that the Claimant Trustee would provide

1   limited information to the claimant board members and Claimant

2   Trust beneficiaries, of which neither Hunter Mountain nor

3   Dugaboy are one.  They can't use equity to just override the

4   very plain meaning of the operative documents and the intent

5   of the settlor.

6       The Claimant Trust agreement is determinative.  Since the

7   value of the trust assets and liabilities at any moment in

8   time is irrelevant to the question of vesting, there is no

9   justiciable controversy to resolve.

10      So, two reasons.  I don't think the Court can order

11   Highland to produce any information, so it fails for that

12   reason.  And even if it did, the whole issue is completely

13   irrelevant, given the plain terms of the trust agreement and

14   the plan, so there is no justiciable controversy.

15      If we can go to the next slide.

16      Some other grounds to dismiss Count One.  Right?  Again,

17   no legal right to the information or an accounting.  Again,

18   the request for equitable relief is barred by the plain terms

19   of the trust agreement since they're not Claimant Trust

20   beneficiaries.

21      And it's worth noting, as I mentioned earlier when we saw

22   the very provision in the trust agreement, even Claimant Trust

23   beneficiaries have no right to an accounting, or any right to

24   any information beyond that provided in Section 3.12.  But,

25   again, I don't want to suggest that Hunter Mountain or Dugaboy

1  have any entitlement.  It's just to contrast where actual

2  trust beneficiaries lie vis-à-vis Hunter Mountain and Dugaboy.

3      If we can go to the next slide.

4      Other grounds to dismiss Count Three.  Again, in Count

5  Three, Plaintiffs seek a declaration as to whether or not the

6  Claimant Trust beneficiaries may be indefeasibly paid and

7  whether the conditions are such that their claimant -- you

8  know, contingent Claimant Trust interests are likely to vest

9  into Claimant Trust interests, making them Claimant Trust

10  beneficiaries, yet another admission that they're not Claimant

11  Trust beneficiaries today.

12      These are inquiries that would require the Court to, among

13  other things, handicap the likelihood of Mr. Dondero's appeal

14  in the Notes Litigation and the amount that is going to be

15  needed to satisfy future indemnity obligations.

16      I have a reference in this bullet to Docket No. 3880.

17  Your Honor, that's the other piece of information that I think

18  the Court required Highland to produce in connection with the

19  mediation, where we identified all of the outstanding

20  litigation that we have.  You know, we are here today.  I was

21  in Dallas two weeks ago before Judge Scholer to have oral

22  argument on the Advisors' appeal of the judgment that was

23  entered in favor of Highland and against them a couple of

24  years ago.

25      We obviously had a lot of paperwork to deal with on the

1   motion for leave, you know, to sue my firm that was withdrawn
2   in the face of a Rule 11 motion.

3       You know, these are all things that weren't even on that
4   list.  We've got the appeal now of the original Hunter
5   Mountain decision.  Again, with so many issues on appeal, I
6   don't even know if the District Court will ever get to the
7   standing question, because there's like literally dozens of
8   issues on appeal.

9       We were in Houston last week for a Fifth Circuit argument
10  on Your Honor's order conforming the plan to the original
11  Fifth Circuit decision on confirmation.

12      All of these things are expensive.  Mr. Dondero is famous
13  for complaining about how expensive this is, and yet he
14  continues to drive these costs.  This hearing is making it
15  much less -- it's making it less likely that he's ever going
16  to be in the money.  Every time we have another court
17  appearance, every time he files another complaint, every time
18  he, you know, does things to cause us to spend money, his
19  being in the money -- not that it's legally relevant; I don't
20  want to make any suggestion that it is -- but that's why we
21  need these indemnification reserves, because there is no end
22  in sight.

23      We do have a vexatious litigant motion, Your Honor.
24  Hopefully, that will be successful.  Hopefully, that will
25  curtail things in the future.  But, you know, remains to be

1    seen.  That's just something that we feel we need to do.

2         The Plaintiffs tacitly admit that these requests are for

3    impermissible advisory opinions.  Obviously, they are.  Any

4    time you're asking the Court to make a determination about

5    what's likely to happen in the future that has no legal

6    significance whatsoever, it's an advisory opinion.

7         And, again, this is what I referred to earlier.  If you

8    look at Footnote 6 to Paragraph 94 of the complaint, oddly,

9    they don't ask the Court to  determine that they're Claimant

10   Trust beneficiaries.  Maybe it's because they've already

11   admitted that they're not.  I don't know.  They're not asking

12   the Court to convert their contingent interests into

13   noncontingent interests.  Again, maybe because they're -- it's

14   an acknowledgement and an admission that that can't happen.

15   But here's the tell, because those issues must be done in

16   accordance with the plan and the CTA.  We agreed.  There's no

17   dispute.  There is no judiciable, justiciable dispute here.

18   We agreed that all of these issues are decided by the plain

19   terms of the plan.

20        I think that's my last slide, so you can take this down.

21        I just briefly want to finish up with just some

22   observations about equities.  As a matter of law, equity can't

23   trump contractual terms.  But if for some reason the Court

24   even wanted to consider the question, I would ask the Court to

25   take very seriously Hunter Mountain and Dugaboy's pleadings

 1  where they're asking not for information regarding assets and

 2  liabilities, but they want a review of all of the prior

 3  transactions.  They want to second-guess everything the

 4  Claimant Trustee has done to date.  That smells.  Right?  And

 5  it's not the first time we've dealt with this issue.  You

 6  know, Your Honor can take judicial notice of their pleadings

 7  in the Fifth Circuit when they were appealing that 2015.3

 8  ruling.  They explicitly told the Fifth Circuit they want

 9  information so that they can bring more claims.  Right?

10      So there's not a good faith basis for this.  There's not a

11  legal basis for it.  There's not an equitable basis for it.

12  The Court has ruled on these issues multiple times already.

13  There is no judiciable controversy before the Court.  And for

14  all of those reasons, the Court should just dismiss this

15  complaint.

16      I have nothing further, Your Honor.

17          THE COURT:  All right.  Mr. Morris, you referred to

18  the list of pending matters.  And last night at 10:00 o'clock

19  in bed, I meant to pull this up because it was referred to in

20  one of the pleadings as well, and I didn't do it.  Could you

21  tell me the docket entry that appears at?

22          MR. MORRIS:  Yeah, I think it's 3880.  I apologize.

23  I'm actually looking at my phone.  I wouldn't typically do

24  this, but I'm going to see if I can quickly find that.  But I

25  believe it's 3880.

1          THE COURT:  Okay.

2       (Court confers with Clerk.)

3          THE COURT:  Okay.  All right.  Ms. Deitsch-Perez?

4          OPENING STATEMENT ON BEHALF OF RESPONDENTS

5          MS. DEITSCH-PEREZ:  Thank you.  This adversary

6   proceeding actually has deep roots.  It was started by motion

7   a long time ago, long before that balance sheet was filed.

8   And it was done because the Claimant Trustee and the estate

9   have consistently obscured the available resources in order to

10  make it harder for the residual equity holders to investigate

11  whether the estate has been mismanaged, to their detriment.

12          THE COURT:  Did you say --

13          MS. DEITSCH-PEREZ:  Mr. Morris talked --

14          THE COURT:  Can I -- you said they've obscured the

15  resources?

16          MS. DEITSCH-PEREZ:  Yes.  They've obscured what's in

17  the estate.  If you -- we'll look more closely at that balance

18  sheet, Your Honor.  In addition to not having filed the 2015

19  reports, the balance sheet, you're right, has a number of

20  notes on it.  But the notes -- and we'll look at those and go

21  through them -- don't -- don't -- aren't illuminating.  If you

22  look at the face of the balance sheet, there is enough money

23  to pay everybody and have money left over.

24      You have to rely on obscure, undetailed notes and

25  assertions and assumptions to say maybe, maybe there won't be

1  money left over.  But on the face of the balance sheet, there

2  is enough money to pay everybody.

3      And if there's enough money to pay everybody, the leftover

4  money is HMIT's.  It's not -- it's not the professionals'.

5  It's not the Claimant Trustee's.  What's being used now is the

6  residual -- old residual equity's money.

7      So Mr. Morris brought up mediation, and that was an

8  interesting point, because in the papers, arguing about

9  whether or not Your Honor should grant mediation, the estate

10  and Mr. Seery made it very clear there would only be a

11  resolution if there were complete and total releases given and

12  all litigation stopped.  So that was clear.  We understood

13  that.  And what was at stake, obviously, in any mediation is

14  what's left.  So, what are the residual -- what's the

15  residual?

16      But if we can't find out what the residual is and we can't

17  find out what actually is being released, this estate can't

18  ever end.  It's not the Plaintiffs here who are keeping the

19  engine going.  It's the Defendants, because they know exactly

20  how to push the buttons to raise suspicions about whether

21  something untoward has gone on.

