# EXHIBIT 3

# Rule 30(b)(6) Subpoena

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Northern District of Texas

In re: **Highland Capital Management, L.P.**
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff

v.

_____
Defendant

Case No. **19-34054-sgj11**

Chapter **11**

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Corporate Representative, Highland Capital Management, L.P., c/o John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067

*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME |
|---|---|
| Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201 | June 23, 2025 at 1:00 p.m. Central Time |

The deposition will be recorded by this method: stenographically and videotaped

■ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit B

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: **June 19, 2025**

CLERK OF COURT

OR

_____     */s/ Andrew K. York*
Signature of Clerk or Deputy Clerk     Attorney's signature

The name, address, email address, and telephone number of the attorney representing *(name of party)* **Patrick Daugherty**, who issues or requests this subpoena, are:

Andrew K. York, Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201; dyork@grayreed.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____
_____
_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because: _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
 (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
 (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
 (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or
  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
 (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

## DEFINITIONS

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1. "Any" and "all" mean "each" and "every."

2. "Claimant Trust" means the Highland Claimant Trust.

3. "Communication" or "Communications" mean the statement or transmission of facts, information, advice, counsel, and/or inquiry from one Person to another, whether orally, in writing, by acts or actions, by signs, by appearances, electronically, telephonically, or otherwise.

4. "Concerning" means supporting, evidencing, reflecting, incorporating, effecting, including, regarding, or otherwise pertaining or relating to, either directly or indirectly, or being in any way logically or factually connected to the subject matter of the inquiry or request.

5. "Confirmation Order" means the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief* [Docket No. 1943].

6. "Daugherty" means Patrick Daugherty.

7. "Document" has the same meaning and scope as Rule 34(a) of the Federal Rules of Civil Procedure, Including ESI, to the broadest extent allowed under the Federal Rules of Civil Procedure. "Documents" also include any "writing," "recording" or "photograph," as those terms are defined in Rule 1001 of the Federal Rules of Evidence. A draft or non-identical copy is a separate Document within the meaning of this term.

8. "Debtor," "Highland," "HCMLP", "You," or "Yours" means Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation trust and their affiliates from December 2015 to the present.

9. "ESI" is an abbreviation of "electronically stored information" Including the following: (a) activity listings of electronic mail receipts and/or transmittals; (b) output resulting from the use of any software program, Including any word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messages or bulletin board postings, source codes, PRF files, PRC files, batch files, ASCII files and all miscellaneous media on which they reside; and (c) any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, magnetic tape, microfiche, or on any other device for storing or maintaining electronic data Including desktop computers, servers and other network computers, laptop computers, home or personal computers used for business purposes, a personal digital assistant, *e.g.* Samsung, Blackberry, iPhone or similar device, external storage devices (such as "keychain" drives) and file folder tabs, or containers and labels appended or relating to any physical storage device associated with each original or copy of all Documents produced in response hereto.

10. "Hunter Mountain Trust" or "HMIT" means Hunter Mountain Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including Crown Global Investments, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC.

11. "Identify" means, depending on whether the request seeks to Identify a Person, Documents, or transactions or occurrences:

   a. When referring to a Person, "Identify" means to provide the full name, last known residence address and home telephone number, last known job title or position, job title or position when working in the relevant position, tenure of employment with You, business address and telephone number, and a detailed description of the area of responsibility while in the relevant position.

   b. When referring to Documents, "Identify" means to state the type of Document, its title, author, recipients, date, and bates-stamp numbers (if applicable), the location of the Document, and to Identify the custodian of the Document.

   c. When referring to Communications, "Identify" means to state the type of communication, its title, author, recipients, date, and bates-stamp number (if applicable), the location of the Communication, and to Identify the custodian of the Communication.

   d. When referring to a Communication, "Identify" means to Identify all Persons involved in such Communication, where and when such Communication occurred and between whom, the substance of the Communication, and to Identify all Documents related to such Communication or Meeting.

12. "Including" means including, but not limited to.

13. "Litigation Sub-Trust" means the Highland Litigation Sub-Trust.

