**EXHIBIT 66**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-----------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

-----------------------------------------------------------

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM CLAIMS 3.65 AND 3.66

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

4880-1728-2300.13 36027.003

HCMLPHMIT00000441

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................................1

II. RELEVANT BACKGROUND ...................................................................................5

    A.  The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response ...................................................................................................................5

    B.  Dondero Terminates Terry and the Parties Execute the Participation Agreement .........................................................................................................6

    C.  The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs ...................................................................................................................10

    D.  The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction ...................................................................................14

    E.  Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement .................16

    F.  The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager ...................................................................................17

    G.  The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award ...................................................................................19

    H.  Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith ...................................................................................21

    I.  Dondero Cannot Testify in Good Faith ...............................................................22

III. ARGUMENT ...................................................................................................24

    A.  The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process ....................................................24

        1.  HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith ....................................................24

            a.  The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration ...................................................................................25

            b.  The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement ...................................................................................27

            c.  Acis Breached its Obligation to Pay the Acis Participation Interest to Highland ...................................................................................29

HCMLPHMIT00000442

2.    HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6)
       Witness Constitutes Bad Faith and a Willful Abuse of the Judicial
       Process ........................................................................................................30

3.    Dondero's Involvement in the Prosecution of the HCLOM Claim
       Constitutes Bad Faith and a Willful Abuse of the Judicial Process...........30

B.    Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs
       Incurred in Connection with the Bad Faith Prosecution of the HCLOM
       Claim.............................................................................................................31

CONCLUSION.................................................................................................................32

HCMLPHMIT00000443

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),*
    751 F.3d 291 (5th Cir. 2014) ...................................................................... 32

*Baker Botts L.L.P. v. ASARCO LLC,*
    576 U.S. 121 (2015) .................................................................................... 32

*Barclays Bank Plc v. Kenton Capital*
    [1994-95 CILR 489] ................................................................................... 25

*Blue v. Ashley*
    [2017] EWHC 1928 (Comm) Leggatt J ...................................................... 25

*Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.),*
    105 F.4th 830 (5th Cir. 2024) .................................................................... 32

*Folkvang Ltd v. Valorte Capital*
    (unreported, 29 February 2024, FSD 199 of 2023, Parker J) ..................... 25

*Golfco Limited v. Borden*
    [2002 CILR 1], Kellock Ag. J ..................................................................... 27

*H.E.B. Enterprises Ltd and Bodden Jr v. Richards*
    [2023] UKPC 7 ............................................................................................ 26

*Heyman v. Darwins Ltd.*
    [1942] AC 356 ............................................................................................. 26

*Hongkong Fir Shipping Co Ltd v. Kawasaki Kisen Kaisha Ltd*
    [1962] 2 W.L.R. 474 ................................................................................... 27

*In re Brown,*
    444 B.R. 691 (E.D. Tex. 2009) ................................................................... 31

*In re Cleveland Imaging & Surgical Hosp., L.L.C.,*
    26 F.4th 285 (5th Cir. 2022) ................................................................. 24, 31

*In re Monteagudo,*
    536 F. App'x 456 (5th Cir. 2013) ............................................................... 32

*In re Paige,*
    365 BR 632 (Bankr. N.D. Tex. 2007) .................................................... 31, 32

*In re Yorkshire, LLC,*
    540 F.3d 328 (5th Cir. 2008) ...................................................................... 31

iii

HCMLPHMIT00000444

*Johnson v. Agnew*
    [1980] A.C. 367 .......................................................................................................... 27

*Lopez v. Portfolio Recovery Assocs. (In re Lopez)*,
    576 B.R. 84 (S.D. Tex. 2017) ...................................................................................... 32

*McDonald v. Dennys Lascelles Ltd*
    (1933), 48 C.L.R. 457 ................................................................................................... 27

*Richards v. H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84].......................... 26

*Schermerhorn v. Kubbernus (In re Skyport Glob. Commc'n, Inc.)*,
    642 F. App'x 301 (5th Cir. 2016) ................................................................................ 32

*Tempo Group Ltd and others v. Fortuna Development Corporation*
    (unreported, 31 March 2015, FSD 125 of 2012, Henderson J .................................... 28

HCMLPHMIT00000445

Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), by and through its undersigned counsel, hereby files this *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* (the "Motion") against Highland CLO Management, Ltd. ("HCLOM Ltd.") and James Dondero ("Dondero" and together with HCLOM Ltd., the "HCLOM Parties"). In support of its Motion, Highland states as follows:

## I.  **PRELIMINARY STATEMENT**[1]

1.     The undisputed facts adduced during discovery show that the HCLOM Ltd. Claim is baseless and HCLOM Ltd. lacks a good faith basis to continue prosecuting its claim.

2.     HCLOM Ltd. holds the Note at issue.[2] ***There is no dispute that (a) HCLOM Ltd. never gave anything of value to Highland (or Acis) for the Note, (b) HCLOM Ltd. never performed any of its obligations under the Transfer Agreement or even attempted the necessary steps to enable it to do so, (c) HCLOM Ltd. never paid Highland any Acis Participation Interests, and (d) Acis failed to pay any Acis Participation Interests after the Transfer Agreement was executed***. Despite Highland not receiving the promised Acis Participation Interests and HCLOM Ltd. providing no consideration and breaching the Transfer Agreement, HCLOM Ltd. offers three reasons why it thinks it can nevertheless enforce the Note against Highland; each reason is meritless.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] Incredibly, at the time of his deposition, Dondero claimed he did not know who held the Note or who was responsible for prosecuting this litigation on HCLOM Ltd.'s behalf. (Ex. 62 at 8:7-14; 14:10-14; 19:22-20:15; 110:2-19). At the hearing, Highland respectfully requests that Stinson be directed to disclose the identity of the individual(s) instructing it in this matter on HCLOM Ltd.'s behalf and who is paying its fees.

HCMLPHMIT00000446

3.    *First*, HCLOM Ltd. contends that the Note is a stand-alone document, enforceable without reference to the Participation Agreement or Transfer Agreement and without regard to whether HCLOM Ltd. provided any consideration or performed its obligations under those agreements.  Response ¶¶ 16-24. This contention lacks any legal basis and is contradicted by the plain and unambiguous terms of (a) the Participation Agreement, pursuant to which Acis agreed to "participate" a portion of its Servicing Fees to Highland in exchange for a downpayment and deferred payments under the Note; (b) the Note which accompanied the Participation Agreement and conditioned its own effectiveness on the effectiveness of the Participation Agreement; and (c) the Transfer Agreement (concocted just days after Terry obtained an $8 million arbitration award against Acis), pursuant to which HCLOM Ltd. was to "step into the shoes of Acis" by becoming Acis' Successor Manager in exchange for the Note.  There can be no credible dispute that these agreements were inextricably intertwined as part of one integrated transaction pursuant to which mutually dependent payments were to be made.  Dondero and Waterhouse confirmed this point during their depositions.  As Dondero testified, "it was essentially a trade of promises, and one side wouldn't have signed if they didn't get the promises of the other side."[3]  HCLOM Ltd.'s contention that the Note is somehow enforceable as a separate, unrelated binding agreement, without regard to the others, is thus unsupported and belied by the documentary and testimonial evidence.[4]

---

[3] Ex. 62 at 50:7-21; *see also id*. at 50:23-51:12.

[4] Notwithstanding HCLOM Ltd.'s new tale, Dondero confirmed these facts under oath in direct examination by his own lawyer in the Acis case in 2018: "Q…it's Mr. Terry's position … that [the Note] does not condition payment by Highland of the promissory note to receipt of service fees from Acis. So what is your response to that contention? A. [Dondero] It was always a – it was always a paired transaction, and the tying of the two together and a recommendation for unwinding or whatever you want to call it, selling the note came to me from counsel and advisors.  I mean does that not answer?"  [Ex. 76 at 151:4-12].

HCMLPHMIT00000447

4. **Second**, HCLOM Ltd. blames the Acis bankruptcy, this Court's June 2018 injunction, and the subsequent Acis plan injunction for its failure to become Acis' Successor Manager. Response ¶¶ 25-32. This contention is likewise false. It is indisputable that a different entity with a strikingly similar name—Highland CLO Management, LLC ("HCLOM LLC")—*was* created by Highland weeks before HCLOM Ltd. and *was* specifically organized, authorized, and equipped to serve as Acis' Successor Manager. But, HCLOM Ltd. and HCLOM LLC were completely separate entities, and HCLOM Ltd. never did, never could, and never would serve in the Acis replacement manager role—a fact Dondero admitted in the Acknowledgement and Waiver Agreement he signed eleven days *before* the Acis bankruptcy petition was even filed.[5]

5. **Finally**, HCLOM Ltd. contends that the Note is enforceable because Highland included it on its Schedules and Seery supposedly testified during the Acis 9019 hearing that the Note was enforceable. Response ¶¶ 33-49. These contentions are equally meritless. By its terms, the Schedules are subject to an extensive reservation of rights "including, but not limited to, the right to dispute or assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability, or classification of the claim, or to otherwise subsequently designate any claim as 'disputed,' 'contingent' or 'unliquidated.'"[6] As HCLOM Ltd. acknowledges, while the

---

[5] Ex. 7. As shown below, the indisputable evidence proves that HCLOM LLC was created and specifically constructed and enabled to serve as Acis' Successor Manager for the resetting and refinancing of the Acis CLOs. *See infra* ¶¶ 43-51. Incredibly, despite being designated as HCLOM Ltd.'s Rule 30(b)(6) witness, Waterhouse did not recall that there was an entity named "Highland CLO Management, LLC" and another entity named "Highland CLO Management, Ltd." (Ex. 3 at 6:2-11; 25:21-26:5). Whether negligently or deceitfully, HCLOM Ltd.'s Response completely and nonsensically confuses HCLOM Ltd. and HCLOM LLC. That confusion or deceit is also reflected in Dondero's recent verified interrogatories in the Acis case where, completely contradicting the terms of the Transfer Agreement and HCLOM Ltd.'s position here, he stated: "Highland CLO Management LLC ("Highland Management") was established to assume management of the Acis CLOs post-reset, including taking on Acis obligation to pay 50% of the Acis CLO fees to Highland Capital as well as becoming payee on Highland Capital's the [*sic*] Promissory Note. In accordance with the above, Acis, on November 7, [*sic*] 2017 agreed to transfer the Promissory Note to Highland Management [LLC] and also agreed to transfer to Highland Management [LLC], when it became manager of the Acis CLO's [*sic*] post-reset, to pay 50% of the CLO management fees to Highland Capital." Ex. 65 (response to Interrogatory No. 4).

[6] *Notice of Filing of Debtor's Amended Schedules*, Docket No. 1082, Ex. 1 at 2.

HCMLPHMIT00000448

HCLOM Claim may be prima facie valid, Highland's Objection and the evidence adduced herein

(and at trial) shifts the burden of proof back to HCLOM Ltd. to establish the validity and amount

of its claim.[7] And Seery will testify that his testimony during the Acis 9019 hearing was based on

the erroneous notion that Highland owned HCLOM Ltd. at the time, a notion HCLOM Ltd.'s own

corporate representative ironically still believes is true.[8]

6.      In addition to pursuing a baseless claim, HCLOM Ltd.'s witnesses—Dondero and

Waterhouse, both individually and as HCLOM Ltd.'s Rule 30(b)(6) witness—were so uninformed

and unprepared to testify that sanctions are warranted. *See infra* ¶¶ 52-59. Dondero deserves

special focus because while he attempted to distance himself from virtually everything, (a) his

family trust, The Dugaboy Investment Trust ("Dugaboy"), was the majority ultimate beneficial

owner of Acis and therefore the primary beneficiary of the tax-driven strategy that lead to the

Participation Agreement, (b) through Dugaboy, he indirectly owns a majority interest in HCLOM

Ltd. and therefore has the largest stake in the outcome of this litigation, and (c) while he claimed

to be unaware of it, Dondero was, and apparently remains, the President of HCLOM Ltd.

7.      Discovery is complete. HCLOM Ltd. knows that there is no genuine dispute that

the HCLOM Claim is invalid and will be disallowed; the continued pursuit of the HCLOM Claim

is now just another vexatious abuse of the judicial process. HCLOM Ltd. should immediately

consent to the entry of an order disallowing the HCLOM Claim—and all the factual and legal

theories upon which it is based—with prejudice. If it fails to do so, Highland requests that the

---

[7] Ex. 20 ¶¶ 13-15.

