**EXHIBIT 71**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>Tuesday, June 8, 2021<br>9:30 a.m. Docket<br><br>- SHOW CAUSE HEARING (2255)<br>- MOTION TO MODIFY ORDER AUTHORIZING RETENTION OF JAMES SEERY (2248)<br>- MOTION FOR ORDER FURTHER EXTENDING THE PERIOD WITHIN WHICH DEBTOR MAY REMOVE ACTIONS (2304) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067-4003<br>(310) 277-6910 |
| For the Debtor: | John A. Morris<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For the Debtor: | Zachery Z. Annable<br>HAYWARD & ASSOCIATES, PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, TX 75231<br>(972) 755-7104 |

APPEARANCES, cont'd.:

For the Charitable DAF, CLO Holdco, Show Cause Respondents, Movants, and Sbaiti & Company:

Mazin A. Sbaiti
Jonathan E. Bridges
SBAITI & COMPANY, PLLC
Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
(214) 432-2899

For Mark Patrick:

Louis M. Phillips
KELLY, HART & HALLMAN, LLP
301 Main Street, Suite 1600
Baton Rouge, LA 70801
(225) 338-5308

For Mark Patrick:

Michael D. Anderson
KELLY, HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
(817) 332-2500

For James Dondero:

Clay M. Taylor
Will Howell
BONDS ELLIS EPPICH SCHAFER JONES, LLP
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102
(817) 405-6900

For the Official Committee of Unsecured Creditors:

Matthew A. Clemente
SIDLEY AUSTIN, LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7539

For the Official Committee of Unsecured Creditors:

Paige Holden Montgomery
SIDLEY AUSTIN, LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
(214) 981-3300

Recorded by:

Michael F. Edmond, Sr.
UNITED STATES BANKRUPTCY COURT
1100 Commerce Street, 12th Floor
Dallas, TX 75242
(214) 753-2062

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.

THE COURT: All right. We have settings in Highland this morning. We have three settings. We have the show cause hearing with regard to a lawsuit filed in the District Court. We have a couple of more, I would say, ministerial matters, although I think we do have objections. I know we have objections. We have a motion to extend the removal period in this case as well as a motion to modify the order authorizing Mr. Seery's retention.

So let's go ahead and start out by getting appearances from the lawyers who are participating today. I'll get those now.

MR. MORRIS: Good morning, Your Honor.

THE COURT: Good morning.

MR. MORRIS: John Morris from Pachulski, Stang, Ziehl & Jones for the Debtor. I'm joined with me this morning by my colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

THE COURT: Okay.

MR. MORRIS: We do have a proposal on how to proceed today, a substantial portion of which is in agreement with the Respondents.

THE COURT: Okay.

MR. MORRIS: So, at the appropriate time, I'd be happy to present that to the Court.

THE COURT: All right. Well, let's get all the

appearances and then I'll hear from you on that.

MR. SBAITI: Your Honor, my name is -- would you like me to approach, Your Honor?

THE COURT: Yes, please.

MR. SBAITI: It's my first time appearing in Bankruptcy Court, Your Honor. My name is Mazin Sbaiti. I'm here on behalf of the charitable DAF Fund, CLO Holdco, and the Respondents to the show cause hearing. We are also representing them as the Movants on the motion to modify the Court's order appointing Mr. Seery.

THE COURT: All right. Thank you.

MR. BRIDGES: Jonathan Bridges, Your Honor, with Mr. Sbaiti, also representing the Charitable DAF and CLO Holdco, as well as our firm that is named in the show cause order.

THE COURT: Okay.

MR. BRIDGES: Thank you, Your Honor.

THE COURT: Thank you.

MR. PHILLIPS: Good morning, Your Honor. Louis M. Phillips from Kelly Hart Hallman here on behalf of Mark Patrick in the show cause matter. I'm joined with my colleague Michael Anderson from the Kelly Hart firm here in Fort Worth. And that's the matter that we're involved in, the show cause auction.

THE COURT: All right. Thank you, Mr. Phillips.

MR. TAYLOR: Good morning, Your Honor. Clay Taylor

of Bonds Ellis Eppich Schafer Jones here on behalf of Jim Dondero. I have Mr. Will Howell here with me from my firm.

THE COURT: All right. Thank you.

MR. CLEMENTE: Good morning, Your Honor. Matthew Clemente from Sidley Austin on behalf of the Committee. I'm here with my partner, Paige Montgomery.

THE COURT: Okay. Thank you.

MR. CLEMENTE: Good morning.

THE COURT: All right. Just to remind people, we do have participants on the WebEx, but in setting the hearing I made clear that participants today needed to be here live in the courtroom. So the WebEx participants are going to be only observers.

We have a camera on the screen here that is poised to capture both the lawyer podium as well as the witness box, and then another camera on the bench.

So, please be mindful. We want the lawyers to speak from the podium so that they are captured and heard by the WebEx. And so hopefully we don't have any cords you will trip over. We've worked hard to make it easy to maneuver around the courtroom.

All right. So, Mr. Morris, you had a proposal on how we would approach this today?

MR. MORRIS: I do, Your Honor. And it's rather brief, but I think it makes a lot of sense.

There are three motions on the calendar for today, --

THE COURT: Uh-huh.

MR. MORRIS: -- only one of which required the personal appearance of certain parties.

THE COURT: Uh-huh.

MR. MORRIS: And for that reason, and because, frankly, it was the first of the three motions filed, we believe that that ought to go first.

THE COURT: Okay.

MR. MORRIS: And then it can be followed by the motion for reconsideration of the July order, assuming time permits, and then the motion to extend the removal deadline.

And with respect to the contempt motion, Your Honor, the parties have agreed that each side shall have a maximum of three hours to make opening statements, closing arguments, direct and cross-examination of witnesses.

You know, I did point out to them that from time to time Your Honor has used the Court's discretion to adjust the time --

THE COURT: Uh-huh.

MR. MORRIS: -- if the Court is making inquiries, and I guess we'll deal with that matter as it comes. But as a general matter, that is what we've agreed to. And I would propose that, unless anybody has any objections, that we just proceed on that basis.

THE COURT: Okay.

MR. MORRIS: And I could -- I could go right forward.

THE COURT: So, three hours in the aggregate?

MR. MORRIS: Uh-huh.

THE COURT: It doesn't matter how people spend it -- with argument, examination, cross -- three hours in the aggregate?

MR. MORRIS: Correct.

THE COURT: Okay. So, Nate, you'll be the timer on that.

MR. MORRIS: Yeah. We thought it was very important to get this done today, with people coming in from out of town.

THE COURT: Okay. Sounds fine.

MR. MORRIS: So does the Court want to inquire if anybody has any questions or comments?

THE COURT: I do. Well, I see Mr. Bridges getting up. You confirm that that's agreeable?

MR. BRIDGES: Thank you, Your Honor. Yes, that's agreeable. We have one slight difference in our proposal. We would suggest to Your Honor that the motion for modification, if Your Honor decides our way, would moot the entire motion for contempt. And we'd suggest, if that possibility is realistic, that we would go first with that motion, perhaps obviate having to have the evidence presented and the lengthy

hearing.

The motion for modification, Your Honor, asks the Court to reconsider -- to modify that order because of jurisdictional and other shortcomings in it that make the order unenforceable. And because that's the order that is the subject of the contempt motion, we'd ask Your Honor to consider putting that motion first.

THE COURT: Okay. Or second? Ahead of the contempt matter?

MR. BRIDGES: Ahead of the contempt matter, --

THE COURT: Uh-huh.

MR. BRIDGES: -- because it has a possibility --

THE COURT: We have the removal matter, which I think is the shortest. All right.

MR. BRIDGES: No objection to that, Your Honor. That's correct.

THE COURT: Okay. So, Mr. Morris, that's fine by you?

MR. MORRIS: Your Honor, that doesn't make a lot of sense to us. We don't believe there's any basis for the Court to reconsider, modify, or amend in any way the July order. But even if we were wrong about that, that would not retroactively validate conduct which was otherwise wrongful at the time it was committed.

The contempt motion needs to go first. The other motion

will have no impact on whether or not there is a finding of contempt of court.

THE COURT: All right. And update me on this. There was something filed yesterday, a notice of a proposed form of order that the Debtor had proposed, that I think was not agreed to, where there would be a change about any action that goes forward, the cause of action would be in the sole jurisdiction of the Court, and you all agreed to change that part of the order, correct?

MR. MORRIS: So, just as a division of labor for Your Honor, I'm doing the contempt motion.

THE COURT: Okay. That's Mr. Pomerantz's?

MR. MORRIS: Mr. Pomerantz is going to take care of that.

MR. POMERANTZ: Yes, Your Honor. Good morning. Good to see you again.

THE COURT: Good to see you.

MR. POMERANTZ: Yes, Your Honor, that's correct. If Your Honor recalls, there's really three aspects of the January 9th and the July 16th order. First, requiring people to come to Bankruptcy Court before commencing or pursuing an action. Second, for the Bankruptcy Court to have the sole and exclusive authority to determine whether the claim is a colorable claim of willful negligence or gross misconduct. And then third, if Your Honor passed the claim through the

gate, whether you would have jurisdiction.

In Your Honor's January 9th and July 16th orders, you said you would have exclusive jurisdiction. In the motion for reconsideration, and particularly the reply, Movants said, if you just change that and say that if passes through the gate that you'd have jurisdiction only to the extent you would otherwise have it, that would resolve the motion, in the same way that the plan of reorganization was amended.

We proposed that. They rejected it. We put it before Your Honor. So we believe that it moots out a good portion -- actually, we think it should moot out the entire motion. They obviously disagree. But we definitely agree it moots out the most significant portion of their motion, which is that Your Honor would take jurisdiction to adjudicate a matter on an exclusive basis when you might not otherwise have jurisdiction on an exclusive basis.

THE COURT: Okay. Well, --

MR. BRIDGES: Your Honor, may I respond to that?

THE COURT: You may. And --

MR. BRIDGES: Thank you, Your Honor.

THE COURT: -- why -- could you clarify why you think it would moot out the entire show cause matter? I wouldn't be retroactively changing my order. Is that what you're proposing?

MR. BRIDGES: Your Honor, with all respect, we

believe the order is defective and unenforceable and has to be modified in order to fix it. And because of the defects, we're -- we're actually arguing, Your Honor, that it is unenforceable in a contempt proceeding. That is exactly what our argument is.

THE COURT: Okay. I think I'm getting way farther down this road than maybe I want to right now. But I guess here's the elephant in the room, I feel like: *Republic Supply versus Shoaf*.

MR. BRIDGES: Uh-huh.

THE COURT: The U.S. Supreme Court *Espinosa* case, for that matter. If I accept your argument that maybe there was a flaw in those orders, that maybe they went too far, don't you have a problem with those two cases?

MR. BRIDGES: Your --

THE COURT: The orders weren't appealed.

MR. BRIDGES: I understand completely, Your Honor.

THE COURT: Uh-huh.

MR. BRIDGES: And I think the answer is no because of the *Applewood* case from the Fifth Circuit. The *Applewood* case cited in our reply brief explains that in order for an order, a final order of the Bankruptcy Court to have exculpatory effect, in order for it to release claims, for example, that the claims at issue must be enumerated in the order. It's not enough to have a blanket statement like the order, the July

order has, like the January order has, saying that Mr. Seery's claims -- claims cannot be brought against him for ordinary negligence at all. The -- Your Honor, we're delving into my argument.

THE COURT: Okay.

MR. BRIDGES: And I was hoping to do this on a preliminary basis.

THE COURT: Right.

MR. BRIDGES: I don't mean to bog you down with that. But Your Honor, no, mandatory authority from the Fifth Circuit after *Shoaf* limits *Shoaf's* application and says that it does not extinguish the claims that are not specifically enumerated in the order. And the reason for that is because it doesn't give the kind of notice to the parties that they would need to make an appearance and object to those orders at the time. It actually helps to stem the amount of litigation at the time rather than to encourage it.

THE COURT: All right. Well, you'll get your opportunity to make your full argument on this. But I'm not convinced, preliminarily, at least, to affect my decision on the sequence, okay? So even if it potentially wastes time under your view of the law, I am going to do the removal matter first -- the extension of time request, I should say -- and then the show cause and then the motion to modify. And I realize, those last two matters, everything is kind of

interrelated. All right?

MR. BRIDGES: Yes, Your Honor.

THE COURT: All right. So, with that decided, is there a desire on the part of the lawyers to make opening statements, or shall we just go to the motions? And, of course, people can use their three hours for oral argument, however much they want to use for oral argument.

MR. MORRIS: Your Honor, the -- to be clear, the six-hour time limit only applies to the contempt proceeding.

THE COURT: Oh, yes. Yes. Uh-huh.

MR. MORRIS: And I do want to make an opening statement.

THE COURT: Okay.

MR. MORRIS: So, as the Movant, I'd like to go first.

THE COURT: You want to make opening statements?

MR. BRIDGES: Yes. Yes, Your Honor.

THE COURT: Okay. Okay.

MR. BRIDGES: I believe we've got a PowerPoint prepared that I think can lay out our side of it.

THE COURT: Okay.

MR. BRIDGES: I don't think we're participating in the motion to extend the removal time.

THE COURT: Okay.

MR. BRIDGES: That's going first.

THE COURT: All right.

MR. BRIDGES: So we'll wait until that is --

THE COURT: Well, so we don't get confused on the timing, let's just do the motion to extend right now. And I think we only had one objection. As Mr. Sbaiti just pointed out, they're not objecting on that one. We have a Dondero objection. So let's, without starting the timer, hear that one. Okay?

MR. DEMO: Good morning, Your Honor. Greg Demo; Pachulski, Stang, Ziehl & Jones.

THE COURT: Good morning.

MR. DEMO: I'll be arguing the removal motion and then turn it over.

It's fairly basic and straightforward, Your Honor. We're asking for a further extension of the statutory deadline to remove cases until December 14th, 2021. The deadline is procedural only. As Your Honor is well aware, there's a lot of moving parts in this case. You know, we don't know to this date, really, the full universe of what could actually be out there. So we're just asking for a short extension of the removal period to cover through December.

I know that there was an objection from Mr. Dondero. I know that he argues that 9006 does not allow us to extend that deadline past the effective date of the plan, and he cites one case for that purpose, which is *Health Support*. I think it's out of Florida. That case dealt with the extension of the

two-year extension of the statute of limitations and was very clear that you can't use 9 --

THE COURT: You mean the 546 deadline?

MR. BRIDGES: Yes. Yes.

THE COURT: Okay.

MR. BRIDGES: That you can't use 9006 to extend non-bankruptcy deadlines. That's not what we're doing here, Your Honor. We're using 9006 to extend the bankruptcy deadline to remove the cases.

THE COURT: Uh-huh.

MR. DEMO: And we'd just ask Your Honor for the extension through December.

THE COURT: Okay. I'll hear Mr. Dondero's counsel.

MR. HOWELL: Good morning, Judge. Will Howell for Mr. Dondero.

So, the argument here is not that the Court can't do this. I was just pointing that there is an outside limit to what we're doing. And so if you look at the cases that the Debtor cites in support of this motion, the one that is most apt was when Judge Nelms did a fourth extension of time. But those were all 90-day extensions. Here, we're in a situation where the Debtor is asking for a fourth 180-day extension of time, and this is really where the, you know, objection came -- or, the response in opposition came from. They specifically asked that it be without prejudice to further extensions.

And so, at some point, you know, does 9006 have an outside limit? You know, do we need to see some sort of a light at the end of the tunnel here?

So we would ask that the motion, at a minimum, be denied in part with respect to this open-ended request for extension beyond two years for a 90-day period. The other cases that they cite, they have one extension here, one extension there, 120 days here, but not 180 days after 180 days after 180 days, and then asking specifically for without prejudice to further extensions beyond two years. So that's -- that's where this comes from.

THE COURT: All right. Do you think it matters that this is a very complex case?

MR. BRIDGES: I --

THE COURT: There's litigation here, there, and everywhere.

MR. HOWELL: I also think, you know, *Mirant* was complex. I think *Pilgrim's Pride* was complex. I think, you know, it is not out of bounds for the Court to grant a fourth extension.

THE COURT: Uh-huh.

MR. BRIDGES: But to -- you know, at some point -- you know, maybe the Court could grant a 90-day extension and make them come back a little more frequently to kind of corral this thing, rather than just saying "This grant of 180 days,

the fourth time, is going to be without prejudice to further extensions." It just gets kind of large.

THE COURT: Okay. Mr. Demo, your motion. You get the last word.

MR. DEMO: Your Honor, I mean, it is without prejudice for further extensions, but that doesn't mean that Your Honor is granting the further extensions now. It means we'll have to come back. We'll have to make our case for why an extension is necessary. And, you know, if Your Honor doesn't want to give us another extension past December 2021, Your Honor doesn't have to. This is not an order saying that it's a limitless grant.

You know, I'd also ask, you know, quite honestly, why Mr. Dondero has such an issue with this. He hasn't said that any of these cases involve him. He hasn't given any reasons why this affects him. He hasn't given any reason why this damages him at all. So I do, I guess, wonder as an initial matter kind of why we're here, you know, why we're responding to Mr. Dondero's request, when that request really has no impact on him.

And then, Your Honor, to the extent that you are inclined to limit this, I would say, you know, we would ask for a reasonable extension of time. We do think an extension of time, because of the complexity of this case, through December is warranted. But if Your Honor for some reason does agree

that a shorter extension is necessary under 9006 -- I don't think it is -- we'd just ask that Your Honor grant us leave to come back for further extensions of time.

THE COURT: Okay. All right. I will -- I'll grant a 90-day extension, without prejudice for further extensions.

MR. DEMO: Thank you, Your Honor.

THE COURT: Maybe in 90 days we'll be farther down the road and we won't need any more extensions, but you'll have the ability to argue for more if you think it's really necessary. All right. So that will bring us to around September 14th, I guess.

All right. Well, let's go ahead and hear opening statements with regard to the show cause matter. And again, if you want to roll in arguments about the -- well, no, you said the six hours only applies to show cause, so we'll not hear opening statements with regard to the Seery retention modification, just show cause.

MR. MORRIS: All right. Before I begin, Your Honor, I have a small deck to guide --

THE COURT: Okay.

MR. MORRIS: -- to guide my opening statement.

THE COURT: All right.

MR. MORRIS: Can I approach the bench?

THE COURT: You may. And is your legal assistant going to share her content --

MR. MORRIS: Yes.

THE COURT: -- so people on the WebEx will see? Okay.

MR. MORRIS: That's the intention, Your Honor.

THE COURT: Okay.

MR. MORRIS: All right. Are you ready for me to proceed?

THE COURT: I am. And obviously, everyone has a copy?

MR. MORRIS: Yes.

THE COURT: Your opponents have a copy of this?

MR. MORRIS: Yep.

THE COURT: Okay. Although we hope to see it on the screen.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. MORRIS: Good morning, Your Honor. John Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

We're here today on the Debtor's motion to hold certain entities and individuals in contempt of court for violating a very clear and specific court order. I hope to be relatively brief in my opening here, Your Honor, and I'd like to begin where I think we must, and that is, how do we -- how do we prove this and what do we have to prove?

The elements of a claim for contempt of court are really rather straightforward. The Movant must establish by clear

and convincing evidence three things.

THE COURT: Let me stop you and stop the clock. We're not seeing the shared content.

MR. MORRIS: Uh-huh.

THE COURT: Did you want her to go ahead and share her content?

MR. MORRIS: I did.

THE COURT: Okay.

MR. MORRIS: I was hoping that she'd do that.

THE COURT: All right. It says it's receiving content.

MR. MORRIS: There we go. It's on my screen, anyway.

THE COURT: Oh, here it is. I don't know why it's not on my Polycom. Can you all see it out there?

(Chorus of affirmative replies.)

THE COURT: Okay. Very good.

MR. MORRIS: Okay.

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor.

So, there's three elements to the cause of action for contempt, for civil contempt. We have to prove by clear and convincing evidence that a court order was in effect; that the order required certain conduct by the Respondents; and that the Respondent failed to comply with the Court's order.

We've cited in the footnote the applicable case law from

the Fifth Circuit, and I don't believe that there's any dispute that is indeed the legal standard.

The intent of the Respondents as to liability is completely irrelevant. It doesn't matter if they thought they were doing the right thing. It doesn't matter if they believed in their heart of hearts that the court order was invalid. These are the three elements, and we will be able to establish these elements not by clear and convincing evidence, but if we ever had to, beyond reasonable doubt.

If we can go to the next slide, please.

We begin with the Court's order, the Court's July 9 order. And that order states very clearly what conduct was required. And the conduct that was required was that no entity could commence or pursue -- those are really the magic words -- commence or pursue a claim against Mr. Seery without the Bankruptcy Court doing certain things. And we've referred to this as the gatekeeper. And the only question I believe the Court has to ask today is whether the Respondents commenced or pursued a claim against Mr. Seery without seeking Bankruptcy Court approval, as set forth in this order.

I'll dispute that there's anything ambiguous about this. I'll dispute that it could not be clearer what conduct was prohibited. It could not be clearer. The only question is whether the conduct constitutes the pursuit of a claim.

Let's see what they did. If we could go to the next

slide. There will be no dispute about what they did. And what they did is, a week after filing a lawsuit against the Debtor and two others arising out of the HarbourVest settlement, a settlement that this Court approved, after notice and a hearing and participation by the Respondents, after they had the opportunity to take discovery, after they had the opportunity to examine Mr. Seery about the value of HarbourVest's interest in HCLOF, after all of that, they brought a lawsuit after Mr. Patrick took control of the DAF and CLO Holdco. And that lawsuit related to nothing but the HarbourVest suit, and it named in Paragraph 2, right up above, Mr. Seery as a potential party. And a week later, Your Honor, they filed what we call the Seery Motion, and it was a motion for leave to amend their complaint to add Mr. Seery as a defendant.

We believe that that clearly violates the Court's July 7 order. And indeed, again, these are facts. They're not -- they're not in dispute. Just look at the first sentence of their motion. The purpose of the motion was to name James Seery as a defendant. That was the purpose of the motion. And the way that they made the motion, Your Honor -- and these are undisputed facts -- the way they made the motion, Your Honor, shows contemptuous intent. We don't have to prove intent, but I think it might be relevant when you get to remedies. Okay?

And so how do I -- why do I say that? Because they made this motion, Your Honor, and they didn't have to. Everybody knows that under Rule 15 they could have amended the complaint if they wanted to. If they wanted to, they didn't need the Court's permission. What they wanted to do was try to get the District Court to do what they knew they couldn't. And that's contemptuous.

And they did it, Your Honor, without notice to the Debtor. Even after the Debtor had accepted service of the complaint, even after we told them, if you go down this path, we're going to file a motion for contempt, they did it anyway. They didn't serve the Debtor. They didn't give the Debtor a courtesy copy. They didn't notify the Debtor. The only thing that happened was the next day, when the District Court dismissed it without prejudice, they sent us a copy of that notice. And within three days, we were here.

A court order was in effect. Mr. Patrick is going to admit to that. There's not going to be any dispute about that. The order required that the Respondents come to this Court before they pursue a claim against Mr. Seery, and they failed to comply with that order. The facts, again -- if we can go to the next slide. We can look at some of the detail, because the timeline is mindboggling.

Mr. Patrick became the Plaintiffs' authorized representative on March 24th. And folks, when I took their

depositions, weren't specific about dates, and that's why some of the entries here refer to sometime after, but there's no question that the order of events is as presented here and as the evidence will show today.

The evidence will show that sometime after Patrick became the Plaintiffs' authorized representative, Mr. Dondero informed Mr. Patrick that Highland had usurped an investment opportunity from the Plaintiffs. Mr. Patrick is going to testify to that. Mr. Patrick is also going to testify that, without prompting, without making a request, D.C. Sauter, the general counsel of NexPoint Advisors, recommended the Sbaiti firm to Mr. Patrick. Mr. Patrick considered nobody else.

Mr. Patrick retained the Sbaiti firm in April. In other words, within 12 days of the filing of the complaint. They're retained and they conduct an investigation. You're going to hear the assertion of the attorney-client and the common interest privilege every time I ask Mr. Dondero what he and Mr. Sbaiti talked about and whether they talked about naming Jim Seery as a defendant. But with Patrick's authorization, the Sbaiti firm filed the complaint on April 12th, just days after they were retained.

It's like a -- it's an enormous complaint. I don't know how they did that so quickly. But in any event, the important point is that they all worked together. None of this happened until Mr. Patrick became the authorized representative.

Mr. Patrick is going to tell you, Your Honor, he's going to tell you that he had no knowledge of any wrongdoing by Mr. Seery prior to the time he assumed the rein of the DAF and the CLO Holdco. He had no knowledge, Your Honor, of any claims that the DAF and CLO Holdco had against the Debtor until he became the Plaintiffs' authorized representative and Mr. Dondero spoke to him.

If we can flip to the next page. Mr. Dondero has effective control of the DAF. He has effective control of CLO Holdco. You're going to be bombarded with corporate documents today, because they're going to show you -- and they want you to respect the corporate form, they really want you to follow the rules and respect the corporate form, because only Mr. Scott was responsible for the DAF and CLO Holdco until he handed the reins on March 24th to Mr. Patrick. Mr. Dondero has nothing to do with this. He's going to tell you. He's going to tell you he had nothing to do with the selection of Mr. Patrick as Mr. Scott's replacement.

The facts are going to show otherwise, Your Honor. The DAF is a $200 million charitable organization that is funded almost exclusively with assets derived from Highland or Mr. Dondero or the Get Good Trust or the Dugaboy Trust. The evidence is going to show that at all times these entities had shared services agreements and investment advisory agreements with HCMLP. The evidence will show that HCMLP at all times

was controlled by Mr. Dondero.

And it made sense. The guy put in an awful lot of money for charitable usage. Is he really just going to say, I don't really care who runs it? The evidence is going to show that between October 2020 and January 2021, Grant Scott actually exercised independence. Grant Scott was Mr. Dondero's childhood friend. They went to UVA together. They were roommates. Mr. Scott was the best man at Mr. Dondero's wedding. But we were now in bankruptcy court. We're now in the fishbowl. And I will -- this may be a little argument, but there's no disputing the facts that Mr. Scott acted independently, and he paid the price for it. Mr. Scott did it three times.

He did it when he amended CLO Holdco's proof of claim to take it down to zero. He did it again after he withdrew the objection to the HarbourVest settlement motion. And he did it again when he settled the lawsuit that the Debtors had brought against CLO Holdco. And that -- and on each of those three occasions, the evidence will show that Mr. Scott did not communicate with Mr. Dondero in advance, that Mr. Dondero found out about these acts of independence after the fact, and that each time he found out about it he had a little conversation with Mr. Scott.

Mr. Dondero is going to tell you about it, and he's going to tell you that he told Mr. Scott each act was inappropriate.

You may have heard that word before. Each act was not in the best interests of the DAF.

The last of those conversations happened either on or just after January 26th. And by January 31st, Mr. Scott gave notice of his resignation. And you're going to see that notice of resignation. And he asks for releases.

Mr. Patrick becomes, almost two months later, the successor to Mr. Scott. Mr. Dondero is going to say he has no idea how that happened. He was just told after the fact that Mr. Patrick and Mr. Scott had an agreement. He's going to tell you they had an agreement and he just heard about it afterwards. He didn't really -- for two months, I guess, he sat there after Mr. Scott told him that he wanted out and did nothing to try to find out who's going to take control of my charitable foundation with $200 million. He wasn't interested.

But here's the thing, Your Honor. If we go to the next slide. Let's see what Mr. Scott said at his deposition last week. Question, "Do you know who selected Mark?" Answer, "I do not." Question, "Do you know how Mark was selected?" Mark is a reference to Mark Patrick. "I do not." "Did you ever ask Mark how he was selected?" "I did not." "Did you ever ask Mark who selected him?" "I did not." "Did you ever ask anybody at any time how Mr. Patrick was selected to succeed you?" "No, I did not." "Did you ever ask anybody at any time

as to who made the decision to select Mr. Patrick to succeed you?" "No, I did not."

So I don't know what happened between Mr. Patrick and Mr. Dondero when Mr. Patrick supposedly told Mr. Dondero that there was an agreement with Mr. Scott, but that is news to Mr. Scott. He had no idea.

Your Honor, we are going to prove by clear and convincing evidence that each of the Respondents violated a very clear and specific court order. And unless the Court has any other questions, I'll stop for now.

THE COURT: No questions.

MR. MORRIS: Thank you, Your Honor.

THE COURT: All right. Who is making the argument for the Respondents?

MR. SBAITI: Your Honor, I am. I'm just trying to put the PowerPoint up on the WebEx.

THE COURT: Okay.

MR. SBAITI: Sorry about that.

MR. MORRIS: Your Honor, I'll try not to make this a practice, but can I inquire as to how much time I used?

THE COURT: Oh. Nate?

THE CLERK: About thirteen minutes.

THE COURT: Thirteen minutes?

MR. MORRIS: Thank you very much.

THE COURT: Okay. All right.

MR. SBAITI: Your Honor, our PowerPoint is a little bit longer than that one. May I approach with a copy?

THE COURT: You may. Uh-huh.

(Pause.)

MR. SBAITI: Your Honor, it does feel good to be back in the courtroom.

THE COURT: Okay.

MR. SBAITI: It's been a long time.

THE COURT: Yes. For us, too.

MR. SBAITI: Jut wish it wasn't under a circumstance where someone is trying to sanction me.

But we're going to be dividing up this oral argument a little bit. Also, to just kind of break up a little bit of the monotony, because I think we have a lot to cover at the opening stage of this. And I'll try to be as expeditious as I can be.

OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

MR. SBAITI: Your Honor, the thing we -- the thing we open with is the due process issue that we raised in our brief. And where this really arises from is the Court's show cause order calls us violators before we've had a chance to respond to the allegations and before we've obviously been able to approach this hearing. And the word violators means something to us, Your Honor, because I've been a lawyer for a long time, my partner has been a lawyer for a long time, our

clients have never been sanctioned, we've never been sanctioned, and for us to be labeled violators first by counsel and then in a court order makes us wonder whether or not this process is already prejudged or predetermined.

THE COURT: I actually want to address that. Turn off the clock.

Just so you know, I looked this up a while back, because we gave a bankruptcy judges panel at some CLE. The average bankruptcy judge in our district, back when I looked, signs over 200 orders a week.

MR. SBAITI: Sure.

THE COURT: Many of those -- in fact, most of them -- are submitted by lawyers. So, you know, a big chunk of my week is signing orders. And I obviously give more scrutiny to those that are substantive in nature. Okay? If someone submits to me a 50-page debtor-in-possession financing order, I will look at that much more carefully than what I consider a mere procedural order setting a hearing.

So I regret that that word was used, but I can assure you I fairly quickly set that -- signed that, I should say -- regarding it as a merely procedural order setting a hearing. Okay? So it's as simple as that. There was no hmm, I like that word, violator. I had a stack, if you will, an electronic stack of probably 200 orders in front of me the day I signed that. Okay?

So, if that makes anyone feel any better, I don't know, but that's the reality.

Okay. You can start the clock again.

MR. SBAITI: And I appreciate Your Honor saying that. It does make us feel better, both about where the -- the genesis of the order and the impact and its reflection on what Your Honor thinks in terms of going into this.

The other thing that obviously raised concerns, and I assume this comes from the same place, was four days ahead of that order counsel told us the Court was going to order everyone to be in person, and they had advance notice of that, and we weren't sure how they had advance notice of that. I guess they assumed --

THE COURT: I can assure you right here on the record I never had ex parte communications with any lawyer in this case, on this matter or any other matter. Okay? Again, those are pretty strong words to venture out there with, which your pleading did venture out there with those words.

My courtroom deputy, Traci, I think answers her phone 24 hours a day. So I'm quite sure she had communications with the lawyers about this, just like she probably had communications with you and your firm and every other firm in this case. Okay?

MR. SBAITI: Like I said, Your Honor, we appreciated what Your Honor -- appreciate what Your Honor said, but that

issue obviously stuck out -- stuck out to us, in combination. So I'll move on from that issue.

This has to do with the lawsuit that was filed, and the lawsuit, the genesis of the lawsuit, I think it's important to say, because the argument has been raised in the briefing and we wanted to address it upfront, why the lawsuit comes about. And it comes about because of the Advisers Act and the responsibilities that the Debtor has to the assets of the funds that it manages. And the Advisers Act imposes a duty not only on Highland but obviously on its control people and its supervised people. And the lawsuit has to do with HCLOF, which is what HarbourVest owned a piece of. And Highland, as the advisor to HCLOF and the advisor to the DAF, owed fiduciary duties to CLO Holdco, which is the DAF's holding entity of its assets in HCLOF, but Highland Capital was also an advisor, a registered investment advisor to the DAF directly at the time. And so those federally-imposed fiduciary duties lie at the crux of that lawsuit.

Moving on, Mr. Seery testified at the hearing that was in this Court to be -- to get him appointed, and this was Exhibit 2 that was presented by the Debtor, and on Page 16 at the bottom he says -- of the transcript, he says, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor. As a registered investment advisor, which is really any advisor of third-party

money over $25 million, it has to register with the SEC, and it manages funds in many different ways.

In the middle of the next page he says, In addition, the Debtor manages about $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other securities, which are hedge funds -- other entities, rather, which are hedge funds or PE style. Private equity style.

On Page 23 towards the bottom he says, As I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors. So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds. CLO Holdco would be an investor in one of those funds, HCLOF.

He goes on to say, Some of them are related parties, and those are a little bit easier. Some of them are owned by Highland. HCLOF was not owned by Highland. But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to maximize value.

Now, the lawsuit alleges that Seery testified that the HarbourVest portion of Highland CLO Funding was worth $22-1/2 million. Now, Mr. Morris wants the Court to hinge on the fact that, well, no one asked him whether he was lying. But that's not really the standard, and it certainly isn't the standard

when someone's an investment advisor and owes fiduciary duties, which include fiduciary duties to be transparent with your investors.

It also includes fiduciary duties not to self-deal.

The lawsuit also alleges that, in reality, those assets were worth double that -- double that amount at the time. We found out just, you know, in late March/early April that a third -- from a third party who had access to the underlying valuations at the time that those values were actually double and that there was a misrepresentation, giving rise to the lawsuit. That change in circumstance is the key issue behind the lawsuit.

We allege that Mr. Seery and the Debtor, as RIAs, had a duty to not self-deal and be fully transparent with that information, and we think both of those things were violated under the Advisers Act.

We don't allege that the HarbourVest settlement should be undone or unwound. We can't unscramble that egg. We do seek damages, as I believe is our right, arising out of the wrongdoing and the process of pushing forth the settlement.

I think one of the allegations in the actual motion for the show cause order was that this was going to undo all of the hard work that Court had done and basically unwind and try to re-piece Humpty Dumpty back together again. But that's simply not the case. Nowhere in our allegations or in the

relief that we request are we trying to undo the HarbourVest settlement as such.

Now, whether the lawsuit should be dismissed under the affirmative defenses that they bring up -- res judicata, waiver, release -- all of those are questionable under the Advisers Act, given the change of circumstance, and therefore are also questions on the merits. They don't go to the colorability of the underlying claims in and of themselves, which I think is important.

So we asked for leave to amend from the Court. And what they want us to do, Your Honor, is they want to sanction us for asking. They're saying asking for leave to amend is the same thing as pursuing a claim. And I'll get to the specifics on that in a little bit. But that's the frame. Can we be sanctioned for asking a court, any court, even if it's the wrong court, for permission to bring the lawsuit? They don't cite a single case that says that that, in and of itself, is sanctionable conduct, us asking.

So I'd like to introduce some of the Respondents.

Your Honor, may I have one of these waters?

THE COURT: Certainly.

MR. SBAITI: Thank you.

THE COURT: That's why they're there, by the way.

MR. SBAITI: I didn't know if they belonged to somebody else.

THE COURT: We've scattered water bottles around for people.

MR. SBAITI: I appreciate it. Thank you, Your Honor.

THE COURT: So if you see these little ones, that's for anyone.

MR. SBAITI: So, this is an org chart, and you'll see it as -- the exhibits that the Debtor's going to bring up. And when we talk about the DAF, Your Honor -- I don't know if that's visible to you. We're on Slide 19, if you're looking at it on paper. There's a little number at the lower right-hand corner. The charitable DAF GP, LLP and then the Charitable DAF Holdco, Ltd. together are the principles of the Charitable DAF Fund, LP. And so when we refer to the DAF or the Charitable DAF, that's really the entity structure that we're referring to. And then the GP and Holdco Ltd. have a managing member. It used to be Grant Scott at the time this was done. Today, it's Mr. Mark Patrick, who's in the room, sitting next to Mr. Bridges.

The DAF is a charitable fund. It's funded over $32 million, as the evidence will show, including Dallas-Fort Worth organizations, The Family Place, Dallas Children's Advocacy, Center for Brain Health, the Crystal Ray Initiative, Friends of the Dallas Police, Snowball Express, various community and education initiatives, Dallas Arts, museums, the Perot Museum, Dallas Zoo. That evidence is undisputed, Your

Honor. The DAF is a real fund. It is a real charitable fund. It does real good in the community.

