**EXHIBIT 80**

SadisGoldbergLLP

| For the Exclusive Use Of: | | Copy No. | |
|---|---|---|---|
| | | | |

# Atlas IDF, LP

### A Delaware "Series" Limited Partnership

**General Partner:**
Atlas IDF GP, LLC

**Investment Manager:**
Rand Advisors, LLC

**Offering of Series 1 Limited Partnership Interests**

**November 30, 2015**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

HCMLPHMIT00003929

## DIRECTORY

### INVESTMENT MANAGER

RAND ADVISORS, LLC
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866
ATTENTION: JOHN HONIS
TELEPHONE: (214) 335-7969
EMAIL: JHONIS@RANDADVISORS.COM

### GENERAL PARTNER

ATLAS IDF GP, LLC
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866
ATTENTION: JOHN HONIS
TELEPHONE: (214) 335-7969
EMAIL: JHONIS@RANDADVISORS.COM

### LEGAL COUNSEL

SADIS & GOLDBERG LLP
551 FIFTH AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10176
ATTENTION: STEVEN HUTTLER, ESQ.
TELEPHONE: (212) 573-8424
FACSIMILE: (212) 573-8151
EMAIL: SHUTTLER@SGLAWYERS.COM

| TABLE OF CONTENTS |
|---|

| CAPTION | PAGE |
|---|---|
| OVERVIEW | 1 |
| IMPORTANT GENERAL CONSIDERATIONS | 4 |
| SUMMARY OF OFFERING AND PARTNERSHIP TERMS | 7 |
| MANAGEMENT | 24 |
| SERVICE PROVIDERS | 26 |
| INVESTMENT PROGRAM | 29 |
| BROKERAGE PRACTICES | 38 |
| RISK FACTORS AND CONFLICTS OF INTEREST | 41 |
| ERISA CONSIDERATIONS | 79 |
| TAXATION | 81 |

**EXHIBITS**

| | |
|---|---|
| AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT | EXHIBIT A |
| SUBSCRIPTION DOCUMENTS | EXHIBIT B |
| PART 2 OF RAND ADVISORS, LLC'S FORM ADV | EXHIBIT C |

HCMLPHMIT00003931

**OVERVIEW**

## DESCRIPTION OF INTERESTS AND STRUCTURE

Atlas IDF, LP ("**Partnership**"), a "series" limited partnership organized under the Delaware Revised Uniform Limited Partnership Act, is offering limited partner interests in the Partnership ("**Interests**") in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended ("**Securities Act**"), and Regulation D promulgated thereunder.  The Partnership may offer Interests in separate Series (as defined and described herein).  Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

Only persons that are Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")) may purchase Interests.  The Subscription Documents (as defined below) set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. If an investor is an insurance company, such investor must require its Policy Owners (as defined herein) to meet the same suitability standards.

The Partnership was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund.  As such, the Interests are being offered only to Limited Partners that are:  (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3).   In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described herein.  While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS— Investor Control" herein.

Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Generally, new Limited Partners will be admitted on the first day

HCMLPHMIT00003932

of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice, subject to certain restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).



## INVESTMENT OBJECTIVE AND STRATEGY

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.** See "INVESTMENT PROGRAM" herein for further details.

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein) that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts (as defined herein) at the time of such admission.**

HCMLPHMIT00003933

## RISK FACTORS, CONFLICTS OF INTERESTS AND OTHER CONSIDERATIONS

Before purchasing an Interest in the Partnership, you should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfers and withdrawals of Interests and various legal, tax and other considerations, all of which are discussed elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**").

HCMLPHMIT00003934

**IMPORTANT GENERAL CONSIDERATIONS**

**You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect.  You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisors.  The purchase of an Interest involves certain risks and conflicts of interest among the General Partner, the Investment Manager and the Partnership.  See "RISK FACTORS AND CONFLICTS OF INTEREST".  The General Partner reserves the right to refuse any subscription for any reason.**

**In making an investment decision, you must rely on your own examination of the Partnership and the terms of the offering of Interests, including the merits and risks involved.  You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Partnership, and any other relevant matters to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.**

**Neither the SEC nor any state securities commission has passed upon the merits of participating in the Partnership, nor has the SEC or any state securities commission passed upon the adequacy or accuracy of this Memorandum.  Any representation to the contrary is a criminal offense.   The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act and the various state securities laws; (ii) the Partnership will not be registered as an investment company under the Investment Company Act, pursuant to an exemption provided by Section 3(c)(7) thereunder; and (iii) neither the General Partner nor the Investment Manager will be registered as a commodity pool operator under the Commodity Exchange Act, as amended ("_CEA_"), based upon an exemption available under Rule 4.13(a)(3) thereunder. Consequently, you will not be entitled to certain protections afforded by those statutes.**

**The Investment Manager is registered as an investment adviser with the SEC. A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.**

**Pursuant to Rule 4.13(a)(3) of the CEA, each of the General Partner and the Investment Manager is exempt from registration with the Commodity Futures Trading Commission ("_CFTC_") as a commodity pool operator and therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document (as such term is defined under CFTC rules) and a certified annual report to participants in the pool.  The foregoing registration exemption is based on the Partnership's limited commodity trading activity and its undertaking that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions, determined at the time the most recent position was established, will not exceed 5% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions; or (b) the aggregate net notional value of the Partnership's commodity interest positions, determined at the time the most recent position was established, will not exceed 100% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions. Similar limitations will apply with respect to investments in Portfolio Funds.   Certain types of swaps are included in the definition of "commodity interests".   These swaps include interest rate swaps, currency swaps, energy and metal swaps, agricultural swaps, swaps on broad-based indices, swaps on government securities and certain mixed swaps.**

**As a Limited Partner, you may withdraw from the Partnership and receive payment for your Interests, subject to certain restrictions, as specified in the Amended and Restated Limited Partnership Agreement of the Partnership (as the same may be**

HCMLPHMIT00003935

amended and/or restated from time to time, the "<u>Partnership Agreement</u>"), a copy of which is attached hereto as Exhibit A.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon. The offering is made only to potential investors who are Accredited Investors, Qualified Clients and Qualified Purchasers. If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards. By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents, in whole or in part, and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner or the Partnership's administrator, a provider of administrative services ("<u>Administrator</u>"), as further set forth herein under "SERVICE PROVIDERS—Administrator".

Notwithstanding any provision in this Memorandum to the contrary, prospective Limited Partners (and their employees, representatives, and other agents) may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the Interests offered hereby. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of the Interests, and does not include information relating to the identity of the issuer, its affiliates, agents or advisors.

There is no public market for the Interests nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner. Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Partnership for an indefinite period of time. You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest. This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents pertaining to the Partnership, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner or the Administrator) for complete information concerning the rights and obligations of the parties thereto. All such summaries are qualified in their entirety by the terms of the actual documents. No person has been authorized to make any representations or furnish any information with respect to the Partnership or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

Certain information contained in this Memorandum constitutes "forward-looking statements", which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth under "RISK FACTORS AND CONFLICTS OF INTEREST", actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

No rulings have been sought from the Internal Revenue Service ("<u>IRS</u>") with respect to any tax matters discussed in this Memorandum. You are cautioned that the views contained herein are subject to material qualifications and subject to

HCMLPHMIT00003936

possible changes in regulations by the IRS or by the U.S. Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

**NOTICE TO BERMUDA RESIDENTS**

THE INTERESTS MAY BE OFFERED OR SOLD IN OR FROM BERMUDA ONLY IN COMPLIANCE WITH THE PROVISIONS OF THE INVESTMENT BUSINESS ACT 2003 OF BERMUDA (THE "BERMUDA ACT") AND THE REQUIREMENTS OF THE RELATED REGULATIONS OF BERMUDA WHICH REGULATE THE SALE OF SECURITIES IN OR FROM BERMUDA. TO THE EXTENT THAT THE INTERESTS ARE OFFERED OR SOLD IN OR FROM BERMUDA, SUCH OFFER OR SALE WILL BE MADE IN ACCORDANCE WITH THE BERMUDA ACT.

THE BERMUDA MONETARY AUTHORITY, THE BERMUDA REGISTRAR OF COMPANIES AND THE BERMUDA MINISTER OF ECONOMIC DEVELOPMENT ACCEPT NO RESPONSIBILITY FOR THE FINANCIAL SOUNDNESS OF ANY PROPOSAL OR FOR THE CORRECTNESS OF ANY OF THE STATEMENTS MADE OR OPINIONS EXPRESSED HEREIN.

NO INVITATION, WHETHER DIRECTLY OR INDIRECTLY, MAY BE MADE TO THE PUBLIC IN OR FROM BERMUDA TO SUBSCRIBE FOR THE INTERESTS.

The information contained herein is current only as of the date hereof and you should not, under any circumstances, assume that there has not been any change in the matters discussed herein since the date hereof.

HCMLPHMIT00003937

## SUMMARY OF OFFERING AND PARTNERSHIP TERMS

The following summary is qualified in its entirety by other information contained elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**") and by Amended and Restated the Limited Partnership Agreement of the Partnership (as defined below) (as the same may be amended and/or restated from time to time, the "**Partnership Agreement**"), a copy of which is attached to this Memorandum as Exhibit A.  You should read this entire Memorandum and the Partnership Agreement, carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the heading "RISK FACTORS AND CONFLICTS OF INTEREST". To the extent relevant, you should also read the offering and governing documents of the PE Portfolio Fund (as defined herein) in which the Partnership will initially invest on behalf of the initial Limited Partners (as defined herein), which are available from the Partnership upon request.  In addition, you should consult your own advisors in order to understand fully the consequences of an investment in the Partnership.

**The Partnership**  Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.  See "INVESTMENT PROGRAM" and "—Portfolio Funds" below.

The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

**Management**  Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis ("**Principal**") controls all of the Partnership's operations and activities.  See "MANAGEMENT" for additional information.

**Issuance of Interests in Multiple Series**  The Interests will be offered in separate series ("**Series**").  The Partnership is currently offering one Series of Interests: "**Series 1 Interests**".  Each Series of Interests will have separate rights and obligations.  In addition, each Series of Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies.  The Partnership may issue additional Series of Interests in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined herein) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations.  The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.  **The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

Under Delaware law, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the

HCMLPHMIT00003938

assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

Unless the context otherwise requires, Series 1 Interests and any other Series of Interests shall be collectively referred to throughout this Memorandum as the "**Interests**." As the context may require, the holders of Series 1 Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Memorandum as the "**Limited Partners**".

References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Memorandum and/or in a separate supplement hereto.

**Portfolio Funds**    In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager. Portfolio Funds may allocate their assets to Illiquid Investments (as defined herein). As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.

As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; and (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC, as further set forth herein.

The Portfolio Funds will bear their own operating and investment related expenses, which will be shared by the partners in such Portfolio Funds, including the Partnership. These fees and expenses may result in greater expenses than if Limited Partners invested directly in the Portfolio Funds or the relevant underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees and expenses.

**The Offering**    The Partnership is offering limited partner interests in the Partnership ("**Interests**") to persons who are Accredited Investors (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended ("**Securities Act**")), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")). Interests represent a percentage interest in the Partnership proportionate to the capital accounts of all Partners.

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund. As such, the Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and

HCMLPHMIT00003939

private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described in the previous paragraph. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies. See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Investor Control" herein.

Each life insurance company Limited Partner ("**Insurance Company Limited Partner**") will be deemed to hold an Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Interest.

**Marketing Fees and Sales Charges.** The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner. See "BROKERAGE PRACTICES—Referral of Investors and Sales Charges".

**How to Subscribe**     Attached as Exhibit B to this Memorandum are the subscription documents and instructions for subscribing ("**Subscription Documents**"). In order to subscribe for Interests, you must complete the Subscription Documents and return them to the Partnership's administrator, a provider of administrative services ("**Administrator**"), as further set forth herein under "SERVICE PROVIDERS—Administrator". You must pay 100% of your investment at the time you subscribe. Payment must be made by wire transfer of immediately available funds to the Partnership. To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner and/or the Administrator may require additional information to verify the identity of any person who subscribes for an Interest in the Partnership.

If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments). Such special charge will be assessed as of such dates deemed appropriate by the General Partner. Any investor who contributes securities (and/or other investments) in lieu of cash to the Partnership should consult with such person's counsel or advisors as to the tax effect of such contribution.

**Eligible Investors**     In order to invest in the Partnership, you must meet certain minimum suitability
**and Suitability**     requirements, including qualifying as an Accredited Investor under the Securities Act, a Qualified Client under the Advisers Act and a Qualified Purchaser under the Investment Company Act. The Subscription Documents set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. You must check the appropriate places in the Subscription Documents to represent to the Partnership that you are an Accredited Investor, a Qualified Client and a Qualified Purchaser in order to be able to purchase Interests. In addition, you must check the appropriate places in the Subscription Documents and/or make the appropriate representations that you are an insurance company investor. If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards. The General Partner, in its sole discretion, can accept or reject any initial subscriptions from prospective Limited Partners

HCMLPHMIT00003940

and any additional capital contributions from existing Limited Partners for any reason or for no reason.

Qualified pension or retirement plans subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and other tax-exempt entities described in Treasury Regulation 1.817-5(f)(3) may purchase Interests.  However, investment in the Partnership by such entities requires special consideration.  Trustees or administrators of such entities should consult their own legal and tax advisors.  The General Partner intends to use reasonable efforts to limit the aggregate equity participation by "benefit plan investors" in the Partnership to less than 25% of the value of any class of Interests in the Partnership.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Minimum Investment**

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Limited Partners are not required to make any additional capital contributions to the Partnership.  There is no minimum or maximum aggregate amount of funds that must or may be contributed by all Partners to the Partnership.

