**EXHIBIT 86**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as August 1, 2022, is entered into by and among JOHN HONIS ("**Seller**"), RAND ADVISORS HOLDING CORP., a Delaware corporation ("**Buyer**"), and CLO HOLDCO, LTD. a Cayman limited company (the "**Guarantor**").

## RECITALS

WHEREAS, Seller owns one hundred (100%) percent of the issued and outstanding membership interests, (the "**Interests**") of each of Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**") and Rand Advisors, LLC, a Delaware limited liability company ("**Advisor**", and together with Atlas GP and Rand GP, each a "**Company**" and collectively, the "**Companies**");

WHEREAS, the Companies collectively manage certain private investment funds, including two (2) insurance-dedicated funds ("**IDFs**") and one (1) one private equity fund that one of the IDFs invests in (collectively, the "**Client Funds**");

WHEREAS, in addition to the foregoing with respect to the Client Funds, Advisor acts as the investment sub-advisor to Rand Advisors Series I Insurance Fund of SALI Multi-Series Fund, L.P., a Delaware series limited partnership (such, product, the "**SALI Fund**");

WHEREAS, Rand GP as the general partner of Rand PE Fund I, LP, ("**Rand LP**") manages: a) Rand LP; b) Rand LP's wholly owned subsidiary Beacon Mountain, LLC ("**Beacon**"); and c) Beacon's sponsorship and administration of the Hunter Mountain Investment Trust ("**HMIT**", and together with Rand LP and Beacon, the "**Managed Companies**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01  Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests, free and clear of any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance. In connection with such sale of the Interests, Seller acknowledges that he retains no rights to any commissions or other compensation or consideration from (a) any Company, (b) any of the Client Funds, (c) the SALI Fund, (d) any of the Managed Funds, and/or (e) any person or entity affiliated with any of the foregoing, that has not been paid as of the Closing.

**Section 1.02 Purchase Price.** The purchase price payable by Buyer for the Interests shall be equal to One Million One Hundred Twenty Thousand ($1,120,000.00) Dollars (the "**Purchase Price**"). The Purchase Price shall be due and payable in sixteen (16) equal quarterly installments of Seventy Thousand ($70,000.00) Dollars (each, an "**Installment Payment**") with the first Installment Payment payable on the Closing Date and subsequent Installment Payments made quarterly thereafter on March 31, June 30, September 30 and December 31 of each calendar year until the Purchase Price has been paid in full; *provided, however*, that if any Installment Payment is due and owing on a day that is not a Business Bay, such Installment Payment shall be paid on the next Business Day. For purposes of this Agreement, the term "Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York. Each Installment Payment shall be paid to Seller pursuant to the wiring instructions provided in writing at least two (2) days prior to Closing; *provided* that Seller may provide alternative wiring instructions in writing at least two (2) days prior to any Installment Payment.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically as of the Effective Date, with the parties executing and exchanging all material closing documents by counterpart, as applicable, on the date that all deliverables pursuant to Sections 2.02 and 2.03 have been delivered, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

    **(a)** The resignation letter, resigning in all capacities from each of the Companies.

    **(b)** The independent contractor agreement, by and between Seller and Buyer, dated as of the date hereof (the "**Independent Contractor Agreement**"), countersigned by Seller.

    **(c)** The books and records of the Companies.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

    **(a)** The Purchase Price.

    **(b)** The Independent Contractor Agreement, countersigned by Buyer.

    **(c)**    Evidence of compliance with Section 5.01(b).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is a natural person and resident of the State of New York. Seller has all necessary authority to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02 Organization, Authority, Qualification and Ownership of the Companies.** Each Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction where the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a material adverse effect. Seller is the sole owner and member of each Company.

