**EXHIBIT 102**

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate
Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

{00290535.DOC; 3}

## TABLE OF CONTENTS

Page

ARTICLE I. CERTAIN DEFINITIONS ..............................................................................................1

ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS ................................................................3

ARTICLE III. NET ASSET VALUE .................................................................................................5

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS ...........................................6

ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS ..................................................................................................................122

ARTICLE VI. EXPENSES. ...........................................................................................................13

ARTICLE VII. INDEMNIFICATION ..............................................................................................13

ARTICLE VIII. TERMINATION ....................................................................................................15

ARTICLE IX. NOTICES, REQUESTS OR CONSENTS ....................................................................16

ARTICLE X. PRIVACY OBLIGATIONS.........................................................................................16

ARTICLE XI. MISCELLANEOUS .................................................................................................17

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("CGLI"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

**WITNESSETH:**

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

**ARTICLE I. CERTAIN DEFINITIONS**

1.1 "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

1.2 "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

1.3 "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

1.4 "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

1.5 "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

1.6 "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

**1.7**    "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner.  Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

**1.8**    "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

**1.9**    "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

**1.10**    "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

**1.11**    "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

**1.12**    "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

**1.13**    "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

**1.14**    "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

**1.15**    "**Policy Owner**" means the owner of a Company Contract.

**1.16**    "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

**1.17**    "**Privacy Law**" means any applicable privacy law.

**1.18**    "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

**1.19**    "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

Schedule A hereto, as the same may be amended from time to time. Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20** "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21** "**Valuation Date**" means the last Business Day of each calendar month.

**1.22** "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

## ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1** **Offering and Sale of Interests**.

**(a)** Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto. The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto. Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**"). The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto. The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A. The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

**(b)** The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

**(c)** The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2** **Payment for Interests**. The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto. Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3** **Withdrawal of Interests**.

**(a)** **General Withdrawal Terms**. Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto. Any partial withdrawal of Jnterest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal. (See Appendix

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

(b)    **Standard Withdrawals.**  Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto.  The Adviser may waive the notice period in its discretion.   The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(c)    **Death Benefit Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**").  The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(d)    **Special Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**").   The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(e)    **Withdrawal Events.**  Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto.  The Adviser shall notify the Company as soon as any Withdrawal Event occurs.  Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**").  Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date.  Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

(f)    **Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

**2.4    Payment of Withdrawal Proceeds.**

**(a)    Payment of Withdrawal Proceeds Generally.**    Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

**(b)    Payment of Withdrawal Proceeds In-Kind.**    The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

**2.5    Company Contracts.**    The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

<h2 style="text-align:center">ARTICLE III. NET ASSET VALUE</h2>

**3.1    NAV Generally.**    The Fund shall determine its net asset value (the "**NAV**") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

**3.2    Adjustments.**    The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

the Adviser is in receipt of the Fund's audited financials.  No retroactive adjustments shall be made.

### ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1    Representations, Warranties and Covenants of the Company.**  The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

(a)    CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

(b)    The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("**Bermuda Insurance Act**") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

(c)    CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

(d)    The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

(e)    The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

(f)    CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

(g)    The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

(h)    The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(i)    The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(j)    The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

(k)    The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i)    the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii)    the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii)    unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

**(l)**     The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

**(m)**     The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

**4.2     Of the Fund.** The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

**(a)**     The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

**(b)**     The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

**(c)**     None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

**(d)**     The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

(e)     The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements. The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5. The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

(f)     The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

(g)     The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

(h)     The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

(i)     The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser. If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

(j)     The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

(k)     The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

(l)     The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM. For the avoidance of doubt, the Fund is not representing whether the Fund PPM

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(m)    No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company.  Any updates thereto shall be promptly delivered to the Company.

(n)    Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

(o)    The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

(p)    Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

(q)    Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

(r)    The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

(s)    The Fund shall promptly notify the Company upon any change to a service provider to the Company.