22      And so let me test the premise of the Defendants here with

23  a hypothetical.  Because, remember, Defendants arguments for

24  dismissal turn on the contention that the Claimant Trust

25  agreement prevents Plaintiffs from being considered

1 beneficiaries, no matter how much money the Claimant Trust has

2 -- or squandered, for that matter -- if Mr. Seery doesn't

3 authorize payment of Class 8 and 9 creditors in full and

4 affirmatively certify that Classes 10 and 11 are

5 beneficiaries. So, unless he does that, it's the Defendants'

6 position Plaintiffs have no means of redress.

7 So let's test that with a hypothetical. Let's say that

8 Mr. Seery, let's say that the Claimant Trustee, to keep

9 earning his $150,000 a month indefinitely, massively

10 overspends professional fees to justify an objectively

11 unreasonable indemnity reserve of $125 million. And let's say

12 he deliberately dribbles out payments to Class 8 and 9 so that

13 eventually the combination of interest, administration, and

14 professional fees is sufficient to eliminate the amounts that

15 would otherwise be payable to the last dollar of 8 and 9, much

16 less Classes 10 and 11.

17 And let's make the hypothetical even more extreme. What

18 if Mr. Seery moved money into the Indemnity Subtrust and paid

19 it to phantom vendors? I'm not saying he did that. I don't

20 want stories about how we're accusing him of something. This

21 is a hypothetical. But let's say he did that. He put it in

22 the subtrust, paid it to phantom vendors, who kicked it back

23 to him, in order to keep the amount low enough to pay the last

24 dollar to Classes 8 and 9.

25 Under the Defendants' theory here, that can't ever be

1    discovered, much less remedied.  And so that's why, that's why

2    there is an equitable argument here, and a practical argument,

3    Your Honor.

4        Because Your Honor has said you want this to end.  This

5    has to end.  Well, the only way it can end is if there's

6    sunshine, if there's enough disclosure and investigation so

7    everybody can get comfortable that releases are appropriate

8    and the money that could be left is left there, and then

9    everybody can go home.  Because we are all really tired of

10   this.  But it's the Defendants that are keeping it going.

11           THE COURT:  Let me interrupt you.  There are many

12   jurisdictional arguments, as you all know.  Many issues for

13   this Court, legal issues here.  But here are two things that

14   stand out above all.  And one is do the Plaintiffs have a

15   contractual right to the information they seek or not.  Why

16   should the Court look beyond the Creditor Trust agreement, the

17   plan, the confirmation order, which are final?  These issues

18   were never complained about.  There's not enough transparency

19   in the trust agreement language:  No one ever made that

20   argument.  It's not on appeal.

21       So, again, many jurisdictional arguments here, but why

22   should I ignore clear contractual terms here?  It almost feels

23   like modifying the plan three years down the road.  So --

24           MS. DEITSCH-PEREZ:  It's not --

25           THE COURT:  So, --

1    MS. DEITSCH-PEREZ:  I'll say it's not, Your Honor.

2  It's not, Your Honor, because under Delaware law and under the

3  good faith and fair dealing, every contract in Delaware --

4  we're not in -- it's not a Texas contract -- in Delaware,

5  there's a covenant of good faith and fair dealing.  And when a

6  party to a contract actually does things that prevent someone

7  else from obtaining the benefits under the contract, then you

8  don't read the contract literally, you read it to prevent the

9  wrongdoer from getting the benefit of their wrongdoing.  And

10  that's --

11    THE COURT:  Okay.

12    MS. DEITSCH-PEREZ:  That's the reason Your Honor can

13  and must allow this case to go forward.  Because, otherwise,

14  there is a terrible, terrible law that's being created.  It

15  enables somebody to --

16    THE COURT:  Well, you say it's terrible law, but,

17  again, the trust agreement was out there for consumption

18  before the confirmation hearing.  And your clients --

19    MS. DEITSCH-PEREZ:  Well, --

20    THE COURT:  -- or others could have come in and said,

21  this just doesn't work, this lack of transparency, this lack

22  of oversight, this lack of access to information.  And you

23  didn't.

24    MS. DEITSCH-PEREZ:  Your Honor, who would have

25  thought that the --

1      THE COURT:  And not only that, but this is not -- I

2  have no reason to believe this is atypical language.  In the

3  dozens if not hundreds of post-confirmation liquidating trust

4  agreements I've seen, it looks like standard fare.

5      MS. DEITSCH-PEREZ:  Your Honor, there is no -- no one

6  could have contemplated at the time that we would be in the

7  situation that we are now, with information not having been

8  provided.  Many Chapter 11s are much more cooperative.

9  They're not liquidations.  They're reorganizations.  They're

10  -- people are trying to end the estate, so they're sharing

11  information.  This is not a circumstance that could have been

12  contemplated.  And Your Honor can do something about it now.

13      THE COURT:  Well, which brings me to my second sort

14  of overarching issue that stands out, of all the different

15  issues.  And these are my own words more than anything I think

16  I've read.  It feels like what you're asking for, if there's a

17  jurisdictional way to get there, if there's a legal way to get

18  there, it feels like it would be a meaningless exercise,

19  because the value in the trust is going down daily.  It's

20  going down hourly, as we speak.  The value I could determine,

21  if this goes to trial, would be completely meaningless a

22  month, two months, five months, three years later, because of

23  all the litiga...

24      MS. DEITSCH-PEREZ:  Your Honor, but on that theory --

25      THE COURT:  Please don't interrupt until I finish.  I

1   want to make sure my point is clear.  My law clerk --

2           MS. DEITSCH-PEREZ:  Okay.

3           THE COURT:  -- did bring in to me the list --

4           MS. DEITSCH-PEREZ:  I understand.

5           THE COURT:  -- the list of litigation.  And even

6   this, if we pulled up the right one, it's several months old,

7   so even this is very dated.

8       But let me put it in very plain terms.  It kind of feels

9   like your client is its worst enemy in getting this relief,

10  because your client, because of the fifty-something appeals

11  and because of the motions for leave to bring litigation, is

12  causing the value of this trust to plummet.  And we're never

13  -- it seems like a meaningless exercise.  I'll never be able

14  to make a declaratory judgment as your client wants me to, if

15  I can get there legally and jurisdictionally.  How could I get

16  to a point of being able to value the trust and value the

17  likelihood, determine the likelihood that your client is in

18  the money when the legal fees are going up hourly because of

19  all of these appeals?

20      I'm not saying your client isn't entitled to appeal, but

21  I'm just saying he may be his own worst enemy.  That strategy

22  means he's probably never going to be in the money.

23      So these are my -- I just, I'm wanting you hopefully to

24  focus on these two biggest overarching issues in my brain.

25  The trust agreement --

1       MS. DEITSCH-PEREZ:  Okay.

2       THE COURT:  -- says what it says.

3       MS. DEITSCH-PEREZ:  And I can do that, Your Honor.

4       THE COURT:  I'm supposed to respect contractual

5  terms.  So that's overarching issue number one in my mind.

6       But second, again, I don't know what the legal term would

7  be for meaningless exercise, but it's just, it's almost like

8  an impossibility thing to ever declare a value that means

9  anything when it's going to be different two weeks from now,

10  --

11       MS. DEITSCH-PEREZ:  Your Honor, --

12       THE COURT:  -- a month from now, a year from now.

13       MS. DEITSCH-PEREZ:  Your Honor, it's not an

14  impossibility.  That, one, we would endeavor to do this really

15  quickly and efficiently so that the cost of this is not

16  material to what's in the estate.

17       But secondly, these kinds of exercises are done all the

18  time in litigation.  You estimate the future values.  You --

19  an expert can assist Your Honor in determining what is a

20  reasonable indemnification reserve.  These are things that can

21  be done.  This is what lawyers and judges do.

22       THE COURT:  This is off the chart.  This is not like

23  any other situation I can think of.  This is off the chart

24  with the amount of post-confirmation litigation.  I mean, if

25  you can point me to something analogous out there, I'd love to

1    see it.

2           MS. DEITSCH-PEREZ:  The fact that there isn't a case

3    exactly like this doesn't change the fact that there are

4    professionals who can look at this, can look at what has been

5    spent so far, can look at whether hearings could have two or

6    three lawyers instead of ten, and make an estimate of the

7    amount that's appropriate for an indemnity reserve.  That's

8    something that's susceptible of proof and determination.

9         It's not impossible for Your Honor to decide that, and

10   it's not fruitless.  Someone can say, hey, wait a minute,

11   every hearing you had, you know, ten people from Pachulski and

12   ten people from Quinn, even though they're no longer really

13   involved, and ten people from Willkie.  And so if you can rein

14   that in, the Court can say, this is what a reasonable

15   indemnification would be and this is what's left.  And so,

16   yes, it will finally create a path for us to resolve this

17   estate.