14. "Motion" means *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216].

15. "Movants" means collectively Highland, the Claimant Trust, and the Litigation Sub-Trust.

16. "Person" means, without limitation, any individual, corporation, any form of partnership, limited liability company, sole proprietorship, joint venture, association, government entity, group or other form of legal entity.

17. "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808].

18. "Settlement Agreement" means the proposed settlement agreement between Highland and the HMIT Entities that is the subject of the motion for entry [Docket No. 4216]

19. "Dondero" means James Dondero an individual who is the cofounder of HCMLP who held his interest and controlled HCMLP directly and through trusts.

20. "Dugaboy Investment Trust" or "Dugaboy" is one of Dondero's family trusts that previously owned interests in HCMLP.

21. "Okada" means Mark Okada, an individual who is the cofounder of HCMLP who held his interest in HCMLP directly and through trusts.

22. "Mark and Pamela Okada Family Trust – Exempt Trust #1" or "MAP #1" is one of Okada's family trusts that previously owned interests in HCMLP.

23. "Mark and Pamela Okada Family Trust – Exempt Trust #2" or "MAP #2" is one of Okada's family trusts that previously owned interests in HCMLP.

24. Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP.

## TOPICS

1. All Communications with Hunter Mountain Trust and its affiliates and their representatives since September 1, 2024

2. Mark Patrick's employment history with HCMLP or any of its affiliates.

3. Mark Patrick's involvement with the Hunter Mountain Trust from inception through his termination from HCMLP in 2021.

4. Hunter Mountain Trust 's formation as a statutory trust established under the laws of the state of Delaware.

5. Hunter Mountain Trust's purchase of limited partnership interests in Debtor from Debtor's then-existing limited partners (i.e., James Dondero, Mark Okada, and entities that they controlled) and Debtor.

6. How Dondero, through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, caused Hunter Mountain Trust to become the owner-in name of 99.5% of the economic interests of Debtor.

7. How Dondero caused Hunter Mountain Trust to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark

4898-0449-1855.1

& Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by Debtor to Hunter Mountain Trust even after they had purportedly sold their limited partnership interests to Hunter Mountain Trust (including one note that was a $63 million secured promissory note Hunter Mountain Trust entered into with Debtor on December 21, 2015 (the "Hunter Mountain Note").

8. Communications Concerning Rand PE Fund I, LP, Series 1 ("Rand") serving as a guarantor of the Hunter Mountain Note.

9. The Contribution Agreement with Hunter Mountain Trust from inception concerning the Debtor and any agreements between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

10. Any promissory notes owed to Hunter Mountain Trust by the Debtor and any agreements from inception between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

11. The transfer of HCMLP's partnership interests from inception regarding the Hunter Mountain Trust, as well as any agreements between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

12. The allegations, and basis (or bases) therefor, in the Amended Complaint and Objection to Claims filed in Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust v. James D. Dondero et al., Adversary Proceeding No. 21-03076-sgj, filed on May 19, 2022.

13. The allegation, and basis therefo, by Debtor that "Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith."

14. The allegation, and basis therefor, by Debtor that "at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due."

15. The allegation, and basis therefor, by Debtor that "Each of these defendants [Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain] was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due."

16. The allegation, and basis therefor, by Debtor that "Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them."

4898-0449-1855.1

17. The allegation, and basis therefor, by Debtor that Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain Trust, given that Hunter Mountain Trust transferred proceeds of such distributions to them.

18. The allegation, and basis therefor, by Debtor of Hunter Mountain Trust, Dugaboy, and Strand being the alter egos of Dondero.

19. The allegation, and basis therefor, by Debtor regarding Dondero's creation of Hunter Mountain Trust as a shell entity whose sole purpose was to purchase the majority of Debtor's limited partnership interests from himself and Dugaboy (among others).

20. The identity of anyone who assisted Dondero in creating Hunter Mountain Trust, and all actions taken by such persons relating thereto.