[8] Ex. 3 at 36:7-22.

HCMLPHMIT00000449

Court enter a finding of bad faith and an award of attorneys' fees[9] jointly and severally against HCLOM Ltd. and Dondero.[10]

## II.      <u>RELEVANT BACKGROUND</u>

### A.    <u>The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response</u>

8.      On October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Court</u>").

9.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].[3]

10.      On December 13, 2019, Highland filed its schedule of unsecured claims that identified "Highland CLO Holdco" as a creditor with claims under a note. Docket No. 247 (Schedule E/F, Part 3.64 and 3.65) (the "<u>Initial HCLOM Claim</u>").

11.      On September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor with the Initial HCLOM Claim with HCLOM Ltd., an entity Highland's independent directors then believed was owned directly or indirectly by Highland. Docket No. 1082 (Schedule E/F, Part 3.65 and 3.66) (the "<u>HCLOM Claim</u>").

---

[9] Highland reserves the right to offer proof of the legal fees it has incurred during the evidentiary hearing currently scheduled for December 18, 2024.

[10] As the Court will recall, Highland moved for similar relief against HCRE but only after the evidentiary hearing was completed and the Court rendered a decision on the merits. *See* Docket No. 3851. To be more efficient; because the evidence supporting Highland's Objection and this Motion will be the same; and to give HCLOM Ltd. fair notice of the relief requested, Highland files this Motion in advance of the hearing. While HCLOM Ltd. technically has 21 days to oppose the Motion, Highland has no objection to HCLOM Ltd. filing its response on December 16, 2024, to take into account the Thanksgiving holiday. Highland reserves the right to offer and rely on such further evidence that is adduced at trial in support of this Motion.

HCMLPHMIT00000450

12.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "<u>Confirmation Order</u>"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "<u>Plan</u>"). The Plan became effective on August 11, 2021 (the "<u>Effective Date</u>") [Docket No. 2700].

13.     Following the Effective Date and in furtherance of the Plan, Highland began reviewing the available information to determine the validity, amount, and priority of all unresolved claims. The evidence will show that, as part of the process, Highland discovered, among other things, that (a) it only held a 1% economic interest in HCLOM Ltd.,[11] (b) HCLOM Ltd. provided no consideration for the Note, (c) HCLOM Ltd. never performed its obligations under the Transfer Agreement and could never have done so, and (d) Acis failed to perform its obligations under the Participation Agreement and the Transfer Agreement, all of which vitiated any obligations Highland may have had under the Participation Agreement, the Note, or the Transfer Agreement. Based on these facts, among others, Highland filed its objection to the HCLOM Claim on February 2, 2023 (the "<u>Objection</u>"). Ex. 1.

14.     On April 3, 2023, HCLOM Ltd. filed its response to the Objection (the "<u>Response</u>"). Ex. 20.

**B.     <u>Dondero Terminates Terry and the Parties Execute the Participation Agreement</u>**

15.     This dispute arises from a series of intercompany agreements and machinations orchestrated in the "Highland Complex" while James Dondero ("<u>Dondero</u>") was firmly in control of all sides of the enterprise.

---

[11] It also held 99% of the voting, non-economic interests in HCLOM Ltd.

HCMLPHMIT00000451

16. Prior to the Petition Date, Acis Capital Management, L.P. ("<u>Acis</u>"), then an affiliate of Highland, provided portfolio management services to the issuers of certain collateralized loan obligations ("<u>CLOs</u>") in exchange for management fees ("<u>Servicer Fees</u>") to be paid under portfolio management agreements (the "<u>PMA's</u>").[12] The PMA's prohibit the portfolio manager from assigning any of its rights or obligations under the PMA's without permission and the satisfaction of certain conditions.[13] At all relevant times, Dondero controlled Acis and Highland.

17. Since Acis had no employees of its own, Highland provided back- and middle-office services as well as investment advisory services to Acis pursuant to certain Shared Services and Sub-Advisory Agreements (the "<u>SSA</u>" and "<u>SAA</u>", respectively, and together, the "<u>HCMLP Services Agreements</u>," as amended). The services provided under the HCMLP Services Agreements enabled Acis to perform under the PMA's. Joshua Terry ("<u>Terry</u>"), a Highland employee, was also an officer and portfolio manager of Acis until 2016.

18. On June 9, 2016, Dondero, acting through Highland, terminated Terry and as a result, Dondero and Frank Waterhouse ("<u>Waterhouse</u>") remained as the sole officers of Acis' general partner. *See* Ex. 9.

19. On July 29, 2016, Highland and Acis amended the HCMLP Services Agreements pursuant to which, among other things, Acis agreed to pay Highland a fee at the following rates for each of the Acis CLOs: (a) 20 basis points for sub-advisory services; and (a) 15 basis points for shared services, for a total of 35 basis points, with the rates applied retroactively to January 1, 2016. *See* Ex.10 at HCLOM00535306 (20 bps for sub-advisory services), HCLOM00535321 (15

---

[12] Fees under the PMA's are calculated by multiplying the fee earning assets in a given CLO by the fee rate, expressed in basis points. The CLO issuers were obligated to pay Acis the following under the Acis managed CLOs: Acis CLO 2013-1, Ltd. 50 bps; Acis CLO 2014-3, Ltd. 40 bps; Acis CLO 2014-4, Ltd. 40 bps, Acis CLO 2014-5, Ltd. 40 bps; and Acis CLO 2015-6, Ltd. 40 bps. *See* Ex. 13 (Schedule A under "Total Servicer Fee").

[13] *See* Ex. 32 §14; Ex. 34 §14; Ex. 36 §14; Ex. 38 § 14.

HCMLPHMIT00000452

bps for shared services).[14]   These fee amendments roughly doubled the aggregate annual fees Highland was to receive from Acis and the retroactive nature of the agreements immediately saddled Acis with approximately $3 million in additional payables to Highland.

20.     In or around September 2016, Dondero caused Highland to sue Terry in Texas state court.  Terry moved to compel arbitration, and his motion was granted. *See* Ex. 25.  As discussed below, the arbitration was conducted in September 2017.

21.     On October 7, 2016, Dondero caused Acis and Highland to enter into an *Agreement for Purchase and Sale of CLO Participation Interests* (the "Participation Agreement").  Ex. 13. The Participation Agreement was not an arms' length economic transaction but was adopted for the tax-driven purpose of converting ordinary income into capital gains for the benefit of Acis' ultimate beneficial owners—Dugaboy and Mark Okada—of up to 20%.[15]   As Dondero previously testified: "So immediately upon Josh's [Terry] leaving back in June [2016], the partnership became just Mark and I, 75/25.  What this transaction was and was meant to be and never anything more was a tax-planning strategy to reduce taxes.  Because Acis was a full taxpaying entity and Highland wasn't.  You know, the creation of the note of Highland paying Acis a note, that note—**Highland never got any monies for it.  Highland never got any value for it, other than a promise for Acis to pay its management fees over time.**"  Ex. 76 at 133:23-134:7 (emphasis added).

22.     In order to try to achieve the desired tax savings under the Participation Agreement, Acis agreed to participate to Highland a portion of the Servicer Fees (the participated portion, the "Acis Participation Interests") for a finite period of time in exchange for Highland's payment to

---

[14] Dondero signed the amendments to the HCMLP Services Agreements on behalf of Acis and Highland.

[15] Dondero admitted that Acis and Highland were "pass through" entities and that the purpose of the Participation Agreement was to defer or recharacterize taxes for the benefit of the ultimate beneficial owners.  (Ex. 62 at 35:10-36:16, 37:4-19; *see also* Ex. 3 at 79:19-80:24, 83:1-6,85:22-86:16 (Waterhouse testified that the Participation Agreement was a "tax-driven strategy" that also provided certain cash management benefits to Highland)).

HCMLPHMIT00000453

Acis of $666,655 in cash (the "Cash Purchase Price") and the payment of deferred annual installments under a note in favor of Acis, in the original principal amount of $12,666,446.00 (the "Note"). *See id.* §§ 1, 1.1; *see also* Ex. 14.[16] While the Note references "advances" by Acis, no money was ever loaned to Highland. The Note simply reflected amounts that would be paid back to Acis by Highland—a "wash" according to Dondero—after Highland received payment of the Acis Participation Interests.[17]

23. Despite Terry's contentious departure in 2016 and the public litigation Highland launched against him later that year, it was "business as usual" for Acis. (*See* Ex. 3 at 68:7-69:24). For example, Acis continued serving as the portfolio manager for the CLOs, managing billions of dollars of bank loans and paying the Acis Participation Interests to Highland in exchange for the installment payments under the Note, all as required under the Participation Agreement. In March 2017, Dondero caused Highland and Acis to further amend the HCMLP Services Agreements. *See* Ex. 11 (Fourth Amended and Restated Shared Services Agreement, dated March 17, 2017); Ex. 12 (Third Amended and Restated Sub-Advisory Agreement, Dated March 17, 2017). The next month, Acis even completed a new, risk-retention compliant CLO ("Acis 7"), using an indirect

---

[16] The Note called for annual payments to be made on May 31, 2017, 2018, and 2019. Ex. 14. The evidence will show that Acis and Highland performed their respective obligations under the Participation Agreement and the Note until the Transfer Agreement was executed in November 2017. After that, even though Dondero controlled Acis until the appointment of a trustee, Acis stopped remitting the Acis Participation Interests to Highland as required under the Participation Agreement, Highland stopped making payments to Acis under the Note and HCLOM Ltd. did absolutely nothing.

[17] In response to his attorney's questioning in the Acis case, Dondero testified as follows: "Q. "This is not like I – for example, I refinanced my house recently, give a note to the bank, but I get cash money at closing from the bank. Are you saying that did not happen here? A. [Dondero] Correct. In October. Highland got nothing other than a promise for Acis to pay. And all the payment schedule – the amortization on the note was timed exactly to match the expected management fees as Acis got them in." Ex. 76 at 134:13-20. Dondero continued: "**It's essentially a wash. They're – yes, it doesn't matter which pocket it goes into.**" *Id.* at 152:23-24 (emphasis added). On cross, Dondero insisted: "A. I'm saying it was paired together, it was a tax transaction, it was supposed to have very little net value, there was supposed to be offsetting flows, and the recommendation on the sale was all guided by counsel, internal and external…." *Id.* at 36:10-14.

HCMLPHMIT00000454

subsidiary, Acis CLO Management, LLC ("ACLOM LLC"), as the portfolio manager.  Ex. 15

(Portfolio Management Agreement between Acis CLO 2017-7, Ltd. and ACLOM LLC).[18]

24.     Things went south in 2017 as summer turned to fall.  Dondero and his team spent

10 days opposing Terry's arbitration in September.  Clearly sensing that the arbitration was not

going well for him, Dondero instructed his attorneys to eliminate arbitration clauses in existing

and future contracts.  Even more tellingly, on October 19, 2017, Highland formed HCLOM LLC

as a Delaware LLC to replace ACLOM LLC for future CLO issuances and resets of existing

managed CLOs. Ex. 87.  The next day, on October 20, 2017, Terry was awarded an $8 million

arbitration award against Acis (the "Arbitration Award"). Ex. 26.[19]

## C.     The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs

25.     Despite having formed HCLOM LLC a week earlier and inserting that entity as

successor manager into draft agreements and memoranda, on October 27, 2017, Highland also

formed HCLOM Ltd. as a Cayman entity with Summit Management Limited ("Summit")

appointed by Highland as HCLOM Ltd.'s initial and sole director.  *See* Ex. 5.  The creation of this

entity in the Cayman Islands was no accident: its sole purpose was to secretly hold the Note and—

according to Isaac Leventon, Highland's then-Assistant General Counsel in charge of litigation—

cause Terry to spend "multiple years to collect" on his Arbitration Award.  Ex. 69; Ex. 83.[20]

---

[18] Dondero stubbornly clings to the notion that all of the asset transfers away from Acis were required because the Acis brand was "toxic."  As the Court will recall, during the Acis case, the Highland team under Dondero's leadership attempted to tag HarbourVest with the "toxicity" concept, but that effort failed.  During his deposition, he tried to tag Goldman Sachs with the concept despite having no personal knowledge to support it.  In fact, the documentary and testimonial evidence is to the contrary.