Now, Respondents -- Holdco, which you will see at the bottom of that chart, is essentially the investment arm. There are assets that the DAF owns in various pots, and Holdco is the actual business engine that generates the money from those assets that then -- that then gets passed up to the charitable -- the four charitable foundations at the top.

I'll go back to Slide 21. And if you look at the top, Your Honor, the Dallas Foundation, Greater Kansas City Community, Santa Barbara Foundation, The Community Foundation of North Texas: Those are the charities that then themselves bestow the funds onto the actual recipients. So the money flows up as dividends or distributions, and then gets contributed.

CLO Holdco invests those assets, and it's an important part of the business model, so that you're not sending out principal. It's the money that CLO makes, the profits, if you will, that it is able to generate that gets donated and makes its way into the community.

So there's an important feature to the structure in that it has to be able to generate money. It's not just money that sits there and waits to be distributed. There's active investing going on.

Mr. Mark Patrick owns the control shares of the entities

comprising the DAF and CLO Holdco, as I showed you, and the beneficiary charitable foundations hold what we call beneficial interests, where they just get money. They don't have a vote.

Mr. Patrick cares about the public service the DAF engages in. He's been an advisor to the DAF, CLO Holdco, and its predecessor, Mr. Scott, since its inception. He receives no compensation for the job he's doing today. And you'll hear how he became -- how he inured to the control position of the DAF and CLO Holdco from him, but it doesn't involve Mr. Dondero, and the absence of someone saying that it did, I think, is going to be striking by the end of the presentation of evidence.

Their only argument against you, Your Honor, is going to be you just can't believe them. But not believing witnesses is not a substitute for the lack of affirmative evidence.

Mr. Patrick has said all along he authorized the filing of the motion for leave to add Mr. Seery to the lawsuit in District Court. He doesn't believe the motion to amend violated this Court's orders, for the reasons stated in our responsive filings to the motions for contempt and show cause order. That's why he authorized it.

My firm, Sbaiti & Company, we're a small Dallas litigation boutique retained by the DAF and CLO Holdco to file the lawsuit. We did an investigation. I'm tickled to death that

Mr. Morris loved our complaint so much and gave us the compliment that we got it done in a short amount of time, but we did get it done in a short amount of time, because, in the end, it's a rather simple issue, as I was able to lay it out in about three or four bullet points in a previous slide.

The written aspect of that doesn't take that long, as Your Honor knows, but the idea that there's a suspicion that we didn't write it or someone else wrote it and ghost-wrote it and gave it to us, which I think is the insinuation he was making, is completely unfounded. There's no evidence of that.

We carefully read Your Honor's orders. We developed a good-faith basis, as required by Rule 11, that the lawsuit and the motion to add Mr. Seery were not filed in bad faith or for an improper purpose. We don't think they're frivolous. We don't think they're in violation of Your Honor's orders, given the current state of the law.

Mr. Dondero is one of the settlors of the CRT, of the Charitable Remainder Trust that ultimately provided assets to CLO Holdco and the DAF. He does care about the DAF's mission. I think Mr. Morris hit the nail on the head. Of course Mr. Dondero cares about what happens to it. He's one of the settlors, and it was his funds that initially were put into it, so he's allowed to care. And I don't think him caring is insidious, and him caring doesn't mean he has control and doesn't mean he's the driving force behind some insidious

conspiracy that they're trying to insinuate exists.

He is an advisor to the DAF and CLO Holdco. It is a lot of money and it needs advice, and he's an advisor to Mr. Patrick. We don't run away from any of those facts, Your Honor.

We also don't run away from the fact that he was the source of some of the information that came in to that complaint and that he relayed some of that information. The content, we do claim work product privilege and attorney-client privilege, because he's an agent of our client, and as lawyers doing an investigation, the content of our communications is protected under the attorney-client and work product privileges, as well as the joint interest privilege. But the fact that we admit that those communications happened, we're not running away from that fact.

So, what does he have to do with this? It's interesting that that opening argument you just heard spent about three minutes on contempt and the other fourteen or fifteen minutes or so on Mr. Dondero. And only on Mr. Dondero. There's a negative halo effect, I believe, that they're trying to get this Court to abide by. They want to inflame Your Honor and hopefully capture -- cultivate and then capitalize on whatever antipathy you might have for Mr. Dondero, and then sweep us all in under that umbrella and sanction everybody just because he had some involvement.

But whatever involvement he has, which we admit he had some involvement in helping us marshal the facts, that's not a basis for us to be sanctioned if there isn't an actual sanctionable conduct that -- as we say there isn't.

We think there's an ulterior motive. That's why Mr. Morris just announced to Your Honor, Mr. Dondero controls it all. The ulterior motive, I believe, is, down the line, when they want to argue some kind of alter ego theory, they want to lay that foundation here. I don't think this is the appropriate time for that foundation, and I don't think any of the information and the evidence they're trying to marshal in front of you is really going to be relevant to the very specific question that's before Your Honor: Does our motion asking the District Court to add Mr. Seery violate your order, or violate it in a way that can be -- that we can be sanctioned for? We don't believe it violates it.

So, the three core standards that have to be met. First of all, civil contempt requires a valid, enforceable order. It's not debatable and it's not -- I don't think that's a shocking statement. Then they have to have clear and convincing evidence of a violation of a specific unambiguous term therein. Mr. Morris wants his version of the word pursue to be unambiguous, and I think the word pursue is unambiguous. But the way he wants you to construe it makes it completely ambiguous, and we'll -- I'll get to that in a moment.

Now, for sanctioning counsel, the Fifth Circuit has held you have to find bad faith. We're adjudged under a slightly separate standard under the Fifth Circuit law. So the contempt motion, though, to the extent it seeks to impose double and treble attorney's fees, those are in punitive fines. They are not compensatory. So criminal contempt standards are raised, and so they have to show a violation in bad faith. In other words, our arguments that we're making have to be bad faith, not simply that we're wrong, and they have to show beyond a reasonable doubt, usually in front of a jury. The U.S. Supreme Court explained the difference and the different procedural protections that have to be involved if they're really going to seek double and treble compensatory damages.

Now, he's right. Saying we intended -- saying that we didn't mean to violate it isn't necessarily a defense. But what you're actually going to hear from him is the opposite argument, that even though we didn't violate it, we wanted to. That's what he says. That's why he quoted you the opening section of our motion asking for permission to sue Mr. Seery, because that's a statement of purpose. And he says you should sanction them right there. That's literally what he said. It's right there, their purpose. If intent is irrelevant to them, it's irrelevant as to us. The fact that we wanted to sue Seery is fully admitted. We don't deny the fact that we

believe Mr. Seery should be a defendant in this lawsuit. But the fact that we didn't sue him is why we didn't violate the order. And they can't say that the fact that we eventually wanted to sue him means we did violate the order. That door swings both ways, Your Honor.

We don't think any element is met. The order, while writ large, prohibits suing Mr. Seery without permission, and we did not sue James Seery, pure and simple. The July 12 -- 14th, 2020 order purports to reserve exclusively to this Court that which, according to the statutes and the case law, we believe the Court can't exclusively reserve to itself. And Your Honor, the order prohibits commencing and pursuing a claim against Jim Seery without coming here first to decide the colorability of such a claim.

They, I believe, admit that we didn't commence a claim against Jim Seery. I think they've admitted that now. So now we're talking about what does pursue mean? We didn't pursue a claim against Jim Seery. Is asking for leave to bring suit the same thing as pursuing a claim? That's the question that's really before Your Honor. Lawyers never talk of pursuing a claim that hasn't been filed. We don't say, I'm pursuing a claim and I'm going to file it next week or next year. Usually, that type of language is in an order, because when the order happens, there may already be claims against Mr. Seery. And so the pursuit of claim is supposed to attack

those cases, to come here and show colorability, presumably, before they continue on with those lawsuits. It doesn't mean asking for permission.

If it did mean asking for permission, then complying with Your Honor's order would be a violation. If the motion for leave is a violation because it is pursuing a claim, if I had filed that motion in this Court, it would still be pursuing a claim without Your Honor's permission. I'd have to get permission just to ask for permission. It puts us in this endless loop of, well, if asking for permission is pursuing a claim, and pursuing a claim is without permission violates the Court's order, we'd always be in violation of the Court's order just for asking, just for following Your Honor's edict.

THE COURT: I'm just, I'm going to interject. You were supposed to, under the order, file a motion in this Court.

MR. SBAITI: I understand that, Your Honor, and I think that we can get to the specifics on why we disagree with how the motion went, Your Honor. We hadn't sued Mr. Seery. So as long as we dealt with the order, which is what our position is, then we don't believe we violated the order.

THE COURT: You think the order was ambiguous, requiring a motion to be filed in the Bankruptcy Court?

MR. SBAITI: Your Honor, what we believe is that the order was ambiguous in terms of whether us asking for

permission in the District Court was in and of itself a violation of the order. We don't think it was. Actually, we don't think the order's ambiguous to that extent. The second we file a suit against Mr. Seery and we don't have some resolution of the issue, then I think the question of sanctionability comes in. But we never filed suit, Your Honor.

The Court doesn't say I can't seek permission in the District Court or that we can't go to the District Court with -- which has general jurisdiction over this case, and has jurisdiction, we believe, over the actual case and controversy that's being raised. But the idea of pursuit being a violation of the order, of the letter of that order, is nonsensical under that, it leads to an absurd result, and it's plainly vague and ambiguous, Your Honor.

Asking Judge Boyle or asking a District Court for permission is not a violation of this Court's order, not the way it was written and not -- and I don't even believe it was a violation necessarily of the Court's -- of the language that the Court has. We -- it doesn't unambiguously prevent us from asking the District Court for leave.

The Court's order yesterday, Your Honor, applied this very rule. The TRO -- you said the TRO did not specifically state, Turn your cell phone over. And you denied motion for sanctions on that. That's basically the argument we're making

here, Your Honor. We think that was the correct ruling, and we think the same type of ruling applies here.

Your order yesterday also determined that the Court ultimately believes that hiring lawyers to file motions should not be viewed as having crossed the line into contemptuous behavior. That's essentially the argument they want you to buy, that there's somehow a vindictiveness behind this and an insidious plan to violate court orders, Your Honor. We don't have any evidence of that.

THE COURT: Okay. Take the words vindictiveness and insidious out of the equation. That's making things personal, and I don't like that. The key is the literal wording of the order, is it not?

MR. SBAITI: Your Honor, the key, I believe, is the --

THE COURT: No entity may commence or pursue a cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court first determining, after notice, that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery and specifically authorizing such entity to bring such a claim. So I'm trying to understand why you argue that filing a motion asking the District Court for permission is not inconsistent

with this order.

MR. SBAITI: Because it's not commencing a claim, Your Honor. It's not commencing a claim against him.

THE COURT: Okay. So is your argument that if Judge Boyle authorizes amendment of the pleading to add Mr. Seery and then you do it, at that point they may have grounds for a motion for contempt, but not yet, because she has not actually granted your motion?

MR. SBAITI: Correct, Your Honor. I mean, in a nutshell. In fact, that's one of -- I think that's probably our next argument. We think, in a sense, this argument is incredibly premature. There is three ways that this -- well, I'd like to address this, so I've got -- I've got a diagram that I think will actually help elucidate what our thought process was.

There's three things she could have done. She could have referred -- referred it to Your Honor, which is what we expected was likely to happen.

THE COURT: But you didn't file a motion for referral of the motion before her.

MR. SBAITI: Well, no, I don't mean in respect of enforcing the reference. The referral we thought was most likely going to happen because it's an associated case, and we actually put those orders in front of her, so we expected that those orders would end up -- that the question would

ultimately end up in front of Your Honor on that basis.

She could have denied our motion outright, in which case we haven't filed a claim, we haven't violated it, or she could have granted our motion and done one of two things. She could have granted it to the extent that she thought leave would be proper but then referred it down, or she could have decided -- taken the decision as the court with general jurisdiction and simply decided it all on her own. She had all of those options, Your Honor, and none of them results in a claim being commenced or pursued without the leave of this Court, if leave is absolutely necessary, Your Honor. And that's the point that we were trying to make.

Your Honor, the -- there's -- you know, there's no evidence that, absent an order from a court with jurisdiction, that we were going to file a claim against Mr. Seery, that we were going to commence or pursue a claim against Mr. Seery. We were cognizant of Your Honor's order. We considered that. And the reason we filed them the way we did is because, according to the statutes and the case law, this is the type of case that would be subject to a mandatory withdrawal of the reference.

And so there's this paradox that arises, Your Honor. And the paradox that arises is that we show up and immediately go, well, we need to be back in the District Court. So we filed our motion there, and I don't think that was contemptuous, it

wasn't intended to be contemptuous of the Court, but we showed the orders to the Court, made the same arguments that we have been making here, that we believe that there's problems with the order, we believe the order oversteps its jurisdiction and maybe is unenforceable, and it's up to that District Court, as it has been in almost all of these other gatekeeper order cases that get filed. None of them result in sanctions, Your Honor. What they result in is a District Court deciding, well, either they refer it or they decide I don't need to refer it. But I don't think that that is the same thing as commencing or pursuing a claim in the end, Your Honor, because all we did was ask for permission, and permission could have been denied or granted or granted in part.

Your Honor, they haven't cited an injury. You've heard the testimony, Your Honor, that they -- the first time they knew we had filed a motion -- which I don't understand why that's the first time they knew we had filed a motion; we told them we were going to file the motion -- was when I forwarded an email saying that it's been denied without prejudice, Your Honor. Well, that means they didn't have to do any work to respond to the motion. They didn't have to do any work to do any of the other things.

And one hundred percent of the damages that they're going to say they incurred is the litigation of this contempt hearing or this sanction motion, as opposed to some other

simpler remedy, like going in to Judge Boyle and saying, Your Honor, all that needs to go, which is what they eventually did. But they would have had to incur those costs anyway because they're now moving to enforce the reference. They filed a 12(b)(6). That briefing would have existed regardless of whether or not we had filed our motion, regardless of whether the sanctions hearing had commenced.

Your Honor, I'm going to let my partner, Mr. Bridges, address this part of it, if I could. I think that gets into more of the questions that you asked, and I think he can answer them a lot better than I can.

THE COURT: Okay.

MR. SBAITI: Thank you.

THE COURT: That's fine.

MR. BRIDGES: Thank you, Your Honor. And I do want to address pointedly the questions that you're asking. First, though, I was hoping to back up to some preliminary remarks that you made and say that I find the 200 orders a week just mindboggling. It amazes me, and puts the entire hearing in a different perspective for me. I'm grateful that you shared that with us.

Your expression of regret about naming us violators was very meaningful to me. It causes me -- well, the strong words in our brief were mine. I wrote them. And your expression of regret causes me to regret some of those words. I'm hopeful

that you can understand, at least in part, our reaction out of concern.

And Your Honor, it's awkward for me to talk about problems with your order, and that's the task that's come to me, to list and talk through four of them and why we think they put us in a really awkward position in deciding what to do in this case, in the filing of it, in where we filed it, and in how we sought leave to go forward against Mr. Seery. That was awkward and difficult for us, and I'm hopeful that I can explain that and that you'll understand, if I'm blunt about problems with the order, that I mean it very respectfully. Two hundred orders a week is still very difficult for me to get my mind around.

The four issues in the order start with the gatekeeping. Then, secondly, in the preliminary remarks, I made mention of the *Applewood* case and the notice that the order releases some claims. Its effect of --

THE COURT: And by the way, I mean, you might elaborate on the facts and holding of *Applewood*, because I came into this thinking *Republic Supply v. Shoaf*, and for that matter, as I said, *Espinosa*, were much more germane. And so, you know, you'll have to elaborate on *Applewood*. I remember that case, but it's just not one people cite as frequently as those two.

MR. BRIDGES: Yes, Your Honor. And our reply brief

devotes a page to the case, and I'm hopeful that I can remember it well enough to give you what you're looking for about it, but I would point you to our reply brief on that topic as well.

The *Shoaf* case that *Applewood* quotes from and distinguishes and expressly limits, the *Shoaf* case actually has been cautioned and limited and distinguished numerous times, if you Shepardize it, and the *Applewood* case is the leading case, and it also is from the Fifth Circuit, that describes and cabins the effects of *Shoaf*. And in *Applewood*, what happened is a bankruptcy confirmation order became final with releases in it, and the court held that exculpatory orders in a final order from the Bankruptcy Court do not have res judicata effect and do not release claims unless those claims are enumerated in the exculpatory order. And --

THE COURT: Okay. So it was about specificity more than anything else, right?

MR. BRIDGES: Yes, Your Honor. It was a --

THE COURT: Okay.

MR. BRIDGES: -- a blanket release, a blanket --

THE COURT: Okay.

MR. BRIDGES: -- exculpatory order that didn't specify what claims were released by what parties, and therefore the parties didn't have the requisite notice.

In my mind, Your Honor, it's comparable to the Texas

Supreme Court's holdings on what's required in a settlement release in terms of a disclaimer of reliance, --

THE COURT: Okay. But, again, --

MR. BRIDGES: -- that if you aren't --

THE COURT: -- it's about specificity --

MR. BRIDGES: Yes, Your Honor.

THE COURT: -- more than anything else? And then we've got the U.S. Supreme Court *Espinosa* case subsequent.

MR. BRIDGES: Okay. Your Honor, I'm not sure what *Espinosa* you're referring to. Can you tell me why that applies?

THE COURT: Well, it was a confirmation order. It was in a Chapter 13 context. And there were provisions that operated to discharge student loan debt, --

MR. BRIDGES: Uh-huh.

THE COURT: -- which, of course, cannot be discharged without a 523 action, a separate adversary proceeding. Nevertheless, the confirmation order operated to do what 523 suggests you cannot do, discharge student loan debt through a plan confirmation order.

The U.S. Supreme Court says, well, that's unfortunate that the confirmation order did something which it doesn't look like you can do, but no one ever objected or appealed. That's my recollection of *Espinosa*. So it seems to be the same holding as *Republic Supply v. Shoaf*. And what I -- why I

asked you to elaborate on *Applewood* is because it does seem to deal with the specificity of the order versus the enforceability, no?

MR. BRIDGES: Your Honor, if it's not obvious already, I'm not prepared to argue *Espinosa*. And your explanation of it is very helpful to me. I think you're right that the specificity issue from *Applewood* is what we're relying on. And it sounds like --

THE COURT: Okay. So, that being the case, how was this order not specific? Okay?

MR. BRIDGES: That's easy, Your Honor, because it doesn't say which parties are releasing which claims. And what we're talking specifically about there -- as we go through the order, I can show you the language -- but what we're talking about specifically are the ordinary negligence and breach of fiduciary duty claims that your order doesn't provide for at all. Rather, it says colorability of gross negligence or willful wrongdoing, if I remember the words precisely, that's what must be shown to pursue a case -- a cause of action against Mr. Seery, thereby -- thereby indicating that claims for mere negligence, not gross negligence, or breach of fiduciary duty, which is an even lesser standard, that those claims are prohibited entirely.

And by having that kind of general all-encompassing release or exculpation for potential liability involving

negligence, and most importantly, fiduciary duty breach under the Advisers Act, that that kind of exculpation under *Applewood* is not enforceable and has no res judicata effect because it wasn't -- those claims weren't enumerated in the order.

That for it to have the intended exculpatory effect, if that was what was intended, that the fiduciary duty claims and the parties who those claims may belong to would have to have been enumerated.

And indeed, that kind of specificity, what was required in *Applewood*, isn't even possible for a claim that hasn't yet occurred for future conduct. It's not possible to enumerate the details, any details, of a future claim, because the underlying act -- if the underlying basis, facts for that claim, haven't yet happened. It's something to happen in the future.

And here, that's what we're dealing with. We're dealing with conduct that took place well after the January and July 2020 orders that had that exculpatory effect. Is -- is that clear?

THE COURT: Understood.

MR. BRIDGES: Thank you, Your Honor. So, the four areas of the order, the four functions that the order does that are problematic to us that led us to do what we have done are the gatekeeping function; the release; the fact that by

stating sole jurisdiction, that it had a jurisdiction-stripping effect; and then, finally, jurisdiction asserting, where, respectfully, Your Honor, we think to some extent the order goes beyond what this Court's jurisdiction is. And so that not only claiming exclusive jurisdiction, but claiming jurisdiction over all actions against Mr. Seery, as described in the order, is going too far.

And those are the four issues I want to talk about one at a time, and here -- I went two screens instead of one. There we go. And here's the order. I have numbered the highlights here out of sequence because this is the sequence that I wish to talk about them and that I think their significance to our decision applies.

Before we get into the words of this July 16, 2020 order, I want to mention the January order as well. Although the motion for contempt recites both orders, we don't actually think the January order applies to us, because our lawsuit against Mr. Seery is not about his role as a director at Strand in any way. We didn't make an issue of that, other than in a footnote in our brief, because we don't think that distinction matters much since the orders essentially say the same things.

I'm not sure that it matters whether we have potentially violated one order or two. If Your Honor finds we've violated one, I think we're on the hook regardless. If Your Honor

finds that we didn't violate the July order, I don't think you will find that we violated the January order, either. So my focus is on the July order.

The gatekeeping function comes from the preliminary language about commencing or pursuing a claim or cause of action against Mr. Seery. And it says what you want us to do first before bringing such a claim.

The second issue of the release comes a little bit later. It's the colorable claim of willful misconduct or gross negligence language. In other words, because only claims of willful misconduct or gross negligence can pass the bar, can pass muster under this order, that lesser claims -- ordinary negligence and breach of fiduciary duty -- that those claims are released by this order. That's the second argument.

Third is your reference to sole jurisdiction and the effect that that has of attempting to say that other courts, courts of original jurisdiction, do not have jurisdiction because it solely resides here. That's the third thing I want to address.

And then the fourth is the notion that we have to come to this Court first for any action that fits the description of an action against Mr. Seery, when some actions are, through acts of Congress, removed from what this Court has the power to address. Under 157(d) of Title 28, Your Honor, there are some kinds of actions which withdrawal of the reference is

mandatory, and therefore this court lacks jurisdiction to address those.

And so those are the four issues I want to tackle, starting with the first, the gatekeeping. Your Honor, Section 28 -- Section 959 of Title 28 appears to be precisely on point. It calls -- it is called by some courts an exception to the Barton Doctrine, which we believe is the only basis, the Barton Doctrine, for this Court to claim that it has jurisdiction or sole jurisdiction and can require us to come here first. We think the Barton Doctrine is the only basis for that. We haven't seen anything in the briefing from opposing counsel indicating there was another basis for it. We think we're talking about the Barton Doctrine here as the basis for that.

959 is exception to the Barton Doctrine, and we think it explicitly authorizes what we have done.

Secondly, Your Honor, the order, the gatekeeping functions of the order are too broad because of its incorporation of the jurisdictional problems and the release problem that we'll talk about later. But for problem number one, the key issue that we're talking about is 959 as an exception to the Barton Doctrine. And I went the wrong way.

THE COURT: So, we could go down a lot of rabbit trails today, and I'm going to try not to do that, but are you saying the very common practice of having gatekeeping

provisions in Chapter 11 cases is just defective law under 28 U.S.C. § 959(a)?

MR. BRIDGES: Can I say yes and no?

THE COURT: Okay.

MR. BRIDGES: Yes, to some extent, for some claims. No as to other claims to another extent. We are not saying gatekeeping orders are altogether wrong, --

THE COURT: Okay.

MR. BRIDGES: -- no.

THE COURT: Okay.

MR. BRIDGES: There are problems with gatekeeping orders that do more than what the law, Section 959 in particular, allows them to do.

THE COURT: Okay. Be more explicit. I'm not -- I think you're saying, no, except when certain situations exist, but I don't know what the certain situations are.

MR. BRIDGES: And Your Honor, you're exactly right. It's complicated, and it takes a long explanation. Let me start --

THE COURT: Okay. I really want to know, --

MR. BRIDGES: Yeah, me, too.

THE COURT: -- since I do these all the time, and most of my colleagues do.

MR. BRIDGES: Thank you, Your Honor. And 959 is on the screen. Managers of any property --

THE COURT: Uh-huh.

MR. BRIDGES: -- is what we're talking about, including debtors in possession. Now, it starts off by saying trustees, receivers. I mean, this is exactly what the Barton Doctrine is about, right? We're talking about trustees and receivers, but not just them. We're also talking about managers of any property, including debtors in possession, --

THE COURT: Uh-huh.

MR. BRIDGES: -- may be sued without leave of the court appointing that. That's contrary to the Barton Doctrine so far.

With respect to what I've numbered five here -- these numbers are mine -- the quote is directly verbatim out of the U.S. Code, but the numbering one through five is mine. With respect to what acts or transactions in carrying on business connected with such property.

And so, Your Honor, what we're talking about isn't Barton Doctrine is inapplicable, or you can't have a gatekeeping order for any claims, but it's about managers of property. And one of the hornbook examples of this is the grocery store that files for bankruptcy and then, when --

THE COURT: Slip-and-fall.

MR. BRIDGES: You've got it, Your Honor.

THE COURT: Uh-huh.

MR. BRIDGES: And because they're managing property,

--

THE COURT: So your cause of action, if it went forward, is the equivalent of a slip-and-fall --

MR. BRIDGES: Yes, Your Honor.

THE COURT: -- in a grocery store?

MR. BRIDGES: Yes, Your Honor.

THE COURT: Okay. Let me skip ahead. What about the last sentence of 959(a)?

MR. BRIDGES: 959(b)? Or 959(a)?

THE COURT: No, of 959(a).

MR. BRIDGES: What we're looking at here?

THE COURT: That's the sentence that I have always thought was one justification for a gatekeeper provision. And I know, you know, a lot of others feel the same.

MR. BRIDGES: Are we talking about what I have listed in number five here?

THE COURT: No. I'm talking about the last sentence of 959(a). Such actions, okay, shall be subject to the general equity power of such court, you know, meaning the Bankruptcy Court, so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to a trial by jury.

Isn't that one of the provisions that lawyers sometimes rely on in arguing a gatekeeper provision is appropriate?

MR. BRIDGES: Certain --

THE COURT: You, Bankruptcy Judge, have the power, the general equity power, so far as the same may be necessary to the ends of justice?

MR. BRIDGES: Your Honor, you bet. Absolutely, there is equitable power to do more. There's no doubt that there are reliance -- there is reliance on that in many instances. So I'm not sure -- I'm not sure I'm responding to your point.

THE COURT: Well, again, I think this is the third or fourth argument down the line that really you start with in the analytical framework here, but I guess I'm just saying I always thought a gatekeeping provision was consistent, entirely consistent with 28 U.S.C. § 959(a), the last sentence.

MR. BRIDGES: When you're dealing --

THE COURT: You disagree with that?

MR. BRIDGES: I do, Your Honor.

THE COURT: Okay.

MR. BRIDGES: And it's not that the Court lacks equitable powers to do more. It's that those equitable powers are affected by when management of other parties, third parties' property is at issue.

What we're talking about is similar to yesterday's contempt order. When you set the basis of describing what it is that Highland's business is, that they're a registered investment advisor in the business of buying, selling, and

managing assets -- assets, of course, are property, and that property is not just Highland's, but it's third-party property, as if a railroad loses luggage belonging to its customers. Rather than the railroad with a trustee appointed having mismanaged railroad property, we're talking about third-party property here, third-party property that belongs to the CLOs, about a billion dollars of assets in these CLO SPEs that Highland manages.

And again, the slide that Mr. Sbaiti showed you showing Highland, yes, they manage their own assets, the assets of the Debtor, but also of the third parties, including the Charitable DAF and CLO Holdco, and that the Advisers Act imposes fiduciary duties on them that are unwaivable when they're doing that.

In *Anderson*, the Fifth Circuit called 959 an exception to the rule requiring court's permission for leave to sue. In *Hoffman v. City of San Diego* much more recently, relying on this statute again, the court rejected a *Barton* challenge and called it a statutory exception. And in *Barton* itself, from a century ago, the U.S. Supreme Court even acknowledged there that where a receiver misappropriated the property of another -- not the debtor's property, the property of another -- that the receiver could still be sued personally, without leave of court.

Absent *Barton*, absent applicability of the Barton

Doctrine, Your Honor, the gatekeeper order is problematic.

*Barton* applies where a court has appointed a trustee, and I don't think, Your Honor, under the circumstances in this case, that it is fair to say Mr. Seery was appointed, as opposed to approved by this Court. And it involves a trustee's actions under the powers conferred on him. The Barton Doctrine is not about a broader exculpation of the trustee.

Here, what the Debtor asked for in its motion for approval, approval of hiring Mr. Seery, what it asked for specifically in the motion was that the Court not interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and asking the Court to uphold the board's decision to appoint Mr. Seery as the CEO as long as they are attributable to any rationale business purpose.

At the hearing, Your Honor, at the hearing, we've quoted your comments saying that the evidence amply shows a sound business justification and reasonable business judgment on the part of the Debtor in proposing that Mr. Seery be CEO and CRO. Your Honor, respectfully, those words don't sound like the judge using its discretion to choose -- appoint a trustee. They sound like the Court exercising deference to the business judgment of a business. And appropriately so. We don't have trouble with application of the business judgment rule. Our problem is with application of it and the Barton Doctrine.

Those two do not go together. A trustee has protection because it's acting under color of the court that appointed it. A court that merely deferred to someone else's appointment, that's not what the Barton Doctrine is about. The Barton Doctrine is about the court's function that the trustee takes on, not deference to the business judgment of the debtor in possession or the other fiduciary appointed by the court.

Problem one was the gatekeeping. Problem two is about the release and the *Applewood* case. Your Honor, again, ordinary negligence and ordinary fiduciary duty breaches do not rise to the level of gross negligence and willful misconduct. And because of that, the language of this order appears to be barring them entirely. No entity may bring a lawsuit against Mr. Seery in certain circumstances without the Bankruptcy Court doing what? Determining that the cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery.

A breach of fiduciary duty under the Advisers Act can be unintentional, it can fall short of gross negligence by miles, and to exculpate Mr. Seery from those kinds of claims entirely is to make him no longer a fiduciary. A fiduciary duty that is unenforceable makes someone not a fiduciary. That's plainly not what Mr. Seery thinks his role is. It's inconsistent with the Advisers Act. And Your Honor, the

notion that he would not owe his clients fiduciary duties as he manages their assets would require disclosures under the SEC regulations. It creates all kinds of problems to state that a fiduciary under the Advisers Act does not have enforceable fiduciary duties. The order appears to be releasing all of those. But for *Applewood's* specificity requirement, it would be doing that.

As an asset manager under the Advisers Act, Mr. Seery is managing assets belonging to CLO Holdco and The Charitable DAF. That's precisely what the District Court action is about, those fiduciary duties. And Mr. Seery, in describing these recently in testimony here -- forgive me for reading through this, Your Honor, but it is pretty short -- Mr. Seery testifies, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor. As a registered investment advisor, which is really any advisor of third-party money over $25 million, it has to register with the SEC and it manages funds in many different ways. The Debtor manages approximately $200 million current values -- it was more than that of the start of the case -- of its own assets.

I'm pausing there, Your Honor. $200 million of its own assets, but we're about to talk about third-party assets.

It doesn't have to be a registered investment advisor for those assets, but it does manage its own assets, which include

directly-owned securities, loans, from mostly related entities but not all, and investments in certain funds, which it also manages.

And then here it comes: In addition, the manager -- the Debtor manages about roughly $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other entities, which are hedge funds or PE style.

We also had to get a very good understanding of each of the funds that we manage. And as I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors. So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds.

Now, some of them are related parties, and those are a little bit easier. Some of them are owned by Highland. But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to manage -- maximize value.

Those duties do not require -- requires the opposite of what I mean. They don't merely require avoiding gross negligence or willful wrongdoing. When you're managing assets of others, the fiduciary duties that you owe are far stricter than that. The highest duty known to law is a fiduciary duty.

The order is inconsistent with that testimony,

acknowledging the fiduciary duties owed to The Charitable DAF and to CLO Holdco. It appears to release the Debtor -- maybe not the Debtor. My slide may be wrong about that. It appears to release Seery from having to uphold these duties.

In addition to problems with the gatekeeping under the Barton Doctrine, in addition to the release problem and *Applewood* and the unwaivable fiduciary duties under the Advisers Act, there's also a problem with telling other courts that they lack jurisdiction. Your Honor knows bankruptcy court law -- bankruptcy -- and the Bankruptcy Code far better than I do, I'm certain. But a first principle, I believe, of bankruptcy law is that this Court's jurisdiction is derivative of the District Court's. And the only doctrine I've heard of that can allow this Court to exercise exclusive jurisdiction of the District Court that it sits in is the Barton Doctrine, which, again, is very problematic to apply in this case, for the reasons we've discussed already.

By claiming to have -- by stating in the order that this Court has sole jurisdiction, it appears to either be inclusive of the District Court, which I understand Your Honor doesn't think her order can be read that way, but if it's not read that way, then it results in telling the District Court that it doesn't have the original jurisdiction that Congress has given it. And that's problematic in the order as well.

THE COURT: Let me ask you. If you think the word

"power" had been used, or "authority," versus "jurisdiction," that would have cured it?

MR. BRIDGES: I think there would still have been other problems. Would it have cured this? I don't think so, Your Honor, because, again, I think the only basis for that power is the Barton Doctrine.

THE COURT: Okay.

MR. BRIDGES: To listen to opposing counsel, you'd think that our jurisdictional argument was entirely about the jurisdiction stripping. It's not. Frankly, Your Honor, that's maybe even a lesser point. A key problem here to is the assertion of jurisdiction, not over any of the claims, but over all of the claims, because of 157(d), Your Honor, because some claims, some causes of action, have been put outside the reach of bankruptcy, the Bankruptcy Court, and those actions may in some instances fit within your description of the cases that are precluded here.

That's a problem jurisdictionally with this Court's ability to say it retains jurisdiction or that it has, that it asserts jurisdiction. Over what? Any kind of claim or cause of action against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor.

Some claims that fit into that bucket also fit into the description in 157(d) of cases that require both consideration

of bankruptcy law and federal laws affecting interstate commerce or regulating it. Right? Some cases must fall into -- under 157(d), despite having something to do with Mr. Seery's role as a chief executive officer. And Your Honor, the Advisers Act fiduciary duty claims asserted by Respondents in the District Court are such claims. They cannot be decided without considering the Advisers Act.

There are also RICO claims that, of course, require consideration of the RICO statute. But the Advisers Act claims absolutely require consideration of both bankruptcy law and this Court's order exonerating -- exculpating Mr. Seery from some liability, in addition to the unwaivable fiduciary duties imposed by the Advisers Act.

The assertion of jurisdiction here blanketed, in a blanket manner, over all claims against Mr. Seery in any way related to his CEO role is a 157(d) problem that the order has no -- has no solution for and we see no way around. 157(d) requires withdrawal of the reference, makes it mandatory, when a case requires considerations of federal law implicating interstate commerce.

Your Honor, we think we had to do it the way we did, filing in the District Court instead of filing here, in order to preserve our jurisdictional arguments. To come to this Court with a motion and then what? Immediately file a motion to withdraw the reference on our own motion here? To come

here and ask for a decision on colorability, when first colorability would exclude the claims that we're trying to bring, at least some of them, the mere negligence, mere fiduciary duty breaches, because they don't rise to the level necessarily of gross negligence or willful wrongdoing.

Your Honor, coming here and asking this Court to rule on that may well have waived our jurisdictional objections. Coming here to this Court and doing that and immediately filing a motion --

THE COURT: I don't get it.

MR. BRIDGES: The ordinary --

THE COURT: Subject matter jurisdiction, if it's a problem, it's not waivable.

MR. BRIDGES: The ordinary issue -- the ordinary waiver rule, Your Honor, is that when you come and ask for a court to rule on something, that you waive your right to -- to later -- you're estopped judicially from taking the contrary position.

THE COURT: Okay. Well, again, I don't get it. If you filed your motion and I ruled in a way you didn't like, you would appeal to the District Court.

MR. BRIDGES: Yes, Your Honor. An appeal to the District Court, we would be entitled to do. I understand, no matter what happens here, we can appeal to the District Court. That's different from whether or not, by coming here first,

have we waived or have we created an estoppel situation, in terms of arguing jurisdiction.

THE COURT: Okay.

MR. BRIDGES: Because of the problems with the order, we thought we were in a situation where coming here would waive rights that we could avoid waiving by asking in the District Court.

In other words, there was a jurisdictional paradox: How does a party ask a court to do something it believes the court lacks the power to do? That's the spot we found ourselves in. What were we supposed to do?

Your Honor, it is definitely a complex case. And coming into this matter with over 2,000 filings on the docket before I had ever heard of Highland was a very daunting thing, coming into this case. And whether or not there's something that we missed is certainly possible, but these orders that are the subject of the contempt motion, these orders are not things that we overlooked. These are things that we studied carefully, that we did not ignore or have disdain for, but that affected and changed our actions.

And in the Slide #3 from Mr. Morris's -- from Mr. Morris's presentation, in his third slide, he quotes from the first page of our motion for leave, the motion that he says exhibits our contemptuous behavior.