**Admission of Limited Partners**

Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time.  Upon such admission or receipt of additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts.

In connection with an additional capital contribution by an existing Limited Partner, the General Partner will:  (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution will be credited and which will be maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner.  Such separate capital accounts may be maintained for any purpose, in the discretion of the General Partner.

**Management Fee**

The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "**Investment Management Agreement**") by and among the Partnership and the Investment Manager.  In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("**Management Fee**"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis.  For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually.  The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each capital account will be charged a blended Management Fee based on the above schedule.

HCMLPHMIT00003941

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee will be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's capital account during any calendar quarter. Management Fees will be payable with respect to the Interests of a Limited Partner in any Side Pocket Account (as defined below). For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

With respect to any Limited Partner who has requested to withdraw all of its Interests from the Partnership, with the exception of any Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account will remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve will be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, will be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined herein), including the PE Portfolio Fund. Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Expenses**   **Organizational and Initial Offering Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates (as defined herein) for all organizational and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including "blue sky" filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to 60 months from the date the Partnership commences operations. Amortization of such expenses is a divergence from U.S. generally accepted accounting principles ("**GAAP**"). In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses, or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in fiscal year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of the Partnership Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within 60 months of its commencement, any unamortized expenses will be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

**Operating Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Interests, including, but not limited to, printing of this Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Administrator, costs of communications with Limited Partners, and ongoing

HCMLPHMIT00003942

legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership.

Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses.  Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

**Allocation of Expenses Among Series**.  The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

**General Partner's and Investment Manager's Expenses.**  The General Partner and the Investment Manager will pay their own general operating and overhead expenses associated with providing the management and investment management services required under the Partnership Agreement and the Investment Management Agreement, respectively.  These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended ("**Exchange Act**"), as further described herein.  See "BROKERAGE PRACTICES—Soft Dollar Arrangements".

**Withdrawals**    **Limited Partner Withdrawals Generally**.  Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date, a "**Withdrawal Date**"), upon at least 91 days' prior written notice to the Administrator, with a copy to the General Partner.  Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000.   All withdrawals will be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital

HCMLPHMIT00003943

other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee will be payable to the relevant Series of the Partnership and will be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

**Ability to Withdraw Is Not Guaranteed**. The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.

In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.

**Payments with Respect to Withdrawals; Applicable on a Series-by-Series Basis**. A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, less than 90% of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable Withdrawal Date. In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, 90% or more of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such fiscal year, 90% of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within 90 days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full capital account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within 90 days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

Upon withdrawal of all of the capital in its capital account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner will be deemed to have withdrawn from the Partnership or the relevant Series, and upon notice of such withdrawal, a Limited Partner will not be entitled to exercise any voting rights afforded to Limited Partners under the Partnership Agreement.

The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

**Limitations on Withdrawals.** The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds; (iii) if the General Partner determines, in its sole discretion, that such suspension or

HCMLPHMIT00003944

postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; (iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account; (v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or (vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

All Limited Partners will be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement will be effected as of the first Withdrawal Date following the recommencement of withdrawals.

<u>Required Withdrawals</u>. The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's capital accounts on at least five days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

<u>Side Pocket Accounts</u>. A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account. At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined below). **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

<u>Reserves</u>. All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal. See "—Management Fee" for more information on the Management Fee Reserve.

<u>Other Limitations on Withdrawals</u>. In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable. For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

<u>Waiver</u>. The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

**Withdrawals, Resignation and Transfers by General Partner and its Affiliates**

Each of the General Partner, the Investment Manager and/or any Investment Manager Affiliate may withdraw all or any of the value in its respective capital account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners. The General Partner may resign as the general partner of the Partnership upon 30 days' prior written notice to the Limited Partners. Upon such resignation of the General Partner, or upon its bankruptcy or dissolution, the remaining Limited Partners have the right to appoint a substitute general partner; otherwise, the Partnership will be dissolved pursuant to the procedures set forth in the Partnership Agreement. The Partnership Agreement permits the General Partner to appoint additional general partners and to transfer its general partner interest to an affiliate of the General Partner without the consent of Limited Partners.

**Leverage**

The Investment Manager may cause the Partnership to undertake leverage. Leverage may take a variety of forms, including, but not limited to, the following: long-term loans,

HCMLPHMIT00003945

convertible notes and repurchase arrangements.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.  See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Determination of Net Asset Value**

The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, is determined in accordance with the Partnership Agreement and is generally equal to the amount by which the value of the Partnership's assets exceeds the amount of its liabilities.  Net Asset Value calculations will be made by the Administrator (based on the information provided by the Investment Manager) on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to 60 months from the date the Partnership commences operations, and (y) reserves may be taken that are inconsistent with GAAP), this Memorandum and the Partnership Agreement.

In making such determinations, securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, will be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date.  Options that are listed on a securities or commodities exchange will be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; *provided* that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options will be valued at the midpoint between the last "bid" and "ask" prices for such options on such date.  Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, will be valued based upon quotations obtained from market makers, dealers or pricing services.

In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

If the Investment Manager, in its sole discretion, determines that the valuation of any security, commodity, option or other financial instrument pursuant to the foregoing does not fairly represent its market value, the Investment Manager will value such security, commodity, option or other financial instrument as it reasonably determines.  Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  Absent bad faith or manifest error, all Net Asset Value determinations pursuant to the Partnership Agreement are conclusive and binding as to all Partners.

**Allocation of Profit and Loss**

To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement allocates net income or loss (increases and decreases in Net Asset Value) to each Partner's capital account.  Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses.  Generally, net income and

HCMLPHMIT00003946

net loss for each month (or other period, as the case may be) will be allocated to the Partners in proportion to their capital account balances as of the start of such month (or such other period). Net income and net losses in any Side Pocket Accounts or other memorandum accounts will be allocated to those Partners participating in such accounts in proportion to their capital account balances in such accounts. All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner in its sole discretion. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value, withdrawals, distributions (if any), and expenses. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Allocation of Taxable Income and Loss**

For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year in a manner consistent with their economic interests in the Partnership. In light of the fact that the Partnership does not intend to make distributions, to the extent that the Partnership's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Partnership without receiving cash distributions from the Partnership with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations in the Partnership Agreement. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Side Pocket Accounts**

The Investment Manager may designate that certain investments held by a Series of the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment, or that a follow-on investment should be categorized as a new Illiquid Investment. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** Illiquid Investments held in a Side Pocket Account will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) will be reallocated, *pro rata*, from the Side Pocket Account to the capital accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account will receive an

HCMLPHMIT00003947

amount equal to its interest in such Side Pocket Account (net of any accrued Management Fee and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve) with respect thereto), within 90 days after such reallocation.  **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission.  **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**  Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account.  If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment, only the Partners participating in such original investment will participate in such follow-on investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that, if a Partner shall have withdrawn from the Partnership, the General Partner will equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the follow-on investment.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest" herein.

**New Issues Accounts; Other Memorandum Accounts**

From time to time, the Partnership may purchase securities that are part of a public distribution.  Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in initial public offerings of equity securities ("**New Issues**"), each subject to a *de minimis* exemption.  To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**").  Participation in New Issues Accounts will be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable FINRA rules.

In addition, as a matter of fairness to Partners that do not participate in New Issues, a use-of-funds charge may be debited to the capital accounts of those Partners that do participate in New Issues and credited to the capital accounts of all the Partners.  The General Partner may calculate such charge, in its discretion, in any manner consistent with applicable FINRA rules, including, debiting amounts equal to interest, (i) on the funds used to purchase the New Issues at the annual rate being paid by the Partnership, or (ii) that would be paid by the Partnership on borrowed funds during the applicable period.

Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the capital accounts of all of the Partners, after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period will be credited or

HCMLPHMIT00003948

debited to the capital accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. Accordingly, the returns to Limited Partners on their investments in the Partnership may differ depending upon whether or not they are a Restricted Person.

In addition to the foregoing with respect to Side Pocket Accounts and New Issues Accounts, to the extent that certain Limited Partners are restricted from participating in any other transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such restricted Limited Partners. Only those Limited Partners who the General Partner determines are eligible will participate in such accounts.

**Side Letters**
The Partnership, the General Partner and/or the Investment Manager may from time to time enter into side letters or other similar agreements (collectively, "**Side Letters**") with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement. Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners. See "RISK FACTORS AND CONFLICTS OF INTEREST—Partnership Risks—Impact of Side Letters" herein.

**Reports to Limited Partners**
Each Limited Partner will receive the following, with respect to the relevant Series: (i) annual financial statements of the Partnership audited by an independent certified public accounting firm; (ii) quarterly unaudited performance information; (iii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns; and (iv) other periodic reports or letters as determined by the General Partner in its sole discretion. The financial statements of the Partnership will be prepared in accordance with GAAP (except to the extent that this Memorandum or the Partnership Agreement states or contemplates that such statements may be inconsistent with GAAP).

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

The Partnership will bear all fees incurred in providing such tax returns and reports.

The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, which may affect investment and withdrawal decisions, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.

**Transferability of Interests**
As a Limited Partner, you may not assign or transfer your Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion. No transfer of an Interest by a Limited Partner will be permitted if it would result in the termination of the Partnership for federal income tax purposes. Transfers of Interests are subject to other restrictions set forth in the Partnership Agreement, including compliance with ERISA and federal and state securities laws.

Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely, unless they withdraw from the Partnership in accordance with the provisions set forth in the Partnership Agreement.

**Distributions; Distributions**
The Partnership does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the

HCMLPHMIT00003949

| | |
|---|---|
| **Upon Termination of the Partnership** | Partnership or the relevant Series. Upon the termination of the Partnership (as further described in the Partnership Agreement), the assets of the Partnership or the relevant Series will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities, establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP), and any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners. The Partnership or the relevant Series may satisfy any distributions to Limited Partners in cash, in-kind or any combination thereof.    Additionally, the General Partner may create a liquidating fund entity (e.g., a liquidating trust or similar vehicle) and may transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership or Series assets, including, but not limited to Side Pocket Accounts, and may distribute ownership interests in such entity to Limited Partners. |

Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

The termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

| | |
|---|---|
| **Bank Holding Companies** | Limited Partners that are Bank Holding Companies ("**BHC Limited Partners**") (as defined by Section 2(a) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) are limited to 4.99% of the voting Interest in the Partnership under Section 4(c)(6) of the BHCA.  The portion of the Interest in the Partnership held by a BHC Limited Partner in excess of 4.99% of the aggregate outstanding voting Interests of all Limited Partners will be deemed non-voting Interests in the Partnership.  BHC Limited Partners holding non-voting Interests in the Partnership are permitted to vote such Interests (i) on any proposal to dissolve or continue the business of the Partnership under the Partnership Agreement and (ii) on matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to the Partnership Agreement or modifications of the terms of its Interest).  For the avoidance of doubt, the foregoing provisions shall apply on a Series-by-Series basis.  Except with regard to restrictions on voting, non-voting Interests are identical to all other Interests held by Limited Partners. |
| **Voting Rights and Amendments** | The voting rights of Limited Partners are very limited.  Other than as explicitly set forth in the Partnership Agreement, Limited Partners have no voting rights as to the Partnership or its management.  Generally, the Partnership Agreement may be amended only with the consent of the General Partner and Limited Partners owning more than 50% of all of the outstanding Interests of each Series; *provided* that:  (x) for matters only relating to one Series, only the Limited Partners of that Series will vote on such matters, and (y) that the General Partner may amend the Partnership Agreement without the consent of or notice to any of the Limited Partners if, in the opinion of the General Partner, the amendment does not materially adversely affect any Limited Partner. |
| **Liability of Limited Partners** | No Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Limited Partner's capital account in the relevant Series, from time to time, including any amounts thereof attributable to capital contributions, except that such Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership or the relevant Series in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership or the relevant Series in order to pay such Limited Partner's *pro rata* share of any Partnership or Series liabilities that arose while such Limited Partner held Interests.  Subject to the foregoing, no Limited Partner shall be obligated to provide any contributions to the Partnership or the relevant Series, other than its initial capital contribution. No Limited Partner shall be obligated to make any loan to the Partnership or a Series. |

HCMLPHMIT00003950

Under the Delaware Revised Uniform Limited Partnership Act ("**Delaware Act**"), when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership or a Series for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership or the relevant Series was prohibited from making such distribution pursuant to the Delaware Act.

**Brokerage Practices**

Portfolio transactions for the Partnership will be allocated by the Investment Manager to brokers on the basis of best execution and in consideration of, among other factors, such brokers' ability to effect transactions, operational efficiency, reputation and financial strength. See "BROKERAGE PRACTICES".

**Other Activities of the General Partner, the Investment Manager, the Principal and Affiliates**

None of the General Partner, the Investment Manager, the Principal or any of their respective partners, managers, members, directors, officers, employees, agents and affiliates (collectively, "**Investment Manager Affiliates**") is required to manage the Partnership as its sole and exclusive function.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage other accounts and/or establish other private investment funds in the future (both domestic and offshore) (such accounts and funds, collectively, "**Affiliated Funds**"), including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

See "MANAGEMENT" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Exculpation and Indemnification**

The Partnership Agreement provides that none of the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct.  The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis. The Investment Management Agreement also provides similar protections to the Investment Manager.