**Section 3.03 Employment Matters.** Seller is the only employee of each of the Companies.

**Section 3.04 Title to Interests.** Seller has exclusive and valid title to all of the Interests, with the absolute right to sell, assign and transfer the same to Buyer free and clear of all liens, pledges, security interests and encumbrances. Seller has not assigned, transferred or sold any rights, options or other benefits associated with the Interests. Further, Seller represents and warrants that the assets of the Companies are free and clear of any and all liens, pledges, security interests and other encumbrances.

**Section 3.05 No Restrictions Against Sale.** Seller has full right, power and authority to sell the Interests to Buyer as provided in this Agreement without obtaining the consent or approval of any creditor, third party or governmental body.

**Section 3.06 Intentionally Blank**

**Section 3.07 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III, none of Seller, the Companies or any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer as to the future revenue, profitability or success of each Company, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or conflict with any provision of any law or governmental order applicable to Buyer; (c) require the consent, notice or other action by any person under, violate or conflict with, or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, governmental order, filing or notice from, with or to any governmental authority; except, in the cases of clauses (b) and (c), where the violation, conflict, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and, in the case of clause (d), where such consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03 Legal Proceedings.** There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any of its affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.04   Buyer Acknowledgement of SALI Agreement and CG Agreement.** Buyer acknowledges the obligations of (i) the Advisor pursuant to the Subadvisor Agreement dated September 25, 2013 between the Advisor and SALI Fund Management, LLC (the "**SALI Agreement**") and (ii) Atlas IDF, LP and the Advisor pursuant to the Participation Agreement dated as of November 30, 2015 among Crown Global Life Insurance Ltd., Atlas IDF, LP and the Advisor (the "**CG Agreement**"). The purchase and sale of the Interests pursuant to this Agreement will not cause a violation of either Exhibit C to the SALI Agreement or Schedule D to the CG Agreement ("**Schedule D**").

**Section 4.05   Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund for such purpose. Buyer represents and warrants that it is aware that the Companies are involved in multiple litigations, the ultimate liability under such litigations may not be quantified and accepts any risk related thereto. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement; and (b) none of Seller, any Company or any other person has made any representation or warranty as to Seller, any Company, any Managed Company, any Client Funds, the SALI Fund or this Agreement, except as expressly set forth in ARTICLE III of this Agreement.

ARTICLE V
COVENANTS

**Section 5.01   Director, Manager and Officer Indemnification Liability.**

(a)   Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by each Company now existing in favor of each person who is now, or has been at any time prior to the date hereof, an officer, manager, member or director of such Company, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date hereof, shall survive the Closing Date and shall *continue in full force and effect in accordance with their respective terms.*

(b)   Each Company shall, and Buyer shall cause each Company to (i) maintain in effect for a period of six (6) years after the Closing Date the current policies of Investment Adviser and Fund Professional and Directors and Officers Liability Insurance (or similar policy) maintained by each Company immediately prior to the Closing Date (provided that each Company may substitute policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors, members, managers and officers of such Company when compared to the insurance maintained by such Company as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the

5

Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the mangers and officers of such Company, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement). The parties acknowledge and agree that the coverages required by this Section 5.01(b) shall not be required to cover the Excluded Claims referenced in Section 5.04 hereinafter.

**(c)** The obligations of Buyer and each Company under this Section 5.01 shall not be terminated or modified in such a manner as to adversely affect Seller.

**(d)** In the event that Buyer, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or such Company, as the case may be, shall assume all of the obligations set forth in this Section 5.01.