(t)    The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

(u)    The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

(v)    The Fund shall not invest in a "passive foreign investment company" (a "PFIC") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("QEF") shareholders with a PFIC Annual

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3    Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4    Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

**(a)**    it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

**(b)**    the Adviser and the Company are not in an affiliate or agency relationship;

**(c)**    upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

**(d)**    except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

**(e)**    the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

**(f)**    the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5    Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

### ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1    Revision of Investment Restrictions.**    The investment restrictions of the Company are as set forth on Schedule B hereto.  The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject. The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser. If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly.  If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2    Provision of Reports and Information.**    The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract.  The Fund shall on a timely basis provide to the Company the following without charge:

   **(a)**    a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

   **(b)**    electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

   **(c)**    any reports and information that the Company requires as a U.S. taxpayer; and

   **(d)**    any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3    Review of Sales Literature.**  Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4    Distribution of Certain Information by the Company.**  The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5    Provision of Information Prior to Signing of Agreement.**  Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request.  For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6    Certification of Investment Diversification.**  As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

## ARTICLE VI. Expenses

**6.1    Expenses Borne by the Company.**  The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2    Expenses Borne by the Fund.**  The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

## ARTICLE VII. Indemnification

**7.1    Indemnification of Fund Parties.**  The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

(a)    the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

(b)    the Claim arises out of, or is based upon, one of the following:

(i)    the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

(ii)    the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.2    Indemnification of Company Parties.**    The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

**(a)**    the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

**(b)**    the Claim arises out of, or is based upon, one of the following:

(i)    the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

(ii)    the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.3    Other Indemnification Provisions.**    No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

**7.4    Notice of Claim of Indemnification.**    A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

**7.5    Assumption of or Participation in Defense Against Claims.**    In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests.  Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

**7.6    Settlements.**  An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent.  An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim.  To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

**7.7    Successors.**  A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

**7.8    Survival.**  This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

### ARTICLE VIII. Termination

**8.1    Termination Generally.**  Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

**8.2    Effectiveness of Termination of Offering Obligation.**  A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately.  A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

**8.3    Mandatory Withdrawal.**  The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify.  The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

**8.4    Termination by Company.**  Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

**(a)**    from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or

**(b)**    if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1**    Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties. Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below. Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

| | |
|---|---|
| **If to the Company:** | Crown Global Life Insurance Ltd.<br>Canon's Court<br>22 Victoria Street<br>Hamilton HM 12<br>Bermuda |
| With a copy to: | Crown Global Life Insurance (Cayman) Ltd<br>Landmark Square, 2nd Floor<br>64 Earth Close, SMB, P.O. Box 10467<br>Grand Cayman  KY1-1004<br>Cayman Islands |

**9.2**    Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1**    The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law. To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

    **(a)**    required by law, regulation or rule, or permitted by Privacy Law;

    **(b)**    necessary to carry out the purposes for which the Party was given the Customer Information; or

(c)    authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

**10.2**    Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

**10.3**    Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

**10.4**    Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

**11.1    Governing Law.**    It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

**11.2    Entire Agreement.**    This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

**11.3    Waiver.**    A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

**11.4    Access to Books and Records.**    Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein.  To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

**11.5    Assignment.**    No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld.  Notwithstanding the previous sentence, the Company may assign,

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

**11.6    Third-Party Beneficiary.**    This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

**11.7    Confidentiality.**    No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

**11.8    Amendment.**    No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

**11.9    Rights and Remedies.**    The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

**11.10   Severability.**    In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**11.11   Headings.**    The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

**11.12   Counterparts.**    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

CROWN GLOBAL LIFE INSURANCE LTD.,

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: _____

Name: _John Howin_

Title: _Managing Member_


**RAND ADVISORS, LLC**

By: _____

Name: _John Howis_

Title: _Managing Member_

{00290535.DOC; 3}

## SCHEDULE A
### As of November 30, 2015

### SEPARATE ACCOUNTS AND ASSOCIATED POLICIES

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|-----|---------------------------------------------------------------|---------------------------------------------------|
|     |                                                               |                                                   |