18        But without this information, we're left with suspicion

19   and uncertainty.  How do you resolve something when you don't

20   even know what's left?  We don't -- because the reporting is

21   quarterly, we've heard rumors in the marketplace that Class 8

22   has been paid in full.  So I would ask Mr. Morris, is that

23   correct?  Has Class 8 already been paid in full?  We don't

24   know.  I mean, can you tell us, what's the amount of the

25   estate right now?  We don't know.  Because we don't know what

1  those notes mean.  And Your Honor isn't -- and Your Honor

2  doesn't know and can't know without shedding a light on this

3  what that balance sheet really means.

4      And Mr. Morris makes a big deal about, oh, there are

5  admissions in the complaint then they don't know if they're in

6  the money.  Your Honor, the complaint was filed before the

7  balance sheet.  So when in the last proceeding HMIT said it's

8  in the money, that's because it knew from the balance sheet

9  it's in the money.  So you know now, you can look at that

10  balance sheet and say on the face of it, okay, there is more

11  -- there are more assets than liabilities.  In order to

12  determine that that wouldn't be the case, you'd need a lot

13  more information about what those notes that you point to in

14  the denial of reconsideration actually mean.

15      But here, the estate is trying to say no, not only do the

16  Plaintiffs not get to know that information, we're not telling

17  Your Honor, either.  We're just putting a lid on it.  And so

18  we can all go on fighting because we don't have the

19  disinfectant of information.

20      And so -- and now we'll get into more of the law.  Your

21  Honor asked, how can I do this?  Delaware law requires this

22  Court to afford standing to all beneficiaries, including

23  contingent ones.  And especially when it's alleged that vested

24  status is being withheld in contravention of the duty of good

25  faith and fair dealing.

1       So let's go to Slide 3.

2       Okay.  Let's take a look at where we started and why, why

3   we're so upset about this.  If you look at the value of the

4   estate as of June of '22, there was somewhere in the mid-$600

5   million in assets.  And at the start, there was something

6   under $400 million in claims.  And so now, as of the end of

7   '23 -- go back a second, go back, Mike, one more -- as of the

8   end of '23, there was about $120 million of Class 8 and 9

9   remaining.  But remember, there was -- you know, if you

10  subtract 400 from 650, you've got $250 million.  That's a

11  pretty big cushion.

12      So let's go forward and look at what we know from the

13  balance sheet.  So, if we -- and we've put references there.

14  But if we go through -- you can see from the face of the

15  balance sheet there is a net value -- that's after everybody,

16  8 and 9 have been paid off -- of $122 million.  So, in order

17  to get rid of that, you have to assume the indemnification is

18  going to eat up all of that.

19      Now, think about what the indemnification means.  If in

20  fact there was no wrongdoing, well, there'll be no judgment to

21  indemnify.

22          THE COURT:  But what about the --

23          MS. DEITSCH-PEREZ:  If in fact --

24          THE COURT:  What about the professional fees?

25          MS. DEITSCH-PEREZ:  $122 million, Your Honor?

1        THE COURT:  Well, we're three years post-

2   confirmation, with no end in sight to these appeals.

3        MS. DEITSCH-PEREZ:  Your Honor, I think it defies

4   belief that they could reasonably spend $122 million.  And the

5   point is, if we can get this information and really have

6   satisfaction that maybe there's really nothing bad that's

7   happened and there are no -- there's no hidden money anywhere,

8   and we know what's there, this can end.  This can end.

9        THE COURT:  Do you --

10       MS. DEITSCH-PEREZ:  We can finally see the light at

11  the end of the tunnel.

12       THE COURT:  I mean, again, we're here for legal

13  argument, but you're saying this could end.  This is never

14  going to end.  This is never going to end.  I stayed things in

15  2023, at your client's request, to take another crack at

16  mediation.  Okay?  Even though we did mediation, even though I

17  stayed everything in 2020 before confirmation and ordered

18  global mediation and things didn't work out, your clients and

19  Mr. Dondero convinced me, two years post-confirmation, stay

20  everything again, because we don't think we got attention or

21  respect from the mediators.  The Debtor was focused on other

22  people, like UBS and the Redeemer Committee and Joshua Terry.

23     So I don't know what happened, and I don't want to know

24  what happened.  It's not my role to know what happened in the

25  most recent mediation exercise.  But I do know that it's

1    enough to convince me this will never end.  When things were

2    stayed --

3            MS. DEITSCH-PEREZ:  And Your Honor, --

4            THE COURT:  When things were stayed and the legal

5    fees weren't -- well, they were probably continuing to accrue

6    because there were still appeal deadlines out there right and

7    left that had to be addressed.  But it's not going to settle.

8    It's going to go on forever whether you get this information

9    or not.

10           MS. DEITSCH-PEREZ:  Your Honor, I'm telling you, and

11   I represent the Plaintiffs, that the only thing that can

12   enable this to end is to have sufficient information to be

13   able to say, okay, I know what this all means, I know what

14   we'll get, I know what we're foregoing.

15       How can anything ever settle if you don't know what you're

16   giving up and you don't know what you're getting?  How would

17   that be possible?  How would that be fair to parties to say,

18   you should settle but you don't know what you're giving up and

19   you don't know what you're getting?  We're trying to get to

20   the point where we could end this.

21       Shall I go on, Your Honor?

22           THE COURT:  Yes, please.

23           MS. DEITSCH-PEREZ:  Okay.  Mike, next slide.

24       Okay.  This is just a quick summary of the Defendants'

25   arguments.  Mootness, collateral estoppel, advisory opinion,

1  standing, failure to state a claim, and unclean hands.

2      Let's go to the next.

3      Okay.  So, ironically, the Defendants argue that the

4  balance sheet filed on July 6th eliminates the controversy

5  among the party, parties, mooting the claims.  But that can't

6  be true, and Defendants won't provide the information to fill

7  out the notes on the balance sheet and when -- when the

8  balance sheet on its face shows assets exceed liabilities but

9  the Defendants continue to maintain that they don't but

10  without any analysis of why that's so.

11      Let's go on to the next.

12      But the Defendants shouldn't be able to have it both ways.

13  If the balance sheet and financial statements are insufficient

14  to determine whether assets exceed liabilities, as they claim,

15  then the claims can't be moot.  And, of course, a claim can't

16  be dismissed simply because a defendant says in a pleading

17  that a particular document shows that plaintiffs lack standing

18  when the document itself does no such thing.

19      On its face, the balance sheet shows assets exceed

20  liabilities.  But if there's any doubt or ambiguity, that

21  means discovery is needed, not that claims should be

22  dismissed.  This is a fact issue on which Plaintiffs are

23  entitled to discovery and trial.

24      The next slide.

25      So, I mean, in response to the mootness arguments,

 1  Plaintiffs cite cases that -- uncontroversial cases that say,

 2  when there's still a controversy, that claims are not moot.

 3  And if you'll look at Defendants' reply, they don't address

 4  any of that.

 5      The Defendants also rely on the Court's order denying

 6  reconsideration of the HMIT gatekeeper regarding insider

 7  trading to say that it either moots Count Three or is the

 8  basis to collaterally estop Plaintiffs from proceeding.  And

 9  there are numerous reasons that that's wrong.

10      So, one, the Court's dicta -- and it was dicta, because

11  the Court had a lot of other reasons that it disposed of the

12  matter -- is based on information that the Defendants now

13  refuse to stand behind.  And the Court's order doesn't address

14  whether HMIT is in the money now or when the complaint was

15  filed or whether it will ever.  And it certainly doesn't

16  exclude the potential that Plaintiffs would certainly be in

17  the money but for Claimant Trustee's alleged breaches of good

18  faith and fair dealing.  So there's nothing about the Court's

19  original or reconsideration order that precludes standing

20  here.

21      Moreover, the order is obviously one that's on appeal and

22  may be overturned.

23      Next slide.

24      If we look more closely at the requirements of collateral

25  estoppel, Defendants are ignoring the basic elements of the

1  doctrine.  So, one, the question is, are the claims identical?

2  And they're not, for the reasons that I mentioned.  The issues

3  were obviously not necessary to the reconsideration decision

4  since the Court stated it had several grounds for its

5  decision.

6      More importantly, the Court's decision was made on a

7  summary record in a gatekeeper proceeding.  The -- so there

8  was no discovery on that issue.  And the Defendants have never

9  fully detailed to the Plaintiff or the Court what's in the

10  Claimant Trust, what's in the Indemnity Subtrust.  We don't

11  know.

12      So the balance sheet is summary information.  The notes

13  are not explained.  And no one, not the Plaintiffs, not the

14  Court, has had an opportunity to test the data and assumptions

15  there, including undisclosed contingent liabilities and $198

16  million in off-balance-sheet adjustments.

17      So let's go to the next slide.

18      So I just urge the Court to go back and look at the

19  balance sheet.  And we have a picture of it up here.  But if

20  you look at it, you'll see notes.  For example, Note 3.  Value

21  reflected herein consists primarily of ownership in private

22  funds and subsidiaries.  What funds?  What are their assets?