21. The identity of the person(s) who administered Hunter Mountain Trust from December 1, 2015 to the present.

22. Whether Dondero, through Hunter Mountain Trust, continued to receive the economic benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those illegal distributions made to Hunter Mountain Trust.

23. Whether the Hunter Mountain Note is currently in default, and the amount due on the Hunter Mountain Note currently as a result of any default.

24. The amount, if any, of damages HCMLP is entitled to from Hunter Mountain Trust and Rand in an amount equal to all unpaid principal and interest, in addition to Debtor's cost of collection, including attorneys' fees in regard to the defaulted Hunter Mountain Note.

25. Whether the Settlement Agreement could be approved in light of any unresolved claims, including but not limited to claims that were above Class 10 under the Plan.

26. Whether the Settlement Agreement violates the Plan or the Claimant Trust Agreement.

27. How the Hunter Mountain Trust capital account with Debtor was treated for accounting (such as GAAP) and tax filing purposes prior to the filing of the Settlement Agreement.

28. How the treatment of the Hunter Mountain Trust capital account with Debtor as proposed in the Settlement Agreement will impact the past tax records of the Debtor, if at all.

29. How the treatment of the Hunter Mountain Trust capital account with Debtor as proposed in the Settlement Agreement will impact the past tax treatment of the Class 8 Claims and the Class 9 Claims holders.

30. The allowance under the Settlement Agreement of a Class 10 interest in the amount of $336,940,230.58 to Hunter Mountain Trust.

31. How the $500,000.00 payment under the Settlement Agreement will be applied to Hunter Mountain Trust's purported claims in the bankruptcy.

32. All discussions of actual or potential releases of any claims against James Dondero, as well as any entities with which Dondero or any of his family members have or have had a direct, indirect or contested ownership interest.

33. All discussions of actual or potential releases any claims against Mark Okada, as well as any entities with which Okada or any of his family members have or have had a direct, indirect or contested ownership interest.

34. Highland's valuation of the "Kirschner Claims" that are being transferred to Hunter Mountain Trust under the Settlement Agreement.

35. How the valuation of the "Kirschner Claims" under the Settlement Agreement was derived.

36. The basis for the agreement to allow a Class 10 equity interest of Hunter Mountain Trust in the amount of $336,940,230.58 under the Settlement Agreement.

37. The basis for the amount of the Class 11 Equity Interests as set forth in footnote 3 of the Motion for Entry of the Settlement Agreement.

38. The Indemnity Trust Agreement.

39. All compensation of the Debtor employees since August 1, 2021, including but not limited to Documents reflecting or relating to any bonuses or additional compensation such employees would receive any time subsequent to the Settlement Agreement being approved.

4898-0449-1855.1

# EXHIBIT B

# **DEFINITIONS**

In the event of any conflict or ambiguity between the following definitions, common usage and reference to any cited rules, statutes, or regulations should be used to provide the broadest interpretation of the term in question.

1. "Any" and "all" mean "each" and "every."

2. "Claimant Trust" means the Highland Claimant Trust.

3. "Communication" or "Communications" mean the statement or transmission of facts, information, advice, counsel, and/or inquiry from one Person to another, whether orally, in writing, by acts or actions, by signs, by appearances, electronically, telephonically, or otherwise.

4. "Concerning" means supporting, evidencing, reflecting, incorporating, effecting, including, regarding, or otherwise pertaining or relating to, either directly or indirectly, or being in any way logically or factually connected to the subject matter of the inquiry or request.

5. "Confirmation Order" means the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief* [Docket No. 1943].

6. "Daugherty" means Patrick Daugherty.

7. "Document" has the same meaning and scope as Rule 34(a) of the Federal Rules of Civil Procedure, Including ESI, to the broadest extent allowed under the Federal Rules of Civil Procedure. "Documents" also include any "writing," "recording" or "photograph," as those terms are defined in Rule 1001 of the Federal Rules of Evidence. A draft or non-identical copy is a separate Document within the meaning of this term.

8. "Debtor," "Highland," "HCMLP", "You," or "Yours" means Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation trust and their affiliates from December 2015 to the present.