[19] Even though the Panel found that—under Dondero's watch—Highland concocted pretextual arguments for denying Terry his benefits and interfering with his economic rights, and that Acis breached its contractual and fiduciary duties (Ex. 26 at 21-22), Dondero inexplicably insists that he has never read the Arbitration Award and is unfamiliar with the findings.  Ex. 62 at 67:11-22, 70:3-20).

[20] During his deposition, Dondero repeatedly disavowed responsibility for anything related to Terry's termination or arbitration or any of the events that followed; instead, he tried to point the finger at Thomas Surgent and Tim Cournoyer (two current employees of Highland). While the issue is legally irrelevant (it does not matter who caused

HCMLPHMIT00000455

26.     On November 3, 2017, roughly two weeks after the Arbitration Award was rendered, a meeting was held with Dondero in his office to discuss the "Terry Arbitration" and the "Acis Restructuring." *See* Ex. 69 (11/3/17 email among Leventon, Ellington, and Welton detailing "[d]raft bullets for internal management discussion"); Ex. 83 (final version of the bullet points); Ex. 81 (acceptance of meeting invite).

27.     Sometime during or immediately after the November 3, 2017 meeting, Dondero executed the *Assignment and Transfer Agreement* (the "Transfer Agreement" or "Assignment") on behalf of Highland[21] and Acis; Summit (acting at the direction of Dondero-controlled Highland) executed the Transfer Agreement on HCLOM Ltd.'s behalf. *See* Ex. 16.

28.     Pursuant to the Transfer Agreement, which falsely stated that Highland notified Acis that Highland was unwilling to continue providing services to Acis under the HCMLP Services Agreements and, therefore, Acis was unable to fulfill its portfolio management duties to the applicable CLO's,[22] (a) HCLOM Ltd. agreed to become the CLOs' Successor Manager (as defined in the Transfer Agreement); (b) Acis and HCLOM Ltd. agreed to remit the Acis Participation Interests to Highland; and (c) the Note was assigned to HCLOM Ltd. Significantly, the Transfer Agreement Assignment provides: "HCLOM, a qualified Successor Manager, irrevocably commits to be appointed as Successor Manager *in consideration of Acis assigning to it the Note*." Ex. 16 at 1 (emphasis added).

---

HCLOM Ltd. not to provide consideration for the Note or perform under the Transfer Agreement), it weighs on credibility or the lack thereof. The evidence will establish that Scott Ellington—with Dondero's knowledge—dictated that Leventon and an outside attorney, Jamie Welton, were to be solely responsible for working on the Terry case (Ex. 68), and that's exactly what happened (*see*, *e.g.*, Ex. 69).

[21] Section 5.1 of the Participation Agreement requires Highland's written consent to an assignment by Acis of any of its rights or obligations thereunder.

[22] Written notice of termination was required under the HCMLP Services Agreements, but no such notice was ever given and, in fact, Highland continued to perform the services under the HCMLP Services Agreements until the summer of 2018 when a new service provided took over following the appointment of the Acis trustee.

HCMLPHMIT00000456

29.     According to Waterhouse, the Transfer Agreement was intended to authorize HCLOM Ltd. to take the necessary steps to become Acis' Successor Manager so that it would receive the Servicing Fees and remit them to Highland in exchange for the expected cash streams due under the Note.  Ex. 3 at 135:24-136:24.

30.     The Transfer Agreement also required (a) Acis (again, then under Dondero's control) to "promptly provide the Controlling Class (as defined in the CLO Indentures) with notice requesting the appointment of HCLOM [Ltd.] as Portfolio Manager pursuant to the requirements of the CLO Documents," and (b) each of Acis and HCLOM Ltd. to "promptly pursue Successor Manager appointment of HCLOM [Ltd.] in respect of each CLO." *Id.* §§ 1, 2.  None of this occurred.

31.     Section 3 of the Transfer Agreement provides:

**3.      Assignment and Transfer of the Promissory Note; Stabilization Payments.**

a. Effective immediately upon execution of this Agreement by the Parties, all right, title and interest of Acis under the Note, including the right to any and all Stabilization Payments not yet paid to Acis, are hereby irrevocably assigned and transferred by Acis to HCLOM [Ltd.], it being understood that from the date of such assignment, HCLOM [Ltd.] shall become the "Payee" thereunder.

b. For so long as Acis shall receive Servicer Fees following the date hereof, Acis shall remit to H[ighland] the HCM Stabilization Fees [*i.e.*, the Acis Participation Interests] pursuant to the Note Purchase Agreement [*i.e.*, the Participation Agreement].

c. For so long as HCLOM [Ltd.] receives any Servicer Fees following any Appointment, then HCLOM [Ltd.] shall remit to H[ighland] any portion of such fees that would otherwise have constituted HCM Stabilization Fees pursuant to the Note Purchase Agreement if Acis was the recipient of such fees.

d. HCLOM [Ltd.] shall sign a joinder to Note Purchase Agreement upon HCM's written notice thereof.

Transfer Agreement, § 3 (emphasis added).

HCMLPHMIT00000457

32.     Thus, the Transfer Agreement provided that HCLOM Ltd. would receive Acis's rights under the Note, subject to HCLOM Ltd. becoming the Successor Manager, and Acis and HCLOM Ltd. continuing to remit Acis Participation Interests to Highland. According to Dondero, from Acis' and Highland's perspective, the purpose of the Transfer Agreement was to replace Acis as Portfolio Manager. Ex. 3 at 83:23-84:11.[23]

33.     Although Dondero signed the Transfer Agreement, he now says he has no knowledge of any facts underlying its execution. For instance, Dondero says he does not recall (a) the document or reading it before he signed it, (Ex. 62 at 79:4-18; 83:12-19); (b) receiving any advice before signing, (*id.* at 100:4-10); or (c) taking any steps to make sure the Transfer Agreement accurately reflected the facts, (*id.* at 108:16-25). Dondero also says he does not know who John Cullinane is and never communicated with him, or anyone authorized to act on HCLOM Ltd.'s behalf, before executing the Transfer Agreement, (*id.* at 79:19-81:19; 82:24-83:3).

34.     During his deposition, Dondero (a) could not recall if he expected Highland to receive *any* benefit under the Transfer Agreement, (*id.* at 84:22-25); (b) was unable to identify *anything* of value HCLOM. Ltd. provided to Highland pursuant to the Transfer Agreement, (*id.* at 88:15-89:2); and (c) did not know if HCLOM Ltd. *ever* gave anything of value to Highland for any purpose, (*id.* at 89:20-91:5). In fact, Dondero (x) was initially unaware that Highland was a party to the Transfer Agreement; (y) could not identify a benefit Highland was to receive even after reviewing the Agreement; and (z) has "no idea" why he signed the Agreement on behalf of Acis and Highland. *Id.* 85:8-86:15.

---

[23] The Transfer Agreement created a new consolidated defined term—"Note Purchase Agreement"—that provided further evidence that the Note and the Participation Agreement (what was being referred to in the Transfer Agreement as the "Purchase Agreement") are one integrated and mutually dependent agreement.

HCMLPHMIT00000458

### D. The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction

35.     Contrary to HCLOM Ltd.'s unsupported contentions, the evidence will show that the Note and payment of Acis Participation Interests under the Participation Agreement and Transfer Agreement are inextricably intertwined as one integrated transaction. The Participation Agreement attached a copy of the Note as an exhibit and made repeated references to the Note. *See, e.g.*, Ex. 13 § 1.1 ("In consideration of the sale of the Acis Participation Interests to the Purchase, the Purchaser shall" pay the Cash Purchase Price and deliver the Note); § 1.3 (the Purchase Price "reflects the arm's length value of the Acis Participation Interests as of the date of this Agreement…").  Unlike the many promissory notes that were issued and separately litigated in the Highland bankruptcy, the Note was not tendered in exchange for a cash advance; rather it was tendered solely for the promise of future Acis Participation Interests.[24]

36.     The Note also refers to, and depends on, the Participation Agreement.  By its terms, the Note was to become effective only upon the effectiveness of the Participation Agreement, which was executed contemporaneously by Highland and Acis.[25]  A condition precedent to the effectiveness of the Note provides:

> ***This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until*** Payee has received each of the following in form and substance acceptable to Payee:
>
> ....

---

[24] Dondero under oath at deposition in the Acis case: "A. What did Highland get when the note was put in place? It's a $12 million note.  Did Highland get $12 million? Did Highland get $13 million? Did Highland get an asset? No. Highland got a promise from Asis to pay it management fees that Acis was gonna get over the next three or four years, and the amortization [of the Note] was tied to the fees as they came in, and Highland got them. So when Highland got fees, it paid down – it paid the money to Acis to pay off the note."  Ex. 78 at 12:8-19.

[25] Dondero on direct in the Acis case: "Q. And I think this is obvious, by why are Exhibits 14 [the Participation Agreement] and 15 [the Note] dated October 7, 2016? A, (Dondero) Because they're paired together." Ex. 76 at 141:6-8.

HCMLPHMIT00000459

(b) the Agreement for Purchase and Sale of CLO Participation Interests dated of even date herewith (the "Purchase Agreement"), by and between Maker and Acis Capital Management, LP, a Delaware limited partnership ("Highland") [*sic*], and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that ***all conditions to the effectiveness of the Purchase Agreement have been or will be fulfilled contemporaneously with the initial advance under this Note***;

Ex. 14 (Note) at 1 (emphases added).

37.    The Transfer Agreement was ostensibly intended to assign Acis' rights and obligations under the Participation Agreement to HCLOM Ltd.  Pursuant to the Transfer Agreement, HCLOM Ltd. would step into Acis' shoes as Successor Manager.  And, as noted above, the Transfer Agreement combines the Note and the Participation Agreement into one agreement—the "Note Purchase Agreement"—and treats them as the fully integrated transaction they were intended to be.

38.    In addition to the plain and unambiguous terms of the Note, Participation Agreement, and Transfer Agreement, Waterhouse—the former Treasurer of Acis and CFO of Highland—admitted that (a) "Highland is giving the Cash Purchase Price and the Note to Acis *in exchange* for Acis' promise to share the Acis' Participation Interest as defined in th[e] agreement," (Ex. 3 at 104:16-105:24 (emphasis added)), and (b) the Note and Participation Agreement "were part and parcel of the same overall transaction," (*id*. at 111:9-112:1).  Regarding the Transfer Agreement, Waterhouse acknowledged "that the reason Highland agreed to transfer the note to HCLOM [Ltd.] is because HCLOM [Ltd.] was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened."  (Ex. 3 at 150:13-23).

39.    Dondero also (once again) confirmed that these agreements all constituted one integrated transaction.  According to Dondero, under the Participation Agreement, Acis was to participate a portion of its expected Servicing Fees for cash and a Note for the purpose of reducing the taxes owed by the beneficial owners.  (Ex. 62 at 35:13-41:25; 43:20-25; *see also* Ex. 3 at 79:19-

HCMLPHMIT00000460

80:24, 83:1-6, 85:22-86:16). As Dondero stated: "one side wouldn't have signed if they didn't get the promises of the other side" (Ex. 62 at 50:7-12; *see also* 50:23-51:12); *see also* (Ex. 28) (opinion letter from Hunton & Williams that conditions favored tax treatment on the continued exchange of Acis Participation Interests for payments under the Note).

E.   **Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement**

40.   The overwhelming, undisputed evidence proves that HCLOM Ltd. breached the Transfer Agreement. HCLOM Ltd. never began, let alone fulfilled, its purported commitment to serve as the Successor Manager—the only "thing of value" that HCLOM Ltd. contends it "gave" to Highland in exchange for agreeing to the transfer of the Note. Ex. 21 (Response to Interrogatory 1) (when asked to identify each thing of value HCLOM Ltd. gave to Highland in exchange for the Note, HCLOM Ltd. stated that it "irrevocably committed in the Assignment to be appointed as successor manager and then took steps to effectuate the transfer as promised."). Contrary to its contention, HCLOM Ltd. never took any steps, nor did it ever have the operational capacity, to be appointed Successor Manager because it:

- had no employees, (Ex. Ex. 3 at 22:1-2);

- was never a registered investment advisor and earned no fees, (Ex. 3 at 26:17-19; Ex. 62 at 91:23-25);

- had no shared services or sub-advisory agreement and therefore could never fulfill its duties as portfolio manager, (Ex. 3 at 22:3-9; Ex. 62 at 93:6-19);

- was not "qualified" pursuant to PMAs and Indentures, (*see* Ex. 62 at 104:24-105:2);

- had no risk retention financing, nor ever tried to obtain any;

- never engaged an investment bank to arrange any reset or refinancing, reissue, refinancing, or new underwriting of any CLO or other vehicle or business;

- was never capitalized and had no bank account or bank relationship, (Ex. 3

HCMLPHMIT00000461

at 26:6-10);

- never maintained financial statements or books and records, (Ex. 3 at 11-16); and

- never sought the consents required to become the Successor Manager.