The second paragraph is kind of tiny print there, Your

Honor, and it's not highlighted, but I'd like to read it. Seery is not named in the original complaint, but this is only out of an abundance of caution due to the Bankruptcy Court in HCM's pending Chapter 11 proceeding having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the Bankruptcy Court also asserts sole jurisdiction over all such causes of action.

Your Honor, our intent was not to violate the order. Our intent was to be cautious about how we proceeded, to fully disclose what we were doing, and to do it in a District Court that absolutely could refer the matter here to this Court for a decision, but to do it in a way that didn't waive our jurisdictional arguments, that didn't waive our arguments regarding the release of the very claims we were trying to bring, by first having to prove that they were colorful claims of willful misconduct or gross negligence, when we were trying to assert claims that weren't willful negligence or gross -- gross negligence or willful misconduct. That was what I was trying to say.

Your Honor, this was not disregard of your order. If we're wrong on the law, we're wrong on the law, but it's not that we disregarded your order or lacked respect for it. We disclosed it.

Mr. Morris has argued in the briefs that we attempted to

do this on an ex parte basis. Your Honor, we did not attempt to do this on an ex parte basis. And if there are errors, they probably are mine. I know one error is mine. On the civil cover sheet in the filing in the District Court, I noted and passed on that we should check the box for related case and list this case on there. I did not follow up to make sure that it happened, and administratively, it didn't happen. We did not check the box on the civil cover sheet. Mr. Morris is correct that we failed to do that. He's incorrect that that was sneaky or intentional. It was my error, having noticed it but not followed up.

Your Honor, similarly, the argument that we didn't serve them with the motion I think is disingenuous. What happened, Your Honor, is that counsel for the Debtor had agreed to accept service of the complaint itself against the Debtor before the motion for leave, and after accepting service, I was under the impression that they'd be monitoring the docket, especially when I emailed them, informed them that we were filing the motion for leave to amend, because I was required to submit a certificate of conference on that motion. I informed them in a polite email. The polite email is not quoted in their brief. It is included in the record, and it's quoted in full in our brief.

The email exchange indicates to them, Thank you for pointing out the Court's orders. We've carefully studied them

and we don't think what we're doing is a violation of those orders.

That we didn't serve them is because we thought they already knew that the motion was coming and would be monitoring the docket, and we didn't know which lawyers they were going to have make an appearance in that case, so we wouldn't have known who to serve. But if not serving them -- first, the Rules do not require that service. But if not serving them out of politeness --

THE COURT: Mr. Morris is standing up. Did --

MR. MORRIS: I move to strike all of this, Your Honor. If Counsel wants to take the stand and raise his hand, he should testify under oath. I'm just going to leave it at that. He's not on their witness list.

THE COURT: All right. I overrule. You can continue.

MR. BRIDGES: Thank you, Your Honor.

If failure to serve them was an error, it was mine. I know of no rule that requires it.

THE COURT: Can I ask you, you were talking about the cover sheet mistake in not checking the box. What about your jurisdictional statement in the actual complaint not mentioning 28 U.S.C. § 1334 as a possible basis for subject matter jurisdiction? Do you think that was a mistake as well, or was that purposeful, not necessary?

MR. BRIDGES: Candidly, Your Honor, standing here right now, I have no recollection whatsoever of it.

THE COURT: You mention 28 U.S.C. § 1331, and then 1367 supplemental jurisdiction, but you don't mention 1334.

MR. BRIDGES: I suspect it's true, but Mr. Sbaiti would have written that.

THE COURT: Okay.

MR. BRIDGES: I have no recollection of --

THE COURT: Okay.

MR. BRIDGES: -- making any decision at all --

THE COURT: All right.

MR. BRIDGES: -- with regards to that.

THE COURT: Okay.

MR. BRIDGES: Your Honor, you've been very patient with a very long opening argument, and I'm very grateful for that. Please know that we take this Court's order seriously. We voluntarily appeared here before the Court ordered us to do so by filing our motion asking for a modification of the order we're accused now of having been in violation of.

And the last thing I'd like to say, Your Honor, Mr. Morris's brief claims that the first he knew of the motion, the motion seeking leave to add Mr. Seery to the District Court claim, the first he knew of that was when Mr. Sbaiti forwarded him the District Court's order dismissing that motion, denying that motion without prejudice.

Your Honor, in a civil contempt proceeding, where the issue is compensating, not punishing, if the aggrieved party didn't even know about the action until it had been denied by the District Court, we submit that there can be no harm from that having taken place.

That's all I have for opening. Thank you, Your Honor.

THE COURT: All right. Thank you.

Before we give you a time check, do we have other opening statements?

MR. ANDERSON: Yes. Yes, Your Honor. Michael Anderson on behalf of Mr. Patrick. If we need to take a break, that's fine, too.

THE COURT: Well, how long do you plan to use?

MR. ANDERSON: No more than ten minutes, for sure.

THE COURT: Let's go ahead and do that, and then we'll take a break.

MR. POMERANTZ: Your Honor, after, I would ask the opportunity to respond to Mr. Bridges' argument. Probably another ten minutes.

THE COURT: All right. Let's go ahead and take a ten-minute break. And Mr. Taylor, you're going to have something, because you --

MR. TAYLOR: Five.

THE COURT: Okay. We'll take a ten-minute break. And Nate, can you give them a time?

THE CLERK: I'm showing it was about 59-1/2 minutes.

THE COURT: Fifty-nine and a half? And is that subtracting some for my questioning?

THE CLERK: I stopped whenever you talked, maybe a little over --

THE COURT: Okay. So he stopped it whenever I asked questions and you answered, so 59 minutes has been used by the Respondents.

All right. We'll take a ten-minute break. We'll come back at 11:35.

THE CLERK: All rise.

(A recess ensued from 11:25 a.m. to 11:37 a.m.)

THE COURT: All right. We're going back on the record in the Highland matter. We have further opening statements. Counsel, you may proceed.

OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

MR. ANDERSON: Thank you. May it please the Court, Counsel. Michael Anderson on behalf of Respondent, Mark Patrick.

Your Honor, after listening to this and looking at the filings in this case, this issue of whether there's contempt -- and I would argue there's not -- is ripe for decision. We have no real undisputed facts for purposes of the contempt issue. We have your Court's July order, the subject of Mr. Bridge's arguments. We have the Plaintiffs in the underlying

lawsuit at issue. They commenced the lawsuit in April of this year. There's absolutely nothing improper about that filing. It's not subject to the contempt. A week later, there is a motion for leave to add Mr. Seery. That's the issue. There's no dispute over that. There's no dispute that Mr. Patrick authorized the filing of the motion for leave.

And so then the question becomes we look at the Court's July order, did a motion for leave, did that violate the terms of the order? The motion for leave is not commencing a lawsuit. It's also not pursuing a claim, because whether or not the Court grants the motion, denies the motion, or whatever the Court does, nothing happened, because the day after the motion for leave was filed it was dismissed *sua sponte* without prejudice because not all parties had been served in the case.

It was permission asked one day. The matter was mooted the following day by the District Court. And so that is completely undisputed.

And so the question is, is asking permission, is that commence? I think everybody says there's no way that's commencing a lawsuit because you have asked permission. The question, then, is it pursuing a claim? And the argument, well, no, that's not pursuing a claim; it's asking permission.

And I think it's also important to note that when the motion for leave was filed, there were no secrets there. I

mean, I'm coming in this after the fact, representing Mr. Patrick. You look at a motion for leave, and right there on Page 1 it talks about Your Honor's order. Page 2, it quotes the order and it gives the reasons, there's arguments being made as to why that order doesn't bar adding Mr. Seery as a defendant in the lawsuit, many of the arguments that Mr. Bridges made.

So that's where we are. And so when I hear, hey, we've got six hours, three hours and three hours, and we're going to split this up, you know, maybe too simplistic from Fort Worth, but I'm like, wait a second, this is all undisputed. It's totally undisputed. The -- whether or not the prior order is enforceable or not enforceable, those are all legal arguments. You know, no witnesses are necessary for that. And as I understood, right before we broke, counsel stood up and he's going to do what generally doesn't happen in opening statements, which is respond to opening statements, which shows that that's a legal issue.

And so it really does come down to undisputed facts. There's no testimony. No -- nothing is necessary. And a lot of what this comes down to is the old statement, you know, is it better to ask forgiveness or permission? And usually that statement comes up when somebody has already done something: Hey, I'm going to go do it anyway and I'll ask for forgiveness later. Well, what the Plaintiffs in the underlying case did

was ask permission. Motion for leave. That is not contemptuous. And there's literally no damages. As was pointed out, by the time counsel found out, it had already been dismissed.

The last thing I want to point out, Your Honor, is that the argument from opposing counsel was, well, under Rule 15 of the Federal Rules of Civil Procedure, since parties hadn't answered yet, the Plaintiffs in the underlying case could have just simply added Mr. Seery as a defendant and moved on that way, but then that would be another ball of wax and then we would be addressing issues as far as whether or not there is a violation of the Court's order, notwithstanding Mr. Bridge's arguments. But then we would have those issues. But that's not what happened. Everybody knows that's not what happened. It was a motion for leave that was resolved the following day.

And so, Your Honor, for those reasons, and those undisputed reasons, we would request that the Court at the end of this hearing deny the request for sanctions and a contempt finding against our client, Mr. Patrick.

Mr. Phillips is going to address one brief issue bankruptcy-wise I believe that was raised earlier.

THE COURT: Okay. Mr. Phillips?

MR. PHILLIPS: Your Honor, thank you very much. Louis M. Phillips on behalf of Mark Patrick.

The only thing that I would point out, Your Honor, and I'm

going to do -- try to simplistically, because that's about the level at which I operate, boil down the questions about the order.

This order was an employment order. The problem that Mr. Bridges has elucidated to Your Honor is that the precise effect, one of the precise effects of that order is to bar the claims of third parties that arise into the future on the basis of the employment of Mr. Seery, because the order required that all claims asserting gross negligence or willful misconduct need to be brought before you to determine that they're colorable.

One question I have is, does it apply to the lawsuit that was filed? Doesn't apply unless the effect of the order was to release those claims and preclude any party from bringing those claims at all. And while you can say correctly that this Court issues gatekeeper orders all of the time, one thing I cannot imagine that you would say is that in employment orders you release claims of third parties existing and as may arise in the future that could be brought against the party employed to be a CRO of a debtor, who, by his own testimony, says we do all kinds of stuff in the billions of dollars for third parties that we owe fiduciary duties to.

There's no way, Your Honor, that you were considering your July order to bar third-party claims arising from breach of fiduciary duties by Mr. Seery to third parties who held third-

party claims that did not involve some assertion that, in his capacity as CRO, he was in some way acting within the scope of his authority as CRO for the Debtor and yet committed negligence against the Debtor.

Now, if the order was asserting that you know what a lot of people in this courtroom know, that the standard of liability for a CRO doing work for a debtor, just like the standard of liability for the president of a corporation or an officer of the corporation, is as long as you're within the course and scope of your employment, your actions for the corporation have -- can -- the corporation takes care of you because there's no personal claim unless you're outside the scope, and you're outside the scope if you commit gross negligence or willful misconduct.

That, if you're restating the standard of care and standard of liability for a CRO, we have no problem with that, because Mr. Patrick did not authorize a cause of action arising against Mr. Seery against the Debtors for damage to the Debtors. He authorized the filing of a complaint in the District Court with jurisdiction for a third-party claim for breach of a fiduciary duty to a third party that Mr. Seery admits he owes, and then sought leave because they didn't understand the order that Your Honor issued. It couldn't have been to release the breach of fiduciary duty claims that wouldn't rise to gross negligence or willful misconduct, it

couldn't be that, but it might be. But if it did, under an employment order? That's very different from *Espinosa*, that's very different from *Shoaf*, when you're at the end of a case in a confirmation of a plan and you're talking about matters arising in the past.

This order, if it has the effect it could be read to have, precludes any third party from asserting a breach of fiduciary duty against Seery for actions that violate the duty to that third party, when Seery's biggest job, it looks to us like, is running third-party money. That could not have been what Your Honor was thinking.

And so all I'm pointing out is I'm trying to distill down. The lawsuit doesn't involve gross negligence or willful misconduct allegations. It involves breach of fiduciary duty, breach of the Advisers Act, et cetera, et cetera. Mr. Patrick authorized that lawsuit.

Now, what we're here for today is to determine whether the complaint, which was not against the Debtor -- which was not against Seery, the motion for leave, which did not -- all they did was ask for permission, not forgiveness. And we can't understand how the Debtor should be saying, all they had to do was amend. Well, if they amended, would we be in hotter water than we are today for asking for permission to sue? I think we would have been, that should have been the prescribed course, when we are more concerned and we are more risk-averse

by asking for leave rather than just amending by right. Absolutely, that makes no sense. We can't be held to be more contemptuous because we asked for permission, when we could have just sued him, because they're saying asking for permission was wrong. Certainly, suing him would have been wrong. That would have been easier.

THE COURT: But Mr. Phillips, the issue is you all didn't come to the Bankruptcy Court and ask permission.

MR. PHILLIPS: Look at your order, Your Honor.

THE COURT: It's right in front of me.

MR. PHILLIPS: Right. That order either doesn't apply to the claims that were brought or it released the claims that were brought. That's our point. It couldn't have released them. Does it apply to them? Thank you.

THE COURT: Okay. Mr. Taylor?

MR. TAYLOR: Good morning.

THE COURT: Good morning.

OPENING STATEMENT ON BEHALF OF JAMES DONDERO

MR. TAYLOR: Your Honor, Clay Taylor on behalf of Jim Dondero. I'll be very brief because I know we've already spent a lot of time on opening argument. But I do think it is appropriate to, one, first look at who brought the lawsuit, CLO Holdco & DAF. That was authorized -- it's undisputed it was authorized by Mr. Patrick. There is no dispute about that. There's no dispute who the Plaintiffs are. But yet my

client is up here as an alleged violator.

I think it's very clear, as all the parties have said, there's no dispute as to there's an order, there was a complaint, and there was a motion for leave.

It seems to me that the rest of the evidentiary hearing that you may be about to go through is going to be about pin the blame on Mr. Dondero. It is undisputed that he is not a control person for the DAF or CLO Holdco. The only type of evidence you will hear is going to be insinuation that he somehow controls Mr. Patrick and used to control Mr. Scott. There will be no direct evidence that he authorized this or that he's the control person and the proper corporate authorized representative that signed off on the --

It seems to me, Your Honor, first of all, that's a discrete issue that should be able to be decided separately from this, and the first gating issue is, was there indeed a violation of this Court's order? It would seem to me that there is no disputes about those facts and that we should bifurcate that, and if you then find that there is a violation and find that there is any even need to move into who the alleged violators are, that then we could have that evidentiary portion. But there is no reason to do that now before there's even been found to be a violation.

THE COURT: All right. Thank you.

All right. Well, someone made the point rebuttals in

opening statements are not very common, --

MR. POMERANTZ: Your -- Your --

THE COURT: -- but you can use your three hours however you want.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. POMERANTZ: Your Honor, I didn't intend to stand up.

THE COURT: Okay.

MR. POMERANTZ: I also didn't intend to have the motion to modify the sealing order presented to Your Honor, which it was in the course of that opening argument. And despite your comments at the beginning of the hearing, the Movants have taken Your Honor down a series of rabbit holes that have really no relevance to the contempt motion. And notwithstanding, as I said, your ruling that basically the contempt would go first and the modification would go second, there they were, persistent in making all the arguments why this Court should modify the order.

They're just really trying to obfuscate the simple issue that Mr. Morris presented and raised at the beginning of the hearing: Did they violate the order by pursuing a claim? We think the answer is undoubtedly yes.

I'm not going to try to address each of the issues they raised in connection with the modification motion in detail. I have a lengthy presentation. I'll do it at the appropriate

time. But there are a few issues I want to address. I want to address one of the last points Mr. Bridges raised first. If they thought that the order was a problem, they could have filed their motion to modify that order before Your Honor. They could have had that heard first. There was no statute of limitations issue in connection with the HarbourVest matter. They could have come to Your Honor to do that. But no, they didn't. They went to the District Court first, and it was only after we filed our contempt motion that they came back and said, well, Your Honor, you should modify the order. Their argument that if they did that there would have been waiver and estoppel is just an after-the-fact justification for what they did and what they tried to do, which was unsuccessful. They tried to have the District Court make the decision.

And why? Your Honor, they've filed motions to recuse before Your Honor. They -- they -- it's no secret the disdain they have for Your Honor's rulings as it relates to them. They wanted to be out of this courtroom and in another courtroom.

And their belated argument, Mr. Bridges falling on the sword, that they failed to check the box, inadvertent, it's on me, it's very curious. Because if they had done so and had referred to the correct 1334 jurisdictional predicate, as Your Honor had mentioned, the complaint would have been referred to

this Court and the entire trajectory of the proceedings would have been different. They would have had the opportunity to take their shot to go to District Court and argue that your order didn't apply.

Your Honor, they say the January 9th order is not relevant. It is entirely relevant. It covered the independent directors and their agents. Yes, Mr. Seery is an independent director, but he was also an agent of the independent directors and carried out the duties. You heard argument at the July 16th hearing that Mr. Seery had been acting as the chief executive officer for several months. And why is it important? Mr. Bridges said, well, if we violated one order, we violated the other. It's important because, Your Honor, number one, Mr. Dondero supported that order. We would never have had an independent board in this case if Mr. Dondero, the decision-making -- of the Debtor at that time, supported that order and supported the exculpations that are now claimed to have been invalid.

And also Your Honor heard testimony at the confirmation hearing that the independent directors would never have taken this job, would never have taken this job because of the potential for litigation, litigation that we've now had to endure for several months. So to come back 16 months later and say, well, you know, you couldn't really exculpate them, it's really an employment order: It was an employment order.

They know it. We know it. Your Honor knows it. It was a resolution of corporate governance issues that changed the whole trajectory of the case, and luckily it -- luckily, Your Honor approved it.

The question just is whether they violated the order, period. And I'll have a lot to say about res judicata, but I won't go in too much in detail, but I will just briefly address their arguments. They're correct and the Court is correct that there's a difference between *Applewood* and *Shoaf*. And Your Honor got the exact difference. In one case, a release was not specific, *Applewood*. In one case it was. *Shoaf* hasn't been discredited by *Applewood*. It was different facts. In fact, *Shoaf* relied on two Supreme Court cases, the *Stoll* case and the *Chicot* case, both for the propositions that a court that enters an order, a clear order, even if it didn't have jurisdiction, that cannot be attacked in res judicata. So here what we have is clear, unambiguous, you come to this Court before commencing or pursuing a claim. That's the clarity. The focus on the releases, that's not what we're here for today, that's not what we're here for on a contempt motion, on whether the release covered them or it didn't cover them. We're here on the clear issue of did they violate the language, and we submit that they did.

And similarly, *Espinosa* applies. Your Honor, just to quote some language, "Appellees could have moved to remand the

action to state court after it improperly -- after its improper removal to the federal court or challenge the district court's exercise in jurisdiction on direct appeal. Because they did neither, they are now barred by principles of res judicata."

Res judicata actually does apply, and I will speak about it in much more detail in the modification motion.

With respect to *Barton*, Your Honor, we disagree with their argument that Mr. Seery is not a court-appointed agent. We've briefed it extensively in our motion to modify. *Barton* applies to debtors in possession. *Barton* applies to general partners of the debtor. *Barton* applies to chief restructuring orders -- officers who are approved by the debtor. And it applies to general counsel who are appointed by the chief restructuring order. Officer.

So the argument that *Barton* is somehow inapplicable is just wrong. Your Honor knows that. Your Honor has written extensively on *Barton* in connection with your *Ondova* opinion.

Some of the argument about 959 is all wrong, as well. Your Honor got it right that 959 applies to slip-and-fall cases or torts, injuries to parties that are strangers to this process. There is a legion of cases that I will cite to Your Honor in connection with argument. 959 does not apply here. There's nothing more core to this case than the transactions surrounding the resolution of the HarbourVest claims.

We also disagree, Your Honor, that the complaint is subject to mandatory withdrawal of the reference. We've -- one of our exhibits in the motion to modify is our motion to enforce the reference. We think Movants have it completely wrong. This is not the type of case that will be subject to withdrawal -- mandatory withdrawal of the reference, and in any event, for this contempt motion, it's irrelevant.

And they argue -- one of the other points Mr. Bridges raises is that, because this Court would not have had jurisdiction under 157 because of the mandatory withdrawal, then Your Honor could not legally act as a gatekeeper. But they haven't addressed *Villegas v. Schmidt*. We've raised it throughout this case. And again, in these series of pleadings, they don't even address it. And *Villegas v. Schmidt* was a *Barton* case. It was a *Barton* case where the -- where the argument was that *Barton* does not apply because it's a *Stern* claim and the Bankruptcy Court would not have jurisdiction. And *Villegas* said no, it does apply. And Your Honor even cited that in your *Ondova* case. And why does it apply? Because there's nothing inconsistent with a Bankruptcy Court having exclusive decision to make a *Barton* determination.

In fact, in that case *Villegas* said, you can't go to the District Court for that decision, it is the Bankruptcy Court's decision.

So, again, it's a red herring, Your Honor. Your Honor had the ability to act as an exclusive gatekeeper for these types of actions.

With that, Your Honor, I'll leave the rest of my argument for the next motion.

THE COURT: All right. Thanks.

All right. Nate, let's give everyone their time.

THE CLERK: That was just about eight and a half additional from the Debtor, and then altogether the other ones were just shy of fourteen minutes. Thirteen minutes and fifty seconds for the other three combined. Do you want me to --

THE COURT: Yes, I meant for Debtor combined versus --

THE CLERK: Oh. Oh.

THE COURT: Respondents combined.

THE CLERK: So that would be twenty one and a half the Debtor. Let me do the math on the other one. Be an hour twelve minutes and fifty seconds for --

THE COURT: Okay. All right. Got that? Debtors used a total of twenty one and a half minutes; Responders have used an hour twelve minutes and fifty seconds.

All right. Mr. Morris, you may call your first witness.

MR. MORRIS: Thank you very much, Your Honor. The Debtor calls Mark Patrick.

THE COURT: All right. Mr. Patrick? Please approach

our witness stand and I'll swear you in. Please raise your right hand.

(The witness is sworn.)

THE COURT: All right. Please take a seat.

MARK PATRICK, DEBTOR'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Patrick.

A Good afternoon.

Q Can you hear me okay?

A Yes, I can.

Q Okay. You have before you several sets of binders. They're rather large. But when I deposed you on Friday, we did that virtually. Now, I may direct you specifically to one of the binders or one of the documents from time to time, so I just wanted you to know that those were in front of you and that I may be doing that.

Mr. Patrick, since March 1st, 2001 [sic], you've been employed by Highland Consultants, right?

A I believe the name is Highgate Consultants doing business as Skyview Group.

Q Okay. And that's an entity that was created by certain former Highland employees, correct?

A That is my understanding, correct.

Q And your understanding is that Mr. Dondero doesn't have an

ownership interest in that entity, correct?

A That he does not. That is correct.

Q And your understanding is that he's not an employee of that -- of Skyview, correct?

A That is correct.

Q Prior to joining Skyview on March 1st, you had worked at Highland Capital Management, LP for about 13 years, correct?

A Correct.

Q Joining in, I believe, early 2008?

A Correct.

Q Okay. I'm going to refer to Highland Capital Management, LP from time to time as HCMLP. Is that okay?

A Yes.

Q While at HCMLP, you served as a tax counselor, correct?

A No, I would like to distinguish that. I did have the title tax counsel. However, essentially all my activities were in a non-lawyer capacity, being the client representative. I would engage other outside law firms to provide legal advice.

Q Okay. So you are an attorney, correct?

A Yes, I am.

Q But essentially everything you did at Highland during your 13 years was in a non-lawyer capacity, correct?

A Correct.

Q In fact, you didn't even work in the legal department; is

that right?
A That is correct. I worked for the tax department.
Q Okay. Let's talk about how you became the authorized representative of the Plaintiffs. You are, in fact, authorized representative today of CLO Holdco, Ltd. and Charitable DAF, LP, correct?
A Charitable DAF Fund, LP. Correct.
Q And those are the two entities that filed the complaint in the United States District Court against the Debtor and two other entities, correct?
A Correct.
Q And may I refer to those two entities going forward as the Plaintiffs?
A Yes.
Q You became the authorized representative of the Plaintiffs on March 24th, 2021, the day you and Mr. Scott executed certain transfer documents, correct?
A Correct.
Q And you had no authority to act on behalf of either of the Plaintiffs before March 24th, correct?
A Correct.
Q The DAF controls about $200 million in assets, correct?
A The Plaintiffs, you mean? CLO Holdco and Charitable DAF Fund, LP.
Q Yes.

A Around there.

Q Okay. Let me try and just ask that again, and thank you for correcting me. To the best of your knowledge, the Plaintiffs control about $200 million in assets, correct?

A Net assets, correct.

Q Okay. And that asset base is derived largely from HCMLP, Mr. Dondero, or Mr. Dondero's trusts, correct?

A Can you restate that question again, Mr. Morris?

Q Sure. The asset base that you just referred to is derived largely from HCMLP, Mr. Dondero, or donor trusts?

A The way I would characterize it -- you're using the word derived. I would characterize it with respect to certain charitable donations --

Q Uh-huh.

A -- that were -- that were made at certain time periods, where the donors gave up complete dominion and control over the respective assets and at that time claimed a federal income tax deduction for that.

I do -- I do believe that, as far as the donor group, as you specified, Highland Capital Management, I recall, provided a donation to a Charitable Remainder Trust that eventually had expired and that eventually such assets went into the supporting organizations. And then I do believe Mr. Dondero also contributed to the Charitable Remainder Trust No. 2, which seeded substantial amounts of the original assets that

were eventually composed of the $200 million. And then from time to time I do believe that Mr. Dondero's trusts made charitable donations to their respective supporting organizations.

Q Okay. Thank you.

A Is that responsive?

Q It is. It's very responsive. Thank you very much. So, to the best of your knowledge, the charitable donations that were made that form the bases of the assets came from those three -- primarily from those three sources, correct?

A Well, you know, there's two different trusts. There's the Dugaboy Trust and the Get Good Trust.

Q Okay.

A Then you have Mr. Dondero and Highland Capital Management. So I would say four sources.

Q Okay. All right. Thank you. Prior to assuming your role as the authorized representative of the Plaintiff, you had never had meaningful responsibility for making investment decisions, correct?

A I'm sorry. You kind of talk a little bit fast. Please slow it down --

Q That's okay.

A -- and restate it. Thank you.

Q And I appreciate that. And any time you don't understand what I'm saying or I speak too fast, please do exactly what

you're doing. You're doing fine.

Prior to assuming your role as the authorized representative of the Plaintiffs, you never had any meaningful responsibility making investment decisions. Is that correct?

A To whom?

Q For anybody.

A Well, during my deposition, I believe I testified that I make investment decisions with respect to my family. Family and friends come to me and they ask me for investment decisions. I was -- in my deposition, I indicated to you that I was a board member of a nonprofit called the 500, Inc. They had received a donation of stock in Yahoo!, and the members there looked to me for financial guidance. As an undergrad at the University of Miami, I was a -- I was a finance major, and so I do have a variety of background with respect to investments.

Q Okay. So you told me that from time to time friends and family members come to you for investing advice. Is that right?

A That is correct.

Q And when you were a young lawyer you were on the board of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance. Is that correct?

THE COURT: Just a moment. I think there's an objection.

MR. MORRIS: Uh-huh.

THE COURT: Go ahead.

MR. ANDERSON: So far -- relevance, Your Honor. This is way out of the bounds of the contempt proceeding. You know, what he did as a young person with Yahoo! stock. We're here to -- he authorized the lawsuit. They filed the lawsuit. That's it. Getting into all this peripheral stuff is completely irrelevant.

THE COURT: Your response?

MR. MORRIS: My response, Your Honor, is very simple. Mr. Patrick assumed responsibility, and you're going to be told that he exercised full and complete authority over a $200 million fund that was created by Mr. Dondero, --

THE COURT: Okay.

MR. MORRIS: -- that funds -- that is funded virtually by Mr. Dondero, and for which -- Mr. Patrick is a lovely man, and I don't mean to disparage him at all -- but he has no meaningful experience in investing at all.

THE COURT: All right. Counsel, I overrule. I think there's potential relevance.

And may I remind people that when you're back at counsel table, please make sure you speak your objections into the microphone. Thank you.

BY MR. MORRIS:

Q When you were a young lawyer, sir, you were on the board

of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance, correct?

A Yes, correct.

Q And -- but during your 13 years at Highland, you never had formal responsibility for making investment decisions, correct?

A That is correct.

Q Yeah. In fact, other than investment opportunities that you personally presented where you served as a co-decider, you never had any responsibility or authority to make investment decisions on behalf of HCMLP or any of its affiliated entities, correct?

A That is correct.

Q And at least during your deposition, you couldn't identify a single opportunity where you actually had the authority and did authorize the execution of a transaction on behalf of HCMLP or any of its affiliates, correct?

A Correct.

Q And yet today you are now solely responsible for making all investment decisions with respect to a $200 million charitable fund, correct?

A Yes, but I get some help. I've engaged an outside third party called ValueScope, and they have been as -- effectively working as a "gatekeeper" for me, and I look to them for investment guidance and advice, and I informally look to Mr.

Dondero since the time period of when I took control on March 24th for any questions I may have with respect to the portfolio. So I don't feel like I'm all by myself in making decisions.

Q Okay. I didn't mean to suggest that you were, sir, and I apologize if you took it that way. I was just asking the question, you are the person now solely responsible for making the investment decisions, correct?

A Yes.

Q Okay. Let's talk about the circumstances that led to the filing of the complaint for a bit. On April 12, 2021, you caused the Plaintiffs to commence an action against HCMLP and two other entities, correct?

A Correct.

Q Okay. One of the binders -- you've got a couple of binders in front of you. If you look at the bottom, one of them says Volume 1 of 2, Exhibits 1 through 18. And if you could grab that one and turn to Exhibit 12. Do you have that, sir?

A It says -- it says the original complaint. Is that the right one?

Q That is the right one. And just as I said when we were doing this virtually last Friday, if I ask you a question about a particular document, you should always feel free to review as much of the document as you think you need to

competently and fully answer the question. Okay?
A Okay. Thank you.
Q All right. You instructed the Sbaiti firm to file that complaint on behalf of the Plaintiffs, correct?
A Correct.
Q And to the best of your recollection, the Plaintiffs returned -- retained the Sbaiti firm in April, correct?
A Correct.
Q So the Sbaiti firm was retained no more than twelve days before the complaint was filed, correct?
A Correct.
Q You personally retained the Sbaiti firm, correct?
A Correct.
Q And the idea of filing this complaint originated with the Sbaiti firm, correct?
A Correct.
Q Before filing -- withdrawn. Before becoming the Plaintiffs' authorized representative, you hadn't had any communications with anyone about potential claims that might be brought against the Debtor arising out of the HarbourVest settlement, correct?
A That is correct.
Q Now, after you became the Plaintiffs' authorized representative, Mr. Dondero communicated with the Sbaiti firm about the complaint that's marked as Exhibit 12, correct?

A Yes. After he brought certain information to myself and then that I engaged the Sbaiti firm to launch an investigation, I also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts.

Q Okay. Mr. Dondero did not discuss the complaint with you, but he did communicate with the Sbaiti firm about the complaint, correct?

A I believe -- yeah. I heard you slip in at the end "the complaint." I know he communicated with the Sbaiti firm. I can't -- I can't say what he said or didn't say with respect to the -- the actual complaint.

Q Okay. But Mr. Dondero got involved in the process initially when he brought some information to your attention concerning the HarbourVest transaction, correct?

A Correct.

Q And he came to you with the HarbourVest information after you assumed your role as the authorized representative of the Plaintiffs on March 24th, correct?

A That is correct.

Q At the time he came to you, you did not have any specific knowledge about the HarbourVest transaction, correct?

A I did not have specific knowledge with respect to the allegations that were laid out and the facts with respect to the original complaint. I think I had just had a general

awareness that there was a HarbourVest something or other, but the specific aspects of it, I was unaware.

Q Okay. And you had no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction at the time you became the Plaintiffs' authorized representative, correct?

A That is correct.

Q But you recall very specifically that some time after March 24th Mr. Dondero told you that an investment opportunity was essentially usurped or taken away, to the Plaintiffs' harm and for the benefit of HCMLP, correct?

A That is correct.

Q And after Mr. Dondero brought this information to your attention, you hired the Sbaiti firm to launch an investigation into the facts, correct?

A Correct.

Q You had never worked with the Sbaiti firm before, correct?

A That is correct.

Q And you had hired many firms as a tax counselor at HCMLP, but not the Sbaiti firm until now. Correct?

A That is correct.

Q You got to the Sbaiti firm through a recommendation from D.C. Sauter, correct?

A Correct.

Q Mr. Sauter is the in-house counsel, the in-house general

counsel at NexPoint Advisors, correct?
A Correct.
Q You didn't ask Mr. Sauter for a recommendation for a lawyer; he just volunteered that you should use the Sbaiti firm. Correct?
A That is correct.
Q And you never used -- considered using another firm, did you?
A When they were presented to me, they appeared to have all the sufficient skills necessary to undertake this action, and so I don't recall interviewing any other firms.
Q Okay. Now, after bringing the matter to your action, Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken. Correct?
A That is correct.
Q But you weren't privy to the communications between Mr. Dondero and the Sbaiti firm, correct?
A I did not participate in those conversations as the -- what I, again, considered Mr. Dondero as the investment advisor to the portfolio, and he was very versant in the assets. I wanted him to participate in the investigation that the Sbaiti firm was undertaking prior to the filing of this complaint.
Q Let's talk for a minute about the notion of Mr. Dondero being the investment advisor. Until recently, the entity

known as the DAF had an investment advisory committee with HC -- an investment advisory agreement with HCMLP. Correct?

A It's my understanding that the investment advisory agreement existed with the Plaintiffs, CLO Holdco, as well as Charitable DAF Fund, LP, up and to the end of February, throughout the HarbourVest transaction.

Q Okay. And since February, the Plaintiffs do not have an investment advisory agreement with anybody, correct?

A That is correct.

Q Okay. So Mr. Dondero, if he serves as an investment advisor, it's on an informal basis. Is that fair?

A After I took control, he serves as an informal investment advisor.

Q Okay. So there's no contract that you're aware of between either of the Plaintiffs and Mr. Dondero pursuant to which he is authorized to act as the investment advisor for the Plaintiffs, correct?

A That is correct.

Q Okay. When you communicated with Grant Scott -- withdrawn. You know who Grant Scott is, right?

A Yes, I do.

Q He's the gentleman who preceded you as the authorized representative of the Plaintiffs, correct?

A Yes.

Q Okay. You communicated with Mr. Scott from time to time

during February and March 2021, correct?

A February and March are the dates? Yes.

Q Yeah. And from February 1st until March 21st -- well, withdrawn. Prior to March 24th, 2021, Mr. Scott was the Plaintiffs' authorized representative, correct?

A Correct.

Q And you have no recollection of discussing with Mr. Scott at any time prior to March 24th any aspect of the HarbourVest settlement with Mr. Scott. Correct?

A Correct.

Q And you have no recollection of discussing whether the Plaintiffs had potential claims that might be brought against the Debtor. Correct? Withdrawn. Let me ask a better question.

You have no recollection of discussing with Mr. Scott at any time prior to March 24th whether the Plaintiffs had potential claims against the Debtor. Correct?

A That is correct.

Q You and Mr. Scott never discussed whether either of -- either of the Plaintiffs had potential claims against Mr. Seery. Correct?

A Correct.

Q Okay. At the time that you became their authorized representative, you had no knowledge that the Plaintiffs would be filing a complaint against the Debtors relating to the

HarbourVest settlement less than three weeks later, correct?
A That is correct.
Q Okay. Now, if you look at Page 2 of the complaint, you'll see at the top it refers to Mr. Seery as a potential party. Do you see that?
A Yes, I do.
Q Okay. You don't know why Mr. Seery was named -- withdrawn. You don't know why Mr. Seery was not named as a defendant in the complaint, correct?
A No, I -- that's correct. I do not know why he was not named. That's in the purview of the Sbaiti firm.
Q Okay. And the Sbaiti firm also made the decision to name Mr. Seery on Page 2 there as a potential party when drafting the complaint, correct?
A That's what the document says.
Q And you weren't involved in the decision to identify Mr. Seery as a potential party, correct?
A That is correct. Again, I rely on the law firm to decide what parties to bring a suit to -- against.
Q Okay. Okay. Do you recall the other day we talked about a document called the July order?
A Yes.
Q Okay. That's in -- that's in Tab 16 in your binder, if you can turn to that. And take a moment to look at it, if you'd like. And my first question is simply whether this is

the July order, as you understand it.

(Pause.)

A Yes, it is. I was just looking for the gatekeeper provision. It looks like it's Paragraph 5. So, --

Q Okay. Thank you for that. About a week after the complaint was filed, you authorized the Plaintiffs to file a motion in the District Court for leave to amend the Plaintiffs' complaint to add Mr. Seery as a defendant. Correct?