**Investor Control**

The Partnership is an insurance-dedicated investment fund.  In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory.  Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory

HCMLPHMIT00003951

and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as its investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the Partnership and/or the Investment Manager Affiliates relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Notwithstanding the foregoing, the Partnership's investment program permits investments in Portfolio Funds, Illiquid Investments and other investments that are managed by, or otherwise affiliated with or related to the Investment Manager.  None of such investments, if made, will be deemed to be directed by the Policy Owner or be part of a pre-arranged binding agreement as a result of such affiliation or relation.

A substantial portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments.  Such investments are often structured as "pass-through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

**Tax Considerations**   The Partnership intends to invest its assets in compliance with the diversification requirements imposed by Section 817(h) of the U.S. Internal Revenue Code of 1986, as amended ("**Code**"), and regulations promulgated thereunder and expects to be treated as a partnership and not as an association or a publicly traded partnership taxable as a corporation for federal tax purposes. Accordingly, the Partnership should not be subject to federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss. Prospective purchasers are responsible for determining the tax considerations of an investment in the Partnership and should consult their own tax advisors with specific reference to their own situations as they relate to an investment in the Partnership.

The Investment Manager will be required to endeavor to invest the assets of the Partnership in compliance with the diversification requirements imposed by Section 817(h) of the Code, and regulations promulgated thereunder.  The Investment Manager will be required to notify the Limited Partners within a commercially reasonable time upon having a reasonable basis for believing that the Partnership has ceased to meet the standards set forth in Section 817(h) of the Code and to take all commercially reasonable steps to comply with the diversification requirements within the grace period afforded under Treasury Regulation Section 1.817-5. None of the Partnership, the General Partner, the Investment Manager or any of their respective affiliates has any obligation to:  (i) determine if any state's diversification requirements or other regulatory requirements applicable to insurance companies or variable contract separate accounts are applicable to the Partnership or to any Limited Partner, or (ii) take any steps to facilitate compliance with any such requirements.

The Investment Manager will not accept investment recommendations, or make any investment decisions regarding the direct or indirect investment of the Partnership's assets based, in whole or in part, on information regarding any investment or group of

HCMLPHMIT00003952

investments received from any Limited Partner or Policy Owner. No Limited Partner or Policy Owners will have the right or be permitted to select or recommend any particular investment or group of investments to be made directly or indirectly with the assets of the Partnership, and there is not, nor will there be, any direct or indirect pre-arrangements or agreement between any Limited Partner or its Policy Owners and the Investment Manager regarding the investments to be made directly or indirectly by the Partnership. See "TAXATION" herein.

**Term**

The term of the Partnership will continue indefinitely until terminated in accordance with the Partnership Agreement. Under the Partnership Agreement, the Partnership may be terminated at the election of the General Partner.

**Fiscal Year**

The fiscal year of the Partnership will end on December 31 of each year. However, the fiscal year may be changed at any time by the General Partner, in its sole and absolute discretion.

**Auditor**

The Partnership intends to engage a nationally recognized public accounting firm to act as the Partnership's auditor. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Administrator**

The Partnership intends to engage a provider of administrative services to acts as the Partnership's Administrator, as further set forth herein. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. See "SERVICE PROVIDERS—Administrator" herein.

**Shared Services Arrangement**

In addition, the Investment Manager has entered into a shared services agreement ("**Shared Services Agreement**") with Highland Capital Management, L.P., a Delaware limited partnership (in its capacity with respect to the Shared Services Agreement, the "**Shared Services Provider**"), pursuant to which the Shared Services Provider will provide certain administrative, information technology, accounting, tax, back-office and other services to the Investment Manager. The Partnership will not incur any additional fees as a result of the arrangements with the Shared Services Provider. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein. Also see "SERVICE PROVIDERS—Administrator" herein.

**Introducing Broker**

The Partnership intends to engage a nationally recognized introducing broker to act as the introducing broker for the Partnership ("**Introducing Broker**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Clearing Broker and Custodian**

The Partnership intends to engage a nationally recognized clearing broker and custodian to act as the clearing broker and custodian for the Partnership ("**Custodian**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Regulatory Compliance Provider**

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Legal Counsel**

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the

HCMLPHMIT00003953

Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership.  Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues.  Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof.  In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Lack of Separate Representation; Potential Conflicts of Counsel" herein.

**Address for Inquiries**    You are invited to, and it is highly recommended that you do, meet with the General Partner and/or the Administrator (to the extent applicable) for a further explanation of the terms and conditions of this offering of Interests and to obtain any additional information necessary to verify the information contained in this Memorandum, to the extent that the General Partner and/or the Administrator (to the extent applicable) possesses such information or can acquire it without unreasonable effort or expense.  Requests for such information should be directed to:

Atlas IDF GP, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention:  John Honis
Telephone:  (214) 335-7969
Email: Jhonis@RandAdvisors.com

HCMLPHMIT00003954

**MANAGEMENT**

### BACKGROUND OF THE GENERAL PARTNER AND THE INVESTMENT MANAGER

The General Partner of the Partnership is Atlas IDF GP, LLC, a Delaware limited liability company.  The General Partner is responsible for the management of the Partnership's affairs.

The Investment Manager of the Partnership is Rand Advisors, LLC, a Delaware limited liability company.  The Investment Manager has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the SEC.  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

Limited Partners do not have any right to participate in the management of the Partnership and have very limited voting rights.

### BACKGROUND OF THE PRINCIPAL

***John Honis, Principal***

Mr. Honis has more than 25 years of investment management and business experience. He has a background in the credit markets and private equity.  Throughout his career in the investment management industry, Mr. Honis has guided many portfolio companies across several continents.  Mr. Honis' business experience includes roles as CEO, CRO and board-level advisory positions to both high-growth and distressed companies, in a wide range of manufacturing and service industries.

Mr. Honis founded Barrier Advisors, a recognized provider of strategic, operational and financial advice to private equity, venture capital and money management institutions.  He led many turnarounds and strategic growth initiatives and has attracted many of the nation's reputable turnaround practitioners to the Barrier team.

Previously, Mr. Honis was a high-tech executive, having served as President, CEO or Chief Restructuring Officer of five telecommunications firms. His experiences in all aspects of growth management, strategic/operational turnarounds, financial restructuring, mergers and acquisitions and capital markets were the foundational elements of Barrier Advisors' charter.  Mr. Honis was previously a Partner and Co-Head of Private Equity at Highland Capital Management, L.P. ("**Highland**") (which now serves as the Shared Services Provider to the Investment Manager).

Mr. Honis' early career started at J.P. Morgan in New York where he was worked in the firm's global consulting practice. At J.P. Morgan, he specialized in the design and implementation of worldwide corporate finance processes and systems. Mr. Honis received a BA Degree in Economics from Syracuse University.

Mr. Honis currently serves on the Board of Trustees for each of Highland's affiliated registered investment companies and on the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland.

See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

***Additional Personnel***

The General Partner and the Investment Manager may employ additional personnel in the future.

HCMLPHMIT00003955

## OTHER ACTIVITIES OF THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates is required to manage the Partnership as its sole and exclusive function. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership.

In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

## INVESTMENTS BY THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

Capital contributions by the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates will generally be on the same basis as capital contributions made by other investors, except that, in the discretion of the Investment Manager, no Management Fee may be assessed to such persons.  Neither the Partnership Agreement nor the Investment Management Agreement requires the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates to maintain any minimum capital account balance.

HCMLPHMIT00003956

## SERVICE PROVIDERS

### ADMINISTRATOR

The Partnership intends to engage an Administrator and enter into an Administration Agreement with the Administrator ("**Administration Agreement**"). The Administrator may be: (x) a nationally recognized provider of administrative services or (y) Highland (i.e., the Shared Services Provider); *provided* that, for the avoidance of doubt, any Administration Agreement with Highland, to the extent applicable, will be in addition to the Shared Services Agreement. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Administration Agreement will include industry-standard provisions relating to scope of services, fees, termination and indemnification.

The Administrator will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership, and therefore accepts no responsibility for any information contained in this Memorandum. The Administrator will not participate in the Partnership's investment decision-making process.

### AUDITOR

The Partnership intends to engage a nationally recognized public accounting firm to act as the auditor for the Partnership. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

### INTRODUCING BROKER

The Partnership intends to engage a nationally recognized Introducing Broker to act as the Partnership's introducing broker. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Introducing Broker will act as the executing broker to the Partnership, and will clear the Partnership's transactions through the Custodian. Accordingly, the Introducing Broker may receive a substantial amount of brokerage commissions related to the securities transactions of the Partnership. The Partnership will not be committed to continuing its introducing brokerage relationship with the Introducing Broker for any minimum period, and may enter into introducing brokerage relationships with other introducing brokers.

The Introducing Broker will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum. The Introducing Broker will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

### CLEARING BROKER AND CUSTODIAN

The Partnership intends to engage a nationally recognized Custodian to act as the Partnership's clearing broker and custodian. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Custodian will act as the clearing broker and custodian for the Partnership, and will generally clear (on the basis of payment against delivery) the securities transactions of the Partnership which are effected through other brokerage firms, specifically including the

HCMLPHMIT00003957

Introducing Broker.  The Partnership may also utilize the Custodian, its affiliates and other brokers and dealers for the purpose of executing transactions for the Partnership. Accordingly, the Custodian may receive a substantial amount of brokerage commissions and/or margin interest related to the securities transactions of the Partnership.   The Partnership will not be committed to continuing its clearing brokerage and custodial relationship with the Custodian for any minimum period, and may enter into clearing brokerage and custodial relationships with other clearing brokers and custodians.

The Custodian will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum.  The Custodian will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

## REGULATORY COMPLIANCE PROVIDER

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

## LEGAL COUNSEL

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters.  Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum.  Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted.  In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership.  Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues.  Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof.  In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain

HCMLPHMIT00003958

of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

HCMLPHMIT00003959

## INVESTMENT PROGRAM

### INTRODUCTION

The Partnership was organized for the purpose of investing and trading in a wide variety of investments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including, but not limited to, the following: common and preferred stocks, bonds and other debt securities, convertible securities, limited partnership interests, other investment funds (including the Portfolio Funds), CLO securities, mutual fund shares, options, warrants, futures, derivatives (including swaps, forward contracts and structured instruments), monetary instruments, other financial instruments, cash and cash equivalents. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the Commodity Exchange Act, as amended ("**CEA**"), that provides an exemption from registration as a commodity pool operator.

References herein to the Partnership shall include, where appropriate: (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

The following is a general description of the principal types of investments which the Investment Manager currently contemplates making for the Partnership, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary, and a Limited Partner should not assume that any descriptions of the specific activities in which the Partnership may engage are intended in any way to limit the types of investment activities which the Partnership may undertake or the allocation of Partnership capital among such investments.

### INVESTMENT OBJECTIVE

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

### INVESTMENT STRATEGY

**Philosophy**

The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The following principles generally guide the Investment Manager's portfolio management strategy and allocation of capital:

- invest with a long-term perspective, minimize turnover and avoid market-timing;
- hold a concentrated investment portfolio; and

HCMLPHMIT00003960

- view each investment relative to other investment opportunities.

*Long-Term Perspective.*  The Investment Manager intends to invest with a long-term perspective, typically holding an ownership position in a company until it reaches its intrinsic value.  In general, when the Investment Manager will be looking to invest in a company, it intends to avoid trying to time the market, but rather intends to focus on the intrinsic value of the company and then find the right entry or purchase point.

*Concentration.*  The Investment Manager intends to have a concentrated portfolio of investments.  The Investment Manager believes that this may provide the Partnership with a competitive advantage over most other private investment vehicles in that:  (i) the Investment Manager's best ideas would be rarely and/or marginally diluted by its lesser ideas; (ii) the extra time saved by not trading may allow the Investment Manager to concentrate on finding other investment ideas; and (iii) careful analysis may allow the Investment Manager to make intelligent and deliberated decisions.

*Relative Analysis.*  The Investment Manager intends to evaluate potential investments in companies of varying market capitalization in an attempt to isolate those securities with the greatest potential for capital appreciation.  As part of its strategy, the Investment Manager intends to invest in those industries, sectors and securities which may provide value on a relative basis.  The Investment Manager intends to seek to understand a company and its industry before investing.

## Strategies

The following is a general description of the principal types of securities in which the Partnership may invest, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio.  The following description is merely a summary, and the Investment Manager has discretion to cause the Partnership to invest in other types of securities and to follow other investment criteria and guidelines.

*Long Equity.*  The Investment Manager expects that a portion of the Partnership's investments will generally be in equities.  In connection with the foregoing, the Partnership's focus will be on companies of varying size that have a reasonable expectation of producing above-average returns.  The Investment Manager intends to favor private companies that are not actively traded in the U.S. but may be willing to invest in companies without respect to market capitalization, geographic location or market sector.

Before investing in a company, the Investment Manager intends to analyze certain financial measures, such as the company's historical and expected cash flows, its projected earnings growth, its valuation relative to its growth and to that of its industry, the historical trading patterns of the company's securities, and forecasts and projections for the relevant industry group.  The Investment Manager will at times gather information about a company from consultants, analysts, competitors, suppliers and customers that may help the effectiveness of the analysis performed.