**Section 5.02 Further Assurances.** Following the Closing:

**(a)** each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**(b)** The parties agree that certain matters in which any of the Affected Parties will be involved may necessitate Seller's cooperation in the future. Accordingly, for any reason, to the extent requested by any of the Affected Parties or their representatives and/or agents, Seller shall reasonably cooperate with the Affected Parties in connection with any matters in which any of the Affected Parties asserts that Seller's assistance is necessary, including, but not limited to, the Kirschner Litigation, the HCMLP Bankruptcy, and any other disputes; provided that, any of the Affected Parties shall make reasonable efforts to minimize disruption of Seller's other activities. The respective Affected Parties shall reimburse Seller for reasonable expenses incurred in connection with such reasonable cooperation and, to the extent that Seller is required to spend substantial time on such matters, the respective Affected Parties shall compensate Seller at an hourly rate of $350.00 per hour. Such reasonable cooperation shall include, but is not limited to, providing interviews, truthful testimony, documents, assistance, information, and executing and returning documents related to any litigation or disputes in which any of the Affected Parties is involved, including, but not limited to, the Kirschner Litigation and/or the HCMLP Bankruptcy and any disputes related thereto. "Affected Parties" shall collectively mean Buyer, Companies, Client Funds, SALI Fund and Managed Companies.

HCMLPHMIT00004207

(c) Additionally, Seller agrees that he will not voluntarily provide reasonable assistance to or cooperate with any party that has any adverse interests to any of the Affected Parties without prior written consent from the respective Affected Parties, and Seller will notify the Affected Parties if any third-party seeks such reasonable assistance or cooperation from Seller. Any failure to comply with this clause by Seller shall constitute a material breach of this Agreement. Seller shall not, except as required by law, disclose to any third party this Agreement, its terms and particularly this cooperation clause. If, at any time, Seller is ordered or subpoenaed by any court, regulator, agency, or legislative body to disclose, or is served with a subpoena or discovery request seeking or requiring disclosure of, this Agreement or any of its terms, Seller shall so notify the Affected Parties at least two (2) business days in advance of the time for compliance with the order, subpoena or discovery request.

**Section 5.03  Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.04  Release.** Effective as of the Closing, (i) Buyer shall, (ii) Buyer shall cause the Companies, (iii) Buyer shall cause the Companies to cause the Client Funds, and (iv) Buyer shall cause the Companies to cause the Managed Companies (together, the "**Buyer Releasors**") generally, irrevocably, unconditionally and completely to release and forever discharge Seller and his partners, affiliates, employees, consultants, counsel and agents, and the counsel, consultants and agents of the Companies, the Managed Companies, and the Client Funds (each, a "**Seller Releasee**" and collectively, the "**Seller Releasees**") from, and irrevocably, unconditionally and completely to waive and relinquish each and all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including any unknown, unsuspected or undisclosed claim (collectively "**Claims**"), that the Buyer Releasors may have had in the past, may now have or may have in the future against any of the Seller Releasees and has arisen or arises directly or indirectly out of, or relates directly or indirectly to, this Agreement and the transactions contemplated hereby, or the operation of the Companies, the Managed Companies, the SALI Fund or the Client Funds, other than any claim that Buyer may have against any of the Seller Releasees that arises under this Agreement. Buyer Releasors, acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." The Buyer Releasors acknowledge that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, the Buyer Releasors, agree that, effective as of the Closing, the Companies, the Client Funds and the Managed Companies shall be deemed to waive any such provision. Buyer shall not permit any Company, Client Fund or Managed Company to institute, solicit or encourage, or participate, assist or cooperate in, any legal proceeding based upon, arising out of, or relating to any of the disputes, claims, controversies, demands, rights,

obligations, liabilities, actions and causes of action waived under this Section 5.04. Notwithstanding the foregoing, the parties acknowledge and agrees that the Claims released by this Section 5.04 shall not include any and all Claims that are found by a court of competent jurisdiction to be a result of a Seller Releasees fraud, gross negligence or willful misconduct (each an "**Excluded Claim**" and/or collectively, the "**Excluded Claims**").

**Section 5.05 Guaranty.**

(a) The Guarantor hereby irrevocably and unconditionally guarantees to Seller full and punctual performance of and compliance with all of Buyer's obligations pursuant to this Agreement. The guaranty set forth in this Section 5.05(a) is an absolute, present, primary and continuing guaranty of performance, payment and compliance. The Guarantor acknowledges and agrees that upon any default by Buyer, Seller shall not be obligated to first attempt enforcement against Buyer. The Guarantor hereby waives any and all defenses to enforcement of the guaranty set forth in this Section 5.05(a), now existing or hereafter arising, which may be available to guarantors, sureties and other secondary parties at law or in equity. The Guarantor further agrees to pay all reasonable costs and expenses, including reasonable attorney fees and related costs, incurred by any Seller Releasee in enforcing the guaranty set forth in this Section 5.05(a).