**<u>SCHEDULE A-2</u>**
**As of November 30, 2015**

**SUPPLEMENT TO PARTICIPATION AGREEMENT**

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2**<br>"Business Day" | No change to standard definition. |
| **Section 1.13**<br>"Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)**<br>Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser<br><br>Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion.<br><br>The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day.<br><br>The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)**<br>Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2**<br>Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)**<br>General Withdrawal Terms | <u>Minimum withdrawal amount</u>: $100,000<br><br>Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal.<br><br><u>Payment of Withdrawal Proceeds</u>: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)**<br>Standard Withdrawals | <u>Notice Period</u>: 91 days<br><br><u>Standard Withdrawal Date</u>: Last day of each calendar quarter. |

<u>Lock-up Period</u>: 12 months.

Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

<u>Payment of Withdrawal Proceeds</u>: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement.

|  |  |
|---|---|
| **Section 2.3(c)**<br>Death Benefit<br>Withdrawals | <u>Notice Period</u>: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br><u>Death Benefit Withdrawal Date</u>: Last day of any calendar quarter.<br><br><u>Payment of Withdrawal Proceeds</u>: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date. For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | <u>Notice Period</u>: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br><u>Special Withdrawal Date</u>: Last day of each calendar quarter.<br><br><u>Payment of Withdrawal Proceeds</u>: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions<br>Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of<br>Investment<br>Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents,<br>Requests or Other<br>Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866     **If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

### <u>SCHEDULE B</u>
**As of November 30, 2015**

### INVESTMENT RESTRICTIONS

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**"). Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended [March 31/June 30/September 30/December 31], 201[-]:

1.  The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a.  No more than 55% of the value of the total assets of the Fund is represented by any one investment;

b.  No more than 70% of the value of the total assets of the Fund is represented by any two investments;

c.  No more than 80% of the value of the total assets of the Fund is represented by any three investments; and

d.  No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| Diversification Test | Name of Issuer | % of Total Assets | Cum % | Test |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2.  If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3.  The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4.  The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this ____ day of _____, 201__.

**Rand Advisors, LLC**

Authorized Signature: _____

Name: _____

## SCHEDULE D

## INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1.  All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2.  No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3.  To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4.  Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5.  No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6.  The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

## **APPENDIX A**

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

>       [bank name/address]
>       ABA:
>       ABA:
>       For the account of:
>
>       Account No.:
>       For further credit to the account of:   [               ]
>       Account No.:           [       ]
>       Ref:                   [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above.  Doing so will help us identify your payment and credit it to the appropriate account.

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**


**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____
Division [Fund #].


**Tax I.D. Number:** _____


**Type of entity (check one):**
☐ *Corporation*
☐ *Other (_____)*


**Subscription Amount in US $** _____          **Policy/Series Identifier (if any):** _____
☐ *Initial Subscription (minimum US $[_____])**
☐ *Additional Subscription (minimum US $[_____])**


**Date of Investment:**     ___/___/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| | | | |
|---|---|---|---|
| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |


\* Each subscription shall be treated as a separate Interest/Capital Account.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank*                      _____
*ABA #*                    _____
*For the Account of* _____
*Account #:*              _____
*Reference:*             _____

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____    By: _____

Name:                                          Name:

Title:                                           Title:

_____
Date of Execution

## APPENDIX B
## WITHDRAWAL FORM
## FOR ATLAS IDF, LP

Date:_____

To:

       [Tel.:  ]
       [Fax:  ]
       Attn:  [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____ Division [Fund #].

**Policy/Series Identifier (if any):** _____

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal* – Amount in US$ _____
*(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal*    ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal*    ☐ *Event Withdrawal*

**Date of Withdrawal** ____/____/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
|---|---|---|---|
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

*Crown Global Life Insurance Ltd.*

* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* _____
*ABA #* _____
*For the Account of* _____
*Account #:* _____
*Reference:* _____

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____    By: _____

Name:                                 Name:

Title:                                Title:

_____
Date of Execution