23  How liquid?  Have they been sold?  For a loss or gain?  What's

24  the resulting change in cash balance?

25      There's another note for other liabilities.  To whom are

1  they owed?  Note 5.  The amount of further incremental
2  indemnification reserves are currently expected to exceed $90
3  million and may be greater.  $50 million?  $90 million?  $125
4  million?  What's the math?  What's the math behind that and
5  how much has been used?  What's been put aside?  Who is
6  getting it?
7      It says $35 million has been funded into the Indemnity
8  Trust.  What's the balance now?  Did the additional funds
9  reduce the value of the Claimant Trust?  Did the money come
10  out of current earnings, so maybe it hasn't reduced it?
11      Incremental springing contingent liabilities that range
12  from $5 to $15 million.  What are they?  How much?  When are
13  they likely to crystallize?
14      These are among the questions that are unanswered from
15  that balance sheet.
16      And let's go to Slide 12.
17      And so while -- Your Honor has pointed out many times that
18  the August 25, 2023 opinion is very long, over a hundred
19  pages, very detailed.  And I concede:  It is over a hundred
20  pages.  It is long.  It has many sentences in it, and it has a
21  lot of discussion.  But there's no analysis about the value of
22  the assets and liabilities or the net value of the Claimant
23  Trust or what has been moved into the Indemnity Subtrust or
24  why and was it justified.  None of that is addressed.
25      The Court's October 6th opinion is short and it's cursory,

1  because it also doesn't analyze the value of the assets or

2  liabilities or the net value of the Claimant Trust or what has

3  been moved into the Indemnity Subtrust or why and whether it's

4  justified.  It simply states HMIT does not give proper

5  attention to the voluminous supplemental notes in the balance

6  sheet that were allegedly, this is a quote, "integral to

7  understanding the numbers therein."

8      But what do those supplemental notes mean?  The Debtor is

9  vigorously shielding any scrutiny, while at the same time

10  arguing that this Court's nonsubstantive reference to those

11  notes collaterally estops Plaintiffs from bringing this

12  action.  But without access to information with which to

13  challenge the other side, a party doesn't have a full and fair

14  opportunity to be heard, and therefore any ruling based on

15  that kind of proceeding can't have collateral estoppel effect.

16      Okay.  So, again, this is just a summary.  No full and

17  fair opportunity prevents collateral estoppel, and the fact

18  that there were numerous other grounds and a lack of reasoning

19  to the issue that's being asserted here should serve

20  collateral estoppel makes collateral estoppel inappropriate.

21      Okay.  The Debtor also -- the Defendants argue that Count

22  Three seeks an advisory opinion.  It doesn't.  It seeks a

23  declaration concerning Plaintiffs' status that could be based

24  on simple math from the face of the balance sheet that

25  presently, presently there's enough money to pay everybody.

 1  And so there would be a -- need to be a whole lot more

 2  explanation for the Defendants justifying why that's not the

 3  case.

 4      So let's look at a hypothetical to see if Defendants'

 5  assertions about standing make sense.  So let's say in a

 6  breach of contract case a broker fails to sell the plaintiff a

 7  million dollars' worth of shares that are at that time selling

 8  for a dollar each.  Can the defendant move to dismiss, saying

 9  that plaintiff has no standing because the shares might go

10  down in value, eliminating any damages?  I'm sure Your Honor

11  would say obviously not.  But isn't that what the Defendants

12  here are saying?  It's -- they're saying it's possible they'll

13  spend enough money to prevent the former equity from getting

14  anything.  But that doesn't mean that Plaintiffs lack standing

15  now.

16      The Claimant Trust had sufficient assets to pay unsecured

17  creditors in Class 8 and 9 in full, with interest, at least as

18  early as mid-2023, maybe as early as September '22.  Had Mr.

19  Seery fulfilled his mandate, he should have distributed that

20  and made the GUC certification.  So Plaintiffs' contingent

21  interests should have officially vested many months ago.  And

22  because of the duty of good faith and fair dealing, the Court

23  --

24          THE COURT:  What about Section 6.1 of the credit

25  trust agreement?

1     MS. DEITSCH-PEREZ:  You have to imply -- you have to

2  add into that a duty of good faith and fair dealing.  And so

3  if Mr. -- if the Claimant Trustee has not taken those actions

4  for the express purpose of making sure to silence -- trying to

5  silence Class 10 and 11 and prevent them from getting money

6  and being able to spend it all, you know, paying -- holding

7  back enough to eventually pay a dollar -- a dollar less to

8  Class 9, and using the rest of the money.  So, Your Honor,

9  because of the duty of good faith and fair dealing, 6.1 does

10  not tie Your Honor's hands.

11      And let's look at the Slide 16.

12     THE COURT:  The Trustee is required to reserve

13  amounts necessary for indemnification obligations and the

14  administration expenses of the trust are entitled to payment

15  ahead of any classes under the plan.  Class 8, Class 9, as

16  well as --

17     MS. DEITSCH-PEREZ:  Uh-huh.

18     THE COURT:  -- 10, 11.

19     MS. DEITSCH-PEREZ:  Your Honor, but is not -- is

20  there not any limit on how much can be set aside?  Let's say

21  there were -- there was $300 million left over.

22     THE COURT:  This is where I go back --

23     MS. DEITSCH-PEREZ:  Could a Claimant --

24     THE COURT:  -- to your client is in control of its

25  own destiny here.  This --

1    MS. DEITSCH-PEREZ:  Well, basically, is Your Honor

2  saying --

3    THE COURT:  This should all be over.  This should all

4  be over, three years post-confirmation.  It should all be

5  over.

6    MS. DEITSCH-PEREZ:  Yes.  And --

7    THE COURT:  They stayed --

8    MS. DEITSCH-PEREZ:  Yes.  And if we --

9    THE COURT:  They stayed the mega-lawsuit.  They

10  stayed the mega-lawsuit for the reasons you are suggesting.

11    MS. DEITSCH-PEREZ:  The unjustified mega-lawsuit that

12  shouldn't have been brought in the first place.  They stayed

13  it.  Very nice.  They stayed it because they didn't -- they

14  knew they didn't need that money.  They knew it was

15  unjustified.  So they stayed it.

16    THE COURT:  So that would suggest to me proper

17  exercise of business judgment, litigation judgment.  But they

18  have no control over all of these appeals and all of the --

19    MS. DEITSCH-PEREZ:  But --

20    THE COURT:  -- litigation that your clients pursue.

21    MS. DEITSCH-PEREZ:  Your Honor, my clients pursue

22  litigation because they don't have the information to know

23  whether they're -- wrongdoing is occurring.  And the hallmark

24  of this bankruptcy --

25    THE COURT:  That doesn't apply with regard to the

1   appeals.  And, again, --

2          MS. DEITSCH-PEREZ:  Yes.  And the appeals --

3          THE COURT:  -- if your client wants to appeal, that

4   is what's beautiful about our system.  You can appeal and

5   maybe get judgments overturned.  But --

6          MS. DEITSCH-PEREZ:  That's right.

7          THE COURT:  -- it's a strategy here.  Right?  As long

8   as you keep doing that, --

9          MS. DEITSCH-PEREZ:  No, it's --

10          THE COURT:  As long as you keep doing that, HMIT and

11   Dugaboy's contingent interests, any recovery on them is going

12   to continue to become less and less likely.

13          MS. DEITSCH-PEREZ:  But so Your Honor, is Your Honor

14   actually suggesting that they should lie down and not

15   challenge anything to save a buck, and so if things have

16   happened --

17          THE COURT:  No.  You heard what I said.  Appeal away.

18   Appeal away.  No trial judge, no bankruptcy judge gets things

19   right a hundred percent of the time.  So appeal away.  But

20   don't complain about maybe not being in the money, when the

21   greatest risk, it sounds like, to your client not being in the

22   money is the professional fees continuing to impair value.

23   And we could never get to a point in time where we could --

24   you know, again, my words earlier, meaningless exercise.  How

25   could I ever make a declaratory judgment about value or the

1   likelihood of your client recovering as long as there are

2   dozens of appeals continuing to cause the liabilities to

3   increase, the expenses to increase?

4           MS. DEITSCH-PEREZ:  Your Honor, that's, I mean, --

5           THE COURT:  You're asking the Court to do something

6   impossible.

7           MS. DEITSCH-PEREZ:  It's not impossible, because

8   these appeals -- appeals like this happen all the time, and

9   there are certainly professionals who are involved --

10          THE COURT:  Name one bankruptcy case in history where

11  there have been this many appeals.

12          MS. DEITSCH-PEREZ:  It -- there don't -- there

13  doesn't have to be another one with this many appeals.  You

14  just look at the cost of an appeal in any case and figure out

15  whether, with what's going on here, what is the appropriate

16  amount to set aside for that cost.  It's eminently doable.  It

17  doesn't -- we don't have to have an exact case to match it to.