9. "ESI" is an abbreviation of "electronically stored information" Including the following: (a) activity listings of electronic mail receipts and/or transmittals; (b) output resulting from the use of any software program, Including any word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messages or bulletin board postings, source codes, PRF files, PRC files, batch files, ASCII files and all miscellaneous media on which they reside; and (c) any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, magnetic tape, microfiche, or on any other device for storing or maintaining electronic data Including desktop computers, servers and other network computers, laptop computers, home or personal computers used for business purposes, a personal digital assistant, *e.g.* Samsung, Blackberry, iPhone or similar device, external storage devices (such as "keychain" drives) and file folder tabs, or containers and labels appended or relating to any physical storage device associated with each original or copy of all Documents produced in response hereto.

10. "Hunter Mountain Trust" or "HMIT" means Hunter Mountain Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including Crown Global Investments, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC.

11. "Identify" means, depending on whether the request seeks to Identify a Person, Documents, or transactions or occurrences:

   a. When referring to a Person, "Identify" means to provide the full name, last known residence address and home telephone number, last known job title or position, job title or position when working in the relevant position, tenure of employment with You, business address and telephone number, and a detailed description of the area of responsibility while in the relevant position.

   b. When referring to Documents, "Identify" means to state the type of Document, its title, author, recipients, date, and bates-stamp numbers (if applicable), the location of the Document, and to Identify the custodian of the Document.

   c. When referring to Communications, "Identify" means to state the type of communication, its title, author, recipients, date, and bates-stamp number (if applicable), the location of the Communication, and to Identify the custodian of the Communication.

   d. When referring to a Communication, "Identify" means to Identify all Persons involved in such Communication, where and when such Communication occurred and between whom, the substance of the Communication, and to Identify all Documents related to such Communication or Meeting.

12. "Including" means including, but not limited to.

13. "Litigation Sub-Trust" means the Highland Litigation Sub-Trust.

14. "Motion" means *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216].

15. "Movants" means collectively Highland, the Claimant Trust, and the Litigation Sub-Trust.

16. "Person" means, without limitation, any individual, corporation, any form of partnership, limited liability company, sole proprietorship, joint venture, association, government entity, group or other form of legal entity.

17. "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808].

4921-1751-9439

18. "Settlement Agreement" means the proposed settlement agreement between Highland and the HMIT Entities that is the subject of the motion for entry [Docket No. 4216]

19. "Dondero" means James Dondero an individual who is the cofounder of HCMLP who held his interest and controlled HCMLP directly and through trusts.

20. "Dugaboy Investment Trust" or "Dugaboy" is one of Dondero's family trusts that previously owned interests in HCMLP.

21. "Okada" means Mark Okada, an individual who is the cofounder of HCMLP who held his interest in HCMLP directly and through trusts.

22. "Mark and Pamela Okada Family Trust – Exempt Trust #1" or "MAP #1" is one of Okada's family trusts that previously owned interests in HCMLP.

23. "Mark and Pamela Okada Family Trust – Exempt Trust #2" or "MAP #2" is one of Okada's family trusts that previously owned interests in HCMLP.

24. Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP.

[*Remainder of page left intentionally blank*]

4921-1751-9439

## **INSTRUCTIONS**

1. Answer and respond to each request separately and fully. If, for any reason, You cannot answer and respond to any request or part thereof, answer and respond to the extent possible and state the reason(s) for Your inability to provide a complete answer and response.

2. If You object to any request, in whole or in part, state in full the reason(s) for your objection and answer so much of the request as is not subject to the objection.

3. If You refuse to answer a request, in whole or in part, based upon a claim of privilege or other protection from disclosure, provide the following information:

    a. state the date of the Document or Communication;

    b. Identify each and every Person who prepared or participated in the preparation of the Document or in the Communication;

    c. Identify each and every Person from whom the Document or Communication was received;

    d. Identify each and every Person who received the Document or Communication;

    e. state the present location of the Document and all copies thereof;

    f. Identify each and every Person having possession, custody, or control of the Document and all copies thereof; and

    g. provide sufficient further information concerning the Document or Communication and the circumstances thereof to explain the claim privilege and to permit the adjudication of the property of that claim.