41. In fact, ***HCLOM Ltd. admits that it failed to perform any of its obligations under the Transfer Agreement*** because it never (a) became Successor Manager, (b) managed the Acis CLOs, or (c) remitted any Acis Participation Interests to Highland. *See* Ex. 21 (Responses to Interrogatories 4-6 and RFAs 2, 4, and 6); Ex. 3 at 20:25-21:20, 31:14-24, 156:15-157:6; Ex. 62 at 106:14-16; 107:1-10.[26]

42. Notably, Acis—while under Dondero's control—also breached the Transfer Agreement. Between November 3, 2017 (when the Transfer Agreement was executed) and April 13, 2018, the time Dondero lost control of Acis with the granting of the order for relief and the appointment of the Acis trustee, Acis continued to receive Servicing Fees in its capacity as the CLO portfolio manager but failed to remit the Acis Participation Interests to Highland as required under both the Participation Agreement and the Transfer Agreement. *See* Ex. 3 at 120:10-18.

**F.  The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager**

43. While HCLOM Ltd. was furtively established as a Cayman Islands entity that did nothing except enter into the Transfer Agreement and purportedly take title to the Note, HCLOM LLC (formed prior to HCLOM Ltd.) was busy actually taking the substantial steps required to become Acis' Successor Manager. As a result, the Note was effectively hidden in the Cayman Islands entity while Highland, under Dondero's control, worked to transfer the business of running the CLOs away from Acis to a separate, same-named, Delaware entity with no obligation to pay

---

[26] Dondero could not recall ever signing a document (other than the Transfer Agreement) that contemplated that HCLOM Ltd. would serve as Acis' Successor Manager. (*See* Ex. 62 at 125:8-12).

HCMLPHMIT00000462

the Acis Participation Interests to Highland.  If Highland could transfer the management of the

CLO's to HCLOM LLC and abscond with the Note, Acis would no longer receive any Servicing

Fees, Acis would get no payments under the Note, and Terry would be unable to collect on his

Arbitration Award.

44.     In the weeks after Terry obtained his Arbitration Award:

- On November 15, 2017, HCLOM LLC entered into an agreement with Mizuho pursuant to which HCLOM LLC would serve as the manager of the Acis CLOs and Mizuho would serve as the placement agent for the resets and refinancings of certain of the applicable CLOs, (Ex. 64);[27]

- On December 19, 2017, HCLOM LLC entered into Shared Services and Sub-Advisory Agreements with Highland so that it was prepared to fulfill its expected duties as the manager of the applicable CLOs, (Ex. 85, Ex. 86);

- On January 19, 2018, HCLOM LLC signed a Custodial Agreement in order to be able to hold the securities required of it under the U.S. "risk retention" rules then in effect, (Ex. 27); and

- Later in January, HCLOM LLC entered into certain agreements (executed by Dondero) to obtain "risk retention" financing that would enable it to reset Acis-3, (Exs. 72, 73).

45.     The Acis involuntary petition and the section 303(f) order did undercut the

willingness of bankers to participate in resetting the CLO's away from Acis' control and,

ultimately, the order for relief and the injunction prevented HCLOM LLC from continuing its plan

to replace Acis as Successor Manager but—contrary to the Response (Ex. 20 ¶¶ 27-28)—neither

the involuntary, the 303(f) order, nor the order for relief and the ultimate plan injunction had *any*

impact on HCLOM Ltd.'s failure to perform it obligations under the Transfer Agreement because

---

[27] *See also* Ex. 62 at 119:18-120:4; 122:5-11; 123:19-124:7 (despite signing the Mizuho Agreement, Dondero (a) did not know where HCLOM LLC obtained authority to enter in that Agreement, (b) acknowledged that HCLOM Ltd. is not mentioned in the document; and (c) does not know why HCLOM LLC entered into the Agreement rather than HCLOM Ltd.).

HCMLPHMIT00000463

HCLOM Ltd. was never going to, nor did it take affirmative steps to, serve in that Successor Manager role.

**G.** **The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award**

46.     The parties' conduct further demonstrates that, following the issuance of the Arbitration Award, neither HCLOM Ltd. nor Acis would ever satisfy their obligations to Highland under the Participation Agreement or the Transfer Agreement.

47.     For example, on January 19, 2018—before the Acis bankruptcy was commenced— Dondero signed an Acknowledgement and Waiver Agreement in which he (a) acknowledged that HCLOM LLC would succeed Acis rather than HCLOM Ltd., and (b) recognized that HCLOM Ltd.'s failure to serve as Acis' successor constituted a material breach of its obligations under the Transfer Agreement.[28]  While purporting to waive HCLOM Ltd.'s breach, Dondero was unaware of anything Highland received in exchange for such waiver (*i.e.*, Highland's waiver of HCLOM Ltd.'s material breach was unsupported by any consideration).[29]

48.     The undisputed evidence will also show that both before and immediately upon the filing of the Acis involuntary petition, while Dondero continued to firmly control both Highland and Acis, Highland eliminated all payments to and from Acis under the Participation Agreement from its internal weekly cash flow forecasts. (*Compare* Ex. 44 at 6 (showing "Stability Transaction" payments during the projection period) *with* Ex. 45 at 3, 6 (showing the removal of the "stability" payments) and Exs. 46-61 (no reference to any stability payments in any forecast

---

[28] Although Dondero signed the Acknowledgement and Waiver Agreement, he does not remember reading it before signing it or discussing it with anyone (Ex. 62 at 129:10-130:7; 134:15-23).

[29] At deposition, Dondero testified that (a) he did not know what Highland received from HCLOM Ltd. in exchange for the waiver; (b) he never asked; and (c) no one ever explained what benefit Highland received for waiving the breaches of the Transfer Agreement (Ex. 62 at 135:18-136:6).

HCMLPHMIT00000464

through May 31, 2018 the date the next amortization payment was due under the Note). The evidence will also show that Acis removed both the Note (asset) and the Participation Agreement (liability) from its financial statements and both Acis and Highland stopped making any payments related to the transaction.[30]

49.     Further, under Dondero's leadership, Highland filed unsecured, priority, and administrative claims in the Acis bankruptcy case for fees due under the HCMLP Services Agreements, (Exs. 17, 67), yet Highland *never* filed a claim for the Acis Participation Interests due under the Participation Agreement.

50.     Finally, while HCLOM Ltd. now claims it can seek payment under the Note notwithstanding the lack of consideration or performance, it abandoned whatever claims it may have had well before Highland filed its Objection. In fact, rather than trying to declare a default under the Note or suing to collect, HCLOM Ltd. signed "forbearance" agreements pursuant to which it agreed not to collect under the Note in exchange for Highland's promise not to demand the Acis Participation Interests. Exs. 18, 19. But this made no sense because Dondero had already acknowledged that HCLOM Ltd. would never succeed Acis and therefore would never receive any Servicing Fees. If HCLOM Ltd.'s current position had any merit (and it doesn't), HCLOM Ltd. should have been trying to enforce its purported rights under the Note. Waterhouse testified that the benefit HCLOM Ltd. received from entering into the forbearance was "preserv[ing] that relationship [with Highland]."[31] The Court can assess the credibility of that testimony.

---

[30] *See, e.g.*, Ex. 76 at 147:6-150:12. Dondero specifically testified that the Transfer Agreement effectively cancelled the Participation Agreement and the Note: "The unwinding of the note plus the unwinding of the liabilities [the participation] which netted each other . . . were never really of any net value anyway." *Id.* at 147:6-9.

[31] Because "everyone knew" HCLOM Ltd. would never receive any Servicing Fees, Waterhouse could not identify any benefit it received from the forbearance agreements other than supposedly "preserving the relationship," even though the same people were making the decisions on behalf of both parties and HCLOM Ltd. was an empty box on a piece of paper. (Ex. 3 at 165:21-168:22, 171:25-172:3, 182:19-184:21).

HCMLPHMIT00000465

51.     Waterhouse admitted that he was unaware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM Ltd. as the portfolio manager of the CLOs." (Ex. 3 at 172:4-173:11). Thus, whether by neglect or design, HCLOM Ltd.'s contention that the Acis bankruptcy and this Court's injunction prevented HCLOM Ltd. from becoming Acis' Successor Manager so that it could perform under the Transfer Agreement is simply untrue.

**H.     Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith**

52.     Waterhouse testified as HCLOM Ltd.'s Rule 30(b)(6) witness but was so uninformed and unprepared that he cannot testify at trial in good faith. In fact, even his verification of HCLOM Ltd.'s interrogatory responses was false.[32]

53.     Attached as **Exhibit A** is a demonstrative exhibit that summarizes Waterhouse's deposition testimony (the transcript of which is offered as Ex. 3). As shown therein, Waterhouse testified that the only thing he did to prepare to testify as HCLOM Ltd.'s Rule 30(b)(6) witness was meet with the Stinson lawyers for a few hours and review the primary transaction documents at issue. He (a) did not review a single email or speak with anyone other than counsel, and (b) testified about whole topics with no personal knowledge or preparation. (Ex. 3 at 6:18-8:9, 7:15-16, 9:15-17, 9:21-11:5, 41:9-42:7, 124:24-126:3).[33]

54.     Reflecting his lack of preparation, Waterhouse testified, among other things, that:

- he did not know that there is an entity called "Highland CLO Management,

---

[32] During his deposition, Waterhouse was forced to admit that (a) his verification falsely stated that it was based on discussions with people with personal knowledge concerning the events at issue and (b) it would be accurate to say that he only spoke with counsel, people he admitted lacked personal knowledge. (*Compare* Ex. 10 (last page) *with* Ex. 3 at 176:4-178:13). Waterhouse also sheepishly admitted he did nothing to verify the accuracy of the interrogatory responses except to take "what counsel provided as correct." As it turns out, certain of the discovery responses were unresponsive or lacked any basis that Waterhouse knew of. (Ex. 3 at 178:21-180:1, 180:14-181:12, 182:3-18).

[33] Waterhouse admitted that he never spoke with Dondero, Cullinane, Sevilla, Ellington or Leventon and read nothing but the primary documents at issue. (Ex. 3 at 9:21-11:5)

HCMLPHMIT00000466

Ltd." and a different entity called "Highland CLO Management, LLC," (*id.* at 6:2-11; 25:21-26:5);

- he did not know if he ever served as an officer of HCLOM Ltd. and did not know if he was an officer of HCLOM Ltd. at the time of the deposition, (*id.* at 14:13-17);[34]

- despite being Acis' Treasurer at the time, and despite causing the Acis bankruptcy and its destructive and continuing aftermath, Waterhouse claimed to have no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017, (*id.* at 131:1-15); and

- he did not know if HCLOM LLC or HCLOM Ltd. was doing the resets and could not competently testify about the meaning, intent or terms of the Acknowledgement and Waiver Agreement, (*id.* at 157:7-163:2).

55. A fair reading of Waterhouse's deposition transcript shows he lacks a good faith basis to testify in this matter.

## I. **Dondero Cannot Testify in Good Faith**

56. Dondero is one of two witnesses HCLOM Ltd. intends to call at the evidentiary hearing in this matter. Ex. 21 (response to Interrogatory No. 10). Given that (a) he controlled Highland, Acis, and HCLOM LLC at all relevant times, (b) has served as HCLOM Ltd.'s President beginning on February 7, 2018, (Ex. 6), and (c) executed many of the relevant agreements on those entities' behalf, that is not surprising. But other than providing certain broad perspectives (all of which undermine HCLOM Ltd.'s contentions), Dondero lacks such basic knowledge, and his testimony will be so disingenuous, that he cannot testify in good faith.

57. Attached as **Exhibit B** is a demonstrative exhibit that summarizes Dondero's deposition testimony (the transcript of which is offered as Ex. 62). As shown therein, Dondero testified, among other things, that:

- he did not know who holds the Note that is the subject of this litigation, (Ex.

---

[34] Of course, Waterhouse (a) has served as HCLOM Ltd.'s Treasurer since February 7, 2018 (Ex. 6), and (b) signed an agreement waiving HCLOM Ltd.'s purported right to collect on the Note at issue for a period of time (Ex. 19).