A I authorized the filing of a motion in Federal District Court that would ask the Federal District Court whether or not Jim Seery could be named in the original complaint with respect to the gatekeeper provision cited in that motion and with respect to the arguments that were made in that motion.

Q Okay. Just to be clear, if you turn to Exhibit 17, the next tab, --

A I'm here.

Q -- do you see that document is called Plaintiffs' Motion for Leave to File First Amended Complaint?

A Yes.

Q And that's the document that you authorized the Plaintiffs to file on or about April 19th, correct?

A Correct.

Q Okay. And can we refer to that document as the motion to amend?

A Yes.
Q Okay. You were aware of the July order at Tab 16 before you authorized the filing of the motion to amend. Correct?
A Yes, because it's cited in the motion itself.
Q Okay. And at the time that you authorized the filing of the motion to amend, you understood that the July order was still in effect. Correct?
A Yes, because it was referenced in the motion, so my assumption would be it would still be in effect.
Q Okay. Before the motion to amend was filed, you're -- you are aware that my firm and the Sbaiti firm communicated by email about the propriety of filing the motion to amend?
A Before it was filed? Communications between your firm and the Sbaiti firm? I would have to have my recollection refreshed.
Q I'll just ask the question a different way. Did you know before you authorized the filing of the motion to amend that my firm and the Sbaiti firm had engaged in an email exchange about the propriety of filing the motion to amend in the District Court?
A It's my recollection -- and again, I could be wrong here -- but I thought the email exchange occurred after the fact, not before. But again, I -- I just --
Q Okay. In any event, on April 19th, the motion to amend was filed. Correct?

A Correct.

Q That's the document that is Exhibit 17. And you personally authorized the Sbaiti firm to file the motion to amend on behalf of the Plaintiffs, correct?

A Correct.

Q And you authorized the filing of the motion to amend with knowledge -- withdrawn.

Can you read the first sentence of the motion to amend out loud, please?

A Yeah. (reading) Plaintiffs submit this motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of defendant Highland Capital Management, LP (HCM) and the chief perpetrator of the wrongdoing that forms the basis of the Plaintiffs' causes of action.

Q And does that fairly state the purpose of the motion?

MR. SBAITI: Objection, Your Honor. Asks him to make a legal conclusion about the purpose of the legal motion filed in court that he didn't draft.

THE COURT: Okay. I overrule. You can answer if you have an answer.

THE WITNESS: It's always been my general understanding that the purpose of filing this motion was to go to the Federal District Court and ask that Court of reference to this Court whether or not Mr. Seery could be named with

respect to the original complaint, citing again the gatekeeper provisions and citing the various arguments that we've heard much earlier.

BY MR. MORRIS:

Q Okay. You personally didn't learn anything between April 9th, when the complaint was filed, and April 19th, when the motion to amend was filed, that caused you to authorize the filing of the motion to amend, correct?

A That is correct.

Q In fact, you relied on the Sbaiti firm with respect to decisions concerning the timing of the motion to amend. Correct?

A Correct.

Q And you had no knowledge of whether anyone acting on behalf of the Plaintiffs ever served the Debtor with a copy of the motion to amend. Correct?

A Yes. I have no knowledge.

Q Okay. And you have no knowledge that the Sbaiti firm ever provided my firm with a copy of the motion to amend. Correct?

A I cannot recall one way or another.

Q Okay. You never instructed anyone on behalf -- acting on behalf of the Plaintiffs to inform the Debtor that the motion to amend had been filed, correct?

A That is correct.

Q And that's because you relied on the Sbaiti firm on

procedural issues, correct?

A That is correct.

Q You didn't consider waiting until the Debtor --

(Interruption.)

Q -- had appeared in the action before authorizing the filing of the motion --

A Yeah, --

THE COURT: Yes. Y'all are being a little bit loud. Okay.

A VOICE: Sorry.

MR. MORRIS: No problem.

MR. PHILLIPS: I've heard that before, Your Honor, and I apologize.

THE COURT: I bet you have. Thank you.

MR. MORRIS: Admonish Mr. Phillips, please.

THE COURT: Okay.

MR. MORRIS: He's always the wild card.

MR. PHILLIPS: I admonish --

MR. MORRIS: He's always the wild card.

MR. PHILLIPS: I admonish myself.

THE COURT: All right. I think he got the message. Continue.

BY MR. MORRIS:

Q You didn't consider waiting until the Debtor had appeared in the action before filing the motion to amend, correct?

A Again, I am the client and I rely upon the law firm that's engaged with respect to making legal decisions as to the timing and notice and appearance and what have you. I'm a tax lawyer.

Q Okay. You wanted the District Court to grant the relief that the Plaintiffs were seeking. Correct?

A I wanted the District Court to consider, under the gatekeeper provisions of this Court, whether or not Mr. Seery could be named in the original complaint. That's -- that, from my perspective, is what was desired.

Q All right. You wanted the District Court to grant the relief that the Plaintiffs were seeking, correct?

MR. SBAITI: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Again, I would characterize this motion as not necessarily asking for specific relief, but asking the Federal District Court whether or not, under the gatekeeper provision, that Mr. Seery could be named on there. What happens after that would be a second step. So I kind of -- I dispute that characterization.

BY MR. MORRIS:

Q All right. I'm going to cross my fingers and hope that Ms. Canty is on the line, and I would ask her to put up Page 57 from Mr. Patrick's deposition transcript.

THE COURT: There it is.

MR. MORRIS: There it is. It's like magic. Can we go down to Lines 18 through 20?

BY MR. MORRIS:

Q Mr. Patrick, during the deposition on Friday, did I ask you this question and did you give me this answer? Question, "Did you want the Court to grant the relief you were seeking?" Answer, "Yes."

A I -- and it was qualified with respect to Lines 12 through 17. In my view, when I answered yes, I was simply restating what I stated in Line 12. I wanted the District Court to consider this motion as to whether or not Mr. Seery could be named in the original complaint or the amended complaint pursuant to the existing gatekeeper rules and the arguments that were made in that motion. That's -- that's what I wanted. And so then when I was asked, did you want the Court to grant the relief that you were seeking, when I answered yes, it was from that perspective.

Q Okay. Thank you very much. If the District Court had granted the relief that you were seeking, you would have authorized the Sbaiti firm to file the amended complaint naming Mr. Seery as a defendant if the Sbaiti firm recommended that you do so. Correct?

A If the Sbaiti firm recommended that I do so. That is correct.

Q Okay. Let's talk for a little bit about the line of succession for the DAF and CLO Holdco. Can we please go to Exhibit 25, which is in the other binder? It's in the other binder, sir.

(Pause.)

Q I guess you could look on the screen or you can look in the binder, whatever's easier for you.

A Yeah. I prefer the screen. I prefer the screen.

Q Okay.

A It's much easier.

Q All right. We've got it in both spots. But do you have Exhibit 25 in front of you, sir?

A Yes, I do.

Q All right. Do you know what it is?

A This is the organizational chart depicting a variety of charitable entities as well as entities that are commonly referred to the DAF. However, when I look at this chart, I do not look at and see just boxes, what I see is the humanitarian effort that these boxes represent.

MR. MORRIS: Your Honor, may I interrupt?

THE COURT: You may.

MR. MORRIS: Okay.

BY MR. MORRIS:

Q I appreciate that, and when your lawyers get up to ask you questions, I bet they'll want to know just what you were about

to tell me. But I just want to understand what this chart is. This chart is the DAF, CLO Holdco, structure chart. Correct?

A Correct.

Q Okay. And you were personally involved in creating this organizational structure, correct?

A I -- yes.

Q Okay. And from time to time, the Charitable DAF Holdco Limited distributes cash to the foundations that are above it. Correct?

A Correct.

Q All right. I want to talk a little bit more specifically about how this happens. The source of the cash distributed by Charitable DAF Holdco Limited is CLO Holdco, Ltd., that entity, the Cayman Islands entity near the bottom. Correct?

MR. ANDERSON: Your Honor, I have an objection. Completely irrelevant. I'm objecting on relevance grounds. This has nothing to do with the contempt proceeding. We've already gone over that he authorized the filing of the complaint, that he authorized the filing of the motion to amend. It's all in the record. This is completely irrelevant at this point.

THE COURT: Okay. Relevance objection. Your response?

MR. MORRIS: I believe that it's relevant to the Debtor's motion to hold Mr. Dondero in contempt for pursuing

claims against Mr. Seery, in violation of the July 7 order. I think an understanding of what the Plaintiffs are, how they're funded, and Mr. Dondero's interest in pursuing claims on behalf of those entities is relevant to the -- to the -- just -- it's just against him. It's not against their clients, frankly. It's just against Mr. Dondero.

THE COURT: I overrule.

MR. MORRIS: I'll try and -- I'll try and make this quick, though.

BY MR. MORRIS:

Q CLO Holdco had two primary sources of capital. Is that right?

A Two primary sources of capital?

Q Let me ask it differently. There was a Charitable Remainder Trust that was going to expire in 2011, correct?

A That is correct.

Q And that Charitable Remainder Trust had certain CLO equity assets, correct?

A Correct.

Q And the donor to that Charitable Remainder Trust was Highland Capital Management, LP. Correct?

A Not correct. After my deposition, I refreshed my memory. There were two Charitable Remainder Trusts that existed, which I think in my mind caused a little bit of confusion. The Charitable Remainder Trust No. 2, which is the one that

expired in 2011, was originally funded by Mr. Dondero.
Q Okay. So, so the Charitable Remainder Trust that we were talking about on Friday wasn't seeded with capital from Highland Capital Management, it came from Mr. Dondero personally?
A That is correct.
Q Okay. Thank you. And the other primary source of capital was the Dallas Foundation, the entity that's in the upper left-hand corner of the chart. Is that correct?
A No.
Q The -- you didn't tell me that the other day?
A You said -- you're pointing to the Dallas Foundation. That's a 501(c)(3) organization.
Q I apologize. Did you tell me the other day that the Dallas Foundation was the second source of capital for HCLO Hold Company?
A No, I did not. You --
(Pause.)
Q Maybe I know the source of the confusion. Is the Highland Dallas Foundation something different?
A Yes. On this organizational chart, you'll see that it has an indication, it's a supporting organization.
Q Ah, okay. So, so let me restate the question, then. The second primary source of capital for CLO Holdco, Ltd. is the Highland Dallas Foundation. Do I have that right?

A Yes.
Q Okay. And the sources of that entity's capital were grantor trusts and possibly Mr. Dondero personally. Correct?
A In addition -- per my refreshing my recollection from our deposition, the other Charitable Remainder Trust, I believe Charitable Remainder Trust No. 1, which expired later, also sent a donation, if you will, or assets to -- and I cannot recall specifically whether it was just the Highland Dallas Foundation or the other supporting organizations that you see on this chart.
Q But the source of that -- the source of the assets that became the second Charitable Remainder Trust was Highland Capital Management, LP. Is that right?
A I think that is accurate from my recollection. And again, I'm talking about Charitable Remainder Trust No. 1.
Q Okay. So is it fair to say -- I'm just going to try and summarize, if I can. Is it fair to say that CLO Holdco, Ltd. is the investment arm of the organizational structure on this page?
A Yes.
Q And is it fair to say that nearly all of the assets that are in there derived from either Mr. Dondero, one of his trusts, or Highland Capital Management, LP?
A Yes. It's like the Bill Gates Foundation or the Rockefeller Foundation. These come from the folks that make

their donations and put their name on it.

Q Okay.

MR. MORRIS: Now, now, Your Honor, I'm going to go back just for a few minutes to how Mr. Scott got appointed, because I think that lays kind of the groundwork for his replacement. It won't take long.

THE COURT: Okay. I have a question either --

MR. MORRIS: Sure.

THE COURT: -- for you or the witness. I'm sorry, but --

MR. MORRIS: Sure. Yeah.

THE COURT: -- the organizational chart, it's not meant to show everything that might be connected to this substructure, right? Because doesn't CLO Holdco, Ltd. own 49.02 percent of HCLOF, --

MR. MORRIS: That --

THE COURT: -- which gets us into the whole HarbourVest transaction issue?

MR. MORRIS: You're exactly right, Your Honor.

THE COURT: Okay.

MR. MORRIS: But that's just an investment that HCLO Holdco made.

THE COURT: Right.

MR. MORRIS: Right? And so I -- let me ask the witness, actually.

THE COURT: Okay. Thank you. Thank you.

MR. MORRIS: Let me ask the witness. Yeah.

THE COURT: I just want my brain --

MR. MORRIS: Right.

THE COURT: -- to be complete on this chart.

BY MR. MORRIS:

Q Mr. Patrick, there are three entities under CLO Holdco, Ltd. Do you see that?

A Yes.

Q And does CLO Holdco, Ltd. own one hundred percent of the interests in each of those three entities?

A Yes.

Q Do you know why those three entities are depicted on this particular chart? Is it because they're wholly-owned subsidiaries?

A Correct.

Q Okay. And CLO Holdco, Ltd. has interests in other companies. Isn't that right?

A It has other investments. That is correct.

Q And the reason that they're not depicted on here is because they're not wholly-owned subsidiaries, they're just investments; is that fair?

A That is fair.

MR. MORRIS: Does that--?

THE COURT: Yes.

MR. MORRIS: Okay.

THE COURT: Uh-huh.

BY MR. MORRIS:

Q So, so let's go back to Mr. Grant for a moment. Mr. Scott, rather. Mr. Dondero was actually the original general partner. If you look at this chart, while it's still up here, you see on the left there's Charitable DAF GP, LLC?

A Yes.

Q And the Charitable DAF GP, LLC is the general partner of the Charitable DAF Fund, LP. Correct?

A Correct.

Q And on this chart, Grant Scott was the managing member of Charitable DAF GP, LLC. Right?

A Correct.

Q Okay. But Mr. Dondero was the original general partner of that entity, correct?

A That is correct. But I do want to point out, I just note that the GP interest is indicating a one percent interest and the 99 interest to Charitable DAF Holdco. I believe that's incorrect. It's a hundred percent by Charitable DAF Holdco, Ltd., and the Charitable DAF GP interest is a noneconomic interest. So that should actually reflect a zero percent to the extent it may indicate some sort of profits or otherwise.

Q Okay. Thank you for the clarification. Can you turn to Exhibit 26, please, in your binder? And is it your

understanding that that is the amended and restated LLC agreement for the DAF GP, LLC?

A Yes.

Q Okay. And this was amended and restated effective as of January 1st, 2012, correct?

A Yes.

Q And if you go to the last page, you'll see there are signatures for Mr. Scott and Mr. Dondero, correct?

A Yes.

Q And Mr. Dondero is identified as the forming -- former managing member and Mr. Scott is identified as the new managing member. Correct?

A Correct. That's what the document says.

Q And it's your understanding that Mr. Dondero had the authority to select his successor. Correct?

A Correct.

Q In fact, it's based on your understanding of documents and your recollection that Mr. Dondero personally selected Mr. Scott as the person he was going to transfer control to, correct?

A Upon advice of Highland Capital Management's tax compliance officer, Mr. Tom Surgent.

Q What advice did Mr. Surgent give?

A He gave advice that, because Mr. Dondero -- and this is what I came to an understanding after the fact of this

transaction, because I was not a part of it -- that by Mr. Dondero holding that GP interest, that it would be -- the Plaintiffs, if you will, would be an affiliate entity for regulatory purposes, and so he advised that if he -- if Mr. Dondero transferred his GP interest to Mr. Scott, it would no longer be an affiliate, is my recollection.

Q Okay. You didn't appoint Mr. Scott, did you?

A No.

Q That was Mr. Dondero. Is that right?

A Yes.

Q Okay. Let's go to 2021. Let's come back to the current time. Sometime in February, Mr. Scott called you to ask about the mechanics of how he could resign. Correct?

A That is correct.

Q But the decision to have you replace Mr. Scott was not made until March 24th, the day you sent an email to Mr. Scott with the transfer documents. Correct?

A That is correct.

Q And it's your understanding that he could have transferred the management shares and control of the DAF to anyone in the world. Correct?

A Correct.

Q That's what the docu... that he had the authority under the documentation, as you understood it, to freely trade or transfer the management shares. Correct?

A Wait. Now, let's be precise here.
Q Okay.
A Are you talking about the GP interests or the management shares held by Charitable DAF Holdco, Ltd.?
Q Let's start with the management shares. Can you explain to the Court what the management shares are?

MR. ANDERSON: Your Honor? Hang on one second. Your Honor, I want to object again on relevance. We're going way beyond the scope of the contempt issue, whether or not --

MR. MORRIS: This is about control.

MR. ANDERSON: -- the motion to amend somehow violated the prior order of this Court. Getting into the management structure, transfer of shares, that's way outside the bounds. I object on relevance.

THE COURT: Okay. Relevance objection?

MR. MORRIS: Your Honor, they have probably 30 documents, maybe 20 documents, on their exhibit list that relate to management and control. I'm asking questions about management and control. Okay? This is important, again, to (a) establish his authority, but (b) the circumstances under which he came to be the purported control person.

THE COURT: Okay. Overruled. Go ahead.

THE WITNESS: It might be helpful to look at the organizational chart, but if not -- but I'll describe it to you again. With respect to the entity called --

MR. MORRIS: Hold on one second. Can we put up the organizational chart again, Ms. Canty, if you can? There you go.

THE WITNESS: Okay. So with respect to the Charitable DAF Holdco, Ltd., it is my understanding that Mr. Scott, he organized that entity when he was the independent director of the Charitable Remainder Trust, and he caused the issuance of the management shares to be issued to himself. And then those are, again, noneconomic shares, but they are control shares over that entity.

And I think, to answer your question, is -- it -- he alone decides who he can transfer those shares to.

BY MR. MORRIS:

Q Do I have this right, that whoever holds the noneconomic management shares has the sole authority to appoint the representatives for each of the Charitable DAF entities and CLO Holdco? It's kind of a magic ticket, if you will?

A It -- I think there's a -- the answer really is no from a legal standpoint, because Charitable DAF Holdco is a limited partner in Charitable DAF Fund, LP, so it does not have authority -- authority under all -- the respective entities underneath that. It could cause a redemption, if you will, of Charitable DAF Fund. And so, really, the authority -- the trickle-down authority that you're referencing is with respect to his holding of the Charitable DAF GP, LLC interest. It's a

member-managed Delaware limited liability company. And from that, he -- that authority kind of trickles down to where he can appoint directorships.

Q All right. I think I want to just follow up on that a bit. Which entity is the issuer of the manager shares, the management shares?

A Yeah, the -- per the organizational chart, it is accurate, it's the Charitable DAF Holdco, Ltd. which issued the management shares to Mr. Scott.

Q Okay. And that's why you have the arrow from Mr. Scott into that entity?

A Correct.

Q And do those -- does the holder of the management shares have the authority to control the Charitable DAF Holdco, Ltd.?

A Yes.

Q Okay. And as the control person for the Charitable DAF Holdco, Ltd., they own a hundred -- withdrawn. Charitable DAF Holdco Limited owns a hundred percent of the limited partnership interests of the Charitable DAF Fund, LP. Correct?

A Correct.

Q And so does the holder of that hundred percent limited partnership interest have the authority to decide who acts on behalf of the Charitable DAF Fund, LP?

A I would say no. I mean, you know, just -- I would love to

read the partnership agreement again. But I, conceptually, what I know with partnerships, I would say the limited partner would not. It would be through the Charitable DAF GP, LLC interest.

Q The one on the left, the general partner?

A The general partner.

Q I see. So when Mr. Scott transferred to you the one hundred percent of the management shares as well as the title of the managing member of the Charitable DAF GP, LLC, did those two events give you the authority to control the entities below it?

A Yes.

Q Thank you. And so prior to the time that he transferred those interests to you, is it your understanding that Mr. Scott had the unilateral right to transfer those interests to anybody in the world?

A Yes.

Q Okay. And you have that right today, don't you?

A Yes, I do.

Q If you wanted, you could transfer it to me, right?

A Yes, I could.

Q Okay. But of all the people in the world, Mr. Scott decided to transfer the management shares and the managing member title of the DAF GP to you, correct?

A Restate that question again?

Q Of all the people in the world, Mr. Scott decided to transfer it to you, correct?
A Yeah. Mr. Scott transferred those interests to me.
Q Okay. And you accepted them, right?
A Yes.
Q You're not getting paid anything for taking on this responsibility, correct?
A I am not paid by any of the entities depicted on this chart.
Q And Mr. Scott used to get $5,000 a month, didn't he?
A I believe that's what he testified to.
Q Yeah. But you don't get anything, right?
A Correct.
Q In fact, you get the exact same salary and compensation from Skyview that you had before you became the authorized representative of the DAF entities and CLO Holdco. Correct?
A Correct.

MR. MORRIS: Okay. Your Honor, if I may just take a moment, I may be done.

THE COURT: Okay.

(Pause.)

MR. MORRIS: Your Honor, I have no further questions.

THE COURT: All right. Pass the witness. Any examination of the witness?

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Mr. Patrick, I just had a few follow-up questions. When you authorized the filing of the lawsuit against Highland Capital Management, LP, Highland HCF Advisor Limited, and Highland CLO Funding, Limited, when that lawsuit was filed in April of this year, was Mr. Seery included as a defendant?

A No.

Q Have the two Plaintiffs in that lawsuit, have they commenced any lawsuit against Mr. Seery?

A No.

Q Have they pursued any lawsuit against Mr. Seery?

A No.

Q Have they pursued a claim or cause of action against Mr. Seery?

A No.

Q At most, did the Plaintiffs file a motion for leave to add Mr. Seery as a defendant?

MR. MORRIS: Objection, Your Honor. To the extent that any of these questions are legal conclusions, I object. He's using the word pursue. If he's trying -- if he's then going to argue that, But the witness testified that he didn't pursue and that's somehow a finding of fact, I object.

THE COURT: Okay. I understand.

MR. MORRIS: Yeah.

THE COURT: But I overrule. He can answer.

MR. MORRIS: That's fine.

THE WITNESS: Can you restate the question again?

BY MR. ANDERSON:

Q Sure. On behalf of the Plaintiffs -- well, strike that. Did the Plaintiffs pursue a claim or cause of action against Mr. Seery?

A No.

Q At most, did the Plaintiffs file a motion for leave to file an amended complaint regarding Mr. Seery?

A Yes. But, again, I viewed the motion as simply asking the Federal District Court whether Mr. Seery could or could not be named in a complaint, and then the next step might be how the Federal District Court might rule with respect to that.

Q And we have -- it's Tab 17 in the binders in front of you. That is Plaintiffs' motion for leave. If you could turn to that, please.

A Yes. I've got it open.

Q Is the Court's July order, the Bankruptcy Court's July order, is it mentioned on the first page and then throughout the motion for leave to amend?

A Yes, it is. I see it quoted verbatim on Page 2 under Background.

Q Was the Court's order hidden at all from the District Court?

A The document speaks for itself. It's very transparent.

Q Was there any effort whatsoever to hide the prior order of the Bankruptcy Court?
A No.

MR. ANDERSON: Pass the witness.

THE COURT: Okay. Other examination?

MR. SBAITI: Yes, Your Honor. Just a couple of questions.

CROSS-EXAMINATION

BY MR. SBAITI:

Q Do you mind flipping to Exhibit 25, which I believe is the org chart, the one that you were looking at before?
A Okay.
Q It'll still be in --
A Okay. Yeah.
Q -- the defense binder. No reason to swap out right now.
A I've got the right binders. Some of them are repeatable exhibits, so --
Q Yeah.
A -- I have to grab the right binder. Yes.
Q As this org chart would sit today, is the only difference that Grant Scott's name would instead be Mark Patrick?
A Yes.
Q Was there ever a period of time where Jim Dondero's name would sit instead of Grant Scott's name prior?
A Yes, originally, when this -- yes.

Q So did Mr. Dondero both have the control shares of the GP, LLC and DAF Holdco Limited?
A No, I believe not. I believe he only held the Charitable DAF GP interest and that Mr. Scott at all times held the Charitable DAF Holdco, LTD interest, until he decided to transfer it to me.
Q Can you just tell us how Mr. Scott came to hold the control shares of the Charitable DAF Holdco, LTD?
A When he was the independent trustee of the Charitable Remainder Trust, he caused that -- the creation of that entity, and that's how he became in receipt of those management shares.
Q And does the Charitable DAF GP, LLC have any control over Charitable DAF Fund, LP's actions or activities?
A Yes, it does.
Q What kind of control is that?
A I would describe complete control. It's the managing member of that entity and can -- and effectively owns, you know, the hundred percent interest in the respective subsidiaries, and so the control follows down.
Q And when did Mr. Scott replace Mr. Dondero as the GP -- managing member of the GP?
A Well, I think as the -- and Mr. Morris had shown me with respect to that transfer occurring on March 2012.
Q So nine years ago?

A Yes.

Q Does Mr. Dondero today exercise any control over the activities of the DAF Charitable -- the Charitable DAF, GP or the Charitable DAF Holdco, LTD?

A No.

Q Is he a board member of sorts for either of those entities?

A No.

Q Is he a board members of CLO Holdco?

A No.

Q Does he have any decision-making authority at CLO Holdco?

A None.

Q The decision to authorize the lawsuit and the decision to authorize the motion that you've been asked about, who made that authorization?

A I did.

Q Did you have to ask for anyone's permission?

A No.

MR. SBAITI: No more questions, Your Honor.

THE COURT: Okay. Any -- I guess Mr. Taylor, no. All right. Any redirect?

REDIRECT EXAMINATION

BY MR. MORRIS:

Q Since becoming the authorized representative of the Plaintiffs, have you ever made a decision on behalf of those

entities that Mr. Dondero disagreed with?

A I have made decisions that were adverse to Mr. Dondero's financial -- financial decision. I mean, financial interests. Whether he disagreed with them or not, I don't -- he has not communicated them to me. But they have been adverse, at least two very strong instances.

Q Have you ever -- have you ever talked to him about making a decision that would be adverse to his interests? Did he tell -- did --

A I didn't -- I don't -- I did not discuss with him prior to making the decisions that I made that were adverse to his economic interests.

MR. MORRIS: Okay. No further questions, Your Honor.

THE COURT: Any further examination? Recross on that redirect?

MR. ANDERSON: No further questions.

MR. SBAITI: No further questions, Your Honor.

MR. ANDERSON: Sorry.

THE COURT: Nothing?

MR. ANDERSON: I think we're good.

THE COURT: Okay. I have one question, Mr. Patrick. My brain sometimes goes in weird directions.

EXAMINATION BY THE COURT

THE COURT: I'm just curious. What are these Cayman Island entities, charitable organizations formed in the Cayman

Islands?

THE WITNESS: Yeah. I'll keep it as simple as I can, even though I'm a tax lawyer, so I won't get into the tax rules, but the Cayman structure is modeled after what you typically see in the investment management industry, and so I -- and I won't reference specific entities here with respect to the Highland case, but I think you'll note some similarities, if you think about it. They're -- it's described as an offshore master fund structure where you have a -- and that would be the Charitable DAF Fund that's organized offshore, usually in the Cayman or Bermuda Islands, where the general partner, typically, in the industry, holds the management --

THE COURT: Yeah. Let --

THE WITNESS: Okay.

THE COURT: -- me just stop you. I've seen this enough --

THE WITNESS: Yeah, it's

THE COURT: -- to know that it happens in the investment world. But in --

THE WITNESS: Yeah.

THE COURT: You know, usually, I see 501(c)(3), you know, domestically-created entities for charitable purposes, so I'm just curious.

THE WITNESS: Yes.

THE COURT: Uh-huh.

THE WITNESS: The offshore master fund structure typically will have two different types of -- they call it foreign feeder funds. One foreign feeder fund is meant to accommodate foreign investors; the other foreign feeder fund is meant to accommodate U.S. tax-exempt investors.

Why, why is it structured that way? In order to avoid something called -- I was trying not to be wonkish -- UBTI. That's, let's see, Un -- Unrelated Trader Business Income. I probably have that slightly wrong. But it's essentially, it's a means to avoid active business income, which includes debt finance income, which is what these CLOs tend to be, that would throw off income that would be taxable normally if the exempts did not go through this foreign blocker, and it converts that UBTI income -- it's called (inaudible) income -- into passive income that flows -- that flows up to the charities.

And so it's very typical that you'll have a U.S. tax-exempt investor, when they make an investment in a fund, prefer to go through an offshore feeder fund, which is actually Charitable DAF Holdco, LTD. That's essentially what, from a tax perspective, represents as a UBTI blocker entity. And then you have the offshore investments being held offshore because there's a variety of safe harbors where the receipt of interest, the portfolio interest exception, is not taxable.

The creation of capital gains or losses under the -- they call it the trading, 864(b) trading safe harbor, is not taxable. So that's why you'll find these structures operating offshore to rely on those safe harbor provisions as well as -- as well as what I indicated with respect to the two type blocker entities. It's very typical and industry practice to organize these way. And so when this was set --

THE COURT: It's very typical in the charitable world to --

THE WITNESS: In the investment management --

THE COURT: -- form this way?

THE WITNESS: In the investment management world, when you have charitable entities that are taking some exposure to assets that are levered, to set this structure up in this way. It was modeled after -- they just call them offshore master fund structures. They're known as Mickey Mouse structures, where you'll have U.S. investors --

THE COURT: Yes. I -- yes, I --

THE WITNESS: -- enter through a U.S. partnership, and the foreign investors enter through a blocker.

THE COURT: It was really just the charitable aspect of this that I was --

THE WITNESS: Yeah. Yeah.

THE COURT: -- getting at.

THE WITNESS: Yeah. No, but I'm just trying to

emphasize if --

THE COURT: All right. It's --

THE WITNESS: Yeah.

THE COURT: -- neither here nor there. All right.

MR. SBAITI: Your Honor, may I ask a slightly clarifying leading question on that, because I think I understand what he was trying to say, just for the record?

THE COURT: Well, --

MR. MORRIS: I object.

THE COURT: -- I tell you what. Anyone who wants to ask one follow-up question on the judge's question can do so. Okay? You can go first.

MR. SBAITI: I'll approach, Your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. SBAITI:

Q Would it be a fair summary of what you were saying a minute ago that the reason the bottom end of that structure is offshore is so that it doesn't get taxed before the money reaches the charities on the U.S. side?

A Tax -- it converts the nature of the income that is being thrown off by the investments so that it becomes a tax friendly income to the tax-exempt entity. Passive income. That's --

Q So, essentially, --

THE COURT: Okay. Okay.

MR. SBAITI: -- so it doesn't get taxed before it hits the --

THE COURT: I said one question.

MR. SBAITI: Sorry, Your Honor.

THE COURT: Okay. He answered it.

MR. PHILLIPS: And I have one question, Your Honor

THE COURT: Okay.

MR. PHILLIPS: I don't know if I need to ask this question, but I'd rather not ask you if I need to ask it.

THE COURT: Go ahead.

MR. PHILLIPS: But if I do, you know, I could --

THE COURT: Go ahead.

MR. PHILLIPS: Well, okay.

RECROSS-EXAMINATION

BY MR. PHILLIPS:

Q We've talked about the offshore structure. Are the foundations in the top two tiers of the organizational chart offshore entities?

A No.

Q They're --

A They're onshore entities. They're tax-exempt entities.

Q Thank you.

A The investments are offshore.

Q Thank you.

THE COURT: Mr. Morris? One question.

FURTHER REDIRECT EXAMINATION

BY MR. MORRIS:

Q Do you hold yourself out as an expert on the organizational structures in the Caribbean for charitable organizations?

A I hold myself out as a tax professional versant on setting up offshore master fund structures. It's sort of a bread-and-butter thing. But there are plenty of people that can testify that this is very typical.

Q Uh-huh. Okay.

THE COURT: Okay. Thank you.

All right. You are excused, Mr. Patrick. I suppose you'll want to stay around. I don't know if you'll potentially be recalled today.

(The witness steps down.)

THE COURT: All right. We should take a lunch break. I'm going to put this out for a democratic vote. Forty-five minutes? Is that good with everyone?

MR. SBAITI: Do we have to leave the building to eat, Your Honor, or is there food in the building?

THE COURT: I think --

MR. SBAITI: I'm sorry to ask that question, but --

THE COURT: Yes. You know what, there used to be a very bad cafeteria, but I think it closed. Right, Mike? So,

you know, --

MR. SBAITI: Sorry I asked that.

A VOICE: Hate to miss that one.

THE COURT: Is 45 minutes not enough since you have to go off campus? I'll give you an hour. It just means we stay later tonight.

A VOICE: Can we just say 2:00 o'clock?

MR. SBAITI: That's fine with us, Your Honor.

THE COURT: 2:00 o'clock. That's 50 minutes. See you then.

MR. SBAITI: Thank you.

A VOICE: Your Honor, can we just get a time check?

THE COURT: Okay.

THE CLERK: Yeah. The Debtors are at an hour and eleven minutes. Respondents at an hour nineteen.

THE COURT: And hour and eleven and an hour and nineteen.

A VOICE: Wait, that's not right.

A VOICE: That can't be right.

A VOICE: Two hours? We started at --

THE COURT: Okay. So, again, their side, the collective Respondents?

THE CLERK: An hour and eleven, responding to your questions, --

A VOICE: Yeah, he's not recording --

THE CLERK: So an hour and eleven and an hour and nineteen.

THE COURT: But they were already over an hour --

A VOICE: Yeah. It's been over three hours.

THE COURT: -- with opening statements.

THE CLERK: An hour and twelve. Yes. They were very short with the questioning. It was only like --

THE COURT: Okay. We'll double-check that over the break with the court reporter.

A VOICE: All right. Thank you, Your Honor.

THE COURT: We'll double-check and let you know.

THE COURT: All rise.

(A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

THE COURT: All right. Please be seated. We're going back on the record in Highland after our lunch break. I'm going to confirm time. We've had the Debtor an aggregate of an hour and eleven minutes. The Respondents, an aggregate of an hour and twenty minutes. Okay? So we've gone two hours and thirty-one minutes.

If it seems like we've been going longer, it's because we did not do the clock on the opening matters regarding removal, extension of time. And then when I interjected with questions, we stopped the clock. All right? So let's go.

You may call your next witness, Mr. Morris.

MR. MORRIS: Thank you, Your Honor. The Debtor calls

James Dondero.

THE COURT: All right.

A VOICE: He had to step down the hall. We had a little trouble getting through security. Let me --

THE COURT: All right. Mr. Dondero, you've been called as the next witness. So if you'll approach our witness stand, please. All right. Please raise your right hand.

(The witness is sworn.)

THE COURT: All right. Please be seated.

JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Dondero.
A Good afternoon.
Q Can you hear me?
A Yes.
Q Okay. So, you were here this morning, correct?
A Yes.
Q All right. So, we're going to put up -- we'll put it up on the screen, but if you'd prefer to look at a hard copy in the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to turn to Exhibit 25. Or you could just follow on the screen. And this is a one-page document, so maybe that's easier.
A Sure.
Q Do you have it? All right.

A Yes.
Q This is the organizational chart for what's known as the DAF, correct?
A Yes.
Q And Mark Patrick set up this structure, correct?
A I believe he coordinated. I believe it was set up by third-party law firms. I believe it was Hutton or a firm like that.
Q Mr. Patrick participated in the creation of this structure because you gave him the task of setting up a charitable entity for Highland at that time, correct?
A Yes.
Q And you approved of this organizational structure, correct?
A Yes.
Q And Grant Scott was the Trustee of the DAF for a number of years, correct?
A I often use that word, trustee, but technically I think it's managing member.
Q That's right. I appreciate that. I was using your word from the deposition. But is it fair to say that, to the best of your knowledge, Grant Scott was the sole authorized representative of the entity known as the DAF from 2011 until just recently?
A Sole -- I would describe it more he was in a trustee

function.

Q Uh-huh.

A Advice was being provided by Highland on the investment side. He wasn't expected to be a financial or an investment expert. And then accounting, tax, portfolio, tracking, you know, compliance with all the offshore formation documents, that was all done by Highland as part of a shared services agreement.

Q Okay. I appreciate that, but listen carefully to my question. All I asked you was whether he was the authorized representative, the sole authorized representative for the ten-year period from 2011 until recently.

A Yes.

Q Okay.

A I believe so.

Q Thank you. You served as the managing member of the DAF GP, LLC before Mr. Scott, correct?

A Yes.

Q Okay. And if you turn to Exhibit 26 in your binder, that's the amended and restated limited liability company agreement for the DAF GP, LLC, correct?

A Yes.

Q And on the last page, that's your signature line, right?

A Yes.

Q And you stepped down as the managing member on March 12,

2012, and were replaced by Mr. Scott, correct?

A Yes.

Q And as you recall it, Mr. Scott came to be appointed the trustee of the DAF based on your recommendation, right?

A Based on my recommendation? Yes, I would say that's fair.

Q And you made that recommendation to Mr. Patrick, right?

A I -- I don't remember who I made the recommendation to. But I would echo the testimony of Mark Patrick earlier that the purpose of stepping down was to make the DAF unaffiliated or independent versus being in any way affiliated.

MR. MORRIS: I move to strike.

BY MR. MORRIS:

Q And I'd ask you to listen carefully to my question.

THE COURT: Sustained.

BY MR. MORRIS:

Q You made the recommendation to Mr. Patrick, correct?