*Short Selling.*  The Investment Manager may sell short individual stocks as a means of attempting to reduce risk and increase performance.  Stocks are generally sold short for a variety of reasons, including, without limitation, the following: (i) temporary overvaluation due to short-term market euphoria for a sector; (ii) faulty business model; (iii) poor earnings; (iv) questionable accounting practices; (v) deteriorating fundamentals; (vi) negative tangible book value; and (vii) weak management unable to adapt to changes in technology, regulation or the competitive environment.  The Investment Manager believes that, by focusing on specific companies that are experiencing any one or more of these elements, the Investment Manager may be able to identify profitable short sale candidates in most stock market environments.  In addition, technical analysis may also be used to help in the decision-making process.

*Event-Driven Investments.* When the opportunity arises, in the opinion of the Investment Manager, the Partnership may invest in companies based upon certain situations or

HCMLPHMIT00003961

events, such as launching of a new product, changes in management, a corporate restructuring, a merger or an acquisition. These situations or events may also include investments that are based on market-timing and impact analysis.

Occasionally, the Partnership may engage in arbitrage transactions that the Investment Manager believes may represent an exceptional risk/reward opportunity. Risk arbitrage opportunities generally arise during corporate mergers, leveraged buyouts or takeovers. Frequently, the stock of the company being acquired will trade at a significant discount to the announced deal price. This discount compensates investors for the time value of money and the risk that the transaction may be canceled. If the discount is significantly greater than the Investment Manager's assessment of the underlying risk, the strategy will be implemented. The Investment Manager intends to use event-driven investments as a tactical, opportunistic strategy and not as part of the Partnership's normal operations.

**Bank Loans**

In general, a portion of the Partnership's net assets will be invested and traded in senior secured floating rate bank loans ("**Bank Loans**") denominated in U.S. dollars. Bank Loans represent amounts borrowed by corporate entities from banks and other lenders. In many cases, they are issued in connection with re-capitalizations, acquisitions, leveraged buyouts and re-financings. Most, if not all, of the Bank Loans in which the Partnership intends to invest will have a below investment-grade credit rating or will not be rated by a major credit rating agency. The Bank Loans in which the Partnership intends to invest are often referred to as "leveraged loans" because the borrowing companies have significantly more debt than equity.

Bank Loans have the highest seniority within a borrower's capital structure. Therefore, in the event of a bankruptcy, holders of Bank Loans are typically paid (to the extent assets are available) before certain other creditors, such as bondholders. Bank Loan maturities typically range from 5 to 8 years, although loan prepayments and re-financings generally result in effective average lives of approximately 3 years depending on market conditions.

Bank Loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. As a result, the Investment Manager believes that the Partnership may experience less sensitivity to changes in market interest rates and lower volatility than if the Partnership invested exclusively in fixed rate obligations.

The Bank Loan market has grown significantly in recent years, as investors have been drawn into the market by the advantageous characteristics of Bank Loans, which include floating interest rates, senior secured status, lower volatility, growing liquidity, greater control over an issuer in times of stress, and lower correlation with other asset classes.

**Other Securities**

When, in the opinion of the Investment Manager, appropriate investments cannot be found or when market conditions dictate a more conservative stance, the Partnership may maintain significant cash positions or invest in money market instruments (e.g., money market funds or U.S. Treasury securities).

**Fixed Income Securities**

The Investment Manager may invest in fixed income securities (bonds) as part of the strategic operations of the Partnership. The Investment Manager may take advantage of special investment opportunities in the high yield and convertible segments of the fixed income market. The Investment Manager considers these investments to be equity substitutes, with the expectation of providing both current income and capital appreciation. The Investment Manager may also seek opportunities in government-issued fixed income securities, as deemed appropriate.

**High Yield Bonds**

HCMLPHMIT00003962

The price and yield of lower-quality (i.e., high yield, high risk) bonds, commonly referred to as "junk bonds," can be expected to fluctuate more than the price and yield of higher-quality bonds. Because these bonds are rated below BBB or are in default, they are regarded as predominantly speculative with respect to the issuer's continuing ability to meet principal and interest payments. Successful investment in lower-medium- and low-quality bonds involves greater investment risk and is highly dependent on credit analysis. A real or perceived economic downturn or higher interest rates could cause a decline in high yield bond prices by lessening the ability of issuers to make principal and interest payments. These bonds can be more difficult to sell and value accurately than high-quality bonds. Because objective pricing data may be less available, judgment may play a greater role in the valuation process. In addition, the entire high yield bond market can experience sudden and sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large or sustained sales by major investors, a high-profile default, or just a change in the market's psychology. This type of volatility is usually associated more with stocks than bonds, but junk bond investors should be prepared for it.

## Derivative Transactions

The Partnership may enter into derivative transactions, including credit default swaps to hedge the market risk of its Bank Loan portfolio. The Investment Manager may purchase and write put and call options that are traded on national securities exchanges or over-the-counter markets, as well as on electronic communications networks. Options can be used in many ways, such as to increase market exposure (i.e., leverage), to reduce overall market exposure (i.e., hedge), to increase the portfolio's current income, or to reduce the cost basis of a new position. The Partnership may also utilize certain options, such as various types of index or "market-basket" options, in an effort to hedge against certain market-related risks, as the Investment Manager deems appropriate. The Investment Manager believes that the use of options and other derivatives may help reduce risk and enhance investment performance of the Partnership's portfolio.

## Foreign Investments

Although the Investment Manager intends to focus primarily on the U.S. marketplace, it may invest in U.S. dollar-denominated securities of foreign issuers or loans of foreign borrowers traded in the U.S.

## Special Situations

The Partnership may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.

## Money Market Instruments

From time to time, the Investment Manager may also invest some of the Partnership's assets in short-term U.S. government obligations, certificates of deposit, commercial paper and other money market instruments. A greater percentage of Partnership assets may be invested in such obligations if the Investment Manager believes that a defensive position is appropriate because of expected economic or business conditions or the outlook for security prices. From time to time, in the sole discretion of the Investment Manager, cash balances in the Partnership's brokerage account may be placed in a money-market fund or other cash equivalents.

## CLO Securities Generally

A portion of the Partnership's assets will also be invested in: (i) rated and unrated, debt relating to collateralized loan obligations ("**CLOs**" or "**CLO Securities**") in the primary and secondary markets, and (ii) collateralized debt obligations that also have leveraged loans as part of their underlying investments.

## Currency Hedging Transactions

HCMLPHMIT00003963

The Investment Manager may, but is not required, to engage in currency hedging transactions to protect against adverse changes in currency and interest rates. Currency hedging instruments may include, without limitation, forward contracts, futures contracts, options contracts, cross-currency swaps, exchange-traded funds ("**ETFs**"), treasury locks, shorting non-U.S. debt and any other instrument deemed reasonable in the Investment Manager's discretion to hedge the non-U.S. currency exposure of the Partnership.

**Description of CLO Investments**

An investment in CLO tranches represents varying levels of exposure primarily to credit performance of the underlying assets and is characterized by a combination of expected significant current cash flow, as well as the opportunity for positive returns through long-term gains on the underlying portfolios. CLO investments often have a relatively short expected duration (usually less than 10 years), as a typical CLO distributes excess cash flows quarterly or semi-annually concurrent with the payment of interest on its liabilities, subject to compliance with overall collateral quality tests and other performance criteria. The Investment Manager believes that CLO debt securities may offer significant relative value in the current market. The Investment Manager believes the attractive spreads currently offered by investments in CLOs have been created by technical factors, mainly rating agency driven, rather than fundamentals of the underlying collateral.

A cash flow CLO is generally analogous to a special purpose finance company. The CLO owns a portfolio consisting of corporate loans and other investments from which it typically receives interest income, together with capital gains and losses. The CLO is often financed with equity, which may be in the form of preference shares or income notes and several levels of long-term debt. CLO debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio. CLO equity is almost always unrated.

In addition to the opportunities in the secondary market, the Investment Manager believes that it may be able to source attractive opportunities from the growing issuance of CLOs in the primary market as well. The CLO market generally is characterized by a lack of liquidity, transparency and the absence of uniform standards. The Investment Manager believes that market participants often tend to lack the expertise and analytic tools to systematically and comprehensively analyze either primary or secondary market CLO tranches. The market for CLO tranches is also highly fragmented and, to date, many investors have had limited leverage in negotiating CLO terms, such as structure and fees. The Investment Manager believes that the Partnership may benefit from the Investment Manager's ability to use its CLO management expertise, proprietary analytics and direct market access to assess value opportunities and effectively execute transactions. In the primary market, the Investment Manager will seek situations where it can influence structures, fees and timing of CLO transactions to achieve favorable terms not directly available to other investors.

The Investment Manager generally intends to invest the Partnership's gross assets in CLO debt that is diversified across maturities, underlying assets and managers. In addition to implementing its rigorous investment process and utilizing proprietary analytical tools to evaluate and select investments for the Partnership, the Investment Manager intends to use its market knowledge and industry position to seek to add value by addressing what it believes may be material inefficiencies of the existing CLO execution process. For example, within the primary new issuance market, the Investment Manager will look to invest in CLOs where it can leverage its expertise and market relationships to achieve the timing, structural and financial terms especially advantageous to the Partnership's investments. In addition, the Investment Manager will look to assess value dislocations of CLOs and other structured investments within the secondary market, as the Investment Manager believes structured products markets may have inherent inefficiencies that often cause significant differentials between intrinsic value and market value.

The Investment Manager will seek to achieve the following specific objectives:

HCMLPHMIT00003964

- seek consistent above-average returns while minimizing volatility;
- access and initiate deal flow directly and through arrangements with underwriters and broker-dealers;
- take advantage of value dislocations in the secondary market;
- reduce risk through efficient, cost-effective transaction execution;
- add value through optimization of terms and structures;
- and leverage expertise in CLO investments and management to create a well-balanced, broadly diversified portfolio.

**Structural Optimization and Transaction Terms with Respect to CLOs**

Typically, CLO securities are offered to investors after the structure has been developed and agreed to by the collateral manager, underwriter and rating agencies. Investors have limited ability to effect significant changes to the structure and/or the key terms. Also, very few investors have the expertise or the tools to model and analyze proposed CLO investments; most are believed to rely on the underwriters to provide analytical support. Proactive, early involvement with select managers and underwriters, and significant investment participation, are expected to enable the Investment Manager to use its structuring capability and proprietary analytics to identify and achieve desirable structural features and transaction terms.

**CLO Investment Process**

*General*. The investment process used by the Investment Manager to evaluate potential CLO tranches will generally employ a combination of rigorous qualitative (manager, portfolio and legal considerations) and quantitative (structural, cash-flow, collateral valuation and pricing/relative value) analysis. Among other resources, the Investment Manager intends to use its proprietary quantitative analytical tool, Rand CLO Insight, as well as INTEX data service, Wall Street Analytics, Moody's Investor Services and Wall Street Office in connection with gathering information with respect to CLO investments by the Partnership.

*Asset/Portfolio Assessment*. The Investment Manager believes the most critical component of investing in CLO securities is the ability to quickly and effectively understand the characteristics of the CLO's underlying collateral, primarily consisting of corporate Bank Loans. The Investment Manager believes that its capability to develop accurate, up-to-date portfolio quality indicators may be critical to the foregoing task because these indicators are key inputs for the subsequent quantitative component of the investment analysis.

Further assessment by the Investment Manager will generally include additional portfolio-level analysis. The Investment Manager intends to consider, among other factors, the following key parameters of a CLO:

- historical par loss due to defaults and distressed sales as a key indicator of prior portfolio performance;
- defaulted securities currently held in the portfolio and prospective recovery levels for such securities;
- aggregate ratings of the performing securities (statistically, lower ratings generally indicate higher probability of default);
- liquidity as measured by the average facility size and percent of the portfolio with private credit ratings, among other metrics;
- projected future portfolio par loss, based on the security-level analysis and the resulting ratings adjustments;
- portfolio market value and portfolio segment trading at distressed prices as another indicator of future portfolio performance; and
- degree of industry and issuer diversification/concentration.

*Manager Evaluation*. The underlying CLO manager is responsible for selecting the assets and for managing them within the ratings-constrained environment according to the specified procedures and limitations that exist in each CLO's indenture. The review of the

HCMLPHMIT00003965

CLO manager will generally encompass historical performance, investment management and structured finance expertise, quality and size of the investment team, co-investment history, investment philosophy and credit process, platform scalability, systems and back office operations. The review process will generally focus on evaluating the manager's performance and capabilities in the following areas:

- Past CLO performance, including par erosion through defaults, recoveries and trading history (gains/losses) of current and prior CLO managed;
- proficiency in the underlying asset classes, integrity of the investment process, investment criteria, decision-making and monitoring processes;
- consistency of historic performance, with an emphasis on performance during a credit down cycle;
- knowledge of CLO structures and the ability to manage the assets within the limitations imposed by indenture constraints;
- upgrade and downgrade history of its prior transactions;
- key personnel, retention arrangements and succession plan, and experience and depth of the entire investment team; and
- technical self-reliance, such as degree of independence from trustee/underwriter to assess impact of potential trades, indenture interpretation, etc.; and
- sophistication of systems, compliance procedures and reporting capabilities.

*Structural Considerations*. A review of the CLO structure will generally focus on the indenture (the governing document of the transaction) provisions that determine which assets may be purchased by the vehicle, as well as the mechanics behind the cash-flow "waterfall" (i.e., priority of payments). The cash-flow "waterfall" determines the order in which cash disbursements are made on each payment date according to the performance of the transaction. In the event of performance deterioration, cash flow may be diverted from lower tranches of the capital structure to prepay the senior or mezzanine tranches, reduce the leverage, and, if possible, restore compliance with the appropriate tests.