(b) The Guarantor represents and warrants to Seller that (i) the execution and delivery of this Agreement, and the Guarantor's performance under this Agreement, including the Guarantor's performance under this Section 5.05, does not violate any law, decree or contractual restriction binding on the Guarantor, (ii) this Agreement has been duly executed and delivered by the Guarantor and constitutes the valid and legally binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditor's rights generally and general principles of equity and (iii) the Guarantor has the financial capacity necessary to perform its obligations under the guaranty set forth in Section 5.05(a).

**Section 5.06 Ownership of Work Product of the Companies.** Seller hereby agrees that all work product, designs, graphics, processes, trade secrets, proprietary information and confidential investor information of the Companies, that is not (i) generally available to the public other than by virtue of a disclosure by Seller after the Closing Date and in violation of this Agreement or (ii) independently developed by Seller from sources not known by Seller to be bound by an obligation of confidentiality to the Companies (collectively, "**Confidential Information**") and shall remain the property of the applicable Company without any further act on Seller's or any Company's part, and that Seller shall not have any past, current or future copyright, trademark right, intellectual property right, property interest and/or any other right, title or interest in such Confidential Information. Seller acknowledges and agrees that all right, title and interest in such Confidential Information, including, without limitation, all conceivable intellectual property rights, including, without limitation, all copyrights, trademarks, service marks, patents, and discoveries shall remain the property of the applicable Company on and after the Closing Date. Notwithstanding anything in this Section 5.06 or otherwise in this Agreement

8

to the contrary, Seller may retain the phone that he used in the management and ownership of the Companies as his own personal property, and all "personal" information/data on such phone shall not constitute Confidential Information.

Section 5.07  **Client Information.**  Seller hereby covenants and agrees at all times following the execution hereof to hold in strictest confidence, and not to use (for himself or for any other person), or to disclose to any person, firm or entity, any such Confidential Information. The provisions of this Section 5.07 shall survive the execution hereof.

Section 5.08  **Buyer Obligations Pursuant to CG Agreement.**  Buyer covenants and agrees to ensure that after the Closing, either (x) Buyer and each person that would be an "Adviser Party" within the meaning of Schedule D immediately after the Closing is not affiliated with any "Policy Party" within the meaning of Schedule D or (y) each such person that would be such an Adviser Party immediately after the closing and that is affiliated with any such Policy Party has established or will establish procedures pursuant to a legally binding written agreement to prevent any communication prohibited by Schedule D.

Section 5.09  **Managed Companies Counsel.**  Buyer expressly acknowledges that counsel who have appeared for or represented the Managed Companies prior to the execution of this Agreement shall withdraw as counsel from any existing litigation and shall be replaced by counsel of Buyer's choice or designation.  The Managed Companies existing counsel shall cooperate with Buyer's designated replacement counsel in all respects, including filing any necessary pleadings or motions with the applicable court and turning over all documents, correspondence or other work product heretofore generated in connection with any such existing litigation to Buyer's designated replacement counsel; *provided* that Buyer acknowledges existing counsel may retain one copy of each such document, correspondence or work product for record keeping purposes.

## ARTICLE VI
## INDEMNIFICATION AND OTHER REMEDIES

Section 6.01  **Indemnification by Buyer.** Buyer shall defend and indemnify each Seller Releasee against, and hold each Seller Releasee harmless from, all Claims (other than Excluded Claims), including those related to Seller's ownership of the Interests or any actions or inaction by any Company, any Managed Company, any Client Fund or the SALI Fund.