18  We just need to have -- are there ever appeals of whether a

19  release is overbroad?  Sure.  Are there ever appeals about

20  whether a gatekeeper is appropriate?  Sure.  Are there ever

21  appeals about whether the dismissal of a claim is appropriate?

22  Sure.  Those are all things that someone can look at and say,

23  well, this is an appropriate amount to be spent on that, and

24  so this is an appropriate amount to hold aside for resolving

25  it.

1     But what we're saying is if we can get sufficient

2  disclosure, we can figure out whether or not there -- it ought

3  to be ended.  But without that, we're left saying, what's

4  being hidden here?  What's actually left?  What's been done?

5  And so that's why -- and this is a problem that comes up in

6  trusts all the time when there's not sufficient disclosure of

7  what's in the trust.  So that's why, under the *Restatement of*

8  *Trusts*, --

9        THE COURT:  Wait, wait, wait.  This is what happens

10  all the time?  I don't know what kind of --

11        MS. DEITSCH-PEREZ:  Yeah.  In other words, that --

12        THE COURT:  What post-confirmation trust agreement

13  that's been approved as part of a plan does this happen all

14  the time?

15        MS. DEITSCH-PEREZ:  I'm not talking about -- about

16  trusts in bankruptcies in particular.  I'm talking about --

17        THE COURT:  That's what we're dealing with here.

18        MS. DEITSCH-PEREZ:  Well, --

19        THE COURT:  And I'm just telling you:  One time, I've

20  wracked my brains, and one time since I've been on the bench

21  -- I'm coming up on my 18-year anniversary.

22        MS. DEITSCH-PEREZ:  Uh-huh.

23        THE COURT:  I'm old.  But one time I have had

24  litigation about what the heck is going on with the post-

25  confirmation creditor trust.

1          MS. DEITSCH-PEREZ:  Uh-huh.

2          THE COURT:  The facts were so very different.  It was

3    a creditor trust agreement, and I think it had a three-year

4    term on it.  The trust was going to be wrapped up in three

5    years.  And Year 3 came along and there was a motion to extend

6    it.  We're not done, we want to expand it, I don't know, six

7    months, maybe a year.  And then that time frame went by and

8    there was another motion to extend it.  So it was extended

9    another year.  And then it happened again.

10         And a creditor objected, saying, I want to know what the

11   heck is going on.  And I looked at the docket sheet and I'm

12   like, gosh, there aren't any appeals out there, there's hardly

13   any activity that's going on.  And so we had a hearing.  And

14   the trustee was getting a flat fee that was rather large for

15   the size of that estate, where unsecured creditors were

16   probably going to get less than ten cents on the dollar.  And

17   we ended up having another hearing where we find out that the

18   oversight committee hadn't met in like three years and these

19   creditors who are likely to get five cents on the dollar, they

20   had just mentally checked out a long time ago.

21         And even in that situation, I was struggling with my

22   power, my jurisdiction, to put any equitable oversight

23   mechanisms in place when the creditors had voted on this, when

24   the creditors got to see the creditor trust agreement before

25   the confirmation hearing and no one complained.  And luckily,

1   that situation was resolved.  The creditor trustee said, we're

2   going to wrap it up in six months.  I'm no longer going to

3   take my compensation.  And it was some tax issue that no one

4   had been focusing on properly, like I think maybe the company

5   hadn't done tax returns in a gazillion years before

6   confirmation.

7       But the point I'm getting at is, again, many, many legal

8   issues out there, but the overarching issue I keep coming back

9   to is there's a creditor trust agreement that everyone got

10  notice of and the Court approved.  And contractual terms are

11  something I'm supposed to respect.  And you're asking me, on

12  an equitable basis, to overrule this.  This has maybe far-

13  reaching effects for everyone who strikes a bargain in Chapter

14  11 with, Here's our plan, here's what the liquidating trust is

15  going to be governed by, here's the hearing, speak now or

16  forever hold your peace, I approve it.  And --

17          MS. DEITSCH-PEREZ:  You're right, Your Honor, that it

18  has far-reaching effects.  And if you don't do something to

19  shine a light on this and enable the disclosure and the

20  hearing, you will embolden claimant trustees to do exactly

21  what's happening here, maybe in even worse circumstances.  And

22  the difference between the case you mention and the case here

23  is -- actually weighs in favor of intercession sooner here

24  because there is so much money involved.

25      So there's -- it's not a piddling amount that, you know,

1 where creditors are only getting a couple cents on the dollar

2 anyway, so, you know, they're going to get three cents or two

3 cents.  It's of less magnitude.  Here, there is an enormous

4 amount of money that may be squandered.  And so it's more

5 important to look hard at this and impose the covenant of good

6 faith and fair dealing.

7     And that's why the *Restatement of Trusts* says that

8 beneficiaries of a trust are -- include contingent

9 beneficiaries.  And then if you take --

10     Let's go to the next slide, Mike.

11     Okay.  Delaware courts also look to *Black's Law*

12 *Dictionary*.  And that's important here, because it actually

13 includes contingent beneficiaries and direct beneficiaries

14 within the definition, without any qualification, but

15 expressly distinguishes an incidental beneficiary or someone

16 who's going to be a beneficiary by virtue of a separate

17 contract.  And nothing in the Claimant Trust agreement

18 indicates that Plaintiffs are merely incidental beneficiaries.

19 And that's important because in that *Paul* case that Defendants

20 rely on so heavily, they were incidental beneficiaries.  It

21 was a separate document, not the trust agreement itself, that

22 would give rise to the status of the plaintiffs.

23     And so Delaware -- go to 18 -- Delaware courts make a

24 point of not -- of not reading statutory language

25 restrictively to exclude classes of beneficiaries.  And so

1    while they are not absolutely on point, they are thematically

2    on point, and to say that if someone is even a contingent

3    beneficiary, they ought to have the rights that one has under

4    the Delaware law.

5         And so -- go to -- move -- next slide.

6         And the duty of good faith and fair dealing is not

7    disclaimed in the Claimant Trust agreement, and moreover, it

8    cannot be disclaimed.  So that's something Your Honor has to

9    take into account.  And the impact of a duty of good faith and

10   fair dealing is that a party is basically estopped from

11   raising a provision that they are using in conjunction with

12   their own wrongdoing.

13        So if the Claimant Trustee is deliberately not paying out

14   $8 million in full in order to keep an unreasonable amount in

15   reserve and be able to be employed at $150,000 a month, you

16   know, being paid the same thing now, when most of the

17   liquidation has already been done, as, you know, when there

18   were a million things going on and a lot of management.  So it

19   does seem unreasonable, and the Claimant Trustee has the power

20   to keep that going basically forever.

21        Next slide.

22        And so -- and when I said earlier, you know, this is a

23   common thing, what I meant was cases like *Estate of Cornell*

24   and *Edwards*.  It's just a -- it's a universal problem that you

25   can prevent or postpone vesting unreasonably and prevent

Case 1:23-cv-30538-gsj1 Doc 25422 Filed 02/20/05/29 25 Entered 02/20/05/20/25 16:18 25 Desc Main
Exhibit Ant Page 49 of 173

51

1 distribution by your own acts.

2     And if you look at the Defendants' reply, there is not one

3 word about these concepts, about whether or not the Court has

4 the power and, really, must stop a trustee from raising their

5 own interest over the interests of the beneficiaries,

6 including the contingent beneficiaries.

7     Next slide.

8     So, and I really covered this to some degree, but

9 Defendants' reliance on *Paul Capital*, which is an unpublished

10 case, is misplaced.  The interests here are not incidental.

11 They're not derived from an outside contract.  The court in

12 *Paul Capital* also relied on the fact that the trust agreement

13 -- agreements in that case were fully integrated, which was a

14 reason they didn't look to that outside contract.  But in

15 fact, there's no merger clause in the CTA, so that's another

16 difference.

17     Next.

18     Defendants' entire argument that Plaintiffs are not

19 entitled to an accounting turns on its erroneous conclusion

20 that Plaintiffs are not beneficiaries under the CTA.  And now

21 they also point to -- which I don't believe they did in their

22 papers -- they also point to the general rule that an

23 accounting is not done as a matter of course.  But this Court

24 has the power under Texas law to impose an accounting when

25 there are questions, as there are here, that need to be

1   answered in order for the parties to make sensible decisions

2   about what ought to be done going forward.

3       Then, unclean hands, it's a one-sentence argument in the

4   Defendants' brief referring to the Kirschner litigation, which

5   it doesn't actually identify by name and doesn't say anything

6   about the fact that it was voluntarily stayed.  And the claim

7   against HMIT, and it is breach of contract, so it's really

8   hard to understand how being a defendant in a breach of

9   contract action is unclean hands.  And the Plaintiffs made

10  these points in response to Defendants' motion, and

11  Defendants' reply brief is conspicuously silent of any

12  rebuttal.