4. These requests shall be deemed continuing in nature, and You are under a duty to supplement or correct any answers.

5. The singular form of a word shall also refer to the plural, the word used in the masculine, feminine, or neutral gender shall refer to and include all genders, and the word used in the present tense, past tense, or future tense shall refer to and include all tenses.

6. The singular and masculine form of any word shall embrace, and shall be read and applied as embracing, the plural, the feminine, and the neuter.

7. It is requested that all documents be produced as separate .pdfs or in their native electronic format (*i.e.*, the format with which the application used to create the document normally reads and writes). For example, native format for documents created in Microsoft Word is usually *.doc or *.docx, Word Perfect, *.wpd, Excel, *.xls or *.xlsx.

4921-1751-9439

8. All references to specific paragraphs, footnotes, or page numbers refer to the Motion.

9. The relevant time periods are **October 16, 2019 through the present, as well as December 21, 2015 to the present regarding Highland's reorganization that introduced Hunter Mountain Trust through the Contribution Agreement, Promissory Notes, and transfer of partnership interests to Hunter Mountain Trust from Strand Advisors, The Dugaboy Investment Trust, Mark K. Okada, Mark and Pamela Okada Family Trust – Exempt Trust #1, Mark and Pamela Okada Family Trust – Exempt Trust #2 and any direct or indirect beneficiaries thereof** (the "Relevant Time Period") unless otherwise specifically indicated, and shall include all Documents and information that relate to such period, even though prepared or published outside of the relevant time period. If a Document prepared before this period is necessary for a correct or complete understanding of any Document covered relevant to the topics set forth below, You must produce the earlier or subsequent Document as well. If any Document is undated and the date of its preparation cannot be determined, the Document shall be produced if You are otherwise obligated to produce it.

## REQUESTS FOR PRODUCTION

1. All Documents and Communications with Hunter Mountain Trust and its affiliates and their representatives since September 1, 2024

2. Produce all Documents and Communications Concerning Mark Patrick working closely with Dondero for over a decade.

3. Produce all Documents and Communications Concerning Mark Patrick's involvement with the Hunter Mountain Trust from inception through his termination from the Debtor in 2021.

4. Produce all Documents and Communications Concerning how Hunter Mountain Trust was formed as a statutory trust established under the laws of the state of Delaware.

5. Produce all Documents and Communications Concerning how Hunter Mountain Trust purchased limited partnership interests in Debtor from Debtor's then-existing limited partners (i.e., James Dondero, Mark Okada, and entities that they controlled) and Debtor.

6. Produce all Documents and Communications Concerning how Dondero, through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, caused Hunter Mountain Trust to become the owner-in name of 99.5% of the economic interests of Debtor.

7. Produce all Documents and Communications Concerning how Dondero caused Hunter Mountain Trust to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by Debtor to Hunter Mountain Trust even after they had purportedly sold their limited partnership interests to Hunter

2

Mountain Trust (including one note that was a $63 million secured promissory note Hunter Mountain Trust entered into with Debtor on December 21, 2015 (the "Hunter Mountain Note").

8. Produce all Documents and Communications Concerning Rand PE Fund I, LP, Series 1 ("Rand") a guarantor of the Hunter Mountain Note.

9. Produce all Documents and Communications Concerning the Contribution Agreement with Hunter Mountain Trust from inception concerning the Debtor and any agreements between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

10. Produce all Documents and Communications Concerning any promissory notes owed to Hunter Mountain Trust by the Debtor and any agreements from inception between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

11. Produce all Documents and Communications Concerning the transfer of partnership interests from inception regarding the Hunter Mountain Trust, as well as any agreements between or among Hunter Mountain Trust, Dondero and Okada or their related parties.

12. Produce all Documents and Communications Concerning the statement by Debtor that "Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith."

13. Produce all Documents and Communications Concerning the statement by Debtor that "at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due."