HCMLPHMIT00000467

62 at 8:7-14; 14:10-14);

- he did not know anything about HCLOM Ltd. or HCLOM LLC other than that they were supposed to be involved in the Acis resets and refinancings, (*id*. at 9:24-10:22, 11:19-12:2);

- he did not know whether HCLOM Ltd. and HCLOM LLC are related in any way, (*id*. at 12:13-13:5);

- he could not identify the ultimate beneficial owners of HCLOM Ltd. or who controls it (and never asked) and did not know if he was authorized to act on its behalf, (*id*. at 14:15-16:13), (again, Dondero has been HCLOM Ltd.'s President for nearly seven years (Ex. 6));

- he never saw HCLOM's Response and does not know who is instructing Stinson in this litigation on HCLOM Ltd.'s behalf, (*id*. at 16:14-23, 18:8-19:13, 19:22-20:15, 110:20-111:3);

- he did not recall if he was an officer of Acis or if he controlled that entity, (*id*. at 24:21-25:6);[35]

- he claimed to have never read the Arbitration Award and was unfamiliar with the Panel's findings that the entities he controlled took actions under false pretenses and breached various agreements and fiduciary duties, (*id*. at 67:11-22, 70:3-20);

- he never communicated with Summit or Cullinane, the counterparty to the Transfer Agreement and related documents, (*id*. at 79:19-81:19, 82:24-83:3);

- he did not recall that Highland was a party to the Transfer Agreement, has "no idea" why he signed it, and could not identify any benefit Highland was expected to obtain even after reviewing the document, (*id*. at 84:22-86:14, 88:15-89:2, 89:20-91:5);

- he claimed to have no personal knowledge about the Notification, who gave it, or why Highland was unwilling to support Acis, (*id*. at 94:24-95:18, 98:12-16, 100:11-14);[36]

---

[35] As Waterhouse acknowledged, Dondero controlled Acis at all times from at least June 10, 2016 (the day after Terry's ouster) until the trustee was appointed in the Acis bankruptcy case. (Ex. 3 at 47;16-21; Ex. 9 (Acis consent showing Dondero's appointment as President)).

[36] "Notification" is defined in the Transfer Agreement and refers to the alleged fact that Highland was unwilling to continue providing services to Acis—the whole premise for the Transfer Agreement. Ex. 13 (third "Whereas" clause). Given that Dondero controlled both entities at the time, he either abdicated responsibility or gave false testimony. In fact, Waterhouse testified that Dondero made the decision to give the Notification. (Ex. 3 at 138:3-13). As noted above, there is no evidence that a written Notification was ever given as required by the HCMLP Services Agreements.

HCMLPHMIT00000468

- he took no steps to make sure the assertions set forth in the Transfer Agreement were true and accurate, (*id*. at 108:6-25); and

- he could not identify anything of value Highland received in exchange for its purported waiver of HCLOM Ltd.'s breaches of the Transfer Agreement, (id. at 135:18-136:6).

58.     As will be shown at trial, Dondero's deposition testimony in this case directly contradicts his sworn testimony in the Acis bankruptcy case (including in the ongoing adversary proceeding) as well as his sworn responses to interrogatories.

59.     This is not just a matter of "credibility." Dondero's testimony is so uninformed and disingenuous that he cannot testify in good faith.

## III.     ARGUMENT

### A.     The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process

60.     Based on clear and convincing evidence, the HCLOM Parties' prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process. *See In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 297 (5th Cir. 2022) (noting that a bankruptcy court may sanction litigants if it finds, "by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process.").

### 1.     HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith

61.     There is no dispute that HCLOM Ltd. failed to perform its obligations under the Transfer Agreement. *See supra* ¶¶ 40-42. Even Dondero and Waterhouse acknowledge that the Note is part of a fully integrated transaction with the Participation Agreement and Transfer Agreement. In fact, the Note represents those deferred payments that Highland was to make in exchange for the deferred Acis Participation Interest payments Acis was able to make under the Participation Agreement. The Note is unenforceable because HCLOM Ltd. (a) provided no

HCMLPHMIT00000469

consideration, (b) both Acis and HCLOM Ltd. materially breached their obligations under the Transfer Agreement, and (c) Acis breached its obligation to pay the Acis Participation Interests to Highland. HCLOM Ltd. knows this because Dondero caused the breaches for each entity which caused a complete failure of consideration to Highland for any purported obligations. Nevertheless, HCLOM Ltd. continues to prosecute the HCLOM Claim without any legal or factual basis.

### a.     The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration

62.     The Note is unenforceable because HCLOM Ltd. failed to provide any consideration in exchange for its assignment. Under Cayman Islands law,[37] "[a] compromise like any agreement, must be supported by consideration…" *Folkvang Ltd v Valorte Capital* (unreported, 29 February 2024, FSD 199 of 2023, Parker J. at ¶ 99);[38] *see also Blue v Ashley* [2017] EWHC 1928 (Comm) Leggatt J at ¶ 49 ("The basic requirements of a contract are that: (i) the parties have reached an agreement, which (ii) is intended to be legally binding, (iii) is supported by consideration, and (iv) is sufficiently certain and complete to be enforceable…").[39] Thus, an agreement is unenforceable for lack of consideration where one party's promised performance fails. *See Barclays Bank Plc v. Kenton Capital* [1994-95 CILR 489]: the Grand Court of the Cayman Islands, per Smellie J at page 499 ("... It may also be the case that the depositors would be entitled to recover, as against Kenton in claims at common law, for moneys had and

---

[37] The Transfer Agreement is governed by the laws of the Cayman Islands. *See* Ex. 65, § 6(d).

[38] *See Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66* (the "Winograd Dec.") (being filed concurrently herewith), **Exhibit 1**.

[39] *See* Winograd Dec., **Exhibit 1**. "*Winograd Dec.*" refers to the *Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66,* being filed concurrently herewith.

HCMLPHMIT00000470

received on the basis that the consideration on which the agreement is based has failed.");[40] *H.E.B.*

*Enterprises Ltd and Bodden Jr v Richards* [2023] UKPC 7, ¶ 58 ("money had and received to the

claimant's use can be recovered where the basis (there referred to as consideration) has wholly

failed.");[41] *Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ¶¶ 102-4 (finding

a total failure of consideration to have occurred in the context of two agreements (namely a

sale/purchase agreement and a loan agreement) which, contrary to the defendant's argument, the

Court found to constitute one agreement, and holding, "…[a]ccordingly, it is correctly submitted

that under the terms of the agreements, there has still been a total failure of consideration on the

sale of the parcels.")[42]

63.    Here, in order to transfer any of the rights or obligations under the Participation

Agreement, Highland's prior written consent was required.  *See* Ex. 13, § 5.1.  HCLOM Ltd.

obtained Highland's agreement to enter into the Transfer Agreement through the commitments of

HCLOM Ltd. set out in the agreement.  HCLOM Ltd. admits that it failed to satisfy any of its

obligations under the Transfer Agreement, the very document pursuant to which HCLOM Ltd.

was assigned the Note.  The ostensible purpose of the Transfer Agreement, *i.e.*, for HCLOM Ltd.

to succeed Acis as Successor Manager, was never realized (indeed, *no* steps were ever taken to

enable HCLOM Ltd. to become Acis' Successor Manager).  *See supra* ¶¶ 40-51.  HCLOM Ltd.

thus failed to perform its promised obligation under the Transfer Agreement, and as a result, the

consideration on which the Transfer Agreement is based has failed. *See Richards v H.E.B*

*Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] per Williams J at ¶ 72, applying *Heyman v*

*Darwins Ltd.* [1942] AC 356, per Lord Porter at page 399 ("Strictly speaking, to say that, upon

---

[40] *See* Winograd Dec., **Exhibit 2**.

[41] *See* Winograd Dec., **Exhibit 3**.

[42] *See* Winograd Dec., **Exhibit 4**.

HCMLPHMIT00000471

acceptance of the renunciation of a contract, the contract is rescinded is incorrect. In such a case the injured party may accept the renunciation as a breach going to the root of the whole of the consideration. By that acceptance he is discharged from further performance and may bring an action for damages, but the contract itself is not rescinded.")[43]  HCLOM Ltd.'s failure of its promised performance under the Transfer Agreement renders the Note unenforceable by HCLOM Ltd.  Based on the evidence adduced in discovery, including HCLOM Ltd.'s extensive admissions, HCLOM Ltd.'s continued prosecution of its HCLOM Claim, with knowledge that it provided no consideration for the Note, constitutes bad faith and a willful abuse of the judicial process.

        **b.**    **The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement**

      64.    It is also undisputed that HCLOM Ltd. materially breached its obligations under the Transfer Agreement.  For this additional reason, the Note is unenforceable.  Under Cayman law, a non-breaching party is relieved of performing its obligations where the counterparty materially breaches its obligations. *See Beach Club Enterprises Limited v Horizon Management Limited* [1980-83 CILR 223], Carberry J.A. at page 235 (an innocent party's termination following a breach of a condition excuses future performance) applying *McDonald v Dennys Lascelles Ltd.* (1933), 48 C.L.R. 457 as approved in *Johnson v Agnew* [1980] A.C. 367;[44] *Hongkong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd* [1962] 2 W.L.R. 474, Lord Diplock, at pages 493-494 (noting that a breach of a condition in a contract provides the innocent party with an immediate, unequivocal right to terminate future performance of the contract);[45] *Golfco Limited v Borden* [2002 CILR 1], Kellock Ag. J at ¶ 25 (finding that the purchaser of an apartment block's

---

[43] *See* Winograd Dec., **Exhibit 5**.

[44] *See* Winograd Dec., **Exhibit 6**.

[45] *See* Winograd Dec., **Exhibit 7**.

HCMLPHMIT00000472

failure: (a) to pay certain instalments to the seller pursuant to the contract for the sale of land; and (b) to remedy their breach within 28 days of receiving a written notice to do so (in accordance with clause 11(1) of the contract of sale) from the seller "*would have had to be regarded as a fundamental breach*");[46] *In the Matter of Re Indies Suites Ltd* [2004-05 CILR 498], Smellie C.J. at ¶ 22, (accepting that termination excuses future performance, together with a right of the innocent party to claim damages by way of compensation for the loss sustained in consequence of the non-performance of the contract in the future, applying the English case of *Photo Production Ltd. v Securicor Transport Ltd.* [1980] A.C. 827).[47]

65.     A breach is "material" when it goes to the "root" of the contract or forms an essential condition of performance. *See Tempo Group Ltd and others v. Fortuna Development Corporation* (unreported, 31 March 2015, FSD 125 of 2012, Henderson J at ¶ 296) ("[a]n act of repudiation must go to the root of the contract ... The repudiatory breach must deprive the innocent parties of substantially the whole benefit which they would have obtained from due performance of the contract…");[48] *Chitty on Contracts,* 35th Ed. Chapter 28-014 (a "condition" of a contract is that of "an essential stipulation of the contract which one party guarantees is true or promises will be fulfilled.").[49]

66.     Here, it is undisputed that HCLOM Ltd. materially breached the Transfer Agreement by failing to (a) "provide the Controlling Class (as defined in each of the CLO Indentures) with notice requesting the appointment of HCLOM as Portfolio Manager," as required by Section 1 of the Transfer Agreement; (b) "promptly pursue Successor Manager appointment,"

---

[46] *See* Winograd Dec., **Exhibit 8**.

[47] *See* Winograd Dec., **Exhibits 9 and 10**.

[48] *See* Winograd Dec., **Exhibit 11**.

[49] *See* Winograd Dec., **Exhibit 12**.

HCMLPHMIT00000473

as required by Section 2 of the Assignment; (c) "achiev[e] all conditions precedent required by the CLO Documents," as required by Section 2 of the Transfer Agreement; and (d) execute a joinder to the to the Participation Agreement [referred to as the "Purchase Agreement" in the Transfer Agreement], as required by Section 3.d of the Transfer Agreement.

67. If there was any doubt—and there isn't—Dondero agreed on behalf of Highland that HCLOM Ltd. and Acis breached the Transfer Agreement in the Waiver and Acknowledgment Agreement (although he purportedly waived those breaches for no consideration). Ex. 7.