A I would give the same answer again.

Q Okay.

MR. MORRIS: Can we please put up Mr. Dondero's deposition transcript from last Friday at Page 297?

I believe, Your Honor, that the court reporter thought that this was a continuation of a prior deposition, and that's why the pages begin in the, you know, high in the 200s and not at Page 1. Just to avoid any confusion.

BY MR. MORRIS:

Q Mr. Dondero, do you see the transcript in front of you?
A Yes.
Q Okay. Were you asked this question and did you give this answer? "Who did you make the" -- question, "Who did you make the recommendation to?" Answer, "It would have been Mark Patrick."
A I don't recall right now as I sit here, and it seems like I was speculating when I answered, but it -- it probably would have been Mark Patrick. I just don't have a specific recollection.
Q You made the recommendation to Mr. Patrick because he was responsible for setting up the overall structure, correct?
A I -- I can't testify to why I did something I don't remember. I think that would be --
Q Can we --
A -- speculative.
Q Are you finished, sir?
A Yeah.
Q Okay.

MR. MORRIS: Can we go to Page 299, please?

BY MR. MORRIS:
Q Lines 6 through 10. Did I ask this question and did you give me this answer? Question, "But why did you select Mr. Patrick as the person to whom to make your recommendation?" Answer, "Because he was responsible for setting up the overall

structure."

Were you asked that question and did you give that answer last Friday?

A Yes.

Q Thank you. But it's your testimony that you don't really know what process led to Mr. Scott's appointment, correct?

A No, I -- I said I was refreshed by Mark Patrick's testimony earlier.

Q Yeah. Were you refreshed that, in fact, you specifically had the authority to and did appoint Grant Scott as the managing member of the DAF GP, LLC?

A I -- I don't know.

Q Well, you're referring to Mr. Patrick's testimony and I'm asking you a very specific question. Did you agree -- is your memory refreshed now that you're the person who put Grant Scott in the position in the DAF?

A I -- I don't know if I owned those secret shares that -- well, they're not secret, but shares that could appoint anybody on the planet. I guess if I was in that box at that time before Grant, then I would have had that ability. I'm not denying at all that I recommended Grant. I'm just saying I don't -- I don't remember if I went specifically to him or if it was Thomas Surgent that was orchestrating it at the time. I don't remember.

Q Do you deny that you had the authority to and that you did

appoint Grant Scott as your successor?

MR. TAYLOR: Your Honor, objection to the extent it calls for a legal conclusion. I can't get close to a mic, so --

THE COURT: I overrule the objection.

THE WITNESS: Can you repeat the question for me?

BY MR. MORRIS:

Q Do you deny that you had the authority to and that you did, in fact, appoint Grant Scott as your successor?

A It'd be better to say I don't -- I don't -- no, I don't remember or I didn't know the details at the time. But, again, I -- I assume I owned those shares. And, again, I do remember recommending Grant and -- but exactly how it happened, I don't remember.

Q Did you hear Mark Patrick say just an hour ago that you appointed Grant Scott as your successor?

MR. SBAITI: Objection, Your Honor. Misstates testimony. The witness testified he transferred shares. That's different than an appointment power.

THE COURT: Response? I can't remember the exact way you worded it, to be honest.

MR. MORRIS: Neither can I, but I'll even take it that way.

THE COURT: Okay.

MR. MORRIS: I think he's wrong, but I'll even take

it that way.

THE COURT: Okay.

BY MR. MORRIS:

Q Mr. Dondero, did you listen to Mark Patrick say that you are the person who made the decision to transfer the shares to Mr. Scott in 2012?

A Yes, I heard him say that.

Q Okay. So, do you -- do you dispute that testimony?

A I -- I don't have any better knowledge to dispute or confirm.

Q You and Mr. Scott have known each other since high school, correct?

A Yes.

Q You spent a couple of years at UVA together, correct?

A Yes.

Q You were housemates together, correct?

A Yes.

Q He was the best man at your wedding, correct?

A Yes.

Q He's a patent lawyer, correct?

A Yes.

Q He had no expertise in finance when -- when he was appointed as your successor to the DAF, correct?

A Correct.

Q To the best of your knowledge, at the time Mr. Scott

assumed his position, he had never made any decisions concerning collateralized loan obligations, correct?

A Correct, but he wasn't hired for that. That wasn't his position.

Q Was he the person who was going to make the decisions with respect to the DAF's investments?

A My understanding on how it was structured was the DAF was paying a significant investment advisory fee to Highland. Highland was doing portfolio construction and the investment selection of -- or the investment recommendations for the portfolio. There is an independent trustee protocol that I believe was adhered to, but it was never my direct involvement. It was always the portfolio managers or the traders.

You have to provide three similar or at least two other alternatives, and then with a rationale for each of them, but a rationale for why you think one in particular is better. And the trustee looks at the three, evaluates them. And the way I understand it always worked, that it works at pretty much every charitable trust or trust that I'm aware of, they generally, if not always, pick alongside the -- or, pick the recommendation of their highly-paid investment advisory firm.

Q And are you the highly-paid investment advisory firm?

A Highland was at the time, yes.

Q And you controlled Highland, right?

A Yes.

Q Okay. But at the end of the day, is it your understanding that Mr. Scott had the exclusive responsibility for making actual decisions on behalf of the charitable trust that you had created?

A Yeah, I mean, subject to the protocol I just described.

Q Yeah, okay, so let's keep going. Mr. Scott had no experience or expertise running charitable organizations at the time you decided to transfer the shares to him, correct?

A Yes, I believe that's correct.

Q Okay. You didn't recommend Mr. Scott to serve as the DAF's investment advisor, did you?

A No.

Q And until early 2021, as you testified, I believe, already, HCMLP served as the DAF's investment advisor, correct?

A Yes.

Q And until early 2021, all of the DAF's day-to-day operations were conducted by HCMLP pursuant to a shared services agreement, correct?

A Yes.

Q And from the time the DAF was formed until January 9, 2020, you controlled HCMLP, correct?

A Yes.

Q You can't think of one investment decision that HCMLP

recommended that Mr. Scott ever rejected in the ten-year period, correct?

MR. SBAITI: Objection, Your Honor. Lacks foundation.

THE COURT: Response?

MR. MORRIS: I'm not quite sure what to say, Your Honor. The witness has already testified that HCMLP was the investment advisor, made recommendations to Mr. Scott, and that Mr. Scott was the one who had to make the investment decisions at the end of the day.

MR. SBAITI: He's not here as a witness for HCMLP. He's here in his personal capacity. There's no foundation he'd have personal knowledge of which specific investments were proposed, which ones were rejected or accepted. He said it was done by the portfolio manager.

THE COURT: Okay. I overrule. He can answer if he has an answer.

BY MR. MORRIS:

Q Sir, you can't think of one investment decision that HCMLP ever recommended to Mr. Scott that he rejected, correct?

A I can't think of one, but I would caveat with I wouldn't have expected there to be any.

Q So you expected him to just do exactly what HCMLP recommended, correct?

A No. I would expect him to sort through the various

investments when he was given three or four to choose from and be able to discern that, just as we had with our expertise, which was much greater than his, discern which one was the best and most suitable investment, the best risk-adjusted investment, that he would come to the same conclusion.

Q Okay. You can't think of an investment that Mr. Scott ever made on behalf of the DAF that didn't originate with HCMLP, correct?

A Again, no, but I wouldn't expect there to be.

Q Okay. And that's because you expected all of the investments to originate with the company that you were controlling, correct?

A We were the hired investment advisor with fiduciary responsibility --

Q Uh-huh.

A -- and with a vested interest in making sure the DAF performance was the best it could be.

Q Okay. Let --

A He was, as you said, a patent attorney. It would have been unusual for him to second-guess. I'm sure, in any private investment or any investment that was one off or didn't have comps, you know, he probably sought third-party valuations. But you would have to talk to him about that, or the people at Highland that did that.

MR. MORRIS: I move to strike. It's a very simple

question.

THE COURT: Sustained.

BY MR. MORRIS:

Q Sir, you can't think of one investment that Mr. Scott made on behalf of the DAF that did not originate with HCMLP, correct?

A I'm going to give the same answer.

Q Okay. Let's go to Page 371 of the transcript, please. Lines 7 through 11.

Oh, I apologize. I think I might -- I think I meant 317. I think I got that inverted. Yeah.

Did I ask this question and did you give this answer: "Can you think of any investment that Mr. Scott made on behalf of the DAF that didn't original with HCMLP?" Answer, "He wasn't the investment advisor, but no, I don't -- I don't recall."

Is that the answer you gave on Friday?

A Yes.

Q Thank you. Let's --

MR. SBAITI: Just for clarification, Your Honor, --

THE COURT: Pardon?

MR. SBAITI: -- the deposition was last Tuesday, not on Friday.

MR. MORRIS: I stand corrected, Your Honor.

THE COURT: Okay.

MR. MORRIS: I apologize.

THE COURT: Okay.

MR. MORRIS: I apologize if the Court thinks I misled it.

BY MR. MORRIS:

Q Let's talk about Mr. Scott's decision during the bankruptcy case that preceded his resignation. After HCMLP filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim, correct?

MR. ANDERSON: Your Honor, I haven't objected yet, but we literally haven't covered anything that deals with commencing or pursuing a claim or cause of action. I'm going to object. This is way outside, again, the bounds of the contempt hearing. It's -- otherwise, it's other discovery for something else. It literally has nothing to do with pursue a claim or cause of action.

THE COURT: We have another relevance objection. Your response?

MR. MORRIS: Your Honor, the evidence is going to show that Mr. Dondero told Mr. Scott on three separate occasions that his conduct, which were acts of independence, were inappropriate and were not in the best interests of the DAF. Within days of the third strike, he resigned. Okay?

I think it's relevant to Mr. Dondero's control of the DAF. I think that the moment that Mr. -- this is the argument I'm

going to make. I'll make it right now. You want me to make it now, I'll make it now. The moment that Mr. Scott exercised independence, Mr. Dondero was all over him, and Mr. Scott left. That's what happened. The evidence is going to be crystal clear.

And I think that that control of the DAF is exactly what led to this lawsuit. And what led -- and I'm allowed to make my argument. So that's why it's relevant, Your Honor, because I think it shows that Mr. Scott -- Mr. Scott, after exercising independence, was forced out.

MR. ANDERSON: That doesn't move the needle one bit as to whether a lawsuit was commenced or a claim or cause of action was pursued, which is the subject of the contempt motion. It doesn't move the needle one bit as to those two issues, as to whether that has any bearing on was it commenced or was it pursued.

MR. MORRIS: Your Honor, I appreciate the very narrow focus that counsel for a different party is trying to put on this, but it is absolutely relevant to the question of whether Mr. Dondero was involved in the pursuit of these claims. All right? That's what the order says. Pursue.

THE COURT: All right. Overruled.

BY MR. MORRIS:

Q After HCMLP filed for bankruptcy, CLO Holdco filed a proof of claim, correct?

A I believe so.
Q And in the fall of 2020, Mr. Scott amended the proof of claim to effectively reduce it to zero, correct?
A I -- I guess.
Q And Mr. Scott made that decision without discussing it with you in advance, correct?
A Yes.
Q But you did discuss it with him after you learned of that decision, correct?
A I don't -- I don't recall. I'm willing to be refreshed, but I don't remember.
Q Well, you told him specifically that he had given up bona fide claims against the Debtor, correct?
A Let me state or clarify my testimony this way. Um, --

MR. MORRIS: Your Honor, it's really just a yes or no question. His counsel can ask him if he wants to clarify, but it's really just a yes or no question.

BY MR. MORRIS:
Q You told Mr. Scott that he gave up bona fide claims against the Debtor, correct?

THE COURT: Okay.

THE WITNESS: I don't know if I told him then with regard to those claims.

BY MR. MORRIS:
Q Okay. Can we go to Page 321 of the transcript? At the

bottom, Line 21? 22, I apologize.

Did I ask this question and did you give this answer? "And what do you" -- Question, "And what do you recall about your discussion with Mr. Scott afterwards?" Answer, "That he had given up bona fide claims against the Debtor and I didn't understand why."

Did I ask that question and did you give that answer last Tuesday?

A Yes.

Q Okay. A short time later, in December, the Debtor filed notice of their intention to enter into a settlement with HarbourVest, correct?

A Yes.

Q And CLO Holdco, under Mr. Scott's direction, filed an objection to that settlement, correct?

A Yes.

Q And that settlement, the substance of that settlement was that the Debtor did not have the right to receive HarbourVest's interests in HCLOF at the time, correct?

A I don't remember the exact substance of it.

Q Okay. But you do remember that you learned that Mr. Scott caused CLO Holdco to withdraw the objection, correct?

A Yes, ultimately.

Q Okay. And again, Mr. Scott did not give you advance notice that he was going to withdraw the HarbourVest

objection, correct?

A No, he -- he did it an hour before the hearing. He didn't give anybody notice.

Q You learned that Mr. Scott caused CLO Holdco to withdraw its objection to the HarbourVest settlement at the hearing, correct?

A Yes.

Q And you were surprised by that, weren't you?

A I believe everybody was.

Q You were sur... you were surprised by that, weren't you, sir?

A Yes.

Q And you were surprised by that because you believed Mr. Scott's decision was inappropriate, right?

A Partly inappropriate, and partly because 8:00 o'clock the night before he confirmed that he was going forward with the objection. And I think the DAF's objection was scheduled to be first, I think.

Q After you learned that Mr. Scott instructed his attorneys to withdraw the CLO Holdco objection to the HarbourVest settlement, you again spoke with Mr. Scott, correct?

A Yes.

Q And that conversation took place the day of the hearing or shortly thereafter, correct?

A Yes.

Q And during that conversation, you told Mr. Scott that it was inappropriate to withdraw the objection, correct?
A Yes.
Q And in response, Mr. Scott told you that he followed the advice of his lawyers, correct?
A Yes.
Q But that didn't -- that explanation didn't make sense to you, right?
A Yes.
Q In fact, you believed that Mr. Scott failed to act in the best interests of the DAF and CLO Holdco by withdrawing its objection to the HarbourVest settlement, correct?
A Yes.
Q And while you didn't specifically use the words fiduciary duty, you reminded Mr. Scott in your communications with him that he needed to do what was in the best interests of the DAF, correct?
A Yes.
Q You're the founder of the DAF, correct?
A I put it -- I put it in motion. Yeah. I tasked Mark Patrick and third-party law firms to do it, but if that boils down to founder, I guess yes.
Q Uh-huh. And you're the primary donor to the DAF, correct?
A Yes.
Q You're the investment advisor to the DAF, or at least you

were at that time?
A Yes.
Q And because you served in these roles, you expected Mr. Scott to discuss his decision to withdraw the HarbourVest objection in advance, correct?
A Yes, I -- I think it was even broader than that. I mean, he was having health and anxiety issues, and to the extent he felt overwhelmed, I -- you know, yeah, you should do what's in the best interests at all times, but -- but yes, I thought it would be helpful if he conferred with me or Mark Patrick or whoever he was comfortable with.
Q Mr. Dondero, you specifically believed that Mr. Scott's failure to tell you that he was going to withdraw the HarbourVest objection in advance was inappropriate, right?
A Yes.
Q Even though he was the sole authorized representative, you believed that, because you were the founder of the DAF, the primary donor of the DAF, and the investment advisor to the DAF, he should have discussed that before he actually made the decision, correct?
A No. What I'm saying is at 8:00 o'clock at night, when he confirms to numerous people he's ready to go first thing with his objection, and then he or counsel or some combination of them change their mind and don't tell anybody before the hearing, that's odd and inappropriate behavior.

MR. MORRIS: Can we go to Page 330 of the transcript, please?

And Your Honor, before I read the testimony, there is an objection there. So I'd like you to rule --

THE COURT: Okay.

MR. MORRIS: -- before I do that. It can be found at -- on Page 330 at Line 21.

(Pause.)

MR. MORRIS: Here we go. Page 30, beginning at Line 19. 330, rather.

THE COURT: Okay.

(Pause.)

THE COURT: Okay. I overrule that objection.

BY MR. MORRIS:

Q Mr. Dondero, were you asked this question and did you give this answer last Tuesday? Question, "Do you believe that he had an obligation to inform you in advance?" Answer, "I don't know if I would use the word obligation, but, again, as the founder or the primary donor and continued donor to the DAF, and as the investment advisor fighting for above-average returns on a daily basis for the fund, significant decisions that affect the finances of the fund would be something I would expect typically a trustee to discuss with the primary donor."

Did you give that answer the other day, sir?

A Yes.
Q If Mr. Patrick decides tomorrow to withdraw the lawsuit that's in District Court, does he have an the obligation to tell you in advance?
A Again, I wouldn't use the word obligation. But something that I think ultimately is going to be a $20 or $30 million, if not more, benefit to the DAF, to the detriment of Highland, if you were to give that up, I would expect him to have a rationale and I would expect him to get other people's thoughts and opinions before he did that.
Q Okay. But does he have to get your opinion before he acts?
A No, he does not.
Q Okay. So he -- Mr. Patrick could do that tomorrow, he could settle the case, and if he doesn't come to you to discuss it in advance, you won't be critical of him, right?
A He doesn't have the obligation, but there's -- there's a reasonableness in alignment of interests. I -- a growing entrepreneur sets up a trust, a lot of times they'll put their wife in charge of it, and she hires investment advisers and whatever, but they've got the best interests at mind for the charity or the children or whatever.

You know, people who go rogue and move in their own self-interest or panic, that stuff can happen all the time. It doesn't make it appropriate, though.

Q A couple of weeks after Mr. Scott withdraw the objection to the HarbourVest settlement, he entered into a settlement agreement with the Debtor pursuant to which he settled the dispute between the Debtor and CLO Holdco, correct?
A Yes.
Q Okay. You didn't get advance notice of that third decision, correct?
A No.
Q Can we go to Page -- Exhibit 32 in your binder? And this is the settlement agreement between CLO Holdco and the Debtor, correct? Attached as the exhibit. I apologize.
A Yes.
Q And do you understand that that's Mr. Scott's signature on the last page?
A Yep.
Q And you learned about this settlement only after it had been reached, correct?
A Yep.
Q And you believed Mr. Scott's decision not to pursue certain claims against the Debtor or to remove HCMLP as the manager of the CLOs was not in the best interests of the DAF, correct?
A Correct.
Q And you let Mr. Scott know that, correct?
A Yes.

Q After learning about the settlement agreement on January 26th, you had one or two conversations with Mr. Scott on this topic, correct?
A Yes.
Q And your message to Mr. Scott was that the compromise or settlement wasn't in the DAF's best interest, correct?
A It was horrible for the DAF.
Q Uh-huh. And you told him that, right?
A Yes.
Q Okay. From your perspective, any time a trustee doesn't do what you believe is in the trust's best interest, you leave yourself open to getting sued, correct?
A Who is "you" in that question?
Q You. Mr. Dondero.
A Can you repeat the question, then, please?
Q Sure. From your perspective, any time you're a trustee and you don't believe that the trustee is doing what's in the best interests of the fund, the trustee leaves himself open to getting sued, correct?
A I don't know who the trustee leaves himself open to, but as soon as you go down a path of self-interest or panic, you -- you potentially create a bad situation. But I don't know who holds who liable.
Q Did you believe that Mr. Scott was acting out of self-interest or panic when he decided to settle the dispute with

the Debtor on behalf of CLO Holdco?

A Yes.

Q Did you tell him that?

A He told me that.

Q He told you that he was acting out of panic or desperation? With self-int... withdrawn. Withdrawn. Did he tell you that he was acting out of self-interest?

A He was having health problems, anxiety problems, and he didn't want to deal with the conflict. He didn't want to testify. He didn't want to come to court. He didn't want to do those things. And I told him I didn't think the settlement was going to get him out of that stuff. I think, you know, it got him out of some issues, but I think you guys are going to go after him for other stuff. But he -- he panicked.

MR. MORRIS: I move to strike the latter remark.

THE COURT: Sustained.

BY MR. MORRIS:

Q Shortly after you had the conversation with Mr. Scott, he sent you notice of his intent to resign from his positions at the DAF and CLO Holdco, correct?

A Yes.

Q Okay. Let's take a look at that, please. Exhibit 29. This is Mr. Scott's notice of resignation, correct?

A Yes.

Q He sent it only to you, correct?

A Yes.
Q A couple of days before he sent this, he told you he was considering resigning; isn't that right?
A Yes.
Q Okay. And he told you he was considering resigning because he was suffering from health and anxiety issues regarding the confrontation and the challenges of administering the DAF given the bankruptcy, correct?
A Yes.
Q He didn't tell you that he made the decision -- withdrawn. Did you tell him in this same conversation -- withdrawn. Is this the same conversation where you conveyed the message that the compromise or settlement wasn't in the best interests of the DAF?
A You mean the conversation -- or the resignation? Is that -- can you rephrase the question, please?
Q Yeah, I apologize. It's my fault, sir. You testified that after the January 26th hearing you had a conversation with Mr. Scott where you told him that the compromise or settlement was not in the best interests of the DAF, correct?
A Yes.
Q Okay. Did Mr. Scott share with you his concerns about anxiety and health issues in that same conversation, or was it in a subsequent conversation?
A It was at or around that time. I -- I don't remember

which conversation.
Q Okay.
A But it was right at or around that time.
Q All right. You never asked Mr. Scott to reconsider, did you?
A No.
Q You don't recall sending this notice of resignation to anyone, do you?
A No.
Q You don't remember notifying anyone that you'd received notice of Mr. Scott's intent to resign from the DAF, do you?
A It was -- yeah, no, I -- I don't remember. It was a busy time around that time and this was a secondary issue.
Q Okay. So the fact that the person who has been running the DAF for a decade gives you and only you notice of his intent to resign was a secondary issue in your mind?
A Yes, because when I talked to him at about that time, I said, okay, well, it's going to take a while. I don't even know how the mechanism works. But don't do anything adverse to the DAF, don't do anything else until, you know, you've figured out transition.
Q Uh-huh.
A And so once he had confirmed he wouldn't do anything outside normal course until he transitioned, I didn't worry about this. I had bigger issues to worry about at the time.

Q In the third paragraph of his email to you, he wrote that his resignation will not be effective until he approves of the indemnification provisions and obtains any and all necessary releases. Do you see that?

A Yes.

Q And that was the condition that on January 31st Mr. Scott placed on the effectiveness of his resignation, correct?

A Condition? Yeah, I -- I think he's trying to state the timing will happen after that.

Q After he gets the release, right?

A Yes.

Q And he wanted the release because you'd told him three different times that he wasn't acting in the best of the DAF, correct?

MR. TAYLOR: Objection, Your Honor.

MR. SBAITI: Objection. Calls for --

MR. TAYLOR: Objection. Calls for speculation.

THE WITNESS: Yeah, I --

THE COURT: Sustained.

THE WITNESS: I can't take that jump. Yeah.

BY MR. MORRIS:

Q In response to this email from your lifelong friend, you responded, if we could scroll up, about whether divest was a synonym -- if we can look at the first one -- whether divest is a synonym for resigned. Do I have that right?

A (no immediate response)
Q If you will look at your response on Monday morning at 9:50.
A Yes.
Q Okay. And then after Mr. Scott responds, you respond further, if we can scroll up, and you specifically told him, "You need to tell me ASAP that you have no intent to divest assets." Correct?
A Yes.
Q And you wrote that because you believed some of his behavior was unpredictable, right?
A I think I wrote that because the term divest in investment terms means sale or liquidate, but I guess it had a different legal term in the way he was looking at it. I wasn't aware at that time of the shares that could be bequeathed to anybody, and I think the divest refers to that, but I wasn't aware that that's how the structure worked at that time, and I was worried that divest could be the investment term and I -- it wouldn't have been appropriate for him to liquidate the portfolio.
Q So, and you wanted to make sure he wasn't liquidating or intending to liquidate any of the CLOs, correct?
A Correct.
Q Okay. So he's still the authorized, the sole authorized representative, but you wanted to make sure that he didn't do

anything that you thought was inappropriate. Fair?

A It's because I had talked to him before this and he said he wasn't going to do anything outside normal course, and then the word divest scared me, but I didn't realize it was a legal term in this parlance here.

Q And so after he explained, you still wanted to make sure that he wasn't divesting any assets, correct?

A Yes.

Q Okay. Since February 1st, you've exchanged exactly one text messages with Mr. Scott; is that right?

A I think there've been several, several text messages. But one on his birthday.

Q Yeah. And you haven't spoken to him in months, correct?

A In a couple months, yes.

Q All right. Let's talk about the replacement of Mr. Scott. With -- with Mr. Scott's notice, someone needed to find a replacement, correct?

A Yes.

Q And the replacement was going to be responsible for managing a charitable organization with approximately $200 million of assets, most of which was seeded directly or indirectly through you, correct?

A Yes.

Q And the replacement was going to get his and her -- his or her investment advice from you and NexPoint Advisors; do I

have that right?
A That was the plan.
Q Okay. Ultimately, Mr. Patrick replaced Mr. Scott, correct?
A Yes.
Q But it's your testimony that you had no knowledge that Mr. Patrick was going to replace Mr. Scott until after it happened on March 24, 2021. Correct?
A That's correct. I believe it happened suddenly.
Q So, for nearly two months after you had received notice of Mr. Scott's intent to resign, you were uninvolved in the process of selecting his replacement, correct?
A I was uninvolved. I'd say the process was dormant for an extended period of time until Mark Patrick came on board, and then Mark Patrick ran the process of interviewing multiple potential candidates.
Q Mark Patrick didn't have any authority prior to March 24th, correct?
A Is March 24th the date that he transitioned the shares to himself from Grant Scott?
Q Yep.
A That's when he then became the trustee of the DAF, yes.
Q Do you know -- do you know who was instructing Mr. Patrick on who to interview or how to carry the process out?
A He was doing that on his own with, I think,

recommendations from third-party tax firms.

Q So Mr. Patrick was trying to find a successor to Mr. Scott, even though he had no authority to do that, and you were completely uninvolved in the whole process? Do I have that right?

A I was uninvolved, yes. He was trying to facilitate it for the benefit of his friendship with Grant Scott and knowing that it -- it -- with his resignation, it had to transition to somebody. And he enjoys working on the DAF, he enjoys the charitable stuff in the community, and he was the most appropriate person to work on helping Grant transition.

MR. MORRIS: All right. I move to strike, Your Honor. It's hearsay.

THE COURT: Sustained.

BY MR. MORRIS:

Q You're aware that Mr. Seery was appointed the Debtor's CEO and CRO last summer, correct?

A Yes.

Q And you're aware that Mr. Seery's appointment was approved by the Bankruptcy Court, correct?

A Yes.

Q And you were aware of that at the time it happened, correct?

A Yes.

Q And even before that, in January of 2020, you consented to

a settlement where you gave up control of the Debtor. Correct?

A To the independent board for a consensual Chapter 11 restructuring that would leave Highland intact.

Q And do you understand that the gatekeeper provision in the July order is exactly like the one that you agreed to in January except that it applies to Mr. Seery instead of the independent directors?

A I -- I learned a lot about that today, but I don't think it's appropriate to move what applied to the board to the CEO of a registered investment advisor.

Q Okay. I'm just asking you, sir. Listen carefully to my question. Were you aware in January 2020 that you agreed to a gatekeeper provision on behalf of the independent board?

A Generally, but not specifically.

Q Okay.

A Not -- not like what we've been going over today.

Q Okay. And you knew that Mr. Seery had applied to be appointed CEO subject to the Court's approval, correct?

A Wasn't it backdated to March? I -- I think the hearing was in June, but it was backdated for -- for money and other purposes, right? I -- that's my recollection. I don't remember otherwise.

Q You do remember that Mr. Seery got -- he got -- his appointment got approved by the Court, right?

A Yes. But, as far as the dates are concerned, I thought it was either in March or retroactive to March. Maybe it was June or July.

Q And you --

A But I don't remember.

Q Did you have your lawyers review the motion that was filed on behalf of the Debtor?

A I'm -- I assume they do their job. I -- if they didn't, I don't know.

Q Okay. That's what you hired them to do; is that fair?

A Yes.

Q Okay. Can we go to Exhibit 12, please? I think it's in Binder 1. You've seen this document before, correct?

A Yes.

Q In fact, you saw versions of this complaint before it was filed, correct?

A Yes, I saw one or two versions towards the end. I don't know if I saw the final version, but --

Q Sir, you participated in discussions with Mr. Sbaiti concerning the substance of this complaint before it was filed, correct?

A Some. I would just use the word some.

Q Okay. Can you describe for me all of your conversations with Mr. Sbaiti concerning the substance of this complaint?

MR. SBAITI: Your Honor, I would object on the basis

of work product privilege and attorney-client communications. He was an agent for my client, the DAF, at the time he was having these discussions with us, and our discussions with him were work product. So to the extent he can reveal the conversations without discussing the actual content, we would raise privilege objection, Your Honor.

THE COURT: Mr. Morris?

MR. MORRIS: Your Honor, there is no privilege here. That's exactly why I asked Mr. Patrick the questions earlier today. Mr. Dondero is not party to any agreement with the DAF today. It's an informal agreement, perhaps, but there is no contractual relationship, there is no privity any longer between Mr. Dondero or any entity that owns and controls in the DAF, as far as I know. If they have evidence of it, I'm happy to listen, but that -- that's exactly why I asked those questions of Mr. Patrick earlier today.

THE COURT: All right.

MR. SBAITI: Your --

THE COURT: That was the testimony. There's an informal arrangement, at best.

MR. SBAITI: Well, Your Honor, I would suggest that that doesn't necessarily mean that he isn't an agent of the DAF. It doesn't have to be a formal agreement for him to be an agent of the DAF.

Everyone's agreed he was an advisor. Everyone's agreed he

was helping out. That is an agency relationship. It doesn't have to be written down. It doesn't have to be a formal investment advisory relationship. He's still an agent of the DAF. He was requested to do something and agreed to do it under the expectation that all of us had that those would be privileged, Your Honor. That is -- that is sufficient -- that is sufficient, I would argue, to get us where we need to be. The privilege should apply, Your Honor, and they don't have a basis for, I would say, invading the privilege, Your Honor.

THE COURT: Well, do you have any authority? Because it just sounds wrong. He's not an employee of your client. He doesn't have any contractual arrangement with your client.

MR. SBAITI: Your Honor, I would dispute the idea that he has no contractual arrangement with my client. The question was asked, do you have a -- do you have a written agreement, and then the question was, so you don't have a contract, and the answer was no, I don't have a contract, building upon that first -- that first question. But the testimony as he just recounted is that there is an agreement that he would advise Mr. Patrick and he would advise the DAF.

THE COURT: Okay.

MR. SBAITI: That's -- that's a contract.

THE COURT: Okay. My question was, do you have any legal authority? That's what I meant when I said authority. Any legal authority to support the privilege applying in this

kind of --

MR. SBAITI: In an informal arrangement, Your Honor? I don't have one at my fingertips at the moment, Your Honor, but I don't know that that should be a reason to invade the privilege.

And I would just add, Your Honor, I would just add, we've already -- because of the purpose of these questions, you've heard Mr. Morris state several times that the purpose is to show that Mr. -- that Mr. Dondero had some role in advising and participating in the creation of this complaint. That's been conceded by myself. I believe it was conceded by Mr. Dondero.

The actual specific facts, the actual specific conversations, Your Honor, shouldn't be relevant at this point and they shouldn't be admissible, given -- given the relevancy, given the perspective of the privilege.

THE COURT: Okay.

MR. MORRIS: If I might --

THE COURT: I overrule your objection. I don't think a privilege has been shown here --

MR. SBAITI: And Your Honor, --

THE COURT: -- and I think it's relevant.

MR. SBAITI: -- I would ask if we could *voir dire* the witness on the basis of the privilege, if that's --

THE COURT: All right. You may do so.

VOIR DIRE EXAMINATION

BY MR. SBAITI:

Q Mr. Dondero, do you have a relationship with the DAF?

A Yes.

Q How would you describe that relationship?

A I view myself and my firm as the investment advisor. I was actually surprised by the testimony today that there wasn't a contract in place, but there should be one. There should be one soon, in my opinion.

Q Have you -- did you hear Mr. Patrick testify earlier that he comes to you for advice?

A Yes.

Q Is that --

A As he should. Yeah.

Q Is that true?

A Yes.

Q When you render that advice, do you render that advice with some expectation about him following or listening to that advice?

A Okay, I think there's only been one investment or one change in the DAF portfolio since Mark Patrick's been involved, only one, and it was a real estate investment that I wasn't directly involved in. And so the people who put that investment forward worked with Mark without my involvement, and then I think Mark got third-party appraisal firms and

third-party valuation firms involved to make sure he was comfortable, which was a good process.

Q When you supplied information to Mr. Patrick, do you do so under the belief that there is a contractual, informal or formal, relationship?

MR. MORRIS: Objection to the form of the question.

THE COURT: Overruled.

MR. SBAITI: What specific form?

THE COURT: Overruled.

MR. SBAITI: Thank you.

THE WITNESS: Yes. I believe it -- it's a relationship that can and should be papered as -- soon. That's my -- I mean, unless I get some reason from counsel not to, I think it's something that should be memorialized.

BY MR. SBAITI:

Q And when you have that -- in that relationship, when you communicate with Mr. Patrick about matters, investment or otherwise, is there an expectation of privacy?

A Yes.

Q When Mr. Patrick -- did Mr. Patrick request that you interface with my firm and myself, as he testified earlier?

A Yes.

Q And when he did so, did he ask you to do so in an investigatory manner?

MR. MORRIS: Objection to the form of the question.

THE COURT: Sustained. Rephrase.

BY MR. SBAITI:

Q Did he tell you why he wanted you to talk to us?

A Yeah. At that point, he had started an investigation into the HarbourVest transaction.

Q And -- and when he -- when you were providing information to us, did he tell you whether he wanted you to help the Sbaiti firm conduct the investigation?

A The -- overall, the financial numbers and tables in there were prepared by not myself, but I -- I did -- I did help on -- on the -- some of the registered investment advisor issues as I understood them.

Q Okay. And the communications that you had with us, was that part of our investigation?

MR. MORRIS: Objection to the form of the question.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. SBAITI:

Q And did you understand that we had been retained by Mr. Patrick on behalf of the DAF and CLO Holdco?

A Yes.

Q And did you appreciate or have any understanding of whether or not you were helping the law firm perform its legal function on behalf of the DAF and CLO Holdco?

A Perform its legal function? I was just helping with

regard to the registered investment advisor aspects of the overall, you know, like that.

Q Let me ask a more simple question. Did you -- did you appreciate that you were assisting a law firm in its representation of the DAF?

A Yes.

Q And you were helping the law -- and were you helping the law firm develop the facts for a complaint?

A Yes. I would almost say, more importantly, I wanted to make sure that there weren't errors in terms of understanding either how CLOs worked or how the Investment Advisers Act worked. So I was -- it was almost more of a proofing.

MR. SBAITI: Your Honor, based upon that, I mean, he's helping a law firm perform its function for the client. That's an agency relationship that gets cloaked. You can call him a consulting expert. You can call him, to a certain extent, a fact witness, Your Honor. If we want to take a break, I'm sure we could find authority on that basis for a work product privilege pretty easily.

But he's an agent of the DAF. Even if it's an informal agency relationship, that's still agency. He's in some respects, I guess, an agent of the law firm, to the extent he's helping us perform our legal work. And it seems like invading that privilege at this juncture is (a) unnecessary, because we've already conceded that there's been

conversations, which I think is the relationship they wanted to establish. And it's not unusual for a law firm to use someone with specialized knowledge to understand some of the intricacies of the actual issues that they're -- that they're getting ready to litigate.

THE COURT: Okay. I find no privilege. All right. That's the ruling.

MR. BRIDGES: Your Honor, may I add one thing to the objection for the record?

THE COURT: Okay, we have a rule, one lawyer per witness. Okay? So, thank you. A District Court rule, by the way, not mine.

MR. SBAITI: Your Honor, may we take a short recess, given the Court's ruling?

THE COURT: Well, I'd really like to finish this witness. How much longer do you have?

MR. MORRIS: About eight more questions.

THE COURT: All right. We'll take a break after the direct, okay?

MR. SBAITI: Your Honor, I would ask that we -- if he's going to ask him more questions about the content of the communications, I ask respectfully for a recess so we can figure out what to do about that. Because, right now, there's a ruling that he's going to have to reveal privileged information, and we don't have a way to go around and figure

out how to resolve that issue if we needed to.

THE COURT: Okay. I've ruled it's not privilege. Okay?

MR. SBAITI: I understand that, Your Honor, but --

THE COURT: Your client is CLO Holdco and the DAF.

MR. SBAITI: Yes, Your Honor.

THE COURT: Representative, Mark Patrick. No contract with Mr. Dondero. The fact that he may be very involved I don't think gives rise to a privilege. That's my ruling.

MR. SBAITI: I understand, Your Honor. I understand, Your Honor, but I'm asking for a recess so that we can at least undertake to provide Your Honor with some case law on a reconsideration before we go there, because that bell can't be unrung.

MR. MORRIS: Your Honor, if I may?

MR. SBAITI: And it's --

THE COURT: Uh-huh.