Further structural analysis by the Investment Manager includes a thorough review of indenture provisions which generally include:

- asset eligibility – the types and required features of the assets permitted to be purchased for the CLO (e.g., loans, rating requirements, maturity restrictions, interest payment frequency, etc.);

- "basket" limitations – percentage limits on securities bearing certain ratings, maximum permitted percentages for certain asset types (e.g., synthetic instruments, structured notes, zero-coupon bonds, etc.);

- trading restrictions – the level of discretionary trading allowed, rules for trading and how they may change in the event that the liabilities are downgraded;

- reinvestment criteria – the rules that govern reinvestment of principal proceeds generated from sales, maturities, calls and tenders during and after the reinvestment period;

- priority of payments – structure of the CLO's cash-flow waterfall and cash-flow diversion mechanisms (the over-collateralization and interest coverage tests); if earlier cash-flow diversion results in deferral of interest payments to certain tranches, these rules determine how deferred interest gets paid when the funds are available and what the protections or risks are for each investor in the CLO;

- management fee structure – senior, subordinate, incentive, contingent fees; generally, proper fee structure is key in aligning the manager's interest with various note holders; and an equity investor would favor a structure that compensates the manager for managing the transaction while providing an incentive to maintain equity distributions without sacrificing the future health of the transaction;

- collateral quality tests haircuts – if a certain "basket" is larger than its limitation, overcollateralization tests may be reduced by the amount above the limitation;

HCMLPHMIT00003966

- analysis of the hedging strategy and of the hedge structure is important in evaluating implications of any mismatch between fixed rate assets and floating rate liabilities; the hedge instrument is valued and the effectiveness of the strategy is evaluated based on various criteria, such as where the termination payments are positioned in the waterfall, whether payments are made upfront or over time and how the notional amount changes over time; improper hedging can prove very costly to investors at all levels of the capital structure;

- governance provisions and voting rights – the rights of investors in different tranches of the capital structure to effect changes (e.g., manager removal, collateral disposition, note redemption, etc.);

- events of default – definitions and implications for each tranche holder; and

- reporting – the frequency and detail provided to the investors updating the portfolio and liability performance and composition.

*Legal/Other Issue Analysis.*  Legal review will generally be an integral part of the Investment Manager's overall investment process with the goal of understanding and interpreting the numerous documents that govern a typical CLO.  Reviewed documents and legal issues may include the following:

- the indenture – the CLO's governing document that acts as a "roadmap" for the entire transaction;

- legal opinions – these provide guidance as to tax treatment and other legal areas that may impact the management of the transaction;

- the management/advisory agreements – these dictate the role, rights and responsibilities of the manager;

- legal structure of equity securities – the structure of the preference shares or income notes may have an impact on the tax treatment;

- financial guaranty agreements – a financial guarantor is typically a monoline insurance company which in the past may have given its rating, usually Aaa/AAA to the senior class of notes to guarantee payments of principal and interest in exchange for a fee and additional rights within the CLO; such rights are important to evaluate as they may have an impact on the rights of the equity investors;

- ratings – agency, analyst, location, timing and basic assumptions used to arrive at the ratings; and

- offering memoranda, deal pitch books and other marketing materials.

*Detailed Quantitative Analysis Using Proprietary Analytics.*  A detailed cash flow analysis is crucial in determining the return characteristics and profile of the tranche under consideration.  The cash flows will generally be stress-tested using multiple economic scenarios and assumptions to assess the risk and return profile of the proposed CLO investment.  Among other items, the quantitative analysis will also include the following:

- a review of the portfolio market value, the resulting market value coverage of the proposed CLO investment, and its change over time;

- the likelihood of future cash flows being diverted or interrupted, as well as the potential severity in the event that it happens;

- analysis of par value and interest coverage cushions.  Cushions in the overcollateralization and the interest coverage tests may indicate the level of losses that can be sustained before a potential cash flow diversion; and

HCMLPHMIT00003967

- analysis of sector and issuer concentrations, largest exposures and level of diversification.

*Final Screen/ Pricing*. The Investment Manager's investment decision will generally be based on the qualitative and quantitative analysis of each investment and on the correlation between the proposed investment and the existing holdings in an effort to ensure an appropriate level of diversification. The Investment Manager will generally compare the risk and return characteristics of the proposed CLO investment against similar CLO bond trade prices in its proprietary pricing database. The combined assessment of the underlying portfolio characteristics, structural considerations, legal and cash flow scenario analyses will generally be compared with the relative value analysis to determine the value of the proposed CLO investment.

## Leverage

The Investment Manager may cause the Partnership to undertake leverage. Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements. Entering into short sales and certain types of derivative instruments may also increase the Partnership's use of leverage. Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.

## Important Notice

The foregoing description of the Partnership's investment program does not purport to be a complete explanation of all the asset classes or securities in which the Partnership may invest. In general, the Investment Manager intends to follow a flexible approach in order to place the Partnership in the best position to capitalize on opportunities in the financial markets. Accordingly, the Investment Manager may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit.

### DEVELOPMENT AND RISKS OF INVESTMENT MANAGER'S INVESTMENT STRATEGY

The development of an investment strategy is a continuous process, and the Partnership's investment strategy and methods may therefore be modified from time to time. The Partnership's investment methods are confidential, and the descriptions of them in this Memorandum are not exhaustive. The Partnership's investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts they manage. Investment decisions require the exercise of judgment by the Investment Manager. The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements, which would have yielded profits or avoided losses. Limited Partners cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investing for the Partnership.

**The Partnership's investment program entails substantial risks, and there can be no assurance that its investment objectives will be achieved. The practices of options trading, short selling, the use of leverage and other investment techniques employed by the Partnership can, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. See "RISK FACTORS AND CONFLICTS OF INTEREST—Market Risks".**

HCMLPHMIT00003968

## BROKERAGE PRACTICES

References herein to the Partnership shall be deemed to apply with respect to the Partnership's traded investments.

### BROKERAGE ARRANGEMENTS

The Investment Manager is responsible for the placement of the portfolio transactions of the Partnership and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Partnership's brokerage transactions through a broker or custodian who will clear the Partnership's transactions.

Securities transactions for the Partnership are executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Partnership. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Partnership, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected and the efficiency of error resolution, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; special execution capabilities; reputation; clearance, settlement, on-line pricing, block trading and block positioning capabilities; willingness to execute related or unrelated difficult transactions in the future; order of call; online access to computerized data regarding clients' accounts; performance measurement data; the quality, comprehensiveness and frequency of available brokerage and research products and services considered to be of value; the availability of stocks to borrow for short trades; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

### SOFT DOLLAR ARRANGEMENTS

The term "soft dollars" refers to commissions accumulated by brokers based on an investment manager's transactions, on behalf of its clients, which may be used by the investment manager to acquire various products or services. The use of client commissions, known as soft dollars, to pay for these products and services, including research and brokerage products and services, presents investment managers with potential conflicts of interest and may give incentives for investment managers to use certain brokers without regard to their obligations to their clients.

The Investment Manager may use soft dollars generated by the Partnership's brokerage transactions to pay for brokerage and research products and services that fall within the safe harbor afforded by Section 28(e) of the Exchange Act ("**Section 28(e)**"). Section 28(e) provides a "safe harbor" to investment managers who use soft dollars to obtain investment research and brokerage products and services. In order to qualify for the safe harbor, the products or services must provide assistance to the investment manager in the performance of its investment decision-making responsibilities, or must relate to the execution, clearance or settlement of a trade.

### REFERRAL OF INVESTORS AND SALES CHARGES

The Investment Manager may direct some Partnership brokerage business to brokers who refer prospective investors to the Partnership. Because such referrals, if any, are likely to benefit the Investment Manager and its affiliates but will provide an insignificant (if any)

HCMLPHMIT00003969

benefit to Limited Partners, the Investment Manager will have a conflict of interest with the Partnership when allocating Partnership brokerage business to a broker who has referred investors to the Partnership.  To prevent Partnership brokerage commissions from being used to pay investor referral fees, the Investment Manager will not allocate Partnership brokerage business to a referring broker unless the Investment Manager determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Partnership.

The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.   The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the Investment Manager and/or the General Partner, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.

## ALLOCATION OF INVESTMENT OPPORTUNITIES

The Investment Manager may at times determine that certain investments will be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, including Affiliated Funds, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager will endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

## AGGREGATION OF ORDERS

The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.

In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## TRADE ERROR POLICY

The Investment Manager has internal controls in place to prevent trade errors from occurring.  On those occasions when such an error nonetheless occurs, the Investment

HCMLPHMIT00003970

Manager will use reasonable efforts to correct the error.  If the error cannot be corrected, the Investment Manager does not intend to make any adjustment, regardless of whether the error works to the benefit or detriment of the Partnership.  The Investment Manager will endeavor to maintain a record of each trade error, including information about the trade and how such error was corrected or attempted to be corrected.  The Partnership (and not the General Partner, the Investment Manager or any of the Investment Manager Affiliates) will be responsible for any losses resulting from trading errors and similar human errors, unless such errors are due to gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction.

HCMLPHMIT00003971

## RISK FACTORS AND CONFLICTS OF INTEREST

An investment in the Partnership (and any Series thereof) involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment.  There can be no assurances or guarantees that:  (i) the Partnership's (or any Series') investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Partnership (or any particular Series).

References herein to the Partnership shall include, where appropriate:  (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

In addition, to the extent relevant, you should also read the offering and governing documents of the PE Portfolio Fund in which the Partnership intends to initially invest on behalf of the initial Limited Partners, which are available from the Partnership upon request.

You should consider the Partnership as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved.  In addition, investors who are subject to income tax should be aware that an investment in the Partnership (or any Series thereof) is likely (if the Partnership (or such Series) is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities.  You should therefore bear in mind the following risk factors and conflicts of interest before purchasing an Interest:

### PARTNERSHIP RISKS

**Dependence Upon the General Partner, the Investment Manager and the Principal; No Participation in Management**.  The Partnership's success will depend on the management of the General Partner and the Investment Manager and on the skill and acumen of the Principal.  If the Principal should cease to participate in the Partnership's business, the Partnership's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Limited Partner, you should be aware that you will have no right to participate in the management of the Partnership, and you will have no opportunity to select or evaluate any of the Partnership's investments or strategies.  Accordingly, you should not invest in the Partnership unless you are willing to entrust all aspects of the management of the Partnership and its investments to the discretion of the General Partner and the Investment Manager.

**Limited or Lack of Operating History**.  Each of the Partnership, the Investment Manager and the General Partner are recently-formed entities that have no operating history upon which prospective investors may evaluate the Partnership's future performance.  Although the Principal has experience with investments of the type the Partnership intends to make, any prior performance of the Principal (or the Investment Manager Affiliates) is not necessarily indicative of results that he may achieve with respect to the Partnership.   As such, there can be no assurances that the Partnership will be able to implement its investment strategy or achieve its investment objective.  In addition, any prior performance of the Principal or the Investment Manager Affiliates is not indicative of the results each may achieve for the Partnership in the future.

**Reliance on the Shared Services Provider**.  The Investment Manager relies on the Shared Services Provider to provide certain administrative and other services.  In the event that the Shared Services Agreement is terminated for any reason, the Investment Manager may not be able to engage another third party to provide such services and may not have the resources to continue advising the Partnership without the provision of such services by the Shared Services Provider.  In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

HCMLPHMIT00003972

**Limited Liquidity of Interests**.  An investment in the Partnership involves substantial restrictions on liquidity, and its Interests are not freely transferable.  There is no market for the Interests in the Partnership, and no market is expected to develop.  Additionally, transfers are subject to the consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion.  Consequently, Limited Partners will be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the Partnership Agreement.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.  Although a Limited Partner may attempt to increase its liquidity by borrowing from a bank or other institution, Interests may not readily be accepted as collateral for a loan.  In addition, the transfer of an Interest as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

A portion of the Partnership's assets may be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under federal or state securities laws.   Such investments may be segregated from other Partnership assets and carried in Side Pocket Accounts, which are subject to restrictions on withdrawals.  Because of the absence of any trading market for these investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Partnership.  Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

**Lack of Registration**.  The Interests have neither been registered under the Securities Act nor under the securities laws of any state and, therefore, are subject to transfer restrictions.  In connection with your purchase of an Interest, you must represent that you are purchasing the Interest for investment purposes only and not with a view toward resale or distribution.  Neither the Partnership nor the General Partner has any plans or assumed any obligation to register the Interests.  Accordingly, the Interests may not be transferred without documentation acceptable to the General Partner, which may include an opinion of counsel to the Partnership that the transfer will not involve a violation of the registration requirements of the Securities Act or require registration by the Partnership under the Investment Company Act.  These restrictions on transfer are in addition to those found in the Partnership Agreement.  Ordinarily, this means that transfers will be restricted to instances of death, gift or passage by operation of law.

**Withdrawal of Capital**.  A Limited Partner's ability to withdraw funds from the Partnership is restricted in accordance with the withdrawal provisions contained in this Memorandum under "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Withdrawals" and the withdrawal provisions contained in the Partnership Agreement.  In addition, substantial withdrawals by investors within a short period of time could require the Partnership to liquidate securities positions and other investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategy.  Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds.

**For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  In addition, because of the absence of any trading market Illiquid Investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Each of the foregoing may impact a Limited Partner's ability to withdraw.