Section 6.02  **Indemnification by Seller.**  Seller shall have no obligations of indemnification with respect to any Claims (other than Excluded Claims), including those related to this Agreement or the transactions contemplated hereby.

Section 6.03  Intentionally Blank

Section 6.04  **Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims for any breach of any representation,

9

warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates arising under or based upon any law, except pursuant to the indemnification and other provisions set forth in this ARTICLE VI. Nothing in this Section 6.04 shall limit any person's right to seek and obtain any equitable relief to which such person shall be entitled or to seek any remedy on account of any fraud by any party hereto. The provisions of this Articles VI shall survive the execution hereof.

### ARTICLE VII
### MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by Buyer at Closing.

**Section 7.02 Notices.** All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Seller:**

John Honis
42 Regatta View Drive
Saratoga Springs, NY 12866
Email: jwhonis@icloud.com

with a copy (which shall not constitute notice) to:

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attn: Steven Huttler
Email: SHuttler@sadis.com

**If to Buyer:**

Rand Advisors Holding Corp.
6716 Glenhurst Dr.
Dallas, TX 75254

        Email: mpatricktax1040@gmail.com
        Attention: Mark Patrick

| | |
|---|---|
| with a copy (which shall not constitute notice) to: | Leggett Clemons Crandall, PLLC<br>5700 Granite Parkway, Ste. 950<br>Plano, TX 75024<br>Email: sclemons@lcclawfirm.com<br>Attention: Steve H. Clemons |

**Section 7.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05 Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.06 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction).

11

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.08(c).

Section 7.09 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.10 **AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement to the contrary, Buyer is expressly purchasing the Interests "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Buyer for same. Except as expressly set forth in this Agreement, Seller has specifically bargained for the assumption by Buyer of all responsibility to investigate Seller, the Companies, the Client Funds, the SALI Fund, the Managed Companies and the Interests, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Except for the representations set forth in ARTICLE III, Buyer is and will be relying strictly and solely on its own inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. Except as set forth

in ARTICLE III and otherwise in this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition, or defect pertaining to Seller, any Company, any Client Fund, the SALI Fund, any Managed Company or the Interests. The provisions of this Section 7.10 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

**Section 7.11   Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 7.12   Privileges; Conflicts**. It is acknowledged by each of the parties hereto that the Seller has retained Sadis & Goldberg LLP ("**Sadis**") to act as their counsel in connection with the transactions contemplated hereby and that Sadis has not acted as counsel for Buyer, any Company, any Client Fund, SALI Fund, any Managed Company or any of their respective affiliates in connection with the transactions contemplated hereby and that no other party has the status of a client of Sadis for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its affiliates (including, after the Closing, the Companies) and the Seller or any of his affiliates, Sadis may represent the Seller or any such affiliate in such dispute even though the interests of the Seller or such affiliate may be directly adverse to Buyer or any of its affiliates (including, after the Closing, the Companies), and even though Sadis may have represented such Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Companies, and Buyer and the Companies hereby waive, on behalf of themselves and each of their affiliates, any claim they have or may have that Sadis has a conflict of interest in connection with, or is otherwise prohibited from engaging in, such representation. Buyer further agrees that, as to all communications among Sadis, Seller, any Company, or their respective affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer, any Company or their affiliates. Buyer agrees to take, and to cause its affiliates to take, all reasonable steps necessary to implement the intent of this Section 7.12. Buyer and Seller further agree that Sadis and its partners and employees are third-party beneficiaries of this Section 7.12.

[SIGNATURE PAGE FOLLOWS]

13

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER**:

_____
JOHN HONIS

**BUYER**:

RAND ADVISORS HOLDING CORP

By_____
Name: Mark Patrick
Title: Director

**GUARANTOR**:

CLO HOLDCO, LTD.,
a Cayman limited company

By_____
Name: Mark Patrick
Title: Director

14

HCMLPHMIT00004215