13      Okay.  So, Defendants' motion to dismiss needs to be

14  denied so that Plaintiffs finally have a full and fair

15  opportunity to challenge Defendants' assertion.

16      Even if this Court disdains Plaintiffs and sympathizes

17  with the Claimant Trustee, the Court is making law here.  And

18  as we've pointed out, the law would create this platform for

19  claimant trustees to enshrine themselves and to do things

20  under a veil of secrecy.  And that's not something that I

21  would think this Court would want to do.

22      If there's enough money to pay all of Classes 8 and 9, the

23  remainder belongs to Classes 10 and 11, not the estate

24  professionals.  Money left over after --

25              THE COURT:  Let me ask you.

1        MS. DEITSCH-PEREZ:  -- Class 8 and 9 are paid --

2        THE COURT:  Again, that's just not entirely correct,

3  because of 6.1.  It is in there that indemnification

4  obligations must be reserved for.  And let me ask you:  How

5  many times have your clients tried to sue Mr. Seery?

6        MS. DEITSCH-PEREZ:  I -- a couple.  And the point is

7  if he --

8        THE COURT:  Only a couple?

9        MS. DEITSCH-PEREZ:  Yes.

10       THE COURT:  Only a couple?  So, --

11       MS. DEITSCH-PEREZ:  Yes.  But --

12       THE COURT:  So they're required to reserve amounts

13  necessary.  How much is your client or your clients seeking to

14  recover from Mr. Seery in those couple of lawsuits?  I think

15  there have been more than two attempts.

16       MS. DEITSCH-PEREZ:  I don't think it's -- I don't

17  think the -- I don't think the amounts sought are the issue.

18  It's -- it's there's -- and I'm not counsel of record in the

19  insider trading case, but I don't remember a large amount.

20  The -- in the case we're bringing to --

21       THE COURT:  The insider trading case?  The insider

22  trading case?  Are you talking about the Stonehill/Farallon

23  thing?

24       MS. DEITSCH-PEREZ:  Yeah.  Yes.  I don't -- that --

25  you asked about every case where Mr. Seery is mentioned.  So I

1  don't think there's a big number there. And the case --

2           THE COURT: Wait, wait, wait.

3           MS. DEITSCH-PEREZ: -- that I have --

4           THE COURT: You don't think there is a big number

5  there? You don't remember the prayer for relief in that?

6           MS. DEITSCH-PEREZ: I don't, Your Honor. It's not --

7  I'm not the lawyer of record in the case.

8           THE COURT: Okay.

9           MS. DEITSCH-PEREZ: But let me point out, if --

10           THE COURT: I think it was rather open-ended and

11  large. Okay? But, and then there's the professional fees and

12  expenses that have priority.

13           MS. DEITSCH-PEREZ: Your Honor, --

14           THE COURT: I mean, I just, I want to hear: Are you

15  asking me to disregard Section 6.1 on equitable grounds? I

16  think at bottom you are, and I just want to hear you answer

17  that question.

18           MS. DEITSCH-PEREZ: Your Honor, I'm going to answer

19  that question, but I'm also going to point out that the

20  indemnification, if in fact there is intentional wrongdoing

21  that occurred, the estate is not obligated to indemnify. If

22  in fact the Claimant Trustee prevails in a claim or Mr. Seery

23  prevails in a claim, there is no judgment to indemnify. So

24  we're only talking about professional fees.

25      And yes, Your Honor, you don't ignore 6.1. You read it

1   with a duty of good faith and fair dealing applied in it, and

2   that enables you to allow this case to proceed, which is

3   necessary if we are ever going to end this matter.

4       And I will tell you, you asked about what's being sought

5   from Mr. Seery.

6           THE COURT:  Can someone on your team -- can someone

7   on your team tell me how many pending appeals there are right

8   now?  Because the chart that I asked my law clerk to pull is

9   several months old.

10          MS. DEITSCH-PEREZ:  We can -- I'm -- we can submit it

11  after the fact, Your Honor.

12          THE COURT:  Okay.  I wanted to know right now, but --

13          MS. DEITSCH-PEREZ:  We'll send something.

14          THE COURT:  I wanted to know right now, when I'm --

15          MS. DEITSCH-PEREZ:  I mean, I don't know right now

16  how many there are.

17          THE COURT:  Is -- are there a dozen?

18          MS. DEITSCH-PEREZ:  And I wouldn't want to try and

19  count while I'm sitting here.

20          THE COURT:  Are there a dozen?  Can you say, are

21  there more than a dozen?

22          MS. DEITSCH-PEREZ:  I don't know, Your Honor.  I

23  think many of them have wound down, and so the only -- we're

24  awaiting decision.  So I don't know.

25      But appeals, of their nature, are generally not that

1    expensive.  There's no discovery.  You write a brief.  You go

2    and argue it.

3         THE COURT:  That is not my recollection whatsoever

4    from reviewing fee apps for 18 years or for practicing law 17

5    years.  You know.  If --

6         MS. DEITSCH-PEREZ:  Your Honor, I agree, if there

7    were not -- if the Defendants didn't bring six or seven people

8    to New Orleans or Houston when there is an appeal, I would

9    think that it would cost less.  There's no reason, in this day

10   and age, where you can -- if you're only listening, you can --

11   you can do that from your office, because the Court provides

12   an audio link.  There's no reason to have that many people

13   travel clear across the country to go sit and listen to

14   arguments.  So, is there a reason things cost more than they

15   should?  Absolutely.  But that's not the Plaintiffs.

16        THE COURT:  Okay.

17        MS. DEITSCH-PEREZ:  This Court could look at what is

18   left and say, you know what, in my experience, taking into

19   account your 18 years, this is -- this is what this many

20   proceedings should cost.  That's the amount of -- and even if

21   you add a little cushion -- that's the appropriate amount of

22   indemnity, and everything else can be distributed.  You can do

23   that, Your Honor.  You have the -- there are professionals who

24   could give expert testimony, and with that, between that and

25   Your Honor's experience, you can figure that out.  It's not a

1 black box.

2         THE COURT:  All right.  Mr. Morris, your rebuttal,

3 please.

4         MR. MORRIS:  Thank you, Your Honor.

5     If nothing else, counsel's presentation proved one thing,

6 and that is this proceeding should be dismissed.  She insists

7 -- she had her presentation up on the board -- that they're in

8 the money.  We disagree.  We disagree both with the analysis

9 and with its legal significance.

10    But just as HMIT contended last summer that they were in

11 the money, counsel today is ratifying that and saying they're

12 in the money.  If they're in the money, why do they need this

13 information?  They don't.

14    Let me just start with the rebuttal, because it's going to

15 be some random points just because I'm -- I've taken some

16 notes.

17    The concept that three-plus years ago Heller Draper,

18 Munsch Hardt, Bonds Ellis couldn't foresee that we would be

19 here is mind-boggling, and, then, legally irrelevant.  You

20 know who had the foresight to see that we might be here?  The

21 Creditors' Committee.  They're actually the ones who drove

22 this process on the Claimant Trust agreement.  It's why the

23 agreement says exactly what it says.  It's an agreement

24 between parties that defines the beneficial owners' rights and

25 the limitations on those rights.

1      There is a reason that contingent trust beneficiaries are

2   not owed any duty whatsoever until their claims vest and that

3   they have no rights under the Claimant Trust agreement or the

4   plan, at least as it pertains to the Claimant Trust agreement,

5   until their rights vest.  The vesting process was not an

6   accident.  It was intended to make sure that Mr. Dondero could

7   not do exactly what counsel is making plain she wants to do

8   today, and that is get information in order to second-guess

9   every decision that Mr. Seery has made.  Okay?

10      Everybody on our side of the table knew, based on Mr.

11  Dondero's very long history of litigation, that this was a

12  possible end result, and they prepared for it.  That Mr.

13  Dondero's lawyers did not is on them.  The Court should not be

14  rewriting the agreement today.

15      Ms. Deitsch-Perez contends that somehow we have obscured

16  resources.  No such thing has ever occurred.  Okay?  The plan

17  and the Claimant Trust agreement provide very specific rules

18  on what must be disclosed.  There are other rules that require

19  disclosures.  There is no allegation whatsoever that the

20  Claimant Trustee or the Claimant Trust has failed to meet its

21  obligations to make the disclosures required under the

22  Claimant Trust agreement and under the law.

23      And in fact -- this is another point that just gets

24  obscured in all of this, like a suggestion that somehow Mr.

25  Seery is some rogue guy doing stuff all by himself.  That's

1  false.  It's baseless.  There is a Claimant Oversight Board

2  with an independent member and with two members who have a

3  substantial stake in the Claimant Trust.  And there are many

4  Claimant Trust beneficiaries, not one of whom is here to

5  complain, not one of whom is concerned about the lack of

6  disclosure, not one of whom is concerned about the reserves

7  that have been made in this case.