14. Produce all Documents and Communications Concerning the statement by Debtor that "Each of these defendants [Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain] was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due."

15. Produce all Documents and Communications Concerning the statement by Debtor that "Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them."

16. Produce all Documents and Communications Concerning the statement by Debtor that Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain Trust, given that Hunter Mountain Trust transferred proceeds of such distributions to them.

17. Produce all Documents and Communications Concerning each of Hunter Mountain Trust, Dugaboy, and Strand being the alter egos of Dondero.

3

18. Produce all Documents and Communications Concerning Dondero's creation of Hunter Mountain Trust as a shell entity whose sole purpose was to purchase the majority of Debtor's limited partnership interests from himself and Dugaboy (among others).

19. Produce all Documents and Communications Concerning who assisted Dondero in creating Hunter Mountain Trust.

20. Produce all Documents and Communications Concerning who administered Hunter Mountain Trust from December 1, 2015 to the present.

21. Produce all Documents and Communications Concerning how Dondero, through Hunter Mountain Trust, continued to receive the economic benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those illegal distributions made to Hunter Mountain Trust.

22. Produce all Documents and Communications that The Hunter Mountain Note is currently in default.

23. Produce all Documents and Communications that entitle Debtor to damages from Hunter Mountain Trust and Rand in an amount equal to all unpaid principal and interest, in addition to Debtor's cost of collection, including attorneys' fees in regard to the defaulted Hunter Mountain Note.

24. Produce all Documents and Communications Concerning whether the Settlement Agreement could be approved in light of any unresolved claims, including but not limited to claims that were above Class 10 under the Plan.

25. Produce all Documents and Communications Concerning whether the Settlement Agreement violated the Plan or the Claimant Trust Agreement.

26. Produce all Documents and Communications Concerning how the Hunter Mountain Trust capital account with Debtor was treated for accounting (such as GAAP) and tax filing purposes prior to the filing of the Settlement Agreement.

27. Produce all Documents and Communications Concerning how the treatment of the Hunter Mountain Trust capital account with Debtor as proposed in the Settlement Agreement will impact the past tax records of the Debtor, if at all.

28. Produce all Documents and Communications Concerning how the treatment of the Hunter Mountain Trust capital account with Debtor as proposed in the Settlement Agreement will impact the past tax treatment of the Class 8 Claims and the Class 9 Claims holders.

29. Produce all Documents and Communications Concerning the allowance under the Settlement Agreement of a Class 10 interest in the amount of $336,940,230.58 to Hunter Mountain Trust.

4

30. Produce all Documents and Communications Concerning how the $500,000.00 payment under the Settlement Agreement will be applied to Hunter Mountain Trust's purported claims in the bankruptcy.

31. Produce all Documents and Communications Concerning discussions of actual or potential releases of any claims against James Dondero, as well as any entities with which Mr. Dondero or any of his family members have or have had a direct, indirect or contested ownership interest.

32. Produce all Documents and Communications Concerning discussions of actual or potential releases any claims against Mark Okada, as well as any entities with which Mr. Okada or any of his family members have or have had a direct, indirect or contested ownership interest.

33. Produce all Documents and Communications Concerning Highland's value of the "Kirschner Claims" that are being transferred to Hunter Mountain Trust under the Settlement Agreement.

34. Produce all Documents and Communications Concerning how the value of the "Kirschner Claims" under the Settlement Agreement was derived.

35. Produce all Documents and Communications Concerning the basis for the agreement to allow a Class 10 equity interest of Hunter Mountain Trust in the amount of $336,940,230.58 under the Settlement Agreement.

36. Produce all Documents and Communications Concerning the basis for the amount of the Class 11 Equity Interests as set forth in footnote 3 of the Motion for Entry of the Settlement Agreement.

37. Produce all Documents and Communications Concerning the Indemnity Trust Agreement.

38. Produce all Documents and Communications Concerning compensation of the Debtor employees since August 1, 2021, including but not limited to Documents reflecting or relating to any bonuses or additional compensation such employees would receive any time subsequent to the Settlement Agreement being approved.