68. Based on the documentary evidence adduced during discovery, including the Waiver Agreement, HCLOM Ltd. is prosecuting its HCLOM Claim based on the Participation Agreement, the Note and the Transfer Agreement despite knowing that it materially breached its obligations the Transfer Agreement. HCLOM Ltd.'s material breaches of the Transfer Agreement excused Highland's obligations under the related Note. HCLOM Ltd.'s continued prosecution of this claim, despite knowing it materially breached the Transfer Agreement, constitutes bad faith and willful abuse of the judicial process.

      c.    **Acis Breached its Obligation to Pay the Acis Participation Interest to Highland**

69. As soon as Terry received the Arbitration Award and the Transfer Agreement was executed, Acis and HCLOM Ltd. breached their obligations under the Participation Agreement and the Transfer Agreement. In addition to the breaches of the Transfer Agreement by HCLOM Ltd. described above, Dondero-controlled Acis ceased paying any Acis Participation Interests to Highland. That failure of consideration continued after the Acis order for relief was entered. The complete failure of Acis and HCLOM Ltd to provide Highland with the consideration it was to receive under Participation Agreement and the Transfer Agreement—the Acis Participation Interests—vitiates any obligation Highland may have had under the Participation Agreement or its

HCMLPHMIT00000474

Note. As recognized in the Participation Agreement, Highland bore the risk of payment of the Note *other than* in the event that Highland it did not receive the Acis Participation Interests "as a result of the Seller [Acis] breaching its covenants [including to promptly remit the Acis Participation Interests] under this Agreement or as result of the fraud or willful misconduct or the Seller." Ex. 13 §3.6. Acis' and HCLOM Ltd.'s breach of their obligations under the Participation Agreement and the Transfer Agreement relieved Highland of any duty to make any further payments under the Note.[50]

**2.  HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process**

70.  HCLOM Ltd.'s designation of Waterhouse as its Rule 30(b)(6) further demonstrates that HCLOM Ltd. is prosecuting the HCLOM Claim in bad faith. As discussed above, Waterhouse was wholly unprepared to testify on behalf of HCLOM Ltd. He lacked knowledge of critical facts underlying the HCLOM Claim, including, for instance, (a) whether he was an officer of HCLOM Ltd. at the time of his deposition; (b) the purpose of the agreements at issue in the HCLOM Claim; and (c) that HLCOM LLC and HCLOM Ltd. were different entities. *See supra* ¶¶ 52-55. It is untenable for a 30(b)(6) witness to lack such fundamental information about the entity it represents.

**3.  Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process**

71.  Dondero's involvement in the prosecution of the HCLOM Claims is likewise in bad faith. As set forth above, Dondero cannot testify in good faith on behalf of HCLOM Ltd. He, like HCLOM Ltd.'s 30(b)(6) witness, lacks critical knowledge underlying the facts of this case, including those as fundamental as, among other things, who holds the Note that is the subject of

---

[50] The Participation Agreement and the Note are governed by Texas law.

HCMLPHMIT00000475

this litigation and why he signed the very agreements that are the subject of this litigation. *See supra* ¶¶ 56-59. Dondero's testimony is not credible, is directly contradicted by his sworn testimony and interrogatory responses given in the Acis case, and is otherwise uncorroborated; he simply cannot testify in good faith on behalf of HCLOM Ltd. Dondero's continued involvement in the prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

**B.** **Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim**

72.    The HCLOM Parties should be sanctioned for their bad faith prosecution of the HCLOM Claim by reimbursing Highland for attorneys' fees and expenses incurred in connection with litigating the HCLOM Claim.

73.    Bankruptcy courts possess inherent authority under section 105 of the Bankruptcy Code to issue sanctions after making a finding of bad faith. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (affirming bankruptcy court's imposition of sanctions for bad faith filing "following an extensive hearing in which the bankruptcy court heard testimony from the parties and witnesses and made certain credibility determines," and made specific findings that Appellants acted in bad faith."); *In re Brown*, 444 B.R. 691, 695 (E.D. Tex. 2009) (issuing sanctions against party and their counsel, and relying on section 105(a) of the Bankruptcy Code as a basis for awarding attorney's fees against parties for acting "with reckless disregard of their duty to this Court"); *In re Paige*, 365 BR 632, 640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to sanction" under section 105(a)); *Cleveland Imaging*, 26 F.4th at 297 (noting that a bankruptcy court may sanction litigants "if it finds, by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process") ; *Schermerhorn v.*

HCMLPHMIT00000476

Kubbernus (In re Skyport Glob. Commc'n, Inc.), 642 F. App'x 301, 304 (5th Cir. 2016) (same);

*(Lopez v. Portfolio Recovery Assocs. (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same).

74.    A bankruptcy court has "broad discretion" to determine reasonable attorneys' fees. *See In re Monteagudo*, 536 F. App'x 456, 459 (5th Cir. 2013) (sanctions orders granted under bankruptcy court's inherent powers are reviewed for "abuse of discretion"); *ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),* 751 F.3d 291, 294 (5th Cir. 2014), *aff'd sub nom.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ("A bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the bankruptcy court is familiar "with the actual services performed" and is well positioned to determine "what is just and reasonable") (internal quotations omitted); *In re Paige*, 365 B.R. 632, 637-640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to sanction" under section 105(a)); *Lopez v. Portfolio Recovery Assocs., LLC (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same); *Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.)*, 105 F.4th 830, 841 (5th Cir. 2024) ("Undergirding our analysis of the sanctions award here is a recognition of the goal of such awards everywhere: "to do rough justice.' ... Complete accuracy is neither required nor expected. The bankruptcy court's judgments in these matters are entitled to our 'substantial deference.'") (internal quotations omitted).

75.    Here, the Bankruptcy Court should award sanctions against HCLOM Ltd. and Dondero in the form of attorneys' fees and expenses incurred by Highland in connection with the bad faith prosecution of the HCLOM Claim, in an amount to be determined at trial.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Highland respectfully requests that the Court enter an order, in the form attached hereto as **Exhibit C**, (a) finding that HCLOM Ltd. and Dondero

HCMLPHMIT00000477

prosecuted the HCLOM Claim in bad faith, (b) entering sanctions jointly and severally against

HCLOM Ltd. and Dondero in the form of reimbursement to Highland of Highland's costs and

expenses incurred in objecting to HCLOM Ltd.'s HCLOM Claim in an amount to be determined

at trial; and (c) granting such other and further relief that the Court deems just and proper under

the circumstances.

Dated:  November 21, 2024          **PACHULSKI STANG ZIEHL & JONES LLP**

                                   Jeffrey N. Pomerantz (CA Bar No. 143717)
                                   John A. Morris (NY Bar No. 2405397)
                                   Gregory V. Demo (NY Bar No. 5371992)
                                   Hayley R. Winograd (NY Bar No. 5612569)
                                   10100 Santa Monica Blvd., 13th Floor
                                   Los Angeles, CA 90067
                                   Telephone: (310) 277-6910
                                   Facsimile:  (310) 201-0760
                                   E-mail:jpomerantz@pszjlaw.com
                                          jmorris@pszjlaw.com
                                          gdemo@pszjlaw.com
                                          hwinograd@pszjlaw.com

                                   - and -

                                   **HAYWARD PLLC**

                                   */s/ Zachery Z. Annable*
                                   Melissa S. Hayward
                                   Texas Bar No. 24044908
                                   MHayward@HaywardFirm.com
                                   Zachery Z. Annable
                                   Texas Bar No. 24053075
                                   ZAnnable@HaywardFirm.com
                                   10501 N. Central Expy, Ste. 106
                                   Dallas, Texas 75231
                                   Telephone: (972) 755-7100
                                   Facsimile:  (972) 755-7110

                                   *Counsel for Highland Capital Management, L.P.*

HCMLPHMIT00000478

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on November 19 and 20, 2024, counsel for Highland Capital Management, L.P., John A. Morris, corresponded with counsel for Highland CLO Management, Ltd., Deborah Deitsch-Perez and Michael Aigen, regarding the relief requested in the foregoing Motion.   As of the filing of the Motion, it is assumed that Highland CLO Management, Ltd. is **OPPOSED** to the relief requested in the Motion.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

HCMLPHMIT00000479

# EXHIBIT A

HCMLPHMIT00000480

<u>**WATERHOUSE DEPOSITION DIGEST**</u>[1]

- **FW does not know that there is an entity called "Highland CLO Management, Ltd." and a different entity called "Highland CLO Management, LLC" (6:2-11; 25:21-26:5)**

<u>**WATERHOUSE DID NOT PROPERLY PREPARE TO TESTIFY**</u>

- To prepare, FW met with counsel and reviewed the Note, the Purchase and Sale Agreement, the Transfer Agreement, the Rule 30(b)(6) notice and the pleadings; he also reviewed portions of Dondero's deposition transcript from the Acis case. (6:18-8:9); FW met with counsel a few weeks before for 2-3 hours (41:9-42:7)

- But FW didn't review any emails (7:15-16); was unaware that there is ongoing, current litigation between Acis and Dondero (9:15-17); spoke with nobody other than counsel to prepare, including Dondero, Cullinane, Sevilla, Ellington or Leventon; and read nothing but the primary documents. (9:21-11:5)

- Even though "resets" were a Rule 30(b)(6) topic, FW looked at no documents to prepare, talked to no one other than counsel, and has no personal knowledge on the topic. (124:24-126:3)

- **FW DNR if he ever served as an officer of HCLOM Limited, and did not know if he was an officer of HCLOM Limited at the time of the deposition. (14:13-17)**

- FW DNR seeing HCLOM Limited resolutions; DNK how Summit Management became Limited's director at formation. (15:4-16:20)

- FW DNK who formed HCLOM Limited and DNK of any communications with Summit or Cullinane on the topic. (16:21-17:7)

- FW discussed with Dondero and legal team the need to form HCLOM because Acis could not continue to serve as CLO manager following Terry's arbitration award. (17:11-18:13)

- Needed to create successor manager. (18:14-23)

- **FW claims Acis couldn't continue because Highland wouldn't support it and investors did not want to be associated with it. (18:24-19:13)**

---

[1] "<u>FW</u>" refers to Frank Waterhouse. "<u>DNR</u>" means "does not recall" or "does not remember." "<u>DNK</u>" means "does not know." Citations are to the transcript of Waterhouse's deposition marked as Ex. 3.

HCMLPHMIT00000481

- **FW can't identify any specific person who told him investors did not want to be associated with Acis, nor could he identify any particular investors (19:10-20:17)**

- **FW DNR why Highland was unwilling to service Acis.  (20:18-20)**

- **HCLOM Limited never served as Successor CLO Services for Acis and DNK if it ever generated a dollar of revenue.  (20:25-21:10)**

- Other than formation expenses, FW DNK if HCLOM Limited ever incurred any expenses.  (21:11-23)

- **FW DNK if he was HCLOM Limited's Treasurer.  (21:24-25)**

- **FW DNR whether HCLOM Limited had any employees or a shared services agreement.  (22:1-9)**

- **FW DNR seeing 2/7/18 HCLOM Limited resolutions; they show he is the Treasurer (22:11-23:7).  This was a Rule 30(b)(6) topic, yet FW has no knowledge concerning HCLOM Limited's officers.  (23:8-24:8)**

- **FW does not know if HCLOM Limited or HCLOM LLC was the entity that tried to take steps to become the Successor Manager.  (24:14-25:20)**

- **FW DNR that HCLOM Limited had a bank account; prepared financial statements; maintained books and records; was a registered financial advisor.  (26:6-19)**

- **FW never saw a document concerning resets where HCLOM Limited was identified as the proposed portfolio manager rather than LLC.  (27:4-7)**

- The Acknowledgement and Waiver Agreement was signed about 10 weeks after the Transfer Agreement by Dondero and Cullinane.  (27:14-29:4)

- FW not aware of anything inaccurate or incorrect.  (29:5-8)

- **FW has no independent knowledge of the Acknowledgement and Waiver Agreement; it says what it says.  (29:9-31:4)**

- **FW admits that the Notices and Appointments required under the Transfer Agreement never occurred.  (31:14-24)**

- **Dugaboy and Okada own HCLOM Limited.  (34:7-10)**

- **FW has no facts to support speculation that Limited and LLC are affiliates.  (33:15-36:1)**

HCMLPHMIT00000482

- **HCMLP had an ownership interest in Limited until 2022. (36:7-22)**

- FW DNK if LLC ever had an ownership interest in Limited. (37:15-19)

- FW's understanding is that Highland owned LLC until 2022. (37:20-38:25)