MR. MORRIS: I'm happy to give them ten minutes, Your Honor, as long as they don't talk to the witness.

THE COURT: Okay.

MR. MORRIS: I want to give them the opportunity. Go right ahead.

THE COURT: All right. We'll take a ten-minute break.

MR. SBAITI: Thank you.

THE COURT: It's 3:05.

THE CLERK: All rise.

(A recess ensued from 3:03 p.m. until 3:17 p.m.)

THE CLERK: All rise.

THE COURT: Okay. Please be seated. Going back on the record in Highland. Mr. Sbaiti?

MR. SBAITI: Yes, Your Honor. May I approach?

THE COURT: You may.

MR. SBAITI: Your Honor, we have some authority to support the position we'd taken. We'd ask the Court to reconsider your ruling on the privilege.

The first bit of authority is Section 70 of the Restatement (Third) of Law Governing Lawyers. Privileged persons within the meaning of Section 68, which governs the privilege, says that those persons include either agents of either the lawyer or the client who facilitate communications between the two in order for the lawyers to perform their function.

Another case that we found is 232 F.R.D. 103 from the Southern District of New York, 2005. It's *Express Imperial Bank of U.S. v. Asia Pulp Company*. And in that case, Your Honor, the consultant was a -- had a close working relationship with the company and performed a similar role to that of the employee and was assisting the law firm in

performing their functions, and the court there found that the work product privilege -- actually, the attorney-client privilege -- attached in what they called a Functional Equivalents Doctrine, Your Honor.

And here we have pretty much the same set of facts that's pretty much undisputed. The fact that there -- and the fact that there isn't a written agreement doesn't mean there isn't a contractual arrangement for him to have rendered services and advice. And the fact that he's, you know, recruited by us to help us perform our functions puts him in the realm, as I said, of something of a consulting expert.

Either way, the work product privilege, Your Honor, should apply, and we'd ask Your Honor not to invade that privilege at this point, Your Honor. And I'll ask you to reconsider your prior ruling.

Furthermore, I believe Mr. Morris, you know, in making his argument, is trying to create separation. The fact that he has no relationship, that the privilege can be invaded, seems to defeat the whole premise of his whole line of questioning.

So, once again, Your Honor, I just -- it's a tit for a tat there, and it seems to kind of eat itself. Either he is working with us, which we've admitted he is working with us, us being the law firm, and helping us do our jobs, or he's not. And if he's not, then this should be done.

THE COURT: Okay.

MR. MORRIS: Your Honor, briefly?

THE COURT: Well, among other things, what do you want me to do? Take a break and read your one sentence from the Restatements and your one case? And could you not have anticipated this beforehand?

MR. SBAITI: Your Honor, --

THE COURT: This is not the way we work in the bankruptcy courts, okay? We're business courts. We have thousands of cases. We expect briefing ahead of time.

MR. SBAITI: Your Honor, this has been a rather rushed process anyway. And to be honest, --

THE COURT: When was the motion filed?

MR. SBAITI: Your Honor, --

THE COURT: More than a month ago.

MR. SBAITI: -- his deposition was a week ago.

THE COURT: Well, okay. So you could not have anticipated this issue until his deposition one week ago?

MR. SBAITI: Your Honor, this issue arose at the deposition, obviously, because that's what he's quoting from. However, at least to us, this is such a well-settled area, and to be honest, --

THE COURT: Such a well-settled area that you have one sentence from the Restatement and one case from the Southern District of New York?

MR. SBAITI: No, Your Honor. I think the work

product privilege lexicon -- we had ten minutes to try to find something more on point than the general case law that applies the work product privilege to people that work with lawyers, consultants who work with lawyers, employees who work with lawyers, even low-down employees who normally wouldn't enjoy the privileges that attach to the corporation, when they work with the company for -- when they work with the company lawyers, it typically attaches.

THE COURT: You know, obviously, I know a few things about work product privilege, but he doesn't check any of the boxes you just listed out.

MR. SBAITI: I disagree, Your Honor.

THE COURT: He's not an employee. He's not a low-level employee.

MR. SBAITI: He's a consultant.

THE COURT: With no agreement.

MR. SBAITI: With a verbal agreement. He's an advisor. And he was recruited by us, and at the request of the DAF, of the head of the DAF, Mr. Patrick, to help us do our job for the DAF. I don't --

THE COURT: Okay. Mr. Morris, what do you want to say?

MR. MORRIS: Just briefly, Your Honor. This issue has been ripe since last Tuesday. They directed him not to answer a whole host of questions about his involvement at the

deposition last Tuesday, so they've actually had six days to deal with this. That's number one.

Number two, there's absolutely nothing inconsistent with the Debtor's position that Mr. Dondero is participating in the pursuit of claims and at the same time saying that his communications with the Sbaiti firm are not privileged. There's nothing inconsistent about that.

So the argument that he just made, that somehow because we're trying to create separation, that that's inconsistent with our overall arching theme that Mr. Dondero is precisely engaged in the pursuit of claims against Mr. Seery, I think that takes care of that argument.

Finally, your Honor, with respect to this consultancy arrangement, not only isn't there anything in writing, but either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero the terms of the agreement. Is he getting paid? Is he doing it for free? Who retained him? Was it Mr. -- because the -- there's no such thing. There's no such thing.

The fact of the matter is what happened is akin to I have a slip-and-fall case and I go to a personal injury lawyer and I bring my brother with me because I trust my brother with everything. It's not privileged. Any time you bring in somebody who is not the attorney or the client, the privilege is broken. It's really quite simple. Unless there's a common interest. They can't assert that here. There is no common

interest. So --

THE COURT: Okay. Mr. Sbaiti, I'll give you up to three more minutes to *voir dire* Mr. Dondero to try to establish some sort of agency relationship or other evidence that you think might be relevant.

VOIR DIRE, RESUMED

BY MR. SBAITI:

Q Mr. Dondero, when you provided information to the law firm, were you doing so under an agency relationship? Do you know what an agency relationship is?

A Generally. When you're working on the -- or why don't you tell me?

Q Tell me your understanding, so we can use --

A That you're working for the benefit or as a proxy for the other entity or the other firm or the other person.

Q Right. So you're working for the DAF?

A Yes.

Q Do you do work for the DAF?

A Yes. As I stated, I'm surprised there isn't -- when we reconstituted after leaving Highland, we put in shared services agreements in place and asset management agreements in place and tasked people with doing that for most of the entities. There might be still a few contracts that are being negotiated, but I thought most of them were in place.

So I would imagine that there'll be an asset management

agreement with the DAF back to NexPoint sometime soon, so it -- it's --

Q Let me ask you this question. When you were providing information to us and having conversations with us, were you doing that as an agent of the DAF, the way you described it, --

A Yes.

Q -- on their behalf?

A Yes.

Q Were you also doing it to help us do our jobs for the DAF?

A Yes.

Q Did you respond to requests for information from myself?

A Yes.

Q Did you help coordinate other -- finding other witnesses or sources of information at my request?

A Yes.

Q Did you do so based upon any understanding that I was working on behalf of the DAF for that?

A Yes. I knew -- I knew you were working for the DAF. No one else, yeah.

Q And so -- and so did you provide any expertise or any in-depth understanding to myself in helping me prepare that complaint?

A I think so, but I give a lot of credit to your firm for researching things that I -- I knew reasonably well but then

you guys researched in even more depth.

MR. MORRIS: I'd move to strike the answer as nonresponsive.

THE COURT: Sustained.

BY MR. SBAITI:

Q Let me ask the question again. When you were providing us information and expertise, were you doing so knowing you were working -- helping us work for the DAF?

A Yes.

Q Now, did you demand any compensation for that?

A No.

Q Do you require compensation necessarily to help the DAF?

A No.

Q Do you do other things for the DAF sometimes without compensation?

A Right. We do the right thing, whether we get paid for it or not. Yes.

Q Had you known that our communications were not necessarily part of an agency relationship with the DAF, as you understood it, that you were just some guy out on the street, would you have had the same conversations with us?

A (sighs)

Q Let me ask a better question. If I had come to you working for someone that wasn't the DAF, you didn't already have a relationship with, would you have given us the same

help?

A I wouldn't have been involved if it was somebody else.

Q Is the reason you got involved because we were the lawyers for the DAF?

A Correct.

MR. MORRIS: Objection. It's just leading. This is all leading.

THE WITNESS: Correct.

THE COURT: Sustained.

MR. SBAITI: Can --

THE WITNESS: Yeah. Sorry.

BY MR. SBAITI:

Q Do you get -- do -- did you -- did you do work for the -- did you provide the help for the DAF laboring under the understanding that there was an agreement?

MR. MORRIS: Objection; leading.

THE COURT: Sustained.

BY MR. SBAITI:

Q Earlier you testified you believed there was an agreement?

A I thought that was an agreement, and I thought there will be one shortly if there isn't one, yes.

Q Okay.

A And so we -- I've been operating in a bona fide way in the best interests of the DAF throughout -- assuming there was an agreement, but even if there wasn't a formal one, I would

still be moving in the best interests of the DAF and helping your firm out or --

Q And you did that because you believed there was an agreement or soon would be?

A Yes.

MR. SBAITI: Your Honor, I mean, I believe we've established a dual role here, both as an agent of the DAF and as an agent of the law firm, Your Honor.

THE COURT: Okay. Just a minute. I'm looking at Texas authority on common interest privilege to see if there's anything that --

(Pause.)

THE COURT: All right. Again, it would have been very nice to get briefing ahead of time. I think this absolutely could have been anticipated.

I do not find the evidence supports any sort of protection of this testimony under work product privilege, common interest privilege. I just haven't been given authority or evidence that supports that conclusion. So the objections are overruled.

Mr. Morris, go ahead.

DIRECT EXAMINATION, RESUMED

BY MR. MORRIS:

Q Can you describe for the Court the substance of your communications with Mr. Sbaiti concerning the complaint?

A As I've stated, directing him toward the Advisers Act and then largely in a proofing function regarding CLO nomenclature and some of the other fund nomenclature that sometimes gets chaotic in legal briefs.

Q Did you communicate in writing at any time with anybody at the Sbaiti firm regarding any of the matters that are the subject of the complaint?

A I can't remember anything in writing. Almost everything was verbal, on the phone.

Q You don't tend to write much, right?

A Periodically.

Q Did you communicate with Mr. Patrick? Did you communicate with anybody in the world in writing regarding the substance of anything having to do with the complaint?

MR. SBAITI: Objection, Your Honor. Argumentative.

THE COURT: Overruled.

THE WITNESS: I --

MR. SBAITI: Your Honor, may I just -- one housekeeping. Rather than raise the same objection, may we have a standing objection, just so we're not disruptive, as to the privilege, just for preservation purposes, on the content of these communications? Otherwise, I'll just make the same objections and we can go through it.

THE COURT: Well, disruptive as it may be, I think you need to object to every --

MR. SBAITI: Okay.

THE COURT: -- question you think the privilege applies to.

MR. SBAITI: I will do so. Thank you, Your Honor. Uh-huh.

BY MR. MORRIS:

Q Mr. Dondero, the question was whether you've ever communicated with anybody in the world in writing concerning anything having to do with the complaint?

A Not that I remember.

Q Okay.

MR. MORRIS: I will point out, Your Honor, that last week, when the privilege was asserted, I had requested the production of a privilege log. I was told -- I forget exactly what I was told, but we never received one. I'll just point that out as well.

THE COURT: Okay.

BY MR. MORRIS:

Q You provided comments to the drafts of the complaint before it was filed, correct?

A Yes, a few.

Q Can you describe for the Court all of the comments that you provided to earlier drafts of the complaint?

MR. SBAITI: Your Honor, we object on the basis of privilege and work product and joint -- joint interest

privilege.

THE COURT: Overruled.

THE WITNESS: It's along the lines of things I've said in this court several times. The obligations under the Advisers Act cannot be negotiated away and they cannot be waived by the people involved, full stop. I remember giving the -- Mazin the example of the only reason why we're in a bankruptcy is from an arbitration award that, even though we did what was in the best interests of the investors, we got the investors out more than whole over an extended period of time, they got an arbitration award that said when we purchased some of the secondary interests we should have offered them up to the other 800 members in the committee besides the -- the 800 investors in the fund besides the eight people on the committee who had approved it and that the committee couldn't approve a settlement that went against the Advisers Act and the Advisers Act stipulates specifically that you have to offer it up to other investors before you take an opportunity for yourself. And someday, hell or high water, in this court or some other, we will get justice on that. And that was the primary point that I reminded Mazin about.

BY MR. MORRIS:

Q And that's exactly the conversation you had with Mark Patrick that started this whole thing, correct?

A No.

Q You told Mark Patrick that you believe the Debtor had usurped a corporate opportunity that should have gone to the DAF, didn't you?
A That was not our conversation.
Q So when Mr. Patrick testified to that earlier today, he just got it wrong, right?
A Well, maybe later on, but it wasn't that in the beginning. The beginning, any conversation I had with Mark Patrick in the beginning was smelling a rat in the way that the Debtor had priced the portfolio for HarbourVest.
Q Hmm. So you're the one, again, who started that piece of the discussion as well, correct?
A Started the -- I -- I guess I smelled a rat, but I put the person who could do all the numbers in touch with the Sbaiti firm.
Q And was the rat Mr. Seery?
A Was the rat Mr. Seery? Or the independent board. Or a combination thereof. I believe the independent board knew exactly what Seery was doing with --
Q Do you have any idea --
A -- HarbourVest.
Q Do you have any idea why, why the Sbaiti firm didn't name the whole independent board in the -- in the motion for leave to amend?
A I don't know. Maybe they will at some point.

Q Yeah.
A I don't know.
Q But did you tell the Sbaiti firm that you thought the whole independent board was acting in bad faith and was a rat?

MR. SBAITI: Your Honor, I object on the basis of privilege.

THE COURT: Overruled.

MR. SBAITI: All three.

THE WITNESS: I knew Jim Seery was and I knew Jim Seery had weekly meetings with the other independent board members, so the HarbourVest settlement was significant enough that it would have been approved, but I don't have direct knowledge of their involvement.

BY MR. MORRIS:
Q And so you -- but you believed Jim Seery was certainly a rat, right?
A Oh, I -- there was a defrauding of third-party investors to the tune of not insignificant 30, 40, 50 million bucks, and it was obfuscated, it was -- it was highly obfuscated in the 9019.
Q Did you think Mr. Seery was a rat, sir? Yes or no?
A I believe he had monthly financials. He knew that the numbers presented in the 9019 were wrong. And if that makes him a rat, that makes him a rat. Or maybe he's just being aggressive for the benefit of his incentive or for the estate.

But I -- I believe those things wholeheartedly.

Q Did you tell the Sbaiti firm you thought Jim Seery was a rat?

MR. SBAITI: Objection, Your Honor. Privilege.

THE COURT: Overruled.

THE WITNESS: I -- I don't remember using those words.

BY MR. MORRIS:

Q Did you tell the Sbaiti Firm that you thought Jim Seery had engaged in wrongful conduct?

MR. SBAITI: Your Honor, objection. Privilege.

THE COURT: Overruled.

THE WITNESS: I believe he violated the Advisers Act, and I was clear on that throughout.

BY MR. MORRIS:

Q Listen carefully to my question. Did you tell the Sbaiti firm that you believed that Jim Seery engaged in wrongful conduct?

MR. SBAITI: Objection, Your Honor. Calls for privileged communications.

THE COURT: Overruled.

THE WITNESS: I think I gave the answer. I'll give the same answer. I believe he violated the Advisers Act.

BY MR. MORRIS:

Q What other wrongful conduct did you tell the Sbaiti firm

you thought Mr. Seery had engaged in?

MR. SBAITI: Same objection, Your Honor.

THE COURT: Overruled.

MR. SBAITI: Calls for privileged communications.

THE COURT: Overruled.

THE WITNESS: I -- I just remember the obfuscating and mispricing portfolio violations of the Advisers Act was all I discussed with the Sbaiti firm regarding Seery's behavior.

BY MR. MORRIS:

Q Did you talk to them about coming to this Court under the gatekeeper order to see if you could get permission to sue Mr. Seery?

A I --

MR. SBAITI: Objection, Your Honor. Calls for privileged communication.

THE COURT: Overruled.

THE WITNESS: I wasn't involved in any of the --

BY MR. MORRIS:

Q Did you --

A -- tactical stuff on who to sell or -- who to sue or when or whatever.

Q Did you tell the Sbaiti firm that you thought they should sue Mr. Seery?

MR. SBAITI: Objection, Your Honor. Calls for

privileged communication.

THE COURT: Overruled.

MR. SBAITI: I'll also say, Your Honor, the question is getting a little argumentative.

THE WITNESS: I didn't get directly --

THE COURT: Overruled.

THE WITNESS: I didn't get directly involved in who was -- who was specifically liable.

BY MR. MORRIS:

Q How many times did you speak with the Sbaiti firm concerning the complaint?

A Half a dozen times, maybe.

Q Did you ever meet with them in person?

A I've only met with them in person a couple, three times. And I don't think any of them -- no, it was, excuse me, it was on deposition or other stuff. It wasn't regarding this.

Q Did you send them any information that was related to the complaint?

A I did not.

Q Did you ask anybody to send the Sbaiti firm information that related to the complaint?

A I did not. I -- I was aware that Hunter Covitz was providing the historic detailed knowledge to the firm, but it -- it wasn't -- I don't believe it was me who orchestrated that.

Q Did you talk to anybody at Skyview about the allegations that are contained in the complaint before it was filed?
A I don't -- I don't remember.
Q Have you ever talked to Isaac Leventon or Scott Ellington about the allegations in the complaint?
A No. They weren't involved.
Q How about -- how about D.C. Sauter? You ever speak to him about it?
A I don't --

MR. TAYLOR: Objection, Your Honor.

THE WITNESS: I don't remember.

MR. TAYLOR: At this point, D.C. Sauter is indeed an employee of Skybridge and is a general counsel for some of the entities which he worked for. And to the extent he's trying to ask for those communications, that would be invasion of the privilege.

MR. MORRIS: I'll withdraw it, Your Honor. That's fair.

THE COURT: Okay

MR. MORRIS: That's fair.

THE COURT: Question withdrawn.

THE WITNESS: I thought you only had eight more questions.

MR. MORRIS: Opened the door.

BY MR. MORRIS:

Q Can you describe the general fact -- withdrawn. You provided facts and ideas to the Sbaiti firm in connection with your review of the draft complaint, correct?

A Ideas and proofreading.

Q Anything beyond what you haven't described already?

A Nope.

Q Okay. Who is your primary contact at the Sbaiti firm, if you had one?

A Mazin.

Q Okay. Did you suggest to Mr. Sbaiti that Mr. Seery should be named as a defendant in the lawsuit before it was filed?

MR. SBAITI: Your Honor, calls for privileged communication. We object --

THE COURT: Overruled.

MR. SBAITI: -- to that answer.

MR. SBAITI: Okay.

THE WITNESS: Again, no. I wasn't involved with the tactics on who would be defendants and when or if other people would be added.

BY MR. MORRIS:

Q Did you -- are familiar with the motion to amend that was filed by the Sbaiti firm?

A I'm more familiar with it after today --

Q Right.

A -- than I was before.

Q And were you aware that that motion was going to be filed prior to the time that it actually was filed?

A I -- I don't remember. Probably.

Q And who would have been the source of that information? Would that have been Mr. Sbaiti?

A Yes.

Q Okay. And did you express any support for the decision to file the motion for leave to amend in the District Court?

A I -- I wasn't involved. It was very complicated legal preservation conver... -- I wasn't involved. I knew the conversations were going on between different lawyers, but I wasn't involved in the ultimate decision. I didn't encourage, applaud, or even know exactly what court it was going to be filed in.

MR. MORRIS: All right. I have no further questions, Your Honor.

THE COURT: All right. Pass the witness.

MR. ANDERSON: We have no questions, Your Honor.

THE COURT: Okay. Any questions from Respondents?

MR. SBAITI: No questions.

THE COURT: Okay. Mr. Taylor?

CROSS-EXAMINATION

BY MR. TAYLOR:

Q Mr. Dondero, --

A Yes, sir.
Q -- you are not the authorized representative of CLO Holdco, are you?
A No.
Q You're not the authorized representative for the DAF, are you?
A No.
Q Do you know who that person is as we sit here today?
A Yes.
Q Who is that?
A Mark Patrick.
Q Thank you.

MR. TAYLOR: No further questions.

THE COURT: Any redirect on that cross?

MR. MORRIS: I do not, Your Honor. I would just like to finish up the Debtor's case in chief by moving my exhibits into evidence.

THE COURT: Okay. Mr. Dondero, you're excused.

(The witness steps down.)

THE COURT: All right. So you have no more witnesses; you're just going to offer exhibits?

MR. MORRIS: Yes, Your Honor.

THE COURT: Okay.

MR. MORRIS: So, at Docket #2410, --

THE COURT: Uh-huh.

MR. MORRIS: -- the Court will find Exhibits 1 through 53.

THE COURT: Uh-huh.

MR. MORRIS: In advance, Your Honor, I've conferred with the Respondents' counsel. They had previously objected to Exhibits 15 and 16, which I believe were the Grant Scott deposition transcripts. They objected to them on the grounds of lack of completeness because I had taken the time to make deposition designations, but I'm happy to put the entirety of both transcripts into evidence, and I hope that that will remove the objections to Exhibits 15 and 16.

THE COURT: All right. Before we confirm, let's just make sure we have the right one.

MR. MORRIS: Oh, I apologize.

THE COURT: I have 16 as the July order.

MR. MORRIS: I apologize. You're absolutely right, Your Honor. What I was referring to was -- oh, goodness. One second. (Pause.) I was referring to Exhibits 23 and 24. Those are Mr. Scott's deposition designations. They had lodged an informal objection with me on grounds of completeness. And in order to resolve that objection, we're happy to put the entirety of both transcripts in.

THE COURT: All right. So if our Respondents could confirm with the agreement to put in the entire depos at 23 and 24, you stipulate to 1 through 53?

MR. PHILLIPS: We also -- Your Honor, --

MR. MORRIS: Yeah, I was going to take them one at a time. Just take those two.

MR. PHILLIPS: Yeah, can we just take those two? Confirmed?

MR. MORRIS: Okay.

THE COURT: Oh, okay.

MR. PHILLIPS: Because there are other -- there are other -- we exchanged objections to each other's witness and exhibit lists. And so I think you can handle the rest of them kind of in a bunch, right?

MR. MORRIS: Yeah. Yeah, there's two bunches, actually.

MR. PHILLIPS: Yeah.

THE COURT: Okay. So you have just now stipulated to 23 and 24 being admitted --

MR. MORRIS: Correct.

THE COURT: -- with the full depos? Okay.

MR. PHILLIPS: Yes, ma'am. Thank you.

THE COURT: All right.

(Debtor's Exhibits 23 and 24 are received into evidence.)

MR. MORRIS: And then the next two that they objected to are Exhibits 15 and 16. 15 is the January order and 16 is the July order. They objected on relevance grounds. I think 16 -- these are the two orders that the Debtors contend the

Respondents have violated, so I don't understand the relevance objection, but that's what it was and that's my response.

MR. PHILLIPS: Resolved, Your Honor.

THE COURT: Okay. 15 and 16 are admitted.

(Debtor's Exhibits 15 and 16 are received into evidence.)

MR. MORRIS: Okay. And then the last objection relates to a group of exhibits. They're Exhibits 1 through 11. Those exhibits I think either come in together or stay out together. They are exhibits that relate to the HarbourVest proceedings, including deposition notices, including I think the transcript from the hearing, the Court's order, the motion that was filed.

The Debtor believes that those documents are relevant because they go right to the issue of the gatekeeper order and had they filed, had the Respondents followed the gatekeeper order, this is -- this is why they didn't do it. You know what I mean? That's the argument, is that the Respondents, one of the reasons the Respondents -- argument -- one of the reasons the Respondents didn't come to this Court is because they knew this Court had that kind of record before it. And I think that's very relevant.

THE COURT: All right. Response?

MR. PHILLIPS: Your Honor, we think that these exhibits are not relevant. We have a very focused, we think, -- we have the Court's order. Those objections are withdrawn.

We have the complaint. We have the motion to amend. And the issue is whether the motion to amend, which was dismissed one day, or the next day after it was filed, constitutes criminal -- constitutes contempt.

So we think the prior proceedings go to their underlying argument, which is the lawsuit or the complaint is no good, and that has nothing to do with -- there's been no foundation laid and it's not relevant what happened in connection with the HarbourVest settlement. It is what it is, and there's no dispute that it is what it is, but it's not relevant to establish any type of -- they've even said intent is not even relevant here. So we -- that's -- we think all of that goes out and simplifies the record, because it has nothing to do with whether or not there was a contempt.

THE COURT: Response?

MR. MORRIS: We withdraw the exhibits, Your Honor. I'm just going to make it simple for the Court.

THE COURT: Okay.

MR. MORRIS: I'm just going to make it simple for the Court.

THE COURT: 1 through 11 are withdrawn.

(Debtor's Exhibits 1 through 11 are withdrawn.)

MR. MORRIS: So, the balance, there was no objection. So all of the Debtor's exhibits on Docket #2410 -- let me restate that. Exhibits 12 through 53 no longer have an

objection. Is that correct?

MR. PHILLIPS: Yes.

MR. MORRIS: Okay. And then --

MR. PHILLIPS: Confirmed.

THE COURT: Okay.

(Debtor's Exhibits 12 through 53 are received into evidence.)

MR. MORRIS: Okay. Thank you. And then we filed an amended list, I believe, yesterday --

THE COURT: Uh-huh.

MR. MORRIS: -- to add Exhibits 40 -- 54 and 55.

THE COURT: Uh-huh.

MR. MORRIS: And those exhibits are simply my firm's billing records.

THE COURT: Okay.

MR. MORRIS: You know, we added Mr. Demo to the witness list in case there was a need to establish a foundation. That's the only thing he would testify to. I don't know if there's an objection to those two exhibits, because we hadn't had an opportunity to confer.

THE COURT: Any objection?

MR. PHILLIPS: Your Honor, we're not going to require authenticity and foundation for -- we have the right, we think, to say that they're not a ground -- we're not going to challenge that they are the bills, and the bills say what they

say. We don't need Mr. -- we don't need a witness to authenticate those exhibits. But we reserve all substantive rights with respect to the effect of those exhibits.

THE COURT: All right. 54 and 55 are admitted.

(Debtor's Exhibits 54 and 55 are received into evidence.)

MR. MORRIS: And with that, Your Honor, the Debtor rests.

THE COURT: Okay. All right. Respondents?

(Counsel confer.)

MR. PHILLIPS: If I could have a second?

THE COURT: Okay.

A VOICE: Sorry, Your Honor.

(Pause.)

MR. PHILLIPS: Your Honor, we have filed in our witness and exhibit list, and I have to say I don't have the number, but we'll get the docket entry number, but we have 44 exhibits. There's an objection to Exhibit #2, which is -- thank you -- it's Document 2411, Your Honor. Thank you.

THE COURT: Uh-huh.

MR. PHILLIPS: There is a pending objection to Exhibit #2 which we have not resolved. There's no objection to any other exhibit. But in reviewing our exhibit list, I found that we had some -- some mistakes and duplications.

So, with respect to 2411, we would withdraw Exhibit 13, 14, and 29, and we would offer Exhibit 1, and then 30 through

44, with 13, 14, and 29 deleted.

THE COURT: Okay. So 1, 3 through 12, --

MR. PHILLIPS: Yes.

THE COURT: -- 15 through 28, and then 30 --

MR. PHILLIPS: And then 30 through 44.

THE COURT: -- through 44? Do you confirm, Mr. Morris?

MR. MORRIS: Yes, Your Honor. The only objection we have is to Exhibit #2.

THE COURT: And that's -- he's not offering that?

MR. MORRIS: Yeah.

MR. PHILLIPS: Not at this time, Your Honor.

THE COURT: Okay.

MR. PHILLIPS: We would have to have testimony about that.

THE COURT: Okay. All right. So those are admitted.

MR. PHILLIPS: Okay.

(Mark Patrick's Exhibits 1, 3 through 12, 15 through 28, and 30 through 44 are received into evidence.)

THE COURT: By the way, it looks like Exhibit 44 is at a different docket number, Docket 2420. Correct? You have --

MR. SBAITI: Your Honor, I believe Exhibit 44 is the hearing transcript from the July approval hearing. At least that's what it's supposed to be.

THE COURT: Okay.

MR. SBAITI: It was Exhibit 2 on the Debtor's list, and then I think they took it off, so we had to add it.

MR. PHILLIPS: Oh, okay. I was looking -- oh, that's right. They -- that's correct, Your Honor.

THE COURT: Okay.

MR. PHILLIPS: Exhibit 44 was added --

THE COURT: Okay.

MR. PHILLIPS: -- because the Debtor's withdrew it, and so it was added in the second -- in the supplemental and amended list. The -- the one that I was talking about was the prior list.

THE COURT: Okay. So that's at Docket 2420?

MR. PHILLIPS: Yes.

THE COURT: You're not offering 45 or 46?

MR. PHILLIPS: No, I think we'd offer 45 and 46 as well. I'm sorry.

THE COURT: Okay. Any objections, Mr. Morris?

MR. MORRIS: No, Your Honor.

THE COURT: Okay. So 45 and 46 are admitted as well. They're at Docket Entry 2420.

(Mark Patrick's Exhibits 45 and 46 are received into evidence.)

THE COURT: All right. Your witnesses?

MR. PHILLIPS: Your Honor, could we have five minutes

to just see what we're -- our plan is, and then we'll be back at 4:00?

THE COURT: Okay. We'll be back at 4:00.

MR. PHILLIPS: Thank you.

THE CLERK: All rise.

(A recess ensued from 3:55 p.m. until 4:04 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated. All right. Back on the record in Highland. Mr. Phillips?

MR. PHILLIPS: Your Honor, with the introduction of the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick, those Respondents, and we consider Mark Patrick a Respondent although not formally named as a Respondent because he is the party who authorized the filing of the Seery motion -- we rest.

THE COURT: You rest? Okay. Well, Mr. Morris, closing arguments?

MR. MORRIS: How much time do I have?

THE COURT: You've got a lot more time than you probably thought you were going to. You're under an hour.

MR. MORRIS: 42 minutes?

THE COURT: How much?

THE CLERK: 42 minutes.

THE COURT: 42 minutes? Feel free not to use it all.

MR. SBAITI: Out of curiosity, how long do we have?

THE COURT: You have a lot of time, which I hope you won't use.

THE CLERK: Hour and twenty-five minutes or so.

MR. SBAITI: I was afraid it was going to be an hour and twenty, so --

MR. PHILLIPS: No, not either.

MR. MORRIS: I don't suspect I'll use all the time.

THE COURT: Okay. Thank you.

MR. MORRIS: May I proceed?

THE COURT: You may.

CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

MR. MORRIS: Good afternoon, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for the Debtor. I'd like to just make some closing remarks after the evidence has closed.

This is a very, very important motion, Your Honor. I take this stuff seriously. It's only the second contempt motion I've ever brought in my life. I've never gone after another law firm. But these facts and circumstances require it, because my client is under attack, and these orders were entered to prevent that.

It is serious stuff. There's no question in my mind, there's no question the evidence showed, clear and convincingly, beyond reasonable doubt, that they violated this Court's order.

I started off with three very simple prongs. So simple you'd think I'd remember them. Number one, was a court order in effect? There is no dispute. The court order was in effect.

Number two, did the order require certain conduct by the Respondent? We believe it did. We heard an hour-long argument styled as an opening statement, but it was really argument and not an opening statement, about all the defects in the order. But the one thing that is crystal clear in the order are the words commence or pursue. You've been told many times by the Respondent that nobody has commenced an action against Mr. Seery. That is true. We all know what the word commence means. We all know what the word pursue means.

I heard argument this morning that pursue means after a claim is filed you pursue a case. That's the way lawyers talk about it. But that doesn't make any sense, Your Honor, because once you've commenced the action you've violated the order. It's commence or pursue, it's in the disjunctive, and you can't read out of the order the concept of pursuit by making it an event that happens after the commencement, because that's exactly what they're trying to do. They're trying to read out of the order the word pursuit.

And I ask you to use very simple common sense. If filing a motion for leave to amend a complaint to add Mr. Seery as a defendant is not pursuit, what is? What is? There's nothing

left. You commence an action or you do something less than commencing an action when you're going after the man. That's what pursuit means. They're going after the man. And they asked the District Court to do what they knew they couldn't.

Mr. Phillips is exactly right. I made the point about Rule 15 because they knew they couldn't do it. I'm not suggesting that they should have. I'm suggesting that the reason that they didn't is because they knew they were -- they were in a bad place. Because if they really just wanted to name Mr. Seery as a defendant, they wouldn't have done it. They knew commence was crystal clear.

What they're trying to do is claim that somehow there's an ambiguity around the word pursuit. Does that make any sense at all? Filing a motion for leave to amend the complaint. And Mr. Patrick, to his credit, candidly admitted that if the motion was granted, they were suing, yeah, as long -- as long as the Sbaiti firm, you know, recommended it. That's what would have happened.

Those orders that you signed, nothing, absolutely meaningless from their point of view. They believed they were wrong. They believed that they were overbroad. They believed they were too narrow. They believed they were vague. They believed they were without authority. They don't get to be the gatekeeper. They want to be the gate -- that's this Court's decision. That's why we went through all of the

processes that we did. And they just flagrantly said, I don't agree. I don't agree because it's wrong this way and it's wrong that way and it's wrong the other way, and therefore let me go find a higher authority to validate my thinking. That's not the way this process is supposed to work.

The independent directors and Mr. Seery relied on the gatekeeper in accepting their positions. It was a quid pro quo. Mr. Dondero agreed to the exact same provision, the exact same gatekeeper provision in the January order that he now complains about today, that the DAF complains about today. Where were these people?

As the Court knows, nobody appealed either order. The Debtor, the independent board, Mr. Seery expected that the plain and unambiguous words would be honored and enforced. I think that's fair. I think that's the way the process is supposed to work.

Instead, we have games. We have these linguistic gymnastics. We have statements that are too cute by half. Mr. Dondero won't even admit that he appointed Mr. Scott back in 2012. I couldn't even get him to do that, really, even though the documents say it, even though Mr. Patrick says it.

I'll take the Respondents one at a time in a moment, but I just want to deal with some of the more interesting arguments they make. The order was vague because it didn't say you can't seek leave from the District Court to amend your

complaint to add Mr. Seery. They said that that's what makes the order vague.

Your Honor, if you had thought to put that language in, you know what they would have done? They would have sued Mr. Seery in New York State Supreme Court, where he lives, and said, the order didn't say I couldn't do that. Where does it end?

There's a reason why the order was crafted broadly to say no commencement or pursuit without Bankruptcy Court approval. You have to bring a colorable claim.

We heard an argument this morning that they couldn't possibly have brought that motion for reconsideration first. You know, the one they filed about eight hours after we filed the contempt motion. They couldn't possibly have brought that motion before the motion for leave to amend because somehow they would have been estopped or they would have been found to have waived some right.

How could it be that anybody reasonably believes that complying with a court order results in a waiver of some right? It just -- these are games. These are not good arguments. And they certainly don't carry the day on a contempt motion.

We've heard repeatedly, the District Court denied the motion without prejudice, how have you been harmed? They shouldn't be able to rely on the District Court's prudence to

protect themselves. The question shouldn't be, have you been harmed since the District Court didn't grant the motion? No. The question should be, were we harmed by the attempt to name Mr. Seery a defendant, in violation of court orders, without notice? Without notice.

I'm told they assumed that I'd be checking the dockets. I wasn't checking the docket, Your Honor. I hadn't filed an appearance in the case. And, in fact, if you look at the exhibits, because I could pull it out, but we put in the communications between the lawyers. The last communication was from Mr. Pomerantz, and the last communication from Mr. Pomerantz said, Don't do it or we're going to file a motion for contempt. That's now in the evidence.

So, having sent that message, I wasn't going to check the docket to see if they really were going to go ahead and do it. I didn't think they would. And if they did, I certainly thought I'd get notice of it. Nothing.

And, again, I don't really need to establish intent at all in order to meet my burden of clear and convincing evidence of a contempt of court, but I think it is relevant when the Court hopefully finds liability and is considering damages, because that's really the most important point I have to make right now, is the Court needs to enforce its own orders, because if the Court doesn't, or doesn't impose a penalty that's meaningful, this is just going to continue. And Your Honor,

it's all in the record. Your Honor knows this. Mr. Daugherty has gone through it. Right? Mr. Terry went through it. UBS went through it. You've seen litigation now for a year and a half. It's happening in New York, right, the Sbaiti firm is reopening the Acis case. we've got this other lawsuit that's filed by an entity with like a five-tenths of one percent interest who's complaining about the SSP transaction that Mr. -- that the Debtor engaged in. There's no end here.

We need the Court to pump the brakes. We need the Court to exercise its authority. We need the Court to protect the estate fiduciary that it approved.