HCMLPHMIT00003973

**Concentration of Investments**.  The Investment Manager implements its investment program in a manner which, in light of investment considerations, market risks and other factors, it believes will provide the best opportunity for attractive risk-adjusted returns in the value of the Partnership's assets. The Partnership Agreement does not formally limit the amount of the Partnership's assets that may be invested in a single company, security, country, industry, sector or asset class.  In addition, the Partnership Agreement does not limit the amount of the Partnership's assets that may be invested in a single Portfolio Fund.  The concentration of the Partnership's portfolio in any manner described above would subject the Partnership to a greater degree of risk with respect to the failure of one or a few investments, or with respect to economic downturns in relation to an individual industry or sector, or single company, security, country, industry, sector or asset class. See "—Regulatory and Tax Risks—Diversification" herein.

**Operating Deficits**.  The expenses of operating the Partnership (including the Management Fee) may exceed its income, thereby requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability.  In addition to the Partnership's own operating expenses, the Partnership will also bear its *pro rata* share of the operating expenses of the relevant Portfolio Fund.  As such, the Partnership is subject to layering of operating expenses due to the expenses charged by the managers and the Portfolio Funds.

**No Distributions**.  The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Partnership income and gain, if any.  Cash that might otherwise be available for distribution will also be reduced by payment of Partnership obligations, payment of Partnership expenses (including fees payable and expense reimbursements to the General Partner) and establishment of appropriate reserves.  As a result, if the Partnership is profitable, Limited Partners in all likelihood will be credited with Partnership net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Limited Partners receive little or no Partnership distributions.  In addition, notwithstanding anything to the contrary herein, the General Partner may limit withdrawals in order to ensure that the Partnership meets the diversification requirements applicable to insurance-dedicated investment funds.

**Investment Expenses**.  The investment expenses (e.g., expenses related to the investment and custody of the Partnership's assets, such as brokerage commissions, custodial fees and other trading and investment charges and fees) as well as other Partnership fees may, in the aggregate, constitute a high percentage relative to other investment entities.  The Partnership will bear these costs regardless of its profitability.

**Cross-Series Liability**.  Section 17-218 of the Delaware Act provides that limited partnerships can be established in separate series in a manner that the liabilities and obligations incurred with respect to any series are only enforceable against the assets of such series, and not against the assets of the limited partnership generally or any other series.  The relevant provisions of the Delaware Act provide the legal requirements for how limited partnerships can be established and operated to maintain this segregation. The statute includes such requirements as the maintenance of separate books and records for each series, and separation of the assets of each series from other series. Despite these statutory provisions, there may be instances where the assets of a particular Series may be exposed to the liabilities of one or more other Series.  For example, there may be certain counterparties which resist entering into a contract with a particular Series and insist that one or more other Series, or the Partnership itself acting on behalf of the Series together, enter into such contract.

**Supervision of Trading Operations**.  The Investment Manager, with assistance from its brokerage and clearing firms, intends to supervise and monitor trading activity in the Partnership's account to ensure compliance with the Partnership's objectives.  Despite the Investment Manager's efforts, however, there is a risk that unauthorized or otherwise inappropriate trading activity may occur in the Partnership account.

**Impact of Side Letters**.  The Partnership, the General Partner and/or the Investment

HCMLPHMIT00003974

Manager may from time to time enter into Side Letters with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement. Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such written agreements or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners. The other Limited Partners will have no recourse against the Partnership, the General Partner, the Investment Manager and/or any of their respective affiliates in the event that certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.

**Broad Discretionary Power to Choose Investments and Strategies**. The Investment Management Agreement gives the Investment Manager broad discretionary power to decide what investments the Partnership will make and what strategies it will use. While the Investment Manager currently intends to use the strategies described in "INVESTMENT PROGRAM", it is not obligated to do so, and it may choose any other investments and strategies that it believes are advisable.

**Limitation of Liability and Indemnification of the General Partner, the Investment Manager and Affiliates**. The Partnership Agreement provides that none of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Investment Management Agreement also provides similar protections to the Investment Manager. Therefore, a Limited Partner may have a more limited right of action against the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates than a Limited Partner would have had absent these provisions in the Partnership Agreement and the Investment Management Agreement. **It is the policy of the SEC that indemnification for violations of securities laws is against public policy and therefore unenforceable.**

**No Minimum Size of Partnership**. The Partnership may begin or continue operations without attaining or maintaining any particular level of capitalization. At low asset levels, the Partnership may be unable to make its investments as fully as would otherwise be desirable or to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers. It is possible that even if the Partnership operates for a period with substantial capital, investors' withdrawals could diminish the Partnership assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program. As a result of losses or withdrawals, the Partnership may not have sufficient capital to diversify its investments to the extent desired or currently contemplated by the Investment Manager.

**Portfolio Valuation**. Valuation of the Partnership's portfolio, which will affect the amount of the Management Fee, involves uncertainties and determinations based on judgments.

HCMLPHMIT00003975

Third-party pricing information may, at times, not be available regarding certain of the Partnership's investments.  A disruption in the secondary markets for the Partnership's investments may limit the ability of the Partnership to obtain accurate market quotations for purposes of valuing its investments.  In addition, material events occurring after the close of a principal market upon which a portion of the investments of the Partnership are traded may require it to make a determination of the effect of a material event on the value of the investments traded on the market for purposes of determining the value of the Partnership's investments on a valuation date.  Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Partnership from time to time, the liquidation values of the Partnership's securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein.  Moreover, because of the inherent uncertainty of valuing an illiquid security, the quoted valuation may be higher than the actual final liquidation value, and these differences could be material.  If the Partnership's valuation should prove to be incorrect, the value of the Partnership's investments could be adversely affected.

**Liability of a Limited Partner for the Return of Capital Contributions**.  If the Partnership should become insolvent, Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership in order to pay such Limited Partner's *pro rata* share of any Partnership liabilities that arose while such Limited Partner held Interests.

Under the Delaware Act, when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership was prohibited from making such distribution pursuant to the Delaware Act.

**Delayed Schedule K-1s**.  The General Partner will endeavor to provide a Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year.  In addition, the Partnership will first have to receive a Schedule K-1 from each Portfolio Fund.  In the event that the Schedule K-1 is not available by such date, a Limited Partner may have to request an extension of time to file or may have to pay taxes based on an estimated amount.

**Lack of Insurance**.  The assets of the Partnership are not insured by any government or private insurer, except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount).  Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

**Forward-Looking Statements; Opinions**.  Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the Partnership.  Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon.  Moreover, certain information contained in this Memorandum constitutes "forward-looking" statements, which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

## MARKET RISKS

### General

**Competition Generally**.  The securities industry and the varied strategies and techniques

HCMLPHMIT00003976

to be engaged in by the Investment Manager are extremely competitive and each involves a degree of risk. The Partnership will compete with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs. Further, lower fees for comparable services may be available from these or other firms.

**Market Volatility**. The profitability of the Partnership substantially depends upon the Investment Manager correctly assessing the future price movements of bonds, stocks, options on stocks, and other financial instruments, and the movements of interest rates. The Partnership cannot guarantee that the Investment Manager will be successful in accurately predicting those prices and interest rate movements.

**Partnership's Investment Activities**. The Partnership's investment activities involve a significant degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive, technological and other conditions (including natural disasters, acts of terrorism and war) that may affect investments in general or specific industries or companies. The securities markets may be volatile, which may adversely affect the ability of the Partnership to realize profits. As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially over time and from period to period.

**Terrorist Actions**. There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

**Unforeseen Events**. The Partnership may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced withdrawals of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value, short squeezes, inability to short stock or changes in tax treatment.

**Potential Cybersecurity Breaches and Identity Theft**. The Investment Manager relies, to a certain extent, on the use of information technology. The Investment Manager's information and technology systems may be vulnerable to damage and/or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages, and/or catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time and/or cease to function properly, the Investment Manager and/or the Partnership may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's and/or the Partnership's operations and may result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the Investment Manager's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance.

**Long-Biased Investment Program**. The Investment Manager expects that its strategy with respect to the Partnership will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Partnership's assets.

**Market Liquidity and Leverage**. The Partnership may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Partnership's ability to adjust its positions. The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in

HCMLPHMIT00003977

overall market leverage, deleveraging as a consequence of a decision by the brokers and/or custodians, or other counterparties with which the Partnership enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Partnership's portfolio.

**Material Non-Public Information**.  By reason of their responsibilities in connection with other activities of the Investment Manager and/or its affiliates, the Principal or employees of the Investment Manager and/or its affiliates may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities.  The Partnership will not be free to act upon any such information.  Due to these restrictions, the Partnership may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Accuracy of Public Information**.  The Investment Manager may select investments for the Partnership, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager evaluates certain such information and data and sometimes seeks independent corroboration when the Investment Manager considers it is appropriate and when it is reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

**Directorships on Boards of Portfolio Companies**.  The principals and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Partnership and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Partnership may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Partnership.

**Short-Swing Liability and Other Limitations**.  From time to time, the Partnership, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company.  As a result, under Section 16 of the Exchange Act, the Partnership may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Partnership will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

**Disruptions or Inability to Trade Due to a Failure to Receive Timely and Accurate Market Data from Third-Party Vendors**.  The Investment Manager's strategy may depend on the receipt of timely and accurate market data from third-party vendors. Any failure to receive such data in a timely manner or the receipt of inaccurate data for any reason could disrupt and adversely affect the Partnership's trading until such failure or inaccuracy is corrected.

**Use of Automated Order Routing and Execution Systems Generally**.  The Investment Manager may use automated order routing and execution systems in its trading.  Such systems are typically provided on an "as is" basis.  Such systems may experience technical difficulties which may render them temporarily unavailable. In addition, such systems may fail to properly perform.  Such failures may result in losses to the Partnership, for which losses the providers of such services have disclaimed all liability.  In an effort to mitigate such risks, the Investment Manager intends to closely monitor trades executed through automated order routing and execution systems and the operation of the systems themselves.

HCMLPHMIT00003978

**Electronic Trading Facilities**. The Partnership may make use of electronic trading facilities (including ECNs), which are generally supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Trading on an electronic trading system (including an ECN) may differ not only from trading in an open-outcry market or telephonic market but also from trading on other electronic trading systems. The Partnership, in undertaking transactions on an electronic trading system, will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that the Partnership's order is either not executed according to its instructions or is not executed at all. The Partnership's ability to limit or recover certain losses may be subject to limits on liability imposed by, without limitation, foreign or domestic law or regulation, the Partnership's own or its broker's internet service provider, other systems providers, market factors, foreign or domestic banking or other market regulations and/or telephonic or other communications providers, foreign or domestic.

**Technology Risk**. The Investment Manager's investment strategy may rely on the use of proprietary and non-proprietary software, data and intellectual property. Any such reliance on this technology and data is subject to a number of important risks. First, the Partnership may be severely and adversely affected by the malfunction of the technology and/or data feed. For example, an unforeseeable software or hardware malfunction could occur, as a result of a virus or other outside force, or as result of a design flaw in the Partnership's system or in its continued implementation. In the past, occurrences of this nature to other funds have sometimes resulted in dramatically negative consequences for the portfolio of the related fund. In addition, changes in the market for publicly available data or in regulatory reporting requirements could cause a severe diminution in the data available for the technology to operate as designed. Such events can also have dramatically negative consequences for the Partnership. Furthermore, if any of the Partnership's software, hardware, data and/or other intellectual property is found to infringe on the rights of any third party, the Partnership could be severely and adversely affected.

**Trading Errors**. The Investment Manager's computerized trading systems rely on the ability of the Investment Manager's personnel to accurately process such systems' outputs and to use the proper trading orders, including stop-loss or limit orders, to execute the transactions called for by the systems. In addition, the Investment Manager relies on its staff to properly operate and maintain the computer and communication systems upon which the trading systems rely. The Investment Manager's systems are accordingly subject to human errors, including the failure to implement, or the inaccurate implementation of any of the Investment Manager's systems, in addition to errors in properly executing transactions. This could cause substantial losses on transactions, and any such losses could substantially and adversely affect the performance of the Partnership. See "BROKERAGE PRACTICES–Trade Error Policy" herein.

**Co-Investments with Third Parties**. The Partnership may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third- party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are inconsistent with those of the Partnership or be in a position to take (or block) action in a manner contrary to the Partnership's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

**Other Investment Vehicles; Limited Recourse**. The Investment Manager may allocate a portion of the Partnership's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Such investment vehicles may trade wholly-independently of one another and may at times hold economically offsetting positions. To the extent that such investment vehicles do, in fact, hold such positions, the Partnership, considered as a whole, may not achieve any gain or loss despite incurring expenses. Additionally, a creditor having a claim that relates to a

HCMLPHMIT00003979

particular investment held by any such investment vehicle may be able to satisfy such claim against all assets of such investment vehicle, without regard to the participation rights of the Partnership and other investors of such investment vehicle in the assets of such investment vehicle.