8       There's really nothing more to talk about, but I have to

9  respond to certain of the other points.  This notion that

10  somehow assets that exceed liabilities are the property of

11  HMIT is legally incorrect.  That's as polite as I can say it.

12  Your Honor focused on it.  6.1.  It is what it is.  But I do

13  need to make the point that there is no way that anybody could

14  make a reasonable estimate of indemnification claims.  It's

15  not just appeals, Your Honor.  That's one aspect, and I

16  appreciate Your Honor focusing on it.  But we have litigation

17  in Guernsey.  We have litigation in the Southern District of

18  New York.  We have, you know, these suits.  He doesn't want --

19  he is just looking for information.

20       He tried to sue my firm on this ridiculous theory that we

21  were actually his lawyer way back in September 2019.  Like,

22  really?  It was withdrawn in the face of a Rule 11 motion.

23  But you know what?  My firm incurred expenses defending

24  itself.

25       These things don't stop.  There is another lawsuit to

1  remove Mr. Seery.  That's been stayed pending the outcome

2  here, because just like they have no legal right or equitable

3  claim to obtain any information from the trust, they have no

4  legal right or equitable claim to remove Mr. Seery.  But we're

5  going to have to do that.

6      The money in the trust is not HMIT's.  They have no legal

7  or equitable claim to that money unless and until all senior

8  claims and expenses are satisfied.  And that will not happen

9  as long as there's pending litigation.

10      You know, you're encouraged to make an estimate.  What

11  happens if your estimate is wrong, Your Honor?  What happens

12  if you come up with a ruling and say the estimate is $50

13  million and that's what Mr. Seery reserves, because he's going

14  to comply with any order this Court issues, and at the end of

15  $50 million there's still litigation and he or other

16  indemnified parties have been sued?  And now what?  Now what

17  happens then?

18      That's why this is completely untenable and it has no

19  basis in law, fact, or equity.

20      Dicta?  Your Honor's decision that HMIT was not in the

21  money was dicta?  That was the whole basis for the motion.

22  The motion sought reconsideration on the basis that they were

23  in the money and therefore had standing.  It's not dicta.

24  It's the holding, after an analysis of the balance sheet,

25  after showing the faulty logic in HMIT's presentation.  That

1    it's a balance sheet, Your Honor.  It's not cash.  You don't

2    spend what's on a balance sheet, you can't buy anything with

3    what's on the balance sheet, because what's on the balance

4    sheet is a bunch of contingent stuff.  Like the Notes

5    Litigation.  $70 million.  They're here telling you they're in

6    the money, and they treat that $70 million as being in the

7    Claimant Trust's pocket.  It's not.  Not only is it not in the

8    Claimant Trust's pocket, Mr. Dondero is doing everything he

9    can to make sure it never gets in the Claimant Trust's pocket.

10       This is their disingenuous theory of what the balance

11   sheet means.

12       Again, apologies for the somewhat disparate nature of the

13   rebuttal.

14       Duty of good faith and fair dealing.  You've heard that a

15   lot.  Where is it in the complaint?  What cause of action here

16   is dependent on duty of good faith and fair dealing?  Nothing.

17   You won't find it.  The words aren't there.  This is a request

18   for information and two requests for declaratory judgment that

19   assets exceed liabilities and that they may vest someday in

20   the future.  Their complaint, the only thing that's the

21   subject of this motion, has nothing to do with the duty of

22   good faith and fair dealing.

23       The Kirschner action.  It was stayed.  But you know what,

24   Your Honor?  It wasn't dismissed.  It was stayed because

25   responsible parties like Mr. Kirschner and Mr. Seery said,

1  let's pause and see what happens.  There may come a time when

2  we start that litigation.  There may come a time.  Right?  It

3  wasn't dismissed.

4       So the notion that we've made a decision that it's not

5  necessary is wrong.  The decision was made that we don't have

6  to spend that money today.  Let's keep it on ice and let's see

7  if we need to in the future.

8       Willkie.  We heard some disparaging remarks about

9  Willkie's participation in these proceedings.  Well, you know

10 what, Your Honor?  Mr. Seery, God bless him, never retained

11 personal counsel in this case until HMIT sought leave to sue

12 him.  Willkie is in this case only because Mr. Dondero made

13 the decision to go after Mr. Seery.  Mr. Seery is entitled to

14 indemnification, he has indemnification, and I'm delighted

15 that the Willkie firm is by my side.

16      If Mr. Seery -- if Mr. Dondero has regrets about Willkie's

17 participation, he shouldn't sue Mr. Seery anymore.  Maybe they

18 wouldn't have such a role.

19      Listen to what they're saying, Your Honor.  Listen to Ms.

20 Deitsch-Perez's hypotheticals.  What if they find out that

21 there's overpayments to professionals?  What if there's

22 payments to phantom vendors?  What if they learn someday that

23 Mr. Dondero -- Mr. Seery has engaged in wrongdoing?  If this

24 is what they want to hold out for, if this is what they want

25 to continue to litigate for, because they think one day maybe

1  they might have something, somebody did something wrong, it's

2  Mr. Dondero's prerogative.  But this is not a vehicle to give

3  him information to pursue those claims.  It's just not.

4      Standing.  There's no standing motion here. We're not

5  saying dismiss this because they don't have standing to spring

6  the claims.  We're saying that they don't have any legal right

7  to seek information because of the plain terms of the Claimant

8  Trust agreement and the plan.  It's not a standing question,

9  it's about whether they have a legal right, and the plain

10  terms of the operative documents state definitively that they

11  do not.

12      They can't settle without the information.

13      (Pause.)

14          THE COURT:  Whoops.  We just lost you, Mr. Morris.

15  We just lost your sound.

16          MR. MORRIS:  Okay.  Am I back?

17          THE COURT:  You're back.

18          MR. MORRIS:  Okay.  People settle claims, known and

19  unknown, all the time.  Okay?  Mr. Dondero should look at his

20  success rate in litigation in this case and decide what he's

21  really holding out for.  He should look at the success in

22  bringing the suit against my firm.  He should look at what

23  happened when we had the evidentiary hearing in Hunter

24  Mountain and it was revealed that he was actually the party

25  who engaged in inside information.  He was actually the person

1  who lied to Mr. Seery about what was happening with MGM.  He

2  should think about his lack of success, the lack of merit,

3  what happened in the Notes Litigation, how ridiculous the

4  supposed oral agreement defense was.  He should ask Mr.

5  Rukavina how the hearing went in front of Judge Scholer last

6  week on the appeal.

7      And he's holding out for more claims?  This is what he

8  wants to do for his life?  God bless him.  We will reserve

9  everything.

10      Mr. Dondero is not the principal.  He doesn't get some

11  final say over the propriety of the actions of the Claimant

12  Trustee or my firm.  He doesn't have that right.  That's what

13  the Claimant Trust agreement was intended to do.  It reflects

14  the settlor's intent.  And the settlor's intent was that Mr.

15  Dondero or Hunter Mountain or Dugaboy would get a check at the

16  end of the day if and when all senior claims and expenses were

17  paid and satisfied.  That has not happened, so they don't get

18  a check.  It's really that simple.  It may be hard for him to

19  take, and I appreciate that, but he should have thought about

20  these issues three-plus years ago when all of this was

21  proposed, because other people thought about it, and here we

22  are.

23      And the Court has, I respectfully say, no authority, no

24  jurisdiction to override the plain terms of an agreement that

25  has been affirmed by this Court and has been affirmed by the

 1   Fifth Circuit Court of Appeals.  There has never been a

 2   challenge to these provisions that they just want you to

 3   completely ignore.

 4        Just one moment, Your Honor.

 5        (Pause.)

 6        MR. MORRIS:  Your Honor, I actually have nothing

 7   further unless the Court has any questions.

 8        THE COURT:  Okay.  I only have one question.  And let

 9   me preface it by saying that I don't pay much attention to

10   appeals and satellite litigation unless something is brought

11   to me.  I mean, there just are not enough hours in the day for

12   me.  Plus it's just, it's not of my concern.  Right?  An

13   appellate court is going to do what it's going to do and issue

14   a mandate to me at some point, if appropriate.  And the same

15   with satellite litigation.  It's either going to somehow be

16   brought before me or not.

17        So you may think that I'm aware, lawyers, parties may

18   think that I'm aware at all times of different things going on

19   out there, but I'm really only sort of aware.  I don't know

20   how many pending appeals there are right now.  But I do know

21   that someone who seemed to know what he was talking about,

22   another judge in Texas, not here, told me that Highland has

23   spawned more appeals at the Fifth Circuit than any other -- I

24   don't know if he said bankruptcy case in history or Chapter

25   11.  And he said, are you proud of that?  Hahaha.  And I said

 1 no.  I'm not even remotely proud of that.  And I haven't

 2 double-checked his figures, but he's kind of a numbers wonky

 3 lovable geek, so I think he probably knew what he was talking

 4 about.