- **FW was "likely" Treasurer of Acis. (43:14-17)**

- **FW admits that on June 10, 2016, the day after Terry was terminated, he and Dondero were Acis' sole remaining officers. (44:2-45:14)**

- **FW has never discussed Acis with Nancy Dondero even though she is the Dugaboy trustee, which owned Acis, and FW was one of only two officers of Acis. (45:24-46:14)**

- **FW agrees that JD controlled Acis at all times from at least 6/10/16 until Phalen is appointed. (47:16-21)**

- If FW needed approval to do something as Treasurer of Acis, he'd turn to Dondero. (48:12-16)

- **Acis had no employees but did have shared services and sub-advisory agreements with Highland enabled Acis to fulfill its duties as portfolio manager. (48:22-50:1)**

- **Dondero signed amended SSA and Sub-Advisory Agreements the month after Terry is terminated. (50:6-51:10)**

- Despite being Highland's CFO and Acis' Treasurer, FW testified that he wasn't involved in amending the service agreements. (51:11-52:9)

- Dondero would have to approve the 20-BPS formula for Acis and Highland. (59:2-7)

- **FW does not know if Highland ever gave written notice of termination of the SSA pursuant to Section 14(b). (60:2-16)**

- Acis was to pay Highland an aggregate of 35 basis points for shared and sub-advisory services. (64:21-65:4)

- **FW DNR Highland providing written notice of termination of the sub-advisory agreement in accordance with Section 7.02. (65:4-66:7)**

- Shared Services and Sub-Advisory Agreements were amended again in March 2017; Dondero signed the amended agreements so, again, Acis is still paying 35 basis points for services. (66:8-68:6)

HCMLPHMIT00000483

- **So as of March 2017, Acis was still the vehicle through which the Acis CLOs were expected to be managed. (68:7-69:6)**

- **FW does not recall anyone expressing concerns over Acis until 2018. (69:7-24)**

- **FW DNR either party ever giving written notice of termination of the service agreements. (69:25-70:16)**

- FW DNR shared services agreement being amended. (72:4-22)

- FW DNR Highland assigning or delegating any rights or obligations. (72:23-75:2)

- **FW DNR sub-advisory agreement being the subject of a written notice of termination. (75:16-76:21)**

- FW DNR Sub-Advisory Agreement ever being amended. (76:22-77:10)

- FW DNR Sub-Advisory Agreement ever being assigned. (77:11-21)


## CLO PARTICIPATION AGREEMENT

- "Highland purchased an … interest in Acis' management fees." (78:10-22)

- **Whole concept was a "tax-driven strategy" that also gave Highland a cash management benefit because it would receive the Servicing Fees before it paid out on the Note. (79:19-80:24; 83:1-6)**

- FW discussed tax planning and cash management aspects with tax group and Dondero. (82:4-25)

- **Because Acis is a pass-through entity, Acis' ultimate beneficial owners were the beneficiaries of the expected tax benefits on the Acis side; same was true on the Highland side. (85:22-86:16)**

- **Unpredictability and instability of Servicing Fees never caused Acis to default or breach obligations. (98:14-22)**

- **FW cannot identify any adverse consequence to Acis from the alleged unpredictability and instability of Servicing Fees. (99:23-25)**

- Terry, Okada, and Dondero were the only people who could make decisions on Acis' behalf because they were the owners; after Terry was terminated, Dondero and Okada remained in control until Phalen was appointed Trustee. (101:13-102:6)

- **FW DNR the issuers ever breaching their obligation to pay servicing fees to Acis or Acis ever declaring a default. (102:7-14)**

HCMLPHMIT00000484

- **Schedule A of the Transfer Agreement identifies the CLOs subject to the Agreement. Based on the figures in Schedule A, and the fees due under the Shared and Sub-Advisory Service Agreements, FW agrees that "Acis was obligated to pay to Highland more than it expected to receive in servicing fees." (102:15-104:15)**

- **As Treasurer of Acis and the CFO of Highland, FW admits that "Highland is giving the Cash Purchase Price and the Note to Acis in exchange for Acis' promise to share the Acis Participation Interest as defined in th[e] agreement" (104:16-105:24)**

- FW DNR how the Cash Purchase Price and initial principal balance of the Note were determined; whether they equaled the value of the Participation interests; or whether they were the subject of negotiation.  (106:1-16)

## NOTE

- **The Note was executed at the same time as the Participation Agreement, both of which "were part and parcel of the same overall transaction." (111:9-112:1)**

- **The same people made decisions on behalf of Acis and Highland in connection with the Participation Agreement and Note.  (112:10-21)**

- Highland did not have a dedicated team looking out for its interests; while H&W was involved, they were engaged solely by Acis.  (112:22-113:10)

- HCLOM Limited never paid servicing fees because it never became the collateral manager of the CLOs.  (118:7-15)

- FW still insists that HCLOM Ltd. didn't become collateral manager of CLOs because of the Acis bankruptcy.  (118:7-18)

- **Highland made the first payment under the Note, but not the second payment due of 5/31/18; HCLOM did not declare a default but entered into the forbearance agreement instead.  (118:20-119:12)**

- **Dondero and FW were the sole officers of Acis from at least November 1, 2017 until Phelan was appointed in the Spring or Summer of 2018.  (120:3-9)**

- **Acis continued to receive quarterly servicing fees from the CLOs after November 1, 2017.  (120:10-15)**

- **FW DNR if Acis remitted servicing fees to Highland after 11/1/17.  (120:16-18)**

- **In April 2017, under Dondero's direction, Acis launched a brand-new CLO (Acis-7).  (121:11-21)**

HCMLPHMIT00000485

- **FW admits that Dondero would not have launched a brand-new CLO if he didn't believe Acis could not perform. (121:18-25)**

- FW DNR recall (a) anyone expressing any concern about Acis' ability to perform or (b) how Acis funded the risk retention amount (or whether Highland loaned the money). (122:1-23)

- Acis looking to reset Acis-3 in late 2017. (123:13-124:2)

## ASSIGNMENT AND TRANSFER AGREEMENT

- **Despite being the CFO of Acis, FW has no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017. (131:1-15)**

- **FW had no recollection that Highland caused a Delaware entity called "Highland CLO Management, LLC" to be created in October 2007. (131:16-132:7)**

- **FW DNK who authorized the creation of LLC or what its purpose was. (132:4-13)**

- **FW DNK why the Transfer Agreement was entered on 11/3/17 except that (a) Terry got his award and (b) Highland said it wouldn't support Acis; those are the only two reasons why this Agreement was entered. (132:22-134:25)**

- **Dondero made the decision to enter the Transfer Agreement on behalf of Highland and Acis, and Cullinane made the decision on behalf of HCLOM Limited. (135:1-10)**

- **The only purpose of the Transfer Agreement was to transfer the participation interest (i.e., the servicing fees) and the Note. (135:24-136:13)**

- **FW admitted that HCLOM Ltd. had to become the manager of the Acis CLOs "to receive the servicing fees to then in turn remit the participation interest to Highland. That was it." (136:14-24)**

- FW DNK if Transfer Agreement was negotiated or what role, if any, Cullinane played in drafting or negotiating the Agreement and despite being the Rule 30(b)(6) witness, FW made no effort to ascertain Cullinane's thoughts concerning the Agreement. (136:25-138:2)

- **Dondero made the decision on behalf of Highland to stop supporting Acis, as set forth in the third recital. (138:3-13)**

- The team managing the Acis CLOs was the same the day after Terry left as it was on 11/3/17, lead by Dondero (139:23-140:24)

HCMLPHMIT00000486

- **In fact, despite Terry's departure and the public litigation that Highland initiated, Dondero still had enough confidence in the Acis brand that he entered into new service agreements and launched a new CLO with the Acis name. (140:25-142:13)**

- **The award was the sole reason FW could identify for entering into the Assignment and Transfer Agreement. (142:14-21)**

- FW DNK who gave the Notice on behalf of Highland or who received it on behalf of Acis, although Dondero did control both entities at the time. (142:22-143:6)

- FW has no knowledge that Acis ever defaulted under either the SSA or Sub-Advisory Agreement. (143:7-144:8)

- **Dondero made the decision on Highland's behalf not to support Acis, and then made the decision on behalf of Acis that it couldn't continue. (144:9-145:10)**

- **FW cannot identify any "damage to the Acis brand" other than the damage allegedly caused by the Acis arbitration award. (145:11-22)**

- **Acis "simply accepted Highland's notification and said, okay, we're done" without seeking alternatives or declaring a default on Highland's part. (146:13-10)**

- **And despite allegedly giving notice, Highland continued to perform under the service agreements until Phalen was appointed. (147:11-21)**

- **HCLOM was "going to step into Acis' shoes" and would "have the obligation under the CLO participation interest agreement to remit… that 20 bases point over to Highland." (149:18-150:12)**

- **FW agrees that it's fair to say "that the reason Highland agreed to transfer the note to HCLOM is because HCLOM was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened." (150:13-23)**

- **"The planning contemplated the sale of the CLO participation interest and a note to the CLO manger." (152:1-13)**

- FW has no knowledge concerning the proofs of claim Highland filed in the Acis bankruptcy case. (153:20-155:25)

- **FW admits that the obligations under sections 1 and 2 of the Transfer Agreement were never fulfilled. (156:15-157:6)**

HCMLPHMIT00000487

- FW has no idea if HCLOM LLC or HCLOM Limited was doing the resets and cannot competently testify about the meaning, intent or terms of the Acknowledgement and Waiver document. (157:7-163:2)

## FORBEARANCE AGREEMENT

- FW signed – but doesn't know if its electronic signature or a wet signature (163:3-21)

- FW DNR (a) the circumstances surrounding his execution of the document or (b) why highland did not make the payment due on 5/31/18. (163:22-164:4)

- FW DNR HCLOM Limited (a) making a demand under the Note, (b) declaring a default, or (c) exercising any remedies. (164:11-20)

- FW DNR (a) reviewing before signing, (b) discussing the document with anyone before signing, (c) who asked him to sign it, or (d) where the idea originated. (164:21-165:20)

- FW admits that "everyone knew" HCLOM Ltd. wasn't receiving fees under the portfolio management agreement and was relieved of the obligation to make payments, so HCLOM received no benefit under the Forbearance Agreement. (165:21-167:11)

- The only thing Waterhouse could identify that HCLOM Ltd. received from entering into the Forbearance Agreement was somehow helping Highland preserve its relationships with the investors in the CLOs. (167:12-168:22)

## AMENDED FORBEARANCE AGREEMENT

- Signed by FW on behalf of both Highland and HCLOM Limited after the Acis plan is confirmed and there is no prospect for Acis reset. (170:5-24)

- FW admits that by this time, there is no chance HCLOM Limited will ever become the portfolio manager of Acis. (170:25-171:13)

- FW DNR HCLOM Limited ever being identified as a portfolio manager in 2019. (171:14-24)

- Only alleged benefit to HCLOM Limited from Forbearance Agreement is "reserv[ation]" of the relationship. (171:25-172:3)

- FW is not aware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM, Ltd. as the portfolio manager of the CLOs." (172:4-173:11)

HCMLPHMIT00000488

**RESPONSE**

- FW read it before and is unaware of any mistakes.  (174:13-175:1)

- **FW is not aware of any amendments needed to fully and accurately set forth HCLOM's factual and legal bases for responding to the Objection or of any intended amendments.  (175:2-9)**

**HCLOM'S DISCOVERY RESPONSES**

- Served before FW reviewed and verified.  (176:4-177:1)

- **The verification falsely states that FW spoke with people with "personal knowledge" about the responses.  (177:2-178:13)**

- **FW does not believe the Responses need to be amended or modified to make them more accurate.  (178:14-20)**

- **FW did not verify the accuracy of the Response to Interrogatory No. 2, he just "took what counsel provided as correct."  (178:21-180:1)**

- **FW then admits the response to Interrogatory No. 2 is unresponsive; he doesn't know if the Transfer Agreement was subject to negotiations; and he did nothing to find out.  (180:14-181:2)**

- **FW DNK basis for the denial of the Firs Request to Admit.  (182:3-18)**

- **The "consideration" HCLOM gave was the "preservation of the relationship" even though the same people making the same decisions on behalf of both entities.  (182:19-184:21)**

- Dondero, Ellington & Waterhouse.  (184:22-185:22)

HCMLPHMIT00000489

# EXHIBIT B

HCMLPHMIT00000490

## <u>DONDERO DEPOSITION DIGEST</u>[1]

- **JD does not know who holds the Note that is the subject of the litigation. (8:7-14; 14:10-14)**

- JD didn't do anything to prepare other than meet with counsel, an hour the Friday before and 15 minutes today; didn't review documents; didn't speak with anyone other than counsel (including FW). (8:15-9:23).