It is true, Mr. Seery is not a trustee. But it is also true that he is a third-party outsider who came into this case with the expectation and the promise in an order that he wouldn't be subjected to frivolous litigation, that this Court would be the arbiter of whether claims could be pursued against him. That was the code of conduct. That was the quid pro quo. That was the deal that Mr. Seery made. It's the deal that the board members made.

What gives these people the right to just say, your order is wrong, and because I think your order is wrong I'm going to go to the District Court, and if the District Court agrees, too bad, and if the District Court doesn't agree, we'll be back before Your Honor, and no harm, no foul? No. It can't be. It can't be that that's the way this process works. It

just can't.

So, Your Honor, let me take the Defendants one at a time, the Respondents one at a time. CLO Holdco and the DAF are corporate entities. They've done what they've done. Mr. Patrick, bless him, I think he's a lovely man. I don't think he quite bargained for what he's getting right now, but nevertheless he is where he is and he's willing to stand up and be counted, and for that, at least, I admire his courage. He's willing to say, I authorized those. But you know what? It's a violation of the law, it's a violation of this Court's order to file that motion, and so he has -- and he was very candid today. He knew of the order. Right? He knew it was in effect. He pointed out that it was in their papers. Right?

They're trying to be cute, they're trying to thread this needle, but it has no hole in it. They keep -- they keep doing this. Well, maybe if we do it this way, maybe if we do it -- no. The order was crystal clear.

The Sbaiti firm. They're probably fathers and husbands and good people and I wish them no ill will, but this is wrong. This is wrong. To come into a court you've never been in before and in less than twelve days to jump the shark like this in twelve -- in less than twelve days, because Mr. Patrick said they weren't hired until April, and the complaint was filed on the 12th.

We're told that they understood this was an overwhelming case with two -- why don't you take your time? What was the rush? Why not wait until the Defendant -- the Debtor appeared in the action before rushing to do this?

It's bad conduct, Your Honor, and that's really a very important point that I have to make, is that there's lots of lawyers who are engaging in highly-questionable conduct here that, from my perspective, goes well beyond the bounds of zealous advocacy.

It's not aggressive lawyering. I love aggressive lawyering. I really do. Respectful, honest -- and I don't, you know, I don't want to say that they're dishonest people. I don't mean to do that. But I think, I think they made a gross error in judgment, and there's no question that they violated this Court's order.

And then that leaves Mr. Dondero. I don't even know what to say about his testimony, Your Honor. He pursued claims against Mr. Seery. He thinks he's a rat. He's the one who started the whole process. He's the one who put the bug in Mark Patrick's ear. All of this is uncontested. Right? Uncontested.

I don't have to go back in time. We can talk about what happened to Grant Scott. It's a very sad story. Mr. Scott, I think, did his honest best to do what he believed, on the advice of counsel, was in the best interest of the DAF. And

Mr. Dondero, as you hear time and time again when he speaks about Mr. Seery, it was inappropriate. He's the arbiter of what's in the best interest of entities that other people control. And they pay a price. And they pay a price. And so Mr. Dondero felt it was his job, even though he tries to distance himself from the DAF -- I have no responsibility, I don't -- I'm not involved -- until, until somebody wants to sue Seery and the Debtor. Then he'll go all in on that, no matter how specious the claim may be.

The Debtor's not going to fold its tent because a motion for leave to amend was denied without prejudice. That's not the point. The point is that people need to respect this Court, people need to respect the Court's orders, and those that aid and abet or otherwise support the violation of court orders ought to be held to account, Your Honor.

I have nothing further.

THE COURT: All right. Thank you. Respondents?

CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

MR. SBAITI: Your Honor, the fact that we're here on a motion for leave, and the motion for leave is what they're saying is pursuing a claim under the Court's order, and then you hear that the mere act of investigating a claim against Mr. Seery is also pursuing a claim, this goes to the infinite regression problem with this word pursue the way they want to construe it, Your Honor. Asking for permission is not

pursuing a claim and can't be the definition of pursuing a claim because it's not doing anything other than asking for permission.

We didn't file a suit. We didn't commence a suit. I think that's established. We did not pursue a claim. Mr. Morris ignores, I think, the very commonsensical aspect that we put out in the opening, which is that the reason pursue -- and sometimes the language in these types of orders is, instead of pursue, it's maintain -- but the reason that word is there is because sometimes the case has already been started when the order is entered. And so to pursue a claim, *i.e.*, one that's already been filed as of the date of the order, that would be lost if the commencement of that claim hadn't happened until after the -- until the -- if the commencement happened before the order was filed. That's the --

THE COURT: Okay. So are you saying it's a sequential thing?

MR. SBAITI: I'm not sure I understood your question, Your Honor. I'm sorry.

THE COURT: Well, I'm trying to understand what it is you're saying about how pursue should be interpreted.

MR. SBAITI: Sure.

THE COURT: I think you're saying you have to -- you can either have -- well, we've got a prohibition on commencing

an action.

MR. SBAITI: Yes.

THE COURT: And then the separate word pursue, I think you're saying that must refer to you already have an action that's been commenced and you're continuing on with it. Is that what you're saying?

MR. SBAITI: Yes, Your Honor.

THE COURT: Then why not use the word continue?

MR. SBAITI: Well, Your Honor, the choice of --

THE COURT: Kind of like 362(a) of the Bankruptcy Code, you know, is worded.

MR. SBAITI: Well, Your Honor, the choice of the wording of pursue at that point, Your Honor, I believe ends up being ambiguous, because by filing the motion here that would be pursuing a claim under that definition. So before I got permission to pursue a claim, I've got to pursue a claim. That's the problem that they have with the words that they're trying to get you to adopt, or the meaning of the words they're trying to get you to adopt.

If I came to this Court and said, Judge, I need permission, I need leave to file suit against Mr. Seery, and then the question is, well, you're not allowed to seek leave because that's pursuing the claim, it's infinitely regressive. And in fact, his closing argument just proved how it's infinitely regressive.

THE COURT: Okay. Let me -- I'm not following this infinitely regressive or whatever the term was.

MR. SBAITI: Yes.

THE COURT: Just answer this very direct question. Why did you not file a motion for leave in the Bankruptcy Court? That would have clearly, clearly complied with the July order.

MR. SBAITI: Your Honor, I believe we explained this in the opening. I took a stab at it. Mr. Bridges took a stab at it. We did not believe coming here and asking for leave and asking for -- for Your Honor to do what we don't believe Your Honor can do, would effectuate an estoppel or a waiver, which we didn't think was in the best interest of our client to have. Your Honor, this happens -- I don't believe this is the --

THE COURT: Okay. Connect the dots. Make that clear as clear can be for me. You file a motion for leave --

MR. SBAITI: Yes.

THE COURT: -- to file this District Court action against the Debtor and Seery, and if I say yes, everything is fine and dandy from your perspective. If I say no, tell me again what your estoppel argument is.

MR. SBAITI: Your Honor, the key question is whether us putting the Court's ability to decide colorability and the Court's gatekeeper functions, for us to invoke those functions

concerned us because there's case law that says that that effectuates an estoppel. And so we don't get our chance in front of an Article III judge to make that in the first instance.

THE COURT: Okay. Tell me what cases you're talking about and the exact context of those cases.

MR. SBAITI: Your Honor, I would have to defer to my partner on this one, Your Honor.

THE COURT: Okay.

MR. SBAITI: So, --

THE COURT: Because I'm just letting you know --

MR. SBAITI: Yes.

THE COURT: -- I am at a complete loss. I'm at a complete loss understanding what you're saying. I am.

MR. SBAITI: Well, Your Honor, the --

THE COURT: I don't understand. If you have followed the order to the letter and I tell you no, --

MR. SBAITI: Then --

THE COURT: -- what, you're saying you were worried you'd be estopped from appealing my order to the District Court and saying abuse of discretion or invalid order in the first place? You'd be estopped from taking an appeal?

MR. SBAITI: No, Your Honor. We wouldn't be estopped from taking an appeal.

THE COURT: Then why didn't you follow the letter of

the order?

MR. SBAITI: For one thing, Your Honor, asking the District Court made sense to us, given the order and given our understanding of the law. Certainly, we had other options, as Your Honor is pointing out. We could have come here. Our read of the law, our understanding of what we were doing, made it -- put us in, like I said, put us in the sort of jurisdictional and paradoxical position.

THE COURT: This is your chance to tell me exactly which law you think applies here. What case? What statute?

MR. SBAITI: Your Honor, like I said, I don't have those at the moment.

THE COURT: Why not? Your whole argument rides on this, apparently.

MR. SBAITI: Well, Your Honor, I don't know that our whole argument rides on that.

THE COURT: Okay.

MR. SBAITI: I mean, our argument rides on we don't think we violated the letter of the order. I think that's really what I'm -- what we're here to say, is that we didn't commence a lawsuit and we didn't pursue a claim by filing for leave in the District Court, just like filing for leave in this Court would not be pursuing a claim. It would be filing for leave.

THE COURT: I agree. Filing a motion for leave in

this Court would be exactly what the order contemplated.

MR. SBAITI: I understand, Your Honor.

THE COURT: What you did is not exactly what the order contemplated.

MR. SBAITI: Your Honor, but we're -- we're moving back and forth between two concepts. One, your question is why didn't we file for leave?

THE COURT: Uh-huh.

MR. SBAITI: And the answer to that, I've tried to explain. And if we -- if you'd like us to bring up the case law or to give you a better articulation of our concern, I'm happy to defer to my partner.

What I'm really here to say, Your Honor, is a very simple point, though. Just because we didn't file for leave here and we filed for leave in the District Court doesn't mean we violated your order, and that's the point I'm trying to make, Your Honor. And I think that's the simplest point I can make. Asking the Article III judge for leave to amend, for leave to amend to add Mr. Seery, doesn't violate, facially, at least as we read it, Your Honor's order. It's not commencing a suit and it's not -- it's not pursuing a claim against him. It's all preliminary to pursuing a claim against him, because a claim hasn't even been filed.

The judge could have -- the judge could have -- the District Court could have denied it, the District Court could

have referred it down here, the District Court could have decided part of it and then asked Your Honor to rule on some portion of it. There are innumerable ways that could have gone. That fork -- those forks in the road is precisely why we say this is not pursuing the claim. Otherwise, where does it stop?

Does pursuing a claim happen just when we file the motion for leave? Why didn't it happen when we started the investigation? If pursuing a claim means having the intent and taking steps towards eventually filing a lawsuit, that's the point that I'm making that it is infinitely regressive, and that's exactly what Mr. Morris argued to you.

He said Mr. Dondero, by merely speaking to me, is pursuing a claim and that violates your order. Speaking to me. Even if we had never filed it. Speaking is pursuing a claim.

THE COURT: I don't agree with that, for what it's worth.

MR. SBAITI: Okay. But that was his argument. I'm just responding to it.

THE COURT: Okay.

MR. SBAITI: And if that's not pursuing a claim, filing a motion for leave likewise wouldn't be pursuing a claim. I understand it's an official act in a court, but we did it in a Court that is an adjutant to this Court. This Court is an adjutant to that Court. It's the Court with

original jurisdiction over the matter. So we didn't go to New York. We didn't go to the state court in New York where I learned Mr. Seery lives. We came to the Northern District of Texas, understanding that this Court and this Court's orders had to be -- had to be addressed. And that's the very first thing we did. We asked the Court to address it.

That judge could either decide to send it down here, which is normally what I think -- what we understood would happen. So it's not like we were avoiding it. But we wanted to invoke the jurisdiction which we, as the Plaintiff, we believe we had the right to invoke. We're allowed to choose our forum. So that's the forum we chose for the primary case, which there's not a problem, no one's raised an issue with us filing the underlying lawsuit.

Adding Mr. Seery to that lawsuit and filing a motion for leave in the same court where we actually had the lawsuit, knowing that it might get -- that might get decided or referred in some way, doesn't strike me as being anything improper, because he didn't get sued and we don't know what Judge Boyle would have said had the motion gone forward. And for them to speculate and to say that, well, this is exactly the type of thing you have to protect against, I completely disagree.

The case law that they cited for you on these -- on most of these orders really do discuss the fact that you have

somebody who is actually protecting the underlying property of the Debtor. This claim comes from a complete third party that Mr. Seery himself has admitted under oath he owes a fiduciary duty to. Two third parties. One is an investor of a fund that he manages, and one to a fund that the Debtor, with Mr. Seery as the head of it, was an advisor for up until recently.

Those fiduciary duties exist. We felt like there was a valid claim to be brought against Mr. Seery. And the only reason -- and he says this like it's a negative; I view it as a positive -- the reason he wasn't named is because of Your Honor's orders. And so we asked a Court, the Court with general jurisdiction, to address it for us or to tell us what to do. And I don't see how that is a violation of this Court's order, nor is it contemptuous of this Court's order.

If every time one of these issues came up it was a contempt of the court that appointed a trustee, we'd see a lot more contempt orders.

Interestingly, the cases that were thrown out to you in the opening argument by the other side, for example, *Villages* [sic] *v. Schmidt*, was a trustee case, but not one that involved a sanction. And the trustee case specifically in that case held that the Barton Doctrine didn't have an exception for *Stern* cases, whereas the cases we cited to you, *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d 1027, expressly held that Section 959 is an exception to the

Barton Doctrine.

And my partner, Mr. Bridges, can walk through the issues that we had on the enforceability of the order, but all -- to me, all of that is sort of a secondary issue because, *prima facie*, we didn't violate this order. I understand it may irritate the Debtor and may raise questions about why the motion wasn't filed here versus the District Court. But it was a motion for leave. In order to sanction us, Your Honor would have to find that asking for permission is sanctionable conduct in the gatekeeper order. Even if we ask the wrong court. Simply asking the wrong court is sanctionable, not knowing what that court would have done, not knowing what that court's mindset was, not even having the benefit of the argument. And that's, I guess, where this bottom -- the bottom line is for me.

The evidence that they put on for you, Your Honor. Everything you heard was evidence in the negative. You know, they talk about the transition from Mr. Dondero to Mr. Scott and Mr. Scott to Mr. Patrick, but if you actually look at the evidence he wants you to see and he wants you to rule on, it's the evidence that wasn't there. It's the evidence that Mr. Dondero had no control. In fact, I believe that was the basis he argued for why there should be no privilege. And all he said is that he was promoting it.

But the fact of the matter is, like I said, all of that is

secondary to the core issue that we didn't violate the order. We didn't take steps to violate the order. We took steps to try to not violate the order. And they want you to punish us to send a message. Even used words like the Court needs to enforce its own orders. And he did that as a transition away from the idea that there were no damages, Your Honor, and I think that has implications.

And then he said you have to enforce a meaningful penalty. Well, Your Honor, I don't think that is the purpose of these sanctions. These sanctions are supposed to be remedial, according to the case law, according to the case law that they cite. So a meaningful --

THE COURT: Coercive or remedial.

MR. SBAITI: Sorry?

THE COURT: Coercive or remedial. Civil contempt.

MR. SBAITI: Sure, Your Honor. But usually coercive sanctions require someone to do something or they are sanctioned until they do it.

THE COURT: Coerced compliance. Coerced compliance --

MR. SBAITI: Yes.

THE COURT: -- with an existing order.

MR. SBAITI: Yes.

THE COURT: Uh-huh.

MR. SBAITI: The last thing, he says you have to

protect the estate of the fiduciary and his expectation -- I believe he's talking about Mr. Seery -- his expectation that the Court would be the gatekeeper. And Your Honor, that argument rings a little bit hollow here, given that what they're really saying is that we should have come here first and asked for permission. But that insinuates that, by coming here, the case is dead on arrival, which I don't think is the right argument.

I think the issue for us has been, who do we have to ask and who can we ask to deal with the Court's gatekeeper order? I believe we chose a court, a proper court, a court with jurisdiction, to hear the issue and decide the issue. Your Court's -- Your Honor's indication of the jurisdiction of this Court we believed invoked the District Court's jurisdiction at the same time.

And so the last thing is he said -- the last thing, and getting back to the core issue, is Mr. Morris wants you to believe that we intended to violate the order, and now, as an afterthought, we're using linguistic gymnastics to get around all of that. But it's not linguistic gymnastics. Linguistic gymnastics is saying that pursue means doing anything in pursuit of a claim. That's a little -- I believe that's almost a direct quote. They're chasing the man. Well, that's the infinite regression that I talked about, Your Honor, that it's going to be impossible in any principled way to reconcile

Mr. Morris's or the Debtor's definition of pursue with any logical, reasonable limitation that is readable into the order, Your Honor.

And I'm going to defer to my partner, Mr. Bridges -- oh, go ahead.

THE COURT: I'm going to stop you. I mean, we have the linguistic argument. But how do you respond to this?

MR. SBAITI: Sure.

THE COURT: What if I tell you, in my gut, this appears to be an end run? An end run. I mean, I'm stating something that should be obvious, right? An end run around this Court. This Court spent hours, probably, reading a motion to compromise issues with HarbourVest, issues between the Debtor and HarbourVest. I had objections. An objection from CLO Holdco that was very document-oriented, as I recall. Right of first refusal. HarbourVest can't transfer its 49.98 percent interest in HCLOF, right? Talk about alphabet soup. We definitely have it.

MR. SBAITI: Yes.

THE COURT: Without giving CLO Holdco the first right to buy those assets. Read pleadings. Law clerk and I stay up late. And then, you know, we get to the hearing and there's the withdrawal -- we heard a little bit about that today -- withdrawal of the objection. We kind of confirmed that two or three different ways on the record. And then I remember going

to Mr. Draper, who represents the Dugaboy and Get Good Trusts. You know, are you challenging the legal propriety of doing this? And he backed off any objection.

So the Court ended up having a hearing where we went through what I would call the standard 9019 prove-up, where we looked at was it in the best interest, was it fair and equitable given all the risks, rewards, dah, dah, dah, dah. You know, HarbourVest had initially, you know, started at a $300 million proof of claim, eye-popping, but this all put to bed a very complicated claim.

MR. SBAITI: Yeah.

THE COURT: Tell me something that would make me feel better about what is, in my core, in my gut, that this is just a big, giant end run around the Bankruptcy Court approval of the HarbourVest settlement, which is not on appeal, right? There are a gazillion appeals in this case, but I don't think the HarbourVest --

A VOICE: It is on -- it is on appeal, Your Honor.

THE COURT: Is it? Oh, it is on appeal? Okay. So I may be told --

MR. SBAITI: I didn't know.

THE COURT: I may be told, gosh, you got it wrong, Judge. You know, that happens sometimes.

So, this feels like an end run. You know, the appeal is either going to prevail or not. If it's successful, then, you

know, do you really need this lawsuit? You know, I don't -- okay. Your chance.

MR. SBAITI: Thank you, Your Honor.

THE COURT: Uh-huh.

MS. SBAITI: Your Honor, this wouldn't be the first case where finality or where there was a settlement -- I'm not familiar as well with bankruptcy, but certainly in litigation -- where the settlement then reveals -- well, after a settlement is done, after everyone thinks it's done, some new facts come to light that change people's views about what happened before the settlement or before the resolution. And that's what happened here, Your Honor. This is what we've pled. And this is what we understand.

There were the instances of Mr. Seery's testimony where he testified to the value of the HarbourVest assets. I believe, as I recall, he testified in I believe it's the approval hearing that Your Honor is talking about that the settlement gave HarbourVest a certain amount of claims of I think it's, Series 8 and then Series 9 claims, and that those were discounted to a certain dollar value that he quantified as about $30, $31 million. And the way he ratified and justified the actual settlement value, the actual money or value he was conferring on HarbourVest, given the critique of HarbourVest claims that he was settling, is he explained it this way. He said $22-1/2 million of this whole pot that I'm giving them

pays for the HarbourVest -- HarbourVest's interests in HCLOF -- it's alphabet soup again -- and Highland CLO Funding, Limited. And so it's the other $9 million that's really settling their claims. And given the amount of expense it's going to take, so on and so forth, $9 million seems like a reasonable amount to settle them with, especially since we're just giving them claims.

So that $22-1/2 million everyone apparently took to the bank as being the value, including CLO Holdco at the time, because they didn't have the underlying valuations. Highland was supposed to give the updated valuations.

So, fast-forward a couple of months -- and this is what we've played in our lawsuit, Your Honor; this is why I don't think it's an end run -- we pled in our lawsuit just a couple months later Highland -- I believe some of the people that worked at Highland started leaving, according to some mechanisms that I saw where Highland didn't want to keep all the staff and so the staff was migrated to other places. And one of those gentlemen, I believe Mr. Dondero referred to him as a gentleman named Hunter Covitz, and Hunter Covitz, who's also an investor in HCLOF, he owns a small piece of HCLOF, he had the data, he had some of the information that showed that, actually, in January, when Mr. Seery said that the HarbourVest settlement was worth 22 -- excuse me, the HarbourVest interests in HCLOF were worth $22-1/2 million, that they're

actually worth upwards of $45 million.

And so that information, Your Honor, we believe gives us a different -- a different take on what happened and what was supposed to happen. This is strictly about the lack of transparency.

THE COURT: Okay. Assuming --

MR. SBAITI: Yeah.

THE COURT: -- I buy into your argument that this is newly-discovered evidence --

MR. SBAITI: Yes.

THE COURT: -- CLO Holdco would not have had reason to know -- I guess that's what you're saying, right?

MR. SBAITI: I'm saying they -- they didn't know.

THE COURT: That they didn't know.

MR. SBAITI: Uh-huh.

THE COURT: And didn't have reason to know. I'm trying to figure out who's damaged here.

MR. SBAITI: Well, CLO Holdco, my client, is damaged, Your Honor.

THE COURT: How?

MR. SBAITI: Because one of the aspects of the -- of Highland, one of the issues under, excuse me, of Highland's advisory, is that it has a fiduciary duty. And that fiduciary duty, at least here, entails two, if not, three prongs. The first prong is they have to be transparent. You can't say --

THE COURT: How is -- you know, I know a lot about fiduciary duties, believe it or not. How is CLO Holdco harmed and the DAF harmed?

MR. SBAITI: Because, Your Honor, they lost out on an investment opportunity to buy the piece of -- the HarbourVest piece. They would have been able to go out and raise the money. They had the opportunity --

THE COURT: Okay.

MR. SBAITI: They would have had the opportunity to make a different argument.

THE COURT: What you're saying, you're saying, if they had known what they didn't have reason to know, that it was worth, let's say, $45 million, that they would have gone out and raised money and said, oh, we do want to exercise this right of first refusal that we decided we didn't have and gave in on, we're going to press the issue and then outbid the $22 million, because we know it's worth more? Is that where you're going? I'm trying to figure out where the heck you're going, to be honest.

MR. SBAITI: That's -- Your Honor, I'd push back on a little of the phrasing, only because the way these duties -- the way we understand the SEC's duties work when you're an investment advisor is you have a transparency obligation and an obligation --

THE COURT: Yes. Yes.

MR. SBAITI: -- not to divert these. So, yes, CLO Holdco would have at least had the opportunity and been offered the opportunity, which it could have taken advantage of, to, if the assets were really on the block for $22-1/2 million, they should have been able to buy their percentage pro rata share of that $22-1/2 million deal. I mean, in a nutshell, that's -- that's where we believe we've been harmed. And we believe that the obfuscation of those values and, to a certain extent, the misrepresentation of those values in the settlement is not cleansable by the argument, well, you should have asked.

Well, you should have asked is fine in normal litigation, but when the person you should have asked actually owes you a positive duty to inform, we believe that the should-have-asked piece doesn't really apply and there's -- and that's, that's the basis of our case.

So it's not an end run around the settlement, Your Honor. I think I opened with we're not trying to undo the settlement. We're not saying HarbourVest has to take its interest back. We're not saying the settlement has to go on. We're not even saying any of the things that happened in Bankruptcy Court need to change. But Section 959 is pretty clear that this is management of third-party property --

THE COURT: I guess -- okay. Again, rabbit trail, maybe. But CLO Holdco still owns its same 49.02 percent

interest that it did before this transaction. So if there's value galore in HCLOF, it still has its 49.02 percent interest. What am I missing?

MR. SBAITI: Oh, I think Your Honor's assuming that HCLOF bought the piece back from HarbourVest. It didn't.

THE COURT: No, I'm not.

MR. SBAITI: Oh.

THE COURT: I'm not assuming that.

MR. SBAITI: Well, --

THE COURT: I know that now the Debtor has, what, fifty point, you know, five percent of HCLOF, whereas it only had, you know, a fraction.

MR. SBAITI: Point six-ish. Yeah.

THE COURT: Point six-ish, and HarbourVest had 49.98.

MR. SBAITI: Right.

THE COURT: So, again, please educate me. I'm really trying to figure out how this lawsuit isn't just some crazy end run around a settlement I approved. And moreover, what's the damages?

MR. SBAITI: Well, Your Honor, --

THE COURT: What's the damages? CLO Holdco still has its 49.02 percent interest in HCLOF.

MR. SBAITI: Your Honor, again, --

THE COURT: What am I missing? I must be missing something.

MR. SBAITI: I think so, Your Honor.

THE COURT: What?

MR. SBAITI: The damages is the lost opportunity, the lost opportunity to own more of HCLOF.

THE COURT: Oh, it could have owned the whole darn thing?

MR. SBAITI: I could have owned 90 -- whatever 49 plus 49.98, 98.98 percent.

THE COURT: But --

MS. SBAITI: Or some pro rata portion.

THE COURT: But Mr. Seery had some information that you think he was holding back from CLO Holdco that CLO Holdco had no reason to know?

MR. SBAITI: Yes, Your Honor. The -- the -- what he testified to that the value of those assets, excuse me, the value of the HarbourVest interests in HCLOF or its share of the underlying assets being $22-1/2 million was either, one, intentionally obfuscated, or, two, and I don't think this excuses it at all, he simply used ancient data and simply never updated himself, not for the Court and not for any representations to the investors, who he himself testified under oath in this Court that he has a fiduciary duty to under the Investment Advisers Act.

THE COURT: This could get very --

MR. SBAITI: So that's injury to my client, Your

Honor.

THE COURT: This could get really dangerous. Maybe --

MR. SBAITI: I'm sorry.

THE COURT: This could get really dangerous. Maybe I should cut off where I'm going on this.

MR. SBAITI: Okay.

THE COURT: Of course, someone dangled it out there in a pleading. You know where I'm going, right?

MR. SBAITI: I'm not sure I do, Your Honor.

THE COURT: Hmm. I do read the newspaper, but someone put it in a pleading. HCLOF owns MGM stock, right? Is that what this is all about? Is that what this is all about? Or shall we not do this on the record?

MR. SBAITI: Well, Your Honor, this has nothing -- I don't -- I don't think this has anything to do with the MGM stock one way or the other.

THE COURT: You don't? OH?

MR. SBAITI: Your Honor, my charge as a counsel for the DAF is pretty straightforward. We looked at the claims. We looked at the newly-discovered information. We talked to the people who had it, Your Honor. That was our investigation. We put together a complaint. We believed that we had a good basis to file suit, despite Your Honor's -- the settlement approval. We expressly, because we understand how

finality is so critical in a bankruptcy context, we expressly didn't ask for rescission. We expressly didn't ask for anything that would undo the settlement.

Asking for damages because of how the settlement happened, through no fault of the Court's, of course, but asking for damages is not, at least not as I see it, an end run around the Court's settlement, and it's a legitimate claim. And I don't think this is far from the first time that new evidence has come up that's allowed someone to question how something was done that actually -- that actually damaged them.

THE COURT: Usually, they come in for a motion to reopen evidence to the court who issued the order approving the settlement.

MR. SBAITI: Well, Your Honor, I mean, that's --

THE COURT: Newly-discovered evidence.

MR. SBAITI: That would be the case in a final judgment, Your Honor. But, you know, our understanding of the way the settlement worked was that that was not necessarily going to be -- not the direction anybody wanted to go, but seeking damages on a straight claim for damages, which we're allowed to seek, which I think is our prerogative to seek, we went that direction.

THE COURT: Okay. Okay.

MR. SBAITI: But this --

THE COURT: My last question.

MR. SBAITI: Yes, Your Honor.

THE COURT: Again, I have to know. You have filed some sort of pleading to reopen litigation against Acis in New York? I'm only asking this because it's part of what's going on here. What is going on here?

MR. SBAITI: Your Honor, that's a -- that's a separate lawsuit, and it's not to reopen litigation against Acis. It deals with post-plan confirmation mismanagement by Acis.

THE COURT: Oh, okay. Okay.

MR. SBAITI: Yeah.

THE COURT: All right.

MR. SBAITI: But I believe there's a motion in front of Your Honor, just to -- that gave notice that the suit was filed, but I believe Mr. -- well, a bankruptcy lawyer filed it. I don't know.

THE COURT: A motion or a notice? I don't know.

MR. SBAITI: I don't know, Your Honor. That's above my paygrade.

THE COURT: I have not seen it. Okay?

MR. SBAITI: Okay.

THE COURT: Maybe it's there, but no one has called it to my attention.

MR. SBAITI: With the Court's permission, I'm going to yield time to Mr. Bridges.

THE COURT: Okay. Mr. Bridges?

CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

MR. BRIDGES: Thank you, Your Honor. I'm grateful that you asked most of those questions to Mr. Sbaiti. I would not have been able to answer them. The one I can answer is the one about judicial estoppel. Apparently, I did a pretty lousy job earlier. I think I'm prepared to do a better job now.

The case law I'd like to refer you to is the Texas Supreme Court's 2009 decision in *Ferguson v. Building Materials*, 295 S.W.3d 642. And this was my concern and my issue, perhaps because I used to teach it and so it was at the front of my mind. But contrary to what you would think and what you said earlier, it's not your ruling against us that would create a judicial estoppel problem. It's if you ruled in our favor. And I know that seems weird. Let me explain.

The two things that have to take place for there to be judicial estoppel are, first, successfully maintaining a position in one proceeding, and then taking an inconsistent position in another. And Your Honor, what we talked about earlier is the notion that your July order forecloses the key claim that Mr. Sbaiti was just describing, that Mr. Seery should have known. Not that he was grossly negligent or did intentional wrong, but that he breached fiduciary duties because he should have known and should have disclosed.

And if your order forecloses that and we come and convince you that we nonetheless have colorable claims, colorable claims of gross negligence or willful wrongdoing, that we ultimately are unable to prove, our lawsuit could fail, even though we had proved -- in the lawsuit we had proved he should have known and that he breached fiduciary duties, but we would be estopped, having succeeded from coming here and asking in compliance with the order and its colorability rule, that we would be estopped from then saying that this Court lacked the authority to have issued that order in the first place, to have released the claim on the mere breach of fiduciary duty or ordinary negligence. That's the inconsistency that I was concerned about.

By coming here rather than trying to make our objection and our position known without submitting to the foreclosure of that claim that is, in many ways, the most important, the headliner from our District Court complaint, is the concern, Your Honor. And frankly, if Your Honor's order does foreclose that, then we're in serious trouble. That's the claim that we're trying to preserve.

But Your Honor, I don't think it was in anyone's contemplation in July of 2000 that what that order would do is terminate -- 2020; sorry, Your Honor -- in July of 2020, that that order would terminate future claims that might arise based on future conduct that had not yet happened in Mr.

Seery's role. Not in his role as a manager of the Debtor's property, but in his role as a registered investment advisor on behalf of his clients and their property. And that is the concern that the judicial estoppel argument is about.

THE COURT: I still don't understand. I'm very well aware of judicial estoppel, the old expression, you can't play fast and loose with the court. Take one position in one court, you're successful, and then take another position in another court. That's the concept.

MR. BRIDGES: Coming here --

THE COURT: How is this judicial estoppel if you had done what I think the order required and asked this Court for leave? What -- and I said fine, you have leave. Where's the judicial estoppel problem?

MR. BRIDGES: If you say fine, you have leave, but that leave is only, as the order states, because we have colorable claims of gross negligence, colorable claims of intentional wrongdoing, what happens to our mere negligence and mere breach of fiduciary duty claims? Are they foreclosed? The order on its face --

THE COURT: Well, I would interpret the order to be yes, and then you could appeal me, and the Court would either say it's too late to appeal that because you didn't appeal it in July 2020, or fine, I'll hear your appeal. Where's the estoppel?

MR. BRIDGES: Your Honor, our claims that this Court lacks the authority either to have made that order in the first place or the jurisdiction to rule on colorability now because of Section -- the mandatory abstention provision, whose section number I've now lost. That if we come to you and ask you to rule on those things, have we not thereby waived on appeal our claim that you couldn't rule in the first place on those things?

That is what our motion for leave in the District Court argues, is that there's -- there are jurisdictional shortcomings with your ability to decide what we're asking that Court to decide. And Your Honor, by coming here first and then appealing, that's what we fear we would have lost. And instead of coming here and appealing, what we -- what we would have done, in the alternative, I guess, would be to come here and ask you not to rule but move to withdraw the reference of our own motion.

That two-step, filing here and filing a motion to withdraw the reference on the thing we filed here, we didn't think was required, nor could we find any case law or rule saying that that was appropriate.

THE COURT: Okay.

MR. BRIDGES: These are not games, Your Honor. We were not trying to play games. We aren't bankruptcy court lawyers. We're not regularly in front of the Bankruptcy

Court. So the notion why didn't we come here first isn't exactly at the top of our mind. The question for trial lawyers typically is, where can we file this, what are the permissible venues, not why don't we come to Bankruptcy Court? Especially when your order appears to say that causes of action that don't rise to the level of gross negligence or intentional wrongdoing are already foreclosed.

Your Honor, the January order, I think I have to just briefly address again, even though I don't understand why it makes a difference. Apparently, counsel thinks it makes a difference because Mr. Dondero apparently supported it in some way. Our position is, for whatever difference it makes, the January versus the July, we don't believe there's anything in the District Court complaint putting at issue Mr. Seery's role as a director, so we don't understand how that order is implicated.

Again, I'm not sure that matters at all. I'm not raising it as a defense. I'm just telling Your Honor this is all about the July order, from our perspective. Certainly, the July order puts his role as a CEO -- certainly, the District Court case puts his role as a CEO at issue, and that's what the July order is about.

Your Honor, the *Applewood* case requires specifics in order to terminate our rights to sue and to bring certain causes of action, and without that kind of specificity, Your Honor, we

believe that that order fails to preclude, fails to have preclusive effect as to these later-arising claims. And we would submit not only that it was not contemplated, but that it was not intended to have that effect, and that even Mr. Seery's testimony suggests that that's not how he understood that order to be effective.

Counsel argued that the Barton Doctrine does apply here and rattled off the names of cases that don't -- to my knowledge, no case, no case that I can find deals with this type of deferential order where someone is asked -- where a court is asked to defer to the business judgment of an entity in approving an appointment, and nonetheless deciding that the Barton Doctrine applies. That's not what *Villegas* holds. That's not what *Espinosa* holds. I don't think *Barton* is applicable in a situation like that. Certainly, it's outside of the context of what *Barton* anticipated itself over a century ago when it was decided.

Your Honor, if we're wrong, please know we're wrong in earnest. These are not games. These are not sneakiness. No such motivation is at issue here. I was hopeful that that would be plain from the text of the motion for leave itself. If it's not, I'd offer this in addition. The docket at the District Court shows that immediately upon filing the motion for leave, a proposed order was filed with it asking to have the proposed complaint deemed filed, which as soon as I saw I

asked us to immediately retract it and to substitute a new proposed order that does not ask for the amended complaint to be deemed filed. That is not what we wanted.

And the fear was what if our motion is granted because the District Court says you have the right, you don't even need leave, but as to the Bankruptcy Court, you're on your own, this is at your own risk, I'm not going to rule on any of the jurisdictional questions that you attempt to raise? We did not want our complaint deemed filed for that reason. What we did want was for a court where we did not risk judicial estoppel to decide whether or not our key claim under the Advisers Act had been foreclosed by your July order, and that was the key and motivating factor.

On top of that, Your Honor, instead of arguing the meaning of the word pursue, let me just say this. We understood pursue in that context to refer to claims or causes of action, not potential, unfiled, unasserted, contemplated claims or causes of action. That until a claim or cause of action is actually asserted in some way, that it can't be pursued, and that the reference here was to two kinds of action, those that had not yet been commenced -- and your order foreclosed the commencing of them without permission -- and those that had been commenced. And your order couldn't foreclose the commencing of them because they hadn't been commenced yet, but your order did foreclose pursuing them.

And that was my reading of what that order said. And it fits with this notion that a claim or cause of action isn't something you're considering or even researching. It didn't dawn on us that researching or talking to a client about a potential claim could violate the order because in some respect that conversation could be in pursuit of the claim.

By the same notion, we didn't think asking a court with original jurisdiction according to Congress, asking a court to decide whether or not we were foreclosed from bringing our claims in a motion for leave was violating your order.

We don't have much else, Your Honor. In terms of the need to enforce compliance with your orders, if we understand them, we sure as heck are going to follow them. And if we've misconstrued the term pursue, I'm certainly very sorry about that.

I appreciate counsel saying he thinks we're probably good people. I did not think what we did was any kind of gross error in judgment. I thought that what we were doing was preserving our clients' rights, going to a court of competent jurisdiction, and asking the question, can we do what we think we ought to be able to do, but is -- frankly, Your Honor, we're a bit confused about because of the order that seems on its face to foreclose the very lawsuit that we think we should be bringing on behalf on this charitable organization that foreclosed it months before the conduct at issue that gave

rise to the complaint. And with that conundrum, knowing what to do was not obvious or easy for the lawyers or for the client who was dependent on his lawyers to give him good, sound advice.