Since the Partnership may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region.  Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist).  Even in the event that such information may be available to the Partnership, the Partnership's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

**Risks Associated with ETFs**.  The Partnership may invest in ETFs.  ETFs represent an interest in a passively managed portfolio of securities and financial instruments selected to replicate a securities or financial instruments index.  Unlike open-end mutual funds, the shares of ETFs are not purchased and redeemed by investors directly with the ETF, but instead are purchased and sold through broker-dealers in transactions on an exchange.  Because ETF shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities or financial instruments.  In addition to bearing the risks related to investments in securities or financial instruments, investors in ETFs intended to replicate an index bear the risk that the ETFs performance may not correctly replicate the performance of the index.  Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses.  As such, the Partnership is subject to layering of such fees.  Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

**Illiquid Securities**.  From time to time, the Partnership may invest in financial instruments that are not publicly traded.  The Partnership may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis.  The Partnership may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time.  Accordingly, the Partnership may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities.  In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Partnership may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale.  The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain.  It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

**Investments in Securities and Other Assets Believed to Be Undervalued**.  The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in securities and other assets that the Investment Manager believes to be undervalued.  The identification of such investment opportunities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired.  While such investments offer the opportunities for above-average capital appreciation, they also involve a high degree of financial risk and can result in substantial losses.  Returns generated from the Partnership's investments may not adequately compensate for the business and financial risks assumed.  The current economic conditions and any future major economic recession can severely disrupt the

HCMLPHMIT00003980

markets for such investments and significantly impact their value. In addition, any such economic downturn can adversely affect the ability of the issuers of such obligations to repay principal and pay interest thereon and increase the incidence of default for such securities. Additionally, there can be no assurance that other investors will ever come to realize the value of some of these investments, and that they will ever increase in price. Furthermore, the Partnership may be forced to hold such investments for a substantial period of time before realizing their anticipated value. During this period, a portion of the Partnership's funds would be committed to the investments made, thus possibly preventing the Partnership from investing in other opportunities.

**Short Sales.** The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in selling securities short. Although the Investment Manager may sell short a variety of assets, it expects most short trades to be in equity securities. Short selling involves the sale of a security that the Partnership does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to the purchaser, the Partnership must borrow securities from a third-party lender. The Partnership subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

**Small Companies**. The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

**Leverage.** When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership. If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

HCMLPHMIT00003981

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments.** The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership. The prices of many derivative instruments, including many options and swaps, are highly volatile. The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them. Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties. The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets. Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options

HCMLPHMIT00003982

are highly specialized activities and entail greater than ordinary investment risks. In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option. This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest. These conditions exist in the stocks of many companies. The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices. Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss. Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions**. Investments in financial instruments such as options and interest rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

**Market or Interest Rate Risk.** The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

**Callable Securities.** Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk.** In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

HCMLPHMIT00003983

circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Inflation Risk.** Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

**Downgrades in Fixed Income Debt Securities**. Unless required by applicable law, the Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**. From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject. Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts. Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments. An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline. Some foreign currencies are particularly volatile. Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings. If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates. On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States. Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**. The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies. Such investments are subject to many of the risks associated with investing directly in non-U.S. securities. These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk. ADRs may be sponsored or unsponsored. Unsponsored ADRs are established without the participation of the issuer. In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or

HCMLPHMIT00003984

other shareholder rights, and may be less liquid.  The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**.  The Partnership may invest a portion of its assets in investments related to emerging market countries.  The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements.  Investing a significant portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies frequently experience high levels of inflation.  In addition, such countries may have:  (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including:  (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of:  (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets.  Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership.  The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets.  The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**.  In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates.  Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**.  It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**.  Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  The Partnership intends to value its holdings and to make distributions in U.S. dollars.  Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings.  Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for

HCMLPHMIT00003985

investment and capital appreciation and political developments.

**Risks of Trading Futures**. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator. Trading futures is a highly risky strategy. Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price. The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds. As a result, the risk of loss in trading futures is substantially greater than in trading those securities. The prices of futures react strongly to the prices of the underlying commodities. The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

**Over-the-Counter-Trading**. Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

**Position Limits**. Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Partnership might have to forego

HCMLPHMIT00003986

or modify certain of its contemplated trades.

**Risk of Default or Bankruptcy of Third Parties**.  The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties.  Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid.  In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

**Custody and Brokerage Risk**.  There are risks involved in dealing with the custodians or other brokers who settle Partnership trades. The Partnership maintains custody accounts with the Custodian.  Although the Investment Manager generally monitors both the Introducing Broker and the Custodian and believes they are appropriate service providers, there is no guarantee that such service providers, or any other introducing broker and/or clearing broker and custodian that the Partnership may use from time to time, will not become bankrupt or insolvent.  While both the U.S. Bankruptcy Code, as amended, and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or the Custodian may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The Custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian.  The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership.  Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the Custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties.  Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions.   Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws.  In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

**Temporary Defensive Investments**.  If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest.   In such circumstances, the Partnership may not achieve its investment objectives.

**Other Instruments**.  The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible.  Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested

HCMLPHMIT00003987

in by the Partnership.

**Specific Risks Associated with Investing in Bank Loans**

You should note that certain of the following risk factors specifically applicable with respect to Bank Loans have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Senior Loans Risk**.  Senior loans are usually rated below investment grade or may also be unrated.  As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured.  Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers.  Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Partnership, and such defaults could have a materially adverse effect on the Partnership's performance.  An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs.  Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value.  Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act or registered under the Exchange Act.  As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources.  Therefore, the Partnership will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed.  No active trading market may exist for certain senior loans, which may make it difficult to value them.  Illiquidity and adverse market conditions may mean that the Partnership may not be able to sell senior loans quickly or at a fair price.  To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

**Variable Interest Rate Risk**.  Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Partnership's investments.  Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Partnership's investments.  In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Partnership's investments.

**Bank Loans**.  The Partnership's investment program will include investments in significant amounts of Bank Loans and participations.  These obligations are subject to unique risks, including:  (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii) environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Partnership to directly enforce its rights with respect to participations.  In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment.  Successful claims by third parties arising from these and other risks will be borne by the Partnership.

**DIP Loans**.  From time to time, the Partnership may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended.  DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing

HCMLPHMIT00003988

working capital during the reorganization process. Such loans are risky and present significant exposure for default risk to the Partnership.

**Adjustments to Terms of Investments**. The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders. Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders. Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Partnership if a sufficient number of the other lenders concurred with such modification, amendment or waiver. There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Partnership originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder. The Investment Manager will have the authority to cause the Partnership to consent to certain amendments, waivers or modifications to the Partnership's investments requested by obligors or the lead agents for loan syndication agreements. The Investment Manager may, in accordance with its investment management standards, cause the Partnership to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder. The Investment Manager will make such determinations in accordance with its investment management standards. Any amendment, waiver or modification of the terms of an investment could adversely impact the Partnership's investment returns.

**Prepayments**. Certain of the Partnership's investments may be prepaid more quickly than expected. Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Partnership's control and consequently cannot be predicted with certainty. Early prepayments give rise to increased re-investment risk, as the Partnership might realize excess cash earlier than it expected. If the Partnership is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Partnership's net investment income and, consequently, could have an adverse impact on the Partnership's ability to make distributions.

**Investments in Loans Secured by Real Estate**. While direct real estate investment is not intended to be the focus of the Partnership, it is possible that, from time to time, the Partnership may, as a result of default, foreclosure or otherwise, hold real estate assets. Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates, attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs. Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing, and potential liability under changing environmental and other laws. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property (including any real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

**Environmental Hazards**. Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title. The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by

HCMLPHMIT00003989

small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Partnership through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Partnership could incur substantial costs and suffer a loss of its investment in such property.

**Fraud**. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Partnership to perfect or effectuate a lien on the collateral securing the loan. The Partnership will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Partnership may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

**Debt Securities**. The Partnership intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities. It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

**Investing in High Yield Securities**. The Partnership intends to invest in high-yield securities. Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace. In addition, the Partnership will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower- rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

**Timing Risk**. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk, i.e., the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk**. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

HCMLPHMIT00003990

circumstances, the Partnership will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Revolving Credit Facilities**. From time to time the Partnership may incur contingent liabilities in connection with an investment. For example, the Partnership may purchase from a lender a revolving credit facility that has not yet been fully drawn. If the borrower subsequently draws down on the facility, the Partnership would be obligated to fund the amounts due.

**Investments in Stressed Debt**. The Partnership is authorized to invest in securities and other obligations of stressed issuers. Stressed issuers are issuers that are not yet deemed distressed or bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

**Investments in Distressed Securities**. The Partnership may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings. These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers. Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Partnership's investment in any instrument, and a significant portion of the obligations and securities in which the Partnership invests may be less than investment grade. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Partnership's loans or the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Partnership invests, the Partnership may lose its entire investment, may be required to accept cash or securities with a value less than the Partnership's original investment and/or may be required to accept payment over an extended period of time. Under such circumstances, the returns generated from the Partnership's investments may not compensate the Limited Partners adequately for the risks assumed. In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security in respect to which such distribution was made.

**Troubled Origination**. The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may in the future be, insolvent, in serious financial difficulty, or no longer in existence. As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated

HCMLPHMIT00003991

may be adversely affected.

**Issuer Default Risk; Negative Loan Performance**.  There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates.  The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality.  The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

A substantial portion of the Partnership's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions.  Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent that the Partnership invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Partnership's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Partnership could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment.  The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Partnership's investments and may reduce the return that such Partnership receives from its investments in certain circumstances.  While some amount of defaults is expected to occur in the Partnership's portfolio, in the event that the Partnership elects to apply leverage to an investment, defaults in or declines in the value of  the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Partnership.

In the case of debt ranking equally with the loans or debt securities in which the Partnership invests, the Partnership would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Partnership invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

**Nature of Reorganization Proceedings**.  The Partnership will hold debt of companies and may, under certain circumstances, hold equity of companies as a result of the recapitalization or restructuring of debt obligations.  Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies.  For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Partnership could experience losses. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain.  Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others.  The uncertainties inherent in evaluating such investments may be

HCMLPHMIT00003992

increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may also render it difficult or impossible for the Partnership to achieve intended results or promptly effect transactions.

**Insolvency and Enforceability of Security**. The Partnership's investments may be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process. For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction. In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

**Risks Associated with Bankruptcy Cases**. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Partnership. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Partnership; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Partnership intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Partnership's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Partnership, by virtue of such action, is found to exercise "domination and control" of a debtor, the Partnership may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Partnership.

The Partnership may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Partnership, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or

HCMLPHMIT00003993

enhancement of the Partnership position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Partnership, it will resign from that committee or group, and the Partnership may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Partnership is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Partnership may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

**Equitable Subordination**. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination"). The Partnership does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Partnership may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

**Liability Following the Disposal of Investments**. While the Partnership may hold certain of its investments to maturity, the Partnership may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate. The Partnership may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation. In the event that the Partnership does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds. Such sales may be effected on unsatisfactory terms.

**Potential Involvement in Litigation**. In the event that the Partnership holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Partnership may become involved in litigation respecting creditor disputes and similar issues among classes of claimants. Litigation entails expense and the possibility of counterclaims against the Partnership and the Investment Manager and ultimately judgments may be rendered against the Partnership for which the Partnership does not carry insurance.

**Specific Risks Associated with Investing in CLOs**

You should note that certain of the following risk factors specifically applicable with respect to CLOs have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Dependence Upon Other Unrelated Managers**. The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Partnership as an

HCMLPHMIT00003994

investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Partnership's investments in such CLOs will depend on the performance of unrelated managers.

**Multiple Levels of Fees**. The Partnership and the CLOs are expected to impose management fees, administrative fees, and/or transaction-based fees. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

**Limited Diversification**. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Partnership may have a concentrated exposure to CLOs of a particular type of CLO.

**CLO Embedded Leverage Risk**. The Partnership's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Partnership retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Partnership's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Partnership invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Partnership to a greater risk of loss.

**Risks of Investment Focus**. The Partnership's portfolio may consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Partnership may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("**CLO Collateral**"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution. CLO Collateral may consist

HCMLPHMIT00003995

of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality).  Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof.  The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

**Interest Rate Mismatch**.  CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate.  As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("**Fixed Rate Assets**"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("**Floating Rate Assets**").  In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt.  As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities.  In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

**Lower Credit Quality Securities**.  There are no restrictions on the credit quality of the investments of the Partnership.  CLO Securities in which the Partnership will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings.  The Partnership may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading.  Lower rated and unrated securities in which the Partnership may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons.  Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies.  Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications.   Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities.  In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities.  There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate.  Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities.  Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities.  Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets.  It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

HCMLPHMIT00003996

**Defaulted Assets Underlying CLO Securities**.  If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset.  In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset.  The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon.  Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security.  Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Partnership's interest in the CLO security, the Partnership may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities in the event of a liquidity crisis.  Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security.  These additional risks may affect the returns on the investments in the Partnership's portfolio.

**Subordination of CLO Debt**.  The Partnership's portfolio may subordinate CLO Debt.  Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches.  Thus, some of the investments of the Partnership in a CLO may rank behind other creditors of the CLO.  To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches.  In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO.  Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt.  Investments of the Partnership may be the first to absorb any losses by the CLO on its underlying portfolio.  This may result in losses on the invested proceeds of the Partnership and could result in the complete loss of invested proceeds.

**Mandatory Redemption of CLO Senior Tranches and CLO Debt**.  Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches.  This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

**Optional Redemption of CLO Senior Tranches and CLO Debt**.  An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Partnership).  As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Partnership) could lose all or a substantial portion of its investment in such CLO securities.

**Insolvency Risks**.  Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "**Insolvent Company**").  The information in this paragraph and the following paragraph is applicable

HCMLPHMIT00003997

with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Partnership) or from subsequent transferees of such payments (such as the Limited Partners). However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States federal and state laws. Insofar as the Partnership's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

**"Widening" Risk**. For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Partnership invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

**There Is Limited Disclosure about the CLO Securities and the Underlying CLO Collateral in this Memorandum**. The Investment Manager will not be required to provide the investors in the Partnership with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Partnership to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or

HCMLPHMIT00003998

terms of, or the identity of any obligor on, any CLO Securities.