 5      But finally getting to my question, Mr. Morris:  You

 6 alluded to there's a vexatious litigant motion pending, and

 7 you reminded me I heard about that at a hearing many months

 8 ago.  I think you said it was before Judge Brantley Starr, a

 9 district judge here in this district.  Is that correct?

10           MR. MORRIS:  It is correct, Your Honor.  And we filed

11 our reply papers last Friday, so it's been fully briefed.

12           THE COURT:  Okay.  Well, even though I don't closely

13 monitor appeals, satellite litigation, I may be monitoring

14 that.

15           MS. DEITSCH-PEREZ:  Your Honor, may I make one

16 rebuttal, by the way, to Mr. Morris's presentation?  I just

17 have one comment.

18           THE COURT:  If it's 30 seconds.  But this is out of

19 order.  Usually, Movant goes last.  I assume this is going to

20 be hugely important.

21           MS. DEITSCH-PEREZ:  It is important.  It's something

22 Your Honor raised and Mr. Morris raised, so I want to point

23 something out so there is no misunderstanding.  There was a

24 lot of talk about, well, the Plaintiff should have done

25 something about this at the time of the plan.  If Your Honor

 1    recalls, at the time of the plan the projections were that

 2    Classes 8 and 9 would recover a fraction of their value.  So

 3    there was no reason Classes 10 and 11 should be -- should have

 4    anticipated the issues that have arisen now.  And I just want

 5    to remind everybody of that.

 6          MR. MORRIS:  And just one sentence, Your Honor.  Mr.

 7    Dondero acquired every single asset that Highland has.  He was

 8    in Highland's offices with full access to all information

 9    through October.  He had Mr. Waterhouse, the CFO, onsite until

10    just before the confirmation hearing, and there was no

11    objection to those projections.

12       What happened is Mr. Seery and his team did a great job

13    and benefited from a rising market, and yet here we're going

14    to be subjected to more litigation.  It's brilliant.

15          THE COURT:  All right.  Well, I am finished hearing

16    everything.  And with respect to that comment for the

17    Plaintiffs, I continue to think this is a very important

18    issue, of the many issues, of the many jurisdictional issues

19    here.  And there are so many issues, I'm not sure, if you

20    prioritize the issues, where this one falls on the list.  And

21    yet as a bankruptcy judge I am obsessed a bit with the issue

22    of the impact on the Chapter 11 world.

23       We have liquidating Chapter 11s with -- or even if they're

24    not liquidating, we have Chapter 11s where there's a

25    litigation trust like this one where there is sometimes a

1  discussion, when are you going to get the creditor trust

2  agreement on file?  Oh, it's going to be part of a plan

3  supplement, and the plan supplement will be filed, you know,

4  ten days before the confirmation hearing.  Whatever.  I'm just

5  giving you a typical fact pattern.  And it's part of the

6  evidence.  It's part of the information.  It's not just

7  evidence at the confirmation hearing.  It's usually on file

8  several days before the confirmation hearing, where it's out

9  there for consumption, for people to complain about if they

10 think there are objectionable terms.  And we just have this in

11 dozens and dozens of cases.

12      And I can even go further back in my brain here.  I mean,

13 Chapter 11, very soon after the case was filed, we had a U.S.

14 Trustee saying conversion to Chapter 7 or appointment of a

15 Chapter 11 trustee.  You know, we can't have Mr. Dondero as

16 the manager of this Debtor anymore.  And despite that

17 argument, we put in place a corporate governance mechanism

18 that Mr. Dondero agreed to.  And my point is there's always

19 been a huge amount of oversight by what we considered the

20 fulcrum security here, the unsecured creditors.  A huge amount

21 of oversight.  A huge amount of oversight in this case that

22 was negotiated in response to a very active Creditors'

23 Committee and a U.S. Trustee saying can't have a debtor-in-

24 possession here.

25      So why do I go back?  I mean, it's really troublesome for

Case 23-90538 Document 2423-11 Filed 02/20/25 in TXSB on 02/20/25 Page 69 of 173
Case 23-90538 Doc 2423-4 Filed 02/20/25 Entered 02/20/25 16:18:18 Desc Main Document Page 669 of 173

69

1    any judge to hear, We have suspicion.  We are worried about a
2    breach of good faith and fair dealing.  What if there are
3    fictional vendors?

4        I mean, this case has been full of extensive oversight.
5    And not only could the Plaintiffs here have complained about
6    the terms of the creditor trust agreement, heck, they could
7    have said convert this sucker to Chapter 7, because a Chapter
8    7 trustee will have -- there will be a lot of transparency for
9    everything that happens in winding down this estate.

10       So, rambling, yes, I'm rambling.  I do that.  But the
11   philosophical issue here, I just, it's hard for me to ignore,
12   because, looming, we have the jurisdictional issues, but what
13   you're asking me to do is something that it's just a fact
14   pattern we see all the time of plans with litigation trust
15   agreements.  And we all know what the terms are going to be,
16   and we can all argue about those terms if we don't think
17   they're appropriate, and we all know that the future is
18   uncertain and things could change, and that's just the way it
19   is.  Here it is.  Live with it or not.

20       Anyway, but so that's a big deal, the contractual rights
21   here.

22       And as I said earlier, another kind of overarching issue
23   is it feels like kind of a meaningless exercise when we have
24   the asset side of the balance sheet but the liabilities just
25   grow unlike any other case.  It's fair to say unlike any case.

1   There have been more appeals generated at the Fifth Circuit

2   from this case than any Chapter 11 ever, and maybe any

3   bankruptcy ever.

4        There was a reference to, well, yeah, there are lots of

5   appeals, but you don't need to send six lawyers to New Orleans

6   or have people.  But I was just writing down as I was thinking

7   through this, and Mr. Morris alluded to some of it, we've had

8   at least the following law firms involved for either Mr.

9   Dondero or entities he controls:  Munsch Hardt; Bonds Ellis;

10  Heller Draper; Louis Phillips' firm, I think that's Kelly

11  Hart; the Stinson law firm; Sawnie McEntire's law firm; Ms.

12  Ruhland, Amy Ruhland; Lang Winshew; and I forget the name of

13  the lawyers who represented the Charitable Trusts.

14           MR. MORRIS:  Mazin Sbaiti.

15           THE COURT:  The Sbaiti law firm.

16       So I've just rattled off from memory nine law firms, okay?

17  I'm not even sure I've captured them all.  Probably not.  So

18  it's, on all sides of this, I can't remember if I've said this

19  in court or I've just maybe said it back in chambers, but I'll

20  say it:  This feels like the Disneyland case.  Have I ever

21  said that in court yet?  Do you know what I mean by that?  I

22  probably haven't.

23       The famous quote of Walt Disney, when someone asked him

24  about the theme park and when it would be finished, and he

25  said, Disneyland will never be finished as long as there are

1   creative people with imaginations.  I mean, this is like the

2   Disneyland case.  It will never be finished as long as there

3   are certain parties and lawyers who have imagination and keep

4   filing stuff.  I don't mean to be flippant, but I really am

5   trying to emphasize what I said.  Sure, people are entitled to

6   appeal, but how can you complain about 'I don't know if I'm in

7   the money or not' when there's just no end in sight?

8       So I'm going to obviously take this under advisement, and

9   we will carefully look at every argument and every case,

10   because that's what we do.  That's what we're duty-bound to

11   do.  We don't knee-jerk anything around here.  But I am very,

12   very troubled by some of the arguments.  And it's what made me

13   ask about the vexatious litigant motion and its status,

14   because it just feels so beyond the pale to make accusations

15   of some sort of breach of good faith and fair dealing and

16   raise the specter of lack of transparency and something

17   untoward may be going on, when these were the terms negotiated

18   as far as post-confirmation oversight, we have an Oversight

19   Committee, and I think every rational person knows that the

20   professional fees and the indemnification obligations and the

21   appeals and the satellite litigation are why we can't wrap

22   this up.  Okay?

23       So let that soak in.  And we will get an opinion out as

24   soon as we can make it happen.

25       All right.  We're adjourned.

1          THE CLERK:  All rise.

2       (Proceedings concluded at 11:28 a.m.)

3                       --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**                    **02/20/2024**

24  _____    _____
Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

73

INDEX

PROCEEDINGS                                                              3

OPENING STATEMENTS

By Mr. Morris                                                           4
By Ms. Deitsch-Perez                                                    23

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

The Highland Parties' Motion to Dismiss Complaint to                    67
(I) Compel Disclosures About the Assets of the Highland
Claimant Trust and (II) Determine (A) Relative Value
of Those Assets, and (B) Nature of Plaintiffs' Interest
in the Claimant Trust [13] - *Taken Under Advisement*

END OF PROCEEDINGS                                                      72

INDEX                                                                   73

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25