- **JD doesn't know anything about HCLOM Limited other than it was one of the entities that was going to be involved in refinancing or resetting of the CLOS. (9:24-10:22)**

- **JD doesn't know when Limited was formed; formed by "the lawyers." (10:23-11:18)**

- **JD is aware that LLC exists and speculates that it was an onshore entity involved in resets and refinancings. (11:19-12:2)**

- **JD doesn't know if LLC/Limited have common ownership or had any contractual relationship. (12:13-13:5)**

- JD never asked why there were entities with similar names because he "wasn't specifically involved in any of the details on a transaction of this size," and DNR anyone ever explaining why. (13:10-14:1)

- **JD can't identify the ultimate beneficial owners of HCLOM Limited as of today or at the time of formation. (14:15-15:17)**

- **JD DNK who controls HCLOM Limited: "This is a small transaction. I wasn't involved in the details," and he never asked anyone. JD doesn't even know if he's authorized to act on behalf of HCLOM Limited. (15:18-16:13)**

- **JD never saw HCLOM's Response; DNR seeing before filed. (16:14-23; 18:8-19:13)**

- **JD doesn't know who, within his organization, is responsible for handling this litigation on behalf of HCLOM Limited; he never designated anyone; no one ever told him who that person was; and he never spoke with anyone internally concerning this litigation. (19:22-20:15)**

---

[1] "<u>JD</u>" refers to James Dondero.  "<u>DNR</u>" means "does not recall" or "does not remember."  "<u>DNK</u>" means "does not know." Citations are to the transcript of Dondero's deposition in this matter, marked as Ex. 62.

HCMLPHMIT00000491

- Acis: formed in 2011 by Dondero, Terry & Okada to be a RIA and manage and invest in CLOs.  (22:4-16)

- Acis obtained role as CLO Manager through management agreements with issuers and would receive fees for services.  (22:17-23:13)

- **JD DNR if he was an officer of Acis or controlled that entity.  (24:21-25:6)**

- **JD doesn't remember if he fired Josh Terry for cause.  (25:7-22)**

- Terry's interests in Acis were allocated between entities owned or controlled by Dondero and Okada, but JD believes the decisions were made by an unnamed in-house lawyer; JD did not delegate to a particular person the responsibility for addressing issues arising from Terry's departure.  (26:3-27:13)

- JD DNR delegating or designating anyone to act on behalf of Acis after Terry departs.  (29:5-10)

- JD controlled HCMLP at all times until Independent Board appointed in 1/20, and authorized HCMLP to file for bankruptcy.  (31:6-17)

- JD acknowledges that Terry left in June 2016, HCMLP sued him based on JD's authority, and Terry moved to compel arbitration on 9/12/16.  (31:18-32:23)

- **JD DNR Acis and Highland entering into the Participation Agreement. (31:18-33:3)**


## PARTICIPATION AGREEMENT

- JD signed but did not read before doing so.  (35:2-9)

- **Purchase of expected fees for a note in order to recharacterize short-term income as capital gains.  Tax advantage.  (35:13-36:6)**

- **Acis is a pass-thru entity; not a tax-paying entity; tax liability goes to owners. (36:7-16)**

- **Highland was also pass through entity so neither Acis nor Highland were the tax-paying entities.  (37:4-19)**

- When JD signed, he understood that Acis "was agreeing to pay to Highland a portion of the servicing fees that it was going to receive from serving as the portfolio manager of the CLOs."  (38:18-23)

HCMLPHMIT00000492

- **Schedule A: "In exchange for the Acis participation interests, as set forth on Schedule A, Highland agreed to give some cash and a note." (38:24-41:14; 41:10-25; 43:20-25)**

- **JD doesn't know the "nuts and bolts" that it takes "to be bona fide for tax purposes" so can't say if you needed cash going both ways. (42:1-13)**

## PROMISSORY NOTE

- **JD signed. (42:24-43:9)**

- **JD doesn't know how principal amount of the Note was calculated; he "wouldn't have been involved with that." (44:1-6)**

- **JD does not know if there is a relationship between cash flow to/from Highland. (46:4-12)**

- Benefit to Highland was tax deferral and/or recharacterization of income. (46:14-25)

- **JD can't quantify the tax benefit to Highland; he didn't ask anyone what it would be; he doesn't know expected rate of return; he didn't ask; DNR if anyone ever told him IRR. (47:1-17)**

- **Idea originated with tax group, but can't name a person. (49:15-22)**

- **The Note was an integral part of the Participation Agreement:**

  - **Exchange of promises: "one side wouldn't have signed if they didn't get the promises of the other side." (50:7-21)**

  - **Wouldn't have agreed without the promises. (50:23-51:12)**

  - JD DNK if HCMLP made any payments under the amortization schedule; he wasn't involved. (52:5-18)

## SHARED SERVICES AND SUB-ADVISORY AGREEMENTS

- JD signed but DNK why he did so. (55:13-56:8)

- **Goldman says brand toxic; JD has no personal knowledge; can't even remember who told him. (57:11-59:14; 61:18-62:21; 64:3-13)**

HCMLPHMIT00000493

## ARBITRATION AWARD

- **JD has never read it. (67:11-22)**

- **Not familiar with findings, only that it was against Acis. (70:3-20)**

- **Recalls that just after Award rendered, he signed the Transfer Agreement. (78:23-79:3)**


## TRANSFER AGREEMENT

- **JD signed. (79:4-18)**

- **JD DNR Summit or Cullinane. (79:19-81:2)**

- **JD DNR ever meeting or communicating with Cullinane. (81:3-19)**

- **JD does not know if agreement was negotiated; "not involved." (82:16-18)**

- **JD never spoke with anyone authorized to act on HCLOM Limited's behalf before it was executed. (82:24-83:3)**

- **JD doesn't recall the document; didn't recall if he read it. (83:12-19)**

- **From Acis and Highland's perspective, JD's understanding is that the purpose of the agreement was to replace Acis as portfolio manager. (83:23-84:11)**

- JD had no opinion when signing whether Highland would continue to receive serving fees in exchange for payments under the Note. (84:12-20)

- **JD does not recall if he expected Highland to receive any benefit under this Agreement. (84:22-25)**

- **JD was unaware that Highland was a party to the Agreement; could not identify a benefit Highland was to receive even after reviewing the document. (85:8-86:4)**

- **JD has "no idea" why he signed the document on behalf of Acis and Highland. (86:5-14)**

- **Based on his reading of Sections 3(b) and (c), the Agreement is "just trying to make sure the promises and the obligations of Acis transfer to the new entity." (87:4-24)**

HCMLPHMIT00000494

- Asked to identify anything of value that HCLOM Limited provided to Highland pursuant to this Agreement, JD referred to "shared servicer fees" but didn't know if HCLOM Limited had a shared services agreement. (88:15-89:2)

- JD has no idea if HCLOM Limited ever gave anything of value to Highland for any purpose. (89:20-91:5)

- HCLOM Limited wasn't a registered investment advisor and had no fees. (91:23-25)

- JD DNK if HCLOM Limited ever entered into SSA or sub-advisory agreement with anyone. (93:6-19)

- JD has no personal knowledge about the Notification (as defined in Transfer Agreement.). (94:24-95:6)

- JD DNK who gave the Notification on Highland's behalf or who received it on Acis' behalf. (95:7-12)

- JD DNK why Highland was unwilling to support Acis. (95:13-18)

- JD has no opinion as to whether agreement was "neutral" to Acis. (97:16-24)

- JD DNK who made the decision on Highland's behalf not to service Acis – but it wasn't him. (98:12-16)

- The Terry relationship and litigation was handled by Surgent. (99:4-18)

- JD DNR any advice he received before signing the Agreement. (100:4-10)

- JD DNK who was authorized to give the Notification. (100:11-14)

- JD DNK if HCLOM Limited was a qualified Successor Manager. (104:24-105:2)

- DNK if HCLOM Limited ever appointed Successor Manager. (106:14-16)

- DNK if HCLOM Limited or HCLOM LLC took steps to become Successor Manager. (107:1-10)

- JD wouldn't have signed the Agreement if he thought there were errors in it (and there were: among other things, HCLOM Limited was not "qualified"). (108:6-14)

- Yet, took no steps to make sure the Agreement reflected the facts; just "trusted internal counsel," without asking any questions at all. (108:16-25)

HCMLPHMIT00000495

- JD's understanding is that the Transfer Agreement "was intended to simply let HCLOM Limited step into the shoes of Acis." (109:22-110:1)

- JD DNK who is managing the litigation on behalf of HCLOM Limited and never asked. (110:2-19)

- JD DNK who owns HCLOM Limited or who its officers are or who is authorized to act on its behalf. (110:20-111:3)

- JD not involved in reset/refinance process. (112:13-22)

- One piece of the resets was that Acis would be replaced as portfolio manager and lose the right to receive the serving fees; the fees would go to the Successor Manager. (113:10-25)

- JD did not authorize or instruct anyone to pursue the resetting of the CLOs. (114:1-115:11).

- JD DNK who was authorized to have Acis reset the CLOs in 11/17. (116:12-15)

## MIZUHO AGREEMENT

- JD signed but DNR ever reading before. (119:18-120:4)

- JD DNK where HCLOM LLC got the authority to engage Mizuho or why HCLOM Limited was designated as the "Company" for this purpose. (122:5-11)

- JD admits that HCLOM Limited is not referred to in the Agreement and he has no knowledge that HCLOM Limited was going to play a role in the transactions subject to the document. (123:19-124:7)

- JD DNK why LLC is the signatory and not Limited and never asked. (124:9-14)

- JD DNR ever signing a document (other than the Transfer Agreement) that contemplated that Limited would serve as Acis' successor portfolio manager. (125:8-12)

## CUSTODIAL AGREEMENT

- JD signed but DNR doing so. (126:15-127:3)

HCMLPHMIT00000496

- Every deal needs a custodial bank; it's a different role than placement agent. (127:25-128:14)

## ACKNOWLEDGEMENT AND WAIVER

- **JD signed it but doesn't remember seeing it; reading it before he signed it; or discussing it with anyone. (129:10-130:7; 134:15-23)**

- **JD has no reason to believe paragraph 3 is incorrect in any way. (131:6-13)**

- **JD DNK if Acis ever promptly gave notice to the controlling class of each CLO. (133:9-14)**

- **JD DNK if Acis and HCLOM ever promptly pursued an appointment for each CLO. (133:16-25)**

- **JD did not have a specific awareness that he was waiving breaches of the Transfer Agreement on Highland's behalf. (135:4-11)**

- **JD DNK what Highland received in exchange for the waiver; he never asked; and no one ever explained what benefit Highland would receive by waiving the breaches of the Transfer Agreement. (135:18-136:6)**

HCMLPHMIT00000497

# EXHIBIT C

4872-7286-7837.1 36027.003

HCMLPHMIT00000498

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR
(A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST
HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION
WITH HCLOM CLAIMS 3.65 AND 3.66**

Before the Court is the *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys'
Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM
Claims 3.65 and 3.66* [Docket No. __] (the "Motion"),[2] filed by Highland Capital Management,
L.P. ("Highland"), in which Highland requests that this Court enter an order (a) finding that

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for
Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall take on the meaning ascribed to them in the Motion.

4872-7286-7837.1 36027.003

HCMLPHMIT00000499

HCLOM Ltd. and Dondero prosecuted the HCLOM Claim in bad faith, and (b) entering sanctions against HCLOM Ltd. and Dondero, jointly and severally, in the form of reimbursement to Highland of Highland's costs and expenses incurred in objecting to the HCLOM Claim.  Having considered (a) the Motion, (b) the evidence in support thereof, and (c) all arguments and evidence heard at the hearing on the Motion on December 18, 2024 (the "Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED**.

2. The clear and convincing evidence supports a finding that HCLOM Ltd.'s and Dondero's prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

3. HCLOM Ltd. and Dondero are hereby ordered, jointly and severally, to reimburse Highland for Highland's costs and expenses incurred in objecting to the HCLOM Claim in the aggregate amount of $[___].

4. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

###End of Order###

4872-7286-7837.1 36027.003