I'm very grateful for you giving us the time and for your very pointed questions. Thank you, Your Honor.

THE COURT: Thank you. All right. Who's next?

CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

MR. ANDERSON: May it please the Court, Michael Anderson on behalf of Mr. Patrick, Mark Patrick.

You know, this is a contempt proceeding. It's very serious. And, you know, my stomach aches for the people here.

THE COURT: Mine does, too, by the way.

MR. ANDERSON: It truly aches.

THE COURT: Uh-huh.

MR. ANDERSON: And I mean what I said when I did opening, when I said we don't need a hearing, an evidentiary hearing. And I still don't believe we did, because it comes down to what does the word pursue mean, because there's already been an acknowledgement --

THE COURT: Do you all want to withdraw all your exhibits? I've got a lot of exhibits that I now need to go through. If I admit them into evidence, I'm going to read them.

MR. ANDERSON: No, I understand.

THE COURT: Uh-huh.

MR. ANDERSON: But it does come down to the word pursue. Counsel has already said commence doesn't do it, and so then it's pursue.

And I could ask Your Honor, what did you mean when you said pursue in the July order, but I'm not going to say that. And I asked my client on the stand, you know, did you pursue a claim or cause of action? And then it was very telling. What happened with counsel? He stood up and objected to me even asking if it was pursued. And it dawned on me, if he's going to object, does pursue have some sort of legal -- that was his objection. It was he objected on legal grounds. Does that have some sort of legal meaning?

This is contempt. You can't be held in contempt unless it is bright-line clear that you have deviated from a standard of conduct and there's no ambiguity. Well, clearly, there is ambiguity, because over on this side of the room we say filing a motion for leave can't be pursue. We can look at the order and we know it doesn't mean pursue because I just heard Your Honor say you should have filed a motion for leave in this Court before doing anything. All right? So if that -- if that is what without the Bankruptcy Court first determining, if that's what the motion for leave is, well, then if we go up to the first sentence, No entity may commence or pursue a claim or cause of action, then it has this, without the

Bankruptcy Court first determining, that means -- if pursue means a motion for leave, if that's what that means, then that order says you can't commence or file a motion for leave before you file a motion for leave. Because that's what it means. If pursue means motion for leave and you've said you should have come here and filed a motion for leave because it says, Debtor, without the Bankruptcy Court first determining that notice that such claim or cause of action represents a colorable claim, and specifically authorizing. The vehicle to do that would be a motion for leave, right? And you can't pursue anything until a motion for leave has been filed.

Now, where was the motion for leave? And I understand, Your Honor, you know, no expert at reading the room, obviously, you're frustrated that the motion for leave was filed in the District Court and not in this Court. But it doesn't change the fact, and neither did any of the evidence, change anything, is what does pursue mean?

And if someone says, well, it's obviously clear it means *x*, well, is it really obviously clear it means filing a motion for leave? Because nobody on my side, when you read it, when you say pursue, can read it that way. And if we're going to have contempt sanctions being posed, and there has to be clear and convincing evidence or beyond reasonable doubt, depending upon, you know, I don't think you have to get to that part, but clear --

THE COURT: This is not criminal contempt.

MR. ANDERSON: Clear and convincing is the civil standard for contempt.

THE COURT: Right.

MR. ANDERSON: And if pursue is open to that much interpretation, it's not the kind of thing that can be held in contempt on. And I understand the frustration. I hear the frustration. I hear counsel talk about that was not their intent when they filed it. You know, I heard Mr. Patrick get up there. I heard counsel say, hey, Mr. Patrick's doing his job, he's a good guy, seems like a good guy. Well, Mr. Patrick's up there. Look, they filed the underlying lawsuit. Nobody -- there's no motion for that in this Court about the underlying lawsuit. It's only about the motion for leave. That's all we're here about.

And so you go to that, and we've heard all these arguments about it, and we've been here almost as long as the motion for leave was actually on file before it was sua sponte dismissed without prejudice.

And so I go back to that and I say that, if pursue means filing a motion for leave, then that order would require an order for anyone to violate -- it would be violated upon the filing of a motion for leave, because you can't pursue something until the Bankruptcy Court has already first determined, after notice, that such claim or cause of action

represents a colorable claim and specifically authorizing the entity to bring such a claim. Because that -- we already know that's a motion for leave in and of itself. Therefore, pursue, just simply filing a motion for leave will put you in that.

But that gets into all these -- we don't need to be having this discussion about, you know, is a motion for leave pursue? Is pursue a motion for leave? I've heard both arguments here. It doesn't justify contempt. And I know -- and so certainly with respect to my side, I, you know -- given that, I would request that the Court deny the request for contempt.

And again, I want to say, too, look, we hear you. Absolutely hear you. Understand the frustration. Totally hear you on that.

I'm going to turn over the balance of my time to Mr. Phillips, --

THE COURT: Okay.

MR. ANDERSON: -- unless you have any questions, Your Honor. I appreciate it.

THE COURT: Okay. I do not.

CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

MR. PHILLIPS: Your Honor, Louis M. Phillips, and I'll be brief. I'm going to try to bring it down to -- I was not involved. We are -- we are here because of the indemnification provisions of CLO Holdco representing Mr.

Patrick individually. My firm was not involved in the litigation. We were hired to represent CLO Holdco and some of the defendants in the UCC litigation, and our role has expanded to do some other stuff, particularly represent Mr. Patrick because of the indemnification provisions of the Holdco entity documents. He's entitled to indemnification and we're providing a defense for him. That's why we're here.

So I come way after the order. We have not been involved in anything. But I think I'm just going to try to distill everything about the order and about the concern and about the litigation, because the Court is asking about is this an end run on the settlement? The Court is also saying, all you had to do was come here first.

But let's look. We're here about one thing, the motion for leave. And as Mr. Anderson pointed out, the commence or pursue a claim, according to the order, commence or pursue can only occur after the Court has authorized the litigation. Okay. So that's what the order says. You can't commence or pursue.

Counsel for the Debtors says, well, it can't be after commencement because you've already commenced the action. So pursue has to mean something before the commencement of the action. It would mean something before the commencement of the action under this order.

But it doesn't mean something before the Court approves

the commencement of the action, because commence or pursue under this order does not occur before the Court has acted. That's the language of the order. It only occurs after the Court has authorized it. That's the context in which commence or pursue exists, after this Court has authorized.

Okay. So it can't be pursuit before the Court has authorized without commencement because it only is triggered by the Court's authorization of the action, which means, before you commence it, actions in time take time, before you commence the action, you have to pursue the action to commence it. But you can't do that until you've approved it. All right?

That's the temporal concern and why we say the motion for leave can't be pursuit of an action under this order. It might be pursuit under another definition or another order. In other words, maybe an order could be issued saying, you can't file a motion for leave in any other court but this one. I don't know whether it'd be a good order, but the order could say that. But when you say all you had to do was file a motion for leave in this Court and everything would be okay, no. The motion for leave is not, under this order, pursuit. Pursuit only occurs under this order after you've done something, after Your Honor has done something.

So if a motion for leave is violative at the District Court, the motion for leave would be violative here, because

it occurs before Your Honor has taken action.

Now, clearly, you want people to ask, but just as clearly, and this was the point of my remarks earlier at the tail-end of opening, just as clearly, I have a question, because frankly, I understand what these guys are saying. These guys haven't really said it. They're a little shame-faced at what these guys are asking. Because what these guys are asking is whether or not an employee Seery, as the CRO -- and we heard, oh, he bargained for it, he wouldn't have done it without getting the order and the protections because -- did he bargain for not having to comply with the Investor Advisory Act? Did he bargain for not having a fiduciary duty to third parties? Because the one thing that Mr. Bridges has been trying to tell you is that, under this order, if it's interpreted one way, you would never authorize a violation of the Investment Advisory Act because it wouldn't necessarily be gross negligence or willful misconduct.

In other words, in employing Seery, did the Debtor go out in this disclosure statement and say, we are advisor to $1.2 billion of third-party money, and guess what, our CRO has no fiduciary duty to you? We have forestalled any claim under the Investment Advisory Act in our employment order. Did that happen?

Because if that happened, I don't know if the Court was really thinking that way, because that -- that can't happen in

a confirmation order before, under the Fifth Circuit authority, after disclosure statement, plan, et cetera, et cetera, because that's a third party release of claims that may -- that haven't occurred yet. You would be releasing because you would be saying you have no right. You have no right. This is not temporal. This is saying you have no right, if it's saying that, to bring an Investment Advisory -- Investment Advisory Act or a Breach of Fiduciary Duty Act that's not gross negligence or willful misconduct forever upon an employment order.

Now, if that's not what it means, then we have another conundrum. The other conundrum -- and I'm new to this, maybe this has been thought out by everybody, but I don't think so. The other conundrum is this order doesn't apply to actions that don't involve willful -- gross negligence or willful misconduct. It only applies to those types of actions. So, frankly, I don't know what the order does.

I think the problem -- I probably shouldn't be the purviewer of who ought to know because my standard's probably really low, given my capacity here. But I'm a guy off the street. Seery gets hired to run the Debtor. Seery testifies and he admits, we've got Investment Advisory Act all over the place. We're making lots of fees out of administering all this third-party money. Do they know? Do they know he's immune? Do the third parties know?

Now, a standard about managing the Debtor? Absolutely. That's just pure D Chapter 11, pure D corporate, pure D standard liability if you're operating an entity. You're not liable for gross negligence or willful misconduct. You're not. And so any claim for damage to the Debtor or to the estate by actions taken in the CRO capacity, absolutely. Absolutely. You don't want a bunch of yoyos suing, you did something against the Debtor and the Debtor is now worth $147 less than it was because you did something, you were negligent and you forgot to put the dog out. No. It's got to be gross negligence or willful misconduct if you are talking about running the Debtor and running the estate.

But that's not what we have here. And you can ask all the questions you want about whether the lawsuit's any good, but that's not what's up before the Court. What's up before the Court is whether filing a motion for leave is contempt. And under this order, you're saying, all you had to do is come here. Well, in one reading of it, you'd have never got relief because you can't bring the kind of action. I foreclosed it by employing Seery. He no longer has a fiduciary duty and is no longer bound by the Investment Advisory Act. Case closed. Get out of here. Unless you can formulate something around so that you can establish gross negligence or willful misconduct, I've done away with all those causes of action.

I don't think that's what happened. And if that's not

what happened, this doesn't apply because it shouldn't apply to third-party actions. It should apply to actions for damage to the estate by creditors of the estate for whom Seery is acting as CRO of the Debtor, who is the -- in possession of the estate. That makes perfect sense. Perfect sense. And nobody would say that you shouldn't have sole authority to determine whether a CRO who's acting for the estate and damages the estate -- because that'd be a claim against the estate. That would be an administrative claim against the estate. That is just hornbook law.

That's the way I see this order. And I admit I didn't write it. I admit I didn't submit it. I admit I didn't litigate it. I admit I'm coming in late. But sometimes maybe a fresh pair of elderly, trifocal-assisted eyes doesn't hurt. Because I will tell you, Judge, on one read this Court says don't bother coming here because you don't have the kind of claim that can be brought, even if you're a third party. And the only way that happens is if Seery's released from any obligation under the Investment Advisory Act, and I think everybody would like to know that. And he can't be sued for breach of fiduciary duty to third parties that he admits he owes. I think people would like to know that.

And if it doesn't, then this is not -- this order is not about that. But the fact -- I've been at this 40 years, and I usually don't want to talk about myself. There's really not a

lot to talk about. But I hear Mr. Morris how he's never done this, he's never done that. I hear this, I'm a good -- you know, whatever. I'm confused. I've been doing this 41 years. Bankruptcy, 39.7. I must be crazy, but that's what I've been doing. And I'm confused because I don't even know if they needed to come here. I don't even know if, had they come here, if they could have even presented an action for gross -- for negligence or breach of fiduciary duty, could have -- gross negligence or willful misconduct? I don't know whether this order just applies to Seery's duties as CRO vis-a-vis creditors of the estate and property of the estate and damage to the estate. Because that's not what we're dealing with here.

The point is, Judge, this is contempt. And I understand Your Honor knows all about contempt. Your Honor knows about *Matter of Hipp*. Your Honor knows about civil contempt authorization for bankruptcy courts. Your Honor knows that you can't operate without the right to impose civil contempt sanctions. And Your Honor knows, and I agree with Your Honor, that civil contempt is both remedial and coercive.

But how do you coerce around my questions? Maybe I am all wet, but if I am, I don't think I am, and I don't understand that I am, and that's why I'm concerned about going off into this contempt wilderness and millions in fees, when the motion for leave was dismissed and when the lawsuit doesn't ask for

or includes most of its claims. I don't even -- I have not studied the lawsuit. I wasn't involved in it. But if it's a breach of fiduciary duty and Advisory Act and it says what you've been told it says, that he should have pulled up different stuff, that the valuation metrics were different, that he shouldn't have used it, I don't know that they're saying fraud. I don't know that they're saying he knew he was doing -- I think they're saying he breached the Investment Advisory Act. And that's not gross negligence or willful misconduct. Then does this order apply or this order -- does this order foreclose that?

The fact is, I think we could have decided this on the pleadings and on the order. We didn't. The fact that Mr. Dondero did A, B, C. And I will tell you this. Mr. Patrick has stood up. He's going to get a harpoon, he's going to get a harpoon, subject to his right to appeal. But he has told this Court. We represent him. We're not trying to get him out of having authorized the order. It's very important for this Court to understand. Mr. Patrick is one of these entities. Mr. Dondero can holler and scream all he wants to. Mr. -- and look, did he terminate Grant Scott? If I'm Grant Scott, and this is my best friend and I was in his wedding and I was his roommate and I was his best friend and I'm doing this stuff for $5,000 and I do something and $5,000 a month and I do something and I get hollered at and I've got a full a

law practice, I'm an IP lawyer, why don't I just tell him to go jump in a lake, which is the other way you could look at Grant Scott leaving. I want you to jump in a lake. I'm out of here. I don't need this.

Thank you.

THE COURT: All right. Thank you.

MR. DEMO: Your Honor, how much time do they have left, --

THE COURT: Um, --

MR. DEMO: -- to be honest?

THE COURT: Nate, are you -- 26 minutes? All right.

MR. TAYLOR: I'll go way under, Your Honor.

THE COURT: Okay.

CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

MR. TAYLOR: Your Honor, Clay Taylor. I'm here on behalf of Mr. Dondero. He was named as an individual alleged violator within the order.

THE COURT: Okay. I'm getting lawyers mixed up. Mr. Anderson, who did you represent?

MR. ANDERSON: Mr. Patrick. Mr. Phillips and I represent --

THE COURT: You're Mr. Patrick?

MR. PHILLIPS: We're Mr. Patrick.

THE COURT: You're both --

MR. PHILLIPS: Mr. Patrick.

THE COURT: Okay. I'm sorry. I'm getting my Fort Worth law firms mixed up. Okay.

MR. TAYLOR: That's quite all right. Clay Taylor from Bonds Ellis here on behalf of Mr. Dondero. And we're here because he was named in the alleged violator motion within the order as an alleged violator. We don't think that he is, for the reasons that we're about to explain, but we were ordered to appear --

A VOICE: No.

MR. TAYLOR: -- and so therefore we are appearing and telling you why we're not an alleged violator.

First of all, for all the reasons that Mr. Sbaiti and Mr. Bridges and Mr. Phillips and Mr. Anderson said, the court order was in effect. We agree with that. It required certain conduct to be done. Yes, it did. It said you couldn't commence something. It said you couldn't pursue it. I think we have gone through what the pursuit and commence. Nobody is arguing that anything was commenced. It comes down to pursuit.

But let's talk about what the evidence shows about Mr. Dondero. It shows that Mr. Dondero believes that there have been breaches of fiduciary duty. He thinks that there has been negligence committed. He believes that actions should be taken. We don't run away from that. He, frankly, told you that.

But here, he didn't take any action to pursue it. The DAF did. CLO Holdco did. It's undisputed that he's not an officer, director, or control person for either of those entities. The act we're here on is a motion for leave to file an amended complaint to include Mr. Seery. That's -- Mr. Dondero didn't take any of those acts. He believes it should have been done, but he's not the authorizing person.

He might have -- let's just pretend that he thought he was authorizing something. It doesn't matter that he thought he could authorize something or that he was trying to push for it. The fact remains he can't authorize it. You know, he can say, I declare war on Afghanistan. Well, he can't. Congress can't. He can write a letter to his Congressman. He already wrote a letter to his Congressman. He talked. He talked with the head of the acting CLO -- CLO Holdco and he said, I think there's something wrong here. I think you should be looking into it. You know what, he goes, you might be right. Go talk with Mazin about it. Give him some data. Conduct an investigation. They did. And then they went to the authorizing person and they filed a motion for leave to include Mr. Seery. Mr. Dondero did nothing wrong in that.

Now, there is some personal animosity. I think that Your Honor has probably seen there seems to be some personal animosity between Mr. Seery and Mr. Dondero, and that's unfortunate. But just because there's some personal animosity

doesn't mean that maybe something wasn't done wrong. Maybe that Mr. Dondero -- he's certainly allowed to at least tell people, well, I think there was something done wrong. And if there is an action to be had, then those appropriate entities can take it. But he didn't do those things.

And so even if he says, just like Michael Scott, "I declare bankruptcy," it doesn't matter. You have to take the certain actions.

THE COURT: I got it. I don't know if everyone did.

MR. TAYLOR: Yes, well, yeah, you have to be a *The Office* fan.

But so that's where we stand. And for all the reasons the prior people have discussed, I don't think that there was any violation of this Court's order. But even if there was, Mr. Dondero in this situation was not the one. We're going to have to deal with the other order that came out yesterday in due course, but for this discrete issue that is before this Court today, Mr. Dondero didn't violate anything.

Thank you.

THE COURT: All right. Mr. Morris, you get the last word.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

MR. MORRIS: Thank you, Your Honor. These are going to be discrete points because it's truly rebuttal. I'm going to try to respond to certain points.

Mr. Bridges and Mr. Phillips made extensive arguments about why they believe the order is wrong, why it's overreaching. They tried to get into your head to think about what you intended or what you thought. The fact of the matter is, the answer to all of those questions -- first of all, none of it's relevant to this motion because we've got the order -- but the answer is very simple. Forget about coming here to seek leave to amend to add Mr. Seery. We can avoid Mr. Sbaiti's concerns about judicial estoppel or something. Why didn't they just file the motion for reconsideration? They filed that after they filed the motion for leave to amend, after we filed the motion for contempt. Only then did they file the motion for reconsideration.

Now, we think it's ill-thought-out. We think it's problematic. Probably not today, is my guess, we'll argue to you as to why we think that motion ought to be denied. But if they truly believed that the order was infirm in any way, wouldn't the proper thing to have been to come here and tell you that? Wouldn't the proper thing to be to come to the court that issued the order that you have a problem with and ask the court to review it again? And if Your Honor overruled the motion, to appeal it.

Why are we even doing this? Why did they do it? It's not we. Why did they do it? Right? And that solves almost everything they've said. That's point one.

Point two, the January order. The January order is very important. It's important not just because it applies to directors, but it's important because Mr. Dondero agreed to it, and it also applies -- I want to get it -- Paragraph 10. It's Exhibit 15. It applies to the independent directors and the independents directors' agents. If a CEO is not an agent of an independent director, I'm not sure what is. The independent directors are the body that appointed the CEO. The CEO, Mr. Seery, is acting on behalf of the board. This is the order that Mr. Dondero agreed to. It's the order -- take out the word independent director; put in Mr. Seery -- it's the order everybody's complaining about. But even the January order certainly applied to Mr. Seery. That's point two.

Point three. I've heard a lot of concerns about the slippery slope and what does pursuit mean and does talking to a lawyer mean pursuit and doing an investigation being pursuit. I don't know, Your Honor, and I don't care, because that's not what we're here to talk about. We're here to talk about a specific act -- not a hypothetical, not a slippery slope. We're talking about the filing of a motion for leave to amend a complaint to add Mr. Seery as a defendant. That's all we're talking about. So, you know, the rest of it, it's just noise. And the only question is whether, and I think it's pretty clear, that means pursuit.

Another version on the theme of was there any alternative

to filing the motion in the District Court, I think there was. The Sbaiti firm did file that suit against Acis in New York. And if Your Honor checks the docket in the Acis bankruptcy, I think you'll find that there's a motion from Mr. Rukavina, for a comfort order, basically, saying that -- asking the court to declare that the filing of the complaint in New York against Acis didn't violate the plan injunction. I think I have that right.

But I point that out, Your Honor -- it's not evidence in the record, but the Court can certainly take judicial notice of what's on its docket -- I point that out because there's another example of a lawyer who is very active in this case who actually -- now, he already commenced the suit, so he did -- they did both simultaneously, so I don't want to suggest that that's the perfect thing to have done, but at least he's here asking for -- he's bringing it to your attention, he's telling you it's happened, he's asking for a comfort order, and someday Your Honor may rule on it. I don't know.

Number six, what's with the pursuit of Mr. Seery? What is with the pursuit of Mr. Seery? Is there any doubt in anybody's mind that the Debtor is going to have to indemnify Mr. Seery and will bring in another law firm? And while I don't think it will ever happen in a hundred billion years, if there is a judgment against Mr. Seery, isn't that going to be the Debtor's responsibility? Why are they even bothering to

do this? I think it's a fair question for the Court to ask.

I think Mr. Taylor came up and talked about animosity. How do you explain going after Jim Seery? How do you do it? He's going to be indemnified. It's in -- it's in like three different orders. It's in the confirmation order. It's in the CEO order. It's -- it's probably as a matter of law. It's in the Strand partnership agreement. It's -- he's been indemnified like 12 different times. What is the purpose, other than to make Mr. Seery's life miserable? There is none. You'll never hear a rational explanation for why they're doing this.

THE COURT: Just so you know, I've not looked at any of the pleadings in the District Court --

MR. MORRIS: And I'm not asking you to.

THE COURT: -- other than what has been presented to me today.

MR. MORRIS: Yeah. That's fine, Your Honor.

THE COURT: But I'm very flipped out about the causes of action against the Debtor, --

MR. MORRIS: Yeah.

THE COURT: -- who hasn't reached an effective date.

MR. MORRIS: Well, --

THE COURT: And I'm most interested to know what the defenses, motions --

MR. MORRIS: We'll get to that.

THE COURT: -- are going to be raised in that regard.

MR. MORRIS: We will get to that in due course.

I do want to point out, just to be clear, because we keep hearing that they learned about, you know, all of these horrible things after the fact. In the complaint, which I think is Exhibit 12, --

THE COURT: I'm there.

MR. MORRIS: -- at Paragraph 127, the Plaintiffs allege, "Mr. Seery was informed in late December 2020 at an in-person meeting in Dallas, to which Mr. Seery had to fly, that HCO" -- excuse me "HCLF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the board, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue."

I cannot begin to tell you the problems with that paragraph. We're not going to discuss them today. I made a promise to these folks that we wouldn't get into the merits of the complaint. But Your Honor was onto something before, and those issues, you know, may see the light of day one day. And if they do, folks are going to have to deal with it. But I will point out that at the time the communication was made, the other TRO was in effect. We didn't bring that one to the Court's attention. But the important point there, Your Honor, is December 2020. It is December 2020. That is the

allegation that's being made against Mr. Seery. And the fact of the matter is, because I've done the research myself, the Court will find that on December 23rd, the day the HarbourVest settlement motion was filed, it was fully public knowledge that Amazon and Apple, I think, had shut down negotiations with MGM at that time. Right? So the big secret information, it was in the public domain on December 23rd.

There will also never be any evidence ever that Mr. Seery got on a plane and flew to Dallas in December 2020, but that's a minor point.

I'd like to just conclude, Your Honor, by saying I've heard pleas that they understand. They understand, Your Honor, now they understand. It would be good if they promised the Court that they won't seek to assert claims against Mr. Seery anywhere but in this Court and comply with the order as it's written. That, that, that would be taking a little bit of responsibility.

I have nothing further, Your Honor.

THE COURT: Okay. Thank you.

All right. Let me give you some clue of when I'm going to be able to rule. I've been glancing at my email in hopes that something set tomorrow would go away, but that's not happening. I've got a hearing that I've been told will take all day tomorrow on a case involving a half-built hotel, luxury hotel in Palm Springs, California. So I have to spend

the next I don't know how long getting ready for that hearing tomorrow, and then I have what looks like a full day of hearings Thursday, including you people coming back on something.

MR. POMERANTZ: Your Honor, I was going to address that. We have Dugaboy's motion to enforce compliance on the 2015(3) reports.

THE COURT: That's what it was.

MR. POMERANTZ: Since we haven't gotten to the motion to modify the Seery order, my suggestion would be we use that time -- of course, Dugaboy, I'm not sure if they're on the phone. They're not here. I'm not sure that's time sensitive. But if Your Honor wanted to have a hearing on that motion, which was contemplated to take place today, the Debtor would be okay having that motion heard on Thursday, perhaps by WebEx, unless Your Honor wants us to stay here, which we would if you do, and then reschedule the 2015(3) motion.

But again, that wasn't my motion. It's Dugaboy's. I'm not sure Mr. Draper is on. But we obviously have some calendar issues.

MR. MORRIS: And Your Honor, just to complete it, I think also on Thursday the Court is supposed to hear HCRE and Highland Capital Management Services motions for leave to amend their complaint in the promissory note litigation against each of them. I think that's also on the calendar for

Thursday. I don't expect that -- I hope that doesn't take very long, but that's also, I believe, on the calendar.

THE COURT: Okay. Mr. Draper, are you out there?

MR. PHILLIPS: I didn't see him on the list, Your Honor. I was just looking. But --

THE COURT: Okay. All right. Well, --

MR. PHILLIPS: What is the question? I can send him a text real quick.

THE COURT: Well, just have -- if you all could follow up with Traci Ellison, my courtroom deputy, tomorrow, I am perfectly happy to continue the motion to modify the Seery order to Thursday morning at 9:30 if Draper is willing to continue the 2015 motion.

MR. POMERANTZ: I know, if I was him, my first question would be is what times does the Court have available? We could work that through Ms. Ellison.

THE COURT: Yes. And I'm just letting you know -- talk to her. Okay. Number one, I'll do these by video, okay? WebEx. But I know I don't have any time Wednesday, and Thursday's a busy day.

We have court Friday morning at 9:30 in--?

THE CLERK: Cici's Pizza.

THE COURT: Cici's Pizza? That's not going to take very long, right?

THE CLERK: I don't think so.

THE COURT: I can potentially do something, you know, 10:00 o'clock Friday morning. Other than that, then you've got to wait a while, because I have a seven-day trial, live human beings in the courtroom starting next Monday. And so my point is mainly to tell you, as much as I would like to rule very, very fast, it's going to be, it looks like, a couple of weeks or so before I can give you a ruling on this.

MR. BRIDGES: Your Honor?

THE COURT: Yes?

MR. BRIDGES: May I? It's our motion. I would propose, if counsel would agree, that we just submit it on the papers.

THE COURT: Everybody good with that? I'm certainly good with that.

MR. POMERANTZ: Your Honor, I'd like there to be argument. I have a lengthy argument. I think I'd like to address a number of the things that -- Mr. Bridges made his argument today. Okay?

THE COURT: Okay.

MR. POMERANTZ: His deck, it was entitled, Motion to Modify.

THE COURT: Okay.

MR. POMERANTZ: So that's very nice of him, but I would like to make my argument.

THE COURT: Okay. Let's try to nail this down right

now. Friday at 10:00 o'clock, can we do the oral argument WebEx?

MR. POMERANTZ: On that one, yes, Your Honor.

THE COURT: On that one? Everybody good? Okay. So we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

You know, I'm going to say a couple of things where -- I've leaned toward thinking this is a pretty simple motion before me, the motion for contempt, but when people offer into evidence documents, I read your documents. Okay? That's my duty. And so I have however many exhibits I admitted today that I am going to look at and see how they sway me one way or another on this issue. But I will tell you that my gut is there has been contempt of court. Okay? I don't see anything ambiguous at all about Paragraph 5 of my July 16th, 2020 order. Somebody may think I overreached, but if that was the case, someone should have argued at the time I was overreaching. Someone should have appealed the order. And I think it's a *Shoaf*/*Espinosa* problem at this point for anyone to argue about the enforceability of that order.

I think there's nothing ambiguous in the wording. Pursue is not ambiguous. There's nothing confusing about the requirement that any entity who wanted to sue or pursue a claim, you know, commence claim, pursue a claim against Mr. Seery, had to come to the Bankruptcy Court. Standard-fare gatekeeping order.

So what I'm going to be looking at is, do these documents I admitted into evidence change my view on that, and then the harder question is who of the alleged contemnors am I going to think it's clear and convincing committed contempt and -- who are the contemnors, and then, of course, what are the damages? Coercive or compensatory damages?

So, again, you know how I feel, to the extent that's helpful in your planning purposes. I'm pretty convinced contempt of court has occurred. It's just a matter of who's a contemnor and what are the damages.

I'll say a couple of remaining things. I continue to be frustrated, I think was the word people used, about unproductive ways we all spend our time. I am going to spend I don't know how many more hours drafting another ruling on a contempt motion, and attorneys' fees are through the roof. And, you know, I dangled out there a question I couldn't resist about MGM.

And I will tell you, I mean, someone mentioned about their stomach aching. Personal story, I could hardly sleep the night it became public about the Amazon purchase, because, silly me, maybe, I'm thinking game-changer. This is such potentially a windfall, an economic windfall. Maybe this could be the impetus to make everyone get in a room and say look, we've got this wonderful windfall of money. I don't know how much is owned directly or indirectly by the Debtor of

MGM stock. I don't know how much the Debtor manages. I don't know how much, you know, some other entity. I know it's probably spread out in many different entities. But I know, I know because I listen, that one or more of the Highland-managed CLOs has some of this, and I think I read -- remember that HCLOF, which now Highland owns more than 50 percent of, has some of this stock. Right?

MR. DONDERO: Do you want to know what happened?

THE COURT: Oh.

A VOICE: No.

THE COURT: Well, okay. So, you know, I can understand I'm getting into maybe uncomfortable territory in a public proceeding, so I'll stop.

But, you know, do we need to set up a status conference? Do you all need to like talk about this? Am I just being naïve? Couldn't this be a game-changer, where maybe it would give new incentive to --

MR. POMERANTZ: Your Honor, I would -- he's been pretty quiet through the whole hearing, Mr. Clemente. He has the Committee, that a couple of people you've heard have sold claims. They're now held by other parties.

You know, the door is always open. I don't think this is going to be game-changer, unfortunately. We would like nothing more, as Debtor's counsel. We don't enjoy coming to Your Honor for contempt hearings.

Mr. Clemente said that it was productive. We would sure participate. But right now, we have creditors who are very angry that millions and millions of dollars have been spent on really a waste of time and a waste of the Court's time and a waste of everyone's time and eating into the creditors' money. So I would ask Mr. Clemente to address that.

MR. CLEMENTE: I'm here.

THE COURT: Yes, he's way in the back, hoping to be ignored.

MR. CLEMENTE: It's too cold, Your Honor, where I was sitting. For the record, Your Honor, --

THE COURT: I noticed some entity called Muck Holdings bought HarbourVest, according to the docket.

MR. CLEMENTE: That's correct. Muck Holdings bought HarbourVest, and I believe also the Acis claim, and then there's a different entity that bought the Redeemer claim.

THE COURT: Uh-huh.

MR. CLEMENTE: So, as we mentioned in our -- one of our pleadings, I think it was the retention pleading for Teneo, the Committee consists of two members currently, Meta-e and UBS.

THE COURT: Uh-huh.

MR. CLEMENTE: Obviously, Your Honor just approved the UBS settlement recently. The U.S. Trustee is aware of the make-up of the Committee, and is currently comfortable with

the Committee maintaining a two-person membership at this point.

In terms of whether the MGM transaction is a game-changer, we've not yet seen, to Your Honor's point, how all of that rolls up through the various interests that the Debtor may or -- you know, may have --

THE COURT: Okay.

MR. CLEMENTE: -- that would be implicated by the MGM transaction. If ultimately the MGM transaction has to actually occur, right? I mean, so, you know, just based on what I read in the public documents, we're not sure when that transaction may actually happen. But obviously it's a good thing for the Debtor's estate because it's going to recognize value for the estate.

In terms of whether it ultimately changes how Mr. Dondero, you know, wishes to proceed, that's entirely up to him, Your Honor. But we don't see it as something at this point that would suggest that there's an overall back to let's talk about a pot plan because of where the MGM transaction might ultimately come out.

So I don't know if that's helpful to Your Honor, but those are -- that's my perspective.

THE COURT: Well, and I'm not trying to, you know, push a pot plan on anyone.

MR. CLEMENTE: No, I understand.

THE COURT: I'm just saying it looked like an economic windfall. I just -- I don't know how much is Highland versus other entities in the so-called byzantine complex, but, gosh, I just hoped that there might be something there to change the dynamic of, you know, lawsuit, lawsuit, lawsuit, lawsuit, motion for contempt, motion for contempt.

MR. CLEMENTE: Agreed, Your Honor.

THE COURT: Uh-huh.

MR. CLEMENTE: And like I said, it was a very positive development obviously for the creditors for the Debtor. But whether it's the game-changer that Your Honor would envision, I'm not sure that I can suggest at this point that it is.

I think that, you know, obviously, we don't like to see these lawsuits continue to be filed. That's the whole point of the gatekeeper order, Your Honor.

THE COURT: Uh-huh.

MR. CLEMENTE: I didn't say anything during the hearing, but obviously the January 9th order, as Your Honor has said many times, was in the context of a trustee being appointed.

THE COURT: Right. Right.

MR. CLEMENTE: Right? So, and the July 16th order, very similar vein, it's an outshoot of that. In fact, it was contemplated in the January 9th settlement that a CEO could be

appointed.

So I think, again, it's just -- it's important, the context in which that January 9th order came into play, for this very reason, so we could avoid this type of litigation, Your Honor.

THE COURT: Uh-huh.

MR. CLEMENTE: And so again, I didn't -- I obviously didn't rise to mention that during the hearing, but Your Honor is already aware of that. I didn't need to remind Your Honor of that.

THE COURT: Uh-huh. Okay.

MR. CLEMENTE: Anything else for me, Your Honor?

THE COURT: No. Thank you.

MR. CLEMENTE: Okay, then, Your Honor.

THE COURT: Sorry I picked on you. But, all right. Well, again, I hope the message has landed in the way I hope will matter, and that is I'm going to look at your documents but I feel very strongly that, unless there's something in there that, whoa, is somehow eye-opening, I'm going to find contempt of court. It's just a matter of who and what the damages are. There's just not a thing in the world ambiguous about Paragraph 5 of the July 9th, 2020 order. So I'll get to it as soon as we humanly can get to it.

Mr. Morris, anything else?

MR. MORRIS: Nothing. No, thank you.

THE COURT: I guess I'll see you Thursday on the WebEx. Thank you.

THE CLERK: All rise.

(Proceedings concluded at 6:00 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/09/2021**

________________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 4

OPENING STATEMENTS (Show Cause)
- Mr. Morris 21
- Mr. Sbaiti 31
- Mr. Bridges 52
- Mr. Anderson 80
- Mr. Phillips 83
- By Mr. Taylor 87
- By Mr. Pomerantz 88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris 95
- Cross-Examination by Mr. Anderson 132
- Cross-Examination by Mr. Sbaiti 135
- Redirect Examination by Mr. Morris 137
- Examination by the Court 138
- Recross-Examination by Mr. Sbaiti 142
- Recross-Examination by Mr. Phillips 143
- Further Redirect Examination by Mr. Morris 144

James D. Dondero
- Direct Examination by Mr. Morris 147
- *Voir Dire* Examination by Mr. Sbaiti 184
- Direct Examination (Resumed) by Mr. Morris 199
- Cross-Examination by Mr. Taylor 210

EXHIBITS

Debtor's Exhibits 1 through 11 Withdrawn 215
Debtor's Exhibits 12 through 53 Received 216
Debtor's Exhibits 15 and 16 Received 214
Debtor's Exhibits 23 and 24 Received 213
Debtor's Exhibits 54 and 55 Received 217

Mark Patrick's Exhibits 1, 3 through 12, 15 through 28, and 30 through 44 Received 218

Mark Patrick's Exhibits 45 and 46 Received 219

INDEX
Page 2

CLOSING ARGUMENTS

- Mr. Morris 221
- Mr. Sbaiti 230
- Mr. Bridges 255
- Mr. Anderson 263
- Mr. Phillips 267
- Mr. Taylor 276
- Mr. Morris 279

RULINGS

Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure filed by Debtor (2304) 19

Show Cause Hearing (2255) - *Taken Under Advisement* 285

Motion to Modify Order Authorizing Retention of James Seery filed by Plaintiffs CLO Holdco, Ltd., The Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement* 285

END OF PROCEEDINGS 296

INDEX 297-298