**Impact of the Volcker Rule on the Liquidity of the Notes.**  Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions.  The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions.  The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities.  This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Partnership's ability to liquidate these positions on a timely basis.

**Specific Risks Associated with Investing in Portfolio Funds and Illiquid Investments**

You should note that certain of the following risk factors specifically applicable with respect to Portfolio Funds and Illiquid  Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Special Situations**.  The Portfolio Funds may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.  In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Portfolio Funds of the security or other financial instrument in respect of which such distribution is received.  Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss.  In connection with such transaction (or otherwise), the Portfolio Funds may purchase securities on a when-issued basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring.  The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment.  Such securities are subject to changes in market value prior to their delivery.  Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Portfolio Funds may invest, there is a potential risk of loss by a Portfolio Fund of its entire investment in such companies.

**Alternative Investments.**  In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager.  The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations**. The Partnership may be subject to withdrawal restrictions of the individual Portfolio Fund(s) in which it will invest.   In addition, the Partnership is permitted to invest in Illiquid Investments.  There is no market for the Interests, and no market is expected to develop.  Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets from a particular Portfolio Fund or with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its

HCMLPHMIT00003999

Limited Partners. In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Portfolio Funds. The illiquidity of Illiquid Investments and restrictions on withdrawals at the level of the individual Portfolio Funds could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time. One or more affiliates of the Investment Manager may serve as general partner or manager of such Portfolio Funds, and will not be required to liquidate Portfolio Fund investments other than when they determine such liquidation is advisable or appropriate in their sole discretion, without regard to withdrawal provisions applicable to the Partnership. Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.

**High Growth Industry Related Risks.** Portfolio Funds may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare). It is noted that these securities may be very volatile. In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.** Illiquid Investments involve a high degree of financial risk. There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur. The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors. There can also be no assurance that the Illiquid Investments will be repaid, able to sell or otherwise liquidate their investments at the optimal time or price. Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.** It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments. Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved. Although investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time. The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment. In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations. It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition. The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available. In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so. Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.** The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies. Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies. For instance, less

HCMLPHMIT00004000

established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks.** Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

HCMLPHMIT00004001

**Regulatory Risks Related to the Highland Transaction**.  In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**.  Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage.  Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**.  For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances.  Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss.  Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**.  The Partnership's investments are not supervised or monitored by any regulatory authority.  The Partnership is not registered as an "investment company" under the Investment Company Act.  Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA.  Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism.**  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities.  The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions.  The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such procedures will apply to pooled investment vehicles such as the Partnership.  Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership.  In addition, in April 2000, the Treasury Department proposed regulations that would require certain investment advisors to establish an anti-money laundering program.  It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests.  Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests.  The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)).  In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry**.  Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a

HCMLPHMIT00004002

substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk**. The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends. No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain. A significant portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments. Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments. As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters. Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action. You should review the section entitled "TAXATION" for a more complete discussion of certain of the

HCMLPHMIT00004003

tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**.  Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time.  Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below).  Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Diversification**.  The tax benefits of the Policies may not be available in the event that the methodology used by the Partnership does not satisfy the diversification rules as described under "TAXATION" herein, including the risk that, if the Partnership fails to meet such diversification rules, owners of Policies funded by a Separate Account that is treated as holding interests in the Partnership would be subject to current taxation on the annual earnings of the Separate Account.

**Diversification of Contracts**.  Interests in the Partnership will be held only by variable contract separate asset accounts of Insurance Companies and state and local governmental pension plans, §529 plans, and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). Variable contract separate asset accounts are subject to certain investment diversification requirements (the "**Diversification Rules**") of Section 817(h) of the Code and the Regulations with respect to assets held in such separate accounts. These rules apply to the investments made by separate accounts (such separate accounts are referred to as "segregated asset accounts") that are used to fund benefits under Policies that are "variable contracts" within the meaning of Section 817(d) of the Code, other than "pension plan contracts."

For purposes of satisfying the Diversification Rules, the assets of the Partnership must be invested in securities such that no more than 55% of total assets of the Partnership may be invested in the securities of any one (1) issuer, no more than 70% of total assets of the Partnership may be invested in the securities of any two (2) issuers, no more than 80% of total assets of the Partnership may be invested in the securities of any three (3) issuers, and no more than 90% of total assets of the Partnership may be invested in the securities of any four (4) issuers. For purposes of these Diversification Rules, all securities of the same issuer are treated as a single investment and in the case of government securities, each government agency or instrumentality is treated as a separate issuer. Thus, all securities issued by the Treasury would be considered a single investment, but securities issued by the Federal Home Loan Banks would be considered a separate investment from Treasury securities. The assets of the Partnership will be invested in compliance with these rules.

Under a "look-through" rule established by the IRS, if:  (i) all Interests of the Partnership are held by one or more segregated asset accounts of Insurance Companies (other than Interests held by persons listed in §1.817-5(f)(3) of the Regulations) and (ii) public access to the Partnership is available exclusively through the purchase of a variable contract as defined in Section 817(d) of the Code, then the test for diversification is made by looking to the assets held by the Partnership. So long as the Partnership is subject to the "look-through" rule, Interests in the Partnership will not constitute a single investment for purposes of the Diversification Rules.  For purposes of applying such Diversification Rules, the Partnership's investment on behalf of Series 1 in the PE Portfolio Fund will be treated as a single asset, since the "look-through" rule will not apply to the PE Portfolio Fund.

In the event that the Partnership fails to satisfy the look-through requirements of the Diversification Rules, any Policy based on a segregated asset account that has invested in the Partnership may not be treated as a life insurance or annuity contract for federal income tax purposes. For this purpose, a Policy is based on a segregated asset account if amounts received under such Policy, or earnings thereon, are allocated to such segregated asset account. If a Policy is no longer treated as a life insurance or annuity

HCMLPHMIT00004004

contract, then the owner of the Policy would be subject to current taxation on the income on the Policy for taxable years in which such failure occurs, and thereafter. If the Policy is a life insurance or annuity contract under local law, however, then certain amounts paid as death benefits will be treated as amounts paid under a life insurance or annuity contract for federal income tax purposes. If the failure to meet the Diversification Rules is shown to be inadvertent, the Insurance Company that issued the Policy is permitted to bring the segregated asset account into compliance with those rules. In such cases, the Diversification Rules contemplate adjustments or the payment of a "toll charge" for the period during which the account failed to meet the Diversification Rules. Accordingly, compliance with the Diversification Rules, as they may be modified from time to time, is important and will be carefully monitored by the Investment Manager. Compliance with the Diversification Rules may have the effect of reducing the return of the Partnership, as the investments and strategies utilized by the Investment Manager may be different from what the Investment Manager might otherwise believe to be desirable.

**Investor Control**.  The Partnership is an insurance-dedicated investment fund.  In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory.  Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as his or her investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the General Partner, any administrator, Investment Manager, or Investment Manager relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Policy Owners should consult their own tax advisors regarding the "investor control" theory.

**This Memorandum Intended for Limited Partners**.  This Memorandum does not address the tax treatment afforded by Policy Owners.  Policy Owners should refer to their insurance contract and related explanatory materials for such a discussion.  The Limited Partners are the owners of Interests in the Interests.  Policy Owners are not Limited Partners of the Partnership and do not have rights as such.

**Accounting Rules**.  The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement.  However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS.  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

HCMLPHMIT00004005

## CONFLICTS OF INTEREST

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**.   None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership.  Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds.**   In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.  Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC.  As such, the Investment Manager and the Principal owe fiduciary duties to different investment vehicles, which may conflict with each other; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy.  In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion.   The records of these Affiliated Funds will not be made available to Limited Partners.  Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests**.  The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas.  Although Mr. Honis has retired from that position, he still currently serves on:  (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing.  Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total

HCMLPHMIT00004006

amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services.  In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential acquisition of all or substantially all of the non-voting limited partnership interests in Highland for the first series of the PE Portfolio Fund (such purchases or other acquisitions, if any, collectively, the "**Highland Transaction**").  Although, as of the date hereof, the PE Portfolio Fund and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

**Highland Transaction; Limited Control**.  If the Highland Transaction is consummated, it is currently contemplated that the PE Portfolio Fund would acquire only limited partnership interests in Highland. As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may:  (i) have economic or business interests or goals that are inconsistent with those of the PE Portfolio Fund and therefore the Partnership, (ii) take actions contrary to the instructions or requests of the PE Portfolio Fund or contrary to the PE Portfolio Fund's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties.  The occurrence of such problems could have a material adverse effect on the business and prospects of the PE Portfolio Fund's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the PE Portfolio Fund's and the Partnership's interests.

**Conflicts Related to Shared Services Provider**.  The Investment Manager has certain affiliated entities that may provide services with respect to the Partnership, the Portfolio Funds (generally and the PE Portfolio Fund specifically) and certain investments held by the Partnership.  The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager.   In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.  The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**. The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any Portfolio Fund or portfolio company of the Partnership, and the Partnership shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership.  Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

HCMLPHMIT00004007

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**.  The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates.  The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client.  By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**.  The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another.  In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

**Soft Dollars**.  The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership.  The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel**.  Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations.  The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner.  No independent counsel has been retained to represent the interests of prospective investors or Limited Partners.  You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different

HCMLPHMIT00004008

times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

**Valuation of Assets**.  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager). In the case of investments in Portfolio Funds that are not readily marketable, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS— Determination of Net Asset Value".

**The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership.  Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.**

HCMLPHMIT00004009

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the Code.  ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties.  Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

## PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations.  The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations.  For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded.  For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**").  The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans.  Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

HCMLPHMIT00004010

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

## PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager. With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership. While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

HCMLPHMIT00004011

## TAXATION

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or its professional tax advisors with respect to the tax results of the investor's investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

### CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

HCMLPHMIT00004012

such Series.  Furthermore, the Insurance Company Limited Partners would lose their look-through treatment for the purposes of complying with the diversification requirements imposed by Section 817(h) of the Code.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners.  The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations.  It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership.  Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners.  Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

### TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS.  Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss).  The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Limited Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership. Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect".  The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect.  The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners. While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test.  However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

HCMLPHMIT00004013

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances. A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss. This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The income tax treatment of the Partnership will depend upon the tax treatment of the Portfolio Funds in which the Partnership invests.

The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment, on behalf of Series 1, in the PE Portfolio Fund, which will own equity interests in one or more business partnerships. The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships. Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership. See "—Tax-Exempt Investors" below.

The Partnership will also engage in investing and trading securities for its own account. Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code. Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions. Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.** A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted tax basis in its Interest at the end of the year in which such loss is incurred. A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the tax basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any). There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership. The most significant of these limitations are discussed below.

**At Risk Limitations**. Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations. The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage. A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the

HCMLPHMIT00004014

Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity.  With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor.  Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution.  A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him.  If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses.  A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

**Investment Interest Limitations**.  To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code.  Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale.  The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses.  Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates.  The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations.  The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment".  Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

**Itemized Deduction Limitations**.  Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("**2% Floor**").  To the extent that the Partnership's operations do not constitute a

HCMLPHMIT00004015

trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income.  Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

## ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks of securities by purchase or by an exchange on which the entire amount of gain or loss is recognized.  This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities.  Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

**Currency Fluctuations - "Section 988" Gains and Losses.**    To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar.  Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock.  However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss.  Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency  that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss.  Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies.  Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988.  However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules.  Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the

HCMLPHMIT00004016

annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income.  Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less.  Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less.  In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments.  A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property.  Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes.  The application of the "straddle" rules in such a case could affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.  In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations.  Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations.  The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes.  Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount.  Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

HCMLPHMIT00004017

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership. Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years. Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above. However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests. Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes. A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock. Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder. Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

## TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax. A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business. UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness"

HCMLPHMIT00004018

at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment.  Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

**Income From the Partnership's Private Equity Investments**.  The Investment Manager will invest a substantial portion of the Partnership's Series 1 assets in the PE Portfolio Fund, and such partnership expects to invest in equity interests of other partnerships which will be engaged in business activities.  It is anticipated that such portfolio companies may also use borrowed funds to acquire property.  Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in such portfolio companies, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

**Income From the Partnership's Other Activities**. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

## OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions.  Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership.  It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries.  Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations.  Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income.  With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources.  The limitation on the foreign tax credit is applied separately to non-U.S. source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership.  The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income.  The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period

HCMLPHMIT00004019

requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year.  Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS.  If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss.  Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code.  Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election.  Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer.  A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000.  Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners.  Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners.  In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners.  In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

**PFIC Reporting**. The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require.  Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621

HCMLPHMIT00004020

for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners.  U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership.  Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests.  Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations.  Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

HCMLPHMIT00004021

## SPECIAL CONSIDERATIONS FOR PARTNERS THAT ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons.  Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**.  The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business.   As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business.  Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**").   Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI.  The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI.  Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**.  In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax.  The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount".  This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year.  Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**.   The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a  tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above.  A USRPI  includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code).  A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**.  The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI.  Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income.  Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary.  The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**.  A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

HCMLPHMIT00004022

taxation on such disposition. A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**. Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership. No attempt is made herein to provide a discussion of such state tax consequences. State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which such Partner a resident. Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

HCMLPHMIT00004023